UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
BLACK LOVE RESISTS IN THE RUST by and
through its Co-Directors NATASHA SOTO and
SHAKETA REDDEN and on behalf of its mem-
bers; DORETHEA FRANKLIN; TANIQUA
SIMMONS; DE'JON HALL; and JANE DOE, in-
dividually and on behalf of a class of all others sim-
ilarly situated;

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

*Plaintiffs,*

- vs -

CITY OF BUFFALO, N.Y.; BYRON B. BROWN,
Mayor of the City of Buffalo, in his individual and
official capacities; BYRON C. LOCKWOOD,
Commissioner of the Buffalo Police Department, in
his individual and official capacities; DANIEL
DERENDA, former Commissioner of the Buffalo
Police Department, in his individual capacity;
AARON YOUNG, KEVIN BRINKWORTH,
PHILIP SERAFINI, ROBBIN THOMAS,
UNKNOWN SUPERVISORY PERSONNEL 1-10,
UNKNOWN OFFICERS 1-20, each officers of the
Buffalo Police Department, in their individual ca-
pacities.

*Defendants.*
-------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.      The City of Buffalo has, for over five years, engaged in a systematic practice of

targeting Black and Latino neighborhoods and residents for aggressive and punitive traffic en-

forcement. The City employs this unlawful practice in part to generate municipal revenue.  The

City has thus effectively sought to balance its budget on the backs of its Black and Latino citi-

zens.

2.      Plaintiff Black Love Resists in the Rust ("Black Love Resists" or "BLRR") and individual plaintiffs and class representatives, Dorothea Franklin, Taniqua Simmons, De'Jon Hall and Jane Doe ("Class Plaintiffs") bring this civil action pursuant to 42 U.S.C. § 1983 on their behalf and as representatives of similarly situated individuals, to obtain an injunction ending and remediating the City's unlawful and discriminatory traffic enforcement practices.  The Class Plaintiffs also seek monetary damages from the City on behalf of the class for the considerable and cumulative financial harm, humiliation, and loss of liberty and property that these invasive and punitive traffic stops have imposed over the years.

3.      Beginning around 2012, high-level Buffalo Police Department (BPD) officials deployed a crime "Strike Force" that implemented a vehicle Checkpoint program to conduct so-called "traffic safety" stops and searches of drivers without any individualized suspicion of wrongdoing. These Checkpoints impose no minor inconvenience. They operate as roadblocks that block off residents' streets and driveways and prevent them from traveling out of their targeted neighborhoods without being stopped and possibly searched, as they are trying to carry out the most basic activities of civic life such as going to work, dropping children at school, grocery shopping, or attending medical appointments or religious appointments.

4.      The City believes it has the authority to subject Buffalo residents to suspicionless searches and liberty restrictions as part of a general crime control strategy or in the undifferentiated interest in deterring criminal activity. But the Constitution does not permit the police to sit in wait and presume all citizens who come before it may have committed a crime.

5.      Moreover, Buffalo residents do not bear this burden on freedom of movement and civic engagement equally.  The City places the Checkpoints overwhelmingly in Black and Latino neighborhoods, predominantly in Buffalo's highly segregated East Side.  Publicly available data

detailed in this complaint demonstrates the dramatic racial disparity in the uses of vehicle Checkpoints and the corresponding, racialized distribution of the burdens they impose.  For example, over 85% of Checkpoints in a study of Checkpoint deployment occurred in predominantly Black or Latino neighborhoods, and nearly 40% of all Checkpoints conducted since 2012 occurred in just three of Buffalo's 77 Census tracts, each of which had a Black or Latino population exceeding 86%.  Statistically, the variable of "Black or Latino population" is the dominant explanation for Checkpoint location, explaining nearly *80 percent* of the variation in Checkpoint location.

6.     The City has deployed vehicle Checkpoints to generate revenue.  The year the City implemented a vehicle Checkpoint strategy, the Buffalo Police Department (BPD) issued more than 36,000 traffic violations, an increase of 92% over the prior year. And after the City created the Buffalo Traffic Violations Agency (BTVA) to keep all of the revenue from traffic tickets, BPD's issuance of traffic tickets increased dramatically, as did the corresponding revenue to the City. Thus, the Checkpoints that the City operated for the constitutionally impermissible purpose of crime control also served to harvest revenue from poor, Black and Latino residents at grossly disproportionate levels—in violation of the requirement of fundamental fairness embodied in the Due Process Clause of the Fourteenth Amendment.

7.     The City enhances its revenue harvesting by regularly layering multiple tickets on an individual during one stop, and for seemingly pretexual bases.  For example, one class member was issued four separate tickets for having four tinted windows, costing him $720 ($180 per window).  Furthermore, in an effort to secure additional payment, the issuing officer offered that class member a choice: jail or the immediate impoundment of his car. The class member chose impoundment, and thus had to pay an additional $125 fee the next day to retrieve his vehicle,

which he needed for his livelihood. Individuals contesting the fines are successful at a vanish-ingly low rate and most feel they have no option but to plead guilty. If class members cannot pay the frequently substantial fines, they will have their license suspended, causing further harm to their professional and personal life and imposing additional financial obligations on them and their families.

8.      The City's practice of targeting poor neighborhoods of color perpetuates a harsh cycle of poverty and racism: the more tickets the City issues against low-income Black and Lati-no residents, the more likely the financial burden on driving for Blacks and Latinos becomes im-possible to bear. The more people lose access to vehicles or their drivers' licenses, the more like-ly they are to lose access to economic or educational opportunities.

9.      The City's policy and practice is a form of over-policing people of color and then literally making them pay for it.  It is unconstitutional.  Thus, an injunction outlawing this prac-tice and compensation to the people aggrieved is necessary to remedy the considerable economic hardship the City of Buffalo has imposed on them.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 2000d, 28 U.S.C. §§ 1331, 1343(a)(3), (a)(4), and the Fourth and Fourteenth Amend-ments to the United States Constitution. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

11.      Venue in this district is proper under 28 U.S.C. § 1391(b) because Plaintiffs' claims arose in this judicial district.

## PARTIES

12.      Plaintiff Black Love Resists in the Rust (Black Love Resists or BLRR) is an unin-corporated membership association located in Buffalo, New York. BLRR brings this action on

behalf of its membership pursuant to Fed. R. Civ. P. 17(b)(3) and N.Y. Gen. Assoc. L. § 12 by and through its Co-Directors Natasha Soto and Shaketa Redden. BLRR's leaders and members are people of color who reside the City of Buffalo and who organize for a more equal, just and free city. Since its founding, a major part of BLRR's advocacy has focused on ending discriminatory policing practices that harm people of color in Buffalo. In the last year, BLRR has engaged in peaceful protest against police brutality and other harmful policing practices; held a community speakout to give Buffalo residents an opportunity to share their stories of harmful police practices; and has issued 11 Policing Demands calling upon the City to reform policing practices. Many of BLRR's members, including its Co-Director Shaketa Redden and Plaintiff De'Jon Hall, have been directly harmed by the unconstitutional policing practices challenged in this lawsuit and would have standing to bring this suit in their own right. BLRR does not have a president or a treasurer; its Co-Directors act in that capacity.

13.     Plaintiff Dorethea Franklin is Black and resides in Buffalo, New York.

14.     Plaintiff Taniqua Simmons is Black and resides in Buffalo, New York.

15.     Plaintiff De'Jon Hall is Black and resides in Buffalo, New York. Plaintiff Hall is a member of organizational Plaintiff Black Love Resists in the Rust.

16.     Plaintiff Jane Doe is Black and resides in Buffalo, New York. Ms. Doe is suing under a pseudonym in order to protect herself from retaliation.

17.     Defendant City of Buffalo ("City") is a political subdivision of the State of New York that can sue and be sued in its own name. Defendant City is authorized under the laws of the State of New York to maintain a police department, the BPD, which acts as its agent in the area of law enforcement. Defendant City is responsible for the policies, practices, supervision, and conduct of the Buffalo Police Department, including the appointment, training, supervision,

and conduct of all BPD personnel and BPD's compliance with federal and state law. Defendant City receives federal financial assistance for its programs and activities, including for programs and activities of the BPD.

18.     At all relevant times, Defendant Byron W. Brown was the Mayor of the City of Buffalo, acting in the capacity of chief executive officer, agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. As Mayor of the City of Buffalo, Defendant Brown is the chief policy making official for the City and all of its agencies, including the BPD.  He is responsible for ensuring that BPD personnel obey the laws of the United States and of the State of New York. Defendant Brown is sued in his official and individual capacities.

19.     Defendant Byron Lockwood is the current Commissioner of the BPD, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City. As Commissioner of the BPD, Defendant Lockwood is responsible for the policy, practice, supervision, implementation, and conduct of all BPD matters and the training, supervision, and conduct of all BPD personnel, including those named as defendants in this action. Defendant Lockwood was the Acting Commissioner from January 2018 until he was appointed Commissioner; prior to that Defendant Lockwood served as Deputy Commissioner of the BPD. In his current capacity as Commissioner and in his prior capacities as Acting Commissioner and Deputy Commissioner, he has for all times relevant hereto been responsible for enforcing the rules and policies of the BPD and for ensuring that BPD personnel obey the laws of the United States and of the State of New York. Defendant Lockwood is sued in his official and individual capacities.

