UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
BLACK LOVE RESISTS IN THE RUST, et al.,

                      *Plaintiffs,*

                                                  Case No. 1:18-cv-719

- vs -

CITY OF BUFFALO, N.Y., et al.,

                      *Defendants*.
-------------------------------------------------------------x


**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL
DEFENDANTS TO COMPLY WITH COURT'S MAY 30, 2019 DISCOVERY ORDER
AND OTHER DISCOVERY OBLIGATIONS</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ..................................................................................................... 2

    I.    Defendants' Ongoing Failure to Search, Collect, and Produce ESI .............................. 2

       A.    Discussions Between the Parties Regarding ESI Search Terms, Custodians, and Format of Production. ................................................................................................. 2

       B.    The Court's May 30 Order Requiring Defendants to Commence Production of ESI Within Two Weeks of Receiving Search Terms and Custodians. ........................................ 4

       C.    Defendants' Failure to Comply with May 30 Order ..................................................... 5

    II.    Defendants' Objections to Production of BPD Housing Unit , Traffic Unit, Strike Force Monthly and Daily Reports......................................................................................... 6

    III.    Defendants' Refusal to Supplement Their Answer to Interrogatory 1, Seeking "Employment History" of Housing Unit and Strike Force Officers ......................................... 8

ARGUMENT ............................................................................................................................. 9

    I.    Defendants' Failure to Search for ESI Contravenes this Court's May 30, 2019 Directive and their Obligations Under the Federal Rules. ...................................................................... 9

       A.    Defendants Have No Valid Justification for Failing to Search for and Produce ESI... 9

       B.    The Court Should Award Plaintiffs' Reasonable Expenses, Including Attorneys Fees, Associated with Bringing this Motion ............................................................................. 15

    II.    Defendants Must Produce the Housing, Traffic Unit, and Strike Force Monthly and Daily Reports with Only the Redactions Proposed by Plaintiffs ............................................. 15

       A.    All of the Requested Monthly and Daily Reports Contain Information Relevant to Plaintiffs' Claims and Unavailable from Other Sources........................................................ 15

       B.    Defendants' Objections are Without Merit and/or Sufficiently Addressed by Plaintiffs' Proposed Redactions ..................................................................................... 17

    III.    This Court Should Compel Defendants to Answer Plaintiffs' Interrogatory Seeking Relevant Dates of Employment of Strike Force and Housing Unit Personnel or to Produce Documents Sufficient to Show this Information. ................................................................... 21

CONCLUSION ........................................................................................................................ 22

## PRELIMINARY STATEMENT

This case has stalled in discovery due to Defendants' failure to produce Electronically Stored Information (ESI) for more than eight months. Despite extensive and patient efforts by Plaintiffs to meet and confer and to reduce the burden of electronic discovery, Defendants continue to evade their discovery obligations.

Defendants' latest failure is a violation of this Court's May 30, 2019 directive that they "make a production" of responsive ESI within two weeks after Plaintiffs provided search terms and custodians. *See* May 30, 2019 Transcript (Tr.), 8:21-24. Plaintiffs sent the search terms and custodians on June 5, 2019. More than six weeks have passed without any production by Defendants. There is no valid excuse for Defendants' failure to abide by the Court's directive or for their continuing failure to provide ESI in this litigation.

In addition, Defendants have refused to produce monthly and daily reports from the Buffalo Police Department's (BPD) Housing, Strike Force and Traffic Units. These reports include statistics and narrative information about the traffic enforcement activities at the heart of this case. Plaintiffs have sought their production for eight months but Defendants have stonewalled.

Defendants have further refused to supplement their answer to Interrogatory 1, which seeks BPD Officers' dates of employment within the Strike Force and Housing Units.

Plaintiffs therefore respectfully move pursuant to Federal Rules of Civil Procedure 37(a)(3)(B)(iii) & (iv) for an Order compelling Defendants (i) to comply with their obligations under the Federal Rules and, specifically, this Court's May 30, 2019 directive, to begin a rolling

production of ESI;[1] (ii) to locate and produce the BPD Housing Unit, Traffic Unit and Strike

Force Monthly and Daily Reports, and (iii) to supplement their answer to Interrogatory 1.

## FACTUAL BACKGROUND

### I.   Defendants' Ongoing Failure to Search, Collect, and Produce ESI

Plaintiffs served their first and second sets of Requests for Production of Documents (the

"Requests") in November 2018 and April 2019. As described in previous filings with the Court,

for more than eight months Plaintiffs have sought to reach agreement with Defendants regarding

the scope and method of searching for and producing ESI. *See* ECF No. 22, at 1-2; ECF No. 24,

at 1-2. At every turn, Defendants have been non-responsive or evasive, advising that they were

working through certain technological barriers while taking no tangible efforts to comply with

their obligations.

#### A.  Discussions Between the Parties Regarding ESI Search Terms, Custodians, and Format of Production.

Since the commencement of discovery, Plaintiffs have sought to "discuss and attempt to

reach agreement as to the method of searching [for ESI], and the words, terms, and phrases to be

searched and any restrictions as to scope and method . . ." *See* Local Civ. R. 26(e)(3); Wilner

Decl. ¶¶ 4-5. Following five conferrals and a court conference, *id.* ¶¶ 6-12 & Ex. E, G,

Defendants advised in January that "the search for and production of ESI is a substantial and

time-consuming endeavor" and that Defendants intended to employ four search terms:

"Checkpoints," "check points," "strike force," and "housing*." Id.* ¶ 13 & Ex. H. Defendants'

counsel stated that he had requested each named Defendant and four other identified custodians

to "search all records for this information specifically including databases, computer files, paper

---

[1] Because the Court declined to treat Plaintiffs' May 28, 2019 submission as a motion to compel, *see* Tr. 9:20-21, Plaintiffs have not brought this motion as one seeking a finding of contempt and sanctions pursuant to Federal Rule of Civil Procedure 37(b)(2)(A).

files, and emails." *Id.* Plaintiffs do not know whether this search in fact occurred, as Defendants never produced any search results.

