UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
BLACK LOVE RESISTS IN THE RUST, et al.,

                      *Plaintiffs,*

                      Case No. 1:18-cv-719

- vs -

CITY OF BUFFALO, N.Y., et al.,

                      *Defendants*.
---------------------------------------------------------------x

**DECLARATION OF CLAUDIA WILNER IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DEFENDANTS TO COMPLY WITH COURT'S MAY 30, 2019 DISCOVERY ORDER AND OTHER DISCOVERY OBLIGATIONS**

I, Claudia Wilner, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am a Senior Attorney at the National Center for Law and Economic Justice (NCLEJ). I am one of the attorneys representing Plaintiffs and the proposed classes in this action. I am fully familiar with the facts stated in this Declaration.

2. I am an attorney admitted to the Western District of New York.

3. I submit this Declaration in support of Plaintiffs Motion to Compel Defendants to comply with the Court's May 30 discovery Order and with other discovery obligations about which the parties have reached an impasse.

4. Discovery in this action commenced in November 2018, when Plaintiffs served their First Requests for Production of Documents, followed by their Second Requests in April 2019. The Requests seek documents and Electronically Stored Information (ESI) pertaining to Defendants' customs, policies and practices, including Defendants' enforcement of New York's Vehicle and Traffic Law and their operation of vehicle checkpoints. Ex. A and B.

5.     Since November 2018, I have had at least 14 telephone conferences with Rob Quinn, counsel for Defendants, regarding the scope and method of searching for ESI, as well as other discovery matters. Other counsel for Plaintiffs have joined these conversations, including Travis England and Britney Wilson (also with NCLEJ) and Darius Charney and Chinyere Ezie (with the Center for Constitutional Rights). The parties have also exchanged numerous emails. I was personally involved in every conference discussed in this declaration, and I either sent or received every letter and email attached as an exhibit.

**Defendants' Failure to Produce ESI**

6.     On November 8, 2018, shortly after serving the first set of Requests, Plaintiffs attempted to confer with Mr. Quinn about his plans for searching and producing ESI. Plaintiffs thereafter proposed that the parties enter into a stipulation governing the format of ESI production—producing emails as native files (.msg) and PDFs of most other documents. Ex. E (Nov. 15, 2019 email from T. England to R. Quinn).

7.     Mr. Quinn did not agree to this approach, refused to enter into any stipulation, did not offer a counter-proposal, and stated that Plaintiffs should wait to see his production before conferring further.

8.     On December 5, 2018, Defendants responded to the Requests but produced very few documents and no ESI.

9.     On December 14 and 19, the parties conferred, and Mr. Quinn represented that he would begin searching for ESI and expected to make a supplemental production in January 2019.

10.    On December 21, 2019, the court held a status conference at which plaintiffs raised Defendants' failure to produce discovery. The court declined to intervene at that time but

directed the parties to contact the court within 30 days regarding issues that could not be resolved. Dkt. 18.

11. On January 4, 2019, the parties conferred again, and Mr. Quinn advised that a search for ESI was underway but provided no timetable for production.

12. On January 18, Plaintiffs wrote to Mr. Quinn concerning Defendants' ongoing failure to produce ESI, among other things. Ex. G (Jan. 18, 2019 letter from C. Wilner to R. Quinn).

13. On January 21, Mr. Quinn stated that he had asked each named Defendant and four other identified custodians to "search all records for this information specifically including databases, computer files, paper files, and emails." Mr. Quinn further stated that the Defendants had employed and intended to employ only four search terms: "Checkpoints," "check points," "strike force," and "housing." Mr. Quinn characterized this limited search as a "substantial and time-consuming endeavor." Ex. H (Jan. 21, 2019 email from R. Quinn to C. Wilner). Mr. Quinn never produced any results from this alleged search.

14. On January 28, Plaintiffs wrote to Mr. Quinn to state their expectations about the format of production of ESI. Ex. I (Jan. 28, 2019 email from C. Wilner to R. Quinn).

15. On January 29, as reflected in Plaintiffs' status update to the court, the parties conferred and agreed on a schedule for ESI production: Plaintiffs would send an email requesting additional search terms and custodians, and Defendants would produce ESI within thirty days. Dkt. 21.

