UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLACK LOVE RESISTS IN )<br>THE RUST, by and through its )<br>Co-Directors Natasha Soto and )<br>Shaketa Redden and on behalf of )<br>its members; DORETHEA FRANKLIN, )<br>TANIQUA SIMMONS, )<br>DE'JON HALL, and JANE DOE, )<br>individually and on behalf of a class )<br>of all others similarly situated, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>CITY OF BUFFALO, N.Y.; BYRON )<br>B. BROWN, Mayor of the City of )<br>Buffalo, in his individual and official )<br>capacities; BYRON C. LOCKWOOD, )<br>Commissioner of the Buffalo Police )<br>Department, in his individual and )<br>official capacities; DANIEL DERENDA,)<br>former Commissioner of the Buffalo )<br>Police Department, in his individual )<br>capacity; AARON YOUNG, KEVIN )<br>BRINKWORTH, PHILIP SERAFINI, )<br>ROBBIN THOMAS, UNKNOWN )<br>SUPERVISORY PERSONNEL 1-10, )<br>UNKNOWN OFFICERS 1-20, )<br>each officers of the Buffalo Police )<br>Department, in their individual )<br>capacities, )<br>)<br>Defendants. ) | Case No. 1:18-cv-719 |

**OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTIONS TO COMPEL
(Docs. 34 and 42)**

In June 2018, Black Love Resists In the Rust and four individuals brought this suit on behalf of the organization, its members, and a purported class of similarly situated individuals (collectively, "Plaintiffs") against the City of Buffalo (the "City"); Buffalo Mayor Byron Brown; current Buffalo Police Department ("BPD") Commissioner Byron Lockwood, individually and in his official capacity; former BPD Commissioner Daniel Derenda, individually; and named and unnamed BPD officers and supervisors (collectively, "Defendants"). Before the court are two motions to compel (Docs. 34 and 42) filed by Plaintiffs seeking the production of documents by the City and the BPD related to BPD traffic checkpoints; racial profiling, bias, and discrimination by the BPD; and BPD traffic stops, traffic ticketing, and other traffic enforcement practices.

Plaintiffs are represented by Andrea C. Ezie, Esq., Baher Azmy, Esq., Britney R. Wilson, Esq., Claudia Wilner, Esq., Darius Charney, Esq., Edward Krugman, Esq., Joseph A. Kelemen, Esq., Keisha A. Williams, Esq., Marc Cohan, Esq., and Travis W. England, Esq. Defendants are represented by Robert E. Quinn, Esq.

I.      **Factual and Procedural Background.**

A.      **The Complaint's Allegations.**

The Complaint alleges that Defendants violated Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution and discriminated against them on the basis of their race or ethnicity. Plaintiffs allege that for the past approximately seven years, the City and the BPD conducted vehicle checkpoints at which members of the BPD "Strike Force" stopped and searched drivers "without any individualized suspicion of wrongdoing." (Doc. 1 at 2, ¶ 3.) The Complaint includes statistics purporting to demonstrate that most of the checkpoints were located in areas of the City with a majority of Black and Latino residents. Plaintiffs further allege the Strike Force worked in conjunction with the BPD Housing Unit to conduct checkpoints near certain public housing complexes with predominantly Black and Latino residents.

Plaintiffs contend that the checkpoint program, along with citywide traffic enforcement practices, led to the disproportionate and sometimes pretextual issuance of traffic tickets to Black and Latino City residents. In 2012, the year the checkpoint

2

program commenced, Plaintiffs allege that the number of traffic violations ticketed in the City increased dramatically and that one of the objectives of increased enforcement was to generate revenue for the City.[1] The checkpoint program also allegedly resulted in an increase in the number of vehicles towed, with a corresponding increase in impound-lot revenue. Plaintiffs allege that the BPD's ticketing and towing practices compound racial and economic inequality, forcing Black and Latino residents who are ticketed at disproportionate rates to choose between paying "frequently substantial fines[,]" *id.* at 4, ¶ 7, or having their driver's licenses suspended, which in turn prevents them from traveling for work or education. According to Plaintiffs, statistical analysis suggests that the checkpoints were not located or conducted to promote traffic safety.

Plaintiffs allege the checkpoint program has been publicly discussed in the City for the last several years, including in the 2017 Democratic mayoral primary race. In July 2017, the City's Common Council[2] passed a resolution expressing concern about the checkpoint program and requesting related BPD data. The State's Attorney General opened an investigation into the checkpoint program in December 2017. In February 2018, the Strike Force was disbanded. However, Plaintiffs allege that the checkpoint program continued through at least April 2018.

Plaintiffs bring individual claims and seek to bring class action claims on behalf of three putative classes. The first putative class is "[a]ll individuals who have been or will be subjected by BPD to 'traffic safety' vehicle Checkpoints[,]" with a proposed subclass consisting of all non-White individuals within the broader class. *Id.* at 39, ¶¶ 230-231. The second putative class is "[a]ll non-White individuals who have received or will receive traffic tickets issued by the BPD." *Id.* at 41, ¶ 237. The third putative class is "[a]ll individuals who within the last three years have received a ticket, been arrested, or

---

[1] In 2014, the City also reached an agreement with the State of New York (the "State") that permitted the City to retain certain traffic ticket revenues previously collected by the State.

