UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

BLACK LOVE RESISTS IN THE RUST by and
through MARIELLE SHAVONNE SMITH and
CHARIS HUMPHREY on behalf of its members;
SHAKETA REDDEN; DORETHEA FRANKLIN;
TANIQUA SIMMONS; DE'JON HALL; JOSEPH
BONDS; CHARLES PALMER; SHIRLEY
SARMIENTO; EBONY YELDON; and JANE
DOE, individually and on behalf of a class of all
others similarly situated;

$\qquad$ *Plaintiffs,*

- vs -

CITY OF BUFFALO, N.Y.; BYRON B. BROWN,
Mayor of the City of Buffalo, in his individual and
official capacities; BYRON C. LOCKWOOD,
Commissioner of the Buffalo Police Department, in
his individual and official capacities; DANIEL
DERENDA, former Commissioner of the Buffalo
Police Department, in his individual capacity;
AARON YOUNG, KEVIN BRINKWORTH,
PHILIP SERAFINI, ROBBIN THOMAS,
UNKNOWN SUPERVISORY PERSONNEL 1-10,
UNKNOWN OFFICERS 1-20, each officers of the
Buffalo Police Department, in their individual
capacities.

$\qquad$ *Defendants*.

---------------------------------------------------------------x

**[PROPOSED] AMENDED AND
SUPPLEMENTAL CLASS
ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**Case No. 1:18-cv-00719-CCR**

## PRELIMINARY STATEMENT

1.      The City of Buffalo ("City") has, for over seven years, engaged in a systematic

practice of targeting Black and Latino neighborhoods and residents for aggressive and punitive

traffic enforcement. The City employs this unlawful practice in part to generate municipal

revenue.  The City has thus effectively sought to balance its budget on the backs of its Black and Latino citizens.

2.     Plaintiff Black Love Resists in the Rust ("Black Love Resists" or "BLRR") and individual plaintiffs and class representatives, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Shaketa Redden, Joseph Bonds, Charles Palmer, Shirley Sarmiento, Ebony Yeldon, and Jane Doe ("Class Plaintiffs") bring this civil action pursuant to 42 U.S.C. § 1983 on their behalf and as representatives of similarly situated individuals, to obtain an injunction ending and remediating the City's unlawful and discriminatory traffic enforcement practices. The Class Plaintiffs also seek monetary damages from the City on behalf of the class for the considerable and cumulative financial harm, humiliation, and loss of liberty and property that these invasive and punitive traffic stops have imposed over the years.

3.     Beginning around 2012, high-level Buffalo Police Department ("BPD") officials deployed a crime "Strike Force" that implemented a vehicle Checkpoint program to conduct so-called "traffic safety" stops and searches of drivers without any individualized suspicion of wrongdoing. These Checkpoints impose no minor inconvenience. They operate as roadblocks that block off residents' streets and driveways and prevent them from traveling out of their targeted neighborhoods without being stopped and possibly searched, as they are trying to carry out the most basic activities of civic life such as going to work, dropping children at school, grocery shopping, or attending medical appointments or religious appointments.

4.     The City believes it has the authority to subject Buffalo residents to suspicionless searches and liberty restrictions as part of a general crime control strategy or in the undifferentiated interest in deterring criminal activity. But the Constitution does not permit the police to sit in wait and presume all citizens who come before it may have committed a crime.

5.      Moreover, Buffalo residents do not bear this burden on freedom of movement and civic engagement equally.  The City places the Checkpoints overwhelmingly in Black and Latino neighborhoods, predominantly in Buffalo's highly segregated East Side.  Publicly available data detailed in this complaint demonstrates the dramatic racial disparity in the uses of vehicle Checkpoints and the corresponding, racialized distribution of the burdens they impose.  For example, over 85% of Checkpoints in a study of Checkpoint deployment occurred in predominantly Black or Latino neighborhoods, and nearly 40% of all Checkpoints conducted since 2012 occurred in just three of Buffalo's 77 Census tracts, each of which had a Black or Latino population exceeding 86%.  Statistically, the variable of "Black or Latino population" is the dominant explanation for Checkpoint location, explaining nearly 80 percent of the variation in Checkpoint location.

6.      Outside of Checkpoints too, the BPD enforces traffic laws in a blatantly discriminatory manner. Ticketing data received in discovery in this action demonstrates that the BPD issued nearly half of all traffic tickets to residents of just four zip codes, in each of which the non-White population is 84% or greater. The number of non-White people in a zip code explains **more than 94%** of the ticketing variation among zip codes.

7.      The City has deployed vehicle Checkpoints and racially discriminatory ticketing practices to generate revenue.  The year the City implemented a vehicle Checkpoint strategy, the BPD issued more than 36,000 traffic violations, an increase of 92% over the prior year. And after the City created the Buffalo Traffic Violations Agency ("BTVA") to keep all of the revenue from traffic tickets, BPD's issuance of traffic tickets increased dramatically, as did the corresponding revenue to the City. Thus, the Checkpoints that the City operated for the constitutionally impermissible purpose of crime control also served to harvest revenue from

poor, Black and Latino residents at grossly disproportionate levels—in violation of the requirement of fundamental fairness embodied in the Due Process Clause of the Fourteenth Amendment.

8.  The City enhances its revenue harvesting by regularly layering multiple tickets on an individual during one stop, and for seemingly pretexual bases. Non-White motorists are 40% more likely than White motorists to receive multiple tickets in a single stop. For example, one non-White class member was issued four separate tickets for having four tinted windows, costing him $720 ($180 per window).  Furthermore, in an effort to secure additional payment, the issuing officer offered that class member a choice: jail or the immediate impoundment of his car. The class member chose impoundment, and thus had to pay an additional $125 fee the next day to retrieve his vehicle, which he needed for his livelihood. Individuals contesting the fines are successful at a vanishingly low rate and most feel they have no option but to plead guilty. To make matters worse, in July 2018, the City enacted thirteen (13) new fees, totaling several hundred dollars, that are assessed on drivers who are issued traffic tickets in Buffalo.  If class members cannot pay the frequently substantial fines and related fees, they will have their license suspended, causing further harm to their professional and personal life and imposing additional financial obligations on them and their families.

9.  The City's practice of targeting poor neighborhoods of color perpetuates a harsh cycle of poverty and racism: the more tickets the City issues against low-income Black and Latino residents, the more likely the financial burden on driving for Blacks and Latinos becomes impossible to bear. The more people lose access to vehicles or their drivers' licenses, the more likely they are to lose access to economic or educational opportunities.

10.     The City's policy and practice is a form of over-policing people of color and then literally making them pay for it.  It is unconstitutional.  Thus, an injunction outlawing this practice and compensation to the people aggrieved is necessary to remedy the considerable economic hardship the City of Buffalo has imposed on them.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 2000d, 28 U.S.C. §§ 1331, 1343(a)(3), (a)(4), and the Fourth and Fourteenth Amendments to the United States Constitution. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

12.     Venue in this district is proper under 28 U.S.C. § 1391(b) because Plaintiffs' claims arose in this judicial district.

## PARTIES

13.     Plaintiff Black Love Resists in the Rust ("Black Love Resists" or "BLRR") is an unincorporated membership association located in Buffalo, New York. BLRR brings this action on behalf of its membership pursuant to Fed. R. Civ. P. 17(b)(3) and N.Y. Gen. Assoc. L. § 12 by and through Marielle Shavonne Smith and Charis Humphrey. BLRR's leaders and members are people of color who reside the City of Buffalo and who organize for a more equal, just and free city. Since its founding, a major part of BLRR's advocacy has focused on ending discriminatory policing practices that harm people of color in Buffalo. For several years, BLRR has engaged in peaceful protests against police brutality and other harmful policing practices; held a community speakout to give Buffalo residents an opportunity to share their stories of harmful police practices; and has issued  Policing Demands calling upon the City of Buffalo to reform its policing practices. Many of BLRR's members, including BLRR Co-Founder Plaintiff Shaketa Redden and member Plaintiff De'Jon Hall, have been directly harmed by the

unconstitutional policing practices challenged in this lawsuit and would have standing to bring this suit in their own right. BLRR does not have a president or a treasurer; Marielle Shavonne Smith and Charis Humphrey act in that capacity.

14.     Plaintiff Shaketa Redden, Co-Founder of organizational Plaintiff Black Love Resists, is Black and a native of Buffalo, New York who currently resides in California

15.     Plaintiff Dorethea Franklin is Black and resides in Buffalo, New York.

16.     Plaintiff Taniqua Simmons is Black and resides in Buffalo, New York.

17.     Plaintiff De'Jon Hall is Black and resides in Buffalo, New York. Plaintiff Hall is a member of organizational Plaintiff Black Love Resists in the Rust.

18.     Plaintiff Charles Palmer is Black and resides in Buffalo, New York.

19.     Plaintiff Joseph Bonds is Black and resides in Buffalo, New York.

20.     Plaintiff Shirley Sarmiento is Black and resides in Buffalo, New York.

21.     Plaintiff Ebony Yeldon is Black and resides in Buffalo, New York.

22.     Plaintiff Jane Doe is Black and resides in Buffalo, New York. Ms. Doe is suing under a pseudonym in order to protect herself from retaliation.

23.     Defendant City of Buffalo ("City") is a political subdivision of the State of New York that can sue and be sued in its own name. Defendant City is authorized under the laws of the State of New York to maintain a police department, the BPD, which acts as its agent in the area of law enforcement. Defendant City is responsible for the policies, practices, supervision, and conduct of the Buffalo Police Department, including the appointment, training, supervision, and conduct of all BPD personnel and BPD's compliance with federal and state law. Defendant City receives federal financial assistance for its programs and activities, including for programs and activities of the BPD.

24.     At all relevant times, Defendant Byron W. Brown was the Mayor of the City of Buffalo, acting in the capacity of chief executive officer, agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. As Mayor of the City of Buffalo, Defendant Brown is the chief policy making official for the City and all of its agencies, including the BPD.  He is responsible for ensuring that BPD personnel obey the laws of the United States and of the State of New York. Defendant Brown is sued in his official and individual capacities.

25.     Defendant Byron Lockwood is the current Commissioner of the BPD, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City. As Commissioner of the BPD, Defendant Lockwood is responsible for the policy, practice, supervision, implementation, and conduct of all BPD matters and the training, supervision, and conduct of all BPD personnel, including those named as defendants in this action. Defendant Lockwood was the Acting Commissioner from January 2018 until he was appointed Commissioner; prior to that Defendant Lockwood served as Deputy Commissioner of the BPD. In his current capacity as Commissioner and in his prior capacities as Acting Commissioner and Deputy Commissioner, he has for all times relevant hereto been responsible for enforcing the rules and policies of the BPD and for ensuring that BPD personnel obey the laws of the United States and of the State of New York. Defendant Lockwood is sued in his official and individual capacities.

26.     Defendant Daniel Derenda was the Commissioner of the BPD from 2010 until January 2018, and acted in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and under color of state law. As Commissioner of the BPD, Defendant Derenda was responsible for the policy, practice, supervision,

implementation, and conduct of all BPD matters and was responsible for the training, supervision, and conduct of all BPD personnel, including those named as defendants in this action; for enforcing the rules and policies of the BPD; and for ensuring that BPD personnel obey the laws of the United States and of the State of New York. Defendant Derenda is sued in his individual capacity.

27.     Defendant Aaron Young is the Chief of the BPD Housing Unit, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City. Defendant Young served as Housing Unit at least January 2013 until August 2015, and from July 2016 to the present. From July 2016 to February 2018, Defendant Young also served as Chief of the Strike Force. In his capacity as Chief of the Housing Unit and Strike Force, Defendant Young was listed as the "Commanding Officer" on BPD "Roadblock Directives," which direct BPD officers and personnel to conduct a Checkpoint at a set time and location. In his capacity as Commanding Officer, Defendant Young oversaw the unconstitutional conduct of BPD officers and personnel operating each Checkpoint. Defendant Young is sued in his individual capacity.

28.     Defendant Kevin Brinkworth is a Lieutenant within the BPD and acts under color of state law in the capacity of agent, servant, and employee of Defendant City. In his capacity as Lieutenant, Defendant Brinkworth served as chief of the BPD Strike Force Unit and was listed as the "Commanding Officer" on hundreds of BPD "Roadblock Directives," which direct BPD officers and personnel to conduct a Checkpoint at a set time and location. In his capacity as Commanding Officer, Defendant Brinkworth oversaw the unconstitutional conduct of BPD officers and personnel operating each Checkpoint. Defendant Brinkworth also served as Chief of the Housing Unit from at least July 2015 until July 2016.  Defendant Brinkworth is sued in his individual capacity.

29.     Defendant Philip Serafini is a Captain within the BPD Housing Unit, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City. Defendant Serafini directs and oversees the activities of the Housing Unit officers and personnel under his command, including their traffic enforcement activities both at and outside of Checkpoints. Mr. Serafini prepares Housing Statistics Reports documenting the traffic enforcement and other activities of officers and personnel within the BPD Housing Unit. Defendant Serafini reports directly to Defendants Young and Lockwood regarding the activities of the Housing Unit, including Checkpoints and ticketing conducted in an unconstitutional manner by Housing Unit officers and personnel. Defendant Serafini is sued in his individual capacity.

30.     Defendant Robbin Thomas is an officer of the BPD, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City. Defendant Thomas is sued in his/her individual capacity.

