**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

---

BLACK LOVE RESISTS IN THE RUST, *et al.*,
individually and on behalf of a class of all others
similarly situated,

        Plaintiffs,

   v.

CITY OF BUFFALO, N.Y., *et al.*,

        Defendants.

No. 1:18-cv-00719-CCR

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION TO COMPEL DEFENDANTS TO COMPLY WITH THE**
**COURT'S DECEMBER 19, 2019 ORDER AND OTHER DISCOVERY OBLIGATIONS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

I.    The Court's December 2019 Motion to Compel Order ........................................... 3

II.   Defendants' Failure to Comply with the December 2019 Order ........................... 4

    A.    ESI ............................................................................................................................ 4

    B.    Metadata Information ......................................................................................... 5

    C.    IAD Files ................................................................................................................ 6

III.  Defendants Fail to Produce Other Relevant Discovery ........................................ 7

    A.    Housing Unit, Traffic Unit, and Strike Force Monthly and Daily Reports.................... 7

    B.    Strike Force, Housing Unit, and Traffic Unit Officer Employment History ................. 8

    C.    Complaints to Commission of Citizens' Rights and Community Relations .................. 9

    D.    Documents in Response to RFP 76 and Plaintiffs' Fourth Requests for Production ..... 10

ARGUMENT ....................................................................................................................... 12

I.    The Court Should Order Defendants to Promptly Comply with the December 2019 Order
and Impose a Deadline or Schedule for ESI Discovery .............................................. 12

    A.    ESI .......................................................................................................................... 12

    B.    Metadata Information ....................................................................................... 14

    C.    IAD Files .............................................................................................................. 14

II.   The Court Should Order Defendants to Promptly Produce the Other Relevant Documents
16

    A.    Housing Unit, Traffic Unit, and Strike Force Monthly and Daily Reports.................... 16

    B.    Strike Force, Housing Unit, and Traffic Unit Officer Employment History ................. 17

    C.    Complaints to Commission of Citizens' Rights and Community Relations .................. 18

    D.    Documents in Response to RFP 76 and Plaintiffs' Fourth Request for Production ...... 19

III.  The Court Should Award Fees and Expenses ................................................... 21

IV.   Regular Status Conferences Are Appropriate to Monitor Defendants' Compliance with
Their Discovery Obligations ........................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Crash near Clarence Ctr., New York, on Feb. 12, 2009*,
    No. 09-cv-294, 2013 WL 5936975 (W.D.N.Y. Nov. 4, 2013)...........................................12, 20

*Albino v. Global Equip. USA, Ltd.*,
    No. 14-cv-06519, 2017 WL 3130380 (W.D.N.Y. July 24, 2017) ............................................12

*Am. Rock Salt Co., LLC v. Norfolk S. Corp.*,
    228 F.R.D. 426 (W.D.N.Y. 2004)..........................................................................................19

*Black v. Buffalo Meat Serv. Inc.*,
    No. 15-cv-49, 2017 WL 3315956 (W.D.N.Y. Aug. 3, 2017) ................................................22

*Godson v. Eltman, Eltman & Cooper, PC.*,
    No. 11-cv-0764, 2015 WL 5784908 (W.D.N.Y. Sept. 30, 2015), *aff'd*, 2015
    WL 9434228 (W.D.N.Y. Dec. 22, 2015).................................................................................22

*Guardians Ass'n v. Civil Serv. Comm'n of City of New York*,
    463 U.S. 582 (1983).................................................................................................................20

*Obiajulu v. City of Rochester, Dep't of Law*,
    166 F.R.D. 293 (W.D.N.Y. 1996)...........................................................................................19

*Vincent v. House*,
    No. 07-cv-632, 2009 WL 2913912 (W.D.N.Y. Sept. 4, 2009)...............................................22

**Rules**

Fed. R. Civ. P. 1 ..............................................................................................................................23

Fed. R. Civ. P. 26 ............................................................................................................................12

Fed. R. Civ. P. 34 ............................................................................................................................21

Fed. R. Civ. P. 37 ...............................................................................................................12, 15, 21

## PRELIMINARY STATEMENT

Plaintiffs move to compel discovery in this putative class action concerning racial bias and police accountability in Buffalo. This case has remained stalled in the initial phases of discovery for almost two years now because of Defendants' failure to comply with the Court's orders and endless delays in turning over relevant discovery.  Plaintiffs served their first discovery requests in November 2018, and over the course of the next several months, attempted to reach an agreement with Defendants on the production of Electronically Stored Information (ESI). In response to these good faith efforts, Defendants refused to cooperate, either evading with delays and excuses or failing to respond at all to Plaintiffs' proposals.  On May 30, 2019, after Defendants still had not produced a single ESI document, the Court held a status conference and ordered Defendants to commence rolling productions within two weeks of receipt of an initial set of search terms and custodians.

Defendants did not comply with that order. Instead, they refused to search for any ESI, forcing Plaintiffs to file a motion to compel in July 2019. Defendants also refused to produce several other categories of discovery, including metadata information for ESI documents and 168 Buffalo Police Department Internal Affairs Division (IAD) files, forcing Plaintiffs to move to compel that discovery as well. In December 2019, the Court issued an order granting Plaintiffs' requests in part, and ordering Defendants to produce ESI on a rolling basis, certain metadata information contemporaneously with those documents, and the 168 IAD files.

Nearly a year has passed, and Defendants have not complied with this Court's Order either. Far from the "rolling" productions ordered by the Court, Defendants have produced documents for fewer than half of the initial twenty custodians identified by Plaintiffs and have not completed production for a single custodian or search term. As for metadata information, Defendants have

not produced any of it, despite the parties' agreement on a protocol for doing so. And Defendants still have not produced more than half the IAD files they were ordered to, and now claim that these files have been destroyed, even though summaries of all of these files appeared in Defendants' electronic internal affairs database as recently as July 2019 and Defendants never mentioned their purported destruction when opposing Plaintiffs' prior motion to compel their production. Plaintiffs have, for months, conferred with Defendants in hopes of resolving these issues, only to be met with more excuses and delays.

