UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

BLACK LOVE RESISTS IN THE RUST, *et al.*,
individually and on behalf of a class of all others
similarly situated,

                Plaintiffs,

   v.

CITY OF BUFFALO, N.Y., *et al.*,

                Defendants.

No. 1:18-cv-00719-CCR

**PLAINTIFFS' STATUS REPORT ON DISCOVERY**

      Plaintiffs respectfully submit this Status Report on the progress of discovery in anticipation of the Status Conference to be held on May 11, 2021.

*Overview*

      Discovery has bogged down. Only two depositions have been taken since the last status hearing, and none are currently scheduled. In March, Plaintiffs discovered that Defendants had produced *no* non-e-mail electronically stored information (ESI), forcing Plaintiffs to adjourn all further depositions until production could be made. Defendants assert that production is in process, but their stated goal of completing such production by the end of May appears increasingly unrealistic given that *no non-e-mail ESI has yet been produced.* Though this Court ordered Defendants to complete ESI production of three custodians per week, Defendants have not completed production for even a single custodian. Defendants have produced no ESI at all since April 4. As of now, therefore, we do not even have a date on which depositions can resume, and that in turn means that we cannot begin to evaluate what additional extension of the Scheduling Order in this action will be required.

Defendants still have not committed anything like the resources necessary to get discovery done. Notwithstanding the commitments Mr. Quinn made to the Court at the last status conference (Tr. 12/14/20 at 4-5), it appears to Plaintiffs that there is still just Mr. Quinn on the other side. And he is a busy man.[1] Mr. Quinn may agree to do *X*, but his doing of *X* slows down or stops the doing of *Y*, to which he had previously agreed. It is an ongoing game of Whack-a-Mole.

The remainder of this Report sets forth the status of the specific open issues,[2] including in each case a portion of the relevant history. Plaintiffs request issuance of an Order containing binding deadlines for completion of each of these open items, with issue-related sanctions (ultimately potentially including terminating sanctions) for failure to comply.[3]

***The Metadata Spreadsheet***

In December 2019, this Court ordered that the spreadsheet of e-mail metadata be produced "contemporaneously" with the e-mails being produced. That did not happen. At the December 14, 2020 Conference, the Court acknowledged that Plaintiffs "have been reasonable and have agreed that the metadata doesn't need to be produced contemporaneously, but they don't want to wait until the end of the production for the metadata" (Tr. 12/14/20 at 5-6), and the conversation turned to benchmarks for ESI production.

Well, metadata *still* has not been produced. The absence of that metadata has cost Plaintiffs substantial time and effort; the inability to "de-dupe" e-mails forces Plaintiffs to review multiple

---

[1]  When we commented on the fact that he had EBTs (depositions) in another case on May 4, 5, and 6, he said wryly, "I have EBTs every day; those are just the ones I can't move."

[2]  We show as "open" (i) those issues where agreement has not been reached and it is unclear to Plaintiffs whether Defendants are in fact maintaining objections to production and if so, what those objections are, and (ii) those issues where agreement has nominally been reached but production has not been completed (or, in some cases, started).

[3]  At various points in this Status Report, Plaintiffs request entry of Orders on the discovery issues discussed herein. In light of the history of discovery in this action and the Court's prior involvement, Plaintiffs believe that such requests are appropriate under Rule 16(c)(2)(F), but Plaintiffs are prepared to proceed by formal motion if the Court so instructs.

copies of effectively identical documents (different recipients' copies of the same e-mail). And because .pdf copies of e-mails frequently truncate cc and bcc lists, Plaintiffs' deposition preparation has been hindered by the lack of knowledge as to who got what. Mr. Quinn keeps saying that he now has a vendor on board and he'll get us the spreadsheet, but somehow he never does. It appears to Plaintiffs that the metadata may not have been gathered contemporaneously as e-mails were processed and produced, so that creating the spreadsheet now means starting from scratch. Mr. Quinn has denied that, but it has become very difficult to think of another explanation for the ongoing absence of the spreadsheet. Defendants were in violation of an explicit Order of this Court throughout 2020. It is now nearly five months since the December 2020 Conference, and there is still no spreadsheet. Defendants have agreed to include metadata as part of the e-mail production going forward, and a test production appears to have the right fields. But that does not address the thousands of e-mails for which metadata has yet to be supplied.

