```
 1              UNITED STATES DISTRICT COURT

 2             WESTERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - X
     BLACK LOVE RESISTS IN THE RUST    18CV719
 4   By and through its Co-directors
     Natasha Soto and Shaketa Redden
 5   And on behalf of its members
     Agent of Just Resisting,  et al)
 6              Plaintiffs
     vs.
 7                          Buffalo, New York
     CITY OF BUFFALO, ET AL,    )  May 11, 2021
 8              Defendant.      12:00 p.m.
     - - - - - - - - - - - - - - X
 9   STATUS CONFERENCE
     ALL PARTIES APPEARED USING THE ZOOM FOR GOVERNMENT
10   PLATFORM
     Transcribed from an Electronic Recording Device
11
                  TRANSCRIPT OF PROCEEDINGS
12       BEFORE THE HONORABLE CHRISTINA CLAIR REISS
                 UNITED STATES DISTRICT JUDGE
13
                  EDWARD KRUGMAN, ESQ.
14                CLAUDIA WILNER, ESQ.
                  National Center for Law and Economic
15                Justice

16                DARIUS CHARNEY, ESQ.
                  ANJANA MALHOTRA, ESQ.
17                Center for Constitutional Rights

18                KEISHA WILLIAMS, ESQ.
                  Western New York Law Center, Inc.
19
                  JORDAN SCOTT JOACHIM, ESQ.
20                Covington & Burling, LLP
                  620 Eighth Street, Suite 4029
21                New York, New York 10018

22                ROBERT EMMETT QUINN, ESQ.
                  City of Buffalo Department of Law
23                65 Niagara Street
                  Buffalo, New York 14202
24                Appearing on behalf of the Defendant

25   COURT REPORTER: Karen J. Clark, Official Court Reporter
                     Karenclark1013@AOL.com
```

```
                    P R O C E E D I N G
                   *         *          *

        THE CLERK:  We're here in the matter of the

Black Love Resist, et al versus the City of Buffalo, et

al, docket No. 18CV719.  This proceeding is scheduled

for a status conference.  Counsel for the Plaintiffs,

please state your name and who you represent for the

record.  Plaintiffs?

        Mr. Krugman, you're on mute.

        MR. KRUGMAN:  I am now unmuted.  I used to

know how to do this.  Good afternoon, your Honor.

Edward Krugman of NCLAH representing Plaintiffs.

        MS. WILNER:  And I'm Claudia Wilner, also

from NCLAH.

        MR. CHARNEY:  Darius Charney.  Good

afternoon, your Honor, I am also representing the

Plaintiffs.

        MR. QUINN:  Robert Quinn representing the

defendants.  Good afternoon, your Honor.

        THE COURT:  Good afternoon.  I have read the

Plaintiff's status report on discovery.  I've gone

through my notes.  I am not adverse to changing

something that isn't working, and we have taken an

approach in this case which is contemplated by the

amendments to the Federal Rules of Civil Procedure where
```

09:49:03  1  the Court gets more actively involved in managing a

09:49:08  2  case.  I can't say that I feel like that has been

09:49:13  3  successful.  So, when in doubt, follow the rules.  And

09:49:19  4  the next step will be motions to compel to the extent

09:49:26  5  they haven't already been filed and orders with hard

09:49:30  6  deadlines and sanctions if we can't get off this current

09:49:34  7  path.  And I don't see a lack of good faith on the part

09:49:41  8  of the defendants, and I'm going to hear your side of

09:49:45  9  the story, but if I tell you to do something on X date

09:49:50  10  and you tell me you can do it for me, that is disobeying

09:49:55  11  a court order.  We're not doing this as suggestions.  I

09:49:59  12  have elicited deadlines, made sure that they were

09:50:03  13  reasonable, and they have to be real.  So I think we're

09:50:08  14  moving into a shift of a different approach and I

09:50:13  15  wouldn't sanction anybody *sua sponte*.  I definitely want

09:50:19  16  to hear both sides.  But it cannot be a response that we

09:50:24  17  have a single attorney on the other side and that is

09:50:27  18  just the way it's going to go.  It's just not going to

09:50:31  19  happen that way.

09:50:32  20          So, I'm going to start with you, Mr. Quinn,

09:50:36  21  as to your take on where we are.  Anything that you want

09:50:40  22  to say in general in response to the Plaintiff's status

09:50:46  23  report on discovery and then we're going to get into the

09:50:51  24  nitty gritty.

09:50:51  25          MR. QUINN:  Understood, Judge.  And I do

| | | |
|---|---|---|
| 09:50:52 | 1 | appreciate you holding this conference and, I absolutely |
| 09:50:55 | 2 | do understand your point.  And I do want to reiterate or |
| 09:50:59 | 3 | at least iterate, I haven't had a chance to respond in |
| 09:51:02 | 4 | full to the status update that was filed late yesterday. |
| 09:51:07 | 5 | We have been working on this case and producing |
| 09:51:10 | 6 | discovery throughout, including in the time period since |
| 09:51:13 | 7 | our last conference.  Just since the last conference, |
| 09:51:17 | 8 | we've produced 26,000 pages of ESI on a consistent basis |
| 09:51:23 | 9 | I've been in constant communication with the Plaintiffs' |
| 09:51:27 | 10 | counsel.  We've done two depositions, numerous e-mails, |
| 09:51:30 | 11 | various other documents produced, we produced records |
| 09:51:49 | 12 | indicating 46,615 commons just in the past two weeks |
| 09:52:05 | 13 | that took substantial effort to put together.  So I |
| 09:52:08 | 14 | don't want it to seem like we're coming in here sort of |
| 09:52:12 | 15 | begging for forgiveness.  We have been working on this |
| 09:52:15 | 16 | case and we truly believe that. |
| 09:52:18 | 17 | THE COURT:  Who is we, though?  Who is we |
| 09:52:20 | 18 | besides we talked about, you know, what one could |
| 09:52:24 | 19 | reasonably expect from one human being.  Who else is |
| 09:52:28 | 20 | working on this case? |
| 09:52:29 | 21 | MR. QUINN:  We hired an intern who has been |
| 09:52:31 | 22 | assisting with this case.  She is going to be leaving |
| 09:52:34 | 23 | soon because she is studying for the bar.  I've spoken |
| 09:52:38 | 24 | with my boss about bringing in a new attorney who we |
| 09:52:42 | 25 | recently hired who has had to do other things, but |

09:52:45  1  should have the available time to assist, particularly

09:52:48  2  with the ESI in this case.  Because I don't know that it

09:52:53  3  was communicated to the Court in Plaintiffs'

09:52:57  4  communications, but we have retained a vender, an

09:53:02  5  outside consultant to assist us with production of ESI.

09:53:07  6          THE COURT:  Let me stop you there.  What is

09:53:09  7  the vender's name?

09:53:11  8          MR. QUINN:  D4.

09:53:12  9          THE COURT:  D4.  And when were they

09:53:16  10  retained?

09:53:17  11          MR. QUINN:  They were retained shortly

09:53:19  12  after, I don't have the document in front of me, but my

09:53:22  13  recollection they were retained shortly after the last

09:53:25  14  conference and there has been production made through

09:53:28  15  the vender, through the Relativity system.  There was

09:53:34  16  some hiccups, some snags in producing that.

09:53:37  17  Specifically, we were able to immediately upload the

09:53:41  18  Outlook files to the Relativity system and process those

09:53:47  19  and that is what we've been doing.  There was difficulty

09:53:50  20  in uploading these restored, the restored Lotus notes

09:53:56  21  files, which is the majority of the custodians.  Just

09:54:00  22  this past week, we did resolve that.  We had to

09:54:03  23  physically produce the documents to an individual and

09:54:09  24  they're in Rochester and then they uploaded them and so

09:54:22  25  we're on track to produce those things.  And there are a

09:54:25  1   couple of things with the deadlines, and I'm sure we'll

09:54:28  2   get into that.   But, I mean, there has been some delays

09:54:32  3   in producing the accounts, the physical accounts because

09:54:35  4   we weren't able to upload some of the Lotus notes to the

09:54:39  5   Relativity.   I believe we've done that.   And I've

09:54:41  6   indicated to Plaintiffs' counsel, and I've asked that we

09:54:45  7   be able to do it on sort of a different time frame

09:54:48  8   because there is a cost associated with producing

09:54:50  9   through the Relativity, they have to go through and do

09:54:53  10  it.   Whereas, previously, I was just doing it on my own

09:54:57  11  and I was producing it sort of day by day.   Here there

09:55:01  12  is a cost to have them do it.   So I would like to spread

09:55:04  13  it out, but we can certainly address that with the

09:55:07  14  Court.

