

June 9, 2021

*Via ECF*

Hon. Christina Reiss
United States District Court
District of Vermont
P.O. Box 446
Burlington, Vermont 05402-0446

Re: ***Black Love Resists in the Rust, et al. v. City of Buffalo, et al., No. 18-CV-719 (W.D.N.Y.)***

Dear Judge Reiss:

Plaintiffs respectfully submit this reply letter on the redaction issue addressed in Plaintiffs' letter to the Court of May 7, 2021 and Defendants' response of June 4.

*Defendants' Relevance Arguments Are
As Wrong as They Are Misplaced*

Under the guise of "proportionality" analysis (Response at 1, 2nd ¶), Defendants assert lack of relevance of the Compstat and GIVE documents as a whole. But *Defendants have already agreed to produce the documents* (albeit they have reneged on a promise to produce them in redacted form while the parties await the Court's decision), and the effort required to do the redactions—perhaps a day of work by a legal assistant—does not even make it into the ballpark for proportionality analysis in a case such as this.

In any event, this case is about far more than merely the specific "incident[s] identified in the Amended Complaint" (Response at 1), or whether any of the social media or arrest information involved any of the Named Plaintiffs (*id*. at 2). This putative class action[1] involves Fourth Amendment violations in the operation of the Checkpoint program *as a whole* and, more broadly, systematic racial discrimination in the way the BPD handled—and handles—traffic policing. That Defendants have chosen to ignore Paragraphs 60-118 of the Amended Complaint will not make those allegations go away, and Plaintiffs are entitled to the discovery necessary to prove them.

As set forth in Plaintiffs' May 10 Status Report (ECF #91 at 7-8), a core issue in this case is whether BPD's "traffic safety" explanation for siting Checkpoints is a subterfuge. In direct support of the allegations in ¶¶ 60-79 of the Complaint, Exhibit 6 to the Status Report (ECF #91-6) confirms the BPD's statements in grant applications (*see*, *e.g*., ECF #66-23) that Checkpoint locations were driven, at least in part, by crime maps and crime data of the type in the Compstat and GIVE reports. The crime data in those reports are also needed as input to statistical analyses of the type undertaken in *Floyd v. City of New York*, 959 F. Supp. 2d 540, 580-82 (S.D.N.Y. 2013), to show that race remains a significant driver both of Checkpoint location and overall ticketing even controlling for crime. Accordingly, Defendants' efforts to use "proportionality" to back-door relevance arguments as to documents they have already agreed to produce is as wrong as it is misplaced.

---

[1] Defendants' discovery shenanigans have slowed the process of Plaintiffs' gathering the information needed to move for class certification, but that process is underway.

*Defendants Have Not Responded at All With Respect to the*
*Social Media Photographs in the Compstat Reports*

Nothing in Defendants' Response so much as mentions the social media photographs in the Compstat reports. These are not "mugshots"; rather, ECAC trolls through the Facebook and other social media accounts of Buffalo residents, downloads photos and other information it thinks might be of interest to the BPD, and presents the photos in the Compstat reports.

Those photos are overwhelmingly of Black people. At least 95%—82 of 86—of the photos in the social media sections of the reports supplied to the Court *in camera* are of Black people; two are of Burmese, and at most two are of White people. Whether or not, as Plaintiffs believe, these photos by themselves create a jury issue that the BPD polices Black people differently than it does Whites, the photos are plainly relevant to that core issue. Defendants have said nothing about the social media photographs because there is nothing they can say.

The social media photographs should not be redacted.

*Other Redactions Should Be Limited to PII*
*of Arrestees and Crime Victims*

The remaining items at issue are GIVE Report gun arrest photos, personally identifying information for arrestees and crime victims, and details of arrests, including locations.

As set forth in our original letter, the GIVE report gun-arrest photo arrays are relevant for the same reason as the Compstat social media photos are, but Plaintiffs do not need any personally identifying information of arrestees beyond those photos, and that PII can be redacted. This is not a search for witnesses but an effort to establish patterns and practices in BPD policing.

For the same reason, Plaintiffs do not need PII of crime victims, and that information may be redacted.

