UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

BLACK LOVE RESISTS IN THE RUST, *et al.*,
individually and on behalf of a class of all others
similarly situated,

                      Plaintiffs,

  v.

CITY OF BUFFALO, N.Y., *et al.*,

                      Defendants.

No. 1:18-cv-00719-CCR

### DECLARATION OF EDWARD P. KRUGMAN IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION AND FOR SANCTIONS AGAINST DEFENDANT CITY AND ROBERT E. QUINN PERSONALLY

**EDWARD P. KRUGMAN** declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a member of the Bar of the State of New York and of this Court and am one of the attorneys for Plaintiffs in this action. I make this declaration in support of Plaintiffs' Motion to Compel Production and for Sanctions Against Defendant City and Robert E. Quinn Personally.

2. The principal relief sought in this motion is to compel production of the numerous open items that should have been produced long ago. Plaintiffs also seek their expenses, including attorneys' fees, under Rule 37(a)(5)(A) against Defendant City of Buffalo ("the party . . . whose conduct necessitated the motion") jointly with its lawyer, Attorney Robert E. Quinn ("the . . . attorney advising that conduct"). And Plaintiffs seek additional sanctions (to be determined by the Court, in its discretion) against Mr. Quinn personally under 28 U.S.C. § 1927 for his ongoing

(and, in Plaintiffs' view, willful) refusal to adhere to promises made in the course of the parties' meet-and-confer processes.

3. Part I of this Declaration sets forth the discovery sought to be compelled and the bases therefor. Part II sets forth the basis for the request for sanctions against Mr. Quinn, which includes the showing under Rule 37(a)(5)(A)(i) and Local Rule 7(d)(3) of the efforts made to secure the discovery without the need for intervention by the Court.

4. This Declaration does not address the amount of monetary sanctions, if any. Plaintiffs' understanding of the procedure in situations such as this is that the Court first determines entitlement to and scope of sanctions, and Plaintiffs then submit hours, expenses, etc. in accordance with the ruling on entitlement and scope.

### I. DISCOVERY SOUGHT AND THE BASES THEREFOR

5. The discovery sought to be compelled is set forth in the proposed Order annexed to the Notice of Motion. The discovery sought falls into three general categories:

(a) The City's violation of the Court's Order, at the May 11 Status Conference, regarding ECAC ESI production.

(b) Seven categories of documents as to which the City agreed to provide the discovery but simply has not done so; in those cases, the showing of relevance and need is more abbreviated than where there is an actual dispute.

(c) Two categories of documents where there is (or, at least, appears to be) some element of dispute. In those cases, I make a full showing of relevance and need—although the City's failure to cooperate in the meet-and-confer process would, I submit, justify peremptory entry of the Order in those cases as well.

6. In addition, because it is relevant to the request for sanctions, I include a fourth general category as well: promised documents that, as of the filing of the most recent request for a discovery extension (ECF #102, *see* ECF #102-2) were still open items but that have now been produced (the "September productions"). These are presented in section I.D below to record the time lag between promise and production.

A.  *The Violation of the May 11 Order re
    ECAC ESI Production*

7.  One of the topics on the table on May 11 was ECAC ESI production. The Court ruled as follows:

> THE COURT: . . . So Plaintiffs, after May 31, are free to give this request to Mr. Quinn and his team, if you have not already done so, and I want it completed within 60 days thereafter.
>
> MR. QUINN: That's totally understandable and fine, Judge. As far as the number of custodians, the identified custodians, would that be something that Plaintiff would be doing or how would we handle who was identified as a custodian?
>
> THE COURT: So, it's going to be the analysts and then Mr. Giammaresi.
>
> MR. KRUGMAN: Giammaresi.
>
> THE COURT: And it's going to go to any BPD address.
>
> MR. KRUGMAN: Yes, any BPD address or any internal e-mails among them that specifically reference the BPD.
>
> THE COURT: Okay. The search on either end is going to have some component of BPD in it and that should limit it. If you have a problem when you propose this to the vender, you come back to me and let me know, but this is what they do. (Tr. 5/11/21 at 30-31)

8.  On July 20, 2021, Plaintiffs renewed their request for production of the ECAC ESI ordered by the Court. That was more than 60 days ago, and production has not happened. Nor has it even been unequivocally promised. The City is in violation of the Order entered at the Status Conference. A further Order should be entered compelling production forthwith; Plaintiffs will seek issue-related sanctions under Rule 37(b)(2)(A) for any non-compliance with that further Order.

