**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLACK LOVE RESISTS IN THE RUST, *et al.*, individually and on behalf of a class of all others similarly situated, | |
| Plaintiffs, | |
| v. | No. 1:18-cv-00719-CCR |
| CITY OF BUFFALO, N.Y., *et al.*, | |
| Defendants. | |

**PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT**
**OF THEIR MOTION TO COMPEL PRODUCTION AND FOR**
**SANCTIONS AGAINST DEFENDANT CITY AND AGAINST**
**ROBERT E. QUINN, ESQ. PERSONALLY**

Defendants put Plaintiffs in an impossible position. First, despite the specific orders of this Court at the last hearing, Defendants have staffed this case with but a single attorney, who also has responsibilities on numerous other cases. In addition, Defendants no longer have access to their e-discovery vendor. Mr. Quinn evades even the most basic of discovery responsibilities and does not commit to a "yes" or a "no" even to simple requests. These ongoing dilatory tactics have been all too effective.

Next, Defendants have the gall to complain that the delays are Plaintiffs' fault, because Plaintiffs have not yet taken many depositions, when the very reason Plaintiffs could not move forward with depositions is Defendants' interminable dragging out of document discovery.

Finally, Defendants seek to benefit from their own delays by asking the Court to limit Plaintiffs' discovery to matters occurring prior to the filing of the amended complaint. This threatens to cause the information to become stale and potentially to impede Plaintiffs' ability to establish their entitlement to prospective injunctive relief at a trial that will occur at least three years *after* the filing of the amended complaint.

Rather than rewarding Defendants for their obstruction, this Court should order Defendants to reengage their e-discovery vendor and produce the remaining documents within a tight time frame, so that Plaintiffs may move this litigation to conclusion. And the Court should award sanctions for the massive waste of time and energy Defendants have caused.

**A.**    ***The Court Should Once Again Compel Production of ECAC ESI and Should Award Monetary Sanctions Under Rule 37(b)(2)(C) for Defendants' Violation of the Order Entered at the May 11 Status Conference.***

If there is one example that best typifies the City's strategy to tapdance forever on every possible discovery issue, it is ECAC ESI. Plaintiffs first sought ECAC documents in their Fourth RFPs, served in May 2020 (ECF #66-20, Sched. B ¶ 88); the City served a boilerplate objection and said it knew of no responsive documents (ECF #66-21). After follow-up with counsel proved

unfruitful (ECF #66 ¶¶ 51-53), Plaintiffs served a subpoena on ECAC in September 2020. ECAC's Rule 45 response (ECF #91-7), however, said that "all our materials are housed by the Buffalo Police Department email system and computer network; we do not have administrative rights to that system," so it was back to the City.[1]

In October 2020, Plaintiffs moved to compel on, *inter alia*, the Fourth RFPs (ECF ##65, 66), but the Court determined to hold that portion of the motion in abeyance (*see* ECF #91 at 8). The parties' ensuing discussions centered around negotiating what would be produced under the categories of the ECAC subpoena (*id.*), and Plaintiffs limited the searches to the accounts of three specific analysts and Mr. Giammaresi. At the May 11 Conference, the Court ordered (a) that the searches be conducted and (b) that the documents be produced within 60 days (Tr. 5/11/21 at 30).[2]

Plaintiffs reinitiated discussions on July 20, but Defendants never responded substantively, did not do the searches, and did not produce the documents. Instead, *five full months* after being ordered to search for and produce the documents, Defendants now "request the opportunity to be heard on the cost and time period to be searched for the ECAC ESI" (ECF #115 ¶ 30).

No.

The time to engage in such discussions has long since passed. This issue has been on the table vis-à-vis the City for nearly ten months now, the timeframe for production was addressed at the Status Conference, and the Court's order requiring production was unequivocal. Defendants

---

[1]  It turns out that Jamie Giammaresi, the now-retired head of ECAC, was not telling the truth when he said that "all our materials" are in the possession of the City, because he personally used a non-City e-mail address (Jamie.Giammaresi@dcjs.state.ny.gov) for at least some of his ECAC business with the BPD (Krugman Reply Dec. ¶ 19). If the City has access to that e-mail account, it is within what it was ordered on May 11 to produce; if it does not, Plaintiffs will follow up with ECAC and/or DCJS.

