UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

BLACK LOVE RESISTS IN THE RUST, *et al.*,
individually and on behalf of a class of all others
similarly situated,

               Plaintiffs,

   v.

CITY OF BUFFALO, N.Y., *et al.*,

              Defendants.

No. 1:18-cv-00719-CCR

**REPLY DECLARATION OF EDWARD P. KRUGMAN
IN FURTHER SUPPORT OF PLAINTIFFS' MOTION
TO COMPEL PRODUCTION AND FOR SANCTIONS**

      Edward P. Krugman declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

      1.    I am a member of the Bar of the State of New York and of this Court. I submit this Reply Declaration in further support of Plaintiffs' Motion to Compel and for Sanctions (ECF #111)

      2.    As Mr. Quinn's Declaration does not question the factual accuracy of the history recited in my moving Declaration (ECF #113 ¶¶ 49-65), I leave further discussion of those matters to our Reply Memorandum. The remainder of this Reply Declaration addresses certain of the items of discovery at issue.

***ENTCAD***

      3.    Mr. Quinn's Declaration makes two assertions about ENTCAD: that the ENTCAD database does not contain material new information and that production would be burdensome because of the asserted need to redact. Neither assertion is correct.

4. There are a number of databases that have been produced by Erie County in this action, but the two principal ones are TraCS and CHARMS. TraCS contains detailed information about tickets; CHARMS is the general "complaint" database and is much broader, including crimes as well as other events. ENTCAD feeds CHARMS.

5. Mr. Quinn acknowledges that the ENTCAD database contains detailed, minute-by-minute timestamps for specific events during encounters involving the BPD and that this information is not available in CHARMS. He is wrong, however, to assert that this is the only new information in ENTCAD. Furthermore, the timestamps are themselves sufficient reason to require production of the database.

***Not Present in CHARMS:***
***Whether Summonses Were Issued***

6. As set forth in my April 28 e-mail to Mr. Quinn (ECF #113-1), ENTCAD not only contains the timestamps but also contains *at least* one additional piece of information not present in CHARMS—whether summonses were in fact issued at the traffic stop. Specifically, the "Complaint Summary Report" for Complaint No. 17-3450582 notes that a summons was issued at 17:39:52 (ECF #113-10 at COB051504). That information does *not* appear in CHARMS; all "Traffic Stops" in CHARMS have the same code, whether or not a summons was issued.

7. As alleged in the Amended Complaint (ECF #63 ¶ 109):

> At a Checkpoint or traffic stop, BPD officers having observed one or more potential violations of the traffic laws are conceptually faced with three distinct decisions:
> - Issue a ticket? – Yes/No.
> - If yes, issue a single ticket (a "single-ticket incident"), or multiple tickets (a "multi-ticket incident")?
> - If issuing multiple tickets, how many?

It is further alleged (¶ 110) that there were significant racial disparities at each of these decision points. Identifying the traffic stops at which summonses were issued as opposed to those at which they were not is plainly relevant to the first bullet in ¶ 109.

8. It is potentially possible, at least in some cases, to cross-reference TraCS and CHARMS and form judgments as to whether summonses were issued at the stop. That is what Plaintiffs have been doing to this point. But such judgments, no matter how well thought through, are not a substitute for actual, recorded data. Until now, that data was not known to exist. Now it is, and it should be produced.

9. Moreover, although CHARMS contains a "TRAFFIC STOP" incident-type,

- There are thousands of tickets in TraCS that do not have an associated Traffic Stop in CHARMS, and
- There are thousands of Traffic Stops in CHARMS that do not result in a ticket posted in TraCS.

For example, I have estimated (through the cross-referencing process described above) that in December 2017, Officer Andrew Whiteford (one of the subjects of ECF #113-10) issued 55 tickets at 12 traffic stops, but he also (a) issued 20 tickets with no traffic stop recorded and (b) recorded 38 traffic stops at which he did not issue a ticket. Since we have the location of each traffic stop and of each ticket issued, we can examine whether (for example), Officer Whiteford was more likely to issue a ticket at a traffic stop in a Black area than in a White area. I am not suggesting that Officer Whiteford himself is particularly relevant (he may or may not be), but performing this analysis for the BPD as a whole (or the Strike Force, or the Housing Unit) plainly *is* relevant.

