UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

---

BLACK LOVE RESISTS IN THE RUST, *et al.*,
individually and on behalf of a class of all others
similarly situated,

                Plaintiffs,

    v.

CITY OF BUFFALO, N.Y., *et al.*,

                Defendants.

No. 1:18-cv-00719-CCR

---

## **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ..........................................................................................................2

I.      The Complaint ..................................................................................................2

II.     Plaintiffs' 2020 Request for Additional Depositions ...........................................3

III.    The First Twenty Depositions Taken and Noticed By Plaintiffs .......................4

IV.     Plaintiffs' Request for 12 Additional Depositions ..............................................5

ARGUMENT ..............................................................................................................6

I.      Plaintiffs' Additional 11 Requested Witnesses Have Important, Non-
        Cumulative Knowledge Relevant to Plaintiffs' Claims. ....................................7

        A.      BPD Officers Who Ticketed the Named Plaintiffs ................................7

        B.      City Employees Involved in Revenue Raising.......................................9

        C.      BPD Officers Who Ticketed Based on Race.........................................11

II.     The Depositions Are Proportional to the Needs of the Case............................14

CONCLUSION ........................................................................................................16

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Farley v. United States*,
No. 11CV198S, 2015 WL 3952295 (W.D.N.Y. June 29, 2015)...................................13, 14

*Floyd v. City of New York.*,
959 F. Supp. 2d 540 (S.D.N.Y. 2013) ...........................................................................7, 15

*Floyd v. City of New York*,
No. 08 Civ. 1034 (S.D.N.Y.) .............................................................................................15

*Gibson v. Berryhill*,
411 U.S. 564 (1973) .........................................................................................................11

*L.W. v. Lackawanna Cnty., Pa.*,
No. 3:14-CV-01610, 2015 WL 2384229 (M.D. Pa. May 19, 2015) ..................................15

*Lent v. Signature Truck Sys., Inc.*,
No. 06CV569S, 2010 WL 1707998 (W.D.N.Y. Apr. 26, 2010).......................................6, 14

*Lucente v. City of Suffolk*,
980 F.3d 284 (2d Cir. 2020) ...........................................................................................1, 13

*Martinez v. California*,
No. CVF-0-7996, 2008 WL 5101359, at *3 (E.D. Cal. Dec. 3, 2008)...............................15

*Matusick v. Erie Cnty. Water Auth.*,
No. 07CV489A, 2009 WL 129439 (W.D.N.Y. Jan. 16, 2009) ..........................................14

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) ...........................................................................................1, 3, 4, 15

*Rosen v. Thornburgh*,
928 F.2d 528 (2d Cir. 1991) .............................................................................................15

*United States v. Town of Oyster Bay*,
No. CV-142317, 2016 WL 11265542 (E.D.N.Y. May 10, 2016)......................................15

**Statutes**

Civil Rights Act of 1964 Title VI.............................................................................................3

**Other Authorities**

U.S. Const. amend IV................................................................................................................2

U.S. Const. amend XIV ........................................................................................3, 14

Fed. R. Civ. P. 26(b)(2)(C) ......................................................................................6

Fed. R. Civ. P. 30(a)(2) ......................................................................................3, 6

## PRELIMINARY STATEMENT

Plaintiffs bring this motion to take the depositions of 11 police officers and employees for Defendant City of Buffalo (the "City") who have knowledge central to Plaintiffs' claims.

In December 2020, Plaintiffs requested permission from the Court to take up to 42 depositions. The Court granted Plaintiffs' request in part, allotting Plaintiffs 20 depositions "to start" and inviting Plaintiffs back later to discuss "how many more" depositions would be necessary. Since then, Plaintiffs have completed most of the initial 20 depositions allotted by the Court. Based on the information learned in these depositions and in document discovery, Plaintiffs have substantially narrowed their earlier list of 42 deponents and now seek to depose 12 additional witnesses beyond the initial 20 already allotted by the Court. Defendants have agreed to one of these but have refused the other 11.

