# Exhibit B

```
 1      UNITED STATES DISTRICT COURT
 2      FOR THE WESTERN DISTRICT OF NEW YORK
 3      -------------------------------------------
 4      BLACK LOVE RESISTS IN THE RUST, et al.,
        individually and on behalf of a class of
 5      all others similarly situated,
 6                              Plaintiffs,
 7       -vs-                    1:18-cv-00719-CCR
 8      CITY OF BUFFALO, N.Y., et al.,
 9                              Defendants.
        -------------------------------------------
10
11
12          ORAL EXAMINATION OF DANIEL DERENDA
13              APPEARING REMOTELY FROM
14                 BUFFALO, NEW YORK
15
16
17               November 10, 2021
18               At 9:00 a.m.
19               Pursuant to notice
20
21      REPORTED BY:
22      Rebecca L. DiBello, RPR, CSR(NY)
23      APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK
```

DEPAOLO CROSBY REPORTING SERVICES, INC.

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1    A. All the chiefs, sometimes different detectives
2       from different units.  Again, I did not
3       attend.  I think I attended maybe one or two.
4       Even as deputy -- when I was deputy
5       commissioner Byron Lockwood also ran it then.
6            Again, every chief would be there.
7       Maybe a representative from homicide or
8       narcotics or from the intelligence.  Maybe
9       some outside agencies at times, different
10      people.
11   Q. And was CompStat something that happened
12      before you were the commissioner?
13   A. It happened -- yes.  It happened probably
14      right after -- I was deputy commissioner of
15      operations from 2006 to 2010 and it went on
16      then, yes.
17   Q. And what was the role of the CompStat meeting?
18          MR. QUINN:  Object to the form.  You can
19      answer.
20   A. Again, information and to find out and make
21      sure everybody was aware of what was going on,
22      particularly the district chiefs and again to
23      find a solution to the problems at hand.

1   Q. Did information from CompStat meetings or from
2      the CompStat reports go into deciding where
3      the Strike Force would be sent to do its work?
4         MR. QUINN: Object to the form. You can
5      answer.
6   A. I imagine it would.
7   Q. But you weren't directly involved with that?
8   A. With what?
9   Q. Assigning the Strike Force areas?
10  A. At times I would request that they go
11     somewhere, but I believe Deputy Commissioner
12     Lockwood was -- well, I don't even know if he
13     was assigning where they would go, but when I
14     was deputy commissioner of operations I would
15     assign the MRU.
16        As commissioner occasionally I would ask
17     the Strike Force based on information I had to
18     go to some areas, but I believe Deputy
19     Commissioner Lockwood handled it then.
20  Q. Okay. The BPD also had a housing unit,
21     correct?
22  A. Correct.
23  Q. And I'm going to mark as Derenda 4 a document

DANIEL DERENDA

1 visibility to curtail a lot of those
2 activities.
3 Q. So when you were picking specifically
4 intersections for traffic checkpoints what
5 information was going into selecting the
6 specific intersections?
7 A. I don't recall picking specific intersections.
8 Are you talking about MRU now or Strike Force?
9 Q. I believe I'm talking about the early days of
10 the Strike Force.
11 A. So in Strike Force I believe I wasn't -- I
12 would occasionally tell them to be in this
13 certain area, but I don't recall specifically
14 on a day-to-day routine of picking locations
15 and/or places.  I believe Lockwood was doing
16 the locations of the roadblocks.  I did for
17 MRU way back as deputy commissioner and,
18 actually, the lieutenants at times picked the
19 locations specific for roadblocks.
20 We would pick the areas that I wanted
21 them to target, meaning what was going on,
22 based on what was going on, is what I best
23 recall.

1      Once I became commissioner MRU
2  disappeared and we disbanded the unit and we
3  re-formed the Strike Force.  I don't know how
4  many years in between.  I didn't have -- it
5  was no longer my job to be assigning them to
6  different locations.  You have deputy
7  commissioner of operations.  Lockwood overseen
8  the housing.  We put him in charge of housing,
9  Strike Force and the schools because we put
10 him all together so he overseen those units
11 and, generally speaking, he would assign them
12 where they would be.
13     Occasionally maybe I would chime in
14 based on something, based on somebody
15 requesting that I knew about, but the
16 day-to-day stuff I didn't handle.  I had too
17 many other things on my plate that I didn't
18 have years before.
19 Q. Now, you expected Strike Force officers to
20    issue a lot of traffic tickets, right?
21 A. I expected Strike Force officers to be
22    proactive and out doing their job making
23    arrests, writing summonses, writing parking

```
 1         who?  Lockwood?
 2    Q.   Yes.
 3    A.   Because at the time Beaty or Lockwood actually
 4         was the administrative who would have overseen
 5         the academy, but we also had Kim Beaty looking
 6         over the academy, too.  Basically Joe Strano
 7         was administrative.  He did budget, finance
 8         and all of the above, so I would have sent it
 9         to them to review also.
10    Q.   Did you read the DOJ report on Ferguson?
11    A.   I don't recall reading it.  If I got the email
12         I probably did.
13    Q.   What is your understanding of what the DOJ's
14         report contained?
15    A.   I don't recall reading it, so I can't give you
16         my understanding of it.
17    Q.   You must have thought that the Ferguson report
18         had some relevance to the BPD because you sent
19         it to three BPD officials, right?
20              MR. QUINN:  Form.
21    A.   I don't recall reading it and I don't recall
22         why I sent it, but it would be for them to
23         read also.
```

