# EXHIBIT A

```
 1    UNITED STATES DISTRICT COURT
 2    FOR THE WESTERN DISTRICT OF NEW YORK
 3    ---------------------------------------------
 4    BLACK LOVE RESISTS IN THE RUST, et al.,
      individually and on behalf of a class of
 5    all others similarly situated,
 6                              Plaintiffs,
 7    -vs-                                1:18-cv-00719-CCR
 8    CITY OF BUFFALO, N.Y., et al.,
 9                              Defendants.
10    ---------------------------------------------
11       EXAMINATION BEFORE TRIAL OF JOSEPH GRAMAGLIA
12                  APPEARING REMOTELY FROM
13                   ERIE COUNTY, NEW YORK
14
15
16                   September 22, 2023
17                 9:05 a.m. - 5:15 p.m.
18                    pursuant to notice
19
20
21    REPORTED BY:
22    Carrie A. Fisher, Notary Public
23    APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK
```

─────DEPAOLO CROSBY REPORTING SERVICES, INC.─────
135 Delaware Avenue, Suite 301, Buffalo, New York 14202
716-853-5544

```
 1          R E M O T E    A P P E A R A N C E S

 2      APPEARING FOR THE PLAINTIFFS:

 3          NATIONAL CENTER FOR LAW
            AND ECONOMIC JUSTICE
 4          BY: CLAUDIA WILNER, ESQ.
            50 Broadway, Suite 500
 5          New York, New York 10004
            (212) 633-6967
 6
        APPEARING FOR THE DEFENDANTS:
 7
            HODGSON RUSS LLP
 8          BY: CHEYENNE N. FREELY, ESQ.,
            PETER SAHASRABUDHE, ESQ.,
 9          and HUGH M. RUSS III, ESQ.,
            140 Pearl Street
10          Buffalo, New York 14202
            (716) 848-1508
11
        ALSO PRESENT:
12
            ANJANA MALHOTRA, ESQ.
13          National Center for Law
            and Economic Justice
14

15

16

17

18

19

20

21

22

23
```

```
 1                      I N D E X
 2   WITNESS              EXAMINATION                    PAGE
 3   Joseph Gramaglia     By Ms. Wilner                     5
 4
 5
 6
                         E X H I B I T S
 7
     EXHIBIT             DESCRIPTION                     PAGE
 8            (Shown electronically to the witness)
 9   GRAMAGLIA
10    1      email with attachment (COB239351)             39
11    2      emails, 2 pages (COB215775)                   43
12    3      email with attachment (COB219516)             46
13    4      emails, 2 pages (COB237638)                   48
14    5      General Order 2021-009                        83
15    6      IAD file re DeAndre Green                    119
16    7      BPD Manual of Procedures Chapter 16          137
17    8      IAD file re Andre Wise                       143
18    9      BPD Manual of Procedures Chapter 15          150
19   10      BPD Manual of Procedures Chapter 2           159
20   11      IAD file re Kaiser Acosta                    168
21   12      BPD Employee Resume re Richard Hy            190
22   13      IAD file re Lavern Stroud                    252
23   14      IAD file re Dakota Eldridge                  273
```

———JOSEPH GRAMAGLIA———

1  that authorization but, you know, you still
2  have to keep that in there for, you know, some
3  safety reasons. You know, there could
4  hypothetically be an escaped prisoner where
5  you have to set up traffic checkpoints. If
6  you could pull up the section of the language
7  and read it more specifically but, you know,
8  having something in there and the
9  authorizations that are required are two
10 different things.
11 Q. Okay. But under the MOP you could restart
12    those traffic safety checkpoints at any time,
13    right?
14 A. I'd have the authorization. I could, yes.
15 Q. Does the BPD conduct performance evaluations
16    of officers?
17 A. Contractually we're not able to, no. That's a
18    subject of union negotiations.
19 Q. Okay. And -- yeah, maybe I will come back to
20    that in a little bit. So aside from
21    performance evaluations, does the BPD evaluate
22    officers' performance in any way?
23 A. No. Subject to the union negotiations, we're

—JOSEPH GRAMAGLIA—

1      not contractually allowed to do evaluations.
2   Q. Do you think that instituting performance
3      evaluations would promote better training and
4      supervision of officers?
5           MR. RUSS:  Objection to form.  You may
6      answer.
7   A. I do.  We're -- it's no secret in the
8      department that we are trying to get that.
9   Q. And the performance evaluations are actually
10     required in order for the BPD to preserve its
11     accreditation, right?
12  A. So we have a waiver from New York State
13     because it's outside of our control.
14  Q. But the waiver was only for a certain period
15     of time, right, and the waiver will expire?
16  A. No, we would have to again apply.  We maintain
17     that application for a waiver so we are still
18     accredited and we are in compliance with our
19     accreditation.
20  Q. The contract is under negotiation now?
21  A. Yeah, the -- the last agreed upon contract
22     expired June 30th of 2019.  It went into
23     binding interest arbitration which was settled

1    last year which was only two years so it
2    covered from July 1st of '19 to June 30th of
3    '21.  So by the time it was settled, it was
4    already expired in itself so we are expired
5    again and moving towards arbitration again.
6  Q. Okay.  And that particular arbitration that
7    results in pay raises for officers but no
8    performance evaluations, right?
9  A. Correct.  That was the arbitrator's decision.
10 Q. Is the City currently seeking to get
11   performance evaluations during the new
12   contract and negotiations?
13 A. We did in the negotiation stage, but now that
14   we are at the mediation stage I don't know
15   what I'm allowed to discuss on mediation.
16   There's rules of mediation that, forgive me, I
17   don't know what we're allowed to discuss
18   because we're in mediation, but I will say
19   that when we were actively negotiating with
20   the union we were -- that was one of the
21   things that we put on the table is performance
22   evaluations.
23 Q. The city charter gives you as commissioner the

—JOSEPH GRAMAGLIA—

```
 1        power and duty to govern and discipline
 2        officers, right?
 3    A.  Well, the contractual agreement and
 4        contractual language sets forth the policy and
 5        procedures of discipline.  So whether or not I
 6        could on my own invoke some form of
 7        discipline, I will lose that to an arbitrator
 8        and an arbitrator has all authority by
 9        contract between the union and the City and
10        it's been that way for decades.  I don't know
11        when that agreement was signed, but it goes
12        back a long way.
13    Q.  So you believe that the collective bargaining
14        agreement supersedes any rights that you have
15        under the city charter to govern and
16        discipline officers?
17            MR. RUSS:  Objection to form.  You may
18        answer.
19    A.  With relation to discipline, yes.  There's
20        contractual language on how that process plays
21        out.
22    Q.  Does the BPD have an early warning system to
23        identify officers who engage in problematic
```