# EXHIBIT B

```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------
```

**BLACK LOVE RESISTS IN THE RUST, ET AL.,
INDIVIDUALLY AND ON BEHALF OF A CLASS OF
ALL OTHERS SIMILARLY SITUATED,**

       Plaintiffs,

-vs-                   1:18-cv-00719-CCR

**CITY OF BUFFALO, N.Y., ET AL.,**

       Defendants.

```
-----------------------------------------
```

**EXAMINATION BEFORE TRIAL**

**OF MAYOR BYRON BROWN**

**APPEARING REMOTELY FROM**

**ERIE COUNTY, NEW YORK**


November 6th, 2023

At 9:00 a.m.

Pursuant to notice


REPORTED BY:

Rebecca L. DiBello, RPR, CSR(NY)

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York 14202
716-853-5544

```
 1          R E M O T E    A P P E A R A N C E S

 2

    APPEARING FOR THE PLAINTIFFS, BLACK LOVE
 3  RESISTS IN THE RUST, ET AL., INDIVIDUALLY AND
    ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY
 4  SITUATED:

 5              CENTER FOR CONSTITUTIONAL RIGHTS
                BY: A. CHINYERE EZIE, ESQ.
 6              666 Broadway, 7th Floor
                New York, New York 10012
 7              (212) 614-6464

 8  APPEARING FOR THE DEFENDANTS, CITY OF BUFFALO,
    N.Y., et al.:
 9
                HODGSON RUSS LLP
10              BY: PETER SAHASRABUDE, ESQ.,
                140 Pearl Street
11              Buffalo, New York 14202
                (716) 848-1508
12

13

14  ALSO PRESENT:

15              National Center for Law
                and Economic Justice
16                  CLAUDIA WILNER, ESQ.
                    MAYA GOLDMAN, ESQ.
17                  ANJANA MOLHOTRA, ESQ.
                    SHYENNE MEDINA, ESQ.
18
                Covington & Burling, LLP
19                  CHRISTINE NELSON, ESQ.

20              Center for Constitional
                Rights
21                  MIKAILA HERNANDEZ, ESQ.

22

23
```

