# Exhibit 7

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

-------------------------------------------

**BLACK LOVE RESISTS IN THE RUST, ET AL., INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED,**

Plaintiffs,

-vs- 1:18-cv-00719-CCR

**CITY OF BUFFALO, N.Y., ET AL.,**

Defendants.

-------------------------------------------

**EXAMINATION BEFORE TRIAL**

**OF MAYOR BYRON BROWN**

**APPEARING REMOTELY FROM**

**ERIE COUNTY, NEW YORK**

November 6th, 2023

At 9:00 a.m.

Pursuant to notice

REPORTED BY:

Rebecca L. DiBello, RPR, CSR(NY)

A. Yes, I am.

Q. Are you able to approve or veto the City budget?

A. Yes, I am.

Q. Are you able to defend the City in litigation when the City is sued or officials are sued?

MR. SAHASRABUDHE: Objection to form. Go ahead.

A. The City Corporation Counsel is the attorney for the municipal corporation.

Q. Do you have a role in lawsuits that are filed against the City as far as, for instance, determining whether a settlement should be approved?

MR. SAHASRABUDHE: Objection to form.

A. I do not.

Q. Okay. And in areas like executive orders is there anyone who can veto your decision?

A. I have not proposed a lot of executive orders. The executive orders that I have proposed have not been objected to.

Q. Okay. Now, as mayor do you have any responsibilities related to municipal

agencies?

MR. SAHASRABUDHE: Form.

A. I have management responsibilities with municipal agencies.

Q. When you say management authorities what do you mean?

A. So ultimately the mayor is the chief executive officer of the administration of City government and I manage the work of the commissioners that manage the various departments of City government.

Q. Okay. Does that include the Buffalo Police Department?

A. Yes, it does.

Q. Does it include the Buffalo Traffic Violations Authority or BTVA?

A. Yes, it does.

Q. Does that include the Commission on Citizens Rights and Community Relations?

A. Yes, it does.

Q. Does it include the Buffalo Municipal Housing Authority Commission?

A. No, not directly. I appoint commissioners to

Q. Okay. Now, we have been talking a bit about the BTVA. When was it created?
A. I don't remember the exact date of creation as we speak.
Q. If I said it began to administer tickets in July of 2015, would that sound accurate to you?
A. It could be accurate.
Q. What role did you have in the creation of the BTVA, if any?
A. I participated in recommending the creation of the agency.
Q. Who did you recommend the creation of the agency to?
A. The City proposed the creation to the City Council and to the state legislature.
Q. Was that at your recommendation?
A. Yes.
Q. Why did you recommend that the BTVA be created?
A. We thought it was a more efficient way to manage traffic violations in the City of Buffalo. Other cities had similar agencies

and we thought that that model would be more efficient.

Q. And when you say efficient what do you mean?

A. I mean just in terms of knowing the number of tickets that were written, being able to determine how that process was managed and removing a lot of the management and oversight of that process from Albany.

Q. As part of your efforts to establish the BTVA you did travel to Albany, correct?

A. I traveled to Albany periodically.

Q. And you spoke to lawmakers in Albany about the need to create the BTVA?

A. Yes.

Q. Am I correct that prior to the creation of the BTVA revenue for traffic tickets was sent to state agencies and divided?

A. That's correct.

Q. And subsequent to the creation of the BTVA ticket revenue from traffic tickets and impounds goes directly to the City of Buffalo?

MR. SAHASRABUDHE: Form.

A. Could you repeat that?

Q. Sure. I'll ask a different question. Am I correct that since the creation of the BTVA revenue from traffic tickets is no longer divided with state agencies?
A. The distribution is greater to the City.
Q. And by greater what do you mean?
A. There's more revenue to the City.
Q. Okay. A significant increase in revenue?
MR. SAHASRABUDHE: Objection to form.
A. I don't know how significant it is.
Q. But since its creation the BTVA has generated millions in revenue for the City of Buffalo?
MR. SAHASRABUDHE: Object to the form.
A. I don't know the answer to that.
Q. But you do prepare the City budget yearly?
A. Yes, I do.
MR. SAHASRABUDHE: Form.
Q. And that includes looking at proposed revenue streams?
A. Yes, that does.
Q. Are you aware that the BTVA revenue lines has been in the millions since 2015?
MR. SAHASRABUDHE: Form.

