# Exhibit 8

```
 1        UNITED STATES DISTRICT COURT

 2     FOR THE WESTERN DISTRICT OF NEW YORK

 3     -----------------------------------------------

 4     BLACK LOVE RESISTS IN THE RUST, et al.,
       individually and on behalf of a class of
 5     all others similarly situated,

 6                          Plaintiffs,

 7      -vs-                        1:18-cv-00719-CCR

 8     CITY OF BUFFALO, N.Y., et al.,

 9                          Defendants.
       -----------------------------------------------
10

11


12          ORAL EXAMINATION OF DANIEL DERENDA

13             APPEARING REMOTELY FROM

14                BUFFALO, NEW YORK

15

16


17                  November 10, 2021

18                  At 9:00 a.m.

19                  Pursuant to notice

20


21     REPORTED BY:

22     Rebecca L. DiBello, RPR, CSR(NY)

23     APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

**DANIEL DERENDA**

1           MR. QUINN:  I think that was the whole

2      answer.

3    Q. Okay.  Thank you.  What was the main mission

4      of the Strike Force?

5           MR. QUINN:  Object to the form.  You can

6      answer.

7    A. The main mission was to -- they would go after

8      guns, drugs, intelligence gathering and again

9      to supplement the districts in areas where we

10      had problems.  Again, they were not tied to

11      the radio.  They were to be proactive and they

12      were out to be on the street depending on

13      circumstances that were going on throughout

14      the city.

15    Q. And the document that I would like to show you

16      -- just one second.  I'm going to mark as

17      Exhibit 1 a document that was produced to us

18      with Bates number COB060319.  It says at the

19      top Strike Force Mission.

20           Mr. Derenda, do you recognize this

21      document?

22    A. I do.

23    Q. Did you author it?

DANIEL DERENDA

1    A. I did.

2    Q. And does this document accurately describe the

3       mission of the Strike Force?

4    A. Yes, it does.

5    Q. And you were directly involved in the creation

6       of the Strike Force, right?

7    A. Correct.

8    Q. Why did you create the Strike Force?

9           MR. QUINN:  Object to the form.

10   A. Actually, before the Strike Force we had a

11      unit called the MRU which was basically the

12      same mission.  Very successful.  It had a

13      shelf life.  The officers assigned there were

14      very proactive and they started to not work as

15      hard so we got rid of the unit and we reformed

16      the Strike Force Unit maybe -- I don't know

17      how much time in between.

18          But again, we did it to target areas of

19      high crime and, again, to supplement the

20      districts and to concentrate on problems.

21   Q. Okay.  And when you say very successful, how

22      was that success measured?

23          MR. QUINN:  Object to the form.  You can

─── **DANIEL DERENDA** ───

1         Do you need me to move down?

2    A.  Yes.

3    Q.  Okay.  Just going to the end of Section B.

4        Then we're also going to go to the next page,

5        Page 4 of the document.  It's COB003845 and

6        we're going to look at letter G which states,

7        drug interdiction, assisting BPD investigators

8        in criminal investigations and the prevention

9        of legal or criminal activity on or near BMHA

10       property or involving BMHA residents shall be

11       the primary focus of the Buffalo Police

12       housing unit.

13            Would you agree with that statement,

14       Mr. Derenda?

15            MR. QUINN:  Object to the form.

16   A.  I would agree that they were there to do all

17       crime.  Again, supplemental patrols to be in

18       there and they did gather intelligence and

19       they did help with different investigations

20       and they did help with different units.  I did

21       not write this document.

22   Q.  Now, the housing unit had a substantial amount

23       of vehicle and traffic reports near the BMHA

**DANIEL DERENDA**

1    property, didn't it?

2         MR. QUINN:  Object to the form.  You can

3    answer.

4    A.  I don't recall numbers of what they did or

5    didn't do.

6    Q.  Would it surprise you to learn that the ticket

7    data in this case shows that the housing unit

8    issued 20 percent of all the tickets issued by

9    the BPD?

10   A.  It wouldn't surprise me for the reason that

11   they're not tied to the radio like other

12   officers are.  The housing unit, the Strike

13   Force, the MRU prior to them, their main

14   mission was to be proactive, to be out doing

15   policing and they were expected to again be

16   very proactive so I guess, no, it wouldn't

17   surprise me.

18   Q.  Would you say that vehicle and traffic

19   enforcement was one of the primary job duties

20   of the housing unit?

21        MR. QUINN:  Object to the form.  You can

22   answer.

23   A.  Would it be a primary job?  Again, they're out

1        Once I became commissioner MRU

2    disappeared and we disbanded the unit and we

3    re-formed the Strike Force.  I don't know how

4    many years in between.  I didn't have -- it

5    was no longer my job to be assigning them to

6    different locations.  You have deputy

7    commissioner of operations.  Lockwood overseen

8    the housing.  We put him in charge of housing,

9    Strike Force and the schools because we put

10    him all together so he overseen those units

11    and, generally speaking, he would assign them

12    where they would be.

13        Occasionally maybe I would chime in

14    based on something, based on somebody

15    requesting that I knew about, but the

16    day-to-day stuff I didn't handle.  I had too

17    many other things on my plate that I didn't

18    have years before.

19  Q.  Now, you expected Strike Force officers to

20     issue a lot of traffic tickets, right?

21  A.  I expected Strike Force officers to be

22     proactive and out doing their job making

23     arrests, writing summonses, writing parking

DANIEL DERENDA

1    tickets, writing city ordinances to be visible

2    and out doing their job proactive, correct.

3         MR. QUINN:  Form to the last question.

4  Q. And you mentioned a number of kinds of things

5    you expected them to do; summonses, parking

6    tickets, city ordinances.

7         What are city ordinances?

8  A. City ordinance could be anything from whether

9    -- high grass was one of them.  We used to

10   have specific details and walk through

11   neighborhoods writing summonses based on city

12   ordinances.  Loud music, high grass, whatever

13   it may be, and the purpose for that was to get

14   officers out of their cars walking down the

15   streets, getting back to what we talked about,

16   high visibility.

17        So when they're out doing something,

18   when they're out walking, when they're out

19   stopping vehicles for traffic violations,

20   they're highly visible and I believe that has

21   a major effect in reducing overall crime and

22   other things.

23 Q. When you felt that Strike Force officers had

**DANIEL DERENDA**

1       low production you let them know, didn't you?

2              MR. QUINN:  Object to the form.

3    A.  If I seen a report and I seen that they

4       weren't doing anything, so if you have ten

5       officers working on a shift and you don't see

6       any arrests and there's no summonses, then

7       they're telling me they're not out doing what

8       they need to be doing, so yes, I would let

9       somebody know if I didn't think they were

10      being out there.

11             Again, when you're not tied to the radio

12      and you're not answering calls you have a lot

13      of time to be proactive and enforce traffic

14      laws, do other things and when you're not --

15      again, I always had the philosophy of what

16      gets measured gets done, so they were forced

17      to do reports every shift and you can see if

18      they're doing things or they're not doing

19      things and there's times depending on holidays

20      or whatever you'd see low numbers because of a

21      couple of reasons.

22             Probably low manpower and people are

23      home and not driving and nobody is out and

1          gets recorded gets attention, so if people

2          know you're watching what they're doing, they

3          tend to do more work.

4    Q.  What is a plate reader?

5    A.  The automatic plate readers.  So they're on

6          patrol vehicles.  Basically a license plate

7          reader.  A license will go by and it scans --

8          it automatically scans cars going by.

9                It will tell you if a vehicle is stolen.

10         It will tell you if the vehicle is not

11         registered.  Possibility of an unlicensed

12         driver.  If that car is registered to somebody

13         on a warrant, it automatically pops up and

14         they can scan cars going by at a high-speed,

15         whatever.  Just automatically scans everything

16         going by.

17   Q.  So he says that the plate reader was -- since

18         the plate reader was fixed all the numbers

19         have increased, impounds most notably.

20   A.  And --

21   Q.  Go ahead.

22   A.  Finish the question.

23   Q.  Please say what you were going to say.

1    A. So when a plate reader is fixed, the plate

2       reader -- they're telling you the car is not

3       registered automatically as you're driving.

4       Screen is changing colors and telling you of

5       violations meaning, like I said, it will tell

6       you if the vehicle is stolen.  It will tell

7       you if the person who owns the vehicle is on a

8       warrant.  It will warn you.  It will tell you,

9       yeah, if it's not registered, expired, no

10      insurance.

11          It will automatically do that.  That's

12      what the plate readers do, so with them being

13      fixed I would believe the numbers would

14      increase over the summonses because I'm sure

15      many summonses were written off those plate

16      readers.

17   Q. He says that is a source of concern with the

18      m.o.p., but the plate reader makes it a no

19      brainer.  Can you explain what you mean?

20   A. The source of the concern with the m.o.p.?

21          MR. QUINN:  Form.

22   A. I don't know what he means in that context

23      going back to the time.  I don't recall, but

**DANIEL DERENDA**

1            the plate reader makes it a no brainer.  So

2            the plate reader is giving you information

3            with which I guess makes it a no brainer to

4            either, A, pull the vehicle over, write it up

5            or do whatever.

6                  So again, I believe with plate readers

