# Exhibit 13

```
 1        UNITED STATES DISTRICT COURT

 2        FOR THE WESTERN DISTRICT OF NEW YORK

 3        ------------------------------------------------

 4        BLACK LOVE RESISTS IN THE RUST, et al.,
          individually and on behalf of a class of
 5        all others similarly situated,

 6                              Plaintiffs,

 7         -vs-                         1:18-cv-00719-CCR

 8        CITY OF BUFFALO, N.Y., et al.,

 9                              Defendants.

10        ------------------------------------------------

11         EXAMINATION BEFORE TRIAL OF JOSEPH GRAMAGLIA

12                   APPEARING REMOTELY FROM

13                   ERIE COUNTY, NEW YORK

14

15

16                   September 22, 2023

17                   9:05 a.m. - 5:15 p.m.

18                   pursuant to notice

19

20

21        REPORTED BY:

22        Carrie A. Fisher, Notary Public

23        APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK
```

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

**JOSEPH GRAMAGLIA**

1    services, and the housing officers worked out

2    of a housing station which is the station that

3    I used to work at when I was a housing officer

4    from '94 to '96 and their primary function was

5    to patrol the housing developments and respond

6    to any issues that the BMHA hierarchy --

7    concerns that they had.

8  Q. And as deputy commissioner for operations,

9    were you part of the Housing Unit command

10   structure?

11 A. And forgive me, I don't recall when they were

12   disbanded.  I believe that I was at the time.

13   Honestly, I didn't look at the dates again.  I

14   believe there was a short time frame I think

15   that I was.  So if you happen to know the date

16   that they were disbanded, you'd help me out.

17 Q. Yes.  I believe that the Housing Unit was

18   disbanded around June of 2020 or July.

19 A. Okay.  Yeah, so I would have --

20 Q. July of 2020.

21 A. So I would have been responsible for them for

22   two years.

23 Q. And so what were your responsibilities with

**JOSEPH GRAMAGLIA**

1          specifically about Internal Affairs complaints

2          I think that we'll -- we will know that so

3          maybe I can clarify the question.

4               I'm not necessarily -- I mean for this

5          question I'm not speaking about Internal

6          Affairs complaints, but were you aware

7          generally of complaints by the tenants'

8          council and by residents of -- about

9          aggressive policing and unjustified stops by

10         Housing Unit officers?

11    A.  I had heard of some but not a lot.

12    Q.  And what had you heard?

13    A.  Basically in a nutshell what you're saying,

14         nothing of substance.

15    Q.  So you think a complaint of aggressive

16         policing or unjustified stops is -- you would

17         characterize that as "nothing of substance"?

18               MS. FREELY:  Objection to form.

19    A.  That's not what I said at all.  What I'm

20         saying is not of substance is I'm not aware of

21         on a broader scale of complaints that had

22         substance.  If someone had a complaint, the

23         process is that they would bring that

**JOSEPH GRAMAGLIA**

1        complaint to Internal Affairs and it would be

2        investigated.  There's a difference between

3        somebody generally making a complaint on a

4        general level of there is this occurring as

5        opposed to someone says that I was subjected

6        to this and file a specific complaint.

7             It is -- it's almost impossible to

8        address generalized complaints based on what

9        something that somebody says that they heard.

10       If there's a specific complaint and we were --

11       we always encourage if somebody has a

12       complaint to come into Internal Affairs, make

13       your complaints specific related to you or

14       something you have direct knowledge of and we

15       will investigate that.  So I had heard

16       generally of complaints that would be made,

17       again, on a general basis.

18   Q.  Okay.

19   A.  If there was a specific complaint made, that

20       would come through the Internal Affairs.

21   Q.  And had you heard generally complaints that

22       Housing Unit officers engaged in racially

23       discriminatory policing?

**JOSEPH GRAMAGLIA**

1          MS. FREELY:  Objection to form.

2     A.  You know, there were some reports in the media

3          of that but, again, I don't recall anything of

4          actual substance that I was directly involved

5          in.

6     Q.  Based on the reports in the media that you

7          were aware of, did you ever investigate

8          whether Housing Unit officers were engaging in

9          discriminatory policing?

10    A.  The complaints that we would have investigated

11         are complaints that would come into Internal

12         Affairs from a complainant or someone who has

13         direct knowledge of something that occurred.

14         It is very difficult to generally investigate

15         a complaint so -- and at that time I did not

16         have operational control over Internal Affairs

17         to be involved in that.  You know, that -- I

18         guess that ground level awareness of anything

19         specific so, you know, when I say that I

20         generally heard of some things in the media,

21         it was not a lot.  I heard some reporting.

22    Q.  Are you aware that the tenants had repeatedly

23         asked the common council to end the Housing

**JOSEPH GRAMAGLIA**

```
 1        Unit contract because of discriminatory

 2        policing concerns?

 3   A.  I think I might have seen a report on the

 4        media about that.

 5   Q.  Are you aware that the state attorney general

 6        Eric Schneiderman at the time is investigating

 7        the Buffalo Police Department's use of traffic

 8        enforcement and sweeps inside public housing

 9        developments?

10   A.  No.  Not -- no, I don't recall an

11        investigation of that.  I was never brought in

12        for any informational sessions on that so my

13        answer would be no.

14   Q.  And just to -- strike that.  Strike that.

15             I'm going to, let's see, introduce

16        Gramaglia 1.  Okay, and are you -- wait, is

17        this -- are you able to see this?

18   A.  I am.  I have to get a little closer to try to

19        read it.

20   Q.  There we go.  Is that better?

21   A.  Yes.

22   Q.  Okay.  This is an email from Matthew Wrona to

23        you.  It's dated June 25th, 2018.
```

**JOSEPH GRAMAGLIA**

1        handled by Captain Rinaldo who handled the

2        ordering, setting up the infrastructure and

3        then getting the training to our training

4        academy, conducting the training, getting them

5        issued, you know, the docks -- again, part of

6        the infrastructure of the docks within their

7        respective station houses needed dedicated

8        lines, you know, for upload purposes, things

9        of that nature.  No, that was not handled by

10       me.

11   Q.  And you wrote your master's thesis on

12       body-worn camera programs, right?

13   A.  I wrote my master's thesis on officers'

14       perceptions on body-worn cameras.

15   Q.  In your thesis you discuss the importance of

16       training to a successful body-worn camera

17       program, right?

