# Exhibit 14

1      UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF NEW YORK

3      ----------------------------------------------

4      **BLACK LOVE RESISTS IN THE RUST, et al.,**
       **individually and on behalf of a class of**

5      **all others similarly situated,**

6                              Plaintiffs,

7       -vs-                        1:18-cv-00719-CCR

8      **CITY OF BUFFALO, N.Y., et al.,**

9                              Defendants.
       ----------------------------------------------

10             **DEPOSITION OF JOSEPH GRAMAGLIA**

11          **Taken pursuant to Rule 30(b)(6)**

12        **of the Federal Rules of Civil Procedure**

13              APPEARING REMOTELY FROM

14               BUFFALO, NEW YORK

15

16

17              January 24th, 2024

18              At 2:15 p.m.

19              Pursuant to notice

20

21      REPORTED BY:

22      Rebecca L. DiBello, RPR, CSR(NY)

23

————— **JOSEPH GRAMAGLIA** —————

1          liked how they specifically laid things out.

2     Q.   Did you look at any other manuals for similar

3          core principles besides Baltimore?

4     A.   I'm sure I did.  I just don't remember

5          specifically if I did or I didn't.  When I dig

6          into -- and I'm not the only one.  Obviously

7          our staff does this, but when we start looking

8          at making changes to our Manual of Procedures

9          we try to look at what some other agencies are

10         doing and it's something that some of our

11         staff has been doing as well.

12    Q.   Did you look at any actions Baltimore or other

13         agencies had taken to train officers on these

14         types of core principles?

15            MS. FREELY:  Objection to form.  You can

16         answer.

17    A.   No, I didn't.  We are not like other police

18         departments, so the way that trainings are

19         conducted, you know, it's -- agencies have

20         their own rules, regulations, challenges,

21         things of that nature, so I know how we train

22         and when we send out a general order we did

23         contract out with a company called Power DMS.

————— **DEPAOLO CROSBY REPORTING SERVICES, INC.** —————

─── **JOSEPH GRAMAGLIA** ───

1          It was a pretty significant advancement

2     for us when we did.  That allows us to

3     electronically send out training bulletins and

4     then get signature confirmation on those, so

5     when we send out a general order or if there

6     are certain trainings it is very difficult to

7     bring in the entire department for training

8     and that takes a considerable amount of time.

9          If we were to train the entire

10    department it would potentially take us six

11    months to a year to do that, so depending on

12    what the level of a topic is, we would prepare

13    a training bulletin, a general order,

14    something of that nature, and then send it out

15    for signature confirmation and this was one of

16    those things.

17    Q. Did you look at whether or did you look into

18       whether Baltimore had taken any steps to

19       implement these core principles beyond putting

20       them in their Manual of Procedures?

21    A. I did not look any deeper than their policy,

22       which Baltimore is under a federal consent

23       decree, a DOJ consent decree, and looking at

**JOSEPH GRAMAGLIA**

1        that, you know, an officer is making arrests

2        that do not have probable cause behind them,

3        at which point we would open up an internal

4        investigation.  We would examine that and then

5        we would take action if warranted.

6    Q.  So my question, though, is just did you look

7        at whether Baltimore or any other agencies

8        were taking those types of steps with regard

9        to these core principles?

10    A.  I did not.

11    Q.  And we touched on some of this on the training

12        issue.  Were officers trained on this update

13        to the MOP, and I'm talking about now the City

14        of Buffalo's MOP when it was issued.

15    A.  So they would have been sent -- as I laid out

16        before, this would have gone out as a general

17        order with signature confirmation and that is

18        essentially the same as a training bulletin

19        that's sent out.  They're made aware there is

20        a change in the policy, so this was one of

21        those that would have been sent.

22            Now, when it comes to training I

23        implemented mandatory annual implicit bias

---

**JOSEPH GRAMAGLIA**

1      training.  These core principles are

2      incorporated within that implicit bias

3      training, so it kind of goes hand in hand.

4  Q.  So as I understand it, this update was sent

5      out and you noted there's an implicit bias

6      training, but there's not any -- there was no

7      specific training relating to this update,

8      correct?

9  A.  Not beyond sending out the general order.  If

10     it's discussed in policy updates when officers

11     come in through the academy of training, I

12     can't answer that.  I believe that you had the

13     captain in earlier who covers topics

14     specifically with him, but the general order

15     is the main mode for delivering this policy

16     change.

17 Q.  Does the City do anything or did BPD do

18     anything to ensure that officers understood

19     the meaning of this update to the MOP?

20         MS. FREELY:  Objection to form.

21 A.  So when they receive it and they do their

22     electronic signature that's their

23     acknowledgement that they have read it and

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

**JOSEPH GRAMAGLIA**

1        understood it.

