# Exhibit 18

1       UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF NEW YORK

3       ------------------------------------------------

4       **BLACK LOVE RESISTS IN THE RUST, et al.,**
        **individually and on behalf of a class of**
5       **all others similarly situated,**

6                              Plaintiffs,

7        -vs-                              1:18-cv-00719-CCR

8       **CITY OF BUFFALO, N.Y., et al.,**

9                              Defendants.

10      ------------------------------------------------

11          **EXAMINATION BEFORE TRIAL OF RICHARD HY**

12              **APPEARING REMOTELY FROM**

13              **ERIE COUNTY, NEW YORK**

14

15

16                    July 19, 2023

17               9:58 a.m. - 5:37 p.m.

18               pursuant to notice

19

20

21      REPORTED BY:

22      Carrie A. Fisher, Notary Public

23      APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

RICHARD HY

1          get in trouble by the department for stopping
2          them for, quote-unquote, no reason even though
3          you had one, we're paraphrasing that person's
4          complaint, then you give them a ticket.  So
5          it's safer to give somebody a ticket then to
6          not and chance a complaint be brought against
7          you and Internal Affairs to then be
8          questioned, "well, if you stopped them, why
9          didn't you issue them a ticket?"  And then my
10          answer would be "my discretion," but that was
11          one instance specifically I think every police
12          officer has had where you let somebody go with
13          a warning and then you wind up getting a
14          complaint.
15     Q.  So you mentioned earlier tinted window
16          tickets.  I'd like to talk a little bit more
17          about those.
18               During your time on the Strike Force,
19          were you aware of any formal policy on writing
20          multiple tickets for tinted window violations?
21     A.  There was -- I forget where it came down from.
22          It was more of a verbal suggestion.  It wasn't
23          a rule, it wasn't a law, but I remember

**RICHARD HY**

1           stating -- I didn't state it.  Somebody -- one

2           of the lieutenants told me, to the group, that

3           it wasn't necessary to issue a ticket for each

4           window, that you could start issuing it

5           singular -- a singular window tint ticket for

6           just one window.

7                An example would be if you have the

8           front windshield, the four doors of a normal

9           sedan tinted and the rear of a vehicle, the

10          rear window tinted, a tint ticket could be

11          issued for each window.  In fact, there's

12          specific vehicle and traffic violations

13          numbers for the front and back window as well

14          as the side front and back windows.  So the

15          suggestion was instead of ticketing one window

16          each, a ticket each, that you could just give

17          one window ticket for a single window that had

18          the tint instead of the max.

19      Q.  And to confirm, do you recall when that

20          suggestion was made to you?

21      A.  It was later on.  It was near the end of

22          Strike Force.  I want to say it was within but

23          not prior to the last year that it was still a

RICHARD HY

1          unit.

2    Q.   And prior to that suggestion, had your

3          practice been to issue one ticket for each

4          piece of glass?

5    A.   Yes.

6    Q.   Okay.  And after receiving that suggestion,

7          did you change your practice?

8    A.   No, it was on discretion.  I was less likely

9          to but I would still issue it, especially if

10         the tint was like limo tint.

11   Q.   Did you ever discuss a practice of issuing

12         multiple tinted window tickets versus one

13         ticket for all windows as we just discussed

14         with other Strike Force officers?

15   A.   Yes.

16   Q.   What do you recall about those discussions?

17   A.   Just in passing talking about that vehicle one

18         day got one ticket because whatever reason and

19         then that vehicle the other day had really

20         dark tints so they got every window, general

21         things like that.

22   Q.   Do you recall whether the majority of people

23         you spoke to had a practice of issuing one

RICHARD HY

1          MR. SAHASRABUDHE:  Objection to form.

2     A. Well, I mean, if it was seniority based,

3        sometimes it would never come to me.  Like I

4        was the lowest man on the totem pole there.  I

5        was -- I had the most junior seniority so the

6        11:30 to like 3:30 shifts, when those were

7        available, the pre-shift overtime, I rarely

8        got those.  But when we had the opposite

9        shift, sometimes I would get that.

10    Q. And were you often looking to work more

11        overtime shifts while on Strike Force?

12    A. When overtime came, yes, yeah, I was hoping to

13        get a little more bump in the paycheck.

14    Q. And do you -- to your knowledge, was that the

15        general -- do the other officers in Strike

16        Force agree with you as far as being motivated

17        to work overtime?

18          MR. SAHASRABUDHE:  Objection to form.

19    A. Everybody wants, you know, more money, yeah.

20        They want their paycheck to be a little bit

21        more beefy, and then you had the old timers

22        that wanted their retirement to reflect that

23        as well.

