# Exhibit 19

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF NEW YORK

3    ------------------------------------------------

4    **BLACK LOVE RESISTS IN THE RUST, ET AL.,**
     **INDIVIDUALLY AND ON BEHALF OF A CLASS OF**

5    **ALL OTHERS SIMILARLY SITUATED,**

6            Plaintiffs,

7     -vs-                    1:18-cv-00719-CCR

8    **CITY OF BUFFALO, N.Y., ET AL.,**

9            Defendants.

10   ------------------------------------------------

11

12           **EXAMINATION BEFORE TRIAL**

13              **OF BYRON LOCKWOOD**

14          **APPEARING REMOTELY FROM**

15             **BUFFALO, NEW YORK**

16

17             August 10, 2023

18             At 11:00 a.m.

19             Pursuant to notice

20

21   REPORTED BY:

22   Rebecca L. DiBello, RPR, CSR(NY)

23   APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

BYRON LOCKWOOD

```
 1          Force and the Housing Unit reporting through
 2          the schools chief to you.
 3               MR. SAHASRABUDHE:  Objection to form.
 4     A.  Yes.  That's what the chart is showing.
 5          School chief, I didn't have no day-to-day
 6          dealings with them.  It was just -- that's
 7          just the operational -- that's just the chart.
 8     Q.  Do you recall who the schools chief was when
 9          you were the deputy commissioner of
10          administration?
11     A.  I'm trying to think in '13.  I don't know if
12          that was -- I know Brinkworth was the school
13          chief at one time and then he was removed and
14          Aaron Young was put in there.  I really
15          couldn't tell you what year that was, though,
16          when Aaron Young took over.
17     Q.  And did Chief Brinkworth and Chief Young
18          report to you?
19     A.  Yes, but before they added this Strike Force
20          -- and what else they got on there?  It was
21          just -- they were answering to me for the
22          school resource officers and then I'm assuming
23          that the commissioner felt that Strike Force
```

**BYRON LOCKWOOD**

1      know.

2   Q. It's not a document that you encountered in

3      your day-to-day work?

4   A. No.

5   Q. Would you be in a position to know if that

6      document was given to officers prior to them

7      running a checkpoint?

8           MR. SAHASRABUDHE:  Objection.

9   A. I wouldn't know that.

10  Q. And if Housing Unit or Strike Force officers

11     ran a checkpoint without that document, would

12     you know that?

13  A. No.

14  Q. Did you ever conduct any oversight over the

15     checkpoints?

16  A. No.

17  Q. Did you ever conduct any evaluation of the

18     checkpoints?

19  A. No.

20          MR. SAHASRABUDHE:  Objection to form.

21  Q. This will be Lockwood 4.  I will make it

22     bigger.  The Bates number is COB 226141.  If

23     we scroll to the top we can see this is a memo

BYRON LOCKWOOD

1        center, no.  No, I didn't have.

2   Q.  So you would review them, but not necessarily

3        approve or disapprove them?

4   A.  If it was coming from Erie County I would just

5        review them, look at them and I may have had

6        some discussion with the training academy

7        captain about it, but this document that

8        you're showing me now, I can't really say if

9        that was or not.

10  Q.  Let's look at the box on the top right that

11       says reasons for vehicle and traffic laws.

12       Can you read to me the fourth reason in this

13       box?

14  A.  It's got to be a little bigger.

15  Q.  Okay.

16  A.  General revenue.  Generate revenue.

17  Q.  Correct.  Do you agree that generating revenue

18       is one of the reasons to enforce vehicle and

19       traffic laws?

20          MR. SAHASRABUDHE:  I didn't hear a

21       portion of that question.  You cut out.  Sorry.

22  Q.  I asked if you agree that generating revenue

23       is one of the reasons for vehicle and traffic

BYRON LOCKWOOD

1    laws?

2    A. I guess you generate revenue from it, yeah.

3       Yes.

4    Q. I'm moving towards the second page of this

5       PDF. And this is the basic course for police

6       officers. It says at the top -- this is also

7       used to train Buffalo Police officers at the

8       academy.

9           And do you agree with me that this says

10      that one of the reasons for vehicle and

11      traffic laws is revenue generating?

12   A. Is that on this document that you're showing

13      me?

14   Q. Yes. Let me move it up. Do you see it now?

15   A. Yes. I see it.

16   Q. Reasons for vehicle and traffic laws include

17      revenue generating.

18   A. Yes.

19   Q. And moving on to the July, 2018 training

20      materials, you would have been commissioner at

21      this time, right?

22   A. Yes.

23   Q. And again, do you see this box, reasons for

BYRON LOCKWOOD

1        vehicle and traffic laws?

2    A. Yes.

3    Q. Again, the training materials included that a

4        reason for vehicle and traffic laws is to

5        generate revenue, right?

6    A. Yes.

7    Q. Are you aware of any other written materials

8        that would have indicated whether the role of

9        police is to generate revenue through

10        enforcing Vehicle and Traffic Law?

11            MR. SAHASRABUDHE:  Objection to form.

12    A. No.  I can't think of anything else.  Not at

13        this particular time, no.

14    Q. In July, 2015 the City of Buffalo launched the

15        Buffalo Traffic Violations Agency, right?

16    A. Yes.

17    Q. And that permitted the city to take over

18        specific adjudications for the state, right?

