# Exhibit 26

```
 1      UNITED STATES DISTRICT COURT

 2      FOR THE WESTERN DISTRICT OF NEW YORK

 3      -------------------------------------------

 4      BLACK LOVE RESISTS IN THE RUST, et al.,
        individually and on behalf of a class of
 5      all others similarly situated,

 6                              Plaintiffs,

 7       -vs-                    1:18-cv-00719-CCR

 8      CITY OF BUFFALO, N.Y., et al.,

 9                              Defendants.

10      -------------------------------------------

11          EXAMINATION BEFORE TRIAL OF ROB ROSENSWIE

12       APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

13

14                      October 2, 2023

15                  9:50 a.m. - 5:48 p.m.

16                     pursuant to notice

17

18

19

20

21      REPORTED BY:

22      Carrie A. Fisher, Notary Public

23      APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK
```

ROB ROSENSWIE

1       discipline means all those methods that can be
2       used to train employees to fully comport with
3       the department rules, regulations and
4       procedures?
5    A. Yes.
6    Q. All right.  What is positive discipline?
7    A. That would be training.
8    Q. Would it also include -- okay, strike that.
9       Are conferences positive discipline?
10   A. That would be considered like a training.
11   Q. Okay.  And then are other -- what other types
12      of training are considered positive
13      discipline?
14      MS. FREELY:  Objection to form.
15   A. It would be a conference pretty much.  It
16      would be like a training.
17   Q. Okay.  So the MOP provides that positive
18      discipline is only used when there are minor
19      violations of department rules, right?
20      MS. FREELY:  Objection to form.
21   A. I don't recall what the wording was.
22   Q. I am going to share my screen.
23      Okay.  So would you agree with this

ROB ROSENSWIE

1    Q. Does this training include instruction on how
2       to identify constitutional violations?
3    A. I don't remember the itinerary we -- what they
4       touched on.  I would assume -- I don't want to
5       assume anything but likely.
6    Q. For the record, we have never received any
7       materials from this training in discovery so
8       we would like to -- we will follow up with a
9       request for materials related to this
10      training.
11          Other than this training at Miami-Dade,
12      did you receive any additional training as
13      lieutenant on effective -- I am sorry, any
14      training at all as a lieutenant in the
15      Internal Affairs Department?
16    A. None that I recall.
17    Q. Okay.  How about as an inspector did you
18      receive any additional training outside of
19      this week-long training at Miami-Dade?
20    A. Yeah, there was one that I did go to.  I can't
21      remember who held it.  It might have been at
22      ECC.
23    Q. Okay.  And when was that?

ROB ROSENSWIE

1    BPD ever discuss the quality of your
2    investigations or other tasks as a lieutenant
3    at the Buffalo Police Department?
4         MS. FREELY:  Objection to form.
5  A. I don't know if they discussed it or not.  I
6    don't know.
7  Q. Did you receive any performance reviews as a
8    lieutenant at the Internal Affairs Department?
9  A. None that I recall.
10 Q. How did you know whether you were doing your
11   job adequately?
12 A. I don't know.  I just think I did a good job
13   and did a thorough investigation.  I'm pretty
14   confident that I did, but I don't -- you know,
15   I don't know.
16 Q. Okay.  And you left your position in IAD as
17   lieutenant in 2015, right?
18 A. I believe it was 2015, yep.
19 Q. Why did you decide to leave at that time?
20 A. Promotion.
21 Q. And then you returned to become inspector of
22   Internal Affairs in January 2018, right?
23 A. Yes.

ROB ROSENSWIE

1    A.  Didn't really have any materials.
2    Q.  Okay.  And so the trainings that you provided
3        your staff were usually a one on one; is that
4        right?
5    A.  Yeah.
6    Q.  Okay.  So you never conducted any formal group
7        trainings; is that right?
8    A.  Not formal.  Like I said, we met as a group
9        but we would just discuss certain things but
10       it was never really a --
11   Q.  Did you --
12   A.  -- PowerPoint or stuff like that.
13   Q.  Okay.  Did you ever train your staff on
14       identifying racially biased misconduct?
15   A.  We had training -- did we have training for
16       that?  I know periodically we had to go for
17       trainings and stuff like that.  I think that
18       might have been one of the subjects, but I
19       don't recall for sure.
20   Q.  Where would you go for training?
21   A.  The academy when we went but, again, I don't
22       remember exactly what topics or stuff but I
23       think that might have been one of them.

ROB ROSENSWIE

1   Q.  Do you recall when that training occurred?
2   A.  No.
3   Q.  Did this training involve investigating
4       racially biased conduct?
5   A.  I don't believe so, no.  I don't think so.  I
6       don't even think we even had training to be
7       honest with you for that.
8   Q.  Was it your responsibility to identify changes
9       into accepted investigation standards and --
10      I'm sorry.  Strike that.
11              Was it your responsibility to identify
12      changes into accepted investigation and
13      disciplinary techniques and standards?
14              MS. FREELY:  Objection to form.
15  A.  I don't know exactly what you're asking me.
16  Q.  I'm going to turn back to Exhibit 3 which is
17      the Complaint Investigation Manual.
18              Here it states at the bottom of
19      paragraph 2 -- paragraph 2 that "PSD members
20      need to keep abreast of the most current
21      trends and techniques in the types of
22      administrative investigations," right?
23  A.  Yep.

