# Exhibit 28

```
 1        UNITED STATES DISTRICT COURT

 2        FOR THE WESTERN DISTRICT OF NEW YORK

 3        ------------------------------------------------

 4        BLACK LOVE RESISTS IN THE RUST, et al.,
          individually and on behalf of a class of
 5        all others similarly situated,

 6                              Plaintiffs,

 7         -vs-                        1:18-cv-00719-CCR

 8        CITY OF BUFFALO, N.Y., et al.,

 9                              Defendants.

10        ------------------------------------------------

11            ORAL EXAMINATION OF PHILIP SERAFINI

12                 APPEARING REMOTELY FROM

13                 ERIE COUNTY, NEW YORK

14

15             Monday, December 27, 2021

16               9:03 a.m. - 5:15 p.m.

17                pursuant to notice

18

19        PAGES 324 & 325 DESIGNATED CONFIDENTIAL

20

21        REPORTED BY:

22        Carrie A. Fisher, Notary Public

23        APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK
```

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1      city of Buffalo and they respond to calls of

2      service within and around those housing units.

3  Q.  Do you know approximately when the Housing

4      Unit was created?

5  A.  It was about probably four years before I

6      arrived there so I arrived in 2015,

7      approximately 2000.

8  Q.  Got it.  How did you become the Housing Unit

9      captain?

10  A.  I put a transfer in and I received it based on

11      seniority.

12  Q.  What interested you in working for that unit?

13          MR. QUINN:  Form.

14  A.  It was a better schedule and there was some

15      overtime.  The Housing captain would receive a

16      little bit of overtime.

17  Q.  Why was that attractive at the time?

18  A.  Well, I was planning on retiring in four years

19      or so and I wanted an opportunity to build up

20      my pension a little bit.

21  Q.  Okay.  What was the basis of overtime for the

22      Housing Unit captain role?

23  A.  My overtime, I would usually come in one day a

1          MR. QUINN:  Form.

2     A. No, they were two separate units.

3     Q. Did they have a similar geographic focus in

4        the city of Buffalo?

5          MR. QUINN:  Form.

6     A. Sometimes.  I mean, as I said, the Housing

7        Unit was responsible for the Housing

8        properties, things that occurred in those

9        properties.  Sometimes if -- I am sure

10       sometimes the Strike Force would patrol in

11       there and police in there.

12    Q. Okay.  And how much involvement did you have

13       in setting the patrols for Strike Force, the

14       Strike Force team?

15    A. I really didn't have anything to do with it

16       but occasionally, as I said, I think I said

17       before, a chief from a district would request

18       that we set up traffic safety checkpoints in

19       their district.

20    Q. Were there ever occasions that you were giving

21       lieutenants on the Strike Force instructions

22       that extended beyond kind of the "a chief

23       requested this, please accommodate"?

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1            MR. QUINN:  Form.

2     A.  The only time I relayed instructions to them

3         was if I was told by the chief or the deputy

4         commissioner or the commissioner that he

5         wanted them to do something or to go into this

6         area I would relay it.  And also when the --

7         when one of those people, one of my superiors

8         requested it, they would email it a lot of

9         times and they would copy me on the email

10        because I worked in the same building.

11    Q.  Do you have a sense of why you would be the

12        recipient of those emails?  It was merely that

13        you shared a building with them?

14    A.  Yes.

15            MR. QUINN:  Form.

16    A.  Oh, I am sorry.  Yes, number one, I share the

17        building.  Number two, I was the person that

18        signed their overtime slips, if they happened

19        to work overtime.  And if they worked -- if

20        they worked overtime, I would have to have

21        knowledge that that shift was actually created

22        or that detail was actually created.  I can't

23        just sign an overtime slip just to sign it.  I

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. Did you conduct performance evaluations of any
2       of the officers you reported -- who reported
3       to you?
4    A. No.  That's the Buffalo Police.
5    Q. You never performed performance evaluations?
6    A. No.
7    Q. Did you say it was BPD policy not to do such
8       evaluations?
9            MR. QUINN:  Form.
10   A. They don't have performance evaluations.
11   Q. Okay.  How would you escalate if -- how would
12      you respond to instances where your officers
13      had deficits?
14           MR. QUINN:  Form.
15   A. What do you mean by "deficits"?
16   Q. Were there ever instances where you thought
17      your officers could benefit from additional
18      training or additional supervision?
19   A. I don't believe there was.
20   Q. But there were instances where your officers
21      would be subject -- the subject of complaints?
22   A. Yes.
23   Q. How did you communicate information to your

1    Q.  Okay.  What was the purpose of those meetings?

2    A.  To update them if there was any updates on

3        things that were going on with our superiors,

4        and they would also give me feedback the

5        things that were happening within their

6        platoons, within their officers.

