# Exhibit 140

**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF NEW YORK**

.................................................................x

BLACK LOVE RESISTS IN THE RUST, et al.,

*Plaintiffs,*

- vs -                                                    Case No. 1:18-cv-719

CITY OF BUFFALO, N.Y., et al.,

*Defendants*.

.................................................................x

## PLAINTIFFS' DEPOSITION DESIGNATIONS for 30(b)(6) Topic 17

Topic 17:    BPD policies, practices, procedures, rules, guidance, training materials, etc., concerning issuance of tickets for seatbelt and tinted window violations of the Vehicle and Traffic Law, including, but not limited to, the use of tint meters to measure tints.

A.  The BPD's policies and practices regulating the number of tinted window tickets that can be issued during a single stop, inclusive of any guidance provided to BPD officers;

B.  Any policy changes, procedures, or investigations that Defendants have adopted or undertaken concerning BPD officers' issuance of multiple tinted window tickets at a single stop in response to the filing of this lawsuit;

C.  Whether BPD officers currently retain the discretion or ability to issue multiple tinted window tickets at a single traffic stop;

D.  The BPD's role in and implementation of fix-it tickets, and a description of the guidance, if any, that has been issued to the BPD concerning fix-it tickets.

1

**DEPOSITION OF PATRICK ROBERTS ON APRIL 20, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 232:12 | 233:23 | Q Okay. So like every -- like every neighborhood, the east side has residents who are law-abiding, correct? <br> A Absolutely, the overwhelming majority. <br> Q Yeah. And there was no differentiation of who went through the checkpoints in terms of whether they were law-abiding or not, correct? <br> A Oftentimes I would never know. <br> Q Okay. And there are residents who are not law-abiding, correct? <br> A I presume. <br> Q And the same can be said for North Buffalo <br> A Sure. <br> Q And South Buffalo as well? <br> A Sure. <br> Q And when you were in the <br> A District, you already testified that you observed vehicle and traffic violations, correct? <br> A Sure. <br> Q Seat belt violations? <br> A Yes. <br> Q Tinted window violations? <br> A Yes. <br> Q Child restraint violations? <br> A Yes. <br> Q But according to this data, there were very few to no checkpoints in South Buffalo that were conducted; is |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | that correct?<br>A Correct.<br>Q Okay. Traffic safety was -- traffic violations were present in South Buffalo. Why were there no checkpoints there?<br>A That would require me to explain what I'm thinking, so I can just tell you it wasn't my -- it wasn't my -- the commissioner told us where to go. |

## DEPOSITION OF PHILIP SERAFINI ON DEC, 27 2021

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 211:8 | 213:1 | Q. Isn't it true that sometimes officers would write, you know, four or five or even six tickets for tinted windows in a single stop?<br>MR. QUINN: Form.<br>A. I don't know. Again, if they had four severely tinted windows, they could write that. If they had one tinted window illegal, they could write that, the one, too. That's up to the officer's discretion.<br>Q. So the officers -- you did not provide officers any guidance about how to approach tinted window ticketing, for instance?<br>MR. QUINN: Form.<br>A. No, I didn't.<br>Q. And you didn't -- officers -- you did not provide officers guidance about how many tickets were too many tickets to issue at once?<br>A. Not that I can remember.<br>Q. Did anyone in the BPD to your knowledge instruct officers that they should refrain from issuing four, five, six tickets at a time to a single motorist? |

| | | |
|---|---|---|
| | | MR. QUINN: Form.<br>A. Not that I can remember.<br>Q. Ultimately, it was just a matter of officer discretion, how many tickets to issue at a time?<br>A. It should have been, yes. If a person had four violations and they wanted to write them for four violations, they could write them. If they want to use discretion and only write them for three and let them go on one, that was up to their discretion as it is any officer in the city.<br>Q. You didn't see it as one of your duties as captain to create standards around how and when your officers issued tickets or summonses?<br>A. Not concerning writing multiple summonses. |
| 215:13 | 215:22 | Q. To confirm, there is nothing in the V&T or BPD policy that requires your officers to issue separate tickets for each tinted window a motorist has, correct?<br>A. Not that I know of.<br>Q. So if your officers issued more than one tinted window ticket, that was an act of discretion on their part?<br>MR. QUINN: Form.<br>A. Yes. |
| 215:23 | 216:2 | Q. And you also agree that not all tinted windows violate the vehicle and traffic laws, correct?<br>A. That's correct. |
| 220:7 | 220:13 | Q. Did you provide your officers any guidance about how to determine if windows were appropriately tinted?<br>A. No, I didn't.<br>Q. You didn't advise them to look to see if there were stickers from the manufacturer, etcetera?<br>A. No. |
| 222:22 | 223:6 | Q. So is it possible that your officers were issuing tinted window tickets to motorists whose cars and windows had already passed inspection?<br>MR. QUINN: Form.<br>A. Is it possible? Is that what you asked?<br>Q. Yes.<br>A. Yes, it's possible. |

**DEPOSITION OF BYRON LOCKWOOD ON AUGUST 10, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 71:2 | 74:16 | Q. Are you familiar with the practice of multiple ticketing? <br> MR. SAHASRABUDHE: Objection to form. <br> A. I'm familiar with it. <br> Q. We'll call that issuing more than one ticket in a single stop, okay? <br> A. Okay. <br> Q. Did you ever provide any guidance to the Strike Force and the Housing Unit on multiple ticketing? <br> A. Can you repeat that? Did I ever -- <br> Q. Provide guidance to the Strike Force and Housing Unit with respect to multiple ticketing? <br> A. Not that I can recall, but I wasn't no fan of it. <br> Q. Why were you not a fan of multiple ticketing? <br> MR. SAHASRABUDHE: Objection to form. <br> A. I just think that giving a lot of tickets for like tinted windows, it's not that you can't give them. You can give a ticket for each dark tinted window, but me personally, I'm just not a fan of that. <br> Q. And why are you not a fan of giving those kind of tickets? <br> A. I'm just not a fan of it. I just don't think -- I just think one ticket for tinted window is good enough or maybe two, but for each window I'm just not a fan of it. <br> Q. Were you aware that Strike Force officers had a common practice of issuing four tickets, one for each window? <br> MR. SAHASRABUDHE: Objection to form. <br> Q. In a single stop? <br> MR. SAHASRABUDHE: Objection to form. <br> A. Yes. <br> Q. Did you ever instruct them that they should not do that? <br> A. I didn't instruct the officers, but I <br> expressed my dissatisfaction with the chief and with the commissioner about it. <br> Q. And when did that occur? <br> A. I don't know when it occurred. It was just verbally. It wasn't no email or whatever and I couldn't tell you what year it was. It was just verbally. <br> Q. What caused you to express your dissatisfaction with the practice? <br> A. I just didn't like it. <br> Q. Was there a particular event that occurred that prompted you to say something? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | A. No.<br>Q. And what did you say?<br>A. I just said I don't think it's necessary to give a ticket for each dark tinted window.<br>Q. And did anything happen after you said that?<br>A. No. I don't think so. Mentioned it to the chief and the commissioner and I don't know if they took it up with them or not. I just mentioned it.<br>MR. SAHASRABUDHE: Objection to form.<br>A. No. I didn't check into it because I know that it was something that they can do. It wasn't illegal what they were doing. It was just that I didn't -- me particularly didn't care for it.<br>Q. Well, regardless of whether it was legal, couldn't you direct the officers not to do it?<br>MR. SAHASRABUDHE: Objection to form.<br>A. I'm not going to direct the officer not to do his job. If it's part of his job then he's going to do what he's going to do as long as it was part of the job.<br>Q. So it's your testimony that issuing four tinted windows tickets in a single stop is part of the officer's job?<br>MR. SAHASRABUDHE: Objection to form.<br>That's not what he said.<br>A. It's legal. It's part of the V&T so they can do it. So it's part of their job. They can do that. |
| 76:2 | 77:9 | Q. Wouldn't there be other instances in which it would be hard to tell without measuring whether the window tint was within legal limits?<br>MR. SAHASRABUDHE: Objection to form.<br>A. Yes.<br>Q. Why didn't the BPD issue tint meters to officers?<br>MR. SAHASRABUDHE: Objection to form.<br>A. I don't know if we had them at one time or maybe traffic may have had them. I'm not sure.<br>Q. Do you think the officers should have had them?<br>MR. SAHASRABUDHE: Objection to form.<br>A. I think it's a good tool to have, yes. If you're going to write for tinted windows, yes.<br>Q. Did you ever take any steps to make sure that officers had tint meters?<br>MR. SAHASRABUDHE: Objection to form. |

6

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | A. No.<br>Q. Were you ever concerned that officers may be issuing invalid tinted windows tickets because they didn't have the ability to measure the degree of tint?<br>MR. SAHASRABUDHE: Objection to form.<br>A. No. It wasn't something I -- no, I didn't. No. The answer is no.<br>Q. Meaning no, that wasn't something that you thought about?<br>A. No. |
| 81:3 | 81:23 | Q. Would you agree that in this email Chief Patterson is describing a program of pretextual stops of suspected gang members?<br>MR. SAHASRABUDHE: Objection to form.<br>A. Yes. Through the email, yes.<br>Q. He wants to make traffic stops for violations like seatbelt and tinted window so that he can check for warrants and search vehicles and seize guns and inhibit the movement of suspected gang members, right?<br>MR. SAHASRABUDHE: Objection to form.<br>A. Yes.<br>Q. Did the Strike Force engage in tactics that are similar to those described in this email?<br>MR. SAHASRABUDHE: Objection to form.<br>A. Yes.<br>Q. And did the Housing Unit engage in tactics that are similar to those described in this email?<br>MR. SAHASRABUDHE: Objection to form.<br>A. Yes. |

**DEPOSITION OF BYRON LOCKWOOD ON AUGUST 17, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 202:7 | 202:12 | Q: Did you ever undertake any internal investigations into the Buffalo Police Department's tinted windows ticketing practices? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | A: No |
| 220:4 | 220:12 | Q. Did there come a time in 2020 when you made changes to the BPD's tinted windows ticketing practices?<br>MR. SAHASRABUDHE: Form.<br>A. No.<br>Q. So if there was a change in frequency of tinted windows ticketing it wasn't something that you caused or ordered?<br>A. No. |

**DEPOSITION OF CHARLES SKIPPER ON MARCH 5, 2021**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 78:20 | 79:1 | Q. Do you recall ever having issued a tinted window ticket at a checkpoint where a tinted window reader was not used to confirm that the window was illegal?<br>A. Yes sir. |
| 80:6 | 80:10 | Q. Did you ever get instruction from any of your supervisors in the Strike Force about when it was appropriate to issue a tinted window ticket without using a tint meter?<br>A. No. |
| 139:19 | 140:3 | Q. Okay. Were there any other reasons why you would write multiple tickets -- in your experience write multiple tickets for the same conduct?<br>MR. QUINN: Object to form.<br>A. No. I mean, you can refer back to writing a<br>tint, you could write all four or write one. It would be your discretion. |

**Deposition of David Wilcox on November 4, 2021**

| Citation start (page: line) | Citation end (page: line) | Testimony |
|---|---|---|
| 122:17 | 122:23 | Q. Did the BPD -- you said sometimes you had readers and sometimes you didn't, tint readers; is that correct?<br>A. Correct.<br>Q. When did the BPD give your officers tint readers?<br>A. I don't believe they did, to my knowledge. |
| 141:2 | 141:14 | Q. Have you ever written a single driver multiple tickets for tinted windows?<br>A. Yes.<br>Q. And while you were a lieutenant with the Strike Force Unit, did you become aware that there were some officers that issued more tickets than others for multiple -- I am sorry, for tinted windows?<br>MR. QUINN: Form.<br>A. You're asking if some officers wrote more tint tickets than other officers? |

| Citation start (page: line) | Citation end (page: line) | Testimony |
|---|---|---|
| | | Q. Right. <br> A. I would assume so. |
| 144:7 | 144:17 | Q. Would you be surprised to learn that there were -- that the majority of the tinted window tickets -- the tinted window ticketing happened on the east side of Buffalo? <br> MR. QUINN: Form. <br> A. Am I surprised? Well, no, if the majority of our -- you said earlier that the majority of our roadblocks and checkpoints were on that side, I would think that all tickets across the board would be more. Doesn't that make sense? |

**DEPOSITION OF LANCE RUSSO ON APRIL 29, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 183:7 | 184:15 | Q. So there were instances where officer would write multiple tinted window tickets at a time? <br> A. Sure. <br> Q. Okay. <br> A. As I said, it was completely pertaining to the V&T law. <br> Q. And those matters were entrusted to officer discretion? <br> MS. RAUH: Objection. Form. <br> A. I mean, you had officer discretion. If you wanted to write all five, you certainly could. If you wanted to write none or one, you don't have to. So yes, it was officer discretion. <br> Q. And there were instances where up to five tickets would be issued at a time to motorists? <br> A. Yeah. I had that it happened and then honestly I think a while back it came down from -- I can't remember where. Somebody in the higher up had mentioned it, hey, maybe not write all five because there's a lot of complaints related to it and again, they can't override the law. The law is that you can write that, but they did suggest a lot of |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | complaints were coming from it.<br>Q. Did you receive some of those complaints personally?<br>A. From motorists you mean?<br>Q. Correct?<br>A. I think so. Yeah. I think I remember complaints about tints |

**DEPOSITION OF JOSEPH FAHEY ON DECEMBER 19, 2019**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 180:13 | 180:19 | **Q.** Do you know -- since you've been the<br>head of the Buffalo Police Academy, are you aware<br>of any training offered either by the Buffalo<br>Police Academy or another law enforcement training<br>facility on how to use automated license plate or<br>window tint readers?<br>**A.** I am not. |

