UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

BLACK LOVE RESISTS IN THE RUST, *et al.*, individually and on behalf of a class of all others similarly situated,

                    Plaintiffs,

     v.

CITY OF BUFFALO, N.Y., *et al.*,

                    Defendants.

No. 1:18-cv-00719-CCR

---

### DECLARATION OF EDWARD P. KRUGMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**EDWARD P. KRUGMAN** declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a member of the Bar of the State of New York and of this Court, and I am one of the counsel for Plaintiffs in this action. I make this declaration on personal knowledge (a) to place before the Court, pursuant to Fed.R.Evid. 1006, various summaries and data compilations in support of Plaintiffs' motion for class certification and (b) to outline the procedures Plaintiffs propose to use to assemble the list of individuals to receive notice pursuant to Fed.R.Civ.P. 23(c)(2) for the Rule 23(b)(3) classes.

2.      By "personal knowledge" I mean that I have been responsible within Plaintiffs' legal team for data discovery and accumulation and related aspects of this case, that I have personally performed or supervised the processes of summarizing and/or compiling the data described herein, that I have reviewed and checked the results presented, and that I believe those results to be accurate.

***The Data Sources***

3.      There are two main collections of data compiled and/or summarized herein—(a) the Traffic and Criminal Software ("TraCS") system maintained by Erie County Central Police Services ("ECCPS") on behalf of the City of Buffalo (the "City") and the Buffalo Police Department (the "BPD") and (b) the UTT database maintained by the City and posted on data.buffalony.gov ("Open Data").

4.      In addition, use has been made of two other datasets: The Complaint History and Record Management System ("CHARMS") maintained by ECCPS on behalf of the City and the "ENTCAD" system, which is the BPD's database of dispatch activity.

5.      In response to Requests for Admission, Defendants have agreed that the TraCS and CHARMS databases meet the requirements of a "record of regularly conducted activity" within the meaning of Fed.R.Evid. 803(6).

6.      Defendants have further agreed that the Open Data database is a statement of a party (the City) within the meaning of Fed.R.Evid. 801(d)(2).

7.      Both TraCS and Open Data contain data concerning each traffic summons issued by the BPD from at least 2012[1] to the present. These data are presented in "records" and "fields". Each ticket is a "record" and appears as a row of a spreadsheet; the "fields" for that are the column entries in the row for the ticket, such as ticket number, nature of the asserted violation, time and location of issuance, issuing officer, license number of the ticketed individual, and so forth.

---

[1]      TraCS also contains some records from 2011, but they appear on their face to be incomplete. We were informed by the City and Erie County during the early stages of discovery that the BPD shifted from its previous paper ticket system to TraCS electronic ticketing in the 2011 timeframe. The new electronic tickets were automatically uploaded into the database upon the officers' signoffs at the end of the shifts in which the tickets were issued. We were informed that efforts were made to back-load the old paper tickets into the database, but those efforts were not fully successful.

8.    We have been informed by the City and by Erie County that the entries in Open Data are derived from the SUMMONS table in CHARMS, which in turn is derived directly from TraCS, with certain additional fields based on CHARMS functionality.

9.    In general terms, the compilations and summaries presented in this declaration are aggregates of certain subsets of the TraCS data, such as numbers of tickets issued by Strike Force officers or number of tickets issued as Checkpoints. The declaration describes how the aggregates have been built up. As required by Rule 1006, all of the underlying data is are the possession of or available to Defendants.

***Tickets Issued by Strike Force and Housing Unit Officers***

10.    The BPD Housing Unit, which existed through June 2020, and the BPD Strike Force, which existed from about July 1, 2012 to March 12, 2018 are described in the brief in support of this motion and the exhibits cited therein.

11.    TraCS identifies (by name and shield number) the officer issuing each ticket, but it does not in general identify the unit of which the issuing officer was a member.[2] Accordingly, other methods must be used to identify the unit and, thus, aggregate the ticket counts by unit by time period.

