## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NEW YORK

BLACK LOVE RESISTS IN THE RUST, *et al.*, individually and on behalf of a class of all others similarly situated,

               Plaintiffs,

     v.

CITY OF BUFFALO, N.Y., *et al.*,

               Defendants.

No. 1:18-cv-00719-CCR

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

FACTS RELEVANT TO CLASS CERTIFICATION ............................................... 4

I.      The City Maintained a Policy of Unlawful and Discriminatory Traffic Enforcement Relevant to the Checkpoints and Tinted Windows Classes ................................................. 4

        A.      Commissioner Derenda Charged the Strike Force and Housing Unit with Carrying Out the Unconstitutional Practices ................................................. 4

        B.      Policy and Practice of Conducting Suspicionless Vehicle Checkpoints in Black and Brown Neighborhoods .......................................................... 5

        C.      Policy and Practice of Issuing Multiple Tinted Windows Tickets to Black and Latino Drivers ................................................................. 8

II.     Formal City Policies Promoted Ticketing for Profit and Created Financial Incentives for BPD Officers to Issue Traffic Tickets ..................................................... 10

III.    The City's Own Data Reveal Shocking Racial Disparities in the BPD's Traffic Enforcement Practices ............................................................ 13

IV.     Under *Monell*, the City Is Responsible for Ongoing Unlawful and Discriminatory Traffic Enforcement ............................................................. 14

        A.      The City Has Long Been on Notice that BPD Officers Engage in Racially Discriminatory Traffic Enforcement ................................................. 14

        B.      The City Has Failed to Act to Prevent Officers from Engaging in Racially Discriminatory Traffic Enforcement ................................................. 16

                1.      The Disciplinary Catch-22 ................................................. 16

                2.      Lack of Written Anti-Discrimination Policy ........................... 17

                3.      Failure to Monitor ........................................................... 17

                4.      Failure to Supervise ......................................................... 18

                5.      Failure to Investigate ....................................................... 19

                6.      Failure to Discipline ......................................................... 20

                7.      Failure to Train ............................................................... 21

V.     City Data and Recordkeeping ........................................................................22

VI.    Proposed Class Representatives ....................................................................22

ARGUMENT............................................................................................................23

I.     THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(A)
       ..........................................................................................................................23

       A.     The Proposed Classes Satisfy the Numerosity Requirement ...............23

       B.     The Proposed Classes Satisfy the Commonality Requirement ............24

              1.     The Checkpoint Class...............................................................25

              2.     The Tinted Windows Class .......................................................26

              3.     The Traffic Enforcement Class .................................................28

       C.     The Proposed Classes Satisfy the Typicality Requirement..................29

              1.     The Checkpoint Class...............................................................30

              2.     The Tinted Windows Class .......................................................30

              3.     The Traffic Enforcement Class .................................................31

       D.     The Proposed Classes Satisfy the Adequacy Requirement..................31

       E.     The Proposed Classes Are Ascertainable............................................32

II.    THE PROPOSED CHECKPOINT AND TINTED WINDOWS CLASSES MEET
       THE REQUIREMENTS OF RULE 23(b)(3) ...................................................34

       A.     Common Questions Predominate Over Individualized Issues .............34

              1.     The Checkpoint Class...............................................................35

                     a)     The Fourth Amendment Claim....................................36

                     b)     The Equal Protection and Title VI Claims ..................37

              2.     The Tinted Windows Class .......................................................38

                     a)     The Due Process Claim...............................................38

                     b)     The Equal Protection and Title VI Claims ..................40

B.  Minor Factual Variations Among Class Members, Such As Differences in Damages, Do Not Defeat Predominance..............................................................42

C.  A Class Action is Superior to Other Methods of Adjudication............................44

III.  THE PROPOSED TRAFFIC ENFORCEMENT CLASS MEETS THE REQUIREMENTS OF RULE 23(b)(2)...........................................................................48

CONCLUSION.......................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdi v. Duke*,
   323 F.R.D. 131 (W.D.N.Y. 2017) ................................................................. 32, 33

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................ 34, 49

*Amgen Inc. v. Conn. Ret, Plans & Tr. Funds*,
   568 U.S. 455 (2013) ...................................................................................... 34

*Augustin v. Jablonsky*,
   819 F.Supp.2d 153 (E.D.N.Y. 2011) ............................................................. 47

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000) ........................................................................... 31

*Barnes v. District of Columbia*,
   278 F.R.D. 14 (D.C. Cir. 2011) ..................................................................... 47

*Barrows v. Becerra*,
   24 F.4th 116 (2d Cir. 2022) ................................................................ 24, 25, 29

*Betances v. Fischer*,
   2022 WL 765963 (S.D.N.Y. Mar. 14, 2022) ................................................. 47

*Brown v. City of Oneonta, N.Y.*,
   221 F.3d 329 (2000) ...................................................................................... 37

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010) ................................................................. *passim*

*Brucker v. City of Doraville*,
   38 F.4th 876 (11th Cir. 2022) ........................................................................ 39

*Butler v. Suffolk County*,
   289 F.R.D. 80 (E.D.N.Y. 2013) ............................................................... 42, 44

*Caperton v. A.T. Massey Coal Co.*,
   556 U.S. 868 (2009) ...................................................................................... 40

*Casale v. Kelly*,
   257 F.R.D. 396 (S.D.N.Y. 2009) ................................................................... 50

*Consol. Rail Corp. v. Town of Hyde Park*,
   47 F.3d 473 (2d Cir. 1995) ....................................................................23

*Cox v. Spirit Airlines, Inc.*,
   341 F.R.D. 349 (E.D.N.Y. 2022), *amended on reconsideration in part*, 2023
   WL 1994201 (E.D.N.Y. Feb. 14, 2023) ...............................................33

*Daniels v. City of New York*,
   198 F.R.D. 409 (S.D.N.Y. 2001) ....................................................28, 31

*Davis v. City of New York*,
   296 F.R.D. (S.D.N.Y. 2013) .............................................................28, 49

*Dellums v. Powell*,
   566 F.2d 167 (D.C. Cir. 1977) .............................................................47

*Doe v. Vill. of Mamaroneck*,
   462 F. Supp. 2d 520 (E.D.N.Y. 2006).................................................37

*In re Drexel Burnham Lambert Grp., Inc.*,
   960 F.2d 285 (2d Cir. 1992) ...........................................................23, 29

*Ebin v. Kangadis Food Inc.*,
   297 F.R.D. 561 (S.D.N.Y. 2014) ..........................................................33

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ..............................................................................35

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ...................................................................31

*Floyd v. City of New York*,
   283 F.R.D. 174 (S.D.N.Y. 2012) .....................................................*passim*

*Frank v. Eastman Kodak Co.*,
   228 F.R.D. 174 (W.D.N.Y. 2005)..........................................................29

*Gacho v. Wills*,
   986 F.3d 1067 (7th Cir. 2021) ..............................................................39

*Godson v. Eltman, Eltman, & Cooper, P.C.*,
   328 F.R.D. 35 (W.D.N.Y. 2018)......................................................32, 45

*Hallmark v. Cohen & Slamowitz*,
   LLP, 293 F.R.D. 410 (W.D.N.Y. 2013) ...............................................31

*Hardgers-Powell v. Angels in Your Home LLC*,
   330 F.R.D. 89 (W.D.N.Y. 2019)...........................................................47

v

*Hill v. City of N.Y.*,
    136 F.Supp.3d 304 (E.D.N.Y. 2015)........................................................................41

*Hill v. City of N.Y.*,
    2019 WL 1900503 (E.D.N.Y. Apr. 29, 2019) .......................................................41

*Ligon v. City of New York*,
    288 F.R.D. 72 (S.D.N.Y. 2013) ................................................................... 28, 31, 50

*Lynch v. City of New York*,
    589 F.3d 94 (2d Cir. 2009) .....................................................................................36

*M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*,
    2008 WL 343011 (W.D.N.Y. Feb. 6, 2008) ..........................................................23

*Macarz v. Transworld Sys., Inc.*,
    193 F.R.D. 46 (D. Conn. 2000)...............................................................................42

*MacNamara v. City of New York*,
    275 F.R.D. 125 (S.D.N.Y. 2011) ..................................................................... 29, 30

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) .........................................................................*passim*

*McCracken v. Verisma Sys., Inc.*,
    2017 WL 3187365 (W.D.N.Y. July 27, 2017)........................................................25

*Mendez v. Radec Corp.*,
    232 F.R.D. 78 (W.D.N.Y. 2005)..............................................................................42

*Mhany Mgmt., Inc. v. Cty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016) ...................................................................................37

*Monell v. Department of Social Services*,
    436 U.S. 658 (1978) .....................................................................................*passim*

*Morrow v. Washington*,
    277 F.R.D. 172 (E.D. Tex. 2011)............................................................................50

*J.S. ex rel. N.S. v. Attica Cent. Sch.*,
    2006 WL 581187 (W.D.N.Y. Mar. 8, 2006) ..........................................................24

*In re Nassau County Strip Search Cases*,
    2009 WL 706252 (E.D.N.Y. Mar. 16 2009)...........................................................46

*In re Nassau County Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ...................................................................................47

*Odom v. Hazen Transp., Inc.*,
  275 F.R.D. 400 (W.D.N.Y. 2011) ............................................................................29

*Ortega-Melendres v. Arpaio*,
  836 F. Supp. 2d 959 (D. Ariz. 2011) ...............................................................28, 50

*In re Petrobras Securities*,
  862 F.3d 250 (2d Cir. 2017) ............................................................ 32, 33, 34, 48

*Plaintiffs # 1-21 v. County of Suffolk*,
  2021 WL 1255011 (E.D.N.Y. Mar. 12, 2021) ...................................27, 28, 31, 49

*Pritchard v. County of Erie*,
  269 F.R.D. 213 (W.D.N.Y. 2010) .....................................................................43, 44

*Raymond v. New York State Dep't of Corr. & Cmty. Supervision*,
  2022 WL 97327 (N.D.N.Y. Jan. 11, 2022) ............................................................49

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) ..................................................................................42

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) .........................................................................*passim*

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ...............................................................................................23

*Singleton v. Fifth Generation, Inc.*,
  2017 WL 5001444 (N.D.N.Y. 2017) ......................................................................33

*Stinson v. City of N.Y.*,
  282 F.R.D. 360 (S.D.N.Y. 2012) ..................................................................*passim*

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ...............................................................................................35

*In re U.S. Foodservice Inc. Pricing Lit.*,
  729 F.3d 108 (2d Cir. 2013) ..................................................................................45

*Umbrino v. L.A.R.E. Partners Network, Inc.*,
  585 F. Supp. 3d 335 (W.D.N.Y. 2022)..............................................................42, 45

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252 (1977) ...................................................................................37, 38, 41

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 123 (2d Cir. 2001) ..................................................................................48

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ............................................................................... 43

*Vogel v. City of New York*,
    2017 WL 4712791 (S.D.N.Y. Sept. 19, 2017) ....................................................... 49

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................... *passim*

**Statutes and Rules**

42 U.S.C. § 1983 ............................................................................................................. 35

N.Y. Veh. & Tr. Law 375(12-a)(b) ............................................................................... 9

New York Executive Law 75(5)(a) ............................................................................... 18

Fed. R. Civ. P. 23 ............................................................................... *passim*

## PRELIMINARY STATEMENT

For over a decade, the Buffalo Police Department (BPD) has unlawfully targeted Black and Latino motorists for aggressive, punitive traffic enforcement. City policymakers sought to transform a limited legal license to undertake administrative traffic checkpoints into a crime investigation and suppression strategy, in contravention of Fourth Amendment principles, which prohibit officers from imposing burdensome seizures on citizens merely in the hope of ferreting out crime; the strategy also contravened Fourteenth Amendment principles that proscribe the racially discriminatory assumption underlying the City's policy, namely that Black and Latino citizens are more prone to commit crimes. On the basis of this impermissible racial profiling, City policymakers urged BPD officers to maximize traffic enforcement in Black and Latino neighborhoods, incentivizing overzealous enforcement with an implicit quota system that tied overtime opportunities to "production." Relying on these same discriminatory assumptions, the BPD has continued systematically to target Black and Latino motorists for traffic enforcement, acting with deliberate indifference to their constitutional rights as reflected in frequent and ongoing individual and community complaints. These practices form part of the City's longstanding scheme to generate revenue on the backs of the poorest, least politically powerful people in Buffalo and are a continuation of the City's deep and troubled history of racial discrimination.

In 2013, the City established a blatantly unconstitutional Checkpoint Policy, erecting unlawful crime suppression roadblocks under the guise of "traffic safety." Under the Checkpoint Policy, BPD officers stopped motorists without any individualized suspicion of wrongdoing, attempted to develop evidence of criminal activity, and issued tickets for as many alleged traffic violations as possible. Over the life of the program, the BPD ran more than 1,600 Checkpoints, ensnaring thousands of predominantly Black and Latino motorists. The BPD placed Checkpoints in predominantly Black or Latino neighborhoods seven times as often as in predominantly white

neighborhoods, amounting to a policy of intentional discrimination in violation of the Fourteenth Amendment and Title VI of the Civil Rights Act. Because the Checkpoint Policy failed to conform to the limited exceptions permitting administrative searches and seizures, and because BPD officers operated under an unconstitutional conflict of interest, the Checkpoint Policy also violated the Fourth Amendment and Due Process rights of the people subjected to it. Plaintiffs seek to certify a damages class of individuals subjected to ticketing and arrests at Checkpoints (the "Checkpoint Class").

