UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

—————————————————————

BLACK LOVE RESISTS IN THE RUST by and
through its Co-Directors Natasha Soto and Shaketa
Redden and on behalf of its members; DORETHEA
FRANKLIN; TANIQUA SIMMONS; DE'JON HALL;
JOSEPH BONDS; CHARLES PALMER; SHIRLEY
SARMIENTO; EBONY YELDON; and JANE DOE,
individually and on behalf of a class of all others
similarly situated;

                              Plaintiffs,

        v.                                              Civil No.: 1:18-cv-00719-CCR

CITY OF BUFFALO, NY; BYRON B. BROWN,
Mayor of the City of Buffalo, in his individual and
official capacities; BYRON C. LOCKWOOD,
Commissioner of the Buffalo Police Department, in his
individual and official capacities; DANIEL DERENDA,
former Commissioner of the Buffalo Police Department,
in his individual capacity; AARON YOUNG, KEVIN
BRINKWORTH, PHILIP SERAFINI, ROBBIN
THOMAS, UNKNOWN SUPERVISORY
PERSONNEL 1-10, UNKNOWN OFFICERS 1-20,
each officers of the Buffalo Police Department, in their
individual capacities.

                              Defendants.

—————————————————————

# CITY OF BUFFALO DEFENDANTS'
# MEMORANDUM OF LAW IN OPPOSITION
# TO MOTION FOR CLASS CERTIFICATION

**HODGSON RUSS LLP**
*Attorneys for Defendants City of Buffalo, NY, Byron B. Brown, Byron C. Lockwood, Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, and Unknown Officers 1-20*
Hugh M. Russ III, Esq.
Peter Sahasrabudhe, Esq.
Cheyenne N. Freely, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000
*hruss@hodgsonruss.com*
*psahasra@hodgsonruss.com*
*cfreely@hodgsonruss.com*

**<u>TABLE OF CONTENTS</u>**

<u>PAGE</u>

PRELIMINARY STATEMENT ............................................................................................1

      A.     FACTS RELEVANT TO DENIAL OF CLASS CERTIFICATION ......................3

      B.     THE INSTANT MOTION.......................................................................8

      C.     MERITS-BASED CONSIDERATIONS..............................................10

LEGAL STANDARD ....................................................................................................17

ARGUMENT ...............................................................................................................18

POINT I.     PLAINTIFFS HAVE FAILED TO MEET THEIR CLASS
               CERTIFICATION BURDEN FOR THE PROPOSED DAMAGES
               CLASSES. ...................................................................................18

      A.     Certification Must Be Denied Because the Proposed Damages Classes Fail
            to Satisfy The Requirements of Rule 23(a).............................................18

      B.     The Proposed Damages Classes Do Not Satisfy the Requirements of Rule
            23(b)(3). ...................................................................................35

POINT II.    CERTIFICATION OF THE PROPOSED INJUNCTIVE CLASS IS
               IMPROPER.................................................................................37

      A.     The Court Should Deny Certification of the Proposed Injunctive Class
            Because the Class Definition Relies Upon Speculative Injuries. .........................37

CONCLUSION .............................................................................................................42

# TABLE OF AUTHORITIES

PAGE

**Federal Cases**

*In re Avon Anti-Aging Skincare Creams & Prods. Mktg. & Sales Practices Litig.,*
    2015 WL 5730022 (S.D.N.Y. Sept. 30, 2015) ........................................................... 32

*Barnes v. D.C.,*
    278 F.R.D. 14 (D.C. Cir. 2011) ................................................................................... 26

*Betances v. Fischer,*
    --- F. Supp. 3d ---, 2023 WL 8699001 (S.D.N.Y. Dec. 15, 2023) ......................... 26-27, 35-37

*Betances v. Fischer,*
    2022 WL 765963 (S.D.N.Y. Mar. 14, 2022) .............................................................. 26-27

*Betances v. Fischer,*
    2024 WL 182044 (S.D.N.Y. Jan. 17, 2024) ................................................................. 6

*Brecher v. Republic of Arg.,*
    806 F.3d 22 (2d Cir. 2015) .......................................................................... 17, 31-32, 34

*Brown v. Kelly,*
    609 F.3d 467 (2d Cir. 2010) ..................................................................................... 27-29, 30

*Burg v. Gosselin,*
    591 F.3d 95 (2d Cir. 2010) ....................................................................................... 10-11

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) .................................................................................................... 17

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ...................................................................................................... 35

*Dellums v. Powell,*
    566 F.2d 167 (D.C. Cir. 1977) ................................................................................... 26

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006) ....................................................................................... 37

*Di Pompo v. Mendelson,*
    2022 WL 463317 (S.D.N.Y. Feb. 15, 2022) ................................................. 10-11, 22, 32, 40

*Dunnigan v. Metro. Life Ins. Co.,*
    214 F.R.D. 125 (S.D.N.Y. 2003) ................................................................................ 37

## <u>TABLE OF AUTHORITIES - cont'd</u>

<u>PAGE</u>

*Fero v. Excellus Health Plan, Inc.*,
    502 F. Supp. 3d 724 (W.D.N.Y. 2020) ...................................................................19

*Floyd v. City of N.Y.*,
    283 F.R.D. 153 (S.D.N.Y. 2012) ..................................................................... 39-41

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) .............................................................................................17, 29

*Hinterberger v. Cath. Health Sys.*,
    299 F.R.D. 22 (W.D.N.Y. 2014) .........................................................................17

*Jackson v. Bank of Am., N.A.*,
    2019 WL 7288508 (W.D.N.Y. Dec. 30, 2019) ............................................ 17, 35-37

*Jensen v. Cablevision Sys. Corp.*,
    372 F. Supp. 3d 95 (E.D.N.Y. 2019) .................................................................27, 31

*Johnson v. Nextel Comms. Inc.*,
    780 F.3d 128 (2015) ..........................................................................................17, 35

*In re Joint E. & S. Dist. Asbestos Litig.*,
    78 F.3d 764 (2d Cir. 1996) ..................................................................................29

*Kennedy v. City of N.Y.*,
    2013 WL 3490351 (E.D.N.Y. July 10, 2013) ................................................ 12, 21-22

*Leyse v. Lifetime Entm't Servs., LLC*,
    679 F. App'x 44 (2d Cir. 2017) ...........................................................................32

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...............................................................28

*LoSardo v. Ribaudo*,
    2015 WL 502077 (E.D.N.Y. Feb. 5, 2015) ........................................................11

*M.G. v. N.Y.C. Dep't of Educ.*,
    162 F. Supp. 3d 216 (S.D.N.Y. 2016) ................................................................34

*MacNamara v. City of N.Y.*,
    275 F.R.D. 125 (S.D.N.Y. 2011) ..................................................................... 38-39

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) ...............................................................................27

## TABLE OF AUTHORITIES - cont'd

PAGE

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010)....................................................................................17, 35

*In re Nassau Cnty. Strip Search Cases*,
    2009 WL 706252 (E.D.N.Y. Mar. 16, 2009)....................................................24, 25

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006)...............................................................................25

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)...................................................................38-39, 41-42

*Passman v. Peloton Interactive, Inc.*,
    671 F. Supp. 3d 417 (S.D.N.Y. 2023)...................................................................29

*In re Patriot Nat'l, Inc. Sec. Litig.*,
    828 F. App'x 760 (2d Cir. 2020) ...........................................................................17

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017)...............................................................................32

*Plaintiffs #1-21 v. Cnty. of Suffolk*,
    2021 WL 1255011 (E.D.N.Y. Mar. 12, 2021)..................................................20, 23

*Rocco v. Nam Tai Elecs., Inc.*,
    245 F.R.D. 131 (S.D.N.Y. 2007) .........................................................................29

*S. Bronx Coal. for Clean Air, Inc. v. Conroy*,
    20 F. Supp. 2d 565 (S.D.N.Y. 1998)...................................................................16

*Shain v. Ellison*,
    356 F.3d 211 (2d Cir. 2004)...............................................................................38

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) ...........................................................................37

*In re Terrorist Attacks on Sep. 11, 2001*,
    2021 WL 640257 (S.D.N.Y. Jan. 22, 2001) ..........................................................36

*Torres v. City of N.Y. through the N.Y.C. Dep't*,
    590 F. Supp. 3d 610 (S.D.N.Y. 2022)............................................. 7, 11, 13-14, 31

*Townes v. City of N.Y.*,
    176 F.3d 138 (2d Cir. 1999)........................................... 20-23, 28, 30, 32, 36

## <u>TABLE OF AUTHORITIES - cont'd</u>

<u>PAGE</u>

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016)........................................................................35

*Velasquez v. Dig. Page, Inc.*,
   303 F.R.D. 435 (E.D.N.Y. 2014)....................................................28

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)........................................................................12

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)............................................................. 10, 17-19

*Washington v. Davis*,
   426 U.S. 229 (1976)........................................................................12

**State Cases**

*In re City of N.Y.*,
   6 N.Y.3d 540 (2006) .................................................................7, 31

**Federal Statutes**

Civil Rights Act of 1964, Title VI ................................8-9, 14-15, 17, 19

**State Statutes**

N.Y. Gen. Mun. Law § 370 .........................................................7, 16

N.Y. Veh & Tr. Law § 375(12-a)(b) ..................................................14

**Rules**

CPLR § 7801(1)........................................................................7, 31

Fed. R. Civ. P. 23 .................................................1, 2, 3, 17, 18, 23

Fed. R. Civ. P. 23(a) ....................................1, 17, 18, 29, 31, 35

Fed. R. Civ. P. 23(b)(2)...............................................9, 17-18, 38

Fed. R. Civ. P. 23(b)(3).......................................1, 8, 17-18, 35, 37

## PRELIMINARY STATEMENT

A class action is supposed to promote efficiency.  Individual questions are disfavored, and common questions are required.  In this case, Plaintiffs challenge the traffic enforcement practices of the Buffalo Police Department (the "BPD").  Every questioned traffic stop, ticket, and arrest involve different actors, different circumstances, and different dispositions.  Each encounter is unique.  The unique nature of these incidents is fatal to class certification.  Despite their arguments to the contrary, Plaintiffs cannot show that their Proposed Classes meet the requirements for class resolution provided in Federal Rule of Civil Procedure 23.

