UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

BLACK LOVE RESISTS IN THE RUST, *et al.*,
individually and on behalf of a class of all others
similarly situated,

                        Plaintiffs,

      v.

CITY OF BUFFALO, N.Y., *et al.*,

                      Defendants.

No. 1:18-cv-00719-CCR

---

## **PLAINTIFFS' REPLY IN SUPPORT OF CLASS CERTIFICATION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

I.   THE CITY GROSSLY MISREPRESENTS PLAINTIFFS' DAMAGES CLAIMS .......... 2

    A.   Plaintiffs' Fourth Amendment Damages Claims Challenge Unlawful
    Detentions, Not Tickets and Impounds .................................................................. 3

    B.   Plaintiffs Need Not Establish That Tickets Were Unjustified to Prevail on
    Their Equal Protection and Title VI Claims .......................................................... 4

    C.   Plaintiffs' Structural Due Process Claims Do Not Require Individualized
    Inquiry ................................................................................................................... 6

II.  THE CITY FAILED TO REBUT PLAINTIFFS' SHOWING THAT THE
    PROPOSED CLASSES SATISFY RULE 23(a) ............................................................ 7

    A.   The Proposed Classes Satisfy Commonality ......................................................... 7

    B.   The Proposed Classes Satisfy Typicality .............................................................. 9

    C.   The Proposed Classes Satisfy Adequacy ............................................................. 10

    D.   The Proposed Classes Are Ascertainable ............................................................ 11

III. THE DAMAGES CLASSES SATISFY PREDOMINANCE UNDER RULE
    23(b)(3) ....................................................................................................................... 13

    A.   Because Plaintiffs Allege Harm Caused by Municipal Policy and Practice,
    the City's Liability Is Necessarily a Common Question ...................................... 13

    B.   Claims for General Damages Are Inherently Common ........................................ 15

    C.   Damages for Tickets and Impounds Are Individualized, but They Do Not
    Defeat Predominance Because They Are Easily Calculated ................................. 17

    D.   Other Individualized Damages Are Highly Unlikely to Arise in Significant
    Number, and the Court Has Tools to Manage Them ............................................ 19

IV.  A CLASS ACTION IS SUPERIOR, AND PLAINTIFFS HAVE A SOUND
    METHODOLOGY FOR IDENTIFYING CHECKPOINT CLASS MEMBERS ........... 19

V.   THE TRAFFIC ENFORCEMENT CLASS SATISFIES RULE 23(b)(2) ...................... 21

    A.   Plaintiffs Have Standing to Seek Injunctive Relief ............................................. 21

    B.   The City's Arguments Against Injunctive Relief Are Baseless ............................ 24

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. Immigr. and Customs Enf't Div. of U.S. Dep't of Homeland Sec.*,
  2012 WL 1344417 (S.D.N.Y. Apr. 16, 2012)..........................................................................8

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)...............................................................................................2, 24

*Amnesty Am. v. Town of W. Hartford*,
  361 F.3d 113 (2d Cir. 2004)...........................................................................................5

*Barnes v. District of Columbia*,
  278 F.R.D. 14 (D.C. Cir. 2011) .....................................................................................16

*Betances v. Fischer*,
  -- F.3d --, 2023 WL 8699001 (S.D.N.Y. Dec. 15, 2023)...................................................16, 17

*Betances v. Fischer*,
  2022 WL 765963 (S.D.N.Y. Mar. 14, 2022) ..................................................................16, 17

*Brown v. Kelly*,
  244 F.R.D. 222 (S.D.N.Y. 2007), *aff'd* 609 F.3d 467 (2d Cir. 2010)................................14, 19

*Butler v. Suffolk County*,
  289 F.R.D. 80 (E.D.N.Y. 2013) ....................................................................................19

*Casale v. Kelly*,
  257 F.R.D. 396 (S.D.N.Y. 2009) ...................................................................................25

*City of Indianapolis v. Edmond*,
  531 U.S. 32 (2000)........................................................................................................3

*Coleman v. Town of Brookside, Ala.*,
  663 F. Supp. 3d 1261 (N.D. Ala. 2023)...........................................................................6

*Cox v. Spirit Airlines, Inc.*,
  341 F.R.D. 349 (E.D.N.Y. 2022), *amended on reconsideration in part*, 2023
  WL 1994201 (E.D.N.Y. Feb. 14, 2023)...........................................................................20

*Daniels v. City of New York*,
  198 F.R.D. 409 (S.D.N.Y. 2001) .....................................................................................9

*Davis v. City of New York*,
  296 F.R.D. 158 (S.D.N.Y. 2013) .................................................................................8, 25

*Dellums v. Powell*,
566 F.2d 167 (D.C. Cir. 1977) ........................................................................................16

*Di Pompo v Mendelson*,
2022 WL 463317 (S.D.N.Y. Feb. 15, 2022) .......................................................................3

*Floyd v. City of New York*,
283 F.R.D. 153 (S.D.N.Y. 2012) .........................................................................8, 22, 24, 25

*Floyd v. City of New York*,
959 F. Supp. 2d 540 (S.D.N.Y. 2013)...................................................................... *passim*

*Floyd v. City of New York*,
959 F. Supp. 2d 668 (S.D.N.Y. 2013)..............................................................................25

*Hyland v. Navient Corp.*,
48 F.4th 110 (2d Cir. 2022) ............................................................................................21

*Jensen v. Cablevision Systems Corp.*,
372 F. Supp. 3d 95 (E.D.N.Y. 2019) ................................................................................9

*Kerman v City of New York*,
374 F.3d 93 (2d Cir. 2004)......................................................................................15, 16

*Langan v. Johnson & Johnson, Consumer Cos.*,
897 F.3d 88 (2d Cir. 2018).............................................................................................20

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018)...............................................................................9

*Ligon v. City of New York*,
288 F.R.D. 72 (S.D.N.Y. 2013) ...........................................................................9, 22, 25

*M.G. v. New York City Department of Education*,
162 F. Supp. 3d 216 (S.D.N.Y. 2016)..............................................................................12

*Macarz v. Transworld Sys., Inc.*,
193 F.R.D. 46 (D. Conn. 2000)........................................................................................20

*MacNamara v. City of New York*,
275 F.R.D. 125 (S.D.N.Y. 2011) ...............................................................................14, 22

*Malley v. Briggs*,
475 U.S. 335 (1986)..........................................................................................................4

*McNeil v. City of Buffalo*,
2023 WL 2574954 (W.D.N.Y. Feb. 24, 2023) ..................................................................23

iv

*Mendez v. The Radec Corp.*,
   260 F.R.D. 38 (W.D.N.Y. 2009)................................................................................7

*Morrow v. Washington*,
   277 F.R.D. 172 (E.D. Tex. 2011)......................................................................8, 23

*In re Nassau County Strip Search Cases*,
   2009 WL 706252 (E.D.N.Y. Mar. 16 2009) ...........................................................16

*In re: Nassau County Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006)..........................................................................14, 21

*Nat'l Cong. for Puerto Rican Rts. v. City of New York*,
   75 F. Supp. 2d 154 (S.D.N.Y. 1999)......................................................................22

