UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLACK LOVE RESISTS IN THE RUST, *et al.*, individually and on behalf of a class of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BUFFALO, N.Y., *et al.*,<br><br>Defendants. | No. 1:18-cv-00719-CCR |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF CLASS CERTIFICATION**

Plaintiffs respectfully submit this supplemental brief in further support of their Motion for Class Certification (ECF 202), pursuant to the Court's Order at the October 23, 2024, oral argument (ECF 238). Along with this supplemental briefing, Plaintiffs respectfully rely on their fully briefed motion and oral argument concerning the same.

**I.   CLARIFICATION OF PLAINTIFFS' POSITION ON DAMAGES**

Given that Plaintiffs do not know of any putative class members who wish to seek the recovery of individual, personal-injury style damages, and in light of the concerns raised by the Court at oral argument, the Checkpoint and Tinted Windows Classes <u>will not seek</u> to recover damages for consequential harms, such as emotional distress and lost wages, which must be

1

proven by individual class member testimony and other personalized evidence. Any class members who wish to seek such damages may do so by excluding themselves from the class as provided by Rule 23(c)(2)(B). Because class representatives and class members seek the same categories of damages, no conflict of interest exists between the two, and the adequacy requirement is still met.

The Checkpoint and Tinted Windows Classes <u>will continue to seek</u>: (1) general damages in an amount determined by the jury;[1] (2) punitive damages in an amount determined by the jury; (3) direct economic damages, consisting of the fines and fees that class members paid in connection with tickets and impounds; and (4) equitable disgorgement of the same. As discussed in Plaintiffs Opening Brief (ECF No. 211 at 55–56) and Reply Brief (ECF No. 223 at 22-25), these forms of damages are either inherently common among class members (in the case of general and punitive damages) or unambiguously established by business records, such that no factual or evidentiary determinations are required. ECF No. 223 at 24-25; *see also* Fed. R. Evid. 803(6). Furthermore, because class members' entitlement to economic damages and disgorgement does not stem from the Fourth Amendment or any procedural Due Process claim, there are no defenses unique to individual class members that require adjudication, as previously explained. *See* ECF No. 223 at 8, 10-14, 17.

Given that all liability questions are common, and damages are either common or easily calculated, the Checkpoints and Tinted Windows Classes unquestionably meet Rule 23(b)(3)'s requirements of predominance and superiority. *Id., accord Roach v. T.L. Cannon Corp.*, 778 F.3d

---

[1] Plaintiffs have not assigned a dollar figure (*e.g.* $100 per motorist) to the general damages recoverable by class members, because this is the province of the jury to decide. Instead, Plaintiffs have proposed a process, or formula, by which a jury can determine such amounts, with the understanding that Defendants are free to propose alternate criteria. *See* ECF No. 211 at 55-56 (discussing approach and collecting related cases); ECF No. 223 at 22-23 (same).

401, 409 (2d Cir. 2015) ("[I]ndividualized damages determinations alone cannot preclude certification under Rule 23(b)(3)"). This Court should certify the damages classes.

## II. THIS COURT SHOULD CERTIFY THE TRAFFIC ENFORCEMENT CLASS UNDER RULE 23(b)(2)

Plaintiffs' proposed Traffic Enforcement Class seeks prospective, injunctive relief to end the City's unlawful and discriminatory traffic enforcement policies and practices that target Black and Latino motorists. These policies and practices include systematically targeting Black and Latino motorists for traffic stops and tickets based on their race and the racial demographics of the neighborhoods in which they happen to be driving, in violation of the Equal Protection Clause and Title VI of the Civil Rights Act, and failing to take steps necessary to eliminate these practices. To prevail on this claim at trial, Plaintiffs will prove that the City has demonstrated deliberate indifference to, and is the moving force behind, ongoing racially discriminatory traffic enforcement practices.[2]

