```
UNITED STATES; DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
---------------------------x        18-CV-719(CCR)
BLACK LOVE RESISTS IN THE RUST,
et al.,            Plaintiffs,

vs.
                                    Buffalo, New York
CITY OF BUFFALO, et al.,            October 23, 2024
                   Defendants.
---------------------------x
```

**MOTION HEARING**

                  TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE CHRISTINA CLAIR REISS
               UNITED STATES DISTRICT JUDGE

FOR PLAINTIFFS:        NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE
                       BY:  CLAUDIA WILNER, ESQ.
                       50 Broadway, Suite 1500
                       New York, New York 10004-3821
                       BY:  ANJANA MALHOTRA, ESQ.
                       275 7th Avenue, Suite 1506
                       New York, New York 10001
                            -and-
                       COVINGTON & BURLING LLP(NY)
                       BY:  CHRISTINE ADRIENNE NELSON, ESQ.
                       BY:  JORDAN SCOTT JOACHIM, ESQ.
                       620 Eighth Avenue, Suite 4029
                       New York, New York 10018
                              -and-
                       WESTERN NEW YORK LAW CENTER, INC.
                       BY:  MATTHEW ALAN PARHAM, ESQ.
                       37 Franklin Street
                       2nd Floor, Suite 210
                       Buffalo, New York 14203


FOR DEFENDANTS:        HODGSON RUSS LLP
                       BY:  HUGH M. RUSS, III, ESQ.
                       BY:  CHEYENNE NICOLE FREELY, ESQ.
                       BY:  PETER A. SAHASRABUDHE, ESQ.
                       The Guaranty Building
                       140 Pearl Street, Suite 100
                       Buffalo, New York 14202


COURT REPORTER:        Diane S. Martens
                       dmartensreporter@gmail.com

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

P R O C E E D I N G S

                    *              *              *

**THE CLERK:**  Your Honor, the matter before the Court is

10:05AM  civil case number 18-CV-719, *Black Love Resists in the Rust*

*v. City of Buffalo, et al.*

Present for the plaintiff are attorneys Claudia Wilner,

Anjana Malhotra, Jordan Joachim, Christine Nelson and

Matthew Parham.

10:05AM  Present for the defendant are attorneys Hugh Russ,

Cheyenne Freely and Peter Sahasrabudhe.

And we're here for a hearing on a motion to certify the

class.

**THE COURT:**  Good morning.

10:06AM  We have a number of people who are going to join by

YouTube.  There is no recording per judicial conference

policies.  Please respect that.  My understanding is the

YouTube is the first time the Western District of New York

has done this.  They did it at the parties' request.  And it

10:06AM  was because our Zoom licenses would have cut off the number

of participants.  So, please honor that.

And we have all day to do this.  So let me ask you,

first:  If either party plans on presenting evidence?

**MS. WILNER:**  No, your Honor.

10:06AM  **THE COURT:**  No.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:06AM 1      How about from the defendants?

2         **MR. RUSS:**  No, your Honor, thank you.

3         **THE COURT:**   And then the way we're going to proceed is

4      moving party, opposition, brief rebuttal.

10:06AM 5      I'm going to ask that you announce yourself each time

6      you speak not only because we have a number of attorneys but

7      that will help us create a record and it will also help the

8      people who are participating by YouTube.

9         I have a number of things that I am thinking about.  I

10:07AM 10     call them musings.  They're not rulings.  These are things

11     that are troubling me and I sometimes do this in advance of a

12     hearing to let you know what I am stuck on.  You should feel

13     free to push back on it.  Don't throw away, don't jettison

14     your entire presentation because I am on some other issue.

10:07AM 15     Don't be hesitant to correct me.  These are just some of the

16     things that I'm wondering about.

17        So it would help me if you are as pragmatic as possible.

18     I'm a very pragmatic person.  And, so, it isn't going to help

19     me decide whether or not to grant Class Certification if you

10:07AM 20     tell me something like there is going to be mini-trials or

21     they're common questions of fact and law.  I like to hear, if

22     you could, how you think that's going to play out in realtime

23     in terms of motion for summary judgment, could the Fourth

24     Amendment violations be resolved by summary judgment?  What

10:08AM 25     would happen at trial in terms of general versus individual

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:08AM   1   damages.  That would be the most helpful to me.

2       One of the issues in this case is the issue of general

3   damages versus individual damages and I know that's an area

4   of dispute.  It's one thing if the plaintiffs' position is

10:08AM   5   everybody was unreasonably detained for both the initial

6   checkpoint and the secondary stop, and I can imagine that

7   would not require individual trials.  But if there's going to

8   be individual damages that examine the difference between two

9   tickets for tinted windows versus five tickets or a stop that

10:09AM  10   lasts 20 minutes versus a stop that lasts 45 minutes, then we

11   are really getting into individual inquiries and I don't

12   really see Class Certification providing answers or common

13   evidence in that.  So I want to trail down on that, and

14   especially since one perspective, the individual damages in

10:09AM  15   some cases will be de minimis.  So what you would get

16   compensated for for getting a tinted window ticket on one

17   occasion when it wasn't, it should not have been issued is

18   not something that I think that we would typically have at

19   trial over an inquiry.  So I want to, you know, drill down

10:10AM  20   into the pragmatics of how that would work.

21       The proposed Class that I am most concerned about is the

22   Traffic Enforcement Class which is roughly defined as Black

23   and/or Latino individuals who have driven their vehicle in

24   the city of Buffalo and an intent to do so in the future.

10:10AM  25       From the Court's perspective, that looks fairly

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:10AM   1   limitless.  It also would be unusual in terms of injunctive

2   relief.  I'm trying to think of how I would fashion it.  I

3   would have to think about, okay, what's the checkpoint going

4   to look like in the future because I think everybody agrees

10:10AM   5   that they have ceased.  But they haven't been abandoned, they

6   haven't been disavowed so I want to hear more about that

7   Traffic Enforcement Class because that really seems quite

8   unmanageable from the Court's perspective and it just doesn't

9   seem to be mapped on to the problem that brings this case to

10:11AM   10   the court.

11       We won't be discussing the merits of the case except as

12   they interplay with Class Certification.  But I am stumped as

13   to the logic of the checkpoints and I'm looking mostly to the

14   defendants to tell the Court the logic.  So the touchtone for

10:11AM   15   the Fourth Amendment is reasonableness.  And if the idea is

16   that we want to have a checkpoint to intercept crime, to

17   deter crime, then I don't really understand the traffic

18   violation part of it.  If it doesn't have anything to do with

19   traffic enforcement, is that some kind of like secondary

10:11AM   20   gratuitous purpose added on to it?  And, if so, that seems

21   like a lot of overkill.  I'm just kind of wondering about it.

22       One of the exhibits points this up fairly clearly.  I'm

23   looking at Exhibit 58.  And it's a email:  "BDC Lockwood

24   wants results with this increased daytime detail.  All

10:12AM   25   officers should be made aware of this and what is expected of

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:12AM  1  them in the past.  The officers assigned to the daytime

2  detail have always yielded good results and we all expect

3  this to continue into the future."

4      "BDC Lockwood also wants two traffic checkpoints run

10:12AM  5  during the daytime detail, one of them at approximately 12

6  noon.  As you have all done in the past, the checkpoint

7  locations should be conducted in and around recent areas of

8  violence.  For example, if there was a shooting during the

9  previous night at Broadway and Fillmore, then the traffic

10:13AM  10  checkpoint should be conducted in that vicinity."

11      So that kind of makes no sense to me because unless

12  you're expecting evidence of a crime to be passing through

13  the checkpoint in the 24 or 48 hours after the crime, it just

14  seems to me more a show of police presence in an area that

10:13AM  15  recently expected or suffered, you know, a violent crime.

16  And there's a lot of other ways to do that besides detaining

17  motorists and issuing tickets.

18      So I know we're kind of into the merits and I know the

19  plaintiffs argue that this was a revenue-generating event on

10:13AM  20  the backs of minority populations in certain housing areas

21  but I'd like to hear from the defendants how it works, how a

22  checkpoint actually was intended to work, and why it works.

23      There are some issues in this case which I think we

24  could agree on, and from the Court's perspective, a good

10:14AM  25  advocate generally concedes them.  For example, I don't

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:14AM   1   believe there are antagonistic interests among the proposed

          2   Classes.  So, I've had Class Certifications where -- dairy

          3   farmers come to mind -- where some people belong to a coop

          4   and some people did not and they really didn't have the same

10:14AM   5   interests.  I don't see that problem in this case and I'm

          6   wondering if the defendants agree.

          7       I also, as I read through Michael Gennaco's lengthy

          8   expert report, I didn't see how failure to train and

          9   supervise investigation of the complaints, documentation,

10:15AM  10   recording, discipline of officers was relevant to Class

         11   certification and I also wondered how it would even come into

         12   the case.  So I was wondering why I was reading about all of

         13   that in this particular case unless, unless I'm missing

         14   something about the claim.  So, lots of criticism about what

10:15AM  15   the Buffalo Police Department is doing wrong and how they're

         16   responding in the aftermath of police alleged misconduct but

         17   it didn't seem to me to go to the core issues.  And maybe you

         18   just provided it as something that would come up later in the

         19   case.

10:15AM  20       One of the central issues in this case, and maybe the

         21   central issue, is the framing of the issue as to whether the

         22   stops were unconstitutional as now set up.  Never mind who

         23   goes through or what happens, this is not a reasonable

         24   detention of motorists and the defendant's efforts to push

10:16AM  25   this into, judge, you're going to have to be deciding whether

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:16AM  1  there's probable cause, you're going to have to look at, you

2  know, whether or not there was an infraction.

3  I don't see that I will be doing that because the

4  plaintiffs are masters of their complaint and if they're not

10:16AM  5  going to be asking the Court or a jury to do that, I don't

6  see that I would.

7  The defendants have the better part of the argument,

8  however, when we get into individualized damages.  And then I

9  think that you do look at that if you are going to say

10:16AM  10  somebody who was arrested without probable cause suffers the

11  same injury as somebody who was arrested for an outstanding

12  warrant, I'm not so sure I would agree unless the plaintiffs'

13  argument is that it's all fruit of the poisonous tree, it's

14  all the same injury, you are going to recover for every

10:17AM  15  arrest, there's going to be a set amount of recovery that's

16  requested.

17  So those are just some of the things that are bothering

18  me and, as I said, you should feel free to push back on them

19  and go your own way but those are -- I like to tell you what

10:17AM  20  I'm struggling with first.

21  Let's start with the plaintiff and remember to announce

22  yourself before you speak.

23  **MS. WILNER:**  Just one moment, your Honor.

24  **THE COURT:**  Sure.

10:17AM  25  **MS. WILNER:**  Good morning.  And may it please the Court.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:17AM   1       Claudia Wilner for the plaintiffs.

2       We're here today to seek certification of three Classes

3   in this case challenging longstanding traffic enforcement

4   policies and practices of the Buffalo Police Department that

10:18AM   5   have greatly harmed and continue to harm Black and Latino

6   communities.  The claims are earmarked (phonetic) for Class

7   certification.  For the damages Class, each damages Class, it

8   is challenging just one policy and practice that has harmed

9   all of the Class members in the same way.

10:18AM  10       Across the Classes, all of the injunct -- all of the

11   liability questions are common.  The injunctive relief that

12   we're requesting for the Traffic Enforcement Class is common

13   to all of the members of that Class.  They're all asking the

14   same thing which is reform to policies and practices of the

10:18AM  15   Buffalo Police Department.

16       For the damages, many of the damages questions are

17   common and there are no significant individual defenses.  So

18   I really --

19       **THE COURT:**  No significant individual defenses, but

10:19AM  20   individual damages.  So --

21       **MS. WILNER:**  Yes.

22       **THE COURT:**  -- they might have not, you know, we're not

23   going to hear officer by officer why he or she did this but

24   your clients are asking for different kinds of damages.  Is

10:19AM  25   that conceded?

Case 1:18-cv-00719-CCR    Document 244    Filed 12/04/24    Page 10 of 102

10

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:19AM 1      **MS. WILNER:** Yes. Yes. That's true. Some of the

2      damages, categories of damages that they're asking for are

3      common and some are individual. What I had thought made

4      sense in my mind -- but you're the judge so it might not make

10:19AM 5      sense in your mind -- was to walk through the Rule 23 factors

6      for each of the Classes and I've prepared some slides just to

7      help do that. And I'm really happy to -- I mean, if you want

8      to start by talking about damages, we can do that or we can

9      stop when we get to that slide and really go through the

10:19AM 10     different categories of damages and how we see them playing

11     out in the trial in this case.

12         **THE COURT:** I'm happy to do it your way.

13         **MS. WILNER:** Okay, great. Thanks.

14         In that case I'll start by talking about the damages

10:20AM 15     Classes. This is a certification under Rule 23(b)(3). We'll

16     start with the Checkpoint Class. We've got almost 4,000

17     members of this Class. This is people who received a ticket

18     or were arrested at traffic safety vehicle checkpoints. And

19     I know you have asked defendants to comment on how the

10:20AM 20     checkpoints were operated. I can talk a little bit about

21     that from our perspective of what the evidence shows.

22         The checkpoints were established by formal and

23     directive. They were operated under written guidelines from

24     2013 to June 2024. The Commissioner chose the checkpoint

10:20AM 25     locations personally. And he placed 78 percent of those

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:20AM  1   checkpoints in Black and Latino communities.  So from
         2   June 2014 and after, lieutenants picked checkpoint locations
         3   following his model under his supervision and they put
         4   87 percent of checkpoints in Black and Latino communities.
10:21AM  5   Each checkpoint was operated in the same way under the
         6   directive.  So all cars were funneled through the checkpoint
         7   for a first inspection which occurred without any
         8   individualized suspicion.  And then some cars were detained
         9   for a secondary inspection and it was after that secondary
10:21AM 10   inspection that tickets and arrests and impounds happened.
        11       And so our Class is seeking damages under the Fourth
        12   Amendment for the unlawful detentions that occurred prior to
        13   the tickets and impounds.  And they're seeking damages under
        14   the Fourteenth Amendment Equal Protection Clause and Title VI
10:21AM 15   for racial discrimination under the Equal Protection Clause.
        16   And they also have due process claims that are under the
        17   Fourteenth Amendment that concern a structural conflict of
        18   interest and those are actually the same claims that the
        19   tinted windows Class has.
10:22AM 20       **THE COURT:**  So I was listening but I didn't quite catch
        21   it.  It's just the initial detention or it's the initial and
        22   the secondary?
        23       **MS. WILNER:**  Well the initial and the secondary, yes.
        24       **THE COURT:**  Okay.
10:22AM 25       **MS. WILNER:**  Under the Fourth Amendment but the Fourth

Case 1:18-cv-00719-CCR    Document 244    Filed 12/04/24    Page 12 of 102

12

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:22AM  1  Amendment claim, from our perspective, really stops with the

2  ticket and the arrest.  So we're not seeking damages under

3  the Fourth Amendment for anything that happened after the

4  moment -- after the detention ends, essentially.

10:22AM  5      All of the liability questions for the Checkpoint Class

6  are common and we listed a number of common questions in our

7  brief and I'm not running away from any of those questions

8  but I wanted to highlight today a few that I think are really

9  important.

10:23AM  10      The first is:  What was the programmatic purpose for the

11  checkpoints?  Was it for crime control?  High visibility?

12  Was it for traffic safety, as the defendants claim?  This is

13  a critical factual question that's going to determine

14  liability and it's common to every single Class member.

10:23AM  15      Another really important question is whether the

16  checkpoint satisfied the special needs exception that the

17  Supreme Court has set forth for limited operation of

18  administrative checkpoints under certain circumstances.  This

19  is a legal question that every single member of the

10:23AM  20  Checkpoints Class is going to have and it will determine for

21  every member of the Class whether they win or whether they

22  lose on the Fourth Amendment claim.  Maybe not whether they

23  lose.  I'm not sure I'll concede that yet but certainly

24  whether they win.

10:23AM  25      So, on our Equal Protection and Title VI claims, were

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:23AM    1    the checkpoints disproportionately placed in Black and Latino

2    neighborhoods?  Was the City's choice of checkpoint locations

3    motivated by racial demographics or racial animus?  These are

4    the most important questions to determining liability on an

10:24AM    5    Equal Protection claim.  And, again, they're common to every

6    Class member because the checkpoints were operated in a

7    centralized way.

8    The due process claims I'd like to defer a little bit

9    until talking about the Tinted Windows Class but the

10:24AM    10    questions are the same for both Classes and that only

11    underscores the commonality.

