# Exhibit 9

```
 1      UNITED STATES DISTRICT COURT

 2      FOR THE WESTERN DISTRICT OF NEW YORK

 3      ---------------------------------------------

 4      BLACK LOVE RESISTS IN THE RUST, et al.,
        individually and on behalf of a class of
 5      all others similarly situated,

 6                          Plaintiffs,

 7       -vs-                        1:18-cv-00719-CCR

 8      CITY OF BUFFALO, N.Y., et al.,

 9                          Defendants.

10      ---------------------------------------------

11          EXAMINATION BEFORE TRIAL OF RICHARD HY

12                 APPEARING REMOTELY FROM

13                  ERIE COUNTY, NEW YORK

14

15

16                    July 19, 2023

17                9:58 a.m. - 5:37 p.m.

18                   pursuant to notice

19

20

21      REPORTED BY:

22      Carrie A. Fisher, Notary Public

23      APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK
```

DEPAOLO CROSBY REPORTING SERVICES, INC.

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

```
 1            R E M O T E   A P P E A R A N C E S

 2       APPEARING FOR THE PLAINTIFFS:

 3            COVINGTON & BURLING LLP
              BY: ANDREW TIMMICK, ESQ.
 4            The New York Times Building
              620 Eighth Avenue
 5            New York, New York 10018
              (212) 841-1277
 6
         APPEARING FOR THE DEFENDANTS:
 7
              HODGSON RUSS LLP
 8            BY: PETER SAHASRABUDHE, ESQ.
              140 Pearl Street
 9            Buffalo, New York 14202
              (716) 848-1508
10
         ALSO PRESENT:
11
              EVA LILIENFELD, Law Clerk
12            Covington & Burling LLP

13            GIOVANNI SCARCELLA, Law Clerk
              Covington & Burling LLP
14
              ANJANA MALHOTRA, ESQ.
15            National Center for Law
              and Economic Justice
16

17

18

19

20

21

22

23
```

RICHARD HY

1                Go ahead.
2           A.   The checkpoint would have a number of cars in
3                the center of the street or on the side with
4                lights on so that we could be visible from a
5                long distance away, and vehicles would drive
6                up to an officer in the center of the road or
7                in that specific lane of travel.  And the
8                officer would identify vehicle and traffic
9                violation; for example, bald tires or somebody
10               not wearing a seat belt or specifically
11               registration and inspections that were
12               expired, and then they would issue a ticket
13               for those violations.
14                     If there were no violations seen, then
15               the vehicle was just told to carry on.  Often
16               people would ask us, you know, what was the
17               checkpoint for.  We'd say inspection,
18               registration, seat belt checks, and then they
19               would carry on with their day.
20          Q.   Were inspection and registration violations a
21               focus for the Strike Force?
22          A.   Yes.
23                     MR. SAHASRABUDHE:  Objection to form.

RICHARD HY

1   Q.  Why is that?
2           MR. SAHASRABUDHE:  Objection to form.
3   A.  I -- I'm not sure what you're asking is why is
4       what?
5   Q.  Did your superiors inform you that inspection
6       and registration violations were a focus for
7       the Strike Force?
8   A.  Yes.
9   Q.  And did they tell you why they -- the Strike
10      Force had that focus?
11  A.  I don't remember if they gave us specific
12      guidance as to why that was.  I just don't
13      remember.  I'm sorry.
14  Q.  That's okay.  That's fine to not remember.
15          As a Strike Force officer, what was your
16      role in the checkpoints?
17  A.  Usually when an officer that was in that
18      center lane or on the specific lanes of travel
19      saw a violation and then was going to go write
20      up that vehicle, that officer would take the
21      identification of the person, tell them to go
22      park to the side, and then create that traffic
23      summons.  They would then get replaced by an

RICHARD HY

1         officer that was not doing that.
2               So if you can imagine kind of like a
3         circular diagram where you have an officer at
4         the checkpoint, sees a violation, stops the
5         vehicle, issues the summons, and then returns
6         to that point to check more vehicles.  In that
7         circle you're having other officers replace
8         the officer that steps off the line.  So
9         that's kind of I guess the way that you would
10        describe it is a round-robin kind of rotating
11        who is up next to start seeing which
12        violation, if any, there are in the oncoming
13        traffic.
14   Q.   So just to make sure I understand correctly,
15        if an officer stopped a driver at a checkpoint
16        initially, they would continue to engage with
17        that driver throughout the driver's duration
18        at that checkpoint?
19   A.   It could be that singular officer that saw
20        that or it could be their partner that was
21        next to them that also viewed the violation.
22        So you could have an instance where myself and
23        a partner -- we will say Officer Pitts was my

