# Exhibit 10

```
 1        UNITED STATES DISTRICT COURT

 2        WESTERN DISTRICT OF NEW YORK

 3        ----------------------------------------------

 4        BLACK LOVE RESISTS IN THE RUST, ET AL.,
          INDIVIDUALLY AND ON BEHALF OF A CLASS OF
 5        ALL OTHERS SIMILARLY SITUATED,

 6              Plaintiffs,

 7         -vs-                      1:18-cv-00719-CCR

 8        CITY OF BUFFALO, N.Y., ET AL.,

 9              Defendants.
10        ----------------------------------------------

11

12              EXAMINATION BEFORE TRIAL

13               OF MAYOR BYRON BROWN

14             APPEARING REMOTELY FROM

15              ERIE COUNTY, NEW YORK

16

17               November 6th, 2023

18               At 9:00 a.m.

19               Pursuant to notice

20

21

22        REPORTED BY:

23        Rebecca L. DiBello, RPR, CSR(NY)
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1        **R E M O T E     A P P E A R A N C E S**

2

        APPEARING FOR THE PLAINTIFFS, BLACK LOVE
3       RESISTS IN THE RUST, ET AL., INDIVIDUALLY AND
        ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY
4       SITUATED:

5                    **CENTER FOR CONSTITUTIONAL RIGHTS**
                     **BY: A. CHINYERE EZIE, ESQ.**
6                    666 Broadway, 7th Floor
                     New York, New York 10012
7                    (212) 614-6464

8       APPEARING FOR THE DEFENDANTS, CITY OF BUFFALO,
        N.Y., et al.:
9
                     **HODGSON RUSS LLP**
10                   **BY: PETER SAHASRABUDE, ESQ.,**
                     140 Pearl Street
11                   Buffalo, New York 14202
                     (716) 848-1508
12

13

14      ALSO PRESENT:

15                   National Center for Law
                     and Economic Justice
16                     CLAUDIA WILNER, ESQ.
                       MAYA GOLDMAN, ESQ.
17                     ANJANA MOLHOTRA, ESQ.
                       SHYENNE MEDINA, ESQ.
18
                     Covington & Burling, LLP
19                     CHRISTINE NELSON, ESQ.

20                   Center for Constitional
                     Rights
21                     MIKAILA HERNANDEZ, ESQ.

22

23

---

MAYOR BYRON BROWN

1   agencies?

2        MR. SAHASRABUDHE:  Form.

3   A. I have management responsibilities with

4      municipal agencies.

5   Q. When you say management authorities what do

6      you mean?

7   A. So ultimately the mayor is the chief executive

8      officer of the administration of City

9      government and I manage the work of the

10     commissioners that manage the various

11     departments of City government.

12  Q. Okay.  Does that include the Buffalo Police

13     Department?

14  A. Yes, it does.

15  Q. Does it include the Buffalo Traffic Violations

16     Authority or BTVA?

17  A. Yes, it does.

18  Q. Does that include the Commission on Citizens

19     Rights and Community Relations?

20  A. Yes, it does.

21  Q. Does it include the Buffalo Municipal Housing

22     Authority Commission?

23  A. No, not directly.  I appoint commissioners to

---

─ MAYOR BYRON BROWN ─

1           the Buffalo Municipal Housing Authority.

2     Q. Okay.  So for the BMHA you have the authority

3           to appoint commissioners, correct?

4     A. Yes, that's correct.

5     Q. But with respect to the other agencies you

6           just described, you have broader managerial

7           powers?

8                MR. SAHASRABUDHE:  Form.

9     A. Yes.  I have management authority over other

10          City departments.

11    Q. Okay.  And in the case of the Buffalo Police

12          Department, your authority extends beyond

13          merely appointing commissioners?

14               MR. SAHASRABUDHE:  Form.

15    A. Well, we work to set policy.  I review

16          recommendations from the commissioners.

17    Q. And that includes the commissioner for the

18          Buffalo Police Department or BPD?

19    A. That's correct.

20    Q. Okay.  And does that also include -- do you

21          also have the ability to review policies

22          related to the BTVA?

23    A. I do.

─────MAYOR BYRON BROWN─────

1    Q. Okay.  Now, we have been talking a bit about
2        the BTVA.  When was it created?
3    A. I don't remember the exact date of creation as
4        we speak.
5    Q. If I said it began to administer tickets in
6        July of 2015, would that sound accurate to
7        you?
8    A. It could be accurate.
9    Q. What role did you have in the creation of the
10        BTVA, if any?
11    A. I participated in recommending the creation of
12        the agency.
13    Q. Who did you recommend the creation of the
14        agency to?
15    A. The City proposed the creation to the City
16        Council and to the state legislature.
17    Q. Was that at your recommendation?
18    A. Yes.
19    Q. Why did you recommend that the BTVA be
20        created?
21    A. We thought it was a more efficient way to
22        manage traffic violations in the City of
23        Buffalo.  Other cities had similar agencies

─ MAYOR BYRON BROWN ─

1          and we thought that that model would be more

2          efficient.

3     Q.  And when you say efficient what do you mean?

4     A.  I mean just in terms of knowing the number of

5          tickets that were written, being able to

6          determine how that process was managed and

7          removing a lot of the management and oversight

8          of that process from Albany.

9     Q.  As part of your efforts to establish the BTVA

10         you did travel to Albany, correct?

11    A.  I traveled to Albany periodically.

12    Q.  And you spoke to lawmakers in Albany about the

