# Exhibit 34

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------------------------
BLACK LOVE RESISTS IN THE RUST by and through
MARIELLE SHAVONNE SMITH and CHARIS HUMPHREY
on behalf of its members, SHAKETA REDDEN,
DORETHEA FRANKLIN, TANIQUA SIMMONS, DE'JON HALL,
JOSEPH BONDS, CHARLES PALMER, SHIRLEY SARMIENTO,
EBONY YELDON, and JANE DOE,
individually and on behalf of a class of all
others similarly situated,

                              Plaintiffs,

     -vs-


CITY OF BUFFALO, N.Y., BYRON B. BROWN,
Mayor of the City of Buffalo, in his individual and
official capacities,
BYRON C. LOCKWOOD, Commissioner of the
Buffalo Police Department, in his individual
and official capacities,
DANIEL DERENDA, former Commissioner of the
Buffalo Police Department, in his individual capacity,
AARON YOUNG, KEVIN BRINKWORTH, PHILIP SERAFINI,
ROBBIN THOMAS,
UNKNOWN SUPERVISORY PERSONNEL 1-10,
UNKNOWN OFFICERS 1-20, each officers of the
Buffalo Police Department,
in their individual capacities,

                              Defendants.
------------------------------------------------------

2

Remote Examination Before

Trial of CHARLES PALMER, Plaintiff, taken pursuant to the

Federal Rules of Civil Procedure, at SUE ANN SIMONIN COURT

REPORTING, 421 Franklin Street, Buffalo, New York, taken on

September 14, 2023, commencing at 9:02 A.M., before NICHOLE

WINANS, Notary Public.

3

<u>INDEX TO WITNESSES</u>

Witness:  CHARLES PALMER                                    Page

Examination By:

    Ms. Freely                                             6

    Ms. Williams                                          108

    Ms. Freely                                            115

4

1                            INDEX TO EXHIBITS

2

3

4     Exhibits                              For Identification

5     A        Amended Complaint                    115

6     B        Buffalo Police Department            115
               Ticket dated November 4, 2015
7
      C        DMV Form MV-232                       115
8
      D        DMV Form MV-80W                       115
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

5

```
 1      APPEARANCES:

 2      WESTERN NEW YORK LAW CENTER,
         By KEISHA A. WILLIAMS, ESQ.,
 3      Cathedral Park Tower,
         37 Franklin Street, Suite 210,
 4      Buffalo, New York 14202,
         Appearing for the Plaintiffs.
 5
         HODGSON RUSS LLP,
 6      By CHEYENNE N. FREELY, ESQ.,
         The Guaranty Building,
 7      140 Pearl Street, Suite 100,
         Buffalo, New York 14202-4040,
 8      Appearing for the Defendants.

 9

10           (The following stipulations were entered

11      into by both parties.)

12           It is hereby stipulated by and between counsel

13      for the respective parties that the oath of the

14      Referee is waived, that signing, filing and

15      certification of the transcript are waived, and

16      that all objections, except as to the form of the

17      questions, are reserved until the time of trial.

18

19   THE REPORTER:  Do all parties involved agree to this

20      deposition being conducted by remote video and to

21      the witness being sworn in remotely?

22   MS. FREELY:  Yes.

23   MS. WILLIAMS:  Yes.
```

6

1    CHARLES PALMER:  Yes.

2

3                    C H A R L E S    P A L M E R,

4         P.O. Box 32094, Charlotte, North Carolina 28232,

5                after being duly called and sworn,

6              testified via videoconference as follows:

7

8    EXAMINATION BY MS. FREELY:

9

10   Q.   Good morning, Mr. Palmer.  My name is Cheyenne

11        Freely, I'm with the firm Hodgson Russ, and we

12        represent the Defendants in this action.  So

13        before we start I just want to go over a couple

14        ground rules so that we're on the same page here.

15        First and foremost, have you ever given any

16        deposition testimony before?

17   A.   No.

18   Q.   Okay.  So some of these things might be new to

19        you, but they're just for clarity and to make

20        sure we are not making Nikki's job any harder

21        than it already is.  So first, for all of your

22        answers today, I just request that you have full

23        verbal answers, so in normal conversations you

7

```
 1        might shake your head or say um-hum, but for the
 2        sake of today, I just ask that your answers are
 3        fully verbal.  Can we agree to that?
 4   A.   Yes.
 5   Q.   And then, can we agree that we will try not to
 6        speak over each other?
 7   A.   Yes.
 8   Q.   If you don't understand a question, can we agree
 9        that you will let me know so that I can rephrase
10        it?
11   A.   Oh, I'm sure.
12   Q.   And if you don't -- if you do answer a question
13        without asking me to clarify, can we agree that I
14        can interpret that as you understanding my
15        question?
16   A.   I'm sorry.  What did you say?
17   Q.   If you do answer my question without asking me to
18        clarify it, can we agree that that's you
19        understanding my question?
20   A.   I'm sure, yeah.
21   Q.   And then can we agree that you won't guess or
22        speculate, and if you do, you'll let me know?
23   A.   Yes.
```

8

1   Q.   Do you understand the difference between a guess

2        and an estimate?

3   A.   No.

4   Q.   Okay.  So a guess is something that you really

5        don't have a point of reference for, for example,

6        if I asked you when my birthday was, you don't

7        have a point of reference for that, so that would

8        be a guess.  If I asked ask you for an estimate,

9        that would be more along the lines of how far

10       away your phone is sitting from you right now,

11       right, you have a point of reference and you can

12       estimate that.  Does that make sense?

13  A.   Yes.

14  Q.   Okay.  So at certain points today I might ask you

15       to estimate or approximate, but I don't want you

16       to guess.  Does that make sense?

17  A.   Sure.

18  Q.   Okay.  And if you need a break at any point in

19       time today, just let me know, I just ask that you

20       answer my question before -- answer any pending

21       question before you request a break.  Can we

22       agree to that?

23  A.   Yes.

9

1    Q.   And then your attorney might object to questions
2         that I ask today, however, you still need to
3         answer my question to the best of your ability,
4         unless your attorney instructs you not to.  Can
5         we agree to that?
6    A.   Sure.
7    Q.   Okay.  Are you currently on any medications that
8         would affect your ability to give truthful and
9         accurate testimony today?
10   A.   No.
11   Q.   And is there any other reason that you wouldn't
12        be able to give truthful and accurate testimony
13        today?
14   A.   No.
15   Q.   Okay.  Mr. Palmer, what is your date of birth?
16   A.   ██████████
17   Q.   And what is your full name?
18   A.   Charles Kris Palmer Junior.
19   Q.   And is that C-H-R-I-S, Chris?
20   A.   No.  K-R-I-S.
21   Q.   Okay.  Thank you.  Have you ever gone by any
22        other names?
23   A.   No.

10

| | | |
|---|---|---|
| 1 | Q. | Okay.  And have you ever been married? |
| 2 | A. | No. |
| 3 | Q. | Do you have any children? |
| 4 | A. | Yes. |
| 5 | Q. | How many? |
| 6 | A. | One. |
| 7 | Q. | And what is their name? |
| 8 | A. | My son's name? |
| 9 | Q. | Yes. |
| 10 | A. | He has nothing to do with this. |
| 11 | Q. | To the extent that this is a question in your |
| 12 | | deposition, you are expected to answer, unless |
| 13 | | again your attorney has any objection that would |
| 14 | | require you not to answer. |
| 15 | A. | Okay. |
| 16 | Q. | So what is your son's name? |
| 17 | A. | I'm not giving you my son's name. |
| 18 | Q. | What is your son's age? |
| 19 | A. | I'm not giving you anything that has nothing to |
| 20 | | do with what we're here for today.  They don't |
| 21 | | have anything to do with this case and I'm not |
| 22 | | giving -- involving them in this case, this is |
| 23 | | for me and for the case as it stands, they're not |

11

1    a part of anything that has to do with this.

2  MS. WILLIAMS:  So the information part, Charles, it's

3    not going to be public, it's just going to be

4    held within this case.  I mean, it's going to

5    be -- it's not going to be published or it's not

6    going to be publicized, it's just information for

7    the case.  It's just background information.

8  THE WITNESS:  That's fine.  I may not be a -- I don't

9    think I'm a good candidate for this because I'm

10   not volunteering to give up personal information

11   like that.  I was under the impression that we

12   were speaking about ticketing and violating of

13   discrimination and violating the rights.  I

14   wasn't -- I'm not in agreeance (sic) to giving up

15   irrelevant information for no reason.

16 BY MS. FREELY:

17 Q.  Mr. Palmer, it is relevant to this case in the

18   complaint, it states that you struggled to pay

19   bills for, and support your son, so your son is

20   mentioned in this lawsuit.  So for the sake of

21   relevance and the fact that he is mentioned in

22   this lawsuit, I do ask that you answer questions

23   related to your son.

12

1   A.   Okay.  That statement is true, but as far as his

2        name or any of his personal information or

3        anybody else's personal information, I'm not

4        involving them, as I stated, but that is, that

5        statement is true, I have struggled to provide

6        for my son and myself, my family behind these --

7        behind this case, and things that have happened

8        as a consequence, but as far as mentioning them

9        or volunteering their personal information, I

10       haven't spoke to my family about this, and I'm

11       not going to just get them involved in something

12       that they're not even involved in.

13  Q.   Okay.  But for the sake of your claim that you

14       have been struggling to support your son, his age

15       is directly relevant.  For example, if he was

16       twenty-two, that support looks a little bit

17       different than if he was a minor or if he was

18       five or a teenager, et cetera.

19  MS.  WILLIAMS:  Can we do an age range just to, and

20       then maybe get back, get you the information

21       later to sort of move ahead.  Can we do an age

22       range, Charles?  And then --

23  THE WITNESS:  My son is nine years old.

13

```
1   BY MS. FREELY:

2   Q.  And I do just have two more questions about your

3       son.  Does he live with you?

4   A.  No.

5   Q.  Okay.  And do you have any kind of joint custody

6       or custody arrangement with him -- well, with his

7       mother?

8   A.  That's pending.

9   Q.  Okay.  Can you describe that?

10  A.  No, not really.  It's a long story, but that's a

11      pending situation, there has been arrangements,

12      and there's currently my application is in and

13      we're currently going to court in regards to

14      that, so like I said, it's pending and there's

15      no, no updates to that at this time.

16  Q.  Okay.  So the exact arrangement is up in the air,

17      but do you pay child support?

18  A.  Yes.

19  Q.  Okay.  And do you support him outside of child

20      support?

21  A.  Currently, yes.

22  Q.  Okay.  And how so?

23  A.  Right now, financially.
```

14

1    Q.   Okay.  But beyond your child support obligation?

2    A.   Yes.

3    Q.   Okay.  Thank you.  I appreciate that.  And I can

4         appreciate wanting to keep your son's personal

5         details out of this, but thank you for your

6         thoughtful answers.

7              So off of that topic, what is your current

8         address, your current residential address, excuse

9         me?

10   A.   I don't have no current address, I'm homeless.  I

11        just have a mailing address.

12   Q.   Can you repeat that last part?  I'm sorry.  You

13        don't have a?

14   A.   I just have a mailing address, I don't have a

15        current address.

16   Q.   Okay.  And what is your mailing address?

17   A.   P.O. Box 32094, Charlotte, North Carolina 28232.

18   Q.   Do you currently reside in North Carolina then?

19   A.   Yes.

20   Q.   Okay.  And did you have a residential address

21        prior?

22   A.   Yes.

23   Q.   What was that?

15

1   A.   I had multiple addresses, so --

2   Q.   So what was the last one?

3   A.   255 Newburgh Avenue, Buffalo, New York 14215.

4   Q.   And what neighborhood is that in Buffalo?

5   A.   What neighborhood is that?

6   Q.   Yes.

7   A.   East Side.

8   Q.   Okay.  Do you remember how long you lived there?

9   A.   I've had that address for over twenty years.

10  Q.   Over twenty years?

11  A.   Yeah.

12  Q.   Okay.  And so then did you reside there for over

13       twenty years?

14  A.   Off and on, yes.

15  Q.   Okay.  And did you own or rent that address?

16  A.   Rent, family, family and rent, yeah.

17  Q.   Okay.  And so when did you move to North

18       Carolina?

19  A.   I moved to North Carolina 2022.

20  Q.   Do you remember an approximate month?

21  A.   February 2021 I believe.

22  Q.   Okay.  So not 2022, it's February 2021?

23  A.   Yeah.

16

1  Q.  Okay.  Understood.  Prior to the Newburgh

2      address, where did you live before that -- or,

3      what was your residential address before that?

4  A.  Not sure.

5  Q.  Do you remember if it was in Buffalo?

6  A.  Yes.

7  Q.  Okay.

8  A.  It was.

9  Q.  Do you recall if you owned or rented there?

10 A.  No.  I lived with my mother.

11 Q.  Okay.  Is that the same house that you grew up in

12     then?

13 A.  One of them, yes.

14 Q.  And so is it safe to say that you grew up in the

15     City of Buffalo?

16 A.  Yes.

17 Q.  What neighborhoods did you grow up in?

18 A.  Multiple neighborhoods.  Primarily the East Side.

19 Q.  Okay.  Do you visit Buffalo often?

20 A.  I haven't, I haven't often recently, no.

21 Q.  Okay.  Do you have plans to visit Buffalo any

22     time soon?

23 A.  Yes.

17

```
 1   Q.  And when is that, approximately?
 2   A.  Not sure.
 3   Q.  Do you come up here to see family, do you come up
 4       to Buffalo to see family?
 5   A.  Sometimes.
 6   Q.  Okay.  And is your son in Buffalo or North
 7       Carolina?
 8   A.  He's in Buffalo.
 9   Q.  Okay.  Where did you attend high school?
10   A.  McKinley High School.
11   Q.  In Buffalo, New York, correct?
12   A.  Yes.
13   Q.  Did you graduate from high school?
14   A.  Yes.
15   Q.  And do you remember in what year did you
16       graduate?
17   A.  2001.
18   Q.  What did you do after high school?
19   A.  You mean directly after high school?
20   Q.  Yes.
21   A.  I went to college.
22   Q.  Where did you go to college?
23   A.  I went to college in Virginia.
```

18

1   Q.   What college or university did you attend?

2   A.   Virginia State University.

3   Q.   And what was your major there?

4   A.   I'm not sure.

5   Q.   Do you remember -- did you graduate?

6   A.   Not from there, no.

7   Q.   Okay.  Where did you graduate from?

8   A.   Buffalo State.

9   Q.   So did you transfer from Virginia State to

10       Buffalo State?

11  A.   Yes.

12  Q.   Do you remember what year you transferred?

13  A.   2006.

14  Q.   Do you remember what your major was at Buff

15       State?

16  A.   Economics.

17  Q.   And what degree did you graduate with?

18  A.   Bachelor's science.

19  Q.   What year did you graduate in?

20  A.   2013.

21  Q.   So did you take some time off after Virginia

22       State University?

23  A.   Off of college?

19

1   Q.   Yes.

2   A.   Yes, I would say so.

3   Q.   Okay.  Because we have you graduating high school

4        in 2001 and then finishing college in 2013.  So

5        what did you do during the gaps in your college

6        education?

7   A.   Bunch of different things.

8   Q.   Can you describe those?

9   A.   No, not really.

10  Q.   What do you mean by not really?

11  A.   No, I don't, I don't -- I can't, I can't describe

12       those.

13  Q.   Do you not recall?

14  A.   No.  Not offhand.

15  Q.   Okay.  Did you work?

16  A.   Pretty sure I worked.

17  Q.   What did you work as, what did you do?

18  A.   Multiple different things.

19  Q.   Okay.  Can you list those things?

20  A.   No.

21  Q.   Why can't you list those things?

22  A.   Because I don't, I don't know off the top of my

23       head and -- I don't know.  It's a long time ago.

20

```
 1        And I'm still struggling with the relevancy of
 2        those questions.  I don't know if we're going to
 3        get to something or if all of these are
 4        considered relevant, I don't know if Keisha is
 5        going to let me know if these questions are
 6        needed for me to continue on, but I didn't plan
 7        on just doing -- I didn't -- like I said, I
 8        didn't plan on this being -- going this way.  I
 9        planned on it being more based on what we're here
10        for today as opposed to my personal and private
11        life.
12    Q.  Which I understand, Mr. Palmer, but by filing
13        this suit you've opened up a certain degree of
14        your personal and private life for the sake of
15        background, like Ms. Williams stated earlier, so
16        if you're refusing to answer because you don't
17        think it's relevant, then that's impermissible,
18        but if you don't recall, then I can appreciate
19        that and that's okay.  But for the sake of this,
20        I'm asking you to answer truthfully, answer to
21        the best of your recollection regardless of
22        whether you think that it's relevant or not.
23    A.  I understand that.  For this area, I don't recall
```

21

1    because, like I said, it was a while ago, and I

2    stated that.  The rest of my statement was for

3    the furtherance of this meeting here, is that I'm

4    not going to -- regardless of what you say, if I

5    don't believe that it's relevant, I'm not going

6    to be subjected to just random questions about

7    going picking through my life, like I stated

8    continuously, this -- my expectation was that it

9    would be based on this case and the information

10   that I've already provided as opposed to coming

11   through my personal and private life, with me, my

12   family and whatever other questions that you

13   decide you want to ask.  I'm not here to just

14   openly answer any questions that you think of.

15 Q.  And I understand that.  However, is it your view

16   that you aren't going to answer questions

17   truthfully and honestly if you view them as

18   irrelevant?

19 A.  No.  That's not what I'm saying.  I'm not going

20   to answer them, I'm not going to participate if

21   that's going to be the case is what I'm saying.

22 Q.  Okay.  Well, I have extensive questions about

23   your background that I do want answers to.  If

22

```
1        you aren't going to answer those then we can call
2        the judge, and they will tell you pretty much the
3        same thing I'm telling you, that you're going to
4        have to answer these questions.
5   A.   Okay.  Well, we can -- I can speak with Keisha or
6        whoever about it and let them know how I feel
7        about that, but if that's what your plan is then
8        we don't need to waste any more time.
9   MS. WILLIAMS:  I mean, I think the background
10       questions, I could object to the relevancy,
11       Charles, but like I said, unless I say don't
12       answer, unfortunately you do have to answer.
13       There are only a few questions that I can tell
14       you not to answer.  If I told you not to answer
15       these questions, I would be out of bounds.  I
16       don't know if -- maybe we can try to do this at
17       another time or do you want to proceed or do you
18       want to stop or --
19  MS. FREELY:  I know we've got our discovery schedule
20       and we want to stick to that, so I don't want to
21       adjourn this for that sake, but how about we take
22       like a early five-ish minute break, and we can
23       reassess, if you want to speak with your client,
```

23

1     and I can speak with other counsel on this to see

2     if that's something they would want to do.

3   MS. WILLIAMS:  Yes.  Okay.

4   MS. FREELY:  Okay.  Perfect.  So we'll come back at

5     like nine-thirty.  Sound good?

6   MS. WILLIAMS:  Sounds good.

7         (Whereupon, a short recess was then taken.)

8   BY MS. FREELY:

9   Q.  Okay.  So, Mr. Palmer, I'm just going to recap

10    where we were and then move forward.  So is it

11    your testimony that you -- let me strike that.

12    Aside from your attendance at Virginia State and

13    Buffalo State, what did you do from 2001 to 2013?

14  MS. WILLIAMS:  Objection.  Even though I object,

15    you're still required to answer or if you don't

16    want to answer you can say.

17  THE WITNESS:  Oh, me?  No.  I would need some

18    specific, like what are you asking me

19    specifically?  That's a long time frame.

20  BY MS. FREELY:

21  Q.  Yes.  Of course.  So from 2001 to 2013, did

22    you -- were you employed?

23  A.  Pretty sure, yes.

24

1  Q.  Okay.  And what were you doing for employment?

2  A.  I'm not sure.

3  Q.  Do you remember the industry that you worked in?

4  MS. WILLIAMS:  Objection.

5  THE WITNESS:  I worked in different industries,

6      primarily construction, but I pick up

7      different -- I have multiple trades, multiple

8      skills that I utilize, and that I perform for

9      income throughout my life, throughout that time

10     period.  There wasn't just one specific thing

11     that I did in that time frame.  I would have to

12     look at my resume and I would have to think about

13     everything that I did in that time frame, but for

14     the most part, I'm a -- I was a carpenter.

15 BY MS. FREELY:

16 Q.  Okay.  And did you receive any professional

17     certificate or credentials as part of being a

18     carpenter?

19 MS. WILLIAMS:  Objection.

20 THE WITNESS:  Yeah.

21 BY MS. FREELY:

22 Q.  And what was that?

23 A.  Multiple certificates, multiple certificates

25

1       construction related, OSHA, CPR, aerial lift

2       certificates, just a bunch of different

3       construction related certificates that I've

4       received by being a carpenter.

5  Q.  Okay.  Shifting gears a little bit.  Did you

6       serve in any capacity in the United States Air

7       Force?

8  A.  Yes.

9  Q.  In what capacity did you serve?

10  A.  I was active duty.  Active duty.  I was active

11       duty.

12  Q.  Okay.  And what was your rank?

13  MS. WILLIAMS:  Objection.

14  THE WITNESS:  My rank, my rank was an E-3.

15  BY MS. FREELY:

16  Q.  Okay.  And when did you begin your time with the

17       Air Force?

18  A.  2002 -- no.  2003.

19  Q.  Okay.  And when did you end your time with the

20       Air Force?

21  A.  2005.

22  Q.  Where were you stationed during that time?

23  MS. WILLIAMS:  Objection.

26

1    THE WITNESS:  I was stationed at Spangdahlem,

2        Germany.

3    BY MS. FREELY:

4    Q.  And why did your time with the Air Force end?

5    MS. WILLIAMS:  Objection.

6    THE WITNESS:  Early separation.

7    BY MS. FREELY:

8    Q.  Can you describe that a little bit more?

9    A.  No.  It's just a program that they -- that's

10       offered, that was offered at the time when the

11       war was ending, and they were downsizing the

12       military, specifically the Air Force members, and

13       then you had opportunity to separate early,

14       earlier than your contract if you would like.

15   Q.  Okay.  Did you sustain any injuries during your

16       service?

17   MS. WILLIAMS:  Objection.

18   THE WITNESS:  Yes.

19   BY MS. FREELY:

20   Q.  And what were those injuries?

21   A.  Multiple injuries.  I don't understand the

22       relevancy of that.  If you can expand on that.

23   Q.  So just to be clear, I'm not going to explain why

1     each of my questions is relevant, I am just

2     seeking to get information on your background

3     here again.  So I will ask the question again.

4     Do you recall what injuries you sustained during

5     your service?

6   MS. WILLIAMS:  Objection.

7   THE WITNESS:  No.  I just stated, as you stated at

8     the beginning of this, that all of these

9     questions will be relevant to what I stated and

10     to this case, so I'm confused as to why you're

11     saying that they're not going to be relevant

12     anymore.

13   BY MS. FREELY:

14   Q.  I never stated that.

15   MS. WILLIAMS:  So can we just go off the record for

16     just a minute?

17   MS. FREELY:  Go ahead.

18         (Discussion off the record.)

19   BY MS. FREELY:

20   Q.  Okay.  So picking up where we left off, what

21     injuries did you sustain during your service with

22     the Air Force?

23   MS. WILLIAMS:  Objection.

28

1    THE WITNESS:  Multiple injuries, there's a list of
2        them.  I'm not sure about every injury, I'm still
3        being seen for injuries, injuries are ongoing.
4    BY MS. FREELY:
5    Q.  Okay.  And can you list the injuries that you've
6        been diagnosed with?
7    MS. WILLIAMS:  Objection.
8    THE WITNESS:  No.
9    BY MS. FREELY:
10   Q.  Why can't you list those injuries?
11   A.  For the reasons I just stated.
12   MS. WILLIAMS:  I think he doesn't want to answer the
13       question, so if you could just say that, Charles,
14       we'll just move on.
15   BY MS. FREELY:
16   Q.  Yes.  The thing is, if you don't want to answer a
17       question, you can just say that and move on, but
18       understand that your refusal to answer questions
19       will come with we will move to compel your
20       answers, we'll likely have to come back here and
21       we'll have a court order requiring that you
22       answer, and we will also move for sanctions,
23       which is including but not limited to dismissing

29

```
 1      you from this action.  Do you understand that?
 2  A.  That's fine.  I don't understand the relevancy
 3      here with what we're talking about right now.
 4      I've answered the questions, so -- but that's
 5      good information to know for the future I guess.
 6  Q.  And I'm telling you that regardless of whether
 7      it's relevant or not, and what your counsel has
 8      told you is that if you do not want to answer a
 9      question, you can say that you don't feel
10      comfortable answering the question, you don't
11      want to answer the question, and we will move on.
12      But those refusals will be noted for our motion
13      to compel and motion for sanctions.  You
14      understand?
15  A.  Okay.  I'm pretty sure that I'm -- we're all on
16      the record and this is recording my answers to
17      those questions, and whatever is deemed to be
18      suitable or not, is not my position, but I've
19      answered the questions that you've asked me.  I
20      don't know where we're at with that.
21  Q.  Okay.  So did any of the injuries that you
22      sustained result in a permanent disability?
23  A.  I'm not sure.
```

30

1    MS. WILLIAMS:  Objection.

2    BY MS. FREELY:

3    Q.   To this day, do you know if you have any

4         permanent disabilities?

