UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BLACK LOVE RESISTS IN THE RUST by and
through its Co-Directors Natasha Soto and Shaketa
Redden and on behalf of its members; DORETHEA
FRANKLIN; TANIQUA SIMMONS; DE'JON HALL;
JOSEPH BONDS; CHARLES PALMER; SHIRLEY
SARMIENTO; EBONY YELDON; and JANE DOE,
individually and on behalf of a class of all others
similarly situated;

                              Plaintiffs,

          v.                                                        Civil No.: 1:18-cv-00719-CCR

CITY OF BUFFALO, NY; BYRON B. BROWN, Mayor
of the City of Buffalo, in his individual and official
capacities; BYRON C. LOCKWOOD, Commissioner of
the Buffalo Police Department, in his individual and
official capacities; DANIEL DERENDA, former
Commissioner of the Buffalo Police Department, in his
individual capacity; AARON YOUNG, KEVIN
BRINKWORTH, PHILIP SERAFINI, ROBBIN
THOMAS, UNKNOWN SUPERVISORY
PERSONNEL 1-10, UNKNOWN OFFICERS 1-20,
each officers of the Buffalo Police Department, in their
individual capacities.

                              Defendants.

_____

## STATEMENT OF UNDISPUTED FACTS

          Defendants the City of Buffalo, NY; Byron B. Brown, Mayor of the City of

Buffalo, in his Individual and Official Capacities; Byron C. Lockwood, Commissioner of the

Buffalo Police Department, in his individual and official capacities; Daniel Derenda, Former

Commissioner of the Buffalo Police Department, in his individual capacity; Aaron Young, Kevin

Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown

Officers 1-20, Each Officers of the Buffalo Police Department, in their individual capacities (the "City Defendants") submit the following Statement of Material Facts as to which there is no genuine issue to be tried, in accordance with Local Rule of Civil Procedure 56(a)(1).

The facts stated herein are "undisputed" only for purposes of this motion and the City Defendants reserve the right to dispute and/or contradict any of these facts at any subsequent trial of this action or in any other proceedings which are unrelated to the current motion.

## STATEMENT OF FACTS

### Policies of the Buffalo Police Department ("BPD")

1.    All officers are expected to comply and act in accordance with the BPD's Manual of Procedures ("MoP").[1]

2.    Section 2.12 of the BPD's Manual of Procedures ("MoP"), entitled "Attitude and Impartiality" states the following: "Employees while vigorous and unrelenting in the enforcement of the law, must maintain a strictly impartial attitude toward complainants, violators, witnesses and suspects."[2]

3.    Section 3.2(b) of the MoP, entitled "Conduct," states the following: "No employee shall conduct himself in such a manner, or perform any act, which is prejudicial to the

---

[1]    Declaration of Peter A. Sahasrabudhe dated February 7, 2025 (hereinafter "Sahasrabudhe Decl."), Exhibit 6 dated September 22, 2023 (hereinafter "Gramaglia Dep. 1") at 178:22-180:1.

[2]    Sahasrabudhe Decl., Exhibit 39, p. 16.

good order, discipline or reputation of the Department, although such action is not specifically

prohibited by any rule or order . . ."[3]

4.    In 2021, the BPD issued General Order 2021-009 (the "Order").[4]

5.    The Order sets forth the following Core Principles of BPD's Traffic

Enforcement Policy:

> Traffic Enforcement and Safety. The purpose of conducting traffic
> enforcement is to favorably alter the violator's future driving
> behavior and to foster public safety. Members shall engage in
> traffic enforcement for public safety purposes and not for the
> purpose of making an arrest.
>
> Constitutional Stops. Members may conduct a brief vehicle stop
> for a traffic violation when the member has Probable Cause to
> believe that the driver has committed a traffic violation. The stop
> may last no longer than the time reasonably required to issue a
> summons for the violation.
>
> Procedural Justice. Procedural justice refers to the perception of
> fairness in an encounter. Members shall treat all persons with
> dignity and respect, give persons a voice during encounters, be
> impartial in their decision making, and convey trustworthy
> motives.
>
> Non-Discriminatory Policing. Members shall not consider
> demographic category (including but not limited to race, ethnicity,
> national origin, religion, gender, sexual orientation, age, disability,
> gender identity or expression, or affiliation with any other similar
> identifiable group) as a factor in conducting a vehicle stop.
> Targeting specific neighborhoods for traffic enforcement based on
> these demographic categories is a form of discriminatory policing
> and is prohibited.
>
> Least Intrusive Response. Considering the circumstances presented at the time,
> members should always take the least intrusive action, consistent with the goal of
> public safety. For most minor violations, warrantless arrest is not the preferred

---

[3]    *Id.* at p. 18.

