UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BLACK LOVE RESISTS IN THE RUST by and
through its Co-Directors Natasha Soto and Shaketa
Redden and on behalf of its members; DORETHEA
FRANKLIN; TANIQUA SIMMONS; DE'JON HALL;
JOSEPH BONDS; CHARLES PALMER; SHIRLEY
SARMIENTO; EBONY YELDON; and JANE DOE,
individually and on behalf of a class of all others
similarly situated;

                                        Plaintiffs,

            v.                                                      Civil No.: 1:18-cv-00719-CCR

CITY OF BUFFALO, NY; BYRON B. BROWN,
Mayor of the City of Buffalo, in his individual and
official capacities; BYRON C. LOCKWOOD,
Commissioner of the Buffalo Police Department, in
his individual and official capacities; DANIEL DERENDA,
former Commissioner of the Buffalo Police Department,
in his individual capacity; AARON YOUNG, KEVIN
BRINKWORTH, PHILIP SERAFINI, ROBBIN
THOMAS, UNKNOWN SUPERVISORY
PERSONNEL 1-10, UNKNOWN OFFICERS 1-20,
each officers of the Buffalo Police Department, in their
individual capacities.

                                        Defendants.

_____

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' <u>MOTION FOR SUMMARY JUDGMENT</u>

**HODGSON RUSS LLP**
*Attorneys for Defendants City of Buffalo, NY, Byron B. Brown, Byron C. Lockwood, Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, and Unknown Officers 1-20*
Hugh M. Russ III, Esq.
Peter Sahasrabudhe, Esq.
Cheyenne N. Freely, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000
*hruss@hodgsonruss.com*
*psahasra@hodgsonruss.com*
*cfreely@hodgsonruss.com*

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION ............................................................................................................1

PRELIMINARY STATEMENT .....................................................................................1

FACTUAL BACKGROUND ..........................................................................................3

PROCEDURAL HISTORY...........................................................................................12

ARGUMENT .................................................................................................................13

    POINT I.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW ...............................................................................13

        A.    Plaintiffs Were Afforded More than Sufficient Procedural Due Process................................................................................13

        B.    Plaintiffs Do Not Have Any Viable Substantive Due Process Claim Under the Fourteenth Amendment.........................17

        C.    The City Defendants Have Not Violated the Equal Protection Clause of the Fourteenth Amendment.........................18

        D.    Plaintiffs Cannot Show Discrimination Under Title VI ...............28

        E.    The Checkpoints Comply with the Fourth Amendment. ...............31

        F.    The Non-Checkpoint Plaintiffs Do Not Have a Fourth Amendment Claim, Either. ............................................................41

    POINT II.    PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF..........43

        A.    Plaintiffs Demand for "Obey the Law" Injunctive Relief ............43

        B.    Plaintiff's Proposed Injunctive Relief Lacks Specificity and is Impermissibly Overbroad.........................................................45

        C.    Plaintiffs Lack Standing Because They Have Not Shown Any Realistic Risk of Future Injury.................................................48

    POINT III.    AS A MATTER OF LAW, THE INDIVIDUAL DEFENDANTS CANNOT BE HELD LIABLE.................................................................49

        A.    The Individual Defendants Did Not Violate Any Clearly Established Rights.........................................................................50

i

## TABLE OF CONTENTS - cont'd

PAGE

B.    The Individual Defendants' Conduct was Objectively Reasonable ...................................................................................51

C.    Former Mayor Byron Brown was not Personally Involved in the Checkpoints...........................................................55

POINT IV.    THE UNKNOWN DEFENDANTS SHOULD BE DISMISSED .............58

POINT V.    BLACK LOVE RESISTS IN THE RUST LACKS STANDING .............58

CONCLUSION.......................................................................................................60

# TABLE OF AUTHORITIES

PAGE

**Federal Cases**

*219 S. Atl. Blvd. Inc. v. City of Ft. Lauderdale,*
   239 F. Supp. 2d 1265 (S.D. Fla. 2002) ................................................22

*Adarand Constructors, Inc. v. Peña,*
   515 U.S. 200 (1995)................................................................................21

*Alexander v. Sandoval,*
   532 U.S. 275 (2001)................................................................................28

*Allen v. Nassau Cnty. Exec. Office,*
   09-cv-1520, 2011 WL 1061019 (E.D.N.Y. Feb. 15, 2011) ...............28, 31

*Anthony v. City of N.Y.,*
   339 F.3d 129 (2d Cir. 2003)................................................................53, 54

*Baltas v. Maiga,*
   2020 WL 6275224 (D. Conn. Oct. 26, 2020) .........................................45

*Black Lives Matter v. Town of Clarkstown,*
   354 F. Supp. 3d 313 (S.D.N.Y. 2018)................................................58, 59

*Black v. Coughlin,*
   76 F.3d 72 (2d Cir. 1996)........................................................................56

*Brown v. City of Oneonta, N.Y.,*
   221 F.3d 329 (2d Cir. 2000)................................................................19, 20

*Burton v. City of Belle Glade,*
   178 F.3d 1175 (11th Cir. 1999) ..............................................................44

*City of N.Y. v. Mickalis Pawn Shop, LLC,*
   645 F.3d 114 (2d Cir. 2011)....................................................................47

*Clay v. Riordan,*
   2020 WL 3893809 (W.D.N.Y. July 10, 2020)........................................55

*Conn. Citizens Defense League, Inc. v. Thody,*
   664 F. Supp. 3d 235 (D. Conn. 2023)......................................................59

*Cuviello v. City of Oakland,*
   2009 WL 734676 (N.D.Cal. Mar. 19, 2009)...........................................45

## TABLE OF AUTHORITIES - cont'd

PAGE

*DeBruin v. Macedon Police Dep't*,
    2020 WL 1980098 (W.D.N.Y. Apr. 27, 2020) ........................................................55

*Delaware v. Prouse*,
    440 U.S. 648 (1979) ...........................................................................................32, 37

*Di Pompo v. Mendelson*,
    2022 WL 463317 (S.D.N.Y. Feb. 15, 2022) ..........................................................31

*Faulk v. N.Y.C. Dep't of Cor.*,
    2014 WL 239708 (S.D.N.Y. Jan. 21, 2014) ...........................................................57

*Floyd v. City of N.Y.*,
    959 F. Supp. 2d 540 (S.D.N.Y. 2013) ..............................................................24, 25

*Garcia v. Does*,
    779 F.3d 84 (2d Cir. 2015) ....................................................................................50

*Grullon v. City of New Haven*,
    720 F.3d 133 (2d Cir. 2013) ..................................................................................56

*Hall v. Ala. State Univ.*,
    2023 WL 6276336 (M.D.Ala. Sep. 26, 2023) .......................................................45

*Harris v. City of N.Y.*,
    16-cv-1214, 2018 WL 4471631 (S.D.N.Y. Sept. 18, 2018) ...................................18

*Hawthorne by Hawthorne v. Cnty. of Putnam*,
    492 F. Supp. 3d 281 (S.D.N.Y. 2020) ..............................................18, 55, 56, 57

*Illinois v. Lidster*,
    540 U.S. 419 (2004) ...............................................................................................37

*A.M. ex rel. J.M. v. N.Y.C. Dep't of Educ.*,
    840 F. Supp. 2d 660 (E.D.N.Y. 2012) ..................................................................45

*Kelly v. Rice*,
    375 F. Supp. 2d 203 (S.D.N.Y. 2005) ......................................................14, 15, 16

*League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*,
    737 F.2d 155 (2d Cir. 1984) ..................................................................................58

*Leder v. Am. Traffic Solutions, Inc.*,
    81 F. Supp. 3d 211 (E.D.N.Y. 2015) ....................................................................18

iv

## TABLE OF AUTHORITIES - cont'd

PAGE

*Lennon v. Miller,*
   66 F.3d 416 (2d Cir. 1995)..................................................................51

*Lora v. Bd. of Educ. of the City of N.Y.,*
   623 F.2d 248 (2d Cir.1980)................................................................29

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)...........................................................................58

*Luna v. Pico,*
   356 F.3d 481 (2d Cir. 2004)..........................................................49, 50

*Lynch v. City of N.Y.,*
   589 F.3d 94 (2d Cir. 2009).............................................................32, 37

*Lyons v. City of Los Angeles,*
   461 U.S. 95 (1983).............................................................................48

*MacNamara v. City of N.Y.,*
   275 F.R.D. 125 (S.D.N.Y. 2011) .......................................................48

*Malley v. Briggs,*
   475 U.S. 335 (1986)...........................................................................49

*Mancuso v. Consol. Edison Co. of N.Y.,*
   130 F. Supp. 2d 584 (S.D.N.Y. 2001)................................................58

*Mateo v. Fischer,*
   682 F. Supp. 2d 423 (S.D.N.Y. 2010)................................................57

*Matthews v. Eldridge,*
   424 U.S. 319 (1976)...........................................................................14

*Miller v. Vohne Liche Kennels, Inc.,*
   2012 WL 3764042 (S.D.Ind. Aug. 29, 2012) .....................................49

*Moore v. Bitca,*
   19-cv-00035, 2020 WL 5821378 (D. Vt. Sep. 30, 2020) (Reiss, J.) ............... *passim*

*Mullenix v. Luna,*
   577 U.S. 7 (2015)...............................................................................49

*Nnebe v. Daus,*
   644 F.3d 147 (2d Cir. 2011)...............................................................14

### TABLE OF AUTHORITIES - cont'd

PAGE

*O'Shea v. Littleton,*
  414 U.S. 488 (1974)..........................................................................48, 49

*Ortiz v. Wagstaff,*
  523 F. Supp. 3d 347 (W.D.N.Y. 2021) ...................................................58

*Paige v. N.Y.C. Police Dep't,*
  2017 WL 1214425 (E.D.N.Y. Mar. 31, 2017) .......................................43

*Payne v. Travenol Labs., Inc.,*
  565 F.2d 895 (5th Cir. 1978) ................................................................44

*Peregrine Myanmar Ltd. v. Segal,*
  89 F.3d 41 (2d Cir. 1996)......................................................................43

*Pinter v. City of N.Y.,*
  976 F.Supp. 2d 539 (S.D.N.Y. 2013) (distinguishing *Floyd* where New York
  City did not have a policy of directing its officers to target gay men) ....................25

*Purgess v. Parauda,*
  2021 WL 2269540 (S.D.N.Y. June 3, 2021) .........................................45

*Reyes v. Cnty. of Suffolk,*
  995 F. Supp. 2d 215 (E.D.N.Y.2014) ....................................................18

*Rodriguez v. City of N.Y.,*
  2023 WL 3304565 (S.D.N.Y. Jan. 20, 2023) ........................................56

*Saucier v. Katz,*
  533 U.S. 194 (2001)...............................................................................49

*Schmidt v. Lessard,*
  414 U.S. 473 (1974)...............................................................................45

*Shain v. Ellison,*
  356 F.3d 211 (2d Cir. 2004)...................................................................48

*Tolbert v. Queens Coll.,*
  242 F.3d 58 (2d Cir. 2001).....................................................................28

*Torres v. City of N.Y. through the N.Y.C. Dep't,*
  590 F. Supp. 3d 610 (S.D.N.Y. 2022).............................................11, 14, 15, 31

## TABLE OF AUTHORITIES - cont'd

PAGE

*Tsinberg v. City of N.Y.*,
  20-cv-749, 2021 WL 1146942 (S.D.N.Y. 2021) ...............................................14, 15

*U.S. v. Bernacet*,
  724 F.3d 269 (2d Cir. 2013)..............................................................................32

*U.S. v. Bowman*,
  496 F.3d 685 (D.C. Cir. 2007)...........................................................................32

*U.S. v. Faulkner*,
  450 F.3d 466 .......................................................................................................38

*U.S. v. Fordice*,
  505 U.S. 717 (1992)............................................................................................29

*U.S. v. Fraire*,
  575 F.3d 929 (9th Cir. 2009) .......................................................................38, 39

*U.S. v. Garcia*,
  279 F. Supp. 2d 294 (S.D.N.Y. 2003)................................................................42

*U.S. v. Henson*,
  351 F. App'x 818 (4th Cir. 2009) .................................................................32, 50

*U.S. v. Johnson*,
  122 F. Supp. 3d 272 (M.D.N.C. 2015) ..............................................................35

*U.S. v. Lucas*,
  338 F. Supp. 3d 139 (W.D.N.Y. 2018) ..............................................................42

*U.S. v. Matusoff Rental Co.*,
  494 F. Supp. 2d 740 (S.D.Oh. 2007) .................................................................45

*U.S. v. McFayden*,
  865 F.2d 1306 (D.C. Cir. 1989)...................................................................32, 50

*U.S. v. Regan*,
  218 F. App'x 902 (11th Cir. 2007) ....................................................................32

*U.S. v. Sturdevant*,
  2009 WL 10689852 (D.Kan. Dec. 11, 2009)......................................................45

*U.S. v. Turner*,
  19-cr-134, 2020 WL 733187 (M.D.Ala. Jan. 27, 2020) .......................33, 35, 36, 37

## TABLE OF AUTHORITIES - cont'd

PAGE

*Varrone v. Bilotti*,
123 F.3d 75 (2d Cir. 1997)............................................................................53

*Venghaus v. City of Hartford*,
06-cv-01452, 2012 WL 1050014 (D. Conn. Mar. 27, 2012)...................................17

*Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)...........................................................................19, 21, 22

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021) .......................................................................23

*Wagner v. Swarts*,
827 F. Supp. 2d 85 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489
F. App'x 500 (2d Cir. 2012) ................................................................. *passim*

*Wakefield v. Scott*,
2021 WL 10342467 (D.Vt. June 24, 2021) .......................................................44

*Walker v. City of Calhoun, GA*,
682 F. App'x 721 (11th Cir. 2017) .................................................................46

*Washington v. Davis*,
426 U.S. 229 (1976)......................................................................................19, 20

*Whitehead v. Walt Disney Co.*,
2024 WL 3678257 (S.D.N.Y. July 23, 2024) ......................................................47

*Whren v. U.S.*,
517 U.S. 806 (1996).....................................................................................42

*Williams v. City of Aurora*,
2024 WL 1195515 (N.D.Ill. Mar. 20, 2024).......................................................48

*Williams v. City of N.Y.*,
683 F. App'x 57 (2d Cir. 2017) ...........................................................34, 35, 48

**State Cases**

*In re City of N.Y.*,
6 N.Y.3d 540 (2006) .....................................................................................11

## TABLE OF AUTHORITIES - cont'd

PAGE

**Federal Statutes**

42 U.S.C. § 1983 ................................................................................................55, 57, 58, 59

Civil Rights Act of 1964 Title VI ........................................................................... *passim*

**State Statutes**

N.Y. Gen. Mun. Law § 370 ................................................................................................12, 16

N.Y. Veh. & Tr. Law § 375 ................................................................................................10

N.Y. Veh & Tr. Law § 375(12-a)(b) ................................................................................................10

**Rules**

CPLR 7801(1) ................................................................................................11, 15

Fed. R. Civ. P. 23(b)(3) ................................................................................................13, 47

Fed. R. Civ. P. 65(d) ................................................................................................43, 45

Fed. R. Civ. P. 65 ................................................................................................45, 47

**INTRODUCTION**

The City of Buffalo, former Mayor Byron B. Brown, Byron C. Lockwood, Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, and Unknown Officers 1-20 (collectively "the City Defendants"), respectfully submit this memorandum of law in support of their motion for summary judgment. Based on the facts and arguments presented in this brief, the City Defendants request that the Court grant summary judgment in their favor as to each cause of action asserted against them.

