UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BLACK LOVE RESISTS IN THE RUST
by and through MARIELLE SHAVONNE
SMITH and CHARIS HUMPHREY on
behalf of its members; SHAKETA
REDDEN; DORETHEA FRANKLIN;
TANIQUA SIMMONS; DE'JON HALL;
JOSEPH BONDS; CHARLES PALMER;
SHIRLEY SARMIENTO; EBONY
YELDON; and JASMINE EVANS,
individually and on behalf of a class of all
others similarly situated,

              Plaintiffs,

              v.

CITY OF BUFFALO, NY; BYRON B.
BROWN, Mayor of the City of Buffalo, in
his individual and official capacities;
BYRON C. LOCKWOOD, Commissioner
of the Buffalo Police Department, in his
individual and official capacities; DANIEL
DERENDA, former Commissioner of the
Buffalo Police Department, in his individual
capacity; AARON YOUNG, KEVIN
BRINKWORTH, PHILIP SERAFINI,
ROBBIN THOMAS, UNKNOWN
SUPERVISORY PERSONNEL 1-10,
UNKNOWN OFFICERS 1-20, each
officers of the Buffalo Police Department, in
their individual capacities,

              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Case No.: 1:18-cv-00719-CCR

ECF Case

## **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE CITY OF BUFFALO**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 4

A.    The Buffalo Checkpoint Program Was a Municipal Policy, Custom, or Practice ........ 4

B.    The Strike Force and Housing Unit's Participation in the Checkpoint Program and Mandatory Reporting to BPD Leadership ........................................................ 5

C.    The Purpose of the Checkpoint Program, According to the City ................................. 5

D.    The Checkpoint Program's Lack of Traffic Safety Considerations ............................. 6

E.    Current Status of Checkpoints ........................................................................... 7

ARGUMENT ......................................................................................................... 7

I.    Plaintiffs Are Entitled to Partial Summary Judgment Because the Checkpoint Program Violates the Fourth Amendment ..................................................... 8

        A.    The Fourth Amendment Prohibits Suspicionless Traffic Stops Subject to a Narrow "Special Needs" Exception ..................................................... 8

        B.    The Checkpoint Program Violates the Fourth Amendment Because Its Asserted Primary Programmatic Purpose Does Not Advance a Special Need ........................................................................................................ 10

                1.    The City's Proffered Justification for the Checkpoint Program Is a Normal Law Enforcement Purpose, Not a Special Need ................... 11

                2.    The City's "Traffic Safety" Justification Is the Same as Its Impermissible Law Enforcement Purpose of Enforcing the Vehicle and Traffic Law ............................................................. 12

                3.    The Checkpoint Program Surpasses Constitutionally Permissible Special Needs Checkpoints in Breadth and Scope ........................... 16

II.    The City is Liable Under the Fourth Amendment Because the Checkpoint Program Was Official Municipal Policy, Custom, or Practice ................................. 20

CONCLUSION ...................................................................................................... 22

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Airbnb, Inc. v. City of New York*,
   373 F. Supp. 3d 467 (S.D.N.Y. 2019) ....................................................... 19

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) ................................................................................... 22

*Bourgeois v. Peters*,
   387 F.3d 1303 (11th Cir. 2004) ........................................................... 9, 15

*Brendlin v. California*,
   551 U.S. 249 (2007) ..................................................................................... 8

*Cassidy v. Chertoff*,
   471 F.3d 67 (2d Cir. 2006) ........................................................ 10, 12, 18, 19

*Chandler v. Miller*,
   520 U.S. 305 (1997) ........................................................................... *passim*

*City of Indianapolis v. Edmond*,
   531 U.S. 32 (2000) ............................................................................. *passim*

*City of Los Angeles v. Patel*,
   576 U.S. 409 (2015) ................................................................................... 19

*City of St. Louis v. Praprotnik*,
   485 U.S. 112 (1988) ................................................................................... 21

*Delaware v. Prouse*,
   440 U.S. 648 (1979) ......................................................................... 8, 13, 17

*Ferguson v. City of Charleston*,
   532 U.S. 67 (2001) ............................................................................. *passim*

*Heien v. North Carolina*,
   574 U.S. 54 (2014) ....................................................................................... 8

*Illinois v. Lidster*,
   540 U.S. 419 (2004) ................................................................................... 17

*Jeffes v. Barnes*,
   208 F.3d 49 (2d. Cir. 2000) ....................................................................... 21

*Jones v. Cnty. of Suffolk*,
   936 F.3d 108 (2d Cir. 2019) ............................................................. *passim*

*Klayman v. Obama*,
    142 F. Supp. 3d 172 (D.D.C. 2015) ................................................................. 9

*Lynch v. City of New York*,
    589 F.3d 94 (2d Cir. 2009) ................................................................. 10, 19

*MacWade v. Kelly*,
    460 F.3d 260 (2d Cir. 2006) ................................................................. 17, 18

*Mandell v. Cnty. of Suffolk*,
    316 F.3d 368 (2d Cir. 2003) ................................................................. 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................. 7

*McLennon v. City of New York*,
    171 F. Supp. 3d 69 (E.D.N.Y. 2016) ................................................................. 20

*Michigan Dep't of State Police v. Sitz*,
    496 U.S. 444 (1990) ................................................................. 1, 13, 16

*Monell v. Dep't of Soc. Servs. of City of New York*,
    436 U.S. 658 (1978) ................................................................. 20, 22

*SEC v. City of Rochester*,
    731 F.Supp.3d 455 (W.D.N.Y. 2024) ................................................................. 7

*Stauber v. City of New York*,
    No. 03 Civ. 9162(RWS), 2004 WL 1593870 (S.D.N.Y. July 16, 2004) ................................ 14

