# EXHIBIT 13

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

BLACK LOVE RESISTS IN THE RUST, by and
through its Co-Directors NATASHA SOTO and
SHAKETA REDDEN and on behalf of its members;
DORETHEA FRANKLIN; TANIQUA SIMMONS;
DE'JON HALL; and JANE DOE, individually and on
behalf of a class of all others similarly situated,

       Plaintiffs,

 v.                Case No. 1:18-cv-00719-CCR

CITY OF BUFFALO, N.Y., BYRON B. BROWN,
Mayor of the City of Buffalo, in his individual and
official capacities; BYRON C. LOCKWOOD,
Commissioner of the Buffalo Police Department in his
individual and official capacities; DANIEL DERENDA,
former Commissioner of the Buffalo Police Department,
in his individual capacity; AARON YOUNG,
KEVIN BRINKWORTH, PHILIP SERAFINI,
ROBBIN THOMAS, UNKNOWN SUPERVISORY
PERSONNEL 1-10, UNKNOWN OFFICERS 1-20,
each officers of the Buffalo Police Department, in their
individual capacities,

       Defendants.

**DEFENDANTS' AMENDED RESPONSES TO PLAINTIFF'S
FIFTH SET OF INTERROGATORIES
<u>AND SIXTH REQUEST FOR PRODUCTION OF DOCUMENTS</u>**

In response to Plaintiff's Fifth Set of Interrogatories and Sixth Request for Production of Documents to Defendants, Defendants City of Buffalo, N.Y., Byron B. Brown, Byron C. Lockwood, Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20 (collectively, the "Buffalo Defendants"), by and through their attorneys, Hodgson Russ LLP, states the following:

## INTERROGATORY RESPONSES

19. Identify and describe in detail all factual and legal bases (including identifying any supporting documents) for Defendants' contention that they are not liable under Plaintiffs' first cause of action, including but not limited to identifying and describing (i) the primary and secondary programmatic purpose(s) of the Checkpoints; (ii) the process for determining the location of the Checkpoints, including who chose the locations, and all criteria, data, documents, and other information used to determine the location of any and all Checkpoints; and (iii) any policies, practices, training, or supervision regarding determining the location of Checkpoints.

**RESPONSE:** Defendants object to this request to the extent it calls upon them to recall and/or reference facts pertaining to each and every checkpoint conducted in the City of Buffalo when the Strike Force and Housing Unit were in operation. Defendants further object to this request to the extent it calls upon them to exhaustively state their litigation position as to key, dispositive issues in this case. Defendants also state that their denials of Plaintiffs' allegations in their operative answer constitutes the basis for their contention that they are not liable under Plaintiffs' first cause of action. Further, Defendants' affirmative defenses also state the basis upon which they contend that they are not liable under Plaintiffs' first cause of action.

Subject to and without waiving these objections, Defendants state that the primary programmatic purpose of checkpoints conducted by the Strike Force and Housing Unit was vehicle and traffic safety and the enforcement of the New York State Vehicle and Traffic Law ("NYVTL"). This primary purpose complies with constitutional standards. The secondary programmatic purpose of the checkpoints was high police visibility, which also complies with constitutional standards. Defendants state that a tertiary benefit of the checkpoint programs was general deterrence of crime, but Defendants state that general crime deterrence was not the

programmatic purpose of the checkpoints.  Defendants also state that the goal of the checkpoints was to be minimally intrusive for motorists and to last for only short periods of time so as to provide minimal inconvenience to motorists on the streets of Buffalo. In other words, the intent of the checkpoint program was to comply with the "special needs doctrine" applicable to vehicle and traffic checkpoints under the applicable Fourth Amendment analysis.

As to the location of checkpoints, Defendants object to this request to the extent it calls upon them to state the specific reasoning behind the location of each and every checkpoint carried out by the Strike Force and Housing Unit.  Defendants cannot reasonably determine the rationale for establishing the location of each and every checkpoint.  Subject to this objection, Defendants state that checkpoint locations were chosen for various reasons, including the ability to perform them safely based on the level of traffic, vehicle and traffic safety concerns, and, much of the time, locations were selected based on the convenience of where the Strike Force and Housing Unit happened to be patrolling on a particular shift.  Checkpoint locations were chosen at times by BPD Commissioner, Daniel Derenda.  At other times, the Chiefs overseeing the Strike Force and Housing Unit were involved in choosing location of checkpoints.  Further, the Captains and Lieutenants in charge of the Strike Force and the Housing Unit chose the location of checkpoints.

