UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BLACK LOVE RESISTS IN THE RUST by and
through its Co-Directors Natasha Soto and Shaketa
Redden and on behalf of its members; DORETHEA
FRANKLIN; TANIQUA SIMMONS; DE'JON HALL;
JOSEPH BONDS; CHARLES PALMER; SHIRLEY
SARMIENTO; EBONY YELDON; and JANE DOE,
individually and on behalf of a class of all others
similarly situated;

                                    Plaintiffs,

        v.                                                      Civil No.: 1:18-cv-00719-CCR

CITY OF BUFFALO, NY; BYRON B. BROWN,
Mayor of the City of Buffalo, in his individual and
official capacities; BYRON C. LOCKWOOD,
Commissioner of the Buffalo Police Department, in
his individual and official capacities; DANIEL DERENDA,
former Commissioner of the Buffalo Police Department,
in his individual capacity; AARON YOUNG, KEVIN
BRINKWORTH, PHILIP SERAFINI, ROBBIN
THOMAS, UNKNOWN SUPERVISORY
PERSONNEL 1-10, UNKNOWN OFFICERS 1-20,
each officers of the Buffalo Police Department, in their
individual capacities.

                                    Defendants.

---

# CITY OF BUFFALO DEFENDANTS'
## MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**HODGSON RUSS LLP**
*Attorneys for Defendants City of Buffalo, NY, Byron B. Brown, Byron C. Lockwood, Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, and Unknown Officers 1-20*
Hugh M. Russ III, Esq.
Peter Sahasrabudhe, Esq.
Cheyenne N. Freely, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000
*hruss@hodgsonruss.com*
*psahasra@hodgsonruss.com*
*cfreely@hodgsonruss.com*

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND...................................................................................2

ARGUMENT ...........................................................................................................2

POINT I.     THE CHECKPOINTS DID NOT VIOLATE THE FOURTH
             AMENDMENT..................................................................................2

    A.     The Primary Purpose of the Checkpoints was Unequivocally
             Vehicle & Traffic Safety.................................................................3

    B.     The Checkpoints' Primary Purpose of Vehicle and Traffic Safety
             Constitutes a "Special Need."..........................................................6

        1.     Empirical Data is Not Necessary to Demonstrate a "Special
                    Need" ...................................................................................8

        2.     The Special Needs Doctrine is Context-Specific..........................10

    C.     The Checkpoints Satisfy the Reasonableness Prong of the Special
             Needs Doctrine.............................................................................13

CONCLUSION.......................................................................................................19

## **TABLE OF AUTHORITIES**

Page(s)

**Federal Cases**

*Airbnb, Inc. v. City of N.Y.,*
    373 F. Supp. 3d 467 (S.D.N.Y. 2019)..................................................................18

*Bd. of Educ. of Pottawatomie Cnty. v. Earls,*
    536 U.S. 822 (2002)........................................................................................8

*Bourgeois v. Peters,*
    387 F.3d 1303 (11th Cir. 2004) ...............................................................12, 13

*Brown v. Texas,*
    443 U.S. 47 (1979)........................................................................................13

*Cassidy v. Chertoff,*
    417 F.3d 67 (2d Cir. 2006).........................................................................8, 17

*Chandler v. Miller,*
    520 U.S. 305 (1997).................................................................................10, 11

*City of Indianapolis v. Edmond,*
    531 U.S. 32 (2000)..........................................................3, 7, 8, 10, 11, 16, 19

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015).................................................................................17, 18

*Del. v. Prouse,*
    440 U.S. 648 (1979)........................................................................6, 7, 8, 9, 10

*Ferguson v. City of Charleston,*
    532 U.S. 67 (2001).............................................................................10, 11, 12

*Ill. v. Lidster,*
    540 U.S. 419 (2004)...........................................................3, 6, 11, 14, 16, 17

*MacWade v. Kelly,*
    460 F.3d 260 (2d Cir. 2006)...........................................................................17

*Mich. Dep't of State Police v. Sitz,*
    496 U.S. 444 (1990)...........................................................................7, 12, 16, 17

*Nat'l Treasury Emps. Union v. Von Raab,*
    489 U.S. 656 (1989)........................................................................................10

### TABLE OF AUTHORITIES - cont'd

PAGE

*U.S. v. Bernacet*,
　724 F.3d 269 (2d Cir. 2013)............................................................................6

*U.S. v. Bowman*,
　496 F.3d 685 (D.C. Cir. 2007) ......................................................................6

*U.S. v. Fraire*,
　575 F.3d 929 (9th Cir. 2009) .........................................................................9

*U.S. v. Henson*,
　351 F. App'x 818 (4th Cir. 2009) ..................................................................6

*U.S. v. Johnson*,
　122 F. Supp. 3d 272 (M.D.N.C. 2015) .........................................................4

