# EXHIBIT 2

```
 1      UNITED STATES DISTRICT COURT
 2      FOR THE WESTERN DISTRICT OF NEW YORK
 3      -------------------------------------------
 4      BLACK LOVE RESISTS IN THE RUST, et al.,
        individually and on behalf of a class of
 5      all others similarly situated,
 6                        Plaintiffs,
 7       -vs-                   1:18-cv-00719-CCR
 8      CITY OF BUFFALO, N.Y., et al.,
 9                        Defendants.
10      -------------------------------------------
11         EXAMINATION BEFORE TRIAL OF DAVID L. BANKS
12                 APPEARING REMOTELY FROM
13                 DURHAM, NORTH CAROLINA
14
15
16               September 27, 2024
17              9:30 a.m. - 3:41 p.m.
18                pursuant to notice
19
20
21
22      REPORTED BY:
23      Carrie A. Fisher, Notary Public
```

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1          **R E M O T E    A P P E A R A N C E S**

2

3    APPEARING FOR THE PLAINTIFFS:

4          **COVINGTON & BURLING LLP**
           **BY: PHILIP A. IRWIN, ESQ.**
5          The New York Times Building
           620 Eighth Avenue
           New York, New York 10018
6          (212) 841-1190

7    APPEARING FOR THE DEFENDANTS:

8          **HODGSON RUSS LLP**
           **BY: CHEYENNE N. FREELY, ESQ.**
9          The Guaranty Building
           140 Pearl Street, Suite 100
10         Buffalo, New York 14202
           (716) 856-4000
11

12   ALSO PRESENT (OBSERVING):

13         **EDWARD P. KRUGMAN, ESQ.**,
           National Center for Law and Economic
14         Justice

15         **S. CONRAD SCOTT, ESQ.**,
           Covington & Burling LLP

16         **JACOB STARK, ESQ.**,
           Covington & Burling LLP
17

18

19

20

21

22

23

1   A. No.

2   Q. How many hours have you worked on the case?

3   A. I don't recall.  I submit a monthly invoice.

4      I am pretty sure that I'm under $15,000.

5   Q. When were you first retained?

6   A. I think it might have been in May or possibly

7      late April of this year.

8   Q. When did you start working on the case?

9   A. It -- I don't recall specifically, but it

10     could not have been earlier than late May.

11  Q. What were you asked to do with respect to this

12     case?

13         MS. FREELY:  Objection to form.

14  A. I was asked to read Professor Bjerk's report

15     and do analyses that examined the credibility

16     of his conclusions.  And I will remind you

17     that as an expert witness, I am not on the

18     side of my lawyers, I am to give the people

19     who retained me the best information that I

20     can regarding the case.

