# EXHIBIT 9

```
 1        UNITED STATES DISTRICT COURT

 2        FOR THE WESTERN DISTRICT OF NEW YORK

 3        ---------------------------------------------

 4        BLACK LOVE RESISTS IN THE RUST, et al.,
          individually and on behalf of a class of
 5        all others similarly situated,

 6                              Plaintiffs,

 7        -vs-                          1:18-cv-00719-CCR

 8        CITY OF BUFFALO, N.Y., et al.,

 9                              Defendants.
          ---------------------------------------------
10              DEPOSITION OF DANIEL DERENDA

11           Taken pursuant to Rule 30(b)(6)

12         of the Federal Rules of Civil Procedure

13              APPEARING REMOTELY FROM

14               BUFFALO, NEW YORK

15

16        (ATTORNEYS' EYES ONLY PAGES 138 - 142)

17

18              January 23rd, 2024

19              At 9:30 a.m.

20              Pursuant to notice

21

22        REPORTED BY:

23        Rebecca L. DiBello, RPR, CSR(NY)
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

0001

1          **R E M O T E     A P P E A R A N C E S**

2      APPEARING FOR THE PLAINTIFFS:

3                        **CENTER FOR CONSTITUTIONAL RIGHTS**
                         **BY: A. CHINYERE EZIE, ESQ.**
4                        666 Broadway, 7th Floor
                         New York, New York 10012
5                        (212) 614-6475

6      APPEARING FOR THE DEFENDANTS:

7                        **HODGSON RUSS, LLP**
                         **BY: PETER SAHASRABUDHE, ESQ.**
8                        **AND CHEYENNE N. FREELY, ESQ.,**
                         140 Pearl Street
9                        Buffalo, New York 14202
                         (716) 856-4000

10

11

       ALSO PRESENT:
12
                        **JORDAN JOACHIM, ESQ.,**
13                          Covington & Burling, LLP

14                      **ANJANA MALHOTRA, ESQ.**
                            National Center for Law
15                          and Economic Justice

16                      **CLAUDIA WILNER, ESQ.**
                            National Center for Law
17                          and Economic Justice

18

19

20

21

22

23

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1          Do you see that?

2    A. Yes.

3    Q. Topic 1 also contains a subtopic which reads,

4        "The patrol locations of the Strike Force, the

5        persons responsible for and data used in their

6        determinations."

7          Do you see that?

8    A. I do.

9    Q. Are you prepared to testify on this topic

10       today?

11   A. Yes, I am.

12   Q. How did you prepare to give testimony on this

13       topic in particular?

14   A. This is mostly personal knowledge and I did

15       speak to Lockwood about his decision to

16       disband the Strike Force.

17   Q. Thank you.  Are there any documents you recall

18       reviewing specifically related to this topic?

19   A. I reviewed the original posting for the Strike

20       Force that went out through the union job

21       postings for people to get on the transfer

22       list for the Strike Force.

23   Q. Okay.  Now, I'd also like to at this moment --

DANIEL DERENDA

```
 1        matter in details of conversations that
 2        happened with counsel.  So you can answer that
 3        limited question.
 4    A.  I don't recall exactly what he would have
 5        educated me on the section.
 6    Q.  Okay.  So let's turn to the Strike Force.  The
 7        Strike Force was created during your time as
 8        BPD commissioner, correct?
 9    A.  Correct.
10    Q.  With your approval?
11    A.  Yes.
12    Q.  What year was the Strike Force created, to
13        your recollection?
14    A.  2013.
15    Q.  And the Strike Force began as a detail and
16        then became a permanent unit of the BPD,
17        correct?
18    A.  It became -- I don't recall if it started as a
19        detail or not, but it was posted for a
20        permanent unit I believe in March of 2013.
21    Q.  Okay.
22    A.  Again, I might be off on the date.
23    Q.  And the mission of the Strike Force was to
```

**DANIEL DERENDA**

1        target guns, drugs and crime, correct?

2            MR. SAHASRABUDHE:  Objection as to form.

3        You may answer.

4   A. The mission of the Strike Force was to target

5        violent crime in crime hot spots.  It's listed

6        on the posting.

7   Q. Okay.  And also gangs?

8            MR. SAHASRABUDHE:  Objection as to form.

9   A. It would target violent crime, period.  It

10       could include gang members, yes, and all

11       crimes, all violent crime and crime hot spots.

12   Q. Okay.  There was also an explicit mission to

13       remove illegal guns from the streets, correct?

14   A. That is part of the function of all patrol

15       officers and officers out there, to remove

16       guns, yes, correct.

17   Q. But that was also a stated objective of the

18       Strike Force per its mission statement?

19   A. I don't believe that was in the posting.

20   Q. I'd like to mark as the third exhibit for this

21       deposition a document that was produced in

22       discovery as COB 060319.  It was also the

23       first exhibit in your non 30(b)(6) deposition.

────── DANIEL DERENDA ──────

1              Are you able to see that on your screen,

2       Mr. Derenda?

3    A.  Yes.

4    Q.  Okay.  Do you recognize this document?

5    A.  I do.

6    Q.  Is this the official mission statement of the

7       Strike Force?

8    A.  I believe -- yeah, there was a posting.  I

9       believe that was the mission statement,

10      correct.

11   Q.  It's actually a mission statement that you

12      helped prepare?

13   A.  I probably prepared it.

14   Q.  And it accurately describes the mission of the

15      Strike Force?

16   A.  Target and eliminate criminal hot spots

17      throughout the city.  Yes.  Guns, zero

18      tolerance crime policy.  Yes.

19   Q.  So to ask my question again, one of the stated

20      purposes of the Strike Force was to remove

21      illegal guns from the streets of Buffalo,

22      correct?

23   A.  Under the mission statement, correct.

────── **DEPAOLO CROSBY REPORTING SERVICES, INC.** ──────
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

```
 1      Q.  Now, traffic safety was not listed as one of
 2          the four missions of the Strike Force on the
 3          mission statement, correct?
 4      A.  It's not listed on this mission statement.
 5      Q.  Okay.  Now, let's turn to the activities the
 6          Strike Force engaged in while it was in
 7          existence.  Once established the Strike Force
 8          was designed to target patrol areas, correct?
 9              MR. SAHASRABUDHE:  Objection to form.
10          Can you restate?
11      Q.  Once established the Strike Force had assigned
12          patrol areas, correct?
13      A.  They had assigned areas, correct.
14      Q.  Areas that were referred to as patrols?
15              MR. SAHASRABUDHE:  Objection as to form.
16      A.  I'm not understanding.
17      Q.  Did you call the areas that the Strike Force
18          was assigned to patrol locations or patrol
19          areas?
20      A.  Areas.  Like they were by number.
21      Q.  Okay.  And the majority of the patrol areas
22          were on the East Side?
23      A.  I believe it broke down the city by different
```

—DANIEL DERENDA—

1          areas by number.

2     Q.  As far as the actual locations where the

3          Strike Force was dispatched, was that

4          predominantly on the East Side?

5     A.  The Strike Force was dispatched based on crime

6          trends and things going on in the area,

7          different areas.

8     Q.  There is data available about where those

9          locations tended to be, correct?

10    A.  There was data gathered where those locations

11         -- yeah.  There would be based on their

12         reports, yes.

13    Q.  Okay.  And you were often involved in the

14         decision as to where the Strike Force would be

15         dispatched, correct?

16              MR. SAHASRABUDHE:  Object to the form.

17    A.  I was, Lockwood was, the chiefs were,

18         sometimes the captains, maybe Serafini of the

19         Strike Force or the other captain.  I don't

20         recall his name.  And sometimes the

21         lieutenants picked the locations based on

22         information.

23    Q.  And that is to say that the commissioner

DANIEL DERENDA

```
 1        participated in the selection of the Strike
 2        Force's patrol locations, correct?
 3   A.  I believe I did, yes.
 4   Q.  As did the deputy police commissioner,
 5        correct?
 6   A.  Lockwood, correct.
 7   Q.  As did captains who were involved in the
 8        Strike Force, correct?
 9   A.  I believe at times they may have, correct.
10   Q.  And as well as lieutenants involved in the
11        Strike Force, correct?
12   A.  I think that was limited, but I believe it
13        could have taken place.
14   Q.  Okay.  And to the extent it took place, it was
15        with the authorization of the BPD chain of
16        command?
17   A.  Correct.
18   Q.  Okay.  Now, what criteria was used in
19        selecting the Strike Force patrol locations?
20   A.  Locations based on current issues going on.
21        We discussed with chiefs.  We looked at crime
22        stats, crime hot spots and they dispatched
23        based on what was going on at that time,
```

DANIEL DERENDA

```
 1          whether it was a series of shootings, whether
 2          it was a series of burglaries or whatever the
 3          reason, they were put in that area for a
 4          reason.
 5     Q.   Okay.  And that reason related to the
 6          interdiction of violent crime, correct?
 7     A.   Basically.  Not always violent crime.  It
 8          depended on different issues.  Chiefs would
 9          request -- we'd have weekly chiefs meetings,
10          district chiefs meetings and they would
11          request Strike Force for different purposes
12          based on different crime trends.  Again,
13          different reasons at different times.
14     Q.   What types of crime trend data was being
15          evaluated when selecting Strike Force
16          locations?
17     A.   Well, we'd work with the analyst center for
18          crime data, but we'd also work with the chiefs
19          from the districts and they would review the
20          daily reports coming in.  They would know if
21          they had a series of robberies.  They would
22          know if they had a series of burglaries or
23          shootings or whatever, and based on current
```

DANIEL DERENDA

1          trends at the time they were assigned to

2          different areas.

3     Q. Okay.  Was crime data related to the location

4          of motor vehicle accidents considered?

5     A. For the Strike Force?

6     Q. Correct.

7     A. No.

8     Q. Was trend data related to the incidence of

9          motorists driving without licenses or

10         registrations considered?

11    A. For the location of the Strike Force, no.

12    Q. Yes.  Was there any consideration of traffic

13         safety data related to the location of Strike

14         Force patrols?

15             MR. SAHASRABUDHE:  We're talking about

16         patrol locations, correct?

17    Q. Correct.

18    A. No.

19    Q. Okay.  Now, in the instances where you were

20         not responsible as commissioner for selecting

21         patrol locations you were made aware of them,

22         correct?

23             MR. SAHASRABUDHE:  Objection as to form.

─────────── DANIEL DERENDA ───────────

```
 1      A.  I would be copied on a daily Strike Force

 2          report so, yes, I would review those reports

 3          periodically, so I would have been made aware

 4          of.

