# EXHIBIT 14

MICHAEL J. GENNACO

```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------------
BLACK LOVE RESISTS IN THE RUST by and through
MARIELLE SHAVONNE SMITH and CHARIS HUMPHREY
on behalf of its members, SHAKETA REDDEN,
DORETHEA FRANKLIN, TANIQUA SIMMONS, DE'JON HALL,
JOSEPH BONDS, CHARLES PALMER, SHIRLEY SARMIENTO,
EBONY YELDON, and JANE DOE,
individually and on behalf of a class of all
others similarly situated,

                              Plaintiffs,

     -vs-


CITY OF BUFFALO, N.Y., BYRON B. BROWN,
Mayor of the City of Buffalo, in his individual and official
capacities,
BYRON C. LOCKWOOD, Commissioner of the
Buffalo Police Department, in his individual
and official capacities,
DANIEL DERENDA, former Commissioner of the
Buffalo Police Department, in his individual capacity, AARON
YOUNG, KEVIN BRINKWORTH, PHILIP SERAFINI,
ROBBIN THOMAS,
UNKNOWN SUPERVISORY PERSONNEL 1-10,
UNKNOWN OFFICERS 1-20, each officers of the
Buffalo Police Department,
in their individual capacities,

                              Defendants.
---------------------------------------------------------
```

0001

2

                        Remote Examination Before Trial of MICHAEL J. GENNACO, taken pursuant to the Federal Rules of Civil Procedure, at SUE ANN SIMONIN COURT REPORTING, 421 Franklin Street, Buffalo, New York, taken on October 4, 2024, commencing at 10:47 A.M., before JANELL M. SULLIVAN, Notary Public.

65

1 report?
2 A. Yes.
3 Q. Okay. And in sum and substance, you kind of go
4 through various sources and factors that, in your
5 view, should alert leadership within the city and
6 BPD that there's an ongoing risk of racial
7 discrimination within the police department,
8 correct?
9 A. Correct.
10 Q. Okay. And I really just want to focus on this
11 first kind of subheading, it's subheading A on
12 page fourteen. Racially discriminatory traffic
13 enforcement is a known risk for every police
14 department in the United States. That's what it
15 says, correct?
16 A. Yes.
17 Q. Okay. Buffalo is not unique in its -- withdrawn.
18 The threat or risk of racially discriminatory
19 policing is not something that's unique to
20 Buffalo, correct?
21 A. Not unique, but certainly prevalent.
22 Q. Okay. What do you mean by that?
23 A. What I mean is that based on the concerns that

|    |    |
|---:|:---|
| 1  | have been raised, and I've highlighted some of |
| 2  | them in this section of the report, and the |
| 3  | number of and intensity of complaints that were |
| 4  | actually received by the Buffalo Police |
| 5  | Department, I would say that those are indicia, |
| 6  | that there was a special risk here for BPD. |
| 7  | Q.   Okay.  So when you say special risk, is it your |
| 8  | opinion, based on your knowledge, training and |
| 9  | experience, that there is a greater risk or |
| 10 | greater threat of racial discrimination within |
| 11 | the Buffalo Police Department as opposed to other |
| 12 | municipal police departments? |
| 13 | MR. MILLER:  Object to form. |
| 14 | THE WITNESS:  I would say yes. |
| 15 | BY MR. SAHASRABUDHE: |
| 16 | Q.   Why? |
| 17 | A.   For the reason I just stated.  Multiple entities, |
| 18 | multiple meetings, multiple concerns, multiple |
| 19 | reports were prepared by a wide variety of |
| 20 | individuals who are interested in how policing is |
| 21 | going on in the City of Buffalo.  A number of |
| 22 | those are included in the report and cited.  And |
| 23 | that, conjoined with the number of complaints |

