# EXHIBIT 16

```
 1        UNITED STATES DISTRICT COURT

 2     FOR THE WESTERN DISTRICT OF NEW YORK

 3     ---------------------------------------------

 4     BLACK LOVE RESISTS IN THE RUST, et al.,
       individually and on behalf of a class of
 5     all others similarly situated,

 6                              Plaintiffs,

 7      -vs-                         1:18-cv-00719-CCR

 8     CITY OF BUFFALO, N.Y., et al.,

 9                              Defendants.
       ---------------------------------------------
10             DEPOSITION OF JOSEPH GRAMAGLIA

11          Taken pursuant to Rule 30(b)(6)

12       of the Federal Rules of Civil Procedure

13              APPEARING REMOTELY FROM

14               BUFFALO, NEW YORK

15

16

17               January 24th, 2024

18               At 2:15 p.m.

19               Pursuant to notice

20

21     REPORTED BY:

22     Rebecca L. DiBello, RPR, CSR(NY)

23
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1    **R E M O T E    A P P E A R A N C E S**

2    APPEARING FOR THE PLAINTIFFS:

3
                    **COVINGTON & BURLING, LLP**
4                   **BY: JORDAN JOACHIM, ESQ.,**
                    620 Eighth Avenue
5                   New York, New York 10018
                    (212) 841-1086
6

7    **APPEARING FOR THE DEFENDANTS:**

8                   **HODGSON RUSS, LLP**
                    **BY: ADAM W. PERRY, ESQ.**
9                   **AND CHEYENNE N. FREELY, ESQ.,**
                    140 Pearl Street
10                  Buffalo, New York 14202
                    (716) 856-4000
11

12
     ALSO PRESENT:
13
                    **ANDREW TIMMICK, ESQ.,**
14                      Covington & Burling, LLP

15                  **A. CHINYERE EZIE, ESQ.,**
                        Center for Constitutional Rights
16
                    **ANJANA MALHOTRA, ESQ.,**
17                      National Center for Law
                        and Economic Justice
18
                    **CLAUDIA WILNER, ESQ.,**
19                      National Center for Law
                        and Economic Justice
20

21

22

23

—— JOSEPH GRAMAGLIA ——

```
 1              liked how they specifically laid things out.
 2    Q.  Did you look at any other manuals for similar
 3        core principles besides Baltimore?
 4    A.  I'm sure I did.  I just don't remember
 5        specifically if I did or I didn't.  When I dig
 6        into -- and I'm not the only one.  Obviously
 7        our staff does this, but when we start looking
 8        at making changes to our Manual of Procedures
 9        we try to look at what some other agencies are
10        doing and it's something that some of our
11        staff has been doing as well.
12    Q.  Did you look at any actions Baltimore or other
13        agencies had taken to train officers on these
14        types of core principles?
15              MS. FREELY:  Objection to form.  You can
16        answer.
17    A.  No, I didn't.  We are not like other police
18        departments, so the way that trainings are
19        conducted, you know, it's -- agencies have
20        their own rules, regulations, challenges,
21        things of that nature, so I know how we train
22        and when we send out a general order we did
23        contract out with a company called Power DMS.
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

**JOSEPH GRAMAGLIA**

1          It was a pretty significant advancement

2      for us when we did.  That allows us to

3      electronically send out training bulletins and

4      then get signature confirmation on those, so

5      when we send out a general order or if there

6      are certain trainings it is very difficult to

7      bring in the entire department for training

8      and that takes a considerable amount of time.

9          If we were to train the entire

10     department it would potentially take us six

11     months to a year to do that, so depending on

12     what the level of a topic is, we would prepare

13     a training bulletin, a general order,

14     something of that nature, and then send it out

15     for signature confirmation and this was one of

16     those things.

17   Q. Did you look at whether or did you look into

18     whether Baltimore had taken any steps to

19     implement these core principles beyond putting

20     them in their Manual of Procedures?

