# EXHIBIT 22

1      UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF NEW YORK

3      ----------------------------------------------

4      **BLACK LOVE RESISTS IN THE RUST, ET AL.,**
       **INDIVIDUALLY AND ON BEHALF OF A CLASS OF**

5      **ALL OTHERS SIMILARLY SITUATED,**

6
              Plaintiffs,

7
        -vs-                      1:18-cv-00719-CCR

8      **CITY OF BUFFALO, N.Y., ET AL.,**

9
              Defendants.

10     ----------------------------------------------

11

12            **EXAMINATION BEFORE TRIAL**

13               **OF BYRON LOCKWOOD**

14           **APPEARING REMOTELY FROM**

15              **BUFFALO, NEW YORK**

16

17              August 10, 2023

18              At 11:00 a.m.

19              Pursuant to notice

20

21     REPORTED BY:

22     Rebecca L. DiBello, RPR, CSR(NY)

23     APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK


**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1      **R E M O T E     A P P E A R A N C E S**

2

3      APPEARING FOR THE PLAINTIFFS, BLACK LOVE
       RESISTS IN THE RUST, ET AL., INDIVIDUALLY AND
       ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY
4      SITUATED:

5                        **NATIONAL CENTER FOR LAW AND
                         ECONOMIC JUSTICE**
6                        **BY: CLAUDIA WILNER, ESQ.**
                         275 Seventh Avenue, Suite 1506
7                        New York, New York 10001
                         (212) 633-6967
8
       APPEARING FOR THE DEFENDANTS, **CITY OF BUFFALO,**
9      **N.Y., et al.:**

10                       **HODGSON RUSS LLP**
                         **BY: PETER SAHASRABUDHE, ESQ.**
11                       **And HUGH RUSS, ESQ.,**
                         140 Pearl Street
12                       Buffalo, New York 14202
                         (716) 848-1508
13

14

15
       ALSO PRESENT: Cheyenne Freeley, Hodgson Russ
16                    Anjana Malhotra

17

18

19

20

21

22

23

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

BYRON LOCKWOOD

 1    know.

 2  Q. It's not a document that you encountered in

 3    your day-to-day work?

 4  A. No.

 5  Q. Would you be in a position to know if that

 6    document was given to officers prior to them

 7    running a checkpoint?

 8    MR. SAHASRABUDHE:   Objection.

 9  A. I wouldn't know that.

10  Q. And if Housing Unit or Strike Force officers

11    ran a checkpoint without that document, would

12    you know that?

13  A. No.

14  Q. Did you ever conduct any oversight over the

15    checkpoints?

16  A. No.

17  Q. Did you ever conduct any evaluation of the

18    checkpoints?

19  A. No.

20    MR. SAHASRABUDHE:   Objection to form.

21  Q. This will be Lockwood 4.  I will make it

22    bigger.  The Bates number is COB 226141.  If

23    we scroll to the top we can see this is a memo

BYRON LOCKWOOD

1          that he put together and it wasn't like I sat

2          in the meeting with him and we designed or put

3          this plan together.

4               This is something that he is cc'ing me

5          telling me this is what is going on and this

6          is what Strike Force is going to do.

7     Q.  So when it says Strike Force has and will be

8          deployed into hot spot areas, what are hot

9          spot areas?

10              MR. SAHASRABUDHE:  Objection to form.

11    A.  Hot spot areas will exist of where the crime

12         is up, you know.  It can be a hot spot where

13         there's been a lot of -- there could have been

14         some homicides there, could have been some

15         assaults, shootings.  That's more of a hot

16         spot.

17              It could have been just -- sometimes hot

18         spots is just a rash of burglaries, a rash of

19         car thefts.  We would consider that a hot spot

20         because it's happening mainly in one area.

