# EXHIBIT 27

```
1      UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF NEW YORK

3      -----------------------------------------------

4      BLACK LOVE RESISTS IN THE RUST, et al.,
       individually and on behalf of a class of
5      all others similarly situated,

6                             Plaintiffs,

7       -vs-                          1:18-cv-00719-CCR

8      CITY OF BUFFALO, N.Y., et al.,

9                             Defendants.

10     -----------------------------------------------

11           ORAL EXAMINATION OF CHARLES MILLER

12               APPEARING REMOTELY FROM

13               ERIE COUNTY, NEW YORK

14

15

16                    June 2, 2023

17               9:32 a.m. - 4:49 p.m.

18                 pursuant to notice

19

20

21     REPORTED BY:

22     Carrie A. Fisher, Notary Public

23     APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK
```

```
 1        R E M O T E   A P P E A R A N C E S

 2    APPEARING FOR THE PLAINTIFFS:

 3        NATIONAL CENTER FOR LAW
          AND ECONOMIC JUSTICE
 4        BY: KARINA TEFFT, ESQ.
          50 Broadway, Suite 500
 5        New York, New York 10004
          (212) 633-6967
 6
      APPEARING FOR THE DEFENDANTS:
 7
          HODGSON RUSS LLP
 8        BY: PETER SAHASRABUDHE, ESQ.
          140 Pearl Street
 9        Buffalo, New York 14202
          (716) 848-1508
10
      ALSO PRESENT:
11
          ANJANA MALHOTRA, ESQ.
12        National Center for Law
          and Economic Justice
13
          CLAUDIA WILNER, ESQ.
14        National Center for Law
          and Economic Justice
15

16

17

18

19

20

21

22

23
```

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

0002

CHARLES MILLER

1    Q. It kind of depended on the day?

2    A. Yeah, it depended on the day, correct.

3    Q. Did all four of those lieutenants depending on

4       the day set your assignments at the Housing

5       Unit?

6    A. Yeah.

7    Q. Were you given specific assignments on a daily

8       basis?

9    A. We would have briefing.  They would discuss

10      certain things that were brought up to them by

11      BMHA staff.  We would be told, you know, "hey,

12      look, there's a complaint over here at the

13      Shaffer Village, one of you guys go check that

14      out."  So, I mean, a car crew would like

15      volunteer, "okay, I will go over there."  Or

16      "there is something over here at the

17      Langfields, can somebody check that out?"

18      "Okay, I will go over there."

19   Q. And that was daily that you had these

20      briefings?

21   A. Yeah.

22   Q. You mentioned one of your duties was

23      high-visibility patrol.  What does that mean?

CHARLES MILLER

```
 1      A.  That means high-visibility patrol, being in

 2          the area presence, police presence.  We used

 3          to do park and walks through the different

 4          BMHA properties where you actually park the

 5          patrol car, you walk through the property so

 6          people see you.  It deters crime.

 7      Q.  And was traffic enforcement part of that?

 8      A.  Yes.

 9      Q.  Were checkpoints or roadblocks part of that as

10          well?

11      A.  Yeah.

12              MR. SAHASRABUDHE:  Form.  You can

13          answer.

14      A.  Yes.

15      Q.  And, you know, back when we were talking just

16          a moment ago about your daily briefings,

17          were -- so this was all verbally communicated

18          to you, what was sort of on the docket?

19      A.  Yes.

20      Q.  Was anything communicated in writing?

21      A.  Some of the 311 complaints were.  You could

22          like go in the computer and print them up, or

23          the lieutenants would print them up and give
```

59

CHARLES MILLER

1           outside of the projects.
2      Q. Okay.  The Housing Unit had a contract with
3           the Buffalo Municipal Housing Authority,
4           right?
5      A. To my knowledge, yes.
6      Q. And that contract provided that the BPD would
7           provide above baseline policing services at
8           all BMHA properties, right?
9      A. I don't know what the contract stated.
10     Q. You've never seen it?
11     A. No.
12     Q. What did you understand to be the mission of
13          the Housing Unit while you were there?
14               MR. SAHASRABUDHE:  Form.
15     A. Patrol the projects, you know, high-visibility
16          patrol, try and reduce crime, police presence.
17     Q. Okay.  If you give me just a second, I'm going
18          to show you a document.
19     A. Sure.
20     Q. If I can figure out how to do the screen
21          share.  Sorry, give me one second.
22               Okay.  Can you see my screen?
23     A. Yes, ma'am.

