# EXHIBIT 30



# 2020-21
# Gun Involved Violence Elimination (GIVE)
# Comprehensive Plan Proposal
# Program Guidance and Funding Document

## Important Information and Dates:

| | |
|---|---|
| Award Notice and GIVE Comprehensive Plan Proposal Released | Thursday, January 16, 2020 |
| GIVE Comprehensive Plan Proposal 1st Draft Due to DCJS | Thursday, March 5, 2020 |
| GIVE Comprehensive Plan Proposal Final Due to DCJS | Friday, April 10, 2020 |
| GIVE 2020-21 Contract Cycle | July 1, 2020 through June 30, 2021 |
| | |

1

COB467807

# TABLE OF CONTENTS

I.    Introduction ...................................................................................................................3

II.   Funding Eligibility and Information for GIVE 2020-21 ...............................................3

III.  GIVE Funding Guidelines and Requirements ...........................................................4
      A.   Allowable GIVE Program Costs......................................................................5
      B.   Unallowable Budget Items...............................................................................7
      C.   Budget Restrictions ..........................................................................................7

IV.   Submitting the GIVE Comprehensive Plan Proposal 2020-21 ................................7

V.    GIVE 2020-21 Guidance and Reference...................................................................9
      A.   SARA (Scanning, Analysis, Response, and Assessment) Model ...............9
            1.   Assessment of Previous GIVE Efforts  ................................................9
            2.   Scanning ..............................................................................................10
            3.   Analysis ...............................................................................................11
            4.   Response Component of SARA ..........................................................13
      B.   GIVE Core Elements .......................................................................................13
      C.   Required Evidence-Based Approaches to Response ..............................14
      D.   Key Elements Tools .........................................................................................15
      E.   Assessment Plan ............................................................................................16

VI.   GIVE Comprehensive Plan Proposal Questions and Budget .............................17
      A.   Required Narrative Response Questions ....................................................17
            1.   Questions 1 – 11   ......................................................................18 - 23
      B.   Required Budget Response ..........................................................................25

VII.  GIVE Comprehensive Plan Proposal Checklist ....................................................26

**Appendices**
Appendix:   GIVE Eligible Agencies ..........................................................................28
Appendix:   GIVE Contract Specific Requirements ................................................29
Appendix:   Evidence – Based Policing Resources................................................33
Appendix:   Key Element Tools .................................................................................42
Appendix:   Aggravated Assault Resources............................................................53
Appendix:   Criminal Justice Knowledge Bank ......................................................54
Appendix:   Data Documents ..................................................................................55

            1.   Shooting Related Violence – GIVE Eligible Jurisdictions
            2.   Shooting Incidents Involving Injury by GIVE Jurisdictions (2010 – 2019)
            3.   Firearm Activity Reports (2010 – 2019)
            4.   Aggravated Assault Crime Data

**Attachments**
#1:  GIVE Tracker – Used for Time and Attendance Budget Information
#2:  GIVE 2020-21 Budget Worksheet

COB467808

# 2020-21
# Gun Involved Violence Elimination (GIVE)
# Comprehensive Plan Proposal
# Program Guidance and Funding Document

## I.  INTRODUCTION

In 2014, DCJS conducted an in-depth analysis of crime data in New York State, and found that while most crime had decreased significantly since 2004, shooting homicides had increased 6%. That data, coupled with the significant economic, social and personal consequences that result from shooting deaths, prompted DCJS to prioritize statewide efforts to reduce shootings and aggravated assaults in the effected jurisdictions. First implemented in July 2014, the Gun Involved Violence Elimination (GIVE) Initiative is a key component of New York's shooting and homicide reduction strategy.  GIVE is an evidence-based initiative involving the integrated efforts of the key criminal justice agencies and support services organizations in each funded jurisdiction. These efforts must be focused on the four core elements of GIVE: People, Places, Alignment and Engagement.

## II.  FUNDING ELIGIBILITY AND INFORMATION FOR GIVE 2020-21

Subject to available appropriation in the enacted New York State SFY 2020-21 Budget, approximately $13.3 million dollars will be made available to support the statewide 2020-21 GIVE grant awards.

DCJS utilizes a deliberate process to make GIVE award decisions, with a focus on awarding funds to support the successful implementation of evidence-based crime reduction strategies.  Awards will be made upon the submission and subsequent DCJS approval of your jurisdictions' GIVE Comprehensive Plan. Final award amounts will be determined based on uniform crime data, your jurisdiction's prior adherence to prescribed GIVE strategies, and historical compliance with GIVE contract requirements.  DCJS reserves the right to make partial awards depending on the quality of the Plan submitted and the factors named above.

As an existing GIVE jurisdiction, you are eligible to receive an award no greater than the amount provided in the accompanying award letter.  See Appendix: *2020-21 GIVE Eligible Agencies* for list of eligible agencies. Contracts for the 2020-21 term will be for the period July 1, 2020 to June 30, 2021.

To receive funding, DCJS is requiring existing GIVE jurisdictions to submit answers to questions located in the GIVE Comprehensive Plan Proposal Questions and Budget, Section VI, of this Program Guidance and Funding Document, hereinafter known as "Guidance document". The

COB467809

responses will make up a GIVE Comprehensive Plan, and each jurisdiction's funding is contingent upon DCJS' approval of the Plan.

A GIVE Comprehensive Plan proposal must be submitted by the county's GIVE co-chairs, with each participating agency's role clearly delineated and defined.

Responses to the questions located in Section VI. of this Guidance document must describe the strategies and interventions that participating agencies will use to combat gun crime and how grant funding will be distributed among each agency participating in the partnership.

This Guidance document provides background and reference information necessary for jurisdictions to draft their GIVE Comprehensive Plan proposals.  The narrative and budget questions must be answered by jurisdictions to delineate the specifics of their proposed GIVE Comprehensive Plan strategies. Grantees should read this Guidance document thoroughly prior to responding to questions.


## III.  2020-21 GIVE FUNDING GUIDELINES AND REQUIREMENTS

*Note:  The following information pertains to and provides guidance for responding to the Budget Question in Section VI. B. Required Budget Response for the 2020-21 GIVE Comprehensive Plan Proposal.*

All funding provided must support program efforts during the contract period.  The funding must supplement, not supplant, non-grant funds that would otherwise be available for expenditure on the strategy proposed.

All funding requests must relate directly to the proposed GIVE Comprehensive Plan proposal. Funding requests not directly related to the plan will not be granted. Detailed information on allowable programmatic expenses is provided in Section A below.

All proposed budget requests must:

- Align with the strategy proposed;
- Promote and enhance the evidence-based strategies proposed;
- Include a specific justification for each budget item and its role in the strategy; and
- Define and justify the role of each funded agency in each element of the overall jurisdiction strategy to reduce shootings and homicides or aggravated assaults where applicable.

State and Federal agencies are **_not_** eligible to receive GIVE funding, but their participation is strongly encouraged, and their roles should be clearly defined by the jurisdiction in your proposal. Jurisdictions are strongly encouraged to engage and collaborate with the New York State

4

COB467810

Department of Corrections and Community Supervision (DOCCS) and the New York State Police in the development of and implementation of your GIVE Comprehensive Plan.

    A.   Allowable GIVE Program Costs

All funding requests must relate directly to the proposed GIVE plan. Funding requests not directly related to the GIVE plan will not be supported. DCJS envisions a collaborative process with our GIVE grantees, and grantees are encouraged to avail themselves of DCJS staff and guidance when developing their draft budget components of their GIVE Comprehensive Plan proposals.

Grantees may contact the DCJS Office of Public Safety at give@dcjs.ny.gov with questions about the comprehensive GIVE plan development and proposed budgets prior to the development of their draft comprehensive plan proposal which is due on March 5, 2020.

Examples of allowable categories for funding include, but are not limited to, the following:

1.   Personnel – All personnel supported through GIVE funding, whether as agency employees or as contractors, must devote their work day, commensurate with the percentage of salary GIVE supports, to working on the goals and objectives of the GIVE Strategy. Fully funded GIVE positions may not conduct duties unrelated to the GIVE Strategy. Requests for funding that do not clearly justify how the requested positions will support the comprehensive GIVE plan, or the enhancement of crime analysis, will not be considered.

Overtime compensation for non-sworn support or administrative positions, including crime analysts, will not be funded.

2.   Crime Analysts – Crime Analysts – Requests to fund crime analysts are strongly encouraged, especially in jurisdictions with resource needs in this discipline. **Jurisdictions are strongly encouraged to assign state-funded analysts to regional crime analysis centers serving such jurisdictions.** Agencies that utilize more than one analyst to support the GIVE-related work must note the proportion of the allotted GIVE funds that will be designated for each analyst. GIVE-funded crime analysts must obtain DCJS certification as a NYS Crime Analyst, and any newly hired analyst must obtain certification within one year of being hired. Examinations will be scheduled periodically throughout 2020 for analysts that have not yet received certification.

3.   Crime Analysis and Intelligence-Led Policing – As a vital component of all GIVE Initiative strategies, requests for software and other crime analysis tools are

COB467811

acceptable. Jurisdictions are encouraged to explore methods of sharing resources, information, and data at the county, regional and statewide levels to enhance crime analysis and support intelligence-led policing.

4. Intelligence Development – Budget requests that will enhance agency field intelligence capacity are acceptable. Requests for overtime funding for intelligence development efforts by sworn law enforcement personnel are acceptable, provided the requests are directly related to the Strategy. Intelligence collection efforts relating to incarcerated individuals, as well as those under community-based supervision, are also acceptable uses of funding.

5. Enforcement/Investigative Component – Requests for overtime funding for extra investigative and enforcement operations by sworn law enforcement personnel conducted as part of the Strategy are acceptable, provided the requests are directly related to specific operations and other enforcement efforts of the GIVE Strategy and are clearly articulated in the budget justification. Specific justification must be made as to why the operation cannot be carried out within standard working shifts. No GIVE funding will be provided for "zero-tolerance" overtime details.  Regarding overtime for enforcement and investigative activities only, the following three conditions apply:

   - The use of overtime funds for GIVE hot-spot policing details must be focused in the specific GIVE zones located within the given city, village or municipality. These overtime details must be tracked using Attachment #1: *GIVE Tracker* and submitted quarterly to DCJS in GMS with the quarterly progress report.

   - The use of overtime funds for investigations focused on increasing clearance rates for non-fatal shootings are acceptable, provided that such uses and efforts are reflected in the jurisdiction's approved 2020-21 GIVE Comprehensive Plan.

   - To be eligible for support under GIVE, proposed use of overtime must be based on an analysis of the time of year, day(s) of week, and hours of the day when the majority of gun violence, or aggravated assaults where applicable, occurs.

6. Travel and Training Funds – Funding to support travel costs to attend meetings, trainings and conferences sponsored or encouraged by DCJS are acceptable requests.  NOTE: When requested, funded personnel and <u>command staff</u> are required to, where applicable, attend DCJS sponsored trainings, meetings and conferences. Appropriate staff are required to make every effort to attend technical assistance training(s) that support the strategies that have been chosen.  DCJS

6

COB467812

intends to host one or two single-day "roundtable" style regional meetings, as well as two or three regional technical assistance offerings and one statewide event held in the Albany area. Agencies are encouraged to plan your funding requests to address any anticipated costs they may incur to attend these events as well as any other travel that fosters inter-jurisdictional information sharing, or the advancement of evidence-based practices in your jurisdiction.

B. Unallowable Budget Items

GIVE funds may **not** be used to support the following purchases or expenses:

1. Vehicles, firearms or conductive energy devices (e.g., Tasers and Stingers)
2. General office supplies and equipment
3. Fringe benefit costs for overtime expenses
4. Air cards, Leads Online or truancy programs
5. Support staff not specifically tied to the GIVE strategy
6. Traditional "gun buy-back" programs
7. Indirect costs expenses for units of local government
8. Overtime compensation for non-uniformed support or administrative positions, including overtime for crime analysts and other non-sworn support positions.

C. Budget Restrictions

The following restrictions apply to the GIVE Comprehensive Plan funding requests:

1. A jurisdiction's total GIVE Comprehensive Plan funding request (for all participating agencies in the county) may not exceed the maximum amount specified in the jurisdiction's award notice; and
2. DCJS reserves the right to approve the final submissions and will assist the jurisdictions on amending the submitted proposal and budgets if needed.


## IV.     SUBMITTING THE GIVE COMPREHENSIVE PLAN PROPOSAL

A draft GIVE Comprehensive Plan proposal must be submitted to DCJS no later than noon on March 5, 2020 via email at GIVE@dcjs.ny.gov. The draft will be reviewed and if necessary, returned to the grantees for any recommended revisions and edits. Complete final GIVE Comprehensive Plan proposals must be submitted to DCJS no later than noon on April 10, 2020.

DCJS will work with and provide technical support to jurisdictions as they develop their GIVE Comprehensive Plans consistent with the state's evidence-based GIVE strategies. This should be a collaborative process and DCJS encourages all jurisdictions to solicit and take advantage of guidance from agency staff when developing their draft GIVE Comprehensive Plan proposals.

COB467813

Additionally, grantees may contact the DCJS Office of Public Safety via email at GIVE@dcjs.ny.gov for information and assistance in preparing their GIVE Comprehensive Plan proposals.

The 2020-21 GIVE Comprehensive Plan proposals must include 2020-21 Memorandum of Understanding(s)/Memorandum of Agreement(s) signed by GIVE partnership members  (include justification for any required member signatures not included).  These MOU(s)/MOA(s) must indicate the knowledge of and support for the comprehensive plan submitted by the applicant jurisdiction. Contracts will not be finalized until MOU(s)/MOA(s) are received by DCJS. In jurisdictions that are supported by a Crime Analysis Center (CAC), the MOU must also include the role of the CAC in the development and implementation of the plan.

The GIVE Comprehensive Plan proposal for your jurisdiction must include detailed narrative answers for each of the questions included in Section VI. Give 2020-21 Comprehensive Plan Proposal Questions and Budget, along with requested budgets and narrative justifications from each GIVE partner within the jurisdiction.

DCJS reserves the right to approve the final submissions and will assist the jurisdictions on amending and resubmitting their final comprehensive final Plans by April 10, 2020. Once final funding determinations are made by DCJS, all participating GIVE agencies will receive formal grant notifications, and the contracting process will begin.

