# EXHIBIT 38

1    UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF NEW YORK

3    ----------------------------------------------

4    **BLACK LOVE RESISTS IN THE RUST, et al.,**
     **individually and on behalf of a class of**

5    **all others similarly situated,**

6            Plaintiffs,

7    -vs-                        1:18-cv-00719-CCR

8    **CITY OF BUFFALO, N.Y., et al.**

9            Defendants.
     ----------------------------------------------

10

11

12         **ORAL EXAMINATION OF LANCE RUSSO**

13            **APPEARING REMOTELY FROM**

14            **ERIE COUNTY, NEW YORK**

15

16            Friday, April 29, 2022

17            At 9:00 a.m. - 6:20 p.m.

18            Pursuant to notice

19

20    REPORTED BY:

21    Brooklyn Morton, Notary Public

22    APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

23

1    **R E M O T E   A P P E A R A N C E S**

2    APPEARING FOR THE PLAINTIFFS:

3                    **CENTER FOR CONSTITUTIONAL RIGHTS**
                     **BY: A. CHINYERE EZIE, ESQ.**
4                    666 Broadway, 7th Floor
                     New York, New York 10012
5                    (212) 614-6475

6    APPEARING FOR THE DEFENDANTS:

7                    **HODGSON RUSS, LLP**
                     **BY: KATELYN A. RAUH, ESQ.**
8                    605 Third Avenue
                     Suite 2300
9                    New York City, New York 10158
                     (646) 218-7528
10
     ALSO PRESENT: **RAFAELA URIBE,** Center for
11                  Constitutional Rights

12

13

14

15

16

17

18

19

20

21

22

23

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

─── LANCE RUSSO - BY MS. EZIE- 04/29/2022 ───

1       sent it to my captain.  I am not really sure

2       where it went from there.

3   Q. Got it.  Okay.  Was that called a daily

4       Housing Unit report or do you recall the title

5       of that document?

6   A. I don't remember honestly, but that's

7       essentially what it was.

8   Q. Got it.  And with respect to duties, is it

9       true that you also were supposed to submit

10      comments and recommendations in IAD cases?

11         MS. RAUH:  Objection to form.

12  A. No.  If you are referring to, like,

13      complaints?

14  Q. Mh-hmm.

15  A. I didn't submit anything.  If anyone had a

16      complaint about an officer that they felt I

17      couldn't address, I would always give them

18      Internal Affairs phone number and advise them

19      to call them if they wanted to further their

20      complaint.

21  Q. And you are talking about members of the

22      public that had complaints in this sense?

23  A. Correct.

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

1          Everybody is by seniority so some officers got

2          a lot or all of it and some didn't.  As far as

3          our detail -- in fact, the detail used to be a

4          lieutenant and two -- was it a lieutenant and

5          two bodies or four bodies?  And then it

6          eventually came down to a lieutenant and one

7          body they cut the manpower back because they

8          didn't want to pay overtime anymore.  So it

9          varied depending on when it started.  It was

10         obviously hot and heavy when it first started

11         and then they started cutting it back and then

12         eventually they stopped doing it at all, but

13         many made much more than others.

14    Q.  Got it.  Was overtime a significant part of

15         your salary?

16    A.  Sure.   Absolutely.

17    Q.  How much -- what was your base salary with the

18         BPD?  What was the range in the ten years you

19         were with the Housing Unit?

20    A.  You mean, contractually my base pay?

21    Q.  Sure.

22    A.  I think base pay contractually was 88,000.  It

23         came out to be closer to 1 00,000 a year to

LANCE RUSSO - BY MS. EZIE- 04/29/2022

 1          walk in the door.

 2      Q.  Okay.  Got it.  And what was the range of

 3          overtime that you received on top of that?

 4      A.  It was pretty substantial.  It varied, but I

 5          was -- between myself and the other housing

 6          lieutenant, again there was only -- you had to

 7          have somebody and between that and our details

 8          and we also worked when a lieutenant was

 9          needed in the Strike Force details, we would

10          get calls for that, too.  So it was pretty

11          substantial.  Do you want actual numbers?

12      Q.  If you have a range, that would be great.

13      A.  I think I probably averaged, like, maybe 150,

14          160 on average.  Sometimes is was higher,

15          sometimes lower over the course of a ten-year

16          period.

