# EXHIBIT 40

1    UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF NEW YORK

3    ------------------------------------------------

4    **BLACK LOVE RESISTS IN THE RUST, et al.,**
     **individually and on behalf of a class of**
5    **all others similarly situated,**

6                          Plaintiffs,

7     -vs-                           1:18-cv-00719-CCR

8    **CITY OF BUFFALO, N.Y., et al.,**

9                          Defendants.

10   ------------------------------------------------

11          **ORAL EXAMINATION OF PHILIP SERAFINI**

12               **APPEARING REMOTELY FROM**

13               **ERIE COUNTY, NEW YORK**

14

15          Monday, December 27, 2021

16             9:03 a.m. - 5:15 p.m.

17               pursuant to notice

18

19       **PAGES 324 & 325 DESIGNATED CONFIDENTIAL**

20

21   REPORTED BY:

22   Carrie A. Fisher, Notary Public

23   APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

1          **R E M O T E   A P P E A R A N C E S**

2     APPEARING FOR THE PLAINTIFFS:

3          **CENTER FOR CONSTITUTIONAL RIGHTS**
           **BY:  A. CHINYERE EZIE, ESQ.**
4          666 Broadway, 7th Floor
           New York, New York 10012
5          (212) 614-6464

6     APPEARING FOR THE DEFENDANTS:

7          **CITY OF BUFFALO LAW DEPARTMENT**
           **BY: ROBERT E. QUINN,**
8          **ASSISTANT CORPORATION COUNSEL**
           1100 City Hall
9          65 Niagara Square
           Buffalo, New York 14202
10         (716) 851-4326

11

12

13

14

15

16

17

18

19

20

21

22

23

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A. We worked in the same district at one time,

2       yes.

3    Q. What district was that?

4    A. A District.

5    Q. Okay.  A District covers South Buffalo?

6    A. Yes.

7    Q. What would you describe as the geographic

8       range of the other districts?  I believe there

9       is five in total, A through E?

10        MR. QUINN:  Form.

11   A. You want me to describe each district and what

12      part of the city they patrol?

13   Q. Yes, please, if you might.

14   A. B District is mostly downtown.  C District is

15      the east side.  D District is North Buffalo

16      and E District is -- we used to call it Cold

17      Springs but it's kind of the east side too, E

18      District.

19   Q. Got it.  That's the E district, okay, and D

20      District is North Buffalo, okay.

21      And so you and your relatives have all

22      served at times in the A District?

23   A. Yes.

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1   Q. Got it.  Now, Mr. Serafini, since leaving the

2      BPD -- sorry, prior to joining the BPD had you

3      had any other job in law enforcement?

4   A. No.

5   Q. And since leaving the BPD, have you had any

6      other jobs in law enforcement?

7   A. No.

8   Q. Are you enjoying a true retirement, or have

9      you found employment somewhere besides the BPD

10     since 2018?

11   A. I have a little business.  I have a picture

12     framing business.

13   Q. That sounds nice.

14        Now, what's the highest level of

15     education that you have completed?

16   A. Twelfth grade.

17   Q. Where did you attend high school?

18   A. I attended Bishop Timon for a year and a half,

19     and then the remaining two and a half years I

20     graduated from Southside High School.

21   Q. Okay.  And are there any other courses or

22     schooling you have received apart from the

23     police academy?

1    A. No.

2    Q. Okay.  Now, I'd like to just briefly go over

3       your employment history within the BPD.  You

4       stated earlier that you began -- you were

5       commissioned in August of 1986.  What was the

6       first position you held within the BPD?

7    A. Police officer.

8    Q. And was that in A District or a different

9       district at that time?

10   A. No, it was in Precinct 10 predominantly.

11   Q. Okay.  What did Precinct 10 cover?

12   A. The west side, lower west side.

13   Q. Okay.  What district would that be considered

14      today?

15   A. That's B.  B, as in boy, District.

16   Q. Okay.  And how long were you a police officer?

17   A. Ten years.

18   Q. Okay.  What's the next position that you held

19      within the BPD?

20   A. Lieutenant.

21   Q. And that was approximately beginning in 1996?

22   A. Yes.

23   Q. And where did you hold the position of

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A.  My job was eliminated, and then I transferred

2        back to A District.

3    Q.  When you say that your job was eliminated, was

4        the Mobile Response Unit eliminated?

5    A.  Not at that time.  Just my job was eliminated,

6        the captain's position.

7    Q.  Okay.  Did you have an understanding as to why

8        that position was eliminated?

9    A.  I just -- I believe it was budgetary.

10   Q.  Okay.  And so what was the next role that you

11       had at that time?

12   A.  The next role I had after the MRU, I stated I

13       went to A District.

14   Q.  Okay.  And as captain of the A District, how

15       would you describe your role at that time?

16           MR. QUINN:  Form.

17   A.  I was the Patrol captain, supervised the

18       lieutenants and the officers on patrol.

19   Q.  How many -- how many officers reported to you?

20   A.  If I had to guess, approximately 75.

21   Q.  As captain of A District, did you and your

22       officers have to respond to traffic safety

23       incidents?

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A. So you --

2          MR. QUINN:  Form.

3    Q. I am sorry.  There was a verbal response.  I

4       didn't hear it.

5    A. Traffic -- you mean accidents, traffic

6       accidents?

7    Q. Yes.

8    A. Yes.  Yes, I did.

9    Q. Did you respond to DUIs?

10   A. Yes, I did.

11   Q. Okay.  Did you respond to incidents of violent

12      crime?

13   A. Yes.

14   Q. Okay.  Were there people in the A District who

15      trafficked drugs to your knowledge when you

16      were captain?

17   A. Yes.

18   Q. Are there people in the A District who

19      unlawfully possess guns?

20   A. Yes.

21   Q. Are there shootings in the A District?

22   A. Yes.

23   Q. Okay.  Did you see gang activity in the A

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1          District?

2      A.  Yes.

3      Q.  Okay.  Now, what was the next role that you

4          held after A District captain?

5      A.  I transferred to the Housing Unit.  I was the

6          Housing Unit captain.

7      Q.  That was a transfer that you made effective

8          June 2015?

9      A.  Approximately, yes.

10     Q.  Okay.  At that point, did you accept a second

11         position as Strike Force captain or did that

12         happen at a later date?

13     A.  No, I was never the Strike Force captain.

14     Q.  You were never the Strike Force captain?

15     A.  No.

16     Q.  There was never a period where you

17         simultaneously held the designations of Strike

18         Force and Housing Unit captain?

19     A.  Oh, I was the Housing captain.  If I could

20         elaborate, we were housed in the same building

21         as the Strike Force.  I was asked to perform

22         some administrative duties for the Strike

23         Force occasionally.

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1   Q.  And why was that important?

2   A.  The Buffalo -- the BMHA wanted more police

3       presence.  When I say patrol, when I say the

4       officers patrolled the housing properties,

5       that was for more visibility in an effort to

6       deter crime.

