# EXHIBIT 41

# THE PUBLIC



NEWS | CULTURE | FOOD & DRINK | EVENTS | VISUALS | ABOUT US

Local | National | State | Abroad | Commentary | Sports

## Local

Home / News / Local



Arthur Jordan, Jr. with his sons.

# The Arthur Jordan Case: Free Speech, Privacy, and the Police

by Aaron Lowinger / Dec. 13, 2016 9pm EST

### "Let's See How They Like It"

Last July, members of Buffalo Police Department's Strike Force were on the lookout for Arthur Jordan, Jr. They knew him from his associations in the city's Central Park neighborhood, and now they knew him from briefings at the station house. He was wanted for questioning by the FBI's Safe Streets Task Force over something he'd posted on Facebook while the country was still reeling from the deaths of Philando



PRINT EDITION

Week of 4/11/19 - 4/24/19

MOST RECENT STORIES

1. Film review: The Country Club
2. Film review: Burt Reynolds: The Last Interview
3. Film review: Mind Leech
4. Film review: The Take Out Move
5. FIlm review: 8:37: Rebirth

0001

Castile in Minnesota and Alton Sterling in Louisiana: "Let's Start Killin Police Let's See How Dey Like It."

According to testimony at a suppression hearing last Thursday in US District Court in downtown Buffalo, Officer Mark Hamilton spotted him first, walking in a group of three heading into a Metro PCS store at Main and Fillmore on July 14. He had cut what Officer Michael Acquino called braids but were really more like shoulder-length dreadlocks. Hamilton recognized him anyway.

Just a month earlier, Acquino's brother Joseph, also a Strike Force officer, was involved in a near tragedy in the vicinity of Schiller Park. According to the BPD, Officer Anthony Fanara was involved in a foot chase with a burglary suspect. Fanara tackled the suspect, then found the man pressing a gun against his chest and squeezing the trigger. The safety was on. Joseph Acquino knocked the gun out of the man's hand, possibly saving several lives.

Jordan's Facebook post occurred a day before the Dallas shootings of police officers on July 7, and Michael Acquino testified that the day they arrested Jordan a week later, "Dallas was certainly fresh on my mind," as was the incident with his brother.

According to testimony from Acquino and Hamilton, Jordan was known to police. He was often seen near the intersection of Fillmore and Jewett in the same places they were used to seeing members of the Central Park gang, whom they described as one of the more active and violent gangs in the city. Police Commissioner Daniel Derenda called Jordan a "gangbanger."

Jordan's parents have cast doubts on this label. It's true that Jordan's filial and social ties run deep in Central Park, and that Jordan has lived in that neighborhood more frequently than any other, they told *The Public*. But they don't know him to be in a gang.

While they both disapprove of the content of that Facebook post, they also feel that someone shouldn't be considered a criminal based on where they live or what they share on social media.

"He's a knucklehead," his mother Suni Ryles said of the 23-year-old. "He's a young, average knucklehead."

But he was never a knucklehead to police. Acquino and Hamilton both testified that their relations with Jordan were positive. Both used the adjective "cordial" to describe his demeanor toward officers, and both stated that he was never known to be involved in drug-dealing. Most of their prior interactions, according to Officer Hamilton, involved Jordan being asked to move off a corner or the porch of a vacant home in the neighborhood. Jordan always complied.

The Facebook post, in the context of recent local and national events, gave the officers a different feeling about Jordan.

What happened inside the store on the day of Jordan's arrest lays bare fundamental questions about police practice in regard to the Fourth Amendment since the Supreme Court decision of *Terry v. Ohio* in 1968, a pivotal decision that has shaped law enforcement policy and protected civil rights. Jordan has been charged with criminal possession of a weapon, obstructing governmental administration, resisting arrest, and interstate communication of threat to injure. US Magistrate

**0002**

Judge H. Kenneth Schroeder made it clear on both days of arguments in the past week that he sees this case as a "poster-child" for *Terry*.

On Monday Schroeder said that "*Terry* and progeny have all said if you are detained you can choose not to be cooperative. I don't think we've ever seen someone exercise that right."




*The intersection where the arrest took place. The officers spotted Jordan from Fillmore Avenue as he was walking on Main Street.*

## The Arrest

The case depends on demonstrable suspicion. *Terry* holds that an officer may detain and search an individual if the officer has reasonable suspicion to believe that criminal activity may be afoot or that the individual may be armed. So, first, US Attorney Wei Xiang asked Acquino to elucidate in excruciating detail what about the Jordan and his two companions was suspicious.

Depending on the editing and narration, the video from inside and outside the store shown in court in the last week show starkly different things. The US Attorney showed the video in small segments, allowing Acquino to narrate the sequence of events that played out during the three-minute video.

Playing the video in five-second snippets, Acquino enumerated activities he considered suspicious: One of the men on camera was pretending to be on the phone, he said. Acquino said this is a tactic he has seen used when a person is trying to "remove himself from the situation." Another man is at the counter talking with the clerk—the video, crucially, lacks audio—and Acquino and Hamilton testified that he sounded nervous, that he was trying to pay a phone bill "with only a couple of dollars in his hand." And when police drew closer, he lifted up his shirt to show police he wasn't a threat. Acquino and Hamilton labeled that behavior suspicious, too.

