# EXHIBIT 43

JUSTIN TEDESCO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BLACK LOVE RESISTS IN THE RUST by and through
MARIELLE SHAVONNE SMITH and CHARIS HUMPHREY
on behalf of its members, SHAKETA REDDEN,
DORETHEA FRANKLIN, TANIQUA SIMMONS, DE'JON HALL,
JOSEPH BONDS, CHARLES PALMER, SHIRLEY SARMIENTO,
EBONY YELDON, and JANE DOE,
individually and on behalf of a class of all
others similarly situated,

                            Plaintiffs,

    -vs-


CITY OF BUFFALO, N.Y., BYRON B. BROWN,
Mayor of the City of Buffalo, in his individual and
official capacities,
BYRON C. LOCKWOOD, Commissioner of the
Buffalo Police Department, in his individual
and official capacities,
DANIEL DERENDA, former Commissioner of the
Buffalo Police Department, in his individual capacity,
AARON YOUNG, KEVIN BRINKWORTH, PHILIP SERAFINI,
ROBBIN THOMAS,
UNKNOWN SUPERVISORY PERSONNEL 1-10,
UNKNOWN OFFICERS 1-20, each officers of the
Buffalo Police Department,
in their individual capacities,

                            Defendants.

---

2

                    Remote Examination Before

Trial of JUSTIN TEDESCO, taken pursuant to the Federal Rules

of Civil Procedure, at SUE ANN SIMONIN COURT REPORTING, 421

Franklin Street, Buffalo, New York, taken on July 11, 2023,

commencing at 9:35 A.M., before NICHOLE WINANS, Notary

Public.

116

1   meters?
2   A.  No. They're self-explanatory.
3   Q.  How often would you use your tint meter during a
4       checkpoint?
5   A.  If the window seemed to be tinted and we couldn't
6       see in, we would test it.
7   Q.  And were there ever times where you didn't use
8       your tint meter to judge the tint level of a
9       window?
10  A.  Yes.
11  Q.  Why would you sometimes not use your tint meter?
12  A.  If we didn't have it or it was malfunctioning.
13  Q.  Okay. What is your understanding of what an
14      illegal tint level is?
15  A.  Let me think back, but I believe it's anything
16      that doesn't allow more than thirty-five percent
17      light through.
18  Q.  If you weren't using your tint meter, how did you
19      make that assessment?
20  A.  If I couldn't see through it, it was tinted
21      illegally.
22  Q.  If you couldn't see through it at all or if you
23      couldn't see through it partly?

127

1  A.  Again, all depends.  I can't speculate or I can't
2      give you specific numbers.
3  Q.  Do you think as many as ten cars might be waiting
4      at once?
5  A.  I'm not going to think on that.
6  Q.  Twenty cars?
7  A.  (Indicating no.)
8  Q.  Okay.  How long did it take to write one or more
9      tickets for a single car, traffic tickets that
10     is?
11 A.  That varied.  That depended on, once again, I
12     told you that our department is not very
13     funded -- is not funded very well, and the
14     computer equipment that we have is antiquated, so
15     also what it also would differ is if the
16     individual had their proper documentations, so if
17     -- and it also depended on the officer, and how
18     seasoned they were at using the TraCS system.  So
19     I can give you the scenario -- I can kind of,
20     this I can give you.  So if an individual is
21     pulled over, and say it's for an inspection
22     sticker, and they have their license, their
23     registration, and their proof of insurance, and

