# EXHIBIT 46

1    UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF NEW YORK

3    ----------------------------------------------

4    **BLACK LOVE RESISTS IN THE RUST, et al.,**
     **individually and on behalf of a class of**
5    **all others similarly situated,**

6          Plaintiffs,

7    -vs-                         1:18-cv-00719-CCR

8    **CITY OF BUFFALO, N.Y., et al.**

9          Defendants.
     ----------------------------------------------
10

11

12          **ORAL EXAMINATION OF THOMAS WHELAN**

13              **APPEARING REMOTELY FROM**

14              **ERIE COUNTY, NEW YORK**

15

16              Friday, June 8, 2022

17              At 9:00 a.m. - 10:55 a.m.

18              Pursuant to notice

19

20    REPORTED BY:

21    Brooklyn Morton, Notary Public

22    APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

23

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1      **R E M O T E    A P P E A R A N C E S**

2      APPEARING FOR THE PLAINTIFFS:

3                  **NATIONAL CENTER FOR LAW AND**
                   **ECONOMIC JUSTICE**
4                  **BY: ANJANA MALHOTRA, ESQ.**
                   50 Broadway
5                  Suite 1500
                   New York, New York 10004
6                  (212) 633-6967

7      APPEARING FOR THE DEFENDANTS:

8                  **HODGSON RUSS, LLP**
                   **BY: KATELYN A. RAUH, ESQ.**
9                  605 Third Avenue
                   Suite 2300
10                 New York City, New York 10158
                   (646) 218-7528

11

12     ALSO PRESENT: **ANDREW TIMMICK,**
                   Coving & Burling, LLP

13                 **SANJAY DURESETI,** Intern

14                 **DANIEL MUSCARELLA,**
                   City of Buffalo Law Department

15

16

17

18

19

20

21

22

23

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

THOMAS WHELAN

1     district or I left the district when I got

2     promoted and then when he got promoted we were

3     back together again.  So many times -- a few

4     times through my 21-year career.

5  Q. Mh-hmm.  And so you said when you were

6     promoted.  Were you in the A District then?

7  A. No.  I was working in -- on the afternoon

8     platoon in C District when I was promoted to

9     lieutenant.

10 Q. And how often did you work with him when you

11     were in the C District?

12 A. Periodically.  Ivan had a lot more seniority

13     than I and for much of my career I was a

14     midnight officer and he was an afternoon

15     officer, but there was overlap of four hours

16     and sometimes we would even ride together.

17 Q. Okay.  And so how often -- did you hear him

18     use racial slurs when you worked with him?

19 A. He was an engaging personality, yes.

20 Q. What do you mean by that?

21 A. He was a very lively person.  Yes.  I heard

22     him use foul language while I rode with him.

23 Q. Okay.  And by foul language, you mean the N

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

THOMAS WHELAN

1    word?

2    A. Sometimes.

3    Q. Okay. Would he use other language that was

4       derogatory towards black or other people of

5       color while you were with him?

6    A. He was an equal opportunity hater.

7    Q. Okay. What other types of words would he use

8       towards people of color?

9    A. Just foul language.

10   Q. Can you give me some examples?

11   A. Get the fuck off the corner or I am going to

12      come back around here and crack you in the

13      skull, okay? Just police banter to move

14      people along that didn't have intent behind

15      it, but it meant he was serious. He wanted

16      them off the corner.

17   Q. Mh-hmm. Okay. Did he use any other racially

18      derogatory language towards black people?

19   A. Not other than what I already told you, no.

20   Q. How about towards Latino people?

21   A. There were not many Latinos in the area where

22      we worked so I never witnessed that.

23   Q. Okay. And he was a lieutenant at this time;

THOMAS WHELAN

1          go on the street?

2     A.  I didn't sit on the street all day long

3          watching so I can't -- I don't know.  I don't

4          have an answer for that.

5     Q.  And was the Schuele Street Gang predominately

6          black?

7     A.  Yes.

8     Q.  Was it all black?

9     A.  I don't know.

10    Q.  Okay.  So you testified that Officer Watkins

11         -- I am sorry, Officer Watkins would use the N

12         word towards some of these individuals; is

13         that correct?

14    A.  Yes.

15    Q.  Okay.  And did you think -- did you think that

16         was appropriate?

17    A.  I thought it was effective.

18    Q.  Okay.  Did you think it was appropriate?

19    A.  I thought coming from a black lieutenant or

20         black -- I never -- yeah.  He was a

21         lieutenant.  I thought coming from a black

22         lieutenant it was less inappropriate than if I

23         had said it.

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1          him using it on the street with gangs.  Can

2          you give me any other examples of when he

3          would use that language?

4     A.  Just at these very large gathering parties he

5          would yell that they all better move along.

6     Q.  Okay.  And he would use the N word when he

7          stated that?

