# EXHIBIT 66



# Collaboration, Communication and Community-Building

A New Model of Policing
for 21st Century Buffalo



A REPORT FOR PUBLIC COMMENT

Partnership for the Public Good

DERENDA
**57**
12-23-2021

0001

0002

# INTRODUCTION: JUSTICE AND OPPORTUNITY

As the nation strives to improve police-community relations, safeguard the lives of officers and residents, and reduce crime while respecting civil liberties, voices around the country – from President Obama to ordinary citizens – are calling for more community policing. The Buffalo Police Department (BPD) has taken important steps toward embracing community policing, such as hiring community police officers, providing all officers with some community policing training, working collaboratively with community groups like Buffalo Peacemakers, improving language access for refugees and immigrants, and creating a scholarship program to diversify its recruits. Drawing on examples from across the country, this report explores a wide variety of ways the BPD can build on this momentum and expand community policing in Buffalo.

This report was created by the Partnership for the Public Good (PPG). PPG is a community-based think tank that does research, advocacy, and civic engagement for over 200 community organizations in Western New York. Each year, PPG's partners vote on a Community Agenda – their top ten policy priorities for building a better Buffalo. In each of the past two years, PPG's partners have prioritized the expansion of community policing in Buffalo.

This report was created for the Justice and Opportunity Table of Open Buffalo. Open Buffalo is a community movement for social and economic justice. The Justice and Opportunity Table is a coalition of groups and individuals with a goal of reducing the overall rates of – and racial disparities within – arrests and incarceration. The Table seeks an improved relationship between police and community: a relationship that is built on respect, trust, confidence, oversight, and mutual benefit, and that better enables police to protect and serve communities of color in Erie County. The Table has sought to take a collaborative and constructive approach with the Buffalo Police Department, seeking input and advice from police officers as it progresses.

As part of its mission, the Justice and Opportunity Table wished to deepen its knowledge of policing in Buffalo, community perceptions and opinions of policing, and best practices from around the nation. The Table decided to create a survey that could serve as a vehicle for civic engagement, especially in communities disproportionately impacted by local policing practices. This report synthesizes what we have learned from the survey and integrates its findings into our research on community policing best practices nationwide. Comprehensive survey results can be found in Appendix C.

This report is written with respect and gratitude for police officers: public servants who risk their lives for their community every day. It is also written with the premise that all government institutions benefit from widespread community engagement and conversation and from a review of best practices from around the nation.

3

0004

# EXECUTIVE SUMMARY

Community policing is a philosophy of law enforcement that changes police culture by prioritizing positive interactions between police and the community, and by using problem-solving methods to prevent crime. This approach encourages police to develop strong relationships with community members and to tailor policing strategies to fit the community's needs. Community policing allows police to share power *with* the community, rather than exerting power *over* the community.

This report recommends that the Buffalo Police Department (BPD) dramatically expand its community policing practices, building on the successful efforts it has made thus far. It begins with an overview of community policing and the challenges that police face today. Then, based on local and national research, it explores five strategies for the BPD to consider implementing.

1. **Promote community policing through culture change, training, incentives, and policies.**

   The BPD should expand its efforts to train and reward all officers for doing community policing. The BPD should require a certain number of community policing hours each week of all officers. In addition, it should add more incentives through assessment, pay and promotional criteria, as well as public recognition for officers who excel at community policing practices. There may also be a need for more extensive training in areas like adolescent development, trauma, and de-escalation tactics. Finally, departmental policies should be revised to deepen the emphasis on problem-solving, to facilitate collaboration with community members and groups, and to increase the accessibility of police officers in the community.

2. **Further increase the diversity and cultural competence of the force.**

   The BPD should continue its progress toward diversity until the force matches the racial/ethnic demographics of the city and many more women are employed. Additionally, the BPD should implement implicit bias training to make officers aware of how subconscious bias can affect decisions, and develop a system of data collection and analysis to monitor bias in police activities. Further, the BPD should continue to improve its language access and cultural competency practices, enhancing communication with and understanding of foreign language speakers as well as other populations. Finally, the BPD should recruit civilian liaisons and police social workers to aid in the implementation of language access and cultural competency initiatives.

3. **Improve transparency and information-sharing.**

The BPD should increase information-sharing, so that all citizens understand local laws, the role of police in enforcing them, and how to interact during encounters with police. To encourage transparency, the BPD should make more information available on the BPD's website and communicate with the public more frequently through public events. Buffalo's civilian review system needs to be reinvigorated. This includes transforming the City's Commission on Citizens Rights and Community Relations into a Human Rights Commission with a broader mandate, more staffing, and the duty to review all misconduct and use-of-force cases. To gather more comprehensive data about police activities, the BPD should develop a system for issuing receipts and documenting all stops, including those that do not result in arrest. The Department should also institute a policy for using body cameras. Finally, the BPD should seek accreditation from state and national accreditation agencies, as required by the City's Charter.

4. **Promote restorative justice, alternatives to arrest, and diversionary programs for vulnerable populations.**

The BPD should incorporate restorative justice practices, which have proven effective in reducing recidivism and aiding in victim recovery. In addition, Buffalo should use more alternatives to arrest, such as fix-it tickets that allow low-level offenders to avoid citations if they are willing to remedy the violation within a reasonable period of time. Moreover, police should employ more non-punitive, diversionary alternatives to incarceration, such as Law Enforcement Assisted Diversion, especially when dealing with vulnerable populations such as youth, and those with mental health and addiction issues.

5. **Increase the use of crime prevention through environmental design**.

Expanding its recent efforts, the BPD should work with community members to develop plans to prevent crime through environmental design, employing local residents to help implement them, particularly in and around public housing developments.

0006

# TABLE OF CONTENTS

Part I: Community Policing and the Challenges of 21st-Century Policing.........7
**I. Policing in Context**.................................................................................... 7
**II. Community Policing, Past and Present**..................................................... 8
**III. The Challenges of 21st-Century Policing**............................................... 10
A. The National Spotlight on Policing................................................................10
B. The Need for Community Policing in Buffalo...............................................11
    1. Alarming Disparities and Police Misconduct................................. 11
    2. Recent Oversight Efforts................................................................. 15
    3. Community Policing in Buffalo....................................................... 15
    4. Challenges and Opportunities......................................................... 17

Part II: Community Policing Strategies for the Buffalo Police Department......19
**I. Promote community-oriented policing through culture change, training, incentives, and policies**...........................................................................................................21
A. Train Community-Oriented Officers.............................................................. 21
B. Incentivize Problem Solving and Relationship Building...............................25
C. Build Relationships and Develop Assets to Encourage Problem-solving...........................26
D. Make Officers More Accessible.....................................................................28
E. Buffalo Municipal Housing Authority...........................................................29

**II. Further increase the diversity and cultural competency of the force**...........................35
A. Diversity of the Police Force......................................................................... 36
B. Implicit Bias Training....................................................................................38
C. Gender Equality.............................................................................................43
D. LGBT and Gender Nonconformity................................................................43
E. Language Access............................................................................................ 44
F. Cultural Competency...................................................................................... 46

**III. Improve Transparency and Information-Sharing**................................. 51
A. Civilian Oversight of Law Enforcement........................................................51
    1. The Commission on Citizens Rights and Community Relations in Buffalo.................54
B. Improving Use-of-Force Policies...................................................................57
C. Documenting Police Stops and Use of Force.................................................58
D. Body Cameras................................................................................................ 61
E. Accreditation.................................................................................................. 63

**IV. Promote restorative justice, alternatives to arrest, and diversionary programs**..............65
A. Developing Alternatives to Arrest for Criminal Offenses..............................66
B. Implementing Restorative Justice and Diversion Strategies.......................... 66
    1. Restorative Justice...........................................................................66
    2. Diversion Strategies........................................................................ 67
C. Working with Vulnerable Populations............................................................ 68
    1. Diversion Resources for Young People and Their Families............. 68
    2. Responding to Drug Users............................................................... 71
    3. Responding to the Mentally Ill....................................................... 73
    4. Interventions with Sex Workers...................................................... 75
**V. Crime Prevention through Environmental Design**.................................................77

0008

# COMMUNITY POLICING AND THE CHALLENGES
# OF 21ST-CENTURY POLICING

I. Policing in Context
II. Community Policing, Past and Present
III. The Challenges of 21st-Century Policing
  A. The National Spotlight on Policing
  B. The Need for Community Policing in Buffalo
    1. Alarming Disparities and Police Misconduct
    2. Recent Oversight Efforts
    3. Community Policing in Buffalo

## POLICING IN CONTEXT

Police forces in 2016 – in Buffalo and around the nation – face difficult challenges. The style of policing dating back to the War on Drugs (and persisting through the War on Terror) has encouraged aggressive responses to quality of life crimes. As a result, arrest and incarceration rates have climbed nationwide, especially in impoverished neighborhoods. Unfortunately, concentrated poverty in many regions has become worse, not better.  The poverty rate in the Buffalo-Niagara metropolitan region hovers right about the national average (15 percent), but within the City of Buffalo the rate is a shockingly high 33 percent; for the city's children, it is 54 percent.[1]  This disparity between city and suburbs overlaps with strong racial disparities. Nationally, the respective unemployment rates for blacks and Hispanics run roughly twice and 1.5 times as high as those of whites, but in Erie County the picture is even worse.  In 2011-2013, for example, the unemployment rate for black workers age 20 to 24 was 20.5 percent, compared to 8.2 percent for their white counterparts.[2]  Not surprisingly, neighborhoods of intense segregation and poverty experience disinvestment, blight, and high rates of crime.  As police increase their presence in these neighborhoods, more residents are drawn into the criminal justice system through stops, arrests, fines, and incarceration, further damaging their employability and life chances.

Compounding the difficulties for the police is the nation's failure to care adequately for people with mental illness.  The deinstitutionalization movement helped free many people with mental illness from sometimes oppressive residential facilities, but, sadly, the public never followed through with the second part of the bargain: adequate community-based treatment.  As a result, police increasingly respond to calls triggered less by criminal intent than by mental illness, and the nation's jails and prisons have become filled with people with mental disabilities.  Closely related is our society's failed approach to drug use, which has emphasized prohibition and policing to deal with problems better solved with public health techniques. As a nation, we have also made police work (and ordinary life) more dangerous than it should be by failing to regulate guns adequately, even as the United States suffers from over 30,000 gun deaths per year.[3]

Finally, the police are challenged by the nation's tragic history of racism and racial and economic inequality. Racial disparities persist in every part of our society, including employment, housing, and health. Racism itself remains deeply ingrained in our culture and in our psyches. Explicitly racist expressions and sentiments remain common, even among popular political and cultural figures. And explicit racism is only the tip of the iceberg. Careful research has shown that implicit racism remains almost universally prevalent among whites, and surprisingly common even among people of color. This subconscious set of attitudes, stereotypes, assumptions, and inclinations may never manifest itself openly, but it affects thousands of decisions every day, which, when aggregated, place people of color at a profound disadvantage. There is no evidence that police officers are more or less racist than other segments of society. But because police officers are involved in situations involving life or death, freedom or imprisonment, and respect or humiliation, the stakes are particularly high.

Given this social context, it is plain that many of the problems in policing are symptoms of deeper economic and social issues that must be addressed by increasing opportunity for all. Nonetheless, there are few arenas in public life more vital than public safety, and economic opportunity is itself dramatically impacted by public safety policies – as when the collateral consequences of arrest and incarceration prevent people from getting jobs. Moreover, the very volatility and intensity of police-community relations demands the closest attention, the fullest community engagement, and the most creative and constructive thinking. Only through this civic conversation can police and community work together to co-create a public realm that is both safe and democratic.

## COMMUNITY POLICING, PAST AND PRESENT

Community policing is a philosophy of law enforcement that employs three complementary strategies: the organizational and cultural transformation of police departments; the cultivation of partnerships among the police, private enterprises, community groups, and individuals; and crime prevention through problem-solving which targets the root causes of local crime.[4] Through community policing, officers reaffirm their role as public servants, fully engaged with the communities they serve.



Community policing calls upon officers to develop relationships with the people, businesses, and organizations in the communities to identify and prioritize public safety issues. Working with residents can increase trust in the police and in law

10

enforcement procedures. With the community's help, police can respond to crime more effectively and renew their legitimacy as law enforcers in the eyes of people they serve.

Despite successes in the past, community policing has been applied inconsistently in the U.S. In the 1970s, community policing matured philosophically and institutionally. San Diego, for example, became one of the first municipalities to report on community-oriented policing practices. Officers were required to become familiar with specific geographic locations, their demographics, topography, and history of service calls. They also customized their policing tactics to match the needs of their service areas and their beats.[5] In a landmark study, the San Diego Police Department found that this type of policing made officers familiar with the people and places in the communities they served, which improved policing and developed mutual respect among residents and officers.[6] At the same time, foot patrol experiments in Newark, New Jersey and Flint, Michigan proved to reduce crime levels and increase citizens' approval and feelings of security while improving morale for officers.[7]

Meanwhile, police expert Herman Goldstein published extensively on the concept of "problem-oriented policing," which challenged police to identify crime hotspots in neighborhoods and develop community-based policing initiatives to address local crime.[8] Patrol officers would determine high-crime areas based on the number of service calls and crime rates and then develop preventive measures to reduce criminal activity. "Beat" cops, in turn, would become more actively involved in the criminal investigation process due to their increased knowledge of crimes in specific areas.[9]

In the 1980s, however, community policing took a back seat to the war on drugs. As Michele Alexander documents in *The New Jim Crow*, new laws and policies led to a massive increase in the number of arrests and convictions for drug offences, with dramatic racial disparities at every stage in the process. Simultaneously, many departments adopted the broken windows theory of policing, which asks police officers to eliminate visible signs of disorder – the types of disorder that were highly prevalent in public housing and low-income neighborhoods.[10] These trends – the drug war and broken windows practices – combined in important ways, as state and federal laws and funding streams incentivized widespread arrests, disproportionately targeting low-level drug offenses in impoverished and nonwhite communities.

In the 1990s, the war on drugs coexisted uneasily with a renewed call for community policing. The Violent Crime and Law Enforcement Act of 1994 established the federal Community-Oriented Policing Services (COPS) program and invested $9 billion over six years to reform policing nationwide.[11] At the same time, however, "tough on crime" policies led to increased arrests and incarcerations, even as crime rates were falling. Policing was heavily influenced by pressure to raise revenues (as in the case of Ferguson) and to meet numerical targets (as in the

11

case of New York City).[12]  In many cities, community policing did not exist or was confined to small specialized units, rather than being a central strategy of the department as a whole.

In the early 2000s, the war on terrorism changed the landscape of policing nationwide. As a precaution against terrorist attacks, law enforcement agencies increasingly militarized their forces, expanding their Special Weapons and Tactical (SWAT) units and acquiring military-grade weapons from the Pentagon's Law Enforcement Support Office, or the 1033 program.  In a national example of mission creep, SWAT units began to be deployed for routine police activities like drug searches and executing warrants and not just in emergencies.[13] And they carried the weapons of war: Between 2006 and 2014, the 1033 program sent 79,288 assault rifles, 11,959 bayonets, and over 600 mine-resistant, ambush-protected vehicles (or MRAPs) to local police departments.[14] Meanwhile, community policing programs and initiatives received few federal and state incentives and thus lost considerable momentum at the dawn of the twenty-first century. Not until tragedy struck in 2014 did community policing resurface as a valuable policing alternative.

## THE CHALLENGES OF 21ST-CENTURY POLICING

### The National Spotlight on Policing

The killing of unarmed African Americans by police has delegitimized law enforcement in black communities and catalyzed nationwide conversations concerning police reform. Over 1,000 people are killed by the police each year in the U.S., compared to less than 10 people per year in countries such as Great Britain, Australia, Germany, and Japan.[15] Of people killed by the police in 2015, 25 percent of African Americans were unarmed, compared with 17 percent of whites.[16] In July 2014, for example, a New York City police officer suffocated Eric Garner during a routine stop and frisk, refusing to release his choke-hold despite Garner's pleas for air. [17] Garner's death raised questions about the pervasiveness of police brutality, especially in black communities, and the impunity with which police used force. Many more black Americans have died at the hands of police in the last few years, including Michael Brown, Walter Scott, Freddie Gray, Tamir Rice, and Sandra Bland.

In 2014, President Barack Obama issued an executive order creating a task force to study best practices in policing and recommend strategies to restore communities' trust in law enforcement agencies. [18] The Task Force on 21st Century Policing issued a final report in 2015, emphasizing community policing as the "guiding philosophy" for reform, the cornerstone of a new relationship between law enforcers and community stakeholders.[19] The Task Force called for community policing to be the core principle in each department and for officers to be hired, trained, evaluated and promoted based on community engagement, not just arrests, tickets, and tactical skills. Today, effective policing requires more than the expertise of law enforcers. For communities to remain safe, the Task Force explained, police must understand the needs of

0012

residents and promote the dignity of society's most vulnerable members.[20]  The way that we measure the success of policing must include the trust and respect it inspires in the community, the extent to which it protects the rights of all residents, and its success in preventing crime from occurring in the first place.

## The Need for Community Policing in Buffalo

### Alarming Disparities and Police Misconduct

In 2013, PPG issued its *Alarming Disparities* report on racial disparities in Erie County's criminal justice system. Between 2007 and 2011, African Americans accounted for 43 percent of arrests in Erie County despite being just 14 percent of the population. And while Hispanics comprise less than 5 percent of the population, they accounted for 7 percent of all County arrests.[21]  In 2010, African Americans were arrested for marijuana possession in Buffalo at 5.7 times the rate of whites, although research shows that African Americans use and sell marijuana at similar or lower rates than whites.[22] The report noted that there are many causes for these disparities, including concentrated poverty and segregation, but it called for changes in policing as part of the solution.

In addition to the data on racial disparities, a series of police misconduct cases has highlighted the need for reforms.

*Case Studies: Police Misconduct Cases in Buffalo, New York*

- In 2006, **Buffalo police officer Greg O'Shei** pled guilty to misdemeanor sexual assault after compelling two women to have sex with him.[23] **One woman reported that O'Shei** visited her home, banged on her door, and demanded sex - threatening to call Child Protective Services to take her children if she refused.[24] **O'Shei resigned from his post** and received probation.[25]

- In November 2006, Officer Cariol Horne alleged that fellow police officer Gregory Kwiatkowski punched and choked a suspect he had handcuffed in a domestic dispute. She also alleged that Kwiatkowski attacked her when she tried to intervene on behalf of the suspect. Kwiatkowski was not charged in the incident, but he was later forced to retire after attacking two other officers in two separate incidents. Kwiatkowski was also federally indicted in 2014 for violating the civil rights of black teen suspects. Officer Horne was accused of obstructing police duty and other charges in the Kwiatkowski incident. She was found guilty of the charges in 2007 and fired from the force. Following **Kwiatkowski's** 2014 indictment, Horne renewed her fight to restore her pension.[26]

- In 2010, Buffalo police officer Anthony Porzio faced charges after a video showed him assaulting a suspect who was handcuffed and in custody.[27]

13

- In 2012, a Buffalo police officer Jorge I. Melendez was arrested and convicted for conspiracy to manufacture more than 100 plants of marijuana. He reportedly harvested plants and conducted other business while on duty. Melendez was subsequently sentenced to 60 months in prison.[28]

- In April 2014, Buffalo police officer John Cirulli was videotaped beating a suspect he had handcuffed. Cirulli pulled John Willet over while driving in the neighborhood around Shaffer Village, one of the Buffalo Municipal Housing developments. Cirulli searched Willet and found drugs in his possession, after which Willet was placed in handcuffs. While Willet lay prone on the ground, handcuffed, Cirulli began to beat him. A bystander captured the incident on video and released it to the media. Cirulli resigned from the force and pled guilty to federal charges.[29]

- In May 2014, Buffalo police officer Robert Eloff, while moonlighting as a bouncer at **Molly's Pub in Buffalo, abetted in the manslaughter of a bar patron.** After the bar owner pushed a patron down a flight of stairs, Eloff allegedly handcuffed the victim, who was unconscious and in need of medical attention. The victim later died of the injuries suffered in the assault.[30] In April 2015, Eloff was charged with two federal civil rights violations, one related to the May 2014 incident, and another stemming from a February **2014 incident at Molly's Pub in w**hich he allegedly assaulted a handcuffed patron.[31] Eloff resigned from the force and pled guilty to a misdemeanor civil rights violation.[32] Eloff had a history of citations for excessive violence. As an officer for SUNY-Buffalo, he was forced to resign following several incidents of using excessive force with students and abusing sick leave and overtime.[33] The Buffalo Police Department (BPD), however, never **requested Eloff's personnel files from his time at UB. While with the BPD, Eloff showed** signs of miscon**duct. He was accused of knocking a phone out of a woman's hand and** attempting to confiscate it when she attempted to record a fellow officer shoving a suspect during a routine stop.[34]

- In October 2014, the BPD fired a female officer following a disciplinary hearing for threatening to kill a Buffalo woman whom she suspected of fraternizing with her boyfriend, another BPD officer. She abandoned her patrol to track the woman down at her workplace and home.[35]

- In 2015, a Buffalo police officer was caught stealing $50 from a lost wallet that a civilian turned into him.[36]

- On June 9, 2016, prosecutors charged Buffalo cell block attendant Matthew Jaskula with beating and dragging Shaun Porter, a handcuffed suspect. Porter suffered a broken nose, bruised ribs, and sprained hand and neck.

While parts of the Buffalo Police Department (BPD) are devoted to community policing, others seem wedded to a "broken windows" or "zero tolerance" approach that prioritizes large numbers of arrests for low level offences and that may contribute to racial disparities and poor community relations. For example, *The Public* recently reported on research by Anjana Malhotra showing

that the BPD's Strike Force Unit and Housing Unit generate huge numbers of misdemeanor arrests, many of them generated at traffic checkpoints, which Professor Malhotra criticized as potentially unconstitutional.[37] It is also surprising how aggressively the BPD enforces marijuana laws and what a severe racial disparity results; in 2013, there were 450 blacks arrested for misdemeanor possession of marijuana, compared to 60 whites.[38]

*The Public* has also reported that during the last week of July, 2016, the BPD Strike Force went door-to-door in the Broadway Fillmore neighborhood for three days, citing residents for minor offences such as high grass, garbage on the lawn, garbage totes left too close to the street, and house numbers not posted on the property.  An urban farmer from the neighborhood commented that the mostly poor and elderly residents were already having trouble staying in their homes and keeping up with expenses, before the imposition of costly fines.  "They're sending people out to give tickets, but why not send people out to knock on the door and offer help?" she asked.[39]

Furthermore, in addition to the misconduct cases cited above, there is evidence of overly aggressive practices within the BPD.  For example, *Artvoice* has reported that a local attorney has twelve active cases against the BPD for shooting dogs during narcotics raids.  In one case, a local man, Cory Meer, claims that the BPD raided his home, handcuffed him, and shot his dog in front of his two year old son.  Meer says that he was not charged with any crime.  In another case, Michael Urban claims that the police mistakenly raided his house, looking for suspects who live elsewhere on his street, and killed his dog.  According to *Artvoice*, "When questioned privately, an officer who regularly raids homes in search of narcotics, said that it is a matter of policy to shoot pit bulls first and not try to find out if they are harmless or aggressive."[40]

The BPD's aggressive police practices affect people as well as dogs.  According to *Artvoice*, Jami and Ricky Krafchak have filed a lawsuit against the BPD, claiming that police executed a wrongful search warrant in their residence. The Krafchaks claim that police conducted an early morning raid in their home searching for a black male suspected of selling marijuana. But the tenants maintain that no black male lives or has lived in their apartment. Jami Krafchak alleges that "about two dozen police, with all of their guns, came running in, shouting at me to put my hands in the air, that it's a raid…They ask[ed] me over and over and over and over if my husband was black." At the time of the raid, she claims she was home alone in her undergarments. Still, police zip tied her hands behind her back, frisked, and photographed her on a personal cell phone. They never found the suspect or drugs on the premises, and Krafchak was not charged for any crime. Assessing the incident, Krafchak states, "They [the police] smashed into our apartment on bad information with 20-25(ish) of people to back them up along with tons of protective gear."[41]

The "broken windows" style of policing appears to be straining police-community relations in Buffalo, especially among blacks and younger people. According to data in Open Buffalo's Community Policing Survey, only 44 percent of black respondents believe they can trust the

police. Trust is low among young people as well. Only 44 percent of respondents under 18 years old and 56 percent between 18 and 25 believe that they can trust the police. When asked how to improve police-community relations, some respondents demanded better treatment for blacks and young people. "Stop being racist," writes one respondent. "Go into high schools and spend time building relationships with kids," writes another. Most respondents wanted interactions with police to be more respectful. "Communicate with us," writes a respondent, "make us feel like you're here to help."