20.     Defendant Daniel Derenda was the Commissioner of the BPD from 2010 until January 2018, and acted in the capacity of agent, servant, and employee of Defendant City, with-

in the scope of his employment as such, and under color of state law. As Commissioner of the

BPD, Defendant Derenda was responsible for the policy, practice, supervision, implementation,

and conduct of all BPD matters and was responsible for the training, supervision, and conduct of

all BPD personnel, including those named as defendants in this action; for enforcing the rules

and policies of the BPD; and for ensuring that BPD personnel obey the laws of the United States

and of the State of New York. Defendant Derenda is sued in his individual capacity.

21.     Defendant Aaron Young is the Chief of the BPD Housing Unit, and acts under

color of state law in the capacity of agent, servant, and employee of Defendant City. Defendant

Young served as Housing Unit at least January 2013 until August 2015, and from July 2016 to

the present. From July 2016 to February 2018, Defendant Young also served as Chief of the

Strike Force. In his capacity as Chief of the Housing Unit and Strike Force, Defendant Young

was listed as the "Commanding Officer" on BPD "Roadblock Directives," which direct BPD of-

ficers and personnel to conduct a Checkpoint at a set time and location. In his capacity as Com-

manding Officer, Defendant Young oversaw the unconstitutional conduct of BPD officers and

personnel operating each Checkpoint. Defendant Young is sued in his individual capacity.

22.     Defendant Kevin Brinkworth is a Lieutenant within the BPD and acts under color

of state law in the capacity of agent, servant, and employee of Defendant City. In his capacity as

Lieutenant, Defendant Brinkworth served as chief of the BPD Strike Force Unit and was listed as

the "Commanding Officer" on hundreds of BPD "Roadblock Directives," which direct BPD of-

ficers and personnel to conduct a Checkpoint at a set time and location. In his capacity as Com-

manding Officer, Defendant Brinkworth oversaw the unconstitutional conduct of BPD officers

and personnel operating each Checkpoint. Defendant Brinkworth also served as Chief of the

Housing Unit from at least July 2015 until July 2016.  Defendant Brinkworth is sued in his individual capacity.

23.     Defendant Philip Serafini is a Captain within the BPD Housing Unit, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City. Defendant Serafini directs and oversees the activities of the Housing Unit officers and personnel under his command, including their traffic enforcement activities both at and outside of Checkpoints. Mr. Serafini prepares Housing Statistics Reports documenting the traffic enforcement and other activities of officers and personnel within the BPD Housing Unit. Defendant Serafini reports directly to Defendants Young and Lockwood regarding the activities of the Housing Unit, including Checkpoints and ticketing conducted in an unconstitutional manner by Housing Unit officers and personnel. Defendant Serafini is sued in his individual capacity.

24.     Defendant Robbin Thomas is an officer of the BPD, employee, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City. Defendant Thomas is sued in his/her individual capacity.

25.     Defendants Unknown Supervisory Personnel 1-10 act under color of state law in the capacity of agent, servant, and employee of Defendant City. They were at all times relevant herein supervisory personnel overseeing the conduct of officers of the BPD Strike Force Unit and/or BPD Housing Unit and oversaw the operation of hundreds of BPD Checkpoints in an unconstitutional manner between 2015 and present, including Checkpoints experienced by Plaintiffs. In their oversight capacity, Defendants Unknown Supervisory Personnel signed off and authorized BPD "Roadblock Directives," which direct BPD officers and personnel to conduct a Checkpoint at a set time and location. In their oversight capacities, Unknown Supervisory Personnel 1-10 directed, oversaw, encouraged, ratified and/or failed to prevent the unconstitutional

conduct of BPD officers and personnel operating BPD vehicle Checkpoints. The true identities

of the Unknown Supervisory Personnel are unknown at this time. When they become known,

Plaintiffs will amend the Complaint to add their true names and capacities. Each Unknown Su-

pervisory Personnel is sued in his/her individual capacity.

26.     Defendants Unknown Officers 1-20 act under color of state law in the capacity of

agent, servant, and employee of Defendant City. Each officer has been involved in conducting

vehicle Checkpoints, including those experienced by Plaintiffs, pursuant to the Checkpoints Pro-

gram. The true identities of the Unknown Officers are unknown at this time. When they become

known, Plaintiffs will amend the Complaint to add their true names and capacities. Each officer

is sued in his/her individual capacity.

27.     Defendants have acted or are continuing to act under the color of state law in the

course and scope of their duties and functions as agents, employees, and officers of the City

and/or the BPD in engaging in the conduct described herein. At all times relevant herein, defend-

ants have acted for and on behalf of the City and/or the BPD with the power and authority vested

in them as officers, agents, and employees of the City and/or the BPD and incidental to the law-

ful pursuit of their duties as officers, employees, and agents of the City and/or the BPD.

28.     At all times relevant herein, Defendants have violated and/or continue to violate

clearly established constitutional standards under the Fourth and Fourteenth Amendments and

under Title VI of the Civil Rights Act, of which a reasonable person would have known.

## FACTS

### *Creation of the Strike Force and Its Use of*
### *Checkpoints for General Crime Control*

29.     In June 2012, Mayor Brown, former Commissioner Derenda, and BPD launched the Strike Force – a mobile unit that targeted supposed crime hotspots to reduce guns, drugs, and gang activity.

30.     The Strike Force, in order both to advance the City of Buffalo's general interest in crime control and to increase revenue, employed suspicionless vehicle Checkpoints. "Suspicion-less" in this context means that all cars approaching the Checkpoint are stopped, without regard to whether there is reasonable suspicion (much less probable cause) to believe that a crime or a traffic violation has been committed.

31.     Other than stopping drivers without reasonable suspicion and issuing as many tickets as possible at each Checkpoint, BPD does not operate the Checkpoints in a standardized, predictable manner.

32.     Some Checkpoints may involve 6-10 police cars stationed at multiple intersec-tions; others involve just a single officer.

33.     The precise Checkpoint locations and times were and are chosen by officers in the field, or by their direct supervisors in consultation with officers in the field. The locations chosen are overwhelmingly in Black or Latino neighborhoods.

34.     Checkpoints are conducted in multiple stages.

35.     In the first stage, cars enter the Checkpoint, where they stop or pass very slowly before an officer and sometimes have their license plates read by an automated license plate reader. Officers check for valid licenses, registration, inspection stickers, seatbelts, and anything suspicious in plain view.

36.     At this stage, officers sometimes ask intrusive questions like, "Where are you go-ing?" and "Where are you coming from?"

37.     BPD officers may direct some drivers to pull over to a second stage where they can be detained for up to 45 minutes while officers subject the driver and passengers to a longer interrogation.

38.     Though Defendants have promulgated a written directive concerning Checkpoint operations, the directive omits key information necessary to guide officers' discretion.

39.     The directive contains no written rules, standards, or guidelines governing BPD officer's decisions about which drivers to pull over for secondary stops.

40.     Moreover, Defendants do not issue oral instructions, rules, standards, or guide-lines governing BPD officer's decisions about which drivers to pull over for secondary stops. Instead, BPD officers exercise unbridled discretion when determining whether to pull drivers over for a secondary stop.

41.     For example, in a suppression hearing concerning a Checkpoint stop made in Sep-tember 2015, a BPD Lieutenant testified that he did not provide oral guidance to his officers be-yond that set forth in the written directive.

42.     BPD does not employ flares, signs, or warning lights to alert motorists of the Checkpoint.

43.     BPD often seeks to establish Checkpoints on one-way streets so that motorists cannot avoid passing through them.

44.     BPD often blocks off streets and intersectiokns adjacent to the Checkpoints so that all local traffic is funneled through the Checkpoint.

45.     BPD officers chase, stop, and question any drivers who they believe to be at-tempting to avoid a Checkpoint.

46.     The Checkpoint directive contains no written rules, standards or guidelines gov-erning BPD officers' determinations about whether a driver is attempting to avoid a Checkpoint.

47.     Moreover, Defendants do not issue oral instructions, rules, standards, or guide-lines governing BPD officers' determinations about whether a driver is attempting to avoid a Checkpoint. Instead, BPD officers exercise unbridled discretion when determining whether a driver may be attempting to avoid a Checkpoint.

***City Policy of Employing Checkpoints for the Unlawful Purpose
of General Crime Control***

48.     In *City of Indianapolis v. Edmond*, the Supreme Court specifically prohibited po-lice departments from employing suspicionless vehicle Checkpoints as a method of general crime control.  In spite of this clearly established law, the BPD does exactly that.

49.     When operating the Checkpoints, BPD officers stop vehicles without having any probable cause or reasonable, articulable suspicion that the driver has violated any criminal or traffic laws.

50.     BPD officials have stated that a primary programmatic purpose of the Check-points is to discover evidence of ordinary criminal wrongdoing on the part of people passing through the Checkpoint and to deter crime by maintaining a highly visible presence in the target-ed neighborhood.

51.     When the Strike Force launched, top City officials, including Defendants Brown and Derenda, repeatedly stated to the media that Strike Force officers conducted daily roadblocks in order to fight crime.