On January 29, as reflected in Plaintiffs' status update to the court, the parties conferred and agreed on a schedule for ESI production: Plaintiffs would send an email requesting additional search terms and custodians, and Defendants would produce ESI within thirty days. Dkt. 21. Plaintiffs subsequently proposed additional custodians and search terms, but Defendants did not respond or produce any ESI. *Id.* ¶ 14 & Ex. J, K.

As to the format of production, Plaintiffs similarly endeavored to stipulate with Defendants a "reasonably usable" format for the production of responsive ESI. *See* Fed. R. Civ. P. 34(a)(1)(A). Whereas Defendants had initially proposed printing ESI (including emails), and then scanning and bates-stamping it, Plaintiffs objected to this time-consuming method, which would not "preserve the integrity of the electronic document's contents." *See* Local Civ. R. 26(e)(5); Wilner Decl. ¶ 14. In November, following Defendants' representations about their production capabilities, Plaintiffs sent Defendants a proposed stipulation meant to accommodate these capabilities, specifying production of emails as native files (.msg) and most other documents as PDFs. *See* Wilner Decl. ¶ 6 & Ex. E. Defendants declined to enter this stipulation but offered no alternative proposals. *Id.* ¶ 7. In January and February, Plaintiffs reiterated their expectations regarding the format of ESI production and provided specific instructions for production geared to Defendants' representations of their technological capacity, but Defendants did not respond and offered no counter-proposals. *Id.* ¶¶ 12-17 & Ex. I, J, K.

In early March—four months after receipt of the first set of document requests— Defendants informed Plaintiffs for the first time that BPD's use of the Lotus Notes email system complicated their search for responsive ESI. *Id.* ¶¶ 18-19 & Ex. L. Defendants stated that BPD's

use of Lotus Notes impaired their ability to conduct a comprehensive search of emails, to

produce metadata affiliated with emails, and to produce native files. *Id*. Defendants had no

reasonable explanation for taking four months to discover that the BPD used Lotus Notes instead

of Outlook as they had previously represented. *Id*. ¶ 18. Defendants also never explained how the

BPD's use of Lotus Notes impairs Defendants' ability to retrieve responsive emails from other

city agencies, such as the Mayor's office or the Buffalo Traffic Violations Agency, which

Plaintiffs understand to use Microsoft Outlook. *Id*. ¶ 20.

      During the two months of conferrals following this revelation, Defendants informed

Plaintiffs that they intended to retain, and then that the City had retained, an ESI vendor to

handle the collection and production of ESI. *Id*. ¶ 21. Plaintiffs requested Defendants to provide

more information regarding the vendor's search and collection capabilities so that they could

provide input on Defendants' search methodology, but Defendants only disclosed the name of

the vendor and that the vendor utilized Relativity, a commonly used ESI platform. *Id*.

Defendants requested that Plaintiffs provide a list of proposed custodians and search terms,

which Plaintiffs did on May 6. *Id*. ¶ 22 & Ex. O. Defendants did not respond to Plaintiffs'

proposal. *Id*.

### B.  The Court's May 30 Order Requiring Defendants to Commence Production of ESI Within Two Weeks of Receiving Search Terms and Custodians.

      Because of Defendants' failure to agree to any methodology, scope, or timeline to

produce ESI, Plaintiffs requested the Court schedule a status conference regarding Defendants'

production of ESI and certain other discovery and schedule-related matters. ECF No. 22.

      On May 30, 2019, the Court held a status conference on these issues. Defendants'

counsel stated that the "reason for any delay" as to Defendants' production of ESI was the

number of Plaintiffs' proposed custodians and search terms. *See* Tr. at 6:1-9. Plaintiffs, in turn,

4

described their extended efforts to confer regarding the scope of the Requests and the technological limitations asserted by Defendants. *See id*. at 6:15-25-7:1-16. The Court thereafter proposed that Plaintiffs provide twenty custodians and twenty search terms to Defendants and for Defendants to commence a rolling production within two weeks of receipt of those search terms. *Id*. at 7:17-25-8:1-10. Defendants' counsel specifically stated that he "[didn't] see any issues" with the Court's proposal. *See* Tr. 8:11-20. Accordingly, the Court ordered the parties to proceed with this protocol. *Id*. at 8:21-25-9:1-4.

### C.  Defendants' Failure to Comply with May 30 Order

Plaintiffs provided a list of twenty custodians and twenty search terms to Defendants on June 5, 2019. Wilner Decl. ¶ 24 & Ex. P. Like the search terms Plaintiffs had proposed in May, these search terms used standard Boolean operators (*e.g.* or, and, not), as well as standard truncation symbols (*e.g.* *, !) in order to ensure that the terms would capture documents relevant to the Parties' claims and defenses and avoid duplication. *Id.* ¶ 22. As Plaintiffs' transmittal email explained, Plaintiffs constructed the search terms based on Defendants' representation that their intended ESI vendor utilized Relativity. *Id.* ¶ 25 & Ex. P.