16. During this conversation, Mr. Quinn represented that the City of Buffalo, including the BPD, used Microsoft Outlook as its email client. Mr. Quinn stated that he intended to search by inputting single words into the Outlook search bar. Mr. Quinn further stated that

3

because he did not have the technological capacity to print emails directly to searchable PDF, which would preserve their metadata, he intended to print them to paper and scan them. Plaintiffs objected to this approach and stated that they would provide direction as to an acceptable format for production within the City's technological limitations.

17. On February 4, Plaintiffs wrote to propose additional custodians and search terms and provide instructions for the format of production. Mr. Quinn did not respond to this proposal, nor did he respond to follow-up emails on February 12 and 27. Ex. J (Feb. 4-12, 2019 email chain from C. Wilner to R. Quinn); Ex. K (Feb. 27 email from C. Wilner to R. Quinn).

18. On March 6—four months after receipt of the first set of Requests—Mr. Quinn informed Plaintiffs **for the first time** that he could not search for responsive ESI because the Buffalo Police Department (BPD) used Lotus Notes instead Microsoft Outlook. Ex. L (Mar. 6, 2019 email from R. Quinn to C. Wilner). When asked why it had taken him so long to discover that BPD used Lotus Notes instead of Outlook, Mr. Quinn admitted that he had assumed, without checking, that BPD used the same system that he and other City agencies used.

19. On a subsequent conference call on March 8, Mr. Quinn stated that Defendants did not know how to conduct a comprehensive search of Lotus Notes, could not produce metadata affiliated with emails, and could not produce native files. Mr. Quinn offered no explanation as to why he had previously characterized his search for ESI as "substantial" and "time-consuming" when, in fact, it had not even begun. Ex. M (Mar. 18, 2019 letter from C. Wilner to R. Quinn).

20. Mr. Quinn has never explained why the BPD's use of Lotus Notes impairs Defendants' ability to retrieve responsive emails from other city agencies, such as the Mayor's office or the Buffalo Traffic Violations Agency, which Plaintiffs understand to use Outlook.

21. During the two months of conferrals following this revelation (on March 22, March 29, April 12 and April 30), Mr. Quinn informed Plaintiffs that the City intended to retain, and then that the City had retained, an ESI vendor to handle the collection and production of ESI. Plaintiffs requested Mr. Quinn to provide more information regarding the vendor's search and collection capabilities so that Plaintiffs' could provide input on search methodology, but Mr. Quinn only disclosed the name of the vendor and that the vendor utilized Relativity, a commonly used platform for the collection, review, and production of ESI.

22. During these conferrals, Mr. Quinn requested that Plaintiffs provide a list of proposed custodians and search terms, which Plaintiffs did on May 6. Plaintiffs' proposed search terms used standard Boolean operators (*e.g.* or, and, not), as well as standard truncation symbols (*e.g.* *, !) in order to ensure that the terms capture documents relevant to the Parties' claims and defenses, and avoid duplication. Ex. O, (May 6, 2019 email from T. England to R. Quinn). Defendants did not respond to Plaintiffs' proposal.

23. Because of Defendants' failure to agree to any methodology, scope, or timeline to produce ESI, Plaintiffs requested the Court schedule a status conference regarding Defendants' production of ESI and certain other discovery and schedule-related matters. Dkt. 22.

24. On May 30, 2019, the Court held a status conference on these issues. During that conference, the Court directed that Plaintiffs provide twenty custodians and twenty search terms to Defendants and for Defendants to commence a rolling production within two weeks of receipt of those search terms. Tr. 7:17-25-8:1-10.

25. On June 5, 2019, Plaintiffs provided twenty custodians and twenty search terms, along with a copy of the Relativity instruction manual they had used to construct the search terms. Ex. P, (Jun. 5, 2019 email from C. Wilner to R. Quinn).

26. Defendants did not respond and did not produce any ESI.

27. Plaintiffs thereafter wrote to Defendants on June 20, 2019, requesting a conferral regarding Defendants' failure to produce ESI in accordance with the Court's May 30 directive. Ex. R, (Jun. 20, 2019 letter from C. Wilner to R. Quinn, at 1).