[2] The Buffalo Common Council is the City's legislative body, comprised of nine council members elected from nine council districts by popular vote.

had their cars towed and/or impounded at a BPD 'traffic safety' vehicle Checkpoint[,]"
including a proposed subclass of all Black or Latin individuals. *Id.*

The Complaint alleges that Defendants violated the individual Plaintiffs' and the
putative class members' rights under the Fourth Amendment by conducting unreasonable
searches and seizures (First Claim for Relief); to equal protection under the Fourteenth
Amendment (Second Claim for Relief); to substantive due process of law under the
Fourteenth Amendment (Third Claim for Relief); and to freedom from discrimination
based on race, color, or national origin in programs receiving federal assistance under
Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) (Fourth Claim for Relief).

Plaintiffs seek class certification, a declaratory judgment that Defendants have
violated Plaintiffs' and class members' constitutional rights, preliminary and permanent
injunctions prohibiting the checkpoint program, compensatory damages, and attorney's
fees and costs pursuant to 42 U.S.C. §§ 1920 and 1988.

**B.    BPD Discovery and Electronically Stored Information ("ESI").**

On May 30, 2019, the court held a status conference to address a dispute regarding
the scope of discovery. Pursuant to the court's instructions, on June 5, 2019, Plaintiffs
provided Defendants with a list of twenty custodians and twenty search terms to prioritize
in ESI discovery. Based on Defendants' representation that they had retained an ESI
vendor that uses the Relativity platform, Plaintiffs chose search terms with standard
Boolean operators and standard truncation symbols. Defendants did not produce any
responsive ESI documents but instead objected on the grounds that Plaintiffs' search
terms were "confusing" (Doc. 34-1 at 7) and could not be utilized on the BPD email
system.

On July 24, 2019 Plaintiffs moved to compel discovery. (Doc. 34.) In their ESI
and BPD motion, Plaintiffs requested a court order requiring Defendants to: (1) produce
ESI discovery from all Defendants, including the BPD; (2) produce monthly and daily
reports from BPD's Housing, Strike Force, and Traffic Units (the "Reports"); and (3)
supplement its response to Plaintiffs' Interrogatory 1 by providing the dates of BPD
officers' employment in the Strike Force and Housing Units. Plaintiffs seek information

in databases and computer files as PDF files with metadata and emails in native (.msg) format.

With regard to the Reports, the parties have been unable to agree on acceptable redactions. In response to Plaintiffs' motion, Defendants object to production of the Reports on the basis that the request is overbroad, unduly burdensome, not reasonably calculated to lead to discoverable materials, and may contain confidential information regarding criminal complainants, suspects, and police procedures. Defendants further assert that the information in the Reports is either redundant or cumulative of information already obtained by Plaintiffs. Defendants asked the court to consider cost-shifting if it orders the production of the ESI sought by Plaintiffs.

As for Interrogatory 1, Defendants initially represented that they were unable to provide additional employment history information for the officers because the BPD does not record when an officer transfers out of a particular unit. However, Defendants produced certain documents reflecting officer transfers on August 20, 2019. *See* Doc. 41 at 9. Plaintiffs are reviewing Defendants' August 20, 2019 production and "will advise whether any further dispute remains." *Id.*

## C. Internal Affairs Division ("IAD") Discovery.

Plaintiffs maintain that the BPD's IAD files reflecting citizen complaints concerning BPD practices are relevant to their claim that the BPD had notice of its officers' allegedly unconstitutional behavior. In accordance with the court's instructions at the May 30, 2019 status conference, on June 27, 2019, Plaintiffs provided Defendants with ten initial search terms for IAD records followed by amended search terms on July 12, 2019. Based on a review of summary information provided as a result of the search terms, on July 24, 2019, Plaintiffs requested that Defendants produce 168 IAD files in full. On July 29, 2019, Defendants objected to producing the files because some records were beyond the scope of the Complaint while others concerned misconduct complaints that were "not sustained" after investigation. (Doc. 42-10 at 3.) Defendants further claimed that New York Civil Rights Law § 50-a ("Section 50-a") prohibited disclosure of some of the records' contents. On August 30, 2019, Plaintiffs moved to compel

production of the IAD records, asking the court to order production of all 168 files or, in the alternative, to review the files *in camera* and direct the production of relevant materials. (Doc. 42.)