31.     Defendants Unknown Supervisory Personnel 1-10 act under color of state law in the capacity of agent, servant, and employee of Defendant City. They were at all times relevant herein supervisory personnel overseeing the conduct of officers of the BPD Strike Force Unit and/or BPD Housing Unit and oversaw the operation of hundreds of BPD Checkpoints in an unconstitutional manner between 2015 and present, including Checkpoints experienced by Plaintiffs. In their oversight capacity, Defendants Unknown Supervisory Personnel signed off and authorized BPD "Roadblock Directives," which direct BPD officers and personnel to conduct a Checkpoint at a set time and location. In their oversight capacities, Unknown Supervisory Personnel 1-10 directed, oversaw, encouraged, ratified and/or failed to prevent the unconstitutional conduct of BPD officers and personnel operating BPD vehicle Checkpoints. The

true identities of the Unknown Supervisory Personnel are unknown at this time. When they become known, Plaintiffs will amend the Complaint to add their true names and capacities. Each Unknown Supervisory Personnel Defendant is sued in his/her individual capacity.

32.     Defendants Unknown Officers 1-20 act under color of state law in the capacity of agent, servant, and employee of Defendant City. Each officer has been involved in conducting vehicle Checkpoints, including those experienced by Plaintiffs, pursuant to the Checkpoints Program. The true identities of the Unknown Officers are unknown at this time. When they become known, Plaintiffs will amend the Complaint to add their true names and capacities. Each officer is sued in his/her individual capacity.

33.     Defendants have acted or are continuing to act under the color of state law in the course and scope of their duties and functions as agents, employees, and officers of the City and/or the BPD in engaging in the conduct described herein. At all times relevant herein, defendants have acted for and on behalf of the City and/or the BPD with the power and authority vested in them as officers, agents, and employees of the City and/or the BPD and incidental to the lawful pursuit of their duties as officers, employees, and agents of the City and/or the BPD.

34.     At all times relevant herein, Defendants have violated and/or continue to violate clearly established constitutional standards under the Fourth and Fourteenth Amendments and under Title VI of the Civil Rights Act, of which a reasonable person would have known.

## FACTS

***Creation of the Strike Force and Its Use of Checkpoints for
General Crime Control***

35.     In June 2012, Mayor Brown, former Commissioner Derenda, and BPD launched the Strike Force – a mobile unit that targeted supposed crime hotspots to reduce guns, drugs, and gang activity.

36.    The Strike Force, in order both to advance the City of Buffalo's general interest in crime control and to increase revenue, employed suspicionless vehicle Checkpoints. "Suspicionless" in this context means that all cars approaching the Checkpoint are stopped, without regard to whether there is reasonable suspicion (much less probable cause) to believe that a crime or a traffic violation has been committed.

37.    Other than stopping drivers without reasonable suspicion and issuing as many tickets as possible at each Checkpoint, BPD does not operate the Checkpoints in a standardized, predictable manner.

38.    Some Checkpoints may involve 6-10 police cars stationed at multiple intersections; others involve just a single officer.

39.    The precise Checkpoint locations and times were and are chosen by officers in the field, or by their direct supervisors in consultation with officers in the field. The locations chosen are overwhelmingly in Black or Latino neighborhoods.

40.    Checkpoints are conducted in multiple stages.

41.    In the first stage, cars enter the Checkpoint, where they stop or pass very slowly before an officer and sometimes have their license plates read by an automated license plate reader. Officers check for valid licenses, registration, inspection stickers, seatbelts, and anything suspicious in plain view.

42.    At this stage, officers sometimes ask intrusive questions like, "Where are you going?" and "Where are you coming from?"

43.    BPD officers may direct some drivers to pull over to a second stage where they can be detained for up to 45 minutes while officers subject the driver and passengers to a longer interrogation.

44. Though Defendants have promulgated a written directive concerning Checkpoint operations, the directive omits key information necessary to guide officers' discretion.

45. The directive contains no written rules, standards, or guidelines governing BPD officer's decisions about which drivers to pull over for secondary stops.

46. Moreover, Defendants do not issue oral instructions, rules, standards, or guidelines governing BPD officer's decisions about which drivers to pull over for secondary stops. Instead, BPD officers exercise unbridled discretion when determining whether to pull drivers over for a secondary stop.

47. For example, in a suppression hearing concerning a Checkpoint stop made in September 2015, a BPD Lieutenant testified that he did not provide oral guidance to his officers beyond that set forth in the written directive.

48. BPD policies state that officers must complete a "Checkpoint Directive" for every Checkpoint operated.

49. However, BPD officers often operate Checkpoints without completing Checkpoint Directives, making the number of Checkpoints conducted by the BPD higher than actually reported.

50. BPD does not employ flares, signs, or warning lights to alert motorists of the Checkpoint.

51. BPD often seeks to establish Checkpoints on one-way streets so that motorists cannot avoid passing through them.

52. BPD often blocks off streets and intersections adjacent to the Checkpoints so that all local traffic is funneled through the Checkpoint.

53.    BPD officers chase, stop, and question any drivers who they believe to be attempting to avoid a Checkpoint.

54.    The Checkpoint directive contains no written rules, standards or guidelines governing BPD officers' determinations about whether a driver is attempting to avoid a Checkpoint.

55.    Moreover, Defendants do not issue oral instructions, rules, standards, or guidelines governing BPD officers' determinations about whether a driver is attempting to avoid a Checkpoint. Instead, BPD officers exercise unbridled discretion when determining whether a driver may be attempting to avoid a Checkpoint.

56.    In addition to Checkpoints documented by Checkpoint Directives, the Strike Force conducted numerous Checkpoints that were *not* subject to formal written directives. These "Undocumented Checkpoints" were omitted from the lists provided by the BPD pursuant to Plaintiffs' FOIL request prior to the commencement of this action, but their existence is apparent in the ticketing data obtained in discovery in this action.

57.    The ticketing data includes a field called "Arrest Type," and Arrest Type 3 means that a ticket was issued at a Checkpoint. Some of these were commercial truck inspections (which are not subject to the claims in this action), but most were not. BPD officers, including Strike Force officers, generally did not code their Checkpoint tickets as Type 3, but review of the ticketing data in context indicates that tickets that *were* coded Type 3 *were*, in very large part, issued at Checkpoints. That is, there are many "false negatives" (Checkpoint tickets not coded Type 3), but very few "false positives" (non-Checkpoint tickets coded Type 3). The Type 3 coding in the ticket data, albeit intermittent, has provided a window into the Undocumented Checkpoints.

58.     In the period January 1, 2013 to July 31, 2017, there were 2,541 tickets coded "Type 3" that were not issued as a result of commercial truck inspections but *were* issued on dates for which there was not a Checkpoint Directive. Many of these tickets point to Undocumented Checkpoints, which also involved the issuance of many tickets *not* coded Type 3. For example:

    a.    Over the course of an hour on July 5, 2014, a date for which there is no Checkpoint Directive, four Strike Force officers, working together with two Housing Unit officers, issued a total of 27 tickets to 12 separate drivers at the intersection of Comstock and Shirley, on the East Side. As is typical of Checkpoint ticketing, only two of these tickets are for actual improper operation of a motor vehicle; the remainder are for inspection, licensing, seat belt, or equipment (including tinted windows) violations. Fifteen of these tickets are coded Type 3 and 12 are not, but they were all plainly issued at the same Checkpoint.

    b.    In a 24-minute period on June 24, 2016, a date for which there is no Checkpoint Directive, four Strike Force officers set up a Checkpoint at or around the intersection of Leslie and Scajaquada, on the East Side, at which they issued 27 tickets to seven separate drivers. Fifteen of those tickets are coded Type 3; 12 are not. None of them was for actual improper operation of a motor vehicle.

    c.    In a 13-minute span on April 27, 2017, a date for which there is no Checkpoint Directive, four Strike Force officers under the command of Lt. Quinn set up a Checkpoint at or around the intersection of Jefferson and Landon on the East Side, at which they issued fourteen tickets, to five separate drivers. Eleven of the tickets are coded Type 3; three are not. None of them is for actual improper operation of a motor vehicle.

    d.    A little more than an hour later, now reinforced by additional officers and commanded by Lt. George McLean, a number of these officers set up a Checkpoint at Massachusetts and 15th Street, at which they issued 49 tickets to 14 separate drivers in less than half an hour. Ten of these tickets are coded Type 3, 39 are not. None of them was for actual improper operation of a motor vehicle.

59.     These Undocumented Checkpoints were operated by the Strike Force as a common practice over a period of years, as part of the overall Checkpoint operation of the BPD and with the knowledge and approval of senior officers.

*City Policy of Employing Checkpoints for the Unlawful Purpose*
*of General Crime Control*

60.     In *City of Indianapolis v. Edmond*, the Supreme Court specifically prohibited police departments from employing suspicionless vehicle Checkpoints as a method of general crime control.  In spite of this clearly established law, the BPD does exactly that.

61.     When operating the Checkpoints, BPD officers stop vehicles without having any probable cause or reasonable, articulable suspicion that the driver has violated any criminal or traffic laws.

62.     BPD officials have stated that a primary programmatic purpose of the Checkpoints is to discover evidence of ordinary criminal wrongdoing on the part of people passing through the Checkpoint and to deter crime by maintaining a highly visible presence in the targeted neighborhood.

63.     When the Strike Force launched, top City officials, including Defendants Brown and Derenda, repeatedly stated to the media that Strike Force officers conducted daily roadblocks in order to fight crime.

64.     For example, the radio station WBFO reported in June 2012 that the Strike Force "specifically targets high crime areas of the city" with "Checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods."[1]

65.     Also in June 2012, Defendant Derenda stated that the Strike Force would target its efforts based on recent crime patterns and that it would employ "high visibility, high saturation" tactics including "daily roadblocks."[2]

---

[1]Eileen Buckley, Mayor pleased with Strike Force Progress, WBFO (June 21, 2012), available at http://news.wbfo.org/post/mayor-pleased-strike-force-progress.

[2] Strike Force to tackle rising crime in Buffalo, New York, WIVB (June 11, 2012), available at https://www.youtube.com/watch?v=mPpF2u6hYPo.

66.     In January 2014, Defendant Derenda told the Buffalo News: "Our Strike Force officers are conducting daily roadblocks at multiple locations and surprising the criminal element. Because of that people are now less likely to carry guns knowing that they may be stopped at a safety Checkpoint."[3]

67.     Testimony from Strike Force officers in federal suppression hearings further evidences that the primary purpose of the vehicle Checkpoints is general crime suppression:

68.     On March 16, 2015, BPD Officer Darren McDuffie testified that "[o]ur job in the Strike Force is to – is to hit high – is to patrol high – high gang areas and violent areas through the city; and we also set up roadblocks throughout the city as well in high crime areas."[4]

69.     On March 30, 2016, BPD Officer Michael Acquino testified that the Strike Force is "based on going after gangs, drugs, guns. We do Checkpoints on a daily basis throughout the city."[5]

70.     On December 8, 2016, Officer Acquino testified that the "Strike Force Unit basically involves taking guns off the street, gang intel, drugs," and that "We do a regular Checkpoint every day."[6]

71.     In 2016, social scientists Andrew P. Wheeler and Scott W. Phillips published an academic study of the Strike Force and its use of daily Checkpoints as part of a "hot spots"

---

[3] *See* Lou Michel, *Buffalo's homicide toll down in 2013-but still 47 too many*, The Buffalo News (Jan. 2, 2014), *available at* https://www.scribd.com/document/364361949/Lou-Michel-Buffalo-s-homicide-toll-down-in-2013-but-still-47-too-many-The-Buffalo-News-Jan-2-2014).

[4] *U.S. v. Wilson*, No. 14-CR-128, Dkt. 20 at 4 (W.D.N.Y.).

[5] *U.S. v. Hubbard*, No. 14-CR-179, Dkt. 37 at 5 (W.D.N.Y.).

[6] *U.S. v. Jordan*, No. 16-CR-93, Dkt. No. 21 at 4 (W.D.N.Y.)

policing strategy ("Checkpoints Study"). The authors examined 60 BPD Strike Force

Checkpoints conducted in 46 different locations from April-May 2013.

72.     According to the Checkpoints Study, "the [BPD] identified problem areas (i.e.,

locations with a high number of robberies, burglaries, criminal mischief, and drug activity) and

then would use high visibility roadblocks at different locations throughout the city."[7] BPD

"specifically aimed to make the roadblocks high-visibility, with the primary goal of deterring

crime and disorder."[8]

73.     The Strike Force also partnered with the BPD Housing Unit—with which it shares

an office and command structure—to conduct regular vehicle Checkpoints near certain housing

complexes operated by the Buffalo Municipal Housing Authority ("BMHA").

74.     BPD records reveal that the programmatic purpose of the joint Housing Unit/

Strike Force Checkpoints was to suppress "blatant drug/weapons activity" and "to show a high

level of enforcement and visibility."

75.     As late as May 2016, BPD Housing Unit Monthly Statistics reports reference joint

Housing Unit/Strike Force Checkpoints conducted in order to "increase our presence and deter

criminal activity."

76.     Through most of the period relevant here, including through at least January 2018,

BPD Strike Force and Housing Unit officers conducted the Checkpoints. The BPD Strike Force

and Housing Unit were part of the Patrol Division.

77.     BPD also has a Division of Traffic Services, which focuses on traffic safety.

---

[7] Andrew Wheeler and Scott Phillips, *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY*, at 1 (May 17, 2016), available at http://ssrn.com/abstract=2781126.

[8] *Id.* at 3.

78.    Through most of the period relevant here, including through at least January 2018, BPD's Division of Traffic Services did not participate in the Checkpoints challenged in this lawsuit, further underscoring the lack of a traffic-safety purpose for the Checkpoint program.

79.    The Checkpoints Study also found that, under some methodologies, Checkpoints actually increased crime and decreased traffic safety.

***City Policy of Intentionally Targeting Black and Latino
Neighborhoods and Drivers for Aggressive Traffic Enforcement***

80.    In April, 2018, counsel for Plaintiffs in this action obtained data from the Buffalo Police Department listing Strike Force Checkpoint locations by Census tract from January 2013 to October 2017 ("Checkpoint Data").