Defendants have followed this same pattern of uncooperative and evasive conduct in failing to respond to a host of other important discovery requests. To begin with, Defendants have failed, for five months, to respond to Plaintiffs' request for certain monthly and daily Housing Unit, Traffic Unit, and Strike Force reports, which request Plaintiffs narrowed in accordance with the Court's December 2019 order. Defendants have likewise failed to produce the employment history for the officers in those units, even after Plaintiffs identified—almost a year ago—the specific gaps in Defendants' productions. And Defendants have completely failed to produce any documents in response to several of Plaintiffs' document requests, including Plaintiffs' request for complaints to the City of Buffalo Commission on Citizens' Rights and Community Relations and all of Plaintiffs' Fourth Set of Requests for Production, both of which were served more than five months ago.

Absent relief, Defendants will continue to disregard Plaintiffs' reasonable requests, evade their discovery obligations, and stall any progression in this case. As a result, the Court should order Defendants to produce—promptly and under penalty of sanctions—documents in response to each of Plaintiffs' outstanding requests outlined above. In addition, Plaintiffs respectfully submit that an award of fees and expenses for bringing this motion is warranted to deter Defendants

from further discovery violations, and that regular status conferences are appropriate to ensure Defendants comply with their discovery obligations going forward.

## FACTUAL BACKGROUND

### I.    The Court's December 2019 Motion to Compel Order

In July and August 2019, Plaintiffs filed two motions to compel discovery against Defendants. Plaintiffs' July 2019 motion to compel (ECF No. 34) sought production of: (1) electronically stored information ("ESI"); (2) metadata for that ESI; (3) Housing, Traffic Unit, and Strike Force Monthly and Daily Reports; and (4) employment dates of Strike Force and Housing Unit personnel. Plaintiffs' August 2019 motion (ECF No. 42) sought production of certain Buffalo Police Department Internal Affairs Division (IAD) files. As explained in those motions, Plaintiffs moved to compel only after both Defendants failed to comply with the Court's May 30, 2019 order requiring them to produce ESI within twenty days of receipt of Plaintiffs' initial search terms and custodians and after Plaintiffs tried unsuccessfully for months to reach an agreement with Defendants on the other discovery requests.

On December 19, 2019, the Court issued an opinion granting in part and denying in part Plaintiffs' motions to compel, and ordered Defendants to produce ESI, certain metadata information, and the IAD files:

1. **ESI**. The Court ordered Plaintiffs to provide Defendants with a list of twenty priority search terms compatible with Defendants' email systems, and ordered Defendants to use those search terms for the twenty priority custodians previously identified and to produce responsive documents on a rolling basis, with an initial production within twenty days of receipt of the search terms.

2. **Metadata**. The Court held that if "Defendants choose to produce emails in a format that does include metadata reflecting the date and time at which emails were sent and received, the sender, and all recipients (including any copied and blind-copied recipients), they must contemporaneously provide Plaintiffs with this information in some other form."

3. **Housing, Traffic Unit, and Strike Force Monthly and Daily Reports**. The Court denied Plaintiffs' motion to compel these daily and monthly reports "without prejudice to renew with a more particularized request."

4. **Strike Force and Housing Unit Employment History**. After Plaintiffs filed their motion, Defendants produced certain documents reflecting officer transfers. As a result, Plaintiffs informed the Court that they were reviewing Defendants' production and would advise whether any further dispute remains.

5. **IAD Files**. Finally, the Court granted Plaintiffs' motion to compel the 168 IAD files they requested in their entirety. The Court ordered Defendants to produce the files within thirty days of entry of an attorneys-eyes only confidentiality order covering their production.

*See* ECF No. 51.

## II.    Defendants' Failure to Comply with the December 2019 Order

Since December 2019, Defendants have failed to comply with nearly every aspect of the Court's order and have continued to avoid discovery.

### A.    ESI

In accordance with the Court's ruling on Plaintiffs' motion, Plaintiffs provided Defendants with a list of twenty priority search terms compatible with Defendants' email systems on January 22, 2020. *See* Wilner Decl. ¶ 4. As the Court had previously indicated during the May 2019 conference, the purpose of this process was to get "the ball rolling" on ESI discovery, so that Defendants could make an initial production of these priority search terms and custodians in "a much shorter time than [] would otherwise be allotted."  5/30/2019 Hr'g Tr. (ECF No. 30) 7:17-8:12. Defendants produced an initial tranche of ESI documents for two custodians within twenty days, on February 11, 2020. *Id.* ¶ 5. But since then, Defendants' productions have been few and far between, and a far cry from the "rolling" productions ordered by the Court. ECF No. 51, at 12. After Defendants' initial February 11 production, they did not make a second ESI production until late April. *See* Wilner Decl. ¶ 5. Defendants then made a few small and sporadic productions in June followed by no production in the nearly two-month period between July 7 and September 1,

2020. *See id*. While interruptions caused by the COVID-19 pandemic may have exacerbated Defendants' delays, no pandemic can justify the pervasive production failures detailed here.

All in all, **nine months** after they were ordered to begin rolling productions, Defendants have barely put a dent in responding to Plaintiffs' initial twenty priority search terms. As Defendants admitted on September 18, 2020, their "[p]roduction has been completed for *some* search terms for a *few* custodians, but *no* custodians or terms have been completed in whole."[1] Ex. 2 (emphasis added).