Late Friday, May 7, Mr. Quinn advised that "You should have metadata for emails going forward and for all emails previously produced by May 31." Let us hope so. Eve-of-status-conference *production* is a normal, anticipated event. Eve-of-conference *promises*, however, stand on a different footing. If the metadata for the existing e-mails is not produced by May 31, 2021 (and earlier would be highly desirable; Plaintiffs need that spreadsheet), Plaintiffs should be awarded compensation for Defendants' ongoing, willful noncompliance.

***ESI Production***

The issues around the ESI production fall into three main categories:

- The production of non-e-mail ESI (memoranda, PowerPoints, maps, spreadsheets, etc. stored on computers and network folders);
- The production of e-mails from the original 20 custodians, based on the original 20 search terms; and,
- Plaintiffs' request that Defendants search additional custodians and terms.

*Non-E-Mail ESI*

At the time of the December 14, 2020 Conference, Plaintiffs did not fully comprehend that Defendants were searching *only* for e-mails and were *not* searching for standalone documents stored on servers maintained by the City or the BPD. So little had been produced, and so sporadically, that Plaintiffs could not discern that Defendants had failed to search for non-e-mailed ESI.

As more ESI production came in during the first two months of 2021, Plaintiffs realized that the only non-e-mail documents they were seeing were attachments to e-mails. They raised the subject with Defendants in March, and Mr. Quinn confirmed that no searches for non-e-mail ESI had been made.

There is heavy overlap between the Plaintiffs' list of initial deponents and their list of initial ESI custodians. Plaintiffs obviously should not be put to deposing witnesses before their documents have been produced, which is why depositions were adjourned. After some discussion, Mr. Quinn agreed to search for non-e-mail ESI of the initial custodians. He has stated that those searches are ongoing, but no production has yet been made.

Accordingly, Plaintiffs request entry of an order requiring completion of such production by a date certain. The non-e-mail ESI to be searched should include that of the 12 additional custodians discussed below.

*E-Mail ESI (Original 20 Custodians/Search Terms)*

On January 22, 2020, pursuant to the Court's direction, Plaintiffs provided Defendants with an initial list of 20 ESI custodians and 20 search terms. Sixteen months later, those searches have still not been completed.

Notwithstanding Defendants' commitment at the December 14, 2020 Conference to do three custodians a week going forward until the original ESI production was finished, there has been no ESI production at all since April 4. It appears that Defendants have finally outsourced the

ESI production to a vendor (good), but comments Mr. Quinn has made about cost suggest that the vendor has been put on a limited budget and is stretching out the work accordingly (not good). Defendants now say "May 31." We will see.

There is also another process point here. During the conferences and correspondence over the last several weeks, Plaintiffs repeatedly asked Mr. Quinn for *his* list of what he believed he had done (custodians and terms) and what he still had left to do, so we could confirm that both sides were looking at the same information. That request was made on April 9 and reiterated at least twice thereafter. The list was not supplied until May 4.

### *ESI (Additional Custodians/Search Terms)*

Defendants' failure (for over a year, and currently) to complete the initial ESI production should not be permitted to obscure that the initial production was never contemplated to be all the ESI that was ever done. Quite the contrary. On May 30, 2019—nearly *two years ago*—the Court told the parties that 20 custodians and 20 search terms "would get the ball rolling" (Tr. 5/30/19 at 7-8), and the Court's December 19, 2019 Order (at 7) expressly characterizes the first 20/20 as "a narrow *initial* ESI production" of "*priority* custodians" (emphasis added). The initial 20/20 was a first step, after which the parties would evaluate what more needed to be done.

Defendants' delay in producing ESI throughout 2020 meant that the evaluation could not take place right away. By February 2021, however, enough ESI had been produced to permit Plaintiffs to make some judgments as to what more was required. Accordingly, in March 2021 Plaintiffs supplied Defendants with a list of 20 additional custodians and 20 additional search terms, and they thereafter supplied a "map" showing which search terms (old and new) should be applied to which custodians (old and new). A copy of that map is annexed as Exhibit 1. As Plaintiffs told Defendants in an e-mail on April 1 (Exhibit 2):

> Most of the "new" custodians are already on our witness list (*i.e.*, they are not really "new"); those that are not have been identified in discovery to date as important players on one issue or another. The search terms reflect an increased understanding, based on the documents produced to date, of the way City and BPD personnel talk about issues that, for the most part, have been in the case since Day 1.