09:55:07  15            THE COURT:   Let's stay on that issue.   How

09:55:09  16  would you like to spread it out?

09:55:12  17            MR. QUINN:   Two weeks is what I asked the

09:55:14  18  Plaintiffs.   I asked that we produce it on the 17th and

09:55:18  19  the 31st of May.

09:55:26  20            THE COURT:   And how does that decrease cost?

09:55:28  21  Does it allow you to batch it?

09:55:30  22            MR. QUINN:   It allows us to do larger

09:55:33  23  batches rather than have the consultant go through each

09:55:36  24  day or each week or however it was and process it.   And

09:55:40  25  I apologize, I'm not entirely familiar with how they do

09:55:44  1   it.  I go through and, sort of, the materials and then

09:55:47  2   they have to actually produce it with the images and

09:55:50  3   metadata and all of that.  So there is time and cost

09:55:52  4   associated with that.  So spreading out the batches

09:55:55  5   allows them to cut down on costs.

09:55:57  6        THE COURT:  What did the Plaintiffs' counsel

09:56:01  7   say when you asked to batch it like that?

09:56:03  8        MR. QUINN:  I don't know that we got a

09:56:05  9   response, but I'll defer to Mr. Krugman or whoever is

09:56:09 10   speaking.

09:56:10 11        THE COURT:  Okay.  Keep going.

09:56:11 12        MR. QUINN:  And so as far as the assistants,

09:56:15 13   we do have another attorney who is admitted to Federal

09:56:19 14   Court who has been assisting, but she has her own case

09:56:23 15   load, so that is also proving not to be ideal.

09:56:26 16   Hopefully with this new attorney who has been hired

09:56:30 17   within the past three months, and, like I said, was not

09:56:33 18   hired to do this type of work and is relatively

09:56:37 19   inexperienced, but now with the ESI, particularly now

09:56:40 20   that we have the consultant, they should be able to

09:56:43 21   greatly increase the speed.  Previously, I had

09:56:46 22   everything on my own laptop.  I was limited in having

09:56:50 23   people assist in the actual production of ESI.  Now we

09:56:54 24   have Relativity, we can have multiple people accessing,

09:56:58 25   that should greatly impact the speed.  As I indicated

09:57:01    1    also to Plaintiffs' counsel, and I don't know that they
09:57:04    2    responded to this substantively either, I believe we'll
09:57:08    3    be able to get it done, including the metadata,
09:57:11    4    including the metadata going back by the end of this
09:57:23    5    month.  Obviously --
09:57:24    6                THE COURT:  What is the new attorney's name?
09:57:27    7                MR. QUINN:  Dan Muscerella.
09:57:29    8                THE COURT:  So you think you're going to
09:57:31    9    have everything, the ESI done by the end of this month?
09:57:35   10                MR. QUINN:  I believe so, yes.  I should
09:57:38   11    clarify.  This would be the e-mail ESI for the 20
09:57:42   12    custodians that previously have been identified.  It
09:57:45   13    would also include much of the non-e-mail ESI.  Some of
09:57:51   14    that stuff is still being worked out, and I'm sure we'll
09:57:54   15    address it today.  But it would just be the initial 20
09:57:59   16    custodians.  And then depending on how the court
09:58:03   17    considers the additional custodians and also the ECAC
09:58:08   18    custodians, that would maybe be a different time period.
09:58:13   19                THE COURT:  Okay.  Anything else that you
09:58:15   20    want to say before we go point by point through the
09:58:19   21    issues that the Plaintiffs have raised.
09:58:23   22                MR. QUINN:  Just that to reiterate that we
09:58:27   23    do certainly take the Court -- we treat the Court's
09:58:31   24    orders very seriously, and we and I are doing our best.
09:58:37   25    You know, I have taken the approach, and maybe it's not

09:58:40  1   the right one.  I mean, I try to work on the discovery

09:58:44  2   that is being requested of me and there are a lot of

09:58:47  3   balls up in the air that the Plaintiffs are requesting.

09:59:06  4   Some that are before the Court in the e-mails, there are

09:59:10  5   some in separate e-mail chains about additional

09:59:20  6   discovery.  So we're not coming in here and arguing with

09:59:23  7   every little point that is identified in this large

09:59:27  8   discovery, specifically some of the tone and things like

09:59:29  9   that.  We do disagree, but ultimately, I am trying to

09:59:33  10  move discovery forward through production of what is

09:59:37  11  being requested.  And we do have objections and we have

09:59:40  12  been working with the Plaintiffs to move through those

09:59:44  13  objections.  And I do want to, you know, reiterate that

09:59:48  14  there is not a day that goes by that I don't work on

09:59:51  15  this case.  And we're going to have other people working

09:59:54  16  on it to the best we can.  So it's not through lack of

09:59:57  17  attention or lack of effort.  And like I said, we've

10:00:01  18  produced, to date, close to 65, if not more than 65,

10:00:06  19  just a Bates number, that doesn't include the countless

10:00:09  20  other communications.  It's not that we're not working

10:00:12  21  forward.  It's just that there is a lot being requested

10:00:15  22  and there is a lot of different issues that we're trying

10:00:18  23  to work through, so I do want to reiterate to the best I

10:00:21  24  can.

10:00:21  25            THE COURT:  So let me push back on some of

| | | |
|---|---|---|
| 10:00:23 | 1 | that. |
| 10:00:24 | 2 | MR. QUINN:  Yes. |
| 10:00:25 | 3 | THE COURT:  Because they say you'll say, |
| 10:00:31 | 4 | "May 7th, I'm getting back to you."  May 7th comes and |
| 10:00:36 | 5 | goes and you don't get back to them.  And I say, "Tell |
| 10:00:40 | 6 | me what you could do."  And you say, "I can do this." |
| 10:00:44 | 7 | And what I say seems to come and go, too, because we |
| 10:00:49 | 8 | shouldn't even be having this conference, and that is |
| 10:00:53 | 9 | why I'm ready to start adopting a different approach |
| 10:00:57 | 10 | because me asking you what is reasonable, okay, now it's |
| 10:01:03 | 11 | my order, you comply with it.  It kind of feels like |
| 10:01:10 | 12 | you're blowing -- not blowing me off -- but blowing past |
| 10:01:14 | 13 | what I consider a court order.  And the fall back is, |
| 10:01:20 | 14 | let's do it formal.  Let's have it in writing.  Let's |
| 10:01:24 | 15 | have discernable sanctions if things don't go forward. |
| 10:01:27 | 16 | So what am I missing about those concerns, not telling |
| 10:01:32 | 17 | the Plaintiffs' counsel, "I'm going to get back to you," |
| 10:01:35 | 18 | and then not getting back to them and me approaching you |
| 10:01:39 | 19 | asking what is reasonable, setting a deadline with your |
| 10:01:42 | 20 | consent and it's not happening. |
| 10:01:45 | 21 | MR. QUINN:  Part of it -- I mean a large |
| 10:01:52 | 22 | part of it is, I mean, I mean, to the extent I'm over |
| 12:22:24 | 23 | promising or trying to do things ahead of time, I'm just |
| 12:22:29 | 24 | juggling a lot of things.  I don't want it to seem like |
| 12:22:32 | 25 | we're ignoring the Court or the Plaintiffs or anyone |

12:22:34  1    else.  We are trying to set the deadlines that I think

12:22:38  2    we can comply with.  Sometimes things come up and life

12:22:42  3    comes up and various other discovery requests come up.