Plaintiffs do, however, need the locations and other details of arrests. Documents indicate that, at least in part, Checkpoint locations and patrol areas tracked crimes and arrests. Captain Philip Serafini's May 2016 Housing Statistical Report, for example, which went to the Commissioner, DPC Lockwood, and two Chiefs, reported for May 29 as follows (Exhibit 1, at COB016249):

> 5-29-16- This tour we focused on the Marine Drive Housing property due to the previous tours violence and gun arrest at Canal Side. Officers spent the early part of their tour breaking up a few fights. We also conducted a traffic checkpoint in the Marine Drive area. During the second half of the tour we moved our patrols to the other BMHA properties. Total of 38 traffic summonses were written, 3 arrests were made and 57 parking tags were written.

Two months later Captain Serafini told the Strike Force Lieutenants that:

> DPC Lockwood also wants 2 traffic checkpoints run during the Daytime Detail, one of them at approximately 12;00 noon. As you all have done in the past, the checkpoint locations should be conducted in and around recent areas of violence. For example, if there was a shooting during the previous night at Broadway/ Filmore, then a traffic checkpoint should be conducted in that vicinity.

Plaintiffs need the locations and details of arrests to explore the prevalence and scope of these practices, which are directly relevant to the allegations of (at least) ¶¶ 60-79, as set forth above.

COB016249

Defendants overstate the impact of the sealing provisions of (N.Y. Crim. Proc. Law §§ 160.50(1)(c), (3)(i), 160.55. In the first place, of course, the provisions apply only where arrests are involved—as they are in the GIVE reports but *not* in the Compstat reports. Moreover, Defendants' assertion that, if the records were sealed, "the Defendants would be legally prohibited from producing these records" (ECF #97 at 3) is simply wrong. This is federal court, and Plaintiffs' claims here are brought under federal law. The *full* quote from *Haus v. City of New York*[2] is:

> As we have previously observed in this case, ***the state sealing statute does not govern here, since the plaintiffs are asserting federal claims***. See *Haus v. City of New York,* 2006 WL 1148680, at *2 (S.D.N.Y. Apr. 24, 2006) (*citing inter alia United States v. Goldberger & Dubin, P.C.,* 935 F.2d 501, 505 (2d Cir.1991)); *see also* Fed. R. Evid. 501; *Von Bulow v. Von Bulow,* 811 F.2d 136, 141 (2d Cir.1987), *vacated on other grounds,* 828 F.2d 94 (2d Cir.1987); *Fountain v. City of New York,* 2004 WL 941242, at *5-6 (S.D.N.Y. May 3, 2004); *Morrissey v. City of New York,* 171 F.R.D. 85, 92 (S.D.N.Y.1997). Nonetheless, federal courts should, in the spirit of comity, take into consideration the policy interests embodied in state privileges and related state laws limiting disclosure of confidential materials, at least to the extent that they can be reconciled with federal policy interests and the discovery needs of federal civil rights litigants. *See, e.g., Cruz v. Kennedy,* 1997 WL 839483, at *1 (S.D.N.Y. Dec. 19, 1997) (*citing King v. Conde,* 121 F.R.D. 180, 187 (E.D.N.Y.1988)).

2006 WL 3375395 (S.D.N.Y Nov. 17, 2006) (emphasis added).

In *Haus*, Judge Dolinger struck the balance by requiring production of the records themselves (not at issue here), with only the information specifically identifying the arrestees redacted. That permitted plaintiffs there to satisfy their "stated need for the documents, which is to assist in pursuing their class allegations about baseless arrests and their *Monell* theories," *id*. The same approach would resolve the redaction issues here: Plaintiffs' need is for the photographs and for the locations and details of the reported arrests; other PII may be redacted.

### With PII Redacted, There Is No Need for "Attorneys' Eyes Only" Treatment

Plaintiffs do not dispute that "attorneys' eyes only" designation can play a role in resolving close issues of confidentiality, but we respectfully submit that the issues here are not close. Certainly not as to the social media pages—that is content that is in the public domain, and Defendants are *not* claiming law enforcement privilege—either for ECAC's gathering and organizing of the material or, for that matter, anything else in the documents (Response at 4). And with PII of arrestees and victims redacted, there is no reason to bar the Named Plaintiffs in this action from having the information necessary to assist in the prosecution of their claims.