B.  *Nominally Agreed Discovery*

   1.  *Nominally Agreed: ECAC Project File Production*

9.  As the Court will recall, "ECAC" is the Erie Crime Analysis Center, which provided data (including hot spot maps) the BPD used for various purposes, including setting patrol

and checkpoint locations. On May 4, the City agreed that non-e-mail production from ECAC limited to the "project files" for projects ECAC performed for BPD officials at the Chief level or higher was "reasonable" (Ex. 1).

10. The City made a partial production from those project files in July, but it has yet to complete that production, and it should be ordered to do so.

11. In addition, the July partial production did not comply with the City's agreement (see ¶¶ 24, 25 below) to produce metadata simultaneously with all ESI production going forward. In light of the nature of the "project file" production, Plaintiffs were able to limit the metadata sought in that specific instance, but even that has not yet been forthcoming. To the extent the September production includes materials that relate to this request (it may), the required information has not been supplied for that production, either. Accordingly, the City should be ordered to include in its production, as to each project, identification of the project and the BPD official for whom it was conducted, and it should further be ordered to supply this information for the project files produced to date.

### 2. *Nominally Agreed: Drafts of JAG Applications*

12. As the Court is aware (*see*, *e.g*, ECF #91 at 8), the City's annual applications for federal Judicial Assistance Grants included narratives describing use of ECAC data and maps in determining patrol and checkpoint locations. The City's Grant Officer was Maureen Oakley, and Plaintiffs had therefore included her on their list of additional ESI custodians to be searched.

13. In reviewing that list following the May 11, 2021 Status Conference, Plaintiffs concluded that they did not need a full search of Ms. Oakley's ESI; all that was needed was the drafting history of the various applications. On August 5, Mr. Quinn agreed to look for and produce such documents, but no production has been forthcoming. Accordingly, the City should be ordered to search for and produce all drafts of the applications for Judicial Assistance Grants for the period

2011 to the present, as well as e-mails or other correspondence relating to the drafting process, with the search to include at least the physical and electronic files of Maureen Oakley and any other physical or electronic files specifically identified to the JAGs.

### 3. *Nominally Agreed: Housing Unit/Strike Force Overtime Reports*

14. On April 28, Plaintiffs wrote to Defendants with a number of discovery follow-up items (Ex. 3), one of which related to Housing Unit/Strike Force Overtime Reports, as follows:

> Document COB046734 is a "Housing/Strike Force Weekly Overtime Report." So far as we can tell, it is the only such document you have produced. Please produce all such weekly reports from January 1, 2012 through the present (we assume the Strike Force reports will only go through the dissolution of the Strike Force in 2018).

15. A number of such documents were produced in the May 2021 productions, and on July 20, 2021, Plaintiffs inquired whether they had been specifically looked for (in which case the issue was closed) or had simply popped up on search terms. At the August 5 meet-and-confer, counsel for Defendant said that the reports had not been specifically looked for, and he agreed to determine if additional, unproduced reports existed. To date, despite follow-up from Plaintiffs, Defendants have neither produced additional reports nor confirmed that no unproduced reports exist. Accordingly, Defendants should be ordered to complete the search and either produce any additional reports or confirm that none exist.

### 4. *Nominally Agreed: RFP ##97-99*

16. Requests for Production 97-99 relate to misconduct investigations of individual BPD employees, and Plaintiffs and the City reached agreement on the scope of the required response in connection with the deposition of P.O. Charles Skipper, which was taken in February. The City has ostensibly agreed to replicate that production in advance of each deposition of a BPD employee, but to ensure that the City's agreement does not, once again, remain "nominal," it should be ordered to comply.

17. Specifically, for each current or former BPD employee whom Plaintiffs depose in this action, the City should be ordered to search for, and produce no later than seven days before the deposition, all documents responsive to Requests 97-99 that relate to that witness, provided that Requests 97(i) and 97(ii) are limited to complaints and BPD misconduct investigations concerning racial profiling, biased policing, checkpoints, towing/impound, and traffic enforcement.

18. This production should be in addition to any that may be required with respect to ESI searches of deposition witnesses, which are addressed in Section C.1.b below.