[2]  The Court told Defendants to come back if their vendor could not handle the searches, but that has not happened. In fact, it seems that Defendants are not paying their vendor and thus are back to doing things with quill pens by themselves (ECF #115 ¶ 36).

should be ordered to complete the task they have already been ordered once to do, and to do so in a very short time frame. Plaintiffs are already entitled to monetary sanctions under Rule 37(b)(2)(C), and any further non-compliance should be the subject of issue-related or terminating sanctions under Rule 37(b)(2)(A). Enough is enough.

**B.**     ***The Court Should Order Production of the Entire ENTCAD Database.***

A database called "ENTCAD" contains minute-by-minute details of traffic stops—a basic subject of this action. As set forth in detail in the Reply Declaration (¶¶ 6-12), ENTCAD contains at least two highly relevant pieces of information regarding such stops that are *not* present in the Erie County CHARMS database: (a) timestamps for events during the stops and (b) whether a summons was issued. The ENTCAD database is no doubt large, but Defendants have not claimed burden based on size—nor could they, because physical production of even enormous databases is a straightforward mechanical task. Defendant *has* asserted a possible need to redact, but ENTCAD feeds CHARMS, and CHARMS has already been produced *without* redaction.

Plaintiffs offered during the meet-and-confer to take two sample days of ENTCAD data and work with Defendants to develop an extraction query. Mr. Quinn just said "No." Given how much time has passed, and in light of the clear relevance of the ENTCAD data, Plaintiffs submit that the Court should simply order production of the entire database. If the Court is inclined to go the sample route, however, Plaintiffs request that it place *very* short deadlines both on the production of the samples and on the holding of the ensuing meet-and-confer.

**C.**     ***The Court Should Order the Additional ESI Production Plaintiffs Seek.***

As directed by the Court, Plaintiffs have taken a close look at the requests for new custodians and search terms and have narrowed them as much as possible. Defendants make no specific objections and do not engage with Plaintiffs' arguments. They simply assert that additional searches would be duplicative and would not produce relevant information. (ECF #115 ¶ 85)

Defendants assert that "a great majority of it does nothing more than reference the fact that the Housing Unit or Strike Force did something, or that some form of ticket or summons has been issued by the Police Department, things which happen on a routine, every day basis." *Id*. ¶ 88. That is precisely the point. Under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), Plaintiffs have the burden to prove that violations occurred pursuant to City policy or custom. Discovery as to the routine, every day customs and practices of the BPD is neither irrelevant nor duplicative; it is the core of a *Monell* case. The additional ESI discovery should be ordered.

**New Custodians.** Plaintiffs have considerably reduced the number of new custodians requested—from 20 down to 7, plus others only if deposed (ECF #113 ¶ 28)—and have made a detailed showing of the need for these custodians and the reasons why they are not duplicative of production already made (*id*. ¶ 28(a)-(g)). Thus:

- Inspectors Robert Rosenwie and Harold McClellan served as heads of Internal Affairs during the relevant time period and handled dozens of complaints about BPD Officers' racially biased policing, unjustified stops, and other misconduct—complaints that often resulted in no or little discipline (*id*. ¶ 28 (b), (f)). No existing ESI custodians are part of the Internal Affairs department. Rosenwie and McClellan frequently handled complaints without the creation of a formal file, and their ESI is core discovery to establish *Monell* liability for the City's deliberate indifference to the BPD's racially discriminatory ticketing practices. Rosenswie was also personally involved in the destruction of a large number of IA files (Tr. 12/14/2020 at 7-8).

- Deputy Commissioner Joseph Gramaglia, the second highest officer at BPD, and Michael DeGeorge, Director of Communications for the City, are *Monell* policymakers who were, among other things, directly involved with BPD's tinted windows ticketing policies and revenue harvesting (ECF #113 ¶ 28(d), (f)). Each has a unique role within the City's and BPD's leadership structure; none of their ESI is duplicative.

- Carmen Menza was Chief of Buffalo's E District, where the bulk of Strike Force checkpoints took place, but officers under his command engaged in significantly different ticketing patterns than did the Strike Force and the Housing Unit (*id*. ¶ 28(a)). None of his e-mails to and from his command will have been picked up by previous searches (*id*.).