10. I have a fair degree of confidence in my estimates as to Officer Whiteford's traffic stops and ticketing in December 2017 (one officer, in one month), but it took me about half an hour of fiddling with filters in Excel to form those estimates. That labor-intensive process is a

far cry from the rapid, mechanical tabulations that would be possible with access to the ENTCAD database.

### *Timestamps*

11. Mr. Quinn acknowledges that ENTCAD contains timestamps that do not appear in CHARMS. Those timestamps are can be significant.

12. What happens at a traffic stop is an important part of what this case is about. Just as the disparity in ticket issuance in White areas vs. Black areas is probative of discriminatory policing, so too is the amount of time spent detaining the driver once a stop is made. Are stops in White areas brief encounters, with warnings issued more often than tickets? That is *not* the experience in Black areas. The timestamps will tell the tale. And those timestamps are available *only* in ENTCAD.

### *The Asserted Burden of Production*

13. Mr. Quinn asserts that production of the ENTCAD database would be burdensome, but he makes no quantifiable assertion that the size of the database has anything to do with that burden (he says "the amount of the data would have a cost", ECF #115 ¶ 119, but he gives no hint what that cost might be). I have no doubt that the database is quite large, but replication and production of even enormous databases is a straightforward, mechanical process, and nothing Mr. Quinn says suggests otherwise.

14. What Mr. Quinn does assert is a need to redact entries. That assertion does not hold water.

15. In the first place, ENTCAD does feed CHARMS, and **CHARMS has already been produced without redaction**. Whatever cat may be present here (Mr. Quinn does not say), it is already out of the bag. Getting the summons and timestamp information to go with what has already been produced raises no confidentiality issues at all.

16. Even were this not the case, the database could be produced on an attorneys'-eyes only basis initially, while Mr. Quinn shows us the kinds of thing he wants to redact. Ordinarily, this situation would be addressed by looking at a codebook and a field list and agreeing that this or that field need not be produced. (That is what Plaintiffs and Erie County did with respect to the CHARMS production.) The City says it does not have such materials, but it should not be permitted to use its own administrative carelessness to pretermit production of important data to Plaintiffs. And, in any event, initial production of two full days of ENTCAD will enable Plaintiffs to see what fields are present and have that discussion.

17. I reiterate that production of the full database (on an attorneys'-eyes only basis, if necessary) makes the most sense, given how long the case has been going on and the fact that there is *no* showing (nor, I believe, could there be) that physical replication and production of the full database is anything more than a straightforward, mechanical task. If, however, the Court determines to go the sampling route, Plaintiffs request that it place strict timeframes on both the City's production of the sample days and the meet-and-confer on what extract is thereafter to be produced.

***Mr. Giammaresi's Misrepresentation About ECAC ESI***

18. ECAC's Rule 45 Response to Plaintiffs' subpoena (ECF #91-7), which was signed by ECAC's now-retired Director Jamie Giammaresi, stated:

> In any event, we are unable to produce all of the information requested as all our materials are housed by the Buffalo Police Department email system and computer network; we do not have administrative rights to that system.

19. This statement was false, and it had to be known to be so by Mr. Giammaresi, since it was his very own e-mail accounts that rendered it false. In addition to whatever BPD e-mail address he had, Mr. Giammaresi had an account through the New York State Division of

Criminal Justice Services—ECAC's parent organization—that he used extensively for ECAC business relating to the BPD. Some examples of e-mails sent to or received from Jamie.Giammaresi@dcjs.state.ny.gov are annexed hereto as Exhibit 1; there are at least 100 more.

*Housing Unit/Strike Force Overtime Reports*

20. Notwithstanding his agreement to search for and produce the documents, Mr. Quinn now questions the relevance of the Housing Unit/Strike Force overtime reports. Discovery to date has indicated, however, that the use of overtime for checkpoints and other traffic enforcement was an ongoing topic of discussion in the BPD (three examples are collected in Exhibit 2), and officers (including Chiefs) were frequently castigated for not having enough tickets written (*see*, *e.g.*, Ex. 3). Plaintiffs assert that overtime was seen as an investment, which would produce returns in additional revenue. The Reports form a part of the evidentiary support for that assertion.

This 26th day of October, 2021, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

*/s/ Edward P. Krugman*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2021, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System.

*/s/ Edward P. Krugman*