The Court should grant Plaintiffs leave to take these 11 additional depositions because these witnesses have knowledge that is highly relevant, non-cumulative, and cannot be gathered in any other manner. Plaintiffs bring multiple constitutional claims under the Fourth and Fourteenth Amendments based on fundamentally unfair and racially-discriminatory traffic enforcement throughout the City that has spanned nearly a decade and continues to this day. Plaintiffs' claims implicate eight Named Defendants, the leadership of and multiple units within the Buffalo Police Department ("BPD"), the City mayor's office, and the Buffalo Traffic Violations Agency ("BTVA"). In addition to needing to depose each of the eight named Defendants, Plaintiffs require significant discovery to satisfy their burden under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and its progeny, which require that Plaintiffs prove Defendants' creation of a "persistent and widespread" "policy, custom" or "practice" of racially-biased traffic enforcement. *Lucente v. City of Suffolk*, 980 F.3d 284, 297-98 (2d Cir. 2020).

1

The 11 additional witnesses can be divided into three categories:

- Four Buffalo Police Officers who ticketed Named Plaintiffs Ebony Yeldon and Charles Palmer in the incidents that provide the basis for their claims and participation in this action as parties and proposed class representatives.

- Two City employees who have knowledge as to the City's revenue raising schemes implemented through the BPD and the BTVA, which schemes form the core of Plaintiffs' Due Process claim.

- Five Buffalo Police Officers who issued tickets in a racially disparate manner, were the subject of citizen complaints alleging racially-biased conduct and punitive traffic enforcement practices, and/or were part of the BPD's Strike Force or Housing Unit, which conducted many of the checkpoints and racially-biased traffic stops at issue in this case.

Because these witnesses have important, relevant, non-cumulative knowledge concerning the claims asserted in this case, Plaintiffs respectfully request leave to take these 11 additional depositions.

## BACKGROUND

### I.    The Complaint

Plaintiffs allege, individually and on behalf of a putative class of similarly situated residents, that the City, for almost a decade, has engaged in widespread punitive traffic enforcement targeting the City's Black and Latino residents primarily in Buffalo's highly segregated East Side.  Compl. ¶¶ 1-10.  The City, through the BPD, has employed a variety of ever-shifting traffic enforcement schemes to balance the City's budget on the backs of people of color, including vehicle checkpoints, multiple ticketing schemes, improper parking enforcement, and illegal vehicle tows targeting Black and Latino residents.  *Id.* ¶¶ 1-10, 119-170.

These aggressive and targeted enforcement schemes have violated Plaintiffs' constitutional rights.  Plaintiffs have asserted four claims:  (1) violation of the Fourth Amendment (subjecting Plaintiffs and class members to unreasonable searches and seizures at

checkpoints operated for the purpose of crime control rather than traffic safety); (2) violation of the Equal Protection Clause of the Fourteenth Amendment (intentionally subjecting Plaintiffs and class members to punitive traffic enforcement practices that disproportionately targeted Black and Latino motorists); (3) violation of the Due Process Clause of the Fourteenth Amendment (subjecting Plaintiffs and class members to punitive traffic enforcement in order to generate overtime compensation and revenue for the City budget); and (4) violation of Title VI of the Civil Rights Act of 1964 (subjecting Plaintiffs and class members to punitive traffic enforcement in a manner motivated by race and ethnicity while receiving federal financial assistance for law enforcement activities). *Id.* ¶¶ 398-454.

There are 10 Named Plaintiffs in the Amended Complaint, and they describe over 30 incidents. As putative class representatives, Plaintiffs allege not only their own harms, but harms against all Black and Latino residents who have been subjected to Defendants' unconstitutional practices for nearly a decade. *See id.* ¶¶ 400-417, 427-431.

Municipal liability under *Monell* requires Plaintiffs to prove that the City's policy, widespread custom, or practice has driven the alleged harm. Because Plaintiffs must prove liability under *Monell*, their claims implicate City employees at every level, including the mayor and other high-ranking members of the City government, current and former BPD commissioners and other high-level members of the BPD, and others in the BPD chain of command, from chiefs to lieutenants to BPD Officers responsible for traffic enforcement on the streets of Buffalo. *See, e.g.*, *id.* ¶¶ 122-25, 138-41, 162-67.