| | | |
|---|---|---|
| 1 | | BPD's use of checkpoints? |
| 2 | A. | I do not recall that. |
| 3 | Q. | I'm marking as Derenda 61 a document |
| 4 | | identified as COB080149.  And this is a copy |
| 5 | | of a resolution passed by the common council |
| 6 | | at the July 25th, 2017 meeting concerning the |
| 7 | | Buffalo Police Department checkpoint policy. |
| 8 | | Does this document refresh your memory? |
| 9 | A. | It does not.  Vaguely. |
| 10 | Q. | You would have received a copy of the |
| 11 | | resolution, right? |
| 12 | A. | Yes. |
| 13 | Q. | And would you have tasked anybody with |
| 14 | | responding to the council or did you manage |
| 15 | | the response personally? |
| 16 | A. | I would have probably tasked Lockwood in |
| 17 | | responding to that. |
| 18 | Q. | And the resolution is directing you to produce |
| 19 | | a report on the use of checkpoints and to |
| 20 | | provide data on the location, frequency and |
| 21 | | results of the checkpoints covering the period |
| 22 | | of three years to date. |
| 23 | | Do you recall how you responded to the |

```
 1            type of misconduct is thoroughly investigated,
 2            right?
 3       A.   What complaint are we speaking of?
 4       Q.   Well, we are going to talk about some specific
 5            complaints, but I am speaking generally.  If a
 6            complaint alleged excessive force and racial
 7            bias it would be your responsibility to ensure
 8            that both the excessive force allegation and
 9            the racial bias allegation were investigated,
10            right?
11       A.   Internal Affairs would investigate both,
12            correct.
13                MR. QUINN:  Form.
14       Q.   And it was your responsibility to ensure that
15            that happened, right?
16       A.   It did happen, correct.
17       Q.   And you would also have responsibility for
18            ensuring that each separate allegation
19            resulted in a disposition?
20                MR. QUINN:  Form.
21       A.   Each complaint would result in a disposition.
22            It would take a complaint as one.  It might
23            have multiple parts to it, but it would be one
```

1    deposition.  They would do an investigation.
2    We would do an informal hearing.  We would see
3    what evidence was there, what we could prove
4    or not prove, whether to remove the charges or
5    not sustained.
6         Everything would be investigated.  We
7    would sit down and do file review once a week
8    and investigate -- when the investigator was
9    done with the complaint we would layout what
10   they have, what the complaint is, what we can
11   prove, what we couldn't prove.
12        We'd have an attorney from law sitting
13   at the table with us and we would make the
14   best decisions based on the information we had
15   and what we could prove to an arbitrator.
16 Q. So let's boil that down a little bit.  You
17   said you had a file review once a week?
18 A. About once a week.  Sometimes less, sometimes
19   more depending on the number of cases piling
20   up.  Depending on how many investigations were
21   complete.
22 Q. And was the file review only of investigations
23   that were complete or did you also discuss

```
 1            investigations underway?
 2       A.   Complete and move towards a disposition.
 3       Q.   And who would be present at these meetings?
 4       A.   The Internal Affairs inspector, Deputy
 5            Lockwood, the other deputy, Deputy Beaty at
 6            times, corporation counsel, an attorney, a BPD
 7            attorney, and then we'd also have the
 8            investigators come and present their case.
 9                 This would be after they were done with
10            their investigation.  We can present it for
11            whether we're going to press charges, not
12            sustain whatever outcome, whatever it was
13            would be determined after we listened to each
14            individual investigator about each individual
15            investigation.
16       Q.   And you said a corp counsel attorney and a BPD
17            attorney.  Are those the same person or two
18            different people?
19       A.   The same person.
20       Q.   Okay.  Were you notified when an investigation
21            was opened?
22       A.   Excuse me?  I didn't hear that.
23       Q.   Were you notified when an investigation was
```

DANIEL DERENDA

```
 1        circumstances.  That would probably be a
 2        question for Stacey Lewis, that particular --
 3     Q. I'm going to mark as Derenda 81 a photo of
 4        Rascheed Roper's license place.  This is from
 5        the Internal Affairs file.
 6            Do you agree with me that the plate is
 7        not obstructed?
 8            MR. QUINN:  Form.
 9     A. Yes.
10     Q. And do you agree that the plate is fully
11        affixed to the car; it's not hanging off on
12        one side or another side?
13            MR. QUINN:  Form.
14     A. Yes.
15     Q. Would you issue a ticket for a license plate
16        in this condition?
17     A. Would I?  No.
18     Q. Derenda 82 is the Complaint Disposition Form
19        for the complaint filed by Mr. Roper.  It's
20        dated February 10th, 2016 and in this case you
21        classified the complaint as not sustained and
22        you also ordered a conference with DPC
23        Lockwood?
```

DANIEL DERENDA

1   A. Apparently, yes.
2   Q. When you made this determination would you
3      have considered Officer Hy's disciplinary
4      history?
5          MR. QUINN: Form.
6   A. I don't recall the particular case so I don't
7      know what I would have considered. You're
8      showing me a snapshot of sheets of
9      dispositions. Doesn't really go through the
10     facts of the case and/or -- again, I keep
11     going back to in many cases complainants stop
12     being cooperative, so I don't know what took
13     place or what didn't.
14  Q. Well, these are not files where complainants
15     are not being cooperative. These are full
16     investigatory files, the investigation
17     reports, the site interviews with the
18     complainant. In this case there was a letter
19     from the complainant about the incident.
20     There was a picture of the license plate that
21     we looked at and you agreed that there was
22     nothing wrong with the license plate.
23         What was the basis for your