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York 14202
716-853-5544

```
 1                  W I T N E S S E S
       WITNESS           EXAMINATION                    PAGE
 2
       BYRON BROWN
 3
                   By Ms. Ezie                            5
 4

 5                    E X H I B I T S
       EXHIBIT           DESCRIPTION                    PAGE
 6     BROWN

 7      1   Buffalo News article                         32

 8      2   WBFO article                                 66

 9      3   Email, 8-12-13                               69

10      4   Strike Force mission                         72

11      5   Memo, 1-23-15                               102

12      6   Memo, 6-27-16                               107

13      7   Email, 2-10-16                              119

14      8   Email, 8-9-20                               123

15      9   Email, 8-31-20                              127

16     10   Certification of records                   135

17     11   Policy brief, 10/21                        168

18     12   Investigative Post article                 184

19     13   Minority Bar Association document          189

20     14   Letter, 5-24-18                            193

21     15   Excerpt of Rosenswie deposition            206

22     16   Daily Public article                       213

23     17   Checkpoint map                             219
```

```
 1                        E X H I B I T S
         EXHIBIT      DESCRIPTION                          PAGE
 2       BROWN

 3       18  Email, 2-7-17                                  228

 4       19  Email, 5-13-13                                 230

 5       20  Video                                          235

 6       21  News 4 Investigates report                     255

 7
                      * * * * * * * * * * * * * * * * * * * *
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

1  THE REPORTER: Will the attorneys
2  participating in this deposition acknowledge
3  that I will administer the oath remotely, and
4  consent to waive any objections to this manner
5  of reporting.
6  MS. EZIE: Yes.
7  MR. SAHASRABUDHE: Yes.
8
9  **MAYOR BYRON BROWN**,
10  201 City Hall, Buffalo, New York 14202, having
11  been first duly sworn, was examined and
12  testified as follows:
13
14  **EXAMINATION BY MS. EZIE:**
15  Q. Good morning again, Mayor Brown. My name is
16  Chinyere Ezie. I'm one of the attorneys for
17  plaintiffs and I'll be taking your deposition
18  today. Is this the first time you've been
19  deposed?
20  A. Yes. I'm thinking maybe not.
21  Q. Maybe not, okay.
22  A. Yeah. In my long service as mayor I'm sure
23  that I have been deposed before probably,

— MAYOR BYRON BROWN —

1  Q. Okay. We'll toggle back. The second question
2     was for police unions, whether they
3     contributed to police violence a great deal, a
4     lot, a moderate amount, a little, not at all
5     or not applicable.
6        Referring back to your response, you
7     responded a great deal. Do you see that?
8  A. I do see that.
9  Q. Can you explain that answer.
10 A. You know, so again in the aftermath of the
11    horrible murder of George Floyd, I looked to
12    our own efforts here in Buffalo to implement
13    various police reforms and was feeling very
14    strongly at that time that the police union
15    was an obstacle, the contract was an obstacle,
16    the collective bargaining process in New York
17    State was an obstacle to implementing all of
18    the reforms and trainings that we wanted to
19    implement.
20 Q. Has that view changed over time?
21       MR. SAHASRABUDHE: Form.
22 A. The view of the police union being an obstacle
23    to reform has not fully changed. We have had

1 these conversations with police union
2 officials here locally and have expressed the
3 view that police reform is good for everyone.
4 It's good for our residents, it's good for our
5 police officers and it makes our entire
6 community safer.
7 Q. And what was the response to that position as
8 you described it?
9     MR. SAHASRABUDHE:  Objection to form.
10 A. So the president of the police union did not
11 see things in the same way that I saw them and
12 felt that the priority of the union was to
13 protect the membership.
14 Q. And when you refer to the president of the
15 police union who are you referring to?
16 A. John Evans.
17 Q. Is John Evans currently the president of the
18 -- it's called the PBA, right?
19 A. Yes.  The Police Benevolent Association.  He
20 is currently the president.
21 Q. When did you communicate with President Evans,
22 PBA President Evans, about the need for police
23 reform?

1  A. At different points, you know, both in person
2     and through contracts that police management
3     and our law department have tried to negotiate
4     with the union to put different reforms in
5     place.
6  Q. And by contract negotiations are you referring
7     to the police collective bargaining agreement?
8  A. Yes, I am.
9  Q. Do you personally have a role in PBA
10    negotiations?
11 A. I do not sit at the table. The negotiating
12    table in that process do strategize with the
13    police management and the management of the
14    law department and the finance department
15    about other negotiating priorities.
16        At a certain point if things get to the
17    point where my coming in and speaking to the
18    police union or another union would be
19    helpful, I would do that, but generally I am
20    not involved in the negotiating process at the
21    table.
22 Q. Okay. But you are kept informed of
23    negotiations as they proceed?

1   Q. Okay. Are there any steps that your
2      administration has taken to increase the
3      ability of officers to be disciplined for
4      misconduct?
5   A. We would certainly like to increase the
6      ability of officers to be disciplined for
7      misconduct by the police commissioner and the
8      commissioner's management, not just for
9      misconduct as it relates to the potential of
10     racial bias, but for a variety of other
11     factors.
12         Again, New York State collective
13     bargaining complicates the ability to achieve
14     that and I think the achievement of certain
15     reforms really is based on changes in federal
16     and state law and not available at the city
17     level.
18  Q. Even in the context of union negotiations?
19  A. In the context of union negotiations, unions
20     will not give up certain rights and privileges
21     and benefits that they don't have to.
22  Q. Isn't it the case that the City has entered
23     into an agreement voluntarily that have

—— MAYOR BYRON BROWN ——

1  weakened oversight of the BPD?
2      MR. SAHASRABUDHE: Objection to form.
3  A. Absolutely not. 100 percent not. The City
4  has not entered into any agreement that would
5  weaken the oversight of BPD. I think if the
6  police commissioner and the commissioner's
7  management were allowed certain powers under
8  state law that there would be very few issues
9  that would require external oversight.
10 Q. I'm not sure I follow your last statement. Do
11  you want to clarify it?
12 A. My clarification is there are basic common
13  sense things that the police commissioner and
14  police management should be allowed to do in
15  the way of discipline that laws do not allow,
16  period, plain and simple. And if the police
17  commissioner and the police management don't
18  have certain levels of oversight under the
19  law, it certainly is not going to be given to
20  external entities.
21 Q. Okay. Would you agree that there are
22  nonetheless policies that the City can
23  implement that do bear on the question of