A. Could you repeat that please.
Q. Sure. Are you aware that the revenue allocation for the BTVA has been in excess of a million since its creation?
A. That sounds accurate.
Q. Okay. Thank you.
So let's go back to talking about some of your mayoral duties. Now, with respect to the BPD, is it true you're able to make appointments?
A. I appoint the commissioner of the Buffalo Police Department.
Q. Do you require anyone else's approval for the commissioner appointments?
A. Yes. All commissioners go through a confirmation process with the City Council.
Q. And you have the authority to make the recommendations for the appointment in the first instance?
A. That is correct.
Q. Are you able to relieve appointees as well?
A. Yes, I am.
Q. And is cause required to relieve an appointee?

Q. You were aware of that initiative?
A. I was aware of that initiative that there were checkpoints in different parts of the city, yes, I was.
Q. And you approved of the checkpoint initiative, correct?
A. Again, I did not disagree with the traffic enforcement initiative, including checkpoints.
Q. Earlier we were speaking about the establishment of the Strike Force. I'd like to direct you to what I believe would be Brown Exhibit 2. I'm going to pull it on my screen now. Let me know Mr. Brown, Mr. Mayor, if you're able to see my screen. And you can let me know when you'd like me to scroll down.
A. I see it.
Q. It's a two-page article so let me know when you'd like me to scroll.
A. You can scroll.
Q. Okay.
A. You can scroll.
Q. That's more or less the end of the article.
A. Yep.

called the City of Buffalo's Untapped Power to Discipline Police Officers.

Are you able to see that on my screen, Mayor Brown?

A. I am able to see it.

Q. This policy brief is several pages. We're looking at part of the first page. I can make it a little smaller so you can see it all or most of it. Sorry. I'm cutting off the date right now.

The date of this policy brief is October, 2021. Just from perusing it, is this a document that you've seen before?

A. I have seen the document before.

Q. You have?

A. I have, yes.

Q. Okay. And you're familiar with some of the conclusions of this report?

A. I am.

Q. Okay. Is this a report that you've discussed with anyone within the Buffalo Police Department?

A. Yes. It's been discussed with the management

of the Buffalo Police Department. It's been discussed with the management of the city's law department. It's been discussed with members of the City Council.

MR. SAHASRABUDHE: Just so you know, if you've discussed this with corporation counsel in a privileged discussion don't reveal it.

Q. Certainly you don't have to disclose any conversations you've had with corporation counsel, but let's turn to discussions you've had about this policy brief with the management of the Buffalo Police Department.

Who are you referring to when you say the management of the police department?

A. This would be the police commissioner and deputy commissioners.

Q. And what do those discussions consist of?

A. Basically we don't agree with this policy brief. We don't believe that the Partnership For Public Good is correct.

Q. With respect to what findings in particular?

A. Findings in general.

Q. So one of the findings, let's turn to page 3

of this document, is that the Buffalo Common Council expressly has the right to discipline police.

Do you see that in the middle of the page it says in 1914 that that was enacted?

MR. SAHASRABUDHE: Form.

A. It says in 1914 the New York State Legislature enacted a charter for the City of Buffalo expressly granting the Common Council the right to discipline police. Title VII, Article 1, Section 250 of that charter states that there shall be a department of police which shall be a subordinate department of the Department of Public Safety, which doesn't exist, and which shall have charge of all police matters of the City. The government and discipline of the Department shall be prescribed by the Council in form of orders, rules and regulations for such Department.

The section goes on to state the orders, rules and regulations of the Council relating to this Department shall have the same force and effect as if herein enacted, provided they

are not in conflict with the laws of the state by the explicit language regarding discipline in this act. The Legislature has expressly committed disciplinary authority over a police department to local officials in Buffalo.

So this is 1914. In a couple of months we'll be in 1924. We'll be in 2024. I don't know if the council ever used or attempted to utilize this power and this itself references a lot of things that could counteract this power, which I doubt still exist in any way, shape or form.

Q. So in your discussions about this article did you form the opinion that local officials have no ability to discipline officers consistent with this article?

MR. SAHASRABUDHE: Objection to form.

A. I would say consistent with this article and other laws that have been promulgated by New York State and other legal rulings for the police that have come down over the years, I'm not aware of this article as a City Council -- as mayor, as a former City Council member, as


a former City Council staffer. I don't know if this ever been used or attempted to be used and the City Council could certainly try to do this.

This doesn't mention the administrative branches of government. It doesn't mention the mayor's office. This is wholly a power, reading this, of the Common Council and if the Council could implement this I would think that they would do it or would try. I doubt this has any basis in fact or ability in 2023.