7            the numbers go up significantly.

8     Q. And I'm going to mark as Derenda 18 an email

9            COB216566.  It's a two-page document.

10    A. Can you blow it up a little bit please.

11    Q. How is that?

12    A. That's good.

13    Q. So this is an email from you to Sally Blersch.

14            Who is Sally Blersch?

15    A. I want to think she's a lieutenant.  I don't

16            remember exactly what she did for us.

17    Q. Okay.  And it looks like you're sending her

18            the information that's compiled for CitiStat?

19    A. Correct.

20    Q. And then it looks like if we go down this is

21            the information that would be provided to

22            CitiStat, correct?

23    A. Apparently.  Apparently.

DANIEL DERENDA

1          through these numbers that are reported here;
2          arrests, traffic summons, impounds, quality of
3          life summonses, parking tags?
4     A.  I measured my progress with the yearly UCR
5          numbers with drops in overall crime is how I
6          measured my progress overall.  My success I
7          believe was because we were able to reduce
8          crime by 40 percent overall.
9               MR. QUINN:  Object to the form of the
10         last question.
11    Q.  I have heard you say what gets measured gets
12         done.  And was that a philosophy that your
13         subordinates were familiar with?  Was that
14         something you communicated to the people who
15         work for you?
16              MR. QUINN:  Form.
17    A.  Well, I communicated to the people that worked
18         for me.  When I say what gets measured gets
19         done, daily reports, tell me what you've done.
20         When you make somebody do activities, reports,
21         you make whatever, they know you're watching
22         to make sure things get done, so what gets
23         measured gets done.

1        When you go back to numbers of arrests

2    and summonses, everything, that was only a

3    part of overall policing strategies to drive

4    down numbers.  Everything from a camera system

5    to block club meetings to Text a Tip, to all

6    kinds of things all led to that big decrease

7    in crime, but I believe Strike Force making

8    arrests and people out, high visibility,

9    everything leads to the point of reducing

10   crime.

11       Strike Force was just a piece of that

12   puzzle to help do that but, again, what gets

13   measured gets done.  I want people to know

14   even at my position as commissioner of police

15   or deputy commissioner that I'm watching to

16   make sure people are working, period.

17 Q. And one way that your officers could increase

18   their production was by writing multiple

19   tickets in a single stop, correct?

20       MS. MOYER:  Form.

21 A. Assuming they wrote multiple tickets in a

22   single stop and part of that I believe is due

23   to two things.  Well, the plate reader is one

1          way, but the other thing, when tickets became

2          automated, meaning when I was a patrol officer

3          way back when and I wrote a ticket I would

4          have to physically handwrite a ticket and go

5          through it and so you might write somebody one

6          ticket, you might write them two.

7               However, when it became automated and

8          they take your driver's license and scan it

9          and everything gets populated and now a person

10         that might have done five violations at one

11         point, if you had to handwrite them maybe

12         you're not going to write five tickets, but I

13         believe with a press of a button, they're

14         printing out tickets and I believe that was a

15         big reason for the increase in the number of

16         summonses over the years.

17    Q.   Did the BPD have a written policy that covered

18         the issuance of multiple tickets?

19    A.   Can you repeat that?

20    Q.   Was there a written policy that covered

21         issuing multiple tickets in a single stop?

22    A.   I don't believe there was, but I know people

23         did write multiple tickets and I believe

**DANIEL DERENDA**

1       that's what -- again, that's the reason.  If

2       they have to physically handwrite them I don't

3       think they would have wrote as many, but

4       because everything became automated it became

5       so much easier for them to do so --

6   Q.  Did you ever communicate to Strike Force that

7       you expected them to write multiple tickets as

8       part of the zero tolerance policy?

9   A.  It gets communicated in that directive.  If

10      you go back to the roadblock directive as far

11      as that, that you should write everybody for

12      every violation equally, so that is the

13      directive there, but did I ever put out that I

14      need people to go out and do their job and

15      write summonses and make arrests?  I'm sure

16      all the time.

17  Q.  Did you specifically provide direction around

18      multiple ticketing?

19  A.  Not that I recall.  I don't remember if I did

20      or I didn't.

21  Q.  And you never said anything to discourage them

22      from issuing multiple tickets?

23  A.  I think at one point some people were writing

**DANIEL DERENDA**

1          multiple tickets for tinted windows, front and

2          back or whatever.  I sort of recall telling

3          them that no, you can't do that.  But I don't

4          remember specifically.  Again, I just don't

5          recall to who or what if there were other

6          cases.

7     Q.  So you're saying you need to leave by 1:00?

8     A.  I have to pick up my daughter at 1:20.

9               MS. WILNER:  We are not going to finish

10         by 1:00.  Rob, what do you want to do?

11              MR. QUINN:  I mean, I sort of expected

12         that we would do two days as you outlined, so

13         we can reschedule a second day now or you can

14         send me an email of your availability, whatever

15         you think.

16              MS. WILNER:  Okay.  Do you want to keep

17         going until 1:00 now and then we'll do the rest

18         on the second day?

19              MR. QUINN:  Up to you.

20              MS. WILNER:  Or are you wanting to break

21         sooner than 1:00?

22              THE WITNESS:  If we can do ten to 1:00

23         I'd be happy with that.

1    Q. So I'm marking as Derenda 19 a graph that we

2        created based on BPD ticketing data.  I don't

3        think that you would have seen this before, so

4        feel free to take a few minutes to look at it.

5        Can you see it?

6    A. Yes, I can see it.

7    Q. And the graph depicts the number of tickets

8        issued in a single stop by various units of

9        the Buffalo Police Department between 2012 and

10       2018 and the units depicted the Strike Force

11       which is in yellow, the housing unit which is

12       in red and the rest of the Buffalo Police

13       Department which is in green.

14           And if you look at what the rest of the

15       Buffalo Police Department did throughout the

16       time period, their ticketing was consistent at

17       about one and a half to two tickets per

18       incident throughout the entire time period.

19       Do you see that?

20   A. Yes.

21   Q. The yellow line is representing the Strike

22       Force ticketing and they also at the beginning

23       were issuing around two tickets per incident,

**DANIEL DERENDA**

1          but starting in June 2015 they began issuing

2          three to five tickets per incident.  Are you

3          with me?

4     A.  Yes.

5               MR. QUINN:  Objection.  I mean, we're

6          just looking at this graph and --

7               MS. WILNER:  Right.  We're making sure

8          that we're on the same page about what the

9          graph is showing.

10              MR. QUINN:  Okay.  Thank you.

11    Q.  The red line is the housing unit that shows

12         that the ticketing rates rose even faster than

13         those of the Strike Force.  They were

14         averaging five to six tickets per incident by

15         the later part of the time period, 2017 and

16         2018.  Agreed?

17    A.  It appears to be such.

18    Q.  And do you have any reason to think that this

19         isn't accurate?

20              MR. QUINN:  Form.

21    A.  I have no reason to believe it's accurate or

22         not accurate.

23    Q.  Were you aware at the time that the housing

─ **DANIEL DERENDA** ─

1          unit and the Strike Force were engaging in

2          more multiple ticketing than the rest of the

3          Buffalo Police Department?

4                  MR. QUINN:   Form.

5     A.  I would expect them to be engaged in more

6          ticketing because, again, they're out there

7          being proactive, not tied to radios and I

8          believe it probably would show -- this graph

9          would probably show a correlation as to when

10         they were -- tickets became automated.

11               I'm not sure what year that was, but I

12         will bet that's a big factor in why you see

13         more tickets being issued.

14    Q.  But when tickets became automated the entire

15         Buffalo Police Department had access to that

16         automated ticket software, correct?

17    A.  Correct.

18    Q.  And from what this graph is showing is that in

19         each stop the Strike Force and the housing

20         units are issuing significantly more tickets

21         at the stop than the other units of the BPD?

22    A.  That's what it appears to show.

23    Q.  Were you aware at the time that the Strike

DANIEL DERENDA

1    Force and the housing unit were issuing more

2    tickets in a single stop than other parts of

3    the Buffalo Police Department?

4        MR. QUINN:  Form.

5  A. Was I aware?  I'll make the assumption that,

6    again, the normal officers in patrol never

7    wrote a lot of tickets to begin with.  They

8    have so many other things going on with call

9    after call, whatever.  They're not doing daily

10   activity reports.

11       When you have Strike Force and you have

12   housing who are doing daily activity reports,

13   what gets measured gets done, and they know

14   you're reviewing numbers and now they have an

15   automated system, I would expect that they're

16   going to start writing more multiple tickets

17   and apparently they did.

18  Q. I will mark as Derenda 20 another graph that

19   we created based on BPD ticketing data.

20   Again, this isn't something you would have

21   seen before, so feel free to take a look at

22   it.  Are you able to see it?

23  A. Yes.

**DANIEL DERENDA**