18   A.  Yes.

19   Q.  You wrote:  "The most important part of the

20       training is to have a significant amount of

21       time spent on providing instruction on the

22       department policy and ensuring that each

23       department member is well-versed in all

—JOSEPH GRAMAGLIA—

```
 1        aspects of the policy.  This is extremely

 2        important because not following department

 3        policy could result in departmental charges

 4        against a member."

 5              MS. FREELY:  Objection.

 6     Q. Do you still agree with this statement?

 7              MS. FREELY:  Objection to form.

 8     A. I do agree with that, yes.

 9     Q. Did the BPD invest a significant amount of

10        time instructing officers on the department's

11        body-worn camera policy?

12     A. I believe we did.  We still provide

13        instruction on that.  We've done training

14        bulletins, but the initial rollout is that

15        officers would come in for a training.  Part

16        of that training is the nomenclature of the

17        body camera itself, how it operates, you know,

18        getting used to its operation and then the

19        policy itself and what that policy was.  When

20        the signed agreement came out with the union,

21        we had to retrain the membership on that as

22        well so yes.  And every member of the

23        department has access to the policy and the
```

**JOSEPH GRAMAGLIA**

1        signed agreement.

2   Q.  And I will state for the record I know that we

3        have the policy, but I don't believe that the

4        signed agreement has been produced in

5        discovery in this litigation.

6              Do you think that the officers are now

7        well-versed in the body-worn camera policy?

8              MS. FREELY:  Objection to form.

9   A.  I believe that they are.  I think the union

10       president -- well, I'm not going to say what

11       he thinks but, yes, we have provided ample

12       training and, as I said, there is some

13       retraining that goes on as well.

14  Q.  Have you ever brought up departmental charges

15       against officers for failing to adhere to the

16       body-worn camera policy?

17  A.  Yes.

18  Q.  And how many times have you done that?

19  A.  I think less than a hundred or about a

20       hundred.  I think it's -- I think the number

21       is under a hundred.

22  Q.  And what have been the penalties that have

23       resulted from those charges?

**JOSEPH GRAMAGLIA**

1  A.  Well, that's the subject of ongoing

2      arbitration.  We have had some officers that

3      have accepted a penalty of suspension.  We've

4      had some officers that have accepted a penalty

5      of a reprimand but ultimately the vast, vast,

6      vast majority of the offers -- so the way our

7      disciplinary process works is that if formal

8      charges are lodged, the commissioner of police

9      will sign charges.  The member in question is

10     served with those charges by Internal Affairs.

11         We have to run what's called an informal

12     hearing within ten days of those charges being

13     returned back to us by the union.  We run the

14     informal hearing where it's similar to in the

15     criminal world is a plea-bargain if you will.

16     An offer is conveyed to the member.  They have

17     the choice of either accepting that offer or

18     not.

19         In the vast majority of those cases,

20     they have not accepted that offer at the

21     urging I believe of the union because that's

22     been the subject of ongoing arbitration.  Of

23     all those cases, we have held one formal

**JOSEPH GRAMAGLIA**

1          arbitration hearing where we actually went to

2          a formal hearing.  The arbitrator found the

3          particular officer in question in violation of

4          the policy and issued a penalty of a formal

5          reprimand.  We have, geez, I think maybe

6          around 60 give or take that are pending formal

7          arbitration and we have had many sessions in

8          front of an arbitrator trying to work through

9          the body camera policy, issues, discipline,

10         and so forth.

11    Q.   And since you have began bringing departmental

12         charges against officers for violations of the

13         body worn camera policy, have instances of

14         violation of the policy reduced?

15    A.   Oh, I think our -- how do I want to put this?

16         I think yes.  I think the amount of

17         disciplinary cases has gone down at a pretty

18         decent rate since the beginning.  You know, I

19         think the rollout of a program like this, and

20         you're going to see this nationwide, you know,

21         it takes time for that technology and there's

22         something called muscle memory, you know,

23         where the officer has to get used to

**JOSEPH GRAMAGLIA**

1         activating those cameras.  You know, that was

2         the initial, you know, issue in the beginning

3         but, yeah, we have gotten better.

4    Q.  It sounds like the department takes adherence

5         to the body-worn camera policy pretty

6         seriously.  Would you agree with that?

7              MS. FREELY:  Objection to form.

8    A.  I would agree with that.

9    Q.  And why do you think it's important to enforce

10        the body-worn camera policy?

11   A.  Number 1, it's policy.  If we put out policy,

12        then you have to adhere to the policy.  Number

13        2, it's transparency.  You know, the -- far

14        and away, the vast majority of those videos

15        that are produced show that the officers are

16        acting in accordance with department policy.

17        There are very few instances that I've seen

18        where the body-worn cameras have shown or

19        produced or resulted in an officer violating

20        policy.  Evidence gathering, obviously it's

21        extremely important in a criminal proceeding

22        to have that evidence, video evidence to be

23        able to show what happened so, you know, those

**JOSEPH GRAMAGLIA**

1        cameras are extremely necessary.

2            You know, I think you go back years when

3        body-worn cameras were coming on the scene,

4        you know, the attitudes and the perceptions of

5        officers were that they did not want them.

6        And I think if you talk to a lot of officers

7        nowadays, the vast majority of officers are

8        happy to have them, want them, and want to

9        show the public what's actually occurring out

10       there.

11   Q. Do you think that officers are generally aware

12       that the body-worn camera policy is enforced?

13          MS. FREELY:  Objection to form.

14   A. Yes.

15   Q. And do you think that results in greater

16       adherence to the policy?

17   A. I believe it has resulted in greater

18       adherence.

19   Q. We talked a little bit about this before, but

20       did George Floyd's death and the protest

21       movement that followed change policing in

22       Buffalo?

23   A. I mean, there were changes made to some

**JOSEPH GRAMAGLIA**

1      academy so I don't -- I don't recall

2      specifically what that national organization

3      would be.

4  Q. And has such a training by a national

5      organization taken place while you were

6      commissioner?

7  A. No.  Not by a national organization, no.  I

8      brought in New York State on -- to update our

9      training academy on implicit bias, brought

10     in -- there was an update and a change to that

11     training so we got the training staff the

12     newest training on that.  We had done implicit

13     bias in the past but, you know, really I think

14     the best person to do some of that

15     constitutional stop training is the DA's

16     office who are the ones that have to prosecute

17     cases and run suppression hearings or handle

18     suppression hearings.

19  Q. And how often does the DA's office provide

20     training on constitutional stops?