2    Q. Is there any testing or exam of the contents

3        or meaning of this MOP update?

4    A. No.

5    Q. And was there any training of BPD leadership

6        relating to this update?

7    A. Other than our staff meeting where we were

8        working on this together as a group, no.  I

9        mean, we spent a lot of time on this.

10   Q. I want to talk about some of these core

11       principles.  The first one is traffic

12       enforcement and safety and it says that the

13       purpose of conducting traffic enforcement is

14       to favorably alter the violator's future

15       driving behavior and to foster public safety.

16       Members shall engage in traffic enforcement

17       for public safety purposes and not for the

18       purpose of making an arrest.

19            Do you see that?

20   A. I do.

21   Q. Does this policy prohibit pretext stops?

22   A. So long as the stop is based on probable

23       cause, if they have a violation of the Vehicle

JOSEPH GRAMAGLIA

1          it on the traffic ticket, so how are you going

2          to audit the data that's not there and it

3          would be -- you don't have it.  You don't have

4          to it audit.

5      Q.  So is there any other reason why those audits

6          are not completed?

7              MS. FREELY:  Objection to form.

8      A.  The reason is that we conduct traffic stops

9          based on constitutional policing, based on

10         probable cause that the operator of the

11         vehicle committed a vehicle and traffic

12         violation.

13             We don't stop people based on their race

14         in either direction.  We stop people if we

15         have a valid reason, probable cause to stop

16         that vehicle for a vehicle and traffic

17         violation.  If somebody goes through a stop

18         sign regardless of what their race is and it

19         was in the presence of the officer, which is a

20         requirement for a traffic infraction.  It has

21         to be in the officer's presence.  They should

22         if they can stop that vehicle and take

23         appropriate action.

**JOSEPH GRAMAGLIA**

1      Q. Are officers trained on how to identify race?

2            MS. FREELY:  Objection to form.

3      A. That's a tricky question.  I don't know how to

4         answer that question.  Are you trained to

5         identify?  I guess no, but they can make

6         general observations.  I mean, that's --

7         descriptions are put out of people, of

8         suspects when crimes occur, and in the

9         instance where they have it to the best of

10        their abilities then race would be put out as

11        a part of that.

12            So part of your observation, I think

13        that's anybody, not just officers, but the

14        general public can observe to the best of

15        their ability what somebody's race might be.

16     Q. Isn't there a policy to include race of the

17        motorists on a stop receipt?

18     A. It's required that you have to answer that

19        question, so you have different races that are

20        on there.  You also have unknown and you have

21        not reported I believe and you have failed to

22        answer or refuse to answer.

23     Q. And are officers required to fill in the race

1         We are under contract and migrating into

2      Axon and we are currently in the roughly

3      18-month or more process, but we are building

4      out what is called Axon standards which will

5      take over for both of -- they're simul

6      programs, IA Pro and Blue Team, so everything

7      will be in Axon, so the IAP program is being

8      used.

9  Q. Can IA Pro be used as an early warning system?

10  A. I think Blue Team has the early warning

11      system.

12  Q. Do you know -- we'll get to Blue Team in a

13      second, but Axon, do you know if Axon has

14      early warning system capabilities?

15  A. I don't know.  I just know that we can

16      customize and build it any way we want.  I

17      can't answer that question.  I'm not on the

18      build-up team.

19         I have members of the Department much

20      smarter than I doing all that work.

21  Q. There are quarterly IA Pro meetings, correct?

22  A. There were.  I'm not sure when the last one

23      was run.

──────── **JOSEPH GRAMAGLIA** ────────

1    Q. So those no longer take place?

2    A. I do not sit in those.  I don't know when the

3       last time they would have taken place.  I'd

4       like to say that as opposed to a quarterly

5       meeting we discuss personnel files.  We

6       discuss them on a weekly basis and we look at

7       -- we do more -- I'll say we do more than

8       quarterly meetings.  We discuss these on an

9       ongoing basis.

10   Q. So do you generate any sort of quarterly

11      report of the IAD files?

12   A. No.  I don't issue -- I don't generate a

13      report.

14   Q. Are you aware of anyone in IAD generating any

15      sort of quarterly report?

16   A. What type of report are you looking for?  What

17      are you --

18   Q. Sure.  Is there any quarterly report of IA

19      Pro?

20   A. There used to be a quarterly report that was

21      done that would pull any officer that had a

22      certain number of complaints.  Forgive me.  I

23      don't remember exactly what that number was.

**JOSEPH GRAMAGLIA**

1          MS. FREELY:  Just note my objection to

2      the last question.