RICHARD HY

1      to immediately state what you would do and how

2      you would utilize different aspects of what

3      you have as a detective such as like SWAT and

4      the Fire Department or a K9 cadaver dog,

5      etcetera, in that scenario.

6              And then based on that, those two things

7      combine, the written and the oral exam, you

8      have scores and those overall scores give you

9      your pecking order for who is the next in line

10     to be promoted.

11  Q. And were there any other metrics that were

12     taken into account as far as a promotion

13     decision?

14          MR. SAHASRABUDHE:  Objection to form.

15  A. I don't know.

16  Q. Do you recall your -- ever being subject to a

17     performance evaluation as part of that

18     promotion decision?

19          MR. SAHASRABUDHE:  Objection.

20  A. No.

21  Q. Were you ever subject to a performance review

22     during your time at the BPD?

23          MR. SAHASRABUDHE:  Objection to form.

RICHARD HY

 1    A. No.  I wish I was.

 2    Q. Why do you say that?

 3    A. I like to know where I stand, you know, where

 4       to improve, where to get better on, you know,

 5       how I stack up against my peers.  It gives you

 6       a better idea of how to self-evaluate.

 7    Q. Did you have any --

 8    A. Plus --

 9    Q. Sorry.  Go ahead.  Excuse me.

10    A. No, go ahead.  That was it.

11    Q. I was just going to say, did you have any kind

12       of periodic review of your workplace conduct

13       of any kind or no?

14    A. Other than an occasional award or an interview

15       with the Internal Affairs Division, not much.

16       You will get a pat on the back from a

17       lieutenant or maybe a senior patrol officer

18       will bring you under his wing and assist you

19       in kind of going in the right direction but

20       that's about it.

21    Q. Outside of those pat-on-the-back situations,

22       were you ever given any feedback on your

23       performance at all throughout your time at the

RICHARD HY

1          cover explicit and implicit bias?

2     A.  I don't think so.

3     Q.  If I say racially biased conduct, do you --

4          what do you understand that to mean?

5               MR. SAHASRABUDHE:  Objection to form.

6     A.  I don't know.  You would have to give me a

7          description.

8     Q.  Could you define racial bias for me?

9               MR. SAHASRABUDHE:  Objection to form.

10    A.  I think racial bias is just treating somebody

11         differently based on their race.  Does that

12         extend to race, color, creed, religion,

13         etcetera, kind of like overall or racist

14         tendencies?

15    Q.  You tell me.

16    A.  I'm sorry.  I don't know.  I'm asking you.

17    Q.  I'm just hoping to get your understanding

18         here.  How -- how did you come to the -- that

19         understanding of racial bias?

20              MR. SAHASRABUDHE:  Objection to form.

21    A.  I honestly don't remember.  I think that's

22         just hearing it on the news, just being biased

23         primarily by the pigmentation of somebody's

**RICHARD HY**

1      balance of questioning during a traffic stop?

2    A. Could you say that again?  I didn't quite hear

3      you.

4    Q. Sure.  Were you ever trained on the acceptable

5      balance of questioning that you could use

6      during a traffic stop?

7        MR. SAHASRABUDHE:  Objection to form.

8    A. I may not know the term "acceptable balance

9      questioning during a traffic stop," but I have

10      been trained on appropriate questions to ask a

11      driver when stopped at a traffic stop.  It may

12      not have been the verbiage that you're using,

13      and it might have been a much more dumbed

14      down, more easily digestible version than

15      maybe what you're asking me.

16    Q. Sure.  So what were you trained as far as the

17      appropriate questions to ask during a traffic

18      stop?

19    A. Questions as if -- if they own the vehicle,

20      where they're traveling to and from, if they

21      had a -- had any impairment, where their age

22      check location -- not age check location,

23      their age, the sex that they identify or what

```
 1          they were born as, their information that's on
 2          their driver's license and potentially the
 3          registration of the vehicle.
 4     Q.   And were you ever trained on the
 5          constitutionality of traffic stops?
 6               MR. SAHASRABUDHE:  Objection to form.
 7     A.   Briefly.  I'm sure that it's a very limited
 8          and broad -- it was a very limited and broad
 9          class, like the generalities.
10     Q.   Do you recall when you attended that class?
11     A.   That would have been during the academy.
12     Q.   And you have -- am I correct -- is it correct
13          that you have not attended further training on
14          the constitutionality of traffic stops since
15          the academy?
16     A.   Correct.
17               MR. SAHASRABUDHE:  Objection to form.
18     Q.   And do you recall what that training covered
19          more than a broad focus on constitutionality
20          when you did attend it?
21     A.   I do not remember what the specifics of that
22          class in the academy were.
23     Q.   So I think we discussed this kind of briefly
```

RICHARD HY

1          during the break, but did you ever receive

2          training on policing specifically in certain

3          areas of Buffalo?