19            MR. SAHASRABUDHE:  Objection to form.

20    A. Yes.

21    Q. And this says the city can keep most of the

22        revenue for the traffic tickets for itself

23        rather than giving most of it to the state,

BYRON LOCKWOOD

```
 1     A. Yes.  That's doing their job.
 2     Q. Are you familiar with the practice of multiple
 3        ticketing?
 4            MR. SAHASRABUDHE:  Objection to form.
 5     A. I'm familiar with it.
 6     Q. We'll call that issuing more than one ticket
 7        in a single stop, okay?
 8     A. Okay.
 9     Q. Did you ever provide any guidance to the
10        Strike Force and the Housing Unit on multiple
11        ticketing?
12     A. Can you repeat that?  Did I ever --
13     Q. Provide guidance to the Strike Force and
14        Housing Unit with respect to multiple
15        ticketing?
16     A. Not that I can recall, but I wasn't no fan of
17        it.
18     Q. Why were you not a fan of multiple ticketing?
19            MR. SAHASRABUDHE:  Objection to form.
20     A. I just think that giving a lot of tickets for
21        like tinted windows, it's not that you can't
22        give them.  You can give a ticket for each
23        dark tinted window, but me personally, I'm
```

BYRON LOCKWOOD

1       just not a fan of that.

2  Q. And why are you not a fan of giving those kind

3       of tickets?

4  A. I'm just not a fan of it.  I just don't think

5       -- I just think one ticket for tinted window

6       is good enough or maybe two, but for each

7       window I'm just not a fan of it.

8  Q. Were you aware that Strike Force officers had

9       a common practice of issuing four tickets, one

10       for each window?

11            MR. SAHASRABUDHE:  Objection to form.

12  Q. In a single stop?

13            MR. SAHASRABUDHE:  Objection to form.

14  A. Yes.

15  Q. Did you ever instruct them that they should

16       not do that?

17  A. I didn't instruct the officers, but I

18       expressed my dissatisfaction with the chief

19       and with the commissioner about it.

20  Q. And when did that occur?

21  A. I don't know when it occurred.  It was just

22       verbally.  It wasn't no email or whatever and

23       I couldn't tell you what year it was.  It was

BYRON LOCKWOOD

```
 1            just verbally.
 2      Q.  What caused you to express your
 3            dissatisfaction with the practice?
 4      A.  I just didn't like it.
 5      Q.  Was there a particular event that occurred
 6            that prompted you to say something?
 7      A.  No.
 8      Q.  And what did you say?
 9      A.  I just said I don't think it's necessary to
10            give a ticket for each dark tinted window.
11      Q.  And did anything happen after you said that?
12      A.  No.  I don't think so.  Mentioned it to the
13            chief and the commissioner and I don't know if
14            they took it up with them or not.  I just
15            mentioned it.
16      Q.  Did you check to see whether the multiple
17            tinted windows ticketing practices were
18            continuing after this after you mentioned it?
19              MR. SAHASRABUDHE:  Objection to form.
20      A.  No.  I didn't check into it because I know
21            that it was something that they can do.  It
22            wasn't illegal what they were doing.  It was
23            just that I didn't -- me particularly didn't
```

1       care for it.

2   Q. Well, regardless of whether it was legal,

3       couldn't you direct the officers not to do it?

4            MR. SAHASRABUDHE:  Objection to form.

5   A. I'm not going to direct the officer not to do

6       his job.  If it's part of his job then he's

7       going to do what he's going to do as long as

8       it was part of the job.

9   Q. So it's your testimony that issuing four

10      tinted windows tickets in a single stop is

11      part of the officer's job?

12          MR. SAHASRABUDHE:  Objection to form.

13      That's not what he said.

14  A. It's legal.  It's part of the V&T so they can

15     do it.  So it's part of their job.  They can

16     do that.

17  Q. Were you aware that the Strike Force and the

18     Housing Unit engaged in more multiple

19     ticketing than other units of the BPD?

20         MR. SAHASRABUDHE:  Objection to form.

21  A. I know they issued a lot of tickets, but I

22     didn't measure their writings compared to

23     traffic or the districts.

BYRON LOCKWOOD

1           MR. SAHASRABUDHE:  Objection to form.

2    Q. And are you aware of any guidance that covers

3        the exercise of that discretion?  How does the

4        officer make that decision?

5           MR. SAHASRABUDHE:  Objection to form.

6    A. I guess it would be on the officer to decide

7        if he's going to, you know, write a ticket.

8        You know, if it's a major, like a serious

9        accident where there is injuries, then you're

10       expected to write summonses, tickets.  But if

11       it's something where someone, you know, didn't

12       -- ran a stop sign or didn't change lanes

13       without putting the signal on, then I guess

14       you can use your discretion on that.

15   Q. Do you think that Black drivers commit more

16       traffic violations than White drivers?

17          MR. SAHASRABUDHE:  Objection to form.

18   A. No.

19   Q. Were you aware that the BPD issued more

20       traffic tickets to Black drivers than White

21       drivers?

22          MR. SAHASRABUDHE:  Objection to form.

23   A. Yes.  I heard.  I heard.  I've been told that,

BYRON LOCKWOOD

```
1        yes.
2    Q. And who told you that?
3    A. Some of the officers felt that more Black
4       drivers getting tickets than White.  It was
5       some of the officers just speaking out.  I'm
6       not going to say no names.
7    Q. Well, I would like to know which officers were
8       saying this and you are required to answer the
9       question.
10   A. I can't remember.
11   Q. Would these have been line officers?
12   A. What is a line officer?
13   Q. Just officers, just police officers.  Not
14      lieutenants or captains or chiefs.  Officers.
15   A. Just officers.
16   Q. Were they Strike Force officers?
17   A. It was just officers where you just if you out
18      and just talk.  People talking.  Just talking.
19   Q. Were they Black officers?
20   A. Yes.
21   Q. What were the names of the officers?
22          MR. SAHASRABUDHE:  Objection to form.
23   A. It was a group of officers talking.  I'm
```

BYRON LOCKWOOD

1    Q. Well, I can tell you that I have looked for

2        it.  I know for a fact that more tickets were

3        issued to Black drivers than White drivers.

4        If it's not that Black drivers were committing

5        more traffic violations what is the reason for

6        that?

7            MR. SAHASRABUDHE:  Objection to form.

8    A. That would be the officer who gave the tickets

9        would have to -- was giving the tickets would

10       have to answer that.  I can't answer that

11       question.  I just can't.