ROB ROSENSWIE

```
 1        so sorry.  I'm a little sick so bear with me.
 2              Did you ever provide performance
 3        evaluations of your staff at the Internal
 4        Affairs Department?
 5   A.   No.
 6   Q.   How -- strike that.
 7              All right.  As IA inspector, how did you
 8        measure the effectiveness of the Internal
 9        Affairs Department?
10   A.   You mean our investigations?
11   Q.   Yes.
12   A.   Just based on the information that was, you
13        know, given at the -- in each individual
14        investigation.
15   Q.   So it was on a -- you measured performance on
16        a complaint-by-complaint basis based on the
17        amount of information that was provided in the
18        investigation; is that right?
19              MS. FREELY:  Objection to form.
20   A.   Well, I wouldn't say that.  Just because
21        sometimes you could have -- I mean, just
22        because an investigation has mounds of
23        material doesn't mean it's all good so, I
```

ROB ROSENSWIE

1   Q. IAPro produced alerts when an officer
2      generated a certain number of complaints; is
3      that right?
4   A. Correct.
5   Q. And would those alerts be discussed at these
6      meetings?
7   A. At the chief meetings?
8   Q. Yes.
9   A. I believe they were, yes.
10  Q. And were chiefs responsible for taking action
11     or exploring action towards officers who --
12     where alerts were generated against them?
13  A. Yeah, that was the intention.
14  Q. Mm-hmm.  And what kind of actions would chiefs
15     take against officers that developed alerts?
16  A. Depending on what the alert was, I don't know.
17     It's hard to say.
18  Q. The officer -- could the -- how often would
19     chiefs take an action to address an
20     officer's -- an alert produced by an officer?
21           MS. FREELY:  Objection to form.
22  Q. I'm sorry.  I couldn't hear you.
23  A. I'm not sure.

ROB ROSENSWIE

1  Q. Okay.  Were any records maintained about the
2     chief's responses to alerts generated by IAPro
3     against officers?
4  A. I don't recall.
5  Q. Do you feel these quarterly IAPro meetings
6     were important for the BPD?
7        MS. FREELY:  Objection to form.
8  A. Yeah, they served a purpose I guess.
9  Q. What purpose did they serve?
10 A. Awareness.
11 Q. Awareness of what?
12 A. Like any -- you know, like what any matters
13    that need to be addressed could possibly be
14    addressed.
15 Q. So by "matters," you mean officers that were
16    the subject of multiple complaints?
17 A. No, it could have been like sick; somebody
18    taking off sick a lot or, you know, whatever.
19    I mean, it's hard to say.  The alerts were
20    pretty sweeping so a lot of it was
21    probationary officers and stuff like that.
22 Q. Would you say that these IAPro meetings helped
23    address any patterns of complaints that were

ROB ROSENSWIE

1  A.  I don't -- probably should have been discussed
2      I guess.
3  Q.  If Eck isn't counseled on these behaviors, how
4      can BPD be sure that they won't recur?
5  A.  I don't know.  Like I said, I don't recall
6      that.  I don't remember seeing that video
7      before so I don't -- I just don't -- I don't
8      recall.
9  Q.  Did Chief Jones or Lieutenant Culver report
10     back to you about the outcome of the
11     conference?
12 A.  I don't recall.
13 Q.  Did you have any mechanisms to determine
14     whether conferences given to officers were
15     effective?
16 A.  Usually emails.
17 Q.  Would you ever look to an officer's complaint
18     history to -- or current complaints to
19     determine whether a complaint -- a conference
20     was effective?
21 A.  I don't recall.
22 Q.  All right.  I'm now going to introduce Exhibit
23     13; is that right, Carrie?  Okay.

```
 1      STATE OF NEW YORK)

 2      COUNTY OF ERIE    )

 3

 4
           I, Carrie A. Fisher, Notary Public, in and
 5      for the County of Erie, State of New York, do
        hereby certify:
 6

 7         That the witness whose testimony appears
        hereinbefore was, before the commencement of
 8      their testimony, duly sworn to testify the
        truth, the whole truth and nothing but the
 9      truth; that said testimony was taken remotely
        pursuant to notice at the time and place as
10      herein set forth; that said testimony was taken
        down by me and thereafter transcribed into
11      typewriting, and I hereby certify the foregoing
        testimony is a full, true and correct
12      transcription of my shorthand notes so taken.

13
           I further certify that I am neither counsel
14      for nor related to any party to said action,
        nor in anyway interested in the outcome
15      thereof.

16
           IN WITNESS WHEREOF, I have hereunto
17      subscribed my name and affixed my seal this
        16th day of October, 2023.
18

19
                  _____
20
                  Carrie A. Fisher
21                Notary Public - State of New York
                  No. 01FI6240227
22                Qualified in Erie County
                  My commission expires 5/02/27
23
```