7    Q.  Okay.  Those were in-person meetings?

8    A.  Yes.

9    Q.  Okay.  Was that an opportunity for you to

10       provide lieutenants instructions on the

11       details or what you expected of officers?

12   A.  Sometimes.

13   Q.  Okay.  Were there any other ways that you sort

14       of communicated or engaged in supervision of

15       your officers that we haven't -- and

16       lieutenants that we haven't discussed?

17   A.  No, none that I can think of.

18   Q.  Okay.  Do you know whether officers on the

19       Housing Unit received training on racial

20       discrimination?

21           MR. QUINN:  Form.

22   A.  I don't know.

23   Q.  Do you know whether they received training on

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1          racial profiling?

2      A. I can't say.

3              MR. QUINN:  Form.

4      Q. Do you know whether Housing Unit officers

5          received training on searches and seizures?

6              MR. QUINN:  Form.  You broke up a little

7          bit on our end.

8      Q. Oh, sorry.  Do you know whether Housing Unit

9          officers received training on the

10         constitutional requirements for searches and

11         seizures?

12             MR. QUINN:  Form.

13     A. No.

14     Q. Do you know whether Housing Unit officers

15         received any training on the procedures for

16         conducting traffic checkpoints?

17             MR. QUINN:  Form.

18     A. No.

19     Q. And during your time as Housing Unit captain,

20         did you provide your officers any instruction

21         on those topics?

22             MR. QUINN:  Form.

23     A. No.

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q.  Did you take any steps to ensure that your

2        officers and lieutenants were not engaging in

3        racial profiling?

4            MR. QUINN:  Form.

5    A.  No.

6    Q.  Okay.  Now, am I correct that the Housing Unit

7        also had an involvement in traffic

8        checkpoints?

9    A.  Sometimes they would conduct traffic safety

10       checkpoints in or around the Buffalo Municipal

11       Housing properties.

12   Q.  Okay.  How often was that the Housing Unit's

13       practice?

14   A.  It was rare.

15   Q.  In instances where the Housing Unit did

16       conduct checkpoints around BMHA properties,

17       what was the reasoning?

18           MR. QUINN:  Form.

19   A.  To enforce vehicle and traffic law and penal

20       law.

21   Q.  Since it was rare, what, if anything, would

22       warrant the creation of a checkpoint to your

23       understanding?

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. Okay.  So I am now going to zoom in on page 2

2       of this document.  Do you so at the top where

3       it says "Housing Unit in general," and it

4       indicates that you "patrol through and respond

5       to calls for service within the BMHA

6       properties"?  Is that one of the functions

7       your Housing Unit officers performed?

8    A. Yes.

9    Q. Okay.  Did they check the parking lot for

10      unauthorized vehicles as indicated here?

11    A. Yes.

12    Q. Did they impound vehicles and conduct traffic

13      stops as well?

14    A. Yes.

15    Q. And do you see here that it says another

16      function you performed was to "stop and

17      question gang members and parolees driving

18      and/or walking through BMHA properties and

19      ensure that they are there for a lawful

20      purpose"?

21    A. Yes, I do see that.

22    Q. Was that one of your practices during the time

23      as --

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A. Yes, but --

2    Q. -- Housing Unit captain?

3    A. Yes, but there is a little more meaning to

4       that.  What I probably should have said in

5       their travels and their duties when they see

6       suspicious people, they stop and question them

7       and a lot of them turn out to be gang members

8       and parolees.

9    Q. And when you say "suspicious people," what do

10      you mean?

11   A. People doing --

12          MR. QUINN:  Form.

13   A. I am sorry.  Conducting suspicious activity

14      they may think are committing or in the

15      process of committing a crime.