**DEPOSITION OF DANIELLE MORGERA ON MAY 26, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 94:5 | 94:16 | Q Okay. Yeah. So let's get to that. You say, "'Fix-it' tickets should always be issued with the correction form." Do you see that? <br> A Yes. <br> Q And you say, "The police have this form in the system they use to print the ticket and it should be printed out when they give the ticket. Some do, some don't." <br> Do you see that? <br> A Yes. <br> Q So some officers don't use the form when handing out tickets, right? <br> A Correct. |
| 95:1 | 95:22 | Q Okay. Well, let me go further in your response. It says, "It concerns me that they don't know this. Understanding the law should be part of officer training." Do you see that? <br> A I do. <br> Q So why do you make that comment? A Common statutorily dismissible equipment violations are -- is something that is called a fix-it ticket. If you have a headlight out, a broken mirror, by state law if you get it fixed right away, it's dismissed. <br> Q Okay. <br> A And my personal opinion is that if officers are writing that violation, they should know enough to also include the correction form so the motorist knows that they have an opportunity to fix it and get it dismissed. <br> Q Okay. So you're concerned here that police officers didn't understand the law regarding fix-it tickets. Is that fair? <br> MR. SHORT: Form. <br> A Yeah. Fair enough |
| 139:9 | 140:10 | Q So just a few questions about this. So you see the top most violation in 2017 was window tints? Do you see that? <br> A Yes. <br> Q 1,536 tickets, right? <br> A Yes. <br> Q If you look at the top ten violations in 2018, window tints are number two at 428. Do you see that? <br> A Yes, I do. <br> Q So there are about a thousand fewer window tints in the 2018 period versus the 2017 period, right? <br> A Yes, I can see that. |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | Q Do you know why there were so many fewer window tint tickets?<br>A Well, we know that Strike Force did give out multiple window tickets, and at that time in the 2017 is when we were getting the tickets in our court.<br>Q Okay. And then you stopped getting window tint tickets from Strike Force in 2018; is that correct?<br>A I believe they were disbanded in the beginning of 2018, so those tickets would have continued to trickle in throughout the rest of the year.<br>Q Okay. But you were getting them less often, let's say. Is that fair?<br>A That's fair, yes. |

**DEPOSITION OF KEVIN BRINKWORTH DATED MARCH 16, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 105:16 | 106:22 | Q How would an officer determine whether the windows on a vehicle are unlawfully tinted without a tint meter?<br>A I don't know other than just viewing it and making a determination if they're dark, but I don't know.<br>Q But you would agree that if the law says 70 percent, it could be hard to tell just by looking at it whether it's 70 percent or 69 percent or 71 percent, right?<br>Mr Poole: Form<br>A I don't know that you could be exact, no.<br>Q Did you ever request that the BPD issue tint meters to Housing Unit and Strike Force officers?<br>A I don't recall.<br>Q Do you think the BPD should have issued tint meters to Housing and Strike Force officers? |

<table>
<tr><td></td><td></td><td>A They're an enforcement tool.<br>Q Given the numbers of tinted windows tickets that were<br>issued by the Strike Force and Housing Unit officers,<br>don't you think that they should have been able to<br>measure the tint of the windows to ensure that they<br>were issuing valid tickets?<br>A Well, according to that memo, some of them did have<br>their tint meters, so if they did have tint meters on<br>site, then they could have used those.<br>Q I don't think that was exactly responsive to my<br>question.<br>MS. WILNER: Luanne, would you be able<br>to read the question back again, please?<br>(Record read by reporter.)<br>A Yes.</td></tr>
</table>

**DEPOSITION OF CHARLES MILLER ON NOVEMBER 8, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 411:13 | 413:18 | Q. Do you always issue a Fix-It ticket when an individual has an equipment violation ticket or equipment violation?<br>A. Not always, no.<br>Q. What circumstances do you not issue a Fix-It ticket?<br>A. A lot of times, to be honest with you, it's based on attitude of the individual being stopped.<br>Q. What do you mean by that?<br>A. If they're rude or argumentative I won't issue a Fix-It ticket. I'll just issue a summons and tell them they have to either pay the fine or show up to court.<br>Q. Okay. Have you ever been counseled that you're required to give Fix-It tickets whenever there is an equipment violation?<br>A. No. |

<table>
<tr>
<td></td>
<td></td>
<td>

MS. FREELY: Objection to form.

Q. Have you ever been provided training or guidance about the prohibition of retaliating against an individual for making statements that -- for making statements and giving them -- and not giving them Fix-It tickets?

MS. FREELY: Same objection.

A. I don't understand your question.

Q. Have you ever been counseled on the prohibition of retaliation?

A. Retaliation, yes.

Q. Would you consider it retaliation not giving someone a Fix-It ticket based on their attitude or what they stated to you?

A. No.

Q. Why not?

A. I'm not required to issue a statement of correction.

Q. Are you required to issue a Fix-It ticket when you encounter a vehicle that has an equipment violation that can be fixed?

A. Not to my knowledge, no.

Q. When you have trained your officers as a lieutenant do you give them the same counsel, to only give Fix-It tickets when -- on a discretionary basis?

MS. FREELY: Can you just repeat that?

You broke up in the beginning of that.

Q. Sure. As a lieutenant, have you provided the same counsel to your police officers under your command that they need only give Fix-It tickets at their discretion?

A. It's discretionary, yes.

</td>
</tr>
</table>

**DEPOSITION OF ADAM WIGDORSKI ON MAY 24, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 74:9 | 74:20 | Q Did you receive any instruction about how many tickets to issue per tinted window violation, so whether to issue one ticket for a vehicle having multiple windows or whether to issue multiple tickets? A No, ma'am. Q Was there any discussion among Strike Force members about issuing multiple tickets? A No, ma'am. Q Was issuing multiple tickets brought up by your supervisors in any way? A No, ma'am |
| 74:21 | 75:17 | Q And you hardly issued any tinted window tickets to white people, correct? A I don't know the racial statistics on my ticket issuance. Q Right. We can go back to Exhibit 9, I believe, which has the total numbers of tinted windows tickets you issued broken down by race. And that document does show that you tended to issue more tinted windows tickets -- not issue tinted windows tickets to white people; is that correct? MR. SAHASRABUDHE: Objection to the form of the question. A Yes. Based on this chart, it shows -- which is also presumed because of the area that I was patrolling. Q Can you explain what you mean by that? A The areas that I patrolled was predominantly like the east side of Buffalo, which is predominantly an African-American and Middle Eastern descent neighborhood |
| 96:12 | 97:6 | Q Okay. Who provided the tint meter that you used? A I purchased it. |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | Q You purchased it? And was it typical for Strike Force officers to purchase their own tint meters? A Any officer. They were not provided by the Buffalo Police Department. Q Okay. And were you instructed to purchase it, or did you purchase it of your own volition? A Of my own. Q Okay. Who trained you how to use a tint meter? A It came with instructions in the box that it came in. Q Okay. So there was no formal training on how to use a tint meter, correct? A That is correct. Q Okay. So during your time at Strike Force, what was the policy regarding using the window tint meter? MR. SAHASRABUDHE: Form. A There was no policy |

**DEPOSITION OF RICHARD HY ON JULY 19, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 75:15 | 78:8 | Q. So you mentioned earlier tinted window tickets. I'd like to talk a little bit more about those. During your time on the Strike Force, were you aware of any formal policy on writing multiple tickets for tinted window violations? A. There was -- I forget where it came down from. It was more of a verbal suggestion. It wasn't a rule, it wasn't a law, but I remember stating -- I didn't state it. Somebody -- one of the lieutenants told me, to the group, that it wasn't necessary to issue a ticket for each window, that you could start issuing it singular -- a singular window tint ticket for just one window. An example would be if you have the front windshield, the four doors of a normal sedan tinted and the rear of a vehicle, the rear window tinted, a |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | tint ticket could be issued for each window. In fact, there's specific vehicle and traffic violations numbers for the front and back window as well as the side front and back windows. So the suggestion was instead of ticketing one window each, a ticket each, that you could just give one window ticket for a single window that had the tint instead of the max. <br> Q. And to confirm, do you recall when that suggestion was made to you? <br> A. It was later on. It was near the end of Strike Force. I want to say it was within but not prior to the last year that it was still a unit. <br> Q. And prior to that suggestion, had your practice been to issue one ticket for each piece of glass? <br> A. Yes. <br> Q. Okay. And after receiving that suggestion, did you change your practice? <br> A. No, it was on discretion. I was less likely to but I would still issue it, especially if the tint was like limo tint. <br> Q. Did you ever discuss a practice of issuing multiple tinted window tickets versus one ticket for all windows as we just discussed with other Strike Force officers? <br> A. Yes. <br> Q. What do you recall about those discussions? <br> A. Just in passing talking about that vehicle one day got one ticket because whatever reason and then that vehicle the other day had really dark tints so they got every window, general things like that. <br> Q. Do you recall whether the majority of people you spoke to had a practice of issuing one violation per piece of glass or one violation for any number of pieces of glass? <br> MR. SAHASRABUDHE: Objection to form. <br> A. If I remember correctly, I think every Strike Force has at one point or another issued multiple tickets for the tinted windows for each, either front windshield, back window, or side windows. |

**DEPOSITION OF JOSEPH GRAMAGLIA ON SEPTEMBER 22, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 81:8 | 82:7 | Q. Well, something we observed is that tinted windows ticketing decreased and -- well, let me ask: Are you aware that around 2020 Buffalo Police Department officers started issuing fewer tinted windows tickets? A. Well, again, if you recall in 2020 we had something called COVID which you will see that all of our categories of tickets and traffic stops significantly decreased, so that's one of those years down the line that will have a big asterisk next to it when it comes to statistics for a lot of categories, not just for policing but everything else in the world. Q. But the BPD never issued any kind of guidance or policy change that was directly concerning tinted windows ticketing? A. A policy change, no. Tinted window tickets is a violation of the New York State Vehicle and Traffic Law. Officers have discretion on whether or not they're going to issue a summons to a particular motorist or not so that's still to this day a violation of the vehicle and traffic law. |

**DEPOSITION OF JUSTIN TEDESCO ON JULY 11, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 153:7 | 153:16 | Q. Okay. And -- strike that. How many tinted windows tickets would you usually issue during a single stop? MR. SAHASRABUDHE: Objection to form. THE WITNESS: As many windows were tinted. BY MS. TEFFT: Q. Were you aware of any formal policy when you were in the housing unit about how many tickets to issue for tinted windows at a single stop? A. I don't believe there was a policy. |
| 242:6 | 246:11 | Q. In the second half of 2018, you see a steep drop-off in the number of tinted windows tickets you wrote. It's down to seventy-four tickets. Do you see that? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
|  |  | A. Yes.<br>Q. And the number of tinted windows tickets dropped even further down to twenty-nine tickets in the first half of 2020, right?<br>A. Yes.<br>Q. What was the reason for the steep drop-off in the number of tinted windows tickets you wrote?<br>A. We were told to stop writing for every single window, and then the massive drop-off was COVID, and we weren't working. And the elimination of the housing unit, and -- yeah, all that.<br>Q. Around that time though, looking at the second half of 2018, for example, even though the number of tinted windows tickets you wrote went down significantly, the average number of tinted windows tickets you wrote per stop stayed relatively high at three point three six tickets per incident. Do you see that?<br>A. Yes.<br>Q. Was that in spite of the instructions you received from your supervisor to not issue more than one tinted window ticket per stop?<br>A. I don't know. It's an average.<br>Q. And then even up until the first half of 2020, you were issuing tinted windows tickets at an average of three point four tickets per stop, right?<br>A. I guess that's what that means.<br>Q. So why did you continue to issue a high volume of tickets, tinted windows tickets, in a single stop |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
|  |  | even after you got instructions from your supervisors to limit your tinted windows tickets to one ticket per stop? A. I don't know. Q. You have no explanation for why you continued to issue multiple tinted windows tickets during a single stop despite instructions from your supervisors? A. Probably because the supervisors changed, probably because usually when we got verbal directives it was only a part-time directive, and it wasn't in the MOP, and I wasn't violating any New York State law, CPL law. I'm allowed to give tickets for every window, so -- Q. When you say it was a part-time directive, do you mean like a temporary directive? A. Sometimes they were temporary directives, so -- Q. Was it your understanding that the directive to only issue one tinted window ticket per stop was a temporary directive at the time that it was issued? A. I don't know what kind of directive it was. Because, like I said, it wasn't like -- I don't believe it was like a pure like -- I didn't think it was a pure mandated directive. I pretty much thought it was because -- I believe it was only given verbally. It was just like hey, knock it off. Kind of given in those terms, so -- Q. So you don't recall receiving a written directive to stop issuing multiple tickets per stop? A. Correct. |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | Q. And you didn't think that that directive was binding on you? A. I didn't know if it was a binding directive, like I said, or just something to be a temporary stop pissing people off type thing. Q. Did you regard other directives that you got from your supervisors as not binding on you? A. No. Like I said, sometimes things were -- like sometimes things were temporary, and sometimes things were supposed to be done, and a lot of times those directives that were given in a non-formal way came from supervisors, and especially if those supervisors left, and then it was never said by the new supervisor, sort of assumed that it was the old supervisor's directive, thought. Q. Did you have -- strike that. How did you usually tell the difference between a permanent directive and a temporary directive? A. It was an order given by the commissioner or the deputy police commissioner -- actually, if it was given by the deputy police commissioner or anybody below, it still came off of the commissioner's whatchamacallit, like a memorandum, his stationary, you know what I mean, it was a pure thing that was given, not something just said verbally in passing or verbally at a briefing. Q. Do you recall receiving any written directives from the commissioner or deputy commissioner with regards to the number of tinted window tickets |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | that you should issue during a single stop?<br>A. I do not. |

**DEPOSITION OF JARED DOMARACKI ON JULY 18, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 67:4 | 67:22 | Q. Based on your experience meaning did you generally write more tickets to Black people as opposed to white people?<br>MR. SAHASRABUDHE: Objection to form.<br>A. My main area of patrol was the east side of Buffalo and that is more demographically Black individuals, so that could be that.<br>Q. Okay. And of the tinted window tickets with coded race you wrote nearly 15 times as many tinted window tickets to Black people as you did to White people. Is it your experience that Black people have more tinted vehicles than White?<br>MR. SAHASRABUDHE: Objection to form.<br>A. I don't understand the question as to why one individual would have tinted windows over another. People drive around with tinted windows that are all races, so I don't really understand the question. |

**PLAINTIFFS' DEPOSITION DESIGNATIONS for 30(b)(6) Topic 18**

Topic 18:    BPD policies, practices, procedures, rules, guidance, training materials, etc., concerning the issuance of multiple tickets in a single vehicle stop.