12.    In discovery, Defendants were requested to provide unit rosters, but they asserted that such rosters were not available. After discussion, it was agreed that Defendants would produce "transfer orders" showing movement of officers into and out of the Strike Force and the Housing Unit. Assuming the transfer orders were complete (they appeared to be mostly but not entirely so, but we do not dispute that Defendants produced what they could find), one could build tentative

---

[2]    There is a field that occasionally appears to contain such information, but it is frequently not populated with data, and the data are not presented consistently when present.

rosters at various points in time by noting the dates of transfers of individual officers into and out of the units in question.

13.    An example of a "transfer order" is annexed as Exhibit 1. Legal assistants acting at my direction and under my supervision compiled the transfer orders into rosters of beginning and ending dates for individuals the units, and the resulting tables are annexed as Exhibit 2. Where available, the rosters also included the individual's current (as of 2019) assignment, as reflected in BPD payroll tables published online.

14.    Because the transfer orders were incomplete, we used the ENTCAD (dispatch) database produced by Defendants to fill in gaps and ambiguities in the tentative unit rosters. This database contains various connected tables, including (a) a list of officers, with their personnel identification numbers and shield numbers and (b) a "DIS_UNIT" table, which contained for each shift in each day, a list of the units on patrol during that shift and identification of the officer(s) assigned to that unit.[3] Because the DIS_UNIT tables (one for each year) were available electronically, it was possible to compile them (using several iterations of Excel's Pivot Table procedure) into lists of earliest and latest dates a given officer appeared in a Housing Unit or Strike Force patrol car, together with a count of the number of such appearances.

15.    These lists were substantially sufficient to resolve the gaps and ambiguities in the tentative rosters of Strike Force and Housing Unit members. We discarded the entries with only a few appearances (for example, a Housing Unit officer might occasionally ride in a Strike Force car) and used the date ranges for the other officers as indicators that the officer was in the given unit during that date range. There might still be an ambiguity if an officer transferred out of a unit and then back in, but the transfer orders suggest that that only happened with two officers (P.O.

---

[3]    "Unit" here refers to the individual patrol car assigned (*e.g.* "S440" or "H410"), not to larger entities such as the Strike Force or the Housing Unit.

Bierl and P.O. Pheto-Howard), and the aggregate of available information as to them was unambiguous.

16.     The resulting lists of Strike Force and Housing Unit officers, and their unit dates, are annexed as Exhibits 3 and 4, respectively. The "begin" date is the later of the unit start date or the date the first ticket issued as a member of the unit; the "end" date is the earlier of the unit end date or the date of the last ticket issued as a member of the unit.

17.     Using these lists, we flagged each ticket in TraCS by whether it was issued by a Strike Force officer, a Housing Unit officer, or neither.

18.     Further, using the results of the geocoding procedure and the census tract demographics described in the expert report of Prof. David Bjerk, which has been submitted in support of this motion, we classified virtually every ticket (all but about 8,000 out of about 393,000) by whether it was issued in a "High Minority" census tract (greater than 60% Black or Hispanic), a "Low Minority" census tract (less than 40% Black or Hispanic), or a "Mixed" census tract (between 40% and 60%).

19.     Using Excel's Pivot Table procedure, we then compiled ticket counts for the Strike Force and the Housing Unit, by Minority Status of the tract of issuance. Exhibit 5 presents the results of these tabulations, together with calculations, by year, of the percentages of the total number of tickets issued by the BPD that were issued by officers in the two units in question. Exhibit 5 covers the period from 2012 to the disbanding of the Strike Force (March 2018) and the Housing Unit (June 2020).

***Tickets Issued at Checkpoints***

20.     The definition of the Checkpoints Class includes persons "who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." The last such checkpoint directive is dated October 27, 2017. Accordingly, identification of members of the

Checkpoints Class requires identification of those individuals who received tickets at a checkpoint from June 28, 2015 to October 27, 2017, or who were arrested at such a checkpoint.