In July 2015, the City launched the Buffalo Traffic Violations Agency ("BTVA") to capture for the City traffic violation revenue that had previously gone to the State. With this financial incentive in place, the BPD's racially discriminatory traffic enforcement practices intensified yet again. At and outside Checkpoints, the BPD maximized ticket revenue by targeting Black and Latino motorists for multiple tickets in a single stop—especially tinted windows tickets. With the full knowledge of the City's highest leadership, BPD officers regularly issued four or more tinted windows tickets at a time—one for each allegedly offending window. From 2012 through 2022, the BPD issued nearly 52,000 tinted windows tickets in more than 22,000 incidents. BPD issued more than 38,000 of the citations for which race could be determined—*86.9%*—to Black and Latino drivers, against only 5,800 to drivers of other races. This widespread custom and practice violates the Due Process Clause, the Equal Protection Clause, and Title VI of the Civil Rights Act. Plaintiffs seek to certify a damages class of Black and Latino individuals issued multiple tinted windows tickets in a single stop (the "Tinted Windows Class").

Though it has curtailed some of the abuses exposed over the course of this lawsuit, the City continues to subject Black and Brown motorists to a systemic program of racially motivated traffic stops, ticketing, and vehicle impounds. Despite receiving high levels of individual and community

complaints, the Mayor and BPD Commissioners have deliberately chosen not to implement adequate accountability, supervision, and training measures that could meaningfully reduce racially biased traffic enforcement. For this reason, Plaintiffs also seek to certify an injunctive class to obtain broad prospective relief to prevent ongoing and future constitutional violations (the "Traffic Enforcement Class").

The time for accountability is now. Plaintiffs' claims—tightly focused on redressing harms caused by City policy, custom, and practice as required by *Monell v. Department of Social Services*, 436 U.S. 658 (1978)—cry out for class-wide adjudication. Plaintiffs seek certification of three separate but overlapping Classes under Rule 23 of the Federal Rules of Civil Procedure:[1]

- A **Checkpoint Class** pursuant to Rule 23(b)(3), represented by Plaintiffs Bonds, Evans, and Redden, defined as: All individuals who received a ticket or were arrested at a BPD "traffic safety" vehicle checkpoint on or after June 28, 2015.

- A **Tinted Windows Class** pursuant to Rule 23(b)(3), represented by Plaintiffs Franklin, Palmer and Yeldon, defined as: All Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015.

- A **Traffic Enforcement Class** pursuant to Rule 23(b)(2), represented by all individual Plaintiffs, defined as: All Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and "traffic safety" vehicle checkpoints by the BPD.

Because Plaintiffs satisfy all of the requirements of Rule 23 as further set forth below, their motion for class certification should be **GRANTED**.

---

[1] Although the three proposed classes are distinct, some individuals may be members of more than one class. For example, a Black motorist who received four tinted windows tickets at a single Checkpoint stop in 2015 and continues to drive in the City of Buffalo today, would be a member of all three classes. Plaintiffs have simplified the class structure proposed in the Amended Complaint. *See* ECF No. 63 ¶ 398.

## FACTS RELEVANT TO CLASS CERTIFICATION

I.   **The City Maintained a Policy of Unlawful and Discriminatory Traffic Enforcement Relevant to the Checkpoints and Tinted Windows Classes**

    A.   **Commissioner Derenda Charged the Strike Force and Housing Unit with Carrying Out the Unconstitutional Practices**

In 2012, BPD Commissioner Daniel Derenda created the BPD Strike Force to "attack high crime areas in the City of Buffalo" and strictly enforce Mayor Brown's Zero Tolerance Crime Policy. Exs.[2] 37; 44. The Strike Force operated to "address Gang & Gun violence." Ex. 41; *see also* Ex. 111. From June 2012 to June 2014, Derenda personally assigned Strike Force patrol locations—mostly in Black neighborhoods on the East Side of Buffalo.[3] Exs. 8 (at 282:1-6); 49. After June 2014, Strike Force lieutenants generally chose their own patrol locations.[4] Exs. 9 (at 21:13-22); 35 (at 18:2-15). Following Derenda's pattern and model, the Strike Force usually patrolled Black and Latino neighborhoods. Exs. 4 (at 41:16-42:2, 49:6-9); 6 (at 39:16-40); 24 (at 36:20-23); 34 (at 75:14-17); 140 (at 24).

The BPD formed the Housing Unit under a contract with the Buffalo Municipal Housing Authority (BMHA). Ex. 39 at 3-5. The Housing Unit and the Strike Force shared an office and a command structure. Exs. 6 (at 26:17-21); 80. Rather than answering general calls for service, the Housing Unit patrolled BMHA buildings and nearby streets. Exs. 8 (at 35:3-21); 28 (at 108:1-8).

---

[2] Citations to "Ex." or "Exs." refer to exhibits to the Declaration of Claudia Wilner unless otherwise noted.

[3] Derenda created 24 target areas to facilitate assigning the Strike Force to different sectors of the city. *See* Ex. 38.

[4] Lockwood (then Deputy Commissioner) and Chiefs Brinkworth and Young, who oversaw the Strike Force and Housing Unit, testified that they did not routinely direct Strike Force patrol locations. Exs. 6 (at 39:7-9); 19 (at 117:2-11); 28 (at 59:12-19); 36 (at 26:4-6). Housing Unit Captain Serafini, who also performed administrative duties for the Strike Force, did not set patrol locations but sometimes passed on orders from his superiors to patrol in a certain place. Exs. 28 (at 59:12-60:10); 36 (at 26:7-20). According to Lockwood, if the Chiefs or Captains did not set patrol locations, the Lieutenants would have done so. Ex. 19 at 117:2-11.

The Housing Unit often focused on predominantly Black and Latino housing developments. Exs. 29 (at 107:6-109:20); 74 (at 4-6).

Commissioner Derenda expected Strike Force and Housing Unit officers to produce large numbers of traffic tickets and vehicle impounds as part of his proactive policing policy. Exs. 8 (at 36:6-17); 9 (at 150:13-18); 40. Derenda monitored both units via daily reports. Exs. 8 (at 104:15-19); 9 (at 156:4-12). The reports listed patrol and checkpoint locations and tallied statistics including vehicle impounds, cash and guns seized, traffic and city ordinance violations issued, and arrests made. Exs. 9 (at 21:2-12); 36 (at 150:1-14); 128 (at 2-5). Derenda kept track of daily statistics, which he emailed to the officers so they would know he was watching. Ex. 43 at 1-2. When officers failed to produce enough tickets, Derenda pressured them to increase ticket numbers. Exs. 8 (at 102:19-104:10); 9 (at 156:13-159:5); 33 (at 257:8-12); 122 (at 1-6). Strike Force and Housing Unit officers reported issuing large numbers of traffic tickets, far more than any other tracked activity. Ex. 47 at 1-2; *see, e.g.,* Ex. 128.

### B.    Policy and Practice of Conducting Suspicionless Vehicle Checkpoints in Black and Brown Neighborhoods

As part of his proactive policing policy, Commissioner Derenda ordered Strike Force and Housing Unit officers to run suspicionless vehicle Checkpoints. Ex. 9 at 259:21-261:10. The BPD promulgated a formal policy governing such Checkpoints, Exs. 42; 125 (at 329-30), and the City's highest policymakers ratified the program. Exs. 7 (at 66:2-8); 9 (at 268:4-7). Strike Force and Housing Unit officers conducted the Checkpoints in a uniform manner in accordance with the Policy. Ex. 9 at 86:15-18, 171:13-172:2.[5] Derenda expected the Strike Force to run checkpoints every day, although some days might be omitted for weather, manpower, or other reasons. Exs. 9

---

[5] The proof at trial will be that the policy's reference to "roadway safety" as a *purpose* of the roadblock was pretextual, but the *mechanics* of checkpoint operation were in general as laid out in the policy.

(at 48:4-11); 59; 69; 70; *see also* Ex. 51. The number of Checkpoints ranged from one to five per day. Krugman Dec. ¶ 68.

Checkpoints were conducted in multiple stages. In the first stage, officers set up the Checkpoint in a manner that funneled all nearby traffic through it. Exs. 9 (at 261:1-10); 33 (at 148:3-8); 42. Officers subjected every car to an initial detention without any individualized suspicion that a crime or traffic violation had been committed. Exs. 6 (at 157:19-158:3); 9 (at 261:1-10); 33 (at 147:22-148:8). Officers checked for valid registrations, inspection stickers, seatbelts, and anything suspicious in plain view. Exs. 9 (at 260:4-11); 33 (at 154:4-14); 42.

In the second stage, BPD officers directed some drivers to pull over for a secondary stop of up to an hour, during which officers subjected the driver and passengers to a longer interrogation and sometimes issued tickets, made an arrest, and/or impounded the vehicle. Ex. 33 at 174:21-177:23, 190:14-191:12. The Policy required officers to issue tickets for all traffic violations identified at Checkpoints; officers had no discretion to do otherwise. Exs. 9 (at 167:13-168:1); 42. When ticketing outside of Checkpoints, though, officers could exercise discretion. Ex. 9 at 279:5-20.

As a matter of formal policy and widespread practice, the BPD erected the vast majority of Checkpoints in Black and Latino neighborhoods. Exs. 4 (at 56:5-12); 8 (at 282:1-6); 24 (at 35:22-36:4). From January 2013 to June 2014, when Derenda personally chose the Checkpoint locations, 78.1% took place in majority nonwhite neighborhoods; when the choice of location devolved to Strike Force lieutenants, the number increased to 87.4%. Krugman Dec. ¶ 67.

In the Spring and Summer of 2017, the Checkpoints became a political issue in the Mayoral primary race, with challengers to Mayor Brown arguing in the news media and at public debates

that the Checkpoints were racially discriminatory. *See* Exs. 62; 134[6]; 137. From March through July 2017, Deputy Commissioner Lockwood took a more assertive role in establishing Checkpoints, directing that some take place in crime hotspots and some take place on the West Side or in North or South Buffalo. Exs. 59 (at 2-3); 62; 70 (at 2). During this time, in response to public criticism, the Common Council twice requested the BPD disclose the Checkpoint locations, dates, and times. Exs. 50 (at 2); 63 (at 4). The Commissioner did not comply with these requests.[7]

In July 2017, the BPD began running considerably more Checkpoints in majority white neighborhoods in which it had rarely (if ever) conducted checkpoints previously;[8] it provided the newly manufactured Checkpoint locations to the news media and the Common Council. Exs. 65,

---

[6] Available at https://spectrumlocalnews.com/nys/central-ny/news/2017/06/22/buffalo--east-side--dorethea-franklin--byron-brown--mayor--taniqua-simmons--mark-schroeder--betty-jean-grant--traffic--check-points--tickets--police; *see also* Aug. 7, 2017 Democratic Mayoral Debate, https://www.wivb.com/news/watch-buffalo-mayoral-debate/; Sept. 6, 2017 Democratic Mayoral Debate, https://www.wbfo.org/local/2017-09-06/watch-listen-democratic-primary-debate-for-buffalo-mayor.

[7] On May 5, 2017, the Common Council emailed Derenda to request disclosure of checkpoint locations. Ex. 50 at 2. Three days later, Captain Serafini emailed Derenda a list of traffic checkpoints conducted from January to May 7, 2017. *See* Ex. 51. Neither Derenda nor then-Deputy Commissioner Lockwood recalled providing Serafini's list to the Council. Exs. 8 (at 339:6-14); 19 (at 136:11-137-11). On July 25, 2017, the Common Council passed a formal resolution demanding that the Commissioner disclose the "location, frequency, and results" of Checkpoints for the past three years. Ex. 52. The BPD had records of the location and frequency of Checkpoints, Exs. 19 (at 136:11-137:11); 64 (at 2), but Derenda never gave them to the Council. Ex. 8 at 339:6-14. Derenda told the Council that he did not have information on Checkpoint "records" and agreed to provide data only going forward. Ex. 135 at 3-4.

[8] The numbers in Black and Latino neighborhoods fell from 87.4% prior to March 2017 to 26.4% after July 2017. Krugman Dec. ¶ 67.

137. Mayor Brown even appeared on television to thank the reporter for "presenting the information that we gave to you, to show Checkpoints are throughout the city." Ex. 136.[9] This subterfuge disseminated a false impression that the BPD had operated Checkpoints evenly across the City.

The BPD temporarily discontinued the Checkpoints program in November 2017 and dissolved the Strike Force in February 2018. Exs. 13 (at 182:11-14); 66; 127 (at 11); 130. The Checkpoint Policy remains in the Manual of Procedures, and the BPD could activate the Policy at any time. Exs. 13 (at 182:11-14); 127 (at 11).