Plaintiffs' motion defies Rule 23, controlling precedent, and the very purpose of the class action mechanism—judicial efficiency.  In an attempt to convince this Court to certify three classes, Plaintiffs gloss over the disqualifying defects in their Proposed Classes.  They encourage this Court to defer addressing these defects until the later stages of the litigation.  Judicial efficiency is not served by certifying three Proposed Classes that plainly do not meet the requirements of Rule 23.  The Proposed Classes include two classes demanding damages and one class demanding injunctive relief.  Both of the Proposed Damages Classes fail to satisfy the mandates of Rule 23(a) and Rule 23(b)(3).  Members of the Proposed Injunctive Class lack standing to pursue injunctive relief for uncertain, speculative, future injuries.  Perhaps worse, Plaintiffs' requested injunctive relief is intrusive and unworkable for law enforcement and the Court.  Without hesitation, the Court should deny Plaintiffs' motion for certification of all three Proposed Classes.

1

In the Proposed Damages Classes, there are no common questions, let alone a predominance of them as required by Rule 23. Plaintiffs distort their claimed basis for entitlement to class certification: they fail to engage genuinely in the "rigorous analysis" required by the Supreme Court. While Plaintiffs cite precedent concerning certification, those cases are inapposite; they do not support Plaintiffs' request. Even more troubling, Plaintiffs endeavor to minimize the individual determinations necessary for each class member's claim against the City Defendants to succeed. On the back end of this case, any assessment of damages necessitates individual determinations for virtually all Proposed Class members. The need for these individualized inquiries similarly defeats typicality of the claims amongst the class members; adequacy of the named Plaintiffs' representation of the classes; ascertainability of the class members; and the need for the class mechanism to be the superior method of adjudication. As for the Proposed Injunctive Class, the class members lack the very foundation for any lawsuit—standing. This class seeks injunctive relief for speculative injuries that may never occur. Not only are the injuries uncertain, at best, but the relief sought would require the federal courts to micromanage the law enforcement operations of the BPD and even further review the decisions of the Buffalo Traffic Violations Agency ("BTVA") and New York State courts. To be succinct, this would not be a proper use of the class action mechanism.

This Court must recognize that Plaintiffs complain not just about the thousands of collective stops made by the Buffalo Police Department in the past. Plaintiffs complain about anticipated, future stops—why each stop is made, who makes each stop, what transpires during each stop, how each person is treated during the stop, and whether each person is ticketed, arrested for a permissible reason, or otherwise harmed during the encounter. Each Proposed

Class member requires an individualized liability analysis—the dreaded mini-trial.  These questions simply cannot be answered on a class basis.  This case is not appropriate for Rule 23 treatment.  Plaintiffs cannot wish away the countless individual questions necessitated, since individual questions predominate on both liability and damages issues.  No matter how hard they try, Plaintiffs cannot argue these disqualifying deficiencies away.

## PROCEDURAL AND FACTUAL BACKGROUND

**A.    FACTS RELEVANT TO DENIAL OF CLASS CERTIFICATION**

The Buffalo Police Department's Commitment to the Equal Enforcement of Law

The Buffalo Police Department (the "BPD") is a police force dedicated to the equal administration and enforcement of the law, including the Vehicle and Traffic Law ("VTL").  This perspective is ingrained in the BPD's Manual of Procedures, specifically in the impartiality and conduct sections of the governing rules and regulations.  Declaration of Cheyenne N. Freely dated July 12, 2024 (hereinafter "Freely Decl."), Exhibit 2 dated January 24, 2024 (hereinafter "Gramaglia Dep. 2") at ¶ 45:10-47:20; *see also* Freely Decl., Exhibit 27 at 16, 18.  In 2021, the BPD reaffirmed its commitment to law enforcement free from racial discrimination with General Order 2021-009.  Freely Decl., Exhibit 28.  Moreover, while in the Erie County Law Enforcement Academy and while employed with the BPD, officers receive a variety of trainings designed to ensure that officers treat *all* members of the community with courtesy and respect—regardless of their race.  Freely Decl., Exhibit 5 dated January 24, 2024 (hereinafter "Banaszak Dep.") at 30:4-30:22; Freely Decl., Exhibit 9 dated July 19, 2023 (hereinafter "Hy Dep.") at 225:12-228:2.

In response to citizen complaints and concerns, that is, requests for definitive action, the BPD Strike Force and Housing Units were created in 2012.  These units were proactive units that were not "tied to the radio."  Freely Decl., Exhibit 6 dated November 10, 2021 (hereinafter "Derenda Dep. 1") at 16:8-16:16; Freely Decl., Exhibit 1 dated September 23, 2023 (hereinafter "Gramaglia Dep. 1") at 14:2-14:12.  They had specific, permissible purposes. Gramaglia Dep. 1 at 15:13-17:4; 17:17-18:7.  The Strike Force was designed to respond to complaints from citizens, deal with vehicle and traffic violations, and reduce gang and gun violence throughout the City.  Gramaglia Dep. 1 at 15:13-15:6, 16:10-17:4; Freely Decl., Exhibit 10 dated November 6, 2023 (hereinafter "Brown Dep.") at 58:12-58:21.  The Strike Force was mainly responsible for patrolling locations with high rates of crime or where recent crimes had occurred.  Freely Decl., Exhibit 7 dated December 23, 2021 (hereinafter "Derenda Dep. 2") at 279:16-280:14.

The Buffalo Municipal Housing Authority ("BMHA") contracted with the City to form the Housing Unit.  Gramaglia Dep. 1 at 17:17-18:7.  This unit was designed to patrol BMHA properties and to respond to any issues arising there.  *Id.*  The Housing Unit's patrols intended to remain highly visible within the BMHA properties to deter crime.  Freely Decl., Exhibit 11 dated December 27, 2021 (hereinafter "Serafini Dep.") at 42-41:14.  The Housing Unit responded to citizen concerns and complaints while patrolling BMHA properties, as well. Freely Decl., Exhibit 12 dated April 29, 2022 (hereinafter "Russo Dep.") at 99:18-100:9; 102:14-103:16.  The Housing Unit also proactively enforced the VTL in and around BMHA properties. Freely Decl., Exhibit 26 dated November 8, 2023 (hereinafter "Miller Dep.") at 48:22-49:11.

<u>Vehicle and Traffic Safety Checkpoints</u>

During their time in operation, both the Strike Force and Housing Unit also conducted vehicle and traffic safety checkpoints (the "Checkpoints")  with the primary purposes of traffic safety and high visibility.  Derenda Dep. 1 at 21:6-21:18; Russo Dep. at 194:13-194:21. Initially, former Commissioner Derenda set the Checkpoint locations for Strike Force.  Freely Decl., Exhibit 13 dated March 16, 2022 (hereinafter "Brinkworth Dep.") at 73: 17-73:21.  After some time, BPD lieutenants began setting the Checkpoint locations.  *Id.*  Checkpoint locations were determined based on where Strike Force officers were assigned to patrol and where BMHA properties were located.  Derenda Dep. 1 at 50:9-50:14.  Therefore, Checkpoints were established in areas where Strike Force patrolled in response to citizen complaints and crime, and where the Housing Unit focused their efforts pursuant to their contract.  In short, the neighborhoods with high minority populations implicated in this action expressly requested a greater police presence to deter crime, including violations of the VTL.  *See* Brown Dep. at 57:4-58:21.

Operation of the Checkpoints was straightforward.  At an intersection or heavily trafficked road, BPD would place a number of cars in the center of the street or on the side of the street with their lights on, so that the cars would be visible from a long distance away.  Hy Dep. at 22:2-22:19.   Vehicles approaching the Checkpoint would drive up to an officer or officers stationed in the center of the road.  *Id.*  Most relevant for the Court's determination of this motion, if there were no visible traffic violations seen on the vehicle approaching the Checkpoint, such as an expired registration sticker or a seat belt violation, the motorist in the vehicle was ***"told to just carry on."***  *Id.* (emphasis added).  There were also instances where,

even if the officer noticed a violation, they would still tell the motorist to carry on.  Hy Dep. at

33:7-33:15.  As a result, a substantial number of individuals briefly stopped at Checkpoints

(likely the vast majority) received no tickets and were stopped for only a brief period of time.  If

the officer or officers noticed a visible traffic violation and decided to write a VTL summons,

they would tell the motorist to park to the side of the road and would then issue a traffic

summons.  Hy Dep. at 23:15-24:13; 31:9-32:6.  After receiving a traffic summons, motorists

would be permitted to drive away if there were no visible crimes which may require an arrest.