*O'Shea v. Littleton*,
   414 U.S. 488 (1974).................................................................................23, 24

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017).................................................................11, 12, 13

*Plaintiffs # 1-21 v. County of Suffolk*,
   2021 WL 1255011 (E.D.N.Y. Mar. 12, 2021) .......................................8, 18, 22, 24

*Shain v. Ellison*,
   356 F.3d 211 (2d Cir. 2004)...............................................................................22

*Stinson v. City of New York*,
   282 F.R.D. 360 (S.D.N.Y. 2012) ...........................................................8, 21, 22, 25

*In re Terrorist Attacks on September 11, 2001*,
   2021 WL 640257 (S.D.N.Y. Jan. 22, 2021) ...........................................................18

*Torres v. City of New York*,
   590 F. Supp. 3d 610 (S.D.N.Y. 2022).....................................................................6

*Townes v. City of New York*,
   176 F.3d 138 (2d Cir. 1999)....................................................................... *passim*

*Tyson Foods Inc. v. Bouaphakeo¸*
   577 U.S. 442 (2016)..........................................................................................15

*Umbrino v. L.A.R.E. Partners Network, Inc.*,
   585 F. Supp. 3d 335 (W.D.N.Y. 2022) ..................................................................13

*United States v. Gomez*,
   877 F.3d 76 (2d Cir. 2017)..................................................................................24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)............................................................................................4

*Vincent v. Annucci*,
    63 F. 4th 145 (2d Cir. 2023) ..........................................................................17

*In re Visa Check/MasterMoney Antitrust Litigation*,
    280 F.3d 123 (2d Cir. 2001)......................................................................18, 19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...................................................................................7, 8, 9

*Warner v. Orange Cnty. Dep't of Probation*,
    115 F.3d 1068 (2d Cir. 1996)............................................................................4

*Whitehorn v. Wolfgang's Steakhouse, Inc.*,
    275 F.R.D. 193 (S.D.N.Y. 2011) ......................................................................9

*Whren v. U.S.*,
    517 U.S. 806 (1996).........................................................................................5

**Other Authorities**

William Prosser & W. Page Keeton, *The Law of Torts* § 11 (5th ed. 1984) ................................15

## INTRODUCTION

Plaintiffs brought this class action lawsuit to hold the City of Buffalo accountable for longstanding racially discriminatory traffic enforcement practices that have deeply injured Black and Latino communities.  Plaintiffs identified two specific municipal policies and practices that inflicted severe economic and dignitary harms on Black and Latino motorists—the Checkpoint Policy and multiple Tinted Windows ticketing—and seek class-wide redress, pursuant to Rule 23(b)(3), for the damage these municipal policies and practices caused.  Plaintiffs further allege that BPD officers continue today to engage in racially discriminatory traffic enforcement, and the City is deliberately indifferent to this harm.  To redress ongoing and future discrimination, Plaintiffs seek injunctive relief pursuant to Rule 23(b)(2) to reform BPD's traffic enforcement practices. Given their tight focus on harms caused by specific municipal policies, Plaintiffs claims satisfy every element of Rule 23 and therefore warrant class certification.

The City grounds its opposition in a series of false narratives that this Court should reject. First, the City invokes the dreaded specter of "mini-trials," which it asserts are necessary to determine the validity of each and every traffic stop.  **No mini-trials are necessary in this case**. Plaintiffs can prevail on their Fourth Amendment, Equal Protection, Due Process, and Title VI class claims <u>regardless</u> of the validity of the individual stops because they stem from a unitary policy and practice.  And because Plaintiffs need not and will not seek to prove that the underlying stops of Checkpoint and Tinted Windows class members lacked adequate individual justification, the City will have no occasion to raise its threatened "*Townes* defense."

Next, the City insists that determining damages will involve too many individualized questions.  The City conveniently ignores that the bulk of the damages Plaintiff seek are either general damages—which are particularly appropriate for class-wide adjudication because class members need not individually plead and prove them—or compensatory damages for fines and

fees extracted from class members, the exact amounts of which are stored for each individual in the City's own records.  This level of individualized recovery is commonplace in nearly every b(3) action and certainly not a basis to deny certification.

Undergirding the City's brief is a series of blatantly improper merits arguments, under which the City attempts to convince the Court to deny class certification because it has allegedly done nothing wrong.  Under binding Supreme Court precedent, however, this Court may consider the merits only insofar as necessary to resolve whether Plaintiffs have met the elements of Rule 23.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013).  Here, the City's evidence demonstrates only what Plaintiffs have argued all along: policing in the City of Buffalo occurs pursuant to municipal policies and widespread practices established and condoned by the City's highest policymakers.  The question whether such policies and practices are discriminatory or otherwise unlawful is efficiently and appropriately resolved in a single action on behalf of every single individual harmed by the specific policies and practices at issue.

As for the injunctive class, the City utterly fails to rebut Plaintiffs' showing that the proposed Traffic Enforcement Class meets all the elements of Rule 23(a) and (b)(2).  The City instead raises two implausible defenses: that the class lacks standing and an injunction would be unworkable (Opp'n at 37-41).  The City's arguments lack merit and directly conflict with established precedent.  This Court should grant Plaintiffs' motion for class certification in all respects.

## I.   THE CITY GROSSLY MISREPRESENTS PLAINTIFFS' DAMAGES CLAIMS

The City devotes much of its brief, including an entire section called "Merits-Based Considerations," to mischaracterizing Plaintiffs' damages claims and the relief sought in a

misguided effort to compensate for the weakness of its positions on the Rule 23 factors.[1]  Here, Plaintiffs set the record straight.

### A. Plaintiffs' Fourth Amendment Damages Claims Challenge Unlawful Detentions, Not Tickets and Impounds

The City mischaracterizes Plaintiffs' Fourth Amendment claims as attempting to challenge tickets and impounds at Checkpoints.  This is false.

Checkpoint Class members claim that the City violated their Fourth Amendment rights by subjecting them—as a matter of municipal policy and practice—to unlawful detentions at Checkpoints, without individualized suspicion, in violation of *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000).  *See* Opening Br. at 36.  The City's reliance on *Di Pompo v Mendelson*, 2022 WL 463317, at *2 (S.D.N.Y. Feb. 15, 2022), fails because Plaintiffs' Fourth Amendment claims are not premised on the issuance of tickets or impounds.  *Di Pompo* actually *supports* Plaintiffs' claims by *allowing* a Fourth Amendment claim based on the initiation of a traffic stop without reasonable suspicion.  *Id.*

Likewise, *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999), unequivocally supports Plaintiffs' claims by establishing as a matter of law that "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy"—which is what Plaintiffs seek in this case for violations of their Fourth Amendment rights.  Members of the Checkpoint Class suffered unlawful detentions at Checkpoints prior to their ticketing or arrest, and *Townes* makes clear they may recover for this harm.[2]  Plaintiffs do not seek class-wide damages for traffic tickets, arrests, and vehicle impounds under the Fourth Amendment.

---

[1] See Appendix A for a table summarizing, for each Class, the claims brought and relief sought.