---

[2] The expert testimony of Michael Gennaco, as reflected in his Expert Report, will support both deliberate indifference (by outlining areas in which BPD's policies fall below generally accepted standards) and causation (by contextualizing how widespread accountability failures within police departments encourage ongoing violations of constitutional rights to persist). The expert testimony of David Bjerk will provide evidence of ongoing statistical disparities in traffic stops and citations. The expert testimony of Robert Silverman will also support discriminatory intent by providing evidence of Buffalo's long history of discriminatory policing and other municipal practices. Plaintiffs also plan to prove discriminatory intent through documentary evidence and witness testimony. *See, e.g., Plaintiffs #1-21 v. Cnty. of Suffolk*, No. 15-cv-2431, 2021 WL 11629176, at *7 (E.D.N.Y. Aug. 5, 2021) (denying summary judgment to class of all Latinos who could be subject to a traffic stop in Suffolk County on Equal Protection claims challenging discriminatory enforcement); *Plaintiffs #1-21 v. Cnty. of Suffolk*, No. 15-CV-2431, 2021 WL 1255011, at *9 (E.D.N.Y. Mar. 12, 2021), *report and recommendation adopted*, No. 15-CV-2431, 2021 WL 1254408 (E.D.N.Y. Apr. 5, 2021) (granting class). *See also Wilkins v. City of Chicago*, No. 23-CV-04072, 2024 WL 2892840, at *4 (N.D. Ill. June 10, 2024); *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013); *Davis v. City of New York*, 959 F. Supp. 2d 324, 359-65 (S.D.N.Y. 2013); *Aikman v. Cnty. of Westchester*, 491 F. Supp. 2d 374, 383 (S.D.N.Y. 2007), *on reconsideration in part*, 691 F. Supp. 2d 496 (S.D.N.Y. 2010); *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 549–53 (S.D.N.Y. 2006).

3

Rule 23(b)(2) provides for class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of (b)(2) class actions. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (citing Adv. Comm. Notes, 28 U.S.C. App., p. 697). The Rule "reflects a series of decisions involving challenges to racial segregation—conduct that was remedied by a single classwide order." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361 (2011). That is exactly the relief Plaintiffs request in this case: a single, class-wide order directing the City to modify its policies and procedures to prevent the BPD from engaging in racially motivated traffic stops and ticketing and retaining jurisdiction until such time as the City can establish compliance, as courts have readily done in similar contexts involving unconstitutional police practices.

### A. Plaintiffs' Proposed Class Definition Is Ascertainable and Consistent with Class Definitions the Second Circuit Has Approved in Rule 23(b)(2) Actions

In the Second Circuit, ascertainability requires only that "a proposed class is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec. Lit.*, 862 F.3d 250, 269 (2d Cir. 2017). Plaintiffs' proposed definition for the Traffic Enforcement Class meets this "modest threshold." *Id.* The proposed definition is: "All Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." The definition is objective, in that it describes a particular subset of drivers—those who are Black and/or Latino *and* subjected to traffic stops, traffic tickets, and "traffic safety" vehicle checkpoints. The class members are easily identified because the City maintains records of traffic stops, traffic tickets, and Checkpoints. People who are neither Black nor Latino are not class members. Black and/or Latino individuals who have no

4

experience with traffic stops, traffic tickets, or Checkpoints are not class members either.[3] The class has definite boundaries. And the class definition is similar to class definitions found ascertainable in other cases challenging discriminatory policing. *See, e.g.*, *County of Suffolk*, 2021 WL 1255011, at *9, *16 ("All Latino or Latina persons who, at any time after January 2012, have been or in the future will be subject to a vehicular or pedestrian stop or detention by an agent of the Suffolk County Police Department in the county of Suffolk.").[4] If anything, Plaintiffs' proposed class definition is narrower than that approved in *County of Suffolk*, as the definition in that case encompassed not only past and future individuals subject to traffic stops, but also those subject to pedestrian stops.

The fact that the class definition encompasses future class members whose identity is not currently known—those who "will be subjected" to traffic stops, tickets, and Checkpoints—does not render the definition unascertainable. 2021 WL 1255011, at *16 ("[C]lasses for injunctive relief can include future members."); *see also Westchester Indep. Living Ctr. v. State Univ. of N.Y, Purchase College*, 331 F.R.D. 279, 299 (S.D.N.Y. 2019) (certifying class defined as "all people with mobility disabilities who use or *will use* pedestrian rights-of-way at SUNY Purchase")[5]; *Abdi v. Duke*, 323 F.R.D. 131, 136 (W.D.N.Y. 2017) (certifying class defined as "all arriving

---

[3] This is true as to future class members as well. At any moment in time, the identities of all those who, through that moment, have been subjected to traffic enforcement are completely and objectively ascertainable. As set forth below, the cases agree that this type of definition meets the ascertainability requirement

[4] *See also Melendres v. Arpaio*, 989 F. Supp. 2d 822, 826 (D. Ariz. 2013) ("[A]ll Latino persons who, since January 2007, have been or will be ... stopped, detained, questioned or searched by [Defendants'] agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona."); *In re Cincinnati Policing*, 209 F.R.D. 395, 397-98 (S.D. Ohio 2002) ("All African–American or Black persons and people perceived as such who reside, work in and/or travel on public thoroughfares in the City of Cincinnati, Ohio either now or in the future and who are stopped, detained, or arrested by Cincinnati Police Officers").