12    And then, of course, because we have claims for

13    municipal liability, we have to establish the requirements of

14    *Monell v. Department of Social Services,* that requires

10:24AM    15    establishing that all of these things happened under

16    municipal policy, custom or practice and that is going to be,

17    again, a common question for all of the Class members.

18    Your Honor already shared your thoughts that you don't

19    see disputes between the Class representatives and members of

10:25AM    20    the Class that would disturb findings of typicality and

21    adequacy and I just wanted to confirm our position that that

22    is absolutely the Class.

23    **THE COURT:**  I also don't see a conflict between your

24    proposed Classes.  So, you're not going to, if we had a

10:25AM    25    Traffic Enforcement Class, they aren't going to get something

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:25AM  1  that would take something away from the Tinted Windows Class.

2        **MS. WILNER:**  Yes.  That's exactly right, your Honor.

3        And I wanted -- I mean the defendants had raised this

4  point under their discussion of typicality and adequacy was

10:25AM  5  one of their primary points that the case was going to

6  devolve into mini-trials because of this need to determine

7  the individual circumstances of each stop.  And from the

8  plaintiffs' perspective, that's absolutely false.  So, under

9  the Fourth Amendment, again, we're only seeking damages for

10:25AM  10  unlawful detention.

11        So there is no need ever in this case to determine

12  whether tickets were supported by probable cause, whether the

13  probable cause justified them, whether they were unjustified,

14  all of that on the merits of the ticket is not going to be

10:26AM  15  relevant to the Fourth Amendment claim.

16        **THE COURT:**  I agree on the merits of the ticket.  Once

17  you get into the secondary inspection, isn't there an inquiry

18  into whether it was justified or not?

19        **MS. WILNER:**  I don't think so, your Honor, because then

10:26AM  20  we're into our fruit of the poisonous tree argument and the

21  Second Circuit case that's on -- that controls -- and I'm

22  just now blanking on the name of it but it's in our brief --

23  that said that the causation point was cut off by independent

24  actions of the prosecutor and the judge.  And so anything

10:26AM  25  that's happening before then where it's just continued

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:26AM 1  actions by the police department is fair game under the

2  Fourth Amendment, and that secondary detention, you know,

3  never would have happened had the car not first been subject

4  to an illegal first detention.  So it all flows together into

10:27AM 5  the same.

6       Under the Equal Protection Clause, the Supreme Court has

7  made it very clear that racial discrimination is actionable

8  even if a stop or a ticket is supported by probable cause.

9  And, so, there's really no need under the Equal Protection

10:27AM 10  Clause again to look into the question of whether the ticket

11  was justified.  That's not the question.  The question is

12  whether it was motivated by racial animus and that gives rise

13  to harm, regardless of whether there was a legal

14  justification for the action.

10:27AM 15       I'm going to stop really briefly on ascertainability

16  just in case your Honor has questions about our Class

17  definition.  I think there is no ascertainability issue in

18  this case.  The Second Circuit standard is really clear:  A

19  Class must be defined using objective criteria that establish

10:28AM 20  a membership with definite boundaries.

21       Our Class definition is up for you on the screen.  It

22  clearly does that.  There's no administrative feasibility

23  requirement in the Second Circuit.  So if there are concerns

24  about Class member identification -- and I don't think there

10:28AM 25  are -- but if there were, that would be something that would

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:28AM 1    be considered as part of the superiority analysis.  It's not

2    a threshold that would impede certification under

3    ascertainability.

4         And I want to -- well, let me ask before I move on.  Are

10:28AM 5    there any other questions that the Court has about the

6    Checkpoints Class or any of the points that we've discussed

7    so far?

8         **THE COURT:**  Not about the Checkpoint Class.

9         **MS. WILNER:**  Okay, wonderful.

10:28AM 10        So let's stop and talk a little bit about the Tinted

11   Windows Class and this Class is challenging the issuance of

12   multiple tinted windows tickets in a single stop.  And this

13   was a practice that was directed overwhelming at Black and

14   Latino drivers and that three successive BPD commissioners

10:29AM 15   knew about and intentionally allowed to continue.

16        The Class is bringing equal protection and title six

17   claims for racial discrimination.  It also brings due process

18   claims.  Those are structural due process claims that I

19   referenced before.  We've had over 6,000 people who have been

10:29AM 20   subjected to these practices that we've identified who meet

21   the Class definition.  So there's clearly no numerosity

22   issue.

23        And I wanted to pause and highlight some of the racial

24   disparities.  These are all contained in the expert report of

10:30AM 25   Dr. Bjerk that was submitted in support of the motion.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:30AM  1      **THE COURT:**  Let me stop you.  And in terms of logic --

2      **MS. WILNER:**  Yeah.

3      **THE COURT:**  -- why is it multiple tickets as opposed to

4  one ticket?  I understand that I've seen the memos where they

10:30AM  5  say let's not engage in overkill, two tickets for tinted

6  windows is enough, you don't need to be doing six.

7      What was the method to why isn't it one, why is it -- is

8  it always two, is it?

9      **MS. WILNER:**  Yeah.  So in thinking about this Class, and

10:30AM  10  it's, it's a good question because -- and you can see even

11  looking at the numbers with 87 percent of tinted tickets

12  going to Black and Latino drivers, you know, overall, that

13  this was a practice that just at its most basic level was

14  grossly disproportionate.  But the issuance of multiple

10:30AM  15  tickets is particularly disturbing and that's because when

16  you're, whether an officer is thinking about a single tinted

17  windows ticket, there could be a factual question, are the

18  windows unlawfully tinted, are there not?  But there's no

19  question about once the decision has already been made to

10:31AM  20  stop the car and issue the tickets, then there really

21  shouldn't be a particular reason or a difference in how

22  people are treated at that stop.

23      And what the evidence shows is that even after within

24  the world of people who are getting tinted windows tickets at

10:31AM  25  all, there is really significant and statistically

18

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:31AM  1  significant disparity in terms of who is getting the multiple

2  tickets.  So the multiple ticketing rate is 15 percent higher

3  for black and Latino drivers from 2013 to 2020.  That, when

4  you're talking about statistics, is a really significant

10:32AM  5  difference and at its height, 90 percent of Black and Latino

6  drivers who received tinted windows tickets at all were

7  receiving multiple tickets in a single stop.  And the

8  economic harm that's piled on for that gratuitous ticketing

9  is really damaging.

10:32AM  10      **THE COURT:**  But to get to dis-proportionality, don't you

11  have to look at, all right, here's all of the cars that are

12  registered to everybody, here's the proportion of them that

13  are registered to Black and Latino drivers.  Now we look at

14  the tinted window tickets and that's what we have to look at

10:32AM  15  that, all people with tinted windows.  I didn't really see

16  that.  Do you think you've done that?

17      **MS. WILNER:**  I'm....

18      **THE COURT:**  So otherwise you might be targeting

19  something.  It might look like it's disproportionate but it

10:33AM  20  just may be that a certain group of people prefers tinted

21  windows to fuzzy dice or people who have screens that, you

22  know, block out the sunshine for somebody sitting in a car

23  seat.  So I didn't see the analysis proceed on that basis and

24  I wondered why not.

10:33AM  25      **MS. WILNER:**  Oh, yes, that issue actually is addressed

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:33AM 1 in the Bjerk report and I think it gets at this question of

2 why I focused on multiple tickets as opposed to just

3 ticketing in general.

4     First of all, I do want to make clear that there

10:33AM 5 actually isn't any evidence in the record and it isn't known

6 what the true overall tinted windows ticketing rate is.  But

7 what the data shows --

8     **THE COURT:**  Isn't --

9     **MS. WILNER:**  -- is that --

10:33AM 10     **THE COURT:**  -- the overall tinted windows so you don't

11 even have a baseline of how many people drive with tinted

12 windows and that's why I'm troubled by how you can get down

13 to disproportionate because a true test would say, okay,

14 there's 5,000 people in the city of Buffalo who have cars and

10:34AM 15 2,000 of them have tinted windows, and of that 2,000, 1,500

16 belong to Black and Latino drivers.  And I just don't see

17 that even Dr. Bjerk does that.

18     **MS. WILNER:**  Oh, okay, I see what you're saying, your

19 Honor.  He, he actually does -- and this is the, this is

10:34AM 20 the -- I think what I was getting at before, trying to get at

21 before but probably was too long-winded, that once you're in

22 looking at multiple ticketing, you're looking only within the

23 universe of people who have been stopped and issued

24 ticketed -- tinted windows tickets.

10:35AM 25     **THE COURT:**  I follow you.  I can see that.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:35AM   1       **MS. WILNER:**  And within that universe there's a

2    statistically significant disparity where Black drivers

3    issued at least one ticket, tinted window ticket are

4    statistically more likely to receive multiple tickets than

10:35AM   5    white drivers issued tinted windows tickets.

6       **THE COURT:**  Okay.

7       **MS. WILNER:**  So, once you're in that baseline, all those

8    other concerns of what is the population doing in general,

9    how many cars have tinted windows at all, you know, those

10:35AM  10    fall away because the disparity is only among incidents of

11    ticket, tinted window ticket issuance.

12       **THE COURT:**  Okay.

13       **MS. WILNER:**  But I do want to point out some other

14    things that showed up in the data that I do think are

10:35AM  15    relevant to this.  One is that the Bjerk report looked at

16    data prior to the issuance of the strike force and at that

17    time tinted window ticketing was lower and racial

18    disparity -- multiple ticketing was lower and racial

19    disparities in multiple ticketing were lower.

10:36AM  20       So there was a significant increase not only in tickets

21    but also in disparities with the advent of the strike force

22    that then after the Buffalo traffic violations agency came

23    online magnified even further.  So it really does suggest

24    that there was a change in behavior within the Buffalo Police

10:36AM  25    Department.  Not -- because there's no reason to suspect, to

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:36AM 1  think that within those years there was baseline change in

2  the population in terms of who had tinted windows and who

3  had -- didn't.

4       And there's also no reason to think -- this is getting

10:36AM 5  back to the multiple ticketing disparities -- that there's

6  any reason that, like, for example, nonminority drivers would

7  tint only one window but everyone else would tint three or

8  four windows.

9       **THE COURT:**  So the narrow focuses:  Secondary stop,

10:37AM 10  multiple tickets between white drivers in the secondary stop

11  and Black and Latino drivers, white or non-- nonBlack or

12  nonLatino drivers and whether or not those two Classes can be

13  compared and is there disproportion there?  Just there?

14       **MS. WILNER:**  I think I need to make a correction because

10:37AM 15  the Tinted Windows Class is not limited to tickets that are

16  issued at checkpoints.

17       **THE COURT:**  Oh.

18       **MS. WILNER:**  Some tinted windows tickets were issued at

19  checkpoints but multiple tinted windows ticketing was a

10:37AM 20  common practice that officers did when they were on regular

21  patrol as well as on checkpoints.  So our Tinted Windows

22  Tickets Class is covering tinted windows ticketing wherever

23  that happened not only at check points.

24       **THE COURT:**  So then the comparator is much harder --

10:37AM 25  like you sold me on the comparator at the secondary stop

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:38AM 1   because I could imagine in pragmatic terms of we would have

2   all that data, there would be a proportion, you could see it.

3       When it's roaming around, how are you going to establish

4   that?

10:38AM 5       **MS. WILNER:**  I think the same points that I made before

6   still apply because, again, we're only looking at disparities

7   within the universe of people who are stopped and ticketed

8   for at least one tinted windows ticket.  So it's, the Equal

9   Protection Claim isn't based on the stop.  We're not

10:38AM 10  challenging whether the stop was justified, whether tinted

11  windows tickets should have been issued, should not have been

12  issued.  The point is that Black drivers were really likely

13  to get four tickets instead of one and that was much less

14  true for white drivers.

10:38AM 15      **THE COURT:**  All right.  So you would characterize this

16  as a non-checkpoint Class?  I mean it could be but it would

17  be -- it's much broader than that.

18      **MS. WILNER:**  Yes, I would say it's much broader than the

19  checkpoints and that shows in the size of the Class.  There

10:39AM 20  is more people who were affected by tinted windows tickets

21  than who were affected by checkpoints ticketing.  So there

22  could be people who would be members of both Classes.  For

23  example, somebody who was issued multiple tinted windows

24  tickets at a checkpoint would be a member of the Checkpoint

10:39AM 25  Class and a member of the Tinted Windows Class.  And how we

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

| | | |
|---|---|---|
| 10:39AM | 1 | see that playing out at trial is that that particular |
| | 2 | individual would have more opportunities to win liability but |
| | 3 | we are not expecting to like double-dip, as it were, in any |
| | 4 | categories of damages. |
| 10:39AM | 5 | Have I answered all your questions? |
| | 6 | **THE COURT:**  You have. |
| | 7 | **MS. WILNER:**  Okay, great. |
| | 8 | So I wanted to drill down on some of the questions that |
| | 9 | were raised and I wanted to stop a bit on the due process |
| 10:40AM | 10 | claim because it is a little bit of a less familiar claim. |
| | 11 | Arises from the Supreme Court decision in *Marshall v.* |
| | 12 | *Jerrico*.  And the Supreme Court said that:  "A scheme |
| | 13 | injecting a personal interest, financial or otherwise, into |
| | 14 | the enforcement process may raise serious constitutional |
| 10:40AM | 15 | questions."   And the Supreme Court made its findings about |
| | 16 | prosecutors but courts have applied it, as well, to police |
| | 17 | officers.  They hold police officers to the same standard as |
| | 18 | prosecutors and have found that where a police officer has a |
| | 19 | personal financial motivation to enforce the criminal law, |
| 10:40AM | 20 | that that can create a conflict of interest that violates the |
| | 21 | due process clause. |
| | 22 | And really importantly for Class certification under the |
| | 23 | case law, this is an objective inquiry.  So the |
| | 24 | constitutional question that has to be resolved is:  Does the |
| 10:40AM | 25 | system create an intolerable risk of bias?  It's not:  Was an |

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:41AM   1    officer actually biased?  Can an officer be proven to be

          2    biased?  But simply is there an intolerable risk of bias.

          3    And that question, because it's objective, is going to be the

          4    same for every member of the Class.

10:41AM   5         So really important common questions that go directly to

          6    liability for this claim is whether city policies created an

          7    improper pecuniary or financial motivation for officers to

          8    enforce traffic laws and issue tickets and, if they did, was

          9    that conflict of interest so serious that it violates the due

10:41AM  10    process clause?  Those are the two most important and Monell

         11    liability obviously, as well, for that claim.  And every

         12    Class member is going to have those same questions.

         13    Answering them is going to resolve liability for every single

         14    Class member at the same time.

10:42AM  15         **THE COURT:**  So if you're not looking at just checkpoint

         16    data, though, and you're just looking at officers patrolling

         17    and issuing these tickets, I think it's going to be pretty

         18    hard to show a financial motive.  So, in the checkpoints

         19    there is the overtime argument and then when this occurred

10:42AM  20    and how long this occurred and you've got the officers

         21    involved and you can figure out the pay.

         22         How are you going to prove it as a pragmatic matter for

         23    more roaming stops?

         24         **MS. WILNER:**  Well, it's really the same body of

10:42AM  25    evidence, your Honor, because it has to do with the

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:42AM  1    performance expectations that were set by the Commissioner
         2    and those didn't apply only to checkpoints.  They applied to
         3    practices in general and the overtime expectations.  And the
         4    tying of overtime possibilities to production, which is
10:43AM  5    essentially a ticketing incentive because officers had the
         6    ability -- when tickets are tied to overtime opportunities,
         7    with the idea that more tickets justifies more overtime
         8    opportunities and also is an expected result of those
         9    overtime opportunities, and the overtime is so significant
10:43AM  10   for these officers and some of these officers doubled their
         11   salaries by working overtime.  Working overtime also not only
         12   just expanded their takehome pay but their eventual pension
         13   benefits.  So there was significant financial opportunity for
         14   officers in working overtime.
10:44AM  15       And if the idea being promulgated from the City is that
         16   the more you ticket, the more overtime you can do, then that
         17   is a financial conflict of interest, at least our -- that's
         18   our belief and what we intend to present to the jury and then
         19   what we'll be asking the jury to decide.
10:44AM  20       **THE COURT:**  So I'm having a hard time distinguishing
         21   that from any other police department anywhere, especially in
         22   the area of substance due process.  It has to be a pretty
         23   significant constitutional violation, otherwise the Supreme
         24   Court has said go under the Fourth Amendment, that's more
10:44AM  25   specific.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:44AM    1        I would assume that most, if not every, police

2    department rewards productivity and offers overtime to the

3    most productive officers who have crime-stopping and

4    crime-intercepting abilities and, so, how is this any

10:45AM    5    different?  And looking at the policies, what are you zoning

6    in on as the directive that makes this different from every

7    other police department in the country?