RICHARD HY

```
 1        general conversation about wondering how much
 2        money the City was able to get from the
 3        tickets that we issued.
 4   Q.   Did you understand generating revenue to be a
 5        purpose of the checkpoints?
 6   A.   No.
 7   Q.   And did you ever recall having a conversation
 8        about that topic with your superior officers
 9        while on Strike Force?
10   A.   Which topic?
11   Q.   Generating revenue for the City as a result of
12        checkpoints.
13   A.   No.  I don't -- I don't think so.
14   Q.   Were you ever asked to increase the number of
15        tickets you wrote at a checkpoint?
16   A.   No.
17   Q.   So at a checkpoint, if I recall correctly, you
18        mention that a driver might be stopped for a
19        violation and moved to a secondary location;
20        am I remembering that correctly?
21   A.   It -- yes.
22   Q.   And so I'm going to refer to that as a
23        secondary inspection.  Does -- do you
```

RICHARD HY

1       understand that if I use that term?
2    A. Yes.
3    Q. Okay.  So in what instances would a motorist
4       be referred to a secondary inspection?
5           MR. SAHASRABUDHE:  Objection to form.
6       Go ahead.
7    A. Well, I'm not sure what you mean by "a
8       secondary inspection."
9    Q. All right.  So when you noticed a violation,
10      what would you do with that motorist?
11   A. Oh.  If we were at a checkpoint and I was the
12      officer in the middle of the road or in those
13      lanes of travel and I saw an infraction for a
14      vehicle driving up, let's say an inspection
15      because they're so easy to see with the
16      different color and obviously the big hole in
17      the middle of the month, I would say:  "Hey,
18      how you doing today?  My name is Officer Hy,
19      Buffalo Police Department.  Hey, what's going
20      on with the inspection?  Your inspection is
21      overdue."
22          And I would make a conversation with the
23      driver to see if they were aware of it.  And

RICHARD HY

1   then I would ask them for their ID, and then I
2   would ask them to pull over to the side of the
3   road.  And then I would walk over to them and
4   I would continue my conversation about the
5   inspection sticker and any other violations
6   that I might have seen.
7   Q. Were there any violations for which it was not
8      necessary to have a motorist pull over to the
9      side of the road to continue that interaction?
10         MR. SAHASRABUDHE:  Objection to form.
11  A. I don't know what that means.
12  Q. So you mentioned that -- for example for an
13     inspection sticker, if you noticed a
14     violation, you would have them pull over to
15     continue the interaction with the motorist; is
16     that -- that's correct?  Am I understanding
17     that right?
18  A. I think so.  I want to make sure.  You're
19     saying that if I saw an infraction, I would
20     ask them to pull over and then we would
21     continue our conversation?
22  Q. Yes.  Is that correct?
23  A. Yes, that is correct.

RICHARD HY

1  Q. And was there any violation, any violation for
2     which you didn't ask them to pull over; it
3     wasn't necessary to engage in that secondary
4     stop on the side?
5  A. I have seen --
6         MR. SAHASRABUDHE:  Objection to form.
7  A. I've seen violations before and then still
8     told people to, you know, carry on, like bald
9     tires or people that were on their way to get
10    the vehicle inspected and they were able to
11    provide a, like a -- not a receipt but like a
12    handbill stating they were scheduled for
13    something at like Dunn Tire.  But every time I
14    saw an infraction I didn't always issue a
15    ticket, if that's what you're asking.
16 Q. How did you determine when you would issue a
17    ticket and when you wouldn't if you saw an
18    infraction?
19 A. Oh geez, there were a lot of factors involved
20    in that.
21 Q. What factors?
22 A. Like you're able to look up a person's history
23    when you're writing a ticket.  So if I'm