13         need to create the BTVA?

14    A.  Yes.

15    Q.  Am I correct that prior to the creation of the

16         BTVA revenue for traffic tickets was sent to

17         state agencies and divided?

18    A.  That's correct.

19    Q.  And subsequent to the creation of the BTVA

20         ticket revenue from traffic tickets and

21         impounds goes directly to the City of Buffalo?

22              MR. SAHASRABUDHE:  Form.

23    A.  Could you repeat that?

1    Q. Sure.  I'll ask a different question.  Am I
2       correct that since the creation of the BTVA
3       revenue from traffic tickets is no longer
4       divided with state agencies?
5    A. The distribution is greater to the City.
6    Q. And by greater what do you mean?
7    A. There's more revenue to the City.
8    Q. Okay.  A significant increase in revenue?
9            MR. SAHASRABUDHE:  Objection to form.
10   A. I don't know how significant it is.
11   Q. But since its creation the BTVA has generated
12      millions in revenue for the City of Buffalo?
13           MR. SAHASRABUDHE:  Object to the form.
14   A. I don't know the answer to that.
15   Q. But you do prepare the City budget yearly?
16   A. Yes, I do.
17           MR. SAHASRABUDHE:  Form.
18   Q. And that includes looking at proposed revenue
19      streams?
20   A. Yes, that does.
21   Q. Are you aware that the BTVA revenue lines has
22      been in the millions since 2015?
23           MR. SAHASRABUDHE:  Form.

──────── MAYOR BYRON BROWN ────────

1    A. Could you repeat that please.

2    Q. Sure.  Are you aware that the revenue

3       allocation for the BTVA has been in excess of

4       a million since its creation?

5    A. That sounds accurate.

6    Q. Okay.  Thank you.

7          So let's go back to talking about some

8       of your mayoral duties.  Now, with respect to

9       the BPD, is it true you're able to make

10      appointments?

11   A. I appoint the commissioner of the Buffalo

12      Police Department.

13   Q. Do you require anyone else's approval for the

14      commissioner appointments?

15   A. Yes.  All commissioners go through a

16      confirmation process with the City Council.

17   Q. And you have the authority to make the

18      recommendations for the appointment in the

19      first instance?

20   A. That is correct.

21   Q. Are you able to relieve appointees as well?

22   A. Yes, I am.

23   Q. And is cause required to relieve an appointee?

─────────────── **MAYOR BYRON BROWN** ───────────────

1    A. No.

2    Q. So you're able to remove the BPD commissioners

3        at your discretion?

4    A. Yes.

5    Q. Are there any other BPD personnel who you

6        appoint?

7    A. No, there are not.

8    Q. Besides appointments, what authority do you

9        have with respect to the Buffalo Police

10       Department or BPD?

11           MR. SAHASRABUDHE:  Object to the form.

12   A. Looking at the budget of the Department.  If

13       the budget of the Department is included in

14       the general City budget, when there are

15       requests for equipment from the Department,

16       reviewing those and including those requests

17       in the City budget.

18   Q. Do you have any role in reviewing overtime

19       requests for the Department?

20   A. I do not directly review overtime requests of

21       the Department, but certainly our management

22       priority is to reduce overtime in every city

23       department.

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

─ MAYOR BYRON BROWN ─

1    Q. And is there someone from -- to the extent
2       that the BPD does receive overtime year in and
3       year out, is there anyone from your office
4       involved in approving those requests?
5    A. That would be reviewed by the police
6       commissioner and the police commissioner's
7       management staff and there would be review by
8       the finance commissioner and the Department of
9       Finance.
10   Q. Okay.  So the mayor's office is not involved
11      in administering overtime requests?
12   A. No.
13   Q. Do you have the ability to veto or disapprove
14      overtime requests by the Department?
15   A. I do not.
16   Q. Are you able to issue executive orders to the
17      Buffalo Police Department?
18          MR. SAHASRABUDHE:  Form.
19   A. I could issue executive orders for the police
20      department.
21   Q. Okay.  Are there any instances where you have?
22          MR. SAHASRABUDHE:  Form.
23   A. Not that I recall at this time.

─────────────── MAYOR BYRON BROWN ───────────────

1    Q. Okay.  Mayor Brown, are you familiar with a

2       BPD unit that was called the Strike Force?

3    A. Yes, I am.

4    Q. Was that a major policy decision of the BPD,

5       the creation of the Strike Force?

6    A. Yes, it was.  I think clearly the police

7       department was trying to respond to vehicle

8       and traffic complaints of residents and that

9       was the impetus for the establishment of that

10      unit.

11   Q. Your testimony today is that the impetus for

12      the establishment of the Strike Force was

13      traffic safety concerns?

14            MR. SAHASRABUDHE:  Form.

15   Q. Please respond verbally.

16            MR. SAHASRABUDHE:  He's thinking about

17      his response.

18   A. Yes.  There have been major traffic safety

19      concerns in the City of Buffalo.  Residents

20      very concerned about people going through stop

21      signs, going through traffic signals, speeding

22      in their neighborhoods, endangering children

23      and seniors and concerns about the playing of

─────────────── **MAYOR BYRON BROWN** ───────────────