5    A.   No.  Because I know there's a difference in

6         permanent disabilities and disabilities, I know

7         there's different classifications of

8         disabilities, and I'm not sure if any of my

9         disabilities are officially considered permanent

10        or not, so I can't -- no.  I can't answer that.

11   Q.   Okay.  I can rephrase that.  On a daily basis, do

12        you encounter any pain that is a result of

13        injuries during your service?

14   MS. WILLIAMS:  Objection.

15   THE WITNESS:  Yes.

16   BY MS. FREELY:

17   Q.   And what pain is that?

18   A.   Chronic pain.

19   Q.   Where?

20   A.   Throughout my body, from my neck down to my feet.

21   Q.   Okay.  Do you have any sensory impairments?  Let

22        me back up.

23   MS. WILLIAMS:  Objection.

31

1    BY MS. FREELY:

2    Q.   Do you know what I mean when I say sensory

3         impairment?

4    A.   Not really, no.

5    Q.   Okay.  So your senses, touch, taste, smell,

6         hearing, and sight, if you have any impediments

7         to those that make it such that you cannot, for

8         example, see without glasses or you cannot fully

9         hear or you cannot -- you don't have sense to

10        touch things and feel them, so do you have any

11        sensory impairments?

12   A.   Yes.

13   Q.   And what are those?

14   A.   I have vision problems, and I have ringing in my

15        ears.  Those two things are what comes in my mind

16        right now, as far as sensory.

17   Q.   Okay.  And how long have you had your vision

18        impairment?

19   A.   Not sure of the exact date.

20   Q.   I don't need an exact date.  Has it been longer

21        than ten years?

22   A.   No.  I believe, I believe about ten years.

23   Q.   Okay.

32

1    A.   Yeah.

2    Q.   And how long have you had the ringing in your

3         ears?

4    A.   That is -- that's been since I was in the Air

5         Force.

6    Q.   Okay.  Are you currently employed?

7    A.   No.

8    Q.   What was the last employment that you held?

9    A.   Last employment I held was Lowe's Home

10        Improvement.

11   Q.   And what was your position there?

12   MS. WILLIAMS:  Objection.

13   THE WITNESS:  I worked in the electrical, retail

14        sales, customer service, specialty sales.

15   BY MS. FREELY:

16   Q.   What Lowe's -- well, let me rephrase.  Where was

17        that Lowe's located, you can just give me a city?

18   A.   I worked at Lowe's in Buffalo as well as in

19        Charlotte.

20   Q.   Okay.  Did you work at the Charlotte one most

21        recently?

22   MS. WILLIAMS:  Objection.

23   THE WITNESS:  Yes.

33

```
 1   BY MS. FREELY:
 2   Q.  Okay.  And when did you start -- I'll back up.
 3   A.  I'm sorry?
 4   Q.  Is it fair to say -- sorry?
 5   A.  What did you say?
 6   Q.  Is it fair to say that you started at the Buffalo
 7       Lowe's?
 8   A.  Yeah.
 9   Q.  And when did you start at the Buffalo Lowe's?
10   A.  I'm not sure.
11   Q.  Do you know an approximate date?
12   A.  No.
13   Q.  Was it before 2020?
14   MS. WILLIAMS:  Objection.
15   THE WITNESS:  I'm not sure.  No, it wasn't before.
16       It wasn't before 2020, no.
17   BY MS. FREELY:
18   Q.  Okay.  So it was after 2020?
19   A.  Yeah.
20   Q.  And do you remember how long you were there for
21       before you went to the Charlotte Lowe's?
22   A.  No.
23   MS. WILLIAMS:  Objection.
```

34

1   BY MS. FREELY:

2   Q.  And did you remain in the same position during

3       your time with Lowe's?

4   MS. WILLIAMS:  Objection.

5   THE WITNESS:  No.

6   BY MS. FREELY:

7   Q.  Okay.  Did you receive a promotion?

8   A.  No.  Changed departments.

9   Q.  Okay.  What department did you change over to?

10  MS. WILLIAMS:  Objection.

11  THE WITNESS:  I changed from, I changed from lumber

12      department to the electrical department.

13  BY MS. FREELY:

14  Q.  Okay.  So then did you start in lumber when you

15      were in Buffalo?

16  A.  Yes.

17  Q.  Okay.  And was this a full-time position?

18  MS. WILLIAMS:  Objection.

19  THE WITNESS:  Yes.

20  BY MS. FREELY:

21  Q.  Do you remember when you left Lowe's?

22  A.  September, September 2022.

23  Q.  And why did you leave?

35

```
1    A.   Medical.   Due to my disabilities.

2    Q.   Can you identify the specific disabilities you're

3         referencing?

4    MS. WILLIAMS:   Objection.

5    THE WITNESS:   Chronic pain.

6    BY MS. FREELY:

7    Q.   And is that chronic pain throughout your whole

8         body like you referenced earlier?

9    A.   Yep.

10   Q.   Okay.  And what did you do before Lowe's, so

11        before you started at the Buffalo Lowe's?

12   A.   Construction.

13   Q.   Did you work for a specific company?

14   MS. WILLIAMS:   Objection.

15   THE WITNESS:   Yes.  Yes.  Changed companies every

16        project, for the most part.

17   BY MS. FREELY:

18   Q.   And how long -- when did you start in

19        construction?

20   A.   2008.

21   Q.   And did you work full-time in construction?

22   A.   Yeah.

23   Q.   Were the jobs you worked in Buffalo?
```

36

```
 1   A.  Western New York.  Western New York, when I lived
 2       in Buffalo.  Western New York, yeah.
 3   Q.  And why did you leave the construction field?
 4   A.  Disabilities.
 5   Q.  Okay.  Have you ever been fired from any job?
 6   MS. WILLIAMS:  Objection.
 7   THE WITNESS:  No.  No.
 8   BY MS. FREELY:
 9   Q.  Have you ever been demoted at any job?
10   MS. WILLIAMS:  Objection.
11   THE WITNESS:  No.
12   BY MS. FREELY:
13   Q.  And have you ever been asked to leave or resign
14       from a job?
15   MS. WILLIAMS:  Objection.
16   THE WITNESS:  No.
17   BY MS. FREELY:
18   Q.  Do you still volunteer with AmeriCorps?
19   A.  No.
20   Q.  When did you stop volunteering with them?
21   A.  I'm not sure.  I'm not sure.
22   Q.  Okay.
23   A.  I believe 2019.  I believe November 2019.
```

37

1   Q.  Okay.  And why did you stop volunteering with

2      them?

3   A.  My term ended.

4   Q.  And when you were with them, what did you do?

5   A.  Economic development.

6   Q.  Can you describe what that entailed?

7   A.  That entailed providing, providing capital to

8      underprivileged community, low income,

9      underserved community, providing small business

10     loan opportunities and technical small business

11     resources and assistance.

12   Q.  And how long were you -- strike that.  When did

13     you start with AmeriCorps?

14   A.  I believe November 2018.

15   Q.  So is it correct that your term with AmeriCorps

16     was about a year?

17   A.  A year term, yes.

18   Q.  Okay.  Do you have any other volunteer

19     involvement?

20   A.  I continuously volunteer, I volunteer not

21     officially.  I still volunteer my services as a

22     business consultant to small business owners and

23     entrepreneurs currently.

38

1   Q.   Do you volunteer with any organizations?

2   A.   No.

3   Q.   Okay.  Have you ever been charged with a crime?

4   MS. WILLIAMS:  Objection.

5   THE WITNESS:  Yeah.

6   BY MS. FREELY:

7   Q.   And can you identify the crime or crimes?

8   MS. WILLIAMS:  Objection.

9   THE WITNESS:  No.

10   BY MS. FREELY:

11   Q.   Why can't you identify those?

12   A.   Because I don't recall.

13   Q.   You don't recall the crimes that you've been

14       charged with or crime?

15   A.   No.

16   Q.   Okay.  Have you ever been convicted of a crime?

17   MS. WILLIAMS:  Objection.

18   THE WITNESS:  Yes.

19   BY MS. FREELY:

20   Q.   Can you identify the crime or crimes that you've

21       been convicted with?

22   MS. WILLIAMS:  Objection.

23   THE WITNESS:  No.

39

1    BY MS. FREELY:

2    Q.  Can you repeat that?  I'm sorry.  I broke up for

3         a second.

4    A.  No.

5    Q.  And why can't you identify those?

6    MS. WILLIAMS:  Objection.

7    THE WITNESS:  I'm not comfortable with speaking on

8         them.

9    BY MS. FREELY:

10   Q.  Okay.  In 2014 did you plead guilty to possession

11        with intent to distribute marijuana?

12   MS. WILLIAMS:  Objection.

13   THE WITNESS:  Yeah.

14   BY MS. FREELY:

15   Q.  And what was your sentence for that?

16   MS. WILLIAMS:  Objection.

17   THE WITNESS:  One year probation.

18   BY MS. FREELY:

19   Q.  Do you recall what the initial charges associated

20        with that conviction were?

21   MS. WILLIAMS:  Objection.

22   THE WITNESS:  Conspiracy to distribute -- no.  I'm

23        not sure.

40

```
 1   BY MS. FREELY:

 2   Q.   It was -- so it was conspiracy to distribute

 3        something, but you're not sure exactly what?

 4   A.   No.   I'm not sure what it was.

 5   MS. WILLIAMS:   Objection.   I think he doesn't

 6        remember the charge.

 7   BY MS. FREELY:

 8   Q.   Okay.   Is it true that when you were arrested the

 9        police seized marijuana and cocaine from your

10        possession?

11   MS. WILLIAMS:   Objection.

12   THE WITNESS:   I'm not sure about that one.

13   BY MS. FREELY:

14   Q.   And did you have any probation violations during

15        your one year probation sentence?

16   MS. WILLIAMS:   Objection.

17   THE WITNESS:   Yeah.   Yeah, I actually did.

18   BY MS. FREELY:

19   Q.   Can you describe those violations?

20   MS. WILLIAMS:   Objection to form.

21   THE WITNESS:   No.   It was just one violation, I'm not

22        sure what it was for, but yeah.

23   BY MS. FREELY:
```

41

1   Q.   Did you receive any additional punishment for
2        that violation?
3   A.   Yes.
4   Q.   And do you recall what that was?
5   A.   Halfway house, I went to a halfway house for
6        ninety days, three months.
7   Q.   Okay.  Do you recall when that was?
8   A.   No.
9   Q.   And aside from the arrest associated with the
10       charge and conviction that we just discussed,
11       have you ever been arrested aside from those --
12       aside from that, excuse me?
13  MS. WILLIAMS:  Objection.
14  THE WITNESS:  No.  I'm not sure, no.
15  BY MS. FREELY:
16  Q.   Okay.  You're not sure or do you not remember?
17  A.   I'm not sure.
18  Q.   Okay.  Have you ever been a party to another
19       lawsuit?
20  A.   I don't believe so.
21  Q.   Okay.  So you've never sued anyone?
22  MS. WILLIAMS:  Objection.
23  THE WITNESS:  Nope.  I don't think so.

42

1    BY MS. FREELY:

2    Q.  And you've never been sued?

3    A.  No.

4    Q.  Okay.  What did you do to prepare --

5    MS. WILLIAMS:  I'm sorry.  I just want to -- sorry.

6        I know that Charles mentioned some family stuff,

7        Family Court issues, so I don't know if that's

8        what you're referring to, so I just wanted to

9        bring that up or not bring it up, just point that

10        out as a possibility.

11    MS. FREELY:  No.  I appreciate that.

12    BY MS. FREELY:

13    Q.  Just so that our record is clear, I don't want

14        anything to be excluded.  In the context of

15        Family Court, have you ever been a party to a

16        matter in Family Court?

17    A.  Have I ever been a party to a matter in Family

18        Court?

19    Q.  Yes.

20    A.  I don't know what you're asking me.  I mean, we

21        did speak about custody of my son that I'm

22        currently going through a proceeding regarding

23        that, I don't know if that's what you mean again.

43

1   Q.  So we spoke about that one, and I recall that

2       one, but is there any other Family Court matter

3       aside from this present custody dispute with your

4       son that you've ever been a party to?

5   A.  I don't know what you're asking me.  No.  Family

6       Court, support, family support court.  Yeah,

7       Family Court and child support is what I have

8       been dealing with in regards to Family Court.

9       Yeah, both sides of that, custody and child

10      support.  I don't know if that's what you're

11      asking me.

12  Q.  Yes.  And so I know you mentioned earlier that

13      your son is nine years old, so have you been

14      handling Family Court matters for the past nine

15      years on and off or is it more of a recent

16      development?

17  MS. WILLIAMS:  Objection.

18  THE WITNESS:  No.  For about the past six years,

19      yeah.

20  BY MS. FREELY:

21  Q.  Okay.  And is it fair to say it's been a variety

22      of things like you described, custody, child

23      support?

44

1   A.   No.  Just those things.  Nothing, I mean, just

2        those things, not a variety.

3   Q.   Okay.  So just those things.  Thank you.  What

4        did you do -- I'm going to back up for a second.

5        So I should have said this to begin with, but the

6        conversations that you have, the contents of the

7        conversations you have with your attorney or

8        attorneys are privileged, so at no point in time

9        do I want to know about their content.  I might

10       ask you if you spoke to your attorney or

11       something along those lines, but I don't want you

12       to divulge anything substantive about those

13       conversations.  Do you understand?

14  A.   No.

15  Q.   Okay.  What part don't you understand?

16  A.   Any of it.

17  Q.   Okay.  Do you understand when I say I don't want

18       you to tell me about any of the contents of the

19       conversations that you've had with your

20       attorneys?

21  A.   No.  I don't understand why you're telling me

22       that, no.

23  Q.   I'm telling you that because that is privileged,

45

1      so that's confidential between yourself and your

2      attorney, so I'm trying to make sure that you

3      don't unintentionally divulge to me privileged

4      information.  Does that make sense?

5   A.   That makes sense.

6   MS. FREELY:  Okay.  And, Ms. Williams, I assume

7      you've versed him on attorney/client privilege,

8      correct?

9   MS. WILLIAMS:  Yes.  Yes.

10  MS. FREELY:  Okay.

11  BY MS. FREELY:

12  Q.   What did you do to prepare for your testimony

13      today, excluding the content of any conversations

14      with your attorney?

15  A.   Nothing.

16  Q.   So you did not meet with anyone to prepare for

17      today?

18  A.   Excluding my attorney?

19  Q.   Well, no.  So this is the difference.  If you met

20      with your attorney, you can say that, and I would

21      -- that would be the truthful statement, if you

22      did meet with your attorney.  But I don't want

23      you to say I met with my attorney, and we

46

```
 1        discussed X, Y and Z.  Does that make sense?
 2   A.   I met with my attorney.
 3   Q.   Okay.  And did you review any documents?
 4   A.   We reviewed documents.
 5   Q.   Okay.  Did you review the complaint in this
 6        matter?
 7   A.   I'm not sure what we reviewed exactly.
 8   Q.   Okay.  But you did review documents?
 9   A.   Yeah.
10   Q.   Okay.  Did you speak with anyone else about this
11        deposition today besides counsel?
12   A.   No, not yet.
13   Q.   Have you ever spoken with any other Plaintiff in
14        this lawsuit at any time?
15   A.   No.
16   Q.   How did you come to be involved in this lawsuit?
17   A.   I'm not sure.
18   Q.   Were you approached by a member of -- I'm
19        actually going to back up.  Okay.  Were you
20        approached by any member of Black Love Resists In
21        The Rust?
22   A.   I'm not sure.
23   Q.   Were you approached by anyone else?
```

47

1    MS. WILLIAMS:  Objection.

2    THE WITNESS:  I don't recall.

3    BY MS. FREELY:

4    Q.   Did you seek out individuals to bring this

5         lawsuit with?

6    A.   Nope.

7    Q.   Okay.  So someone else approached you then,

8         correct?

9    A.   I'm not sure.

10   Q.   Okay.  So is it your testimony that you do not

11        know how you came to be involved in this lawsuit?

12   A.   You could say that.

13   Q.   Okay.  Are you aware of what the organization

14        Black Love Resists In The Rust is?

15   MS. WILLIAMS:  I'm sorry.  I just want to note my

16        objection to the -- that was a misstatement.  I

17        think he said he wasn't sure, not that he doesn't

18        know.

19   MS. FREELY:  Okay.

20   BY MS. FREELY:

21   Q.   So is it your testimony that you are not sure

22        that you -- how you became involved with this

23        lawsuit?

48

1   A.   Right.

2   Q.   At one point in time did you ever know how you

3        became involved in this lawsuit?

4   A.   I'm pretty sure at the beginning, yeah.

5   Q.   Okay.  Are you aware of what the organization

6        Black Love Resists In The Rust is?

7   A.   Not much, no.

8   Q.   Okay.  For the sake of brevity, can we agree that

9        I will call Black Love Resists In The Rust BLRR?

10  A.   BLRR, you want to call them that, sure.

11  Q.   So you just stated that you're not sure what they

12       do, is that correct?

13  A.   No.  I'm not sure, no.

14  Q.   Okay.  Have you ever spoken with anyone from

15       BLRR?

16  A.   My attorney.

17  Q.   Okay.  And are you currently or have you ever

18       been a member of BLRR?

19  A.   I'm not sure.  I don't think so.

20  Q.   Okay.  So did you have any active role in

21       bringing this litigation?

22  MS. WILLIAMS:  Objection.

23  THE WITNESS:  Active role, no.  I don't think so.  I

49

```
 1      believe it was already in litigation before me.
 2   BY MS. FREELY:
 3   Q.  Okay.  And so did you join in after there had
 4       been a group of Plaintiffs already?
 5   MS. WILLIAMS:  Objection.
 6   THE WITNESS:  I'm not sure the status, I'm not sure.
 7   BY MS. FREELY:
 8   Q.  Okay.  Are you involved with any other social
 9       justice or activist organizations?
10   A.  No.
11   Q.  And since this lawsuit was filed, have you spoken
12       with anyone about the allegations in the lawsuit,
13       besides counsel?
14   MS. WILLIAMS:  Objection.
15   THE WITNESS:  No.
16   BY MS. FREELY:
17   Q.  Okay.  Do you currently have a valid driver's
18       license?
19   A.  Yes.
20   Q.  And what state is that driver's license issued
21       in?
22   A.  North Carolina.
23   Q.  Since you first received your license have you
```

50

1    always had a valid driver's license?

2  A.  No.

3  Q.  When did you first lose your license?

4  A.  I'm not sure.

5  Q.  Was it within the past ten years?

6  A.  No.

7  Q.  So it was more than ten years ago?

8  A.  I'm not sure actually.

9  Q.  Okay.  Do you recall why you lost your license?

10  A.  No.

11  Q.  Do you recall how, was it suspended or was it

12    revoked?

13  A.  I mean, if you're talking just my complete

14    history of having a license, it may have been

15    more than one occasion, I'm not sure, but I know

16    that my license was suspended due to these

17    tickets, these tickets that we're here for today.

18  Q.  Okay.  So it was suspended that one time because

19    of unpaid tickets, is that correct?

20  A.  Excessive tickets, yes.  Excessive discriminatory

21    tickets.

22  Q.  Okay.  And then you may have lost your license --

23    or, it may have been suspended or revoked another

51

```
 1       time, but you don't recall?
 2  A.   Maybe.
 3  Q.   Okay.  When did you -- after your license was
 4       suspended due to the tickets at issue here, when
 5       did you regain your driver's license?
 6  A.   I'm not sure.
 7  Q.   Was it a year later, two years later?
 8  A.   I'm not sure.
 9  Q.   Okay.  Do you currently own your own car?
10  A.   Yeah.
11  Q.   And how long have you owned that car for?
12  A.   Maybe about three years.
13  Q.   Okay.  Can you describe -- can you tell me the
14       make of that car?
15  MS. WILLIAMS:  Objection.
16  THE WITNESS:  No.
17  BY MS. FREELY:
18  Q.   You don't know the make of the car that you
19       drive?
20  A.   No.  I don't choose to disclose that information.
21  Q.   Okay.  Do you recall the model of the car that
22       you drive?
23  MS. WILLIAMS:  Objection.
```

52

1   THE WITNESS:  No.  I don't choose to disclose that.

2   BY MS. FREELY:

3   Q.  Okay.  And the year of the car?

4   MS. WILLIAMS:  Objection.

5   THE WITNESS:  Not disclosing any of that.

6   BY MS. FREELY:

7   Q.  Did you get the car from a dealership?

8   MS. WILLIAMS:  Objection.

9   THE WITNESS:  I don't want to disclose any of that.

10  BY MS. FREELY:

11  Q.  Okay.  Was this the same car that you were

12      driving in Buffalo?

13  A.  I drove the car in Buffalo.

14  Q.  Okay.  Was this the car that you drove in 2015

15      during the time of the stops listed in the

16      complaint?

17  A.  No.  I had this vehicle for three years.

18  Q.  Okay.  And what car did you -- did you own a car

19      before that?

20  A.  I've owned cars throughout my life.

21  Q.  Okay.  So what car did you own in 2015 during the

22      stops listed in the complaint?

23  A.  I believe it was a Chevy Impala.

53

1  Q.  Do you remember the year of the car?

2  A.  2013 maybe, I'm not sure.  I think 2013.

3  Q.  Did you own any other cars in 2015?

4  A.  I don't think so.  I'm not sure.

5  Q.  And did you regularly drive any other cars in

6     2015?

7  A.  I'm not sure.

8  Q.  If I refer to a traffic safety checkpoint, do you

9     understand what I'm talking about?

10 A.  Traffic safety checkpoint?

11 Q.  Yes.

12 A.  Yes.

13 Q.  Okay.  Can you describe your understanding of

14    what those are?

15 A.  No, I can't.

16 Q.  So you know what they are, but you cannot

17    describe them?

18 MS. WILLIAMS:  Objection.

19 THE WITNESS:  Right.  I'm familiar with them, but I

20    can't describe them.

21 BY MS. FREELY:

22 Q.  Why is that?

23 MS. WILLIAMS:  Objection.

54

1   THE WITNESS:  I don't know.

2   BY MS. FREELY:

3   Q.   Okay.  So if I represent to you that -- strike

4        that.  When I refer to traffic safety checkpoints

5        I am referring to the checkpoints that were done

6        by the Buffalo Police Department to check for

7        violations of the Vehicle and Traffic Law.  Do

8        you understand that?

9   MS. WILLIAMS:  Objection.

10  THE WITNESS:  Okay.

11  BY MS. FREELY:

12  Q.   Okay.  Have you ever been through a traffic

13       safety checkpoint in the City of Buffalo?

14  A.   I believe so, yep.

15  Q.   Okay.  Do you recall how many times?

16  A.   I don't know if there's different checkpoints,

17       traffic safety checkpoints or if there's, I don't

18       know, DUI checkpoints or whatever, I don't know

19       if they're all just considered traffic safety

20       checkpoints, but as far as the checkpoints that

21       I'm familiar with that I've been through, I

22       don't, I don't know if they're considered that or

23       what, if that's what you're referring to.

55

1   Q.   So I'm not referring to DUI checkpoints, I'm

2        referring to checkpoints that were specifically

3        used to check for violations of the Vehicle and

4        Traffic Law.

5   MS. WILLIAMS:  Objection to the form.  I just want to

6        state on the record that there's no way Mr.

7        Palmer would know the purpose behind the

8        checkpoints.

9   MS. FREELY:  Okay.

10  MS. WILLIAMS:  We can just call them checkpoints, it

11       may just be easier.

12  MS. FREELY:  That's fine.

13  BY MS. FREELY:

14  Q.   So we can make it broad.  Have you ever been

15       stopped in any kind of checkpoint in the City of

16       Buffalo?

17  A.   Yes.

18  Q.   Any kind of police checkpoint, excuse me?

19  A.   Yes.

20  Q.   Okay.  How many times?

21  A.   I'm not sure.

22  Q.   Do you recall when?

23  A.   No.

56

1    Q.  Do you recall where?

2    A.  Buffalo.

3    Q.  Do you recall a specific place in Buffalo?

4    A.  Multiple checkpoints throughout the East Side

5        primarily.  I don't know.  I'm pretty sure I

6        gave -- I've given my attorney and the

7        representatives the location or it was on -- they

8        got it off of the tickets, but I don't know

9        offhand, no.

10   Q.  Okay.  Do you recall how long on average you

11       waited in these checkpoints?

12   A.  No.

13   Q.  Do you recall on average how long you were

14       stopped for by the police in these checkpoints?

15   MS. WILLIAMS:  Objection.

16   THE WITNESS:  No.

17   BY MS. FREELY:

18   Q.  Do you recall if you were issued any tickets at

19       any of these checkpoints?

20   A.  Yes.

21   Q.  Okay.  And what tickets were those?

22   A.  I'm not sure.  Well, actually, I'm not sure if I

23       was issued tickets at the checkpoints or not.

57

1  Q.  Is there a reason that your experiences at

2      checkpoints were not included in your complaint?

3  MS. WILLIAMS:  Objection.  Objection.

4  THE WITNESS:  No.  I was under the impression that

5      they are included.

6  BY MS. FREELY:

7  Q.  Okay.  So I am going to introduce Exhibit A.

8      Okay.  Can we all see my screen?

9  MS. WILLIAMS:  Not well enough to read, but I can see

10     it.  I don't know if Mr. Palmer can.