[4]    Sahasrabudhe Decl., Exhibit 40.

- 3 -

option, and certain violations only allow for the issuance of a traffic summons or a traffic stop receipt (P-1389) and not arrest. A member should issue a summons or make an arrest only when doing so directly advances the goal of public safety, and the situation cannot be effectively resolved in a less intrusive manner with the issuance of a traffic stop receipt.[5]

**The Strike Force & Housing Unit**

6.       In 2012, the BPD created the Strike Force and Housing Unit.[6]

7.       The units were created in response to residential complaints concerning traffic safety.[7]

8.       These units were proactive in that they were not "tied to the radio."[8]

9.       The Strike Force was designed to respond to citizen complaints, enforce the Vehicle and Traffic Law (the "VTL"), and reduce gang and gun violence throughout the City.[9]

10.      The Strike Force was mainly responsible for patrolling areas with high crime rates and locations where recent crimes had occurred.[10]

---

[5]      *Id.*

[6]      Sahasrabudhe Decl., Exhibit 11 dated November 10, 2021 (hereinafter "Derenda Dep. 1") at 16:8-16; Gramaglia Dep. 1 at 14:2-12.

[7]      *See* Sahasrabudhe Decl., Exhibit 10 dated November 6, 2023 (hereinafter "Brown Dep.") at 57:4-58:1.

[8]      *Id.*

[9]      *Id.*

[10]     Sahasrabudhe Decl., Exhibit 12 dated December 23, 2021 (hereinafter "Derenda Dep. 2") at 279:16-280:14.

11.     The Buffalo Municipal Housing Authority (the "BMHA") contracted with the City to create the Housing Unit.[11]

12.     The Housing Unit patrolled the BMHA properties and responded to issues and resident complaints there on the properties.[12]

13.     The Housing Unit's patrols involved intended to be highly police visible within the BMHA properties in order to reduce and deter crime.[13]

14.     The Housing Unit proactively enforced the VTL in and around BMHA properties.[14]

**Vehicle and Traffic Safety Checkpoints**

15.     Both the Strike Force and Housing Unit conducted vehicle and traffic safety Checkpoints (the "Checkpoints").[15]

16.     The primary purposes of the Checkpoints were traffic safety and high visibility to curtail the unsafe operation of vehicles.[16]

---

[11]     Gramaglia Dep. 1 at 17:17-18:7.

[12]     *Id.*; Sahasrabudhe Decl., Exhibit 13 dated April 29, 2022 (hereinafter "Russo Dep.") at 99:18-100:9; 102:14-103:16.

[13]     Sahasrabudhe Decl., Exhibit 23 dated December 27, 2021 (hereinafter "Serafini Dep.") at 41:1-6.

[14]     Sahasrabudhe Decl., Exhibit 20 dated November 8, 2023 (hereinafter "Miller Dep.") at 48:22-49:11.

[15]     *See* Derenda Dep. 1 at 74:13-14; 92:8-12.

[16]     Derenda Dep. 1 at 21:6-18; Russo Dep. at 194:13-21; Sahasrabudhe Decl., Ex. 41.

17.    The BPD issued Roadblock Directives governing the operation of Checkpoints.[17]

18.    The stated purpose of the Checkpoints was "roadway safety."[18]

19.    BPD policy required that all officers assigned to the Checkpoints be given a copy of the Directives prior to the Checkpoint's operation.[19]

20.    The Directives instructed officers as follows:

- Make the roadblock obvious. Overhead flashing lights must be activated on all vehicles taking part in the roadblock.
- The roadblock must not be unreasonably intrusive to motorists.
- Set the roadblock up in a way that minimizes the possibility of avoiding it.
- The above roadblock must begin at the above stated times.[20]

21.    At the outset, former Commissioner Derenda established the locations for Checkpoints.[21]

---

[17]    Sahasrabudhe Decl., Ex. 41.

[18]    *Id.*

[19]    *Id.*

[20]    *Id.*

[21]    Sahasrabudhe Decl., Exhibit 14 dated March 16, 2022 (hereinafter "Brinkworth Dep.") at 73:17-21.