**PRELIMINARY STATEMENT**

In the wake of national racial justice movements, local governments and their police departments, understandably, have been the subjects of close scrutiny. As a country, we have been forced to confront the ways in which racism and implicit bias can affect the entities tasked with upholding law and order. This shift in national discourse, however, has not shifted the role of our judicial system in these matters. Courts are still charged with determining whether police policies and practices comply with the Constitution. The Court faces that very challenge in this action. For the reasons presented in this brief, the City Defendants have complied, in all respects, with their Constitutional obligations.

The City of Buffalo and the Buffalo Police Department (the "BPD") are committed to the constitutional and equal enforcement of the law, including the Vehicle and Traffic Law. Notwithstanding this reality, Plaintiffs have alleged a nefarious conspiracy to discriminate against Black and Latino motorists in the City. Plaintiffs have conducted exhaustive and exhausting discovery over the past six years to try and prove their case. Their

efforts have revealed the opposite. At all times under scrutiny, the BPD has adhered to the Constitutional mandates governing traffic patrols.

Plaintiffs' case focuses on vehicle and traffic safety Checkpoints, conducted by the BPD between 2012 and 2018, as well as traffic enforcement generally. Plaintiffs claim that the BPD policies and practices governing these matters violate procedural due process, the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964 and the Fourth Amendment. Plaintiffs particularly focus on the BPD's traffic enforcement efforts on the East Side of Buffalo—an area that has predominately Black residents and a disproportionate amount of crime and gang activity. What Plaintiffs ignore, perhaps purposefully, are the requests from that community for a greater police presence. Former Mayor Byron Brown testified that the East Side community, through block clubs and church groups, requested a greater police presence, including assistance discouraging harmful vehicle and traffic practices. Was the City obligated to disregard the requests of its citizens so as to avoid the impression of unconstitutional overpolicing? Was the BPD required to neglect a large portion of the community it serves simply because of its high minority population? No. The Constitution does not prevent the City from doing exactly what it did here—respond to its citizens' concerns with traffic enforcement and vehicle and traffic safety Checkpoints. As a matter of law, Plaintiffs have not sustained their burden for any of their claims.

The BPD must strike a balance between addressing citizen complaints and concerns, earning public trust, and upholding the law. There is no perfect solution to achieve this balance, and the BPD worked hard to do so with its traffic enforcement efforts that Plaintiffs challenge. While Plaintiffs may contend that the City did not follow "best practices," this Court

2

need not adjudicate "best practices," only constitutional ones.  To allow Plaintiffs' challenge to proceed is to obligate the judiciary to second guess law enforcement practices—whether those practices are the "best," whether those practices serve everyone, and whether those practices conform to the Plaintiffs' ideals of what law enforcement agencies should do.  A review of the record here requires the Court to uphold the BPD's traffic enforcement policies as constitutional.

## FACTUAL BACKGROUND

The Mission of the Buffalo Police Department

The equal administration and enforcement of the law is a core mission of the BPD.  This mission is reflected in the BPD's Manual of Procedures ("MoP").  Declaration of Peter A. Sahasrabudhe dated February 7, 2025 (hereinafter "Sahasrabudhe Decl."), Exhibit 7 dated January 24, 2024 (hereinafter "Gramaglia Dep. 2") at ¶ 45:10-47:20; *see also* Sahasrabudhe Decl., Exhibit 39 at 16, 18.  Section 2.12 of the MoP, entitled "Attitude and Impartiality" states "[e]mployees, while vigorous and unrelenting in the enforcement of the law, must maintain a strictly impartial attitude toward complainants, violators, witnesses and suspects."  *Id.* at p. 16.  Section 3.2(b) of the MoP, entitled "Conduct" further states "[n]o employee shall conduct himself in such a manner, or perform any act, which is prejudicial to the good order, discipline or reputation of the Department, although such action is not specifically prohibited by any rule or order . . ."  *Id.* at p. 18.  All officers are expected to act in accordance with the MoP.  Sahasrabudhe Decl., Exhibit 6 dated September 22, 2023 (hereinafter "Gramaglia Dep. 1") at 178:22-180:1.

These policies apply to all aspects of policing, including traffic enforcement. In 2021, the BPD again affirmed its commitment to equality in traffic enforcement as stated in General Order 2021-009 (the "Order"). Sahasrabudhe Decl., Exhibit 40. The Order sets forth the five core principles of traffic enforcement:

**Traffic Enforcement and Safety.** The purpose of conducting traffic enforcement is to favorably alter the violator's future driving behavior and to foster public safety. Members shall engage in traffic enforcement for public safety purposes and not for the purpose of making an arrest.

**Constitutional Stops.** Members may conduct a brief vehicle stop for a traffic violation when the member has Probable Cause to believe that the driver has committed a traffic violation. The stop may last no longer than the time reasonably required to issue a summons for the violation.

**Procedural Justice.** Procedural justice refers to the perception of fairness in an encounter. ***Members shall treat all persons with dignity and respect, give persons a voice during encounters, be impartial in their decision making, and convey trustworthy motives.***

**Non-Discriminatory Policing**. ***Members shall not consider demographic category (including but not limited to race, ethnicity, national origin, religion, gender, sexual orientation, age, disability, gender identity or expression, or affiliation with any other similar identifiable group) as a factor in conducting a vehicle stop. Targeting specific neighborhoods for traffic enforcement based on these demographic categories is a form of discriminatory policing and is prohibited.***

**Least Intrusive Response.** Considering the circumstances presented at the time, members should always take the least intrusive action, consistent with the goal of public safety. For most minor violations, warrantless arrest is not the preferred option, and certain violations only allow for the issuance of a traffic summons or a traffic stop receipt (P-1389) and not arrest. A member should issue a summons or make an arrest only when doing so directly advances the goal of public safety, and the situation cannot be

4

> effectively resolved in a less intrusive manner with the issuance of
> a traffic stop receipt.

*Id.* at pp. 1-2 (emphasis added).  Though these principles have been taught in the police academy and practiced by the BPD for decades, in line with modern policing strategies, the Order was issued to explicitly reiterate and reinforce these principles.  *See* Gramaglia Dep. 1 at 85:20-86:19.

From their time at the Erie County Law Enforcement Academy through their employment with the BPD, officers are taught that all members of the community must be treated with courtesy and respect—regardless of their race.  Sahasrabudhe Decl., Exhibit 8 dated January 24, 2024 (hereinafter "Banaszak Dep.") at 30:4-31:22; Sahasrabudhe Decl., Exhibit 9 dated July 19, 2023 (hereinafter "Hy Dep.") at 225:12-228:2.

The Strike Force & Housing Unit

In 2012, the City needed a solution to address residential complaints and concerns surrounding traffic safety.  *See* Sahasrabudhe Decl., Exhibit 10 dated November 6, 2023 (hereinafter "Brown Dep.") at 57:4-58:1.  Residents were "very concerned about people going through stop signs, going through traffic signals, speeding in their neighborhoods, [and] endangering children and seniors. . ." *Id.* at 57:18-23.  Part of the solution to this issue was the creation of the BPD Strike Force and Housing Unit in 2012.  These units were proactive units that were not "tied to the radio."  Sahasrabudhe Decl., Exhibit 11 dated November 10, 2021 (hereinafter "Derenda Dep. 1") at 16:8-16; Gramaglia Dep. 1 at 14:2-12.  They had specific, permissible purposes.  Gramaglia Dep. 1 at 15:13-17:4; 17:17-18:7.  Responding to community calls for action, the Strike Force was designed to respond to complaints from citizens, enforce

5

the Vehicle and Traffic Law, and reduce gang and gun violence throughout the City.  Gramaglia Dep. 1 at 15:13-16:6, 16:10-17:4; Brown Dep. at 58:12-21.  To accomplish these priorities, the Strike Force was mainly responsible for patrolling locations with high rates of crime or where recent crimes had occurred.  Sahasrabudhe Decl., Exhibit 12 dated December 23, 2021 (hereinafter "Derenda Dep. 2") at 279:16-280:14.

        The Buffalo Municipal Housing Authority ("BMHA") contracted with the City to form the Housing Unit.  Gramaglia Dep. 1 at 17:17-18:7.  The Housing Unit patrolled BMHA properties and responded to any issues arising there.  *Id.*  The unit's patrols intended to remain highly visible within the BMHA properties to deter crime.  Sahasrabudhe Decl., Exhibit 23 dated December 27, 2021 (hereinafter "Serafini Dep.") at 41:1-6.  Housing Unit patrols directly responded to citizen complaints and concerns while patrolling BMHA properties.  Sahasrabudhe Decl., Exhibit 13 dated April 29, 2022 (hereinafter "Russo Dep.") at 99:18-100:9; 102:14-103:16.  The Housing Unit also proactively enforced the VTL in and around BMHA properties.  Sahasrabudhe Decl., Exhibit 20 dated November 8, 2023 (hereinafter "Miller Dep.") at 48:22-49:11.

Vehicle and Traffic Safety Checkpoints

        During their times in operation, both the Strike Force and Housing Unit conducted vehicle and traffic safety checkpoints (the "Checkpoints").  *See* Derenda Dep. 1 at 74:13-14; 92:8-12.  The primary purposes of the Checkpoints were traffic safety and high visibility to curtail the unsafe operation of vehicles.  Derenda Dep. 1 at 21:6-18; Russo Dep. at 194:13-21; Sahasrabudhe Decl., Exhibit 41.

6

Checkpoint locations were established based on a variety of factors. Initially, former Commissioner Derenda set the Checkpoint locations for Strike Force. Sahasrabudhe Decl., Exhibit 14 dated March 16, 2022 (hereinafter "Brinkworth Dep.") at 73:17-21. His decisions regarding Checkpoint locations were based on multiple factors. First, complaints from residents and block clubs helped the former Commissioner determine where Checkpoints should be located. Derenda Dep. 1 at 96:3-97:2. Many of these complaints came from residents in neighborhoods with high minority populations, like the East Side of Buffalo. *See* Brown Dep. at 57:4-58:21, 15:15-22. These complaints included reports of individuals driving without licenses, speeding, and engaging in other unsafe driving behaviors. Derenda Dep. 1 at 96:3-97:2. Checkpoint locations were also determined based on where Strike Force officers were assigned to patrol and where BMHA properties were located. Derenda Dep. 1 at 50:9-14. After some time, BPD lieutenants began setting the Checkpoint locations based on these factors. Brinkworth Dep. at 73:17-21.

The BPD Roadblock Directives (the "Directives") governed the operation of Checkpoints. Sahasrabudhe Decl., Ex. 41. As stated in the Directives, the Checkpoints' purpose was "roadway safety." *Id.* BPD policy required that all officers assigned to the Checkpoints be given a copy of the Directive prior to the Checkpoint's operation. *Id.* In setting up the Checkpoints, the Directives instructed officers as follows:

- Make the roadblock obvious. Overhead flashing lights must be activated on all vehicles taking part in the roadblock.

- The roadblock must not be unreasonably intrusive to motorists.

- Set the roadblock up in a way that minimizes the possibility of avoiding it.

7

- The above roadblock must begin at the above stated times.

*Id.* Based on these factors, Checkpoints were set up at an intersection or heavily trafficked road. Hy Dep. at 22:2-19. BPD would place several cars in the center of or on the side of the street with their lights on, so that the Checkpoint was visible from a distance. *Id.* Cars approached the Checkpoints. BPD did not select cars to stop. Vehicles approaching the Checkpoint would drive up to an officer or officers stationed in the center of the road. *Id.*

Officers assigned to Checkpoints had the following objectives:

- Check all drivers and passengers for seatbelts.
- Check all vehicles for valid registration stickers.
- Check all vehicles for valid inspection stickers.
- Act on any and all probable cause resulting from information obtained from the mobile plate reader or from plain view observations.
- Write summons for all who are in violation of any of the above or other NYS Vehicle & Traffic Laws.

Sahasrabudhe Decl., Ex. 41. If there were no visible traffic violations, the motorist was waved through the Checkpoint. *See* Hy Dep. at 22:2-19. A substantial number of individuals who went through Checkpoints received no tickets and were stopped for only a brief period of time. *See* Sahasrabudhe Decl., Exhibit 15 dated July 18, 2023 (hereinafter "Domaracki Dep.") at 36:13-37:10. If an officer observed a VTL violation, the officer instructed the motorist to park to the side of the road and would then issue a traffic summons. Hy Dep. at 23:15-24:13; 31:9-32:6. If no probable cause for an arrest arose or was observed by the officer during the interaction, motorists were permitted to drive away. *Id.*

8

Under former BPD Commissioner Byron Lockwood's tenure, the Strike Force and Housing Unit were both disbanded. *See* Sahasrabudhe Decl., Exhibit 22 dated April 1, 2022 (hereinafter "Quinn Dep.") at 16:12-14 (Strike Force); Sahasrabudhe Decl., Exhibit 19 dated August 17, 2023 (hereinafter "Lockwood Dep. 2") at 217:5-218:5 (Housing Unit). The Checkpoints have not been reinstated since. Former Commissioner Joseph Gramaglia did not reinstate the Checkpoints during his tenure. *See* Gramaglia Dep. 1 at 181:19-182:10. [1] Commissioner Alfonso Wright assumed his role as Commissioner directly after former Commissioner Gramaglia. Sahasrabudhe Decl., Exhibit 5 ¶ 2 dated February 6, 2025. Commissioner Wright will not reinstitute Checkpoints during his tenure. *Id.* at ¶ 6.