*Treasury Employees v. Von Raab*,
    489 U.S. 656 (1989) ................................................................. 8, 9, 11

*United States v. Lifshitz*,
    369 F.3d 173 (2d Cir. 2004) ................................................................. 3, 10

*United States v. Martinez-Fuerte*,
    428 U.S. 543 (1976) ................................................................. 8, 16

*Vernonia Sch. Dist. 47J v. Acton*,
    515 U.S. 646 (1995) ................................................................. 11, 13

*Wagner v. Swarts*,
    827 F. Supp. 2d 85 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F.
    App'x 500 (2d Cir. 2012) ................................................................. 18

*Whren v. Robinson*,
    517 U.S. 806 (1996) ................................................................. 8

**Statutes**

42 U.S.C § 1983 ................................................................. 20

**Other Authorities**

U.S. Const. amend. IV ............................................................................................ *passim*

Buffalo City Charter, Art. 13 § 13-4 .......................................................................... 21

Fed. R. Civ. P. 56(a) ................................................................................................. 7

## INTRODUCTION

For over a decade, the City of Buffalo ("City"), through the Buffalo Police Department ("BPD"), has targeted Black and Latino motorists for revenue raising and racially-discriminatory law enforcement through a series of unconstitutional practices. *See* ECF 211, Pls. Mem. of Law, at 1-22. From June 2012 until November 2017, the BPD erected motor vehicle Checkpoints in Black and Latino communities pursuant to the Checkpoint Program, a municipal policy, custom, and practice created by BPD Commissioner Daniel Derenda with the support of Mayor Byron Brown. The Checkpoints—conducted almost daily, and often multiple times per day—disrupted the fabric of life for Black and Latino residents, subjecting thousands of ordinary citizens to suspicionless stops and casting a pall of fear and anxiety over the essential tasks of life such as driving to work, school, and the grocery store. Plaintiffs are entitled to partial summary judgment on their claim that the Checkpoint Program violated the Fourth Amendment.

Under well-established Fourth Amendment jurisprudence, suspicionless vehicle stops at checkpoints are "seizures"—and unconstitutional unless justified by a "special need." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990). A "special need" is a "closely guarded category," *Chandler v. Miller*, 520 U.S. 305, 309 (1997), applicable only when "exceptional circumstances" justify a departure from the constitutional requirement of individualized suspicion. *Jones v. Cnty. of Suffolk*, 936 F.3d 108, 115 (2d Cir. 2019). A routine law enforcement purpose does *not* constitute a special need. *Id.* Instead, courts have only upheld suspicionless searches and seizures based on *non*-law enforcement needs that are "substantial" as well as narrow in scope and/or purpose. *Id.* Government officials shoulder the burden of establishing the special need. *Id.*

1

The City has asserted that the primary programmatic purpose of the Checkpoint Program was "vehicle and traffic safety and the enforcement of the New York State Vehicle and Traffic Law." Ex. 13, Defs.' Feb. 20, 2024 Rog. Responses at 2. Plaintiffs contest this assertion given that the evidentiary record overwhelmingly demonstrates that the BPD operated the Checkpoints for the primary programmatic purpose of general crime control, rendering the Checkpoints *per se* unconstitutional under *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000).[1] However, even accepting *arguendo* the City's assertion, summary judgment is proper on Plaintiffs' Fourth Amendment claim for two independent reasons:

*First*, the City's concession that the Checkpoint Program's primary purpose was "enforcement of the New York State Vehicle and Traffic Law" destroys any attempt to justify it under the "special needs" exception. *See* §§ I.B.1-I.B.2, *infra*. Supreme Court and Second Circuit law clearly provide that ordinary law enforcement objectives cannot constitute "special needs" that bypass the Fourth Amendment's default requirement of individualized suspicion. And enforcing the vast array of traffic violations, misdemeanors, and felonies gathered under the broad umbrella of New York's Vehicle and Traffic Law ("VTL") is among the most ordinary of police objectives.

*Second*, the sweeping and indiscriminate nature of the Checkpoint Program, completely untethered to any particularized traffic safety concern, far exceeds the breadth and scope limitations on constitutionally permissible special needs checkpoints. The suspicionless

---

[1] This motion demonstrates why Plaintiffs are entitled to summary judgment against the City *even* if the City's asserted primary purpose is taken at face value. As Plaintiffs will show in their Opposition to the City's Motion for Summary Judgment, determining the primary programmatic purpose of the Checkpoints likely involves resolution of disputed material facts, though the weight of the evidence so overwhelmingly favors Plaintiffs that it is possible no *genuine* dispute exists. Regardless, because the City's asserted primary purpose is itself unlawful, this Court may grant summary judgment to Plaintiffs without resolving that question.

searches and seizures that have been upheld by courts are those where the government offers an empirical, fact-based, non-law enforcement justification *and* the program in question is tailored to address that specific concern. For example, courts have upheld sobriety checkpoints targeted at drunk drivers, security checkpoints where the government has identified specific threats (e.g., terrorism), and drug testing of people in sensitive positions (e.g., student athletes, railway workers). In contrast, courts have rejected "implausible or overbroad assertions of 'special needs'" as grounds to justify the disposal of the requirement of individualized suspicion. *United States v. Lifshitz*, 369 F.3d 173, 185-86 (2d Cir. 2004); *Chandler*, 520 U.S. at 322 (striking down state drug testing regime where the "need revealed, in short, is symbolic, not 'special'"). No precedent sanctions the City's decision to sidestep the constitutional requirement of individualized suspicion—multiple times near-daily over a five-year period—based on a generalized assertion of "vehicle and traffic safety and enforcement of the New York State Vehicle and Traffic Law." Ex. 13, Defs.' Feb. 20, 2024 Rog. Responses at 2. This is plainly not a "special" need but rather a blatant disregard of the Constitution. The Court should not endorse it. *See* § I.B.3, *infra*.