As to policies, practices, and procedures regarding the determination of the location of checkpoints, Defendants refer to the 30(b)(6) deposition testimony of Daniel Derenda.  Further, BPD issued a directive as to how checkpoints should be conducted. Additionally, supervisors were entrusted to ensure that proper procedures were followed when a

- 3 -

checkpoint was conducted and to determine that the location of a checkpoint was suitable for the purposes of checkpoints.

Defendants also contend they are not liable for Plaintiff's first cause of action because, under the Fourth Amendment, monies paid from the issuance of traffic summonses are not compensable.  As such, Plaintiffs cannot recover damages for monies paid based on traffic summonses or other traffic related expenses.  As such, Plaintiffs are only entitled to nominal damages at most assuming that any stops were in fact in violation of the Fourth Amendment, but Defendants maintain that the stops at issue complied with the Fourth Amendment.  Further, Plaintiffs are not entitled to class certification as to the proposed damages class related to their Fourth Amendment claim, as each alleged class member would have to have their own separate mini trial as to whether they were in fact stopped, how many times they were stopped, whether the stops complied with constitutional standards, and even if the stops were unconstitutional, what if any damages the alleged class member would be entitled to.

Finally, Defendants are not liable under Plaintiffs' first cause of action to the extent that it seeks injunctive relief as Defendants no longer conduct checkpoints and have no plans to operate daily checkpoints with any of the currently active BPD units.  Defendants also have no plans to create any unit which might conduct daily checkpoints.

20.    Identify and describe in detail all factual and legal bases (including identifying any supporting documents) for Defendants' contention that they are not liable under Plaintiffs' second cause of action, including but not limited to (i) any and all alleged nondiscriminatory reasons for the locations of the Checkpoints; (ii) any and all alleged nondiscriminatory reasons for racial disparities in BPD's traffic ticketing patters, including but not limited to racial disparities in the issuance of multiple traffic tickets in a single stop; and (iii) any and all steps taken by the City and the BPD to prevent racial discrimination in the BPD's traffic enforcement practice.

- 4 -

**RESPONSE:**    Defendants object to this request to the extent it calls upon them to recall and/or reference facts pertaining to each and every checkpoint or traffic stop conducted in the City of Buffalo when the Strike Force and Housing Unit were in operation. Defendants further object to this request to the extent it calls upon them to exhaustively state their litigation position as to key, dispositive issues in this case. Defendants also state that their denials of Plaintiffs' allegations in their operative answer constitutes the basis for their contention that they are not liable under Plaintiffs' second cause of action. Similarly, Defendants affirmative defenses constitute the basis for their contention that they are not liable under Plaintiffs' second cause of action.

Subject to and without waiving these objections, Defendants state that checkpoints were chosen based on areas of the City where checkpoints could be performed safely based on the level of traffic, potential vehicle and traffic concerns, and the convenience of where Strike Force and the Housing Units happened to be patrolling. Each of these reasons for determining the location of a checkpoint has nothing to do with race or the racial demographics of certain areas within the City of Buffalo. For example, patrol locations of Strike Force were based on crime statistics, complaints received, and locations where the presence of a proactive police unit was deemed necessary. Housing Unit patrol locations, of course, were dictated by the locations of the BMHA housing facilities that the Housing Unit was charged with proactively patrolling. Race of motorists in a particular area of the City was never considered when determining the location of a checkpoint.

As to alleged racial disparities in BPD's traffic enforcement practices, Defendants do not accept Plaintiffs unilaterally compiled data on this issue and do not concede that any