*U.S. v. Martinez-Fuerte*,
　428 U.S. 543 (1976)...............................................................................16, 17

*U.S. v. McFayden*,
　865 F.2d 1306 (D.C. Cir. 1989) ....................................................................6

*U.S. v. Regan*,
　218 F. App'x 902 (11th Cir. 2007) .......................................................5, 6, 13

*U.S. v. Turner*,
　2020 WL 733187 (M.D.Ala. Jan. 27, 2020) ...........................................3, 4, 14

*Wagner v. Swarts*,
　827 F. Supp. 2d 85 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489
　F. App'x 500 (2d Cir. 2012) ............................................1, 2, 3, 5, 6, 7, 11, 12, 13, 14, 15, 17

**State Cases**

*People v. Pastrana*,
　41 N.Y.3d 23 (2023) ......................................................................................6

## PRELIMINARY STATEMENT

Plaintiffs' case rests upon the baseless allegation that the City of Buffalo (the "City") and the Buffalo Police Department (the "BPD") targeted Black and Latino motorists through discriminatory traffic enforcement in a conspiracy to deprive them of their Constitutional rights. Plaintiffs urge the Court to believe this demonstrably false narrative. But Plaintiffs have not presented any relevant or meritorious evidence to support their allegation. Especially deficient is their Fourth Amendment claim regarding the BPD's Vehicle and Traffic Safety Checkpoints (the "Checkpoints"). Despite Plaintiffs' efforts to prove that the Checkpoints were established for insidious purposes in violation of the Constitution, neither the facts nor the law supports Plaintiffs' false narrative.

As at least a dozen witnesses testified, the primary purpose of the Checkpoints was vehicle and traffic safety.[1] *See. e.g.*, Dkt. Nos. 252-42; 252-11 at 107:1-2, 111:17-113:6; 252-12 at 21:6-18, 78:23-79:2; 252-14 at 194:13-21; 252-15 at 55:19-56:3; 252-16 at 28:5-23; 252-17 at 32:12-18; 252-18 at 48:9-16. By implementing the Checkpoints, the BPD also intended high police visibility and the reduction of drug, gun, and gang activity; however, those were secondary purposes. *See* Dkt. Nos. 252-11 at 58:12-21; 252-12 at 21:6-18; 252-7 at 15:13-

---

[1] There is no genuine issue of fact regarding the Checkpoints' primary purpose. Plaintiffs argue that determining the genuine primary purpose of the Checkpoints "likely involves resolution of disputed material facts . . ." Dkt. No. 253-1, p. 2. The City anticipates that Plaintiffs will argue that the primary purpose of the Checkpoints was general, discriminatory crime control. The Court should reject that argument, just as the District Court for the Northern District of New York rejected a similar attempt in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 95-96 (N.D.N.Y. 2011) (hereinafter "*Wagner I*") (deeming primary purpose of motorcycle checkpoints to be traffic safety and rejecting plaintiffs' argument that the primary purpose was to target "outlaw bikers" for crime control), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012) (hereinafter "*Wagner II*").

16:6, 16:10-17:4.  The BPD established the Checkpoints in response to requests from the

community for a greater police presence to curtail the unsafe operation of vehicles in residential

neighborhoods.  *See* Dkt. Nos. 252-11 at 57:4-58:1; 252-12 at 96:3-97:2.

Ignoring this reality, Plaintiffs try to force the facts and law to conform to their

version of events.  To promote their narrative, Plaintiffs cherry pick inapplicable standards from

factually distinct cases.  Plaintiffs selectively quote the City's statements and case law.  And

Plaintiffs craft illogical standards of law that defy well-settled precedent.  Put simply, Plaintiffs

have not shown, as a matter of law, that the Checkpoints violated the Fourth Amendment.  On

the contrary, Plaintiffs' arguments only confirm that the Checkpoints in all respects complied

with the Fourth Amendment.  For this reason, the Plaintiffs' Fourth Amendment claim should be

dismissed as requested in the City's Motion for Summary Judgment (the "City's Motion").  At a

minimum, Plaintiffs' motion for partial summary judgment must be denied.

## **FACTUAL BACKGROUND**

For the sake of brevity, the City incorporates the factual background and

procedural history of this case as stated in the City's Memorandum of Law (Dkt. No. 252-46),

the Declaration of Peter A. Sahasrabudhe (Dkt. No. 252-1), and the Statement of Undisputed

Facts (Dkt. No. 252-45), all in Support of the City's Motion, dated February 7, 2025.