21  Q. You said you were tasked with doing analyses

22     to examine the credibility of Dr. Bjerk's or

23     Professor Bjerk's analysis.  Were you asked to

```
 1        do your own analysis of the data?
 2   A.   Yes.
 3   Q.   Okay.  And did you do that?
 4   A.   Not precisely.  Professor Bjerk, his analysis
 5        made an assumption that any discrepancy, any
 6        disparity in traffic citations must be due to
 7        racial prejudice or ethnic prejudice, and I
 8        dispute that assumption.
 9   Q.   Okay.  But you didn't do your own
10        comprehensive analysis of the data, correct?
11   A.   I did some analysis of data, yes.
12   Q.   Did you, yourself, attempt to examine whether
13        the data reflected racial discrimination?
14   A.   Professor Bjerk I think did a very good but
15        narrow job.  We spot-checked some of his work.
16        It seemed right, and I did not examine every
17        single calculation that he made.
18   Q.   Okay.  Well, I understand that you reviewed
19        Dr. Bjerk's report and had some issues with
20        assumptions he was making and we will get into
21        all of that.
22             My question is a little bit different
23        which is, did you attempt to do your own
```

```
 1        comprehensive analysis of the Buffalo data to
 2        reach your own conclusions about what it
 3        showed or didn't show?
 4    A.  I'm not sure I take your point.  I did some
 5        analysis.  I don't know what you mean by
 6        "comprehensive."  You don't have to eat a
 7        whole apple to know that it's bad, so I'm not
 8        sure I follow where you're going.
 9    Q.  Well, was the nature of your analysis simply a
10        rebuttal to Dr. Bjerk, or did you make any
11        effort to do your own affirmative analysis of
12        the data?
13    A.  It is a rebuttal report so my effort was to
14        show that Professor Bjerk's conclusions in his
15        report were not well-founded.
16    Q.  In paragraph 6 you indicate that you used
17        datasets labeled Exhibits A, B, and C.  Do you
18        see that?
19    A.  Yes.
20    Q.  Can you describe what you used Exhibit A for?
21    A.  Let's see.  It should be listed in the report.
22        I think I indicated at various numbered
23        paragraphs which datasets I drew upon at which
```

```
 1      BY MR. IRWIN:
 2      Q. Professor Banks, when you were initially
 3         retained, was the project pitched to you as a
 4         rebuttal report or was there any discussion of
 5         doing your own opening report?
 6              MS. FREELY:  Form.
 7      A. The initial plan was for me to do my own
 8         analysis and my own report of the data.  The
 9         time constraints did not permit that to happen
10         and so we pivoted to a rebuttal report.
11              If I may, during the interval I went
12         back and looked at email.  The previous work
13         with the NAACP Legal Defense Fund was in 2009.
14         It had to do with the Racial Justice Act in
15         North Carolina which was -- followed the
16         exoneration of several innocent Black men who
17         had been sentenced to death.  And there were a
18         series of cases in Cumberland and Johnson
19         Counties that Jay Ferguson and the NAACP were
20         concerned about and I believe, although I
21         didn't have time to confirm all the details,
22         it had to do with jury composition.
23      Q. Okay.  And you were retained by the defense in
```

```
 1        or minority driver is more likely to have a
 2        broken taillight or is more likely to be
 3        committing some other type of moving
 4        violation.  If it's a young Hispanic driver,
 5        that person may be more likely to speed or
 6        more likely to run a stop sign or otherwise
 7        commit an infraction than an older White or
 8        Black driver.
 9   Q.   This is probably a good breaking point.  I'm
10        about to go on to something new so should we
11        take a ten-minute break?
12   A.   Sounds good.  Thank you so much.
13             (A recess was taken.)
14   BY MR. IRWIN:
15   Q.   Professor Banks, before the break we were
16        talking about Professor Bjerk's multiple
17        ticketing analysis.
18   A.   Yes.
19   Q.   And you flagged a scenario where a person
20        might receive multiple tickets for different
21        categories of violation.  I want to focus you
22        on a different scenario where a person is
23        given multiple tickets for the same violation
```

```
 1          and does the assumption -- well, let me
 2          rephrase that.
 3                  For that scenario, do you agree that
 4          Dr. Bjerk is not assuming differences between
 5          races as to the underlying true infraction
 6          rate?
 7                  MS. FREELY:  Form.
 8      A.  I -- could you be more specific?  I'm not
 9          following.
10      Q.  Okay.  So before the break I think you
11          identified the possibility that someone would
12          get multiple tickets because perhaps -- I'm
13          making up the example now but for different
14          categories.  So maybe someone is pulled over
15          and gets a speeding ticket and then while
16          they're pulled over the police officer notices
17          that their taillight is out so it gets two
18          different tickets for that scenario.
19      A.  Yes.
20      Q.  I'm asking about another possibility where
21          someone would get a ticket for the same
22          type -- get multiple tickets for the same type
23          of violation, and am I correct that your
```

```
 1        assertion that Professor Bjerk is assuming the
 2        same behavior between races does not apply to
 3        that type of scenario?
 4             MS. FREELY:  Form.
 5   A.   I -- I suspect that you are referring to the
 6        case in which a person would get multiple
 7        citations for heavily tinted windows, one
 8        citation for each window.  Is that the type of
 9        scenario you're considering?
10   Q.   That's an example, yes.
11   A.   I don't recall any data that identified
12        whether that was racially motivated or
13        racially associated with the driver, so I am
14        not sure whether the people who got multiple
15        citations were minorities or majorities.
16   Q.   Okay.  But in any event you're not accusing
17        Professor Bjerk of making that improper
18        assumption that we've talked about as to that
19        specific analysis?
20             MS. FREELY:  Form.
21   A.   No.
22   Q.   All right.  Let me turn to -- well, I will
23        turn to another.
```

```
 1    Q. And let's go to Figure 14 which is that
 2       paragraph 295.  I will go ahead and make this
 3       one bigger.  I don't need to put two on the
 4       screen.
 5           Are you able to see Figure 14?
 6    A. Yes.
 7    Q. Okay.  And you understand here that he -- that
 8       Professor Bjerk is showing the number of
 9       incidents resulting -- well, the fraction of
10       tinted windows incidents with multiple tinted
11       windows by driver race, correct?
12    A. I believe it's showing the number of -- the
13       fraction of incidents in which there were
14       multiple tickets for tinted windows on the
15       same incident.
16    Q. Okay.  Thank you.  That was definitely more
17       articulate than my question.
18           And the changes that we see over time in
19       this figure also cannot be explained by a
20       change in the underlying infraction rate,
21       correct?
22    A. I agree.
23    Q. All right.  Let's go to paragraph 20 of your
```

```
 1    STATE OF NEW YORK)

 2    COUNTY OF ERIE   )

 3

 4
             I, Carrie A. Fisher, Notary Public, in and
 5    for the County of Erie, State of New York, do
      hereby certify:
 6

 7          That the witness whose testimony appears
      hereinbefore was, before the commencement of their
 8    testimony, duly sworn to testify the truth, the
      whole truth and nothing but the truth; that said
 9    testimony was taken remotely pursuant to notice at
      the time and place as herein set forth; that said
10    testimony was taken down by me and thereafter
      transcribed into typewriting, and I hereby certify
11    the foregoing testimony is a full, true and
      correct transcription of my shorthand notes so
12    taken.

13
            I further certify that I am neither counsel
14    for nor related to any party to said action, nor
      in anyway interested in the outcome thereof.
15

16          IN WITNESS WHEREOF, I have hereunto
      subscribed my name and affixed my seal this
17    24th day of October, 2024.

18
                      (signature)
19    _____

20    Carrie A. Fisher
      Notary Public - State of New York
21    No. 01FI6240227
      Qualified in Erie County
22    My commission expires 5/02/27

23
```

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York 14202
716-853-5544