 5      Q.  Okay.  And if you had concerns or objections

 6          to the patrol locations you could have voiced

 7          those concerns, correct?

 8              MR. SAHASRABUDHE:  Objection to form.

 9      A.  Yes.

10      Q.  Did you ever?

11      A.  I don't recall.

12      Q.  And there were others in the BPD who received

13          Strike Force daily reports, correct?

14      A.  It would be -- yes, that's correct.

15      Q.  Who were those individuals by job title?

16      A.  I don't remember the total who would be on it,

17          but it would be district chiefs at the time.

18          The deputy commissioners would receive it.  I

19          would receive it.  Strike Force lieutenants

20          would receive it.  Captains, all chiefs.  That

21          would probably be the chain.  I don't recall

22          exactly who would be on that chain.

23      Q.  Okay.
```

─────── **DEPAOLO CROSBY REPORTING SERVICES, INC.** ───────

─── **DANIEL DERENDA** ───

```
 1      A.  I didn't educate myself on that prior to.

 2      Q.  But in any event, members of BPD's leadership

 3          including the commissioner received the daily

 4          reports?

 5      A.  Yes.

 6      Q.  What was the function of the Strike Force

 7          daily reports?

 8      A.  Of the daily reports?

 9      Q.  Yes.

10      A.  To know what was being done.  My philosophy is

11          what gets measured gets done.

12      Q.  So as commissioner you were briefed on a daily

13          basis about the Strike Force's activities in

14          the City of Buffalo, correct?

15      A.  I was sent a daily report.  Whether I read it

16          daily or not, sometimes, sometimes not.

17      Q.  Okay.  But you were nonetheless given notice

18          about the activities the Strike Force was

19          engaged in in the City of Buffalo?

20              MR. SAHASRABUDHE:  Objection as to form.

21      A.  I was sent the daily report.

22      Q.  Okay.  And that was a practice that was

23          instituted during your time as commissioner of
```

─── **DEPAOLO CROSBY REPORTING SERVICES, INC.** ───
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1        the BPD, these daily reports?

2    A.  Yes.

3    Q.  And they were made in the regular course of

4        business for the BPD, correct?

5            MR. SAHASRABUDHE:  Objection as to form.

6    A.  Correct.

7    Q.  Now, I would like to turn to the Housing Unit.

8        The Housing Unit was a unit of the BPD that

9        existed between 2010 and 2020, correct?

10   A.  I don't recall the dates.

11   Q.  Okay.  But you are aware that the activities

12       of the Housing Unit is the subject for which

13       you were supposed to be educated today?

14   A.  Correct.  I just don't recall the dates that

15       it was started and ended.

16           MS. EZIE:  I think that, Peter, we would

17       consider this as part of the deposition notice,

18       but we will keep going.

19           MR. SAHASRABUDHE:  I don't see anywhere

20       on any topic listed the date that the Housing

21       Unit started and the date that it ended.  I

22       also don't get why that really matters for

23       purposes of this deposition, but --

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1           MS. EZIE:  Okay.  I'm just making a
2      record.
3  Q. Now, the primary focus of the Housing Unit was
4      crime prevention, correct?
5  A. In and around the housing complexes.
6  Q. So the primary focus of the Housing Unit was
7      crime prevention in and around BMHA housing
8      units?
9  A. In and around the complexes.  They were to
10      patrol those areas.
11  Q. And by housing complexes you mean Buffalo
12      Municipal Housing Authority complexes or BMHA
13      property?
14  A. Right.
15  Q. Their patrol zone was not just limited to the
16      units, but included the surrounding areas?
17  A. They would be patrolling the units and the
18      surrounding areas, correct.
19  Q. Up to about half a mile circumference around
20      the properties?
21           MR. SAHASRABUDHE:  Objection as to form.
22  A. I don't think we ever put a limit on how far
23      away they could patrol.  Again, they would go

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1          to and from so, again, I don't ever remember a
2          number being placed on that.
3      Q.  Okay.  So during the time that you were
4          commissioner they were authorized to patrol
5          the housing complexes as well as any of the
6          neighborhoods that they passed through on
7          their way to the housing complexes?
8      A.  They would have city-wide jurisdiction,
9          correct.
10     Q.  Okay.  And in addition to crime prevention
11         their focus was drug interdiction, correct?
12     A.  Their focus was being police officers and
13         enforcing all laws.
14     Q.  Okay.  But they still were subject to a
15         contract with the BMHA, correct?
16     A.  There was a contract with BMHA, correct.
17     Q.  And that contract indicated that their primary
18         focuses would be criminal investigations and
19         drug interdiction, correct?
20     A.  Their primary focus would be crime.  I don't
21         have the contract.  I did not review the
22         contract prior to this meeting.  It wasn't one
23         of the stated topics, but their objective

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

0016

DANIEL DERENDA

```
 1          whether it was Housing, whether it was
 2          individual district details, they were all
 3          made to do daily reports that I would have
 4          been copied on.
 5     Q.  Okay.  And so as commissioner you were made
 6          aware of the Housing Unit's patrol location?
 7     A.  I would have been sent a copy of the report
 8          which would have made me aware had I read the
 9          report.
10     Q.  Okay.  Why was that a practice of the BPD?
11     A.  I don't understand.  Why was it a practice to
12          have the reports?
13     Q.  Yes.
14     A.  What gets measured gets done.  I want to know
15          people are out there working doing what
16          they're supposed to be doing.  I always liked
17          to keep a handle on what was going on
18          throughout the city.
19              Again, I had numerous reports just about
20          for every detail.  Every unit would send
21          reports and, again, did I read all of them?
22          No.  Did I go through them?  Yes.
23     Q.  What else was contained on these daily reports
```

DEPAOLO CROSBY REPORTING SERVICES, INC.

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1        besides patrol locations?

2    A.  Probably would be the number of arrests, the

3        number of summonses, any parking tickets, any

4        city ordinance tickets.  Just numbers in

5        general.  Anything that happened that night of

6        interest, special interest, guns recovered,

7        whatever.  It would be a report to know what

8        happened that night within the unit or detail.

9    Q.  Okay.  And as you testified, BPD commissioner

10       -- the BPD commissioner received these

11       reports, correct?

12   A.  Yes.

13   Q.  Who else in BPD leadership received these

14       reports?

15   A.  It would be the same chain of command, whether

16       it was detail reports, Strike Force reports,

17       the deputy commissioners, the commissioners,

18       the chiefs received the reports because

19       whether it was Strike Force or Housing, it

20       could have been something taking place in

21       their district, the district chiefs, and then

22       the leadership of the units.

23   Q.  Okay.  Now, the Strike Force was disbanded in

─────────── DANIEL DERENDA ───────────

```
 1                MR. SAHASRABUDHE:   Objection as to form.

 2      A. I don't believe so.  He just wanted to go in a

 3         different direction was what he told me

 4         yesterday.

 5      Q. Okay.  Were civilian complaints concerning the

 6         Strike Force a motivation in the dissolution

 7         of the Strike Force?

 8      A. I do not believe so.

 9      Q. Has the Buffalo Police Department adopted any

10         policy that prevents the Strike Force from

11         being reassembled in the future?

12      A. Units come and go and if the current

13         commissioner wanted to form a unit like the

14         Strike Force he has the ability to do so.

15      Q. Okay.  So there is nothing prohibiting a

16         police commissioner from re-establishing the

17         Strike Force in the future?

18      A. The Strike Force or any other unit he chooses

19         to create.

20      Q. Now, the Housing Unit was disbanded in 2020,

21         correct?

22      A. Yes.  I believe so.

23      Q. And prior to its disbandment the Housing Unit
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1          quote unquote.  In speaking to Gramaglia and

2          the other individuals, they didn't recall the

3          term either.

4     Q.  Okay.  We'll get to that momentarily, but is

5          your indication that you are more or less

6          relying on personal knowledge for Topic 3

7          because the person you contacted did not have

8          information pertinent?

9     A.  No.  I'm not saying they didn't have

10         information for that, but the use of traffic

11         enforcement is general.  Like I can answer

12         that from personal knowledge on what I believe

13         why we did traffic enforcement.

14    Q.  Okay.  Okay.  So let's again -- so once the

15         Strike Force was established it began

16         operating checkpoints, correct?

17    A.  At some point it operated checkpoints,

18         correct.

19    Q.  The Strike Force after establishment also

20         began engaging in traffic enforcement?

21    A.  No.  The Strike Force would -- traffic

22         enforcement would be part of their job just

23         like any other patrol units that do patrol.

1          Whether district patrols, housing patrols,

2          Strike Force patrols, traffic enforcement is

3          part of their patrols and in general as to

4          Topic 3, traffic enforcement to me is part of

5          proactive policing, part of the mayor's zero

6          tolerance crime policy and part of high

7          visibility and I believe being out there

8          enforcing all laws, be it traffic, be it Penal

9          Law, whatever, is part of their job.

10    Q.  Okay.  And Mr. Derenda, are you reading from

11          something in front of you?

12    A.  I am not.  The only thing I have in front of

13          me are the topics that you have.

14    Q.  Okay.  So you said a lot there, but I just

15          want to confirm that we have agreement that

16          the Strike Force during its period of

17          operation engaged in traffic enforcement,

18          correct?