67

1    over the years, in seventy some complaints over
2    the course of the year, the time period I was
3    looking at, focusing just on traffic enforcement.
4  Q. Is that -- would you consider that number,
5    seventy-four, to be high compared to other
6    municipalities?
7  A. It's hard to compare across the board, but it's
8    certainly not low.  I would say it's high, yes.
9  Q. Okay.  Are there other municipalities who have a
10   higher number of complaints?
11 MR. MILLER:  Object to form.  Speculation.
12 THE WITNESS:  Some of that would depend on the size
13   of the organization, obviously.
14 BY MR. SAHASRABUDHE:
15 Q. Sure.  Are there similarly-sized cities that have
16   equal or a higher number complaints?
17 MR. MILLER:  Same objection.
18 THE WITNESS:  Not that I'm aware of.
19 BY MR. SAHASRABUDHE:
20 Q. Okay.  So as far as you're aware, in terms of
21   cities its size, BPD ranks higher than others as
22   far as number of complaints received?
23 MR. MILLER:  Same objection.

68

1  THE WITNESS:  Yes.
2  BY MR. SAHASRABUDHE:
3  Q.   Okay.  Are there other cities of comparable size
4       that you think of off the top of your head that
5       you know received fewer Internal Affairs
6       complaints similar to the ones you reviewed in
7       this case?
8  MR. MILLER:  Same objection.
9  THE WITNESS:  Off the top of my head, no.  But the
10      number in Buffalo, specifically related to this
11      aspect of policing, is higher than one would
12      expect, in my opinion.
13 BY MR. SAHASRABUDHE:
14 Q.   Okay.  I want to go to page twenty of your
15      report.  Okay.
16           Are you with me on page twenty, sir?
17 A.   I am.
18 Q.   Okay.  If you want to take a second to look it
19      over, that's fine.  But in sum and substance
20      here, you opine that BPD should, in its mission
21      statement, have an expressed prohibition against
22      racially discriminatory policing.  Is that fair
23      to say?

72

1           sir?
2    A.     Yes.
3    Q.     And this is by far the longest opinion, correct?
4           And you opine that the complaint investigation
5           procedures of the BPD are inadequate?
6    A.     Wholly inadequate.
7    Q.     Wholly inadequate?  So I guess let me start with
8           a general question and then I'll get more
9           specific.
10              Is it your opinion that deficiencies that
11          you have found within the Buffalo Police
12          Department's complaint investigation procedures
13          are greater than other comparable municipalities?
14   A.     Absolutely.
15   Q.     Are the deficiencies the greatest that you've
16          ever seen?
17   MR. MILLER:  Object to form.
18   THE WITNESS:  I would say yes.
19   BY MR. SAHASRABUDHE:
20   Q.     Okay.  So there is no municipality who has more
21          deficient complaint investigation procedures that
22          you know of than the Buffalo Police Department?
23   MR. MILLER:  Object to form.  Asked and answered.

73

1  THE WITNESS:  There may be others, I'm just not aware
2      of them.  I haven't looked at all eighteen
3      thousand agencies.
4  BY MR. SAHASRABUDHE:
5  Q.  Understood.  But as far as the ones you've looked
6      at, Buffalo has the worst?
7  A.  Yes.
8  Q.  Okay.  Are there any police agencies that you
9      have worked with that had comparable issues to
10     the Buffalo Police Department?
11 MR. MILLER:  Object to form.  Vague.
12 THE WITNESS:  I'm not sure what you mean by
13     comparable issues, if you're talking about areas
14     of improvement, as I've indicated, there's always
15     room for improvement.
16 BY MR. SAHASRABUDHE:
17 Q.  I guess I mean, was the extent of the issues that
18     you found with the Buffalo Police Department
19     similar in any of the other municipalities who
20     you have conducted a review and investigation?
21 MR. MILLER:  Same objection.
22 THE WITNESS:  Not to the degree of Buffalo, not to
23     the degree that I saw in Buffalo, no.