21   A. I did not look any deeper than their policy,

22     which Baltimore is under a federal consent

23     decree, a DOJ consent decree, and looking at

**JOSEPH GRAMAGLIA**

1            that, you know, an officer is making arrests

2            that do not have probable cause behind them,

3            at which point we would open up an internal

4            investigation.  We would examine that and then

5            we would take action if warranted.

6     Q.  So my question, though, is just did you look

7            at whether Baltimore or any other agencies

8            were taking those types of steps with regard

9            to these core principles?

10    A.  I did not.

11    Q.  And we touched on some of this on the training

12            issue.  Were officers trained on this update

13            to the MOP, and I'm talking about now the City

14            of Buffalo's MOP when it was issued.

15    A.  So they would have been sent -- as I laid out

16            before, this would have gone out as a general

17            order with signature confirmation and that is

18            essentially the same as a training bulletin

19            that's sent out.  They're made aware there is

20            a change in the policy, so this was one of

21            those that would have been sent.

22                    Now, when it comes to training I

23            implemented mandatory annual implicit bias

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

───────── JOSEPH GRAMAGLIA ─────────

1    training.  These core principles are

2    incorporated within that implicit bias

3    training, so it kind of goes hand in hand.

4    Q. So as I understand it, this update was sent

5       out and you noted there's an implicit bias

6       training, but there's not any -- there was no

7       specific training relating to this update,

8       correct?

9    A. Not beyond sending out the general order.  If

10      it's discussed in policy updates when officers

11      come in through the academy of training, I

12      can't answer that.  I believe that you had the

13      captain in earlier who covers topics

14      specifically with him, but the general order

15      is the main mode for delivering this policy

16      change.

17   Q. Does the City do anything or did BPD do

18      anything to ensure that officers understood

19      the meaning of this update to the MOP?

20          MS. FREELY:  Objection to form.

21   A. So when they receive it and they do their

22      electronic signature that's their

23      acknowledgement that they have read it and

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

---

**JOSEPH GRAMAGLIA**

1   understood it.

2 Q. Is there any testing or exam of the contents

3   or meaning of this MOP update?

4 A. No.

5 Q. And was there any training of BPD leadership

6   relating to this update?

7 A. Other than our staff meeting where we were

8   working on this together as a group, no.  I

9   mean, we spent a lot of time on this.

10 Q. I want to talk about some of these core

11   principles.  The first one is traffic

12   enforcement and safety and it says that the

13   purpose of conducting traffic enforcement is

14   to favorably alter the violator's future

15   driving behavior and to foster public safety.

16   Members shall engage in traffic enforcement

17   for public safety purposes and not for the

18   purpose of making an arrest.

19     Do you see that?

20 A. I do.

21 Q. Does this policy prohibit pretext stops?

22 A. So long as the stop is based on probable

23   cause, if they have a violation of the Vehicle

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

JOSEPH GRAMAGLIA

1          and Traffic Law then they can make that stop

2          as a matter of law.  It doesn't say in there

3          that it prohibits what is known as a, quote,

4          unquote, pretextual stop.

5     Q.  Then under procedural justice it says

6          procedural justice refers to the perception of

7          fairness in an encounter.  Members shall treat

8          all persons with dignity and respect, give

9          persons a voice during encounter, be impartial

10         in their decisionmaking and convey trustworthy

11         motives.

12              Do you see that?

13    A.  Yes, I do.

14    Q.  Do these principles help reduce risk of

15         racially-biased policing?

16    A.  It should.  It should also help with

17         de-escalation.

18              MS. FREELY:  Note my objection to the

19         last question just based on form.

20    Q.  Okay.  And why would you say that?

21    A.  Because when you're -- I have done many

22         traffic stops.  I was a patrol officer for

23         16 years including my previous employment with

**JOSEPH GRAMAGLIA**

1        the Housing police department and five years

2        as a lieutenant, so 19 years of patrol.