21    Q.  How were hot spot areas identified?

22              MR. SAHASRABUDHE:  Objection to form.

23    A.  Well, they can be identified through increase

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1          of calls there, 911 calls.  It can be, you

2          know, complaints from the citizens.  And once

3          you look at it and you investigate it and you

4          determine that it's a problem here and then

5          you consider that as a hot spot.

6     Q.  Did you review data to determine what hot

7          spots were?

8               MR. SAHASRABUDHE:  Objection to form.

9     A.  You can go back and you can go back a month or

10         two and see what was happening in that area

11         and if you can see that now that area there

12         seems to be more, you know, crime in that

13         area, then you can consider that, okay, this

14         is a hot spot because two or three months ago

15         there was nothing going on here.  Now all of a

16         sudden there seems to be an increase of crime

17         there.

18    Q.  Were hot spots identified based on information

19         from ECAC?

20    A.  Erie County Analyze Center?  Okay.  They would

21         give some -- yeah, I would say yeah.

22    Q.  And were there hot spot areas all over the

23         city?

1          center, no.  No, I didn't have.

2    Q.  So you would review them, but not necessarily

3          approve or disapprove them?

4    A.  If it was coming from Erie County I would just

5          review them, look at them and I may have had

6          some discussion with the training academy

7          captain about it, but this document that

8          you're showing me now, I can't really say if

9          that was or not.

10   Q.  Let's look at the box on the top right that

11         says reasons for vehicle and traffic laws.

12         Can you read to me the fourth reason in this

13         box?

14   A.  It's got to be a little bigger.

15   Q.  Okay.

16   A.  General revenue.  Generate revenue.

17   Q.  Correct.  Do you agree that generating revenue

18         is one of the reasons to enforce vehicle and

19         traffic laws?

20              MR. SAHASRABUDHE:  I didn't hear a

21         portion of that question.  You cut out.  Sorry.

22   Q.  I asked if you agree that generating revenue

23         is one of the reasons for vehicle and traffic

─ BYRON LOCKWOOD ─

1    laws?

2    A.  I guess you generate revenue from it, yeah.

3        Yes.

4    Q.  I'm moving towards the second page of this

5        PDF.  And this is the basic course for police

6        officers.  It says at the top -- this is also

7        used to train Buffalo Police officers at the

8        academy.

9            And do you agree with me that this says

10       that one of the reasons for vehicle and

11       traffic laws is revenue generating?

12   A.  Is that on this document that you're showing

13       me?

14   Q.  Yes.  Let me move it up.  Do you see it now?

15   A.  Yes.  I see it.

16   Q.  Reasons for vehicle and traffic laws include

17       revenue generating.

18   A.  Yes.

19   Q.  And moving on to the July, 2018 training

20       materials, you would have been commissioner at

21       this time, right?

22   A.  Yes.

23   Q.  And again, do you see this box, reasons for

BYRON LOCKWOOD

1          was about vehicle and traffic issues there,

2          then I probably told them to setup a

3          checkpoint.

4     Q.  Well, that's not what this email says.  The

5          email says the checkpoints should be conducted

6          in and around recent areas of violence.

7               MR. SAHASRABUDHE:  Is there a question?

8     Q.  Why did you want to conduct checkpoints around

9          recent areas of violence?

10              MR. SAHASRABUDHE:  Objection to form.

11    A.  Actually, what this email was saying he's

12         saying that, but he's saying for the example

13         if there was a shooting or something that

14         night, then to setup a checkpoint there.

15              I don't remember having this

16         conversation with Captain Serafini.  Did I

17         send him an email instructing him to do this?

18         Do we have an email of me instructing him to

19         do this?

20              MR. SAHASRABUDHE:  Don't just -- you're

21         asked what is in front of you and what you know

22         and what you remember.

23    Q.  Why would a traffic checkpoint be conducted in

─ BYRON LOCKWOOD ─

1          the vicinity of a recent shooting?

2               MR. SAHASRABUDHE:  Objection to form.

3     A.  If there was a shooting in that area you would

4          as you check -- you would setup a checkpoint.