CHARLES MILLER

```
 1     Q.  Sure.  So what I'm showing you here is a piece
 2         of the BPD's Manual of Procedures.
 3     A.  Okay.
 4     Q.  We've got Section 8.5 here is what I'm going
 5         to point you to if you can see me
 6         highlighting.  It says, "Housing Unit (BPD
 7         HU)."
 8     A.  Okay.
 9     Q.  And for folks' reference, this is on page 45
10         of the document.  So I'm just going to read
11         through this paragraph with you, if you'll
12         follow along with me.
13             It says:  "The Housing Unit (BPD HU)
14         will be housed at the former BMHA Police
15         Station located in the Perry Complex and shall
16         be under the command of the Deputy
17         Commissioner of Operations.  The unit will be
18         responsible for all policing and security
19         issues in the BMHA Housing Complexes located
20         throughout the City and will work closely with
21         the BMHA Staff, Council, outside agencies, as
22         well as other units in the BPD to maintain
23         strict enforcement of the Mayor's zero
```

CHARLES MILLER

1          tolerance crime policy.  Officers assigned to

2          the Housing Unit would be assigned to work in

3          combination" -- "in a combination of one and

4          two officer levels."

5               Are you familiar with this section of

6          the Manual of Procedures?

7               MR. SAHASRABUDHE:  Form.

8      A.  It's been a long time since I've seen it but,

9          yeah, this refreshes my memory, yeah.

10     Q.  So you have seen it before?

11     A.  Yeah.

12     Q.  When do you think that was?

13     A.  Probably years ago before the MOP was changed.

14     Q.  Do you have any reason to believe that this is

15         not the version of the Manual of Procedures

16         that you were trained on?

17              MR. SAHASRABUDHE:  Form.

18     A.  No.

19     Q.  So does this paragraph accurately describe the

20         mission and purpose of the Housing Unit?

21     A.  I would say so, yes.

22     Q.  So a key part of the Housing Unit's mission

23         was to strictly enforce Mayor Brown's zero

CHARLES MILLER

1            tolerance policy on crime, right?
2                    MR. SAHASRABUDHE:  Form.
3       A.  Yes.
4       Q.  What do you understand the mayor's zero
5            tolerance crime policy to be?
6       A.  I mean, if -- basically from the perspective
7            of police officers, if you see a crime being
8            committed, you react and do your job.
9       Q.  So you're talking about reacting to crime, but
10           you also earlier described that this was a
11           proactive unit, correct?
12      A.  Correct.
13      Q.  So what did you proactively do to carry out
14           this mission of enforcing the mayor's zero
15           tolerance policy on crime?
16      A.  Go through the different BMHA properties, be
17           visible, and if you've seen something
18           happening, did your job as a police officer.
19      Q.  How did you learn about what this policy was,
20           the zero tolerance policy on crime?
21      A.  It's in the MOP, or it was in the --
22      Q.  Was there -- I'm sorry, I didn't mean to
23           interrupt.

CHARLES MILLER

1    Jasper Parrish is African Americans, Hispanic.

2    I'm sure there is -- what was the other one?

3    LaSalle Courts.  I mean, I would say a

4    majority of the housing projects are

5    predominantly African American or Hispanic.

6 Q. Did you focus on any complexes that were

7    predominantly White?

8 A. I'm going to be honest, there really aren't a

9    lot of the complexes that are primarily White.