Narrative responses to all questions must be submitted as one complete Microsoft Word document, using Arial 11-point font, 1.5-line spacing format. All narrative responses to the questions in Narrative Questions and Answers section of this document, as well as the Budget justification narrative, must be consolidated into a single Word document.

GIVE Comprehensive Plan proposals submitted in alternate formats will not be accepted or reviewed by DCJS. Use of the Portable Document Format (PDF) is NOT acceptable when submitting the narrative responses, however, other types of supporting documentation, e.g., charts and maps developed by crime analysts, may be submitted in PDF format. Do not submit photographs or media articles as part of a proposal. These will not be reviewed or considered by DCJS.

Jurisdictions that do not specifically answer each of the required questions(s) located in Section VI. GIVE Comprehensive Plan Proposal Questions and Budget, or do not adhere to the formatting guidelines above, will be contacted by DCJS to revise and resubmit their proposal(s).

COB467814

## V. GIVE 2020-21 GUIDANCE AND REFERENCE

*Note: The following information pertains to and provides guidance for responding to the GIVE Comprehensive Plan Proposals Questions in Section VI.*

### A. SARA (Scanning, Analysis, Response, and Assessment) Model

Informed decision-making through data-driven policing is recognized as the foundation for effective crime reduction strategies. The GIVE initiative is rooted in the Problem-Oriented Policing (POP) SARA (Scanning, Analysis, Response, and Assessment) Model. DCJS has applied the principles of POP in developing the narrative portions of the GIVE Comprehensive Plan proposal. A link to the POP Key Element Tool can be found in Appendix: *Evidence – Based Policing Resources*, click here. As indicated above, GIVE Comprehensive Plan proposals must focus specifically on the reduction of shootings and homicides, or aggravated assaults where applicable.

### 1. ASSESSMENT OF PREVIOUS GIVE EFFORTS

*(Note: Question #1 in Section VI: GIVE Comprehensive Plan Proposal Questions and Budget, addresses the required Assessment components of your plan that are detailed below.)*

A critical first step in the development and institutionalization of any crime reduction strategy is an assessment of the strategy's previous effectiveness in achieving the desired outcome.

Assessment requires an understanding of the expected outcomes of the proposed plan and a definition of qualitative and quantitative performance measures to determine whether the expectations were met. Assessment also requires a clear picture of how strategies were expected to be implemented, the fidelity of the actual implementation, and a periodic review of how the strategies can be modified and improved.

**Jurisdictions MUST conduct an assessment of their previous GIVE efforts, with emphasis on the 2019-20 GIVE contract period, prior to developing their 2020-21 GIVE Comprehensive Plan Proposals.** The Problem-Oriented Policing Key Element Tool has been developed for jurisdictions to utilize for this purpose. See Appendix: *Key Elements Tools* for additional information.

The GIVE Comprehensive Plan proposal should also include each jurisdiction's plan for institutionalization of their evidence-based GIVE strategies throughout the policies and procedures of their agency and/or department.

9

COB467815

Institutionalization of evidence-based practices is how departments incorporate evidence and research findings into their everyday organizational systems, such as departmental and academy training, patrol, investigations, supervision, and promotion and award and advancement processes.

## 2. SCANNING

(Note: Questions #2 and #3 in Section VI. GIVE Comprehensive Plan Proposal Questions and Budget addresses the required Scanning components of your plan that are detailed below.)

While DCJS has provided data to be used as a starting point in the scanning of your local crime and community, jurisdictions should consider other data sources to assist in identifying the underlying issues associated with your shooting or aggravated assault problem. This is required in your GIVE Comprehensive Plan Proposal. The DCJS data is available in the following Appendices:

- **Appendix (1): Shooting Related Violence – GIVE Eligible Jurisdictions.** This table provides cumulative 35-month (January 2017 - October 2019) totals showing the number of shooting incidents, individuals killed by gun violence, reported homicides and reported violent crimes involving a firearm in each GIVE jurisdiction.

- **Appendix (2): Shooting Incidents Involving Injury by Year by GIVE Jurisdiction (2010-2019)**. This table provides the annual number of shooting incidents involving injury for each of the past ten years.  2019 data is limited to eleven months, January through November.

- **Appendix (3): Firearm Activity Reports.** A review of these jurisdiction-specific data pages can represent an initial step in assessing firearm-related crime trends within a jurisdiction (additional, more comprehensive local analysis must also be performed).  The graphs and data tables present a year-to-date (January - November) comparison between the current reporting year (2019), the prior reporting year (2018), and the 5 Year Average for the same YTD period for 2014 through 2018.

- **Appendix (4): Aggravated Assault Crime Data**. Recognizing that the frequency of shooting and homicide events vary among GIVE jurisdictions and based upon an analysis of crime data submitted by each GIVE police department, DCJS has determined that six jurisdictions; Broome, Chautauqua, Rensselaer, Rockland, and Ulster counties, and the City of Middletown must address the violent crime of Aggravated Assault. The data in this appendix provides annual counts of the number and type of assaults that occurred within these six jurisdictions during 2017, 2018, and January through October 2019.

10

COB467816

### 3. ANALYSIS

*(Note: Questions #4 through #6 in Section **VI. GIVE Comprehensive Plan Proposal Questions and Budget** addresses the required Analysis components of your plan that are described below.)*

In compiling the GIVE Comprehensive Plan proposals, jurisdictions must conduct three analyses of their communities:  a Jurisdiction-wide Analysis, a Place-based Analysis, and a People-based analysis. Your agency crime analyst and/or your local Crime Analysis Center should play a prominent role in all three analyses.

   a. <u>Jurisdiction-wide Analysis</u> –Jurisdictions must coordinate with crime analyst(s) and their regional Crime Analysis Center, where applicable, to prepare a comprehensive analysis of shootings and homicides (or aggravated assaults where applicable) that identifies patterns, trends, locations, and "Top Offenders" (including groups) responsible for the majority of shootings and homicides, or aggravated assaults where applicable, in their jurisdiction.

   Jurisdictions should retain the final work-products of all analyses conducted with Crime Analysis Center or agency Crime Analyst(s) for inclusion in their GIVE Comprehensive Plan proposals, including maps of GIVE zone(s), a.k.a. hotspot geographic locations.

   Jurisdictions should also examine any significant changes to these conditions that may have occurred during the previous GIVE contract periods (which may also be addressed in the narrative submission in the Response Section), and prepare a summary of the significant data points used in their analysis.

   b. <u>Place-based Analysis</u> - Jurisdictions are required to undertake a Place-based Analysis of their communities to determine "hot spots," and must detail the rationale used for such determinations.  In doing so, jurisdictions are strongly encouraged to take advantage of technical assistance offered by DCJS and to also use information provided by the <u>Hot-Spots Policing Key Elements Tool</u>. Jurisdictions are <u>required</u> to utilize long-term (most recent 3 years or greater) analysis to determine persistent areas of gun violence within the jurisdiction, where the majority of prevention and enforcement efforts regarding the GIVE hot-spots strategy will be concentrated. Jurisdictions' focused on shooting incidents should delineate specific geographic locations where those efforts will occur, also known as Hot-Spots, GIVE zones and POP areas, whereas jurisdictions focused on the crime of aggravated assault should determine whether or not aggravated assaults are clustered in small geographic locations, where hot-spots prevention and enforcement activities could be implemented.

11

COB467817

0011

Jurisdictions should retain the final work-products of all analyses conducted with Crime Analysis Center or agency Crime Analyst(s) for inclusion in their GIVE Comprehensive Plan proposals, including: maps of GIVE zone(s) and/or hotspot geographic locations.

c.  **People-based Analysis:**   All GIVE jurisdictions, including those that already utilize a top offender list, are required to undertake a People-based Analysis of their communities that designates known "top offenders" in the jurisdiction.

In conducting this analysis, jurisdictions are **required** to use a non-biased, systematic ranking system to designate the top offenders in the jurisdiction, with consideration given to actionable intelligence gathered from crime analysts, field intelligence officers, and other intelligence sources. Jurisdictions are also required to regularly update their "top offenders" reports.

Jurisdictions should retain the final work-products of their analyses conducted with Crime Analysis Center and agency Crime Analyst(s) for inclusion in their GIVE Comprehensive Plan proposals.  No identifying information should be included regarding individual top offenders.

d.  **Alignment with Community Programs and Resources:**

*(Note: Questions #7 and #8 in Section* **VI. GIVE Comprehensive Plan Proposal Questions and Budget** *addresses the required Alignment components of your plan that are described below.)*

Jurisdictions are required to align their efforts and activities with other existing resources, programs, and initiatives within their communities that aim to reduce shootings, homicides, and associated violence. Examples of such community-based programs and resources include but are not limited to Byrne Criminal Justice Innovation grant recipients, street outreach programs (e.g. SNUG), Project Safe Neighborhoods program participants, youth development programs, and mentoring programs.

Note: The following GIVE jurisdictions are currently using the SNUG program as part of their overall violent crime reduction strategies: Albany, Buffalo, Hempstead, Mt. Vernon, Newburgh, Poughkeepsie, Rochester, Syracuse, Troy, Wyandanch, and Yonkers. These jurisdictions are required to align their GIVE and SNUG program efforts towards the goal of reducing shootings and must also comply with the GIVE/SNUG information sharing requirements provided in Appendix: *GIVE Contract Specific Requirements*.

12

COB467818

### 4.  RESPONSE COMPONENT OF SARA

After completing the initial Assessment, Scanning and Analysis components of SARA (Scanning, Analysis, Response and Assessment), jurisdictions will be required to develop one comprehensive response that sets forth multiple, integrated evidence-based strategies to reduce shootings and homicides, or aggravated assaults where applicable.  These strategies must incorporate all four core elements of GIVE while addressing procedural justice considerations throughout.

Jurisdictions are reminded that Procedural Justice is to be incorporated in all elements of the GIVE Comprehensive Plan proposals.  Procedural justice focuses on the way law enforcement interacts with the public, and how these interactions influence crime rates, the public's view of law enforcement, and people's willingness to obey the law. It is not a practice, but a philosophy that promotes organizational change, upholds legitimacy in the community, and enhances officer safety. The four pillars of Procedural Justice are: Voice, Neutrality, Respect and Trustworthiness.  For more information on Procedural Justice, please reference the strategy summary, Appendix: *Evidence-Based Policing Resources*, click here.

Jurisdictions are required to use integrated evidence-based strategies to respond to the shooting and homicide (or aggravated assault where applicable) problem(s) in their jurisdiction, and those strategies must incorporate all four of the **required GIVE Core Elements into their Comprehensive GIVE Plan proposal responses** (see below "GIVE Core Elements"). Strategies should be integrated, with each GIVE partner or resource identified during the initial analysis playing a specific role in the comprehensive plan. Jurisdictions must integrate the efforts of crime analysts and Crime Analysis Centers in the development, implementation and institutionalization of their Responses.

Jurisdictions' comprehensive response plans should build on GIVE efforts implemented during past contract periods and consider alternative evidence-based strategies that may enhance the effectiveness of the jurisdiction's efforts to reduce and even eliminate gun-involved violence or aggravated assaults, where applicable.

### B.  GIVE Core Elements

The following four core elements of GIVE must be incorporated into jurisdictions' GIVE Comprehensive Plans:

1.  **People –** The strategy must focus preventative and enforcement efforts on top offenders that have been identified to be responsible for most shootings and homicides, or aggravated assaults where applicable.

COB467819

**2. Places –** The strategy must focus preventative and enforcement efforts in the geographic locations (hot spots) identified in the Scanning and Analysis sections, where most shootings and homicides, or aggravated assaults where applicable, occur.

**3. Alignment –** The strategy must describe how partners will coordinate and align all existing resources identified in the Analysis Section in the effort to reduce shootings and homicides, or aggravated assaults where applicable.

**4. Engagement –** The strategy must clearly articulate how organized outreach to key stakeholders and the community at large will occur, how the stakeholders and community will be given a voice, and how coordination will occur in a transparent manner that fosters wide-ranging support for violence reduction efforts.

## C.  Required Evidence-Based Approaches to Response

*(Note: Question #9 in Section VI. GIVE Comprehensive Plan Proposal Questions and Budget addresses the required Response components of your plan that are described below.)*

GIVE Comprehensive Plan proposals must utilize **more than one** of the evidence-based approaches noted below.   Jurisdictions will be required to explain in their narrative responses to questions located in Section VI. GIVE Comprehensive Plan Proposal Questions and Budget how these approaches will be incorporated into their GIVE Comprehensive Plan.

1. **Hot Spots Policing –** Hot Spots policing interventions focus on small geographic areas or locations, usually in urban centers, where crime is concentrated.  Such interventions are based on the understanding that there are settings with significant clusters of crime that generate a large proportion of the total crime reported in the broader community. For more information on this strategy, Appendix: *Evidence-Based Policing Resources*, click here.

2. **Crime Prevention Through Environmental Design (CPTED) –** CPTED is based on the principle that proper design and effective use of buildings and public spaces in neighborhoods can lead to a reduction in the fear and incidence of crime, and an improvement in the quality of life. For more information on this strategy, Appendix: *Evidence-Based Policing Resources*,  click here.

3. **Focused Deterrence –** Focused deterrence strategies allow police to increase the certainty, swiftness, and severity of punishment by directly engaging with known chronic offenders, often group members or those who traffic in illegal drugs, and communicate clear incentives for compliance and consequences for

14

COB467820

that criminal activity. The strategy also rewards compliance and nonviolent behavior by providing positive incentives, such as access to social services. For more information on this strategy, Appendix: *Evidence-Based Policing Resources*, click here.

4. **Street Outreach** – The SNUG Street Outreach program is an evidence-based, violence reduction initiative that treats gun violence like a disease by identifying its causes and interrupting its transmission. The program identifies high-risk individuals who engage in gun violence; addresses the issues that prompt those individuals to use guns; and aims to change community norms and attitudes that accept violence as a part of life. The program employs street outreach workers who live in the communities where they work, many of whom have previously been engaged in street-level violence and served terms of incarceration. They are viewed as credible messengers because they have had similar experiences as the youth they aim to help: predominantly, boys and young men who are 14 to 25 years old who are at high-risk for involvement with guns and violence. Street outreach workers respond to shootings to prevent retaliation, help detect conflicts and work to resolve them peacefully before they lead to additional violence; and respond to hospitals to assist family members of those who have been injured or killed. They engage the community, religious organizations and clergy, and local businesses through rallies and special events, and meet with high-risk youth involved with the program to set goals and connect them with assistance to improve their educational and job opportunities. For more information on this strategy, See Appendix: *Evidence-Based Policing Resources*, click HERE.