17      Q.  Are you describing your salary base pay plus

18          overtime or just the overtime?

19      A.  Yeah.  I am sorry.  That would be everything,

20          like a yearly salary, but it varied.  I mean,

21          it could be higher than that, it was lower.

22          It all depended on the year.  It tended to go

23          up as the time went on from 2010 to 2020.

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1        but it is specifically written under the

2        housing unit.  I don't believe I read that

3        before.

4    Q.  Okay.  I will stop the screen share.  Now,

5        what types of police activities did the

6        Housing Unit engage in during your almost

7        decade with the Housing Unit?

8    A.  Everything that every district did and then

9        some.  I mean, there was regular patrol, there

10       was enforcement of V&T, there were arrests, we

11       -- instead of getting calls, we would

12       follow-up on a lot of activity that occurred

13       that the districts would give us, as I stated

14       before.  And then additionally, we would do

15       things districts -- not because they weren't

16       supposed to, but they clearly didn't have time

17       to do with as busy as the city is.

18            We followed up on a lot of complaints

19       within -- like, residential complaints within

20       the units.  Our officers would walk the

21       properties, they would walk all the

22       high-rises.  There was a lot of foot traffic

23       because we weren't call-to-call.  So we wanted

1    high visibility so that the residents there

2    felt a bit more at ease, as well as to deter

3    criminal activity, which unfortunately, there

4    was quite a bit of.

5        Officers would attend meetings,

6    community meetings, functions like that that

7    you would not attend within a district.  That

8    would not be something that an officer would

9    be required to do.  So things of that nature.

10   Q. Got it.  Now, you mentioned that officers

11   would kind of walk the premises?

12   A. Correct.

13   Q. Is that something that was referred to as a

14   park and walk?

15   A. Yes.

16   Q. Okay.  So in your own words, what is a park

17   and walk?

18   A. You respond to a location.  Let's say, LBJ

19   Towers, just call it a park and walk.  That

20   was a way of letting radio know what you were

21   doing.  Park and walk at LBJ.  You exit your

22   vehicle and you walk the stairwells of the

23   property, walk the perimeter of the property,

LANCE RUSSO - BY MS. EZIE- 04/29/2022

1          and down the flights of stairs in a housing

2          unit to do inspections?

3    A.  Yeah.  But again, that was park and walk.

4          Maybe somebody referred to it as I am doing a

5          sweep of LBJ, but those were park and walks.

6    Q.  Okay.  And you mentioned that you did V&T

7          enforcement.  What type of V&T enforcement?

8    A.  Anything that pertained to V&T that was

9          noticeable.  The range within the housing

10         units as far as the age ranges are everything

11         from little kids to the elderly to families

12         that are trying to raise their families in

13         some pretty crappy circumstances.  So we got

14         lots of complaints about certain intersections

15         within locations where cars are blowing

16         through intersections and they are going to

17         kill somebody.  You were in very tight corners

18         within -- I am sure you know this.  Within a

19         lot of the locations within the city and there

20         are kids everywhere and a lot of blatantly

21         disregard.

22              So I would get emails or 311 complaints

23         or quite honestly, most of them came from

1      people that would just call us or when I was

2      driving around they would stop us and say,

3      hey, can you follow-up on this, please?

4      Somebody is going to get killed.  So I would

5      have a car crew assigned to a location to

6      monitor an intersection, let's say, a stop

7      sign within the projects where there is heavy

8      foot traffic, especially during, you know,

9      school hours or right after school, but that

10     can vary.  Whenever there was an issue.  And

11     those officers would either -- they would

12     observe and either write tickets or they could

13     simply be there as a deterrent so that people

14     saw the car and they would slow down.  If you

15     do that long enough, it just started to

16     register.

17          There were times if you don't have

18     enough officers to man, even now you may see a

19     police car that is not manned.  It is left

20     somewhere in the city, but somebody driving is

21     going to see that car and think it is a manned

22     vehicle.  It is a deterrent.  Again, it varied

23     depending on what you came across, like

1    Q. Okay.  And apart from receiving occasional

2       emails from Phil Serafini regarding the Strike

3       Force checkpoints, you don't have an

4       understanding of the criteria they used to

5       identify checkpoint locations?