7   Q.  What steps or strategies did the Housing Unit

8       take to be highly visible?

9           MR. QUINN:  Form.

10  A.  They were in marked police cars and they drove

11      through the housing properties, occasionally

12      stopping, talking to residents and also

13      attended community meetings within the housing

14      projects -- housing properties.

15  Q.  And is it accurate that within BMHA the

16      Housing Unit concentrated its activities on a

17      few main developments?

18          MR. QUINN:  Form.

19  A.  They were in charge -- or they patrolled all

20      of the Housing properties.  Some Housing

21      properties demanded more attention, they're

22      larger than others, some were small so it

23      varied.

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1           MR. QUINN:  Form.

2     A. No, they were two separate units.

3     Q. Did they have a similar geographic focus in

4        the city of Buffalo?

5           MR. QUINN:  Form.

6     A. Sometimes.  I mean, as I said, the Housing

7        Unit was responsible for the Housing

8        properties, things that occurred in those

9        properties.  Sometimes if -- I am sure

10       sometimes the Strike Force would patrol in

11       there and police in there.

12    Q. Okay.  And how much involvement did you have

13       in setting the patrols for Strike Force, the

14       Strike Force team?

15    A. I really didn't have anything to do with it

16       but occasionally, as I said, I think I said

17       before, a chief from a district would request

18       that we set up traffic safety checkpoints in

19       their district.

20    Q. Were there ever occasions that you were giving

21       lieutenants on the Strike Force instructions

22       that extended beyond kind of the "a chief

23       requested this, please accommodate"?

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. Did you conduct performance evaluations of any

2       of the officers you reported -- who reported

3       to you?

4    A. No.  That's the Buffalo Police.

5    Q. You never performed performance evaluations?

6    A. No.

7    Q. Did you say it was BPD policy not to do such

8       evaluations?

9            MR. QUINN:  Form.

10   A. They don't have performance evaluations.

11   Q. Okay.  How would you escalate if -- how would

12      you respond to instances where your officers

13      had deficits?

14           MR. QUINN:  Form.

15   A. What do you mean by "deficits"?

16   Q. Were there ever instances where you thought

17      your officers could benefit from additional

18      training or additional supervision?

19   A. I don't believe there was.

20   Q. But there were instances where your officers

21      would be subject -- the subject of complaints?

22   A. Yes.

23   Q. How did you communicate information to your

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. Did you take any steps to ensure that your
2       officers and lieutenants were not engaging in
3       racial profiling?
4            MR. QUINN:  Form.
5    A. No.
6    Q. Okay.  Now, am I correct that the Housing Unit
7       also had an involvement in traffic
8       checkpoints?
9    A. Sometimes they would conduct traffic safety
10      checkpoints in or around the Buffalo Municipal
11      Housing properties.
12   Q. Okay.  How often was that the Housing Unit's
13      practice?
14   A. It was rare.
15   Q. In instances where the Housing Unit did
16      conduct checkpoints around BMHA properties,
17      what was the reasoning?
18           MR. QUINN:  Form.
19   A. To enforce vehicle and traffic law and penal
20      law.
21   Q. Since it was rare, what, if anything, would
22      warrant the creation of a checkpoint to your
23      understanding?

---

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1           MR. QUINN:  Form.

2     A. If we -- if we received a complaint that cars

3        were speeding through Buffalo Municipal

4        Housing property, we would conduct a traffic

5        safety checkpoint to try to curtail that

6        activity.

7     Q. Are there any other instances you can think of

8        where -- any other reasons why the Housing

9        Unit in particular engaged in checkpoints?

10    A. Well, as I said, just in response to

11       complaints we received from the Housing

12       residents.

13    Q. Okay.  That's different than the Strike Force

14       checkpoints, correct?  Those were not

15       complaint driven?

16           MR. QUINN:  Form.

17    A. No, those -- those the Strike Force conducted

18       them on a daily basis.

19    Q. Okay.  And am I correct that Housing Unit

20       officers would sometimes assist the Strike

21       Force in conducting those checkpoints?

22    A. Sometimes.

23    Q. What was the circumstance where the Housing

—— PHILIP SERAFINI - BY MS. EZIE - 12/27/21 ——

```
 1          Unit would assist?
 2     A.  They required a minimum amount of officers to
 3          conduct a traffic safety checkpoint.  For the
 4          safety of the officers it was a minimum amount
 5          of officers.  You couldn't conduct it with
 6          just two officers.  So sometimes if the Strike
 7          Force was shorthanded, meaning they didn't
 8          have enough personnel, a couple of the Housing
 9          officers would assist them.
10     Q.  Were those overtime details for the Housing
11          Unit?
12     A.  Sometimes they -- sometimes -- no but
13          sometimes they were on overtime and they would
14          work it, but it wasn't specifically for the
15          traffic safety checkpoint as far as the
16          Housing officers are concerned.
17     Q.  Got it.  Now, you described earlier that you
18          would receive instructions from higher-ups at
19          the BPD about the operation of the Strike
20          Force checkpoints from time to time, correct?
21     A.  Yes.
22              MR. QUINN:  Form.
23     Q.  I'd like to turn to what has been marked as
```

```
 1          COB016284.  If I am not mistaken, I think that
 2          would make that would be Exhibit 5 so Serafini
 3          Exhibit 5.
 4               Okay.  Mr. Serafini, are you able to see
 5          this?
 6     A.  Yes.
 7     Q.  Okay.  Do you see that it's an email that you
 8          authored on April 17th, 2017?
 9     A.  Yes.
10     Q.  And it's a message to several lieutenants as
11          well as Chief Aaron Young.  Do you see that?
12     A.  Yes.
13     Q.  Am I correct that the distribution list here
14          consists of both Housing Unit lieutenants and
15          Strike Force lieutenants?
16     A.  That's correct.
17     Q.  Okay.  And what are you -- what is this email
18          conveying?
19     A.  Let me have a second to read it.
20     Q.  Sure.
21     A.  This was letting all the lieutenants know that
22          for one of the traffic safety checkpoints that
23          the Housing officers would assist the Strike
```

1          Force officers.

2     Q.  Okay.  Were you also instructing the Strike

3          Force about where their checkpoints would take

4          place?

5               MR. QUINN:  Form.

6     A.  That's correct.

7     Q.  And you were providing maps to them as well?

8     A.  Correct, yes.

9     Q.  Okay.  How often were you providing the Strike

10         Force instructions about where they should

11         conduct checkpoints?

12    A.  What I believe happened on this occasion is I

13         was at headquarters one day and Deputy

14         Commissioner Lockwood gave me some maps that

15         he received from the Crime Analysis Unit, and

16         on the maps were some hotspots where there

17         were some violent crimes and he wanted -- he

18         wanted the traffic safety checkpoints

19         conducted in these sectors, specifically here

20         it's E2 and the E4 sectors which were in E

21         District so I distributed them to the

22         officers.  And as I said, he wanted them

23         conducted in those areas so I made sure they

1          conducted the checkpoints in those areas.