0003

Acquino testified that he told Jordan he was wanted for questioning, without naming the FBI, and that Jordan told him he wasn't going to comply. The officers also took exception with how he was gripping the counter behind him. Both Hamilton and Acquino testified that they noticed Jordan had a "white knuckle" type of grip. Acquino testified that was when he began to suspect that Jordan had a gun in his back pocket.

Xiang ended the video after the weapon was seized, and Jordan was pepper-sprayed and subdued.

When Xiang rested, Jordan's public defender, John Humann, asked the court to play the three-minute video again, without interruption. Xiang and Acquino's choreographed veil of suspicion faded from plain view. Instead, the video showed three men calmly facing the police until the four officers, including Joseph Acquino, press in on Jordan until they are pushing him backward against the counter.

Once Michael Acquino is able to reach Jordan's back left pocket and feel a weapon, the officers' movement's change. Hamilton loosens a strap on his vest for his pepper spray and changes position to spray Jordan multiple times. Once Jordan is handcuffed, Michael Acquino throws a few punches into Jordan's face.

"You gave him a few punches, yes?" Humann asked Michael Acquino.

"I did what I had to do to effect the arrest," Acquino responded.



## The Case

Once Humann began revealing some cracks in the BPD's adherence to the law, the tenor of the court changed. Schroeder was at turns passionate and impatient.

"There was no warrant, no 911 call," Humann pointed out. How could this person be arrested—defining the moment of arrest as when the police walk through the door and the men feel they are not free to leave—without either of those justifications? "Jordan's under no compulsion to comply with you," Humann said. He asked

**0004**

Acquino why the officers felt they could search a man absent a warrant, a 911 call, or a grand jury subpoena:

> *Acquino: The severity of him saying he wanted to kill police officers, I wanted to get him in the vehicle.*
>
> *Humann: The basis of the search was his refusal to comply?*
>
> *Acquino: I took a guess he had a gun.*
>
> *Humann: How could you have guessed there was a weapon?*

From there, Schroeder kept interrupting and imploring the government to show him what constitutes suspicious behavior, putting Xiang and the two officers on their heels.

Xiang pointed to testimony from Hamilton that he'd noticed a change in the demeanor of the three men outside of the store, after they'd seen the police, that was suspicious. Hamilton testified that the men quickened their pace and looked back over their shoulders to see if the police were following them.

Hamilton also testified that he noticed something different in Jordan's body language on that day that put him on alert, not like other times when we was asked to move off a corner or porch. Xiang stated that the men's quickened gait was documented by another video, which the court reconvened on Monday to view. That video, another angle from inside the store, showed the men enter the store in a seemingly casual way.

But that perception was panned by both Humann and Schroeder. Humann held that those prior encounters could not be compared to cornering Jordan in store. "Maybe because you never came up on him with three other officers to detain him in a store," Schroeder said. "You know down South they used to have these kinds of laws. They were called loitering, and they were ruled unconstitutional."

"Is it the government's position that this warrants suspicion of criminal activity? Three gentleman going into a store?" Schroeder asked Xiang. "What did these individuals do of a criminal nature that caused officers to walk into store? You have to have suspicion of criminal activity."

Schroeder grew testy when Xiang responded that no suspicion was needed, arguing that there are cases where constitutional rights can be limited. An exasperated Schroeder interrupted Xiang immediately and began an explanation of *Terry* and his own ruling in *US v. McCargo*. After a Talmudic exchange, Schroeder began referencing local and national cases of brutality and police-involved shootings of unarmed people of color.

"I don't live in a vacuum," Schroeder said, saying he reads and watches the news and pointing out that both police and people of color have reason to feel nervous. Schroeder explained anecdotally that an African American living in this country interacting regularly with police in their neighborhood could be expected to have much different response than a "white person in Williamsville." Appearing nervous should not provide "reasonable suspicion that criminal activity was afoot, or reasonable suspicion that the person was armed," he said—the bases for *Terry*.

**0005**

Schroeder also referenced recent cases of police brutality committed by the BPD: "We have a case upstairs right now where a lieutenant has pleaded guilty" to shooting youths with a BB gun with the remaining two being tried for police brutality, he pointed out.

[RELATED: READ TRANSCRIPT OF HEARING]

Hamilton testified that police didn't tell Jordan he was being stopped, and Schroeder again interjected: "If he's not detained, why would you search him? Are you familiar with the New York City stop-and-frisk laws that got shut down? Since when does being nervous constitute criminal activity?"

Humann brought up the other video shown in court on Monday in which Hamilton, the sole African-American officer of the four involved in the arrest, is seen putting on gloves as he enters the store. Hamilton testified that he always puts on his gloves if he thinks he may touch somebody. Humann pointed out that this action alone could have made the men nervous.