128

|   |   |   |
|---|---|---|
| 1 |    | the computer system is running perfectly and the |
| 2 |    | printer is running perfectly, and we don't run |
| 3 |    | out of printer paper and the officer is very |
| 4 |    | versed with TraCS, a ticket can be produced in |
| 5 |    | about a minute, minute and a half.  But there's |
| 6 |    | all kinds of outlining and outside, so if they |
| 7 |    | didn't give you the license, then you have to |
| 8 |    | manually type everything in, if they don't give |
| 9 |    | you the registration, we have to manually type |
| 10 |    | everything in.  If the computer is acting |
| 11 |    | glitchy, we have to wait for it to recover, if a |
| 12 |    | cord is yanked out, because that's happened in |
| 13 |    | these cars, because there's thirty, forty cords |
| 14 |    | running through these old Crown Vics and these |
| 15 |    | Tahoes, because that's what we were using at the |
| 16 |    | time, it could take a minute or two, it could |
| 17 |    | take a little bit longer.  We attempted always to |
| 18 |    | be as quick and as prompt as we were with issuing |
| 19 |    | tickets and getting them going. |
| 20 | Q. | Was there any guidance or instruction from your |
| 21 |    | supervisors telling you to -- telling you how |
| 22 |    | much time you should take during these secondary |
| 23 |    | stops? |

179

```
 1      recall all my tickets, and I can't recall
 2      everyone I've given tickets to, their skin color,
 3      their race, their creed, their sex.
 4   Q. Do you think black drivers commit more traffic
 5      infractions than white drivers?
 6   A. No.
 7   Q. Do you think black drivers commit more crimes
 8      than white drivers?
 9   A. No.
10   Q. Have you ever witnessed your fellow officers
11      engaging in racially biased policing out in the
12      field?
13   A. Not that I can recall.
14   Q. While in the housing unit, did you ever hear
15      about any citizen complaints against other
16      housing unit officers for engaging in racial
17      profiling or racially biased policing?
18   A. Probably.
19   Q. What do you recall about what you heard?
20   A. I don't recall who it was or when it was, but
21      there probably was.
22   Q. But you have no specific recollection about
23      specific complaints?
```

1    see that sentence?
2  A. Yes.
3  Q. Did your supervisor -- your superiors ever stress
4     to you the importance of production in the form
5     of arrests and summonses during your overtime
6     shifts?
7  A. Pretty much that came across as you better not be
8     sitting in the station house watching TV.
9  Q. Is that something that was communicated to you by
10    your superiors?
11 A. That, what I just said, yes.
12 Q. Was that something that they communicated
13    frequently?
14 A. That was something that was kind of spoken
15    because units prior, that was one of the reasons
16    they were disbanded.
17 Q. Can you explain that more, that was one of the
18    reasons that they were disbanded, what do you
19    mean?
20 A. MRU, because they wouldn't work.
21 Q. And MRU stands for what?
22 A. I have no idea.  That was before my time.
23 Q. So was it your impression that being proactive

196

1      about making arrests and writing summonses was
2      important during your overtime shifts?
3  MR. SAHASRABUDHE:  Objection to form.
4  THE WITNESS:  Working was important.
5  BY MS. TEFFT:
6  Q.  Okay.  And why was it important?
7  A.  Because you're getting paid to do your job, so do
8      your job.  Your job is to stop crime.  And you
9      serve the public, so that's what we were told to
10     do.
11 Q.  During your time in the housing unit, was it your
12     understanding that there would be more overtime
13     shifts scheduled if officers wrote a higher
14     number of tickets on those shifts?
15 A.  No.
16 Q.  Was it your understanding there would be more
17     overtime shifts scheduled if officers made a high
18     number of arrests on those shifts?
19 A.  No.
20 Q.  Was it your understanding there would be more
21     overtime shifts scheduled if officers impounded a
22     high number of vehicles on those shifts?
23 A.  No.

307

1    Jose Hernandez-Rossy, which ended with you
2    shooting and killing Mr. Hernandez-Rossy,
3    correct?
4  MR. SAHASRABUDHE:  Objection.
5  THE WITNESS:  Can we go off record?  Can we go off
6    record for a second?
7  MR. SAHASRABUDHE:  Yes.
8        (Discussion off the record.)
9  BY MS. TEFFT:
10 Q.  Back on the record.
11       So I'm just going to restate my question to
12   you, Mr. Tedesco.  In May of 2017 you were
13   involved in the traffic stop of Mr. Jose
14   Hernandez-Rossy, which ended with you shooting
15   and killing Mr. Hernandez-Rossy, correct?
16 A.  Yes.
17 MR. SAHASRABUDHE:  Objection to form.
18 BY MS. TEFFT:
19 Q.  And that incident happened around the Black Rock
20   Riverside area, correct?
21 A.  Correct.
22 Q.  How frequently did you patrol that area while in
23   the housing unit?