8     A.  Sometimes.

9     Q.  Okay.  And so there were, like -- okay.  So

10         were there any other officers around when he

11         used that language?

12    A.  I am sure there were.

13    Q.  Do you remember who those officers were?

14    A.  I am sure I don't.  There were dozens of us on

15         the scene trying to control very large crowds

16         of hundreds of people in the street partying,

17         obstructing traffic.

18    Q.  And do you think that those circumstances give

19         rise to a permissible use of that language,

20         the N word?

21              MS. RAUH:  Form.

22    A.  Can you ask the question again?

23    Q.  Yeah.  Did you think that those circumstances

THOMAS WHELAN

1          that you just described gave rise to an

2          appropriate use of the N word?

3              MS. RAUH:  Form.

4     A.  If using foul language or even derogatory

5          language will get people to comply with what

6          you are trying to get them to do, then I guess

7          I do think it is acceptable because it's a

8          very busy hot summer night and we don't feel

9          like having to arrest six or eight people for

10         simply obstructing traffic.  And if putting

11         our arms across the street and walking towards

12         them and a couple officers yelling to get back

13         will gain their compliance, then that's a win.

14         Compliance is what we want.

15             I didn't go to work -- no officer goes

16         to work every day thinking I want to arrest

17         people.  No.  I don't want to arrest people.

18         I went them to enjoy their life just like I

19         want to enjoy my life, but I don't want them

20         in the street obstructing the city bus that is

21         trying to get by or the fire department or

22         just regular citizens.  And you mentioned

23         earlier in my previous testimony, I said

**THOMAS WHELAN**

1       something and I will paraphrase that a good

2       verbal thrashing beats going to jail every

3       day.  That's true.  Nobody wants to go to

4       jail.

5   Q.  Mh-hmm.  And that thrashing could include

6       racially derogatory language like the N word?

7   A.  You asked me if I ever heard Lieutenant

8       Watkins use the word and I said yes and I

9       explained how it was effective.

10  Q.  Okay.  And so you just testified that you have

11      heard other officers use the N word and in

12      your previous deposition that you heard

13      officers who were not black use the N word in

14      situations.  "In situations where there's a

15      ton of street commotion and there's been a

16      shooting and there's people running and

17      screaming and using foul language."  And so

18      are you -- when you made that statement, were

19      you referring to the same types of situations

20      where other officers use the N word?

21          MS. RAUH:  Form.

22  A.  I would -- yes.  Yes.  When the crowd is

23      screaming vulgar language at you and racial

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

1       epithets.  Officers are human, too, and it

2       gets a rise out of them and they respond in

3       kind.  In my previous testimony I told you

4       that I have used the N word and I -- am I

5       proud of it, no, but in the heat of the moment

6       when you are surrounded by people and they are

7       getting your -- they are raising your dander

8       up by yelling and screaming at you or not

9       complying and surrounding you, you are only

10      human.

11   Q.  Mh-hmm.  And this is while you were a

12      lieutenant?

13   A.  An officer and a lieutenant.

14   Q.  Okay.  And what do you mean by you are only

15      human?

16   A.  All humans make mistakes.

17   Q.  Okay.  So you testified that you heard other

18      BPD officers use racially offensive language

19      and the N word.  Who did you hear -- what

20      other officers did you hear using the N word

21      while on duty?

22   A.  I can't recall who exactly.  Probably every

23      officer.

1    Q. Every officer you worked with?

2    A. Probably every officer at one time or another.

3    Q. Uh-huh.  While you were a lieutenant as well?

4    A. Probably.

5    Q. Do you remember any of the specific -- so you

6       -- would you say every officer in your platoon

7       or your command used the N word?

8           MS. RAUH:  Form.

9    A. That requires me to say that every officer I

10      ever worked with -- or every officer on my

11      platoon used the word, no.  I am not going to

12      commit to that.

13   Q. Okay.  So how many times do you think you have

14      heard other BPD officers use the N word?

15   A. Over a 21-year career, dozens.

16   Q. Dozens.  By A District employee officers?

17   A. I don't know exactly where the officers were

18      working at the times when I heard derogatory

19      language.

20   Q. Okay.  You described officers using this

21      language in situations where there were large

22      groups of people gathered and did -- and were

23      there other circumstances -- strike that.

**THOMAS WHELAN**

1          Where there were large groups of people

2       gathered.  And were other superior officers

3       gathered during those times?

4              MS. RAUH:  Form.

5    A. I don't recall.

6    Q. Okay.  All right.  So did you ever report

7       anyone for using the N word while on duty?

8    A. No.

9    Q. Okay.  Did you feel like you -- you said that

10      it was a mistake.  Did you feel at any time

11      that it was your obligation to report anyone

12      for using the N word?

13             MS. RAUH:  Form.

14   A. No.

15   Q. Okay.  What other words did you use -- I'm

16      sorry.  I am sorry.  Strike that.