16

*Recent Oversight Efforts*

In the last decade, the City of Buffalo has attempted to increase oversight of the Buffalo Police Department. In 2010 the Buffalo Common Council established the Joint Police Reform Commission to assess police practices and develop recommendations for reform. Staffed by Council and mayoral appointees,[42] among them H. McCarthy Gipson, former Commissioner of the BPD, and Thomas F. Higgins, former Erie County Sherriff, the Commission was created to assess police practices and develop recommendations for reform. But the Commission was shrouded in controversy from its inception. The commission's interim chair, community activist Ricky Allen Sr., was arrested on federal drug charges in March 2011.[43] Gipson and Higgins resigned shortly thereafter, and the Commission eventually withered away.

In 2014, the Buffalo Common Council reestablished its Police Oversight Committee in response to several cases of police misconduct. Councilmember David Rivera, a former police officer, was selected to serve as the chair.[44] The Committee has met with police on a semi-regular basis to discuss structural and policy changes but has not yet issued a set of recommendations. Nor has the Police Oversight Committee effectively monitored key police activities like improved weapons training. *The Investigative Post* has reported that, despite awarding the BPD with $60,000 for training, the Committee has not tracked how those funds were spent.[45]

Police Commissioner Daniel Derenda has stressed that the vast majority of officers are dedicated professionals, and that his administration works hard to hold officers accountable when they engage in misconduct.[46] Even so, the range of misconduct cases, the racial disparities in our system, and the responses to the Open Buffalo Community Policing Survey all suggest a need for policy reforms in addition to individual responses.

*Community Policing in Buffalo*

Currently, the Buffalo Police Department (BPD) practices community policing in several ways. The BPD employs eleven sworn officers as community police officers (CPOs). Each of Buffalo's five police districts has two community police officers, and the housing unit has one. Captain Steve Nichols oversees the CPOs, although their direct supervisors are district captains. Nichols describes community policing as "engaging with the community" and "taking time to sit with people and listen to them."[47] To distinguish between community police officers and patrolmen, Nichols makes a healthcare analogy. Patrol officers, he explained, are like emergency room doctors, treating sudden illnesses and injuries hoping to save lives. Community police officers, on the other hand, are more like family doctors, who provide nonemergency, preventive care for their patients. "The community needs both," Captain Nichols asserts. CPOs engage the community in non-enforcement settings, playing an important role as liaisons between the police and the people they serve.[48]

0017

To cultivate relationships with community members, Buffalo community police officers attend block club meetings and cosponsor community events. At block club meetings, community police officers listen to the public safety needs and concerns of community members as well as discuss neighborhood crime data and strategies the police are using to address crime hotspots. The community events that community police officers cosponsor range widely from block parties and cookouts, to clinics on what to do when stopped by police, to trainings on how to administer Narcan when someone overdoses on opioids.

Since 2010, when Mayor Byron Brown revived the Community Policing Unit, the BPD's CPOs have been permanent fixtures at citywide programs and initiatives. For example, CPOs accompany the Mayor and top police administrators each year touring neighborhoods during National Night Out, a federally funded festival to encourage crime prevention partnerships between neighborhood watch groups and police.[49] CPOs and patrolmen also accompany bicyclists with Slow Roll Buffalo, a local group that promotes community cohesion by hosting weekly group bike rides through the city.[50] During the 2015 winter holiday season, the BPD community officers were present at neighborhood holiday events to hand out bicycles to community members. And throughout the summer of 2016, the Community Policing Unit used state funding from a Give Grant to organize corner barbeques in selected neighborhoods, with Buffalo Peacemakers and Buffalo SNUG Violence Prevention Initiative serving as community partners in this effort.[51]

*Case Study: Peacemakers in Buffalo, New York*

In 2013, city officials, the Buffalo Police Department, and six antiviolence community groups collaborated to create the Buffalo Peacemakers Gang Intervention Program, a coalition committed to enhancing public safety and reducing crime in Buffalo neighborhoods. Modelled after successful gang intervention programs around the country, Buffalo Peacemakers provides counseling, mentoring, and conflict resolution services for at-risk youth, especially those involved in local gangs. Peacemakers also respond to conflicts at schools and community events to stem outbreaks of violence.[52] Peacemakers work in concert with city agencies, including the Buffalo Police Department, with whom Peacemakers train as well as coordinate neighborhood events and initiatives.

One of the ways that the BPD has used Peacemakers effectively has been at mass demonstrations and protests. Some residents have expressed concern, however, about the recent creation of the Emergency Response Team (ERT) to deploy at protests in addition to Peacemakers. The BPD has spent $30,000 providing the ERT with "armor and equipment."[53] Furthermore, the Buffalo Police Benevolent Association, the police union, has renewed its call to arm police officers with high-powered AR-15 rifles, fearing that local police would be ill prepared for armed shooters

0018

like the men who killed officers in Dallas, Texas and Baton Rouge, Louisiana.[54] These current initiatives seem to indicate more militarized policing than community policing.

Deputy Commissioner Kimberly Beaty would like to see an increase in community policing practices in Buffalo. Beaty has emphasized her desire to see community policing expanded to include all officers, not just those who are designated community police officers.[55] There is no plan, however, to expand the number of community police officers, to incentivize community policing through pay increases or promotions, or to require that all officers devote a certain number of hours per week to community policing. While it appears that there is some culture change underway at the BPD, with high ranking officers speaking positively about community policing, a systemic set of changes to policy and practice is needed to fully implement community policing in Buffalo.

Buffalo has many assets to build on as it explores community-police relations, including a police department that has embraced community policing and instituted many good policies, practices, and collaborations.  As with any government institution, however, there is room for improvements and additions. Clearly, the community is looking for some changes. When appropriately weighted to reflect the 2010 U.S. Census demographics for Buffalo, the Community Policing Survey revealed that 29 percent of Buffalo residents state that the police do not respect women, 50 percent that they do not respect youth, and 57 percent that they do not respect people of color.  A troubling 39 percent of Buffalo residents say they have an unfavorable impression of the police, and 42 percent say that the police do a poor job working with the community to prevent crime.  (See Appendix B for Community Policing Survey data.) These perceptions point unmistakably toward a need for better police-community relations.

*Challenges and Opportunities*

The Buffalo Police Department (BPD) may certainly encounter challenges when trying to incorporate community policing practices citywide. While some changes will impose no costs, others (such as body cameras, for example) may be expensive and require difficult fiscal decisions. Additionally, some changes will require collaboration or negotiation with the police officers' union, the Police Benevolent Association.  Others require shifts in culture and attitude, which can take a long time to achieve.

However, the BPD has a unique opportunity to become a national leader in community policing. Overall, the community policing practices recommended in this report can save the city money by reducing crime, conflict, and litigation. Additionally, police officers will be safer and more engaged with the community when they move away from militarization and concentrate on cultivating community partnerships. They can then leverage their ties to community members to prevent crime, rather than react to it. Furthermore, as the Community Policing Survey shows, many residents want better police-community relations in Buffalo, a call for reform that aligns

with community policing practices. The BPD should use the survey results to reengage the community around its needs.

Of course, the BPD is not the only police force in Erie County that arrests and incarcerates people of color in disproportionate numbers. Residents of the metropolitan region have long expressed concerns about racial profiling by suburban police forces in communities such as Cheektowaga, Kenmore, Amherst, and Tonawanda.  But by incorporating community policing practices, the BPD can work to reduce disparities in the city and help neighboring police forces develop strategies to reduce their own. The BPD should answer President Obama's call for more community policing and leave its own mark on Buffalo's moment of renewal and renaissance.

0020

# COMMUNITY POLICING STRATEGIES FOR THE BUFFALO POLICE DEPARTMENT

Building trust within a community is an ongoing process for police departments.

Therefore, this report recommends a continued and large expansion of community policing efforts. Rather than only reacting to crime, police officers should interact with community members, cultivate trust, and leverage these relationships to *prevent* crime. By highlighting the best practices implemented nationwide, the report shows how expanding community policing in Buffalo, especially in public housing and low-income communities, can work.

To implement community policing more fully, the Buffalo Police Department (BPD) must change how police officers are hired, trained, evaluated, and promoted. It must change how they spend their days to allow for more positive interactions with community members.  It must partner with and be accountable to civilians.  In addition to the BPD, city officials and community members must play their part to change the culture of policing in Buffalo. City officials need to partner with the police and complement their efforts by offering more services and opportunities to keep residents away from crime in the first place.   The City should also adjust its oversight mechanisms to make them more effective.  Community members must also contribute by opening the lines of communication between themselves and law enforcement agencies. They must help identify problems, propose solutions, and assess the strategies and impacts of policing on their communities.

0022

# 1.

## PROMOTE COMMUNITY-ORIENTED POLICING THROUGH CULTURE CHANGE, TRAINING, INCENTIVES, AND POLICIES

A. Train Community-Oriented Officers
B. Incentivize Problem Solving and Relationship Building
C. Build Relationships and Develop Assets to Encourage Problem-Solving
D. Make Officers More Accessible
E. Transform the Housing Unit into a Community Policing Unit

In order to implement community policing, the Buffalo Police Department (BPD) must train officers to interact effectively with allies and assets in the community, encourage officers to strengthen ties to residents through incentives and promotions, and empower community members to participate in crime reduction and prevention strategies. "Police need to be out in the community walking the street and getting to know the communities they serve," wrote one Community Policing Survey respondent. Another raised the issue of trust. "It is difficult to trust someone to have your 'best interest' if they only come around when there is a problem," the respondent explained, "To address the need of the community [police officers] should be a part of that community." Several practical reforms can help the BPD prepare police officers for the type of community policing that survey respondents recommended for Buffalo. These suggestions are discussed in detail below.

## Training Community-Oriented Officers

High-ranking officers and police administrators must actively change the culture of their departments in order for community policing to thrive. If presented as a secondary strategy, community policing will not be integrated into the entire police force and will likely lose support and funding during political and budgetary crises.[56] It is essential, then, that everyone from veteran officers to new recruits be taught, trained in, and promoted based on their application of community policing methods. Reflecting on community policing practices, Edward Flynn, Chief of Police of Arlington County, Virginia, explains that "the greatest guarantee of citizen safety is a relationship with the police based on mutual trust and respect. The greatest guarantee of officer safety is citizen support and approval."[57] Buffalo residents who participated in the Community Policing Survey seem to agree. "[Buffalo police officers] see us as problems not as people," opined one respondent, "Officers need to build relationships with people in their community."

*Case Study: Community Policing In Camden, New Jersey*

In 2013, Camden County, New Jersey implemented a community policing initiative that included opening two new police stations, putting more officers on the streets, [58] and encouraging officers to interact with community members through meet-the-officer fairs, and at local baseball games. [59] The county puts ice cream trucks out in areas where police are on foot patrol and encourages citizens to get free ice cream. [60] In addition, Camden promotes civilian participation in policing efforts: for example, civilian ambassadors conduct strolls through business districts, and community leaders can view surveillance footage from home to monitor for crime. [61] **Camden's community policing program demonstrates the potential benefits of community policing for crime reduction: a 10-19 percent reduction in crime and a 51 percent reduction in violent crime have been credited to the increased use of foot patrols.** [62] But the program also highlights a need for caution when community **policing is combined with increased police presence and a "broken windows" approach.** More police on the streets means more interaction with offenders, and low-level offenders in particular. The president of the local ACLU chapter noted a significant increase in arrests and summons for crimes such as having tinted windows (a 381 percent increase) and disorderly conduct (43 percent increase). [63]

Buffalo's Mayor and Police Commissioner seem to agree that cultivating trust in the community should lead to professional advancement. In 2014, Kimberly L. Beaty, formerly chief of the Northeast District, was appointed Deputy Commissioner in part because of her community-oriented policing style. [64] Commenting on Beaty's promotion, Buffalo Police Commissioner Daniel Derenda touted her influential work cultivating community relationships in the Northeast District. [65] When asked about community policing, Beaty explained that it is more than just a program: "It's the way you do your job." At the crux of community policing, she continues, are relationships with community members, "[B]uilding relations [with the community will] keep our neighborhoods stable and ultimately safer…[s]trong ties to the community make our jobs a lot easier." [66]

The BPD has also increased training in community policing. New York State requires only a minimal level of training in community policing. Currently, the New York State Municipal Police Training Council (MPTC), which determines state wide training standards for new police officers, mandates a minimum of 649 hours of basic training. [67] However, only two hours of instruction time are dedicated to community policing, and only five to cultural diversity/bias issues. [68] In 2014, after the John Willet case described previously, the Buffalo Common Council changed municipal law to require that Buffalo police officers take part in a minimum of 21 hours of diversity, ethics, and use-of-force training each year. [69] And in 2015, all officers were required to attend a four hour community policing training. [70]

Currently, one preliminary community policing training takes place in the Erie County Police Academy. This training is led by Deputy Commissioner Beaty. Captain Nichols conducts another

24

two-hour community policing training during the Buffalo police orientation, administered to all city police officers who graduate the county academy. Nichols is assisted by representatives from various community groups, including members of immigrant and refugee populations. The BPD-specific training explains the role of the community police officer and how to address non-criminal neighbor disputes, problem properties, and eviction processes.  Additionally, new recruits are taught to partner with community groups and neighborhood watches.

This additional training is welcome, but it needs to be complemented with incentives that encourage officers to use community policing in their daily work, and with community collaborations like those described in this report's case examples.  Most importantly, the training needs to be part of an overall culture shift in the department, so that officers see themselves as "guardians" instead of "warriors."

*Case Study: Relationship-based Policing in Watts, California*

Public housing in the Watts neighborhood of Los Angeles faced extraordinary rates of crime and gang related activity. In 2010 alone, there were 800 violent crimes reported. The Urban Peace Institute, a civil rights organization, conducted a survey of public housing residents, who identified the fear of gangs, distrust of police, and inadequacy of housing authority staff as the three major issues impacting public housing. To address these issues, the Los Angeles Police Department (LAPD), Los Angeles Housing Authority, Urban Peace Institute, and Watts public housing residents collaborated to develop a Community Safety Partnership that focused largely on relationship-based policing. The three goals included: 1) long-term relationship development; 2) community-capacity development; 3) and community partnering and input. To meet these goals, the LAPD offered pay and promotion incentives to officers who chose to work in public housing and who committed to relationship-based policing methods. The Urban Peace Institute provided relationship-based training, teaching officers to collaborate with public housing residents to solve problems they faced. The Community Safety Partnership led to a 50 percent reduction in violent crime over the first three years. Among the strategies that program administrators identified as best practices were: 1) careful recruitment of officers and pay incentives; 2) training in communication skills, adolescent development, and the impact of trauma on communities: 3) asset-mapping, relationship building, and spending time with community members; 4) ongoing data collection and assessment to identify strengths and weakness and to improve accountability.[71]

Officers may face life-threatening situations and are trained to make split-second judgments. Surviving the day can mean navigating social terrain that is hostile to police presence, and so officers arm themselves with a "warrior mentality." Describing this "warrior worldview," former police officer and legal scholar Seth Stoughton explains that police officers "learn to treat every individual they interact with as an armed threat and every situation as a deadly force encounter in

0025

the making." This warrior mentality ultimately prevents officers from forming bonds with community members, while increasing the chances of violent confrontations.[72]

The Buffalo Police Department should train its police to serve as "guardians." According to Stoughton, the guardian mindset seeks to open lines of communication between police and the community. Guardians prioritize relationship-building and collaboration. "And in the use-of-force context," Stoughton explains, "the Guardian emphasizes patience and restraint over control, stability over action." One way that the BPD already deploys the guardian mindset is to send police officers door-to-door to distribute contact information for the confidential Buffalo Police tip line. This initiative, called Working Against Violent Events (WAVE), aims to improve the police response to neighborhood crimes by working with residents to solve them. The canvassing police officers serve as neighborhood guardians and conduits of critical crime-solving information.[73] Building on WAVE, the BPD should require new officers to log a set number of "non-enforcement" contact hours, when they interact with community members in positive ways. In addition, the BPD should increase the amount of training in tactical restraint, or de-escalation, to avoid and defuse confrontations.[74]

*Case Study: Blue Courage and the Buffalo Police Department, Buffalo, New York*

According to Deputy Chief Kim Beatty and Captain Steven Nichols, the Buffalo Police Department intends to make the community policing philosophy integral to all law enforcement strategies and practices in Buffalo, New York. One tool they have begun to use is **"Blue Courage: The Heart and Mind of the Guardian," a leadership development training.** Founded by Illinois police officers, Blue Courage is an organization comprised of policing experts from across the U.S. that offers a wide range of educational programs for law enforcement agencies.[75] **"The Heart and Mind of a Guardian" session in Buffalo was a two**-day training that taught police officers to develop the guardian mentality by cultivating mental health and wellness: through individual self-discovery, attendees were encouraged to care for themselves and to promote integrity, courage, and character while conducting law enforcement activities. The purpose of this leadership training was to improve police officers' discretion when engaging community members.[76] **"To exercise discretion well,"** retired police **commander Michael J. Nila wrote, "an of**ficer needs to know and embrace . . . patience; humility; a sense of fairness and justice; the desire to help others, to listen, and to be empathetic; and an aspiration to build community trust through coll**aboration."**[77]

The current community policing in-service training (4 hours per year) should be greatly expanded so that officers continue to learn new community policing methods over the course of their careers. Research suggests that on-the-job experience is more useful for officers than classroom training. With that in mind, new officers should be assigned to experienced community police officers to learn community policing techniques on the job.

On a related note, officers should receive training that allows them to interact directly with community members and practice new skills. While basic training includes 40 hours of interpersonal skills training, it is focused on arrest techniques and taught by a defensive tactics instructor.[78] More effective would be educational and relationship-building meetings with community leaders and residents on issues like adolescent development, the impact of trauma on individuals, and restorative justice and diversionary methods. Training could also include role-playing exercises in which officers interact with trained facilitators in scenarios where they utilize community policing skills and receive feedback on their performance.[79]

### Incentivizing Problem Solving and Relationship Building

In addition to new training procedures, the Buffalo Police Department should develop institutional methods to encourage community policing. Currently, it does not appear that officers other than community police officers are required or incentivized to use community policing methods. In addition to developing specific projects like those noted in the case studies, the BPD should require each officer to devote a certain number of hours per week to community policing activities such as foot patrols, bike patrols, meetings with residents, mentoring youth, and collaborating on community improvements.

Good methods of evaluation, feedback, and performance review are essential to institutionalizing community policing within the force. Officers should be recognized and rewarded for improving community relations and developing outreach programming, not just for making arrests. As former Seattle police chief Norm Stamper notes, pressure on officers for more "numbers," whether in the form of arrests, tickets, moving violations, or field interrogations, can transform cops into hunters, with citizens as their prey, dehumanizing both the police and the people they meet on their beat.[80] Performance reviews should include measures of effectiveness in solving problems, fostering relationships with residents and businesses, and partnering with community organizations to address issues in the community.

It is also critical for supervisors to personally review the work of officers and provide them with regular, constructive feedback on their performance in policing. According to Stamper, supervisors should, but rarely do, ride along with beat officers and observe their interactions with residents. Supervisors should also carefully review reports and ask follow up questions. They should talk with people who have been stopped and arrested and ask them, "How did my officer treat you last night?"[81] The Annual Performance Evaluation used by the Niagara Falls Police Department offers one example.

*Case Study: Niagara Falls Police Department Annual Performance Evaluation*

All sworn officers in the Niagara Falls Police Department (NFPD) receive annual performance **evaluations. These reviews help the Department provide feedback to improve officers'** performance; evaluate the effectiveness of training exercises; provide data for promotion, disciplinary action, and termination; and assess progress toward departmental goals and objectives.[82]

**The NFPD review process evaluates police officers' professionalism, work ethic, and skills.** Significantly, a substantial portion of the evaluation measures how effectively police officers apply community policing skills. For exampl**e, officers' professionalism is assessed according to their ability to build relationships with citizens by "striving to present a** favorable image of the Department as well as demonstrate a caring and courteous **demeanor."**[83] Another measure of professionalism is whether the officer proactively patrols **(his or her) beat or zone; this involves directly interacting with citizens "to identify quality of life issues as well as crime."**[84]

Another way to incentivize policing reform is to increase the pay and promotional opportunities for officers who adopt and implement community policing practices. Organizers with the Urban Peace Institute acknowledged that the Community Safety Partnership in Watts was successful in large part because the LAPD created incentives for community-oriented policing. These practices include hiring and promotion criteria that gauge an officer's understanding of, and dedication to, community policing practices. Currently, there is no financial incentive for officers to become community police officers in Buffalo; in fact, there is a disincentive, in that community police officers are last in line for overtime assignments.

## Building Relationships and Developing Assets to Encourage Problem-Solving

One of the most important tools that police officers can use to implement community policing practices is "asset mapping" to identify community resources and deficits. The assets in a community include residents, organizations, and businesses with vested interests in the safety and development of the neighborhood. Local police officers should develop direct contacts with community assets to promote collaborative problem solving. Specifically, local police should collaborate with organizations working with young people, the mentally ill, the homeless, those with addiction issues, foreign language speakers, and other marginalized populations.

Similarly, police should learn from residents about community deficits that may contribute to neighborhood problems. What does the neighborhood need in order to promote peace, security, and healthy living? Underlying social and economic deficits drive crime and violence. Police officers should work with residents and non-profit partners to uncover these deficits and develop "non-enforcement" strategies to facilitate public safety. For example, if panhandling is an issue, officers can refer panhandlers to a local organization to provide supportive services, rather than issuing a citation or making an arrest.

0028

*Case Study: The 11ᵗʰ Street Corridor Program, Philadelphia, Pennsylvania*

As poverty, unemployment, and crime spiked in Philadelphia's public housing in the late 1990s, residents teamed up with Philadelphia's Housing Authority, Housing Authority police, and Temple University to restore safety to their homes and neighborhoods. Their collaboration created and implemented the Philadelphia Community Policing Program, which targeted five public housing facilities throughout Philadelphia.

The Community Policing Program's first initiative was the 11ᵗʰ Street Avenue Corridor Program. The Housing Authority increased police presence in the 11ᵗʰ Street corridor and made two critical policy changes. First, the officers were assigned to permanent geographical areas, so they could build familiarity with residents and take "police ownership" of the neighborhood. Second, the officers engaged housing residents with the purpose of directing them to social services provided by community organizations. The goal was not to increase arrests but to cultivate community ties and rehabilitate the image of police. [85]

The 11ᵗʰ Street Corridor Program's second strategy aimed to increase community participation in policing services. The program organizers created a problem-solving group that included residents, site managers, police officers, business owners, and community organizers. This group served as "a forum for the police, other PHA services and the community to discuss public safety concerns and to design and implement local interventions to address these concerns." [86]

Surveys of program participants showed that community policing changed the dynamics between police and the community. Police officers reported that they gained greater familiarity with the community and, as a result, supported community-derived crime prevention activities. Residents also noted a shift in their perception of police officers when afforded an opportunity to interact with them as social equals. They also welcomed the opportunity to shape policing services in their neighborhoods and help law enforcers implement strategies that reflect community needs. [87]

Participatory asset mapping and community surveys can be utilized by BPD in officer training, as they were in Watts and Philadelphia, respectively. Particularly for new recruits, having knowledge of community organizations and their missions, as well as a working relationship with their staff, can provide much needed support during the initial stages of immersion with the community. Direct contact with community residents and leaders can also serve as a foundation for other community policing methods discussed below, such as targeted improvements, environmental design, and enforcement assisted diversion.

29

*Case Study: Neighborhood Resource Team, Miami-Dade County, Florida*

In 1992, the Florida State Attorney announced the creation of the Neighborhood Resource Team (NRT), tasked with improving public safety in West Perrine, especially in Perrine Gardens, a public housing complex riddled with crime. The NRT developed a two-part strategy to transform the neighborhood. First, family-centered intervention sent NRT representatives into the homes of residents **to assess tenants' family needs and to establish relationships for follow-up monitoring and treatment.** Second, community-wide intervention aimed to change how residents viewed the neighborhood by encouraging collaboration with police and by involving tenants in policing, maintenance, and community clean-up. The NRT also increased police interaction with the community. Officers were assigned long-term duty in specific areas, where they shared personal contact information with residents, kept offices open to the public, attended neighborhood meetings, and collaborated with community organizations, churches, and businesses. The NRT has helped reduce crime in Perrine Gardens and revitalize West Perrine.[88]

## Make Officers More Accessible

Some citizens feel threatened by the police. An effective way to change this dynamic is to create outreach programs and safe spaces where police and community members can interact – outside the exigencies of crime response – and develop the trust and rapport essential to community policing.

The BPD should also increase foot and bike patrols. Buffalo residents have expressed dissatisfaction with the amount of time Buffalo police officers spend in their cars. "Stop just sitting in the police car all day," demands one Community Policing Survey respondent, recommending that police officers "actually [engage] with people." Foot and bike patrols would give police the opportunity to meet residents and become recognized faces in the community, build trust, and gain input. Currently, foot and bike patrols appear to be assigned on a somewhat ad hoc basis by precinct captains, often through the use of officers volunteering for overtime. The BPD should explore a more strategic and targeted use of foot and bike patrols and make them a more regular part of police duty, rather than an add-on.