52.     For example, the radio station WBFO reported in June 2012 that the Strike Force "specifically targets high crime areas of the city" with "Checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods."[1]

53.     Also in June 2012, Defendant Derenda stated that the Strike Force would target its efforts based on recent crime patterns and that it would employ "high visibility, high saturation" tactics including "daily roadblocks."[2]

54.     In January 2014, Defendant Derenda told the *Buffalo News*: "Our Strike Force officers are conducting daily roadblocks at multiple locations and surprising the criminal element. Because of that people are now less likely to carry guns knowing that they may be stopped at a safety Checkpoint."[3]

55.     Testimony from Strike Force officers in federal suppression hearings further evidences that the primary purpose of the vehicle Checkpoints is general crime suppression:

   a.   On March 16, 2015, BPD Officer Darren McDuffie testified that "[o]ur job in the Strike Force is to – is to hit high – is to patrol high – high gang areas and violent areas through the city; and we also set up roadblocks throughout the city as well in high crime areas."[4]

---

[1]   Eileen Buckley, Mayor pleased with Strike Force Progress, WBFO (June 21, 2012), available at http://news.wbfo.org/post/mayor-pleased-strike-force-progress

[2]   Strike Force to tackle rising crime in Buffalo, New York, WIVB (June 11, 2012), available at https://www.youtube.com/watch?v=mPpF2u6hYPo

[3]   *See* Lou Michel, *Buffalo's homicide toll down in 2013-but still 47 too many*, The Buffalo News (Jan. 2, 2014), *available at* https://www.scribd.com/document/364361949/Lou-Michel-Buffalo-s-homicide-toll-down-in-2013-but-still-47-too-many-The-Buffalo-News-Jan-2-2014).

[4]   *U.S. v. Wilson*, No. 14-CR-128, Dkt. 20 at 4 (W.D.N.Y.).

b. On March 30, 2016, BPD Officer Michael Acquino testified that the Strike Force is "based on going after gangs, drugs, guns. We do Checkpoints on a daily basis throughout the city."[5]

c. On December 8, 2016, Officer Acquino testified that the "Strike Force Unit basically involves taking guns off the street, gang intel, drugs," and that "We do a regular Checkpoint every day."[6]

56.     In 2016, social scientists Andrew P. Wheeler and Scott W. Phillips published an academic study of the Strike Force and its use of daily Checkpoints as part of a "hot spots" policing strategy ("Checkpoints Study"). The authors examined 60 BPD Strike Force Checkpoints conducted in 46 different locations from April-May 2013.

57.     According to the Checkpoints Study, "the [BPD] identified problem areas (i.e., locations with a high number of robberies, burglaries, criminal mischief, and drug activity) and then would use high visibility roadblocks at different locations throughout the city."[7] BPD "specifically aimed to make the roadblocks high-visibility, with the primary goal of deterring crime and disorder."[8]

58.     The Strike Force also partnered with the BPD Housing Unit—with which it shares an office and command structure—to conduct regular vehicle Checkpoints near certain housing complexes operated by the Buffalo Municipal Housing Authority (BMHA).

---

[5]     *U.S. v. Hubbard*, No. 14-CR-179, Dkt. 37 at 5 (W.D.N.Y.).

[6]     *U.S. v. Jordan*, No. 16-CR-93, Dkt. No. 21 at 4 (W.D.N.Y.)

[7]     Andrew Wheeler and Scott Phillips, *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY*, at 1 (May 17, 2016), available at http://ssrn.com/abstract=2781126

[8]     *Id.* at 3.

59.     BPD records reveal that the programmatic purpose of the joint Housing Unit/ Strike Force Checkpoints was to suppress "blatant drug/weapons activity" and "to show a high level of enforcement and visibility."

60.     As late as May 2016, BPD Housing Unit Monthly Statistics reports reference joint Housing Unit/Strike Force Checkpoints conducted in order to "increase our presence and deter criminal activity."

61.     Through most of the period relevant here, including through at least January 2018, BPD Strike Force and Housing Unit officers conducted the Checkpoints. The BPD Strike Force and Housing Unit were part of the Patrol Division.

62.     BPD also has a Division of Traffic Services, which focuses on traffic safety.

63.     Through most of the period relevant here, including through at least January 2018, BPD's Division of Traffic Services did not participate in the Checkpoints challenged in this lawsuit, further underscoring the lack of a traffic-safety purpose for the Checkpoint program.

64.     The Checkpoints Study also found that, under some methodologies, Checkpoints actually increased crime and decreased traffic safety.

*City Policy of Intentionally Targeting Black and Latino*
*Neighborhoods and Drivers for Aggressive Traffic Enforcement*

65.     In April, 2018, counsel for Plaintiffs in this action obtained data from the Buffalo Police Department listing Strike Force Checkpoint locations by Census tract from January 2013 to October 2017 ("Checkpoint Data").

66.     The Checkpoint Data show that BPD Strike Force conducted more than 1,700 Checkpoints between January 2013 and October 2017. More than 1400 of these were conducted in the period from January 2013 to June 30, 2017, the period prior to BPD's efforts, as alleged below, to cover up its unconstitutional activities.

15

67. Defendants conducted the vast majority of Checkpoints in Black or Latino neighborhoods.

68. BPD conducted nearly 40% of all Checkpoints through June 30, 2017—545 out of 1424—in just three of Buffalo's 77 Census tracts. In each of those three tracts, the Black or Latino population exceeded 86%.

69. Likewise, of the 60 Checkpoints featured in the Checkpoints Study discussed above, 53 (or 87%) occurred in predominantly Black or Latino neighborhoods. The authors of the Checkpoints Study noted that "[c]ompared to the rest of the city, roadblock locations had a smaller total population, and had larger proportions of black residents and female headed households."[9]

70. A map, attached as Exhibit A to this Complaint and based on the Checkpoint Data, illustrates the concentration of BPD Checkpoints in low-income communities of color.

71. Statistical analysis demonstrates that "Black or Latino population" is a highly significant driver of Checkpoint location—so much so that only an exponential model captures the true extent of the BPD's invasion of the East Side. Under an exponential model, "Black or Latino population" explains *78.8%* of the variation in Checkpoint locations.

72. The exponential fit strongly implies intentional racial discrimination. Disproportionality of racial impact bears on intent, and here the BPD went far beyond merely disproportionately concentrating Checkpoints in Black and Latino neighborhoods. As the map indicates, not only did BPD target Black and Latino neighborhoods, but the *extent* of the disproportionality increased as the percentage of Black or Latino population in the neighborhood increased.

73. Analysis of the Checkpoint Data shows that another variable had some predictive power in explaining Checkpoint locations: the number of reported crimes in the Census tract.

---

[9] Wheeler & Phillips, *supra*.

This variable was independently statistically significant, but when combined with the racial and ethnic demographics of the Census tract, it caused only a mild increase (to 80.8%) in the amount of variation in Checkpoint locations explained by the model.

74.     Traffic safety explains far less of the variation in Checkpoint locations and adds almost nothing to the explanatory power of racial demographics and reported crimes. Indeed, not only is "Black or Latino population" a far stronger predictor of Checkpoint location than is either crime or accident location but, all other things being equal, the number of Checkpoints in a Census tract actually *decreases* as the number of accidents increases, which indicates that the BPD did not select Checkpoint locations for accident prevention purposes.

75.     In sum, the overwhelming majority of the variation in Checkpoint location—more than 80 percent—can be explained by two constitutionally impermissible purposes: targeting Black and Latino neighborhoods and general crime control. The only arguably lawful purpose of Checkpoints—vehicle and traffic safety—has nothing to do with the BPD's choice of Checkpoint locations.

76.     BPD also disproportionately and intentionally targets neighborhoods and drivers of color for traffic enforcement outside of Checkpoints.

77.     BPD's Housing Unit of just 19 officers writes approximately one-third of all traffic violations issued by BPD.

78.     BPD's Housing Unit primarily polices buildings operated by the Buffalo Municipal Housing Authority ("BMHA").

79.     According to BMHA's own data, as of 2016 BMHA housed approximately 5,855 people in 28 properties, of whom 2,031 (35%) were under 18 (and thus largely not of driving age). BMHA's population is 74% Black and 17% Latino. Moreover, 96% of BMHA households

are classified as Very Low Income, meaning that their household income is less than half of the median household income for the area.

80.     Since July 2015, the Housing Unit has spent nearly all its time at three BMHA properties: Kenfield Homes, Langfield Homes, and Shaffer Village.

81.     Kenfield and Langfield are located in close proximity to each other on Buffalo's East Side; their population is 93% African American.

82.     Shaffer Village is located in Northwest Buffalo; its population is 37% African American and 49% Hispanic.

83.     In 2017 alone, the 19 officers detailed to the BPD Housing Unit issued **14,853** traffic tickets and made **3,278** misdemeanor traffic arrests on or near BMHA property.

84.     Given the racial and economic demographics of the BMHA properties where the Housing Unit spent most of its time, it is highly plausible that the vast majority of the people cited or arrested by the Housing Unit were low-income people of color.

85.     Data obtained from the New York State Division of Motor Vehicles suggest that Buffalo drivers who reside in predominately Black zip codes are more than ***eight times*** as likely to be issued multiple traffic tickets at a single traffic stop or Checkpoint than those who live in predominately White zip codes.