Two weeks passed without Defendants producing any ESI or otherwise explaining their failure to comply with the Court's May 30 order. *Id.* ¶ 26.  Plaintiffs wrote to Defendants on June 20, 2019, requesting a meet-and-confer. *Id.* ¶ 27 & Ex. R. Defendants' counsel responded by email, requesting that the parties "discuss local rule 26 as it pertains to e-discovery, costs, and language of requests, among other things*." Id.* ¶ 28 & Ex. S.

The Parties conferred by telephone on June 24, 2019. During that conferral, Defendants' counsel stated that he did not search for ESI because: (1) Plaintiffs' proposed search terms were "confusing," (2) the BPD email system would not be able to utilize these search terms, and (3) Plaintiffs' request for metadata affiliated with the ESI would require the use of a vendor. *Id.* ¶ 29.

According to Defendants' counsel, these difficulties rendered the emails "not reasonably accessible" and required the parties to discuss "cost-shifting" under the local rules. *Id*. When pressed by Plaintiffs' counsel to specify the purported costs of running the twenty searches, Defendants' counsel admitted that he did not know because he did not provide Plaintiffs' list of custodians and search terms to the ESI vendor. *Id*. ¶ 30.

Based on this conferral, Plaintiffs remain uncertain as to: (1) Defendants' actual capacity to search for and produce ESI; (2) whether Defendants have retained a vendor to assist in ESI production; and (3) whether Defendants have taken or will be taking any actions to comply with the Court's May 30 directive regarding ESI. Plaintiffs are certain, however, that Defendants did not "make a production" of responsive Electronically Stored Information (ESI) within two weeks from providing search terms and custodians to Defendants. *See* Tr. at 8:21-24. Plaintiffs accordingly advised Defendants that they intended to seek judicial intervention. *Id*. ¶ 30.

## II.    Defendants' Objections to Production of BPD Housing Unit , Traffic Unit, Strike Force Monthly and Daily Reports

The Parties have also reached an impasse as to Plaintiffs' November 5, 2018 requests for the production of all BPD Housing Unit, Traffic Unit, and Strike Force Monthly and Daily Statistics Reports from 2013 to the present. *Id*. ¶ 32 & Ex. A at 8-11. The Monthly Reports tabulate the total number of traffic tickets issued and misdemeanor traffic arrests made by the unit each month.  They also contain narrative information about traffic enforcement activities. *Id*., Ex. V. The Daily Reports provide similar information for each day along with statistical tabulations for each individual officer. *Id*., Ex. N.

Defendants objected to the production of all of these reports on grounds that they are overly broad, vague, not likely to result in the production of admissible evidence, and seek information that is (i) protected by the deliberative process and law enforcement privileges, (ii)

may be sealed, (iii) is part of ongoing investigations, and/or (iv) is subject to other unspecified confidentiality concerns. *Id.*, Ex. A at 8-11.[2]

The parties first conferred about the production of the reports on December 19, 2018. During this conversation, Defendants' counsel stated that he did not know of any reports other than the Monthly Housing Reports that he had already produced. *Id.* ¶ 35. Plaintiffs subsequently sent Defendants a copy of a Housing Unit Daily Report and stated their understanding that other units of the BPD issued similar daily and monthly reports. *Id.* ¶ 36. Defendants advised that they would search for these documents. *Id.*

On January 29, after multiple conferrals, Defendants confirmed that the Housing Unit and Strike Force Unit each issued daily reports, which Defendants stored electronically and would produce as ESI. *Id.* ¶¶ 37-39. Defendants also reported that they had not yet located Strike Force monthly reports and did not know whether the Traffic Unit issued reports. *Id.*

On March 6, as explained above, Defendants advised that they could not produce the Daily Reports in electronic form because they were stored in Lotus Notes. *Id.* ¶ 40 & Ex. L. Defendants advised that certain of the forms existed in paper format, but they would require "heavy redaction" and had been printed in such a manner as to render them partly illegible. *Id.*

The parties conferred twice in March, and Defendant agreed to produce a small sample of strike force and housing daily reports so that Plaintiffs could assess their utility and the need for redaction. *Id.* ¶ 41 & Ex. N. The parties then conferred several additional times regarding the appropriate level of redaction but did not reach agreement. *Id.* ¶¶ 42-43. The parties discussed

---

[2] Notwithstanding their objections, Defendants produced Housing Unit Monthly Reports from the 2013-2017 period, with only information about ongoing investigations and the personal identifying information of non-BPD personnel redacted. *Id.* ¶ 33 & Ex. V. Prior to litigation, Defendants had produced these same records, with the same redactions, to Plaintiffs' counsel NCLEJ in response to a Freedom of Information request. *Id.*

the Daily Reports briefly at the May 30 conference, during which Defendants stated for the first time that they had additional objections to producing the reports beyond the redaction issue. Tr. 27:13-25. But during a conferral on June 24, Defendants agreed that if the parties could resolve the redaction issue, Defendants would produce the reports despite their other objections. *Id.* ¶ 47.

Plaintiffs have made two alternative proposals: (1) Defendants would redact only (a) names and other personal identifying information of witnesses, crime victims, crime suspects, arrestees, and informants, and (b) information related to currently ongoing BPD investigations, *id.* ¶ 47 & Ex. R; or (2) Defendants would redact the above categories of information, plus all non-traffic-enforcement-related information contained in the reports. *Id.* ¶ 48 & Ex. T. Defendants rejected both proposals, offered no counter-proposal, and maintained their objections to producing the requested Monthly and Daily Reports. *Id.*

### III.    Defendants' Refusal to Supplement Their Answer to Interrogatory 1, Seeking "Employment History" of Housing Unit and Strike Force Officers

The Parties have also reached an impasse as to Plaintiffs' Interrogatory 1, which seeks "Employment History" of Housing Unit and Strike Force officers. *Id.* ¶ 49. Plaintiffs defined "Employment History" to include "the names and dates of all positions held." *Id*. Ex. C. Defendants have provided some, but not all, of the requested information. *Id.* ¶ 50 & Ex. D.