28. Mr. Quinn responded by email, requesting that the parties "discuss local rule 26 as it pertains to e-discovery, costs, and language of requests, among other things." Ex. S, (Jun. 21, 2019 email from R. Quinn to C. Wilner).

29. On June 24, the parties conferred. Mr. Quinn stated that he did not attempt to search for ESI because (1) Plaintiffs' proposed search terms were "confusing," (2) the BPD email system would not be able to utilize these search terms, and (3) Plaintiffs' request for metadata affiliated with the ESI would require the use of a vendor. According to Defendants' counsel, these difficulties rendered the emails "not reasonably accessible" and required the parties to discuss "cost-shifting" under the local rules.

30. When pressed by Plaintiffs' counsel to specify the purported costs of running searches, Defendants' counsel admitted that he did not know because he did not provide Plaintiffs' list of custodians and search terms to the ESI vendor.

31. Plaintiffs accordingly advised Defendants that they intended to seek formal judicial intervention based on Defendants' failure to abide by this Court's May 30 directive.

**Defendants' Refusal to Produce Statistical Reports**

32. Requests 10-15 seek production of Daily and Monthly Statistical Reports of the Strike Force, Housing Unit, and Traffic Enforcement Division. Ex. A at pp. 8-11.

33. Defendants produced the Housing Unit Monthly Reports, which they had already provided to NCLEJ pursuant to a pre-litigation FOIL request and which were redacted only to

remove information about ongoing investigations and the personal identifying information of non-BPD personnel. Ex. V (Housing Unit Monthly Report for Dec. 2016). ( Defendants objected to producing all the other reports on the grounds that the Requests were "overly broad, burdensome, vague, is not likely to result in the production of admissible evidence, and seeks information protected by the deliberative process privilege, and which may be sealed, part of an ongoing investigations [*sic*], sealed [*sic*], and/or subject to other confidentiality concerns." *Id.*

34. To address confidentiality concerns, Plaintiffs have repeatedly suggested that the parties enter into a confidentiality order that would protect the personal identifying information of individuals, *e.g.* Ex. E; Ex. G at 9, but Defendants have rejected this proposal.

35. The parties first conferred about the production of the reports on December 19, 2018. During this conversation, Mr. Quinn stated that he did not know of any reports other than the Monthly Housing Reports.

36. Plaintiffs subsequently provided Mr. Quinn with a copy of a Housing Unit Daily Report and stated their belief that other units of the BPD issued similar daily and monthly reports. Mr. Quinn responded that he would search for responsive documents. Ex. F (Jan. 3, 2019 email from C. Wilner to R. Quinn).

37. On January 4, 2019, the parties conferred by telephone. Mr. Quinn stated that he was still searching for responsive documents, but that to the extent he found them, he would produce them.

38. On January 18 and 28, Plaintiffs wrote to Mr. Quinn seeking an update on the status of his search. Ex. G at 6; Ex. I.

39. On January 29, 2019, the parties conferred. Mr. Quinn stated that he had confirmed that the Housing Unit and Strike Force Unit each issued daily reports, which the BPD

7

stored electronically and would produce as ESI. Mr. Quinn further stated that he had not located Strike Force monthly reports and was not certain whether the Traffic Unit issued reports. Following this conversation, on February 4, 12 and 27, Plaintiffs attempted to confirm that Mr. Quinn would produce the Strike Force, Housing Unit, and Traffic Unit reports as part of his first tranche of ESI production. Ex. J & K. Mr. Quinn did not respond to these communications.

40. On March 6, Mr. Quinn advised that he could not produce the Daily Reports in electronic form because they were stored in Lotus Notes. Ex. L. Mr. Quinn further stated that he had been able to find certain of the forms in a paper format, but that they would require "heavy redaction" and had been printed in such a manner as to render them partly illegible. *Id.*

41. The parties conferred on March 8, and Plaintiffs subsequently proposed that Defendants produce a sample of 10 each Housing Unit and Strike Force Daily Reports so that the parties could reach agreement on the appropriate level of redaction. Ex. M. In a subsequent conferral on March 22, Mr. Quinn agreed to this proposal and admitted that there could be Strike Force monthly reports in Lotus Notes that he had not yet located. On March 25, Mr. Quinn provided redacted examples of the Strike Force and Housing Unit daily reports. Ex. N (Mar. 25, 2019 email from R. Quinn to T. England & selected attachments).