## II.  Conclusions of Law and Analysis.

In civil litigation, parties are entitled to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." *S.E.C. v. Rajaratnam*, 622 F.3d 159, 181 (2d Cir. 2010) (quoting Fed. R. Civ. P. 26(b)(1)). Relevant information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

"[A]s in all matters relating to discovery, the district court has broad discretion to limit discovery in a prudential and proportionate way." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012). "Discovery rules are to be accorded a broad and liberal treatment . . . to effectuate their purpose that civil trials in the federal courts no longer need be carried on in the dark." *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003) (internal quotation marks omitted). "Moreover, the rules generally do not place any initial burden on parties to justify their . . . discovery requests." *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 (2d Cir. 2003). Nonetheless,

> [A] district court [may] limit [t]he frequency or extent of use of the discovery methods otherwise permitted under [the federal] rules if it determines that (1) the discovery sought is unreasonably cumulative or duplicative, or more readily obtainable from another source; (2) the party seeking discovery already has had ample opportunity to obtain the information sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit.

*Id.* (citing Fed. R. Civ. P. 26(b)(2)) (internal quotation marks omitted). In addition, "[t]he party seeking discovery bears the initial burden of proving the discovery is relevant, and then the party withholding discovery on the grounds of burden [or] expense . . . bears the burden of proving the discovery is in fact . . . unduly burdensome and/or expensive." *Citizens Union of New York v. Attorney General of New York*, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017).

## A.    Whether Defendants Must Produce the Requested ESI.

Defendants object that the email ESI Plaintiffs seek is not reasonably accessible because it would require custodians to manually search their accounts and print responsive documents.  They note that the BPD has approximately 850 employees which apparently demonstrates the burden of conducting ESI searches.  (*See* Doc. 40 at 6, ¶ 32.) However, Plaintiffs provided Defendants with a list of twenty priority custodians pursuant to the court's May 30, 2019 instructions, and the total number of BPD employees is not relevant to the burden of completing a narrow initial ESI production. Defendants further represent that their email systems (LotusNotes for the BPD and Microsoft Exchange for the City) cannot accommodate search terms more complex than "one word or a phrase in parenthes[e]s." *Id.* at 5, ¶ 29.  According to Defendants, preliminary estimated costs for the services of an e-discovery vendor to assist with the search of data for twenty custodians are between $8,175.00 and $10,075.00, subject to potential additional expenses for processing, hosting, and storage.

Defendants further assert that Plaintiffs have not shown good cause to require the production of metadata in accordance with Local Civil Rule 26(e)(4), which provides that "[e]xcept as otherwise provided, metadata, especially substantive metadata,[3] need not be routinely produced, except upon agreement of the requesting and producing litigants, or upon a showing of good cause in a motion filed by the requesting party."  Plaintiffs counter that they require system metadata for ESI to conduct their own searches effectively.  Plaintiffs further assert that Defendants are obligated by Fed. R. Civ. P. 34(b)(2)(E) to produce ESI "as [it is] kept in the usual course of business[,]" "in a

---

[3] "Substantive metadata . . . is created as a function of the application software used to create the document or file and reflects substantive changes made by the user.  This category of metadata reflects modifications to a document, such as prior edits or editorial comments[.]" *Aguilar v. Immigration & Customs Enforcement Div. of U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350, 354 (S.D.N.Y. 2008) (internal quotation marks and citation omitted).  System metadata "include[s] data concerning the author, date and time of creation, and the date a document was modified. . . . This type of metadata also makes electronic documents more functional because it significantly improves a party's ability to access, search, and sort large numbers of documents efficiently" *Id.* (internal quotation marks and citation omitted).  Plaintiffs appear to request system metadata "such as 'to, from, date sent, and date received[.]'" (Doc. 34-1 at 13.)

form . . . in which it is ordinarily maintained or in a reasonably usable form[,]" which, they argue, would include metadata.

Generally, a party is not required to produce ESI from sources "'that the party identifies as not reasonably accessible because of undue burden or cost.'" *Star Direct Telecom, Inc. v. Glob. Crossing Bandwidth, Inc.*, 272 F.R.D. 350, 358 (W.D.N.Y. 2011) (quoting Fed. R. Civ. P. 26(b)(2)(B)). The Federal Rules of Civil Procedure further specify that:

> On motion to compel discovery . . . the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C).

Fed. R. Civ. P. 26(b)(2)(B); *see Stinson v. City of New York*, 2015 WL 4610422, at *4 (S.D.N.Y. July 23, 2015) ("When determining a motion to compel the production of ESI, a district court conducts a two-stage inquiry: first, has the party resisting discovery shown that the information in question is not *reasonably* accessible because of *undue* cost, and second, has the party requesting discovery nonetheless shown good cause to obtain it?") (emphasis in original). To determine if the requesting party has shown good cause, the court must consider

> whether (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

*Capitol Records, Inc. v. MP3tunes, LLC*, 261 F.R.D. 44, 51 (S.D.N.Y. 2009) (internal quotation marks omitted) (citing Fed. R. Civ. P. 26(b)(2)).