81.    The Checkpoint Data show that BPD Strike Force conducted more than 1,700 Checkpoints between January 2013 and October 2017. More than 1400 of these were conducted in the period from January 2013 to June 30, 2017, the period prior to BPD's efforts, as alleged below, to cover up its unconstitutional activities.

82.    Defendants conducted the vast majority of Checkpoints in Black or Latino neighborhoods.

83.    BPD conducted nearly 40% of all Checkpoints through June 30, 2017—545 out of 1424—in just three of Buffalo's 77 Census tracts. In each of those three tracts, the Black or Latino population exceeded 86%.

84.    Likewise, of the 60 Checkpoints featured in the Checkpoints Study discussed above, 53 (or 87%) occurred in predominantly Black or Latino neighborhoods. The authors of the Checkpoints Study noted that "[c]ompared to the rest of the city, roadblock locations had a

smaller total population, and had larger proportions of black residents and female headed households."[9]

85.    A map, attached as Exhibit A to this Complaint and based on the Checkpoint Data, illustrates the concentration of BPD Checkpoints in low-income communities of color.

86.    Statistical analysis demonstrates that "Black or Latino population" is a highly significant driver of Checkpoint location—so much so that only an exponential model captures the true extent of the BPD's invasion of the East Side.  Under an exponential model, "Black or Latino population" explains **78.8%** of the variation in Checkpoint locations.

87.    The exponential fit strongly implies intentional racial discrimination. Disproportionality of racial impact bears on intent, and here the BPD went far beyond merely disproportionately concentrating Checkpoints in Black and Latino neighborhoods. As the map indicates, not only did BPD target Black and Latino neighborhoods, but the *extent* of the disproportionality increased as the percentage of Black or Latino population in the neighborhood increased.

88.    Analysis of the Checkpoint Data shows that another variable had some predictive power in explaining Checkpoint locations: the number of reported crimes in the Census tract. This variable was independently statistically significant, but when combined with the racial and ethnic demographics of the Census tract, it caused only a mild increase (to 80.8%) in the amount of variation in Checkpoint locations explained by the model.

89.    Traffic safety explains far less of the variation in Checkpoint locations and adds almost nothing to the explanatory power of racial demographics and reported crimes. Indeed, not only is "Black or Latino population" a far stronger predictor of Checkpoint location than is either

---

[9] Wheeler & Phillips, *supra*.

crime or accident location but, all other things being equal, the number of Checkpoints in a Census tract actually *decreases* as the number of accidents increases, which indicates that the BPD did not select Checkpoint locations for accident prevention purposes.

90. In sum, the overwhelming majority of the variation in Checkpoint location—more than 80 percent—can be explained by two constitutionally impermissible purposes: targeting Black and Latino neighborhoods and general crime control. The only arguably lawful purpose of Checkpoints—vehicle and traffic safety—has nothing to do with the BPD's choice of Checkpoint locations.

91. BPD also disproportionately and intentionally targets neighborhoods and drivers of color for traffic enforcement outside of Checkpoints.

92. BPD's Housing Unit of just 19 officers writes approximately one-third of all traffic violations issued by BPD.

93. Officers in BPD's Housing Unit primarily police buildings operated by BMHA.

94. According to BMHA's own data, as of 2016 BMHA housed approximately 5,855 people in 28 properties, of whom 2,031 (35%) were under 18 (and thus largely not of driving age). BMHA's population is 74% Black and 17% Latino. Moreover, 96% of BMHA households are classified as Very Low Income, meaning that their household income is less than half of the median household income for the area.

95. Since July 2015, the Housing Unit has spent nearly all its time at three BMHA properties: Kenfield Homes, Langfield Homes, and Shaffer Village.

96. Kenfield and Langfield are located in close proximity to each other on Buffalo's East Side; their population is 93% African American.

97.     Shaffer Village is located in Northwest Buffalo; its population is 37% African American and 49% Hispanic.

98.     In 2017 alone, the 19 officers detailed to the BPD Housing Unit issued **14,853** traffic tickets and made **3,278** misdemeanor traffic arrests on or near BMHA property.

99.     Given the racial and economic demographics of the BMHA properties where the Housing Unit spent most of its time, it is highly plausible that the vast majority of the people cited or arrested by the Housing Unit were low-income people of color.

100.    Data obtained from the New York State Division of Motor Vehicles suggest that Buffalo drivers who reside in predominately Black zip codes are more than ***eight times*** as likely to be issued multiple traffic tickets at a single traffic stop or Checkpoint than those who live in predominately White zip codes.

101.    Moreover, drivers from predominately Black zip codes are more than ***four times*** as likely to have their driver's licenses suspended because they cannot pay their traffic tickets than those who live in predominately White zip codes.

102.    Ticketing data received in discovery in this action confirm the existence and vast extent of racially discriminatory traffic enforcement by the Buffalo Police Department, both at and away from Checkpoints.

103.    The BPD issued 240,170 tickets to residents of Buffalo or its immediate surrounding area (16 zip codes in the City; 12 in the "first ring" around the City) during the 7+-year period January 1, 2012 to March 31, 2019.

104.    The four zip codes in Buffalo with the highest concentration of non-White drivers accounted for almost half of these tickets:

| Zip Code | Driving Age Population | % Non-White | # Tickets |
|---|---|---|---|
| 14208 | 7,499 | 89.4% | 11,522 |
| 14215 | 30,203 | 86.4% | 56,334 |
| 14204 | 6,740 | 85.5% | 8,838 |
| 14211 | 16,330 | 84.4% | 33,347 |
| Total | 60,772 | | 110,041 |

105.    These four zip codes contained only 13% of the driving age population of the City and its immediate environs, but they accounted for 46% of the total tickets issued by the BPD to residents of that area.

106.    In sharp contrast, the four most heavily White zip codes in the City had a *greater* total driving age population than the four most heavily non-White zip codes (66,259 vs. 60,772), but the residents of these heavily White zip codes received only a little more than **a quarter** of the number of tickets received by the residents of the four most heavily non-White zip codes:

| Zip Code | Driving Age Population | %White | # Tickets |
|---|---|---|---|
| 14220 | 19,241 | 88.6% | 6,391 |
| 14206 | 16,066 | 81.6% | 8,559 |
| 14210 | 11,704 | 80.7% | 6,496 |
| 14216 | 19,248 | 74.6% | 7,765 |
| Total | 66,259 | | 29,211 |

107.    Regression analysis of the ticketing data confirms the BPD's severely racially disparate ticketing patterns suggested by these examples:

(a)    The number of non-White people of driving age living in a zip code in or immediately surrounding the City of Buffalo is, by far, the strongest predictor of the number of tickets BPD issued to residents of the zip code.

(b)    For the period January 1, 2012 to March 21, 2019, that number explains *more than 94%* of the zip code-by-zip code variation in the number of tickets BPD issued to residents of the zip code.

(c)    The number of White people of driving age living in a zip code, in contrast, is not a statistically significant predictor of the number of tickets issued to residents of that zip code ($p = 0.076$).

(d)    Although BPD occasionally issues tickets to White people, BPD's ticketing of people of color happens at a far greater rate. The expected increase in the number of tickets associated with adding one more driving age resident to a zip code is, with a very high degree of likelihood, at least *twelve*

*times as great* for adding a non-White individual than it is for adding a White individual.

108.    On a zip code-by-zip code basis, the average number of tickets issued to driving-age residents of Buffalo each year increases as the number of non-White driving age individuals within a zip code rises, as illustrated below.



109.    At a Checkpoint or traffic stop, BPD officers having observed one or more potential violations of the traffic laws are conceptually faced with three distinct decisions:

- Issue a ticket? – Yes/No.

- If yes, issue a single ticket (a "single-ticket incident"), or multiple tickets (a "multi-ticket incident")?

- If issuing multiple tickets, how many?

110.    At each of these decision-points, a racial disparity in BPD ticketing is apparent. Statistical evidence shows that non-White motorists are much more likely to be ticketed by the BPD than are White motorists.

    (a)    Non-White motorists are approximately ten times as likely as White motorists to be subject to incidents in which the BPD issues one or more tickets.

    (b)    When tickets are issued, non-White motorists are approximately 40% more likely than White motorists to receive multiple tickets as opposed to a single ticket. The disparity is even greater for tickets issued on the East Side.

    (c)    When multiple tickets are issued, non-White motorists receive approximately 12% more tickets than White motorists do.

111.    Tickets issued under Section 375 of the Vehicle and Traffic Law for improperly tinted windows are a particularly egregious example of the BPD's racially discriminatory traffic enforcement.

112.    As a matter of BPD policy, issuance of tinted window tickets is discretionary with the issuing officer,[10] and BPD officers routinely exercise that discretion in favor of ticketing people of color.

113.    Of the 43,649 tinted windows tickets issued by the BPD from January 1, 2012 to March 14, 2019 to residents of the 28 zip codes in Buffalo or its immediate environs, fully 22,426, or 51.4%, were issued to residents of the four most heavily non-White zip codes, 14204, 14208, 14211, and 14215.

114.    The number of non-White driving age individuals in a given zip code accounts for **90%** of the zip code-by-zip code variation in tinted windows tickets.

---

[10]    *Buffalo's Most Issued Traffic Ticket Is for Tinted Windows*, Buffalo News, May 13 2019.

115.    The number of White driving age individuals in a zip code, in contrast, is not a statistically significant predictor of the number of tinted windows tickets issued to residents of that zip code.

116.    On the rare occasions that White motorists *are* ticketed by the BPD for tinted windows, they can be expected to receive about 23% fewer tickets per incident than non-White motorists can.

117.    The BPD's ticketing practices under Section 1229 of the VTL, for no seat belt or for not having or using an appropriate child restraint, are similar to its tinted window practices. The number of non-White driving age individuals living in a zip code accounts for 90% of the variation in number of seatbelt tickets issued, and the impact of the comparable White population on the number of such tickets is not statistically different from zero.

118.    The BPD's racially discriminatory traffic enforcement is not merely historical; it has continued to present, notwithstanding the dissolution of the Strike Force in March 2018. The most recent ticketing data available for the post-Strike Force period continue to show disparities so large that they are explainable only on the basis of intentional racial discrimination.

***City Policy of Issuing Tickets for the Unlawful Purpose of
Revenue Harvesting***

119.    The City of Buffalo has a custom, policy and/or practice of overly aggressive enforcement of traffic laws in order to generate revenue for the City budget via tickets, ticket-related fees, impounds, and towing fees.

120.    The City's custom, policy, or practice of generating revenue through traffic enforcement began in 2012 with Checkpoints, but has continued to this day in different forms.

121.    The BPD's official police academy training materials for BPD recruits even acknowledge that one of the reasons for vehicle and traffic law enforcement is to "generate revenue."

122.    Accordingly, when making traffic stops—both at and outside of Checkpoints— BPD officers write multiple tickets for as many violations as possible.

123.    BPD officers have and use specialized computer software to maximize the number of traffic violations that they can issue in a single stop. BPD uses this software far more often in minority neighborhoods than in white neighborhoods.

124.    When BPD officers make traffic stops and issue tickets for tinted windows, they often issue multiple tickets, most commonly four—one for each window. BPD officers also issue multiple tinted windows tickets per traffic stop far more often against drivers who reside in majority non-White neighborhoods than they do against drivers who reside in majority White neighborhoods.

125.     Overall, BPD officers  issue far more tickets for tinted windows  than they do for any other  traffic violation. Between 2014 and 2017, 17% of traffic tickets issued by the BPD were for tinted windows, more than seven times the number of speeding tickets that the BPD issued during that period. Yet, tinted windows were listed as a cause in only 2 vehicle accidents in Erie County in 2017, while speeding was listed as a cause in more than 1700 Erie County accidents that year.

126.    BPD also issues far more tinted window tickets than do police departments in all other cities in New York State except New York City, which has more than thirty times the population of Buffalo. Between 2014 and 2017, the BPD issued more than 34,000 tinted window

tickets, while police in the similarly-sized cities of Syracuse and Rochester issued just over 6000 and just under 3000 such tickets respectively.

127.    When BPD officers make traffic stops and issue tickets for seatbelt violations, they often issue multiple tickets. BPD officers issue multiple tickets per traffic stop for seatbelt violations far more often against drivers who reside in majority non-White neighborhoods than they do against drivers who reside in majority White neighborhoods.

128.    BPD officers also routinely patrol the parking lots of BMHA buildings, where they check parked cars for registration and inspection violations and issue tickets for these violations whenever they encounter a vehicle without updated registration or inspection.

129.    The New York Vehicle and Traffic Law permits issuing such tickets only to vehicles that are "parked upon the public highways of this state," N.Y. Veh. & Traffic L. §§ 306(b), 402(6).

130.    A BMHA parking lot is part of a private residence, not a "public highway."

131.    Registration and inspection violations issued in BMHA parking lots are processed through the City's Parking Violations Bureau.

132.    The City keeps the majority of revenue from these violations.

133.    BPD officers also seek to tow and impound vehicles whenever possible as a means of boosting revenue.

134.    The City custom, policy, or practice of generating revenue through traffic enforcement began with the Checkpoints, but continues to this day in different forms.

135.    During the 2013-14 fiscal year, the first year after it created the Strike Force and instituted daily Checkpoints, BPD issued 36,818 traffic violations, a 92% increase from the previous year.

136.    Also, during this period, the City towed four times as many cars annually as it did prior to instituting the Checkpoints, and the City's revenue from impound lots doubled to $1.1 million.

137.    The City then developed a plan which would allow it to reap even more revenue from traffic enforcement.

138.    Historically, the New York State Department of Motor Vehicles (DMV) handled the adjudication of traffic violations issued in the City of Buffalo.