### B.    Metadata Information

Likewise, Defendants have failed to comply with the Court's order to produce metadata information. After Defendants refused to produce metadata, the Court's December 2019 order permitted Defendants to produce, "contemporaneously" with their ESI productions, metadata information "in some other form." ECF No. 51, at 12. After the parties conferred and negotiated an acceptable compromise, Defendants agreed on June 2, 2020 to produce spreadsheets with their ESI productions providing, for each document that included an email with hidden recipients (e.g., emails sent to listserv and BCC recipients) or that had attachments: (i) the document's bates number, (ii) the bates numbers of all attachments, (iii) the hidden recipients, (iv) the custodian, and (v) the date field. *See* Ex. 2. Yet, despite agreeing to this compromise more than three months ago, Defendants have not produced a single spreadsheet or provided any metadata for their productions. *See* Wilner Decl. ¶ 12-13. Nor have Defendants explained, let alone justified, their decision to ignore the Court's order and renege on the parties' negotiated agreement. *See id.*

---

[1] Although Defendants' rate of production for ESI documents (but not any other discovery) appeared to have increased in September 2020, Defendants have produced no documents since October 2 and do not appear to be even close to completing their production of documents in response to Plaintiffs' initial priority search terms and custodians, let alone all ESI discovery.

### C.     IAD Files

Notwithstanding the Court's order *nearly a year ago* requiring Defendants to produce the 168 IAD files requested by Plaintiffs *within 30 days* of entry of an attorneys-eyes only confidentiality order governing their production, which the Court entered on January 24, 2020 (*see* ECF No. 54), Defendants have produced fewer than half of those files. Accounting for apparent duplicates, Defendants still have not produced 73 of the 136 unique IAD files that they were ordered to. *See* Wilner Decl. ¶ 16.

Nor have Defendants justified their failure to comply with the Court's order. Since Defendants last made a production of IAD files more than six months ago, Plaintiffs have followed up about this request numerous times, but Defendants have not provided any clear explanation for their failure to produce the remaining 73 IAD files. *See id.* ¶ 17-20. For example, on March 6, Defendants indicated that some of the IAD files "no longer exist" and that they would continue to search for them, but did not explain why they "no longer exist" or what happened to them. Ex. 5. Plaintiffs asked Defendants to confirm whether these records were destroyed, and if so when, and requested that Defendants produce any relevant document retention policies. *See* Wilner Decl. ¶ 19-20. But Defendants never responded to these inquiries. *See id.*

Most recently, Plaintiffs followed up with Defendants about this issue on September 25, 2020, and Defendants continued to filibuster, stating that they "believe some [files] were destroyed per document retention policies," and promised that they would "look into [it] further and provide "more detailed information by next Friday," October 9. *Id.*, Ex. 6. But as of the date of this motion, Defendants have not produced any of the outstanding 73 files, or "more detailed information" on their whereabouts, nor have they produced any relevant document retention policies or other evidence corroborating their claim that these files have been destroyed. *See* Wilner Decl. ¶ 20.

Defendants' explanation that the files were likely destroyed is all the more confusing given Defendants' representations during the course of the parties' original conferrals and motion practice regarding the IAD files. In July 2019, during the parties' original conferrals on Plaintiffs' IAD file discovery request, Defendants provided summary descriptions of all of the files that were taken directly from the BPD's "IAPro" electronic database of its internal affairs files, but said nothing about any of those files having possibly been destroyed. *See* ECF No. 42-9. Moreover, at no point during the briefing of Plaintiffs' original motion to compel production of the IAD files did Defendants raise the possibility that any of the files may have been destroyed, even while specifically noting that the requested IAD files were physically stored in multiple locations within the BPD. *See* ECF. No. 45 at 5-6.

## III.    Defendants Fail to Produce Other Relevant Discovery

Defendants' evasion of their discovery obligations has not been limited to the three categories of discovery they were specifically ordered to produce by the Court. As described below, since the Court's December 2019 order, Defendants have continued to flout their obligations by failing to produce several other categories of relevant discovery.

### A.    Housing Unit, Traffic Unit, and Strike Force Monthly and Daily Reports

After the Court denied Plaintiffs' request for these reports "without prejudice to renew with a more particularized request," ECF No. 51, at 15, Plaintiffs narrowed their request to: (1) monthly Housing Unit reports for January 1, 2018 to present; (2) the first pages of Housing Unit and Strike Force Daily Reports for January 1, 2013 to present; and (3) the narratives for 36 Strike Force daily reports from dates when a Checkpoint likely occurred but Defendants had not produced a

Checkpoint directive for that date, with personal identifying information of non-BPD personnel and information concerning open BPD investigations redacted. *See* Wilner Decl. ¶ 21.

On May 6, 2020, Defendants agreed to produce the monthly Housing Unit reports from January 2018 to present, but five months later, and despite Plaintiffs' repeated efforts to follow up, Defendants still have not produced *any* monthly reports. *See id.* ¶ 22-23. As for the daily reports, Defendants have not even provided a clear response to Plaintiffs' narrowed proposal for the first pages of the daily reports and the narratives of the 36 relevant Strike Force reports (the dates of which Plaintiffs identified to Defendants on June 25), let alone produced any documents. *See id.* ¶ 25-27. Plaintiffs have raised this issue with Defendants numerous times in the last year including most recently in their September 25 letter, but Defendants have continued to delay without providing any clear explanation or objection to Plaintiffs' narrowed proposal. *Id.*

**B.    Strike Force, Housing Unit, and Traffic Unit Officer Employment History**

Plaintiffs' Interrogatory Nos. 1 and 12 requested that Defendants "identify each person who has worked as part of the [Strike Force, Housing Unit, or BPD Traffic Unit] and provide his or her Employment History," which was defined to include "the names and dates of all positions held." Ex. 11, Interrogatory No. 1; Ex. 12, Interrogatory No. 12. Defendants initially produced a list of individuals who had worked in the Strike Force, Housing Unit, or BPD Traffic unit, but refused to identify the dates the individuals worked in these three units. Plaintiffs moved to compel Defendants to supplement their responses with these dates in July 2019, *see* ECF No. 34-1, at 21, but rather than oppose Plaintiffs' request, Defendants produced 34 pages of transfer orders in an effort to "moot" Plaintiffs' motion, ECF No. 40, at ¶¶ 57-58. On reply, Plaintiffs explained that they were reviewing Defendants' eleventh hour production and would advise whether any further dispute remains. *See* ECF No. 41, at 9.