After some back-and-forth, the parties began discussing the specific additional custodians and terms on April 15, and those discussions continued, both by e-mail and by Zoom, over the following two weeks, culminating in a long Zoom meet-and-confer on Friday, April 30. In that meet-and-confer, the proposed custodians and terms were discussed one by one. Plaintiffs dropped one custodian and said that searches as to seven others could wait for such time as those individuals were deposed (and no deposition would mean no search). At the end of the Zoom, Mr. Quinn said he understood our position and did not have any further questions. He made it clear that he had an objection to one specific search term and told us he would give us his position on the remaining custodians and terms by Monday, May 3.

He did not do so. When we pressed him, he wrote on Tuesday evening as follows (Exhibit 3):

> We're generally objecting to all additional terms and custodians as I still don't think you've responded to the basic questions I posed, but putting that aside, I don't see how the school zone term is relevant to this lawsuit so we're specifically objecting to that on all grounds. I haven't attempted these searches yet, so there may be additional objections which come up, but I will attempt to run preliminary searches by Friday and respond further as necessary.

To respond in this way after five weeks of discussion, including custodian-by-custodian and term-by-term review during a multi-hour Zoom, is beyond the pale. The "new" custodians include (for example) the BPD's grant writer (who wrote the documents describing the BPD's data-driven choice of patrol and "crackdown" locations), the two heads of the BPD's Internal Affairs Division, a Deputy Commissioner who called for, and received, "Traffic Stop" data compilations starting

six days after this lawsuit was filed, and the Chief of the E District, where the overwhelming majority of the Checkpoints were located. The search terms are largely rephrasings of existing concepts that Plaintiffs have seen in the documents they have reviewed. This is basic, core discovery. Plaintiffs understand (but disagree with) the one specific objection Mr. Quinn has made to a search term,[4] but to say after all this time that "[w]e're generally objecting" on the basis of unanswered questions, when the April 30 meet-and-confer ended with no questions on the table, is simply unacceptable.

Plaintiffs request entry of an order requiring Defendants to conduct ESI searches of the 12 new custodians who remained live after the meet-and-confer. The search terms to be used for each custodian (old and new) should be in accordance with Exhibit 1. The order should also specify that ESI for the seven "witness" custodians should be produced no later than 10 business days prior to the deposition of each witness if, as, and when that deposition is taken.

*Erie Crime Analysis Center (ECAC)*

A core issue under the Fourth Amendment claim in this action is whether the "primary programmatic purpose" of the Checkpoints was the arguably permissible one of traffic safety or the clearly impermissible one of general crime control. *See Ferguson v. City of Charleston*, 532 U.S. 67, 81-82 (2000). In 2017 Defendants told the New York Attorney General's Office that the purpose was traffic safety,[5] but Plaintiffs have alleged that was a subterfuge, and the discovery to

---

[4] The term is "school zone" and relates to the City of Buffalo's renewed installation of speed cameras in school zones—or, at least, in school zones in non-White neighborhoods. The policy was, in Plaintiffs' view, a continuation of the racially discriminatory revenue harvesting practices alleged in the Complaint. The Common Council recently voted to abandon the policy following community outcry. A May 7, 2021 *Buffalo News* article on the controversy (Exhibit 4) noted "complain[ts] that the cameras target the city's most impoverished residents by placing many of the cameras in high-poverty minority neighborhoods."

[5] In December 2017 (Exhibit 5), Mr. Quinn told the Attorney General's Office that
> In practice, the Department has indicated that the locations are generally based on a non-exclusive combination of Police Department observations, familiarity with traffic patterns, citizen complaints, and other information regarding traffic safety and motor

date indicates that Plaintiffs are correct. Thus, the BPD told the United States Department of Justice that it used ECAC data and maps to implement "'crackdown' interventions in hot spot cluster areas" (ECF #66-23, highlighted portion), and the BPD's First Deputy Commissioner sent an ECAC map of "shooting hot spots" to the head of the Strike Force, who turned around and told his Lieutenants that "[w]e should target our patrols and traffic safety checkpoints in these areas" (Exhibit 6).

ECAC's documents, communications, data, and analysis lie at the heart of this disputed issue,[6] and ECAC has thus been on the table for a very, very long time. Plaintiffs served a subpoena on ECAC in 2019 but were told in ECAC's Rule 45 objections that all of its BPD-related e-mail and documents "are housed by the Buffalo Police Department email system and computer network; we do not have administrative rights to that system" (Exhibit 7); Plaintiffs' Fourth Request for Production Documents sought ECAC documents from the City. When the Court determined at the December 14, 2020 Status Conference to hold the 4th RFP portion of Plaintiffs' motion to compel in abeyance, the parties' ensuing discussions centered around negotiating what would be produced under the categories of the subpoena.