12:22:46  4    And I try to work through them the best I can.  When

12:22:50  5    Plaintiffs, I say, I try to get back to you May 7th, if

12:22:54  6    I don't get back to them by May 7th, I get back to them

12:22:59  7    by May 8th or May 9th.  I understand the Court, the

12:23:22  8    Court needs deadlines and the Plaintiffs need deadlines,

12:23:25  9    and I do my best to try and comply with those where we

12:23:29  10   can and I do take them seriously.  It's not that we

12:23:32  11   don't.  It is, essentially, that, you know, I'm trying

12:23:36  12   to do my best to comply with them and there is just a

12:23:40  13   lot going, and maybe sometimes we fall short.  Where

12:23:44  14   that does happen, I try to communicate, to the best of

12:23:46  15   my ability, why it happened.  I try to continue to

12:23:50  16   communicate, here is what we plan to do.  I do

12:23:54  17   consistently, and I want to reiterate, we're

12:23:57  18   consistently and constantly working on these things and

12:24:00  19   we're all working on these things.  So could I do a

12:24:05  20   better job on could I send that e-mail on May 7th rather

12:24:12  21   than May 8th?  I absolutely could.  Could I do a better

12:24:15  22   job of under promising, I probably should.  But I'm just

12:24:19  23   trying to move it forward to the best that we can.

12:24:22  24   Normally in all of the --

12:24:23  25                THE COURT:  Let me ask you.  And I'll push

12:24:26  1  back on the Plaintiffs as well.  I certainly was not

12:24:28  2  getting the impression when they told me that you

12:24:32  3  weren't getting back to them that they were hearing from

12:24:36  4  you the next day.  I certainly did not get that

12:24:39  5  impression from their materials.  If you promise to get

12:24:42  6  back to them on May 7th, I'm not under an impression

12:24:45  7  that it came on May 8th or May 9th.  I'm under the

12:24:50  8  impression that it came not at all.  Is that inaccurate?

12:24:54  9          MR. QUINN:  I don't believe that that is

12:24:56  10  accurate.  And I don't think it's fair.  Certainly there

12:25:00  11  are arguments that Mr. Krugman, particularly, is making

12:25:03  12  about, you know, the sufficiency of our response and

12:25:07  13  things like that.  But, I mean, I'm here working all of

12:25:12  14  the time.  I'm trying to respond as soon as I can.

12:25:15  15  Often, you know, at non-normal hours.  But I don't

12:25:22  16  believe, and maybe they'll disagree with me, that we

12:25:26  17  have just ignored them in any way, shape or form.  I

12:25:31  18  mean, we had, just this past -- I probably responded

12:25:34  19  every single day this past week.  We had a long meet and

12:25:38  20  confer at their request.  I did it on a couple day's

12:25:41  21  notice because I had previously indicated I have some

12:25:45  22  depositions, that's fine.  I am happy to do those

12:25:48  23  things.  I don't think it is, respectfully, I don't

12:25:51  24  think it's that we're not responsive or not ignoring.

12:25:55  25  I'm sure they would like us to move faster.  I'm sure

12:25:58  1  they do.  I don't think it's fair to say we're just

12:26:02  2  blowing them off.

12:26:03  3       THE COURT:  Okay.  Let's turn to Plaintiffs.

12:26:07  4  And we're going to start with your status report and you

12:26:12  5  can respond to my general concerns.  My understanding is

12:26:18  6  that the first issue was potentially resolved and that

12:26:29  7  was the, well, I'll let you go through at your own pace.

12:26:42  8  I've got my notes about what I think is resolved, but I

12:26:46  9  want to hear from you first.

12:26:49  10      MR. KRUGMAN:  Thank you, your Honor.  The

12:26:51  11  first issue is the metadata -- the introductory issues,

12:26:55  12  I think the Court understands.  And I think it has been

12:27:00  13  abundantly clear today, there is just Mr. Quinn and it

12:27:05  14  is not enough by a couple of orders of magnitude.  And

12:27:09  15  that is the dominant fact of what has been happening

12:27:13  16  here.  We can -- I'll leave it at that.  I was going to

12:27:24  17  -- I'll leave it at that.  I don't want to go further on

12:27:28  18  specifically on Mr. Quinn.

12:27:29  19           Having said that, the metadata spreadsheet,

12:27:33  20  you know, is the first issue.  It has been now promised

12:27:36  21  for May 31st.  Mr. Quinn has said, and I heard him, that

12:27:45  22  he does have all of the material going back.  It has

12:27:52  23  been a very, very long time with orders and so forth.

12:27:57  24  It either will or will not come in on May 31st.  We need

12:28:02  25  it, we would like to have it sooner.  We knew we wanted

12:28:07　1　it, we knew we needed it as the ESI started to come in.

12:28:12　2　And some of those 65,000 pages are 14 copies of

12:28:18　3　multiple, I mean 14 copies of the same e-mail.  So it

12:28:21　4　depends on how you count and the spreadsheet is the --

12:28:25　5　you know, getting metadata, getting a spreadsheet like

12:28:28　6　that is how one handles 14 copies, because, you know,

12:28:32　7　you have them on a spreadsheet and you only have to look

12:28:35　8　at them once.  So the metadata spreadsheet, he said May

12:28:40　9　31st.  I've heard things before.  I've heard May 31st

12:28:46　10　today.  If we get it May 31st, that is May 31st.  We'd

12:28:51　11　like to get it sooner because we'd like to get back to

12:28:56　12　work on these things, but it is what it is.

12:28:58　13　　　　　　　THE COURT:  Okay.  Let's stay on this issue.

12:29:00　14　Mr. Quinn, is it going to be May 31st?

12:29:02　15　　　　　　　MR. QUINN:  Yes, your Honor.

12:29:03　16　　　　　　　THE COURT:  The Court hereby orders the

12:29:06　17　defendant to produce the metadata spreadsheet no later

12:29:13　18　than May 31st, and warns the defendant, the failure to

12:29:15　19　do may subject it to sanctions.  Let's take up the next

12:29:20　20　issue.

12:29:23　21　　　　　　　MR. KRUGMAN:  The next issue is the ESI,

12:29:26　22　generally.  And there are a number of sub issues there.

12:29:33　23　The history, I think as set forth in the status report,

12:29:36　24　and the Court has indicated it's been read, we did not

12:29:40　25　realize until early this year that we had not gotten

12:29:47   1   non-e-mail ESI except as attachments to e-mails.

12:29:52   2           THE COURT:  But I heard Mr. Quinn say that

12:29:54   3   you are getting some.

12:29:56   4           MR. KRUGMAN:  We haven't gotten any yet.

12:29:58   5           THE COURT:  Okay.

12:29:59   6           MR. KRUGMAN:  He has said he has been

12:30:01   7   gathering it.  I did not hear that he has been

12:30:05   8   successful in getting it all gathered from all of the

12:30:08   9   custodians.  And, of course, there is the separate issue

12:30:11  10   of the additional custodians.  But we haven't gotten any

12:30:15  11   yet, so I don't have a basis for evaluating, if you

12:30:20  12   will, the speed at which we can expect to get it once we

12:30:24  13   get it.  I just don't know.  I don't have a basis for

12:30:27  14   concluding anything because I don't have any data

12:30:30  15   points.  I don't have any of it yet.  And the e-mail ESI

12:30:38  16   on the original custodians, we now have lists.  Our

12:30:43  17   lists compare with his list.  There are, I think, eight

12:30:49  18   custodians left to do.  There has not been any e-mail

12:30:52  19   ESI production since the 4th of April.  Even before

12:30:56  20   that, he was not meeting three a week.  This is just

12:31:00  21   facts.  They are facts that have been frustrating.