The cases cited by Defendants do not support a different result. In both *Floyd* and *Fowler*, the redacted documents ordered to be produced for "attorney's eyes-only" also contained unredacted information that the court had determined was itself sensitive and needed to be kept confidential. *See Floyd v. City of New York*, 739 F. Supp. 2d 376, 383-86 (SDNY 2010) (files of ongoing

---

[2] Magistrate Judge Dolinger issued many discovery opinions in the long-running *Haus* litigation. Defendants' citation to one of the 2008 decisions (2009 WL 623344) is incorrect; the correct citation is the one in text here, which refers back to an earlier decision at 2006 WL 1148680.

internal affairs investigations were covered by the law enforcement privilege even with redactions of PII because "public disclosure of either the existence of an ongoing investigation or the specific investigative steps taken or planned could possibly taint the inquiry or chill the accessibility and candor of complainants and witnesses"); *Fowler-Washington v. City of New York,* 2020 WL 5893817, at *4 n.4 (E.D.N.Y. Oct. 5, 2020) (Ordering that "social security numbers, dates of birth, home addresses, and the names of family members" be redacted from police officer personnel records while other PII in these same records, including personal telephone numbers, emails and medical information, "is restricted to attorney's eyes only."). In contrast, the documents at issue here, with the redactions to which Plaintiffs have agreed, do not contain any such *unredacted* sensitive information. Thus, an attorney's-eyes only protective order is not warranted.[3]

## Conclusion

For the reasons set forth herein in and in Plaintiffs' May 7 letter, Plaintiff respectfully submit that the Compstat and GIVE documents should be redacted only as to PII (but not photographs) of arrestees and PII of crime victims.

Respectfully submitted,

*s/ Edward P. Krugman*

Edward P. Krugman
Senior Attorney

---

[3] Plaintiffs also note that the "Attorneys' eyes-only" confidentiality order covering the BPD Internal Affairs files previously produced in this litigation, ECF #54, was entered specifically to "effectuate the intent" of a New York State law that had generally protected police officer personnel records from public disclosure. *See* ECF #51 at 18-19; N.Y. Civil Rights Law § 50-a. However, because this law was fully repealed by the New York State Legislature in June 2020, *see* 2020 Sess. Law News of N.Y. Ch. 96 (S. 8496) § 1 (June 12, 2020), Plaintiffs intend to move to modify the confidentiality order to permit the Plaintiffs, and merely their attorneys, to view the internal affairs records. Defendants have indicated they are amenable to this change.

# Exhibit 1

| | |
|---|---|
| Philip M Serafini/BPD | To   Aaron V Young/BPD@BuffaloPoliceDept, |
| 06/08/2016 06:07 PM | cc |
| | bcc |
| | Subject   Monthly Statistical Report |

Chief,

This is the Housing Monthly report that I write up at the end of every month, for the pervious months statistics.

Respectfully,

Captain Serafini

----- Forwarded by Philip M Serafini/BPD on 06/08/2016 06:06 PM -----

## BUFFALO POLICE DEPARTMENT
## HOUSING STATISTICS REPORT

Attn:    Daniel Derenda, Police Commissioner
         Byron Lockwood, Deputy Commissioner
         Kevin Brinkworth, Housing Chief

Prepared By: Philip M Serafini

Date Prepared: 06/01/2016

Report Dates: 05/01/2016 to 05/31/2016

| Total Arrests for Period | | Total Arrests in B.M.H.A Locations | |
|---|---|---|---|
| Felony | 24 | Felony | 21 |
| Misdemeanor | 72 | Misdemeanor | 70 |
| Violation | 6 | Violation | 5 |
| Traffic Misdemeanor | 256 | Traffic Misdemeanor | 253 |
| **Total Tickets Issued For Period** | | **Total Tickets Issued on B.M.H.A Property** | |
| Traffic Infraction | 1537 | Traffic Infraction | 1526 |
| Parking Tags | 483 | Parking Tags | 481 |

| City Ordinance | 22 | City Ordinance | 21 |
|---|---|---|---|
| **Total Weapons Recovered** | | **Total Weapons Recovered on B.M.H.A. Property** | |
| 6 | | 1 | |

Special concerns addressed/individuals contacted:

In addition to the above noted statistics generated by the Buffalo Police Housing Unit, a total of 67 vehicles were impounded, 62 of which were from in and around BMHA properties. These vehicles were impounded for a variety of reasons, including but not limited to the following: suspended license/ registration, DWI, narcotics possession, driver wanted on warrant, and weapons possession.