### 5. *Nominally Agreed: Native Production, Where Available, for Pre-May 2021 E-Mails*

19. The City complied with this Court's order to produce the "metadata spreadsheet" for existing e-mail production by May 31, 2021, but the spreadsheet as produced was worthless. It was riddled with errors (80% or greater error rate), and counsel for the City has confirmed that it was created by having human beings look at the as-produced .pdf copies of the e-mails and writing down what they saw, rather than by machine extraction of data from the e-mails themselves.

20. Plaintiffs have concluded that there is no effective relief to ask for regarding the spreadsheet itself and, therefore, that it is time to move on as to the spreadsheet. Nevertheless, it would still be desirable to know who got what e-mails, and the *native* e-mails will still have their original metadata. Plaintiffs have requested (and understand Defendants to have agreed) that to the extent (but only to the extent) that the native versions of the e-mails previously produced in .pdf form have been segregated, those e-mails be re-produced in native form and Plaintiffs will extract the metadata themselves. Plaintiffs are *not* asking for searches to be redone; only existing, segregated collections of native e-mails that were previously produced in .pdf form need be produced.

### 6. *Nominally Agreed: GIVE Meeting Materials*

21. The City was the recipient of a series of "GIVE" grants (Gun-Involved Violence Elimination. In addition to the grant reports that have now been produced (see § I.D below), the City also agreed to search for and produce paper or electronic files specifically identified to the GIVE program (or its predecessor IMPACT program) that were maintained by regular attendees at the periodic GIVE or IMPACT meetings. This is not a "search term" search but asking people who went to the meetings whether they maintained a "GIVE file" and, if so, to review that file for meeting notes and related documents.

22. Meeting notes are, of course, the basic stuff of discovery. It is one thing (an important thing, to be sure) to see the program reports. It is another (pure gold when it exists) to see what attendees said about those reports at the meetings.

23. In the September production the City finally produced GIVE reports and some agendas, but it still has not produced meeting notes or similar documents. The City should be ordered to effectuate its agreement to look for such documents and produce what it finds.

### 7. *Nominally Agreed: Form of Production/Metadata*

24. The Court is, of course, aware of the history of Plaintiffs' efforts to obtain the Court-ordered metadata for the e-mail productions prior to May 2021 (ECF #91 at 2-3). On April 1, 2021, the City agreed that, going forward, production would be made from a platform (Relativity) that allowed full metadata to be produced with the documents. The May 17 and May 31 productions complied with this agreement, but its partial production of ECAC "project files" (see ¶¶ 10-11 above) in July 2021 did not.

25. With Relativity in place there is no reason the City cannot produce metadata when it makes ESI production, and it should be ordered to do so. (The September productions

were not based on ESI searches but were of specifically requested documents, so the Metadata obligation did not apply to them.)

**C.** *Arguably Disputed Discovery*

26. The arguably disputed areas of discovery are:

- Additional custodians and search terms for ESI, and
- ENTCAD (dispatch database) production.

I say "arguably" disputed because, except as to ENTCAD, counsel for the City has not said "No"; he has merely indicated potential concerns and has not said "Yes," despite months of back-and-forth. As to these topics, however, Plaintiffs cannot assert that the City has agreed, so I set forth more detail as to relevance and need.

1. *Additional Custodians and Search Terms for ESI*

    a. *New Custodians*

27. As indicated at the May 2021 Status Conference (Tr. 5/11/2021 at 19-20), Plaintiffs had been able at that time to reduce their requests for additional ESI custodians from the original 20 to twelve; one was given back altogether, and the remaining seven would be searched only if they were deposed.

28. Since that time, and with the benefit of the massive May production, Plaintiffs have been able to reduce their requests further, by eliminating Ms. Oakley (*see* § B.2 above) and shifting four other individuals to the "only if deposed" category. Accordingly, Plaintiffs now seek ESI searches of only seven additional custodians. These are:

   (a) *Chief Carmen Menza*. Chief Menza is the Chief of Buffalo's E District, which comprises the bulk of the East Side, was the location of the vast majority of the Checkpoints, and contained several of the more heavily ticketed BMHA housing complexes. The ticketing data show a sharp divergence between the "multiple ticketing" practices (*see* ECF #63 ¶¶ 109, 110, 122, 124, 127, 151) of, on the one hand, the Strike Force and the Housing Unit and, on the other hand, the other units of the BPD (*see* Ex. 4, which shows

"tickets per incident" over time, separately for the Strike Force, the Housing Unit, and the rest of the BPD). The officers under Chief Menza's command thus were policing the same area as were the Strike Force and the Housing unit but were behaving quite differently. The searches undertaken to date will not have picked up Chief Menza's e-mails to and from the officers in his command, for none of those officers was on the original list of custodians. Understanding the reasons for the difference in behavior between the E District and the Strike Force and Housing Unit is a core subject of discovery in this race discrimination case.