- P.O. William Macy was the Community Policing Officer for the Housing Unit and has continued in that role since the Unit was disbanded. He wrote e-mails that

discussing BPD's ticketing practices in BMHA parking lots and revenue generated thereby, along with the role of the Housing Unit generally (*id.* ¶ 28(c)). Given the centrality of the Housing Unit to this action and Officer Macy's location at the meeting-point between the BPD and the community, it is important to look beyond simply those e-mails he sent to the original ESI custodians, including any correspondence he may have had with BMHA officials and residents (*id.*).

- P.O. Robbin Thomas is a named defendant who participated in incidents described in the Amended Complaint and who was subject to multiple complaints about rude behavior and racial profiling during traffic stops, for which she received no discipline (*id.* ¶ 28(b)). None of the first 20 custodians was a line officer; in addition to their substantive roles, Officers Thomas and Macy provide a narrow, limited opportunity for Plaintiffs to have ESI from individual officers at every level of command.

Astonishingly, ***Mr. Quinn's Declaration never addresses any of these individuals***. He never so much as mentions their names. With respect to ESI custodians, Mr. Quinn's Declaration is just another example of the blue fog he has been throwing over this case for years.

In *Thomas v. City of New York*, 336 F.R.D. 1, 2 (E.D.N.Y. 2020), a civil rights case against New York City and NYPD officials, the Court rejected similarly tenuous arguments in granting an individual plaintiffs' motion to compel ESI searches for five additional line officers and officials. There, the Court rejected the defendants' argument that the additional ESI searches would "yield no unique or non-duplicative information" because "[d]efendants offer[ed] not a modicum of proof for this position (such as email exhibits showing that all parties were copied on the relevant emails) or plausible explanation (such as a factual proffer that, given their roles as supervisors, these defendants always emailed with each other about all employees)." *Id.* at 2. To the extent there was some overlap, the court found that this did not render plaintiffs' new ESI custodian searches "unreasonably cumulative or duplicative" because "[t]he mere existence of overlap and some duplication is insufficient to preclude the discovery sought." *Id.* at 2-3; *accord*, *e.g.*, *Garcia Ramirez v. U.S. Immigr. & Customs Enf't*, 331 F.R.D. 194, 198 (D.D.C. 2019) (compelling ESI searches for 16 additional custodians, where defendants' opposition was mere "general statements").

-5-

Defendants' references to the volume of material already produced are likewise beside the point. "The mere fact that many documents have already been produced is not sufficient to establish that there are no other relevant materials to be found." *Family Wireless #1, LLC v. Automotive Technologies*, 2016 WL 2930887, at *2-4 (D.Conn. May 19, 2016). *Accord Thomas*, 336 F.R.D. at 3; *Garcia Ramirez,* 331 F.R.D. at 198. Plaintiffs respectfully request that the Court cut through Defendants' blue fog and order searches of the seven ESI custodians identified above.

**Search Terms.** Mr. Quinn objects to Plaintiffs' proposed search terms on the ground that they include overly broad terms like "housing," "ticket," and "summons." (ECF #115 ¶¶ 88-90). This objection misrepresents Plaintiffs' considerably narrowed requests.

Plaintiffs do *not* seek to have all search terms run against all custodians. There is a limited set of "core terms" to be run for each custodian (ECF #113 ¶¶ 29, 30), with additional terms tailored to a given custodian's position in the hierarchy and role in the case. *Contra* Mr. Quinn, Plaintiffs have *not* sought to use the search term "ticket" at all, and they seek to search "housing" for only one custodian:  Chief Menza, whose district includes the properties where the Housing Unit focused the majority of its enforcement efforts. And Plaintiffs seek to use the term "summons" only for Gramaglia and the two Internal Affairs leaders. Search terms that produce too many hits can be reviewed, but Defendants' effort to cut off the process at the outset by misrepresenting what has been asked for is beyond the pale.

***"Only if deposed" custodians***. Defendants argue that many of the "only if deposed" custodians are police officers who generally do not send emails, and that in any event, their emails are not likely to include discoverable information (ECF #115 ¶¶ 98-99). Of course, without running the searches, Defendants have no idea what information these officers' emails may contain. "[L]ower-level employees may discuss execution of policies amongst themselves and with third

parties other than their superiors." *Family Wireless*, 2016 WL 2930887, at *3. The fact that these particular custodians use less email, as Mr. Quinn argues, simply lessens the burden of conducting the searches. *Thomas*, 336 F.R.D. at 2-3.