II.     **Plaintiffs' 2020 Request for Additional Depositions**

On December 10, 2020, after Defendants refused to stipulate to lifting the default limit of 10 depositions under Federal Rule of Civil Procedure 30(a)(2), Plaintiffs requested the Court's permission to take 42 depositions. Plaintiffs' Dec. 10, 2020 Letter (ECF #74), at 1.

At a status conference on December 14, 2022, the Court granted Plaintiffs leave to take 20 depositions "to start," and invited Plaintiffs to return later to discuss "how many more" would be necessary.  Tr. of Dec. 14, 2020 Status Conference (ECF #76), at 2:13-17.

III.   **The First Twenty Depositions Taken and Noticed By Plaintiffs**

In accordance with the Court's directive, Plaintiffs have conducted 14 depositions to date.  Plaintiffs have also identified and informed Defendants they intend to take the depositions of six additional witnesses to complete the first 20 authorized by the Court.  These 20 initial depositions sought testimony from Defendants and their representatives across the City's framework.  Plaintiffs have deposed or plan to depose five City and BPD leaders directly responsible for creating and directing the City's racially-biased policies whose testimony is essential to establishing liability under *Monell*:

- Byron Brown (Mayor of the City of Buffalo, 2006-present, and Named Defendant)
- Byron Lockwood (former Buffalo Police Commissioner, 2018-2021 and Named Defendant)
- Daniel Derenda (former Buffalo Police Commissioner, 2010-2018 and Named Defendant)
- Joseph Gramaglia (current Commissioner of the Buffalo Police Department, 2022-present)
- The City of Buffalo pursuant to Rule 30(b)(6)

*See* Decl. of Claudia Wilner ("Wilner Decl.") ¶¶ 4-5.

Plaintiffs identified an additional twelve witnesses who supervised the BPD Strike Force and Housing Units at various levels throughout the relevant time period, which spans nearly a decade, and were essential in translating policymakers' decisions into practice:

- Charles Skipper (former Strike Force and Traffic Officer who ticketed Named Plaintiff Shaketa Redden)
- Lance Russo (former Housing Unit Lieutenant, 2010-2020)
- Michael Quinn (former Strike Force Lieutenant, December 2015-June 2018)
- David Wilcox (former Strike Force Lieutenant, April 2013-December 2016)
- Thomas Whelan (former Strike Force Lieutenant, 2013-2016)

- Patrick Roberts (former Strike Force and Housing Unit Captain, 2012-2015)
- Philip Serafini (former Housing Unit Captain, June 2015-2018, and Named Defendant)
- Kevin Brinkworth (former Schools Chief, 2007-2016, former Strike Force and Housing Unit Chief, and Named Defendant)
- Aaron Young (Chief of Schools, 2016-present, former Housing Unit Chief, 2017-2020, and Named Defendant)
- Joseph Fahey (former Accreditation Lieutenant, responsible for police officer training during the relevant time period)
- Harold McClellan (former Police Inspector and head of Internal Affairs)
- Robert Rosenswie (current Police Inspector and head of Internal Affairs)

*See Id.*

Two of Plaintiffs' identified witnesses have held senior roles within the BTVA during the relevant time period, and therefore have been instrumental in carrying out the City's improper revenue raising schemes, which form the core of Plaintiffs' Due Process claim, by collecting revenue from traffic tickets and BTVA fees assessed as part of the BPD's traffic enforcement:

- Danielle Morgera (BTVA Administrator)
- Kevin Helfer (former BTVA Executive Director)

*See Id.* ¶ 4.