Q. And did you conduct any investigation or further research to confirm that theory?

A. I did not conduct any further research on this 1914 act of the state legislature pertaining to the City Council, no. I did not research it at all because it clearly as written here is a power allegedly of the City Council, but not of the mayor.

Q. Now, you stated a few minutes ago that you did speak to the Common Council about this article or this policy brief by the Partnership For Public Good?

A. Yes, that's correct. There are a number of things in it. This is just one of them. I think the Council has seen it. I don't manage the City Council. I don't control the City Council.

The City Council members are all independently elected and the form of government in the City of Buffalo is strong mayor, strong council, so anything in this document that the council wished to pursue, they could try to pursue it and I could not prevent them from doing so, nor would I try to.

Q. What discussions did you have with the Common Council about this article which again purports to say that the City has untapped powers to discipline police officers?

MR. SAHASRABUDHE: Object to the form.

A. Just with the few council members that I saw that I read it and the administration review is that it was not accurate.

Q. Who formed the opinion that it was not accurate?

MR. SAHASRABUDHE: Objection to form. To the extent that's a privileged attorney-client communication, don't reveal it.

A. I can't reveal all of that, but I would say again that any of this -- if the council in their review felt that anything in this policy brief was doable they could implement it.

Q. Did you have any discussions with council members encouraging them to see if they could exercise additional powers concerning police discipline?

A. No. I had no discussions with the Council urging them to try to assume additional police oversight powers.

Q. Why not?

MR. SAHASRABUDHE: Objection to form.

A. Because the council members are independently elected. I don't manage the council. I don't control the council and if there was anything in this document that the council felt they could implement or wanted to implement they would and could do so.

Q. Is it your testimony that you never make

representations to the Common Council about policies they should adopt within the City of Buffalo?

MR. SAHASRABUDHE: Objection to form.

A. I would make recommendations to the council on policies that would be adopted that the administrative branch of City government would manage and carry out, but I don't make recommendations to the City Council on things that they should be doing.

Q. But your testimony today is that you have felt tempered by the union when it comes to engaging in police discipline and oversight activity?

A. Could you repeat that?

Q. Earlier am I correct that you testified that the police union has been an impediment to adopt these policies related to police discipline in the City of Buffalo?

A. I did say that to you and I am quoted on the record numerous times as saying that.

Q. And you've been concerned about the ways that the City's ability to engage in police

oversight are limited by the union?

MR. SAHASRABUDHE: Object to the form.

A. I am concerned that I believe the union should also want police oversight, should also want the police commissioner to be able to manage and properly discipline officers for misconduct and while I think the union has been an impediment, it's much more than the union.

It's collective bargaining in New York State. It's court cases that have been won by unions, it's federal policy, so this is much bigger than the union. While I think the Buffalo PBA and its presidents have been impediments, this is much bigger than the union.

Q. Now, all that said, you did discuss this article with the Common Council -- with certain Common Council members, correct?

A. With certain council members, not in any great detail or depth.

Q. But you never recommended that they explore whether they have -- whether the Common

Council has the ability to engage in additional oversight activity for the police?

MR. SAHASRABUDHE: Objection to form.

A. I never did recommend based on this article that the council should explore additional oversight powers over police and I do believe that the council, if they believed there were additional oversight powers that they actually had, if they believe that this article was -- this policy brief was accurate, they would move forward on some of the items contained in it.

Q. Did you ever discuss with the Common Council why they were not moving forward with oversight proposals related to the BPD?

MR. SAHASRABUDHE: Objection to form.

A. The council actually has moved forward with oversight proposals related to BPD. There is a Common Council oversight committee that is something that the council has implemented, but never discussed why the council did or didn't attempt to implement anything in this policy brief.

STATE OF NEW YORK)

COUNTY OF ERIE )

I, Rebecca Lynne DiBello, CSR, RPR, Notary Public, in and for the County of Erie, State of New York, do hereby certify:

That the witness whose testimony appears hereinbefore was, before the commencement of their testimony, duly sworn to testify the truth, the whole truth and nothing but the truth; that said testimony was taken pursuant to notice at the time and place as herein set forth; that said testimony was taken down by me and thereafter transcribed into typewriting, and I hereby certify the foregoing testimony is a full, true and correct transcription of my shorthand notes so taken.

I further certify that I am neither counsel for nor related to any party to said action, nor in anyway interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal this 19th day of November, 2023.

Rebecca L. DiBello
_________________________________

Rebecca Lynne DiBello, CSR (NY)
Notary Public - State of New York
No. 01D14897420
Qualified in Erie County
My commission expires 5/11/2027