```
 1     Q. Where tinted window tickets were issued, yes,
 2        so it's not an average -- yeah.  Among the
 3        stops where tinted window tickets were issued,
 4        the average is a little over three per stop.
 5     A. Okay.
 6     Q. Were you aware at the time that the tinted
 7        window ticketing rate was increasing?
 8     A. I was made aware of some point that some
 9        officers were writing multiple tickets for
10        same vehicle at the same time which I am told
11        needed to end.  They were just getting thrown
12        out of court anyway.  If you're going to write
13        tinted window tickets it should be one ticket.
14            It didn't make sense to write multiple
15        tickets for different windows in my opinion
16        and I know they were being tossed out.  I
17        don't know what year or what timeframe that
18        was, but I do recall something along those
19        lines.
20     Q. Well, does it look like from this chart that
21        you were successful in reducing the number of
22        tinted window tickets that were issued?
23            MR. QUINN:  Form.
```

**DANIEL DERENDA**

1    everybody's time.

2         I believe they were being thrown out of

3    court so, again, I don't know the facts behind

4    it and I don't recall totally.

5  Q. And why did the BPD issue so many tinted

6    window tickets?

7         MR. QUINN:  Form.

8  A. I believe when they're -- okay.  Let's go back

9    to -- and I don't know for a fact, but if the

10   directive says issue tickets, if you go back

11   if they're doing through checkpoints and the

12   directive says issue any and all, that could

13   be part of it or you might have certain

14   officers, specific officers that wrote the

15   majority of those tickets because that's what

16   they did.

17        I don't know.  I don't know what those

18   numbers are.

19  Q. Did you ever look into the tinted windows

20   ticketing numbers when you were commissioner?

21  A. Not that I recall.

22        MR. QUINN:  Form.

23  A. Possible, but I don't recall.

DANIEL DERENDA