21  A. I don't know.  I can't answer that question.

22     I don't know the last time that that would

23     have been done.  You know, training is a

**JOSEPH GRAMAGLIA**

1              of a criminal or a traffic or even a parking

2              adjudication.

3          Q. Do you recall making changes to the BPD's

4              tinted windows ticketing practices in 2020?

5          A. Making changes?  No, not changes.  I'm not

6              sure what you're referring to as -- well, I

7              guess I will wait for your next question.

8          Q. Well, something we observed is that tinted

9              windows ticketing decreased and -- well, let

10             me ask:  Are you aware that around 2020

11             Buffalo Police Department officers started

12             issuing fewer tinted windows tickets?

13         A. Well, again, if you recall in 2020 we had

14             something called COVID which you will see that

15             all of our categories of tickets and traffic

16             stops significantly decreased, so that's one

17             of those years down the line that will have a

18             big asterisk next to it when it comes to

19             statistics for a lot of categories, not just

20             for policing but everything else in the world.

21         Q. But the BPD never issued any kind of guidance

22             or policy change that was directly concerning

23             tinted windows ticketing?

**JOSEPH GRAMAGLIA**

1    A.   A policy change, no.  Tinted window tickets is

2         a violation of the New York State Vehicle and

3         Traffic Law.  Officers have discretion on

4         whether or not they're going to issue a

5         summons to a particular motorist or not so

6         that's still to this day a violation of the

7         vehicle and traffic law.

8              MS. FREELY:  I'd just like to note my

9         objection on the record to the previous

10        question.  Thank you.

11             MS. WILNER:  To what?  I'm sorry; I

12        didn't hear that.

13             MS. FREELY:  To the previous question.

14   Q.   So if tinted windows ticketing decreased

15        after -- in response to COVID but then the

16        numbers stayed low, what would the reason --

17        what do you think would be the reason for

18        that?

19             MS. FREELY:  Objection to form.

20   A.   You're talking specifically tinted window

21        tickets?

22   Q.   Yes.

23   A.   I don't know.  I mean, officers have the

**JOSEPH GRAMAGLIA**

1    officer was out of procedure, out of line and

2    then we would conduct an internal

3    investigation on that.

4        MS. FREELY:  Claudia, do you want to --

5    do you still have questions in this line of

6    questioning?

7        MS. WILNER:  I do.  I just have one or

8    two more questions and then we'll be ready to

9    take a break if you don't mind.

10        MS. FREELY:  Okay.  I am trying to go

11    off the record for a second.  Peter just

12    walked in so we can switch off without taking

13    that break then.

14  Q. Have you ever brought anybody up on

15    departmental charges for not complying with

16    the core principles in the traffic enforcement

17    policy?

18  A. So the way you're asking the question, I think

19    we don't have a -- our rules and regulations

20    are pretty specific so, you know, there's a

21    rule that's charged typically when we have an

22    internal complaint called conduct.  So we

23    don't have a rule and regulation that says you

1    violated the core principles of MOP chapter

2    this section.

3        If there is a complaint that came in and

4    somebody complained of say rudeness or, you

5    know, how a particular encounter went down, if

6    it -- if the conduct was what we would believe

7    is not proper, we would bring a conduct charge

8    and then we would cite a statement of facts of

9    what that conduct was that we believe was a

10    violation of the officer's -- of the rules and

11    regulations.  So we don't have a rule and

12    regulation that would be formally charged

13    stating core principles of chapter this and

14    subsection that.

15        Everything is very specific to a

16    situation, and then we would have to determine

17    whether or not it rose to the level of a

18    formal charge or if we believed that an

19    officer conducted a traffic stop and the core

20    principles weren't necessarily followed

21    because of, you know, some rude comments that

22    were made, that may open an Internal Affairs

23    investigation but it may only rise to the

**JOSEPH GRAMAGLIA**

1       level of a conference based on a, you know,

2       prior history with the officer and being

3       addressed at that point.  So my long-winded

4       answer is there is no rule and regulation

5       specifically stating core principles.  It's

6       conduct or could be something else more in

7       depth.

8   Q. Okay.  Thank you for that explanation.

9   A. It's a tough way to answer a question so...

10   Q. Okay.  We can go ahead and take a five-minute

11       break now.

12   A. Great.  Thank you.

13       MR. SAHASRABUDHE:  Thanks.

14       (A recess was taken.)

15   BY MS. WILNER:

16   Q. So I'd like to talk a little bit about

17       conferences.  This was something that came up

18       in our discussion just a few minutes ago.  So

19       when a Internal Affairs complaint results in a

20       conference -- well, let me ask -- let me start

21       a different way.

22       Was it your role when you were a deputy

23       police commissioner to conduct conferences

**JOSEPH GRAMAGLIA**

1          things of that nature.

2     Q.   Was it your practice to keep notes or records

3          of the conference?

4     A.   No.  They were verbal discussions, and then

5          the only note would have been writing on the

6          file the date and the time that the conference

7          was held.

8     Q.   And did you ever receive any training or

9          guidance on how to conduct a conference?

10    A.   Just from the commissioner stating what -- you

11         know, what would occur in a conference, the

12         type of conversation that would be had.

13    Q.   Meaning that the commissioner would tell you

14         what the conference should be about; is that

15         what you're saying?

16    A.   Yeah, typically.  Yeah, yeah, typically.  The

17         first conference that I would have conducted

18         when I was a district chief at B District and

19         then Commissioner Derenda would have sent a

20         file to me to conduct the conference with an

21         officer.

22    Q.   I see.  So when you were the chief and you

23         were conducting conferences, you would have

1      officer's disciplinary history in preparation

2      for a conference?

3   A. Not necessarily in preparation of the

4      conference.  I would look at it but because

5      the determination has already been made by the

6      commissioner of police looking at the

7      disciplinary history to see if there was a

8      history of this.  And if there was a history

9      of similar conduct, chances are it wouldn't be

10     at a conference; it would rise to the level of

11     a formal charge which takes it into a

12     different realm at that point.

13  Q. Would the officer's disciplinary history have

14     any impact on your understanding of what

15     occurred during the incident?

16          MR. SAHASRABUDHE:  Objection to form.

17  A. I guess I'm not sure what you're -- can you

18     ask that again, be a little more descriptive?

19     Are you asking if their disciplinary history

20     determines why this is a conference or how the

21     conversation is going to go?