3  Q.  Are there any restraints on your ability to

4      supervise or monitor officers beyond the ones

5      we've spoken about regarding discipline and

6      scheduling?

7          MS. FREELY:  Same objection.

8  A.  What do you mean monitor?  It's up to a

9      lieutenant, the first line supervisor or any

10     supervisor.  If they see an officer starting

11     to stray it's up to them to pull them back in

12     and address that situation, but that's on a

13     more informal basis.

14          Otherwise, if it's formalized it has to

15     be through a formalized process.  I mean,

16     that's a core basis of a supervisor, of a

17     first line supervisor or any supervisor is to

18     monitor the employees under their charge.

19  Q.  Does the City charter grant you the authority

20     to discipline officers?

21  A.  The City charter says one thing and then the

22     disciplinary triage agreement of 2014 says

23     something else and then there was an interest

JOSEPH GRAMAGLIA

1          arbitration award from 1992 that says

2          something else, so there's a 1986 agreement

3          that says something else, so although the

4          charter says one thing, the contractual

5          agreements are different.

6     Q.   You do agree that the City charter grants you

7          the right to or the authority to discipline

8          BPD officers, right?

9                MS. FREELY:  Form.

10    A.   The City charter says one thing, yes.  I agree

11         with you with what it says and contractual

12         language says something different.

13    Q.   Okay.

14    A.   And it's been upheld, so --

15    Q.   Is the City aware that the New York Court of

16         Appeals has held that when there's legislation

17         specifically committing police discipline to

18         the discretion of local officers collective

19         bargaining over disciplinary matters is

20         prohibited?

21               MS. FREELY:  Form.

22    A.   That's more of a question going to the

23         corporation counsel.  I work under the advice

**JOSEPH GRAMAGLIA**

1        of my attorneys and Corporation Counsel.  I

2        know what the contract says.  I'm getting way

3        outside of my lane if I start getting involved

4        in court decisions and things of that nature.

5        I'm going to stay in my lane on that one.

6    Q.  Is it your belief, though, that the CBA

7        supersedes your authority to discipline

8        officers under the City charter?

9            MS. FREELY:  Form.

10   A.  On the advice of my counsel, yes, I'm

11       interpreting what I read and on the advice of

12       my counsel and what I have seen through

13       sitting through the formal disciplinary

14       process the arbitrator's decision is final and

15       binding and that's been upheld.

16   Q.  I want to focus in on 15-B which is about any

17       measures proposed by the City during the

18       collective bargaining process that would

19       improve the City's ability to supervise,

20       monitor and prevent officers from engaging in

21       future misconduct.

22   A.  Where are we?

23   Q.  In the subtopic list.

——— **JOSEPH GRAMAGLIA** ———

1              (Recess taken.)

2

3     Q.  Welcome back, Commissioner Gramaglia.

4              So I want to turn back to Topic 19 which

5         relates to stop receipts.  Do you recall that

6         topic?

7     A.  I do.

8     Q.  Can you just briefly tell me what a stop

9         receipt is?

10    A.  A stop receipt is if an officer performs a

11        traffic stop if they are -- in their

12        discretion they are not going to issue a

13        traffic summons.  They would then have to

14        issue a stop receipt so when they go back to

15        the car with the documentation, license,

16        registration, they can scan those documents

17        in.

18              It automatically uploads through our RMS

19        system, records management system, and it will

20        print out the date, the time, the location,

21        the complaint number, the officer's

22        identifying information, the vehicle

23        information and then there is a reason as to

---

JOSEPH GRAMAGLIA

1           again trust and transparency.

2    Q. So you answered some of my questions.

3           So it's mandatory to issue a stop

4        receipt when a ticket is not issued, correct?

5    A. Correct.

6    Q. Okay.  And race of the driver can be recorded

7        in a stop receipt, correct?

8    A. It's on the stop receipt, correct.

9    Q. And that field, the race field, needs to be

10       filled out, correct?

11   A. It's a mandatory field.  They cannot skip over

12       so they have to fill something in.

13   Q. Has the City done anything to monitor whether

14       officers are filling in race on stop receipts?

15          MS. FREELY:  Form.

16   A. We don't have to monitor if they're filling it

17       in or not.  It's a mandatory field.  You

18       cannot go to the next field if you don't enter

19       something in that field.

20   Q. Besides particular races like say White or

21       Black, are there options such as not available

22       or not sure?

23          MS. FREELY:  Form.

---

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

**JOSEPH GRAMAGLIA**

1  A. Yes.  There's refuse to answer, not reported,

2     unknown I think were all the fields.

3  Q. Okay.  And has the City taken any steps to

4     monitor whether officers are actually using

5     the race options versus the unknown or other

6     options?