4                    MR. SAHASRABUDHE:  Objection to form.

5      A.  I don't think so.

6      Q.  Did you ever, for example, receive training on

7          how to interact with the citizens specifically

8          on Buffalo's East Side?

9                    MR. SAHASRABUDHE:  Objection to form.

10     A.  No.  No, I don't believe that I received a

11         class like that.

12     Q.  And did you ever receive training on how to

13         interact with Buffalo citizens of color in

14         particular?

15                   MR. SAHASRABUDHE:  Objection to form.

16     A.  There are -- I can't remember the class, and

17         it may have even been just conversations

18         during more formal instruction on how to treat

19         individuals and the perception that like

20         minority communities have with police and to

21         be aware of that, but I can't remember like a

22         specific block of instruction and the bulleted

23         points of that.

1    Q. In addition to being aware of that, do you

2       recall any concrete steps that you were

3       instructed on taking to -- in light of -- in

4       light of the possibility of interacting with

5       minority communities?

6           MR. SAHASRABUDHE:  Objection to form.

7    A. Could you say that again?

8    Q. Sure.  You mentioned that the -- you had

9       conversations about the awareness of policing

10      in minority neighborhoods, correct?

11    A. Yes.

12    Q. Did those conversations include any sort of

13      concrete steps or action items that you could

14      take to improve policing in those minority

15      neighborhoods?

16          MR. SAHASRABUDHE:  Objection to form.

17    A. From what I remember, it was more of an

18      understanding of seeing things -- I'm being

19      very general here, of seeing things through

20      other people's eyes and experiences that

21      others may have are not your own and to treat

22      everybody as an individual and not, you know,

23      specifically based on, you know, like race,

RICHARD HY

1    color, creed, etcetera.  You're supposed to be

2    kind of blind to what makes up the individual

3    and more open up to listening to the

4    individual.

5    Q. Did you have any specific concerns about

6    policing in neighborhoods of color?

7    A. No.

8         MR. SAHASRABUDHE:  Objection to form.

9    Q. Did you feel you were adequately prepared by

10   the BPD to do so?

11        MR. SAHASRABUDHE:  Objection to form.

12   A. Yes.

13   Q. And was that preparation in virtue of that one

14   training you're mentioning, or were there

15   other things that you feel prepared you to do

16   that type of policing?

17        MR. SAHASRABUDHE:  Objection to form.

18   A. Specifically the field training program that

19   not only the law -- Erie County Law

20   Enforcement Academy puts you through but also

21   the City of Buffalo, Buffalo Police

22   Department's field training program.

23   Q. Would you describe that field training program

RICHARD HY

1           in more detail?

2      A.   So the similarities between the Erie County

3           Law Enforcement and the City of Buffalo's

4           field training program are that you are

5           embedded with your department, whoever you're

6           going to be working for, whoever has hired

7           you.  For a certain period of time we are

8           doing the left see, right see where there is a

9           field training officer, usually a senior

10          officer who's got -- who's gone through some

11          field officer training so they're not just a

12          normal patrolman but a normal patrolman that's

13          also been -- gone through a course in how to

14          guide, mentor the next generation of police

15          officers.

16               And you go to calls, you're evaluated by

17          your first-line lieutenants and leaders and in

18          this on-the-job experience you get to learn,

19          see, and digest how your field training

20          officer, and you can jump around from one to

21          the other and go to different districts, deals

22          with or interacts with different members of

23          the community, race, color, creed, religion,

RICHARD HY

1          you know, ethnic background, all of these

2          things you get to see in person.

3     Q. Were you ever a field training officer while

4          in the BPD?

5     A. No.  No, not yet.  I was in the academy, but I

6          wasn't a field training officer.

7     Q. And when you participated in that field

8          training program, do you recall being

9          instructed on racial bias or racially biased

10         policing in any way?

11              MR. SAHASRABUDHE:  Objection to form.

12    A. No.

13    Q. But you mentioned that you do feel that the

14         field training program adequately prepared you

15         to police in Buffalo's neighborhoods of color?

16              MR. SAHASRABUDHE:  Objection to form.

17    Q. Is that correct?

18    A. Yes.

19    Q. So do you feel that there is not any specific

20         racial bias training necessary to adequately

21         prepare you to police in Buffalo's

22         neighborhoods of color?