12   Q. Did you ever take any affirmative steps to

13       investigate whether BPD officers were engaging

14       in racial profiling?

15   A. No.

16           MR. SAHASRABUDHE:  Objection.

17   Q. Did you ever take any affirmative steps to

18       investigate whether BPD officer were engaging

19       in racially biased policing?

20   A. No.

21   Q. Did you know that BPD officers sometimes used

22       racial slurs when carrying out their duties?

23           MR. SAHASRABUDHE:  Objection to form.

BYRON LOCKWOOD

1  A. The thing is that they would complain, but
2     when Internal Affairs asked someone to come in
3     to sign a complaint most of the time they
4     didn't come back.
5  Q. So you felt that your hands were tied because
6     the complainants weren't going forward with
7     complaints?
8        MR. SAHASRABUDHE:  Objection to form.
9  A. If someone used racial slurs to someone, a
10    citizen, the only way I would have substantial
11    evidence is they would have to come in and
12    they would have to go to Internal Affairs and
13    file -- and make a report.  Not only a report,
14    they would have to give a statement and
15    Internal Affairs would investigate it.
16 Q. Are you saying that the only way for you to
17    address the use of racial slurs by officers is
18    through the Internal Affairs complaint
19    investigation process?
20       MR. SAHASRABUDHE:  Objection to form.
21 A. That or if I heard it personally I would
22    address it.
23 Q. Is it appropriate for officers to use racial

1         to the lieutenants.

2   Q.  And if the chief or captain -- in this case it

3         happens that the chiefs and the captains have

4         testified that they did not provide those

5         instructions.  So then was it just coming from

6         the lieutenants?

7             MR. SAHASRABUDHE:  Objection to form.

8   A.  If they wasn't providing it then I'm assuming

9         it was coming from the lieutenants because I

10        always thought that it would come from the top

11        down to the bottom.

12  Q.  Okay.  And we were speaking about the Strike

13        Force, but do you have any reason to think

14        that the Housing Unit operated differently?

15            MR. SAHASRABUDHE:  Objection.

16  A.  The Housing Unit was strictly housing complex.

17        You know, their job was housing complex and

18        they would get the order.  Unless their chief,

19        you know, didn't give the lieutenants a

20        specific assignment then I'm quite sure the

21        officers would go from one complex to the next

22        complex to the next one.

23  Q.  Okay.  In those instances when you did receive

1          scroll down he is forwarding you an email from

2          Malcolm Ertha who is with the City Council and

3          the subject is Unanswered Questions From

4          Budget Public Hearings.  And I'll let you read

5          the email for a minute.

6      A.  Okay.

7      Q.  So in this email the Common Council is

8          requesting information from the BPD concerning

9          traffic checkpoints, right?

10     A.  Yes.

11     Q.  And by sending you the email did Commissioner

12         Derenda task you with responding to the Common

13         Council?

14              MR. SAHASRABUDHE:  Objection to form.

15     A.  He was sending me the email to make sure that

16         I gathered this information and sent it over

17         to the Council.  Once again, I believe it was

18         just him and I that was, you know,

19         commissioner and deputy commissioner and I

20         normally go over it every year for the budget,

21         do the budget while representing the police

22         department with our budget and this is one of

23         the workshops and they wanted this

1   information, so I believe I provided it for

2   him.

3   Q. Okay.  So you would have been responsible for

4   providing the information that they were

5   requesting?

6   A. Yes.

7   Q. And did you gather this information -- well,

8   first of all, did you provide it?

9   A. I would think I did provide it for him.  I

10  gave him as much as what I can gather and give

11  to him.

12  Q. And would you have gathered the information

13  yourself or asked somebody else to gather it

14  for you?

15  A. I would have had someone else gather it for

16  me.  I believe that probably would have been

17  Inspector Strano.

18  Q. Let's look at another email.  This one is

19  dated May 8th, 2017 so a few days later, COB

20  041705, and it's from Captain Serafini to the

21  commissioner and you and it says, "Traffic

22  safety checkpoint locations and it says,

23  Commissioner, attached are the traffic safety

1          checkpoint locations from January 1st, 2017

2          through May 7th, 2017.  If you need any more

3          information please let me know."

4                So would this information have been

5          compiled in response to the Common Council

6          request?

7                MR. SAHASRABUDHE:  Objection to form.

8     A.  It could have been.  I know I gave the -- I'm

9          almost positive when I came back I probably

10         gave the order to Joe Strano.  I mean, well,

11         after the commissioner sent it to me I

12         probably went to Joe Strano and told him to

13         gather this information for me.

14    Q.  Do you recall receiving it from Strano?

15                MR. SAHASRABUDHE:  Objection to form.

16    A.  I'm quite sure that I probably would have got

17         the information from Strano and handed over --

18         either I would have brought it over there with

19         me or he would have brought it with him over

20         there to the Council.  The Council asks for a

21         lot of things and this one specific one I

22         would say that I gave them what they was

23         asking for because I don't think -- I don't

BYRON LOCKWOOD

1        know if there was any, you know, that they had

2        to send another email over requesting it

3        again.  I don't know.  Usually when they ask

4        for something I get it for them.

5   Q. Okay.  You can go ahead and look at the

6        checkpoint locations there following.  We can

7        look down the list.  If you need it to be

8        bigger or scroll up?

9   A. Bigger.  Can you make it bigger?

10  Q. Let me know when I can scroll down.

11  A. You can scroll down.

12  Q. I'll keep scrolling a little more so you can

13       get a sense of what is here. Would you agree

14       that as you're looking at the intersections

15       the majority of them are in Black

16       neighborhoods on the East Side of Buffalo?

17  A. Yes.

18            MR. SAHASRABUDHE:  Objection to form.

19  Q. Is that a surprise?

20            MR. SAHASRABUDHE:  Objection to form.

21  Q. It's consistent with your understanding at the

22       time of where the Strike Force was running the

23       majority of its checkpoints?