16   Q. You agree that's not what this indicates here?

17          MR. QUINN:  Form.

18   A. Well, I should have worded it a little bit

19      differently.  What this is is our services

20      that we perform above baseline which meant

21      normal patrol and everything.  This is the

22      result of some of the investigative patrolling

23      that the officers did.  A lot of times when

1          they did investigate suspicious activity, the

2          person turned out to be a gang member or

3          someone that was out on parole.

4     Q.  That's to say that after they were stopped and

5          questioned by officers, these are things that

6          you would learn at that time?

7     A.  I am sorry, can you repeat that, please?

8     Q.  Sorry.  That after these individuals were

9          stopped and questioned by your officers, it

10         might be revealed that they are gang members

11         or parolees?

12    A.  Exactly.  After they were investigated, it was

13         discovered that they were a gang member or

14         someone out on parole.

15              MR. QUINN:  Form.

16    A.  They didn't specifically stop everybody in the

17         Housing Units.  They wouldn't have even had

18         time to do that, but I am sorry.

19    Q.  Okay.  Now, your officers also engaged in what

20         I think is described as vertical patrols; is

21         that correct?

22    A.  I don't know what you mean by vertical

23         patrols.  Oh, I am sorry, they would do

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1          walkups in the high-rises.  There is a lot of
2          high-rises in some of the Housing projects.
3          Five, six stories high.  That's what they mean
4          by vertical.  They would walk through it.  A
5          lot of time there will be people doing
6          criminal things in those -- or shooting drugs
7          up in those stairwells and hallways.
8     Q.  Okay.  So by vertical patrol, that's to say
9          that your officers would walk up and down the
10         flights of stairs at the Housing units --
11         sorry, at the BMHA properties?
12    A.  Exactly.
13              MR. QUINN:  Form.
14    Q.  Okay.  And what occurred during the vertical
15         sweeps or patrols?  Were there any protocols
16         that officers were to follow?
17              MR. QUINN:  Form.
18    A.  Just regular police duties.  If they had
19         suspicions or had cause to arrest somebody,
20         just as their normal patrol duties except they
21         were walking up and down so not patrolling in
22         the vehicle.
23    Q.  Now on two occasions you have described, you

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. But you did relay the instructions you were

2       given?

3    A. Yes, I did.

4    Q. Okay.  Were some of those maps showing areas

5       with recent shootings?

6          MR. QUINN:  Form.

7    A. Yes.

8    Q. Why would checkpoints be located in areas with

9       recent shootings?

10         MR. QUINN:  Form.

11   A. Because it's been shown that they deter crime.

12      When a traffic checkpoint is conducted in an

13      area -- when you have 15 police officers in an

14      area with six or seven patrol cars and they're

15      checking registrations, the criminals aren't

16      going to commit crimes right there.  More

17      likely than not they're not going to commit

18      crimes there.  They're going to -- criminals

19      are going to stay away from where the police

20      are if they can see the police.

21   Q. Okay.  So were the checkpoints operated in a

22      manner where only motorists who were involved

23      in shootings had to pass through them?

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1           MR. QUINN:  Form.

2     A. No, it was all motorists.

3     Q. So any motorist in the area, regardless if

4        they were involved in any suspicious activity,

5        would be stopped?

6     A. Well, not stopped.  They were slowed down so

7        that the officers could look at the

8        inspection/registration sticker and some were

9        stopped but not all of them were stopped.

10    Q. They would all have to pass through the

11       checkpoint if it was established --

12    A. They would --

13    Q. -- along their commute?

14    A. Yes, drive through it.

15    Q. Okay.  What other activities did your officers

16       or Strike Force officers perform at the

17       traffic checkpoints?

18           MR. QUINN:  Form.

19    A. They slowed down the vehicles.  They looked

20       for vehicular and traffic law violations and

21       sometimes they came across other things.

22    Q. Did they question the motorists?

23    A. Sometimes if the motorists were stopped.  Most

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A. No, it's --

2           MR. QUINN:  Form.

3    A. -- not.

4    Q. How would you describe it?

5    A. I don't know what takes place in the

6       conference so I can't answer that, and I don't

7       have knowledge of what is said at the

8       conference.  I don't get any documentation of

9       what was transpired in a conference.  All I --

10      the only thing I would receive was that he had

11      a conference.  I don't know what they talked

12      about.  They talked about the complaint, but I

13      don't know anything else.