A.  The BPD's policies and practices regulating the number of tickets (of any variety) that can be issued during a single stop, inclusive of any guidance provided to BPD officers;

B.  Any policy changes, procedures, or investigations that Defendants have adopted or undertaken concerning BPD officers' issuance of multiple tickets at a single stops in response to the filing of this lawsuit;

C.  Whether BPD officers currently retain the discretion or ability to issue multiple tickets at a single traffic stop.

**DEPOSITION OF CHARLES SKIPPER ON MARCH 5, 2021**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 134:1 | 134:13 | Q. Okay. And was it typically your practice, you know, to -- when you were in the Strike Force to write multiple tickets for the same conduct? <br> In other words, a person drove a car, like in this example, without a valid license. Was it typically your practice to write multiple tickets for that violation or just a single ticket? <br> MR. QUINN: Object to form. The same conduct. You can answer. <br> A. It was my practice to do that. These tickets were written to Buffalo City Court. |
| 139:19 | 140:3 | Q. Okay. Were there any other reasons why you would write multiple tickets -- in your experience write multiple tickets for the same conduct? <br> MR. QUINN: Object to form. <br> A. No. I mean, you can refer back to writing a tint, you could write all four or write one. It would be your discretion. |

**DEPOSITION OF DANIEL DERENDA ON NOVEMBER 10, 2021**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 123:6 | 123:16 | Q. Did you ever communicate to Strike Force that you expected them to write multiple tickets as part of the zero tolerance policy? <br> A. It gets communicated in that directive. If you go back to the roadblock directive as far as that, that you should write everybody for every violation equally, so that is the directive there, but did I ever put out that I need people to go out and do their job and write summonses and make arrests? I'm sure all the time. |
| 127:23 | 128:17 | Q. Were you aware at the time that the Strike Force and the housing unit were issuing more tickets in a single stop than other parts of the Buffalo Police Department? <br> MR. QUINN: Form. <br> A. Was I aware? I'll make the assumption that, again, the normal officers in patrol never wrote a lot of tickets to begin with. They have so many other things going on with call after call, whatever. They're not doing daily activity reports. When you have Strike Force and you have housing who are doing daily activity reports, what gets measured gets done, and they know you're reviewing numbers and now they have an automated system, I would expect that they're going to start writing more multiple tickets and apparently they did. |

**DEPOSITION OF KEVIN BRINKWORTH DATED MARCH 16, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 98:16 | 100:5 | Q One way to increase the number of tickets issued is to write multiple tickets in a single stop, right? <br> A Yes. <br> MR. POOLE: Form. <br> Q And that way, a single stop, instead of just producing one ticket, can produce four or six, right? <br> A Yes. <br> Q Just so we're clear, I'm going to call this practice multiple ticketing. |

18

| | | |
|---|---|---|
| | | A Okay.<br>Q Did you personally ever provide guidance to the<br>Strike Force and the Housing Unit officers with<br>respect to multiple ticketing?<br>A No.<br>Q And did you request that anybody else in the BPD<br>provide guidance to Strike Force and Housing Unit<br>officers on the multiple ticketing?<br>A No.<br>Q Were you aware that Strike Force and Housing Unit<br>officers had a common practice of engaging in<br>multiple ticketing, for example, with tinted window<br>stops, issuing one ticket for each window?<br>MR. POOLE: Form.<br>A I knew that they were issuing tickets for tints.<br>Q Did you know that instead of issuing a single ticket,<br>they would issue four?<br>A I had heard that, yes.<br>Q And did you feel that it was appropriate for Strike<br>Force and Housing Unit officers to be issuing four<br>tickets in a single stop for tinted windows?<br>MR. POOLE: Form.<br>A I don't recall having an opinion<br>Q Did you ever speak to Strike Force and Housing Unit officers about their tinted window ticketing<br>practices?<br>A Not that I recall |
| 129:2 | 129:9 | Q If an officer pulls somebody over for an<br>investigatory stop, the officer doesn't have to write<br>the person a ticket, right?<br>MR. POOLE: Form.<br>A No.<br>Q Whether and how many tickets to write is in the<br>officer's discretion?<br>A Yes. |
| 129:23 | 130:15 | Q Can you explain the racial disparity in issuance of multiple tickets?<br>A I can't |

| | | |
|---|---|---|
| | | Q Do you think that Black drivers commit more traffic violations than white drivers?<br>A I don't have the statistics on that. I don't know.<br>Q As chief, did you take any affirmative steps to learn whether your officers were engaging in racial profiling?<br>A No.<br>Q And did anybody within the BPD ever ask you to investigate whether your officers were engaging in racial profiling?<br>A No. |

**DEPOSITION OF AARON YOUNG ON OCTOBER 26, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 80:17 | 81:20 | Q According to our data, which we alleged in the Amended Complaint in this action, drivers from predominantly Black Zip codes were eight times as likely to be issued multiple tickets in a single stop than drivers from predominantly white Zip codes. Do you have any reason to believe that data is incorrect? <br> A I -- if those are the numbers, I have no reason to. <br> Q Can you explain the racial disparity in the issuance of multiple tickets at a single stop? <br> A I can't <br> Q As chief, did you take any affirmative steps to learn whether your officers were engaging in racial profiling? <br> A No, I did not. <br> Q Did you take any affirmative steps to learn whether your officers were engaging in racially biased policing? <br> A I did not. <br> Q Did anybody within the BPD ever ask you to investigate whether your officers were engaging in racial profiling? <br> A No. <br> Q Or racially biased policing? <br> A No. |
| 91:1 | 91:8 | Q So we talked briefly before about multiple ticketing, the practice of issuing more than one ticket in a single stop. And you're with me on understanding what I mean by "multiple ticketing"? <br> A Yes. <br> Q Did you ever provide guidance to the Strike Force and Housing Units on multiple ticketing? <br> A No, I did not. |
| 92:1 | 92:5 | Q Did Commissioner Derenda or Lockwood ever instruct you to convey to Strike Force and Housing Unit officers that they should not issue more than one tinted window ticket per stop? <br> A I don't recall ever. |
| 94:3 | 94:6 | Q Do you personally believe that it's appropriate for an officer to write two or more tinted windows tickets in a single stop? <br> A No, I do not. I never did at least. |

**DEPOSITION OF JARED DOMARACKI ON JULY 18, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 67:4 | 67:22 | Q. Based on your experience meaning did you generally write more tickets to Black people as opposed to white people?<br>MR. SAHASRABUDHE: Objection to form.<br>A. My main area of patrol was the east side of Buffalo and that is more demographically Black individuals, so that could be that.<br>Q. Okay. And of the tinted window tickets with coded race you wrote nearly 15 times as many tinted window tickets to Black people as you did to White people. Is it your experience that Black people have more tinted vehicles than White?<br>MR. SAHASRABUDHE: Objection to form.<br>A. I don't understand the question as to why one individual would have tinted windows over another. People drive around with tinted windows that are all races, so I don't really understand the question. |

**PLAINTIFFS' DEPOSITION DESIGNATIONS FOR 30(B)(6) TOPIC 25**

Topic 25:     The role of the BPD in generating revenue for the City through ticketing and towing/impound of vehicles.

**DEPOSITION OF KEVIN HELFER ON JUNE 22, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 21:14 | 21:22 | Q. What are the sources of the Department of Parking's revenue?<br>A. So you can get revenue from paid parking tickets. You get revenue from towing and storage. You would get revenue from auctioned vehicles. And you would<br>get revenue through the contract that I had talked about before with Buffalo Civic Auto Ramps.<br>Q. And those revenues go into the city's general fund?<br>A. Correct |
| 25:8 | 27:11 | Q. If their registration is suspended, do they have to get it reinstated in order to get the vehicle back?<br>A. If they don't get it reinstated, they have to tow the vehicle out. They cannot drive it out. We do not allow an illegal vehicle to be driven out of the auto impound.<br>Q. Are they required to pay any fines?<br>A. Yes.<br>Q. Okay. Could you describe what the fines are?<br>A. It depends on what the ticket was. Generally the cost of a ticket for whatever that violation was, late fees if there are any, towing and storage if there are any.<br>Q. Do you recall the amount of -- the amount Buffalo charged for towing and storage fees?<br>A. I have been gone for three months. I don't know. I'm just going to generalize. I think it was $125 for a tow and $40 for storage if I'm not mistaken. Do not hold me to that because they could have changed. I do not know, and I could be off by a<br>little here or there.<br>Q. Okay. Thank you. So that was what you recall the fees being at the time you left, correct?<br>A. That's what I recall.<br>Q. Did those fees change at all during the time you were at parking?<br>A. Yes.<br>Q. And how did they change? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | A. I can't recall all the specifics, but some parking tickets went up either 5 or 10 dollars. And the towing charge, I don't recall 12 years ago what it was, but it went up a little bit as well as storage.<br>Q. And is towing a flat fee, or is that dependent on how long the vehicle has been in the impound lot?<br>A. Those are two different questions. The length of time in the lot is called storage. Towing is its own independent fee.<br>Q. So I'm sorry. I confused that question, but let me just make sure it's clear. There's a flat feet fee for towing, correct?<br>A. Not necessarily.<br>Q. Okay. Why do you say "not necessarily"?<br>A. It depends what you're towing.<br>Q. Okay. So there's a towing fee that depends on what type of vehicle it is; is that correct?<br>A. Size of the vehicle.<br>Q. And then there's a storage fee that depends at least in part on how long the vehicle has been in the impound lot; is that correct?<br>A. Yes. |
| 27:12 | 28:15 | Q. Okay. Thank you. In what situations did parking auction vehicles?<br>A. Basically V&T governs how quickly you can auction off a vehicle. We never were quick at all. We always gave people ample chance to get their car. We would notify them, encourage them to pay or make a payment plan. And probably on average the earliest we would auction a car would be somewhere around 45 days.<br>Q. Was there a policy about how long you would wait to auction cars?<br>A. Well, like I said, yes, there is. I mean, never could we legally be allowed to auction a car within roughly -- it's my policy never less than 30 days.<br>Q. And would you auction all vehicles that were in the impound lot over a certain period of time, or would you only select some of them?<br>A. Right when I left, every vehicle was being auctioned. Prior to that, some vehicles were being deemed as scrap. And there was a contract for a fixed fee of I believe roughly $275 that we had with a company that if the vehicle was just so bad, you would just automatically scrap it. The reason we started going to auctions is because scrap prices were very high and catalytic converters were very much in demand, and we were able to generate more income for that car by auctioning it<br>as opposed to scrapping it. |