21.     To start the process of such identification, Plaintiffs used a list of checkpoints (the "Checkpoint List") received from the BPD in response to a pre-suit Freedom-of-Information Law ("FOIL") request. During discovery, counsel for Defendants informed us that the source material for the Checkpoint List was a series of "Roadblock Directives" that specified when and where a checkpoint would take place.

22.     By agreement with the City to resolve litigation over the FOIL request, the original Checkpoint List (Exhibit 6a) did not contain specific (*i.e.*, street-intersection level) location information for the checkpoints listed, but only the census tract in which the checkpoint was located. (If the checkpoint was on a street bordering two or more tracts, all such tracts were listed.) Nor did it contain the time of day for the checkpoint.

23.     The Roadblock Directives, however, generally did contain time-of-day and intersection-level location information. Accordingly, upon our receipt of the Roadblock Directives during discovery, our legal assistants cross-referenced the Checkpoint List against the Roadblock Directives, corrected errors, and added intersection and other information Annexed as Exhibit 6b is a copy of the Checkpoint List, as so amended, as limited to the Class Period, and excluding various columns compiled for Plaintiffs' own, internal work product purposes.

24.     The Checkpoint List contains only checkpoints operated by Strike Force, since only the Strike Force had Roadblock Directives. The Housing Unit also operated checkpoints (although

fewer than the Strike Force), which did not have Roadblock Directives associated with them.[4] The data sources for identifying Housing Unit checkpoints are discussed below.

### *Overview of Procedures*

25.    The procedures to identify potential members of the Checkpoint Class varied slightly by type of checkpoint, but in each instance the goal was construct a list of substantially all tickets issued or arrests made at checkpoints of that type, in furtherance of the goal of being able to provide notice to all class members who could be "identified with reasonable effort" under Rule 23(c)(2).

(a)    Importantly, the list could be *over*-inclusive—that is, it could include some tickets or arrests that did not in fact relate to checkpoints—but it should omit few if any tickets or arrests that did relate to checkpoints and thus would not be *under*-inclusive.

(b)    Once the potentially relevant tickets and/or arrests were identified, one can obtain the name and address of the person summonsed or arrested from TraCS (traffic tickets) or CHARMS (arrests), as described below.

(c)    Because the list would not be under-inclusive, it would include tickets issued to, and arrests of, substantially all potential class members and thus satisfy Rule 23(c)(2). There might be tickets and/or arrests of non-class-members on the list, but few people who *were* class members would fail to be identified.

(d)    Once the potentially relevant tickets and/or arrests were identified, the next step will be to obtain the name and address of the person summonsed or arrested as set forth in ¶ 52 & n.11 below.

(e)    Whether any particular individual to whom notice was sent is in fact a member of the Checkpoint Class, and thus entitled to share in any judgment favorable to the Class, can be determined later, as part of a proof-of-claim process after judgment.

---

[4]    In response to a Request for Admission, Defendants admitted that they are unaware of any Housing Unit checkpoints that had Roadblock Directives but purported to reserve the right to assert that some may have existed.

### *Identifying Tickets Issued at Strike Force Checkpoints*

26.    The Checkpoint List, with the updates and modifications described above, identifies the date and time and the street intersection at which the Roadblock Directive stated the checkpoint would be located.

27.    TraCS also contains date, time, and intersection information for tickets issued.

28.    TraCS in theory contains a code identifying checkpoint tickets, but the code is only partially reliable.

(a)    Arrest-Type "3" in theory denotes a ticket issued at a checkpoint, with other Arrest-Types (the dominant one being "1", for tickets issued on ordinary patrol) indicating non-checkpoint tickets.

(b)    These codes, however, were to be filled in by the ticketing officer at the time of issuance, and it is clear that many officers did not use the codes consistently.

(c)    There are many more "false negatives" than "false positives." That is, use of the "3" code is a fairly accurate indication of a checkpoint ticket, but use of the other codes says very little, one way or the other, about whether the ticket was issued at a checkpoint.

(i)    In making this determination, we looked most closely at the period from June 28, 2015 to August 3, 2017, which is the portion of the Class Period reviewed by the interns in the process described below.