At Checkpoints during the Class Period (*i.e.*, after June 28, 2015), the BPD issued at least 11,000 tickets to at least 3,000 individuals, resulting in at least $400,000 of damages from paid traffic tickets alone (Krugman Dec. ¶ 37), with additional damages stemming from vehicle impounds. Class members also lost time and freedom of movement and experienced the grave dignitary harms of racial discrimination and unlawful detention. Redden Dec. ¶¶ 5-6; Bonds Dec. ¶¶ 9-11.

### C.    Policy and Practice of Issuing Multiple Tinted Windows Tickets to Black and Latino Drivers

Plaintiffs also challenge the BPD's policy and practice of issuing multiple tinted windows tickets in a single stop. BPD officers issued such tickets at Checkpoints and during their regular patrol activities—86.9% to Black and Latino drivers. Exs. 4 (at 82:6-10); 9 (at 278:1-18); Krugman Dec. Ex. 13. From 2012 through 2022, BPD issued 38,364 such **citations** to Black and Latino drivers, but only 5,800 to drivers of other races (7,718 to drivers whose race was not recorded). Krugman Dec. Ex. 13.

---

[9] Available at https://www.wgrz.com/article/news/local/buffalo-mayor-answers-questions-about-traffic-checkpoints/71-460311897.

Under New York law, each tinted window constitutes a separate legal violation. N.Y. Veh. & Tr. Law 375(12-a)(b). BPD officers thus had discretion to issue four or more tinted windows tickets in a single stop, Exs. 1 ¶¶ 294-295; 9 (at 297:5-20); 27 (at 183:7-20), and they exercised this discretion to issue multiple tinted windows tickets at significantly greater rates to Black and Latino drivers, who accounted for 11,459 of the 13,133 multiple-tinted-window **incidents** in which driver race could be determined (87.3%). Krugman Dec. Ex. 13. The disparity is all the more striking given that, prior to 2013, Black and Latino drivers who received tinted windows tickets were only slightly more likely than other drivers to receive multiple tickets, and these differences were not statistically significant after controlling for driver age and time of day. Ex. 1 ¶ 299 & Table 14. After the advent of the Strike Force, however, Black and Latino drivers were significantly more likely than other drivers to receive multiple tinted-windows tickets. *Id.*

Commissioner Derenda not only knew about the BPD's tinted windows ticketing practices, but he *expected* multiple ticketing to occur as a byproduct of his proactive policing policy. Ex. 8 at 128:11-17. Despite setting these expectations, Derenda knew issuing multiple tinted windows tickets was excessive and wrong; he believed officers should issue no more than one per stop. Ex. 9 at 288:3-12. In 2017, Derenda made an ineffective, informal attempt to limit multiple tinted windows ticketing to one per stop.[10] As a result, Captain Serafini directed Strike Force and Housing Unit officers to issue just *two* tinted windows tickets (note: not one) per stop, Ex. 81 at 2, but

---

[10] Derenda testified that he verbally instructed Strike Force Chief Aaron Young to ensure that officers issued only one tinted window ticket per stop. Ex. 8 at 133:21-134:5. He did not check to see if his directive was followed. Ex. 9 at 286:8-21. Chief Young testified that he did not discuss the tinted window policy change with Derenda and did not recall issuing such an order. Ex. 36 at 92:1-5. Derenda also testified: "We never removed the discretion. . . . V&T allows them to write multiple tickets for multiple windows and, again, currently today it is their discretion on traffic stops how many tickets they write for violations. It's a discretion they still have and they had under my command." Ex. 9 at 280:5-21.

officers continued to issue as many as four per stop, Krugman Dec. ¶ 60. Officers either did not receive Derenda's message or viewed it as informal and thus nonbinding. *See, e.g.*, Exs. 18 (at 75:18-23); 21 (at 173:17-22); 32 (at 102:18-21); 34 (at 74:9-14). Derenda made no effort to enforce the limitation, Exs. 8 (at 248:23-249:4); 9 (at 286:8-21), and multiple tinted windows ticketing continued apace. Krugman Dec. ¶ 60.

Derenda's successor, Commissioner Lockwood, similarly *knew* that officers routinely issued multiple tinted windows tickets in a single stop, but he chose not to order an end to the practice. Ex. 19 at 72:8-19. He believed that officers had a right to issue multiple tickets, even though he personally disdained the practice, because NY traffic law permitted it. *Id.* at 71:18-72:7, 73:9-22. Lockwood, and his successor Gramaglia, allowed multiple ticketing of Black drivers to continue even after the practice was exposed in *The Buffalo News*, and after the filing of the Complaint and Amended Complaint in this matter, which detailed the racial disparities generated by the BPD's tinted windows ticketing practices. *See* ECF Nos. 1, 63; *also* Exs. 13 (at 81:21-82:1); 19 (at 220:4-12); 138 (at 2-4).

In the Class Period, at least 6,266 distinct Black and Latino drivers received tinted windows tickets in incidents where more than one such ticket was given. Krugman Dec. ¶ 57. They have paid the City of Buffalo at least $515,837 on account of such tickets. *Id.* ¶ 58.

## II.    Formal City Policies Promoted Ticketing for Profit and Created Financial Incentives for BPD Officers to Issue Traffic Tickets

Throughout Mayor Brown's tenure, the City experienced significant financial pressure. Exs.11 (at 25:19-22); 105 (at 3-5). The City had to maintain a balanced budget by charter. Exs. 11 (at 22:6-11); 105 (at 2). At times, expenditures exceeded revenues, yet Mayor Brown refused to raise property taxes. Ex. 11 at 23:13-21, 25:19-22. The City had to find other forms of revenue and

identified traffic and parking enforcement as a revenue generator. *Id.* The BPD and Parking Department generated revenue through ticketing, impounding and auctioning vehicles, and issuing parking violations. Ex. 17 at 71:6-75:18, 257:11-16.

From the beginning, City policymakers tracked the Strike Force's capacity to generate revenue. *See, e.g.,* Exs. 53 (at 2); 110 (at 2); 115; 121. In 2013, coinciding with the launch of the Strike Force, the City invested in a computerized ticketing technology called TraCS. Ex. 48 at 7. TRaCS facilitated multiple ticketing by pre-filling many fields in the ticket, allowing officers to issue five tickets as quickly as one. Ex. 8 at 121:21-122:16. At around the same time, the City invested in Automatic License Plate Readers (ALPRs). Ex. 91. Mounted to a patrol vehicle, the ALPR instantly identifies registration and other ownership-related violations not readily apparent to the human eye, allowing officers to generate more tickets and impounds—and thus more revenue. Exs. 6 (at 80:2-4, 81:7-14); 17 (at 50:3-51:21); 91.

The City then developed a plan which would allow it to reap even more revenue from traffic enforcement. Historically, the NYS Department of Motor Vehicles (DMV) handled the adjudication of traffic violations issued in Buffalo. Ex. 71 at 2. Under this system, the State retained much of the ticket revenue. Exs. 7 (at 18:9-19:7); 22 (at 22:8-12). In 2014, however, the Buffalo Common Council and NYS legislature worked together to establish the Buffalo Traffic Violations Agency (BTVA) to "provide fiscal relief to City government and taxpayers." Ex. 141 at 3. Adjudicating tickets through the BTVA allowed the City to keep most of the revenue from traffic tickets within the City instead of sending it to the State. Exs. 11 (at 59:4-9); 72 (at 9); 73 (at 13).

Launched in July 2015, the BTVA is a City agency operated under the direction and control of Mayor Brown. Exs. 7 (at 15:7-17); 22 (at 19:1-4); 71 (at 2). According to the City's 2017-18 Executive Budget, one of the official goals of the BTVA is to "Generate revenue." Ex. 56 at 42.

Because ticket revenue far outstrips the BTVA's operational expenses, the more tickets the BPD issues, the more profit the City makes. Exs. 11 (at 177:2-14); 22 (at 135:4-7); 99 (at 2); 142 (at 35-39).

The City deliberately encouraged officers to issue more tickets in two ways. First, the City trained incoming police recruits that one of the purposes of traffic enforcement is to generate revenue. Exs. 19 (at 51:22-52:3); 45 (at 5); 57 (at 3). Second, the City's overtime structure operated as a powerful personal incentive to officers to issue more tickets. *See, e.g.*, Exs. 8 (at 244:1-9); 18 (at 96:10-13); 27 (at 254:7-10); 46 (at 2). From the BPD Commissioner on down, BPD supervisors communicated to officers that continued overtime opportunities depended on "results," measured most concretely in tickets and impounds, and that good "numbers" would lead to more overtime opportunities. Exs. 8 (at 246:5-18); 25 (at 259:8-19); 27 (at 245:22-247:19); 33 (at 294:5-15); 58; *see also* Ex. 46 at 2. As the Commissioner himself recognized, these production expectations caused officers to "pad their numbers" through multiple ticketing. Ex. 9 at 281:1-11. Ticketing also gave officers opportunities to enlarge their salaries through "court time"—four hours of pay earned simply for showing up in court to defend a ticket.  Ex. 4 (at 99:8-21); *see also* Ex. 127 at 12. Court time and overtime substantially increased officers' paychecks—and their pension bene-fits.  Exs. 8 (at 244:7-9); 18 (at 96:10-13); 25 (at 29:8-12); 28 (at 29:12-20); 33 (at 51:2-13). Thus, the system created powerful financial incentives for officers to ticket heavily to secure and justify overtime opportunities. Exs. 6 (at 89:9-23); 27 (at 254:7-10); 88 (at 2).

The City's incentive strategy worked. Almost immediately after the BTVA's launch, the BPD began to issue many more traffic violations than ever before. During the 2015-16 fiscal year, BPD issued 54,960 traffic violations, a 31.5% increase over the previous year. Krugman Dec. ¶ 69. The following year it increased again, to 58,645. *Id*. Revenue from traffic fines hit $3,993,940 in

the 2016-2017 fiscal year, compared to $503,494 in 2013-2014 before the creation of the BTVA. Exs. 76 (at 5); 133 (at 5). Over the same period of time, the City appropriated more money to BPD, and BPD spent increasing amounts on overtime. Exs. 75 (at 8); 78 (at 9); 131 (at 4); 139 (at 8-9).

Over the years, City policymakers continued to focus on maximizing the revenue-raising function of the City's traffic enforcement efforts. For example, when BTVA revenues temporarily slowed in 2017, Commissioner Kevin Helfer expressed concern: "Money is way down. We have to get to the bottom of this." Ex. 109. At a November 2018 meeting of the Buffalo Common Council's Finance Committee, Donna Estrich, the City's Commissioner of Administration and Finance, told the Council: "Traffic violations is below budget, and you know, we're working with police. They just created a new traffic detail and put that out." In response, a finance committee member stated "[w]hen you're mining for gold, it's good to know that there's gold in the well, and there's plenty of gold there to be digging for."[11]

## III.   The City's Own Data Reveal Shocking Racial Disparities in the BPD's Traffic Enforcement Practices

Plaintiffs' data expert, Dr. David Bjerk, performed a statistical analysis of the BPD's traffic ticketing practices from 2012-22.[12] Ex. 1 ¶¶ 11-14. He found that, across the period, Black and Latino drivers received approximately 75% of citations, even though they accounted for only half of Buffalo's population. *Id.* ¶ 15. Relative to their proportion of the population, Black and Latino drivers were thus ticketed at 3.2 times the rate of other drivers. *Id.* The differences are statistically significant and exist throughout the period studied. *Id*. ¶¶ 23, 269-273 & Table 11. Black and Latino drivers were also significantly more likely to receive multiple tickets per stop, in general and

---

[11]  Common Council Committee on Finance (Nov. 7, 2018), https://buffalony.iqm2.com/Citizens/SplitView.aspx?Mode=Video&MeetingID=1579, at 4:45, 7:44.

[12]  This was the most recent data available at the time Dr. Bjerk performed his analysis. Dr. Bjerk has reserved the right to supplement his report with 2023 data. Ex. 1 at n.1.

with respect to tinted windows tickets in particular. *Id.* ¶¶ 30, 286-99 & Tables 13 &14. These disparities occur even though the BPD has "no data to suggest" that Black drivers commit more traffic violations than white drivers. Ex. 13 at 203-206, 207.

Dr. Bjerk also found significant racial disparities in where the BPD issued tickets. In early 2012, the BPD issued tickets in high- and low-Minority neighborhoods at similar rates. Ex. 1 ¶ 183 & fig. 3a (10.63 vs. 8.44). But from July 2012-June 2015, BPD issued 4.4 times as many tickets in the highest-Minority neighborhoods as in the lowest-Minority neighborhoods. *Id.* ¶ 184 & fig. 3a (65.19 vs. 14.76). This rate rose to five times as many tickets (for all violations) from July 2015 to January 2018. *Id.* ¶ 185 (109.86 vs. 21.96). During the 2015–18 period, the BPD issued more than **six times as many** non-moving citations in the highest-Minority neighborhoods as it did in the lowest-Minority neighborhoods. *Id.* ¶ 191 & fig. 3c (93.69 vs. 14.54).