*Id.*

Under former BPD Commissioner Byron Lockwood's tenure, the Strike Force

and Housing Unit were both disbanded.  *See* Freely Decl., Exhibit 14 dated April 1, 2022

(hereinafter "Quinn Dep.") at 16:12-16:14 (Strike Force); Freely Decl., Exhibit 16 dated August

17, 2023 (hereinafter "Lockwood Dep. 2") at 217:5-218:5 (Housing Unit).  The Checkpoints

have not been reinstated since.  Current Commissioner Joseph Gramaglia has no plans to

reinstate the Checkpoints.  Gramaglia Dep. 1 at 181:19-182:10. [1]

The Buffalo Traffic Violations Agency

With New York State enabling legislation, the BTVA was created in 2015 to

assist the Buffalo City Court in the adjudication of noncriminal traffic infractions.  Freely Decl.,

Exhibit 17 dated May 26, 2022 (hereinafter "Morgera Dep.") at 18:2-18:5; 19:20-20:3.  The

Agency was designed to give motorists ticketed in the City an opportunity to plead out and give

---

[1] The vehicle and traffic safety Checkpoints at issue here differ from DWI Checkpoints.  The City's lack of plans to reinstate the vehicle and traffic safety Checkpoints does not apply to DWI Checkpoints, which the City reserves the right to implement in areas where there is a high frequency or likely to be a high frequency of drunk driving.

motorists alternatives to resolve their tickets, as is done in town and village courts across the State.  Freely Decl., Exhibit 18 dated June 8, 2023 (hereinafter "Villegas Dep.") at 39:8-40:16.  The BTVA allows ticketed motorists to take a plea offer or proceed to traffic court before a judicial hearing officer.  Morgera Dep. at 26:6-26:23.  If a person chooses to proceed to a trial in traffic court, the judicial hearing officer will make a final determination.  *Id.*  To challenge the officer's determination, an individual may bring an appeal in Erie County Court.  Freely Decl., Exhibit 29.  The ability to challenge a BTVA determination in County Court mirrors other New York motorists' right to file Article 78 Petitions to challenge VTL determinations made by traffic agencies.  *See* N.Y. CPLR 7801(1); *In re City of N.Y.*, 6 N.Y.3d 540, 547 (2006) (noting that a person aggrieved by an agency's determination must challenge that decision with a timely Article 78 proceeding in State Supreme Court); *see also Torres v. City of N.Y. through the N.Y.C. Dep't*, 590 F. Supp. 3d 610, 617 (S.D.N.Y. 2022).

The creation of the BTVA also allowed the City to keep a portion of revenue derived from the adjudication of traffic tickets.  Morgera Dep. at 21:11:-22:7.  Prior to the establishment of the BTVA, all revenues from traffic violations went to the State.  *Id.* at 22:8-22:12.  With the BTVA, State law provides that the City can keep a portion of those revenues and remit a portion to the State.  *Id.* at 21:11:-22:7.

Buffalo's traffic agency is not an outlier.  In fact, other municipalities throughout the State, including Nassau County, Suffolk County, and Rochester, have developed similar traffic violation agencies pursuant to New York law.  N.Y. Gen. Mun. Law § 370 (McKinney); *see also* Villegas Dep. at 31:7-31:22.

**B.      THE INSTANT MOTION**

On June 28, 2018, Plaintiffs filed this action against the City of Buffalo, the BPD, and various high-ranking officials and personnel, including the Mayor (collectively referred to herein as the "City Defendants").  Dkt. No. 1.  On May 21, 2020, Plaintiffs filed the operative amended class action complaint.  Dkt. No. 63.  Plaintiffs make four claims against the City Defendants: (1) violation of the Fourth Amendment; (2) violation of the equal protection clause of the Fourteenth Amendment; (3) violation of the due process clause of the Fourteenth Amendment; and (4) violation of Title VI of the Civil Rights Act of 1964.  *Id.* at pp. 68-72. These claims arise from what Plaintiffs allege to be discriminatory traffic enforcement against Black and Latino drivers in the City of Buffalo.  *See generally* Dkt. No. 63.

On May 29, 2024, Plaintiffs filed their Motion for Class Certification.  *See* Dkt. Nos. 93-105.  Plaintiffs seek to certify three proposed classes: (1) the Checkpoint Class; (2) the Tinted Windows Class; and (3) the Traffic Enforcement Class.  The Checkpoint and Tinted Windows Proposed Classes demand damages pursuant to Fed. R. Civ. P. 23(b)(3) (collectively referred to as the "Proposed Damages Classes").  Plaintiffs define the Proposed Damages Classes as follows:

1.  The Checkpoint Class: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015."

2.  The Tinted Windows Class: "All Black and/or Latino individuals who received multiple tinted window tickets from the BPD in a single traffic stop on or after June 28, 2015."

Dkt. No. 211, p. 3.  For purposes of establishing damages, Plaintiffs have proposed a two-phase process.  *Id.* at pp. 46-47.  In Phase I, Plaintiffs ask this Court to determine and award "general

damages" for loss of liberty and the dignitary harms of racial discrimination.  *Id.* at 46.  Plaintiffs propose that the Court allow the testimony of up to ten class members per side regarding the details of the allegedly unlawful traffic enforcement.  *Id.*  In Phase II, the Court will have to determine the individualized damages owed to each class member based on the ticket issued, vehicle impounded, and "any other individualized damages issues that may arise."  *Id.* at 47.

The Traffic Enforcement Class demands injunctive relief under Fed. R. Civ. P. 23(b)(2) (referred to herein as the "Proposed Injunctive Class").

3.  <u>The Traffic Enforcement Class:</u> "All Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD."

*Id.* at p. 3.  Specifically, Plaintiffs seek an order:

a)  enjoining the City from conducting vehicle checkpoints for the purpose of general crime control; targeting Buffalo motorists for traffic stops, tickets, and vehicle Checkpoints based on their race and ethnicity; and performing traffic stops and vehicle Checkpoints for improper pecuniary purposes;

b)  requiring the City to implement programs and policies with respect to supervision, monitoring, accountability, training, and discipline that will significantly reduce the risk that BPD officers will subject people to racially discriminatory traffic enforcement;

c)  requiring the BPD to document all traffic stops and tickets in sufficient detail required for independent supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act and to ensure such documentation is retained in a single, up-to-date computerized database.

*Id.* at pp 48-49.

These Proposed Classes are so flawed that they preclude certification.

## C.   MERITS-BASED CONSIDERATIONS

Analysis of Plaintiffs' Motion for Class Certification necessarily involves some overlap with the merits of Plaintiffs' underlying claims.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  Plaintiffs' arguments supporting the merits of their claims paint a one-dimensional picture.  This picture ignores the realities of the facts and law applicable to this case.  To the extent the Court needs to consider the merits of Plaintiffs' claims, the City Defendants provide a fuller picture of governing law.

Fourth Amendment Claim

Under their Fourth Amendment claim, Plaintiffs allege that the City Defendants acted with deliberate indifference to the rights of the Proposed Checkpoint and Traffic Enforcement Classes.  Dkt. No. 63 ¶¶ 435-439.  But this claim seeks to recognize rights that do not exist under governing precedent.

The tickets received by members of the Proposed Checkpoint and Traffic Enforcement Classes do not violate the Fourth Amendment, because "the issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure."  *Di Pompo v. Mendelson*, 2022 WL 463317, at *2 (S.D.N.Y. Feb. 15, 2022) (citing *Burg v. Gosselin*, 591 F.3d 95, 98 (2d Cir. 2010)).  In *Di Pompo*, the Court dismissed the plaintiff's Fourth Amendment claim based on plaintiff's traffic ticket and vehicle impound for an expired registration.  *Id.*  Plaintiffs raise the same meritless argument here as the plaintiff in *Di Pompo*—that the traffic tickets issued to class members and, in some instances, vehicle impoundments violate the Fourth Amendment.  They do not.

10

VTL tickets do not constitute seizures under the Fourth Amendment. *See Torres*, 590 F. Supp. 3d at 627 (citing *Burg*, 591 F.3d at 96); *Di Pompo*, 2022 WL 463317, at *2 (distinguishing between damages available for traffic stops, which are available, from damages for tickets, which are not available under the Fourth Amendment). Moreover, seizing property, including the towing and impounding of vehicles for the ticketed infraction or failure to pay tickets, is reasonable under the Fourth Amendment. *See id.*; *Di Pompo*, 2022 WL 463317, at *3; *see also LoSardo v. Ribaudo*, 2015 WL 502077, at *5 (E.D.N.Y. Feb. 5, 2015). To hold otherwise would convert every traffic ticket, vehicle impoundment, or tow into a potential Section 1983 claim. *Id.*

For this reason, the Court's Fourth Amendment analysis is confined to traffic stops alone–the Court is not focused on traffic tickets and summonses nor impounds or tows. But the Proposed Checkpoint Class, which seeks damages on a class wide basis, is not focused on stops. Plaintiffs do not include as part of the Checkpoint Class individuals simply ***stopped*** during the Checkpoints, but rather seek damages for tickets, towing fees, and impoundment costs, which are not available under a Fourth Amendment claim. *Di Pompo*, 2022 WL 463317, at *2. The proposed Checkpoint Class should clearly not be certified given that it seeks damages that are simply unavailable under the Fourth Amendment. And even if Plaintiffs did confine the Proposed Checkpoint Class to mere stops, this would lead to an obvious ascertainability problem, among others. To determine the identity of individuals who were simply stopped at a Checkpoint during the relevant time period would be impossible.[2]

---

[2]     Even if Plaintiffs could propose a practical way of identifying all individuals subjected to mere stops at Checkpoints in the City of Buffalo, which they cannot, the class members would be entitled to nominal

When the Court considers what is actually at issue in Plaintiffs' Fourth Amendment claim, it is clear that the Court will be forced to determine who was subjected to a traffic stop, the length of time each individual was subjected to a stop, why they were subjected to a traffic stop, and whether the stop was justified.  These determinations are all fact specific, individualized questions—questions which are not properly answered on a class-wide basis.