[2] In *Townes,* the plaintiff disclaimed any damages from the initial invasion of privacy and instead sought damages only for his arrest, prosecution, and incarceration.  *Id.* at 149.  The Second Circuit rejected his claims for *post*-arrest damages, ruling that the intervening, independent actions of the (continued…)

**B.      Plaintiffs Need Not Establish That Tickets Were Unjustified to Prevail on Their Equal Protection and Title VI Claims[3]**

The City errs in assuming that resolution of the Equal Protection and Title VI damages claims turns on a judicial determination of the propriety of individual stops (Opp'n at 13).  Each class will ask the jury to determine whether *a specific municipal policy or practice*—the Checkpoint Policy for the Checkpoint Class and the targeting of Black and Latino motorists for multiple tinted windows tickets for the Tinted Windows Class—was motivated at least in part by race.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977).  Answering this question does not require particularized factfinding at a stop-by-stop level.

Under the common-law tort principles that underlie § 1983 causation, defendants "are responsible for the natural consequences of their actions."  *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986); *Warner v. Orange Cnty. Dep't of Probation*, 115 F.3d 1068, 1071 (2d Cir. 1996).  Therefore, if the Checkpoint Class succeeds in establishing that the City targeted Checkpoints specifically at Black and Latinx communities, at least in part because of the racial demographics of those communities, the City will be liable for the foreseeable consequences that follow.  Given that the BPD's written policies directed officers operating Checkpoints to evaluate each car methodically for violations of the Vehicle and Traffic Law and issue tickets for all possible violations, ECF 205-0—and eliminated officer discretion to do otherwise, ECF 203-9 at 23—tickets and impounds are obviously foreseeable harms of the Checkpoint Policy.  The intent of the individual officers operating Checkpoints need not be adjudicated because the harm flows directly from the

---

prosecutor and the judge broke the chain of causation, and the arrest itself was based on probable cause.  *Id.* at 147-49.  But that does not mean that damages for unlawful detention prior to arrest are *never* available, only that Mr. Townes did not ask for them.

[3] The Equal Protection and Title VI claims are essentially identical.

discriminatory policy.[4]  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) (municipal liability arises when employee enforces an unconstitutional policy).

Similarly, the Tinted Windows Class alleges and will prove at trial that the BPD had a widespread practice of issuing multiple tinted windows tickets in a single stop specifically to Black and Latino drivers and that the City's highest policymakers allowed these practices to continue unabated, ratifying the practice.  Under Plaintiffs' theory, the City's intentional failure to act to prevent discriminatory harm caused officers to continue engaging in racially discriminatory tinted windows ticketing.  The tickets that ensued from the racially discriminatory policy are thus recoverable as damages regardless of the intent of the individual officer who issued them.  *See id.*

If the jury finds that the City's Checkpoint and multiple tinted windows ticketing policies were motivated at least in part by race, it will be no defense that the tickets and arrests were justified.  The Supreme Court has established that a racially-motivated traffic stop is still unlawful, even if supported by probable cause.  *Whren v. U.S.*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."); *see also Floyd v. City of New York*, 959 F. Supp. 2d 540, 666–67 (S.D.N.Y. 2013) (the success of an Equal Protection claim does not turn on proving that stops of Black and Latino motorists "are suspicionless").  Applying the same logic, a ticket issued pursuant to a racially discriminatory policy is still unlawful even if supported by probable cause.

---

[4] If the individual officer acted with discriminatory intent when issuing multiple tinted windows tickets at a particular stop, that would constitute an independent violation of the Equal Protection Clause.  But Plaintiffs need not establish discriminatory intent at the individual officer level if they can show that the municipal policy itself was discriminatory and caused them injury.

**C.      Plaintiffs' Structural Due Process Claims Do Not Require Individualized Inquiry**

Despite the discussion in Plaintiffs' Opening Brief clearly grounding the Due Process claim in the Supreme Court's conflict-of-interest jurisprudence (Opening Br. at 38-39), the City pretends that Plaintiffs bring a standard procedural due process claim.  Not so.  Plaintiffs do not dispute the adequacy of procedural protections provided by New York law, nor do they claim that the BTVA's procedures for adjudicating traffic tickets violate due process.  Adjudicating Plaintiffs' due process claims will not require the Court to determine whether individual class members received adequate process.  *Torres v. City of New York*, 590 F. Supp. 3d 610 (S.D.N.Y. 2022), discussed on pages 13–14 of the City's brief, is thus irrelevant to Plaintiffs' claims.

As the Opening Brief describes (Opening Br. at 39), Plaintiffs will prove at trial that the City created a constitutionally intolerable ticketing incentive by tying production expectations to overtime opportunities, which incentivized officers to earn more money by issuing more tickets.[5] Under the incentive scheme, officers understood that they should issue tickets and impound vehicles in order to justify and receive overtime opportunities—which directly boosted their salaries and pension benefits.  Such schemes pose *structural* violations of the Due Process Clause and are appropriate for class treatment because the same structural defect applies to each class member: the system itself is biased.  Should members of the Checkpoint or Tinted Windows class prevail on their Due Process claims, they will be entitled to recover damages for the tickets and impounds issued under the defective policy.  *Cf. Coleman v. Town of Brookside, Ala.*, 663 F. Supp. 3d 1261, 1270, 1277 (N.D. Ala. 2023) (denying motion to dismiss class claims based on structural due process violation).

---

[5] The City's brief bizarrely and incorrectly describes the overtime and BTVA evidence as supporting only the Title VI claim.

## II.  THE CITY FAILED TO REBUT PLAINTIFFS' SHOWING THAT THE PROPOSED CLASSES SATISFY RULE 23(a)

The City *concedes* that the Traffic Enforcement Class satisfies all requirements of Rule 23(a) and all Classes satisfy numerosity.[6]  The City argues that the Checkpoint and Tinted Windows Classes fail to meet the commonality, typicality, and adequacy requirements and that the Checkpoint class is not ascertainable.  The City's brief demonstrates a lack of familiarity with core class action principles, fails to engage with the case law Plaintiffs cited, and relies on blatant mischaracterizations of Plaintiffs' claims.

### A.  The Proposed Classes Satisfy Commonality

The City properly asserts that "there must be common answers to questions that are capable of classwide resolution" (Opp'n at 19), but then refuses to address the abundance of common questions posed in the Opening Brief ( Opening Br. at 25-27).  Plaintiffs listed 11 such questions for the Checkpoint Class and eight for the Tinted Windows Class.  The City does not explain why these questions do not pass muster.  Nor could they.  Each of the questions Plaintiffs posed "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  For example, one common question for both Classes is whether the specific municipal policy or practice at issue was motivated by race. Clearly, these are central questions for the Equal Protection claims: if answered in Plaintiffs' favor, all class members are one step closer to winning, but if answered in the City's favor, all class members will lose unless they can establish deliberate indifference to racial discrimination.  *All* of the 19 questions Plaintiffs posed go to the heart of their claims in this way.

---

[6] Having failed to raise any objections, the City has waived the right to do so at a later stage.  *See e.g.*, *Mendez v. The Radec Corp.*, 260 F.R.D. 38, 44 (W.D.N.Y. 2009).