[5] Emphasis added to all citations in this paragraph.

asylum-seekers who have passed a credible fear interview and who are or *will be* detained at the Buffalo Federal Detention Facility and who have not been granted parole") (subclass subsequently decertified based on intervening change in controlling law). Inclusion of future members is a frequent feature of (b)(2) class definitions, and the Second Circuit has often approved such definitions. For example, in *Sykes v. Mel S. Harris and Associates*, the Second Circuit affirmed certification of a (b)(2) class defined as "all persons who have been *or will be* sued by the Mel Harris defendants as counsel for the Leucadia defendants in actions commenced in New York City Civil Court and where a default judgment has been *or will be* sought." 780 F.3d 70, 79 (2d Cir. 2015). And in *Barrows v. Becerra*, the Second Circuit affirmed a *nationwide* class consisting of "[a]ll Medicare beneficiaries who, on or after January 1, 2009 . . . have received *or will have received*" certain services. 24 F.4th 116, 130 n.54 (2d Cir. 2022). In *Marisol A. v. Giuliani*, the Second Circuit approved certification of two classes consisting of "children who are *or will be* in the custody of the New York City Administration for Children's Services ('ACS')" and "children who, while not in the custody of ACS, are or *will be* at risk of neglect or abuse and whose status is or should be known to ACS." 126 F.3d 372, 378 (2d Cir. 1997); *see also Elisa W. v. City of New York*, 82 F.4th 115, 119 (2d Cir. 2023) ("all children who are now *or will be* in the foster care custody of the Commissioner of New York City's Administration for Children's Services").

Inclusion of future members does not pose a class management problem because of the nature of the (b)(2) class: individualized notice is "not obligatory, and the relief sought is injunctive rather than compensatory." *Westchester Indep. Living Ctr.*, 331 F.R.D. at 299 (citing *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 419 n.3 (S.D.N.Y. 2012)). Rule 23(b)(2) applies "only when a single injunction or declaratory judgment would provide

6

relief to each member of the class." *Wal-Mart Stores*, 564 U.S. at 360. Because relief consists of a single injunction directed to the defendants, the court need not specifically identify each plaintiff class member who will benefit from the change in policy. Given that the Rule's drafters designed the (b)(2) mechanism to provide relief to classes "*whose members are incapable of specific enumeration*," "precise ascertainability" is "unnecessary" in (b)(2) class actions. *Floyd v. City of New York*, 283 F.R.D. 153, 171 (S.D.N.Y. 2012) (quoting Advisory Committee Note to Rule 23(b)(2)); *accord Marisol A.*, 126 F.3d at 378 (approving certification of "large and amorphous" class because harms "stem[med] from central and systemic failures" and plaintiffs sought "injunctive relief and . . . predicate[d] the lawsuit on the defendants' acts and omissions with respect to the class") (cleaned up).

The scope of Plaintiffs' proposed class definition is appropriate. Because Plaintiffs challenge the harms flowing from the City's ongoing discriminatory traffic enforcement policies and practices, all Black and Latino individuals who are or will be exposed to such policies and practices are suitable class members, as all will benefit from an injunction requiring the City to identify and end racially biased traffic enforcement. *See County of Suffolk*, 2021 WL 1255011, at *17 ("class-wide injunction to reform" policies and practices "would benefit the class as a whole"); *Abdi*, 323 F.R.D. at 137–38 ("inclusion of future class members is appropriate in this case because they are under threat of imminent injury"); *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 369 (S.D.N.Y. 2019) (policy poses same risk of injury to all members of the class, including those not yet subjected to it).[6]

---

[6] While it may seem tempting to limit the class to those who have or will experience "unlawful" or "discriminatory" traffic enforcement practices, this would create a fail-safe class, in which class membership turns on the merits determination. *See generally* 1 Newberg on Class Actions § 3:6 (6th ed.). While the Second Circuit has not barred the use of fail-safe definitions in b(2)

7

Accordingly, Plaintiffs' proposed class definition is ascertainable.