8        **MS. WILNER:**  Yeah.  Thank you for the question.

9        And with all due respect -- and you can let me know if

10:45AM   10    this is not a satisfactory answer -- but our job is to

11    represent our plaintiffs and to look at the policies and

12    practices of the Buffalo Police Department, and whether those

13    policies and practices violate the due process clause.  And,

14    so, I don't think it's an element of our substantive claims

10:45AM   15    how our -- how what happened here may or may not compare to

16    what happened elsewhere.

17        **THE COURT:**  Well you're asking me to find that this is a

18    financial incentive and I'm pushing back and saying I assume

19    there's a financial incentive in most police departments to

10:46AM   20    be productive -- when I'm thinking about ascertainability in

21    this.  And I'm not seeing that this is some unique situation

22    where the Court can say, yeah, we need to have a Class

23    because this is going to zero in on a policy that is

24    particular to the Buffalo Police Department.

10:46AM   25        **MS. WILNER:**  Well, I do think there are some specific

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:46AM 1  factors here that are important.  I mean, the production

2  expectations were pretty strong, the launch of the Buffalo

3  Traffic Violation Agency which was specifically designed in

4  order to bring in more revenue to the City of Buffalo, the

10:46AM 5  reaction to the installation of the Buffalo Traffic

6  Violations Agency which saw ticketing go up substantially

7  after that came online, the training of officers, that one

8  goal of traffic enforcement was to generate revenue, I think

9  all of those things work together.  And really, more

10:47AM 10  importantly, your Honor, from the Class Certification

11  perspective, there's nothing about any of those arguments

12  that's specific to any particular Class member.  All of our

13  Class members can make those same claims.

14      **THE COURT:**  Also one argument is there's no motion to

10:47AM 15  dismiss the due process claims so you don't have to show me

16  that it's plausible at this point in time.  As it interplays

17  with the Class, it does become an issue.

18      **MS. WILNER:**  And we also have yet to have dispositive

19  motions so there -- I, to me, the dispositive motion stage,

10:47AM 20  the trial stage where you're asking, you know, what are the

21  facts -- first, are there disputes of facts and then what are

22  the facts and then applying the law to the facts, that is

23  where the merits of the claim are dealt with and there really

24  aren't any aspects of the merits of these claims that are

10:48AM 25  different from one Class member to the next.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:48AM   1       Just quickly on the commonality for the Equal Protection

2   and Title VI claims.  The questions are similar as we saw for

3   the Checkpoint Class:  Did multiple tinted windows ticketing

4   disproportionately impact Black and Latino drivers?  Did City

10:48AM   5   policymakers intentionally permit these practices to

6   continue?  And if they did, were those policymaker decisions

7   motivated by race?  Those are the key most important

8   questions that we have to deal with in order to prevail on

9   those Equal Protection claims.  Again, those are questions

10:49AM  10   that are going to be common to every Class member.

11       In order to prove intent, we plan to present evidence,

12   circumstantial evidence of intent of the type that the

13   Supreme Court discusses in *Arlington Heights*, that includes

14   the statistical disparities, that includes the historical

10:49AM  15   context for these decisions -- and we have a social historian

16   who can talk about some of that context.  We would be talking

17   about substantive departures from normal police procedures

18   such as the lack of any public safety rationale for issuing

19   multiple tickets when one ticket would essentially accomplish

10:49AM  20   the same thing.  And including the Commissioner Derenda's

21   judgment that multiple ticketing was just something that

22   officers did to, quote, pad their numbers.  So those are all

23   facts that play into the intent analysis.  And, again, those

24   are going to be common to every single Class member.

10:50AM  25       And I'm going to be discussing the Gennaco Report more

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:50AM    1    in terms of the Traffic Enforcement Class but this is an

2    example of where some of our police practices experts

3    findings are relevant to making that decision about intent.

4    And the purpose of putting that report now at the Class

10:50AM    5    Certification stage is to demonstrate that his evidence

6    common to every Class member.  Each Class member can rely on

7    that same expert report in the same way to prove their

8    claims.

9         So, of course, for any damages Class, predominance under

10:51AM   10    Rule 23(b)(3) is the critical factor.  And in this case I

11    think predominance is pretty easy because as we've discussed

12    when talking about the common questions, all the liability

13    questions are common and each Class member is going to be

14    relying on the same body of evidence in order to establish

10:51AM   15    liability.

16         So, under the checkpoints, things like the programmatic

17    purpose of the checkpoints, the intent of the Commissioner in

18    establishing checkpoint locations are common.  The evidence

19    of discriminatory practices for tinted windows ticketing and

10:51AM   20    the decision to allow that discrimination to continue is

21    common.  And overtime incentives and the production

22    incentives are common.  So there really aren't liability

23    questions that are going to be specific to any Class member.

24    We don't need to determine whether any particular officers

10:52AM   25    was actually biased because what we're looking at is whether

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:52AM 1   the system was biased.  And we don't need to determine

2   whether there was probable cause or a discriminatory intent

3   at the individual officer level because we're really focused

4   on policies and practices and decisions that are coming from

10:52AM 5   the policy level.

6        Is there -- no, okay, great.  So moving on.

7        **THE COURT:**  But I will tell both sides if you're going

8   to do a PowerPoint, it's very helpful after we're done if you

9   provide your PowerPoint to the Court.  It's a good summary

10:52AM 10  for me when I'm issuing a decision to make sure I've covered

11  the points that you thought were the most important.

12       **MS. WILNER:**  Yeah.  And we have printed out copies so we

13  can provide that and we have copies for the defense, as well,

14  if they would like them.

10:53AM 15       So I know that the court has a lot of questions on

16  damages.  I want to start with really what I consider to be a

17  Hornbook Rule in the Second Circuit that where liability is

18  common, individualized damages are not going to defeat

19  predominance.  And I'm relying on *In re Nassau County Strip*

10:53AM 20  *Search Cases* for this point but there's actually many, many

21  cases in this Circuit that make the same point.  A lot of the

22  damages questions in this case, though, are common.

23       So I'll start with general damages which is something

24  that we're seeking for unconstitutional detentions under the

10:53AM 25  checkpoints and we're also seeking general damages for the

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:54AM 1   personal degradation that's involved in racial

2   discrimination.

3       So the Second Circuit has established this category of

4   damages, general damages in *Kerman v. City of New York* and

10:54AM 5   the idea behind general damages is that they are available

6   "as a matter of law" once the constitutional violation is

7   established, and that the damages are intended to compensate

8   for the inherent nature of the constitutional harm.  They are

9   not meant to compensate for individualized damages like

10:54AM 10  emotional distress, lost wages, any of that kind of thing

11  that would have to be pleaded and proved up by each person.

12  It's just --

13      **THE COURT:**  So you are not seeking any personal injury

14  damages?

10:55AM 15      **MS. WILNER:**  I'm not saying that, your Honor, but I want

16  to look at each of these categories separately so that we can

17  look at the full scope of damages.  And also what I think is

18  really concerning you, which is how am I going to deal as a

19  judge with all these damages and what is the jury going to be

10:55AM 20  looking at?

21      **THE COURT:**  Well, I have a different -- that is a

22  problem but one of the issues is:  It's your complaint --

23      **MS. WILNER:**  Yeah.

24      **THE COURT:**  -- you're the master.  You get to decide

10:55AM 25  what kind of damages you are seeking.  And there used to be

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:55AM 1    kind of a common method, oh, you can't have Class

2    Certification for personal injury cases, it's just not a

3    thing and the courts have said that's not really the rule,

4    that's not how it works out.

10:55AM 5        But there are fairly few Class Certification cases with

6    personal injuries that are, you know, non-economic.  And, so,

7    I am kind of surprised when arguably some of it is de

8    minimis, why we're going down that path.

9        **MS. WILNER:**  Yeah.  I think...

10:56AM 10       **THE COURT:**  I mean, it's your choice but it is a

11   stumbling block which I could understand if somebody had

12   catastrophic personal injuries like there's no way this isn't

13   going to be a focus of our case.  Here, if the generalized

14   injury is you violated my Fourth Amendment rights and that is

10:56AM 15   the core injury and everybody suffers that same injury --

16       **MS. WILNER:**  Yes.

17       **THE COURT:**  -- and you're not getting into the degree of

18   outrage, that's a much different case than when we are

19   hearing about the stress or -- I mean, I'm trying to think of

10:56AM 20   what it could be other than emotional distress if you cover

21   the economics.

22       So tell me a little bit about that.

23       **MS. WILNER:**  Yeah.  And from our perspective we don't

24   think those kinds of damages are likely to be a significant

10:57AM 25   feature.  We're not actually aware of any unnamed Class

Case 1:18-cv-00719-CCR    Document 244    Filed 12/04/24    Page 33 of 102

33

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:57AM   1   members at this point who are planning to assert those kinds

          2   of damages and there may be --

          3       THE COURT:  But you decide what kind of damages the

          4   Class is going to assert with the Class representatives.

10:57AM   5   And, so, to tell the Court this far into the case at Class

          6   Certification that, you know, I don't know that the Class

          7   members are going to want to pursue this or not, it just kind

          8   of hangs out there and then thinking down the path, there

          9   will have to be some kind of management tool and we have the

10:57AM  10   supplemental authority about do you decertify at that point,

         11   do you not do it, what do you handle with it?

         12       And so, in light of how vague it sounds like this claim

         13   is at this point, I'm kind of perplexed as to why it's in the

         14   case.  That's your business but it is creating an issue that

10:58AM  15   needs to be resolved in terms of is this something that the

         16   Court could do in a Class setting?

         17       MS. WILNER:  Yeah.  Well, if we look at all of the

         18   potential damages that there are in this Class, we're seeking

         19   general damages.  We've also asked for punitive damages and

10:58AM  20   equitable disgorgement, all of those are common forms of

         21   damages.

         22       Then we are seeking recovery for economic harms.  And

         23   the economic harms are going to be things like how much do

         24   people pay for checkpoint tickets or multiple tinted windows

10:59AM  25   tickets.  How much did they pay in impound fees and those

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

10:59AM  1  damages are individual.  But the city has data and records

2  that already have the amounts calculated for every single

3  Class member.  So, even though those economic harms are

4  individual, they're easily calculated and they're the type of

10:59AM  5  individual damages that is very routine and commonplace

6  probably in every damages Class Action.

7  So I would say like if you're, if you're looking at this

8  as maybe an iceberg or a pyramid, the general damages and the

9  other common damages and the economic harms are going to be

10:59AM  10  most of that period and then very much at the tip of it is

11  this prospect that some Class members may wish to seek

12  individual -- other individual damages on top of that.

13  **THE COURT:**  Okay.

14  **MS. WILNER:**  Now --

11:00AM  15  **THE COURT:**  So say that's going to happen and how is it

16  going to happen.  So you're going to have a proof of claim

17  form and they're going to check off I want to pursue the

18  following additional damages and then either the person or

19  the entity that's sorting out the claims, or the Court

11:00AM  20  itself, is going to say there's, you know, there's a thousand

21  people who want additional damages, now I need two trials for

22  those people, how is that going to work practically?

23  Because --

24  **MS. WILNER:**  I --

11:00AM  25  **THE COURT:**  -- it's troubling to me that you're like,

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:00AM  1   well, they may be asserting these claims.  It's your

2   complaint.  It's either in there or it's not.

3       **MS. WILNER:**  You know, I think it's just really hard to

4   tell from this vantage point what that will look like because

11:01AM  5   we haven't had dispositive motions and we haven't had the

6   trial.  So we don't even know what are the claims that we

7   will be seeking damages on.

8       **THE COURT:**  You are in control of all of that.  I mean,

9   I've never had a Class Certification where the nature of

11:01AM 10   damages is unknown this far into it.  You have 99 percent of

11   what you're asking for but you're not telling me -- and you

12   don't need to say -- I'm giving up the 1 percent but the

13   1 percent is what's going to cause the individualized trials

14   and that's something the Court needs to be realistic about as

11:01AM 15   to how is that going to work out.

16       **MS. WILNER:**  Yeah.  And, again, this is where I would

17   say that that 1 percent of potential damages is like the tail

18   wagging the dog of this entire Class Certification.  And when

19   we get to that point, if we get to that point, we can decide

11:02AM 20   how to handle that category of damages.  And there are a lot

21   of options.  So, there are -- is the possibility of dividing

22   people into separate groups.  There are Special Masters.

23   Magistrates can be involved.  Decertification is an option.

24   So it's really, I think, going to depend on factors that we

11:02AM 25   don't even know right now and it could be possible that

Case 1:18-cv-00719-CCR    Document 244    Filed 12/04/24    Page 36 of 102

36

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:02AM   1   nobody comes forward to --

          2       **THE COURT:**  Well, how are you --

          3       **MS. WILNER:**  -- assert --

          4       **THE COURT:**  Sorry, I didn't mean to jump on you,

11:03AM   5   especially for the court reporter.

          6       How are you going to determine who's coming forward so

          7   it doesn't like -- when I said I was pragmatic, I am thinking

          8   about when am I going to know?  Is it going to be when the

          9   claim form when you let me know?  Because it's an issue in

11:03AM  10   the case right now, something that the defendants are

         11   concerned about --

         12       **MS. WILNER:**  Yeah.

         13       **THE COURT:**  -- and the Court's concerned about it and

         14   when do you foresee this coming up?  Because I don't see it

11:03AM  15   coming up on summary judgment.  I don't think that's the

         16   stage where somebody raises their hand in the air and says,

         17   by the way, I want to pursue a separate claim for myself on

         18   the following basis.  Where do you see it coming up?

         19       **MS. WILNER:**  I think the claim form --

11:03AM  20       **THE COURT:**  Okay.

         21       **MS. WILNER:**  -- would be where these issues would be

         22   fleshed out.  And we have to remember that there's going to

         23   be general damages.  People are going to be compensated for

         24   their economic harms.  So how many people -- and there may be

11:03AM  25   also, and this is something that we haven't discussed, but

Case 1:18-cv-00719-CCR    Document 244    Filed 12/04/24    Page 37 of 102

37

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:03AM   1    there may be types of harms that they can't be compensated

  2    for in this Class Certification because there's intervening

  3    causation so they're not entitled to it or whatever.  We

  4    haven't gotten to the -- and maybe I messed up the case by

11:04AM   5    bringing in more questions -- I hope not -- but I think the

  6    point is that it's, it's really too early right now to know

  7    the shape of it.

  8        But through the claim form practice, through the claim

  9    form we should be able to have an idea of, you know, how many

11:04AM   10    people are we talking about and what is it that they want to

  11    present.  And we --

  12       **THE COURT:**  That's really not what happens with the

  13    claim form, though.  So, I mean, I've never seen a claim form

  14    that asks potential Class participants after certification --

11:04AM   15    because that's when it would come out -- what do you want to

  16    ask for.  So, for example, in the dairy farmers.  We had a

  17    formula based on milk weight and people provided records of

  18    how much milk they produced during a particular time period.

  19    There was a formula, this is how much you're entitled to.

11:05AM   20    And there was no, like, category "and what else would you

  21    like to complain about that the defendants are doing and seek

  22    recovery for".  So, have you ever seen that in a claim form?

  23       **MS. WILNER:**  I'm not sure that I have.

  24        Another potential option that we've thought about is

11:05AM   25    including something in the notice process that would ask

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

| | |
|---|---|
| 11:05AM | 1 |

11:05AM 1   people to identify whether or not they thought that they

2   would want to present this category of damages.  So I think

3   that there are a number of points in the process where it

4   would be possible to identify whether this is even an issue.

11:05AM 5   **THE COURT:**  Okay.

6   **MS. WILNER:**  Are there other concerns about damages that

7   have been troubling the Court?  No.

8   Moving on, then, to the other piece of the 23(b)(3)

9   discussion, the superiority analysis.  As you know, there are

11:06AM 10   a number of factors that go into the superiority analysis and

11   we discussed many of them in our briefs.

12   I want to rely on our briefs for a lot of the

13   superiority discussion but I do want to highlight the sheer

14   number of Class members in this case because that, in and of

11:06AM 15   itself, weighs in favor of certification.  These -- we've got

16   thousands of people who have identified virtually identical

17   claims and having to litigate those claims one by one by one

18   by one, I mean, that just doesn't make any sense.  That would

19   overwhelm the courts.  That would overwhelm the city.  It

11:07AM 20   would probably overwhelm us, although, you know, we're

21   willing to undertake it if we have to.  And if there's no

22   Class action, then the alternative to doing all of those

23   thousands of trials one by one is just to leave thousands of

24   harmed people with no redress for constitutional violations,

11:07AM 25   and that's not an acceptable outcome, either.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:07AM 1    So just given the strong close association of all of

2    these claims that are virtually the same as each other and

3    the number of people who have these claims, the Class action

4    is clearly the superior and the most efficient vehicle for

11:07AM 5    resolving them.