RICHARD HY

1   Q.  And do you recall an estimate for how long it
2       would take to verify someone's license -- or
3       identification, excuse me?
4   A.  If they had their ID on them and it was that
5       individual's ID, several minutes.  But if they
6       did not have their ID on them and you were
7       unable to find them in DMV, that process of
8       trying to identify who they were and their
9       license and the validity of that license,
10      honestly the time limit would be as long as
11      until the person wanted to be forthcoming and
12      honest with what their actual identity was.
13  Q.  What's the longest you recall an interaction
14      like that taking during your time on the
15      Strike Force?
16          MR. SAHASRABUDHE:  Objection to form.
17  A.  I -- I don't know.  I know that I'm sure one
18      time lasted over 45 minutes.
19  Q.  Did the number of officers working on a
20      checkpoint have any impact on how long it
21      would take to get drivers through the
22      checkpoint?
23  A.  No.  That round-robin that I kind of explained

RICHARD HY

1  usually kept things fairly fluid.
2  Q. Was any effort made by the Strike Force to
3     minimize the time spent at a checkpoint?
4        MR. SAHASRABUDHE: Objection to form.
5  A. I don't know what you mean by us trying to
6     minimize the time.
7  Q. I can rephrase.
8        Was any effort made by the Strike Force
9     to minimize the amount of time that drivers
10    would, for example, wait at a checkpoint or it
11    would take them to proceed through a
12    checkpoint from once they arrived?
13 A. Yes.
14 Q. And what efforts were made?
15 A. As I stated previously, if we saw a long line
16    of cars, you know, in the checkpoint line,
17    let's say in a southbound lane there was five
18    cars backed up, we would just send the five
19    cars through just to quickly get people to
20    where they're needed to go and to prevent that
21    quagmire of traffic backing up and backing up
22    for blocks on end.
23       It was usually like a visual. If you

RICHARD HY

1    could see that there was, you know, a string
2    of ten cars, you knew it was time to push
3    people through to allow traffic to continue
4    normally and then restart the checkpoint.  I
5    don't want to say -- it's not like you
6    start -- stopped it, but you would reengage
7    with identifying infractions once the flow of
8    traffic started again.
9    Q. So to make sure I'm understanding correctly,
10     you didn't -- in those cases you didn't stop
11     every individual that passed through the
12     checkpoint?
13   A. Correct.
14   Q. Were there other instances where you didn't
15     stop individuals who drove through
16     checkpoints?
17         MR. SAHASRABUDHE:  Objection to form.
18   A. What do you mean?
19   Q. Outside of when you were waving drivers
20     through to continue the flow of traffic like
21     you just described, did you stop every driver
22     that arrived at a checkpoint and conducted an
23     inspection?

RICHARD HY

1  A.  Oh, no. No, we didn't stop -- I want to make
2      sure I say this and answer your question
3      correctly. We would stop every driver and
4      identify any infraction; but if there was no
5      infraction, we would let them go through. And
6      then also if we saw that there was a backup of
7      traffic, we would understand that the flow of
8      traffic was important and we would just wave a
9      number of cars through so that traffic could
10     flow normally. Does that answer your
11     question, or was I misunderstanding?
12 Q.  Yeah, let me try to ask a little clarifying
13     question.
14         So in the instances where you were
15     trying to move traffic along, there were
16     instances where drivers passed through
17     checkpoints without ever interacting with you
18     at all besides to be waved by basically?
19 A.  Yes.
20 Q.  And was there any other time that a driver
21     would come through a checkpoint and not be
22     stopped at all?
23 A.  I don't -- I don't think so. If they were