```
 1            loud music by vehicles in neighborhoods.
 2       Q.  The Strike Force was created during your time
 3            as mayor, correct?
 4       A.  Yes.
 5       Q.  How would you describe your involvement, if
 6            any, in its creation?
 7       A.  I wasn't involved in the creation.  It was a
 8            recommendation of the police department to
 9            address these concerns, primarily traffic
10            related, and the Strike Force was established
11            to address the concerns that residents had.
12       Q.  And is your testimony today that the primary
13            mission of the Strike Force was attending to
14            traffic concerns?
15               MR. SAHASRABUDHE:  Objection to form.
16       A.  The mission of the Strike Force in its
17            creation was to deal with vehicle and traffic
18            concerns related to speeding, dangerous
19            driving, going through stop signs, traffic
20            signals, speeding through neighborhoods,
21            speeding past schools, yes.
22       Q.  Okay.  And I remind you, Mayor, that you're
23            under oath today.
```

─────────────── **MAYOR BYRON BROWN** ───────────────

1         does build on that activity where the primary

2         purpose of checkpoints was traffic safety.

3    Q.  Have you ever seen a document in writing that

4         identifies traffic safety as the primary

5         purpose of the BPD's Strike Force checkpoints?

6    A.  Not that I can recall.

7    Q.  I'd like to go ahead and direct you to a

8         document that was produced in discovery.  I

9         guess this will be Exhibit 6 if I'm keeping

10        track.  COB 22549.

11            I'm going to pull it on my screen right

12        now.  It's two pages.  I'm making the first

13        page a little larger.  Let me know when you

14        would like me to scroll, Mayor Brown.

15   A.  I can see the top of the document so you can

16        scroll now.

17   Q.  Okay.  Well, before we turn from the first

18        page, do you see that this document is an

19        email from Commissioner Daniel Derenda to you

20        copying then Deputy Police Commissioner

21        Byron C. Lockwood?

22   A.  I do see that, that this document is from

23        Commissioner Derenda and copies then First

─────── **DEPAOLO CROSBY REPORTING SERVICES, INC.** ───────

―MAYOR BYRON BROWN―