11 BY MS. FREELY:

12 Q.  Mr. Palmer, can you see this?

13 A.  No.  Not clearly, no.

14 Q.  Do you want me to make it bigger?

15 A.  You can try.

16 Q.  Okay.  Can you see that?

17 A.  I can see it for the most part, yeah.

18 Q.  Okay.  So I am just going to scroll down to where

19     we first start talking about your interactions

20     with Buffalo police officers.  Can you read, you

21     don't have to read it out loud, you can read it

22     to yourself, can you read paragraph three o two

23     down through three o five?

58

1    A.   You would like me to read that?

2    Q.   Yes.  You can just read it to yourself, and just

3         let me know when you're ready for me to scroll

4         down.

5    A.   Okay.

6    Q.   And for this one, let's reference, can you please

7         read three o six through three o seven?

8    A.   Three o six and three o seven?

9    Q.   Yes.

10   A.   Okay.

11   Q.   Okay.  Are you done?

12   A.   Yes.

13   Q.   Okay.  So do you recognize this as the complaint

14        in your lawsuit?

15   A.   It looks like it.

16   Q.   Okay.  So from what you read, those are, I will

17        represent to you that those are your -- the

18        allegations of your interactions with Buffalo

19        police officers.  Why is there no mention of any

20        of the checkpoints that you previously

21        referenced?

22   MS. WILLIAMS:  Objection.

23   THE WITNESS:  I'm not sure.  I believe the one is.

59

1    BY MS. FREELY:

2    Q.   Sorry?

3    A.   One is, I believe the checkpoints are -- I

4         believe those might be checkpoints, at least one

5         of them, but I'm not sure.  Maybe it's just not

6         listed, I don't know.

7    Q.   Okay.  Did you review this document before it was

8         filed at all?

9    A.   I reviewed it.

10   Q.   Okay.  So we are going to focus in on the

11        November 4th interaction that is paragraph three

12        o two.  So we will actually start, we'll focus on

13        three o one through three o four, if you need to

14        read these again, feel free, but do these

15        accurately describe the incident where you were

16        cited for a traffic violation on November 4th,

17        2015?

18   A.   I'm not sure.

19   Q.   You don't know if these statements are accurate

20        or not?

21   A.   It depends on as far as how level of accuracy,

22        pretty accurate.

23   Q.   Okay.  So starting with three o one, is it true

60

1      that in or about 2015 you began experiencing

2      vision problems and that the sun bothered you

3      when you drove?

4  A.  During that period.  I wouldn't say that's when

5      it began, maybe.

6  Q.  Okay.  Is it true that you decided to tint your

7      car windows to address that light sensitivity?

8  A.  Yes.

9  Q.  Okay.  And is paragraph three o two true?

10  A.  I'm not sure, I believe so.

11  Q.  Okay.  Is paragraph three o three true?

12  A.  I believe so.

13  Q.  And is paragraph three o four true?

14  A.  I'm not sure.  I don't know if I read that.

15  Q.  You can take the time to read it now.

16  MS. WILLIAMS:  Can you make it bigger?

17  MS. FREELY:  Yes.

18  THE WITNESS:  What were you saying?

19  BY MS. FREELY:

20  Q.  Is paragraph three o four true?

21  A.  I believe so.

22  Q.  Can you describe for me in your own words what

23      happened when you were pulled over by Officer

61

```
1        Domaracki on November 4th, 2015?
2   A.   No.
3   Q.   And why not?
4   A.   Not comfortable with doing that at this time.
5   Q.   You're not comfortable with describing
6        allegations in your complaint?
7   A.   Right.
8   Q.   Okay.  Where were you coming from on November
9        4th, 2015 when you were pulled over by Officer
10       Domaracki?
11  A.   I'm not sure.
12  Q.   And what was the address that you were headed to
13       during that time?
14  A.   I'm not sure.
15  Q.   Do you remember around what time this incident
16       occurred?
17  A.   No.
18  Q.   Okay.  So previously you testified that you --
19       actually, I'll back up.  I'll strike that.  Is it
20       true that you were going home on that day at that
21       time?
22  A.   I believe so.
23  Q.   Okay.  And where was home at that time?
```

62

1  A.  I'm not sure.

2  Q.  Were you living at your aunt's address?

3  A.  I'm not sure.

4  Q.  Okay.  So this paragraph three o three states --

5      I'll highlight actually, if I can.  Yes.

6      Starting there, Mr. Palmer moved frequently, and

7      used his aunt's address on the East Side of

8      Buffalo as a permanent address.  So was your

9      aunt's address where you actually resided or did

10     you have a different residential address?

11 A.  Exactly as it states there.  I'm not sure.

12 Q.  Can you describe your interaction with Officer

13     Domaracki?

14 A.  No.

15 Q.  Why not?

16 A.  Because I'm not sure.

17 Q.  When you say you're not sure, do you mean you

18     don't recall or you don't --

19 A.  Yeah.

20 Q.  -- you can't remember?

21 A.  For the most part.  Yeah, this is a long time

22     ago.  I can't give you exact, I don't have

23     photographic memory or anything like that or I

63

```
 1        can't go back in time.  I don't -- I'm not sure.
 2   Q.   Okay.  So is it your testimony that you have no
 3        memory of your interaction with this officer,
 4        Officer Domaracki, on November 4th, 2015?
 5   MS. WILLIAMS:  Objection.
 6   THE WITNESS:  No.
 7   BY MS. FREELY:
 8   Q.   What is your testimony?
 9   MS. WILLIAMS:  Objection.
10   THE WITNESS:  That my testimony is as it states, and
11        I'm not sure of anything additional.
12   BY MS. FREELY:
13   Q.   Okay.  Was he unprofessional to you, if you can
14        recall?
15   MS. WILLIAMS:  Objection.
16   THE WITNESS:  As I stated, I don't recall anything
17        additional besides what it states.
18   BY MS. FREELY:
19   Q.   Was any other officer present besides Officer
20        Domaracki?
21   A.   I'm not sure.
22   Q.   Can you describe the vision problems referenced
23        in paragraph three o one?
```

64

1    MS. WILLIAMS:  Objection.  I think we went over that,

2        with the light sensitivities.

3    MS. FREELY:  Yes.  So I'm just asking him to

4        describe them in more detail.

5    THE WITNESS:  I have, I believe it's called

6        keratoconus disease, eye disease, that's ongoing,

7        ongoing treatment for, that started around when I

8        was thirty, early thirties, and -- yeah.  I

9        believe I'm legally blind, I believe I'm legally

10        blind in one of my eyes without, without my

11        contacts or any vision assistance, glasses or

12        anything like that, this has started around that

13        time, I guess what we said, 2015, what have you.

14    BY MS. FREELY:

15    Q.  Okay.  And do you recall when you received your

16        diagnosis?

17    A.  No.

18    Q.  Okay.  Do you still experience sensitivity to

19        light?

20    A.  Not like before.

21    Q.  Did you see a doctor when these vision problems

22        initially arose in your early thirties?

23    A.  Yeah.  Ongoing, ongoing treatment for that, yes.

65

```
 1   Q.  Okay.  Would sunglasses have helped in the sun?
 2   MS. WILLIAMS:  Objection.
 3   THE WITNESS:  I believe I had sunglasses.  No.
 4   BY MS. FREELY:
 5   Q.  Okay.  Did a doctor recommend that you have
 6       tinted windows?
 7   MS. WILLIAMS:  Objection.
 8   THE WITNESS:  I'm not sure.
 9   BY MS. FREELY:
10   Q.  What sparked your decision to have your windows
11       tinted?
12   MS. WILLIAMS:  Objection.
13   THE WITNESS:  As stated.
14   BY MS. FREELY:
15   Q.  Which is what?
16   A.  Light sensitivity and vision problems.
17   Q.  Did you tint your windows yourself?
18   A.  No.
19   Q.  Did you have someone else tint your windows?
20   A.  Professionally tinted by a tinting window
21       company.
22   Q.  Do you remember what company that is, that was?
23   A.  No.
```

66

1    MS. WILLIAMS:  Objection.

2    BY MS. FREELY:

3    Q.  Do you remember how much they charged you for

4        that?

5    A.  Not exactly, no.

6    Q.  Was it over a hundred dollars?

7    A.  I believe so.

8    Q.  Okay.  Was it less than five hundred?

9    A.  I believe so.

10   Q.  Were you aware that your tint exceeded the degree

11       of tint allowed by law?

12   MS. WILLIAMS:  Objection.

13   THE WITNESS:  No.

14   BY MS. FREELY:

15   Q.  So when you asked for window tint from this

16       company, did you specify a specific level you

17       wanted?

18   MS. WILLIAMS:  Objection.

19   THE WITNESS:  A specific level, no.

20   BY MS. FREELY:

21   Q.  So how did they know how much tint you wanted

22       applied to the windows?

23   A.  By my description and the options they provided

67

1     me.

2  Q.  How many of your windows were tinted?

3  A.  Five.

4  Q.  So is that your -- which windows were tinted?

5  A.  Four windows and the rear window.

6  Q.  The rear windshield?

7  A.  Yes.

8  Q.  Okay.  Did the officer use a tint meter when --

9      to test how tinted your windows were on November

10     4th, 2015?

11 A.  I'm not sure, I can't recall.

12 Q.  Okay.  Did you communicate your vision problems

13     to the officer on that date?

14 A.  I'm not sure.

15 Q.  So paragraph three o three states that you moved

16     frequently.  Why is that?

17 MS. WILLIAMS:  Objection.

18 THE WITNESS:  I'm not sure.

19 BY MS. FREELY:

20 Q.  So was it your aunt's address that was on your

21     license, your driver's license?

22 A.  I'm not sure.

23 Q.  Do you remember what license -- what address was

68

1        listed on your license at that time?

2   A.   No.

3   Q.   Why did you use your aunt's address as your

4        permanent address?

5   MS. WILLIAMS:  Objection.

6   THE WITNESS:  I'm not sure.

7   BY MS. FREELY:

8   Q.   Would it have been so that you could receive mail

9        there?

10  A.   I'm not sure.

11  Q.   Did you ever retrieve mail from your aunt's

12       address?

13  MS. WILLIAMS:  Objection.

14  THE WITNESS:  Yeah.

15  BY MS. FREELY:

16  Q.   So did you use your aunt's address to have things

17       mailed to you?

18  A.   I'm not sure what you're asking me.

19  Q.   Did you list your aunt's address when you were

20       receiving mail, for example, if you were ordering

21       packages or did you expect to receive DMV notices

22       or any kind of notices at your aunt's address?

23  MS. WILLIAMS:  Objection.  Objection.

69

1  THE WITNESS:  I used, I used that address as a

2      mailing address in the past, yes.

3  BY MS. FREELY:

4  Q.  Okay.  So paragraph three o four notes that you

5      received three tickets that day.  Did you

6      challenge any of those tickets in court?

7  A.  I'm not sure.

8  Q.  You don't -- you're not sure if you went to court

9      for these tickets?

10 A.  Right.

11 Q.  Okay.  Do you recall what the fines were for

12     these tickets?

13 A.  No.

14 Q.  Did you pay them outright?

15 A.  Yes, I did.

16 Q.  And do you recall how much you paid?

17 A.  No.

18 Q.  Do you recall when you paid them?

19 A.  No.

20 Q.  Was it immediately after you received the tickets

21     or within -- was it immediately after you

22     received the tickets?

23 A.  No.

70

1   Q.   Was it within a month?

2   A.   No.

3   Q.   Was it within six months?

4   A.   No.  It was years.  Years.  Year plus, years.

5        Years I was -- my license was suspended for

6        years.  I was affected by that for multiple

7        years, as far as I remember.  It took me a while

8        to pay that off.  A thousand plus dollars if I

9        recall.

10  Q.   So the license being suspended though came after

11       this incident, correct?

12  A.   I'm not sure.

13  Q.   You don't remember if your license was suspended

14       as a result of these tickets before or after you

15       received the tickets?

16  MS. WILLIAMS:  Objection.

17  THE WITNESS:  I'm pretty sure if my license was

18       suspended I would have got arrested, so if I was

19       to guess, I would say my license was not

20       suspended or I would have gotten a ticket for

21       that.

22  BY MS. FREELY:

23  Q.   Okay.  Why did you wait to pay these tickets?

71

1   A.   Wasn't financially able to.

2   Q.   Approximately how long did Officer Domaracki have

3        you pulled over for?

4   A.   I believe you asked me this already.

5   Q.   I did not.

6   A.   You asked me how long I was pulled over for, how

7        long did I have to wait for these traffic stops.

8        I don't know if this is something different, but

9        I'm not sure.

10  Q.   I asked you that in reference to checkpoints, now

11       I'm asking you in reference to the November 4th,

12       2015 incident where you were pulled over by

13       Officer Domaracki.  How long, approximately how

14       long were you pulled over for?

15  A.   I'm not sure.

16  Q.   Were you ever arrested during this incident?

17  A.   I was arrested during one of these incidents, I'm

18       not sure if it was this one.

19  Q.   Okay.  Is there a reason why that arrest is not

20       detailed in this complaint?

21  MS. WILLIAMS:  Objection.

22  THE WITNESS:  No.  I'm not sure.

23  BY MS. FREELY:

72

1    Q.  Okay.  So after this incident on November 4th,
2         2015, did you update your address on file with
3         the DMV?
4    MS. WILLIAMS:  Objection.
5    THE WITNESS:  I'm not sure.
6    BY MS. FREELY:
7    Q.  I'm sorry.  I think the two talking at the same
8         time cut Charles out for me.  What did you say,
9         Charles?
10   MS. WILLIAMS:  Sorry.
11   THE WITNESS:  I'm not sure.
12   BY MS. FREELY:
13   Q.  Do you know the difference between a permanent
14        address and a current address?
15   A.  No.
16   Q.  Okay.  A permanent address is something that
17        someone uses like your aunt's address, for the
18        purposes of mail, where they know they can
19        receive mail.  Whereas a current address might be
20        different from a permanent address, if someone
21        resides or lives at a different address.  Do you
22        understand that?
23   A.  It sounds good.

73

1   Q.   Okay.  Did you know that the DMV allows you to

2        have two separate addresses on file, one for your

3        permanent address where you receive mail, and the

4        other a current residential address?

5   MS. WILLIAMS:  Objection.

6   THE WITNESS:  I believe so.

7   BY MS. FREELY:

8   Q.   So is there a reason you did not have your

9        current address on file at the DMV?

10  MS. WILLIAMS:  Objection.

11  THE WITNESS:  I never said my current address wasn't

12       on file.

13  BY MS. FREELY:

14  Q.   Was your aunt's address your current address at

15       the time of the November 4th, 2015 stop?

16  A.   I'm not sure.

17  Q.   Did you reside with your aunt during 2015?

18  A.   I don't recall.

19  Q.   So do you remember what the address was that was

20       on file with the DMV at that time?

21  A.   No.

22  Q.   Did you know that you can update your current

23       address and your permanent address for free with

74

1        the DMV?

2    MS. WILLIAMS:  Objection.

3    THE WITNESS:  No, I didn't know that.

4    BY MS. FREELY:

5    Q.  Okay.  Did you know that you can make that change

6        online, via mail or in person at the DMV?

7    A.  No.

8    MS. WILLIAMS:  Objection.

9    BY MS. FREELY:

10   Q.  Did you ever check to see what address was on

11       file with the DMV after this incident?

12   A.  No.  It was on my driver's license, my address is

13       listed on my driver's license.

14   Q.  And was that address your aunt's address?

15   A.  I'm not sure.

16   Q.  Do you recall what address that was?

17   A.  I'm not sure.

18   Q.  Okay.  Did you remove the window tint after this

19       incident?

20   A.  I believe so.

21   Q.  Did you have it professionally removed?

22   A.  I don't recall.

23   Q.  Okay.  And approximately how long after November

75

1          4th, 2015 did you have the window tint removed?

2    A.   I'm not sure if I got it removed or if I didn't

3          or when or if it was never removed or not.

4    Q.   So are you amending your prior statement that you

5          previously said that it was removed, are you

6          amending that to say you're not sure?

7    A.   No.  I don't believe I said it was removed.

8    MS. FREELY:  Nikki, can you read that back?

9          (Whereupon, the above-requested answer was

10         then read back by the reporter.)

11   BY MS. FREELY:

12   Q.   So are you amending that statement that in which

13         you said I believe it was removed, I believe so,

14         to say you're not sure now?

15   A.   Yeah, I'm not sure.  I believe so, but I don't, I

16         don't think -- I don't know.  I don't believe I

17         had the -- yeah, I'm not sure.

18   Q.   Okay.  So we are going to move on to the next

19         incident, I'm going to scroll down, again, if you

20         need this bigger, let me know.  Okay.  I don't

21         think -- do you just want to read paragraph three

22         o five here and then I'll move on to paragraph

23         three o six.

76

1    A.   Who, me?

2    Q.   Yes.

3    A.   Okay.  Okay.

4    Q.   Okay.  Does this -- do these paragraphs, and if

5         you need me to scroll down or up at any point in

6         time during this, please let me know, do these

7         paragraphs, paragraph three o five and three o

8         six accurately describe the incident on January

9         15th, 2016?

10   A.   I'm not sure.

11   Q.   Okay.  Can you tell me in your own words what

12        happened during this incident?

13   A.   No.  I'm not sure.

14   Q.   Is it true that on or about January 15th, 2016

15        you were pulled over by Strike Force Officer Adam

16        Wigdorski on Newburgh and East Delavan on the

17        East Side and given five tickets?

18   A.   Sounds about right.

19   Q.   And is it true that Officer Wigdorski asked you

20        where you were going and ticketed you because the

21        address you gave did not match the address on

22        your license?

23   A.   It sounds about right.

77

1    Q.  Did you tell Officer Wigdorski that you were

2        headed home?

3    A.  I don't recall that.  I don't think so.

4    Q.  Okay.  Where were you coming from that day?

5    A.  I'm not sure.

6    Q.  And do you recall the address that you were

7        headed to?

8    A.  No.

9    Q.  Do you remember what time this occurred at?

10   A.  No.

11   Q.  And can you describe your interaction with the

12       officer at all?

13   A.  No.

14   Q.  Was any other officer present besides Officer

15       Wigdorski?

16   A.  I'm not sure.

17   Q.  Okay.  And did Officer Wigdorski use a tint meter

18       to test how tinted your windows were?

19   A.  I'm not sure.

20   Q.  Did you communicate your vision problems to the

21       officer?

22   A.  I'm not sure.

23   Q.  So is it your testimony that you're not sure

78

1      about any of the details related to this incident

2      on January 15th, 2016?

3  MS. WILLIAMS:  Objection.

4  THE WITNESS:  You can say that I don't recall any of

5      that, you're right, correct.  No, I don't recall

6      it at this moment, no.

7  BY MS. FREELY:

8  Q.  Okay.  Did you challenge these five tickets in

9      court?

10  A.  I'm not sure.

11  Q.  And do you remember the fines associated with

12      these five tickets?

13  A.  Do I remember them?

14  Q.  Yes.

15  A.  Not exactly.

16  Q.  What do you mean when you say not exactly?

17  A.  I remember the tickets, I don't recall exactly

18      how much they were or any of the details.  I

19      recall getting ticketed.

20  Q.  Okay.  And did you pay these immediately after

21      you received them or did you pay them at the same

22      time you paid the November 4th tickets?

23  A.  I believe I paid them all at the same time.

79

1    Q.   Okay.   Approximately how long did the officer
2         have you pulled over on January 15th, 2016?
3    A.   I'm not sure.
4    Q.   Were you arrested during this incident at all?
5    A.   I'm not sure.
6    Q.   Were you ever asked to step out of the car during
7         this incident?
8    A.   I don't recall.
9    Q.   Did you update the address on file with the DMV
10        after this incident?
11   MS. WILLIAMS:   Objection.
12   THE WITNESS:   I don't remember.
13   BY MS. FREELY:
14   Q.   Did you remove the window tint on your car
15        windows after this incident?
16   MS. WILLIAMS:   Objection.
17   THE WITNESS:   I'm not sure.
18   MS. FREELY:   Okay.   Keisha, can we take -- actually,
19        can we take an early lunch?   Can we come back at
20        like noon, does that work for you, Mr. Palmer?
21   THE WITNESS:   Sure.
22   MS. FREELY:   All right.   Perfect.   See everyone at
23        noon then.

80

```
 1   MS. WILLIAMS:  Okay.
 2          (Whereupon, a lunch recess was then taken.)
 3   BY MS. FREELY:
 4   Q.   So just to recap, we just covered the January
 5        15th, 2016 incident that was detailed in the
 6        complaint.  So I am going to move on to the last
 7        incident, the June 5th, 2016 incident.
 8   MS. WILLIAMS:  I was just saying, did you say
 9        November 14, 2015?
10   MS. FREELY:  No.  I said I just covered the January
11        15th, 2016 incident.
12   MS. WILLIAMS:  Oh, I'm sorry.
13   MS. FREELY:  That's okay.
14   BY MS. FREELY:
15   Q.   Okay.  Mr. Palmer, I am going to direct your
16        attention to paragraph three o seven, and I will
17        make it a little bigger.  Can you read three o
18        seven to yourself?
19   A.   That's good.
20   Q.   Okay.
21   A.   You said three o seven?
22   Q.   Yes.
23   A.   Okay.  Okay.
```

81

```
1    Q.   Okay.  Does this accurately reflect -- I'm sorry.
2         One second.  Does this accurately reflect the
3         June 5th, 2016 incident that you experienced?
4    A.   I don't know.  It sounds about right.
5    Q.   Okay.  And can you tell me in your own words the
6         details of this June 5th, 2016 incident?
7    A.   No, I can't.  I don't recall it.
8    Q.   Okay.  And do you recall where you were coming
9         from on June 5th, 2016?
10   A.   No.
11   Q.   Do you remember where you were headed to?
12   A.   No.
13   Q.   And do you remember around what time this
14        occurred?
15   A.   No.
16   Q.   Okay.  Can you describe your interaction with
17        Officer Charles Miller?
18   A.   No.
19   Q.   Why can't you describe that interaction?
20   A.   I don't recall.
21   Q.   Okay.  Was any other officer present besides
22        Officer Miller?
23   A.   I'm not sure.
```

82

1   Q.  And did Officer Miller use a tint meter to test
2       out how your windows were before he gave you the
3       four tickets?
4   A.  I don't recall.
5   Q.  Were you aware that your registration had expired
6       on June 5th, 2016?
7   A.  No.
8   Q.  So did you -- strike that.  Do you have any way
9       to make sure that you keep up with your vehicle
10      registration?
11  MS. WILLIAMS:  Objection.
12  THE WITNESS:  No.
13  BY MS. FREELY:
14  Q.  So do you try to keep up with your vehicle
15      registration to make sure it's up-to-date?
16  A.  Yes.
17  Q.  And do you have any calendar reminder for that or
18      anything else of that nature?
19  MS. WILLIAMS:  Objection.
20  THE WITNESS:  No.
21  BY MS. FREELY:
22  Q.  Do you believe it's the driver's responsibility
23      to keep their registration up-to-date?

83

1    A.  Yes.

2    Q.  Do you believe that it was your responsibility to

3         keep your registration up-to-date?

4    A.  Yes.

5    Q.  So do you believe that Officer Miller should have

6         written you a ticket for an expired registration?

7    MS. WILLIAMS:  Objection.

8    THE WITNESS:  It's discretionary.

9    BY MS. FREELY:

10   Q.  Okay.  And when you say discretionary, can you

11        explain a little bit further?

12   A.  It was one day expired, it was discretionary

13        whether he wanted to be strict on that or give me

14        a warning or notification, seeing as though it

15        had just expired twenty-four hours prior, but

16        it's definitely my responsibility.

17   Q.  Do you believe that Officer Miller should have

18        made an exception for you and not written you a

19        ticket?

20   MS. WILLIAMS:  Objection.

21   THE WITNESS:  No.

22   BY MS. FREELY:

23   Q.  So do you believe that he -- strike that.  So do

84

1      you believe that he was justified in writing you

2      this ticket?

3   A.   Yes.

4   Q.   Okay.  Did you challenge any of these, in total,

5      five tickets from the June 5th, 2016 incident?

6   A.   I'm not sure.  I don't believe so.

7   Q.   Okay.  Do you recall how much the fines were for

8      these five tickets?

9   A.   No.

10  Q.   And did you pay them immediately or did you pay

11     them when you paid your prior tickets that we've

12     discussed?

13  A.   Paid all the tickets at the same time.

14  Q.   Okay.  Approximately how long did Officer Miller

15     have you pulled over for?

16  A.   I'm not sure.

17  Q.   Do you recall if he asked you to step out of the

18     car at all?

19  A.   I don't recall.

20  MS. WILLIAMS:  Objection.

21  BY MS. FREELY:

22  Q.   And were you ever arrested during this incident?

23  A.   I don't recall.

85

1   Q.   Okay.  Earlier you stated that you believed you

2       were arrested during one of these incidents.  Is

3       it your testimony today that you don't recall

4       which incident that was?

5   A.   Correct.

6   Q.   Okay.  Regardless of --

7   A.   Pretty sure it was the last incident, if this is

8       the last incident -- matter of fact, I'm pretty

9       sure it was this incident, but I don't recall for

10      sure, but I'm pretty sure it was.  If this is the

11      last incident, I'm pretty sure it was this

12      incident, but I don't recall for sure.