22.     Former Commissioner Derenda based his location decisions on a variety of factors including citizen complaints received, where BMHA properties were located, and where Strike Force officers were assigned to patrol.[22]

23.     Complaints included reports of individuals driving without licenses, speeding, and engaging in other unsafe driving behaviors.[23]

24.     The City Defendants received many complaints from residents in the East Side of Buffalo, a community with majority Black residents.[24]

25.     After some time in operation, BPD lieutenants began setting Checkpoint locations based on the aforementioned factors.[25]

26.     Checkpoints were established at intersections and heavily trafficked roads.[26]

27.     In keeping with the Directives, BPD would place several squad cars in the center of or on the side of the street with their lights on, so that the Checkpoint was visible from a distance.[27]

---

[22]     Derenda Dep. 1 at 50:9-14; 96:3-97:2.

[23]     Derenda Dep. 1 at 96:3-97:2.

[24]     *See* Brown Dep. at 57:4-58:21, 15:15-22.

[25]     Brinkworth Dep. at 73:17-21.

[26]     Sahasrabudhe Decl., Ex. 41.

[27]     Sahasrabudhe Decl., Exhibit 9 (hereinafter "Hy Dep.") at 22:2-19.

28.    All vehicles approaching the Checkpoint would drive up to the officer or officers stationed at the Checkpoint for an initial visual inspection.[28]

29.    Officers assigned to Checkpoints were directed to:

- Check all drivers and passengers for seatbelts.
- Check all vehicles for valid registration stickers.
- Check all vehicles for valid inspection stickers.
- Act on any and all probable cause resulting from information obtained from the mobile plate reader or from plain view observations.
- Write summons for all who are in violation of any of the above or other NYS Vehicle & Traffic Laws.

30.    If motorists did not have any visible traffic violation, they were immediately directed to proceed through the Checkpoint.[29]

31.    A substantial number of motorists received no tickets and were stopped for only brief periods of time at the Checkpoints.[30]

32.    If an officer observed a VTL violation, the officer instructed the motorist to pull to the side of the road.  The officer would then issue a traffic summons.[31]

---

[28]    *See id.*

[29]    *See* Hy Dep. at 22:2-19.

[30]    *See* Sahasrabudhe Decl., Exhibit 15 dated July 18, 2023 (hereinafter "Domaracki Dep.") at 36:13-37:10.

[31]    Hy Dep. at 23:15-24:13; 31:9-32:6.

33.     If no probable cause for an arrest arose or was observed by the officer during the interaction, the motorist was permitted to drive away.[32]

34.     The Strike Force and Housing Unit were both disbanded under former BPD Commissioner Byron Lockwood's tenure in early 2018.[33]

35.     Following former Commissioner Lockwood's tenure, former Commissioner Gramaglia did not reinstate the Checkpoints during his time as Commissioner.[34]

36.     Current BPD Commissioner Alfonso Wright will not reinstate Checkpoints during his tenure.[35]

**Traffic Enforcement and Tinted Windows**

37.     Two of the goals for the BPD's traffic enforcement efforts are "to favorably alter the violator's future driving behavior and to foster public safety."[36]

38.     The BPD does not require officers to meet any ticket quotas.[37]

---

[32]     *Id.*

[33]     *See* Sahasrabudhe Decl., Exhibit 22 dated April 1, 2022 (hereinafter "Quinn Dep.") at 16:12-14 (Strike Force); Sahasrabudhe Decl., Exhibit 19 dated August 17, 2023 (hereinafter "Lockwood Dep. 2") at 217:5-218:5 (Housing Unit).

[34]     *See* Gramaglia Dep. 1 at 181:19-182:10.

[35]     *Id.*

[36]     Sahasrabudhe Decl., Ex. 40.

[37]     Sahasrabudhe Decl., Exhibit 28 dated November 4, 2021 (hereinafter "Wilcox Dep.") at 133:18-134:1.

39.    BPD command did not advise officers that they would receive overtime for writing more tickets.[38]

40.    Officers did not receive overtime pay for writing more tickets.[39]

41.    BPD command did not pressure officers to write more tickets.[40]

42.    Officers retain the discretion to write as many tickets for tinted windows as there are tinted windows on a vehicle.[41]

**The Buffalo Traffic Violations Agency ("BTVA")**

43.    In 2015, the New York State Legislature created the BTVA to assist the Buffalo City Court in adjudicating noncriminal traffic infractions within the City of Buffalo.[42]

44.    The BTVA was designed to give ticketed motorists alternatives to resolve their tickets, as is done in almost all town and village courts across the State.[43]

---

[38]    *See* Sahasrabudhe Decl., Exhibit 24 dated March 5, 2021 (hereinafter "Skipper Dep.") at 119:14-120:7; Sahasrabudhe Decl., Exhibit 25 dated March 23, 2023 (hereinafter "Thomas Dep.") at 116:7-117:12; Serafini Dep. at 261:19-23.