Traffic Enforcement and Tinted Windows

Two of the BPD's goals in enforcing the VTL are "to favorably alter the violator's future driving behavior and to foster public safety." Sahasrabudhe Decl., Ex. 40. Like police departments across the country, BPD officers write traffic tickets to enforce the VTL and accomplish these goals. Contrary to one of Plaintiffs' theories of this case, the BPD does not incentivize its officers to write more tickets, financially or otherwise.

Officers are not required to meet any ticket quotas. Sahasrabudhe Decl., Exhibit 28 dated November 4, 2021 (hereinafter "Wilcox Dep.") at 133:18-134:1. BPD command did not advise officers that they would receive overtime for writing more tickets, nor did they receive

---

[1]    The vehicle and traffic safety Checkpoints at issue here differ from DWI Checkpoints. The City's lack of plans to reinstate the vehicle and traffic safety Checkpoints does not apply to DWI Checkpoints, which the City reserves the right to implement in areas where there is a high frequency or likely to be a high frequency of drunk driving.

overtime pay for writing more tickets. *See* Sahasrabudhe Decl., Exhibit 24 dated March 5, 2021 (hereinafter "Skipper Dep.") at 119:14-120:7; Sahasrabudhe Decl., Exhibit 25 dated March 23, 2023 (hereinafter "Thomas Dep.") at 116:7-117:12 (testifying she was never told that more overtime would be available for officers who wrote more tickets); Serafini Dep. at 261:19-23 (testifying that overtime was not a reward). BPD command did not pressure officers to write more tickets. *See* Wilcox Dep. at 133:18-134:12; Hy Dep. at 30:7-16 (testifying he was never instructed to write more tickets at Checkpoints); Thomas Dep. at 118:15-119:13. The number of tickets an officer wrote simply was not connected to any professional or financial incentives, despite Plaintiffs' groundless allegations.

One of the VTL violations commonly ticketed by the BPD is tinted windows. In New York, tints on car windows and windshields cannot block more than 30% of light. *See* N.Y. Veh. & Tr. Law § 375 (12-a). In practice, any form of aftermarket tint violates the law. Domaracki Dep. at 96:21-97:6. Under New York State Vehicle & Traffic Law, officers are permitted to issue as many tinted window tickets as there are tinted windows on a vehicle. N.Y. Veh & Tr. Law § 375(12-a)(b). Thus, police officers in New York retain the discretion to determine how many tickets to issue for tinted windows on a vehicle. *See* Sahasrabudhe Decl., Exhibit 18 dated August 10, 2023 (hereinafter "Lockwood Dep. 1") at 73:16-74:16. BPD officers vary—some have written four tickets for four tinted windows, some have written one ticket for four tinted windows, and others have issued different numbers of tickets for the offenses. Ultimately, the number depends upon the officers' discretion. Regardless, traffic court and the Buffalo Traffic Violations Agency have often reduced multiple tinted window tickets

down to one.  *See* Sahasrabudhe Decl., Exhibit 26 dated June 8, 2023 (hereinafter "Villegas

Dep.") at 122:18-123:23.

The Buffalo Traffic Violations Agency ("BTVA")

   In 2015, New York State created the BTVA to assist the Buffalo City Court in the

adjudication of noncriminal traffic infractions.  Sahasrabudhe Decl., Exhibit 21 dated May 26,

2022 (hereinafter "Morgera Dep.") at 18:2-5; 19:20-20:3.  The BTVA processes all traffic tickets

issued in the City of Buffalo.  Villegas Dep. 43:21-45:9.  The BTVA was designed to give

motorists ticketed in the City alternatives to resolve their tickets, as is done in virtually all town

and village courts across the State.  Villegas Dep. at 39:8-40:16.  Specifically, ticketed motorists

can take a plea offer or proceed to traffic court before a judicial hearing officer.  Morgera Dep. at

26:6-23.  If a person chooses to proceed to a trial, the judicial hearing officer will make a final

determination.  *Id.*  Individuals may appeal the officer's determination in Erie County Court.

Sahasrabudhe Decl., Exhibit 42.  The ability to challenge a BTVA determination in County

Court mirrors other New York motorists' abilities to file Article 78 challenges to VTL

determinations made by traffic agencies. *See* N.Y. CPLR 7801(1); *In re City of N.Y.*, 6 N.Y.3d

540, 547 (2006) (noting that a person aggrieved by an agency's determination must challenge

that decision with a timely Article 78 proceeding in State Supreme Court); *see also Torres v.

City of N.Y. through the N.Y.C. Dep't*, 590 F. Supp. 3d 610, 617 (S.D.N.Y. 2022).

   Under State law, the City's creation of the BTVA allows it to keep most of the

revenue derived from the adjudication of traffic tickets.  Morgera Dep. at 21:11:-22:7.  Prior to

the establishment of the BTVA, all revenues from traffic violations went to the State.  *Id.* at 22:8-

11

12.  Buffalo's traffic agency is not an outlier.  Other municipalities throughout the State, including Nassau County, Suffolk County, and Rochester, have developed similar traffic violation agencies pursuant to New York law.  N.Y. Gen. Mun. Law § 370 (McKinney); *see also* Villegas Dep. at 31:7-22.

## PROCEDURAL HISTORY

On June 28, 2018, Plaintiffs filed this action against the City of Buffalo, the BPD, and various high-ranking officials and personnel, including former Mayor Byron Brown. Sahasrabudhe Decl., Exhibit 1 dated June 28, 2018.  On May 21, 2020, Plaintiffs filed the operative amended class action complaint.  Sahasrabudhe Decl., Exhibit 3 dated July 30, 2018 (hereinafter "Compl.").  Plaintiffs make four claims against the City Defendants: (1) violation of the Fourth Amendment; (2) violation of the equal protection clause of the Fourteenth Amendment; (3) violation of the due process clause of the Fourteenth Amendment; and (4) violation of Title VI of the Civil Rights Act of 1964.  *Id.* at pp. 68-72.  These claims arise from what Plaintiffs allege to be discriminatory traffic enforcement against Black and Latino drivers in the City of Buffalo.  *See generally id.*

Shortly after filing this action, Plaintiffs embarked on a discovery expedition of epic proportions.  To this day, Plaintiffs continue to advance demands for documents and records and to seek additional depositions.  The discovery Plaintiffs have received in this case has included well over thirty depositions of defense witnesses, *see* Dkt. No. 160, thousands of traffic stop-related records spanning over a decade, and hundreds of files of body camera footage.  *See* Sahasrabudhe Decl. ¶ 5-9.  Due in large part to the number and breadth of demands made by Plaintiffs, discovery in this case has been ongoing since 2018.

On May 29, 2024, Plaintiffs filed their Motion for Class Certification.  *See* Dkt. Nos. 93-105.  Plaintiffs sought to certify three proposed classes: (1) the Checkpoint Class; (2) the Tinted Windows Class; and (3) the Traffic Enforcement Class.  The Checkpoint and Tinted Windows Proposed Classes demand damages pursuant to Fed. R. Civ. P. 23(b)(3).  *See generally* Dkt. No. 211.  The Traffic Enforcement Class seeks injunctive relief.  *See id.*  After the Class Certification Motion was fully briefed by both sides, the Court held oral argument on October 23, 2024.  Dkt. No. 244, p. 1.  Subsequently, the Court granted leave for Plaintiffs to file supplemental briefing on a limited number of issues and for the City to file a response.  *See* Dkt. Nos. 241, 245.  At the time of the filing of the instant Motion, the Motion for Class Certification remains pending.  To the extent the Court renders a decision on the Motion for Class Certification that renders any of the following arguments moot, the Court need not consider those arguments.

## ARGUMENT

**POINT I.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW**

**A.    Plaintiffs Were Afforded More than Sufficient Procedural Due Process.**

Plaintiffs' third cause of action can readily be dismissed.  That cause of action purports to seek relief for a violation of Plaintiffs' "procedural due process" rights under the Fourteenth Amendment.   Compl. ¶¶ 445-450.  According to Plaintiffs' Amended Complaint, because members of the Buffalo Police Department have enforced traffic laws against them (at Checkpoints and otherwise), and because there are associated fines that go to the City of Buffalo after the creation of the BTVA, Defendants have violated their due process rights.  *See id.*  This claim has no basis in law and has no merit.

13

To succeed on a cause of action alleging a violation of procedural due process rights, a plaintiff must demonstrate that they were deprived of their liberty or property interests without constitutionally required procedural protections. *Torres*, 590 F. Supp. 3d at 617 (citing *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011)). Constitutional process is satisfied when a plaintiff is provided notice of the deprivation and opportunity to be heard in opposition. *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). Generally, to determine whether a state or municipal entity's procedural safeguards satisfy minimal constitutional requirements, courts apply the three-factor test set forth by the Supreme Court in *Matthews*. *Id.* Under that test, the Court must weigh and balance: (1) the private interest at stake; (2) the risk of erroneous deprivation and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including administrative burdens, that the additional procedural requirements would entail. *Id.*

Here, however, the Court need not labor in applying the *Matthews* test to a new set of facts. Other courts throughout this Circuit have already held that the procedural safeguards available to motorists throughout New York State, which mirror those available to motorists in Buffalo, satisfy minimal constitutional requirements under the *Matthews* test. *Torres*, 590 F. Supp. 3d at 617-618. Courts have uniformly held that, when a municipality provides for an administrative hearing where a motorist can challenge a ticket, citation, or other traffic enforcement measure taken by a police officer, and the motorist also has an ability to appeal any findings made in the administrative proceeding, minimal constitutional process has not only been met but exceeded. *Tsinberg v. City of N.Y.*, 20-cv-749, 2021 WL 1146942, at *5 (S.D.N.Y. 2021) (collecting cases); *Kelly v. Rice*, 375 F. Supp. 2d 203, 210 (S.D.N.Y. 2005); *Torres*, 590 F.

14

Supp. 3d at 617-618.   In cases like *Tsinberg*, *Kelly*, and *Torres*, the courts held that motorists in

New York City were afforded the minimal process "due" under the Constitution where they

could challenge citations and traffic enforcement measures in proceedings before Administrative

Law Judges ("ALJ's") and then subsequently challenge determinations made by ALJ's in NY

CPLR Article 78 proceedings.  *Id.* Motorists in the City of Buffalo, including Plaintiffs, can avail

themselves of almost identical procedures.  As in New York City, discussed in these three cases,

Plaintiffs here have no cause of action for a violation of their procedural due process rights.

       Indeed, it is undisputed that our Plaintiffs, after receiving a ticket, had an

opportunity to challenge the citation and potentially avoid a fine or other deprivation in

proceedings held by BTVA's Judicial Hearing Officers. Morgera Dep. at 26:6-23.  It is further

undisputed that, if Plaintiffs were unhappy with the Judicial Hearing Officers' determination,

they could appeal those determinations either through an appeal to New York State County Court

or through an Article 78 proceeding.  Sahasrabudhe Decl., Ex. 42; *see* CPLR 7801(1).  Under

applicable authority**,** these procedures satisfy constitutional requirements, and Plaintiffs simply

have no claim for a procedural due process violation.  *Tsinberg*, 2021 WL 1146942, at *5;

*Torres*, 590 F. Supp. 3d at 617-618.[2]  The process afforded to motorists in Buffalo mirrors, if not

exceeds, those afforded to motorists in New York City.  Many of the named Plaintiffs utilized

these procedures to have their citations or tickets dismissed. *See* Sahasrabudhe Decl., Exhibit 38

---

[2]     As explained in *Torres*, it is irrelevant for purposes of procedural due process that certain
Plaintiffs received multiple tickets for tinted windows. *Torres*, 590 F. Supp. 3d at 617.
Because Plaintiffs had a constitutionally valid procedure for challenging their tickets,
their procedural due process rights were not violated.  Further, as explained in *Torres*, the
issuance of multiple citations for the same violation does not constitute a procedural due
process violation.  *Id.*

dated December 15, 2022 (hereinafter "Bonds Dep.") at 77:20-78:1; Sahasrabudhe Decl., Exhibit 33 dated September 6, 2023 (hereinafter "Redden Dep.") at 74:11-75:8; Sahasrabudhe Decl., Exhibit 30 dated December 13, 2022 (hereinafter "Yeldon Dep.") at 99:17-21.  Given that Plaintiffs in some instances utilized the available procedures to avoid a penalty or fine, they cannot plausibly argue that the process afforded by the BTVA and New York State is somehow constitutionally deficient.  *Kelly*, 375 F. Supp. 2d at 210.

Plaintiffs' misguided procedural due process claim seems to stem from a fundamental misconception.  As Plaintiffs see it, because the BTVA, acting on behalf of the City of Buffalo, collects fines associated with traffic and parking citations, this automatically gives them a claim against the City of Buffalo under the due process clause.  But Plaintiffs ignore the fact that traffic laws are enforced throughout New York State and throughout the country through the imposition of fines that are collected by *some* government entity.  Indeed, prior to the creation of the BTVA, the State of New York collected fines from motorists like Plaintiffs.  Morgera Dep. at 22:8-12.  And other municipalities throughout the State began collecting fines for traffic tickets far before Buffalo did.  *See* N.Y. Gen. Mun. Law § 370 (McKinney); *see also* Villegas Dep. at 31:7-22.  Did motorists who paid a fine to New York State have viable a procedural due process claim against the State simply because it is collected a fine from them for their traffic violations?  Do motorists in other municipalities have procedural due process claims against other cities or towns simply because those entities collect fines for traffic violations within their jurisdiction?  Of course not.  If that were the case, federal courts would be saddled with adjudicating the propriety of thousands upon thousands of traffic tickets throughout multiple jurisdictions.  That is not how the law works.

16

Rather, traffic enforcement and adjudication of traffic violations is left to the states and local governments. So long as the procedures provided by the states and local governments comport with minimal constitutional requirements, no need for federal court involvement exists. Because Buffalo and New York State's procedures clearly comply with minimal constitutional requirements, there is no need for the Court to involve itself here—at least from a due process perspective. The procedural safeguards implemented for traffic violations by New York State and Buffalo are more than adequate, and so Plaintiffs' Fourteenth Amendment procedural due process claim must be dismissed.