*Finally*, municipal liability against the City is proper because the Checkpoint Program was a policy, custom, or practice of the Buffalo Police Department that the City's final decisionmakers on municipal policy designed, authorized, and ratified as implemented. *See* § II, *infra*.

3

## BACKGROUND

**A.    The Buffalo Checkpoint Program Was a Municipal Policy, Custom, or Practice**

Daniel Derenda, who served as the Commissioner of the BPD and its final policymaker, created, authorized, and oversaw the Checkpoint Program. Pls.' 56.1 Stmt. of Material Facts ("SMF") ¶¶ 11-15. Mayor Byron Brown supported and approved of it. SMF ¶ 17.

Under the Checkpoint Program, the BPD conducted more than 1,600 Checkpoints over a five-year period from June 2012 until November 2017. SMF ¶ 3. The BPD predominantly erected Checkpoints in majority Black or Latino communities such as the East Side. SMF ¶ 6. The BPD ran Checkpoints one to four times daily, except when manpower or weather concerns arose. SMF ¶ 19. Officers were instructed to set up Checkpoints to minimize the possibility of motorists avoiding them and to stop any vehicle attempting to avoid a Checkpoint. SMF ¶ 20. At Checkpoints, all vehicles were subjected to an initial stop without any individualized suspicion. SMF ¶ 24. Officers were instructed to look for and issue tickets for all VTL violations. SMF ¶¶ 26-27. They could also investigate motorists for potential criminal wrongdoing. SMF ¶ at 28. Commissioner Derenda instructed officers to "impound as many vehicles as legally possible" and to "make arrests and write traffic summonses as many as possible." SMF ¶ 29.

The City stopped and ticketed thousands of motorists under the Checkpoint Program. SMF ¶ 4. Plaintiffs Joseph Bonds, Jasmine Evans, Dorethea Franklin, De'Jon Hall, Shaketa Redden, Taniqua Simmons, and Ebony Yeldon were each stopped at one or more Checkpoints. SMF ¶ 8. Plaintiffs Bonds, Evans, Redden, and Simmons received tickets, while Plaintiffs Hall, Yeldon, and Franklin were stopped but not ticketed. SMF ¶¶ 9-10. Each Plaintiff has driven in Buffalo and intends to do so in future. SMF ¶ 7.

**B.**    **The Strike Force and Housing Unit's Participation in the Checkpoint Program and Mandatory Reporting to BPD Leadership**

The BPD Strike Force operated the Checkpoints, with periodic assistance from the BPD Housing Unit. SMF ¶¶ 30, 33. The mission of the Strike Force was to target violent crime in crime hot spots, including by gang members, and to remove illegal guns from the streets of Buffalo. SMF ¶ 31. The mission of the Housing Unit was crime prevention in and around Buffalo Municipal Housing Authority ("BMHA") housing complexes. SMF ¶ 34.

Commissioner Derenda required Strike Force and Housing Unit officers to submit daily reports logging their felony and misdemeanor arrests, traffic summonses, impounds, and seizures of guns and cash, including at Checkpoints. SMF ¶ 35. Commissioner Derenda required these reports because his "philosophy is what gets measured gets done," and he wanted to ensure that officers were "doing what they were being paid to do." SMF ¶¶ 36-37. Commissioner Derenda also let the Strike Force and Housing Unit know when he was dissatisfied with their "production." SMF ¶ 38.

Once the Checkpoint Program began, tinted window tickets became the BPD's most frequently issued violation. SMF ¶ 39. Tinted windows do not cause many traffic accidents. SMF ¶ 40. The BPD considers them an "officer safety issue." SMF ¶ 41.

**C.**    **The Purpose of the Checkpoint Program, According to the City**

The City has asserted that the Checkpoint Program had a primary purpose of ordinary law enforcement. SMF ¶¶ 42, 54, 56. Specifically, the City's answers to contention interrogatories state that the "primary programmatic purpose" of the Checkpoint Program was "vehicle and traffic safety and the enforcement of the New York State Vehicle and Traffic Law." SMF ¶ 42. Commissioner Derenda, the City's 30(b)(6) representative, further clarified that by "traffic safety" the City was "referring to the enforcement of the New York State Vehicle

and Traffic Laws or VTL." SMF ¶ 44. The BPD Manual of Procedures ("MOP"), which contains provisions authorizing the Checkpoint Program, likewise states that "the purpose of a checkpoint is to stop motorists and to methodically evaluate their compliance with the law." SMF ¶ 49.

Other top municipal officials similarly testified that the goal of the Checkpoint Program was to enforce the VTL. For example, Mayor Brown testified that "[t]he primary purpose of checkpoints was vehicle and traffic interdiction." SMF ¶ 45. Aaron Young, who served as Chief of the Housing Unit and Strike Force, testified that the goal of the Checkpoint Program was "to enforce provisions of the vehicle and traffic law." SMF ¶ 46. And Philip Serafini, Captain of the Housing Unit, testified that the Housing Unit conducted checkpoints around BHMA properties in order "to enforce vehicle and traffic law and penal law." SMF ¶ 47.

The VTL contains more than nine hundred provisions. SMF ¶ 50. Violations of the VTL are classified as violations, misdemeanors, or felonies. SMF ¶ 51. Penalties for violations of the VTL range from civil fines to jail time, depending on the gravity of the offense. SMF ¶ 53. Enforcement of the VTL is part of the ordinary law enforcement duties of BPD officers. SMF ¶ 54. Enforcing the VTL is law enforcement. SMF ¶ 56.