- 5 -

legally significant racial disparities exist. Defendants further state that, even if Plaintiffs are correct that racial disparities exist, the reason for such disparities is that the BPD's two proactive units happened to patrol areas of the City with higher minority populations. Proactive police units are more likely to make vehicle and traffic stops because they are not tied to the radio and, therefore, are more likely to notice a higher volume of vehicle and traffic violations as they occur. This may lead to a higher number of tickets issued in the areas of the City where the proactive units happen to patrol. Again, the patrol locations of the two proactive units were not based on race. The patrol locations of the Strike Force were based on crime statistics, complaints, and other non-racial factors, and the Housing Unit's patrol locations were determined by where BMHA properties are located. As to alleged racial disparities in the issuance of multiple traffic tickets, Defendants do not accept Plaintiffs unilaterally compiled data on this issue and do not concede that any legally significant racial disparities exist. Defendants further state that, even if alleged disparities do exist, that is because the two proactive units that focused on or emphasized enforcement of the NYVTL happened to patrol in areas with higher minority populations. Again, because these units placed an emphasis on vehicle and traffic stops and enforcement of the NYVTL, they may have been more likely to write more tickets for multiple violations when making a traffic stop. But the patrol locations of these units had nothing to do with the racial demographic of the locations. Finally, Defendants state that they have not seen any evidence that vehicle and traffic stops were made, or that any tickets were issued, for anything other than legitimate violations of the NYVTL. Defendants have seen no evidence of any tickets being written to motorists due to the motorists' race.

      Defendants also refer Plaintiffs to the deposition testimony of Joseph Gramaglia, who testified as to the policies and procedures BPD has in place to prevent and protect against

racial discrimination by officers generally.  Defendants state that, if and when they receive a complaint involving alleged racial discrimination by a BPD officer, that officer will be investigated and will be subject to discipline if the complaint is substantiated.  This would include a complaint alleging that an officer intentionally fabricated a vehicle and traffic violation by a minority motorist based on the motorist's ethnicity, or that an officer acted in a racially discriminatory manner in enforcing the NYVTL.  Defendants state that at no time was any officer permitted to use race as a factor in determining whether to conduct a traffic stop, unless they were making a stop pursuant to a warrant or BOLO, but even in those instances, race alone would not be the only factor that an officer would weigh in deciding whether a stop was appropriate.

      Defendants also contend that Plaintiffs are not entitled to class certification as to the proposed damages class related to their Fourteenth Amendment claim, as each alleged class member would have to have their own separate mini trial as to whether they were in fact stopped, how many times they were stopped, whether the stops complied with constitutional standards, and even if the stops were unconstitutional, what if any damages the alleged class member would be entitled to.  Defendants are not liable under Plaintiffs' second cause of action to the extent that it seeks injunctive relief as Defendants are not intentionally enforcing the NYVTL in a racially discriminatory manner and Defendants also have no plans to do so in the future.

      Finally, Defendants state that they are not liable under Plaintiffs' second cause of action because there is no evidence that BPD does not enforce the NYVTL against white motorists in the City of Buffalo.  Again, there is no evidence that vehicle and traffic enforcement is or has been done based on anything other than visible NYVTL violations by vehicles, which

have no race or ethnicity.  Defendants also state that no administrator or official of the City of Buffalo ever intended for there to be any racial disparity in vehicle and traffic enforcement within the City of Buffalo, nor was race a motivating factor in any of Defendants' traffic enforcement initiatives.

21.     Identify and describe in detail all factual and legal bases (including identifying any supporting documents) for Defendants' contentions that they are not liable under Plaintiffs' third cause of action, including but not limited to explaining Defendants' position, and the bases therefor, regarding: (i) whether the City of Buffalo had a revenue motive to increase ticketing; (ii) whether the City created the BTVA at least in part to increase municipal revenue; (iii) whether the City created policies and practices under which BPD officers could earn overtime; and (iv) whether the City was deliberately indifferent to the risk that it was creating structures, such as overtime policies and practices, under which officers have a personal financial motivation to issue traffic tickets.

**RESPONSE:**   Defendants object to this request to the extent it calls upon them to exhaustively state their litigation position as to key, dispositive issues in this case.  Defendants also state that their denials of Plaintiffs' allegations in their operative answer constitutes the basis for their contention that they are not liable under Plaintiffs' third cause of action.  Defendants further object to this request to the extent it requires Defendants to speculate regarding the personal financial motivations of all BPD officers.  Similarly, Defendants' affirmative defenses constitute the basis for their contention that they are not liable under Plaintiffs' third cause of action.

Subject to and without waiving any of the foregoing objections, Defendants state that there has never been any quota for ticketing and that financial motivations or revenue have never been a stated or unstated motivation for vehicle and traffic enforcement in the City of Buffalo, with Strike Force, the Housing Unit, or any other unit of the BPD.  No City official or BPD administrator has ever encouraged patrol officers from any unit to write more tickets for financial or revenue-based purposes.  To the extent that Strike Force and Housing Unit officers

- 8 -

were expected to write tickets during their patrols, this was only part of their overall mission to proactively enforce all laws of New York State. There was never any financial or revenue-based justification or purpose for the Strike Force and Housing Unit's efforts to enforce NYVTL. While the revenue from tickets issued within the City of Buffalo is now kept by the City rather than going directly to the State since the creation of the BTVA, this is a function of New York State legislation.