## **ARGUMENT**

## **POINT I.   THE CHECKPOINTS DID NOT VIOLATE THE FOURTH AMENDMENT**

Suspicionless searches and seizures comply with the Fourth Amendment where

they satisfy the special needs doctrine.  *See, e.g.*, *Wagner I*, 827 F. Supp. 2d at 93.  "Under this

doctrine, programs designed to serve special needs, beyond the normal need for law enforcement, are sustainable in absence of individualized suspicion." *Id.* (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)) (internal quotations omitted).

Where, as here, a program's primary purpose qualifies as a "special need," Courts apply a balancing test to determine the reasonableness of the program. *Id.* at 96. The balancing test analyzes (a) the gravity of public concerns served by the program; (b) the degree to which the program advances the public interest; and (c) the severity of the interference with individual liberty. *Id.* at 96 (citing *Ill. v. Lidster*, 540 U.S. 419, 427 (2004)). When a challenged program satisfies the reasonableness balancing test and fulfills the special need, the program is constitutionally permissible.

A.  **The Primary Purpose of the Checkpoints was Unequivocally Vehicle & Traffic Safety.**

Testimony and documentary evidence in this case confirm that the primary purpose of the Checkpoints was traffic safety.[2] To ensure vehicle and traffic safety, BPD officers enforced the New York Vehicle and Traffic Law (the "VTL"). The two concepts go hand and hand, as the District Court recognized in *U.S. v. Turner*, 2020 WL 733187, at *4 (M.D.Ala. Jan. 27, 2020). There, the Court determined that the primary purpose of motor vehicle checkpoints was traffic safety. *Id.* In making that determination, the Court considered the testimony of a police chief, the operational plan for the checkpoint, and the fact that traffic

---

[2] *See. e.g.*, Dkt. Nos. 252-42; 252-11 at 107:1-2, 111:17-113:6; 252-12 at 21:6-18, 78:23-79:2; 252-14 at 194:13-21; 252-15 at 55:19-56:3; 252-16 at 28:5-23; 252-17 at 32:12-18; 252-18 at 48:9-16.

citations were issued at the challenged checkpoint.  *Id.* at *4-5; *see also U.S. v. Johnson*, 122 F. Supp. 3d 272, 374-375 (M.D.N.C. 2015) (holding the primary purpose of checkpoints to be traffic safety where officers consistently testified as much).  That evidence made it clear that the purpose was traffic safety.  *Id.*  Plaintiffs discovered virtually identical evidence here, and their arguments to the contrary ring hollow.

Plaintiffs' strained reading of the City's statement regarding the primary purpose of the Checkpoints is unpersuasive.  Plaintiffs offer the City's response to an interrogatory in this case as the "smoking gun" that purportedly undermines the City's argument in favor of the Checkpoints' constitutionality.  Specifically, Plaintiffs argue that, according to the City's interrogatory response, the primary purpose of the Checkpoints was "enforcement of the New York State Vehicle and Traffic Law."  Dkt. No. 253-1, p. 7.  This argument stumbles from its first step.

First, this is a deliberately selective quotation from the City's interrogatory response.  The City's full response, including language Plaintiffs omit, states " . . . Defendants state that the primary programmatic purpose of checkpoints conducted by the Strike Force and Housing Unit was **vehicle and traffic safety and the enforcement of the New York State Vehicle and Traffic Law** . . ."  Dkt. No. 254-13 (emphasis added).  Though it would fit Plaintiffs' narrative more comfortably if the City had just listed enforcement of the VTL as the Checkpoints' primary purpose, that was not the case.  Like a misleading sound bite, Plaintiffs' exclusion of the "vehicle and traffic safety" portion of the City's response is a transparent attempt to make the primary purpose seem like nothing more than normal law enforcement.

Nevertheless, vehicle and traffic safety, through the proactive enforcement of the VTL, was the primary purpose of the Checkpoints, no matter how strenuously Plaintiffs protest.

Second, even if the City's response had excluded the "vehicle and traffic safety" language, Plaintiffs' argument would still fall short. The evidence in this case—including the depositions of dozens of City employees and BPD officers as well as the Roadblock Directive—uniformly demonstrates that the primary purpose of the Checkpoints was vehicle and traffic safety.[3] The Court should reject Plaintiffs' effort to distort the record otherwise. Moreover, enforcement of the VTL inherently promotes vehicle and traffic safety and vice versa. As Plaintiffs note, the two concepts are one and the same. Dkt. No. 253-1, p. 17. The Courts agree. For example, in *Wagner I* and *Wagner II*, the District Court for the Northern District of New York and the Second Circuit, respectively, upheld motorcycle checkpoints with the primary purpose of traffic safety. Like here, those checkpoints were designed to detect safety violations and ensure proper registration and compliance with New York licensing requirements. *Wagner I*, 827 F. Supp. 2d at 94; *Wagner II*, 489 F. App'x at 500-501. In other words, the motorcycle checkpoints there enforced the VTL. Similarly, in *U.S. v. Regan*, 218 F. App'x 902, 904 (11th Cir. 2007), the Eleventh Circuit upheld a checkpoint with a primary purpose of road safety, even though the officers used the checkpoint to "enforce compliance with general traffic laws" in addition to checking licenses, registrations, and proofs of insurance. Enforcement of the vehicle and traffic laws in those cases did not render the motorcycle checkpoints unconstitutional. Nor