19    A.  Yes.

20    Q.  And it also operated checkpoints, correct?

21    A.  Correct.

22    Q.  Now, the Strike Force operated checkpoints as

23          part of the mayor's plan to deal with gang and

**DANIEL DERENDA**

1       chief and/or the captains, but most likely

2       communicated to the chiefs.

3   Q.  And when the Strike Force operated checkpoints

4       it was part of the mayor's plan to deal with

5       gang and gun violence, correct?

6          MR. SAHASRABUDHE:  Objection as to form.

7       Asked and answered.  Go ahead.

8   A.  The mayor's zero tolerance crime policy was to

9       go after all crime, period, separate from the

10      Strike Force.  Part of the Strike Force in my

11      opinion was implementing zero tolerance crime

12      policy on all, whether it's traffic tickets,

13      whether it's city ordinances, whether it's any

14      crime it's part of the zero tolerance crime

15      policy.

16   Q.  Okay.  And during your time as commissioner

17      there was such a thing as the plan to address

18      gang and gun violence, correct?

19          MR. SAHASRABUDHE:  Object to the form of

20      the question.  Go ahead.

21   A.  Possibly, but I don't recall any specifics at

22      this point, but yes, we did want to address

23      gang and gun violence, yes.

DANIEL DERENDA

1    correct?

2        MR. SAHASRABUDHE:  Objection to form.

3    What topic are we on?

4        MS. EZIE:  We are talking about Topics 1

5    and 3, and in my opinion 4.

6        MR. SAHASRABUDHE:  I mean, GIVE grants

7    weren't listed as a topic.  We didn't prepare

8    to talk about GIVE grants, but --

9  A. My recollection, we had a lot of different

10    grants that were given to us.  I vaguely

11    remember the term GIVE grants, but I don't

12    totally recall.

13  Q. Okay.  Isn't it true that the BPD applied for

14    and received funding for the checkpoints by

15    describing -- the Strike Force checkpoints by

16    describing how they would be used to recover

17    guns?

18        MR. SAHASRABUDHE:  Objection as to form.

19  A. I don't recall.  I wouldn't have written the

20    grants, nor would I have applied for.  I have

21    not read that material so I really can't

22    answer that.  I don't recall the criteria for

23    GIVE grants.  We had a grant writer back then.

**DANIEL DERENDA**

1          I don't know how it was written, but I do know

2          who would have written it, but I don't recall,

3          no.

4    Q.  But you were responsible as commissioner for

5          assigning things like -- strike that.

6                    Our I'll go ahead and mark as Exhibit --

7          I believe we're up to 6 and my colleagues can

8          correct me if I'm wrong -- a document that's

9          produced in discovery as COB 463302.  It's a

10         five-page document.

11                   Right now we are displaying page 1 in

12         its entirety.  Are you able to see it,

13         Mr. Derenda, or should I make it larger?

14   A.  Can you make it larger because I can't get

15         close enough to the screen.

16   Q.  Is that better?

17   A.  That's good.  That's good.

18   Q.  Okay.  It's a five-page document entitled

19         memorandum of understanding, Gun Involved

20         Violence Elimination (GIVE) Buffalo/Erie

21         County.  Do you see that as the title of this

22         document?

23   A.  I do.

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

—— DANIEL DERENDA ——

1    Q. And I'm going to scroll to the bottom which is
2       page 5 so that you can see this is a
3       memorandum that was addressed for your
4       signature.  Do you see that?
5    A. It's addressed for my signature, the district
6       attorney, the sheriff, Erie County probation,
7       and then commissioner of Central Police
8       Services, correct.
9    Q. Does this refresh your memory that Buffalo
10      Police Department participated in something
11      called the Gun Involved Violence Elimination
12      program?
13   A. I believe we did, but I don't have a recall of
14      a specific grant.
15   Q. Okay.  I'd like to turn to page 2 of this
16      document.  I'm scrolling back up.
17           Do you see in paragraph 2 there is
18      discussion about the Strike Force?
19           MR. SAHASRABUDHE:  Can you point with
20      your cursor?
21           MS. EZIE:  Sure.  Unfortunately, it's
22      not letting me.
23           MR. SAHASRABUDHE:  He found it.

DANIEL DERENDA

```
 1      A.  I found it.
 2      Q.  Is this large enough for you to read or would
 3          you like me to blow it up?
 4      A.  Just a little bit bigger.  That's good.
 5      Q.  Let me know when you've had a chance to read
 6          that.
 7      A.  (Reading).  Okay.  I read it.
 8      Q.  Okay.  Mr. Derenda, is this paragraph
 9          accurately describing activities that the
10          Buffalo Police Department engaged in during
11          your time as commissioner?
12              MR. SAHASRABUDHE:  Objection as to form.
13      A.  Buffalo Police dedicated patrols.  Strike
14          Force was assigned to target high crime in hot
15          spots throughout the city.  Again, I didn't
16          write this.  I don't recall reading it, but
17          apparently I would have signed it.
18              MR. SAHASRABUDHE:  Objection.  Don't
19          speculate.
20      Q.  And so my question is is this paragraph
21          accurately describing activities of the
22          Buffalo Police Department?
23              MR. SAHASRABUDHE:  Form.
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

—DANIEL DERENDA—

```
 1    A.  It describes Buffalo Police will be assigned
 2        to dedicated patrols who will engage in
 3        location-specific hot spots, directed patrols,
 4        in each of the targeted E District locations
 5        along with officers assigned to Strike Force.
 6              They're saying the specialized unit
 7        designed to target gangs, guns in high crime
 8        area.  They were designed to target violent
 9        crime in hot spots which would include gangs
10        and guns.
11              Officers will be watching for gun
12        activity at specific times and at specific
13        locations and will be using a ceasefire
14        approach.  I don't recall what a ceasefire
15        approach is.  And includes setting up
16        roadblocks, patrolling hot spots with other
17        partners is what it says.  Reinforcing zero
18        tolerance for crime.
19    Q.  So if you stop right there, the paragraph --
20        the two sentences you just read that appear in
21        memorandum of understanding concerning Gun
22        Involved Violence Elimination funds, do those
23        two sentences accurately describe activities
```

1      of the Buffalo Police Department during your

2      time as commissioner?

3           MR. SAHASRABUDHE:  Objection as to form.

4    A. It is what is stated.  It was a memorandum

5      that I do not recall, but again it describes

6      activities that would be targeting areas with

7      gang activity under a specific grant, again,

8      which includes setting up roadblocks and,

9      again, as I stated numerous times the purpose

10      of checkpoints/roadblocks were for traffic

11      safety, but also for high visibility and that

12      would be why that would be setup.

13           Patrolling with other partners, again, I

14      don't recall this document that you're showing

15      me at this point.

16           MS. EZIE:  I will ask the court reporter

17      to repeat my question.

18

19           (Record read back by reporter.

20

21    Q. It's a yes or no question.

22           MR. SAHASRABUDHE:  Objection as to form.

23    A. I believe it would reflect activities under

DANIEL DERENDA

```
 1        this grant which the officers would have
 2        performed.
 3    Q.  Thank you.
 4            Now, moving on, when the Strike Force
 5        operated checkpoints they received assistance
 6        at times from the Housing Unit, correct?
 7    A.  Correct.
 8    Q.  The Strike Force and Housing Unit also engaged
 9        in traffic enforcement outside of checkpoints,
10        correct?
11    A.  It would be part of their duties on patrol to
12        enforce traffic, correct.
13    Q.  So they engaged in these activities with your
14        knowledge and permission?
15    A.  Yes.
16    Q.  Including on the East Side?
17    A.  Including all parts of the City of Buffalo.
18    Q.  And that includes the East Side?
19    A.  Correct.
20    Q.  Now, as BPD commissioner you participated in
21        the decision to deploy the Strike Force for
22        use in traffic enforcement, correct?
23            MR. SAHASRABUDHE:  Objection as to form.
```

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1    A.  As I stated, traffic enforcement was a
2        function of all patrol units including the
3        Strike Force, housing district patrols,
4        traffic patrols, whatever.  It's part of their
5        daily job for any officer out doing patrol.
6    Q.  So they engage in these activities with your
7        knowledge and approval, correct?
8    A.  Correct.
9    Q.  The checkpoints -- the Strike Force and
10       Housing Unit also participated in checkpoints
11       with your knowledge and approval?
12           MR. SAHASRABUDHE:  Objection to form.  I
13       think he's already told you they did.  Go
14       ahead.
15   A.  Yes.
16   Q.  Now, did the mayor play any role in the
17       decision to deploy the Strike Force and
18       Housing Unit to engage in checkpoint?
19           MR. SAHASRABUDHE:  Objection as to form.
20       I'm also going to state again I don't see what
21       topic this relates to, but you can answer.
22   A.  The mayor didn't play a role in our plans.  He
23       was always made aware of what we were doing.

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