74

1  BY MR. SAHASRABUDHE:
2  Q.  Okay. I want to go to page twenty-four of the
3      complaint. Sorry, not the complaint, your
4      report. And there it's kind of a subheading that
5      says BPD supervisors do not consistently accept
6      complaints, correct?
7  A.  Yes.
8  Q.  And there you essentially found lieutenants or
9      field officers who have supervisory authority
10     don't do an adequate job of receiving and
11     recording complaints by civilians, correct?
12 MR. MILLER: Object to form.
13 THE WITNESS: Yes, sir.
14 BY MR. SAHASRABUDHE:
15 Q.  Okay. Very often, would you agree with me when
16     people or civilians have interactions with police
17     officers, they are presented with a situation
18     that they would find to be frustrating?
19 MR. MILLER: Objection. Vague.
20 THE WITNESS: At times, yes.
21 BY MR. SAHASRABUDHE:
22 Q.  Police officers engaging with citizens is likely
23     to, based on the nature of the interaction, draw

131

1      Vehicle and Traffic Law allows for officers to
2      write a ticket for each tinted window they see?
3  A.  Yes.
4  Q.  So officers aren't violating the law when they
5      write multiple tickets for tinted windows
6      necessarily, correct?
7  MR. MILLER:  Objection.  Calls for a legal conclusion
8      and vague.
9  THE WITNESS:  My opinion is that perhaps the law
10     allows it, but whether you can do something is
11     different than whether you should do something.
12 BY MR. SAHASRABUDHE:
13 Q.  Understood.  And certain BPD command staff have
14     shared that opinion with you as stated through
15     testimony, correct?
16 A.  Yes.
17 Q.  Very briefly, you say there is no public safety
18     benefit to issuing multiple tinted window tickets
19     to the same driver in a single stop when one
20     ticket would suffice, right?
21 A.  Yes.
22 Q.  What's your basis for making that statement?
23 A.  Based on experience, and how this has worked in

1    some jurisdictions, if you increase the financial
2    penalty by increasing the amount of citations
3    that are given to a particular motorist, you're
4    going to likely never get to what you're trying
5    to accomplish, which is to get rid of that
6    illegal tint on the car.  Which is why, as I also
7    say in the report, it's really important and
8    should be important and Buffalo Police Department
9    should consider the use of fix-it tickets, where
10   a direct consequence occurs, that is essentially
11   what you're trying to accomplish in issuing the
12   citation, in a much more helpful way.  If you
13   have multiple tickets and the financial burden
14   then occurs to the motorist, there's going to be
15   less likelihood that they'll fix the ticket
16   because they have to use the limited resources
17   they have to pay the fines.
18 Q. I understand that and this question will likely
19   draw yet another objection, but would you agree
20   that it would be reasonable for an officer to
21   conclude that in writing more tinted window
22   tickets, it would serve as a higher deterrent for
23   people to drive around with illegally tinted

133

1       windows?
2  MR. MILLER:  Calls for speculation.  Incomplete
3       hypothetical.  To the extent it calls for legal
4       conclusion and vague.
5  THE WITNESS:  One, I'm not sure that is a reasonable
6       conclusion, but quite frankly, I don't know that
7       this decision about this kind of enforcement
8       should be made at the officer level.  I think
9       this is something that should come from the
10      highest levels of the organization, and
11      apparently has over the years.
12 BY MR. SAHASRABUDHE:
13 Q.   Well, when an officer makes a traffic stop, they
14      don't need to get approval from a supervisor or
15      higher levels of the organization as to what
16      tickets they're going to write, correct?
17 MR. MILLER:  Same objection.
18 THE WITNESS:  Correct, but when BPD announces to its
19      personnel that we now have a zero tolerance,
20      proactive policing policy, and that we want you
21      out there ticketing aggressively, that's sending
22      a message to do what we're talking about.
23 BY MR. SAHASRABUDHE:

Sue Ann Simonin Court Reporting

```

160

STATE OF NEW YORK)

                SS:

COUNTY OF ERIE)

    I, Janell M. Sullivan, a Notary Public in and for the State of New York, County of Erie, DO HEREBY CERTIFY that the testimony of MICHAEL J. GENNACO was taken down by me in a verbatim manner by means of Machine Shorthand, on October 4, 2024. That the testimony was then reduced into writing under my direction. That the testimony was taken to be used in the above-entitled action. That the said deponent, before examination, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth, relative to said action.

    I further CERTIFY that the above-described transcript constitutes a true and accurate and complete transcript of the testimony.

*Janell M. Sullivan*
JANELL M. SULLIVAN,
Notary Public.