3            I conducted a lot of traffic stops and I

4        found how you talk to people not just on

5        traffic stops but even any other type of

6        encounter can sometimes help guide it into a

7        more favorable outcome, if you will.  Not

8        always, but when you have that encounter and

9        when the opportunity presents itself when it's

10       safe to do so and you explain why you're

11       there, you leave somebody hopefully with

12       minimal to no questions after the encounter is

13       over, I think that certainly leaves the

14       situation better than you found it.

15    Q.  The next section is nondiscriminatory

16       policing.  It says members shall not consider

17       demographic category, including a number of

18       categories such as race.

19            Does this policy also help reduce the

20       risk of racially-biased policing?

21    A.  You know, it certainly -- it should.  That's

22       why we have it in there.  We make officers

23       aware that their stops are based on violations

JOSEPH GRAMAGLIA

1          of the Vehicle and Traffic Law, Penal Law.
2          You know, as long as there's a constitutional
3          reason, probable cause or a reasonable
4          suspicion based on the specific scenario, then
5          you have a good stop and that's what you
6          should be basing your stops on, not any other
7          reason as detailed out in here.
8     Q.  And then the next section is titled least
9          intrusive response.  Does the policy about
10         least intrusive response also help reduce the
11         risk of racially-biased policing?
12    A.  It certainly should.  What it's there for is,
13         again, you kind of go back to the first part
14         of constitutional stops, so if you don't have
15         what you need, if the situation arises you
16         should not go any further, conduct a traffic
17         stop, release them on a warning, traffic stop
18         receipt with summons.  If an arrest is
19         warranted make the arrest, but you go with
20         what you have at the time.
21    Q.  So prior to the update to the MOP was there
22         any policy that prohibited considering race as
23         a factor in conducting a traffic stop?

JOSEPH GRAMAGLIA

1    A.  I believe there was.  I don't have the old

2        policy in front of me.  Some of the language

3        was in there.  What I liked about these core

4        principles is it actually took it out of the

5        body of the policy and made those into

6        specific sections themselves and better

7        identified them.

8            I don't have the writing of the older

9        one, but there certainly was language to this

10       effect.  This one to me and why I wanted it in

11       there laid them out in their own sections and

12       even more detail than there was before.

13   Q.  Do you believe there was a policy that

14       explicitly prohibited considering race as a

15       factor in a traffic stop?

16   A.  Yes.

17   Q.  And what provision was that?

18   A.  I'd have to again go back.  I did not go back

19       and look at the former traffic enforcement

20       policy.  I don't have it in front of me and I

21       didn't review it.

22   Q.  Has BPD taken any action to ensure that

23       officers comply with this general order?

DEPAOLO CROSBY REPORTING SERVICES, INC.

---

**JOSEPH GRAMAGLIA**

1              MS. FREELY:  Objection to form.

2     A. We would take disciplinary action if a case

3        was brought to us or if we saw evidence that

4        something outside of policy occurred then we

5        would have Internal Affairs look into that and

6        open a case.  Potentially open a case and

7        bring charges if we did see a violation of it.

8     Q. So besides the complaint process, are there

9        any steps BPD is taking to ensure officers

10       comply?

11    A. No.  Other than training.

12    Q. So is it important to ensure the provisions

13       regarding respect and dignity are enforced to

14       reduce the risk of racial profiling and bias?

15    A. Say that again.

16    Q. Is it important to enforce the provisions

17       requiring respect and dignity to reduce the

18       risk of racial profiling and bias?

19             MS. FREELY:  Objection to form.

20    A. Of course it is.  Of course it is.

21    Q. And was there any policy prior to this general

22       order update requiring respect and dignity?

23    A. Well, it's in our mission statement.

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

---

**JOSEPH GRAMAGLIA**

1          Integrity, respect, professionalism and

2          excellence.

3     Q.  Was there any requirements that officers treat

4          motorists with respect and dignity in the

5          prior version of the MOP?

6              MS. FREELY:  Objection to form.

7     A.  Yes.  It would have been our traffic

8          enforcement policy.  Like I said, although

9          there are additions to this and it's more

10         expanded, some things may not have been as

11         descriptive as they are here, but the basics

12         of them were covered in older policies.