5          Sometimes they come across weapons in the

6          vehicles, you know, in that area.

7     Q.  Lockwood 10 is another email from Captain

8          Serafini.  This one is from March, 2017.  The

9          Bates is COB 016263.  I'm going to make it

10         larger.  And can you see this?

11    A.  Yes.

12    Q.  Okay.  So Captain Serafini says he met with

13         Chief Young.  He had a meeting with you

14         outlining our new Strike Force focus and

15         overtime detail.  You must have had at least

16         some role in oversight over the Strike Force

17         if you were meeting with the chief to discuss

18         their focus and their overtime details.  Don't

19         you agree?

20              MR. SAHASRABUDHE:  Objection to form.

21         Go ahead.

22    A.  Yes.  I look at this -- Chief Young probably

23         came to me and was requesting overtime and as

1           far as the outline of the new Strike Force.

2           New Strike Force focus.  I don't know what the

3           -- it could have been many things.  But as far

4           as the overtime, I assume we approved it.

5           Yeah.

6    Q.  Okay.  And it's discussing different details,

7           so if we look -- can you read the paragraph

8           that says nighttime overtime detail?

9    A.  (Reading.) Okay.

10   Q.  So he says that the overtime detail will

11          conduct three traffic checkpoints during their

12          overtime period, two of them in the designated

13          hot spots and one in either the south or north

14          part of the city.

15              So, why did you order that two

16          checkpoints be conducted in designated hot

17          spots?

18              MR. SAHASRABUDHE:  Objection to form.

19          I'm not sure what the hot spots were, but

20          obviously it was a problem in those spots, in

21          those areas.

22   Q.  How would running the checkpoints address the

23          problem in those areas?

—— BYRON LOCKWOOD ——

```
 1            MR. SAHASRABUDHE:  Objection to form.
 2    A. Sometimes you had vehicles that these
 3       criminals drive that's not registered or, you
 4       know, and if the car is not registered then
 5       you can, you know, write it up or impound the
 6       vehicle.
 7    Q. So the checkpoints would have been directed at
 8       criminals within the hot spots?
 9            MR. SAHASRABUDHE:  Objection to form.
10    A. Checkpoint was -- everyone would go through
11       the checkpoint.  It was a checkpoint and if
12       there was any vehicles that was not registered
13       then those vehicles would be either tagged or
14       either, you know, impounded.
15            Some of the vehicles didn't have
16       insurance on them, you know, so --
17    Q. And if we look up in the second paragraph it
18       mentions the red or orange highlighted hot
19       spots on the ECAC map that I will distribute.
20            So would those areas highlighted on the
21       ECAC map would have been the areas where you
22       wanted the checkpoints run, right?
23            MR. SAHASRABUDHE:  Objection to form.
```

BYRON LOCKWOOD

1    A.  I don't think I was -- I didn't have no maps

2        and I'm assuming that Chief Young and the

3        captain must have discussed those maps and

4        they brought it to me and I probably approved

5        it, okay.

6    Q.  What kinds of problems were in the hot spots?

7            MR. SAHASRABUDHE:  Objection to form.

8    A.  Once again, the hot spots can consist of many

9        violent crimes.  It could have been shootings,

10       could have been homicides, could have been,

11       you know, a variety of things.  Could have

12       been sexual assaults being a hot spot.

13   Q.  So why did you want to run a traffic

14       checkpoint in the hot spot?

15           MR. SAHASRABUDHE:  Objection to form.

16   A.  Once again, the vehicles -- some vehicles that

17       are not registered or no insurance and

18       sometimes when you impound those vehicles you

19       find weapons and drugs in these vehicles.

20   Q.  Captain Serafini also said in the email please

21       stress to your officers that we are looking

22       for production in the form of arrests,

23       summonses, etcetera.

--- BYRON LOCKWOOD ---

1              just not a fan of that.

2    Q.  And why are you not a fan of giving those kind

3         of tickets?