10 Q. Okay.  So in being an officer at the Housing

11    Unit, were you ever given any demographic data

12    like race or income data about the residents

13    of the BMHA properties?

14 A. No.

15 Q. Did you ever discuss the demographics of those

16    properties with your supervisors?

17 A. No.

18 Q. So now I do want to pivot into the checkpoints

19    which we've already talked about a little bit.

20 A. Okay.

21 Q. So you testified earlier that one of the crime

22    reduction strategies used by the Housing Unit

23    while you were there was traffic checkpoints,

CHARLES MILLER

```
 1      right?
 2           MR. SAHASRABUDHE:  Form.
 3   A. Yes.
 4   Q. The Housing Unit conducted its own
 5      checkpoints, right?
 6   A. Separate from Strike Force, yes.
 7   Q. Right, separate from Strike Force.  And as a
 8      Housing Unit officer, you said you sometimes
 9      took part in conducting those checkpoints?
10   A. Yes.
11   Q. How frequently were you doing that?
12   A. Like I said, it wasn't as frequent as Strike
13      Force.  I'd say maybe two to three times a
14      month.  I don't remember doing it really that
15      frequently with Housing.
16           I worked Strike Force overtime a few
17      times like -- well, probably ten times over a
18      summer and we did checkpoints there, but every
19      time I did that overtime it was generally --
20      you know, I knew when I was taking Strike
21      Force overtime, you're probably going to be
22      doing a checkpoint because they do them every
23      day more or less.
```

CHARLES MILLER

1          activity report, and shall also prepare a
2          'Buffalo Police Department Traffic Checkpoint
3          Form' (also referred to as a Roadblock Form),
4          as directed by the DPC."  Do you see that?
5      A. I do.
6      Q. That's in that first paragraph.
7      A. Yes, ma'am.
8      Q. Okay.  Now I want to show you a different
9          document.  Can you see this?
10     A. Yes, ma'am.
11     Q. I am going to mark this as Miller 3.  This is
12         an example of a Roadblock Form we know was
13         used by the Strike Force when they were
14         conducting checkpoints.
15     A. Okay.
16     Q. Do you have any reason to doubt that that's
17         true?
18     A. I don't.  I've never seen it, but it says
19         "Buffalo Police Department Roadblock
20         Directive" on it.
21     Q. So in situations where the Housing Unit ran
22         its own checkpoints, so you were not as a
23         Housing Unit officer working on a Strike Force

```
 1        checkpoint in other words, did the Housing
 2        Unit use Roadblock Forms or Roadblock
 3        Directives similar to the one you see here?
 4    A.  Not that I know of, no.  But I would have --
 5        my supervisor may have done it.  I've never
 6        seen that form as a patrolman.
 7    Q.  So what types of forms, documents, or other
 8        instructions were you given regarding
 9        checkpoint locations before you ran a
10        checkpoint?
11    A.  Generally it would just be discussed in
12        briefing.
13    Q.  So it would be a verbal instruction only?
14    A.  Correct.  In briefing it would, "okay, we're
15        going to do a checkpoint at this location at
16        this time."
17    Q.  During those briefings, were you ever informed
18        about why a particular checkpoint location was
19        chosen?
20    A.  No, I was not.
21    Q.  It was not discussed at all?
22    A.  No.
23    Q.  What was your understanding as to why a
```

CHARLES MILLER

1       saying?

2   A.  Yes.

3   Q.  And if folks were complaining about racial

4       profiling to your supervisors, how did you

5       know that the complaint happened?

6   A.  Supervisor would tell us about it like, "hey,

7       this guy is saying that you stopped him, what

8       happened with the stop?"  And like I said,

9       those -- so like I don't know if I explained

10      it right.  People would complain to me like

11      they would say to me like, "hey, why are you

12      stopping me?"  I'd explain that to them and

13      then they'd say, "well, you're stopping me

14      because I'm Black."