### D.  Key Elements Tools

***(Note: Question #10 in Section VI. GIVE Comprehensive Plan Proposal Questions and Budget addresses the Key Elements component of your plan.)***

In developing the overall GIVE Comprehensive Plan proposals, jurisdictions will be required to use the Key Elements Tools as a guide to detail how most, if not all, of the key strategy elements for their chosen strategies will be incorporated into their specific jurisdictional response plans.

For example, jurisdictions that plan to utilize Focused Deterrence should address: how the strategy will be supported by a committed governing body; if a specific person will be assigned to coordinate the focused deterrence strategy; whether your agency has a fixed routine in place for the collection and dissemination of intelligence; how you will choose call-in participants; whether the call-ins will be conducted with fidelity to the program model, etc.

15

COB467821

Each Key Elements Tool can be found by clicking on the following hyperlink(s), as appropriate:

- Hot Spots Policing
- Crime Prevention Through Environmental Design (CPTED)
- Focused Deterrence
- Street Outreach

**E. Assessment Plan**

**(Note: Question #11 in Section VI. GIVE Comprehensive Plan Proposal Questions and Budget addresses the required Assessment Plan component of your plan.)**

A critical piece of the development and institutionalization of any crime reduction strategy is an assessment of that strategy's effectiveness in achieving the desired outcome. Assessment requires an understanding of the expected outcomes of the proposed plan and a definition of qualitative and quantitative performance measures to determine whether the expectations were met.  Assessment also requires a clear picture of how strategies were expected to be implemented, the fidelity of the actual implementation, and a periodic review of how the strategies can be modified and improved.

During the 2020-21 contract cycle, GIVE jurisdictions will continue to be required to complete GIVE Self-Assessment Tools (SATs). The GIVE SATs have been designed to allow GIVE jurisdictions to evaluate their evidence-based strategy implementation efforts by identifying only those elements most critical to achieving fidelity to the strategy model, and the components of those key elements. The SATs will enable jurisdictions to memorialize the evidence-based work that is critical to the foundation of GIVE as well as ensure the fidelity of the strategies being implemented locally.

The SATs will also serve the purpose of allowing GIVE agencies to fulfill the progress reporting requirements required for participation in this grant funded program. The SATs were developed with input from Subject-Matter-Experts from across the country, as well as internal and external GIVE stake-holders. GIVE agencies will be required to utilize these SATs and report to DCJS using the DCJS Grants Management System (GMS) on a quarterly basis. These SATs will be found in the workplan tab of your contract in GMS. Jurisdictions may use these performance measures from the SATs to satisfy the requirements noted above but are also encouraged to consider other measures that may assist in the assessment of the local GIVE strategy institutionalization efforts.

16

COB467822

## VI.    GIVE COMPREHENSIVE PLAN PROPOSAL QUESTIONS AND BUDGET

The GIVE Comprehensive Plan proposal for your jurisdiction must include detailed narrative answers for each of the questions below along with requested budgets and narrative justifications from each GIVE partner within the jurisdiction.

### A.  Required Narrative Response Proposal

2020-21 GIVE Comprehensive Plan proposals submitted by all jurisdictions must include narrative responses to the following questions describing the approaches and activities that participating agencies will use to combat shootings, or aggravated assaults, where applicable, and detail how grant funding will be distributed among participating agencies. Jurisdictions must use this Guidance document and all appendices, when developing and describing your answers.

Please answer <u>each</u> question in the sections below when developing your narrative response.

**Narrative responses to all questions must be submitted as one complete Microsoft Word document, using Arial 11-point font, 1.5-line spacing format. All narrative responses to the questions in Narrative Questions and Answers section, as well as the Budget justification narrative, must be consolidated into a single Word document. Appropriate headings should be included that indicate which question number and section the response pertains to (i.e. Assessment, Scanning, Analysis, Response (include sub-headings for each strategy chosen), and Assessment Plan).**

GIVE Comprehensive Plan proposals submitted in alternate formats will not be accepted or reviewed by DCJS. Use of the Portable Document Format (PDF) is NOT acceptable when submitting the narrative responses, however, other types of supporting documentation, e.g., charts and maps developed by crime analysts, may be submitted in PDF format. Do not submit photographs or media articles as part of a proposal. These will not be reviewed or considered by DCJS.

Jurisdictions that do not answer each of the required questions(s) below, or do not adhere to the formatting guidelines above, will be contacted by DCJS and required to revise and resubmit their proposal.

17

COB467823

For each question below your response must detail the process you engaged in as well as the results of that process.

❖     **Question #1 – Assessment of Previous GIVE Efforts** (Not to Exceed 8 Pages)

**How did you assess your previous GIVE-related strategy implementation efforts(s), and what conclusions did you reach as a result of your assessment?**

**Responses should detail how you:**

a) conducted a process assessment to determine whether the plan was implemented as intended;
b) collected the pre– and post–response qualitative and quantitative data, and include a summary of the results;
c) determined whether the broad goals and specific objectives initially defined were attained;
d) identified any new strategies or adaptations to the original strategy needed to augment the original plan; and
e) conducted repeated assessments to ensure continued effectiveness.

**Please refer to Section V. *GIVE 2020-21 Guidance and Reference*, Section A. 1 Assessment of Previous Give Efforts, for additional information.**

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 1 – Assessment."  This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative response document and submitted with the completed proposal.  The responses for each of the section questions must be contained in one comprehensive document.*

❖     **Question #2 - Scanning** – (Not to exceed 2 pages)

**Question #2 - Has a scanning plan been developed which identifies local issues that may contribute to the shooting or aggravated assault problem(s) in your jurisdiction?**

Responses should address how you:

a) identified recurring problems that are of concern to the public and police;
b) identified the consequences of those problems;
c) prioritized those problems;
d) confirmed that the problem exists;
e) determined how frequently the problem occurs and its duration;
f) selected your crime of focus for closer examination; and
g) developed goals that address your crime of focus that are specific, measurable, achievable, relevant, and time-bound (e.g., reduce shooting incidents by X% over the GIVE cycle, improved community perception of safety by X% over the GIVE cycle).

COB467824

**Provide a summary of the jurisdictional data that was utilized in the scanning process to substantiate the local problem and subset(s) of the problem you've identified. This should include at least three years of data not provided by DCJS.**

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 2 – Scanning." This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative response document and submitted with the completed proposal. The responses for each of the section questions must be contained in one comprehensive document.*

❖  **Questions #3, # 4 and #5** – Analysis – Not to Exceed 8 pages

**Question #3 - How did you conduct the jurisdiction-wide analysis of your shootings, or aggravated assaults where applicable, to better understand the underlying factors associated with it, and what conclusions did you reach as a result?**

Your response should address each of the following Jurisdiction Analysis Components, to demonstrate how you have:

a) identified and understood the nature of the people and place-based conditions and events that are associated with your shootings or aggravated assaults, where applicable;

b) researched what is known about your shootings or aggravated assaults, where applicable;

c) isolated the subset of problems associated with your shootings or aggravated assaults, where applicable, that are to be addressed;

d) identified a variety of resources that may be of assistance in developing a deeper understanding of your crime of focus;

e) developed a working hypothesis about why the problem is occurring;

f) conducted an analysis of your shootings and homicides, or aggravated assaults where applicable;

g) identified patterns, trends, and locations of shootings and homicides, or aggravated assaults where applicable; and

h) addressed any changes noted in the patterns, trends, locations, of your shootings and homicides, or aggravated assaults where applicable, during the previous GIVE conducted an analysis of your engagement efforts, specifically focusing on the utilization of the regional Crime Analysis Center/crime analyst, and the collaboration with the local street outreach program, where applicable.

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 3 – Jurisdiction-Wide Analysis." This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative*

19

COB467825

*response document and submitted with the completed proposal. The responses for each of the section questions must be contained in one comprehensive document.*

❖  **Question # 4 - How did you conduct the Place-Based Analysis of your shootings, or aggravated assaults where applicable, to better understand the underlying factors associated with it, and what conclusions did you reach as a result?**

When answering this question, please address each of the following Place-Based Analysis Components, to demonstrate how you have:

   a)  developed a plan to monitor hot-spot locations; and

   b)  plan to use information learned from hot-spot policing technical assistance offerings in the identification of hot-spot location(s) in your jurisdiction;

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 4 – Place-Based Analysis." This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative response document and submitted with the completed proposal. The responses for each of the section questions must be contained in one comprehensive document.*

❖  **Question #5 - How did you conduct the People-based Analysis of your shootings, or aggravated assaults where applicable, to better understand the underlying factors associated with it, and what conclusions did you reach as a result?**

When answering this question, please address each of the following People-Based Analysis Components, to demonstrate how you have:

   a)  developed the criteria used to develop a top offender report; and

   b)  developed a plan to monitor top offenders.

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 5 – People-Based Analysis." This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative response document and submitted with the completed proposal. The responses for each of the section questions must be contained in one comprehensive document.*

❖  **Questions # 6 and 7** – Alignment – (Not to exceed 2 pages)

   **Question #6 - What existing resources (including SNUG if applicable) within your**

COB467826

**jurisdiction will be leveraged as part of your proposed Comprehensive GIVE Plan?**

Local Alignment: In your response, jurisdictions must examine and summarize other resources, programs, and initiatives that currently exist within your communities that support efforts to reduce shootings, homicides, and associated violence. Examples include but are not limited to: Byrne Criminal Justice Innovation grant recipients, street outreach programs (SNUG), Project Safe Neighborhoods, youth development, and mentoring programs.

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 6 – Existing Resources." This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative response document and submitted with the completed proposal. The responses for each of the section questions must be contained in one comprehensive document.*

- ❖ **Question #7 - How will you align your jurisdiction's GIVE efforts with existing state programs and resources?**

State Alignment: When answering this question, describe how your jurisdiction will coordinate resources and prevention efforts with state agencies, such as the state Department of Corrections and Community Supervision and the New York State Police, in addition to other local programs and resources identified in the Alignment part of your Analysis.

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 7 – Alignment." This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative response document and submitted with the completed proposal. The responses for each of the section questions must be contained in one comprehensive document.*

- ❖ **Questions #8(a – e) - Response Component of the SARA (Scanning, Analysis, Response, and Assessment).** (Not to exceed 10 pages)

    8a. **Which evidence-based strategies have you chosen to reduce gun-violence (or aggravated assaults where applicable) in your jurisdiction?**

    8b. **Why have you chosen these evidence-based strategies?**

    8c. **Explain how you examined what other communities with similar problems have done.**

    8d. **Explain how you considered the strategies other communities used, as well as other evidence-based interventions, to address the**

21

COB467827

problem.

8e.    **Explain how you've incorporated the four Core Elements of GIVE into your strategies.**

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 8 (a-e) – Response Overview Component." This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative response document and submitted with the completed proposal. The responses for each of the section questions must be contained in one comprehensive document.*

❖    **Question #9 – Key Elements Tool**

**Using the Key Elements Tool provided in _Appendix: Key Element Tools_, for each evidence-based strategy chosen, describe how most, if not all, of the key strategy elements for the respective strategy will be incorporated within your specific jurisdictional strategy.**

**For example**, jurisdictions that plan to utilize Focused Deterrence should, using the Key Element Tool as a guide, include, but not limit your response to : how the strategy will be supported by a committed governing body; if a specific person will be assigned to coordinate the focused deterrence strategy; whether your agency has a fixed routine in place for the collection and dissemination of intelligence; how you will choose call-in participants; whether the call-ins will be conducted with fidelity to the program model, etc.

Each Key Elements Tool can be found by clicking on the following hyperlink(s), as appropriate:

- Hot Spots Policing
- Crime Prevention Through Environmental Design (CPTED)
- Focused Deterrence
- Street Outreach

**Responses should be delineated utilizing sub-headings "Hot-Spots", "CPTED", "Focused Deterrence" and "Street Outreach", as appropriate.**

22

COB467828

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 9 – Response Key Elements Component." This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative response document and submitted with the completed proposal. The responses for each of the section questions must be contained in one comprehensive document.*

❖ **Question # 10 - Institutionalization**

**How you will institutionalize evidence-based practices into your overall agencies policies and procedures?**

When answering this question, describe how each participating agency in your jurisdiction will:

a) examine current agency policies and procedures for opportunities to advance evidence-based practices;
b) utilize training and educational opportunities to incorporate the use of evidence-based practices within your organization; and
c) obtain feedback from all levels within your organization to better inform the continued implementation of evidence-based practices within the agency.

**See Section V. GIVE 2020-21 GUIDANCE AND REFERENCE: Assessment of Previous GIVE Efforts, for additional information when preparing this response.**

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 10 – Institutionalization." This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative response document and submitted with the completed proposal. The responses for each of the section questions must be contained in one comprehensive document.*

❖ **Question #11 – Assessment Plan**
**How will you assess your GIVE strategy implementation efforts?**

When answering the question, describe how your jurisdiction will:

a) **conduct a process assessment to determine whether the plan was implemented as intended;**
b) **collect pre– and post–response qualitative and quantitative data;**
c) **determine whether the broad goals and specific objectives initially defined were attained;**
d) **identify any new strategies or adaptations needed to augment the**

23

COB467829

original plan; and

e) **conduct ongoing assessments by utilizing the GIVE Self-Assessment Tools (SAT) to ensure continued effectiveness**

See Section V. GIVE Guidance and Reference, Assessment of Previous GIVE Efforts, for additional information when preparing this response.

*Jurisdictions must respond to this question in Microsoft Word with the heading "Question 11 – Assessment Plan." This response along with the additional required responses found throughout this application must be included in the jurisdictions narrative response document and submitted with the completed proposal. The responses for each of the section questions must be contained in one comprehensive document.*

24

COB467830

**B.  Required Budget Response for the 2020-21 GIVE Comprehensive Plan Proposal**

GIVE 2020-21 Budget Worksheet and Budget Narrative

General Instructions

One comprehensive GIVE plan Budget worksheet (a Microsoft Excel document; see Attachment 2: *GIVE Budget Worksheet*) and one complete narrative budget response must be submitted for each jurisdiction requesting funding.