6    A. I do not.

7    Q. Okay.  Now I would like to turn to an exhibit

8       that is a compilation of checkpoints that we

9       believe you may have worked on.  I am going to

10      label this Russo Exhibit 8.  I am also going

11      to ask you to tell me if I have done a good

12      job identifying your handwriting or if this

13      actually is from another officer.  Let me know

14      if you are able to see my screen.

15   A. I can't see the bottom of the screen, but I

16      can see -- I see just above the signature.

17   Q. Okay.  Let me --

18   A. Are there more than one?

19   Q. It is more than one page.  Can you see the

20      stamp at the bottom that says COB?

21   A. Yeah.

22   Q. So now you are able to see the full first

23      page.  Let me know if you would like me to

LANCE RUSSO - BY MS. EZIE- 04/29/2022

1           enlarge it again?

2     A.  No.  I can see it.

3     Q.  Mr. Russo, do you recognize this document?

4     A.  I do.  That's not my handwriting, though.

5     Q.  Okay.  And that's not your signature at the

6           bottom?

7     A.  No.

8     Q.  Can you tell whose signature it is?

9     A.  I have no idea.

10    Q.  Okay.  Well, how do you recognize this

11          document?

12    A.  This is what they used to use for their

13          directive for their checkpoints.

14    Q.  Got it.  The Strike Force in particular?

15    A.  Correct.

16    Q.  Was there anything comparable that the Housing

17          Unit used when they conducted checkpoints?

18    A.  I am not sure if we used it like this in a

19          variation of this or not.  It is not ringing a

20          bell.  We didn't do a whole lot of

21          checkpoints.  We may have actually used this

22          form and just used like the command as housing

23          instead of where it says Strike Force on

LANCE RUSSO - BY MS. EZIE- 04/29/2022

1         there.

2    Q. Got it.  So I am going to keep scrolling down

3         this document.  It has a few pages, but I am

4         inferring that the first one was not your

5         handwriting that these other ones are not your

6         handwriting; is that correct?

7    A. Correct.

8    Q. Okay.  Not your handwriting?

9    A. No.  They appear to be the same, but that's

10        not me.

11   Q. Okay.  In any event, do you recall ever making

12        use of a form like this in connection with a

13        Strike Force checkpoint?

14   A. I may have filled one out on the odd time or

15        two.  I honestly can't recall.

16   Q. Okay.

17   A. But, I am familiar with the form.

18   Q. Okay.  And how did you become familiar with

19        the form?

20   A. Well, they were handed out, essentially the

21        directive on how it was run.

22   Q. How the Strike Force checkpoints in particular

23        were run?

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

LANCE RUSSO - BY MS. EZIE- 04/29/2022

1    A. Yeah.  How they should be run and why.

2    Q. Okay.  And if we had never seen a document

3       like this filled out for -- with a command

4       Housing Unit, would that be an indication that

5       perhaps there were no such forms in use by the

6       Housing Unit?

7            MS. RAUH:  Objection.  Form.

8    A. I honestly don't know.  I mean, I am familiar

9       with the form.  I am not sure if we used it or

10      not.

11   Q. Right now you don't recall this form being in

12      use specifically for the Housing Unit?

13   A. No, I don't.

14   Q. Okay.  Now, so, Mr. Russo, you described

15      although you did not have involvement in

16      selecting the checkpoint locations, you

17      participated in a number of checkpoints,

18      correct?

19   A. Correct.

20   Q. What typically occurred at a Strike Force

21      checkpoint?

22   A. They would be designated where officers would

23      be -- well, first, the location it would take

LANCE RUSSO - BY MS. EZIE- 04/29/2022

1    Q.  Okay.  And you stated earlier that you often

2        would schedule checkpoints after there was a

3        shooting; is that accurate?

4    A.  Well, no.  Not often.  I used that as an

5        example of a checkpoint for -- I mean, it

6        could be for anything, but it was generally a

7        high -- an area after there was an incident.

8        It doesn't necessarily have to be a shooting.

9    Q.  A crime incident?

10   A.  Crime or somewhere we had a problem with.  It

11       could have been a chase the night before,

12       anything like that.

13   Q.  Okay.  And was the thinking that the presence

14       of the checkpoint would deter crime?

15          MS. RAUH:  Objection.  Form.

16   A.  That was part of it.  I mean, again, it was --

17       the checkpoint is for V&T, but we also wanted

18       it for the high visibility and if that

19       resulted in various things, you know, keeping

20       the residents happy or ultimately deterring

21       crime, that was certainly a bonus, too.