2     Q.  Okay.  Is it fair to say it was not uncommon

3          that you would be tasked with giving

4          instructions both to the Housing Unit and to

5          the Strike Force regarding checkpoints?

6               MR. QUINN:  Form.

7     A.  It happened occasionally.  Not all the time,

8          but once in a while.

9     Q.  And how often would you say that the Strike

10         Force and Housing Unit collaborated on the

11         operation of checkpoints?

12              MR. QUINN:  Form.

13    A.  Rarely.

14    Q.  By rare, how -- you know, once a year, once a

15         week, what would you estimate would be the

16         frequency?

17    A.  Well, this email right here was when we had

18         details during the day, again, outside of our

19         regular shifts so it's hard to say.  As I

20         said, at nighttime if they were shorthanded we

21         would assist them.  Sometimes they wouldn't

22         run a traffic -- sometimes the Strike Force

23         would not run a traffic safety checkpoint

1          fights between the students at the football

2          games and basketball games so they would be

3          detailed there.

4      Q. And although you were not captain of the

5          Strike Force, you were involved in relaying

6          instructions along these lines to Strike Force

7          lieutenants?

8      A. That's correct.

9      Q. Okay.  Now earlier, Mr. Serafini, we spoke

10         about the Housing Unit running its own

11         checkpoints from time to time near BMHA

12         properties.  Do you recall that?

13     A. Yes.

14     Q. Over your time as captain, do you have a guess

15         of how many Housing Unit checkpoints were

16         conducted?

17              MR. QUINN:  Form.

18     A. I don't know.

19     Q. Would it have been more than ten?

20     A. In the three years that I was at Housing?

21     Q. Yes.

22     A. Three and a half years, would it have been

23         more than ten?  It's possible.  As I said, it

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1      wasn't on a daily basis like the Strike Force.

2      It was a very -- it was rarely.

3  Q. Okay.  Were there -- was anyone -- any of your

4      higher-ups in BPD providing you guidance or

5      directives on the Housing Unit checkpoints?

6  A. Sometimes they did.  Again, I can't remember

7      every occasion, but they would send me an

8      email or call me on the phone and say "I'd

9      like a checkpoint set up over here."

10  Q. And who is "they" in this instance?

11  A. Deputy Commissioner Lockwood or Chief Aaron

12      Young or Chief Kevin Brinkworth.

13  Q. Do you -- did you have any recordkeeping

14      practices related to those checkpoints, the

15      Housing Unit checkpoints?

16  A. Records of the checkpoints?

17  Q. Yes.

18  A. I don't believe so.  I believe for the Housing

19      Unit I don't think -- it would have been noted

20      on the activity report.  It would have been

21      noted on the activity report that the

22      lieutenants submitted every day but as far as

23      a separate statistic for it, no.

1    Q. Okay.

2    A. But I know in my time as a police officer, I

3       know it was a long time ago, we were allowed

4       to do that.  We did it regularly.  That was

5       from 1986 to 1996.

6    Q. And when you were -- when you were a captain

7       in the Housing Unit, you permitted your

8       officers to impound vehicles for expired

9       driver's licenses with the exception that you

10      described of if another owner is identified

11      who can drive it away?

12          MR. QUINN:  Form.

13   A. Yes.  When that came down from my superiors, I

14      don't know what period of time it was but it

15      was sometime within my -- maybe the last two

16      years I was there, that's correct.

17   Q. Did you allow your officers to impound

18      vehicles that had expired registrations?

19          MR. QUINN:  Form.

20   A. Yes.

21   Q. Did you allow your officers to impound

22      vehicles that had expired inspection stickers?

23          MR. QUINN:  Form.

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A. Yes.

2    Q. Okay.  And except for the directive, you

3       allowed your officers to impound vehicles that

4       had -- whose drivers had a suspended license?

5    A. Yes.

6           MR. QUINN:  Form.

7    Q. Okay.  And, Mr. Serafini, did you allow your

8       officers to impound vehicles on BMHA

9       properties itself?

10   A. Yes.

11   Q. Were you ever notified that BMHA properties

12      might be considered private properties where

13      parking tags and impounds should not occur?

14   A. Not that I can remember, no.

15   Q. Did you allow your officers to do impounds on

16      private properties?

17   A. I don't -- I don't remember if they ever

18      impounded a vehicle on private property, but

19      it's a possibility that they could have.

20   Q. Okay.  But you did allow your officers to

21      write parking tags at BMHA properties?

22   A. Yes.

23   Q. Okay.  And to issue traffic summonses?

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

 1    A. Yes, but --

 2    Q. -- Housing Unit captain?

 3    A. Yes, but there is a little more meaning to

 4       that.  What I probably should have said in

 5       their travels and their duties when they see

 6       suspicious people, they stop and question them

 7       and a lot of them turn out to be gang members

 8       and parolees.

 9    Q. And when you say "suspicious people," what do

10       you mean?

11    A. People doing --

12           MR. QUINN:  Form.

13    A. I am sorry.  Conducting suspicious activity

14       they may think are committing or in the

15       process of committing a crime.

16    Q. You agree that's not what this indicates here?

17           MR. QUINN:  Form.

18    A. Well, I should have worded it a little bit

19       differently.  What this is is our services

20       that we perform above baseline which meant

21       normal patrol and everything.  This is the

22       result of some of the investigative patrolling

23       that the officers did.  A lot of times when

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

```
 1            MS. EZIE:  Unless you're objecting for
 2       privilege, Mr. Quinn, he may answer.
 3            MR. QUINN:  Inappropriate question to
 4       ask him to guess.
 5   Q.  What's your understanding of why -- I will
 6       rephrase.
 7            What's your understanding of why Deputy
 8       Commissioner Lockwood was a supporter of the
 9       Housing Unit?
10            MR. QUINN:  Form.
11   A.  He saw a need.  He saw a need for more
12       personnel specifically assigned to the Buffalo
13       Municipal Housing Authority properties.
14   Q.  And so Deputy Commissioner Lockwood,
15       Commissioner Derenda, the Chiefs Brinkworth
16       and Young, they all approved and signed off on
17       your activities during the time that you were
18       Housing Unit captain?
19            MR. QUINN:  Form.
20   A.  Yes.
21   Q.  Okay.  Now, I'd like to switch to the topic of
22       checkpoints.
23            Mr. Serafini, how often would you say
```

1              that Housing Unit officials were involved in

2              the operation of Strike Force checkpoints?

3        A.  When we had the daytime details which were

4              intermittent, we would have them for a few

5              weeks and then we wouldn't have them.  They

6              were involved because one of the duties during

7              the checkpoints -- or during the daytime

8              details was to conduct one checkpoint,

9              usually.