"You can almost feel the testosterone coming through the video," Humann said in his closing remarks, in reference to the way the four officers entered the store. "This was not a *Terry* stop, this was not an arrest. They were there to scoop him up and bring him to the FBI."

Humann argued that the arrest was unlawful and the fruits of that arrest, namely the weapon that Acquino found in Jordan's back pocket, should be suppressed. Not just the weapon, but also the statements he made after the arrest. (According to police, Jordan doubled-down on the content of his Facebook post after he was arrested, saying, among other things, "I should've done some CNN shit," referring to the coverage given to the police shootings in Dallas.)

Both sides will prepare briefs in the coming weeks and present to the judge for a ruling. "A person has a right to resist an illegal arrest," Schroeder instructed Xiang. "The question is to what degree was this a legal arrest. That's question one you should address in the brief."

Jordan's search and detention are just issue number one: Humann, in his filings with the court, has already argued that Jordan's Facebook post does not constitute a genuine threat and is protected speech under the First Amendment.



*Strike Force officers Macy, Fanara, and Christopher providing security at Donald Trump's rally earlier this year. (Cory Perla)*

## Postscript: Strike Force

On the stand, Michael Acquino said that Strike Force conducts a checkpoint every day. Those checkpoints have been the focus of recent criticism (as reported in this newspaper) with some researchers describing these stops comprising a pattern of Fourth Amendment and *Terry* violations.

"Buffalo residents have routinely been racially profiled, detained, and arrested without probable cause, stopped without individualized suspicion, and been subject to patently unconstitutional sweeps, raids and checkpoints," SUNY at Buffalo law professor Anjana Malhotra has concluded, based on research that she and others have conducted.

Thursday's hearing was attended by eight members of Just Resisting, a collective of organizers and artists who identify as black or people of color in Buffalo, and who are organizing around civil rights issues in Buffalo and the city's policing practices, among other things. Just Resisting has begun tracking the actions of the BPD, and Strike Force in particular.

"The situation with A. J. [Jordan] could have happened to any Buffalo native who is angry about the current situation with policing in our country," said James Paul Lopez, Jr. "If you are a person of color, your life is walking on eggshells. If you don't present yourself a certain way, you are expendable, and always under suspicion."

Another member, Savion Mingo, told *The Public* that Jordan's prosecution has further isolated the African-American community. "It's like black folks can't grieve."

*Editor's note: Courtroom quotes have been recorded as faithfully as possible without use of electronic recording devices, as per court policy.* The Public *is working to obtain the offical transcript and will post when it is available.*

COMMENTS

**0007**

**3 comments**

Sort by Oldest

Add a comment...


**Michael Walker**
These same officers just received awards for taking a lot of guns off the street ,the other side of this are their illegal searches and lying in court. I have no problem with guns taken off the streets but if you stop and violate 100 black males and get one gun how should the 99 black males feel. Upset and violated. Plus these strike force and housing officers get paid overtime to make arrests,write summons and impound vehicles making money for the city mainly on the Eastside. If you check into it most SF and housing officers are some of the highest paid in the Bpd, so I guess there is a bounty on minorities heads on the east and west sides of buffalo

Like · Reply · 8y


**Gilleece Dianne**
Plus, they are not "taking guns off the streets" from white men.

Like · Reply · 8y


**Thomas Joad**
These guys terrify me because this testimony, as well as other comments only show that they are already biased enough to lie to the face of a federal judge. And as they continue as officers it will only get worse until they get caught planting evidence. It's amazing to not only have the nerve to lie to a judge, tbh the truth is even worse, they actually believe themselves. And that is terrifying because they will start bending more rules until they can get away with anything. Amazing how quickly they went from appreciating Jordan as a community member to downright hating him. These are the same people that read a brietbart faux pad story and put idiots into Congress. What happened to looking at situations from different viewpoints? Police have become the Gestapo as far as I'm concerned. As liberal as I might be in sticking up on ammunition. It's gonna get there within my lifetime. Shame.

Like · Reply · 7y


**Johnnie Vinson**
Free Arthur Jordan. What in God's green earth is wrong with voicing your opinion regarding injustices the police is doing to our black people. We are due our day in court just like tke whites in this country. Yet we are shot down like rabbit dogs in the street. Well we are sick and tired of it all. Everyone has the right to freedom of speech and the right to bare arms in this country. Again i say Free Arthur Jordan.

Like · Reply · 7y

Facebook Comments Plugin



P.O. Box 873
Buffalo, New York 14205
(716) 480-0723

TERMS OF USE — PRIVACY POLICY



NEWS
Local
National
State
Abroad
Commentary
Sports

CULTURE
Music
Film
Visual Arts
Theater
Performing Arts
Literary
Comedy
Etc.

FOOD & DRINK
Reviews
Food
Drink

EVENTS
Music
Visual Arts
Theater
Performing Arts
Literary
Comedy
Etc.

VISUALS
Art
Photos
Comics

ABOUT US
Who We Are
Distribution
Contact
Advertise