308

1  A.   Frequently.
2  Q.   Like more frequently than any other parts of your
3       patrol?
4  A.   Well, the Jaspers are right there, the Shaffers
5       are right there, driving down Tonawanda is a
6       cut-through to get to Niagara to get downtown, to
7       get to the Stuyvesant, to the Sedita over on
8       Richmond, it's a thoroughway and a fairway.
9  Q.   And so the incident specifically unfolded around
10      Garfield Street and Hartman Place, right?
11 A.   Correct.
12 Q.   Is there a specific BMHA property that that's
13      nearest to?
14 A.   No.  Shaffer, the Shaffer is probably a quarter
15      mile, third of a mile down the street, you go
16      down Tonawanda, you make a right onto Ontario,
17      and the Shaffer is right there.
18 Q.   But that's not a BMHA property area?
19 A.   No.  Not specifically.
20 Q.   Okay.  So why did you decide to pursue Mr.
21      Hernandez-Rossy for a traffic stop in this
22      situation?
23 A.   Because he was smoking marijuana.

313

```
 1  BY MS. TEFFT:
 2  Q.  And with respect to the Internal Affairs
 3      investigation of this matter, you were
 4      exonerated, correct?
 5  A.  Yes.
 6  Q.  So you faced no discipline from the BPD at all,
 7      correct?
 8  A.  Correct.
 9  Q.  Did you have to do any training as a result of
10      this incident?
11  A.  I had to do refreshment training when I returned
12      to work a year and a half later.
13  Q.  What is refreshment training?
14  A.  Just like going over like typical things that I
15      might have forgot in a year and a half, kind of
16      like what the rookies would go through, I kind of
17      went through a couple days of that.
18  Q.  And we talked about this a bit at the top, but I
19      just want to make sure we get more information
20      about what you were doing during this year and a
21      half.  Was that entire year and a half all
22      administrative leave status or only some of it
23      was administrative leave status?
```

315

```
 1      whenever I returned to work, and then whenever I
 2      was cleared from this, I can't remember.
 3   Q. Okay.
 4   A. Altogether, everything was about a year and a
 5      half.
 6   Q. So you got a commendation from the department for
 7      how you acted in this incident, correct?
 8   MR. SAHASRABUDHE:  Objection to form.
 9   THE WITNESS:  I don't know.  I don't remember.  I
10      don't know.  I might have.  I didn't really
11      participate in any of that.
12   BY MS. TEFFT:
13   Q. Okay.  I'm going to mark as Tedesco Exhibit 23 --
14   A. Okay.
15   Q. -- a letter of commendation dated June 20, 2017
16      from Captain Serafini of the housing unit to
17      Commissioner of Police Daniel Derenda.
18   A. Okay.  I guess I did.  I don't even remember if I
19      read this or not.
20   Q. So you do not recall receiving this commendation?
21   A. Like I said to you earlier off, I don't talk
22      about this stuff.  I don't dwell on this stuff.
23      I don't focus on this stuff, so I could have been
```

```
 1        told I had it and it went in one ear and out the
 2        other.
 3  Q.    So the date on this is June 20th, 2017, you had
 4        not been exonerated yet by this date, correct?
 5  A.    Correct.
 6  Q.    Okay.  Why did the investigation of this matter
 7        at the BPD take so long?
 8  A.    Asking the wrong person.
 9  Q.    Okay.  And at the time that this commendation
10        letter was issued June 20th, 2017, it was still
11        believed at that time that Mr. Hernandez-Rossy
12        had been armed and that he shot your partner,
13        correct?
14  A.    I believe so.
15  Q.    And later, the attorney general's office found
16        that Mr. Hernandez-Rossy was not, in fact, armed
17        during this incident, correct?
18  A.    I think it was just unfounded.  I don't think
19        there was a pure determination.
20  Q.    And unfounded means what?
21  A.    We still weren't sure.  I'm not sure, like I
22        said, I didn't -- I really don't even believe I
23        read the report from my hearing.
```