17          In your last deposition you testified

18      that officers used the N word and other

19      racially derogatory language.  What other

20      words did you hear officers use that was

21      racially derogatory?

22   A. Besides the N word, I don't recall really

23      hearing other racially derogatory language

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

THOMAS WHELAN

1           unless when Ivan was calling me you stupid

2           honkey or something like that.  It was just

3           police officer banter between two officers.

4       Q.  Okay.  But so in that circumstance, I am going

5           to borrow a bit from Carl Paladino here in

6           terms of his list of racial slurs.  Have you

7           ever heard BPD officers use the following

8           terms, thug?

9       A.  Was the question thugs?

10      Q.  Yes.

11      A.  Yes.  But I don't consider that a racially

12          derogatory term.

13      Q.  Okay.  How about monkeys?

14      A.  Yes.

15      Q.  In what context?

16      A.  You know, I don't know for sure that it was

17          officers that I heard use it or if it was just

18          the general public.

19      Q.  Okay.  Can you recall any circumstance where

20          an officer --

21      A.  No.

22      Q.  Or sorry, can you please describe the

23          circumstances you are thinking about?

THOMAS WHELAN

1    Q. Okay.  How about ape?

2    A. No.

3    Q. Okay.  Are there any other racially derogatory

4       terms that you heard BPD officers use towards

5       black people other than the N word?

6    A. No.

7    Q. Never?

8    A. I mean, we covered the monkey aspect and I

9       don't recall if I heard it from officers or

10      the general population.

11   Q. Okay.  Earlier in our last deposition you

12      mentioned BPD personnel were probably

13      reprimanded for using the N word.  What makes

14      you say that?

15   A. I would just -- I guess it was an assumption

16      on my part.  The law of averages.

17   Q. Okay.  Yeah.  You said that you -- you

18      testified that you did not mean any specifics.

19      Can you think of any specific instance where

20      someone was reprimanded for using that

21      language?

22   A. No.

23   Q. Okay.  All right.  And you testified that you

THOMAS WHELAN

1          had used the N word and you testified to that

2          again today while working at the BPD?

3     A.  Is that a question?

4     Q.  Correct?  Yes.  It is a question.

5     A.  I admit it, yes.

6     Q.  And how many times would you say that you used

7          the N word?

8     A.  I couldn't fathom a guess.  Less as I got

9          older and more educated.

10    Q.  But, you used it while you were a lieutenant?

11         You already testified to that, correct?

12    A.  Okay.  All right.  Yeah.

13    Q.  Okay.  When did you use the N word?

14    A.  I can't recall.

15    Q.  Okay.  You mentioned these situations where

16         there was a melee and people would be using

17         the -- BPD employees would be using the N

18         word.  Would you use the N word in those

19         circumstances as well?

20    A.  Not to the best I can recall.  And when

21         officers are being screamed at by the

22         population with the N word, because there's

23         plenty of black police officers in the City of

1    A. Not that I am aware of, no.

2    Q. Okay.  Were there any police officers that you

3       recall that used the N word more frequently

4       than others?

5    A. No.

6    Q. Okay.  And would other lieutenants or captains

7       or chiefs ever be out with you during these

8       public circumstances, for example, on Schuele

9       Street when you were -- when you were trying

10      to address gang members?

11   A. Some of the larger events that I am speaking

12      about, half the police department would be

13      there.  So were there captains there, I am

14      sure they probably were standing behind the

15      fire trucks waiting for the lieutenants to

16      take control and get the situation under

17      control.

18   Q. Yeah.  In those situations, that's when you

19      would hear other officers --

20   A. You would hear every kind of language.

21   Q. What other kind of language would you hear?

22   A. Foreign languages, too.

23   Q. Can you give me some examples?

─ **THOMAS WHELAN** ─

1    A.  No.  I don't speak another language.

2    Q.  Okay.  And Spanish or what else do you recall

3        hearing?

4    A.  I don't recall.  Every day is screaming and

5        the situation is out of control.

6    Q.  Mh-hmm.  Okay.

7    A.  Short of shots being fired or people starting

8        buildings on fire, everything else included.

9    Q.  Okay.  And you testified that you obviously

10       use the N word because you are a human being.

11       What do you mean by that?

12            MS. RAUH:  Don't answer.  Counsel, we

13       agreed to this additional time today to have

14       Mr. Whelan --

15            MS. MALHOTRA:  First, we are going to

16       stop the clock on this.  Go ahead, Ms. Rauh.