0030

*Case Study: 22nd District Foot Patrols, Philadelphia, Pennsylvania*

In 2009, police officials and researchers from Temple University developed a social experiment to assess the impact of community policing methods on rates of crime. Police foot patrols are believed to make residents feel safer in their neighborhoods as well as **improve residents' perceptions of police. Officials wanted to know, however, if the patrols** could actually *reduce* crime. In the Philadelphia Foot Patrol Experiment, a pair of police officers was assigned to each city corner identified as a violent crime hot spot. They walked two shifts, five days a week, for the entire summer of 2009. Analyzing data for three months, researchers found that foot patrols did, in fact, help to reduce crime. Violent crime decreased by 23 percent, and researchers estimate that 53 violent crimes were prevented during the summer.[89]

## The Buffalo Municipal Housing Authority

Buffalo's public housing developments feel the impacts of the region's segregation, inequality, and disparities in a particularly intense way. The Buffalo Municipal Housing Authority (BMHA) owns and manages 29 developments with 4,332 housing units.[9] Of its residents, 75 percent are African-American and 12 percent are Hispanic.[10] Most residents are living in deep poverty, with 73 percent having an extremely low income (0 percent to 30 percent of the area median), 18 percent having a very low income (31 percent to 50 percent of median), and 7 percent having a low income (51 percent to 80 percent of the area median).[11]

Public safety is a primary concern for BMHA residents, many of whom are elderly, disabled, or children. In the past, the BMHA maintained its own police force, but in recent years BMHA has not done so due to budgetary constraints. In 2010, after BMHA tenants requested an increased police presence in the housing developments, the BMHA made a contract with the City of Buffalo, under which the Buffalo Police Department created a Housing Unit with 18 police officers and 2 lieutenants under the direction of a captain to "develop and implement a law enforcement operation plan for the improvement of public safety on various Authority properties."[12] BMHA agreed to pay up to $650,000 per year for "above and beyond baseline services," in addition to normal patrols, 911 responses, and investigative follow-up.[14] The BPD agreed to "develop and submit a law enforcement operation plan, regarding a comprehensive security strategy in the BMHA."

Under the agreement, the Housing Unit Captain has many duties, including:

- Provide monthly and annual reports;
- "Initiate and monitor ongoing lines of communication with public housing resident leaders to effectively employ community policing concepts and to address in a timely manner the concerns raised by such leaders;"

0031

- "Attend public housing resident council meetings as needed and assist in developing resident security programs."[15]

In recent years BMHA residents have raised concerns about the work of the BPD under the contract. In a letter to the executive director of the BMHA, the president of the Jurisdiction-Wide Resident Council stated that the BPD had not met its duties to provide more than baseline services and to communicate with residents, develop a security program, and use community policing. Moreover, the president stated:

> BPD has implemented police practices that create a pattern and practice of unlawful stops and false arrests. Many residents have been falsely accused of trespassing for doing nothing more than walking to or from their apartments. Some residents have even been arrested for trespassing in their own homes.[18]

In addition, public interest groups such as the Legal Aid Bureau, Western New York Law Center and National Lawyers Guild have expressed concern about the policing of BMHA properties. Legal Aid Bureau attorneys have begun litigating some of the trespass cases brought against BMHA residents and visitors.



While the BMHA's contract with the BPD calls for the use of "community policing concepts," in fact the Housing Unit prioritizes proactive stops and frequent arrests. According to a recent article in *The Public*, the Housing Unit's 21 officers made 39 percent of all misdemeanor arrests in the city from May 2013 through April 2014, of which 44 percent were traffic misdemeanors. During that year the Housing Unit confiscated a total of 18 weapons.[90]

While one officer in the Housing Unit voluntarily became a community police officer, the other members of the unit do not appear to employ community policing practices. They are not permanent beats, do not necessarily forge relationships with residents and resident leaders or with BMHA staff, and are not required to engage in community-building and trust-building activities. More familiarity with public housing residents will decrease the number of stops of lawful residents and their visitors, as officers learn names and faces and visiting patterns. Using the relationship-based policing model implemented in Watts, the police can completely remake their relationship with BMHA residents. Some public housing tenant

32

councils have taken their own steps to incentivize community policing. One tenant group even purchased bicycles for officers to encourage them to leave their vehicles and interact with residents more.[91]

*Case Study: City Public Housing Initiative, Fort Myers, Florida*

To reduce the crime rate in Fort **Myers'** seven public housing developments, the Fort Myers Police Department, Housing Authority, and community organizations created the Public Housing Initiative. The Initiative sought to prevent crime among juveniles and to increase community involvement in policing services. Police officers did more than just respond to crime. They patrolled in a car, on a bicycle, and by foot; participated in tenant associations; and supported social workers in the administration of juvenile justice and youth services. They also helped develop Crime Prevention through Environmental Design projects, which aim to change the physical environment to improve social interaction and behavior. The initiative reduced serious crimes by 35 percent.[92]

*Case Study: Police Neighborhood Resource Center (PNRC) Program, Greensboro, North Carolina*

**In 1989, the drug trade thrived in Greensboro, North Carolina's five largest public housing** communities. To address this problem, local law enforcers and community leaders created a crime prevention program that increased police visibility as well as provided educational and treatment services to residents afflicted by drug addiction. The Police Neighborhood Resource Center (PNRC) has decreased crime successfully in Greensboro public housing for nearly three decades.[93] **The cornerstone of the PNRC program is the "storefront police station." The PNRC assigns two police officers to each public housing development to** increase police visibility and help social workers coordinate referrals for residents. The officers are expected to conduct frequent foot and bike patrols and to establish citizen contacts, building rapport and trust with the community. By establishing contacts, officers gain insights into the values of the communities they serve, which they leverage for critical information about criminal elements, including the names, faces, and routines of individuals involved in crime.[94] The PNRC also provides on-site human services, including job training and recruitment agencies, support groups for troubled youth, and substance abuse professionals. Volunteer residents coordinate community activities with officers to introduce **residents to the services provided at the "storefront police station." Greensboro Police** Chief Anita Holder cited the **PNRC is a main reason why "the communities and the City of** Greensboro have seen a remarkable decrease in crime and a greater sense of serenity in the **targeted communities."**[95]

33

In addition to the case studies presented above, there are many other examples of community policing in affordable housing developments:

- **Miami-Dade County** addressed problems in a 16 block neighborhood by collaborating with 27 local pastors and other community groups to create a neighborhood resource team with five members: a police officer, a housing representative, a public health nurse, and two social workers. This approach cut burglaries by half, auto thefts by two-thirds, and robberies by two-thirds. The success has led to the model spreading to several additional neighborhoods.[96]

- **Indio, California** addressed problems in its largest low-income housing development, Mecca Vineyards, by upgrading lighting and landscaping, installing new playground equipment and a basketball/rollerblade court, building a community center, opening a Head Start program and a computer lab, and dedicating one full time community-oriented police officer to the development.[97]

- **Moline, Illinois** created a community policing initiative with the Moline Housing Authority. The police sought input from residents, and sought officers specifically interested in community policing. The police opened a satellite office in Spring Brook Courts with two officers who surveyed the tenants on their concerns and grew to be on a first name basis with them. Calls for service have gone down, fear of crime has diminished, and there is more support for the police.[98]

- **Southfield, Michigan** assigned a veteran officer to its troubled John Grace Community. He built a rapport with youth and families through frequent school visits, home visits, and participation in neighborhood functions. Working with other city departments, the officer has created drop-in roller hockey, basketball, volleyball, and weightlifting programs, as well as movie nights, trips to baseball games, and other activities.[99]

- **Hattiesburg, Mississippi**, police worked with the Hattiesburg Housing Authority to form a Neighborhood Enhancement Team, which did one-on-one meetings with residents and partnered with counselors from the University of Southern Mississippi's School of Social Work to help families solve their problems.[100]

The BMHA should help to create community watch groups directed by volunteers and assisted by community police officers. These types of bottom-up policing processes are cost-effective methods that would help citizens feel more engaged in their communities as well as free up time for officers. The BMHA should also offer tenants and community members "know your rights" trainings, so they learn the laws that police officers enforce, how to interact with officers, and what steps to take to file a complaint.

<u>Recommendations</u>

- Shift the culture of policing from the warrior mentality to the guardian mentality.
- Incorporate more community policing into training for new recruits and in-service police officers.
- Integrate community policing methods into daily police practices and create community policing collaborations like those listed in the case studies, using asset mapping, problem-solving, and other techniques.
- Require officers to devote a certain number of hours per week to community policing activities such as attending community meetings and events, doing foot and bike patrols, mentoring youth, etc.
- Offer more training in trauma, adolescent development, and tactical restraint/de-escalation strategies.
- Conduct annual performance reviews and regular assessments that recognize and reward community policing activities.
- Increase pay and promotional opportunities for officers who commit to community policing.
- Convert the BPD's Housing Unit from a strike-force model to a community policing model.

0035

0036

# 2.

## FURTHER INCREASE THE DIVERSITY AND CULTURAL COMPETENCE OF THE FORCE

A. Diversity of the Police Force
B. Implicit Bias Training
C. Gender Equality
D. LGBT and Gender Nonconformity
E. Language Access
F. Cultural Competency

Many Community Policing Survey respondents asked that Buffalo police officers be more sensitive to the communities they serve, especially when policing across racial and cultural lines. When asked to comment on their perceptions of police, some respondents wrote frankly about racial profiling: "The cops need to leave blacks alone;" "The police always abuse Hispanic people;" and "Stop police brutality" were some of their views. Another respondent explained that the BPD needs to "[h]ave cops that actually care about the people they should be taking care of." How did respondents recommend the BPD improve policing in Buffalo? Many recommended that the BPD recruit more police of color, so that the officers can reflect the communities they patrol. Others called for more training to address problems of implicit bias, cultural insensitivity, and overall disengagement from the community. One respondent called for the BPD to communicate more effectively with different cultural groups by offering officers more interpreting and translating services. The respondent also stated that police officers would benefit from "mid-year community meetings in each district, cultural competency trainings, mental health trainings, [and] community policing tactics."

Increasing the diversity and cultural competency of the Buffalo Police Department will improve how police interact with Buffalo's heterogeneous populations. Diversity is necessary for successful, unbiased police training and operations. Police officers must be willing and prepared to protect and serve people of various races, genders, sexual orientations, age groups, and religions.[101] By encouraging positive interactions with diverse populations, departments can improve public perceptions of the police and decrease some of the prejudices that lead to confrontations between police and the community.[102] Moreover, increasing diversity in the police force can prevent incidences of police misconduct.[103]

0037

## Diversity of the Police Force

The Buffalo Police Department (BPD) does not demographically reflect the population it serves. Minority groups comprise more than 50 percent of the population in Buffalo (36 percent black, 10.5 percent Hispanic, 3.2 percent Asian).[104] As of 2014, however, 70 percent of the police force was white. Only 21 percent were black, 7 percent were Latino, and 0.27 percent were Asian. These figures have changed very little over the past two years. Currently, blacks and Hispanics comprise less than 30 percent of the BPD, despite representing over 48% the City of Buffalo's population. Whites are 69.8 percent of the police force, but only 50.4 percent of the city population.[105]



The overrepresentation of whites in the police force may foster racial and ethnic alienation in some Buffalo communities, especially among historically oppressed and underrepresented populations.[106]   The BPD should set a goal of having the police force fully reflect the demographics of the City, implement strategies to reach that goal, and report out on its progress each year.

The BPD should also set goals for increasing the number of women on the force.  In his book, *To Protect and Serve*, former Seattle police chief Norm Stamper makes a powerful case for hiring more women (currently, women are about 12 percent of officers nationwide). Stamper notes that research has proven female officers to be equally effective overall and to bring some key advantages:

- They are less likely to use excessive force, accounting for only 2 percent of sustained allegations of excessive force;
- They report greater support for community-oriented policing, along with greater respect and less cynicism regarding citizens;
- They will improve police response to violence against women; and
- They will reduce the incidence of sex discrimination and harassment within police agencies.[107]

38

In concert with community advocates who called for the BPD to make the police force more representative and community-oriented, Buffalo has developed three key initiatives. To increase the pool of applicants, the BPD has lowered the educational standard for admission. Previously, applicants needed 60 college credits, two years of uninterrupted military service, or 6 years uninterrupted active reserve duty to enter the police academy. [108] Now, eligible applicants must be between the ages of 19 and 35, be able to pass a criminal background check, and have a high school diploma or GED. [109] To ensure that police officers remain invested in serving and protecting the City of Buffalo, the BPD established residency requirements. New recruits must live in Buffalo for at least 90 days before taking the police examination. Moreover, newly hired police officers must live in Buffalo for 7 years after the time of hire. [110] Finally, to recruit more officers with the guardian mindset, the City invested in the I/O Solutions pre-employment examination, called the National Criminal Justice Officer Selection Inventory (NCJOSI). The NCJOSI is designed to assess prospective officers' cognitive abilities and personality traits to select the candidates most likely to promote public safety on the force. [111]

---

*Case Study: The Buffalo Police Department 21st Century (BPD21C) Program in Buffalo, New York*

The Buffalo Police Department 21st Century (BPD21C) is a police academy scholarship program to recruit candidates from underrepresented communities, including racial minorities, women, and first-generation immigrants. [112] BPD21C offered fifty scholarships to Buffalo residents to cover tuition at the police academy, books, and uniforms (a total value of $6,800). [113] Recruitment targeted minority communities, with recruitment officers placed strategically at local supermarkets, coffee shops, community centers, churches, movie theatres, and local colleges. [114] The BPD21C is a model that should be repeated and expanded.

---

The Buffalo Police Department can also increase the diversity of its police force by implementing community policing methods and by changing the public's perception of police work. By some estimates, 80 percent of police work is service-related, while only 20 percent involves "crime fighting." [115] By emphasizing community policing and service in its practices and in its marketing, the BPD may draw on recruits who might not otherwise see themselves as future officers.

Another solution is to encourage police departments to integrate social workers into law enforcement services. Illinois, for example, has an established Association of Police Social Workers, and 33 of its departments have police social workers on staff. [116] Police social workers provide the force with trained professionals equipped to do crisis intervention, mediation and referrals in domestic violence, mental health, elder abuse, and juvenile delinquency cases. [117]

39

The BPD could combine community-building activities with recruitment. Studies show that the lack of economic and professional opportunities in low-income, underrepresented communities can push young people toward crime. Law enforcement agencies can prevent crime among young people, as well as reduce recidivism in youth offenders, by creating youth development programs that offer work experience and employment.[118] BPD resources could be used to support adolescents living in Buffalo through a summer jobs program emphasizing community policing and crime prevention through environmental design. Summer job opportunities with the BPD would serve as inroads into a career in law enforcement while also preventing crime and building the community's trust in the police.

Finally, the City could involve civilians in the hiring of police officers.  Former Seattle police chief Stamper writes that "American's citizens simply must participate in deciding who gets hired, and who doesn't."[119] He recommends that citizens sit on oral interview boards and participate as actors in testing simulations.

### Implicit Bias Training

In addition to increasing diversity on the police force, the Buffalo Police Department should encourage ongoing diversity training to curb the effects of implicit bias on policing. Research in social psychology has shown that bias allows individuals to make quick generalizations about people and categorize them into groups with similar characteristics. While these can be helpful cognitive skills, they rely heavily on stereotypes that shape how individuals behave toward one another both consciously and subconsciously.

Race-crime stereotypes make implicit bias particularly dangerous in law enforcement. Criminal psychologist Lorie Fridell warns that everyday people, including police officers, harbor "black-crime stereotypes"[120] that assume African Americans are predisposed to violence and criminal behavior.[121] Police who act on black-crime stereotypes risk using excessive and sometimes fatal force based on false generalizations, associations, and quick decisions.[122] As a result, national data shows that blacks are disproportionately likely to be stopped and subjected to the use of force: for example, to be pushed into a wall, pushed to the ground, or threatened with a gun.[123]

The Community Policing Survey data shows that black and Latino respondents were more likely to feel disrespected by Buffalo police. This perceived lack of respect directly correlates to data showing that blacks and Latinos distrust police. It is possible that implicit bias among Buffalo police officers leads to racial profiling that strains relations between the BPD and black and Latino communities. "Police are rude and don't respect people," reported one black woman surveyed. "[T]o [the police] you are criminal until proven innocent…"



**Question 9, Weighted**

In general, do you think that police respect people of color?

Pie chart:
- Yes 20%
- No 57%
- Do Not Know 23%

**Percent yes (vs. No or Do Not Know)**

| Category | Percent yes |
|---|---|
| ALL | 20 |
| **RACE/ETHNICITY** | |
| Asian | 30 |
| Black | 12 |
| Hispanic | 21 |
| Mixed | 13 |
| Native American | 19 |
| White | 26 |
| **AGE GROUP** | |
| 11-17 | 11 |
| 18-25 | 17 |
| 26-34 | 16 |
| 35-44 | 20 |
| 45-54 | 22 |
| 55-64 | 29 |
| 65+ | 26 |
| **GENDER** | |
| female | 18 |
| male | 24 |

41

Police misconduct due to implicit bias can damage the relationship between police and the communities they serve.[124] But researchers have shown that biases are malleable and that police officers can overcome implicit biases by increasing positive contact with diverse communities and individuals who defy stereotypes.[125] It is imperative, then, that law enforcement agencies like the BPD implement ongoing training and community contacts to address implicit bias in policing.

In addition to training, the BPD should encourage the collection and analysis of data related to bias. In Minneapolis, for example, local police agencies are collaborating with social scientists to study implicit bias, procedural justice, and racial reconciliation in relations between police and the community. This local study is part of the Department of Justice's National Initiative for Building Community Trust and Justice, a three-year, $4.75 million program designed to improve policing services using up-to-date data and social science research. Minneapolis is one of six cities participating in the national initiative, including Birmingham, Alabama; Stockton, California; Gary, Indiana; Pittsburgh, Pennsylvania; and Forth Worth, Texas.[126]

The BPD could also seek partnerships with national organizations dedicated to the study and implementation of community policing methods. The Center for Policing Equity (CPE) and Office of Community-Oriented Policing Services (COPS) encourage collection of data to analyze policing services. The CPE conducts free research with interested police departments.[127] COPS is an office of the Department of Justice that advances community policing practices in state, local, and tribal law enforcement agencies by providing best practices information and financial resources for implementation.[128]

*Case Study: Implicit Bias Training*

The Office of Community-Oriented Policing Services (COPS) has partnered with renowned researcher Lorie Fridell of Fair and Impartial Policing to develop a series of evidence-based implicit bias trainings that include workshops for managers, supervisors, and line officers.[129] The training accepts as a premise that all people have biases; that biases help people function on a day-to-day basis; and that biases can be unconscious and still affect **individuals' choices and actions. The purpose of the training, then, is to cultivate the skills police officers need to "reduce and manage"** their own biases. To this end the Fair and Impartial Policing training curriculum for police recruits and patrol men and women involves sessions on understanding the science of implicit bias; measuring the impact of implicit bias on communities and police departments; and developing skills to control biases and improve policing.

Town of Cheektowaga police Chief David Zack has received implicit bias training through Lorie Fridell and has publicly recounted the ways in which it has helped him and his police force. One lesson he learned was that police must develop more empathy for the community members they serve: **"Look at things through the eyes of the person you're dealing with."** [130]

## Gender Equality

Unweighted data from the Community Policing Report suggest that Buffalo police officers struggle in interacting with residents across gender lines. For example, when asked if the police respect women, only 41 percent of respondents said yes. Several female respondents explicitly criticized how male officers treated them. "As a 31 year old white woman," writes one respondent on the Community Policing Survey, "I feel that the police mistreat women." A black female respondent states: "Every time I see a male police officer he gives me googly eyes." Perhaps the most troubling anecdote is from a young black woman who told male police officers she was being sexually assaulted, but found them reluctant to act. "[The officers'] definition of sexual consent [was] skewed," she writes. "According to them, coercively removing my clothes . . . isn't sexual assault."

Gender bias in policing can prevent officers from responding effectively to crime and, consequently, delegitimize them in victims' eyes. Like racial bias, gender bias can surface explicitly or implicitly, shaping how police officers address sexual assaults or domestic violence incidents. According to a recent report by the Office of Community-Oriented Policing Services (COPS), eliminating gender bias in policing has the benefit of securing the safety of individual victims and the community at large. Responding swiftly and effectively to sexual assault and domestic violence cases can prevent future attacks and take repeat offenders off the streets. Additionally, victims will be more confident to report cases knowing that local law enforcers respond effectively.[131]

It is important that the BPD have standardized policies and procedures concerning sexual assaults and domestic violence cases, and that the department monitor each incident on a case-by-case basis to ensure compliance with departmental policy. By monitoring these cases, BPD officials can ensure that assumptions and stereotypes about gender do not determine how officers respond to victims' allegations. The BPD should also provide extensive training on how to interact across gender lines and how to interview survivors of traumatic experiences.

## LGBT and Gender Nonconformity

Sexual assaults and acts of domestic violence impact disproportionate numbers of individuals who identify as lesbian, gay, bisexual, and transgender (LGBT). According to the National Center for Injury Prevention and Control, 35 percent of heterosexual women in the United States have experienced rape, physical violence, and/or stalking by an intimate partner. These percentages increase to 44 percent for lesbian women and 61 percent for bisexual women. Among males, 29 percent of heterosexual men, 37 percent of bisexual men, and 26 percent of gay men have experienced violence by an intimate partner.[132] Given these high rates of crimes committed against LGBT people nationwide, it is critically important that police departments develop the skills and cultivate the relationships they need to address LGBT issues more effectively.

In Buffalo, LGBT residents who participated in the Community Policing Survey called for greater sensitivity around issues of gender nonconformity and sexual orientation. Approximately 10 percent of survey respondents identified as lesbian, gay, bisexual, or queer. When asked about their interactions with Buffalo police, one respondent stated: "I feel that the police do not respect members of the LGBT community." Part of the problem is a lack of understanding concerning gender transitioning. "Trans women and men ARE women and men, not a separate category," asserts one respondent. These data suggest that the Buffalo Police Department (BPD) must change current policing practices to increase safety and trust in the local LGBT community.

INCITE!, a national organization fighting to end violence against women, gender non-conforming, and trans people of color, explains that law enforcers tend to police gender lines as much as they do the crimes committed against LGBT people. Before police can make society safe for LGBT people, INCITE! says, they must first stop enforcing the gender binary of male and female during detainment and incarceration, and stop punishing gender nonconformity through verbal abuse and physical violence.[133]

The BPD should work closely with national groups like INCITE! and local organizations like Pride Center of Western New York to build stronger rapport with LGBT community members and to develop a deeper understanding their values and needs. The BPD should also provide ongoing gender trainings to inform officers about gender nonconformity and how to interact with community members who do not subscribe to male or female gender identities. Finally, the BPD should hire members of the LGBT community as police officers to diversify the force and to improve its services.

Language Access

Buffalo has a significant immigrant, refugee, and non-English speaking population, including many recent arrivals from Puerto Rico, Yemen, Burma, Iraq, Nepal, and Somalia, among others. The expansion of Buffalo's immigrant community means that officers must develop the ability to communicate effectively with those who do not speak fluent English.

For example, over the past two years, Buffalo's Burmese refugee community was the target of a series of home burglaries. Many of these incidents went unaddressed, because victims with limited English proficiency (LEP) could not communicate effectively with the police. Leaders in the refugee communities demanded a more effective police response. In October 2015, three refugee-led community organizations (Burmese Community Services, Karen Society of Buffalo, and the Bhutanese-Nepali Community of Buffalo) aided by the Legal Aid Bureau of Buffalo, submitted a proposal for a Language Access Plan (LAP) to the BPD.

On February 29, 2016, the City announced that the BPD had adopted a language access plan incorporating many, although not all, of the provisions proposed by the refugee groups, including:[134]

- Giving each officer a language identification card to use with LEP individuals, so that they can identify which language they speak, after which the officer will request help from a qualified bilingual BPD member or a professional interpreter;
- Maintaining a list of all BPD qualified bilingual members;
- Specifying that BPD members should not use family members, friends, bystanders, neighbors, or volunteers to interpret except under exigent circumstances;
- Posting signage at BPD facilities indicating that free interpreting is available;
- Including primary language spoken in incident reports involving LEP individuals;
- Requiring LEP training for new recruits and in-service training for BPD members;
- Monitoring and coordinating compliance;
- Collecting LEP data and reporting on it regularly.