86.     Moreover, drivers from predominately Black zip codes are more than ***four times*** as likely to have their driver's licenses suspended because they cannot pay their traffic tickets than those who live in predominately White zip codes.

***City Policy of Issuing Tickets for the***
***Unlawful Purpose of Revenue Harvesting***

87.     The City of Buffalo has a custom, policy and/or practice of aggressively enforcing traffic laws in order to generate revenue for the City budget via tickets, impounds, and towing fees.

88.     Accordingly, when making traffic stops—both at and outside of Checkpoints—BPD officers write multiple tickets for as many violations as possible.

89.     BPD officers have and use specialized computer software to maximize the number of traffic violations that they can issue in a single stop. BPD uses this software far more often in minority neighborhoods than in white neighborhoods.

90.     BPD officers also seek to tow and impound vehicles whenever possible.

91.     The City custom, policy, or practice of generating revenue through traffic enforcement began with the Checkpoints.

92.     During the 2013-14 fiscal year, the first year after it created the Strike Force and instituted daily Checkpoints, BPD issued 36,818 traffic violations, a 92% increase from the previous year.

93.     Also during this period, the City towed four times as many cars annually as it did prior to instituting the Checkpoints, and the City's revenue from impound lots doubled to $1.1 million.

94.     The City then developed a plan which would allow it to reap even more revenue from traffic enforcement.

95.     Historically, the New York State Department of Motor Vehicles (DMV) handled the adjudication of traffic violations issued in the City of Buffalo.

96.     Under this system, the State of New York collected the revenue from traffic tickets issued in the City.

97.     In 2014, however, the Buffalo Common Council and New York State legislature worked together to establish the Buffalo Traffic Violations Agency (BTVA) to "provide fiscal relief to City government and taxpayers."[10]

98.     Councilmember Smith, during a June 20, 2014 interview with a local news outlet, WIVB-TV, , stated that the BTVA would be a "win-win for not only the residents, but also the city, because the city also has the opportunity now to keep home some of the dollars from the traffic infractions.[11]

99.     New York State Senator Grisanti expressed similar sentiments: "It's basically additional funds that are going to flow into the city of Buffalo that could help prevent crime and help community block club programs."

100.    The BTVA is part of the Executive Department of the City and operates under the direction and control of Defendant Brown. Buffalo City Charter § 6-24.

101.    The Executive Director of the BTVA is appointed by and serves at the pleasure of the Mayor. *Id.* § 6-24(1)(a).

102.    According to the City's 2017-18 Executive Budget, one of the official goals of the Traffic Violations Agency is "To administer punitive punishment that is reasonable, but not more than necessary, to: (a) Generate revenue; and, (b) Achieve rehabilitation of offender-motorists."

---

[10]    Demone A. Smith, Legislative Intent of Local Law Intro #1-2015, Common Council Proceedings (June 2, 2015).

[11]    Interview by WIVB-TV (June 20, 2014), transcribed, available at https://www. youtube.com/watch?v=ivCe8WB-wiU

103.    The City's General Fund pays the salary of BTVA's executive director, traffic prosecutor, and all other administrative expenses of the BTVA. The City's General Fund also pays for salary and overtime for BPD Officers.

104.    Revenue from traffic violations adjudicated by the BTVA goes to the City's General Fund.

105.    The BTVA began adjudicating non-misdemeanor traffic violations in the City of Buffalo on July 1, 2015.

106.    Almost immediately, BPD began to issue many more traffic violations than ever before.

107.    During the 2015-16 fiscal year, BPD issued 52,466 traffic violations, a 43% increase over the previous year. Officers from the Patrol Division, which includes the Strike Force and Housing Unit, issued nearly all (52,169) of those traffic violations.

108.    Over the same period of time, the City appropriated more money to BPD, and BPD spent increasing amounts on overtime.

109.    BPD spent approximately $13.7 million on overtime in 2015, $15.6 million in 2016, and $16.8 million in 2017.

110.    Much of this overtime went to Strike Force and Housing Unit officers, who are also some of the highest-paid City employees.[12]

111.    During its first year in operation, BTVA collected more than $2 million for the City's General Fund.

112.    During the 2016-17 fiscal year, the BTVA collected more than $3.9 million.

---

[12]    Aaron Lowinger, "Buffalo Police Overtime Earnings Balloon," *The Public* (Jan. 24, 2017) available at http://www.dailypublic.com/articles/01242017/buffalo-police-overtime-earnings-balloon.

113.    In its most recent adopted budget, the City projected that BTVA would generate $4.2 million in the 2017-2018 fiscal year.

114.    According to the Buffalo Comptroller, BTVA brought in $3.99 million in calendar year 2017 and is projected to raise $6.2 million for the General Fund in 2018.

115.    Meanwhile, the cost to the City to operate the BTVA is only $535,000.

116.    According to the BTVA's 2017 Annual Report, of the 45,592 dispositions adjudicated by the BTVA during the reporting period, only 17 (.0004%) resulted in not guilty verdicts.

117.    In other words, 99.9996% of violations adjudicated by the BTVA result in a payment or judgment in favor of the City.

### *Defendants Have Acted with Deliberate Indifference to the Rights of Plaintiffs and Class Members*

118.    For the past several years, Plaintiffs, class members, and members of the general public have repeatedly expressed dissatisfaction with Defendants' operation of the Checkpoints and have complained in public fora and in the media that BPD operates Checkpoints in a racially discriminatory manner and in violation of constitutional mandates.

119.    Likewise, Plaintiffs, class members, and members of the general public have repeatedly expressed concern that BPD engages in and has a history of engaging in racial profiling and race-based discrimination.

120.    In 2015, Buffalo residents created Facebook groups to record and publicize Checkpoint locations so that people could avoid them. Each Facebook group has thousands of members. Comments on the Facebook page make clear the general belief that BPD targets the Eastside of Buffalo for Checkpoints and traffic enforcement generally.

121.    In July 2016, a comprehensive article in *The Public* documented concerns of advocates and Black community members that the BPD employs Checkpoints in a racially discriminatory manner.

122.    A 2016 report by the Greater Buffalo Racial Equity Roundtable identified traffic violations in Buffalo as "a means for sweeping and arresting people of color, regardless of witnessing any criminal activity or receiving complaints."[13] The report linked traffic enforcement to Stop and Frisk and other "Broken Windows" policing strategies that have created racial disparities at every stage of the criminal justice system, from arrest, to prosecution to sentencing.

123.    Also in 2016, Partnership for the Public Good released a report stating that traffic enforcement, often at Checkpoints, may contribute to racial disparities and poor police-community relations. The report revealed that only 30% of Black residents said that the police work well with their neighborhoods, compared to 82% of white residents. Further, the report found, only 20% of Buffalo residents believe that police respect people of color.

124.    In 2017, BPD's use of Checkpoints became a prominent issue in the mayoral primary campaign.  All of Defendant Brown's challengers in the Democratic primary, including Erie County Legislator Betty Jean Grant, City Comptroller Mark Schroeder, and Plaintiff Taniqua Simmons, criticized BPD's racially discriminatory use of police Checkpoints at mayoral debates and in the media.

125.    In response to these and other complaints, Defendants Brown and Derenda defended the City's traffic enforcement policies and practices, including those pertaining to Checkpoints.

---

[13]    Greater Buffalo Racial Equity Roundtable, *The Racial Equity Dividend: Buffalo's Great Opportunity*, at 32 (September 2016)

126.    However, prior to August 2017, the City, BPD, and Defendants Brown and Derenda did not gather and did not review statistical information about the operation and results of the Checkpoint program, such as the locations of Checkpoints, the aggregate number of people who pass through Checkpoints, the number of people subjected to secondary stops, the average wait times, the number of tickets issued, fines generated, cars towed, money collected, licenses suspended, the race, age and gender of people subjected to enforcement at a Checkpoint, or any other related data.

127.    On July 25, 2017, the Buffalo Common Council adopted a resolution entitled "Buffalo Police Department Checkpoint Policy," raising concerns about the discriminatory use of Checkpoints, and requesting detailed information from the BPD about Checkpoints over the last three years

128.    In response to the Council's request, BPD stated that it did not have historical information on Checkpoint locations but that it would provide data going forward.

129.    In August 2017, BPD introduced a "Traffic Safety Checkpoint Tally Sheet" to record basic information about the results of the Checkpoints going forward. However, the Tally Sheets do not track the numbers of people who pass through the Checkpoints, average waiting times, or demographic information about people stopped, ticketed, and/or arrested at Checkpoints.

130.    The Tally Sheets exist only for the period August 4, 2017 through October 27, 2017.

131.    At the same time that it started producing the Tally Sheets, BPD also began to conduct Checkpoints in white neighborhoods that had never previously experienced Checkpoints. BPD then provided the Tally Sheets with these Checkpoint locations to the City Council in an effort to demonstrate to the public that it did not conduct Checkpoints in a discriminatory manner.

132.    The choice of Checkpoint locations in the July-October 2017 time period therefore bears little relationship to the choice of locations in the previous four-and-a-half years and was a sham to cover up the previous intentionally discriminatory targeting of Black and Latino neighborhoods.