On June 20, Plaintiffs notified Defendants that in order to perform a statistical analysis of BPD's ticketing patterns, they needed to be able to identify whether tickets were issued by Housing Unit or Strike Force officers. *Id.* ¶ 51 & Ex. R.

The parties conferred on June 24, and Defendants explained that BPD maintains Special Orders documenting officer transfers *into* a particular unit, but no corresponding order when an officer transferred *out of* a particular unit. *Id*. ¶ 52 & Ex. U. Defendants therefore refused to supplement their answer to the Interrogatory. *Id*. Plaintiffs proposed that, in lieu of answering the

Interrogatory, Defendants produce the Special Orders documenting (a) all transfers into the

Strike Force and Housing Unit; and (b) all transfers for the period immediately following the

dissolution of the Strike Force. *Id.* ¶ 53. Defendants offered no substantive response to this

proposal. *Id.* The requested transfer orders would provide nearly all of the information required

for this aspect of Plaintiffs' statistical analysis, and any additional follow-up needed would be

narrowly defined and not burdensome. *Id.* ¶ 54.

* * *

Pursuant to Federal Rule of Civil Procedure 37(a)(1), Plaintiffs' counsel hereby certify

that they have conferred in good faith regarding the subject of this motion, as described above

and in the accompanying Declaration of Claudia Wilner.

## ARGUMENT

### I.    Defendants' Failure to Search for ESI Contravenes this Court's May 30, 2019 Directive and their Obligations Under the Federal Rules.

#### A.  Defendants Have No Valid Justification for Failing to Search for and Produce ESI

As described above, Defendants received Plaintiffs' list of custodians and search terms

and then did nothing—in violation of the Court's May 30 Order. Only after violating this Order

and receiving Plaintiffs' June 20 letter did Defendants request a conferral to "discuss local rule

26." Wilner Decl. Ex. S. Defendants now erect new roadblocks to producing ESI, claiming that

their own email systems are "not reasonably accessible" because Plaintiffs' search terms are

purportedly too complex and objecting to Plaintiffs' request for metadata. These *post hoc*

excuses are procedurally and substantively meritless.

First, the time for raising these issues has long since passed.  Defendants have been on

notice from the beginning of discovery that Plaintiffs sought ESI and they made no specific

objection to producing it. A responding party must identify the sources it is neither searching nor

9

producing with enough detail to "'enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources.'" *Star Direct Telecom, Inc. v. Glob. Crossing Bandwidth, Inc.*, 272 F.R.D. 350, 359 (W.D.N.Y. 2011) (quoting Fed. R. Civ. P. 26, advisory committee's note). Indeed, searches and production of ESI, including emails, are standard fare in federal discovery. *See Baker v. Gerould*, 2008 U.S. Dist. LEXIS 28628, at *5 (W.D.N.Y. Mar. 27, 2008) ("Potentially discoverable evidence, of course, includes electronically stored information, such as email communications between and among the parties.") (citing *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 317 (S.D.N.Y. 2003)); Fed. R. Civ. P. 26(b)(2)(B). The Local Rules plainly require search and production of ESI after receiving a request for production. *See* Local Civ. R. 26(e)(1).

Nor did Defendants raise these issues at the May 30 status conference.  To the contrary, Defendants stated at the conference that he "[didn't] see any issues" with the Court's protocol for ESI discovery.  Plaintiffs abided by the Court's directive and created a prioritized list of custodians and search terms meant to begin the process of identifying relevant and responsive emails. Defendants now appear to reject the Court's approach, based on their assertion that the format of the search terms and Plaintiffs' request for associated metadata renders the emails "not reasonably accessible."

A party's own technological limitations and/or unwillingness to undertake the most basic attempt at searching for ESI do not render e-mails "not reasonably accessible" or require cost-shifting to the requesting party. Holding otherwise would permit a party to avoid nearly all discovery obligations related to ESI simply by claiming ignorance of how to search for it. This is not how discovery works under the Federal Rules. *Hallmark v. Cohen & Slamowitz*, 307 F.R.D. 102, 105-06 (W.D.N.Y. Apr. 28, 2015) (citing *Brooks v. Macy's, Inc.*, 2011 U.S. Dist. LEXIS

48788, 2011 WL 1793345, at *4 (S.D.N.Y. May 6, 2011) ("[T]he burden that results from disorganized record-keeping does not excuse a party from producing relevant documents."); *Kozlowski v. Sears, Roebuck & Co.* 73 F.R.D. 73, 76 (D.Mass. 1976) ("To allow a defendant whose business generates massive records to frustrate discovery by creating an inadequate filing system, and then claiming undue burden, would defeat the purposes of the discovery rules."). Cost-shifting is "wholly inappropriate to even consider" when the requested data consists of accessible active and archived email files (not stored on back-up tapes), such as the files at issue here. *Zubulake*, 217 F.R.D. at 324. Defendants' purported difficulty in searching and retrieving files from Lotus Notes—their active system of record—is not Plaintiffs' responsibility. And Defendants have no excuse for not undertaking a search for emails of custodians employed by other City agencies that do not use Lotus Notes.