42. On March 29, the parties conferred regarding the appropriate level of redaction but did not reach agreement.

43. On April 12, the parties conferred again. Mr. Quinn stated that he did not yet have a position on the redaction issue, but that he would send us an email stating his position the following Monday. He never did.

44. On May 29, Plaintiffs raised the redaction issue in their motion to this Court. Dkt. 23 at 8.

45. The parties discussed the Daily Reports briefly at the May 30 conference, during which Mr. Quinn stated for the first time that he had additional objections to producing the statistical reports, beyond the redaction issue. Tr. 27:13-25.

46. On June 6 and 11, Plaintiffs requested to confer on this issue, but Mr. Quinn did not respond to the requests. Ex. Q (June 6-11, 2019 email chain from C. Wilner to R. Quinn).

47. On June 20, Plaintiffs wrote to Mr. Quinn to clarify their current position on the Strike Force, Housing Unit, and Traffic Unit monthly reports. Ex. R (June 20, 2019, letter from C. Wilner to R. Quinn).

48. On June 24, the parties conferred, and Mr. Quinn agreed that if the parties could resolve the redaction issue, he would produce the statistical reports despite his other objections. Plaintiffs then wrote to Mr. Quinn to reiterate their position on redactions and asked Mr. Quinn to respond in writing. On July 7, Mr. Quinn responded with a proposal for very limited production under which he would redact large portions of the documents for relevance and provide only very limited agreed categories of information. On July 9, in an effort to reach resolution and avoid involving the Court, Plaintiffs proposed that Defendants redact all non-traffic and non-checkpoint related information from the Daily Reports. Mr. Quinn did not agree to this proposal and offered no counter-proposal. Ex. T (June 27-July 9, 2019 email chain between D. Charney and R. Quinn). The parties are now at an impasse.

**Defendants' Refusal to Supplement Their Answer to Interrogatory 1, Seeking "Employment History" of Housing Unit and Strike Force Officers**

49. Interrogatory 1 seeks "Employment History" of Housing Unit and Strike Force officers. "Employment History" is a defined term that means a "person's date of hire; the names and dates of all positions held; the date and basis of any discipline received; and the date and

9

basis of their separation (where applicable)." Ex. C (excerpt of Plaintiff Black Love Resists' First Set of Interrogatories to Defendant City of Buffalo).

50. Defendants initially refused to answer this Interrogatory at all, but subsequently supplemented their response to provide some, but not all, of the requested information. Ex. D (excerpt of First Supplemental Responses to Plaintiffs' First Set of Requests for Production to Defendant City of Buffalo, N.Y.)

51. On June 20, 2019, Plaintiffs advised Mr. Quinn that in order to perform a statistical analysis of the BPD's ticketing patterns, they needed to be able to identify whether tickets were issued by Housing Unit or Strike Force officers. This in turn would require Defendants to identify the specific time period during which BPD officers worked for the Housing Unit and/or Strike Force. Ex. R.

52. The parties conferred on June 24, and Mr. Quinn subsequently explained that BPD maintained Special Orders documenting officer transfers *into* a particular unit, but no corresponding order when an officer transferred *out of* a particular unit. Mr. Quinn therefore refused to supplement Defendants' answer to the Interrogatory. Ex. U (July 3-8, 2019 email chain between R. Quinn and C. Wilner).

53. Plaintiffs proposed that, in lieu of supplementing their answer, Defendants produce the Special Orders documenting (a) all transfers into the Strike Force and Housing Unit; and (b) all transfers for the period immediately following the dissolution of the Strike Force. Mr. Quinn offered no substantive response to this proposal. *Id*.

54. The requested transfer orders would provide nearly all of the information required for this aspect of Plaintiffs' statistical analysis, and any additional follow-up needed would be narrowly defined and not burdensome.

Dated: July 24, 2019.

/s/ Claudia Wilner
Claudia Wilner