As Plaintiffs point out, at least some of the information they seek appears to reside on Defendants' active email systems and is therefore presumably accessible. *See Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318-19 (S.D.N.Y. 2003) (holding that "active, online data" is a category of ESI that is "typically identified as accessible"); *see*

*also Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 302 (S.D.N.Y. 2012) ("Reasonabl[y] accessible sources generally include . . . files available on or from a computer user's desktop, or on a company's network, in the ordinary course of operation.") (citation omitted).  Although Defendants assert that it would be unduly burdensome for them to produce ESI because Plaintiffs' proposed search terms are incompatible with Defendants' email systems, they have not quantified that burden in terms of the number of documents subject to collection and review or "the amount of time and manpower that would be reasonably required" to comply with the requests. *Gross v. Lunduski*, 304 F.R.D. 136, 152 (W.D.N.Y. 2014) (rejecting burdensomeness objection where supporting affidavit was "too generalized and thus insufficient").

Moreover, Defendant's assertions of undue burden and expense must be weighed against Plaintiffs' need for the ESI discovery and "the importance of the discovery in resolving the issues[.]" Fed. R. Civ. P. 26(b)(1); *see also Tucker v. Am. Int'l Group., Inc.*, 281 F.R.D. 85, 98 (D. Conn. 2012) ("[W]hether to require a responding party to search for and produce information that is not reasonably accessible depends not only on the burdens and costs of doing so, but also on whether those burdens and costs can be justified in the circumstances of the case.") (footnote omitted).  The operation of the checkpoint program, as well as the BPD's and City officials' knowledge of its alleged targeting of minorities, are relevant to Plaintiffs' claim that Defendants engaged in intentional discrimination and violations of Plaintiffs' and the putative class members' constitutional rights.  Because it is likely that emails and other ESI will contain information that is probative of those issues, balancing this against Defendants' unspecified burden in producing it weighs in favor of finding that Plaintiffs are entitled to ESI discovery.

As for Plaintiffs' request that ESI be produced with metadata, Local Rule of Civil Procedure 26(e)(4) creates a presumption that "metadata . . . need not be routinely produced" absent agreement of the parties or a showing of good cause by the requesting party.  Plaintiffs assert that metadata will permit them to search Defendants' production and is therefore necessary to satisfy the requirement that the ESI be provided in a

"reasonably usable form." Fed. R. Civ. P. 34(b)(2)(E)(ii). However, Plaintiffs have not established that the facilitation of searches by the requesting party is, on its own, "good cause" to require the production of metadata under the Local Rules. Courts in the Second Circuit have denied requests for metadata, even where the metadata itself might have some probative value, where that potential value is "outweighed by the cost and burden of production." *Wiley v. Paulson*, 2007 WL 7059722, at *2 (E.D.N.Y. Sept. 26, 2007) (finding plaintiffs' speculative theory as to who drafted relevant emails did not show good cause to compel production of metadata); *see also Hui Qin Wang v. Jian Ping Yao*, 2013 WL 2304180, at *2 (E.D.N.Y. May 17, 2013) (finding no good cause to require production of metadata where it would not be probative of a fact in dispute); *Aguilar v. Immigration & Customs Enforcement Div. of U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350, 360 (S.D.N.Y. 2008) (declining to order production of metadata where requesting party failed to show that metadata would "yield useful information beyond that which the Plaintiffs already have"). Against this backdrop, the court declines to order metadata for all responsive ESI.

However, because the advisory committee notes to Rule 34 provide that ESI that is "searchable by electronic means . . . should not be produced in a form that removes or significantly degrades th[at] feature[,]" Fed. R. Civ. P. 34, advisory committee's notes to 2006 amendments to subsection (b), Defendants must preserve the searchability of ESI records by producing data in a text-searchable format. Plaintiffs are therefore entitled to data documenting the date and time at which emails were sent and received, the sender, and all recipients (including any copied and blind-copied recipients). *See In re Payment Card Interchange Fee & Merchant Discount*, 2007 WL 121426, at *4 (E.D.N.Y. Jan. 12, 2007) (denying request for protective order that plaintiffs need not produce native files and observing that plaintiffs' claim of undue burden was weakened where no production had been made and they had notice that defendants sought metadata).

Defendants request that the court consider cost-shifting if it orders production of ESI, while Plaintiffs respond that there is no basis for cost-shifting here. In most instances, "the party responding to discovery requests bears all costs associated with

production[,]" including of ESI. *North Shore-Long Island Jewish Health Systems, Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 52 (E.D.N.Y. 2018) (citations omitted). However, when the court orders production notwithstanding undue burden or expense for the responding party, it should "consider cost-shifting of such production expenses to the requesting party." *Id.* at 53 (internal quotation marks omitted). Local Rule of Civil Procedure 26(e)(2) provides that the party seeking discovery of ESI "may be required to pay all or a portion of the costs of search, retrieval, review, and production of the information, upon application to the Court." To determine whether cost-shifting is warranted on a motion to compel, the court considers:

1. The extent to which the request is specifically tailored to discover relevant information;
2. The availability of such information from other sources;
3. The total cost of production, compared to the amount in controversy;
4. The total cost of production, compared to the resources available to each party;
5. The relative ability of each party to control costs and its incentive to do so;
6. The importance of the issues at stake in the litigation; and
7. The relative benefits to the parties of obtaining the information.