139.    Under this system, the State of New York collected the revenue from traffic tickets issued in the City.

140.    In 2014, however, the Buffalo Common Council and New York State legislature worked together to establish the BTVA to "provide fiscal relief to City government and taxpayers."[11]

141.    Councilmember Smith, during a June 20, 2014 interview with a local news outlet, WIVB-TV, stated that the BTVA would be a "win-win for not only the residents, but also the city, because the city also has the opportunity now to keep home some of the dollars from the traffic infractions.[12]

142.    New York State Senator Grisanti expressed similar sentiments: "It's basically additional funds that are going to flow into the city of Buffalo that could help prevent crime and help community block club programs."

---

[11] Demone A. Smith, Legislative Intent of Local Law Intro #1-2015, Common Council Proceedings (June 2, 2015).

[12] Interview by WIVB-TV (June 20, 2014), transcribed, *available at* https://www. youtube.com/watch?v=ivCe8WB-wiU.

143.    The BTVA is part of the Executive Department of the City and operates under the direction and control of Defendant Brown. Buffalo City Charter § 6-24.

144.    The Executive Director of the BTVA is appointed by and serves at the pleasure of the Mayor. Id. § 6-24(1)(a).

145.    According to the City's 2017-18 Executive Budget, one of the official goals of the Traffic Violations Agency is "To administer punitive punishment that is reasonable, but not more than necessary, to: (a) Generate revenue; and, (b) Achieve rehabilitation of offender-motorists."

146.    The City's General Fund pays the salary of BTVA's executive director, traffic prosecutor, and all other administrative expenses of the BTVA. The City's General Fund also pays for salary and overtime for BPD Officers.

147.    Revenue from traffic violations adjudicated by the BTVA goes to the City's General Fund.

148.    The BTVA began adjudicating non-misdemeanor traffic violations in the City of Buffalo on July 1, 2015.

149.    Almost immediately, BPD began to issue many more traffic violations than ever before.

150.    During the 2015-16 fiscal year, BPD issued 52,466 traffic violations, a 43% increase over the previous year. Officers from the Patrol Division, which includes the Strike Force and Housing Unit, issued nearly all (52,169) of those traffic violations.

151.    BPD did not merely issue more tickets following the creation of the BTVA; it also issued more *multiple* tickets. Controlling for the racial composition of the driver's zip code (the strongest predictor of whether a given ticketing incident would be a multiple-ticket incident or a single-ticket incident), the advent of the BTVA is associated with a statistically significant

increase of the likelihood of multi-vs-single-ticketing, from 41.5% prior to the BTVA to 58.5% thereafter.

152. Over the same period of time, the City appropriated more money to BPD, and BPD spent increasing amounts on overtime.

153. BPD spent approximately $13.7 million on overtime in 2015, $15.6 million in 2016, and $16.8 million in 2017.

154. Much of this overtime went to Strike Force and Housing Unit officers, who are also some of the highest-paid City employees.[13]

155. During its first year in operation, BTVA collected more than $2 million for the City's General Fund.

156. During the 2016-17 fiscal year, the BTVA collected more than $3.9 million.

157. In its most recent adopted budget, the City projected that BTVA would generate $4.2 million in the 2017-2018 fiscal year.

158. According to the Buffalo Comptroller, BTVA brought in $3.99 million in calendar year 2017 and was projected to raise $6.2 million for the General Fund in 2018

159. Meanwhile, the cost to the City to operate the BTVA is only $535,000.

160. According to the BTVA's 2017 Annual Report, of the 45,592 dispositions adjudicated by the BTVA during the reporting period, only 17 (.0004%) resulted in not guilty verdicts.

161. In other words, 99.9996% of violations adjudicated by the BTVA result in a payment or judgment in favor of the City.

---

[13] Aaron Lowinger, "Buffalo Police Overtime Earnings Balloon," *The Public* (Jan. 24, 2017), *available at* http://www.dailypublic.com/articles/01242017/buffalo-police-overtime-earnings-balloon.

162.    In the first half 2018, Mayor Brown and other City officials grew very concerned that the City was not meeting its revenue projections for the year and therefore considered imposing new municipal taxes and fees to make up for this revenue shortfall.[14]

163.    This revenue shortfall extended to the BTVA, which in 2018 collected less than half of the revenue that City officials had projected for the year.

164.    Thus, in July 2018, at Mayor Brown's urging, the Buffalo Common Council unanimously passed an amendment to the municipal fees schedule in Chapter 175 of the Buffalo Municipal Code, adding 13 new fees to be assessed by the BTVA against individuals who receive traffic tickets in the City of Buffalo.[15]

165.    The 13 fees are as follows:

    a.  **PUBLIC SAFETY FEE ("PSF")**- The **$55** PSF is assessed on all traffic violations. This fee is for the purpose of promoting and protecting the safety and well-being of the residents and visitors to the City, including but not limited to traffic safety, policing security and anti-terrorism activities and by deterring illegal and reckless driving.

    b.  **DRIVER RESPONSIBILITY FEE ("DRF")-** A **$45** DRF is assessed on any ticket or Notice of Liability (NOL) for any disposition other than Not Guilty or dismissals on proof.

    c.  **INITIAL DEFERRED PAYMENT FEE – PER TICKET-** A **$15** fee to encourage immediate payment and to defray the cost of delayed payment.

    d.  **SUBSEQUENT DEFERRED PAYMENT FEE – PER DEFERRAL – PER TICKET-** A **$10** fee to encourage the payment within the deferred payment time period and to defray the cost of granting and recording additional time to pay.

    e.  **SCOFFLAW/DEFAULT JUDGMENT ADMINISTRATIVE PROCESSING FEE-** A **$50** administrative fee to defray the costs of processing

---

[14] Deidre Williams, "For First Time in 12 Years, City May Hike Taxes," *The Buffalo News* (April 27, 2018), *available at* https://buffalonews.com/2018/04/27/tax-or-fee-hikes-likely-in-upcoming-buffalo-budget/.

[15] Marsha McLeod, "City Hall Cashing in on Traffic Tickets," *Investigative Post* (Feb. 27, 2019), *available at* https://www.investigativepost.org/2019/02/27/city-hall-cashing-in-on-traffic-tickets/; *see also* Buffalo Munic. Code § 175-1.

a scofflaw/default judgment request. A scofflaw request includes notifying NYSDMV. A Scofflaw/Default Judgment request requires sending a certified or registered mailing, return receipt requested to each scofflaw/default judgment candidate.

f. **DEFAULT CONVICTION ADMINISTRATIVE PROCESSING FEE**- A **$75** administrative fee to defray the costs of processing a default conviction. A default conviction is filed against the defendant-motorist when he/she fails to appear for a scheduled trial or hearing. The scheduled trial or hearing is a specific time set aside for the defendant-motorist to provide their testimony and/or evidence, why they believe they are not guilty of the alleged violation. The City of Buffalo brings the issuing officer to court to explain the circumstances that caused the issuance of the summons. When the defendant-motorist fails to appear as scheduled, a default conviction is recorded and transmitted to NYSDMV.

g. **MOTION TO VACATE DISPOSITION APPLICATION FEE**- A **$75** administrative fee to defray the costs of processing a written application of motion to vacate a disposition. The process includes reviewing why the defendant-motorist missed their specific trial or hearing date, or failed to answer, and whether or not a defendant-motorist has a meritorious defense. The process involves a Prosecutor review and written or oral response, judicial review or judicial hearing, clerical support and in some cases filing various documents with NYSDMV to vacate the previously disposed violation on the defendant-motorist's driving record.

h. **ADMINISTRATIVE FEE FOR FILING JUDGMENTS**- A **$100** administrative fee to defray the costs of filing money judgments in the Erie County Clerk's Office. The process includes Judicial approval, clerical support, office supplies, and postage.

i. **LATE FEES**- (1) After 30 days: $50.00; (2) After 60 days: additional $20.00= $70.00; (3) After 90 days: additional $20.00= $90.00

j. **COLLECTIONS FEE**- $25.00 per ticket

k. **DISTRACTED DRIVER DIVERSION PROGRAM APPLICATION FEE**- $250.00.[16]

166.    Taken together, these fees, all of which either automatically apply to every traffic ticket issued in the City of Buffalo or are more likely to kick in the more tickets that BPD

---

[16] *See* Buffalo Munic. Code § 175-1; *see also* BTVA FAQ's on Applicable Fees, available at https://www.buffalony.gov/Faq.aspx?QID=117.

officers issue to each driver they stop, dramatically increase the amount of money that Buffalo drivers must pay, and the amount of revenue the City receives, for each traffic ticket issued by the BPD and adjudicated by the BTVA.

167.    Buffalo Common Council Member Christopher Scanlon, who introduced the legislation that added the 13 new BTVA fees, indicated that the fees were enacted to cover BTVA's costs and "bring things in line with other municipalities."[17]

168.    However, even with its revenue underperformance, the BTVA still turned a $2 million profit in 2018, and there are no municipalities in New York State that assess anywhere near the number and total dollar amount of fees for traffic violations that the City of Buffalo now does.

169.    City policymakers continue to focus on maximizing the revenue-raising function of the City's traffic enforcement efforts.

170.    At a November 2018 meeting of the Buffalo Common Council's Finance Committee, Donna Estrich, the City's commissioner of Administration and Finance, told the Council: "Traffic violations is below budget, and you know, we're working with police. They just created a new traffic detail and put that out." In response, a finance committee member stated "[w]hen you're mining for gold, it's good to know that there's gold in the well, and there's plenty of gold there to be digging for."[18]

---

[17] See Marsha McLeod, "City Hall Cashing in on Traffic Tickets," *Investigative Post* (Feb. 27, 2019), *available at* https://www.investigativepost.org/2019/02/27/city-hall-cashing-in-on-traffic-tickets/.

[18] *Id.*; *see also* Buffalo Common Council Committee on Finance, (Nov. 7, 2018), *available at* http://buffalony.iqm2.com/Citizens/SplitView.aspx?Mode=Video&Meet-ingID=1579&MinutesID=1558&FileFormat=pdf&Format=Minutes&MediaFileFormat=mpeg4.

***Defendants Have Acted with Deliberate Indifference to the***
***Rights of Plaintiffs and Class Members***

171.   For the past several years, Plaintiffs, class members, and members of the general

public have repeatedly expressed dissatisfaction with Defendants' operation of the Checkpoints

and have complained in public fora and in the media that BPD operates Checkpoints in a racially

discriminatory manner and in violation of constitutional mandates.

172.   Likewise, Plaintiffs, class members, and members of the general public have

repeatedly expressed concern that BPD engages in and has a history of engaging in racial

profiling and race-based discrimination.

173.   In 2015, Buffalo residents created Facebook groups to record and publicize

Checkpoint locations so that people could avoid them. Each Facebook group has thousands of

members. Comments on the Facebook page make clear the general belief that BPD targets the

Eastside of Buffalo for Checkpoints and traffic enforcement generally.

174.   In July 2016, a comprehensive article in *The Public* documented concerns of

advocates and Black community members that the BPD employs Checkpoints in a racially

discriminatory manner.

175.   A 2016 report by the Greater Buffalo Racial Equity Roundtable identified traffic

violations in Buffalo as "a means for sweeping and arresting people of color, regardless of

witnessing any criminal activity or receiving complaints."[19] The report linked traffic

enforcement to Stop and Frisk and other "Broken Windows" policing strategies that have created

racial disparities at every stage of the criminal justice system, from arrest, to prosecution to

sentencing.

---

[19] Greater Buffalo Racial Equity Roundtable, *The Racial Equity Dividend: Buffalo's Great Opportunity* at 32 (Sept. 2016).

176.    Also in 2016, Partnership for the Public Good released a report stating that traffic enforcement, often at Checkpoints, may contribute to racial disparities and poor police-community relations. The report revealed that only 30% of Black residents said that the police work well with their neighborhoods, compared to 82% of white residents. Further, the report found, only 20% of Buffalo residents believe that police respect people of color.

177.    In 2017, BPD's use of Checkpoints became a prominent issue in the mayoral primary campaign.  All of Defendant Brown's challengers in the Democratic primary, including Erie County Legislator Betty Jean Grant, City Comptroller Mark Schroeder, and Plaintiff Taniqua Simmons, criticized BPD's racially discriminatory use of police Checkpoints at mayoral debates and in the media.

178.    In response to these and other complaints, Defendants Brown and Derenda defended the City's traffic enforcement policies and practices, including those pertaining to Checkpoints.

179.    However, prior to August 2017, the City, BPD, and Defendants Brown and Derenda did not gather and did not review statistical information about the operation and results of the Checkpoint program, such as the locations of Checkpoints, the aggregate number of people who pass through Checkpoints, the number of people subjected to secondary stops, the average wait times, the number of tickets issued, fines generated, cars towed, money collected, licenses suspended, the race, age and gender of people subjected to enforcement at a Checkpoint, or any other related data.

180.    On July 25, 2017, the Buffalo Common Council adopted a resolution entitled "Buffalo Police Department Checkpoint Policy," raising concerns about the discriminatory use

of Checkpoints, and requesting detailed information from the BPD about Checkpoints over the last three years

181.    In response to the Council's request, BPD stated that it did not have historical information on Checkpoint locations but that it would provide data going forward.

182.    In August 2017, BPD introduced a "Traffic Safety Checkpoint Tally Sheet" to record basic information about the results of the Checkpoints going forward. However, the Tally Sheets do not track the numbers of people who pass through the Checkpoints, average waiting times, or demographic information about people stopped, ticketed, and/or arrested at Checkpoints.

183.    The Tally Sheets exist only for the period August 4, 2017 through October 27, 2017.

184.    At the same time that it started producing the Tally Sheets, BPD also began to conduct Checkpoints in white neighborhoods that had never previously experienced Checkpoints. BPD then provided the Tally Sheets with these Checkpoint locations to the City Council in an effort to demonstrate to the public that it did not conduct Checkpoints in a discriminatory manner.

185.    The choice of Checkpoint locations in the July-October 2017 time period therefore bears little relationship to the choice of locations in the previous four-and-a-half years and was a sham to cover up the previous intentionally discriminatory targeting of Black and Latino neighborhoods.