The information produced by Defendants is, and remains, incomplete. While the transfer orders produced by Defendants have allowed Plaintiffs to identify the employment history of certain additional Traffic, Strike Force, and Housing Unit officers, there are still significant gaps. *See* Wilner Decl. ¶ 33. For example, Plaintiffs have identified 45 open dates for 38 individuals in the Strike Force and Housing Units. *Id.* Likewise, Plaintiffs have identified six Traffic Unit employees for whom an end date is still lacking, and twelve individuals that Plaintiffs suspect were Traffic Unit employees but for whom Defendants did not produce any date information. *Id.* ¶ 37.

Plaintiffs have attempted to resolve to resolve these problems with Defendants for nearly a year now, including by meeting and conferring with Defendants about it (e.g., on October 17 and November 25, 2019), explaining gaps in the information provided and sending Defendants a spreadsheet to help identify the missing information (*see* Ex. 14 & 15). But Defendants have met Plaintiffs' good faith efforts with a series of delays and empty promises. For example, during a meet and confer on January 21, 2020, Defendants' counsel stated that he was in the process of "confirming dates" of Strike Force and Housing Unit officers and would provide updated information by "early next week." *See* Wilner Decl. ¶ 40 & Ex. 7. Defendants' counsel did not follow through. *Id.* Similarly, during a May 20, 2020 meet and confer, Defendants' counsel said he would follow up with Plaintiffs by May 22. *Id.* ¶ 41. He did not do so. *Id.* And on June 1, 2020, Defendants' counsel claimed he was "working on this" and he "[a]nticipate[d] we will have a response next week." Ex. 2. That next week came and went without any further response. *See* Wilner Decl. ¶ 42. As a result, Defendants have avoided responding fully to Plaintiffs' Interrogatory No. 12 for more than a year and to Interrogatory No. 1 for nearly two years.

### C.    Complaints to Commission of Citizens' Rights and Community Relations

In Plaintiffs' Third Set of Requests for Production, served on August 12, 2019, Plaintiffs requested production of certain documents relating to the City of Buffalo Commission on Citizens'

Rights and Community Relations ("CCRCR"), a City-chartered commission tasked with eliminating prejudice, intolerance, bigotry and discrimination; encouraging equality of treatment and preventing discrimination; and assuring respect for the civil liberties of all citizens.[2] Specifically, Plaintiffs requested "all documents concerning citizen complaints received, reviewed, and/or investigated by the City of Buffalo Commission on Citizens' Rights and Community Relations concerning: (a) racial, ethnic, and/or national origin discrimination by BPD and/or BPD personnel; (b) BPD Checkpoints; (c) BPD traffic stops and/or other BPD traffic enforcement practices; (d) traffic tickets, fines, and fees; and (e) the BTVA." Ex. 16, RFP 79. Other documents produced by Defendants indicate that such complaints exist. Wilner Dec. ¶ 47 & Ex. 19.

More than a year has passed since this request was served on Defendants, and Defendants have not produced any complaints responsive to this request, nor even confirmed whether Defendants have conducted a search for such complaints. *See* Wilner Decl. ¶ 48. For example, on May 14, Defendants responded simply that they "do not have any further information on this but will continue to attempt." Ex. 8. Plaintiffs have followed up with Defendants about this request, including most recently on September 25, but Defendants have not provided any further information, nor any justification for their extended delay. *See* Wilner Decl. ¶ 49.

### D. Documents in Response to RFP 76 and Plaintiffs' Fourth Requests for Production

On August 25, 2019, Plaintiffs served their Amended Third Set of Requests for Production of Documents, and on May 12, 2020, Plaintiffs served their Fourth Set of Requests for Production

---

[2] *See* Bylaws of the Commission on Citizens' Rights and Community Relations for the City of Buffalo, at § 3, https://www.buffalony.gov/DocumentCenter/View/1790/Bylaws-PDF.

on Defendants (the "Fourth RFPs"). Ex. 16 & 20. These RFPs included nine requests relevant to

Plaintiffs' claims, including:

- **RFP 76, 85 and 90** - Documents relating to activities conducted by Defendants pursuant to Federal Grants, including any racial and ethnic bias training conducted by the City or BPD in connection with any Federal Grants.

- **RFP 86** - Documents sufficient to identify areas designated "hotspots" by Defendants.

- **RFP 87** - Documents concerning any Crackdown and High Visibility Interventions conducted by the City and/or the BPD.

- **RFP 88** - Crime data and other materials concerning the City generated by the Erie Crime Analysis Center.

- **RFP 89** - Directives issued by Defendants concerning the towing and impound of vehicles, or the issuance of fines and fees related to parking, traffic enforcement, and Vehicle and Traffic Law violations.

- **RFP 91 to 93** - Certain documents relating to citations issued by the BPD for violations of the Vehicle and Traffic Law, and to the Buffalo Parking Violations Agency's adjudication of citations.

On June 11, 2020, Defendants responded to the Fourth RFPs by asserting boilerplate objections in

response to each request, and claiming that they were not aware of responsive documents at that

time for certain requests. *See* Ex. 21. After Plaintiffs asked Defendants to clarify whether they

intended to search for and produce documents in response to the Fourth RFPs, Defendants

responded on June 23 that Defendants were still searching for documents in response to the

requests and would advise when those searches were complete. *See* Ex. 22.