---

vehicle accidents, all of which are analyzed on a a case by case basis to determine the chosen checkpoint locations. Factors such as proximity to manpower, ease of transport and travel, and concerns over officer safety may also play a role in evaluating a particular location. Based on experience, there are occasions when successful checkpoints are used more than once.

[6] Siting of checkpoints and choices of patrol areas also relate to the Equal Protection and Title VI claims, of course, and the ECAC documents and information are crucial for those claims as well. For example, they are expected to provide data supporting the allegations of the Complaint that, *even controlling for patrol and checkpoint location decisions*, the BPD tickets Black and Brown people far more heavily than it tickets White people.

It appeared for a time that progress was being made, but it has turned out that Mr. Quinn is refusing to take a position on the crucial issue of ECAC e-mail production, and Plaintiffs must thus request entry of an order compelling that production.[7]

As refined in the parties' discussions, Plaintiffs' position on ECAC discovery has e-mail and non-e-mail components. The two are inter-related: Plaintiffs sharply limited the non-e-mail ESI they sought because they concluded that the e-mail production would provide most of what they needed. Defendants have agreed to the non-e-mail component, but their failure to agree to the e-mail component is not only a problem in and of itself; it also undermines the basis on which Plaintiffs cut back their request for non-e-mail ESI

On e-mail, Plaintiffs have requested that the existing search terms, plus several more specific to ECAC, should be run against (a) e-mails to and from the BPD involving (i) ECAC analysts and (ii) Mr. Giammaresi, and (b) internal ECAC e-mails referencing the BPD. This will capture the communication of data, maps, and other relevant information to and from the BPD, as well as discussions and analysis of that information within ECAC, while omitting matters that do not relate to the issues in this case. If these searches are run, Plaintiffs have agreed to limit *non-e-mail* ECAC production to projects undertaken for BPD personnel at the Chief level or higher.

Plaintiffs' proposal was discussed at length during the April 30 meet-and-confer, and Mr. Quinn was to get back with a position on Monday, May 3. He did not. Plaintiffs chased, and he still did not take a position. His last word, on Tuesday evening May 4, was "I'm still looking into this part."

---

[7] At various times Mr. Quinn has mused about whether he personally has the authority to search ECAC e-mail, but he has never denied the assertion by ECAC's Executive Director that ECAC e-mails and documents are in the City's control, which is all that matters for Rule 34 purposes.

Plaintiffs request entry of an Order directing Defendants to comply with the ECAC request as described above.

***Compstat and GIVE Reports***

Defendants have stated that these are ready to produce, subject to resolution of the redaction issue described in Plaintiffs' letter to the Court of May 7, 2021.

***GIVE Meeting Materials***

The GIVE program involved, among other things, identification of specific "hot spots" where targeted anti-gun measures would be undertaken. Plaintiffs believe that those measures included Checkpoints. Tracy Masiello, a BPD crime analyst, testified to regular meetings involving the GIVE grants, and Plaintiffs requested agendas and notes taken by attendees.

Defendants have already agreed to produce the formal reports/presentations prepared for the meetings (subject to the redaction issues addressed in my letter of May 7), but it appears that the request for notes and other meeting materials was not addressed in the most recent round of correspondence between counsel. Plaintiffs would be prepared to limit this additional request to any paper or electronic files specifically identified to GIVE (or its predecessor program, IMPACT) that were maintained by regular attendees.

***Fifth Set of RFPs***

Plaintiffs served their Fifth Set of Requests for Production on November 10, 2020, and Defendants responded on December 11 (Exhibit 8). As of the date of this Report, Defendants have produced little in response to several of those requests. Moreover, despite two meet-and-confer sessions and extended e-mail correspondence between the parties over the past three months, it is still not clear to Plaintiffs whether Defendants maintain objections to certain of these requests or, if not, whether and when Defendants have searched for and intend to produce the requested materials. Plaintiffs are thus prepared to file a motion to compel production of the documents sought in

these requests if necessary, but we would welcome the Court's assistance in clarifying and resolving the issues without the need for yet more motion practice.