12:31:07  22   There are potentially reasons for it, and this custodian

12:31:11  23   takes longer and that custodian and so forth, but the

12:31:15  24   facts on the ground are that there has been no e-mail

12:31:18  25   ESI production since the 4th of April.  There has been

12:31:22  1    other production.  You know, we're doing things that

12:31:24  2    people do in litigation all of the time.  We're looking

12:31:27  3    at documents and sending followup requests.  Some of

12:31:31  4    those followup requests we've gotten, you know.  And

12:31:35  5    that is what I was that talking about about whack a mole

12:31:40  6    in the status report.  The doing of those followup

12:31:57  7    requests, and, good, thank you, Mr. Quinn, yes, we've

12:32:00  8    gotten them, but that gets in the way of doing the other

12:32:03  9    stuff.  That is what it means to be just Mr. Quinn on

12:32:07  10   the other side and it really has been the dominant fact

12:32:10  11   of discovery in this case for 18 months.

12:32:13  12          THE COURT:  Okay.  How do you feel about the

12:32:17  13   batching?

12:32:18  14          MR. KRUGMAN:  I'm comfortable with that.

12:32:20  15   You know, you know, two weeks, if it ends on May 31st

12:32:25  16   with what he is now saying with all of the original

12:32:31  17   e-mail ESI and he is saying non-e-mail, but I can't

12:32:36  18   evaluate that.  I will take batching, that's fine.  When

12:32:42  19   he said batching, to us, we said we need to know

12:32:45  20   amounts, we need to know intervals and we need to know

12:32:51  21   an end date.  That is still true.  I don't know that.  I

12:32:57  22   would love it for the Court to order the same thing for

12:33:00  23   the non-e-mail ESI on May 31st for the spreadsheet.  I

12:33:05  24   don't know that Mr. Quinn can comply with that.  I hope

12:33:07  25   he can.  But I don't know that he can.  Because I

| | | |
|---|---|---|
| 12:33:10 | 1 | haven't seen anything on non-e-mail ESI to make an |
| 12:33:14 | 2 | evaluation. |
| 12:33:14 | 3 | THE COURT:  Okay.  Back to you, Mr. Quinn. |
| 12:33:18 | 4 | Can your non-e-mail ESI reasonably be completed by May |
| 12:33:23 | 5 | 31st? |
| 12:33:24 | 6 | MR. QUINN:  For the custodians, the 20 |
| 12:33:26 | 7 | custodians that have been identified, I believe so. |
| 12:33:29 | 8 | Now, it does get -- and maybe it might make sense to |
| 12:33:35 | 9 | explain sort of what's going on.  If that includes the |
| 12:33:41 | 10 | ECAC, these are other things that may come up.  If it's |
| 12:33:46 | 11 | just the custodians, I believe we can produce it by the |
| 12:33:49 | 12 | 31st.  Some of the other things, I can't necessarily |
| 12:33:52 | 13 | make these promises because these are unknown. |
| 12:33:56 | 14 | THE COURT:  We're just talking about the 20 |
| 12:33:58 | 15 | custodians, right, Mr. Krugman. |
| 12:34:00 | 16 | MR. KRUGMAN:  We have more to talk about |
| 12:34:02 | 17 | about other things, but, right now, yes. |
| 12:34:05 | 18 | THE COURT:  So I will be whacking the mole |
| 12:34:07 | 19 | and we're going to take one mole at a time.  So the |
| 12:34:11 | 20 | Court hereby orders that non-e-mail ESI for the 20 |
| 12:34:17 | 21 | custodians shall be produced by May 31st.  That batching |
| 12:34:23 | 22 | is permissible according to the intervals proposed by |
| 12:34:28 | 23 | Mr. Quinn.  Failure to comply with that deadline may |
| 12:34:31 | 24 | subject the defendant to sanctions. |
| 12:34:34 | 25 | Now we're going to take up the next issue. |

| | | |
|---|---|---|
| 12:34:39 | 1 | Mr. Krugman? |
| 12:34:40 | 2 | MR. KRUGMAN:  Thank you, your Honor.  There |
| 12:34:41 | 3 | is the additional custodians and search terms.  There is |
| 12:34:47 | 4 | history here.  We've laid it out.  We started talking |
| 12:34:52 | 5 | with the Court and Mr. Quinn about custodians and search |
| 12:34:55 | 6 | terms in May of 2019.  That is two years ago.  There was |
| 12:35:00 | 7 | a conference then and the Court said do an initial 20 |
| 12:35:04 | 8 | and 20, it will get the ball rolling, and it will happen |
| 12:35:10 | 9 | quickly.  There was a motion to compel because it didn't |
| 12:35:13 | 10 | happen and the Court ordered -- made a specific order in |
| 12:35:18 | 11 | December of 2019, and we have now been doing it for 18 |
| 12:35:22 | 12 | months.  In the meantime, we've been looking at |
| 12:35:26 | 13 | documents.  There has been stuff coming in.  And we did |
| 12:35:32 | 14 | what one would expect people to do after they get the |
| 12:35:36 | 15 | initial tranche.  They look and decide what do they |
| 12:35:40 | 16 | need, what more do they need.  We were not in a position |
| 12:35:44 | 17 | to do that because nothing was coming in during 2020. |
| 12:35:49 | 18 | Starting, really, at the end of 2020 and the beginning |
| 12:35:52 | 19 | of 2021, we were able to start looking at things and |
| 12:35:57 | 20 | make some judgments as to what more we needed and we |
| 12:36:01 | 21 | sent Mr. Quinn an additional list.  There was a lot of |
| 12:36:04 | 22 | back and forth that I don't think was either Mr. Quinn's |
| 12:36:08 | 23 | favorite conversation or mine, but, eventually we |
| 12:36:11 | 24 | started talking about the -- about the items on that |
| 12:36:17 | 25 | list.  And where we came out, and we think it's entirely |

| | | |
|---|---|---|
| 12:36:21 | 1 | appropriate, there are 12 additional custodians that we |
| 12:36:27 | 2 | think we simply need.  And we need them now and we've |
| 12:36:31 | 3 | been through the reasons for them with Mr. Quinn, |
| 12:36:34 | 4 | perhaps not in as much detail as we think he would like, |
| 12:36:40 | 5 | plenty of detail, we think these are players.  There is |
| 12:36:43 | 6 | one additional custodian that we gave back.  We gave |
| 12:36:47 | 7 | back the, I think, the D district chief.  The E district |
| 12:36:52 | 8 | chief, which is where, virtually, all of the check |
| 12:36:55 | 9 | points were, we still want.  And there are seven |
| 12:37:00 | 10 | custodians who are basically line officers.  And this is |
| 12:37:06 | 11 | not the place, I think, to talk about the depositions |
| 12:37:13 | 12 | past the first 20.  We have a long way to go for the |
| 12:37:17 | 13 | first 20.  But part of the way that we intend to, and we |
| 12:37:21 | 14 | will be talking about this with the Court, part of the |
| 12:37:23 | 15 | way that we intend to discover and litigate this case is |
| 12:37:29 | 16 | we will need a spread of people from the BPD at various |
| 12:37:33 | 17 | levels.  One can argue, and have discussions about how |
| 12:37:36 | 18 | big a spread and who we need and so forth, but seven of |
| 12:37:41 | 19 | the new custodians were line officers that we want for |
| 12:37:45 | 20 | one reason or another, eventually.  But we said to Mr. |
| 12:37:49 | 21 | Quinn, and we say it now, we're fine with it, we will |
| 12:37:53 | 22 | want their ESI before they are deposed and two weeks |
| 12:37:58 | 23 | before they are deposed.  But, excuse me, but if we |
| 12:38:02 | 24 | don't get that deposition, we won't get the ESI.  That |
| 12:38:07 | 25 | is fine.  So what we're down to is 12 additional |

12:38:11  1   custodians.