The Buffalo Police Housing Unit did also seize a total of $1,526.00 from in and around the BMHA properties. This money was seized in relation to narcotics possession/ sales and was obtained subsequent to arrest and by following the United States Government guidelines for asset forfeiture.

The following is a daily list of some of the actions performed by the Buffalo Police Housing Unit:

Please note that for the entire month of May, Housing officers have been predominately assigned to the Kenfield/ Langfield and Shaffer Village properties.

5-1-16- With limited manpower we patrolled the big 6 Housing properties. Total of 27 traffic summonses issued, 2 arrests were made and 9 parking tags were issued.

5-2-16- Conducted a traffic checkpoint at Rano /Crowley advising numerous drivers of traffic violations and writing 47 traffic summonses. DMV computers were down for a long period which hampered our ability to write traffic summonses somewhat. Ten parking tags were issued, 5 vehicles impounded, and 9 arrests were made, 3 being felonies.

5-3-16- We received a complaint from the Langfield manager of possible trespassing at 132 Langfield, apt. 128. Housing officers responded and checked apartment which appeared to be secure at this time. Tenant was evicted for non payment of rent. Officers covered on several shots fired calls in E District, and assisted with a man shot in B District. Total of 45 traffic summonses issued, $993.00 confiscated from an arrest, 2 vehicles impounded, 17 parking tags issued, and 2 arrests were made.

5-4-16- Officers were alerted to 2 suspicious person inside a vacant Housing property at 476 Perry. Two arrests were made and a large amount of needles confiscated. CPO Macy attended a recruiting session in the Langfield/ Kenfield property. Total of 44 traffic summonses issued, 17 parking tags written, 2 vehicles impounded, and 6 arrests were made.

5-5-16- In addition to conducting a traffic checkpoint in D District, we assisted BPD Narcotics and SWAT on raids where 2 guns were recovered. Total of 36 traffic summonses issued, 15 parking tags written, 2 vehicles impounded, and 2 arrests were made.

5-6-16- CPO Macy met with the manger of the Marine Drive Housing property regarding the upcoming Canal Festival season. We impounded 2 vehicles on BMHA property in response to tenant complaints. Officers developed information that the person wanted from a gun possession chase a few weeks ago is nicknamed KK. Two arrests were made, 12 traffic summonses issued, and 3 vehicles were impounded.

5-7-16- Housing officers assisted on a robbery in D District. Suspect fled scene in a taxi and was later apprehended by D District officer with the assistance of our officers. Total of 19 traffic summonses were issued and 5 parking tag written.

5-8-16- Conducted a traffic checkpoint at Route 33 and Suffolk St. exit from 1645- 1800 hrs. Assisted B District with locating and impounding a vehicle at 309 Mulberry St. Vehicle was used in shooting. Total of 25 traffic summonses issued and 2 arrests were made.

5-9-16- Very little manpower tonight but we were still able to follow up on residential complaints about illegal parking and abandoned vehicles on BMHA property. Total of 14 traffic summonses issued, 3 vehicles impounded, 26 parking tags written, and 3 arrests were made.

5-10-16- This tour was very busy with shots fired and shooting calls in C and D Districts so we moved all of our patrols to the BMHA properties in those Districts. Total of 37 traffic summonses issued, 6 arrests were made, 19 parking tags written, and one vehicle was impounded.

5-11-16- Officers were briefed on intel by CPO Macy which he gained from a recent BMHA meeting in the Langfield property. This intel pertained to possible shooting suspects in the area and potential future violence. We also followed up on another wanted shooting suspect from the Jasper Parish Housing property. Later in the tour we received resident drug complaints from the Sedita property and made an arrest. Total of 37 traffic summonses issued, 6 arrests were made, 3 vehicles were impounded and 2 parking tags were written.

5-12-16- We received a complaint from the Shaffer Village manager about a tenant who displayed and threatened a BMHA worker with a knife. Officers responded to this complaint and made an arrest for menacing. H410 was involved in a foot chase with several suspicious males, which resulted in an injury to the officer. Total of 38 traffic summonses issued, 12 parking tags written, 3 vehicles impounded, and 3 arrests were made.

5-13-16- A call came out at 0030 hrs in the Langfield area of shots fired. A Housing car was on scene and there was no evidence of shots fired. Housing Drug Recognition officer (DRE) Agee assisted C District with a 4 car accident at Bailey/ Lovejoy. Total of 47 traffic summonses issued, 1 arrest and 10 parking tags were written.