(b) *P.O. Robbin Thomas*: P.O. Thomas is a named defendant in the litigation who issued multiple tickets to Plaintiff Jane Doe at a Strike Force checkpoint. She was a Strike Force officer until BPD disbanded the unit and is the recipient of multiple complaints from Buffalo residents alleging that she treated them rudely and unprofessionally at traffic stops, often issuing 4-5 tickets in a single stop and sometimes engaging in suspected racial profiling. The BPD resolved all of these complaints without significant disciplinary action against P.O. Thomas. The lack of appropriate response to citizen complaints supports the City's liability under *Monell v. Dep't of Social Services* and is a core subject of discovery in this matter. The attached emails (*see* Ex. 5) illustrate the complaints made against Officer Thomas and BPD's response. (I have not appended the complaint files themselves because they are marked "Attorneys Eyes Only.") Line officers such as P.O. Thomas tend not to have much ESI, but what there is, Plaintiffs need.

(c) *P.O. William Macy*. Officer Macy was and is the "Community Policing Officer" for the Housing Unit. He has written e-mails that discuss BPD's ticketing practices in BMHA parking lots and revenue generated thereby, along with the role of the Housing Unit generally (*see* Ex. 6). Given the centrality of the Housing Unit to this action and Officer Macy's location at the meeting-point between the BPD and the community, it is important to look beyond simply those e-mails he wrote to those on the list of original ESI custodians, including any correspondence he may have had with BMHA officials and residents.

(d) *Deputy Comm'r Joseph Gramaglia*. Commissioner Gramaglia was Chief of the B District and is now the number 2 at the BPD. There are numerous specific documents suggesting his direct involvement in the core issues of this case, including BPD's traffic ticketing practices generally, tinted windows ticketing specifically, racially discriminatory policing practices, and surveillance of civil rights activists protesting police brutality (*see* Ex. 7). These important emails have come to our attention solely through the inboxes of other custodians, and we lack the complete history that a search of Gramaglia's own ESI would produce.

(e) *Michael DeGeorge*: Mr. DeGeorge is the Director of Communications for the City. He is a key figure often involved in high level communications between Mayor Brown's office and the BPD. He has been involved in shaping the City's position on numerous matters central to this lawsuit including

tinted window ticketing and the revenue generated from traffic tickets (*see* Ex. 8). Given DeGeorge's central position in the Brown administration, a search of his ESI could reveal relevant and important information not otherwise available.

(f) *Insp. Robert Rosenswie and Insp. Harold McClellan*: Inspector McClellan was the head of Internal Affairs during the earlier part of the relevant time period; Inspector Rosenswie was his replacement. Numerous e-mails indicate that much discipline (or, more precisely, lack of discipline) was handled by e-mail, without creation of a formal IAD file. Their ESI is core discovery.

29. The search terms to be run on these custodians consist of a set of core terms to be run on all, plus, in some cases, additional terms specific to the individual custodian. The core terms are as follows:

> check-point, road-block, impound, tint, tow, discriminat, rac, profil, bias, revenue, road check, zero tolerance, numbers, stop receipt/report, school/speed zone

Experience in this case has indicated that these terms are likely to produce relevant documents and *not* produce irrelevant documents. Each of these terms includes a set of "equivalents," as set forth in Exhibit A to the Proposed Order.

30. The core terms are obviously relevant, and most of them were in the original set of 20 search terms. The City has never raised *any* objection to *any* of these terms except "stop receipt/report" and "school/speed zone." As to these:

(a) In June 2020, Mayor Brown announced a new policy that "stop receipts" would be required at all traffic stops. Under the policy, BPD officers must complete a "stop report" at each traffic stop that records, among other things, the reason for the stop and the race of the person stopped (Ex. 9). Early analysis by the Partnership for the Public Good revealed that in the first three months of the program: (a) only 11% of BPD officers actually filled out stop reports as required; (b) more than two thirds of people reportedly stopped were Black (Ex. 10). The stop receipt program, including the data generated by the program and BPD's creation, implementation and assessment of the program, directly relate to Plaintiffs' claims that they are entitled to prospective injunctive relief because BPD continues to enforce traffic laws in a racially discriminatory manner. Plaintiffs therefore are entitled to ESI discovery with respect to this program.