Notices of deposition of individual witnesses routinely seek production of the witness's individual documents, beyond what was produced in general discovery, and the search terms here are narrow and specific and appropriate to line officers who have been the subject of multiple misconduct complaints and who routinely engaged in high levels of unconstitutional checkpoint stops and ticketing, disproportionately in Black communities (ECF #113 ¶ 34). It would be unfair and prejudicial for Plaintiffs to depose these officers without the benefit of their ESI. *See, e.g., Scantibodies Lab'y, Inc. v. Church & Dwight Co.*, 2016 WL 11271874, at *38 (S.D.N.Y. Nov. 4, 2016), *report and recommendation adopted*, 2017 WL 605303 (S.D.N.Y. Feb. 15, 2017).

***Additional search terms for prior custodians.*** Plaintiffs have always stated—and this Court has recognized—that some custodians might require more than 20 search terms (Tr. 5/11/21, pp. 18-21). Review of the original production indicated that important new information could be obtained about a few narrow, specific concepts (ECF #113 ¶ 35). Plaintiffs seek only three or four new searches for the majority of prior custodians (ECF #113-11).

Defendants' only specific objection is to terms (relating to "stop reports," "stop receipts," and school zone speed cameras) that concern events that post-date the filing of the Complaint (ECF #115 ¶ 103). However, where (as here) Defendants have altered their practices post-filing (*see id.* ¶¶ 40-42), and Plaintiffs have the burden to establish ongoing constitutional violations in order to obtain injunctive relief, Plaintiffs have a need and obligation to explore post-filing events that are part of the pattern and practice alleged in the Amended Complaint. Post-filing events frequently form part of the evidentiary record in cases seeking prospective injunctive relief to address ongoing

violations of constitutional rights. For example, *Floyd v. City of New York* was filed in 2008, but the trial evidence concerned stops taking place from 2004-2012 and a detailed examination of policies first adopted in 2011. 959 F.Supp.2d 540, 573, 600-01 (S.D.N.Y. 2013).

Each of "stop reports," "stop receipts," and school zone speed cameras directly relates to the allegations (ECF #63 ¶¶ 80-170) that the City has an ongoing policy and practice of targeting low-income Black residents for revenue-harvesting ticketing schemes. The cameras, for example, were installed in 2020 at the height of the Covid-19 pandemic, were disproportionally located in Black communities, and extracted millions of dollars in traffic fines from residents of those communities (ECF #113 ¶ 30(b), ECF #113-9). And the stop reports, unlike traffic tickets, *do* record race and will provide evidence of racial profiling (ECF #113 ¶ 30(a), ECF #113-8). These are appropriate subjects for discovery, responsive to existing RFPs 28, 33, and 36 (*see* ECF #24-1), and the Court should order Defendants to run the requested search terms.

**D.**    ***The Court Should Order Production of Nominally Agreed Discovery by a Date Certain.***

***ECAC Project File Discovery*.** Defendants have agreed to produce this information. The Court should order a date by which Defendants must complete production.

***Drafts of the JAG Applications.*** The City's annual applications for federal Judicial Assistance Grants included narratives describing use of ECAC data and maps in determining patrol and checkpoint locations (ECF #113 ¶¶ 12-13); drafts of the applications are likely to contain information about contemplated strategies for assigning patrol and checkpoint locations. Reneging on their agreement, Defendants now object that these documents are irrelevant and potentially privileged—but also claim not to have found responsive documents (ECF #115 ¶¶ 57-59). Mr. Quinn's Declaration is conspicuously silent as to whether Defendants searched the files of Maureen Oakley, the City's Grant Officer. The City should be ordered to search for and produce the requested information or confirm that its searches included Ms. Oakley's files.

***Housing Unit and Strike Force Overtime Reports***. Although ostensibly agreeing to continue their search for Housing Unit/Strike Force Overtime Reports, Defendants now dispute the relevancy and discoverability of these documents (ECF #115 ¶¶ 60-61). Discovery thus far, however, has made clear that Strike Force and Housing Unit Officers frequently received overtime to conduct checkpoints and other traffic enforcement, and BPD officers were castigated if they issued an insufficient number of tickets (Reply Dec. ¶ 20 & Exs. 2, 3). Relevance is indisputable. If Defendants conduct a proper search and certify they have produced all that can be located, that will be the end of the matter, but that has not happened yet.