Plaintiffs' final witness served as the BPD's sole crime analyst and worked closely with the Erie Crime Analysis Center, giving her unique knowledge as to how the BPD used crime data and related analysis to inform its policing practices:

- Tracy Masiello (Crime Analyst)

*See Id.*

## IV.    Plaintiffs' Request for 12 Additional Depositions

On September 23, 2022, Plaintiffs requested that Defendants consent to the following 12 additional depositions, beyond the initial 20 granted by the Court:

- Robbin Thomas (Police Officer and named Defendant)

5

- Michael Healy (former A District Officer)
- Jared Domaracki (former Housing Unit Officer)
- Charles Miller (former Housing Unit Officer)
- Adam Wigdorski (former Strike Force Officer)
- Justin Tedesco (former Housing Unit Officer)
- Andrew Whiteford (former Housing Unit Officer)
- Michael Acquino (former Strike Force and Housing Unit Officer)
- Richard Hy (former Strike Force and Housing Unit Officer)
- Kelvin Sharpe (former Housing Unit Officer)
- Donna Estrich (Former Commissioner of Administration, Finance, Policy & Urban Affairs)
- Octavio Villegas (BTVA Traffic Prosecutor)

*See* Plaintiffs' September 23, 2022 Letter to Defendants, Wilner Decl. Ex. A.

On October 14, 2022 the parties met and conferred, and Defendants informed Plaintiffs that they would not consent to Plaintiffs' request for additional depositions, with the exception of Robbin Thomas, a Named Defendant.  Wilner Decl. ¶ 8.  Plaintiffs therefore respectfully move the Court for leave to take the additional 11 requested depositions.

## ARGUMENT

Under Rule 30(a)(2), a party shall request leave to take "more than 10 depositions" during discovery if the parties have not stipulated to the depositions.  Fed. R. Civ. P. 30(a)(2). The Court "must grant" leave to take the additional depositions where the information sought is (1) relevant, (2) neither "unreasonably cumulative or duplicative," (3) not previously available to the party, and (4) likely more beneficial than burdensome, "taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."  *Lent v. Signature Truck Sys., Inc.*, No. 06CV569S, 2010 WL 1707998, at *2 (W.D.N.Y. Apr. 26, 2010); *see also* Fed. R. Civ. P. 30(a)(2); Fed. R. Civ. P. 26(b)(2)(C).

I.      **Plaintiffs' Additional 11 Requested Witnesses Have Important, Non-Cumulative Knowledge Relevant to Plaintiffs' Claims.**

Plaintiffs' proposed additional depositions target key information that is not otherwise available.  As putative class representatives in an action that alleges a City-wide discriminatory scheme, Plaintiffs must prove that Defendants have a "policy or custom" of discrimination, or a "practice[] so persistent and widespread as to practically have the force of law." *Floyd v. City of New York.*, 959 F. Supp. 2d 540, 557-58 (S.D.N.Y. 2013).  That requires Plaintiffs to gather information at all levels of government, from the City's policymaking officials, to BPD supervisory personnel, to BPD Officers who implement the racially-biased traffic enforcement policies on a day-to-day basis.  In addition, Plaintiffs also require testimony concerning the specific incidents described in the Complaint that form the basis of the 10 Named Plaintiffs' claims and their participation as proposed class representatives.  The 11 proposed witnesses fall into three categories of relevance: (A) BPD Officers who ticketed the Named Plaintiffs in incidents alleged in the Amended Complaint, (B) certain City employees involved in Defendants' unconstitutional revenue-raising efforts, and (C) other BPD Officers whose ticketing reflects high rates and racial disparities.

A.      **BPD Officers Who Ticketed the Named Plaintiffs**

Four proposed witnesses are police officers who ticketed Named Plaintiffs in the incidents that form the basis of their involvement in this action.

1.      *Michael Healy*.  Officer Healy issued multiple tinted window tickets to Named Plaintiff Ebony Yeldon while she was working as a taxi driver.  Compl. ¶¶ 269-76.  These incidents, among other checkpoint incidents, form the basis of Ms. Yeldon's participation in this action.  *Id.* ¶¶ 267-296.

2.     *Jared Domaracki*.  Officer Domaracki issued multiple tickets to Named Plaintiff Charles Palmer, including multiple tinted window tickets and a ticket for failure to change an address, events which form the basis of Mr. Palmer's participation in this action. *Id.* ¶¶ 297-304, 308-14.  Further, Officer Domaracki was a member of the Housing Unit and has information related to policing and ticketing in and around Buffalo Municipal Housing Authority ("BMHA") properties.  As set forth in the Amended Complaint, the Housing Unit played a significant part in BPD's ticketing practices and is therefore important to Plaintiffs' claims.  *See id.* ¶¶ 73-78 (describing Housing Unit and Strike Force partnership to conduct checkpoints for the purpose of deterring criminal activity), ¶¶ 73-78 (alleging that the Housing Unit's 19 officers operate primarily in areas with high minority populations and write approximately one-third of all BPD traffic violations).