```
 1    Q.  Did you when you were commissioner of the BPD
 2        have any written policy on tinted windows
 3        ticketing?
 4    A.  I don't recall.
 5    Q.  I will mark as Derenda 21 a document that's
 6        been identified as COB202653.  And this is an
 7        email sent by Jeff Rinaldo to you and others
 8        on January 29th, 2016.  Are you able to read
 9        this okay?
10    A.  I'm good.  Have to squint a little bit.  There
11        you go.  Better.
12    Q.  And is this the incident that you were
13        thinking of where it was mentioned that the
14        BTVA was writing off tickets and is this what
15        caused you to --
16    A.  Possible.
17             MR. QUINN:  Form.
18    A.  Again, I do recall some incident happening or
19        seeing something.  This could have been when
20        it --
21    Q.  So you remember advising officers to only
22        write one ticket?
23    A.  I believe if I received this email I would
```

**DANIEL DERENDA**

1       have spoken to the chiefs and everybody

2       involved and pointed it out that they're

3       wasting their time because it's all being

4       reduced.  I'm sure I would have pointed it

5       out, but I don't recall specific.

6   Q.  At the same time the officers would have

7       continued to feel an expectation to produce

8       numbers, correct?

9           MR. QUINN:  Form.

10  A.  They would feel an expectation to do their job

11      and be out there and be proactive.

12  Q.  I'm going to mark as Derenda 22 a document

13      identified as COB027693 and this is a memo

14      signed by you at the bottom that went out to

15      chiefs, inspectors, captains, lieutenants and

16      the subject is equipment checkup date.

17          It directs officers to conduct window

18      tint inspections.  Can you explain what that

19      means?

20  A.  I don't recall this.  It's a general order

21      that went out through the inspector's office.

22      Officers to immediately direct to conduct

23      equipment checks on vehicles at the districts