22  Q. Yeah, let's take the second question.  Does

23     the -- did the officer's disciplinary history

**JOSEPH GRAMAGLIA**

1    have any impact on how a conversation with you

2    would go?

3  A. Well, it gets to the level of a conference

4    because there probably is no prior history

5    related to that type of an offense, but we

6    also through, again, the collective bargaining

7    agreement and the disciplinary process within

8    our department which is contractual, we have

9    to mostly keep that conference specific to

10   that specific reason alone.

11       Getting into older history, older cases,

12   things that have already been adjudicated or

13   dismissed would be cause for the officer to go

14   back to the union, reopen the case, and then

15   an arbitrator can come back, and has come

16   back, and would say that you have to keep the

17   conference specific to that specific

18   complaint.

19  Q. Okay.

20  A. Because it's -- I don't want to use the term

21   but I'm going to use the term.  You have to be

22   careful of a double jeopardy situation where

23   you're reopening something that's already been

**JOSEPH GRAMAGLIA**

1          letting that district chief know and then

2          usually that district chief would then come in

3          and meet me.  So we're not talking about a lot

4          of instances here, but the district chief

5          would be in the conference with me when those

6          times where they were conducted.  There was

7          not a lot of those, but that would occur.

8     Q.  Well, you testified earlier that the purpose

9          of a conference was really for training,

10         right?

11    A.  Yes.

12    Q.  And so you would be advising the officer of

13         how they should correct or improve their

14         behavior, right?

15    A.  Based on the incident that occurred, yes.

16    Q.  Would you then inform the officer's supervisor

17         of the corrections and improvements that

18         were -- that you as DPC thought were needed?

19              MR. SAHASRABUDHE:  Form.

20    A.  No, it needs to be addressed with the officer

21         directly.

22    Q.  But then doesn't that leave the officer's

23         supervisors unaware of issues and unable to

-JOSEPH GRAMAGLIA-

1          offer ongoing guidance and supervision around

2          those issues?

3              MR. SAHASRABUDHE:  Objection to form.

4     A.  The way these are laid out is that we conduct

5          a conference with the specific member of the

6          department.

7              You know, if it's for a car accident, we

8          address, you know, what driving habit led to

9          that particular situation, you know, short of

10         - I don't know if the officer is driving in a

11         reckless manner on a regular occasion and this

12         particular time they got in an accident, just

13         as much as I don't believe a -- having been a

14         district supervisor, a patrol supervisor for

15         five years, you know, if I saw something, if I

16         felt an officer was driving in a manner, I

17         would tell them at that time but we have to

18         address situations -- immediate supervisors

19         have to address situations if they see it at

20         the time.

21             So if I told a supervisor, hey, I

22         conferenced him for their driving, I mean, the

23         supervisor is going to know that they were

**JOSEPH GRAMAGLIA**

1        involved in an accident; they were going to

2        know they were being brought in for a

3        conference.  You know, that's how it was

4        addressed.  Going back to the supervisor and

5        saying just so you know I told him -- you

6        know, this is what I told him, it's not going

7        to change their immediate supervision of

8        that -- of that person.

9    Q. What about the example of a complaint of

10       rudeness that results in a conference and

11       you're advising the officer about their

12       behavior, do you talk to the supervisor about

13       the rudeness that was discussed at the

14       conference?

15    A. Well, the supervisor is going to be aware that

16       a conference was being held with that officer,

17       but I would also fully expect any supervisor

18       in the police department that if they were at

19       a particular scene/situation and they

20       witnessed an officer being rude or going in a

21       direction that they were being rude, that they

22       would immediately address that.  If it's not

23       in their presence, they're not going to know

1    either; we would then find out by way of a
2    complaint so we can't be --
3  Q. Right.
4  A. -- everywhere every time to see every
5    situation.  Those have to be addressed by the
6    on-scene supervisor if they see it.
7  Q. Yes, and I am talking about the specific
8    circumstance in which there is an Internal
9    Affairs complaint for rudeness and the
10   commissioner decides that that should be
11   resolved by a conference with you.  You
12   conference the officer on their rudeness.  Do
13   you then tell the lieutenant, hey, I just
14   spoke to Officer Smith about his rudeness; can
15   you keep an eye on him to make sure that he is
16   dealing with civilians and treating them with
17   respect?
18  A. No, I --
19       MR. SAHASRABUDHE:  Form.
20  A. No, I don't because it's already expected that
21   the lieutenant, if they witness an officer in
22   their command being rude that they are going
23   to address that so it's -- it would almost be

**JOSEPH GRAMAGLIA**

1        redundant.  Address it with the officer or a

2        deputy commissioner or a chief would address

3        that with the officer and the lieutenants are

4        well aware of what's expected.  And if the

5        lieutenant stood by and watched somebody, one

6        of their subordinates or any subordinate

7        within the police department, conducting

8        themselves in a manner, the lieutenant would

9        be brought in for a statement and be subject

10       to an Internal Affairs investigation so it

11       would almost be redundant to tell the

12       lieutenant that I talked to the officer about

13       a situation.  Keep an eye on them, they're

14       supposed to.  That's their nature of their job

15       as a supervisor is to watch out for the

16       members of their command.  They can't watch

17       somebody when they're not directly there at a

18       situation.  It's already expected of our

19       supervisors to do that.

20   Q.  And what if the lieutenant wasn't there to

21       witness the incident, would you then inform

22       the lieutenant about it?

23          MR. SAHASRABUDHE:  Form.

1    A.  I guess my question back to you is if a

2         lieutenant is not there to witness something,

3         how are they supposed to know something --

4         that the officer didn't conduct themselves in

5         a certain manner?  So that would have to be

6         the citizen coming in and filing a complaint.

7              I think just common sense dictates that

8         I can't tell a supervisor to keep an eye out

9         for an officer when they're not there to

10        actually see what's happening.  We have to

11        rely on citizen complaints to bring officers'

12        conduct to our attention.  But if a supervisor

13        is at a situation, the full expectation is

14        that they will address that at that time or

15        shortly thereafter and handle it

16        appropriately.  I can't expect a supervisor to

17        handle a situation if they're not there to be

18        a witness to it.

19   Q.  So after you conducted a conference, and we're

20        going to stick with the example of the

21        conference for rudeness, would you do any kind

22        of follow up?

23              MR. SAHASRABUDHE:  Form.

**JOSEPH GRAMAGLIA**

1    A. A follow up after the conference?

2    Q. Yes.

3    A. No.  The case is resolved.

4    Q. Did you have any systems in place to monitor

5       officers' conduct after a conference to see if

6       they were comporting with the guidance that

7       you gave them?