7        MS. FREELY:  Form.

8  A. Steps to ensure they are, no.  Like I said,

9     they have to fill out something, but I do not

10    make it mandatory that the officer ask the

11    motorist what their race is.  I testified

12    earlier my reasons for that.  I can do it

13    again if you like.

14 Q. If you briefly could just explain why you

15    don't require that.

16       MR. PERRY:  I'm advising the witness

17    that I don't want him to guess what his

18    testimony is and testify again.  It's been

19    asked and answered, but he said very briefly.

20 A. Just don't want to escalate a situation.

21       MR. JOACHIM:  Okay.  And I will just say

22    that I object.  It seems like there's two

23    attorneys on the other side objecting, which I

---

**JOSEPH GRAMAGLIA**

1          MS. FREELY:  Form.

2     A.  What percentage of stop receipts actually have

3          race identified?  I don't know the percentage.

4          I just know that looking at it -- I don't

5          know, two, three weeks ago, a couple of weeks

6          ago, there is significantly more stop receipts

7          issued with race attached than the unknowns

8          that were showing on there.

9     Q.  Has the City ever looked into whether specific

10         officers are filling out race or identifying

11         race less often than other officers?

12          MS. FREELY:  Form.

13    A.  No, we have not.

14    Q.  Has the City ever required training for

15         officers who were not identifying race on stop

16         receipts?

17          MS. FREELY:  Objection to form.

18    A.  No.

19    Q.  Has any disciplinary action been taken against

20         any officer for failing to identify race on a

21         stop receipt?

22          MS. FREELY:  Same objection.

23    A.  No because it's not required.

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

---

**JOSEPH GRAMAGLIA**

1    Q. So is there anything -- is there any

2       prohibition against an officer filling out

3       unknown for the race field on every single

4       stop receipt that he or she completes?

5           MS. FREELY:  Form.

6    A. No.  The requirement is they actually complete

7       the traffic stop receipt and hand it to the

8       motorist so they have a documentation of the

9       stop, and again when they're given that

10      traffic stop receipt they're given a break.

11      There's no tickets issued.  No arrest was

12      made, clearly, so there's no fines associated

13      with that.

14          That's a documentation of a stop and

15      great discretion was used, but the requirement

16      is to give a stop receipt out.  All the fields

17      that are required are mandatory fields, so an

18      officer cannot skip a field.

19   Q. But they're not actually required to identify

20      a race if they don't want to, correct?

21          MS. FREELY:  Form.

22   A. Correct.

23   Q. Has the City ever undertaken any steps to

---

--- JOSEPH GRAMAGLIA ---

1           analyze racial disparities in stop receipt

2           data?

3                 MS. FREELY:  Form.

4      A. We have not, no.

5      Q. And why not?

6      A. Because, again, we instruct our officers --

7           they're taught in the academy to stop vehicles

8           when they have probable cause or reasonable

9           suspicion to stop a vehicle and as long as we

10          have constitutional stops and they conduct

11          themselves professionally and there is a legal

12          basis to stop the car, then the officer has

13          met the requirements.

14     Q. Has there been any training of officers on the

15          stop receipt program?

16     A. A training bulletin.  When the stop receipt

17          was created it was the policy and also the

18          instructional training -- I'm sorry.  The

19          instructions on how to complete it were also

20          sent out for signature confirmation.  So they

21          know how to do it, they learn how to do it and

22          then obviously the training bulletin states

23          that if you're not going to issue a summons or

1          STATE OF NEW YORK)

2          COUNTY OF ERIE    )

3

4

5           I, Rebecca Lynne DiBello, CSR, RPR, Notary
           Public, in and for the County of Erie, State of
           New York, do hereby certify:

6

7           That the witness whose testimony appears
           hereinbefore was, before the commencement of

8          their testimony, duly sworn to testify the
           truth, the whole truth and nothing but the

9          truth; that said testimony was taken pursuant
           to notice at the time and place as herein set

10         forth; that said testimony was taken down by me
           and thereafter transcribed into typewriting,

11         and I hereby certify the foregoing testimony is
           a full, true and correct transcription of my

12         shorthand notes so taken.

13

14          I further certify that I am neither counsel
           for nor related to any party to said action,

15         nor in anyway interested in the outcome
           thereof.

16

17          IN WITNESS WHEREOF, I have hereunto
           subscribed my name and affixed my seal this

18         4th day of February, 2024.

19

20         _____

21         Rebecca Lynne DiBello, CSR (NY)
           Notary Public - State of New York

22         No. 01D14897420
           Qualified in Erie County

23         My commission expires 5/11/2027