23              MR. SAHASRABUDHE:  Objection to form.

RICHARD HY

1    A. Yes.

2    Q. I'm going to pull up a document here.  Give me

3       one second, and I will share my screen.  I

4       believe this will be Exhibit 9.  I'm sure

5       Carrie will correct me if that's incorrect.

6              So this is a document bearing Bates

7       number COB042040.  This was produced to us by

8       Defendants.  It's a memorandum indicating that

9       you were to report -- or that certain officers

10      were to report to training on February 9th,

11      2016, at 1630.  And if you look at the list in

12      the middle of the document, your name is on

13      the bottom of the list on the right.  Do you

14      have any reason to believe that this

15      memorandum is not accurate?

16             MR. SAHASRABUDHE:  Objection to form.

17   A. No.

18   Q. Do you recall reporting to training on this

19      date?

20   A. I don't remember.

21   Q. Do you ever recall a training titled

22      "Diversity, First Aid, Blood Bourne, and

23      PESH"?

RICHARD HY

```
1     A.  I am familiar with the bloodborne pathogens
2         and first aid being annual training and its --
3         the contents of it.  I'm not -- I do not
4         remember the PESH or the diversity training.
5     Q.  Do you know what PESH is?
6     A.  I don't remember.
7     Q.  Do you ever recall attending diversity
8         training?
9     A.  I don't recall sitting in the class and going
10        through the slideshows or the instruction, no.
11    Q.  I'm going to stop sharing the screen now.
12             While you were an officer on the Strike
13        Force, do you recall ever witnessing any
14        racially biased conduct by your peer officers?
15             MR. SAHASRABUDHE:  Objection to form.
16    A.  I would need a better definition of what --
17        what you're saying racially biased is.
18    Q.  So I should -- do you feel that you can
19        identify racially biased conduct without -- on
20        your own I should say?
21             MR. SAHASRABUDHE:  Objection to form.
22    A.  I don't understand the term "racially biased
23        conduct."  Could I determine if somebody was
```

RICHARD HY

1          David Wright wrote this report in which he

2          states that you did state the N word?

3     A.  I will tell you that there is some conflict

4          between the conduct of Lieutenant David Wright

5          and Officer Joseph Milewski to where that the

6          two are not to be working with one another and

7          that his professionalism has been called into

8          question.

9     Q.  So your explanation for him -- am I correct to

10         understand your explanation for him writing

11         this statement here is that it's due to a

12         personal issue he has with Officer Milewski?

13    A.  Correct.

14    Q.  And did an investigator in this investigation

15         ever ask you about the alleged use of -- your

16         alleged use of the N word in this incident?

17    A.  I don't remember.

18    Q.  After this complaint, did you receive any

19         training related to bias?

20    A.  No.

21              MR. SAHASRABUDHE:  Objection to form.

22    Q.  Do you recall any training at all in direct

23         result of this incident?

RICHARD HY

1    A.  No.

2            MR. SAHASRABUDHE:  Objection to form.

3            MR. TIMMICK:  I'm going to stop sharing

4       my screen.  If we could take a quick break, I

5       think we've got --

6            MR. SAHASRABUDHE:  How long have we been

7       on the record for?

8            MR. TIMMICK:  I'm doing math right now.

9       Carrie, do you have that on you?

10           THE REPORTER:  Yep, I have 6 hours 31

11      minutes, 54 seconds.

12           MR. TIMMICK:  Thank you.  I'm not sure

13      we will need all of those 30 minutes, Peter,

14      but can we take a quick five minutes and

15      then --

16           MR. SAHASRABUDHE:  Sure.  Can we make it

17      five, please?

18           MR. TIMMICK:  Yeah, sure.

19           MR. SAHASRABUDHE:  Thank you.

20           MR. TIMMICK:  All right, thanks.

21               (A recess was taken.)

22      BY MR. TIMMICK:

23    Q.  I am going to just pull up one more document

RICHARD HY

1          STATE OF NEW YORK)

2          COUNTY OF ERIE )

3

4

5              I, Carrie A. Fisher, Notary Public, in
           and for the County of Erie, State of New York,
6          do hereby certify:

7              That the witness whose testimony appears
           hereinbefore was, before the commencement of
8          their testimony, duly sworn to testify the
           truth, the whole truth and nothing but the
9          truth; that said testimony was taken remotely
           pursuant to notice at the time and place as
10         herein set forth; that said testimony was taken
           down by me and thereafter transcribed into
11         typewriting, and I hereby certify the foregoing
           testimony is a full, true and correct
12         transcription of my shorthand notes so taken.

13             I further certify that I am neither
           counsel for nor related to any party to said
14         action, nor in anyway interested in the outcome
           thereof.

15

16             IN WITNESS WHEREOF, I have hereunto
           subscribed my name and affixed my seal this
17         7th day of August, 2023.

18

19         _____
20         Carrie A. Fisher
           Notary Public - State of New York
21         No. 01FI6240227
           Qualified in Erie County
22         My commission expires 5/02/27

23