1              MR. SAHASRABUDHE:  Objection to form.

2      A. I would say that it was -- right here is

3         mostly the East Side.  I do see a few in North

4         Buffalo and South Buffalo, but the majority of

5         them is on the East Side.

6      Q. At the time did you form an opinion of why the

7         Common Council was requesting disclosure of

8         checkpoint locations?

9              MR. SAHASRABUDHE:  Objection to form.

10     A. No.  I can't remember why they requested this.

11        I just can't remember.  I don't even remember

12        the email, to be honest with you.

13     Q. And that should have been, for the record,

14        Lockwood 20.  This will be Lockwood 21.  This

15        is another Serafini email dated June 29th,

16        2017.  It's COB 016339.

17             You're copied on the email.  And you can

18        go ahead and read it.

19     A. Okay.

20     Q. And so this email says that you want

21        adjustments to the checkpoints and the

22        adjustments that you wanted were out of 21

23        weekly checkpoints only four would be

1          records.  What we needed, he would pull those.

2     Q.   This is going to be Lockwood 23.  This

3          document is COB 251775.  This concerns a FOIL

4          request that the BPD received asking for

5          checkpoint locations.

6     A.   Can you make that a little bigger?

7     Q.   Yes.  So this was also in July of 2017.

8     A.   Yes.  FOILs, Captain Antonio took care of

9          FOILs.

10    Q.   And this particular email Captain Serafini is

11         making you aware of the request and he's

12         confirming that in fact the BPD does keep

13         track of checkpoint locations and has records

14         of checkpoint locations, right?

15    A.   Right.

16    Q.   And that's consistent with your understanding?

17    A.   Yes.  BPD kept records of checkpoints.

18    Q.   This will be Lockwood 24 and it's COB 041727.

19         This is a Serafini email from August, 2017 and

20         it says new checkpoint form/policy and it's

21         the new form -- creation of a new form called

22         the Traffic Safety Checkpoint Tally Sheet and

23         the tally sheet -- here's a blank tally sheet

```
 1    STATE OF NEW YORK)

 2    COUNTY OF ERIE    )

 3

 4         I, Rebecca Lynne DiBello, CSR, RPR, Notary

 5    Public, in and for the County of Erie, State of

 6    New York, do hereby certify:

 7         That the witness whose testimony appears

 8    hereinbefore was, before the commencement of

 9    their testimony, duly sworn to testify the

10    truth, the whole truth and nothing but the

11    truth; that said testimony was taken pursuant

12    to notice at the time and place as herein set

13    forth; that said testimony was taken down by me

14    and thereafter transcribed into typewriting,

15    and I hereby certify the foregoing testimony is

16    a full, true and correct transcription of my

17    shorthand notes so taken.

18         I further certify that I am neither counsel

19    for nor related to any party to said action,

20    nor in anyway interested in the outcome

21    thereof.

22         IN WITNESS WHEREOF, I have hereunto

23    subscribed my name and affixed my seal this

      26th day of August, 2023.
```

Rebecca L. DiBell

_____

Rebecca Lynne DiBello, CSR, RPR
Notary Public - State of New York
No. 01DI6897420
Qualified in Erie County
My commission expires 5/11/2027

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

135 Delaware Avenue, Suite 301, Buffalo, New York 14202
716-853-5544

195

1        UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF NEW YORK

3        ----------------------------------------------

4        **BLACK LOVE RESISTS IN THE RUST, ET AL.,**
         **INDIVIDUALLY AND ON BEHALF OF A CLASS OF**
5        **ALL OTHERS SIMILARLY SITUATED,**