14   Q. And that's true even in cases where the

15      officer or lieutenant is someone in your

16      direct command?

17   A. That's correct.

18   Q. Okay.  I'd like to turn to an exhibit that was

19      produced by defendants as COB042054.  This is

20      going to be Serafini Exhibit 16.  This is a

21      document where for some reason we did not

22      receive the full file so what I am able to

23      share is just your email that is dated April

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1        discovery as COB016309 and I am pulling that

2        up momentarily.

3               Okay.  Mr. Serafini, are you able to see

4        this?

5    A.  I see it, yes.

6    Q.  Do you see that this is an email that you sent

7        on May 8th, 2017, to a number of BPD personnel

8        including the Strike Force lieutenants and

9        Chief Young?

10   A.  I see that, yes.  As I said, I guess I created

11       the top portion.  I know I didn't create the

12       bottom portion of that form.

13   Q.  Okay.  And do you see that it's indicating

14       that one of the main changes you have made is

15       that you have space now to write in up to four

16       checkpoint locations?

17   A.  I see that.

18   Q.  So you can write all four checkpoint locations

19       on one sheet?

20   A.  That's correct.

21   Q.  Does that refresh your recollection that as of

22       2017 the Strike Force was at times running up

23       to four checkpoints a day?

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A. At that period of time, yes, in 2017.

2    Q. Okay.  And it also states that "every week I

3       will be forwarding a copy of these checkpoint

4       forms to Deputy Police Commissioner Lockwood's

5       office so please ensure that all the

6       information is accurate."  Do you see that?

7    A. Yes, I do.

8    Q. Do you have any understanding of why these

9       forms were being forwarded to Deputy Police

10      Commissioner Lockwood?

11   A. He instructed me that he wanted the forms.

12   Q. Did he explain why?

13   A. No, he didn't.

14   Q. And who instructed you to maintain checkpoint

15      location data more generally?

16          MR. QUINN:  Form.

17   A. I don't know if it came from Deputy

18      Commissioner Lockwood or not.

19   Q. But BPD --

20   A. There is -- let me reiterate.  They were

21      keeping track of the locations on a form

22      before I was transferred there so, I mean,

23      this just continued when I was transferred

1          multiple -- about motorists being issued

2          multiple tickets at one stop?

3      A.  I don't know if I received complaints about

4          that but that was an occurrence.  Sometimes

5          officers -- you know, someone had six or seven

6          violations and the officers wrote them tickets

7          for all those violations.

8      Q.  Isn't it true that sometimes officers would

9          write, you know, four or five or even six

10         tickets for tinted windows in a single stop?

11             MR. QUINN:  Form.

12     A.  I don't know.  Again, if they had four

13         severely tinted windows, they could write

14         that.  If they had one tinted window illegal,

15         they could write that, the one, too.  That's

16         up to the officer's discretion.

17     Q.  So the officers -- you did not provide

18         officers any guidance about how to approach

19         tinted window ticketing, for instance?

20             MR. QUINN:  Form.

21     A.  No, I didn't.

22     Q.  And you didn't -- officers -- you did not

23         provide officers guidance about how many

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1        tickets were too many tickets to issue at

2        once?

3    A.  Not that I can remember.

4    Q.  Did anyone in the BPD to your knowledge

5        instruct officers that they should refrain

6        from issuing four, five, six tickets at a time

7        to a single motorist?

8            MR. QUINN:  Form.

9    A.  Not that I can remember.

10   Q.  Ultimately, it was just a matter of officer

11       discretion, how many tickets to issue at a

12       time?

13   A.  It should have been, yes.  If a person had

14       four violations and they wanted to write them

15       for four violations, they could write them.

16       If they want to use discretion and only write

17       them for three and let them go on one, that

18       was up to their discretion as it is any

19       officer in the city.

20   Q.  You didn't see it as one of your duties as

21       captain to create standards around how and

22       when your officers issued tickets or

23       summonses?

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. Okay.  Now, assuming you have reviewed the

2       complaint in this case, are you aware that we

3       allege there are instances where officers did

4       in fact write four, five, or six traffic

5       summonses for tinted windows at a time?

6    A. Am I aware of an officer doing that

7       specifically?  No.

8    Q. Are you aware that that's an allegation in

9       this case?