| 40:2 | 40:18 | Q. So I want to focus in on revenues from the parking department specifically. Over your tenure as commissioner of parking, were revenues consistent, or did they change over time?<br>A. They changed over time.<br>Q. Okay. And how did they change?<br>A. It depends on the amount of parking tickets you issue. It depends on the amount of cars that get impounded. It depends on the amount of cars that get auctioned. It depends on how well the agreement with<br>Buffalo Civic Auto Ramps was for the revenue – not revenue -- from the parking ramps.<br>Q. Did the revenue trend upwards during your tenure, downwards, or did it just fluctuate?<br>A. Both.<br>Q. What do you mean by "both"?<br>A. Sometimes up, sometimes down. |
| --- | --- | --- |
| 42:19 | 43:6 | Q. Do you recall any discussions with the budget department about ways to increase the parking department's revenues?<br>A. Yes.<br>Q. Okay. Can you describe what you recall about those discussions?<br>A. Really the only -- there's only two ways you're going to increase revenues. You're going to either raise the fines and fees or you're going to issue more violations. And frankly, if people are not violating the law, you would issue none. |
| 43:7 | 43:16 | Q. Did you take any actions in response to those discussions?<br>A. We did comparable research of other municipalities to see if we were in line with our charges for parking violations fines.<br>Q. And what did those studies find?<br>A. Predominantly we were always less than anybody else.<br>Q. Okay. And did you increase parking violations fines in response to that finding?<br>A. Not immediately, but over time, yes. |
| 46:15 | 46:23 | Q. Okay. That's fine. The next sentence is "With the Strike Force operating seven days per week, our tows have dramatically increased." So Strike Force caused tows to dramatically increase during this period, |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | right?<br>A. It went up, right.<br>Q. Dramatically?<br>A. It depends how you want to define "dramatically," but yes. |
| 50:3 | 50:18 | Q. What are LPRs?<br>A. License plate readers.<br>Q. Okay. And so you're saying here that the license plate readers have also contributed to the number of tows, correct?<br>A. Correct.<br>Q. And can you explain why those LPRs added to the tows?<br>A. Sure. The LPRs were uploaded with data that would tell if people met the threshold in terms of the amount of money owed for their car to be towed. The LPRs were installed on parking enforcement vehicles. They'd drive down the road. If that criteria is met, the LPR goes off with the alarm and the person would pull over and see if indeed the car didn't pay their outstanding tickets and owed a substantial amount of money. |
| 50:19 | 51:21 | Q. I have a few more questions about that. Were LPRs used by Buffalo Police Department officers as well?<br>A. Yes.<br>Q. Okay. Would Buffalo Police Department officers tow a vehicle if it had too many outstanding parking tickets?<br><div align="center">MS. RAUH: Form</div>They could.<br>Q. And would the LPRs just check for outstanding parking tickets, or would they check for other things as well?<br>A. On our system, we were not allowed to check for anything else but outstanding parking tickets. Police had a different policy.<br>Q. Do you know what police LPRs checked for?<br>MS. RAUH: Form<br>A. They could check for a lot of things, stolen car, expired registration. That's the little I know about the police side of it.<br>Q. Were LPRs viewed as a way to generate revenue?<br>A. LPRs would give us a way to have people pay if they were scofflaws. |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | Q. So they were a way to generate revenue from people who were scofflaw, correct?<br>A. They were a way to get paid for people who were scofflaw, yes. |
| 52:16 | 52:23 | Q. Okay. So it's fair to say that you were towing more vehicles than you expected to in the -- in this time frame, right?<br>A. It's fair to say that we were towing more vehicles than I had money budgeted for.<br>Q. And you budgeted money based on your expectations, correct?<br>A. Of the previous year, yes |
| 67:18 | 67:22 | Q. Let's look at Exhibit 7. And this is just a cover email. It's a March 21, 2013 email Bates stamped COB075239. And you're sending this to Commissioner Estrich, right?<br>A. Uh-huh. |
| 69:2 | 71:13 | Q. Do you see an Excel spreadsheet now?<br>A. I do.<br>Q. I think I asked, do you recall what the purpose of this was?<br>A. Okay. Sure, I know what the purpose of this is now, sure.<br>Q. Okay. What is it?<br>A. Similar to what we were talking about before, periodically you'll increase your rates. This was the parking rates going I believe from 50 cents an hour to a dollar an hour for the metered parking, a dollar an hour to $2 an hour for the four-hour metered parking and $2 to $3 for all day parking. That would be line number four.<br>Line number five was a recommendation from Buffalo Civic Auto Ramps to increase their reserved and nested parking rate by $10 a month, and there you see the calculation. Number six is increasing BCAR rates systemwide. Once again, you see the analysis of that system. Additional all day spots, they restriped the parking ramps and were able to get an additional 250 spots. There's the calculation. And here we were saying we're increasing towing and storage from $90. Towing goes from 90 to 120 dollars. Storage goes from 25 to 30. And the corresponding increase in revenues for fiscal year ending '14, fiscal year ending '15, fiscal year ending '16. At one point we talked about the sale of Dart Street, and that's what that number is in there for. And then we had a new initiative, line number 11, event night rate for parking. Previous to this, there was no charge for parking around the arena after 5:00 p.m., and that was our initiative to start charging around the arena. So as I mentioned to you before, there were numerous times that I put my budget together, it would go to Donna Estrich. We would communicate back and forth. She would agree to a final number, put it in the budget, submit it to the Common Council for approval. |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | Q. So I want to ask you about the towing and storage increases. Do you know if those increases were put into effect? <br> A. I know they were definitely put into effect somewhere along the line. I'm not going to say that I know for certain they went into effect that fiscal year ending '14. <br> Q. And then I want to refer you to C at the bottom here, and it says, "Our Towing and Storage rates are low. This increase of $30 on towing and $5 on daily storage rates might generate more than I am anticipating id the Strike Force goes back into effect." Did you mean if the Strike Force goes back into effect? <br> A. Yes. |
| 71:14 | 72:6 | Q. Okay. And so you're saying they might generate more than you budget if the Strike Force goes into effect, correct? <br> A. Back into effect. I think I've been very consistent in trying to explain that developed my budgets by looking a previous years' statistics. Obviously you showed a slide before that Strike Force was taking a pause, so I'm basing this on previous year analysis. It is nothing but a budget. It's a roadmap. I made an editorial comment that that could increase if Strike Force goes back into effect. <br> Q. Okay. And that's because as we looked at before, Strike Force had caused tows to dramatically increase, right? <br> A. Yes. |
| 75:12 | 75:18 | Q. One of the purposes of LPR is to increase revenue? <br> MS. RAUH: Form <br> A. The purpose of the LPR was to have people comply with the financial obligation for outstanding tickets. <br> Q. And if people complied, that would lead to more revenue for the city, right? <br> A. That would be the revenue, yes. |
| 121:12 | 121:21 | Q. Let's move on to 16. And 16, it's not titled in the document, but I will tell you that this is from the 2017-2018 budget, the Executive Department details, which I downloaded directly from the Buffalo government website. And I'm going to refer to the 2017-2018 budget for the BTVA, which is near the end. <br> A. Okay. <br> Q. There's the first page. Do you recognize this page? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | A. Yes. |
| 122:3 | 122:8 | Q. And I want to refer to this page which lists goals and activities for the Traffic Violations Agency. Do you see that?<br>A. Yes. This is part of the documentation that the Common Council requests for submission with our annual budget. |
| 122:9 | 122:20 | Q. Okay. So did you have any role in putting this information together?<br>A. Along with Ms. Morgera, yes.<br>Q. Okay. So you reviewed this before it was submitted to Common Council?<br>A. I should have. I assume I did.<br>Q. Do you know who wrote this information?<br>A. Ms. Morgera did.<br>Q. Does the mayor's office also review this information before it's submitted to Common Council?<br>A. I cannot answer that. I know that Commissioner Estrich certainly does. |
| 122:21 | 123:2 | Q. And this indicates that one of the Traffic Violations Agency's goals is to generate revenue, correct?<br>A. Sure.<br>Q. And that was one of the goals?<br>A. It's one of them, yes. |
| 139:8 | 139:12 | Q. So in other words, BTVA's revenue is directly correlated with the number of tickets BTVA issues, right?<br>A. For the most part. It depends on the people paying as well. |

**DEPOSITION OF KEVIN HELFER ON JUNE 29, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 244:16 | 244:23 | Q. Okay. So you testified yesterday that as stated in this document and the other one we looked at, one of the goals of BTVA was to generate revenue, right? A. Yes. Q. Where did you get that understanding that that was one of the goals? A. Well, you wouldn't fine people -- if you're fining people, you're generating revenue. |
| 247:4 | 247:10 | Q. Did anyone ever tell you that BTVA's goals no longer included generating revenue? A. No. Q. Did BTVA change any of its policies or practices after this goal was removed from the work program statistics? A. No. |
| 257:6 | 257:16 | Q. So why did you believe that the number – information regarding the number of tickets was relevant to Commissioner Estrich's duties? A. I mean, there is a supposition that a percentage of tickets result in revenue for those who pay. Q. Would you regularly keep Commissioner Estrich updated on the number of traffic tickets coming in? A. Anything that related to fiscal, I would communicate with her and vice versa. Q. And the number of tickets was related to fiscal? A. Certainly. |

**DEPOSITION OF DONNA ESTRICH ON JULY 12, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 18:1 | 19:7 | Q. Okay. Could you just walk me through the process for how the budget was created? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | A. Every year we have our financial system, and so each of the departments would input their requests and they would have to request personnel, anything associated with personnel there's a lot of union benefits, holiday time, overtime, things like that that they'd have to cover, any travel expenses they were anticipating, service supplies, and then they would also have to input any revenue expectations. So they had a month to do that, and then in February -- that was in January. In February myself and my department would review it, make sure -- you know, look what was added, if they had missed anything. And then end of February, March, we would work with the departments and sit down and talk with them and say, you know, what are you anticipating here, why did you increase this, did you forget to put this in, and kind of come to an agreement on what the budget would be. And then April, you know, we'd still fine tune it. We'd have to look at our revenues. We'd have to look at property taxes, any other offsets to the expenses, and then the mayor would approve it and then it would be submitted to council and then we also have to commit to the control board. |
| 20:2 | 20:16 | Q. And you said there was a discussion that would occur between you and, you know, the departments or the -- about what they were submitting. Would that be both expenses and revenue? A. Yes, it would. Q. Okay. And so would you ever provide feedback or ask questions about their revenue expectations? A. Yes, we would. Sometimes it was newly created revenue, sometimes it was old revenues and it would be, you know, where are you coming up with these numbers, why do you think you're going to meet your recommendation on these numbers. |
| 20:17 | 21:11 | Q. Would you ever -- let me -- I will get to that question later. So was there a particular person you would coordinate with in each of the departments? A. Usually with the commissioner, the deputy commissioners, and then within each departments there's different functions so we would deal with probably the director of that function also so it was a group effort. Q. Okay. So just to give some specific examples here, for the BPD, the Buffalo Police Department, was there a particular person you would have budget-related discussions with? A. They had a budget analyst that used to do most of their work. Q. Okay. Do you recall who that was? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | A. John Stanchak. |
| 23:13 | 23:21 | Q. Did the mayor's office ever express to you a goal to increase revenues?<br>A. Well, the only time we would -- you would want to increase revenues is because he was very insistent on keeping our property taxes level. And I would say, "we're going to have to raise taxes to cover the budget," and he would say, "well, then I have to find some more revenues. We need to do something else." And -- |
| 59:4 | 59:9 | Q. So ultimately BTVA was created, right?<br>A. Yes.<br>Q. Okay. And that allowed City of Buffalo to keep a higher percentage of revenue from traffic tickets?<br>A. Yes. |
| 62:6 | 62:15 | Q. Okay. Are there any other consequences if a department does not meet its adopted budget or is not on track to meet its adopted budget?<br>A. Depending on how many departments are under budget in their revenues, we would put a freeze on expenditures throughout the whole city.<br>Q. Okay. Would you ever put a freeze on just a particular department?<br>A. We have. |
| 62:22 | 63:7 | Q. Okay. I want to move to kind of some specific questions about the numbers in here, and I'm going to start with under the "Fines" category, the first item is "traffic violations fines." Do you see that?<br>A. Yes.<br>Q. Okay. So for 2013-2014 the actual amount is a bit over 500,000, correct?<br>A. Yep. |
| 63:13 | 64:3 | Q. Okay. And then under adopted budget, it says 4.2 million. Do you see that?<br>A. Yes, I do.<br>Q. Do you recall how that number was developed?<br>A. I don't remember.<br>Q. Okay. It would have been in consultation with the BTVA?<br>A. Yes.<br>Q. Okay. So this document lists revenues, correct?<br>A. Yes.<br>Q. And do all of these revenues go into the city's general fund? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | A. Yes. |
| 177:12 | 177:14 | Q. And the BTVA drove an increase in revenue for the City, right?<br>A. Yes. |

## DEPOSITION OF DANIELLE MORGERA ON MAY 26, 2022

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 70:10 | 70:18 | Q. So BTVA's revenue is directly correlated with the number of tickets BPD issues on a two-month delay?<br>A. No. That's not what that means. What it means is that most people are resolving their ticket within two months and paying it off.<br>Q. Okay. And that results in a direct relationship between the revenue and the number of tickets issued, right?<br>A. As long as they pay it, yes. |
| 71:4 | 71:12 | Q. Got it. Okay. And just for an example, if the BPD issues a lot of tickets in May, you would expect a lot of revenue in July assuming motorists pay their tickets, right?<br>A. At the time when I did this research, yes, that was what we had hypothesized.<br>Q. Okay. And has that changed since?<br>A. I don't know. I haven't -- I haven't explored those numbers in this way |
| 80:15 | 81:5 | Q. Okay. Let's move on to Exhibit 10. And this is a September 29, 2017 email from Mr. Helfer to Mr. Kaufman. Do you see that on your screen?<br>A. I do.<br>Q. Okay. And we're going to focus on the -- one of the attachments, and specifically there are two attachments. The first, I believe, is related to parking. And I believe the second is related to the TVA. Do you see a letter dated September 29, 2017 on your screen?<br>A. Yes.<br>Q. And it says "Review of Overtime, Buffalo Traffic Violations," right? |

| | | |
|---|---|---|
| | | A. Okay. |
| 81:13 | 82:10 | Q. So it says in the -- I guess the second main paragraph at the very end, "The average number of tickets has<br>increased by 15 percent from fiscal year 2016 to fiscal year 2017." Do you see that?<br>A. I don't. Just a little bit more.<br>Q. I'm sorry. I'll zoom in a little bit.<br>A. -- asking you to make your screen bigger.<br>Q. It's right above the graph if that helps.<br>A. Okay. All right. Let's go. Yep.<br>Q. Do you see the 15 percent?<br>A. 15 percent? The average number of tickets – yes.<br>Q. Okay. And then the sentence at the top of the next page, it says, "Further, as caseload increases, revenue increases. Revenue increased by 215 percent from fiscal year 2016 to fiscal year 2017," right?<br>A. Yes.<br>Q. So that's a big increase, right?<br>        MR. SHORT: Form.<br>A. It's a logical increase because the more tickets you have, the more revenue you have. |
| 84:22 | 85:19 | Q. As we discussed, there's a direct relationship between the number of tickets and revenue, right?<br>A. At the time we had opined that.<br>Q. So have you ever debunked that theory?<br>        MR. SHORT: Form.<br>A. Not officially.<br>Q. Do you have a different theory now?<br>        MR. SHORT: Form.<br>A. I do. And a big part of it is because the state mandated us to do payment plans.<br>Q. So can you explain your theory to me now?<br>        MR. SHORT: Form.<br>A. Tickets don't make revenue. If somebody doesn't want<br>to pay their ticket, they're not going to pay it. Just because there's tickets issued doesn't mean people are going to pay their ticket.<br>Q. So is it fair to say that tickets create revenue if motorists pay them?<br>        MR. SHORT: Form.<br>A. Yes. |
| 135:4 | 135:7 | Q. And so you want more tickets so BTVA can generate more revenue, right?<br>A. Well, we've already done the data research that has gleaned that more tickets generate more revenue, yes. |

| 147:16 | 148:11 | Q. So did you -- you created the revenue estimate for 2019-2020?<br>A. Yes.<br>Q. And so it's higher than both what you collected in 2017-2018 and what you are projecting in 2018-2019, right?<br>A. Yes.<br>Q. And so what was your basis for the higher revenue number?<br>A. Well, I can tell you first off that the very top line, for some reason, the trends were pointing towards more tickets coming out. So because of those<br>trends, I was anticipating more tickets coming in. I don't know why. I don't remember why. Also, your dollar outstandings, your fourth -- yeah, fourth to the last line, again in anticipation<br>of successful collections efforts, we were hoping to reduce some of the bad debt, which in turn would create more revenue. |