(ii)    In that period, we identified (using the procedure described below) 9754 tickets as very likely issued at Strike Force checkpoints, with another 443 possibles, for a total of 10,193 tickets.

(iii)    Of these 10,193 tickets, 4683 were coded Arrest_Type 3 and 5510 were not. Those 5510 tickets are "false negatives" and consisted of 54.1% of the actual checkpoint tickets.

(iv)    From the other direction, there were 110,028 tickets in the period that were not actual or potential checkpoint tickets, of which 1705 were coded Arrest_Type 3, for an initial "false positive" rate of 1.5%.

(v)    In fact, the "false positive" rate is slightly lower than that, because 122 of the Arrest_Type 3 tickets were issued by one officer (P.O. Slawek) to commercial vehicles, for violations of federal trucking law. These tickets are not part of subject matter of this action.

    (vi)        Furthermore, 222 of the potential false positives were issued by Housing Unit officers other than at Strike Force checkpoints.[5] Thus, the actual false positive rate would be in the range 1.3% to 1.4%, depending on how many of the Housing Unit tickets were accurately coded Arrest_Type 3.

    (vii)       In any event, the false positive rate is a tiny fraction of the false negative rate.

29.    Based on our understanding, subsequently confirmed by testimony, that checkpoints generally lasted about an hour after they were established,[6] I and the interns acting under my direction first identified tickets that were stated in TraCS to have been issued in the interval from 30 minutes before to one hour after the listed starting time of the checkpoint. We included the half-hour before the listed start time in the interval to ensure that we would not miss tickets for checkpoints that started a little early.

30.    Then, we located the checkpoint on a standard mapping application (I used Apple Maps, because I work on a Mac; the interns used Google Maps because they worked on PCs). For each ticket in the time interval set forth above, we identified the location of issuance using the VIO_STREET field in TraCS and used the mapping application to determine the distance between ticket issuance and the checkpoint. We used Euclidean distance ("as the crow flies"), rather than road distance (the distance given by the "driving directions" feature of the mapping application), because the presence or absence of one-way streets in the area around the checkpoint could introduce substantial variability in the distance given by the driving directions. A ticket was listed as a "potential checkpoint ticket" if it was issued during the time interval given above and no more than 500 meters from the identified checkpoint location.

---

[5]    Housing Unit officers occasionally participated in Strike Force checkpoints. Their tickets in such instances are excluded from the 222 stated in text.

[6]    Whelan dep. at 146: "They were directed to last an hour. I'm not going to lie. We usually cut them off at about 45 minutes."

31.    The choice of a 500-meter radius is, of course, somewhat arbitrary, but it was driven by the following considerations:

(a)    In general, one could not expect all tickets issued at a checkpoint to be issued at precisely the intersection set forth in the Roadblock Directive. Depending on street layout and geography, the location of the "secondary stop" area, where many tickets would be issued, could be down the block or around the corner, which could easily be 200 meters or so from the listed checkpoint location.

(b)    Checkpoint tickets would also include tickets given to drivers who had sought to avoid the traffic cone funnel leading to the checkpoint.[7] To further the goal of avoiding under-inclusivity, we extended the radius around the checkpoint to 500 meters to allow for pulling over such drivers. Based on spot-checks,[8] I concluded that this extension was sufficient; that is, there were very few, if any, actual class members who would not be picked up by using the extended radius.

32.    The interns then coded the possible checkpoint tickets as "2" (possible), "3" (likely) or "4" (virtually certain) for my review. I reviewed all the 2s and 3s and a selection of the 4s.

(a)    I found virtually no potential errors in the 4s.

(i)    Many of the 4s consisted of tickets issued at precisely the intersection specified in the Checkpoint List or at most a block or two away. These bear no risk of over-inclusivity; they are clearly checkpoint tickets.

(ii)    Others of the 4s were physically further away but well within 500 meters and appeared on the map to be in logical locations for secondary stops or for traffic stops of persons who attempted to evade the checkpoints. Some of these are potentially over-inclusive and might need final resolution at the proof-of-claim stage.