Dr. Bjerk performed a separate analysis of incidents in which BPD stopped motorists but did not issue a ticket. *Id.* ¶¶ 300-310. Since 2020, the BPD conducted three times as many stops in the district with the highest Minority population as it did in the lowest, with stops based on purported equipment violations or failure to use a turn signal accounting for a disproportionate share of stops in high-Minority neighborhoods. *Id.* ¶ 302 & Table 15. Dr. Bjerk found the same disparities when he performed the analysis by race of driver (Black and Latino drivers were stopped more than twice as often as other drivers). *Id.* ¶ 303.

## IV. Under *Monell*, the City Is Responsible for Ongoing Unlawful and Discriminatory Traffic Enforcement

### A. The City Has Long Been on Notice that BPD Officers Engage in Racially Discriminatory Traffic Enforcement

From 2013 to the present, Mayor Brown and Commissioners Derenda, Lockwood, and Gramaglia have received a steady stream of complaints from the public via town halls, forums, reports and the media that BPD officers were and are engaging in racially discriminatory policing

and traffic enforcement. For example, Brown and Derenda read a 2016 article in *The Public* exposing the BPD's concentration of Checkpoints on the East Side practices. *See* Ex. 2 at § I.B. In 2017, then-SUNY Buffalo Law Professor Anjana Malhotra and Cornell Law School documented and publicized the BPD's widespread, discriminatory checkpoints, traffic enforcement, and other practices. Anjana Malhotra, *Unchecked Authority without Accountability in Buffalo, New York: The Buffalo Police Department's Widespread Pattern and Practice of Unconstitutional Discriminatory Policing, and the Human, Social and Economic Costs*, 2-3 (2017); *see* Ex. 2 at § II. A subsequent report and survey of 2000 residents by Partnership for the Public Good found pervasive distrust; only 12 percent of Black people surveyed agreed that the BPD respected people of color. Ex. 3 at 30. The Buffalo Police Advisory Board also conducted numerous hearings and issued a report concerning racism and white supremacy within the BPD. *See, e.g.,* Ex 2 at § I.B.

In addition, from 2012 to the present, at least 73 people complained to IAD of racial discrimination in the context of traffic enforcement. Ex. 2, Appendix C. In recent years, at least 110 people have filed lawsuits and notices of claim, many alleging that BPD engaged in civil rights violations, including racial bias. *Id.* at § III.B.2; Ex. 145. And numerous judicial decisions have found that BPD officers engaged in unconstitutional traffic enforcement. *Id.* at § III.B.2.

Moreover, racial discrimination and bias have long been embedded within the BPD's policing and traffic enforcement practices—a problem that continues to this day. For example, former BPD lieutenant Thomas Whelan testified that BPD officers routinely used the n-word when dealing with Black members of the public (for which they never received discipline)—a practice that has resurfaced in numerous complaints that the BPD largely disregarded, Ex. 2, Appendix C, and in 2022 when BPD Captain Amber Beyer launched a racist rant in front of her subordinate team members. Ex. 2 at § II. Beyer asserted, among other things, that white officers develop PTSD from

working on the East Side of Buffalo and that she would be suspicious of a Black man walking through her neighborhood. *Id*. BPD officials also expressed racial bias in their statements and emails. *Id.* at § V.B. Plaintiffs' historical expert, Prof. Robert Silverman, situates the BPD's policing practices within a larger and continuing history of racial discrimination intentionally perpetrated by the City against its Black residents through racial segregation in housing and education and documented patterns of discriminatory policing, including racially biased traffic enforcement. Ex. 3.

Mayor Brown well knows that racial discrimination plagues the Buffalo Police Department. In 2020, he reported to the Menino Survey of Mayors that police treatment of White people in his city is "somewhat better" than police treatment of Black people. Ex. 126 at 19, 34. When asked his opinion on whether certain factors contributed to police violence in his city, he indicated that "racism on the police force" had contributed "a moderate amount." *Id.* at 20, 35.

**B.     The City Has Failed to Act to Prevent Officers from Engaging in Racially Discriminatory Traffic Enforcement**

Faced with innumerable warnings and obvious signs that racial discrimination plagues the BPD's traffic enforcement practices, the City has failed to address the problem.

**1.     *The Disciplinary Catch-22***

Three successive BPD Commissioners have maintained a disciplinary Catch-22 that prevents the BPD from identifying and correcting racially discriminatory conduct. Eschewing basic accountability measures (such as early warning and internal audit systems) employed in other jurisdictions to reduce the risk of racially biased policing, these Commissioners all maintained that they could not and cannot address racial discrimination other than by investigating individual IAD complaints. Exs. 2 (at Summary of Findings & VI); 8 (at 293:16-294:9); 13 (at 38:6-21, 119:4-17, 204:11-207:10); 19 (at 230:15-231:12). However, when people complained to IAD about racial

discrimination they endured, the investigations were fundamentally ineffective, and the disciplinary process always resulted in a finding in favor of the officer on the racial bias allegation. Ex. 2 at Summary of Findings. BPD policy further requires considering each complaint in isolation, so the BPD never detects patterns of discriminatory behavior. Exs. 2 (at III.E); 8 (at 452:17-453:3); 13 (at 103:3-18). This paradoxical approach to accountability and discipline has caused racially discriminatory policing to persist, unchecked.

### 2. *Lack of Written Anti-Discrimination Policy*

Until May 2021, the BPD had no formal written policy prohibiting racially biased policing. Four years after the filing of this lawsuit, the BPD updated its Manual of Procedures to prohibit racial discrimination in traffic enforcement. But the BPD still does not have a general policy prohibiting racially discriminatory policing, including the use of racial slurs and racially derogatory language, departing from well settled police practices. Ex. 2 at § II.

### 3. *Failure to Monitor*

The BPD has failed to take basic measures to monitor officers' compliance with anti-discrimination law. For example:

- BPD leadership has never gathered or reviewed statistical data to ascertain whether BPD operated the Checkpoints or engaged in multiple tinted windows ticketing in a racially discriminatory manner. Exs. 8 (at 132:19-23, 265:5-266:16); 19 (at 36:14-19).

- The BPD does not require officers to record the race and ethnicity of people ticketed, even though the BPD has the capability to do so. Exs. 13 (at 210:12-21); 127 (at Requests 31-32). Commissioner Lockwood did not think it was important to be able to identify racial disparities in the BPD's ticketing practices. Ex. 19 at 241:8-13, 243:6-10. Commissioner Gramaglia does not audit for racial disparities because "we conduct traffic stops based on constitutional policing." Ex. 14 at 43:8-9. Without collecting race data, the BPD cannot measure and assess racial disparities in ticketing.

- Since June 2020, the BPD has required officers to issue stop receipts to people stopped but not ticketed and to record the race of the person stopped. Exs. 2 (at § VI.F); 14 (at 44:16-

22, 155:8-17, 157:6-12). However, officers do not enter a race 20% of the time, and Commissioner Gramaglia has not attempted to improve compliance.[13] Exs. 1 (¶ 300); 14 (at 158:3-11). To the contrary, Gramaglia is satisfied when officers consistently record the race of people stopped as "unknown." Ex. 14 at 163:9-164:22.

- To the extent that officers record race on stop receipts, Gramaglia does not audit this data for trends to uncover patterns of racially biased traffic stops. Ex. 14 at 164:23-165:4. When confronted by media reports exposing racial disparities, Gramaglia saw no need to investigate further. Exs. 2 (at § VI.F); 13 (at 203:1-207:10).

- The BPD does not collect information about the racial demographics of IAD complainants, although it could do so. Exs. 8 (at 289:21-290:9); 19 (at 244:22-245:1). The BPD has never assessed whether a disproportionate number of racial discrimination, rudeness, discourtesy, and poor service complaints come from Black and Latino individuals. *Id.*

- The BPD could use its IAPro computer system to audit, track, and monitor racial discrimination complaints against officers, but it does not do so other than minimal compliance with the New York Executive Law 75(5)(a). Exs. 2 (at § VI.C); 13 (at 185:22-186:9).

- The BPD could audit body camera footage to assess whether officers treat civilians with respect and in a nondiscriminatory manner. Ex. 2 at § VI.D-E. However, the Commissioner contracted with the police union that it would not do so. Exs. 2 (at § VI.E); 79 (at -023).

In sum, the BPD has taken no affirmative steps to identify, measure, and reduce racial disparities in traffic enforcement or racially discriminatory conduct of officers, despite receiving voluminous complaints about such conduct. Exs. 2 (at §§ I, V.A); 6 (at 129:7-130:15); 8 (at 293:16-294:14); 9 (at 268:17-273:12); 19 (at 102:12-20, 230:9-231:22, 241:8-14); 28 (at 67:1-5); 36 (at 80:6-81:5).

### 4.   *Failure to Supervise*

The BPD has failed to supervise officers to ensure that they do not engage in racially discriminatory conduct. Basic supervision failures include the following:

- The BPD has not conducted performance evaluations of officers. Exs. 2 (at § VI.A); 13 (at 182:15-183:1); 18 (at 191:21-192:1); 25 (at 131:8-10); 26 (at 80:7-9, 95:2-5); 28 (at 63:1-10); 33 (at 68:22-69:10). Since 2013, officers have received no feedback on the quality of their work. Exs. 2 (at § VI.A); 18 (at 191:21-192:6); 26 (at 80:10-15). Though the City

---

[13] Nor has Commissioner Gramaglia ensured that officers issue stop receipts at all. For example, Lt. Miller, who has received multiple traffic enforcement complaints, testified that he does not issue stop receipts in half of his stops. He conditioned his issuance of a stop receipt on drivers being polite and non-argumentative during the stop. Ex. 21 at 321:21-323:6.

Charter gives the Commissioner authority over supervision of officers, Buffalo City Charter, Article 13 § 4 (2019), the City and Commissioner have adopted the legally incorrect position that the collective bargaining agreement supersedes the City Charter. Exs. 7 (at 168:14-178:12); 13 (at 182:15-183:1); 14 (at 111:19-113:15); 19 (at 246:12-247:6).[14]

- The BPD bargained away the right to use body worn camera footage to enhance supervision of officers. Exs. 2 (at § VI.E); 79.

- BPD supervisors have shirked their responsibility to report and address racially biased conduct and complaints and have used such language themselves. Ex. 2 at § V.C.

- IAD complaints are often disposed by sending the officer to an informal conference with a Chief or Deputy Commissioner instead of imposing formal discipline, thus squandering a potential training or supervision opportunity. Exs. 2 (at § III.E.6); 19 (at 262:16-263:10); 20 (at 51:13-23); 26 (at 67:9-16). The BPD makes no record of the content of conferences, does not inform the officer's direct supervisor of the subject matter, and has no mechanism for following up to assess whether the officer's behavior improves after the conference. Exs. 13 (at 96:2-7, 113:16-119:17); 19 (at 265:12-270:2); 26 (at 255:13-21).

- When a complaint is filed against an officer, the officer's direct supervisor is not informed of the nature of the complaint or its resolution and thus cannot learn what behavior needs close monitoring or ensure that the officer does not reoffend. Exs. 2 (at § III.F); 24 (at 123:6-19, 124:16-125:3); 28 (at 172:5-17).

### 5.    *Failure to Investigate*

Police practices expert Michael Gennaco reviewed and analyzed 73 complaint files involving racial discrimination and identified the following investigative failures:

- The BPD's complaint intake system departs from accepted industry standards and, frequently, its own rules. The BPD creates unreasonable barriers to filing a complaint, including not having a publicized, online complaint mechanism and failing to ensure that supervisors accept complaints. BPD also fails to investigate misconduct allegations from news sources, civil lawsuits, and judicial decisions. Ex. 2 at §§ III.A–B.

- Contrary to BPD's own rules, untrained field level command staff often handled racial bias investigations—depriving the BPD of any real opportunity to identify and address racially biased policing. *Id.* at § III.C.

---

[14] The City and BPD Commissioner agreed that the union contract prevented the Commissioner from conducting performance evaluations unless explicitly authorized. Ex. 13 at 182:15–183:1 Not until December 2023 did the City obtain such a contract. But the current agreement allowing performance evaluations hamstrings the City's supervision by providing that they cannot be used for discipline or promotion. Ex. 2 at § VI.A.

- The BPD failed to conduct "thorough and complete" investigations into racial bias allegations and sometimes did not investigate allegations of racial profiling or discrimination at all. BPD repeatedly failed to scope violations of BPD's traffic enforcement policy, which led to no investigation into these violations at all. *Id.* at §§ III.D.1–4.

- BPD repeatedly failed to pursue investigative leads, interview witnesses, and obtain video and other evidence. Investigators often failed to comply with standard interview procedures. Target officers' interviews, if they occurred, were short, incomplete, and included leading questions. Complaint files often did not include a recorded statement from the complainant, officers, or witnesses. Files contained inaccurate or no summaries of body worn camera footage—even though the Commissioner relies on the summaries in lieu of watching the footage. In some instances, the officers' body-worn camera footage was cut off or missing entirely without explanation. *Id.* at §§ III.D.5–8.