Equal Protection Claim

Plaintiffs allege the City Defendants violated the equal protection rights of all classes,  Dkt. No. 63 ¶¶ 440-444.  This allegation requires them to show the City Defendants' policing has a discriminatory effect and is motivated by a discriminatory purpose.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  The instant motion relies, in part, on Plaintiffs' expert reports, including that of Dr. David Bjerk, whose report concludes that Black and Latino motorists are ticketed disproportionately for VTL violations.  Dkt. No. 203-1, pp. 3-8.  Incredibly, Plaintiffs' expert ignores the racial composition of Buffalo's neighborhoods—particularly, that Buffalo is a heavily segregated City.  Official action is not unconstitutional merely because it has a racially disproportionate impact.  *Vill. of Arlington Heights*, 429 U.S. at 265.  Proof of racially discriminatory intent or purpose is required to show an equal protection violation.  *Id.*  Despite their exhaustive and exhausting discovery, Plaintiffs have uncovered no discriminatory intent on the part of the City Defendants.

---

damages at most –assuming they could show that their particular stop violated the Fourth Amendment. *Kennedy v. City of N.Y.*, 2013 WL 3490351, at *4 (E.D.N.Y. July 10, 2013).

To hold the City Defendants liable for this claim will require the Court to analyze whether individual stops, arrests, and tickets were illegitimate.  In other words, the Court will have to do an analysis of each stop, arrest, and ticket to determine whether a motorist suffered legal consequences for a legitimate purpose, or whether each stop and subsequent penalty  was motivated by some discriminatory animus.  Surely, even the lawyers representing Plaintiffs cannot contend that every single ticket or stop of a minority motorist in the City of Buffalo is illegitimate or done for a discriminatory reason.  To determine whether tickets were legitimate or in fact discriminatory requires a fact sensitive, individualized analysis, much like analysis the Court would undertake for Plaintiffs' Fourth Amendment claim.[3]  Therefore, Plaintiffs' Equal Protection claims are not appropriately addressed on a class-wide basis.

Due Process Claim

Plaintiffs allege that the City Defendants violated the procedural due process rights of members of all three Proposed Classes.  Dkt. No. 63 ¶¶ 445-450.

Concerning the Tinted Window Class, for which Plaintiffs seek damages on a class wide basis, Plaintiffs cannot recover for the issuance of multiple tickets for tinted window infractions.  *See Torres*, 590 F. Supp. 3d at 617.  In *Torres*, the Court held that the issuance of multiple tickets at different times of the day for an illegally parked car was not a violation of procedural due process.  *Id.* at 614.  Critically, the Court noted that the multiple ticketing practice

---

[3]     The City Defendants of course contend that no traffic stops or traffic enforcement measures have been taken because of any motorist's race.  They will fully demonstrate this point during summary judgment briefing.  Certainly, the City Defendants vehemently and categorically deny that any policy or directive coming from BDP's command staff has been taken due to anyone's race.  Everything the BPD command staff has done during the relevant time period has been based on legitimate law enforcement needs that have absolutely nothing to do with race.

13

is permitted by the New York City Administrative Code  *Id.* at 618.  Similarly, New York State

law permits officers to issue as many tinted window tickets for as many windows are tinted.

N.Y. Veh & Tr. Law § 375(12-a)(b).  Consequently, officers writing more than one tinted window

ticket is not, as Plaintiffs claim, a procedural due process violation.  *Torres*, F. Supp. 3d at 617.

   This claim will easily be dismissed as to all Plaintiffs.  New York Law provides

sufficient protections for motorists such that the issuance of traffic tickets or the effecting of a

traffic stop does not violate procedural due process.  *Torres*, 590 F. Supp. 3d at 617-618.  This is

particularly true because New York law also allows for motorists to appeal any traffic penalties

through, among other channels, Article 78 challenges.  *Id.*  In fact, motorists are permitted to

challenge BTVA hearing officer determinations through appeals to County Court, too.  Freely

Decl., Exhibit 29.

   Even if the procedural due process claim were not completely lacking in merit,

which it is, it would not be appropriately resolved with on a class wide basis.  The Court would

have to answer specific, individualized questions for each Plaintiff regarding whether procedural

due process rights were violated for each individualized traffic related grievances.

Title VI Claim

   Plaintiffs' final claim alleges racial and ethnic discrimination in violation of Title

VI of the Civil Rights Act of 1964.  Dkt. No. 63 ¶¶ 451-454.  Specifically, Plaintiffs allege that

the City Defendants "devised, implemented, enforced, encouraged, and sanctioned a policy,

practice, and/or custom" of discriminatory traffic enforcement.  *Id.* at ¶ 453.  For the same

14

reasons applying to the equal protection claim, the Title VI claim is not properly handled as a class action.

In partial support of this claim, Plaintiffs point to an alleged practice that the BPD uses overtime to incentivize officers to write more tickets.  Dkt. No. 211, pp. 12-13.  Despite the efforts Plaintiffs have made to advance this narrative since the inception of this case, throughout discovery, during depositions, and now, this theory contradicts the evidence.  Of the extensive number of depositions taken in this case, none of the officers testified that overtime provided an incentive to write more tickets.  In fact, numerous officers affirmatively stated that they did not view overtime as a reward for writing more tickets.  *See* Freely Decl., Exhibit 19 dated March 23, 2023 (hereinafter "Thomas Dep.") at 116:16-117:12 (stating that no supervising officer ever told her that more overtime would be available if officers wrote more tickets, issued more summonses, or impounded more vehicles); Serafini Dep. at 261:19-261:23 (stating that he did not consider overtime to be a reward for good work performed by his officers); Derenda Dep. 2 at 233:13-233:18 (stating that he did not reward officers for issuing more tickets); Brinkworth Dep. at 90:7-90:9 (stating that he did not view overtime as a reward for production); *see also* Freely Decl., Exhibit 20 dated July 12, 2023 (hereinafter "Estrich Dep.") at 142:7-142:9 (stating that she was not aware of a time BPD tried to justify overtime as a reward for officers).  Contrary to Plaintiffs' argument, overtime was not viewed or treated as a reward for officers who wrote more tickets.  The testimony adduced during discovery proves otherwise.

Plaintiffs point to former Commissioner Derenda's expectation of "results" from his officers.  *Id.*  The term "results" does not translate to unconstitutional or illegitimate arrests or tickets, and it certainly does not translate to more overtime for officers.  Indeed, Officer Lance

Russo testified that "results" referred to "[i]f there was an arrest to be made, do it. If you are walking around and you are enforcing V&T, you are going to come across those things, you are going to have arrests. You are going to have summonses written, you are going to have impounds. Those things are going to happen when you are doing your job."  Russo Dep. at 247:12-247:19.  There was no policy, practice, or custom of encouraging officers to write more tickets based on the incentive of overtime.  Plaintiffs cannot stretch the truth of the evidence to prove otherwise.

Plaintiffs also point to the establishment of the BTVA as evidence that the City's policies encouraged ticketing to raise revenue.  Dkt. No. 211, pp. 10-11.  The BTVA had multiple purposes.  First, local legislators advocated for the creation of State legislation authorizing the BTVA principally to allow ticketed motorists to plead their infractions down and given them alternatives to resolve their tickets.  Villegas Dep. at 39:8-40:16.  While the legislation authorizing the BTVA's creation allows the City of Buffalo to keep a portion of the revenue generated from the adjudication of traffic violations, this is not unique to Buffalo.  Morgera Dep. at 21:11:-22:7.  Multiple municipalities throughout the State have created similar agencies also entitled to a portion of traffic ticket revenue.  Villegas Dep. at 31:7-31:22; N.Y. Gen. Mun. Law § 370 (McKinney).  Plaintiffs try to portray the City as improperly and uniquely driven solely by traffic ticket revenue.  This picture is contrary to the evidence.

To prove liability under a Title VI claim, Plaintiffs are required to prove that their claimed injuries resulted from intentional discrimination.  *S. Bronx Coal. for Clean Air, Inc. v. Conroy*, 20 F. Supp. 2d 565, 571 (S.D.N.Y. 1998).  For the same reasons as their Equal

Protection Claim, that fact sensitive, individualized question is not appropriately dealt with on a class wide basis.

## **LEGAL STANDARD**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Hinterberger v. Cath. Health Sys.*, 299 F.R.D. 22, 46 (W.D.N.Y. 2014) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). A party moving for class certification bears the burden of satisfying the requirements of Rule 23 by a preponderance of the evidence. *See id.* (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)); *Johnson v. Nextel Comms. Inc.*, 780 F.3d 128, 137 (2015). A class action can only be certified if the trial court is persuaded, "after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Jackson v. Bank of Am., N.A.*, 2019 WL 7288508, at *5 (W.D.N.Y. Dec. 30, 2019) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). As Plaintiffs recognize, Rule 23(a) imposes "four threshold requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Wal-Mart*, 564 U.S. at 345; *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 764 (2d Cir. 2020). In addition to these requirements, the moving party must satisfy the "implied requirement of ascertainability." *Brecher v. Republic of Arg.*, 806 F.3d 22, 24 (2d Cir. 2015).

After meeting these prerequisites, the moving party must demonstrate that the class satisfies the requirements under one of the subsections of Rule 23(b). *Wal-Mart*, 564 U.S. at 345. Plaintiffs seek to certify classes under Rule 23(b)(2) and 23(b)(3). Dkt. No. 202.

Plaintiffs must establish:

> (1) "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2), *quoted in Collins*, 2024 WL 1172697, at *6; and
>
> (2) "questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicated the controversy." Fed. R. Civ. P. 23(b)(3).

Plaintiffs fail to carry their heavy burden that the Proposed Classes satisfy the mandates of Rule 23.