Though unclear, the City appears to be making a misplaced analogy to *Wal-Mart* itself, in which commonality was lacking. *Wal-Mart*, one of the largest class actions ever certified, was a nationwide class action challenging "literally millions of employment decisions," each made by tens of thousands of individual managers who operated independently, without any central governing policy. *Id.* at 342–43, 352. That is a far cry from this case, in which each proposed Class challenges one specific policy or practice of a single police department.

In *Floyd v. City of New York*, 283 F.R.D. 153, 173 (S.D.N.Y. 2012), and many other cases, district courts have rejected the same argument the City makes here. *Floyd* distinguished *Wal-Mart* because NYC had "a single stop and frisk program," under which officers "are required to use the tactic as a central part of the Department's pro-active policing [policy]." *Id.* The same logic applies to the Checkpoint policy.

*Floyd* also observed: "Since *Wal-Mart*, at least three district courts have granted class certification in cases alleging Fourth and Fourteenth Amendment violations due to a police department's policy and/or practice of making unlawful stops and arrests; all of these courts have rejected the notion that the individual circumstances of a stop defeat commonality." *Id.* at 173-74 (citing *Stinson v. City of New York*, 282 F.R.D. 360 (S.D.N.Y. 2012); *Morrow v. Washington*, 277 F.R.D. 172 (E.D. Tex. 2011); *Aguilar v. Immigr. and Customs Enf't Div. of U.S. Dep't of Homeland Sec.*, 2012 WL 1344417 (S.D.N.Y. Apr. 16, 2012)). And while the City attempts to rely on *Plaintiffs # 1-21 v. County of Suffolk*, 2021 WL 1255011 (E.D.N.Y. Mar. 12, 2021), the court in that case also found commonality satisfied—not because it "assumed" commonality, as the City wrongly asserts (Opp'n *at* 23), but because the "questions are similar to the common questions presented in other unlawful stop cases that Courts certified to proceed as class actions." *County of Suffolk*, 2021 WL 1255011, at *13 & n.45 (citing *Floyd*, 283 F.R.D. at 174 n.138; *Davis v. City*

*of New York*, 296 F.R.D. 158, 166 n.50 (S.D.N.Y. 2013); *Ligon v. City of New York*, 288 F.R.D. 72, 82 (S.D.N.Y. 2013); *Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001)).  Plaintiffs cited all of these cases in their Opening Brief (Opening Br. at 28), but the City fails to distinguish Plaintiffs' cases and makes no effort to explain why commonality would be present in those cases but absent here under nearly identical circumstances.

The bulk of the City's argument (Opp'n at 20-27) boils down to a complaint that individualized damages preclude certification—which is not properly part of the commonality analysis at all.[7]  "Because commonality does not mean that all issues must be identical as to each member, the need for an individualized determination of damages suffered by each class member generally does not defeat the requirement."  *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 275 F.R.D. 193, 199 (S.D.N.Y. 2011).  And because "even a single common question will do," *Wal-Mart*, 564 U.S. at 359, Plaintiffs more than satisfy the commonality requirement for all proposed Classes.

### B.    The Proposed Classes Satisfy Typicality

The City argues that the proposed class representatives are not typical because they claim to have unique defenses as to some class members that do not apply to all (Opp'n at 27-28).  In support of this proposition, the City cites *Jensen v. Cablevision Systems Corp.*, 372 F. Supp. 3d 95, 122 (E.D.N.Y. 2019), in which the class representative had opted out of a mandatory arbitration agreement that bound nearly all class members, and *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 461 (S.D.N.Y. 2018), which cautions: "the court should not disqualify a named plaintiff based upon any groundless, far-fetched defense that the defendant manages to articulate."

---

[7] Plaintiffs address damages in their discussion of predominance under Rule 23(b)(3).

Here, the City asserts only "groundless, far-fetched" defenses, based on a fundamental misapprehension of Plaintiffs' claims.  For example, the City asserts as possible unique defenses "the inability for the Proposed Checkpoint Class to recover under the Fourth Amendment for tickets given at Checkpoints" and the "*Townes* defense" which it plans to use against "all class members whose tickets and arrests were validly issued and made, respectively" (Opp'n at 28). None of these defenses apply, however, because Plaintiffs' claims do not turn on proving that individual tickets and arrests were invalid.  *See* Part I.  Additionally, Plaintiffs do not seek damages under the Fourth Amendment for tickets and arrests at Checkpoints.  Plaintiffs seek Fourth Amendment damages only for unlawful detention prior to arrest and ticketing, and the City has not identified any unique defenses to *that* claim.  Nor do any exist.

### C.      The Proposed Classes Satisfy Adequacy

The City's adequacy argument echoes its typicality argument, and it fails for the same reasons.  The City does not question the adequacy of Plaintiffs' counsel, but rather attacks the proposed class representatives as deserving of their tickets and therefore barred from seeking damages that other class members could seek.  The City raises the specter of "mini-trials to determine the validity of their tickets and/or arrests" and accuses Plaintiffs of seeking to "re-litigate the dispositions of traffic tickets adjudicated in the New York court system or by the BTVA" (Opp'n at 31).  Plaintiffs seek no such thing.

This Court should not concern itself with this parade of horrors.  As previously explained, Plaintiffs do not bring Fourth Amendment claims for unlawful tickets or arrests, nor do their Equal Protection, Title VI, or Due Process claims turn on the validity of tickets and impounds leveled against them.  Class representatives and class members are entitled to the same categories of damages (though amounts may differ, as discussed below).  There is no conflict of interest between class representatives and members.

### D.      The Proposed Classes Are Ascertainable

The City attacks only the Checkpoint Class as lacking ascertainability (Opp'n at 32-35), conceding that the Tinted Windows and Traffic Enforcement classes *are* ascertainable.  The City's ascertainability discussion contains numerous egregious errors of law.

First, the City cites the wrong legal standard.  In the Second Circuit, ascertainability begins and ends with the class definition:   "The ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017).

The proposed class definition for the Checkpoint Class meets this standard.  The definition is: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015."  (Opening Br. at 3).  The definition is objective.  The class is defined as all individuals who experienced a certain action, at a certain location, during a certain period of time.  *See Petrobras*, 862 F.3d at 269 ("securities purchases identified by subject matter, timing, and location" are "clearly objective" and "sufficiently definite").  This Court will have no problem determining the boundaries of the class: any given individual either received a ticket or was arrested at a Checkpoint during the specified time frame, or not.  Further, while the City does not specifically contest the ascertainability of the other two Classes, all three class definitions rely on similarly objective and definite criteria.

The City refuses to engage with the actual class definitions Plaintiffs have proposed, perhaps because the City knows they work.  The City argues instead that "only members issued invalid tickets and arrested improperly are appropriate members of the classes."  (Opp'n at 32). To the contrary, the "appropriate" members of the classes are those who fit the definitions, and Plaintiffs' proposed class definitions do not require the Court to determine the validity of tickets

and arrests.  (Nor do Plaintiffs' substantive claims.)  This Court should reject the City's attempt to rewrite Plaintiffs' class definitions.