### B. Recent Second Circuit Case Law Confirms That the Proposed Traffic Enforcement Class Meets Commonality and Typicality Requirements

The Second Circuit's recent opinion in *Elisa W. v. City of New York*, reversing a district court's denial of class certification in a case involving municipal defendants, strongly supports finding commonality and typicality in this case. In *Elisa W.*, which concerned systemic failures of New York City's foster care system, the Second Circuit instructed that whether a municipality "exhibits deliberate indifference to a known risk or specific duty may be a common question that can be answered on a class-wide basis." 82 F.4th at 124. In support of this conclusion, the Second Circuit pointed to a series of overarching municipal policy failures—principally failures to train, supervise, and exercise adequate oversight over municipal employees and contractors—all of which "can properly be litigated in a class setting." *Id.* at 126. In this case, like in *Elisa W.*, one of Plaintiffs' arguments is that the City's wholesale failure to hold municipal officers accountable for discriminatory traffic enforcement has allowed such practices to fester and continue, as comprehensively demonstrated by Plaintiffs' expert reports and a myriad of other evidence common to class members. *See, e.g.,* Bjerk Report, ECF No. 203-1; Gennaco Report, ECF No. 203-2; Silverman Report, ECF No. 203-3 *see also* Plaintiffs' Opening Brief Sections III-IV, ECF No. 202 at pp. 13-21 (cataloguing common evidence of intentional discrimination); Wilner Declaration, ECF No. 203, and accompanying exhibits.

In *Elisa W.*, "plaintiffs' claims turn[ed] not on the cause of permanency delays for any particular child, but on whether ACS's practices lead to permanency delays thereby placing all foster children at an unreasonable risk of harm." 82 F.4th at 126. The same applies here:

---

classes—just as it has never held that a b(2) class definition must satisfy the implied requirement of ascertainability—the best practice is to devise class definitions that are "both ascertainable and non-circular." *Id.* Plaintiffs' proposed definition satisfies these criteria.

8

Plaintiffs' injunctive claims do not turn on the justification and motivation for each stop or ticket but on whether the BPD's policies and practices are discriminatory and the City's deliberate indifference places all Black and Latino motorists at "unreasonable risk" of experiencing racially biased traffic enforcement. *Id.* Because these questions go to the heart of liability and are shared by all class representatives and class members alike, and because common evidence – including statistical and *Arlington Heights* evidence – will be used to prove these claims, commonality and typicality are satisfied. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (Rule 23's requirements are satisfied where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.") (citation omitted).

### C. Plaintiffs Seek Injunctive Relief That Is Specific, Manageable, and Similar to Relief Ordered in Analogous Cases

At the October 23 oral argument, this Court questioned how it would fashion an injunction in this case, and what specific remedies the Court would order. Although the breadth and scope of injunctive remedies fall within the sound discretion of the court under Rule 65, and are not typically addressed at the class certification stage or prior to a liability determination, Plaintiffs offer the following points of clarification:

#### 1. Plaintiffs Seek Precisely Tailored Injunctive Remedies, Not An "Obey the Law" Injunction

If the Traffic Enforcement Class succeeds in establishing that the City's discriminatory traffic enforcement policies, practices, and deliberate indifference are the moving force behind ongoing racially discriminatory traffic enforcement, Plaintiffs would not seek a mere "follow the law" injunction. Instead, Plaintiffs would ask this Court to order specific injunctive remedies tailored to redress ongoing constitutional violations by the City, whether via permanent

9

injunction or consent decree. *See Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 12–16 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."). Rectifying systemic police discrimination typically involves—and requires—a comprehensive remedial process, and in fashioning relief the Court will follow a well-trodden path.[7]