6    We don't see significant management issues in this

7    Class.  Certainly with Class member identification, the

8    process is nearly complete at this point, just a final step.

9    And we think that the best way to proceed with the trial is

11:08AM 10   to phase the trial.  So, to begin with the jury determination

11   of liability to the checkpoint and Tinted Windows Class

12   members and have that same jury determine general damages

13   afterwards if we prevail on those claims.

14   But I want to make sure that I have an opportunity to

11:08AM 15   answer any additional management questions you have.

16   **THE COURT:**  So management on all checkpoint-based claims

17   seems relatively straightforward and easy.  We have the dates

18   and the times and the tickets.

19   And once you move beyond the checkpoints, then it gets a

11:08AM 20   lot more amorphous and that's what I have been thinking about

21   is when you take it into roving controls and you're

22   essentially asserting the same claims and you have a due

23   process component to it and it will be more difficult to see

24   whether there's any -- that's where I'm kind of getting

11:09AM 25   bogged down.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:09AM  1      **MS. WILNER:**  I see.  So the Tinted Windows Class is just

2      as ascertainable as the checkpoints Class.  And we have a

3      spreadsheet that has on it a list of all of the people who

4      received multiple tinted windows tickets in a single stop.

11:09AM  5      And so identifying the Class members is not going to be a

6      difficulty.  And then --

7      **THE COURT:**  I guess I would just say it's almost a

8      different case and it doesn't mean that you can't bring it

9      but it is -- I understood the crux of the checkpoint, and

11:09AM 10      even the crux of this case, is these checkpoints are targeted

11      to certain neighborhoods and anybody going in or out is going

12      to be detained and it's unconstitutional, it's not reasonable

13      and then to add insult to injury, once they're detained, they

14      get loaded up with traffic violations and it's incentivized

11:10AM 15      and so they are bearing the burden of, you know, paying the

16      overtime.

17      Once you move beyond that, it is a different type of

18      claim which is, in general, what happens when you have tinted

19      windows because obviously if you get stopped with tinted

11:10AM 20      windows, the officer does not know the race of the driver.

21      Then we look at the pinpoint of the stop and whether it's one

22      ticket or two tickets or no tickets.  And are they recording

23      race in those stops?

24      **MS. WILNER:**  No, they did not record race in those

11:10AM 25      stops.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:10AM  1      **THE COURT:**  So you're doing it on the back-end based on

2  the tickets, right?  So --

3      **MS. WILNER:**  Yes.

4      **THE COURT:**  -- how would you eliminate people who were

11:11AM  5  stopped and not given a ticket and the officer says you got

6  to take care of that?

7      **MS. WILNER:**  The Tinted Windows Class -- and maybe let

8  me just go back to the Class definition is defined as:  All

9  Black and/or Latino individuals who received multiple tinted

11:11AM  10  windows tickets from the BPD in a single traffic stop on or

11  after June 28, 2015.

12      So people who were stopped but were not issued a ticket

13  are not members of the Tinted Windows Class.

14      **THE COURT:**  Right.  But I'm trying to figure out how

11:11AM  15  that determination gets made when you're telling me that the

16  race of the driver's not recorded.  There's no record of

17  people who were stopped but weren't ticketed and the argument

18  is that you couldn't be stopping these people based on race

19  because you can't see through the tinted windows.  And

11:12AM  20  that -- I think that's a very different claim than your

21  checkpoint claim.

22      So then I'm into a more of a management in terms of is

23  this even a Class or is this -- if you had a policy that said

24  this is what we're trying to accomplish with tinted windows,

11:12AM  25  then it could be directed at the policy but I don't see it as

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:12AM  1  that black and white in terms of what the policy says.

2      **MS. WILNER:**  Okay.  So, I think there are a few layers

3  here that I'd like to respond to.

4      First of all, your -- I agreed with your description of

11:12AM  5  the Checkpoints Class but the behavior that you were talking

6  about, the targeting of Black and Latino communities and

7  people for traffic enforcement and ticketing wasn't limited

8  to checkpoints.  So the same officers who are doing those

9  checkpoints were also going to those same neighborhoods where

11:13AM  10  the checkpoints were being run and engaging in multiple

11  tinted windows ticketing there.  And those -- many of those

12  same practices are still continuing today and that's the

13  focus of the injunctive claims for the Traffic Enforcement

14  Class.  And I definitely I know that the Court has concerns

11:13AM  15  about that Class so I want to discuss that a lot.

16      So there is a spectrum and a pattern of behavior here.

17  From all of that spectrum and pattern of behavior for the

18  damages Class, we selected out two groups of people whose

19  claims could and should be litigated together because they

11:13AM  20  are so similar and they all experienced the same harm and

21  that's people who are harmed by checkpoints and Black and

22  Latino individuals were harmed by multiple tinted windows

23  ticketing.

24      Now I do want to say that once the officer stops the car

11:14AM  25  and sees the driver and is issuing a tinted windows ticket,

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:14AM   1   that officer does see the race of the driver.

2       **THE COURT:**  Agreed.  But they if they don't record it,

3   we have no way of knowing.

4       **MS. WILNER:**  Oh, I see.  Well, the City does, actually

11:14AM   5   does --

6       **THE COURT:**  I just asked you if they did and you said

7   they didn't so.

8       **MS. WILNER:**  Well, so, it's not quite so

9   straightforward.  The Buffalo Police Department does not

11:14AM  10   require officers to record on the race of -- on the ticket,

11   itself, the race of the person being ticketed.  They could do

12   that but they don't do that.  So it's not on the ticket.

13   But --

14       **THE COURT:**  Nor could it be because you wouldn't be able

11:14AM  15   to discern the race without asking a lot of nosy

16   inappropriate questions.  Always -- I mean, you couldn't

17   always do that.

18       **MS. WILNER:**  Right.  Well, what our police practices

19   expert has said about that is what officers should do is

11:15AM  20   record their perceived -- their impression or their

21   perception of what the person's race is and that what you're

22   actually wanting to do is in that instance is have a record

23   of officers' perceptions.  That's really for the second

24   claim, again, the traffic enforcement claim.

11:15AM  25       But City data actually has matched many of the tickets

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:15AM  1  to a race because the TraCS system in which -- the tickets

2  are in the system called TraCS but TraCS is a part of a

3  larger system that includes everything that the Buffalo

4  Police Department does and that system is called CHARMS.  And

11:16AM  5  CHARMS actually has a lot of race data in it from other

6  situations in which people encountered the justice system and

7  their race was recorded in those other areas because while

8  race is not typically recorded for traffic violations, it is

9  recorded for misdemeanors and other types of encounters that

11:16AM  10  people have with the criminal system.

11      So, in fact, you can go on the city of Buffalo's website

12  and you can go into their data portal and you can download

13  traffic tickets and it has a field in it for the race of the

14  person ticketed and that race is populated most of the time.

11:16AM  15      What our data -- and I don't want to go into too much

16  detail on this because I'm worried I'll get it wrong -- but

17  if you look in Dr. Bjerk's report, he used that City data.

18  But he also had another method of assigning race to

19  individuals.  I don't want to go too much into detail with it

11:17AM  20  but it is explained in a lot of detail.  And the two ways

21  that he did it matched each other.

22      And, so, we are very confident that we are able to if --

23  going back to the question of manageability -- that we are

24  able to identify the race of Class members based on the data

11:17AM  25  that the City has in its possession.  And, of course, if

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:17AM  1  there is a claim form process and if there is a question

2  about a particular individual, it can always be clarified at

3  the proof of claim stage whether or not a person actually is

4  a member of the defined Class.  And, of course, that's

11:18AM  5  something that has to happen regardless.

6      I'm not sure if I was able to, if I, if I got to

7  answering all of your questions about the manageability of

8  this Class.

9      **THE COURT:**  Let's move on.  Yes, you have.

11:18AM  10     **MS. WILNER:**  Okay.  So let's talk about the Traffic

11  Enforcement Class.  And I appreciate your Honor sharing your

12  hesitations and my job is to clear up those hesitations.

13     This is a very different kind of Class because this

14  Class is not seeking damages for past times.  We are seeking

11:18AM  15  declaratory and injunctive relief for ongoing and future

16  violations.  So this is a forward-looking Class.  And the

17  certification is under Rule 23(b)(2).  And so the focus of

18  this Class is on the policies and the practices of the

19  Buffalo Police Department.

11:19AM  20     And it is a broader Class definition.  But it's okay

21  that it's a broader Class definition because the policies and

22  practices that are at stake affect a broader group of people.

23     And the injunctive relief that we're ultimately asking

24  for is going to affect and benefit all of that group of

11:19AM  25  people.  And there's no particular individualized relief that

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:19AM  1  people would be getting as part of this Class.  This is about

2  addressing systemic problems with policies and practices of

3  the police department.  And --

4  **THE COURT:**  Do you see a significant difference between

11:20AM  5  the declaratory component and the injunctive component so

6  saying you can't do X, Y or Z that it's a violation of the

7  Fourth Amendment is one thing.  Enjoining future behavior

8  based on predicting future events is a different task.

9  Do you see the -- do you make that distinction yourself?

11:20AM  10  **MS. WILNER:**  Yes, I do.  They are very different.

11  The standing requirements are the same for the two forms

12  of relief but saying that a constitutional -- that the

13  Constitution has been violated and directing changes in

14  behavior to address the constitutional violation are two

11:20AM  15  different things.

16  But that kind of redress for constitutional violations

17  is commonly done by courts all across the country and in

18  New York.  And we've cited probably six or seven examples in

19  our brief of similar claims for unconstitutional policing

11:21AM  20  practices where courts have redressed those policing

21  practices with injunctive relief and those cases also had

22  similar definitions to the definition in our case.

23  So this is a large Class.  A lot of people are affected

24  by traffic enforcement in the city of Buffalo and because it

11:21AM  25  is prospective, the Class is going to include in it future

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:21AM  1    members.  That's just a nature of the (b)(2) certification

2    always.  And so, again, no issues with numerosity.

3        And, in fact, in its brief, the City conceded all of the

4    23(a) factors for this Traffic Enforcement Class including --

11:22AM  5    **THE COURT:**  Whether the City challenges or the

6    defendants challenge numerosity for any of the Classes?

7        **MS. WILNER:**  They didn't.  They didn't.  And for this

8    Class they didn't challenge commonality or typicality or

9    adequacy, for that matter.

11:22AM  10   But commonality is really important for any (b)(2)

11   certification because if the Court is going to be issuing an

12   injunction, it has to insure that it's addressing the same

13   harms and in this case the court would be --

14   **THE COURT:**  Why does the Court need to have a separate

11:22AM  15   Traffic Enforcement Class?  So, I do think the standing

16   requirement is different in terms of an injunction.  There

17   needs to be a possibility of a injury that's not shared by

18   the general public and I think that I could order injunctive

19   relief without this Class for the other Classes.

11:23AM  20   **MS. WILNER:**  I don't believe that's correct, your Honor.

21   **THE COURT:**  So, if I find, or the jury finds, a

22   violation of the Fourth Amendment and I would have to find

23   that there was some form of prospective harm but I would not

24   need a separate Class to do that.

11:23AM  25   **MS. WILNER:**  I, I think you may, your Honor.  I think

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:23AM    1    you may need the separate Class for the prospective

2    injunctive relief because.

3         **THE COURT:**  So, for example, I'll go back to the dairy

4    farmers.  You can't do this particular monopsony practice any

11:23AM    5    more and you're not allowed to tie compensation to X, Y and Z

6    any more.  You don't need a separate Class for that.

7         **MS. WILNER:**  Mm-mm.  Well, what I would say to that,

8    your Honor, is the, the checkpoints Class and the Tinted

9    Windows Class are seeking damages for two very specific, very

11:24AM   10    tightly bound policies and practices and the reason for that

11    is because looking at the predominance requirement under

12    (b)(3), the Class has to be very unified in that way in order

13    for the common questions to predominant over the individual

14    issues.

11:24AM   15         But in the (b)(2) universe there is no requirement that

16    common questions predominate over individual issues.  All you

17    need is a common question.  And the unlawful behavior that

18    the BPD is currently engaged in is broader than checkpoints

19    and tinted windows.  It is happening in the same

11:25AM   20    neighborhoods.  It's happening to the same people.  So, the

21    Class of Black and Latino drivers in Buffalo is still being

22    harmed by racially discriminatory traffic stops, racial

23    profiling, ticketing.  And that is why injunctive relief is

24    necessary.

11:25AM   25         So the common questions that we're looking at for this

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:25AM  1  Traffic Enforcement Class is whether the City today is

2  continuing to engage in racially discriminatory traffic

3  enforcement and, if so, whether the City's deliberate

4  indifference to that ongoing discrimination has caused

11:25AM  5  practices to continue.  And we've included in this also

6  injunctive relief for the Checkpoints and Tinted Windows

7  Class.

8      I suppose if the preference is to handle, you know,

9  those components, you know, as part of the (b)(3)

11:26AM  10  certification, I don't really have an issue with that.

11      But in terms of the ongoing racial discrimination, we

12  are asking for injunctive relief to correct that harm.  And

13  the question of whether discrimination is happening and

14  whether it is a policy or practice of the City of Buffalo,

11:26AM  15  those questions are important common questions that every

16  single Class member has had.

17      And you had asked about the relevance of the Gennaco

18  Report.  The Gennaco Report is really critical evidence of

19  discriminatory intent and ongoing discrimination.  So, we

11:27AM  20  have a lot of evidence that we intend to present at trial to

21  establish that racial discrimination in traffic enforcement

22  is a current, ongoing practice.

23      **THE COURT:**  But you would agree with me that's not a

24  question I reach in Class Certification?  So I don't need to

11:27AM  25  find that they're not doing a good job training the officers

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:27AM  1  and they're not doing a good job in responding to complaints.

2  None of that is something that I'm going to be inquiring

3  about right now.

4  **MS. WILNER:**  No.  You are going to just be inquiring

11:27AM  5  about whether that question is common to all of the Class

6  members.  And the Gennaco Report supports that it is and it

7  also supports the common nature of the proof that all of the

8  Class members are able to rely on the same body of evidence

9  in order to establish their claims.  So that's really the

11:27AM  10  relevance of the report at the Class Certification stage.

11  **THE COURT:**  Okay.

12  **MS. WILNER:**  In terms of standing, which defendants have

13  challenged, the law in the Second Circuit is that only one

14  named plaintiff needs to have standing in order for the Class

11:28AM  15  Certification to proceed.  Now, of course, we believe that

16  all of our named plaintiffs have standing.  They're in the

17  same position as each other.  They have the same claims as

18  each other.

19  What the courts have said is that when individual

11:28AM  20  plaintiffs in police discrimination or unconstitutional

21  policing case like this, when they have faced repeated past

22  incidents and that there's also an official policy, or an

23  equivalent, that those two things together create standing

24  for prospective relief.

11:28AM  25  And we meet that standard, your Honor.  All of our named

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:28AM  1  plaintiffs have described at least one incident where they

2  believe they were subjected to racial discriminatory traffic

3  enforcement.  Many of them have talked about more than one

4  time when they believe they have suffered discrimination in

11:29AM  5  traffic enforcement from the BPD.

6      There is compelling evidence that we plan to submit

7  around statistical disparities, around racial animus within

8  the Buffalo Police Department, around the mayor's admissions

9  to the Menino Survey of theirs that BPD officers treat white

11:29AM  10  people somewhat better than black people and that racism on

11  the police force is partially responsible for police violence

12  in Buffalo.  So -- and we have a lot of other evidence that's

13  similar.

14      The really critical piece of the Gennaco Report is that

11:30AM  15  it underscores the City's policymakers' responsibility for

16  this situation.  Because discrimination is happening and the

17  City is not correcting it.  They are not supervising

18  officers.  They are not monitoring.  They're investigation

19  process is broken.  It is an unbelievable Catch-22 where the

11:30AM  20  commissioners say that the only thing they can do to address

21  discrimination is to adjudicate individual complaints that

22  people file with the Internal Affairs Department but then the

23  Internal Affairs Department's procedures are so lacking and

24  so far beyond any standard, that they're incapable of

11:30AM  25  assessing whether discrimination is occurring.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:30AM  1          The City has refused to collect data or look at data
2     that could help to elucidate this.  They are not supervising
3     their officers.  They're not auditing.  They're not -- the
4     body camera footage that they agreed that they're not going
11:31AM  5     to look at to see if officers are treating people with
6     respect or treating people in a non-discriminatory manner.