RICHARD HY

```
 1   Q.   In addition to being aware of that, do you
 2        recall any concrete steps that you were
 3        instructed on taking to -- in light of -- in
 4        light of the possibility of interacting with
 5        minority communities?
 6             MR. SAHASRABUDHE:  Objection to form.
 7   A.   Could you say that again?
 8   Q.   Sure.  You mentioned that the -- you had
 9        conversations about the awareness of policing
10        in minority neighborhoods, correct?
11   A.   Yes.
12   Q.   Did those conversations include any sort of
13        concrete steps or action items that you could
14        take to improve policing in those minority
15        neighborhoods?
16             MR. SAHASRABUDHE:  Objection to form.
17   A.   From what I remember, it was more of an
18        understanding of seeing things -- I'm being
19        very general here, of seeing things through
20        other people's eyes and experiences that
21        others may have are not your own and to treat
22        everybody as an individual and not, you know,
23        specifically based on, you know, like race,
```

```
 1              color, creed, etcetera.  You're supposed to be
 2              kind of blind to what makes up the individual
 3              and more open up to listening to the
 4              individual.
 5         Q.   Did you have any specific concerns about
 6              policing in neighborhoods of color?
 7         A.   No.
 8                   MR. SAHASRABUDHE:  Objection to form.
 9         Q.   Did you feel you were adequately prepared by
10              the BPD to do so?
11                   MR. SAHASRABUDHE:  Objection to form.
12         A.   Yes.
13         Q.   And was that preparation in virtue of that one
14              training you're mentioning, or were there
15              other things that you feel prepared you to do
16              that type of policing?
17                   MR. SAHASRABUDHE:  Objection to form.
18         A.   Specifically the field training program that
19              not only the law -- Erie County Law
20              Enforcement Academy puts you through but also
21              the City of Buffalo, Buffalo Police
22              Department's field training program.
23         Q.   Would you describe that field training program
```

1        in more detail?
2    A.  So the similarities between the Erie County
3        Law Enforcement and the City of Buffalo's
4        field training program are that you are
5        embedded with your department, whoever you're
6        going to be working for, whoever has hired
7        you.  For a certain period of time we are
8        doing the left see, right see where there is a
9        field training officer, usually a senior
10       officer who's got -- who's gone through some
11       field officer training so they're not just a
12       normal patrolman but a normal patrolman that's
13       also been -- gone through a course in how to
14       guide, mentor the next generation of police
15       officers.
16           And you go to calls, you're evaluated by
17       your first-line lieutenants and leaders and in
18       this on-the-job experience you get to learn,
19       see, and digest how your field training
20       officer, and you can jump around from one to
21       the other and go to different districts, deals
22       with or interacts with different members of
23       the community, race, color, creed, religion,

|   |   |
|---|---|
| 1 | you know, ethnic background, all of these |
| 2 | things you get to see in person. |
| 3 | Q. Were you ever a field training officer while |
| 4 | in the BPD? |
| 5 | A. No. No, not yet. I was in the academy, but I |
| 6 | wasn't a field training officer. |
| 7 | Q. And when you participated in that field |
| 8 | training program, do you recall being |
| 9 | instructed on racial bias or racially biased |
| 10 | policing in any way? |
| 11 | MR. SAHASRABUDHE: Objection to form. |
| 12 | A. No. |
| 13 | Q. But you mentioned that you do feel that the |
| 14 | field training program adequately prepared you |
| 15 | to police in Buffalo's neighborhoods of color? |
| 16 | MR. SAHASRABUDHE: Objection to form. |
| 17 | Q. Is that correct? |
| 18 | A. Yes. |
| 19 | Q. So do you feel that there is not any specific |
| 20 | racial bias training necessary to adequately |
| 21 | prepare you to police in Buffalo's |
| 22 | neighborhoods of color? |
| 23 | MR. SAHASRABUDHE: Objection to form. |

```
 1      STATE OF NEW YORK)

 2      COUNTY OF ERIE )

 3

 4

 5          I, Carrie A. Fisher, Notary Public, in
        and for the County of Erie, State of New York,
 6      do hereby certify:

 7          That the witness whose testimony appears
        hereinbefore was, before the commencement of
 8      their testimony, duly sworn to testify the
        truth, the whole truth and nothing but the
 9      truth; that said testimony was taken remotely
        pursuant to notice at the time and place as
10      herein set forth; that said testimony was taken
        down by me and thereafter transcribed into
11      typewriting, and I hereby certify the foregoing
        testimony is a full, true and correct
12      transcription of my shorthand notes so taken.

13          I further certify that I am neither
        counsel for nor related to any party to said
14      action, nor in anyway interested in the outcome
        thereof.
15

16          IN WITNESS WHEREOF, I have hereunto
        subscribed my name and affixed my seal this
17      7th day of August, 2023.

18
                     (signature)
19          _____

20          Carrie A. Fisher
            Notary Public - State of New York
21          No. 01FI6240227
            Qualified in Erie County
22          My commission expires 5/02/27

23
```

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544