```
 1          interdiction.  The police commissioner and his

 2          management team recommended initially that

 3          based on the large number of complaints that

 4          we were getting from residents about traffic

 5          safety, vehicle safety, that this was a

 6          strategy that could be employed and I think

 7          secondarily once this strategy was employed it

 8          was found that they were identifying people

 9          who were driving in vehicles with illegal guns

10          visible, with drugs visible and as a secondary

11          purpose this could keep areas of the City

12          safer.

13     Q.   Is your testimony that Daniel Derenda informed

14          you that traffic safety data was going to be

15          used to formulate checkpoint locations?

16               MR. SAHASRABUDHE:  Objection to form.

17     A.   It is my testimony that there were a large

18          number of complaints from residents about

19          speed, running through red lights, running

20          through traffic signals, speeding in

21          neighborhoods, speeding past schools and

22          endangering the community.  Initially traffic

23          interdiction, traffic checkpoints, were
```

─ **MAYOR BYRON BROWN** ─

1          established to address those issues and as a

2          secondary purpose it was found that caught in

3          those traffic checkpoints were people with

4          criminal backgrounds, with illegal guns, with

5          illegal drugs that were threatening the safety

6          of the community and that that was also a

7          major concern of residents of the City of

8          Buffalo.

9     Q.   And what is the basis for your testimony that

10         checkpoints were developed -- Strike Force

11         checkpoints were developed with traffic safety

12         concerns as the primary objective?

13              MR. SAHASRABUDHE:  Object to the form.

14    A.   I previously mentioned in meeting with the

15         commissioner and the commissioner's management

16         team that as we wanted to be responsive to

17         complaints in the community about traffic

18         safety, that this was a strategy that was

19         going to be employed and employing this

20         strategy that did address speeding in

21         neighborhoods, did address loud music being

22         played in neighborhoods, people running stop

23         signs, running through traffic signals, that

—MAYOR BYRON BROWN—

1              the secondary purpose that was identified is

2              there were also people driving in vehicles

3              with guns, with drugs, people who had criminal

4              records that were endangering the safety of

5              the community and there was a high priority in

6              the community for people to want to be safe.

7      Q. And when you refer to conversations with the

8              commissioner were you referring to

9              Commissioner Daniel Derenda?

10     A. Yes.  I was referring to Commissioner Derenda.

11     Q. Are you aware that Daniel Derenda has given

12             sworn testimony in this case?

13     A. I am aware of that.

14     Q. Have you reviewed that testimony?

15     A. I have not reviewed the commissioner's

16             testimony.

17     Q. Are you aware that Commissioner Derenda

18             indicated that he never relied on traffic

19             safety data when developing a checkpoint

20             location?

21             MR. SAHASRABUDHE:  Objection to form.

22     A. I am not aware of that, but I think traffic

23             safety data was a part of it and I think

────────────── MAYOR BYRON BROWN ──────────────

1        speeding past the schools where their children

2        went, so many direct conversations with

3        residents of the community about that.

4   Q. Isn't it true that you had direct

5        conversations with community members about

6        racial bias in policing?

7          MR. SAHASRABUDHE:  Form.

8   A. It is true that I speak to residents of the

9        community about a lot of different things.

10       There were not as many concerns about racial

11       bias in policing as there were concerns about