13   Q.   Okay.  And just to clarify, we are talking about

14      the June 5th, 2016 incident, that is indeed the

15      last incident that is detailed in your complaint.

16   A.   And what was the location, this was in North

17      Buffalo?

18   Q.   I can pull it up again.

19   MS. WILLIAMS:  It was Bailey and Kensington on the

20      East Side.

21   MS. FREELY:  Yes.

22   THE WITNESS:  Oh, I'm not sure.  I'm not sure.

23   BY MS. FREELY:

86

1   Q.   Okay.  Did you remove the window tint after this
2        last incident, the June 5th incident?
3   A.   I don't recall.
4   Q.   Okay.  Does reading paragraph three o eight
5        refresh your memory?
6   A.   No.
7   Q.   Okay.  So paragraph three o eight reads, plagued
8        by the constant tickets, Mr. Palmer inquired
9        about having the tint on his car removed.  He
10       learned that removal would cost approximately one
11       hundred and thirty dollars.  At the time Mr.
12       Palmer had not had a carpentry job in a while and
13       could not afford to have the tints removed, nor
14       could he afford to pay the tickets.  So do you
15       recall if you ever had the tints removed
16       subsequent to June 5th, 2016?
17  A.   It don't sound like it, no.  Not yet.
18  Q.   Okay.  Do you recall if you sold the car back to
19       the dealership with the tints on?
20  MS. WILLIAMS:  Objection.
21  THE WITNESS:  Possibly.
22  BY MS. FREELY:
23  Q.   Okay.  With respect to all of these incidents,

87

1     the three that we've talked about today, and the

2     three that are obviously in your complaint, did

3     you ever file a complaint with the Buffalo Police

4     Department?

5  MS. WILLIAMS:  Objection.

6  THE WITNESS:  About what?

7  BY MS. FREELY:

8  Q.  About the allegations in your complaint.

9  A.  I'm not sure.  I don't recall.

10  Q.  Okay.  Do you believe you were targeted by the

11     Buffalo Police Department during these traffic

12     stops?

13  MS. WILLIAMS:  Objection.

14  THE WITNESS:  Individually, racially, I'm not sure

15     what magnitude you're speaking on.

16  BY MS. FREELY:

17  Q.  Any, in any way do you believe you were targeted

18     by the Buffalo Police Department as a result of

19     these stops?

20  A.  Yes.

21  Q.  Okay.  Why do you believe that?

22  A.  Because I'm under the impression that's the

23     nature of this case, of these checkpoints being

88

1       placed in these discriminatory locations,

2       targeting certain groups of people, and I was one

3       of those people in that group.

4   Q.  So you just referenced the checkpoints, however,

5       there's no reference to the checkpoints in

6       your -- in the part of the complaint dealing with

7       your allegations.  So --

8   MS. WILLIAMS:  Objection.

9   BY MS. FREELY:

10  Q.  -- how is that relevant to your allegations?

11  MS. WILLIAMS:  Objection.

12  THE WITNESS:  I'm not sure.  I mean, that's a part of

13      it, whether it's included in this or not, I mean,

14      it happened to me.  I don't know if it's included

15      in this or not, as I stated, but that was an

16      example, even with these -- which these are

17      pretty much the same, officers it seems like in

18      the same area, the same locations, and the same

19      experiences, so that's how I came to that belief

20      and theory based on my experience.

21  BY MS. FREELY:

22  Q.  So was there anything with respect to your actual

23      interactions with the officers that led you to

89

1        believe you were targeted?

2   MS. WILLIAMS:  Objection.

3   THE WITNESS:  Yes.  The complete experience, the

4        whole experience from the stop to the ending

5        results, to the suspension of my license for an

6        extended period of time.  And all of the other

7        effects it caused.

8   BY MS. FREELY:

9   Q.   Throughout today's testimony in response to my

10       questions about your interactions with these

11       police officers, you've largely answered that you

12       don't recall, you don't remember or that you're

13       not sure, so how can you be sure that you have

14       been targeted by the Buffalo Police Department?

15  MS. WILLIAMS:  Objection.

16  THE WITNESS:  I'm just referring to my experiences

17       that we stated and that we have evidence of these

18       tickets and dates, times and officers' names, and

19       there may be more that are not mentioned that I

20       may be referring to, as I stated that this is a

21       time ago, and I'm not for sure the specific

22       details, but I am pretty certain on my overall

23       experience.

90

BY MS. FREELY:

Q.   So you referenced a couple things there.  But you
     said, for one, based on the dates, this is
     pointing you to believe that you were targeted.
     What about these dates makes you believe that you
     were targeted?

MS. WILLIAMS:  Objection.

THE WITNESS:  No.  I don't think that's -- that's a
     misunderstanding.  I was referring to the
     checkpoints and the dates that are provided here
     are correlating.  But I don't know if you have
     that information, you stated you don't have any
     checkpoint information, so that's why I stated to
     you that my overall experience collaborated with
     what's listed here.

BY MS. FREELY:

Q.   Okay.  Just so that I'm clear on your testimony.
     Are you saying that because you believe the
     checkpoints were run during the same time frame
     that you were pulled over, that contributes to
     your belief of targeting by the BPD?

A.   I'm not sure.

Q.   Okay.  So then can you explain what you meant?

91

1  A.  No.  I'm not sure.

2  MS. WILLIAMS:  Objection.

3  BY MS. FREELY:

4  Q.  You also pointed to the tickets themselves as

5      evidence of targeting by the Buffalo Police

6      Department.  What about the tickets themselves

7      led you to believe that you were targeted by the

8      BPD?

9  A.  I'm not sure.

10  Q.  And then you also cited the names of the officers

11      involved as contributing to your belief that you

12      were targeted by the BPD.  Can you explain what

13      the names of the officers have to do with that

14      belief?

15  MS. WILLIAMS:  Objection.

16  THE WITNESS:  No.  I don't know the names of the

17      officers, I'm not sure.

18  BY MS. FREELY:

19  Q.  So you just listed a number of reasons that we've

20      gone over that lead you to believe that you were

21      targeted by the BPD, but when I asked you to

22      explain those reasons, you're not sure, is that

23      correct?

92

1   A.   Yes.   That's correct.

2   Q.   Okay.   Do you believe that the Buffalo police

3        officers should have made an exception for you

4        during any of these incidents and not ticketed

5        you?

6   MS. WILLIAMS:   Objection.

7   THE WITNESS:   No.   I feel they should have been fair

8        all across the board.

9   BY MS. FREELY:

10  Q.   And what does fair all across the board mean to

11       you?

12  A.   That, under my understanding, is that this, that

13       this complaint is about specific targeting in

14       specific neighborhoods and locations towards a

15       specific group of people, so that's what I mean

16       by targeted.

17  Q.   And what group of people are you referencing?

18  A.   Whatever group that is being represented in this

19       complaint.

20  Q.   Okay.   So if I represented to you that this

21       complaint refers to the targeting of black and

22       brown people, would that sound familiar to you?

23  A.   I'm not sure.   I would have to get specific

93

1      information on that, whoever it is.  I can tell
2      you who I am.
3   Q.  Can you see paragraph five?
4   A.  Okay.
5   Q.  Do you see where it says the city places the
6      checkpoints overwhelmingly in black and Latino
7      neighborhoods, predominantly in Buffalo's highly
8      segregated East Side.  Does that sound familiar
9      to you?
10  A.  I mean, this looks like what I've been talking
11     about.  I don't know why you're trying to confuse
12     me like you don't know what I'm talking about, it
13     sounds like what I've been expressing to you,
14     that you act like you didn't know anything about.
15     You said it wasn't listed in this complaint.
16  Q.  I never said that.  I'm trying to clarify.  You
17     referenced a group of people that was being
18     targeted by the Buffalo Police Department, but
19     you could not tell me what that group of people
20     is, so I'm trying to refresh your recollection.
21  MS. WILLIAMS:  Objection.
22  BY MS. FREELY:
23  Q.  I'm trying to refresh your recollection, and I'm

94

```
 1        asking you if you believe that the Buffalo Police
 2        Department has been targeting black and Latino
 3        neighbors?
 4   A.   What I was referring to is the checkpoints, I
 5        guess I overlooked that.  I just see that it says
 6        these checkpoints, and you said checkpoints
 7        wasn't listed here, and that's what kind of threw
 8        me off.
 9   Q.   Mr. Palmer, I never said checkpoints were not
10        listed here.  I said checkpoints are not listed
11        in your allegations specific to yourself.
12   A.   Okay.  So what are we talking about?
13   Q.   Back to my initial question, do you believe that
14        you were targeted as a result of your race by the
15        Buffalo Police Department?
16   A.   I'm not sure.
17   Q.   Okay.  So then why did you join this lawsuit --
18   MS. WILLIAMS:  Objection.
19   BY MS. FREELY:
20   Q.   -- alleging -- why did you join this lawsuit
21        alleging discrimination against black and Latino
22        communities by the Buffalo Police Department?
23   A.   I fall in that classification.
```

95

1    Q.   I'm sorry.  Can you repeat that?  I just didn't

2         hear you.

3    A.   I fall within those classifications.

4    Q.   Okay.  So is it your belief that because you

5         identify as a black man, because you were pulled

6         over in the City of Buffalo, that you were

7         targeted as a result of your race?

8    A.   Yes.

9    Q.   Okay.  Do you believe that all black men pulled

10        over in the City of Buffalo have been targeted as

11        a result of their race by the Buffalo Police

12        Department?

13   MS. WILLIAMS:  Objection.

14   THE WITNESS:  I can't answer that.

15   BY MS. FREELY:

16   Q.   But why can you say that for certain with respect

17        to yourself?

18   MS. WILLIAMS:  Objection.

19   THE WITNESS:  Because I can speak on my experiences.

20   BY MS. FREELY:

21   Q.   But again, today you responded that you were

22        unsure, you don't remember, and you don't recall

23        most of these experiences, so I'm asking, what is

96

1        pointing you to believe that you specifically

2        have been targeted by the Buffalo Police

3        Department?

4    MS. WILLIAMS:  Objection.  I think we've asked and

5        answered that a few times.  He does not know, he

6        said he's part of the group in total, he can't

7        say exactly why, but he's a part of the targeted

8        group.  We have data in the complaint, and Mr.

9        Palmer is not -- he's given his own experience,

10        he can't speak for the entire group.

11   MS. FREELY:  And I'm asking him for his own

12        experience as to why he thinks specifically that

13        he was targeted.  He can only articulate the fact

14        that he's a part of this group and that he was

15        pulled over.  So I'm just trying to make sure

16        we're clear here.

17   BY MS. FREELY:

18   Q.  Is there anything else that leads you to believe,

19        besides your race and the fact that you were

20        ticketed, that you've been targeted by the

21        Buffalo Police Department?

22   A.  Yes.

23   Q.  And what would that be?

97

1  A.  The fact that I meet other people with the same

2      experience and they're similar race and similar

3      experience, and similar locations, and that's --

4      I'm pretty sure that's how I came across this

5      program or what have you, or organization, that's

6      the whole point of it, is to come together and

7      stand up together against discrimination and

8      against racism, and just violation of rights in

9      general, so that's my stance and my belief.

10 Q.  And do you believe your rights were violated

11     based on these incidents?

12 A.  I believe so.  If the statistics show that this

13     only happened in certain neighborhoods to certain

14     people and not in other neighborhoods to other

15     people, then I would say yes, that's definitely

16     targeted.

17 Q.  Okay.  So paragraph three o nine, right here,

18     this short paragraph, states that in or around

19     June 2016, Mr. Palmer learned that his license

20     had been suspended due to unpaid tickets.  Is

21     that true?

22 A.  I'm not sure who said that.

23 Q.  Did you say you're not sure who said that?

98

1    A.    I said I'm not sure who said that.

2    Q.    Well, in or around June 2016 did you learn that

3          your license was suspended?

4    A.    Oh, yeah.  That sounds about right, yeah.  Okay.

5    Q.    How did you learn that your license was

6          suspended?

7    A.    Probably by getting pulled over and ticketed or

8          notification, I'm not sure.

9    Q.    Okay.  So you're not sure whether you were pulled

10         over again and given another ticket?

11   A.    No.

12   Q.    Okay.  Can you review paragraph three ten and

13         three eleven, and just read them to yourself and

14         let me know when you're done?

15   A.    You said three ten and what, three eleven?

16   Q.    Yes.

17   A.    Okay.

18   Q.    Okay.  So do you remember when you returned your

19         car to the dealership?

20   A.    No.

21   Q.    Was it in 2016?

22   A.    I believe so.

23   Q.    Okay.  And when you returned your car to the

99

1    dealership -- strike that.  Were you leasing that

2    car?

3  A.  No.

4  Q.  Did you own that car?

5  A.  No.

6  Q.  So how did you have possession of that car?

7  A.  It was financed.

8  Q.  Okay.  So when you returned it to the dealership,

9    did you get any money from the dealership?

10  A.  Did I get any money?

11  Q.  Yes.  In return for the car.

12  MS. WILLIAMS:  Objection.

13  THE WITNESS:  I don't care to answer that.

14  BY MS. FREELY:

15  Q.  You're refusing to answer whether you received

16    compensation for the car from the dealership?

17  A.  I'm not sure.  I'm not comfortable talking about

18    that, I don't find the relevancy.

19  Q.  Okay.  Again, I'm not going to argue relevance

20    with you, but please know that I will be making a

21    motion at the end of this to compel your answers

22    and for sanctions to have you dismissed from this

23    action.

100

1    MS. WILLIAMS:  Objection.

2    BY MS. FREELY:

3    Q.  So let's see -- okay.  So three eleven discusses

4        how you could no longer accept carpentry jobs

5        from the union if they were not accessible via

6        public transportation.  Is that true?

7    A.  Yep.

8    Q.  And could you have used a taxi or rideshare

9        service like Uber to accept carpentry jobs and go

10       out to those if they were not accessible via

11       public transportation?

12   MS. WILLIAMS:  Objection.

13   THE WITNESS:  No.

14   BY MS. FREELY:

15   Q.  Why not?

16   A.  I'm not sure.

17   Q.  Have you ever used a rideshare service?

18   MS. WILLIAMS:  Objection.

19   THE WITNESS:  I have.

20   BY MS. FREELY:

21   Q.  Okay.  When was the last time you were pulled

22       over by the Buffalo Police in the City of

23       Buffalo?

101

1    A.   I'm not sure.

2    Q.   Have you been pulled over by the Buffalo Police

3         in the City of Buffalo after June 2016?

4    A.   I'm not sure.

5    Q.   And were you pulled over by the Buffalo Police

6         Department prior to November 4th, 2015?

7    A.   I'm not sure.

8    Q.   Prior to all of the incidents listed in the

9         complaint, have you ever received a traffic

10        ticket before?

11   A.   You said prior?

12   Q.   Yes.

13   A.   I'm not sure.  I believe my license was clean

14        before all of these tickets.

15   Q.   And by clean, what do you mean?

16   A.   Before and after I didn't have a -- it wasn't

17        suspended.  I've had a license since I was

18        sixteen I believe.

19   Q.   Okay.  So by clean, you mean prior to these

20        incidents it had not been suspended?

21   A.   I mean, that my license wasn't suspended until I

22        got these tickets.

23   Q.   Okay.  But prior to these incidents, do you

102

1     remember if you had ever received a traffic

2     ticket before?

3  A.  I'm not sure.

4  MS. WILLIAMS:  Objection.

5  BY MS. FREELY:

6  Q.  And have you received any traffic tickets since

7     2016?

8  A.  I'm not sure.

9  Q.  Paragraph three thirteen, can you see that?

10  A.  Yes.

11  Q.  Okay.  It states, in 2018 Mr. Palmer used one of

12     his veterans' compensation checks to pay his

13     outstanding traffic tickets.  He believes he paid

14     around three thousand dollars.  Have you always

15     received these veterans' compensation checks

16     since you left the service?

17  A.  No.

18  Q.  Okay.  When did you first begin receiving them?

19  A.  I'm not sure.

20  Q.  Did you begin receiving them prior to 2015?

21  A.  I'm not sure.

22  Q.  Did you begin receiving them in 2016?

23  A.  I stated I'm not sure.

103

1    Q.   Okay.  This is a different question.  I'm asking

2         you per year, do you remember receiving them in

3         2017?

4    A.   You asked me if I remember when I received them,

5         I said I'm not sure.

6    Q.   Yes.  And now I'm asking you by year to see if

7         you remember the year.  So in 2017, do you recall

8         whether you started receiving veterans'

9         compensation checks then?

10   A.   I don't recall.

11   Q.   Okay.  Do you still receive these checks today?

12   MS. WILLIAMS:  Objection.

13   THE WITNESS:  I don't know what you're referring to.

14   BY MS. FREELY:

15   Q.   Do you still receive the veterans' compensation

16        checks today?

17   MS. WILLIAMS:  Objection.

18   THE WITNESS:  Disability, yeah.

19   BY MS. FREELY:

20   Q.   Okay.  And how often do you receive these checks?

21   A.   Monthly.

22   Q.   And when did you start claiming disability?

23   A.   I'm not sure.

104

1    MS. WILLIAMS:  Objection.

2    BY MS. FREELY:

3    Q.  Was it prior to 2015?

4    A.  I'm not sure.

5    Q.  Why did you not use money from your veterans'

6        compensation checks to pay your tickets when you

7        got them?

8    MS. WILLIAMS:  Objection.

9    THE WITNESS:  It states why.

10   BY MS. FREELY:

11   Q.  It does not.

12   A.  Okay.  I'm not sure.

13   MS. WILLIAMS:  Objection.

14   BY MS. FREELY:

15   Q.  Were you aware that your license would be

16       suspended if you did not pay off your tickets

17       within a certain amount of time?

18   A.  I'm not sure.

19   Q.  Could you afford to pay off your tickets

20       referenced in this complaint when you received

21       them?

22   A.  No.

23   Q.  What was your income, what was your -- what forms

105

1      of income did you have during that 2015-2016?

2  MS. WILLIAMS:  Objection.

3  THE WITNESS:  I'm not sure.  I believe it was limited

4      income at that time.  As it states, I was working

5      off and on as a carpenter.

6  BY MS. FREELY:

7  Q.  Is it your testimony that you're not sure whether

8      or not you were receiving veterans' compensation

9      checks at that time?

10 A.  No, I'm not sure.  I don't believe so.

11 Q.  Last couple questions from me.  Paragraph three

12     fourteen, the second sentence right here,

13     although he drives on occasion in rental cars and

14     would like to drive more, he limits his driving

15     because he fears that the BPD will continue to

16     target, harass, and ticket him.  Earlier you

17     stated that you own your own car now.  So when

18     did you stop renting cars to get around?

19 MS. WILLIAMS:  Objection.

20 THE WITNESS:  I stated I got this car, the current

21     vehicle, three years ago.

22 BY MS. FREELY:

23 Q.  Okay.  And do you still have the same fear

106

1        referenced in paragraph three fourteen?

2    A.   Yes.

3    Q.   Do you have an up-to-date registration currently?

4    A.   Yes.

5    Q.   Do you have an up-to-date inspection currently?

6    A.   I believe so.

7    Q.   And do you know if your windows are tinted beyond

8        the level allowed by law currently?

9    A.   No.  I don't have any tints.

10   Q.   Okay.  Does the DMV have your current residential

11       address on file?

12   A.   Yeah.

13   Q.   And are you aware of whether or not your vehicle

14       is in violation of any other laws regarding the

15       Vehicle and Traffic Law?

16   A.   As far as I know.

17   Q.   Okay.  Earlier you referenced that you have plans

18       in the future to visit Buffalo.  Do you believe

19       that the BPD will pull you over even if you have

20       not violated the law?

21   A.   They shouldn't.

22   Q.   Did you say they shouldn't?

23   A.   Right.

107

1    Q.  Do you believe that they will?

2    MS. WILLIAMS:  Objection.

3    THE WITNESS:  I don't know.

4    BY MS. FREELY:

5    Q.  So where is this fear coming from, that you will

6         continue to be targeted, harassed and ticketed?

7    MS. WILLIAMS:  Objection.

8    THE WITNESS:  Experiences.

9    BY MS. FREELY:

10   Q.  Which experiences?

11   A.  The ones we stated.

12   Q.  Okay.  Did you review this complaint before it

13        was filed for accuracy?

14   MS. WILLIAMS:  Objection.

15   THE WITNESS:  You asked me that before.

16   BY MS. FREELY:

17   Q.  Okay.  And what was the answer?

18   A.  I'm not sure.  I believe I said --

19   MS. WILLIAMS:  He said yes.  He said yes.

20   THE WITNESS:  I believe I said that we reviewed this.

21   MS. FREELY:  Okay.  Those are all the questions I

22        have.

23            Keisha, do you have anything?

108

1    MS. WILLIAMS:  Yes.  I just have a few questions.

2

3    EXAMINATION BY MS. WILLIAMS:

4

5    Q.   Charles, if you could just bear with me for a few

6         minutes, I know it's been a long morning.  Just

7         to go back to the complaint, and I can share my

8         screen, but I don't necessarily need to, I just

9         wanted to know whether or not the facts as they

10        were summarized in the complaint, was there

11        anything that you think that was wrong or

12        incorrect when you reviewed it for counsel?

13   A.   No.

14   Q.   And so it's your testimony that it accurately

15        summarizes your experience when you met with

16        whoever drafted the complaint?

17   A.   Yes.

18   Q.   On one occasion you were ticketed, the first

19        occasion on November 4th, 2015, you were ticketed

20        by Officer Domaracki, he issued you two tickets

21        for tinted windows, and one for failure to change

22        your address.  Do you remember why Officer

23        Domaracki pulled you over, did he say why he

109

1       pulled you over?

2   A.  I don't recall exactly.  I believe it was for the

3       tints.

4   Q.  Okay.  And I can -- I think if I could just share

5       for a minute, I'll just share screen, so this

6       is --

7   MS. FREELY:  Do we want to mark this as Exhibit B?

8   MS. WILLIAMS:  Sure.  Yes.  Thank you.

9   BY MS. WILLIAMS:

10  Q.  So we're going to mark this as Exhibit B, it's

11      one of the tickets that you were issued on

12      November 4th, 2015 by Officer Jared -- J.

13      Domaracki.  This ticket is for failure to notify

14      DMV of your address.  And it states in the

15      amended complaint that you told Officer Domaracki

16      that you were going home, and so it says that

17      because the address on your driver's license did

18      not match the address where you were residing at

19      the time, you were issued this ticket for failure

20      to update your address.  I am going to also

21      share, and I would like to have this marked as

22      Exhibit C, this is DMV form MV-232, this form

23      says the New York State law requires that you

110

1        notify DMV within ten days of any permanent

2        address change if you have a New York State

3        driver's license, learner permit or non-driver ID

4        card, or a New York State registration for a

5        vehicle, boat or snowmobile.  It says do, all

6        caps, not report a temporary address change.  Can

7        you testify today or do you remember whether or

8        not when you spoke to Officer Domaracki in 2015,

9        whether or not you had a permanent change of

10       address that you had to report or whether or not

11       it was a temporary address?

12   A.  Temporary.

13   Q.  Thank you.  It also said, and this is the

14       complaint, Officer Domaracki gave you two tickets

15       for tinted windows, and I'm just going to go back

16       to Exhibit B to look at the tickets for the

17       tinted windows, it's four-thirty-five p.m.,

18       November 4th, 2015.  I just want to confirm that

19       you grew up in Buffalo, correct?

20   A.  Yes.

21   Q.  Around four-thirty in November, is it usually

22       really bright out, is it sunny or is it dusk or

23       based on your experience, can you explain or just

111

1       describe what the -- not the weather, but whether

2       it's bright out or darker around four-thirty-five

3       in November?

4   A.  Four-thirty-five p.m.?

5   Q.  Yes.

6   A.  It's bright.

7   Q.  It's bright.  Okay.  And so Officer Domaracki

8       pulled you over around four-thirty-five, I'm

9       assuming, as you stated, that he noticed that

10      your windows were tinted, this one says rear side

11      windows non-transparent, you're required to have

12      I think above forty-one percent, do you remember

13      whether or not Officer Domaracki had a tint meter

14      with him, did he go around and test each of your

15      windows or not?

16  A.  I don't recall.

17  Q.  Okay.  And so you were issued two tickets for

18      tints.  I am going to enter Exhibit D, this is a

19      DMV form, DMV form 80W, it says that the law

20      provides an exemption for any person who, for

21      medical reasons, must be shielded from direct

22      sunlight.  The person who requests an exemption

23      must be either the driver or someone who is a

112

1    regular passenger in the vehicle.  At any time

2    when you were pulled over by Officer Domaracki,

3    Officer Wigdorski or Officer Miller, did either

4    of them inquire whether or not you had any

5    medical condition that required you to have tint?

6  A.  I don't think so.

7  Q.  If they had done so, would you have applied for a

8    tinted window exemption as is allowed in New York

9    State?

10  A.  Yes.

11  Q.  Okay.  I just want to go back to the complaint

12    again for a second.  Officer Domaracki issued

13    you two tickets for tinted windows in paragraph

14    three o four, Officer Wigdorski, however, for the

15    same reasons, he issued you four tinted window

16    tickets, and one for failure to notify the DMV.

17    Between November 2015 and January 2016, did you

18    remove the other two tints from your windows or

19    did your car have the same amount of tints as

20    before in January 2016?