[39]    *Id.*

[40]    *See* Wilcox Dep. at 133:18-134:12; Hy Dep. at 30:7-16; Thomas Dep. at 118:15-119:13.

[41]    *See* Lockwood Dep. 1 at 73:16-74:16.

[42]    Sahasrabudhe Decl., Exhibit 21 dated May 26, 2022 (hereinafter "Morgera Dep.") at 18:2-5; 19:20-20:3.

[43]    Sahasrabudhe Decl., Exhibit 26 dated June 8, 2023 (hereinafter "Villegas Dep.") at 39:8-40:16.

45.     The BTVA processes all traffic tickets issued within the City of Buffalo.[44]

46.     Motorists can take a plea offer or proceed to a hearing before a judicial hearing officer.[45]

47.     Judicial hearing officers render final determinations for a ticketed motorists' infraction(s).[46]

48.     Ticketed motorists may appeal a hearing officer's final determination in Erie County Court.[47]

49.     Motorists can also challenge a ticket or traffic enforcement action through a New York CPLR Article 78 proceeding.[48]

50.     Certain named Plaintiffs in this case had their tickets dismissed by utilizing procedures available to them through the BTVA and New York State law.[49]

---

[44]     *Id.* at 43:21-45:9.

[45]     Morgera Dep. at 26:6-23.

[46]     *Id.*

[47]     Sahasrabudhe Decl., Ex. 42.

[48]     *See* N.Y. CPLR 7801(1)

[49]     Sahasrabudhe Decl., Exhibit 38 dated December 15, 2022 (hereinafter "Bonds Dep." at 77:20-78:1; Sahasrabudhe Decl., Exhibit 33 dated September 6, 2023 (hereinafter "Redden Dep.") at 74:11-75:8; Sahasrabudhe Decl., Exhibit 30 dated December 13, 2022 (hereinafter "Yeldon Dep.") at 99:17-21.

51.    Prior to the creation of the BTVA, all revenue derived from traffic tickets went to the State.[50]

52.    Under State law, the operation of the BTVA allows the City to keep most of the revenue derived from the adjudication of traffic tickets.[51]

53.    Other municipalities throughout the State, including Nassau County, Suffolk County, and Rochester, also have similar traffic violations agencies.[52]

**<u>Facts Related to Plaintiffs' Claims of Intentional Discrimination</u>**

54.    BPD's Checkpoint directive and traffic enforcement policies are race neutral in that they do not classify motorists based on their race.[53]

55.    Members of the Buffalo Police Department are not supposed to consider a motorist's race when making traffic stops.[54][55]

56.    In general, traffic stops can only be made by BPD officers for visible violations of the New York State Vehicle and Traffic Law.[56]

---

[50]    Morgera Dep. at 22:8-12.

[51]    *Id.* at 21:11:-22:7.

[52]    N.Y. Gen. Mun. Law § 370 (McKinney); *see also* Villegas Dep. at 31:7-22.

[53]    Sahasrabudhe Decl., Ex. 41; Ex. 40; Ex. 39 at pp. 16, 18.

[54]    *Id.*

[55]    Derenda Dep. 2 at 258:7-258:14, 312:10-312:18.

[56]    *Id.*

57.     Officers of the Buffalo Police Department are not allowed to use race as a basis to stop a vehicle at a Checkpoint or in a routine traffic stop.[57]

58.     All Plaintiffs in this case were cited for violations of the New York State Vehicle and Traffic Law, which are race neutral laws.[58]

59.     Jasmine Evans (formerly identified as Jane Doe), Joseph Bonds, Shaketa Redden, and Taniqua Simmons received tickets at checkpoints. [59]

60.     Evans was ticketed for three seat belt violations associated with her own lack of a seat belt, improper car seats for her two children, and for driving on a learner's permit.[60]

61.     Evans admitted these violations were legitimate at the time she was ticketed for them.[61]

62.     Bonds alleges that he was ticketed for expired insurance and an expired inspection sticker.[62]

---

[57]     Derenda Dep. 2 at 258:7-258:14, 312:10-312:18.

[58]     Sahasrabudhe Delc. Ex. 37 ("Evans Dep.") at 77:10-77:14; 82:14-82:2; 58:10-58:14; Ex. 38 ("Bonds Dep."), at 84:21-85:3; Ex. 31 ("Simmons Dep."), at 25:14-25-18; Ex. 3 ("Compl.") ¶ 246 (admitting Redden committed a VTL violation); Ex. 36 ("Franklin Dep."), at 43:13-44:12; Ex. 30 ("Yeldon Dep."), at 87:3-87:5; Ex. 34 ("Palmer Dep.") at 65:10-65:21; 67:2-67:7; 112:11-112:21;  Ex. 32 ("Sarmiento Dep")., at 45:16-45:18; 46:17-45:22.