**B.    Plaintiffs Do Not Have Any Viable Substantive Due Process Claim Under the Fourteenth Amendment.**

Plaintiffs' "due process" claim focuses on principles of procedural due process, not substantive due process. Plaintiffs seem to have admitted as much during class certification briefing. Dkt. No. 211 at, pp. 38-39. However, to the extent Plaintiffs now try to take the position that their claim invokes principles of substantive due process, their claim still must fail as a matter of law.

Put simply, Plaintiffs' allegations, which focus on traffic enforcement efforts of the City of Buffalo, do not implicate the type of "fundamental rights" required to maintain a claim based on a substantive due process violation. *See Venghaus v. City of Hartford*, 06-cv-01452, 2012 WL 1050014, at *8 (D. Conn. Mar. 27, 2012) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.") In fact, Courts have held that the traffic related penalties of which Plaintiffs complain here are insufficient to invoke the substantive due process clause of

17

the Fourteenth Amendment. *Leder v. Am. Traffic Solutions, Inc.*, 81 F. Supp. 3d. 211, 224

(E.D.N.Y. 2015) (collecting cases); *Reyes v. Cnty. of Suffolk*, 995 F. Supp. 2d 215, 230

(E.D.N.Y.2014) ("Therefore, since the Complaint alleges that the Plaintiff's property interest is

the use and possession of his vehicle, he has failed to state a claim for violation of substantive

due process.").

Moreover, to the extent Plaintiffs seek to base a substantive due process claim on

their allegation that BPD has violated their Fourth Amendment rights, the claim would be

duplicative of other claims Plaintiffs bring in this case. This duplication, too, necessitates

dismissal of any "substantive due process" claim Plaintiffs purport to bring. *Hawthorne by

Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 303-304 (S.D.N.Y. 2020); *Harris v. City of

N.Y.*, 16-cv-1214, 2018 WL 4471631, at *10 n.17 (S.D.N.Y. Sept. 18, 2018) ("To the extent that

Plaintiff attempts to assert a separate substantive 'due process' deprivation of liberty claim based

on the same conduct that underlies her Fourth Amendment claims for false arrest or unlawful

strip search, this claim is dismissed as duplicative.").

Given this reality, Plaintiffs cannot maintain a due process claim of any kind. The

third cause of action in the Amended Complaint must therefore be dismissed.

## C.    The City Defendants Have Not Violated the Equal Protection Clause of the Fourteenth Amendment.

Plaintiffs' second cause of action must also be dismissed. This claim alleges that

Defendants violated Plaintiffs' right to equal protection of the law under the Fourteenth

Amendment. Compl. ¶¶ 440-444. According to Plaintiffs, the former Mayor of the City of

Buffalo, two separate police commissioners, and BPD's command staff intentionally conspired to target and exploit minorities living in the City's East Side. *See id.* These allegations, while scandalous, have no basis in fact. They are simply not supported by the volumes of evidence Plaintiffs have received throughout the cumbersome discovery process in this litigation. What the evidence actually shows is that the BPD responded to requests and complaints from East Side residents and decided to proactively enforce traffic laws in the neighborhoods from which the requests and complaints were received. While this may have led to a higher frequency of traffic citations on the East Side, this does not mean that minority motorists were targeted based on their race. No evidence even suggests that happening. Because there was no discrimination in BPD's traffic enforcement policies, let alone intentional discrimination, Plaintiffs' Fourteenth Amendment claim necessarily fails.

　　　　　"To state a race-based claim under the Equal Protection Clause, plaintiffs must allege that a government actor intentionally discriminated against them on the basis of their race." *Brown v. City of Oneonta*, *N.Y.,* 221 F.3d 329, 337 (2d Cir. 2000). Plaintiffs can do this by showing that a law or policy expressly classifies individuals based on their race. *Id.* Alternatively, a plaintiff may attempt to demonstrate that a facially neutral law has been applied in ***an intentionally discriminatory*** manner. *Id.* (emphasis added). To make this showing, a plaintiff must demonstrate that enforcement of the laws or policies at issue not only has a discriminatory effect, but also was ***motivated by a discriminatory purpose***. *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)) (emphasis added).

In this case, Plaintiffs have no evidence that BPD implemented a policy that classified individuals based on their race.  Nor do Plaintiffs have any evidence that BPD was ever motivated by a discriminatory purpose when enforcing traffic laws on the East Side of Buffalo.  Plaintiffs' equal protection claim thus fails as a matter of law.

1.    The City of Buffalo had no law or policy that expressly classified motorists based on race.  The policies at issue were race neutral

There is no argument that BPD implemented policies that expressly classified motorists based on race.  BPD's Checkpoint policy makes no mention of race, and the race of motorists was not considered when deciding where and when to operate a Checkpoint. Sahasrabudhe Decl., Ex. 41; Derenda Dep. 2 at 258:7-14, 312:10-18.  Outside of Checkpoints, BPD's policy makes no mention of race, and officers are taught to base traffic stops on VTL violations, not a motorist's race.  *See* Sahasrabudhe Decl., Ex. 40; Sahasrabudhe Decl., Ex. 39, pp. 16, 18.  So, Plaintiffs cannot rely on any express racial classification to support their equal protection claim.  Rather, Plaintiffs must show that enforcement of BPD's race neutral policies were motivated by discriminatory animus or applied in an intentionally discriminatory manner. *Brown*, 221 F.3d at 337.  For the reasons to follow, Plaintiffs are not able to make that showing.

2.    The City of Buffalo's traffic enforcement policies were not applied in an intentionally discriminatory manner or motivated by racially discriminatory intent

The evidence fails to show any discriminatory intent by City Officials. Discriminatory intent or purpose typically refers to those instances when a government actor seeks to disadvantage or negatively impact a group of persons. *See, e.g., Washington*, 426 U.S. at 245–46 (concluding that purposeful discrimination was not present in a police officer's examination designed simply to test the level of an applicant's verbal skills, even though black

20

candidates suffered disproportionate adverse effects); *Arlington Heights*, 429 U.S. at 268–71, (finding that, ***although the ultimate effect of a policy was discriminatory, there was no intent to discriminate when the record aptly demonstrated the decision was motivated by zoning, not racial, concerns***) (emphasis added); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 230 (1995) (an "individual suffers an injury when he or she is disadvantaged by the government because of his or her race ....") (emphasis added).

    As revealed through discovery, there is no evidence that any BPD Commissioner or official sought to disadvantage or negatively impact minority motorists. At best, the evidence shows that City Officials might have been aware that, by responding to citizen complaints and proactively enforcing traffic on the East Side, more minorities would be ticketed. However, mere knowledge of a disparate impact is insufficient to show discriminatory intent. *Arlington Heights*, 429 U.S. at 268–70. Rather, what the evidence shows is that City officials' intent had nothing to with race, and instead was focused on making the East Side safer. Checkpoints were only put in place because of complaints received by East Side residents. Brown Dep. at 57:4-58:1; Derenda Dep. 1 at 96:3-97:2. And, the proactive approach to traffic enforcement generally taken by the Strike Force and Housing Unit was also in response to a request for a higher police presence on the East Side. *Id.* While Plaintiffs may disagree with the manner in which BPD sought to achieve its goal or purpose, the policies and law enforcement procedures implemented by BPD had nothing to do with their race. The Court should recognize that, despite taking over thirty depositions, Plaintiffs have adduced no evidence whatsoever that any member of the BPD even considered targeting them, let alone targeted them because of their race.

In fact, for the sake of argument, even crediting Plaintiffs' allegations that BPD instituted Checkpoints and enforced traffic on the East Side for "general crime control purposes,"[3] this would still be inconsistent and fatal to their equal protection claim.  *See, e.g.*, Compl. ¶¶ 4, 36.  If BPD and City officials were motivated by a desire to prevent crime on the East Side, or intended to reduce crime on the East Side, this would actually show that crime control—and not race—motivated BPD's traffic enforcement policies.  *See 219 S. Atl. Blvd. Inc. v. City of Ft. Lauderdale*, 239 F. Supp. 2d 1265, 1276-1277 (S.D. Fla. 2002) (where goal of prevention of crime was animating purpose behind law enforcement activity, no equal protection claim could be maintained).

In short, whether BPD and the City were motivated to respond to requests for assistance by residents for the East Side, or whether BPD was motivated by a desire to prevent crime, they certainly were not motivated by race.  Race played no role in the City of Buffalo's traffic enforcement efforts, and the equal protection claim must be dismissed.  *Arlington Heights*, 429 U.S. at 268–7.

3.    <u>Statistical disparities alone do not show discriminatory intent</u>

Defendants anticipate that, rather than pointing to actual evidence of racial motivation for actions taken by relevant decision makers, Plaintiffs will point to statistical disparities between the rates that white motorists and minority motorists were ticketed in the City of Buffalo.  The problem with Plaintiffs' position, however, is that statistical disparities alone,

---

[3]    Allegations that are not supported by the evidence, as demonstrated in Section E, below.

without evidence of actual discriminatory intent, are insufficient to prove intentional

discrimination for equal protection purposes. *Vitolo v. Guzman*, 999 F.3d 353, 362 (6th Cir.

2021) (explaining that statistical disparities alone do not support an equal protection claim).  In

fact, in dealing with a case involving allegations of racial discrimination in traffic enforcement,

this Court held that statistical disparities alone are not enough to show intentional discrimination

by law enforcement. *Moore v. Bitca*, 19-cv-00035, 2020 WL 5821378, at *23 (D. Vt. Sep. 30,

2020) (Reiss, J.) (holding that data showing statistical disparities in race of motorists stopped by

town police department "does not establish a cause of action on Plaintiff's behalf because

disparate impact alone does not establish intentional discrimination.").

       This rule exists for good reason.  Statistical disparities may exist for a multitude

of reasons—and correlation does not equal causation.  As explained by the City Defendants'

statistical expert Dr. David Banks, there are many reasons why one group of motorists may be

ticketed at a higher rate than another that have nothing to do with race.  Sahasrabudhe Decl.,

Exhibit 43 dated July 13, 2024 (hereinafter "Banks Report"), pp. 4-8.  For example, if one group

of motorists is more distrustful of police, this may lead to them driving with tinted windows at a

higher rate than other groups.  Of course, a natural consequence would be that this group would

experience more citations for tinted window violations.  *Id*.  Socio-economic status may make

certain motorists less likely to pay to have necessary repairs done, or to be up to date on their car

inspections and insurance.  *Id.*  Again, a natural consequence would then be these motorists

getting ticketed at a higher rate for things like insurance lapses, failure to make required repairs,

and failure to keep a registration up to date.  *Id.*  The higher rate of ticketing has nothing to do

with race, but rather is based on factors over which the police (and sometimes the motorist) have

no control.  Economic disparities do not equate to intentional discrimination.  For precisely these reasons, a plaintiff seeking to establish a violation of the Fourteenth Amendment Equal Protection Clause is required to provide evidence of intentional discrimination along with statistics.

Plaintiffs have failed to adduce that kind of evidence here.  Beyond statistics, Plaintiffs have no evidence of intentional discrimination by BPD.  For this reason, as well, their equal protection claim must be dismissed.  *Moore*, 2020 WL 5821378, at *23.

4.    *Floyd v. City of N.Y.* is distinguishable

Plaintiffs have obviously modeled their approach in this case to the one taken by Plaintiffs in the case of *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013).  The same firms and offices which represented the plaintiffs in that case represent the Plaintiffs here.  But that case is highly distinguishable from this one—especially for equal protection purposes.

*Floyd* focused on NYPD's implementation of an investigatory tactic known as "stop and frisk."  *Id.* at 556.  The plaintiffs in *Floyd*, like Plaintiffs here, adduced evidence that minority residents of New York City were more likely to be stopped and frisked than white residents.  *Id.*  There is a glaring difference between Floyd and this case.  In *Floyd*, the evidence showed—and NYPD even acknowledged—that it was using race as a factor in determining whom to stop and frisk.  *Id.* at 603.  High ranking officers testified under oath that, in many instances, it was appropriate to stop and frisk individuals if they belonged to a certain racial demographic.  *Id.*  This testimony ***in addition to*** Plaintiffs' statistical data, was sufficient for the Court to find a violation of the Equal Protection Clause.  *Id.*

24

In contrast to *Floyd*, there is absolutely no evidence that BPD command staff (or anyone at BPD for that matter) encouraged officers to make stops based on a motorist's race. In reality, under the applicable BPD policies, race is not to be considered at all in making traffic stops. At Checkpoints, every vehicle was supposed to be temporarily stopped. Hy Dep. at 22:2-19; Sahasrabudhe Decl., Ex. 41. The vehicles were stopped, as opposed to the people inside them, and the officers made the stops without any regard for the race of the motorist inside the vehicle. Sahasrabudhe Decl., Ex. 41; Derenda Dep. 2 at 258:7-258:14, 312:10-312:18. As to traffic enforcement generally, BPD's policies clearly state that vehicles, not people, are generally only to be stopped when the vehicle commits a clear violation of the VTL. *Id.* Absent exceptional circumstances, BPD officers are never allowed to consider the race of a motorist when making a traffic stop of a vehicle. Sahasrabudhe Decl., Ex. 40; Sahasrabudhe Decl., Ex. 39, pp. 16, 18. In *Floyd*, people were allowed to be stopped and frisked, in part, due to their race. 959 F. Supp. 2d at 603. Here, vehicles can only be stopped for reasons that have nothing to do with race. *Floyd* is thus inapplicable, and Plaintiffs have failed to demonstrate an equal protection violation like that in *Floyd*. *See Pinter v. City of N.Y.*, 976 F.Supp. 2d 539, 567 n.127 (S.D.N.Y. 2013) (distinguishing *Floyd* where New York City did not have a policy of directing its officers to target gay men).