**D.    The Checkpoint Program's Lack of Traffic Safety Considerations**

The BPD did not rely on traffic safety data to determine Checkpoint locations. SMF ¶¶ 57-58. The City could not identify any instance in which it had established a Checkpoint location based on traffic safety or accident data or reports of motor vehicle accidents, red light, speeding, stop sign, DWI, licensing, registration, or inspection violations. SMF ¶¶ 59-65.

Instead, the BPD chose Checkpoint locations based on Strike Force and Housing Unit law enforcement priorities. SMF ¶ 66. To the extent the BPD relied on data to determine

Checkpoint locations at all, that data was crime statistics, hot spot maps, and reports of recent shootings or violence. SMF ¶ 67.

The City never conducted any analysis to determine whether the Checkpoint Program improved traffic safety. SMF ¶ 68. When asked why no such analyses were conducted, Commissioner Derenda, as the City's 30(b)(6) representative, testified: "We had a focus of reducing crime throughout the city which we accomplished. Traffic safety, if we came across numbers of accidents the chief said, oh, we're having numerous accidents here, we would address it with *different issues*." SMF ¶ 69 (emphasis added).

**E.    Current Status of Checkpoints**

The Checkpoint Program was suspended in November 2017. SMF ¶ 70. However, nothing prevents the City from reinstating the Checkpoints. SMF ¶ 71. Indeed, the BPD MOP still contains provisions authorizing the Checkpoint Program. SMF ¶ 72.

**ARGUMENT**

Summary judgment is proper under Rule 56 of the Federal Rules of Civil Procedure where the moving party establishes "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *SEC v. City of Rochester*, 731 F.Supp.3d 455, 463 (W.D.N.Y. 2024) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986)) (emphasis in original). Further, non-movants "must do more than simply show that there is some metaphysical doubt as to the material facts;" they "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

I.     **Plaintiffs Are Entitled to Partial Summary Judgment Because the Checkpoint Program Violates the Fourth Amendment**

A.     **The Fourth Amendment Prohibits Suspicionless Traffic Stops Subject to a Narrow "Special Needs" Exception**

The Fourth Amendment prohibits unreasonable seizures. *Edmond*, 531 U.S. at 37; *Whren v. Robinson*, 517 U.S. 806, 808-10 (1996). Traffic and checkpoint stops of motorists and their passengers constitute seizures under the Fourth Amendment, even when "the purpose of the stop[s] is limited and the resulting detention is quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *accord United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976) ("checkpoint stops are 'seizures' within the meaning of the Fourth Amendment"); *Brendlin v. California*, 551 U.S. 249, 254 (2007) (seizures occur whenever "an officer, by means of physical force or show of authority, terminates or restrains [a motorist's] freedom of movement") (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

Seizures by law enforcement are presumptively unreasonable in the absence of individualized suspicion of wrongdoing. *Edmond*, 531 U.S. at 37; *Prouse*, 440 U.S. at 654 (justification for this rule is "to safeguard the privacy and security of individuals against arbitrary invasions") (citations omitted). Individualized suspicion exists when "the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. Individualized suspicion also exists when the police have "a particularized and objective basis for suspecting the particular person stopped" is breaking the law. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (internal citations omitted); *accord Prouse*, 440 U.S. at 663.

The special needs doctrine is a limited exception to the constitutional requirement of individualized suspicion—one that applies only in "exceptional circumstances." *Jones*, 936 F.3d at 115 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring)); *accord Edmond*, 531 U.S. at 37. To satisfy the Fourth Amendment, a program of suspicionless

searches or seizures must advance "special needs, beyond the normal need for law enforcement." *Edmond*, 531 U.S. at 37; *accord Treasury Employees v. Von Raab*, 489 U.S. 656, 665 (1989). The special need must have a primary and immediate objective that is separate and distinct from normal or ordinary law enforcement activity. *Edmond*, 531 U.S. at 37; *Ferguson v. City of Charleston*, 532 U.S. 67, 79-80 (2001). The government bears the burden of identifying "a substantial non-law enforcement" justification for the intrusion. *Jones*, 936 F.3d at 115; *accord Ferguson*, 532 U.S. at 79-84 (placing the burden on the government to establish that the primary purpose served is a constitutionally permissible objective beyond general law enforcement).

Courts have consistently held that a "special" need must be just that: narrow, limited, and exceptional, not normal or ordinary. *See Ferguson*, 532 U.S. at 83 (special needs are a "closely guarded category"); *Chandler*, 520 U.S. at 319 (rejecting suspicionless searches in the absence of a "concrete danger demanding departure from the Fourth Amendment's main rule"); *Von Raab*, 489 U.S. at 668 (special needs apply in "limited circumstances"); *Jones*, 936 F.3d at 115 (special needs apply in "exceptional circumstances"); *Bourgeois v. Peters*, 387 F.3d 1303, 1312 (11th Cir. 2004) (special needs apply in "narrow cases"); *Klayman v. Obama*, 142 F. Supp. 3d 172, 192 (D.D.C. 2015) (rejecting "sweeping" suspicionless program that was not "a discrete or targeted incursion").