While the BTVA was created by New York State legislation at the behest of the City, it is a mischaracterization to state that the City created the BTVA. The City acknowledges that the creation of the BTVA allows it to keep revenue from traffic tickets and summonses where such revenue used to go to the State of New York. This may have been a motivating factor for the City to request the creation of the BTVA. However, Defendants deny that revenue is a motivating factor for any traffic ticket or summons issued to a motorist and that the motivating factors for issuing tickets or summonses is the enforcement of the NYVTL and public safety.

Finally, Defendants acknowledge that its CBA allows officers to take overtime, but the City disputes that officers have intentionally used court time from traffic tickets as a means to increase their overtime pay. In fact, with the creation of the BTVA, Defendants state that officers are now less likely to make Court appearances in connection with the traffic summonses they write, as summonses are more likely to be resolved through dismissal or pleas. Before the BTVA was created, officers were required to attend Court at a higher rate because the State had more stringent rules about mandatory court appearances than BTVA does. Moreover, Defendants cannot answer whether every officer in the BPD views court time as a personal

financial motive to write traffic tickets; however, there is no evidence that supports the conclusion that court time is a financial incentive for officers to write tickets. On the contrary, deposition testimony from current and former patrol officers throughout this litigation demonstrates that court time was not a financial motive for those officers to write tickets to motorists.

Dated:        Buffalo, New York
                February 20, 2024

                                          **Responses and Objections By:**

                                          By:  s/ Peter A. Sahasrabudhe
                                                    Peter A. Sahasrabudhe
                                                      Cheyenne N. Freely
                                            The Guaranty Building
                                            140 Pearl Street — Suite 100
                                            Buffalo, New York 14202-4040
                                            Telephone: 716-848-1508

## VERIFICATION OF INTERROGATORY RESPONSES

I, Commissioner Joseph A. Gramaglia, believe, based on reasonable inquiry, that the foregoing factual responses are true and correct to the best of my knowledge, information and belief.

I verify that under penalty of perjury that the foregoing is true and correct.

By: _____
Joseph A. Gramaglia

## VERIFICATION OF INTERROGATORY RESPONSES

I, former Commissioner Daniel Derenda, believe, based on reasonable inquiry, that the foregoing factual responses are true and correct to the best of my knowledge, information and belief.

I verify that under penalty of perjury that the foregoing is true and correct.

By: _____
Daniel Derenda

## VERIFICATION OF INTERROGATORY RESPONSES

I, Octavio Villegas, Esq., believe, based on reasonable inquiry, that the foregoing factual response contained in Response #21 is true and correct to the best of my knowledge, information and belief.

I verify that under penalty of perjury that the foregoing is true and correct.

By: _____
Octavio Villegas, Esq.

- 11 -

TO: **WESTERN NEW YORK LAW CENTER**
*Attorneys for Plaintiffs*
Matthew Alan Parham
Joseph A. Kelemen
Cathedral Park Tower
37 Franklin Street, Suite 210
Buffalo, New York 14202
Telephone: 716-828-8415
*mparham@wnylc.com*
*jkelemen@wnylc.com*

**NATIONAL CENTER FOR LAW
 AND ECONOMIC JUSTICE**
*Attorneys for Plaintiffs*
Claudia Wilner, Esq.
Edward Krugman, Esq.
Anjana Malhotra, Esq.
275 Seventh Avenue, Suite 1506
New York, New York 10001
wilner@ncleg.org
krugman@nclej.org
malhotra@ncleg.org

**CENTER FOR CONSTITUTIONAL RIGHTS**
*Attorneys for Plaintiffs*
Chinyere Ezie, Esq.
666 Broadway, 7th Floor
New York, New York 10012
Telephone: 212-614-6475
cezie@ccrjustice.org

**COVINGTON & BURLING LLP**
*Attorneys for Plaintiffs*
Jordan Joachim (*pro hac vice*)
620 Eighth Avenue
New York, New York 10018
Telephone: 212-841-1000
jjoachim@cov.com

16422056v2