---

[3] *See. e.g.*, Dkt. Nos. 252-42; 252-11 at 107:1-2, 111:17-113:6; 252-12 at 21:6-18, 78:23-79:2; 252-14 at 194:13-21; 252-15 at 55:19-56:3; 252-16 at 28:5-23; 252-17 at 32:12-18; 252-18 at 48:9-16.

should that be the case here.  Try as they might, Plaintiffs cannot meaningfully distinguish this precedent.

**B.      The Checkpoints' Primary Purpose of Vehicle and Traffic Safety Constitutes a "Special Need."**

Vehicle and traffic safety is a "special need" that goes beyond the need for normal law enforcement.  *See, e.g.*, *Wagner I*, 827 F. Supp. 2d at 94 (holding traffic safety to be a permissible "special need" discernible from a general interest in crime control); *U.S. v. Henson*, 351 F. App'x 818, 821 (4th Cir. 2009); *Regan*, 218 F. App'x at 905; *see also People v. Pastrana*, 41 N.Y.3d 23, 27 (2023) (holding roadway safety to be a permissible "special need").[4]

Plaintiffs' argument against the special needs exception here rests upon the erroneous notion that vehicle and traffic safety, and inherently enforcement of the VTL, is a routine police function that does not constitute a "special need."  *See* Dkt. No. 253-1, p. 16. Contrary to Plaintiffs' argument, the United States Supreme Court has expressly noted that the general interest in crime control prohibited by the special needs doctrine does not refer to every law enforcement objective.  *Lidster*, 540 U.S. at 424.

The Supreme Court has also specifically distinguished checkpoints like the BPD's Checkpoints—checking for proper seatbelt usage, valid drivers' licenses, and vehicle

---

[4] *See also U.S. v. Bowman*, 496 F.3d 685, 692 (D.C. Cir. 2007) ("[A] roadblock is constitutionally permissible where its principal purpose is to regulate vehicular traffic by allowing police to check driver's licenses and vehicle registrations."); *U.S. v. McFayden*, 865 F.2d 1306, 1313 (D.C. Cir. 1989); *Del. v. Prouse*, 440 U.S. 648, 663 (1979) (noting that a traffic safety roadblock to question all oncoming traffic regarding their drivers' licenses and vehicle registrations would be constitutional); *U.S. v. Bernacet*, 724 F.3d 269, 273 (2d Cir. 2013).

registrations—from checkpoints with a primary purpose of detecting "ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 37-38. Citing to its own decision in *Prouse*, the Court noted that States have a "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." *Id.* at 39 (citing 440 U.S. at 658). The Court further noted that these purposes are "distinct from a general purpose of investigating crime." *Id.* at 39-40 (". . . *Prouse* itself reveals a difference in the Fourth Amendment significance of highway safety interests and the general crime control."); *see also Wagner I*, 827 F. Supp. 2d at 94. Not only is Plaintiffs' argument contrary to the controlling case law, but it defies logic.

A law enforcement officer's job is to enforce the law. Plaintiffs' argument is that because the BPD enforced the VTL during these Checkpoints, there was no special need. Plaintiffs would require officers to act beyond that job description, and the law, in order to satisfy the special needs doctrine. For example, officers conducting sobriety checkpoints are enforcing VTL § 1192, which prohibits the operation of a motor vehicle while intoxicated. By Plaintiffs' logic, because sobriety checkpoints do nothing more than enforce the VTL, sobriety checkpoints do not serve a sufficient "special need." Again, this argument is contrary to the law. *See Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 445 (1990). Plaintiffs' tortured interpretation of the special needs doctrine would render it a nullity.

Here, officers at Checkpoints were required to check for valid registrations, valid inspections, proper seatbelt usage, and any other VTL violations detected through plain view

observations and mobile plate readers.  *See* Dkt. No. 252-42.  As noted in *Edmond* and *Prouse*, these objectives were designed to ensure that vehicles were safe for operation and the people operating them were permitted to do so.  Accordingly, the Checkpoints' primary purpose of vehicle and traffic safety transcends ordinary crime control, so as to render vehicle and traffic safety a permissible "special need."  Though the inquiry should end there, Plaintiffs raise a litany of irrelevant and unsupported arguments to advance their claim that the Checkpoints do not serve a "special need."  For the sake of argument, the City responds to each of them.