```
1         Again, the plans usually came from myself
2         through my command staff, whatever we did.
3    Q.   But you notified the mayor of the decision to
4         use -- to operate checkpoints in the City of
5         Buffalo, correct?
6    A.   I'm positive he knew we were running
7         checkpoints in the City of Buffalo and I'm
8         sure I told him we were doing so.
9    Q.   Did the mayor ever object to your decision to
10        operate checkpoints in the City of Buffalo?
11             MR. SAHASRABUDHE:  Objection to form.
12   A.   I have no recollection of that.
13   Q.   Now, as part of their work the Housing Unit
14        engaged in traffic enforcement at or near BMHA
15        properties, correct?
16   A.   That would be correct.
17   Q.   And as part of that work they stopped and
18        questioned motorists?
19             MR. SAHASRABUDHE:  Motorists?
20   Q.   Correct.
21   A.   As part of their job it would be to enforce
22        Vehicle and Traffic Law which in fact would
23        stop motorists for whatever violation,
```

———DANIEL DERENDA———

1          correct.

2      Q. Housing Unit officers were also instructed to

3          stop anyone they believed to be a gang member,

4          correct?

5              MR. SAHASRABUDHE:  Objection as to form.

6      A. I don't recall that to be correct.

7      Q. But you're aware that the Housing Unit had a

8          Captain Serafini?

9      A. There was a Captain Serafini, correct.

10     Q. Was Captain Serafini authorized to provide

11         instructions to Housing Unit officers during

12         their patrols?

13     A. He was the captain in that unit.  He would

14         have the right to instruct them, correct.

15     Q. Okay.  I'd like to mark as Exhibit 7 a

16         document that was produced in discovery as COB

17         044624.

18             MR. SAHASRABUDHE:  What topic are we on

19         right now?

20             MS. EZIE:  We're on Topic 2 and 3.

21     Q. Mr. Derenda, this is a three-page memorandum

22         that was authored by -- it's two pages and a

23         blank page -- Captain Phillip M. Serafini of

**DANIEL DERENDA**

1      permission as Strike Force to do so when I was

2      commissioner.

3  Q. You mean as Housing Unit?

4  A. Housing and Strike Force.  I just don't recall

5      personally them doing them.

6  Q. Okay.  Since you have been educated about this

7      topic and since it squarely falls under Topic

8      2, how frequently did the Housing Unit conduct

9      its own checkpoints?

10        MR. SAHASRABUDHE:  Objection as to form.

11  A. I don't have that information.

12  Q. Do you know whether the Housing Unit

13      checkpoints differed from Strike Force

14      checkpoints in any way?

15  A. Any checkpoints done by whether Housing or

16      Strike Force had to follow the Manual of

17      Procedure and the roadblock checkpoint

18      directive.

19  Q. So there were no differences that you're aware

20      of between the way Housing Unit checkpoints

21      were supposed to function and Strike Force

22      checkpoints?

23  A. It should have functioned or followed -- the

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

```
 1          same rules should have been in place and were
 2          in place through the Manual of Procedure and
 3          the checkpoint directive.  That's how they
 4          should have been done.
 5               Can I tell you that's how they've always
 6          been done?  I can't tell you that, but I can
 7          tell you that's how they should have been
 8          done.
 9     Q.  So pursuant to the Manual of Procedures, when
10          Housing Unit officers do the checkpoints they
11          were required to issue checkpoint directives?
12     A.  Correct.
13     Q.  Did they issue those directives?
14               MR. SAHASRABUDHE:  Form.
15     A.  They were supposed to.  I can't tell you they
16          always did or didn't.
17     Q.  Did you investigate whether they issued
18          checkpoint directives as part of your
19          preparation for this deposition?
20     A.  I did not.  Like I said, I can't tell you if
21          they did or they did not.
22     Q.  And there is no steps you took to educate
23          yourself on this topic ahead of this
```

DANIEL DERENDA

1

2      **BY MS. EZIE:**

3   Q. Mr. Derenda, are you aware of any instances

4      where the Housing Unit issued checkpoint

5      directives when operating checkpoints without

6      the Strike Force?

7          MR. SAHASRABUDHE:  Objection to form.

8   A. I am not aware if they issued directives.  I

9      am telling you it was part of what they should

10     have done.  I don't even know if these records

11     would exist today or where they would be kept

12     but, again, if they did a checkpoint they were

13     under the same orders as anyone else who would

14     have done a checkpoint under the Manual of

15     Procedure and the directives they should have.

16     I can't tell you if they did.

17  Q. Why did the Manual of Procedures require that

18     checkpoint directives be issued in connection

19     with checkpoints?

20  A. Because the directive states everything they

21     should and shouldn't do and I believe the

22     directive again about traffic safety, about

23     the time and place and setting up for --

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

---

**DANIEL DERENDA**

1      again, I don't have the directive in front of

2      me, but it lays out what the officers should

3      do to make everybody safe and to do what I

4      believe constitutionally.

5  Q. To confirm, however, you are not aware of

6      whether the Housing Unit complied with this

7      requirement, correct?

8  A. I am not aware.  I am telling you that they

9      should have.

10  Q. Okay.  Now, Mr. Derenda, there are special

11      rules that apply to towing cars on private

12      property, correct?

13  A. Yes.

14  Q. The same thing with issuing parking tags on

15      private property?

16  A. That would be correct.

17  Q. And technically speaking, BMHA parking lots

18      are private property, correct?

19           MR. SAHASRABUDHE:  Objection as to form.

20  A. It would be BMHA property which is a

21      government entity.

22  Q. But it's not a public roadway, correct?

23           MR. SAHASRABUDHE:  Objection as to form.

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

DANIEL DERENDA

1              authorize this plan, correct?

2      A.  Apparently, correct.

3      Q.  And you gave her authorization with the

4              exception of a request for overtime, correct?

5      A.  It says okay for plan except the lieutenant on

6              overtime.  You have two lieutenants working

7              assigned shifts, one to the detail, but not

8              bringing one in, correct.

9      Q.  For clarity, this is not describing the use of

10             roadblocks for traffic safety, is it?

11     A.  It's what she wrote.  Utilize traffic and AIU

12             to perform roadblocks for safety checks on

13             highly travelled areas in the districts.  Then

14             she says vehicles are involved in the majority

15             of shootings with subjects firing from moving

16             cars.  The use of roadblocks may lead to

17             interdiction of the subjects and their

18             weapons.

19                  As I stated earlier, the purpose of

20             roadblocks are traffic safety and high

21             visibility and at times those roadblocks did

22             lead to other crimes and in the directive I

23             believe it says look for any and all

**DANIEL DERENDA**

1     violations of V&T and other laws, so at times
2     they could have been -- you know, they could
3     have gotten different results other than the
4     traffic stop.
5  Q. But for clarity, during your time as
6     commissioner you expressly approved the use of
7     roadblocks whose primary purpose was crime
8     interdiction, correct?
9         MR. SAHASRABUDHE:  I object to the form
10     of the question.  Go ahead.
11  A. Roadblocks are for the express purpose of
12     traffic safety and high visibility.  As I
13     stated, high visibility has an effect and the
14     authorization of roadblocks for traffic safety
15     and a high visibility effect has the
16     deterrence on violent crime and other crimes
17     in the area so, again, if they're setting up
18     in an area -- highly traveled area with
19     roadblocks and where there's issues of
20     shootings going on, when they're setting up
21     these shootings will not likely happen so,
22     again, it's about traffic safety, secondary
23     high visibility.

─────DANIEL DERENDA─────

```
 1        for minor traffic offenses to increase the
 2        chances of catching gang bangers traveling out
 3        of the area or coming back into the area.  Do
 4        you see that?
 5    A.  The districts would assign two-man cars to
 6        patrol perimeter of the gang territories on
 7        all shifts making vehicle and traffic stops
 8        for minor offenses such as, and he has a list,
 9        correct.
10    Q.  Okay.  And ultimately he's asking your
11        permission as commissioner.  Do you see that?
12    A.  Again, he sent this email to me and the
13        command staff.  I don't recall the email.  I
14        don't recall any discussion with him or
15        anybody else on the command staff.  I don't
16        remember that there was a detail setup.
17    Q.  Okay.  But you are aware that BPD officers
18        were seeking to use traffic enforcement as a
19        means of engaging in gang interdiction and gun
20        interdiction first and foremost, correct?
21            MR. SAHASRABUDHE:  Objection as to form.
22    A.  That's what he's writing, correct.
23    Q.  Did you prohibit policing of this type during
```

─────**DEPAOLO CROSBY REPORTING SERVICES, INC.**─────
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

```
 1        your time as commissioner?
 2             MR. SAHASRABUDHE:  Objection as to form.
 3    A. As I said, I don't recall the email.  Again,
 4        traffic stops can lead to other offenses.  If
 5        you make stops for seat belts, tinted windows,
 6        something else can develop.
 7    Q. And my question is did you authorize -- isn't
 8        it true that between the message we saw from
 9        Chief Kubala and this message from Chief
10        Patterson you were aware that BPD officers
11        were trying to use vehicle and traffic
12        enforcement as a pretext to disrupt gang
13        activities?
14             MR. SAHASRABUDHE:  Objection as to form.
15    A. That was in their emails.  As I stated, I
16        don't recall the emails.  I don't recall
17        okaying it and I don't know if there was any
18        conversation about it, but that's what is
19        stated in the emails, correct.
20    Q. Turning back to Exhibit 9, I believe, the
21        message from Chief Kubala, you did in fact
22        approve her use of policing of this type,
23        correct?
```

—DANIEL DERENDA—

1          are the clubhouses and their clubhouses are

2          ones -- that doesn't mean they hang out in

3          that area, but they do go to their clubhouses.

4          Those are the only ones I can think of that

5          were predominantly White.

6     Q.  Thank you.  Okay.

7              So now I would like to turn back to the

8          subject of checkpoints.  You testified earlier

9          that during your time as commissioner you

10         aspired to have the checkpoints conducted

11         daily in the City of Buffalo, correct?

12    A.  With the Strike Force or Housing, correct.

13    Q.  Okay.  And that was policy that was rolled out

14         when initially?

15    A.  Probably right after the formation of the

16         Strike Force.  Whenever the Strike Force

17         started that is when they started doing

18         checkpoints.

19    Q.  Okay.  So the checkpoint program as -- the

20         daily checkpoint program as described dates

21         back as far as 2013 in the City of Buffalo?

22    A.  Again, I'm sure there were checkpoints before

23         that, but Strike Force used to conduct them

0039

DANIEL DERENDA

```
 1          daily or they were requested to do them daily.
 2          Didn't always happen for whatever reasons.
 3     Q.   And so Strike Force -- the Strike Force was
 4          involved in the operation of checkpoints in
 5          2013, correct?
 6     A.   Yes.  I believe so.
 7     Q.   They were involved in the operation of
 8          checkpoints in 2014?
 9     A.   Yes.
10     Q.   2015?
11     A.   Yes.
12     Q.   2016?
13     A.   Yes.
14     Q.   2017?
15     A.   Yes.
16     Q.   Any times after 2017?
17     A.   I don't believe so.
18     Q.   Okay.  Was the Housing Unit involved in the
19          operation of checkpoints in the 2013 to 2017
20          period?
21     A.   I'll make the assumption, yes.
22     Q.   Has the BPD conducted any checkpoints since
23          the Strike Force's dissolution?
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

— DANIEL DERENDA —

1              MR. SAHASRABUDHE:   Form.

2     A.  When it was necessary when it should be done,

3         yes.