13             This greatly expanded and took them out

14         of the body of the policies and made them the

15         core principles as the heading.  We wanted to

16         show -- I specifically wanted to show that,

17         hey, here's the core principles of traffic

18         enforcement.

19             That's why we took them out and put them

20         up the way we did.  That's why I liked the way

21         I saw it when I saw it in the other policy and

22         incorporated it into ours to show the

23         importance of it, but it doesn't mean that it

---

—— JOSEPH GRAMAGLIA ——

1     was not -- the core principles, not to say the

2     section, but the core principles, everything

3     that is in there, was still a part of the

4     prior policies.

5  Q. Okay.  And apart from the core principles,

6     were there any policies that prohibited

7     officers from engaging in discriminatory

8     policing?

9         MS. FREELY:  Objection to form.

10 A. Sure.

11 Q. And what provisions were those?

12 A. I'd have to go through -- we'd have to get

13    more specific on what time you're talking

14    about, but there was language in the old -- in

15    the former Manual of Procedures.

16        Again, it also talks about it in the

17    mission statement.  Rules and regulations

18    prohibit again against that, so that's part of

19    the training that we have, the implicit bias

20    training.  There were trainings prior to

21    implicit bias called procedural justice.

22        They had different levels to them, so

23    that all goes part and parcel with the

---

**JOSEPH GRAMAGLIA**

1         training as well.

2    Q.  Does the mission statement explicitly prohibit

3         racial bias?

4    A.  Not in those exact words, but it has -- it

5         certainly touches on that core of the factors

6         around integrity, respect, professionalism.

7    Q.  Is there any -- prior to this MOP update was

8         there any reference to the word discrimination

9         in the Manual of Procedures?

10       MS. FREELY:  Objection to form.

11   A.  I'm sure there was, but without specifically

12        having it and looking at it and seeing --

13        there definitely is language and there has

14        been going back quite some time in our

15        manuals, but again, without having those older

16        policies in front of me I can't sit there and

17        cite it in chapter and verse.

18   Q.  And so if it's your view that these principles

19        were already incorporated in the prior MOP why

20        did you feel the need to make this update?

21       MS. FREELY:  Objection to form.

22   A.  Because I like the way that it put it first.

23        I like the way that it took it out of the

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

135 Delaware Avenue, Suite 301, Buffalo, New York  14202

716-853-5544

---

**JOSEPH GRAMAGLIA**

1      section within the traffic enforcement

2      section.  I liked how it actually labeled the

3      specific categories, put them at the front of

4      the policy and called them core principles.

5  Q.  Going back to this policy, is BPD taking any

6      steps to ensure that officers comply with it?

7           MS. FREELY:  Objection to form.

8  A.  That really goes through training.

9  Q.  So training and you said the complaint

10      process.  Is there anything else?

11  A.  Training and the complaint process.

12  Q.  There's no exam?

13  A.  There is no exam.

14  Q.  Does BPD do any sampling of body camera

15      footage?

16  A.  Prohibited from doing that by the body camera

17      MOA with the PBA.

18  Q.  Does BPD do any review of race data and

19      tickets issued?

20           MS. FREELY:  Objection to form.

21  A.  Review as how?

22  Q.  So BPD has some data about which -- BPD has

23      data about the race of people that are pulled

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

---

**JOSEPH GRAMAGLIA**

1          it on the traffic ticket, so how are you going
2          to audit the data that's not there and it
3          would be -- you don't have it.  You don't have
4          to it audit.
5      Q.  So is there any other reason why those audits
6          are not completed?
7              MS. FREELY:  Objection to form.
8      A.  The reason is that we conduct traffic stops
9          based on constitutional policing, based on
10         probable cause that the operator of the
11         vehicle committed a vehicle and traffic
12         violation.
13             We don't stop people based on their race
14         in either direction.  We stop people if we
15         have a valid reason, probable cause to stop
16         that vehicle for a vehicle and traffic
17         violation.  If somebody goes through a stop
18         sign regardless of what their race is and it
19         was in the presence of the officer, which is a
20         requirement for a traffic infraction.  It has
21         to be in the officer's presence.  They should
22         if they can stop that vehicle and take
23         appropriate action.