4    A.  I'm just not a fan of it.  I just don't think

5         -- I just think one ticket for tinted window

6         is good enough or maybe two, but for each

7         window I'm just not a fan of it.

8    Q.  Were you aware that Strike Force officers had

9         a common practice of issuing four tickets, one

10        for each window?

11             MR. SAHASRABUDHE:  Objection to form.

12   Q.  In a single stop?

13             MR. SAHASRABUDHE:  Objection to form.

14   A.  Yes.

15   Q.  Did you ever instruct them that they should

16        not do that?

17   A.  I didn't instruct the officers, but I

18        expressed my dissatisfaction with the chief

19        and with the commissioner about it.

20   Q.  And when did that occur?

21   A.  I don't know when it occurred.  It was just

22        verbally.  It wasn't no email or whatever and

23        I couldn't tell you what year it was.  It was

BYRON LOCKWOOD

1          just verbally.

2     Q.  What caused you to express your

3          dissatisfaction with the practice?

4     A.  I just didn't like it.

5     Q.  Was there a particular event that occurred

6          that prompted you to say something?

7     A.  No.

8     Q.  And what did you say?

9     A.  I just said I don't think it's necessary to

10         give a ticket for each dark tinted window.

11    Q.  And did anything happen after you said that?

12    A.  No.  I don't think so.  Mentioned it to the

13         chief and the commissioner and I don't know if

14         they took it up with them or not.  I just

15         mentioned it.

16    Q.  Did you check to see whether the multiple

17         tinted windows ticketing practices were

18         continuing after this after you mentioned it?

19              MR. SAHASRABUDHE:  Objection to form.

20    A.  No.  I didn't check into it because I know

21         that it was something that they can do.  It

22         wasn't illegal what they were doing.  It was

23         just that I didn't -- me particularly didn't

————— BYRON LOCKWOOD —————

1           care for it.
2      Q. Well, regardless of whether it was legal,
3           couldn't you direct the officers not to do it?
4                MR. SAHASRABUDHE:  Objection to form.
5      A. I'm not going to direct the officer not to do
6           his job.  If it's part of his job then he's
7           going to do what he's going to do as long as
8           it was part of the job.
9      Q. So it's your testimony that issuing four
10          tinted windows tickets in a single stop is
11          part of the officer's job?
12               MR. SAHASRABUDHE:  Objection to form.
13          That's not what he said.
14     A. It's legal.  It's part of the V&T so they can
15          do it.  So it's part of their job.  They can
16          do that.
17     Q. Were you aware that the Strike Force and the
18          Housing Unit engaged in more multiple
19          ticketing than other units of the BPD?
20               MR. SAHASRABUDHE:  Objection to form.
21     A. I know they issued a lot of tickets, but I
22          didn't measure their writings compared to
23          traffic or the districts.

————— **DEPAOLO CROSBY REPORTING SERVICES, INC.** —————

BYRON LOCKWOOD

1    Q. Yes.

2    A. Okay.

3    Q. Would you agree that in this email Chief

4       Patterson is describing a program of

5       pretextual stops of suspected gang members?

6            MR. SAHASRABUDHE:  Objection to form.

7    A. Yes.  Through the email, yes.

8    Q. He wants to make traffic stops for violations

9       like seatbelt and tinted window so that he can

10      check for warrants and search vehicles and

11      seize guns and inhibit the movement of

12      suspected gang members, right?

13           MR. SAHASRABUDHE:  Objection to form.

14   A. Yes.

15   Q. Did the Strike Force engage in tactics that

16      are similar to those described in this email?

17           MR. SAHASRABUDHE:  Objection to form.

18   A. Yes.

19   Q. And did the Housing Unit engage in tactics

20      that are similar to those described in this

21      email?

22           MR. SAHASRABUDHE:  Objection to form.

23   A. Yes.

1              MR. SAHASRABUDHE:  Objection to form.

2     Q. And are you aware of any guidance that covers

3        the exercise of that discretion?  How does the

4        officer make that decision?