15          I can't justify or I can't say that

16      happened on a checkpoint or on a regular

17      traffic stop.  So I can't tell you if for sure

18      it happened on a checkpoint.  I mean, traffic

19      stops in general, I've had people say that to

20      me.  It may have happened on a checkpoint; I'm

21      not a hundred percent sure.

22  Q.  So if either at a traffic stop or a checkpoint

23      a driver said to you, "you're only stopping me

1    because I'm Black," what is your answer to

2    that?

3  A. "No, I'm stopping you because of this, because

4    of, you know, we're conducting this

5    checkpoint, you know, your reg is bad, your

6    inspection is bad, your car has this

7    vehicle/traffic violation going on," or "your

8    car hit on the license plate reader as a

9    suspension; that's why I'm stopping you."

10  Q. How often did you hear folks say "you're

11    stopping me because I'm Black" or things of

12    that nature?

13  A. I would say not --

14        MR. SAHASRABUDHE:  Form.  Go ahead.

15  A. Oh, okay.  I would say not that often.  I

16    mean, I've made a lot of traffic stops.  I

17    don't know, maybe percentage-wise 5 percent.

18    I wouldn't say it was like a ton.

19  Q. Would you tell your supervisors when that

20    happened?

21  A. Not always, no.

22  Q. Why -- in the times that you did, why did you

23    decide to tell them?

CHARLES MILLER

1    A.  I thought maybe like, "hey, you know, I'm

2        giving you a heads up, I don't know if this

3        guy is going to file a complaint because he

4        was extremely agitated, this is what

5        happened," making them aware of the situation.

6    Q.  So was it more about getting out in front of a

7        potential formal complaint?

8            MR. SAHASRABUDHE:  Objection to form.

9    A.  I don't know about "getting out in front of

10       it" because there really is no getting out in

11       front of it.  It's just making him aware.  I

12       mean, people, if they want to file a

13       complaint, they have the right to do that and

14       that's fine.  I mean, my name --

15   Q.  What would your supervisor say about it?

16   A.  He would say, "okay."

17   Q.  Would he express any concern about the fact

18       that the driver said "you're only stopping me

19       because I'm Black"?

20   A.  Not really, no.  I mean, typically -- through

21       my experience, when people are accused of

22       something and they're wrong and they know

23       they're wrong, I would say that they may say

CHARLES MILLER

1    Q. Which ones told you that?

2    A. I don't recall, but I know I've heard it from

3       other officers.  I know I've asked people

4       before.  I couldn't tell you who it was.  It

5       was a long time ago.

6    Q. So at this point, like as you're working now,

7       so not just during your time at the Housing

8       Unit, are you aware of any current policy in

9       effect at the BPD regarding how many tinted

10      windows tickets you can issue in a single

11      stop?

12   A. No.

13   Q. You're not aware of any written policy

14      governing this?

15   A. No.  Like I said, I don't do a lot of V&T

16      anymore.

17   Q. Was there any point when you were at the

18      Housing Unit where your supervisors directed

19      you to limit the number of tinted windows

20      tickets you wrote to, you know, one ticket per

21      stop or two tickets per stop?

22   A. Not that I recall.

23   Q. So as far as you understood, during the

**CHARLES MILLER**

1   A. I don't know.

2   Q. You don't know if it surprises you?

3   A. I would say it is a bit surprising, but I

4      don't know the demographic of the city of

5      African American, Hispanic, to White.

6   Q. Why does it surprise you?

7   A. Because I don't know the demographic of the

8      city from African American to Hispanic to

9      White.  I don't know the population size like

10     that.

11  Q. Do you think --

12  A. I know I grew up in Riverside, and it was

13     primarily White, Black, and Hispanic.

14  Q. Do you think Black drivers commit more traffic

15     infractions than White drivers?

16         MR. SAHASRABUDHE:  Objection to form.

17  A. No.  No.

18  Q. Do you think Black drivers commit more crimes

19     than White drivers?