Using the guidance provided in Section III. 2020-21 GIVE Funding Guidelines and Requirements, each participating GIVE agency must complete the applicable section of the budget spreadsheet referencing their agency, detailing the specific funding amounts requested to support each of the evidence-based strategy categories listed. Corresponding, appropriate justification must also be provided for each amount requested in the required budget narrative. Any requests for funded personnel/positions must be detailed in the "personnel" section of the budget spreadsheet, including salary and fringe benefit costs.

The detailed budget for the grant period provided must be complete, providing sufficient detail for each component.  It must also be reasonable and appropriate, as determined by DCJS, and directly tied to the comprehensive plan.

Jurisdiction budgets should include expenses for travel and training. DCJS reserves the right to make mathematical corrections to requested budgets.

1.  **Complete Attachment 2: Comprehensive *GIVE Plan Budget Worksheet* and submit as described below:**

    Complete the operating budget worksheet in Attachment 2: *GIVE Initiative Budget Worksheet*. Operating budgets should project total costs for the contract period and must not exceed the jurisdiction's eligible award. Please note that Tab 2 of the attached budget worksheet (Attachment 2) allows for the entry of other agencies outside of the four primary GIVE partners (police departments, district attorneys' offices, county sheriffs' offices, and county probation departments). This Worksheet must be submitted with the completed Comprehensive GIVE plan.

2.  **Budget Narrative**(s) - One complete narrative budget response must be submitted for each jurisdiction requesting funding.  The budget narrative for each jurisdiction should be included within the single Word document providing answers to the Narrative Response Questions, under the *Heading*: **Budget Narrative**.

COB467831

Narratives should justify support for each of the evidence-based strategy categories listed in the budget spreadsheet. Guidance for what is, and what is not, allowable with GIVE funds is provided in Section III 2020-21 GIVE Funding Guidelines and Requirements).

**When developing their budget narratives, jurisdictions are encouraged to use the below budget checklist to ensure that all information has been submitted to support the budget request**.

- Does the budget request(s) comply with the funding restrictions set forth in this Comprehensive GIVE Plan Proposal Guidance document?
- Did each agency within the eligible jurisdiction complete the individual agency budget section on the combined county budget worksheet for the 12-month budget cycle?
- Are budget lines directly related to program institutionalization and sufficiently justified?
- Is there a clear relationship between the budgeted items and resource requirements identified in the submitted Comprehensive GIVE Plan?
- Are the roles of budgeted personnel well defined and essential to the strategy to reduce shootings and homicides, or aggravated assaults where applicable?
- Is the time allotment specified for proposed personnel commensurate with the amount of funding requested for that position?
- Are non-personnel service items essential and directly related to the Strategy?
- Are budgeted amounts reasonable and calculated based on adequate supporting detail (e.g., number of hours worked, hourly rates, percent-of-effort (FTEs), fringe rates, unit costs, etc.)?
- Is there sufficient detail about requests for overtime to conduct operations?

As stated above, one GIVE Initiative Budget worksheet (see Attachment 2) along with a complete narrative budget response, must be submitted for each jurisdiction requesting funding.

## VII.    GIVE Comprehensive Plan Proposal Checklist

- A single request must be submitted for each eligible county by the county co-chairs;

- A first draft of your GIVE Comprehensive Plan proposal is required to be submitted to DCJS no later than noon on March 5, 2020;

- Final GIVE Comprehensive Plan proposals **must be submitted to DCJS via email at** GIVE@dcjs.ny.gov no later than noon on April 10, 2020;

COB467832

- Complete GIVE Comprehensive Plan proposals must be complete and provided in the form of a word document with answers to questions labeled by headings as described in Section VI of this document;

- Attachment 2: *GIVE Budget Worksheet* must be submitted as an attachment with the proposal. The Worksheet itemizes operating expenses in support of the program;

- All other attachments and required documents are submitted with proposal to GIVE@dcjs.ny.gov;

- Attach the 2020 - 2021 Memorandum of Understanding(s)/Memorandum of Agreement(s) signed by the partnership members (include justification for any required member signatures not included), to the proposal. Contracts will not be finalized until MOU(s)/MOA(s) are received by DCJS;

- Ensure that Monthly crime data is submitted for primary and secondary (where applicable) police departments and no reports are outstanding at the time of proposal submission; and

- Ensure Monthly Gun Data Reports are submitted for primary and secondary (where applicable) police departments and that no reports are outstanding at the time of proposal submission.

**Note:**
Grantees may contact the DCJS Office of Public Safety via email at GIVE@dcjs.ny.gov for information and assistance in preparing their GIVE Comprehensive Plan Proposals.

COB467833

**Appendix:** *2020 - 2021 GIVE Eligible Agencies*

Note: Each eligible county must develop a partnership that consists of the eligible police department(s), District Attorney's office, Sheriff's office, and Probation Department.The Co-Chairs of the partnership are the District Attorney and the Chief of  Police in the Eligible Law Enforcement Agencies noted below. Other agencies within eligible jurisdictions that are approved by the co-chairs and DCJS (e.g., not-for-profit agencies, and local governmental agencies that require funding to address the needs of certain populations) can also receive funding. *

| | |
|---|---|
| Albany County<br>Albany City PD | Onondaga County<br>Syracuse City PD |
| Broome County<br>Binghamton City PD | Orange County<br>Newburgh City PD – Co- Chair<br>Middletown PD |
| Chautauqua County<br>Jamestown City PD | Rensselaer County<br>Troy City PD |
| Dutchess County<br>Poughkeepsie City PD | Rockland County<br>Spring Valley Village PD |
| Erie County<br>Buffalo City PD | Schenectady County<br>Schenectady City PD |
| Monroe County<br>Rochester City PD | Suffolk County<br>Suffolk County PD |
| Nassau County<br>Nassau County PD – Co-Chair<br>Hempstead PD | Ulster County<br>Kingston City PD |
| Niagara County<br>Niagara Falls City PD | Westchester County<br>Yonkers City PD – Co-Chair<br>Mt Vernon PD |
| Oneida County<br>Utica City SD | |

*If jurisdictions choose to partner with other agencies approved by the co-chairs, including local governmental agencies requiring funding to address the needs of certain populations, a subcontract and/or a memorandum of understanding/memorandum of agreement (where applicable) with these agencies will be required. Examples of this may include partnerships with county social services departments, or non-profit organizations that offer social services to at-risk individuals.

COB467834

**Appendix:** *GIVE Specific Contract Requirements*

Each agency is contractually required to meet various requirements which are closely monitored by DCJS staff. Non-compliance with any of the requirements may result in the contract being placed in "stop payment" status until the delinquent measure is brought into compliance.

### A.  MONTHLY REQUIREMENTS

**1)  Monthly Meetings**

Monthly partnership meetings are critical for coordination and  collaboration and must be held each month.  These meetings are required to be structured  to maximize the coordination, collaboration and accountability of partner agencies. The general theme of the meeting shall be the discussion of each partner's role in the four core principles of the jurisdictions GIVE plan: People, Places, Alignment, and Engagement.

a.  The GIVE Initiative Co-Chairs, or your Executive level designee, and at least one representative from every GIVE funded agency within the partnership must attend all monthly meetings.  In the case of the District Attorney's Office, if the District Attorney is unable to attend, the designee must be a supervising Assistant District Attorney or equivalent.

b.  The meeting agenda must be sent via email to the DCJS GIVE Initiative Manager a minimum of two days in advance of the meeting.

c.  The meetings must include an in-depth discussion of the firearm-related violent  crime (or aggravated assaults as applicable), utilizing the Self-Assessment Tool, provide an update on key elements compliance and future plans for implementation, including the need for strategy modification when applicable. In the jurisdictions where a regional Crime Analysis Center (CAC) exists, the CAC should play an integral role in the meeting through  preparation (i.e., providing analysis of crimes and related material) and participation. In jurisdictions without a regional CAC, a designated Crime Analyst should assume this role.

d.  In addition to the requirements noted above, the monthly meetings should include a summary of the following information:

(1) shooting incidents involving injury;
(2) victims hit by gunfire;
(3) Individuals killed as a result of gun violence;
(4) aggravated assaults (aggravated assault jurisdictions only)
(5) domestic violence-related assaults occurring, both aggravated and simple

*For each of the above, jurisdictions should report on the statistics for the identified "GIVE zones", SNUG zones, and citywide totals.

(6) Total crime guns recovered and submitted to ATF for trace;
(7) Total persons arrested for firearm-related crimes;
(8) Discussion of institutionalization efforts on GIVE Initiatives;
(9) Updated intelligence regarding "hot spots" and "top offenders"

29

COB467835

e. The GIVE Monthly Meeting Minutes Template must be utilized to document the above requirements and sent to the GIVE Representative for your county within 5 days of the meeting.

**2)** Timely, Accurate, Crime Data

Each month, all participating law enforcement agencies  are required to submit monthly crime reports to DCJS through the eJusticeNY Integrated Justice Portal (IJPortal) IBR/UCR Reporting Interface within 30 days after the close of the reporting period.

**Incident-Based Reporting (IBR) Agencies –** Monthly IBR extract files are required to be uploaded through the IBR Reporting Interface on the IJPortal.  The following two UCR Summary reports are required to be submitted to DCJS through the UCR Data Entry Interface on the IJPortal:

o   Hate Crime
o   Law Enforcement Officers Killed or Assaulted (LEOKA)

**Summary (UCR) Reporting Agencies –** The following UCR Summary reports are required to be submitted to DCJS through the UCR Data Entry Interface on the IJPortal:

o   Return A (Monthly Offenses known to Police)
o   Arrests of Persons 18 and Over
o   Arrest of Persons Under 18
o   Supplemental Homicide Report (SHR)
o   Arson
o   Hate Crime
o   Law Enforcement Officers Killed or Assaulted (LEOKA)

**Monthly Gun Data –** Both primary and DCJS designated secondary police departments must submit the Monthly Gun Data Report within 7 business days of the end of the month that is being reported on. When the police department is unable to submit the data within 7 business days,  the Chief must submit the reasoning to DCJS while ensuring the data is submitted as soon as possible.  If it is deemed that the reasoning for the late submission was out of the control of the police department, a waiver will be granted to avoid a finding of contract non-compliance.

All law enforcement agencies must stay current with your monthly submissions. When the police department is unable to submit the data within 30 days, the Chief must submit the reasoning to DCJS while ensuring the data is submitted as soon as possible.  If it is deemed that the reasoning for the late submission was out of the control of the police department, a  waiver will be granted to avoid a finding of contract non-compliance.

**B.   ONGOING REQUIREMENTS**

**1) Information Sharing Networking –** DCJS may conduct region-based roundtable style meetings occasionally throughout the budget cycle to bring jurisdictions together to discuss current trends and best practices.  Agencies will be required to send appropriate representatives when requested by DCJS. Participants of GIVE will also participate in

COB467836

cross-jurisdictional networks that will help shape strategies and share the results of the institutionalization of the strategies with multiple jurisdictions. These networks will be implemented through participation in cross-jurisdictional information sharing meetings, conference calls, program submissions to the DCJS Knowledge Bank, and other information sharing initiatives.

2) **Crime Guns** - All crime gun seizures require the following:

   a. **GGUN Entry**:  All required information on the seized firearm are to be submitted  via the IJPortal GGUN entry form. This step will  automatically initiate an ATF eTrace submission, a NYS Pistol Permit inquiry and  submission to the NYS Gun Clearinghouse for further analysis.  NOTE: Agencies must have executed an MOU with ATF for access to an eTrace account, a n d  per the MOU, are NOT to make entries into the ATF eTrace program.  The GGUN entry will automatically initiate the eTrace inquiry. NOTE:  eTrace  access is intended for information access only.  Agencies are not to submit any  information via the eTrace system.

   b. **Lab Submission for Firearm Analysis**: All recovered crime guns and  appropriately related ballistic evidence including recovered casings are to be  submitted to your regional  crime lab for analysis; to include National Integrated Ballistic Information Network (NIBIN) inquiries.  Submissions, including test firing requirements, are to be executed per the  requirement of your regional crime lab.

   c. **Crime Analysis Support**: All information related to a crime gun recovery  including firearm information, incident information on the seizure, and all  subsequent results of the above inquiries including NIBIN results are to be  shared with your crime analysis unit and/or regional Crime Analysis Center when the  information is received.

3) **Domestic Incident Report Database** - Agencies are required to participate in utilizing the DCJS Domestic Incident Report (DIR) Repository. The repository provides electronic, cross- agency access to DIRs filed by police departments and sheriff's offices in the 57 counties  outside of New York City. This secure database automates information – previously only  captured on paper – that will enable law enforcement to more safely respond to domestic  incidents, improve the supervision of offenders on parole and probation and enhance the  prosecution of domestic violence crimes.

   **Contact the DCJS Customer Contact Center at cccenter@dcjs.ny.gov, 518-457-5837 or 1-800-262-3257 for more information and to enroll.**

4) DNA Collection – Agencies are expected to ensure that all DNA databank collections are being taken in a timely manner and as required by law.

5) **Sex Offender Address Verification –** Agencies are expected to be vigilant in verifying the  addresses of all sex offenders assigned to your jurisdictions and promptly report the action  taken on eJusticeNY.

6) **Sex Offender Photos –** Agencies are expected to be vigilant in ensuring all photos due from sex offenders assigned to your jurisdiction are obtained in a timely manner and promptly uploaded to eJusticeNY.

COB467837

7) **Street Outreach Data Sharing Requirements –** Jurisdiction's that have a SNUG Street Outreach program are required to adhere to the following data sharing requirements:

a.  Participating police departments will work to ensure that street outreach concepts are understood by personnel within the agency. Supervisors, investigators and patrol staff assigned to target areas should be familiar with the goals and practices of the street outreach program. A policy should be developed for interacting with the local street outreach program staff.

b.  Participating police departments will attend monthly meetings, at a minimum, with the SNUG program manager or his/her designee and regional crime analysts, or agency crime analyst, to discuss firearm related crime, group activity, and violence. Meeting frequency may be increased at the discretion of DCJS based on shootings, homicides, and the incidence of violent crime within a jurisdiction.

c.  By the 15th day of each month, participating police departments will provide SNUG personnel with a monthly list of high-risk individuals who have been identified as known or suspected group members, group leaders who promote gun violence, and candidates most likely to carry guns and/or be involved in shooting incidents. Police agencies may use discretion when it comes to supplying sensitive information regarding these high-risk individuals (i.e. persons involved in active criminal investigations).

d.  By the 7th day of each month, the participating police department will provide DCJS a crime map pinpointing the locations of the prior month's shooting incidents for both the SNUG target area(s) and the entire city. A copy of this map will be sent to the GIVE Program Manager and the Statewide SNUG Director.

e.  Participating police departments will provide DCJS an annual crime map pinpointing the locations of all shooting incidents which have occurred between July 1 and June 30 of the preceding GIVE contract period for both the SNUG target area(s) and the entire city. This annual crime map will be due on the last day of the month following the expiration date of the contract. A copy of this map will be sent to the GIVE Program Manager and the Statewide SNUG Director.

f.  By the 7th day of each month the participating police department will provide DCJS a report detailing a month to month comparison of shootings and homicides for the current calendar year and the two preceding calendar years for the target area(s) and the entire city.

g.  Participating police departments will develop written protocols detailing established procedures to notify the SNUG program manager or his/her designee of all shootings and/or homicides **within 2 hours** of each incident. The written procedures must be submitted to DCJS with the first Quarterly Progress Report.