22   Q.  Okay.  But, there was a relationship between

23       crime incidents and the checkpoint locations,

LANCE RUSSO - BY MS. EZIE- 04/29/2022

1         lot and they requested us to remove vehicles
2         as well.  They also at one point were the ones
3         who would say, hey, this person lives here.  I
4         don't even remember where the hell that was
5         from.  But yes, it was brought to my
6         attention.  I just can't remember from where.
7     Q.  Okay.  Now, is it true that when cars were
8         impounded it generated revenue for the city?
9     A.  I have no idea.
10            MS. RAUH:  Objection.  Form.
11    Q.  Okay.  And is it -- am I correct that as a
12        Housing Unit officer you kept statistics
13        related to the impounds, arrest and summons
14        and parking tags that you issued?
15    A.  Yeah.
16            MS. RAUH:  Objection.
17    A.  There was essentially an activity report to
18        make sure that you are doing your job and not
19        sitting around watching TV for ten hours.  So
20        anything we did throughout the tour from
21        summonses to arrests to parking lots, all that
22        stuff was either in an individual column or
23        summarized in, like, a summary space.  So the

—— LANCE RUSSO - BY MS. EZIE- 04/29/2022 ——

1       officers would turn that in.  I would compile
2       that and then I would forward that.
3    Q. So on these reports you recorded how many
4       traffic summons that officers of the Housing
5       Unit issued?
6    A. Yeah.  I believe it was tallied like after
7       each tour, like if I had four cars working,
8       they would list the cars, what they did
9       throughout the tour, and then it was totaled.
10   Q. You also kept track of how many parking tags
11      officers wrote?
12   A. Yeah.  That would be part of it, too.  I don't
13      know them off the top of my head, but there
14      were spaces for several different things.
15   Q. Okay.  And you also tracked how many impounds
16      that officers performed in the Housing Unit?
17   A. Yes.
18   Q. And who did you forward those statistics to?
19   A. I would send them to my captain.
20   Q. So that could have been Captain Roberts,
21      Captain Serafini?
22   A. Testa and then Lee, yes.
23   Q. So during your entire time as a Housing Unit

LANCE RUSSO - BY MS. EZIE- 04/29/2022

1       remember getting a pat on the back for it.

2   Q.  Okay.  Let's take a look at our next Russo

3       exhibit.  It's a one-page document.  It has an

4       attachment that is a separately labeled

5       document.  So we will start with the email and

6       then we will move onto the attachment.

7           I believe this is Russo Exhibit 12.  And

8       the first document we are going to look at has

9       been produced in discovery as COB0718512.  I

10      am zooming it in because it's just one page so

11      you can see the text.

12  A.  Okay.

13  Q.  Let me know if you are able to see this okay,

14      Mr. Russo.

15  A.  Yeah.  I can.

16  Q.  Okay.  So do you see this is a document from

17      -- an email from Captain Serafini to the

18      Strike Force and housing lieutenants?

19  A.  Yes.

20  Q.  With a CC to Chief Brinkworth?

21  A.  Yes.

22  Q.  And the subject is yearly comparison?

23  A.  Okay.

LANCE RUSSO - BY MS. EZIE- 04/29/2022

1    Q. And do you see that it's describing that

2       Captain Serafini has made a spreadsheet

3       combining the housing and Strike Force yearly

4       statistics?

5    A. Yep.

6    Q. And that the spreadsheet includes numbers form

7       2013, 2014 and 2015?

8    A. Correct.

9    Q. And do you see that he is noting that your

10      statistics have increased from year to year?

11   A. Yep.

12   Q. And he states that's because of the fine work

13      that you and your officers do.

14   A. Okay.

15   Q. Is that a fair way of characterizing what he

16      states?

17   A. Yeah.  That's what it says.  And if it

18      reflects that the officers were doing their

19      jobs, I agree wholeheartedly.

20   Q. And do you see that he thanked you for all of

21      your efforts, along with Chief Brinkworth?

22   A. Yep.

23   Q. So I am going to turn to what can be labeled

—— LANCE RUSSO - BY MS. EZIE- 04/29/2022 ——

1        regarding numbers.

2   Q. Were you aware that there were times that at

3      least with respect to the Strike Force that

4      BPD chain of command expressed concerns about

5      their "low production"?