10       Q.  At least one checkpoint?

11       A.  Usually.  I say that manpower permitting,

12             weather conditions permitting.

13       Q.  So weather conditions and manpower permitting,

14             checkpoints -- Strike Force checkpoints were

15             supposed to occur on a daily basis?

16       A.  When we had it -- sorry.  When we had a

17             detail, the daily detail, the five-hour daily

18             detail was not on a regular daily basis.  It

19             was intermittent.

20       Q.  Okay.  It's true, however, that there was a

21             program within the BPD of running daily

22             checkpoints weather and manpower permitting

23             for several years, correct?

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1             MR. QUINN:  Form.

2     A.  That was the Strike Force, not the Housing

3         Unit.

4     Q.  Okay.  Are you familiar with the Strike

5         Force -- the Strike Force's daily checkpoints?

6             MR. QUINN:  Form.

7     A.  Yes.

8     Q.  Okay.  So the Strike Force had a practice of

9         running daily checkpoints for a period of

10        several years?

11    A.  During the time that I was there, yes, weather

12        and manpower provided.

13    Q.  Okay.  And the Housing Unit would join those

14        checkpoints if or when there was a daytime

15        detail approved?

16            MR. QUINN:  Form.

17    A.  The Housing performed their own checkpoints if

18        there was manpower and if the weather was

19        permitting during the daytime details, the

20        five hour -- I believe it was five hours a

21        day.

22    Q.  Those were the checkpoints you described as

23        occurring at BMHA -- at or near BMHA

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1       properties?

2    A. That's correct, yes.

3    Q. Were those checkpoints run in conjunction with

4       the Strike Force or solely with Housing Unit

5       personnel?

6           MR. QUINN:  Form.

7    A. Again, if there weren't enough Housing

8       manpower to run that on their own, sometimes

9       Strike Force would assist them.  Sometimes --

10   Q. Okay.

11   A. -- if there wasn't enough manpower, they

12      wouldn't run it.

13   Q. What's your estimate of how many checkpoints

14      the Housing Unit ran pursuant to those

15      overtime details during your time as captain?

16          MR. QUINN:  Form.

17   A. That's hard because we would have the detail

18      for a month or two and then it would stop and

19      then two months later they would start it

20      again.  Then they would only start it on

21      Fridays or Saturdays.  And then in the summer

22      it would be all week long.  It's hard to

23      predict.  If you look back on all the reports,

1    the lieutenant's reports you could figure it

2    out but it's kind of tedious.

3  Q. Earlier we had discussed whether the Housing

4    Unit had run more than ten checkpoints during

5    your time as captain.  Now that you are

6    remembering that it was connected to the --

7    the daytime details being authorized, is it

8    fair to say that the Housing Unit likely ran,

9    say, more than a hundred checkpoints during

10    your time as captain?

11        MR. QUINN:  Form.

12  A. I think it would be less than a hundred, if I

13    had to guess.

14  Q. Okay.  But whenever the details were

15    authorized, the checkpoints would happen on a

16    daily basis manpower and weather permitting?

17        MR. QUINN:  Form.

18  A. Yes.

19  Q. Okay.  Now with respect to the Strike Force

20    checkpoints, how would you describe your

21    involvement?

22  A. Occasionally my superiors would relay to me --

23    would want me to relay to the lieutenants if

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

```
 1        it states "keep in mind there will be three

 2        checkpoints on the MP4 shift daily"?

 3   A. Yes, that's what Deputy Commissioner wanted at

 4        that time.

 5   Q. Okay.  "Deputy commissioner" being who in this

 6        instance?  Lockwood?

 7   A. Deputy Commissioner Lockwood, yes.

 8   Q. Okay.  And do you see that the second to last

 9        sentence states, you know, "please remember to

10        email the DPC."  Is that deputy police

11        commissioner?  Is that what that stands for?

12   A. Yes.

13   Q. "Chief and myself of the checkpoint locations

14        daily."

15   A. Yes, I see that.

16   Q. Okay.  Do you have an understanding of why the

17        deputy police commissioner had instructed you

18        to ensure that three checkpoints were being

19        run on a daily basis by the Strike Force?

20   A. I do.  At that particular time, the deputy

21        commissioner would receive information from

22        the Crime Analysis Unit of certain hotspots,

23        high crime locations where crimes were
```

1          committed, violent crimes were committed, and

2          at that time Deputy Commissioner Lockwood

3          wanted to make sure we put two traffic safety

4          checkpoints in those areas.

5     Q. So under Deputy Commissioner Lockwood the

6          traffic safety checkpoints were part of a

7          crime control and crime prevention strategy?

8               MR. QUINN:  Object to form.

9     A. Should I answer it?

10    Q. You may answer it.

11    A. Yes, yes, yes.

12    Q. Okay.  We have been going for a little bit of

13         time and I know that at some point we need to

14         take a lunch break.  Is this a good time to do

15         all of the above?

16    A. It's up to you.

17              MR. QUINN:  Yeah, I want to get it done

18         as quick as we can so whatever you think.

19              MS. EZIE:  Okay.  Ms. Fisher, how long

20         for your purposes would you need?

21              THE REPORTER:  Even just 15 minutes is

22         fine.

23              MS. EZIE:  Do we want to take a

—————PHILIP SERAFINI - BY MS. EZIE - 12/27/21—————

1        commissioner.

2     Q. Okay.  That was not a determination that you

3        made --

4     A. No.

5     Q. -- that a lieutenant should be provided that

6        authority?

7             Do you know what guidance, if any, the

8        lieutenants were provided about choosing

9        checkpoint locations?

10            MR. QUINN:  Form.

11    A. No, I don't.

12    Q. Okay.  So -- okay.  Is that to say that the

13       lieutenants had complete and total discretion

14       about where to locate checkpoints?

15            MR. QUINN:  Form.

16    A. I don't specifically know.

17    Q. Okay.  Isn't it fair to say that when the

18       lieutenants chose the locations of

19       checkpoints, they were operating with some

20       general guidance or parameters from BPD

21       leadership?

22            MR. QUINN:  Form.

23    A. You said is it fair to say that?

—————DEPAOLO CROSBY REPORTING SERVICES, INC.—————
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1    Q. Yes.

2    A. Yes.

3    Q. Okay.  I'd like to show you an exhibit that --

4       this will be Serafini Exhibit 12.  It's a

5       document that was produced in discovery as

6       COB016252.  I am pulling it up right now.

7          Mr. Serafini, are you able to see this

8       document?

9    A. Yes.  Yes.

10   Q. Okay.  And do you see that it is an email that

11      you sent on July 5th, 2016, to the Strike

12      Force lieutenants copying Chief Young?

13   A. Yes.

14   Q. Okay.  And it's called -- I guess it's a typo,

15      but it's describing the Strike Force daytime

16      detail?