317

1  Q.  Did you have any informal conversations with any
2      of your supervisors concerning this incident?
3  A.  What do you mean?
4  Q.  Any conversations that were not part of the BPD's
5      investigation process concerning what happened in
6      this incident, did you talk about this with
7      anybody at the BPD, be that fellow officers or
8      superiors?
9  A.  I didn't talk about the incident itself, but
10     people reached out to see how I was doing
11     mentally and stuff.
12 Q.  Okay.
13 A.  No.  Mr. Burton had me tight gagged.
14 Q.  I'm sorry.  What was that?
15 A.  I said Burton had me tight gagged.  Gag order.
16 MR. SAHASRABUDHE:  His attorney wasn't allowing him
17     to talk to anyone.
18 THE WITNESS:  Yes.
19 MS. TEFFT:  I see.  Okay.
20 THE WITNESS:  Sorry.
21 BY MS. TEFFT:
22 Q.  So next I'm just going to show you a copy of a
23     civil lawsuit that's been filed against you by

318

1     Mr. Hernandez-Rossy's estate.  I'm going to mark
2     this as Tedesco Exhibit 24.  Have you seen this
3     complaint before?
4 A.  I haven't read it.
5 Q.  But you're familiar with this lawsuit?
6 A.  Yeah.  I was deposed on it.
7 Q.  And this lawsuit is ongoing, correct?
8 A.  Correct.
9 Q.  So the first page here is a summons in a civil
10    action, and you see that there is a date stamped
11    in the top right corner of October 2nd, 2017?
12 A.  Yes.
13 Q.  Did the BPD conduct its own investigation into
14    the incident involving Mr. Hernandez-Rossy
15    starting before or after this date?
16 A.  I don't remember.
17 Q.  Okay.
18 A.  You have the file.
19 Q.  So I'm looking at page seven of this document,
20    which is part of the complaint under the section
21    factual background, so specifically looking at
22    paragraph sixteen.
23 A.  Okay.

321

1  THE WITNESS:  No.
2  BY MS. TEFFT:
3  Q.  Is it true that your treatment of Mr.
4      Hernandez-Rossy during your encounter with him
5      was motivated by racial animus because Mr.
6      Hernandez-Rossy was of Hispanic ethnicity?
7  A.  No.
8  MR. SAHASRABUDHE:  Objection to form.
9  BY MS. TEFFT:
10 Q.  Did you ever discuss the allegations in this
11     civil lawsuit that you engaged in racial
12     profiling during the stop of Mr. Hernandez-Rossy
13     with your supervisors?
14 A.  No.
15 MS. TEFFT:  That is all that I have.
16 THE WITNESS:  Thank you.  Appreciate it.
17 MR. SAHASRABUDHE:  I have nothing.  You're free to
18     go.
19 THE WITNESS:  Cool.
20 MS. TEFFT:  Yes.  Thank you so much for your time,
21     and I hope you get over the stomach flu.
22 THE WITNESS:  Thank you.  I appreciate you in the
23     last parts.

326

```
 1    STATE OF NEW YORK)
 2                      SS:
 3    COUNTY OF ERIE)
 4
 5         I, Nichole Winans, a Notary Public in and
 6    for the State of New York, County of Erie, DO
 7    HEREBY CERTIFY that the testimony of JUSTIN
 8    TEDESCO was taken down by me in a verbatim manner
 9    by means of Machine Shorthand, on July 11, 2023.
10    That the testimony was then reduced into writing
11    under my direction.  That the testimony was taken
12    to be used in the above-entitled action.  That
13    the said deponent, before examination, was duly
14    sworn by me to testify to the truth, the whole
15    truth and nothing but the truth, relative to said
16    action.
17         I further CERTIFY that the above-described
18    transcript constitutes a true and accurate and
19    complete transcript of the testimony.
20
21                          _____
                              NICHOLE WINANS,
22                            Notary Public.
23
```