17       He has to answer every question I ask.

18            MS. RAUH:  Then we will end this

19       deposition because I am advising him not to

20       answer any questions regarding his prior

21       testimony.  The purpose of this deposition was

22       to explore additional topics because you didn't

23       finish last time, not to cross-examine about

**DEPAOLO CROSBY REPORTING SERVICES, INC.**

1    supervisors/superiors must initiate

2    disciplinary actions.  It states that whenever

3    the level of performance falls below

4    acceptable limits, supervisors/superior

5    officers are responsible for initiating

6    disciplinary action if the employee assigned

7    to their command or temporarily assigned to

8    their command or if substandard performance

9    occurred in the superior's presence, correct?

10   A.  That's what it says.

11   Q.  Okay.  Did you never initiate discipline over

12       any of your employees?

13   A.  Yes.

14   Q.  Did any of those disciplinary actions involve

15       any kind of racially bias conduct?

16   A.  No.

17   Q.  Okay.  What kind of conduct would you initiate

18       disciplinary proceedings under?

19   A.  I charged one officer one time for failure to

20       perform their duties.

21   Q.  Okay.  I believe you testified to this before,

22       but --

23   A.  I did.

1    Q. Yep.  Okay.  So we don't need to discuss that

2        again.

3              Okay.  So then I am going to turn to

4        Chapter 17, Section 1.0 entitled courtesy

5        policy.  Under this section the MOP makes

6        clear that BPD employees perform their duties

7        in a courteous manner and provides that police

8        should all be courteous and considerate to the

9        public, to their superior officers and fellow

10       employees; is that correct?

11   A. That's what it says.

12   Q. And it also states that they shall not use

13       harsh, profane or insulant language, correct?

14   A. That's what it says.

15   Q. And that they should be tactful in their

16       performance and their duties and they are

17       expected to exercise the utmost patience and

18       discretion even under the most trying

19       circumstances, correct?

20   A. Yes, ma'am.

21   Q. Do you remember reading the MOP and this

22       provision?

23   A. Well, I am sure everybody has to say yes

—THOMAS WHELAN—

1          because they are probably required to.  So

2          sure, yes.

3     Q.  Is this your -- is this consistent with your

4          understanding of how officers should conduct

5          themselves?

6     A.  Yes.

7     Q.  Okay.  So you previously testified during this

8          deposition that you heard multiple officers

9          using racially bias language, correct?

10    A.  I did.

11    Q.  And do you feel that language would violate

12         this policy?

13    A.  Well, it probably would.

14    Q.  Okay.  And why did you decide not to initiate

15         any disciplinary proceedings or discipline for

16         those officers?

17    A.  Well, because under the circumstances I

18         already stated; that the officers involved and

19         myself included lost their cool.  They lost

20         their cool.  So if that's a failure on my part

21         for this policy, okay.  I will take it.

22    Q.  Mh-hmm.

23    A.  I was the lieutenant, I will take it.

**THOMAS WHELAN**

1    Q. Mh-hmm.

2    A. If you would like, you can call Internal

3       Affairs and report me.

4    Q. That's -- okay.  This is a deposition

5       obviously so and -- you know, I would not do

6       that, Mr. Whelan.  And so you consider the use

7       of racially bias language as falling below

8       acceptable limits; is that correct?

9    A. Yes, it is.  It's unacceptable.

10   Q. Mh-hmm.

11   A. Is it always 100 percent unavoidable?  No.  It

12      is not going to be unavoidable.  It's not.

13      People lose their tempers, people lose their

14      cool.

15   Q. And do you think that people losing their

16      tempers gives them the right to use racially

17      derogatory language?

18   A. I believe they have going to use harsh

19      language.  Is it necessarily racially

20      derogatory, not always.

21   Q. Mh-hmm.  Do you think there were other methods

22      that officers could use outside of racially

23      derogatory language to control a crowd?

**DEPAOLO CROSBY REPORTING SERVICES, INC.**
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

433

1  STATE OF NEW YORK)

2           ) ss.

3  COUNTY OF ERIE  )

4

5       I, Brooklyn Morton, Notary Public, in and for

6  the County of Erie, State of New York, do

7  hereby certify:

8       That the witness whose testimony appears

9  hereinbefore was, before the commencement of

10 their testimony, duly sworn to testify the

11 truth, the whole truth and nothing but the

12 truth; that said testimony was taken pursuant

13 to notice at the time and place as herein set

11 forth; that said testimony was taken down by me

12 and thereafter transcribed into typewriting,

13 and I hereby certify the foregoing testimony is

14 a full, true and correct transcription of my

15 shorthand notes so taken.

14

15      I further certify that I am neither counsel

16 for nor related to any party to said action,

17 nor in anyway interested in the outcome

18 thereof.

17

18      IN WITNESS WHEREOF, I have hereunto

19 subscribed my name and affixed my seal on this

20 23rd day of July, 2022.

19

20      

21      ----------------------

22      Brooklyn Morton

23

DEPAOLO CROSBY REPORTING SERVICES, INC.

135 Delaware Avenue, Suite 301, Buffalo, New York 14202

716-853-5544