In a study released by the White House in June 2016, entitled "Bright Spots in Welcoming Integration," Buffalo's LAP was recognized as an excellent model for cultivating police-community partnerships and improving communications in communities with limited English language skills.[135]



Unfortunately, the BPD added qualifying language to many of the policies, with words such as "if possible" and "where practicable." For example, the collection and reporting of LEP data will be done only "if possible." The BPD also declined the advocates' proposal that a Language Access Liaison officer be identified and tasked with monitoring and implementing the order.

BPD should revise its plan to include all the recommendations of the refugee groups and to remove the hedging language in the plan. In addition, BPD should be sure to train officers on what constitutes "exigent circumstances," using real life scenarios to ensure that officers know the limited number of situations they can use community members or persons known to the victim as an interpreter.

0045

## Cultural Competency

Community policing seeks to improve safety outcomes through collaboration and relationship building between police and many different communities. These communities include minority groups, youth, the LGBT community, people with disabilities, people experiencing homelessness, and the diverse immigrant and refugee communities in Buffalo.

Tensions between the police and community members arise for various reasons. For historically disadvantaged and underserved communities, bad personal experiences with law enforcement in the U.S. can fuel distrust. For immigrants, negative experiences with abusive and corrupt police forces in their countries of origin can make community members reluctant to report crimes. Some immigrants might also be unclear about the immigration enforcement role that local and federal officers play.

The BPD should hire community liaisons in various neighborhoods, especially for Buffalo Municipal Housing Authority developments and neighborhoods with high numbers of non-English language speakers. Liaisons can either be sworn officers or civilians. Officers will have more knowledge of police culture, whereas civilians will have more approachability in the community.

Another strategy is to hire police social workers with the training to work across cultures and the skills to build rapport with isolated communities. Social workers placed in police departments can help cultivate relationships with community organizations and develop strategies to interact more effectively with vulnerable populations.

46

*Case Study: Community Liaisons in Brooklyn Park and Brooklyn Center, Minnesota*

In 2005, the Brooklyn Center and Brooklyn Park suburbs of Minneapolis, Minnesota, faced an increase of misdemeanor violations in the local Liberian immigrant community. Many of the Liberian residents were recently arrived refugees with a limited understanding of U.S. laws and the role played by police enforcing them. Tensions surfaced when police officers began to respond to noise complaints concerning boisterous parties and social gatherings in Liberian households. No matter how frequently police were called to disperse the parties, the noise complaints continued, and in some instances, officers found themselves in verbal confrontations with Liberian residents offended by the police intrusions. To improve police relations with Liberian community members, the two police departments partnered with a local Human Services Council to form the Joint Community Policing Partnership (JCPP).

The JCPP learned that the Liberian community was unaware of the laws that governed social engagements, and they lacked effective ways to communicate with law enforcers. To address these issues, the JCPP hired a civilian community liaison, who convened meetings at community spaces to bring community members and the police into direct dialogue. In addition to meetings, the civilian community liaison developed and distributed an informational letter that outlined local laws, the role of police in law enforcement, and the individuals a community member could contact with questions and concerns. By diagnosing the problem, leveraging community assets, and developing educational materials, the JCPP effectively reduced the number of noise complaints and incidences of police-immigrant confrontations.[136]

In Chelsea, Massachusetts city officials have hired newcomer advocates to do outreach in immigrant communities and facilitate relations with the police. Advocates train immigrants and police to share critical knowledge about the other's culture. Newly arrived immigrants learn about policing, and police have the opportunity to hear from immigrants about their past experiences with and perceptions of law enforcement.[137]

Whatever policy approach is adopted, it is important for police to sustain ongoing contact and communication with vulnerable communities, rather than conduct outreach only when problems arise.[138] Buffalo is fortunate to have a vibrant and engaged immigrant community that draws support not only from the four resettlement agencies that assist newly arrived refugees, but also from immigrant and refugee-led community groups. In addition, Mayor Brown's new Office of New Americans offers valuable resources for City employees and community members alike. BPD community officers have worked with these organizations and cultural community leaders in the past to address public safety issues. A more formal and sustained effort involving more officers would strengthen these relationships and provide these communities and officers more direct contact and positive interactions.

The many cultural events held throughout the year provide opportunities for BPD to get to know the immigrant community. BPD should not only participate in these events, but should more actively publicize their participation so that the community recognizes their effort to build relationships.

*Case Study: Mobile Policing Units in Storm Lake, Iowa*

In 2011 Storm Lake, Iowa was a rapidly industrializing rural community of approximately 13,000. Various immigrants, especially Latinos and Laotians, were settling in Storm Lake to take advantage of new job opportunities. While economic expansion was welcomed, demographic diversity presented the Storm Lake Police Department (SLPD) with new **problems. To begin, Storm Lake's immigrants increasingly became the target of local** criminals. Noticing that few spoke English, and that many feared immigration enforcement, perpetrators committed robberies, violent assaults, and domestic violence, expecting immigrant victims not to report the crimes.

With only 19 sworn officers, the SLPD had to be strategic about serving 13,000 residents who spoke 24 different languages. To address these issues, the SLPD first compiled data on their service calls to identify crime hotspots to target with their resources. Next, the SLPD dispatched a mobile command unit to the communities with high incidences of crime. This **"temporary substation" was parked in stra**tegic locations for 2-3 hours per evening, when the department received its greatest volume of calls, and it was staffed by police department personnel and a bilingual civilian community officer, among other service providers and first responders. Each evening, the mobile command unit attracted between 50 and 150 immigrant community members, many of whom reported crimes and raised public safety concerns.[139]

Recommendations:

- Recruit more police officers from Buffalo's diverse communities, including minorities, women, LGBT people, refugees, immigrants, and people with disabilities.
- Repeat and expand the Buffalo Police Department 21st Century scholarship program.
- Increase the age of police eligibility to 45 years old to recruit police officers with diverse life and work experiences.
- Require regular implicit bias, cultural competence, and diversity training for all officers, including positive contacts with individuals from various communities as part of the training.
- Work with local and national agencies to develop a system of data collection and analysis to monitor bias in police activities.
- Revise the BPD's Language Access Plan to include the recommendations of refugee leaders and to remove hedging language.

- Provide ongoing language access training to officers and evaluate their performance to ensure successful implementation.
- Hire civilian liaisons and police social workers to aid in language access, cultural competency, mental health response, and other situations.

49

0049

0050

# 3.

## IMPROVE TRANSPARENCY AND INFORMATION-SHARING

A. Civilian Oversight of Law Enforcement
   1. The Commission on Citizens Rights and Community Relations in Buffalo
B. Improving Use-of-force Policies
C. Documenting Police Stops and Use of Force
D. Body Cameras
E. Accreditation

Community Policing Survey respondents made powerful calls for better and more frequent communication from the police, as well as increased civilian oversight over policing practices. "Communicate with us," wrote one survey respondent, "make us feel like you're here to help." Another recommended that a separate agency monitor the Buffalo Police Department "to police the police." Yet another argued that there should be a "process to weed out potential officers with negative personality traits." Citing "too much abuse of badge and gun," a respondent called for greater personal assessments and more stringent punishments for officers who misuse their authority.

Across the country, cities are improving transparency by establishing civilian review boards, modifying use-of-force policies, adding documentation to stop and frisk procedures, and creating more comprehensive body camera programs. These reforms are discussed in detail below.

### Civilian Oversight of Law Enforcement

Cities should implement effective civilian oversight committees to increase transparency and build trust with the communities served by law enforcement. When residents examine policing methods and evaluate police performance in a wide range of services, they gain new insights into law enforcement as a profession. They also have the unique opportunity to shape policing in their neighborhoods, which enhances the rapport



between the community and police. Public safety improves as residents support the police programs and initiatives created with their input.

In 2001 the National Institute of Justice (NIJ) outlined best practices for creating civilian review boards. In *Citizen Review of Police: Approaches and Implementation*, the NIJ identified four types of police oversight initiatives operative across the country:

> **Type 1**: Citizens investigate police misconduct and make recommendations to the chief of police or sheriff.

> **Type 2**: Police, through Internal Affairs (IA), investigate allegations of misconduct; then citizens review the findings and advise the chief or sheriff to accept or reject the findings.

> **Type 3**: Complainants may appeal IA investigation results to a citizen review board that reviews the investigation and makes recommendations to the chief or sheriff.

> **Type 4**: Citizens audit the IA process for fairness and thoroughness.[140]

In 2012, President Obama's Task Force on 21st-Century Policing echoed the findings of the NIJ, recommending more Type 1 civilian oversight committees to build trust between the police and the community and to improve transparency in police departments. Civilian oversight committees help to restore the legitimacy of the police, because they show a willingness to welcome impartial stakeholders into the decision-making processes of local departments.[141] In cases of police shootings and possible misconduct, for example, the President's Task Force recommended that local police departments invite community members to serve on "Serious Incident Review Boards" to review the incident and help "identify any administrative, supervisory, training, tactical, or policy issues that need to be addressed."[142]

*Case Study: Citizen Review of Police in Rochester, New York*

Established in 1992, the Rochester Civilian Review Board (CRB) reviews the findings of the **Rochester Police Department's internal** affairs (IA) unit. In particular, they assess how IA addresses allegations against sworn police officers concerning misconduct, the illegal use of force, and other actions considered a crime.[143]

**The CRB is a panel of three trained civilians "who are selected on a rotating basis from a pool of qualified people of varied ethnic, racial, age and gender backgrounds."**[144] CRB participants work with the Center for Dispute Settlement (CDS), a nonprofit that provides alternative dispute resolution programming, to develop skills as impartial reviewers. They receive 40 hours of training on civil rights and police policies and procedures,[145] and complete an 8 hour ride along with an officer on shift.[146]

The CRB reviews cases in which allegations have been made against police officers that their actions were criminal. The CRB also examines use-of-**force cases. The board's charge** is to ensure that the investigation of these allegations by the internal affairs unit showed **"fairness, thoroughness and timeliness" and to point out "any possible deficiencies"** in the investigation.[147]

When the CRB deems the investigation adequate, the Board makes a determination (based on a preponderance of the evidence standard)[148] of sustained, unprovable, unfounded, or exonerated.[149] The CRB may also recommend policy changes, additional training for **officers, verbal reprimands, or the insertion of a "memorandum of record" on t**he incident **in an officer's file.**[150] The final decision, however, rests with the chief of police.[151] In cases where the CRB finds the IA investigation inadequate, the board has the authority to demand a new investigation.

Although the CRB reviews only **complaints that involve "use of force, criminal activity or other serious procedural matters," the Center for Dispute Settlement** also offers a voluntary and confidential mediation process in which citizens and officers can speak to each other with the help of a neutral party and try to find common ground.[152] The CDS also hosts hundreds of informational sessions each year to increase community understanding of police complaints, the role of mediators in resolving community disputes, and how civilians can structure oversight of law enforcement.[153]

Communities and police that have participated in citizen review note various benefits.[154] Citizens indicate feeling validated when a complaint allegation is upheld. Even when officers are exonerated, complainants appreciate the opportunity to speak with an impartial party or with the officer involved during mediation.[155] Police, for their part, have indicated that citizen review can improve community relations, enhance a community's understanding of police work and police procedures, and demonstrate to the public that police departments take allegations of misconduct seriously.[156] Police have also reported that citizen review boards can have a positive impact through policy recommendations and that oversight can improve the quality of misconduct investigations.[157]

0053

Research on the effectiveness of civilian oversight committees has yielded mixed results, in part because of the limited investigative and disciplinary powers of the committees in most cities. One problem is that civilian oversight often occurs in tandem with Internal Affairs, and final decisions rest with the chief of police. At least one author has recommended doing away with Internal Affairs altogether and giving full investigative and enforcement powers to civilian oversight committees.[158]

## The Commission on Citizens' Rights and Community Relations in Buffalo

In Buffalo, city officials created the Commission on Citizens Rights and Community Relations (CCRCR) in 2001. The City Charter delineates the CCRCR's goals as:

- To eliminate group prejudice, intolerance, bigotry and discrimination within the city;
- To encourage equality of treatment and prevent discrimination against persons based on race, ethnic background, religion, sex, sexual preferences, disability, nationality and age; and
- To assure respect for civil liberties of all citizens.[159]

The Commission is comprised of eleven members, each appointed by the Mayor. The Charter calls for two paid staff, Executive Director and Secretary, and allows for the appointment of additional field representatives and staff.[160]

The CCRCR has the authority to review, monitor, and report on the relationship between the Buffalo police and community members. According to the Charter, the CCRCR should serve as an advocate for citizens with grievances against the police – i.e., to "assist citizens with filing and pursuing complaints of police misconduct." The Executive Director can review Internal Affairs investigations, as well as recommend more training and oversight for a particular officer if she notices a pattern of misconduct or sees the officer's name in multiple incident reports. The CCRCR has the power to hold public and private hearings, take testimony under oath, and to issue subpoenas.

The Charter calls on the CCRCR to evaluate how the police department interacts with the community it serves. This means assessing the BPD's community relations training, its protocols for resolving civilian complaints against officers, and its internal investigations of police misconduct. Moreover, the CCRCR is required to publicize its findings in a yearly report on "the state of the police department's initial and ongoing training programs in community relations and respect for citizens' rights and standards and procedures for investigating and acting upon complaints of police misconduct."[161]

The CCRCR, therefore, can perform the work of a Type 2 civilian oversight committee, much like Rochester's CRB. However, the CCRCR has been largely dormant in recent years. The CCRCR has not released a report to the public since 2008. Nor has not used its power to hold hearings and take testimony since 2014. The CCRCR at times has had only one paid staff person and is currently staffed by two. In addition, the CCRCR has had vacant commissioner positions for years.

The recent hiring of a new director and staff offers an opportunity for a fresh start for the CCRCR: an opportunity worth seizing. The Buffalo Human Rights Center recommends that the CCRCR be transformed into a Commission on Human Rights with an expanded scope, independence, and impact.  The Partnership for the Public Good's partners chose to include this as a plank in PPG's 2016 Community Agenda, making it one of their top priorities for the year.

The changes proposed by the Human Rights Center would:

- Enhance the political independence and human rights expertise of Commission members;
- Expand the Commission's mandate and powers, empowering it to take on the full set of human rights concerns relevant to the city, including affordable housing, redlining, healthcare, living wages, racial justice, food security, gender equity, LGBT rights, in addition to complaint-based racial discrimination and police misconduct; and
- Strengthen its investigatory powers.

In addition to these proposed Charter amendments, the CCRCR could benefit from some immediate changes in its practices. To begin, the CCRCR should review all Internal Affairs (IA) cases. In the past, the CCRCR has chosen to review only cases that are brought by residents to its office. Currently, the CCRCR is not notified of every case that IA investigates, although under the Charter it could receive such notice and review all such cases. Without a review of all IA cases, overarching trends will be difficult to spot, and problematic officers may not always be subject to civilian review.

There are many precedents for such an approach. The civilian oversight committee in Berkeley, California, requires Internal Affairs to pass along all investigations to their oversight board. Rochester's CRB requires IA to refer all cases that involve accusations of excessive force, officer criminal conduct, and other cases at the police chief's discretion. Civilian oversight committees in Orange County, Florida, and San Francisco require all firearms discharge incidents to go before their civilian review boards.[162] Portland uses random audits to identify trends in civilian concerns and make recommendations for policy changes. This approach allowed the city's oversight committee to identify a problematic trend where officers were asked for their badge number and refused to give it based on a technicality (they had ID numbers, not

badge numbers). The oversight committee made a recommendation that officers be instructed to interpret badge number requests as a request for their ID number. [163] Miami's Civilian Investigative Panel is empowered to add officers to a "monitor list" once the officers reaches a threshold number of complaints and the police chief is notified when an officers is added to the list. [164]

The Buffalo CCRCR must do a better job of reporting out to the public.  Cities like Rochester and Portland issue annual reports to the public on their civilian oversight committees' findings. These reports improve public faith in civilian oversight processes and rehabilitate their views of the police. The Buffalo CCRCR is obligated under the City charter to issue reports, but no reports been published for several years.[165]

The Commission should host regular meetings for civilians, in which police and the CCRCR discuss recent developments and the broader concerns of the community. [166] The CCRCR could coordinate with BPD station chiefs to host these meetings. The chiefs currently run monthly meetings in each of the five police districts in which they provide updates and solicit concerns from the community. The CCRCR would serve as a non-police presence at these meetings, raising community concerns and encouraging follow up. At these meetings, the CCRCR should create opportunities for officers to clarify department policy and inform citizens of their rights and responsibilities when interacting with police.

The CCRCR can also raise awareness about diversion methods available to police. The Commission, for example, could partner with restorative justice coalitions to highlight alternatives to arrests. Like the CDS in Rochester, the CCRCR could offer confidential conciliation between officers and civilians in lower level incidents.[167]

In addition to the CCRCR process, the City of Buffalo Charter requires the BPD to establish a citizen complaint process that includes the following elements:

- Publishing a brochure precisely explaining the professional standards policy;
- Developing a standard complaint form;
- Establishing and maintaining a comprehensive management information system which would record each complaint, the date of each complaint, action taken, referrals, investigations, disposition, discipline, and response to each complainant including the date of each response;
- Publishing an annual report which is made available to the public, summarizing the activities of the professional standards division;
- Establishing a list of alternative sites where citizens may obtain standard complaint forms and where citizens may file complaints;
- Establishing a conciliation process for certain complaints;

- Publishing a semi-annual report on the department's use of exceptional police controls and deterrents including but not limited to sprays, dogs and specials squads.[168]

A review of the BPD's website shows, on its Internal Affairs web page, a standard complaint form and a set of semi-annual reports on use of force, controls, and deterrents. Not immediately apparent are the annual reports, brochure, list of alternative sites, and conciliation process called for by the charter. If those exist, they should be easily accessible on the website; if they do not exist, they should be created promptly.

## Improving Use-of-Force Policies

*The Investigative Post* reports that the Buffalo Police Department is lagging behind law enforcement agencies across the nation in training programs. Whereas other law enforcement agencies require that officers receive between eleven and twenty hours of training on firearms and use of force each year, Buffalo police officers receive only two hours of training. These training programs are based in classroom settings, where officers review the use of force policy in the New York State public law. None of their training places officers in real-life scenarios to prepare them for the stressful situations they encounter on patrol. In addition, Buffalo police officers do not receive training in de-escalation tactics. Journalist Daniela Porat argues rather convincingly that use of force training in Buffalo "falls short in quantity and quality."[169]

The U.S. Department of Justice recommends that law enforcement agencies develop use-of-force policies that emphasize a respect for life, as such policies have been shown to reduce firearm use "without negative effects on law enforcement or public safety."[170] This focus on respect for life must start with the chief of police because "[i]f the chief stresses conduct that respects the sanctity of human life, and follows up through close administrative review, line officers will respond accordingly."[171]

*Case Study: The Use of Force Policy in Niagara Falls, New York*

In 2010, dozens of residents in Niagara Falls reported that police officers in the Niagara Falls Police Department (NFPD) were using excessive force, especially against African American suspects. Internal files also yielded evidence that some NFPD officers had used excessive force more than five times in a year. In response, the New York Attorney General sponsored an inquiry into the use of force policies and practices in the NFPD. Following the investigation, the City of Niagara Falls and the NFPD agreed to a consent decree to reform use of force policies and procedures. In September of 2013, the NFPD implemented a new use of force policy that included respect for life language: **"The Niagara Falls Police Department recognizes the value of all human life and is committed to respecting human rights and the dignity of every individual, and the Constitutional right to be free from excessive force, whether deadly or not, by a law enforcement officer."**[172]

The Las Vegas Police Department (LVPD) offers an example. In 2012, the LVPD included respect for life language in its use-of-force policy stating: "It is the policy of this department that officers hold the highest regard for the dignity and liberty of all persons, and place minimal reliance upon the use of force. The department *respects the value of every human life* and that the application of deadly force is a measure to be employed in the most extreme circumstances."[173] The policy explains that police derive their authority from the community, and "unreasonable force degrades the legitimacy of that authority."[174]

In addition, the LVPD use-of-force policy includes a "Duty to Intervene" provision that *requires* an officer to "safely intervene" (if it is possible to do so) when she witnesses another officer using excessive force. The intervening officer must also report the incident to a supervisor.[175] Creating a duty to report excessive use of force further emphasizes that abuse of power will not be tolerated, and has the practical outcome of providing additional support and legitimacy  to a civilian claim against the department. Moreover, it aids the administration in identifying officers that require additional training, and those that may need to be removed if they pose a risk to community safety.

Other cities have broadened use-of-force policies to include contextual elements. In Seattle, for example, city officials have limited officers' authority to use force in verbal confrontations. Force is not sanctioned "unless the vocalization impedes a legitimate law enforcement function or contains specific threats to harm the officers or others."[176] In Los Angeles, use-of-force polices have been revised to encourage de-escalation of conflicts between police and community members. The LAPD use-of-force policy requires "consideration[s] of not only the use of deadly force itself, but also an officer's tactical conduct and decisions leading up to the use of force when determining its reasonableness."[177] These revisions suggest a desire among police departments to prevent the use of force by police in nonviolent arguments and other instances when there were alternatives to violence.

### Documenting Police Stops and Use of Force

The Buffalo Police Department should make criminal justice information more accessible for citizens. The public must have easy access to police records that document investigatory stops, frisks, and arrests. Everyday citizens should also be able to find and search a police database with information detailing any fines, charges, or other penalties they face.

0058

The Fourth Amendment of the U.S Constitution requires that police have probable cause to search and seize an individual. Probable cause enables police officers to complete an arrest of a suspect and execute a full, invasive search to discover evidence of criminal wrongdoing. Without probable cause searches and seizures are "unreasonable" and violate the Constitution.[178] The U.S. Supreme Court, however, has made exceptions for police, giving them limited authority to stop and frisk people for their own protection. Under the *Terry* rule, the police can stop a person if they have a reasonable suspicion that the person is engaged in criminal activity, and they can then frisk the person if they have a reasonable suspicion that the person is armed and dangerous.

New York City offers a famous example of stop-and-frisk policies and practices that were found to violate the law. In New York the police stopped and frisked blacks and Latinos at vastly disproportionate rates. Between 2004 and 2012, the New York Police Department (NYPD) conducted more than 4.4 million stops and 2.3 million frisks. Despite comprising just over half of the city population (52 percent), blacks and Latinos were 83 percent of the people stopped by police in an eight year period; 52 percent were black and 31 percent Latino. And despite claiming they had reasonable suspicion that these individuals were armed and engaged in crime, police found few reasons to arrest and even fewer weapons. In fact, 88 percent of the stops resulted in no further law enforcement and 98.5 percent of the frisks yielded no weapons.[179]

In *Floyd v. City of New York* (2013), a federal court found that the NYPD's stop-and-frisk program violated the constitutional rights of New York City minority groups. Judge Scheindlin's decision demanded that police cease racial profiling and decrease arrests for petty offenses, and the court commissioned a monitor to assure compliance. Judge Scheindlin further recommended that police wear body cameras and host community meetings to field concerns and grievances that New Yorkers had with NYPD stop-and-frisk practices.[180]

> *Case Study: The New York Police Department Stop and Frisk Receipt*
>
> The NYPD has recently implemented a practice of issuing receipts to all individuals stopped, but not arrested, by police. The receipt policy was proposed by Peter Zimroth, the federal monitor assigned to oversee NYPD stop and frisk practices following the **court's decision in** *Floyd v. City of New York.* [181] The receipts explain police policy on stops, and include the officer**'s** name, badge number, and justification for the stop,[182] Among the justifications are "conc**ealing or possessing weapon," "e**ngaging in a drug **transaction," "p**roximity to the **scene of a crime," "matches specific suspect description,"** and **"acting as a lookout."**[183] **Officers can no longer cite "making a furtive movement" or "being in a high crime area" as justifications.**[184]

The court-ordered monitor in *Floyd* was later extended to the defendants in *Davis et al. v. City of New York* as part of a settlement agreement.[185] The *Davis* case dealt with allegations that the NYPD routinely stopped public housing residents and their guests without reasonable suspicion.

The settlement requires that the NYCHA modify its prohibition on "lingering" as well as that police provide documentation for all trespass arrests in New York City public housing. [186]

Other jurisdictions are also beginning to document all police stops. Illinois recently enacted legislation to require officers to provide a "stop receipt" to persons who are stopped and frisked, including the officer's name, badge number, and a reason for the stop.[187] Following precedents in New York and Illinois, the Buffalo Police Department should document and offer receipts for all stops. Such documentation would enable study of the effectiveness of the stops and their racial impacts.