133.    Thus, the percentage of Checkpoints in (a) majority-minority areas and (b) largely white areas, by period, was as follows:

| Period | % in Majority/ Minority Areas | % in Largely White (Minorities < 25%) Areas |
|---|---|---|
| 2013 | 88.3% | 5.1% |
| 2014 | 94.1% | 1.0% |
| 2015 | 96.7% | 1.0% |
| 2016 | 92.6% | 4.6% |
| Jan.-June 2017 | 76.8% | 16.2% |
| July-Oct. 2017 | 41.5% | 34.5% |

134.    In December 2017, the Attorney General of the State of New York opened an investigation into BPD's Checkpoint practices. The investigation resulted from a complaint filed by Black Lives Matter-Buffalo that alleged widespread racial discrimination by BPD.

135.    In January 2018, Defendant Derenda retired as BPD Commissioner.

136.    In February 2018, Defendant Lockwood, in his role as Acting Commissioner, disbanded the Strike Force Unit.[14]

137.    However, simply disbanding the Strike Force Unit does not and will not adequately address the violations raised and claims brought in this lawsuit.

138.    BPD officials moved Strike Force Officers to the Division of Traffic Enforcement.

---

[14]    http://buffalonews.com/2018/02/09/buffalo-police-to-end-its-strike-force-unit-put-focus-on-community-policing/

139.    In February 2018, in BPD's only public statement on the future of the Check-points, Captain Jeff Rinaldo told the Buffalo News that Checkpoints will continue.[15]

140.    BPD has in fact continued to run Checkpoints as recently as April 2018.

141.    BPD has not disbanded the Housing Unit.

142.    Defendant Brown continues to express support for aggressive traffic enforcement.

143.    The City and Defendants Brown and Lockwood continue to direct BPD officers to issue as many traffic tickets as possible.

144.    The City's budget continues to rely on millions of dollars in revenue from traffic tickets.

145.    The City, BPD and Defendants Brown and Derenda still direct officers to conduct traffic Checkpoints but provide no training or guidance as to where to locate and how to operate Checkpoints in accordance with constitutional mandates.

146.    The City, BPD, and Defendants Brown and Derenda still direct officers to aggressively enforce traffic laws but provide no training or guidance as to how to do so in a nondiscriminatory manner.

147.    The City, BPD, and Defendants Brown and Derenda currently do not gather and do not review statistical information to ascertain whether BPD operates vehicle Checkpoints in a racially discriminatory manner.

148.    The City, BPD, and Defendants Brown and Derenda also do not gather and do not review statistical information about traffic stops outside of Checkpoints, including the location of the stops and the race, age, and gender of the person stopped, ticketed, and/or arrested.  The City,

---

[15]    Maki Becker, Buffalo Police to End Strike Force Unit, Put Focus on Community Policing, *The Buffalo News* (Feb. 10, 2018), available at http://buffalonews.com/2018/02/09/buffalo-police-to-end-its-strike-force-unit-put-focus-on-community-policing/

BPD, and Defendants Brown and Derenda have no way to evaluate and do not evaluate whether BPD officers are enforcing traffic laws in a racially discriminatory manner.

***Defendants' Policies, Practices and/or Customs***
***Have Harmed Plaintiffs and Class Members***

149.    Defendants' policies, practices, and/or customs have subjected and will continue to subject thousands of Buffalo residents—mostly low-income people of color—to unreasonable, suspicionless stops in violation of the Fourth Amendment. Defendants have targeted and will continue to target Plaintiffs and class members for these stops based on their race and/or the racial demographics of their neighborhoods, in violation of the Fourteenth Amendment.

150.    Defendants' policies, practices, and/or customs have caused and will continue to cause the BPD to issue thousands of traffic violations, and to make arrests and impound vehicles, motivated by pecuniary interests and racial profiling and discrimination.

151.    Defendants' policies, practices, and/or customs have directly caused the New York State Department of Motor Vehicles to suspend thousands of driver's licenses belonging to low-income people of color in Buffalo. The BTVA requests such suspensions whenever a person does not pay a traffic ticket – even when the reason for nonpayment is that the person cannot afford to pay. Thus Defendants policies, practices, and/or customs, far from improving traffic safety, have actually decreased traffic safety by depriving low-income people of their driver's licenses, thus increasing the number of unlicensed and uninsured drivers.

## ALLEGATIONS OF NAMED PLAINTIFFS

***Dorethea Franklin***

152.    Plaintiff Dorethea Franklin is a 45-year-old Black woman and mother of seven children. To support her family, she runs a cleaning business called Benton Property Management. Ms. Franklin also performs extensive volunteer work in her community on behalf of peo-

ple with disabilities. Ms. Franklin lives and works on the East Side of Buffalo in a predominately Black neighborhood.

153.    Ms. Franklin has endured dozens of vehicle Checkpoints in and around her home on the East Side of Buffalo.

154.    From approximately January 2013 through October 2017, Defendants operated a vehicle Checkpoint on Ms. Franklin's street and near her home almost every Sunday during non-winter months. BPD often operated this Checkpoint at times of heavy traffic when members of the local community are travelling to or from church.

155.    Ms. Franklin lives on a one-way street that extends from the off-ramp of the Bailey Avenue exit of New York State Route 33.

156.    Bailey Avenue runs through the heart of Buffalo's East Side, which is a predominately African American community. Many people travelling to the East Side of Buffalo must take the Bailey Avenue exit in order to reach their destination.

157.    The Bailey Avenue vehicle Checkpoints typically were staffed by multiple BPD officers utilizing multiple BPD police cars and an Automated License Plate Reader. BPD also had tow trucks stationed at the Checkpoint.

158.    Every car that exited Route 33 at Bailey Avenue had to pass through the Checkpoint. BPD officers checked every car for license, registration, inspection sticker, and they looked inside the car for visible violations. BPD officers honked their horns if they wanted other officers to pull a car over for a secondary inspection.

159.    Ms. Franklin observed that, to the extent white people went through the Bailey Avenue Checkpoint, they tended to pass through without being pulled over for a secondary stop. Most of the drivers pulled over for secondary inspections were Black.

28

160.     During the operation of the Checkpoints that Ms. Franklin observed, the entire street was lined with cars waiting for secondary inspection or to be ticketed and/or towed. There is an auto repair business on the corner at the end of the block, and BPD usually filled the lot with cars waiting to be towed.

161.     BPD officers typically operated the Checkpoints that Ms. Franklin has observed for around 90 minutes, and during this time BPD officers issued around 100 tickets, made several arrests, and towed multiple vehicles.

162.     On dozens of occasions during the operation of these vehicle Checkpoints, in order to enter or exit her driveway to go about her daily life, Ms. Franklin had to proceed through a Checkpoint.  On many other occasions, officers established the Checkpoint directly in front of Ms. Franklin's driveway, blocking her vehicle entirely for the duration of the Checkpoint. During these times, if Ms. Franklin was home, she could not leave in her vehicle until the Checkpoint ended.

163.     Even though the officers who operated the Checkpoint knew Ms. Franklin (because they saw her regularly), they treated her rudely and disrespectfully when she passed through the Checkpoint.

164.     Ms. Franklin was pulled over for a secondary inspection three times. Each time took about 45 minutes.

165.     On two of the occasions, BPD officers directed Ms. Franklin to secondary inspection for no apparent reason and eventually let her go without a ticket.

166.     On another occasion in May 2016, BPD officers directed Ms. Franklin to secondary inspection because her registration had expired the previous day. Ms. Franklin was travelling home with five of her children ranging in age from three to 16. While awaiting secondary inspec-

tion, Ms. Franklin went online and renewed her registration. When the officer returned to Ms. Franklin's vehicle, he accused her of not having proper child safety restraints and threatened to write her five tickets, one for each of her children. Ms. Franklin responded that each child was in fact restrained appropriately for his or her age and weight. The officer did not issue Ms. Franklin any tickets.

167.    When Ms. Franklin was at home while BPD is operating a Checkpoint on Bailey Avenue, she had to listen to the noise of constant honking, idling engines, and other noise coming from the Checkpoint.

168.    Even though it is a one-way street, people often turn into Ms. Franklin's driveway in an effort to avoid the Checkpoint.

169.    Ms. Franklin has also experienced smaller, more informal Checkpoints.

170.    On or about June 5, 2017, around 4:30 or 5:00 p.m., Ms. Franklin witnessed two officers in a single police car stop at a red light on Broadway and Bronwell, turn on the lights on the top of their car, jump out of the car, and begin to operate a Checkpoint. The officers waved Ms. Franklin through, but all of the cars in back of her had to line up to go through the Checkpoint. In this particular instance, it appeared to Ms. Franklin that the officers simply decided to run a Checkpoint at random.

171.    Ms. Franklin has also passed through a smaller, informal Checkpoint on Grant Street on the West Side. At that particular Checkpoint, there were only two or three police cars and no lights, signs, warning lights or other warning indicia of a Checkpoint.

172.    Ms. Franklin has never received a ticket at a Checkpoint, but she always worries about that possibility and is extremely nervous about being stopped by BPD whenever she is driving through her neighborhood. She feels that she is always under scrutiny.

173.    Ms. Franklin feels targeted for increased police enforcement because of her race and because she lives in a predominantly African American neighborhood.