Further, Plaintiffs' request for metadata does not render the emails "not reasonably accessible." Indeed, metadata is typically produced with emails in order to make them reasonably usable, pursuant to Federal Rule of Civil Procedure 34(a)(3). The Federal Rules permit the requesting party to specify a form of production and request accompanying metadata, to which the responding party may object and state an alternative form. Fed. R. Civ. P. 34(b)(1)(C), (b)(2)(D). The rules require the responding party to "produce [ESI] in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms," yet they are not "free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation." Fed. R. Civ. P. 34(b)(2)(E)(ii), Committee Notes, 2006 Amendment. It is the metadata fields (such as "to, from, date sent, and date received") as well as the text of the document that enable a party to reasonably search

emails. *See*, *e.g.*, *Aguilar v. Immigration & Customs Enf't Div.*, 255 F.R.D. 350, 355 (S.D.N.Y. 2008) (producing ESI in a "reasonably usable form. . . will enable the receiving party to have the same ability to access, search, and display the information.").

Defendants' proposal—printing, and then scanning and bates-stamping responsive ESI (including emails)—would entirely strip the emails of usability and would not "preserve the integrity of the electronic document's contents." *See* Local Civ. R. 26(e)(5). For this reason, there is also "good cause" for the Court to order the production of metadata. *See* Local Civ. R. 26(e)(4); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2007 U.S. Dist. LEXIS 2650, at *10 (E.D.N.Y. Jan. 12, 2007) (holding that once plaintiffs objected to the print-scan production of ESI which stripped documents of metadata, defendants were required to produce ESI in its native format).

Nor can Defendants demonstrate that ESI cost-shifting is warranted under the seven-factor *Zubulake* test, which courts in this District apply. *Hallmark v. Cohen & Slamowitz*, 2016 U.S. Dist. LEXIS 37841, at *10 (W.D.N.Y. Mar. 23, 2016); *Zubulake*, 217 F.R.D. at 324. Under that test, the Court examines the following factors to determine whether to shift the costs of ESI production:

> 1. The extent to which the request is specifically tailored to discover relevant information; 2. The availability of such information from other sources; 3. The total cost of production, compared to the amount in controversy; 4. The total cost of production, compared to the resources available to each party; 5. The relative ability of each party to control costs and its incentive to do so; 6. The importance of the issues at stake in the litigation; and 7. The relative benefits to the parties of obtaining the information.

*Zubulake*, 217 F.R.D. at 323. Each factor weighs heavily in Plaintiffs' favor.

The first factor—the specific tailoring of the requests—strongly supports Plaintiffs. As explained above, the Court has already directed Plaintiffs to propose an initial set of search terms

and custodians designed to target ESI of highest relevance, and Plaintiffs did so.[3] Although Plaintiffs believe that additional terms beyond this first round of twenty will be necessary, Plaintiffs have carefully and narrowly drawn these initial terms to zero in on those concepts likely of central relevance to the parties' claims and defenses.

The second, sixth and seventh factors—the importance of the issues at stake, the relative benefits to the parties of obtaining the information, and the availability of the information from other sources—likewise strongly support Plaintiffs. This case raises sweeping claims of discrimination and improper and unconstitutional ticketing practices that have affected thousands of low-income people of color in Buffalo and continue to affect them every day. Plaintiffs expect email communications, particularly those between members of certain units of the BPD or between the BPD, the Mayor, and the BTVA, to reveal evidence centrally relevant to their assertions that Defendants have a policy and practice of unconstitutional policing. Defendants also undoubtedly have numerous electronic documents stored on computers and servers, such as internal memoranda, supporting documentation, drafts of policies and press releases. And these documents and communications are *only* available from Defendant through their electronic systems.

The remaining factors—focused on the relative costs of obtaining the information—support Plaintiffs. Defendants cannot meet their burden to show that the ESI sought by Plaintiffs is "not reasonably accessible because of undue burden or cost." *Baker*, 2008 U.S. Dist. LEXIS

---

[3] On June 5, Plaintiffs provided 20 search terms specifically designed for Relativity, the system used by Defendants' ESI vendor, but using standard Boolean terms that most systems can accommodate. Wilner Decl. ¶¶ 21-22, 25 & Ex. P. On February 4, however, Plaintiffs had previously provided a set of single-word search terms meant to be entered into a Microsoft Outlook search bar, which would be appropriate for any system that cannot accommodate Boolean searches. *Id.* ¶ 17 & Ex. J. Defendants have never even attempted to employ either set of search terms.

28628, *7; Fed. R. Civ. P. 26(b)(2)(B). Indeed, Defendants had advised the Court that they had "worked through" technological barriers to searching for ESI. Defendants have no evidentiary support for their boilerplate assertions of burden and cost.[4] *See Hallmark*, 2016 U.S. Dist. LEXIS 37841, at *12 (placing evidentiary burden on party resisting discovery to establish that files are inaccessible or that costs pose an undue burden); *Murray v. Coleman*, 2012 U.S. Dist. LEXIS 130219, at *4-5 (W.D.N.Y. Sep. 12, 2012) (requiring objecting party to file affidavit of person with knowledge of the document and email retention system). As for the relative burdens, however, Defendants are a major municipality and Plaintiffs are a class of low-income City residents. And as Defendants have sole control of access to the files, they are the party with the power and ability to control costs. *Id.* at *16.