*Zubulake*, 217 F.R.D. at 322; *see also Hallmark v. Cohen & Slamowitz, LLP*, 2016 WL 1128494, at *4 (W.D.N.Y. Mar. 23, 2016) (applying *Zubulake* factors and concluding cost-shifting not warranted).

In this case, Plaintiffs have narrowed their requests in accordance with a court order. They have no access to Defendants' email and other electronic files and have requested ESI that is likely to contain relevant information. There is no evidence that the equivalent information is available from other sources. To the extent that Defendants claim they have already produced the requested information, they bear the burden of demonstrating the accuracy of that claim. Although the amount in controversy has not yet been specifically determined, in light of the serious nature of the claims presented, the discovery sought is "proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1).

Defendants have not quantified their prospective discovery expenses beyond providing quotes from an e-discovery vendor, but Defendants have some ability to control costs as they have "sole control over the access to the relevant files." *Hallmark*, 2016 WL 1128494, at *4. For the foregoing reasons, cost-shifting is not warranted.

Plaintiffs' motion to compel the production of ESI is GRANTED IN PART, subject to the following conditions: Plaintiffs must provide Defendants with a list of twenty (20) priority search terms that are compatible with Defendants' email systems. Defendants must use those search terms to collect ESI for the twenty (20) priority custodians previously identified by Plaintiffs. Defendants must produce responsive documents in a text-searchable format on a rolling basis, with an initial production to be made no later than twenty (20) days from the date on which Plaintiffs provide a revised list of search terms. If Defendants choose to produce emails in a format that does include metadata reflecting the date and time at which emails were sent and received, the sender, and all recipients (including any copied and blind-copied recipients), they must contemporaneously provide Plaintiffs with this information in some other form. Defendants shall bear the costs of their ESI production.

## B.     Whether Defendants Must Produce BPD Unit Reports.

Plaintiffs seek production of the Reports, arguing that the quantitative data contained therein will permit them to search for statistical evidence of improper incentives for traffic ticketing while the narrative information contained in the Reports may "provide information about where and why officers engage in [ticketing and other traffic enforcement] activities, both of which are factual questions central to Plaintiffs' Fourth Amendment, Equal Protection, and Due Process/revenue harvesting claims." (Doc. 34-1 at 19.) Defendants respond that Plaintiffs' request is overbroad and unduly burdensome and that the Reports contain certain categories of confidential information that require redaction.

In *Floyd v. City of New York*, the court relied on monthly forms tracking officer activity to support its conclusion that the New York City Police Department pressured officers to increase the number of stops made without emphasizing that all such stops

must be lawful. *See* 959 F. Supp. 2d 540, 600-02 (S.D.N.Y. 2013). The court held that "imposing numerical performance goals for enforcement activities, without providing effective safeguards to ensure the activities are legally justified, could result in an officer taking enforcement action for the purpose of meeting a performance goal rather than because a violation of the law has occurred." *Id.* at 602 (internal quotation marks, footnote, and alteration omitted). In this case, the quantitative information in the Reports may allow Plaintiffs to compare the activity of the Housing and Strike Force Units with that of the Traffic Unit to demonstrate that the primary objective of the checkpoint program was not to promote traffic safety but, rather, to generate and collect revenue for the City.[4]

As for the narrative portions of the Reports, Plaintiffs argue they will "provide information about where and why officers engage in [traffic enforcement] activities" (Doc. 34-1 at 19). However, the examples produced by the Defendants do not provide information regarding why locations were selected or the motivation for any enforcement activity at checkpoints. *See, e.g.*, Doc. 40-10 at 9 ("Check point at Isabelle/Laird Ave."); Doc. 40-11 at 4 ("Conducted checkpoints at Busti/Pennsylvania, Massachusetts/W Utica/15th, Massachusetts/Shields, Auburn/Hoyt & Maryland/7th."), 5 ("Conducted checkpoints at Hampshire/Grant, Parkdale/Berkshire & Grant/Forest), 10 ("Checkpoints: Fillmore/Rodney,[]Walden/Sycamore,[]Olympic/33,[]Midway/Comstock, []Peace/Doat").[5] Similarly, references to "traffic," "stop," and related terms in the

---

[4] Plaintiffs also assert that the quantitative data in the Reports "could provide evidence of potential quotas or other forms of pressure or incentives imposed by BPD or City leadership on BPD officers to increase the quantity of their traffic enforcement activities," which they contend would support their "Due Process/revenue harvesting claim" based on *Floyd v. City of New York*, 959 F. Supp. 2d 540, 600-01 (S.D.N.Y. 2013). (Doc. 34-1 at 18.) In *Floyd*, the court found that police department policies setting quotas for enforcement activities and requiring that officers be evaluated based on their "activity levels" were evidence of deliberate indifference to unconstitutional stops. The court found that police officer performance evaluation forms reflected this "emphasis on enforcement activity numbers" consistent with an explicit written policy. *Id.* at 601. It did not, as Plaintiffs propose to do, rely on the contents of the forms to deduce the existence of a policy.