186.    Thus, the percentage of Checkpoints in (a) majority-minority areas and (b) largely white areas, by period, was as follows:

| Period | % in Majority/ Minority Areas | % in Largely White (Minorities < 25%) Areas |
|---|---|---|
| 2013 | 88.3% | 5.1% |
| 2014 | 94.1% | 1.0% |
| 2015 | 96.7% | 1.0% |
| 2016 | 92.6% | 4.6% |
| Jan.-June 2017 | 76.8% | 16.2% |
| July-Oct. 2017 | 41.5% | 34.5% |

187.    In December 2017, the Attorney General of the State of New York opened an investigation into BPD's Checkpoint practices. The investigation resulted from a complaint filed by Black Lives Matter-Buffalo that alleged widespread racial discrimination by BPD.

188.    In January 2018, Defendant Derenda retired as BPD Commissioner.

189.    In February 2018, Defendant Lockwood, in his role as Acting Commissioner, disbanded the Strike Force Unit.[20]

190.    However, simply disbanding the Strike Force Unit does not and will not adequately address the violations raised and claims brought in this lawsuit.

191.    BPD officials moved Strike Force Officers to the Division of Traffic Enforcement.

192.    In February 2018, in BPD's only public statement on the future of the Checkpoints, Captain Jeff Rinaldo told the Buffalo News that Checkpoints will continue.[21]

193.    BPD has in fact continued to run Checkpoints as recently as April 2018.

194.    BPD has not disbanded the Housing Unit.

195.    Defendant Brown continues to express support for aggressive traffic enforcement.

---

[20] Maki Becker, Buffalo Police to End Strike Force Unit, Put Focus on Community Policing, *The Buffalo News* (Feb. 10, 2018), http://buffalonews.com/2018/02/09/buffalo-police-to-end-its-strike-force-unit-put-focus-on-community-policing/

[21] *Id.*

196.    The City and Defendants Brown and Lockwood continue to direct BPD officers to issue as many traffic tickets as possible.

197.    The City's budget continues to rely on millions of dollars in revenue from traffic tickets.

198.    The City, BPD and Defendants Brown, Derenda and Lockwood directed officers to conduct traffic Checkpoints but provided no training or guidance as to where to locate and how to operate Checkpoints in accordance with constitutional mandates.

199.    Though they claim to have suspended the Checkpoint program in response to the filing of this lawsuit, the City, BPD and Defendants Brown and Lockwood have issued no formal policy ending the Checkpoint program and could direct BPD Officers to resume operating Checkpoints at any time.

200.    Moreover, the City, BPD, and Defendants Brown and Lockwood continue to direct officers to aggressively enforce traffic laws without providing any training or guidance as to how to do so in a nondiscriminatory manner.

201.    The City, BPD, and Defendants Brown, Derenda and Lockwood have not and do not gather and review statistical information to ascertain whether BPD operates vehicle Checkpoints in a racially discriminatory manner.

202.    The City, BPD, and Defendants Brown, Derenda and Lockwood also have not and do not gather and review statistical information about traffic stops outside of Checkpoints, including the location of the stops and the race, age, and gender of the person stopped, ticketed, and/or arrested.  The City, BPD, and Defendants Brown, Derenda and Lockwood have never had a way to evaluate and have not and do not evaluate whether BPD officers are enforcing traffic laws in a racially discriminatory manner.

*Defendants' Policies, Practices and/or Customs Have Harmed*
*Plaintiffs and Class Members*

203.    Defendants' policies, practices, and/or customs have subjected and will continue to subject thousands of Buffalo residents—mostly low-income people of color—to unreasonable, suspicionless stops in violation of the Fourth Amendment. Defendants have targeted and will continue to target Plaintiffs and class members for these stops based on their race and/or the racial demographics of their neighborhoods, in violation of the Fourteenth Amendment.

204.    Defendants' policies, practices, and/or customs have caused and will continue to cause the BPD to issue thousands of traffic violations, and to make arrests and impound vehicles, motivated by pecuniary interests and racial profiling and discrimination.

205.    Defendants' policies, practices, and/or customs have directly caused the New York State Department of Motor Vehicles to suspend thousands of driver's licenses belonging to low-income people of color in Buffalo. The BTVA requests such suspensions whenever a person does not pay a traffic ticket – even when the reason for nonpayment is that the person cannot afford to pay. Thus Defendants policies, practices, and/or customs, far from improving traffic safety, have actually decreased traffic safety by depriving low-income people of their driver's licenses, thus increasing the number of unlicensed and uninsured drivers.

### ALLEGATIONS OF NAMED PLAINTIFFS

*Dorethea Franklin*

206.    Plaintiff Dorethea Franklin is a 45-year-old Black woman and mother of seven children. To support her family, she runs a cleaning business called Benton Property Management. Ms. Franklin also performs extensive volunteer work in her community on behalf of people with disabilities. Ms. Franklin lives and works on the East Side of Buffalo in a predominately Black neighborhood.

207.    Ms. Franklin has endured dozens of vehicle Checkpoints in and around her home on the East Side of Buffalo.

208.    From approximately January 2013 through October 2017, Defendants operated a vehicle Checkpoint on Ms. Franklin's street and near her home almost every Sunday during non-winter months. BPD often operated this Checkpoint at times of heavy traffic when members of the local community are travelling to or from church.

209.    Ms. Franklin lives on a one-way street that extends from the off-ramp of the Bailey Avenue exit of New York State Route 33.

210.    Bailey Avenue runs through the heart of Buffalo's East Side, which is a predominately African American community. Many people travelling to the East Side of Buffalo must take the Bailey Avenue exit in order to reach their destination.

211.    The Bailey Avenue vehicle Checkpoints typically were staffed by multiple BPD officers utilizing multiple BPD police cars and an Automated License Plate Reader. BPD also had tow trucks stationed at the Checkpoint.

212.    Every car that exited Route 33 at Bailey Avenue had to pass through the Checkpoint. BPD officers checked every car for license, registration, inspection sticker, and they looked inside the car for visible violations. BPD officers honked their horns if they wanted other officers to pull a car over for a secondary inspection.

213.    Ms. Franklin observed that, to the extent white people went through the Bailey Avenue Checkpoint, they tended to pass through without being pulled over for a secondary stop. Most of the drivers pulled over for secondary inspections were Black.

214.    During the operation of the Checkpoints that Ms. Franklin observed, the entire street was lined with cars waiting for secondary inspection or to be ticketed and/or towed. There

40

is an auto repair business on the corner at the end of the block, and BPD usually filled the lot with cars waiting to be towed.

215.    BPD officers typically operated the Checkpoints that Ms. Franklin has observed for around 90 minutes, and during this time BPD officers issued around 100 tickets, made several arrests, and towed multiple vehicles.

216.    On dozens of occasions during the operation of these vehicle Checkpoints, in order to enter or exit her driveway to go about her daily life, Ms. Franklin had to proceed through a Checkpoint.

217.    On many other occasions, officers established the Checkpoint directly in front of Ms. Franklin's driveway, blocking her vehicle entirely for the duration of the Checkpoint. During these times, if Ms. Franklin was home, she could not leave in her vehicle until the Checkpoint ended.

218.    Even though the officers who operated the Checkpoint knew Ms. Franklin (because they saw her regularly), they treated her rudely and disrespectfully when she passed through the Checkpoint.

219.    Ms. Franklin was pulled over for a secondary inspection three times. Each time took about 45 minutes.

220.    On two of the occasions, BPD officers directed Ms. Franklin to secondary inspection for no apparent reason and eventually let her go without a ticket.

221.    On another occasion in May 2016, BPD officers directed Ms. Franklin to secondary inspection because her registration had expired the previous day. Ms. Franklin was travelling home with five of her children ranging in age from three to 16. While awaiting secondary inspection, Ms. Franklin went online and renewed her registration. When the officer

returned to Ms. Franklin's vehicle, he accused her of not having proper child safety restraints and threatened to write her five tickets, one for each of her children. Ms. Franklin responded that each child was in fact restrained appropriately for his or her age and weight. The officer did not issue Ms. Franklin any tickets.

222.    When Ms. Franklin was at home while BPD is operating a Checkpoint on Bailey Avenue, she had to listen to the noise of constant honking, idling engines, and other noise coming from the Checkpoint.

223.    Even though it is a one-way street, people often turn into Ms. Franklin's driveway in an effort to avoid the Checkpoint.

224.    Ms. Franklin has also experienced smaller, more informal Checkpoints.

225.    On or about June 5, 2017, around 4:30 or 5:00 p.m., Ms. Franklin witnessed two officers in a single police car stop at a red light on Broadway and Bronwell, turn on the lights on the top of their car, jump out of the car, and begin to operate a Checkpoint. The officers waved Ms. Franklin through, but all of the cars in back of her had to line up to go through the Checkpoint. In this particular instance, it appeared to Ms. Franklin that the officers simply decided to run a Checkpoint at random.

226.    Ms. Franklin has also passed through a smaller, informal Checkpoint on Grant Street on the West Side. At that particular Checkpoint, there were only two or three police cars and no lights, signs, warning lights or other warning indicia of a Checkpoint.

227.    Ms. Franklin has never received a ticket at a Checkpoint, but she always worries about that possibility and is extremely nervous about being stopped by BPD whenever she is driving through her neighborhood. She feels that she is always under scrutiny.

228.    Ms. Franklin feels targeted for increased police enforcement because of her race and because she lives in a predominantly African American neighborhood.

229.    Ms. Franklin finds BPD's vehicle Checkpoints to be extremely intrusive. She believes that they engender mistrust between the neighborhood and the BPD, that they are fundamentally unfair and discriminatory, and that they divert scarce police resources away from other important activities, such as solving more serious crimes.

230.    Because of the frequency and burdens imposed by the Checkpoints on or near her street, Ms. Franklin has expressed frustration and concern regarding BPD's vehicle Checkpoints to members of her family, her neighbors, and members of the general public.

231.    On June 23, 2017, Ms. Franklin appeared on Spectrum News-TWC in a segment called "Are Buffalo Check Points Targeting the East Side." The segment focused on community complaints that the Checkpoints target the East Side of Buffalo in a discriminatory manner, resulting in the issuance of hundreds of tickets for minor infractions, while serious crimes go unsolved.

232.    During the segment that aired, Ms. Franklin stated: "There is no refuge on the East Side from Checkpoints."

233.    Defendant Brown also appeared in the segment to defend the City's use of Checkpoints.

234.    Ms. Franklin still lives and works in parts of the City where BPD frequently run Checkpoints and engage in discriminatory traffic enforcement in order to harvest revenue.

235.    Ms. Franklin also drives frequently for work, to take her children to and from school and daycare, to go to church and volunteer activities, to shop for groceries and for many other reasons.

236.    Ms. Franklin is thus at risk of encountering BPD's unconstitutional traffic enforcement—both at and outside of Checkpoints—at any time.

*Taniqua Simmons*

237.    Plaintiff Taniqua Simmons is a 43-year-old mother of seven. Ms. Simmons is African American and lives in a predominately African American neighborhood located close to the divide between the East and West sides of Buffalo. She works full time in the health care industry and is a prominent community activist.

238.    Between 2014 and July 2017, Ms. Simmons has driven through at least 40 vehicle Checkpoints operated by the BPD, many conducted by BPD Strike Force Officers, all on the East Side of Buffalo in predominately African American neighborhoods.

239.    Specifically, Ms. Simmons has endured the following BPD vehicle Checkpoints since 2014:

        a.    East Ferry and Grider, approximately 10-15 times;

        b.    East Ferry and Filmore, approximately 10-15 times;

        c.    Fox and Moselle, approximately 5 times;

        d.    Bailey and East Delavan, 3 times;

        e.    Bailey and East Ferry, approximately 2-3 times;

        f.    Bailey and Scajaquada Parkway, 2 times;

        g.    33 and Cloverdale, 2 times;

        h.    Genesee and Union, 1 time.

240.    Ms. Simmons last passed through a Checkpoint in summer 2017, at 33 and Cloverdale. On that particular occasion, Ms. Simmons had to wait approximately 20 minutes in order to pass through the Checkpoint because there was a long line of cars coming off the expressway.

241.    Ms. Simmons cannot avoid passing through BPD Checkpoints as she goes about her daily life. BPD frequently locates Checkpoints on one-way streets that she needs to use to leave from or arrive at her home, the homes of her family and friends, the local businesses that she frequents, and her job.

242.    Ms. Simmons' typical experience of the Checkpoints is as follows:

243.    At each Checkpoint, Ms. Simmons has to wait 5-15 minutes behind multiple cars in order to pass through the Checkpoint. Generally, during daylight hours BPD provides no warnings regarding the presence of a Checkpoint; sometimes the BPD vehicles have flashing lights at night. BPD patrol cars block nearby streets so as to force everyone in the area of the Checkpoint to go through the Checkpoint. Cars line the road or nearby parking lots while their drivers and occupants wait for BPD officers to issue them tickets. BPD officers also make arrests and sometimes tow and impound vehicles.

244.    An officer stands in the middle of the road and appears to check to see if drivers or passengers are visibly violating the law, such as by not wearing a seatbelt. If the officer finds such a violation, he will tell the driver to pull over for a ticket. Otherwise, the officer waves the car through to the next police officer.

245.    A second police officer stops other cars not identified by the first officer as in obvious violation of the law. This second officer approaches the car, sometimes with a flashlight, and orders the driver to roll down his or her window. Typical questions that follow include: "Where are you going?," "Where are you coming from?," and "What are you doing?" The officer looks inside the car and checks license and registration. Often, but not always, drivers are allowed to proceed through the Checkpoint from this point.