More than three months have passed since then, and despite Plaintiffs' attempts to follow

up on this request (including on September 25), Defendants still have not produced a single piece

of discovery responsive to any of the Fourth RFPs. Wilner Decl. ¶ 53. Nor have Defendants offered

any justification for their complete failure to produce relevant documents. *Id. ¶* 56

\*      \*      \*

11

Pursuant to Federal Rule of Civil Procedure 37(a)(1), Plaintiffs' counsel hereby certify that they have conferred in good faith regarding this motion, as described above and in the accompanying Declaration of Claudia Wilner.

<strong>ARGUMENT</strong>

"Discovery in federal court is broad and permissive." *In re Air Crash near Clarence Ctr., New York, on Feb. 12, 2009*, No. 09-cv-294, 2013 WL 5936975, at *1 (W.D.N.Y. Nov. 4, 2013). Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Relevance, in this context, is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case." *Albino v. Global Equip. USA, Ltd.*, No. 14-cv-06519, 2017 WL 3130380, at *1 (W.D.N.Y. July 24, 2017).

Under Federal Rule 37(a), a party "may move for an order compelling disclosure or discovery" after "the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery." The party resisting discovery bears the burden of showing why the movant's requests are objectionable. *In re Air Crash*, 2013 WL 5936975, at *2. Objections "must clearly set forth the specifics of each objection and how that objection relates to the discovery being demanded." *Id.* "Pat, generic, boilerplate, and non-specific objections will not suffice." *Id.*

## I.    The Court Should Order Defendants to Promptly Comply with the December 2019 Order and Impose a Deadline or Schedule for ESI Discovery

### A.    ESI

Despite the Court's order last year requiring Defendants to commence "rolling" ESI productions, Defendants have proceeded at a snail's pace. Nearly a year after the Court's order, it

appears Defendants have produced documents for fewer than half of Plaintiffs' twenty priority custodians and search terms.[3] Moreover, these priority custodians and search terms were intended to be the *initial phase* of ESI discovery, with more custodians and/or search terms to come. *See* 5/30/2019 Hearing Tr. at 7:17-8:12 (proposing that Plaintiffs propose 20 custodians and 20 search terms "to get[] the ball rolling"). Defendants' delays have ground discovery nearly to a halt.

Plaintiffs recognize that the COVID-19 pandemic has caused interruptions of normal business activity for all parties, and Plaintiffs have tried to work cooperatively with Defendants to ease such issues, including by inviting Defendants to produce documents electronically rather than by CD. *See* Wilner Decl. ¶ 6. But COVID-19 does not explain or justify the months of delays and empty promises by Defendants. For one thing, Defendants' failures began well before COVID-19. For example, as noted above, Defendants only made one ESI production from January through most of April. *Id.* ¶ 5. In addition, Defendants have never provided a specific explanation why COVID-19 might impact the production of ESI documents, which by their nature are accessible electronically and remotely.

Without Court intervention, Defendants will continue to delay and offer empty promises and vague excuses. To ensure that going forward discovery proceeds at a reasonable pace, Plaintiffs respectfully request that the Court order:

1. Defendants to complete production of the twenty priority search terms and custodians by no later than November 7, 2020;

---

[3] Because, as explained above, Defendants have not produced the spreadsheet with custodian information that they agreed to produce, nor identified the custodians of the documents they have produced in any consistent manner, it is not possible for Plaintiffs to determine exactly how many custodians Defendants have produced documents for. *See* Wilner Decl. ¶ __. Based on the limited information provided to Plaintiffs, it appears Defendants have produced some documents hitting on the twenty priority search terms (but not all documents) for approximately 8 out of the 20 initial custodians.

2. The parties to meet and confer about the scope of any further ESI discovery by no later than November 11, 2020;

3. Defendants to complete production of all remaining ESI documents by no later than December 11, 2020.

### B.   Metadata Information

Defendants have violated the Court's order, as well as the parties' agreement, in failing to produce *any* metadata information. In deciding Plaintiffs' July 2019 motion to dismiss, the Court gave Defendants a choice: either produce metadata or "contemporaneously" produce certain metadata information "in some other form." ECF No. 51, at 12. But Defendants have done neither of those things. *See* Wilner Decl. ¶ 12. Nor have Defendants complied with the parties' agreement, which Plaintiffs negotiated in good faith, to produce certain metadata information in the form of a spreadsheet. *Id.*

Plaintiffs respectfully request that the Court order Plaintiffs to abide by the parties' agreement—specifically, that Defendants produce, contemporaneous with each ESI production, a spreadsheet with the following metadata fields: Beginning bates number (BEGDOC); Beginning bates number of all attachments (BEGATT); BCC field (emails only); Custodian; and Date.

### C.   IAD Files

Defendants have likewise failed to produce all of the IAD files this Court ordered them to produce. As Defendants do not dispute, they still have not produced approximately half of the IAD files they were ordered to in December 2019. *See* Ex. 5 & 6. Defendants suggest that the missing files may have been destroyed, but that claim is suspect and, if true, deeply concerning.

The claim appears dubious because Defendants searched electronic records of the IAD files, including the ones they now claim were destroyed, earlier in this litigation. Specifically, in June and July 2019, pursuant to the Court's direction, Plaintiffs sent Defendants a list of search terms for the IAD files. *See* ECF No. 42-1, at 3. In response, Defendants sent Plaintiffs

14

spreadsheets listing summaries of IAD files that hit on the search terms provided by Plaintiffs, *including* the IAD files Defendants now claim were destroyed. *See id*.; ECF No. 42-9. Defendants have not explained how they possibly could have searched files they now claim do not exist. Further, several of the purportedly destroyed IAD files appear to be quite recent—for example, Defendants' records indicate 6 IAD files from 2018, including 3 from after the Complaint in this action was filed. *See* Wilner ¶ 16.