The current status of each outstanding request is summarized below, along with the relief sought by Plaintiffs for that request

*RFP ##95-96*

RFP #95 seeks all documents, including, but not limited to, traffic and parking citations, police reports, police officer notes, photographs, and audio and video recordings, of the traffic stop and ticketing incidents involving the nine individual named Plaintiffs which are described in the First Amended and Supplemental Complaint. RFP #96 seeks documents concerning the driving and criminal histories of the nine individual named Plaintiffs. Defendants made some initial production, and they made further production on Friday evening. Subject to verification that the production is now complete, these RFPs are resolved.

*RFP ##97-99*

RFP #97 seeks documents concerning civilian complaints against and misconduct investigations and disciplinary histories of those BPD officers who stopped and ticketed the individual named plaintiffs as described in the Amended Complaint and all other BPD personnel whom Plaintiffs have noticed for deposition in this litigation. RFP #98 seeks documents concerning lawsuits filed against those same BPD personnel, and RFP #99 seeks documents regarding concerns raised about the testimonial credibility of those same BPD personnel by the Erie County District Attorney, City of Buffalo Corporation Counsel and state and federal courts and grand juries.

In their Responses and Objections to the Fifth Set of RFP's, Defendants objected to all three requests. Thereafter, during the parties' January 19, 2021 telephonic meet-and-confer, Mr. Quinn indicated that, without waiving their objections, Defendants would search for documents responsive to these three requests that pertain to the first five BPD personnel whom Plaintiffs had

11

noticed for deposition in February and March 2021 and, once those documents were located, Defendants would determine and let Plaintiffs know whether they still objected to producing some or all such documents. On February 26, 2021, Defendants produced some responsive documents pertaining to one of those first five deponents, BPD Officer Charles Skipper, whom Plaintiffs deposed on March 5. However, Defendants have not produced responsive documents concerning the other four initial deponents—much less any of the other BPD personnel referenced in RFP ##97-99— and have given no indication that they have even begun the proimised search for such documents. Plaintiffs followed up on April 1 and again on April 9 regarding the other four initial deponents, but on April 15 Mr. Quinn simply reiterated that Defendants had objected to these document requests. He made no mention of searching for documents pertaining to the four other initial deponents, and he indicated he would respond further by April 21, which he did not do.

Thus, on April 26, 2021, Plaintiffs followed up again, indicating that they were willing to narrow RFP #97 to only those civilian complaints and misconduct investigations pertaining to racial profiling, biased policing, checkpoints, towing/impound, and traffic enforcement. Plaintiffs also asked Defendants to inform them by no later than April 30 whether Defendants maintained their objections to producing additional documents responsive to RFP ##97-99 and, if not, a date certain by which they would produce those documents. During the parties' April 30 Zoom meet-and-confer, Mr. Quinn indicated he would provide an update on Defendants' position regarding RFP ##97-99 by May 7. As of the date of this Report, Plaintiffs have received no further update.

Plaintiffs submit that the documents sought by RFP ##97-99 are discoverable. This Court has already ruled that civilian complaints made to the BPD's Internal Affairs Division concerning the aforementioned issues, whether sustained or not, must be produced to Plaintiffs. *See* ECF #51 at 15-19. Moreover, the disciplinary, misconduct, and litigation histories and concerns raised about

the past testimonial credibility of BPD employees are relevant to evaluating the current testimonial credibility of those employees, which Plaintiffs are entitled to do for each BPD employee who testifies in a deposition and/or at trial in this action.

Accordingly, Plaintiffs seek an order directing Defendants to search for and produce all documents responsive to RFP ##97 (as narrowed by Plaintiffs), 98, and 99 that pertain to the remaining 4 initial deponents by no later than May 24, 2021, and requiring that, going forward, Defendants produce all responsive documents pertaining to every other current or former BPD employee noticed for deposition at least ten business days prior to the date of that employee's deposition.

***RFP #100***

This request seeks documents related to those BPD officers who appear on a list created by the Erie County District Attorney of local law enforcement officers whose prior histories of misconduct and/or incredible court testimony raised concerns for the DA about calling them as witnesses in criminal prosecutions. Plaintiffs first learned of the existence of this list from a November 2020 story in the *Investigative Post* newspaper,[8] which discussed the long misconduct history of one of the BPD officers on the list, Joseph Hassett, a former Strike Force officer whose "irredeemable problems of credibility" had caused the District Attorney to inform BPD Commissioner Byron Lockwood by letter in April 2019 that the DA's office would no longer call Hassett as a witness in any future criminal cases.[9] At Plaintiffs' Counsel's request, the *Investigative Post* reporter who authored the piece on the DA list provided the names of the 19 BPD officers on the

---

[8]  Geoff Kelly, "Problem Cop Still on Buffalo Police Force," *Investigative Post* (November 2, 2020), available at https://www.investigativepost.org/2020/11/02/problem-cop-still-on-buffalo-police-force.