12:38:12  2            For the search terms, most, not all, not

12:38:15  3   all, but most are looking at documents and saying, okay,

12:38:19  4   they are talking about hot spots over here and they are

12:38:22  5   talking about hot pockets over here, and the GIVE

12:38:26  6   reports talk about hot pockets.  We better ask for hot

12:38:30  7   pockets, too, because we want to make sure that they are

12:38:34  8   sending, our read of the documents, and I'm showing some

12:38:38  9   of it to the Court, and there is a lot more, is our read

12:38:42  10  of the documents is they are putting check points where

12:39:04  11  they think the crime is.  And we've got problems with

12:39:07  12  that from a Fourth Amendment standpoint.  We think that,

12:39:11  13  notwithstanding, even if they are doing that, they are

12:39:14  14  still doing it in a racially discriminatory manner.

12:39:17  15  That is what discovery is about.  We're going to try and

12:39:20  16  prove that.

12:39:21  17            THE COURT:  Okay.  So here is some concerns

12:39:23  18  that I have.  I can't fault you for being hasty about

12:39:29  19  it, but it's not going to be helpful to be adding

12:39:35  20  custodians until we get to the May 31st date.  We're

12:39:38  21  going to stop with that 20 custodians and that has to be

12:39:42  22  completed.  Then, with regard to, I was hoping you

12:39:49  23  weren't going to tell me another 20, because I would not

12:39:52  24  have found that reliable.  Then with the 12 additional

12:39:58  25  ones, you are going to decide which ones you can agree

12:40:02  1  to and you're going to bring to me only those people

12:40:07  2  that you're fighting over.  And I want to see the

12:40:12  3  documents that you are relying on in telling me we need

12:40:16  4  Officer Jones.  So, Officer Jones was at the scene of a

12:40:20  5  traffic stop on July 4th, you know, blah, blah, blah.  I

12:40:25  6  want to see, because I want to be able to rule on the

12:40:27  7  papers relevant person needs to get deposed as opposed

12:40:34  8  to talking through everybody's role in it.  So that is

12:40:37  9  how you're going to bring it to me as a motion to compel

12:40:40  10  after May 31st.  You know, you still have your

12:40:45  11  obligation to meet and confer.  But that is how I want

12:40:48  12  it served up to me.  Any reason why that can't happen?

12:40:51  13          MR. KRUGMAN:  No reason at all, your Honor.

12:40:53  14  That makes perfect sense to us.  I have a question or

12:40:57  15  two for clarification just to make sure I understand.

12:41:01  16  Because the Court has said "officers" --

12:41:06  17          THE COURT:  Whoever it is.

12:41:07  18          MR. KRUGMAN:  The officers are the ones

12:41:09  19  we've given up until we get the depositions.  I just

12:41:12  20  wanted to make sure that was clear.

12:41:14  21          THE COURT:  Okay.

12:41:15  22          MR. KRUGMAN:  And, yes, absolutely, we will

12:41:17  23  go through that with Mr. Quinn.  It's a process we've

12:41:20  24  started.  It's now a process we will complete and we'll

12:41:23  25  agree where we can and bring it to the Court if we

12:41:27  1    can't.

12:41:27  2                THE COURT:  Okay.  Mr. Quinn, any reason

12:41:29  3    that won't work for you?  You have a period of abeyance

12:41:33  4    on these additional custodians until the end of May

12:41:33  5    31st.

12:41:37  6                MR. QUINN:  That sounds entirely reasonable.

12:41:39  7    The one thing I will bring up, Judge, is there is some

12:41:43  8    overlap with the ECAC e-mails on this specific issue.  I

12:41:48  9    don't know if it makes sense to address that now or

12:41:51  10   wait.  Essentially, they are asking for specific

12:41:54  11   custodians from ECAC to be searched.  I don't know if

12:41:58  12   that would be inclusive or in addition or what, but

12:42:02  13   there would be some overlap I can see there.

12:42:05  14               THE COURT:  That looks to be the next issue,

12:42:08  15   so that is a nice segue.  Let me go back to the

12:42:11  16   Plaintiffs.

12:42:11  17               MR. KRUGMAN:  Thank you, your Honor.  ECAC

12:42:14  18   is where the data and the analysis and the analysis of

12:42:20  19   crime is done.  And the analysis of pretty much

12:42:23  20   everything in the BPD.  ECAC has six to eight analysts,

12:42:29  21   we took the deposition of one of them.  The only one who

12:42:33  22   is actually on the BPD pay work.  This is, BPD has

12:42:40  23   outsourced its crime analysis to ECAC.  And we learned

12:42:45  24   some things, but we already knew the grant applications

12:42:48  25   made it very clear.  They are talking about crack downs

12:42:51  1   and targeted interventions and so forth using ECAC data
12:42:56  2   using hot spot maps.  And this has been around since
12:43:00  3   2019 when we served the subpoena on ECAC.  And Mr.
12:43:04  4   Giammaresi is the chairman of ECAC, wrote back and wrote
12:43:09  5   a Rule 45, an objection, and said, "I don't have
12:43:14  6   administrative control of the documents.  They are all
12:43:16  7   of City's."  And so we turned to the City, and this is
12:43:20  8   part of the fourth production that was held in abeyance
12:43:29  9   after the last conference.  And our conversations with
12:43:31  10  Mr. Quinn, since then, were to go through the subpoena,
12:43:36  11  and we came to large agreements as to what needed to be
12:43:41  12  done from a category standpoint.  But how to get it done
12:43:45  13  was a different question.  When Mr. Joachim took the
12:43:53  14  Masselon deposition, I was there.  We learned more on
12:43:56  15  how ECAC is structured and we were able to come to the
12:44:03  16  following judgment.  ECAC, all by itself, doesn't matter
12:44:10  17  unless it told something to the BPD.  But it told a lot
12:44:16  18  to the BPD and it told it every day and it's all of the
12:44:20  19  data and it's all of the data that we think and we've
12:44:25  20  got lots of documents and we gave the Court one example,
12:44:47  21  but there are millions more of documents indicating that
12:44:49  22  this is how they determine check point location, this is
12:44:53  23  how they determine patrol areas, this is how.  And we'll
12:44:57  24  get to the -- and the compstat reports, you know, also,
12:45:04  25  the redaction issue there is based on ECAC information.

12:45:12  1    Those social media pages are ECAC social media pages
12:45:16  2    that they provide to the BPD.  And what you see is black
12:45:20  3    face after black face after black face.  And you don't
12:45:24  4    see any white faces.  And this is all -- this is all
12:45:29  5    part of what ECAC is, the guts of this.  ECAC is where
12:45:34  6    the data lives.  This case is about lots of things, but
12:45:37  7    one of the things it's about is data.  And so that is
12:45:41  8    where we've been.  What we have asked for is the
12:45:47  9    communications back and forth between the BPD and ECAC
12:45:52  10   and we've limited it to the analysts, and Mr. Giammaresi
12:46:00  11   regarding the search terms because the search terms are
12:46:03  12   how you identify things that are relevant to this case.
12:46:06  13   And there are those search terms, and I think, I think
12:46:10  14   there may have been eight more that are variants of
12:46:14  15   those search terms that, knowing what we know about
12:46:18  16   ECAC, we think those things would be relevant.  And they
12:46:23  17   have a vender, they -- ECAC e-mail, you know, they know
12:46:30  18   who the people are.  They have their e-mail addresses.
12:46:33  19   You know, that is something that mechanically, I've been
12:46:38  20   doing ESI discovery for a very long time, mechanically
12:46:42  21   you tell the vender this is what needs to be done and
12:46:45  22   you give it to the vender and the vender does it.  And
12:46:49  23   we have the parameters listed in the status report.
12:46:54  24   I've looked at that.  I don't see how to limit it any
12:46:57  25   further.

```
12:46:58   1              THE COURT:  So let's stay on that issue and
12:47:00   2    let me hear from Mr. Quinn.
12:47:03   3              There is, according to the Plaintiffs, a
12:47:06   4    targeted ECAC request.  All you would do is feed it to
12:47:11   5    your third-party vender.  It would accomplish it.  And
12:47:14   6    we would take care of that issue.  What is wrong with
12:47:18   7    that proposition?
12:47:20   8              You're muted, Mr. Quinn.
12:47:24   9              MR. QUINN:  I apologize, Judge.  There was a
12:47:28   10   lot there.  I apologize.  On that specific issue, I
12:47:30   11   mean, it's probably good to just talk about the way this
12:47:34   12   is all laid out, if I could, for a second.  Now, ECAC
12:47:38   13   serves a number of different -- serves is maybe not the
12:47:41   14   right term -- it works with a number of different
12:47:44   15   entities; the district attorney's office and other
12:47:47   16   municipalities in the area.
12:47:49   17             THE COURT:  I know what it is because even
12:47:51   18   in little Vermont, we have that.
12:47:53   19             MR. QUINN:  Understood.
12:47:54   20             THE COURT:  Then tell me why this -- let's
12:47:57   21   stay on the request.  You've got the parameters we.
12:48:03   22   Want the analysts and Mr. Giammaresi, and we've got the
12:48:07   23   search terms, feed it to the third-party vender, they
12:48:11   24   are going to do it.  What is the problem?
12:48:12   25             MR. QUINN:  It's, as far as the e-mails, and
```