5-14-16- DPC B. Lockwood and Chief K. Brinkworth instituted a daily Housing detail consisting of four officers to run from 1130- 1530hrs. The detail will concentrate on the Kenfield/ Langfield Housing property. There was a shots fired call in the Shaffer Village property in which the incident was captured by the BMHA cameras. The shooter was identified as Onyx Jones, and  is still outstanding at this time. Total of 57 traffic summonses issued, 4 parking tags written and 2 vehicles were impounded.

5-15-16- Officers attempted to locate Onyx Jones at 77 Halbert. Total of 73 traffic summonses issued, 1 arrest made, 19 parking tags written and 4 vehicles were impounded.

5-16-16- During the Housing Detail hours H230 located and arrested wanted felony suspect Akeem Cortez. During the regular tour we focused on D and E Districts. Total of 65 traffic summonses issued, 17 parking tags written and 3 vehicles were impounded.

5-17-16- Today was our double up day. We conducted a traffic checkpoint in the Shaffer Village area during the first half of the tour. Then we continued routine patrols and answered resident complaints in Langfield about gang and drug activity. We also assisted C District on a shooting, located a wanted person for the BPD Sex Offense Squad, and worked on complaints from tenants and manager of Shaffer Village property. Total of 65 traffic summonses issued, 8 arrests were made, 15 parking tags written and 4 vehicles were impounded.

5-18-16- Daytime detail focused on the Kenfield/ Langfield and Douglass Towers/ Willert Park Housing properties. A total of $282.00 in cash was confiscated from an arrest, 63 traffic summonses issued, 12 parking tags written, 6 vehicles were impounded, and five arrests were made, 2 of them being felonies.

5-19-16- Housing officers pulled up on a fight at 211 Niagara St. and recovered a loaded handgun and made 3 arrests. Officers discovered several 4 wheelers and motorcycles driving on Isabelle St. in the Shaffer Village Housing property. They subsequently confiscated one motorcycle and made one arrest. Suspect lives at 83 Mayer. Total of 94 traffic summonses were issued and 4 vehicles were impounded.

5-20-16- Very busy tour with the daytime detail concentrating on the Douglass Towers and Langfield Housing properties. During the regular tour we assisted B District on a double shooting and D and E Districts on several shots fired calls in the Shaffer Village and Donovan Drive properties. Late in the tour H440 assisted in apprehending 2 individuals possessing a loaded .357 revolver and illegal narcotics. Total of 91 traffic summonses issued, 6 arrests were made, 3 parking tags written and 3 vehicles were impounded.

5-21-16- During the detail hours we patrolled the Donovan Drive property due to the previous days shots fired calls. We also expanded patrols to Jasper Parish and Shaffer Village after a large fight broke out in Jasper. Additionally there was a robbery/ car shot up in Donovand Drive vicinity around 1:00PM which we also responded to. We also assisted on a large fight involving a couple hundred people at a carnival at MLK park. Total of 68 traffic summonses issued, 25 parking tags written and 3 vehicles were impounded.

5-22-16- Slower tour today. We patrolled the big 6 Housing properties and assisted C District on numerous fight and gun calls relating to the carnival at MLK park. We also asssited on a homicide later in the tour. Total of 57 traffic summonses issued, 30 parking tags written, 2 vehicles were impounded and 2 arrests were made.

5-23-16- During the detail hours we focused on drug complaints from the Langfield tenants and made an arrest, recovering Heroin from one of the parking lots. We assisted on another stabbing and shooting during the regular tour. Total of 42 traffic summonses issued, 8 parking tags written, 3 vehicles were impounded and 3 arrests were made.

5-24-16- CPO Macy attended two meetings in the Langfield Community Center and gained intel regarding violence between Kenfield and Langfield people. We also learned of a new Heroin problem starting up in the Langfield property. We ran a traffic checkpoint in this same area during our regular tour in order to increase our presence and deter criminal activity. Total of 87 traffic summonses issued, one arrest was made, 12 parking tags written and 3 vehicles were impounded.