-10-

(b) In March 2020, the City of Buffalo installed speed cameras in school zones around the City. The City claimed that the cameras were necessary to deter speeding near schools, but the cameras were disproportionally located in Black communities and extracted millions of dollars in traffic fines from residents of those communities (Ex. 11). The camera program was only very recently terminated, in response to enormous community pressure, but the program directly implicates Plaintiffs' claims that the BPD has a present, ongoing policy of seeking to extract fines from low-income communities of color in order to generate revenue, in violation of the Fourteenth Amendment Due Process Clause, and Plaintiffs are entitled to ESI discovery with respect to this program.

31. The search terms, by custodian, are as follows:

(a) Chief Menza: Core terms, plus housing, strike-force, hot pocket, hotspot
(b) P.O. Thomas: Core terms, plus east side, traffic-stop, complain*, Internal Affairs Department (IAD)
(c) P.O. Macy: Core terms
(d) DC Gramaglia: Core terms, plus traffic-stop, law-suit, strike-force, summons, budget, hot pocket, hotspot, high crime, violent crime, high visibility, traffic/roadway safety
(e) Mr. DeGeorge: Core terms
(f) Insp. McClellan and Rosenswie: Core terms plus traffic-stop, strike-force, summons, Hy, Hassett, Zak.

These lists are tailored to each individual's position and to the reasons ESI discovery of that individual is sought. Since there has been no objection to these terms,[1] I will defer detailed, term-by-term discussion pending the City's response.

### b. "Only if Deposed" Custodians

32. As set forth above, Plaintiffs were able to move most of the requested new custodians to the "only if deposed" category. Some of those witnesses are on the current list of deponents; others are not. The inclusion of an individual on this list is not meant to pre-judge whether

---

[1] Mr. Quinn at one point objected to "numbers" as likely to produce too many hits, but only the plural is sought (as in, "You have to get your numbers up"). Plaintiffs' review of the documents produced to date indicates that this restriction will be effective in keeping the hits few and relevant.

that individual will in fact be deposed; it is merely to set parameters for the search of the individual's ESI if, as, and when the deposition is scheduled.

33. It is routine, in a notice of deposition of an individual witness, to seek production of the witness's individual documents, beyond what was produced in general discovery. That is what is being done here. Once again, the search terms have been tailored to the reasons for seeking the individual's deposition (if, in fact, that happens).

34. The "only if deposed" individuals are Officers M. Acquino, Domaracki, M. Healy, Hy, Hassett, Whiteford, Wigdorski, Tedesco, and Miller, and Chief Barba. As will be seen, the individuals at issue here are mostly line officers, plus one Chief. As noted, the line officers are unlikely to have much ESI, so the burden of this production should be minimal.

    (a)    For all individuals except Chief Barba, the search terms are the core terms plus east-side, traffic-stop, complain*, and Internal Affairs Department (IAD).

    (b)    For Chief Barba, the search terms are the core terms plus housing, strike-force, hot pocket, hotspot, complain*.

    *c.*    ***Additional Search Terms for Previous Custodians***

35. As mentioned at the May 11 Status Conference, review of the production under the original search terms indicated that some additional search terms were appropriate. Most of these were ways the documents indicated that BPD personnel spoke about concepts already being searched. A few others (*e.g.*, "zero tolerance") were concepts that first appeared after documents started being produced; three specific names (Officers Hy, Hassett, and Zak) relate to the Erie County District Attorney's views as to credibility of individual BPD officers (*see* ECF ##99, 101).

36. The Court accepted at the Status Conference that the City might wish it had run these search terms with the rest of the May 2021 ESI push (Tr. 5/11/2021 at 39), but declined to

order the City to do so, as it already had a lot on its plate for the month of May. The time has now come for these terms to be run.

37. Once again, the only terms the City has specifically questioned are "school/speed zone," "stop receipt/report," and "numbers," each of which has been addressed above.