***GIVE Meeting Materials.*** GIVE documents are directly relevant because Defendants relied on GIVE grants to identify crime hot spots and fund checkpoints as an intervention (ECF #113 ¶¶ 21, 22). *How* these decisions were made would have been discussed at the meetings. Perhaps multiple people attended GIVE Meetings (ECF #115 ¶¶ 69-75), but it would be a simple matter for counsel to send an email to the relevant individuals to locate their GIVE files (to the extent they have them) and turn over what they have. The Court should order that that be done.

***ESI Spreadsheet/Metadata***: The metadata spreadsheet that Defendants produced pursuant to court order was essentially worthless (ECF #113 ¶¶ 19-20). In the August 2021 meet-and-confer, Mr. Quinn agreed to native production of any previously produced emails that had been segregated at the time of the original searches. Plaintiffs did *not* ask for additional searches, only that existing, segregated collections of native emails be produced (ECF #113 ¶ 20). It appears from Mr. Quinn's Declaration, however, that he never segregated any of the e-mails that he pdf-ed; in other words, his "agreement" applied to a null set. If so, Plaintiffs will never have full recipient

lists for the City's production prior to May 2021, notwithstanding two Court orders. This is, unfortunately, typical of the City's behavior throughout discovery in this action. To prevent a recurrence, Defendants should be ordered to use an e-discovery vendor going forward.

**E.      *Mr. Quinn's Excuses Do Not Justify His and Defendants' Continued Vexatious Conduct, and They Should be Sanctioned.***

Defendants' response to the sanctions request discounts the seriousness of this case and the extent to which Defendants have continually flouted basic discovery obligations. Defendants' papers do not take issue with Plaintiffs' recitation of the historical facts constituting the endless game of rope-a-dope this case has become. Defendants have ignored their discovery obligations and violated orders of this Court. Sanctions against them and their counsel under Rule 37(b)(2)(C) and 37(a)(5)(A) are plainly appropriate. And sanctions against Mr. Quinn personally under 28 U.S.C. § 1927 are likewise the appropriate response to his pathological inability to keep his word and to the mockery he has made of the meet-and-confer process.

Plaintiffs hope that these sanctions will effect a change in Defendants' behavior, but if they do not Plaintiffs will seek entry of a default judgment. In *Burke v. ITT Auto., Inc.*, 139 F.R.D. 24, 36 (W.D.N.Y. 1991), Judge Curtin entered a default judgment for plaintiff because "[t]his case has been characterized by a history of inexcusable dilatory conduct by [defendant]." *Accord*, *e.g.*, *U.S. Freight Co. v. Penn Central Transportation Co.,* 716 F.2d 954, 955 (2d Cir. 1983) (per curiam); *Bhagwanani v. Brown*, 665 F.App'x 41, 43 (2d Cir. 2016); *Rahman v. Red Chili Indian Cafe, Inc.*, 2021 WL 50877, at *8 (S.D.N.Y. Jan. 6, 2021).

### CONCLUSION

The Court should (1) enter the Proposed Order compelling discovery, (2) award Plaintiffs their attorneys' fees incurred in making this motion, and (3) award additional monetary sanctions against Mr. Quinn for making a mockery of the meet-and-confer process.

Dated: October 26, 2021

/s/ Keisha A. Williams
Joseph Keleman
Keisha Williams
WESTERN NEW YORK LAW CENTER
Cathedral Park Tower
37 Franklin Street, Suite 210
Buffalo, NY 14202
Tel: (716) 828-8415
Fax: (716) 270-4005
jkeleman@wnylc.com
kwilliams@wnylc.com

/s/ Edward P. Krugman
Claudia Wilner
Edward Krugman
Anjana Malhotra
NATIONAL CENTER FOR LAW
AND ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
wilner@nclej.org
krugman@nclej.org
malhotra@nclej.org

/s/ Chinyere Ezie
Chinyere Ezie
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
212-614-6475
CEzie@ccrjustice.org

/s/ Jordan Joachim
Jordan Joachim (admitted pro hac vice)
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
212-841-1000
jjoachim@cov.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2021, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System.

*/s/ Edward P. Krugman*