3.     *Charles Miller*.  Officer Miller issued a registration ticket and multiple tinted window tickets to Named Plaintiff Charles Palmer in an incident that forms the basis of Mr. Palmer's participation in this action.  *Id.* ¶¶ 297-301, 307-14.  Officer Miller was also a member of the Housing Unit and has information as to policing and ticketing in and around BMHA properties.

4.     *Adam Wigdorski*.  Officer Wigdorski issued multiple tinted window tickets to Charles Palmer, as well as one ticket for failure to notify the DMV because the address Mr. Palmer gave in response to Officer Wigdorski's questioning did not match the address on his driver's license.  *Id.* ¶¶ 305-06.  These incidents form the basis of Mr. Palmer's participation in this action.  *Id.* ¶¶ 297-301, 305-06, 308-14.  Further, Officer Wigdorski was a member of the Strike Force and has information pertaining to that unit's operations as related to checkpoints and other enforcement within the city.  The Strike Force was the BPD unit tasked

with implementing the City's checkpoints; Strike Force leaders worked with BPD and City leadership to choose checkpoint locations; and Strike Force officers conducted a significant portion of the on-the-ground, racially-discriminatory enforcement that forms the basis of Plaintiffs' case.  *See id.* ¶¶ 36-37, 56-59, 63-81.

These incidents of multiple ticketing and discriminatory traffic enforcement of Buffalo's minority residents form the basis of Named Plaintiffs' participation in this action, both individually and on behalf of the putative class members they represent.  *See id.* ¶¶ 267-314.  Officers Healy, Domaracki, Miller, and Wigdorski are four of the numerous BPD officers who issued relevant tickets to Named Plaintiffs, and thus unquestionably have knowledge related to Plaintiffs' allegations that cannot be obtained by other means.  In addition, as former members of the Housing Unit or Strike Force, Officers Domaracki, Miller, and Wigdorski have knowledge relevant to Plaintiffs' claims regarding the those units' unconstitutional ticketing practices and policies.  Officers Domaracki, Miller, and Wigdorski are current members of the BPD and therefore have knowledge relevant to the City's ongoing discriminatory and revenue-generating practices.

### B.      City Employees Involved in Revenue Raising

Two proposed witnesses have direct knowledge relating to the City's revenue-raising motivations underlying its traffic and parking enforcement programs.  As alleged in the Amended Complaint, Defendants' revenue raising schemes have created improper structural incentives to the BPD's traffic enforcement programs—incentives which form the basis of Plaintiffs' Due Process Clause claim, and are thus central to Plaintiffs' case.  *See id.* ¶¶ 445-450.  Specifically, Plaintiffs allege that the City continues to rely on revenue from traffic tickets and associated fees to balance its budget, and it does so in substantial part through the BTVA.  *Id.* ¶¶ 119-170.  In addition, revenue raising was itself a goal of the BTVA prior to its

creation.  *Id.* ¶¶ 141-42, 145.  The witnesses identified below have information related to this claim.

5.      *Octavio Villegas*.  Mr. Villegas is the BTVA's sole prosecutor, and therefore has unique knowledge regarding the extent and limits of BTVA's prosecutorial discretion, the handling and adjudication of traffic tickets, and the operation of the BTVA and its courts.  *See* Danielle Morgera Dep. Tr., Wilner Decl. Ex. B ("Morgera Dep. Tr."), at 262:15-263:3 (noting that Mr. Villegas reviewed applications for traffic court fee waiver programs while admitting her own lack of knowledge of the subject), 264:7-265:10 (describing Mr. Villegas expressing "concern" with the BTVA for failing to implement the Buffalo Motorist Assistance Program, including via "many hours" of advocacy with the City law department during which Ms. Morgera was not present).