```
 1        STATE OF NEW YORK)

 2        COUNTY OF ERIE   )

 3


 4
           I, Rebecca Lynne DiBello, CSR, RPR, Notary
 5        Public, in and for the County of Erie, State of
          New York, do hereby certify:
 6

 7         That the witness whose testimony appears
          hereinbefore was, before the commencement of
 8        their testimony, duly sworn to testify the
          truth, the whole truth and nothing but the
 9        truth; that said testimony was taken pursuant
          to notice at the time and place as herein set
10        forth; that said testimony was taken down by me
          and thereafter transcribed into typewriting,
11        and I hereby certify the foregoing testimony is
          a full, true and correct transcription of my
12        shorthand notes so taken.

13
           I further certify that I am neither counsel
14        for nor related to any party to said action,
          nor in anyway interested in the outcome
15        thereof.

16
           IN WITNESS WHEREOF, I have hereunto
17        subscribed my name and affixed my seal this
          14th of November, 2021.
18

19

20        _____
          Rebecca Lynne DiBello, CSR, RPR
21

22

23
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1          UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF NEW YORK

3          ----------------------------------------------

4          **BLACK LOVE RESISTS IN THE RUST, et al.,**
           **individually and on behalf of a class of**
5          **all others similarly situated,**

6                                  Plaintiffs,

7           -vs-                              1:18-cv-00719-CCR

8          **CITY OF BUFFALO, N.Y., et al.,**

9                                  Defendants.
           ----------------------------------------------

10

11                         **CONTINUED**

12              **ORAL EXAMINATION OF DANIEL DERENDA**

13                 **APPEARING REMOTELY FROM**

14                    **BUFFALO, NEW YORK**

15

16

17                    December 23rd, 2021

18                    At 9:20 a.m.

19                    Pursuant to notice

20

21          REPORTED BY:

22          Rebecca L. DiBello, RPR, CSR(NY)

23          APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK


              **DEPAOLO CROSBY REPORTING SERVICES, INC.**
           135 Delaware Avenue, Suite 301, Buffalo, New York  14202
                           716-853-5544

```
 1      Q.  Is an impound under those circumstances
 2          consistent with the BPD policy on impounds?
 3                  MR. QUINN:  Form.
 4      A.  I don't believe it is.
 5      Q.  Okay.  Was Captain Roberts ever disciplined
 6          for his role in impounding this vehicle?
 7      A.  I don't recall.
 8      Q.  Also in this document Captain Roberts states
 9          Commissioner Derenda maintained a daily
10          running total of all statistics generated by
11          the unit including impounds and held me
12          personally responsible for the unit's
13          productivity in this area.
14                  Did you hold Captain Roberts personally
15          responsible for the unit's productivity in
16          terms of impounds?
17                  MR. QUINN:  Form.
18      A.  Productivity, period.  Again, what gets
19          measured in my opinion gets done, so we looked
20          at the stats.  We would compile the stats and
21          I held the captain, the chief and everybody
22          else accountable for those stats.
23      Q.  And that would include their stats on
```

```
 1                 MR. QUINN:  Form.
 2      A.  I don't believe so.  There would be no reason
 3          for that.
 4      Q.  This Exhibit I will mark as Derenda 31.  This
 5          contains documents that were produced to us
 6          under subpoena by Erie County Central Police
 7          Services.  We've requested that BPS produce
 8          materials used to train officers on enforcing
 9          the Vehicle and Traffic Law from 2013 to the
10          present and this is part of what they've
11          produced to us and this is a copy of the
12          subpoena.
13                 Here we have a page dated January 13,
14          2015.
15                 MR. QUINN:  This is the third page?
16      Q.  This is the third page of the PDF.  It is a
17          collection of PowerPoints, but it's dated
18          January 13th, 2015.
19      A.  This is from Erie County, not from the Buffalo
20          Police Department, correct?
21      Q.  Yes.  This is from Erie County.  The second --
22          sorry.  Page 4 of the PDF is also a series of
23          PowerPoint slides.  These are dated 7/18/2018.
```

```
 1          And then Page 5 of the PDF is an excerpt from

 2          the basic course for police officers and it

 3          has the number 3-G.3 at the top.

 4               At the bottom it's labeled New York

 5          State Division of Criminal Justice Services,

 6          Office of Public Safety, copyright 2012, July

 7          of 2012.

 8               Are you familiar with any of these

 9          documents?

10     A.  I am not.

11     Q.  Do you think you've seen them before?

12     A.  Not that I recall.

13     Q.  Do you have any reason to dispute these were

14          the materials that were used to train incoming

15          police recruits during the time that you were

16          commissioner?

17     A.  Again, I have no knowledge if this was used or

18          not.  If you're telling me it was, I'll

19          stipulate to that.

20     Q.  Did you routinely review the course materials

21          that were provided to police recruits at the

22          training academy?

23     A.  I did not.
```

```
 1      Q. And why didn't you?
 2      A. Why didn't I?  At the training academy -- we
 3         have our own training academy within the BPD.
 4         Whether they would review Erie County's law
 5         enforcement training to train the police
 6         officers I don't know, but they would be part
 7         of it, but the commissioner of police to
 8         review every lesson that went through the Erie
 9         County Law Enforcement Training Academy would
10         be impossible given all the other tasks that
11         have to be done daily.
12      Q. You didn't think it was important to know how
13         your officers were being trained?
14            MR. QUINN:  Object to the form.  That's
15         pretty argumentative, but you can answer.
16      A. It's very important that the officers are
17         trained properly.  Again, you have to --
18         they're the experts at the academy on
19         training, along with our academy, along with
20         New York State and other representatives.
21         I'll make the assumptions that they were
22         trained properly.
23      Q. Okay.  I'll direct your attention to this box
```

```
 1              that says reasons for vehicle and traffic
 2              laws.  And could you read for me reason number
 3              four?
 4                   MR. QUINN:  This is on Page 3, correct?
 5       Q. Yes.
 6       A. Number four says generate revenue.
 7       Q. And this is the 2018 version of the training.
 8          Under reasons for vehicle and traffic laws do
 9          you agree that this also states that a reason
10          for vehicle and traffic laws is to generate
11          revenue?
12       A. That's what it states.
13       Q. And looking at the basic course for police
14          officers, do you agree that it says reasons
15          for vehicle and traffic laws include, number
16          four, revenue generating?
17       A. That's what it states.
18       Q. Do you sitting here today agree that
19          generating revenue is one of the reasons to
20          enforce vehicle and traffic laws?
21       A. I do not believe that's a reason to enforce
22          it.  It did occur when people are given
23          summonses.  It does generate revenue, but
```

```
 1              that's not a purpose -- should not be the
 2              purpose of any law enforcement agency.  It
 3              should be to traffic safety and all of the
 4              others.
 5         Q.  And was that also your belief while you were
 6              the commissioner?
 7         A.  Yes.  Again, generating revenue is not what
 8              the police department -- it's not their job.
 9              It does occur.  However, again, you don't give
10              tickets just to generate revenue.
11         Q.  And yet, all of your police recruits were
12              trained at the academy that one reason to
13              enforce vehicle and traffic laws is to
14              generate revenue.
15         A.  You have to take that up with Erie County if
16              it's in fact how the officers were trained,
17              whether that would be Buffalo officers,
18              Amherst, all the other surrounding towns and
19              cities.  Again, I don't believe that should be
20              there.
21         Q.  Did you as commissioner ever do anything to
22              counter or correct this training?
23                   MR. QUINN:  Form.
```

1    A. I don't believe I have ever seen this
2       training.  If I did I seen it when I went
3       through the academy and I don't recall back in
4       1986.
5    Q. I will mark as Derenda 32 a P-73 prepared by
6       Patrick Roberts.  It's dated January 10th,
7       2013.  It's identified as COB063327.
8             Again, you received this memo, correct?
9    A. I mean, it goes on -- my name or commissioner
10      of police goes on every P-73.  I can't say for
11      sure whether I received it or not, but
12      apparently I did through the email I just
13      looked at, yes.
14   Q. And I'll give you a minute to read it.
15   A. (Reading.)  Okay.
16   Q. All right.  In this memo Captain Roberts is
17      requesting that Housing Unit overtime be
18      allowed to continue, right?
19   A. He wants more overtime, correct, or continued,
20      yes.
21   Q. He says, the officers have shown great
22      production with regards to arrests/V&T
23      issuances and vehicle impounds more than

```
 1        traffic tickets?
 2              MR. QUINN:  Form.
 3    A.  What I believe took place, and I'm not sure
 4        what year they were installed, but at one
 5        point when I was on patrol going way back if
 6        you wrote a traffic ticket you actually wrote
 7        the traffic ticket.  You wrote out a summons.
 8              We changed to an automated system where
 9        you now take your license, scan it.  It
10        populates the tickets and with the press of a
11        button you fill, print, fill, print, so I
12        think there was a big increase.
13              So an officer that might write one or
14        two summonses now wrote more summonses because
15        it was easy to do so.  He didn't have to
16        handwrite summonses, so I believe that was the
17        big reason for the increase.
18    Q.  And would that have been related to when the
19        BPD converted to the TraCS system?
20              MR. QUINN:  Form.
21    A.  I think that's what it was called, but I'm not
22        100 percent sure.  It switched whenever we
23        converted to the automated system.  I don't
```

1          in traffic tickets coinciding with the launch

2          of the BTVA?

3              MR. QUINN:  Form.

4      A. So it says June.  When the speed limit was

5          lowered because of the child's death there

6          were 3,700 that month.  I know that we had

7          details and we had them writing tickets on

8          that section of the Scajaquada everyday

9          because people were not obeying the 30 mile an

10         hour speed limit.

11             It could be that, but I don't recall the

12         situation of why there were more.

13     Q. Actually, I'll point out to you if we look up

14         to the paragraph that's appearing at the top

15         of the screen, it looks like they asked you

16         about stepped up traffic enforcement and you

17         said that the TraCS system came online in

18         2013.

19     A. Widespread use of new traffic and criminal

20         software system.  Okay.  That's apparently

21         what I said.

22     Q. So we're dating the use of the automated

23         system in 2013 so their automated symptom is

1          make more money by working overtime and some

2          officers liked to work overtime.  So you can

3          call it they did receive more pay for working

4          overtime.

5     Q.   Does the email reflect a quid pro quo in which

6          officers are expected to produce results in

7          order to continue receiving overtime

8          opportunities?