8            MR. SAHASRABUDHE:  Form.

9    A. There is no system in place other than a

10      complaint coming in to address how an officer

11      conducts themselves.  The body-worn cameras

12      are there so we can see the -- what previously

13      was unseen and it was a person-on-person

14      complaint, he said/she said is the common

15      term, but there's -- you know, there's no

16      system in place that can monitor what someone

17      is doing when nobody is watching.

18   Q. Okay.  And I would like to take a look at some

19      conferences, some IAD files for conferences

20      that you conducted when you were the deputy

21      police commissioner.  And I'm going to

22      start -- this is going to be Gramaglia 6, and

23      this is the IAD file of Deandre Green.  And I

1          certain things, sexual harassment, bloodborne

2          pathogens, PESH, those are mandatory so

3          sometimes we have to stop, detour, get into

4          these mandatories before the year is up and

5          then go back to some of these other things and

6          then we hit other trainings.  So I know there

7          was an aggressive push, I think it was 2019,

8          to get the department through that ABLE

9          training.  I believe we got through a good

10          portion of it, at least the patrol force, but

11          I don't have the exact numbers.

12     Q.  And how about the implicit bias training, how

13          many officers have taken the implicit bias

14          training?

15     A.  I don't have --

16              MR. SAHASRABUDHE:  Form.  Go ahead.

17     A.  Yeah, I don't have the number of that, but I

18          made that mandatory training departmentally.

19          And with those, we have five hours of New York

20          State mandated.  Implicit bias is one of those

21          that must be done every year so I don't have

22          the exact numbers but we got through a

23          significant number of the department.

**JOSEPH GRAMAGLIA**

1              Keep in mind, you're not going to have

2        everybody because you've got officers that

3        are -- that might be on leave, some might be

4        on long-term suspension, some are on a leave

5        of absence, some are on long-term injury or

6        sick leave so you're not going to get 100

7        percent of the department.  There's people we

8        just are not going to be able to bring in for

9        training for other reasons.

10   Q.  Okay.  I'd like to move on and look at another

11       file.  And actually while I'm calling it up,

12       for the implicit bias training, is that -- is

13       everybody required to take that training so

14       captains, chiefs, detectives, lieutenants, or

15       is it only for officers?

16   A.  No, everybody.

17   Q.  And this is going to be Gramaglia 8, and this

18       is the IAD file of Andre Wise.  And this was a

19       complaint from October 2018, and this was

20       another one where you were directed to

21       conference the officers.  The officers

22       involved were Shawn McCabe, Patrick McDonald,

23       and Lieutenant, how do you say his name,

**JOSEPH GRAMAGLIA**

1       that authorization but, you know, you still

2       have to keep that in there for, you know, some

3       safety reasons.  You know, there could

4       hypothetically be an escaped prisoner where

5       you have to set up traffic checkpoints.  If

6       you could pull up the section of the language

7       and read it more specifically but, you know,

8       having something in there and the

9       authorizations that are required are two

10      different things.

11   Q. Okay.  But under the MOP you could restart

12      those traffic safety checkpoints at any time,

13      right?

14   A. I'd have the authorization.  I could, yes.

15   Q. Does the BPD conduct performance evaluations

16      of officers?

17   A. Contractually we're not able to, no.  That's a

18      subject of union negotiations.

19   Q. Okay.  And -- yeah, maybe I will come back to

20      that in a little bit.  So aside from

21      performance evaluations, does the BPD evaluate

22      officers' performance in any way?

23   A. No.  Subject to the union negotiations, we're

**─JOSEPH GRAMAGLIA─**

1           not contractually allowed to do evaluations.

2      Q. Do you think that instituting performance

3           evaluations would promote better training and

4           supervision of officers?

5                MR. RUSS:  Objection to form.  You may

6           answer.

7      A. I do.  We're -- it's no secret in the

8           department that we are trying to get that.

9      Q. And the performance evaluations are actually

10          required in order for the BPD to preserve its

11          accreditation, right?

12     A. So we have a waiver from New York State

13          because it's outside of our control.

14     Q. But the waiver was only for a certain period

15          of time, right, and the waiver will expire?

16     A. No, we would have to again apply.  We maintain

17          that application for a waiver so we are still

18          accredited and we are in compliance with our

19          accreditation.

20     Q. The contract is under negotiation now?

21     A. Yeah, the -- the last agreed upon contract

22          expired June 30th of 2019.  It went into

23          binding interest arbitration which was settled

**─JOSEPH GRAMAGLIA─**

1          last year which was only two years so it

2          covered from July 1st of '19 to June 30th of

3          '21.  So by the time it was settled, it was

4          already expired in itself so we are expired

5          again and moving towards arbitration again.

6     Q.  Okay.  And that particular arbitration that

7          results in pay raises for officers but no

8          performance evaluations, right?

9     A.  Correct.  That was the arbitrator's decision.

10    Q.  Is the City currently seeking to get

11         performance evaluations during the new

12         contract and negotiations?

13    A.  We did in the negotiation stage, but now that

14         we are at the mediation stage I don't know

15         what I'm allowed to discuss on mediation.

16         There's rules of mediation that, forgive me, I

17         don't know what we're allowed to discuss

18         because we're in mediation, but I will say

19         that when we were actively negotiating with

20         the union we were -- that was one of the

21         things that we put on the table is performance

22         evaluations.

23    Q.  The city charter gives you as commissioner the

**JOSEPH GRAMAGLIA**

1       power and duty to govern and discipline

2       officers, right?

3  A.  Well, the contractual agreement and

4       contractual language sets forth the policy and

5       procedures of discipline.  So whether or not I

6       could on my own invoke some form of

7       discipline, I will lose that to an arbitrator

8       and an arbitrator has all authority by

9       contract between the union and the City and

10      it's been that way for decades.  I don't know

11      when that agreement was signed, but it goes

12      back a long way.

13  Q.  So you believe that the collective bargaining

14      agreement supersedes any rights that you have

15      under the city charter to govern and

16      discipline officers?

17         MR. RUSS:  Objection to form.  You may

18      answer.

19  A.  With relation to discipline, yes.  There's

20      contractual language on how that process plays

21      out.

22  Q.  Does the BPD have an early warning system to

23      identify officers who engage in problematic

**JOSEPH GRAMAGLIA**

1      practices?