6                 Plaintiffs,

7         -vs-                        1:18-cv-00719-CCR

8        **CITY OF BUFFALO, N.Y., ET AL.,**

9                 Defendants.

10       ----------------------------------------------

11

12            **CONTINUED EXAMINATION BEFORE TRIAL**

13                  **OF BYRON LOCKWOOD**

14              **APPEARING REMOTELY FROM**

15                **BUFFALO, NEW YORK**

16

17                 August 17, 2023

18                 At 1:00 p.m.

19                 Pursuant to notice

20

21       REPORTED BY:

22       Rebecca L. DiBello, RPR, CSR(NY)

23       APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK


**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

```
 1              MR. SAHASRABUDHE:  Objection to form.
 2      A. No.
 3      Q. But you knew afterwards, right?
 4              MR. SAHASRABUDHE:  Objection to form.
 5      A. No.  Actually, this is my first time hearing
 6         that.
 7      Q. Did you ever undertake any internal
 8         investigations into the Buffalo Police
 9         Department's tinted windows ticketing
10         practices?
11              MR. SAHASRABUDHE:  Form.
12      A. No.
13      Q. The article specifically mentions allegations
14         that BPD disproportionately issued tinted
15         windows tickets in black and brown
16         neighborhoods and your response was to state
17         that since you became commissioner tickets for
18         tinted windows had been issued across Buffalo.
19              How did you know that this was true?
20              MR. SAHASRABUDHE:  Objection to form.
21      A. Did I say that in this article?
22      Q. You did and I can show it to you.  I can share
23         the screen again.  This is here and it says --
```

```
 1              it actually refers to this lawsuit which
 2              alleged the city focused on certain
 3              neighborhoods, and Lockwood said since he
 4              became commissioner tickets have been issued
 5              for tinted windows across Buffalo.
 6                   How did you know that this was true?
 7                   MR. SAHASRABUDHE:  Objection to form.
 8    A.  I would say that if we're going to ticket --
 9              my theory is if we're going to ticket we're
10              going to ticket, you know, all across Buffalo,
11              not a certain area.
12    Q.  So is it fair to say that the statement was
13              based on wishful thinking?
14                   MR. SAHASRABUDHE:  Objection to form.
15    A.  No.
16    Q.  What was the basis for the statement that
17              tickets were issued across Buffalo?
18                   MR. SAHASRABUDHE:  Objection to form.
19    A.  That was -- that's my belief, that it was
20              issued all across Buffalo.  I didn't have no
21              complaints that it was in one neighborhood or
22              Black neighborhoods.  I didn't have those
23              complaints on my desk.
```

```
 1    Q. But you didn't check the data to see where
 2       tinted windows tickets were actually being
 3       issued, did you?
 4            MR. SAHASRABUDHE:  Objection to form.
 5    A. No.
 6    Q. I'm sorry.  I didn't hear that.  Can you
 7       repeat.
 8    A. No.
 9    Q. Our data shows that in 2019 tinted windows
10       tickets did drop.  Can you explain the reason
11       for the drop in ticketing?
12            MR. SAHASRABUDHE:  Objection to form.
13    A. No.
14    Q. Next I'd like to discuss changes to policing
15       practices that the city made after 2020 and
16       the reasons for those changes.
17            I'd like to start with the pandemic.
18       Did COVID affect the BPD's operations?
19            MR. SAHASRABUDHE:  Objection to form.
20    A. Yes.
21    Q. How?
22            MR. SAHASRABUDHE:  Objection to form.
23    A. We had some of the precinct houses, we had to
```

```
 1              They didn't want police patrolling BMHA.
 2         So that was a discussion with the City and
 3         BMHA and I guess the contract just wasn't
 4         renewed, so when it wasn't renewed we
 5         disbanded the unit.
 6    Q.   Did anything replace the Housing Unit?
 7              MR. SAHASRABUDHE:  Objection to form.
 8    A.   They came up -- yes.  They came up with an
 9         idea of each district will have a community
10         police officer assigned to the housing complex
11         unit.
12    Q.   And what was the job responsibility of the
13         community policing officer?
14    A.   The job was to do community policing in the
15         housing complex to assist citizens to work
16         with the children, to help setup programs over
17         there and also attend the meetings.
18    Q.   Did the job of the community policing officer
19         include traffic enforcement around the BMHA
20         building?
21              MR. SAHASRABUDHE:  Form.
22    A.   If there was a traffic violation then their
23         job was to enforce the traffic violation, yes.
```

1    Q. Did these community policing officers engage

2       in traffic enforcement as frequently as the

3       Housing Unit officers had done?

4           MR. SAHASRABUDHE:  Objection to form.

5    A. That I couldn't -- I have no documents

6       comparing that.

7    Q. Did the community police officers have to fill

8       out Housing Unit statistical reports that were

9       similar to those filled out by the Housing

10      Unit?

11          MR. SAHASRABUDHE:  Form.

12   A. They had to fill out activity reports.

13   Q. Did the report include counting the numbers of

14      traffic violations issued?

15   A. I'm sure if they gave some traffic tickets out

16      it would be in their report.

17   Q. Do you recall if the report that the community

18      policing officers filled out had a series of

19      columns for statistics including traffic

20      summonses issued, traffic misdemeanors,

21      arrests, quality of life violations issued and

22      those other sorts of statistics?

23   A. The community police officers that was

```
 1            assigned there after the housing unit, right
 2            now I can't remember what their activity
 3            report had.  I can't remember that right now.
 4        Q. Did there come a time in 2020 when you made
 5            changes to the BPD's tinted windows ticketing
 6            practices?
 7                    MR. SAHASRABUDHE:  Form.
 8        A. No.
 9        Q. So if there was a change in frequency of
10            tinted windows ticketing it wasn't something
11            that you caused or ordered?
12        A. No.
13        Q. And in December, 2020 you disbanded the
14            Traffic Unit, right?
15        A. Yes.
16        Q. Why did you decide to disband the Traffic
17            Unit?
18        A. We felt that the district can do a better --
19            we felt the district can handle traffic in
20            their districts.
21        Q. How was traffic enforcement handled after the
22            Traffic Unit was disbanded?
23                    MR. SAHASRABUDHE:  Objection to form.
```

```
 1              the year that it was presented.
 2    Q. Can you tell me when this policy would have
 3       been issued?
 4    A. No.  I don't know when.
 5    Q. But you believe that it's posted on bulletin
 6       boards in the station houses?
 7    A. Yes.  Before I became commissioner there were
 8       -- yeah.  Yeah.
 9    Q. Did you ever issue a commissioner's memo on
10       racial profiling or biased policing?
11    A. No.
12    Q. Did you ever cause a training bulletin to be
13       issued on racial profiling or biased policing?
14    A. No.
15    Q. Did you take any affirmative steps to identify
16       whether your officers were engaging in
17       racially-biased traffic enforcement?
18              MR. SAHASRABUDHE:  Objection to form.
19    A. Are you saying traffic?
20    Q. Yes.
21    A. I had no complaints when I was commissioner.
22    Q. Okay.  And my question was did you take any
23       affirmative steps to identify whether your
```

```
 1          officers were engaging in racially-biased
 2          traffic enforcement?
 3               MR. SAHASRABUDHE:  Objection to form.
 4     A.  No.
 5     Q.  Did you take any affirmative steps to identify
 6          and correct racial bias on the part of BPD
 7          officers?
 8               MR. SAHASRABUDHE:  Objection to form.
 9     A.  If there was a --
10               MR. SAHASRABUDHE:  Objection to form.
11     A.  If there was a complaint -- I had no
12          complaints, so no.
13     Q.  Can you recall a specific incident in which
14          you disciplined an officer for engaging in
15          racial profiling?
16               MR. SAHASRABUDHE:  Objection to form.
17     A.  I can't think of none offhand.
18     Q.  Can you recall a specific incident in which
19          you disciplined an officer for engaging in
20          racially-biased policing?
21               MR. SAHASRABUDHE:  Objection to form.
22     A.  I can't.  No, I can't remember that, no.
23     Q.  Are you aware of any instances in which the
```

1      A.  I can't remember.

2      Q.  Can you remember if they received complaints

3          of racial discrimination?

4              MR. SAHASRABUDHE:  Objection to form.

5      A.  No.

6      Q.  Did you have systems that were setup to alert

7          you if the same officer received multiple

8          complaints of discrimination?