10    A. That someone is alleging that?  I am not aware

11       that someone is alleging that or was alleging

12       that.

13    Q. To confirm, there is nothing in the V&T or BPD

14       policy that requires your officers to issue

15       separate tickets for each tinted window a

16       motorist has, correct?

17    A. Not that I know of.

18    Q. So if your officers issued more than one

19       tinted window ticket, that was an act of

20       discretion on their part?

21          MR. QUINN:  Form.

22    A. Yes.

23    Q. And you also agree that not all tinted windows

1       it.  All right?

2    A. Thank you.

3    Q. Do you want to take 10 minutes this time?

4    A. That's fine.  Thanks.

5    Q. Thanks.

6             (A recess was taken.)

7

8       BY MS. EZIE:

9    Q. Okay.  Mr. Serafini, earlier we were speaking

10      about TraCS and ENTCAD and I think it's fair

11      to say you didn't really engage those systems

12      much.  Are you aware that TraCS allows --

13      sorry, that these systems allow for the race

14      of motorists to be recorded alongside ticket

15      information?

16   A. I wasn't aware of that, no.

17   Q. Did you ever -- so fair to say that you never

18      instructed your officers to try and record the

19      race of motorists who they stopped?

20   A. No.

21            MR. QUINN:  Form.

22   Q. Okay.  And now there were, however, a number

23      of paperwork practices that you engaged in on

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1          one hand as chief of the Housing Unit and on

2          the other hand as someone that helped with

3          administration of the Strike Force, correct?

4     A. Yes, as captain of the Housing Unit, right.

5     Q. Correct, okay.  And so that included creating

6          reports that officers could fill out regarding

7          the number of arrests they made, for instance?

8     A. Yes.

9     Q. The number of traffic summonses they issued?

10    A. Yes.

11    Q. The number of vehicles they impounded?

12    A. Yes.

13    Q. Among other police functions.  And you

14         documented this both for the Housing Unit as

15         well as the Strike Force, correct?

16    A. Yes.

17              MR. QUINN:  Form.

18    Q. Okay.  And it was your practice to review this

19         information as well as to report it out to

20         higher-ups at the BPD?

21    A. Yes.

22    Q. That includes the commissioner of the BPD,

23         Commissioner Derenda?

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A. Yes.

2    Q. As well as Deputy Commissioner Lockwood?

3    A. Yes.

4    Q. Deputy Commissioner Beaty when she -- it's a

5       she, I believe, when she joined --

6    A. Yes, when she was in that position.

7    Q. Okay.  Also Chief Young?

8    A. Yes.

9    Q. And Chief Brinkworth before Chief Young?

10   A. Yes.

11   Q. Okay.  Why was it your practice to provide

12      information of the nature we just discussed to

13      all of those individuals?

14          MR. QUINN:  Form.

15   A. It was my responsibility.  It was part of my

16      duties.

17   Q. And what was the importance of those numbers

18      as you understood it?

19          MR. QUINN:  Form.

20   A. Did you say what was the importance?

21   Q. Yes.

22   A. It's a certain measure of production for

23      police officers.

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. It was important for your officers to be

2       productive and to have high production?

3    A. To show the work they were doing.

4    Q. And that work included, you know, making

5       arrests and issuing summonses, impounding

6       cars?

7    A. Yes.

8    Q. Okay.  And am I correct that there were times

9       where -- am I correct that you were expected

10      to have high production when it came to those

11      metrics?

12          MR. QUINN:  Form.

13   A. Well, I don't know what you mean by "high

14      production" but you're expected to do some

15      work during the tour unless there were

16      extenuating circumstances where you weren't on

17      patrol.

18   Q. Okay.  But work, again, as we're describing it

19      here is producing arrests, summonses,

20      impounds, etcetera?

21          MR. QUINN:  Form.

22   A. That's a part of it, a part of it.

23   Q. And am I correct that there were times where

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1      of a shift police officers would not make

2      arrests or issue summonses solely because

3      there was no crime to respond to?

4          MR. QUINN:  Form.

5   A. That's quite possible, yes, sure.

6   Q. So what explains the attitude that if you're

7      not producing results you may not be doing the

8      work?

9   A. I don't understand the question.

10  Q. Okay.  There seems to be an expectation that

11     if you are doing your jobs and doing the work

12     that you're also generating arrests and

13     summonses.  Why is that?