**DEPOSITION OF KEVIN BRINKWORTH ON MARCH 16, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 81:2 | 82:4 | Q I'll direct you to the place in the email where Lieutenant Wilcox says "our unit impounds more cars and writes more summons (by a wide margin) than any<br>district or unit in the city. Our single plate reader has been paid for many times over."<br>So here Lieutenant Wilcox appears to believe that Strike Force officers should get more plate readers because they can generate the revenue to pay for them. Would you agree with that?<br>MR. POOLE: Form.<br>A It appears that because they do so much work, they do write a lot of summonses, that it's needed. I can't speak to his -- go ahead.<br>Q You go. Please finish your answer.<br>A I can't speak to whether he has any insight into budget.<br>Q Would you agree that his email shows an awareness that his work writing summons and impounding vehicles generates revenue for the city?<br>A Yes. |

| | | |
|---|---|---|
| | | MR. POOLE: Form.<br>Q And he also states that he needs additional plate readers in order to meet the commissioner's expectations for production, right?<br>MR. POOLE: Form.<br>A He does mention that, yes. |
| 85:10 | 85:14 | Q Do you understand Lieutenant Wilcox to be arguing that the Strike Force should be able to do more impounds so as to generate more revenue?<br>MR. POOLE: Form.<br>A It does appear to imply that. |
| 88:15 | 88:19 | Q Do you recall ever telling Captain Roberts that he was wrong to suggest that Housing Unit officers had the responsibility to generate enough revenue to pay for overtime details?<br>A I don't recall that. |

**PLAINTIFFS' DEPOSITION DESIGNATIONS FOR 30(B)(6) TOPIC 26**

**The creation and use by the BPD of any explicit or implicit performance metrics relating to numbers of tickets issued, number of vehicles impounded, quality of life or parking tags issues, or amount of revenue actually or potentially raised thereby.**

**DEPOSITION OF DANIEL DERENDA ON DECEMBER 23, 2021**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 164:8 | 164:22 | Q. Also in this document Captain Roberts states Commissioner Derenda maintained a daily running total of all statistics generated by the unit including impounds and held me personally responsible for the unit's productivity in this area. Did you hold Captain Roberts personally responsible for the unit's productivity in terms of impounds? MR. QUINN: Form. A. Productivity, period. Again, what gets measured in my opinion gets done, so we looked at the stats. We would compile the stats and I held the captain, the chief and everybody else accountable for those stats. |
| 202:2 | 202:11 | Q. And you always continued to emphasize the importance of generating numbers, right? A. Generating, out there performing. Again, when you have ten officers, for example, working that are not tied to radio calls, they need to be out there enforcing Vehicle and Traffic Law, out there being proactive and policing and I always did look at numbers, correct, to show me that they were in fact doing what they were assigned to do. |
| 231:10 | 232:8 | Again, as I said before, numbers driven, period. Whether you go back to the MRU or the beginning of the Strike Force, it was always put to them to be out there, be proactive, writing summonses, making arrests, period. So again, my whole purpose is to get people out, visible and doing their job proactively. Q. Did you ever communicate to the officers that it was even more important that they engage in proactive policing now that the city could keep the revenue? A. I always said to the officers it's important to be proactive and particularly units that that's what they do. Again, when you have Strike Force, when you have a Housing, they're out there. They're out in their areas that they're assigned to. Again, they're expected to be proactive. I probably repeat myself a million times but, again, I believe what gets measured gets done and I think they all knew that. They can equate it any way they want to. |
| 242:5 | 242:23 | Q. Does the email reflect a quid pro quo in which officers are expected to produce results in order to continue receiving overtime opportunities? MR. QUINN: Form. A. Officers were always expected to produce results whether it was on overtime details or on straight time details, whether it was Housing or Strike Force. Again, I expected them to be out there doing their job. |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | Q. Was availability of overtime contingent on producing results?<br>MR. QUINN: Form.<br>A. There were certain details on overtime that were expected results. Again, if we wanted people out there and to be proactive, if we were paying for extra details on overtime, I certainly expect them to be out there doing their job. |
| 252:13 | 253:12 | Q. So I'm trying to understand from your perspective as commissioner were you expecting your officers to make every single traffic stop that they possibly could or were you wanting them to make selective traffic stops with the goal of uncovering other criminal wrongdoing?<br>MR. QUINN: Form.<br>A. I wanted my officers, especially on the units like Strike Force, to be out there proactive. I didn't want them sitting, quote, in doughnut shops having coffee instead of being out on the street. If they see a violation of traffic in front of them I'd expect that they would be pulling over vehicles.<br>You could literally drive around if you're not answering calls and people do<br>things in front of you all the time. My expectations were you're out there, this is<br>your job. Pull over cars whenever you see an offense, period.<br>Again, we were numbers driven on everything. What gets measured gets done. |

## DEPOSITION OF PHILIP SERAFINI ON DECEMBER 27, 2021

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 138:13 | 141:9 | Q. Okay. And then in paragraph 2, it begins by saying that "Deputy Police Commissioner Lockwood wants results with this increased daytime detail." Do you see that?<br>A. Yes.<br>Q. And then it states, "all officers should be made aware of this, and of what is expected of them." Do you see that?<br>A. Yes.<br>Q. "In the past, the officers assigned to the daytime detail have always yielded good results and we all |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | expect this to continue into the future." Do you see that?<br>A. Yes.<br>Q. What were you -- what were you describing or conveying in that paragraph?<br>MR. QUINN: Form.<br>Q. I will rephrase. What were you communicating to officers here?<br>MR. QUINN: Form.<br>A. Sometimes when officers are on an overtime detail, not just specific to the Housing and the Strike Force Units, sometimes when they're<br>on an overtime detail, they get a little laxed and they don't perform like they normally should so this email was just making them -- wanted to make the officers aware that they're expected to work.<br>Q. And by "work," is that what you mean when you say results?<br>A. Yes.<br>Q. What does results mean exactly?<br>A. Well –<br>MR. QUINN: Form.<br>A. Work and results, what I mean by that is what was expected of them: To patrol all the areas that they were designated to patrol, to enforce the vehicle and traffic law, to investigate suspicious activity whether it was on the street or by someone operating a vehicle.<br>Q. And what was expected of officers exactly?<br>MR. QUINN: Form.<br>A. It was expected of them to write some summonses, some parking tags if it was warranted, and to make arrests if it was warranted.<br>Q. And when you say that in the past the officers have always yielded good results, are you referring to arrests, summonses, parking tags,<br>those types of results?<br>A. I am referring to their overall performance --<br>Q. How did you --<br>A. -- not just those specific things.<br>Q. Sorry. How did you measure performance in that case?<br>MR. QUINN: Form.<br>A. By the statistics and then by other things such as sometimes they would develop information from citizens or from Housing |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | residents on drug houses or locations or people that were carrying guns, certain vehicles. It was a development of information in addition to the statistics of summonses, arrests, guns confiscated. |
| 231:22 | 234:7 | Q. Okay. And now there were, however, a number of paperwork practices that you engaged in on one hand as chief of the Housing Unit and on the other hand as someone that helped with administration of the Strike Force, correct? <br> A. Yes, as captain of the Housing Unit, right. <br> Q. Correct, okay. And so that included creating reports that officers could fill out regarding the number of arrests they made, for instance? <br> A. Yes. <br> Q. The number of traffic summonses they issued? <br> A. Yes. <br> Q. The number of vehicles they impounded? <br> A. Yes. <br> Q. Among other police functions. And you documented this both for the Housing Unit as well as the Strike Force, correct? <br> A. Yes. <br> MR. QUINN: Form. <br> Q. Okay. And it was your practice to review this information as well as to report it out to higher-ups at the BPD? <br> A. Yes. <br> Q. That includes the commissioner of the BPD, Commissioner Derenda? <br> A. Yes. <br> Q. As well as Deputy Commissioner Lockwood? <br> A. Yes. <br> Q. Deputy Commissioner Beaty when she -- it's a she, I believe, when she joined -- <br> A. Yes, when she was in that position. <br> Q. Okay. Also Chief Young? <br> A. Yes. <br> Q. And Chief Brinkworth before Chief Young? <br> A. Yes. <br> Q. Okay. Why was it your practice to provide information of the nature we just discussed to all of those individuals? <br> MR. QUINN: Form. |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | A. It was my responsibility. It was part of my duties.<br>Q. And what was the importance of those numbers as you understood it?<br>MR. QUINN: Form.<br>A. Did you say what was the importance?<br>Q. Yes.<br>A. It's a certain measure of production for police officers.<br>Q. It was important for your officers to be productive and to have high production?<br>A. To show the work they were doing.<br>Q. And that work included, you know, making arrests and issuing summonses, impounding cars?<br>A. Yes. |
| 236 :18 | 244:2 | Q. And the expectation that your units would be productive was an expectation held by the higher-ups at the BPD, correct?<br>MR. QUINN: Form.<br>A. That's correct, yeah. Yes.<br>Q. Including Commissioner Derenda and Chiefs Young and Brinkworth?<br>MR. QUINN: Form.<br>A. Yes.<br>Q. Deputy Commissioner Lockwood as well?<br>MR. QUINN: Form.<br>A. Yes.<br>Q. I would like to mark as an exhibit I believe this will be Exhibit 26, Serafini Exhibit 26, a document that's been produced by defendants<br>and Bates stamped COB042018. Mr. Serafini, let me know if you're able to see this.<br>A. Yes, I can see it.<br>Q. Okay. Because it's an email chain I am going to scroll to the bottom, but do you see that looking at the top that this is an email<br>that -- an email chain that includes you from October 2015?<br>A. Yes, I see that.<br>Q. Okay. So, again, I am scrolling down just so we can read from the beginning of the chain. So do you see this that the subject of this<br>message is a new Strike Force Daily Report has been submitted?<br>A. Yes.<br>Q. What can you tell us about Strike Force Daily Reports? What were they? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | A. Well, that's the report I referred to earlier, we have referred to earlier, that every night -- every day at the end of the tour the Strike Force and the Housing would send a daily report. They would send it through the |
| | | computer system. It would go on what they called our bulletin boards which was a computer -- again, an area of the computer |
| | | system and a report would directly go to me, the captain, and it would go to the deputy commissioners, the commissioner, and the chief |
| | | of the units. |
| | | Q. Got it. And that's in part what this distribution list reflects? |
| | | A. Yes. |
| | | Q. Okay. So I am scrolling up and this was not produced with the underlying report as an attachment so I don't have that for us to |
| | | review, but I am going to just show you the email chain. So do you see here that Police Commissioner Derenda responds to this Strike |
| | | Force Daily Report? |
| | | A. Yes. |
| | | Q. What does his response state? |
| | | A. If you can scroll it up a little bit more? |
| | | Q. Sure. It's kind of stretched between two |
| | | pages. |
| | | A. Oh, I am sorry. Commissioner Derenda states, "not much production." |
| | | Q. Got it. So is it fair to say that he is commenting on the results or the numbers that were submitted in the nightly report? |
| | | A. Yes -- |
| | | MR. QUINN: Form. |
| | | A. -- he is commenting on that. |
| | | Q. Okay. And he is expressing some disapproval about the performance? |
| | | MR. QUINN: Form, specifically "performance". |
| | | A. I think what he is implying is he wants to know why. |
| | | Q. Okay. |
| | | A. Why there was no production that evening. |
| | | Q. Okay. On occasions where your production was low, that was something you had to explain or expected to explain? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
|  |  | MR. QUINN: Form.<br>A. I don't remember explaining it a lot but occasionally, once in a blue moon, yes.<br>Q. So do you see here that officer -- sorry, I believe he is a lieutenant.<br>A. Yes.<br>Q. Thomas Whelan, he is a Strike Force lieutenant?<br>A. Lieutenant Whelan was a Strike Force lieutenant, yes.<br>Q. So he responds to Derenda, correct?<br>A. Yes.<br>Q. And his first -- the first sentence of his email states "the numbers represented are not indicative of unit performance." Do you see<br>thas low? at?<br>A. Yes.<br>Q. Is it fair to say that the numbers that you generated were one of the metrics that the commissioner used to see whether your unit was<br>performing adequately?<br>MR. QUINN: Form.<br>Q. Or the Strike Force, in this case?<br>A. It was one of the measures, yes.<br>Q. And do you see that he, Lieutenant Whelan, goes on to try to explain why the performance on this night w<br>A. Yes.<br>Q. And do you see that you went ahead and forwarded that message to Chief Brinkworth?<br>A. Yes.<br>Q. Why would you have forwarded -- why would you have had this communication with Chief Brinkworth?<br>MR. QUINN: Form.<br>A. What I think happened was the deputy commissioner had talked to the chief about it but he directly emailed Lieutenant Whelan and Lieutenant Whelan emailed his response back to Commissioner Derenda without including our chief on the report and I wanted to make my chief aware of it.<br>Q. So low --<br>A. He is in the chain of command.<br>Q. Understood. Low performance is something that concerned the commissioner of police as well as the chief -- the chiefs that you reported to? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | MR. QUINN: Form.<br>A. Yes.<br>Q. Okay. Now, is it fair to say that you took pride in -- strike that.<br>Is it fair to say that when your unit, the Housing Unit, and when the Strike Force generated more arrests, summonses, impounds, parking tags, etcetera, that that was viewed favorably within the BPD?<br>MR. QUINN: Form.<br>A. Yes.<br>Q. It's something that you took personal pride in when you saw your officers' arrests and summonses numbers increasing?<br>MR. QUINN: Form.<br>A. Yes, as long as it was being done properly and Legally<br>Q. Is that something that was tracked on the reports that you generated?<br>MR. QUINN: Form.<br>A. You're referring to the arrests and summonses, yes.<br>Q. Yes. Did it indicate whether the arrest was lawful or unlawful, or did it just say "here is the number of arrests"?<br>MR. QUINN: Form.<br>A. It just stated the number of arrests.<br>Q. Okay.<br>A. And if they were a felony or a misdemeanor.<br>Q. Okay. So when you saw evidence that summonses, impounds, arrests were increasing among the Housing and Strike Force Units, you<br>saw that as evidence of the good work that those units were doing in the city of Buffalo?<br>A. Like I said, as long as it was done properly, yes, and lawfully.<br>Q. But, again, that wasn't something that you tracked necessarily in any statistics, whether these arrests or impounds were lawful or unlawful?<br>MR. QUINN: Form.<br>A. No. |
| 244:3 | 246:14 | Q I would like to show you an exhibit that was<br>produced -- I'd like to show as Exhibit 27 an<br>exhibit that was produced -- a document that<br>was produced in discovery by defendants that<br>was Bates stamped 018512 and its attachment |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | which is COB018513. Just give me one moment and I will pull it up. Mr. Serafini, are you able to see this document? Let me make it a little bigger. A. Yes. Q. Are you able to read that? Okay. Do you see that this is an email that you're sending to the Strike Force and the Housing lieutenants as well as Chief Brinkworth? A. Yes. Q. The subject is Yearly Comparison? A. Yes. Q. And it's stating that you have made a spreadsheet for the combined Housing and Strike Force yearly statistics including theseized? Do you see that? A. Yes. Q. So why were you applauding them for these increased statistics? MR. QUINN: Form. A. Well, I told them they were doing a good job. The statistics were increasing and, again, it's one measure of the work the officers are 2013, 2014, and 2015 yearly totals? A. That's correct. Q. And do you see that your email states that "our stats have increased from year to year due to the fine work of you and your officers. The chief and I thank you for all of your efforts"? A. Yes, I see it. Q. Okay. So you're applauding the lieutenants for the fact that their statistics have increased year after year? |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | MR. QUINN: Form.<br>A. Yes.<br>Q. Okay. This is the attachment which we're also<br>marking as part of Exhibit 27. Do you see<br>the -- sorry, are you able to see these<br>numbers clearly?<br>A. Yes, I can.<br>Q. Is fair to say according to this chart between 2013 and 2015 many of the statistics almost doubled, at least with respects to arrests,<br>summonses, city ordinances, that's probably closer to tripled, parking tags, guns, cash seized? Do you see that?<br>A. Yes.<br>Q. So why were you applauding them for these increased statistics?<br>MR. QUINN: Form.<br>A. Well, I told them they were doing a good job. The statistics were increasing and, again, it's one measure of the work the officers are<br>doing.<br>Q. So when statistics increased, statistics such as these increased, you viewed it as evidence of a job well done?<br>MR. QUINN: Form.<br>A. Partially, yes. |
| 246:15 | 249:7 | Q. Okay. I'd like to turn to an exhibit<br>Plaintiffs' Exhibit -- sorry, Serafini Exhibit<br>28 which is a document that was produced in<br>discovery by defendants as COB018565.<br>So do you see that this is an email that<br>you drafted to Chief Young copying the Strike<br>Force and Housing Unit officers in March 2017?<br>A. Yes, I do.<br>Q. Okay. And why don't you take a moment to review it since it's a little long?<br>A. Okay. I have read it.<br>Q. Okay. So is it fair to say that in the first |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | paragraph you are providing Chief Young an update about some of the difficulties you have encountered trying to compile the annual statistics for the Strike Force and Housing Units as of 2016? MR. QUINN: Form. A. Yes. Q. Why did you feel it was important to let Chief Young know that you were having trouble with these statistics? A. Well, previous to this year, to 2017, I would receive a yearly -- someone at headquarters would compile the stats and give me the yearly totals, and all of a sudden they stopped. They weren't doing it anymore. I don't know why but as you can read. So because they stopped, I figured I should do it on my own and that's what I started to do. Q. Got it. So is it fair to say in paragraph 2 you're providing some explanation for why these statistics are important to track? MR. QUINN: Form. A. Yes. Q. What do you provide as the explanation? MR. QUINN: Form. A. I don't understand the question. Q. Sorry. So in paragraph 2 what are you indicating about the numbers, these numbers and -- A. That they're an important barometer, meaning a measure, to help the department understand the amount of work both the Housing and the Strike Force officers do and that they -- MR. QUINN: Form. A. They have increased since 2013. |