(b)    The 2s and 3s mostly related to tickets near the outer edges of, or slightly outside, the time periods or the 500-meter radius, which I resolved (bearing in mind the willingness to be over-inclusive but not to be under-inclusive) by looking at the street geography, the nature of the ticket,[9] and at how the unit and officers that issued the tickets related to the units and officers who issued

---

[7]    The Roadblock Directives require officers establishing the roadblock to "[s]et the roadblock up in a way that minimizes the possibility of avoiding it" and directs them to "[c]onduct a traffic stop on any vehicle that attempts to avoid the roadblock."

[8]    The spot-checks looked for tickets issued by Strike Force officers during the time interval of the checkpoint but more geographically remote than the 500-meter radius.

[9]    For example, except at Crowley/Rano, tickets for failure to stop at a stop sign were not typically issued at checkpoints.

tickets that clearly were within the checkpoint parameters. These tickets will likely need final resolution at the proof-of-claim stage.

(c)     For ascertainability purposes, and in line with *In re Petrobras Securities Litigation*, 862 F.3d 250, 267 (2d Cir. 2017), and *Cox v. Spirit Airlines, Inc.,* 341 F.R.D. 349, 372–73 (E.D.N.Y. 2022), *amended on reconsideration in part*, 2023 WL 1994201 (E.D.N.Y. Feb. 14, 2023), Plaintiffs propose that the tickets in category (a)(i) above be conclusively presumed to have been given to members of the Checkpoints Class, whereas tickets in categories (a)(ii) and (b) might require supplemental information at the proof-of-claim stage, such as an affidavit from the putative class member.

33.     The interns reviewed only tickets from the period June 28, 2015, to August 3, 2017. I personally reviewed the tickets from August 4, 2017, through the last checkpoint on our list, which was October 27, 2017. In doing so, I naturally collapsed the two steps of creating 2s and 3s and then resolving them pursuant to paragraph 32(b), since I was performing both steps.

34.     The overall result of this exercise was to identify 11,691 tickets within the class period that met the criteria discussed above for inclusion in the list of individuals to be given notice under Rule 23(c)(2). Over 11,000 of these were classified as "4s" and thus are very likely to have been given to members of the Checkpoints Class.

35.     Using the ticket and license numbers in TraCS and de-duplicating, it was determined that the 11,691 tickets were given to 3,894 distinct individuals who held New York driver's licenses at the time of ticketing (and thus are highly likely to have their names and addresses in TraCS, as described below). There were 116 other individuals who held non-New York licenses (who still *should* have their names and addresses in TraCS, depending on whether the license-scan electronic link between TraCS Mobile and the out-of-state DMV was functioning at the time of ticketing), and there were 186 tickets (not individuals) where the state of issuance was blank (and thus may well not have identifying information in TraCS).

36.     For numerosity purposes, the review described above indicated that, conservatively, at least 3,000 distinct individuals are members of the Checkpoints Class.

37.    To estimate one element of the damages available to these Checkpoints Class members, I tied the checkpoint tickets identified above to a database of BTVA adjudicatory and financial transactions maintained by the New York State Office of Court Administration, which we obtained through informal discovery of the OCA. In that database, one can locate at least $400,000 of fine and fee payments corresponding to the tickets referred to in paragraph 34

### *Undocumented Strike Force Checkpoints*

38.    As alleged in the Amended Complaint (¶¶ 56-59), there were several apparent Strike Force checkpoints for which no Roadblock Directive was provided. We have identified a number of these by looking for clusters of tickets issued at about the same time, in about the same place, by several different Strike Force officers, generally including at least some tickets coded Arrest_Type 3.

39.    Annexed as Exhibit 7 is the list of 24 undocumented checkpoints that I supplied to Prof. Bjerk for use in his expert report, plus an additional one (on March 17, 2017, at the intersection of East Delavan Avenue and Courtland Avenue, on Buffalo's East Side) that has been identified as part of the process of preparing this declaration.