- Complaint files lack analysis of the evidence collected during the investigations. In many cases, BPD relied on an officer's reputation to dismiss the allegations. Investigators disparaged complainants and relied on their criminal histories to impugn their credibility and bolster the credibility of officers, including findings that officers should be exonerated. These comments demonstrate a mindset predisposed against the complainant as opposed to allowing the facts and evidence developed through the investigative process to determine the outcome. *Id.* at §§ III.C.2, III.E.2.

Gennaco concluded that the BPD's complaint investigation system is fundamentally broken and falls far below accepted industry practices. Without a properly functioning investigative process, BPD cannot detect and address instances of racially biased policing. *Id.*

### 6.    *Failure to Discipline*

The BPD has never issued formal discipline against an officer for engaging in racially discriminatory policing; for subjecting Black and Latino motorists to wrongful search and seizure; for failing to treat civilians with courtesy and respect; or for not recording the race of people given stop receipts. Exs. 2 (at § III.G, Appx. C); 13 (at 232:18-233:14); 14 (at 163:19-23); 19 (at 256:2-19, 258:5-14); 33 (at 400:11-16). All of this conduct violates the Manual of Procedures (including the Traffic Enforcement Policy), along with federal and state constitutional law and Section 13-21 of the Buffalo City Charter (in the case of stop receipts), and therefore could form the basis for discipline. Exs. 124; 125.

### 7.    *Failure to Train*

The City has failed adequately to train officers on racial discrimination, racial bias, racial profiling, and discriminatory policing. Until very recently, BPD officers received no anti-discrimination training outside of their initial brief course in the academy, and BPD officers received training with an erroneous definition of racial bias. Ex. 2 at § IV. When asked, officers could not define racial discrimination or racial profiling. Exs. 10 (at 73:7-21); 18 (at 213:8-16, 230:12-231:7); 31 (at 174:20-175:2). Officers also testified incorrectly that if there were probable cause for a traffic stop, it could not be the result of racial profiling. Exs. 6 (at 127:12-128:10); 21 (at 211:8-212:16).

To this day, the BPD fails to provide training to supervisors on identifying and correcting racially discriminatory behavior by officers or on responding to civilian complaints of discrimination, rudeness, discourtesy, or poor service. Ex. 2 at § IV.B. Similarly, IAD lieutenants and captains receive no training on how to investigate complaints of racial discrimination. *Id.*; Exs. 20 (at 78:17-79:17); 23 (at 23:12-24:3, 25:20-26:5).

Although the BPD updated its Traffic Enforcement Policy in May 2021 to prohibit racially biased traffic enforcement, the BPD did not train officers on the updated policy. Exs. 2 (at § III.D.3); 14 (at 20:11-22:9); 124. Rather, BPD leadership delivered the revisions through a computerized update system under which BPD officers merely acknowledged receipt of the policy. Ex. 14 at 17:22-18:16, 21:21-22:1. In contrast, when the BPD launched a body worn camera program, it provided extensive training to officers, because BPD leadership recognized that in the absence of training, officers would not know and follow the policy. Ex. 13 at 60:9-61:1.

In recent years, under Commissioner Gramaglia, the BPD began offering updated implicit bias training to officers. Ex. 2 at § IV. However, BPD has no mechanism for ensuring that officers retain the concepts taught. *Id.*

21

## V.      City Data and Recordkeeping

The City maintains data and recordkeeping that easily permits identification of class members and calculation of damages. Members of the Checkpoints and Tinted Windows classes can be identified using the procedures described in the Krugman Declaration. The City maintains electronic records of tickets, tows, and impounds that Plaintiffs can use to identify financial harms suffered by individual class members. This data includes:

> (i) substantially all traffic tickets issued by the Buffalo Police Department, including records and data indicating the identity of the motorist who received the traffic ticket, the disposition of the traffic ticket, the amounts paid on the traffic ticket (if any), and the amounts still owed on the traffic ticket; and (ii) substantially all tows and impounds by the City of Buffalo, including the license plate number of the vehicle, the date of the impound, the duration of the impound, whether the vehicle was released, sold or auctioned, the amount assessed for towing or storage fees, the amount paid from any source, and the amounts owed.

Exs. 127 (at Request 38); 129. If the damages classes are certified and Plaintiffs prevail on liability, the City can produce this data to facilitate calculating damages owed to class members. *Id.*

## VI.      Proposed Class Representatives

Named Plaintiffs Shaketa Redden, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Joseph Bonds, Charles Palmer, Shirley Sarmiento, Ebony Yeldon, and Jasmine Evans are Black individuals who drive in the City of Buffalo, often in predominantly Black and Latino neighborhoods, and intend to do so in future. Ms. Franklin, Mr. Palmer and Ms. Yeldon all received multiple tinted windows tickets in a single stop after June 28, 2015. Mr. Bonds, Ms. Evans, and Ms. Redden all received tickets at a BPD Checkpoint on or after June 28, 2015. In addition, Ms. Franklin, Ms. Simmons, and Mr. Hall passed through BPD Checkpoints but did not receive tickets within the class period. All of these individuals experienced the BPD Checkpoints as an abuse of power and authority directed at the Black and Latino people of Buffalo and as an unreasonable restriction on their privacy and freedom of movement. *See* Class Representative Declarations.

**ARGUMENT**

Class certification is mandatory where plaintiffs satisfy all prerequisites of Rule 23(a) and one of the subsections of Rule 23(b). *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398-400 (2010). Here, Plaintiffs seek certification of two damages classes pursuant to Rule 23(b)(3) and one injunctive class pursuant to Rule 23(b)(2). Because each proposed Class meets the elements of Rule 23(a) and (b), this Court should grant Plaintiffs' motion.

## I.   THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(A)

The Rule 23(a) criteria are that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

### A.   The Proposed Classes Satisfy the Numerosity Requirement

The proposed classes satisfy the requirement that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable" means that individual adjudication of all claims would take an extended period of time and be "expensive, time-consuming, and logistically unfeasible." *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 290 (2d Cir. 1992).

Courts in this Circuit regularly find that the numerosity requirement is met for groups of more than 40 members. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 2008 WL 343011, at *3-4 (W.D.N.Y. Feb. 6, 2008) (89 members "undoubtedly" represents a large enough number). Plaintiffs need not provide evidence of exact class size or identity of class members to meet the numerosity requirement. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Plaintiffs must only show "some evidence

of" or "reasonably estimate" the number of class members. *Id.* And "numerosity must be recognized" where a proposed class includes "future members who are necessarily unidentifiable." *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 2006 WL 581187, at *4 (W.D.N.Y. Mar. 8, 2006).

Each of the proposed classes contains well over the 40-member threshold where numerosity is presumptively satisfied. The Checkpoint Class contains at least 3,000 members. Krugman Dec. ¶¶ 35, 36, 53. The Tinted Windows Class contains in excess of 6,000 individuals. *Id.* ¶ 57. The Traffic Enforcement Class contains many more than 10,000 current members. *Id.* ¶ 64. In addition, this class contains members who will be subjected to traffic stops, traffic ticketing, and "traffic safety" vehicle checkpoints by the BPD in the future. Numerosity therefore must be recognized for this class, as these future class members are "necessarily unidentifiable" at this time. *Attica Cent. Sch.*, 2006 WL 581187, at *4.

Joinder of so many thousands of individual class members' claims would be not merely impracticable but impossible. Adjudicating such claims individually would strain judicial resources past the breaking point, take many years, and multiply legal expenses for all parties. Plaintiffs' proposed classes therefore satisfy the numerosity requirement under Rule 23(a)(1).

## B.    The Proposed Classes Satisfy the Commonality Requirement

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Class members' claims "need not be identical for them to be common." *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022). Rather, the claims need only generate common answers that apply class-wide to resolve the litigation. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Becerra*, 24. F.4th at 131. Plaintiffs need only demonstrate a "single common question." *Wal-Mart*, 564 U.S. at 359.

In this Circuit, Rule 23 is given a "liberal rather than restrictive" construction. *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). So long as "the same unlawful conduct [is] directed

24

at or affect[s] both the named plaintiff and the class," the commonality requirement is generally

met "irrespective of minor variations in the fact patterns underlying individual claims."

*McCracken v. Verisma Sys., Inc.*, 2017 WL 3187365, at *3 (W.D.N.Y. July 27, 2017) (citing *Robi-*

*doux*, 978 F.2d at 936-37); *see also Marisol A.*, 126 F.3d at 377 (affirming class certification where

plaintiffs' alleged injuries "derive[d] from a unitary course of conduct" within a single state's child

welfare scheme). Where all class members (1) share the same kinds of claims that (2) arise out of

the same defendants' (3) same conduct or practice, "there is a common question." *Becerra*, 24

F.4th at 131.

### 1.    The Checkpoint Class

The Checkpoint Class seeks damages on behalf of people who received a ticket or were

arrested at a BPD "traffic safety" vehicle on or after June 28, 2015. Members of the Checkpoint

Class share key, common questions of fact and law. These include, among others:

- First, whether the Checkpoint Policy subjects the municipality to *Monell* liability, which asks: (i) whether the Policy was a formal policy, practice, or custom of the City of Buffalo; (ii) whether Defendants demonstrated deliberate indifference by failing to supervise, monitor, investigate, train, and discipline officers who operated the Checkpoints; (iii) and whether such policies, customs, practices, and/or deliberate difference were the moving force behind Plaintiffs' injuries;

- Second, whether the Checkpoint Policy violated class members' Fourth Amendment rights, which asks: (i) whether Defendants established and conducted Checkpoints for the primary programmatic purposes of general crime control and/or revenue harvesting; (ii) whether Defendants' professed "traffic safety" rationale for the Checkpoint Policy was merely a pretext to conduct routine traffic stops without individualized suspicion or probable cause; (iii) whether the Checkpoint Policy complied with the requirements the Supreme Court has established for administrative checkpoints; and (iv) whether the Checkpoints imposed burdens on community members and the public at large that outweighed their purported traffic safety value;

- Third, whether the Checkpoint Policy violated class members' Equal Protection and Title VI rights, which asks: (i) whether Defendants disproportionately operated Checkpoints in majority Black and Latino neighborhoods; (ii) whether Defendants' choice of Checkpoint locations was motivated, at least in part, by the racial demographics of Buffalo's neighbor-

hoods; (iii) whether tickets issued at Checkpoints disproportionally harmed Black and La-
tino people; and (iv) whether the BPD received federal funding while it operated the
Checkpoints in a racially discriminatory manner.

Each of these questions relates to Defendants' conduct **_in general_**, not merely vis-a-vis one
or more individual class members, each is subject to common proof, and each will "generate com-
mon answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350.

Furthermore, many important damages questions are also common. These include whether
class members are entitled to general damages for violations of their Fourth Amendment and/or
Equal Protection rights and, if so, the amount of such damages; whether class members are entitled
to punitive damages and, if so, the amount of such damages; whether class members are entitled
to equitable disgorgement and, if so, the amount to be disgorged; and the methodology for appor-
tioning aggregate damages, if awarded, among individual class members. The answers to each of
these questions will be the same for each class member.

### 2.    *The Tinted Windows Class*

The members of the proposed Tinted Windows Class also share common questions of law
and fact. These include:

- First, whether the City's tinted window ticketing practices subject the municipality to *Mo-
  nell* liability, which asks: (i) whether the BPD established a formal municipal policy, cus-
  tom, or practice of targeting Black and Latino motorists for multiple tinted windows tick-
  ets; (ii) whether Defendants demonstrated deliberate indifference by failing to supervise,
  monitor, investigate, train, and discipline officers who engaged in tinted windows ticket-
  ing; (iii) and whether such policies, customs, practices, and/or deliberate difference were
  the moving force behind Plaintiffs' injuries;

- Second, whether Defendants' tinted windows ticketing policies and practices violated class
  members' Equal Protection and Title VI rights, which asks: (i) whether such policies and
  practices were motivated at least in part by race; (iii) whether the City's final policymakers
  knew of the BPD's tinted windows ticketing practices and deliberately allowed them to
  continue; (vii) whether the BPD received federal funding while it engaged in multiple
  tinted windows ticketing of predominantly Black and Latino drivers;

26

- Third, whether BPD officers faced financial conflicts of interest that ran afoul of the Due Process Clause; and whether the City's production expectations and overtime policies created a financial incentive for BPD officers to issue multiple tinted windows tickets to Black and Latino drivers.

As with the proposed Checkpoint Class, answering these questions "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.[15]

*Plaintiffs # 1-21 v. County of Suffolk*, 2021 WL 1255011 (E.D.N.Y. Mar. 12, 2021), provides the model. There, plaintiffs alleged the Suffolk County Police Department subjected Latino motorists to race-based traffic stops. *Id.* at *2. Plaintiffs further alleged that the police department knew of and "ignored" the discriminatory conduct while also "fail[ing] to take the actions necessary to investigate and eliminate the[] practices." *Id.* The court reasoned that "policies, practices, and decisions … made at high levels of the [police] department" "generally arise from a centralized source and employ a hierarchical supervisory structure to effect and reinforce [those] policies" in a way that supports a finding of commonality. *Id.* at *14.