## ARGUMENT

**POINT I.      PLAINTIFFS HAVE FAILED TO MEET THEIR CLASS CERTIFICATION BURDEN FOR THE PROPOSED DAMAGES CLASSES.**

**A.      Certification Must Be Denied Because the Proposed Damages Classes Fail to Satisfy The Requirements of Rule 23(a).**

Plaintiffs' Proposed Damages Classes cannot be certified because they do not meet all of the certification requirements specified in Fed. R. Civ. P. 23(a).  Plaintiffs fail to show (1) commonality; (2) typicality; or (3) adequacy of representation for the Proposed Damages Class.  Plaintiffs also fail to show that the Checkpoint Class is (4) ascertainable.

**1.      Commonality**

Commonality poses the biggest problem for Plaintiffs' claim for damages, since commonality requires Plaintiffs to show questions of law or fact common to the class.  *Wal-Mart*, 564 U.S. at 349.  "[A]ny competently crafted class complaint literally raises common questions[;]"  however, commonality requires Plaintiffs to demonstrate that the class members

18

have suffered the same injury. *Id.* at 349-350. The same injury is not just the same violation of law, as Plaintiffs have argued. *Id.* at 350. Rather, there must be common answers to questions that are capable of class wide resolution. *Id.*; *see also Fero v. Excellus Health Plan, Inc.*, 502 F. Supp. 3d 724, 743 (W.D.N.Y. 2020). In *Wal-Mart*, the Court noted that a mere claim of Title VII injury by the same company—analogous to what Plaintiffs allege here—does not satisfy the commonality requirement. *See* 564 U.S. at 350. The biggest problem with Plaintiffs' application involves the decided lack of commonality for each Proposed Damages Class.

The Checkpoint and Tinted Windows Proposed Classes lack commonality, because the differing circumstances surrounding each ticket issued and each arrest made necessarily result in differing injuries amongst the class members. For the Checkpoint Class, Plaintiffs argue that commonality stems from general questions involving *Monell* liability; the Fourth Amendment; Equal Protection, and Title VI. Dkt. No. 211, p. 34. Contravening settled law, Plaintiffs seek to establish a class for members to recover for thousands of tickets given and arrests made at Checkpoints, each with entirely different circumstances and results. Similarly, Plaintiffs argue that the Proposed Tinted Windows Class satisfies commonality because common questions involving *Monell* liability, Equal Protection, Title VI, and Due Process exist among class members. Dkt. No. 211, pp. 26-27. Alleged violations of the same statute do not automatically confer commonality, as noted. Plaintiffs' reiteration of these purportedly "common questions" does nothing to resolve the central inquiry of commonality—whether the class members have suffered the same injury. They obviously have not.

Plaintiffs' demand to divide damages into the phases (a) individualized damages and (b) general damages does nothing to cure the lack of commonality among the class members. The categories fail to cure their commonality problem.

### a.    Individualized Damages

Plaintiffs' plan for individualized damages involves the Court determining the damages owed to each class member based on the ticket issued, vehicle impounded, and "any other individualized damages issues that may arise." Dkt. No. 211, p. 47.  On their very face, these damages cannot be awarded on a class-wide basis because of the glaring lack of commonality between the class members.  The Court has to proceed one-by-one.  Requiring countless individual determinations, the Proposed Damages Classes cannot be certified.

"[W]hether each person's rights were violated, and what, if any injury [they] sustained, entails individualized inquiry" that precludes commonality among the members of the Proposed Damages Classes. *See Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 1255011, at *18 (E.D.N.Y. Mar. 12, 2021).  As a matter of law, the members of the Checkpoint Class and the Tinted Windows Class have not suffered the same injury, because the circumstances surrounding each ticket and arrest vary.  Class members cannot recover damages for tickets or arrests resulting from the Checkpoints if the tickets and arrests were issued for valid infractions and made pursuant to probable cause.  *See Townes v. City of N.Y.*, 176 F.3d 138, 148 (2d Cir. 1999).

In *Townes*, the Second Circuit determined that victims of unreasonable searches or seizures "cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." *Id.*  There, the plaintiff claimed that his Fourth Amendment rights were violated by officers during a traffic stop of a taxicab in which he was a

passenger. *Id.* at 141. During the stop, officers searched the plaintiff and the taxicab. *Id.* After finding handguns in the taxicab, the officers arrested the plaintiff and searched him again at the police station, where they found cocaine. *Id.* The Plaintiff sought compensatory damages related to his conviction and incarceration, including reputational damages and damages for isolation from society, separation from friends and family, and loss of potential earnings. *Id.* at 149. In denying the plaintiff's claim, the Court stated "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including, where appropriate damages for physical injury, property damage, injury to reputation, etc.; but victims cannot be compensated for injuries that result from the discovery of incriminating evidence and subsequent criminal prosecution." *Id.* at 148. Constitutional tort liability for violation of the Fourth Amendment is limited to the kind of injury that the Fourth Amendment was designed to prevent—unreasonable searches and seizures, not compensation for individual violations. *Id.* ("The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all."). Courts applying *Townes* have agreed that any alleged impropriety with respect to the initial stop does not affect a subsequent ticket or arrest. *See Kennedy*, 2013 WL 3490351, at *4.

A plaintiff whose initial stop is illegal leading to the discovery of incriminating evidence "may only recover damages for the initial stop and associated seizure, which would 'at most support slight or nominal damages.'" *Id.* (citing *Townes*, 176 F.3d at 145). For example, *Kennedy* provided that even if police officers lacked any reason for pulling over plaintiff's car, their subsequent arrest of plaintiff for driving while intoxicated was supported by probable cause.

*Id.* at *4.  In *Kennedy*, the plaintiff was not entitled to damages for the arrest, but only "nominal damages arising from the minor invasion of privacy occasioned by the stop of his car."  *Id.*

Controlling this case, *Townes* and its progeny hold that members of the Proposed Damages Classes can only recover—and therefore, only have a common injury—if their tickets and/or arrests were invalid.  *See* 176 F.3d  at 148.  This result comports with Fourth Amendment precedent, which has held that traffic tickets are not seizures under the Fourth Amendment, and plaintiffs, therefore, cannot recover damages for traffic tickets.  *See Di Pompo*, 2022 WL 463317 at *2.  In other words, if an individual was arrested at a Checkpoint for driving while intoxicated, regardless of whether the Checkpoint was constitutional, if the individual was in fact intoxicated, that individual cannot recover damages for the ticket or arrest.  In the same fashion, if a Proposed Class member was issued two tickets for two tinted windows which actually violated the VTL, regardless of the constitutionality of the initial stop, that individual does not have a claim for damages associated with that ticket.  Surely, Plaintiffs are not arguing that **every** ticket given, and arrest made in the City of Buffalo during the Class Period were invalid.  But under Plaintiffs' presently suggested approach, to certify the Proposed Damages Classes would involve forcing this Court to determine for each class member whether the member was in fact stopped, whether that stop was the result of racial discrimination, and whether the ticket issued and/or arrest made weas invalid.  In other words, the Court would have to individually assess the propriety of each ticket and each arrest.  The review Plaintiffs require is not contemplated in Rule 23, the class action mechanism.

While *Townes* does allow those subjected to unreasonable searches and seizures to recover damages for physical injury, property damage, injury to reputation, or other damages

directly related to the invasion of their privacy, *Id.* at 148, this avenue only raises more individualized questions and individualized inquiries – again, the kind not properly resolved in a class action.  If Plaintiffs' Proposed Classes are certified, this Court will face thousands of mini-trials.  There is no avoiding that certainty.  The Court will have to determine which class members are entitled to nominal damages, if any, and which tickets and arrests were valid or not precluded by *Townes*.  There simply are no common questions among the members of the Proposed Damages Classes, since Plaintiffs cannot show that they have all suffered the same injury—arrests absent probable cause and the issuance of invalid tickets.  Alteration of the Proposed Class definition cannot save Plaintiffs' class claim, either.

Even if the Proposed Checkpoint Class were more appropriately focused on traffic stops, as discussed in the above Fourth Amendment analysis, it still would not meet the commonality requirement.  The Court would still have to analyze the individual circumstances, injuries, and outcomes of each stop.  Every single one.  Plaintiffs direct this Court to *Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 1255011 (E.D.N.Y. 2021) as the "model" to follow here.  Dkt. No. 211, p. 27.  Plaintiffs' reference to this case misses the mark on account of the glaring points of distinction between that case and this one.  Prior to class certification in *Plaintiffs #1-21*, the police department admitted in a Court-approved settlement agreement that its policies were insufficient to prevent discrimination.  *Id.* at *3.  The primary defendant officer had been criminally convicted of stealing money from over two dozen Latino class members.  *Id.* at *4.  No such admission of liability or criminal convictions exist here.  Therefore, the commonality requirement cannot be assumed here as it was in *Plaintiffs #1-21*.  Plaintiffs' reliance on this case actually serves to undercut their argument for certification as a whole.  ***There, the Court noted***

*that the damages class could not be certified because damages for each ticket and arrest would need to be determined on an individual basis*.  *See id.* at *18.  The same would be true here, as the City Defendants have demonstrated.

Even the reports of Plaintiffs' disclosed experts demonstrate the decided lack of commonality.  For example, Michael Gennaco describes Plaintiffs' claims in his lengthy report.  Dozens and dozens of individual circumstances are chronicled.  *See e.g.*, Dkt. No. 203-2, pp. 24-28; 29-35; 33-36; 38-40; 41-47; 51-58.  Even these accounts serve to predict the countless individual inquiries required for this litigation to proceed.  Plaintiffs' Proposed Damages Classes cannot be certified because of their claim for individual damages.