The Checkpoint Class definition is not overbroad.  The Checkpoint Class alleges and will prove at trial that *all* Checkpoints violated the Fourth Amendment because they were operated primarily for improper law enforcement purposes or failed to meet the special needs exception, and that *all* Checkpoints violated the Equal Protection Clause and Title VI because the City's choice of checkpoint locations was motivated at least in part by the racial demographics of Buffalo's segregated neighborhoods.  Every class member has the same claim; every class member suffered the same injury.  This case is thus very different from *M.G. v. New York City Department of Education*, 162 F. Supp. 3d 216, 238 (S.D.N.Y. 2016), in which a proposed subclass would have contained disabled students who lost services from their IEPs *for any reason*, not exclusively because of the policy challenged in the lawsuit.[8]  Whereas the proposed class in *M.G.* would have contained many individuals whose injuries did not flow from the challenged policy but from other, independent sources, the proposed Checkpoint Class consists entirely of people subjected to the BPD's unlawful and discriminatory Checkpoint program.

The City criticizes Plaintiffs' choice to include as class members only those individuals ticketed or arrested at Checkpoints, rather than all people who passed through Checkpoints (Opp'n at 11).  Constraining the class in this way reflects an appropriate narrowing to ensure that the Checkpoint class contains only individuals who (a) can be identified via City and court records; and (b) experienced more than *de minimis* harm.  People who passed through Checkpoints without

---

[8] *M.G.* was decided before *Petrobras*, and though *M.G.* characterized the overbroad subclass as "unascertainable," the court's use of the word is not consistent with the narrowed construction set forth in *Petrobras*.  An overbroad class definition raises questions of standing and predominance, not ascertainability.  Regardless, in this case Plaintiffs' proposed class definitions are not overbroad.

ticket or arrest experienced violations of their Fourth and Fourteenth Amendment rights, but their detentions were comparatively minimal and without economic consequence.  In contrast, those ticketed or arrested at Checkpoints suffered unlawful detentions of up to an hour prior to the ticket or arrest.  A detention of that length constitutes a substantial invasion of privacy that is compensable under the Fourth Amendment.  Moreover, under the Fourteenth Amendment and Title VI, these same individuals are entitled to recover financial compensation for unlawful tickets and impounds.  Plaintiffs' proposed Checkpoint class definition thus includes all people who suffered compensable harm at Checkpoints—and nobody who did not.

The City's remaining arguments against the ascertainability of the Checkpoint Class pertain to the mechanics of class member identification.  Under *Petrobras*, 862 F.3d at 269 & n.20, this Court may *not* consider this practical challenge as part of the ascertainability analysis, but rather as part of the balancing inquiry required under Rule 23(b)(3).

## III.    THE DAMAGES CLASSES SATISFY PREDOMINANCE UNDER RULE 23(b)(3)

The City has advanced two main theories against class certification:  First, that each traffic stop presents its own unique circumstances, and second, that individualized damages predominate.  Neither argument prevails under the circumstances of this case.  Here, as explained in Part  II.A, the City's liability is a common question.  Damages, too, are either common or a matter of mechanical extraction from the City's own records.  Under such circumstances, common questions predominate.

### A.    Because Plaintiffs Allege Harm Caused by Municipal Policy and Practice, the City's Liability Is Necessarily a Common Question

"When plaintiffs are allegedly aggrieved by a single policy of defendants, the case presents precisely the type of situation for which the class action device is suited since many nearly identical litigations can be adjudicated in unison."  *Umbrino v. L.A.R.E. Partners Network, Inc.*, 585 F.

13

Supp. 3d 335, 361 (W.D.N.Y. 2022).  In this case, the Checkpoint and Tinted Windows class members seek redress for harms caused by specific municipal policies and practices.  Thus, "the predominant issue here turns not on the circumstances of particular" stops but on "the existence of a policy or practice . . . whether or not individualized probable cause existed." *MacNamara v. City of New York*, 275 F.R.D. 125, 146 (S.D.N.Y. 2011).  As in *Brown v. Kelly*, 244 F.R.D. 222, 237-38 (S.D.N.Y. 2007), *aff'd* 609 F.3d 467 (2d Cir. 2010), and *In re: Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006), core *Monell* questions, such as whether the City (1) maintained unconstitutional policies that (2) caused injury to Checkpoint and Tinted Window class members, predominate.  The City's position that Plaintiffs have "no common questions" (Opp'n at 36) lacks all credibility.

*Townes* does not create individual defenses because that case applies only to claims Plaintiffs do not bring (classwide Fourth Amendment challenges to issuance of tickets and impounds) and bars only damages Plaintiffs do not seek.  *See* Part 1.A.  *Townes* does not provide a defense to the Equal Protection claims, which are actionable regardless of whether the tickets of individual class members are supported by probable cause.  *See* Part 1.B.

The City criticizes the expert report of Michael Gennaco as comprised of "countless individual inquiries" (Opp'n at 24).  But Gennaco offered the anecdotes, not as examples of potentially harmed class members (many IAD complainants do not fall within the Checkpoint or Tinted Windows class definitions), but to explain the basis for his overarching opinion that the BPD's accountability procedures and practices, including the operation of Internal Affairs Department, fall far below industry standards to the point that the BPD is incapable of identifying and addressing racial discrimination.  *See generally* ECF 203-2.  Gennaco's testimony is persuasive evidence of the City's past and continuing deliberate indifference to racial

discrimination—and every single class member can rely on his testimony. Gennaco's report thus *supports*, not undermines, commonality and predominance. *Tyson Foods Inc. v. Bouaphakeo*¸ 577 U.S. 442, 454–60 (2016) (expert testimony supported predominance finding where all class members could rely on it in the same way).

### B.      Claims for General Damages Are Inherently Common

The City's discussion of general damages (Opp'n at 24-27) demonstrates a fundamental misunderstanding of the concept. The City primarily appears to argue that because liability cannot be determined on a classwide basis, general damages would also be inappropriate. "General damages" is not a synonym for "class damages," however, but rather a specific category of damages that courts have authorized for certain constitutional violations. General damages are awarded when the constitutional violation indisputably causes harm, but the harm is nonspecific and difficult to quantify. Under Second Circuit precedent, even an individual plaintiff may be entitled to general damages, depending on the nature of the constitutional injury.

In *Kerman v City of New York*, 374 F.3d 93, 125 (2d Cir. 2004), the Second Circuit held in an individual case that "general damages" are available for unlawful detentions that violate the Fourth Amendment, like those experienced by members of the Checkpoint Class. As the Second Circuit explained, once the defendant is found to have caused an unlawful deprivation of liberty, "the plaintiff is entitled to an award of compensatory damages as a matter of law." *Id.* at 124. The tort "is complete with even a brief restraint of the plaintiff's freedom," and "it is not necessary that any damage result from it other than the confinement itself." *Id.* at 125 (quoting William Prosser & W. Page Keeton, *The Law of Torts* § 11, at 48 (5th ed. 1984)). General damages are thus "inseparable from" the confinement itself while "separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering." *Id.* at 125–26.