---

[7] *See, e.g.,* Final Order Approving Class Action Settlement and Judgment and Dismissing Class claims Against County Defendants with Prejudice, *Plaintiffs 1-21 v. County of Suffolk*, Dkt. 443, No. 2:15-CV-02431 (E.D.N.Y. July 14, 2023) (ordering data collection and auditing, civilian oversight, Precinct-level advisory boards, and changes to policies and training); *Morrow v. City of Tenaha Deputy City Marshal Barry Washington*, No. 2:08-CV-00288, 2020 WL 5534486, at *3 (E.D. Tex. Sept. 15, 2020); Draft Settlement Agreement and Consent Decree, attached as Exhibit A to Joint Motion for Entry of Order Approving Settlement Agreement and Consent Decree at 7-21; *Morrow*, No. 2:08-CV-00288 (E.D. Tex. Aug. 7, 2013), ECF No. 267-2. (specific requirements for equipment, audio and video recording, documentation, certification and training, and officer performance records related to traffic stops and searches incident to those stops); *Illinois v. City of Chicago*, No. 17-CV-6260, 2019 WL 398703, at *2 (N.D. Ill. Jan. 31, 2019); Consent Decree at 2-24, 76-104, 170-86, *Illinois*, No. 17-CV-6260, ECF No. 703-1 (Jan. 31, 2019) (community policing partnerships, increased officer training and supervision on biased policing, data collection, and public transparency regarding complaints and investigations, all under the supervision of an independent monitor); Order and Settlement Agreement, Dkt. 135, *Collins v. City of Milwaukee*, No. 17-CV-234 (E.D. Wis. July 23, 2018) (oversight by monitor, community engagement, data collection and publication, self-audits of stops by race, sustained and continuing data-based improvements to constitutional based policing, changes to policies, training, and supervision, and improved accountability procedures); *Melendres v. Arpaio*, No. CV-07-02513, 2013 WL 5498218, at *1 (D. Ariz. Oct. 2, 2013), *aff'd in part, vacated in part*, 784 F.3d 1254 (9th Cir. 2015)*; Melendres v. Arpaio*, No. CV-07-2513, 2016 WL 3996453 (D. Ariz. July 26, 2016), *aff'd sub nom. Melendres v. Maricopa Cnty.*, 897 F.3d 1217 (9th Cir. 2018) (appointment of monitor to audit and oversee mandatory data collection of traffic stops and outcomes, significant changes to internal affairs structure and process, and adoption of a dash camera program and early warning system); Settlement Agreement, Class Certification, and Consent Decree, Dkt. 16, 2:10-cv-05952, *Bailey v. City of Philadelphia* (June 21, 2011) (approving settlement requiring oversight by monitor, quarterly data collection and review, benchmarks to reduce constitutional violations, and changes to policies and practices); Order and Joint Stipulation for Court Order Approving Class Settlement, Dkt. Nos. 1909-10, *Thomas v. City of Los Angeles*, No. CV 90-5217 (approving settlement designating a Special Counsel to monitor and report on Sheriff's Department, allocating of funding for use of force and cultural diversity training, as well as Lynwood Trust Fund).

A non-exhaustive list of remedies that may be appropriate in this case based on the evidentiary record and initial conversations with our clients include:

- Cessation of BPD policies and practices contributing to racially biased traffic enforcement, including an end to pretextual traffic stops, "traffic safety" vehicle checkpoints and multiple tinted windows ticketing;

- Collection and regular publication of racial and other demographic data for all traffic stops, violations, and arrests (whether fingerprintable or not);

- Regular auditing of traffic stop, ticketing and arrest data; complaints; and body camera footage to identify and address patterns of biased policing and areas of improvement;

- Reforms to supervision and officer performance evaluation criteria to focus on quality and legality of officer activity;

- Enhanced procedural justice and anti-discrimination training for officers and supervisors, with a focus on interactions during traffic stops. All training should include interactive models, role plays, and a testing component to ensure that both officers and supervisors retain the concepts taught;

- Training for supervisors and Internal Affairs staff on identifying and correcting racial profiling and racially biased traffic enforcement practices committed by officers;

- Reforms to the Internal Affairs Department to bring the complaint investigation process in line with generally accepted practices;

- A mechanism overseen by a court-appointed monitor to allow for meaningful community input on additional policing reforms needed;

- Reforms to supervision and discipline so that officers are held accountable for violations of policy and constitutional rights, possibly including the creation of an empowered, independent Citizen Review Board; and,

- Debt relief and financial assistance for low-income people dealing with unaffordable repairs, unpaid tickets, waiver of outstanding tickets and towing fees, and reinstatement of suspended driver's licenses.