7          And, so, those 120 pages or whatever it is of the
8     Gennaco Report records in detail all of the ways that the
9     policymakers within the City of Buffalo have failed to do
11:31AM  10    anything -- anything -- to identify and address and correct
11    ongoing racial discrimination.  And that gives rise to
12    liability under Monell.  And that is also an official policy
13    that provides the basis for standing.  I will refer the Court
14    to our briefs but we cited a number of very similar cases
11:32AM  15    where courts have found that they had standing to bring
16    claims for prospective injunctive relief.

17          And then -- well, let me just stop here.  Are there
18    questions remaining in your mind on standing?

19          **THE COURT:**  There's questions remaining but you helped
11:32AM  20    my questions and you answered with your answers.

21          **MS. WILNER:**  Thank you.

22          Then you had also asked about the injunctive relief and
23    although I don't have it handy, so I'm going to refer the
24    Court to the amended complaint.  The amended complaint sets
11:32AM  25    out specific relief that we would be asking the Court to

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:32AM
1    order.  And the types of relief that we're asking for are

2    types of relief that are very commonly ordered in other

3    cases.  So whether it's collecting race data for people who

4    are ticketed and then actually being able to look at that

11:33AM
5    data, whether it's improving training for officers, there are

6    some specific things that we've asked for such as not running

7    the checkpoints anymore, and ending the multiple tinted

8    windows ticketing practices.

9        But it's really about changing the policies and

11:33AM
10   practices of the Buffalo Police Department so that it is

11   possible for the police department to meet its constitutional

12   obligations which is to identify when racial discrimination

13   is occurring and to take the steps that it needs to prevent

14   it.  And it's not to say that the City has to -- and I don't

11:33AM
15   think it can -- prevent 100 percent of every incident from

16   ever occurring but the City has to have policies and

17   practices in place to address the situation.  It can't just,

18   you know, put its head in the sand and allow discrimination

19   to continue and to say, oh, I didn't, I didn't know about it.

11:34AM
20   I've buried my head in the sand, I've chosen not to look and,

21   therefore, I don't have to do anything, that's not the way

22   the ball works and that's --

23       **THE COURT:**  The City --

24       **MS. WILNER:**  -- not what the Constitution demands.

11:34AM
25       **THE COURT:**  If the City said we are going to stop all

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

| | | |
|---|---|---|
| 11:34AM | 1 | checkpoints except DUI checkpoints and we're going to have a |
| | 2 | policy that if you issue a tinted window violation, you can |
| | 3 | only issue one, how much of your injunctive relief -- other |
| | 4 | than general don't violate the Fourth Amendment -- how much |
| 11:34AM | 5 | of your injunctive relief would go by the wayside? |
| | 6 | **MS. WILNER:**  I don't think very much, your Honor, |
| | 7 | because a really important part of this Class is the fact |
| | 8 | that the Buffalo Police Department is continuing to engage in |
| | 9 | racial profiling with stops and with tickets.  And, so, it's |
| 11:35AM | 10 | extremely important that there be changes to monitoring |
| | 11 | supervision and discipline of officers to prevent that racial |
| | 12 | profiling and racially-motivated stops and ticketing from |
| | 13 | continuing.  And that's not relief that really flows from |
| | 14 | either of the Checkpoints Class or the Tinted Windows Class. |
| 11:35AM | 15 | It's really broader and it's about practices that are |
| | 16 | happening now. |
| | 17 | **THE COURT:**  So -- |
| | 18 | **MS. WILNER:**  And prac -- |
| | 19 | **THE COURT:**  So getting back to the pragmatic. |
| 11:35AM | 20 | **MS. WILNER:**  Yeah. |
| | 21 | **THE COURT:**  And you know that if the Court issues an |
| | 22 | injunction, it has to be very specific -- |
| | 23 | **MS. WILNER:**  Yeah. |
| | 24 | **THE COURT:**  -- as to who it's directed to and what's |
| 11:36AM | 25 | necessary and it can't be just comply with the Fourth |

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:36AM   1    Amendment.

2         **MS. WILNER:**  Right.

3         **THE COURT:**  And it can't be:  Adopt appropriate measures

4    to insure that documentation of all civil traffic stops and

11:36AM   5    vehicle checkpoints is retained.

6         I mean, it has to be very, very specific.

7         **MS. WILNER:**  Yeah.  So, this is not something that --

8    it's in our briefing but I can tell you that's the main thing

9    that our organization does is these kinds of civil rights

11:36AM  10    Class Actions seeking injunctive relief to reform complex

11    governmental systems so that they comply with the

12    Constitution and the law.

13        And so the way that that normally happens there's a

14    couple of paths.  One is that we could get to a point where

11:36AM  15    the defendants and we agree that there is a problem and

16    sometimes this doesn't happen until after the liability

17    issues have determined but once -- it's very common that

18    there is then a collaborative process between the parties and

19    the Court to determine the shape of the injunction that's

11:37AM  20    eventually issued.

21        **THE COURT:**  Well, that's why --

22        **MS. WILNER:**  I --

23        **THE COURT:**  -- I asked if they disavow future

24    checkpoints and they say no tinted window tickets beyond one,

11:37AM  25    how much of that takes care of that.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:37AM  1      But I'm understanding you to say you're looking for much

2    broader reforms?

3      **MS. WILNER:**  That's correct.  So that really wouldn't --

4    that would not provide adequate relief to our Class but what

11:37AM  5    the relief would be, there has to be a lot more detailed

6    conversation about that.  So, sometimes the courts will ask

7    each side to make a detailed proposal.  There can be

8    hearings.  There can be presentation of evidence.  In the

9    *Floyd* case -- which was the New York City stop and frisk

11:38AM  10   case -- there was a lot of testimony and presentation and a

11   very detailed injunctive plan that the judge issued after

12   taking in all the evidence from both sides.

13     So there's different ways that courts handle this.  But

14   you have to be able to hear from both sides because there is

11:38AM  15   information that we have from our clients' experience and

16   there's information that the defendants have from, on their

17   side, from their administrative oversight of policing.  And

18   an injunction is only effective when both sides are able to

19   provide that information to the Court and then relief is

11:38AM  20   fashioned to address the specific practices that are causing

21   the harm.

22     And usually there are also a series of benchmarks or

23   goals that we would meet or expectations that have to be met

24   in order to determine whether the injunctive relief is

11:39AM  25   achieving the goal of ending the constitutional violation.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:39AM    1    So it is a step-by-step process but it's one that courts do

2    frequently.

3        I think I'll conclude and step down, your Honor.  Thank

4    you.

11:39AM    5    **THE COURT:**  All right.  Let's start with defendants.

6    We've got about a little shy of a half hour before noon.  I'm

7    happy to break later if you want but I want to give you equal

8    opportunity.  So however long you want to take, I will be

9    here.

11:39AM   10    **MR. RUSS:**  Thank you, your Honor.

11        I don't intend on taking that long unless it's to answer

12    your questions.

13        Thank you.  And may it please the Court.

14        Before I get started, I wanted to thank the Court for

11:40AM   15    coming from Vermont, for bringing her staff from Vermont.  I

16    know it's out of the ordinary and we truly appreciate it.

17        I guess the best we could do for you is to get some

18    green marble.

19    **THE COURT:**  That does look like Vermont marble.

11:40AM   20    **MR. RUSS:**  Also, your Honor, congratulations.  I

21    understand that you are now chief.

22    **THE COURT:**  For the second time, yes.

23    **MR. RUSS:**  And I'm sorry that I have no PowerPoint.  I

24    have no real excuse other than I'm kind of a dinosaur.

11:40AM   25        I'm going to go, actually, backwards.  I'm more

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:40AM   1   concerned with addressing the Court's musings than I am

2   making a formal argument.  So what I will try to do is

3   address some of the musings that you have made and then if

4   there's something left, I'll do a formal argument.

11:41AM   5       But just before I address the musings, I feel compelled

6   to say two things:  Even though we are talking about

7   discriminatory practices and, you know, for purposes of this

8   motion, we are talking about discriminatory practices and

9   discriminatory policies, the City defendants, and in

11:41AM  10   particular the Mayor and the Former Mayor, do not concede

11   discrimination.  It's difficult for me to imagine that our

12   Mayor, who just stepped down last week, had been mayor for 19

13   plus years and is Black and one of the police commissioners

14   involved during the timeframe of this case is Black, and a

11:42AM  15   number of the police officers involved are Black, it's just

16   difficult to conceive that the kind of discriminatory animus

17   that plaintiffs recite existed.

18       And the other thing I feel compelled to say, your Honor,

19   is that you had asked for some background on the checkpoints

11:42AM  20   and how they operated.

21       **THE COURT:**  But you would, you would agree with me,

22   women discriminate against women, people over the age of 40

23   can discriminate against other people over the age of 40.  I

24   mean, there isn't any preclusion that just because you are a

11:42AM  25   member of the alleged targeted Class, that categorically you

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:42AM    1    couldn't be engaged in discrimination?

2        **MR. RUSS:**  I do concede that, your Honor.  However, I

3    state that the way it's been framed in this case is this vast

4    conspiracy and in order for plaintiffs' claims to be

11:43AM    5    believed, all kinds of people were working together to erect

6    the system and carry out this process and it's just, it's not

7    supported by the evidence.

8        The second thing that the Court should know -- and this

9    is about the checkpoints.  You had asked to explain how they

11:43AM   10    worked and how they operated.  Well, plaintiffs left out the

11    start.  The checkpoints started when the East Side of

12    Buffalo -- which I will stipulate is predominantly Black and

13    has been since the 1940s -- the east side of Buffalo through

14    public meetings, many at churches, others at community

11:43AM   15    centers asked the mayor and the police department for a

16    greater police presence on the East Side.

17        And the first -- the first and motivating principle of

18    the checkpoints was traffic safety.  There were reports that

19    cars were racing through the East Side and bad things were

11:44AM   20    happening with cars and we had to do something about the

21    traffic on the East Side.  That was the start of everything.

22    So, I mostly agree with plaintiff's recitation of how the

23    checkpoints operated, at least the factual part, but it

24    started with a request from the community for a greater

11:44AM   25    police presence.  Okay.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:44AM   1       Your musings.  Your first musing was you asked us to

2   discuss summary judgment and how summary judgment might fit

3   into this process.

4       **THE COURT:**  Do you mind if I stop you --

11:44AM   5       **MR. RUSS:**  Sure.

6       **THE COURT:**  -- and go back to -- assume that I, you

7   know, for the sake of argument, that your recitation about

8   how they work and why they were set up works.  I'm trying to

9   understand in Fourth Amendment reasonableness terms.  So,

11:45AM   10   there's a request for a police presence, you start these

11   checkpoints, the checkpoints, I assume based on what I've

12   read, were for public safety not, not so much people are

13   driving too fast but somebody's going to get killed or to get

14   people who have outstanding warrants, that kind of thing.

11:45AM   15       Then what's the thought process with the traffic tickets

16   coming out of it?  How does that get factored into it?

17   Because whether somebody has tinted windows or not doesn't

18   have anything to do with how fast they're driving or how

19   recklessly they're driving and it doesn't have anything to do

11:45AM   20   with whether there's an outstanding warrant or there is an

21   unlicensed firearm in the car or the person's a felon or

22   anything else like that.  So what's that step about?

23       **MR. RUSS:**  So, I think you put your finger on it, your

24   Honor, when you were talking about safety.  If you just stop

11:46AM   25   people and let everyone go with no consequences, what's the,

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:46AM 1   what's the deterrent or what's the remedy for the, for the

2   neighborhood?  But if in during the stop you find that there

3   are -- you have probable cause, you find that there are

4   violations, and then you issue tickets for those violations,

11:46AM 5   I think that goes to the purpose of stopping the problem

6   traffic.

7        **THE COURT:**  Okay.  I can --

8        **MR. RUSS:**  In other words if you just stop.

9        **THE COURT:**  No, I understand the consequent part.

11:46AM 10       But to me it sounds a fair amount like stop and frisk,

11   where the policy is you're going in, you're going to get

12   stopped and you're going to get frisked.  Everybody's going

13   to go in.  So it creates an incentive don't come in with a

14   gun, don't come in with drugs because this is going to happen

11:47AM 15   to you every time you go into the City.  And I'm not seeing

16   any kind of concession by the City that that's what this is.

17       And, so, if it's general crime -- or I would say violent

18   crime, then it doesn't seem to make sense to issue the

19   traffic violations and if it's only about traffic

11:47AM 20   enforcement, it seems like overkill in that you would have,

21   you know, a secondary inspection and you would be stopping

22   people on their way to work and to the grocery store and back

23   from school because of an unregistered vehicle or suspended

24   license.  And, as I said, it doesn't really seem to make any

11:47AM 25   difference whether somebody's got a registered vehicle in

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:48AM 1    terms of how careful they drive.  In fact, they might drive

2    more carefully because they don't want to get stopped and

3    have the lack of registration be found.

4        So, that's the step I'm missing in terms of how does

11:48AM 5    this make sense in any kind of objection, you know, and I use

6    the example in my musings of there was a shooting on this

7    particular corner last night, let's get a traffic checkpoint

8    there the next day.  To do what?  To show a police presence?

9    Okay, that's one thing.  But to garner evidence of that

11:48AM 10   crime, it's probably too late for that.  So that's where I'm

11   stopped.

12       **MR. RUSS:**  Yeah, I think you said Broadway and

13   somewhere.

14       **THE COURT:**  Fillmore or something.

11:48AM 15      **MR. RUSS:**  Let me try three answers to that because I

16   can never do just one.  First one, it is not a stop and frisk

17   or it's not like a stop and frisk because not everyone is

18   detained.

19       **THE COURT:**  Well they're all initially detained.

11:49AM 20      **MR. RUSS:**  They're all stopped.

21       **THE COURT:**  Right.

22       **MR. RUSS:**  But it could be two seconds and they're

23   going.

24       **THE COURT:**  But we would agree that that stop is a

11:49AM 25   detention.  Whether it violates the Fourth Amendment or not,

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:49AM  1    it's a seizure.

2        **MR. RUSS:**  I agree that the stop is a detention.  I

3    don't think it's a stop and frisk because it's not applied to

4    everyone single person no matter what.

11:49AM  5        **THE COURT:**  Well let me ask:  Everybody going through

6    that checkpoint has to stop.  So it's not like a -- it's not

7    even like a DUI checkpoint where they're like we're going to

8    stop every fourth car, everybody gets stopped, correct?

9        **MR. RUSS:**  Yes, your Honor.  But some get waved right

11:49AM 10    through so that the stop is a matter of seconds.

11        The second thing I was going to say, your Honor, is that

12    your own description of the deterrence was, oh, I'm going to

13    get stopped and I'm going to get a ticket for such and such

14    and so and so.  That's the deterrence.

11:50AM 15        **THE COURT:**  Okay.

16        **MR. RUSS:**  Even you --

17        **THE COURT:**  Okay.

18        **MR. RUSS:**  Even you said that.

19        And the third -- I'm getting old.  I can't remember.  If

11:50AM 20    it comes back to me, I'll say it.  But...

21        **THE COURT:**  Well I was asking about how would it help

22    after a crime.  Does that prompt you?

23        **MR. RUSS:**  Oh, you did ask that.  And what I was going

24    to say -- and I'm not exactly articulate on this, I

11:50AM 25    understand, but because checkpoints may be inartfully set up

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:50AM  1  or set up in sort of some, perhaps, questionable locations,

2  that doesn't mean they're set up for discriminatory purposes

3  and it doesn't mean that because they are set up in certain

4  places, that, you know, automatically there's this violation

11:51AM  5  of the Fourth Amendment.

6      **THE COURT:**  Agreed.

7      **MR. RUSS:**  Bad judgment is not a violation of the Fourth

8  Amendment, I don't think.

9      You had asked about summary judgment and how does it fit

11:51AM  10  in.  I understand that Class Actions are complicated and

11  motion heavy.  But I just don't see summary judgment here at

12  all on anything, even the most basic issue were our practices

13  discriminatory?  We're going to say no, they're going to say

14  yes.  That's a question of fact.  And that's before you get

11:51AM  15  to any individual concerns.  And I just, I just -- I don't

16  know how.