12       community safety and the police department

13       being active, proactive in addressing the

14       community's safety concerns.

15  Q. So your testimony today is that there was more

16       of an interest in there being checkpoints in

17       East Side communities than there were concerns

18       about racial bias by police?

19  A. My testimony today is there were dramatically

20       more concerns about community safety in East

21       Buffalo than there were about racial bias in

22       policing, dramatically.

23  Q. Nonetheless -- and I'm trying to confirm what

---

MAYOR BYRON BROWN

1          prior map indicating that checkpoints were

2          predominantly on the East Side of Buffalo?

3                MR. SAHASRABUDHE:  Form.

4     A. This map does look consistent with the other

5          map that you just showed me.

6     Q. Okay.  Now, Mayor Brown, going back to Brown

7          Exhibit 16, you forwarded the article in the

8          Daily Public to Daniel Derenda, Byron Lockwood

9          and others, correct?

10    A. Yes, that's correct.

11    Q. Why did you forward the article to this group

12         of BPD officials?

13                MR. SAHASRABUDHE:  Object to the form.

14    A. My view is that I wanted to make sure that

15         what we were doing was being done properly.  I

16         wanted to see if the article was accurate and

17         to get more information.

18    Q. Did you request any information from the BPD

19         officials that you contacted?

20    A. I was briefed by BPD officials.

21    Q. What did they brief you on?

22    A. Again, the briefing was that there was no

23         targeting of the East Side, that our traffic

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

--- MAYOR BYRON BROWN ---

1          safety priorities were being followed and that
2          the secondary mission of the Strike Force for
3          community safety was overlaying with that.
4          That was the summary of the briefing.
5     Q. Got it.  And was that briefing communicated
6          verbally to you?
7     A. Yes, it was.
8     Q. Was there anything that you received in
9          writing following your discussion about the
10         checkpoints?
11    A. I'm sure there was data at the time.
12    Q. Have you ever seen data disputing the
13         conclusions of this report that checkpoints
14         were predominantly on the East Side?
15              MR. SAHASRABUDHE:  Objection to form.
16    A. I have never seen data disputing that the
17         checkpoints were predominantly on the East
18         Side.  I do reject the motives that were
19         presented in that article and presented by
20         others in terms of the motives of what was
21         being done.
22    Q. So why were the checkpoints that the BPD
23         operated prior to 2017 concentrated on the

```
1        STATE OF NEW YORK)

2        COUNTY OF ERIE   )

3


4         I, Rebecca Lynne DiBello, CSR, RPR, Notary
5        Public, in and for the County of Erie, State of
         New York, do hereby certify:
6

7         That the witness whose testimony appears
         hereinbefore was, before the commencement of
8        their testimony, duly sworn to testify the
         truth, the whole truth and nothing but the
9        truth; that said testimony was taken pursuant
         to notice at the time and place as herein set
10       forth; that said testimony was taken down by me
         and thereafter transcribed into typewriting,
11       and I hereby certify the foregoing testimony is
         a full, true and correct transcription of my
12       shorthand notes so taken.

13

14        I further certify that I am neither counsel
         for nor related to any party to said action,
         nor in anyway interested in the outcome
15       thereof.

16
          IN WITNESS WHEREOF, I have hereunto
17       subscribed my name and affixed my seal this
         19th day of November, 2023.
18

19

20       _____

21       Rebecca Lynne DiBello, CSR (NY)
         Notary Public - State of New York
22       No. 01D14897420
         Qualified in Erie County
23       My commission expires 5/11/2027
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544