21  A.  No.  It was the same.

22  Q.  So Officer Domaracki chose to issue you two

23    tickets while Officer Wigdorski issued you four

113

1        tinted window tickets.  Can you explain why there

2        was a difference in the amount of tickets that

3        you were issued?

4    MS. FREELY:  Objection to form.

5    THE WITNESS:  No.  That is correct.

6    BY MS. WILLIAMS:

7    Q.   Okay.  So do you think that Officer Domaracki

8         just used his discretion and issued you less

9         tickets?

10   A.   Yes.

11   Q.   And so Officer Wigdorski could have done the

12        same, and same with Officer Charles Miller, he

13        could have issued you one ticket or four tickets,

14        but Officer Miller and Officer Wigdorski chose to

15        issue you four tickets on these occasions,

16        correct?

17   MS. FREELY:  Objection to form.

18   THE WITNESS:  Yes.

19   BY MS. WILLIAMS:

20   Q.   Okay.  Thank you.  I'm going to stop sharing.  Is

21        it your understanding that this lawsuit is about

22        the Buffalo Police Department's practice -- I'm

23        sorry.  Traffic enforcement practices, and the

114

1       checkpoints, is that your understanding?

2   A.  Yes.

3   Q.  And is it your testimony that whether or not you

4       were issued a ticket at a traffic stop -- I'm

5       sorry.  At a checkpoint or not, that your

6       experience is relevant to this case?

7   A.  Correct.

8   Q.  And do you have any associates, friends, family

9       members who have driven through checkpoints?

10  MS. FREELY:  Objection to form.

11  THE WITNESS:  Yes.

12  BY MS. WILLIAMS:

13  Q.  And did you ever observe a checkpoint on the East

14      Side whether or not you drove through the

15      checkpoint?

16  A.  Yes.

17  MS. FREELY:  Objection to form.

18  MS. WILLIAMS:  I don't think I have any more

19      questions.  Thank you.

20  MS. FREELY:  I just have one follow-up on that.  I

21      believe it was Exhibit D, was Exhibit D our

22      medical exemption exhibit?

23  MS. WILLIAMS:  Yes.

115

1    RE-EXAMINATION BY MS. FREELY:

2

3    Q.   Did you ever apply for the medical exception that

4         was referenced in Exhibit D by your counsel?

5    A.   Not that I recall.

6    Q.   Okay.  Were you aware of that exception before

7         today?

8    A.   No.

9    MS. FREELY:  Okay.  That's all.

10   MS. WILLIAMS:  Okay.

11

12        (An Amended Complaint was received and

13    marked as Exhibit A,

14        a Buffalo Police Department Ticket dated

15    November 4, 2015 was received and marked as

16    Exhibit B,

17        a DMV Form MV-232 was received and marked as

18    Exhibit C, and

19        a DMV Form MV-80W was received and marked as

20    Exhibit D, for identification.)

21

22                 *    *    *    *    *

23

116

1        I HEREBY CERTIFY that I have read the

2    foregoing 115 pages and that, except as to those

3    changes set forth in the attached errata form(s),

4    they are a true and accurate transcript of the

5    testimony given by me in the above-entitled

6    action on September 14, 2023.

7

8

9

10                    _____

11                         CHARLES PALMER

12

13

14    Sworn to before me this

15

16    _____ day of _____ 2023.

17

18

19    _____

20        Notary Public.

21

22

23

117

1        STATE OF NEW YORK)

2                        SS:

3        COUNTY OF ERIE)

4

5            I, Nichole Winans, a Notary Public in and

6        for the State of New York, County of Erie, DO

7        HEREBY CERTIFY that the testimony of CHARLES

8        PALMER was taken down by me in a verbatim manner

9        by means of Machine Shorthand, on September 14,

10       2023.   That the testimony was then reduced into

11       writing under my direction.   That the testimony

12       was taken to be used in the above-entitled

13       action.   That the said deponent, before

14       examination, was duly sworn by me to testify to

15       the truth, the whole truth and nothing but the

16       truth, relative to said action.

17           I further CERTIFY that the above-described

18       transcript constitutes a true and accurate and

19       complete transcript of the testimony.

20

21       _____

22                      NICHOLE WINANS,
                         Notary Public.

23

ERRATA FORM

PAGE _____    LINE _____    CORRECTION: _____

_____

REASON: _____

PAGE _____    LINE _____    CORRECTION: _____

_____

REASON: _____

PAGE _____    LINE _____    CORRECTION: _____

_____

REASON: _____

PAGE _____    LINE _____    CORRECTION: _____

_____

REASON: _____

PAGE _____    LINE _____    CORRECTION: _____

_____

REASON: _____

PAGE _____    LINE _____    CORRECTION: _____

_____

REASON: _____

PAGE _____    LINE _____    CORRECTION: _____

_____

REASON: _____

ERRATA FORM

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

Charles Palmer

**1**

**1-10** [1] - 1:17
**1-20** [1] - 1:18
**10/13/83** [1] - 9:16
**100** [1] - 5:7
**108** [1] - 3:7
**115** [6] - 3:8, 4:5, 4:6, 4:7, 4:8, 116:2
**14** [4] - 2:10, 80:9, 116:6, 117:9
**140** [1] - 5:7
**14202** [1] - 5:4
**14202-4040** [1] - 5:7
**14215** [1] - 15:3
**15th** [6] - 76:9, 76:14, 78:2, 79:2, 80:5, 80:11

**2**

**2001** [4] - 17:17, 19:4, 23:13, 23:21
**2002** [1] - 25:18
**2003** [1] - 25:18
**2005** [1] - 25:21
**2006** [1] - 18:13
**2008** [1] - 35:20
**2013** [6] - 18:20, 19:4, 23:13, 23:21, 53:2
**2014** [1] - 39:10
**2015** [27] - 4:6, 52:14, 52:21, 53:3, 53:6, 59:17, 60:1, 61:1, 61:9, 63:4, 64:13, 67:10, 71:12, 72:2, 73:15, 73:17, 75:1, 80:9, 101:6, 102:20, 104:3, 108:19, 109:12, 110:8, 110:18, 112:17, 115:15
**2015-2016** [1] - 105:1
**2016** [22] - 76:9, 76:14, 78:2, 79:2, 80:5, 80:7, 80:11, 81:3, 81:6, 81:9, 82:6, 84:5, 85:14, 86:16, 97:19, 98:2, 98:21, 101:3, 102:7, 102:22, 112:17, 112:20
**2017** [2] - 103:3, 103:7
**2018** [2] - 37:14, 102:11
**2019** [2] - 36:23
**2020** [3] - 33:13, 33:16, 33:18
**2021** [2] - 15:21, 15:22

**2022** [3] - 15:19, 15:22, 34:22
**2023** [4] - 2:10, 116:6, 116:16, 117:10
**210** [1] - 5:3
**255** [1] - 15:3
**28232** [2] - 6:4, 14:17

**3**

**32094** [2] - 6:4, 14:17
**37** [1] - 5:3

**4**

**4** [2] - 4:6, 115:15
**421** [1] - 2:9
**4th** [15] - 59:11, 59:16, 61:1, 61:9, 63:4, 67:10, 71:11, 72:1, 73:15, 75:1, 78:22, 101:6, 108:19, 109:12, 110:18

**5**

**5th** [9] - 80:7, 81:3, 81:6, 81:9, 82:6, 84:5, 85:14, 86:2, 86:16

**6**

**6** [1] - 3:6

**8**

**80W** [1] - 111:19

**9**

**9:02** [1] - 2:10

**A**

**A.M** [1] - 2:10
**AARON** [1] - 1:16
**ability** [2] - 9:3, 9:8
**able** [2] - 9:12, 71:1
**above-described** [1] - 117:17
**above-entitled** [2] - 116:5, 117:12
**above-requested** [1] - 75:9
**accept** [2] - 100:4, 100:9
**accessible** [2] - 100:5, 100:10
**accuracy** [2] - 59:21, 107:13
**accurate** [6] - 9:9, 9:12, 59:19, 59:22, 116:4, 117:18

**accurately** [5] - 59:15, 76:8, 81:1, 81:2, 108:14
**act** [1] - 93:14
**action** [6] - 6:12, 29:1, 99:23, 116:6, 117:13, 117:16
**active** [5] - 25:10, 48:20, 48:23
**activist** [1] - 49:9
**actual** [1] - 88:22
**Adam** [1] - 76:15
**additional** [2] - 41:1, 63:11, 63:17
**address** [65] - 14:8, 14:10, 14:11, 14:14, 14:15, 14:16, 14:20, 15:9, 15:15, 16:2, 16:3, 60:7, 61:12, 62:2, 62:7, 62:8, 62:9, 62:10, 67:20, 67:23, 68:3, 68:4, 68:12, 68:16, 68:19, 68:22, 69:1, 69:2, 72:2, 72:14, 72:16, 72:17, 72:19, 72:20, 72:21, 73:3, 73:4, 73:9, 73:11, 73:14, 73:19, 73:23, 74:10, 74:12, 74:14, 74:16, 76:21, 77:6, 79:9, 106:11, 108:22, 109:14, 109:17, 109:18, 109:20, 110:2, 110:6, 110:10, 110:11
**addresses** [2] - 15:1, 73:2
**adjourn** [1] - 22:21
**aerial** [1] - 25:1
**affect** [1] - 9:8
**affected** [1] - 70:6
**afford** [3] - 86:13, 86:14, 104:19
**age** [1] - 10:18, 12:14, 12:19, 12:21
**ago** [6] - 19:23, 21:1, 50:7, 62:22, 89:21, 105:21
**agree** [10] - 5:19, 7:3, 7:5, 7:8, 7:13, 7:18, 7:21, 8:22, 9:5, 48:8
**agreeance** [1] - 11:14
**ahead** [2] - 12:21, 27:17
**air** [1] - 13:16
**Air** [7] - 25:6, 25:17, 25:20, 26:4, 26:12, 27:22, 32:4
**allegations** [7] -

**accurately** section continues:
**49:12**, 58:18, 61:6, 87:8, 88:7, 88:10, 94:11
**alleging** [2] - 94:20, 94:21
**allowed** [3] - 66:11, 106:8, 112:8
**allows** [1] - 73:1
**amended** [1] - 109:15
**Amended** [2] - 4:5, 115:12
**amending** [3] - 75:4, 75:6, 75:12
**AmeriCorps** [3] - 36:18, 37:13, 37:15
**amount** [3] - 104:17, 112:19, 113:2
**ANN** [1] - 2:8
**answer** [34] - 7:12, 7:17, 8:20, 9:3, 10:12, 10:14, 11:22, 20:16, 20:20, 21:14, 21:16, 21:20, 22:1, 22:4, 22:12, 22:14, 23:15, 23:16, 28:12, 28:16, 28:18, 28:22, 29:8, 29:11, 30:10, 75:9, 95:14, 99:13, 99:15, 107:17
**answered** [4] - 29:4, 29:19, 89:11, 96:5
**answering** [1] - 29:10
**answers** [6] - 6:22, 6:23, 7:2, 14:6, 21:23, 28:20, 29:16, 99:21
**APPEARANCES** [1] - 5:1
**Appearing** [1] - 5:4
**appearing** [1] - 5:8
**application** [1] - 13:12
**applied** [2] - 66:22, 112:7
**apply** [1] - 115:3
**appreciate** [4] - 14:3, 14:4, 20:18, 42:11
**approached** [4] - 46:18, 46:20, 46:23, 47:7
**approximate** [3] - 8:15, 15:20, 33:11
**area** [2] - 20:23, 88:18
**argue** [1] - 99:19
**arose** [1] - 64:22
**arrangement** [2] - 13:6, 13:16
**arrangements** [1] -

**13:11**
**arrest** [2] - 41:9, 71:19
**arrested** [8] - 40:8, 41:11, 70:18, 71:16, 71:17, 79:4, 84:22, 85:2
**articulate** [1] - 96:13
**aside** [5] - 23:12, 41:9, 41:11, 41:12, 43:3
**assistance** [2] - 37:11, 64:11
**associated** [3] - 39:19, 41:9, 78:11
**associates** [1] - 114:8
**assume** [1] - 45:6
**assuming** [1] - 111:9
**attached** [1] - 116:3
**attend** [2] - 17:9, 18:1
**attendance** [1] - 23:12
**attention** [1] - 80:16
**attorney** [14] - 9:1, 9:4, 10:13, 44:7, 44:10, 45:2, 45:14, 45:18, 45:20, 45:22, 45:23, 46:2, 48:16, 56:6
**attorney/client** [1] - 45:7
**attorneys** [2] - 44:8, 44:20
**aunt** [1] - 73:17
**aunt's** [12] - 62:2, 62:7, 62:9, 67:20, 68:3, 68:11, 68:16, 68:19, 68:22, 72:17, 73:14, 74:14
**Avenue** [1] - 15:3
**average** [2] - 56:10, 56:13
**aware** [7] - 47:13, 48:5, 66:10, 82:5, 104:15, 106:13, 115:6

**B**

**Bachelor's** [1] - 18:18
**background** [5] - 11:7, 20:15, 21:23, 22:9, 27:2
**Bailey** [1] - 85:19
**based** [6] - 20:9, 21:9, 88:20, 90:3, 97:11, 110:23
**basis** [1] - 30:11

**bear** [1] - 108:5
**became** [2] - 47:22, 48:3
**began** [2] - 60:1, 60:5
**begin** [5] - 25:16, 44:5, 102:18, 102:20, 102:22
**beginning** [2] - 27:8, 48:4
**behalf** [2] - 1:6, 1:8
**behind** [3] - 12:6, 12:7, 55:7
**belief** [6] - 88:19, 90:21, 91:11, 91:14, 95:4, 97:9
**believes** [1] - 102:13
**best** [2] - 9:3, 20:21
**between** [5] - 5:12, 8:1, 45:1, 72:13, 112:17
**beyond** [2] - 14:1, 106:7
**bigger** [4] - 57:14, 60:16, 75:20, 80:17
**bills** [1] - 11:19
**birth** [1] - 9:15
**birthday** [1] - 8:6
**bit** [4] - 12:16, 25:5, 26:8, 83:11
**black** [6] - 92:21, 93:6, 94:2, 94:21, 95:5, 95:9
**Black** [4] - 46:20, 47:14, 48:6, 48:9
**BLACK** [1] - 1:5
**blind** [2] - 64:9, 64:10
**BLRR** [4] - 48:9, 48:10, 48:15, 48:18
**board** [2] - 92:8, 92:10
**boat** [1] - 110:5
**body** [2] - 30:20, 35:8
**BONDS** [1] - 1:7
**bothered** [1] - 60:2
**bounds** [1] - 22:15
**Box** [2] - 6:4, 14:17
**BPD** [6] - 90:21, 91:8, 91:12, 91:21, 105:15, 106:19
**break** [3] - 8:18, 8:21, 22:22
**brevity** [1] - 48:8
**bright** [4] - 110:22, 111:2, 111:6, 111:7
**bring** [3] - 42:9, 47:4
**bringing** [1] - 48:21
**BRINKWORTH** [1] -

1:16
**broad** [1] - 55:14
**broke** [1] - 39:2
**BROWN** [1] - 1:12
**brown** [1] - 92:22
**Buff** [1] - 18:14
**BUFFALO** [1] - 1:12
**Buffalo** [63] - 1:13, 1:14, 1:16, 1:18, 2:9, 4:6, 5:4, 5:7, 15:3, 15:4, 16:5, 16:15, 16:19, 16:21, 17:4, 17:6, 17:8, 17:11, 18:8, 18:10, 23:13, 32:18, 33:6, 33:9, 34:15, 35:11, 35:23, 36:2, 52:12, 52:13, 54:6, 54:13, 55:16, 56:2, 56:3, 57:20, 58:18, 62:8, 85:17, 87:3, 87:11, 87:18, 89:14, 91:5, 92:2, 93:18, 94:1, 94:15, 94:22, 95:6, 95:10, 95:11, 96:2, 96:21, 100:22, 100:23, 101:2, 101:3, 101:5, 106:18, 110:19, 113:22, 115:14
**Buffalo's** [1] - 93:7
**Building** [1] - 5:6
**bunch** [2] - 19:7, 25:2
**business** [4] - 37:9, 37:10, 37:22
**BY** [136] - 6:8, 11:16, 13:1, 23:8, 23:20, 24:15, 24:21, 25:15, 26:3, 26:7, 26:19, 27:13, 27:19, 28:4, 28:9, 28:15, 30:2, 30:16, 31:1, 32:15, 33:1, 33:17, 34:1, 34:6, 34:13, 34:20, 35:6, 35:17, 36:8, 36:12, 36:17, 38:6, 38:10, 38:19, 39:1, 39:9, 39:14, 39:18, 40:1, 40:7, 40:13, 40:18, 40:23, 41:15, 42:1, 42:12, 43:20, 45:11, 47:3, 47:20, 49:2, 49:7, 49:16, 51:17, 52:2, 52:6, 52:10, 53:21, 54:2, 54:11, 55:13, 56:17, 57:6, 57:11, 59:1, 60:19, 63:7, 63:12, 63:18, 64:14, 65:4, 65:9, 65:14, 66:2,

66:14, 66:20, 67:19, 68:7, 68:15, 69:3, 70:22, 71:23, 72:6, 72:12, 73:7, 73:13, 74:4, 74:9, 75:11, 78:7, 79:13, 80:3, 80:14, 82:13, 82:21, 83:9, 83:22, 84:21, 85:23, 86:22, 87:7, 87:16, 88:9, 88:21, 89:8, 90:1, 90:16, 91:3, 91:18, 92:9, 93:22, 94:19, 95:15, 95:20, 96:17, 99:14, 100:2, 100:14, 100:20, 102:5, 103:14, 103:19, 104:2, 104:10, 104:14, 105:6, 105:22, 107:4, 107:9, 107:16, 108:3, 109:9, 113:6, 113:19, 114:12, 115:1
**BYRON** [2] - 1:12, 1:14

## C

**calendar** [1] - 82:17
**candidate** [1] - 11:9
**cannot** [4] - 31:7, 31:8, 31:9, 53:16
**capacities** [3] - 1:13, 1:15, 1:19
**capacity** [3] - 1:16, 25:6, 25:9
**capital** [1] - 37:7
**caps** [1] - 110:6
**car** [30] - 51:9, 51:11, 51:14, 51:18, 51:21, 52:3, 52:7, 52:11, 52:13, 52:14, 52:18, 52:21, 53:1, 60:7, 79:6, 79:14, 84:18, 86:9, 86:18, 98:19, 98:23, 99:2, 99:4, 99:6, 99:11, 99:16, 105:17, 105:20, 112:19
**card** [1] - 110:4
**care** [1] - 99:13
**Carolina** [7] - 6:4, 14:17, 14:18, 15:18, 15:19, 17:7, 49:22
**carpenter** [4] - 24:14, 24:18, 25:4, 105:5
**carpentry** [3] - 86:12, 100:4, 100:9
**cars** [5] - 52:20, 53:3, 53:5, 105:13,

105:18
**case** [12] - 10:21, 10:22, 10:23, 11:4, 11:7, 11:17, 12:7, 21:9, 21:21, 27:10, 87:23, 114:6
**Cathedral** [1] - 5:3
**caused** [1] - 89:7
**CENTER** [1] - 5:2
**certain** [8] - 8:14, 20:13, 88:2, 89:22, 95:16, 97:13, 104:17
**certificate** [1] - 24:17
**certificates** [4] - 24:23, 25:2, 25:3
**certification** [1] - 5:15
**CERTIFY** [3] - 116:1, 117:7, 117:17
**cetera** [1] - 12:18
**challenge** [3] - 69:6, 78:8, 84:4
**change** [6] - 34:9, 74:5, 108:21, 110:2, 110:6, 110:9
**changed** [4] - 34:8, 34:11, 35:15
**changes** [1] - 116:3
**charge** [2] - 40:6, 41:10
**charged** [3] - 38:3, 38:14, 66:3
**charges** [1] - 39:19
**CHARIS** [1] - 1:6
**Charles** [11] - 9:18, 11:2, 12:22, 22:11, 28:13, 42:6, 72:8, 72:9, 81:17, 108:5, 113:12
**CHARLES** [7] - 1:2, 1:7, 2:7, 3:4, 6:1, 116:11, 117:7
**Charlotte** [5] - 6:4, 14:17, 32:19, 32:20, 33:21
**check** [3] - 54:6, 55:3, 74:10
**checkpoint** [9] - 53:8, 53:10, 54:13, 55:15, 55:18, 90:13, 114:5, 114:13, 114:15
**checkpoints** [34] - 54:4, 54:5, 54:16, 54:17, 54:18, 54:20, 55:1, 55:2, 55:8, 55:10, 56:4, 56:11, 56:14, 56:19, 56:23, 57:2, 58:20, 59:3, 59:4, 71:10, 87:23, 88:4, 88:5, 90:10,

105:18
**case** [12] - 10:21, ...

90:19, 93:6, 94:4, 94:6, 94:9, 94:10, 114:1, 114:9
**checks** [1] - 102:12, 102:15, 103:9, 103:11, 103:16, 103:20, 104:6, 105:9
**Chevy** [1] - 52:23
**Cheyenne** [1] - 6:10
**CHEYENNE** [1] - 5:6
**child** [6] - 13:17, 13:19, 14:1, 43:7, 43:9, 43:22
**children** [1] - 10:3
**choose** [2] - 51:20, 52:1
**chose** [2] - 112:22, 113:14
**CHRIS** [1] - 9:19
**Chris** [1] - 9:19
**chronic** [2] - 30:18, 35:5, 35:7
**cited** [2] - 59:16, 91:10
**CITY** [1] - 1:12
**city** [2] - 32:17, 93:5
**City** [8] - 1:13, 16:15, 54:13, 55:15, 95:6, 95:10, 100:22, 101:3
**Civil** [1] - 2:8
**claim** [1] - 12:13
**claiming** [1] - 103:22
**clarify** [4] - 7:13, 7:18, 85:13, 93:16
**clarity** [1] - 6:19
**class** [1] - 1:8
**classification** [1] - 94:23
**classifications** [2] - 30:7, 95:3
**clean** [3] - 101:13, 101:15, 101:19
**clear** [4] - 26:23, 42:13, 90:17, 96:16
**clearly** [1] - 57:13
**client** [1] - 22:23
**cocaine** [1] - 40:9
**collaborated** [1] - 90:14
**college** [7] - 17:21, 17:22, 17:23, 18:1, 18:23, 19:4, 19:5
**comfortable** [5] - 29:10, 39:7, 61:4, 61:5, 99:17
**coming** [5] - 21:10, 61:8, 77:4, 81:8, 107:5
**commencing** [1] - 2:10

**Commissioner** [2] - 1:14, 1:15
**communicate** [2] - 67:12, 77:20
**communities** [1] - 94:22
**community** [2] - 37:8, 37:9
**companies** [1] - 35:15
**company** [4] - 35:13, 65:21, 65:22, 66:16
**compel** [3] - 28:19, 29:13, 99:21
**compensation** [7] - 99:16, 102:12, 102:15, 103:9, 103:15, 104:6, 105:8
**complaint** [28] - 11:18, 46:5, 52:16, 52:22, 57:2, 58:13, 61:6, 71:20, 80:6, 85:15, 87:2, 87:3, 87:8, 88:6, 92:13, 92:19, 92:21, 93:15, 96:8, 101:9, 104:20, 107:12, 108:7, 108:10, 108:16, 109:15, 110:14, 112:11
**Complaint** [2] - 4:5, 115:12
**complete** [3] - 50:13, 89:3, 117:19
**condition** [1] - 112:5
**conducted** [1] - 5:20
**confidential** [1] - 45:1
**confirm** [1] - 110:18
**confuse** [1] - 93:11
**confused** [1] - 27:10
**consequence** [1] - 12:8
**considered** [4] - 20:4, 30:9, 54:19, 54:22
**conspiracy** [2] - 39:22, 40:2
**constant** [1] - 86:8
**constitutes** [1] - 117:18
**construction** [7] - 24:6, 25:1, 25:3, 35:12, 35:19, 35:21, 36:3
**consultant** [1] - 37:22
**contacts** [1] - 64:11
**content** [2] - 44:9, 45:13

**contents** [2] - 44:6, 44:18
**context** [1] - 42:14
**continue** [3] - 20:6, 105:15, 107:6
**continuously** [2] - 21:8, 37:20
**contract** [1] - 26:14
**contributes** [1] - 90:20
**contributing** [1] - 91:11
**conversations** [6] - 6:23, 44:6, 44:7, 44:13, 44:19, 45:13
**convicted** [2] - 38:16, 38:21
**conviction** [2] - 39:20, 41:10
**correct** [15] - 17:11, 37:15, 45:8, 47:8, 48:12, 50:19, 70:11, 78:5, 85:5, 91:23, 92:1, 110:19, 113:5, 113:16, 114:7
**correlating** [1] - 90:11
**cost** [1] - 86:10
**counsel** [7] - 5:12, 23:1, 29:7, 46:11, 49:13, 108:12, 115:4
**COUNTY** [1] - 117:3
**County** [1] - 117:6
**couple** [3] - 6:13, 90:2, 105:11
**course** [1] - 23:21
**COURT** [2] - 1:3, 2:8
**court** [6] - 13:13, 28:21, 43:6, 69:6, 69:8, 78:9
**Court** [9] - 42:7, 42:15, 42:16, 42:18, 43:2, 43:6, 43:7, 43:8, 43:14
**covered** [2] - 80:4, 80:10
**CPR** [1] - 25:1
**credentials** [1] - 24:17
**crime** [5] - 38:3, 38:7, 38:14, 38:16, 38:20
**crimes** [3] - 38:7, 38:13, 38:20
**current** [13] - 14:7, 14:8, 14:10, 14:15, 72:14, 72:19, 73:4, 73:9, 73:11, 73:14, 73:22, 105:20, 106:10
**custody** [6] - 13:5,