[59]     *See* Evans Dep. at 77:10-77:14; 82:14-82:2; 58:10-58:14; Bonds Dep., at 84:21-85:3; Simmons Dep., at 25:14-25-18; Compl. ¶ 246.

[60]     *See* Evans Dep. at 77:10-77:14; 82:14-82:2; 58:10-58:14.

[61]     *Id.*

[62]     *See* Bonds Dep., at 84:21-85:3.

63.     Bonds admitted that his inspection sticker was, in fact, expired when he received these tickets.[63]

64.     Shaketa Redden was ticketed for an expired inspection sticker and admitted that her inspection sticker was expired at the time she received the ticket for that infraction.[64]

65.     Simmons was ticketed for having an expired inspection sticker.[65]

66.     Simmons has since admitted that she had an expired inspection sticker when she received the ticket.[66]

67.     Other than Defendant, Robin Thomas, none of the officers involved in the above-listed Checkpoint tickets are parties to this case.[67]

68.     Evans, Simmons, Bonds, and Redden have adduced no evidence demonstrating that any officer took action against them based on their race.[68]

---

[63]     *Id.*

[64]     Compl. ¶ 351.

[65]     Simmons Dep., at 25:14-25-18.

[66]     Compl. ¶ 246.

[67]     *Id.*

[68]     *See generally*, Evans Dep., Bonds Dep, Redden Dep., Simmons Dep.

69.    Plaintiffs Dorothea Franklin, Charles Palmer, and Ebony Yeldon were stopped and given tickets for tinted windows.[69]

70.    Franklin admitted that her windows were tinted.[70]

71.    Yeldon admitted that her windows were tinted.[71]

72.    Palmer admitted his windows were tinted.[72]

73.    None of the officers who wrote the above-listed tinted windows tickets are parties to this case.[73]

74.    Yeldon, Franklin, and Palmer have adduced no evidence suggesting that any officer took action against them due to their race.[74]

75.    De'Jon Hall never received a ticket from a Buffalo police officer or received any traffic related penalty for which he is bringing suit. Rather, Hall was briefly stopped at one Checkpoint and did not receive a ticket.[75]

---

[69]    Franklin Dep., at 43:13-44:12; Yeldon Dep., at 87:3-87:5; Palmer Dep. at 65:10-65:21; 67:2-67:7; 112:11-112:21.

[70]    Franklin Dep., at 43:13-44:12.

[71]    Yeldon Dep., at 87:3-87:5.

[72]    Palmer Dep. at 65:10-65:21; 67:2-67:7; 112:11-112:21

[73]    *See generally*, Compl.

[74]    *See generally*, Yeldon Dep, Franklin Dep., Palmer Dep.

[75]    Sahasrabudhe Decl. Exhibit 40 (hereinafter "Hall Dep.") at 31:19-32:21.

76.     The officers who stopped Hall at the Checkpoint are not parties to this case.[76]

77.     Hall has adduced no evidence of any Buffalo police officer taking action against him because of his race.[77]

78.     Shirley Sarmiento alleges that she received tickets while her car was parked.[78]

79.     Sarmiento admits that these tickets were for legitimate violations.[79]

80.     The officers who wrote Sarmiento's tickets are not parties to this action.[80]

81.     Sarmiento has adduced no evidence that a Buffalo police officer took action against her due to her race.[81]

82.     There is no evidence that any of the traffic enforcement actions concerning which Plaintiffs complain were carried out pursuant to a federally funded program.[82]

---

[76]     *Id.*

[77]     *See generally* Hall Dep.

[78]     Sarmiento Dep. at 48:14-16.

[79]     Sarmiento Dep., at 45:16-45:18; 46:17-45:22

[80]     *See generally*, Compl.

[81]     *See generally,* Sarmiento Dep.

[82]     *See* Sahasrabudhe Decl., Ex. 41; Ex. 40; Ex. 39 at pp. 16, 18.

Dated:          February 7, 2025

**HODGSON RUSS LLP**
*Attorneys for Defendants City of Buffalo, NY, Byron B. Brown, Byron C. Lockwood, Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, and Unknown Officers 1-20*


By:  */s/ Peter A. Sahasrabudhe*
        Hugh M. Russ III, Esq.
        Peter Sahasrabudhe, Esq.
        Cheyenne N. Freely, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000
*hruss@hodgsonruss.com*
*psahasra@hodgsonruss.com*
*cfreely@hodgsonruss.com*

- 17 -

66502018v1