5.     <u>None of the named Plaintiffs have shown that their race played any role in the traffic enforcement actions taken against them</u>

Similar to their failure to demonstrate policy-based discrimination against them, the named Plaintiffs have failed to adduce any evidence that the actual traffic enforcement actions taken against them had anything to do with their race. Jasmine Evans (formerly identified as Jane Doe), Joseph Bonds, Shaketa Redden, and Taniqua Simmons received tickets

25

at Checkpoints. *See* Sahasrabudhe Decl., Ex. 37 dated December 15, 2022 (hereinafter "Evans Dep.") at 77:10-77:14; 82:14-82:2; 58:10-58:14; Bonds Dep., at 84:21-85:3; Sahasrabudhe Decl., Ex. 31 dated May 16, 2023 (hereinafter "Simmons Dep.") at 25:14-25-18; *Compl.* ¶ 246.

During depositions and in their pleadings, each of these Plaintiffs admitted that they were ticketed for legitimate VTL violations. Evans was ticketed for three seat belt violations associated with her own lack of a seat belt, improper car seats for her two children, and for driving on a learner's permit. *See* Evans Dep. at 77:10-77:14; 82:14-82:2; 58:10-58:14. Evans admitted these violations were legitimate at the time she was ticketed for them. *Id.* Bonds alleges that he was ticketed for expired insurance and an expired inspection sticker. *See* Bonds Dep., at 84:21-85:3. Bonds admitted that his inspection sticker was, in fact, expired when he received these tickets. *Id.* Shaketa Redden was ticketed for an expired inspection sticker and admitted that her inspection sticker was expired at the time she received the ticket for that infraction. *Compl.* ¶ 351. Simmons was ticketed for having an expired inspection sticker. Simmons Dep., at 25:14-25-18. She has since admitted that she had an expired inspection sticker when she received the ticket. *Compl.* ¶ 246. Moreover, none of these Plaintiffs have adduced any evidence showing that any officer knew or considered their race when deciding to stop them at a Checkpoint. The same is true of De'Jon Hall, who never received any ticket or penalty of any kind, but simply went through a Checkpoint on one occasion. Sahasrabudhe Decl., Ex. 35 dated May 17, 2023 (hereinafter "Hall Dep.") at 31:19-32:21. There is no evidence whatsoever that the officers who interacted with these Plaintiffs during the Checkpoints even considered their race. For this additional reason, these Plaintiffs do not have a viable equal protection claim. *Moore*, 2020 WL 5821378, at *23.

26

Plaintiffs Dorothea Franklin, Charles Palmer, and Ebony Yeldon were stopped and given tickets for tinted windows. Sahasrabudhe Decl., Ex. 36 dated May 15, 2023 (hereinafter "Franklin Dep.") at 43:13-44:12; Yeldon Dep., at 87:3-87:5. Franklin admitted that her windows were tinted. Franklin Dep., at 43:13-44:12. Yeldon admitted that her windows were tinted. Yeldon Dep., at 87:3-87:5. And, Palmer admitted his windows were tinted. Sahasrabudhe Decl., Ex. 34 dated September 14, 2023 (hereinafter "Palmer Dep.") at 65:10-21; 67:2-7; 112:11-21. There is no evidence that these Plaintiffs received these tickets or had any prolonged interaction with the Buffalo Police for any reason other than their own admitted violations of the Vehicle and Traffic Law. Most importantly, there is no evidence that these three individuals' races were known or considered by any police officer before they were stopped and legitimately cited for violations of the law. These Plaintiffs, therefore, have no valid equal protection claim, either. *Moore*, 2020 WL 5821378, at *23.

Finally, Shirley Sarmiento alleges only that she received tickets while her car was parked. Sahasrabudhe Decl., Ex. 32 dated December 13, 2022 (hereinafter "Sarmiento Dep.") at 48:14-16. She admits that these tickets were for legitimate violations. Sarmiento Dep., at 45:16-45:18; 46:17-45:22. And, more importantly, the officers who wrote the tickets would have no way of knowing her race because she was not inside the vehicle when she was ticketed. *Id*. Ms. Sarmiento, like the other Plaintiffs, also has no valid equal protection claim under these circumstances because no action was taken against her based on her race. *Moore*, 2020 WL 5821378, at *23.

Simply put, the named Plaintiffs here have done nothing more than assume that, because they are members of a minority group and were the subjects of BPD's traffic

enforcement efforts, they must have been racially discriminated against.  As this Court has

recognized, far more than Plaintiffs' speculation is required to show intentional discrimination in

violation of the Equal Protection Clause of the Fourteenth Amendment.  Because the named

Plaintiffs have failed to show that they were the victim of intentional racial discrimination, each

of their equal protection claims must be dismissed.


**D.**    **Plaintiffs Cannot Show Discrimination Under Title VI**

Plaintiffs' fourth cause of action must be dismissed for the same reasons  their

equal protection claim fails.  Their fourth cause of action alleges that Defendants violated Title

VI of the Civil Rights Act.  Compl. ¶ 451-454.  Importantly, Title VI affords a private right of

action only for ***intentional*** discrimination.  *Alexander v. Sandoval*, 532 U.S. 275, 293 (2001)

(emphasis added). To maintain a claim for a violation of Title VI, Plaintiffs must demonstrate

that: (1) action taken against them was discriminatory and based on race, color, or national

origin; (2) such discrimination was intentional; and (3) the discrimination was a substantial or

motivating factor for Defendants' actions.  *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir.

2001).  Further, to maintain a cause of action under Title VI, Plaintiffs must show that the action

taken against them was in furtherance of, or at least connected to, a federally funded program.

*Allen v. Nassau Cnty. Exec. Office*, 09-cv-1520, 2011 WL 1061019, at *11 (E.D.N.Y. Feb. 15,

2011).  Plaintiffs have not demonstrated any of these factors.

In this case, Plaintiffs' Title VI claim fails because, as already described,

Plaintiffs have not adduced any evidence of intentional discrimination despite comprehensive

and exhaustive discovery.  Moreover, Plaintiffs fail to allege that any traffic enforcement action

taken against them was done in furtherance of a federally funded program.  For these simple, but important reasons, Plaintiffs' Title VI claim fails.  *Moore*, 2020 2020 WL 5821378, at *23.

      1.    <u>BPD did not intentionally discriminate against Plaintiffs</u>

The Court can dismiss Plaintiffs' Title VI claim for the same reasons it should dismiss Plaintiffs' equal protection claim.  Indeed, the standards for discrimination under Title VI and Fourteenth Amendment equal protection claims are the same. *U.S. v. Fordice*, 505 U.S. 717, 732 n. 7 (1992) ("the reach of Title VI's protection extends no further than the Fourteenth Amendment"); *Lora v. Bd. of Educ. of the City of N.Y.*, 623 F.2d 248, 250 (2d Cir.1980) ("The standard of discrimination in Title VI is the same standard the Supreme Court establishes for discrimination under the Fifth and Fourteenth Amendments.").

As explained at length in Section C, Plaintiffs fail to show that any traffic enforcement actions taken by the BPD were related to their race.  Rather, the Checkpoints were implemented due to traffic related complaints from residents of the East Side of the City.  *See* Derenda Dep. 1 at 96:3-97:2; Brown Dep. at 57:4-58:21, 15:15-22.  The race of motorists had absolutely nothing to do with the BPD command staff's decision to implement Checkpoints. Sahasrabudhe Decl., Ex. 41; Sahasrabudhe Decl., Ex. 40, pp. 16, 18.  Moreover, BPD's stops of motorists outside of Checkpoints were and are based on the legitimate need to enforce the VTL, and were not at all related to any Plaintiffs' race.  *Id.*  There simply was no intentional discrimination by BPD against any Plaintiff.

Defendants anticipate that Plaintiffs will reference statistical disparities in the number of tickets written to minorities within the City of Buffalo in an attempt to argue a

question of fact on the issue of intentional discrimination. Again, for purposes of Title VI, just like equal protection, statistical disparities are not enough demonstrate intentional discrimination. This very Court has recognized as much. *Moore*, 2020 WL 5821378, at *23. This Court reached that holding for good reason. As explained by Defendants' expert, Dr. David Banks, statistical disparities in traffic enforcement, or enforcement of laws generally, do not constitute prima facie evidence of intentional discrimination. Banks Report, pp. 4-8. Statistical disparities may exist for any number of reasons which have absolutely nothing to do with race. Because Plaintiffs rely solely on statistical evidence and have no evidence of actual discriminatory intent by City officials, their Title VI claim fails as a matter of law. *Moore*, 2020 2020 WL 5821378, at *23.

Plaintiffs have adduced no evidence to show that Defendants intentionally discriminated against them based on their race. Just like their equal protection claim, their Title VI claim also fails.

2.    The actions taken against Plaintiffs were not done in furtherance of any federally funded program

Plaintiffs' Title VI claim must also be dismissed because no named Plaintiff faced any traffic enforcement penalty in furtherance of a federally funded program. It may be true that the Buffalo Police Department received federal funding, but there is no evidence that any of the traffic enforcement actions Plaintiffs complaint of were done in furtherance of any federal program or grant. *See* Sahasrabudhe Decl., Ex. 41; Sahasrabudhe Decl., Ex. 40; Sahasrabudhe Decl., Ex. 39, pp. 16, 18. Receipt of federal funds in general cannot subject a municipality and its employees to Title VI liability for any action that they might take. There must be a definite connection between the federal funding and the action concerning which a plaintiff complains.

30

*Allen*, 2011 WL 1061019, at *11 (dismissing Title VI claim where plaintiff had not "identified

any federally funded program or activity that subjected her to discrimination). Because the stops

and tickets at issue in this case have no apparent connection to federal funding received by BPD,

the Title VI claim fails as a matter of law. *Id.*

E.      **The Checkpoints Comply with the Fourth Amendment.**

        A search or seizure without individualized suspicion of wrongdoing is permissible

under the Fourth Amendment where it satisfies the special needs doctrine. *See Wagner v.

Swarts*, 827 F. Supp. 2d 85, 93 (N.D.N.Y. 2011) (hereinafter "*Wagner I*"), *aff'd sub nom.

Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012) (hereinafter "*Wagner II*"). Under the

special needs doctrine, programs "designed to serve special needs beyond the need for normal

law enforcement" comply with the Fourth Amendment. *Id.*

        Here, the Checkpoints satisfy the special needs doctrine. The evidence is clear.

The Checkpoints' primary purpose was traffic safety. *See, e.g.*, Sahasrabudhe Decl., Ex. 41;

Derenda Dep. 1 at 21:6-18; Russo Dep. at 194:13-21. Despite the considerable evidence to the

contrary, Plaintiffs allege that the suspicion-less stops and searches at Checkpoints constitute

unreasonable searches and seizures in violation of the Fourth Amendment. Compl. ¶¶ 435-439.[4]

---

[4]     At oral argument for Plaintiffs' Class Certification Motion, Plaintiffs took the position
        that they seek damages under the Fourth Amendment for unlawful detentions only, not
        tickets or impounds. Dkt. No. 244 at 11:11-13, 14:8-10; *see also* Dkt. No. 241, p. 2.
        Plaintiffs are bound to this position. Should Plaintiffs try to alter that position, the case
        law precludes Plaintiffs from seeking damages for tickets and impounds under the Fourth
        Amendment. *See Di Pompo v. Mendelson*, 2022 WL 463317, at *2 (S.D.N.Y. Feb. 15,
        2022); *Torres*, 590 F. Supp. 3d at 627.

Specifically, they claim that the Checkpoints' primary purpose was general crime control, which is an impermissible primary purpose under the Fourth Amendment.  Compl. ¶ 7; *see also Wagner*, 827 F. Supp. 2d at 93 (citing *Lynch v. City of N.Y.*, 589 F.3d 94, 102 (2d Cir. 2009)).  This claim should be dismissed as a matter of law.

Vehicle checkpoints whose primary purpose is traffic safety are routinely upheld by federal courts under the special needs doctrine.[5]  To determine whether a vehicle checkpoint meets the special needs doctrine, courts analyze (1) whether the checkpoints implicate a "special need" and (2) whether the checkpoints are reasonable based on the circumstances.  *Wagner*, 827 F. Supp. 2d at 95-96.

*Wagner I* is analogous to the case at bar.  There, motorcyclists challenged the implementation and execution of motorcycle checkpoints by the New York State Police ("NYSP").  *Id.* at 88.  The District Court for the Northern District of New York extensively analyzed the plaintiffs' constitutional claims and the defendants' affirmative defenses, most which have been raised in this case.  The defendants argued, and the Court agreed, that the checkpoints were constitutionally permissible because, as is the case here, their primary purpose

---

[5]    *See, e.g.*, *Wagner I*, 827 F. Supp. 2d at 93; *U.S. v. Bowman*, 496 F.3d 685, 692 (D.C. Cir. 2007) ("[A] roadblock is constitutionally permissible where its principal purpose is to regulate vehicular traffic by allowing police to check driver's licenses and vehicle registrations."); *U.S. v. Henson*, 351 F. App'x 818, 821 (4th Cir. 2009) (holding vehicle checkpoints whose primary purpose was traffic safety were constitutional); *U.S. v. McFayden*, 865 F.2d 1306, 1313 (D.C. Cir. 1989) (same); *U.S. v. Regan*, 218 F. App'x 902, 905 (11th Cir. 2007) (same); *see also Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (noting that a traffic safety roadblock to question all oncoming traffic regarding their drivers' licenses and vehicle registrations would be constitutional); *U.S. v. Bernacet*, 724 F.3d 269, 273 (2d Cir. 2013).

was traffic safety. The Court further held that programs, like the NYSP checkpoints, designed to serve "special needs" beyond the normal need for law enforcement are sustainable, as opposed to those whose primary purpose involves "crime control." *Id.* at 93.

Having found that the NYSP had a permissible special need, *Wagner* proceeded to apply a balancing test to determine whether the checkpoints were reasonable. *Id.* at 96. The Court analyzed "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 96. The Court ultimately upheld the checkpoints. *Id.* Using this same analysis, the same conclusion is warranted here.

1.   <u>Special Need</u>

For a vehicle checkpoint to be permissible, the primary purpose of the checkpoint must serve a "special need" beyond general crime control. *Wagner*, 827 F. Supp. 2d at 93. The primary purpose of the Checkpoints was traffic safety. Derenda Dep. 1 at 21:6-18; Russo Dep. at 194:13-21; Sahasrabudhe Decl., Exhibit 41. An additional purpose was high police visibility to curtail the unsafe operation of vehicles. Derenda Dep. 1 at 21:6-18. Traffic safety has repeatedly been upheld as an appropriate "special need" within the special needs doctrine. *See, e.g.*, *Wagner*, 827 F. Supp. 2d at 94; *U.S. v. Turner*, 19-cr-134, 2020 WL 733187, at *4 (M.D.Ala. Jan. 27, 2020). Where, as here, the record reflects that the primary purpose of vehicle checkpoints was traffic safety, the checkpoints serve a "special need" beyond general crime control.