Where there is no valid special need, or the special need is not the *primary* purpose of a program of suspicionless seizures or searches, the program is a *per se* violation of the Fourth

Amendment and the court's inquiry ends. *Edmond*, 531 U.S. at 458; *Ferguson*, 532 U.S. at 93-84.[2]

**B.    The Checkpoint Program Violates the Fourth Amendment Because Its Asserted Primary Programmatic Purpose Does Not Advance a Special Need.**

It is undisputed that the City, through the Checkpoint Program, effectuated a regime of suspicionless traffic stops of Buffalo motorists, including Plaintiffs. SMF ¶¶ 5, 8. Such a regime is presumptively unconstitutional. Thus, the threshold question before this Court is whether the *primary purpose* of the Checkpoint Program serves a "'special need' . . . divorced from the State's general interest in law enforcement." *Ferguson*, 532 U.S. at 79; *see also Lynch v. City of New York*, 589 F.3d 94, 100 (2d Cir. 2009) (when applying doctrine, courts must first consider whether the primary programmatic purpose serves special needs). It does not.

The Second Circuit has identified two important limitations on the special needs doctrine arising out of governing Supreme Court case law. First, the government's asserted special need "must not be isomorphic with law enforcement needs, but rather go beyond them." *Cassidy v. Chertoff*, 471 F.3d 67, 81 (2d Cir. 2006); *accord Lifshitz*, 369 F.3d at 185 (same). Second, courts should not "ratify implausible or overbroad assertions" of special needs. *Cassidy*, 471 F.3d at 81. The BPD Checkpoint Program violates both of these tenets, each of which is independently fatal to the City's position. The City's own statement of the primary

_____

[2] Even if a special need is identified, that does not alone make a suspicionless search or seizure permissible under the Fourth Amendment. *Jones*, 936 F.3d at 118. Instead, courts determine the constitutionality of the search or seizure by applying a multi-part balancing test that weighs "(1) the weight and immediacy of the government interest, (2) the nature of the privacy interest allegedly compromised by the [detention], (3) the character of the deprivation imposed by the detention, and (4) the efficacy of the detention in advancing the government interest." *Id*. (citations omitted). The balancing test is beyond the scope of this motion because Plaintiffs seek summary judgment based on the invalidity of the asserted special need.

purpose of the Program shows that it does not serve "special needs," and the Program as a whole is impermissibly broad. Accordingly, the BPD Checkpoint Program violates the Fourth Amendment.

### 1. The City's Proffered Justification for the Checkpoint Program Is a Normal Law Enforcement Purpose, Not a Special Need

An ordinary law enforcement purpose cannot constitute a "special need" that justifies suspicionless searches or seizures. *See, e.g., Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (special needs doctrine applies "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.") (permitting drug testing of interscholastic athletes) (citing *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal quotation marks omitted)); *Edmond*, 531 U.S. at 37 (same) (invalidating suspicionless drug interdiction checkpoints); *Von Raab*, 489 U.S. at 665-66 (special needs doctrine applied where program was "not designed to serve the ordinary needs of law enforcement") (permitting drug testing of certain customs officials); *Ferguson*, 532 U.S. at 79-80 (special needs doctrine has only been applied in cases where "the 'special need' that was advanced…was one divorced from the State's general interest in law enforcement") (invalidating state hospital's suspicionless drug testing program); *Chandler*, 520 U.S. at 313-314 ("[P]articularized exceptions to the main [Fourth Amendment individualized suspicion] rule are sometimes warranted based on 'special needs, beyond the normal need for law enforcement.'") (citing *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619 (1989)) (invalidating suspicionless drug testing of candidates for state office).

Here, the City's own admissions demonstrate that the asserted primary purpose of the Checkpoints is ordinary law enforcement plain and simple. In response to an interrogatory seeking an identification of the primary programmatic purpose of the Checkpoints, the City

stated: "vehicle and traffic safety and *the enforcement of the New York State Vehicle and Traffic Law*." Ex. 13, Defs.' Feb. 20, 2024 Rog. Responses at 2. (emphasis added). The City and its law enforcement officials have also acknowledged that enforcing the VTL is a routine police function—one expected to be performed in adherence with the ordinary requirements of individualized suspicion. SMF ¶¶ 42-56. The Fourth Amendment demands something "special," over and above normal law enforcement needs, to justify suspicionless seizures. Here, there is nothing. Because enforcing the law is definitionally not a "special need[], beyond the normal need for law enforcement," *Edmond*, 531 U.S. at 37, the special needs exception does not apply. *Id.* at 38.

### 2. The City's "Traffic Safety" Justification Is the Same as Its Impermissible Law Enforcement Purpose of Enforcing the Vehicle and Traffic Law

The City's invocation of "vehicle and traffic safety" as part of the asserted primary purpose does not alter the conclusion that the special needs doctrine does not apply, because the undisputed evidence is that the two purposes are one and the same—and both constitute law enforcement. BPD Commissioner Derenda, who was both the final municipal policymaker in charge of the Checkpoint Program and the City's 30(b)(6) representative, testified:

> Q. We have been talking a bit about traffic safety enforcement. But to confirm, when you refer to the checkpoints furthering the goal of traffic safety, you're referring to the enforcement of the New York State Vehicle and Traffic Laws or VTL, correct?

> A. Correct.

Ex. 5, Derenda Jan. 23, 2024 30(b)(6) Dep. at 248:6-12. Thus, for the City, "vehicle and traffic safety" means nothing more than "enforcement of the New York State Vehicle and Traffic Law." It is "isomorphic with law enforcement needs," so it cannot be "special." *Cassidy*, 471 F.3d at 81.