     1.     <u>Empirical Data is Not Necessary to Demonstrate a "Special Need"</u>

        Plaintiffs argue that the Checkpoints did not serve a traffic safety purpose beyond general law enforcement because "no specific traffic safety concerns informed the operation of the Program" and because the City did not look to "traffic safety data."  Dkt. No. 253-1, p. 18. Initially, the City notes that this argument is irrelevant to whether a program's primary purpose is a sufficient "special need."  "[T]he government need not adduce a specific threat in order to demonstrate a special need."  *Cassidy v. Chertoff*, 417 F.3d 67, 83 (2d Cir. 2006) (citing *Bd. of Educ. of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 835-836 (2002) (noting that there is no requirement that a "particularized or pervasive . . . problem [occur] before allowing the government to conduct suspicionless searches where there is a real threat of substantial harm to society.")).  The existence or inexistence of empirical data related to the Checkpoints may be relevant to the "gravity of public concerns" part of the reasonableness inquiry, but not to whether a special need exists.

While the City may not have looked at quantitative data—and may be ignorant as to how accurate quantitative data would even be captured regarding licensing, registration, and inspection violations within the City—the City did, in fact, have specific traffic safety concerns which motivated the creation of the Checkpoints. Complaints from residents and block clubs regarding individuals driving without licenses, speeding, and engaging in other unsafe automotive behaviors motivated the creation of the Checkpoints and the locations where they were held. *See* Dkt. Nos. 252-11 at 57:4-58:21, 15:15-22; 252-12 at 96:3-97:2.

Plaintiffs point to the absence of empirical evidence in *Prouse* and argue that the absence of such evidence here should similarly militate against the constitutionality of the Checkpoints. This argument is faulty for two reasons. First, the Ninth Circuit faced the same argument in *U.S. v. Fraire*, 575 F.3d 929, 933 (9th Cir. 2009) and rejected it, noting ". . . there is nothing to suggest that the absence of empirical data was a dispositive factor in *Prouse*; rather, the lack of empirical data of effectiveness meant there was nothing to overcome the presumption of ineffectiveness derived from 'common sense.'" *Id.* Here, as in *Fraire*, common sense suggests the opposite. In *Fraire*, the defendants did not have empirical evidence to justify their poaching checkpoints at a national park, but common sense suggested it was a reasonably efficient tool to prevent poaching. *Id.* Similarly, here, common sense dictates that vehicle and traffic safety checkpoints were a reasonably efficient tool to prevent the unsafe and unregulated operation of motor vehicles.

Second, *Prouse* and the case at bar are factually distinct. *Prouse* involved both randomized stops—not checkpoints—and a complete absence of empirical data indicating that

the random stops would be effective in promoting roadway safety.  440 U.S. at 659-660.

However, the Supreme Court specifically noted that the questioning of all oncoming traffic at

checkpoints, as was the case with the BPD Checkpoints, would be a permissible alternative to

the random, roving stop practice.  *Id.*  That the City did not analyze empirical evidence in

creating and placing the Checkpoints does not negate the primary purpose of the Checkpoints or

their reasonableness.

        In response to citizen complaints regarding the unsafe operation of vehicles in its

various neighborhoods, the City implemented Checkpoints with the primary purpose of vehicle

and traffic safety.  The lack of empirical data here does not undermine the Checkpoints'

satisfaction of the special needs doctrine.

    2.    <u>The Special Needs Doctrine is Context-Specific</u>

        The case at bar involves analyzing the special needs doctrine in the context of

vehicle and traffic safety Checkpoints.  Notably, none of Plaintiffs' cited cases deem vehicle and

traffic safety to be an impermissible "special need" for motor vehicle checkpoints.  Instead, in an

effort to undermine the well-settled recognition of vehicle and traffic safety as a "special need"

and to distort the applicable standard, Plaintiffs cite to cases outside the vehicle and traffic safety

context.  These cases are inapplicable because, as noted in two of Plaintiffs' cited cases, the

Fourth Amendment special needs inquiry is context-specific.  *See Nat'l Treasury Emps. Union v.*

*Von Raab*, 489 U.S. 656, 665-666 (1989); *see also Chandler v. Miller*, 520 U.S. 305, 306

(1997)).  The invalidation of drug interdiction checkpoints in *Edmond*, 531 U.S. at 306, a

hospital's drug testing program in *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), and drug

testing for political candidates in *Chandler*, 520 U.S. at 306, are all vastly different from the traffic safety Checkpoints here. In the context of motor vehicle checkpoints, traffic safety has been repeatedly upheld as a "special need" that transcends the need for routine law enforcement. *See, e.g., Wagner I,* 827 F. Supp. 2d at 94.