4     Q.  While operating checkpoints, correct?

5     A.  While operating checkpoints they should

6         enforce all the V&T rules, all laws and it

7         should be done on every vehicle that comes

8         through so everybody is treated equally.

9     Q.  Okay.  So conducting impounds was part of the

10        expected role of officers operating at Strike

11        Force checkpoints?

12             MR. SAHASRABUDHE:   Objection to form.

13    A.  It wasn't expected, but if they impound the

14        vehicle it would be part of what they did for

15        various reasons through the checkpoint.

16    Q.  It's something that you tracked as far as data

17        is concerned?

18    A.  I believe they might have put down the number

19        of impounds on the report.  I don't recall

20        exactly, but they would track all the numbers

21        whether it was traffic summonses, number of

22        misdemeanor arrests, felony arrests, guns

23        recovered.  There might have been impounds on

DANIEL DERENDA

1              there, but I don't recall that.

2    Q.  And it was your policy to have the Strike

3         Force track those type of statistics, correct?

4    A.  It was my policy to have them track basically

5         all statistics.  As I said, what gets measured

6         gets done.

7              I know when Strike Force is out there

8         and they're a proactive policing unit, they

9         are not tied to the radio, to tell me that

10        they're out there for eight hours or ten hours

11        a shift and there's five cars and two-man cars

12        that they should be doing something.

13             There should be numbers of tickets

14        because if you drive around you can always see

15        traffic infractions.  There's always something

16        and they're a proactive unit and they were

17        instructed to be proactive and be out there

18        enforcing the law, zero tolerance.

19   Q.  And whose policy was the zero tolerance

20        policy?

21   A.  It was basically my policy, but it was always

22        the mayor's crime plan, zero tolerance crime

23        policy.  It was basically my plan put together

DANIEL DERENDA

1    Q.  Okay.  The Housing Unit also submitted detail
2        reports of sorts to you, correct?
3    A.  Correct.
4    Q.  And it was your practice to review the
5        submissions of the Housing Unit and Strike
6        Force?
7    A.  I would periodically review the daily reports.
8        I didn't read every report that came to me.
9        They were all sent to me whether they were
10       from district details, Strike Force, Housing.
11       I got the reports daily.  I read some.  I
12       didn't read others.
13   Q.  Why did you read them from time to time?
14   A.  Just to keep track to make sure things were
15       being done.  Again, going back to my
16       statement, what gets measured gets done, so I
17       look at an example of a detail report and we
18       have a chief's meeting and I say, okay, you
19       ran a detail for five days and there wasn't
20       one thing done.  You ran a detail for eight
21       hours a day on the 198 and there was not one
22       speeding ticket written.
23               Well, you can drive down the 198 today

DANIEL DERENDA

1          and every car you see is going over 30 miles

2          an hour.  So if they were out there eight

3          hours and they wrote no tickets they weren't

4          trying very hard and I would address

5          situations like that with the chief.

6     Q.  And so it was your practice to give feedback

7          on the production of the Strike Force and

8          Housing Unit?

9     A.  Correct.

10    Q.  And it was your practice to complain if

11         production was ever too low, correct?

12              MR. SAHASRABUDHE:  Objection as to form.

13         Go ahead.

14    A.  I would want to know -- there would be reasons

15         at times why they weren't -- maybe they didn't

16         have the manpower.  Maybe they were doing

17         something different than their normal duties

18         so, again, we keep track and make sure people

19         were doing what they were being paid to do.

20    Q.  But you would notify the command if you

21         thought the numbers were not good, correct?

22    A.  I'm positive I did that on probably more than

23         one occasion.

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1    Q.  And the expectations that officers generate

2        numbers was -- so you communicated the

3        expectation that officers generate numbers

4        when they're working on Strike Force details,

5        correct?

6            MR. SAHASRABUDHE:  Form.

7    A.  My expectations were they were out there

8        working.  Again, it isn't all about numbers.

9        It's about people being active and doing their

10       jobs.  I worked on patrol for ten years.  I

11       probably made over 200 arrests, 300 arrests a

12       year with my partner.

13           We were out there.  We were active and

14       basically if you're getting paid to be out

15       there, you're not tied to answering radio

16       calls, I expected you to be proactive because

17       that's what the unit was formed for, to be

18       proactive to get out there be visible

19       proactive and do your job so, again, at times

20       numbers were low and they had a reason for it,

21       but working patrol for ten years I know that

22       there's violations all around you and if you

23       were proactive you'd be doing your job.

1    Q. And you instructed officers to impound as many

2       vehicles as legally possible, correct?

3             MR. SAHASRABUDHE:  Objection as to form.

4    A. I probably did.  Probably on more than one

5       occasion and that's actually --

6    Q. Why would that be your policy as commissioner?

7    A. Again, if you have illegal vehicles out

8       unregistered, uninsured, whatever reason,

9       they're a danger to the public and they

10      shouldn't be on the road and they should be

11      removed until they're within the guidelines of

12      New York State.

13            That's my opinion.  If you have somebody

14      driving with no insurance and they hit your

15      car and they take off, there's nobody legally

16      responsible.  If the car had switched plates

17      or whatever reason to impound a vehicle if it

18      wasn't supposed to be on the street I

19      encouraged them to remove it.

20   Q. But isn't it true that BPD impounded cars so

21      they could also search for weapons and guns?

22            MR. SAHASRABUDHE:  Objection as to form.

23   A. At times they could impound cars, but if

**DANIEL DERENDA**

1    you're going to search a vehicle for anything

2    that's not visible you have to get a search

3    warrant.

4  Q. Are you aware that officers sought to impound

5    cars expressly so they could do warrantless

6    searches of the vehicle?

7        MR. SAHASRABUDHE:  Objection as to form.

8  A. They should not have been stopping cars for

9    the purpose of doing warrantless searches.

10   There's rules that they need to follow.  Had

11   there been complaints filed with Internal

12   Affairs, they would have been investigated.

13   There's rules on how officers should act on

14   traffic stops.

15       At times it could lead to a search of a

16   vehicle if there's something in plain view or

17   what have you, officer safety, but every

18   situation would be dictated by -- everything

19   would be dictated by the certain situations

20   and I can't explain what every officer did on

21   every stop, but there's rules and procedures

22   both in the Manual of Procedure and just in

23   the V&T and Criminal Procedure Law and how to

1       proceed on all of the above.

2   Q.  Would you expect that BPD chiefs would be

3       aware of those legal requirements?

4   A.  Yes, I do.  I would expect they would be.

5   Q.  Does it concern you that chiefs gave

6       instructions to officers contrary to those

7       legal requirements?

8           MR. SAHASRABUDHE:  Objection to form.

9   A.  I'd have to see when it happened.  Again, I

10      don't kn,ow.  I don't know what you're talking

11      about so I really can't answer on that.

12  Q.  Okay.  You also during your time as

13      commissioner instructed BPD officers engaged

14      in traffic enforcement to make arrests and

15      write traffic summonses as much as possible,

16      correct?

17          MR. SAHASRABUDHE:  Objection as to form.

18  A.  Actually, that's on the directive to write as

19      many tickets and violations as you see.  We'll

20      go back to the checkpoints for a minute.

21      They're supposed to tag every violation that

22      they see and make every arrest for every

23      violation of the criminal, or whatever.

DANIEL DERENDA

1              Again, you can't -- you see one person
2         not wearing a seatbelt, he should get a tag
3         just like every other person coming through
4         that checkpoint.
5              I encouraged them to be proactive,
6         especially on the checkpoint situation that
7         they weren't given a choice but to write as
8         many tickets as possible based on what they
9         see and to treat everybody the same.
10    Q.  Is that departmental policy?
11    A.  That was on a checkpoint directive to tag
12        every violation they see was because I don't
13        want motorist A to be treated any different
14        than motorist B, so I wrote one ticket for
15        motorist A when he had four violations, but on
16        motorist B I wrote five violation tickets, but
17        not the same.
18             I wanted everybody treated the same,
19        tagged for every violation that came through.
20    Q.  So your testimony is that you wanted all
21        motorists in the City of Buffalo to be treated
22        the same with respect to traffic enforcement?
23    A.  Correct.

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1    Q. So during your time as commissioner did you
2       ever have a policy requiring that if the
3       Strike Force performed four checkpoints or
4       five checkpoints that they would be in each of
5       the five police districts in the City of
6       Buffalo?
7    A. I don't believe that was the case at all.  We
8       moved them around.  Again, over the years
9       different people had input on where they went,
10      but there was no keeping track of I did one in
11      A, I did one in B, I did one C, D and E.  I
12      don't believe that took place, no.
13   Q. Why not?
14   A. Again, a lot of the checkpoints were done for
15      convenience of where they were assigned so it
16      made it easier for them to setup where they
17      were as opposed to moving to the other side of
18      the city.
19          Again, it was about traffic safety.  It
20      was about high visibility, but at times it was
21      easier just for them to setup wherever they
22      were assigned.
23   Q. Are there traffic safety issues in A District?