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

--- JOSEPH GRAMAGLIA ---

1     Q. Are officers trained on how to identify race?

2          MS. FREELY:  Objection to form.

3     A. That's a tricky question.  I don't know how to

4        answer that question.  Are you trained to

5        identify?  I guess no, but they can make

6        general observations.  I mean, that's --

7        descriptions are put out of people, of

8        suspects when crimes occur, and in the

9        instance where they have it to the best of

10       their abilities then race would be put out as

11       a part of that.

12          So part of your observation, I think

13       that's anybody, not just officers, but the

14       general public can observe to the best of

15       their ability what somebody's race might be.

16    Q. Isn't there a policy to include race of the

17       motorists on a stop receipt?

18    A. It's required that you have to answer that

19       question, so you have different races that are

20       on there.  You also have unknown and you have

21       not reported I believe and you have failed to

22       answer or refuse to answer.

23    Q. And are officers required to fill in the race

───── JOSEPH GRAMAGLIA ─────

 1              (Recess taken.)

 2

 3      Q.  Welcome back, Commissioner Gramaglia.

 4              So I want to turn back to Topic 19 which

 5          relates to stop receipts.  Do you recall that

 6          topic?

 7      A.  I do.

 8      Q.  Can you just briefly tell me what a stop

 9          receipt is?

10      A.  A stop receipt is if an officer performs a

11          traffic stop if they are -- in their

12          discretion they are not going to issue a

13          traffic summons.  They would then have to

14          issue a stop receipt so when they go back to

15          the car with the documentation, license,

16          registration, they can scan those documents

17          in.

18              It automatically uploads through our RMS

19          system, records management system, and it will

20          print out the date, the time, the location,

21          the complaint number, the officer's

22          identifying information, the vehicle

23          information and then there is a reason as to

───── DEPAOLO CROSBY REPORTING SERVICES, INC. ─────
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

0019

---

**JOSEPH GRAMAGLIA**

1              again trust and transparency.

2    Q. So you answered some of my questions.

3              So it's mandatory to issue a stop

4        receipt when a ticket is not issued, correct?

5    A. Correct.

6    Q. Okay.  And race of the driver can be recorded

7        in a stop receipt, correct?

8    A. It's on the stop receipt, correct.

9    Q. And that field, the race field, needs to be

10       filled out, correct?

11   A. It's a mandatory field.  They cannot skip over

12       so they have to fill something in.

13   Q. Has the City done anything to monitor whether

14       officers are filling in race on stop receipts?

15           MS. FREELY:  Form.

16   A. We don't have to monitor if they're filling it

17       in or not.  It's a mandatory field.  You

18       cannot go to the next field if you don't enter

19       something in that field.

20   Q. Besides particular races like say White or

21       Black, are there options such as not available

22       or not sure?

23           MS. FREELY:  Form.

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

---

JOSEPH GRAMAGLIA

1    A. Yes.  There's refuse to answer, not reported,

2       unknown I think were all the fields.

3    Q. Okay.  And has the City taken any steps to

4       monitor whether officers are actually using

5       the race options versus the unknown or other

6       options?

7          MS. FREELY:  Form.

8    A. Steps to ensure they are, no.  Like I said,

9       they have to fill out something, but I do not

10      make it mandatory that the officer ask the

11      motorist what their race is.  I testified

12      earlier my reasons for that.  I can do it

13      again if you like.

14   Q. If you briefly could just explain why you

15      don't require that.

16         MR. PERRY:  I'm advising the witness

17      that I don't want him to guess what his

18      testimony is and testify again.  It's been

19      asked and answered, but he said very briefly.

20   A. Just don't want to escalate a situation.

21         MR. JOACHIM:  Okay.  And I will just say

22      that I object.  It seems like there's two

23      attorneys on the other side objecting, which I

---

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

───────── JOSEPH GRAMAGLIA ─────────

1            MS. FREELY:  Form.

2     A.  What percentage of stop receipts actually have

3         race identified?  I don't know the percentage.