5              MR. SAHASRABUDHE:  Objection to form.

6     A. I guess it would be on the officer to decide

7        if he's going to, you know, write a ticket.

8        You know, if it's a major, like a serious

9        accident where there is injuries, then you're

10       expected to write summonses, tickets.  But if

11       it's something where someone, you know, didn't

12       -- ran a stop sign or didn't change lanes

13       without putting the signal on, then I guess

14       you can use your discretion on that.

15    Q. Do you think that Black drivers commit more

16       traffic violations than White drivers?

17             MR. SAHASRABUDHE:  Objection to form.

18    A. No.

19    Q. Were you aware that the BPD issued more

20       traffic tickets to Black drivers than White

21       drivers?

22             MR. SAHASRABUDHE:  Objection to form.

23    A. Yes.  I heard.  I heard.  I've been told that,

BYRON LOCKWOOD

1        yes.

2   Q.  And who told you that?

3   A.  Some of the officers felt that more Black

4       drivers getting tickets than White.  It was

5       some of the officers just speaking out.  I'm

6       not going to say no names.

7   Q.  Well, I would like to know which officers were

8       saying this and you are required to answer the

9       question.

10  A.  I can't remember.

11  Q.  Would these have been line officers?

12  A.  What is a line officer?

13  Q.  Just officers, just police officers.  Not

14      lieutenants or captains or chiefs.  Officers.

15  A.  Just officers.

16  Q.  Were they Strike Force officers?

17  A.  It was just officers where you just if you out

18      and just talk.  People talking.  Just talking.

19  Q.  Were they Black officers?

20  A.  Yes.

21  Q.  What were the names of the officers?

22          MR. SAHASRABUDHE:  Objection to form.

23  A.  It was a group of officers talking.  I'm

───── BYRON LOCKWOOD ─────

1              to the lieutenants.

2     Q.  And if the chief or captain -- in this case it

3         happens that the chiefs and the captains have

4         testified that they did not provide those

5         instructions.  So then was it just coming from

6         the lieutenants?

7              MR. SAHASRABUDHE:  Objection to form.

8     A.  If they wasn't providing it then I'm assuming

9         it was coming from the lieutenants because I

10        always thought that it would come from the top

11        down to the bottom.

12    Q.  Okay.  And we were speaking about the Strike

13        Force, but do you have any reason to think

14        that the Housing Unit operated differently?

15             MR. SAHASRABUDHE:  Objection.

16    A.  The Housing Unit was strictly housing complex.

17        You know, their job was housing complex and

18        they would get the order.  Unless their chief,

19        you know, didn't give the lieutenants a

20        specific assignment then I'm quite sure the

21        officers would go from one complex to the next

22        complex to the next one.

23    Q.  Okay.  In those instances when you did receive

───── DEPAOLO CROSBY REPORTING SERVICES, INC. ─────

BYRON LOCKWOOD

1          (Discussion held off the record.)

2                    (Recess taken.)

3

4      Q.  In your opinion, did the checkpoints

5          exacerbate hostility between the Buffalo

6          Police Department and members of the general

7          public?

8              MR. SAHASRABUDHE:  Objection to form.

9      A.  I guess some people didn't like it.

10     Q.  And who didn't like it?

11     A.  I said I guess some people didn't like it.

12         We're talking about it and I'm quite sure

13         people complained about it, so some people

14         didn't like it.

15     Q.  Was that something you ever discussed with

16         Commissioner Derenda?

17     A.  Discussed checkpoints with him?

18     Q.  Yes.

19     A.  Never discussed that with him.

20     Q.  Did you follow the work of the Greater Buffalo

21         Racial Equity Roundtable?

22              MR. SAHASRABUDHE:  Objection to form.

23     A.  Who were they?  I'm not sure who they are.

BYRON LOCKWOOD

1          scroll down he is forwarding you an email from

2          Malcolm Ertha who is with the City Council and

3          the subject is Unanswered Questions From

4          Budget Public Hearings.  And I'll let you read

5          the email for a minute.