20  A. No.

21         MR. SAHASRABUDHE:  Objection to form.

22         THE WITNESS:  Sorry.

23         MR. SAHASRABUDHE:  That's okay.

1          can always come back to the directed patrol at

2          a later time.

3     Q.  And what are the circumstances in which an

4          officer on directed patrol would stop someone

5          and issue tickets?

6     A.  I would say if it's --

7               MR. SAHASRABUDHE:  Objection to form.

8     A.  I would say if it's anything like a danger to

9          the public, you know, like a car -- car is

10         drag racing down the street or a bicyclist

11         gets hit by a vehicle or we actually had this

12         not too long ago, a bicyclist hit the side of

13         a bus, like he hit the side of a bus.  The bus

14         had the right of way, something like that.

15    Q.  Okay.  And pivoting back to the document that

16         we're looking at here which is Miller Exhibit

17         21, do you have any insight into why these

18         revisions to the Manual of Procedures were

19         made?

20              MR. SAHASRABUDHE:  Objection to form.

21    A.  I'm going to say it's probably because, I

22         mean, George Floyd happened and criminal

23         justice reform started so I think that the

CHARLES MILLER

```
 1          department just wanted something more clear in

 2          writing.

 3     Q.   So you think that the murder of George Floyd

 4          did have something to do with this particular

 5          policy update?

 6     A.   I think the murder of George Floyd had a lot

 7          to do with a lot of law enforcement policy

 8          updates.

 9     Q.   What other policy updates do you attribute to

10          the murder of George Floyd?

11     A.   I mean, use of force for one.

12               MR. SAHASRABUDHE:  Objection to form.

13     Q.   Use of force.  Anything else?

14     A.   The implicit bias training.

15     Q.   And when you said you had the first implicit

16          bias training that you could remember about

17          four or five years ago, was that sometime

18          after George Floyd's murder?

19     A.   I want to say --

20               MR. SAHASRABUDHE:  Objection to form.

21     A.   I want to say it was around the same time.  I

22          thought it was before.  I could be wrong.  I

23          think it was 2020, 2019.
```

**CHARLES MILLER**

1       ensure that guys are not doing that.  When I

2       show up to their calls, they're not doing

3       anything that's obviously intrusive, you know.

4               Again, this is kind of like the same

5       answer I gave you two other times.  I show up

6       to their calls, show up to their traffic

7       stops.  I kind of ensure that everything is

8       good.  I have yet to have a citizen -- the

9       screen keeps going dark.

10      (Pause in proceedings for Mr. Sahasrabudhe and

11      the witness to reconnect to the

12      videoconference.)

13      BY MS. TEFFT:

14   Q. Back on the record after a brief break.

15              I want to direct you to Section 4.4 in

16      Exhibit 21 that we were just discussing.

17      That's at the bottom of page 2, specifically

18      subpart A that says "Warnings/Traffic Stop

19      Receipt."

20   A. Yes.

21   Q. So backing up a little bit to before you

22      became a lieutenant, you were still a patrol

23      officer.  When you did traffic enforcement,

CHARLES MILLER

1          did you ever issue Stop Receipts to drivers
2          that you didn't ticket?
3    A.  Yes.
4    Q.  How frequently?
5    A.  Half the time.
6    Q.  Half the time you said?
7    A.  Yeah, roughly.
8    Q.  When you issued Stop Receipts, did you record
9          the race of the motorist on those Stop
10         Receipts?
11   A.  I think you have to.  I don't remember.  It's
12         been a minute since I've done it.
13   Q.  You think you have to in the system where you
14         record them?
15   A.  I think you have to report something.
16   Q.  How did you decide whether or not to issue a
17         Stop Receipt in circumstances where you were
18         not writing someone a ticket?
19              MR. SAHASRABUDHE:  Objection to form.
20   A.  Again, generally how I always did things.  If
21         they were polite, you know, like polite and
22         they understood why I stopped them, they
23         weren't argumentative, okay, well, I can give

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1          you -- I can use my discretion and give you a

2          courtesy.  I would always explain to them when

3          I gave them the Stop Receipt like, "hey, you

4          know, this is not a ticket.  There is no fine

5          attached to it.  This is simply a receipt

6          explaining why I pulled you over."