COB467838

Appendix: *Evidence – Based Policing Resources*

Jurisdictions must use more than one of the evidence-based strategies listed below when developing a comprehensive strategy to respond to your shooting and homicide problem, or aggravated assaults where applicable. All approaches must be formulated based on the four core elements of people, places, alignment, and engagement with the primary goal of the elimination of gun-involved violence.

References to additional materials on each of the approaches are included:

## Problem-Oriented Policing

**Summary:** In 1979, Herman Goldstein advocated for a paradigm shift in policing that would replace the primarily reactive, incident-driven model of policing with one that required police to proactively identify underlying problems that could be targeted to alleviate crime at its roots. He termed this new approach "problem-oriented policing" (POP). Using this approach, police manage a range of problems in the community through criminal law enforcement in tandem with civil statutes and municipal and community resources. Eck and Spelman's SARA model was developed in 1987 and expanded upon Goldstein's approach. SARA describes four steps police should follow when implementing POP: (1) Scanning: identify and prioritize potential problems; (2) Analysis: thoroughly analyze the problem(s) using a variety of data sources; (3) Response: develop and implement interventions designed to solve the problem; and (4) Assessment: determine whether the response worked and construct new responses. Police agencies implementing POP have widely accepted and adopted the SARA model.

**Evidence:** Weisburd, Telep, Hinkle, and Eck (2010) conducted a review on the effects of POP on crime and disorder, finding a statistically significant impact among 10 experimental and quasi-experimental studies. Studies that showed less significant impacts had implementation issues that may have been affected by lack of fidelity to the POP model; sites that implemented more successful models tended to show stronger effects. Additionally, Weisburd et al. (2010) examined less rigorous but more numerous pre/post studies without a comparison group, which showed positive findings.

**Critical Components:** Careful analysis and clear understanding of problems that result in tailor-made solutions is essential to problem-oriented policing. The Center for Problem-Oriented Policing has created more than 70 problem-specific guides for police that provide recommendations on how agencies can address different problems. Weisburd, Telep, Hinkle, and Eck (2008) also provide guidance on the types of POP interventions proven to be most effective:

1. Hot-spots policing interventions that use POP have shown successful results. In the studies conducted, it is difficult to determine whether problem solving or the focus on small geographic areas is driving the success, but the two strategies seem to work well in concert.
2. POP is most effective when police officers and department staff are on board and fully committed to its tenets.
3. Program expectations must be realistic. Officer case assignment must be kept to a manageable level and police should not be expected to tackle major problems in a short period of time.

33

COB467839

4. Limited evidence shows that collaboration with outside criminal justice agencies appears to be an effective approach in POP.
5. Under the SARA model, the analysis and assessment phases are particularly important. In-depth problem-analysis, rather than merely a peripheral analysis of crime data with a largely law enforcement-oriented response, is required. The assessment phase provides a framework for agencies to consistently learn from and improve your problem-solving projects.

*Source: Center for Evidence-Based Crime Policy, George Mason University*

For additional resources on Problem-Oriented Policing see:

1. Center for Problem-Oriented Policing

2. US DOJ COPS

3. Herman Goldstein - Developing POP

34

COB467840

### Procedural Justice

**Summary:**  Procedural justice is rooted in the idea that individual regard for the criminal justice system is related more to a person's encounter with the system and your perception of the fairness of the process rather than the fairness of the outcome.  Research suggests that procedural justice in police-citizen encounters is an important precursor to perceived police legitimacy. There also is a connection between these perceptions of legitimacy and compliance behavior, which suggests a possible link between community outreach efforts that build legitimacy and reduced crime.  Aspects of community policing can be combined with other successful interventions in ways that may increase your overall effectiveness. For example, Braga and Weisburd (2010) describe a community-oriented approach to hot-spots policing in which the community was consulted on tactics used in those hot spots to ensure those tactics did not damage police-resident relationships.  Procedural justice and community policing were both emphasized in the recommendations of President Obama's Task Force on 21st Century Policing (2015).

**Evidence:**  Recent studies examining procedural justice evaluated officer interactions that utilized key elements of the strategy – decision-making neutrality, voice, and respect – and how those interactions affected citizens' compliance and perceived fairness. Similar to studies conducted in other criminal justice settings, such as courts and corrections, these studies showed that individuals who expressed overall satisfaction with your interaction were more compliant with police orders. In a systematic review, Mazerolle, Bennett, Davis, Sargeant, and Manning (2013) examined police interventions that were designed to enhance procedural justice and/or to increase citizen perceptions of police legitimacy. Mazerolle et al. also used one of the components of procedural justice in your study. There was some evidence that these interventions increased citizen satisfaction, cooperation, and levels of procedural justice, however, the overall effect of these programs on perceived legitimacy was not statistically significant.

**Critical Components:**  Yale Law School Professor Tom Tyler's research focuses on procedural justice in police-citizen encounters as the key antecedent of legitimacy. According to Dr. Tyler, procedural justice includes four components:

1. Citizens need to participate in the decision process (i.e., be given a voice).
2. Neutrality is a key element of procedural justice. Citizens tend to view a situation as fairer when officers are transparent about why they are resolving a dispute in a particular way.
3. Individuals want to be treated with dignity and respect.
4. Citizens are more likely to view an interaction as fair when they trust the motives of the police (i.e., an officer shows a genuine concern for the interests of the parties involved).

Survey and observational research generally suggest that when officers incorporate these components of procedural justice into your interactions with the public, individuals are more likely to comply with police directives and the law because they see the police as more legitimate. As a result, increased legitimacy has the potential to reduce crime because it increases compliant behavior.

*Source: Center for Evidence-Based Crime Policy, George Mason University*

35

COB467841

Below are some links to journal articles and other publications to assist in creating a thorough understanding of Procedural Justice.

1. Procedural Justice for Judges and Courts
2. The Importance of Procedural Justice
3. Procedural Justice | Center for Court Innovation
4. PERF Report
5. Innovation: Racial Reconciliation | National Network for Safe Communities
6. National Initiative for Building Community Trust and Justice
7. 21st Century Policing Task Force Report
8. Principles of Procedurally Just Policing

COB467842

0036

### Hot-Spots Policing

**Summary:** Over the past two decades, research has suggested that police can effectively address crime and disorder by focusing on hot spots: small units of geography with high rates of crime. Known as hot-spots policing or place-based policing, this strategy stands in contrast to traditional policing and crime prevention activities, which are typically focused on people. Hot spots or places are specific locations, such as addresses, blocks, or clusters of addresses or blocks, within larger geographic areas: beats, precincts, communities and neighborhoods. Hot-spots policing uses a range of tactics rooted in the idea that crime prevention is maximized when police focus your resources on places where crime is highly concentrated.

**Evidence:** There is a strong evidence base for hot-spots policing. A National Research Council (2004: 250) review noted, "studies that focused police resources on crime hot spots provided the strongest collective evidence of police effectiveness that is now available." A review by Braga et al. (2012) also found that the vast majority of hot spots studies have shown statistically significant findings; 20 of 25 tests from 19 experimental or quasi-experimental evaluations reported noteworthy crime or disorder reductions. These results show that when police focus on hot spots, they can have a significant impact on crime in these areas. Further, there was little evidence to suggest spatial displacement of crime as a result of hot spots interventions; in other words, crime did not shift from hot spots to nearby areas.

**Critical Components:** Studies have shown that increased police presence alone leads to some crime and disorder reduction. Koper (1995) found that each additional minute officers spent in a hot spot increased the amount of time after those officers departed before disorderly activity occurred. The ideal time spent in the hot spot was 14 to 15 minutes. The best approach is for police to travel among hot spots in an unpredictable order, so that potential offenders recognize a greater cost of offending in these areas because enforcement could increase at any moment.

Having officers adopt principles from problem-oriented policing (POP) is another promising component utilized in hot-spots policing. While studies have shown that problem-solving approaches may take more time to show beneficial results, the resulting successes may be more long-lasting. In your systematic review, Braga and colleagues (2012) conclude that problem solving may bring about longer-term crime control gains than increased enforcement alone.

*Source: Center for Evidence-Based Crime Policy, George Mason University*

Additional Resources for Hot-Spots Policing can be found below:

1. NIJ Hot Spots Policing
2. Practice: Hot Spots Policing - CrimeSolutions.gov
3. The Importance of Legitimacy in Hot Spots Policing

37

COB467843

0037

## Crime Prevention through Environmental Design (CPTED)

**Summary:** Crime Prevention through Environmental Design (CPTED) examines how environmental features create opportunities for crime and how those features can be adjusted to eliminate those opportunities. Adjustments can be implemented to: 1) control or make access more difficult; 2) deter offenders by increasing the risk of apprehension; 3) increase visibility; 4) increase or encourage guardianship; 5) regulate or adjust behaviors and routines; or 6) reduce the rewards for crime.  Examples of environmental features that could create opportunities for crime include: trees and shrubbery that block visibility; lack of lighting; traffic direction or lack of signaling; abandoned buildings; alleyways or cuts in between buildings; and empty lots hidden from the street. Adjustments that address these features may include cutting down shrubs to increase visibility; adding lighting to a dark alley; boarding up abandoned homes; or improving traffic conditions by adding signage, signals and speed bumps.

**Evidence:** Contemporary approaches to address crime, including CPTED, emerged from research on the relationship between crime and place, known as environmental criminology, situational crime prevention, rational choice theory, or routine activities theory.  Each of these theories focuses on the crime and how the offender understands and uses the environment to commit that crime. The research supports the ideas that: crime is specific and situational; the distribution of crimes is related to land use and transportation networks; offenders are opportunistic and commit crimes in places they know well; opportunity arises out of daily routines and activities; and places with crime are often also places without observers or guardians.

**Critical Components:**

- CPTED focuses on the design and productive use of space, not safety and security (e.g., locks, guards and alarms).  Target hardening and security measures are not the primary means for improvement.
- While crime, fear and victimization are important considerations, an environmental evaluation requires police to gather and analyze data and information beyond the scope of law enforcement (e.g., land use and zoning, housing code or health code violations, or traffic volumes and pedestrian activity).
- Quality of life issues, such as trash, weeds, vacant lots, and declining property values, also are considered because these problems often have a debilitating impact on a community and can be symptoms of, or precursors to, crime.
- CPTED is frequently considered the responsibility of police, but many of the tools and techniques fall outside the purview of policing.  Depending on the crime problem being addressed, individuals or organizations with expertise on issues related to traffic and transportation, transit, parks and recreation, housing and redevelopment, and economic development may be essential.  As a result, CPTED is a team effort, one in which officers participate, but which they do not control.
- It is important that stakeholders engage in analysis and planning. While the problem, circumstances and location will determine which stakeholders to engage, they can include representatives from schools, cultural facilities, and nonprofit organizations, and residents of the neighborhood. These individuals can contribute critical information because they are familiar with the place and problem, may recognize crime-environment relationships that can explain events and anticipate trends not

38

COB467844

revealed through data. Broad community support also enhances the potential for success during implementation.

*Source: Center for Problem-Oriented Policing*

Additional Resources for CPTED can be found below:

1. U.S. Department of Housing and Urban Development - Creating Defensible Spaces
2. NIJ - Crime Prevention Through Environmental Design
3. CPTED Security - Guidelines
4. Robert A. Gardner, CPP - CPTED Overview
5. Seattle Police Department – Neighborhood CPTED Guide

39

COB467845

### Focused Deterrence

**Summary:**   Focused deterrence strategies allow police to increase the certainty, swiftness, and severity of punishment by directly engaging with known offenders, often group members or those who traffic in illegal drugs and communicating clear incentives for compliance and consequences for that criminal activity. Many of these strategies employ the "pulling levers" framework popularized in Boston with Operation Ceasefire. Under this model, law enforcement selects a specific crime problem, such as gun violence or drugs; conducts research to identify key offenders or groups of offenders; and engages in direct, strategic communication with these group members through call-ins and custom notifications.   At call-ins, law enforcement, community members, and social service providers come together to deliver the message that violence will no longer be tolerated, and if violence does occur, every available legal lever will be pulled to bring an immediate and certain response. This "hard" message, usually delivered by police and prosecutors, is accompanied by a "soft" message that emphasizes the community's willingness to help individuals change, and the availability of services (e.g., job training, drug treatment) for those interested in engaging in more pro-social behavior.   Custom notifications are home or street visits that communicate this message to specific people and can be conducted quickly to help interrupt cycles of violence and address retaliation and active disputes.

**Evidence:**   A 2018 systematic review of focused deterrence strategies by Braga, Weisburd, and Turchan shows that focused deterrence strategies can have a significant impact on crime reduction. The meta-analysis incorporated 24 quasi-experimental evaluations, which is more than double the number included in a 2012 systematic review by Braga and Weisburd (2012). Nineteen of those 24 evaluations found a statistically significant effect on crime reduction.  Further, the authors concluded that strategies were most effective when used in programs designed to reduce serious violence by groups and criminally active groups. Programs designed to reduce repeated offending by highly active individual offenders showed moderate effects, which suggests that the effectiveness of a focused deterrence strategy will vary depending on the population targeted by the intervention.

**Critical Components:**   Focused deterrence strategies are a subgroup of problem-oriented policing interventions and, as a result, should address the specific group, gun, or drug crime problems that a jurisdiction faces. It is important that police establish a working group of representatives from local government and social service agencies to analyze underlying issues and customize strategies to the jurisdiction. This process is key to the pulling levers and other focused deterrence approaches. Also important is an emphasis on the word *focused* in focused deterrence strategies, which can be accomplished by narrowing the focus of an intervention to specific offenders and specific geographic areas. These strategies are successful in part because they create a credible deterrent threat.