6   A. I can only speak to my unit.  I wouldn't know

7      that.

8   Q. Okay.  Are you aware that Captain Serafini

9      tried to adopt measures to avoid seeing your

10     "numbers" or "statistics" drop?

11  A. He tried to -- for the housing or Strike

12     Force?

13  Q. Correct.

14  A. Not to my knowledge.

15  Q. Okay.  Let's see.  I am going to go ahead and

16     mark as -- I believe we are up to Russo

17     Exhibit 14, a document that was produced in

18     discovery as COB016260.  And it's a one-page

19     document.  I am going to start with it so that

20     you are able to see the whole document and

21     then if you would like me to zoom in, just let

22     me know.

23  A. Yeah.  If you could zoom in.

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

1    Q. Okay.

2    A. That's good.

3    Q. Okay.  Let me know when you have had a chance

4       to review it.

5    A. Okay.

6    Q. Okay.  Do you see that this is an email from

7       Captain Serafini to Chief Young in 2016?

8    A. Yep.

9    Q. You are copied along with housing and Strike

10      Force lieutenants?

11   A. Correct.

12   Q. And he's requesting an accommodation that

13      would allow you all to hold a Housing Unit and

14      Strike Force Christmas party?

15   A. Correct.

16   Q. And in this email he states that he's taken

17      steps to insure that your statistics will not

18      be negatively affected by the shift change.

19   A. Okay.

20   Q. Do you see that?

21   A. I do.

22   Q. And do you see that towards the end of the

23      paragraph it says, you can assure the

1      commissioner that our numbers will not suffer

2      as a result?

3   A. Yes.

4   Q. Does this refresh your recollection that

5      Captain Serafini in his role as Housing Unit

6      captain was concerned about the numbers that

7      you all generated when it came to the police

8      activities we have discussed?

9   A. Well, this is a request that we can have a

10     party.  He just wanted let them know, hey, we

11     are going to work.  We are not just going to

12     come in that day.  We will work our shift

13     during these hours.  So we will still be

14     active that day and we will still be

15     productivity.  That's what this was for so --

16     but, yes.  It does state what you said as

17     well.

18  Q. Okay.  Would you agree that making arrests,

19     impounds, summons, issuing parking tags, that

20     all of that helped to justify the existence of

21     your departments?

22          MS. RAUH:  Objection.  Form.

23  A. Yes.  I would.  I would expect the guys to do

1          their jobs and if those numbers are a

2          reflection that they were out there doing

3          those jobs, regardless of what the numbers

4          were, then that's exactly what I expected of

5          them.

6     Q.   Okay.  And is it fair to say -- and I will

7          stop the screen share.  Is it fair to say that

8          you were also expected to generate high

9          numbers when it came to justifying overtime?

10    A.   Our overtime wasn't based like that.  Ours was

11         -- a lot of our overtime of speaking

12         specifically of housing so there's -- to

13         differentiate, we had it as a post to be

14         available because of an issue.  So when guys

15         went on overtime for -- there were actually

16         two different overtimes.  You have a daytime

17         overtime and you have an evening overtime, but

18         a lot of those overtimes were based on you

19         just being there.

20              So we didn't want guys downtown making

21         arrests or doing other things.  We wanted you

22         present in case something happened, but they

23         did conduct activities during that time, but

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

321

```
 1    STATE OF NEW YORK)
 2              ) ss.
 3    COUNTY OF ERIE )
 4
 5         I, Brooklyn Morton, Notary Public, in and for
 6    the County of Erie, State of New York, do
 7    hereby certify:
 8         That the witness whose testimony appears
 9    hereinbefore was, before the commencement of
      their testimony, duly sworn to testify the
10    truth, the whole truth and nothing but the
      truth; that said testimony was taken pursuant
11    to notice at the time and place as herein set
      forth; that said testimony was taken down by me
12    and thereafter transcribed into typewriting,
      and I hereby certify the foregoing testimony is
13    a full, true and correct transcription of my
      shorthand notes so taken.
14
15         I further certify that I am neither counsel
16    for nor related to any party to said action,
      nor in anyway interested in the outcome
17    thereof.
18         IN WITNESS WHEREOF, I have hereunto
      subscribed my name and affixed my seal on this
19    19th day of May, 2022.
20
21    ---------------------
22              Brooklyn Morton
23
```



DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

0023