17   A. Yes, I see that.

18   Q. Okay.  And your testimony is that these

19      daytime details, whether they were Strike

20      Force or Housing Unit details, were always

21      overtime details?

22          MR. QUINN:  Form.

23   A. Not always.  If they were operated during the

1    day, they were overtime because that was

2    outside of our normal work schedule and

3    outside of Strike Force's normal work

4    schedule.

5  Q. So the daytime detail referenced here was an

6    overtime detail?

7  A. The daytime details were always overtime, yes.

8  Q. Okay.  So this is describing in the first

9    paragraph that there has been an increased

10    manpower for the overtime detail, daytime

11    detail; is that correct?

12  A. Yes.

13  Q. Okay.  And then in paragraph 2, it begins by

14    saying that "Deputy Police Commissioner

15    Lockwood wants results with this increased

16    daytime detail."  Do you see that?

17  A. Yes.

18  Q. And then it states, "all officers should be

19    made aware of this, and of what is expected of

20    them."  Do you see that?

21  A. Yes.

22  Q. "In the past, the officers assigned to the

23    daytime detail have always yielded good

1          results and we all expect this to continue

2          into the future."  Do you see that?

3     A.  Yes.

4     Q.  What were you -- what were you describing or

5          conveying in that paragraph?

6               MR. QUINN:  Form.

7     Q.  I will rephrase.

8               What were you communicating to officers

9          here?

10              MR. QUINN:  Form.

11    A.  Sometimes when officers are on an overtime

12         detail, not just specific to the Housing and

13         the Strike Force Units, sometimes when they're

14         on an overtime detail, they get a little laxed

15         and they don't perform like they normally

16         should so this email was just making them --

17         wanted to make the officers aware that they're

18         expected to work.

19    Q.  And by "work," is that what you mean when you

20         say results?

21    A.  Yes.

22    Q.  What does results mean exactly?

23    A.  Well --

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1          MR. QUINN:  Form.

2     A.  Work and results, what I mean by that is what

3          was expected of them:  To patrol all the areas

4          that they were designated to patrol, to

5          enforce the vehicle and traffic law, to

6          investigate suspicious activity whether it was

7          on the street or by someone operating a

8          vehicle.

9     Q.  And what was expected of officers exactly?

10          MR. QUINN:  Form.

11    A.  It was expected of them to write some

12          summonses, some parking tags if it was

13          warranted, and to make arrests if it was

14          warranted.

15    Q.  And when you say that in the past the officers

16          have always yielded good results, are you

17          referring to arrests, summonses, parking tags,

18          those types of results?

19    A.  I am referring to their overall performance --

20    Q.  How did you --

21    A.  -- not just those specific things.

22    Q.  Sorry.  How did you measure performance in

23          that case?

0034

1           MR. QUINN:  Form.

2      A. By the statistics and then by other things

3         such as sometimes they would develop

4         information from citizens or from Housing

5         residents on drug houses or locations or

6         people that were carrying guns, certain

7         vehicles.  It was a development of information

8         in addition to the statistics of summonses,

9         arrests, guns confiscated.

10     Q. Okay.  Now, in the third paragraph it states

11        that Deputy Commissioner Lockwood also wanted

12        there to be two traffic checkpoints run during

13        the daytime detail.  Do you see that?

14     A. Yes.

15     Q. And then in the second sentence of that

16        paragraph it states "as you all have done in

17        the past, the checkpoint locations should be

18        conducted in and around recent areas of

19        violence."  Do you see that?

20     A. Yes.

21     Q. It goes on to say, "for example, if there was

22        a shooting during the previous night at

23        Broadway/Fillmore, then a traffic checkpoint

1      should be conducted in that vicinity."

2      Correct, that's what it states?

3  A. Yes, I see that.

4  Q. Okay.  What was the source of this guidance

5      that you were providing the Strike Force

6      lieutenants?

7         MR. QUINN:  Form.

8  A. Well, as I mentioned before, the Strike Force

9      lieutenants a lot of times determined the

10     locations of the traffic safety checkpoints.

11     And if there was a shooting, for example, the

12     night before or if they had problems while

13     they were working the night before, if they

14     heard violence going on in a certain area,

15     then the next day they were expected to set up

16     the traffic safety checkpoint in that area or

17     around that area.

18  Q. Why?

19  A. Because it's been proven where we set up the

20     traffic safety checkpoint crime would be

21     curtailed.

22  Q. Got it.  So following that strategy allowed

23     for the checkpoints to be a crime prevention

1         tool?

2     A.  Yes.

3     Q.  And lieutenants were expected to use

4         checkpoints -- when they were determining the

5         actual locations of checkpoints, they were

6         supposed to be following this crime control

7         guidance here?

8             MR. QUINN:  Form.

9     A.  That's correct.

10    Q.  And you state here that "as you have done in

11        the past, the checkpoint locations should be

12        conducted in and around recent areas of

13        violence."  Were those the standing

14        instructions for how Strike Force checkpoints

15        should be determined unless and until you

16        received a request from someone, for instance,

17        at the chief or deputy commissioner level?

18            MR. QUINN:  Form.

19    A.  That's accurate, yes.

20    Q.  Okay.  And so although lieutenants had some

21        discretion about where to place the actual

22        checkpoint as far as the intersection, they

23        were expected to use -- to follow this

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1        guidance, correct?

2    A. Yes.

3    Q. And is this guidance that you would have

4        received from the leadership of the BPD?

5            MR. QUINN:  Form.

6    A. Yes.

7    Q. Does that include Commissioner Derenda?  Would

8        Commissioner Derenda have approved these

9        checkpoint instructions?

10            MR. QUINN:  Form.

11    A. It was my understanding, yes.

12    Q. And the same is true for Deputy Police

13        Commissioner Lockwood?

14    A. Yes.

15    Q. And Chief Young?

16    A. At this period of time, yes.

17    Q. Okay.  When Chief Brinkwood [sic] was the

18        chief ahead of you, was this the same guidance

19        that was followed as to checkpoint locations?

20            MR. QUINN:  Form.

21    A. Yes.

22    Q. I will take this exhibit down.

23            There was also a period where you were

---

—— PHILIP SERAFINI - BY MS. EZIE - 12/27/21 ——

1    Q. But you did relay the instructions you were

2        given?

3    A. Yes, I did.

4    Q. Okay.  Were some of those maps showing areas

5        with recent shootings?

6            MR. QUINN:  Form.

7    A. Yes.

8    Q. Why would checkpoints be located in areas with

9        recent shootings?

10            MR. QUINN:  Form.

11    A. Because it's been shown that they deter crime.

12        When a traffic checkpoint is conducted in an

13        area -- when you have 15 police officers in an

14        area with six or seven patrol cars and they're

15        checking registrations, the criminals aren't

16        going to commit crimes right there.  More

17        likely than not they're not going to commit

18        crimes there.  They're going to -- criminals

19        are going to stay away from where the police

20        are if they can see the police.