Case Study: Open Data Policing, North Carolina

Open Data Policing NC aggregates and publishes public records related to all traffic stops in North Carolina. Users can enter an agency name into a search field and review data on the racial and ethnic demographics of people stopped, searched, and subjected to force in the course of traffic stops in a given jurisdiction. Data are available for most North Carolina departments and officers serving populations greater than 10,000. North Carolina law requires all such agencies to report their data on a monthly basis to the NC Department of Justice.[188]

In addition to data on stops, the BPD should create a comprehensive communications plan to present all their data to the public for discussion and commentary. Vastly more information should be easily available on the BPD's website, including all police policies. The Los Angeles Police Department's website, for example, includes a comprehensive list of its vehicles, uniforms, equipment, and weapons, with color photos of each item.[189] Public meetings should be held where information is shared with all community stakeholders. Social media should also be used for those who cannot attend meetings or are concerned about privacy. Recently, Mayor Brown partnered with *Nextdoor.com*, a private social network for neighborhood residents to share information about crime. But this information does not include the type of data about police practices discussed above, and online communication should not exclude other methods of outreach like community events and television and radio programming. In high poverty neighborhoods, internet access is not always readily available, so a variety of techniques are needed to allow people to gain and share information with each other and community police officers.

Concerns have also been raised about the BPD's responsiveness to Freedom of Information Law Requests. The New York Civil Liberties Union (NYCLU) brought suit against the BPD on March 15, 2016 alleging violations of FOIL. The NYCLU alleged that it had requested records in June 2015 and that the BPD had "shown extraordinary resistance to transparency regarding these basic police practices, refusing to produce any records in response to the vast majority of

60

the NYCLU's requests" and that it had simply ignored seven items in the request.[190]  If true, the NYCLU's allegations raise troubling questions about BPD's commitment to transparency.

## Body Cameras



Many experts support the use of body cameras to record interactions between police and community members. Because they are a new technology and costly to implement, the use of body cameras has not become widespread enough to fully gauge their effectiveness. Still, in places where body cameras have been adopted, researchers have found them capable of facilitating transparency, increasing community trust, and decreasing use of force.

Video footage has helped civilian review boards make decisions concerning use of force. The Civilian Complaint Review Board in New York City has utilized body camera footage to evaluate police conduct. The Board has credited the increased prevalence of video of police encounters (from civilians and security footage) with enabling the Internal Affairs investigators to meet the burden of proof in more cases. In turn, the Board has been able to substantiate more claims of excessive use of force.[191] Importantly, video evidence has also been used to exonerate officers wrongly accused of misconduct.[192] The Board anticipates that the implementation of the city-wide body camera program in New York City will increase transparency and justice for citizens and officers alike.

Despite their advantages, the use of body cameras raises several thorny legal and economic issues. One concern is that body camera footage will compromise the privacy of police officers and their suspects. The use of cameras can involve highly sensitive and compromising situations. Already with dashboard cameras there have been instances of videos being released to embarrass people online or on televisions shows.[193] Policies must specify what can be recorded, what can be released, and who can view these materials. Policies should also determine when release is permissible, and when consent is needed.  Many reformers demand that there be public access to body camera footage for cases of police killings. Incidents such as the killing of Laquan McDonald by Chicago police and the initial refusal to release footage show the need for some level of public access so that agencies cannot suppress evidence of possible wrongdoing.

Sarah Lustbader, a staff attorney with the Bronx Public Defenders office, has warned about the dangers of not disclosing video footage to the public. The problem with police-controlled body camera programs in cities such Chicago and New York City is that they give police ownership over video and lack procedures for ensuring oversight and transparency.[194] Lustbader states that the NYPD's body camera policy emphasizes officer safety and prosecutorial evidence, not

civilian safety or police oversight. She believes that third-party control of body-camera footage is essential to ensure the effectiveness and legitimacy of body-camera programs.

*Case Study: Urban Institute Offers Guidelines for Releasing Body Camera Footage to the Public*

In 2015, the Urban Institute outlined guidelines for public access to body camera footage. The guidelines for release of footage include:

- Allow public access to footage, but restrict ability to reproduce. Access can be controlled and supervised by allowing a setting for viewing where cell phones and recording devices are not allowed, and viewers are informed of rights and responsibilities before viewing footage.
- Footage should be shown in its entirety—never edited prior to public viewing.
- Whether footage is openly released to the public should be assessed by an independent group of community representatives who can weigh the costs and benefits to public and private interest. [195]

**The Urban Institute's guide**lines strike a delicate balance. They allow the public to view footage in an effort to hold police accountable for their actions, but they also protect officers from misrepresentation by requiring that incidents be shown in their entirety.

The second major problem raised by the use of body cameras is cost. Each officer's body camera costs between $120 and $2000.[196] Expenses associated with body cameras extend beyond the cameras themselves. Auxiliary costs include storage, accessory equipment, staff to handle implementation, and disclosure of recordings to the public.[197]

Notwithstanding concerns about privacy and cost, several police departments in western New York have body camera programs. The City of Tonawanda Police Department implemented a body camera program in December 2015, using asset forfeiture funds.[198] One officer noted the potential for the program to protect officers from unjustified allegations of excessive force or discourtesy.[199] The police forces in Lockport and Niagara Falls have also implemented body camera programs.[200]

As part of a task force commission by Mayor Byron Brown, members of the BPD, District Attorney's office, and the Police Benevolent Association are currently assessing the possibility of implementing body cameras. Among the issues they are reportedly studying are costs for hardware, storage capacity for the camera footage, and the additional personnel needed to analyze and share the footage.[201] Body cameras are a promising technology, but the Buffalo Police Department should be careful to create cost-effective policies that address privacy concerns, impartiality, and transparency.

62

## Accreditation

The City of Buffalo's charter requires the BPD to obtain accreditation by an agency recognized for "certifying compliance with generally accepted law enforcement training, policies and procedures and other relevant techniques and methods of operation."[202] The BPD, which is currently not accredited, should move promptly to come into compliance with the Charter.  Of the ten largest cities in New York State, seven are accredited through the New York State Law Enforcement Accreditation Program (NYSLEAP), a free program that aims to increase accountability, officer understanding of policies, government funding, and community support while decreasing liability in civil lawsuits.

The City of Albany, already accredited by NYSLEAP, is in the process of being accredited by the Commission on Accreditation for Law Enforcement in North America (CALEA) as well. CALEA requires its accredited agencies to reach an approximate reflection of their cities' diversity in their personnel, and a study has found that CALEA-accredited agencies hire more women and women of color.[203] CALEA-accredited agencies also must engage with the community in addressing perceptions of crime, preventing crime, and building grass-roots community support and understanding, and officers at CALEA agencies report more success with community-oriented policing than non-CALEA agencies.  CALEA agencies also offer more field training hours. However, researchers found that accreditation did not actually impact the rate at which officers participated in community-oriented policing, which was driven more by the officers' own views, the views of their peers, their gender, and their experience level.[204]  Clearly, accreditation is no magic bullet, but as part of a comprehensive shift of philosophy and practices, it is well worth pursuing and is required by law.

Recommendations:

- Hire an additional staff person for the Buffalo Commission on Citizens Rights and Community Relations (CCRCR) and fill all vacant commissioner positions as prescribed by the City Charter.
- Require the CCRCR to review all Internal Affairs cases to look for systemic problems, repeat offenders, and unfair results
- Require the CCRCR to release reports of oversight to the public and to host community meetings to present their findings.
- Amend the Charter to transform the CCRCR into a broader and more effective Commission on Human Rights.
- Publish the Buffalo Police Department's policies and more department data on the BPD website to facilitate greater transparency, and ensure that all the information and reports required by the City Charter are presented.
- Revise the BPD's use-of-force policy to include "respect for life" language and a "duty to intervene" provision in incidents of excessive force.

63

- Develop a procedure for recording all police stops and issuing receipts to those stopped, and create a database where the public can access these records.
- Implement body cameras after carefully creating policies governing their usage and public access to the records created.
- Obtain accreditation of the police department as required by the City Charter.

# 4.

## PROMOTE RESTORATIVE JUSTICE, ALTERNATIVES TO ARREST, AND DIVERSIONARY PROGRAMS FOR VULNERABLE POPULATIONS

A. Developing Alternatives to Arrest for Criminal Offenses
B. Implementing Restorative Justice and Diversion Strategies
   1. Restorative Justice
   2. Diversion Strategies
C. Working with Vulnerable Populations
   1. Diversion Resources for Young People and Their Families
   2. Responding to Drug Users
   3. Responding to the Mentally Ill
   4. Interventions with Sex Workers

The Buffalo Police Department, in concert with Erie County and New York State Police, has worked diligently to prepare officers to respond effectively to a variety of emergencies. According to the Open Buffalo community policing survey, however, some Buffalo residents feel that police officers alienate certain vulnerable populations. "I am an active member in the community to help the individuals with drug problems," wrote one respondent, "and when I needed the police I was…harassed for weeks on why I'm doing what I do." The police struggle to interact positively with young people as well. "I would like to see the police department train their officers to learn how to communicate with our youth better," asserted one survey respondent. The police too frequently dismissed young people, he explained, as if they were "all bad and not worth taking the time to reach out to them."

In the course of their duties, police officers encounter individuals who become involved with law enforcement due to youth, mental illness, substance use, poverty, homelessness, trauma, or a combination of these. Officers cannot solve all the underlying problems in society, but they should have protocols for handling individuals with diverse needs. Officers should be able to determine when the safety of the individual and the community is better served by diversionary methods like referrals to human service providers or restorative justice than by punitive justice. As discussed below, alternatives to arrest can ensure the rights and safety of vulnerable populations, help individuals get access to needed services, improve equity and reduce recidivism.[205]

0065

## Developing Alternatives to Arrest for Criminal Offenses

In New York, criminal offenses are defined as acts and behaviors that violate state and local laws and warrant penalties of fines and/or terms of imprisonment.[206] There are four types of offenses: felonies, misdemeanors, violations, and traffic infractions. Felonies and misdemeanors are classified as crimes, and generally their perpetrators are arrested, fingerprinted, and processed by local courts. Violations and traffic infractions are deemed petty offenses for which people receive summons to return to court, unless they have an outstanding warrant, in which case they are arrested.[207]

New York State law provides police broad discretion regarding arrests. The police ultimately determine how to engage criminal offenders. For example, the officer can choose to warn or admonish an individual if s/he deems that an alternative to arrest would better address the situation.[208] In many situations, police officers should address low-level misdemeanors and petty offenses with such alternative means.

Some municipalities have developed procedures to guide officers down this path. One example comes from Missouri. In the wake of the U.S. Department of Justice's (DOJ) report documenting unconstitutional, racially biased policing in the Ferguson Police Department (FPD),[209] the DOJ recommended that the FPD create "fix-it" tickets to reduce the arrests and fines related to "correctable violations." The FPD has begun to issue correctable violation tickets for "vehicular equipment violations, traffic violations involving the failure to provide proof of driver's license, any housing, zoning, or animal licensing violations (including occupancy and maintenance violations) enforced by FPD, and additional violations as the city deems appropriate."[210] If the resident can provide proof of correction of the violation within a reasonable period of time, he or she can avoid a citation altogether.

New York City is adopting another tool: steering a number of minor offenses, especially those not otherwise covered by state law, out of criminal court and into administrative proceedings.[211] This alternative to arrest and prosecution has the potential to lessen the burden on criminal courts, as well as reduce fines and arrests for individuals who are willing to quickly correct the issue, or who have committed only a low-level offense with little harm to others.

## Implementing Restorative Justice and Diversion Strategies

### Restorative Justice

Restorative justice is a philosophy that aims to repair the harm that criminal offenders do rather than simply punish them. As political scientist Paul McCold explains, the underlying theory in restorative justice "is that crime harms people and relationships and that justice requires the healing of harm as much as possible."[212] In the 1970s, restorative justice practices began as mediation and reconciliation strategies that brought victims, offenders, and law enforcement

agents together to develop plans for restitution. These meetings encouraged victims, offenders, and other stakeholders to discuss the transgression, how it made each party feel, and ways to resolve the conflict.[213] In recent years, proponents have diversified restorative justice practices and begun to apply them as an alternative to arrest.

Restorative justice practitioners employ two main processes. One is a restorative conference, in which a facilitator convenes a meeting between an offender and victim and their respective families and/or other impacted parties. In a guided discussion, the parties discuss the wrongdoing and then propose ways to repair the harm done.[214] A second process is a peace circle. More inclusive by design, the peace circle may or may not include offenders and their victims. Circle keepers, or facilitators, encourage members of the circle to speak honestly about an issue they are facing as a community. Only one person in the circle speaks at a time, and back-and-forth discussion is prohibited. Peace circles create safe spaces where each member has a voice and where the community is required to listen.[215]

In Buffalo, community leaders have embraced restorative justice to resolve conflicts in local schools and to restore peace in troubled neighborhoods. In 2014-2015, for example, the Buffalo Public School system incorporated restorative justice in its code of conduct, hoping to prevent suspension and to improve the sense of community in each school.[216] Back to Basics Outreach Ministries, a community group that offers reentry services to individuals recently released from prison, also utilizes restorative justice practices to promote healing and unity in Buffalo neighborhoods afflicted by poverty and crime, as does the Erie County Restorative Justice Coalition. These localized actions can settle disputes without the need for arrests and charges, or in lieu of prosecutions.[217]

The police officers in the Buffalo Police Department (BPD) should be trained in restorative justice practices and develop strong relationships with Buffalo's restorative justice coalitions. Certain neighbor disputes and minor offenses, for example, should be referred to neighborhood peace hubs rather than addressed through formal citations.

Diversion Strategies

Because the War on Drugs and "Broken Windows" policing have increased the number of arrests, courts and jails have become overcrowded. In turn, judges, legislators, and community leaders are beginning to consider ways to divert individuals from the criminal justice system. These diversion alternatives have concentrated mainly on individuals with substance use and mental health issues, populations that represent a significant portion of people incarcerated. According to one study, 56 percent of inmates in state prisons have mental health problems and 53 percent have substance use disorders.[218] Providing treatment and support to low-level offenders with substance use and mental health issues is more effective than having them arrested and incarcerated.

Practitioners separate diversion methods into three phases: law enforcement, prosecution, and court phases. This report discusses diversion at the law enforcement phase, before offenders face legal prosecution in criminal or specialty courts.  In the law enforcement phase, police officers work collaboratively with social service providers and community advocates to prevent arrest and incarceration for minor offenses.

## Working with Vulnerable Populations

Vulnerable populations often lack the resources to secure support from police departments. Race, sex, and socioeconomic status can directly impact the access that an individual has to law enforcement agencies and place greater demands on police to respond to their needs. The Buffalo Police Department should develop diversionary programs for young people, drug users, the mentally ill, and individuals trapped in the sex trade.

### Diversion Resources for Young People and Their Families

Young people challenge authority in many ways, sometimes running away from home, skipping school, violating curfew, or getting arrested for misdemeanors like vandalism and fighting. These transgressions often reflect the offenders' age and the circumstances in which they live. Neurologically, young people have limited impulse control, and if their personal lives are negatively impacted by conflict, illness, or trauma, they are even more inclined to "act out." Often these acts pose little threat to public safety, and it is better to respond in ways that help youth grow without criminalizing and detaining them. The Vera Institute's Center on Youth Justice proposes three diversion programs that permit families and communities to correct or prevent deviant behavior without calling the police.[219]

- **Juvenile Assessment and Resource Centers.** Also known as "diversion hubs," assessment and resource centers offer troubled young people consultations with social workers and mental health specialists. These trained professionals evaluate the behavior and circumstances of the youth they encounter and recommend services and support that might improve behavior. The centers provide safe spaces to resolve the crises that young people face and a support regimen tailored to their individual cases.[220]

- **Crisis Response Services.** Crisis Response Service providers offer police officers, school personnel, and family members behavior support services without admitting the young offender in the hospital or detaining him or her in the local jail. Trained as social workers and therapists, these service providers de-escalate potentially violent conflicts, offer remediation for family issues, and connect young people and their families to community-based support groups.[221]

- **Crisis Intervention Teams for Youth.** A model of preventive policing, crisis intervention teams for youth train police officers to identify and assist young people who exhibit mental illnesses. By better understanding youth development and related mental health issues, the police officers are prepared to connect at-risk youth to appropriate services and community-based support groups. The goal is to intervene early, before emerging mental health and behavioral issues result in criminal behavior.[222]

*Case Study: Jefferson County, Colorado, Juvenile Assessment Center*

Jefferson County, Colorado, has developed a restorative justice model that provides youth offenders the opportunity to avoid jail when they have committed minor offenses. Jefferson County police officers collaborate with the Juvenile Assessment Center (JAC), which refers youth offenders to human service agencies better suited to meet their needs. When officers apprehend a juvenile offender who is at risk for immediate detention, they contact the JAC, where the suspect is assessed by an intake specialist. The specialist explores the suspect's personal history, including mental health, substance abuse, family history, school history, contact with police, and relationship to peers. In some cases the offender is sent to the local detention center, but in other cases the specialist develops referral plans for the youth and discusses service options with the juvenile's guardian. The JAC also receives referrals from court to provide case management to first-time offenders. Some Jefferson County schools also refer youth to the JAC for temporary "time-out" services.[223]

The BPD should expand county and city initiatives that target young people, including ride-alongs, afterschool activities, and youth police academies. Youth are critical to community policing, and, currently, far too many of Buffalo's youth view the police as enemies rather than protectors. In building trust and relationships, there is no substitute for meaningful contact in positive situations.

69

*Case Study: Youth Court Program, Dane County TimeBank, Madison, Wisconsin*

Established in 2005, the Dane County TimeBank in Madison, Wisconsin, operates on a simple premise - **everyone's time is equal. TimeBank members contribute one hour of skilled labor** or service and receive one hour of service in return. With more than 2200 members, including 170 organizations, the Dane County TimeBank offers a valuable network of service exchanges, fostering collaboration and self-sufficiency.

When applied to the juvenile justice system, the timebanking philosophy provides an innovative alternative to arrest and other punitive m**easures. Specifically, TimeBank's Youth Court Program targets high school students and diverts them from the juvenile justice** system. Rather than ticket, fine, or arrest a young person for a low level offense, police officers in Dane County can refer them to youth courts in local schools, where they are tried by a jury of high school age peers. Jurors issue restorative sentences, which, once **completed, will not appear on the offenders' juvenile records.**

As members of the TimeBank, jurors can consult professionals with experience working with troubled youth. Leveraging this knowledge base, the jurors create sentencing strategies that help offenders build skills and networks of support. Sentences have included traditional restorative justice measures like writing letters of apology to victims, tutoring younger members of the community, or serving on the Youth Court. Other sentencing options rely on services accessible through the TimeBank like anger management, mentoring, tutoring, job shadowing, and discussion groups.

Student jurors benefit from the Youth Court Program as well. By logging hours in the TimeBank, they reap personal or institutional rewards. Each hour of service a juror **"deposits" can be converted into an hour of service "withdrawn" from the resources** available through the TimeBank. Some student jurors have logged several hours hearing cases and exchanged their service for lessons in gardening, music, or art. Others earn hours for their school**s, and the schools pool students' hours to secure programming in mentoring, staff** development, and even yoga instruction.[224]

To this end, the BPD can expand programs that already exist in western New York. One organization, the Police Athletic League (PAL), provides various leadership and athletic programing to youth.[225] This program could be expanded to serve more BMHA properties and complement the work done by the Housing Unit's community police officer, who reportedly has very limited funds for youth activities.  Another example worth examining is the Erie County Sherriff's Youth Live-in Camp, which promotes youth leadership and positive exposure to members of the Sherriff's Department.[226]

Responding to Drug Users

Nationwide, our society is failing to care adequately for people with substance abuse problems. Many drug offenders would be better served by diversion to a drug addiction treatment facility than a prison sentence. But the road to rehabilitation has been blocked by poor public policy decisions. What are some diversion strategies that can improve police response to drug issues? One strategy is to partner law enforcement officers with mental health and drug rehabilitation specialists. The LEAD program in Seattle, Washington, has implemented this strategy and helped reduce arrest and recidivism rates.

*Case Study: Law Enforcement Assisted Diversion (LEAD) in Seattle, Washington*

In 2011, Seattle elected officials, law enforcers, civil rights leaders, and social service providers pioneered the Law Enforcement Assisted Diversion (LEAD) program. In LEAD, police officers refer low-level offenders involved in drugs or prostitution to community-based social service providers rather than charging them.[227] Local leaders recognized that the traditional **criminal justice response did little more than create a "revolving door" that exacerbated** social problems. For those engaged in drug addiction or prostitution, an arrest and conviction created barriers to the employment and housing needed to make a change.[228] Rather than continue the punitive criminal justice approach, LEAD focuses on improving community health by targeting underlying problems of addiction and poverty.

To encourage the participation of Seattle police, LEAD administrators used police officer focus groups during protocol development. Officers thus served as an invaluable source of information and reported feeling more respected by, and invested in, the program. The program also involves training for officers, ongoing conversations between officers and other program stakeholders, and the recruitment of trained legal service providers to deal with **clients' m**any legal problems.

Seattle officers have considerable discretion to divert individuals who would otherwise be charged.[229] The officer brings the individual to a LEAD case manager and turns over the **arrest record to the District Attorney's office.**[230] Case managers practice principles of harm **reduction; rather than abstinence, they focus on addressing the client's immediate needs and building the client's motivation to change.**[231] Case managers also employ an assertive approach, tracking down clients in the city and accompanying them to appointments to ensure services are delivered.[232] If a client opts not to engage in services, the District **Attorney's office may bring** charges on the initial offence.[233]

LEAD successfully allows individuals to avoid arrest for violations and low-level offenses that are preventable through social services. Over a five year implementation period (2009-2014), **program evaluators found "statistically significant reductions in arrests and felony charges for LEAD participants."**[234] Moreover, recidivism rates decreased: LEAD participants were 58 percent less likely to be arrested after the program than individuals arrested and convicted in the criminal justice system.[235]

71

In April 2016, Albany launched the first LEAD program in New York. Albany's program is overseen by a Policy Coordinating Group, comprised of representatives from the Albany Police Department, Mayor's office, County Executive's office, and community-based organizations. The Albany program is based on the Seattle model; police officers visited Seattle to learn firsthand how to implement and operate the program. In Albany, LEAD employs one case manager, paid by the Albany Medical Center (using Medicaid Redesign funding from the state), and charged with managing up to 25 cases at a time. Many case types can be diverted, including petty larceny, drug possession, and sex work, among others. The focus is on people also using emergency room resources, such as people with mental health issues.

Western New York is currently facing a spike in opioid-related crimes and overdoses. According to the Drug Enforcement Administration (DEA), New York is a major distribution center in the heroin drug trade; the New York Division seized 33 percent of all the heroin confiscated by the DEA in 2015. [236] The heroin market in the Buffalo Niagara region has expanded with devastating impacts. In Buffalo, there were ten overdose deaths in ten days in March 2016.[237] The BPD has responded by educating residents in the administration of Narcan, an opiate antidote. The BPD is hosting Narcan classes in neighborhoods with the highest incidences of heroin overdoses, hoping that residents can act swiftly and effectively if confronted with a heroin overdose.[238]

The BPD has also begun conversations with law enforcement officials in Gloucester, Massachusetts, who have developed a successful diversion strategy for residents struggling with drug addiction. Similar to gun buyback programs, the Gloucester Initiative encourages addicts to surrender their drug paraphernalia without being arrested and offers referrals to social workers and treatment facilities.[239]The Erie County Department of Health invited members of the Gloucester Police Department to discuss its PAARI diversion program in a presentation to local law enforcement and addiction treatment specialists in November 2015. Buffalo Police should continue to work collaboratively to develop a program like LEAD or PAARI (discussed in depth below) that is adapted to Buffalo's current needs and existing resources.

*Case Study: Police Assisted Addiction and Recovery Initiative (PAARI), Gloucester, Massachusetts[240]*

In Gloucester, police participate in the Police Assisted Addiction and Recovery Initiative (PAARI), which sees drug addiction as a mental health issue rather than a criminal offense and offers drug offenders addiction treatment rather than jail time. PAARI represents a prime example of community policing, including problem-solving, community-oriented solutions to crime, and development of diversionary methods.

PAARI was largely a product of the advocacy and organizational efforts of Police Chief Campanello. First, police and other officials engaged the legislature to target asset forfeiture money for addiction recovery programs. Second, the police agreed to pay for large quantities of Narcan—a narcotic used to reverse the effects of an opiate overdose—and worked with pharmacy chains to offer an affordable price for uninsured individuals. Third, police[241] have opted to divert individuals in possession of small amounts of drugs who come to their offices seeking assistance. Rather than arrest them, the police pair these individuals **with an "angel" who waits with them until they are referred to a hospital or direct**ly to a treatment program.

Gloucester Police report that in the first few months of the program they saw a 31 percent decrease in crime.  They note that the success of the program depends upon bringing multiple stakeholders to the table—law enforcement, treatment providers, insurance companies, and doctors.