174.    Ms. Franklin finds BPD's vehicle Checkpoints to be extremely intrusive. She believes that they engender mistrust between the neighborhood and the BPD, that they are fundamentally unfair and discriminatory, and that they divert scarce police resources away from other important activities, such as solving more serious crimes.

175.    Because of the frequency and burdens imposed by the Checkpoints on or near her street, Ms. Franklin has expressed frustration and concern regarding BPD's vehicle Checkpoints to members of her family, her neighbors, and members of the general public.

176.    On June 23, 2017, Ms. Franklin appeared on Spectrum News-TWC in a segment called "Are Buffalo Check Points Targeting the East Side." The segment focused on community complaints that the Checkpoints target the East Side of Buffalo in a discriminatory manner, resulting in the issuance of hundreds of tickets for minor infractions, while serious crimes go unsolved.

177.    During the segment that aired, Ms. Franklin stated: "There is no refuge on the East Side from Checkpoints."

178.    Defendant Brown also appeared in the segment to defend the City's use of Checkpoints.

179.    Ms. Franklin drives frequently for work, to take her children to and from school and daycare, to go to church and volunteer activities, to shop for groceries and for many other reasons. Ms. Franklin lives and works in parts of the City where BPD frequently runs Checkpoints and engages in discriminatory traffic enforcement in order to harvest revenue. Ms. Frank-

lin is thus at risk of encountering BPD's unconstitutional traffic enforcement—both at and outside of Checkpoints—at any time.

***Taniqua Simmons***

180.     Plaintiff Taniqua Simmons is a 43-year-old mother of seven. Ms. Simmons is African American and lives in a predominately African American neighborhood located close to the divide between the East and West sides of Buffalo. She works full time in the health care industry and is a prominent community activist.

181.     Between 2014 and July 2017, Ms. Simmons has driven through at least 40 vehicle Checkpoints operated by the BPD, many conducted by BPD Strike Force Officers, all on the East Side of Buffalo in predominately African American neighborhoods.

182.     Specifically, Ms. Simmons has endured the following BPD vehicle Checkpoints since 2014:

   a.   East Ferry and Grider, approximately 10-15 times;

   b.   East Ferry and Filmore, approximately 10-15 times;

   c.   Fox and Moselle, approximately 5 times;

   d.   Bailey and East Delavan, 3 times;

   e.   Bailey and East Ferry, approximately 2-3 times;

   f.   Bailey and Scajaquada Parkway, 2 times;

   g.   33 and Cloverdale, 2 times;

   h.   Genesee and Union, 1 time.

183.     Ms. Simmons last passed through a Checkpoint in summer 2017, at 33 and Cloverdale. On that particular occasion, Ms. Simmons had to wait approximately 20 minutes in order to pass through the Checkpoint because there was a long line of cars coming off the expressway.

184.    Ms. Simmons cannot avoid passing through BPD Checkpoints as she goes about her daily life. BPD frequently locates Checkpoints on one-way streets that she needs to use to leave from or arrive at her home, the homes of her family and friends, the local businesses that she frequents, and her job.

185.    Ms. Simmons' typical experience of the Checkpoints is as follows:

186.    At each Checkpoint, Ms. Simmons has to wait 5-15 minutes behind multiple cars in order to pass through the Checkpoint. Generally, during daylight hours BPD provides no warnings regarding the presence of a Checkpoint; sometimes the BPD vehicles have flashing lights at night. BPD patrol cars block nearby streets so as to force everyone in the area of the Checkpoint to go through the Checkpoint. Cars line the road or nearby parking lots while their drivers and occupants wait for BPD officers to issue them tickets. BPD officers also make arrests and sometimes tow and impound vehicles.

187.    An officer stands in the middle of the road and appears to check to see if drivers or passengers are visibly violating the law, such as by not wearing a seatbelt. If the officer finds such a violation, he will tell the driver to pull over for a ticket. Otherwise, the officer waves the car through to the next police officer.

188.    A second police officer stops other cars not identified by the first officer as in obvious violation of the law. This second officer approaches the car, sometimes with a flashlight, and orders the driver to roll down his or her window. Typical questions that follow include: "Where are you going?," "Where are you coming from?," and "What are you doing?" The officer looks inside the car and checks license and registration. Often, but not always, drivers are allowed to proceed through the Checkpoint from this point.

189.    Ms. Simmons has been pulled over by BPD officers for a prolonged final stop following this process five times, most recently in 2014. She understood these additional stops to be for various reasons, ranging from the questioning officer not liking her answers, a legal violation with her car or registration, or sometimes for no reason at all. She has generally not been told why she was being pulled over. Her wait times during these prolonged additional stops have been 45 minutes and longer. In 2012 she received a ticket for having an expired inspection sticker, and another time, in 2014, Ms. Simmons' husband received a ticket for not wearing a seatbelt. The other times BPD officers eventually let her go without a ticket after holding and questioning her for a prolonged period.

190.    Based on her experiences, Ms. Simmons approaches every Checkpoint with fear and anxiety. Although she knows that she complies with the law, she believes BPD officers act arbitrarily. In the past, BPD officers at Checkpoints have made her feel that she could be arrested and jailed for no reason at all. Every Checkpoint stop has been stressful and humiliating.

191.    Based on her interactions with and observations of BPD Checkpoints, most drivers and passengers forced to go through the Checkpoints are African American. Ms. Simmons has frequently observed these individuals arrested, ticketed, or towed.

192.    Ms. Simmons believes that through the operation of these Checkpoints, the BPD treats her and her family and friends like criminals though they have done nothing wrong. She has suffered anxiety from being stopped at these Checkpoints.

193.    In November 2016, Ms. Simmons testified before the Community Oversight Committee that she believed BPD Checkpoints were discriminatory, that they made her friends and family feel as though they lived in a police state, and that they diverted police attention from more important responsibilities such as solving crime and homicides.

194.    Ms. Simmons made similar comments to BPD officials at a community forum at Bauguard High School in November 2016.

195.    Ms. Simmons also spoke out against BPD Checkpoints at Buffalo Common Council meetings in or about June and July 2016.

196.    Also in June 2016, at a Father's Day event, Ms. Simmons had the opportunity to share her views on Checkpoints directly with Defendant Brown. Ms. Simmons told Mr. Brown that she believed 95% of Checkpoints took place on the East Side of Buffalo, and that they were unfair and discriminatory. Mr. Brown responded by saying that the Checkpoints were "all over the city" and that he would "look into it."

197.    Ms. Simmons drives frequently for work, to take her children to and from school and daycare, to go to church and volunteer activities, to shop for groceries and for many other reasons. Ms. Simmons lives and works in parts of the City where BPD frequently runs Checkpoints and engages in discriminatory traffic enforcement in order to harvest revenue. Ms. Simmons is thus at risk of encountering BPD's unconstitutional traffic enforcement—both at and outside of Checkpoints—at any time.

### De'Jon Hall

198.    Plaintiff De'Jon Hall is a 27-year-old Black man and a graduate of the University of Buffalo School of Law. Mr. Hall is the manager of a non-profit organization with a mission to help end the HIV/AIDS epidemic and improve the health and welfare of Queer and Trans people of color.

199.    Mr. Hall is also a member of organizational Plaintiff Black Love Resists in the Rust.

200.     In April 2017, Mr. Hall moved to Buffalo and was living with his grandmother on Shirley Avenue on the East Side.

201.     At first, Mr. Hall did not drive in Buffalo because he did not have a vehicle, but on April 17, 2017, he bought a new car.

202.     Nine days later, on April 26, 2017, Mr. Hall encountered a Checkpoint on Comstock Avenue near Kensington Avenue.

203.     At the Checkpoint, Mr. Hall observed a number of police cars and approximately 10 officers. Several vehicles had flashing lights. Every car approaching the Checkpoint had to come to a full stop. The officer asked to see Mr. Hall's driver's license and checked his inspection sticker. Mr. Hall observed a tow truck and cars lined up on the side of the Checkpoint.

204.     Mr. Hall found the experience of passing through the Checkpoint so unsettling that he decided he never wanted to go through another one. Mr. Hall felt that BPD officers were arbitrary and unpredictable, and he wished to avoid interactions with the police. He found the Checkpoints inconvenient and did not want to be late to classes or important meetings because he had to spend time waiting to pass through a Checkpoint. Although he knew that BPD could not possibly have a reasonable basis to stop and search him, he believed that BPD officers often acted unreasonably, and he feared being stopped, searched, ticketed, arrested, or harmed at a Checkpoint.

205.     Mr. Hall subscribed to the Buffalo Checkpoints Facebook page so that he could receive advance warning of Checkpoint locations.

206.     He checked the Facebook page every time he got in the car in order to know where the Checkpoints were. If necessary, he adjusted his route in order to avoid having to pass through a Checkpoint.

207.     So far, Mr. Hall has not had to pass through another Checkpoint, but he has also had to expend a significant amount of time and effort avoiding Checkpoints.

208.     Mr. Hall no longer lives with his grandmother, but he still drives through the Eastside often for work and to visit her and other friends and family members. Mr. Hall continues to monitor the Facebook page every time he drives through the Eastside. However, because the Facebook page does not record every Checkpoint, he remains at risk of encountering another Checkpoint or encountering BPD's unconstitutional traffic enforcement—both at and outside of Checkpoints—at any time.