Defendants have also not explained how their alternative proposal will be any less burdensome or costly. As far as Plaintiffs can surmise, Defendants intend to search each individual custodian's email client using unspecified "simpler" terms, printing responsive emails (rendering them unsearchable), and then scanning and bates stamping them. Retaining a vendor to pull and search all custodians at once from the back end is likely much less time consuming, and the additional costs of producing metadata using this method will be minimal.

Accordingly, Defendants have offered no valid explanation for their failure to abide by the Court's May 30 discovery directive. Plaintiffs respectfully request the Court enter an Order directing Defendants to comply with the Court's May 30 discovery directive and to comply with their obligations under the Federal Rules of Civil Procedure.

---

[4] Indeed, this Court cannot even assess the cost because Defendants have not done the most basic due diligence to determine what that cost would be. Even if there is some cost to Defendants, however, there is no basis for shifting it to Plaintiffs.

**B.  The Court Should Award Plaintiffs' Reasonable Expenses, Including Attorneys Fees, Associated with Bringing this Motion**

If a Court grants a motion to compel, Federal Rule of Civil Procedure 37(a)(5)(A) provides that, absent specific justifications, the Court "must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated" a motion to compel to "pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." *See Disabled Patriots of Am. v. Niagara Grp. Hotels, Ltd. Liab. Co.*, 2008 U.S. Dist. LEXIS 28031, at *7 (W.D.N.Y. Apr. 4, 2008)("[i]f a motion to compel is granted, the Court must award reasonable motion expenses, including attorney's fees, or, if relief is partially granted, apportion the reasonable expenses."). For the reasons stated above, Defendants cannot demonstrate that they were "substantially justified" in failing to search for and produce ESI, especially in light of this Court's May 30, 2019 directive and their ongoing representations to Plaintiffs and to the Court. *See* Fed. R. Civ. P. 37(a)(5)(A)(ii). Accordingly, Plaintiffs respectfully request that the Court issue an Order requiring Defendants to pay Plaintiffs' reasonable expenses, including attorney's fees, in making this motion.

**II.    Defendants Must Produce the Housing, Traffic Unit, and Strike Force Monthly and Daily Reports with Only the Redactions Proposed by Plaintiffs**

**A.  All of the Requested Monthly and Daily Reports Contain Information Relevant to Plaintiffs' Claims and Unavailable from Other Sources**

The requested Housing, Traffic Unit and Strike Force reports contain information that is highly relevant to Plaintiffs' claims.  First, the traffic enforcement activity data (numbers of vehicle impounds, traffic citations, traffic misdemeanor arrests, etc) relates directly to the factual allegations undergirding Plaintiffs' due process/revenue harvesting claim, including: (1) the Housing Unit and Strike Force, rather than the Traffic Unit, have been the primary drivers of the

15

large increases in the quantity of BPD traffic enforcement activity since 2013, *see* ECF No. 1 (Plaintiffs' Complaint) ¶¶ 91-93, and (2) traffic enforcement activity of the Housing Unit and Strike Force increased appreciably after July 1, 2015, when the City of Buffalo began adjudicating and keeping the revenue from traffic tickets issued by the BPD and using that revenue to pay overtime to Housing and Strike Force officers. *Id.* ¶¶ 104-10.

Relatedly, the Daily Reports' tabulations of each individual Housing, Strike Force, and Traffic Unit officer's numbers of traffic tickets, vehicle impounds, and other traffic enforcement actions—especially when those numbers are high and/or are significantly increased from the pre-July 1, 2015 period—could provide evidence of potential quotas or other forms of pressure or incentives imposed by BPD or City leadership on BPD officers to increase the quantity of their traffic enforcement activities, which would in turn support Plaintiffs' *Monell* Due Process/revenue harvesting claim against Defendant City of Buffalo. *See Floyd v. City of New York*, 959 F.Supp.2d 540, 590, 600-01 (S.D.N.Y 2013) (finding that monthly activity reports that tracked the enforcement activity numbers of individual New York police officers were evidence of the pressure imposed by the NYPD on its officers to increase their stop-and-frisk activity without regard for constitutionality, which was a basis for holding the City of New York liable for its officers' unconstitutional stops-and-frisks activity under *Monell*).

In addition, comparing the quantity of traffic enforcement activity of the Housing and Strike Force Units (whose primary mission is crime deterrence and who patrol almost exclusively in majority minority neighborhoods) with that of the Traffic Unit (whose primary mission is traffic safety) would help determine the extent to which BPD's checkpoint and other traffic enforcement efforts are motivated primarily by crime deterrence and are targeted at

communities of color.  These factual questions are highly relevant to Plaintiffs' Fourth

Amendment and Equal Protection claims. *See* Compl. ¶¶ 48-54, 58-63, 76-84.

Similarly, the Daily and Monthly Reports' narrative entries on the checkpoints, traffic

ticketing and other traffic enforcement activities conducted by Housing, Strike Force and Traffic

Units provide information about where and why officers engage in these activities, both of which

are factual questions central to Plaintiffs' Fourth Amendment, Equal Protection, and Due

Process/revenue harvesting claims.

The traffic enforcement statistics contained in these Daily and Monthly reports do not

duplicate any of the documents or data that Defendants or third parties have produced to

Plaintiffs. While Plaintiffs have received electronic data on all traffic tickets issued by the BPD

since 2011 from the Erie County Central Police Services (ECCPS), this data does not indicate the

specific BPD units of the officers who issued the tickets. Thus, Plaintiffs need the requested

reports to determine which tickets were issued by Housing Unit, Strike Force, and Traffic Unit

officers. Similarly, while the ECCPS data includes information on ticketing locations and the

Checkpoint tally sheets produced by Defendants indicate checkpoint locations, neither set of

materials provides the kind of narrative information found in the Monthly and Daily Reports

revealing the reasons that BPD selected those locations for checkpoint and other traffic

enforcement efforts. Finally, the Daily Reports do not duplicate the Monthly Reports because

only the former break down the traffic enforcement by individual officer, and the former often

contain narratives not found in the latter. *Compare* Wilner Decl. Ex. N *with* Ex. V.