[5] The Strike Force Daily Reports contain one reference to intelligence developed at a checkpoint. (*See* Doc. 40-11 at 6) ("Developed intel[ligence] at a checkpoint about [redacted] fraud[ulent]ly

exhibits document police activities without recording the rationale or motivation for those activities. Based on these examples, Plaintiffs have not demonstrated that the narratives in the Reports will be relevant to their claims.

Defendants have also raised significant proportionality concerns as Plaintiffs' request for daily and monthly Reports for three units for an approximately six-year period would require production of over 6,700 Reports. In addition, Defendants assert that some of the information in the Reports is protected by the law enforcement privilege, the purpose of which is "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir. 1988); *In re City of New York*, 607 F.3d 923, 941 (2d Cir. 2010). The privilege's purpose is "not only to facilitate investigations, but also to protect individuals whose reputation may be damaged by disclosure of investigative leads or statements from witnesses developed during the investigation." *Nat'l Cong. for Puerto Rican Rights ex. rel. Perez v. City of New York*, 194 F.R.D. 88, 93 (S.D.N.Y. 2000) (internal quotation marks omitted) (citing *In re Dep't of Investigation of City of New York*, 856 F.2d at 486).

Plaintiffs contend that the law enforcement privilege is traditionally applied to "undercover, internal governmental agency investigation[s], and other non-public-facing law enforcement activities[,]" (Doc. 34-1 at 21), but the case law is not so limited. *See Arroyo v. City of Buffalo*, 2018 WL 4376798, at *6 (W.D.N.Y. Sept. 13, 2018) (finding privilege applied to a request that defendants identify BPD policies and procedures); *see also In re City of New York*, 607 F.3d at 944 (finding privilege applied to field reports detailing undercover police operations); *In re Dep't of Investigation of City of New York*, 856 F.2d at 485 (finding law enforcement privilege applied to Mayor's letter appointing

---

allowing individuals with unregistered [and] uninspected motor vehicles to "'rent' dealer plates. Took the plates to the DMV office on Dingens St[reet and] met with their investigators."). This narrative does not explain why the checkpoint was conducted.

special counsel for investigation); *Nat'l Cong. for Puerto Rican Rights*, 194 F.R.D. at 97 (ordering disclosure of limited summary information from officer disciplinary records subject to law enforcement privilege).

"Once a court has determined that the law enforcement privilege applies, . . . there ought to be a . . . strong presumption against lifting the privilege." *In re City of New York*, 607 F.3d at 945 (internal quotation marks omitted). The requesting party may overcome the presumption by showing "(1) that its suit is non-frivolous and brought in good faith, (2) that the information sought is not available through other discovery or from other sources, and (3) that the information sought is important to the party's case." *Id.* (internal quotation marks and brackets omitted). Even if the requesting party can make such a showing, a court must still weigh "the public interest in nondisclosure against the need of a particular litigant for access to the privileged information" before ordering disclosure. *Id.* at 948 (internal quotation marks omitted).

The court cannot evaluate the applicability of the law enforcement privilege without a privilege log and an *in camera* inspection of the Reports. However, because the sample Reports provided by Defendants do not support Plaintiffs' theory of relevance, a time-consuming and in-depth review would not be proportional to the needs of the case. *See Citizens Union of City of New York v. Attorney General of N.Y.*, 269 F. Supp. 3d 124, 165 (S.D.N.Y. 2017) (declining to order production of documents for *in camera* review "because [p]laintiffs have failed to establish how they are relevant and proportional to the needs of this case"). The court therefore DENIES Plaintiffs' motion to compel the production of the Reports without prejudice to renew with a more particularized request.

**C.    Whether Defendants Must Produce the IAD Files.**

Plaintiffs provided Defendants with a list of ten search terms for use in querying Defendants' IAD database of citizen complaints. Defendants ran the search terms and provided Plaintiffs with summary spreadsheets identifying information about the responsive complaints, including the date of the complaint, the general topic ("use of force," "conduct," etc.), and a brief narrative description. (*See* Doc. 42-9 at 2-27.)

15

Plaintiffs reviewed this summary and requested that Defendants disclose the full files for 168 complaints which they believe support their claim that Defendants had notice of BPD officers' allegedly unconstitutional conduct. Defendants oppose this request on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to admissible evidence, and seeks discovery of information that may be protected from disclosure by Section 50-a. If the court orders Defendants to produce the IAD files, Defendants request "an *in camera* review of anything ordered produced, an order addressing . . . [Section] 50-a, and a protective order specifying that [] any documents produced shall be kept confidential, used only for the purposes of this case, and that the disclosure shall be restricted to [P]laintiffs' attorney's eyes only in this case." (Doc. 45 at 2-3, ¶ 9.)