246.    Ms. Simmons has been pulled over by BPD officers for a prolonged final stop following this process five times, most recently in 2014. She understood these additional stops to be for various reasons, ranging from the questioning officer not liking her answers, a legal violation with her car or registration, or sometimes for no reason at all. She has generally not been told why she was being pulled over. Her wait times during these prolonged additional stops have been 45 minutes and longer. In 2012 she received a ticket for having an expired inspection sticker, and another time, in 2014, Ms. Simmons' husband received a ticket for not wearing a seatbelt. The other times BPD officers eventually let her go without a ticket after holding and questioning her for a prolonged period.

247.    Based on her experiences, Ms. Simmons approaches every Checkpoint with fear and anxiety. Although she knows that she complies with the law, she believes BPD officers act arbitrarily. In the past, BPD officers at Checkpoints have made her feel that she could be arrested and jailed for no reason at all. Every Checkpoint stop has been stressful and humiliating.

248.    Based on her interactions with and observations of BPD Checkpoints, most drivers and passengers forced to go through the Checkpoints are African American. Ms. Simmons has frequently observed these individuals arrested, ticketed, or towed.

249.    Ms. Simmons believes that through the operation of these Checkpoints, the BPD treats her and her family and friends like criminals though they have done nothing wrong. She has suffered anxiety from being stopped at these Checkpoints.

250.    In November 2016, Ms. Simmons testified before the Community Oversight Committee that she believed BPD Checkpoints were discriminatory, that they made her friends and family feel as though they lived in a police state, and that they diverted police attention from more important responsibilities such as solving crime and homicides.

251.    Ms. Simmons made similar comments to BPD officials at a community forum at Burguard High School in November 2016.

252.    Ms. Simmons also spoke out against BPD Checkpoints at Buffalo Common Council meetings in or about June and July 2016.

253.    Also in June 2016, at a Father's Day event, Ms. Simmons had the opportunity to share her views on Checkpoints directly with Defendant Brown. Ms. Simmons told Mr. Brown that she believed 95% of Checkpoints took place on the East Side of Buffalo, and that they were unfair and discriminatory. Mr. Brown responded by saying that the Checkpoints were "all over the city" and that he would "look into it."

254.    Ms. Simmons drives frequently for work, to take her children to and from school and daycare, to go to church and volunteer activities, to shop for groceries and for many other reasons. Ms. Simmons lives and works in parts of the City where BPD frequently runs Checkpoints and engages in discriminatory traffic enforcement in order to harvest revenue. Ms. Simmons is thus at risk of encountering BPD's unconstitutional traffic enforcement—both at and outside of Checkpoints—at any time.

### De'Jon Hall

255.    Plaintiff De'Jon Hall is a 27-year-old Black man and a graduate of the University of Buffalo School of Law. Mr. Hall is the manager of a non-profit organization with a mission to help end the HIV/AIDS epidemic and improve the health and welfare of Queer and Trans people of color.

256.    Mr. Hall is also a member of organizational Plaintiff Black Love Resists in the Rust.

257.    In March 2017, Mr. Hall moved to Buffalo and was living with his grandmother on Shirley Avenue on the East Side.

258.    At first, Mr. Hall did not drive in Buffalo because he did not have a vehicle, but on April 17, 2017, he bought a new car.

259.    Nine days later, on April 26, 2017, Mr. Hall encountered a Checkpoint on Comstock Avenue near Kensington Avenue.

260.    At the Checkpoint, Mr. Hall observed a number of police cars and approximately 10 officers. Several vehicles had flashing lights. Every car approaching the Checkpoint had to come to a full stop. The officer asked to see Mr. Hall's driver's license and checked his inspection sticker. Mr. Hall observed a tow truck and cars lined up on the side of the Checkpoint.

261.    Mr. Hall found the experience of passing through the Checkpoint so unsettling that he decided he never wanted to go through another one. Mr. Hall felt that BPD officers were arbitrary and unpredictable, and he wished to avoid interactions with the police. He found the Checkpoints inconvenient and did not want to be late to classes or important meetings because he had to spend time waiting to pass through a Checkpoint. Although he knew that BPD could not possibly have a reasonable basis to stop and search him, he believed that BPD officers often acted unreasonably, and he feared being stopped, searched, ticketed, arrested, or harmed at a Checkpoint.

262.    Mr. Hall subscribed to the Buffalo Checkpoints Facebook page so that he could receive advance warning of Checkpoint locations.

263.    He checked the Facebook page every time he got in the car in order to know where the Checkpoints were. If necessary, he adjusted his route in order to avoid having to pass through a Checkpoint.

264.    So far, Mr. Hall has not had to pass through another Checkpoint, but he has also had to expend a significant amount of time and effort avoiding Checkpoints.

265.    Mr. Hall no longer lives with his grandmother, but he still drives through the Eastside often for work and to visit her and other friends and family members.

266.    Mr. Hall remains at risk of encountering another Checkpoint or encountering BPD's unconstitutional traffic enforcement—both at and outside of Checkpoints—at any time.

***Ebony Yeldon***

267.    Plaintiff  Ebony Yeldon, a thirty-two-year-old Black woman and mother of three children, lives on the West Side of Buffalo.

268.    Ms. Yeldon currently works two  jobs as a sales associate at a dollar store and providing respite care for children with disabilities.

269.    Ms. Yeldon worked as a taxi driver for Cold Spring Taxi and as a school bus driver for Student Transportation Bus Company until May 2018.

270.    In or about the Summer of 2017, Ms. Yeldon drove through a Checkpoint at East Ferry and Grider on the East Side while on her way to visit her mother.

271.    Then, on or about December 18, 2017, BPD Officer Michael Healy pulled Ms. Yeldon over while she was driving a Cold Spring Taxi in South Buffalo, a predominately white neighborhood. Ms. Yeldon's employer owned the vehicle.

272.    Officer Healy asked Ms. Yeldon to produce her license, registration, and insurance.

273.    Officer Healy wiped his finger across one of the windows of the taxi and told Ms. Yeldon it was dirty. He did not measure the taxi's window tint.

274.    Officer Healy gave Ms. Yeldon two tickets for tinted windows and one ticket for driving without insurance.

275.    Ms. Yeldon assured Officer Healy that the vehicle was insured, and she asked whether he could look up the vehicle's insurance status and issue a warning instead of a ticket.

276.    In response, Officer Healy told Ms. Yeldon that she was lucky that he only gave her two tinted windows tickets instead of four.

277.    The tickets amounted to approximately $1,000.

278.    In May 2018, Ms. Yeldon had a *pro se* hearing at the BTVA.

279.    At the hearing, Officer Healy testified that he measured Ms. Yeldon's tints with a tint-meter and that the tint level was 17%.

280.    A tint level of 17% is not in violation of New York State's Vehicle Traffic Laws.

281.    Ms. Yeldon testified that she did not own the vehicle and that the vehicle had insurance at the time of the stop.

282.    Conviction under section 319 of the New York Vehicle and Traffic Law requires proof that the person ticketed owned the vehicle or had actual knowledge that the vehicle lacked insurance.

283.    Therefore, there was no factual basis to convict Ms. Yeldon of any of the alleged violations.

284.    Nevertheless, the BTVA hearing officer convicted Ms. Yeldon on all counts.

285.    The New York State Department of Motor Vehicles immediately suspended Ms. Yeldon's license because of the conviction on the insurance violation.

286.    Ms. Yeldon immediately lost both of her jobs because she no longer had a valid driver's license.

287.    Ms. Yeldon appealed the decision to the Erie County Appellate Term.

288.    On October 17, 2018, the Appellate Term reversed the charge for lack of insurance but sustained the tinted windows violations because: "The appellant has submitted and shown competent proof that the marked taxi she was driving, with a valid taxi license, was fully

insured and owned by her employer and that the tint was removed from the windows in a timely fashion after the stop."

289.    It took Ms. Yeldon several months to earn the money needed to reinstate her driver's license.

290.    Ms. Yeldon now has a valid driver's license. She drives frequently on the Eastside of Buffalo and remains at risk of encountering another Checkpoint or encountering BPD's unconstitutional traffic enforcement—both at and outside of Checkpoints—at any time.

291.    Ms. Yeldon has never recovered from the financial losses she sustained as a result of losing her driver's license.

292.    For several months, she had no income with which to support her family.

293.    Without a license, Ms. Yeldon had difficulty caring for her family in other ways. For example, she had to use public transportation to get her children to and from school and sports activities, which added several hours to her and her children's daily commute.

294.    Even after she found her current positions, Ms. Yeldon now earns significantly less money than she did previously.

295.    Ms. Yeldon has an extremely difficult time paying bills and providing for her children on her reduced income.

296.    Ms. Yeldon is afraid to return to taxi driving because she fears racial profiling by the BPD.

### Charles Palmer

297.    Plaintiff Charles Palmer, a 36-year-old Black man and veteran of the United States Air Force, lives on the East Side of Buffalo.

298.    He sustained various disabilities during his military service and receives Veterans Disability Compensation, which he uses to support himself and his five-year-old son.

299.    Mr. Palmer volunteers with AmeriCorps around issues of economic and community development.

300.    Until 2016, Mr. Palmer worked on call as a carpenter. He paid dues to a union and responded to service calls that the union referred to him. Mr. Palmer typically drove his car to jobs at various locations, including Rochester and Syracuse, New York.

301.    In or about 2015, Mr. Palmer began experiencing vision problems, and the glare from the sun bothered him while he drove. He decided to tint his car windows to address his sensitivity to the light.

302.    On or about November 4, 2015, BPD Housing Unit Officer Jared Domaracki pulled Mr. Palmer over on Suffolk St. and Hempstead Ave. on the East Side. Officer Domaracki ran Mr. Palmer's license and asked him where he was going.

303.    Mr. Palmer responded that he was going "home," and Officer Domaracki asked where home was. Mr. Palmer moved frequently and used his aunt's address on the East Side of Buffalo as a permanent address. For this reason, the address on Mr. Palmer's driver's license did not match the address where he resided at the time of the traffic stop.

304.    Officer Domaracki gave Mr. Palmer three tickets: one ticket for failure to notify the DMV of a change of address and two tickets for tinted windows.

305.    On or about January 15, 2016, BPD Strike Force Unit Officer Adam Wigdorski pulled Mr. Palmer over on Newburgh and East Delavan on the East Side and gave him five tickets: four for tinted windows and one for failure to notify the DMV of a change of address.

306.    As in the previous incident, Officer Wigdorski asked Mr. Palmer where he was going and ticketed him when the address he gave the officer did not match the address on his driver's license.

307.    On or about June 5, 2016, BPD Housing Unit Officer Charles Miller pulled Mr. Palmer over on Bailey and Kensington on the East Side and gave him four tickets for tinted windows and one ticket for expired registration. Mr. Palmer's registration had expired the day before the stop.

308.    Plagued by the constant tickets, Mr. Palmer inquired about having the tints on his car removed. He learned that removal would cost approximately $130. At the time, Mr. Palmer had not had a carpentry job in a while and could not afford to have the tints removed, nor could he afford to pay the tickets.

309.    In or around June 2016, Mr. Palmer learned that his license had been suspended due to unpaid tickets.

310.    Because of the continued ticketing and harassment by the BPD, his suspended driver's license, and his inability to pay his outstanding tickets, Mr. Palmer decided to return his car to the dealership where he had purchased it. With no vehicle and no valid license, Mr. Palmer had to stop driving.

311.    Mr. Palmer could no longer accept carpentry jobs to which the union referred him if they were not accessible via public transportation. Very few jobs met this criterion. Therefore, the union eventually stopped referring jobs to Mr. Palmer because he did not drive.

312.    Mr. Palmer struggled to pay bills and support his son. His vision continued to deteriorate, and he was diagnosed with Keratoconus. Mr. Palmer was also diagnosed with major

depression, which he attributes to stress caused by his worsening health, financial

hardship, and harassment by the BPD.

313.    In 2018, Mr. Palmer used one of his veterans' compensation checks to pay his

outstanding traffic tickets. He believes he paid around $3,000.

314.    Mr. Palmer currently has a valid license and can drive with corrective

lenses. Although he drives on occasion in rental cars and would like to drive more, he limits his

driving because he fears that the BPD will continue to target, harass, and ticket him.

***Joseph Bonds***

315.    Plaintiff Joseph Bonds is a sixty-three-year-old African American man who lives

in the BMHA Marine Drive Apartments in downtown Buffalo.

316.    Mr. Bonds is a minister at the House of Prayer for All People in Buffalo and a

former construction worker.

317.    In October or November 2016, while on his way to Walmart with his son and two

friends after church, Mr. Bonds went through a Checkpoint on William St. and South Ogden St.

on the East Side.

318.    The officers had been sitting across the street with their lights off and Mr. Bonds

did not initially see them.

319.    During the ten-minute stop, the BPD pulled over Mr. Bonds' car and two other

cars.

320.    The officers brandished their flashlights into the car and told Mr. Bonds that his

insurance had expired. Mr. Bonds told the officers that it had not expired because he had paid it

that same day.

321.    He then showed the officers receipts of his payment.

54

322.    The officers still gave Mr. Bonds a ticket and told him to go to the BTVA to resolve the issue.

323.    When Mr. Bonds later went to the BTVA and presented proof of insurance, the ticket was dismissed.

324.    In August 2017, Mr. Bonds went through a Checkpoint on Jefferson Ave. and Carlton St. just off of the 33 Expressway in the Fruitbelt Area on the East Side.

325.    Mr. Bonds made a left turn onto Jefferson Ave. immediately after exiting the Expressway when he encountered the Checkpoint. Ten or twelve police cars were lined up along the street, and police officers were standing outside of their vehicles.

326.    BPD officers were checking people's registration and inspection stickers using a device on their cars. If the officers discovered an issue, they asked the driver to pull over. If not, they let the driver go.

327.    The officers stopped Mr. Bonds for three or four minutes and checked his registration and inspection sticker. There were two or three other cars waiting in line behind him to be checked and approximately ten cars that the officers had asked to pull over onto the service road off of Jefferson.