Even if accurate, Defendants' claim that 73 IAD files have been destroyed only leads to a more troubling question—namely, whether Defendants have spoliated evidence. As discussed above, it appears that  Defedandants created at least three of the missing files *after* Plaintiffs filed this action. Moreover, it appears that all of the missing IAD files existed as of mid-2019, and Defendants knew by that time (if not earlier) that the files were potentially relevant to Plaintiffs' claims. After all, Plaintiffs served their initial requests seeking complaints nearly two years ago. Any failure to take reasonable steps to preserve the 73 missing IAD files would therefore justify appropriate sanctions pursuant to Federal Rule 37(e).

To get to the bottom of these issues, Plaintiffs respectfully request that the Court order that within 14 days Defendants must either produce all the remaining IAD files, or provide an explanation, in a sworn affidavit, why they cannot do so. If Defendants maintain that any files have been destroyed, Defendants should be ordered to explain the circumstances of that destruction, including when, how, why, and by who, and to produce any relevant document retention policies, so that Plaintiffs can determine whether a motion for sanctions is warranted and the Court can determine whether such sanctions are appropriate.

## II.    The Court Should Order Defendants to Promptly Produce the Other Relevant Documents

### A.    Housing Unit, Traffic Unit, and Strike Force Monthly and Daily Reports

The Court should move to compel Defendants to comply with Plaintiffs' narrowed request for the monthly and daily Housing Unit, Traffic Unit, and Strike Force reports. After the Court denied Plaintiffs' request for these reports "without prejudice to renew with a more particularized request" because of proportionality concerns in December 2019, *see* ECF No. 51, at 15, Plaintiffs followed the Court's direction. In May 2020, Plaintiffs significantly limited their request for these reports to only: (1) monthly Housing Unit reports for January 1, 2018 to present; (2) the first pages of Housing Unit and Strike Force Daily Reports for January 1, 2013 to present; and (3) the narratives for 36 Strike Force daily reports from dates when a Checkpoint occurred but Defendants had not produced a Checkpoint directive. *See* Ex. 7 & 8; Wilner Decl. ¶ 21.

Plaintiffs tailored these requests to obtain the most relevant pieces of information from the Reports while addressing Defendants' objections that producing all daily and monthly reports would be burdensome and disproportionate to the needs of the case and may implicate the law enforcement privilege. *See* ECF No. 51, at 14-15. The first pages of the Housing Unit and Strike Force Daily Reports contain only statistical information concerning Housing Unit and Strike Force activities (such as the numbers of tickets and parking tags issued, vehicles impounded, guns and money seized). As the Court has already noted, this information is relevant to Plaintiffs claims because it "may allow Plaintiffs to compare the activity of the Housing and Strikeforce Units to that of the Traffic Unit to demonstrate that the primary objective of the checkpoint program was not to promote traffic safety but, rather, to generate and collect revenue for the City.". *See* ECF No. 51 at 13. Furthermore, the information is not available elsewhere, and it requires no redaction because it does not contain confidential or privileged information of any kind, thereby eliminating

16

the burden identified by Defendants in objecting to Plaintiffs' original request for these documents. *See* ECF No. 40 ¶ 52. Plaintiffs also requested production of 36 narratives for dates on which Plaintiffs believe Defendants' conducted Checkpoints, but Defendants' did not produce Checkpoints Directives for those dates. Plaintiffs believe that the narratives will shed light on whether Defendants conducted Checkpoints on those days.

Finally, although Defendants agreed, months ago, to produce the remaining monthly Housing Unit Reports from January 1, 2018, to the present, they have not followed through on their agreement. *See* Wilner Decl. ¶ 22-23. And although Defendants have not clearly objected to producing the first pages of the daily reports and the 36 narratives of the Strike Force reports, they have not produced those documents either. *See id.* ¶ 25-27. Rather, in each case, Defendants have repeatedly put off Plaintiffs, blaming technical issues, promising to respond later, and then never following through. *See id.* An order compelling Defendants to produce responsive documents within 14 days is appropriate to secure Defendants' compliance with their discovery obligations.

## B.  Strike Force, Housing Unit, and Traffic Unit Officer Employment History

Likewise, the Court should compel Defendants to supplement their answers to Interrogatories No. 1 and 12 by providing specific dates of employment of Strike Force, Housing Unit, and Traffic Unit personnel. Like the daily and monthly reports, Plaintiffs have attempted to confer with Defendants about this issue for months, only to receive a seemingly endless string of unfulfilled promises and vague excuses. *See* Wilner Decl. ¶ 35-43.

Plaintiffs seek the specific dates of employment officers were employed in the Strike Force, Housing, and Traffic Units so that they can conduct a statistical analysis of BPD ticketing data obtained from the Erie County Central Police Services (ECCPS). Plaintiffs' Amended Complaint alleges that these specific units within the BPD engaged in discriminatory and other unconstitutional conduct, including by operating illegal checkpoints and targeting certain

17

neighborhoods based on racial composition. *See* Amended Complaint ("Compl."), ECF No. 63, ¶ 80-118. While the ECCPS data identifies each ticket issued by the BPD and the officer that wrote the ticket, it does reliably identify the officer's unit. *See* Wilner Decl. ¶ 31. As a result, the dates on which each officer was employed in these units are necessary in order to connect each ticket to the unit that issued it.

It has been clear for more than a year now that Defendants are capable of providing this information. Indeed, Defendants have admitted as much and even agreed to provide the missing information. *Id.* ¶ 35-43. But Defendants have not followed through on that agreement despite Plaintiffs' outreach and even after Plaintiffs attempted to ease the burden on Defendants by producing a spreadsheet for them to fill in. *See id.* Defendants' perpetual delays prejudice Plaintiffs.  Accordingly, the Court should order Defendants to supplement their interrogatory responses with complete employment history information within 14 days.