[9]  *See* Letter from Erie County District Attorney John Flynn to BPD Commissioner Byron Lockwood, dated April 17, 2019, available at https://www.documentcloud.org/documents/7208877-Flynn-Letter-in-Re-Jospeh-Hassett.html.

list, three of whom, Hassett, Richard Hy and Thomas Zak, worked in the Strike Force for some or all of the class period in this litigation.

In their initial response to Plaintiffs' Fifth Set of RFPs, Defendants objected to producing any documents responsive to this request. Thereafter, during the parties' January 19 telephonic meet-and-confer, Mr. Quinn indicated that he was in the process of gathering and would produce responsive documents pertaining to Officer Hassett but that Defendants would not be in a position to locate responsive documents concerning other BPD officers or to determine whether they maintained their objections to producing such documents unless and until Plaintiffs provided Defendants with the names of the other 18 BPD officers on the DA's list. Mr. Quinn also indicated that he would be willing to consider running ESI searches on custodians and search terms proposed by Plaintiffs.

Plaintiffs Counsel provided the names of those 18 BPD officers on January 21. However, while documents concerning officer Hassett have appeared in some of Defendants' ESI productions, Defendants have yet to produce any documents concerning the other 18 officers on the DA list, nor have they indicated whether they maintain their objections to producing such documents. Plaintiffs requested updates on Defendants' position on RFP #100 in e-mails on April 1 and 9 but did not receive any. In their April 26 e-mail, Plaintiffs (i) asked Mr. Quinn to confirm that Defendants had produced all responsive documents pertaining to Officer Hassett, (ii) indicated that Plaintiffs were willing to narrow RFP #100 to documents pertaining only to Officers Hassett, Hy, and Zak, and (iii) provided a list of 14 custodians on which to run ESI searches for responsive documents, using only Hassett, Hy, and Zak's names as search terms. Ten of these 14 custodians are among the initial 20 custodians for whom Defendants have already run ESI searches pursuant to the Court's prior orders in this case, and the remaining four include the current and former heads

of the BPD's Internal Affairs Division, the person or persons within the BPD who handles legal matters related to the DA's office, and a former Deputy BPD Commissioner who was cc'd on several emails regarding civilian complaints against BPD officers that appear in the ESI previously produced by Defendants. Mr. Quinn said during the April 30 Zoom meet-and-confer that he would provide an update on Defendants' position regarding RFP #100 by May 7, but as of the date of this Report he has not yet done so.

Plaintiffs submit that the documents sought in RFP #100 are discoverable. Plaintiffs have noticed Officers Hassett and Hy for deposition, and thus their testimonial credibility is an issue that Plaintiffs are entitled to explore in discovery. Further, the alleged misconduct of BPD Strike Force officers and senior BPD officials' notice of and response to that misconduct is a central component of Plaintiffs' *Monell* claims in this case. Accordingly, Plaintiffs seek an order directing Defendants to search for and produce all documents responsive to RFP #100 that pertain to Officers, Hassett, Hy, and Zak by a date certain.

## CONCLUSION

Plaintiffs look forward to addressing these issues with the Court on May 11.

Dated: May 10, 2021

Respectfully Submitted,

*/s/ Keisha A. Williams*
Joseph Keleman
Keisha Williams
WESTERN NEW YORK LAW CENTER
Cathedral Park Tower
37 Franklin Street, Suite 210
Buffalo, NY 14202
Tel: (716) 828-8415
Fax: (716) 270-4005
jkeleman@wnylc.com
kwilliams@wnylc.com

*/s/ Claudia Wilner*
Claudia Wilner
Edward Krugman
NATIONAL CENTER FOR LAW
AND ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
wilner@nclej.org
krugman@nclej.org

*/s/ Darius Charney*
Darius Charney
Chinyere Ezie
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
212-614-6475
DCharney@ccrjustice.org
CEzie@ccrjustice.org

*/s/ Jordan S. Joachim*
Jordan Joachim
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
212-841-1000
jjoachim@cov.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2021, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System.

*/s/ Edward P. Krugman*