12:48:15  1  it's maybe -- I didn't mean to -- as far as the e-mails

12:48:18  2  go, the e-mails, to the extent that those e-mails are on

12:48:22  3  BPD servers, which some of them are and some of them are

12:48:26  4  not, there are Sheriffs that work with the department

12:48:29  5  that don't have BPD e-mails.  Some of the analysts do

12:48:33  6  have BPD e-mails.  I don't believe they have been

12:48:37  7  identified by Plaintiffs.  They are not City of Buffalo

12:48:58  8  employees.  But, to search those e-mails, it would be no

12:49:02  9  different than doing a custodian search for the other

12:49:05  10  e-mails.  That is why I brought it up earlier as to

12:49:08  11  whether or not that would be included in the e-mail

12:49:10  12  custodians, the additional e-mail custodians or not, so

12:49:15  13  --

12:49:15  14          THE COURT:  So let me ask this.  That is a

12:49:17  15  good clarification.  I got the impression from Mr.

12:49:20  16  Krugman that he was saying, we're only interested in

12:49:26  17  what was told to the Buffalo Police Department.  Well,

12:49:33  18  we can get that, not from the Buffalo Police Department,

12:49:37  19  we can get it based on what was sent.  And it seemed to

12:49:41  20  me like a third-party request.  So maybe I am missing

12:49:44  21  that piece of it.  I thought this was something that you

12:49:49  22  were going to get the third party to comply with.  The

12:49:55  23  vender was going to come in and it wasn't going to be

12:49:58  24  searching "recipient," it was going to be searching

12:50:02  25  "senders."  Mr. Krugman, why don't you correct me?

| | |
|---|---|
| 12:50:05 | 1 |
| 12:50:07 | 2 |
| 12:50:14 | 3 |
| 12:50:18 | 4 |
| 12:50:22 | 5 |
| 12:50:24 | 6 |
| 12:50:33 | 7 |
| 12:50:37 | 8 |
| 12:50:40 | 9 |
| 12:50:46 | 10 |
| 12:50:53 | 11 |
| 12:50:57 | 12 |
| 12:51:00 | 13 |
| 12:51:04 | 14 |
| 12:51:10 | 15 |
| 12:51:15 | 16 |
| 12:51:19 | 17 |
| 12:51:24 | 18 |
| 12:52:11 | 19 |
| 12:52:13 | 20 |
| 12:52:16 | 21 |
| 12:52:24 | 22 |
| 12:52:28 | 23 |
| 12:52:28 | 24 |
| 12:52:29 | 25 |

MR. KRUGMAN:  I think the answer is yes and no, your Honor.  And so let me unpack it a little bit. What we were told by Mr. Giammaresi was that all of their e-mails and all of their computer files were under the control of the BPD and the City.  That is his formal -- that is what he said in the Rule 45 response. On that basis, we've been asking the city to produce it. And what we are asking for is the e-mails in both directions, but from the -- from the ECAC side and their internal e-mails, only these individuals, there are, I think, Ms. Masselon identified, I think seven.  It may have been eight analysts and Mr. Giammaresi.  These are the people, Matt Rono, we know, for example, he is the guy that does the maps or his boss Kirk Chelburger does the maps.  Ms. Biltetti, I think is her name, who is the gang analyst.  There are the shooting analysts.  These are the people whose e-mail to and from the BPD and internal e-mails talking about the BPD hitting these search terms; it's core information.

THE COURT:  Okay.  So let me push back and suggest that you start with just not in both directions. You start with ECAC.  You are going to get their e-mails.

MR. KRUGMAN:  Sure.

THE COURT:  You're going to know who the

12:52:31  1    recipients are, and then we can narrow the other second

12:52:34  2    search.  So you're not doing it simultaneously from both

12:52:39  3    ends.  You're starting with the core, as you say, and

12:52:42  4    then when you pick up the recipients, we can target that

12:52:46  5    further.

12:52:46  6              MR. KRUGMAN:  Your Honor, we were not

12:52:48  7    talking about the recipients at all.  And I'm glad the

12:52:51  8    Court raised that because I want to clarify.  We are

12:52:54  9    talking about only from the ECAC side, from the ECAC

12:53:00  10   e-mail accounts, but going in both directions.  Because

12:53:03  11   once you're there, you can do both directions.  But from

12:53:06  12   the ECAC e-mail accounts only.

12:53:08  13             THE COURT:  Okay.  So back to you, Mr.

12:53:10  14   Quinn.

12:53:11  15             MR. QUINN:  Just so I try to understand, and

12:53:14  16   I apologize for trying to explain it.  I do try to mean

12:53:18  17   to be helpful as opposed to be argumentative.  The ECAC

12:53:23  18   employees, with the exception of Ms. Massillon, so who

12:53:27  19   was an initial custodian, and her e-mails were searched,

13:03:00  20   are not City of Buffalo employees, they would be

13:03:03  21   somebody else's employees.

13:03:05  22             THE COURT:  But they said you own this data.

13:03:08  23             MR. QUINN:  I believe some of their e-mail

13:03:10  24   accounts are through the BPD, so I would, theoretically,

13:03:14  25   be able to do the same type of e-mail search, assuming I

13:03:18  1    got approval from those employees.  And I don't know

13:03:38  2    what that would consist of for the e-mail back an forth,

13:03:42  3    I would have to do the same type of search that is done

13:03:46  4    for all of the custodians.  It would just be additional

13:03:49  5    custodians.  So it would be -- there is not a central

13:03:53  6    way to search it, I don't believe, that I could just

13:04:20  7    search ECAC e-mails to do a search by custodians.

15:54:12  8                THE COURT:  Okay.  But we've narrowed it to

15:54:17  9    ECAC custodians, and we got the search terms, and you've

15:54:23  10   got a third-party vender, and you have a response that

15:54:28  11   your client has authority over this, so I don't see any

15:54:34  12   obstacles to doing it.

15:54:36  13               MR. QUINN:  As far as the search terms,

15:54:40  14   again, these folks work with different cities,

15:54:44  15   municipalities, things like that.  The terms, as I would

15:54:49  16   understand it, would be the initial 20 terms, and then

15:54:53  17   also an additional set of, I think, seven terms.  And my

15:54:57  18   guess will be, just knowing that a majority of their

15:55:02  19   work is not BPD, is not for the BPD, it's for the

15:55:07  20   combined others, that there is going to be a lot of

15:55:10  21   information in there that is not pertaining to the

15:55:12  22   Buffalo Police Department, so I guess my question would

15:55:16  23   be, how would that be dealt with?