5-25-16- Daytime detail focused on Langfield, Douglass Towers and Willert Park locations. We assisted on a foot chase on E. Ferry with the Strike Force and assisted with a gun arrest at 32 Roehrer. Chief Brinkworth, Captain Serafini and CPO Craig Macy attended a meeting with BMHA security Chief Paul Kihl. Paul relayed important maps of criminal activity within the Kenfield/ Langfiels property. Paul also gave us a list of names of suspected individuals who have a history of criminal activity. This was very helpful and we relayed all of this information to the Housing Lieutenants and their officers. Total of 48 traffic summonses issued, 2 arrests were made, 24 parking tags written and 2 vehicles were impounded.

5-26-16- Housing officers assisted S430 with a traffic stop resulting in one gun recovered. Officers also covered on violent and shots fired calls in E and C District along with a violent call in the Perry Housing property. Total of 63 Traffic summonses were issued, 7 arrests were made, 4 City Ordinances were written, 10 parking tag issued and 2 vehicles were impounded.

5-27-16- During the detail hours we addressed quality of life issues within BMHA areas. We assisted E District on a shooting on Wholers. Officers confiscated $251.00 cash from a drug arrest. Total of 65 traffic summonses were issued, 5 arrests were made, 13 City Ordinances written, 27 parking tags were issued and one vehicle was impounded.

5-28-16- Housing officers assisted on a foot chase originating from Warren St. where an arrest was eventually made and one gun was recovered. Officers also covered on a shots fired call involving a fleeing vehicle and helped to recover the targeted vehicle and the suspects. This resulted in 2 arrests and 2 guns being recovered. Total of 43 traffic summonses were issued, 30 parking tags written and 3 City Ordinances were issued.

5-29-16- This tour we focused on the Marine Drive Housing property due to the previous tours violence and gun arrest at Canal Side. Officers spent the early part of their tour breaking up a few fights. We also conducted a traffic checkpoint in the Marine Drive area. During the second half of the tour we moved our patrols to the other BMHA properties. Total of 38 traffic summonses were written, 3 arrests were made and 57 parking tags were written.

5-30-16- Today was Memorial Day and officers focused on the Marine Drive property due to the large number of people at the Canal Side Festival and the Bisons game. We also spent time at the other BMHA locations assisting with violent and shots fired calls. Total of 40 traffic summonses issued and 38 parking tags were written.

5-31-16- Officers continued to gather intel from the Langfield property relating to the recent shootings and gang activity between Kenfield and Langfield. CPO Macy has also set up a clean sweep project for the following tour based on his intel. Total of 56 traffic summonses were issued, 3 arrests were made, 20 parking tags written and 1 vehicle was impounded.

COB016250

 * For statistical purposes numbers attributed to B.M.H.A. property are to be considered within one half of one mile of B.M.H.A. property

COB016251

# Exhibit 2

**Philip M Serafini/BPD**
07/05/2016 09:09 PM

To: George P McLean/BPD@BuffaloPoliceDept, Michael P Quinn/BPD@BuffaloPoliceDept, David E Wilcox/BPD@BuffaloPoliceDept, Thomas R
cc: Aaron V Young/BPD@BuffaloPoliceDept
bcc:
Subject: Strike Froce Daytime Detail

Lieutenants,

Effective immediately, the manpower has increased for the Strike Force Daytime Detail. It will now comprise of 6 P.O.'s and 2 Lieutenants from 1130-1530hrs, daily. If we can only fill it with 1 Lieutenant, then another P.O. can be called in. Below are a few things to keep in mind:

DPC Lockwood wants results with this increased Daytime Detail. All officers should be made aware of this, and of what is expected of them. In the past the officers assigned to the Daytime Detail have always yielded good results and we all expect this to continue into the future.

DPC Lockwood also wants 2 traffic checkpoints run during the Daytime Detail, one of them at approximately 12;00 noon. As you all have done in the past, the checkpoint locations should be conducted in and around recent areas of violence. For example, if there was a shooting during the previous night at Broadway/ Filmore, then a traffic checkpoint should be conducted in that vicinity.

A separate Strike Force Daytime Detail report shall be filed every day by the Lieutenant who works the Detail. This report will include the stats from the Strike Force Daytime Detail car crews only. It should also include the names of person(s) arrested and their charges. You will still compile all of the stats for the entire day (daytime detail and regular shift) on the nightly report.

If there are any questions or comments please let me know. Thank you all for your good work and cooperation.

Captain Serafini