## 2. *ENTCAD Production*

38. In April, Plaintiffs came across a document (Ex. 12) that suggested that there was a data source concerning the City's traffic enforcement that had never been mentioned and from which production had never been made. On April 28 (Ex. 3), I wrote to Mr. Quinn as follows:

- In reviewing the documents you have produced recently, we have become concerned that there may be data sources at BPD that should have been, but were not, tapped with respect to your original document production.
    - Please see Documents COB051503-04 attached (the full document includes two additional pages, but 51503-04 are what we're focusing on). These are a "Dispatch Monitor – Unit History Report" (51503) for Unit H440 (Whiteford and Miller) for December 13, 2017 and a Complaint Summary Report for one of the traffic stops listed on the Unit History Report (51504).
    - We can see the four listed complaints (17-3450582, 0599, 0776, 0833) in CHARMS, but the CHARMS data we received from Erie County has nothing like the detailed, second-by-second information listed in either of the two attached documents.
    - Moreover, although "Summons" is apparently a "disposition" (see COB051504), the "disposition code" in CHARMS does not distinguish between traffic stops where a summons was issued and those where no summons was issued. All traffic stops in CHARMS are coded 3005.
    - All this strongly indicates that there is *another* data system at the BPD, probably tied to Dispatch, that feeds CHARMS and that records more information than ultimately makes it to CHARMS. Please locate that database and provide us as soon as possible a field list, a codebook, and a listing (by date and, if appropriate, by type of information) of what is retained in the live system, what is archived, and what is not available at all. We will then get back to you with what should be produced.

39. Mr. Quinn investigated and reported back that there is such a database, it is called ENTCAD, that it was not clear whether it was a City database or an Erie County database

(he has since determined it is a City database), and that the City did not have a codebook or field list for the database.

40. There the matter lay through May and the completion of the original-custodian ESI production on May 31. When Plaintiffs renewed the discovery discussions with the City on July 20, my e-mail to Mr. Quinn (Ex. 13, discussed in detail in § II below) requested

> all entries in the database from January 1, 2013 to the present relating to traffic stops or checkpoints (including the callout, if any, and any tickets, arrests, and other encounters incident thereto).

41. I continued:

> From a mechanical standpoint it would probably be simplest to give us the entire database. If you are unwilling to do that, you will need to show us a field list and codebook and explain the extraction strategy you propose to use.

42. At the August 5, 2021 meet-and-confer, Mr. Quinn refused to produce ENTCAD data and further refused to produce even a single test day for Plaintiffs to assess whether in fact—as certainly appears to be the case from the one document Plaintiffs have—that the database contains more, and more detailed, information concerning traffic stops than any data previously produced.

43. Plaintiffs believe that the most straightforward approach is for the City simply to produce the ENTCAD database from January 1, 2012 to the present. There will be a lot of data, but storage is cheap; given that the City does not have a field list or codebook, proceeding in this fashion would prevent errors from misunderstandings or mis-specification of queries.

44. In the alternative, Plaintiffs request that the City be ordered to comply with Plaintiffs' step-by-step approach of producing two days of data from the database, on the basis of which the parties could then discuss the need for and scope of further production.

### D. *Documents That Have Finally Been Produced*

45. As to a few categories of documents, the promised production was finally made this month (after the filing of ECF #102-2)

#### 1. *Redacted COMPSTAT/GIVE Reports*

46. The City long ago agreed to produce the monthly COMPSTAT and periodic GIVE reports for the period 2012-2017; the only issue was what redactions would be made in the production.

47. The redaction issue is pending before the Court (*see* Plaintiffs' letter to Chambers dated May 7, 2021 and ECF ##97, 98). No later than May 14, 2021, the City agreed to produce redacted reports pending the Court's resolution of Plaintiffs' request for unredacted production. That agreement was called to the City's attention several times in the ensuing months; the City finally complied on September 16, more than four months later.

#### 2. *IA Pro files re Lost/Destroyed IAD Files*

48. As the Court is aware (*see* Tr. 12/14/2020 at 7-8), Defendant City has discarded or lost a substantial number of files relating to investigations by the BPD's Internal Affairs Division. The City's "IA Pro" system contains electronic records of some (but not all) of the discarded information. On July 20, Plaintiffs requested that the City produce the full "IA Pro" records for the discarded files. The City agreed to do so on August 5; production was made in September.