6.      *Donna Estrich*.  Commissioner Estrich was head of the City's Department of Administration and Finance.  In that role, Commissioner Estrich had unique knowledge regarding the City's budget and revenues, including those of the BTVA and BPD.  *See* Kevin Helfer Dep. Tr., Wilner Decl. Ex. C ("Helfer Dep. Tr.), at 98:3-9 (admitting that Commissioner Estrich would be better suited to answer whether the BTVA was seen as an opportunity for the City to generate revenue), 64:9-23 (describing Helfer's inability to remember whether his and Commissioner Estrich's "joint decision" to increase city tow drivers resulted in more net revenue for the City); Morgera Dep. Tr., at 117:13-17 (describing Commissioner Estrich asking Ms. Morgera via email for monthly BTVA revenue projections), 118:18-20 (describing Ms. Morgera's lack of knowledge about the purpose of the revenue projection request), 137:18-138:6 (affirming that budget department employees, including Commissioner Estrich, asked Ms. Morgera to "run the ticket counts" "from time to time").

These witnesses are directly relevant to Plaintiffs' claims that the City's reliance on revenue from traffic tickets and associated BTVA fees have created improper structural incentives in the BPD's traffic enforcement processes in violation of the Due Process Clause. *See* Compl. ¶¶ 445-450.  Testimony from Mr. Villegas and Commissioner Estrich is directly relevant to Defendants' "financial stake" motivating its unconstitutional enforcement practices.  *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973).  Plaintiffs thus far have only deposed two BTVA employees, Ms. Morgera and Mr. Helfer, and only seek to depose two additional witnesses regarding the BTVA's role in Defendants' violations of the Due Process Clause.  As noted by the City's own current and former employees during past depositions, these witnesses have specific knowledge about how Defendants use unconstitutional policies and practices to pad the City's budget.  Morgera Dep. Tr., at 118:18-20; 264:7-265:10; Helfer Dep. Tr., at 99:17-101:8.  Because this information goes to the core of Plaintiffs' Due Process Clause claims, the Court should grant Plaintiffs leave to depose Mr. Villegas and Ms. Estrich.

### C.     BPD Officers Who Ticketed Based on Race

The remaining five proposed witnesses are police officers who, according to data provided by Defendants, have issued tickets in a racially disparate manner.  This pattern of disparities is central to the issues in this action and each of these officers can provide information as to their participation in this pattern of policing.

7.     *Michael Acquino*.  Officer Acquino was a member of both the Housing Unit and the Strike Force at various times during his career at the Buffalo Police Department.  Officer Acquino issued over 91% of tickets with race categories coded as Black, Hispanic, or Not Coded.  Decl. of Edward Krugman ("Krugman Decl.") Ex. 1, Compilation of Total Tickets Issued by Officer ("Total Tickets Chart"), at 1.  Moreover, Officer Acquino issued an average of 4.04 tickets per incident when race was coded as Black, or approximately one more

ticket per incident than when race was coded as Hispanic, Not Coded, or White.  Krugman

Decl. Ex. 3, Compilation of Average Tickets Issued per Incident by Officer ("Tickets per

Incident Chart"), at 1.

8.     *Kelvin Sharpe*.  Based on data provided by Defendants, Officer Sharpe, a

member of the Housing Unit, issued almost 12,000 tickets between 2012-2020, the highest

number of tickets of any BPD Officer in the data provided.  Total Tickets Chart at 1.  Officer

Sharpe issued 1,818 tinted window tickets, 1,235 (67.9%) of which he issued with the race

coded as Black.  Krugman Decl. Ex. 2, Compilation of Tinted Window Tickets Issued by

Officer ("Tinted Window Tickets Chart"), at 1.  Officer Sharpe was also the subject of

multiple complaints, including complaints alleging retaliatory ticketing.  Wilner Decl. Ex. D,

Compilation of Race-Based Complaints ("Complaint Data Compilation"), at 1, 4-5.