9               MR. QUINN:  Form.

10    A.   Officers were always expected to produce

11         results whether it was on overtime details or

12         on straight time details, whether it was

13         Housing or Strike Force.  Again, I expected

14         them to be out there doing their job.

15    Q.   Was availability of overtime contingent on

16         producing results?

17              MR. QUINN:  Form.

18    A.   There were certain details on overtime that

19         were expected results.  Again, if we wanted

20         people out there and to be proactive, if we

21         were paying for extra details on overtime, I

22         certainly expect them to be out there doing

23         their job.

```
 1      Q.  And some officers increased their salaries
 2          considerably with overtime, didn't they?
 3               MR. QUINN:  Form.
 4      A.  Throughout the department, correct.  I used
 5          overtime whenever I needed and had to do it to
 6          achieve my objectives.
 7      Q.  And working overtime also gave officers the
 8          opportunity to increase their pensions, right?
 9      A.  Yes.
10      Q.  Do you or did you as commissioner believe that
11          overtime is a reward for production?
12               MR. QUINN:  Form.
13      A.  I believed that when overtime was utilized
14          that they needed to produce, but I believed
15          they needed to produce whether it was on
16          straight time or overtime, whether it was the
17          homicide unit working overtime hours, whether
18          it was the narcotics unit, whether it was
19          traffic, Strike Force, overtime was utilized
20          across the board with the objective of
21          lowering crime throughout the city.
22               So again, we used a lot of overtime over
23          the years, but still maintained our budget.
```

```
 1              Would you agree that Captain Serafini is
 2         communicating that the availability of
 3         overtime is contingent on making the
 4         production as expected of them?
 5    A.   From reading this I would say that he's saying
 6         that unless you're out there doing your job
 7         and being productive, that's what these
 8         details are dependent upon.  There would be no
 9         purpose to have a detail to address issues,
10         and I don't know what issues specifically at
11         the time they were trying to address because I
12         don't recall, but if you're going to take a
13         detail and in particular if you're going to
14         pay somebody overtime on a detail you expect
15         them to be productive and out there doing
16         their job and those details are contingent
17         upon them doing their assigned tasks,
18         regardless of what it was.
19    Q.   Moving up, I'm in this top paragraph here,
20         Captain Serafini says we are looking for
21         production in the form of arrests, summonses,
22         etcetera.  Advise your officers to avoid
23         overkill on issuing of multiple traffic
```

1       summonses for the same offense to one

2       motorist, meaning they should not be issuing

3       six separate traffic summons for window tints.

4       Two tint summonses per motorist is enough.

5           Do you think that this email is related

6       to the incident we discussed last time in

7       which you testified that you had told

8       subordinates not to issue multiple tinted

9       windows tickets for a single stop?

10          MR. QUINN:   Form.

11  A. I don't know if this email relates to that.  I

12      don't recall what years that was, but some

13      officers were writing multiple tickets on the

14      same vehicle for each window being tinted

15      which didn't make any sense because they'd all

16      get thrown out anyway.

17  Q. Right.  And this is March 2017?

18  A. I don't recall specifically when I was made

19      aware of the issue and when I said something,

20      so I don't know if this is it or there are

21      other emails or discussions.  I don't recall

22      the timeframe, but I know it did happen and we

23      did move to correct it.

```
 1    Q.  Your testimony last time was if you're going
 2        to write tinted window tickets it should be
 3        one ticket.
 4    A.  That's my opinion.
 5    Q.  Were you aware that Captain Serafini was
 6        instructing officers to issue two tickets?
 7    A.  I don't recall seeing this email, but if he
 8        instructed them to issue two tickets I still
 9        believe when they went to the adjudication
10        bureau they would be knocked down to one or
11        something else.
12    Q.  Why was Captain Serafini instructing officers
13        to write two tickets per incident if you said
14        that they should write one ticket per
15        incident?
16    A.  I don't recall specific language to Captain
17        Serafini or anyone else.  What I believe I
18        said in the context of multiple tickets should
19        not be written for tinted windows; you should
20        write one ticket.  Now, I passed that on.  So
21        why he's writing what he did, I guess you'd
22        have to ask him that.
23    Q.  Did you ever take any specific steps to ensure
```

```
 1          that your instructions about not issuing
 2          multiple tinted windows tickets in a single
 3          stop were being followed?
 4     A.   I don't recall.
 5     Q.   If you had taken any steps would that be
 6          documented in some way?
 7     A.   Again, I don't recall what I did, who I spoke
 8          to.  Might have been a conversation.  I don't
 9          recall, but it did come to me at some point
10          that they were running multiple tickets for
11          tinted windows and I probably addressed it at
12          a chief's meeting when they were all there,
13          what should be done and if they need to stop
14          whether it was Housing, Strike Force or
15          districts, that they needed to write just one
16          ticket based on -- probably based on a
17          complaint coming from traffic adjudication.
18     Q.   You don't recall doing anything specific after
19          that to check to see if your instructions were
20          being followed?
21     A.   I don't recall.
22               MS. WILNER:  Okay.  So it's 12:00 now.
23          I certainly have a full afternoon of materials
```

1    A. Correct.

2    Q. Does the BPD have any written policies to

3       guide the officer's discretion in this area?

4    A. I don't recall if there was or there wasn't.

5    Q. So in the amended complaint that was filed in

6       this lawsuit it would be alleged that from

7       2012 to 2019 drivers from predominantly black

8       zip codes were eight times as likely to be

9       issued multiple tickets in a single stop than

10      drivers from predominantly white zip codes.

11         Do you have any reason to believe that

12      that allegation is incorrect?

13         MR. QUINN:  Object to the form.

14   A. I don't have any reason to believe it's

15      correct or not correct.  I haven't looked at

16      the numbers that I recall.

17   Q. What is your explanation for the racial

18      disparity in the issuance of multiple tickets?

19         MR. QUINN:  Object to the form.

20   A. Again, each individual writes tickets for

21      whatever reason based on what is going on.

22      Were there roadblocks that they went through?

23      I don't know.  I don't have an explanation.

1    Q. Was it something you ever looked into?

2    A. Not that I recall.

3    Q. The amended complaint that was filed in this

4       action also alleges that from 2012 to 2019

5       61 percent of tinted windows tickets which is

6       just over half of all tinted windows tickets

7       were issued to drivers from the four most

8       heavily non white zip codes in Buffalo.

9            Do you have any reason to believe that

10      that allegation is incorrect?

11   A. Again, I don't know that to be true or not.

12           MR. QUINN:  Object to the form.

13   Q. Do you have an explanation for the racial

14      disparity issuance of tinted windows tickets?