2           MR. RUSS:  Objection to form.  You may

3      answer.

4    A. We have a program that Internal Affairs uses

5      called IAPro.  It has the ability to do it but

6      because of contractual limitations we are not

7      able to act upon any early intervention

8      system.  That would have to be agreed upon,

9      negotiated with the union.

10   Q. And is that part of the negotiations that are

11     happening now with the new contract?

12   A. An early warning system, I don't recall or

13     believe that it was part of the initial

14     negotiations.

15   Q. And were those negotiations -- sorry.  Did

16     this latest round of negotiations, did that

17     begin during your time as commissioner or was

18     that something that began under Lockwood and

19     that you continued?

20   A. Well, I will say which time?  So I was only

21     remotely involved in one aspect of the

22     negotiations that led to the binding

23     arbitration and then ultimately the binding

**JOSEPH GRAMAGLIA**

1    Q.  Okay.  Are you aware that the traffic stop

2        receipt data shows racial disparities in that

3        Black drivers are stopped more often than

4        White drivers?

5            MR. RUSS:  Objection to form.  You may

6        answer.

7    A.  So I -- and this was covered in depth and even

8        not aired.  You have to look at -- a lot

9        deeper into the data.  Break it down by each

10       patrol district, you will see differences in

11       the data.  And then what was not aired, what

12       was not put on anything is you're

13       automatically assuming that everybody that got

14       a stop receipt in a particular area lives

15       within that same census tract area.

16           You cannot -- and there are studies

17       showing that you should not, cannot use census

18       tract data compared and overlaid with traffic

19       stop data, traffic stop receipt data, summons

20       data for that census tract area unless you dug

21       into every single one of those stop receipts

22       or summonses and then looked to see exactly

23       where those individuals live.  You're assuming

**JOSEPH GRAMAGLIA**

1   that someone is only being stopped within the

2   census tract data tract that they live in.

3   There's a lot of variables that come into

4   place.  And you're also assuming that someone

5   was not stopped for a valid reason.  If

6   there's a valid reason, then by law we have

7   every ability to stop somebody.

8  Q.  Okay.  I'm looking at the situation of the

9   traffic stop receipt data.

10  A.  I understand.

11  Q.  And it shows that Black drivers are stopped

12   more often than White drivers based on what

13   your officers reported of the race of the

14   people stopped, and I'm asking is that

15   something that you're aware of?

16     MR. RUSS:  Objection to form.  You may

17   answer.

18  A.  I think I did answer the question.  I looked

19   at the --

20  Q.  I am looking for a yes or no answer.  Are you

21   aware of those disparities?

22     MR. RUSS:  Objection to form.  You may

23   answer.

**JOSEPH GRAMAGLIA**

1    A. I'm aware of the data.

2    Q. And the fact that it shows a racial disparity?

3          MR. RUSS:  Objection to form.  You may

4       answer.

5    A. It depends on how you want to look at the

6       data; that's my answer.

7    Q. Are you aware that the data shows that Black

8       drivers are stopped more often than White

9       drivers?

10         MR. RUSS:  Objection to form.  You may

11      answer.

12   A. I've answered the question in numerous ways.

13   Q. Well, actually, you haven't asked -- you have

14      not directly answered that question.

15   A. I may not have answered it the way your --

16         MR. RUSS:  He has answered it several

17      times.

18   A. I may not have answered it the way you want me

19      to answer it, but I've answered the question.

20      It's a deeper answer.

21   Q. Well, I'm not asking for an explanation of the

22      reason, your opinion of whether it's right or

23      wrong.  I'm just asking if you're aware of the

**JOSEPH GRAMAGLIA**

1      numbers.

2           MR. RUSS:  Objection to form.  You may

3      answer.

4   A. I am aware of the numbers, yes.  I have not

5      looked at the numbers recently.  I'm aware of

6      the numbers as of the last time I pulled them,

7      and I don't know when that was.

8   Q. And have you investigated the reasons for

9      those disparities?

10  A. I investigate complaints that come into

11     Internal Affairs.  If there's no complaints,

12     then I have to assume that the reason for the

13     traffic stop was a valid reason and that the

14     motorist that was stopped, for whatever reason

15     that was, did not file a complaint.  They must

16     have felt that there was a valid reason why

17     they were stopped as well.

18          And you have to remember not every

19     traffic stop ends up in a traffic stop

20     receipt.  Some of those end with a traffic

21     summons being issued, and the racial data is

22     not collected on the traffic summons by New

23     York State.  That's a New York State summons,

**JOSEPH GRAMAGLIA**

1          not a City of Buffalo summons.

2     Q.  Okay.  And I'm still talking about traffic

3          stop receipts, and I asked whether you

4          investigated the reason for those disparities

5          and I understood the answer to that question

6          to be no; am I correct?

7               MR. RUSS:  Objection to form.  You may

8          answer.

9     A.  Unless there's an Internal Affairs complaint

10         filed, then there is no investigation.

11    Q.  Do you believe Black drivers commit more

12         traffic violations than White drivers?

13               MR. RUSS:  Objection to form.  You may

14         answer.

15    A.  I have no data to suggest that.

16    Q.  I do recall that when the WIVB reporter asked

17         you about traffic stop receipt disparities,

18         you said that the data was not looked at deep

19         enough and I heard you say that again today in

20         this deposition.  Did you, yourself, ever do a

21         deeper look into the data that you said was

22         needed?

23    A.  I didn't say it was needed.  I told them that

**JOSEPH GRAMAGLIA**

1       if they wanted to make certain allegations

2       that they should look deeper into that.  I

3       have not done an analysis based on addresses

4       where people live and where they received a

5       summons or where they were stopped.  I respond

6       to complaints, and I've explained the

7       disciplinary process.  I've explained the

8       investigative process, the complaint process.

9           If somebody feels that they were

10      stopped -- and I've been on TV on this, in

11      that very interview.  If somebody believes

12      that they were stopped for an invalid reason

13      or for reasons other than committing a traffic

14      offense or for reasonable suspicion based on

15      articulable facts that they are encouraged,

16      not even asked, they are encouraged to come in

17      and file a complaint and we will investigate

18      that.  Our department has made significant

19      changes over the years with technology in the

20      advent of body cameras and that really helps,

21      you know, to investigate complaints and I

22      don't have complaints.

23   Q.  Are you aware -- and now I'm going to move on

**JOSEPH GRAMAGLIA**

1    Q.  Well, now that you know that it is possible to

2        enter the race of the person ticketed into

3        TraCS, have you considered issuing a general

4        order requiring officers to collect and record

5        that information?