9              MR. SAHASRABUDHE:  Objection to form.

10     A.  I didn't have -- we didn't have a system

11         setup, but if it was racially involved I think

12         I would remember it.

13     Q.  Is it possible that there could be complaints

14         of racial discrimination against an officer

15         that you would never see?

16             MR. SAHASRABUDHE:  Form.

17     A.  If it was reported to Internal Affairs then

18         unless a case opened up on it then I would --

19         well, if I'm sitting in that file review I

20         would see it.  I wasn't in all file reviews.

21         I wouldn't see something if it was reported to

22         the FBI or another agency, you know, another

23         state agency.  No, I wouldn't know that.

```
 1           race is.  Just look on the license and what is
 2           up on the license, that's the race.
 3    Q. Well, New York State doesn't have race on the
 4           license, right?
 5                MR. SAHASRABUDHE:  Form.
 6    A. I think when I got my first license I had race
 7           on it.  Maybe they changed it.
 8    Q. Did you think it was important to be able to
 9           identify racial disparity in the BPD's
10           ticketing practices?
11                MR. SAHASRABUDHE:  Objection to form.
12    A. No.  I don't think -- I mean, I didn't think
13           race was that important.  You give a ticket,
14           you give a ticket.
15    Q. Why did you require officers to record the
16           race of people issued stop receipts, but not
17           the race of people issued traffic summons?
18                MR. SAHASRABUDHE:  Objection to form.
19    A. I don't remember giving that order.
20    Q. We looked at the traffic receipts training
21           bulletin, right, and it specifically says that
22           race was to be recorded, correct?
23                MR. SAHASRABUDHE:  Objection to form.
```

```
 1        to enter the race into TraCS?
 2            MR. SAHASRABUDHE:  Objection to form.
 3   A. No.  I'm not aware of the police -- I mean,
 4      I'm not aware of what the state police was
 5      doing.
 6   Q. Is it fair to say that you just didn't think
 7      it was important to know the race of people
 8      being ticketed?
 9            MR. SAHASRABUDHE:  Objection to form.
10   A. Yes.
11   Q. Did you personally review the stop receipt
12      data that was collected?
13   A. No.
14   Q. Did you ask anybody else to review the data?
15   A. That data was -- I want to say had to be
16      reviewed by one of the deputies.
17   Q. Which deputy would have reviewed the data?
18   A. That one I'm not sure, but I know it was being
19      reviewed by one of the deputies.
20   Q. So Gramaglia or Lark?
21   A. Yes.
22   Q. Were you aware that around 25 percent of the
23      time officers did not fill out the race field?
```

```
 1     A.  No.

 2               MR. SAHASRABUDHE:  Object to form.

 3     Q.  Were you aware that the traffic stop receipt

 4         data showed racial disparities and that Black

 5         drivers were stopped more often than White

 6         drivers?

 7               MR. SAHASRABUDHE:  Objection to form.

 8     A.  No.

 9     Q.  Do you think you should have been aware of

10         that?

11               MR. SAHASRABUDHE:  Objection to form.

12     A.  Yeah.  Yeah.

13     Q.  Did the BPD collect data on vehicle impounds

14         by the race of the driver or the vehicle

15         owner?

16               MR. SAHASRABUDHE:  Form.

17     A.  The BPD what about the impound again?

18     Q.  Did you collect data on the race of the driver

19         or the vehicle owner involved with an impound?

20               MR. SAHASRABUDHE:  Form.

21     A.  No.  No.

22     Q.  Did the BPD collect data on the race of IAD

23         complainants?
```

```
 1    A. No.
 2    Q. While you were commissioner did the BPD have
 3       an early warning system to identify officers
 4       who engaged in problematic practices?
 5            MR. SAHASRABUDHE:  Objection to form.
 6    A. Yes.  They had what's called the Blue Team.
 7    Q. And what was the Blue Team?
 8    A. It would trigger a notice to Internal Affairs
 9       when there's certain officers within a certain
10       period of time of complaints and Internal
11       Affairs would notify the chief of that
12       district so he was sent -- through the Blue
13       Team he was sent to the chief of that
14       district.
15    Q. And was Blue Team limited to excessive force?
16    A. Not just an excessive force, but it was --
17       excessive force was part of it, too.
18    Q. Was it any kind of complaint that could
19       trigger the Blue Team?
20    A. If you didn't fill out the form for using
21       force, you know, if you had to use force to
22       lock someone up you had to fill out a Blue
23       Team form.
```

```
 1      Q.  What other complaints besides excessive force
 2          were part of the Blue Team?
 3      A.  It would be complaints, you know.  Any
 4          complaints that would come in within a certain
 5          period -- you know, if you got different
 6          complaints within -- for example, within three
 7          months, you know.  It would probably trigger
 8          the Blue Team.
 9      Q.  And who is in charge of the Blue Team?
10      A.  That would be the inspector of Internal
11          Affairs.
12      Q.  Did the BPD conduct regular performance
13          evaluations of officers?
14              MR. SAHASRABUDHE:  Objection to form.
15      A.  Evaluations is something that we -- it would
16          have to be contractual with the union.  I
17          don't know what you mean by evaluation.  We
18          can't -- by contract we can't do evaluations.
19      Q.  So the answer to my question is no, the BPD
20          does not conduct regular performance
21          evaluations of officers?
22              MR. SAHASRABUDHE:  Objection to form.
23      A.  No, because of the contract.
```

```
 1    Q.  Did the BPD evaluate officers' performance in
 2        any way?
 3    A.  We can evaluate when you first come on the job
 4        for the first 18 months.  And we train and we
 5        evaluate you.  But yearly evaluations, that's
 6        something contractual.  Can't do it.
 7    Q.  When you were commissioner did you have
 8        procedures in place to review body-worn camera
 9        footage for general supervision purposes?
10    A.  When I left we were still in the process of
11        policy -- making policy with the union on body
12        cameras, evaluations of body camera, viewing
13        the body camera, who can review it, when can
14        we review it and that was all in front of an
15        arbitrator.
16    Q.  Were you involved in the contract negotiation?
17    A.  Yes.  Some parts of it, yes.
18    Q.  You said that performance evaluations must be
19        bargained for under the contract, right?
20    A.  Yes.
21    Q.  There's nothing in the collective bargaining
22        agreement that prohibits performance
23        evaluations, right?
```

```
 1              MR. SAHASRABUDHE:  Form.
 2      A. During my tenure.  I'm trying to think of the
 3         individual's name.  I just can't.  He's a
 4         lieutenant.  Well, he did -- it wasn't racial,
 5         but he was unprofessional when he went out and
 6         called a young lady out of her name.  I
 7         brought him up on suspension, brought him up
 8         on charges.  He was going to an arbitrator and
 9         he decided he was just going to retire.  I
10         can't think of the name.
11      Q. I'm sorry.  Let me understand this.  This was
12         a lieutenant who -- what conduct was the
13         lieutenant complained of doing?
14      A. His conduct was he addressed a female citizen
15         out of her name.  He called her a cunt.  I
16         suspended -- they brought him up on charges.
17         My recommendation was termination.  He went to
18         an arbitrator and before the arbitrator can
19         come up with a finding he retired.
20      Q. Okay.  And was this an incident where it was
21         broadcast on social media?
22      A. It was broadcast around the country.
23      Q. Okay.  So other than that one incident, can
```

```
 1        you were commissioner which is a much shorter
 2        period of time than it is when you had
 3        responsibility for Internal Affairs
 4        investigation.
 5             During that period of time when you were
 6        commissioner did a complaint of rudeness or
 7        discourtesy ever result in a guilty plea or
 8        finding?
 9             MR. SAHASRABUDHE:  Form.
10    A.  I just gave you the one rudeness.  That's the
11        only one that I can think of that I went for a
12        termination on.  I can't think of any specific
13        ones right now, no.  I just can't think of
14        them.
15    Q.  How many complaints of excessive force,
16        rudeness or discourtesy would you say you
17        handled as commissioner?