14          MR. QUINN:  Form.

15  A. Because, like it or not, there is crime out

16     there.  There are people/citizens that are

17     violating the laws.

18  Q. And the expectation that your units would be

19     productive was an expectation held by the

20     higher-ups at the BPD, correct?

21          MR. QUINN:  Form.

22  A. That's correct, yeah.  Yes.

23  Q. Including Commissioner Derenda and Chiefs

1          Young and Brinkworth?

2               MR. QUINN:  Form.

3     A. Yes.

4     Q. Deputy Commissioner Lockwood as well?

5               MR. QUINN:  Form.

6     A. Yes.

7     Q. I would like to mark as an exhibit I believe

8        this will be Exhibit 26, Serafini Exhibit 26,

9        a document that's been produced by defendants

10       and Bates stamped COB042018.

11             Mr. Serafini, let me know if you're able

12       to see this.

13    A. Yes, I can see it.

14    Q. Okay.  Because it's an email chain I am going

15       to scroll to the bottom, but do you see that

16       looking at the top that this is an email

17       that -- an email chain that includes you from

18       October 2015?

19    A. Yes, I see that.

20    Q. Okay.  So, again, I am scrolling down just so

21       we can read from the beginning of the chain.

22       So do you see this that the subject of this

23       message is a new Strike Force Daily Report has

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1          been submitted?

2     A.  Yes.

3     Q.  What can you tell us about Strike Force Daily

4          Reports?  What were they?

5     A.  Well, that's the report I referred to earlier,

6          we have referred to earlier, that every

7          night -- every day at the end of the tour the

8          Strike Force and the Housing would send a

9          daily report.  They would send it through the

10         computer system.  It would go on what they

11         called our bulletin boards which was a

12         computer -- again, an area of the computer

13         system and a report would directly go to me,

14         the captain, and it would go to the deputy

15         commissioners, the commissioner, and the chief

16         of the units.

17    Q.  Got it.  And that's in part what this

18         distribution list reflects?

19    A.  Yes.

20    Q.  Okay.  So I am scrolling up and this was not

21         produced with the underlying report as an

22         attachment so I don't have that for us to

23         review, but I am going to just show you the

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1        email chain.  So do you see here that Police

2        Commissioner Derenda responds to this Strike

3        Force Daily Report?

4    A. Yes.

5    Q. What does his response state?

6    A. If you can scroll it up a little bit more?

7    Q. Sure.  It's kind of stretched between two

8        pages.

9    A. Oh, I am sorry.  Commissioner Derenda states,

10       "not much production."

11   Q. Got it.  So is it fair to say that he is

12       commenting on the results or the numbers that

13       were submitted in the nightly report?

14   A. Yes --

15           MR. QUINN:  Form.

16   A. -- he is commenting on that.

17   Q. Okay.  And he is expressing some disapproval

18       about the performance?

19           MR. QUINN:  Form, specifically

20       "performance".

21   A. I think what he is implying is he wants to

22       know why.

23   Q. Okay.

—————— PHILIP SERAFINI - BY MS. EZIE - 12/27/21 ——————

1    A. Why there was no production that evening.

2    Q. Okay.  On occasions where your production was

3       low, that was something you had to explain or

4       expected to explain?

5          MR. QUINN:  Form.

6    A. I don't remember explaining it a lot but

7       occasionally, once in a blue moon, yes.

8    Q. So do you see here that officer -- sorry, I

9       believe he is a lieutenant.

10   A. Yes.

11   Q. Thomas Whelan, he is a Strike Force

12      lieutenant?

13   A. Lieutenant Whelan was a Strike Force

14      lieutenant, yes.

15   Q. So he responds to Derenda, correct?

16   A. Yes.

17   Q. And his first -- the first sentence of his

18      email states "the numbers represented are not

19      indicative of unit performance."  Do you see

20      that?

21   A. Yes.

22   Q. Is it fair to say that the numbers that you

23      generated were one of the metrics that the

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1      commissioner used to see whether your unit was

2      performing adequately?

3           MR. QUINN:  Form.

4  Q. Or the Strike Force, in this case?

5  A. It was one of the measures, yes.

6  Q. And do you see that he, Lieutenant Whelan,

7      goes on to try to explain why the performance

8      on this night was low?