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| | | Q. Got it. And your view here, and I think expressed elsewhere, is that when the numbers increase, that's evidence of your officers' hard work and dedication? <br> MR. QUINN: Form. <br> A. That's part of it, yes. That's a part of it. <br> Q. And what's the other part of it? <br> MR. QUINN: Form <br> A. Their interactions with the public is a big part of it, complaints, if there is a rise in complaints or a decrease in complaints. <br> Q. Is that information that you track in the same manner that you track arrests and summonses? <br> MR. QUINN: Form. <br> A. No |

**DEPOSITION OF AARON YOUNG ON OCTOBER 26, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 101:8 | 101:19 | Q And he also is asking for the stats for the shift to be compiled on a report. Are you familiar with the reports that they used to record their stats for the overtime details? <br> A I've seen it before, yes. <br> Q What types of things would they record on the detail form? <br> A Summonses written, guns confiscated, any arrests made. <br> Q So do you think that good results would be judged based on the stats on the detail form? <br> A It could be inferred, yes. |

**PLAINTIFFS' DEPOSITION DESIGNATIONS FOR 30(B)(6) TOPICS 27 AND 28**
**27: BPD policies etc. re: approval / distribution of overtime and performance expectations**
**28: Financial benefit of working overtime details to BPD officers, incl. SF and HU**

**DEPOSITION OF KEVIN BRINKWORTH ON MARCH 16, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 89:12 | 90:6 | Q And he also says that a great reward would be an overtime detail, right?<br>A Yes, he does say that.<br>Q Why would overtime opportunities be viewed as a reward?<br>MR. POOLE: Form.<br>A Well, overtime provides more money in your paycheck.<br>Q Did officers get paid time and a half for overtime?<br>A Yes.<br>Q And some officers increased their salaries considerably by working overtime, didn't they?<br>A Yes.<br>MR. POOLE: Form.<br>Q And did working overtime also give opportunities -- excuse me.<br>Did working overtime also give officers the<br>opportunity to increase their pensions?<br>A Yes. |

**DEPOSITION OF DANIEL DERENDA ON NOVEMBER 10, 2021, DECEMBER 23, 2021, JANUARY 10, 2022 (COMBINED)**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 200:16 | 200:20 | Q. Was running an overtime detail in any way dependent on generating the revenue to pay for it? <br> MR. QUINN: Form. <br> A. Running overtime detail was on them being productive and being out doing their job. I looked at everything we did in lowering crime numbers. |
| 241:18 | 242:4 | Q. Did you view overtime details as an <br> opportunity to provide a financial reward to <br> officers? <br> MR. QUINN: Object to the form. <br> A. I believe that's what he was referring to. <br> Did I view it as a financial reward? They did make more money by working overtime and some officers liked to work overtime. So you can <br> call it they did receive more pay for working overtime. |
| 242:15 | 242:23 | Q. Was availability of overtime contingent on producing results? <br> MR. QUINN: Form. <br> A. There were certain details on overtime that were expected results. Again, if we wanted people out there and to be proactive, if we were paying for extra details on overtime, I certainly expect them to be out there doing their job. |
| 244:1 | 244:9 | Q. And some officers increased their salaries considerably with overtime, didn't they? <br> MR. QUINN: Form. <br> A. Throughout the department, correct. I used overtime whenever I needed and had to do it to achieve my objectives. <br> Q. And working overtime also gave officers the <br> opportunity to increase their pensions, right? <br> A. Yes. |

**DEPOSITION OF RICHARD HY ON JULY 19, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 96:10 | 96:23 | Q. And were you often looking to work more overtime shifts while on Strike Force? <br> A. When overtime came, yes, yeah, I was hoping to get a little more bump in the paycheck. <br> Q. And do you -- to your knowledge, was that the general -- do the other officers in Strike Force agree with you as far as being motivated to work overtime? <br> MR. SAHASRABUDHE: Objection to form. <br> A. Everybody wants, you know, more money, yeah. They want their paycheck to be a little bit more beefy, and then you had the old timers that wanted their retirement to reflect that as well. |
| 102:4 | 102:10 | A. I had conversations with the old timers about their retirement, yes. <br> Q. And what did those conversations entail? <br> A. That they're just working hard to get their numbers up so they can retire easier, you know, easier time retiring, do more things when they retire. |

**DEPOSITION OF DANIELLE MORGERA ON MAY 26, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 80:1 | 80:14 | A I don't know why, but I could assume that we were looking for justification for overtime, which is, you know, something that isn't unusual. <br> Q Okay. So you were using BTVA's revenue to justify overtime, correct? <br> MR. SHORT: Form. <br> A That is what I'm gleaning from this email. <br> Q Okay. Have you done that before? <br> MR. SHORT: Form. <br> A Have I used revenue to generate -- to justify overtime? <br> Q Yes. <br> A I don't want to say that I've done it, but that is something that is common, yeah. |

**DEPOSITION OF LANCE RUSSO ON APRIL 29, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 87:14 | 87:16 | Q. Got it. Was overtime a significant part of your salary? <br> A. Sure. Absolutely. |
| 88:2 | 88:16 | Q. Okay. Got it. And what was the range of overtime that you received on top of that? <br> A. It was pretty substantial. It varied, but I was -- between myself and the other housing lieutenant, again there was only -- you had to <br> have somebody and between that and our details and we also worked when a lieutenant was needed in the Strike Force details, we would <br> get calls for that, too. So it was pretty substantial. Do you want actual numbers? <br> Q. If you have a range, that would be great. <br> A. I think I probably averaged, like, maybe 150, 160 on average. Sometimes is was higher, sometimes lower over the course of a ten-year <br> period. |
| 121:1 | 121:9 | A ... When it says housing manpower minimums are not always <br> being met, that -- he is referring, I believe -- you can ask him, but he is referring to that we have a lack of manpower. There wasn't a minimum because if there was, people certainly would have come in for <br> overtime. Everybody wants the overtime. We would have filled it. |
| 121:17 | 121:23 | A. So the overtime mostly was coming from Strike Force and our guys were used when they were called in and then they would want that to be back filled so that our unit also was sufficiently -- it was more or less a way of using their overtime to make sure we had enough officers to work. |
| 122:8 | 122:18 | A. Not related -- I mean, only that I am reading it, no. There was a time where they did say -- I think actually we requested it that we need a minimum manpower of X amount of bodies between the warmer months that they did grant that, but as far as not filling it, I – that would never occur. I mean, we just -- I don't <br> know how else I can explain this. If we had an actual manpower, we are the ones that requested it and if they granted it, then we filled it with overtime. |
| 123:3 | 123:20 | Q. Okay. Now, am I correct this email is describing instances where Housing Unit officers would work the Strike Force on an overtime basis? <br> A. Correct. <br> MS. RAUH: Form. |

| | | |
|---|---|---|
| | | Q. How often did that occur, to your knowledge?<br>A. I think quite a bit. They -- I mean, if they were needed, they would call our officers first. It was kind of a -- we were two completely separate units tasked with two completely separate things, but when they started the Strike Force they didn't have a location to put them, so they put them with us. So we shared a lunch table and a locker room with these people and overtime it became if it was necessary, hey, it was like a<br>gentleman's agreement. |
| 142:16 | 143:8 | Q. And it is describing Strike Force checkpoints that were to be conducted with the assistance of the housing daytime detail.<br>A. Okay.<br>Q. Would you agree that's what it is describing?<br>A. Yes.<br>Q. Housing daytime detail, that was one of the overtime details that was established since, as you described, your shifts were typically in the afternoon?<br>A. Yeah. I think our details would have been, like, started at 10:30 in the morning until the start of our shift so they would be referring to -- I believe they would be referring to whoever was on that detail assisting Strike Force. |
| 245:22 | 246:10 | Q. And it states that Deputy Police Commissioner Lockwood wants results with this increase daytime detail and that all officers should be<br>made aware of this and what is expected of them?<br>A. Correct.<br>Q. What do you understand that paragraph to be referring to?<br>A. Again, your job. Whatever that pertains to. You are not coming in on overtime and not being out there. So, I mean, if it means summonses or making an arrest … |
| 248:5 | 248:14 | Q. Got it. Do you believe you would have followed Serafini's instruction to have all officers be made aware that the deputy police commissioner wanted results and what is expected of them?<br>MS. RAUH: Objection.<br>A. I am sorry. Am I answering?<br>Q. Yes. You can answer.<br>A. If that was my order as it is here, that's exactly what I would have done. |
| 254:7 | 254:10 | Q. Isn't it true that overtime also served as an incentive for officers?<br>A. Yeah. Who doesn't want to work for extra money? Of course. |

**DEPOSITION OF PATRICK ROBERTS ON APRIL 20, 2022**

| Citation Start | Citation End | Testimony |
|---|---|---|
| | | |

| (Page: Line) | (Page: Line) | |
|---|---|---|
| 204:21 | 205:2 | Q And here again, you request Derenda to set up checkpoints and to use overtime to set up checkpoints<br>to get out in front of violent crime; is that correct?<br>A Yes. |
| 208:10 | 208:14 | Q And so the purpose and justification for the overtime<br>here is to suppress gang activity that leads to violent acts affecting the citizens of Buffalo, correct?<br>A Yeah. Through the high visibility and -- yeah. |
| 253:5 | 253:20 | Q All right. So in this email, you request additional overtime -- so in this email, you state that the Housing Unit had been allotted 120 hours per overtime shift to run a detail during the mp-4 shift; is that correct?<br>A Yes. And that's for a 14-day pay period.<br>Q Okay.<br>A So about eight hours a day or something like that.<br>Q And this detail had been highly productive and shown great production with regard to arrests, V&T issuances, vehicle impounds, and you said that it was more than paying back the city for its overtime expense, correct?<br>A That's correct. We were not -- yeah, the officers were not wasting anybody's time. They were coming in and enforcing the laws that they observed. |
| 257:3 | 257:17 | Q Okay. And you stated that your guys are highly motivated and you think that a great reward would be<br>at least a limited overtime detail and they are jumping through hoops for us and you think it would be great for morale; is that correct?<br>A Yes. It seems that I'm indicating that these guys are highly motivated, they're doing their job for nothing extra. Morale in police work is a – it cannot be overestimated. And a small thing like, you know, earning some overtime is very helpful. You know, guys -- I should say officers do enjoy in some cases working overtime. They don't want to be forced, but they will absolutely come in. But it<br>seems to demonstrate that they're being their most productive ever without any incentive. |
| 257:18 | 258:8 | Q Okay. And you referred to overtime as a reward, correct? So did -- is that correct?<br>A You know, overtime is going to be spread around the department, and sometimes, let's just say, for example, people who aren't asked to do a tremendous amount are going to get a tremendous amount just because of the nature of where they're assigned. And these are officers who are extremely diligent, and you don't want them going someplace. You like to keep them right where they are. They're<br>doing a great job for you. And so, you know, I suppose in other lines of work, money, however small -- it might be like a Christmas bonus or something -- it's a motivating factor. |

| 259:8 | 260:6 | Q All right. So this is an email from -- I just want to direct you to the particular part of the email that this question relates to. This is an email from you to lieutenants where you request that they -- you<br>state that morale is great and that you -- you state that -- you state to them, "Make sure overtime details generate good numbers and do separate checkpoint sheets for each location." What did you mean by "generate good numbers"?<br>A Well, if you call in people for overtime and they sit on their hands, there's going to be no productivity<br>there, so basically go out and do your job.<br>Q So how many tickets would be good numbers to you?<br>A I don't know if it was tickets necessarily. Just arrests. Sometimes wording can be clumsy. It's an email. But I don't know. I guess if you had – what number of officers? You tell me. Like ten officers? We shouldn't have, you know, no tickets observed, no arrests. That would be unacceptable. I mean, there's crime going on like crazy, so just go do your job. That was my clumsy way of saying go do<br>your job. |