40.    The tickets from these 25 checkpoints will be subjected to the class-member identification process described below and included in the notice list for the Checkpoint Class.

### *The Crowley/Rano Housing Unit Checkpoints*

41.    One set of checkpoints that appear to have been operated by the Housing Unit was at the intersection of Rano Street and Crowley Avenue, which is in northwest Buffalo, a few blocks southeast of the Shaffer Village BMHA housing development (*see* Google Earth Map, Exhibit 8). The maps indicate that Rano runs north/south in this area, and Crowley begins at Rano and runs one-way west (*see* Exhibit 9, looking east along Crowley against the direction of travel). As shown on Google Earth (Exhibit 10), there is a stop sign on the northbound side of Rano at Crowley.

42.    TraCS shows a large number of stop-sign tickets with location either "Crowley/Rano," "Crowley/Isabelle" (one block down from Rano), or on the 300 block of Crowley, which is the block between Rano and Isabelle. Through June 2020, when the Housing Unit was disbanded, 1157 out of 1238 such tickets (93.5%) were issued by members of the Housing Unit.

43.    Looking at the layout of the intersection as reflected in Exhibits 9 and 10, there is a fair inference that Housing Unit officers camped out on Crowley, a little way down from the intersection, and stopped and ticketed the no-stops or rolling stops.

44.    In addition to the stop-sign tickets, however, TraCS also shows a number of "incidents" (same driver, same time) at Crowley/Rano in which **no stop sign ticket was issued**. Four hundred thirty eight of the Crowley/Rano tickets were coded "Arrest_Type 3" (checkpoint). Plaintiffs assert that they are entitled to the inference that the Housing Unit officers were not merely camped out but in fact had set up a checkpoint on Crowley, so that they were stopping cars *regardless* of whether they had probable cause from observation of a stop-sign violation.  Given that BPD officers were notoriously spotty in "Arrest_Type" coding, and that the overall proportion of false positives is much lower than that of false negatives (see above), the inference that checkpoints were in operation at that intersection becomes compelling.

45.    Plaintiffs do not assert that a ticket issued at Crowley/Rano in an incident in which a stop-sign ticket was given triggers membership in the Checkpoint Class, because membership in that class is triggered by *suspicionless* stops. But tickets issued in incidents *without* a stop-sign ticket do not have the probable cause predicate and thus do trigger membership in the Checkpoint Class.

46.     On and after June 28, 2015, 409 tickets were issued at Crowley/Rano in incidents in which there was no stop-sign ticket. These tickets were issued to 117 distinct, identifiable individuals, who will be added to the list to receive the class notice.

### Other Housing Unit Checkpoints

47.     Although the Housing Unit did not have Roadblock Directives, it did file daily and monthly reports reflecting its activities. On a number of occasions, those reports indicated that the unit had operated checkpoints in certain areas at certain times.

48.     A lawyer and a legal assistant reviewed the monthly reports and provided me a list of the checkpoints indicated thereon.[10] I then cross-referenced that list against TraCS to determine whether any tickets were issued at the indicated checkpoints, using the same review techniques as described above for the Undocumented Strike Force Checkpoints. It appears that more than half the putative checkpoints had no tickets issued, or that one could not determine with a reasonable degree of certainty that there were. Those cases will not contribute to the list of members of the Checkpoints Class, but where it is reasonably clear that tickets were issued at the checkpoint, those tickets will be subjected to the class-member identification process described below and included in the notice list for the Checkpoint Class.

### Arrests at Checkpoints

49.     Identifying arrests related to checkpoints proceeds in a similar way to identifying tickets associated with checkpoints. Each checkpoint that actually appears to have taken place, whether Strike Force, Crowley/Rano, or other Housing Unit, has a location and a date and time associated with it. The ARRESTS table in CHARMS likewise has locations, dates, and times

---

[10]     We also obtained unredacted daily reports from the dates on which the monthly reports indicated checkpoints and used the narrative portions of the daily reports as an additional cross-check. In most but not all cases it appeared that the monthly reports had been compiled from the daily reports, but in a few cases the daily reports provided more specific location information than had the monthlies.

associated with each arrest. As was done above, one can identify arrests that took place within a given interval around the checkpoint start time (half an hour before to an hour after) and within 500 meters of the checkpoint location.