As with the Checkpoint Class, the Tinted Windows Class members' claims focus on "a single policy of defendants"—targeting Black and Latino motorists for multiple tinted windows tickets—that resulted in "commonality of the violation and the harm" experienced by class representatives and proposed class members. *County of Suffolk*, 2021 WL 1255011 at *13. And Plaintiffs allege that this policy was established not by individual officers but by the City and the BPD itself. ECF No. 63 ¶ 427. That "centralized source" of the violation and the harm supports a commonality finding for the Tinted Windows Class. *County of Suffolk*, 2021 WL 1255011 at *14.

---

[15] Additionally, the Tinted Windows class has all of the same common damages questions as the Checkpoint Class.

### 3.   *The Traffic Enforcement Class*

Finally, members of the proposed Traffic Enforcement Class share common questions of law and fact, including: (i) whether the City maintains a policy, custom, or practice of disproportionately subjecting Black and Latino motorists to traffic enforcement on the basis of their race or ethnicity; (ii) whether the City is deliberately indifferent to the need to address and correct such practices and to the risk that BPD officers are engaging in ongoing, racially-discriminatory traffic enforcement practices; (iii) whether the City has failed to monitor, supervise, and train officers with regard to racially discriminatory policing and traffic enforcement; (iv) whether the City has failed adequately to investigate allegations of discriminatory policing and/or to discipline officers engaged in racially discriminatory traffic enforcement, thus allowing such practices to continue; (v) whether the City's actions and inactions have facilitated and create a realistic and substantial risk that class members will continue to face racially discriminatory traffic enforcement, including via Checkpoints and multiple tinted windows ticketing, in the future; and (iv) whether the BPD continues to receive federal funding.

As with the Checkpoint Class and the Tinted Windows Class, "[t]hese questions are similar to the common questions presented in other unlawful stop cases that Courts certified to proceed as class actions." *County of Suffolk*, 2021 WL 1255011 at *13 (citing *Floyd v. City of New York*, 283 F.R.D. 174 n.138 (S.D.N.Y. 2012); *Davis v. City of New York*, 296 F.R.D. at 166 n.50 (S.D.N.Y. 2013); *Ligon v. City of New York*, 288 F.R.D. 72, 82 (S.D.N.Y. 2013); *Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001)); *see also Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) (commonality satisfied for claim that "a policy of racial profiling, in violation of the Fourteenth Amendment … leads officers to detain individuals without reasonable suspicion that they have committed a crime, in violation of the Fourth Amendment"). And as in these polic-

ing cases challenging discriminatory traffic and pedestrian stops stemming from centralized, hier-

archical policies and practices, "class wide proceeding here will generate common answers to these

questions that are apt to drive the resolution of the litigation." *Floyd*, 283 F.R.D. 175. Commonality

is therefore satisfied for the Traffic Enforcement Class, and for each of Plaintiffs' proposed classes

here.

### C.       The Proposed Classes Satisfy the Typicality Requirement

The class representatives must present claims that are "typical of the claims … of the class."

Fed. R. Civ. P. 23(a)(3). "Typical" claims are those which "arise[] from the same course of events"

and rely on "similar legal arguments" to prove the defendant's liability. *Marisol A.*, 126 F.3d at

376; *Becerra*, 24 F.4th at 131-32 (representatives' retroactive claims against a hospital were typi-

cal of a class of future hospital patients because they relied on the same legal arguments under the

Due Process Clause); *see also Odom v. Hazen Transp., Inc.*, 275 F.R.D. 400, 408 (W.D.N.Y. 2011)

(citing *In re Drexel Burnham Lambert Grp.*, 960 F.2d at 291) (finding typicality where represent-

atives' claims arose from the same circumstances as class members claims, and thus raised the

same legal arguments).

Like the commonality requirement, typicality does not require that all class members, or

even class representatives, bring "identical" claims. *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174,

182 (W.D.N.Y. 2005); *see also MacNamara v. City of New York*, 275 F.R.D. 125, 138 (S.D.N.Y.

2011) ("[T]he typicality criterion does *not* require that the factual predicate of each claim be iden-

tical to that of all class members.") (emphasis in original). "[W]hen the same unlawful conduct"

affects both the named plaintiff and the class, typicality is generally met "irrespective of minor

variations" in the claims' underlying facts. *Robidoux*, 978 F.2d at 936-37.

### 1.   *The Checkpoint Class*

Named Plaintiffs Bonds, Evans, and Redden bring claims that are typical of the Checkpoint Class. All these Plaintiffs are Black individuals who were stopped pursuant to the Checkpoint Policy, and all received tickets at those Checkpoints. Those claims all arise out of the "same course of events" as proposed class members' claims: the BPD's use of Checkpoints to carry out a racially discriminatory traffic enforcement scheme. *Marisol A.*, 126 F.3d at 376. While there are differences among the types of tickets issued to class members, the dates and times of their traffic stops, or the amounts owed for the infractions, these "minor variations" do not prevent a finding of typicality given that the harms arise from Defendants' same unlawful and discriminatory Checkpoint practices. *Robidoux*, 978 F.2d at 936-37. Typicality is met under these circumstances.

### 2.   *The Tinted Windows Class*

Named Plaintiffs Franklin, Palmer, and Yeldon present claims that are typical of claims brought by members of the Tinted Windows Class. Each are Black individuals who received multiple tinted window tickets from BPD officers at a single traffic stop while driving in the City of Buffalo. Exs.143 (at 112-113); 144 (at 76-77, 99). Though their factual situations are not identical, due to receiving different numbers of tickets in different numbers of incidents, they need not be. *See MacNamara*, 275 F.R.D. at 138. Plaintiffs Yeldon and Palmer seek relief for their individual claims under the same legal theories as the class as a whole: that the Buffalo Police Department has a policy of targeting Black and Latino individuals for multiple tickets in a discriminatory manner such that the policy violates the Equal Protection Clause and Title VI of the Civil Rights Act, and that the City's production expectations and overtime policies created a financial incentive for officers to issue multiple tinted windows tickets to drivers of color, in violation of the Due Process Clause. Where, as here, class representatives and class members have "nearly identical" claims,

*Hallmark v. Cohen & Slamowitz*, LLP, 293 F.R.D. 410, 418 (W.D.N.Y. 2013), Rule 23(a)(3)'s typicality requirement is met.

### 3.   The Traffic Enforcement Class

All individual Plaintiffs—like the rest of the Traffic Enforcement Class members—are Black and/or Latino individuals who have driven vehicles in the City of Buffalo and intend to do so in future. And all individual Plaintiffs have experienced some or all of the unlawful traffic enforcement practices at issue in this lawsuit. Thus, they all have the same interest in challenging the BPD's unconstitutional policy of targeting Black and Latino drivers for traffic stops, traffic tickets, and vehicle Checkpoints. Further, all individual Plaintiffs bring legal claims raising the same basic questions as proposed class members: whether the Defendants' traffic enforcement policies and practices violate the Fourth Amendment, the Due Process Clause, the Equal Protection Clause, and Title VI of the Civil Rights Act of 1964. Courts have found typicality in similar cases raising similar allegations of racially discriminatory policing practices. *County of Suffolk.*, 2021 WL 1255011 at *14-15 (citing *Floyd*, 283 F.R.D. at 177); *Ligon*, 288 F.R.D. at 82; *Daniels*, 198 F.R.D. at 418. The Traffic Enforcement Class easily satisfies the typicality requirement.

### D.   The Proposed Classes Satisfy the Adequacy Requirement

Under Rule 23(a)(4), class representatives must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The focus of the Rule 23(a)(4) inquiry is on "whether plain-tiff[s'] interests are antagonistic to the interest of other members of the class." *Hallmark v. Cohen & Slamowitz*, LLP, 293 F.R.D. 410, 418 (W.D.N.Y. 2013) (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 315 (2d Cir. 2009)). Additionally, class counsel must be "qualified, experienced, and [generally] able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

31

Class representatives here will have no problem "fairly and adequately" pursuing the best interests of the classes they represent. Fed. R. Civ. P. 23(a)(4). Class representatives and class members have aligned interests, and no proposed class representative has any conflict of interest that would prevent them from serving as a class representative. *See* Class Representative Declarations; Wilner Dec. ¶ 9.

Plaintiffs' counsel are well-qualified, well-resourced, and more than capable of handling a complex class action. Counsel span four different organizations, each with its own expertise representing plaintiffs in class actions and civil rights litigation. The Center for Constitutional Rights, the National Center for Law and Economic Justice, and the Western New York Law Center are nonprofit civil rights organizations that regularly litigate civil rights class actions. Covington & Burling LLP is a leading global law firm that often handles complex civil litigation and class actions, including those alleging violations of Fourth and Fourteenth Amendment rights. Wilner Dec. ¶¶ 3-8. Together, these organizations form a team that is "qualified, experienced," and more than capable of serving as class counsel. *Marisol A.*, 126 F.3d 1997. Both elements of Rule 23(a)(4) are unquestionably satisfied.

### E. The Proposed Classes Are Ascertainable

In addition to the standard Rule 23(a) elements, a plaintiff seeking to represent a proposed class must establish that the proposed class definitions satisfy the "implied requirement of ascertainability." *Abdi v. Duke*, 323 F.R.D. 131, 137 (W.D.N.Y. 2017). A class is ascertainable if it may be "defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Securities*, 862 F.3d 250, 257 (2d Cir. 2017). "The requirement that there be a class … will not be deemed satisfied unless the description of it is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Godson*

*v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 47 (W.D.N.Y. 2018) (quotation marks and citation omitted). Furthermore, a class should be narrowly tailored to include only aggrieved parties. *Abdi*, 323 F.R.D. at 137.

The ascertainability standard is "not demanding" and indeed is "designed only to prevent the certification of a class whose membership is truly indeterminable." *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014). "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Petrobras*, 862 F.3d at 269. Plaintiffs in the Second Circuit need not demonstrate that class members can be identified in an administratively feasible way. "The Circuit … declined to adopt a heightened ascertainability theory that requires a showing of administrative feasibility at the class certification stage." *Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444, at *14 (N.D.N.Y. 2017) (citing *Petrobras*, 862 F.3d at 265).

Here, the proposed classes are specifically defined based on objective criteria. The class definitions identify specific groups of people, subjected to specific acts, within a defined time period. For example, the Checkpoint Class is defined as "All individuals, including Black and/or Latino individuals, who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." Though some work remains to identify the individual class members, (Krugman Dec. ¶¶ 25-35, 52-53, 56-57), that work need not be done now. Here, as in *Petrobras*, 862 F.3d at 267, and *Cox v. Spirit Airlines, Inc.,* 341 F.R.D. 349, 372-73 (E.D.N.Y. 2022), *amended on reconsideration in part*, 2023 WL 1994201 (E.D.N.Y. Feb. 14, 2023), additional materials can be submitted as part of putative class members' proofs of claim. At the certification stage, it is sufficient that the definition itself be based entirely on objective criteria, and

the definition of the Checkpoint Class plainly is. The same applies to the other proposed Classes. Accordingly, Plaintiffs meet the implied ascertainability requirement.

## II.   THE PROPOSED CHECKPOINT AND TINTED WINDOWS CLASSES MEET THE REQUIREMENTS OF RULE 23(b)(3)

Rule 23(b)(3) applies to damages class actions, *Wal-Mart*, 564 U.S. at 362, and requires plaintiffs to establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) "encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010). Plaintiffs can establish predominance and superiority for the two proposed classes for which Plaintiffs seek damages (the Checkpoints Class and the Tinted Windows Class).

### A.   Common Questions Predominate Over Individualized Issues

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). Predominance is satisfied if: "(1) resolution of any material legal or factual questions . . . can be achieved through generalized proof, and (2) these [common] issues are more substantial than the issues subject only to individualized proof." *Petrobras*, 862 F.3d at 270. Where Plaintiffs are "allegedly aggrieved by a single policy of the defendants, and there is strong commonality of the violation and the harm, this is precisely the type of situation for which the class action device is suited." *Brown*, 609 F.3d at 484. While the predominance test is a more demanding inquiry than that of commonality under Rule 23(a), predominance "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to class-wide proof." *Amgen*

34

*Inc. v. Conn. Ret, Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (emphasis in original). Individual questions "need not be absent." *Sykes*, 780 F.3d at 81. Rather, predominance asks "whether the common, aggregation-enabling, issues in the case are *more prevalent or important* than . . . individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (emphasis added). The starting point for this analysis is "the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).[16]

For all claims in both Classes, Plaintiffs must establish that City policy, custom, or deliberate indifference caused their injuries. Given its focus on establishing a singular intent at the policymaker level, the evidence in support of *Monell* liability does not vary from class member to class member. Thus municipal liability is itself a major, overarching common question that justifies a predominance finding. *E.g. Brown*, 609 F.3d at 483-84; *Stinson v. City of N.Y.*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012). But common questions also predominate for Plaintiffs' substantive claims.

### 1.    The Checkpoint Class

The Checkpoint Class brings claims for violations of the Fourth Amendment, Fourteenth Amendment Due Process and Equal Protection Clauses, and Title VI of the Civil Rights Act.[17] Plaintiffs' evidence will establish that the BPD operated the Checkpoints in a uniform manner pursuant to formal municipal policy.