     **b.**    **General Damages**

Plaintiffs' demand for "general damages" for lost liberty and/or the dignitary harms of racial discrimination, Dkt. No. 211, p. 46, likewise fails to clear the commonality hurdle.  Whether a traffic stop is the product of racial discrimination or supported by probable cause is, by definition, a fact-sensitive individualized inquiry.  General damages cannot be awarded across the board for this kind of injury.  Plaintiffs point to a variety of inapposite cases in support of their entitlement to general damages and their method for determining proper awards.  None of these cases involved the same, or even a remotely similar, degree of individualized inquiries or commonality deficiencies.  These cases are inapplicable, and the Court should reject them.

Plaintiffs first point to *In re Nassau Cnty. Strip Search Cases*, 2009 WL 706252, at *2-3 (E.D.N.Y. Mar. 16, 2009) to justify their proposed method for determining general damages.  Under Plaintiffs' method, each side could call up to ten class members who would

testify regarding the details of the unlawful traffic enforcement (length of detention, number of tickets issued, etc.), but not injuries suffered or individual backgrounds.   Dkt. No. 211, p. 46. As a preliminary matter, it must be noted that this method does not follow that presented in *Nassau Cnty.*   In *Nassau Cnty.*, witness testimony included details surrounding each search and background information to assist the jury in determining credibility.  2009 WL 706252 at *3. Plaintiffs might concede that individual backgrounds are necessary to assess witness credibility. But Plaintiffs seek to deprive this Court of that information while citing a case that does the exact opposite.

Regardless of the degree to which Plaintiffs actually adhere to the *Nassau Cnty.* method, general damages are inapplicable here.  *Nassau Cnty.* did not involve the same background, the same comonality problems.  In *Nassau Cnty.*, the proposed class was defined as all persons arrested for misdemeanors and non-criminal offenses who were subjected to the defendants' **blanket** strip-search policy.  *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 229 (2d Cir. 2006).  The Second Circuit emphasized that this definition "obviated the need for individualized proceedings to determine class membership" because the all-inclusive nature of the blanket policy and its avoidance of questions of probable cause.  *Id.*  The opposite is true here.  Not everyone in the Proposed Damages Classes received a ticket.  Not everyone in the Proposed Damages Classes was arrested.  The Proposed Damages Classes necessarily involve analyses of probable cause and reasonable suspicion, on an individual basis, whether the stop was the product of racial discrimination, and whether the person was properly arrested and/or ticketed.  The Court in *Nassau Cnty.* did not need to engage in this type of analysis, because

there were common questions capable of class-wide resolution and, therefore, an award of general damages.

The other cases Plaintiffs cite in favor of their general damages argument are similarly distinguished.  The class in *Dellums v. Powell*, 566 F.2d 167, 173 (D.C. Cir. 1977) included all people arrested while assembled on the Capitol steps on May 5, 1971 during a Vietnam War protest.  Unlike here, the class members in *Dellums* were all arrested at the same time in connection with the same course of events.  The only differentiation the Court had to engage in involved determining sliding scale damages based on the number of hours each class member was detained.  *Id.* at 174 n.6.  Similarly, the Court in *Barnes v. D.C.*, 278 F.R.D. 14, 20-21 (D.C. Cir. 2011) awarded general damages based on length of overdetentions and number of strip searches to which each class member was subjected.  Critically, general damages here would involve far more individualized inquiries than just length of detention or number of stops.  Necessary inquiries, including the presence of the necessary racial discrimination and the validity of the ticket or arrest, are not capable of class wide resolution with sliding scale general damages.

*Betances v. Fischer*, 2022 WL 765963, at *3, 11-12 (S.D.N.Y. Mar. 14, 2022) ("*Betances V*") illustrates the dangers of certifying a class for general damages where varying factual circumstances predominate.  Plaintiffs' citation to this case is misguided for the obvious reason that the class was decertified due to the need for individualized inquiries that precluded general damages.  *Betances v. Fischer*, --- F. Supp. 3d ---, 2023 WL 8699001, at *23 (S.D.N.Y. Dec. 15, 2023) ("*Betances VI*"); *see also Betances v. Fischer*, 2024 WL 182044, at *21-22 (S.D.N.Y. Jan. 17, 2024).  In *Betances V*, the Court initially held that general damages were

appropriate given the class included all individuals sentenced to incarceration and not post-release supervision ("PRS") but were still subject to enforcement of PRS terms after their sentences.  2022 WL 765963 at *3.  Like the blanket policy in *Nassau Cnty.*, the class-definition in *Betances V* appeared to not require the level of individualized inquiries required here, which are inappropriate for an award of general damages.  In *Betances VI*, the Court decertified the class and held that general damages could not be awarded until "individual trials are held to determine for each class the fact issues specific to their circumstances . . ."  2023 WL 8699001 at *23.  Despite how Plaintiffs maneuver, the reality is that, as in *Betances VI*, individualized inquiries, improperly decided in a class action, will bleed into the determination of general damages.

The conclusion is inescapable: there is no commonality among the members of the Proposed Damages Classes—both for individualized damages and general damages.  For this reason alone, the Court must deny certification of these classes.

## 2.    <u>Typicality</u>

Still, there are other reasons to deny certification.  "Typicality requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class members." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010).  Typicality exists when "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Id.* (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)).  Where, as here, unique defenses are not applicable to all class representatives and members, the claims are not typical.  *See Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 122 (E.D.N.Y. 2019).  Typicality and commonality analyses often merge

together.  *Id.*  For the same reasons that the Proposed Damages Classes fail the commonality analysis, they also cannot withstand the typicality analysis.

A defendant need only show that the unique defenses are meritorious enough to require the plaintiffs to devote considerable time to rebut them.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 460-461 (S.D.N.Y. 2018).  The inability for the Proposed Checkpoint Class to recover under the Fourth Amendment for tickets given at Checkpoints is one unique defense only applicable to certain members of the Proposed Checkpoint Class.  The City Defendants also have the *Townes* doctrine available as a defense to many of  individuals who would be a member of the Proposed Damages Classes.  Specifically, the City Defendants can use this defense against all class members whose tickets and arrests were validly issued and made, respectively.  The legal arguments Plaintiffs advance do not protect the Proposed Damages Classes from splintering.  Typicality involves an inquiry into "the fairness of allowing an entire class's claim to rise or fall with the fate of the named representative's claims." *Velasquez v. Dig. Page, Inc.*, 303 F.R.D. 435, 443 (E.D.N.Y. 2014) (citation omitted).  Here, the Proposed Classes are not only unfair, they are impossible.

To allow a class to be certified where considerable differences exist between what class members, if any, can actually recover damages is simply not fair.  Some members of the Proposed Damages Classes will have to argue that their tickets and arrests were invalid.  Others will have no argument against *Townes* at all.  Regardless, the legal arguments proffered by the class members, and the unique defenses applicable to many of them destroy typicality among all the members.

For these reasons, the named Plaintiffs are also inadequate representatives of the Proposed Damages Classes.

### 3. <u>**Adequacy**</u>

Typicality and adequacy tend to merge together, although adequacy also raises issues of conflicts of interest. *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 446 (S.D.N.Y. 2023) (citing *Falcon*, 457 U.S. at 157 n. 13). "In order for a class representative to meet the adequacy requirement of Rule 23(a), the class members must not have interests that are antagonistic to one another." *Brown*, 609 F.3d at 479 (citing *In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 778 (2d Cir. 1996)) (internal quotations omitted). Where, as here, there is a divergence between class representatives who are barred from damages and class representatives and members who may be entitled to damages, the class representatives are inadequate. *See Brown*, 609 F.3d at 479 (noting that the class representatives were inadequate because "the action involves a host of legal and factual issues unique to them that are likely to distract from their representation of the class"). The representatives of the Proposed Damages Classes are inadequate, because many of them are likely not entitled to the damages the rest of the class seeks. *See Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("Just as [the plaintiff] is subject to unique defenses questioning his typicality, this Court also finds him prone to the following unique defenses that jeopardize his adequacy.").

Plaintiffs offer Joseph Bonds, Jasmine Evans, and Shaketa Redden as proposed representatives for the Checkpoint Class. Dkt. No. 211, p. 3. Bonds alleges that he was ticketed for expired insurance and an expired inspection sticker. Dkt. No. 63 ¶¶ 315-342. Bonds admitted that his inspection sticker was, in fact, expired when he received these tickets. Dkt. No.

63 ¶¶ 335-337; Freely Decl., Exhibit 21 (hereinafter "Bonds Dep.") at 84:21-85:3.  Jasmine

Evans alleges that she was ticketed for three seat belt violations associated with her own lack of

a seat belt, improper car seats for her two children, and for driving on a learner's permit.  Dkt.

No. 63 ¶¶ 380-387.  Evans admitted these violations were legitimate at the time she was ticketed

for them.  Dkt. No. 63 ¶¶ 380-384; Freely Decl., Exhibit 22 dated December 15, 2022

(hereinafter "Evans Dep.") at 58:10-58:14; 76:20-77:14; 82:14-82:21.  Shaketa Redden was

ticketed for an expired inspection; failure to notify the DMV of an address change; driving with a

suspended registration; an expired registration; and a dirty license plate.  Dkt. No. 63 ¶¶ 351-356.

Redden admitted that her inspection sticker was expired at the time she received the ticket for

that infraction.  Dkt. No. 63 ¶ 351.  These proposed representatives admit that they were properly

ticketed for specific infractions and are, therefore, precluded from seeking damages for those

tickets.

Plaintiffs Dorothea Franklin, Charles Palmer, and Ebony Yeldon seek to represent

the Tinted Windows Class.  Dkt. No. 211, p. 3.  Franklin admitted that her windows were tinted.

Freely Decl., Exhibit 23 dated May 15, 2023 (hereinafter "Franklin Dep.") at 43:13-44:12.