15

Should members of the Checkpoint and Tinted Windows Classes establish a class-wide violation of the Equal Protection Clause, they will likewise seek general damages for the dignitary harm of being subjected to racial discrimination. Like unlawful deprivations of liberty under the Fourth Amendment, the personal degradation caused by an Equal Protection violation is inseparable from the violation itself and need not be specifically pleaded and proved.

Because general damages are "inseparable from" the constitutional violation itself and need not be specifically pleaded and proven, *id.* at 125, they are particularly appropriate for class administration. In their Opening Brief (Opening Br. at 55-56), Plaintiffs cited a series of cases in which courts approved general damages in class actions, including *In re Nassau County Strip Search Cases*, 2009 WL 706252, at *2-3 (E.D.N.Y. Mar. 16 2009); *Dellums v. Powell*, 566 F.2d 167, 174 n.6 (D.C. Cir. 1977); *Barnes v. District of Columbia*, 278 F.R.D. 14, 20-21 (D.C. Cir. 2011); and *Betances v. Fischer*, 2022 WL 765963, at *11-12 (S.D.N.Y. Mar. 14, 2022). Plaintiffs cited these cases to demonstrate that district courts have awarded general damages in a class context and to illustrate the various methodological approaches courts have applied to help the jury determine the amount of general damages to award, which must be based solely on the inherent gravity of the constitutional harm and not the unique impact of that harm on each individual class member.[9] While the precise methodology to be applied in this case is an appropriate subject for the Rule 16 pretrial conference, the cases cited offer several reasonable approaches.

Finally, the recent decertification of *Betances v. Fischer*, -- F.3d --, 2023 WL 8699001 (S.D.N.Y. Dec. 15, 2023) ("*Betances VII*"), does not undermine Plaintiffs' entitlement to general

---

[9] Defendants dispute the applicability of these cases, citing their familiar refrain that establishing liability in this case depends on too many individualized considerations. Plaintiffs have already demolished this argument.

damages. *Betances VII* did not hold that a need for individualized inquiries "precluded general damages," as the City argues (Opp'n at 26). To the contrary, *Betances VII* recognized class members' continuing entitlement to general damages for "the inherent value of a day of lost liberty," which it characterized as a "common issue." *Id.* at *22. *Betances* was decertified because an intervening Second Circuit decision, *Vincent v. Annucci*, 63 F. 4th 145 (2d Cir. 2023), established that each class member had substantial individual damages *in addition to* general damages, and that assessing such damages (including the compensable length of each person's unlawful detention) involved complex individual inquiries. *Betances VII* at *22–23. Therefore, while the *Betances* court noted that it could "[i]n theory" hold a class trial on general damages, the fact that other categories of damages required individual trials meant that common questions of damages no longer predominated over individual ones. *Id.*

In this case, unlike in *Betances*, the balance is different and favors certification. As discussed below, while Checkpoint and Tinted Windows class members have some individualized damages resulting from different assessments of tickets and impound fees, the economic harm to each class member is recorded in the City's records. Calculating the amount of each person's economic harm is straightforward and does not involve the same complex factual determinations as *Betances* required post-*Vincent*. Furthermore, *Betances* specifically acknowledged that, despite subsequent decertification in the damages phase, "there is no doubt that the common policy and failures to act that lie at the heart of Defendants' liability were best addressed by proceeding as a class." *Betances VII* at *24. *Betances VII* thus reaffirms the correctness of the court's original decision to certify the class and supports certification here.

C.   **Damages for Tickets and Impounds Are Individualized, but They Do Not Defeat Predominance Because They Are Easily Calculated**

17

Plaintiffs readily recognize they may be entitled to individual damages. Specifically, if Checkpoint and/or Tinted Windows Class members prevail on their Equal Protection, Title VI, and/or Due Process claims, Class members will be entitled to recover for economic harms including ticket and impound debt. (If the City disputes Plaintiffs' entitlement to this category of damages, that will pose yet another common question to weigh in favor of class certification.) These types of straightforward individual damages are routinely handled in class actions throughout this circuit, *see In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 123, 139 (2d Cir. 2001), and Plaintiffs cited at least seven relevant examples in their Opening Brief (Opening Br. at 42-44). The City does not so much as mention any of Plaintiffs' cases.

Instead, the City relies on *In re Terrorist Attacks on September 11, 2001*, 2021 WL 640257 (S.D.N.Y. Jan. 22, 2021). In that case, damages were extremely complex, as one would expect from the aftermath of a terrorist attack that caused mass casualties. Damages calculations included "both economic and non-economic damages" based on "the deceased's earnings capacity," "the relationship between the putative class member and the deceased," and "offsets from collateral source compensation, where permitted." *Id.* at *8. Such a scenario clearly has little applicability to the present case, in which individualized damages primarily consist of economic costs incurred for traffic tickets and impounds—and the City admits that it has electronic records of such costs that it can produce upon request. ECF 209-1; ECF 209-3.

Likewise, the City's invocation of *County of Suffolk* fails. There, the true barrier to class certification was the thousands of individual liability determinations required just to establish class membership, thanks to the inclusion of "unlawfully" as part of the class definition. 2021 WL 1255011, at *18. *County of Suffolk* did not hold that routine, mechanical damages calculations predominate over common questions of liability.

18

**D.     Other Individualized Damages Are Highly Unlikely to Arise in Significant Number, and the Court Has Tools to Manage Them**

Hypothetically, a few class members may seek to recover more substantial individual damages, such as lost employment income, emotional distress, and the like.  But Plaintiffs do not currently know of any unnamed class members who wish to assert such damages.

In *Butler v. Suffolk County*, 289 F.R.D. 80, 102 (E.D.N.Y. 2013), the court considered a similar prospect.  Recognizing that common questions included whether jail conditions were "cruel or inhuman in violation of the Eighth and Fourteenth Amendments," whether "Defendants were deliberately indifferent to the conditions," and "whether administrative remedies were unavailable," the court found that "these issues predominate over the issues subject to individualized proof—namely the extent of each class members' damages."  *Id.*  Noting the plethora of management tools available,[10] the court had "the flexibility to deal with issues regarding the management of this class action as they arise," so that "individualized questions regarding damages does not warrant denying certification."  *Id.*  The same holds true here.

## IV.     A CLASS ACTION IS SUPERIOR, AND PLAINTIFFS HAVE A SOUND METHODOLOGY FOR IDENTIFYING CHECKPOINT CLASS MEMBERS

In their Opening Brief (Opening Br. at 53-57), Plaintiffs laid out a thorough case for the superiority of the class mechanism over individual actions.  The City failed to grapple with any of the arguments Plaintiff raised, merely parroting its familiar refrain.

As part of its ascertainability argument, however, the City denounced Plaintiffs' methods for identifying members of the Checkpoint class.  The City's criticisms are wildly overblown: for

---

[10] These include (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damage proceedings; and (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages in separate proceedings after the liability trial. *Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 141; *Brown*, 609 F.3d at 486.

example, the City argues that Plaintiffs "randomly" focused on time periods and geographic areas to identify Class members (Opp'n at 33).  To the contrary:  Plaintiffs used the City's own records to pinpoint the time and location of each Checkpoint, and then searched electronic ticket data to identify tickets issued at those times and locations.  This is not a random process, but a surgical method to cull from a database of *all* tickets only those highly likely to have been issued at a Checkpoint.  Plaintiffs can then match those tickets to individuals using City and State databases. *See generally* ECF 210-0 (describing methodology).