Each of the remedies identified is specifically tailored to address the ongoing violations of law at the heart of the Traffic Enforcement Class's case, and to prevent further injury to class

members, which is what Rule 23(b)(2) classes are all about.[8] *See Raymond v. New York State Dep't of Corr. & Cmty. Supervision*, 579 F. Supp. 3d 327, 343 (N.D.N.Y. 2022) (Rule 23(b)(2) certification is appropriate when "litigants seek[] institutional reform in the form of injunctive relief.") (citing *Stinson v. City of New York*, 282 F.R.D. 360, 379 (S.D.N.Y. 2012). Although courts must exercise caution when balancing policing and safety interests against the constitutional rights of citizens affected by police practices, "where the levers of municipal democracy have failed, leaving in place practices that violate constitutional rights, courts have a duty to intervene." *Ligon v. City of New York*, 925 F. Supp. 2d 478, 542 (S.D.N.Y. 2013); *accord Floyd*, 959 F. Supp. 2d at 674.

### 2. Manageable Processes Exist to Aid the Court in Fashioning Injunctive Relief

At oral argument, the Court queried how it would fashion injunctive relief. Courts generally employ a multi-step process to determine the scope and content of a complex remedial scheme like the one that would be required here. A key, overarching point is that the Court does not have to manage the process alone, and rarely does. Input from the parties and key stakeholders is essential, and courts often appoint a magistrate judge, special master, or monitor to facilitate the process of developing specific remedies and to oversee implementation.

The Court could begin the process of fashioning an injunction by sending the parties to mediation before a magistrate judge, either immediately or after an initial round of briefing. The goal of the mediation would be for the parties to work together to fashion a consent decree that spells out in detail the steps the City will take to come into compliance, the benchmarks the City must meet to earn its way out of the consent decree, and the data, reforms, and reporting

---

[8] Indeed, as Plaintiff Experts Michael Gennaco and Robert Silverman found, even when the City says the right things (and it frequently doesn't), it never ***does*** the right things or implements needed reforms. *See generally* ECF No. 203-2, ECF No. 212.

necessary for the parties and the Court to measure the City's progress against the benchmarks. For example, Plaintiffs' counsel NCLEJ is currently counsel to the class in multiple (b)(2) class actions around the country where courts have ordered or are in the process of ordering comprehensive, detailed and specific injunctive relief following this kind of collaborative process. *See, e.g.*, *A.M.C. v. Smith*, No. 20-CV-240, 2024 WL 3956315 (M.D. Tenn Aug. 26, 2024) (in mediation); *Holmes v. Knodell*, No. 22-CV-4026, 2024 WL 2097081 (W.D. Mo. May 9, 2024) (in mediation); *Reynolds v. Giuliani*, No. 98-civ-8877 (S.D.N.Y. Apr. 19, 2024) (court ordered stipulation of settlement and corrective action plan); *Newkirk v. Pierre*, No. 19-CV-4283, 2022 WL 20358182 (E.D.N.Y. Oct. 25, 2022) (final approval order); *Baez v. New York City Housing Auth.*, No. 13-CV-8916, 2018 WL 6242224 (S.D.N.Y. Nov. 29, 2018) (approving revised consent decree). Here in the Western District of New York, NCLEJ and the Western New York Law Center represented the plaintiffs in two (b)(2) class actions that each secured lasting relief for the plaintiff class via negotiated consent decrees; both cases were eventually dismissed after the governmental agencies met the required benchmarks. *See McCoy v. Restaino*, No. 13-cv-00711 (W.D.N.Y.); *Martin v. Werner*, No. 06-CV-00094E (W.D.N.Y.). The settlement in *County of Suffolk* was also achieved through mediation. *See* Final Order Approving Class Action Settlement and Judgment and Dismissing Class claims Against County Defendants with Prejudice, *Plaintiffs 1-21 v. County of Suffolk*, Dkt. 443, No. 2:15-CV-02341 (E.D.N.Y. July 14, 2023) (court ordered mediation); *See also Illinois*, 2019 WL 398703, at *2. (consent decree following numerous settlement conferences with the Court)

*In re Cincinnati Policing*, presents a particularly effective model for reaching consensus in cases involving systemic police discrimination. There, when the parties indicated an openness to settlement following the filing of a class complaint, the court ordered the parties to participate