17      **THE COURT:**  Well, there's a robust body of law on the

18  Fourth Amendment as to when you can stop people and when you

19  cannot.  And if there isn't a special need and, you know, the

11:52AM  20  best example is the DUI checkpoints which are generally, if

21  they're handled well, are deemed constitutional.  I'll be

22  looking at other checkpoints.  I mean, the border's kind of

23  not a good example because of the heightened ability of law

24  enforcement near the proximity of the border.  But there's

11:52AM  25  plenty of cases about doing that too far from the border and

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

| | |
|---|---|
| 11:52AM | 1 |
what happens to the analysis under the Fourth Amendment if
you're not in close proximity to the border.  But you're in
Montpelier, Vermont and you're checking cars to see if
somebody is in the country without status.  So it's not like
it couldn't be resolved on summary judgment.

**MR. RUSS:**  I agree with you in theory, your Honor.  And
if this were, you know, one checkpoint or one week or one set
of checkpoints, then maybe that you can determine whether
that would violate the Fourth Amendment.  But you have
hundreds here.  And then within those checkpoints, you have
potentially hundreds of stops.  So I just --

**THE COURT:**  But maybe if I could resolve nothing on
summary judgment, so be it.  Do you think that that's kind of
a pivot point for Class Certification?

**MR. RUSS:**  The Fourth Amendment claims?

**THE COURT:**  No.  I mean, whether I can -- I wanted you
to be pragmatic and you're being pragmatic for me by saying
you're right, this is not something we can just do on summary
judgment, we're going to have to have a trial and that's
fine.  But that's not much of a pivot point for Class
Certification or not, would you agree with me?

**MR. RUSS:**  I would agree with you but I was endeavoring
to answer the Court's first question, first musing.

**THE COURT:**  Okay.  So you think this is not a case in
which --

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:54AM    1        **MR. RUSS:**  No.

           2        **THE COURT:**  -- we can do it?

           3        **MR. RUSS:**  No.

           4        **THE COURT:**  Okay.

11:54AM    5        **MR. RUSS:**  And I'll go further, your Honor.  I've had

           6    Class actions where -- that I've defended where we -- and

           7    maybe your dairy farmer one was like this -- where you can

           8    kind of whittle things down but I just don't see that here.

           9        You mused about general damages.  There may be some

11:54AM   10    questions of general damages here but it's virtually all

          11    individual.  And the most obvious element or the most obvious

          12    example of that is, okay, each of these claimants states that

          13    my Fourth Amendment rights were violated.  Well, how does

          14    that affect that person?  What did that cause?  How did they

11:55AM   15    feel?  Did they have job consequences?  Did they have

          16    financial consequences?  All that, all those individual kind

          17    of questions -- which I'll talk more about -- I think so far

          18    outweigh any notion of general damages.

          19        The second thing I would say, your Honor --

11:55AM   20        **THE COURT:**  Well, let me stop you on that point.  Do you

          21    agree -- and the plaintiffs didn't so you don't have to worry

          22    about it -- they could do away with all of that, they could

          23    say all we're seeking is general damages and we weren't

          24    looking for any individualized harm recovery other than this

11:55AM   25    economic component which they say we can easily determine

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

| | | |
|---|---|---|
| 11:55AM | 1 | because we've got the records of how many tickets and who |
| | 2 | they went to and how much they paid and what the impound fees |
| | 3 | were, they could do away with the whole question of how in |
| | 4 | particular was your Fourth Amendment violation for you? |
| 11:56AM | 5 | **MR. RUSS:** I agree with that, your Honor, but I don't |
| | 6 | see that coming. |
| | 7 | **THE COURT:** It's not coming to. |
| | 8 | **MR. RUSS:** And I think -- I'm sorry to refer to your |
| | 9 | dairy farmer case -- but you had mentioned, you had started |
| 11:56AM | 10 | to describe damages on that based on the weight of the milk |
| | 11 | and the volume, whatever. You know, that's a case where |
| | 12 | there's a formula. And at least as it's pled now, there's no |
| | 13 | formula. Everything's individual. |
| | 14 | You had asked about the Traffic Enforcement Class and I |
| 11:56AM | 15 | know you asked counsel a bunch of questions and I don't |
| | 16 | necessarily want to repeat those. But what I'd like to add, |
| | 17 | your Honor is a couple things. |
| | 18 | You did note that the City has stopped doing these |
| | 19 | checkpoints and the current Commissioner of Police, Joseph |
| 11:57AM | 20 | Gramaglia testified under oath that they're stopped, there's |
| | 21 | no future intent to do them. |
| | 22 | But I feel -- this is maybe a little obnoxious and I |
| | 23 | apologize -- but I feel as if plaintiffs don't really know |
| | 24 | what they want. And I feel, I feel like it's, you know, |
| 11:57AM | 25 | Donald Trump being asked what he's going to do and he says, |

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:57AM   1   well, I have a concept of a plan.  That means you don't have

          2   a plan.  And I don't think that they know.  What is the

          3   injunctive relief?  Don't violate the law?  You know, don't

          4   violate the Fourth Amendment?  I just -- I don't see it.

11:57AM   5       **THE COURT:**  Well, let me ask you about the Traffic

          6   Enforcement Class, obviously the one the Court has the

          7   biggest problem with, and especially the injunctive relief

          8   component.  And there is a body of law that's recent from the

          9   Second Circuit that talks about you can't just say, well,

11:58AM  10   Commissioner Jane says she's not going to have -- she's got

         11   no plans for another checkpoint and that's enough to take

         12   care of the injury because somebody else can say I'd, you

         13   know, change that policy in a heartbeat.  And we just had a

         14   case challenging a facial challenge to a statute in Vermont

11:58AM  15   about harassment by electronic means where somebody was

         16   posting, tagging somebody as a racist and there's apparently

         17   a group that then attack the business and whether that was a

         18   violation.  And I found standing because even though the

         19   Attorney General was like we're not going to do this and we

11:58AM  20   don't enforce these, it had happened once and there's no

         21   guarantee that it won't.  But people do disavow:  We're not

         22   going to do this again.  And we, you know, a City Council can

         23   do that.

         24       And that's not happening in this case, either.  So I'm

11:59AM  25   not hearing there will be no more checkpoints.  There will be

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

11:59AM   1   no more than one ticket for tinted windows.  So those are all

2   things that are concrete and it's not a statement like don't

3   violate the Fourth Amendment.  I mean, I could order those

4   things, if the proof merited it.

11:59AM   5     **MR. RUSS:**  I definitely think that you could order those

6   things.  And I hesitate to say this but I think some of that

7   relief, we'd probably stipulate to.

8     **THE COURT:**  I agree.  And I raise that because those are

9   kind of things that -- that's why I asked Ms. Wilner if those

12:00PM  10  two components, how much would be left of injunctive relief

11   and she had, you know, good answers but, yes, that is what

12   happens in some of these cases, without an admission of

13   liability, this isn't going to happen and that's not going to

14   happen.

12:00PM  15    **MR. RUSS:**  Right.  So --

16     **THE COURT:**  That's kind of beyond what we have to do for

17   Class Certification.

18     **MR. RUSS:**  That's all right, your Honor.  It's, it's

19   more fun than talking to a wall, so no worry.

12:00PM  20    Other things about the injunctive relief Traffic

21   Enforcement Class.  I told you the practice has stopped but

22   what happens if you enter an injunction and it's violated,

23   does the Court have to enforce everything, does the Court

24   have to address every claimed violation of the injunction?

12:00PM  25  Does the Court have to involve itself in the operations of

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

12:01PM | 1 | the Buffalo Police Department?

2 | I'm not sure that it's something that the Court would

3 | want to do, let alone be equipped to do and a concrete

4 | specific injunction about one practice, you know, that's

12:01PM | 5 | easily monitored but this kind of nebulous amorphous concept

6 | of a plan, practice, I don't know how the Court deals with

7 | that and I don't know that the Court wants to deal with that.

8 | You asked some questions and there was some discussion

9 | of the plaintiffs' expert report, Gennaco Report.  And what I

12:01PM | 10 | wanted to add to the discussion, your Honor, is that that 120

11 | something page report talks about ideal practices and best

12 | practices and what certain police departments do and should

13 | do and what the Buffalo Police Department does and should do.

14 | And I would just say, your Honor, that I don't think it

12:02PM | 15 | has any relevance to this motion right now, first of all.

16 | And, second of all, if it does, the fact that the Buffalo

17 | Police Department may not use best practices does not equal

18 | constitutional violations.  So, that they could improve their

19 | practices doesn't give rise for some kind of finding of

12:02PM | 20 | discrimination and result in an injunction.

21 | **THE COURT:**  I think the answer was -- and it was a good

22 | one -- is that all of the Class members could use the same

23 | expert and whether it would be admissible in this particular

24 | case is a whole different issue but they wouldn't need to go

12:03PM | 25 | out and get their own experts because they would use this

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

12:03PM   1   report.

2        **MR. RUSS:**  I'm not going to concede that, your Honor.

3   But let's say that, that was the process.  Don't you have to

4   evaluate whether the challenged practices went into the

12:03PM   5   setting up of every checkpoint and each officer's disposition

6   on a certain night in a certain neighborhood, you know, went

7   into the kind of was not a best practices thing, was not a

8   discriminatory?  I mean, I understand that the report is

9   probably helpful to kind of tell the background and to show

12:03PM  10   that the police department does have problems.  But I don't

11   know how it translates into each individual Class member's

12   claim.

13        **THE COURT:**  I agree.

14        **MR. RUSS:**  We spent a lot of time talking about the

12:04PM  15   Checkpoint Class and the Tinted Windows Class and the point I

16   want to make, your Honor, and the point I would have tried to

17   make if I had given you a straightforward formal argument is

18   that while there may be some common questions, there are

19   unlimited individual questions on both sides, both on the

12:04PM  20   liability side and on the damages side.  And the damages you

21   spent a lot of time talking about and I don't need to go

22   through all of that, I don't think.

23        But just the point that I made about, you know, a

24   violation of the Fourth Amendment, how did that affect that

12:05PM  25   individual person?  What happened to that person because of

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

12:05PM  1  it?  That's an individual -- that's an individual analysis.

2  There's no way you can do that on a common basis.

3  **THE COURT:**  Well, they can, they can do that.  They can

4  say for each Fourth Amendment violation, we are seeking a

12:05PM  5  allegedly nominal sum of damages of $100 per Class member.

6  They can do that.  That's one way.  And then they say, you

7  know, don't worry about that because we're going to stop our

8  damages after that secondary detention.  So, if you were

9  going to base it on the first detention which we're saying is

12:05PM  10  unconstitutional, the secondary detention unconstitutional,

11  we weren't going to take up whether you get arrested, you get

12  strip searched, whether you're detained for three hours

13  later, whether there's probable cause, whether there's no

14  probable cause, that's all not going to be part of our case.

12:06PM  15  And they can carve out their case that way and arguably they

16  probably would make their case easier if they carved out

17  individual damages, period, that way.  But that's why I

18  started with they're the masters of their complaint and they

19  can decide how to plead it.

12:06PM  20  **MR. RUSS:**  That's not how it's pled.

21  **THE COURT:**  I agree.

22  **MR. RUSS:**  And as the defendant, I have to address how

23  it's pled.  And the pleadings seek those kind of damages

24  which are individual damages.

12:06PM  25  Maybe some aspect of it could be the dairy farmer

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

12:06PM   1   formula like we were stopped once, then we were stopped

2   twice, you know, that's a hundred dollars.  But if you start

3   getting into how long were you stopped the first time, how

4   long were you stopped the second time, what happened, that's

12:07PM   5   just all individual.  And I, I don't know how we do that with

6   the thousands and thousands and thousands of plaintiffs here

7   considered.

8       **THE COURT:**  It's after noon now.  And, like I said,

9   we're here all day and we tried to get an earlier flight

12:07PM  10   based on your time period.  We didn't get one so we can go

11   all day.

12       Would you like to break for lunch and come back because

13   we're going to have a little bit of time for rebuttal so it

14   seems like it might not be a bad idea.

12:07PM  15      **MR. RUSS:**  I want to make the court happy.  So if that

16   is what makes the court happy, I'm happy.

17       **THE COURT:**  We do have court staff.  I could continue

18   but I want to give them a break, as well.  Why don't we come

19   back at five after 1 for resumption, and does that work for

12:07PM  20   everybody?

21      **MR. RUSS:**  Yes, your Honor, thank you.

22      (**WHEREUPON,** luncheon recess taken.)

23      (Open court:)

24      **THE COURT:**  We are back on the record in *Black Love*

1:14PM  25   *Resists in the Rust, et al. v. the City of Buffalo.*

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:14PM    1        Reminder to the people on YouTube, that we do not allow

          2   any recording.

          3        And we are in the defendant's argument.

          4        And you may resume.

1:15PM    5   **MR. RUSS:**  Thank you, your Honor.

          6        And for the people out there in hyperspace, I'm Hugh

          7   Russ representing the defendants.

          8        And I'm close to finishing, your Honor.  I did want to

          9   make a few more points.  Before I do, I, again, want to thank

1:15PM   10   the Court for coming to Buffalo and bringing its staff to

         11   Buffalo.  This really has been helpful, so thank you.

         12        I wanted to say a couple more things about damages.

         13   Counsel made the point that the plaintiffs' Monell claims

         14   could be a general question for the entire Class or Classes.

1:15PM   15   And I think that's probably right whether the City had a

         16   policy, custom or procedure that applied, I think is a

         17   general question.  But whether it applied in each

         18   circumstance and that's -- you know, the police officers at

         19   issue were acting out of some general policy or procedure --

1:16PM   20   is an individual question that has to be addressed at every

         21   single stop.

         22        The Court asked some questions and counsel made some

         23   argument concerning whether there was financial motive to

         24   issue the tickets and while there have been documents and

1:16PM   25   other evidence seeming to suggest that the City was trying to

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:16PM  1   raise revenue through the issuance of more and more traffic

2   tickets, all of the individual officers who testified during

3   depositions said that that was not their motive, that

4   overtime wasn't their motive, that the number of tickets

1:17PM  5   wasn't their motive, that they were just doing their job.

6   So --

7       **THE COURT:**  But, but that's -- self-serving testimony

8   can be admissible.  There are documents that talk about

9   overtime incentives and the desire to have maximum

1:17PM  10  enforcement of the traffic laws and you need to be issuing

11  those tickets and I think one of the phrases "we're looking

12  for production".  So, that will be a question of fact.

13      My concern was much more specific.  It's one thing to

14  say in the checkpoints, these officers were allegedly

1:18PM  15  motivated by amping up their production to get overtime.

16  It's another thing to say in the entire City of Buffalo, all

17  the time for every reason, these people were stopping

18  individuals and violating their rights in order to garner

19  more overtime and rise up in their career.  And the

1:18PM  20  conversation was about, well, almost every police department

21  probably recognizes productivity and, you know, I mean, how

22  would that be a claim that would be proveable and that's more

23  of a question for a motion to dismiss but that was what I was

24  concerned about.  Any thoughts about that?

1:18PM  25      **MR. RUSS:**  As usual, your Honor, you have phrased it

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:18PM  1   better than I have.  But I think that's the exact concern.

2   And the attendant concern is -- related concern is

3   complimented by the point that the City changed its system of

4   traffic tickets from a state-based system to a City-based

1:19PM  5   system so that it could keep the revenues.  Every City, town,

6   village in New York does that or did that and the City was

7   actually very late in doing that.  So, yes, it is evidence of

8   something but I don't think it's evidence of the Fourth

9   Amendment violation that plaintiffs believe.

1:19PM  10       I was listening to counsel's argument about damages and

11  what damages they were seeking and what damages they weren't

12  seeking and at one point I heard, oh, only general damages

13  but then I heard also individual damages and I don't think

14  they know, first of all, but, second of all, as soon as you

1:19PM  15  go into individual damages, you have individual questions

16  that make a Class inappropriate.

17       I wanted to call the Court's attention to one case in

18  our brief:  *Townes*.  And that stands for the proposition that

19  even if there is an unConstitutional stop, if the discipline

1:20PM  20  meted out, that is the tickets, are valid and reasonable and

21  lawful, then you can't recover damages for the ticket and the

22  attending damages, you can only recover for the

23  unconstitutional stop and so that's going to have to be

24  applied to every, every individual claim and, again, that

1:20PM  25  frustrates the Class treatment.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:21PM  1       **THE COURT:**  Do you think, though, that that shifts if

2  the claim is limited to any time there's more than two

3  tickets or two tickets and more for tinted windows?  Because

4  I think the argument is, you never need to do more than one.

1:21PM  5  It's unlikely that a driver has a tinted windshield and

6  nothing else.  So, it's likely the whole car's tinted because

7  that's the whole purpose.  So you can kind of assume that one

8  ticket would serve the whole car.  And then you don't really

9  have to get into whether it should have been issued or it

1:21PM  10  shouldn't have been issued because you're talking about the

11  number as opposed to whether it was valid.