13:6, 42:21, 43:3, 43:9, 43:22
**customer** [1] - 32:14
**cut** [1] - 72:8

**D**

**daily** [1] - 30:11
**DANIEL** [1] - 1:15
**darker** [1] - 111:2
**data** [1] - 96:8
**date** [10] - 9:15, 31:19, 31:20, 33:11, 67:13, 82:15, 82:23, 83:3, 106:3, 106:5
**dated** [2] - 4:6, 115:14
**dates** [4] - 89:18, 90:3, 90:5, 90:10
**days** [2] - 41:6, 110:1
**DE'JON** [1] - 1:7
**dealership** [7] - 52:7, 86:19, 98:19, 99:1, 99:8, 99:9, 99:16
**dealing** [2] - 43:8, 88:6
**decide** [1] - 21:13
**decided** [1] - 60:6
**decision** [1] - 65:10
**deemed** [1] - 29:17
**Defendants** [3] - 1:20, 5:8, 6:12
**definitely** [2] - 83:16, 97:15
**degree** [3] - 18:17, 20:13, 66:10
**Delavan** [1] - 76:16
**demoted** [1] - 36:9
**department** [3] - 34:9, 34:12
**Department** [19] - 1:14, 1:16, 1:18, 4:6, 54:6, 87:4, 87:11, 87:18, 89:14, 91:6, 93:18, 94:2, 94:15, 94:22, 95:12, 96:3, 96:21, 101:6, 115:14
**Department's** [1] - 113:22
**departments** [1] - 34:8
**deponent** [1] - 117:13
**deposition** [4] - 5:20, 6:16, 10:12, 46:11
**DERENDA** [1] - 1:15
**describe** [20] - 13:9, 19:8, 19:11, 26:8, 37:6, 40:19, 51:13, 53:13, 53:17, 53:20,

59:15, 60:22, 62:12, 63:22, 64:4, 76:8, 77:11, 81:16, 81:19, 111:1
**described** [2] - 43:22, 117:17
**describing** [1] - 61:5
**description** [1] - 66:23
**detail** [1] - 64:4
**detailed** [3] - 71:20, 80:5, 85:15
**details** [5] - 14:5, 78:1, 78:18, 81:6, 89:22
**development** [2] - 37:5, 43:16
**diagnosed** [1] - 28:6
**diagnosis** [1] - 64:16
**difference** [5] - 8:1, 30:5, 45:19, 72:13, 113:2
**different** [13] - 12:17, 19:7, 19:18, 24:5, 24:7, 25:2, 30:7, 54:16, 62:10, 71:8, 72:20, 72:21, 103:1
**direct** [2] - 80:15, 111:21
**direction** [1] - 117:11
**directly** [2] - 12:15, 17:19
**disabilities** [8] - 30:4, 30:6, 30:8, 30:9, 35:1, 35:2, 36:4
**disability** [3] - 29:22, 103:18, 103:22
**disclose** [3] - 51:20, 52:1, 52:9
**disclosing** [1] - 52:5
**discovery** [1] - 22:19
**discretion** [1] - 113:8
**discretionary** [3] - 83:8, 83:10, 83:12
**discrimination** [3] - 11:13, 94:21, 97:7
**discriminatory** [2] - 50:20, 88:1
**discussed** [3] - 41:10, 46:1, 84:12
**discusses** [1] - 100:3
**Discussion** [1] - 27:18
**disease** [2] - 64:6
**dismissed** [1] - 99:22
**dismissing** [1] - 28:23
**dispute** [1] - 43:3

**distribute** [3] - 39:11, 39:22, 40:2
**DISTRICT** [2] - 1:3, 1:4
**divulge** [2] - 44:12, 45:3
**DMV** [20] - 4:7, 4:8, 68:21, 72:3, 73:1, 73:9, 73:20, 74:1, 74:6, 74:11, 79:9, 106:10, 109:14, 109:22, 110:1, 111:19, 112:16, 115:17, 115:19
**DO** [1] - 117:6
**doctor** [2] - 64:21, 65:5
**document** [1] - 59:7
**documents** [3] - 46:3, 46:4, 46:8
**DOE** [1] - 1:8
**dollars** [4] - 66:6, 70:8, 86:11, 102:14
**Domaracki** [19] - 61:1, 61:10, 62:13, 63:4, 63:20, 71:2, 71:13, 108:20, 108:23, 109:13, 109:15, 110:8, 110:14, 111:7, 111:13, 112:2, 112:12, 112:22, 113:7
**done** [5] - 54:5, 58:11, 98:14, 112:7, 113:11
**DORETHEA** [1] - 1:7
**down** [7] - 30:20, 57:18, 57:23, 58:4, 75:19, 76:5, 117:8
**downsizing** [1] - 26:11
**drafted** [1] - 108:16
**drive** [4] - 51:19, 51:22, 53:5, 105:14
**driven** [1] - 114:9
**driver** [2] - 110:3, 111:23
**driver's** [10] - 49:17, 49:20, 50:1, 51:5, 67:21, 74:12, 74:13, 82:22, 109:17, 110:3
**drives** [1] - 105:13
**driving** [2] - 52:12, 105:14
**drove** [4] - 52:13, 52:14, 60:3, 114:14
**due** [4] - 35:1, 50:16, 51:4, 97:20
**DUI** [2] - 54:18, 55:1
**duly** [2] - 6:5, 117:14

Charles Palmer

4

**during** [25] - 19:5, 25:22, 26:15, 27:4, 27:21, 30:13, 34:2, 40:14, 52:15, 52:21, 60:4, 61:13, 71:16, 71:17, 73:17, 76:6, 76:12, 79:4, 79:6, 84:22, 85:2, 87:11, 90:19, 92:4, 105:1
**dusk** [1] - 110:22
**duty** [2] - 25:10, 25:11

**E**

**E-3** [1] - 25:14
**early** [6] - 22:22, 26:6, 26:13, 64:8, 64:22, 79:19
**ears** [2] - 31:15, 32:3
**easier** [1] - 55:11
**east** [1] - 15:7
**East** [8] - 16:18, 56:4, 62:7, 76:16, 76:17, 85:20, 93:8, 114:13
**EBONY** [1] - 1:8
**economic** [1] - 37:5
**economics** [1] - 18:16
**education** [1] - 19:6
**effects** [1] - 89:7
**eight** [2] - 86:4, 86:7
**either** [2] - 111:23, 112:3
**electrical** [2] - 32:13, 34:12
**eleven** [3] - 98:13, 98:15, 100:3
**employed** [2] - 23:22, 32:6
**employment** [3] - 24:1, 32:8, 32:9
**encounter** [1] - 30:12
**end** [3] - 25:19, 26:4, 99:21
**ended** [1] - 37:3
**ending** [2] - 26:11, 89:4
**enforcement** [1] - 113:23
**entailed** [2] - 37:6, 37:7
**enter** [1] - 111:18
**entered** [1] - 5:10
**entire** [1] - 96:10
**entitled** [2] - 116:5, 117:12
**entrepreneurs** [1] -

37:23
**ERIE** [1] - 117:3
**Erie** [1] - 117:6
**errata** [1] - 116:3
**ESQ** [2] - 5:2, 5:6
**estimate** [4] - 8:2, 8:8, 8:12, 8:15
**et** [1] - 12:18
**evidence** [2] - 89:17, 91:5
**exact** [4] - 13:16, 31:19, 31:20, 62:22
**exactly** [9] - 40:3, 46:7, 62:11, 66:5, 78:15, 78:16, 78:17, 96:7, 109:2
**EXAMINATION** [3] - 6:8, 108:3, 115:1
**Examination** [2] - 2:6, 3:5
**examination** [1] - 117:14
**example** [5] - 8:5, 12:15, 31:8, 68:20, 88:16
**exceeded** [1] - 66:10
**except** [2] - 5:16, 116:2
**exception** [4] - 83:18, 92:3, 115:3, 115:6
**excessive** [2] - 50:20
**excluded** [1] - 42:14
**excluding** [2] - 45:13, 45:18
**excuse** [3] - 14:8, 41:12, 55:18
**exemption** [4] - 111:20, 111:22, 112:8, 114:22
**Exhibit** [13] - 57:7, 109:7, 109:10, 109:22, 110:16, 111:18, 114:21, 115:4, 115:13, 115:16, 115:18, 115:20
**exhibit** [1] - 114:22
**EXHIBITS** [1] - 4:1
**Exhibits** [1] - 4:4
**expand** [1] - 26:22
**expect** [1] - 68:21
**expectation** [1] - 21:8
**expected** [1] - 10:12
**experience** [13] - 64:18, 88:20, 89:3, 89:4, 89:23, 90:14, 96:9, 96:12, 97:2, 97:3, 108:15, 110:23,

114:6
**experienced** [1] - 81:3
**experiences** [7] - 57:1, 88:19, 89:16, 95:19, 95:23, 107:8, 107:10
**experiencing** [1] - 60:1
**expired** [4] - 82:5, 83:6, 83:12, 83:15
**explain** [7] - 26:23, 83:11, 90:23, 91:12, 91:22, 110:23, 113:1
**expressing** [1] - 93:13
**extended** [1] - 89:6
**extensive** [1] - 21:22
**extent** [1] - 10:11
**eye** [1] - 64:6
**eyes** [1] - 64:10

**F**

**fact** [5] - 11:21, 85:8, 96:13, 96:19, 97:1
**facts** [1] - 108:9
**failure** [4] - 108:21, 109:13, 109:19, 112:16
**fair** [5] - 33:4, 33:6, 43:21, 92:7, 92:10
**fall** [2] - 94:23, 95:3
**familiar** [4] - 53:19, 54:21, 92:22, 93:8
**family** [10] - 12:6, 12:10, 15:16, 17:3, 17:4, 21:12, 42:6, 43:6, 114:8
**Family** [9] - 42:7, 42:15, 42:16, 42:17, 43:2, 43:5, 43:7, 43:8, 43:14
**far** [8] - 8:9, 12:1, 12:8, 31:16, 54:20, 59:21, 70:7, 106:16
**fear** [2] - 105:23, 107:5
**fears** [1] - 105:15
**February** [2] - 15:21, 15:22
**Federal** [1] - 2:8
**feet** [1] - 30:20
**few** [4] - 22:13, 96:5, 108:1, 108:5
**field** [1] - 36:3
**file** [9] - 72:2, 73:2, 73:9, 73:12, 73:20, 74:11, 79:9, 87:3, 106:11

**filed** [3] - 49:11, 59:8, 107:13
**filing** [2] - 5:14, 20:12
**financed** [1] - 99:7
**financially** [2] - 13:23, 71:1
**fine** [3] - 11:8, 29:2, 55:12
**fines** [3] - 69:11, 78:11, 84:7
**finishing** [1] - 19:4
**fired** [1] - 36:5
**firm** [1] - 6:11
**first** [7] - 6:15, 6:21, 49:23, 50:3, 57:19, 102:18, 108:18
**five** [7] - 12:18, 22:22, 57:23, 66:8, 67:3, 75:22, 76:7, 76:17, 78:8, 78:12, 84:5, 84:8, 93:3, 110:17, 111:2, 111:4, 111:8
**five-ish** [1] - 22:22
**focus** [2] - 59:10, 59:12
**follow** [1] - 114:20
**follow-up** [1] - 114:20
**following** [1] - 5:10
**follows** [1] - 6:6
**Force** [8] - 25:7, 25:17, 25:20, 26:4, 26:12, 27:22, 32:5, 76:15
**foregoing** [1] - 116:2
**foremost** [1] - 6:15
**Form** [4] - 4:7, 4:8, 115:17, 115:19
**form** [1] - 5:16, 40:20, 55:5, 109:22, 111:19, 113:4, 113:17, 114:10, 114:17
**form(s** [1] - 116:3
**former** [1] - 1:15
**forms** [1] - 104:23
**forth** [1] - 116:3
**forty** [1] - 111:12
**forty-one** [1] - 111:12
**forward** [1] - 23:10
**four** [17] - 59:13, 60:13, 60:20, 67:5, 69:4, 82:3, 83:15, 110:17, 110:21, 111:2, 111:4, 111:8, 112:14, 112:15, 112:23, 113:13,

113:15
**four-thirty** [1] - 110:21
**four-thirty-five** [4] - 110:17, 111:2, 111:4, 111:8
**fourteen** [2] - 105:12, 106:1
**frame** [4] - 23:19, 24:11, 24:13, 90:19
**FRANKLIN** [1] - 1:7
**Franklin** [2] - 2:9, 5:3
**free** [2] - 59:14, 73:23
**Freely** [3] - 3:6, 3:8, 6:11
**FREELY** [159] - 5:6, 5:22, 6:8, 11:16, 13:1, 22:19, 23:4, 23:8, 23:20, 24:15, 24:21, 25:15, 26:3, 26:7, 26:19, 27:13, 27:17, 27:19, 28:4, 28:9, 28:15, 30:2, 30:16, 31:1, 32:15, 33:1, 33:17, 34:1, 34:6, 34:13, 34:20, 35:6, 35:17, 36:8, 36:12, 36:17, 38:6, 38:10, 38:19, 39:1, 39:9, 39:14, 39:18, 40:1, 40:7, 40:13, 40:18, 40:23, 41:15, 42:1, 42:11, 42:12, 43:20, 45:6, 45:10, 45:11, 47:3, 47:19, 47:20, 49:2, 49:7, 49:16, 51:17, 52:2, 52:6, 52:10, 53:21, 54:2, 54:11, 55:9, 55:12, 55:13, 56:17, 57:6, 57:11, 59:1, 60:17, 60:19, 63:7, 63:12, 63:18, 64:3, 64:14, 65:4, 65:9, 65:14, 66:2, 66:14, 66:20, 67:19, 68:7, 68:15, 69:3, 70:22, 71:23, 72:6, 72:12, 73:7, 73:13, 74:4, 74:9, 75:8, 75:11, 78:7, 79:13, 79:18, 79:22, 80:3, 80:10, 80:13, 80:14, 82:13, 82:21, 83:9, 83:22, 84:21, 85:21, 85:23, 86:22, 87:7, 87:16, 88:9, 88:21, 89:8, 90:1, 90:16, 91:3, 91:18, 92:9, 93:22, 94:19,

Charles Palmer

5

| | | | | |
|---|---|---|---|---|
| 95:15, 95:20, 96:11, 96:17, 99:14, 100:2, 100:14, 100:20, 102:5, 103:14, 103:19, 104:2, 104:10, 104:14, 105:6, 105:22, 107:4, 107:9, 107:16, 107:21, 109:7, 113:4, 113:17, 114:10, 114:17, 114:20, 115:1, 115:9<br>**frequently** [2] - 62:6, 67:16<br>**friends** [1] - 114:8<br>**full** [4] - 6:22, 9:17, 34:17, 35:21<br>**full-time** [2] - 34:17, 35:21<br>**fully** [2] - 7:3, 31:8<br>**furtherance** [1] - 21:3<br>**future** [2] - 29:5, 106:18<br><br>**G**<br><br>**gaps** [1] - 19:5<br>**gears** [1] - 25:5<br>**general** [1] - 97:9<br>**Germany** [1] - 26:2<br>**given** [6] - 6:15, 56:6, 76:17, 96:9, 98:10, 116:5<br>**glasses** [2] - 31:8, 64:11<br>**graduate** [6] - 17:13, 17:16, 18:5, 18:7, 18:17, 18:19<br>**graduating** [1] - 19:3<br>**grew** [3] - 16:11, 16:14, 110:19<br>**ground** [1] - 6:14<br>**group** [11] - 49:4, 88:3, 92:15, 92:17, 92:18, 93:17, 93:19, 96:6, 96:8, 96:10, 96:14<br>**groups** [1] - 88:2<br>**grow** [1] - 16:17<br>**Guaranty** [1] - 5:6<br>**guess** [9] - 7:21, 8:1, 8:4, 8:8, 8:16, 29:5, 64:13, 70:19, 94:5<br>**guilty** [1] - 39:10<br><br>**H**<br><br>**halfway** [2] - 41:5<br>**HALL** [1] - 1:7<br>**handling** [1] - 43:14 | **harass** [1] - 105:16<br>**harassed** [1] - 107:6<br>**harder** [1] - 6:20<br>**head** [2] - 7:1, 19:23<br>**headed** [4] - 61:12, 77:2, 77:7, 81:11<br>**hear** [2] - 31:9, 95:2<br>**hearing** [1] - 31:6<br>**held** [3] - 11:4, 32:8, 32:9<br>**helped** [1] - 65:1<br>**hereby** [1] - 5:12<br>**HEREBY** [2] - 116:1, 117:7<br>**high** [5] - 17:9, 17:13, 17:18, 17:19, 19:3<br>**High** [1] - 17:10<br>**highlight** [1] - 62:5<br>**highly** [1] - 93:7<br>**history** [1] - 50:14<br>**HODGSON** [1] - 5:5<br>**Hodgson** [1] - 6:11<br>**Home** [1] - 32:9<br>**home** [4] - 61:20, 61:23, 77:2, 109:16<br>**homeless** [1] - 14:10<br>**honestly** [1] - 21:17<br>**hours** [1] - 83:15<br>**house** [3] - 16:11, 41:5<br>**hum** [1] - 7:1<br>**HUMPHREY** [1] - 1:6<br>**hundred** [3] - 66:6, 66:8, 86:11<br><br>**I**<br><br>**ID** [1] - 110:3<br>**identification** [1] - 115:20<br>**Identification** [1] - 4:4<br>**identify** [6] - 35:2, 38:7, 38:11, 38:20, 39:5, 95:5<br>**immediately** [4] - 69:20, 69:21, 78:20, 84:10<br>**impairment** [2] - 31:3, 31:18<br>**impairments** [2] - 30:21, 31:11<br>**Impala** [1] - 52:23<br>**impediments** [1] - 31:6<br>**impermissible** [1] - 20:17<br>**impression** [3] - 11:11, 57:4, 87:22 | **Improvement** [1] - 32:10<br>**IN** [1] - 1:5<br>**incident** [34] - 59:15, 61:15, 70:11, 71:12, 71:16, 72:1, 74:11, 74:19, 75:19, 76:8, 76:12, 78:1, 79:4, 79:7, 79:10, 79:15, 80:5, 80:7, 80:11, 81:3, 81:6, 84:5, 84:22, 85:4, 85:7, 85:8, 85:9, 85:11, 85:12, 85:14, 85:15, 86:2<br>**incidents** [8] - 71:17, 85:2, 86:23, 92:4, 97:11, 101:8, 101:20, 101:23<br>**included** [4] - 57:2, 57:5, 88:13, 88:14<br>**including** [1] - 28:23<br>**income** [5] - 24:9, 37:8, 104:23, 105:1, 105:4<br>**incorrect** [1] - 108:12<br>**indeed** [1] - 85:14<br>**INDEX** [2] - 3:1, 4:1<br>**individual** [4] - 1:13, 1:14, 1:16, 1:19<br>**individually** [2] - 1:8, 87:14<br>**individuals** [1] - 47:4<br>**industries** [1] - 24:5<br>**industry** [1] - 24:3<br>**information** [17] - 11:2, 11:6, 11:7, 11:10, 11:15, 12:2, 12:3, 12:9, 12:20, 21:9, 27:2, 29:5, 45:4, 51:20, 90:12, 90:13, 93:1<br>**initial** [2] - 39:19, 94:13<br>**injuries** [12] - 26:15, 26:20, 26:21, 27:4, 27:21, 28:1, 28:3, 28:5, 28:10, 29:21, 30:13<br>**injury** [1] - 28:2<br>**inquire** [1] - 112:4<br>**inquired** [1] - 86:8<br>**inspection** [1] - 106:5<br>**instructs** [1] - 9:4<br>**intent** [1] - 39:11<br>**interaction** [6] - 59:11, 62:12, 63:3, 77:11, 81:16, 81:19 | **interactions** [4] - 57:19, 58:18, 88:23, 89:10<br>**interpret** [1] - 7:14<br>**introduce** [1] - 57:7<br>**involved** [9] - 5:19, 12:11, 12:12, 46:16, 47:11, 47:22, 48:3, 49:8, 91:11<br>**involvement** [1] - 37:19<br>**involving** [2] - 10:22, 12:4<br>**irrelevant** [2] - 11:15, 21:18<br>**ish** [1] - 22:22<br>**issue** [3] - 51:4, 112:22, 113:15<br>**issued** [14] - 49:20, 56:18, 56:23, 108:20, 109:11, 109:19, 111:17, 112:12, 112:15, 112:23, 113:3, 113:8, 113:13, 114:4<br>**issues** [1] - 42:7<br><br>**J**<br><br>**JANE** [1] - 1:8<br>**January** [8] - 76:8, 76:14, 78:2, 79:2, 80:4, 80:10, 112:17, 112:20<br>**Jared** [1] - 109:12<br>**job** [5] - 6:20, 36:5, 36:9, 36:14, 86:12<br>**jobs** [1] - 35:23, 100:4, 100:9<br>**join** [3] - 49:3, 94:17, 94:20<br>**joint** [1] - 13:5<br>**JOSEPH** [1] - 1:7<br>**judge** [1] - 22:2<br>**June** [12] - 80:7, 81:3, 81:6, 81:9, 82:6, 84:5, 85:14, 86:2, 86:16, 97:19, 98:2, 101:3<br>**Junior** [1] - 9:18<br>**justice** [1] - 49:9<br>**justified** [1] - 84:1<br><br>**K**<br><br>**K-R-I-S** [1] - 9:20<br>**keep** [5] - 14:4, 82:9, 82:14, 82:23, 83:3<br>**KEISHA** [1] - 5:2<br>**Keisha** [4] - 20:4, 22:5, 79:18, 107:23 | **Kensington** [1] - 85:19<br>**keratoconus** [1] - 64:6<br>**KEVIN** [1] - 1:16<br>**kind** [5] - 13:5, 55:15, 55:18, 68:22, 94:7<br>**Kris** [1] - 9:18<br><br>**L**<br><br>**largely** [1] - 89:11<br>**last** [12] - 14:12, 15:2, 32:8, 32:9, 80:6, 85:7, 85:8, 85:11, 85:15, 86:2, 100:21, 105:11<br>**Latino** [3] - 93:6, 94:2, 94:21<br>**Law** [3] - 54:7, 55:4, 106:15<br>**law** [5] - 66:11, 106:8, 106:20, 109:23, 111:19<br>**LAW** [1] - 5:2<br>**laws** [1] - 106:14<br>**lawsuit** [15] - 11:20, 11:22, 41:19, 46:14, 46:16, 47:5, 47:11, 47:23, 48:3, 49:11, 49:12, 58:14, 94:17, 94:20, 113:21<br>**lead** [1] - 91:20<br>**leads** [1] - 96:18<br>**learn** [2] - 98:2, 98:5<br>**learned** [2] - 86:10, 97:19<br>**learner** [1] - 110:3<br>**leasing** [1] - 99:1<br>**least** [1] - 59:4<br>**leave** [3] - 34:23, 36:3, 36:13<br>**led** [2] - 88:23, 91:7<br>**left** [3] - 27:20, 34:21, 102:16<br>**legally** [2] - 64:9<br>**less** [2] - 66:8, 113:8<br>**level** [4] - 59:21, 66:16, 66:19, 106:8<br>**license** [33] - 49:18, 49:20, 49:23, 50:1, 50:3, 50:9, 50:14, 50:16, 50:22, 51:3, 51:5, 67:21, 67:23, 68:1, 70:5, 70:10, 70:13, 70:17, 70:19, 74:12, 74:13, 76:22, 89:5, 97:19, 98:3, 98:5, 101:13, 101:17, |

101:21, 104:15, 109:17, 110:3
**life** [6] - 20:11, 20:14, 21:7, 21:11, 24:9, 52:20
**lift** [1] - 25:1
**light** [4] - 60:7, 64:2, 64:19, 65:16
**likely** [1] - 28:20
**limited** [2] - 28:23, 105:3
**limits** [1] - 105:14
**lines** [2] - 8:9, 44:11
**list** [6] - 19:19, 19:21, 28:1, 28:5, 28:10, 68:19
**listed** [12] - 52:15, 52:22, 59:6, 68:1, 74:13, 90:15, 91:19, 93:15, 94:7, 94:10, 101:8
**litigation** [2] - 48:21, 49:1
**live** [2] - 13:3, 16:2
**lived** [3] - 15:8, 16:10, 36:1
**lives** [1] - 72:21
**living** [1] - 62:2
**LLP** [1] - 5:5
**loan** [1] - 37:10
**located** [1] - 32:17
**location** [2] - 56:7, 85:16
**locations** [4] - 88:1, 88:18, 92:14, 97:3
**LOCKWOOD** [1] - 1:14
**look** [2] - 24:12, 110:16
**looks** [3] - 12:16, 58:15, 93:10
**lose** [1] - 50:3
**lost** [2] - 50:9, 50:22
**loud** [1] - 57:21
**LOVE** [1] - 1:5
**Love** [4] - 46:20, 47:14, 48:6, 48:9
**low** [1] - 37:8
**Lowe's** [11] - 32:9, 32:16, 32:17, 32:18, 33:7, 33:9, 33:21, 34:3, 34:21, 35:10, 35:11
**lumber** [2] - 34:11, 34:14
**lunch** [2] - 79:19, 80:2