33

*Wagner I* is analogous to the case at bar.  As outlined, motorcyclists challenged the implementation and execution of motorcycle checkpoints by the New York State Police.  *Id.* at 88.  The District Court for the Northern District of New York extensively analyzed the plaintiffs' constitutional claims and the defendants' affirmative defenses, most of which have been raised in this case.  The defendants argued that the checkpoints were constitutionally permissible because, as is the case here, their primary purpose was traffic safety.  Programs designed to serve "special needs" beyond the normal need for law enforcement are sustainable, as opposed to those whose primary purpose involves "crime control."  *Id.* at 93.

While the BPD Checkpoints served multiple purposes, including traffic safety, high police visibility, and the reduction of drug, gun, and gang activity, their primary purpose was traffic safety.  After all the program involved stopping vehicles driving on City streets, and not some other approach such as stop and frisk or residential searches.  As such, the BPD Checkpoints served a permissible special need.

In the event Plaintiffs attempt to manufacture an issue of fact with their "general crime control" argument, the Court should reject their effort.  Plaintiffs cannot rely upon speculation and conjecture to create a triable issue of fact.  *Wagner I*, 827 F. Supp. 2d at 92 (N.D.N.Y. 2011); *see also Williams v. City of N.Y.*, 683 F. App'x 57, 58 (2d Cir. 2017).  In *Wagner I*, the plaintiffs engaged in a similar tactic that was rejected by the Court.  There, the defendants conducted motorcycle checkpoints to detect motorcycle safety violations and insure proper licenses and registrations.  *Id.* at 94.  The defendants argued, and the Court accepted, that the checkpoints satisfied the special needs doctrine, in part, because the primary purpose was safety.  *Id.*

34

In response, the plaintiffs argued that a factual dispute existed as to the primary purpose, in part, because of "defendants' view that select segments of the motorcycling community who attend the events targeted consist of 'outlaw bikers' and 'dangerous gang members;'" a recommendation that more officers be available at checkpoints to inspect for non-traffic offenses; and a report stating that motorcycle grant money includes funding for overtime for intelligence gathering and traffic and criminal enforcement at checkpoints. *Id.* at 94. Despite these documents, the Court rejected the plaintiffs' attempts to cast doubt on the primary purpose of the checkpoints and deemed the checkpoints constitutional. *Id.* at 84-95. Here, there is no genuine doubt that the Checkpoints were designed and executed for the primary purpose of traffic safety. *See, e.g.*, Derenda Dep. 1 at 21:6-21:18; Russo Dep. at 194:13-21; Brinkworth Dep. at 55:19-56:3; Sahasrabudhe Decl., Ex. 29 (hereinafter "Young Dep.") at 32:16-19.

In *Turner*, the Court upheld a traffic safety checkpoint as constitutional. 2020 WL 733187 at *5. The Court considered the testimony of a police chief, the operational plan for the checkpoint, and the fact that traffic citations were issued at the challenged checkpoint. *Id.* at *4. The police chief testified that the purpose was traffic safety to ensure valid driver's licenses, insurance, and registrations and that the drivers were not impaired, did not have an active warrant, and did not have defective motor vehicle equipment. *Id.* The operational plan stated the same purpose. *Id.* The Court concluded that the record "clearly reflects that the checkpoint was designed to serve the special need of traffic safety." *Id.*; *see also U.S. v. Johnson*, 122 F. Supp. 3d 272, 374-375 (M.D.N.C. 2015) (holding the primary purpose of checkpoints to be traffic safety where officers consistently testified as much).

35

As in *Turner*, officer testimony, the governing document for the Checkpoints, and the traffic citations issued at the Checkpoints make it abundantly clear that the primary purpose of the BPD Checkpoints was traffic safety.   Former Strike Force officers, Housing Unit officers, supervisory personnel, commanding officers, and the former Mayor uniformly testified that the primary purpose of the Checkpoints was traffic safety.  *See, e.g.*, Sahasrabudhe Decl., Exhibit 16 dated September 5, 2023 (hereinafter "Acquino Dep.") at 32:12-18; Brinkworth Dep. at 55:19-56:3; Brown Dep. at 107:1-2, 111:17-113:6; Derenda Dep. 1 at 78:23-79:2; Domaracki Dep. at 28:5-23; Sahasrabudhe Decl., Exhibit 17 dated December 19, 2019 (hereinafter "Fahey Dep.") at 48:9-16.  Like the operational plan in *Turner*, the BPD Roadblock Directives specifically state "[t]he purpose of this roadblock is to ensure 'roadway safety.'"  Sahasrabudhe Decl., Ex. 41.  In that same vein, officers were instructed to check for valid registration and inspection stickers, seatbelt infractions, and other VTL violations.  *Id.*  Officers then issued citations for VTL violations.  Hy Dep. at 23:15-24:13; 31:9-32:6.  Plaintiffs cannot reasonably argue that the primary purpose of the Checkpoints was anything but traffic safety.

But Plaintiffs try, suggesting that the primary purpose of the Checkpoints was "general crime control."  *See* Dkt. No. ¶ 36.  Plaintiffs' wishful thinking is contrary to the evidence in the record.  To the extent the Checkpoints had the effect of crime control or were aimed at crime control, that was not their primary purpose.  Though officers also arrested individuals at these Checkpoints, these arrests were based on probable cause resulting from information learned during the stop and plain view observations.  Similarly, in *Turner*, the officers there also arrested individuals.  2020 WL 733187 at *4.  These arrests do not transform the primary purpose of the Checkpoint from traffic safety into general crime control.  "[T]he

36

mere fact that crime control is *one* purpose—but not the *primary* purpose—of a program of searches does not bar the application of the special needs doctrine." *Wagner II*, 489 F. App'x at 501 (citing *Lynch*, 589 F.3d at 102). Plaintiffs attempts to convince this Court otherwise should be rebuffed here, as they were in *Wagner I*, *Wagner II*, and *Turner*.

The primary purpose of the Checkpoints was traffic safety. This is a permissible "special need" under the special needs doctrine.

2.    <u>Reasonableness</u>

Because the Checkpoints implicate a "special need," the Court's next inquiry involves whether the Checkpoints were reasonable. The reasonableness inquiry requires a balancing test which considers (a) the gravity of the public concerns served by the seizure; (b) the degree to which the seizure advances the public interest; and (c) the severity of the interference with individual liberty. *Id.* at 96 (citing *Illinois v. Lidster*, 540 U.S. 419, 427 (2004)).

a.    Gravity of Public Concerns

Traffic safety is crucial to the overall safety and welfare of the City of Buffalo and its residents. The City Defendants undoubtedly have an interest in "ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." *Wagner I*, 827 F. Supp. 2d at 96 (citing *Prouse*, 440 U.S. at 658). More than that, the Checkpoints were created and set in specific locations to respond to residents' complaints

37

regarding VTL violations and unsafe driving practices in their neighborhoods. *See* Brown Dep. at 57:4-58:1; Serafini Dep. at 67:15-68:12 (noting that Checkpoints were set up around BMHA properties in response to complaints from residents); Gramaglia Dep. at 1 25:13-26:9 (same). The regulation of traffic safety is a sufficiently important public interest to support the Checkpoints.

        b.      Advancement of Public Interest

The next factor analyzes the ability of the program at issue to accomplish its primary purpose. At the request of the community, the Checkpoints were designed to improve an important public interest—traffic safety. During the time Checkpoints were conducted, the BPD detected thousands of VTL violations, including unlicensed drivers, drivers with equipment violations, and children in incorrect and unsafe restraints. Data demonstrating the degree of efficacy is neither feasible nor necessary to analyze this factor. One cannot measure everything. It is impossible to know precisely how many traffic tickets were issued at Checkpoints. Additionally, any applicable statistical analysis of efficacy would require data showing how many motorists, in total, were violating the VTL at any given time and comparing that to how many motorists were ticketed at Checkpoints. That information is simply not available. But efficacy can also be measured "by the relationship of the checkpoint to its objective, rather than by any measurable results, or by any results period." *U.S. v. Fraire*, 575 F.3d 929, 931 (9th Cir. 2009) (citing *U.S. v. Faulkner*, 450 F.3d 466, 472-473)). After the Checkpoints were instituted in the City, the number of traffic tickets issued in the City of Buffalo increased. *See* Serafini Dep. 245:19-246:2. Logically, the Checkpoints were effective in making Buffalo roadways safer due to the number of violations the Checkpoints were able to uncover.

In *Fraire*, the Court upheld checkpoints set up by park rangers to mitigate illegal poaching within a national park. 575 F.3d at 931. Although the defendants did not have empirical evidence to measure the efficacy in reducing poaching, the Court held that common sense suggested that the checkpoints would be a "reasonably efficient tool" at preventing poaching. *Id.* at 934. The same logic applies here. The Checkpoints were closely related to addressing the concerns over traffic safety. Therefore, this factor also weighs in favor of the Checkpoints' constitutionality.

        c.        Severity of Liberty Interference

To pass constitutional muster, checkpoints must be minimally intrusive in that they (i) are clearly visible; (ii) be part of some systematic procedure that strictly limits the discretionary authority of police officers; and (iii) must detain cars no longer than is reasonably necessary unless reasonable suspicion of criminal activity arises. *Wagner I*, 827 F. Supp. 2d at 97.

The BPD set up Checkpoints so that they were clearly visible. Checkpoints were obvious and overhead flashing lights were on for all BPD vehicles participating in the Checkpoint. Sahasrabudhe Decl., Ex. 41. Officer testimony confirmed the visibility requirement. Former Strike Force Officer Richard Hy testified "[t]he checkpoint would have a number of cars in the center of the street or on the side with lights so that we could be visible from a long distance away. . ." Hy Dep. at 22:2-5.

The next factor requires a systematic procedure to strictly limit the discretion of officers conducting the Checkpoints. Notably, this factor does not require that officers be

stripped of all discretion.  "[R]emoving all discretion from the officer[] conducting the

checkpoints is unnecessary and impractical."  *Wagner I*, 827 F. Supp. 2d at 98.  Even though the

officers in *Wagner I* retained the discretion as to who to inspect, what to inspect, and what to

cite, the Court held that the officers' discretion was appropriately limited.  *Id.*  The checkpoints

occurred at fixed locations, every motorcycle was stopped or inspected, and additional

investigation only arose if individualized suspicion existed.  *Id.*  The NYSP implemented a

systematic procedure limiting officer discretion during the Checkpoints.  The BPD used nearly

the same approach that limited discretion even more.

Officer discretion was strictly limited in the planning and execution of

Checkpoints.  First, only supervisory officers and the Commissioner determined the locations of

the Checkpoints.  *See* Brinkworth Dep. at 73:17-21; Derenda Dep. 1 at 50:9-14.  The Checkpoint

policy strictly limited the discretion of officers when issuing tickets.  Officers stopped every

driver to identify any visible infractions.  Sahasrabudhe Decl., Ex. 41.  If there were none,

officers would wave them through the Checkpoint.  Hy Dep. at 43:1-5.[6]  Officers were instructed

to write summonses for *all* those in violation of the VTL and to act on *all* probable cause

---

[6]    To avoid the unsafe situation in which a Checkpoint caused a long back up of traffic,
officers would temporarily cease the Checkpoint to allow cars through and then reengage
with identifying infractions when traffic resumed at a normal flow.  Hy Dep. 41:15-42:8.
This fact does not undermine the limited discretion officers had when conducting
Checkpoints.  *See Wagner I*, 927 F. Supp. 2d at n. 13 (noting that although checkpoints
were temporarily shut down when "checkpoint resources were overwhelmed and/or when
safety considerations so required," the balancing test does not require officers to forego
safety considerations to "eradicate all discretion.").

resulting from plain view observations and information obtained during the Checkpoint. Sahasrabudhe Decl., Ex. 41.

Finally, the policy also instructed officers that the Checkpoints could not be "unreasonably intrusive" to motorists. *Id.* In practice, this limitation meant that most individuals were stopped at Checkpoints for a brief amount of time for an initial visual inspection. *See* Domaracki Dep. at 36:13-37:10. According to Strike Force Lieutenant, Thomas Whelan, these initial stops lasted only 10-15 seconds if there was no violation. Sahasrabudhe Decl., Exhibit 27 dated April 26, 2022 (hereinafter "Whelan Dep. 1") at 146:12-17. If a motorist was pulled to the side for a secondary stop, the flow of Checkpoint traffic would continue while an officer would go to conduct the secondary stop. *Id.* The length of secondary stops depended upon whether the driver had appropriate documents and the nature of the violation. *See id.*; Hy Dep. at 40:1-12.

In light of the foregoing factors, the Checkpoints were reasonable under the special needs doctrine. Because the Checkpoints were reasonable, there is no constitutional violation, and the City Defendants are entitled to judgment as a matter of law.

## F.    **The Non-Checkpoint Plaintiffs Do Not Have a Fourth Amendment Claim, Either.**

Plaintiffs Complaint alleges a violation of the Fourth Amendment on behalf of "all Plaintiffs and the Checkpoint Injunction and Checkpoint Damages Classes and Subclasses." Compl. P. 68. For the reasons already explained, the Checkpoints did not violate the Fourth Amendment. The remaining Fourth Amendment claims seek to address BPD traffic stops conducted outside of Checkpoints. The named Plaintiffs who allege such claims (the "non-

41

Checkpoint Plaintiffs"), Ebony Yeldon, Charles, Palmer, and Shaketa Redden cannot show any Fourth Amendment violations.