As further confirmation that the Checkpoints served no "traffic safety" purpose beyond general law enforcement, the undisputed evidence is that no specific traffic safety concerns informed the operation of the Program. The City did not peg Checkpoint locations to traffic safety data, reports of speeding, motor vehicle accidents, red light violations, or other traffic infractions such as licensing, registration, and inspection violations. *See, e.g.*, Ex. 5, Derenda Jan. 23, 2024 30(b)(6) Dep. at 208-211 (confirming this was not BPD policy); Ex. 14, Defs.' Mar. 11, 2024 RFA Response at 3-10 (acknowledging that no such instances could be identified). Nor did the City conduct any formal analysis to assess whether the Checkpoints improved traffic safety. *Id.* at 10. The BPD "did not keep metrics on traffic safety issues." Ex. 5, Derenda Jan. 23, 2024 30(b)(6) Dep. at 197:1-2. Like the suspicionless stops struck down in *Delaware v. Prouse*, 440 U.S. 648 (1979), "*no* empirical evidence indicated" that the Checkpoints "would be an effective means of promoting roadway safety." *Sitz*, 496 U.S. at 454 (emphasis in original). Unlike the DUI checkpoints approved in *Sitz*, the Checkpoint Program operated with "a complete absence of empirical [traffic safety] data." *Id.*[3]

Supreme Court precedent establishes that amorphous public safety rationales— untethered to specific risks or circumstances, as here—cannot constitute "special needs" because they are indistinguishable from general law enforcement interests. Rather, "special needs" must be "sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler*, 520 U.S. at 318. In *Chandler*, the Court struck down a Georgia law requiring candidates for certain state offices to certify that they had taken a drug test and that the result was negative. *Id.* at 305. In reaching its holding, the Court emphasized

---

[3] The BPD did, however, use and collect general crime control data in connection with the Checkpoint Program. SMF ¶¶ 35, 67.

the government's failure to present "any indication of a concrete danger demanding departure from the Fourth Amendment's main rule," in direct contrast with prior special needs precedent. *Id.* at 318-20 (citing *Skinner*, 489 U.S. at 606-08 (upholding drug testing of rail employees in response to evidence of drug and alcohol abuse by some employees and associated train accidents)). *See also Vernonia*, 515 U.S. at 648 (upholding random drug testing of high school students in athletic competitions in response to "a sharp increase in drug use" in the school district); *cf. Stauber v. City of New York*, No. 03 Civ. 9162(RWS), 2004 WL 1593870, at *31-32 (S.D.N.Y. July 16, 2004) (suspicionless bag searches based on "a general invocation of terrorist threats" violated Fourth Amendment where city failed to show the searches would "reduce the threat"). Similarly, here, the record is devoid of any reason, let alone a "substantial" reason, that the BPD needed to bypass the Fourth Amendment in order to enforce the VTL. *Chandler*, 520 U.S. at 318.

Even if the City operated the Checkpoints Program with the ultimate goal of improving traffic safety, that does not create a "special need." In *Ferguson*, the Supreme Court considered the constitutionality of a state hospital program that conducted suspicionless drug tests of patients who were pregnant or had recently delivered and notified law enforcement of positive test results, which led to arrests. 532 U.S. at 67-74. The Supreme Court concluded that even if the ultimate goal of the policy was encouraging drug treatment among pregnant women, that could not constitute a special need because the "immediate objective" of the suspicionless search program was to "generate evidence *for law enforcement purposes*." *Id.* at 83 (emphasis in the original). In so doing, the Court explained: "[L]aw enforcement involvement always serves some broader social purpose or objective." *Id.* at 84. Thus, invoking the ultimate purpose behind the enforcement of a law is insufficient to constitute a special need; otherwise, "virtually

any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose." *Id*. Here, the clear emphasis of the Checkpoint Program was on developing evidence of VTL violations in order to issue tickets, make arrests, and impound vehicles—all traditional law enforcement activities that normally require individualized suspicion. SMF ¶¶ 42-56. The City's invocation of the ultimate purpose behind aspects of the vehicle and traffic law—"vehicle and traffic safety"—falls squarely within the Supreme Court's admonition in *Ferguson*, making it legally insufficient.

*Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004), is similarly instructive. There, the Eleventh Circuit considered the constitutionality of a city policy requiring every person wishing to attend an annual protest to submit to a magnetometer (i.e., a metal detector) search at a checkpoint near the protest site. *Id.* at 1307. According to the city, this was a permissible "special needs" search because its purpose was "not to detect unlawful activity or criminal wrongdoing, but . . . [to] detect[ ] dangerous devices to ensure the safety of participants, spectators, and law enforcement." *Id.* at 1312.

The Eleventh Circuit disagreed, explaining that "where the very purpose of a particular law (such as the law banning the possession of certain dangerous items) is to protect the public, and the government protects the public by enforcing that law, it is difficult to see how public safety could be seen as a governmental interest independent of law enforcement; the two are inextricably intertwined." *Id.* at 1312-13. The same is true here: "vehicle and traffic safety" as the City uses the term is not a "rationale totally independent of the City's interest in law enforcement." *Id.*; Ex. 5, Derenda Jan. 23, 2024 30(b)(6) Dep. at 248:6-12. If this Court were to accept the City's assertion of "traffic safety" here as a purpose distinct from general law

enforcement, any checkpoint "intended to enforce a given law would be permissible so long as the government officially maintained that its purpose was to secure the objectives that motivated the law's enactment in the first place (e.g., public safety) rather than simply to enforce the law for its own sake." *Bourgeois*, 387 F.3d at 1313. As the *Bourgeois* court explained, "[s]uch a distinction is untenable." *Id.*; *see also Edmond*, 531 U.S. at 42, 46 (rejecting the notion that checkpoints could be considered lawful so long as highway safety was merely one of several law enforcement aims, noting that under such a regime "law enforcement authorities would be able to establish checkpoints for virtually any purpose"). Accordingly, Plaintiffs are entitled to summary judgment on their Fourth Amendment claim.