Plaintiffs' reference to the standard articulated in *Chandler* uses a selectively edited quotation to obscure what was actually stated. In *Chandler*, the Court noted "[o]ur precedents establish that the proffered special need ***for drug testing*** must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." 520 U.S. at 318 (emphasis added). *Chandler* articulates the standard for suspicionless drug testing, not for suspicionless motor vehicle checkpoints, and certainly not for the special needs doctrine generally. Plaintiffs do not cite to any authority applying this heightened standard to vehicle and traffic safety checkpoints. No matter how diligently Plaintiffs attempt to misstate the law, when conducting a "special need" analysis, Courts "must undertake a context-specific inquiry. . ." *Id.* at 306; *see also Lidster*, 540 U.S. at 424 (noting that the Court's analysis of the stops in *Edmond* "must be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.").

This case is also distinguishable from *Ferguson*, upon which Plaintiffs also rely. In yet another non-analogous drug testing case, the Court held that even if the ultimate objective of the drug testing program were to promote the health of women and children, the immediate

objective involved gathering evidence of unlawful drug use.  *Ferguson*, 532 U.S. at 82-84.

Plaintiffs argue that, here, the immediate objectives of the Checkpoints were to issue tickets,

make arrests, and impound vehicles.  Dkt. No. 253-1, p. 15.  If the Court were to adopt the

*Ferguson* rationale in the context of vehicle and traffic safety checkpoints, it would upend the

substantial body of case law holding that vehicle and traffic safety checkpoints serve a

permissible "special need."

   For example, in *Wagner I*, the primary purpose of the motorcycle checkpoints was

safety.  827 F. Supp. 2d at 94.  The fact that the checkpoints were designed to ticket for

violations of the VTL did not obviate that special need.  *Id.* at 94.  To further demonstrate the

illogical nature of Plaintiffs' argument, sobriety checkpoints are designed to issue tickets, make

arrests, and impound vehicles.  Yet, the Supreme Court has held that sobriety checkpoints satisfy

the special needs doctrine.  *See Sitz*, 496 U.S. at 445.

   Finally, the fearmongering Plaintiffs attempt with their reference to *Bourgeois v.*

*Peters*, 387 F.3d 1303 (11th Cir. 2004) is unfounded.  *Bourgeois* is yet another case involving an

entirely different factual circumstance—the institution of a policy requiring all protestors to

submit to a metal detector test.  *Id.* at 1306.  Plaintiffs try to contest the validity of vehicle and

traffic safety as a special need by arguing that because the purpose of the VTL is to protect the

public, "it is difficult to see how public safety could be seen as a governmental interest

independent of law enforcement."  Dkt. No. 253-1, p. 20 (citing *id.* at 1312-1313).  But this is

not the standard for traffic safety in the context of vehicle checkpoints, as multiple federal courts,

including the Eleventh Circuit, have made clear.

12

Three years after issuing the *Bourgeois* opinion, the Eleventh Circuit upheld a motor vehicle checkpoint where its primary purpose was traffic safety. *Regan*, 218 F. App'x at 904. In *Regan*, as in this case, the checkpoint was established in response to citizen complaints about unsafe driving. *Id.* During the checkpoint, each vehicle was stopped to check motorists' licenses, registrations, proofs of insurance, and compliance with general traffic laws. *Id.* Under Plaintiffs' reading of *Bourgeois*, law enforcement could never conduct suspicionless searches with a public safety primary purpose where there are already laws or regulations in place aimed at fulfilling that purpose. In effect, this would render all suspicionless searches by law enforcement unconstitutional. Assuming, for the sake of argument, that this were an accurate reading, *Bourgeois* would be in direct conflict with *Regan*. But *Bourgeois* has not been overruled. Certainly, the Eleventh Circuit would overrule any of its prior decisions that conflicted with *Regan*. But it has not done so—because *Bourgeois* and *Regan* do not conflict. The two cases articulate two different standards for two different contexts. The applicable standard here is the one articulated in *Regan*, the case actually involving vehicle and traffic safety checkpoints. Under that appropriate standard, the checkpoints are constitutional.

**C.    The Checkpoints Satisfy the Reasonableness Prong of the Special Needs Doctrine.**

When a program's primary purpose qualifies as a "special need," the next step is a balancing test to determine whether the program was reasonable. *Wagner I*, 827 F. Supp. 2d at 96; *Wagner II*, 489 F. App'x at 501 (citing *Brown v. Texas*, 443 U.S. 47, 50-51 (1979)). The reasonableness balancing test considers (a) the gravity of the public concerns served by the seizure; (b) the degree to which the seizure advances the public interest; and (c) the severity of

the interference with individual liberty.  *Id.* (citing *Lidster*, 540 U.S. at 427).  The BPD's

Checkpoints satisfy the balancing test for the reasons articulated in the City's Memorandum of

Law in Support of its Motion for Summary Judgment.  *See* Dkt. No. 252-46, pp. 48-52.