1          Again, I don't recall ever looking at
2      numbers saying we did too many here, we did
3      too many there.  Again, they were assigned
4      spread out, but at times, as I said, they were
5      put in areas where the Strike Force was
6      assigned.
7   Q.  So with respect to the checkpoint program, you
8      did not during your time as commissioner adopt
9      a policy treating all motorists in the City of
10     Buffalo the same as pertains to checkpoint
11     locations, correct?
12          MR. SAHASRABUDHE:  Objection as to form.
13  A.  So we treated everybody who came through a
14     checkpoint the same.  That was the directive.
15     Everybody should have been tagged for every
16     violation coming through.  We took away the
17     officer's direction.  Traffic stops issuing
18     tickets is an officer's discretion what they
19     write tickets for.
20          When they came through the checkpoints
21     on the directive it makes it clear that they
22     don't have that discretion.  They were to tag
23     everybody for every violation that came

DANIEL DERENDA

1       through.

2    Q.  But you did not adopt a policy of ensuring

3       that checkpoints were distributed evenly

4       across districts in the city, correct?

5    A.  Checkpoints, no, I did not.  Checkpoints

6       primarily were with Strike Force and Housing

7       and, as I said, many times for the sake of

8       convenience they were done in the areas that

9       they were assigned.

10   Q.  Am I correct that the Strike Force had

11      city-wide jurisdiction?

12   A.  They did.

13   Q.  Am I correct that the Housing Unit has

14      city-wide jurisdiction?

15   A.  They did.

16   Q.  But you did not instruct the Strike Force or

17      Housing Unit to ensure that checkpoints took

18      place in all neighborhoods across the City of

19      Buffalo, correct?

20          MR. SAHASRABUDHE:  Objection as to form.

21   A.  Checkpoints were part of the daily duties of

22      the Strike Force.  No, I did not tell them to

23      go to every different part.  Again, they were

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1       assigned to target areas based on crime stats,

2       based on crime issues, based on issues and for

3       the sake of convenience I believe they did a

4       lot of their checkpoints in those areas that

5       they were assigned.

6             Rather than packing up, going to the

7       other side of the city for an hour and then

8       coming back to where they were assigned, many

9       times I believe they did it where they were

10      assigned.

11  Q.  Is your testimony that traffic safety

12      violations only occur in certain city

13      neighborhoods?

14  A.  No.  They occur all over the city and county

15      and everywhere else.

16  Q.  So if the goal of the checkpoints is traffic

17      safety why weren't the checkpoints

18      administered by the Strike Force across all

19      city neighborhoods?

20             MR. SAHASRABUDHE:  Objection as to form.

21  A.  They probably at one point were in all

22      different neighborhoods.  Again, breaking it

23      up by the numbers, I don't have the numbers,

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

0053

1    A.  Correct.

2    Q.  Is that a policy that was -- was that the

3        policy of the Buffalo Police Department during

4        your time as commissioner?

5    A.  Yes.

6    Q.  Was it a policy that was enforced?

7             MR. SAHASRABUDHE:  Objection as to form.

8    A.  Yes.

9    Q.  So were all of the checkpoints operated by the

10        Strike Force during their tenure checkpoints

11        that were approved with the express permission

12        of an inspector, a chief, a deputy police

13        commissioner or the police commissioner?

14             MR. SAHASRABUDHE:  Objection as to form.

15    A.  It would have been all approved by me.  It was

16        part of their duties and they were expected to

17        do it.  That was what they were told to do and

18        whether they did it on Monday, Tuesday,

19        Wednesday and didn't do one on Friday because

20        they didn't have the manpower, that was an

21        expectation of what their units were supposed

22        to do, so with the express permission they

23        could set up a checkpoint on any given time.

**DANIEL DERENDA**

1          They had my permission to do it as part of

2          their job duties.

3     Q.  And when you refer to they you're referring to

4          the Strike Force as well as the Housing Unit?

5     A.  Correct.

6     Q.  They operated checkpoints inclusive of -- they

7          operated checkpoints with your express

8          permission, correct?

9     A.  Correct.

10    Q.  And that was inclusive of the locations where

11         they operated their checkpoints?

12    A.  That would be whatever locations were

13         determined.  As I said, it was done in

14         different ways, but they would have the

15         ability to do that, correct.

16    Q.  You had the authority as commissioner to

17         choose checkpoint locations, correct?

18    A.  Correct.

19    Q.  You indicated that other individuals chose

20         them -- chose locations as well, correct?

21    A.  Correct.

22    Q.  Was that pursuant to a delegation of authority

23         -- of your authority as commissioner?

—— DANIEL DERENDA ——

```
 1    A.  The authority would have been delegated down

 2        to -- I believe it was stated in that section

 3        of the MOP.  So an inspector who didn't talk

 4        to me could authorize a checkpoint and I would

 5        find out about it later and find out that,

 6        yes, it was authorized by an inspector for

 7        whatever reason, but as far as Strike Force

 8        and Housing, they had my express authority to

 9        setup daily checkpoints and they were expected

10        to do so wherever possible.

11    Q.  Got it.

12            And was that authority, was that an

13        omnibus grant of authority or did the policy

14        require you to individually approve each and

15        every checkpoint that was conducted?

16    A.  I did not have to approve -- again, it was

17        express authority to do checkpoints daily and

18        the locations wasn't part of that.  As I said,

19        locations were picked for some reasons or no

20        reasons.  They were moved around for no other

21        reason than it was convenience.

22    Q.  So is your testimony that the MOP requiring

23        authorization or permission to operate
```

DANIEL DERENDA

1          probably would have been in connection with
2          the state police, but other than that I don't
3          believe any checkpoints have been conducted
4          since 2017.
5     Q.  Have concerns related to traffic safety been
6          eradicated in the City of Buffalo since 2017?
7     A.  Traffic safety is always a concern in the City
8          of Buffalo and elsewhere.
9     Q.  So why haven't traffic safety checkpoints,
10         using air quotes, for traffic safety been
11         conducted in the City of Buffalo since 2017?
12    A.  They don't have the units to do them.  Again,
13         if you don't have a unit that's not tied to
14         the radio it's very hard to do.  Within a
15         district when people are going from call to
16         call not likely that they'll be able to put
17         together a checkpoint.
18             No more Traffic Unit, no more Strike
19         Force, no more Housing Unit and I believe even
20         the Traffic Unit was disbanded sometime -- it
21         might have been in 2018, so it would be very
22         difficult to do.
23    Q.  Did the Buffalo Police Department perform any

—— DANIEL DERENDA ——

1          analyses to determine if the checkpoint

2          program was contributing to traffic safety

3          during its period of operation?

4     A.   We did not.  Again, we didn't do evaluations

5          on effective checkpoints.  Checkpoints were

6          part of what I wanted them to do everyday for

7          the reason of traffic safety and high

8          visibility.  There were no evaluations done on

9          checkpoints.

10               However, I did do evaluations on the

11         overall effectiveness of the Strike Force and

12         I did that by looking at crime trends and

13         statistics and seeing where they were located

14         and see how the numbers come down from what

15         was going on, so if you had a series of events

16         in an area where they were assigned and the

17         robberies dropped for whatever reason they

18         were there for, if the numbers went down I

19         seen that as being effective and, as I stated

20         earlier, at the time I was deputy commissioner

21         to the time I left overall crime fell 40

22         percent, so I believe we were quite effective.

23    Q.   To the extent that crime fell in the City of

DANIEL DERENDA

```
 1        Buffalo by 40 percent, you attribute that to
 2        the Strike Force in part?
 3    A.  Yeah.  They're a part of it.  All the
 4        different things we did.  Everything from
 5        details to surveillance cameras to everything
 6        throughout the city.  Every little thing we
 7        did was for the purpose of -- even block club
 8        meetings, gathering with block clubs,
 9        everything we did was for the express purpose
10        of making the city a safer place to live, work
11        and raise a family and I believe we
12        accomplished that.
13    Q.  To the extent that crimes in the City of
14        Buffalo in your testimony or in your words
15        decreased by 40 percent, do you attribute that
16        to the Strike Force checkpoints in part?
17    A.  I attribute part again to the whole --
18        everything we did with the Strike Force.
19        Other initiatives and checkpoints were only a
20        small part of what the Strike Force did.
21    Q.  Did you keep any measure as part of your crime
22        statistics as to reductions in traffic safety
23        issues in the City of Buffalo?
```

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

—— DANIEL DERENDA ——

1    A.  I did not keep metrics on traffic safety

2        issues.

3    Q.  Why not?

4    A.  Because I didn't.

5    Q.  Why did you feel it was important to track

6        traffic safety statistics if you were running

7        a multiyear program that in your words has the

8        focus of improving traffic safety?

9    A.  We had a focus of reducing crime throughout

10       the city which we accomplished.  Traffic

11       safety, if we came across numbers of accidents

12       the chief said, oh, we're having numerous

13       accidents here, we would address it with

14       different issues.

15           We addressed speeding on the 198 when

16       the speed limit went down, so different issues

17       were addressed for traffic safety reasons.  We

18       didn't keep track of numbers as I do with the

19       crime statistics that are mandated to report

20       to the federal authorities and are published

21       by the federal authorities.

22           Crime statistics are one thing.  Traffic

23       statistics are a different thing, but whenever

DANIEL DERENDA

1      we seen issues with traffic safety we would
2      work to resolve those issues to different
3      needs.
4   Q. Has the BPD issued any directives that
5      prohibit the use of BPD checkpoints going
6      forward?
7   A. There's -- not that I'm aware of that they've
8      issued a directive that prohibits.  It is
9      still in the Manual of Procedure, but they
10     would have to obtain permission to do so as
11     stated in the Manual of Procedure.
12  Q. So checkpoints -- a daily checkpoint program
13     could be re-established tomorrow provided that
14     the chief, the commissioner, the director or
15     the deputy police commissioner signed off,
16     correct?
17         MR. SAHASRABUDHE:  Objection as to form.
18  A. A daily checkpoint initiative would more than
19     likely come from the commissioner of police.
20     If he chose to put together a unit, if he
21     wanted to resurrect the Strike Force tomorrow,
22     that is his prerogative.  If he wanted to do
23     daily checkpoints starting tomorrow that is

DANIEL DERENDA

1     his prerogative.  But as of now there is no

2     checkpoint.  There is no Strike Force unit at

3     this time.