4         I just know that looking at it -- I don't

5         know, two, three weeks ago, a couple of weeks

6         ago, there is significantly more stop receipts

7         issued with race attached than the unknowns

8         that were showing on there.

9     Q.  Has the City ever looked into whether specific

10        officers are filling out race or identifying

11        race less often than other officers?

12            MS. FREELY:  Form.

13    A.  No, we have not.

14    Q.  Has the City ever required training for

15        officers who were not identifying race on stop

16        receipts?

17            MS. FREELY:  Objection to form.

18    A.  No.

19    Q.  Has any disciplinary action been taken against

20        any officer for failing to identify race on a

21        stop receipt?

22            MS. FREELY:  Same objection.

23    A.  No because it's not required.

───── **DEPAOLO CROSBY REPORTING SERVICES, INC.** ─────
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

**JOSEPH GRAMAGLIA**

1    Q.  So is there anything -- is there any

2        prohibition against an officer filling out

3        unknown for the race field on every single

4        stop receipt that he or she completes?

5            MS. FREELY:  Form.

6    A.  No.  The requirement is they actually complete

7        the traffic stop receipt and hand it to the

8        motorist so they have a documentation of the

9        stop, and again when they're given that

10       traffic stop receipt they're given a break.

11       There's no tickets issued.  No arrest was

12       made, clearly, so there's no fines associated

13       with that.

14           That's a documentation of a stop and

15       great discretion was used, but the requirement

16       is to give a stop receipt out.  All the fields

17       that are required are mandatory fields, so an

18       officer cannot skip a field.

19   Q.  But they're not actually required to identify

20       a race if they don't want to, correct?

21           MS. FREELY:  Form.

22   A.  Correct.

23   Q.  Has the City ever undertaken any steps to

─ **JOSEPH GRAMAGLIA** ─

1      analyze racial disparities in stop receipt

2      data?

3             MS. FREELY:  Form.

4   A. We have not, no.

5   Q. And why not?

6   A. Because, again, we instruct our officers --

7      they're taught in the academy to stop vehicles

8      when they have probable cause or reasonable

9      suspicion to stop a vehicle and as long as we

10     have constitutional stops and they conduct

11     themselves professionally and there is a legal

12     basis to stop the car, then the officer has

13     met the requirements.

14  Q. Has there been any training of officers on the

15     stop receipt program?

16  A. A training bulletin.  When the stop receipt

17     was created it was the policy and also the

18     instructional training -- I'm sorry.  The

19     instructions on how to complete it were also

20     sent out for signature confirmation.  So they

21     know how to do it, they learn how to do it and

22     then obviously the training bulletin states

23     that if you're not going to issue a summons or

```
 1        STATE OF NEW YORK)

 2        COUNTY OF ERIE   )

 3


 4
          I, Rebecca Lynne DiBello, CSR, RPR, Notary
 5     Public, in and for the County of Erie, State of
       New York, do hereby certify:
 6


 7        That the witness whose testimony appears
       hereinbefore was, before the commencement of
 8     their testimony, duly sworn to testify the
       truth, the whole truth and nothing but the
 9     truth; that said testimony was taken pursuant
       to notice at the time and place as herein set
10     forth; that said testimony was taken down by me
       and thereafter transcribed into typewriting,
11     and I hereby certify the foregoing testimony is
       a full, true and correct transcription of my
12     shorthand notes so taken.

13
          I further certify that I am neither counsel
14     for nor related to any party to said action,
       nor in anyway interested in the outcome
15     thereof.

16
          IN WITNESS WHEREOF, I have hereunto
17     subscribed my name and affixed my seal this
       4th day of February, 2024.

18

19

20     _____

21        Rebecca Lynne DiBello, CSR (NY)
          Notary Public - State of New York
22        No. 01D14897420
          Qualified in Erie County
23        My commission expires 5/11/2027
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York 14202
716-853-5544