6     A.  Okay.

7     Q.  So in this email the Common Council is

8          requesting information from the BPD concerning

9          traffic checkpoints, right?

10    A.  Yes.

11    Q.  And by sending you the email did Commissioner

12         Derenda task you with responding to the Common

13         Council?

14              MR. SAHASRABUDHE:  Objection to form.

15    A.  He was sending me the email to make sure that

16         I gathered this information and sent it over

17         to the Council.  Once again, I believe it was

18         just him and I that was, you know,

19         commissioner and deputy commissioner and I

20         normally go over it every year for the budget,

21         do the budget while representing the police

22         department with our budget and this is one of

23         the workshops and they wanted this

—BYRON LOCKWOOD—

1        information, so I believe I provided it for

2        him.

3    Q.  Okay.  So you would have been responsible for

4        providing the information that they were

5        requesting?

6    A.  Yes.

7    Q.  And did you gather this information -- well,

8        first of all, did you provide it?

9    A.  I would think I did provide it for him.  I

10       gave him as much as what I can gather and give

11       to him.

12   Q.  And would you have gathered the information

13       yourself or asked somebody else to gather it

14       for you?

15   A.  I would have had someone else gather it for

16       me.  I believe that probably would have been

17       Inspector Strano.

18   Q.  Let's look at another email.  This one is

19       dated May 8th, 2017 so a few days later, COB

20       041705, and it's from Captain Serafini to the

21       commissioner and you and it says, "Traffic

22       safety checkpoint locations and it says,

23       Commissioner, attached are the traffic safety

BYRON LOCKWOOD

1    A. No.  They all went back to patrol, answering

2       calls.

3    Q. How did you handle traffic enforcement after

4       the Strike Force was disbanded?

5          MR. SAHASRABUDHE:  Objection to form.

6    A. Well, it was still -- Traffic Unit was still

7       there and the district officers that work in

8       the district as always, you see a V&T traffic

9       infraction and you enforce it.

10   Q. Did the Traffic Unit work all over the city?

11   A. Yes.

12   Q. Did you decide where the Traffic Unit would

13      patrol?

14   A. No.  They they had a captain down there.  Some

15      days the captain -- some days the Traffic Unit

16      would be assigned to the Key Center if there's

17      Sabres games or whatever there.  If there's a

18      race they would be assigned to a race.

19      Different details that they would have been

20      assigned to.

21   Q. Did the Traffic Unit run traffic safety

22      checkpoints?

23          MR. SAHASRABUDHE:  Object to the form.

```
 1        STATE OF NEW YORK)

 2        COUNTY OF ERIE   )

 3


 4
           I, Rebecca Lynne DiBello, CSR, RPR, Notary
 5        Public, in and for the County of Erie, State of
          New York, do hereby certify:
 6


 7         That the witness whose testimony appears
          hereinbefore was, before the commencement of
 8        their testimony, duly sworn to testify the
          truth, the whole truth and nothing but the
 9        truth; that said testimony was taken pursuant
          to notice at the time and place as herein set
10        forth; that said testimony was taken down by me
          and thereafter transcribed into typewriting,
11        and I hereby certify the foregoing testimony is
          a full, true and correct transcription of my
12        shorthand notes so taken.

13
           I further certify that I am neither counsel
14        for nor related to any party to said action,
          nor in anyway interested in the outcome
15        thereof.

16
           IN WITNESS WHEREOF, I have hereunto
17        subscribed my name and affixed my seal this
          26th day of August, 2023.

18

19

20        _____

21        Rebecca Lynne DiBello, CSR, RPR
          Notary Public - State of New York
22        No. 01D14897420
          Qualified in Erie County
23        My commission expires 5/11/2027
```

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544