7     Q.  Do you recall ever being trained on issuing

8          Stop Receipts?

9     A.  No, I don't.

10    Q.  So Stop Receipts came about around 2020,

11         correct?

12    A.  Yeah, around there.

13    Q.  Do you remember being informed about what Stop

14         Receipts were around that time?

15    A.  Yes, I do remember that.

16    Q.  Who told you?

17    A.  I think it came out in a departmental email.

18         I don't remember there being any specific

19         training, no.  I think it was just --

20    Q.  And do you?

21    A.  -- a procedure update, and it gave you like

22         guidelines basically on how to do it.

23    Q.  Okay.

CHARLES MILLER

```
 1     A. It was notated that if you conducted a traffic
 2        stop that did not end in a summonses, you
 3        either had to, A, give a summons or, B, give a
 4        Traffic Stop Receipt, one or the other.
 5     Q. And that was an update that you saw when you
 6        were still a line officer?
 7     A. Yes.
 8     Q. And as a lieutenant, have you trained your
 9        officers that you supervise on issuing Stop
10        Receipts?
11     A. My officers, I mean, I'm not going to say they
12        have a lot of time on it.  I personally don't
13        think I have a lot of time on, it's 11 and a
14        half years, but a majority of my officers have
15        like five years on so they know well enough
16        that what they're supposed to be doing if they
17        conduct traffic stops and do not issue a
18        summons.
19     Q. Do you check on whether or not they are
20        issuing Stop Receipts in circumstances when
21        they didn't issue any tickets?
22     A. I honestly -- I don't know how to even go
23        about doing that, how I would check the system
```

0023

1    for that.

2  Q. Do you encourage you officers to issue

3     warnings instead of tickets when possible?

4  A. I -- I mean, it's never really come about

5     where an officer has said, "hey, what do you

6     think about this?"  I mean, I want them to do

7     whatever they feel is necessary based upon a

8     situation.

9  Q. Okay.  And briefly I want to direct you to the

10     third page of this Exhibit 21 Subsection C

11     toward the top of the page.  Do you see that?

12  A. Yes.

13  Q. Where it says "Arrests."  So is it your

14     understanding that these are the only

15     circumstances in which an arrest at a traffic

16     stop would be permitted under this new policy?

17  A. Yeah.

18  Q. Are there any other circumstances not in this

19     list where an arrest would be permitted as far

20     as you're aware?

21        MR. SAHASRABUDHE:  Objection to form.

22  A. That I can think of off the top of my head

23     right now, no.

```
1          STATE OF NEW YORK)

2                      )  ss.

3          COUNTY OF ERIE    )

4

5

            I, Carrie Fisher, Notary Public, in and for
6          the County of Erie, State of New York, do
            hereby certify:
7

8           That the witness whose testimony appears
            hereinbefore was, before the commencement of
9          their testimony, duly sworn to testify the
            truth, the whole truth and nothing but the
10         truth; that said testimony was taken pursuant
            to notice at the time and place as herein set
11         forth; that said testimony was taken down by
            me and thereafter transcribed into
12         typewriting, and I hereby certify the
            foregoing testimony is a full, true and
13         correct transcription of my shorthand notes so
            taken.
14

15          I further certify that I am neither counsel
            for nor related to any party to said action,
16         nor in anyway interested in the outcome
            thereof.
17

18          IN WITNESS WHEREOF, I have hereunto
            subscribed my name and affixed my seal this
19         16th day of June, 2023.

20

21         -----------------------
            Carrie A. Fisher
22         Notary Public - State of New York
            No. 01FI6240227
23         Qualified in Erie County
            My commission expires 5/02/27
```