Braga and Weisburd (2012: 22) emphasize that "In the focused deterrence approach, the emphasis is on not only reducing the risk of offending but also decreasing opportunity structures for violence, deflecting offenders away from crime, increasing the collective efficacy of communities, and increasing the legitimacy of police actions." Thus, increasing the likelihood of detection can be combined with other program components such as situational crime prevention, to reduce opportunities; social service programs, to divert offenders away; engaging with the community, to build collective efficacy; and using procedural justice in communications with offenders, to build or enhance legitimacy.

COB467846

*Source:* Center for Evidence-Based Crime Policy, George Mason University

Additional Resources for Focused Deterrence can be found below:

1. National Network for Safe Communities  Brochure.pdf
2. National Network for Safe Communities - Pulling Levers
3. https://www.crimesolutions.gov/Practice Profile Details
4. National Network for safe Communities - Group-Violence-Intervention-institutionalization-guide
5. National Network for Safe Communities - Custom-Notifications
6. National Network for Safe Communities - Shooting-Scorecards
7. The National Network for Safe Communities- Racial Reconciliation - Drugs-race-and-common-ground-reflections-on-the-high-point-intervention

41

COB467847

0041

Appendix: *Key Element Tools*

The below Key Elements Tools has been developed in conjunction with subject-matter-experts as a guide for jurisdictions to utilize when developing the plan for their GIVE Comprehensive Plan proposal, including an assessment of previous GIVE-related efforts. The description following each item is not a complete list of all components that should be considered, only those most important to the model. In the appropriate narrative section in your funding request for GIVE please ensure that each of the key components is described in your responses to questions. After choosing the strategies (Hot Spots, CPTED, Focused Deterrence or Street Outreach), jurisdictions will provide detailed responses to each of the Key Elements questions of the strategy selected.

| Item | POP Key Elements |
|---|---|
| 1. | Are POP concepts understood by key personnel in your agency? |

When answering the question, consider whether you have:

    a. received training or conducted independent study that led to a better understanding of the POP strategy;
    b. included law enforcement officials, members from the community, and officials from relevant partner agencies; and
    c. applied training and independent study to POP implementation or general agency policies or practices.

| Item | POP Key Elements |
|---|---|
| 2. | Is community engagement present in all phases of the POP process? |

When answering the question, consider whether you have:

    a. obtained feedback from all relevant stakeholders regarding the underlying issue(s) driving the crime of focus in all communities in your jurisdiction;
    b. received input/feedback from the public, and recorded the results;
    c. engaged external organizations to assist in addressing those underlying issue(s);
    d. established formal partnerships with the community and community-based organizations;
    e. routinely updated the community regarding the issue(s);
    f. obtained post-implementation feedback from the community regarding the effect of the interventions.

COB467848

| Item | POP Key Elements |
|---|---|

| 3. | How have you assessed your previous GIVE-related response(s)? |
|---|---|

When answering the question, consider whether you have:

a. conducted a process assessment to determine whether the plan was implemented as intended;
b. collected pre– and post–response qualitative and quantitative data;
c. determined whether the broad goals and specific objectives initially defined were attained;
d. identified any new strategies or adaptations to the original strategy needed to augment the original plan; and
e. conducted repeated assessments to ensure continued effectiveness.

| 4. | Did you clearly define a scanning plan and identify problem(s)? |
|---|---|

When answering the question, consider whether you have:

a. identified recurring problems that are of concern to the public and police;
b. identified the consequences of those problems;
c. prioritized those problems;
d. confirmed that the problems exist;
e. determined how frequently the problems occurs and their duration;
f. selected your crime of focus for closer examination; and
g. developed goals addressing your crime of focus that are specific, measurable, achievable, relevant, and time-bound (e.g., reduce shooting incidents by X% over the GIVE cycle).

| 5. | Have you created a robust data collection plan? |
|---|---|

When answering the question, consider whether you have:

a. identified the relevant criminogenic factors that will be measured;
b. developed a list of data sources, including identification of appropriate personnel, such as agency crime analysts and/or regional CACs, and identified the specific types of data that will be collected;
c. identified the scope of data (e.g., time frame, area); and
d. identified a process for data collection and retention (quantitative & qualitative).

43

COB467849

| Item | POP Key Elements |
|------|------------------|
| 6. | Have you conducted an analysis of your crime of focus to better understand the underlying factors associated with it? |

When answering the question, consider whether you have:

a. identified and understood the nature of the people and place-based conditions and events that are associated with your crime of focus;
b. researched what is known about your crime of focus;
c. identified a variety of resources that may be of assistance in developing a deeper understanding of your crime of focus;
d. isolated the subset of problems associated with your crime of focus that you will address; and
e. developed a working hypothesis about why the problem is occurring.

| | |
|------|------------------|
| 7. | Is the response to the problem evidence-based, and are all relevant agencies engaged? |

When answering the question, consider whether you have:

a. searched for what other communities with similar problems have done;
b. considered those and other evidence-based interventions to address the problem;
c. chosen evidence-based interventions;
d. outlined a response plan for those interventions and identified responsible partner agencies;
e. defined the specific objectives of the response plan; and
f. carried out planned activities as intended.

| | |
|------|------------------|
| 8. | How will you assess your GIVE-related response as described above? |

When answering the question, consider how you will:

a. conduct a process assessment to determine whether the plan was implemented as intended;
b. collect pre– and post–response qualitative and quantitative data;
c. determine whether the broad goals and specific objectives initially defined were attained;
d. identify any new strategies or adaptations to the original strategy needed to augment the original plan; and
e. conduct ongoing assessments to ensure continued effectiveness.

COB467850

| Item | CPTED Key Elements |
|---|---|

**1. How will you continue to ensure CPTED concepts are understood by key personnel in your agency?**

When answering the question, describe how you will:
  a. conduct training or independent study that leads to a better understanding of key elements;
  b. include a broad array of staff such as law enforcement officials and partners from relevant agencies who are directly involved in the oversight and implementation of the strategy;
  c. document the type of training/independent training conducted or received;
  d. document who completed training and how they were selected as training participants; and
  e. apply the training/independent study to CPTED strategy implementation.

**2. How will the CPTED strategy be coordinated?**

When answering the question, describe how you will:
  a. identify specific individuals who will be responsible for the coordination of the CPTED strategy;
  b. define the roles of these personnel in the planning and implementation of the CPTED strategy; and
  c. document the involvement and support of the chief executives from the partner agencies.

**3. How will appropriate partners be involved in the management of CPTED projects?**

When answering the question, describe how you will involve community stakeholders impacted by current crime problems in the planning and implementation of CPTED projects.

**4. How will each CPTED project plan consider the four key design elements of territorial reinforcement, natural surveillance, natural access control, and maintenance?**

When answering the question, describe how you will ensure that each project plan includes the following considerations:
  a. potential attributes that will express ownership of the location;
  b. ability to observe activities in/around the location directly;
  c. control of access routes to potential crime targets; and
  d. routine maintenance and upkeep of physical attributes at the location.

**5. How will you conduct systematic, multi-disciplinary assessments of identified hot-spot areas within the jurisdiction to identify CPTED projects?**

When answering the question, describe how you will:
  a. conduct systematic, multi-disciplinary assessments of environmental conditions to diagnose criminogenic impacts;

45

    b.  conduct assessments that include population characteristics, land use/development patterns, traffic/transportation/transit systems, interviews with residents, on-site observations, and safety audits; and

    c.  use the results of the assessments and analysis to identify specific CPTED projects.

| Item | CPTED Key Elements |
|------|--------------------|

**6.   How will CPTED projects be implemented as planned?**

When answering the question, describe how you will implement all aspects of CPTED project plans.

**7.   How will the CPTED strategy include plans and procedures to sustain initial modifications?**

When answering the question, describe how you will:

    a.  develop a plan to periodically review specific CPTED work areas to ensure initial modifications are sustainable;

    b.  ensure that the timing of the review of initial modifications is appropriate for the project; and

    c.  review available resources (i.e., personnel, equipment, and financial) to ensure sustainability of initial modifications.

**8.   How will you include a community education component in the CPTED strategy?**

When answering the question, describe how you will educate community stakeholders (i.e., residents, property owners, community associations, institutions, and businesses) so they can make or recommend legitimate design, security and policy choices to prevent crime.

**9.   How will you collect and use data on CPTED strategy implementation and outcomes?**

When answering the question, describe how you will:

    a.  record data on a regular basis (i.e., assessments, surveys, recommendations, modifications and impacts);

    b.  analyze and review data with key partners and personnel;

    c.  use data to make operational decisions;

    d.  monitor and evaluate data on population characteristics, land use and development patterns, traffic, transportation and transit systems, interviews with residents, on-site observations, and safety audits; and

    e.  implement and document operational changes when needed.

46

COB467852

| 10. | How will procedural justice be incorporated into the CPTED strategy? |
|---|---|

When answering the question, describe how you will include the four pillars of procedural justice (voice, neutrality, respect and trustworthiness) into the CPTED strategy.

| Item | Hot-Spots Key Elements |
|---|---|

| 1. | How will you continue to ensure hot-spots concepts are understood by key personnel in your agency? |
|---|---|

When answering the question, describe how you will:

  a. conduct training or independent study on hot-spots policing and chronic offenders;
  b. include a broad array of staff such as law enforcement officials and partners from relevant agencies that are directly involved in the planning, oversight and implementation of the strategy;
  c. document the type of training/independent study received or conducted;
  d. document who completed training and how they were selected as training participants; and
  e. apply the training/independent study to hot-spots strategy implementation and general agency policies and practices.

| 2. | How is data and analysis used to identify appropriate hot-spots? |
|---|---|

When answering the question, describe how you:

  a. use data to identify hot-spots for shootings or aggravated assaults as appropriate;
  b. use mapping software to identify hot-spots within the jurisdiction;
  c. have selected hot-spots that are appropriate in number and size for the planned interventions and available resources; and
  d. will reassess hot-spots on a regular basis, not less than quarterly.

| 3. | How was data and analysis used to identify chronic offenders within hot-spots to ensure accurate enforcement and prevention strategies are in place and directed appropriately? |
|---|---|

When answering the question, describe how you:

  a. identified specific chronic offenders using non-biased, systematic criteria, including information gathered from a range of human intelligence sources;
  b. will monitor individuals' activities and potential criminal-involvements on a routine basis; and
  c. will conduct chronic offender assessments on a regular basis, not less than quarterly.

47

COB467853

| Item | Hot-Spots Key Elements |
|------|------------------------|
| 4. | How will the hot-spots policing strategy be coordinated? |

When answering the question, describe how you:

    a. identified the specific individuals who will be responsible for coordinating the hot-spot strategy;
    b. defined the roles of these personnel in the planning, implementation, and strategy assessment of the hot-spot strategy;
    c. will conduct multi-disciplinary planning meetings to review hot-spot strategies, no less than monthly; and
    d. will ensure that all relevant GIVE partners will participate in tactical planning.

| | |
|------|------------------------|
| 5. | How will the hot-spots policing operations be conducted? |

When answering the question, describe how you:

    a. identified the specific individuals who will be responsible for the overall management of hot-spots operations and the proper allocation of resources;
    b. will include all relevant GIVE partners in operations, including joint patrols, enforcement efforts and investigations, community events, meetings and other activities associated with the implementation of the strategy;
    c. will ensure that front line staff conducting the hot-spots operations understand the role of the intervention within the hot-spots strategy framework, and
    d. will use crime data to schedule hot-spots overtime details.

| | |
|------|------------------------|
| 6. | How will the hot-spots policing strategy include community engagement? |

When answering the question, describe how you will:

    a. consult with community members and other stakeholders in areas where hot-spots interventions/activities are planned in regard to underlying issue(s) that contribute to the crime problem and possible solutions;
    b. regularly inform those communities about the planned interventions, to the extent practical; and
    c. use feedback from those communities as to the perceived effect of interventions.

| | |
|------|------------------------|
| 7. | How will the hot-spots policing strategy include focused interventions for chronic offenders in the identified area(s)? |

When answering the question, describe how you will:

    a. apply focused interventions to previously identified chronic offenders; and
    b. assess focused interventions directed at identified chronic offenders, no less often than on a quarterly basis.

48

COB467854

| Item | Hot-Spots Key Elements |
|------|------------------------|

**8. How will data on the hot-spots strategy implementation and outcomes continuously be collected and used?**

When answering the question, describe how you will:

a. regularly record data about intervention and prevention activities and strategy outcomes, including staff and community perceptions of results;
b. analyze and review data by key partners and personnel;
c. use project data to make operational decisions about hot-spots interventions; and
d. implement and document operational changes when needed, including any hot-spots adjustments.

**9. How will procedural justice be incorporated into the hot-spots policing strategy?**

When answering the question, describe how you will include the four pillars of procedural justice (voice, neutrality, respect, and trustworthiness) into the Hot-Spots strategy.

| Item | Focused Deterrence Key Elements |
|------|--------------------------------|

**1. How will this strategy be supported by a committed governing body that meets regularly?**

When answering the question, describe how you will:

a. establish a governing body which includes the Mayor (or designee), Police Chief, District Attorney, DOCCS, probation, relevant research partner (where applicable), service provider, and/or community leader/coordinator; and
b. ensure that the governing body meets at least quarterly, and that these meetings are separate from operational meetings that will occur more frequently.

**2. Is there a specific person assigned to coordinate the focused deterrence strategy?**

When answering the question, describe:

a. how you will establish a focused deterrence strategy that is coordinated by a designated person;
b. the role of this person in the planning, implementation, and assessment of the focused deterrence strategy; and
c. how the designated person will be supported by executive staff from the jurisdiction's GIVE partnership.

49

3.  **Does your agency have a fixed routine in place for the collection and dissemination of intelligence?**

When answering the question, describe how you will:

a. assign key personnel to all aspects of intelligence collection;
b. establish a process for intelligence collection that includes, at a minimum, weekly shooting reviews and bi-annual group audits; and
c. document intelligence and share reports with the appropriate personnel.