21    Q. Okay.  So were the checkpoints operated in a

22        manner where only motorists who were involved

23        in shootings had to pass through them?

—— DEPAOLO CROSBY REPORTING SERVICES, INC. ——
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1    Q. Was there any guidance about when officers

2        should -- provided to officers about when they

3        should stop, issue summonses, have a longer

4        interaction with the motorist?

5    A. Well, they were allowed to use some

6        discretion, too.  They didn't stop every

7        single person that had a taillight out or a

8        headlight out but, again, I don't have

9        personal knowledge of all the details of that.

10   Q. So to your knowledge, there was no guidance

11       that officers were following with respect to

12       the operation of the checkpoints; they were

13       using their discretion?

14            MR. QUINN:  Form.

15   A. Yes.

16   Q. Okay.  And did you supervise officers or

17       lieutenants when they were operating

18       checkpoints?

19            MR. QUINN:  Form.

20   A. Once.  On one point I was there for about a

21       half hour or an hour.

22   Q. So in your three years as captain of the

23       Housing Unit with administrative duties over

1          supervisor there in housing.  That's the only

2          time I worked there, and I would drive through

3          Langfield-Kenfield once a night.  So that's

4          the only part I know.  I mean, I know the

5          lower west side; I worked there for ten years.

6          I know A District; I worked there for probably

7          eight years.  I don't know places where I

8          didn't work.

9     Q.  Okay.  How would you describe the A District,

10         South Buffalo?

11    A.  A District is predominantly White people --

12    Q.  Okay.

13    A.  -- from what I have learned.

14    Q.  And if I said the E District and East Buffalo

15         was predominantly Black; would you agree?

16              MR. QUINN:  Form.

17    A.  It's possible.

18    Q.  Were the BMHA residences that you patrolled,

19         were they majority minority?

20    A.  It depends which one, which property.  There

21         were a lot of properties.

22    Q.  Was Kenfield-Langfield a majority minority

23         property?

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1 A. From what I saw driving through once a night,

2   I saw -- probably saw more Black residents

3   than White residents, yes.

4 Q. Okay.  Now, why is it that you only attended

5   one checkpoint during your time as Housing

6   Unit captain stationed with the Strike Force?

7     MR. QUINN:  Form.

8 A. Well, first of all, that was the Strike Force

9   checkpoint and Strike Force wasn't really

10   under my domain except for the administrative

11   duties.

12 Q. Okay.  Was there anyone, to your knowledge,

13   who was monitoring or observing the Strike

14   Force's activities at checkpoints?

15     MR. QUINN:  Form.

16 A. The lieutenants were.

17 Q. Was there anyone above the lieutenant level?

18     MR. QUINN:  Form.

19 A. No.

20 Q. Was there anyone who was supervising the

21   Strike Force and their operation of the

22   checkpoints above the lieutenant level?

23     MR. QUINN:  Form.

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A. If she is on the roster, yes.  But as I said,
2       most of my interactions with her was when she
3       was in the Housing Unit.  She was our
4       community officer for I believe the last two
5       years I was there.
6    Q. And it does indicate on this roster that she
7       was part of Housing Unit effective 2018.  Does
8       that sound right to you as far as your
9       recollection?
10   A. Sounds right, yes, as I just said.
11   Q. Okay.  So at the time of this 2016 complaint,
12      you were not a direct supervisor for Officer
13      Howard?
14   A. No.
15   Q. You didn't know her particularly well since
16      she was not one of your officers?
17           MR. QUINN:  Form.
18   A. No.
19   Q. Okay.  But you recommended that this complaint
20      be dismissed because you saw no reason not to
21      believe Officer Howard?
22           MR. QUINN:  Form.
23   A. Correct.

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1        relaying, correct?

2            MR. QUINN:  Form.

3    A.  These were instructions I received from the

4        deputy police commissioner in March of 2017.

5    Q.  This is not how the checkpoints were

6        operated -- strike that.

7            Fair to say that prior to March 2017 the

8        majority of Strike Force checkpoints were not

9        located in South Buffalo?

10           MR. QUINN:  Form.

11   A.  I think that's a fair statement, yes.

12   Q.  Is it fair to say that prior to March 2017 the

13       majority of checkpoints were not located in

14       North Buffalo?

15           MR. QUINN:  Form.

16   A.  That's fair to say.

17   Q.  Okay.  Do you know why you were being asked to

18       relay this guidance to the Strike Force and

19       housing lieutenants at this time?

20   A.  No.

21   Q.  You don't have any understanding of why Deputy

22       Commissioner Lockwood and Chief Young wanted

23       you to begin locating checkpoints in

---

1        it.  All right?

2    A. Thank you.

3    Q. Do you want to take 10 minutes this time?

4    A. That's fine.  Thanks.

5    Q. Thanks.

6                (A recess was taken.)

7

8        BY MS. EZIE:

9    Q. Okay.  Mr. Serafini, earlier we were speaking

10        about TraCS and ENTCAD and I think it's fair

11        to say you didn't really engage those systems

12        much.  Are you aware that TraCS allows --

13        sorry, that these systems allow for the race

14        of motorists to be recorded alongside ticket

15        information?

16    A. I wasn't aware of that, no.

17    Q. Did you ever -- so fair to say that you never

18        instructed your officers to try and record the

19        race of motorists who they stopped?

20    A. No.

21            MR. QUINN:  Form.

22    Q. Okay.  And now there were, however, a number

23        of paperwork practices that you engaged in on

1       one hand as chief of the Housing Unit and on

2       the other hand as someone that helped with

3       administration of the Strike Force, correct?

4  A. Yes, as captain of the Housing Unit, right.

5  Q. Correct, okay.  And so that included creating

6       reports that officers could fill out regarding

7       the number of arrests they made, for instance?

8  A. Yes.

9  Q. The number of traffic summonses they issued?

10  A. Yes.

11  Q. The number of vehicles they impounded?

12  A. Yes.

13  Q. Among other police functions.  And you

14       documented this both for the Housing Unit as

15       well as the Strike Force, correct?

16  A. Yes.

17         MR. QUINN:  Form.

18  Q. Okay.  And it was your practice to review this

19       information as well as to report it out to

20       higher-ups at the BPD?

21  A. Yes.

22  Q. That includes the commissioner of the BPD,

23       Commissioner Derenda?

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A. Yes.

2    Q. As well as Deputy Commissioner Lockwood?

3    A. Yes.

4    Q. Deputy Commissioner Beaty when she -- it's a

5        she, I believe, when she joined --

6    A. Yes, when she was in that position.

7    Q. Okay.  Also Chief Young?

8    A. Yes.

9    Q. And Chief Brinkworth before Chief Young?

10   A. Yes.

11   Q. Okay.  Why was it your practice to provide

12       information of the nature we just discussed to

13       all of those individuals?