## Responding to the Mentally Ill

As noted above, the nation's failure to adequately serve people with mental health problems has led to shocking numbers of arrests and incarcerations. Nationwide, of the 3.5 million people with severe mental illness, 250,000 are in prison, compared to some 60,000 in state and county psychiatric hospitals.[242] Locally, the Erie County Holding Center has had a long history of tragedies involving mental health, including multiple suicides and the death of India Cummings, a 27-year-old woman who died in circumstances that still await full explanation.[243] These incidents emphasize the importance of a coordinated approach to mental health problems and the active involvement of mental health professionals at every step of the process, from the original incident to possible arrest and incarceration.

0073

*Case Study: The Los Angeles Police Department Mental Evaluation Unit, Los Angeles, California*

**The Los Angeles Police Department's (LAPD) Mental Evaluation Unit (MEU) is one of the largest** co-response mental health operations in the nation.[244] When confronted by a mental health crisis, the LAPD sends a team of law enforcement and mental health professionals to address the **situation. Here's how it works: all LAPD officers complete an 8**-hour training during which they are taught how to identify persons with mental illness. Whenever an officer suspects that mental illness is involved on a call, the officer must call the MEU-Triage desk before taking action.[245] **The Triage desk is staffed by mental health nurses who look up the client's history (medica**tion, psychiatrists, etc.) before deciding whether to deploy Systemwide Mental Assessment Response Team (SMART) officers—a paired officer/mental health clinician team—or to deploy a patrol officer to take the individual directly to a mental health facility.

About 2/3 of the cases called into the Triage desk are one-time mental health crises[246]; **individuals get mental health services and don't encounter the LAPD again. But for those who the** LAPD recognize as repeat offenders, the Case Assessment and Management Program (CAMP) provides long-term case management and service plans.

The Buffalo Police Department should continue to expand its mental health and crisis intervention training and its collaborations with mental health providers, perhaps using the model pioneered by the Memphis Crisis Intervention Team. In Memphis, officers once jailed 20 percent of the mentally ill people they encountered; today that number is 2 percent.[247] As part of training, officers should encounter realistic scenarios to prepare them for interactions with community members suffering mental illnesses, in the type of informal "drop-in" sessions used in Memphis.[248] In collaboration with mental health workers, officers will be able to provide coordinated responses to mental health issues and crises, many of which can be successfully de-escalated and solved without an arrest.

Erie County's Police Mental Health Coordination Project is a step in the right direction and should be expanded. The Project is designed to strengthen the partnership and transparency among police, healthcare providers, social service professionals, and community members involved in policing the mentally ill. The Project's goals are to provide training to those who will interact with mentally ill individuals and develop appropriate interface protocols, so that police work effectively with hospital and emergency room staff and the individuals in need of care.

An important partner is Crisis Services of Erie County and its Mobile Outreach Program. Crisis Services staff members respond to calls from community members or police and conduct phone assessments to determine appropriate responses. The goal is to divert individuals in crisis away from unnecessary psychiatric hospitalization, arrest, or detainment in the Erie County Holding Center. Instead, staff members will provide direct outreach through the Mobile Outreach Center, which travels to the site, assists individuals in crisis, and refers them to social service providers.

The BPD should expand its collaboration with the Mobile Outreach Program to ensure that mental health professionals accompany officers to crises and other situations where health services can prevent the need for criminal justice services.  Mental health specialists should work alongside police officers to provide on-site assessments and recommend diversion where appropriate. The BPD should provide co-response units like the LAPD's MEU and the San Diego Police Department's PERT (discussed below).

*Case Study: The Psychiatric Emergency Response Team, San Diego, California*

In San Diego, California, when a mental health-related call comes in through 911, San Diego Police are not sent to the scene alone. Instead, each officer is paired with a mental health clinician to form a Psychiatric Emergency Response Team (PERT). These mobile co-response crisis teams evaluate the mental health condition of the individual and provide psychiatric services and referrals. PERT-designated officers attend a 24-hour training, including workshops on various psychiatric conditions like schizophrenia.[249] The program is funded by a county contract, local mental health system grants, a community foundation, and occasional donations.[250] PERT has proven successful at reducing arrests through diversion. In the **program's first two years of** operation, PERT handled around 6,000 cases, and only 1% of those cases resulted in incarceration.[251] Further, 63 percent **of PERT's clients lac**ked insurance, meaning that PERT provided services to individuals who may not have received care otherwise.[252]

## Interventions with Sex Workers

Although the LEAD program in Seattle offered diversion for prostitution offenses as well as low level drug offenses, these two issues do not always warrant the same approach. While some research suggests that addiction and poverty are often motivating factors for individuals to participate in street-based prostitution, not all sex workers have addiction issues, and some may have no interest in leaving sex work.[253] In some instances, then, diversionary programs may be inappropriate.

However, lawmakers increasingly acknowledge that the criminalization of prostitution can cause more harm than good. By arresting and convicting prostitutes, law enforcers make it more difficult for them to find legal employment when they choose to abandon the sex trade. To prevent the collateral consequences of arrests and convictions is the goal of decriminalization efforts in Washington, D.C.[254] and New Hampshire,[255] and decriminalization policies advocated by Amnesty International[256] and the National Association of Social Workers.[257]

Diversionary methods of policing sex workers should include outreach programs that connect those who want to leave the sex trade to social workers who can help them reintegrate into society. The BPD must collaborate with organizations that conduct outreach to street-based sex

workers in order to connect these vulnerable populations to the resources that they need to improve their safety, including a safe space to discuss crimes committed against them.

Recommendations:

- Increase training in and use of restorative justice options instead of arrests and/or prosecutions for minor offenses.
- Develop standards by which BPD officers can determine when a suspect should be referred to a social service agency rather than arrested.
- Utilize fix-it tickets for minor, correctable offenses.
- Carefully monitor practices regarding violations and minor crimes to ensure that a desire for fine revenue does not distort policing and unduly harm people with low incomes.
- Support local efforts to create a Law Enforcement Assisted Diversion (LEAD) for minor drug and other offenses.
- Develop collaborative relationships with organizations that work with youth, homeless people, the mentally ill, substance abusers, and street-based sex workers to offer referral options over arrest, and break the revolving door of incarceration.

0076

# 5.

## CRIME PREVENTION THROUGH ENVIRONMENTAL DESIGN

Crime prevention through environmental design (CPTED) can reduce crime by changing the physical environment. Most policing methods attempt to prevent or reduce crime by bolstering police forces at crime "hot spots." This approach is largely reactive. Unlike these conventional policing methods, CPTED changes how public spaces are designed to enhance safety without the need to increase the number of police officers on patrol. CPTED methods improve public safety by controlling access to spaces, increasing visibility within them, and designating spaces as publically owned and maintained.[258]



CPTED can offer a more positive version of "broken windows" policing.  If a neighborhood suffers from broken windows, the most effective response may be to hire neighborhood residents to fix the broken windows rather than to arrest them for minor "quality of life" offenses. Whereas making large number of minor arrests can have negative consequences (interrupting the income of the arrestees, lessening their employability, increasing police-community tensions), hiring residents to fix up their neighborhoods can have many positive consequences (adding income, increasing employability, reducing police-community tensions, and making the neighborhood a better place to live).  For example, earlier in this report we noted a recent instance of the BPD strike force aggressively ticketing residents of Broadway Fillmore for minor offences such as having their garbage totes too close to the street or lacking a house number. Instead of this punitive approach, why not work directly with community groups and residents to create projects to hire local residents to clean, improve, beautify, and make safe the neighborhood?

This strategy, sometimes called "building our way out of crime," has been successful in many cities.[259]  The police in Providence, Rhode Island dramatically reduced crime in one of the city's most  challenged areas by working closely with non-profit housing developers to make physical improvements to parks, streets, and buildings. In Seattle's Rainier Valley neighborhood, community police officers worked hand-in-hand with local residents to identify a crime hot spot and to implement CPTED solutions, including a redesigned bus shelter, planters, banners, a news kiosk designed by a local artist, and new curbs for a nearby street.  Thanks to these and other community policing initiatives, drug trafficking declined by 20 percent.[260]  In Minneapolis, use of CPTED included replacing a gas station/convenience store that accounted for 517 police calls in a year with a bakery that provided jobs for local residents while also adding many more "eyes

0077

on the street" to reduce crime. An open-air drug market was replaced by a market offering Native American goods and a pedestrian plaza used for community festivals. Arrests plunged dramatically and a neighborhood was renewed, not by displacing residents, but by working with them.[261]

---

*Case Study: Druid Hills Revitalization Project in Charlotte, North Carolina*

**In Charlotte's Druid Hills neighborhood, crime ran rampant in the late 1990s, but many** residents did not trust the police enough to call them or work with them. The police department worked with a non-profit housing corporation and city government to create a holistic plan of community policing and CPTED. The housing non-profit facilitated a process of cr**eating a neighborhood action team and ensuring that the residents' own assessment of the problems and solutions drove the team's work. CPTED improvements included a new** road, the rehabilitation of housing units, and city grants for small business and neighborhood beautification. As a result, while serious crime rose in Charlotte as a whole, it declined by 44.8 percent in Druid Hills.[262]

---

CPTED methods have two distinct approaches, one that is based on territory and another that is based on community. Both have proven effective and can be implemented in Buffalo, particularly at and near Buffalo Municipal Housing Authority developments.

The territorial approach emphasizes six strategies:[263]

- **Territorial reinforcement**. Demarcate social space with signs, fences, hedges, and roadblocks to designate public and private properties and to limit vulnerabilities. This could be a particularly good strategy for BMHA developments, where tenants have called for more opportunities for residents to develop job skills. Residents themselves could be hired to do grounds work and basic maintenance. They could be paid a living wage, develop job skills, and importantly, take ownership over their own property.

- **Surveillance**. Facilitate observation of space and its use by creating more windows, improving lighting, establishing police substations, and expanding foot patrols. Lighting has been an issue at some BMHA properties, according to both tenant council members and city officials. Upgrades to existing lighting should include the use of LED lighting, which improves visibility at night.

- **Access control**. Define ownership of spaces and acceptable patterns of use. Given past issues related to excessive use of trespass violations and traffic tickets, exploring environmental, rather that purely punitive options means that controlling access to BMHA should be viewed as an essential aspect of crime deterrence and community policing. There should be staffing and programming to encourage people to be out and

78

around in the BMHA communities, interacting with one another as well as police. Access control need not involve arrests and ticketing but, rather, the "above baseline" service the police are contracted to provide should include officers biking and walking around properties to discourage criminal activity and develop familiarity with the residents. When residents have more opportunities to approach officers in non-confrontational settings, they will be more likely to seek advice, provide tips and report crime.

- **Image**. Rehabilitate how community members view places by making them well-maintained, clean, and attractive to visitors. Clean ups, such as those orchestrated by the Buffalo City Clean Sweep program, or those organized by individual block clubs and tenant councils would promote this concept. Covering graffiti with fresh paint is a start; even better is the creation of new public art in key areas.

- **Legitimate activity support**. Place unsafe activities (like withdrawing cash from the bank) in safe spaces in order to attract legitimate business. The increased traffic has the potential to deter certain kinds of crime by increasing the number of "eyes on the street." Increasing on-site programming in common areas and encouraging public gardens, summer cookouts, and other community-driven events all will help reduce crime.

- **Target hardening**. Prevent crime through physical barriers like fences, gates, security doors, and locks. This involves ensuring that individual apartments or units are secure, that only residents or their guests have access buildings.[264]

In recent years, urban planners have acknowledged that social forces shape the use of space as much as urban design. Addressing these new concerns, planners have adapted CPTED methods to incorporate the participation and self-policing of community members. These methods hinge on four strategies:

- **Social cohesion**. Cultivate an environment of mutual respect, with a unified vision and sense of belonging.

- **Community connectivity**. Facilitate connections between community members and government and nongovernmental agencies.

- **Community culture**. Host festivals, cultural events, and other community-building institutions that impart a sense of shared space.

- **Threshold capacity**. Avoid developing land uses that facilitate anonymity, crime, vandalism, and other criminal behaviors.[265]

*Case Study: Crime Prevention through Environmental Design (CPTED) in Buffalo, New York*

In recent years, the Buffalo Police Department has embraced crime prevention through environmental design as a policing strategy. In fall 2015, Buffalo Police implemented CPTED at a **strip mall on East Delevan and Cortland Avenue on the City's east side. Th**e corner was notorious for drug dealing and was the site of several shootings. As part of the CPTED initiative, the City made changes to the streetscape, trimming trees, moving a bus stop, adding new curb structures, and re-routing the entrance through the parking lot, which changed the flow of traffic through the area. The BPD also pressured local business-owners to make improvements. Since the City authorizes District Chiefs and their Community Police Officers (CPOs) to review business licenses in their districts, local business-owners risked losing their licenses if they did **not make changes to their properties, they paved paths to their stores, fixed stores'** facades, and hired private security to monitor the strip mall. The CPTED initiative on East Delevan and Cortland was effective in reducing the prevalence of crime in the area and improving business relations.[266]

The next step is for BPD to work closely with city officials, community groups, and residents to prioritize some key areas for CPTED projects. One obvious place to start is the BMHA housing developments, which in many cases have suffered from physical deterioration as federal funding for public housing has been slashed despite rising expenses. The City should target Community Development Block Grant funding and align the Mayor's Summer Youth Program to work with BMHA and the police to hire BMHA residents to work side-by-side with police in making CPTED-oriented improvements to their neighborhoods.

**Case Study: CPTED and Mayor Brown's Summer Internship Program in Buffalo, New York**

In Buffalo, the Youth Employment Program, run by the Buffalo Youth Services department of the Buffalo Employment and Training Center (BETC), provides summer jobs, career guidance, and training for city of Buffalo youth ages 14-21.[267] **Also known as the Mayor's Summer Internship** program, in 2015 this program was slated to employ 1,450 youth for six weeks at $8.75 per hour.[268] The Mayor had hoped to expand the program to reach 2,500 youth per year, and has raised money through his Fund to Advance Buffalo to aid in this effort, but the program does not appear to have grown in recent years.[269] The City of Buffalo and the BPD Housing Unit should work together to exp**and the Mayor's Summer Internship program by hiring BMHA youth to work** on CPTED projects in the housing developments. Preventing crime while also creating economic **opportunities for community members should be a priority among the BPD's community policing** initiatives. Notably, a recent University of Pennsylvania study has shown that employment through a summer jobs program for high school youth in Chicago decreased violence among those surveyed **by 43% over 16 months. "Offering summer employment at this key** point in the life **course,"** wrote criminologist Sara Heller, **"could make crime a relatively less attractive** option.**"**[270]

## CONCLUSION

The Buffalo Police Department faces an imposing array of challenges in serving a city wracked with concentrated poverty and racial inequality. Community policing will not, alone, solve all of these challenges. But our survey of best practices from Buffalo and the nation provides an impressive array of innovative approaches that can help improve public safety and police-community relations while reducing the stark racial disparities in the criminal justice system. These approaches can make officers' jobs safer and more rewarding, while increasing the public's trust that the police will protect and serve every resident, without exceptions.

*This report was prepared by a team of Partnership for the Public Good staff, interns, and volunteers including Sam Magavern, Steve Peraza, Kerry Battenfield, Caryn Blair, Erin Carman, Stephen Hart, Tina Meyers, and Sarah Wooten.*

0081

0082

# APPENDIX A: RECOMMENDATIONS FOR BUFFALO

**Promote community policing through culture change, training, incentives, and policies.**

- Shift the culture of policing from the warrior mentality to the guardian mentality.
- Incorporate more community policing into training for new recruits and in-service police officers.
- Integrate community policing methods into daily police practices and create community policing collaborations like those listed in the case studies, using asset mapping, problem-solving, and other techniques.
- Require officers to devote a certain number of hours per week to community policing activities such as attending community meetings and events, doing foot and bike patrols, mentoring youth, etc.
- Offer more training in trauma, adolescent development, and tactical restraint/de-escalation strategies.
- Conduct annual performance reviews and regular assessments that recognize and reward community policing activities.
- Increase pay and promotional opportunities for officers who commit to community policing.
- Convert the BPD's Housing Unit from a strike-force model to a community policing model.

**Further increase the diversity and cultural competence of the force.**

- Recruit more police officers from Buffalo's diverse communities, including minorities, women, LGBT people, refugees, immigrants, and people with disabilities.
- Repeat and expand the Buffalo Police Department 21st-Century scholarship program.
- Increase the age of police eligibility to 45 years old to recruit police officers with diverse life and work experiences.
- Require regular implicit bias, cultural competence, and diversity training for all officers, including positive contacts with individuals from various communities as part of the training.
- Work with local and national agencies to develop a system of data collection and analysis to monitor bias in police activities.
- Revise the BPD's Language Access Plan to include the recommendations of refugee leaders and to remove hedging language.
- Provide ongoing language access training to officers and evaluate their performance to ensure successful implementation.
- Hire civilian liaisons and police social workers to aid in language access, cultural competency, mental health response, and other situations.

**Improve transparency and information-sharing.**
- Hire an additional staff person for the Buffalo Commission on Citizens Rights and Community Relations (CCRCR) and fill all vacant commissioner positions.
- Require the CCRCR to review all Internal Affairs cases to look for systemic problems, repeat offenders, and unfair results
- Require the CCRCR to release reports of oversight to the public and to host community meetings to present their findings.
- Amend the City Charter to transform the CCRCR into a broader and more effective Commission on Human Rights.
- Publish the Buffalo Police Department's policies and more department data on the BPD website to facilitate greater transparency, and ensure that all the information and reports required by the City Charter are presented.
- Revise the BPD's use-of-force policy to include "respect for life" language and a "duty to intervene" provision in incidents of excessive force.
- Develop a procedure for recording all police stops and issuing receipts to those stopped, and create a database where the public can access these records.
- Implement body cameras after carefully creating policies governing their usage and public access to the records created.
- Obtain accreditation of the police department as required by the City Charter.

**Promote restorative justice, alternatives to arrest, and diversionary programs.**
- Increase training in and use of restorative justice options instead of arrests and/or prosecutions for minor offenses.
- Develop standards by which BPD officers can determine when a suspect should be referred to a social service agency rather than arrested.
- Utilize fix-it tickets for minor, correctable offenses.
- Carefully monitor practices regarding violations and minor crimes to ensure that a desire for fine revenue does not distort policing and unduly harm people with low incomes.
- Support local efforts to create a Law Enforcement Assisted Diversion (LEAD) for minor drug and other offenses.
- Develop collaborative relationships with organizations that work with youth, homeless people, the mentally ill, substance abusers, and street-based sex workers to offer referral options over arrest, and break the revolving door of incarceration.

**Increase the use of crime prevention through environmental design**.
- Work with community groups and, where possible, hire local residents, to improve public safety through physical improvements to neighborhoods.

0084

## APPENDIX B: OPEN BUFFALO COMMUNITY POLICING SURVEY

In spring 2016, Open Buffalo administered a Community Policing Survey to 2,018 residents of Buffalo. Conducting brief, in-person interviews, surveyors engaged a diverse cross-section of the city population – men and women of different races, ages, genders, and incomes, who reside in neighborhoods that span over thirty zip codes. They surveyed residents at grocery stores, metro stops, community events, neighborhood meetings, and other sites and venues across the city. The Community Policing Survey was also translated into Spanish, Burmese, Karen, and Nepali to reach many of the city's foreign language speakers. One of the goals of the Survey was to reach people who are often underrepresented in traditional polls, surveys, and public discourse, and yet who are often the most impacted by policing. In particular, the survey reached larger numbers of youth and African Americans than a random selection poll would have done.

Using the raw data provides particularly rich information about the attitudes of different populations and how they compare with each other. That information is presented in this appendix. It should not be used to generalize about the attitude of city residents taken as a whole, however, because of the different demographics of the respondents when compared to the city's population. For that reason, we also present a weighted version of the data which adjusts for the age, race, and gender of the respondents. This weighted version can be used as a snapshot of how Buffalo residents as a whole view the police. In the body of the report, when we generalize about attitudes toward the police held by Buffalo residents, we present the weighted data.

The weighted data offers a slightly more positive view of the police than the raw data. For example, the proportion who say that the police treat people of color with respect increases from 16.9 to 20 percent. In general, however, the differences are surprisingly small, with a median difference of 4.2 points. We urge readers to carefully review both data sets and consider issues of policing not just through the lens of a random cross-section of Buffalonians but through the lenses of Buffalo's many populations. Regardless of which data set is consulted, it is clear that while many Buffalo residents have a positive view of the police, an unacceptably high number of residents, especially but by no means exclusively women, people of color, and youth, yearn for more respectful treatment and improved relationships.

*PPG is grateful to Stephen Hart, Ph.D., for preparing the weighted version of the data. Dr. Hart has a Ph.D. in sociology from the University of California at Berkeley and did post-doctoral training in survey sampling and error calculations at the University of Michigan before working for many years in the field of survey research.*

| | City of Buffalo[a] | Community Policing Survey |
|---|---|---|
| *Gender* | | |
| Female | 52.5% | 58.9% |
| Male | 47.5% | 41.1% |
| | | |
| *Age[b]* | | |
| 11-17 | 10.9% | 16.3% |
| 18-25 | 18.4% | 22.7% |
| 26-34 | 14.8% | 17.7% |
| 35-44 | 13.6% | 12.4% |
| 45-54 | 16.3% | 12.2% |
| 55-64 | 12.7% | 12.6% |
| 65+ | 13.3% | 6.1% |
| | | |
| *Race/Ethnicity[c]* | | |
| Asian | 3.1% | 5.1% |
| Black | 36.3% | 52.3% |
| Hawaiian | 0.0% | 0.0% |
| Hispanic | 9.3% | 10.8% |
| Mixed | 1.8% | 3.3% |
| Native American | 0.6% | 0.9% |
| Other | 0.1% | 0.0% |
| White | 48.8% | 27.5% |

Notes:

[a] The survey did not have an explicit lower age limit, but young children were not interviewed. Those conducting the survey estimate that in general children under 11 were not given the survey. Therefore the population figures omit children under 11.

[b] These are age categories from the survey. Census data was downloaded with exact age, and then sums for these categories were calculated.

[c] There were 75 cases in the survey where race/ethnicity was not ascertained; these cases are not included in the percentages above.

86

| Question 1, Raw Data | |
|---|---|
| Do you think you can trust the police to help you when you need it? |  |

| Question 1, Weighted | |
|---|---|
| Do you think you can trust the police to help you when you need it? |  |

87





88

Question 2, Raw Data

Do you think that your neighborhood works well with the police?



No 40%
Yes 36%
Do Not Know 24%

Question 2, Weighted

Do you think that your neighborhood works well with the police?



No 35%
Yes 43%
Do Not Know 23%

Percent yes (vs. No or Do Not Know)

Percent yes (vs. No or Do Not Know)

89

0089



Question 3a, Raw Data

In the past 6 months, have you been stopped by the police?

Question 3a, Weighted

In the past 6 months, have you been stopped by the police?

90





91

| Question 3b, Raw Data | |
|---|---|
| Do you feel that the police were fair? |  No 38% / Yes 29% / Do Not Know 33% |
| Percent yes (vs. No or Do Not Know) | |

| Question 3b, Weighted | |
|---|---|
| Do you feel that the police were fair? |  No 33% / Yes 34% / Do Not Know 33% |
| Percent yes (vs. No or Do Not Know) | |

92



Question 4, Raw Data

Have you called the police in the past six months?

Question 4, Weighted

Have you called the police in the past six months?

93





0094

| Question 5, Raw Data | |
|---|---|
| Have the police helped you in the past six months? |  |
| Percent yes (vs. No or Do Not Know) | |

| Question 5, Weighted | |
|---|---|
| Have the police helped you in the past six months? |  |
| Percent yes (vs. No or Do Not Know) | |

95



Question 6, Raw Data

Do the police respond quickly to your neighborhood?

Question 6, Weighted

Do the police respond quickly to your neighborhood?

96





97

| Question 7, Raw Data | | Question 7, Weighted | |
| --- | --- | --- | --- |
| In general, do you respect the police? | No 19% / Do Not Know 11% / Yes 69% | In general, do you respect the police? | No 16% / Do Not Know 10% / Yes 74% |
| Percent yes (vs. No or Do Not Know) | | Percent yes (vs. No or Do Not Know) | |

98



0099





100

0100

| Question 9, Raw Data | |
| --- | --- |
| In general, do you think that police respect people of color? | Yes 17%, Do Not Know 20%, No 63% |
| Percent yes (vs. No or Do Not Know) | |

| Question 9, Weighted | |
| --- | --- |
| In general, do you think that police respect people of color? | Yes 20%, Do Not Know 23%, No 57% |
| Percent yes (vs. No or Do Not Know) | |

101



Question 10, Raw Data

In general, do you think that police respect women?

Question 10, Weighted

In general, do you think that police respect women?

102





103

| Question 11, Raw Data | | Question 11, Weighted | |
|---|---|---|---|
| In general, do you think that police respect people in your neighborhood? | No 38% / Yes 37% / Do Not Know 25% | In general, do you think that police respect people in your neighborhood? | No 32% / Yes 46% / Do Not Know 22% |
| Percent yes (vs. No or Do Not Know) | | Percent yes (vs. No or Do Not Know) | |

104



Question 12, Raw Data

Are you part of a block club?