*Jane Doe*

209.     Plaintiff Jane Doe is a 27-year-old mother of three who works as a medical assistant. Ms. Doe is Black and lives in a predominately Black neighborhood in Buffalo.

210.     Ms. Doe passed through approximately ten BPD vehicle Checkpoints prior to July 2015. She observed during these experiences that BPD officers stop drivers, examine their cars, and often require the driver and passengers to display identification and registration.

211.     On July 2, 2015, Ms. Doe and her two children, ages 3.5 and 4.5, encountered a Checkpoint at Leslie and Scajaquada administered by Defendant Thomas. At the time of the stop, Ms. Doe had a learner's permit, but not a driver's license.

212.     Ms. Doe came to a complete stop as she waited in line for her turn to pass through the Checkpoint. While stopped, she took off her seatbelt to reach into her glove compartment for her registration. Defendant Thomas then approached the car and requested to see her license and registration.

213.     Ms. Doe had secured her children in booster seats. Defendant Thomas never asked her children's height and weight but simply stated that they needed to be in a "5 point harness."

214.    Defendant Thomas then issued Ms. Doe four tickets: three seat belt violations and a violation for driving on a learner's permit.

215.    Ms. Doe subsequently purchased new booster seats for her children, including a seat with a 5 point harness for her younger child.

216.    Ms. Doe contested the tickets and eventually had a hearing before the Buffalo Traffic Violations Agency on March 10, 2017.

217.    On March 20, 2017, the BTVA sent Ms. Doe a letter finding her guilty of all four violations and assessing eight points on her driver's license and $446 in fines. As a result of this incident, Ms. Doe also owed a Driver Responsibility Assessment in the amount of $450.

218.    At the time of hearing, Ms. Doe was attending school full-time and had no income.

219.    Ms. Doe could not afford to pay her tickets and surcharges in one lump sum.

220.    Ms. Doe sought a payment plan from the BTVA. The BTVA refused to provide a payment plan or accept partial payments.

221.    Because she could not have a payment plan, Ms. Doe could not pay at all.

222.    The NYS Department of Motor Vehicles suspended Ms. Doe' learner's permit because she could not pay the tickets and surcharges.

223.    Ms. Doe graduated from school and obtained a job in Williamsville as a medical assistant. The only way for Ms. Doe to get to work was to drive. Ms. Doe's fiancé had to drive her to and from work because she could not drive herself.

224.    After July 2015, Ms. Doe subscribed to the Buffalo Checkpoints Facebook page so that she and her fiancé could avoid passing through Checkpoints. They checked the Facebook

page before driving anywhere and altered their routes through the City in order to avoid the Checkpoints. Still, Ms. Doe passed through two additional Checkpoints that she could not avoid.

225.    Ms. Doe has found every Checkpoint that she has been stopped at to be discriminatory and stressful. She believes that through the operation of these Checkpoints, the BPD treats her and her family and friends like criminals despite having done nothing wrong. She has suffered anxiety from being stopped at these Checkpoints.

226.    In February 2018, Ms. Doe used her tax refund to pay off her traffic tickets. Subsequently, she reinstated her learner's permit.

227.    Ms. Doe intends to obtain her driver's license in the very near future.

228.    Ms. Doe lives in a part of the City where BPD frequently conducts Checkpoints and engages in discriminatory traffic enforcement in order to harvest revenue. Ms. Doe is at risk of encountering BPD's unconstitutional traffic enforcement—both at and outside of Checkpoints—in the very near future.

## CLASS ACTION ALLEGATIONS

229.    Plaintiffs bring this case as a class action under Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf three separate but overlapping classes, two of which contain subclasses.

### *The Checkpoints Class and Subclass*

230.    Plaintiffs seek certification under Rule 23(b)(2) of a Checkpoints Class defined as:

> All individuals who have been or will be subjected by BPD to "traffic safety" vehicle Checkpoints.

231.    The Checkpoints Class contains a Subclass defined as:

> All non-White individuals who have been or will be subjected by BPD to "traffic safety" vehicle Checkpoints.

232.    All Plaintiffs represent the Checkpoints Class and Subclass.

233.    Defendants have acted or failed to act on grounds generally applicable to the Checkpoints Class and Subclass, thereby making appropriate final injunctive relief with respect to the Checkpoints Class and Subclass as a whole.

234.    Checkpoints Class members share a number of common questions of law and fact, including, but not limited to:

   a.  Whether Defendants established and conduct the Checkpoints for the impermissible purposes of general crime control and/or revenue harvesting;

   b.  Whether Defendants have a policy, practice, and/or custom of permitting BPD officers and personnel to conduct unregulated and unsupervised Checkpoints in a manner that fails to comport with the Fourth and Fourteenth Amendments;

   c.  Whether Defendants have failed to properly train, supervise, monitor, and/or discipline BPD officers, and whether those failures have caused and will cause BPD officers to violate Classmembers' Constitutional rights;

   d.  Whether Defendants have encouraged, sanctioned, acquiesced to, and/or failed to rectify unconstitutional practices in the Checkpoints Program by BPD officers and personnel of which they were aware or should have been aware, and whether such acts and/or omissions have caused and will cause BPD officers to violate Class members' Constitutional rights.

235.    The Checkpoints Subclass shares these questions and in addition shares other common questions of law and fact such as whether Defendants intentionally and discriminatorily target Black and Latino neighborhoods for Checkpoints.

236.    The Named Plaintiffs' claims are typical of class and subclass members' claims. Each Named Plaintiff (including the organizational plaintiff in its representative capacity) has been and likely will again be subjected to a BPD "traffic safety" vehicle Checkpoint. The Named Plaintiffs seek relief under legal theories that are the same or similar to those on which all members of the Checkpoints Class and Subclass will rely. The Named Plaintiffs suffered harms that are typical of the harms suffered by class and subclass members.

### *The Unconstitutional Ticketing Class*

237.    Plaintiffs seek certification under Rule 23(b)(2) of an Unconstitutional Ticketing

Class defined as:

> All non-White individuals who have received or will receive traffic tickets issued
> by the BPD.

238.    All Plaintiffs represent the Unconstitutional Ticketing Class.

239.    Defendants have acted or failed to act on grounds generally applicable to the Un-

constitutional Ticketing Class, thereby making appropriate final injunctive relief with respect to

the Unconstitutional Ticketing Class as a whole.

240.    Unconstitutional Ticketing Class members share a number of common questions

of law and fact, including, but not limited to:

> a.  Whether Defendants have an impermissible pecuniary interest in assessing and
>     collecting fines and fees for traffic violations, in violation of the Due Process
>     Clause of the Fourteenth Amendment;
> b.  Whether Defendants intentionally and discriminatorily target non-White individu-
>     als for multiple tickets in a manner not applied to White individuals;
> c.  Whether Defendants intentionally and discriminatorily target non-White individu-
>     als for traffic enforcement in general, and not merely at Checkpoints;

241.    The Named Plaintiffs' claims are typical of class members' claims. Each Named

Plaintiff is a non-white driver who drives regularly in the City and is at risk of receiving a traffic

ticket from the BPD. The Named Plaintiffs seek relief under legal theories that are the same or

similar to those on which all members of the Unconstitutional Ticketing Class will rely. The

Named Plaintiffs suffered harms that are typical of the harms suffered by class members

### *The Damages Class and Subclass*

242.    Plaintiffs seek certification under Rule 23(b)(3) of a Damages Class defined as:

> All individuals who within the last three years have received a ticket, been arrest-
> ed, or had their cars towed and/or impounded at a BPD "traffic safety" vehicle
> Checkpoint.

243.    The Damages Class contains a Subclass defined as:

All Black or Latino individuals who within the last three years have received a ticket, been arrested, or had their cars towed and/or impounded at a "traffic safety" vehicle Checkpoint operated by the BPD.

244.    Plaintiff Doe represents the Damages Class and Subclass.

245.    The Damages Class and Subclass share the questions above with the Injunction Class and Subclass, and in addition share other common questions of law and fact, such as whether the individual capacity Defendants have violated clearly established statutory or constitutional rights of which a reasonable person would have known.

246.    The common questions outlined above predominate over issues affecting individual class members.

247.    Moreover, a class action is superior to any other method for the fair and efficient adjudication of this legal dispute. The damages suffered by class members, although substantial in the aggregate, are small in relation to the extraordinary expense and burden of individual litigation. Managing this case as a class action should not present any particular difficulty.

248.    Plaintiffs Doe's claims are typical of class and subclass members' claims. Plaintiff Doe has received a traffic ticket at a BPD Checkpoint within the last three years. Plaintiff Doe seeks relief under legal theories that are the same or similar to those on which all membersof the Damages Class and Subclass will rely. Plaintiff Doe suffered harms that are typical of the harms suffered by class and subclass members

249.    Each Class and Subclass includes thousands of members and is so numerous that joinder of all class members is impracticable. Since January 2015, BPD officers have conducted more than 1,300 Checkpoints, at which they have issued thousands of violations and conducted hundreds of arrests and vehicle impounds. BPD officers issue tens of thousands of tickets annu-

ally. The substantial majority of the tickets, arrests and impounds have involved Black or Latino drivers.