### B. Defendants' Objections are Without Merit and/or Sufficiently Addressed by Plaintiffs' Proposed Redactions

Given the clear relevance of the information contained in the requested Daily and

Monthly Housing, Strike Force and Traffic Unit Reports and its unavailability from other

sources, Defendants must turn the Reports over unless they can provide specific facts supporting

a valid ground for objecting to their production. *See Gross. v. Lunduski*, 304 F.R.D. 136, 151

(W.D.N.Y. 2014); *Williams v. Swack*, 13-cv-00974, 2016 WL 3536574, *3 (W.D.N.Y. June 29,

2016). However, Defendants have not made and cannot make such a showing because all of their

asserted objections are inapplicable, unsupported by the record, and/or sufficiently addressed by

Plaintiffs' proposed redactions.

First, Plaintiffs' requests are not burdensome because the Monthly and Daily Reports are

stored in and retrievable from Defendants' electronic systems. In addition, Defendants'

vagueness objection is meritless given that Plaintiffs' document requests specifically refer to the

requested reports by the very names that appear on the faces of the reports themselves. And the

Daily and Monthly Housing, Strike Force, and Traffic Unit Reports are business records

admissible under Federal Rule of Evidence 803(6), belying Defendants' objection that Plaintiffs'

requests are not likely to result in production of admissible evidence.

The law enforcement privilege does not bar discovery of the checkpoint and other traffic

enforcement activity information contained in the requested Daily and Monthly Reports. The law

enforcement privilege is intended to "prevent disclosure of law enforcement techniques and

procedures, to preserve the confidentiality of sources, to protect witness and law enforcement

personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to

prevent interference with an investigation." *In re Dep't of Investigation of the City of N.Y.*, 865

F.2d 481, 484 (2d Cir. 1988); *In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010) (same).

"The privilege covers law enforcement techniques and protocols where disclosure may harm

current or future law enforcement efforts," and "[t]he party asserting the privilege is required to

make 'a substantial threshold showing[ ] that there are specific harms likely to accrue from

disclosure of the specific materials.'" *Arroyo v, City of Buffalo*, 15-cv-753A, 2018 WL 4376798, *5 (W.D.N.Y. Sep. 13, 2018).

Beyond their conclusory assertion of the privilege, Defendants have articulated no specific harms that could accrue from disclosure of the Daily and Monthly Reports to Plaintiffs. The confidentiality of sources and privacy and safety of suspects, arrestees, victims, witnesses and all other non-BPD personnel would be protected by the redactions Plaintiffs proposed. Moreover, this Court has already ruled that historical information on the locations of BPD checkpoints does not threaten officer safety or the effectiveness of future checkpoints, *see* Transcript of October 9, 2018 Video Conference, at 13-17, and the same would no doubt be true for historical information on other traffic enforcement activity (traffic stops, tickets, car impounds, traffic misdemeanor arrests) contained in the Daily and Monthly Reports. Unlike the undercover, internal governmental agency investigation, and other non-public-facing law enforcement activities that the courts of this Circuit have typically held are covered by the law enforcement privilege,[5] the historical information that Plaintiffs seek pertains exclusively to checkpoints and other routine and/or public-facing traffic enforcement activities, and its production will in no way "disclose secret law enforcement techniques or interfere with a particular investigation." *Floyd v. City of New York*, 08 Civ. 1034, 2008 WL 4179210, * 3 (Sep. 10, 2008) (holding that historical data on locations of pedestrian *Terry* stops conducted by New York police officers was not protected by law enforcement privilege because "stops and frisks routinely occur in public" and "[t]he individuals stopped and observers in the area already know

---

[5] *See, e.g.*, *Arroyo*, *supra* (executing search warrants in private homes); *In re City of N.Y.*, *supra* (undercover police investigations); *In re Dep't of Investigation*, *supra* (internal city government corruption investigation); *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 88, 81 (S.D.N.Y. 2000) (internal police officer disciplinary investigations).

the location of many of these stops.").

The deliberative process privilege also does not apply to the checkpoint and other traffic enforcement activity information contained in the Monthly and Daily Reports. In order to invoke the privilege, the document at issue must be both "predecisional" and "deliberative." *Hopkins v. U.S. Dep't of Housing & Urban Dev.*, 929 F.2d 81 (2d Cir. 1991). "Information is predecisional if it precedes, in temporal sequence, the decision to which it relates, rather than a postdecisional memorandum setting forth the reason for an agency decision already made." *Flaherty v. Giambra*, 02-cv-0243, 2004 WL 816906, * 1 (W.D.N.Y. Jan 27, 2004)(internal quotations omitted); *Citizens Against Casino Gambling in Erie Cty v. Stevens*, 814 F.Supp.2d 261, 267 (W.D.N.Y. 2011) (same). Documents are not deliberative if they contain "purely factual material," *Hopkins*, *supra*, at 85, "as opposed to opinions and recommendations." *Flaherty*, *supra*, at *1 (citing *Resolution Trust Corp. v. Diamond*, 137 F.R.D. 634, 641 (S.D.N.Y. 1991)). The Daily and Monthly Reports' summary statistics and narratives on where, when, and how often BPD officers conduct checkpoints, issue traffic tickets, or an engage in other traffic-enforcement activity on a given day or in a given month are purely factual and thus clearly not deliberative. Moreover, all of this information and even the narratives that provide reasons why certain locations were chosen or specific traffic enforcement actions were taken are historical, *i.e.*, they pertain to actions already taken by BPD personnel, and thus are by definition not predecisional.