> Where a plaintiff brings a claim against a municipality under 42 U.S.C. § 1983,
>
> the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.

*Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citation omitted). In a case alleging deliberate indifference, "prior complaints made against the defendants, whether substantiated or not, are discoverable . . . so long as the complaints are similar to the constitutional violations alleged in the complaint[.]" *Sowell v. Chappius*, 2010 WL 1404004, at *1 (W.D.N.Y. Mar. 31, 2010); *see also Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 328 (2d Cir. 1986) ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force."). IAD files recording complaints and investigations of claims against the BPD related to racial profiling and discrimination, traffic enforcement, and traffic checkpoints are well within the scope of discovery authorized by Federal Rule of Civil Procedure 26(b)(1). *See Dobson v. Dougherty*, 2018 WL 6321390, at *4 (W.D.N.Y. Dec. 4, 2018) (ordering disclosure of complaint against

sheriff's deputy to plaintiffs if it "involve[d] conduct similar in nature to the behavior alleged in [plaintiffs' § 1983] lawsuit").

To support their claim of undue burden, Defendants "must submit an affidavit or other evidence revealing the nature of the burden." *Gross*, 304 F.R.D. at 151. Defendants' counsel affirmed in his declaration that the IAD files at issue are stored in multiple locations such that "if a search was to be performed, it would require either an Officer or some other City employee to suspend other daily duties to physically pull each file[.]" (Doc. 45 at 5, ¶ 21.) As only 168 files are at issue, this burden is hardly insurmountable. In any event, "the burden that results from disorganized record-keeping does not excuse a party from producing relevant documents." *Brooks v. Macy's, Inc.*, 2011 WL 1793345, at *4 (S.D.N.Y. May 6, 2011) (citation omitted); *see also Kozlowski v. Sears, Roebuck & Co.*, 73 F.R.D. 73, 76 (D. Mass. 1976) ("To allow a defendant whose business generates massive records to frustrate discovery by creating an inadequate filing system, and then claiming undue burden, would defeat the purposes of the discovery rules.").

As for Defendants' objection that Plaintiffs' request is overbroad, courts in this District have generally limited an overbreadth challenge to requests for *all* grievances and complaints filed against defendants. *See, e.g., Melendez v. Falls*, 2010 WL 811337, at *4 (W.D.N.Y. Mar. 3, 2010) (finding request for "any and all grievances filed by inmates" for a four-year period was overbroad); *Ashford v. Goord*, 2009 WL 2086838, at *4 (W.D.N.Y. July 10, 2009) (finding request for "all grievances and complaints filed against defendants . . . since June 1, 2002" was overbroad). Here, by contrast, Plaintiffs have narrowed their request to only those IAD files that are likely to be relevant to their claims. In addition, because evidence of the sufficiency of internal investigations may be probative of deliberate indifference, the entirety of the IAD file is discoverable. *See Fiacco*, 783 F.2d at 331 (finding a rational juror could conclude the city demonstrated deliberate indifference to constitutional violations based on an "uninterested and superficial" response to complaints); *Jenkins v. City of New York*, 2019 WL 2367060, at *9 (E.D.N.Y. June 5, 2019) ("[A] reasonable juror could conclude that the persistent

17

inadequacies in the . . . investigations demonstrate that City officials . . . were indeed indifferent to whether or not excessive force was used.") (internal quotation marks omitted). Because Plaintiffs have limited their request to those IAD files that pertain to the issues raised in their Complaint, it is not overbroad.

Defendants also assert that the IAD files may not be produced without a court order pursuant to Section 50-a, which provides that "[a]ll [police] personnel records used to evaluate performance toward continued employment or promotion . . . shall be considered confidential and not subject to inspection or review without the express written consent of [the employee] . . . except as may be mandated by lawful court order." Section 50-a specifies the procedure for the production of covered records as follows:

> Prior to issuing such court order [requiring production] the judge must review all such requests and give interested parties the opportunity to be heard. . . . If, after such hearing, the judge concludes there is a sufficient basis he shall sign an order requiring that the personnel records in question be sealed and sent directly to him. He shall then review the file and make a determination as to whether the records are relevant and material in the action before him. Upon such a finding the court shall make those parts of the record found to be relevant and material available to the persons so requesting.

Nonetheless, Section 50-a "'is not really a privilege in the sense that it could justify complete refusal to disclose relevant evidence.'" *Martin v. Lamb*, 122 F.R.D. 143, 146 (W.D.N.Y. 1988) (quoting *King v. Conde*, 121 F.R.D. 180, 191-92 (E.D.N.Y. 1988)) and "it is undisputed that under federal law . . . [S]ection 50-a does not prohibit discovery of police personnel documents." *Worthy v. City of Buffalo*, 2014 WL 4640884, at *3 (W.D.N.Y. Sept. 16, 2014). As a result, "federal courts consider the legislative intent prompting enactment of . . . [Section] 50-a and effectuate that intent to the extent that it does not impede federal interests." *Mitchell v. Whitenight*, 2013 WL 5936978, at *1 (W.D.N.Y. Nov. 4, 2013) (citing *King*, 121 F.R.D. at 187).