328.    Finding no violations, the officers let Mr. Bonds go.

329.    Mr. Bonds stopped driving at night to try to avoid having to go through checkpoints.

330.    BMHA parking lots are not public highways within the meaning of the Vehicle and Traffic Law. Residents of BMHA's Marine Drive Apartment building are required to pay fifteen dollars for a tag in order to park in the BMHA parking lot.

331.    Mr. Bonds purchased and possessed a valid tag that enabled him to park in the BMHA lot.

332.    Notwithstanding Mr. Bond's valid parking tag, BPD officers repeatedly ticketed Mr. Bonds' vehicle while it was parked overnight in the BMHA lot.

333.    The BPD issued many of these tickets during the winter, and the officers would go so far as to wipe snow off Mr. Bonds' windshield during storms to place a ticket there.

334.    The tickets Mr. Bonds received while his car was parked and not in use were for not having a current inspection sticker.

335.    Although Mr. Bonds routinely got his car inspected, if it failed inspection, he often did not have the money to pay for required repairs within the allotted ten-day period.

336.    As a result, it would sometimes take him a while to get his inspection up to date.

337.    Mr. Bonds received such tickets on October 26, 2018, January 7, 2019, January 19, 2019, and twice on January 27, 2019 while his car was parked in the BHMA lot.

338.    In or around January 2019, after having been ticketed several times, Mr. Bonds began parking his car in a garage to avoid further tickets.

339.    In May 2019, Mr. Bonds sold his vehicle to a car parts place because he could not afford to continue incurring and paying tickets.

340.    Mr. Bonds paid approximately $1,000 to resolve the tickets.

341.    Mr. Bonds now plans to get a new car and continue driving.

342.    However, he remains fearful that he will once again be subjected to BPD's unlawful ticketing practices.

***Shaketa Redden***

343.     Shaketa Redden, a 37-year-old Black woman and native of Buffalo, was born and raised on the East Side.

344.    Ms. Redden is a co-founder and former co-director of organizational Plaintiff Black Love Resists in the Rust. She is also a Lead Organizer at Causa Justa, a grassroots social justice organization in Oakland, California.

345.    On September 9, 2015, Ms. Redden was driving on New York State Route 33 (Kensington Expressway) when she encountered a BPD-operated Checkpoint before the exit at Suffolk Street, which leads to the East Side. She drove to the East Side multiple times a week for work and to visit her family and friends.

346.    At the Checkpoint, Ms. Redden observed a long line of cars ahead of hers. Two officers stood outside of their vehicles at the top of the exit ramp, and one officer stood at the bottom.

347.    The officers had stopped approximately four cars in front of Ms. Redden and several others behind her. The officers stopped each vehicle and made each driver roll down their windows.

348.    Ms. Redden observed the officers pulling over other Black drivers. She did not observe them pulling over any white drivers.

349.    When the officers got to Ms. Redden's car, they asked her where she was going.

350.    Ms. Redden told the officers she was going to her friend's house to get her hair done.

351.    The officers then checked the inspection sticker on Ms. Redden's car window and looked inside her car.

Ms. Redden's inspection had lapsed the day before. The officers issued Ms. Redden a ticket.

352.     On September 13, 2018, after dropping BLRR co-founder Natasha Soto home from a vigil in honor of Rafael Rivera, a man who had recently been killed by the BPD, BPD Strike Force Officer Charles Skipper pulled Ms. Redden over on the corner of West Utica St. and Richmond Ave., near Ms. Soto's home.

353.     Officer Skipper stated that Ms. Redden's license plates were suspended. Ms. Redden told the officer that she had not received any notification of this.

354.     Officer Skipper gave Ms. Redden six tickets for the following offenses: failure to notify the DMV of a change of address (2 tickets), driving while her registration was suspended (2 tickets), expired registration, and having a dirty license plate.

355.     Officer Skipper then told Ms. Redden that he would have to impound her vehicle. Ms. Redden asked the officer if she could drive her car home or leave it in the parking lot of her nearby church on the corner of West Utica and Richmond, and address the registration issue as soon as possible. The officer said no and proceeded to have Ms. Redden's car towed.

356.     The next day, Ms. Redden checked and confirmed that the DMV had the correct address on file for her. She renewed her registration and recovered her vehicle from the impound lot after paying a towing and storage fee of $140.

357.     In Buffalo City Court on September 27, 2018, the judge dismissed all the tickets because Ms. Redden had already renewed her vehicle registration.

358.     Ms. Redden believes that BPD officers have profiled her because of her race and that BPD's practices regarding racial profiling and ticketing practices are an abuse of power and authority, and she fears that she will continue to be targeted for unjust stops and ticketing by law enforcement whenever she drives in the City of Buffalo.

359.    In January 2020, Ms. Redden moved from Buffalo to Oakland, CA. However, she intends regularly to visit her family and friends who remain in Buffalo and to drive during those visits.

360.    Ms. Redden remains at risk of encountering BPD's unconstitutional traffic enforcement when she returns home to visit family and friends because she drives through Buffalo neighborhoods where ticketing and stops are concentrated.

### Shirley Sarmiento

361.    Plaintiff Shirley Sarmiento, a seventy-three-year-old Black woman, lives in BMHA's Marine Drive Apartments in downtown Buffalo.

362.    Ms. Sarmiento is a retired educator and advocate who has one adult daughter and three grandsons. Her only income is Social Security.

363.    Residents of BMHA's Marine Drive Apartments are required to pay fifteen dollars for a tag in order to park overnight in the building parking lot.

364.    At all relevant times, Ms. Sarmiento possessed a valid tag allowing her to park overnight in the BMHA lot. Ms. Sarmiento routinely got her car inspected, but if it failed inspection, she often did not have the money to pay for required repairs right away.

365.    When this happened, Ms. Sarmiento would leave her car parked in the BMHA parking lot until she had the money to pay for repairs.

366.    In or about March 2018, Ms. Sarmiento awoke to find two tickets for expired inspection on her car, which had been parked in the Marine Drive parking lot overnight.

367.    Both tickets had the same wording and were for the exact same offense, and Ms. Sarmiento did not understand why she had gotten two of them.

368.    Ms. Sarmiento paid $80 to resolve these tickets.

369.    In March 2019, Ms. Sarmiento again awoke to find a ticket for expired inspection on her car.

370.    Ms. Sarmiento paid $40 to resolve this ticket.

371.    Prior to these incidents, Ms. Sarmiento had received tickets on other occasions, including November 5, 11, and 12, 2016, and January 5, 2017. To the best of Ms. Sarmiento's memory, her vehicle received these tickets while parked overnight at her residence, for which she had a valid parking permit.

372.     Ms. Sarmiento paid at least $310 to resolve these tickets.

373.    At times, Ms. Sarmiento has had to park her car at a friend's garage in order to avoid BPD's excessive ticketing.

374.    Ms. Sarmiento routinely drives in order to visit friends and family, run errands, go to the grocery store and doctor, and engage in activities in her community.

375.    Ms. Sarmiento regularly drives on Eastside of Buffalo because many of her family and friends live there and she participates in activities there.

376.    Ms. Sarmiento also continues to need to park overnight at her BMHA residence.

377.    For this reason, whether driving through the streets of Buffalo or parked at her residence, Ms. Sarmiento is at risk of experiencing the BPD's unconstitutional ticketing practices at any time.

### Jane Doe

378.    Plaintiff Jane Doe is a 27-year-old mother of three who works as a medical assistant. Ms. Doe is Black and lives in a predominately Black neighborhood in Buffalo.

379.    Ms. Doe passed through approximately ten BPD vehicle Checkpoints prior to July 2015. She observed during these experiences that BPD officers stop drivers, examine their cars, and often require the driver and passengers to display identification and registration.

380.     On July 2, 2015, Ms. Doe and her two children, ages 3.5 and 4.5, encountered a Checkpoint at Leslie and Scajaquada administered by Defendant Thomas. At the time of the stop, Ms. Doe had a learner's permit, but not a driver's license.

381.     Ms. Doe came to a complete stop as she waited in line for her turn to pass through the Checkpoint. While stopped, she took off her seatbelt to reach into her glove compartment for her registration. Defendant Thomas then approached the car and requested to see her license and registration.

382.     Ms. Doe had secured her children in booster seats. Defendant Thomas never asked her children's height and weight but simply stated that they needed to be in a "5 point harness."

383.     Defendant Thomas then issued Ms. Doe four tickets: three seat belt violations and a violation for driving on a learner's permit.

384.     Ms. Doe subsequently purchased new booster seats for her children, including a seat with a 5 point harness for her younger child.

385.     Ms. Doe contested the tickets and eventually had a hearing before the Buffalo Traffic Violations Agency on March 10, 2017.

386.     On March 20, 2017, the BTVA sent Ms. Doe a letter finding her guilty of all four violations and assessing eight points on her driver's license and $446 in fines. As a result of this incident, Ms. Doe also owed a Driver Responsibility Assessment in the amount of $450.

387.     At the time of hearing, Ms. Doe was attending school full-time and had no income.

388.     Ms. Doe could not afford to pay her tickets and surcharges in one lump sum.

389.     Ms. Doe sought a payment plan from the BTVA. The BTVA refused to provide a payment plan or accept partial payments.

390.     Because she could not have a payment plan, Ms. Doe could not pay at all.

391.     The NYS Department of Motor Vehicles suspended Ms. Doe' learner's permit because she could not pay the tickets and surcharges.

392.     Ms. Doe graduated from school and obtained a job in Williamsville as a medical assistant. The only way for Ms. Doe to get to work was to drive. Ms. Doe's fiancé had to drive her to and from work because she could not drive herself.

393.     After July 2015, Ms. Doe subscribed to the Buffalo Checkpoints Facebook page so that she and her fiancé could avoid passing through Checkpoints. They checked the Facebook page before driving anywhere and altered their routes through the City in order to avoid the Checkpoints. Still, Ms. Doe passed through two additional Checkpoints that she could not avoid.

394.     Ms. Doe has found every Checkpoint that she has been stopped at to be discriminatory and stressful. She believes that through the operation of these Checkpoints, the BPD treats her and her family and friends like criminals despite having done nothing wrong. She has suffered anxiety from being stopped at these Checkpoints.

395.     In February 2018, Ms. Doe used her tax refund to pay off her traffic tickets. Subsequently, she reinstated her learner's permit.

396.     Ms. Doe intends to obtain her driver's license in the very near future.

397.     Ms. Doe lives in a part of the City where BPD frequently conducts Checkpoints and engages in discriminatory traffic enforcement in order to harvest revenue. Ms. Doe is at risk of encountering BPD's unconstitutional traffic enforcement—both at and outside of Checkpoints—in the very near future.

## CLASS ACTION ALLEGATIONS

398.    Plaintiffs bring this case as a class action under Fed. R. Civ. P. 23(b)(2) and (b)(3)

on behalf of four separate but overlapping classes, two of which contain subclasses.

### *The Checkpoints Injunction Class and Subclass*

399.    Plaintiffs seek certification under Rule 23(b)(2) of a Checkpoints Class defined

as:

> All individuals who have been or will be subjected by BPD to "traffic safety"
> vehicle Checkpoints.

400.    The Checkpoints Class contains a Subclass defined as:

> All non-White individuals who have been or will be subjected by BPD to "traffic
> safety" vehicle Checkpoints.

401.    All Plaintiffs represent the Checkpoints Class and Subclass.

402.    Defendants have acted or failed to act on grounds generally applicable to the

Checkpoints Class and Subclass, thereby making appropriate final injunctive relief with respect

to the Checkpoints Class and Subclass as a whole.

403.    Checkpoints Class members share a number of common questions of law and

fact, including, but not limited to:

404.    Whether Defendants established and conduct the Checkpoints for the

impermissible purposes of general crime control and/or revenue harvesting;

405.    Whether Defendants have a policy, practice, and/or custom of permitting BPD

officers and personnel to conduct unregulated and unsupervised Checkpoints in a manner that

fails to comport with the Fourth and Fourteenth Amendments;

406.    Whether Defendants have failed to properly train, supervise, monitor, and/or

discipline BPD officers, and whether those failures have caused and will cause BPD officers to

violate Classmembers' Constitutional rights;

407.    Whether Defendants have encouraged, sanctioned, acquiesced to, and/or failed to rectify unconstitutional practices in the Checkpoints Program by BPD officers and personnel of which they were aware or should have been aware, and whether such acts and/or omissions have caused and will cause BPD officers to violate Class members' Constitutional rights.

408.    The Checkpoints Subclass shares these questions and in addition shares other common questions of law and fact such as whether Defendants intentionally and discriminatorily target Black and Latino neighborhoods for Checkpoints.

409.    The Named Plaintiffs' claims are typical of class and subclass members' claims. Each Named Plaintiff (including the organizational plaintiff in its representative capacity) has been and likely will again be subjected to a BPD "traffic safety" vehicle Checkpoint. The Named Plaintiffs seek relief under legal theories that are the same or similar to those on which all members of the Checkpoints Class and Subclass will rely. The Named Plaintiffs suffered harms that are typical of the harms suffered by class and subclass members.

***The Unconstitutional Ticketing Class***

410.    Plaintiffs seek certification under Rule 23(b)(2) of an Unconstitutional Ticketing Class defined as:

> All non-White individuals who have received or will receive traffic tickets issued by the BPD.

411.    All Plaintiffs represent the Unconstitutional Ticketing Class.

412.    Defendants have acted or failed to act on grounds generally applicable to the Unconstitutional Ticketing Class, thereby making appropriate final injunctive relief with respect to the Unconstitutional Ticketing Class as a whole.