### C.    Complaints to Commission of Citizens' Rights and Community Relations

Defendants should also be required to produce documents responsive to Plaintiffs' Request for Production No. 79—all documents concerning citizen complaints to the CCRCR concerning (a) racial, ethnic, and/or national origin discrimination by BPD and/or BPD personnel; (b) BPD Checkpoints; (c) BPD traffic stops and/or other BPD traffic enforcement practices; (d) traffic tickets, fines, and fees; and (e) the BTVA. Ex. 16. These documents are unquestionably relevant to Plaintiffs' claims, which allege (among other things) that Defendants: (a) discriminated on the basis of race, ethnicity, and/or national origin, (b) maintained an illegal checkpoints program, (c) engaged in unconstitutional traffic enforcement practices, (d) imposed tickets, fines, and fees that violate the Constitution; and (e) created the BTVA in order to harvest revenue, *see generally id.* Amended Complaint, ECF No. 63. And there is strong evidence that these complaints exist. For

example, the minutes for the May 18, 2016 CCRCR meeting produced by Defendants indicate that CCRCR maintained a "complainant database" and include a discussion about "the complaints filed." Ex. 19, COB010024.

Defendants lack any basis for their refusal to produce these documents. In Defendants' responses and objections, they asserted only one objection to this Request: that it is "overly broad, burdensome, vague, and is not likely to result in the production of admissible evidence." Clearly, this nonspecific boilerplate objection is insufficient. *See Obiajulu v. City of Rochester, Dep't of Law*, 166 F.R.D. 293, 295 (W.D.N.Y. 1996) (explaining that similar "pat, generic, non-specific objections, intoning the same boilerplate language, are inconsistent with both the letter and the spirit of the Federal Rules of Civil Procedure"); *Am. Rock Salt Co., LLC v. Norfolk S. Corp.*, 228 F.R.D. 426, 432 (W.D.N.Y. 2004) ("[G]eneralized objections that discovery requests are vague, overly broad, or unduly burdensome are not acceptable, and will be overruled.").

Defendants also responded that they were "not aware of any responsive documents at this time." Ex. 8. But as explained above, other materials Defendants produced establish the existence of these complaints. *See* Ex. 19. If Defendants nonetheless maintain that no responsive documents exist, that would again raise the prospect that responsive documents have been spoliated. Accordingly, Defendants should be ordered to produce documents responsive to Plaintiffs' Request for Production 79. If Defendants continue to take the position that they do not have responsive to produce, they should be required to explain, within 14 days, in a sworn affidavit: (1) what steps they took to search for responsive documents; (2) whether these documents have been lost or destroyed; and (3) if so, when, how, why, and by who.

### D.    Documents in Response to RFP 76 and Plaintiffs' Fourth Request for Production

The Court should also require Defendants promptly to produce documents in response to RFP 76 and Plaintiffs' Fourth RFPs. Like the CCRCR complaints, these requests are "reasonably calculated to lead to the discovery of admissible evidence." *In re Air Crash*, 2013 WL 5936975, at *1. For example, documents relating to "areas that have been designated Hot Spots by Defendants" (RFP 86), "Crackdown and High Visibility Interventions" (RFP 87), and "crime data and hot spot mapping" (RFP 88) are relevant to Plaintiffs' allegations that Defendants "disproportionately and intentionally targets neighborhoods and drivers of color for traffic enforcement" and that they illegally subjected "Buffalo residents to suspicionless searches and liberty restrictions as part of a general crime control strategy," Compl. ¶ 4, 91. Documents relating to the federal grants Defendants received (e.g., RFPs 76, 85, 90) are relevant to Plaintiffs' Title VI claim, which requires proof that a defendant received federal funding, *see Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 589 (1983). Beyond that, the narratives in the few grant documents that *have* been produced contain descriptions of the methods by and bases on which Defendants chose patrol and checkpoint locations—central issues in proving Plaintiffs' claim that the BPD patrolled and ticketed excessively in minority areas and, as well, in meeting Defendants' expected defenses to that claim. Ex. 23 & 24. And documents relating to Vehicle and Traffic Law citations (e.g., RFPs 91-93) are relevant to Plaintiffs' claim that Defendants had a "custom, policy and/or practice of overly aggressive enforcement of traffic laws in order to generate revenue for the City budget via tickets, ticket-related fees, impounds, and towing fees," Compl. ¶ 119.

In response to these requests, Defendants have not produced a single document, and instead offered only boilerplate objections and vague excuses. Defendants' responses and objections repeated many of the same improper, generic objections in response to each request (e.g., the

request "is overly broad, burdensome, vague, is not likely to result in the production of admissible evidence, and seeks information protected by the deliberative process privilege, the attorney-client privilege, and/or attorney work-product privileges"). *See* Ex. 21. Indeed, it does not appear that even Defendants intend to defend these objections. When Plaintiffs noted to Defendants that certain of their responses did not state whether any responsive materials are being withheld on the basis of their objections, in violation of Federal Rule 34(b)(2)(C), and that the other responses indicated that Defendants were not aware of responsive documents "at this time" without stating whether Defendants had completed their search, Defendants responded that they were continuing to search for responsive documents in response to nearly all the requests. Ex. 22. Yet, after nearly four months, Defendants have not produced any responsive documents. *See* Wilner Decl. ¶ 53. Nor have the "advise[d] once the search is complete," as they agreed to do. *Id.* Defendants should therefore be compelled to produce responsive documents within 14 days.