15:55:18  24               MR. KRUGMAN:  Your Honor, if I may, I think

15:55:21  25   we've answered this, and let me be clear.  Our request

15:55:26  1   is limited to e-mails to and from BPD e-mail messages to

15:55:36  2   the ECAC people.  So if they are sending an e-mail to

15:55:45  3   the Cheektowaga Police Department, we don't care, and it

15:55:46  4   won't show up.  But if they copy the e-mail to BPD, it

15:55:50  5   will show up.  Any vender can restrict a search by

15:55:54  6   recipient and so forth.  And I think they can probably

15:55:58  7   do the search terms all at once.  Venders I've dealt

15:56:01  8   with can, whether this vender can, I don't know, but

15:56:05  9   once you have a custodian up, you can do all of the

15:56:08  10  search terms at once.

15:56:09  11       THE COURT:  Any vender should be able to do

15:56:11  12  that, be able to limit the field that way.  All right.

15:56:16  13  So Plaintiffs, after May 31, are free to give this

15:56:23  14  request to Mr. Quinn and his team, if you have not

15:56:30  15  already done so, and I want it completed within 60 days

15:56:33  16  thereafter.

15:56:34  17       MR. QUINN:  That's totally understandable

15:56:36  18  and fine, Judge.  As far as the number of custodians,

15:56:40  19  the identified custodians, would that be something that

15:56:43  20  Plaintiff would be doing or how would we handle who was

15:56:47  21  identified as a custodian?

15:56:52  22       THE COURT:  So, it's going to be the

15:56:56  23  analysts and then Mr. Giammaresi.

15:56:59  24       MR. KRUGMAN:  Giammaresi.

15:57:01  25       THE COURT:  And it's going to go to any BPD

15:57:06  1   address.

15:57:06  2          MR. KRUGMAN:  Yes, any BPD address or any

15:57:09  3   internal e-mails among them that specifically reference

15:57:12  4   the BPD.

15:57:13  5          THE COURT:  Okay.  The search on either end

15:57:15  6   is going to have some component of BPD in it and that

15:57:20  7   should limit it.  If you have a problem when you propose

15:57:23  8   this to the vender, you come back to me and let me know,

15:57:27  9   but this is what they do.

15:57:29 10          MR. KRUGMAN:  Thank you, your Honor.  And

15:57:30 11   one additional question, because, if it is the case that

15:57:33 12   there are some of the analysts do not have BPD

15:57:38 13   addresses, if Mr. Quinn can let us know and we'll simply

15:57:42 14   renew the subpoena to ECAC.

15:57:45 15          THE COURT:  Okay.

15:57:46 16          MR. QUINN:  And one last question, I

15:57:47 17   apologize.  As far as the time period, I don't know that

15:57:51 18   these people have continuously been employed by ECAC.

15:57:55 19          MR. KRUGMAN:  I'm not sure of the question,

15:57:57 20   but I think we could probably talk about which one we're

15:58:00 21   doing when in the context of the Court's order.

15:58:02 22          THE COURT:  No.  I think he is talking about

15:58:05 23   the time frame for the parameters.  So you don't care

15:58:09 24   about what happened in 1999.  You want a time frame.  Is

15:58:15 25   that what you're asking, Mr. Quinn?

| | |
|---|---|
| 15:58:17 | 1 |
| 15:58:18 | 2 |
| 15:58:21 | 3 |
| 15:58:28 | 4 |
| 15:58:32 | 5 |
| 15:58:32 | 6 |
| 15:58:34 | 7 |
| 15:58:35 | 8 |
| 15:58:36 | 9 |
| 15:58:37 | 10 |
| 15:58:39 | 11 |
| 15:58:44 | 12 |
| 15:58:49 | 13 |
| 15:58:56 | 14 |
| 15:58:58 | 15 |
| 15:58:59 | 16 |
| 15:59:02 | 17 |
| 15:59:04 | 18 |
| 15:59:06 | 19 |
| 15:59:10 | 20 |
| 15:59:12 | 21 |
| 15:59:15 | 22 |
| 15:59:19 | 23 |
| 15:59:22 | 24 |
| 15:59:36 | 25 |

MR. QUINN:  Correct, Judge.  Yes, thank you.

MR. KRUGMAN:  Your Honor, our basic time period is January 1 2012 to the present, and that is true for all of the reasons.  It's always been true and it's true here.

THE COURT:  You should put that in your request as well.

MR. KRUGMAN:  Will do.

MR. QUINN:  Thank you, Judge.

THE COURT:  I think I have another case at 1, so we're going to go through the next issue, which I believe is the fifth set of requests for production. And it looks to me like 95 to 96 is resolved.  And I'm just checking with Plaintiffs that that has been resolved.

MR. KRUGMAN:  Your Honor, Mr. Charney will pick this part up.

MR. CHARNEY:  Yes, your Honor.  It has been. We, of course, we need to go back and check through the production because the production, I believe, was made on Friday, the most recent production, and we will follow up with Mr. Quinn if we have questions.  And for your purposes, it is resolved, those two.

THE COURT:  All right.  RFP 97 through 99, and this is for depositions that were noticed for

| | | |
|---|---|---|
| 15:59:43 | 1 | February, March, and March of 2021.  So let's hear from |
| 15:59:50 | 2 | you Mr. Quinn about these requests. |
| 15:59:53 | 3 | MR. QUINN:  I'm not -- I wasn't entirely |
| 15:59:58 | 4 | clear on what is being requested in this one.  We've had |
| 16:00:02 | 5 | discussions as far as the RP, the fifth one, there are a |
| 16:00:07 | 6 | number of issues going on, so I know Plaintiffs have |
| 16:00:09 | 7 | said they've limited things, but I'm not exactly sure |
| 16:00:13 | 8 | from reading this if I understand what the outstanding |
| 16:00:16 | 9 | issues are. |
| 16:00:18 | 10 | THE COURT:  Okay.  And in the interest of |
| 16:00:20 | 11 | time, here is what's going to happen.  You are going to |
| 16:00:26 | 12 | see if you can resolve this.  If you can't, you have an |
| 16:00:29 | 13 | obligation under the rules, but I'm also ordering you to |
| 16:00:33 | 14 | narrow the dispute.  If you can't resolve it, I want a |
| 16:00:37 | 15 | motion to compel, which I am likely to decide on the |
| 16:00:41 | 16 | papers and a response, and I will issue an order and I |
| 16:00:47 | 17 | will set forth a deadline.  And you should be very |
| 16:00:49 | 18 | specific about what you're requesting and why.  And if I |
| 16:00:54 | 19 | need to see a document to determine relevancy, you |
| 16:00:58 | 20 | should be supplying that document.  I don't need 400 |
| 16:01:01 | 21 | pages of documents.  I want to be able to address this |
| 16:01:04 | 22 | quickly. |
| 16:01:05 | 23 | Let's move onto RFP 97.  And I think that |
| 16:01:11 | 24 | might be in the same series, so I'm going to pass by |
| 16:01:14 | 25 | that. |

| | | |
|---|---|---|
| 16:01:17 | 1 | RFP 100.  Let's hear from Plaintiffs. |
| 16:01:31 | 2 | MR. CHARNEY:  Yes, your Honor.  This request |
| 16:02:32 | 3 | pertains to documents related to BPD officers who appear |
| 16:02:36 | 4 | on a list that the Erie County District Attorney has |
| 16:02:39 | 5 | created of officers with, you know, misconduct histories |
| 16:02:44 | 6 | and testimonial credibility problems.  Three of the |
| 16:02:48 | 7 | officers on that list are officers from the strike |
| 16:02:51 | 8 | force, which, as your Honor is aware, is a serious focus |
| 16:02:54 | 9 | of this litigation.  Two of those three, we have already |
| 16:02:58 | 10 | noticed for deposition.  So we have asked for documents |
| 16:03:02 | 11 | in the City's possession relating to this list or any |
| 16:03:06 | 12 | communications that the district attorney has had with |
| 16:03:09 | 13 | the BPD about this list.  We know for, at a minimum, |
| 16:03:14 | 14 | there was some communications about one of the officers |
| 16:03:17 | 15 | on that list, Officer Hassett that we mentioned but the |
| 16:03:20 | 16 | other two, Officer Zach and Officer Hy, we have not |
| 16:03:25 | 17 | received any documents related to them, so we are |
| 16:03:28 | 18 | seeking documents related to those two officers and the |
| 16:03:31 | 19 | concerns raised about them by the district attorney. |
| 16:03:35 | 20 | THE COURT:  So we're talking about officers, |
| 16:03:38 | 21 | all members of the strike force, that's it at this |
| 16:03:41 | 22 | point. |
| 16:03:42 | 23 | MR. CHARNEY:  Yes. |
| 16:03:42 | 24 | THE COURT:  All right.  Mr. Quinn. |
| 16:03:44 | 25 | MR. QUINN:  Just as far as the -- I didn't |

16:03:46  1    understand why these three individuals were identified

16:03:48  2    as opposed to somebody else.  It doesn't appear they

16:03:51  3    have any connection with any of the named Plaintiffs.  I

16:03:54  4    don't see any specific allegations of these Plaintiffs

16:03:57  5    in the Complaint, so we did object on those grounds.