### II. MR. QUINN'S REPEATED AND ONGOING INABILITY TO KEEP HIS WORD

49. As set forth throughout Plaintiffs' Status Report for the May 11 Conference (ECF #91), and as the Court observed, Mr. Quinn has a great deal of difficulty doing things when he says he will do them. Since Plaintiffs re-initiated discovery conversations on July 20, that failure has become pathological.

50. On July 20, 2021, I sent Mr. Quinn the e-mail annexed hereto as Exhibit 13 to restart conversations about open discovery issues. In it I said:

> After you have had a chance to review this e-mail, we'd like to get together on a Zoom to talk it through. Please respond in writing before that, so that this e-mail and your response can be the agenda for the Zoom. On the Zoom, we will request specific commitments as to specific dates for each of the items.

51. Three days later, Mr. Quinn wrote, "Sorry, busy this week. I'll respond on Monday [July 26], let me know what dates you were thinking for a meet and confer." (Ex. 14)

52. No response was forthcoming that Monday.

53. On Tuesday, July 27, Mr. Quinn wrote, "Slight delay, sorry, should have by end of today." (Ex. 15)

54. No response was forthcoming that day (or any other day to the present).

55. We set up the meet-and-confer for August 5, with my e-mail putting the meeting out that far (Ex. 16) reflecting "the idea that we may be able to get some stuff resolved by e-mail between receipt of your response and that meeting."

56. On July 29, having still received no substantive response to my July 20 e-mail, I sent Mr. Quinn a chaser and received the following response:

> I know, sorry, we're losing an attorney so I'm in the process of inheriting a lot of new cases. Should have a response tonight or tomorrow at latest. (Ex. 17)

57. On August 4, the day before the scheduled meet-and-confer, Mr. Quinn wrote (Ex. 18):

> Still working on these responses, apologize for delay.
>
> I now have 2 conflicts tomorrow and not enough attorneys to cover. Would it be possible to move our meet and confer to tomorrow afternoon or Friday?
>
> Sorry for the late notice, I have depos that were supposed to finish today that are now being extended into tomorrow.

58. Plaintiffs told Mr. Quinn that the meet-and-confer would not be adjourned, and he acquiesced. Some progress seemed to have been made during the meeting, although less than if Mr. Quinn had provided a written response to the July 20 e-mail, as requested. Mr. Quinn was to provide follow-up by August 12, but on August 11 he had to cancel due to a death in his family; he indicated that he would be back in the office on August 18.

59. We did not hear from Mr. Quinn on August 18, or on any other day that week. On Monday, August 23, I wrote to Mr. Quinn as follows:

> My condolences again, and I hope your time in Florida went as well as it could. Based on your e-mails of 8/12 we had understood we would hear from you by 8/18, but we would understand if your family matters took longer to resolve than expected.
>
> In any event, we need to move this along. Your failure to fulfill your repeated promises to respond in writing to my e-mail of July 20 (now over a month ago!) meant that our conference on August 5 was less productive than it should have been, but it is now time to bring all those issues to closure. Attached to this e-mail is a proposed consent Order that we propose to ask Judge Reiss to enter. To the extent you disagree with anything in the Order, please send us a redline with your proposed changes, no later than COB Wednesday. We currently intend to move on any area where the parties do not agree, but a final decision must, of course, await our review of your redline. (Ex. 19)

60. Mr. Quinn responded, "Thanks, I'm working on this now and will respond by Wednesday (Ex. 20).

61. Mr. Quinn did not respond by that Wednesday, nor on any other day to the present.

62. On August 26, Mr. Quinn wrote, "Just waiting on 2 things, should have a response today. Sorry for delay." (Ex. 21)

63. There was no response that day, or on any other day to the present.

64. On September 7, Mr. Quinn wrote:

I'll have an omnibus response out today. I believe we'll largely agree and should be able to abide by the time frames, but we may have a dispute over the search

terms and time frame of discovery.  If it's worthwhile to have a further discussion, I can be available Friday after 11. (Ex. 22)

       65.    No "omnibus response," and no other response, was forthcoming on that day, or on any other day to the present.

This 28th day of September, 2021, I declare under penalty of perjury that the foregoing is true to the best of my knowledge, information, and belief.

                                            s/ *Edward P. Krugman*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2021, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System.

*/s/ Edward P. Krugman*