9.     *Richard Hy*.  Officer Hy was a member of both the Housing Unit and the Strike

Force at various times during his career at the Buffalo Police Department.  Officer Hy issued

over 90% of tickets with race categories coded as Black, Hispanic, or Not Coded.  Total

Tickets Chart at 1.  And he issued an average of more than 4.3 tickets per incident for race

categories coded in the same three categories while he issued an average of just over 3.3

tickets per incident with the race coded as White.  Tickets per Incident Chart at 1.  Officer Hy

was also the subject of multiple racially-biased policing complaints, as well as complaints

alleging rudeness and excessive force.  Complaint Data Compilation at 2-4.

10.    *Justin Tedesco*.  Officer Tedesco was an officer in the Housing Unit who

issued over 89% of his tickets with a race code of Black, Hispanic, or Not Coded.  Total

Tickets Chart at 1.  In addition, based on data provided by Defendants, Officer Tedesco was

the subject of multiple race-based complaints.  Complaint Data Compilation at 1-6.

11.     *Andrew Whiteford*.  Officer Whiteford was a member of the Housing Unit and the subject of multiple race-based and traffic complaints.  *Id.* at 1, 3.  Officer Whiteford also issued a high number of average tickets per incident involving citizens with race coding of Black or Hispanic. Based on data provided by Defendants, Officer Whiteford issued just under 4.5 tickets per incident to these citizens while issuing an average of 3.7 tickets per incident to other race categories.  Tickets per Incident Chart at 1.

In sum, these officers have highly relevant information about the implementation of Defendants' discriminatory and unconstitutional policies and practices, as the ticketing data and citizen complaint excerpts produced by Defendants illustrate.  Under *Monell's* framework, it is essential to understand not only how one individual officer carried out his duties, but how officers more broadly supported a discriminatory "policy, custom, or usage" through BPD enforcement activities. *Lucente*, 980 F.3d at 297-98.  As some of the many BPD officers responsible for carrying out Defendants' discriminatory and punitive traffic enforcement policies and practices on a daily basis, these five officers can testify directly to this issue.  All five officers are also current members of the BPD and therefore have knowledge relevant to the City's ongoing discriminatory and revenue-generating practices.

Moreover, their testimony is not readily available from any other source.  Unlike BPD supervisors and City officials who conducted much of their work through email and other documents, police officers did not regularly record their motivations and reasoning in writing.[1]  Their testimony is the least burdensome method to understanding the City's on-the-

---

[1] *See* Wilner Decl. ¶ 6.  Defendants produced vastly fewer documents for police officers, such as Officers William Macy and Robbin Thomas (1,329 and 4,569 documents, respectively), than for supervisors and city employees, such as former Inspector Robert Rosenswie and former Police Commissioner Byron Lockwood (11,043 and 12,872 documents, respectively).

ground implementation of its racially-discriminatory traffic enforcement policies; policies that still affect the City's Black and Latino residents today. *See Farley v. United States*, No. 11CV198S, 2015 WL 3952295, at *4 (W.D.N.Y. June 29, 2015) (noting that depositions of additional ICE officers would provide plaintiff information about the handling of certain key reports without being so burdensome as to prejudice to the defendant); *see also* Compl. ¶¶ 412, 444, 454 (detailing Plaintiffs' injunctive claims for relief alleging ongoing unconstitutional ticketing practices in violation of Plaintiffs' and class members' Fourth and Fourteenth Amendment rights).

II.     **The Depositions Are Proportional to the Needs of the Case.**

Plaintiffs' request to depose the 11 additional witnesses discussed above is particularly appropriate in light of the complexity, breadth, and public importance of the claims at issue here. When parties request depositions beyond the allotted ten, Courts within this Circuit routinely grant leave for parties to take them where parties might learn previously unavailable information about government processes, *Farley*, 2015 WL 3952295, at *4, where the case raises "complex issues," *Lent*, 2010 WL 1707998, at *4, or where the case involves a "large number of defendants," *Matusick v. Erie Cnty. Water Auth.*, No. 07CV489A, 2009 WL 129439, at *1 (W.D.N.Y. Jan. 16, 2009).