15           MR. QUINN:  Object to the form.

16   A. I do not.

17   Q. I'm marking as Derenda 45 a document that's

18      COB263554.  This is an email that

19      Councilmember Scanlon from South Buffalo sent

20      to you and copied Kimberly Beaty.  I'll let

21      you take a look at it.

22   A. (Reading.)  Can you scroll down please.  Okay.

23   Q. So in the email Councilmember Scanlon who

1           recall it.

2      Q.   And scrolling down to this end of the exhibit,

3           this is the last date that we have.  It's

4           July 2nd, 2014.  You can see that in the later

5           times the designated Strike Force area that

6           you left the specific location of the

7           roadblock to be determined by the lieutenant.

8                MR. QUINN:  Form.

9      A.   Apparently.

10     Q.   Do you have any reason to believe that after

11          this date of July 2nd, 2014 you continued to

12          personally specify roadblock locations?

13     A.   I don't recall doing it.  I don't recall doing

14          it in early years, but apparently I had some

15          input.  I know at some point Lockwood took

16          over doing the assignments of the roadblocks.

17          I don't know what point that was.

18     Q.   Okay.  I want to look at the assignments that

19          you made in June, 2013.  COB016023.  And do

20          you see the references here to Juneteenth?

21     A.   Where do you see Juneteenth?  Gus Macker.

22     Q.   Juneteenth is June 15th and June 13th.

23     A.   Can you scroll down because I can only see 13.

```
 1              My question is asking about the fact
 2         that more than 80 percent of the checkpoints
 3         were in black neighborhoods.
 4              MR. QUINN:  Object to the form.
 5    A.   If that's what your stats show, then that's
 6         what they were.
 7    Q.   Did you specifically place checkpoints in
 8         places where you wanted to have a highly
 9         visible presence?
10    A.   Again, going back to two reasons for the
11         checkpoints.  Traffic safety and high
12         visibility.  You wanted people to see them.
13         You wanted them to be there or wherever there
14         was or wherever we had issues with crime, so
15         if you had a checkpoint somewhere where you
16         had issues with shootings or burglaries,
17         again, with the police standing there it's
18         highly unlikely that these crimes would be
19         committed.
20    Q.   You didn't set checkpoints in places where
21         there were a lot of accidents, right?
22    A.   I don't believe I used accidents as a
23         criteria.  It's possible we did, but I don't
```

```
 1     Q. And what about --
 2     A. On the quality of life summons it would be a
 3        lot of times issued to an address so that you
 4        wouldn't know who lived there per se.
 5     Q. Did you look at the distribution of where in
 6        the City of Buffalo the quality of life
 7        summonses were written?
 8     A. At one point we had quality of life details in
 9        every district so they were written in every
10        district, and quite aggressively in a lot of
11        cases.
12     Q. Did the BPD collect data on vehicle impounds
13        by the race of the driver?
14     A. Not that I recall.
15     Q. Or the race of the vehicle owner?
16     A. I don't recall that.  I don't believe so.
17     Q. While you were commissioner did the BPD
18        collect data on misdemeanor arrests by race?
19     A. I'm sure that data could be run, but I don't
20        remember specifically seeing it.
21     Q. Did the BPD collect data on the race of
22        Internal Affairs complainants?
23     A. I'm sure that data could be found very easily
```

```
 1          if they decided to search it.  I don't recall

 2          them breaking it down, but it's possible they

 3          did.

 4      Q.  Did the BPD collect data that looked at the

 5          resolution of Internal Affairs complaints by

 6          race of the complainant?

 7      A.  I know they collected data with the

 8          resolution.  I don't remember if they broke it

 9          down by race of complainant.

10      Q.  The uniform traffic ticket has a field for

11          entering the race of the person ticketed,

12          correct?

13      A.  I don't know what it has on the computer and I

14          don't recall what it was when I used to

15          handwrite tickets.  Possibly.  Probably.

16          Well, maybe.  I'm not sure.  I'm not

17          100 percent sure.

18      Q.  Okay.  I'm going to mark as Derenda 49 a

19          document.  I'm going to call it traffic ticket

20          quick guide because that's what it says on the

21          top left of the document and there is a big

22          stamp at the bottom, COB_Inc_00000119.

23              And this is a guide that accompanied the
```

```
1         it was important to be able to identify racial
2         disparities in the BPD's traffic enforcement
3         policy?
4               MR. QUINN:  Form.
5    A.   You're assuming there were racial disparities.
6         Again, I don't recall seeing those numbers so
7         I don't know how to answer your question.
8    Q.   Did you ever ask to see those numbers?
9    A.   I don't recall if I seen them, asked for them.
10        I just don't have that recollection.
11   Q.   It wasn't something that occurred to you as
12        being important to look at?
13              MR. QUINN:  Form.
14   A.   It was something I don't recall being brought
15        up to me as being an issue.
16   Q.   When you were the commissioner did you take
17        any affirmative steps to find out whether your
18        officers were engaging in racial profiling?
19   A.   The steps that would have been taken would
20        have been based on complaints.  I don't recall
21        what complaints, but that would have been
22        handled through Internal Affairs and at some
23        point I would have seen those complaints, so
```

```
 1          usually an example of something reaching me as
 2          a complaint would have been that somebody is
 3          writing numerous tickets for one car for
 4          tinted windows and we would address the issue
 5          by stopping it or putting out through the
 6          chiefs and putting out through the deputies to
 7          stop it.
 8               Again, if something was brought up as an
 9          issue, we addressed it.
10     Q.   You don't recall taking any affirmative steps
11          to look into the issue?
12               MR. QUINN:  Form.
13     A.   I don't recall if we had complaints and I
14          don't recall looking into it if we did.
15     Q.   I'm going to mark this Derenda 50, a map of
16          checkpoints locations.  This was a map that
17          was attached to the original complaint filed
18          in this case as Exhibit A to that complaint.
19          It shows the number of checkpoints run in the
20          City of Buffalo between January 2013 and
21          June 2017.  It shows the racial composition of
22          neighborhoods and checkpoints.
23               It might be easier to see if I make it a
```

1    A. Obviously sent it to Byron Lockwood who he was

2       overseeing the Strike Force Housing Unit at

3       the time, so he probably retrieved the data

4       and got it to the council at the workshop or

5       answered the questions at the workshop.

6    Q. So you believe that you did provide a log of

7       checkpoint locations as requested by the

8       council?