6    A.  No.  I don't control New York State TraCS

7        system to make that field open and a part of

8        the TraCS summons so my answer was no.

9    Q.  Well, okay.  And that's based on the fact that

10       you think that the -- I'm sorry, I don't

11       understand the reason.  I didn't understand

12       that answer.  You testified that you learned

13       that it is possible to enter race into TraCS,

14       correct?

15   A.  I know that now, yes, that it is possible.

16   Q.  Okay.  And given that it is possible to enter

17       race into TraCS, have you considered ordering

18       your officers to enter the race of the person

19       ticketed into TraCS?

20   A.  I did not issue a general order.  No, I have

21       not considered it.

22   Q.  Do you think it's important to be able to

23       identify racial disparities in the BPD's

**JOSEPH GRAMAGLIA**

1  racial disparities in ticketing, and I would

2  like a yes or no answer.

3  A.  It's a priority for me to investigate all

4  complaints of alleged misconduct or other

5  allegations, and I will investigate those

6  complaints but, you know, simply looking at

7  one dataset.  Was the traffic stop for a valid

8  reason?  If it was, then that's the end of the

9  conversation at that point for that traffic

10  stop.  If a complaint is made, I can

11  investigate that complaint.  I don't have any

12  complaints that I'm aware of for someone who

13  was pulled over and they felt that they were

14  improperly pulled over.

15  Q.  Interestingly right in that WIVB interview

16  that you gave on TV they interviewed a person

17  who was a Black man who said that he was --

18  had been improperly pulled over because of his

19  race.  Did you investigate that situation?

20      MR. RUSS:  Objection to form.  You may

21  answer.

22  A.  Did he file a complaint with Internal Affairs?

23  I remember the story obviously.  I just don't

**JOSEPH GRAMAGLIA**

1          remember who the person was, what were they

2          written a summons for, or what were they

3          stopped for.  Was that stop valid and legal?

4          That's what I have to look at, if the stop was

5          valid and legal.

6     Q.  Well, did you ask Internal Affairs to open an

7          investigation of the racial profiling that was

8          alleged in that media interview?

9     A.  I did not.  The --

10              MR. RUSS:  Objection to form.  You may

11          answer.

12    A.  The individual didn't come forward that I'm

13          aware of to Internal Affairs.  And as part of

14          that media interview, I also said -- and I

15          don't know if it made it to air, but I also

16          said on several occasions that we encourage

17          people to come forward if they believe that

18          they were the subject of racial profiling, if

19          they believe that the stop was not valid.  I

20          said that on numerous occasions in that

21          interview.

22    Q.  Isn't the department required to investigate

23          allegations regardless of how they're

**JOSEPH GRAMAGLIA**

1          received, even without -- even without a

2          formal complaint being filed by that

3          individual, here you have an individual saying

4          right on TV that they were stopped because of

5          their race, why not open an investigation on

6          that?

7                    MR. RUSS:  Objection to form.  You may

8          answer.

9     A.   Well, as you said, I respond to allegations.

10         If I have a complaint, if I have an

11         allegation, come forward and we will

12         investigate that.  I need facts to move

13         forward with an investigation.

14    Q.   Does the BPD have a written policy that

15         prohibits the use of racial slurs or racially

16         derogatory language by officers?

17    A.   Yes, I think you read it earlier.

18    Q.   I'm sorry, where did I -- where did I read

19         that earlier?

20    A.   When we were looking over one of the

21         complaints, wasn't that in one of the sections

22         that you read?  A section on profane language,

23         we had a discussion on that.  I thought you

**JOSEPH GRAMAGLIA**

1        read something -- or brought something up on
2        that before.
3    Q. So --
4    A. But, yes, we do have policies on that.
5    Q. Okay.  So it would be the general policies
6        that prohibit profane language and require
7        courtesy and respect.  Other than that, is
8        there anything specific -- specifically on
9        racially derogatory language?
10   A. I mean, there's sections on officers' conduct.
11   Q. And, again, those are -- those would be
12       general conduct but I'm wondering if there is
13       anything specific that you know of
14       specifically on the use of racially derogatory
15       language?
16   A. Yeah, it's in there.  I just don't know
17       exactly where it is off the top of my head.
18       I'd have to pull it up.
19   Q. Are you familiar with signs posted on bulletin
20       boards in station houses that prohibit the use
21       of racial slurs or racial profiling?
22   A. No.
23   Q. And are there any such signs posted on

**JOSEPH GRAMAGLIA**

1      significantly offended that that was purported

2      to be widespread in the normal course of

3      business.

4  Q.  So did you ever do any investigation or

5      auditing to assess whether his testimony was

6      valid?

7  A.  I don't know how I would conduct an

8      investigation other than asking everybody one

9      by one if you talk that way as a regular

10     course of your business.  Again, I can only

11     operate on complaints that come in and I also

12     have every expectation that the supervision of

13     this police department and the officers that

14     work in this department that if they heard,

15     you know, any type of offensive language,

16     whatever it is, that they would -- they would

17     report it and act upon it.

18          MR. RUSS:  And, Claudia, as you know,

19     that testimony came in a deposition which is

20     part of another lawsuit against Buffalo Police

21     Department and various individuals.

22          MS. WILNER:  I'm not -- I'm only

23     aware -- I'm aware of what's happening in this

1          question, and he will give his answer.

2      Q.  And I think your answer on progressive

3          discipline was no, correct?

4      A.  We do not have a disciplinary matrix, no.

5          That would have to be negotiated with the

6          union and for them to accept the discipline

7          that comes along with a particular case.

8          Otherwise, it goes to the arbitrator.  They

9          don't have to accept any discipline.  The

10         member is free to reject any discipline that

11         is offered by the commissioner of police at

12         which point it will go to a formal hearing or

13         go to disciplinary triage.  If it cannot be

14         resolved at that level, then it goes to a

15         formal hearing and that could take a year,

16         that could take two years, it could take three

17         years.

18     Q.  Since becoming commissioner, and setting aside

19         the Amber Beyer situation, have you brought

20         charges against any officers for using racial

21         slurs or racially derogatory language?