18             MR. SAHASRABUDHE:  Objection to form.
19    A.  I'm quite sure I had -- I'm quite sure I had a
20        few of them.
21    Q.  Would it have been more than ten?
22    A.  During my four-year period I would say maybe.
23        Yeah.  I'm not sure.  The cases, you know, you
```

```
 1          get the cases about an accident, you get a
 2          case about someone's lateness, someone missed
 3          a call.  You get all these different cases in
 4          there and it's just hard for me right now to
 5          sit here and say what particular ones because
 6          they all come in different forms.
 7     Q.  It's fair to say that as commissioner you
 8          reviewed a number of complaints that involved
 9          allegations of excessive force, rudeness,
10          discourtesy, right?
11     A.  I have, yes.
12     Q.  And none of those cases resulted in a guilty
13          plea or a finding, right?
14              MR. SAHASRABUDHE:  Objection to form.
15     A.  I wouldn't say that, no.
16     Q.  You just told me that you couldn't remember
17          any of them that did result in a guilty plea
18          or finding.
19     A.  I can't -- you was asking specifics.  I can't
20          say specific, but I'm not going to say every
21          case that came before me was not, you know,
22          there was no discipline there.  I'm not going
23          to sit and say that.  I'm going to have to see
```

```
 1        it.
 2   Q.  How often did those meetings take place?
 3   A.  Sometimes it would take place every other week
 4        or if they needed to -- I would say within a
 5        month period of time I would say probably
 6        twice out of the month.
 7   Q.  And if a complaint against an officer was not
 8        sustained the commissioner would have the
 9        option to send the officer for an informal
10        conference, right?
11   A.  If it wasn't sustained then he would -- no.
12        He wouldn't -- if it was not sustained it
13        wouldn't say the case is completely closed at
14        this particular time.  There's not enough
15        evidence to move forward with it.
16   Q.  Okay.  Did Commissioner Derenda from time to
17        time direct you to conduct informal
18        conferences with officers who had complaints
19        filed against them?
20   A.  Yes.
21   Q.  And what was the purpose of the informal
22        conference?
23   A.  You would conference them all whatever the
```

```
 1            complaint is about.
 2       Q. So in general what would happen during an
 3            informal conference?
 4                 MR. SAHASRABUDHE:  Objection to form.
 5       A. The officer would come in and sometimes their
 6            chief would come in with them and wherever the
 7            complaint is you would conference them on the
 8            complaint, you know.  You would conference
 9            them.  You would talk to them about the
10            complaint.
11       Q. And how long did the conferences usually take?
12       A. Various.  There was no set time.  Varied
13            times.
14       Q. Could you give me a range of times that they
15            might typically be?
16       A. Could be anywhere from 20 minutes to an hour.
17            It depends.
18       Q. How did you prepare for an informal
19            conference?
20       A. You read the case file.
21       Q. So was your practice to review the case file
22            prior to the informal conference?
23       A. Yes.  Before the officer comes in, yes.
```

```
 1          most part the files that we reviewed did not
 2          contain transcripts, written transcripts of
 3          the interviews.
 4     Q.   So when Commissioner Derenda directed you to
 5          conduct an informal conference did he give you
 6          instructions about what to address in the
 7          conference?
 8     A.   No.  He would just assign the conference to
 9          either myself or the other deputy or sometimes
10          they would have a chief conference with their
11          chief.
12     Q.   Okay.  And I'm speaking specifically about the
13          conferences that you did.  When you conducted
14          an informal conference did you inform the
15          officer's chief?
16     A.   Did I inform them?
17     Q.   Yes.  Would the chief know?  The chief of the
18          person who was being conferenced, would they
19          know that there was a conference?
20               MR. SAHASRABUDHE:  Form.
21     A.   Yes.  Yes.  They would know.
22     Q.   And would the lieutenant know?
23               MR. SAHASRABUDHE:  Form.
```

```
 1      A.  Which lieutenant are we talking about?
 2      Q.  The lieutenant of the person who is being
 3          conferenced, their direct supervisor.  Would
 4          their direct supervisor know that they were
 5          being conferenced?
 6                  MR. SAHASRABUDHE:  Form.
 7      A.  That would be up to the chief.  We would just
 8          send it to the chief.  I would say that the
 9          chief would let the lieutenant know that one
10          of his officers is being -- have to go to a
11          conference.
12      Q.  Did you discuss with the chief the contents of
13          the conference?
14      A.  No.
15      Q.  So the conference was just between you and the
16          person who is being conferenced?
17      A.  Yes.  With me and the officer and, like I
18          said, if the chief was there he would be
19          involved, too.
20      Q.  Did the officer's direct supervisor know like
21          what the person was being conferenced about?
22          In other words, you're trying to correct --
23          well, scratch that.
```

```
 1              Let me back up for a second.  Is the
 2       purpose of the conference to correct the
 3       officer's behavior so they don't engage in a
 4       similar behavior again in the future?
 5              MR. SAHASRABUDHE:  Form.
 6   A. Yes.
 7   Q. But did you tell the officer's direct
 8       supervisor what the behavior was that they
 9       needed to correct that was being discussed in
10       the conference?
11              MR. SAHASRABUDHE:  Objection to form.
12   A. Their chief would know.
13   Q. So for example, if it was a complaint of
14       rudeness or discourtesy and you were
15       counseling the officer about their
16       discourteous behavior you would tell the chief
17       I'm counseling officer so-and-so about his
18       discourtesy in this incident?
19              MR. SAHASRABUDHE:  Form.
20   A. The chief would know what I'm conferencing
21       when he comes down because when we send in the
22       paperwork -- when we send the form down there
23       that he has to report he would have to report,
```

```
 1          but the majority of the time I would -- the
 2          chief would probably ask me, you know, or he
 3          would tell me I'll be down with my officer on
 4          this conference and I would probably say yeah.
 5          At that probably particular time I would say
 6          yes, you know, what the case is about and what
 7          the conference is going to be about.
 8     Q.   And after that it would be up to the chief to
 9          supervise the officers so that the behavior is
10          not repeated?
11               MR. SAHASRABUDHE:  Objection to form.
12     A.   The chief should -- the chief probably would
13          have a conversation with the officer and the
14          chief should have a conversation with his
15          immediate supervisor, too.
16     Q.   Is there any specific document or policy that
17          spells this out anywhere?
18               MR. SAHASRABUDHE:  Form.
19     A.   When I have a conference with them I use -- I
20          would send something back in the file saying
21          that I conferenced.
22     Q.   I think I have seen those.  It says that a
23          conference happened, but it doesn't say what
```

```
 1            the conference was about.
 2     A.  Well, the conference -- the file right there
 3            tell you -- the file tells you what the
 4            complaint is and I'm conferencing on the
 5            complaint in the file.
 6     Q.  Was it your practice to keep notes or records
 7            of the conferences?
 8                  MR. SAHASRABUDHE:  Form.
 9     A.  No.  I didn't keep notes of it, no.
10     Q.  And after you conducted the conference did you
11            do any kind of follow-up?
12     A.  No.  I didn't follow-up on that officer.  Once
13            I conferenced him and the chief was there, the
14            chief -- I assume the chief probably spoke
15            with them afterwards and it went down to his
16            lieutenant and that was the basis of it.
17     Q.  So you relied on the chain of command; isn't
18            that correct?
19     A.  Yes.
20     Q.  Did you have any way to assess whether the
21            conference was effective?
22                  MR. SAHASRABUDHE:  Objection to form.
23     A.  I would say that officer I conferenced -- I
```