9  A. Yes.

10 Q. And do you see that you went ahead and

11     forwarded that message to Chief Brinkworth?

12 A. Yes.

13 Q. Why would you have forwarded -- why would you

14     have had this communication with Chief

15     Brinkworth?

16          MR. QUINN:  Form.

17 A. What I think happened was the deputy

18     commissioner had talked to the chief about it

19     but he directly emailed Lieutenant Whelan and

20     Lieutenant Whelan emailed his response back to

21     Commissioner Derenda without including our

22     chief on the report and I wanted to make my

23     chief aware of it.

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. So low --

2    A. He is in the chain of command.

3    Q. Understood.  Low performance is something that

4       concerned the commissioner of police as well

5       as the chief -- the chiefs that you reported

6       to?

7            MR. QUINN:  Form.

8    A. Yes.

9    Q. Okay.  Now, is it fair to say that you took

10      pride in -- strike that.

11           Is it fair to say that when your unit,

12      the Housing Unit, and when the Strike Force

13      generated more arrests, summonses, impounds,

14      parking tags, etcetera, that that was viewed

15      favorably within the BPD?

16           MR. QUINN:  Form.

17   A. Yes.

18   Q. It's something that you took personal pride in

19      when you saw your officers' arrests and

20      summonses numbers increasing?

21           MR. QUINN:  Form.

22   A. Yes, as long as it was being done properly and

23      legally.

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. Is that something that was tracked on the

2       reports that you generated?

3             MR. QUINN:  Form.

4    A. You're referring to the arrests and summonses,

5       yes.

6    Q. Yes.  Did it indicate whether the arrest was

7       lawful or unlawful, or did it just say "here

8       is the number of arrests"?

9             MR. QUINN:  Form.

10   A. It just stated the number of arrests.

11   Q. Okay.

12   A. And if they were a felony or a misdemeanor.

13   Q. Okay.  So when you saw evidence that

14      summonses, impounds, arrests were increasing

15      among the Housing and Strike Force Units, you

16      saw that as evidence of the good work that

17      those units were doing in the city of Buffalo?

18   A. Like I said, as long as it was done properly,

19      yes, and lawfully.

20   Q. But, again, that wasn't something that you

21      tracked necessarily in any statistics, whether

22      these arrests or impounds were lawful or

23      unlawful?

1        MR. QUINN:  Form.

2    A. No.

3    Q. I would like to show you an exhibit that was

4       produced -- I'd like to show as Exhibit 27 an

5       exhibit that was produced -- a document that

6       was produced in discovery by defendants that

7       was Bates stamped 018512 and its attachment

8       which is COB018513.  Just give me one moment

9       and I will pull it up.

10           Mr. Serafini, are you able to see this

11       document?  Let me make it a little bigger.

12    A. Yes.

13    Q. Are you able to read that?

14           Okay.  Do you see that this is an email

15       that you're sending to the Strike Force and

16       the Housing lieutenants as well as Chief

17       Brinkworth?

18    A. Yes.

19    Q. The subject is Yearly Comparison?

20    A. Yes.

21    Q. And it's stating that you have made a

22       spreadsheet for the combined Housing and

23       Strike Force yearly statistics including the

```
1          STATE OF NEW YORK)

2          COUNTY OF ERIE   )

3


4
            I, Carrie A. Fisher, Notary Public, in and
5       for the County of Erie, State of New York, do
        hereby certify:
6

7           That the witness whose testimony appears
        hereinbefore was, before the commencement of
8       their testimony, duly sworn to testify the
        truth, the whole truth and nothing but the
9       truth; that said testimony was taken remotely
        pursuant to notice at the time and place as
10      herein set forth; that said testimony was taken
        down by me and thereafter transcribed into
11      typewriting, and I hereby certify the foregoing
        testimony is a full, true and correct
12      transcription of my shorthand notes so taken.

13
         I further certify that I am neither counsel
14      for nor related to any party to said action,
        nor in anyway interested in the outcome
15      thereof.

16
            IN WITNESS WHEREOF, I have hereunto
17      subscribed my name and affixed my seal this
        12th day of January, 2022.

18

19             _____

20             Carrie A. Fisher
21             Notary Public - State of New York
               No. 01FI6240227
22             Qualified in Erie County
               My commission expires 5/02/23

23
```