## DEPOSITION OF PHILIP SERAFINI ON DECEMBER 27, 2021

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 29:8 | 29:20 | Q. Got it. How did you become the Housing Unit captain?<br>A. I put a transfer in and I received it based on seniority.<br>Q. What interested you in working for that unit?<br>MR. QUINN: Form.<br>A. It was a better schedule and there was some overtime. The Housing captain would receive a little bit of overtime.<br>Q. Why was that attractive at the time?<br>A. Well, I was planning on retiring in four years or so and I wanted an opportunity to build up my pension a little bit. |
| 29:21 | 30:18 | Q. Okay. What was the basis of overtime for the Housing Unit captain role?<br>A. My overtime, I would usually come in one day a week and work overtime, you know, sometimes less, sometimes more. |

|  |  |  |
|---|---|---|
|  |  | Q. Was the overtime kind of prescheduled?<br>A. Sometimes it was.<br>Q. Which is to say how did you understand when you were seeking out the transfer that that would be an opportunity available?<br>A. My direct supervisor was the chief, and he would ask me what day was convenient for me to come in.<br>Q. Okay. So there was --<br>MR. QUINN: Just make sure you let her finish a question before you answer it.<br>THE WITNESS: Sorry.<br>MR. QUINN: You're fine.<br>Q. So there was typically at least one day of scheduled overtime a week; is that correct?<br>A. Usually, yes. |
| 60:11 | 61:14 | Q. Do you have a sense of why you would be the recipient of those emails? It was merely that you shared a building with them?<br>A. Yes.<br>MR. QUINN: Form.<br>A. Oh, I am sorry. Yes, number one, I share the building. Number two, I was the person that signed their overtime slips, if they happened<br>to work overtime. And if they worked – if they worked overtime, I would have to have knowledge that that shift was actually created or that detail was actually created. I can't<br>just sign an overtime slip just to sign it. I would have to in fact make sure they actually worked.<br>Q. Fair enough. Fair enough. So let's just take a step back. With respect to your role as captain of the Housing Unit, how would you describe your duties? You know, what did your<br>duties consist of?<br>MR. QUINN: Form.<br>A. I supervised all of the members in the Housing Unit. I coordinated details on occasion. I did most all the administrative duties as far<br>as staffing and planning and adjusting shifts, signed overtime slips. I investigated complaints. |
| 68:19 | 69:16 | Q. Okay. And am I correct that Housing Unit officers would sometimes assist the Strike Force in conducting those checkpoints?<br>A. Sometimes.<br>Q. What was the circumstance where the Housing Unit would assist?<br>A. They required a minimum amount of officers to conduct a traffic safety checkpoint. For the safety of the officers it was a minimum amount of officers. You couldn't conduct it with just two officers. So sometimes if the Strike<br>Force was shorthanded, meaning they didn't have enough personnel, a couple of the Housing officers would assist them. |

| | | |
|---|---|---|
| | | Q. Were those overtime details for the Housing Unit?<br>A. Sometimes they -- sometimes -- no but sometimes they were on overtime and they would work it, but it wasn't specifically for the<br>traffic safety checkpoint as far as the<br>Housing officers are concerned. |
| 137:18 | 138:7 | Q. Okay. And your testimony is that these daytime details, whether they were Strike Force or Housing Unit details, were always overtime details?<br>MR. QUINN: Form.<br>A. Not always. If they were operated during the day, they were overtime because that was outside of our normal work schedule and outside of Strike Force's normal work<br>schedule.<br>Q. So the daytime detail referenced here was an overtime detail?<br>A. The daytime details were always overtime, yes. |
| 138:8 | 141:9 | Q. Okay. So this is describing in the first paragraph that there has been an increased manpower for the overtime detail, daytime detail; is that correct?<br>A. Yes.<br>Q. Okay. And then in paragraph 2, it begins by saying that "Deputy Police Commissioner Lockwood wants results with this increased<br>daytime detail." Do you see that?<br>A. Yes.<br>Q. And then it states, "all officers should be made aware of this, and of what is expected of them." Do you see that?<br>A. Yes.<br>Q. "In the past, the officers assigned to the daytime detail have always yielded good results and we all expect this to continue<br>into the future." Do you see that?<br>A. Yes.<br>Q. What were you -- what were you describing or conveying in that paragraph?<br>MR. QUINN: Form.<br>Q. I will rephrase. What were you communicating to officers here?<br>MR. QUINN: Form.<br>A. Sometimes when officers are on an overtime detail, not just specific to the Housing and the Strike Force Units, sometimes when they're<br>on an overtime detail, they get a little laxed and they don't perform like they normally should so this email was just making them --<br>wanted to make the officers aware that they're expected to work.<br>Q. And by "work," is that what you mean when you say results?<br>A. Yes. |

| | | |
|---|---|---|
| | | Q. What does results mean exactly?<br>A. Well –<br>MR. QUINN: Form.<br>A. Work and results, what I mean by that is what was expected of them: To patrol all the areas that they were designated to patrol, to enforce the vehicle and traffic law, to investigate suspicious activity whether it was on the street or by someone operating a vehicle.<br>Q. And what was expected of officers exactly?<br>MR. QUINN: Form.<br>A. It was expected of them to write some summonses, some parking tags if it was warranted, and to make arrests if it was warranted.<br>Q. And when you say that in the past the officers have always yielded good results, are you referring to arrests, summonses, parking tags,<br>those types of results?<br>A. I am referring to their overall performance --<br>Q. How did you --<br>A. -- not just those specific things.<br>Q. Sorry. How did you measure performance in that case?<br>MR. QUINN: Form.<br>A. By the statistics and then by other things such as sometimes they would develop information from citizens or from Housing residents on drug houses or locations or people that were carrying guns, certain vehicles. It was a development of information<br>in addition to the statistics of summonses, arrests, guns confiscated. |
| 270:6 | 271:2 | Q. You sought and requested overtime details though on behalf of your officers?<br>A. Yes.<br>MR. QUINN: Form.<br>Q. And that's a -- you requested overtime to -- sorry, both on behalf of Housing Unit and the Strike Force?<br>A. Yes, I did.<br>Q. Okay. And it's fair to say that over your time as captain you made those requests more than once?<br>A. More than once? Yeah, I believe it was more than once.<br>Q. Okay. And when there were moments where overtime details were paused or suspended, am I correct that you would lobby the leadership to see if they could be reinstated for the benefit of your officers?<br>MR. QUINN: Form.<br>A. That's correct. |
| 271:18 | 271:23 | Q. Isn't it true that when your officers were approved for overtime it had a financial benefit for them?<br>MR. QUINN: Form.<br>A. For the officers, yes. They made overtime. They made more money. |

| 272:15 | 272:22 | Q. Is it true that without the incentive of overtime it would have been difficult for the Strike Force to maintain its staffing levels?<br>MR. QUINN: Form.<br>A. There always would have been officers transferring there because they like to do the work, but some officers were incentivized by<br>the overtime, the periodic overtime, yes. |
| 273: 20 | 275:4 | Q. Now, given that you were not actually captain of the Strike Force, why did you feel it was important to advocate for the Strike Force to have overtime details?<br>MR. QUINN: Form.<br>A. Well, it was twofold. I believed in the work they were doing, number one. And, number two, a lot of Housing officers, officers in my unit, would work the Strike Force overtime. When the Strike Force couldn't fill their overtime, which happened on a regular basis,<br>it would immediately go to the Strike Force officers because they were in what the union calls the same house. They were housed in the same building so any overtime -- even though it wasn't for the Housing Unit, even though the overtime was for the Strike Force Unit, if the Strike Force couldn't fill it with their officers, then it was available to our Housing officers and the same thing goes for the lieutenants.<br>Q. Got it. And so if Strike Force details were discontinued, Housing Unit officers would have a negative financial impact as well?<br>A. Well --<br>MR. QUINN: Form.<br>A. I am sorry. It's possible they could benefit -- they benefited -- the Housing Unit benefited from the Strike Force overtime. If there is no Strike Force overtime, Housing Unit wouldn't benefit. |
| 275:23 | 276:7 | Q. Okay. And you see here that according to this email you warned Deputy Police Commissioner Lockwood that you had a fear that officers may transfer away from the Strike Force permanently -- may transfer away from the Strike Force if overtime was suspended for a<br>long time or permanently?<br>A. That's correct. |

## DEPOSITION OF CHARLES SKIPPER ON MARCH 5, 2021

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
| --- | --- | --- |
| 105:1 | 105:7 | Q. And why did you choose to work those overtime details?<br>MR. QUINN: Object to form. You can answer.<br>A. The overtime revenue. |

| | | |
|---|---|---|
| | | Q. The money; is that right?<br>A. I won't lie to you. |
| 106:18 | 107:4 | Q. And while this detail was working during those hours, there was also a regular platoon shift for Strike Force that was also working, correct?<br>A. No.<br>Q. No? So there was -- the only -- so does that mean the only Strike Force officers who were on duty from 11:30 to 3:30 would have been the<br>overtime detail?<br>A. Yes, sir. |
| 108:15 | 108:19 | Q. Okay. Now this email says that one of the things that this particular overtime detail is going to do is conduct it looks like two traffic checkpoints; is that correct?<br>A. Correct. |
| 113:9 | 113:19 | Q. Got it. All right. And the overtime detail, so the daytime overtime detail in your experience typically how many officers would work that detail?<br>A. Four officers, maybe four to six, maybe less, and one lieutenant.<br>Q. Got it. And then what about the nighttime detail? Same?<br>A. Basically, yes. |
| 154:5 | 154:14 | Q. Okay. So but you're saying that once you left Strike Force your tinted window numbers would have come down because you weren't writing as many tinted window tickets after you left Strike Force?<br>A. What I am going to say is between '16, '17, '15, there was also the overtime details so we were working -- both platoons were working twice as much so the hours were doubled or tripled. There was more enforcement. |

**DEPOSITION OF JUSTIN TEDESCO ON JULY 11, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 188:21 | 189:6 | Q. Okay. So now I want to shift gears a bit and talk about overtime. In the housing unit, how was overtime allocated among officers?<br>A. Seniority, everything is by seniority.<br>Q. And you testified earlier that you worked overtime shifts with the strike force, but did you also work overtime shifts just within the<br>housing unit?<br>A. Yes. |

| 190:3 | 190:15 | Q. What periods were you doing more overtime shifts than you typically would?<br>A. I don't know. When I felt like doing it.<br>Q. And why would you feel like doing it?<br>A. Because I wasn't busy in my personal life.<br>Q. And you were paid time and a half on overtime shifts, right?<br>A. Correct.<br>Q. And that obviously affected your total compensation, correct?<br>A. Correct. Same with overtime in D District and overtime in traffic and overtime in normal patrol functions that you would be able to take. |
| 205:23 | 206:8 | Q. Did overtime at the housing unit count towards your pension benefits?<br>A. Yes, it does.<br>Q. How did you learn about the fact that housing unit overtime counted towards your pension benefits?<br>A. All overtime counts towards my pension benefits.<br>Q. And how did you first learn about that?<br>A. When I was hired. |