50.    For example, on November 19, 2015, there were three Strike Force checkpoints, including one at the intersection of Leslie St. and Scajaquada St., on the East Side, which began at 12:30 PM. Two individuals were arrested that day at that intersection, both at 1:15PM. Accordingly, those individuals are members of the Checkpoint Class.

51.    This process will be repeated for the other arrests within the time period surrounding a checkpoint, and the individuals will be added to the notice list for the Checkpoint Class. As before, it will likely be necessary to defer final determination of class members to the proof-of-claim stage.

***Going from Tickets and Arrests to Checkpoint Class Members***

52.    As noted above, the final step in the identification process is to obtain the names and addresses of the potential class members associated with the listed tickets and arrests. These data exist in TraCS (tickets) and CHARMS (arrests).[11] For privacy reasons we did not originally request personal identifying information in our TraCS and CHARMS subpoenas to Erie County, but the City has stipulated (Ex. 14) that the information is available and may be used for, *inter alia*, identifying class members.

53.    For numerosity purposes, it is sufficient to point to the list of individuals ticketed at documented Strike Force checkpoints, as described above. The final list for class notice will

---

[11]    The ARRESTS table is part of the CHARMS system and thus can be linked to the MASTER_NAME table to provide necessary details of the person arrested.An example of such linking with respect to the SUMMONS table in CHARMS is given in the e-mail from counsel for the City, annexed as Exhibit 12.

also include the individuals (including arrests) identified through the processes described for the other types of checkpoints discussed herein.

***Tinted Window Tickets***

54.    The Tinted Window Class is defined as, "All Black and/or Latinx individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015."

55.    Tinted window tickets are issued for alleged violations of one of the four subsections of N.Y. Veh. & Traf. Law § 375-a(b)(12), and thus are readily identifiable in TraCS.

56.    At our request, Prof. Bjerk has supplied a basic summary of the tinted window tickets issued in each of the five separate time periods he studied, broken out by race/ethnicity and by single or multiple tickets per incident. A copy of his summary is annexed as Exhibit 13.

57.    Focusing specifically on the Class Period, and using Prof. Bjerk's file of race/ethnicity designations (compiled as described in his report), TraCS shows that 6,266 distinct Minority (Black or Hispanic) drivers had tinted window "incidents" in which they received more than one tinted window ticket.[12] Substantially all of these can be identified by name and address by supplemental TraCS production, as described above with respect to the Checkpoints Class.

58.    Tying the tickets in these incidents to the BTVA/OCA database as was done with checkpoint tickets yields payments to the City of Buffalo in the amount of $515,837.

59.    In contrast with the Checkpoints Class, where potential uncertainties in identifying a portion of the tickets issued at checkpoints led to the need for over-inclusivity, the identification of members of the Tinted Window Class set forth herein is precise.

---

[12]    Because Prof. Bjerk did not receive 2023 data in time to extend his analysis into that year, the list of Tinted Window Class members includes only those Minority drivers who received multiple tinted b window tickets through December 31, 2022. It is likely that we will be able to update the list before class notices go out.

60.    Using the Strike Force and Housing Unit rosters described above, the average number of tinted window tickets per tinted window incident, over time, for each of the two units was:

| 6-mo.period | SF tix/inc | HU tix/inc |
|---|---|---|
| 2012//2 | 1.00 | 1.33 |
| 2013//1 | 1.58 | 1.45 |
| 2013//2 | 2.12 | 2.20 |
| 2014//1 | 2.42 | 2.25 |
| 2014//2 | 2.68 | 2.62 |
| 2015//1 | 2.84 | 2.65 |
| 2015//2 | 2.84 | 3.05 |
| 2016//1 | 3.01 | 3.31 |
| 2016//2 | 3.04 | 3.33 |
| 2017//1 | 2.80 | 2.99 |
| 2017//2 | 2.90 | 3.03 |
| 2018//1 | 3.19 | 3.42 |

Or, graphically:



*The Traffic Enforcement Class*

61.    The Traffic Enforcement Class includes future members (Black or Latino motorists who "have been or will be" subject to traffic enforcement), so the number of members is essentially indeterminate.