---

[16] The elements of a § 1983 violation are that a person acting under color of state law causes a violation of the plaintiff's federal constitutional or statutory rights. 42 U.S.C. § 1983. Here, Defendants indisputably acted under color of state law when they subjected Plaintiffs and class members to traffic enforcement. Accordingly, this brief focuses on the second element of the § 1983 claim: the violation of federal rights.

[17] The Due Process claim is discussed in the context of the Tinted Windows class; the claim and supporting evidence is the same for both Classes.

a) ***The Fourth Amendment Claim***

In *City of Indianapolis v. Edmond*, the Supreme Court held that a checkpoints program operated with a "primary purpose . . . to uncover evidence of ordinary criminal wrongdoing" violates the Fourth Amendment. 531 U.S. 32, 42 (2000). Plaintiffs allege, and intend to prove at trial, that the BPD subjected them and thousands of similarly situated class members to unlawful crime suppression checkpoints, in violation of the core principles articulated in *Edmond.*

Resolution of the Fourth Amendment claim turns on one or two key questions, each of which can be answered at once for every single class member. First, what was "the primary purpose of the Checkpoints program"? *Edmond*, 531 U.S. 32, 33 (2000). Identifying the primary purpose turns on the goals and objectives underlying the policy "at the programmatic level"; the "subjective intentions" of the individual officers who carry out the policy "are irrelevant." *Id.* at 45-46; *see also Lynch v. City of New York*, 589 F.3d 94, 100 (2d Cir. 2009). Because the programmatic goals of the program do not vary by class member, this is a common question. And the question is a predominant one as well, for if Plaintiffs prove that Defendants operated the Checkpoints for a primary programmatic purpose of generalized crime control, they will have established Defendants' liability on the Fourth Amendment claim.

Alternatively, Plaintiffs contend that even if operated for the ostensible purpose of traffic safety, the Checkpoints fail the special needs balancing test articulated in *Lynch*, which weighs the strength of the governmental interest against the intrusion on the privacy rights of those members of the public impacted by the policy. 589 F.3d at 100, 103-04. Again, the application of the balancing test is not merely a common question, turning on common evidence that will not vary from class member to class member. It is also a *predominant* question, for if Plaintiffs obtain the answer they seek, Defendants will be liable to *all* class members.

### b)       The Equal Protection and Title VI Claims

The Equal Protection and Title VI Claims have the same elements. Both claims require Plaintiffs to prove that Defendants intentionally discriminated against them on the basis of race.[18] *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 337 (2000). Plaintiffs may establish either that (1) the City applied a facially neutral policy in an intentionally discriminatory manner; or (2) the City's facially neutral policy had an adverse impact and was motivated by discriminatory animus. *Id.*; *see also Floyd*, 959 F. Supp. 2d at 661. Determining discriminatory intent, in turn, requires application of "the familiar *Arlington Heights* factors," which include statistical disparities, the historical background of the decision, substantive departures from normal procedures, and the legislative or administrative history surrounding the enactment of the policy. *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 606, 612 (2d Cir. 2016) (citing *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-67 (1977)); *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 547 (E.D.N.Y. 2006). The critical factor here is the *City's* discriminatory intent in promulgating and implementing the Checkpoint Policy, which caused harm to Plaintiffs and class members.

Plaintiffs intend to prove their Fourteenth Amendment Equal Protection and Title VI claims with common evidence pertaining to the City's policy and practice of locating Checkpoints overwhelmingly in Black and Latino neighborhoods, particularly on the East Side of Buffalo. Specifically, Plaintiffs will show that from January 2013 through June 2017, when BPD started manufacturing Potemkin checkpoints in response to the Common Council, BPD erected more than 79% of their Checkpoints in Black and Latino neighborhoods (Krugman Dec. ¶ 67, rows 1-3, 1201/1506)—and the relevant City policymaker, Commissioner Derenda, selected or ratified the

---

[18] Plaintiffs' Title VI claims require proof of an additional element: that the BPD received federal funds during the time period at issue. Defendants have admitted this element. Ex. 127 at 16.

locations. Plaintiffs will prove that City policy required officers running Checkpoints to issue tick-ets for all possible violations identified at the Checkpoint; officers had no discretion under the Checkpoint Policy. Plaintiffs will also show that the BPD disproportionately targeted Black and Latino neighborhoods in a manner that cannot be explained by crime, accidents, or traffic safety. Plaintiffs will establish that in 2015 the City established its own Traffic Violations Bureau to max-imize municipal ticket revenue, and that subsequently the BPD ran even more Checkpoints and issued more tickets at Checkpoints in Black and Latino neighborhoods. Plaintiffs will also demon-strate that when the Buffalo Common Council and local news media demanded public disclosure of the Checkpoint locations as part of an effort to investigate whether the BPD's Checkpoint pro-gram disproportionately targeted Black and Latino neighborhoods, the BPD ran Checkpoints pre-dominately in white neighborhoods and disclosed only those manufactured Checkpoint locations to the public. As for the *Arlington Heights* factors, Plaintiffs' experts will testify as to the discrim-inatory impact and the historical background of racially discriminatory policing and the Check-points program (and each class member will rely on the same expert testimony). As with the Fourth Amendment violations, Plaintiffs' Equal Protection theory turns on the intent and motivations of municipal policymakers, not individual officers.

### 2.    The Tinted Windows Class

Similarly, common questions predominate for members of the Tinted Windows Class. This Class brings claims under the Fourteenth Amendment Due Process and Equal Protection Clauses and Title VI of the Civil Rights Act.

### a)    The Due Process Claim

Finally, Plaintiffs' Fourteenth Amendment Due Process Claim turns entirely on common evidence of municipal policy. This claim arises out of the Supreme Court's decision in *Marshall v. Jerrico*, which held: "A scheme injecting a personal interest, financial or otherwise, into the

enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." 446 U.S. 238, 249-50 (1980). Courts apply the same standards to police officers as they do to prosecutors. *E.g.*, *Brucker v. City of Doraville*, 38 F.4th 876, 887 (11th Cir. 2022). In *Marshall*, the Supreme Court denied the due process claim because under the challenged scheme, the prosecutor had no personal financial motivation to prosecute child labor violations. 446 U.S. at 250. The same cannot be said for BPD officers and traffic enforcement.

Here, Plaintiffs will use common evidence to prove that City policies created unlawful, personal financial incentives for officers to issue traffic tickets and impound vehicles. Top municipal policymakers, including Mayor Brown, faced intense pressure to raise revenue without raising property taxes; they identified traffic tickets as a promising revenue source; and they created the BTVA in part to become a profit center for the City. The City also created—as a matter of municipal policy—overtime opportunities under which officers could and did significantly increase their salaries and future pension benefits. The Commissioner communicated that he expected officers to issue large numbers of traffic tickets and vehicle impounds, and officers understood that overtime opportunities bore a strong relationship to traffic enforcement, because high ticket and impound numbers both justified and were an expected outcome of overtime shifts. These expectations drove Checkpoints and multiple ticketing of Black and Latino motorists. All of these facts do not vary one iota from one class member to the next.

As with Plaintiffs' other claims, whether in fact an individual officer consciously recognized a financial motivation to issue a ticket (or multiple tickets) to a particular individual has little bearing on the legal analysis. "The imperatives of due process require application of an objective standard in all cases, whether or not actual bias exists or can be proved." *Gacho v. Wills*, 986 F.3d

1067, 1071 (7th Cir. 2021) (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009)). The important legal consideration is whether the municipal policies at issue created a substantial and unacceptable *risk* of bias by tying overtime opportunities—which directly benefit officers in the form of higher salaries and increased pension contributions—to high ticket and impound numbers. While Plaintiffs and Defendants surely have different answers to this question, none of it depends on individualized evidence from class members.

### b)        The Equal Protection and Title VI Claims

In addition to the evidence presented on behalf of the Checkpoint Class, Plaintiffs and Tinted Windows class members will show that Defendants had a widespread custom and practice of targeting Black and brown drivers for multiple tinted windows tickets—often issuing four or more tinted windows tickets in a single stop—both at and outside of Checkpoints.

The data tells a shocking story: tinted windows ticketing exploded with the advent of the Strike Force, and catapulted again after the City established the BTVA. During this time, the BPD issued 86.8% of tinted windows tickets where race could be identified (and 73.3% of *all* tinted window tickets) to minority drivers. Krugman Dec. Ex. 13 (panel 4, columns 2 and 3). Further, the BPD issued *multiple* tinted windows tickets to minority drivers 65-90% of the time, as compared to 50-75% of the time for white drivers. Ex. 1 ¶¶ 295-96. In raw numbers, the BPD issued 38,364 tinted-windows tickets to minority drivers in 15,999 incidents, as compared to 5,800 tickets in 2,843 incidents to white drivers. Krugman Dec. Ex. 13 (panel 4, column 6; panel 5, column 6).

Top city policymakers including Commissioners Derenda and Lockwood, and Chiefs Brinkworth and Young all knew that BPD officers engaged in these practices—and they knew it was wrong. Commissioner Derenda verbally ordered officers to stop engaging in the practice—but took no measures (not even issuing a written command) to ensure that officers implemented their orders. Predictably, officers did not stop, and city policymakers did nothing to enforce their

order. Commissioner Lockwood knew that officers engaged in multiple tinted windows ticketing and deliberately allowed them to continue—even after the filing of the Amended Complaint in this action, which put the City on clear notice of the profound racial disparities involved in the BPD's tinted windows ticketing practices. Plaintiffs will argue that the City's institutional failure to protect class members from known wrongful practices derives from discriminatory intent. Plaintiffs will also show that BPD's tinted windows ticketing practices constituted irregularities and substantive departures, relevant to the *Arlington Heights* analysis.

*Hill v. City of N.Y.*, 2019 WL 1900503 (E.D.N.Y. Apr. 29, 2019), is instructive. In *Hill*, a class of predominantly minority NYPD 911 Operators brought pattern and practice disparate treatment claims against the city, alleging that they worked under different and worse employment rules (overtime, scheduling, breaks, leave, etc.) than predominantly white dispatchers for the Fire Department and Emergency Management Services who performed the same job functions. *See generally Hill v. City of N.Y.*, 136 F.Supp.3d 304 (E.D.N.Y. 2015) (describing facts and claims). At the class certification stage, the court had no problem concluding that common questions predominated because "the gravamen of every class member's claim is that Defendants engaged in an overarching pattern of discrimination." 2019 WL 1900503, at *9. As for the critical question of discriminatory intent, the claim that the municipality treated a minority group differently and worse than a similarly situated non-minority group was "subject to generalized proof" because "it requires analysis at the group level." *Id.* at *10. So too here. As set forth above, the evidence clearly shows that the BPD had an entrenched custom and practice of treating minority drivers differently

41

from non-minority drivers with respect to tinted windows ticketing.[19] The City policymakers' tolerance of this overarching pattern of discrimination is common to all class members.

*None* of these facts vary from class member to class member. Plaintiffs' claims cry out for common resolution.

### B.  Minor Factual Variations Among Class Members, Such As Differences in Damages, Do Not Defeat Predominance

Minor factual variance—such as the circumstances of individual ticketing incidents or variations in damages—does not impede the common resolution of Plaintiffs' and class members' claims. Where class members' claims "all arise from the same core allegation," certification is appropriate despite the presence of some individualized questions. *Brown*, 609 F.3d at 484. "Rule 23(b)(3) requires that common questions predominate, not that the action include only common questions." *Id.*

To begin with, "individualized monetary claims belong in Rule 23(b)(3)" *Wal-Mart Stores*, 564 U.S. at 362. For this reason, "individualized damages determinations alone cannot preclude certification under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015); *see also Umbrino v. L.A.R.E. Partners Network, Inc.*, 585 F. Supp. 3d 335, 361 (W.D.N.Y. 2022) (while there "may be individualized questions as to damages," common questions predominated because "the matter of liability can be determined on a class-wide basis with generalized proof"); *Mendez v. Radec Corp.*, 232 F.R.D. 78, 92 (W.D.N.Y. 2005) (individualized damages arise in "almost any class action" and do "not mean that a class should not be certified"); *Macarz v. Transworld Sys., Inc.*, 193 F.R.D. 46, 54 (D. Conn. 2000) ("While damage amounts may vary, the

---

[19] In the alternative, Plaintiffs will argue, supported by the expert testimony of Michael Gennaco, that the City was deliberately indifferent to the risk of racially discriminatory tinted windows ticketing by BPD officers. Again, the pivotal question of the City's deliberate indifference is common to all class members, further supporting predominance. *See Butler v. Suffolk County*, 289 F.R.D. 80, 102 (E.D.N.Y. 2013).

claims of the class present the same legal theories based on identical facts such that common questions clearly predominate.").

Similarly, that individualized defenses "may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones….[A]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of [a defense] will not automatically foreclose class certification." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001).