Palmer admitted that his windows were tinted.  Freely Decl., Exhibit 4 dated September 14, 2023

(hereinafter "Palmer Dep.") at 65:10-65:21; 67:2-67:7; 112:11-112:21.  Yeldon admitted that her

windows were tinted.  Freely Decl., Exhibit 24 dated December 13, 2024 (hereinafter "Yeldon

Dep.") at 80:16-80:20; 89:21-90:21.  Under *Townes*, these named Plaintiffs would not be entitled

to damages.  Where, as here, class representatives are barred from the very relief the rest of the

class seeks—damages—the class representatives are inadequate.  *See Brown*, 609 F.3d at 479.

30

Even in instances where the named Plaintiff has not admitted guilt for ticketed infractions, determination of the validity of tickets given falls within the jurisdiction of the BTVA and New York State courts.  Deciding whether the named Plaintiffs are adequate representatives would require mini-trials to determine the validity of their tickets and/or arrests. This Court, as a court of federal (limited) jurisdiction, should not re-litigate the dispositions of traffic tickets adjudicated in the New York court system or by the BTVA, which has been lawfully delegated authority to adjudicate traffic summonses.[4]

The interests of the class representatives do not coincide with the interests of all class members.  *See Jensen*, 372 F. Supp. 3d at 124-125.  The Second Circuit has recognized the danger that class members will suffer where, as here, their class representatives have to defend against arguments unique to them.  *Gary Plastic Packaging*, 903 F.2d 176, 180 (2d Cir. 1990) ("Regardless of whether the issue is framed in terms of the typicality of the representatives claims . . . or the adequacy of its representation . . . there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.").  Under these uncontradicted factual circumstances, the named Plaintiffs for the Proposed Damages Classes are inadequate representatives.

**4.** **Ascertainability**

Under Rule 23(a), the Second Circuit requires that a proposed class be ascertainable.  *Brecher*, 806 F.3d at 24.  "A class is ascertainable when defined by objective

---

[4]    Motorists who wish to appeal BTVA decisions may do so in New York State courts as well, so they are not left without redress from the BTVA if they feel it has not justly adjudicated a traffic summons.  *See* Freely Decl., Exhibit 29; N.Y. CPLR 7801(1); *In re City of N.Y.*, 6 N.Y.3d at 547; *see also Torres*, 590 F.Supp.3d at 617.

criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Leyse v. Lifetime Entm't Servs., LLC*, 679 F. App'x 44, 47 (2d Cir. 2017) (citing *Brecher*, 806 F.3d at 24-25); *see also In re Avon Anti-Aging Skincare Creams & Prods. Mktg. & Sales Practices Litig.*, 2015 WL 5730022, at *5 (S.D.N.Y. Sept. 30, 2015) (denying class certification where mini-hearings required to identify members and declarations required to verify membership would be "an invitation to speculate, or worse[.]"). As the Second Circuit subsequently clarified, while administrative feasibility is not an independent element of the ascertainability test, the purpose underlying the definiteness and objectivity required for a class to be ascertainable ensures that it is administratively feasible for the court to determine class membership. *In re Petrobras Sec.*, 862 F.3d 250, 266 (2d Cir. 2017).

Plaintiffs' Proposed Damages Classes are not ascertainable. Only members issued invalid tickets and arrested improperly are appropriate members of the classes. Moreover, certification of the Checkpoint Class is also improper because Plaintiffs rely upon arbitrary methods for determining class membership.

As previously discussed, members of the Checkpoint Class who received tickets and were arrested for legitimate infractions, even if initiated in a discriminatory stop—which the City Defendants vehemently deny—are not entitled to damages. *See Townes*, 176 F.3d at 145.[5] Necessarily, the Court would have to engage in thousands of mini-trials to re-litigate the validity of each ticket and arrest to determine class membership. This would be unreasonable and

---

[5]     Indeed, Plaintiffs are not even entitled to recover for traffic tickets at all under their Fourth Amendment claim. *Di Pompo*, 2022 WL 463317, at *2.

directly contrary to the purpose of a class action.  For this reason, as well, the Proposed Damages Classes are not ascertainable.

Plaintiff's arbitrary methods for determining membership of the Checkpoint Class also fail to clear the ascertainability hurdle of class certification.  Plaintiffs randomly focus on time periods and geographic areas in an attempt to identify class members.  For instance, to try and determine tickets given and arrests made at Checkpoints, Plaintiffs took the start times listed on Checkpoint Directives and identified all tickets given 30 minutes before to one hour after the listed start time.  Dkt. No. 210 ¶¶ 27-29.  This determination relies solely upon Plaintiffs' counsel's arbitrary decision to include earlier tickets in case the Checkpoints started earlier than the listed start time and the deposition testimony of one officer who testified as to his personal experiences running Checkpoints.  *Id.* at ¶ 29 (relying on the testimony of Thomas Whelan). Different officers remembered different Checkpoints with varying lengths of time.  Quinn Dep. at 48:18-48:21 (noting that Checkpoints lasted "30 to 40 minutes, sometimes as much as an hour"); Russo Dep. at 154:1-154:14 (noting that Checkpoints ranged in length anywhere from 45 minutes to an hour and a half); Thomas Dep. at 60:22-61:21 (noting that while Checkpoints ended after 45 minutes, officers could be at the location for longer to process motorists); Freely Decl., Exhibit 25 dated May 24, 2023 (hereinafter "Wigdorski Dep.") at 43:6-43:10 (noting that Checkpoints lasted "[t]hirty minutes to an hour, maybe 45 minutes.").  To focus on just one officer's recollection is arbitrary and unreliable.  Plaintiffs' next arbitrary assumption involves including all tickets given during that time frame within 500 meters.  Dkt. No. 210 at ¶¶ 30-32. Plaintiffs acknowledge that this method is over-inclusive; however, they attempt to avoid this

over-inclusivity by arguing that it "might need final resolution at the proof-of-claim stage." *Id.* at 32.

In *M.G. v. N.Y.C. Dep't of Educ.*, 162 F. Supp. 3d 216, 238 (S.D.N.Y. 2016), the Court held that a subclass could not be ascertained because it was overbroad. There, parents of students with autism participating in individualized education programs (IEPs) sued the New York City and New York State Departments of Education for violations of state and federal law arising out of policies that plaintiffs alleged impeded the provision of adequate special education services. *Id.* at 224-225. Specifically, Plaintiffs alleged that their injuries were the result of a directive, which informed parents that students would no longer be able to receive special education unless it was offered through the particular program the child was already attending. *Id.* at 228-229. The proposed subclass was unascertainable, because it would cover all individuals who were removed from their IEPs for any reason, as opposed to just students removed specifically due to the NPS Directive. *Id.* at 238. This expansive subclass resulted from the fact that it would be difficult, if not impossible, to identify students whose services were terminated for reasons unrelated to the directive. *Id.*

Plaintiffs point to "objective" criteria that will purportedly allow the Checkpoint Class to be ascertained. Dkt. No. 211, p. 33. Use of objective criteria alone is not enough to establish ascertainability "when those criteria, taken together, do not establish the definite boundaries of a readily identifiable class." *Brecher*, 806 F.3d at 25. Here, Plaintiffs' "objective" criteria do nothing more than create an overbroad class and arbitrary boundaries resulting in a quagmire of uncertainty. As in *M.G.*, Plaintiffs' method for determining membership in the Checkpoint Class will include

individuals ticketed and/or arrested unrelated to a Checkpoint.  Therefore, the Checkpoint Class is not ascertainable.

Because Plaintiffs have failed to show that the Proposed Damages Classes are ascertainable, class certification must be denied.

**B.      The Proposed Damages Classes Do Not Satisfy the Requirements of Rule 23(b)(3).**

   **1.      <u>Predominance</u>**

Rule 23(b)(3)'s predominance requirement is even more demanding than that in Rule 23(a).  *See Johnson*, 780 F.3d at 139 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).  A predominance inquiry requires the Court to examine (1) the elements of the claims and defenses; (2) whether individualized proof will be needed to establish each class member's entitlement to relief; and (3) whether common issues will be overwhelmed by individual issues. *Johnson*, 780 F.3d at 138 (holding that where damages for the entire class had to be decided on an individual basis, plaintiffs failed to meet the predominance method of litigation).  The purpose of this requirement is to "ensure[] that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Jackson*, 2019 WL 7288508, at *7 (citing *Myers*, 624 F.3d at 547).

An individualized question is one where members of the proposed class "will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof."  *Betances*, 2023 WL 8699001, at *21 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).  As discussed in the City

Defendants' commonality argument, there are **no common questions** here due to the inherent differences in the circumstances surrounding each ticket and arrest.  There are different circumstances surrounding every traffic stop.  Even if Plaintiffs were able to demonstrate certain common questions, which they are not, individual questions would predominate over any potentially common ones.  To avoid the City Defendants' *Townes* defense, each class member will have to offer evidence that the challenged ticket(s) and/or arrest(s) were invalid.  These individualized assessments exist at the very core of Plaintiffs' Proposed Damages Classes.  They cannot be avoided.

While the possibility that damages may have to be determined on an individualized basis is not an automatic bar to class certification, the Court must consider individualized damages as a factor in the predominance analysis.  *See Jackson*, 2019 WL 7288508, at *9; *In re Terrorist Attacks on Sep. 11, 2001*, 2021 WL 640257, at *7 (S.D.N.Y. Jan. 22, 2001).  There is no avoiding this reality: the question of damages is inherently highly individualized because "both liability and damages are contested and there is no ready reference for calculating either individual economic or non-economic losses."  *In re Terrorist Attacks*, 2021 WL 640257, at *8.  Plaintiffs have completely failed to show that common questions predominate over individual ones.  This failure dooms their motion for class certification.