Over-inclusivity at the notice stage is not a problem.  *Macarz v. Transworld Sys.*, *Inc.*, 193 F.R.D. 46, 61 (D. Conn. 2000) (ordering notice to a 25% overinclusive list).  Rule 23(c)(2)(B) does not require perfection.  Instead, it directs "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Plaintiffs' proposed procedure handily meets this test.

To be sure, the Court must eventually ensure that damages are distributed only to class members.  But this final assurance is typically made much later in the litigation, at the proof of claim stage.  For example, in *Macarz*, the court certified a class comprised of all individuals in Connecticut who had received a certain debt collection letter about a non-business debt—despite the fact that the defendant's records could not reliably distinguish between business and non-business debts.  In approving class certification, the court noted that "any disputes regarding whether a particular class member's debt is consumer or commercial can be remedied through proper drafting of the claim form, and at the damages phase of this case."  *Id.* at 57; *see also Langan v. Johnson & Johnson, Consumer Cos.*, 897 F.3d 88, 91 n.2 (2d Cir. 2018) (approving use of sworn affidavits to establish when class members purchased baby oil); *Cox v. Spirit Airlines, Inc.,* 341 F.R.D. 349, 372-73 (E.D.N.Y. 2022), *amended on reconsideration in part*, 2023 WL

1994201 (E.D.N.Y. Feb. 14, 2023) (using "sworn affidavits or proofs of claim" to confirm when class members flew for the first time). As in these cases, a well-drafted claim form or sworn affidavit will ensure that only people issued tickets or arrested at Checkpoints (as opposed to near Checkpoints) can recover damages. There is no manageability issue here.

Moreover, without the class action mechanism, thousands of Checkpoint and Tinted Windows class members "likely never will know that defendants violated their clearly established constitutional rights, and thus never will be able to vindicate those rights." *In re Nassau County Strip Search Cases*, 461 F.3d at 229. A class action is clearly superior.

## V.    THE TRAFFIC ENFORCEMENT CLASS SATISFIES RULE 23(b)(2)

The City does not refute Plaintiffs' showing that the Traffic Enforcement Class satisfies every element of Rule 23(a) and b(2), arguing instead that Plaintiffs lack standing and an injunction would interfere with judicial proceedings. These misguided arguments must fail.

### A.    Plaintiffs Have Standing to Seek Injunctive Relief

The City relies on inapposite cases to argue that the "likelihood of future injuries are too speculative to establish standing" (Opp'n at 38), ignoring the heavy weight of precedent in Plaintiffs' favor. To obtain injunctive relief, Plaintiffs must demonstrate that a "real and immediate threat of repeated injury" is "likely, as opposed to merely speculative," and that the defendant maintains a policy, practice, or custom that would cause that injury. *Stinson*, 282 F.R.D. at 381–82. If even a single named plaintiff has standing, the class action may proceed. *Hyland v. Navient Corp.*, 48 F.4th 110, 117-18 (2d Cir. 2022).[11]

---

[11] The City cites *Denney v. Deutsche Bank AG* for the proposition that "[N]o class may be certified that contains members lacking Article III standing." 443 F.3d 253, 264 (2d Cir. 2006). However, once "there is a named plaintiff with the requisite standing, there is no requirement that the members of the class also proffer such evidence." *Hyland*, 48 F. 4th at 118 n.1.

In analogous police discrimination cases, courts have found that the combination of repeated past incidents and an official policy or its equivalent rises above the level of speculation, establishing standing. *See, e.g.*, *County of Suffolk*, 2021 WL 1255011 at *10 n.39; *Ligon*, 288 F.R.D. at 81; *Stinson*, 282 F.R.D. at 382; *Nat'l Cong. for Puerto Rican Rts. v. City of New York*, 75 F. Supp. 2d 154, 160 (S.D.N.Y. 1999). "The possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Floyd*, 283 F.R.D. at 169.

This case differs from *MacNamara*, 275 F.R.D. at 140, in which the protester plaintiffs had only "indeterminate future plans to participate in New York City protests . . . of unspecified date, duration, or scope." Here, Plaintiffs have an actual, demonstrated need to continue driving in the City of Buffalo as part of their daily lives. ECF 202-1–202-9.[12] *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004), is even less persuasive. There the plaintiff would likely never again have faced arrest by the same police agency that subjected him to an unconstitutional strip search. *Id.* Here, in contrast, Plaintiffs will continue to drive in Buffalo, routinely exposing themselves to discriminatory traffic enforcement.

Plaintiffs unquestionably have standing under the governing rule. Plaintiffs have all attested to past discriminatory traffic stops, most to more than one instance, *see* ECF 202-1–202-9, and have presented abundant evidence of discriminatory intent and that the City is deliberately indifferent to ongoing racially discriminatory traffic enforcement, causing such practices to continue. *See* Opening Br. at 13–21 (cataloguing evidence of animus and deliberate indifference); ECF 203-2 at 98-107. Moreover, statistically significant racial disparities persisted throughout

---

[12] Defendants' objection to the standing of Plaintiffs Redden and Palmer, citing *MacNamara*, is baseless. Even those two plaintiffs, who no longer live in Buffalo, have plans to visit Buffalo that are more concrete than the plaintiffs in *MacNamara*, as they have already visited since moving away. *See* Charles Palmer Dep. 17 ("Sometimes" came to Buffalo to see family); Shaketa Redden Dep. 31–32 ("I come back at least once or twice a year every year to Buffalo.").

2023, the most recent period for which data is available.  Wilner Decl. Ex. A.  The City's argument completely disregards the record of past injuries and continuing policies and practices, including ongoing racial disparities.

Nor does *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974), convince.  Before their future injuries could conceivably have occurred, the *O'Shea* plaintiffs would have had to experience a chain of questionable events (be arrested, charged with a crime, and then be subjected to bond proceedings, sentencing, or trial).  *Id.* at 496.  No similar chain of inferences applies here.  Because of the City's ongoing deliberate indifference, Plaintiffs run the risk of experiencing unconstitutional traffic enforcement simply "while going about [their] daily li[ves]."  *See Floyd*, 283 F.R.D. at 169–70.[13]

In the face of class members' likelihood of future injury, the City disingenuously argues that Plaintiffs "can avoid [a traffic] stop by complying with the VTL and Penal Law" (Opp'n at 40).  This is both false and a telling misapprehension of Equal Protection jurisprudence.  Considering the ongoing police discrimination to which the City is deliberately indifferent, Plaintiffs could easily be stopped despite violating no traffic laws.  Plaintiffs have sworn to multiple instances of BPD officers subjecting them to traffic stops that did not result in any tickets or in which a court later dismissed their tickets.  *See e.g.*, ECF 202-1, 202-3, 202-8, 202-9; *see also McNeil v. City of Buffalo*, 2023 WL 2574954, *7 (W.D.N.Y. Feb. 24, 2023), *report and recommendation adopted*, 2023 WL 2573379 (W.D.N.Y. Mar. 20, 2023) (alleging wrongful vehicle

---

[13] Defendants argue that future harm from Checkpoints is speculative because the practice has been discontinued (p. 38).  However, the Manual of Procedures still authorizes the Checkpoints, and current Commissioner Gramaglia testified that he can restart them at any time.  ECF 219-1 at 181:14–17, 182:11–14.  Under such circumstances, Plaintiffs' request for injunctive relief as to Checkpoints is not moot.  *See Morrow v. Washington*, 277 F.R.D. 172, 199 (E.D. Tex. 2011).  But even if it were, the Checkpoints represent only one aspect of Buffalo's unconstitutional policing practices which, as discussed above, are widespread and ongoing.

stop and search arising out of "a policy and/or custom to target minorities for traffic infractions and reward officers for writing as many tickets as possible").