13

in a collaborative procedure, which ultimately included the City, class counsel, and numerous stakeholders. 209 F.R.D. at 396-97; *See Tyehimba v. City of Cincinnati*, No. C-1-99-317, 2001 WL 1842470, at *1 (S.D. Ohio May 3, 2001). The court retained an expert to serve as a special master to manage the collaborative process. *In re Cincinnati Policing*, 209 F.R.D. at 398. The special master and the parties used surveys, in-person discussion sessions, and exhaustive data collation and analysis to ascertain "five consensus goals for police-community relations of the entire Cincinnati community," which became a structuring framework for the settlement agreement. The agreement included community-based policing strategies, extensive data collection to monitor progress, the adoption of a Citizen Complaint Authority ("CCA") to address complaints, and additional provisions to address discriminatory policing practices and deficient supervisory structures. *In re Cincinnati Policing*, 209 F.R.D. at 397–402. The agreement also provided for a monitor to oversee implementation, compliance, and disputes that arose between the parties. *Id*. at 402-03; Collaborative Agreement at 24, *In re Cincinnati Policing*, 209 F.R.D. at 395. In approving the agreement, the court observed that it was a "surgical tool" that addressed the mutual ultimate interests of both parties of "assuring efficient and effective policing for all citizens, regardless of race, in an atmosphere of mutual respect." *Id.*. at 403. The settlement is heralded as a "landmark" agreement that "has been widely recognized as a successful model for other police reform." *Floyd*, 959 F. Supp. 2d at 686 & n.71.

While Plaintiffs urge the use of a collaborative process like that employed in Cincinnati, Defendants may not voluntarily agree to such a process. In *Floyd*, where Plaintiffs' counsel Center for Constitutional Rights and Covington & Burling LLP represented the class, the district court ordered relief after an adversarial process. First, recognizing that "[b]ecause of the complexity of the reforms that will be required to bring the NYPD's stop and frisk practices into

14

compliance with the Constitution, it would be impractical for this Court to engage in direct oversight of the reforms," the court appointed an independent monitor to oversee the reform process. *Id*. at 676. The court charged the monitor with developing and implementing "an initial set of reforms to the NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk" (the "Immediate Reforms") followed by a "Joint Remedial Process" to develop "a more thorough set of reforms." *Id.* at 678. The court ordered all parties to participate in the Joint Remedial Process, which involved extensive input from institutional stakeholders and the general public, and hired a facilitator to oversee the process and recommend reforms. *Id.* at 688. In this way, the court ensured that its remedial orders reflected input from all key stakeholders, police practices and data experts, and the general public. The independent monitor continues today to oversee compliance with the court-ordered relief. *See https://www.nypdmonitor.org*.

      The examples above demonstrate that the Court can call upon a variety of mechanisms to ensure that injunctive relief is specific, workable, and tailored to the needs of the case. In addition, Plaintiffs' counsel have a combined wealth of experience that could potentially aid the Court and that further exemplifies their suitability to serve as class counsel. The task of developing specific remedial relief and monitoring the City's compliance with remedies could fall to a court-appointed independent monitor or special master. The monitor would ensure that injunctive remedies entered by the Court are executed on an ongoing, continuous basis, using data collection and reporting mechanisms; seek additional expert assistance as needed; and provide periodic reports to the Court. The parties would only seek redress from the Court in instances where violations of the Court's injunctive orders persisted without meaningful correction, thereby ensuring that the supervisory and administrative duties of the Court were appropriately limited.

## CONCLUSION

Accordingly, Plaintiffs respectfully request that their motion for class certification be

GRANTED

Dated: November 19, 2024

Respectfully Submitted,

 /s/ Claudia Wilner

Claudia Wilner
Edward Krugman
Anjana Malhotra
NATIONAL CENTER FOR LAW
AND ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
212-633-6967
wilner@nclej.org
krugman@nclej.org
malhotra@nclej.org

Philip Irwin (*pro hac vice*)
Jordan Joachim (*pro hac vice*)
Christine Nelson (*pro hac vice*)
Andrew Timmick (*pro hac vice*)
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
212-841-1000
pirwin@cov.com
jjoachim@cov.com
cnelson@cov.com
atimmick@cov.com

Matthew Alan Parham
WESTERN NEW YORK LAW
CENTER
Cathedral Park Tower
37 Franklin Street, Suite 210
Buffalo, NY 14202
716-828-8415
mparham@wnylc.com

Chinyere Ezie
Baher Azmy
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
212-614-6475
cezie@ccrjustice.org
bazmy@ccrjustice.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2024, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System.

*/s/ Claudia Wilner*