12       **MR. RUSS:**  I understand that concern, your Honor.  I

13  would call the Court's attention to another case in our

14  brief.  It's *Torres*.  And that involved, rather than moving

1:22PM  15  violations, that involved parking violations.  And the Court

16  basically held that multiple parking violations within a

17  relatively short time period were permissible and, you know,

18  I think it's the same, same idea here.  Is issuing multiple

19  tinted windows the best judgment?  Or the best use of police

1:22PM  20  time?  Probably not.  But it is permissible and --

21       **THE COURT:**  Well, it's certainly permissible but I think

22  that their argument is different than that.  They're saying

23  the stop was unlawful, unconstitutional.  The secondary

24  inspection:  Unconstitutional, unlawful.  And anything that

1:22PM  25  flows from it is the fruit of the poisonous tree but we're

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:23PM  1  going to limit our claims to two tickets for tinting because

2  one ticket would suffice and we can show that black and

3  Latino drivers caught the two tickets and more and the white

4  drivers were, you know, given one ticket.  So even if that

1:23PM  5  was permissible, that would still be discriminatory and it

6  wouldn't be okay just because you can do it.

7      I mean, there's lots of things you can do, like if you

8  strip search every female who goes to a jail, even if you

9  have the right to strip search visitors to the jail but

1:23PM  10  you're singling out the females, you could still have a

11  constitutional claim.  So I think that they're narrowing that

12  down fairly finally in terms of trying to target what is

13  unconstitutional and what flows from it.

14      Why isn't that -- if the first stop and the second stop

1:24PM  15  are unConstitutional for sake of argument, why wouldn't it be

16  the fruit of the poisonous tree?

17      **MR. RUSS:**  First of all, your Honor, the *Townes* case

18  that I mentioned talks in that language.  So I would

19  encourage the Court to read it.  And the Court says no,

1:24PM  20  that's not the fruit of the poisonous tree.

21      Secondly, your Honor --

22      **THE COURT:**  So I read *Townes* but remind me:  They found

23  no Fourth Amendment violation or they found a Fourth

24  Amendment violation and they said you can't recover for the

1:24PM  25  consequences of it.  You can recover for the violation but if

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:24PM 1   the ticket that results or the arrest that results is valid,

2   no recovery for that.  Isn't that how it came out?

3       **MR. RUSS:**  That's exactly how it came out.

4       **THE COURT:**  Okay.

1:24PM 5       **MR. RUSS:**  The second thing I would say, your Honor, is

6   that in the example you mentioned of the strip searching of

7   women, that's a situation -- or I hear that's a situation

8   where every single woman is stopped and strip searched, that

9   there's no discretion involved, some get passed through the

1:25PM 10  system without it, others don't.  And I think the tinted

11  windows situation, it just would require more individual

12  questions.  Why were you -- why did you issue four or why did

13  you issue three or why did you issue two?  And the

14  circumstances of that depend on each situation.  And, again,

1:25PM 15  I don't know how you do that on a Class basis.

16      **THE COURT:**  I think you could possibly do it on the

17  checkpoints.  I'm not persuaded you could do it elsewhere.

18      **MR. RUSS:**  I would think that -- and I'm sorry I keep

19  referring back to your dairy farmer Class action idea -- but

1:26PM 20  if, if the Checkpoint Class were limited to, you know, some

21  similar question, were you stopped or not and then the

22  damages from that might be, you know, $25 per tinted window

23  or something like that, some, some formula, then I could see

24  a Class limited like that.  But to have to evaluate

1:26PM 25  everything that happens and that happened and why it happened

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:26PM  1    and who did what and how people felt, that's just not right.

2        **THE COURT:**  Well, they're -- plaintiffs are telling the

3    Court:  We're not going to do that.  We're going to stop at

4    that secondary stop and so we're going to prove the first

1:27PM  5    stop was unconstitutional.  The second detention unreasonably

6    prolonged a unconstitutional stop and that's it.  We're not

7    going to get into whether the arrest was good or not.  We're

8    not going to be seeking to recover for that.  Because I asked

9    the same question you're asking:  Isn't it a different injury

1:27PM 10    if you're arrested without probable cause versus there's an

11    arrest warrant, it's valid and that's why you're taken into

12    custody and they said we're not going to be doing any of

13    that.

14        So if they limit it that way to the first and the second

1:27PM 15    stop, why wouldn't that be a common question that wouldn't

16    require any kind of individualized inquiry?  Because

17    according to them -- and I think there's a concession --

18    everybody's stopped.  Everybody that goes through the

19    checkpoint is stopped.  It's not like a DUI checkpoint where

1:27PM 20    there's a preexisting we're going to stop every fourth car.

21    It's everybody.

22        **MR. RUSS:**  Just on that, your Honor, I think some people

23    were waved through so I don't think everyone was stopped.

24    And when you were asking questions about, well, how do you

1:28PM 25    identify people that didn't get the tinted windows -- that

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:28PM    1    were stopped but didn't get the tinted windows?

2         **THE COURT:**  So you think that there was no -- that some

3    people didn't even have to brake, they were just waved

4    through.

1:28PM    5         **MR. RUSS:**  Well, they had to slow down and come through

6    slowly but, yes, certainly some were just waved through

7    (indicating).  I had a brilliant answer for you and I lost

8    it.  I apologize.

9         So, that's a long way of saying, your Honor, that on the

1:28PM   10    damages Classes, there are just way too many individual

11    questions.  There may be some common questions but the

12    predominance is not common questions.  The predominance is

13    decidedly individual questions.

14         I wanted to just mention a couple more things.  Counsel

1:29PM   15    mentioned something like only 1 percent of the cases are

16    seeking individual damages and that the, that's the tail

17    wagging the dog.  They still require work and, you know, if

18    they're thousands and thousands and thousands of people, that

19    means that thousands and thousands and thousands of discovery

1:29PM   20    demands, maybe depositions.  So, just because it may be a

21    minor part of the damages claimed, you know, does not

22    eliminate the work involved in getting this case ready.

23         I know the Court has asked good questions, frankly, and

24    I've done my best to answer them but if there's anything else

1:30PM   25    that you need at this point, I'm happy to try.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:30PM    1         **THE COURT:**  Nope, thank you.  You did a nice job.

2         **MR. RUSS:**  Thank you, your Honor.

3         **THE COURT:**  Any rebuttal argument?

4         **MR. WILNER:**  Yes, your Honor.  Thank you.

1:30PM    5         So I'd like to start with clarifying some of the points

6    that were raised just in this last discussion and then I have

7    a few more points I'd like to address after that that go back

8    to the conversation that was happening before the break.

9         So -- and I'll start with the applicability of the

1:31PM   10    *Townes* case which you were just discussing.  *Townes* does not

11    create a need for individual determinations in this case.

12    *Townes* is a Fourth Amendment case and it applies only to

13    Fourth Amendment violations and as your Honor observed and

14    I'm just making very clear, we are not seeking damages for

1:31PM   15    tickets and arrests.  We're really not seeking damages for

16    arrests at all but tickets under the Fourth Amendment.

17         *Townes* does not apply to the Equal Protection Clause and

18    we know that has to be true because the Supreme Court has

19    held that racial discrimination is actionable regardless of

1:32PM   20    whether the stop is supported by probable cause.

21         And, lastly, just in terms of the facts of *Townes*,

22    *Townes* held that un -- that damages for unlawful detention

23    are available under the Fourth Amendment.  In that particular

24    case, Mr. Townes didn't seek damages for unlawful detention.

1:32PM   25    All of the damages that he was seeking were for the

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:32PM    1   imprisonment that happened after he was charged and then he

2   was tried, he was in jail for a long time.  The conviction

3   was eventually reversed because the -- I think there was a

4   bad stop and search at the beginning of it.  So the Court

1:32PM    5   held that there was an intervening causation factor that

6   prevented him from being able to recover for those damages

7   that occurred after the prosecution and punishment for those

8   charges.  But the Court absolutely held that damages would be

9   available for the unlawful detention prior to the intervening

1:33PM   10   act of the prosecutor and the judge.

11       And that's what we're seeking in this case:  That

12   unlawful detention window.  So there is no need to get into

13   individualized questions of probable cause for that.

14       The other case that counsel just brought up, the *Torres*

1:33PM   15   case, that was a case about procedural due process violations

16   with parking tickets.  And we haven't raised a procedural due

17   process claim in this case.  *Torres* does not speak to whether

18   multiple ticketing can violate the Equal Protection Clause

19   and, clearly, if multiple ticketing is motivated by racial

1:34PM   20   animus, it can violate the Equal Protection Clause.

21       I think this takes me into the issue of the Tinted

22   Windows Class and your Honor had expressed some doubt about

23   whether perhaps there was sufficient commonality or whether

24   it would be necessary to look into officer level motivations

1:34PM   25   for the tint -- for the Equal Protection Claims.  And, again,

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:34PM    1    our primary claim for Class purposes is that the

2    Commissioners who were setting the policy were acting with a

3    racial motivation.  And that that setting of policy allowing

4    the discriminatory tinted windows ticketing to continue when

1:35PM    5    they knew all about the practice, allowing it to go forward,

6    that that harmed our Class members, and our Class members can

7    recover for that harm.

8         And it's not important to decide for that, for that

9    issue whether or not, in addition, there was a separate and

1:35PM    10    additional violation of the Equal Protection Clause by the

11    officer who issued the ticket.  If a racially discriminatory

12    policy is harming all members of the Class, then all members

13    of the Class are entitled to recover for that harm.

14         **THE COURT:**  But the proof of the harm, so the evidence

1:35PM    15    that's going to answer that, as the *Wal-Mart* case talks about

16    evidence that's going to answer questions, where is that

17    evidence going to come from and how is it going to be kind of

18    processed on a Class certification basis?  So, never mind the

19    checkpoints because you are not confining it to the

1:36PM    20    checkpoints, where is that common proof coming from?

21         **MR. WILNER:**  Yeah.  Well, *Arlington Heights* sets out a

22    mosaic of factors that are used to decide discriminatory

23    intent.  A really important aspect of the Arlington Heights

24    standard is statistical disparities so that's one piece of

1:36PM    25    evidence that we're going to be relying on and the

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:36PM  1    statistical disparities in terms of multiple tinted windows

2    tickets are really stark.  The practices were ubiquitous so

3    they were practices that were known to everybody in the

4    Buffalo Police Department and the Commissioners all testified

1:36PM  5    that they knew about them.  There is other evidence that we

6    plan to introduce under Arlington Heights that goes to racial

7    animus within the Buffalo Police Department, the historical

8    context, all of those factors.  So this is common evidence

9    that will get to the question of whether there was a

1:37PM  10    discriminatory intent on behalf of the Monell policymaker.

11    And if the jury agrees with us that there was such an intent,

12    then the City is going to be liable for the harm that flowed

13    from the discriminatory policy.

14        **THE COURT:**  Okay.

1:37PM  15        **MR. WILNER:**  I wanted to also briefly address the issue

16    about being waved through checkpoints and want to state

17    unequivocally that that first passing through a checkpoint is

18    a seizure for Fourth Amendment purposes.  I don't think

19    there's any "waved-through" at the checkpoints because

1:38PM  20    everybody who was waved through was still subject to a visual

21    inspection for details that could be observed at common view

22    that wouldn't be observable if they weren't slowed down to

23    either a stop or an extremely slow roll.  As well, none of

24    the Class members, none of the people passing through the

1:38PM  25    checkpoints being subject to that initial inspection were

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:38PM    1    free to leave.  In fact, the policy specifically required

2    that police should chase down and stop anybody who seemed

3    like they were trying to evade a checkpoint.  So it's very

4    clear that even that first passing through the checkpoint was

1:38PM    5    a seizure for Fourth Amendment purposes.

6        **THE COURT:**  So the secondary checkpoint, not an issue.

7    Are there cases that say wave-through is a seizure?

8        **MR. WILNER:**  I would have to look and see if there's

9    specific cases, your Honor, but the general Fourth Amendment

1:39PM   10    standard for a seizure is going to turn on whether the person

11    would been free to leave the police encounter and there --

12    people were not free to leave.  They absolutely were subject

13    to that stop and that was, it was a stop that was made

14    entirely without any kind of individualized suspicion.  It

1:39PM   15    was dragnet policing in black and Latino communities.

16        But if that's a point that would be helpful to have more

17    commentary on it, we can look and see if there are cases that

18    specifically look at that first pass and provide it after the

19    argument.

1:39PM   20        **THE COURT:**  Well, I'm not aware of any case that says a

21    wave-through is a stop.  But I'm also not aware of anything

22    that says if you have to go through the checkpoint to get to

23    your home or to get into a neighborhood or go to the grocery

24    store and instead of coming to a full stop, you're allowed to

1:40PM   25    slowly roll through it, that's not a seizure because we want

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:40PM  1    those brakes on, that seems kind of a crazy standard, so.

2         **MR. WILNER:**  Okay.  I'll leave it there, your Honor.

3         I'd like to address some of the points regarding damages

4    and I don't think that we've talked a lot about how general

1:40PM  5    damages would be determined.  I'm not sure if that's a

6    question that the Court may have concerns about.  But we've

7    cited a number of cases in our materials in which general

8    damages were awarded in Class Actions.  The jury has

9    determined the amount of the general damages but it is

1:40PM 10    essentially a trial by formula.

11         So how we would see this working, for example, for the

12    unlawful detentions is that the jury would determine the

13    dollar value of the length of time of the detention and then

14    that formula would be applied to every Class member who

1:41PM 15    passes through the checkpoint.  And there really isn't a lot

16    of authority or examples out there to apply general damages

17    to an Equal Protection violation.  But the principle is the

18    same:  That it would be up to the jury to determine uniform

19    amount to apply that is tied to the inherent harms of the

1:41PM 20    constitutional violation and that is the amount that every

21    Class member would get.

22         **THE COURT:**  So I think our focus was not so much on what

23    the jury would do, although that's a good point, because the

24    jury's going to do what you ask it to do or the Court asks it

1:41PM 25    to do.  And at this point, from plaintiffs' standpoint, there

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:42PM   1   isn't any kind of formula, or at least I didn't see one

2   proposed, of this is how we're going to do it.  And that's

3   when I asked, you know, pragmatically what are you going to

4   be seeking and how would that happen and what would it look

1:42PM   5   like?  And I suggested to opposing counsel you could say $100

6   for every stop.  You're suggesting you would potentially tie

7   some monetary amount to the duration of the stop.

8       **MR. WILNER:**  Correct.  And we did in our opening brief

9   in the section of the brief that discusses manageability,

1:42PM  10   there is some discussion of how -- and actually I believe we

11   covered it in our reply brief, as well.  So we have offered

12   some examples of how courts have administered general damages

13   in Class actions in other cases.  The question of individual

14   damages, again, we believe that the primary individual

1:43PM  15   damages in this case are the economic harms that are already

16   known and stored in City records and where those damages are

17   very easily administered.

18       **THE COURT:**  But this is where I really think the

19   defendants have some traction.  You could say the tip of

1:43PM  20   iceberg.  You can say it's a small fraction of what we're

21   doing.  But in terms of court time and the need for

22   evidentiary hearings and whether it fits into Rule 23 and is

23   going to be effective, that's where it doesn't matter if

24   it's, you know, a request for $25.  If we're going to have a

1:44PM  25   jury trial on it, that's going to be where it breaks down.

89

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:44PM    1       So that's the concern is not that it's just a small

2    fragment of what you're requesting, it's the time constraints

3    in that fragment and whether it makes sense if we, I mean,

4    what are we going to have an evidentiary hearing for 6,000,

1:44PM    5    10,000 people?  I mean, that would be unmanageable.

6       **MR. WILNER:**  I agree that that could potentially be

7    unmanageable but that's not a reason to deny Class

8    Certification now.  So, for starters, if we look at the --

9       **THE COURT:**  But their point is -- and I agree you've got

1:44PM   10    the better point -- their point is that takes predominance

11    out.  So if you're talking about 10,000 evidentiary hearings

12    on individual damages and I look at the common, you know, the

13    commonality and the predominance and what can I get resolved

14    as a Class, their argument is this pie is way bigger and so

1:45PM   15    this isn't a Class Action suit.  You're not going to be able

16    to achieve much by proceeding as a Class.