**M**

**Machine** [1] - 117:9
**magnitude** [1] - 87:15
**mail** [7] - 68:8, 68:11, 68:20, 72:18, 72:19, 73:3, 74:6
**mailed** [1] - 68:17
**mailing** [4] - 14:11, 14:14, 14:16, 69:2
**major** [2] - 18:3, 18:14
**man** [1] - 95:5
**manner** [1] - 117:8
**MARIELLE** [1] - 1:6
**marijuana** [2] - 39:11, 40:9
**mark** [2] - 109:7, 109:10
**marked** [5] - 109:21, 115:13, 115:15, 115:17, 115:19
**married** [1] - 10:1
**match** [2] - 76:21, 109:18
**matter** [5] - 42:16, 42:17, 43:2, 46:6, 85:8
**matters** [1] - 43:14
**Mayor** [1] - 1:13
**McKinley** [1] - 17:10
**mean** [9] - 11:4, 17:19, 19:10, 22:9, 31:2, 42:20, 42:23, 44:1, 50:13, 62:17, 78:16, 88:12, 88:13, 92:10, 92:15, 93:10, 101:15, 101:19, 101:21
**means** [1] - 117:9
**meant** [1] - 90:23
**medical** [5] - 35:1, 111:21, 112:5, 114:22, 115:3
**medications** [1] - 9:7
**meet** [3] - 45:16, 45:22, 97:1
**meeting** [1] - 21:3
**member** [3] - 46:18, 46:20, 48:18
**members** [3] - 1:6, 26:12, 114:9
**memory** [3] - 62:23, 63:3, 86:5
**men** [1] - 95:9
**mention** [1] - 58:19
**mentioned** [5] - 11:20, 11:21, 42:6, 43:12, 89:19

**mentioning** [1] - 12:8
**met** [4] - 45:19, 45:23, 46:2, 108:15
**meter** [4] - 67:8, 77:17, 82:1, 111:13
**might** [7] - 6:18, 7:1, 8:14, 9:1, 44:9, 59:4, 72:19
**military** [1] - 26:12
**Miller** [9] - 81:17, 81:22, 82:1, 83:5, 83:17, 84:14, 112:3, 113:12, 113:14
**mind** [1] - 31:15
**minor** [1] - 12:17
**minute** [3] - 22:22, 27:16, 109:5
**minutes** [1] - 108:6
**misstatement** [1] - 47:16
**misunderstanding** [1] - 90:9
**model** [1] - 51:21
**moment** [1] - 78:6
**money** [3] - 99:9, 99:10, 104:5
**month** [2] - 15:20, 70:1
**monthly** [1] - 103:21
**months** [2] - 41:6, 70:3
**morning** [2] - 6:10, 108:6
**most** [6] - 24:14, 32:20, 35:16, 57:17, 62:21, 95:23
**mother** [2] - 13:7, 16:10
**motion** [3] - 29:12, 29:13, 99:21
**move** [11] - 12:21, 15:17, 23:10, 28:14, 28:17, 28:19, 28:22, 29:11, 75:18, 75:22, 80:6
**moved** [3] - 15:19, 62:6, 67:15
**MS** [303] - 5:22, 5:23, 6:8, 11:2, 11:16, 12:19, 13:1, 22:9, 22:19, 23:3, 23:4, 23:6, 23:8, 23:14, 23:20, 24:4, 24:15, 24:19, 24:21, 25:13, 25:15, 25:23, 26:3, 26:5, 26:7, 26:17, 26:19, 27:6, 27:13, 27:15, 27:17, 27:19, 27:23, 28:4, 28:7,

28:9, 28:12, 28:15, 30:1, 30:2, 30:14, 30:16, 30:23, 31:1, 32:12, 32:15, 32:22, 33:1, 33:14, 33:17, 33:23, 34:1, 34:4, 34:6, 34:10, 34:13, 34:18, 34:20, 35:4, 35:6, 35:14, 35:17, 36:6, 36:8, 36:10, 36:12, 36:15, 36:17, 38:4, 38:6, 38:8, 38:10, 38:17, 38:19, 38:22, 39:1, 39:6, 39:9, 39:12, 39:14, 39:16, 39:18, 39:21, 40:1, 40:5, 40:7, 40:11, 40:13, 40:16, 40:18, 40:20, 40:23, 41:13, 41:15, 41:22, 42:1, 42:5, 42:11, 42:12, 43:17, 43:20, 45:6, 45:9, 45:10, 45:11, 47:1, 47:3, 47:15, 47:19, 47:20, 48:22, 49:2, 49:5, 49:7, 49:14, 49:16, 51:15, 51:17, 51:23, 52:2, 52:4, 52:6, 52:8, 52:10, 53:18, 53:21, 53:23, 54:2, 54:9, 54:11, 55:5, 55:9, 55:10, 55:12, 55:13, 56:15, 56:17, 57:3, 57:6, 57:9, 57:11, 58:22, 59:1, 60:16, 60:17, 60:19, 63:5, 63:7, 63:9, 63:12, 63:15, 63:18, 64:1, 64:3, 64:14, 65:2, 65:4, 65:7, 65:9, 65:12, 65:14, 66:1, 66:2, 66:12, 66:14, 66:18, 66:20, 67:17, 67:19, 68:5, 68:7, 68:13, 68:15, 68:23, 69:3, 70:16, 70:22, 71:21, 71:23, 72:4, 72:6, 72:10, 72:12, 73:5, 73:7, 73:10, 73:13, 74:2, 74:4, 74:8, 74:9, 75:8, 75:11, 78:3, 78:7, 79:11, 79:13, 79:16, 79:18, 79:22, 80:1, 80:3, 80:8, 80:10, 80:12, 80:13, 80:14, 82:11, 82:13, 82:19, 82:21, 83:7, 83:9, 83:20, 83:22, 84:20, 84:21, 85:19, 85:21,

85:23, 86:20, 86:22, 87:5, 87:7, 87:13, 87:16, 88:8, 88:9, 88:11, 88:21, 89:2, 89:8, 89:15, 90:1, 90:7, 90:16, 91:2, 91:3, 91:15, 91:18, 92:6, 92:9, 93:21, 93:22, 94:18, 94:19, 95:13, 95:15, 95:18, 95:20, 96:4, 96:11, 96:17, 99:12, 99:14, 100:1, 100:2, 100:12, 100:14, 100:18, 100:20, 102:4, 102:5, 103:12, 103:14, 103:17, 103:19, 104:1, 104:2, 104:8, 104:10, 104:13, 104:14, 105:2, 105:6, 105:19, 105:22, 107:2, 107:4, 107:7, 107:9, 107:14, 107:16, 107:19, 107:21, 108:1, 108:3, 109:7, 109:8, 109:9, 113:4, 113:6, 113:17, 113:19, 114:10, 114:12, 114:17, 114:18, 114:20, 114:23, 115:1, 115:9, 115:10
**multiple** [11] - 15:1, 16:18, 19:18, 24:7, 24:23, 26:21, 28:1, 56:4, 70:6
**must** [2] - 111:21, 111:23
**MV-232** [3] - 4:7, 109:22, 115:17
**MV-80W** [2] - 4:8, 115:19

**N**

**N.Y** [1] - 1:12
**name** [7] - 6:10, 9:17, 10:7, 10:8, 10:16, 10:17, 12:2
**names** [5] - 9:22, 89:18, 91:10, 91:13, 91:16
**nature** [2] - 82:18, 87:23
**necessarily** [1] - 108:8
**neck** [1] - 30:20
**need** [9] - 8:18, 9:2, 22:8, 23:17, 31:20, 59:13, 75:20, 76:5, 108:8

Charles Palmer

needed [1] - 20:6
neighborhood [2] - 15:4, 15:5
neighborhoods [6] - 16:17, 16:18, 92:14, 93:7, 97:13, 97:14
neighbors [1] - 94:3
never [7] - 27:14, 41:21, 42:2, 73:11, 75:3, 93:16, 94:9
NEW [3] - 1:4, 5:2, 117:1
new [1] - 6:18
New [13] - 2:9, 5:4, 5:7, 15:3, 17:11, 36:1, 36:2, 109:23, 110:2, 110:4, 112:8, 117:6
Newburgh [3] - 15:3, 16:1, 76:16
next [1] - 75:18
Nichole [1] - 117:5
NICHOLE [2] - 2:10, 117:21
Nikki [1] - 75:8
Nikki's [1] - 6:20
nine [5] - 12:23, 23:5, 43:13, 43:14, 97:17
nine-thirty [1] - 23:5
ninety [1] - 41:6
non [2] - 110:3, 111:11
non-driver [1] - 110:3
non-transparent [1] - 111:11
noon [2] - 79:20, 79:23
normal [1] - 6:23
North [8] - 6:4, 14:17, 14:18, 15:17, 15:19, 17:6, 49:22, 85:16
Notary [4] - 2:11, 116:20, 117:5, 117:22
note [1] - 47:15
noted [1] - 29:12
notes [1] - 69:4
nothing [5] - 10:10, 10:19, 44:1, 45:15, 117:15
noticed [1] - 111:9
notices [2] - 68:21, 68:22
notification [2] - 83:14, 98:8
notify [3] - 109:13, 110:1, 112:16
November [23] - 4:6, 36:23, 37:14, 59:11,

59:16, 61:1, 61:8, 63:4, 67:9, 71:11, 72:1, 73:15, 74:23, 78:22, 80:9, 101:6, 108:19, 109:12, 110:18, 110:21, 111:3, 112:17, 115:15
number [1] - 91:19

## O

oath [1] - 5:13
object [3] - 9:1, 22:10, 23:14
objection [123] - 10:13, 23:14, 24:4, 24:19, 25:13, 25:23, 26:5, 26:17, 27:6, 27:23, 28:7, 30:1, 30:14, 30:23, 32:12, 32:22, 33:14, 33:23, 34:4, 34:10, 34:18, 35:4, 35:14, 36:6, 36:10, 36:15, 38:4, 38:8, 38:17, 38:22, 39:6, 39:12, 39:16, 39:21, 40:5, 40:11, 40:16, 40:20, 41:13, 41:22, 43:17, 47:1, 47:16, 48:22, 49:5, 49:14, 51:15, 51:23, 52:4, 52:8, 53:18, 53:23, 54:9, 55:5, 56:15, 57:3, 58:22, 63:5, 63:9, 63:15, 64:1, 65:2, 65:7, 65:12, 66:1, 66:12, 66:18, 67:17, 68:5, 68:13, 68:23, 70:16, 71:21, 72:4, 73:5, 73:10, 74:2, 74:8, 78:3, 79:11, 79:16, 82:11, 82:19, 83:7, 83:20, 84:20, 86:20, 87:5, 87:13, 88:8, 88:11, 89:2, 89:15, 90:7, 91:2, 91:15, 92:6, 93:21, 94:18, 95:13, 95:18, 96:4, 99:12, 100:1, 100:12, 100:18, 102:4, 103:12, 103:17, 104:1, 104:8, 104:13, 105:2, 105:19, 107:2, 107:7, 107:14, 113:4, 113:17, 114:10, 114:17
objections [1] - 5:16
obligation [1] - 14:1
observe [1] - 114:13
obviously [1] - 87:2

occasion [4] - 50:15, 105:13, 108:18, 108:19
occasions [1] - 113:15
occurred [3] - 61:16, 77:9, 81:14
OF [4] - 1:4, 1:12, 117:1, 117:3
offered [2] - 26:10
offhand [2] - 19:14, 56:9
Officer [38] - 60:23, 61:9, 62:12, 63:4, 63:19, 71:2, 71:13, 76:15, 76:19, 77:1, 77:14, 77:17, 81:17, 81:22, 82:1, 83:5, 83:17, 84:14, 108:20, 108:22, 109:12, 109:15, 110:8, 110:14, 111:7, 111:13, 112:2, 112:3, 112:12, 112:14, 112:22, 112:23, 113:7, 113:11, 113:12, 113:14
officer [9] - 63:3, 63:19, 67:8, 67:13, 77:12, 77:14, 77:21, 79:1, 81:21
OFFICERS [1] - 1:18
officers [10] - 1:18, 57:20, 58:19, 88:17, 88:23, 89:11, 91:10, 91:13, 91:17, 92:3
officers' [1] - 89:18
official [2] - 1:13, 1:15
officially [2] - 30:9, 37:21
often [3] - 16:19, 16:20, 103:20
old [2] - 12:23, 43:13
one [40] - 10:6, 15:2, 16:13, 24:10, 32:20, 39:17, 40:12, 40:15, 40:21, 43:1, 43:2, 48:2, 50:15, 50:18, 58:6, 58:23, 59:3, 59:4, 59:13, 59:23, 63:23, 64:10, 71:17, 71:18, 73:2, 81:2, 83:12, 85:2, 86:10, 88:2, 90:3, 102:11, 108:18, 108:21, 109:11, 111:10, 111:12, 112:16, 113:13, 114:20
ones [1] - 107:11

ongoing [5] - 28:3, 64:6, 64:7, 64:23
online [1] - 74:6
opened [1] - 20:13
openly [1] - 21:14
opportunities [1] - 37:10
opportunity [1] - 26:13
opposed [2] - 20:10, 21:10
options [1] - 66:23
order [1] - 28:21
ordering [1] - 68:20
organization [3] - 47:13, 48:5, 97:5
organizations [2] - 38:1, 49:9
OSHA [1] - 25:1
outright [1] - 69:14
outside [1] - 13:19
outstanding [1] - 102:13
overall [2] - 89:22, 90:14
overlooked [1] - 94:5
overwhelmingly [1] - 93:6
own [14] - 15:15, 51:9, 52:18, 52:21, 53:3, 60:22, 76:11, 81:5, 96:9, 96:11, 99:4, 105:17
owned [1] - 16:9, 51:11, 52:20
owners [1] - 37:22

## P

p.m [2] - 110:17, 111:4
P.O [2] - 6:4, 14:17
packages [1] - 68:21
page [1] - 6:14
Page [1] - 3:4
pages [1] - 116:2
paid [7] - 69:16, 69:18, 78:22, 78:23, 84:11, 84:13, 102:13
pain [5] - 30:12, 30:17, 30:18, 35:5, 35:7
Palmer [11] - 6:10, 9:15, 9:18, 57:10, 79:20, 80:15, 86:8, 86:12, 94:9, 97:19, 102:11
palmer [7] - 11:17, 20:12, 23:9, 55:7, 57:12, 62:6, 96:9

PALMER [7] - 1:2, 1:7, 2:7, 3:4, 6:1, 116:11, 117:8
paragraph [24] - 57:22, 59:11, 60:9, 60:11, 60:13, 60:20, 62:4, 63:23, 67:15, 69:4, 75:21, 75:22, 76:7, 80:16, 86:4, 86:7, 93:3, 97:17, 97:18, 98:12, 102:9, 105:11, 106:1, 112:13
paragraphs [2] - 76:4, 76:7
Park [1] - 5:3
part [14] - 11:1, 11:2, 14:12, 24:14, 24:17, 35:16, 44:15, 57:17, 62:21, 88:6, 88:12, 96:6, 96:7, 96:14
participate [1] - 21:20
parties [3] - 5:11, 5:13, 5:19
party [4] - 41:18, 42:15, 42:17, 43:4
passenger [1] - 112:1
past [4] - 43:14, 43:18, 50:5, 69:2
pay [14] - 11:18, 13:17, 69:14, 70:8, 70:23, 78:20, 78:21, 84:10, 86:14, 102:12, 104:6, 104:16, 104:19
Pearl [1] - 5:7
pending [4] - 8:20, 13:8, 13:11, 13:14
people [10] - 88:2, 88:3, 92:15, 92:17, 92:22, 93:17, 93:19, 97:1, 97:14, 97:15
per [1] - 103:2
percent [1] - 111:12
perfect [2] - 23:4, 79:22
perform [1] - 24:8
period [3] - 24:10, 60:4, 89:6
permanent [13] - 29:22, 30:4, 30:6, 30:9, 62:8, 68:4, 72:13, 72:16, 72:20, 73:3, 73:23, 110:1, 110:9
permit [1] - 110:3
person [3] - 74:6, 111:20, 111:22
personal [8] - 11:10, 12:2, 12:3, 12:9, 14:4,

20:10, 20:14, 21:11
**PERSONNEL** [1] - 1:17
**PHILIP** [1] - 1:16
**phone** [1] - 8:10
**photographic** [1] - 62:23
**pick** [1] - 24:6
**picking** [2] - 21:7, 27:20
**place** [1] - 56:3
**placed** [1] - 88:1
**places** [1] - 93:5
**plagued** [1] - 86:7
**Plaintiff** [2] - 2:7, 46:13
**Plaintiffs** [3] - 1:10, 5:4, 49:4
**plan** [3] - 20:6, 20:8, 22:7
**planned** [1] - 20:9
**plans** [2] - 16:21, 106:17
**plead** [1] - 39:10
**plus** [2] - 70:4, 70:8
**point** [9] - 8:5, 8:7, 8:11, 8:18, 42:9, 44:8, 48:2, 76:5, 97:6
**pointed** [1] - 91:4
**pointing** [2] - 90:4, 96:1
**points** [1] - 8:14
**Police** [22] - 1:14, 1:16, 1:18, 4:6, 54:6, 87:3, 87:11, 87:18, 89:14, 91:5, 93:18, 94:1, 94:15, 94:22, 95:11, 96:2, 96:21, 100:22, 101:2, 101:5, 113:22, 115:14
**police** [7] - 40:9, 55:18, 56:14, 57:20, 58:19, 89:11, 92:2
**position** [4] - 29:18, 32:11, 34:2, 34:17
**possession** [3] - 39:10, 40:10, 99:6
**possibility** [1] - 42:10
**possibly** [1] - 86:21
**practice** [1] - 113:22
**practices** [1] - 113:23
**predominantly** [1] - 93:7
**prepare** [3] - 42:4, 45:12, 45:16
**present** [4] - 43:3, 63:19, 77:14, 81:21
**pretty** [15] - 19:16,

22:2, 23:23, 29:15, 48:4, 56:5, 59:22, 70:17, 85:7, 85:8, 85:10, 85:11, 88:17, 89:22, 97:4
**previously** [3] - 58:20, 61:18, 75:5
**primarily** [3] - 16:18, 24:6, 56:5
**private** [3] - 20:10, 20:14, 21:11
**privilege** [1] - 45:7
**privileged** [3] - 44:8, 44:23, 45:3
**probation** [3] - 39:17, 40:14, 40:15
**problems** [7] - 31:14, 60:2, 63:22, 64:21, 65:16, 67:12, 77:20
**Procedure** [1] - 2:8
**proceed** [1] - 22:17
**proceeding** [1] - 42:22
**professional** [1] - 24:16
**professionally** [2] - 65:20, 74:21
**program** [2] - 26:9, 97:5
**project** [1] - 35:16
**promotion** [1] - 34:7
**provide** [1] - 12:5
**provided** [3] - 21:10, 66:23, 90:10
**provides** [1] - 111:20
**providing** [3] - 37:7, 37:9
**public** [3] - 11:3, 100:6, 100:11
**Public** [4] - 2:11, 116:20, 117:5, 117:22
**publicized** [1] - 11:6
**published** [1] - 11:5
**pull** [2] - 85:18, 106:19
**pulled** [22] - 60:23, 61:9, 71:3, 71:6, 71:12, 71:14, 76:15, 79:2, 84:15, 90:20, 95:5, 95:9, 96:15, 98:7, 98:9, 100:21, 101:2, 101:5, 108:23, 109:1, 111:8, 112:2
**punishment** [1] - 41:1
**purpose** [1] - 55:7
**purposes** [1] - 72:18
**pursuant** [1] - 2:7

**Q**

**questions** [26] - 5:17, 9:1, 11:22, 13:2, 20:2, 20:5, 21:6, 21:12, 21:14, 21:16, 21:22, 22:4, 22:10, 22:13, 22:15, 27:1, 27:9, 28:18, 29:4, 29:17, 29:19, 89:10, 105:11, 107:21, 108:1, 114:19

**R**

**race** [5] - 94:14, 95:7, 95:11, 96:19, 97:2
**racially** [1] - 87:14
**racism** [1] - 97:8
**random** [1] - 21:6
**range** [2] - 12:19, 12:22
**rank** [3] - 25:12, 25:14
**RE** [1] - 115:1
**RE-EXAMINATION** [1] - 115:1
**read** [18] - 57:9, 57:20, 57:21, 57:22, 58:1, 58:2, 58:7, 58:16, 59:14, 60:14, 60:15, 75:8, 75:10, 75:21, 80:17, 98:13, 116:1
**reading** [1] - 86:4
**reads** [1] - 86:7
**ready** [1] - 58:3
**really** [6] - 8:4, 13:10, 19:9, 19:10, 31:4, 110:22
**rear** [3] - 67:5, 67:6, 111:10
**reason** [5] - 9:11, 11:15, 57:1, 71:19, 73:8
**reasons** [5] - 28:11, 91:19, 91:22, 111:21, 112:15
**reassess** [1] - 22:23
**recap** [2] - 23:9, 80:4
**receive** [10] - 24:16, 34:7, 41:1, 68:8, 68:21, 72:19, 73:3, 103:11, 103:15, 103:20
**received** [19] - 25:4, 49:23, 64:15, 69:5, 69:20, 69:22, 70:15, 78:21, 99:15, 101:9, 102:1, 102:6, 102:15,

103:4, 104:20, 115:12, 115:15, 115:17, 115:19
**receiving** [7] - 68:20, 102:18, 102:20, 102:22, 103:2, 103:8, 105:8
**recent** [1] - 43:15
**recently** [2] - 16:20, 32:21
**recess** [2] - 23:7, 80:2
**recognize** [1] - 58:13
**recollection** [3] - 20:21, 93:20, 93:23
**recommend** [1] - 65:5
**record** [5] - 27:15, 27:18, 29:16, 42:13, 55:6
**recording** [1] - 29:16
**REDDEN** [1] - 1:6
**reduced** [1] - 117:10
**refer** [2] - 53:8, 54:4
**Referee** [1] - 5:14
**reference** [7] - 8:5, 8:7, 8:11, 58:6, 71:10, 71:11, 88:5
**referenced** [10] - 35:8, 58:21, 63:22, 88:4, 90:2, 93:17, 104:20, 106:1, 106:17, 115:4
**referencing** [2] - 35:3, 92:17
**referring** [10] - 42:8, 54:5, 54:23, 55:1, 55:2, 89:16, 89:20, 90:9, 94:4, 103:13
**refers** [1] - 92:21
**reflect** [2] - 81:1, 81:2
**refresh** [4] - 86:5, 93:20, 93:23
**refusal** [1] - 28:18
**refusals** [1] - 29:12
**refusing** [2] - 20:16, 99:15
**regain** [1] - 51:5
**regarding** [2] - 42:22, 106:14
**regardless** [4] - 20:21, 21:4, 29:6, 85:6
**regards** [2] - 13:13, 43:8
**registration** [8] - 82:5, 82:10, 82:15, 82:23, 83:3, 83:6, 106:3, 110:4

**regular** [1] - 112:1
**regularly** [1] - 53:5
**related** [4] - 11:23, 25:1, 25:3, 78:1
**relative** [1] - 117:16
**relevance** [2] - 11:21, 99:19
**relevancy** [5] - 20:1, 22:10, 26:22, 29:2, 99:18
**relevant** [12] - 11:17, 12:15, 20:4, 20:17, 20:22, 21:5, 27:1, 27:9, 27:11, 29:7, 88:10, 114:6
**remain** [1] - 34:2
**remember** [38] - 15:8, 15:20, 16:5, 17:15, 18:5, 18:12, 18:14, 24:3, 33:20, 34:21, 40:6, 41:16, 53:1, 61:15, 62:20, 65:22, 66:3, 67:23, 70:7, 70:13, 73:19, 77:9, 78:11, 78:13, 78:17, 79:12, 81:11, 81:13, 89:12, 95:22, 98:18, 102:1, 103:2, 103:4, 103:7, 108:22, 110:7, 111:12
**reminder** [1] - 82:17
**remote** [1] - 5:20
**Remote** [1] - 2:6
**remotely** [1] - 5:21
**removal** [1] - 86:10
**remove** [4] - 74:18, 79:14, 86:1, 112:18
**removed** [10] - 74:21, 75:1, 75:2, 75:3, 75:5, 75:7, 75:13, 86:9, 86:13, 86:15
**rent** [2] - 15:15, 15:16
**rental** [1] - 105:13
**rented** [1] - 16:9
**renting** [1] - 105:18
**repeat** [3] - 14:12, 39:2, 95:1
**rephrase** [3] - 7:9, 30:11, 32:16
**report** [2] - 110:6, 110:10
**REPORTER** [1] - 5:19
**reporter** [1] - 75:10
**REPORTING** [1] - 2:9
**represent** [3] - 6:12, 54:3, 58:17