Traffic stops comply with the Fourth Amendment when the officer has either probable cause or reasonable suspicion of unlawful conduct. *U.S. v. Garcia*, 279 F. Supp. 2d 294, 298 (S.D.N.Y. 2003) *see also Whren v. U.S.*, 517 U.S. 806, 806 (1996). All of the non-Checkpoint Plaintiffs' Fourth Amendment claims necessarily fail since the officers who ticketed them had reasonable suspicion or probable cause. Officers have probable cause or reasonable suspicion to stop a vehicle that they observe with excessively tinted windows. *See id.* at 298-299; *U.S. v. Lucas*, 338 F. Supp. 3d 139, 154 (W.D.N.Y. 2018) ("Stopping a vehicle based upon probable cause or reasonable suspicion that a vehicle is being operated with tinted windows in violation of § 375(12-a)(b)(2), even if the officers' true motivations are driven by a desire to investigate other illegal activity, complies with the Fourth Amendment.") Ms. Yeldon was ticketed for tinted windows that she admitted were tinted. *See* Compl. 274; Yeldon Dep. at 80:16-18; 90:20-21. On three separate occasions, Mr. Palmer was ticketed for tinted windows. Compl. ¶¶ 302-307. He admitted his windows were tinted. *See* Palmer Dep. 60:6-7. Moreover, Officer Domaracki, who stopped Mr. Palmer and cited him on one occasion, specifically testified that he pulled him over because he saw Mr. Palmer's tinted windows. Domaracki Dep. at 100:23-101:3.

In addition to other violations, Ms. Redden was ticketed for an expired registration. Compl. ¶ 354. Plaintiffs admit that Ms. Redden's registration was expired. *See* Compl. ¶ 356; Redden Dep. 72:20-73:9. Officer Skipper had probable cause to pull her over when his license plate reader notified him that her registration was expired. Skipper Dep. at

190:13-17. *See Paige v. N.Y.C. Police Dep't*, 2017 WL 1214425, at *3 (E.D.N.Y. Mar. 31, 2017) (holding probable cause to stop plaintiff existed where license plate reader notified officer of expired registration).

Therefore, Plaintiffs' Fourth Amendment claims, including those of the non-Checkpoint Plaintiffs, should be dismissed in their entireties.

### POINT II.  PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF

Even if the Court were to hold the City liable for any of Plaintiffs' claims, which it should not, Plaintiffs are not entitled to the injunctive relief they seek for three reasons: (A) Plaintiffs seek an impermissible "obey the law" injunction; (B) the relief sought is overbroad and unspecific; and (C) Plaintiffs lack standing to seek injunctive relief.

### A.  Plaintiffs Demand for "Obey the Law" Injunctive Relief

Plaintiffs have not provided any reasonable detail or proposed language for their requested injunctive relief beyond a mandate that the City Defendants obey the law.  "[A]n injunction must be more specific than a simple command that the defendant obey the law." *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) (citing Fed. R. Civ. P. 65(d)).

Plaintiffs have been given multiple chances to sufficiently delineate the injunctive relief they seek here—once with their Complaint, again with their Amended Complaint, again in their Motion for Class Certification, and again in their supplemental briefing to the Court following Class Certification oral argument.  Plaintiffs have failed to provide any meaningful guidance each time.  Instead, they list several remedies that they claim "may be appropriate in

43

this case. . ."  Dkt. Nos. 211, pp. 48-49; 241, p. 11.  All of these proposed remedies are merely demands for "obey the law" injunctive relief.

      For example, Plaintiffs have announced that they may seek an injunction ordering the "[c]essation of BPD policies and practices contributing to racially biased traffic enforcement, including an end to pretextual traffic stops, "traffic safety" vehicle checkpoints and multiple tinted windows ticketing."  Dkt. No. 241, p. 11.  Plaintiffs also apparently seek an order "enjoining the City from conducting vehicle checkpoints for the purpose of general crime control; targeting Buffalo motorists for traffic stops, tickets, and vehicle Checkpoints based on their race and ethnicity; and performing traffic stops and vehicle Checkpoints for improper pecuniary purposes."  Dkt. No. 211, p. 3.  Both requests ask the Court to order the City to obey the law—specifically, ordering the City not to engage in racially discriminatory policing, to not violate the Fourth Amendment, and to not stop motorists without probable cause.  These requests cannot be classified as anything other than paradigmatic "obey the law" injunctive relief.  *See Wakefield v. Scott*, 2021 WL 10342467, at *4 (D.Vt. June 24, 2021) (denying request for injunctive relief where plaintiff alleged the defendant officers violated her constitutional rights with race-based discriminatory traffic stops and plaintiff's demand for injunctive relief ordering defendants to cease the practice was nothing more than an "obey the law" injunction); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (holding that demand seeking to enjoin municipal defendant from discriminating based on race was an impermissible "obey the law" injunction).[7]

---

[7]    *See also Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897-898 (5th Cir. 1978) (holding that demand seeking to enjoin defendant from discriminating based on color, race, or sex

Plaintiffs' proposed "obey the law" injunctive relief violates Rule 65(d) and cannot be granted, regardless of liability.

## B. Plaintiff's Proposed Injunctive Relief Lacks Specificity and is Impermissibly Overbroad.

### 1. Lack of Specificity

Requests for injunctive relief must contain "specific terms and describe in reasonable detail . . . the act or acts sought to be restrained." *A.M. ex rel. J.M. v. N.Y.C. Dep't of Educ.*, 840 F. Supp. 2d 660, 677 (E.D.N.Y. 2012) (internal quotations and citations omitted). "[B]ecause an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what is outlawed." *Purgess v. Parauda*, 2021 WL 2269540, at *5 (S.D.N.Y. June 3, 2021) (internal quotations omitted) (citing *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). Plaintiffs' demanded injunctive

---

in employment practices was an unsustainable "obey the law" injunction); *Baltas v. Maiga*, 2020 WL 6275224, at *22 (D. Conn. Oct. 26, 2020) (demand for injunction enjoining defendants from retaliating against plaintiff dismissed for failure to comply with Rule 65); *U.S. v. Sturdevant*, 2009 WL 10689852, at *5 (D.Kan. Dec. 11, 2009) ("Injunctions which seek to prohibit 'discrimination' do not satisfy Rule 65(d) because they do no more than instruct defendants to obey the law." (citing *U.S. v. Matusoff Rental Co.*, 494 F. Supp. 2d 740, 757 (S.D.Oh. 2007)); *Cuviello v. City of Oakland*, 2009 WL 734676, at *3 (N.D.Cal. Mar. 19, 2009) (demand for injunctive relief stating defendants could only make 'lawful arrests' and prohibiting defendants from interfering with plaintiffs' free speech rights was an unenforceable "obey the law" injunction); *Hall v. Ala. State Univ.*, 2023 WL 6276336, at *16 (M.D.Ala. Sep. 26, 2023) (demand for injunctive relief prohibiting defendant from discriminatory conduct towards plaintiff was an unenforceable demand for an "obey the law" injunction).

relief blatantly violates this requirement. It fails to offer any workable framework for the City to follow, let alone for the Court to administer and enforce.

Plaintiffs seek unspecified "[r]eforms to supervision and discipline so that officers are held accountable for violations of policy and constitutional rights. . ." Dkt. No. 241, p. 11. It is unclear what "reforms" would be necessary to accomplish that goal. It is unclear what degree of accountability is required and how that would be measured. The demand for such relief for all "violations of policy and constitutional rights" is similarly undefined and exceeds the allegations in this lawsuit. Uniform infractions are a violation of policy but have nothing to do with Plaintiffs' allegations of racially discriminatory traffic enforcement. This leaves the City Defendants and this Court struggling to guess which policies and which constitutional rights the injunctive relief would address. In short, there is no "operative command capable of enforcement or review" and the demand "offers no guidance on the minimal standards required by the Constitution." *Walker v. City of Calhoun, GA*, 682 F. App'x 721, 724 (11th Cir. 2017).

Perhaps even more problematic, Plaintiffs' remedies beg questions that further complicate manageability—what practices contribute to racially biased traffic enforcement, how would the Court determine when a stop is pretextual, what is sufficient accountability for officer supervision and discipline, what reforms would accomplish Plaintiffs' lofty goals, what is a pattern of biased policing, and what constitutes meaningful community input on additional policing reforms? More importantly, is this Court the appropriate body to make these determinations? These are open-ended questions that would require analysis on a case-by-case basis. Where, as here, a demand for an injunction requires the defendant to comply with the constitution and adopt unspecific measures to prevent violations, the demand does not comply

46

with Rule 65.  *See City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011).

The request cannot be enforced.

2.    Overbreadth

Plaintiffs' proposed injunctive relief also exceeds necessary measures that would

address the core of their allegations.  Plaintiffs dramatically overreach.  "[A] request for

injunctive relief must necessarily be tied to the specific claims on which the plaintiff is

proceeding."  *Whitehead v. Walt Disney Co.*, 2024 WL 3678257, at *2 (S.D.N.Y. July 23, 2024).

As already demonstrated, the lack of specificity in Plaintiffs' proposed relief

creates issues of overbreadth.  Another example of overbreadth is Plaintiffs' demand for "debt

relief and financial assistance for low-income people dealing with unaffordable repairs, unpaid

tickets, waiver of outstanding tickets and towing fees, and reinstatement of suspended driver's

licenses."  Dkt. No. 241, p. 11.  How financial relief to *all* low-income people, regardless of race,

would address Plaintiffs' allegation that the BPD unconstitutionally and discriminatorily targets

Black and Latino individuals for traffic enforcement is unclear.[8]  Would this requirement be

limited or endless?  How long would the City be forced to offer debt relief and financial

assistance to all low-income people ticketed for vehicle and traffic violations?  Can the City's

---

[8]    Even if this request were tailored to Black and Latino individuals and provided a
reasonable time limitation, "debt relief" and "financial assistance" are compensatory in
nature.  Plaintiffs attempt to transform their injunctive relief class into a class requesting
damages.  Plaintiffs cannot circumvent the requirements of Rule 23(b)(3) by labeling the
Traffic Enforcement Class as "injunctive," when it really demands compensatory relief.

Common Council be compelled to make the necessary expenditures? Plaintiffs simply neglect to address these fundamental issues to their own detriment.

## C.     Plaintiffs Lack Standing Because They Have Not Shown Any Realistic Risk of Future Injury.

To possess standing to seek injunctive relief, Plaintiffs must show that they are "immediately in danger of sustaining some direct injury as a result of the challenged official conduct." *MacNamara v. City of N.Y.*, 275 F.R.D. 125, 140 (S.D.N.Y. 2011) (citing *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). "[P]ast exposure to illegal conduct does not in itself present a case or controversy regarding injunctive relief . . .if unaccompanied by any continuing, present adverse effects." *Williams v. City of Aurora*, 2024 WL 1195515, at *9 (N.D.Ill. Mar. 20, 2024) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-496 (1974)).

In *Williams*, the Court dismissed the plaintiff's claim for injunctive relief because the plaintiff failed to demonstrate a realistic threat of future harm. *Id.* There, as here, the plaintiff sought to enjoin the city defendant from its "policy, practice and/or custom of unconstitutional stops, arrests, and searches." *Id.* The Court held that the plaintiff lacked standing to seek injunctive relief because more than four years had elapsed since his traffic stop and the initiation of his case and the plaintiff had not alleged any additional traffic stops since. *Id.* (citing *Lyons v. City of Los Angeles*, 461 U.S. 95, 108 (1983)).

Plaintiffs have failed to show that they face a realistic threat of future injury. The Checkpoints have been discontinued. *See* Gramaglia Dep. 1 at 181:19-182:10; Sahasrabudhe Decl., Ex. 5. While it is possible that Plaintiffs may be subjected to traffic stops again, they have

not demonstrated any reasonable probability that they will suffer harm. *Miller v. Vohne Liche Kennels, Inc.*, 2012 WL 3764042, at *2 (S.D.Ind. Aug. 29, 2012) (holding that plaintiff lacked standing to obtain an injunction where it was no more than speculation to conclude that he would be subjected to another traffic stop and unconstitutional search by a drug-detection dog again). For named Plaintiffs Shaketa Redden and Charles Palmer, who no longer even reside in the area, the prospect of suffering harm from traffic stops within the City of Buffalo is especially speculative. *See* Compl. ¶¶ 359, Palmer Dep. at 14:10-19, 16:21-23. Overall, Plaintiffs put forward nothing more than "general assertions or inferences" that they will be subjected to future violations and that is not enough to establish standing. *O'Shea*, 414 U.S. at 497.

**POINT III.**  **AS A MATTER OF LAW, THE INDIVIDUAL DEFENDANTS CANNOT BE HELD LIABLE**

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In enforcing this principle, federal courts hold that municipal employees are entitled to qualified immunity and are thus shielded from individual liability, except where they violate a plaintiff's clearly established constitutional right. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). For qualified immunity purposes, courts look to whether the challenged law was sufficiently clear at the time of the alleged violation such that "every reasonable [officer] would have understood that what he was doing violated [the right at issue]." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015); *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004). Even if an individual's conduct did violate a clearly established law, that individual remains entitled to qualified immunity if it was objectively reasonable to

49

believe the questioned action did not violate the law.  *See Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015).

Here, Plaintiffs have sued former Mayor Byron Brown, former Commissioners Byron Lockwood and Daniel Derenda, Chief Aaron Young, Captain Philip Serafini, Lieutenant Kevin Brinkworth, and Officer Robbin Thomas in their individual capacities (collectively, the "Individual Defendants").  Compl. ¶ 24-30.  In this case, the Individual Defendants are unquestionably entitled to qualified immunity as to all of Plaintiffs' claims.

## A.    The Individual Defendants Did Not Violate Any Clearly Established Rights

Plaintiffs allege the Individual Defendants are liable for violations of Plaintiffs' clearly established constitutional rights by, among other things, establishing Checkpoints.  *See* Compl. ¶¶ 34, 421.  In this District, "[a] right is clearly established if: (1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful."  *Luna*, 356 F.3d at 490.

There is no constitutional right against being subjected to vehicle checkpoints conducted for traffic safety purposes.  Nor was there during the time the Checkpoints here operated.  On the contrary, as discussed in Section I.F., checkpoints designed to accomplish these ends have been repeatedly upheld as constitutional.  *See, e.g.*, *Wagner I*, 827 F. Supp. 2d at 98-99; *Henson*, 351 F. App'x at 821; *McFayden*, 865 F.2d at 1313.  For this reason alone, the Individual Defendants are entitled to qualified immunity.  *See Wagner I*, 827 F. Supp. 2d at 101

50

(granting individual officers qualified immunity after deeming traffic safety checkpoints constitutional).

To the extent Plaintiffs allege the Individual Defendants should be held personally liable for the BPD's general traffic enforcement practices, the same logic applies. As discussed herein, the challenged BPD traffic enforcement policies and practices are constitutional. In no way did the Individual Defendants violate any clearly established constitutional rights held by the Plaintiffs. As a result, all claims brought against the Individual Defendants in their individual capacities should be dismissed.