### 3. The Checkpoint Program Surpasses Constitutionally Permissible Special Needs Checkpoints in Breadth and Scope

The BPD's Checkpoint Program is unconstitutional for an additional reason: its sweeping breadth and scope exceed the bounds of any permissible "special need" recognized by courts. Under the Program, BPD conducted more than 1,600 suspicionless checkpoints over a five-year period, clustered primarily in majority Black and Latino communities, even though the decision to place the Checkpoints there instead of other neighborhoods was not driven by traffic safety considerations. SMF ¶¶ 3, 6, 57-69. Each of these Checkpoints dispensed with individualized suspicion for the sake of enabling BPD officers to enforce an expansive array of traffic and criminal laws. SMF ¶¶ 5, 42-56. There is simply no analogue for the BPD Checkpoints in the special needs caselaw.

Indeed, because individualized suspicion is a hallmark of reasonableness under the Fourth Amendment, the "special needs" that the Supreme Court has recognized in the context of motor vehicle stops are narrow. *See, e.g.*, *Edmond*, 531 U.S. at 37 ("[W]e have recognized only limited circumstances in which the usual rule [of individualized suspicion] does not

apply."). For example, in *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-57 (1976), the Supreme Court approved of checkpoints that briefly stopped people for questioning where the primary aim was responding to the crisis of human smuggling in the special context of the United States border, where other methods of detection had proven impracticable. In *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 451-52 (1990), the Supreme Court upheld a sobriety checkpoint that advanced the special law enforcement need of removing impaired motorists, who posed a clear and present danger to others, from the road. In *Illinois v. Lidster*, 540 U.S. 419, 423 (2004), the Supreme Court approved checkpoints that had the narrow, targeted aim of determining if members of the public had information that could assist law enforcement in solving a specific third party hit-and run accident. And in *Delaware v. Prouse*, 440 U.S. 648, 643 (1979), the Supreme Court indicated in *dicta* that checkpoints with a limited purpose of ensuring that motorists had valid licenses, registrations, and insurance in the interest of highway safety might qualify as a special need.

The City's definition and approach to "traffic safety" is completely untethered from these legal standards, since by "traffic safety" it simply meant "the enforcement of the New York State Vehicle and Traffic Law." Ex. 5, Derenda Jan. 23, 2024 30(b)(6) Dep. at 248:6-12; *see also* Ex. 18, BPD MOP Ch. 8 § 10.5 ("The purpose of a checkpoint is to stop motorists and to methodically evaluate their compliance with the law"). The Supreme Court has never authorized law enforcement to dispense with the constitutional requirements of individualized suspicion in pursuit of such sweeping and expansive law enforcement goals. *See Edmond*, 531 U.S. at 41 ("[O]ur checkpoint cases have recognized only *limited exceptions* to the general rule that a seizure must be accompanied by some measure of individualized suspicion.") (emphasis added). Nor should the Court here.

17

The BPD Checkpoints also run afoul of Second Circuit caselaw, which has confined the special needs doctrine to "exceptional circumstances" where a program is limited in scope and justified by a concrete, substantial, and "sufficiently vital" non-law enforcement interest. *Jones*, 936 F.3d at 115 (citing *Chandler*, 520 U.S. at 314, 318). In *MacWade v. Kelly*, 460 F.3d 260, 264-67, 271-72 (2d Cir. 2006), which permitted randomized bag searches on the New York City subway for three-and-a-half months, that interest was safeguarding the subway system from terrorist attacks following similar bombings in London, Moscow, and Madrid that made the danger of such attacks "substantial and real." The subway program was also designed to ensure that all searches performed were voluntary; individuals could permissibly decline inspection without risking arrest simply by exiting the subway station. *Id.* at 264-65. Officers were also prohibited from purposefully looking for contraband besides explosives. *Id.* at 265.

Similarly, in *Cassidy*, the Second Circuit upheld random searches of carry-on baggage on ferries in light of the government's purpose of preventing "terrorist attacks on large vessels engaged in mass transportation and determined by the Coast Guard to be at heightened risk of attack." 47 F.3d at 82. The search program was limited in scope and based on "extensive findings about the risk these vessels present in relation to terrorism." *Id.* at 80-81. Basing the program solely on an assertion of terrorism without specific empirical support, however, would have posed "a legitimate concern" because there would be "no clear limit to the government power to conduct suspicionless searches" since "the threat of terrorism is omnipresent." *Id.*

Likewise, the checkpoints upheld in *Wagner v. Swarts*, 827 F. Supp. 2d 85 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012), were part of a Statewide Motorcycle Enforcement and Education Initiative that was considerably narrower than the BPD Checkpoint Program in terms of both its scope and aims. The program was the

18

product of empirical research devised to respond to "an alarming increase in motorcycle crashes," *id.* at 96, its focus was motorcycle safety alone, *id.* at 89, and only seventeen checkpoints were performed as part of the initiative. *Id.* at 91.

And in *Lynch v. City of New York*, 589 F.3d 94 (2d Cir. 2009), the Second Circuit approved of a breathalyzer program confined to instances where an NYPD officer fired their gun killing or injuring a member of the public. *Id.* at 97-98. Further, criminal prosecution was not the program's core aim; instead, it served the non-law enforcement purpose of ensuring that officers who deployed firearms were not intoxicated as a matter of personnel management. *Id.* at 100-102.