Instead of engaging in the required balancing test analysis, Plaintiffs bypass it and

argue that the Checkpoints were unconstitutional, because their "sweeping breadth and scope

exceed the bounds of any permissible 'special need' recognized by courts."  Dkt. No. 253-1, p.

21.  This effort involves nothing more than Plaintiffs reiterating inapplicable case law and

erroneous interpretations of case law to bolster their argument that the Checkpoints do not satisfy

the "special need" prong of the special needs doctrine.  Despite Plaintiffs' failure to address the

requisite balancing test, the City will respond to Plaintiffs' breadth and scope arguments in turn.

At the outset, the City rejects Plaintiffs' characterizations of the Checkpoints.  As

previously discussed, the Checkpoints were driven by traffic safety considerations as first voiced

by residents in the community.  *See* Dkt. Nos. 252-7 at 25:13-26:9; 252-12 at 57:4-58:1; 252-24

at 67:15-68:12.  The Checkpoints were designed for the limited, primary purpose of vehicle and

traffic safety.  *See, e.g.,* Dkt. Nos. 252-42. While high police visibility and the reduction of drug,

gun, and gang activity were additional purposes ultimately served by the Checkpoints, those

were not the primary purposes.  Under the special needs doctrine, these additional purposes do

not transform the Checkpoints' primary purpose into that of just general law enforcement, no

matter what Plaintiffs argue.  *See Wagner II*, 489 F. App'x at 501 (citing *Lynch*, 589 F.3d at

102); *see also Turner*, 2020 WL 733187 at *4 (holding that the primary purpose of checkpoints

was traffic safety, even though individuals were arrested for non-safety violations at the checkpoints).

There are several analogous decisions in the special needs case law. Plaintiffs simply either do not address them or they deliberately misinterpret their holdings. For example, Plaintiffs address *Wagner I;* however, their attempt to distinguish the case is meritless. Plaintiffs argue the motorcycle checkpoints upheld in *Wagner I* differ from the Checkpoints here because the motorcycle checkpoints were "narrower" in that they were supported by empirical evidence; they focused on motorcycle safety "alone," and only seventeen checkpoints were conducted. Dkt. No. 253-1, pp. 23-24. For the reasons previously articulated, the presence or lack of empirical evidence is not a dispositive factor in a special need analysis. Plaintiffs' assertion that the motorcycle checkpoints focused on motorcycle safety "alone" is simply not true. Out of the 1,064 tickets issued at the seventeen checkpoints conducted in 2008, 600 of them were for non-safety related violations. *Id.* at 91. The City anticipates Plaintiffs will attempt to argue in their opposition to the City's Motion for Summary Judgment, what the plaintiffs in *Wagner I* argued—that multiple non-traffic safety aspects of the checkpoints undermined their asserted primary purpose. 827 F. Supp. 2d at 94. In response, the *Wagner I* Court held that the fact the New York State Police Special Investigation Unit and gang task force were present at checkpoints and focused on non-safety violations did not render the checkpoints unconstitutional. *Id.* So, no, the motorcycle checkpoints did not focus on motorcycle safety alone. Finally, the total number of checkpoints conducted does not seem to have any bearing on the Court's holdings in *Wagner I* or *Wagner II.* Neither opinion even makes any mention of the number of checkpoints in its analysis. The *Wagner* case is directly on point with the Checkpoint

program here.  The same holding in favor of the Checkpoints' constitutionality should result here.

Plaintiffs claim the Checkpoints should be deemed unconstitutional, because they are not "narrow" like the vehicle stops in *U.S. v. Martinez-Fuerte*, 428 U.S. 543 (1976); *Sitz*; and *Lidster*.  But there is no requirement that the primary purpose of a vehicle checkpoint be "narrow."  Rather, *Edmond* simply noted that, at the time of its opinion, the Supreme Court had recognized "only limited circumstances" in which suspicionless searches and seizures were permissible.  531 U.S. at 37.  That *Martinez-Fuerte* dealt with checkpoints for detecting undocumented Mexican migrants, 428 U.S. at 545, that *Sitz* dealt with sobriety checkpoints, 496 U.S. at 444, and that *Lidster* dealt with highway checkpoints seeking information on a recent hit and run, 540 U.S. at 423-424, do not foreclose law enforcement's ability to conduct checkpoints directed at other special needs.

In *Martinez-Fuerte*, the Court recognized that "[a] requirement that stops on major routes inland always be based on reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of [undocumented migrants]."  428 U.S. at 557. The same is true of trying to determine whether occupants in a vehicle are wearing their seatbelts properly, whether drivers possess valid drivers' licenses, and whether the vehicle has a valid registration—all objectives of the BPD Checkpoints.