4          MR. SAHASRABUDHE:  Can we take a

5     five-minute break?

6          MS. EZIE:  Sure thing.  Let's come back

7     at 2:40.

8

9          (Recess taken.)

10

11  Q. Now, Mr. Derenda, as part of this deposition

12     you were asked to identify or prepare

13     information regarding the criteria used to

14     select checkpoints, correct?

15  A. Checkpoint locations, correct.

16  Q. Are you prepared to testify about that today?

17  A. About checkpoint locations?

18  Q. And the specific criteria?

19  A. The criteria, yes.

20  Q. And Mr. Derenda, we also asked you to prepare

21     for Topic 11, the responses the City gave to

22     the Buffalo Common Council, Police Advisory

23     Board and the Attorney General's office

1    asking me from '21 if what I said back then is

2    consistent with what I'm saying now.  This

3    time I'm representing the City and I have had

4    conversations with other officers and people

5    we stated.

6         It is possible that maybe some were done

7    for that reason.  I don't know for sure.  I

8    don't recall for sure.  Most of the time, as I

9    said, they were set for convenience.  It

10   appears to be set for convenience by the -- by

11   somebody within the Strike Force supervision

12   of where they were assigned and I believe

13   that's consistent with what you just read.

14        Again, they were put in certain areas.

15   It was easier for them to do it there, but we

16   did assign different places.  Do I

17   specifically remember a reason of why I put a

18   checkpoint in a certain spot?  I do not.

19  Q. I'll put the transcript away for now.

20        Based on your recollection and the

21   testimony you reviewed just now and based on

22   the preparations you took to -- you undertook

23   to get ready for the deposition today, was it

---

DANIEL DERENDA

1        the BPD's policy to require that checkpoint
2        locations be selected based on traffic safety
3        data?
4    A.  No.  It wasn't a policy to be selected.
5        Again, it was selected for, as I said, maybe
6        reasons or no reason other than convenience.
7        There was no policy to setup their Strike
8        Force checkpoint based on traffic data, no.
9    Q.  Was it a policy of the BPD to require that
10       checkpoints be selected based on the location
11       of motor vehicle accidents?
12   A.  No.  It was not a requirement, no.
13   Q.  Was it a policy of the BPD to require that
14       checkpoints are selected based on the location
15       of red light violations?
16   A.  No.
17   Q.  Was it a policy of the BPD to require that
18       checkpoints be selected based on the location
19       of stop sign violations?
20   A.  No.
21   Q.  Was it a policy of the BPD to require that
22       checkpoints be selected on the basis of
23       individuals driving without a license

---

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

```
 1        infraction?
 2    A.  No.
 3    Q.  Was it a policy of the BPD to require that
 4        checkpoint locations be selected on the basis
 5        of driving without a valid registration
 6        violation?
 7    A.  No.  That wouldn't make sense.  How would I
 8        know where people are driving without valid
 9        registrations?
10    Q.  Okay.  And was it a policy of the BPD to
11        select checkpoint locations based on the
12        location of where motorists were stopped for
13        driving without valid inspection stickers?
14    A.  No.
15    Q.  Was it a policy of the BPD to require
16        individuals involved in checkpoint selection
17        to review traffic safety data before making
18        their selection?
19    A.  No.
20    Q.  Was it a policy of the BPD to require
21        individuals involved in checkpoint location
22        selection to review 311 data concerning
23        traffic incidents?
```

---DANIEL DERENDA---

```
 1     A.  Policy, no.
 2     Q.  Are you aware sitting here today of any
 3         instances where checkpoint locations were
 4         selected based on the incidence of driving
 5         without a license infraction?
 6     A.  Again, driving without a license infraction
 7         can occur anywhere, so the answer to that is
 8         no.  How would you gather data where people
 9         drive without licenses or inspections or
10         others?
11     Q.  Well, wouldn't you have ticketing information
12         concerning where people have been ticketed for
13         those infractions in the past?
14     A.  I don't even think past would reference -- if
15         I was driving without a license in Cheektowaga
16         and got pulled over and got a ticket there,
17         and then I was driving in Lancaster -- I don't
18         how you would correlate that, but no, there
19         was no policy.
20     Q.  And you have no information to suggest that
21         motorists drove without a license in C
22         District more often than A District, for
23         instance?
```

—— DANIEL DERENDA ——

```
 1     A.  No.
 2     Q.  You don't have any information suggesting that
 3         motorists were more likely to have an expired
 4         registration in E District over A District,
 5         for instance?
 6     A.  I don't know how I would have that
 7         information.
 8     Q.  But the BPD did have a practice of reviewing
 9         information concerning violent crime when
10         selecting checkpoint locations, correct?
11             MR. SAHASRABUDHE:  Objection as to form.
12     A.  I didn't review violent crime for checkpoint
13         locations.  I reviewed crime and issues for
14         Strike Force locations.
15     Q.  And checkpoints would be set in the areas
16         where you had identified there to be crime
17         patterns of concern, correct?
18             MR. SAHASRABUDHE:  Objection as to form.
19     A.  Not always, but yes, they could have been and
20         yes, they were at times.
21     Q.  And that was in fact a policy of numerous
22         individuals in the supervisory command in the
23         BPD, correct?
```

— DANIEL DERENDA —

1    Q. But you agree that prior versions of Strike

2        Force checkpoint reports did not in the manner

3        of Exhibit 23 break down traffic -- the type

4        of traffic summons by category, correct?

5    A. I don't believe it did.

6    Q. We have been talking a bit about traffic

7        safety enforcement.  But to confirm, when you

8        refer to the checkpoints furthering the goal

9        of traffic safety, you're referring to the

10       enforcement of the New York State Vehicle and

11       Traffic Laws or VTL, correct?

12   A. Correct.

13   Q. And VTL violations, those can be criminal

14       offenses, correct?

15   A. Aggravated unlicensed operation to some

16       degree, yes.  There could be some criminal

17       misdemeanor charge in there.  It may be --

18       drunk driving could be a felony charge.  Could

19       be a criminal charge, yeah.

20   Q. But to confirm, the BPD did not study the

21       impact of checkpoints on the commission of

22       traffic safety violations within the City of

23       Buffalo, correct?

— DANIEL DERENDA —

1      A.  We did not.

2      Q.  I'd like to mark this as Exhibit 25.  I'd like

3          to walk you through the response to the

4          Buffalo City Council's information request

5          that we received.  I will go ahead and put

6          that on my screen.  This will be Exhibit 25.

7              Can you see my screen, Mr. Derenda?

8      A.  Yes.

9      Q.  And it says BPD checkpoint data August through

10         September, 2017?

11     A.  Yes.

12     Q.  And if I scroll to the next page we see that I

13         guess on your letterhead a dissemination to

14         the Council -- President of the Buffalo City

15         Council, Darius Pridgen, and to Council Member

16         David Rivera, traffic safety checkpoint tally

17         sheets from August 4th, 2017 to

18         September 20th, 2017.

19              Do you see that?

20     A.  I do.

21     Q.  And the transmission date of this message is

22         September 21st, 2017?

23     A.  Okay.

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1    Q.  But the checkpoints were not administered in a
2        manner where motorists who are not suspected
3        of Vehicle and Traffic Law violations could
4        bypass the checkpoints entirely, correct?
5    A.  Correct.  Everybody has to come through the
6        checkpoint when you're in that motion and,
7        again, there's nobody suspected of anything.
8        They're coming through a checkpoint and
9        they're being checked for certain things as
10       stated.
11   Q.  Now, Mr. Derenda, you're aware that the
12       complaint in this case alleges that
13       checkpoints were predominantly on the East
14       Side between 2013 and the conclusion of the
15       program in 2017, correct?
16   A.  I believe that to be correct.
17   Q.  Are you aware of any information that
18       disproves the allegation that checkpoints were
19       predominantly on the East Side during the
20       period of the Strike Force's operation of that
21       checkpoint?
22   A.  I'm not aware of the actual breakdown of where
23       the checkpoints were and what percentage, so

DANIEL DERENDA

1    I'm not aware of anything disputing what
2    you're saying.
3  Q. Okay.  And in preparing for this deposition
4    you did not undertake any review of checkpoint
5    locations?
6  A. I did not.
7  Q. But you acknowledge receiving checkpoint
8    locations as part of Strike Force daily
9    reports during the time they were operating,
10   correct?
11 A. I acknowledge receiving Strike Force reports.
12   I don't remember if they had the locations of
13   the checkpoints on them.  I don't know that to
14   be the case.  We did daily reports and it
15   would have the area the Strike Force was
16   assigned to, but I do know the directives have
17   the location of the checkpoints and I believe,
18   if I'm not mistaken, that's where the
19   information was retrieved on where the
20   locations were.
21 Q. Did you have access to the checkpoint
22   directives as commissioner?
23 A. I did not have access.  Could I have had

DANIEL DERENDA

1    Q. Okay.  And there were in many of the news
2       reports concerning the checkpoints that were
3       critical of the checkpoints, correct?
4    A. Correct.
5    Q. When those reports -- I'm sorry.  One such
6       report appeared in the Daily Public news
7       journal; is that correct?
8    A. I don't know that to be correct or not.
9    Q. If we turn to Topic 10, that is a topic that
10      you came prepared to testify about today?
11   A. Correct.
12   Q. Do you see that Topic 10 Subpart B refers to a
13      Checkpoint, Buffalo Police Practices article
14      that appeared in the Daily Public?
15   A. Yes.
16   Q. Is that an article that you reviewed in
17      connection with this deposition?
18          MR. SAHASRABUDHE:  Hold on.  He's
19      prepared to testify as to what the topic
20      states, what the City's response was to that
21      article, so --
22   Q. And I'll repeat my question.
23          Is that article something you reviewed

— DANIEL DERENDA —

1      in connection with your deposition preparation

2      today?