4.  **How will you choose appropriate participants for the call-ins?**

When answering the question, describe how you will:

a. choose representatives for participation in the call-in from as many active violent groups in the jurisdiction as possible;
b. use the most recently available intelligence and analysis in choosing participants; and
c. include local community supervision agency representatives in the identification of participants.

| Item | Focused Deterrence Key Elements |
|---|---|

5.  **Are the call-ins conducted in compliance with the model?**

When answering the question, describe how you will:

a. Clearly deliver the deterrence, service, and community moral voice messages during the call-ins:
b. Schedule call-ins at regular intervals, ideally 3-4 times a year; hold call-ins at a place of civic importance, i.e., church, college, community center, etc.; and
c. Properly manage call-ins, i.e., on-time, appropriate facilitator, proper messaging, appropriate security, food and beverage provided.

6.  **How will you deliver a credible message of support at the call-ins?**

When answering the question, describe how you will:

a. ensure that all call-in presenters, law enforcement personnel, community members, and service providers clearly indicate that they want to see participants take advantage of services, and that participants will be given timely access;
b. provide a 24/7 direct phone number to participants to contact the appropriate person for services; and
c. ensure that the appropriate contact person will be present at the call-in to offer services.

COB467856

| 7. | How will you provide timely follow-up for call-in offers of support? |
|----|---|

When answering the question, describe how you will:

    a. assign a representative who is specifically designated to conduct follow-ups with service providers and call-in participants regarding offers of support; and
    b. ensure follow-ups are conducted in a timely manner.

| 8. | How will you conduct enforcement actions according to the model? |
|----|---|

When answering the question, describe how you will:

    a. ensure that appropriate groups and group members are identified for enforcement actions through the effective collection and analysis of intelligence;
    b. ensure that recipients of enforcement actions understand why they are receiving attention;
    c. use all appropriate enforcement tools on those identified for a group enforcement action; and
    d. direct enforcement efforts at all or a substantial portion of the identified group, regardless if they are directly connected to violent activity or not.

| Item | Focused Deterrence Key Elements |
|------|---|

| 9. | How will data be collected on call-ins and enforcement actions? |
|----|---|

When answering the question, describe how you will document:

    a. information about participants' attendance at call-ins; and
    b. how many participants accept offers of support for services at the call-ins, violence levels after each call-in, and qualitative and quantitative data regarding the triggering incident(s), and resulting enforcement actions, custom notifications, and services.

| 10. | How will procedural justice be incorporated into the focused deterrence strategy? |
|-----|---|

When answering the question, describe how you will include the four pillars of procedural justice (voice, neutrality, respect, and trustworthiness) into the Focused Deterrence strategy.

COB467857

| Item | Street Outreach Key Elements |
|------|------------------------------|
| 1. | How will you continue to ensure street outreach concepts are understood by key personnel in your agency? |

When answering the question, describe how you will ensure that all supervisors, investigators, and patrol staff assigned to the street outreach target area are familiar with the goals and practices of the street outreach program operating within the area, as well as the department's policy with regard to the program and expectations for staff's behavior in interacting with the program and its staff.

| | |
|------|------------------------------|
| 2. | What are the formal procedures for coordination and communication between the police department and the street outreach program? |

When answering the question, describe the:

a. written police department procedure to notify the street outreach program manager, or his/her designee, of all shootings within 2 hours of each incident;
b. specific police department personnel assigned as liaisons to work with the local street outreach program; and
c. arrangements for the police department liaison to meet at least monthly with the street outreach program manager.

| | |
|------|------------------------------|
| 3. | How will the police department share information on high-risk individuals with the street outreach program? |

When answering the question, describe how you will provide the street outreach program manager with a list of high-risk individuals by the 15th of each month. The list should include known or suspected gang/group members, gang/group leaders who promote gun violence, and those most likely to carry guns and be involved in shootings, including retaliatory shootings.

| | |
|------|------------------------------|
| 4. | How do you ensure that the police department provides maps of shooting locations to DCJS and the street outreach program? |

When answering the question, describe how you:

a. provide maps to the street outreach Program Manager pinpointing the locations of the prior month's shooting incidents for both the street outreach target area(s) and the entire jurisdiction by the 7th of the month;
b. provide an annual map pinpointing the locations of all shooting incidents that occurred between July 1 and June 30 of the preceding year. All maps must designate which shooting incidents were homicides.

52

COB467858

**Appendix: *Aggravated Assault Resources***

The six jurisdictions (Broome, Chautauqua, Middletown, Rockland, Rensselaer and Ulster) required to focus on aggravated assaults may use the below resources to respond to the problems underlying aggravated assaults (as defined by FBI Uniform Crime Reporting guidelines).  Should it be determined that the other evidence-based approaches will appropriately address the underlying aggravated assault problem they may also be considered.

1. POP in Violent Crime Places

2. DCJS Youth Violence Reduction Strategy

3. Australian Institute of Criminology

4. POP and Domestic Violence

5. Intimate Partner Violence Intervention

6. Domestic Violence High Risk Team

53

COB467859

Appendix: *Criminal Justice Knowledge Bank*

The Division of Criminal Justice Services developed the Criminal Justice Knowledge Bank to provide additional support and resources to help police, prosecutors and community corrections professionals improve local practices using data-driven and evidence-based approaches.

The Knowledge Bank provides a forum for these professionals to share promising and innovative practices; learn from peers and foster collaboration; access national research; and connect with academic researchers.

*Knowledge Bank Features*

Programs: Profiles of programs and initiatives submitted by agencies and organizations that detail the problem they were designed to target, implementation details, outcomes and lessons learned.

Research Consortium: Connects criminal justice professionals with academics who can analyze programs and initiatives to help assess effectiveness and use data to support new approaches and ideas to address crime.

Resources: Links to national research and information on evidence-based criminal justice programs and practices.

To learn more, contact the Knowledge Bank: KnowledgeBank@dcjs.ny.gov or (518) 457-7301.

COB467860

0054

Appendix: *Crime Data Documents*

COB467861

0055

## Data Appendix 1

# Shooting Related Violence
# GIVE Eligible Jurisdictions
### Ranked by Shooting Incidents Involving Injury

## January 2017 - October 2019

| Jurisdiction | Shooting Incidents Involving Injury | Individuals Killed by Gun Violence | Homicides | Violent Crimes Involving a Firearm |
|---|---|---|---|---|
| Buffalo City PD | 535 | 111 | 138 | 2,222 |
| Rochester City PD | 419 | 52 | 83 | 1,639 |
| Syracuse City PD | 287 | 45 | 59 | 586 |
| Suffolk County PD | 151 | 35 | 65 | 810 |
| Albany City PD | 123 | 17 | 24 | 350 |
| **Nassau County Total** | **108** | **17** | **46** | **527** |
| Nassau County PD | 55 | 10 | 30 | 356 |
| Hempstead Vg PD | 53 | 7 | 16 | 171 |
| **Westchester County Total** | **99** | **15** | **28** | **511** |
| Yonkers City PD | 57 | 7 | 15 | 297 |
| Mount Vernon City PD | 42 | 8 | 13 | 214 |
| Utica City PD | 73 | 5 | 14 | 242 |
| Niagara Falls City PD | 64 | 6 | 6 | 353 |
| **Orange County Total** | **41** | **13** | **16** | **197** |
| Newburgh City PD | 34 | 9 | 11 | 155 |
| Middletown City PD | 7 | 4 | 5 | 42 |
| Schenectady City PD | 38 | 2 | 6 | 267 |
| Troy City PD | 30 | 1 | 8 | 211 |
| Poughkeepsie City PD | 25 | 4 | 8 | 108 |
| Binghamton City PD | 21 | 3 | 9 | 120 |
| Jamestown City PD | 8 | 1 | 3 | 50 |
| Kingston City PD | 7 | 1 | 2 | 24 |
| Spring Valley Vg PD | 2 | 1 | 1 | 21 |

Source: DCJS, UCR/IBR Reporting System
Data as of 01/02/2020

COB467862

## Data Documents Appendix 2
## Shooting Incidents Involving Injury
## By GIVE Jurisdiction
As of 1/08/2020

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rochester City PD | 155 | 131 | 194 | 192 | 168 | 191 | 156 | 156 | 137 | 157 |
| Buffalo City PD | 220 | 229 | 217 | 171 | 205 | 204 | 262 | 200 | 206 | 153 |
| Syracuse City PD | 80 | 86 | 78 | 74 | 94 | 113 | 128 | 113 | 109 | 86 |
| Suffolk County PD | 81 | 77 | 53 | 57 | 65 | 74 | 72 | 61 | 41 | 54 |
| Albany City PD | 37 | 44 | 27 | 33 | 34 | 31 | 27 | 39 | 45 | 48 |
| **Nassau County Total** | **97** | **64** | **76** | **71** | **60** | **44** | **64** | **39** | **41** | **33** |
| Nassau County PD | 59 | 41 | 39 | 34 | 33 | 28 | 32 | 20 | 18 | 19 |
| Hempstead Vg PD | 38 | 23 | 37 | 37 | 27 | 16 | 32 | 19 | 23 | 14 |
| Niagara Falls City PD | 18 | 22 | 25 | 20 | 29 | 15 | 19 | 22 | 19 | 28 |
| Utica City PD | 12 | 11 | 9 | 21 | 24 | 22 | 21 | 23 | 27 | 25 |
| **Westchester County Total** | **46** | **46** | **39** | **24** | **43** | **56** | **60** | **52** | **28** | **23** |
| Yonkers City PD | 31 | 21 | 8 | 12 | 27 | 34 | 35 | 28 | 15 | 15 |
| Mount Vernon City PD | 15 | 25 | 31 | 12 | 16 | 22 | 25 | 24 | 13 | 8 |
| **Orange County Total** | **34** | **31** | **42** | **36** | **42** | **43** | **41** | **16** | **8** | **21** |
| Newburgh City PD | 30 | 28 | 36 | 36 | 42 | 43 | 38 | 14 | 6 | 17 |
| Middletown City PD | 4 | 3 | 6 | 0 | 0 | 0 | 3 | 2 | 2 | 4 |
| Schenectady City PD | 24 | 21 | 21 | 15 | 15 | 24 | 18 | 12 | 14 | 14 |
| Troy City PD | 14 | 10 | 11 | 7 | 11 | 13 | 7 | 10 | 10 | 13 |
| Poughkeepsie City PD | 15 | 17 | 13 | 32 | 13 | 15 | 17 | 8 | 11 | 9 |
| Binghamton City PD | 11 | 2 | 8 | 2 | 6 | 5 | 5 | 10 | 7 | 7 |
| Jamestown City PD | 1 | 1 | 0 | 1 | 2 | 3 | 7 | 3 | 3 | 4 |
| Kingston City PD | 6 | 5 | 1 | 2 | 2 | 2 | 2 | 2 | 3 | 4 |
| Spring Valley Vg PD | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 |

Source: DCJS, GIVE Monthly Shooting Activity Report Form

COB467863

Data Documents Appendix 3

# Gun Involved Violence Elimination (GIVE)Total
### January - December 2019 vs. 2018

As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 810 | 709 | 680 | -4.1% | -16.1% |
| Shooting Victims (Persons Hit) | 936 | 803 | 784 | -2.4% | -16.2% |
| Individuals Killed by Gun Violence | 125 | 128 | 113 | -11.7% | -9.5% |



**Shooting Incidents Involving Injury**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 47 | 30 | 43 | 37 | 61 | 77 | 81 | 49 | 56 | 74 | 60 | 65 |
| 2018 | 30 | 36 | 32 | 54 | 57 | 61 | 98 | 69 | 69 | 68 | 54 | 61 |
| 5 Year Avg (2014-2018) | 55 | 42 | 48 | 60 | 73 | 83 | 92 | 87 | 73 | 73 | 61 | 64 |



**Shooting Victims (Persons Hit)**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 53 | 35 | 51 | 40 | 68 | 101 | 93 | 53 | 64 | 76 | 70 | 80 |
| 2018 | 34 | 37 | 37 | 56 | 63 | 98 | 119 | 76 | 84 | 73 | 57 | 69 |
| 5 Year Avg (2014-2018) | 60 | 49 | 54 | 69 | 87 | 99 | 109 | 103 | 84 | 83 | 69 | 71 |



**Individuals Killed by Gun Violence**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 11 | 7 | 6 | 5 | 7 | 11 | 14 | 10 | 17 | 6 | 6 | 13 |
| 2018 | 3 | 4 | 9 | 11 | 7 | 21 | 19 | 8 | 12 | 12 | 11 | 11 |
| 5 Year Avg (2014-2018) | 9 | 7 | 8 | 9 | 9 | 13 | 14 | 12 | 12 | 11 | 10 | 10 |

## Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467864

# Albany City PD

## January - December 2019 vs. 2018
As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 35 | 45 | 48 | 6.7% | 36.4% |
| Shooting Victims (Persons Hit) | 41 | 55 | 52 | -5.5% | 26.2% |
| Individuals Killed by Gun Violence | 5 | 10 | 3 | | |



**Shooting Incidents Involving Injury**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 2 | 1 | 2 | 0 | 4 | 4 | 11 | 4 | 5 | 6 | 6 | 3 |
| 2018 | 3 | 0 | 2 | 4 | 6 | 6 | 9 | 4 | 3 | 3 | 3 | 2 |
| 5 Year Avg (2014-2018) | 2 | 1 | 2 | 4 | 3 | 3 | 5 | 3 | 3 | 3 | 3 | 2 |

**Shooting Victims (Persons Hit)**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 2 | 1 | 2 | 0 | 4 | 4 | 12 | 4 | 8 | 6 | 6 | 3 |
| 2018 | 3 | 0 | 2 | 4 | 4 | 6 | 15 | 5 | 5 | 3 | 3 | 3 |
| 5 Year Avg (2014-2018) | 2 | 2 | 2 | 4 | 4 | 4 | 7 | 3 | 4 | 3 | 3 | 3 |

**Individuals Killed by Gun Violence**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 |
| 2018 | 1 | 0 | 0 | 1 | 0 | 2 | 2 | 0 | 2 | 0 | 1 | 0 |
| 5 Year Avg (2014-2018) | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |

## Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467865

# Buffalo City PD

## January - December 2019 vs. 2018
As of 1/8/2020

|  | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
|---|---|---|---|---|---|
|  |  |  |  | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 215 | 206 | 153 | -25.7% | -29.0% |
| Shooting Victims (Persons Hit) | 253 | 236 | 183 | -22.5% | -27.8% |
| Individuals Killed by Gun Violence | 37 | 45 | 37 | -17.8% | -1.1% |