14           MR. QUINN:  Form.

15   A. It was my responsibility.  It was part of my

16       duties.

17   Q. And what was the importance of those numbers

18       as you understood it?

19           MR. QUINN:  Form.

20   A. Did you say what was the importance?

21   Q. Yes.

22   A. It's a certain measure of production for

23       police officers.

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q.  It was important for your officers to be
2        productive and to have high production?
3    A.  To show the work they were doing.
4    Q.  And that work included, you know, making
5        arrests and issuing summonses, impounding
6        cars?
7    A.  Yes.
8    Q.  Okay.  And am I correct that there were times
9        where -- am I correct that you were expected
10       to have high production when it came to those
11       metrics?
12           MR. QUINN:  Form.
13   A.  Well, I don't know what you mean by "high
14       production" but you're expected to do some
15       work during the tour unless there were
16       extenuating circumstances where you weren't on
17       patrol.
18   Q.  Okay.  But work, again, as we're describing it
19       here is producing arrests, summonses,
20       impounds, etcetera?
21           MR. QUINN:  Form.
22   A.  That's a part of it, a part of it.
23   Q.  And am I correct that there were times where

1      been submitted?

2   A. Yes.

3   Q. What can you tell us about Strike Force Daily

4      Reports?  What were they?

5   A. Well, that's the report I referred to earlier,

6      we have referred to earlier, that every

7      night -- every day at the end of the tour the

8      Strike Force and the Housing would send a

9      daily report.  They would send it through the

10     computer system.  It would go on what they

11     called our bulletin boards which was a

12     computer -- again, an area of the computer

13     system and a report would directly go to me,

14     the captain, and it would go to the deputy

15     commissioners, the commissioner, and the chief

16     of the units.

17  Q. Got it.  And that's in part what this

18     distribution list reflects?

19  A. Yes.

20  Q. Okay.  So I am scrolling up and this was not

21     produced with the underlying report as an

22     attachment so I don't have that for us to

23     review, but I am going to just show you the

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1      email chain.  So do you see here that Police
2      Commissioner Derenda responds to this Strike
3      Force Daily Report?
4    A. Yes.
5    Q. What does his response state?
6    A. If you can scroll it up a little bit more?
7    Q. Sure.  It's kind of stretched between two
8      pages.
9    A. Oh, I am sorry.  Commissioner Derenda states,
10     "not much production."
11   Q. Got it.  So is it fair to say that he is
12     commenting on the results or the numbers that
13     were submitted in the nightly report?
14   A. Yes --
15         MR. QUINN:  Form.
16   A. -- he is commenting on that.
17   Q. Okay.  And he is expressing some disapproval
18     about the performance?
19         MR. QUINN:  Form, specifically
20     "performance".
21   A. I think what he is implying is he wants to
22     know why.
23   Q. Okay.

1    A. Why there was no production that evening.

2    Q. Okay.  On occasions where your production was

3       low, that was something you had to explain or

4       expected to explain?

5          MR. QUINN:  Form.

6    A. I don't remember explaining it a lot but

7       occasionally, once in a blue moon, yes.

8    Q. So do you see here that officer -- sorry, I

9       believe he is a lieutenant.

10   A. Yes.

11   Q. Thomas Whelan, he is a Strike Force

12      lieutenant?

13   A. Lieutenant Whelan was a Strike Force

14      lieutenant, yes.

15   Q. So he responds to Derenda, correct?

16   A. Yes.

17   Q. And his first -- the first sentence of his

18      email states "the numbers represented are not

19      indicative of unit performance."  Do you see

20      that?

21   A. Yes.

22   Q. Is it fair to say that the numbers that you

23      generated were one of the metrics that the

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1      commissioner used to see whether your unit was

2      performing adequately?

3            MR. QUINN:  Form.

4   Q. Or the Strike Force, in this case?

5   A. It was one of the measures, yes.

6   Q. And do you see that he, Lieutenant Whelan,

7      goes on to try to explain why the performance

8      on this night was low?

9   A. Yes.

10  Q. And do you see that you went ahead and

11     forwarded that message to Chief Brinkworth?

12  A. Yes.

13  Q. Why would you have forwarded -- why would you

14     have had this communication with Chief

15     Brinkworth?

16            MR. QUINN:  Form.

17  A. What I think happened was the deputy

18     commissioner had talked to the chief about it

19     but he directly emailed Lieutenant Whelan and

20     Lieutenant Whelan emailed his response back to

21     Commissioner Derenda without including our

22     chief on the report and I wanted to make my

23     chief aware of it.

---

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. So low --

2    A. He is in the chain of command.

3    Q. Understood.  Low performance is something that

4       concerned the commissioner of police as well

5       as the chief -- the chiefs that you reported

6       to?

7            MR. QUINN:  Form.

8    A. Yes.

9    Q. Okay.  Now, is it fair to say that you took

10      pride in -- strike that.

11           Is it fair to say that when your unit,

12      the Housing Unit, and when the Strike Force

13      generated more arrests, summonses, impounds,

14      parking tags, etcetera, that that was viewed

15      favorably within the BPD?

16           MR. QUINN:  Form.

17   A. Yes.

18   Q. It's something that you took personal pride in

19      when you saw your officers' arrests and

20      summonses numbers increasing?

21           MR. QUINN:  Form.

22   A. Yes, as long as it was being done properly and

23      legally.

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    Q. Is that something that was tracked on the

2       reports that you generated?

3            MR. QUINN:  Form.

4    A. You're referring to the arrests and summonses,

5       yes.

6    Q. Yes.  Did it indicate whether the arrest was

7       lawful or unlawful, or did it just say "here

8       is the number of arrests"?

9            MR. QUINN:  Form.

10   A. It just stated the number of arrests.

11   Q. Okay.

12   A. And if they were a felony or a misdemeanor.

13   Q. Okay.  So when you saw evidence that

14      summonses, impounds, arrests were increasing

15      among the Housing and Strike Force Units, you

16      saw that as evidence of the good work that

17      those units were doing in the city of Buffalo?

18   A. Like I said, as long as it was done properly,

19      yes, and lawfully.

20   Q. But, again, that wasn't something that you

21      tracked necessarily in any statistics, whether

22      these arrests or impounds were lawful or

23      unlawful?

1          seized?  Do you see that?

2     A. Yes.

3     Q. So why were you applauding them for these

4          increased statistics?

5              MR. QUINN:  Form.

6     A. Well, I told them they were doing a good job.

7          The statistics were increasing and, again,

8          it's one measure of the work the officers are

9          doing.

10    Q. So when statistics increased, statistics such

11         as these increased, you viewed it as evidence

12         of a job well done?

13             MR. QUINN:  Form.

14    A. Partially, yes.

15    Q. Okay.  I'd like to turn to an exhibit

16         Plaintiffs' Exhibit -- sorry, Serafini Exhibit

17         28 which is a document that was produced in

18         discovery by defendants as COB018565.