Question 12, Weighted

Are you part of a block club?



Percent yes (vs. No or Do Not Know)

| | |
|---|---|
| ALL | 15 |
| **RACE/ETHNICITY** | |
| Asian | 7 |
| Black | 18 |
| Hispanic | 8 |
| Mixed | 13 |
| Native American | 6 |
| White | 15 |
| **AGE GROUP** | |
| 11-17 | 4 |
| 18-25 | 8 |
| 26-34 | 9 |
| 35-44 | 17 |
| 45-54 | 22 |
| 55-64 | 31 |
| 65+ | 44 |
| **GENDER** | |
| female | 16 |
| male | 14 |



Percent yes (vs. No or Do Not Know)

| | |
|---|---|
| ALL | 19 |
| **RACE/ETHNICITY** | |
| Asian | 9 |
| Black | 20 |
| Hispanic | 9 |
| Mixed | 14 |
| Native American | 6 |
| White | 20 |
| **AGE GROUP** | |
| 11-17 | 5 |
| 18-25 | 7 |
| 26-34 | 10 |
| 35-44 | 17 |
| 45-54 | 21 |
| 55-64 | 31 |
| 65+ | 47 |
| **GENDER** | |
| female | 20 |
| male | 18 |

0106

| Question 13, Raw Data<br><br>Overall, would you say the level of crime in your neighborhood has decreased, increased or stayed the same from a year ago? |  | Question 13, Weighted<br><br>Overall, would you say the level of crime in your neighborhood has decreased, increased or stayed the same from a year ago? |  |
|---|---|---|---|
| Percent Stayed the Same or Decreased (vs. Increased) | | Percent Stayed the Same or Decreased (vs. Increased) | |

107



0108





109

| Question 15a, Raw Data<br><br>How would you rate the Buffalo Police Department in the following areas: Working with the community to reduce crimes | Excellent 5%<br>Very Poor 19%  Good 17%<br>Poor 25%  Fair 34% | Question 15a, Weighted<br><br>How would you rate the Buffalo Police Department in the following areas: Working with the community to reduce crimes | Very Poor 16%  Excellent 7%<br>Good 20%<br>Poor 22%  Fair 35% |
|---|---|---|---|
| Percent Excellent or Very Good  (vs. Fair, Poor, or Very Poor) | | Percent Excellent or Very Good  (vs. Fair, Poor, or Very Poor) | |

110



Question 15b, Raw Data

How would you rate the Buffalo Police Department in the following areas: Working with the community to prevent crime

Question 15b, Weighted

How would you rate the Buffalo Police Department in the following areas: Working with the community to prevent crime

111





0112



Question 15c, Raw Data

How would you rate the Buffalo Police Department in the following areas: Creating partnerships with the community

Excellent 6%
Good 13%
Fair 28%
Poor 29%
Very Poor 24%

Question 15c, Weighted

How would you rate the Buffalo Police Department in the following areas: Creating partnerships with the community

Excellent 7%
Good 16%
Fair 31%
Poor 27%
Very Poor 19%

Percent Excellent or Very Good  (vs. Fair, Poor, or Very Poor)

| | |
|---|---|
| ALL | 19 |
| RACE/ETHNICITY | |
| Asian | 41 |
| Black | 13 |
| Hispanic | 19 |
| Mixed | 12 |
| Native American | 13 |
| White | 30 |
| AGE GROUP | |
| 11-17 | 12 |
| 18-25 | 16 |
| 26-34 | 13 |
| 35-44 | 18 |
| 45-54 | 27 |
| 55-64 | 26 |
| 65+ | 26 |
| GENDER | |
| female | 19 |
| male | 19 |

Percent Excellent or Very Good  (vs. Fair, Poor, or Very Poor)

| | |
|---|---|
| ALL | 23 |
| RACE/ETHNICITY | |
| Asian | 42 |
| Black | 14 |
| Hispanic | 20 |
| Mixed | 12 |
| Native American | 13 |
| White | 32 |
| AGE GROUP | |
| 11-17 | 12 |
| 18-25 | 18 |
| 26-34 | 16 |
| 35-44 | 19 |
| 45-54 | 31 |
| 55-64 | 34 |
| 65+ | 30 |
| GENDER | |
| female | 23 |
| male | 23 |

113

114

0114



Question 15d, Raw Data

How would you rate the Buffalo Police Department in the following areas: Responding to the community's concerns

Excellent 7%
Good 16%
Fair 29%
Poor 27%
Very Poor 21%

Question 15d, Weighted

How would you rate the Buffalo Police Department in the following areas: Responding to the community's concerns

Very Poor 17%
Excellent 8%
Good 20%
Fair 31%
Poor 24%

**Percent Excellent or Very Good  (vs. Fair, Poor, or Very Poor)**

| | Left chart | Right chart |
|---|---|---|
| ALL | 23 | 28 |
| **RACE/ETHNICITY** | | |
| Asian | 37 | 40 |
| Black | 15 | 16 |
| Hispanic | 23 | 24 |
| Mixed | 12 | 11 |
| Native American | 25 | 25 |
| White | 36 | 38 |
| **AGE GROUP** | | |
| 11-17 | 20 | 22 |
| 18-25 | 21 | 26 |
| 26-34 | 18 | 21 |
| 35-44 | 20 | 22 |
| 45-54 | 27 | 32 |
| 55-64 | 26 | 33 |
| 65+ | 30 | 35 |
| **Frequency / GENDER** | | |
| female | 22 | 27 |
| male | 24 | 30 |

115

## Notes



[1] Jay Rey, "More than half of Buffalo children live in poverty, latest Census figures show."  Buffalo News, October 1, 2016. http://buffalonews.com/2016/10/01/half-buffalo-children-live-poverty-new-census-figures-show/

[2] Partnership for the Public Good, "Working Toward Equality: Employment and Race in Buffalo," http://ppgbuffalo.org/files/documents/working_toward_equality_final.pdf

[3] Norm Stamper, *To Protect and Serve: How to Fix America's Police* (New York: Nation Books, 2016), 85-6.

[4] Linda S. Miller, Karen Matison Hess, and Christine Hess Orthmann, *Community Policing: Partnerships for Problem Solving* 6th ed. (Clifton Park: Delmar Cengage Learning, 2011), 4, 19; Victor E. Kappeler and Larry K. Gaines, *Community Policing: A Contemporary Perspective* (New York: Routledge, 2011), 4.

[5] Bureau of Justice Assistance, Community Policing Consortium, *Understanding Community Policing: A Framework for Action*, (Washington, D.C.: August 1994), 9.

[6] Ibid.

[7] Ibid.

[8] Ibid.

[9] Ibid., 10.

[10] Jeffrey Fagan, Garth Davies, and Adam Carlis, "Race and Selective Enforcement in Public Housing," *Journal of Empirical Legal Studies* 9 (2012): 700.

[11] "COPS Program Spurs Community Policing Nationwide, According to New Urban Institute Evaluation," Urban Institute, September 6, 2000, http://www.urban.org/publications/900043.html.

[12] Malcom Sparrow, *Handcuffed: What Holds Policing Back, and the Keys to Reform* (Washington, DC: Brookings Institution Press, 2016), 18.

[13] War Comes Home: The Excessive Militarization of American Policing, American Civil Liberties Union, June 2014 (Accessed August 22, 2016, https://www.aclu.org/feature/war-comes-home).

[14] "MRAPs and Bayonets: What We Know about the Pentagon's 1033 Program," NPR, September 2, 2014 (Accessed August 22, 2016, http://www.npr.org/2014/09/02/342494225/mraps-and-bayonets-what-we-know-about-the-pentagons-1033-program).

[15] Malcom Sparrow, *Handcuffed: What Holds Policing Back, and the Keys to Reform* (Washington, DC: Brookings Institution Press, 2016), 8; and Campaign Zero, "The Problem," http://www.joincampaignzero.org/problem/.

[16] Ibid., 8.

[17] Al Baker, J. David Goodman, & Benjamin Mueller, *Beyond the Chokehold: The Path to Eric Garner's Death*, June 13, 2015, http://www.nytimes.com/2015/06/14/nyregion/eric-garner-police-chokehold-staten-island.html

[18] President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing* (Washington, D.C.: Office of Community-Oriented Policing Service, 2015), 5.

[19] Ibid., 3, 41-50.

0116

[20] Ibid., 49.

[21] Erin Carman, Open Buffalo, "Alarming Disparities: The Disproportionate Number of African Americans and Hispanics in the Erie County Criminal Justice System," (2013), 2. Available from: Partnership for the Public Good: http://www.ppgbuffalo.org/wp-content/uploads/2013/03/Alarming-Disparities-in-EC-Criminal-Justice-System.pdf.

[22] Kelsey Garlock and Ammad W. Rafiqi, "Preliminary Analysis and Findings on Racial Profiling and Law Enforcement Tactics Leading To Racial Disparities in The Erie County Criminal Justice System," (SUNY Buffalo Immigration and Human Rights Clinic, 2014), 7.

[23] Matthew Spina, "When a Protector Becomes a Predator," *Buffalo News*, November 22, 2015, http://projects.buffalonews.com/abusing-the-law/index.html

[24] Ibid.

[25] Ibid.

[26] Kendra Eaglin, "Timeline Leading up to Firing of Buffalo Cop," June 4, 2015, *WKBW*, http://www.wkbw.com/news/city-revisits-fired-buffalo-cop-case; Jen Hayden, "Former Buffalo Cop Fights for Pension after Exposing Brutality," December 19, 2014, *Daily Kos*, http://www.dailykos.com/story/2014/12/19/1352929/-Former-Buffalo-cop-fights-for-pension-after-exposing-brutality.

[27] Hannah Buehler, "Buffalo Police Officer Suspended without Pay after Video Surfaces of Him Striking Suspect," July 16, 2015, *WKBW*, http://www.wkbw.com/news/buffalo-police-officer-suspended-without-pay-after-video-surfaces.

[28] Lou Michel, "Fired Officers Wins Back Pay of $195,507 from Buffalo Police Department," Buffalo News, May 8, 2015, http://www.buffalonews.com/city-region/buffalo/fired-officer-wins-back-pay-of-195507-from-buffalo-police-department-20150508; Jonathan D. Epstein, "Once a Marijuana-Growing Site, Warehouse on Buffalos East Side Planned as a Brewery," July 25, 2016 (Accessed August 1, 2016, http://www.buffalonews.com/business/once-a-marijuana-growing-site-warehouse-on-buffalos-east-side-planned-as-brewery-20160725). .

[29] Brittni Smallwood, "Police Oversight Begins After Brutality Investigations," *WIVB*, November 5, 2014, http://wivb.com/2014/11/05/police-oversight-committee-begins-after-brutality-investigations/.

[30] Phil Fairbanks, "Buffalo Cop Faces Federal Charges in Molly's Pub Case," *Buffalo News*, April 28, 2015, http://www.buffalonews.com/city-region/federal-court/buffalo-cop-faces-federal-charges-in-mollys-pub-case-20150428.

[31] "Buffalo Police Officer Facing Civil Rights Violations," *WGRZ*, April 30, 2015, http://legacy.wgrz.com/story/news/crime/2015/04/28/buffalo-police-officer-facing-civil-rights-violation/26527217/.

[32] Lou Michel, "Eloff, key figure in Molly's Pub case, will resign as Buffalo police officer," Buffalo News, June 24, 2016, http://www.buffalonews.com/city-region/police-courts/eloff-key-figure-in-molly8217s-pub-case-will-resign-as-buffalo-police-officer-20160624.

[33] Lou Michel, "Molly's Pub Guard Had Record of Abuse Before His Hiring," *Buffalo News*, April 26, 2015, http://www.buffalonews.com/city-region/buffalo/mollys-pub-guard-had-record-of-abuse-before-his-hiring-20150426.

[34] Ibid.

0117

[35] Lou Michel, "Buffalo Police Officer Fired for Allegedly Threatening to Kill Woman," *Buffalo News*, October 18, 2014, http://www.buffalonews.com/city-region/buffalo-police-officer-fired-for-allegedly-threatening-to-kill-woman-20141018.

[36] "Buffalo Cop Fired for Stealing Cash from Wallet," June 25, 2015, *WKBW*, http://www.wkbw.com/news/police-blotter/buffalo-cop-fired-for-stealing-cash-from-wallet

[37] Aaron Lowinger, "Checkpoint: Buffalo Police Practices Questioned," The Public, July 13, 2016.

[38] Partnership for the Public Good, "The Potential Impact of Legalizing, Regulating, and Taxing Marijuana on Erie County and New York State," October 28, 2015.  Available from www.ppgbuffalo.org.

[39] Aaron Lowinger, "Zero Tolerance," The Public, August 10-16, 2016.

[40] "Attorney seeks charges against Buffalo Police in dog 'shooting spree.'", Artvoice, August 4, 2016.

[41] Frank Parlato, "Man Whose Pit Bull Was Killed in 'Wrong House' Raid to Sue Buffalo Police," Artvoice, August 25-31, 2016.

[42] Brian Meyer, "Panel to Assess Police Issues; Last Outside Review Was Done in '90s," *Buffalo News*, November, 27, 2010, http://www.buffalonews.com/Panel_to_assess_police_issues___Last_outside_review_was_done_in_apos90s.html.

[43] T.J. Pignataro, "City Police Reorganization Panel Will Survey Residents about Crime," *Buffalo News*, July 1, 2011, http://www.buffalonews.com/City_police_reorganization_panel_will_survey_residents_about_crime.html; Ashley Hassett, "Man Involved in Police Reorganization Arrested," *WBFO*, http://news.wbfo.org/post/man-involved-police-reorganization-arrested; Phil Fairbanks, "Former Buffalo Police Advisor Pleads Guilty to Drug Charge, *Buffalo News*, April 3, 2013, http://www.buffalonews.com/20130403/former_buffalo_police_adviser_pleads_guilty_to_drug_charge.html.

[44] David Rivera, Interview by author, Buffalo, NY, February 2, 2016.

[45] Daniela Porat, "Tempting a Ferguson in Buffalo," *Investigative Post*, October 31, 2016.

[46] Matthew Spina, "Culture of Misconduct in Police Department Has Existed for Years," *Buffalo News*, May 24, 2015, http://www.buffalonews.com/city-region/police-courts/culture-of-misconduct-in-buffalo-police-department-has-existed-for-years-20140524

[47] Lieutenant Steve Nichols, interview by author, Buffalo, NY, December 3, 2015.

[48] Ibid.

[49] Rebecca Morris, "National Night Out: Building Police and Community Partnerships to Prevent Crime," Practitioner Perspectives, U.S. Department of Justice, May 2000

[50] "What Is Slow Roll?" Slow Roll Buffalo (Accessed August 23, 2016, http://slowrollbuffalo.org/); Annaliza Guard and J.T. Messinger, "Slow Roll Promotes Community in Buffalo, July 11, 2016 (Accessed August 23, 2016, http://www.wgrz.com/news/local/slow-roll-promotes-community-in-buffalo/269936515).

[51] Ibid.

[52] See Buffalo Peacemakers: Responding to the Needs of the People (Accessed July 8, 2016, http://www.buffalopeacemakers.org/#).

118

[53] Callan Gray, "Buffalo Police Unveil Specialized Team for Mass Demonstrations," July 5, 2016, *WIVB.Com* (Accessed July 8, 2016, http://wivb.com/2016/07/05/only-on-4-buffalo-police-unveil-specialized-team-for-mass-demonstrations/)

[54] Gene Warner, "After Cop Killings, Buffalo Police Union Requests High-Powered Rifles," Buffalo News, July 18, 2016 (Accessed July 20, 2016, http://www.buffalonews.com/city-region/buffalo/after-cop-killings-buffalo-police-union-requests-high-powered-rifles-20160718).

[55] Lou Michel, "Greater Scrutiny from Citizens Makes Police Officers More Mindful, Cautious," *Buffalo News*, Feb. 10, 2015, http://www.buffalonews.com/city-region/east-side/greater-scrutiny-from-citizens-makes-police-officers-more-mindful-cautious-20150210.

[56] Susan Lee, Urban Peace Institute, interview by author, Buffalo, NY, November 5, 2015.

[57] Police Use of Excessive Force: A Conciliation Handbook for the Police and the Community. U.S. Department of Justice, Community Relations Service (2002), https://www.justice.gov/archive/crs/pubs/pdexcess.htm.

[58] Ibid.

[59] Kate Zernike, Camden Turns Around With New Police Force, N.Y. Times, Aug. 31, 2014, http://www.nytimes.com/2014/09/01/nyregion/camden-turns-around-with-new-police-force.html?_r=0

[60] Jeff Brady, Obama: Camden, N.J., Police A Model For Improving Community Relations, National Public Radio, May 22, 2015 4:26 PM, http://www.npr.org/2015/05/22/408824877/obama-camden-n-j-police-a-model-for-improving-community-relations.

[61] Kate Zernike, Camden Turns Around With New Police Force, N.Y. Times, Aug. 31, 2014, http://www.nytimes.com/2014/09/01/nyregion/camden-turns-around-with-new-police-force.html?_r=0

[62] Jeff Brady, Obama: Camden, N.J., Police A Model For Improving Community Relations, National Public Radio, May 22, 2015 4:26 PM, http://www.npr.org/2015/05/22/408824877/obama-camden-n-j-police-a-model-for-improving-community-relations.

[63] Ibid.

[64] Matt Gryta, "New Deputy Commission and Other Buffalo Police Promotions," *Buffalo News*, July 25, 2014, http://www.buffalonews.com/city-region/police-courts/new-deputy-commissioner-and-other-buffalo-police-promotions-20140725 (Accessed June 7, 2016).

[65] Lou Michel, "Police Promotion Puts Woman Back in Top Tier," *Buffalo News*, July 14, 2014, http://www.buffalonews.com/city-region/buffalo/police-promotion-puts-woman-back-in-top-tier-20140714.

[66] Lou Michel, "Greater Scrutiny from Citizens Makes Police Officers More Mindful, Cautious," *Buffalo News*, Feb. 10, 2015, http://www.buffalonews.com/city-region/east-side/greater-scrutiny-from-citizens-makes-police-officers-more-mindful-cautious-20150210.

[67] "Basic Course for Police Officers," New York State Division of Criminal Justice Services, http://www.criminaljustice.ny.gov/ops/training/bcpo/bcpo01.htm.

[68] "Basic Course for Police Officers—Table of Contents," New York State Division of Criminal Justice Services, 7, http://www.criminaljustice.ny.gov/ops/docs/training/pubs/basicpolice/bcpooutline.pdf.

[69] Ashley Hirtzel, "City Orders Additional Training for Police Officers," *WBFO*, November 6, 2014, http://news.wbfo.org/post/council-orders-additional-training-city-police-officers.

[70] Deputy Commissioner Kimberly Beaty, Buffalo Police Department, interview by author, Buffalo, NY, May 12, 2016.

[71] Constance Rice & Susan K. Lee, *Relationship-based Policing Achieving Safety in Watts: A Report for the President's Task Force on 21st Century Policing*. Josh Green and Melissa Nalani Ross (eds.).

[72] Seth Stoughton, "Law Enforcement's 'Warrior' Problem," *Harvard Law Review* 128 (2015): 225.

[73] "Mayor Brown Conducts Neighborhood Anti-Crime/Anti-Violence Effort Following Shooting on Sprenger Ave," September 2008, Buffalo Police Department (Accessed July 20, 2016, http://www.bpdny.org/Home/Press/2008/MayorBrownConductsNeighborhoodAntiCrimeEffort).

[74] Seth Stoughton, "Law Enforcement's 'Warrior' Problem," *Harvard Law Review* 128 (2015): 225.

[75] "Blue Courage Delivery and Development Team," *Blue Courage* (Accessed September 6, 2016, http://bluecourage.com/team/).

[76] "Courses Offered," *Blue Courage* (Accessed September 6, 2016, http://bluecourage.com/courses-offered/).

[77] Michael J. Nila, Barry Schwartz, and Kenneth Share, "Educating the 21st Century Cop: Developing Blue Courage and Practical Wisdom," The Police Chief Magazine, LXXIX (November 2012) (Accessed September 6, 2016, http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=print_display&article_id=2802&issue_id=112012).

[78] "Basic Course for Police Officers—Table of Contents," New York State Division of Criminal Justice Services, 2, http://www.criminaljustice.ny.gov/ops/docs/training/pubs/basicpolice/bcpooutline.pdf.

[79] This approach has been shown to have a lasting impact on officer behavior, according to a study focusing on officer interactions with persons with mental illness. Yasmeen I. Krammedine and Peter H. Silverstone, "How to Improve Interactions between Police and the Mentally Ill. *Frontiers in Psychiatry* 5 (2105): 1-5, doi:10.3389/fpsyt.2014.00186.

[80] Norm Stamper, *To Protect and Serve: How to Fix America's Police* (New York: Nation Books, 2016), 8.

[81] Ibid., 185.

[82] Niagara Falls Police Department General Order, No. 120.00, Performance Evaluations: Sworn Personnel, Nov. 5, 2013, Appendix A: Training Manual, Available from: Niagara Falls Police Department, 4 (Accessed June, 8, 2016, http://www.egovlink.com/public_documents300/niagarafalls/published_documents/Police/Administration percent20Policies percent202014/120_00 percent20Performance percent20Evaluations.pdf

[83] Ibid., 4.

[84] Ibid., 5.

[85] Ibid., iii.

[86] Ibid., iv.

[87] Ibid., xv-xvi.

[88] Miami-Dade's Neighborhood Resource Team Delivers Full Range of Family, Community Services Team Includes Police, Housing, Health, Homeless, Other Public and Private Agencies, *U.S. Mayors Articles*, March 19, 2001 (Accessed June 8, 2016, https://www.usmayors.org/bestpractices/usmayor01/BP_Miami_Dade.asp).

[89] See "The Philadelphia Foot Patrol Experiment," Temple University, Department of Criminal Justice (Accessed June 14, 2016, http://www.cla.temple.edu/cj/center-for-security-and-crime-science/the-philadelphia-foot-patrol-

0120

experiment/); Thomas Ferrick, "Using Data, Philly Police Bring Major Crimes to Lowest Levels in Five Years," *Axis Philly,* July 22, 2013, http://axisphilly.org/article/using-data-philly-police-bring-major-crimes-to-lowest-levels-in-five-years/.

[90] Aaron Lowinger and Justine Sondel, "Checkpoint: BPD Housing Unit's High Arrest Rate," The Public, July 27, 2016.

[91] Leonard Williams, interview by author, Buffalo, NY, December 3, 2015.

[92] The United States Conference of Mayors, *Safer Neighborhoods through Community Policing: Volume I: Successful Initiatives in 72 Cities* (Washington, D.C.: April 2001), 22.

[93] Greensboro Police Department, "Police Neighborhood Resource Program" (2014), 5 (Accessed June 8, 2016, http://www.greensboro-nc.gov/modules/showdocument.aspx?documentid=25787).

[94] Ibid., 21-22.

[95] Ibid., 24.

[96] United States Conference of Mayors, "Safer Neighborhoods through Community Policing, Volume 2: Three Case Studies" (2000). Available from www.usmayors.org.

[97] United States Conference of Mayors, "Safer Neighborhoods through Community Policing, Volume 1: Successful Initiatives in 72 Cities" (2001). Available from www.usmayors.org.

[98] Ibid.

[99] Ibid.

[100] Ibid.

[101] "The Police Responsibility to Community-Oriented Policing in a Diverse Society," in *Training the 21st Century Police Officer*, 99.

[102] Ibid.

[103] For example, a higher percentage of female officers has been associated with fewer civilian complaints of excessive use of force. Liqun Cao, Curbing Police Brutality: What Works? A Reanalysis of Citizen Complaints at the Organizational Level (Report, 2015), 20.

[104] U.S. Census Bureau, Buffalo (city) New York. http://quickfacts.census.gov/qfd/states/36/3611000.html

[105] "Buffalo Police Department Sworn Officer Demographic, June 10, 2016," acquired during interview with BPD officials, July 2016; U.S. Census Bureau, Buffalo (city) New York. http://quickfacts.census.gov/qfd/states/36/3611000.html.

[106] Gene Grabiner, "Recommendations for Enhanced Police Practice" (Report, 2015), 18.

[107] Norm Stamper, *To Protect and Serve: How to Fix America's Police* (New York: Nation Books, 2016), 220-225.

[108] Recruitment Exam Booklet (2011). Available from: Buffalo Police Department: http://www.bpdny.org/files/pdf/10366_Test_booklet_mech.pdf.

121

[109] "Buffalo Police Announce New Recruitment Program," *WGRZ*, October 19, 2015, http://www.wgrz.com/story/news/local/buffalo/2015/10/19/buffalo-police-announce-new-recruitment-program/74234744/.