250.    Joinder is also impracticable because, upon information and belief, many putative class members are not aware that their constitutional and statutory rights have been violated and that they have the right to seek redress in court. Many class members lack the means to retain an attorney to represent them in a civil rights lawsuit, and they also fear retaliation and reprisals by BPD officers should they pursue enforcement of their rights in a court of law. A class action thus serves as the most appropriate vehicle for the protection of class members' rights.

251.    The Named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with class members, and will fairly and adequately protect the interests of the class.

252.    Counsel for Named Plaintiffs are highly competent and experienced in federal class action litigation.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### *Violation of the Fourth Amendment*
#### *On behalf of all Plaintiffs and all Classes*

253.    Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of subjecting Plaintiffs and class members to unreasonable seizures and searches at Checkpoints.

254.    BPD's constitutional abuses and violations were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendants City, Brown, Lockwood and Derenda, including: (1) the sanctioning and encouragement of, and the failure to rectify, BPD's operation of the Checkpoints; and (2) the

failure to train, supervise, monitor and discipline BPD officers engaged in operation of the Checkpoints.

255.    Each Defendant has acted with deliberate indifference to the Fourth Amendment rights of Named Plaintiffs and class members. Defendants' acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' and class members' Fourth Amendment rights. By acting under color of state law to deprive Plaintiffs and class members of their Fourth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

256.    Defendants continue to operate the Checkpoints, and Plaintiffs continue to drive regularly in Buffalo in the neighborhoods targeted by the Checkpoints. Plaintiffs face the real and immediate threat that, unless enjoined by this Court, Defendants will again violate their Fourth Amendment rights by subjecting them to suspicionless stops and searches at Checkpoints.

257.    As a direct and proximate result of Defendants' policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs and attorneys' fees.

**SECOND CLAIM FOR RELIEF**
***Violation of the Fourteenth Amendment Equal Protection Clause***
***On behalf of all Plaintiffs, the Unconstitutional Ticketing Class, and the***
***Checkpoints and Damages Subclasses***

258.    Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of subjecting Plaintiffs and class members to aggressive, punitive traffic enforcement, including at Checkpoints, based on race and/or national origin. Defendants' policy, practice, and/or custom of targeting Black and Latino neighborhoods for such traffic enforcement amounts to racial and ethnic profiling.

259.    BPD's constitutional abuses and violations were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendants City, Brown, Lockwood and Derenda, including: (1) the sanctioning and encouragement of, and the failure to rectify, BPD's targeting of Black and Latino neighborhoods for aggressive, punitive traffic enforcement (including but not limited to the use of Checkpoints); and (2) the failure to train, supervise, monitor and discipline BPD officers engaged in such traffic enforcement.

260.    Each Defendant has acted with deliberate indifference to the Fourteenth Amendment rights of Named Plaintiffs and class members. Defendants' acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' and class members' Fourteenth Amendment rights. By acting under color of state law to deprive Plaintiffs and class members of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

261.    Defendants continue to target Black and Latino neighborhoods for aggressive, punitive traffic enforcement. Because Plaintiffs and class members continue to drive in these neighborhoods, they face the real and immediate threat that, unless enjoined by this Court, Defendants will again violate their Fourteenth Amendment rights.

262.    As a direct and proximate result of Defendants' policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs and attorneys' fees.

## THIRD CLAIM FOR RELIEF
### *Violation of the Fourteenth Amendment Due Process Clause*
### *On behalf of all Plaintiffs and the Checkpoints and Unconstitutional Ticketing Classes*

263.    Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of subjecting Plaintiffs and class members to aggressive, punitive traffic enforcement in order to generate revenue for the City budget.

264.    The City's reliance on traffic ticket revenue creates an institutional incentive for the City, the BPD, and the BTVA to ticket, convict and fine defendants, regardless of the nature of their individual offenses. Defendants' pecuniary interests conflict with their obligations to be and appear disinterested and to serve the interests of justice. The institutional incentive to generate revenue creates bias, and an appearance of bias, that deprives Plaintiffs and class members of due process of law.

265.    This violation of Due Process is directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendants City, Brown, Lockwood and Derenda including: (1) the sanctioning and encouragement of, and the failure to rectify, BPD's aggressive, punitive enforcement of traffic laws in order to generate revenue and (2) the failure to train, supervise, monitor and discipline BPD officers engaged in such traffic enforcement.

266.    Each Defendant has acted with deliberate indifference to the Fourteenth Amendment rights of Named Plaintiffs and class members. Defendants' acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' and class members' Fourteenth Amendment rights. By acting under color of state law to deprive Plaintiffs and class members of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

267.    Defendants continue to engage in aggressive, punitive traffic enforcement and continue to rely on ever-increasing traffic ticket revenue to balance the City budget. Because Plaintiffs and class members continue to drive, they face the real and immediate threat that, unless enjoined by this Court, Defendants will again violate their Fourteenth Amendment rights by subjecting them to traffic enforcement solely for pecuniary gain.

268.    As a direct and proximate result of Defendants' policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs and attorneys' fees.

### FOURTH CLAIM FOR RELIEF
*Violation of Title VI of the Civil Rights Act of 1964*
*On behalf of all Plaintiffs, the Unconstitutional Ticketing Class, and the*
*Checkpoints and Damages Subclasses*

269.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) *et seq.* prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance, including law enforcement programs and activities. Title VI prohibits intentional discrimination on the basis of race or ethnicity. It prohibits law enforcement officers from conducting police activities in a manner that is motivated by race or ethnicity, or in a manner that has a discriminatory effect on a racial or ethnic group, or which is motivated by a discriminatory purpose.

270.    Defendants receive federal financial assistance, including financial assistance for law enforcement activities.

271.    Defendants devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of BPD officers and personnel operating Checkpoints and engaging in

aggressive, punitive traffic enforcement in a manner that is motivated by race and ethnicity and results in a significant disparate impact on Black and Latino people. Defendants' policy, practice, and custom of targeting Black and Latino neighborhoods for aggressive, punitive traffic enforcement (including but not limited to Checkpoints) amounts to racial and ethnic profiling.

272.    As a direct and proximate result of Defendants' policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs and attorneys' fees.

## RELIEF REQUESTED

Wherefore, the named Plaintiffs and members of the Main and Damages Classes they seek to represent respectfully request that this Court:

A. Issue an Order certifying this case as a class action pursuant to Rules 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, with all of the named Plaintiffs as representatives of the Checkpoints Class and Subclass and the Unconstitutional Ticketing Class and Subclass, and Plaintiff Doe as representative of the Damages Class and Subclass;

B. Declare that Defendants have violated the rights of Plaintiffs and class members under the Fourth and Fourteenth Amendments to the U.S. Constitution;

C. Preliminarily and permanently enjoin Defendants:

a.    From continuing the policy, practice, and custom of conducting vehicle Checkpoints for the purpose of general crime control;

b.    From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of their race and ethnicity;

c. From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints for improper pecuniary purposes;

d. To institute and implement policies and programs with respect to training, supervision, and discipline that will eliminate the policy, pattern, practice, and custom of:

　i. conducting vehicle Checkpoints for the purpose of general crime control;

　ii. enforcing traffic laws in a manner that targets Buffalo residents on the basis of their race and ethnicity or that reflects an improper pecuniary motive.

e. To institute and implement appropriate and adequate supervision and discipline of BPD officers and personnel who conduct vehicle Checkpoints;

f. To implement appropriate measures to ensure that BPD officers and personnel document all traffic stops and vehicle Checkpoints in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act;

g. To implement appropriate measures to ensure that documentation of all traffic stops and vehicle Checkpoints is retained in a single, up-to-date computerized database;

D. Award damages to the Damages Class and Subclass and Plaintiff Doe in an amount to be determined trial;

E. Award reasonable attorneys' fees to all Plaintiffs, pursuant to 42 U.S.C. § 1988;

F. Award costs of litigation to all Plaintiffs, pursuant to 42 U.S.C. §§ 1920 and 1988; and

G. Award such other relief as this Court may deem appropriate and in the interests of justice.

**PLAINTIFFS DEMAND TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

Respectfully submitted this 28th day of June, 2018.

/s/ Keisha A. Williams

Joseph Keleman
Keisha Williams
WESTERN NEW YORK LAW CENTER
Main Seneca Building
237 Main Street, Suite 1130
Buffalo, NY 14203
Tel: (716) 828-8415
Fax: (716) 270-4005
jkeleman@wnylc.com
kwilliams@wnylc.com

/s/ Marc Cohan

Marc Cohan
Claudia Wilner*
Edward Krugman*
Travis W. England*
Theresa Lau*
NATIONAL CENTER FOR LAW
AND ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
cohan@nclej.org
wilner@nclej.org
krugman@nclej.org
england@nclej.org
lau@nclej.org

/s/ Darius Charney

Baher Azmy*
Darius Charney*
Britney Wilson*
Anjana Malhotra (cooperating counsel)*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
212-614-6439
BAzmy@ccrjustice.org
DCharney@ccrjustice.org
bwilson@ccrjustice.org
anjana.malhotra@gmail.com

* *Application for admission forthcoming.*