Defendants' overbreadth objection is also unwarranted. "To be sustained, an objection based on overbreadth requires a showing that the interrogatory extends to information not relevant to the claims or defenses in the matter. *Arroyo* 2018 WL 4376798 at * 3 (internal citations omitted). As set forth above, all of the information in the Reports sought by Plaintiffs is

relevant both temporally and in terms of subject matter.  Plaintiffs have only requested Daily and

Monthly Reports from 2013 to the present, which is within the time period in which the events

giving rise to Plaintiffs claims have taken place, *see* Compl. ¶¶ 29-228.[6]  Plaintiffs would accept

redactions of all portions of the Reports unrelated to checkpoints or traffic enforcement.

Defendants' remaining objections to disclosing "information which may be sealed"[7] or otherwise

confidential are likewise addressed by the redactions to which Plaintiffs have already agreed.

    In sum, Defendants have failed to establish any valid basis for objecting to producing the

Daily and Monthly Housing, Strike Force, and Traffic Unit Reports to Plaintiffs.

**III.    This Court Should Compel Defendants to Answer Plaintiffs' Interrogatory Seeking Relevant Dates of Employment of Strike Force and Housing Unit Personnel or to Produce Documents Sufficient to Show this Information.**

    As explained *supra*, Interrogatory 1 asked Defendants to identify each person employed

in the BPD's Strike Force and Housing Units, and to provide their "Employment History."

Wilner Decl. ¶ 49, Ex. C. After initially refusing to answer, Defendants have provided limited

information, such as the date that each person retired from or left the employment of BPD (if

applicable). Wilner Decl. ¶ 49, Ex. D. Plaintiffs seek the specific dates of employment of each

Strike Force and Housing Unit officer so that they can conduct a statistical analysis of BPD

ticketing data obtained from ECCPS. This ticketing data identifies each ticket issued by the BPD

and the officer that wrote the ticket, but it does not reliably identify the officer's unit. Because

Plaintiffs allege that specific units within BPD have engaged in certain unconstitutional

---

[6] Because Plaintiffs are seeking prospective injunctive relief in this case, evidence of BPD's
current checkpoint and other traffic enforcement practices, as reflected in Monthly and Daily
Reports from the current year, are relevant and thus discoverable.

[7] This objection appears to refer the New York State law prohibition on public disclosure of
police records related to criminal cases that are dismissed or otherwise terminated in favor of the
accused. *See* N.Y. CPL § 160.50(1)(c).

behaviors—such as illegal operation of vehicle checkpoints and ticketing that violates Due Process and Equal Protection—they require information sufficient to identify the dates that each officer listed in the ticketing data was a member of those units.

Defendants have objected to supplementing their answering to this interrogatory, stating that the BPD's personnel database does not record the dates that officers have been assigned to particular units within the BPD. Wilner Decl. ¶ 51. Defendants have admitted that they can retrieve each officer's start date within a BPD unit from review of Special Orders documenting officer transfers *into* a particular unit. Wilner Decl. ¶ 51. Based on this representation, Plaintiffs requested that Defendants either use this information to supplement their interrogatory response or provide to Plaintiffs each Special Order for the Strike Force and Housing Units, and for all units for the time period immediately following the dissolution of the Strike Force, so that Plaintiffs can identify when each officer formed part of those units. Wilner Decl. ¶ 52.

Defendants have no reasonable grounds for refusing to provide this information. Defendants have already identified a reasonable method for obtaining the requested information. Requiring Defendants to supplement their answer or produce the identified Special Orders will cause minimal burden and is extremely important to Plaintiffs. Accordingly, Plaintiffs respectfully request that the Court order Defendants to provide the requested information.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court issue an Order compelling Defendants (1) to comply with the Court's May 30 directive that Defendants begin searching for and producing ESI immediately; (2) to produce all Housing, Strike Force, and Traffic Unit Daily and Monthly Statistics Reports from 2013 to the present with only the redactions proposed by Plaintiffs; and (3) to supplement their response to Plaintiffs' interrogatory seeking relevant dates of employment of Strike Force and Housing Unit personnel

22

or provide the requested Special Orders.  Plaintiffs further request that the Court grant them an award of reasonable expenses, including attorney's fees, associated with Plaintiffs' making this motion pursuant to Federal Rule of Civil Procedure 37(a)(5)(A).

/s/ Keisha A. Williams
Joseph Keleman
Keisha Williams
WESTERN NEW YORK LAW CENTER
Main Seneca Building
237 Main Street, Suite 1130
Buffalo, NY 14203
Tel: (716) 828-8415
Fax: (716) 270-4005
jkeleman@wnylc.com
kwilliams@wnylc.com

/s/ Claudia Wilner
Claudia Wilner
Travis W. England*
Britney Wilson*
NATIONAL CENTER FOR LAW
AND ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
wilner@nclej.org
england@nclej.org
wilson@nclej.org

/s/ Darius Charney
Darius Charney
Chinyere Ezie
Brittany Thomas*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
212-614-6439
DCharney@ccrjustice.org
CEzie@ccrjustice.org
BThomas@ccrjustice.org

 * Application for admission forthcoming.