The desire to "prevent time consuming and perhaps vexatious investigation into irrelevant collateral matters . . . and . . . avoid embarrassment and harassment of testifying officers by cross-examination concerning unsubstantiated and irrelevant

matters in their personnel files" is sufficient to justify an *in camera* review. *Evans v. Murphy*, 2013 WL 2250709, at *4 (W.D.N.Y. May 22, 2013) (internal quotation marks omitted). However, other measures, such as attorneys' eyes only production, may alleviate the judicial burden if the records in question are voluminous. *See Rashada v. City of Buffalo*, 2013 WL 474751, at *5 (W.D.N.Y. Feb. 6, 2013) (ordering production of BPD personnel files without *in camera* review subject to attorneys' eyes only designation); *Smith v. Goord*, 222 F.R.D. 238, 241, 243 (N.D.N.Y. 2004) (finding that "adoption of a practice of routinely conducting an *in camera* inspection whenever the specter of . . . [Section] 50-a is raised would potentially cast a considerable burden on the court" and ordering production of Department of Correctional Services personnel records subject to a protective order "restricting the dissemination of such information to counsel and counsel's agents, to the exclusion of the plaintiff").

Notwithstanding Plaintiffs' objection that restricting access to the IAD files to attorneys' eyes only would impede their ability to strategize with counsel, that restriction is one way in which the court can "effectuate" the intent of Section 50-a without "imped[ing] federal interests." *Mitchell*, 2013 WL 5936978, at *1. Plaintiffs may elect between the submission of the relevant files for an *in camera* review or production of the files subject to a protective order limiting disclosure of the files to attorneys' eyes only. Upon Plaintiffs' election, Defendants shall have thirty (30) days to produce the relevant files. For the reasons stated above, Plaintiffs' motion to compel the 168 IAD files in their entirety is GRANTED.

**D.     Attorney's Fees.**

Plaintiffs request attorney's fees and costs if the court grants their motion to compel the production of ESI and the Reports.[6] (Doc. 34 at 1.) Pursuant to Fed. R. Civ. P. 37(a)(5)(A),

> If the motion [to compel] is granted . . . the court must, after giving an
> opportunity to be heard, require the party . . . whose conduct necessitated

---

[6] Plaintiffs did not request an award of costs in their motion to compel the production of the IAD files. (Doc. 42.) Thus, only the request in Plaintiffs' first motion to compel (Doc. 34) is before the court.

the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust.

If a motion to compel is granted in part and denied in part, "the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Fed. R. Civ. P. 37(a)(5)(C).

"[T]he test for avoiding the imposition of attorney's fees for resisting discovery in district court is whether the resistance was substantially justified, . . . or if reasonable people could differ as to the appropriateness of the contested action[.]" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks and alteration omitted). In this case, the parties had a genuine, good faith dispute with regard to what must be produced, with each party advocating a reasonable position. Plaintiffs' request for an award of attorney's fees and costs in connection with their motion to compel (Doc. 34) is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel the production of ESI and the Reports (Doc. 34) is GRANTED IN PART and DENIED IN PART without prejudice as to the request for production of the Reports. Plaintiffs' request for attorney's fees and costs is DENIED. Their motion to compel the production of the IAD files (Doc. 42) is GRANTED IN PART. The parties are further ORDERED as follows:

(1) Plaintiffs must provide Defendants with a list of twenty (20) priority search terms that are compatible with Defendants' email systems. Defendants must use those search terms to collect ESI for the twenty (20) priority custodians previously identified by Plaintiffs. Defendants must produce responsive documents in a text-searchable format on a rolling basis, with an initial production to be made no later than twenty (20) days from the date on which Plaintiffs provide a revised list of search terms. If Defendants choose to

produce emails in a format that does not include metadata, they must contemporaneously provide Plaintiffs with the date and time at which emails were sent and received, the sender, and all recipients (including any copied and blind-copied recipients). Defendants shall bear the costs of their ESI production.

(2) Plaintiffs must notify the court of their choice between an *in camera* review of the 168 IAD files or production of the files subject to attorneys' eyes only restriction. If Plaintiffs elect for production for attorneys' eyes only, the parties should submit to the court a proposed protective order limiting disclosure of the IAD files to counsel and counsel's agents. Defendants shall have thirty (30) days from the date of Plaintiffs' election to provide the relevant files.

`To the extent that Defendants redact or withhold in full any material that they assert is protected from discovery by privilege, they are hereby ORDERED to provide Plaintiffs with a privilege log containing the information specified in Fed. R. Civ. P. 26(b)(5)(A).

SO ORDERED.

Dated this _19th_ day of December, 2019.

Christina Reiss, District Judge
United States District Court