413.    Unconstitutional Ticketing Class members share a number of common questions of law and fact, including, but not limited to:

414.    Whether Defendants have an impermissible pecuniary interest in assessing and collecting fines and fees for traffic violations, in violation of the Due Process Clause of the Fourteenth Amendment;

415.    Whether Defendants intentionally and discriminatorily target non-White individuals for multiple tickets in a manner not applied to White individuals;

416.    Whether Defendants intentionally and discriminatorily target non-White individuals for traffic enforcement in general, and not merely at Checkpoints;

417.    The Named Plaintiffs' claims are typical of class members' claims. Each Named Plaintiff is a non-white driver who drives regularly in the City and is at risk of receiving a traffic ticket from the BPD. The Named Plaintiffs seek relief under legal theories that are the same or similar to those on which all members of the Unconstitutional Ticketing Class will rely. The Named Plaintiffs suffered harms that are typical of the harms suffered by class members

***The Checkpoint Damages Class and Subclass***

418.    Plaintiffs seek certification under Rule 23(b)(3) of a Checkpoint Damages Class defined as:

> All individuals who received a ticket, been arrested, or had their cars towed and/or impounded at a BPD "traffic safety" vehicle Checkpoint on or after June 28, 2015.

419.    The Checkpoint Damages Class contains a Subclass defined as:

> All Black or Latino individuals who received a ticket, been arrested, or had their cars towed and/or impounded at a "traffic safety" vehicle Checkpoint operated by the BPD on or after June 28, 2015.

420.    Plaintiffs Doe, Bonds, and Redden represent the Checkpoint Damages Class and Subclass.

421.    The Checkpoint Damages Class and Subclass share the questions above with the Injunction Class and Subclass, and in addition share other common questions of law and fact,

such as whether the individual capacity Defendants have violated clearly established statutory or constitutional rights of which a reasonable person would have known.

422.    The common questions outlined above predominate over issues affecting individual class members.

423.    Moreover, a class action is superior to any other method for the fair and efficient adjudication of this legal dispute. The damages suffered by class members, although substantial in the aggregate, are small in relation to the extraordinary expense and burden of individual litigation. Managing this case as a class action should not present any particular difficulty.

424.    The claims of Plaintiffs Doe, Bonds and Redden are typical of class and subclass members' claims. Each of these plaintiffs has received a traffic ticket at a BPD Checkpoint since the start of the class period, June 28, 2015. They seek relief under legal theories that are the same or similar to those on which all members of the Damages Class and Subclass will rely. They suffered harms that are typical of the harms suffered by class and subclass members.

### The Multiple Ticketing Damages Class

425.    Plaintiffs seek certification under Rule 23(b)(3) of a Multiple Ticketing Damages Class defined as:

> All non-White individuals who received multiple tickets from the BPD in a single traffic stop for tinted windows or seatbelt violations on or after June 28, 2015.

426.    Plaintiffs Doe, Yeldon, and Palmer represent the Multiple Ticketing Damages Class.

427.    The Multiple Ticketing Damages Class shares common questions of law and fact, such as such whether the City of Buffalo has a policy, custom or practice of targeting non-White individuals for multiple tickets in a manner not applied to White individuals and, if so, whether such policy, custom or practice violates the Equal Protection Clause.

428.    The common questions outlined above predominate over issues affecting individual class members.

429.    Moreover, a class action is superior to any other method for the fair and efficient adjudication of this legal dispute. The damages suffered by class members, although substantial in the aggregate, are small in relation to the extraordinary expense and burden of individual litigation. Managing this case as a class action should not present any particular difficulty.

430.    The claims of Plaintiffs Doe, Yeldon, and Palmer are typical of class members' claims. Each of these plaintiffs have received multiple tickets in a single stop for tinted windows or seatbelt violations since the start of the class period, June 28, 2015. They seek relief under legal theories that are the same or similar to those on which all members of the Multiple Ticketing Damages Class will rely. They suffered harms that are typical of the harms suffered by class and subclass members.

431.    The Multiple Ticketing Damages class includes thousands of members and is so numerous that joinder of all class members is impracticable. Since January 2015, BPD officers have issued more than 50,000 tickets for tinted windows alone, the great bulk of which involved the issuance of multiple tickets to drivers from majority-Black neighborhoods. The same practices apply to BPD's issuance of seatbelt tickets.

432.    Joinder is also impracticable because, upon information and belief, many putative class members are not aware that their constitutional and statutory rights have been violated and that they have the right to seek redress in court. Many class members lack the means to retain an attorney to represent them in a civil rights lawsuit, and they also fear retaliation and reprisals by BPD officers should they pursue enforcement of their rights in a court of law. A class action thus serves as the most appropriate vehicle for the protection of class members' rights.

433.    The Named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with class members, and will fairly and adequately protect the interests of the class.

434.    Counsel for Named Plaintiffs are highly competent and experienced in federal class action litigation.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of the Fourth Amendment
### On behalf of all Plaintiffs and the Checkpoint Injunction and Checkpoint Damages Classes and Subclasses

435.    Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of subjecting Plaintiffs and class members to unreasonable seizures and searches at Checkpoints.

436.    BPD's constitutional abuses and violations were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendants City, Brown, Lockwood and Derenda, including: (1) the sanctioning and encouragement of, and the failure to rectify, BPD's operation of the Checkpoints; and (2) the failure to train, supervise, monitor and discipline BPD officers engaged in operation of the Checkpoints.

437.    Each Defendant has acted with deliberate indifference to the Fourth Amendment rights of Named Plaintiffs and class members. Defendants' acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' and class members' Fourth Amendment rights. By acting under color of state law to deprive Plaintiffs and class members of their Fourth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

438.    Defendants continue to operate the Checkpoints, and Plaintiffs continue to drive regularly in Buffalo in the neighborhoods targeted by the Checkpoints. Plaintiffs face the real and immediate threat that, unless enjoined by this Court, Defendants will again violate their Fourth Amendment rights by subjecting them to suspicionless stops and searches at Checkpoints.

439.    As a direct and proximate result of Defendants' policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs and attorneys' fees.

## SECOND CLAIM FOR RELIEF

***Violation of the Fourteenth Amendment Equal Protection Clause***
***On behalf of all Plaintiffs, the Unconstitutional Ticketing Class, the***
***Checkpoint Injunction and Checkpoint Damages Subclasses, and the Multiple Ticketing***
***Damages Class***

440.    Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of subjecting Plaintiffs and class members to aggressive, punitive traffic enforcement, including at Checkpoints, based on race and/or national origin. Defendants' policy, practice, and/or custom of targeting Black and Latino neighborhoods for such traffic enforcement amounts to racial and ethnic profiling.

441.    BPD's constitutional abuses and violations were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendants City, Brown, Lockwood and Derenda, including: (1) the sanctioning and encouragement of, and the failure to rectify, BPD's targeting of Black and Latino neighborhoods for aggressive, punitive traffic enforcement (including but not limited to the use of Checkpoints and multiple ticketing for tinted windows and seatbelt violations); and (2) the

failure to train, supervise, monitor and discipline BPD officers engaged in such traffic enforcement.

442.    Each Defendant has acted with deliberate indifference to the Fourteenth Amendment rights of Named Plaintiffs and class members. Defendants' acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' and class members' Fourteenth Amendment rights. By acting under color of state law to deprive Plaintiffs and class members of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

443.    Defendants continue to target Black and Latino neighborhoods for aggressive, punitive traffic enforcement. Because Plaintiffs and class members continue to drive in these neighborhoods, they face the real and immediate threat that, unless enjoined by this Court, Defendants will again violate their Fourteenth Amendment rights.

444.    As a direct and proximate result of Defendants' policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs and attorneys' fees.

### THIRD CLAIM FOR RELIEF

*Violation of the Fourteenth Amendment Due Process Clause*
*On behalf of all Plaintiffs and the Checkpoint Damages, Unconstitutional Ticketing, and*
*Multiple Ticketing Damages Classes*

445.    Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of subjecting Plaintiffs and class members to aggressive, punitive traffic enforcement in order to generate revenue for the City budget.

446.    The City's reliance on revenue from traffic tickets and associated BTVA fees creates an institutional incentive for the City, the BPD, and the BTVA to ticket, convict and fine defendants, regardless of the nature of their individual offenses. Defendants' pecuniary interests' conflict with their obligations to be and appear disinterested and to serve the interests of justice. The institutional incentive to generate revenue creates bias, and an appearance of bias, that deprives Plaintiffs and class members of due process of law.

447.    This violation of Due Process is directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendants City, Brown, Lockwood and Derenda including: (1) the sanctioning and encouragement of, and the failure to rectify, BPD's aggressive, punitive enforcement of traffic laws in order to generate revenue and (2) the failure to train, supervise, monitor and discipline BPD officers engaged in such traffic enforcement.

448.    Each Defendant has acted with deliberate indifference to the Fourteenth Amendment rights of Named Plaintiffs and class members. Defendants' acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' and class members' Fourteenth Amendment rights. By acting under color of state law to deprive Plaintiffs and class members of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

449.    Defendants continue to engage in aggressive, punitive traffic enforcement and continue to rely on ever-increasing traffic ticket revenue to balance the City budget. Because Plaintiffs and class members continue to drive, they face the real and immediate threat that, unless enjoined by this Court, Defendants will again violate their Fourteenth Amendment rights by subjecting them to traffic enforcement solely for pecuniary gain.

450.     As a direct and proximate result of Defendants' policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs and attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### *Violation of Title VI of the Civil Rights Act of 1964*
### *On behalf of all Plaintiffs, the Unconstitutional Ticketing Class, the*
### *Checkpoints and Checkpoint Damages Subclasses, and the Multiple Ticketing Damages Class*

451.     Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) *et seq.* prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance, including law enforcement programs and activities. Title VI prohibits intentional discrimination on the basis of race or ethnicity. It prohibits law enforcement officers from conducting police activities in a manner that is motivated by race or ethnicity, or in a manner that has a discriminatory effect on a racial or ethnic group, or which is motivated by a discriminatory purpose.

452.     Defendants receive federal financial assistance, including financial assistance for law enforcement activities.

453.     Defendants devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of BPD officers and personnel operating Checkpoints and engaging in aggressive, punitive traffic enforcement in a manner that is motivated by race and ethnicity and results in a significant disparate impact on Black and Latino people. Defendants' policy, practice, and custom of targeting Black and Latino neighborhoods for aggressive, punitive traffic enforcement (including but not limited to Checkpoints) amounts to racial and ethnic profiling.

454.     As a direct and proximate result of Defendants' policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs and attorneys' fees.

## RELIEF REQUESTED

Wherefore, the named Plaintiffs and members of the Main and Damages Classes they seek to represent respectfully request that this Court:

1.     Issue an Order certifying this case as a class action pursuant to Rules 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, with all of the named Plaintiffs as representatives of the Checkpoints Injunction Class and Subclass and the Unconstitutional Ticketing Class; Plaintiffs Doe, Bonds and Redden as representatives of the Checkpoints Damages Class and Subclass; and Plaintiffs Doe, Palmer and Yeldon as representatives of the Multiple Ticketing Damages Class.

2.     Declare that Defendants have violated the rights of Plaintiffs and class members under the Fourth and Fourteenth Amendments to the U.S. Constitution;

3.     Preliminarily and permanently enjoin Defendants:

a.     From continuing the policy, practice, and custom of conducting vehicle Checkpoints for the purpose of general crime control;

b.     From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of their race and ethnicity;

c.     From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints for improper pecuniary purposes;

d.     From continuing to enforce and assess any of the 13 BTVA fees enumerated in § 175-1 of Buffalo Municipal Code Chapter 175.

e.     To institute and implement policies and programs with respect to training, supervision, and discipline that will eliminate the policy, pattern, practice,

and custom of:

    i.   conducting vehicle Checkpoints for the purpose of general crime control;

    ii.   enforcing traffic laws in a manner that targets Buffalo residents on the basis of their race and ethnicity or that reflects an improper pecuniary motive.

f.    To institute and implement appropriate and adequate supervision and discipline of BPD officers and personnel who conduct vehicle Checkpoints;

g.    To implement appropriate measures to ensure that BPD officers and personnel document all traffic stops and vehicle Checkpoints in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act;

h.    To implement appropriate measures to ensure that documentation of all traffic stops and vehicle Checkpoints is retained in a single, up-to-date computerized database;

4.    Award damages to the Checkpoint Damages Class and Subclass, the Multiple Ticketing Damages Class, and Named Plaintiffs in an amount to be determined trial;

5.    Award reasonable attorneys' fees to all Plaintiffs, pursuant to 42 U.S.C. § 1988;

6.    Award costs of litigation to all Plaintiffs, pursuant to 42 U.S.C. §§ 1920 and 1988; and

7.    Award such other relief as this Court may deem appropriate and in the interests of justice.

**PLAINTIFFS DEMAND TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

Respectfully submitted this 23rd day of April, 2020.

| | |
|---|---|
| _/s/ Keisha A. Williams_ | _/s/ Claudia Wilner_ |
| Joseph Keleman | Claudia Wilner |
| Keisha Williams | Britney Wilson |
| WESTERN NEW YORK LAW CENTER | Edward P. Krugman |
| 37 Franklin Street, Suite 210 | NATIONAL CENTER FOR LAW |
| Buffalo, NY 14202 | AND ECONOMIC JUSTICE |
| Tel: (716) 828-8415 | 275 Seventh Avenue, Suite 1506 |
| Fax: (716) 270-4005 | New York, NY 10001 |
| jkeleman@wnylc.com | Tel: (212) 633-6967 |
| kwilliams@wnylc.com | wilner@nclej.org |
| | wilson@nclej.org |
| | krugman@nclej.org |

_/s/ Darius Charney_
Baher Azmy
Darius Charney
A. Chinyere Ezie
Brittany Thomas
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6439
bazmy@ccrjustice.org
dcharney@ccrjustice.org
cezie@ccrjustice.org
bthomas@ccrjustice.org