## III.   The Court Should Award Fees and Expenses

Under Federal Rule 37(a)(5)(A), if a motion to compel discovery is granted, or further disclosure is provided after the motion was filed, the court must require the offending party, the advising attorney, or both, to pay the movant's reasonable fees and expenses incurred in making the motion, including attorney's fees, unless (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the offending party's nondisclosure or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust. "The test for avoiding the imposition of attorney's fees for resisting discovery in district court is whether the resistance was substantially justified, … or if reasonable people could different as to the appropriateness of the contested action." ECF No. 51, at 20 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

Defendants' failure to produce discovery here is neither substantially justified nor reasonable. In the case of the ESI documents, metadata information, and IAD files, the Court already ordered Defendants to produce these documents more than a year ago. Their failure to comply with that unambiguous order cannot be deemed justified or reasonable. *See Black v. Buffalo Meat Serv. Inc.*, No. 15-cv-49, 2017 WL 3315956, at *3 (W.D.N.Y. Aug. 3, 2017) ("[F]or failure to comply with this Court's previous discovery Order, the movant may recover her reasonable motion expenses."); *Godson v. Eltman, Eltman & Cooper, PC.*, No. 11-cv-0764, 2015 WL 5784908, at *5 (W.D.N.Y. Sept. 30, 2015), *aff'd*, 2015 WL 9434228 (W.D.N.Y. Dec. 22, 2015) ("[Defendant's] disregard for the rules of discovery and this Court's decisions warrants an award of attorney's fees."). In the case of the monthly and daily reports, employment history, CCRCR complaints, and Fourth RFPs, Defendants' failure to produce documents is not the product of some reasonable disagreement or well-founded objection. Rather, their failure is the result of months of unreasonable and unjustified delays and an overarching refusal to cooperate with Plaintiffs in discovery. *See Vincent v. House*, No. 07-cv-632, 2009 WL 2913912, at *5 (W.D.N.Y. Sept. 4, 2009) ("On the present record, the nondisclosure or delay in disclosure is not substantially justified."). In both cases, an award of the reasonable fees and expenses in bringing this motion are appropriate, as is any other sanction that the Court deems just and proper.

## IV.    Regular Status Conferences Are Appropriate to Monitor Defendants' Compliance with Their Discovery Obligations

Finally, Plaintiffs respectfully request that the Court schedule regular telephonic status conferences (e.g., once per month) before Your Honor or a Magistrate Judge in order to supervise discovery and to monitor Defendants' compliance with their discovery obligations. Unfortunately, it has become apparent that notwithstanding Plaintiffs' good faith efforts, Defendants will not timely discharge their discovery obligations absent Court intervention. As a result, this case has

remained nearly stagnant in the initial phases of document discovery despite the more than two years that have passed since the action was filed. Plaintiffs respectfully submit that regular conferences before the Court will advance the pace of discovery, ensure that Defendants comply with their obligations, and promote the "just, speedy, and inexpensive determination" of this action. Fed. R. Civ. P. 1.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an order:

1. Compelling Defendants to complete production of the twenty priority search terms and custodians by no later than November 7, 2020; the parties to meet and confer about the scope of any further ESI discovery by no later than November 11, 2020; Defendants to complete production of all remaining ESI documents by no later than December 11, 2020.

2. Compelling Defendants to produce, contemporaneous with each ESI production, a spreadsheet with the following metadata information: Beginning bates number (BEGDOC); Beginning bates number of all attachments (BEGATT); BCC field (emails only); Custodian; and Date.

3. Compelling Defendants to produce, within 14 days of its order, all the remaining IAD files, or provide an explanation, in a sworn affidavit, why they are incapable of doing so. If Defendants maintain that the remaining files have been lost or destroyed, Defendants should be ordered to explain the circumstances of that loss or destruction, including when, how, why, and by who, and to produce any relevant document retention policies

4. Compelling Defendants to produce, within 14 days of its order, (1) monthly Housing Unit reports for January 1, 2018 to present; (2) the first pages of Housing Unit and Strike Force Daily Reports for January 1, 2013-present and (3) the narratives for 36 Strike Force daily reports from the dates previously identified by Plaintiffs.

5. Compelling Defendants to supplement, within 14 days of its order, their responses to Interrogatories No. 1 and 12 to include the dates that each Strike Force, Housing Unit, and Traffic Unit officer were employed within those units.

6. Compelling Defendants to produce, within 14 days of its order, all documents responsive to Plaintiffs' Request for Production No. 79, or provide an explanation, in a sworn affidavit, why they are incapable of doing so. If Defendants maintain that the remaining files have been lost or destroyed, Defendants should be ordered to explain the circumstances of that loss or destruction, including when, how, why, and by who, and to produce any relevant document retention policies

23

7. Compelling Defendants to produce, within 14 days of its order, all documents responsive to RFP 76 and Plaintiffs' Fourth RFPs.

8. Awarding Plaintiffs Reasonable Fees and Expenses in bringing this motion, including attorneys' fees.

9. Scheduling regular status conferences to monitor discovery in this action.

10. Awarding any other relief that the Court deems appropriate.

Dated: October 22, 2020                    Respectfully submitted,

/s/ Keisha A. Williams_____        /s/ Claudia Wilner_____
Joseph Keleman                             Claudia Wilner
Keisha Williams                            Edward Krugman
WESTERN NEW YORK LAW CENTER                Britney Wilson
Cathedral Park Tower                       NATIONAL CENTER FOR LAW
37 Franklin Street, Suite 210              AND ECONOMIC JUSTICE
Buffalo, NY 14202                          275 Seventh Avenue, Suite 1506
Tel: (716) 828-8415                        New York, NY 10001
Fax: (716) 270-4005                        212-633-6967
jkeleman@wnylc.com                         wilner@nclej.org
kwilliams@wnylc.com                        krugman@nclej.org
                                           wilson@nclej.org


/s/ Darius Charney_____
Darius Charney
Chinyere Ezie
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
212-614-6475
DCharney@ccrjustice.org
CEzie@ccrjustice.org


                                           *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2020, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System.

*/s/ Claudia Wilner*