16:04:21  6    With that said, largely, the back and forth on this has

16:04:24  7    been such, a search would be done and what method would

16:04:27  8    a search be done for the information they are

16:04:30  9    requesting.  Now I understand it, to some extent, if

16:04:33  10   they depose these individuals, wanted to ask these

16:04:36  11   questions, but in the abstract, we did object of why

16:04:40  12   these individuals were identified and how would the

16:04:42  13   search be done.

16:04:43  14             THE COURT:  So they are strike force members

16:04:45  15   or that is the allegation and there is allegedly a list,

16:04:51  16   right?

16:04:52  17             MR. QUINN:  Correct.

16:04:52  18             THE COURT:  And somebody is communicating

16:04:57  19   with the district attorney about these individuals,

16:05:00  20   correct?

16:05:01  21             MR. QUINN:  That I'm not sure.  I know there

16:05:05  22   was a letter that went, which was provided to me by

16:05:08  23   Plaintiffs' counsel, identifying certain individuals.

16:05:10  24             THE COURT:  So, realistically, whoever is

16:05:13  25   talking to the district attorney about credibility

16:05:16   1   issues is not the administrative assistant for some HR

16:05:24   2   director.  It's going to be somebody at the top of the

16:05:26   3   organization.  Agreed?

16:05:30   4          MR. QUINN:  Likely, yes.

16:05:31   5          THE COURT:  And you would be searching for

16:05:36   6   these names from those key people to the district

16:05:44   7   attorney and it would be after this list was devised.

16:05:48   8   Would I have that right, Mr. Charney?

16:05:50   9          MR. CHARNEY:  That's correct.  I think the

16:05:53  10   one, kind of, complication is we don't know exactly when

16:05:56  11   the list was devised.  We know we learned of it just

16:06:00  12   last fall.  But, you know, the correspondence that I

16:06:03  13   referred to earlier regarding Officer Hassett was from

16:06:08  14   April of 2019.  It could be that the list is from before

16:06:12  15   April of 2019, and, you know, we learned of the list, as

16:06:15  16   I said, through reporting by the local media.  And, you

16:06:20  17   know, so we don't actually have the physical list in our

16:06:23  18   possession.  So it's hard to know exactly when it was

16:06:27  19   created.

16:06:28  20          THE COURT:  And you've requested the

16:06:35  21   physical list?

16:06:36  22          MR. CHARNEY:  Well, Mr. Quinn said it was in

16:06:38  23   the possession of the district attorney, so we would

16:06:40  24   have to subpoena it from them, which we're prepared to

16:06:43  25   do.  We were more interested in how the BPD responded

16:06:47  1   with respect to these three individual officers, which

16:06:52  2   has been the focus of our inquiry thus far.  We, of

16:06:55  3   course, are prepared to subpoena the list, if we need

16:06:58  4   to.

16:06:58  5           THE COURT:  So I would like you to subpoena

16:07:01  6   the list.  I don't care whether you do discovery or not.

16:07:06  7   But if we are tailoring things, you should be getting a

16:07:09  8   list, it should be redacted to eliminate anybody who

16:07:14  9   hasn't been on the strike force because it's not

16:07:16  10  relevant, and that is going to give you your time frame,

16:07:20  11  and it's going to substantially help Mr. Quinn narrow

16:07:25  12  potential custodians and make sure that we get

16:07:28  13  responsive documents.

16:07:32  14          MR. CHARNEY:  Understood, your Honor.

16:07:33  15          THE COURT:  So that issue we're going to

16:07:35  16  just postpone until the initial work has been done.  If

16:07:41  17  you can't resolve it, you're going to file a motion to

16:07:44  18  compel, give me the materials that I need to decide it

16:07:47  19  and I'll go from there.

16:07:50  20          Anything else that we can take up in the

16:07:53  21  very limited time we have left?

16:07:56  22          MR. KRUGMAN:  Your Honor, one very fast

16:07:58  23  point of clarification on the May 31st, and the original

16:08:01  24  20.  There are some custodians yet to be searched, and

16:08:07  25  my question is, does that include the additional terms

16:08:12  1   for those custodians, because, to us, it would make

16:08:17  2   sense to do that all at once or does it not?  It's a

16:08:20  3   clarification question because I just wanted to make

16:08:22  4   sure that we knew where we were.

16:08:26  5            THE COURT:  Let me ask Mr. Quinn for his

16:08:28  6   response because he is going to be producing the

16:08:30  7   documents.

16:08:32  8            MR. QUINN:  Just so I'm clear, the question

16:08:34  9   is whether or not additional terms for the existing

16:08:48  10  custodians would be searched by May 31st.

16:08:51  11           MR. KRUGMAN:  Yes, whether the additional

16:08:54  12  terms for those custodians under the map for the ones

16:08:58  13  you haven't done yet could be searched.

16:09:02  14           MR. QUINN:  I will attempt to do so.  It

16:09:05  15  would -- it would consist of us going back to the

16:09:08  16  previously searched custodians, so there would be an

16:09:11  17  additional time, I'll try and do the search at the same

16:09:14  18  time, but I think it will add some time that I don't

16:09:17  19  know that I could tell you and sit here today it would

16:09:20  20  be done by the 31st.

16:09:21  21           MR. KRUGMAN:  Your Honor, if I may, what I

16:09:23  22  had in mind was I knew that custodians who he has

16:09:28  23  basically completed, he couldn't add more to for May

16:09:33  24  31st.  The one he hasn't completed it, seems to me this

16:09:36  25  is almost free.  You just add some search terms and then

16:09:40    1    we'll deal with the ones who he has completed for the

16:09:43    2    additional search terms and part of the post May 31st

16:09:48    3    process that your Honor described, that is what I had in

16:09:53    4    mind.

16:09:53    5              THE COURT:  As far as the Court's order, the

16:09:56    6    additional terms are not included.  I'll agree with you,

16:09:59    7    it's a twofer for him because I'll be right back on the

16:10:03    8    issue after May 31st, so he may decide to include those

16:10:06    9    search terms and get it done with.  But, as the way the

16:10:10   10    issue was framed up for the Court, it was original

16:10:13   11    custodians and original search terms, and that is what I

16:10:17   12    ordered.  And we're going to stay on that issue.  All

16:10:17   13    right?

16:10:20   14              I'm out of time.  And I'm going to let you

16:10:24   15    all go and I will probably be hearing from you soon.  If

16:10:30   16    I don't, it's probably a good sign.  Okay.

16:10:33   17              MR. KRUGMAN:  Thank you, your Honor.

16:10:33   18              MR. CHARNEY:  Thank you, your Honor.

16:10:34   19              MR. QUINN:  Thank you.

16:10:35   20              MR. KRUGMAN:  Have a good afternoon.

           21

           22

           23

           24

           25

1

2                          *    *    *

3                   CERTIFICATE OF REPORTER

4

5      I certify that the foregoing is a correct transcript

6   of the record to the best of my ability of proceedings

7   transcribed from the audio in the above-entitled matter.

8

9   S/ Karen J. Clark,  RPR

10  Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25