Here, all three of those factors are present. Plaintiffs' claims involve "complex" government processes, including racially-discriminatory traffic enforcement practices resulting in violations of the Fourth and Fourteenth Amendments throughout the city of Buffalo, a municipality of more than 280,000 residents. *Lent*, 2010 WL 1707998, at *4. These practices and policies were implemented by a "large number" of Defendants over a period of nearly a decade, and have affected every City resident driver. *See* Compl. ¶¶ 3-205; *Matusick*, 2009 WL 129439, at *1. Indeed, the practices and policies at issue implicate

multiple separate units within the BPD, the City mayor's office, as well as multiple other City

departments.  Compl. ¶¶ 119-170 (detailing interactions and policy overlap between the City

mayor's office, the BPD, and the BTVA at various points throughout the relevant time frame).

Many of these discriminatory practices started over a decade ago in 2012 and continue to this

day.  *Id.* ¶¶ 35, 412, 444, 454.  Further, Plaintiffs allege not only their own individual harms,

but also practices and policies that have harmed all similarly situated Black and Latino

Buffalo residents.  *Id.* ¶¶ 398-454.

      In light of these factors, Plaintiffs' request for up 32 depositions in total is in line with

the number of depositions taken in similar cases.  For example, in a case sharing many

similarities to the one here, *Floyd v. City of New York*, No. 08 Civ. 1034 (S.D.N.Y.), the

plaintiffs deposed as many as 76 witnesses.  Decl. of Philip Irwin ¶ 4.  Similar to here, the

plaintiffs in *Floyd* alleged complex discrimination and other constitutional claims against a

municipality based on a widespread practice or custom under *Monell*.

      Courts faced with requests for additional depositions in other municipal discrimination

cases have likewise recognized the need to grant such depositions in light of the complexity

and importance of the issues at stake.  *See, e.g.*, *United States v. Town of Oyster Bay*, No. CV-

142317, 2016 WL 11265542, at *2 (E.D.N.Y. May 10, 2016) (citing *Rosen v. Thornburgh*,

928 F.2d 528, 533 (2d Cir. 1991)) (granting leave to conduct 11 additional depositions where

Plaintiff alleged that two separate decades-long municipal housing programs were enacted,

implemented, and administered by multiple entities in a discriminatory manner because "in

the context of discrimination claims … the one who discriminates is 'unlikely to leave a

smoking gun'"); *L.W. v. Lackawanna Cnty., Pa.*, No. 3:14-CV-01610, 2015 WL 2384229, at

*6 (M.D. Pa. May 19, 2015) (granting plaintiffs' request to conduct 26 depositions in a case

alleging civil rights violations); *Martinez v. California*, No. CVF-0-7996, 2008 WL 5101359, at *3 (E.D. Cal. Dec. 3, 2008) (allowing plaintiff 30 depositions in an action containing, among other allegations, civil rights claims pursuant to 42 U.S.C. § 1983).

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs leave to take the depositions of Michael Healy, Jared Domaracki, Charles Miller, Adam Wigdorski, Octavio Villegas, Donna Estrich, Michael Acquino, Kelvin Sharpe, Richard Hy, Justin Tedesco, and Andrew Whiteford.

Dated: December 15, 2022

Respectfully Submitted,


/s/ *Claudia Wilner*
Claudia Wilner
Anjana Malhotra
Edward Krugman
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
Tel: 212-633-6967
wilner@nclej.org
malhotra@nclej.org
krugman@nclej.org

A. Chinyere Ezie
Baher Azmy
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel/Fax: 212-614-6464
cezie@ccrjustice.org
bazmy@ccrjustice.org


Keisha Williams
WESTERN NEW YORK LAW CENTER
37 Franklin Street, Suite 210
Buffalo, NY 14202
Tel: 716-828-8415
kwilliams@wnylc.com

Jordan Scott Joachim
COVINGTON & BURLING, LLP
620 Eighth Ave., Suite 4029
New York, NY 10018
Tel: 212-841-1000
Fax: 212-841-1010
jjoachim@cov.com

*Counsel for Plaintiffs*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2022, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System.

*/s/ Claudia Wilner*