9    A. I don't recall if we did or we didn't.  It was

10      sent to Lockwood probably to answer.  I don't

11      know if he did or he didn't, but we would have

12      gone to a workshop after the meeting and they

13      would have had any follow-up questions that we

14      would have provided answers to.

15   Q. Did you provide the council with information

16      on criteria used to establish checkpoints?

17   A. I'm sure we did.

18   Q. Would that have been done verbally in these

19      follow-up meetings?

20   A. I believe it probably was done verbally, but

21      it might have been -- written stuff might have

22      been sent over, but I believe I would have

23      gave that to Lockwood to send over.

1  Q. So you think if there was a written response

2   it would have been sent by Lockwood?

3  A. Yeah, I believe so.  It's more likely we

4   responded verbally, but if there were sheets

5   of information he would have gotten the

6   information to pass it along.

7  Q. Does the BPD have a stop and frisk policy?

8  A. They didn't have a stop and frisk policy.

9  Q. I'm sorry.  I didn't understand that.

10  A. We didn't have a stop and frisk policy.  There

11   is a stop and frisk provision under the CPL

12   when you would pat somebody down for a weapon

13   or something if you felt threatened or what

14   have you, but there was no BPD stop and frisk

15   policy in place.

16  Q. Did you provide the summary of Strike Force

17   overtime pay that the council requested?

18  A. I don't recall if Lockwood provided it or not

19   or I did.  I'm sure we would have answered

20   their questions.  That information on payroll

21   could have came from Inspector Strano.

22  Q. And I will mark as Derenda 59 document

23   COB041705.  And this is an email from Captain

1        STATE OF NEW YORK)

2        COUNTY OF ERIE   )

3


4        I, Rebecca Lynne DiBello, CSR, RPR, Notary
5   Public, in and for the County of Erie, State of
    New York, do hereby certify:
6

7        That the witness whose testimony appears
    hereinbefore was, before the commencement of
8   their testimony, duly sworn to testify the
    truth, the whole truth and nothing but the
9   truth; that said testimony was taken pursuant
    to notice at the time and place as herein set
10  forth; that said testimony was taken down by me
    and thereafter transcribed into typewriting,
11  and I hereby certify the foregoing testimony is
    a full, true and correct transcription of my
12  shorthand notes so taken.

13

         I further certify that I am neither counsel
14  for nor related to any party to said action,
    nor in anyway interested in the outcome
15  thereof.

16

         IN WITNESS WHEREOF, I have hereunto
17  subscribed my name and affixed my seal this
    8th of January, 2022.

18

19             *Rebecca L. DiBello*

20  _____ _____

21  Rebecca Lynne DiBello, CSR, RPR
    Notary Public - State of New York
22  No. 01D14897420
    Qualified in Erie County
23  My commission expires 5/11/2023

1     UNITED STATES DISTRICT COURT

2     FOR THE WESTERN DISTRICT OF NEW YORK

3     ---------------------------------------------

4     **BLACK LOVE RESISTS IN THE RUST, et al.,**
      **individually and on behalf of a class of**
5     **all others similarly situated,**

6                  Plaintiffs,

7     -vs-               1:18-cv-00719-CCR

8     **CITY OF BUFFALO, N.Y., et al.,**

9                  Defendants.
     ---------------------------------------------

10

11                **CONTINUED**

12      **ORAL EXAMINATION OF DANIEL DERENDA**

13        **APPEARING REMOTELY FROM**

14          **BUFFALO, NEW YORK**

15

16

17           January 10th, 2022

18           At 9:00 a.m.

19           Pursuant to notice

20

21     REPORTED BY:

22     Rebecca L. DiBello, RPR, CSR(NY)

23     APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

**DANIEL DERENDA**

1    A. Correct.

2    Q. And he had one past complaint for excessive

3       force, right?

4    A. Correct.  August 11th.  August 7th, 2011.

5    Q. And that was also resolved not sustained,

6       correct?

7    A. Correct.

8    Q. And then there were six other disciplinary

9       incidents, correct?

10   A. Correct.

11   Q. We have one that was pending.  That's on --

12      one that was sustained?

13   A. Correct.

14   Q. And four that were either not sustained or

15      sent to conference?

16   A. There was one that was exonerated.

17   Q. Did you consider Mr. Cyrek's disciplinary

18      record when you reviewed Ms. Lucas' complaint?

19   A. We would have looked at it.  Again, I don't

20      know the outcome of the last case against him

21      but, again, we looked at every case

22      individually and whether we could prove it or

23      not prove it would lead to sustained or not

1    sustained based on each and every case being

2    different.

3         As I said, many of these cases may have

4    had an initial complaint.  We're looking at

5    two of them from the same day.  Would have

6    been two different complaints, but I don't

7    know what took place with each case.  I don't

8    know if the complainant followed up or would

9    followup, so a lot of times it would be left

10   as not sustained if the complainant totally

11   dropped out of the process.

12        Again, it's hard to tell from a sheet

13   what took place, but it's something we would

14   look at.  We would look at his overall record

15   and, again, I still have to be able to prove

16   what was being said.

17  Q. So how would his past record figure into your

18     determination of what happened in Ms. Lucas'

19     case?

20        MR. QUINN:  Form.

21  A. It wouldn't figure in because each case is

22     different that I would have to prove.  Again,

23     I'm looking at all these.  I see three

```
 1        STATE OF NEW YORK)

 2        COUNTY OF ERIE   )

 3


 4
           I, Rebecca Lynne DiBello, CSR, RPR, Notary
 5        Public, in and for the County of Erie, State of
          New York, do hereby certify:
 6


 7         That the witness whose testimony appears
          hereinbefore was, before the commencement of
 8        their testimony, duly sworn to testify the
          truth, the whole truth and nothing but the
 9        truth; that said testimony was taken pursuant
          to notice at the time and place as herein set
10        forth; that said testimony was taken down by me
          and thereafter transcribed into typewriting,
11        and I hereby certify the foregoing testimony is
          a full, true and correct transcription of my
12        shorthand notes so taken.

13

           I further certify that I am neither counsel
14        for nor related to any party to said action,
          nor in anyway interested in the outcome
15        thereof.

16
           IN WITNESS WHEREOF, I have hereunto
17        subscribed my name and affixed my seal this
          16th of January, 2022.

18

19

20        _____

21        Rebecca Lynne DiBello, CSR, RPR
          Notary Public - State of New York
22        No. 01D14897420
          Qualified in Erie County
23        My commission expires 5/11/2023
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544