22     A.  No, not that -- no.  I don't believe so, no.

23         Nothing stuck out in my head.

**JOSEPH GRAMAGLIA**

1    Q. Since becoming commissioner, have you handled
2       complaints of officers engaging in racial
3       profiling or racially biased policing?
4    A. No.
5    Q. And have you ever disciplined an officer for
6       engaging in racially biased policing?
7    A. I don't believe I've had any substantiated
8       complaints of that.  You're saying outside of
9       the named member, or are you including the
10      named member Amber Beyer?
11    Q. Outside of -- outside of Amber Beyer.
12    A. Outside of Amber, no, I don't -- I don't
13      believe I've had any complaints come in in
14      that regard.
15    Q. Are you aware of instances in which the BPD
16      has received more than one complaint against
17      the same officer for racial discrimination?
18    A. Since becoming commissioner?
19    Q. Well, just generally are you aware of officers
20      that have multiple racial discrimination
21      complaints against them?
22    A. I mean, you've pointed out a few but outside
23      of that, I have not seen too much of those

**JOSEPH GRAMAGLIA**

1    Q. So other than the formal IAD complaint

2       process, do you have any other systems that

3       are set up to alert you to multiple --

4       officers who have received multiple

5       complaints?

6    A. I don't have a system, but the Attorney

7       General of New York has a system in place

8       which I'm sure you're familiar with.  If -- we

9       have to provide any member of the department

10      that has acquired five cases in a 24-month

11      time frame regardless of the outcome of those

12      cases, those complaints, whether they're

13      unfounded or sustained, any five within a

14      24-month time frame must be sent to the

15      attorney general.  The captain in Internal

16      Affairs gathers those files, has a system in

17      place set forth by the attorney general and

18      sends those out and then the attorney general

19      opens up their own investigation.

20   Q. And when those alerts are sent to the attorney

21      general, do you get copies of them as well?

22   A. Copies of the files?  We already have the

23      files in our possession.  We're the ones

**JOSEPH GRAMAGLIA**

1          discovery.  Going on --
2              MR. RUSS:  We can talk about it.
3          BY MS. WILNER:
4      Q. Since becoming commissioner, have you made
5          changes to the way the Internal Affairs
6          Division operates?
7      A. You mean by policy?  No.
8      Q. And are you familiar with the quarterly IAPro
9          meetings?
10     A. Well, I'm aware of -- we have not conducted a
11         quarterly IAPro meeting; it's been quite some
12         time, you know.  IAPro meetings were put into
13         place a long time ago for the purposes of what
14         you brought up as early intervention.  We
15         can't act on that.  We act on every individual
16         complaint as it comes in.  So, you know, I
17         think outside of a quarterly meeting that I
18         can't take action on, I'm aware of every
19         complaint when it comes in and what the
20         investigative process is and we review those
21         mostly on a weekly basis --
22     Q. I see.
23     A. -- with Internal Affairs.

**JOSEPH GRAMAGLIA**

1   IAPro alerts.  I can't act on early

2   intervention.

3 Q. And so do the IAPro alerts go to the

4   lieutenants, captains, and chiefs?

5 A. I just answered that.  We don't send out IAPro

6   alerts because we can't act on them.

7 Q. I see.  And that's been -- you sent them

8   once -- at one time you did send them, but

9   then you stopped sending them prior to COVID

10   or?

11 A. I didn't send them.  We had IAPro quarterly

12   meetings.  I attended them when I was a

13   district chief.  When I became deputy

14   commissioner, we had some.  I felt they really

15   weren't productive when I went to them

16   because, as I said many times, we can't act --

17   we have to act on each individual complaint as

18   it comes in.  I can't act in a generalization

19   to say I think you're trouble.  There is no

20   mechanism in place in the contractual

21   agreements that I can act on somebody because

22   I believe that they are in trouble -- or they

23   are a trouble.

1              Additionally, we have to look at the

2      complaints on the merits of the complaints and

3      where the investigation goes and what evidence

4      is produced.  So, you know, you can't just

5      take into an assumption because a complaint is

6      made that an officer is in the wrong.  If they

7      are in the wrong, we need the evidence to

8      substantiate that and we will take

9      disciplinary action if we have the evidence to

10     prove it.

11  Q. Are you familiar with major and minor

12     violations?

13  A. Well the term, yes.

14  Q. Would an allegation that an officer used a

15     racial slur be a major or a minor violation?

16         MR. RUSS:  Objection to form.  You may

17     answer.

18  A. I mean, we don't have a list of this is major,

19     this is minor.  I think there's -- it's just

20     kind of known as major and minor violations.

21     So I -- there's no list where this is

22     considered.  I would consider a major

23     violation not to and including but if there

—JOSEPH GRAMAGLIA—

1    Q. No.

2    A. It was just traffic summonses?

3    Q. Correct.

4    A. I mean, I guess that would be up to a court to

5       determine whether or not there was a violation

6       there, but that's where the case ended at that

7       point.

8    Q. When you were looking at this case, did you

9       look at Officer Garry's disciplinary history?

10   A. I don't recall if I did or I didn't but,

11      again, looking back on it, I look at the facts

12      and circumstances of this case.  Whatever is

13      in the prior history that is proven, just like

14      in a criminal case, you have to look at the

15      facts and circumstances of the case that is

16      before you right now.  I can't find that an

17      officer violated policy on something because

18      of a past history of doing something.  He has

19      to be or she has to be held accountable for

20      the actions of the case at hand in that

21      particular case.

22   Q. Okay.  And so I am looking at Officer Garry's

23      disciplinary history which is part of the IAD,

```
1        STATE OF NEW YORK)

2        COUNTY OF ERIE    )

3

4

5        I, Carrie A. Fisher, Notary Public, in and
         for the County of Erie, State of New York, do
         hereby certify:

6

7        That the witness whose testimony appears
         hereinbefore was, before the commencement of
8        their testimony, duly sworn to testify the
         truth, the whole truth and nothing but the
9        truth; that said testimony was taken remotely
         pursuant to notice at the time and place as
10       herein set forth; that said testimony was
         taken down by me and thereafter transcribed
11       into typewriting, and I hereby certify the
         foregoing testimony is a full, true and
12       correct transcription of my shorthand notes so
         taken.

13

14       I further certify that I am neither counsel
         for nor related to any party to said action,
15       nor in anyway interested in the outcome
         thereof.

16

17       IN WITNESS WHEREOF, I have hereunto
         subscribed my name and affixed my seal this
18       11th day of October, 2023.

19

20       _____

21       Carrie A. Fisher
         Notary Public - State of New York
22       No. 01FI6240227
         Qualified in Erie County
23       My commission expires 5/02/27
```