1          can't remember conferencing someone on the

2          same, same topic.  I can't remember that.

3     Q.   And I'll look at an example of a file in which

4          you conducted a conference.  This is going to

5          be Lockwood 36 and this is the IAD file of a

6          complaint filed by Alex Overton.

7               It's a 2016 complaint.  And can you see

8          here in this disposition box that this

9          complaint was not sustained and was ordered to

10         conference with you?

11    A.   I don't have the whole form up.  I mean, I see

12         the form.

13    Q.   Do you see where it says not sustained and

14         other, DPC conf, Lockwood?

15    A.   Yes.

16    Q.   And I'm going to go to page 15 and that's

17         going to have the investigative summary.  Let

18         me start at the top and then go down for you.

19    A.   Okay.

20    Q.   So this is a complaint against Housing Unit

21         Officer Joseph Acquino and the complaint is

22         that Acquino called him "a smart ass

23         motherfuckin' N word" and pulled him out of

```
 1        STATE OF NEW YORK)

 2        COUNTY OF ERIE   )

 3


 4
          I, Rebecca Lynne DiBello, CSR, RPR, Notary
 5        Public, in and for the County of Erie, State of
          New York, do hereby certify:
 6

 7         That the witness whose testimony appears
          hereinbefore was, before the commencement of
 8        their testimony, duly sworn to testify the
          truth, the whole truth and nothing but the
 9        truth; that said testimony was taken pursuant
          to notice at the time and place as herein set
10        forth; that said testimony was taken down by me
          and thereafter transcribed into typewriting,
11        and I hereby certify the foregoing testimony is
          a full, true and correct transcription of my
12        shorthand notes so taken.

13
           I further certify that I am neither counsel
14        for nor related to any party to said action,
          nor in anyway interested in the outcome
15        thereof.

16
           IN WITNESS WHEREOF, I have hereunto
17        subscribed my name and affixed my seal this
          31st day of August, 2023.

18

19

20        _____

21        Rebecca Lynne DiBello, CSR, RPR
          Notary Public - State of New York
22        No. 01D14897420
          Qualified in Erie County
23        My commission expires 5/11/2027
```