## DEPOSITION OF THOMAS WHELAN (DAY 1) ON APRIL 26, 2022

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 26:16 | 27:1 | Q What did you earn? And I'm interested in your salary and the overtime.<br>A A police lieutenant's salary was I think around $81,000 a year at the time, I think.<br>Q Okay. And do you know what you earned with overtime?<br>A My last year, I think I made 153,000.<br>Q So on top of the 81,000, was the remainder made through overtime?<br>A Overtime and court appearances. |
| 27:8 | 27:16 | Q What is the rate you were paid when you attend court?<br>A Court time is paid straight time for a minimum of four hours.<br>Q And how about overtime, what is the rate of overtime pay?<br>A One and a half times.<br>Q Thank you. And was your pension paid based on both your salary and overtime and court time?<br>A Yes. |
| 50:19 | 51:22 | Q Okay. And during the summer days, once or twice a week was that because you were engaged in overtime? |

| | | |
|---|---|---|
| | | MR. SHORT: Form.<br>A Either myself or they were engaged in overtime, bringing them under my supervision. We worked extended hours through most of the summer also.<br>Q Did you work a lot of overtime in the Strike Force?<br>A As much as anybody else, I would say. Probably average --<br>Q What --<br>A -- average for lieutenants.<br>Q Average for lieutenants on the Strike Force?<br>A Correct.<br>Q And about how much overtime did you work on the Strike Force?<br>A Well, I think you pointed it out earlier. I had about 65,000, 70,000 dollars worth of overtime earnings one year.<br>Q And was that more than when you worked in the A District?<br>A Yes.<br>Q About how much overtime did you work in the A District?<br>A Very little.<br>Q And when you say "very little," about how much is very little?<br>A I'll say probably 80 to a hundred hours a year. |
| 53:1 | 53:16 | A I thought I said that. Yes, we had manpower shortages in the Strike Force Unit that I couldn't fill using only Strike Force officers, so we could call the Housing Unit officers.<br>Q Okay. And the Strike Force Unit conducted a fair amount of checkpoints; is that correct?<br>A Yes.<br>Q And was -- when you needed manpower for the Housing Unit, was that usually for checkpoints?<br>A No.<br>Q Okay. So a range of duties?<br>A Yes, a range of duties.<br>Q Okay. Did the Strike Force frequently engage in checkpoints during overtime hours?<br>MR. SHORT: Form.<br>A Yes. |
| 91:20 | 92:9 | Q And you requested overtime reinstatement to run the details for high visibility checkpoints, four details in a day and two details in the evening, correct?<br>A I did.<br>Q And you did not mention traffic safety in here in this request for overtime; is that right?<br>A I didn't mention who?<br>Q Traffic safety.<br>A No, no. You're right I did not mention traffic safety. |
| 245:3 | 245:20 | Q All right. Was there an expectation that Derenda<br>reviewed the citation, impound and other production numbers of your unit? |

| | | |
|---|---|---|
| | | A There was an expectation that we would be productive.<br>Q And how was that --<br>A Now, he -- and I'm -- I can't tell you what he was thinking, but you've taken 20 officers and four lieutenants out of the districts. That doesn't sound like a lot, but when summer comes and the districts are all short of manpower and they're calling overtime like crazy to just meet the bare minimum manpower, you have to justify why there's 20 officers and four lieutenants assigned to the special units. Now, the unit is expected to go out and be productive. If we're not going to be productive, then do away with the unit and send the officers and lieutenants back to their districts and maybe you'll knock down some of the overtime in those districts. |
| 270:12 | 271:16 | "In the past, and when fiscal shortfalls have necessitated, the Strike Force has used discretionary overtime to achieve these goals in the following manner: One lieutenant and six officers for five hour segments a total of six times per pay period. Four of the details would be run during the MP-2 shift --" okay. When you stated "fiscal shortfalls," what were you referring to?<br>A When they cut the overtime.<br>Q All right. And so when they cut overtime, the Strike Force used discretionary overtime?<br>A Correct. They called it that. I don't know what the difference was quite honestly. Bean counter stuff.<br>Q All right. So there was discretionary overtime, and then there was other overtime, another category of overtime; is that right?<br>A Like I said, it's a bean counter thing. You know, it's for the -- for the fiscal people that --different codes on the overtime slips. I'm -- I'm going to read into what I think it means, but don't take my word as gospel. There may have been federal grant money that we were using for summer, you know, upping the manpower, so those overtime hours needed to be documented a certain way so that they can request reimbursement from the federal government. And they just use<br>different terms, discretionary or whatever. |
| 292:23 | 293:14 | Q Okay. We're going to go back to Exhibit 8. All right. This is the June 5, 2016 email from Captain Serafini to you and the other Strike Force lieutenants dated July 5th. And in this email, he discusses Strike Force daytime details. Those are overtime details that worked during the daytime with the Strike Force, correct?<br>MR. SHORT: Form.<br>A That is correct.<br>Q Were the primary purpose of these details to run checkpoints?<br>MR. SHORT: Form.<br>A It was officer visibility, and we did -- on every overtime detail during the day, we did do one roadway safety checkpoint. |

| 294:18 | 296:8 | Q How did you assign overtime?<br>A It's all by seniority.<br>Q So -- and you said the overtime rate was one and a half times salary?<br>A That's correct.<br>Q And how much overtime could officers do each month?<br>A Well, as much as they want, but we had a fifteen-hour rule for a daily. So in combination with your regularly scheduled shift, which was ten hours, you -- if you were scheduled to work that day, you could only work another five hours of overtime. If it was your day off, you could come in and work a full fifteen hours overtime if it was available.<br>Q Okay. And so could you do that seven days a week, work another five hours a day seven days a week?<br>A Yeah. There was some -- during the summer, there was some pretty sick people who just couldn't get enough.<br>Q So there were some officers that were working 35 hours of overtime a week?<br>MR. SHORT: Form.<br>A Let me think about your question for a minute. Let me think. I'm not sure that that amount of overtime<br>would have been available to them. But hypothetically, they could have worked 60 -- they -- yes.<br>Q So 75 hours.<br>A Yeah, 75 hours a week.<br>Q And so would overtime be a big part of Strike Force officers' salaries?<br>A Absolutely.<br>MR. SHORT: Form.<br>Q All right. And was that a common reason that people took overtime, to increase their salary?<br>MR. SHORT: Form.<br>A Well, I don't go to work because I have nothing else to do. I go to work to make money to improve my family's quality of life. |

| 296:16 | 297:5 | Q So every day six police officers and two lieutenants could get four hours of overtime each day; is that right? MR. SHORT: Form. A Yes. The way I'm reading it, yes, that's what it means, four hours a day, seven days a week. Q Okay. And then two -- and then during that overtime detail, officers were expected to run two traffic checkpoints during the detail; is that right? A During this time frame -- MR. SHORT: Form. A -- it appears that Deputy Commissioner Lockwood ordered two checkpoints to be conducted. |
|---|---|---|
| 298:6 | 299:2 | So in this email, you said, "Four of the details would be run during the MP-2 shift to provide visibility through vehicle and traffic checkpoints and area saturation, especially during early afternoon hours;" is that correct? A That's correct. Q And what's the MP-2 shift? A Day shift. Q And then you said, "The other two would run during later evening hours to supplement regular MP-4 officers to provide greater presence through high visibility checkpoints," correct? A Correct. Q So you tied this request for overtime to run checkpoints; is that right? A I put it in there, yes, that would be part of our duties. Q And Captain Serafini testified that this request was granted. Is that consistent with your recollection? A Yeah, I would say so. |

**DEPOSITION OF THOMAS WHEELAN (DAY 2) ON JUNE 8, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 357:15 | 358:16 | Q. Right. But you specifically requested multiple times that officers receive overtime to conduct checkpoints as we discussed at the last deposition; is that correct? <br> A. Part the of unit's mission was to do roadway safety checkpoints. <br> Q. Okay. <br> A. We had a set number of -- a set schedule, 15:30 to 01:30. The overtime would permit us to do these roadway safety checkpoints at a different time in the day. We weren't on duty before 15:30. <br> Q. Okay. And during checkpoints officers wrote tickets; is that correct? <br> A. If there were violations, yes, they did. <br> Q. Okay. And you testified in your previous deposition that Derenda wanted results from overtime. If officers failed to produce results, did you counsel them? And by results, I mean -- yes. I will leave it at that. <br> MS. RAUH: Form. <br> A. I never found it necessary to counsel officers because they were productive. They went out and did their jobs very well. |

**DEPOSITION OF ADAM WIGDORSKI ON MAY 24, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 86:14 | 86:17 | Q Did a supervisor ever explain what the purpose of running a specific overtime shift was?<br>A It was just expanding the overall shift of Strike Force into the morning part of the day. |
| 92:2 | 92:7 | What was the reason that you would want to take an overtime shift?<br>A Increased pay.<br>Q Okay. Did Strike Force ever have issues filling overtime shifts?<br>A I believe -- not issues, no. |
| 104:23 | 105:7 | Q Right. And at times, you said that Housing Unit officers assisted Strike Force officers on checkpoints, right?<br>MR. SAHASRABUDHE: Form.<br>A Not as their role as a Housing officer. As you mentioned overtime, they would -- if eligibility would be offered to them and then they would come and work under the Strike Force branch that day. |

**DEPOSITION OF DAVID WILCOX ON NOVEMBER 4, 2021**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 186:8 | 186:20 | Q. Okay. How would you -- did you decide whether or not someone would be approved for overtime?<br>A. It was all the lieutenant's responsibility to fill the overtime. We tried to share the responsibility among the lieutenants. We have<br>to follow procedures which is seniority, but it was never a problem because most times if we couldn't fill it, officers were either testifying and they couldn't come in or we<br>didn't have enough officers so maybe we couldn't do it and so you couldn't just have one officer show up for overtime if you needed six. That wasn't worthwhile or safe. |
| 188:18 | 190:14 | Q. Okay. In your experience, was there a correlation between officer productivity and the availability of overtime for officers?<br>MR. QUINN: Form.<br>A. It was -- you know, for the most part overtime was seasonal, you know, and turn the winter months |

|  |  | there really wasn't overtime. You know, during the huge snowstorm that South Buffalo got hit with the one year, you know, just because South Buffalo was shut down we were down there but, I mean, that was just craziness. But overtime happened every summer, you know, during the heat of the year when the shootings are up and all of that other activity is up. So our unit was very productive so overtime was going to come our way provided we maintained our productivity. Otherwise, we probably would be disbanded the year prior to that, you know. Q. And just to repeat again when you say "productivity," you're talking about tickets, correct? MR. QUINN: I don't think that's accurate. Q. I was going to list other things because he said tickets. One of the things was tickets, arrests. A. I know that's your priority. Our priority was guns and violence and violent people and, to be honest, all the officers that received awards during my time there, it was related to guns and violence, not tickets, not impounds and that. And the officers that took all those guns off the street, I mean, nobody was hurt, not once during any of those altercations, not once. Q. And so if violence and guns was the main focus, why did the Strike Force spend, you know, so much time doing traffic enforcement? MR. QUINN: Object to form, so much time. You can answer. A. That went from the highest office in the city down to us. |

**DEPOSITION OF AARON YOUNG ON OCTOBER 26, 2022**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 96:22 | 97:2 | Q And Strike Force and Housing Unit officers had opportunities -- regular overtime opportunities, right, more so than in the districts? A I believe so, yes. |
| 99:11 | 99:12 | Overtime in the department is set by the deputies or the commissioner, not by the chiefs… |
| 99:17 | 100:8 | In other words, he's [Captain Serfaini] saying that they're looking for production in the form of arrests and summonses and then saying that it's a reward -- that overtime details are a reward for good work. Would you -- do you interpret this to mean that he's saying that overtime is a reward for producing arrests and summonses? MR. SAHASRABUDHE: Form. |

| | | |
|---|---|---|
| | | A From this email, you could read into that, yes.<br>Q Did you instruct Captain Serafini that overtime details are not rewards?<br>A No, I did not.<br>Q Did you ask to convey down the chain of command that overtime details are not rewards?<br>A No, I don't recall. |
| 100:16 | 101:19 | Q And again, Captain Serafini says, "DPC Lockwood wants results with this increased Daytime Detail. All<br>officers should be made aware of this, and what is expected of them. In the past the officers assigned to the Daytime Detail have always yielded good results and we all expect this to continue into the future." What do you understand Captain Serafini to mean by "results"?<br>MR. SAHASRABUDHE: Form.<br>A If officers during these details could confiscate guns, you know, prevent crime, you know, where the<br>crime -- where what was once a hotspot is not a hotspot anymore. So this can infer many levels of crime production -- prevention of criminal activity.<br>Q And he also is asking for the stats for the shift to be compiled on a report. Are you familiar with the reports that they used to record their stats for the overtime details?<br>A I've seen it before, yes.<br>Q What types of things would they record on the detail form?<br>A Summonses written, guns confiscated, any arrests made.<br>Q So do you think that good results would be judged based on the stats on the detail form?<br>A It could be inferred, yes. |

**DEPOSITION OF MICHAEL ACQUINO ON SEPTEMBER 5, 2023**

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 91:3 | 91:6 | Q. Were overtime shifts regularly scheduled<br>during your time on the Strike Force?<br>A. Yes. There's regularly scheduled overtime,<br>yes. |
| 92:17` | 93:1 | Q. Were Strike Force overtime shifts scheduled for the purpose of running a checkpoint?<br>MS. FREELEY: Objection to form.<br>A. It was just like a normal shift. Same stuff; checkpoint, brief, checkpoint. I mean, checkpoints were only, I mean, the majority of<br>the time an hour out of the day. Now you're talking nine hours of other policing. |

| 99:8 | 99:13 | Q. How could you increase your earnings as a patrol officer?<br>A. Overtime.<br>Q. Was there any other way to increase your earnings as a patrol officer?<br>A. Yes. Court time. |

## DEPOSITION OF JOSEPH GRAMAGLIA ON SEPTEMBER 22, 2023

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 32:20 | 33:11 | Q. To your understanding, why did Commissioner Lockwood eliminate the Housing Unit?<br>MS. FREELY: Objection to form.<br>A. It was a combination of reasons but primarily financial. The amount of money that the City was being paid by the Housing Authority was<br>significantly lower than what our output costs were for the unit. We also needed that staffing throughout the districts to have more officers within the districts to help curb<br>some of the overtime so we decided to disband that unit, put those officers into the districts, disperse them around, and also get their cars from within that unit again into<br>the districts. |

## DEPOSITION OF MAYOR BYRON BROWN ON NOVEMBER 6, 2023

| Citation Start (Page: Line) | Citation End (Page: Line) | Testimony |
|---|---|---|
| 22:1 | 22:9 | Q. And is there someone from -- to the extent that the BPD does receive overtime year in and year out, is there anyone from your office<br>involved in approving those requests?<br>A. That would be reviewed by the police commissioner and the police commissioner's management staff and there would be review by the finance commissioner and the Department of Finance. |

Respectfully submitted

,

D

a

t

e

d

:

A

p

r

i

l

,

2

0

2

4

/s/ Anjana Malhotra

Anjana Malhotra
Claudia Wilner
Edward Krugman
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500 New
York, NY 10004 212-633-6967
malhotra@nclej.org
wilner@nclej.org
Krugman@nclej.org


Matthew Parham
WESTERN NEW YORK LAW CENTER
37 Franklin Street, 2nd Floor
Buffalo, NY 14202
716-855-0203 x112
mparham@wnylc.net

Chinyere Ezie
Baher Azmy
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th
Floor New York, NY
10012 Tel/Fax: (212)
614-6464
CEzie@ccrjustice.org
BAzmy@ccrjustice.org


Jordan Scott
Joachim Phillip
Irwin Christine
Nelson Andrew
Timmick
COVINGTON & BURLING, LLP
620 Eighth Ave. Suite 4029
New York, NY 10018
Tel: (212) 841-1000
Fax: (212) 841-1010
jjoachim@cov.com
pirwin@cov.com
cnelson@cov.com
atimmick@cov.com

*Counsel for Plaintiffs*