62.    Nevertheless, it is possible to come up with a very conservative lower bound on the number of members, which will suffice for demonstrating numerosity.

63.    To do this, we look at 2021 and 2022, the last two years for which Prof. Bjerk determined race-of-driver, as described in ¶¶ 130-136 of his report. TraCS lists 37,640 citations in those two years combined; Prof. Bjerk determined that at least 22,447 of these were issued to Black or Latino drivers, 7,557 were issued to non-Minority drivers, and for 7,637 race could not be determined.

64.    Looking at the Minority license numbers for 2021 and 2022 in TraCS and deduplicating, we are left with 10,173 unique individuals. Each of these individuals is a Black or Latino person who (because they are in TraCS) "has been" subject to traffic enforcement. Accordingly, the Traffic Enforcement Class contains *at least* that many individuals—and, of course, it actually contains many more.

*Record Support for Brief*

65.    This section of this Declaration sets forth support for various data-derived statements in the brief in support of the instant motion. Unless stated to the contrary, the assertions below are based on the same personal knowledge and the same data sources as the previous portions of this declaration.

### *Checkpoint Locations Over Time*

66.    As set forth in the brief, Checkpoint locations were set in different ways at different times: by Commissioner Derenda from January 1, 2013 to June 30, 2014; by Strike Force

Lieutenants and their superiors within their chain of command from July 1, 2014 to March 30, 2017; by Commissioner Lockwood from April 1, 2017 to June 30, 2017, and thereafter under (as Plaintiffs assert) a Potemkin scheme that was entirely different from past practices.

67.    Using the full Checkpoint List of locations and Prof. Bjerk's classification of census tracts as "High Minority" (>60% Black and Latino), "Low Minority" (<40%), and "Mixed" (between 40% and 60%), the location of checkpoints, by time period, was as follows:

| Time Period | Tract Type (1=high, 2 = mixed, 3 = low; fraction = border of diff types) | | | | | | | | %high |
|---|---|---|---|---|---|---|---|---|---|
| | 1.00 | 1.50 | 1.67 | 2.00 | 2.33 | 2.50 | 3.00 | Total | |
| 1/2013-6/2014 | 242 | 1 | 5 | 34 | 2 | 6 | 20 | 310 | 78.1% |
| 7/2014-3/2017 | 834 | | 14 | 55 | 1 | 14 | 36 | 954 | 87.4% |
| 4/2017-6/2017 | 125 | | 3 | 31 | | 8 | 75 | 242 | 65.4% |
| 7/2017-end | 46 | 4 | 1 | 27 | | 4 | 89 | 171 | 26.4% |
| Grand Total | 1247 | 5 | 23 | 147 | 3 | 32 | 220 | 1677 | 74.4% |

As set forth in the table, the "fractional" tract types reflect checkpoints that were on the border of tracts of different type, with the fractions determined by averaging the types of the several tracts.

### *Number of Checkpoints Per Day*

68.    As set forth in the brief, Strike Force officers have testified that they were expected to run checkpoints every day, although for weather, manpower, or other reasons they were not always able to do so. The full Checkpoint List reflects that, from 2013 through March 2017 (the Derenda and Lieutenants' eras above), the days with checkpoints had between one and five checkpoints a day.

### *Increase in Total Citations from FY2014 to FY2015*

69.    TraCS reflects that the total number of citations issued by the BPD in Fiscal Year 2014 (7/1/2014-6/30/2015) was 41,800. In FY15, it increased to 54,960, an increase of 31.5%. In FY16 it increased again, to 58,645.

This 29th day of May, 2024, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

s/ *Edward P. Krugman*

Edward P. Krugman