Cases similar to this one are routinely certified. For example, in *Brown v. Kelly*, the Second Circuit upheld b(3) class certification even though it acknowledged that "the district court will be required to make individualized inquiries with respect to some of the plaintiffs and some of the claims." 609 F.3d at 483. Common questions included whether the city had a policy of enforcing an unconstitutional statute or failed adequately to train officers, whether policymakers had knowledge of the unlawful acts of subordinates, and whether individual defendants could take advantage of qualified immunity. *Id.* at 484. These questions predominated because they "are likely to be central to all of the plaintiffs' cases and could be dispositive to the resolution of some claims." *Id.*

Similarly, in *Pritchard v. County of Erie*, 269 F.R.D. 213, 219 (W.D.N.Y. 2010), the court certified a b(3) class after determining that common questions, including whether defendants had a strip search policy, the constitutionality of the policy, and the ultimate liability of the County and individual defendants, outweighed individual questions. In *Stinson v. N.Y.*, 282 F.R.D. 360, 382-83 (S.D.N.Y. 2012), the common questions "whether Defendants engaged in a pattern and practice of issuing summonses in the absence of probable cause, whether that practice has been motivated by a quota, whether that practice has been perpetuated by inadequate training and whether potential

plaintiffs' constitutional rights have been infringed upon as a result of the NYPD's alleged sum-
monsing practices" predominated. And in *Butler*, 289 F.R.D. at 102, common questions concern-
ing whether jail conditions were unconstitutionally cruel and inhuman, whether defendants were
deliberately indifferent to such conditions, and the availability of administrative remedies predom-
inated over individual issues like the extent of each class member's damages.

Here, as in *Brown*, *Pritchard*, *Stinson*, and *Butler*, common questions include whether the
City of Buffalo instituted or acceded to certain policies and practices with respect to policing and
overtime; the intent of city policymakers in maintaining and perpetuating such policies; the extent
of policymaker knowledge and failure to train, monitor, supervise, and discipline officers; and
whether the city's implementation of the policies resulted in violations of class members' consti-
tutional rights. These common questions go directly to liability and far outweigh any minor indi-
vidual questions Defendants may raise.

### C.    A Class Action is Superior to Other Methods of Adjudication

Rule 23(b)(3)'s second prong considers whether "a class action is superior to other availa-
ble methods for the fair and efficient adjudication of the [claims]."[20] Fed. R. Civ. P. 23(b)(3). Here,
given the sheer number of class members and the fact that many of the people targeted by the
City's unlawful ticketing practices (including all residents of the BMHA and many East Side res-
idents) have extremely low incomes, a class action is not just superior to other methods of adjudi-
cation: it is the *only* method of adjudication. Absent class certification, individual class members

---

[20] Relevant factors include: "(A) the interest of the members of the class in individually controlling
the prosecution or defense of separate actions; (B) the extent and nature of any litigation concern-
ing the controversy already commenced by or against members of the class; (C) the desirability or
undesirability of concentrating the litigation of the claims in the particular forum; and (D) the
difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3).
"[W]hile these factors, structurally, apply to both predominance and superiority, they more clearly
implicate the superiority inquiry." *Sykes*, 780 F.3d at 82.

will have no practical way to vindicate their rights. *Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 50 (W.D.N.Y. 2018) (in considering Rule 23(b)(3) superiority, it is appropriate for the court to consider the "inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually").

Class actions "facilitate the redress of claims where the costs of bringing the individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Lit.*, 729 F.3d 108, 130 (2d Cir. 2013). Here, the individual Plaintiffs and class members suffered loss of liberty, the indignities of racial discrimination, and financial harm from wrongful ticketing and impound practices. These harms deserve recompense, and given the number of class members affected, the aggregate damages are substantial. However, each individual class member's damages are miniscule in comparison to the immense costs of litigation. To obtain relief in an individual case, each class member would need to build an evidentiary record sufficient to support *Monell* liability; litigation expenses would dwarf any individual recovery. Moreover, many class members have limited income and lack access to counsel for individual litigation. Perhaps this explains why there are no similar cases pending in the Western District of New York, despite Defendants' practices having harmed tens of thousands of people. Under such circumstances, a class action is superior. *See, e.g., Umbrino*, 585 F. Supp. at 335.

The most important superiority factor—manageability—also favors certification. Determination of class membership is straightforward, as Plaintiffs have obtained electronic records containing detailed data for all traffic arrests and tickets made by the BPD since January 1, 2012. Krugman Dec. ¶¶ 3-7, 25(b). The data includes the name and driver license number of the person stopped, the location of the stop or arrest, the specific violation(s) alleged, and the identity of the

issuing or arresting officer, among other details. *Id.* ¶¶ 7, 25(b), 27, 52. Plaintiffs also have, as a result of pre-suit FOIL requests and follow-up discovery, a list of checkpoints including date, time and location. *Id.* ¶¶ 21-23; Exs. 6a, 6b. Plaintiffs can identify tickets issued to and arrests of members of the Checkpoint Class by cross-referencing the ticketing and arrest data against the checkpoint list. *Id.* ¶¶ 25-36, 52-53.[21] Plaintiffs can identify members of the Tinted Windows class simply by searching the ticketing records for individuals who received more than one tinted windows ticket in a single stop. *Id*. ¶ 57. Indeed, Plaintiffs' counsel have already run such searches and have lists of tickets issued to putative class members. *Id*. ¶¶ 25-54, 57. All that is required is to convert tickets to names and addresses, and the City has stipulated that it has the information necessary to do that. *Id.* ¶ 52; Krugman Dec. Ex.14. These lists plainly provide a manageable plan—mailing to the addresses on the lists—for providing "the best notice practicable" to class members, as required by Rule 23(c)(2)(B).

Plaintiffs propose a phased trial plan. In Phase I, Plaintiffs will use common evidence to prove Defendants' liability on a class-wide basis. Should one or more Classes prevail on their Fourth Amendment and/or Equal Protection claims, the same jury will immediately convene to determine the general damages to which class members are entitled for lost liberty and/or the dignitary harms of racial discrimination. For purposes of establishing general damages, Plaintiffs suggest the Court allow each side to call up to ten class members, who will testify to the details of the unlawful traffic enforcement (length of detention, number of tickets issued, etc.) but not injuries suffered or their individual backgrounds (such as occupations, education levels, criminal histories, family situations, and similar personal facts). *See In re Nassau County Strip Search Cases*, 2009

---

[21] Certain Checkpoints not on the main Checkpoint list likewise generate lists of ticket numbers, which translate into class members. *Id*. ¶¶ 38-48; Krugman Dec. Ex. 7.

WL 706252, at *2-3 (E.D.N.Y. Mar. 16 2009) (devising method); *see also Betances v. Fischer*, 2022 WL 765963, at *11-12 (S.D.N.Y. Mar. 14, 2022) (endorsing "a matrix or grid system" for calculating class-wide general damages for lost liberty); *Barnes v. District of Columbia*, 278 F.R.D. 14, 20-21 (D.C. Cir. 2011) (allowing jury to calculate general damages based on representative class member testimony "limited solely to the details of such class members' overdetentions and strip searches"); *Dellums v. Powell*, 566 F.2d 167, 174 n.6 (D.C. Cir. 1977) (awarding general damages for false arrest and false imprisonment on sliding scale based on length of detention). Importantly, general damages for constitutional violations are based on the monetary value of harms "inseparable from the injury to human dignity." *Augustin v. Jablonsky*, 819 F.Supp.2d 153, 163 (E.D.N.Y. 2011). General damages do *not* compensate for emotional distress, psychological harm, loss of employment, or other forms of special or consequential damages, each of which must be individually proven.

Phase II will determine the individualized damages owed to the class members, many of which are straightforward and easily calculated. The City of Buffalo maintains data from which it is possible to determine for each ticket issued, the dollar value of the fine levied and whether the defendant paid the fine. Exs. 127 (at 12-13); 129. Similarly, the City maintains impound records, including the license plate number of the vehicle, data and duration of impound, and amounts paid and owed on the vehicle. *Id.* These records permit a basic calculation of the direct financial harms flowing from Defendants' unlawful traffic enforcement. Courts routinely find such "mechanical calculations" manageable. *Hardgers-Powell v. Angels in Your Home LLC*, 330 F.R.D. 89, 104 (W.D.N.Y. 2019).

As for any other individualized damages issues that may arise, "there are a number of management tools available to a district court to address" them. *In re Nassau County Strip Search*

*Cases*, 461 F.3d 219, 231 (2d Cir. 2006). These include (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damage proceedings; and (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages in separate proceedings after the liability trial. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 123, 141 (2d Cir. 2001). Moreover, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *Petrobras*, 862 F.3d at 268.

Class certification will permit the resolution of tens of thousands of individual claims in a single forum, at one time, thereby avoiding either a multiplicity of repetitive lawsuits, or worse yet, and more likely, no lawsuits at all. Under these circumstances, a class action is superior.

## III.   THE PROPOSED TRAFFIC ENFORCEMENT CLASS MEETS THE REQUIRE-MENTS OF RULE 23(b)(2)

Plaintiffs proposed Traffic Enforcement Class seeks prospective, injunctive relief to end the unlawful and discriminatory traffic enforcement policies that target Black and Latino motorists. Rule 23(b)(2) provides for certification when the requirements of Rule 23(a) are met and defendants have "acted or refused to act on grounds that generally apply to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). In other words, Rule 23(b)(2) class certification is warranted when "a single, indivisible remedy would provide relief to each class member." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 341 (2011).

The Traffic Enforcement Class meets the Rule 23(b)(2) requirements because the challenged policies affect the entire class and the remedy sought benefits the class as a whole. Plaintiffs seek to enjoin Defendants from conducting vehicle checkpoints for the purpose of general crime

control; targeting Buffalo motorists for traffic stops, tickets, and vehicle Checkpoints on the basis of their race and ethnicity; and performing traffic stops and vehicle Checkpoints for improper pecuniary purposes. Plaintiffs also seek an Order requiring Defendants to implement programs and policies with respect to supervision, monitoring, accountability, training, and discipline that will significantly reduce the risk that BPD officers will subject people to racially discriminatory traffic enforcement. Additionally, Plaintiffs seek an order requiring the BPD to document all traffic stops and tickets in sufficient detail required for independent supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act and to ensure such documentation is retained in a single, up-to-date computerized database. All class members will benefit from these reforms.

Certification under Rule 23(b)(2) is particularly appropriate when parties seek "*institutional reform* in the form of injunctive relief." *Raymond v. New York State Dep't of Corr. & Cmty. Supervision*, 2022 WL 97327, at *9 (N.D.N.Y. Jan. 11, 2022) (quoting *Stinson*, 282 F.R.D. at 379 (emphasis added)). The Supreme Court has specified that "civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) class actions. *Amchem*, 521 U.S. at 614. Here, the Traffic Enforcement Class seeks declaratory and injunctive relief to achieve institutional reform.

Class actions seeking prospective relief from policing practices, including those alleging violations of the Fourth and Fourteenth Amendments, have routinely been certified under Rule 23(b)(2). *See, e.g.*, *Suffolk*, 2021 WL 1255011, at *1 (pattern and practice of discriminatory policing of Latinos); *Vogel v. City of New York*, 2017 WL 4712791, at *7 (S.D.N.Y. Sept. 19, 2017) (enforcement of law affecting unhoused people); *Davis* , 296 F.R.D. 158 (pattern of discriminatory

stops, searches, and arrests to enforce trespassing prohibition); *Ligon* , 288 F.R.D. 72 (unconstitutional searches of residents and visitors of public housing); *Floyd*, 283 F.R.D. 153 (racially discriminatory stop and frisk policy); *Stinson*, 282 F.R.D. 360 (issuing summonses to fulfill a quota); *Ortega-Melendres*, 836 F. Supp. 2d 959 (racial profiling of Latino motorists); *Morrow v. Washington*, 277 F.R.D. 172 (E.D. Tex. 2011) (targeting racial and ethnic minorities for pretextual stops); *Casale v. Kelly*, 257 F.R.D. 396, 401 (S.D.N.Y. 2009) (enforcement of unconstitutional anti-loitering law). This precedent strongly supports certification of the Traffic Enforcement Class. Because the Traffic Enforcement Class meets all requirements of Rule 23(a) and (b)(2), class certification is required.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court certify the Classes described in this motion.

Dated: May 29, 2024

Respectfully submitted,

Matthew Alan Parham
WESTERN NEW YORK LAW CENTER
Cathedral Park Tower
37 Franklin Street, Suite 210
Buffalo, NY 14202
716-828-8415
mparham@wnylc.com

Philip A. Irwin (*pro hac vice*)
Jordan S. Joachim (*pro hac vice*)
Christine Nelson (*pro hac vice*)
Andrew Timmick (*pro hac vice*)
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
212-841-1000
pirwin@cov.com
jjoachim@cov.com
cnelson@cov.com
atimmick@cov.com

*Counsel for Plaintiffs*

Claudia Wilner
Edward Krugman
Anjana Malhotra
NATIONAL CENTER FOR LAW
AND ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
wilner@nclej.org
krugman@nclej.org
malhotra@nclej.org

Chinyere Ezie
Baher Azmy
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
212-614-6475
cezie@ccrjustice.org
bazmy@ccrjustice.org