## 2. <u>**Superiority**</u>

For the same reasons the Proposed Damages Classes fail to satisfy the predominance requirement, the classes fail to satisfy the superiority requirement.  *See Betances*, 2023 WL 8699001, at *24 ("But, for the same reasons that common issues no longer predominate, it is no longer sensible to manage the case as a class action.").  Courts weigh the

following factors when determining whether a proposed class meets the superiority requirement: (1) the class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. *Jackson*, 2019 WL 7288508, at *7 (citing Fed. R. Civ. P. 23(b)(3)(A)-(D)).  The more individual determinations are required, the less likely superiority can be established. *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 99 (S.D.N.Y. 2010).

Where, as here, class membership and entitlement to relief would need to be determined with a series of mini-trials, "a class action is not a feasible, let alone superior, method for the fair, efficient, and manageable adjudication" of the class's claims. *See Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 142 (S.D.N.Y. 2003); *see also Betances*, 2023 WL 8699001, at *24.  A class action is not the superior method of adjudicating the Proposed Damages Class members' claims, no matter how strenuously Plaintiffs argue.

On account of Plaintiffs' failure to meet their burdens of proof as to commonality, typicality, adequacy, ascertainability, predominance, and superiority, the Court should deny Plaintiffs' motion to certify the Proposed Damages Classes.

## POINT II.     CERTIFICATION OF THE PROPOSED INJUNCTIVE CLASS IS IMPROPER.

### A.     The Court Should Deny Certification of the Proposed Injunctive Class Because the Class Definition Relies Upon Speculative Injuries.

"[N]o class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).  In order to establish standing to

seek injunctive relief, Plaintiffs bear the burden of establishing that they have sustained or are "immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *MacNamara v. City of N.Y.*, 275 F.R.D. 125, 140 (S.D.N.Y. 2011) (citing *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). To satisfy this burden, Plaintiffs cannot rely upon a past injury but must show a likelihood of future injury and the existence of an official policy or equivalent that will cause the injury. *Id.*; *see also O'Shea v. Littleton*, 414 U.S. 488, 495-496 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."). Plaintiffs' arguments regarding the likelihood of future injuries are too speculative to establish standing, especially since the Checkpoints they challenge have been discontinued. Commissioner Gramaglia confirmed under oath that he has no plans to reinstate the Checkpoints. Gramaglia Dep. 1 at 181:19-182:10. There is virtually no likelihood of future injury from Checkpoints.

The same is true of traffic enforcement inquiries generally. In *MacNamara*, several class representatives' expected plans to attend demonstrations in New York in the future at unspecified dates and times did not translate into real and immediate threats of future injury. 275 F.R.D. at 141. These indefinite future plans were insufficient to support a likelihood of future harm. *Id.* at 140. The Court held that the chain of inferences was "simply too speculative and conjectural to supply a predicate for prospective injunctive relief." *Id.* at 141 (citing *Shain*, 356 F.3d at 216). Because certification under Rule 23(b)(2) is only proper where the relief sought applies to the class as a whole, the Court denied the motion for class certification. *Id.* That provision applies here. The relief would not be available to the Proposed Traffic

38

Enforcement Class, as a whole, because the Court would have to speculate regarding whether the class is likely to encounter traffic enforcement in the City, specifically unconstitutional traffic enforcement.

Named Plaintiff, Shaketa Redden, lives in Oakland, California.  Dkt. No. 63 ¶ 359.  Ms. Redden has indeterminate future plans to "visit her family and friends who remain in Buffalo and to drive during those visits."  *Id.*  Named Plaintiff Charles Palmer resides in Charlotte, North Carolina and has only generic plans to visit Buffalo in the future.  *See* Palmer Dep. at 14:10-14:19; 16:21-16:23.  These indeterminate plans mirror those rejected in *MacNamara* are and insufficient to show real and immediate threat of injury.

Plaintiffs' requested injunctive relief also fails to demonstrate a real and immediate threat of repeated, imminent injury because "the prospect of future injury rests on the likelihood" that the class members will be pulled over, ticketed, and/or subjected to Checkpoints. *See O'Shea*, 414 U.S. at 496.  In *O'Shea*, plaintiffs sought injunctive relief prohibiting racially discriminatory enforcement of criminal laws in retaliation for their exercise of First Amendment rights.  *Id.* at 500.  The Court held that plaintiffs' "general assertions or inferences" that they would be subject to future violations of the law were not enough to demonstrate a likelihood of future injury.  *Id.* at 497.  The same analysis holds here.  Plaintiffs' speculative assertions that Black and Latino individuals will be subjected to traffic stops, tickets, and Checkpoints are not enough.

To the extent that plaintiffs point to *Floyd v. City of N.Y.*, 283 F.R.D. 153, 160 (S.D.N.Y. 2012) to try and rebut this argument, they miss the mark.  In *Floyd*, the plaintiffs

challenged New York City's stop and frisk policy, which allowed officers to stop and frisk individuals even without reasonable suspicion.  *Id.* at 159.  *Floyd* is distinguishable for two main reasons: (1) the risk of injury there did not rely upon unlawful conduct and (2) the race of an individual being stopped and frisked out in public is readily ascertainable.  The Court in *Floyd* noted that the likelihood of a named plaintiff being stopped and frisked was not speculative because the risk of future injury did not depend on their unlawful conduct.  *Id.* at 170.  As a result, the named plaintiff could not avoid injury by following the law because the challenged stops required no suspicion to institute.  *Id.*  Unlike in *Floyd*, the present case deals with traffic stops.  Officers may only conduct traffic stops where they have probable cause to believe that the driver has committed a VTL violation or is otherwise engaged in criminal activity.  *Di Pompo*, 2022 WL 463317 at *2.  An individual can avoid a traffic stop by obeying the law, where the same is not necessarily true of a stop and frisk.

Plaintiffs may try to rebut this point by arguing that the BPD stopped motorists because of their race.  This is contrary to the evidence.  BPD officers repeatedly testified that a motorist's race is not relevant to their decision to pull the motorist over.  *See* Freely Decl., Exhibit 3 dated October 26, 2022 (hereinafter "Young Dep.") at 72:18-72:21; Freely Decl., Exhibit 15 dated (hereinafter "Lockwood Dep. 1) at 90:7-90:9; Gramaglia Dep. 2 at 43:8-43:23.  Additionally, the race of a motorist is not readily ascertainable unlike the race of an individual walking out in public.  Indeed, officers may not even see the driver until after the vehicle is stopped and the officer approaches the vehicle.  *See* Freely Decl., Exhibit 8 dated March 5, 2021 (hereinafter "Skipper Dep.") at 155:22-156:17.[6]  Therefore, *Floyd* is readily distinguishable from

---

[6] This is especially true during evening hours, when Strike Force primarily operated.

the present case.  Unlike *Floyd*, the likelihood of future injury Plaintiffs assert is too speculative to confer standing: Plaintiffs rely upon the assumption that they will have their vehicle stopped, when the reality is they can avoid the stop by complying with the VTL and Penal Law.

The uncertain nature of the future injury also makes Plaintiffs' requested injunction "intrusive and unworkable."  *O'Shea*, 414 U.S. at 500.  In *O'Shea*, the plaintiffs sought an injunction "aimed at controlling or preventing the occurrence of specific events that might take place in the course of future criminal trials."  *Id.*  The Court held that plaintiff's requested injunction would present difficulty measuring claims of noncompliance, problems regarding proof of noncompliance, and the "continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings is in sharp conflict with the principles of equitable restraint which this Court has recognized . . ."  *Id.* at 501.  In *O'Shea*, the class action was not permitted to proceed.  *Id.*

Here, Plaintiffs seek an order that would unquestionably intrude into municipal and state proceedings without any workable standard for ensuring compliance.  Specifically, Plaintiffs seek an order:

> (i) enjoining Defendants from conducting vehicle Checkpoints for the purpose of general crime control; targeting Buffalo motorists for traffic stops, tickets, and Checkpoints based on their race or ethnicity; and performing traffic stops and Checkpoints for improper pecuniary purposes;
>
> (ii) mandating Defendants implement programs and policies for supervision, monitoring accountability, training, and discipline to reduce the risk of racially discriminatory traffic enforcement;
>
> (iii) requiring the BPD to document all traffic stops and tickets in sufficient detail required for independent supervisory review for compliance with the Fourth Amendment, Fourteenth Amendment, and Title VI of the Civil Rights Act and to ensure the documentation is retained in a single, up-to-date database.

Dkt. No. 211, pp. 48-49.  Plaintiffs' requested relief begs the same questions raised in *O'Shea*:

how will these subjective orders be issued; what standards will govern claims of noncompliance;

and, is it appropriate for federal courts to repeatedly impose their judgment on state traffic and

criminal proceedings?  Federal courts, which of course are courts of limited jurisdiction, are

generally not  in the business of micromanaging state courts, municipal agencies, or the traffic

enforcement of municipal police departments.  Accordingly, the Court should deny certification

of the Proposed Injunctive Class.

### **CONCLUSION**

For these compelling reasons and the very real specter of countless mini-trials,

Plaintiffs' motion for class certification should be denied in its entirety.


Dated:       July 12, 2024


**HODGSON RUSS LLP**
*Attorneys for Defendants City of Buffalo, NY, Byron
B. Brown, Byron C. Lockwood, Daniel Derenda,
Aaron Young, Kevin Brinkworth, Philip Serafini,
Robbin Thomas, Unknown Supervisory Personnel
1-10, and Unknown Officers 1-20*


By: *Cheyenne Freely*
       Hugh M. Russ III, Esq.
       Peter Sahasrabudhe, Esq.
       Cheyenne N. Freely, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000
*hruss@hodgsonruss.com*
*psahasra@hodgsonruss.com*
*cfreely@hodgsonruss.com*