The City ineptly attempts to distinguish *Floyd* by claiming that the challenged stops there "required no suspicion to institute" (Opp'n at 40).  However, NYPD policy required reasonable suspicion to stop and frisk, *Floyd*, 283 F.R.D. at 163, just as officers must have reasonable suspicion or probable cause to initiate a traffic stop.  *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017).  The City's assertion that Plaintiffs can avoid traffic stops by obeying the law but the plaintiffs in *Floyd* could not by doing the same is absurd.  As for the City's attempts to distinguish *Floyd* by arguing that BPD officers do not engage in racial discrimination—these are nothing more than "free-ranging merits inquiries" that this Court has "no license" to resolve at the class certification stage.  *Amgen*, 568 U.S. at 465–66.[14]

### B.    The City's Arguments Against Injunctive Relief Are Baseless

Finally, the City raises the specious argument, relying on *O'Shea*, that Plaintiffs' requested relief would "intrude into municipal and state proceedings" (Opp'n at 41).  This argument fails because Plaintiffs do not seek an injunction directed at judicial proceedings of any kind.

If the City's argument were correct, *all* federally imposed relief against *all* state and local agencies would be forbidden as "micromanaging" (Opp'n at 42).  However, that is not the case; courts routinely certify classes seeking the kinds of relief Plaintiffs have requested.  *E.g. County of Suffolk*, 2021 WL 1255011, *17 (E.D.N.Y. Mar. 12, 2021) (requested relief included collecting and analyzing traffic stop data, appointing an independent monitor, establishing a Citizen

---

[14] The same is true of the City's nonsensical assertion that Plaintiffs' expert "ignores the racial composition of Buffalo's neighborhoods" (p. 12), when fully half of Dr. Bjerk's report is precisely *about* that racial composition.  Whatever the City may or may not be trying to say, it is not for resolution on this motion, since the Bjerk report is all about *aggregate* behavior of the BPD and raises no individual issues at all.

Complaint Review Board, and implementing a comprehensive training program); *Stinson*, 282 F.R.D. at 363 (requested relief included "immediate remedial training" for "all current members of the NYPD" and a comprehensive monitoring system); *Floyd*, 283 F.R.D. at 177 (requesting "a broad-based structural injunction");[15] *Davis* 296 F.R.D., at 167 (requesting "a uniform injunctive remedy involving reforms to the City's policies and practices"); *Ligon*, 288 F.R.D. at 76 (requesting "an order requiring the NYPD to create and implement new policies, training programs, and monitoring and supervisory procedures that specifically address the problem of unconstitutional trespass stops"); *Casale v. Kelly*, 257 F.R.D. 396, 404 (S.D.N.Y. 2009) (requesting "city-wide remedial policies aimed at eliminating the enforcement" of anti-loitering laws and expungement of related criminal records).

As the court explained in *Floyd*:

[I]f the [BPD] is engaging in a widespread practice of unlawful stops, then an injunction seeking to curb that practice is not a "judicial intrusion into a social institution" but a vindication of the Constitution and an exercise of the courts' most important function: protecting individual rights in the face of the government's malfeasance.

283 F.R.D. at 178.

This Court should certify the Traffic Enforcement Class.

## CONCLUSION

This Court should grant Plaintiffs' motion in all respects.

---

[15] For a description of the comprehensive injunctive relief ultimately ordered, see *Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013).

Dated: August 9, 2024                          Respectfully submitted,


Matthew Alan Parham                            Claudia Wilner
WESTERN NEW YORK LAW CENTER                    Edward Krugman
Cathedral Park Tower                           Anjana Malhotra
37 Franklin Street, Suite 210                  NATIONAL CENTER FOR LAW
Buffalo, NY 14202                              AND ECONOMIC JUSTICE
716-828-8415                                   50 Broadway, Suite 1500
mparham@wnylc.com                              New York, NY 10004
                                               212-633-6967
                                               wilner@nclej.org
                                               krugman@nclej.org
Philip A. Irwin (*pro hac vice*)               malhorta@nclej.org
Jordan S. Joachim (*pro hac vice*)
Christine Nelson (*pro hac vice*)
Andrew Timmick (*pro hac vice*)                Chinyere Ezie
COVINGTON & BURLING LLP                        Baher Azmy
620 Eighth Avenue                              CENTER FOR CONSTITUTIONAL
New York, NY 10018                             RIGHTS
212-841-1000                                   666 Broadway, 7th Floor
pirwin@cov.com                                 New York, NY 10012
jjoachim@cov.com                               212-614-6475
cnelson@cov.com                                cezie@ccrjustice.org
atimmick@cov.com                               bazemy@ccrjustice.org


*Counsel for Plaintiffs*

# APPENDIX A

CLASSES

| | < --------------------------------------------- **CLAIMS** --------------------------------------------- > | | |
|---|---|---|---|
| | *Fourth Amendment* | *Equal Protection/Title VI* | *Due Process* |
| **Checkpoint Class**: All individuals who received a ticket or were arrested at a BPD "traffic safety" vehicle checkpoint on or after June 28, 2015. | • General Damages<br>• Punitive Damages<br>• Fees, costs, and other appropriate relief | • General Damages<br>• Compensatory Damages<br>• Equitable Disgorgement<br>• Punitive Damages<br>• Fees, costs, and other appropriate relief | • General Damages<br>• Compensatory Damages<br>• Equitable Disgorgement<br>• Punitive Damages<br>• Fees, costs, and other appropriate relief |
| **Tinted Windows Class**: All Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015. | N/A | • General Damages<br>• Punitive Damages<br>• Fees, costs, and other appropriate relief | • General Damages<br>• Compensatory Damages<br>• Equitable Disgorgement<br>• Punitive Damages<br>• Fees, costs, and other appropriate relief |
| **Traffic Enforcement Class**: All Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and "traffic safety" vehicle checkpoints by the BPD | • Injunctive Relief<br>• Fees, costs, and other appropriate relief | • Injunctive Relief<br>• Fees, costs, and other appropriate relief | • Injunctive Relief<br>• Fees, costs, and other appropriate relief |

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2024, the foregoing document and accompanying motion papers were filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System.

*/s/ Claudia Wilner*