17       I agree with you that courts often do it this way

18    anyways because at least it's easier to manage some parts of

19    the case but that's the concern.

1:45PM   20       **MR. WILNER:**  Yeah.  And I, I absolutely understand the

21    concern.  I mean -- the *Betances* case I think we just

22    submitted in a supplemental briefing, I think the Court in

23    that case was very thoughtful about the different kinds of

24    damages and how they were handled.  The Court in that case

1:45PM   25    absolutely said that it was always appropriate to certify the

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:45PM   1   Class at least for the liability phase and *In re Nassau*

  2   *County Strip Search Cases* says the same thing because in

  3   liability, all of the issues are common.  So at least for

  4   liability Class certification, it's definitely appropriate.

1:46PM   5       In *Betances*, the Court then went on to also look at how

  6   it could administer at least those parts of damages that were

  7   common and were general.  I proposed to the Court because

  8   Class certification is flexible and the court always retains

  9   a lot of control over how to manage the proceedings and, for

1:46PM  10   that matter, defendants can move to decertify a Class at any

 11   time.  And in *Betances*, I think they moved four times to

 12   decertify the Class as the Class moved along.

 13       The most efficient thing to do is to certify the Class

 14   based on the overall predominance of the liability and the

1:46PM  15   fact that most damages questions are common, to adjudicate

 16   the common questions which includes liability and the common

 17   damages, and then at that point we'll know a lot more about

 18   whether there even are individual damages claims.  At this

 19   point they don't even know if they will materialize.  But if

1:47PM  20   they do materialize, we'll have a much better idea of how

 21   significant they are, how many people are bringing them on,

 22   and then can decide what to do.  And it may be at that point

 23   that the Class needs to be decertified, if there is an

 24   unmanageable number of individual Classes.

1:47PM  25       But if you're looking at this from a superiority

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:47PM   1   perspective, those Class members are so much better off

         2   having liability determined which would be probably

         3   impossible for them to do on their own without us to

         4   represent them in that trial, having their general damages

1:47PM   5   determined, having their economic harms determined.  That

         6   leaves a small amount for them to handle on their own as

         7   opposed to just abandoning them to have no recourse for those

         8   claims.

         9        That said, I do want to say I can't stand up here today

1:48PM  10   and disclaim those damages because I would need to have

        11   conversations with our clients.  But if the Court feels that

        12   this issue really would be an impediment to certification, we

        13   certainly would like the opportunity to discuss it with our

        14   clients and, you know, reconsider the position that's been

1:48PM  15   taken here today.

        16        **THE COURT:**  So I'm not an interventionalist judge and

        17   don't get involved.  I point out -- like if you discontinue

        18   the practice of issuing two tickets for tinted windows some

        19   of the injunctive relief goes out the window.  It's nothing

1:48PM  20   you can't see for yourself.  You decide what you want to do.

        21   I've expressed my concerns about that portion of the case.

        22        **MR. WILNER:**  Okay.  Thank you very much.

        23        I'd like to go back to the traffic enforcement Class and

        24   answer, I think a few doubts that I heard from the Court on

1:49PM  25   that Class.  And I'd like to stop -- or, actually, start with

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:49PM  1    the Class definition.  And this is not a boundless Class.

2    This is a Class comprised of people who have been or will be

3    subjected to traffic stops, traffic tickets and traffic

4    safety vehicle checkpoints.

1:49PM  5        **THE COURT:**  Think about it this way.  I've got to issue

6    a notice -- and you'll be helping me draft it, along with the

7    defendant if I grant Class certification -- who is that

8    notice going to.

9        **MR. WILNER:**  Yeah.  So for the (b)(2) certification,

1:49PM  10   there is no requirement for individualized notice.

11       **THE COURT:**  But still who's it going to?  It's going to

12   be in the newspaper --

13       **MR. WILNER:**  Yes.

14       **THE COURT:**  -- and it's going to say if you are black or

1:50PM  15   Latino and you plan to drive -- and you have driven in

16   Buffalo or you plan to drive in Buffalo, you may be a Class

17   member?

18       **MR. WILNER:**  The way we usually handle notice for (b)(2)

19   Class actions is notice by publication, as well as usually

1:50PM  20   we'll provide notice to places that are likely to have a

21   proof of contact with Class members so that they can provide

22   notice.  So, for example, the Legal Aid Society that's often

23   representing defendants in tickets, legal, other legal

24   services programs, community organizations that are in the

1:50PM  25   community.  So we would provide notice --

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:50PM | 1 | **THE COURT:** I'm not --

2 | **MR. WILNER:** That --

3 | **THE COURT:** -- so concerned with where.

4 | **MR. WILNER:** Yes.

1:50PM | 5 | **THE COURT:** Would it say:  If you're black or Latino --

6 | I'm looking at your --

7 | **MR. WILNER:** Yes.

8 | **THE COURT:** -- definition, that's what it would say?

9 | **MR. WILNER:** Yes.  The notice would provide the Class

1:51PM | 10 | definition as well as to me it makes sense because the (b)(3)

11 | Class members would be each entitled to an individual notice

12 | of the certification of the damages Classes and so it would

13 | make sense to me to also include specific individual notice

14 | to them.  They would also be members of the traffic

1:51PM | 15 | enforcement Class.  So they would -- it's not required under

16 | the rules but it would be no extra cost to provide a

17 | specific --

18 | **THE COURT:** And would you agree with me that the Class

19 | would then include any black or Latino individual who either

1:51PM | 20 | drives currently or may want to drive in the future in

21 | Buffalo?

22 | **MR. WILNER:** No, that would be an overbroad look at the

23 | Class definition.  The Class definition is limited to people

24 | who are actually subjected to traffic stops, traffic tickets,

1:51PM | 25 | and traffic safety vehicle checkpoints.

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:51PM  1      **THE COURT:**  Or will be.

2      **MR. WILNER:**  The --

3      **THE COURT:**  Or will be.

4      **MR. WILNER:**  Or will be.  But they don't become a member

1:52PM  5  of the Class until they actually experience the traffic

6  enforcement.  It's a little weird but that's the way that

7  courts normally think about it.  So it's in determinant in

8  the sense that the Class contains future members whose

9  identity is not known now but when they become subject to the

1:52PM  10  particular defined activity, they are known.  And a traffic

11  stop, a traffic ticket, these are things that the City of

12  Buffalo has records of.  So there isn't ever really a

13  question about who is and isn't a member of the Class.  And

14  then, furthermore, all the relief is directed at the

1:52PM  15  defendants, it's directing them to change their practices.

16      **THE COURT:**  So if it was retrospected, it's

17  ascertainable.  I don't see how it's ascertainable if we're

18  talking about future conduct.

19      **MR. WILNER:**  Well, again, the question for

1:53PM  20  ascertainability is whether the definition is based on

21  objective factors.  And these are objective factors.

22      **THE COURT:**  Well -- but they can't be speculative.  Like

23  if the objective factor is:  Are you likely to be offended if

24  your car is stopped without reasonable suspicion, I could say

1:53PM  25  that's objective.  But there's no way of you have to get into

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:53PM   1   some subjective analysis:  Is the person going to be

         2   offended?  And when you get into will be subjected to traffic

         3   stops, traffic tickets and traffic safety, you're not talking

         4   about any collected data that the City has produced.  You're

1:53PM   5   talking about somebody who says this hasn't happened to me

         6   but it may happen to me in the future and then I'm going to

         7   be part of the Class.  That seems like it would be everybody.

         8   Anybody who was -- unless they're not committed to never

         9   driving.

1:54PM  10       **MR. WILNER:**  I...

        11       My cocounsel reminds me that in *Floyd* and in *Plaintiffs*

        12   *1 through 21 v. county of Suffolk,* very similar Class

        13   definitions were approved and it was -- it is the same issue

        14   of people now and in the future being subjected to certain

1:54PM  15   policing practices.  So --

        16       **THE COURT:**  Did you know what those, what the future

        17   Class, the language of the future Class in those cases was?

        18       **MR. WILNER:**  I can look it up and maybe I can go -- I

        19   mean, I could go on to address other issues while we look it

1:55PM  20   up.

        21       **THE COURT:**  Why don't you do it as a supplemental.

        22       **MR. WILNER:**  Yes.

        23       **THE COURT:**  Because I haven't seen something that broad.

        24       **MR. WILNER:**  Yes, okay, I think that's a good idea.

1:55PM  25   That will give us a chance to gather together some more

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:55PM  1    examples for you.

2          Thank you, your Honor.

3          So I wanted to address the relevance of the Gennaco

4    Report for this traffic enforcement class.  And we have a

1:55PM  5    deliberate indifference *Monell* theory in this Class.  That is

6    one of the main things that we are planning to prove.

7          A major part of our deliberate indifference theory is

8    that the City can did not properly handle complaints of

9    racial discrimination in traffic enforcement that it received

1:55PM  10   through its Internal Affairs Division and through other

11   sources.

12         And another important aspect of our deliberate

13   indifference theory is that the City did not properly audit

14   or supervise or train its officers.  The Gennaco Report is

1:56PM  15   not that the Buffalo Police Department didn't use best

16   practices.  It's that the practices of the Buffalo Police

17   Department in all these areas fall below generally accepted

18   standards and that they did so in a way that's likely to

19   cause discrimination to continue in the future.

1:56PM  20         So, the Gennaco testimony is really there as a core

21   underpinning of establishing the *Monell* deliberate

22   indifference that really is at the heart of the prospective

23   claims.  And this kind of evidence is really traditional and

24   well-trodden path to proving deliberate indifference on the

1:57PM  25   part of police officials and police policymakers.  So that

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:57PM   1   would be the purpose of the Monell report.  It's not on Class

2   certification -- or excuse me, Gennaco Report on Class

3   certification.  It's really to establish the common body of

4   evidence.

1:57PM   5       But when we get into the trial of this case, it will be

6   there to show that the City is deliberately indifferent and

7   that there is an intent to discriminate that rises to the

8   level of a municipal policy.

9       **THE COURT:**  And your deliberate indifference is which

1:57PM  10   claim?

11       **MR. WILNER:**  It's the Equal Protection Claim, deliberate

12   indifference to ongoing racial discrimination.

13       Now the opposing counsel had criticized the injunctive

14   relief we were seeking as not being specific.  But there

1:58PM  15   isn't a requirement under Rule 23 that injunctive relief be

16   specifically enumerated in the complaint or at the Class

17   certification stage.

18       What Rule 23 requires is that we establish -- and this

19   is Rule 23(b)(2) -- that defendants have acted or refused to

1:58PM  20   act on grounds that generally apply to the Class.  And the

21   deliberate indifference *Monell* theory, that's our primary

22   theory for this claim.  That is exactly refusing to act on

23   grounds that are generally applicable to the Class.

24       The other piece of the definition is so that final

1:59PM  25   injunctive relief is appropriate with respect to the Class as

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1:59PM  1  a whole.  And if the Court finds or the other -- in this

2  case, it's an injunction so you would be the fact-finder.  If

3  the Court finds that the City was deliberately indifferent to

4  ongoing violations of the Equal Protection Clause, then

1:59PM  5  injunctive relief would be appropriate for the Class as a

6  whole because the remedy that would be applied would be

7  reforming those policies and practices to prevent the

8  discrimination from continuing.

9  Now it's really difficult at this stage to say what all

1:59PM  10  the pieces of the relief are.  Because remedies are usually

11  handled in a separate proceeding after the liability stage,

12  assuming liability is established.  And it's often, as I said

13  before, a collaborative process.  But if it's not a

14  collaborative process, typically courts will get briefing

2:00PM  15  from both sides on what they think the injunctive relief

16  should be.  There's often a hearing.  There may be testimony

17  or evidence that's presented about the different practices

18  and how they should be performed and the Court would use that

19  information in order to fashion an injunction.

2:00PM  20  **THE COURT:**  So, let me make sure I have the right

21  starting point of how we got here.  I thought the plaintiffs'

22  position is the traffic enforcement Class is about injunctive

23  relief and you and I had that debate about whether you need a

24  separate Class for injunctive relief and I was saying I don't

2:00PM  25  think you do and you were saying I think I do.  And that's

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

2:00PM  1   why we're getting into "so what are we talking about".

2   Because if the argument was one of the many things we request

3   is injunctive relief, that's one thing.  The Court is asked

4   routinely to do that in cases, civil rights cases.

2:01PM  5       If it's I want you to certify a Class now for only for

6   injunctive relief, then there are more specific questions

7   about for what, for whom, who's in the Class, how do we

8   determine who's in the Class, and that's how we got there.

9       **MR. WILNER:**  Mm-mm.  Well, I think it may be helpful to

2:01PM  10  address this as well as part of the supplemental brief

11  briefing.

12      **THE COURT:**  Okay.

13      **MR. WILNER:**  Because it really all goes together and

14  maybe me saying more on this topic isn't going to help now.

2:01PM  15  But I would like to provide more of that underpinning for the

16  Court about how these cases worked with those.  What we're

17  asking for is not something that --

18      **THE COURT:**  But even if it, you know, mirrors, it's

19  great if three other people do it, it doesn't mean that I do

2:02PM  20  it.  So it really makes much more sense if you tell me how

21  it's going to work in this case as opposed to telling me,

22  Judge So-And-So in the Southern District of New York did

23  this --

24      **MR. WILNER:**  Well --

2:02PM  25      **THE COURT:**  -- okay?

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

2:02PM  1      **MR. WILNER:**  Yes.  We will definitely keep that in mind.

2           This is a Class that is bringing claims primarily under

3      the Equal Protection Clause for ongoing violations of the

4      Equal Protection Clause that go towards racially

2:02PM  5      discriminatory traffic stops, traffic tickets.  And we, if we

6      establish that, that discrimination is ongoing, that the City

7      has been deliberately indifferent to it, then we will have

8      won the liability case and then the remedies would happen

9      afterwards in order to redress that violation of

2:03PM  10     constitutional rights and it's a forward-looking claim.  So

11     our standing is to -- we have to be focused on harms that are

12     happening now and future harms.

13          Again, there are questions about how the injunctive

14     relief, once it is articulated, would be managed over time.

2:03PM  15     Usually --

16          **THE COURT:**  I'm not actually worried about that --

17          **MR. WILNER:**  Okay.

18          **THE COURT:**  -- now.  There's often recourse for doing

19     that.  Sometimes the parties have an obligation to try to

2:03PM  20     work it out themselves.  That's not something that is

21     particularly novel.

22          **MR. WILNER:**  Okay.  In that case, your Honor, I'd like

23     to leave you with these words from *Floyd v. City of New York*.

24          "If the BPD is engaging in a widespread practice of

2:04PM  25     unlawful stops, then an injunction seeking to curb that

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

2:04PM 1   practice is not a 'judicial intrusion into a social

2    institution' but a vindication of the Constitution and an

3    exercise of the courts' most important function:  Protecting

4    individual rights in the face of the government's

2:04PM 5   malfeasance."

6        **THE COURT:**  Anything further in this matter?

7        **MR. RUSS:**  No, your Honor.  I would simply again thank

8    the Court for coming here, and for its musings.  And I would

9    suggest that as the Court reviews what has happened today and

2:04PM 10   the briefs and everything else, and look at the transcript

11   and look at how we either did address or didn't address the

12   Court's concerns.  Thank you.

13       **THE COURT:**  All right.  Well, we love coming to Buffalo.

14   It's a good food town, nice midwestern charm.  We've been

2:04PM 15   here before, as the court reporter knows.  So no harm in us

16   coming to Buffalo.  I'm going to give you an opportunity to

17   respond to the plaintiffs' supplemental authority or brief.

18   So, you know, you'll have 14 days after it comes.  Don't wait

19   too long to give it to me.  It's not like the decision's

2:05PM 20   going to be issued tomorrow but do it in a timely fashion.

21       Anything else that we can address?

22       **MR. WILNER:**  No, thank you, your Honor.

23       **MR. RUSS:**  No, your Honor, thank you.

24       **THE COURT:**  Thank you.

2:05PM 25       (**WHEREUPON**, proceedings adjourned.)

BLRR, et al vs. City of Buffalo, et al - 18-CV-719

1

2

3

4                          *              *              *

5                      CERTIFICATE OF REPORTER

6

7              In accordance with 28, U.S.C., 753(b), I

8    certify that these original notes are a true and correct

9    record of proceedings in the United States District Court

10   of the Western District of New York before the

11   Honorable Christina Clair Reiss on October 23, 2024.

12

13

14   S/ Diane S. Martens

15   Diane S. Martens, FCRR, RPR
     Official Court Reporter

16

17

18

19

20

21

22

23

24

25