**representatives** [1] - 56:7
**represented** [2] - 92:18, 92:20
**request** [2] - 6:22, 8:21
**requested** [1] - 75:9
**requests** [1] - 111:22
**require** [1] - 10:14
**required** [3] - 23:15, 111:11, 112:5
**requires** [1] - 109:23
**requiring** [1] - 28:21
**reserved** [1] - 5:17
**reside** [3] - 14:18, 15:12, 73:17
**resided** [1] - 62:9
**residential** [6] - 14:8, 14:20, 16:3, 62:10, 73:4, 106:10
**resides** [1] - 72:21
**residing** [1] - 109:18
**resign** [1] - 36:13
**RESISTS** [1] - 1:5
**Resists** [4] - 46:20, 47:14, 48:6, 48:9
**resources** [1] - 37:11
**respect** [3] - 86:23, 88:22, 95:16
**respective** [1] - 5:13
**responded** [1] - 95:21
**response** [1] - 89:9
**responsibility** [3] - 82:22, 83:2, 83:16
**rest** [1] - 21:2
**result** [7] - 29:22, 30:12, 70:14, 87:18, 94:14, 95:7, 95:11
**results** [1] - 89:5
**resume** [1] - 24:12
**retail** [1] - 32:13
**retrieve** [1] - 68:11
**return** [1] - 99:11
**returned** [3] - 98:18, 98:23, 99:8
**review** [6] - 46:3, 46:5, 46:8, 59:7, 98:12, 107:12
**reviewed** [5] - 46:4, 46:7, 59:9, 107:20, 108:12
**revoked** [2] - 50:12, 50:23
**rideshare** [2] - 100:8, 100:17
**rights** [3] - 11:13, 97:8, 97:10
**ringing** [1] - 31:14, 32:2

**ROBBIN** [1] - 1:17
**role** [2] - 48:20, 48:23
**Rules** [1] - 2:8
**rules** [1] - 6:14
**run** [1] - 90:19
**Russ** [1] - 6:11
**RUSS** [1] - 5:5
**Rust** [4] - 46:21, 47:14, 48:6, 48:9
**RUST** [1] - 1:5

# S

**safe** [1] - 16:14
**safety** [6] - 53:8, 53:10, 54:4, 54:13, 54:17, 54:19
**sake** [7] - 7:2, 11:20, 12:13, 20:14, 20:19, 22:21, 48:8
**sales** [2] - 32:14
**sanctions** [3] - 28:22, 29:13, 99:22
**SARMIENTO** [1] - 1:7
**schedule** [1] - 22:19
**school** [5] - 17:9, 17:13, 17:18, 17:19, 19:3
**School** [1] - 17:10
**science** [1] - 18:18
**screen** [3] - 57:8, 108:8, 109:5
**scroll** [4] - 57:18, 58:3, 75:19, 76:5
**second** [5] - 39:3, 44:4, 81:2, 105:12, 112:12
**see** [18] - 17:3, 17:4, 23:1, 31:8, 57:8, 57:9, 57:12, 57:16, 57:17, 64:21, 74:10, 79:22, 93:3, 93:5, 94:5, 100:3, 102:9, 103:6
**seeing** [1] - 83:14
**seek** [1] - 47:4
**seeking** [1] - 27:2
**segregated** [1] - 93:8
**seized** [1] - 40:9
**sense** [6] - 8:12, 8:16, 31:9, 45:4, 45:5, 46:1
**senses** [1] - 31:5
**sensitivities** [1] - 64:2
**sensitivity** [3] - 60:7, 64:18, 65:16
**sensory** [4] - 30:21, 31:2, 31:11, 31:16

**sentence** [3] - 39:15, 40:15, 105:12
**separate** [2] - 26:13, 73:2
**separation** [1] - 26:6
**September** [5] - 2:10, 34:22, 116:6, 117:9
**SERAFINI** [1] - 1:16
**serve** [2] - 25:6, 25:9
**service** [8] - 26:16, 27:5, 27:21, 30:13, 32:14, 100:9, 100:17, 102:16
**services** [1] - 37:21
**set** [1] - 116:3
**seven** [5] - 58:7, 58:8, 80:16, 80:18, 80:21
**shake** [1] - 7:1
**SHAKETA** [1] - 1:6
**share** [4] - 108:7, 109:4, 109:5, 109:21
**sharing** [1] - 113:20
**SHAVONNE** [1] - 1:6
**shielded** [1] - 111:21
**shifting** [1] - 25:5
**SHIRLEY** [1] - 1:7
**short** [2] - 23:7, 97:18
**Shorthand** [1] - 117:9
**show** [1] - 97:12
**sic** [1] - 11:14
**side** [1] - 111:10
**Side** [8] - 15:7, 16:18, 56:4, 62:7, 76:17, 85:20, 93:8, 114:14
**sides** [1] - 43:9
**sight** [1] - 31:6
**signing** [1] - 5:14
**similar** [3] - 97:2, 97:3
**similarly** [1] - 1:9
**SIMMONS** [1] - 1:7
**SIMONIN** [1] - 2:8
**sitting** [1] - 8:10
**situated** [1] - 1:9
**situation** [1] - 13:11
**six** [6] - 43:18, 58:7, 58:8, 70:3, 75:23, 76:8
**sixteen** [1] - 101:18
**skills** [1] - 24:8
**small** [1] - 37:9, 37:10, 37:22
**smell** [1] - 31:5
**SMITH** [1] - 1:6

**snowmobile** [1] - 110:5
**social** [1] - 49:8
**sold** [1] - 86:18
**someone** [5] - 47:7, 65:19, 72:17, 72:20, 111:23
**sometimes** [1] - 17:5
**son** [11] - 11:19, 11:23, 12:6, 12:14, 12:23, 13:3, 17:6, 42:21, 43:4, 43:13
**son's** [5] - 10:8, 10:16, 10:17, 10:18, 14:4
**soon** [1] - 16:22
**sorry** [16] - 7:16, 14:12, 33:3, 33:4, 39:2, 42:5, 47:15, 59:2, 72:7, 72:10, 80:12, 81:1, 95:1, 113:23, 114:5
**sort** [1] - 12:21
**sound** [4] - 23:5, 86:17, 92:22, 93:8
**sounds** [7] - 23:6, 72:23, 76:18, 76:23, 81:4, 93:13, 98:4
**Spangdahlem** [1] - 26:1
**sparked** [1] - 65:10
**speaking** [3] - 11:12, 39:7, 87:15
**specialty** [1] - 32:14
**specific** [13] - 23:18, 24:10, 35:2, 35:13, 56:3, 66:16, 66:19, 89:21, 92:13, 92:14, 92:15, 92:23, 94:11
**specifically** [5] - 23:19, 26:12, 55:2, 96:1, 96:12
**specify** [1] - 66:16
**speculate** [1] - 7:22
**spoken** [3] - 46:13, 48:14, 49:11
**SS** [1] - 117:2
**stance** [1] - 97:9
**stand** [1] - 97:7
**stands** [1] - 10:23
**start** [9] - 6:13, 33:2, 33:9, 34:14, 35:18, 37:13, 57:19, 59:12, 103:22
**started** [5] - 33:6, 35:11, 64:7, 64:12, 103:8
**starting** [2] - 59:23, 62:6
**State** [13] - 18:2,

18:8, 18:9, 18:10, 18:15, 18:22, 23:12, 23:13, 109:23, 110:2, 110:4, 112:9, 117:6
**state** [2] - 49:20, 55:6
**STATE** [1] - 117:1
**statement** [6] - 12:1, 12:5, 21:2, 45:21, 75:4, 75:12
**statements** [1] - 59:19
**STATES** [1] - 1:3
**states** [11] - 11:18, 62:4, 62:11, 63:10, 63:17, 67:15, 97:18, 102:11, 104:9, 105:4, 109:14
**States** [1] - 25:6
**stationed** [2] - 25:22, 26:1
**statistics** [1] - 97:12
**status** [1] - 49:6
**step** [2] - 79:6, 84:17
**stick** [1] - 22:20
**still** [10] - 9:2, 20:1, 23:15, 28:2, 36:18, 37:21, 64:18, 103:11, 103:15, 105:23
**stipulated** [1] - 5:12
**stipulations** [1] - 5:10
**stop** [8] - 22:18, 36:20, 37:1, 73:15, 89:4, 105:18, 113:20, 114:4
**stopped** [2] - 55:15, 56:14
**stops** [5] - 52:15, 52:22, 71:7, 87:12, 87:19
**story** [1] - 13:10
**Street** [3] - 2:9, 5:3, 5:7
**strict** [1] - 83:13
**strike** [7] - 23:11, 37:12, 54:3, 61:19, 82:8, 83:23, 99:1
**Strike** [1] - 76:15
**struggled** [2] - 11:18, 12:5
**struggling** [2] - 12:14, 20:1
**stuff** [1] - 42:6
**subjected** [1] - 21:6
**subsequent** [1] - 86:16
**substantive** [1] - 44:12
**SUE** [1] - 2:8

Charles Palmer

10

**sued** [2] - 41:21, 42:2
**suit** [1] - 20:13
**suitable** [1] - 29:18
**Suite** [2] - 5:3, 5:7
**summarized** [1] - 108:10
**summarizes** [1] - 108:15
**sun** [2] - 60:2, 65:1
**sunglasses** [2] - 65:1, 65:3
**sunlight** [1] - 111:22
**sunny** [1] - 110:22
**SUPERVISORY** [1] - 1:17
**support** [12] - 11:19, 12:14, 12:16, 13:17, 13:19, 13:20, 14:1, 43:6, 43:7, 43:10, 43:23
**suspended** [17] - 50:11, 50:16, 50:18, 50:23, 51:4, 70:5, 70:10, 70:13, 70:18, 70:20, 97:20, 98:3, 98:6, 101:17, 101:20, 101:21, 104:16
**suspension** [1] - 89:5
**sustain** [2] - 26:15, 27:21
**sustained** [2] - 27:4, 29:22
**Sworn** [1] - 116:14
**sworn** [3] - 5:21, 6:5, 117:14

---

### T

**TANIQUA** [1] - 1:7
**target** [1] - 105:16
**targeted** [20] - 87:10, 87:17, 89:1, 89:14, 90:4, 90:6, 91:7, 91:12, 91:21, 92:16, 93:18, 94:14, 95:7, 95:10, 96:2, 96:7, 96:13, 96:20, 97:16, 107:6
**targeting** [6] - 88:2, 90:21, 91:5, 92:13, 92:21, 94:2
**taste** [1] - 31:5
**taxi** [1] - 100:8
**technical** [1] - 37:10
**teenager** [1] - 12:18
**temporary** [3] - 110:6, 110:11, 110:12
**ten** [7] - 31:21,

31:22, 50:5, 50:7, 98:12, 98:15, 110:1
**term** [3] - 37:3, 37:15, 37:17
**test** [4] - 67:9, 77:18, 82:1, 111:14
**testified** [2] - 6:6, 61:18
**testify** [2] - 110:7, 117:14
**testimony** [22] - 6:16, 9:9, 9:12, 23:11, 45:12, 47:10, 47:21, 63:2, 63:8, 63:10, 77:23, 85:3, 89:9, 90:17, 105:7, 108:14, 114:3, 116:5, 117:7, 117:10, 117:11, 117:19
**THE** [110] - 1:5, 5:19, 11:8, 12:23, 23:17, 24:5, 24:20, 25:14, 26:1, 26:6, 26:18, 27:7, 28:1, 28:8, 30:15, 32:13, 32:23, 33:15, 34:5, 34:11, 34:19, 35:5, 35:15, 36:7, 36:11, 36:16, 38:5, 38:9, 38:18, 38:23, 39:7, 39:13, 39:17, 39:22, 40:12, 40:17, 40:21, 41:14, 41:23, 43:18, 47:2, 48:23, 49:6, 49:15, 51:16, 52:1, 52:5, 52:9, 53:19, 54:1, 54:10, 56:16, 57:4, 58:23, 60:18, 63:6, 63:10, 63:16, 64:5, 65:3, 65:8, 65:13, 66:13, 66:19, 67:18, 68:6, 68:14, 69:1, 70:17, 71:22, 72:5, 72:11, 73:6, 73:11, 74:3, 78:4, 79:12, 79:17, 79:21, 82:12, 82:20, 83:8, 83:21, 85:22, 86:21, 87:6, 87:14, 88:12, 89:3, 89:16, 90:8, 91:16, 92:7, 95:14, 95:19, 99:13, 100:13, 100:19, 103:13, 103:18, 104:9, 105:3, 105:20, 107:3, 107:8, 107:15, 107:20, 113:5, 113:18, 114:11
**themselves** [2] - 91:4, 91:6
**theory** [1] - 88:20

**thinks** [1] - 96:12
**thirteen** [1] - 102:9
**thirties** [2] - 64:8, 64:22
**thirty** [8] - 23:5, 64:8, 86:11, 110:17, 110:21, 111:2, 111:4, 111:8
**THOMAS** [1] - 1:17
**thoughtful** [1] - 14:6
**thousand** [2] - 70:8, 102:14
**three** [48] - 41:6, 51:12, 52:17, 57:22, 57:23, 58:7, 58:8, 59:11, 59:13, 59:23, 60:9, 60:11, 60:13, 60:20, 62:4, 63:23, 67:15, 69:4, 69:5, 75:21, 75:23, 76:7, 80:16, 80:17, 80:21, 86:4, 86:7, 87:1, 87:2, 97:17, 98:12, 98:13, 98:15, 100:3, 102:9, 102:14, 105:11, 105:21, 106:1, 112:14
**threw** [1] - 94:7
**throughout** [7] - 24:9, 30:20, 35:7, 52:20, 56:4, 89:9
**Ticket** [2] - 4:6, 115:14
**ticket** [12] - 70:20, 83:6, 83:19, 84:2, 98:10, 101:10, 102:2, 105:16, 109:13, 109:19, 113:13, 114:4
**ticketed** [6] - 76:20, 78:19, 92:4, 96:20, 98:7, 107:6, 108:18, 108:19
**ticketing** [1] - 11:12
**tickets** [55] - 50:17, 50:19, 50:20, 50:21, 51:4, 56:8, 56:18, 56:21, 56:23, 69:5, 69:6, 69:9, 69:12, 69:20, 69:22, 70:14, 70:15, 70:23, 76:17, 78:8, 78:12, 78:17, 78:22, 82:3, 84:5, 84:8, 84:11, 84:13, 86:8, 86:14, 89:18, 91:4, 91:6, 97:20, 101:14, 101:22, 102:6, 102:13, 104:6, 104:16, 104:19, 108:20, 109:11, 110:14, 110:16, 111:17, 112:13,

112:16, 112:23, 113:1, 113:2, 113:9, 113:13, 113:15
**tint** [17] - 60:6, 65:17, 65:19, 66:10, 66:11, 66:15, 66:21, 67:8, 74:18, 75:1, 77:17, 79:14, 82:1, 86:1, 86:9, 111:13, 112:5
**tinted** [16] - 65:6, 65:11, 65:20, 67:2, 67:4, 67:9, 77:18, 106:7, 108:21, 110:15, 110:17, 111:10, 112:8, 112:13, 112:15, 113:1
**tinting** [1] - 65:20
**tints** [8] - 86:13, 86:15, 86:19, 106:9, 109:3, 111:18, 112:18, 112:19
**TO** [2] - 3:1, 4:1
**today** [10] - 6:22, 7:2, 8:14, 8:19, 9:2, 9:9, 9:13, 10:20, 20:10, 45:13, 45:17, 46:11, 50:17, 85:3, 87:1, 95:21, 103:11, 103:16, 110:7, 115:7
**today's** [1] - 89:9
**together** [2] - 97:6, 97:7
**took** [1] - 70:7
**top** [1] - 19:22
**topic** [1] - 14:7
**total** [2] - 84:4, 96:6
**touch** [2] - 31:5, 31:10
**towards** [1] - 92:14
**Tower** [1] - 5:3
**trades** [1] - 24:7
**traffic** [15] - 53:8, 53:10, 54:4, 54:12, 54:17, 54:19, 59:16, 71:7, 87:11, 101:9, 102:1, 102:6, 102:13, 113:23, 114:4
**Traffic** [3] - 54:7, 55:4, 106:15
**transcript** [4] - 5:15, 116:4, 117:18, 117:19
**transfer** [1] - 18:9
**transferred** [1] - 18:12
**transparent** [1] - 111:11
**transportation** [2] - 100:6, 100:11
**treatment** [2] - 64:7, 64:23

**Trial** [1] - 2:7
**trial** [1] - 5:17
**true** [16] - 12:1, 12:5, 40:8, 59:23, 60:6, 60:9, 60:11, 60:13, 60:20, 61:20, 76:14, 76:19, 97:21, 100:6, 116:4, 117:18
**truth** [3] - 117:15, 117:16
**truthful** [3] - 9:8, 9:12, 45:21
**truthfully** [2] - 20:20, 21:17
**try** [4] - 7:5, 22:16, 57:15, 82:14
**trying** [6] - 45:2, 93:11, 93:16, 93:20, 93:23, 96:15
**twenty** [5] - 12:16, 15:9, 15:10, 15:13, 83:15
**twenty-four** [1] - 83:15
**twenty-two** [1] - 12:16
**two** [15] - 12:16, 13:2, 31:15, 51:7, 57:22, 59:12, 60:9, 72:7, 73:2, 108:20, 110:14, 111:17, 112:13, 112:18, 112:22

---

### U

**Uber** [1] - 100:9
**um-hum** [1] - 7:1
**under** [5] - 11:11, 57:4, 87:22, 92:12, 117:11
**underprivileged** [1] - 37:8
**underserved** [1] - 37:9
**understood** [1] - 16:1
**unfortunately** [1] - 22:12
**unintentionally** [1] - 45:3
**union** [1] - 100:5
**UNITED** [1] - 1:3
**United** [1] - 25:6
**university** [1] - 18:1
**University** [2] - 18:2, 18:22
**UNKNOWN** [2] - 1:17, 1:18
**unless** [3] - 9:4,

10:12, 22:11
**unpaid** [2] - 50:19, 97:20
**unprofessional** [1] - 63:13
**unsure** [1] - 95:22
**up** [31] - 11:10, 11:14, 13:16, 16:11, 16:14, 16:17, 17:3, 20:13, 24:6, 27:20, 30:22, 33:2, 39:2, 42:9, 44:4, 46:19, 61:19, 76:5, 82:9, 82:14, 82:15, 82:23, 83:3, 85:18, 97:7, 106:3, 106:5, 110:19, 114:20
**up-to-date** [5] - 82:15, 82:23, 83:3, 106:3, 106:5
**update** [4] - 72:2, 73:22, 79:9, 109:20
**updates** [1] - 13:15
**uses** [1] - 72:17
**utilize** [1] - 24:8

## V

**valid** [2] - 49:17, 50:1
**variety** [2] - 43:21, 44:2
**vehicle** [7] - 52:17, 82:9, 82:14, 105:21, 106:13, 110:5, 112:1
**Vehicle** [3] - 54:7, 55:3, 106:15
**verbal** [2] - 6:23, 7:3
**verbatim** [1] - 117:8
**versed** [1] - 45:7
**veterans'** [6] - 102:12, 102:15, 103:8, 103:15, 104:5, 105:8
**via** [4] - 6:6, 74:6, 100:5, 100:10
**video** [1] - 5:20
**videoconference** [1] - 6:6
**view** [2] - 21:15, 21:17
**violated** [2] - 97:10, 106:20
**violating** [2] - 11:12, 11:13
**violation** [5] - 40:21, 41:2, 59:16, 97:8, 106:14
**violations** [4] - 40:14, 40:19, 54:7, 55:3

**Virginia** [5] - 17:23, 18:2, 18:9, 18:21, 23:12
**vision** [9] - 31:14, 31:17, 60:2, 63:22, 64:11, 64:21, 65:16, 67:12, 77:20
**visit** [3] - 16:19, 16:21, 106:18
**volunteer** [6] - 36:18, 37:18, 37:20, 37:21, 38:1
**volunteering** [4] - 11:10, 12:9, 36:20, 37:1
**vs** [1] - 1:11

## W

**wait** [2] - 70:23, 71:7
**waited** [1] - 56:11
**waived** [2] - 5:14, 5:15
**war** [1] - 26:11
**warning** [1] - 83:14
**waste** [1] - 22:8
**weather** [1] - 111:1
**Western** [3] - 36:1, 36:2
**WESTERN** [2] - 1:4, 5:2
**whereas** [1] - 72:19
**whole** [4] - 35:7, 89:4, 97:6, 117:15
**Wigdorski** [10] - 76:16, 76:19, 77:1, 77:15, 77:17, 112:3, 112:14, 112:23, 113:11, 113:14
**Williams** [3] - 3:7, 20:15, 45:6
**WILLIAMS** [146] - 5:2, 5:23, 11:2, 12:19, 22:9, 23:3, 23:6, 23:14, 24:4, 24:19, 25:13, 25:23, 26:5, 26:17, 27:6, 27:15, 27:23, 28:7, 28:12, 30:1, 30:14, 30:23, 32:12, 32:22, 33:14, 33:23, 34:4, 34:10, 34:18, 35:4, 35:14, 36:6, 36:10, 36:15, 38:4, 38:8, 38:17, 38:22, 39:6, 39:12, 39:16, 39:21, 40:5, 40:11, 40:16, 40:20, 41:13, 41:22, 42:5, 43:17, 45:9, 47:1, 47:15, 48:22, 49:5, 49:14, 51:15, 51:23,

52:4, 52:8, 53:18, 53:23, 54:9, 55:5, 55:10, 56:15, 57:3, 57:9, 58:22, 60:16, 63:5, 63:9, 63:15, 64:1, 65:2, 65:7, 65:12, 66:1, 66:12, 66:18, 67:17, 68:5, 68:13, 68:23, 70:16, 71:21, 72:4, 72:10, 73:5, 73:10, 74:2, 74:8, 78:3, 79:11, 79:16, 80:1, 80:8, 80:12, 82:11, 82:19, 83:7, 83:20, 84:20, 85:19, 86:20, 87:5, 87:13, 88:8, 88:11, 89:2, 89:15, 90:7, 91:2, 91:15, 92:6, 93:21, 94:18, 95:13, 95:18, 96:4, 99:12, 100:1, 100:12, 100:18, 102:4, 103:12, 103:17, 104:1, 104:8, 104:13, 105:2, 105:19, 107:2, 107:7, 107:14, 107:19, 108:1, 108:3, 109:8, 109:9, 113:6, 113:19, 114:12, 114:18, 114:23, 115:10
**WINANS** [2] - 2:11, 117:21
**Winans** [1] - 117:5
**window** [10] - 65:20, 66:15, 67:5, 74:18, 75:1, 79:14, 86:1, 112:8, 112:15, 113:1
**windows** [22] - 60:7, 65:6, 65:10, 65:17, 65:19, 66:22, 67:2, 67:4, 67:5, 67:9, 77:18, 79:15, 82:2, 106:7, 108:21, 110:15, 110:17, 111:10, 111:11, 111:15, 112:13, 112:18
**windshield** [1] - 67:6
**WITNESS** [108] - 11:8, 12:23, 23:17, 24:5, 24:20, 25:14, 26:1, 26:6, 26:18, 27:7, 28:1, 28:8, 30:15, 32:13, 32:23, 33:15, 34:5, 34:11, 34:19, 35:5, 35:15, 36:7, 36:11, 36:16, 38:5, 38:9, 38:18,

38:23, 39:7, 39:13, 39:17, 39:22, 40:12, 40:17, 40:21, 41:14, 41:23, 43:18, 47:2, 48:23, 49:6, 49:15, 51:16, 52:1, 52:5, 52:9, 53:19, 54:1, 54:10, 56:16, 57:4, 58:23, 60:18, 63:6, 63:10, 63:16, 64:5, 65:3, 65:8, 65:13, 66:13, 66:19, 67:18, 68:6, 68:14, 69:1, 70:17, 71:22, 72:5, 72:11, 73:6, 73:11, 74:3, 78:4, 79:12, 79:17, 79:21, 82:12, 82:20, 83:8, 83:21, 85:22, 86:21, 87:6, 87:14, 88:12, 89:3, 89:16, 90:8, 91:16, 92:7, 95:14, 95:19, 99:13, 100:13, 100:19, 103:13, 103:18, 104:9, 105:3, 105:20, 107:3, 107:8, 107:15, 107:20, 113:5, 113:18, 114:11
**witness** [1] - 5:21
**Witness** [1] - 3:4
**WITNESSES** [1] - 3:1
**words** [3] - 60:22, 76:11, 81:5
**writing** [2] - 84:1, 117:11
**written** [2] - 83:6, 83:18

## Y

**year** [14] - 17:15, 18:12, 18:19, 37:16, 37:17, 39:17, 40:15, 51:7, 52:3, 53:1, 70:4, 103:2, 103:6, 103:7
**years** [21] - 12:23, 15:9, 15:10, 15:13, 31:21, 31:22, 43:13, 43:15, 43:18, 50:5, 50:7, 51:7, 51:12, 52:17, 70:4, 70:5, 70:6, 70:7, 105:21
**YELDON** [1] - 1:8
**York** [13] - 2:9, 5:4, 5:7, 15:3, 17:11, 36:1, 36:2, 109:23, 110:2, 110:4, 112:8, 117:6
**YORK** [3] - 1:4, 5:2, 117:1
**YOUNG** [1] - 1:16
**yourself** [8] - 45:1,

57:22, 58:2, 65:17, 80:18, 94:11, 95:17, 98:13