**B.    The Individual Defendants' Conduct was Objectively Reasonable**

Even if the Court determines that there was a clearly established constitutional right against having to go through traffic safety Checkpoints and against traffic enforcement generally, the individual Defendants are still entitled to qualified immunity because their actions were objectively reasonable. A police officer's conduct is "objectively reasonable if a reasonably competent officer would have acted the same way under similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-421 (2d Cir. 1995); *see also Wagner I*, 827 F. Supp. 2d at 100-101.

1.    Commanding Officers

The actions of former Commissioners Byron Lockwood and Daniel Derenda in ordering the Checkpoints and setting policy for traffic enforcement were objectively reasonable.

Former Commissioner Derenda created the Strike Force and Housing Unit in response to citizen complaints. *See* Derenda Dep. 1 at 16:8-16. The units were designed to be proactive in that patrols were not "tied to the radio." *Id.*; Gramaglia Dep. 1 at 14:2-12. In addition to their regular patrols, both the Strike Force and Housing Unit conducted Checkpoints to promote traffic safety and maintain high police visibility. Derenda Dep. 1 at 21:6-18; Russo Dep. at 194:13-21. In light of citizen complaints and concerns over traffic safety, it was objectively reasonable for former Commissioner Derenda to establish Checkpoints aimed at remedying those concerns. *See Wagner I*, 827 F. Supp. 2d at 101. For these same reasons, it was objectively reasonable for former Commissioner Lockwood to continue operating Checkpoints during his tenure.

Simply put, in line with New York State Vehicle and Traffic Law, it was objectively reasonable for the former Commissioners to order their officers to enforce the VTL.

2.    <u>Supervisory Officers</u>

Plaintiffs sued Chief Aaron Young ("Chief Young"), Lieutenant Kevin Brinkworth ("Lt. Brinkworth"), and Captain Serafini ("Capt. Serafini") in their individual capacities for their oversight and involvement in Checkpoints. Compl. ¶ 27-29. Chief Young was the Chief of the BPD Housing Unit and previously served as a Housing Unit officer and the Chief of the Strike Force. Young Dep. at 11:7-19. Lt. Brinkworth served as a Chief of the BPD Strike Force and supervised the operation of Checkpoints. *See* Brinkworth Dep. at 13:18-14:10. Capt. Serafini was a captain in the BPD Housing Unit who oversaw the unit's operations, including its traffic enforcement efforts. *See* Serafini Dep. at 27:3-23. Chief Young, Lt.

52

Brinkworth, and Capt. Serafini are entitled to qualified immunity, because their actions in following orders were objectively reasonable.

While these officers participated in and exercised some supervisory control over the Checkpoints, their conduct was pursuant to the instruction of former Commissioners Derenda and Lockwood. As the Second Circuit has long recognized, "[p]lausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Anthony v. City of N.Y.*, 339 F.3d 129, 138 (2d Cir. 2003); *see also Varrone v. Bilotti*, 123 F.3d 75, 81 (2d Cir. 1997) (holding that subordinate officers were entitled to qualified immunity where they carried out an "apparently valid order" of a superior).

Commissioner Derenda created and implemented the Checkpoint policy. Derenda Dep. 1 at 16:8-16. Chief Young received instructions and locations for the Checkpoints from the Deputy of Operations at the time, Byron Lockwood. *See* Young Dep. at 26:7-22. Similarly, Capt. Serafini was told where Checkpoints should be located by the Commissioner or Deputy Commissioner at that time. *See* Serafini Dep. at 20:22-21:18; 53:15-54:13. Nor was Lieutenant Brinkworth personally involved in setting Checkpoint locations; he received that instruction from Commissioner Derenda. Brinkworth Dep. at 73:4-74:19. All of their actions involving the Checkpoints resulted from the apparently valid orders of their superior officers. In other words, Chief Young, Capt. Serafini, and Lt. Brinkworth were all told to conduct Checkpoints and to ticket for VTL infractions. It was objectively reasonable for them to do so.

Additionally, to the extent Chief Young, Capt. Serafini, and Lt. Brinkworth otherwise enforced the VTL personally, their efforts were objectively reasonable. To the extent they ordered officers under their command to execute these commands, that too was objectively reasonable. One of the roles of law enforcement necessarily involves enforcing the law. Therefore, these individually named BPD supervising officers are entitled to qualified immunity.

3.    Robbin Thomas

Plaintiffs sued Officer Robbin Thomas ("Officer Thomas") in her individual capacity for her ticketing of Plaintiff Jasmine Evans at a Checkpoint. Compl. ¶ 30. Evans purports to be a member of the Checkpoint Class[9] and claims that she is entitled to damages from Officer Thomas' alleged violation of her Fourth Amendment, Equal Protection, and Title VI rights. *See* Dkt. No. 211, pp. 3, 25. Instead, Officer Thomas is entitled to qualified immunity for two additional reasons.

First, Officer Thomas was a Strike Force officer following the objectively valid orders of her superior officers to conduct Checkpoints. Like the other officers, she is entitled to qualified immunity. *See Anthony*, 339 F.3d at 138.

---

[9]    Plaintiffs' Complaint alleges that Evans is a member of the "Multiple Ticketing Damages Class," which is defined as "All non-White individuals who received multiple tickets from the BPD in a single traffic stop for tinted windows or seatbelt violations on or after June 28, 2015." Compl. ¶¶ 425-426. Plaintiffs have abandoned this class. Instead, in their Motion for Class Certification, Dkt. Nos. 202-212, 223-224, 241, Plaintiffs argue that their "Tinted Windows Class," defined as "All Black and/or Latino individuals who received multiple tinted window tickets from the BPD in a single traffic stop on or after June 28, 2015." Dkt. No. 211, p. 3.

Second, it was objectively reasonable for Officer Thomas to ticket Ms. Evans for her VTL violations. On or about July 2, 2015, Officer Thomas pulled Plaintiff Jasmine Evans over at a Checkpoint for various VTL violations. Compl. ¶ 380. Ms. Evans was driving with a learner's permit (not a valid driver's license), not wearing a seat belt. Thomas Dep. at 133:21-135:20. She also had her two children in booster seats that were inappropriate for their sizes and ages. *Id.* Officer Thomas ticketed her for three seat belt violations and for driving on her learner's permit. *Id.* at ¶¶ 380-383. At her deposition, Ms. Evans admitted these violations. Evans Dep. at 73:2-78:15.

In 2015, there was no Supreme Court or Second Circuit caw law that would have placed Officer Thomas on notice that ticketing Evans for her seat belt violations and for driving without a license would amount to a constitutional violation. Indeed, officers acting on probable cause at a traffic stop are entitled to qualified immunity. *See Clay v. Riordan*, 2020 WL 3893809, at *5 (W.D.N.Y. July 10, 2020); *see also DeBruin v. Macedon Police Dep't*, 2020 WL 1980098, at *3 (W.D.N.Y. Apr. 27, 2020). Officer Thomas did not violate a clearly established law. Even if there had been a clearly established law that Officer Thomas violated, which there is not, her belief that Ms. Evans' VTL violations posed a threat to public safety entitles her to qualified immunity. *See Hawthorne*, 492 F. Supp. 3d at 298-299.

## C.    Former Mayor Byron Brown was not Personally Involved in the Checkpoints

During the entire time frame at issue, former Mayor Byron Brown ("Mayor Brown") was the mayor of Buffalo. "[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he or she held a high position of authority."

*Id.* at 294 (internal quotations omitted) (citing *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)). "Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Rodriguez v. City of N.Y.*, 2023 WL 3304565, at *4 (S.D.N.Y. Jan. 20, 2023). In the Second Circuit, the following factors determine whether a defendant in a position of authority was personally involved:

> (i) the defendant participated directly in the alleged constitutional violation;
>
> (ii) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (iii) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (iv) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (v) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (citing *Grullon v. City of New Haven*, 720 F.3d 133, 138-139 (2d Cir. 2013)).

Mayor Brown does not meet any of these criteria. Plaintiffs have failed to show any evidence that former Mayor Brown had any personal involvement whatsoever in the challenged conduct alleged in the Complaint.

The Amended Complaint does not allege that Mayor Brown had any personal involvement in the Checkpoints. Rather, Plaintiffs seek to hold him individually liable simply because he held a position of high authority. Plaintiffs allege that Mayor Brown, by virtue of his position, was the chief policy making official for the City and the person ultimately responsible for ensuring that the BPD obeyed all laws. Compl. ¶ 24. It cannot be credibly argued or

56

supported with evidence that Mayor Brown participated in the creation or execution of Strike Force or the Checkpoints. *See* Brown Dep. 58:2-11.

        Plaintiffs may argue that Mayor Brown failed to stop the Checkpoints after complaints about them were brought to his attention and the attention of the Buffalo Common Council. This argument is unpersuasive. In response to these complaints, Mayor Brown followed up with BPD officials and was briefed on the issue. Brown Dep. at 220:11-221:7. During that briefing, he was assured that the Checkpoints were operating in a permissible manner. *Id.* The former Mayor's response is not enough to trigger personal involvement sufficient to defeat qualified immunity. "Notably, mere knowledge and acquiescence to unconstitutional conduct, or mere failure to act on a complaint, without more, fails to state a claim under Section 1983." *Hawthorne*, 492 F. Supp. 3d at 294 (internal quotations omitted) (citing *Faulk v. N.Y.C. Dep't of Cor.*, 2014 WL 239708, at *10 (S.D.N.Y. Jan. 21, 2014)); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010)). In *Mateo*, the Court noted that the receipt of grievances or complaints, alone, does not amount to personal involvement. 682 F. Supp. 2d at 430. That Mayor Brown learned of complaints and made a follow up inquiry with the BPD is not enough to hold him liable in his individual capacity. Mayor Brown is entitled to qualified immunity.

        Even if the Court were to determine that the Individual Defendants violated Plaintiffs' clearly established constitutional rights, the legal precedent did not, and still does not, put them on notice that their conduct would be objectively unreasonable. Absent that showing of unreasonableness, summary judgment should be granted to the Individual Defendants on Plaintiffs' claims based on qualified immunity.

**POINT IV.  THE UNKNOWN DEFENDANTS SHOULD BE DISMISSED**

Plaintiffs have not identified any of the unknown supervisory personnel and unknown officers named as parties in the Amended Complaint.  Plaintiffs have not further amended their Complaint to identify those individuals.  Therefore, Unknown Supervisory Personnel 1-10 and Unknown Officers 1-20 should be dismissed.  *See Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 261 (W.D.N.Y. 2021) (dismissing claims against unknown BPD defendants where plaintiffs failed to identify them in any meaningful manner and failed to amend complaint to name them).

**POINT V.  BLACK LOVE RESISTS IN THE RUST LACKS STANDING**

Plaintiff Black Love Resists in the Rust ("BLRR") does not have standing to assert the rights of Black and Latino residents of Buffalo.  Article III requires that all parties before federal courts must have standing to bring their claims.  *See Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 321 (S.D.N.Y. 2018) ("*BLM*") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Standing is a jurisdictional requirement that can be raised at any time and cannot be waived.  *Mancuso v. Consol. Edison Co. of N.Y.*, 130 F. Supp. 2d 584, 588-589 (S.D.N.Y. 2001) (citations omitted).

Second Circuit law holds that "[o]rganizations do not have standing to assert the rights of their members in § 1983 cases because 'the rights § 1983 secures are personal to those purportedly injured.'" *BLM*, 354 F. Supp. 3d at 322 (citing *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 10 (2d Cir. 1984)).  Despite this "Plaintiff [BLRR] and individual plaintiffs and class representatives . . . bring this civil action

58

pursuant to 42 U.S.C. § 1983 on their behalf and as representative of similarly situated

individuals . . ."  Compl. ¶ 2.  BLRR clearly lacks standing in this action.

To the extent that BLRR argues it has standing to sue on its own behalf, BLRR is

wrong.  First, Plaintiffs' Amended Complaint does not contain any allegation that BLRR is suing

on its own behalf.  The Amended Complaint specifically states "BLRR brings this action on

behalf of its membership . . ."  Compl. ¶ 13.  Even if BLRR did bring this action on its own

behalf, it still lacks standing.  An organization can only bring a § 1983 claim on its own behalf if

it can satisfy the requirements for Article III standing.  *BLM*, 354 F. Supp. 3d at 322.

Specifically, an organization must show (i) an imminent injury to itself as an organization that is

distinct and palpable from the injury to its members; (ii) the injury is fairly traceable to the

defendant's actions; and (iii) the court can redress the injury.  *Id.*  BLRR has not alleged that it

suffered *any* injury as a result of the BPD's traffic enforcement practices, let alone an imminent

injury.  *See generally* Compl.  Therefore, BLRR lacks standing to sue on behalf of its members.

*See BLM*, 354 F. Supp. 3d 313, 322-323 (S.D.N.Y. 2018) (dismissing BLM organization for lack

of standing in Section 1983 action where BLM failed to state an injury specific to the

organization); *see also Conn. Citizens Defense League, Inc. v. Thody*, 664 F. Supp. 3d 235, 248

(D. Conn. 2023)

BLRR should be dismissed from this action for lack of standing.

## CONCLUSION

For these compelling reasons, the Court should grant the City Defendants' Motion for Summary Judgment in its entirety, and grant such further and additional relief as the Court may deem just and proper.

Dated:        Buffalo, New York
              February 7, 2025

                                        **HODGSON RUSS LLP**
                                        *Attorneys for Defendants City of Buffalo, NY, Byron*
                                        *B. Brown, Byron C. Lockwood, Daniel Derenda,*
                                        *Aaron Young, Kevin Brinkworth, Philip Serafini,*
                                        *Robbin Thomas, Unknown Supervisory Personnel*
                                        *1-10, and Unknown Officers 1-20*

                                        By:  */s/ Peter A. Sahasrabudhe*_____
                                               Hugh M. Russ III, Esq.
                                               Peter Sahasrabudhe, Esq.
                                               Cheyenne N. Freely, Esq.
                                        The Guaranty Building
                                        140 Pearl Street, Suite 100
                                        Buffalo, NY  14202-4040
                                        716.856.4000
                                        *hruss@hodgsonruss.com*
                                        *psahasra@hodgsonruss.com*
                                        *cfreely@hodgsonruss.com*