In stark contrast to these cases, the City has invoked a purported generalized aim of vehicle and traffic law enforcement to justify a five-year program of near-daily—and often multiple times daily—roadblocks in Black and Latino neighborhoods. SMF ¶¶ 1-6, 19-29, 42-69. That program is in no way "special": it is not narrow in purpose, duration, or scope. This overreach renders the City's Checkpoint Program unreasonable under the Fourth Amendment because it allows "what has always been a narrow exception to swallow the rule." *City of Los Angeles v. Patel*, 576 U.S. 409, 424-25 (2015); *accord Edmond*, 531 U.S. at 44 ("We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime."); *see also Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 492 (S.D.N.Y. 2019) (refusing to extend the special needs doctrine to searches "unsupported by individualized suspicion or any tailored justification"). After all, it is axiomatic that special needs means *special*, not *everything under the sun*. *Cassidy*, 471 F.3d at 81 ("The Supreme Court has indeed been reluctant to ratify . . . overbroad assertions of 'special needs.'") (internal quotation marks omitted); *Chandler*, 520

U.S. at 323 (suspicionless searches must be "calibrated to the risk" posed by a specific context, such as "at airports and at entrances to courts and other official buildings"); *McLennon v. City of New York*, 171 F. Supp. 3d 69, 84 (E.D.N.Y. 2016) (explaining that the doctrine is "necessarily circumscribed").

The Supreme Court has recognized that if law enforcement officials could "construct roadblocks for almost any conceivable law enforcement purpose . . . the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Edmond*, 531 U.S. at 42. Yet, this is precisely what the City did here when it implemented a daily regime of suspicionless Checkpoint stops in Black and Latino neighborhoods in the City of Buffalo. Because the City's Checkpoint Program was not focused on promoting roadway safety in the targeted and circumscribed manner previously approved by the Supreme Court and Second Circuit, but rather on enforcing the full breadth of vehicle, traffic, and criminal law, the Checkpoint Program falls outside "the closely guarded category" of cases where special needs justify an exception to the ordinary requirement of individualized suspicion. *Chandler*, 520 U.S. at 309; *Jones*, 936 F.3d at 115 (asking whether the special need asserted is "vital").

## II.    The City is Liable Under the Fourth Amendment Because the Checkpoint Program Was Official Municipal Policy, Custom, or Practice

Finally, municipal liability for the City of Buffalo is proper on the undisputed facts, as the unconstitutional Checkpoint Program constituted an official municipal policy, practice, or custom of the City. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). In a suit under 42 U.S.C § 1983, a municipality is liable if a violation of rights resulted from the "government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.*

Here, local law establishes that Commissioner Derenda, who served as the highest-ranking member of the BPD, had policymaking authority with respect to the Checkpoint Program. Buffalo City Charter, Art. 13 § 13-4; SMF ¶ 12-14; *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d. Cir. 2000) (citing *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989) (looking to local law for authority). This conclusion is confirmed by Defendants' own admissions. Commissioner Derenda, who established the Checkpoint Program and oversaw it during its over five-year span, testified under oath that he authorized and approved the Checkpoint Program. SMF ¶¶ 11, 14-15. Commissioner Derenda even went as far as to say that the Strike Force and Housing Unit had his "express authority to setup daily checkpoints and they were expected to do so wherever possible." Ex. 5, Derenda Jan. 23, 2024 30(b)(6) Dep. at 176:7-10. Combined with the applicable Buffalo law establishing Commissioner Derenda's final policymaking authority, this admission suffices to impose municipal liability on the City. *See, e.g.*, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability") (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

Likewise, Mayor Brown, the Chief Executive for the City, testified that he approved and ratified the BPD's Checkpoint Program as it was administered in his capacity as Mayor. SMF ¶¶ 16-18; *see also* Ex. 2, Brown Dep. at 238:10-11, 15-16 ("The checkpoint program as it was proposed and administered I did support at the time . . . I have not issued any directives prohibiting the checkpoint program from continuing.").

Although the direct involvement of municipal policymakers like Derenda and Brown in the creation of the Checkpoint Program is more than sufficient to establish municipal liability, *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003)*,* municipal liability is also proper

because the Checkpoint Program was a custom or practice of the BPD that occurred almost daily over a five-year period, and it was a policy formally incorporated into the BPD's MOP. *Monell*, 436 U.S. at 694; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970).

Because the injury that Plaintiffs allege—being subjected to suspicionless checkpoint stops by the BPD under the Checkpoint Program—follows directly from the City's municipal policy, custom, and practice, the City is liable for the Fourth Amendment violations that flowed from the Checkpoint Program. *Monell*, 436 U.S. at 694.

## CONCLUSION

Because the undisputed material facts entitle Plaintiffs to judgment on their Fourth Amendment claim as a matter of law, Plaintiffs respectfully request that their Motion for Partial Summary Judgment Against the City of Buffalo be GRANTED.

Dated:  February 7, 2025

                                         Respectfully Submitted,

_s/ Philip Irwin_

Philip Irwin (_pro hac vice_)
Jordan S. Joachim (_pro hac vice_)
Christine Nelson (_pro hac vice_)
Andrew Timmick (_pro hac vice_)
COVINGTON & BURLING, LLP
620 Eighth Ave., Suite 4029
New York, NY 10018
212-841-1000
pirwin@cov.com
jjoachim@cov.com
cnelson@cov.com
atimmick@cov.com

Baher Azmy
A. Chinyere Ezie
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org
cezie@ccrjustice.org

Matthew A. Parham
WESTERN NEW YORK LAW CENTER
37 Franklin Street, 2nd Floor
Buffalo, NY 14202
(716) 828-8422
mparham@wnylc.net

Claudia Wilner
Anjana Malhotra
Edward Krugman
NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
wilner@nclej.net
malhotra@nclej.net
krugman@nclej.net

_Attorneys for Plaintiffs_