Contrary to Plaintiffs' reading, the checkpoint in *Lidster* was not confined to only determining whether members of the public had relevant information.  The plaintiff sued the

State of Illinois, because he was arrested and convicted for driving under the influence of alcohol, which officers detected when he approached the information-seeking checkpoint. 540 U.S. at 422. The Court did not deem the stop unconstitutional, even though it went beyond what Plaintiffs have termed the checkpoint's "narrow" purpose. The common thread between *Martinez-Fuerte*, *Sitz*, and *Lidster* is that the Court found that all the stops there were constitutional because they served different special needs and were reasonable. The same is true here. Though the special need here—vehicle and traffic safety—differs from the special needs in those cases, the difference does not render the Checkpoints unconstitutional. *Lidster*, 540 U.S. at 426-427 (noting that programs evaluated under the special needs doctrines must be judged "on the basis of the individual circumstances.").

Plaintiffs' remaining case citations deal with the evaluation of completely different factual circumstances. Again, vehicle and traffic safety is a recognized "special need." *See, e.g., Wagner I,* 827 F.Supp. 2d at 94. Though it may not provide as "exceptional" of a circumstance as the counter-terrorism efforts in *MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006) and *Cassidy* or breathalyzer tests after NYPD officers shot or wounded someone in *Lynch*, the BPD Checkpoints do not contradict the ample case law supporting the notion that vehicle and traffic safety is a substantial governmental objective sufficient to meet the "special need" requirement of the special needs doctrine.

Plaintiffs' citation to *City of Los Angeles v. Patel*, 576 U.S. 409, 424-425 (2015) does not support their emphasis on "narrowness." That case involved administrative searches, which fall under a different exception to the Fourth Amendment—the administrative search

exception—and thus, necessitates a different standard.  *Id.*  Plaintiffs' selective quotation involving allowing "what has always been a narrow exception to swallow the rule," referred to the narrow administrative search exception.  *Id.*  The case at bar does not involve administrative searches.  *Patel* is inapplicable.

Similarly, in *Airbnb, Inc. v. City of N.Y.*, 373 F. Supp. 3d 467, 472 (S.D.N.Y. 2019), the ordinance at issue essentially operated as an administrative subpoena requiring plaintiffs to produce voluminous data regarding their customers.  In assessing the ordinance's reasonableness, the Court held that the standards governing agency subpoenas and administrative searches were applicable.  *Id.* at 487, 495.  Plaintiffs cite to this obviously inapposite case for the proposition that the Court refused "to extend the special needs doctrine to searches 'unsupported by individualized suspicion or any tailored justification.'"  Dkt. No. 253-1, p. 24 (citing *Airbnb*, 373 F. Supp. 3d at 492).  But that is not the ground on which the Court's decision turned. Rather, the Court noted that "[t]he City has not cited any decision suggesting that **the governmental appropriation of private business records on such a scale**, unsupported by individualized suspicion or any tailored justification, qualifies as a reasonable search and seizure."  *Id.* (emphasis added).  Using the actual standards applicable to agency subpoenas and administrative searches, the Court held that the ordinance was unconstitutional.  *Id.*  Because it lacked a mechanism for pre-compliance review, required by administrative search cases, and because the sweep of the ordinance was overbroad under the agency subpoena standard—which requires such subpoenas to be limited in scope, relevant in purpose, and specific in directive— the ordinance failed.  *Id.* at 487, 495.  As should be plainly obvious, these are standards that are simply not applicable here.

18

The Checkpoints were not "justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime."  Dkt. No. 253-1, p. 24 (citing *Edmond*, 531 U.S. at 44).  They were justified by the special need that is vehicle and traffic safety.  The gravity of public concerns, the Checkpoints' advancement of the public interest in vehicle and traffic safety, and the minimally intrusive nature of the Checkpoints render the Checkpoints reasonable under the Fourth Amendment.  The Checkpoints fully complied with the Fourth Amendment, and Plaintiffs' arguments to the contrary are meritless.

## **CONCLUSION**

For these compelling reasons, the Court should deny the Plaintiffs' Motion for Partial Summary Judgment as to their Fourth Amendment claim and, in turn, grant the City Defendants' Motion for Summary Judgment dismissing Plaintiffs' Fourth Amendment claim. The Court should grant such further and additional relief as the Court may deem just and proper.

Dated:      Buffalo, New York
            May 30, 2025

**HODGSON RUSS LLP**

*Attorneys for Defendants City of Buffalo, NY, Byron B. Brown, Byron C. Lockwood, Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, and Unknown Officers 1-20*

By: */s/ Cheyenne N. Freely*
       Hugh M. Russ III, Esq.
       Peter Sahasrabudhe, Esq.
       Cheyenne N. Freely, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000
hruss@hodgsonruss.com
psahasra@hodgsonruss.com
cfreely@hodgsonruss.com

20