3   A. I did not review them, but I do know we did

4      not have a response to them.

5   Q. And when you say you did not have a response

6      what do you mean?

7   A. There was no response to the articles that you

8      have listed.  After talking with the

9      corporation counsel and the other officers

10     during preparation there was no response.

11         If there was any issues anybody was free

12     to file an Internal Affairs report and I can't

13     tell you at this point if any were filed.

14  Q. So with respect to the Buffalo Police

15     practices question article in the Daily

16     Public, that's an article that you received

17     during your time as commissioner, correct?

18  A. I don't recall if I did or I didn't.  I don't

19     recall ever reading that.  It's possible

20     somebody sent it to me, but I don't recall if

21     I did review it.

22  Q. If the mayor of the City of Buffalo sent it to

23     you do you think it's something you would have

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

—— DANIEL DERENDA ——

1    reviewed?

2    A.  I would have read it, correct.

3    Q.  Okay.  I'd like to go ahead and mark as our

4        next exhibit, and hopefully someone can tell

5        me what exhibit it is, a document that was

6        produced in discovery as COB 082897 and the

7        linked document that it refers to.  I believe

8        we're at Exhibit 28.

9            THE REPORTER:  It is 27.

10   Q.  So hopefully you can see the document on my

11       screen.  I'm going to make it a little bigger.

12           Do you see, Mr. Derenda, that this is an

13       email from Mayor Byron Brown to you sent on

14       July 13th, 2016 copying several members of the

15       Buffalo Police Department?

16   A.  Yes.

17   Q.  And it is circulating an article that appeared

18       in the DailyPublic.com?

19   A.  Yes.

20   Q.  On the next page -- the next six pages are

21       that article.  I'm just going to scroll.  The

22       title of the article as you see here is

23       "Checkpoint, Buffalo Police Practices

—— DEPAOLO CROSBY REPORTING SERVICES, INC. ——

———— DANIEL DERENDA ————

1        So sitting here today, there is no

2    studies that the Buffalo Police Department

3    have done to dispel the allegations or to

4    disapprove the allegation that Black motorists

5    in the City of Buffalo were stopped in

6    checkpoints more frequently than White

7    motorists?

8        MR. SAHASRABUDHE:  Objection to form.

9  A.  There have been no studies done.

10  Q.  Now, has the Buffalo Police Department since

11    2013 conducted any studies regarding the

12    racial impact of the Buffalo Police

13    Department's traffic enforcement practices,

14    setting aside the issue of checkpoints?

15        MR. SAHASRABUDHE:  Objection as to form.

16  A.  Not that I'm aware of.

17  Q.  Has the City of Buffalo conducted or

18    commissioned any studies regarding the racial

19    impacts of the Buffalo Police Department's

20    towing practices on the City of Buffalo?

21        MR. SAHASRABUDHE:  Objection to form.

22  A.  Not that I'm aware of.

23  Q.  Has the City of Buffalo since 2013

**DANIEL DERENDA**

1     Q.  Okay.  Now, Mr. Derenda, there's an allegation

2         in this case that Strike Force and Housing

3         Unit officers at times were issuing multiple

4         tickets to motorists at a single stop.

5              Are you aware of that?

6     A.  Yes.

7     Q.  Including multiple tinted window tickets?

8     A.  I am aware.

9     Q.  And you're aware that Strike Force and Housing

10       Unit officers at times did issue multiple

11       tickets at a single stop?

12    A.  Probably issued multiple tickets numerous

13       times at stops.

14    Q.  And you're aware that Strike Force and Housing

15       Unit officers on numerous occasions issued

16       multiple tinted windows tickets at a single

17       stop?

18    A.  Yes.

19    Q.  That was -- when officers engaged in that

20       conduct they did so with your permission?

21         MR. SAHASRABUDHE:  Objection to form.

22       Go ahead.

23    A.  When I found out that they were issuing

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

─ DANIEL DERENDA ─

1          multiple tickets for multiple windows the

2          policy was put in place that it was to stop.

3          Speaking to current Commissioner Gramaglia he

4          today still maintains that policy.

5               However, under Vehicle and Traffic Law

6          it is permissible to write multiple tickets

7          for multiple windows and as far as multiple

8          tickets go, if you read the directive, the

9          checkpoint directive, they're to write

10         everything that they see coming through the

11         checkpoints, so multiple tickets were probably

12         written almost every time and it is their

13         prerogative.

14              Other than the checkpoint, it was not

15         their prerogative.  They would have to write

16         every ticket, but on traffic stops it's the

17         prerogative of how many tickets they write, if

18         they want to write one ticket, if there's

19         multiple violations, it's left to the

20         discretion of the officers.

21    Q.   Is your testimony that you took steps while

22         you were commissioner to remove the discretion

23         that officers otherwise enjoyed as to how many

1    A.  No.  Commissioner Gramaglia maintained a
2         policy that I put in place that they were to
3         issue one ticket because the fact of the
4         matter is it would go to the court and the
5         judge would throw out the tickets other than
6         one anyway, but still, to me, what part of the
7         Strike Force they were just putting numbers so
8         they could put it on a report and that wasn't
9         the purpose of the report, just to pad their
10        numbers and say they were doing more than they
11        were actually doing.
12             So you had four tickets for a tinted
13        window and in my opinion it should be one, but
14        as I stated, under V&T traffic law it is
15        permissible for them to write for each window.
16        I just didn't like that.
17    Q.  You stated -- so your testimony is today that
18        you prohibit the practice of issuing multiple
19        tinted windows tickets?
20    A.  We put out a policy telling them to stop.
21    Q.  What form did that policy take?
22             MR. SAHASRABUDHE:  Form.
23    A.  It would have probably have been a directive

DANIEL DERENDA

1    Q. Did your policy authorize officers to write

2        two tinted windows tickets per stop?

3            MR. SAHASRABUDHE:  Objection to form.

4    A. We told them to write one ticket for tinted

5        windows is what I believe the policy was.  We

6        didn't -- again, you go back to V&T law.  They

7        can do that.  We did not want them to do that

8        and we had told the chief and the chiefs that

9        the process needs -- that that needs to stop.

10   Q. And were the chiefs supposed to be enforcing

11       the policy of writing a single tinted window

12       ticket per stop?

13            MR. SAHASRABUDHE:  Form.

14   A. Yes.

15   Q. Would that include Chief Young?

16   A. Yes.

17   Q. Then Deputy Commissioner Byron Lockwood, was

18       he made aware of the policy of your new

19       guidance concerning tinted windows tickets?

20   A. Yes, he would have been.

21   Q. Would you have expected him to enforce the

22       policy within the Department?

23   A. He wasn't the direct oversight for the Strike

DEPAOLO CROSBY REPORTING SERVICES, INC.

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

```
1           but yeah, maybe sometime in '17, maybe
2           sometime earlier.
3                I don't recall when I found out about
4           it, but we found out about it from Traffic
5           Violations Bureau got a phone call saying what
6           was going on and we wanted it to stop and we
7           told the chiefs to make sure it was stopped.
8      Q.   Did you ever check to see if your directive
9           was being followed?
10     A.   You make the assumption the chiefs are doing
11          what they're ordered to do unless I find out
12          different, so I give somebody an order to do
13          something or a policy and they don't do it and
14          I find out about it, they have a problem and
15          they probably wouldn't be a chief anymore if
16          they're not following my orders, so you have
17          to make the assumption, you have to trust your
18          people to do what they're being told, so we'll
19          make the assumption that they were doing what
20          they were being told unless I find out
21          different.
22     Q.   I'd like to mark as what I believe is
23          Exhibit 28 a document I have provided in
```

DANIEL DERENDA

1    Q.  Is that consistent with the policy directives

2        that you --

3    A.  My best recollection is I said they should be

4        issuing one ticker per tinted window violation

5        regardless of if there were six windows

6        tinted.

7    Q.  So this directive that Captain Serafini gave

8        to the Strike Force to issue up to two

9        summonses was not consistent with your policy

10        as stated, correct?

11    A.  It is my belief it should have stated one tint

12        summons per motorist is enough.

13    Q.  Now, did you ever check with Chief Young or

14        anyone else in the supervisory command of the

15        Strike Force to ensure that your policy of

16        just a single summons was being followed?

17    A.  I don't recall if I did or I didn't, but I

18        know we were no longer getting complaints from

19        the Traffic Violations Bureau.

20    Q.  In your opinion, should Chief Young have

21        corrected Captain Serafini and indicated that

22        the Department's new policy was in fact to

23        issue only one ticket per tinted window

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

0083

1    STATE OF NEW YORK)

2    COUNTY OF ERIE   )

3

4    I, Rebecca Lynne DiBello, CSR, RPR, Notary

5    Public, in and for the County of Erie, State of

6    New York, do hereby certify:

7        That the witness whose testimony appears

8    hereinbefore was, before the commencement of

9    their testimony, duly sworn to testify the

     truth, the whole truth and nothing but the

     truth; that said testimony was taken pursuant

10   to notice at the time and place as herein set

     forth; that said testimony was taken down by me

     and thereafter transcribed into typewriting,

11   and I hereby certify the foregoing testimony is

     a full, true and correct transcription of my

12   shorthand notes so taken.

13

14       I further certify that I am neither counsel

     for nor related to any party to said action,

     nor in anyway interested in the outcome

15   thereof.

16       IN WITNESS WHEREOF, I have hereunto

17   subscribed my name and affixed my seal this

     30th day of January, 2024.

18

19   _Rebecca L. DiBello_

20   _____

21       Rebecca Lynne DiBello, CSR (NY)
         Notary Public - State of New York

22       No. 01DI4897420
         Qualified in Erie County

23       My commission expires 5/11/2027


─DEPAOLO CROSBY REPORTING SERVICES, INC.─

716-853-5544
135 Delaware Avenue, Suite 301, Buffalo, New York 14202

305
0084