**Current year data is preliminary and subject to change.**

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467866

analysis

# Hempstead Village PD

### January - December 2019 vs. 2018
As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 23 | 23 | 14 | -39.1% | -40.2% |
| Shooting Victims (Persons Hit) | 26 | 28 | 17 | -39.3% | -35.6% |
| Individuals Killed by Gun Violence | 4 | 2 | 4 | | |



**Shooting Incidents Involving Injury**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 0 | 1 | 1 | 0 | 2 | 0 | 4 | 1 | 2 | 0 | 1 | 2 |
| 2018 | 0 | 1 | 0 | 2 | 0 | 4 | 2 | 3 | 3 | 3 | 1 | 4 |
| 5 Year Avg (2014-2018) | 1 | 1 | 1 | 1 | 2 | 1 | 3 | 2 | 3 | 2 | 2 | 3 |



**Shooting Victims (Persons Hit)**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 0 | 2 | 2 | 0 | 2 | 0 | 5 | 1 | 2 | 0 | 1 | 2 |
| 2018 | 0 | 2 | 1 | 2 | 0 | 5 | 2 | 6 | 4 | 3 | 4 | 4 |
| 5 Year Avg (2014-2018) | 1 | 1 | 1 | 1 | 2 | 2 | 4 | 3 | 4 | 2 | 2 | 3 |



**Individuals Killed by Gun Violence**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| 5 Year Avg (2014-2018) | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |

## Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467867

# Mount Vernon City PD

## January - December 2019 vs. 2018
As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 20 | 13 | 8 | | |
| Shooting Victims (Persons Hit) | 25 | 15 | 9 | | |
| Individuals Killed by Gun Violence | 4 | 4 | 0 | | |







**Current year data is preliminary and subject to change.**

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467868

# Nassau County PD

## January - December 2019 vs. 2018
### As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
|---|---|---|---|---|---|
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 26 | 18 | 19 | 5.6% | -27.5% |
| Shooting Victims (Persons Hit) | 28 | 19 | 24 | 26.3% | -14.3% |
| Individuals Killed by Gun Violence | 5 | 5 | 3 | | |







**Current year data is preliminary and subject to change.**

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467869

0063

# Newburgh City PD

### January - December 2019 vs. 2018
As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
|---|---|---|---|---|---|
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 29 | 6 | 17 | -40.6% | |
| Shooting Victims (Persons Hit) | 35 | 8 | 23 | -34.7% | |
| Individuals Killed by Gun Violence | 3 | 2 | 3 | | |



**Shooting Incidents Involving Injury**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 1 | 1 | 0 | 0 | 1 | 3 | 1 | 0 | 3 | 4 | 1 | 2 |
| 2018 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 1 |
| 5 Year Avg (2014-2018) | 1 | 2 | 3 | 3 | 3 | 2 | 2 | 3 | 2 | 2 | 3 | 2 |

**Shooting Victims (Persons Hit)**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 1 | 1 | 0 | 0 | 1 | 6 | 2 | 0 | 4 | 4 | 1 | 3 |
| 2018 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 4 | 1 |
| 5 Year Avg (2014-2018) | 1 | 4 | 3 | 3 | 4 | 2 | 3 | 4 | 2 | 3 | 5 | 2 |



**Individuals Killed by Gun Violence**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| 5 Year Avg (2014-2018) | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |

## Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467870

# Niagara Falls City PD

### January - December 2019 vs. 2018
As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
|---|---|---|---|---|---|
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 21 | 19 | 28 | 47.4% | 34.6% |
| Shooting Victims (Persons Hit) | 22 | 20 | 34 | 70.0% | 54.5% |
| Individuals Killed by Gun Violence | 2 | 2 | 1 | | |







## Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467871

# Poughkeepsie City PD

### January - December 2019 vs. 2018
As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 13 | 11 | 9 | | |
| Shooting Victims (Persons Hit) | 14 | 12 | 9 | | |
| Individuals Killed by Gun Violence | 2 | 3 | 3 | | |



Shooting Incidents Involving Injury

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 1 | 1 | 0 | 0 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 3 |
| 2018 | 1 | 1 | 0 | 0 | 2 | 1 | 0 | 1 | 0 | 2 | 3 | 0 |
| 5 Year Avg (2014-2018) | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 1 | 1 | 1 | 1 | 0 |



Shooting Victims (Persons Hit)

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 1 | 1 | 0 | 0 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 3 |
| 2018 | 1 | 1 | 0 | 0 | 3 | 1 | 0 | 1 | 2 | 3 | 0 | |
| 5 Year Avg (2014-2018) | 1 | 1 | 1 | 1 | 2 | 2 | 1 | 1 | 1 | 1 | 1 | 0 |



Individuals Killed by Gun Violence

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 2018 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| 5 Year Avg (2014-2018) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

## Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467872

# Rochester City PD

**January - December 2019 vs. 2018**
As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 162 | 137 | 157 | 14.6% | -2.8% |
| Shooting Victims (Persons Hit) | 186 | 154 | 172 | 11.7% | -7.3% |
| Individuals Killed by Gun Violence | 21 | 20 | 21 | 5.0% | -1.9% |





**Current year data is preliminary and subject to change.**

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467873

# Schenectady City PD

## January - December 2019 vs. 2018
### As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 17 | 14 | 14 | 0.0% | -15.7% |
| Shooting Victims (Persons Hit) | 18 | 17 | 15 | -11.8% | -17.6% |
| Individuals Killed by Gun Violence | 3 | 0 | 0 | | |





## Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467874

# Suffolk County PD

## January - December 2019 vs. 2018

As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change 19 vs. 18 | % Change 5 Yr. Avg vs. 2019 |
|---|---|---|---|---|---|
| Shooting Incidents Involving Injury | 63 | 41 | 54 | 31.7% | -13.7% |
| Shooting Victims (Persons Hit) | 72 | 48 | 63 | 31.3% | -12.3% |
| Individuals Killed by Gun Violence | 13 | 12 | 16 | 33.3% | 25.0% |



**Shooting Incidents Involving Injury**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 4 | 1 | 6 | 3 | 3 | 7 | 7 | 6 | 5 | 7 | 2 | 3 |
| 2018 | 2 | 3 | 4 | 1 | 4 | 5 | 7 | 6 | 2 | 4 | 4 | 3 |
| 5 Year Avg (2014-2018) | 5 | 3 | 4 | 3 | 6 | 7 | 7 | 7 | 6 | 5 | 5 | 4 |



**Shooting Victims (Persons Hit)**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 4 | 1 | 7 | 3 | 4 | 13 | 8 | 6 | 5 | 7 | 2 | 3 |
| 2018 | 2 | 3 | 5 | 1 | 6 | 6 | 7 | 7 | 2 | 4 | 2 | 3 |
| 5 Year Avg (2014-2018) | 5 | 3 | 5 | 3 | 7 | 8 | 8 | 9 | 7 | 6 | 5 | 5 |



**Individuals Killed by Gun Violence**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 1 | 0 | 0 | 2 | 3 | 2 | 2 | 3 | 2 | 0 | 1 | |
| 2018 | 0 | 1 | 4 | 0 | 0 | 1 | 4 | 0 | 1 | 0 | 0 | 2 |
| 5 Year Avg (2014-2018) | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 0 | 1 | 2 | |

# Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467875

# Syracuse City PD

## January - December 2019 vs. 2018
As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 111 | 109 | 86 | -21.1% | -22.8% |
| Shooting Victims (Persons Hit) | 130 | 121 | 102 | -15.7% | -21.7% |
| Individuals Killed by Gun Violence | 17 | 17 | 11 | -35.3% | -33.7% |



**Shooting Incidents Involving Injury**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 10 | 5 | 5 | 7 | 4 | 5 | 10 | 2 | 7 | 10 | 7 | 14 |
| 2018 | 2 | 8 | 4 | 7 | 9 | 14 | 14 | 10 | 14 | 11 | 6 | 10 |
| 5 Year Avg (2014-2018) | 7 | 5 | 5 | 8 | 9 | 12 | 13 | 10 | 9 | 14 | 9 | 11 |



**Shooting Victims (Persons Hit)**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 13 | 6 | 7 | 7 | 5 | 5 | 11 | 3 | 8 | 10 | 8 | 19 |
| 2018 | 3 | 8 | 5 | 7 | 9 | 16 | 15 | 11 | 19 | 11 | 6 | 10 |
| 5 Year Avg (2014-2018) | 8 | 7 | 7 | 9 | 10 | 13 | 15 | 12 | 12 | 16 | 11 | 11 |



**Individuals Killed by Gun Violence**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 2 | 1 | 1 | 2 | 1 | 0 | 1 | 0 | 2 | 0 | 0 | 1 |
| 2018 | 0 | 2 | 0 | 3 | 1 | 3 | 0 | 1 | 0 | 2 | 1 | 3 |
| 5 Year Avg (2014-2018) | 1 | 1 | 1 | 2 | 1 | 2 | 2 | 1 | 1 | 2 | 1 | 2 |

## Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467876

# Utica City PD

## January - December 2019 vs. 2018

As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 23 | 27 | 25 | -7.4% | 6.8% |
| Shooting Victims (Persons Hit) | 26 | 28 | 30 | 7.1% | 16.3% |
| Individuals Killed by Gun Violence | 2 | 3 | 1 | | |

### Shooting Incidents Involving Injury



|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 1 | 1 | 1 | 1 | 7 | 5 | 1 | 2 | 3 | 3 | 1 | 1 |
| 2018 | 1 | 0 | 1 | 1 | 4 | 1 | 3 | 3 | 4 | 2 | 5 | 2 |
| 5 Year Avg (2014-2018) | 2 | 1 | 1 | 2 | 3 | 2 | 2 | 2 | 3 | 2 | 1 | 2 |

### Shooting Victims (Persons Hit)



|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 2 | 1 | 1 | 1 | 8 | 7 | 1 | 3 | 3 | 3 | 1 | 1 |
| 2018 | 1 | 0 | 1 | 1 | 4 | 1 | 3 | 3 | 4 | 2 | 5 | 2 |
| 5 Year Avg (2014-2018) | 2 | 2 | 1 | 2 | 3 | 3 | 2 | 2 | 3 | 3 | 2 | 2 |

### Individuals Killed by Gun Violence



|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 2018 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| 5 Year Avg (2014-2018) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467877

# Yonkers City PD

### January - December 2019 vs. 2018
As of 1/8/2020

| | 5 Year Average YTD (2014-2018) | 2018 YTD | 2019 YTD | % Change | |
| --- | --- | --- | --- | --- | --- |
| | | | | 19 vs. 18 | 5 Yr. Avg vs. 2019 |
| Shooting Incidents Involving Injury | 28 | 15 | 15 | 0.0% | -46.0% |
| Shooting Victims (Persons Hit) | 32 | 16 | 17 | 6.3% | -46.2% |
| Individuals Killed by Gun Violence | 2 | 1 | 2 | | |







## Current year data is preliminary and subject to change.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Averages are rounded to the nearest whole number.

COB467878

0072

## Data Documents Appendix 4
## Aggravated Assault Crime Data
### 2017 - YTD 2019

**Part I Index Crimes**

| Jurisdiction | Violent Crime | | | Aggravated Assault | | | Agg. Assault % of Total Violent | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | Jan-Oct 2019 | 2017 | 2018 | Jan-Oct 2019 | 2017 | 2018 | Jan-Oct 2019 |
| Binghamton City PD | 362 | 327 | 289 | 227 | 208 | 198 | 63% | 64% | 69% |
| Jamestown City PD | 198 | 227 | 170 | 138 | 150 | 127 | 70% | 66% | 75% |
| Kingston City PD | 73 | 70 | 55 | 45 | 47 | 37 | 62% | 67% | 67% |
| Middletown City PD | 103 | 110 | 70 | 53 | 62 | 43 | 51% | 56% | 61% |
| Spring Valley Vg PD | 133 | 121 | 93 | 74 | 61 | 47 | 56% | 50% | 51% |
| Troy City PD | 351 | 283 | 263 | 200 | 167 | 173 | 57% | 59% | 66% |

**Part I and Part II Assaults**

| Jurisdiction | Total | | | Aggravated | | | Simple | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | Jan-Oct 2019 | 2017 | 2018 | Jan-Oct 2019 | 2017 | 2018 | Jan-Oct 2019 |
| Binghamton City PD | 883 | 918 | 871 | 227 | 208 | 198 | 656 | 710 | 673 |
| Jamestown City PD | 796 | 833 | 847 | 138 | 150 | 127 | 658 | 683 | 720 |
| Kingston City PD | 337 | 399 | 308 | 45 | 47 | 37 | 292 | 352 | 271 |
| Middletown City PD | 356 | 415 | 257 | 53 | 62 | 43 | 303 | 353 | 214 |
| Spring Valley Vg PD | 329 | 356 | 285 | 74 | 61 | 47 | 255 | 295 | 238 |
| Troy City PD | 1,339 | 1,197 | 1,096 | 200 | 167 | 173 | 1,139 | 1,030 | 923 |

**Domestic Violence Victim Assaults**

| Jurisdiction | Total | | | Aggravated | | | Simple | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | Jan-Oct 2019 | 2017 | 2018 | Jan-Oct 2019 | 2017 | 2018 | Jan-Oct 2019 |
| Binghamton City PD | 285 | 311 | 262 | 52 | 57 | 52 | 233 | 254 | 210 |
| Jamestown City PD | 451 | 525 | 472 | 61 | 66 | 54 | 390 | 459 | 418 |
| Kingston City PD | 143 | 156 | 136 | 7 | 20 | 9 | 136 | 136 | 127 |
| Middletown City PD | 207 | 225 | 133 | 25 | 32 | 24 | 182 | 193 | 109 |
| Spring Valley Vg PD | 148 | 168 | 129 | 25 | 26 | 15 | 123 | 142 | 114 |
| Troy City PD | 669 | 647 | 550 | 37 | 46 | 32 | 632 | 601 | 518 |

Note: Violent Crime, Aggravated Assault and Total Assault counts are based upon top charge. Victims of DV-Related Total Assault counts are victim-based.

Source: DCJS, UCR/IBR Reporting System
Data as of 1/10/2020

COB467879

**The following are Attachments:**

**Attachment 1) GIVE Tracker – Used for Time and Attendance Budget Information**
**Attachment 2) GIVE Initiative Budget Worksheet**

**End of Document**

COB467880

0074