19             So do you see that this is an email that

20         you drafted to Chief Young copying the Strike

21         Force and Housing Unit officers in March 2017?

22    A. Yes, I do.

23    Q. Okay.  And why don't you take a moment to

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1          somewhere else, a different location.

2     Q.  Is that the only way it impacted the BPD as

3          far as where you would report for a traffic

4          hearing or were there other impacts?

5              MR. QUINN:  Form.

6     A.  As far as I know, that's the only way it

7          impacted the officers.

8     Q.  Are you aware that beginning with that 2015

9          change the City of Buffalo began keeping the

10         revenue from traffic summonses for itself and

11         for city purposes --

12    A.  I had heard that, something to that --

13         something to that respect.  Previously I

14         believe they kept only a percentage of the old

15         system.

16    Q.  If you recall, how did you become aware of

17         that change?

18             MR. QUINN:  Form.

19    A.  As I said, they sent a message out.

20    Q.  So the fact that the City of Buffalo could

21         keep the revenue from traffic tickets was

22         something communicated within the BPD?

23             MR. QUINN:  Form.

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1    A.  Yes.  I don't know exactly how it was

2        communicated, but it was knowledge.  There was

3        common knowledge of it.

4    Q.  Do you remember what, if anything, was

5        communicated about the significance of that

6        change?

7             MR. QUINN:  Form.

8    A.  Again, the only way it affected me or the

9        officers under my command was that they would

10       be going to a different location to adjudicate

11       their summonses.

12   Q.  Okay.  Isn't it true that another impact of

13       the change is that when the Housing Unit and

14       Strike Force issue traffic summonses, it was

15       now going to generate revenue for the City?

16            MR. QUINN:  Form.

17   A.  If it is as you say, that would be a byproduct

18       of it.

19   Q.  Okay.  Is it true that your officers were

20       aware at various points that generating

21       traffic summonses was a way of the BPD

22       generating revenue for the City?

23            MR. QUINN:  Form.

—— PHILIP SERAFINI - BY MS. EZIE - 12/27/21 ——

1      A.  That's accurate to say, yes.

2      Q.  Okay.  And that was viewed as a positive?

3              MR. QUINN:  Form.

4      A.  I don't think the officers cared one way or

5          the other.

6      Q.  Okay.  I am going to mark as an exhibit a

7          document that was produced in discovery as

8          COB047751.  Just give me a moment to pull it

9          up.  I am also going to close my door.  I am

10         hearing background noise.

11             Okay.  Mr. Serafini, do you see this

12         document?

13     A.  Yes, I do.

14     Q.  Can you see it clearly?

15             Okay.  Do you see the subject is plate

16         car reader [sic]?

17     A.  I am reading it.

18     Q.  Okay.

19     A.  I read it.

20     Q.  Okay.  So who is Peter Nigrelli?

21     A.  He was an officer at A District at the time.

22         He is currently a lieutenant.

23     Q.  Okay.  He was an officer who was underneath

PHILIP SERAFINI - BY MS. EZIE - 12/27/21

1          of the vehicles on days.  That was under his

2          purview so that's why I forwarded it to him.

3     Q. Got it.  Now, isn't it -- is it true that

4          through issuing summonses and impounds the

5          officers you worked for did generate

6          increasing revenue for the City and, for

7          instance, the bureau of parking?

8               MR. QUINN:  Form.

9     A. That's correct, yes.

10    Q. Okay.  Do you know how that increased revenue

11         was used?

12              MR. QUINN:  Form.

13    A. I have no idea.

14    Q. Do you know whether the increases to your

15         production helped make the case for overtime

16         for Strike Force officers?

17              MR. QUINN:  Form.

18    A. I don't know specifically, no.

19    Q. Do you consider -- did you consider overtime

20         to be a reward for good work performed by your

21         officers?

22              MR. QUINN:  Form.

23    A. Did I consider it to be a reward?  No.

1                MR. QUINN:  Form.

2        A.  That's correct.

3        Q.  Why did you view overtime as important for the

4            Strike Force and the Housing Unit?

5        A.  Because it gave -- in my opinion, there should

6            have been around-the-clock.  There was no

7            coverage during the days.  There was only

8            coverage from 3:30 to 1:30 -- 3:30 in the

9            afternoon to 1:30 in the morning.  I would

10           have liked to see us work day shift also.

11           Crime happens in the day, too, not just from

12           3:30 to 1:30.

13       Q.  Is it true that your officers and lieutenants

14           benefited from overtime as far as their --

15       A.  I am sorry, the whole beginning of that I

16           didn't hear.

17       Q.  Oh, sorry.  I will repeat.

18                Isn't it true that when your officers

19           were approved for overtime it had a financial

20           benefit for them?

21                MR. QUINN:  Form.

22       A.  For the officers, yes.  They made overtime.

23           They made more money.

1    Q. Okay.  And is it true that there were concerns

2       about the amount of overtime that the Strike

3       Force and Housing Unit collected within the

4       BPD?

5            MR. QUINN:  Form.

6    A. What do you mean by "concerns"?

7    Q. Were there attempts to restrict the amount of

8       overtime that you collected?

9            MR. QUINN:  Form.

10   A. I don't know of any attempts to restrict it.

11      It was either there when they approved it, and

12      it wasn't when they said stop it --

13   Q. Okay.

14   A. -- by my superiors.

15   Q. Is it true that without the incentive of

16      overtime it would have been difficult for the

17      Strike Force to maintain its staffing levels?

18            MR. QUINN:  Form.

19   A. There always would have been officers

20      transferring there because they like to do the

21      work, but some officers were incentivized by

22      the overtime, the periodic overtime, yes.

23   Q. Okay.  I would like to introduce as

```
1        STATE OF NEW YORK)

2        COUNTY OF ERIE    )

3


4            I, Carrie A. Fisher, Notary Public, in and
5        for the County of Erie, State of New York, do
         hereby certify:
6

7            That the witness whose testimony appears
         hereinbefore was, before the commencement of
8        their testimony, duly sworn to testify the
         truth, the whole truth and nothing but the
9        truth; that said testimony was taken remotely
         pursuant to notice at the time and place as
10       herein set forth; that said testimony was taken
         down by me and thereafter transcribed into
11       typewriting, and I hereby certify the foregoing
         testimony is a full, true and correct
12       transcription of my shorthand notes so taken.

13
          I further certify that I am neither counsel
14       for nor related to any party to said action,
         nor in anyway interested in the outcome
15       thereof.

16
             IN WITNESS WHEREOF, I have hereunto
17       subscribed my name and affixed my seal this
         12th day of January, 2022.
18

19

20       _____
         Carrie A. Fisher
21       Notary Public - State of New York
         No. 01FI6240227
22       Qualified in Erie County
         My commission expires 5/02/23
23
```