[110] "Police Exam Announcement," Buffalo Police Department, March 2016 (Accessed July 20, 2016, http://www.city-buffalo.com/files/1_2_1/Police/Police_Exam_Announcement.pdf).

[111] National Criminal Justice Officer Selection Inventory™ - NCJOSI™ I/O Solutions (Accessed July 20, 2016, http://www.iosolutions.org/Products_and_Services/OTS/National_Criminal_Justice_Officer_Selection_Inventory.aspx).

[112] See City Stat Buffalo (video), Oct. 30, 2015. Available from: City of Buffalo: https://cityofbuffalo.viebit.com/#8b06167bd85216cee7accd0eb5bf9ecb; and Lou Michel, "City Hopes New Initiative Will Lead to More Minority Police Officers," *Buffalo News*, October 19, 2015, http://www.buffalonews.com/city-region/city-hopes-new-initiative-will-lead-to-more-minority-police-officers-20151019.

[113] City Stat Buffalo (video), Oct. 30, 2015. Available from: City of Buffalo: https://cityofbuffalo.viebit.com/#8b06167bd85216cee7accd0eb5bf9ecb.

[114] @BPD21C (Twitter account), https://twitter.com/bpd21c.

[115] George T. Patterson, Police Social Work: A Unique Area of Practice Arising from Law Enforcement Functions (July 2008), www.naswnyc.org/general/custom.asp?page=77.

[116] Association of Police Social Workers, "Find a Police Social Worker" www.policesocialwork.org

[117] George T. Patterson, Police Social Work: A Unique Area of Practice Arising from Law Enforcement Functions (July 2008), www.naswnyc.org/general/custom.asp?page=77.

[118] Economic Perspectives on Incarceration and the Criminal Justice System, Council of Economic Advisors, Executive Office of the President of the United States (April 2016): 57.

[119] Norm Stamper, *To Protect and Serve: How to Fix America's Police* (New York: Nation Books, 2016), 236.

[120] Lorie A. Fridell, "Racially Biased Policing: The Law Enforcement Response to the Implicit Black-Crime Association," http://fairandimpartialpolicing.com/docs/rbp-thelaw.pdf , 58.

[121] Fridell, "Racially Biased Policing," http://fairandimpartialpolicing.com/docs/rbp-thelaw.pdf , 43.

[122] Cheryl Staats, Kelly Capatosto, Robin A. Wright, and Danya Contractor, *State of the Science: Implicit Bias Review* (2015): 65. Available from: Kirwan Institute: http://kirwaninstitute.osu.edu/wp-content/uploads/2015/05/2015-kirwan-implicit-bias.pdf.

[123] Roland G. Fryer, "An Empirical Analysis of Racial Differences in Police Use of Force," National Bureau of Economic Research Working Paper 22399 (NBER, July 2016), http://www.nber.org/papers/w22399.

[124] Contract for Policing Justice, (2010): 4. Available from: Consortium for Police Leadership in Equity: http://policingequity.org/wp-content/uploads/2015/06/cple_contract_for_policing_justice.pdf.

[125] Cheryl Staats, Kelly Capatosto, Robin A. Wright, and Danya Contractor, *State of the Science: Implicit Bias Review* (2015): 65. Available from: Kirwan Institute: http://kirwaninstitute.osu.edu/wp-content/uploads/2015/05/2015-kirwan-implicit-bias.pdf.

0122

126 Peter Callaghan, "Professors and Police, How Minneapolis Project May Change the Way Cops Everywhere Relate to the Public," *MinnPost,* August 27, 2015. https://www.minnpost.com/politics-policy/2015/08/professors-and-police-how-minneapolis-project-may-change-way-cops-everywhere.

127 The Center for Policing Equity, http://policingequity.org/about/

128 Community-Oriented Policing Services, U.S. Department of Justice, http://www.cops.usdoj.gov/about.

129 Fair and Impartial Training, Overview Flyer, *Fair and Impartial Policing* (Accessed June 9, 2016, http://static1.squarespace.com/static/54722818e4b0b3ef26cdc085/t/5623ec8ce4b0099ac9caaada/1445194892676/Extended_About+FIP_2015.pdf.)

130 Rod Watson, "Police Tackle Problems of 'Implicit Bias,'" *Buffalo News,* June 3, 2015, http://www.buffalonews.com/columns/rod-watson/police-tackle-problem-of-implicit-bias-20150603.

131 Office of Community-Oriented Policing Services, Department of Justice, "Identifying and Preventing Gender Bias in Law Enforcement Response to Sexual Assault and Domestic Violence: A Roundtable Discussion," March 23, 2016 (Accessed July 11, 2016, https://www.justice.gov/opa/file/799366/download).

132 Centers for Disease Control, National Center for Injury Prevention and Control, National Intimate Partner and Sexual Violence Survey: 2010 Findings on Victimization by Sexual Orientation (2013), p. 2 (Accessed July 12, 2016, https://www.cdc.gov/violenceprevention/pdf/nisvs_sofindings.pdf).

133 INCITE! "Policing Gender," p. 5, 7 (Accessed July 12, 2016, http://www.incite-national.org/).

134 "Buffalo Police Department Adopts Language Access Plan for Limited English Proficient Individuals to Better Serve the City's Growing Diverse Communities," BPD Language Access Plan, Press Release, City of Buffalo, https://www.ci.buffalo.ny.us/Mayor/Home/Leadership/Press_Releases/BPDLanguageAccessPlan.

135 *Bright Spots in Welcoming and Integration: A Report by White House Task Force on New Americans, June 2016*, The White House (Accessed July 20, 2016, https://www.whitehouse.gov/sites/default/files/docs/bright_spots_report_63016.pdf).

136 Pradine Saint-Fort, Noelle Yasso, & Susan Shah, "Engaging Police in Immigrant Communities: Promising Practices from the Field," Vera Institute of Justice (October 2012), 8-9.

137 Ibid., 16-17.

138 Ibid., 23.

139 Ibid., 38-40.

140 Ibid., vii.

141 See 2.8 Recommendation in President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing* (Office of Community-Oriented Policing Services: Washington, D.C., 2015), 26.

142 President's Task Force on 21st Century Policing, *Final Report*, 22.

143 Rochester Police Community Relation Program: Civilian Review Board Annual Report (Center for Dispute Settlement, 2014): 2.

144 Rochester Police Community Relation Program, 15; Programs: Police/Community Relations, Monroe County Sheriff Review Panel. Center for Dispute Settlement. http://www.cdsadr.org/programs/policecommunity-

0123

relations/monroe-county-sheriffs-review-panel-2/. See also Programs: Police/Community Relations, Rochester Civilian Review Board (CRB). Center for Dispute Settlement.

http://www.cdsadr.org/programs/policecommunity-relations/rochester-civilian-review-board-crb/

[145] Rochester Police Community Relation Program, 14.

[146] Ibid., 7.

[147] Ibid., 15.

[148] Ibid., 4.

[149] Ibid., 15.

[150] Ibid., 24.

[151] Ibid., 24.

[152] Ibid., 27.

[153] Ibid., 9.

[154] Peter Finn, *Citizen Review of Police: Approaches and Implementation*, Abt. Associates Inc., for National Institute of Justice, U.S. Department of Justice (March 2001).

[155] Ibid., 7-8.

[156] Ibid., 8.

[157] Ibid., 8.

[158] Rachel Moran, "Ending the Internal Affairs Farce," *Buffalo Law Review* 64 (August 2016).

[159] Chapter C, Article 18-20, Commission on Citizens Rights and Community Relations, Charter of the City of Buffalo (Accessed June 21, 2016, http://ecode360.com/13552306?highlight=community percent20relations,communications,communities,community,relations,relating,relation,related).

[160] Ibid.

[161] Ibid.

[162] Peter Finn, *Citizen Review of Police: Approaches and Implementation*, Abt. Associates Inc., for National Institute of Justice, U.S. Department of Justice (March 2001).

[163] Ibid.

[164] "Fiscal Year 2011 Annual Report," *Civilian Investigative Panel,* accessed April 20, 2016, http://www.miamigov.com/cip/downloads/FY2011CIVILIANINVESTIGATIVEPANELANNUALREPORT.pdf, 4; "Fiscal Year 2010 Annual Report," *Civilian Investigative Panel,* accessed April 20, 2016, http://www.miamigov.com/cip/downloads/fy2010annualreport.pdf, 5..

[165] CCR website—verify.

0124

[166] Peter Finn, Citizen Review of Police: Approaches and Implementation, Abt. Associates Inc., for National Institute of Justice, U.S. Department of Justice (March 2001).

[167] Cite to DOJ report and Rochester site.

[168] City of Buffalo Charter, Section 13-17.

[169] Daniela Porat, "Tempting a Ferguson in Buffalo," *Investigative Post*, October 31, 2016.

[170] Ibid.

[171] Ibid.

[172] Nancy Fischer, "Consent decree forced positive changes on Niagara Falls Police Department," *Buffalo News*, December 3, 2015 (Accessed September 6, 2016, http://www.buffalonews.com/apps/pbcs.dll/article?avis=BN&date=20151203&category=CITYANDREGION&lopenr=151209725&Ref=AR&profile=1157&template=printart); "Niagara Falls Police Department General Order: Use of Force; Deadly Weapons – Firearms," *Egovlink.com* (Accessed September 6, 2016, http://www.egovlink.com/public_documents300/niagarafalls/published_documents/Police/Administration%20Policies%202014/122_20%20Use%20of%20Force%20Firearms.pdf.)

[173] Las Vegas Metropolitan Police Department, Use of Force, General Order (GO-005-14, 2014), http://www.lvmpd.com/Portals/0/OIO/GO-005-14_Use_of_Force.pdf. Emphasis added.

[174] Ibid.

[175] Ibid, 10.

[176] Ibid.

[177] Ibid.

[178] Fourth Amendment, "Constitution of the United States," *The Charters of Freedom* (Accessed June 23, 2016, http://www.archives.gov/exhibits/charters/constitution_transcript.html).

[179] Floyd, et al. v. City of New York, et al. (2013) 959 F. Supp. 2d 540.

[180] Joseph Goldstein, *Judge Rejects New York's Stop-and-Frisk Policy*, New York Times, August 12, 2013.

[181] Joe Coscarelli, Stop-and-Frist rules Unconstitutional, But It Won't Stop, New York Magazine, Aug. 12, 2013, 11:03 AM, http://nymag.com/daily/intelligencer/2013/08/stop-and-frisk-ruled-unconstitutional.html.

[182] Caroline Bankoff, Don't Forget Your NYPD Stop-and-Frist Receipt, New York Magazine, Sept. 28, 2015, 1:36 PM, http://nymag.com/daily/intelligencer/2015/09/dont-forget-your-nypd-stop-and-frisk-receipt.html.

[183] Ibid.

[184] Ibid.

[185] Davis et al. v. City of New York, 10 Civ. 0699 (S.D.N.Y) (settled in 2015).

[186] The settlement also stipulated that the New York Police Association would make policy changes to adapt its training regarding vertical patrols in public housing buildings. See *Davis et al. v. City of New York*, 10 Civ. 0699 (S.D.N.Y) (settled in 2015); see also "Davis et al. v. City of New York et al., 10 Civ 0699," *The Legal Aid Society* (Access June 23, 2016, http://www.legal-aid.org/en/criminal/criminalpractice/davissettlement.aspx); "Preliminary

0125

settlement reached in federal class action lawsuit challenging police practices in NYC public housing; Major NYPD reforms to be implemented in court-ordered monitoring process." NAACP Legal Defense Fund (Press release January 7, 2015) http://www.naacpldf.org/update/preliminary-settlement-reached-federal-class-action-lawsuit-challenging-police-practices-nyc-; and Letter from parties in *Davis et al v. City of New York*, to the Honorable Shira A. Scheindlin (January 7, 2015). http://www.legal-aid.org/media/189033/stamped_letter.pdf.

[187] Illinois Public Act 099-0352, http://www.ilga.gov/legislation/publicacts/99/PDF/099-0352.pdf.

[188] Open Data Policing NC (Accessed July 12, 2016, https://opendatapolicingnc.com/).

[189] Norm Stamper, *To Protect and Serve: How to Fix America's Police* (New York: Nation Books, 2016), 90.

[190] Memorandum of Law in Support of Verified Petition, New York Civil Liberties Union v. Buffalo Police Department, March 14, 2016, http://www.nyclu.org/files/releases/3_14_16_Buffalo_Police_Transparency_Memorandum_of_Law.pdf.

[191] NYC Civilian Complaint Review Board. Semi-annual Report (January-June, 2015), pp. 1-2.

[192] Ibid at 2.

[193] Jay Stanley, American Civil Liberties Union, *Police Body-Mounted Cameras: With Right Policies in Place, a Win for All*, (2013), 3.

[194] Sarah Lustbander, The Real Police-Video Problem, *The New York Times*, Opinion, A27, Dec. 2, 2015.

[195] Dave McClure & Daniel Lawrence, Urban-Wire, Police body-camera footage: Why public should only kind of mean public. Urban Institute, Jul 8, 2015, http://www.urban.org/urban-wire/police-body-camera-footage-why-public-should-only-kind-mean-public

[196] *Implementing a Body-Worn Camera Program: Recommendations and Lessons Learned*, Community-Oriented Policing Services, United States Department of Justice,  2014, 32.

[197] Ibid.

[198] George Reichert, *Tonawanda Police Start Using Body Cameras*, Dec. 15, 2015, http://wivb.com/2015/12/15/tonawanda-police-start-using-body-cameras.

[199] Ibid.

[200] Ibid.

[201] Scott Brown, "Buffalo closer to decision on body cameras," *WGRZ*, August 4, 2016.

[202] City of Buffalo Charter, Section 13-18.

[203] David Burlingame and Agnes L. Baro, "Women's Representation and Status in Law Enforcement: Does CALEA Involvement Make a Difference?" *Criminal Justice Policy Review 16,* no.4 (2005): 391-411, http://scholarworks.gvsu.edu/scjpeerpubs/1/.

[204] Richard R. Johnson, "Examining the Effects of Agency Accreditation on Police Officer Behavior," *Public Organization Review 15,* no.1 (2015): 139-155, http://link.springer.com/article/10.1007/s11115-013-0265-4.

[205] *Community Policing a Foundation for Restorative Justice,* International Institute for Restorative Practices, August 12, 2000, http://www.iirp.edu/article_detail.php?article_id=NDc3.

0126

[206] NYS Penal Law Section 10.00(1).

[207] NYS Penal Law Section 10.00(6); William J. Bratton, "Broken Windows and Quality of Life Policing in New York City," New York City Police Department (2015), 10.

[208] Bratton, "Broken Windows and Quality of Life Policing," 11. N.Y. C.P.L. § 140.10(1)-(5).

[209] "Investigation of the Ferguson Police Department," Civil Rights Division, U.S. Department of Justice (2015), 2.

[210] *U.S. v. City of Ferguson, Missouri*, Consent Decree (Jan. 2016), 23.

[211] J. David Goodman, New Yo0rk City is Set to Adopt New Approach on Policing Minor Offenses, New York Times, January 20, 2016. http://www.nytimes.com/2016/01/21/nyregion/new-york-council-to-consider-bills-altering-how-police-handle-minor-offenses.html

[212] Paul McCold and Ted Wachtel, "In Pursuit of Paradigm: A Theory of Restorative Justice," Paper presented at the XIII World Congress of Criminology, 10-15 August 2003 in Rio de Janeiro, Brazil.

[213] Ted Wachtel, "Defining Restorative," *International Institute for Restorative Practices* (2013), 1-2.

[214] Ibid., 6.

[215] Ibid., 7-8.

[216] "Restorative Justice, Training and Community," Erie County Restorative Justice Coalition (Accessed August 1, 2016, http://www.ecrjc.org/#!training--community/c13qt).

[217] *Community Policing a Foundation for Restorative Justice,* International Institute for Restorative Practices, August 12, 2000, http://www.iirp.edu/article_detail.php?article_id=NDc3.

[218] "A National Survey of Criminal Justice Diversion Programs and Initiatives," Center for Health and Justice at TASC (December 2013), 4.

[219] Karen Tamis and Cymone Fuller, "It Takes a Village: Diversion Resources for Police and Families," Center on Youth Justice, Vera Institute of Justice (June 2016), 1-2.

[220] Tamis and Fuller, "It Takes a Village," 4.

[221] Ibid., 6.

[222] Ibid., 8.

[223] Jefferson County Juvenile Assessment Center, What We Do, accessed Feb. 10, 2016. https://www.jeffcojac.org/what-we-do/

[224] See "Dane County TimeBank: An Overview," Dane County TImeBank (Accessed July 1, 2016, http://danecountytimebank.org/start), and "Youth Court and Restorative Justice," *Dane County TimeBank* (Accessed July 1, 2016, http://danecountytimebank.org/projects/youth-court-restorative-justice).

[225] Buffalo Police Athletic League, http://buffalopal.com/.

[226] "Sherriff/Youth Live-in Camp," National Federation for Just Communities, http://www.nfjcwny.org/sheriffyouthcamp.html.

[227] LEAD Law Enforcement Assisted Diversion, About LEAD, http://leadkingcounty.org/about/. Accessed March 11, 2016.

127

[228] Susan E. Collins, Heather S. Lonczak, & Seema L. Clifasefi, LEAD Program Evaluation: Recidivism Report, Harm Reduction Research Treatment Lab, University of Washington—Harborview Medical Center, p. 4March 27, 2015. http://leadkingcounty.org/lead-evaluation/

[229] Katherine Beckett, Seattle's Law Enforcement Assisted Diversion Program: Lessons Learned from the First Two Years, Ford Foundation, March 21, 2014, p. 9.  Some offenders are not eligible, including those in possession of more than 3 grams of a controlled substance, those who are not interested in diversion, anyone believed to be exploiting minors in the drug trade, those believed to be promoting prostitution, and individuals with a criminal history involving, among other crimes, murder, assault, domestic violence, robbery, and kidnapping.

[230] While there is a presumption that charges will not be brought, the DA has the final say regarding prosecution. See Katherine Beckett, Seattle's Law Enforcement Assisted Diversion Program: Lessons Learned from the First Two Years, Ford Foundation, March 21, 2014, p. 11.

[231] Ibid., 11.

[232] Ibid., 11.

[233] Ibid., 11-12.

[234] Susan E. Collins, Heather S. Lonczak, & Seema L. Clifasefi, LEAD Program Evaluation: Recidivism Report, Harm Reduction Research Treatment Lab, University of Washington—Harborview Medical Center, p. 3 March 27, 2015. http://leadkingcounty.org/lead-evaluation/

[235] Ibid.

[236] Luke Moretti, "No quick fix to combat heroin, opioid crisis," *News 4* (Accessed September 2, 2016, http://wivb.com/investigative-story/heroin-addiction/).

[237] Rachee Mongiovi, "Police educate public on how to administer Narcan," News 4.

[238] Lou Michel, "Latest front in opioid battle: Narcan classes in targeted neighborhoods," *Buffalo News*, February 29, 2016.

[239] Ibid.

[240] Leonard Campanello, Police Assisted Addiction and Recovery Initiative Training, Erie County Community College, Police Academy, November 9, 2015.

[241] Some individuals are not eligible for diversion. These include minors, people who pose a danger to themselves or others, those with active warrants (the officers can still aid with referrals, but the individual is subject to arrest), and those with three or more previous convictions.

[242] Norm Stamper, *To Protect and Serve: How to Fix America's Police* (New York: Nation Books, 2016), 48, 53-4.

[243] Jane K. Radlich, "Mysteries Surround Sudden Death of Erie County Holding Center Inmate," The Buffalo News, February 26, 2016 (Accessed July 8, 2016, http://www.buffalonews.com/city-region/mysteries-surround-sudden-death-of-erie-county-holding-center-inmate-20160226).

[244] "Los Angeles (CA) Police Department," *Justice Center: The Council of State Governments,* accessed August 25, 2016, https://csgjusticecenter.org/wp-content/uploads/2015/05/LAPDOverview.pdf.

[245] "Los Angeles Police Department: mental evaluation unit," *Justice Center: The Council of State Governments,* last modified April 13, 2016,

http://www.cdcr.ca.gov/COMIO/Uploadfile/pdfs/2016/April20/MEU%20Program%20Outline%20updated%20UPDATED%204-13--2016.pdf.

[246] Stephanie O'Neill, "Police and the Mentally Ill: LAPD Unit Praised as Model for Nation," *Justice Center: The Council of State Governments,"* last modified March 9, 2015, http://csgjusticecenter.org/law-enforcement/media-clips/police-and-the-mentally-ill-lapd-unit-praised-as-model-for-nation/.

[247] Norm Stamper, *To Protect and Serve: How to Fix America's Police* (New York: Nation Books, 2016), 58.

[248] Ibid., 57.

[249] Supra, note 1.

[250] Ibid.

[251] "Psychiatric Emergency Response Team and Homeless Outreach Team: San Diego Police Department," *Center for Problem-Oriented Policing,* last modified May 12, 2005, http://www.popcenter.org/library/awards/goldstein/2005/05-12.pdf.

[252] Ibid.

[253] Juhu Thukral & Melissa Ditmore, "Revolving Door: An Analysis of Street-based Prostitution in New York City," Urban Justice Center, Sex Workers Project (2003) http://sexworkersproject.org/downloads/RevolvingDoor.pdf.

[254] Patrick Madden, D.C. Councilmember proposes decriminalizing sex work.  Aug. 14, 2015. Wamu.org American University Radio. http://wamu.org/news/15/08/14/dc_council_member_proposes_decriminalizing_sex_work.

[255] New Hampshire, HB 1614-FN [proposed legislation].

[256] Global movement votes to adopt policy to protect human rights of sex workers. Aug. 11, 2015, Amnesty International News. https://www.amnesty.org/en/latest/news/2015/08/global-movement-votes-to-adopt-policy-to-protect-human-rights-of-sex-workers.

[257] Darrell P. Wheeler & Angelo McClain, *Prostituted People, Commercial Sex Workers, and Social Work Practice*, in Social Work Speaks: NASW Policy Statements, 10th ed. (2015).

[258] Diane Zahm, *Using Crime Prevention Through Environmental Design in Problem-Solving*, Problem Oriented Guides for Police Problem-Solving Tools Series No. 8. U.S. Department of Justice, Office of Community-Oriented Policing Services. August 2007, 5.

[259] Bill Geller and Lisa Belsky, "Building Our Way out of Crime: the Providence, Rhode Island Case Study" (Geller and   Associates, 2009).  Available from www.gellerassociates.net.

[260] "Curbing Crime, One Street at a Time," MetLife Foundation (2007). http://www.annedodge.com/lisc_aesthetics_2007.pdf

[261] "Building Our Way Out of Crime" presentation at the 2007 National POP Conference, http://www.popcenter.org/conference/conferencepapers/2009/community_development_POP_response.pdf

[262] "Druid Hills Revitalizing Project," MetLife Foundation Community-Police Partnership Award Winner. https://casesimportal.newark.rutgers.edu/storage/documents/multi_level_governance_networking/public/case/2007_MetLife_Awards_-_Charlotte_Mecklenburg_Housing_Partnership__Charlotte-Mecklenburg_Police_Department.pdf

0129

263 Six strategies derived from Paul Cozens & Terence Love, "A Review and Current Status of Crime Prevention through Environmental Design (CPTED)," *Journal of Planning Literature* 30 (2015): 4-5. DOI: 10.1177/0885412215595440.

264 Paul Cozens & Terence Love, "A Review and Current Status of Crime Prevention through Environmental Design (CPTED)," *Journal of Planning Literature* 30 (2015): 4-5. DOI: 10.1177/0885412215595440.

265 Ibid, 5.

266 Captain Steve Nichols, interview by author, Buffalo, NY, December, 3, 2015.

267 "Youth Services," Buffalo Employment and Training Center, accessed October 8, 2015, http://www.workforcebuffalo.org/youth/services.asp.

268 "2015 Summer Youth Program Is Underway," City of Buffalo, accessed August 8, 2016, https://www.ci.buffalo.ny.us/Mayor/Home/Leadership/PublicRelations/Archive_Press_Releases/2015Archives/February2015/2015SummerYouthEmployment.

269 "Brown Raises Summer Youth Jobs Goal to 2,500," City of Buffalo, accessed August 8, 2016, https://www.ci.buffalo.ny.us/Home/Leadership/Mayor/CitiStat_Buffalo/ArchieveCitiStatNews/2007Archives/BrownRaisesSummerYouthJobsGoalTo2500.

270 Sara Heller, "Summer jobs reduce violence among disadvantaged youth," *Science* 346, no. 6214, December 5, 2014.

Partnership for the Public Good
Open Buffalo Innovation Lab
www.ppgbuffalo.org
www.openbuffalo.org
617 Main St., Suite 300, Buffalo, NY 14203

0130