# EXHIBIT 105

# CHAPTER 1: ORGANIZATION

CONTENTS

**1.0    MISSION**

**2.0    AUTHORITY**
2.1    Powers of the Buffalo Police Department
2.2    Geographical Area of Jurisdiction

**3.0    JOB CLASSIFICATIONS - SWORN MEMBERS**
3.1    Duties Not All Inclusive
3.2    Commissioner of Police
3.3    Deputy Police Commissioner
3.4    Chief of Police
3.5    Police Inspector
3.6    Duty Inspector
3.7    Police Captain - General
3.8    Police Captain - District
3.9    Police Lieutenant
3.10   Detective Sergeant
3.11   Detective
3.12   Police Officer

**4.0    JOB CLASSIFICATIONS - CIVILIAN MEMBERS**
4.1    Assistant Accountant
4.2    Camera Systems Administrator
4.3    Cellblock Attendant
4.4    Community Grant Coordinator
4.5    Crime Analyst
4.6    Crime Scene Technician
4.7    Head Janitor
4.8    Laborer I
4.9    Laborer II
4.10   Motor Equipment Maintenance Supervisor I
4.11   Motor Equipment Mechanic
4.12   Police Surveillance Camera Monitor
4.13   Public Safety Dispatcher
4.14   Report Technician
4.15   Report Technician (Spanish Speaking)
4.16   Secretary to the Commissioner
4.17   Senior Budget Examiner
4.18   Senior Cellblock Attendant
4.19   Senior Public Safety Dispatcher
4.20   Superintendent of Fleet Maintenance
4.21   Tow Truck Operator

**5.0 ORGANIZATIONAL STRUCTURE**
5.1 Division of Work
5.2 Organizational Chart
5.3 Chain of Command
5.4 Unity of Command
5.5 Span of Control
5.6 Authority and Responsibility
5.7 Position Management System
5.8 Annual Workload Assessment
5.9 Specialized Assignments to be Reviewed Annually
5.10 Major Organizational Components

**6.0 POLICE COMMISSIONER**
6.1 Police Commissioner

**7.0 OPERATIONS**
7.1 First Deputy Police Commissioner
7.2 Chief of Detectives
7.3 Division of Administration and Communications

**8.0 PATROL SERVICES**
8.1 Deputy Commissioner
8.2 Patrol Districts
8.3 Traffic Bureau
    A. Accident Investigation Unit
8.4 Tactical Services
    A. Crisis Management Team (CMT)
    B. Special Weapons and Tactics Team (SWAT)
    C. Underwater Rescue and Recovery Team (URRT)
8.5 Housing Unit
8.6 Strike Force Task Force

**9.0 LEGAL AFFAIRS**
9.1 Legal Advisor

**10.0 DIRECTION**
10.1 Direction Defined
10.2 Commissioner's Responsibility to Direct the Department
10.3 Succession of Command

**11.0 WRITTEN ORDERS**
11.1 Policy
11.2 Structuring Written Orders
11.3 General Orders
11.4 Special Orders
11.5 Training Bulletins
11.6 Master File
11.7 Responsibility of Commanding Officers

11.8    Other Written Orders
11.9    Monthly Reminders

**12.0    RECRUITING AND SELECTING POLICE OFFICER CANDIDATES**
12.1    Policy
12.2    Recruitment
12.3    Responsibility of the Police Academy for Recruitment
12.4    Recruiters
12.5    Equal Employment Opportunity Plan
12.6    Determining Eligibility for Appointment
12.7    Process for Determining Eligibility
12.8    Appeals to the Department of Human Resources -Civil Service Commission
12.9    Appointment to the Police Department
12.10   Probationary Status

**13.0    TRAINING**
13.1    Policy
13.2    The Buffalo Police Academy
13.3    Administration and Operation of the Academy
13.4    Training Instructors
13.5    Training Records
13.6    Basic Recruit Training
13.7    In Service Training
13.8    Roll Call Training
13.9    Specialized Training
13.10   Firearms Training

## 1.0    MISSION

### THE BUFFALO POLICE DEPARTMENT MISSION STATEMENT

The primary mission of the Buffalo Police Department is to improve the quality of life in the City of Buffalo.

This goal will only be accomplished through the cooperative effort of the Police Department and the community. By working together we can maintain the peace, provide safety and security for our citizens, reduce the fear of crime and solve problems.

To be successful in our mission requires the commitment of the Administration, every employee of this Department and the citizens of our City, all working together to maintain the Buffalo Police tradition as a trusted source of help.

To accomplish this mission the following values must be the basis for all of our actions:

**RESPECT**

The Buffalo Police Department recognizes that its members are its greatest asset, and our actions shall reflect this belief. The members will respect the citizens and recognize their ethnic and cultural diversity. We will respect each other as professionals and fellow human beings.

**INTEGRITY**

We believe in the principles embodied in the Constitution. We recognize the authority of federal, state and local laws. Honesty and truth must be the standards in all our interactions with the community and with our members.

**EXCELLENCE**

We will strive for personal and professional excellence, dedication to duty and the delivery of quality service to the public. We are part of a team dedicated to the safety and protection of our community. Our actions will reflect intelligent, sincere, efficient and courteous service.

## 2.0    AUTHORITY

### 2.1    POWERS OF THE BUFFALO POLICE DEPARTMENT

1. "Members of the police force shall possess all the powers conferred by law upon peace officers, and any search warrant or warrant of arrest issued by a magistrate of the state may be executed in any part of the state by members of the police force. Every criminal process issuing out of the city court of Buffalo shall be served and executed only by members of the police force. Each member of the police force shall have authority to arrest without process any person committing, threatening, or attempting to commit any violation of an ordinance of the city".

2. A "Police Officer" is any "sworn Officer of an authorized Police Department or force of a City, Town, Village or Police District".

## 2.2 GEOGRAPHICAL AREA OF JURISDICTION

The geographical area of employment for the Buffalo Police Department means all that area encompassed within the boundaries of the City of Buffalo.

The boundaries of the City of Buffalo shall be as specified in Article 1, Section 3 of the City Charter.

## 3.0 JOB CLASSIFICATIONS - SWORN MEMBERS

### 3.1 DUTIES NOT ALL INCLUSIVE     The duties specified for sworn personnel in this section are not all inclusive.

### 3.2 COMMISSIONER OF POLICE

A. The Commissioner of Police shall be the head of the Department of Police (Article 12 section 220 of the City Charter).

B. The Commissioner of Police shall be appointed by the Mayor, subject to confirmation by the Council, and shall be removable at the pleasure of the Mayor. On the removal without cause of a Commissioner of Police, who at the time of his/her appointment as Commissioner of Police was a member of the Department of Police, (s)he shall be restored at his/her request to the rank and duty which (s)he held at the time of his/her appointment. In the event of the death of the Commissioner of Police, or a vacancy in that office for any other cause whatsoever, the Mayor shall appoint a Commissioner of Police to serve for a period not to exceed six months, which temporary appointment shall not be subject to confirmation by the Council (Article 12 Section 221 of the City Charter).

C. The Commissioner of Police shall be charged with the power and duty of governing and disciplining the Department and the members of the Police Force and all subordinates and employees of the Department, and to that end may, from time to time, make and enforce orders, rules, regulations not inconsistent with the City Charter or any general law, which orders, rule or regulations shall have the same force and effect as if specially enacted in the City Charter. Existing rules and regulations shall continue until changed (Article 12 Section 224 of the City Charter).

### 3.3 DEPUTY POLICE COMMISSIONER

There shall be two Deputy Commissioners of Police in the exempt class of the civil service, with power to act generally for and in place of the Commissioner of Police, who shall be appointed and removed at the pleasure of the Commissioner and shall perform such other and additional duties as may, from time to time, be assigned to them by the Commissioner. On removal of a Deputy Commissioner of Police, who at the time of his/her appointment as a Deputy Commissioner of Police, was a member of the Department of Police, (s)he shall, before such removal becomes effective, be restored at his/her request to the rank and duty which was held at the time of his/her appointment. (City Charter Article 12 section 222).

3.4    CHIEFS OF POLICE

There shall be seven Chiefs of Police in the non-competitive class of the civil service, who shall be appointed and removed at the pleasure of the Commissioner of Police and shall perform such other and additional duties as may, from time to time, be assigned to them by the Commissioner of Police or a Deputy Commissioner of Police. On the removal, as hereinbefore provided, of a Chief of Police, who, at the time of his appointment as Chief of Police was a member of the Department of Police, (s)he shall, before such removal becomes effective, be restored at his/her request to the rank and duty which (s)he held at the time of his appointment.(City Charter Article 12 section 222.1). The Chiefs of Police shall be selected from the ranks of Police Inspector, Police Captain, or Police Lieutenant.

3.5    POLICE INSPECTOR

A.  Distinguishing Features

Police Inspector is an administrative and supervisory position which has responsibility for a division of the Police Department and/or may also be responsible for directing all phases of the city wide service on an assigned shift. This position is subordinate in command only to the Police Commissioner, the Deputy Police Commissioners and the Chiefs and is responsible for directing, managing, and evaluating assigned law enforcement activities. Work is performed in accordance with established procedures and policies and may require the application of advanced police skill and knowledge to analyze problems in the field of criminal investigation; however, decisive action is required in this position, where no guidelines exist. Supervision is exercised over all functions during an assigned shift and Inspectors must work independently in carrying out police functions.

B.  Duties

 May be responsible charge for the proper performance of police activities of a division or function under their command;

1.  May plan, supervise, coordinate, and evaluate activities of subordinate personnel;

2.  May conduct frequent inspection of police personnel and equipment for conformance with rules and regulations of the Department;

3.  May instruct and train subordinate officers in proper procedures through in-service and on-the-job training;

4.  May review work schedules and makes necessary changes to ensure adequate personnel;

5.  May participate in the personnel process regarding appointments, promotions, and assignments;

6.  May investigate, review and report allegations of misconduct made against

members of the Department and makes recommendations in relation thereto;

7.   May initiate or approve disciplinary action;

8.   May recommend/approve resolution to grievances;

9.   May take command of police activities when serious situations arise requiring their presence;

10.  May Provide adequate police service at large fires and other special details or emergencies;

11.  May study problems and take appropriate action to improve police effectiveness and efficiency;

12.  May serve on committees to study police problems;

13.  May elicit and provide input for development and implementation of policy;

14.  May establish and maintain contact with community organizations;

15.  May address adverse socio-economic groups to explain police operations;

16.  May work with the Police Department and other groups to organize and develop new enforcement, crime prevention, and police service delivery programs.

3.6   <u>DUTY INSPECTORS</u>  Effective 06/09/10
Listed below are duties and expectations for Inspectors while acting as Duty Officers. These duties are not all inclusive, but are a minimum of what must be done:

1.   Duty Officers are required to be in full uniform unless otherwise directed by the Commissioner or Deputy Police Commissioner.

2.   Duty Officers must fill out an activity report at the end of each tour of duty.  A copy must be forwarded via e-mail to the Commissioner and DPC of Operations.

3.   When reporting for duty, Inspectors acting as Duty Officers will be responsible to apprise appropriate personnel of any activity from the previous shift or actions that will carry-over into the upcoming shift.

4.   At the start of each tour of duty, Duty Officers must contact the 911 Lieutenant to obtain copies of citywide manpower.  These manpower reports must be reviewed to insure proper staffing levels.  Knowledge of the manpower is also necessary if any major incidents take place during said tour of duty.

5. The Duty Officer will inform the 911 Lieutenant as to what radio channel they will monitor. Also, the Duty Officer will provide the 911 Lieutenant with a cell phone and pager number.

6. Duty Officers must inspect all major events taking place in the City during their tour of duty. This will include "The Chippewa Entertainment District" on Friday and Saturday nights.

7. Duty Officers must respond to all major crime scenes and incidents. Duty Officers are required to ensure all proper notifications are made including authorizing OT call outs. The list for call outs and notifications include but are not limited to; Evidence, Photo, Homicide, Narcotics, SWAT, CMT, URRT, District Detectives, Chiefs, Deputy Commissioners, Commissioner, Sheriff's Bomb Squad, ATF, FBI and others.

8. When at the scene of a SWAT/CMT incident, Duty Officers will control the outer perimeter. The SWAT Commander will be responsible for all activity in the inner perimeter. Major decisions at the scene of these call-outs will be made by the SWAT Commander in concert with the Duty Officer.

9. Duty Officers will respond when any Supervisor requests their services.

10. Duty Officers assigned on the afternoon or night shifts will visit each District station-house at least once during their ten hour tour of duty. Time of said visits must be documented on the Inspectors activity report. If any problems are encountered concerning any major or minor violation of Department procedure the Duty Officer must take immediate action. All said actions must be documented on the Inspectors activity report and if need be, the Duty Officer shall contact the Inspector of IAD, the DPC of Operations or the Commissioner of Police. If for any reason the Duty Officer fails to visit each District-house it must be noted and explained on the Duty Officers activity report.

11. The Duty Officer shall respond to all instances of Injured Officers. The Duty Officer will ensure proper notification of Officers families and the Commissioners when necessary. The same applies should an Officer loses his life while on duty.

12. The Duty Officers must work in concert with the 911 Lieutenant or designee in setting up details for injured prisoners.

13. Duty Officers are required to periodically, during each tour of duty, monitor CAD for pending calls.

14. Duty Officers must monitor the radio for car chases and call off said chases if it is considered too dangerous. Decisions shall be made on the basis of safety considerations balanced with the reasons for the chase.

On those days and/or times when there will be no Duty Officer on duty, it will remain the responsibility of the most senior on-duty Captain.  In the event there is no Captain on duty, it will be the responsibility of the most senior on-duty Lieutenant assigned to the District in which an incident occurs to direct police activities at the scene until relieved by a superior Officer.

3.7    <u>POLICE CAPTAIN</u>  - GENERALLY (amended effective 1-15-2007)

A.  <u>Distinguishing Features</u>

Police Captain is a management position involving responsibility for directing and managing activities of a command and/or staff assignment. Duties are performed in accordance with established procedures and policies, subject to any directives from a Superior Officer, however, often times decisions must be made based upon knowledge of sound police practices, including those practices that have been modified as a result of research.    Supervision is exercised over assigned sworn and support rank subordinates.  The distinguishing features of POLICE CAPTAIN – GENERALLY shall be applied in addition to the distinguishing features of POLICE CAPTAIN – DISTRICT.

B.  <u>Duties</u>

Duties are inclusive of, but not limited to, the following:

1.  Has charge of or assists in command of a police district or other major organizational component;

2.  Visits operating units within the command and discusses problems with supervisory personnel;

3.  Assigns tasks to personnel and ensures timely, accurate and thorough completion of same;

4.  Trains, advises and evaluates personnel as to accepted methods and    procedures;

5.  Recommends or initiates actions to improve police effectiveness;

6.  Analyzes police and public safety problems and recommends or initiates appropriate action;

7.  Develops and initiates appropriate crime prevention measures;

8.  Conducts or reviews investigations of employee misconduct;

9.  Recommends disciplinary actions up to an including demotion and   termination.

10. Reviews progress reports on criminal investigations

11. Prepares and/or reviews work schedules taking into account adequate staffing levels, vacation, injured on duty, sick leave, etc;

12. Prepares correspondence within the scope of authority and signs same;

13. Maintains records in compliance with Department regulations;

14. Prepares and submits reports as requested;

15. Establishes and maintains contact with community organizations;

16. Is responsible for the maintenance and cleanliness of buildings or offices under his/her command.  This maintenance includes, but is not limited to, plowing, lighting etc.;

17. Maintains orderly and conducive work atmosphere;

18. Participates in establishing and developing goals and objectives for the improvement or enhancement of his/her respective assignment in line with Departmental policy.

3.8     POLICE CAPTAIN – DISTRICT  (added effective 01-15-2007)

A.  Distinguishing Features

(In addition to the distinguishing features of a POLICE CAPTAIN – GENERALLY 3.15A) Captains assigned to any of the five districts will act in an administrative capacity.

B.  Duties

Duties are inclusive of, but not limited to, the following:

1.  Ensures vehicles are properly maintained;

2.  Monitors firearms qualifications and ensures all officers are qualified;

3.  Accounts for all inventory at the District level.  Including, but not limited to portable radios, MCT's, radar equipment, tint meters, armory, etc.;

4.  Ensures all members of the command are properly and timely notified of impending court cases;

5.  Tracks and ensures compliance with all in-service training programs.  Coordinates training with Training Academy;

6.  Ensures an adequate supply of departmental forms and supplies are available;

7.  Ensures all confiscated property is properly delivered to the Property Office;

8. Maintains accurate, up-to-date business files;

9. Coordinates, inspects, recommends approval/disapproval of City permits/licenses including Street Closures and Block Parties.

10. Attends Community and Block Club meetings at the direction of the District Chief;

11. Responsible for District Detectives activities including, review of progress on criminal investigations and forwarding reports to appropriate Chiefs.

3.9    POLICE LIEUTENANT

A. Distinguishing Features

Police Lieutenant is a first line supervisor who performs important law enforcement functions involving the operation of a police section, function or unit within the Buffalo Police Department. Responsibilities include assigning duties to subordinates, evaluating their work performance and instructing them in new and approved law enforcement methods including community policing, tactical patrol, criminal investigation, crime prevention and community organizing. Work is performed in accordance with established procedures and policies as outlined by the Police Department. Police Lieutenants are responsible for the caliber of police service rendered by the unit or function to which (s)he is assigned and for making decisions concerning important police and administrative problems within the scope of their authority. All work is performed under general Departmental regulations and they directly supervise all subordinate personnel under their command or within their assigned function.

B. Duties

1. Has complete charge of a patrol section and/or geographical area within a police district or of a unit or function within the Department or an assigned shift;

2. Briefs and/or advises Detectives Sergeants, Detectives, Police Officers and civilian employees on general tasks or assignments to ensure that they are informed of current appropriate information and Departmental regulations;

3. Inspects personnel for compliance with the rules and regulations;

4. Supervises the patrol response within assigned areas/ shifts and visits with personnel and inspects equipment and readiness;

5. Supervises and instructs officers and support personnel concerning police activities;

6. Enforces all regulations of the Department and takes action commensurate with authority;

7. When necessary, provides administrative supervision of those subordinates

not directly under their command, takes action commensurate with authority and ensures that the individual's chain of command is notified when this occurs;

8.  May direct police activities at scenes of serious accidents, crimes, fires, civil disturbances or disorders until relieved by a superior officer;

9.  Makes recommendations to Commanding Officers or takes action within the scope of his/her authority for more efficient use of police personnel and for improvement of police service;

10. Is responsible for taking action within their scope of authority regarding incidents of misconduct, making sure that superior officers are properly notified and that thorough, accurate and timely reports are completed and forwarded;

11. Prepares work schedules to ensure adequate staffing and approves vacation and other time off taking into account budgetary considerations in those areas;

12. Reviews use of sick time by subordinate personnel and takes action as necessary, commensurate with a Police Lieutenant's authority;

13. Reviews and thoroughly investigates reports of injury by subordinate personnel;

14. Prepares and/or supervises the preparation of records and reports relating to activities of their section, unit or geographical area;

15. Performs related work as required.

3.10   <u>DETECTIVE SERGEANT</u>

A.  <u>Distinguishing Features</u>

Detective Sergeants command and supervise Detectives, Police Officers and subordinate police personnel in the conduct of investigations. Detective Sergeants also conduct preliminary or follow-up investigations on a variety of criminal complaints. They conduct assigned investigations within a specific command and must use considerable discretion in applying specific knowledge and ability. Detective Sergeants conduct protracted investigations and supervise personnel. Casework assignments are received from and are performed under the supervision of a designated superior.

B.  <u>Duties</u>

1.  Commands and supervises Detectives, Police Officers, and subordinate police personnel in conducting an investigation;

2.  Conducts investigations of crime in a specific command;

COB000258

   3.  Obtains information and/or secures evidence for the conclusion of an investigation or the arrest of persons alleged to have committed a crime;

   4.  Responds to the scene of crimes, conducts searches for those involved, or for witnesses;

   5.  Conducts extradition and rendition proceedings;

   6.  Interviews and takes statements from suspects and witnesses to obtain information about crimes;

   7.  May conduct surveillance as necessary;

   8.  Prepares written reports;

   9.  Keeps abreast of the latest developments in the field of criminal investigations;

  10.  Performs related work as required.

## 3.11   DETECTIVES

### A.  Distinguishing Features

Detectives conduct either preliminary or follow-up investigations within a specific command. They conduct assigned investigations within a specific command and use considerable discretion requiring specialized knowledge and abilities. Casework assignments are received from and performed under the supervision of a Detective Sergeant or a designated superior.

### B.  Duties

   1.  Conducts investigations of crime scenes in a specific command;

   2.  Obtains information and/or secures evidence for the conclusion of an investigation or the arrest of the person alleged to have committed a crime;

   3.  Responds to the scene of crimes and conducts searches for those persons involved or for witnesses;

   4.  Conducts extradition and rendition proceedings;

   5.  Interviews and takes statements from suspects and witnesses in order to obtain information and evidence;

   6.  Appears in court to present evidence and to testify against persons accused of crimes;

    7. May conduct surveillance as necessary;

    8. Participates in the return of fugitives from outside the state or from other towns;

    9. Prepares written reports;

    10. Keeps abreast of the latest developments in the field of criminal detection;

    11. Performs related work as required;

## 3.12 POLICE OFFICER

### A. Distinguishing Feature

Police Officers have personal responsibility for the enforcement of laws and ordinances and for the protection of life and property within the City of Buffalo. Work activities of Police Officers consist primarily of patrol tasks, conducting investigation of criminal offenses and the apprehension of criminals. They receive general supervision, however the duties of Police Officers involve an element of personal danger, and require the exercise of considerable judgment in detecting and preventing crime, arresting offenders and preserving the peace. Work is performed in accordance with established police practices and Departmental rules and regulations.

### B. Duties

    1. Patrols an assigned area/district on foot, motorcycle, GEM vehicle, golf cart, Segway, bicycle or in a car;

    2. Inspects doors and windows of unoccupied businesses and residential property;

    3. Responds to calls from the Radio Dispatcher and takes proper action;

    4. Identifies and protects evidence at crime scenes;

    5. Arrests suspects;

    6. Has prisoners booked on charges and escorts them to jail or court;

    7. Photographs and fingerprints prisoners as required;

    8. Investigates suspicious activities and makes arrests for violations of federal, state and local laws and ordinances;

    9. Responds to vehicular accidents; inspects vehicles involved; interviews witnesses at the scene; and identifies individuals involved in the accident;

10. Investigates cases of wanted and missing persons, juveniles, neglected, abused or delinquent children, and stolen cars and property;

11. Interviews families, neighbors, schools and social agencies to gather information concerning the above cases;

12. Directs traffic;

13. Issues traffic and speeding summonses for VTL violations;

14. Tags cars for parking violations;

15. Locates and arrests persons for whom warrants or court orders have been issued;

16. Attends court proceedings and presents evidence in connection with cases investigated;

17. Provides direction and information to the public;

18. Maintains crowd control at parades and public gatherings;

19. Maintains records and reports of investigations;

20. Performs related work as required.

## 4.0    JOB CLASSIFICATIONS - CIVILIAN EMPLOYEES

### 4.1    ASSISTANT ACCOUNTANT

A. Distinguishing Features

An incumbent to a position in this class performs professional accounting work of more than ordinary difficulty in maintaining financial accounts and records. Work involves the application of advanced accounting techniques to a variety of general accounting assignments. Work not only involves reconciliation and balancing activities but preparation of non-complex financial reports, data and statements. Work is performed under general supervision with independent action contingent on the nature of the assignments. Unusual problems or questions regarding policy and procedures are referred to a supervisor for decision and review. Supervision may be exercised over personnel.

B. Duties

1. Performs general accounting work in the preparation of financial reports and journal entries;

2.  Updates personnel database to reflect proper coverage and bills for any amounts due from employees or outside agencies;

3.  Works with the Division of Labor Relations to make certain benefits comply with union agreement;

4.  Allocates costs among various funds;

5.  Reconciles various departmental accounts;

6.  Reconciles departmental revenue reports with reports generated by the Division of the Treasury;

7.  Prepares deposit slips and maintains revenue reports for the Division of Accounting;

8.  Assists in the reconciliation of bank statements;

9.  Assists in preparing departmental budget by performing calculations, projections and supplying supporting detail;

10. Assists in developing and monitoring fiscal budgets for Grants entered into by the department;

11. Prepares and maintains all fiscal reports necessary for the duration and completion of a grant;

12. Reconciles payroll reports to entries in expenditure ledger and notifies departments of any overdrafts;

13. Reviews check disbursements for proper application to accounting records;

14. Reviews and processes reimbursements for travel expenses in accordance with city travel guidelines;

15. Inputs all contract encumbrances and processes change orders through computer system;

16. Operates personal computer for use of both word-processing and financial spread sheet software;

17. Operates calculating and other office machines;

18. For Police Department, reconciles monthly deposits of prisoner property funds; monitors funds paid back to prisoners or other agencies; identifies funds to be cleared for utilization;

19. Performs related work as required.

 COB000262

4.2     CAMERA SYSTEMS ADMINISTRATOR

A.  Distinguishing Features

Under direction of the Buffalo Police Department Administration, the incumbent plans, designs, and implements camera patrols and provides system level programming support. Incumbents ensure availability of all Video Surveillance Center Systems.  The Administrator may also assist in department related investigations and surveillance.  S/he exercises independent judgment when needed and reports directly to the Commissioner or a designee.  Supervision is exercised over Camera Monitors and other personnel as assigned.   Incumbents must be available 24 hours/7 days a week for emergency situations.

B.  Duties

    1.  Directs the daily operations of the video surveillance room computer systems;

    2.  Supervises and schedules assigned staff;

    3.  Works with system vendor and trains and supports staff in the use of camera specific software and hardware for monitoring;

    4.  Designs, assigns and facilitates all camera patrols, specific to each camera;

    5.  conducts daily review of all cameras functionality;

    6.  Investigates video systems problems and formulates and implements solutions to these problems;

    7.  Installs and configures software selected to support system users;

    8.  Reviews recorded videos when needed;

    9.  Duplicates videos upon request, including under FOIL;

    10. Maintain logs and retains all requested videos for department archives;

    11. Prepares and securely maintains records and reports related to assigned activities;

    12. Develops policy and procedures and makes recommendations on implementation;

    13. Performs related duties as required.

4.3     CELLBLOCK ATTENDANT

A. Distinguishing Features

Cellblock Attendants are responsible for the enforcement of rules and regulations governing the custody, security, conduct, discipline, safety and general well-being of prisoners in a City Lock-Up. They work on an assigned shift; have considerable prisoner contact and supervision of them. The Cellblock Attendant must be alert to possibilities of emergency situations arising and exercise sound judgment when problems occur. Work is performed under the immediate supervision sworn Officer with leeway for the exercise of independent judgment in dealing with day-to-day situations in the lock-up.

B. Duties

1. Makes periodic rounds and supervises the movement and activities of prisoners on an assigned shift;

2. Checks cells and corridor areas for faulty bars, gates, etc.

3. Makes routine fire and safety checks;

4. Monitors surveillance equipment including video and/or audio equipment;

5. Locks and unlocks cells and access doors using mechanical and electrical devices;

6. Maintains jail security at an assigned post;

7. Monitors prisoners for unusual incidents or activities including violation of lock-up rules or life threatening situations;

8. Reports same to supervisor on shift;

9. Mediates minor prisoners incidents;

10. Takes direct action to break up fights or other disturbances between prisoners;

11. Assists in the completion of the prisoner intake process by taking fingerprints and photo identification;

12. Inventories and records prisoners clothing and personal property;

13. Issues disposable clothing and blankets and instructs prisoners in its proper care;

14. Operates a variety of equipment including electronic gate equipment, two-way radios, leg irons, handcuffs, etc.;

15. Escorts visitors and observes prisoners visitations;

16. Searches cells, frisks prisoners and confiscates contraband;

17. Listens to prisoners problems;

18. Advises them of the rules and regulations governing conduct discipline, safety and their general well being while at the City lock-up facility;

19. Makes referrals to appropriate staff when problems cannot be resolved;

20. May be required, if departmentally trained, to use chemical agents, restraining devices and protection equipment in case of fights or other disturbances;

21. Distribute meals to prisoners as required;

22. Dispenses a variety of prescription medications as indicated by prisoners at time of their intake/booking;

23. Prepares and maintains a variety of records and reports related to the care of prisoners and security of the lock-up facility;

24. Operates a variety of office equipment during the processing of prisoners or preparation of records and reports;

25. Performs related duties as required.

## 4.4    COMMUNITY GRANT COORDINATOR

A.  Distinguishing Features

The Community Grants Coordinator is responsible for the coordination of community activities between City Departments and various governmental agencies, community organizations, non-profit organizations, and educational institutions.   The recurring activity will be a hands-on interaction and coordination of community programs between the Department and other governmental units, social service agencies, non-profit organizations and other stake-holders in the community.  (S)he may supervise personnel assigned to the project.

B.  Duties

1.  Oversees and coordinates the day-to-day tasks and functions of community grants activities;

2.  Prepares grant applications and tracks correspondence relating to said grant and implementation;

COB000265

3. Collects, compiles and presents statistics and information relating to grant activity (outcomes, outputs, deliverables, etc.);

4. Collects, compiles and performs file studies of and prepares reports relating to grant applications and implementation;

5. Develops, maintains and updates applications, reporting requirements and close-out documents for grant applications;

6. Develops and maintains computer files and reports relating to grant applications;

7. Operation of a personal computer involving the use of application programs;

8. Responds to requests for information or documents relating to grant applications;

9. Processes checks, requisitions, vouchers, bills, receipts and other documents and materials;

10. Collaborates with other governmental agencies, non-profit organizations, social service agencies, law enforcement agencies, etc.;

11. Maintains personnel and payroll information and records;

12. Performs related duties as required to meet the needs, goals and objectives of the project.

4.5    <u>CRIME ANALYST</u>

A. <u>Distinguishing Features</u>

Crime Analysts gathers, processes and disseminates information to identify crime trends and patterns in the City of Buffalo. They perform a variety of studies in order to aid them in their research. Crime Analysts must possess a high degree of analytical judgment in evaluating and analyzing findings and then submitting recommendations. Immediate supervision is received from a higher designated authority. Supervision may be exercised over clerical personnel assigned.

B. <u>Duties</u>

1. Collects, collates and organizes pertinent data about crime, victims and offenders through review of police reports, computer files and other sources of information;

2. Analyzes the linkage and similarities between crimes, offenders, suspects and victims;

3. Identifies evolving or existing crime problems and patterns, geographically

and through similar offense patterns;

4. Prepares and disseminates crime analysis bulletins, newsletters and crime reports to detectives and other members of the Department and the public at large;

5. Prepares monthly, quarterly and annual reports regarding incidents of crime, calls for service, arrests, evictions, crime trends, etc.;

6. Coordinates the gathering and sharing of data with other law enforcement agencies and other segments of the criminal justice community;

7. Analyzes and makes recommendations on where manpower could best be deployed based upon the analysis of various workload statistical information;

8. Performs comparative analysis on the incidence of crime and rates per population in other cities of the state of comparable size versus the City of Buffalo;

9. Assists legal and management departments with crime statistical information necessary for eviction proceedings in Housing Developments;

10. Assists in the preparation of surveys to determine needs, concerns and/or problems relating to safety and security issues;

11. Inputs data and other information on computer;

12. Performs related work as required;

4.6    CRIME SCENE TECHNICIAN

A. Distinguishing Features

This is technical field and office work in the collection, classification, photography and securing of criminal evidence, at crime scenes, automobile accidents, homicides, etc., on an assigned shift or emergency call-out. Employees in this class are responsible for the identification of fingerprints, collection of evidence, crime scene photography, executing diagrams and documentation of crime scene investigations. Incumbents may be required to testify in court concerning evidence collected, including photographic evidence. Duties are performed under the supervision of the Commanding Officer of the Detective Division Administrative Bureau, or a designee. Incumbents have no supervisory duties.

B. Duties

1. Gathers, preserves and transports evidence at crime scenes;

2. Photographs and may be required to lift fingerprints at crime scenes;

3. Executes crime scene diagrams;

4. Takes photographs (both color and black and white) and operates video equipment at the scene of crimes and incidents including automobile accidents, homicides, morgue cases, major burglaries, arson cases, etc.

5. Photographs and/or videotapes line-ups, prisoners, employees and others, as required;

6. Performs all photographic processing activities including developing, enlarging, reproducing, finishing, coloring, etc.;

7. Maintains all records of photographic and video activities;

8. Prepares exhibits and may be required to appear in court to offer testimony on photographs, fingerprints and evidence;

9. Prepares reports on all work performed;

10. Provides assistance to Police Officers, Detectives and superiors in all aspects of crime scene investigations and photography;

11. Operates a personal computer using application programs;

12. Performs related duties as required.

4.7    HEAD JANITOR

A. Distinguishing Features

Head Janitors are responsible for the cleaning and upkeep of a building or group of buildings. They work under general supervision from a higher ranking employee, however, because of the routine nature of the work, they are allowed considerable latitude in planning and directing work activities. Direct supervision is exercised over a number of janitors, cleaners, cleaning workers, laborers and other employees.

B. Duties

1. Supervises the sweeping, mopping and scrubbing of floors, washing of walls and windows, dusting of furniture, etc.;

2. Directs snow shoveling, lawn mowing, etc.;

3. Inspects the cleaning and maintenance work performed by subordinates;

4. Supervises and performs minor repairs to plumbing fixtures, locks, etc.;

5. Requisitions materials and supplies, and maintains an inventory of same;

6.   Distributes janitorial supplies and materials to employees;

7.   Arranges work schedules for subordinate employees;

8.   Personally performs a variety of cleaning and maintenance tasks;

9.   Performs related work as required.

4.8     LABORER I

A.  Distinguishing Features

Personnel classified as Laborer I are entry level employees who perform routine unskilled manual work. At times, the duties of this position may allow him/her to work independently; however, the completed work is inspected by the immediate supervisor. They receive immediate direction from a supervisor and many of the duties are repetitive in nature. A Laborer I has no supervisory responsibilities.

B.  Duties

1.   May maintain watch over buildings and property; makes periodic rounds inside and outside of buildings, checking all entrances, windows, doors, lights, restrooms, fire hazards, stair wells, etc.;

2.   May safeguard vehicles and contents when held in auto pound;

3.   May tend lift bridges notifying of approaching waterway traffic which involves the operation of traffic signals and barriers to hold approaching vehicles and pedestrians;

4.   May descend into sewer via manhole and assists in general maintenance and cleaning;

5.   May operate a passenger or freight elevator;

6.   May answer inquiries regarding offices and personnel; may direct visitors to points of interest;

7.   May service automotive equipment by gassing, oiling and checking tires and checking various fluid levels in City owned vehicles;

8.   May maintain gas pump area to insure cleanliness and safety;

9.   May be required to work in stockroom issuing materials and supplies; may, under direction , requisition supplies;

COB000269

10. May receive, accept and sign for all deliveries; checks incoming orders against items listed on requisitions/invoices counting, grading or weighing the articles;

11. May assist in the unloading and loading of materials;

12. May assist in placing materials and supplies in bins/on shelves in various stockrooms;

13. May render first aid in the treatment of minor injuries and ailments;

14. May perform a variety of laboring duties in the maintenance or repair of City streets, curbs and sidewalks;

15. May be required to operate a light pick-up truck, automobile or other light motorized equipment; pickup/deliver various parts, materials and supplies, invoices and other forms to any City garages, repair shops, parts stores, etc.;

16. Performs general labor and custodial work in and around City owned buildings including the removal of trash from buildings or apartments;

17. May be required to prepare various reports as requested; May be required to maintain various records;

18. Performs general building and grounds cleaning tasks as required.

4.9  <u>LABORER II</u>

A.  <u>Distinguishing Features</u>

A Laborer II performs a wide variety of unskilled independent laboring work. Duties may involve assisting or acting as a "helper" to a skilled craft worker (journeyman) in the area of maintenance, repair and service activities. This position differs from Laborer I in that Laborer II requires incumbents to have a working knowledge of the basic methods and techniques used in the area of maintenance and repair of buildings, equipment and grounds. Duties of this position may allow a Laborer II to work independently. Work is performed under immediate supervision; however a Laborer II has no supervisory responsibilities.

B.  <u>Duties</u>

A Laborer II will be required to perform any tasks of an unskilled nature as deemed necessary by departments/divisions/agencies in city service:

1. May act as an assistant to a skilled craft worker (journeyman) Carpenter, Mason, Electrician, Painter, Bricklayer, Plasterer, Glazier, General Mechanic and other skilled trades personnel;

COB000270

2.  May serve as a general handyman performing duties, which include but are not limited to the following:

3.  repairing windows, doors, floors, walls;

4.  cleaning, operating, lubricating and repairing of boilers, pumps, heaters, pipe lines, motors, valves, traps and metering equipment;

5.  mixing plaster and concrete;

6.  performing necessary repair work on cranes, air compressors, air hoists;

7.  May assist in laying bricks, plastering walls, finishing concrete, painting etc.;

8.  May assist in the making and hanging of street signs and the erection of posts for this purpose;

9.  May assist in the maintenance of traffic signals and controllers;

10. May service automotive equipment by gassing, oiling and checking tires and various fluid levels in city owned vehicles;

11. May maintain gas pump area to insure cleanliness and safety;

12. May assist a Motor Equipment Mechanic in repairing trucks, automobiles and other automotive equipment by performing the less skilled mechanical repair work including but not limited to the following:

    1.  charging of batteries;
    2.  fixing flat tires;
    3.  replacing worn or faulty parts, gaskets, broken wheels;
    4.  changing spark plugs.

13. May stoke, clinker and clean furnaces used in burning of refuse materials;

14. May assist in the maintenance of plant equipment such as oiling and greasing cranes and motors;

15. May attend hoppers, which feed furnaces and clear material through them into furnaces;

16. May attend push pits and clear material into tractor-trailers at Refuse  Transfer Station;

17. May be required to work in stockroom issuing supplies and materials;

18. May, under direction, requisition supplies;

19. Maintains stockroom area to insure cleanliness and safety;

20. May receive, accept and sign for all deliveries;

21. Checks incoming orders against items listed on requisitions/invoices counting, grading or weighing the articles;

22. May assist in loading and unloading of delivery vehicles such as parts, battery and tire truck, wagons, trucks, etc.;

23. May assist in placing materials and supplies in bins or on shelves in various stockrooms;

24. May be required to operate a light pick-up truck, automobile or other light motorized equipment including the operation of the Zamboni Ice Machine;

25. Pick-up or deliver various parts, materials and supplies, invoices and other forms to any city garages, repair shops, parts stores, etc.;

26. May perform general labor and custodial work in and around city owned buildings including the removal of trash from buildings or apartments;

27. May be required to prepare various reports as requested;

28. May be required to maintain various records;

29. May perform general building and grounds cleaning tasks as required;

30. May lift garbage containers onto truck;

31. Operates packer controls;

32. May distribute load on truck and cover with tarpaulin;

33. May assist in the care and handling of animals in the Animal Shelter;

34. Assists in the cleaning of the Animal Shelter and kennels;

35. May gather and dispose of dead animals found in city streets, SPCA, veterinarian hospitals and various city laboratories;

36. May excavate and backfill for new construction and repairs;

37. May dig and refill trenches for water pipe lines;

38. May clean and flush streets, park areas, culverts, basins and sewer receivers;

39. May remove snow from streets, parks and recreational areas;

40. May assist in performing maintenance and repair on city streets, curbs and sidewalks;

41. May perform a variety of laboring duties in the ash removal system of a sewage treatment plant;

42. May cut grass, trim shrubs, rake leaves, cut brush, spade flower beds and assist in ground maintenance activities including forestry improvement, tree planting and wood cutting;

43. May assist personnel in charge of recreation programs, in the organization and development of recreational activities;

44. May assist in the maintenance of recreational equipment in city parks, playgrounds and community centers;

## 4.10    MOTOR EQUIPMENT MAINTENANCE SUPERVISOR I

### A.  Distinguishing Features

Motor Equipment Maintenance Supervisor I is considered a working supervisor and has responsible charge for the maintenance and repair activities to city equipment and vehicles. They schedule preventive and maintenance programs and yearly NYS Inspections for equipment in their Departments. The Motor Equipment Maintenance Supervisor I exercises independent judgment as to tasks and methods used in performing their duties. They may determine work priorities in order to assure that all equipment will be in operating condition at all times. Immediate supervision is received from the Commissioner or employees in positions so designated by the Commissioner. Supervision is exercised over the Head Motor Equipment Mechanics, Motor Equipment Mechanics, Tire Mechanics, Laborers and other assigned personnel.

### B.  Duties

1. Supervises personnel and participates in the maintenance and repair of automobiles, trucks, tractors, bulldozers, graders, snowplows and other automotive and motorized vehicles and equipment;

2. Schedules work priorities and reassigns employees when necessary to meet maintenance/repair schedules;

3. Inspects work completed to ensure that it meets established standards;

4. Recommends rebuilding of defective parts to maintain vehicle and equipment downtime and repair costs to a minimum;

5. Schedules preventive maintenance programs in accordance with dealer specifications;

COB000273

6. Schedules NYS Inspections for equipment and vehicles;

7. Requisitions parts, materials and supplies needed in repairing equipment and vehicles, and maintains an inventory of the same;

8. Instructs personnel on proper procedures for maintaining and repairing motor equipment;

9. Ensures that accepted safety procedures are followed by personnel;

10. Maintains records and reports concerning vehicle maintenance and repair activities, i.e., worked performed on vehicles, cost of material used, time required to perform work, and submits same regularly;

11. Acts as a liaison between the Department and the Division of Inventory and Stores to insure that parts for vehicles and equipment are obtained in order to shorten downtime;

12. Performs related work in connection with the maintenance and repair activities of the repair shop.

4.11 <u>MOTOR EQUIPMENT MECHANIC</u>

A. <u>Distinguishing Features</u>

Motor Equipment Mechanics perform skilled mechanical work for all types of repairs to gasoline and diesel power automotive and motorized vehicles and equipment. They are constantly engaged in various physical activities in the repair of vehicles including pulling, pushing, carrying, kneeling, sitting, crawling, reaching, climbing and other physical activities as necessary. Motor Equipment Mechanics must work in garages which are often poorly ventilated, inadequately heated in cold weather, have cramped quarters, etc., and on city streets where breakdowns occur. Work involves close relationships with other mechanics in the garage. Direct supervision is received from a Motor Equipment Mechanic Supervisor I or another ranking supervisor so designated by the Department head.

B. <u>Duties</u>

1. Performs all types of repairs on automobiles, trucks, tractors, bulldozers, graders, snow plows and other automotive and motorized vehicles and equipment including but not limited to adjusting and cleaning of spark plugs, tuning up gas and diesel engines, adjusting carburetors, repairing faulty wiring, hydraulics, electronic fuel injection and sensor systems, anti- lock brakes, fixing flat tires, repair drive trains in all types of vehicles and any other repairs that are required;

2. Performs general repairing, installation, alignment and overhauling of motors and engines, transmissions and differentials and related parts and equipment;

3. Operates various types of mechanical tools, shop tools, pullers, forklifts, chainfalls, lift jacks and jack stands, body repair tools and greasing equipment while performing repairs;

4. Operates a personal computer to run diagnostic and computerized manuals;

5. May be required to do some burning and welding:

6. Is responsible for keeping the work area in good housekeeping order;

7. May be required to perform body repairs, painting and undercoating;

8. May be required to perform Motor Vehicle Inspection checks;

9. Maintains daily records and related log of work performed;

10. Performs related work in connection with the maintenance and repair activities of the repair shop.

### 4.12   POLICE SURVEILLANCE CAMERA MONITOR

A. Distinguishing Features

On an assigned shift, a Police Surveillance Camera Monitor is responsible for monitoring criminal, Homeland Security, and business district activity that are captured in progress by the Buffalo Police Department surveillance camera system. The Camera Monitor operates a computer as well as remotely monitors and manipulates cameras that are off-site. S/he must exercise sound judgment, alertness and responsiveness to emergency situations. Work is performed under direct supervision of the Camera System Administrator and a sworn Police Supervisor. During emergency situations, may be required to be on call 24 hours/7 days a week. No supervisory duties are exercised.

B. Duties

1. Performs the following by directive of the Police Commissioner, under direct supervision of the Camera Administrator or Police Supervisor:

2. Monitors activity captured via the Police Surveillance Camera System from a central location;

3. Reviews events or activities that may be currently in progress or occurred hours, days or weeks earlier;

4. Manipulates cameras by remote control in order to capture suspicious and/or criminal activity;

5. Operates radio equipment to relay information to Police Officers responding to an incident from the surveillance cameras;

COB000275

6. Monitors current activity on Computer Aided Dispatch System;

7. Operates radio equipment to report suspicious and/or criminal activity to Police Dispatchers;

8. Handles sensitive information and maintains confidentiality of all information obtained and observed from camera activity;

9. Maintains a daily log of activities performed;

10. Records and files reports and securely maintains files;

11. Performs related duties as required.

## 4.13   PUBLIC SAFETY DISPATCHER

A.  Distinguishing Features

Public Safety Dispatchers are responsible for receiving information from various sources and dispatching vehicles and personnel for routine and emergency police calls for service. In addition to operating the police radio they operate teletype and computer terminals. Some independent judgment is exercised but most work is performed in accordance with established procedures and policies. Public Safety Dispatchers operate under the general supervision of a superior officer.

B.  Duties

1. Receives information regarding various incidents requiring police attention, i.e., robberies, stolen vehicles, missing persons;

2. Operates radio equipment to dispatch police personnel and equipment;

3. Dispatches vehicles and personnel for routine and emergency service calls;

4. Maintains continuous status and location records of police mobile units;

5. Operates teletype and computer terminal to retrieve information and relay same as needed including E-Mail;

6. Determines priorities of service when necessary in accordance with established policies and procedures;

7. Receives incoming telephone calls and provides information or receives complaints from the public;

8. Receives call over the telephone from fire and other governmental agencies;

9. Maintains a daily log of calls received and transmitted;

     10. Records and files complaints and accidents reports;

     11. Performs related work as required.

## 4.14    REPORT TECHNICIAN

A.  Distinguishing Features

Report Technicians are responsible for the performance of routine, specialized and detailed clerical tasks in the Buffalo Police Department which involve the full-time or substantial part-time operation of equipment requiring the manipulation of a standard alphanumeric keyboard including typewriters and electronic word processing equipment, CRT Terminals, Personal Computers, Data Terminals and Printers. Report Technicians are assigned to clerical tasks within the Department so that uniform personnel may be released for the performance of work of an enforcement nature. Duties require the exercise of independent judgment in the performance of various clerical tasks and a general understanding of office rules, procedures and policies. Immediate supervision is received from a member of the Police Department as designated by the Commissioner. This position exercises no supervisory responsibilities.  **Report Technicians may be required to work any of the three (3) shifts, including weekends and holidays.**

B.  Duties

    1.  Receives and processes calls and inquiries from the general public and directs them to the proper authority;

    2.  Answers walk-in counter requests for information, accident records, crime reports, etc.;

    3.  Processes requests for warrant checks, criminal history checks, motor vehicle and other police related computer and manual checks;

    4.  Maintains all records concerning police operations including report taking (crime reports, accident reports, etc.) from Police Officers and walk-ins;

    5.  May make telephone reports and other reports through electronic means (i.e. fax, etc.);

    6.  Records information involving stolen and recovered vehicles;

    7.  Logs all transactions;

    8.  Maintains a record of and is responsible for all property taken from prisoners at central booking until same is either turned over to the Property Officer or is forwarded to City Court with the prisoner as the case may be;

    9.  Prepares, enters and/or cancels messages on local, central police services and New York State Police Information Network, teletype and other police

information systems;

10. May be responsible for creating and maintaining computer files in relation to police related activities;

11. Prepares and types arrest records, correspondence, documents, reports and other material using equipment with an alpha numeric keyboard;

12. Proofreads typed copy, noting any errors and makes corrections by using appropriate techniques;

13. Processes, checks, codes and files mail, requisitions, vouchers, ledger cards, bills, receipts and other documents and/or materials;

14. Compiles data, performs simple file studies, and prepares periodic reports;

15. Collects, compiles and types statistics and other related information;

16. May operate various office machines including personal computers, copying machines, transcription machines, etc.;

17. Collects fees and accounts for monies received;

18. May be responsible for reconciling and accounting for departmental funds;

19. Maintains personnel records and schedules;

20. Maintains Department payroll including input of the information;

21. May be responsible for coordinating and maintaining day to day functions of special projects or operations which may involve confidentiality;

22. Performs related work as required.

## 4.15   REPORT TECHNICIAN (SPANISH SPEAKING)

A.  Distinguishing Features

A Spanish speaking Report Technician is responsible for the performance of routine, specialized and detailed clerical tasks in the Buffalo Police Department which involves the full-time or substantial part-time operation of equipment requiring the manipulation of a standard alphanumeric keyboard including typewriters and electronic word processing equipment, CRT Terminals, Personal Computers, Data Terminals and Printers.  The Report Technician is assigned to clerical tasks within the Buffalo Police Department so that uniform personnel may be released for the performance of work of an enforcement nature.  Duties require the exercising of independent judgment in the performance of various clerical tasks and a general understanding of office rules, procedures and policies.  Incumbents may be required to work any of the three (3) shifts,

COB000278

including weekends and holidays. Immediate supervision is received from a member of the Buffalo Police Department as designated by the Commissioner of Police. This position exercises no supervisory responsibilities.

B. Duties

1. Receives and processes calls and inquiries from the general public and directs them to the proper authority, using the English and Spanish language;

2. answers walk-in counter requests for information, accident records, crime records, etc., using the English and Spanish language;

3. Processes requests for warrant checks, criminal history checks, motor vehicle and other police related computer and manual checks;

4. Maintains all records concerning police operations including report taking (crime reports, accident reports, etc.) from Police Officers, walk-ins;

5. May take telephone reports (using the English and Spanish language) and reports through other electronic means (i.e., Fax etc.);

6. Records information involving stolen and recovered motor vehicles; logs of all transactions;

7. Maintains a record of and is responsible for all property taken from prisoners at central booking until same is either turned over to the Property Officer or is forward to City Court with the prisoner as the case maybe;

8. May be required to perform related duties including moving boxes in or out of storerooms;

9. Prepares, enters and/or cancels messages on local, central police service and New York State Police Information Network, teletype and other police information networks;

10. May be responsible for creating and maintaining computer files in relation to police related activities;

11. Prepares and types arrest records, correspondence, documents, reports and other materials using equipment with an alpha numeric keyboard;

12. Proofreads typed copy, noting any errors and makes corrections by using appropriate techniques;

13. Processes, checks, codes and files mail, requisitions, vouchers, ledger cards, bills, receipts and other documents and/or materials;

14. Compiles data; performs simple file studies; prepares periodic reports;

15. Collects, compiles and types statistics and other related information;

16. May be required to operate various office equipment including but not limited to personal computer, copying machine, transcription machine, as well as digital photo equipment and electronic fingerprint scanner, etc.;

17. Collects fees and accounts for monies received;

18. May be responsible for reconciling and accounting for departmental funds;

19. Maintains personnel records and schedules;

20. Maintains departmental payroll including the input of information etc.;

21. May be responsible for coordinating and maintaining day-to-day functions of special projects or operations, which may involve confidentiality;

22. Performs related duties as required.

## 4.16   SECRETARY TO THE COMMISSIONER

A.  Duties

1.  Answers phones, relays messages

2.  maintains calendar

3.  transcribes materials from dictation

4.  answers correspondence

5.  prepares letters and other material on Word Perfect

6.  performs other related work as requested by the Commissioner

7.  handles confidential material and messages to and from the Commissioner

## 4.17   SENIOR BUDGET EXAMINER

A.  Distinguishing Features

This is an important fiscal management position involving the responsibility for assembling and/or revising budget estimates and requests for appropriations submitted by divisions/departments, to formulate the departmental budget. The incumbent maintains a constant review of budget activity to ensure proper spending according to the adopted budget and evaluates and addresses any potential budget variances. The incumbent is allowed considerable leeway for the exercise of independent judgment in developing budgetary techniques, devising and installing new procedures. Work is performed under

direct supervision of the department head and supervision is exercised over personnel assigned.

B. <u>Duties</u>

1. Works closely with the City's Budget Division in the performance of duties;

2. Performs the checking of budget requests as to arrangement, accuracy and conformity with salary ordinances and account classifications;

3. Calculates, assembles and revises estimates and requests for appropriations and revenues;

4. Maintains a monthly, quarterly and yearly allocation system for tracking expenditures and revenues;

5. Supervises and participates in audits and investigations of budgetary matters;

6. Verifies the need for increased appropriations and transfer of funds;

7. Devises, develops and installs new budgetary techniques and reporting procedures to be utilized by Divisions/Departments;

8. Calculates, classifies, forecasts and monitors revenue flows for the department(s);

9. Conducts fiscal reviews and studies of departmental revenues, appropriation and expenditures;

10. Assists in preparing grant budgets and fiscal cost reports;

11. Supervises the maintenance of departmental records concerning leave banks, personnel records, etc.;

12. Supervises and participates in the preparation and maintenance of other financial records associated with special projects and/or other activities encountered by the Department(s);

13. Monitors staffing levels and compares number of filled positions to budgeted positions;

14. Ensures personnel are budgeted properly according to adopted budget;

15. Ascertains vacant positions and informs appropriate Department Head of same;

16. Performs related duties as required.

4.18    SENIOR CELLBLOCK ATTENDANT

A.  Duties

1.  Supervises and participates, on an assigned shift, in the performance of duties relating to the safety, security and general well being of prisoners at the city lock-up facility;

2.  Makes periodic rounds and supervises the movement and activities of prisoners;

3.  Maintains jail security at all times;

4.  Searches cells and prisoners and confiscates contraband;

5.  Monitors prisoners for unusual incidents or activities involving violation of lock-up rules or life threatening situations;

6.  Screens prisoners for and verifies suicide prevention;

7.  If possible, mediates prisoners disputes;

8.  Takes direct action to break up fights or other disturbances between prisoners;

9.  May be required, if departmentally trained, to use chemical agents, restraining devices and protection equipment in case of fights or other disturbances;

10. Advises prisoners of the rules and regulations governing conduct, discipline, safety and their general well being while at the City lock-up facility;

11. Distributes and accounts for prisoner's meals;

12. Assists in the intake process of prisoners by taking fingerprints and photo identification and issuance of disposable clothing and blankets;

13. Directs and/or participates in prisoner transport;

14. Operates and is responsible for a variety of assigned equipment including electronic gate equipment, two-way radios, leg irons, handcuffs, etc.;

15. Dispenses a variety of prescription medications as indicated by prisoners at time of their intake/booking;

16. Maintains a variety of records related to the care of prisoners and security of the lock-up facility;

17. Prepares and submits reports as requested;

18. May be required to present testimony in court;

19. Performs related work as required.

4.19    SENIOR PUBLIC SAFETY DISPATCHER

A.  Distinguishing Features

On an assigned shift, an incumbent to a position in this class is responsible for operating the Public Safety Communication System in the Department of Police. The Senior Public Safety Dispatcher is a working supervisor, training personnel and participating in the operation of a telephone, radio, computer and related equipment to dispatch police personnel and equipment to scenes of crimes, accidents and other emergencies. Incumbents must be able to function calmly under stress, and take appropriate action swiftly. They must exercise sound judgment, alertness and responsiveness in emergency situations. Work is performed under supervision from a higher level Police official in accordance with established policies and procedures. Supervision is exercised over Public Safety Dispatchers.

B.  Duties

1.  Assists the shift Lieutenant in supervising the dispatch center,

2.  Schedules personnel and replacements for each shift;

3.  Trains personnel and participates in the operation of radio equipment, teletype, and computer terminal to dispatch police personnel and equipment;

4.  Receives information regarding various incidents requiring police, fire or EMS attention emergencies, i.e.

5.  Fires, robberies, stolen vehicles, missing persons, etc.

6.  Dispatches vehicles and personnel for routine and emergency service calls,

7.  Maintains continuous status and location records of police, fire, and emergency vehicles.

8.  Operates teletype and computer terminal to retrieve information and relay same as needed including E-Mail system.

9.  Determines priorities of service when necessary in accordance with established policies and practices,

10. Receives incoming telephone calls and provides information or receives complaints from the public,

11. Receives calls over the telephone from fire and other governmental agencies;

12. Records and files complaints,

13. Performs related work as required.

4.20    <u>SUPERINTENDENT OF FLEET MAINTENANCE</u>

A.  <u>Distinguishing Features</u>

The Superintendent of Police Vehicle Maintenance oversees the operation, maintenance and repair activities to all police vehicles. He establishes and implements various repair, preventive maintenance and state inspection programs. The Superintendent of Police Vehicle Maintenance exercises considerable discretion in planning and assigning work activities within the framework of available personnel. He is responsible for drawing up specifications to acquire new police vehicles in accordance with guidelines of the Department. Immediate supervision is received from the Police Lieutenant assigned to the Division of Administration and Finance. Supervision is exercised over Motor Mechanics, Laborers and other assigned personnel.

B.  <u>Duties</u>

A.  Plans and supervises the work of subordinate personnel in the maintenance and repair of all police vehicles;

B.  Plans work according to priorities and repair schedules;

C.  Inspects work to ensure that it meets established standards;

D.  Designs and implements repair, maintenance and inspections programs;

E.  Schedules preventive maintenance inspections of all police vehicles every 3,000 miles;

F.  Schedules yearly NYS inspections for vehicles

G.  Maintains accurate records of vehicle repairs, preventive maintenance and inspections;

H.  Oversees the process of contracting automobiles and services from outside contractors;

I.  Draws up specifications for all new automobiles and motorcycles;

J.  Inspects equipment to insure that it meets established standards;

K.  Orders all special equipment that is needed in the daily operation of the garage, i.e., tools, testing equipment, etc.;

L.  Instructs personnel on proper procedures for maintaining and repairing police vehicles;

M.  Maintains all records and reports including mileage surveys and accidents;

N.  Informs insurance companies when claims for damage against their client are warranted;

O.  Oversees impounded vehicles that have been delivered to the police garage to be held as evidence and those that were involved in accidents;

P.  Supervises and maintains all personnel records of employees of the police garage;

Q.  Acts as a liaison between the Division of Inventory and Stores and the Buffalo Police Department to insure parts for vehicles are obtained as soon as possible to shorten down time;

R.  Develops and oversees the budget for the police garage;

S.  Performs related work as required.

4.21  <u>TOW TRUCK OPERATOR</u>

A.  <u>Distinguishing Features</u>

An incumbent to this position operates a tow truck and provides road service maintenance to disabled city-owned vehicles.  Work consists of routine manual and simple mechanical operations of equipment.  Direct supervision is received from a superior who may perform periodic inspection of work.  No supervision is exercised.

B.  <u>Duties</u>

1.  Tows all vehicles referred to the Division of Parking Enforcement with a combination weight of up to 18,000 lbs.;

2.  Operates a tow truck vehicle and car carrier (flatbed) to clear accident scenes;

3.  Provides road service maintenance to disabled city-owned vehicles such as changing tires, replacing batteries and other minor mechanic service;

4.  Tows disabled city-owned vehicles to garage when necessary work cannot be accomplished at the scene;

5.  Performs minor maintenance work on tow trucks including maintaining oil, gas, grease, anti-freeze, tire inflation and cleanliness of truck;

6.  Assists mechanics in repairing vehicles;

    7.  May be required to tow civilian vehicles when necessary;

    8.  Performs related duties as required.

## 5.0    ORGANIZATIONAL STRUCTURE

5.1    **DIVISION OF WORK**
The Buffalo Police Department performs many different functions and provides a wide variety of services to the public. In order to provide the broadest range of police services in the most efficient manner possible, the Department has divided the work and has created separate Departmental units based on function, geographical area, clientele and purpose.

5.2    **ORGANIZATIONAL CHART**
The organizational structure of the Police Department shall be as depicted in the Organizational Chart. As changes are made to the organizational structure, the Organizational Chart shall likewise be amended to reflect these changes. The Division of Administration and Communication shall be responsible for maintaining an up-to-date and accurate Organizational Chart. (See next page)

5.3    **CHAIN OF COMMAND**
The chain of command is that line of authority, in either ascending or descending order, extending from the Commissioner through every level of command, as indicated by the Organizational Chart of the Department. The chain of command, delineates lines of authority and responsibility; facilitates the orderly flow of orders and information; accommodates the expertise of lower ranking employees in decision making; and, permits supervisors and lower ranking commanding officers some latitude in managing their units.

5.4    **UNITY OF COMMAND**
Each employee shall be accountable to only one supervisor at any given time and each organizational component of the Department shall be under the overall command of a single clearly identified commanding officer.

5.5    **SPAN OF CONTROL**
Span of control refers to the number of employees that a Supervisor has under his/her immediate control and direction. Superior Officers in the Buffalo Police Department shall have a span of control of a size that results in effective and efficient supervision. The actual span of control shall be determined after considering the following:

    A.  The ability of the supervisor;
    B.  The ability of the supervisor's subordinates;
    C.  The types of work being performed;
    D.  The complexity of the work;
    E.  The time needed to complete tasks;
    F.  The size of the geographical area involved;
    G.  The types of persons served.

BUFFALO POLICE DEPARTMENT – ORGANIZATIONAL CHART



Daniel Derenda/Commissioner of Police

Revised: September 3, 2013

5.6     AUTHORITY AND RESPONSIBILITY

    1.  All employees who are assigned responsibility for performing a given task must be given commensurate authority and they are to be held accountable for the use of that authority.

    2.  An employee acting in a supervisory capacity shall be held accountable for the performance of the employees under his/her immediate control.

5.7     POSITION MANAGEMENT SYSTEM
The Fiscal Management Section shall be responsible for tracking the status of all existing budgeted positions. It shall:

    A.  Maintain information concerning the number and type of each position authorized in the Department's budget;

    B.  The location of each authorized position within the Department's organizational structure;

    C.  Whether the position is currently filled or vacant.

5.8     SPECIALIZED ASSIGNMENTS TO BE REVIEWED ANNUALLY
Units created for a specific and targeted purpose shall be reviewed during the month of November of each year. The review shall include:

    A.  a listing of all current specialized units,

    B.  the reason for the creation of the unit and whether the reason continues to require police attention;

    C.  how effective the unit has been and whether there has been any progress made;

    D.  whether the unit should continue to exist.

5.9     MAJOR ORGANIZATIONAL COMPONENTS
The major organizational components of the Buffalo Police Department are:

    A.  Police Commissioner

    B.  Operations

    C.  Patrol Services

    D.  Legal Affairs

    E.  Internal Affairs Division

**6.0**  **POLICE COMMISSIONER**

6.1  POLICE COMMISSIONER'S OFFICE
  A. The Police Commissioner is the head of the Police Department and as such has ultimate authority and responsibility for all facets of Department operations. The following shall all report directly to the Police Commissioner:

  1. The Deputy Police Commissioners
  2. The Internal Affairs Division
  3. The Public Safety Communications Director
  4. Video Surveillance Room
  5. Citizen's Advisory Committee
  6. Legal Advisor

**7.0**  **ADMINISTRATIVE**

7.1  FIRST DEPUTY POLICE COMMISSIONER
  The First Deputy Commissioner shall be in charge of the administrative functions for the Buffalo Police Department.

7.2  CHIEF OF DETECTIVES (refer to MOP Chapter 17)
  The Chief of Detectives shall be responsible for the operation of the Detective Bureau and reports directly to the Deputy Commissioner of Operations.

7.3  DIVISION OF ADMINISTRATION AND COMMUNICATIONS
  The Division of Administration and Communications is headed by a Police Inspector, who reports to the 1st Deputy Police Commissioner, and has general responsibility for the fiscal operations including the budget, liaison with courts; for maintaining required records; for computer operations; for dispatch; for Communications; for planning; responsible for updating the Manual of Procedures and for special projects.

**8.0**  **PATROL SERVICES**

8.1  DEPUTY COMMISSIONER OF OPERATIONS
  The Deputy Police Commissioner shall be in charge of operations for the Buffalo Police Department.

8.2  PATROL DISTRICTS
  For organizational purposes the City is geographically divided into five patrol districts. Each district is an organizational unit commanded by a District Chief. District personnel are distributed over several different work shifts with each shift being supervised by an on duty Lieutenant. Patrol District personnel are primarily responsible for providing patrol services within their respective Districts. District
  Detectives and Detective Sergeants are responsible for conducting the follow-up investigation of certain crimes, serving subpoenas and arrest warrants, and conducting investigations as required by their commanding officers, within the Patrol District. The boundaries of each Patrol District change over time as the needs of the Department change. District Chiefs are responsible to inform their subordinates of current boundaries

affecting their respective Patrol Districts.

8.3     TRAFFIC BUREAU
The principle objective of the Traffic Unit is to execute traffic-related responsibilities and services within the City of Buffalo. The activities of the Traffic Unit are specifically directed toward reducing traffic violations and accidents through preventative patrol and active enforcement. In addition, the unit provides a variety of diverse traffic related services including escorts, reporting roadway hazards, emergency assistance, public information, and traffic direction and control, with the aim of expediting the smooth movement of vehicular and pedestrian traffic.

The Inspector of Administration and Communication exercises control over the Civilian School Crossing Guards. Civilian School Crossing Guards assist young children to safely cross busy intersections near grammar schools during the school year.

Also contained within the Traffic Unit are K-9 Officers.

A.  The Accident Investigation Unit
The primary function of the Accident Investigation Unit is to investigate traffic incidents involving fatalities, serious physical injuries, city involved accidents, and drug/alcohol traffic related arrests. The activities of the unit include providing emergency assistance to the injured, protecting accident scenes, conducting on scene and follow-up investigations, preparing reports and taking proper enforcement action relative to such incidents.

8.4     TACTICAL SERVICES

A.  Crisis Management Team (also referred to as the Diginitary Protection Unit)
The Crisis Management Team (CMT) is a group of highly trained officers who, in addition to their regular duties, can respond to and resolve crisis situations through negotiations. The mission of the CMT is to preserve life through the use of trained negotiators. Its goal is to resolve crisis situations through dialogue, using current negotiating techniques. It also has responsibility for coordinating dignitary protection. Refer to M.O.P. Chapter 11.

B.  Special Weapons and Tactics Team
The Special Weapons and Tactics Team (SWAT) is a group of highly trained officers who, in addition to their regular duties, can respond to and resolve armed crisis situations. They are called out for sniper situations, hostage situations, barricaded subjects, armed and suicidal suspects, the execution of warrants where suspects may be heavily armed, VIP protection, and whenever special weapons are needed. Refer to M.O.P. Chapter 11.

C.  Underwater Rescue and Recovery Team (URRT)
The Underwater Rescue and Recovery Team (URRT) is a group of specially trained and equipped officers who, in addition to their regular assignments, shall respond to all water related incidents in which underwater recovery is necessary. The URRT is responsible for any and all water related incidents including but not limited to

drowning victim rescue, stolen cars, evidence collection and underwater and surface related police protection. Refer to M.O.P. Chapter 11.

8.5    HOUSING UNIT (BPD HU)
The Housing Unit (BPD HU) will be housed at the former BMHA Police Station located in the Perry Complex and shall be under the command of the Deputy Commissioner of Operations. The unit will be responsible for all policing and security issues in the BMHA Housing Complexes located throughout the City and will work closely with the BMHA Staff, Council, outside agencies, as well as other units in the BPD to maintain strict enforcement of the Mayor's zero tolerance crime policy.   Officers assigned to the Housing Unit would be assigned to work in a combination of one and two Officer levels.

8.6    STRIKE FORCE TASK FORCE
The purpose of the Strike Force Task Force is to target and eliminate high crime areas throughout the city.   The unit is housed at the Traffic station house and will work jointly with the ECSD and the NYSP. This force is under the command of the Chief of Schools and will target violent crime areas as well as other crime hotspots throughout the City.

**9.0    LEGAL AFFAIRS**
The Legal Affairs component of the Department is headed by the 1st Deputy Police Commissioner and has general responsibility for legal matters involving the Department.

9.1    LEGAL ADVISOR
The Legal Advisor maintains a police related Federal and State Court civil litigation caseload and responds to Article 78 petitions and Freedom of Information appeals.  (S)he acts as a liaison with the Corporation Counsel assisting with informational needs, document production and Buffalo Police Department interviews.  The legal Advisor drafts and reviews grant and personal services, contracts, policy and procedure statements, and police related pending legislation.

**10.0    DIRECTION**

10.1    DIRECTION DEFINED
For purposes of this section direction means the continuous process of making decisions and then relating those decisions to members of the Department through oral and written orders, general orders, special orders, and training bulletins.

10.2    COMMISSIONER'S RESPONSIBILITY TO DIRECT THE DEPARTMENT
Refer to M.O.P. Chapter 1.

10.3    SUCCESSION OF COMMAND

A.  In those instances in which the Police Commissioner is unavailable or incapacitated, the First Deputy Police Commissioner shall be in command of the Department. If for any reason the First Deputy Commissioner is unable to assume command, the Deputy Commissioner shall be in command.

B.  The District Chiefs shall be responsible for all police operations within their

respective Districts unless relieved by a Deputy Police Commissioner or the Police Commissioner.

C. The superior officer at the scene of any police operation shall assume command of that operation until relieved by a higher ranking officer.

D. In instances in which superior officers of equal rank are on the scene of a police operation, the superior officer with the most seniority shall assume command, unless specified otherwise.

E. In the following circumstances, the superior officer of a specialized unit may assume command:

   1. The Superior Officer of the Homicide Unit who is on the scene of a serious assault, suicide or homicide, shall assume command of the crime scene, the detention and interviewing of witnesses, and the investigation surrounding such events;

   2. The Commanding Officer of the Crisis Management Team (CMT) or his/her designate shall assume command of the negotiation phase of any police operation to which the CMT has been summoned (refer to M.O.P. Chapter 11;

   3. The Commanding Officer of the Special Weapons and Tactics Team (SWAT) or his/her designate shall assume command of the SWAT phase of any police operation to which the SWAT Team has been summoned (refer to M.O.P. Chapter 11);

   4. The Commanding Officer of the Under Water Rescue and Recovery Team (URRT) or his/her designee shall assume command of any police operation involving the use of the URRT for water related rescues or under water salvage operations;

   5. The Superior Officer assigned to a specialized unit who is at the scene of a raid shall assume command of police operations related to that raid.

## 11.0   WRITTEN ORDERS

11.1   POLICY
It is the policy of the Buffalo Police Department to issue written directives in those instances in which a large number of Departmental personnel will be affected; or, a specific operation in which the Department is involved is detailed or complex; or, to maintain a record in a specific case that an order has been issued, the exact content of the order and the date and time it was issued; or whenever a written directive is appropriate under the circumstances.

11.2   STRUCTURING WRITTEN ORDERS

A. Written orders shall be written in clear and concise language so that doubt or

confusion on the part of the recipient is kept to an absolute minimum.

B. The written order shall specify the date and time that the order is to go into effect and the person who is issuing the order.

C. Written orders issued at any level shall not conflict with existing policies and procedures unless prior approval is made by a member of the chain of command who has clear authority to make such change. For example, Department wide policies and procedures can only be changed by the Commissioner; District/Division wide polices can only changed only by the District/Division Chief or his/her superior; Squad wide policies can be changed only by the commanding officer of that squad or his/her superior officers, etc.

D. Written orders that supersede prior orders shall so note.

E. Written orders shall be reviewed at least annually to determine whether they should be retained, revised, or canceled.

11.3   GENERAL ORDERS
A General Order is a written order issued by the Commissioner outlining policy on matters which affect the entire Department. A General Order is the most authoritative directive issued by the Department and may be used to amend, supersede, or cancel any other rule, regulation, or order. General orders are permanent Department policy and remain in full force and effect until amended, superseded, or canceled by the Commissioner. General Orders shall be numbered so that the first two digits indicate the year in which they were issued and are followed by the number of the General Order issued in that year so that they are numbered consecutively. The Division of Administration and Communication shall be responsible for numbering and transmitting General Orders.

11.4   SPECIAL ORDERS

A. Special Orders shall be used for establishing procedures for specific events or temporary circumstances, and for announcing personnel related matters.

   1. Major events involving personnel from various units of the Department working in concert, or events involving elaborate logistical operations, shall be the subject of a special order.  The special order shall designate the number of members involved in the operation, the unit from which they are assigned, the date, time and place of duty, the specific procedures for the special event and the duties and responsibilities of the employees assigned.

   2. Personnel matters involving hiring, assignments, transfers, promotions, demotions, suspensions, retirements, terminations, resignations, pleas of guilty to disciplinary charges, the sustaining of disciplinary charges after a hearing, and any other personnel related matter shall be the subject of a special order.

B. A Special Order may only be issued with approval of the Commissioner or a Deputy

Commissioner. Special Orders shall be numbered so that the first two digits indicate the year in which they were issued and are followed by the number of the Special Order issued in that year so that they are numbered consecutively. The Division of Administration and Communications shall be responsible for numbering and transmitting Special Orders.

11.5     TRAINING BULLETIN

A.  Training Bulletins are directives used to inform employees about pertinent law enforcement topics; to clarify Department policies and procedures; to provide information concerning relevant court decisions and changes in the law; and to provide employees with information that will better enable them to perform their duties.

B.  The Buffalo Police Academy will be responsible for preparing training bulletins.

C.  The Division of Administration and Communication shall be responsible for numbering and transmitting all training bulletins. Training Bulletins shall be numbered so that the first two digits indicate the year in which they were issued and are followed by the number of the Training Bulletin issued in that year so that they are numbered consecutively.

11.6     MASTER FILE
The Division of Administration and Communication shall maintain a master file of all General Orders, Special Orders and Training Bulletins.

11.7     RESPONSIBILITY OF COMMANDING OFFICERS

A.  Commanding Officers shall be responsible for ensuring that all employees under their command become familiar with the contents of all newly issued General or Special Orders or any Training Bulletins. Within thirty days of the original publication of the order or training bulletin, commanding officers shall arrange to have each employee sign and date an acknowledgment that the order or training bulletin was received and understood. At the end of this thirty day period the record of acknowledgments shall be forwarded to the Police Academy for filing.

B.  Commanding Officers shall be responsible for making arrangements at their command so that each employee has ready access to all such directives.

11.8     OTHER WRITTEN ORDERS
At their discretion, Commanding Officers may submit written orders to their subordinates.

Written orders may be used when:

1.  The order is directed to a group of employees;

2.  The order is intended to have a continuing affect for a long period of time

(i.e., standing orders);

3. Strict compliance is required and the Commanding Officer needs to ensure that the order is received and understood;

4. The Commanding Officers deem a written order is appropriate under the circumstances.

5. All such written orders shall be filed in the Command of the Officer who issued the order and shall be retained there until such time as the order is no longer applicable or until it can be disposed of by law, whichever is later.

## 12.0   RECRUITING AND SELECTING POLICE OFFICER CANDIDATES

12.1   POLICY
It is the policy of the Buffalo Police Department to work in concert with the  Buffalo Municipal Civil Service Commission to recruit highly qualified candidates and to afford all eligible candidates an equal employment opportunity.

12.2   RECRUITMENT
During the course of their official duties, all members are encouraged to take an active role in the recruitment process by identifying potential candidates and by attempting to attract these candidates to a career in the Buffalo Police Department.

12.3   RESPONSIBILITY OF THE 1ST DEPUTY POLICE COMMISSIONER OF ADMINISTRATION FOR RECRUITMENT
The 1ST Deputy Police Commissioner of Administration shall be the primary Departmental unit responsible for coordinating the Department's recruitment function. It shall work in concert with the Buffalo Municipal Civil Service Commission in recruiting potential candidates.

12.4   RECRUITERS
All members assigned to perform recruitment duties shall have a thorough knowledge of:

1. eligibility requirements;
2. promotional opportunities;
3. wages and fringe benefits;
4. training requirements;
5. Civil Service selection processes;
6. the special needs of ethnically diverse population groups.

12.5   EQUAL EMPLOYMENT OPPORTUNITY PLAN
The Police Department shall be guided by the City Of Buffalo equal employment opportunity plan.

12.6   DETERMINING ELIGIBILITY FOR APPOINTMENT
The Department of Human Resources is responsible for determining eligibility for appointment to the Buffalo Police Department. The staff of the Buffalo Police Academy

shall work closely with the Department of Human Resources so that the highest quality candidates are deemed eligible.

12.7    PROCESS FOR DETERMINING ELIGIBILITY

The Buffalo Municipal Civil Service Commission has established a process for determining eligibility for appointment to the Police Department. All elements of the selection process are administered, scored, evaluated and interpreted in a uniform manner.

A.    Written Test

Each candidate for appointment to the Buffalo Police Department must first pass a written examination.

B.    Physical Agility Test

Each candidate for appointment to the Buffalo Police Department must first pass a state sanctioned physical agility test.

C.    Psychological Screening

Each candidate for appointment to the Buffalo Police Department must submit to a psychological screening test.

D.    Background Investigation

A background investigation is conducted before a candidate can be deemed eligible for appointment. All background investigations shall be kept on file for at least three years. The background investigation is conducted by recruiters who are knowledgeable in collecting the required information and it minimally includes:

1.    verification of all credentials required for appointment to the Department;
2.    a review of the candidates criminal history record;
3.    verification of the candidate's character through at least three personal references.

E.    Polygraph Examinations

All candidates must submit to a polygraph examination that is administered by a trained polygraph operator. Candidates shall be provided with a list of areas from which polygraph questions may be drawn. The polygraph shall be merely an investigative aid and a negative result, by itself, shall be insufficient to preclude eligibility for appointment. An admission before, during, or after the polygraph exam, however, may be sufficient to preclude eligibility for appointment.

F.    Oral Interview

The Civil Service Commission shall arrange for the selection and training of individuals who shall be charged with the responsibility of conducting oral interviews of potential police recruits. The oral interview shall be one factor in assessing the candidate's suitability for appointment to the Department.

G.    Medical Examination

After a candidate has been through the entire selection process (s)he shall be

subjected to a medical examination by the Civil Service Commission physician.

12.8    APPEALS TO THE DEPARTMENT OF HUMAN RESOURCES – CIVIL SERVICE
ADMINISTRATION
Candidates who are rejected or who are deemed ineligible for appointment or are
adversely effected during the selection process may appeal to the Department of Human
Resources – Civil Service Administration.

12.9    APPOINTMENT TO THE POLICE DEPARTMENT
Appointments to the Buffalo Police Department shall be made from a certified Civil
Service list and shall be made in compliance with Civil Service laws and regulations.

12.10    PROBATIONARY STATUS
Eligible candidates appointed to the Department shall serve a probationary period that
shall last eighteen months.

## 13.0    TRAINING

13.1    POLICY
The Buffalo Police Department recognizes that the field of law enforcement is dynamic
and continuously evolving. The optimum method for adapting to change and encouraging
innovation in this dynamic environment is through continuous high quality training. It is
the policy of the Buffalo Police Department to maintain exemplary standards of police
service by providing its employees with training that is relevant, necessary, timely and of
high caliber.

13.2    THE BUFFALO POLICE ACADEMY
The Buffalo Police Academy shall be that unit within the Department's organizational
structure that has primary responsibility for ensuring that Department personnel are
appropriately trained. The Police Academy staff shall:

A. Work in conjunction with the Buffalo Municipal Civil Service Commission in
recruiting and selecting eligible candidates for appointment to the Department;

B. Coordinate recruit training with the Erie County Department of Central Police
Services;

C. Provide Department recruits with instruction concerning Department rules,
regulations and operations;

D. Monitor recruits during their probationary periods and coordinate the completion of
recruit evaluation forms;

E. Identify topics that require additional training and implement in-service training
programs;

F. Advise and assist the various Department commanding officers in their efforts to
provide roll-call training;

G. Prepare and issue Departmental Training Bulletins;

H. Maintain an up to date library and keep current with relevant court decisions and the latest trends in law enforcement.

13.3    <u>ADMINISTRATION AND OPERATION OF THE ACADEMY</u>
The Officer in charge of the Training Academy shall maintain updated written guidelines concerning:

A. the Academy's goals and responsibilities;

B. the organization and staffing of the Academy;

C. the Academy's administrative procedures;

D. the Academy's operating procedures;

13.4    <u>TRAINING INSTRUCTORS</u>

A. <u>State Certification Required</u>
Personnel who are assigned to the Police Academy and who perform a training function must be certified by New York State and must have satisfactorily completed all requisite training. The Firearms Training Unit is part of the Academy and Firearms instructors must also be State certified.

B. <u>Lesson Plans Required</u>
Training courses conducted by the Buffalo Police Academy require that the Instructor prepare a written lesson plan. The lesson plan shall:

1. ensure that the subject to be covered is addressed completely and accurately;
2. establish the purpose of the training by stating performance and job related objectives;
3. reflect the content of the training and specification of the appropriate instructional techniques;
4. be approved by the officer in charge of the Police Academy;
5. identify any tests used in the training process;
6. be rehearsed in front of the Officer in charge of the academy by the instructor.

13.5    <u>TRAINING RECORDS</u>

A. The Police Academy shall be responsible for maintaining all records related to training. This includes basic recruit training, recruit evaluations, in-service training, roll-call training, seminars, supervision schools, SWAT, CMT, URRT, K- 9 and any other specialized training. Members who complete any training will forward all certificates and other relevant material to the Academy for filing.

B. Firearm training records will be maintained by the Firearms Training Unit.

13.6    BASIC RECRUIT TRAINING

 A. All Buffalo Police Department recruits must attend and satisfactorily complete the Erie Community College Training Academy. No recruit shall be allowed to perform any regular police duties until (s)he has successfully completed the basic course for police officers.

 B. Recruits shall not be allowed to carry or use any firearm in connection with the performance of official police duties until they have successfully completed that portion of the Municipal Police Training Counsel Program that constitutes basic instruction in the use of deadly physical force and the use of firearms.

 C. In addition to the training received at the ECC Training Academy, all recruits are required to receive training at the Buffalo Academy concerning policies and procedures that are specific to the Buffalo Police Department.

 D. Recruits will be evaluated on at least a monthly basis until the expiration of their probationary period.

13.7    IN-SERVICE TRAINING

 A. The Police Academy staff shall closely monitor events within the Department and shall prepare in service training programs to correct areas that present continuous or widespread problems.

 B. The Police Academy staff shall keep abreast of relevant court decisions and emerging trends in law enforcement and they shall develop in service training programs to keep Department personnel appropriately informed.

 C. Sworn members shall annually receive training in the use of force and the use of deadly physical force as well as being afforded legal updates regarding changes in the law.

 D. The Police Academy staff shall stay in close contact with the ECC Training Academy and other law enforcement training facilities and shall apprise Department personnel of relevant training opportunities at those facilities.

 E. The Police Academy staff shall maintain records of all in-service training attended and successfully completed by Department personnel.

13.8    ROLL CALL TRAINING

 A. At the start of a tour of duty, Commanding Officers and shift supervisors may use roll call training to periodically provide members of their command with relevant law enforcement information that is designed to supplement in service training. Roll call training may entail reviewing Department policies and procedures, reviewing accepted law enforcement techniques, reviewing legal updates or apprising members of changes in the law. The training may also include the use of video training tapes

from the Police Academy.

B.  Roll call training shall be closely coordinated with the Police Academy.

13.9  <u>SPECIALIZED TRAINING</u>

A.  Members of the Department shall not be permitted to perform specialized police functions that require state certification until such time as they have successfully completed the required training (e.g. breathalyzer operator, radar, k-9, etc.). To continue performing these specialized functions, members are required to keep their state certifications current.

B.  Members of SWAT, CMT and URRT must participate in training drills as required by the units' commanding officer. Refer to M.O.P. Chapter 11.

C.  The Police Academy staff shall maintain a record of all specialized training received by members of the Department.

13.10  <u>FIREARMS TRAINING</u>
Refer to M.O.P. Chapter 12

## CHAPTER 2: AIDED AND ACCIDENT CASES

CONTENTS

**1.0      MOTOR VEHICLE ACCIDENTS - GENERALLY**
1.1      Policy
1.2      Definitions
      A.  Motor Vehicle
      B.  Motor Vehicle Accident
1.3      Response to Scene
1.4      Responsibility to Investigate and Report

**2.0      MEMBERS DUTIES - GENERALLY**
2.1      Call Takers and Dispatchers
2.2      Responding Officers
      A.  Initial Procedures
      B.  Investigation
2.3      Supervisors' Responsibilities
2.4      Commanding Officers

**3.0      EXCEPTIONAL CIRCUMSTANCES**
3.1      Hit and Run Accidents
      A.  Responding Officers
      B.  Supervisors
      C.  Accident Investigation Unit
3.2      Motor Vehicle Accidents Involving Trucks and Busses
3.3      City Involved Accidents
      A.  Non police vehicles
      B.  Fire hydrants
      C.  Pot Holes
      D.  Hearings
      E.  Police Vehicles
3.4      Motor Vehicle Accidents Creating Dangerous Conditions
3.5      Serious Physical Injury or Fatal Accidents
3.6      Accidents At or Near a School Crossing
3.7      Accidents Reported at the Stationhouse
3.8      Accidents on the NYS Thruway

**4.0      HANDLING ACCIDENT VICTIM'S PROPERTY**
4.1      Policy
4.2      Vehicles
4.3      Personal Property

**5.0      PREPARATION AND HANDLING OF ACCIDENT REPORTS**
5.1      Policy
5.2      Supervisors to Examine and Approve
5.3      Forwarding Reports
5.4      Use of Reports in Court

COB000301

**6.0      VEHICLE TOWING AND STORAGE**
6.1      Policy
6.2      City Tow Truck
6.3      When Vehicles May be Towed
6.4      NYS Clear Road Policy
6.5      General Towing Procedures
6.6      Towing Procedures in Specific Cases
      A.  Illegally Parked
      B.  Safety Check
      C.  Evidence Processing
      D.  Vehicles Held as Evidence
      E.  VTL 511.2 and 511.3
      F.  Asset Forfeiture
      G.  Mini-Tow Procedures
6.7      Personal Property in a Towed Vehicle
6.8      Private Tow Trucks
6.9      Responsibilities after Towing

**7.0      NON-VEHICULAR ACCIDENTS**
7.1      Policy
7.2      Non-Vehicular Accident Defined
7.3      Responsibility
7.4      Investigation
7.5      Reports
      A.  Contents
      B.  Distribution

**8.0      DANGEROUS CONDITIONS AND HAZARDOUS MATERIALS**
8.1      Policy
8.2      Definitions
      A.  Dangerous Condition
      B.  Hazardous Material
8.3      Gasoline Spills
8.4      Natural Gas Leaks
8.5      Electrical Hazards
8.6      Hazardous Material Exposures

**9.0      SICK AND INJURED PERSONS**
9.1      Policy
9.2      Rendering Aid
9.3      Transportation of sick or Injured
9.4      Rescue Squad Calls and Routine Ambulance Calls
9.5      Poison Control
9.6      Services of the Clergy
9.7      Apparent Drownings

**10.0     INCIDENTS INVOLVING ANIMALS**
10.1     Policy

COB000302

10.2    Animal Bite Cases - Police Response
10.3    Dog Control Violation Summons
10.4    Vicious, Wild or Rabid Animals
10.5    Stray, Injured or Dead Animals
10.6    SPCA Emergency Service
10.7    Destruction of Injured Animal
10.8    Animal Cruelty - Report to SPCA

**11.0   DEAD HUMAN BODY**
11.1    Policy
11.2    Preliminary Investigation
11.3    Unidentified Dead Human Body
11.4    Notification of Next of Kin
11.5    Notification of Clergy

**12.0   MEDICAL EXAMINER**
12.1    Policy
12.2    Cases Requiring the Services of the Medical Examiner
12.3    Explanations
      A.  Accidental
      B.  Homicidal
      C.  Suicidal
      D.  Abortions
      E.  Sudden Deaths

**13.0   PUBLIC ADMINISTRATOR**
13.1    Policy
13.2    Scope and Authority of Public Administrator
13.3    Public Administrator's Services Required
13.4    Notification of the Public Administrator
13.5    Protection of Property
13.6    Unavailability of Public Administrator

**14.0   FOUND CHILDREN AND FOUND ADULTS (AMNESIA VICTIMS)**
14.1    Policy
14.2    Definitions
      A.  Found Child
      B.  Found Adult

14.3    Found Children
      A.  Custody
      B.  Care of the Child
      C.  Disposition of the Found Child
      D.  Report Required
14.4    Found Adults (Amnesia Victims)

**15.0   MISSING PERSONS AND RUNAWAYS**
15.1    Policy

15.2    Definitions
15.3    Amber Alert Procedures
15.4    Reporting
15.5    Search For Persons Under Twelve Years of Age
15.6    Channeling Reports
15.7    Sex Offense Squad Responsibilities
15.8    Runaways

**16.0    CHILD ABUSE/NEGLECT**
16.1    Policy
16.2    Definitions
16.3    Handling Child Abuse/Maltreatment Cases
16.4    Removal of the Child From the Home
16.5    Reports Required
16.6    Follow up Procedure - Sex Offense Squad

## 1.0    MOTOR VEHICLE ACCIDENTS - GENERALLY

1.1    POLICY
It is the policy of the Buffalo Police Department to respond to all incidents involving motor vehicle accidents and to render assistance to the involved parties. It may not be necessary to investigate or file accident reports in those instances in which the damage is minor and there are no physical injuries or other aggravating factors.

1.2    DEFINITIONS

Motor Vehicle
Motor vehicle as defined in Title 1, Article 1, Section 125 of the Vehicle and Traffic Law. Every vehicle operated or driven upon a public highway which is propelled by any power other than muscular power, except:

A.  electrically driven invalid chairs being operated or driven by an invalid
   1.  electric personal assistive mobility devices operated outside a City with a population of one million or more
B.  vehicles which run only upon rails or tracks
C.  snowmobiles as defined in Title XI, Article 47
D.  all-terrain vehicles as defined in Title XI, Article 48 B (Refer to the statute for a more comprehensive definition).

B.  Motor Vehicle Accident
A motor vehicle accident is any accident involving a motor vehicle in motion, including the vehicle's load or contents, that results in death, injury, or property damage.

1.3    RESPONSE TO SCENE
Members of the Department will be dispatched to all reported instances of motor vehicle accidents.

1.4    RESPONSIBILITY TO INVESTIGATE AND REPORT
Officers dispatched to the scene of a motor vehicle accident or coming upon a motor vehicle accident shall thoroughly investigate and complete all proper reports when the accident involves any of the following:

A.  death or injury;
B.  damage to public or private property, other than the motor vehicles;
C.  city involved accidents;
D.  damage to the motor vehicles in excess of $1,000.00;
E.  impairment due to alcohol and/or drugs;
F.  hazardous materials;
G.  occurrences on private property;
H.  hit and run accidents.

**2.0**     **MEMBERS DUTIES - GENERALLY**

2.1     DISPATCHERS DUTIES
Any member of the Department receiving a call of a motor vehicle accident shall cause a patrol car to be dispatched to the scene.

A.  In instances of injury, an ambulance shall be dispatched.

B.  The Buffalo Fire Department shall be dispatched if:

    1.  there exists a threat of fire or explosion;
    2.  hazardous materials may be involved;
    2.  an accident victim is trapped in the car;
    3.  there is a seriously injured victim.

C.  The Accident Investigation Unit shall be dispatched in instances of serious physical injury or death or when City property has been damaged.

D.  The District Supervisor shall be dispatched in instances of City involved accidents involving a Department vehicle, fatal accidents and serious physical injury accidents that may prove fatal.

E.  The Internal Affairs Division will be dispatched in instances of City involved accidents involving a Department vehicle.

F.  In instances in which the motor vehicles sustained minor damage and the accident is not of a kind specified in MOP 2/1.4 A through H, the 911 call taker or other Department member receiving the call, shall caution the caller that while a patrol car will be dispatched, its arrival may be delayed. The motorists shall be advised that they need to exhibit their driver's license and insurance card to one another and to exchange information concerning their name and residence. The motorists shall also be reminded of their duty to report the accident to the Department of Motor Vehicles on form MV104.

2.2     RESPONDING OFFICERS

A.  Initial Procedures

    1.  Safely proceed to the scene as quickly as possible.

    2.  Utilizing the overhead flashing lights, position the police car at the accident scene so that it protects the scene from any further damage. Direct traffic away from the scene using hand signals and gestures (refer M.O.P. Chapter 7). Road flares, traffic cones, additional Police vehicles and other traffic control devices should be used when necessary.

    3.  Keep motorists and pedestrians a safe distance from the scene.

4. Carefully check for fire hazards, electrical wires, hazardous material or any other circumstance that could jeopardize life and safety.

5. Call for ambulances and/or the fire department, and render first aid where appropriate.

6. Call for a tow truck if needed.

7. Clear the roadway as soon as possible

8. Check for damage to City property, signage, fire hydrants, etc.

<u>Investigation</u>

1. Locate all drivers and witnesses and separately obtain a description of the accident from each.

2. Conduct a field sobriety test of any driver that appears to be impaired by alcohol or drugs.

3. Check for valid driver's licenses, registrations and insurance coverage.

4. Take appropriate enforcement actions when evidence indicates that traffic violations were a contributing factor.

5. Check the vehicles for physical damage and determine if the damage is consistent with the accident description given by the drivers and witnesses.

6. Check for engineering or environmental factors (e.g. traffic signs or signals, lighting, road defects, grade of the road, etc.) and determine if they contributed to the accident.

7. Gather all information necessary for the Police Accident Report (form MV104A) and complete the report.

8. Provide each motorist with form MV-104 and advise them of their responsibility to submit the report to the Department of Motor Vehicles within 10 days.

9. Cause to be removed from the scene any vehicle that is disabled or is impounded, and any debris that would create a hazard to other motorists

## 2.3    SUPERVISORS RESPONSIBILITIES

A. Check the Police Accident Report (MV104A) submitted by members of his/her command for completeness and accuracy.

B. Respond to the accident scene and prepare the MV104A whenever a member of the

Department is involved in a motor vehicle accident in a city owned vehicle in the Supervisor's district and notify the Internal Affairs Division (refer to M.O.P. Chapter 2).

C.  Respond to and take command of accident scenes involving:

   1.  fatalities;
   2.  serious physical injuries that may prove fatal;
   3.  accidents requiring multiple officers to handle;
   4.  accidents in which his/her presence is requested by the investigating Officers.
   5.  City involved vehicles.

2.4     COMMANDING OFFICERS RESPONSIBILITIES
Commanding Officers shall maintain in the stationhouse an Accident Log which shall serve as a record of traffic accidents that have occurred in their district. It shall include:

A.  An accident number, starting with number one (1) on January 1st, and running consecutively until December 31st of each year;

B.  Date and location of accident;

C.  Type of accident:

   1.  Property damage only;
   2.  Injury;
   3.  Fatal;
   4.  Hit and Run;
   5.  City Involved.

## 3.0     EXCEPTIONAL CIRCUMSTANCES

3.1     HIT AND RUN ACCIDENTS

A.  Responding Officers
In addition to the duties specified in section 2.6 of this Chapter, the responding officers will:

   1.  conduct the initial investigation and close the case, if possible;
   2.  take appropriate enforcement action;
   3.  if the initial investigation does not result in closing the case, broadcast a description of the hit and run vehicle and its driver;
   4.  in addition to preparing the MV104A, prepare a P203 and have the complainant sign it;
   5.  in instances involving physical injury (VTL 600-2) prepare a crime report;
   6.  forward the case to the Accident Investigation Unit for follow up investigation.

B.  Supervisors

Supervisors shall be responsible for:

1.  carefully checking all reports for accuracy and completeness;
2.  assuring that the responding officers conducted an appropriate preliminary investigation.

C.  Accident Investigation Unit - Hit and Run Squad

The Hit and Run Squad is responsible for the follow up investigation of hit and run accidents not closed by the responding officer.

3.2   MOTOR VEHICLE ACCIDENTS INVOLVING TRUCKS OR BUSES

In addition to the procedures outlined in Chapter 2, Section 2.6 the Supplemental Police Accident Report MV-104S Truck and Bus must be completed for each qualifying vehicle and attached to the corresponding MV-104A for certain trucks, tractor-trailers, and buses involved in motor vehicles accidents when:

A.  The vehicle is:

1.  a truck, tractor, truck-trailer or tractor-trailer having at least six tires in contact with the road surface, or;
2.  any vehicle displaying a hazardous material placard; or,
3.  a bus with seating capacity for more than fifteen (15) persons, including the driver;

**AND**

B.  The accident results in at least one of the following conditions for any person or any vehicle involved:

1.  a fatality; or,
2.  a person injured severely enough to require transportation from the scene for immediate medical attention; or;
3.  a vehicle had to be moved, up-righted or otherwise assisted by emergency equipment (other than for a flat tire).

3.3   CITY INVOLVED ACCIDENTS

A.  Non-Police Department Vehicles

Officers responding to a motor vehicle accident involving City property other than Police Department vehicles shall in addition to the procedures outlined in Chapter 2, Section 2.6:

1.  Prepare an MV-104A in every case; and,
2.  Take appropriate enforcement action; and,
3.  Request the assistance of the Accident Investigation Unit.

B.  Fire Hydrants

The responding officer shall prepare an MV104A for motor vehicle accidents

involving fire hydrants. In addition, the investigating officer shall request the Radio Dispatcher to notify the City Division of Water so that the hydrant can be repaired.

C. <u>Pot Holes</u>

An MV104A shall be prepared for any damage to a vehicle resulting from a pot hole. The District shall report the location of the pot hole in the District blotter and to the Office of Citizen Services by means of the "311" Call and Resolution Center.

D. <u>Motor Vehicle Hearings, City Involved Accidents</u>

When a member of the Department is to attend a trial or motor vehicle hearing in which the City is involved, the member shall notify the Corporation Counsel assigned to the Department through official channels at least forty-eight (48) hours before the scheduled time of the trial or hearing.

E. <u>In cases involving Police Department vehicles:</u>

1. The Supervisor in charge of the district in which the accident occurred shall respond to the scene and contact the Internal Affairs Division (the Supervisor shall be responsible for preparing the MV104A and a Supervisor's Internal Report);

2. The Supervisor shall request the assistance of the Accident Investigation Unit which unit shall conduct a thorough investigation and issue summons when enforcement action is indicated (AIU shall be responsible for preparing the AIU Internal Report);

3. The Supervisor shall instruct the Officers involved in the accident to prepare an Intra-departmental Memorandum describing in elaborate detail the circumstances leading up to the accident.

4. The Supervisor shall check the Officer's report for completeness and accuracy and forward the report along with the MV104A and the Supervisor's Internal Report through the chain of command to the appropriate Deputy Commissioner. Each intermediate member of the chain of command will review the reports and make an independent evaluation of the surrounding circumstances. They will make recommendations for additional training or disciplinary action where appropriate.

   Distribution: original with MV104A attached- appropriate DPC
   　　　　　　　copy – Chief of District
   　　　　　　　copy - Commanding Officer IAD
   　　　　　　　copy - Supervisor of Fleet Maintenance
   　　　　　　　copy - AIU
   　　　　　　　copy - Command file/Captains Office

5. The AIU Internal Report will be reviewed and signed by the commanding Officer of AIU and it shall then be forwarded through the chain of command to the appropriate Deputy Commissioner.

 COB000310

Distribution: original - appropriate DPC
copy - appropriate Chief
copy - district command file
copy - AIU file

6. AIU shall maintain accurate and up to date files of all police related motor vehicle accidents.

3.4 **MOTOR VEHICLE ACCIDENTS CREATING DANGEROUS CONDITIONS**
Refer to M.O.P Chapter 2 (*DANGEROUS CONDITIONS AND HAZARDOUS MATERIALS*)

3.5 **SERIOUS PHYSICAL INJURY OR FATAL ACCIDENTS**
The following procedures shall be followed in addition to those procedures outlined in Section 2.6 of this Chapter:

A. The responding officers shall request the presence of their Supervisor as well as notify the Accident Investigation Unit, in the event of any motor vehicle accident that involves:

1. a fatality;
   or
2. serious physical injury that may prove fatal.

B. The responding officers shall protect the accident scene until all evidence has been collected, photographs taken, and measurements made, by the Accident Investigation Unit. In cases of death, the Medical Examiner shall be notified. Where death occurs at the accident scene and there is no chance of reviving the victim, the body shall not be moved until photographs are taken and the Medical Examiner directs its removal.

C. The responding officers shall have the vehicles impounded and prepare the necessary paperwork (refer to M.O.P. Chapter 2);

D. Notification of next of kin. The member of the Accident Investigation Unit investigating the fatal or serious physical injury accident together with the District Supervisor shall be responsible for notifying next of kin Refer to M.O.P. Chapter 2.

E. The Accident Investigation Unit is responsible for fully investigating fatal and serious physical injury accidents.

3.6 **ACCIDENTS AT OR NEAR A SCHOOL CROSSING**
In addition to the procedures outlined in Chapter 2, Section 2.6 whenever a motor vehicle accident occurs at, or near, the scene of an intersection where a school Crossing Guard is on duty, the district supervisor shall obtain a detailed statement from the Crossing Guard on an Intra- Departmental Memorandum,  describing the circumstances leading up to the accident.

Distribution:  Original and 1 copy to City Court Booking with Accident Report
                        Copy - Accident Investigation Supervisor

3.7    ACCIDENTS REPORTED AT THE STATIONHOUSE

A.    When a person reports a motor vehicle accident at any stationhouse and the accident
involved a _fatality_, an MV104A shall be prepared, the Accident Investigation Unit's
assistance requested, and the on duty supervisor notified.

B.    When a person reports a motor vehicle accident at any stationhouse and the accident
resulted in personal injury, an MV104A shall be prepared if the accident did not
occur more than five days previous. When more than 5 days have elapsed since the
accident, the driver shall be advised to report the accident to the Department of Motor
Vehicles on form MV-104. A notation shall be made in the District Complaint Book
indicating the name of the person reporting the accident and the date, time and
location of the accident. No MV-104A need be prepared.

C.    When a person reports a motor vehicle accident at any stationhouse and the accident
resulted in property Damage only, it is not necessary to prepare an MV- 104A. A
notation shall be made in the District Complaint Book indicating the name of the
person reporting the accident and the date, time and location of the accident. The
person shall be provided with an MV-104 and instructed to complete and file the
report with the Department of Motor Vehicles.

3.8    ACCIDENTS ON THE NYS THRUWAY
Motor vehicle accidents occurring on the NYS Thruway including the entrance and exit
ramps, within the territorial limits of the City of Buffalo, shall be investigated by the New
York State Police Thruway Detail. The NYS Police Thruway Detail will be responsible
for dispatching ambulances, tow trucks and for providing other services for this stretch of
roadway.

**4.0    HANDLING ACCIDENT VICTIM'S PROPERTY**

4.1    POLICY
It is the policy of the Buffalo Police Department to safeguard the property of    accident
victims and to take reasonable steps to prevent theft or further damage.

4.2    VEHICLES
Refer to M.O.P. Chapter 2 for instructions regarding towing vehicles.

4.3    PERSONAL PROPERTY

A.    Personal property will be secured in the victim's vehicle if:

1.    the vehicle is capable of being secured; and
2.    the value of the property is not substantial (i.e. no single item of property has
an approximate value in excess of $50.00, or the property does not have an

approximate aggregate value in excess of $200.00); and

3.  there exists no immediate threat of theft.

B.  Property exceeding the above limitations must be inventoried.

C.  Property not secured in the victim's vehicle will be handled as outlined in M.O.P. Chapter 18.

D.  For vehicles involved in accidents that are towed to the Auto Pound, refer to M.O.P. Chapter 2 for the handling of personal property.

## 5.0   PREPARATION AND HANDLING OF ACCIDENT REPORTS

5.1   POLICY
It is the policy of the Buffalo Police Department to prepare all accident reports completely and accurately and that Accident Report Form MV104A will be prepared in accordance with the directions set forth by the NYS Department of Motor Vehicles.

5.2   SUPERVISORS TO EXAMINE AND APPROVE
District supervisors shall examine each accident report for completeness, accuracy and sufficiency before (s)he signs it. Reports not meeting the supervisor's approval shall be returned to the investigating Officer(s) to be corrected and the corrected report shall be re-submitted before the end of the Officers' shift.

5.3   FORWARDING REPORTS

A.  Accident reports, whether complete or incomplete, shall not be retained in any command for longer than a twenty-four (24) hour period after Police first received the report of the accident.

B.  Additional information received for incomplete accident reports shall be placed on either an MV-104A or P-202, as the case dictates, and forwarded to CCB, using the same district accident report number and event number.

5.4   USE OF REPORTS IN COURT
Officers requiring accident reports for use in Court shall obtain a photo static copy from the District Station file, or if unavailable in the District, a request for the copy shall be made to City Court Booking.

## 6.0   VEHICLE TOWING AND STORAGE

6.1   POLICY
It is the policy of the Buffalo Police Department to have a vehicle towed whenever it comes under the control of the Department and it is necessary to safeguard the vehicle and its contents from damage or theft; or when the vehicle is evidence or an instrumentality of a crime; or when a vehicle presents a hazard or inconvenience to the public.

6.2 <u>CITY TOW TRUCK</u>
The City tow truck is operated by the Department of Parking. Members of the Police Department requiring the use of a tow truck for an official function shall contact the City tow truck through the Police Radio Dispatcher.

6.3 <u>WHEN VEHICLES MAY BE TOWED</u>

A. Damaged, broken down, or illegally parked vehicles may be towed when:

1. the vehicle is obstructing traffic or creating a hazardous traffic condition
2. the vehicle is blocking a driveway;
3. the vehicle is illegally parked in a handicapped zone;
4. the vehicle has been abandoned or the vehicle has no license plates affixed;
5. the vehicle is obstructing street repairs, snowplowing, or other necessary work in the roadway; it is parked on a snow emergency route during a snow emergency, or towing is necessary to facilitate a special event (e.g. parade, street festival, etc.).

B. Recovered stolen vehicles shall be towed to the Auto Pound. (Refer to M.O.P. Chapter 2 - Private Tow trucks).

C. Vehicles will be towed to the Seneca Street Police Garage when:

1. There was a fatality or serious physical injury motor vehicle accident
2. It is impounded by the officers for further investigation (e.g.   equipment check, criminal investigation);

D. Vehicles will be towed to the Auto Pound when;

1. It is not drivable and the owner is unable to make arrangements for immediate private towing;
2. The vehicle is unable to be secured and there is a threat that the vehicle may be stolen or further damaged.
3. Vehicles shall be towed if they are an integral piece of evidence that needs to be preserved for a successful prosecution of the charges. Vehicles shall not be routinely towed incident to arrest.
4. Vehicles seized pursuant to VTL 511-b shall be towed;
5. Vehicles used in a criminal transaction rendering them eligible for forfeiture, shall be towed.
6. Vehicles which are parked illegally <u>and</u> are scofflaws, shall be towed.

E. Vehicles may not be impounded for the following reasons:

1. Solely for an expired Driver's License
2. Solely for an expired Registration
3. Solely for an expired Inspection Sticker

6.4    NYS STATE CLEAR ROAD POLICY ON NYS THOROUGHFARES

The Kensington Expressway, the Scajaquada Expressway, Route 198 and the Skyway complex are thoroughfares in the City that are maintained by New York State. The Police Department adheres to the NYS Clear Road Policy.

A. Disabled vehicles in a lane or in a location which may interfere with traffic, or that constitutes an immediate hazard, shall be towed.

B. Disabled vehicles that are located off the roadway or in a location that is <u>not</u> interfering with traffic or pose no immediate hazard shall be handled as follows:

    1. <u>Personal Repairs</u>
Personal repairs are allowed provided the necessary equipment is available at the scene, or repairs to the vehicle can be made at the scene within a 24 hour period. Vehicles left more than 24 hours shall be towed.

    2. <u>Abandoned Vehicles</u>
Any motor vehicle with no license plates affixed shall be considered abandoned and shall be towed.

    3. <u>Recovered UUV</u>
Recovered UUV's shall be towed.

6.5    GENERAL TOWING PROCEDURES

In **each** instance in which a vehicle is to be towed, the member of the Department shall:

A. determine if the vehicle is stolen or wanted;

B. request that the Dispatcher send a tow truck and provide the dispatcher with the year, make, color, plate number and location;

C. gather all necessary information and fully complete a "*Vehicle Tow Report*" (P-31, distribution is on the form);

D. notify the vehicle's owner, if possible.

E. The "*Buffalo Police Department Vehicle Inventory*" form (P-1373) <u>MUST</u> be completed if vehicle is open or accessible.

6.6    TOWING PROCEDURES IN SPECIFIC CASES

In addition to complying with the procedures outlined in Chapter 2, Section 6.12, officers must also comply with the following procedures in specific circumstances.

A. <u>Illegally parked vehicles</u>
When an illegally parked vehicle is to be towed, the officer shall:

    1. issue a PVB summons;

B. Vehicles held for a safety check

When a vehicle is impounded to determine if the vehicle's equipment meets the requirements mandated by the Vehicle and Traffic Law, the officer impounding the vehicle must:

1. safeguard the vehicle until the tow truck arrives;
2. direct the tow truck operator to tow the vehicle to the Seneca Street Police Garage;
3. specify on the P-31 the type of equipment violation suspected (e.g.. brakes, steering, etc.);
4. the vehicle shall not be released until after the desired safety check has been completed.
5. Garage personnel are to notify Officer and the owner of the vehicle once completed.

C. Vehicles held for evidence processing

When a vehicle is impounded because it may contain evidence associated with a crime (e.g. fingerprints, hair fibers, DNA, etc.), the officer impounding the vehicle shall:

1. safeguard the vehicle until the tow truck arrives;
2. direct the tow truck operator to tow the vehicle to the Seneca Street Police Garage and secure it in the evidence bay, if available;
3. follow the Tow Truck to the garage in order to retain the chain of custody;
4. make an application for a search warrant with the help of a Detective, if necessary;
5. prepare form P-274A (Hold For Investigation) and attach it to the vehicle's windshield;
6. prepare form P-77-C (Request for Fingerprint) specifying the type of evidence suspected, and fax the P-77 to the Evidence Collection Unit;
7. indicate on the P-31 that the vehicle is being held for evidence processing;
8. do not authorize release of the vehicle until after all testing has been completed and the District Attorney's Office has approved.

D. Vehicles held as evidence

When a vehicle is impounded because it was used in the commission of a crime or is the instrumentality of a crime (e.g. hit and run, vehicular manslaughter, vehicular assault, etc.), the impounding officer shall;

1. safeguard the vehicle until the arrival of the tow truck;
2. direct the tow truck operator to tow the vehicle to the Seneca Street Police Garage and to secure the vehicle inside;
3. follow the Tow Truck to the garage in order to secure chain of custody;
4. prepare form P-274A (Hold for Investigation) and attach it to the windshield;
5. indicate on the P-31 that the vehicle is being held as evidence;
6. if the vehicle is to be examined for fingerprints, Form 77C shall be faxed to the Evidence Collection Unit;
7. do not authorize release of the vehicle until approved by the District

COB000316

Attorney's Office.

E. VTL 511-2 and 511-3

In circumstances in which vehicles are held in conjunction with charging the operator with the crime of aggravated unlicensed operation of a motor vehicle in the first or second degree (VTL 511-2 or 511-3) the Officer impounding the vehicle shall:

1. comply with the requirements of VTL 511-b;
2. direct the tow truck operator to tow the vehicle to the Auto Pound;
3. indicate on the P-31 that VTL 511-b was the reason for the tow;
4. do not authorize release of the vehicle without the approval of the District Attorney's Office or Officer in charge of the case.

F. Forfeitures

When a vehicle suspected of being subject to state or federal asset forfeiture laws is seized, the officer seizing the vehicle shall:

1. safeguard the vehicle until the tow truck's arrival;
2. direct the tow truck operator to tow the vehicle to the Seneca St Garage;
3. prepare the Record/Receipt Of A Seized Asset and forward it to the Chief of Detectives office;
4. indicate on the P-31 that the vehicle is being held for asset forfeiture;
5. the member of the Detective Division assigned to the handling of seized assets shall then be responsible for the disposition of the property to the appropriate state or federal agency.
   .

G. Parking Violations and Mini-Tows (refer to Training Bulletin 2006-03)

1. When a Police Officer finds an illegally parked vehicle that requires mini-tow, (s)he will:

   a. Issue a Parking Violation Summons.
   b. Immediately call radio dispatch that a mini-tow is required.
   c. Provide dispatch with the make, plate number and location of vehicle.
   d. Then writes in comment section on the PVB summons the time of call to dispatch and make, plate number and location of vehicle.
   e. Leave the PVB summons on the vehicle windshield.
   f. Leave the box in the middle of the PVB Summons ticket empty that states **MINI-TOW:  IF BOX IS CHECKED ADD $40 TO FINE AMOUNT.**
   g. Leave the scene and proceed back in service to attend to other duties.

2. The Tow Truck Operator who is an employee of the Police Department is advised by radio dispatch to go to location of vehicle:

   a. Tow Truck Operator arrives at scene where dispatch advised him of location of vehicle.
   b. (S)he then puts an X in the Mini-Tow box on the PVB summons indicating that a Mini- Tow has occurred and fills out the tow log that

indicates vehicle make, license plate, where the vehicle was located and moved to and the ticket number. The tow truck driver will also put his/her initials next to the appropriate area on the PVB summons box.

c. If the vehicle matching description is there, he/she calls radio dispatch and verifies with dispatch make and plate number.

d. (S)he moves vehicle from illegally parked location.

e. (S)he confirms this in writing in his/her **TOW LOG** that is submitted to his/her supervisor at the Seneca Street Police Garage at the end of his/her shift. After this form is submitted to his/her supervisor, the supervisor submits this form to the Division of Parking Enforcement on the next business day**.**

f. If by the time the tow truck operator arrives the citizen has removed the vehicle, the tow truck operator notifies dispatch that the subject vehicle is gone on arrival and **MINI-TOW NOT PERFORMED.**

g. Because the vehicle is already gone, the box indicating a fine for the mini-tow remains unchecked.

3. <u>Division of Parking Enforcement</u>

a. Parking enforcement receives the tow log on the first business day following mini-tow. They serve as an additional check – but in theory the citizen may pay ticket before weekly verification occurred.

b. The tow log will be attached to the office copy of the PVB summons, thus validating the mini-tow.

c. Parking Violations Bureau will enter the summons information, along with the corresponding mini-tow.

## 6.7  <u>PERSONAL PROPERTY IN A TOWED VEHICLE</u>

Whenever a vehicle is to be towed, the officer requesting the tow shall:

A. inspect the vehicle for obvious damage;

B. if the vehicle is unlocked, conduct a thorough and complete inventory of all the contents of the vehicle, including an inspection of the glove compartment and trunk, if they are unlocked, and the opening and inspection of any unlocked and unsealed containers;

C. complete the Vehicle Inventory form while conducting the inventory, noting the disposition of each item of inventory (i.e. left in the car, delivered to Property Office or returned to owner or other person);

D. secure the property in the vehicle unless:

1. any single item of property has an approximate value in excess of $50.00, in which case it shall be seized for safekeeping, or the property has an approximate aggregate value in excess of $200.00; or,

2. there exists a reasonable threat that if left in the vehicle, the property will be lost or stolen; or,

   3. the property constitutes contraband or evidence.
   4. if the property is not secured in the vehicle, and it is not contraband or evidence, hold it for safekeeping (refer to M.O.P. Chapter 18) and process the property as specified in M.O.P. Chapter 18.

6.8    <u>PRIVATE TOW TRUCKS</u>

   A. <u>Prohibition on Calling</u>
   Employees of this Department shall not recommend nor summon any private tow truck directly. The employee shall request same from the Dispatchers.

   B. <u>Recovered stolen vehicles</u>
   When a member of the Department recovers a vehicle that has been reported stolen, and the arrival of the tow truck will be delayed in excess of thirty (30) minutes, the Radio Dispatcher may call for the services of a private towing service. The Radio Dispatcher shall maintain a written log of all instances in which a private tow truck has been called to tow a recovered vehicle. The log shall include a description of the vehicle, the name of the towing company and the date and time of contact. The log shall be forwarded to the First Deputy Commissioner's Office weekly.

   C. <u>Accidents on the Skyway, Route 33 or Route 198</u>
   When there is an accident on the Skyway, Route 33 or Route 198, the Radio Dispatcher or the 911 Lieutenant is authorized to contact a private towing company if the City Tow Truck is unable to respond within 20 minutes. The Dispatcher will contact the towing company next on the list that has been provided by parking enforcement. If the company next on the list is unavailable that fact will be noted on the log.

   D. <u>Non-requested appearance on the scene</u>
   Under circumstances in which a tow truck appears at the scene of an incident,   and the tow truck has not been summoned by the owner or operator of any of the vehicles, officers shall advise the owner or operator that (s)he is free to select the service of his/her choice and that (s)he is not obligated or mandated, to accept the non-requested service.

   E. <u>Rendering Assistance</u>
   When the operator or owner of a damaged vehicle is present and able to arrange for towing, (s)he shall be allowed to arrange for the towing service of  his/her choice.

6.9    <u>RESPONSIBILITIES AFTER TOWING</u>
   Once a vehicle is towed, the Parking Violations Bureau is responsible for the overall care and custody of that vehicle. Only a member of the Parking Violations Bureau can release a vehicle to its owner.

   A. <u>Exception</u>
   Those vehicles having evidentiary value or having been used in the commission of a crime or being held for a safety check (refer to M.O.P. Chapter 2), shall remain in the custody of the Police Department:

COB000319

1. until the safety check has been completed, in the case of a safety check as specified in M.O.P. Chapter 2;
2. until the District Attorney's Officer authorizes the release of the vehicle, in the case of evidence
3. as specified in M.O.P. Chapter 2.

## 7.0   NON-VEHICULAR ACCIDENTS

7.1   POLICY
It is the policy of the Buffalo Police Department to attempt to eradicate circumstances and conditions, coming to any employee's attention, which could potentially result in non-vehicular accidents.

7.2   NON-VEHICULAR ACCIDENT DEFINED
A non-vehicular accident is any unintended happening or mishap, resulting in physical injury or property damage, not involving a motor vehicle in motion.

7.3   RESPONSIBILITY
Sworn members of the Department becoming aware of circumstances or conditions that could potentially cause physical injury or property damage; shall attempt to eradicate such circumstances or conditions. Attempts to eradicate circumstances or conditions that threaten physical injury or property damage shall include, but not be limited to, alerting property owners or their agents, and notifying appropriate governmental or quasi-governmental agencies.

7.4   INVESTIGATION

A. Members shall thoroughly investigate and report all incidents in which the City may become liable, or which involves City property in any way, (e.g. falling trees or branches, holes in street, raised curbing, fire hydrants, etc.).

B. When the City is not involved, members shall prepare a P-73 through your chain of command to keep at the station-house, of any non-vehicular accident that involves injury to persons or damage to property.

C. Fire Hydrants - Any member of the Department who receives a report of a damaged fire hydrant, or notices that a fire hydrant is damaged, shall, in addition to subdivision "A" above, also cause the Water Division to be notified.

D. Bicycle Accident - Any non-motor vehicle bicycle accident on a public road that results in death or serious physical injury shall be investigated.

7.5   REPORTS

A. Contents. All reports of non-vehicular accidents shall contain:

1. Incident number;
2. Date and time of incident;

COB000320

3. Exact location of incident;
4. Facts surrounding the incident;
5. Measurement and diagrams, if necessary.

B. Types of Reports to be Prepared and Distribution:

1. PROPERTY DAMAGE ONLY - CITY NOT INVOLVED
2. Intra-Departmental Memorandum in duplicate.
> Distribution: Original to City Court Booking
> Copy to: Command File
3. PROPERTY DAMAGE ONLY - CITY INVOLVED
4. Intra-Departmental Memorandum
> Distribution: Original to: City Court Booking
> Copy to: Corporation Counsel
> Copy to: City Department Involved
> Copy to: Command File
5. ALL PHYSICAL INJURY NON-VEHICULAR ACCIDENTS
6. Intra-Departmental Memorandum
7. MV 104C (When applicable)
> Distribution: Original to Corporation Counsel (City Involved
> Cases)
> Copy to: City Court Booking
> Copy to: Command File

## 8.0   DANGEROUS CONDITIONS AND HAZARDOUS MATERIALS

### 8.1   POLICY
It is the policy of the Buffalo Police Department to expeditiously respond to incidents involving dangerous conditions and to minimize the danger to life, health and property.

### 8.2   DEFINITIONS

A. Dangerous condition - As used in this section, "dangerous condition" means any unusual event or circumstance, of whatever origin, that creates an imminent risk of serious injury or extensive property damage. It includes, but is not limited to, natural disasters such as floods and tornadoes, and man made events such as hazardous material exposures.
B. Hazardous material - As used in this section, "hazardous material" means any article, substance or chemical, that when exposed in uncontrolled circumstances creates a serious danger to health and safety.

### 8.3   GASOLINE SPILLS
In incidents involving gasoline spills, the responding officers shall keep all persons a sufficient distance from the site of the spill and shall request the assistance of the Fire Department.

### 8.4   NATURAL GAS LEAKS
In incidents involving natural gas leaks occurring inside a building, the building shall be

immediately evacuated and the officer shall notify Dispatch to call the National Fuel Gas CO and the Buffalo Fire Department. Windows shall be opened if such can be accomplished without unduly endangering the officers. In no event will the officer use any electronic appliance or device or use a light switch to turn lights on while in the building.

8.5     ELECTRICAL HAZARDS
In instances in which an electric power line, or a utility pole is down, sparking, or creating an unsafe condition, the responding officers shall:

A.  Have the radio dispatcher or stationhouse contact the utility company;

B.  Keep all vehicular and pedestrian traffic away and remain on the scene until there no longer is any danger;

C.  Not touch any part of, or attempt to move anything in contact with the power source that is creating the dangerous condition, until the utility company has de-energized the system.

8.6     HAZARDOUS MATERIAL EXPOSURES
Refer to M.O.P. Chapter 11

**9.0     SICK AND INJURED PERSONS**

9.1     POLICY
It is the policy of the Buffalo Police Department to aid and comfort victims of illness and injury and to summon medical assistance when necessary, however members of the Department will not ordinarily respond to rescue squad calls or routine ambulance calls unless there are extenuating circumstances and are requested to do so by the Fire Department or ambulance service.  If an Officer is requested at the scene, he/she shall prepare a P-71 (Aided Case Report).

9.2     RENDERING AID
When a person is sick or injured, the officer at the scene shall request the assistance of the Fire Department and/or an ambulance where appropriate, render first aid when necessary, attempt to make the victim as comfortable as possible under the circumstances, and provide whatever assistance the officer deems prudent.

9.3     TRANSPORTATION OF SICK OR INJURED

A.  Whenever a person needs emergency medical attention, an ambulance will be summoned.

B.  When summoning an ambulance, the officer shall provide a brief description of the nature of the sickness or injuries to the radio dispatcher so that Ambulance Dispatch and Inspection (ADI) can be advised for an appropriate dispatch.

COB000322

C. It is rarely, if ever, in the victim's best interest to be transported by police vehicle. Police vehicles shall not be used to transport persons who are sick or injured unless the victim is extremely critical and his/her life would be jeopardized by waiting for the arrival of an ambulance. In such cases, the officer shall contact the radio dispatcher and have him/her alert the hospital to have the emergency staff ready to provide optimum care.

9.4    RESCUE SQUAD CALLS AND ROUTINE AMBULANCE CALLS
Members of the department will not as a matter of course respond to rescue squad calls or routine ambulance calls. All calls of this nature shall be referred to the Fire Department or ambulance dispatcher, as the case may require. If the Fire Department or Ambulance Service later determines that the presence of the police is necessary, officers shall be dispatched and they shall take necessary action and render all reasonable assistance. In incidents involving rescue or ambulance calls involving infants and young children, members shall respond to ascertain that the incident is not suspicious in nature, and shall inform the dispatcher of same.

9.5    POISON CONTROL
Call the Poison Control center – 1-800-222-1222

9.6    SERVICES OF THE CLERGY
When a person suffering from sickness or injury requests the notification of a Clergy member, the Officer at the scene shall contact the 911 Communications Lieutenant. When a person is seriously ill or injured but because of his/her physical condition is unable to request a Clergy member, and the Officer is able to determine the person's religious denomination, a Clergy member shall be notified as though a request had been made. The 911 Communications Lieutenant shall notify a clergy member who is of the appropriate denomination. The 911 Communications Lieutenant shall maintain an up to date list of Departmental Chaplains who can be contacted.

9.7    APPARENT DROWNINGS
In circumstances in which a person disappears under the surface of a body of water, the senior on-scene Supervisor of the affected command, shall notify the 911 Lieutenant who in turn shall activate the Underwater Rescue and Recovery Team (URRT). All on-duty URRT personnel respond to the scene for evaluation. The URRT Commander is to be called. If URRT is not needed, all URRT personnel shall return to service and the Commander leaves the scene. Depending on the temperature of the water and length of time submerged, some victims may be revived if rescued in a timely fashion. Refer to M.O.P. Chapter 11.

**10.0    INCIDENTS INVOLVING ANIMALS**

10.1    POLICY
It is the policy of the Buffalo Police Department to treat animals in a humane manner, to protect the public from vicious and rabid animals, and to fully cooperate with those agencies charged with the responsibility of dealing with animals and the health consequences associated therewith.

10.2    ANIMAL BITE CASES

    A.    Members of the Department will not routinely respond to incidents involving animal bites.

        1.    If the victim of the animal bite seeks treatment at a hospital, the hospital is responsible for contacting the Health Department.

        2.    If the victim does not seek medical treatment at a hospital, an Animal Bite Investigation Report (P-91) shall be completed over the phone by the person assigned to desk duty in the district in which the event occurred.

            a.    If a report is prepared by a member of the Department, the member shall prepare the report in quadruplicate and call the Erie County Health Department, 961-6800 or after hours,     898-4225 ECMC Emergency Medical Response, to report the incident:
                Distribution:  3 copies to City Court Booking
                          1 copy to command file
            b.    City Court Booking will forward two (2) copies to the Health Department at the following address:
                Erie County Department of Health
                503 Kensington Avenue
                Buffalo, New York  14214

        3.    Response required.
        In any of the following circumstances, members of the department will respond to incidents involving animal bites:

            a.    the victim is severely injured and requires an ambulance; or,
            b.    the animal remains at large and is a threat to injure others; or,
            c.    the owners of the animal are unknown and the officers may be of assistance in establishing identity; or,
            d.    any situation that may require the immediate assistance of a police officer at the scene.

    B.    Members of the Police Department will cooperate fully with personnel of the Health Department who are addressing dog bite complaints.

10.3    DOG CONTROL VIOLATION SUMMONS

    A.    Issuing the Summons
    If any violation of any City Ordinance occurs relating to the licensing, identification or control of dogs, the owner shall be issued a Dog Control Violation Summons, citing the applicable violation.

    B.    Service of the Summons
    The summons must be served personally to the owner. Officers are advised to issue the summons at the owner's home or place of business.

COB000324

Distribution: Original (white copy) to PVB
Green copy to Traffic Records
Green Envelope to defendant.

C. <u>Supporting Depositions</u>
If the officer did not witness an infraction for which a Dog Control Violation Summons is to be issued, a Supporting Deposition (BPD-5) shall be obtained from witnesses (see M.O.P. Chapter 3).

D. <u>Commanding Officers to Account for Dog Violations Summons</u>
The Commanding Officer of each District shall attach an Intra-Departmental Memorandum to each Dog Violations Summons Book. The Officer issuing the summons shall record the date and time of issuance, the summons number and the Officer's name on the Intra-Departmental Memorandum. Commanding Officers shall investigate instances in which summonses are missing and forward the results of their investigation on an Intra-Departmental Memorandum to the Internal Affairs Division, through the chain of command.

10.4   <u>VICIOUS, WILD OR RABID ANIMALS</u>

A. Officers shall attempt to confine the vicious, wild or rabid animal in an enclosed area if such can be accomplished without unduly jeopardizing the safety of the officer or others.

B. The officer shall request the assistance of a member of the Small Animal Shelter, or if unavailable, the Erie County SPCA, whenever circumstances permit.

C. If it is not possible to confine the vicious, wild or rabid animal, or the safety of any person would be jeopardized by waiting for the arrival of a member of the Small Animal Shelter or SPCA, the officer shall notify his/her supervisor, who shall immediately respond to the scene and take command.

1. The Supervisor shall take whatever action is necessary to minimize danger to the Officers and the public.

a. If there does not exist any other practical alternative, the supervisor may order that the animal be destroyed. The owner's permission shall be obtained prior to destroying a vicious or rabid animal, if practicable. In issuing such an order, the supervisor must make sure that no one will be placed in jeopardy as a result of the discharge of a firearm. Only one officer will be designated by the supervisor to perform this task.

b. <u>EXCEPTION:</u>  If the officer or another person is in the process of being attacked by an animal and is in imminent danger, the officer may discharge his/her firearm to ward off the attack. However even under these circumstances, no officer shall discharge a firearm where the possibility exists that any person will be struck by a bullet as a result.

COB000325

    2.  If a firearm is used, a BPD-1 is to be filed.

   D.  <u>Rabid Animals</u>

      1.  Animals suspected of being rabid <u>shall not be shot through the head</u>.
      2.  The body of a suspected rabid animal must be identified and held for rabies tests.
      3.  The Erie County Health Department, Room 800, Edward A. Rath, County Building, Communicable Disease Control, 961-6800, shall be notified by telephone, and form P-91 forwarded in such cases.

## 10.5  <u>STRAY, INJURED OR DEAD ANIMALS</u>

The Small Animal Shelter, 380 Oak Street, phone 851-5694, will accept calls for dog bite cases, stray, injured, dead, or vicious small animals, between 0800 and 2200 hrs. Police may deliver small animals to the shelter everyday including holidays, but not on Sundays.

## 10.6  <u>SPCA EMERGENCY SERVICE</u>

The Erie County SPCA will respond to all emergency calls for injured animals in Erie County on a 24 hour basis. From 0800 hours to 2000 hours, calls will be received on a special phone line - 875-7363 and answered by a staff member, who will transmit the call to an SPCA Agent. <u>DO NOT GIVE THIS PHONE NUMBER TO THE PUBLIC.</u>

From 2000 hours to 0800 hours an SPCA Agent can be contacted by means of a pager. The pager number is 696-8562 - a message should consist of a phone number that the SPCA Agent can call for a complete description of the emergency location.

<u>If the Local Dog Control Officer is unable to be contacted for an injured or stray dog, the SPCA will respond.</u>

## 10.7  <u>DESTRUCTION OF INJURED ANIMAL</u>

When an animal is critically injured and there is little chance for its survival, and the services of the Small Animal Shelter and the SPCA are either not available or would be substantially delayed, the animal may be destroyed employing the guidelines established in M.O.P. Chapter 2 above.

## 10.8  <u>ANIMAL CRUELTY  - REPORT TO SPCA</u>

Cases of cruelty, neglect or other mistreatment of animals shall be reported to the Erie County Society for the Prevention of Cruelty to Animals, 205 Ensminger Road, Town of Tonawanda, New York, 875-7360.

## 11.0  **<u>DEAD HUMAN BODY</u>**

## 11.1  <u>POLICY</u>

It is the policy of the Buffalo Police Department that when members of the Department encounter a human body that appears to be dead, the member shall verify that the person has, in fact, expired; determine if there is some criminal or suspicious activity related to the death; and, safeguard the body and its property until properly disposed of. The

deceased person's remains will be treated in a dignified manner and the survivors of the deceased shall be accorded the utmost respect.

11.2   <u>PRELIMINARY INVESTIGATION</u>
Officers responding to an incident involving a dead human body shall;

A. Examine the body to determine if there is any sign of life. This can be done by:

1. feeling for the pulse of the person;
2. placing a mirror or piece of glass in front of the mouth of the victim, and observing the presence or absence of vapor on the glass/,mirror from the breathing process;
3. watching for the rising and falling of the chest;
4. examining the eyes of the victim for reaction to:
   a. light from a flashlight or match,
   b. finger or hand passed in front of person's eyes to note reaction to moving object,
   c. light thumb pressure placed on person's eyeballs.

**<u>NOTE</u>**:  No one but a qualified physician can officially pronounce a person dead

.

B. Having determined that there are no signs of life, the officer must search for any facts, circumstances or conditions that might tend to indicate that criminal or suspicious activity attended the death, or that a suicide has occurred. If such facts, circumstances or conditions are detected, the officer shall proceed as outlined in M.O.P Chapter 17.

C. The Medical Examiner's Office must be contacted in every case of death. That office will instruct the officers as to how the body should be disposed of (e.g. private funeral director, morgue, etc.). The Medical Examiner shall not be requested to appear at the scene to routinely pronounce a person dead when the person died of natural causes in his/her own home or in a place of business. M.O.P Chapter 2 outlines those circumstances in which the Medical Examiner's presence at the scene is required.

D. Members of the Department shall not search the body of the deceased.

a. In those instances in which the Medical Examiner's presence is required, <u>only</u> the Medical Examiner shall perform the search and <u>no one else</u>.  An officer at the scene shall witness the search, and, at the request of the Medical Examiner, sign the property envelope listing the items found on the body. The Medical Examiner will retain the property and the envelope. The Medical Examiner does not take or retain evidence.

b. In all other instances, either a member of the deceased's family or the Public Administrator will perform the search. In such instances, the officer shall make a memorandum of items of personal property found on the body.

COB000327

E. The officers discovering the body shall be responsible for preparing the Death Report (Form P-178).

Distribution: Original to City Court Booking
1st Copy to Homicide Unit
2nd Copy to Medical Examiner
3rd Copy to Command file

In instances in which the services of the Public Administrator are needed, an additional copy shall be provided to him/her.

## 11.3   UNIDENTIFIED DEAD HUMAN BODY

In incidents involving a dead human body whose true name and address are unknown, the Homicide Unit shall be called to investigate. The Homicide Unit shall be responsible for notifying City Court Booking so that a description of the unidentified body can be entered into the NYSPIN System. The Homicide Unit will also be responsible for ascertaining the identity of the deceased and contacting next of kin.

## 11.4   NOTIFICATION OF NEXT OF KIN

Notification of next of kin in cases of death is one of the most difficult tasks that a member of the Department can be called on to perform. In the face of this difficulty the member must maintain his/her professionalism and focus attention on the needs and well being of the deceased's survivors.

A. The responsibility for notifying the next of kin rests with members of the Department in the following manner:

1. In all cases in which the Homicide Unit is required to appear, the member of the Homicide Unit who possess the most information in the investigation;
2. In cases of fatal or serious physical injury, which are a result of a motor vehicle accident, the member of the Accident Investigation Unit in charge of the investigation together with the Supervisor on duty in the District in which the fatality occurred;
3. When the request for notification of next of kin originates from an outside agency, any member designated by a superior officer;
4. In any other case, the senior officer assigned to investigate.

B. General Guidelines:

1. Gather sufficient information concerning the victim's death so that the survivor's questions can be answered correctly. Officers must refrain from revealing unusually graphic details or gruesome accounts of the death.
2. Take care to correctly identify the victim's closest relative. Gather information concerning the relative. Any currently existing medical, psychological or emotional condition should be considered when making the notification. The presence of friends, clergy or other relatives to assist the survivor after notification has been made can be especially helpful.
3. The telephone shall not be used to notify the next of kin. If the survivor is at home, the officer should enter the dwelling prior to revealing news of the

death. If notification is to be made anywhere other than at the survivor's home, a quiet room should be used. This will better enable the officer to evaluate and deal with reaction to the information.

4. The news of the death should be revealed in a concise, straightforward, and compassionate manner. The words "dead" or "death" should be used since euphemistic expressions may only serve to confuse the survivor.

5. Reaction to news of this sort is unpredictable. The officer's goal is to control the situation as best as possible, and to restore some sense of order and stability, being ever mindful of the need for compassion

6. The officer shall remain with the survivor sufficiently long enough to help the survivor obtain assistance from any other person or agency that may prove beneficial.

C. Requests to or from outside police agencies to deliver notifications of death. The 911 Communications Lieutenant shall be responsible for coordinating the notification of next of kin through outside police agencies.

1. In instances in which the notification is to be made outside the City of Buffalo, the 911 Communications Lieutenant shall request that the local police agency notify the next of kin. The 911 Communications Lieutenant shall provide the local police agency with all pertinent details concerning the death and request that agency apprise the Buffalo Police Department when notification of next of kin has been accomplished.

2. In instances in which death has occurred outside the City, and notification of next of kin is to be accomplished within the City limits, the 911 Communications Lieutenant shall elicit all pertinent details concerning the death and request the supervisor of the district within which the next of kin resides, to designate an officer to make the notification. Once notification has been made, the designated officer shall so inform the 911 Communications Lieutenant who will, in turn, apprise the requesting agency.

11.5  <u>NOTIFICATION OF CLERGY</u>
In instances involving a dead human body or the notification of next of kin, the services of the clergy may be helpful. Officers needing the assistance of the clergy should follow the guidelines established in M.O.P. Chapter 2.

## 12.0  <u>MEDICAL EXAMINER</u>

12.1  <u>POLICY</u>
It is the policy of the Buffalo Police Department to notify the Medical Examiner's Office in all cases of death and to fully cooperate with the personnel of that agency. The Medical Examiner is not required to appear at the scene of every death and members of the Department shall comply with his/her directions.

12.2  <u>CASES REQUIRING THE SERVICES OF THE MEDICAL EXAMINER</u>
The Medical Examiner is responsible for investigating the death of any person who dies as a result of criminal violence, or neglect, or by casualty, or by  suicide, or suddenly when in apparent good health, or when unattended by a  physician, or in any suspicious

or unusual manner.

A.  TYPES OF DEATH REPORTABLE

    1. Accidental - All forms, including death arising from employment.
    2. Homicidal.
    3. Suicidal.
    4. Abortions - criminal or self induced.
    5. Sudden deaths
        a. when in apparent good health, or
        b. when unattended by a physician, or
        c. under any suspicious or unusual circumstances.

12.3   <u>EXPLANATIONS</u>

A.  <u>ACCIDENTAL</u>
An accidental death is any death that is the unintended consequence of any non-criminal event. This includes, but is not limited to:

    1.  automobile accidents
    2.  drowning
    3.  electrical shock
    4.  burns and scalds
    5.  suffocation
    6.  crushing
    7.  explosion
    8.  poisoning
    9.  carbon monoxide
    10. heat exhaustion
    11. exposure
    12. falls
    13. firearms

B.  <u>HOMICIDAL</u>
Homicide encompasses deaths which result from criminal conduct.

C.  <u>SUICIDAL</u>
Suicide involves a person intentionally causing his/her own death.

D.  <u>ABORTIONS</u>
Abortion includes any intentional death to an unborn child or to the mother.

E.  <u>SUDDEN DEATHS</u>
Sudden deaths include:

    1.  Sudden death on the street, at home, in a public place, or at a place of employment.
    2.  Alcoholism.

3. Death under unknown circumstances, whenever there are no witnesses or where little or no information can be learned concerning the deceased person. Deaths of this type include those persons whose dead bodies are found in the open, in places of temporary shelter, or in their own home under conditions which offer no indication as to cause or causes.

4. Deaths which follow injuries sustained at a place of employment or when related to injurious occupational exposure.

5. All stillborn infants where there is a suspicion of illegal interference.

6. Death of persons where attending physicians cannot be found or death of persons who have not been under continuous treatment prior to death.

## 13.0   PUBLIC ADMINISTRATOR

13.1   POLICY
It is the policy of the Buffalo Police Department to safeguard the property of persons whose death it has investigated and to notify and assist the Public Administrator in appropriate cases.

13.2   SCOPE AND AUTHORITY OF PUBLIC ADMINISTRATOR
The Public Administrator in his/her proper County, shall have the authority to take possession and charge of:

A. The real property, goods, chattels, personal estate, and credits of persons dying intestate (not having a will).

B. Any real property, or any goods, chattels, or effects, within the County, of any person known to have left surviving him/her, a competent adult entitled by law to act as his/her personal representative, and has died intestate, whether within this State or elsewhere.

C. Any goods, chattels, or effects, of such persons, which arrive in the County after his/her death.

13.3   PUBLIC ADMINISTRATOR'S SERVICES REQUIRED
The Office of the Public Administrator shall be called in the following cases:

A. When a person dies leaving no known relatives; or,

B. The deceased person's relatives are known but cannot be reached immediately; or,

C. It cannot be readily determined who the responsible relatives are; or,

D. Unusual circumstances are present that raise doubt as to the proper disposal of the deceased's property.

13.4   NOTIFICATION OF PUBLIC ADMINISTRATOR
The Public Administrator is an appointed position that changes from time to time. The 911 Communications Lieutenant and all commands shall maintain a current address and

telephone number for the Public Administrator.

13.5    PROTECTION OF PROPERTY
Whenever a person's death comes to the attention of the Department under circumstances requiring the services of the Public Administrator, the Department member shall protect the deceased's property until relieved by a competent authority. In addition, the officer shall include in the Death Report (form P-178) the following information (one copy of the Death Report to be forwarded to the Public Administrator):

A.  the time the Public Administrator was first notified and the time that (s)he arrived;

B.  the condition of the premises;

C.  when the officer is relieved by another member of this Department, the name of the relieving officer and the time relieved.

13.6    UNAVAILABILITY OF PUBLIC ADMINISTRATOR
When the Officer is unable to contact the Public Administrator, the officer's supervisor must respond to the scene. The Supervisor will contact the 911 Communications Lieutenant, and the Duty Inspector to determine how best to secure the deceased person's property until the Public Administrator can be contacted. The greater the value of the property; or the higher the risk to the property; the greater the precautions that need to be taken.

**14.0    FOUND CHILDREN AND FOUND ADULTS WITH MEMORY LOSS ISSUES**

14.1    POLICY
It is the policy of the Buffalo Police Department when encountering a found child, or when encountering an adult, who is unable to remember his/her name or place of abode, to make reasonable inquiry concerning the person's identity and residence. In the case of a found child, when the child's parents or guardians cannot be identified or located, or the child appears to be suffering from abuse or neglect, the assistance of the appropriate social service agencies will be sought.

14.2    DEFINITIONS

A.  A found child is a child found on the street or in a public place, who does not know his/her place of residence and who has not yet been reported missing by a parent, guardian or other person entrusted with the child's care.

B.  A found adult is any adult found on the street or in a public place, who does not remember his/her name or place of abode and has not yet been reported as a missing person.

14.3    FOUND CHILDREN

A.  CUSTODY

1.  A member of the Department encountering a found child shall make reasonable inquiry concerning the identity and residence of the child, in the neighborhood in which the child was found. The officer shall also query the radio dispatcher to determine if the child may have been recently reported as missing.

2.  If the initial inquiry is unsuccessful, the officer shall broadcast over the police radio a description of the child and the place where originally found.

3.  The child shall then be taken to the stationhouse and the officer shall further investigate to determine if the child has been reported as missing.

4.  If the officer is unable to determine the identity or residence of the child or locate the child's parents or guardian within one hour, Child Protective Services shall be requested to take custody of the child.

B.  CARE OF THE FOUND CHILD

1.  The officer bringing the found child to the stationhouse shall be responsible for his/her care. At the direction of the supervisor, the care of the child may be delegated to desk personnel.

2.  A sick, injured, or apparently ill child, in need of immediate medical attention, shall be taken to Women and Children's Hospital for treatment. In cases that are not urgent, Child Protective Services shall be notified.

3.  A police stationhouse is not an appropriate environment to house children for long periods of time. If the child's identity and residence cannot be established,  and the child's parents or guardian located within one hour from the time of the  child's arrival at the stationhouse, Child Protective Services shall be notified.

C.  DISPOSITION OF THE FOUND CHILD

1.  The found child shall be returned to the parents or guardian when possible, but only after the officer has determined that there has been no abuse or neglect and that the child's welfare will not be unduly threaten by such action.

2.  The child shall be turned over to Child Protective Services in all other cases.

a.  The name of the caseworker and a telephone number at which the caseworker can be contacted shall be elicited by the officer whenever a found child is released to Child Protective Services.

D.  REPORT REQUIRED - P-71  AIDED CASE REPORT
The officer handling the case shall prepare an Aided Case Report (Form P-71)     in each instance of a found child.
Distribution:   Original to Child Protection

Copy to the Sex Offense Squad
Copy to Command file


14.4    FOUND ADULTS WITH MEMORY LOSS ISSUES

A.  INITIAL ACTION

1.  When a member of the Department encounters a person who is unable to remember his/her name or place of abode, a reasonable effort shall be made to determine the person's name, address, family or friends.

2.  If unable to do so, the person's description and the location where found, should be broadcast over the radio. The officer should attempt to determine if the person has been reported as missing, and if not, a CCB message should be transmitted with a description and the location where the person was found.

3.  If the person's identity is not determined within a reasonable amount of time, an Aided Case Report (Form P-71) should be prepared and the person taken to the Erie County Medical Center Psychiatric Section.

Distribution:   Original to ECMC with the person
                Copy to the Sex Offense Squad
                Copy to Command File


**15.0   MISSING PERSONS, RUNAWAYS, AND ABDUCTED CHILDREN**

15.1    POLICY

It is the policy of the Buffalo Police Department to attempt to locate missing persons, runaways, and Amber Alert abducted children where possible and to comply with all NY State reporting requirements.  Members of the Department will periodically apprise family members of the status of open missing person investigations.

1.  To thoroughly investigate all reports of missing children.

2.  Every child under the age of 18, reported missing shall be considered "at risk" until significant information to the contrary is confirmed.

3.  If the missing child either resides in or was last seen in the jurisdiction of the Buffalo Police Department, the Department will immediately initiate the required reporting process.

4.  If the missing child resides in this jurisdiction but was last seen in another jurisdiction and the law enforcement agency responsible for that jurisdiction chooses not to initiate the required reporting process, the Buffalo Police Department will assume reporting and investigative responsibility.

5.  The Buffalo Police Department will accept the report of a missing child even if custody has not been established.

6. Members of the Department will open a case when it can be shown that the child has been removed, without explanation from his/her usual place of residence.

7. In those instances where it has been determined that:

   A. There are reasonable grounds to believe that an abduction has occurred;

      AND

   B. The officer believes that the missing child is in imminent danger of serious physical injury or death;

      AND

   C. There exists sufficient descriptive information about the victim and the abduction;

      AND

   D. The abducted party is a child whose age is 17 years or younger the supervisor shall:

      1. Immediately have the information entered into the National Crime Information Center (NCIC) system.

      2. Take all necessary steps to request activation of the "Amber Alert System" (see M.O.P Chapter 2).

## 15.2   DEFINITIONS

A. Missing Person - a missing person is any person missing from his/her usual place of abode in the City of Buffalo, under any of the following circumstances:

   1. the person is a juvenile less than 18 years of age;
   2. the person's absence is inconsistent with his/her ordinary habits;
   3. the person is unable to adequately care for himself/herself because of age, infirmity, or physical or mental handicap;
   4. the person is in need of hospitalization, or medication may be required;
   5. there exists the possibility that the person is the victim of foul play or has indicated an intention to commit suicide;
   6. the person may be a victim of a drowning, accident or disaster;
   7. the person is a mental patient who has been admitted to a mental health facility.   (Authorization to return the mental patient is outlined under the Mental Hygiene Law, Section 29.19);
   8. the person is absent without an apparent reason under circumstances indicating involuntary disappearance.

B.  The term "missing person" does <u>not</u> include any of the following:

1.  a person for whom a warrant of arrest has been issued;
2.  a person wanted in connection with the commission of a crime; **<u>or</u>**
3.  a person of the age of eighteen years or older who voluntarily leaves his/her abode. If it is clear that an adult of sound mind has left voluntarily, and there exist none of the circumstances listed in Section A above, the officer shall explain to the complainant that the police have no authority to act in such cases or to compel the adult to return home.
    <u>However, in these cases, a NYS Police Missing Person Report (pp.3 and 4) shall be completed and forwarded to SOS for filing.</u>

C. Runaway - A runaway is a missing person who is:

1.  any person under the age of eighteen years, who has run away from home without just cause, or who, in the reasonable opinion of the officer, appears to have runaway without just cause, (FCA 718); **<u>or</u>**
2.  any person under the age of eighteen years, who refuses to give his/her name or the name and address of his/her parent or other person legally responsible for the child's care, (FCA 718); or the officer reasonably doubts that the name or address given by the child is the actual name and address of the parent or other person responsible for the child's care (FCA 718).

D. Abducted Child Amber Alert Protocol Defined is:

1.  An abduction of a child (under the age of 18) has occurred, **<u>and</u>**
2.  The child is believed to be in danger of serious bodily harm or death, either due to the actions of another or due to a proven mental or physical condition.

The Buffalo Police Department does NOT sent AMBER Alert messages.  The determination to send an AMBER Alert is at the discretion of the NYSP.

**NYSP COMSEC DETERMINES IF THE AMBER ALERT WILL BE ACTIVATED.**

15.3    <u>AMBER ALERT REPORTING PROCEDURE FOR ABDUCTED CHILDREN</u>
The New York State **AMBER** Alert Plan is a voluntary partnership between law enforcement, broadcasters and others to immediately involve the public, especially motorists, in the search for an abducted child.

Investigating agencies submit information directly to the New York State Police Communications Section (COMSEC) in Albany. In turn, through use of the statewide Emergency Alert System (EAS) and other systems capable of rapidly disseminating information, details are sent to broadcasters and law enforcement agencies in the area of the abduction.  Details may include descriptions of the child, abductor and/or involved automobiles. They can be seen or heard on:

- ❑ Television stations.
- ❑ Radio stations.
- ❑ Highway variable message signs.
- ❑ Lottery in-store ticket terminals.
- ❑ NYS Thruway Authority service areas.
- ❑ DMV issuing office message boards.
- ❑ New York State AMBER, New York State Police and DCJS Missing and Exploited Children Clearinghouse websites.

Experience has shown that excessive or inconsistent use of the **AMBER** Alert Plan diminishes program integrity and effectiveness. Not only is the relationship between broadcasters and law enforcement harmed, but the public can become apathetic. To maintain program integrity, stringent activation criteria have been established and are strictly followed.

## NYS AMBER ALERT ACTIVATION PROTOCOL

The New York State **AMBER** Alert Plan can be activated when an investigating law enforcement agency confirms that:

1. An abduction of a child (under the age of 18) has occurred, **and**
2. The child is believed to be in danger of serious bodily harm or death, either due to the actions of another or due to a proven mental or physical condition.

Even if formal activation criteria have been met, activation may be impractical:

Available information is not specific enough **and/or**
An extended period of time passed since the disappearance.

For example, an **AMBER** Alert specifying involvement of a white van (without a license plate number) could actually hinder an investigation by causing the public to inundate police agencies with possible sightings.

**Notes:**

1. **"Confirms"** is defined as having reasonable cause to believe that a child has been abducted. While confirmation is usually established through eyewitness accounts, eliminating other possibilities through investigation can also be used to reasonably conclude that a child has been abducted.
2. Familial abductions qualify only if a child is endangered by the actions of the abducting family member.
3. If preliminary investigation indicates that an **AMBER** Alert is warranted, submitting an activation request should be given a very high level of priority.
4. Whenever the NYSP COMSEC declines to issue an **AMBER** Alert, requesting agencies are referred to the NYS DCJS Missing and Exploited Children Clearinghouse (MECC) for possible issuance of a Missing Child/College Student Alert and to other NYSP investigative resources.

## INVESTIGATING AGENCY AMBER ALERT ACTIVATION PROCEDURE

1.  A preliminary investigation must be done prior to requesting an **AMBER** Alert activation.

Investigating agencies should not request activation based solely on information received from a caller.

All personnel shall be familiar with DCJS 1508/nysp cb-7 (REV 1/99) "Missing Person Data Collection Guide" booklet.

➢ When a person has been confirmed as missing, the DCJS 1608 (Pages 1 & 2) shall be completed immediately.
➢ The type of case shall be determined by using the codes listed on the backside of the form. Once the code has been determined and the individual confirmed as missing the immediate supervisor shall be notified.
➢ If confirmed as meeting the Amber Alert Criteria (see above "NYS Amber Alert Activation Protocol") the parent/guardian must sign the "NYS Amber Alert Authorization to Publicize" form. This form can be found in NYS DCJS 1508 booklet.
➢ The officer shall immediately submit the "NYS Amber Alert Submission" form which can be found in the "NYS Amber Alert Law Enforcement Guidelines and Activation Forms" to the 911 Communications Lieutenant. The form will then be immediately submitted through NYSPIN.

Once investigation confirms that an abduction has occurred, activation should be viewed as just one component of the investigation. Other actions should be taken simultaneously, in accordance with agency child abduction response plans.

2.  Once an abduction has been confirmed, call the NYSP COMSEC AT (518) 457-6811 and advise that an activation request is being prepared.
3.  Photographs or digital images of the child and abductor (if known) should be obtained and submitted as soon as possible.
4.  The investigation agency must immediately enter missing child information into DCJS and NCIC missing person files (File 6 – MENT).

➢ Immediate entry of missing child information into DCJS and NCIC files is required pursuant to State and Federal Laws.
➢ The entry should contain all available biographical information and details (i.e., description of clothing; unique marks and scars; circumstances.)
➢ The entry must specify "involuntary", "endangered" or "disability".
➢ Ensure that the missing child entry is formally cross-referenced with suspect and vehicle entries (if known.)

**Note:** Activation will not be delayed if a missing person entry has not been made. However, the entry must be made immediately following the activation request.

5. Investigating agencies must also send an abduction message (File 11A) via NYSPIN.
6. Immediately before transmitting an AMBER Alert, the NYSP COMSEC will call the investigation agency to verify that information has not changed.
7. New or revised information should be immediately forwarded to NYSP COMSEC.

Updated broadcasts should be requested only when new or revised information is substantial and is likely to strengthen public involvement.

8. In the event the child is recovered or the case is determined to no longer qualify (i.e., false report), immediately notify NYSP COMSEC via telephone to facilitate a cancellation broadcast.

## INVESTIGATING AGENCY CONSIDERATIONS

1. **Expect numerous calls from the public.**

   ➤ Investigating agencies must be prepared to handle a large number of incoming inquiries and leads.
   ➤ Calls will be received at the area "911" center, as well as the "non-emergency" number submitted by the investigating agency.
   ➤ Use of a formal abduction response plan is strongly recommended. Model plans are available from the DCJS Missing and Exploited Children Clearinghouse.

2. **Non-submitting agencies should take detailed information.**

   ➤ Agencies in the area near a submitting agency should also expect numerous calls.
   ➤ Detailed information on every lead should be taken by the agency receiving the call and should be immediately forwarded to the investigating agency.
   ➤ Vital information may be lost if a caller is referred to another telephone number (i.e., he or she does not make a second call.)

3. **Non-submitting agencies should be prepared to respond to leads.**

   ➤ Non-submitting agencies may receive lead information requiring immediate action (i.e., sighting of a suspect vehicle.)
   ➤ For purposes of lead coordination, all information resulting from such a response should be promptly forwarded to the investigating agency.

4. **Be prepared for pressure to activate cases that do not meet the protocol.**

   ➤ It is likely that individuals will pressure for activation in cases that do not meet established protocols. Be prepared to explain why adherence to program protocol is necessary.

> ➢ Alternative methods of information dissemination, such as a DCJS Missing Child/College Student Alert and traditional media involvement are available in these cases and should be pursued immediately.

**When a missing child <u>or</u> college student is deemed to be endangered, but the case does <u>not</u> meet AMBER alert activation criteria, an alternative alert system is available.**

Known as a Missing Child/College Student Alert, information can be distributed electronically to every police agency in New York State, NYS Thruway travel plazas and toll barriers, broadcasters, Alert subscribers and others within minutes. Information is also placed on the NYS DCJS website. Unlike an **AMBER** Alert, EAS is not used to disseminate a Missing Child/College Student Alert and station managers decide when to broadcast information. Requests for a Missing Child/College Student Alert are made by contacting the DCJS Missing and Exploited Children Clearinghouse at 1-800-FIND-KID.

## DUTIES OF THE CITY COURT BOOKING UNIT

➢ Immediate entry of the missing child information into DCJS and NCIC files (file 6_
➢ Contains all available info
➢ Detailed description

1. Clothing, unique marks
2. Circumstances
3. Specify "involuntary", "endangered" or "disability"

➢ Ensure missing child entry is formally cross referenced with suspect and vehicle entries if known
➢ Send abduction message via NYSPIN

1. Use NYSPIN formatted abduction (F11a message)

➢ Be prepared for increased volume of phone calls. Forward calls to proper District/Unit/Squad

## RECEIVING AN AMBER ALERT FROM NYSP

Upon activation of an **AMBER** Alert by NYSP, NYSP will notify the Central Court Booking Unit, 911, and Commissioner of Police of the **AMBER** Alert by FAX.

An e-mail confirming the **AMBER** Alert will also be sent from NYSP to Commissioners, Inspectors and the 911 Dispatch Lieutenants.

The on duty 911 Lieutenant will immediately broadcast Alert details to all available units. Patrols using LPR equipment should be advised to manually place involved vehicle plate number, if available, into respective LPR databases.

The on duty 911 Lieutenant will forward the E-Mail message to all Districts and verbally notify all Districts to print and post the E-mail immediately. The E-mail will also be forwarded to the Erie Crime Analysis Center for posting on Digital signage as soon as possible.

Officers using vehicles equipped with LPR should promptly search vehicle LPR database to determine if there is a record of past encounters. If an encounter is identified, information should be forwarded immediately to NYS DCJS by calling 1-800-346-3543.

Upon cancellation of the **AMBER** Alert, the 911 Lieutenant will immediately cause a message to be broadcast as well as send an e-mail to all Districts and the Erie Crime Analysis Center advising them of the cancellation.

15.4    REPORTING

In response to incidents involving a missing person, members of the Department shall:

A. Determine if the person reported as being missing falls within the criteria set out in section Chapter 2, Section 15.6, above, (there is no minimum waiting period before a person is to be considered missing);

B. If the person reported as being missing falls within the criteria set out in Chapter 2, Section 15.6, a State of New York Police Missing Person Report (pp. 3 and 4 of the State of New York Missing Person Data Collection Guide) shall be prepared;

C. If a person reported as being missing, lives outside the City of Buffalo, the person making the report should be referred to the police agency in the jurisdiction in which the missing person resides. If that police agency deems it necessary, it can contact this Department through the 911 Communications Lieutenant;

D. If a person reported as being missing was temporarily living in the City or who was visiting the City, a State of New York Police Missing Person's Report shall be prepared. In such case, the member accepting the report shall notify the 911 Communications Lieutenant who shall notify the police agency in the jurisdiction of the missing person's permanent residence, via teletype. The other police agency shall be requested to provide any pertinent information concerning the missing person;

E. When an attempt is made to report a missing person at a stationhouse other than the one that covers the area of the missing person's residence, desk personnel shall prepare the report and arrange to have it delivered as soon as possible to the appropriate district.

15.5    SEARCH FOR PERSONS UNDER TWELVE YEARS OF AGE

A. When a person under the age of twelve is reported missing, the member of the Department handling the incident shall immediately notify the supervisor who shall respond to the scene.

B. The Supervisor shall direct his/her officers in conducting a search of the child's residence, the neighborhood of the residence, and the location where the child was last seen.

C. The extent of the search will be determined by the age of the child and the circumstances surrounding the disappearance. Factors to be considered:

    1. age and sex of the child,
    2. attractive nuisances in the area,
    3. previous history of running away,
    4. recent disciplinary action by parent,
    5. mental and physical condition.

D. A description of the missing person, the location where last seen, and the probable direction or destination, shall be broadcast over the police radio.

E. The supervisor shall request the assistance of S.O.S, district detectives, K-9 units, the Erie County Sheriff's Department helicopter, or additional officers, when their presence may prove helpful in locating the missing child.

F. The Supervisor shall keep his/her superiors informed of all pertinent information and any significant changes in the status of the case.

## 15.6   CHANNELING REPORTS

A. After the NYS Police Missing Person Report (pp.3 and 4) has been completed, it shall be turned over to desk personnel at the stationhouse;

B. Desk personnel will transmit a Departmental CCB message concerning the missing person and alert the City Court Booking unit;

C. City Court Booking will enter the required information into the NYSPIN network;

D. Where immediate investigation is required, the missing person report shall be brought to the attention of the Sex Offense Squad, and in their absence, the 911 Communications Lieutenant.

E. One copy of the NYS Police Missing Person Report will be forwarded to City Court Booking who shall retain a copy of the report and maintain an up to date, Department wide list of all missing persons.

## 15.7   SEX OFFENSE SQUAD RESPONSIBILITY

A. SOS shall be responsible for the follow up investigation of all missing persons throughout the city.

B. As soon as practicable after a person has been reported missing, SOS shall finish completing the NYS Missing Person Collection Guide booklet that has been

COB000342

forwarded by the Patrol Division, and SOS shall forward a copy of the report to City Court Booking except that the booklet need not be completed if the missing person has already been located.

C.  Whenever a missing person is located, SOS shall:

1.  cause a Department wide CCB message to be transmitted; and
2.  promptly notify City Court Booking.

D.  SOS shall maintain communication with the missing person's family until the missing person has been located. Contact shall be made no less than bi-weekly.

E.  SOS shall maintain a list of all persons reporting missing within the City of Buffalo. The list shall include:

1.  all persons currently missing;
2.  the date reported missing;
3.  the name of the complainant;
4.  the date the complainant was last contacted;
5.  the status of the case (e.g. still missing, found, etc.).

F.  SOS shall establish a procedure for identifying persons who have been missing for more than thirty (30) days. For those persons missing more than thirty (30) days, SOS shall forward pages 20 through 28 of the NYS Missing Person Data Collection Guide to the missing person's dentist. If there are several dentists, a separate copy will be made and sent to each. If the missing person did not have a dentist of record or if the dentist is unknown, page 21 will reflect that fact. Page 21 will then be forwarded to the Division of Criminal Justice Services (DCJS).

## 15.8    RUNAWAYS

Members of the Department apprehending a runaway shall:

A.  determine if there are any current juvenile warrants for the runaway;

B.  if there are no current warrants, return the runaway to his/her parent or other person legally responsible for the child's care, or as an alternative, the officer may take the runaway to a facility approved for such purposes by the State Department of Social Services;

C.  determine if the runaway has been reported missing and is currently listed as a missing person;

D.  cause CCB and NYSPIN messages reporting the runaway as missing to be canceled;

E.  if the child has runaway from within Erie County, but outside the City limits, the 911 Communications Lieutenant shall make arrangements for the child's return with:

1.  the child's parents or other person legally responsible for his/her care, or

   2. the law enforcement agency of the locality from which the child has runaway;

F. if the runaway is from a place outside of Erie County, the child may be placed in detention pending his/her return. The Detention Center must first be contacted and all required documentation presented before the runaway will be admitted.

G. prepares a report containing the following:

   1. Name and address of runaway
   2. age and date of birth
   3. school and grade attending
   4. time and place apprehended
   5. physical condition
   6. name and address of person to who released.
      Distribution: Original to CCB
                    Copy to Command files

## 16.0 CHILD ABUSE/NEGLECT

### 16.1 POLICY

It is the policy of the Buffalo Police Department to protect children from abuse, neglect and maltreatment; to thoroughly investigate such incidents; and to make reports to and cooperate with Child Protective Services and other social service agencies in dealing with children in these circumstances.

### 16.2 DEFINITIONS

A. Child Abuse (section 1012(e) F.C.A.)

"Abused child" means a child less than eighteen years of age whose parent or other person legally responsible for his/her care;

   I. inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, **or**
   II. creates or allows to be created a substantial risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, **or**
   III. commits, or allows to be committed an offense against such child defined in article one hundred thirty of the penal law; allows, permits or encourages such child to engage in any act described in sections 230.25, 230.30 and 230.32 of the penal law; commits any of the acts described in section 255.25 of the

penal law; or allows such child to engage in acts or conduct described in article two hundred sixty-three of the penal law provided, however, that (a) the corroboration requirements contained in the penal law and (b) the age requirement for the application of article two hundred sixty-three of such law shall not apply to proceedings under this article.

B. <u>Child Neglect (section 1012(f) F.C.A.)</u>

"Neglected child" means a child less than eighteen years of age:

    I. whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his/her parent or other person legally responsible for his/her care to exercise a minimum degree of care

    II. in supplying the child with adequate food, clothing, shelter or education in accordance with the provisions of part one of article sixty-five of the education law, or medical, dental, optometric or surgical care, though financially able to do so or offered financial or other reasonable means to do so; or

    III. in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment; or by misusing a drug or drugs; or by misusing alcoholic beverages to the extent that he loses self-control of his/her actions; or by any other acts of a similarly serious nature requiring the aid of the court; provided, however, that where the respondent is voluntarily and regularly participating in a rehabilitative program, evidence that the respondent has repeatedly misused a drug or drugs or alcoholic beverages to the extent that he loses self-control of his/her actions shall not establish that the child is a neglected child in the absence of evidence establishing that the child's physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as set forth in paragraph (I) of this subdivision; or (II) who has been abandoned, in accordance with the definition and other criteria set forth in subdivision five of section three hundred eighty-four-b of the social services law, by his/her parents or other person legally responsible for his/her care.

## 16.3   <u>HANDLING CHILD ABUSE/NEGLECT CASES</u>

When a member of the Department comes upon a situation involving a case of suspected child abuse or maltreatment, the member shall:

A. take immediate steps to see that the child receives emergency medical care, if required;

B. determine whether the child needs to be immediately removed from the home;

C.  contact the NYS Child Abuse and Maltreatment Register 1-800-342-3720;

D.  arrest the perpetrator in appropriate cases.

16.4    <u>REMOVAL OF THE CHILD FROM THE HOME</u>

A.  <u>Authority</u>

1.  <u>Temporary Removal **With** Consent</u>
A Peace Officer acting pursuant to his/her special duties, or a Police Officer, may remove a child from the place where the child is residing <u>with the written consent</u> of the parent or other person legally responsible for his/her care, if the child is an abused or neglected child.

2.  <u>Emergency Removal **Without** Court Order</u>
A peace officer, acting pursuant to his/her special duties, police officer, or a law enforcement official, or an agent of a duly incorporated society for the prevention of cruelty to children or a designated employee of a city or county department of social services shall take all necessary measures to protect a child's life or health including, when appropriate, taking or keeping a child in protective custody, and any physician shall notify the local department of social services or appropriate police authorities to take custody of any child such physician is treating, without an order under section one thousand twenty-two and without the consent of the parent or other person legally responsible for the child's care, regardless of whether the parent or other person legally responsible for the child's care is absent, if (i) such person has reasonable cause to believe that the child is in such circumstance or condition that his/her continuing in said place of residence or in the care and custody of the parent or person legally responsible for the child's care presents an imminent danger to the child's life or health; and (ii) there is not time enough to apply for an order under section one thousand twenty-two.  If a person authorized by this section removes or keeps custody of a child, he shall (i) bring the child immediately to a place approved for such purpose by the local social services department, unless the person is a physician treating the child and the child is or will be presently admitted to a hospital, and (ii) make every reasonable effort to inform the parent or other person legally responsible for the child's care of the facility to which he has brought the child, and (iii) give, coincident with removal, written notice to the parent or other person legally responsible for the child's care of the right to apply to the family court for the return of the child pursuant to section one thousand twenty-eight of this act, and of the right to be represented by counsel in proceedings brought pursuant to this article and procedures for obtaining counsel, if indigent. Such notice shall also include the name, title, organization, address and telephone number of the person removing the child, the name, address, and telephone number of the authorized agency to which the child will be taken, if available, the telephone number of the

person to be contacted for visits with the child, and the information required by section one thousand twenty-three of this act. Such notice shall be personally served upon the parent or other person at the residence of the child provided, that if such person is not present at the child's residence at the time of removal, a copy of the notice shall be affixed to the door of such residence and a copy shall be mailed to such person at his/her or her last known place of residence within twenty-four hours after the removal of the child. If the place of removal is not the child's residence, a copy of the notice shall be personally served upon the parent or person legally responsible for the child's care forthwith, or affixed to the door of the child's residence and mailed to the parent or other person legally responsible for the child's care at his/her last known place of residence within twenty-four hours after the removal. An affidavit of such service shall be filed with the clerk of the court within twenty-four hours of serving such notice exclusive of weekends and holidays pursuant to the provisions of this section. The form of the notice shall be prescribed by the chief administrator of the courts. Failure to file an affidavit of service as required by this subdivision shall not constitute grounds for return of the child. (iv) Inform the court and make a report pursuant to title six of the social services law, as soon as possible. (c) Any person or institution acting in good faith in the removal or keeping of a child pursuant to this section shall have immunity from any liability, civil or criminal, that might otherwise be incurred or imposed as a result of such removal or keeping. (d) Where the physician keeping a child in his/her custody pending action by the local department of social services or appropriate police authorities does so in his/her capacity as a member of the staff of a hospital or similar institution, he shall notify the person in charge of the institution, or his/her designated agent, who shall then become responsible for the further care of such child.   (e) Any physician keeping a child in his/her custody pursuant to this section shall have the right to keep such child in his/her custody until such time as the custody of the child has been transferred to the appropriate police authorities or the social services official of the city or county in which the physician maintains his/her place of business. If the social services official receives custody of a child pursuant to the provisions of this section, he shall promptly inform the parent or other person responsible for such child's care and the family court of his/her action.

B. <u>Duties Upon Removal</u>

Whenever a member of the Department removes a child from the child's residence or retains custody of a child, under circumstances described in 2/16.12A, above, the member shall:

1. take the child to the stationhouse and request the assistance of Child Protective Services;
2. fully inform the Child Protection worker of the circumstances surrounding the

removal of the child;

3. relinquish custody of the child to the Child Protection worker after obtaining the worker's name and telephone number;

4. arrange with the Child Protection worker to provide the parent or other person legally responsible for the child's care, written notice as required in Section F.C.A.1026, b, iii;

C. Any person or institution acting in good faith in the removal or keeping of a child pursuant to the Family Court Act shall have immunity from any liability, civil or criminal, that might otherwise be incurred or imposed as a result of such removal or keeping.

## 16.5    REPORTS REQUIRED

When any member of the Department has reasonable cause to suspect that a child is abused or maltreated, the member must:

A. prepare a "Report of Suspected Child Abuse or Maltreatment" (Form LDSF-2221-A);

B. immediately make an oral report by telephone to the NYS Child Abuse and Maltreatment register at 1-800-342-3720 (local emergency numbers 830-3657 or 883-3658);

C. forward a completed form LDSF-2221-A in a sealed enveloped to the Sex Offense Squad, and the Sex Offense Squad shall make and retain a copy of the report, forwarding the original to Child Protection and Abuse, 814 Ellicott Square, 295 Main Street, Buffalo, NY 14203;

D. both the oral and written reports described in this section are mandated by the NYS Social Services Law;

E. prepare a crime report if a crime has occurred.

## 16.6    FOLLOW UP PROCEDURE

The Sex Offense Squad shall be responsible for follow up investigation of child abuse and maltreatment cases. It shall coordinate its efforts with those of Child Protective Service, especially in those circumstances where criminal prosecution of the offender is possible.

# CHAPTER 3: ARRESTS

## CONTENTS

**1.0    POWER AND AUTHORITY TO ARREST**
1.1    Policy
1.2    Arrest Without a Warrant
1.3    Arrest With A Warrant
1.4    Informing the Suspect of the Officer's Authority and Purpose
1.5    Unconditional Release of Arrested Person
      A.  Warrantless Arrest
      B.  Arrest Pursuant to a Warrant
      C.  Reports Required
1.6    Entering Premises to Make an Arrest
      A.  Without an arrest warrant
      B.  With an arrest warrant
      C.  Making notice of authority and purpose
      D.  Entry
1.7    Housing Projects
1.8    New York State Thruway Jurisdiction
1.9    Peace Bridge Jurisdiction
1.10   Vessels of US or Foreign Registry
1.11   International Boundary
1.12   Federal Cases
      A.  US Marshals - US Warrants
      B.  Federal Crimes
      C.  Federal Lands/Property
      D.  Courts and Magistrates in Federal Criminal Cases
1.13   Diplomatic Immunity

**2.0    CONSTITUTIONAL GUARANTEES**
2.1    Policy
2.2    Rights to Be Protected

**3.0    INTERROGATIONS**
3.1    Policy
3.2    Non Custodial Interrogations
3.3    Custodial Interrogations
3.4    Spontaneous Admissions
3.5    Taking Statements - Generally
3.6    Written Statements
3.7    Statements of Complainants and Witnesses
3.8    CPL 710.30 Requirement
3.9    Right to Counsel After Criminal Complaint Filed

**4.0    SEARCHES AND SEIZURES**
4.1    Policy
4.2    Searches and Seizures - Generally

4.3    Exceptions to the Search Warrant Requirement
      A.  Arrest Warrant Exception
      B.  Search Incident to Arrest
      C.  Consent Search
      D.  Frisk
      E.  Plain View Observation
      F.  Abandoned or Discarded Property
      G.  Open Fields Exception
      H.  Automobile Searches
      I.   Inventory Searches
      J.   Exigent Circumstances
      K.  Administrative Searches
      L.  Searches Expressly Allowed by Statute
            1.  Environmental Searches
            2.  Probation Search Orders
            3.  Parole Searches
4.4    Search Warrants
4.5    Obtaining Search Warrants
4.6    Executing Search Warrants - Legal Requirements
4.7    Executing Search Warrants - Strategic Planning

**5.0    EYEWITNESS IDENTIFICATION**
5.1    Policy
5.2    Eyewitness Identification - Generally
5.3    Show-Up Identifications
5.4    Photo Array Identification
5.5    Line-Up Identifications
5.6    Defendant's Right to Counsel at Line-Up Identifications

**6.0    USE OF FORCE**
6.1    Policy
6.2    Use of Force - Generally
6.3    Use of Force Continuum
      A.  Cooperative
      B.  Verbal Resistance
      C.  Constructive Resistance
      D.  Physical Resistance
      E.  Deadly Resistance
6.4    Use of Deadly Physical Force
6.5    Use of Firearms
6.6    Drawing Weapons
6.7    Reporting Requirements - Use of Force or Injuries to Civilians
6.8    Persons Injured Resulting From the Use of Force
6.9    Use of Chemical Spray
6.10   Persons Killed or Seriously Injured From the Use of Deadly Physical Force
6.11   Discharge of Firearms - Reporting Requirements
6.12   Administrative Duty
6.13   Annual Instruction on Use of Force

**7.0    TRANSPORTING PRISONERS AFTER ARREST**
7.1    Policy
7.2    Preliminary Searches
7.3    Restraints
7.4    Method of Transporting Prisoners After Arrest
7.5    Transporting Prisoners of the Opposite Gender
7.6    Handicapped Prisoners
7.7    Escaped Prisoners

**8.0    ARREST BOOKING PROCEDURES**
8.1    Juvenile Arrests
8.2    City Court Booking
8.3    Remanding of the Prisoner to the City Court Lock-Up
8.4    Searching Prisoners at City Court Booking
8.5    Responsibility for Searching the Prisoner at City Court Booking
8.6    Searching Prisoners of the Opposite Gender
8.7    Strip Searches
8.8    Strip Searches – Female Prisoners
8.9    Filing of Accusatory Instruments – Preparation of Court Folders
8.10   Circumstances Particular to Arrests Hostile/Combative Prisoners
8.11   Prisoners Requiring Medical/Psychological Treatment Prior to Booking
8.12   Prisoners Requiring Medical/Psychological Treatment after Confinement in the
       City Court Lock-Up
8.13   Persons Turning Themselves in on a Warrant
8.14   Preparing and Handling Arrest Documents
8.15   Fingerprinting and Photographing Prisoners
8.16   Prisoners Charges by the Buffalo Police Department who are also Wanted by an Outside
       Agency
8.17   Booking Prisoners Arrested by a Private Person
8.18   Arrest Made while Engaged in Outside Employment

**9.0    PRISONER'S PROPERTY**
9.1    Policy
9.2    Processing Prisoner's Property
9.3    Returning Prisoner's Property
9.4    Discrepancy Claims and Missing Prisoner's Property
9.5    Prisoner's Vehicles

**12.0   ARRESTS FOR DWI/DWAI**
12.1   Policy
12.2   Conducting Field Sobriety Tests
12.3   Breathalyzer Testing - Generally
12.4   Breathalyzer Testing Procedure
12.5   Alternative to Breathalyzer Testing
12.6   Defendant's Refusal to Submit to Chemical Test
12.7   Compelling Submission to a Chemical Test - Fatal and Serious Physical Injury
       Accidents

**13.0     DOMESTIC VIOLENCE INCIDENTS**
13.1     Policy
13.2     Definitions
13.3     911 Procedures
13.4     Responding Officer Procedures
        A.  On Scene Investigation
        B.  Arrest
        C.  Victim Assistance/Crime Prevention
13.5     Forms to be Completed
13.6     Police Academy Responsible for Training
13.7     Domestic Disputes Involving Department Members
13.8     Officers Responding to Domestic Disputes Involving Department Members
13.9     Supervisor's Duties - Department Members Involved
13.10    Duties of Commanding Officers and/or District Chiefs
13.11    Internal Affairs Division - Responsibilities
13.12    Involved Member's Responsibility

**14.0     ORDERS OF PROTECTION**
14.1     Policy
14.2     Enforcing Orders of Protection - Arrest
14.3     Handling Orders of Protection

**15.0     ADDITIONAL BOOKING PROCEDURES IN PARTICULAR CASES**
15.1     Homicide Arrests
15.2     Welfare Abuses
15.3     Foreign Nationals
15.4     Sex Related Offenses
15.5     Arrest of Operators of Common Carriers
15.6     Traffic Arrests
15.7     Mass Arrests
15.8     Military Deserters

**16.0     MENTALLY ILL**
16.1     Policy
16.2     Mental Illness Defined
16.3     Powers and Duties of Police Officer/Peace Officers
        A.  Emergency Admissions by Police Officers
        B.  Emergency Admissions by Director of Community Services
        C.  Apprehending Escapees From a Mental Health Facility
        D.  Mental Hygiene Warrants
16.4     Handling the Mentally Ill
        A.  General Guidelines
        B.  Using Force and Using Restraints
        C.  Armed and Dangerous Mentally Ill Persons
        D.  Searching the Mentally Ill Person
16.5     Transporting Apparently Mentally Ill Persons
16.6     Disposition of Mentally Ill Person's Property
16.7     If No Criminal Charges are Placed

16.8    If Criminal Charges are Placed
16.9    If the Apparently Mentally Ill Person is Refused Admission
16.10   Attempted Suicides
16.11   Required Forms
16.12   Alternate Procedures

**17.0    <u>JUVENILE OFFENDERS</u>**
17.1    Policy
17.2    Categories of Juvenile In Trouble With the Law
        A.  Petty Offender
        B.  Person In Need of Supervision PINS
        C.  Juvenile Delinquent
        D.  Juvenile Offender (As Defined in the Penal Law)
17.3    Handling Juvenile Petty Offenders
17.4    Handling Persons in Need of Supervision
        A.  Investigating Complaints
        B.  Taking into Custody
        C.  Family Court in Session
        D.  Family Court Not in Session
17.5    Handling Juvenile Delinquents
        A.  Power and Authority to Take Into Custody
        B.  Family Court in Session
        C.  Family Court Not in Session
        D.  Fingerprinting and Photographing Juveniles
        E.  Custody and Release of Juveniles
        F.  Family Court Appearance Ticket
17.6    Handling Juvenile Offenders
17.7    Arranging For Detention For Juveniles
17.8    Interviewing Juveniles
17.9    Juveniles Under the Influence of Alcohol/Drugs

**18.0    <u>ARREST WARRANTS</u>**
18.1    Policy
18.2    Requests for Arrest Warrants
18.3    All Warrants to be Processed at City Court Booking
18.4    Distribution of Arrest Warrants
18.5    Warrant Log -District/Unit Responsibility
18.6    Warrant/Want Form
18.7    Responsibility for Serving Arrest Warrants
18.8    Post Arrest Procedures - Local Criminal Court Warrants
18.9    Post Arrest Procedures - Superior Court Warrants
18.10   Unserved Warrants
18.11   Transfer of Warrants
18.12   Warrant Arrests For Outside Agencies
18.13   Arrest on City Warrants By Outside Agencies
18.14   Extradition

**19.0  APPEARANCE TICKETS**
19.1  Policy
19.2  Appearance Ticket
19.3  Issuing Appearance Tickets at City Court Lock-up/City Court Booking

**20.0  ADJUDICATION SUMMONS**
20.1  Policy
20.2  Adjudication Summons - Defined
20.3  Distribution of Adjudication Summons Books
20.4  Obtaining Adjudication Summons Books
20.5  Units to Maintain a Record of Adjudication Summons Books
20.6  Care of Adjudication Summons Books
20.7  Issuing Adjudication Summonses to Violators
20.8  Preparing the Adjudication Summons
20.9  Voiding Adjudication Summonses
20.10  Adjudication Summonses - Where Returnable
20.11  Members Appearance at the Administrative Adjudication Bureau
20.12  Administrative Adjudication Hearing Guidelines
20.13  Court Date of Appearance
20.14  Processing Adjudications Summonses - Command/Unit Responsibility

## 1.0    POWER AND AUTHORITY TO ARREST

1.1    POLICY
It is the policy of the Buffalo Police Department to exercise in a fair and impartial manner, all those powers of arrest conferred by law on Police Officers and to do so in a manner consistent with the stated mission of the Department.

1.2    ARREST WITHOUT A WARRANT

A.  Violations and Traffic Infraction
A Buffalo Police Officer may make an arrest without a warrant for a violation or a traffic infraction if:

1. the offense or traffic infraction is believed to have been committed in the Police Officer's presence; and,
2. the offense or traffic infraction is believed to have been committed in the City of Buffalo; and,
3. the arrest is made in Erie County, or in any adjoining county.

B.  Felonies and Misdemeanors
A Buffalo Police Officer may make an arrest without a warrant anywhere in the State of New York, when (s)he reasonably believes that a felony or misdemeanor was committed within the State.

C.  Continuous Close Pursuit
1. Crimes
If a member of the Department has authority to make a summary arrest for a crime in this State, (s)he can make an arrest in any adjoining state for that crime, if the arrest of the suspect immediately follows a continuous close pursuit that originated in New York State.
2. Petty Offenses
If a member of the Department has authority to make a summary arrest for a petty offense, (s)he can make an arrest for that petty offense in any County in New York State, if the arrest of the suspect immediately follows a continuous close pursuit that originated in the county in which the petty offense was committed or in an adjoining county.

D.  City Ordinances
Each sworn member of the Police Force shall have authority to arrest without process any person committing, threatening, or attempting to commit any violation of an ordinance of the city. (City Charter Section 230).

1. While having authority to enforce all City Ordinances, Officers shall not attempt to enforce those ordinances with which they have no familiarity and which are normally enforced by other agencies of City government (e.g. building codes, fire codes, health codes, plumbing codes, etc.).

2. In lieu of effecting an arrest for a City Ordinance violation, the member may

issue an Adjudication Summons (refer to M.O.P. Chapter 3).

1.3    ARREST WITH A WARRANT
A warrant of arrest issued by a local criminal court may be executed anywhere in the county of issuance or an adjoining county, by any Police Officer to whom it is addressed or a delegate of that Police Officer. It may be executed anywhere in NY State if endorsed by the local criminal court in the county in   which the arrest is to be made.

1.4    INFORMING THE SUSPECT OF THE OFFICER'S AUTHORITY AND PURPOSE
When making an arrest the Officer must inform the suspect of the Officer's authority and purpose and the reason for making the arrest, or in the case of an arrest pursuant to a warrant, the Officer must inform the suspect of the existence of the warrant and the associated offenses, unless the Officer encounters        physical resistance, flight or any other factor that renders such procedure impractical.

1.5    UNCONDITIONAL RELEASE OF ARRESTED PERSON

A.  Warrantless Arrest
If, after making a warrantless arrest of a person, regardless of the offense, the Officer discovers that there does not exist reasonable cause to believe that the arrested person committed the offense or any other offense based upon the conduct in question, the Officer must cause the immediate release of the person from custody.

B.  Arrest Pursuant to an Arrest Warrant
If an Officer arrests a person on a warrant and it is later determined that the warrant in question has previously been served on the Defendant or that the warrant was withdrawn, the Officer must cause the immediate release of the person from custody.

C.  Reports Required
In each instance in which a suspect is unconditionally released from custody, the Officer shall prepare a complete report on an Intra-Departmental Memorandum explaining the details of the incident.
Distribution: Original to Commissioner's Office
Copy to Division/District Chief
Copy to CCB
Copy to Command Files

1.6    ENTERING PREMISES TO MAKE AN ARREST

A.  Without an Arrest Warrant
A Buffalo Police Officer may enter any premises in which the Officer reasonably believes the defendant to be present except the defendant's dwelling or the dwelling of a third party. The Officer may enter the defendant's dwelling or the dwelling of a third party without an arrest warrant or search warrant only in those cases where there exist exigent circumstances which lead the Officer to believe that:

1.  a crime has been committed or is being committed, and

2. that immediate action is essential to terminate the crime, or the Officer reasonably suspects that (s)he or others will suffer physical injury or death, or (s)he reasonably believes that evidence of the crime will be destroyed or otherwise lost.

B. <u>With an Arrest Warrant</u>
A Buffalo Police Officer may enter any premises in which the Officer reasonably believes the defendant to be present, except the dwelling of a third party who is not the subject of the arrest warrant. If the defendant is reasonably believed to be in the dwelling of a third party, a search warrant must be obtained.

C. <u>With A Search Warrant</u>
Refer to M.O.P. Chapter 3.

D. <u>Making Notice of Officer's Authority</u>
Before making entry the Officer must give, or make reasonable effort to give, notice of his/her authority and purpose to the occupant, unless there is reasonable cause to believe that giving such notice will:

1. result in escape, or an attempt to escape; or,
2. endanger the life or safety of the Officer or another; or,
3. result in the destruction, damage, or secretion of material evidence.

E. <u>Entry After Giving Notice of Authority</u>
If, after giving notice, or if (s)he is authorized to enter without giving notice, the Officer may enter the premises, and by a breaking if necessary.

1.7 <u>HOUSING PROJECTS</u>
Members of the Department shall provide to housing projects located within the City of Buffalo, police service of the same character and to the same extent as that provided to other City residents.

1.8 <u>NEW YORK STATE THRUWAY JURISDICTION</u>

A. Law enforcement responsibility on the Niagara Section of the New York State Thruway, within the boundaries of the City of Buffalo, lies with the New York State Police Thruway Detail. It encompasses all that section of the Thruway (including exit and entrance ramps) that extends from the Ogden Street Exit/Entrance on the east to the center line of Vulcan Street on the west. It does not include the arterial expressways or the feeder sections of the system.

B. Traffic infractions committed on the Niagara Section of the Thruway are the sole jurisdiction of the State Police Thruway Detail. No member of the Buffalo Police Department shall make a traffic infraction arrest on this stretch of roadway.

C. If an investigation, by pursuit or otherwise, takes a member onto the Niagara Section of the Thruway within the City Limits, the member will be accorded all possible cooperation by the Thruway Detail. Conversely, all members of the Department will

accord all possible cooperation to the Thruway Detail if an investigation takes them off the Thruway.

1.9    PEACE BRIDGE JURISDICTION

Only the American sector of the Peace Bridge is within the jurisdiction of members of the Department. The American sector extends to the middle of the bridge where the international boundary with Canada is clearly marked. Members have no arrest power on the Canadian side of the bridge.

1.10    VESSELS OF UNITED STATES OR FOREIGN REGISTRY

A sworn member's power to arrest within New York State extends to any vessel, whether of US or foreign registry, that is on the United States' side of the International Boundary line.

1.11    INTERNATIONAL BOUNDARY

The City, State, and Federal boundaries in Lake Erie and the Niagara River are coterminous.

The break wall is well within the City and State boundary. The South Harbor entrance on the break wall is about 3 1/4 miles due east of the International Boundary.

The North Harbor entrance is approximately one mile due east of the International Boundary. The City Water Intake Station is approximately 1,000 feet east of the International Boundary.

The International Boundary is in about the middle of the Niagara River. The exact location can be determined by reference to the Niagara Upper Chart No. 312 of 1949 prepared by the US Corps of Engineers.

For further reference, the City Charter more fully delineates the boundaries of the City of Buffalo.

1.12    FEDERAL CASES

A.    United States Marshals - U. S. Warrants

No member of the Department shall arrest, or assist in making an arrest, on a United State Warrant, except when called upon by a United States Marshall who is in the immediate discharge of his/her duties, and who needs assistance.

B.    Federal Crimes

Members of this Department shall not make arrests for Federal Crimes. Whenever a violation of a Federal Law comes to the attention of a member of the Department, the appropriate Federal Agency shall be immediately contacted.

**NOTE**: In some situations, conduct constituting a crime may violate both state and federal statutes (e.g. bank robbery). In such cases, sworn members of the Buffalo Police Department may arrest the suspect and charge him/her with the state law violation. The District Attorney's Office and the US Attorney's Office will ultimately decide if the

defendant shall be tried in state or federal court.

C. Federal Lands/Property
The Buffalo Police Department has no jurisdiction over Federal property for which the Federal Government has accepted a deed of cession executed by the State of New York. There are three such locations within the City of Buffalo. They are the Veteran's Administration Hospital at 3495 Bailey Avenue, the US Court House at 68 Court Street and the track of sovereign land known as the Seneca Buffalo Creek Casino at 1 Fulton Street. Any Buffalo Police Department member directed to respond to either of these facilities or has a need to conduct an investigation /serve warrants, etc., shall contact the appropriate Federal Police Agency for assistance. For the US Court House, contact the Federal Protection Safety Division Police, and for the Veteran's Administration Hospital, contact the Veteran's Administration Police. Questions concerning criminal jurisdiction on Federal property shall be referred to the US Attorney and the Erie County District Attorney for resolution.

D. Courts and Magistrates in Federal Criminal Cases
All cases involving violations of Federal Statutes are within the jurisdiction of the U. S. District Court, located at 68 Court Street, Buffalo, NY, 14202.

## 1.13 DIPLOMATIC IMMUNITY

A. No member of the Department shall arrest, issue a parking tag to, or issue a summons to, any person who is entitled to diplomatic immunity.

B. Persons entitled to diplomatic immunity should have in their possession an identification card that is issued by the U. S. Department of State and that displays the words either "United Nations" or "Diplomatic."

1. United Nations Identification Card
The United Nations card is embossed with the seal of the United Nations. It contains the name, title, date of issue, and the picture and signature of the envoy. The seal of the Department of State is included, together with the signatures of the Secretary of State and the Chief of Protocol.

2. Diplomatic Identification Card
The Diplomatic Card is embossed with a seal of the Department of State and includes the photograph and signature of the diplomatic agent. It also includes the diplomat's title, diplomatic mission, and if a family member of a diplomat, his/her relationship to the named individual. The card is signed by the Chief of Protocol for the Secretary of State.

3. Issues concerning eligibility for diplomatic immunity can be referred to:
   a) US Department of State Operation Center (202) 647-1512
   b) US Department of State Protocol Office   (202) 647-1984

C. Instead of arresting, issuing a parking tag or issuing a summons to such person, the member shall obtain the person's name and title, the government that (s)he represents,

or, in the case of a parking violation, the license number of the vehicle. This information shall be forwarded to the member's Commanding Officer on an Intra-Departmental Memorandum.

> Distribution:   Original and first copy to Commissioner
> Copy to Division or District Chief

D.  Members of the Department shall be courteous to such persons and treat them with due respect.

## 2.0   CONSTITUTIONAL GUARANTEES

2.1   POLICY

It is the policy of the Buffalo Police Department to protect those rights and freedoms guaranteed to all citizens by both the New York State and the United State Constitutions. The constitutional rights of those suspected of engaging in criminal activity shall in no way be diminished.

2.2   RIGHTS TO BE PROTECTED

While it is the duty of every member of the Department to vigilantly protect all those rights enumerated in the New York State and United States Constitutions, the following rights are most commonly implicated in the law enforcement context:

A.  freedom of speech, religion and the press, and the right to peacefully assemble;

B.  freedom from unreasonable searches and seizures;

C.  freedom from self incrimination;

D.  the right to a speedy trial and to confront witnesses;

E.  the right to have counsel present during questioning and at other critical stages of the proceedings.

## 3.0   INTERROGATIONS

3.1   POLICY

It is the policy of the Buffalo Police Department to enhance the preparation and presentation of cases by obtaining statements from witnesses, suspects and defendants. All questioning must be consistent with the constitutional rights guaranteed to the person being questioned.

3.2   NON CUSTODIAL INTERROGATIONS

If a suspect is not in custody, or is not in any significant way deprived of his/her freedom, the suspect need not be apprised of the Miranda Warnings before being questioned.

A.  Miranda Warnings need not be recited to a motorist who has been stopped for a traffic infraction. If the motorist is in custody for a traffic misdemeanor or felony (e.g.. DWI), the warnings are required.

B.  A person temporarily detained in a "stop and frisk" situation need not be apprised of the warnings.

C.  At that point in a non custodial interrogation when the suspect is taken into custody or deprived of his/her freedom in a significant way, the suspect must be given the Miranda Warnings before any additional questioning can be done.

3.3    CUSTODIAL INTERROGATIONS

A.  Generally, custodial interrogation means:

1.  the person has been taken into custody, or otherwise deprived of his freedom in a significant way; or,
2.  the interrogation takes place in a police dominated environment and the suspect is deprived of communication with others; or,
3.  the suspect is thrust into an unfamiliar environment and subjected to interrogation; or,
4.  when a suspect is in police custody, he is surrounded by antagonistic forces and subjected to techniques of persuasion.

B.  When conducting custodial interrogations, the Miranda Warnings must be given before any questions are posed to the suspect.

C.  The Miranda Warnings should be read from the Miranda Rights Card supplied by the Department.

D.  Questioning of the suspect can only proceed if the suspect waives his/her Miranda rights. The burden of proof is on the government to show that the waiver was made voluntarily, knowingly and intelligently. The member shall record the date, time and exact words used by the suspect in waiving his/her rights. The member should also attempt to have the suspect sign the Miranda Rights card as well as have the suspect include the date and time of the waiver.

3.4    SPONTANEOUS ADMISSIONS
It is not necessary to advise a suspect of the Miranda Warnings if the member of the Department does not ask the suspect any questions concerning the illegal activity. Spontaneous and unelicited statements made by the suspect are admissible even though the Miranda Warnings were not given.  For these type statements to be admissible in court they cannot be made in reply to a question from the Officer nor may they be made as a response to a statement made by the Officer when it is likely the Officer's statement would elicit such a response (refer to CPL 710.30 in Chapter 3).

3.5    TAKING STATEMENTS - GENERALLY

A.  Miranda Warnings must be given where appropriate (refer to Chapter 3, above).

B.  It is recommended at least one witness should be present for the signing of a statement.

C. The question and answer style statement is preferred to the narrative type statement. The question and answer style statement is easier to correct and less prone to ambiguity.

D. Leading questions that elicit a "yes" or "no" response, should be avoided.

E. For questioning juveniles, refer to M.O.P. Chapter 3.

F. If a suspect makes a verbal statement but refuses to make a written statement, the details of that verbal statement shall be carefully recorded by the Department member. If a suspect assists in the making of a written statement but then refuses to sign the statement after it has been completed, the unsigned written statement shall be maintained as part of the case file.

3.6    WRITTEN STATEMENTS

A. Statement Defined
For purposes of this section, statements shall be construed to mean anything communicated to a member of the Department by a witness, suspect or defendant, concerning the commission of a crime, including admissions and confessions.

B. Statements shall, when possible, be reduced to writing and signed by the person making that statement.

All written statements shall minimally include:

1. the date and time the statement was commenced and the time concluded;
2. the location where the statement was taken;
3. the person's age, date of birth, address and place of employment;
4. the person(s) present when the statement was made;
5. if the person making the statement is a suspect, a recitation of the Miranda Warnings and the suspect's voluntary, knowing and intelligent waiver thereof;
6. a detailed account of the incident in the person's own words;
7. an acknowledgment by the person of the number of pages that the statement consists of, that (s)he has read the statement or has had the statement read to him/her, and that (s)he has initialed each correction (e.g.. I have read this statement, consisting of two pages, and it is all true.  I have placed my initials by each correction and I sign it below.);
8. an affirmation by the person making the statement attesting to its truthfulness ( e.g.. I, John Doe, do hereby solemnly swear and affirm that the above is my statement, that I have read/or have had read to me this statement, and that the information contained therein is correct and true.);
9. at the end of the narrative, the signature of the person making the statement as well as the signature of the witness(s);
10. an attestation by a Notary Public or Commissioner of Deeds (e.g. "*Sworn and subscribed to before me this_____ day of _____, 2011*", together with the Notary's or Commissioner's of Deeds signature and the date his/her commission expires.)

C.  The investigating members shall read the completed statement out loud to the suspect or have the suspect himself/herself read the completed statement out loud to the investigating members.

D.  After the suspect has read the completed statement out loud, or has had the completed statement read out loud to him/her, (s)he should be allowed to make any changes desired. All changes must be initialed by the suspect. The suspect must then read or have the corrections read out loud to him/her.

E.  The signature of the suspect must appear at the end of the statement just above that of the witnesses and the Notary Public or Commissioner of Deeds.

F.  If during the interrogation, the suspect admits to other unrelated offenses, a separate statement should be taken for each unrelated offense.

3.7  STATEMENTS OF COMPLAINANTS AND WITNESSES

A.  Whenever the testimony of a witness may prove important in the preparation and presentation of a case, his/her statement should be put in writing as soon as possible, while events are still fresh in his/her mind.

B.  Statements of witnesses should ordinarily be taken in the form of a Supporting Deposition. However, the regular statement form should be used by the Investigating Officer when it will serve to enhance the preparation and presentation of a case.

C.  Statements of females in cases of sex or moral offenses should be taken by a female Officer if at all possible.

D.  Statements of complainants and witnesses shall have a typed closing statement that reads: "I have read, and or had read to me, the above statement and it is correct and true but not necessarily complete in every minute detail."

3.8  CPL 710.30 REQUIREMENT
Any time a defendant makes a statement to a member of the Department in conjunction with a criminal charge that may be introduced by the prosecution as evidence; the member must prepare a 710.30 Notice notifying the defendant's attorney that such statement was made.

3.9  RIGHT TO COUNSEL AFTER CRIMINAL COMPLAINT FILED
After a criminal charge has been filed with the Court, a critical stage of the proceeding has been reached and the defendant is entitled to representation by an attorney. Defendants arrested pursuant to an arrest warrant cannot be questioned without the consent of their attorney.

**4.0  SEARCHES AND SEIZURES**

4.1  POLICY
It is the policy of the Buffalo Police Department to thoroughly investigate criminal

activity, and to search for and seize evidence, contraband and instrumentalities of crime. All searches and seizures must be conducted with due regard for the safety of Department members. The constitutional rights of the parties involved must be safeguarded and the integrity of the Department must not be compromised.

4.2    SEARCHES AND SEIZURES - GENERALLY

Questions of law concerning the constitutional validity of a search and seizure are decided on a case by case. It is beyond the scope of a Police Manual of Procedures to address in detail the intricacies of this complex and ever changing area of law. Consequently, only general principles can be presented here.

A. "Unreasonable searches and seizures" are prohibited by the US Constitution. Generally, any search conducted without a search warrant is "unreasonable" and therefore, impermissible unless it falls within the limited number of exceptions to the search warrant requirement.

B. A search and seizure pursuant to a search warrant (as opposed to a warrantless search) more readily withstands the scrutiny of the court and can offer some measure of insulation from civil liability.

C. Searches and seizures, with or without a search warrant, must be based on probable cause to believe that the property to be seized is stolen, unlawfully possessed, evidence, or an instrumentality of a crime.

D. The extent of any search is constrained by the nature of the probable cause.  (e.g. It would be impermissible to search in a jewelry box when the property sought is a stolen couch.).

E. All searches should be conducted in the least intrusive manner, with a minimum of disruption to the person and physical property being searched.

F. While searches shall be thorough they should also be conducted in the shortest amount of time possible.

4.3    EXCEPTIONS TO THE SEARCH WARRANT REQUIREMENT

In the following circumstances, where the requisite level of probable cause exists, a legal search can be conducted without the necessity of first obtaining a search warrant. The critical factor is whether the defendant has an "expectation of privacy" in the place or thing to be searched.

A. Arrest Warrant Exception:  If there exists an active arrest warrant, an Officer may search any premise for the defendant, including the defendant's home, if there is probable cause to believe that the defendant is in that premise at the time of the search. This exception does not permit the Officers to search  for the defendant in the dwelling of a third person not named in the warrant.  The search is strictly limited to locating the defendant and cannot include searching for evidence.

B. Search Incident to Arrest: After an arrest has been made a thorough search of the

defendant may be undertaken as well as any area within the physical reach of the defendant.

C. <u>Consent to Search</u>: Any consent to search must be made knowingly, voluntarily and affirmatively (silence and acquiescence are insufficient). Consent must be given by a person who has control of the property and has legal authority to grant such consent. It is always better to obtain written consent although that is not a legal requirement. Consent can be withdrawn at any time.

D. <u>Frisk</u>: A frisk is a pat down search for weapons.

    1. A "stop." When an Officer has reasonable <u>suspicion</u> to believe that a person is committing, has committed, or is about to commit a <u>misdemeanor</u> or <u>felony</u> as defined in the Penal Law, the Officer may stop that person and ask the person's name, address and for an explanation of the conduct (CPL 140.50).

    2. During the "stop" if the officer reasonably suspects (s)he is in danger of physical injury, the Officer may conduct a pat down search for anything that is readily capable of causing serious physical injury and of a kind not ordinarily carried in public by law abiding citizens. (CPL 140.50-1).

E. <u>Plain View Observation</u>: An Officer may seize anything that is within his/her plain view and that the Officer has probable cause to believe is evidence or contraband. The key is to establish that the Officer has a legitimate reason for being in the place from which the evidence or contraband was observed.

F. <u>Abandoned or Discarded Property</u>: A person relinquishes his/her expectation of privacy in any property that (s)he abandons or discards, including property discarded at the approach of a police officer. Property falling into this category may be searched thoroughly.

G. <u>Open Fields Exception</u>: Buildings, homes and yards have constitutional protection. Open fields, woods and pastures that are neither fenced nor posted to exclude trespassers, can be searched without a warrant.

H. <u>Automobile Searches</u>: Automobiles can be searched when the Officer has probable cause to believe that there is evidence in the vehicle. The extent of the search is dictated by the probable cause. An entire automobile may be searched, as well as containers in the automobile, if the probable cause so dictates.

I. <u>Inventory Search</u>: An inventory search requires that the property lawfully came into the possession of the police (e.g.. vehicle towed after an accident) and the inventory is conducted pursuant to a standard Department policy.

J. <u>Exigent Circumstances</u>: There must be probable cause to believe that a crime has been committed or is being committed, and that immediate action is necessary to terminate the crime, or that someone will suffer physical injury or death, or that evidence of the crime will be destroyed. The search must be made at the time of occurrence under circumstances in which there is no time to secure a search warrant.

This exception should be used only in true emergency situations.

K. <u>Administrative Searches</u>: These are not searches for evidence, but rather inspections to assure compliance with governmental laws and regulations of specific businesses. An administrative search requires a pervasive and detailed regulatory scheme for the specified business. Examples include:

1. firearms dealers and gunsmiths,
2. pawnbrokers,
3. junk dealers,
4. scrap processors,
5. wholesale and retail off-premise sellers of alcoholic beverages.

L. <u>Searches Expressly Allowed by Statute</u>: There are certain very limited circumstances in which statutes have authorized warrantless searches. Knowledge of current statutes and case law is highly recommended.

4.4   <u>SEARCH WARRANTS</u>
Members shall be guided by Article 690 of the Criminal Procedure Law in obtaining and executing search warrants, and processing property seized by search warrants.

4.5   <u>OBTAINING SEARCH WARRANTS</u>
Supervisors shall take an active part in assisting subordinate officers in obtaining, executing, and following up with search warrants. Search warrants shall not be sought without the Supervisor's prior knowledge and approval. All narcotic related search warrants must have the prior approval of a Narcotics    Lieutenant, Detective Sergeant or the Detective Division Captain.  Information on narcotics related search warrants is contained in the Narcotics Unit Operations Manual.

4.6   <u>EXECUTING SEARCH WARRANTS  - LEGAL REQUIREMENTS</u>
Execution of search warrants is governed by CPL Section 690. Refer to this section for regulations and laws concerning search warrants. All applicable sections of CPL 690 shall be followed.

4.7   <u>EXECUTING SEARCH WARRANTS - STRATEGIC PLANNING</u>

A. The Officer obtaining the search warrant must attempt to gather information concerning the physical layout of the place to be searched, persons who may be present, the possibility that the search will be met with resistance, and whether weapons are present that could pose a serious risk to the safety of the officers executing the search warrant. In those circumstances in which the risk to the Officers executing the search warrant is high or where there is reliable information indicating the presence of weapons in the place to be searched, the SWAT Team Commander must be contacted for assistance.

B. The ranking officer involved in executing a search warrant must a Supervisor or above. (S)he shall conduct a pre-execution briefing with all members involved in the search. The following factors should be addressed:

1. clearly establish the officer who is to be in command;
2. all circumstances leading up to the search warrant;
3. the type and scope of the warrant issued;
4. the name and physical description of the person sought or the kind or property authorized to be seized;
5. a complete description of the physical layout of the location to be searched;
6. the roles of each officer involved in the search warrant execution;
7. tactics and strategies that may be used to gain entry;
8. special hazards that may exist and persons who may be encountered;
9. equipment to be used and the attire to be worn (e.g.. plainclothes officers must wear clothing that clearly identifies them as members of the Buffalo Police Department).

C. A member of the team of Officers executing the search warrant shall be designated to notify the Radio Dispatcher of the location of the search. The notification shall be made simultaneous with entry or immediately thereafter, if prior notification would jeopardize Officer safety.

D. The Officers executing the search warrant must announce their presence and purpose unless specified otherwise in the search warrant. Only the amount of force sufficient to gain entry shall be used. All persons encountered in the premises must be immediately controlled. The owner or person responsible for the premise shall be given a copy of the search warrant.

E. An orderly and coordinated search of the premises shall be conducted, consistent with the scope of the warrant. Officers will be assigned specific areas to search. The ranking officer shall ensure that all areas authorized to be searched are searched thoroughly. (S)he must also assure that the extent of the search does not exceed the scope of the warrant.

F. After the search warrant is executed, a copy of the warrant and a receipt for property taken must be left at the scene and the premises must be secured as best as possible.

G. All property seized must be inventoried and delivered to the Court without unnecessary delay along with the original search warrant and the Application for a Search Warrant. The ranking Officer shall document on Intra- Departmental Correspondence any damage caused in executing the search warrant or any injuries suffered by any person involved in the search, including police personnel, defendants or other civilians.

H. All members participating in the execution of the search warrant shall participate in a critique of the entire search warrant operation ranging from the pre-execution briefing, notification of the Dispatcher, the entry, the search and the post execution documentation.

I.

## 5.0    EYEWITNESS IDENTIFICATION

5.1    POLICY
The identification of a suspect by an eyewitness can be a powerful tool in the arrest and prosecution of criminals. Proper identification procedures can also exonerate suspects who have been wrongly accused. It is the policy of the Buffalo Police Department to use eyewitness identification procedures that are fair and that comply with Constitutional requirements.

5.2    EYEWITNESS IDENTIFICATIONS GENERALLY

A.    The circumstances surrounding the identification of a suspect by a witness must be fundamentally fair. Circumstances created by the police that would unduly suggest that a particular suspect is the culprit, violates the suspect's right to due process.

B.    There are three basic types of police identification procedures:

1.    the show-up, in which a suspect is returned to the scene of the crime shortly after its commission, for the purpose of having a witness look at the suspect on a one on one basis;
2.    the photo-array, in which a number of mug shots are grouped together and the witness is asked if (s)he can identify the suspect by picking out the suspect's mug shot;
3.    the line-up, in which the suspect appears with a number of individuals bearing similar physical characteristics, and the witness is asked to pick out the suspect.

5.3    SHOW UP IDENTIFICATIONS

A.    If a suspect is apprehended within a reasonable time after the commission of a crime, the suspect shall be returned to the scene of the crime and viewed by the witness. This allows the witness to view the suspect under the same conditions under which the witness saw the suspect commit the crime. For this reason, the witness should not be taken to the location where the suspect was apprehended.

B.    For witnesses or victims that are injured and hospitalized, the suspect can be taken to the hospital for show up identification purposes.

C.    Show up identifications shall not be conducted at a police facility unless the crime occurred there.

5.4    PHOTO ARRAY IDENTIFICATIONS

A.    The policy of the Buffalo Police Department is to utilize "double blind" photo arrays as a routing course of criminal investigations.
1.    The personnel who organize the photo array should be different from the personnel who show the photo array.
2.    The personnel who show the photo array should not know who the suspect is.

B.    Investigating Officers shall use the Photo-Imaging System to produce photo-arrays.

The photos shall depict individuals that have physical characteristics similar to that of the suspect.

C.  Investigating Officers shall not use mug shots from any sealed records.

D.  If a witness identifies a suspect in a photo-array, the photo-array itself becomes evidence and must be preserved by the investigating officer and retained in the case file along with the affidavit and line-up report.

E.  Additional sources of photo images may be available through the NFTA, Department of Motor Vehicles or Board of Education bus passes.

5.5     LINE- UP IDENTIFICATIONS

A.  Line-up identification may be used when a suspect is in custody and the identification procedure is necessary to complete the case.

B.  The Officer requesting a line up identification shall prepare a comprehensive report sent through his/her Commanding Officer and directed to the Chief of Detectives. The report shall contain:

1.  the name, race, age, height and weight of the person to be viewed;
2.  the offense with which defendant is charged;
3.  any particular phrase to be repeated by persons in the line-up and the intonation used in saying that phrase;
4.  any articles found at the scene of the crime, such as clothing, glasses, etc., shall be made available during the line-up;
5.  any other information that may prove relevant in assisting witnesses to accurately identify the perpetrator.

C.  The Chief of Detectives will be responsible for approving or denying requests for line-ups and for arranging payment for civilian stand-ins. The Chief of Detectives or his/her designate is responsible for conducting a line-up.

D.  The Detective assigned to the case will be responsible for:

1.  identifying witnesses to the crime for which the defendant is charged and identifying witnesses to similar crimes in which the defendant may be a suspect, and notifying these witnesses of the time and place of the scheduled line-up;
2.  making arrangements for at least four (4) stand-ins who must bear as close a resemblance to the defendant as possible ( if the Detective has difficulty locating stand-ins, (s)he shall contact the on duty, Duty Officer for assistance);
3.  contacting the District Attorney's Office.

E.  The Crime Scene Technician shall photograph each line-up identification.

5.6    DEFENDANT'S RIGHT TO COUNSEL AT LINE-UP IDENTIFICATIONS

A. If a suspect is taken into custody by virtue of a summary arrest (i.e. no arrest warrant, no accusatory instrument filed, no indictment, etc.) the police need not advise the defendant of his/her right to counsel at the line-up.

B. A defendant does have a right to an attorney at a line-up identification if:

1. an accusatory instrument has been filed with the court, or the defendant has been arraigned on the criminal charge, or the case was commenced by indictment; or,
2. the defendant specifically requests the presence of an attorney; or,
3. the Police are aware that the suspect is represented by an attorney regarding the investigation for which the line-up is being conducted; or,
4. the line-up is being held pursuant to an ex-parte court order (i.e. obtained by the Police or the DA's Office without notice to the defendant or his/her attorney) and involves a suspect who is incarcerated on an unrelated matter.

C. If the defendant specifically requests an attorney the Detective shall:

1. make a reasonable effort to contact the attorney;
2. allow the attorney a reasonable amount of time to appear (usually two (2) hours, except in unusual circumstances).

D. An attorney is permitted to make limited suggestions as to the conduct of the line-up. It is up to the discretion of the Officer conducting the line-up whether any of the attorney's suggestions will be implemented. The Officer may consult with the DA's Office regarding any such suggestions. All suggestions made by an attorney will be duly noted.

**6.0    USE OF FORCE**

6.1    POLICY
It is the policy of the Buffalo Police Department to use only that amount of physical force that is reasonably necessary to achieve a legitimate law enforcement objective, including protecting a person from the imminent use of physical force, effecting an arrest or preventing an escape from custody.  Any force used must be consistent with the Fourth Amendment of the United States Constitution and Article 35 of the New York State Penal Law.  Excessive or unreasonable force shall not be used.

6.2    USE OF FORCE - GENERALLY

A. Members of the Department must be familiar with Article 35 of the NYS Penal Law which outlines the legal parameters for the use of physical force and the use of deadly physical force.

B. Physical force shall only be used when no other viable option is available.

C. When force is used, only that amount of force that is reasonably necessary to overcome a subject's resistance or aggression shall be employed.

D. The use of force must be reasonable and can never be reckless.

E. During an encounter in which force has become necessary, the level of resistance or aggression displayed by the subject may vary at different points in the encounter. The level of force used by the Officer shall be adjusted to changes in the suspect's level of resistance or aggression.

6.3    USE OF FORCE CONTINUUM

A. Members of the Department may use no more than the amount of force reasonably necessary to achieve a legitimate law enforcement objective. In most cases, the degree of resistance or aggression displayed by a subject will be the primary factor in determining what level(s) of force by the Officer is reasonable and authorized. A subject's reaction to an Officer's attempts at control or restraint may be broadly classified into five categories. Those categories, together with the generally authorized Officer force response options, are set forth below:

   1. Compliant/ Cooperative
      The subject generally complies with the commands of the Officer and offers no resistance. In this instance the use of force is not authorized, but customary handcuffing and escort techniques are authorized.

   2. Passive/Verbal Resistance
      The subject passively resists the Officer's attempts to gain compliance or is verbally abusive, insulting or taunting and refuses to comply with the Officer's commands, but is not verbally threatening to cause imminent physical harm to the Officer or another person. The Officer shall use verbal techniques to achieve compliance and if those techniques are unsuccessful, is authorized to take physical control of the subject by grabbing, holding, and /or using customary handcuffing techniques on the subject.

   3. Active Resistance
      The subject makes physically evasive movements to defeat an Officer's attempt at control (e.g. bracing, tensing, moving away) or verbally threatens imminent harm to the Officer or another person or verbally signals an intention not to be taken into or retained in custody, providing the subject's intent to physically resist is clear. The Officer is authorized to physically restrain and take control of the subject by grabbing, holding forcibly handcuffing and/or using pain compliance holds and/or chemical agent on the subject.

   4. Physical Resistance
      The subject engages in or is about to engage in resistance or aggression that is aimed directly at the Officer. This includes grabbing, pushing, punching, kicking, biting, throwing objects or any behavior in which the Officer

becomes the object of the subject's actions. Physical resistance also includes that situation in which an Officer reasonably believes that the subject is using or is about to use the above degree of physical force against another person. The Officer is authorized to use the amount of force reasonably necessary to overcome the resistance or aggression by using chemical agent, physical skills, physical tactics or impact weapons, or any appropriate lesser means of force.

5. Deadly Resistance

The subject engages or is about to engage in such an escalated level of resistance or aggression that the Officer reasonably believes that the subject's actions constitute "deadly physical force." "Deadly physical force" means physical force that, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury. It may include attempts to render the Officer unconscious, grabbing for the Officer's service firearm, blows to vital organs, stabbing, shooting, or any other action that would create a likelihood of causing the Officers serious physical injury or death. This category also includes a subject who an Officer reasonably believes is using or is about to use deadly physical force on another person. This level of resistance or aggression authorizes the Officer to use the amount of force reasonably necessary to preserve life or prevent serious physical injury and includes the use of deadly physical force.

B. Although a subject's level of resistance or aggression is usually the primary factor that determines what level of force is reasonable and authorized, there may be other factors present that may reasonably cause an Officer to escalate or de-escalate the level of force used during an encounter. These factors include, but are not limited to:

1. Officer/Subject Factors (e.g. relative age, size, strength, skill level, injury/exhaustion, number of Officers versus number of subjects);
2. Influence of drugs or alcohol;
3. Presence/proximity of weapons;
4. Other tactical factors (e.g. position of advantage, cover, time for decision);
5. Availability of other viable force options.

6.4    USE OF DEADLY PHYSICAL FORCE

A. Members of the Department may use deadly physical force but only when it is necessary to defend the Officer or third person from what the Officer reasonably believes to be the use or imminent use of deadly physical force.

B. Even if the use of deadly physical force is authorized, the Officer may not be reckless in its use.

C. Depending upon the circumstances in which they are utilized, the use of the night stick, restraining holds, police vehicles, as well as service firearms, may be construed as the use of deadly physical force.

6.5     USE OF FIREARMS

    A.  Members of the Department shall discharge their firearms at a person only in those circumstances in which it is necessary to defend the Officer or another person from what the Officer reasonably believes to be the imminent use of deadly physical force. In attempting to take a suspect into custody, members of the Department shall discharge their firearms only in those circumstances in which the member reasonably believes that the use of deadly physical force by the suspect is imminent.

    B.  Members shall not discharge a firearm or shoulder weapon from or at a moving vehicle or its occupants unless the occupants of the other vehicle are using deadly physical force against you or another person by means other than the vehicle. Members shall not discharge their   firearms at or from a moving vehicle when the consequences of so doing will jeopardize the safety of other members of the Department or innocent bystanders.

    C.  In those circumstances in which members of the Department are justified in discharging their firearms, they are not allowed to do so recklessly.

    D.  Warning shots are prohibited.

    E.  Members of the Department may use their firearms for target practice or competition at an approved range. Dry firing or other forms of practice on any Departmental property, except under the personal direction of a firearms instructor, is strictly prohibited.

    F.  Members of the Department may use their firearms to incapacitate wild, vicious or rabid animals consistent with the guidelines set forth in M.O.P. Chapter 2.

6.6     DRAWING  WEAPONS

A.  A member of the Department is authorized to remove his/her firearm from its holster or gun mount and have it ready for immediate use, in any circumstance in which the member reasonably believes his/her life or safety may be in danger.

B.  A member of the Department may point his/her firearm at a person when the officer reasonably believes that the person poses an immediate risk of death or serious physical injury to any other person.

6.7     REPORTING REQUIREMENTS – USE OF FORCE OR INJURIES TO CIVILIANS

A.  Reporting requirements shall apply whether an incident occurred on or off-duty.  A member of the Department shall prepare a Use of Force Report (via Blue Team) when (s)he:

    1. applies any level of physical force as defined in Section 6.3 A3, A4 or A5 above on a person; or

    2. uses chemical spray on or affecting a person;

    3. charges a subject with resisting arrest in violation of the NYS Penal Law Section 205.30.

        a. When a member of the Department charges a subject with resisting arrest in violation of the NYS Penal Law Section 205.30, that member shall promptly notify their immediate on duty supervisor. The on-duty Supervisor shall as soon as practical, and in any event prior to the end of their tour of duty, conduct an investigation into the circumstances of the arrest and enter their findings on the subordinate's Use of Force Report (via Blue Team).

        b. If more than one officer is involved and uses any level force as defined above, each officer shall prepare a Use of Force Report Use of Force Report (via Blue Team).

B. In addition to a Use of Force Report, a member of the Department shall prepare a written report on an Intra-Departmental Memorandum (form P-73) whenever the member:

    1. discharges his/her firearm for other than training or recreational purposes (refer to M.O.P. Chapter 3) (also see M.O.P. Chapter 8);

    2. takes any law enforcement action that results in, or is alleged to have resulted in, serious physical injury or death to another person.

C. All reports submitted pursuant to subdivision "A" and "B" above shall be completed prior to the officer's tour of duty and forwarded through the chain of command to the Internal Affairs Division. The Use of Force Report shall be submitted (via Blue Team). Each member in the chain of command shall review the report for completeness, accuracy and conformity with the Department's use of force policy (via Blue Team). Each member in the chain of command shall enter their comments on the Use of Force Report (via Blue Team). The final approved report shall be completed **within 10 days** of the incident.

In the event the Use of Force Report (via Blue Team) cannot be utilized the following procedures will be followed:

The hard copy P-1374 will be completed. The on duty supervisor shall fax the P-1374 to the Internal Affairs Division at extension 5229 prior to the end of their tour of duty. If a fax is not possible, the on duty supervisor shall immediately send an email the IAD Inspector. The email shall contain an explanation for the inability to fax the report, the involved officer(s) name(s), the subject's name, and the incident number.

D. In the event an officer is incapacitated and unable to prepare the proper reports, the member's immediate Supervisor shall cause the reports to be prepared on the member's behalf (via Blue Team).

E.  The Internal Affairs Division shall review all such reports and make recommendations to the Commissioner. In addition, the Internal Affairs Division shall make an annual review of all such incidents and report any patterns or trends that may necessitate additional or modified training or that may require alterations in policy.

F.  The Training Academy Captain shall access Blue Team to determine if there are any training issues needing to be addressed

6.8    <u>PERSONS INJURED RESULTING FROM THE USE OF FORCE</u>
In all circumstances in which a person is injured by a member of the Department as a result of the use of force other than deadly physical force:

A.  the member shall have the injured person taken for medical treatment to the Erie County Medical Center, ECMC;

B.  notify his/her immediate supervisor;

C.  prepare form P-1261 (Request For Medical Attention of Injured Prisoner).

6.9    <u>USE OF CHEMICAL SPRAY</u>

A.  <u>The Product</u>
The only chemical agent projector (C.A.P.) to be used by an on duty member of the Buffalo Police Department is the Department issued.

B.  <u>Issuance</u>
The Department issues authorized chemical agent projectors to those Officers trained in its use. The chemical agent projector issued by the Department is for on duty use only and it is not to be used or carried while the member is off-duty or while employed outside the Department.

C.  <u>Replacement</u>
Requests for replacement of empty or malfunctioning chemical agent projectors shall be submitted to the Police Academy on an Intra-Departmental Memorandum (P-73), which shall include an explanation of the necessity for the replacement. When an Officer requests replacement of an empty container, a check will be made to determine if the appropriate number of reports (P-1174) have been submitted to reflect why the chemical agent container is empty. If an appropriate number of reports have not been submitted, the Officer will not be issued a replacement chemical agent.

1.  Although chemical agent containers are stamped with a date on the canister, the chemical agent is effective as long as the product is able to be discharged from the canister.
2.  If an issued chemical agent projector is lost by any member of the Department, the member must immediately report the loss in writing. The report shall detail the circumstances of the incident and shall be forwarded to the Training Academy through the chain of command.

D. Use

    1. In General

Chemical agent projector spray is a use of force and shall be used only in conformity with the Departmental policy on use of force. Accordingly, chemical agent projector spray may be used only when its use is reasonably necessary to achieve a legitimate law enforcement objective. As a general rule, chemical agent projector spray is authorized for use on a subject when an Officer encounters "Active Resistance" or "Physical Resistance", as those terms are defined in the Department's Use of Force Continuum.

E. Officer Accidentally Sprayed With A Chemical Agent

In the event that an Officer is accidentally sprayed with a chemical agent, or is intentionally sprayed by another person, the safety of that Officer becomes paramount. The attempted apprehension of the suspect must be abandoned if the safety of the sprayed Officer is unduly jeopardized.

F. Decontamination

    1. The arresting Officer is responsible for the decontamination of any prisoner sprayed with a chemical agent. Decontamination will be accomplished in accordance with procedures and regulations at the City Court Lock-up.

    2. If the chemical agent is used indoors, occupants are to be advised to air out the room where the chemical agent was used, for at least one hour before using the room.

G. Reporting

    1. A Use of Force Report (via Blue Team) must be completed any time a member of the Department discharges a chemical agent, except those discharges occurring during testing, training, a malfunction, a use against an animal or an accidental discharge with no person affected. A Use of Force Report (via Blue Team) shall be completed by each Officer using the chemical agent.

    2. Accidental discharges with no person affected or uses against animals require an Intra- Departmental Memorandum with explanation directed to the Training Academy.

6.10   PERSONS KILLED OR SERIOUSLY INJURED AS A RESULT OF THE USE OF DEADLY PHYSICAL FORCE

A. While on duty

In all circumstances in which a person is killed or seriously injured by an on duty member of the Department and is the result of the use of deadly physical force:

    1. the member shall call for medical attention if the person is still alive;

    2. the member shall immediately notify his/her immediate supervisor who shall notify the 911 Communications Lieutenant, whom will notify the Commissioner

    3. the Homicide Squad shall conduct the investigation.

    4. members shall follow the guidelines set out in M.O.P. Chapter 17.

B. <u>While off duty</u>

In all circumstances in which a person is killed or seriously injured by an off duty member of the Department and is the result of the use of deadly physical force:

    1. the member shall immediately notify the law enforcement agency in the jurisdiction in which the incident occurred and shall request medical attention if the person is still alive;

    2. the member shall immediately notify his/her commanding officer, or in the commanding officer's absence, the 911 Communications Lieutenant;

    3. the member shall follow the guidelines set out in M.O.P. Chapter 17;

    4. and if the incident occurred outside of the city, the 911 Communications Lieutenant shall send Buffalo Police personnel to investigate.

## 6.11 <u>DISCHARGE OF FIREARMS - REPORTING REQUIREMENTS</u>

A. <u>BPD Firearms Report - Intra-Departmental Memorandum - E-Mail Message</u>

Whenever a member discharges a firearm(s) while on duty, other than in practice or at a firearms range, (s)he shall immediately report the incident to the Supervisor on duty in the District in which the incident occurred, except that if the discharge occurred in the headquarters building, the 911 Communications Lieutenant shall be notified. The member must also immediately report the incident to his/her own Supervisor. The member's command will be responsible for obtaining an event number and transmitting an E-Mail message reporting the incident. The member shall prepare a report on an Intra-Departmental Memorandum prior to reporting off duty, relating the details of the incident. The Intra-Departmental Memorandum shall be addressed to the Commissioner, attention to the appropriate Commanding Officers in the chain of command. The member shall also prepare a Firearms Use Report (BPD-1) according to the instructions on that form and before the member reports off duty.

B. <u>Investigation by Commanding Officer - Intra-Departmental Memorandum</u>

The Commanding Officer of the member discharging the firearm shall conduct a complete investigation of the incident and file a report on an Intra-Departmental Memorandum. The report shall be addressed to the Commissioner, attention the appropriate District/Division Commanding Officer in the chain of command.

**Distribution**: Original and copy of form BPD-1, the member's Intra-Departmental Memorandum and the Commanding Officer's Investigation Report on an Intra-Departmental Memorandum shall be sent to the appropriate District/Division Chief; third copy to command files.

C. <u>Action by the District/Division Chief</u>

The District/Division Chief shall carefully examine all reports. They shall make further inquiry as they deem appropriate. The Chief shall make recommendations

concerning training, discipline, approval of the member's action, or other appropriate action on an Intra-Departmental Memorandum.

D. Incidents Occurring While Off Duty

    1. If a member discharges a firearm while off duty, whether intentionally or accidentally, the member shall notify the police authorities in the jurisdiction in which the incident occurred, and (s)he shall also be responsible for submitting a Firearms Use Report (Form BPD-1) and an Intra-Departmental Memorandum to his/her commanding officer, except that no such notification or report need be made if the officer was legitimately engaged in target practice or hunting.

    2. If a member intentionally or accidentally discharges a firearm while off duty and the result is an injury to himself/herself, or injury or death to another, the member shall immediately contact the law enforcement authorities in the jurisdiction in which the incident occurred. Medical attention shall be requested and the scene of the incident preserved (refer M.O.P. Chapter 17). The member must immediately contact his/her Commanding Officer, or in the Commanding Officer's absence, the 911 Communications Lieutenant, and shall as soon as practicable there after, complete a Firearms Use Report and an Intra- Departmental Memorandum.

E. Investigating Incidents Occurring Outside the City

Whenever a member of the Department intentionally or accidentally discharges their firearm while outside the city, other than when legitimately involved in hunting or target practice, the 911 Communications Lieutenant or the Duty Inspector will determine whether a member of the Buffalo Police Department will respond to the incident based on the following:

    1. the apparent surrounding circumstances;
    2. the severity of the injuries, if any;
    3. the possibility of criminal conduct by the member;
    4. the distance from the City.

6.12    ADMINISTRATIVE DUTY

At the discretion of the Police Commissioner or his/her designee, any member involved in a shooting or any other incident resulting in death or serious physical injury to another, may be temporarily assigned to administrative duty. Administrative duty, for purposes of this section, is any assignment that does not ordinarily require the making of arrests. Assignment to administrative duty is in no way a punitive measure and shall be used when it tends to advance the mission and goals of the Department.

6.13    ANNUAL INSTRUCTION ON USE OF FORCE

All members of the Department authorized to carry weapons shall receive a copy of the Department's use of force policies as established in this section and shall receive instruction on these policies during their annual firearms qualification at the Firearms Unit.

## 7.0    TRANSPORTING PRISONERS AFTER ARREST

7.1    POLICY

It is the policy of the Buffalo Police Department that when transporting a prisoner after arrest, members shall take steps necessary to minimize opportunities for the prisoner's escape, and they shall ensure that the safety of the Officers, the prisoner, and the general public is not jeopardized.

7.2    PRELIMINARY SEARCHES

A. Members shall search their police vehicles for contraband and weapons at the beginning and end of each tour of duty. They shall also search the vehicle after removing a prisoner from the vehicle.

B. Members shall not place a prisoner in a police vehicle until they have thoroughly searched the prisoner for:

1. any weapon or dangerous instrument;
2. any article, substance or thing that may pose a danger to the safety of the officers, the prisoner, or the general public, or with which the prisoner may cause damage to property;
3. evidence that the prisoner can destroy, mutilate or effect in any way.

C. The extent of the preliminary search will be determined by the surrounding circumstances but must minimally include:

1. a pat down search of all body and clothing surfaces; and
2. a search of all clothing pockets, purses, bags, etc., in which a weapon or
3. contraband can be concealed and be readily available.

D. Preliminary searches of prisoners of the opposite gender should be avoided whenever possible. Officers of the opposite gender may conduct a preliminary search of the prisoner but only in those instances in which an Officer of the same gender is not readily available and the Officer reasonably believes that:

1. the safety of the Officer or the prisoner is unduly jeopardized by not conducting an immediate preliminary search:
   or
2. immediate action is necessary to preserve evidence material to the case.

In any such case, the extent of the search shall not be more intrusive than what the Officer's reasonable belief dictates.

7.3    RESTRAINTS

A. All prisoners will be handcuffed and the handcuffs will be double locked whenever possible.

B. Prisoners shall be handcuffed with their palms facing out and their hands behind their back unless they have an injury or physical deformity that   prevents such method of restraint.

C. Prisoners shall be transported with their seat belts securely fastened.

D. Prisoners shall not be placed lying face down in the rear seat of a police vehicle.

## 7.4   PROCEDURES   FOR   ADULT   ARRESTS   BY   THE   BUFFALO   POLICE DEPARTMENT

A. Prisoners shall never be transported in the front seat of any police vehicle.

    1. If only one Officer is transporting the prisoner, the prisoner shall be positioned in the rear seat on the passenger side.
    2. The number of prisoners being transported in a single vehicle shall not exceed the capacity of the rear seat of the vehicle.

B. Male and female prisoners shall not be transported together unless they are related (i.e. husband-wife, mother-son, father-daughter, etc.).

C. Juvenile prisoners under the age of 16 shall not be transported with adult prisoners unless the prisoners are related.

D. K-9 vehicles shall not be used to transport prisoners.

E. Vehicles not equipped with safety partitions shall not be used to transport prisoners unless there are two Officers assigned to the unit. In that case, the prisoner shall be secured in the rear passenger side seat.

F. Prisoners shall not be left unattended in a police vehicle.

G. Unless otherwise specified, prisoners shall be taken directly to City Court Lock-up. Officers shall not engage in any type of emergency driving or pursuit while prisoners are in the vehicle. They shall not respond to any other calls for service except those instances in which there exists a clear risk of grave injury and the safety of the prisoner is not unduly jeopardized. Even in these extreme cases, the prisoner shall not be left unattended.

H. Injured prisoners shall not be transported to the City Court Lock-up but shall be taken for medical treatment first (Refer to M.O.P. Chapter 4).

I. The Radio Dispatcher shall be notified that the Officers are engaged in transporting prisoners to the City Court Lock-up.

J. A prisoner shall not be allowed to communicate with friends, relatives, or even his/her attorney from inside a police vehicle.

7.5    TRANSPORTING PRISONERS OF THE OPPOSITE GENDER

In those instances in which no Officer in the vehicle is the same gender as the prisoner being transported, the Officers shall:

A. advise the Radio Dispatcher of the Officer's location, destination and odometer reading, and request a time check;

B. take the most direct route to the destination;

C. advise the Radio Dispatcher of their arrival at their destination and the odometer reading, and request another time check.

7.6    HANDICAPPED PRISONERS

A. When a prisoner is handicapped, the transporting Officer will request the type of assistance and equipment that will enable the Officer to transport the prisoner in a safe and efficient manner. The assistance of the Supervisor shall be sought in unusual cases in which devising a means of transportation for the prisoner is especially difficult.

B. The transporting Officer shall make arrangements to allow the prisoner to retain any special equipment or medical device that is necessitated by the prisoner's condition.

C. Officers may dispense with handcuffing handicapped prisoners when it is obvious that the prisoner poses no threat to the Officer, or to himself/herself, and the possibility of escape is negligible.

7.7    ESCAPED PRISONERS

When a prisoner who had been in the custody of a member of this Department escapes, the member shall:

A. Immediately notify the Radio Dispatcher and provide a complete description of the escapee, his/her last known direction of travel, and any other pertinent information that may assist in the prisoner's re-capture.

B. The ranking supervisor on duty in the District in which the prisoner escaped shall immediately respond to the scene and lead a coordinated search for the escaped prisoner. They shall use all available resources to re-capture the prisoner.

C. The 911 Communications Lieutenant shall be notified by the Supervisor at the scene of the escape.

D. The member of the Department from whom the prisoner escaped shall make a complete report of the incident in writing on Intra-Departmental Memorandum. The report shall be forwarded through proper channels   to the member's District/Division Chief who, based on the recommendations of his/her subordinate Commanding Officers and Supervisors, shall take appropriate remedial action.

## 8.0     ARREST BOOKING PROCEDURES

Officers will adhere to the procedures outlined in the Manual of Procedures for particular cases i.e. Homicide, Sex-Related Offenses, DWI/DWAI, etc.

DWI/DWAI arrests must first proceed to Police Headquarters for testing at the Accident Investigation Unit (AIU) as defined in the Manual of Procedures.  After completion of the AIU process, officers will take their prisoner to the City Court Booking and follow established arrest procedure.

8.1     JUVENILE ARRESTS
        Refer to M.O.P. Chapter 4

8.2     CITY COURT BOOKING
        Arrests made by members of the Buffalo Police Department will consist of two phases:

        1.  Remanding of the prisoner to the City Court Lock-up;
        2.  Filing of accusatory instruments – preparation of court folders in City Court Booking

8.3     REMANDING OF THE PRISONER TO THE CITY COURT LOCK-UP

        a.  Arresting Officer(s) will inform radio that they are preceding directly to the City Court Lock-up with their prisoner.

        b.  Officers will enter the garage and park their police vehicle.

        c.  Officer(s) will then exit the patrol vehicle and will secure their weapon(s) in the lockers provided in City Court Booking.  NO WEAPONS OR AMMUNITION ARE TO BE BROUGHT INTO THE CELLBLOCK AREA. Gun Lockers are located immediately outside prisoner entrance, outside cellblock area in prisoner transport hallway, and inside the booking office area.

8.4     SEARCHING PRISONERS AT CITY COURT BOOKING
        Refer to Chapter 4

8.5     SEARCHING PRISONERS OF THE OPPOSITE GENDER
        Refer to Chapter 4 - Appendix A- Searches

8.7     STRIP SEARCHES
        Refer to M.O.P. Chapter 4

8.8     STRIP SEARCHES – FEMALE PRISONERS
        Refer to Chapter 4 – Appendix A

8.9     FILING OF ACCUSATORY INSTRUMENTS – PREPARATION OF COURT  FOLDERS

A. Immediately following the procedures at the City Court Lock-up all arresting officers will proceed to Police Headquarters and complete the final phase of their arrest at City Court Booking.

B. Upon arrival at City Court Booking the Officers will be asked to produce copies of the P-163, any warrant printouts and the prisoner property receipt(s).

C. Arresting Officer(s) shall take large property items to Room 104 during normal business hours. When the Property Office is closed, the submitting Officer will secure property/evidence in Room 101. All Officers have access to the evidence/property room via their BPD Employee Identification Card. Put completed paperwork and property inside a suitable locker (oversized items may be left on the floor). Enter the transaction in log book on table and place key in drop safe.

D. Procedures at City Court Booking will continue to be as they are, with a few administrative changes to ease the flow of paperwork and time spent in completing the arrest

E. Complainants, witnesses or other persons needed to file paperwork will be told to go directly to Buffalo Police Department headquarters (74 Franklin Street), as is the present procedure

F. The procedures outlined in M.O.P. CHAPTER 3 are still in effect and all officers are directed to adhere to same.

G. Once the court documentation is completed, the arresting Officer(s) will call their car(s) back in service.

8.10  CIRCUMSTANCES PARTICULAR TO ARRESTS  HOSTILE/COMBATIVE PRISONERS

A. Officers will inform radio that they have a combative and/or hostile prisoner.

B. Radio will then call the City Court Lock-up and inform them of the situation.

C. The hostile/combative prisoner will be taken immediately into the City Court Lock-up, via the sally port and metal detector, and placed in an isolation cell.

D. Buffalo Police Department Personnel cannot leave the facility until they can obtain a property receipt and the copy of the P-163 and other necessary paperwork.

E. Once the prisoner is placed in the isolation cell, the arresting officer will take their place  back in line, if that is the case.

8.11  PRISONERS REQUIRING MEDICAL/PSYCHOLOGICAL TREATMENT PRIOR TO BOOKING

a. Prisoners that are sick/injured, mentally ill, have ingested or are suspected of having ingested a foreign object or substance and prisoners whose ability is

impaired by alcohol/drugs to the extent that they may be unconscious or semi-unconscious must be taken directly to ECMC, unless exigent circumstances exist, for medical treatment prior to being booked at the City Court Booking.

b.  The arresting officer(s) shall prepare a P-1261 (Request for Medical Examination of Prisoner form) leave a copy with the City Court Lock-up after the prisoner is booked.  The original P-1261 will accompany the Officer back and copies will be distributed per Department Policy.

c.  All policies pertaining to hospitalized prisoners shall remain in effect.

## 8.12  PRISONERS REQUIRING MEDICAL/PSYCHOLOGICAL TREATMENT AFTER CONFINEMENT IN THE CITY COURT LOCK-UP

a.  If while in custody a prisoner complains of injury, illness or pain that was not evident when the prisoner was taken into custody, the on-duty Sheriff's Deputy Supervisor shall be notified and determination of the removal of the prisoner to the hospital will be decided according to their departmental policy.

b.  The on-duty Sheriff's Deputy Supervisor will notify Buffalo Police Radio Dispatch that a prisoner is in need of medical attention.  The Supervisor shall provide the dispatcher with the radio call number of the arresting officers and/or district of arrest and the name of the prisoner seeking treatment.

c.  Buffalo Police Department Radio Dispatch will call the arresting officer(s) or a car from that district if the arresting officers are unavailable, and direct them to proceed to the City Court Lock-up to take a prisoner to the hospital.  Dispatch shall inform the officer(s) of the name of the prisoner seeking treatment.  If neither the arresting officer nor a member of his/her unit is available, a mobile patrol unit from B-District shall transport the prisoner.  All other procedures regarding transporting of the prisoner shall remain the same.

d.  A prisoner requiring an ambulance shall have a Buffalo Police Officer ride with him/her in the body of the ambulance.

e.  The officer(s) transporting the prisoner shall prepare the "Request for Medical Examination of Prisoner" form (P-1261), or the "Request for Examination of Person Apparently Mentally Ill" form (P-1321) as the case may be.  A copy of either form must accompany the prisoner back to the City Court Lock-up.  All other copies shall be distributed as stated on the form.

## 8.13  PERSONS TURNING THEMSELVES IN ON A WARRANT

a.  If a person presents themselves to BPD headquarters to turn him/herself in on a warrant, the district/squad that originated the warrant will be called to pick up the prisoner for processing at the City Court Booking.

b. If no one from the squad/district is available a mobile patrol unit form B- District will be dispatched to process the arrest.

c. The prisoner will be transported to the City Court Booking for processing as described above.

d. Appearance tickets should be issued, whenever possible, to cut down on the number of prisoners needed to be held for arraignment. (Appearance tickets are not to be issued for warrant arrests). It will be the responsibility of the on-duty City Court Lock-up Lieutenant or his/her designee to issue Appearance Tickets. City Court Booking will give the prisoner a copy of the signed Appearance Ticket and advise him/her of their return date for court. A copy will be made and inserted into the prisoner's CCB file.

e. All confiscated weapons shall be recorded on a P-10a (Property Report) and secured at Buffalo Police Department Headquarters, as is the present policy.

f. Evidence will also be handled as per those procedures outlined in the Manual of Procedures.

## 8.14   PREPARING AND HANDLING ARREST DOCUMENTS

A. The arrest documents that are prepared shall conform to those required by existing CCB policies and procedures.

B. Arresting Officers shall use extreme care when charging a prisoner, making certain that all of the elements necessary for sustaining the charge are present. Officers shall not "overcharge" a defendant but shall place only those charges which they reasonably believe can be sustained by the available evidence. Disputes concerning the propriety of placing certain charges shall be resolved by the Lieutenant in charge of City Court Booking, or in his/her absence, the 911 Communication Lieutenant

C. In executing an Accusatory Instrument, the name of only one Officer shall appear and it shall be the name of the Officer having the most factual knowledge of the case (refer to M.O.P. Chapter 6).

D. The arresting officer shall assist CCB personnel in completing the Buffalo Police Department Report to the District Attorney (P-32) and the Buffalo Police Department Misdemeanor VTL Arrest form (P-33) (refer to M.O.P. Chapter 6).

1. Special attention shall be given to section "H" on form P-32. This section shall not contain facts that are already contained in the Information/Complaint but shall only contain information that supplements the facts contained in the Information/Complaint. Examples include: background information, previous knowledge of the defendant, suspicions concerning the defendant, etc.

2. The information contained on forms P-32 and P-33 will be used by the District Attorney's Office to determine the propriety of accepting pleas in

specific cases. These reports are handled in a confidential manner, are not included in the Court file and are forwarded each day to the District Attorney's Office in a sealed envelope.

3.  In the event that the arresting officer has highly sensitive information concerning the defendant that (s)he deems would be inappropriate to reveal on the P-32, the officer may request under Section "H" that the District Attorney personally contact him/her.

E.  It shall be the responsibility of City Court Booking to prepare a cover folder containing all required documents.

8.15  FINGERPRINTING AND PHOTOGRAPHING PRISONERS
Prisoners requiring post-arrest fingerprinting and photographing shall be done as follows:

A.  Persons arrested and issued Appearance Tickets other than at the City Court Lock-up need not be photographed or fingerprinted before being released, but must return to City Court Booking for this purpose, after their arraignment. City Court Booking shall notify the command responsible for the persons arrest and that command shall send a representative to City Court Booking to assist in the process.

B.  Children arrested as juvenile delinquents shall be photographed and fingerprinted only in accordance with the current sections of appropriate NYS and/or federal law (see Chapter 4).

8.16  PRISONERS CHARGED BY THE BUFFALO POLICE WHO ARE ALSO WANTED BY AN OUTSIDE AGENCY
In addition to all the normally required arrest documentation, City Court Booking shall place in the court folder, the appropriate copy of the "Apprehension for Outside Agency" form. The form shall contain the name of the individual arrested, the Buffalo Police Department file number (AFN), the name of the wanting agency, and the authority under which the person is wanted (i.e. warrant number, detainer, hold for immigration, etc.).

8.17  BOOKING PRISONERS ARRESTED BY A PRIVATE PERSON
Article 140 of the Criminal Procedure Law dictates those circumstances in which a private person may make an arrest. (Refer CPL140.30 and 35). Prisoners arrested by a private person shall be booked at the City Court Lock-up.

8.18  ARREST MADE WHILE ENGAGED IN OUTSIDE EMPLOYMENT
Refer to M.O.P. Chapter 6.

**9.0  PRISONER'S PROPERTY**

9.1  POLICY
All property seized by the BPD, other than evidence, contraband, or instrumentalities of a crime, shall be relinquished to the prisoner upon his/her release from custody. Property seized during arrest procedures and received by the City Court Lock-up shall be governed by their respective rules and regulations.

9.2     PROCESSING PRISONER'S PROPERTY

   A.   Prisoner's property not otherwise disposed of, shall be taken daily to the Property
        Office on the first floor of Police Headquarters. A receipt for the prisoner's property
        shall be obtained by the member delivering it.

   B.   When the Property Office is closed, property shall be stored in a locker within the
        Evidence/Property Room, Room 101.  Oversized items may be left on the floor.  Put
        the property with the completed paperwork inside a suitable locker.   Enter the
        transaction in the log book and place the key in the drop safe.

9.3     RETURNING PRISONER'S PROPERTY

   A.   As a general rule, prisoner property is held at the City Court Lock-up.  Arresting
        officers shall bring the yellow copy of the City Court Lock-up Property Receipt; form
        F-8-3150 City Court Lock-up to City Court Booking along with the P-163 Arrest
        Data Sheet. Property held at the City Court Lock-up shall be released at their
        discretion in accordance with their existing procedures.

   B.   A prisoner who has been released from custody and appears at the Property Office to
        claim his/her large or bulky property being held there shall be required to establish
        their identity as determined by the Property Office personnel. A copy of the
        identification presented shall be stapled to the Property Office copy of the P-
        10cbb(2).

   C.   If the prisoner's property has already been forwarded to the Property Office, the
        person shall be referred to the Property Office window located at the Church Street
        entrance of Headquarters to reclaim the property.

9.4     DISCREPANCY CLAIMS AND MISSING PRISONER'S PROPERTY
        If a prisoner claims a mistake or discrepancy in the property returned, or prisoner's
        property is missing, and the property had not yet been forwarded to the Property Office,
        the Officer in charge of CCB shall thoroughly investigate the claim and make a complete
        report of the incident in writing to his/her Commanding Officer.  The Commanding
        Officer shall review the report and make recommendations before forwarding it to the
        Commissioner's Office through the chain of command.  Any disputes over property being
        taken by City Court Lock-up personnel shall be referred to the Buffalo Police
        Department.

9.5     PRISONER'S VEHICLES

   A.   If a prisoner has been arrested while in a vehicle, the vehicle will not ordinarily be
        towed unless:

        1.   the vehicle or its contents are evidence;
        2.   the vehicle is the instrumentality of a crime (e.g.. hit and run accidents);
        3.   the vehicle was used in a criminal transaction rendering it eligible for
             forfeiture;

    4.  the vehicle is seized pursuant to VTL 511-b;
    5.  the seizing officer determines the vehicle is likely to be damaged or   stolen.

B.  Refer to M.O.P. Chapter 2 for instructions, if the vehicle is to be towed.

C.  If the vehicle is not to be towed, the arresting Officers, prior to transporting the prisoner for booking, shall:
    1.  secure the property in the vehicle unless:
        a.  any single item of property has an approximate value in excess of $50.00, or the property has an approximate aggregate value in excess of $200.00, in which case it shall be seized for safekeeping; or,
        b.  there exists a reasonable threat that if left in the vehicle, the property will be lost or stolen; or,
        c.  the property constitutes contraband or evidence;

    2.  if the property is not secured in the vehicle, and it is not evidence or contraband, it shall be held for safekeeping (refer to M.O.P. Chapter 18), and it shall be processed as specified in M.O.P. Chapter 18.

    3.  notify the district in which the arrest occurred of the vehicle's  description and location, the date and time of arrest, the prisoner's name, the vehicle's condition and the arresting officers' names. District personnel shall periodically check on the vehicle.

D.  If the vehicle of the prisoner is a commercial truck and it contains perishables, the arresting Officer shall:

    1.  if locally owned or operated, promptly notify the owner or other person who can take custody of the vehicle;
    2.  if not locally owned or operated and there is no local contact person, the Senior on-duty Commanding Officer of the unit making the arrest shall be notified and (s)he shall attempt to make contact with responsible parties to dispose of the property.


## 12.0  ARRESTS FOR DWI / DWAI

12.1  POLICY
It is the policy of the Buffalo Police Department to rigorously enforce laws that prohibit the operation of a motor vehicle while the driver is under the influence of alcohol or drugs. Special arrest procedures have been devised to meet the requirements necessary for successfully prosecuting this category of offender.


12.2  CONDUCTING FIELD SOBRIETY TESTS

Members of the Department suspecting that an operator of a motor vehicle is under the influence of alcohol or drugs may conduct a field sobriety test. If used, these tests must be conducted in an area and under conditions that assure the safety of the motorist and that result in an accurate assessment of the operator's coordination and motor skills. Tests

of this nature shall not be conducted on slippery or uneven surfaces, or under weather conditions that would adversely affect the Officer's evaluation. Officers may use one, or all, of the following tests:

A. Finger to Nose Test
   The subject is requested to:

   1. stand with feet together and arms at the side
   2. turn the palms outward and point with each index finger
   3. close his/her eyes and tilt the head back slightly
   4. touch the tip of the nose with one index finger at a time
   5. return the hand to the side.

B. Alphabet Test
   The Officer must first determine how far the subject went in school. The subject is then asked to recite the alphabet beginning at a letter selected by the Officer. If the subject stops or misses a letter, (s)he should be asked if (s)he is done. The Officer should note the manner of the subject's speech.

C. Walk and Turn Test
   The subject is requested to:
   1. place feet on a straight line, left foot in front of right foot, heel to toe
   2. keep arms at side and eyes watching his/her feet
   3. take nine steps forward, turn, and take nine steps back, counting each step.

## 12.3  BREATHALYZER TESTING - GENERALLY

Persons arrested for alcohol/drug related driving offenses shall be taken to the Accident Investigation Unit before being booked at City Court Booking.  The Breathalyzer test is the standard method of testing used by this Department for persons arrested for DWI and DWAI and it shall be used in every case unless there are extenuating reasons why the Breathalyzer test cannot be administered. (Refer to M.O.P. Chapter 3 for alternatives).

The Breathalyzer Operator shall observe the subject for twenty minutes prior to administering the Breath Test. This minimum twenty minute observation period is not required when the type of test used is a blood test. All tests - breathalyzer or blood tests- of persons suspected of driving while under the influence of alcohol/drugs must be completed within two hours of the time of arrest.

Persons suspected of driving while under the influence of alcohol/drugs must be kept under constant observation from the time of arrest until the time the chemical test is administered. Such person shall not be permitted to place anything in his/her mouth or to smoke within twenty minutes prior to the test.

A person must be allowed to contact an attorney before taking an alcohol/drug test if (s)he so requests and there remains sufficient time to complete the test.    Failure to contact an attorney in a timely fashion does not relieve the person of the responsibility for taking the test. If a person requests an attorney the arresting Officer shall:

1. dial the attorney's phone number and confirm contact;
2. make a record of:
   a. the attorney's name,
   b. the telephone number,
   c. the time of the call,
   d. whether the attorney was contacted;
3. if contact is made, allow the person to speak with the attorney.

Persons suspected of driving under the influence of alcohol/drugs "... shall be permitted to choose a physician to administer a chemical test in addition to the one administered at the direction of the police officer." (VTL 1194.4b)   Members are <u>not</u> required to inform the defendant of this right to a second test.  Failure to allow this second test within a reasonable time, if requested, could result in the suppression of the original test. Additional testing is at the defendant's own expense and (s)he shall be responsible for documenting the chain of custody and having the sample analyzed.

## 12.4   <u>BREATHALYZER TESTING PROCEDURE</u>

If the defendant has been arrested for DWI (s)he shall be advised as follows (from the rights card P- 90D):

1. "Your are under arrest for driving while intoxicated"
2. "A refusal to submit to a chemical test or any portion thereof, will result in the immediate suspension and subsequent revocation of your license or operating privilege, whether or not you are found guilty of the charge for which   you were arrested"
3. "Your refusal to submit to a chemical test, or any portion thereof, can be introduced into evidence against you at any trial, proceeding or hearing resulting from this arrest"
4. "Will you submit to a chemical test to determine the alcohol content or drug content of your blood?"

If the defendant has been arrested for DWAI (s)he shall be advised as follows:
(from the rights card P- 90D):

1. "You are under arrest for driving while ability impaired by the use of drugs"
2. "A refusal to submit to a chemical test, or any portion thereof, will result in the immediate revocation of your license or operating privilege, whether or not you are found guilty of the charge for which you were arrested"
3. "Your refusal to submit to a chemical test or any portion thereof, can be introduced into evidence against you at any trial, proceeding or hearing resulting from this arrest"
4. "Will you submit to a chemical test to determine the alcohol or drug content of your blood?"

The defendant shall be issued the Miranda Warnings.

If the defendant refuses to submit to a chemical test, the procedures outlined in M.O.P. Chapter 3 shall also be followed.

If the person agrees to submit to a chemical test, the test shall be conducted at the Accident Investigation Unit by a NYS certified Breathalyzer operator. The Breathalyzer operator shall be responsible for preparing all reports necessitated by the administration of the test and shall ensure that all proper procedures are followed.

The arresting officer shall prepare the New York State Standardized DWI Arrest Instrument (DCJS-3204). The form will be completed for all arrests alleging violations of any section of 1192 VTL. A copy of the report will be included in the case file.

The arresting Officer shall obtain from City Court Booking, a print out of the defendant's current driving record and deliver it to the City Court Lock-up for inclusion in the defendant's Court Folder.

After the test is administered, or after the defendant refuses to submit to a chemical test, all proper documents shall be prepared and the defendant taken to City Court Lock-up for booking.

12.5    ALTERNATIVE TO BREATHALYZER TESTING

A person suspected of driving while under the influence of alcohol/drugs may be subjected to a blood test when:

1. the defendant is hospitalized;
2. the defendant is physically unable to take a breath test;
3. the Breathalyzer is inoperable or a certified Breathalyzer operator is unavailable;
4. the defendant is suspected of being under the influence of drugs;
5. in cases of fatal or serious motor vehicle accident injuries.

In cases in which a blood test is to be administered, the following procedure is applicable:

1. The defendant shall be transported to a hospital if (s)he is not already confined there. Blood may only be withdrawn by a licensed physician, registered nurse, registered physician's assistant, or under the supervision and direction of a physician, medical laboratory technician, medical technologist, phlebotomist or an advanced emergency medical technician. Only a non-alcohol swab shall be used to cleanse the area where the defendant's blood is to be drawn.
2. The hospital staff shall be informed that the defendant is under arrest for driving while under the influence of alcohol/drugs. If the defendant is conscious (s)he must be given the appropriate warnings as outlined in M.O.P. Chapter 3 above. If the defendant then refuses to have blood withdrawn, his/her action should be construed as a refusal to submit to a chemical test. If the defendant is unable to give consent due to his/her injuries, the arresting Officer shall direct the hospital staff to withdraw the blood, basing the Officer's authority on the defendant's Implied Consent as specified in VTL 1194.2. If the defendant was involved in an accident in which there was a fatality or serious physical injury to a person other than the defendant, and

(s)he does not give consent, a Court Order may be obtained compelling the defendant's blood to be withdrawn, ( Refer to  M.O.P. Chapter 3).

<u>Handling the Blood Sample</u>

1. The blood must be drawn in the presence of the arresting officer. After it has been drawn it shall be given to the arresting officer and (s)he shall check the test tube sample to ensure that a label is affixed and that the label contains the name or initials of the physician or other person who withdrew the blood. The Officer delivering the blood sample to the CPS Lab shall also inscribe his/her initials on the label.
2. The Officer shall then place the blood sample with two (2) completed copies of a "Request for Forensic Examination" (DCPS-L-1) in an envelope, seal the envelope, place his/her initials on the outside of the envelope and deliver the envelope to the CPS Lab.
3. When the CPS Lab is not open, the Officer shall deliver the envelope and its contents to the CPS depository located at 45 Elm Street.
4. A copy of the New York State Standardized DWI Arrest Instrument (DCJS-3204) shall be forwarded to the CPS Lab along with the blood sample.
5. The arresting Officer shall be responsible for maintaining the chain of custody of blood samples submitted as evidence.
6. After the CPS Lab has completed the blood testing, they shall forward the results of the examination to the arresting Officer on form DCPS-L-1.
7. The Officer shall then proceed to City Court Lock-up to book the defendant.

12.6   <u>DEFENDANT'S REFUSAL TO SUBMIT TO A CHEMICAL TEST</u>
If a defendant refuses to submit to a chemical test after being given all the appropriate warnings, the arresting Officer shall prepare, the "*Report of Refusal to Submit to a Chemical Test*" (form AA-134). This form, along with all other required forms shall be delivered to City Court Lock-up and included in the defendant's Court Folder.

12.7   <u>COMPELLING SUBMISSION TO A CHEMICAL TEST –
FATAL AND SERIOUS PHYSICAL INJURY ACCIDENTS</u>

<u>Preliminary Requirements</u>
There must exist, reasonable cause to believe that:

1. the subject was the operator of the motor vehicle involved in an accident; and,
2. a person, other than the defendant was either killed or sustained serious physical injury as that term is defined in Section 10 of the Penal Law: and,

1. the subject operated the vehicle in violation of VTL 1192, or that a preliminary breath test indicated that the subject had consumed alcohol;  and,
2. the subject is under arrest; and,
3. the subject has refused to submit to a chemical test or is unable to give  his/her consent.

Procedure

1.  The arresting Officer shall request the assistance of a member of the Accident Investigation Unit (AIU).
2.  The AIU member shall contact the Assistant District Attorney on call and apprise him/her of all relevant circumstances.  If there exists reasonable cause to justify the issuance of a court order, the Assistant District Attorney shall provide the member with the telephone number of a judge who is to be available for such purpose.
3.  When the member speaks with the judge, the member shall have a copy of form P-97 "Verbatim Longhand Notes for Application for Compulsory Chemical Tests Pursuant to Vehicle and Traffic Law Section 1194(a)" and form P- 97A, the court order.
4.  If the judge grants the order, the member must sign the judge's name to the court order (P-97A) and the member's own name as the one who signed the order for the judge.
5.  The appropriate hospital personnel shall be informed by the member that a court order has been issued to compel the subject to submit to a chemical test.
6.  A blood test sample shall then be taken from the subject (Refer to Chapter 3, Section 12.15B and C). The subject cannot refuse to submit to this test and the use of reasonable physical force may be used to compel submission.
7.  The court order shall not be left at the hospital but must be delivered to the issuing judge within twenty-four (24) hours of being obtained. This can be accomplished by delivering the order either to the issuing judge or to the District Attorney's Office.

## 13.0   DOMESTIC VIOLENCE INCIDENTS

13.1   POLICY:
It is the policy of the Buffalo police Department to:

A.  Reduce the incidence and severity of domestic disputes;

B.  Protect victims of domestic disputes and provide them with support through a combination of law enforcement and community services;

C.  Promote Officer safety by ensuring that Officers are fully prepared to respond to, and effectively deal with domestic incident calls for service;

D.  Provide a proactive, pro-arrest approach in responding to domestic incidents.

13.2   DEFINITIONS

A.  A *domestic incident* is any disturbance, dispute, violence (threatened or committed), or report of a crime or an offense between individuals within a *domestic relationship* where police intervention occurs.

B.  A *domestic relationship* includes:

Persons who are "members of the same family or household" as defined in Criminal Procedure Law, Section 530.11(1) and Family Court Act, Section 812(1):

1. Persons related by consanguinity (blood) or affinity (marriage); or
2. Persons legally married to one another; or
3. Persons formerly married to one another; or
4. Persons who have a child in common, regardless whether such persons have been married or lived together at any time.

A *domestic relationship* also includes any person identified as a member of the same family, and persons who are or have been in an intimate relationship, including same sex couples, regardless of whether such persons have lived together at any time. Factors Officers may consider in determining whether a relationship is an "intimate relationship" include, but are not limited to: the nature or type of the relationship, regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship. Neither a casual acquaintance nor ordinary fraternization between two individuals in business or social contexts shall be deemed to constitute an "intimate relationship".

## 13.3    911 PROCEDURES

A. Whenever the complaint writer reasonably suspects that the safety of the victim is in danger, the call shall be classified as a "violent domestic" and dispatched as a priority two call. All other domestic dispute calls will be dispatched as priority three calls.

B. Dispatchers shall not cancel a police response to a domestic dispute complaint based solely on a follow-up call from the location of the original call, requesting such cancellation. However, the dispatcher shall advise the officers of the request.

## 13.4    RESPONDING OFFICER PROCEDURES

A. <u>On Scene Investigation</u>
   When responding to a domestic dispute call, the officers shall:

1. Restore order by gaining control of the situation;
2. Take control of all weapons used or threatened to be used;
3. Assess the need for medical attention and call for medical assistance if indicated;
4. Interview all parties, separately and alone if practical;
5. After each party has been interviewed, responding officers shall confer to determine if an arrest should be made or whether other action should be taken;
6. Collect and record evidence where appropriate;
7. Complete appropriate crime or incident reports where necessary. The New York *Domestic Incident Report* (DCJS-3221) shall be completed in every instance of a *domestic incident*, whether or not a violation of law is determined to have occurred. The responding Officer is required (CPL 530-11-6) to "advise the victim of the availability of a shelter or other services in

the community, and shall immediately give the victim of a family offense under the relevant provisions of the criminal procedure law, the Family Court Act and the Domestic Relations Law. Such notice shall be prepared in Spanish and English and if necessary, shall be delivered orally…". Therefore, the responding Officer must distribute to the victim the pink information sheet attached to Page 2 of the *Domestic Incident Report* (DCJS-3221).

8. If the offender has left the scene and a crime has been committed, the officers will attempt to locate and arrest the suspect;

9. The responding Officer will complete a domestic incident referral card (P-1369DV), and give same to the complainant. A warrant Card (P-1369) shall not be issued in domestic incident cases.

B. <u>Arrest</u>

1. Officers will make an arrest and will not attempt to mediate or reconcile the parties whenever:

   a. There exists reasonable cause to believe that a *felony* was committed, whether in the officer's presence or not;

   b. There exists reasonable cause to believe that a misdemeanor was committed, whether in the officer's presence or not.

   c. There exists reasonable cause to believe that a *violation* occurred in the officer's presence;

   d. A *violation* has occurred out of the Officer's presence and the victim will make a citizen's arrest and sign the required accusatory instruments;

   e. There exists reasonable cause to believe that a violation of an Order of Protection has occurred and the subject has knowledge of the existence of the order.

In domestic incidents, the officer shall attempt to identify and arrest the primary physical aggressor after considering the comparative extent of any injuries inflicted by and between the parties; whether any such person is threatening or has threatened future harm against another party or another family or household member; whether any such person has a prior history of domestic violence that the officer can reasonably ascertain; and whether any such person acted defensively to protect himself or herself from injury. The officer shall evaluate each complaint separately to determine who is the primary physical aggressor, and shall not base the decision to arrest or not to arrest on the willingness of a person to testify or otherwise participate in a judicial proceeding.

The Officers should state to the victim and the offender that the criminal action is being initiated by the state and not the victim. The arresting Officer shall indicate to the CCB personnel that the arrest is in connection with a domestic incident. Absent exigent circumstances, appearances tickets shall not be issued nor pre-arraignment bail set. Deviation requires prior approval of the 911 Lieutenant. A victim shall never be discouraged or prevented from filing a petition in Family Court or signing an accusatory instrument to initiate an action in Criminal Court.

If the offense to be charged is either a misdemeanor or felony, and a member of the Sex Offense Squad is on duty, that unit shall be notified.

C.  Victim Assistance/Crime Prevention
Many victims of domestic disputes feel trapped in violent relationships because they are unaware of the resources available to help them or that domestic violence is a crime. Also, the offenders may have threatened further violence if the victim attempts to leave or seek assistance. Officers are therefore required to provide the following assistance to victims, batterers and where appropriate, the children:

1.  Advise all parties of the criminal nature of family violence, its potential for escalation, and that help is available;
2.  Secure medical treatment for victims;
3.  Insure the safety of children, including checking for signs of child abuse since domestic violence and child abuse are often interrelated;
4.  Remain on the scene until satisfied that there is no threat to the victims;
5.  Remain on the scene to preserve the peace as one person removes personal property;
6.  Provide the victim with referral information for legal or social assistance and support;
7.  If necessary, transport the victim and children to a safe haven.

13.5  FORMS TO BE COMPLETED

A.  For all domestic incidents, whether a violation of law has occurred or not, the responding Officer must complete:

1.  NYS Domestic Incident Report (DCJS 3221);
2.  the pink and victim information sheet are issued to the victim.

B.  For domestic incidents in which a crime (i.e. felony or misdemeanor) has occurred, the responding officer must complete the Domestic Incident Report and an incident/ crime report.

C.  For domestic incidents in which an arrest is made, the arresting Officer must complete:

1.  a Domestic Incident Report;
2.  an incident/crime report (including arrests for violations);
3.  accusatory instruments, depositions and related court papers as the case requires

13.6  POLICE ACADEMY RESPONSIBLE FOR TRAINING
The Buffalo Police Training Academy will be responsible for training Department members about family offense laws, including the intake and recording of victims' statements, use of domestic violence incidence report forms, mandatory arrest provisions, victims' rights and specialized evidence collection.

13.7   DOMESTIC DISPUTES INVOLVING DEPARTMENT MEMBERS

All of the procedures involving domestic disputes are equally applicable to Department members who are involved as parties to a domestic dispute.

13.8   OFFICERS RESPONDING TO DOMESTIC DISPUTES INVOLVING DEPARTMENT MEMBERS

Officers responding to incidents of domestic disputes involving department members shall follow the procedures outlined in M.O.P. Chapter 3.  In addition, they shall request the appearance of a supervisor in every such case.

13.9   SUPERVISOR'S DUTIES - DEPARTMENT MEMBERS INVOLVED

Whenever a Supervisor responds to a domestic dispute involving a Department member (s)he shall:

A.  Take command of the incident and insure that all Department guidelines are followed;

B.  If an arrest of a Department member is required:

   1.  personally place the Department member under arrest;
   2.  through the Dispatcher or 911 Lieutenant, request the presence of a member of the  Internal Affairs Division.

C.  Whether or not an arrest is made, the Supervisor must seize all guns and firearms, regardless of legal authority under which they are held, if, in the Supervisor's judgment, the health or safety of any individual may be jeopardized thereby.

D.  Whether or not an arrest is made, the Supervisor shall prepare a detailed report (5 copies) of the incident and immediately forward one copy to the Commissioner and one copy to IAD. The remaining copies shall be forwarded through proper channels to IAD.

E.  Whenever it comes to the attention of a Supervisor that a Department member has been involved in a domestic dispute outside of the City of Buffalo, (s)he shall forward a report of the incident to the Commissioner and to the Internal Affairs Division.  If a domestic dispute related arrest of a Department member is to be made outside the city, The 911 Communications Lieutenant shall send a member of the IAD to assist the outside agency.

13.10  DUTIES OF COMMANDING OFFICERS AND/OR DISTRICT CHIEFS

A.  Commanding Officers and/or District Chiefs shall review reports submitted by Supervisors concerning Department members involved in domestic disputes. After determining that the report is complete and accurate, they shall forward the report to the Internal Affairs Division together with their recommendations.

B.  They shall assist the Internal Affairs Division in completing the investigation when requested.

C. In all instances, whether the Department member is the alleged abuser or the victim, the Commanding Officer and/or the District Chief shall apprise the Department member of the availability of the Employee Assistance Program (EAP) and encourage him/her to utilize its services.

13.11   INTERNAL AFFAIRS DIVISION – RESPONSIBILITIES
In incidents of domestic disputes involving Department members, the Internal Affairs Division shall:

A. Respond to all domestic disputes involving the arrest of Department members, whether or not within the City limits;

B. Make a determination as to the propriety of immediately suspending the arrested member from duty;

C. Fully prepare a disciplinary case involving any violation of Department rules;

D. Cooperate with the District Attorney's prosecution of a criminal case;

E. Make recommendations to the Commissioner.

13.12   INVOLVED MEMBER'S RESPONSIBILITY

A. Federal Law, Title 18 U.S.C. 922 (g) (8) requires that whenever a person is served with an order of protection stemming from a domestic violence incident, that person must relinquish all personal weapons. 18 U.S.C. 925 (a) (1) exempts Police Officers but only for weapons issued by the Department   and while the member is on duty.

B. In any case in which an employee of the Buffalo Police Department is named as a defendant/respondent and is served with an Order of Protection, that employee must turn in his/her personal weapons to either the Property Office, a legitimate firearms dealer or the Bureau of Alcohol Tobacco and Firearms. A copy of the Order of Protection and a copy of the receipt for weapons relinquished will be forwarded to IAD through the chain of command.

C. In cases involving sworn members of the Department, the Department issued weapon will be secured at the member's command and is to be in the member's possession only while the member is on duty.

**14.0   ORDERS OF PROTECTION**

14.1   POLICY
It is the policy of the Buffalo Police Department to cooperate fully with the local and superior courts in the enforcement of Orders of Protection and to place under arrest those persons who are suspected of being in violation of such Orders.

14.2   ENFORCING ORDERS OF PROTECTION – ARREST

A. The member must first determine that a valid Order of Protection exists and that the person suspected of violating the Order had knowledge of its existence. Refer to M.O.P Chapter 3.

B. If there exists, reasonable cause to believe that the person has violated the terms of a valid Order of Protection, the person shall be arrested and taken to the City Court Lock-up for booking. There is no requirement that the violation occurred in the member's presence and the requisite "reasonable cause to believe" a violation occurred, may be based on other factors existing at the time.

C. The complainant shall be required to make a Supporting Deposition, stating the facts that substantiate the violation. The Supporting Deposition shall be included in the Court File along with a copy of the Order of Protection.

D. In addition to violating the Order of Protection, the defendant shall be charged with any other criminal conduct which the member has reasonable cause to believe that the defendant committed. This includes, but is not limited to, those sections of the NYS Penal Law prohibiting Criminal Contempt (PL 215.50, PL 215.51 and PL 215.52).

E. If the Order of Protection is one issued by Family Court, the victim is also required to appear in Family Court to file a petition and shall be so advised.

14.3   HANDLING ORDERS OF PROTECTION
Refer to M.O.P Chapter 6.

**15.0   ADDITIONAL BOOKING PROCEDURES IN PARTICULAR CASES**

15.1   HOMICIDE ARRESTS
Whenever any member of the Department, other than a member already assigned to the Homicide Squad, makes an arrest for any homicide related offense, the arresting Officer shall immediately notify the Homicide Squad. Instead of transporting the prisoner directly to the City Court Lock-up, the arresting Officer shall take the prisoner directly to the Homicide Squad.  The arresting Officer shall not interrogate, question or Mirandize the suspect.  The Homicide Squad will assume control of the investigation and the arresting Officer will be guided by the direction of the Officer in charge of the Homicide Squad.

15.2   WELFARE ABUSES
Whenever information is received that an arrested person may be involved in welfare abuses of any kind, the information shall be forwarded to the Erie County Department of Social Services.

15.3   FOREIGN NATIONALS
The arrest of foreign nationals is governed by various treaties that the United States has entered into with other countries. Generally, these treaties require that when foreign nationals are arrested, including US citizens when they are arrested outside their own country, they must be afforded an opportunity to have a representative of their own country notified of the arrest.  Whenever a foreign national has been arrested, the 911

Communications Lieutenant and the Duty Inspector shall be notified. (S)he shall promptly contact the appropriate foreign consulate or embassy and make a record of such notification. The 911 Communications Lieutenant shall keep a current list of telephone numbers of foreign consulates and embassies. Subject to existing laws and Department regulations concerning access to prisoners, consular offices have a right to visit their nationals who are held in custody. They may converse and correspond with the prisoner and arrange legal representation, but they are precluded from taking any action on the prisoner's behalf if the prisoner refuses such assistance. The 911 Communications Lieutenant shall maintain a current and accurate list of the countries under this category. Members of the Department should contact the US Department of State concerning any questions that arise concerning foreign nationals at (202) 647- 4415. Written inquiries may be addressed to the Office of Assistant Legal Adviser for Consular Affairs, Department of State, Washington, DC 20520.

A. Consular Notification and Access

The following information are instructions for Federal, State and Local Law enforcement and other officials regarding foreign nationals in the United States and the rights of Consular Officials to assist them.

1. Summary of Requirements Pertaining to Foreign Nationals:

   a. When foreign nationals are arrested or detained, they must be advised of the right to have their consular officials notified

   b. In some cases, the nearest consular officials must be notified of the arrest or detention of a foreign national, regardless of the national's wishes.

   c. Consular officials are entitled to access to their nationals in detention, and are entitled to provide consular assistance

   d. When a government official becomes aware of the death of a foreign national; consular officials must be notified.

   e. When a guardianship or trusteeship is being considered with respect to a foreign national who is a minor or incompetent, consular officials must be notified.

   f. When a foreign ship or aircraft wrecks or crashes, consular officials must be notified.

2. Steps to Follow When a Foreign National is Arrested or Detained:

   1) Determine the foreign national's country. In the absence of other information, assume this is the country on whose passport or other travel documents the foreign national travels.

   2) If the foreign national's country is **not** on the mandatory notification list (see below):

      * Offer without delay, to notify the foreign national's consular officials of the arrest/detention.

      * If the foreign national asks that consular notification be given, notify the nearest consular officials of the foreign national's country without delay.

3) If the foreign national's country **is** on the list of mandatory notification countries (see below):
   * Notify that country's nearest consular officials, without delay, of the arrest/detention.
   * Tell the foreign national that you are making this notification.
4) Keep a written record of the provision of notification and actions taken.

**Mandatory Notification Countries and Jurisdictions**

| | |
|---|---|
| Algeria | Mauritius |
| Antigua and Barbuda | Moldova |
| Armenia | Mongolia |
| Azerbaijan | Nigeria |
| Bahamas, The | Philippines |
| Barbados | Poland (non permanent resident only) |
| Belarus | Romania |
| Belize | Russia |
| Brunei | St. Kitts and Nevis |
| Bulgaria | St Lucia |
| China (not Republic of China) | St Vincent and the Grenadines |
| Costa Rica | Seychelles |
| Cyprus | Sierra Leone |
| Czech Republic | Singapore |
| Dominica | Slovakia |
| Fiji | Tajikistan |
| Gambia, The | Tanzania |
| Georgia | Tonga |
| Ghana | Trinidad and Tobago |
| Grenada | Tunisia |
| Guyana | Turkmenistan |
| Hong Kong | Tuvalu |
| Hungary | Ukraine |
| Jamaica | United Kingdom (British dependencies also) |
| Kazakhstan | USSR (travel on old passport-refer to new country) |
| Kiribati | Zambia |
| Kuwait | Zimbabwe |
| Malaysia | |
| Malta | |

*   More information may be obtained from US Department of State "Consular Notification and Access" Booklet and Pocket Card.

Information on Diplomatic Immunity and BPD policy can be found in the Manual of Procedure Chapter 3.

15.4   SEX RELATED OFFENSES
       If any member of the Department, other than a member already assigned to the Sex

Offense Squad, makes an arrest involving a sex related offense as defined in NYS Penal Law 130, the Sex Offense Squad shall be contacted. Statements of victims of sex offenses shall be taken by a member of the Sex Offense Squad. The Sex Offense Squad shall assist the arresting Officer in gathering evidence and developing the case.

15.5    ARREST OF OPERATORS OF COMMON CARRIERS

A. When it becomes necessary to arrest the operator of a common carrier (e.g. bus, train, etc.), the arresting officer shall not take the operator off the common carrier unless there is another employee present capable of taking the arrested employee's place. The operator who has been arrested shall be given an opportunity to notify his/her supervisor whenever possible.

B. If there is no substitute capable of taking over the operator's responsibilities, the arresting officer will accompany the operator to the transit garage or railroad depot to make the arrangements necessary to safeguard the passengers and equipment.

C. The arresting officer will, at the first opportunity, notify his/her immediate supervisor of the circumstances of the arrest.

15.6    TRAFFIC ARRESTS
Refer to M.O.P. Chapter 7.

15.7    MASS ARRESTS
Refer to M.O.P. Chapter 11.

15.8    MILITARY DESERTERS
Refer to M.O.P. Chapter 14.

## 16.0    MENTALLY ILL

16.1    POLICY
It is the policy of the Buffalo Police Department to treat all persons suffering from an affliction of mental illness in a humane manner. Members must use appropriate caution in dealing with such persons to protect themselves and others, as well as the mentally ill person himself/herself. Proper medical and psychological attention will be provided in those instances where the person is a danger to himself or others.

16.2    MENTAL ILLNESS DEFINED
Mental illness means an affliction with a mental disease or condition which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation. (Sec.03.20 MHL)

16.3    POWERS AND DUTIES POLICE/PEACE OFFICERS

1. Emergency Admissions by Police Officers
2. Any Peace Officer acting pursuant to his/her special duties, or any Police Officer, may take into custody any person who appears to be mentally ill and

is conducting himself/herself in a manner which is likely to result in serious harm to himself/herself or others, (Sec 9.41 MHL). "Likely to result in serious harm" means:

    a. substantial risk of physical harm to himself/herself as manifested by physical threats of, or attempts at suicide or serious bodily harm, or other conduct demonstrating that (s)he is dangerous to himself/herself; or

    b. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

3. If the above criteria are met and the person is taken into custody, (s)he shall be immediately taken to the Erie County Medical Center for evaluation.

B. Emergency Admissions by the Director of Community Services

1. The Director of Community Services or his/her designee has the power to direct the removal of any person within his/her jurisdiction to an approved hospital if the parent, spouse, child, physician, health officer, Peace Officer, or Police Officer reports to him/her that such person has a mental illness for which immediate treatment and care in a hospital is appropriate and which is likely to result in serious harm to himself or others (Sec. 9.45 MHL).

2. It is the duty of Peace Officers acting pursuant to their special duties, and Police Officers to take into custody and transport such persons. Under this section the Police Officer does not have the authority to make an independent evaluation of the mental health of such person.

3. Certain members of the Emergency Outreach Service of Crisis Services are designees of the Director of Community Services. As such, they can direct a Police Officer to transport an apparently mentally ill person to a hospital. The designee must provide the Police Officer with a completed copy of the form entitled "Request to Take Mentally Ill Person into Custody" before the Officer is required to transport the person.

C. Apprehending Escapees from a Mental Health Facility

A person who has been committed or admitted to a Mental Health facility and has escaped or who resists or evades lawful custody, may be apprehended, restrained, transported to, and returned to such facility by a Peace Officer acting pursuant to his/her special duties or any Police Officer. It shall be the    duty of Buffalo Police Department members to assist any Mental Health Department representative in taking any such person into custody.

D. Mental Hygiene Warrants

1. A court may issue a warrant for a person's arrest based on a verified  statement that establishes that the person is:

    1. mentally ill, and:

        i. that the person engages in conduct that would likely result in serious harm to himself or others; or

        ii. that the person engages in conduct that would otherwise constitute

disorderly conduct.

2. Mental Hygiene Warrants shall be served only during the times that court is in session and the person can be arraigned.

3. If a sworn member of the Department comes into contact with a person for whom a Mental Hygiene Warrant is outstanding and court is not in session, the person may be apprehended and taken to the Erie County Medical Center if the criteria set forth in M.O.P. Chapter 3 are met. If the criteria in M.O.P. Chapter 3 are not met then the apprehension of the person shall be postponed until court is next in session.

16.4    HANDLING THE MENTALLY ILL
A.  General Guidelines
1. The person must be handled with a gentle firmness. Without unduly agitating the mentally ill person beyond his/her current state, the Officer must exert control over the situation, attempting to minimize the potential danger to himself and to the mentally ill person.

2. Members shall attempt to obtain the cooperation of the patient's family and friends in determining the proper action to be taken.

3. Officers shall avoid handling mentally ill persons alone. The Officer would be taking an undue risk, and the patient would be less deterred from resisting than if at least two Officers were present.

4. Officers shall not ride alone in a vehicle with a mentally ill person. The potential for physical danger is too high and the possibility of unfounded allegations of improper conduct is too great.

B.  Using Force and Using Restraints
1. If it becomes necessary to use force or restraint, the Officers shall use only that amount of physical force necessary to take the person into custody. Use of the nightstick should be avoided and it should only be used when necessary to defend the Officer from physical injury. When employing force or restraint it is often advisable to approach the person from opposite directions simultaneously, and subdue the person quickly.

2. Handcuffs, or restraints provided by the ambulance crew, shall be used in every instance in which a mentally ill person resists being taken into custody.

3. Mentally ill persons who physically resist being taken into custody should be transported to the hospital by an ambulance after being placed in restraints.

B.  Armed and Dangerous Mentally Ill Persons
If a mentally ill person is armed, the Crisis Management Team and the SWAT Team shall be called in accordance with M.O.P. Chapter 11.

C.  Searching the Mentally Ill Person
Any apparently mentally ill person taken into custody by a member of the Department shall be thoroughly searched before being placed in a vehicle and transported to a medical facility.

16.5    TRANSPORTING APPARENTLY MENTALLY ILL PERSONS

    A.    Apparently mentally ill persons who have not resisted being taken into custody and who are not violent or combative may be transported to the hospital in a Departmental vehicle.  All other mentally ill persons shall be transported by ambulance.

    B.    If requested to do so by an ambulance attendant or physician, an Officer shall ride in an ambulance that is transporting a mentally ill person.  In such case, another Officer in a police vehicle shall follow the ambulance to the hospital.

    C.    Any female patient that is being transported to or from a facility shall be accompanied by another female unless she is accompanied by her father, brother, husband or son (MHL 33.17).

16.6    DISPOSITION OF MENTALLY ILL PERSON'S PROPERTY

    A.    If a criminal charge has been placed against an apparently mentally ill person, his/her property shall be treated as prisoner's property and handled in accordance with existing procedures.

    B.    If no criminal charge has been placed, the apparently mentally ill person's property shall be delivered to the hospital along with the patient.

    C.    Contraband articles shall be retained and handled consistent with procedures outlined in M.O.P. Chapter 5.

16.7    IF NO CRIMINAL CHARGES ARE PLACED

    A.    Mentally ill persons who are not charged with a criminal offense and who have been taken into custody under a provision of the Mental Hygiene Law shall be taken directly to the Erie County Medical Center for examination and treatment. The mentally ill person is not to be taken to the City Court Lock-up for booking.

    B.    Persons apprehended on the authority of a Mental Hygiene Warrant shall be taken directly to Court and shall not be taken to the City Court Lock-up unless there are also criminal charges outstanding. MHL warrants are to be served only when court is in session.

    C.    Whenever questions arise as to the propriety of an examination or admission, members may call the Erie County Medical Center's Comprehensive Psychiatric Emergency Program (CPEP) at 834-3131 or they may call the Crisis Services Suicide Prevention outreach team at 898-3462.

16.8    IF CRIMINAL CHARGES ARE PLACED

    A.    When Court is in Session
        When court is in session and an apparently mentally ill person is charged with a criminal offense, the person shall be booked at the City Court Lock-up on the

criminal charge and then taken to court for arraignment as soon as possible. It is within the court's discretion to order the person to undergo psychological evaluation.

B. <u>When Court is Not in Session</u>
When a criminal charge is placed against an apparently mentally ill person and court is not in session, the person shall be taken to the City Court Lock-up for booking on the criminal charge unless circumstances mandate the person's immediate removal to the Erie County Medical Center. Arrest documents are only prepared for the criminal charges and not the Mental Hygiene Law charges.

C. <u>Hospital Guard</u>
No Police hospital guard will be required for mentally ill persons who are also charged with a criminal offense except in unusual cases, such as a serious felony or for some other extenuating reason. Only the Duty Inspector or any Officer senior in rank can approve a request for a police hospital guard. The hospital should be requested to notify the Department of the date and time that the patient is to be released.

16.9  <u>IF THE APPARENTLY MENTALLY ILL PERSON IS REFUSED ADMISSION</u>

A. If the apparently mentally ill person is refused admission at ECMC, and the conduct in which the person had engaged would have otherwise constituted an offense (e.g. disorderly conduct, harassment, etc.), the person may be taken to the City Court Lock-up for booking on that charge. In this instance a notation that the person was refused hospital admittance must be recorded on the "Request for Examination (form P-1321), as well as the name of the physician who refused such admittance.

B. If the apparently mentally ill person is refused admission at ECMC and the examining physician recommends a course of action for the mental and physical welfare of the person that does not include preferring criminal charges, the Officer shall attempt to comply with the physician's   recommendations where feasible. When in doubt, the Officers shall consult with the Duty Inspector or 911 Communications Lieutenant and follow his/her directions.

C. If the apparently mentally ill person is refused admission at ECMC and the person had not engaged in any conduct for which an offense could be charged, Officers should attempt to release him/her to the care of a relative or other concerned person.

16.10  <u>ATTEMPTED SUICIDES</u>
In all cases of attempted suicide the member of the Department must:

A.  have the person taken to ECMC for medical and psychological attention;

B.  complete the "Request For Examination" (form P-1321);

C.  notify the Homicide Squad immediately.

16.11  REQUIRED FORMS

    A.  In all cases in which an apparently mentally ill person is sent to ECMC for examination and/or admission, Form P-1321 "Request for Examination" shall be prepared in accordance with the instructions on the form. An incident number should be obtained in every case.

    B.  In preparing the form, great care must be taken to accurately describe the specific conduct that leads the member to believe that the person "is apparently mentally ill and is conducting himself in a manner that is likely to result in serious physical harm to him/herself or others."

        DISTRIBUTION:  Original to ECMC
                          Copy to City Court Booking
                          Copy to Command File
                          Copy to Homicide Squad (in cases of attempted suicide only)

16.12  ALTERNATE PROCEDURES
Whenever circumstances exist in which the person's conduct is not so serious as to authorize the Officer to act under MHL 9.41 but it is apparent that the person is mentally ill, the Officer has several alternatives.

    A.  Officers may recommend that the family seek guidance from their family physician.

    B.  Officers may recommend that the family seek a Mental Hygiene Warrant from City Court.

    C.  Officers may put the family in contact with Crisis Services at 834-3131.

    D.  Officers may notify the Erie County Director of Community Services (Erie County Commissioner of Mental Health, 95 Franklin Street) of the circumstances and the person involved.  It is then the Director's responsibility to take the necessary steps to ensure the proper care and treatment of such person (MHL 9.47). If a referral of this nature is made, the Officer shall prepare an Aided Case Report (P-71) citing all the pertinent facts of the case.

    E.  Either a Police Officer or the parent, spouse, or child, of a mentally ill person who is conducting himself/herself in a manner likely to result in serious physical harm to himself/herself or others, may notify the Director of Community Services or his/her designee.  Either the Director or his/her    designee may direct the removal of such person to the appropriate agency.

    F.  An apparently mentally ill person may be admitted to a proper facility upon the certification of two examining physicians.

    G.  The person may be admitted as an "informal" or voluntary patient.

## 17.0    JUVENILES IN TROUBLE WITH THE LAW

17.1    POLICY
It is the policy of the Buffalo Police Department to promote the general welfare of juveniles by working closely with the Family Court and the various service agencies, to detect juveniles who are in trouble and to prevent any further anti-social behavior. The applicable Family Court Act and/or NYS Penal Law sections shall control responses involving juveniles.

17.2    CATEGORIES OF JUVENILE IN TROUBLE WITH THE LAW

A.  Petty Offender

B.  Person in Need of Supervision

C.  Juvenile Delinquent

D.  Juvenile Offender

17.3    HANDLING JUVENILE PETTY OFFENDERS
When it has been brought to the attention of any member of the Department that a juvenile is alleged to have committed a petty offense, the member shall:

A.  prepare a Juvenile Bureau Referral Form (P-1294), and

B.  release the juvenile to the parent's custody or to the custody of the person responsible for the juvenile's care.

Distribution of P-1294:  original to Juvenile/SOS
copy to District file

17.4    HANDLING PERSONS IN NEED OF SUPERVISION (PINS)

A.  Investigating Complaints
Members investigating complaints of "persons in need of supervision" shall:

1.  thoroughly investigate the complaint; and,
2.  if there is a strong indication that the child fits the criteria of a P.I.N.S., the member shall prepare a Juvenile Bureau Referral Form (P-1294) which  shall be forwarded to Juvenile/SOS and (s)he shall also refer the parent or guardian to the Family Court P.I.N.S. Diversion unit  at 858-8349, and;
3.  if the juvenile is a runaway, a missing persons report shall be completed and the parent or guardian shall be advised that they should contact the Family Court P.I.N.S. Diversion Unit as soon as possible.

B.  Taking Into Custody
Juveniles suspected of being a "person in need of supervisions" shall only be taken into custody by a member of the Department if there is a PINS warrant on file.

C.  <u>Family Court in Session</u>
In those instances in which Family Court is in session when the "person in need of supervision" is taken into custody, the juvenile, along with the PINS warrant shall be taken directly to Family Court.

D.  <u>Family Court Not in Session</u>
If Family Court is not is session when the "person in need of supervision" is taken into custody, the member shall transport the juvenile, along with the PINS Warrant, to the Juvenile Detention Center at 766 E. Ferry Street. The member should phone (923-4062) the detention facility prior to his/her departure to let the detention facility personnel know of the anticipated arrival of the juvenile.

17.5   <u>HANDLING JUVENILE DELINQUENTS</u>

A.  <u>Power and Authority to Take Into Custody</u>
1.  A Police Officer may take a child under the age of sixteen (16) into custody without a warrant under the same conditions that (s)he may arrest any person for a crime under CPL 140 (FCA 305.2).
2.  A private person may take a person under the age of sixteen (16) into custody in cases in which (s)he may arrest another for a crime under CPL 140.30.
3.  When a juvenile is taken into custody, or is delivered to a Police Officer by a private person, the Officer shall immediately notify the parent or other person legally responsible for the juvenile's care or other person with whom the juvenile is domiciled (FCA 724).

B.  <u>Family Court in Session</u>
When Family Court is in session and the child is to be charged as a juvenile delinquent based on conduct which would constitute a crime, the following procedures shall be followed:

1.  The member shall contact the juvenile's parent, guardian, or other person legally responsible for the juvenile's care. If the member is unable to contact the juvenile's parent, guardian or other person legally responsible for the juvenile's care, the member shall leave a notice at the juvenile's residence.

2.  Juvenile offenders shall be restrained with handcuffs and shall not be transported along with adult prisoners unless they are related to the adult prisoner.

3.  Juvenile Offenders shall be taken to City Court Booking, but should not make entry through the same area as an adult prisoner. The Juvenile and arresting officer shall enter City Court Booking via the outside elevator.  Upon entry to City Court Booking, every effort shall be made to keep the juvenile from making contact, visual or otherwise, with any adult prisoner.  The arresting officer shall provide the City Court Booking with a completed Juvenile Referral Form (P-1294), and CCB will be responsible for preparing the Juvenile Information/Complaint, and a Supporting Deposition and/or 710.30 Notice when necessary.  The preparation of all other related paperwork rests

with the arresting Officer.

    a. The Juvenile Information/Complaint is to be subscribed by the complainant or by the Officer, if the Officer is the complainant.
    b. The Supporting Deposition is to be subscribed by a witness other than the complainant.
    c. If an adult and a juvenile are co-defendants and the charges against the juvenile are answerable in Family Court, the name of the juvenile shall <u>not</u> appear in the adult's arrest documents that are forwarded to City Court. However, the name of the adult co-defendant must appear on the juvenile's documents in Family Court.

4. If the juvenile has been charged with conduct that would constitute a felony for which the juvenile must be fingerprinted (refer to M.O.P. Chapter 3) the 911 Communications Lieutenant shall be notified and (s)he shall arrange to have the juvenile fingerprinted and photographed in the first floor juvenile room by a Police Officer.

5. City Court Booking shall be responsible for assembling all required documentation and forwarding it to Family Court.

C. <u>Family Court Is Not In Session</u>
At any time that Family Court is not in session, members shall adhere to the following procedures:

1. Same as M.O.P. Chapter 3 above.
2. If the juvenile is to be released to a parent, guardian or other person legally responsible for his/her care, City Court Booking shall prepare a Family Court Appearance Ticket.
3. If the juvenile is not to be released, the member must arrange to have him/her detained at the Juvenile Detention facility at 766 E. Ferry.

D. <u>Fingerprinting and Photographing Juveniles</u>
Refer to M.O.P.   Chapter 3.

E. <u>Custody and Release of Juvenile Delinquents</u>
Whenever practical, juveniles coming into Police custody for engaging in conduct that would constitute an offense; shall be released as soon as possible to their parents, guardian, or other person responsible for their care. Juveniles who are alleged to have engaged in conduct that would constitute a class D Felony or any more serious felony will be taken to the E. Ferry Detention Center. Juveniles may also be referred for detention for the following reasons:

1. When there is reason to believe that the child will abscond unless detained and the member can clearly articulate this reason.
2. When there is reason to believe that the juvenile will commit another serious offense unless detained and the member can clearly articulate this reason.

3. The juvenile is to be held for another jurisdiction (e.g. absconded from an institution, material witness under court order, parole violator, runaway, etc.).
4. When a parent, guardian, or other person responsible for the juvenile's care cannot be found.
5. Juveniles over 16 years of age can only be accepted for detention under the authority of a warrant or court order.
6. A person in need of supervision (PINS) cannot be placed in detention unless a petition has already been filed with the Family Court.

In any circumstance in which a child is to be petitioned as a juvenile delinquent and (s)he is placed in detention, the petition must be forwarded by City Court Booking to the Family Court within seventy-two hours of the juvenile being placed in detention.

F. <u>Family Court Appearance Ticket</u>
A Family Court Appearance Ticket is a written notice issued and signed by a Police Officer, Peace Officer, probation service director or his/her designee, or the operator of a detention facility or his/her designee, directing a child and his/her parent or other person legally responsible for the child's care, to appear without security at a designated probation service on a specified return date, in connection with the child's commission of the crimes specified in the Appearance Ticket.

1. If the crime charged is a designated felony, and the juvenile is not a "juvenile offender" as defined in PL 10.18, the return date shall be no later than seventy-two (72) hours after the date the Appearance Ticket was issued, excluding Saturdays, Sundays and holidays.

2. A "designated felony" is any of those crimes listed in FCA 301.2 (8).

3. If the crime charged is not a "designated felony," the return date shall be no less than seven (7) and no more than fourteen (14) days after the date the Appearance Ticket was issued. Appearance Tickets issued under these circumstances shall be made returnable as follows:
   a. District A - Monday 0900hrs
   b. District B - Monday 1400hrs
   c. District C - Thursday 0900hrs
   d. District D - Monday 1400hrs
   e. District E - Thursday 1400hrs

4. The complainant, the juvenile, the juvenile's parent, guardian, or other person responsible for his/her care, and the Adjustment Bureau must all be provided with a copy of the Appearance Ticket. The Adjustment's Bureau's copy must be immediately forwarded along with the Juvenile Information/Complaint, and the Supporting Deposition, if any. The Appearance Ticket must be received by the Adjustment Bureau within twenty-four (24) hours of its issuance.

17.6    HANDLING JUVENILE OFFENDERS (AS DEFINED IN THE PENAL LAW)

A.  Notification of Parents
After arresting a child who is categorized as a juvenile offender, the arresting Officer shall immediately notify the juvenile's parent, guardian, or other person responsible for the juvenile's care, and inform him/her of the juvenile's arrest and the location where the juvenile is detained.

B.  Booking Procedures
1.  Juvenile offenders shall be restrained with handcuffs (refer M.O.P. Chapter 3).
2.  Juveniles shall not be transported along with adult prisoners unless they are related to the adult prisoner.
3.  Juvenile Offenders shall be processed at City Court Lock-up as outlined in Chapter 4.
4.  City Court Booking shall prepare the arrest cards.
5.  City Court Booking personnel shall contact the Cell Block and make arrangements to have Cell Block personnel fingerprint and photograph the juvenile.  No adult prisoner is to be allowed in/out of the cellblock area while a juvenile is being fingerprinted and photographed. The privacy curtain should be extended and remain extended until the juvenile is fingerprinted and photographed and has left the room.
6.  City Court Booking shall forward a copy of the completed fingerprint cards to Albany.
7.  If a line-up is necessary, it will be handled in the same manner as though the juvenile were an adult defendant.
8.  City Court Booking shall assemble all related original arrest documents and place them in a court folder to be delivered to City Court. City Court Booking shall forward copies of the arrest documents to the Erie County Probation Department Intake, 25 Delaware Avenue, Room 502.
9.  If City Court is in session, Officers shall transport the juvenile offender to City Court after processing has been completed.
10. If City Court is not in session, the juvenile offender shall be taken to the Detention Intake Office at 766 E. Ferry at 923-4062. Juvenile offenders are not to be held at Headquarters or any stationhouse unless authorized by the New York State Division for Youth.
11. The Juvenile Referral Card (P-1294) shall be completed for juvenile offenders and a copy of all arrest documents shall be forwarded to SOS.

17.7    ARRANGING FOR DETENTION FOR JUVENILES
When it is necessary to place a child in detention and Family Court is not in session, the member shall:
A.  First call the Detention Intake Office at 923-4062 (this number is for Police purposes only and shall not be divulged to the public) located at 766 E. Ferry.  Apprise them of the necessity to place the juvenile in detention and follow their guidance. After the call is placed, CCB will fax the Juvenile Information/Complaint to the Detention Center. This information is required before the Juvenile Detention Center will accept custody of the juvenile.

B. Thoroughly search the juvenile and seize all contraband, evidence, and instrumentalities of the crime. All other personal property shall be delivered to the Intake Office with the juvenile. A receipt shall be obtained for all property handed over to the Intake Office.  Female juveniles shall only be searched by female members of the Department.

C. Transport the child to the Detention Intake Office at 766 E. Ferry.

17.8   <u>INTERVIEWING JUVENILES</u>

A. The questioning of any juvenile who has been taken into custody can only proceed at a facility that has been approved by the chief administrator of the courts as being a suitable place for questioning juveniles, or, in the alternative, at the juvenile's residence, when the juvenile's parent, guardian, or other person responsible for the his/her care has consented.  The appropriate juvenile room in Police Headquarters shall be used for interviewing juveniles.

B. Reasonable efforts must be made to notify a parent, guardian, or other person responsible for the juvenile's care and have them present prior to the commencement of any questioning.

C. If after reasonable effort has been made, the parent, guardian, or other person responsible for the juvenile's care cannot be located, the member shall document in a supporting deposition the reason for their absence and the efforts expended in attempting to secure their presence.

D. Prior to beginning the questioning, the juvenile and his/her parent, guardian, or other person responsible for his/her care, must be advised of the Miranda Warnings.

E. Questioning shall take place for only a reasonable amount of time.

F. In questioning female juveniles, a female member should be present in most cases and must be present in morals cases or any case of a sensitive nature. No more than two members shall interview a juvenile at one time.

17.9   <u>JUVENILES UNDER THE INFLUENCE OF ALCOHOL/DRUGS</u>

A. Juveniles under the influence of alcohol/drugs who do not require medical attention should be released to their parent, guardian or other person responsible for the juvenile's care, whenever possible.

B. If the child is completely disoriented, or it is apparent that medical attention is necessary, the child shall be taken to a hospital for treatment and the parent, guardian, or other person responsible for the child's care, immediately  notified.

1. Children's Hospital and ECMC will both accept juveniles who are ill as the result of the ingestion of alcohol/drugs.
2. Juveniles who are under the influence of alcohol/drugs and who are violent or

uncontrollable shall be taken to ECMC.

C. The member of the Department shall also report the incident as a case of possible child neglect to the NYS Register of Child Abuse. Child Protective Services is also available for protective custody until a parent, guardian, or other person responsible for the child's care can be located.

D. Form DSS-2221-A must be completed by the member and forwarded to Juvenile/SOS.

## 18.0  ARREST WARRANTS

### 18.1  POLICY

It is the policy of the Buffalo Police Department to record and execute arrest warrants in a manner consistent with constitutional requirements and the requirements of the Criminal Procedure Law and to apply for and use arrest warrants as a mechanism to advance the successful prosecution of criminal cases.

### 18.2  REQUESTS FOR ARREST WARRANTS

When there exists reasonable cause to believe that a person has committed an offense and after a diligent search, the person is unable to be located, the Officers shall issue a Warrant/Summons Request Form (P-1369).  If the offense is a crime (misdemeanor or felony), a crime/incident report shall also be prepared.

A. The complainant shall be advised to report to the Warrant Clerk's Office in City Court, Family Court, etc. with the Warrant Request Form (P-1369). The purpose of the Warrant Request Form is to verify that the police have investigated the incident and to provide sufficient facts about the incident upon which a warrant may be prepared. After the warrant/summons has been either approved or denied, the Warrant/Summons Request Form will be forwarded to the Court Liaison Unit where they will be retained. If there is any change in the crime alleged, the Court Liaison Unit shall notify the Detectives of the concerned unit so that any additional reports may be prepared.

B. A warrant card (P-1369) shall not be issued in the following cases, but the complainant shall instead be referred to the appropriate Detective Unit.

   1. Sexual assault cases (i.e. rape, sodomy, etc.) shall be referred to SOS.
   2. Telephone harassment shall be referred to the Officer handling obscenity cases in the Narcotics/Vice Units' Communication Crime Unit (CCU).

C. Members shall not apply for a warrant for an assault upon themselves, without first reporting the circumstances, through their Commanding Officer, to the Commissioner and obtaining his/her permission.

18.3   ALL WARRANTS TO BE PROCESSED AT CITY COURT BOOKING

    A.   All arrest warrants received by, or delivered to, any member of the Department shall be immediately sent to City Court Booking for processing.

    B.   City Court Booking shall be the central repository for all arrest warrants.   That unit shall be responsible for making the necessary computer entries and deletions, maintaining appropriate records, and distributing copies of warrants to the various units for execution.

    C.   The CCB personnel shall ensure that a Warrant/Want Form (CPS-IS-313-2) is attached to each copy of the arrest warrant before they are distributed to the various Departmental units for service. Copies of arrest warrants shall be distinctly marked as being copies and not originals.

18.4   DISTRIBUTION OF ARREST WARRANTS
The original arrest warrant shall remain at CCB until it is executed.  Copies of arrest warrants shall be distributed for execution by City Court Booking to the various Departmental units in the following manner:

    A.   A copy of the warrant shall be forwarded to the District in which the defendant resides or where (s)he may most likely be located.

    B.   Copies of warrants for juveniles shall be forwarded to SOS.

    C.   Copies of warrants, in which the underlying crime charged is handled by a specialized unit, shall be forwarded to that unit, consistent with the directives of the Chief of Detectives (e.g. narcotics, sex offenses, etc.).

    D.   Copies of warrants for defendants who live outside the City or who can be located outside the City, shall be forwarded to the Correspondence Unit.

18.5   WARRANT LOG - DISTRICT/UNIT RESPONSIBILITY

    A.   Districts and other units shall maintain a log book of all copies of warrants received from City Court Booking. The Warrant Log shall be in a form, and maintained in a manner, approved by the Chief of Detectives.

    B.   The Warrant Log shall be used to record copies of all warrants received by the unit and the date and time the warrant was served or otherwise disposed of.

    C.   Entries in the Warrant Log Book shall reflect that copies of warrants remaining unserved for in excess of thirty (30) days have been returned to City Court Booking.

    D.   Warrant Logs shall be periodically examined by the Commanding Officer of   each unit, as well as other supervisory personnel, to ensure that they are being maintained in a manner consistent with Departmental directives.

18.6   WARRANT/WANT FORM

A.   All copies of warrants forwarded by City Court Booking to any other Department unit must have one (1) copy (green) of the warrant/want Form (CPS-IS-313-2) attached. Any warrant received without such form shall be returned to the CCB Unit with an explanatory note.

B.   CCB personnel and Officers to whom a copy of a warrant is assigned for service shall follow the instructions outlined on the reverse side of the Warrant/Want form.

C.   When the fully completed Warrant/Want Form is received by City Court Booking after the warrant has been served, City Court Booking personnel shall expunge the warrant from the CPS computer and place the original warrant in the court folder to be forwarded with other applicable documents.

18.7   RESPONSIBILITY FOR SERVING ARREST WARRANTS

A.   Commanding Officers in charge of the various Departmental units shall be responsible for ensuring the prompt processing and serving of arrest warrants that have been assigned to their respective commands. Department units will receive from CCB, copies of arrest warrants that they are assigned to execute.

B.   Officers to whom warrants are assigned for service shall:

1.   Make a diligent effort to serve the warrant as promptly as possible.
2.   When necessary, make a thorough investigation of the offense charged.  The investigation shall minimally include an interview of the complainants and witnesses, the taking of all required statements, the preservation of evidence, and attempts to recover stolen property.
3.   The investigating Officer must complete in duplicate the Warrant Investigation Report (form P-57) indicating the date, time and place, and person(s) interviewed, in their attempt to apprehend the defendant.
4.   If the defendant cannot be readily located, the investigating Officer shall check the City Court Lock-up and the Erie County Correction Facility to see if the subject is incarcerated in either institution.
5.   If the defendant cannot be readily located, and the warrant is for a felony, a Class "A" misdemeanor, or for parole violation, the investigating Officer shall contact the particular Social Service Office in writing, for information as to the defendant's current address

C.   Indictment Warrants:
Officers attempting to serve Indictment Warrants shall, in addition to section "B" above, also:

1.   contact the United States Postal Authorities for any possible change in address;
2.   contact the Auto Registration Unit to determine if the defendant has a NYS driver's license or registration which may indicate a new address;

    3.  make at least five (5) attempts to apprehend the defendant;

    4.  record all attempts to determine the defendant's whereabouts and all attempts to apprehend the subject, on the Warrant Investigation Report (P-57).

D.  Arrest warrants assigned to individual Officers for service shall not be kept by the Officer but shall be retained in a location in the unit where they are accessible to other Officers.

## 18.8  POST ARREST PROCEDURES - LOCAL CRIMINAL COURT WARRANTS

After a defendant has been placed under arrest pursuant to an arrest warrant, all the normal booking procedures are to be followed. In addition, the following procedures must also be adhered to.

A.  Before being taken to Court, the defendant must be fingerprinted and photographed. If fingerprinting and photographing are required by the Criminal Procedure Law. Refer M.O.P. Chapter 3.

B.  The City Court Booking shall be responsible for removing the executed warrant from the C.P.S. computer immediately after service.

C.  In addition, CCB personnel shall check the CCB "Daily Record of Arrests" to ensure that in all warrant arrests, the warrants have been removed from the C.P.S. computer.

## 18.9  POST ARREST PROCEDURES - SUPERIOR COURT WARRANTS

A.  A Superior Court Warrant is a warrant from a County Court, State Supreme Court, Violation of Probation Warrants, Indictment Warrants, and Family Court Warrants. Except for Family Court Warrants, defendants booked on all other Superior Court warrants shall be booked at the City Court Lock-up in accordance with existing regulations and booking procedures.

B.  Family Court Warrants

    Adults arrested on Family Court warrants shall be booked at City Court Booking in accordance with existing regulations and booking procedures.

C.  Pending City Court Charges in Addition to the Superior Court Warrant.

    1.  If a person is arrested on a Superior Court warrant and there are currently City Court charges on which the prisoner needs to be arraigned, (s)he shall first be taken to City Court in accordance with existing regulations and booking procedures.

    2.  The appropriate copy of the "Apprehension for Outside Agency" form shall be attached to the Court papers that accompany the prisoner to City Court.

## 18.10  UNSERVED WARRANTS

A.  Departmental units which are unable to serve a warrant within thirty (30) days after it was first received, shall on the thirty-first (31) day, complete the Warrant/Want form

according to the instructions on its reverse side, and then return the warrant along with the completed Warrant/Want form to City Court Booking.

B. Commanding Officers shall be responsible for ensuring that members of their command have made a diligent attempt to serve the warrant before it is returned to City Court Booking and that all attempts to locate the defendant have been properly entered on the Warrant/Want form.

## 18.11   TRANSFER OF WARRANTS

A. If information is received by the Officer assigned to serve the warrant that the defendant can be located in another command, the warrant and the executed green copy of the Warrant/Want form shall be returned to City Court Booking. CCB shall then redirect the warrant to the proper Command for service.

B. If the defendant can be found outside the City but within Erie County or in any adjoining county, City Court Booking shall send a copy of the warrant to the Correspondence Unit to be forwarded to the Police Agency in the jurisdiction in which the defendant can be located.

C. When a copy of a warrant for a felony charge is returned unserved to the City Court Booking, the warrant shall be entered on the CPS computer on the state-wide warrant systems.

## 18.12   WARRANT ARRESTS FOR OUTSIDE AGENCIES

A. In those instances in which a person is taken into custody by a member of the Buffalo Police Department pursuant to a warrant issued by a local criminal court other than Buffalo City Court, the arresting Officer shall:

   1. verify that the warrant is still active and that the originating police agency will retrieve the prisoner;
   2. transport the prisoner to the  City Court Lock-up for processing;
   3. a notation will be made in the Apprehension For Outside Agencies arrest blotter that the prisoner is being held for a particular outside police agency;

B. Arrests on non-felony warrants issued outside Erie County or any adjoining county.

   1. If a member of the Department is delegated by another agency to arrest a defendant pursuant to a non-felony warrant that was issued by a local criminal court outside of Erie County or any adjoining county, the Officer may hold the defendant for up to two (2) hours while waiting to transfer the defendant to the delegating agency.

   2. If the defendant is in default of bail on the original warrant, (s)he can be held for longer than two (2) hours but (s)he must be turned over to the  delegating police agency without unnecessary delay.

3. If the transfer is not made within two hours and the defendant is not in default of bail, the defendant must be informed that (s)he has the right to appear in Buffalo City Court for the purpose of being released on his/her own recognizance or having bail fixed.

4. If the defendant does not want to appear in Buffalo City Court, (s)he must "make, sign and deliver" to the Officer, a written statement to that effect. (Such statement is often contained on the reverse of the warrant form). In this case the defendant shall be turned over to the delegating police agency without unnecessary delay.

5. If the defendant does want to appear in Buffalo City Court or refuses to furnish the required statement, (s)he shall be taken to Court without unnecessary delay. The arresting Officer must submit to the Court a written Supporting Deposition reciting material facts concerning the issuance of the warrant, the offense involved, and all other essential    matters relating to the arrest.

## 18.13   ARRESTS ON CITY WARRANTS BY OUTSIDE AGENCIES

A. When another Police Agency arrests a person for <u>any offense</u> pursuant to a City of Buffalo warrant and the arrest is outside the City limits but within Erie County or an adjoining county, the 911 Communications Lieutenant or the Duty Inspector shall arrange for the prisoner's immediate return by Buffalo Police personnel.

B. When another Police Agency arrests a person for a <u>non-felony offense</u> pursuant to a City of Buffalo warrant and the arrest is made outside Erie County or any adjoining county, the 911 Communications Lieutenant or the Duty Inspector shall arrange for the prisoner's immediate return but only if travel time to the destination of arrest does not exceed two (2) hours.

C. When a person is arrested on a City of Buffalo warrant by another Police Agency and the warrant is for a <u>felony</u>, and the arrest is made outside Erie County or any adjoining county, but within New York State, the 911 Communications Lieutenant or the Duty Inspector shall confer with the Chief of Detectives.

D. When a person is taken into custody outside of New York State on an arrest warrant for a felony that occurred within the City of Buffalo, extradition may be required (refer to M.O.P. Chapter 17).

## 18.14   EXTRADITION
Refer to M.O.P. Chapter 17.

## 19.0   **APPEARANCE TICKETS**

## 19.1   POLICY
It is the policy of the Buffalo Police Department to release all eligible prisoners on Appearance Tickets unless the prisoner has been charged with a domestic violence related offense or there are other extenuating circumstances that preclude such release.

19.2    APPEARANCE TICKET

Applicable sections of the NYS CPL, Penal Law, or Family Court Act as they are in effect at any given time shall govern the use and issuance of Appearance Tickets.

Appearance Tickets shall not be issued when circumstances indicate that the issuance of an Appearance Ticket would be inappropriate (e.g.. where the safety of any person would be jeopardized by the defendant's immediate release, or it is apparent that the defendant will continue to engage in conduct of the same nature for which (s)he was originally arrested, etc.),

Appearance Tickets shall not be issued where the arrested person appears to be under the influence of alcohol, narcotics or other drugs, to the degree that (s)he may endanger himself or others.

When arrests are made for offenses involving domestic violence, Appearance Tickets may be issued only if there are extenuating circumstances and the Duty Inspector or a higher rank authorizes the defendant's release.

19.3    ISSUING APPEARANCE TICKETS AT CITY COURT BOOKING

A.  The defendant's identity must be positively established. Acceptable forms of identification are:

   1.  NYS driver's license/non-driver's identification
   2.  Social Service Card
   3.  Military ID Card
   4.  Buffalo Public School or Local College ID Card for the current year
   5.  US Passport
   6.  Buffalo Police Mug
   7.  For defendants eighteen (18) years old or younger, a birth certificate with seal, if presented by a parent or guardian who himself/herself has identification of a kind specified in 1-6 above.

B.  There cannot exist active arrest warrants for the defendant.

C.  A copy of the Appearance Ticket (white copy) shall be given to the defendant. The person issuing the Appearance Ticket shall explain to the defendant the nature and purpose of the Appearance Ticket, the day, date, and time the defendant is to appear in Court, and have the defendant sign the Appearance Ticket where indicated. The member shall also warn him/her that failure to appear as required may result in the issuance of a warrant for the defendant's arrest.

D.  In all cases in which an Appearance Ticket is issued, an Arrest Data Report (form P-163), and an Information/Complaint (form P-60) must be completed by the arresting Officer.

20.0    **ADJUDICATION SUMMONS**

20.1    POLICY

It is the policy of the Buffalo Police Department to use adjudication summons to enforce specific City Ordinances.

20.2    DISTRIBUTION OF ADJUDICATION SUMMONS BOOKS

A.  Adjudication summons books shall be distributed by the Inspector of Administration and Communication to the various Department units as needed.

B.  Adjudication Summons Journals (P-186A) shall be distributed by the office of the Inspector of Administration and Communication to the various Department units to record all Adjudication Summons Books issued to that unit.

20.3    OBTAINING ADJUDICATION SUMMONS BOOKS

The District Commanding Officers will determine the number of Adjudication Books that are necessary for use in their respective commands.

All Adjudication Summons Books shall be charged to the Commanding Officer of the unit receiving them and shall be signed for by an authorized member of that command.

The following procedure will be used when replacement books are required:

1.  The Commanding Officer will cause a listing of completed Adjudication Summons Books to be prepared in duplicate on an Intra-Departmental Memorandum. It shall show the beginning and ending number of each completed book.

    Distribution: Original to Inspector of Administration and
    Communication
    Copy to Command file

2.  The member receiving additional Adjudication Summons Books shall sign a receipt for the replacement books received, and then deliver the books to his/her Commanding Officer.

20.4    UNITS TO MAINTAIN A RECORD OF ADJUDICATION SUMMONS BOOKS

A.  When new Adjudication Summons Books are received at a Department unit, the Commanding Officer shall ensure that the books are checked for deficiencies. Each book shall be listed by date received and book number, in the journal provided for that purpose.

B.  If any books are discovered to be deficient because of missing summons, misprints, or for any other reason, the deficiencies shall be noted on an Intra-Departmental Memorandum, and the book, together with the Intra-Departmental Memorandum shall be returned to the office of the Deputy Commissioner of Operations.

C.  When a book is issued to a member of his/her command, the officer's name, the date of issuance, and the book number, shall be recorded in the Adjudication Summons Journal (P-186A).

20.5    CARE OF ADJUDICATION SUMMONS BOOKS BY INDIVIDUAL MEMBERS
Members to whom Adjudication Summons Books are issued shall be strictly responsible for their care and use.

Upon receipt of an Adjudication Summons Book, the member shall carefully check it for completeness. If any deficiencies are found, they shall return the book to their Commanding Officer so it can be returned to the office of the Inspector of Administration and Communication.

Adjudication Summons Books shall be maintained in a secure place when not in use and they shall not be taken home or left in any private vehicles.

Members having Adjudication Summons Books shall use care so that the book does not become mutilated, lost, etc.

20.6    ISSUING ADJUDICATION SUMMONSES TO VIOLATORS
A police officer may issue any Adjudication Summons upon having reasonable cause to believe that a violation of a City Ordinance as cited in the Adjudication Summons Book has been committed. **Juveniles cannot be issued an Adjudication Summons.**

The officer has the option to arrest **or** issue a summons but cannot do both.

20.7    PREPARING THE ADJUDICATION SUMMONS
The Adjudication Summons must be filled out completely and accurately or the underlying charges will be dismissed.

If the violator is to be cited for multiple violations, a separate summons shall be prepared for each violation.

A ball-point pen must be used.

All entries must be printed except the Officer's signature.

The violator's name and address must be entered on the Adjudication Summons. Adjudication Summonses must be addressed to an individual unless the violation is for an abandoned or junk vehicle on public or private   property. In such case the VIN or license plate number shall be entered.
The location where the violation occurred must be entered on the Adjudication Summons.

The Adjudication Summons must include the day, date and time of the violation.
The issuing Officer must indicate the manner in which the Adjudication Summons was served. The Adjudication Summons may be personally served on the violator. If the violator is not present and it is left with someone else, the name of the person with whom it was left must be indicated. If the Adjudication Summons is left on a vehicle, the date of service must be indicated and the word "vehicle" shall be substituted for the word "door" on the Adjudication Summons.

The offense code, fine class and the chapter and section violated must be noted. Only those violations noted on the back of the Adjudication Summons Book can be charged. All other City Ordinance violations must be prosecuted in City Court.

The factual part of the Adjudication Summons is a Supporting Deposition.   Information contained in this part must be factual and specific. If the issuing Officer did not personally observe the violation, the Officer must state his/her source of knowledge. Additional information can be included on an Intra-Departmental Memorandum and forwarded with the Adjudication Summons to the Adjudication Bureau.

The issuing Officer must sign the Adjudication Summons.

The issuing Officer must include his/her employee number and unit to which (s)he is assigned.

20.8   VOIDING AN ADJUDICATION SUMMONS
Whenever an Adjudication Summons must be voided, the member voiding the Adjudication Summons shall complete a Bureau of Administrative Adjudication Void Summons Request. The voided Adjudication Summons shall be attached to the completed form and forwarded to the Administrative Adjudication Bureau.

At the back of the Adjudication Summons Book there is a form to be used to record voided Adjudication Summonses. This is for personal reference only and does not relieve the Officer of the responsibility for preparing the Bureau of Administrative Adjudication Void Summons Request.

20.9   ADJUDICATION SUMMONSES - WHERE RETURNABLE
Adjudication Summonses are only to be made returnable to the Administrative Adjudication Bureau, Room 215, City Hall.

Only those specific City Ordinance violations listed in the Adjudication Summons Book can be cited for Adjudication. All other City Ordinance violations must be prosecuted through City Court.

20.10   SWORN MEMBERS - APPEARANCE AT THE ADMINISTRATIVE
ADJUDICATION BUREAU
Sworn members of the Department shall not appear in court or at any Administrative Adjudication proceeding in connection with an Adjudication Summons that the sworn member may have issued without first having the approval of the Court Liaison Unit.

20.11   PROCESSING ADJUDICATION SUMMONSES – COMMAND/UNIT
RESPONSIBILITIES
Commanding Officers are to insure that all Adjudication summons are reviewed for accuracy.  White and yellow copies, along with a memo listing the summons numerically, are to be forwarded daily to the Operations Office, Room 212, Headquarters.

The Operations Office will document the summons for statistical data and forward to the Adjudication Bureau, Room 215, City Hall where computer entry will be made.

COB000423

# CHAPTER 4: PRISONERS

## CONTENTS

**1.0**    **CITY COURT LOCK-UP**
1.1    Arrests Made by Members of the Buffalo Police Department
1.2    Remanding of the Prisoner to the City Court Lock-Up
1.3    Circumstances Particular to Arrests Hostile/Combative Prisoners
1.4    Prisoners Requiring Medical/Psychological Treatment Prior to Booking

**2.0**    **ARRESTING OFFICER RESPONSIBILITY**
2.1    Policy
2.2    Transporting Prisoners after Arrest
2.3    Transporting Complainants/Witnesses to City Court Booking
2.4    Disposition of Prisoners after Booking – Males
     A.   Magnetometer
     B.   Adult Male Prisoners to the Cellblock after Booking
     C.   No Weapons Allowed in City Court Lock-up
     D.   Search by Cellblock Personnel

**3.0**    **SEARCHING PRISONERS IN THE CELLBLOCK**
3.1    Policy
3.2    Conducting the Search

**4.0**    **FINGERPRINTING AND PHOTOGRAPHING PRISONERS**
4.1    Policy
4.2    Fingerprinting and Photographing Procedures

**5.0**    **FEMALE PRISONERS**
5.1    Policy
5.2    Booking Procedures - Females
5.3    Searching Female Prisoners
5.4    Handcuffing Female Prisoners
5.5    Transporting Female Prisoners to the Female Lock-up

**6.0**    **JUVENILES**
6.1    Handling Juvenile Offenders (as Defined in the Penal Law)
     A.   Notification of Parents
     B.   Booking Procedures

**7.0**    **CITY COURT CELLBLOCK**
7.1    Policy
7.2    City Court Cellblock – Generally
     A.   Adult Males Prisoners Only
     B.   Adult Females Prisoners Only
     C.   Responsibilities of Members Assigned
     D.   Temporary Confinement Only

E.  No Female Prisoners to be Confined in the Men's City Court Lock-up
F.  No Male Prisoners to be Confined in the Women's City Court Lock-up
G.  No Juveniles to be confined in City Court Lock-up
H.  Medical Attention Necessary for Sick, Injured and Intoxicated Prisoners
I.  No Medication shall be given to a Prisoner unless Authorized or Prescribed by a Physician
J.  Staffing Levels
K.  No Special Privileges for Prisoners

**8.0   CARE OF PRISONERS**
8.1   Policy
8.2   Examination before Confinement
8.3   Examination after Confinement
8.4   Dangerous Prisoners
    A.  Use of Prisoner Restraint Chair
    B.  Use of Chemical Spray
8.5   Telephone Calls
8.6   Prisoner Supplies
8.7   Prisoner Meals
8.8   Prisoners Requiring Medical or Psychological Attention
    A.  Medical Treatment
    B.  Prisoners Requiring Mental Observation
8.9   Prisoners Returned to the Cellblock after Treatment
8.10  Administering Medications

**9.0   UNUSUAL INCIDENTS IN THE CELLBLOCK**
9.1   Policy
9.2   Unusual Occurrence – Definition
9.3   Unusual Occurrence – Procedure
9.4   Unusual Occurrence – Reporting Requirements
9.5   Deaths in the Cellblock – Additional Procedures
9.6   Escapes
9.7   Reporting Requirements

**10.0   CELLBLOCK SECURITY**
10.1   Policy
10.2   Doors to be Locked
10.3   Key Control
10.4   Radios
10.5   Emergencies
    A.  Members Needing Assistance
    B.  Emergency Evacuation Route
10.6   Escorting Prisoners to and From Cells
10.7   Identifying Prisoners Prior to Release
10.8   Visiting and Interviewing Prisoners
    A. Only Authorized Persons Allowed in Cellblock
    B.  Police Interviews
    C.  Attorney or Clergy visits

D.  Pre-Trial District Attorney and Horizon Mental Health Personnel
E.  Written Authorization Required

**11.0  PRISONER'S RIGHTS**
11.1  Policy
11.2  Specific Rights

**12.0  PRISONER'S PROPERTY**
12.1  Policy
12.2  Returning Prisoner's Property

**13.0  INSPECTING CELLS AND CELLBLOCK AREAS**
13.1  Policy
13.2  Inspection Immediately Before and After a Cell is Used
13.3  Daily Inspection
13.4  Weekly Inspection
13.5  Cleaning of Cells
13.6  Accounting for Tools and Culinary Equipment

**14.0  CELLBLOCK RECORDS AND FORMS**
14.1  Policy
14.2  Inspector of Administration and Communication Responsibility
14.3  Safeguarding Records
14.4  Cellblock Prisoner Control Form (P-19)
14.5  Records Reporting Required – NYS Commissioner of Correction

**15.0  Prisoners to City Court**
15.1  Policy
15.2  Ill, Injured or Intoxicated Prisoners
15.3  Transporting to City Court – Procedure
A.  City Court Detail
B.  Prisoner Clothing
C.  Handcuffing Prisoners
D.  Court Documents and Prisoner Identification
E.  Prisoners Leaving Cellblock for City Court
F.  Notifying Court When the Prisoner Presents a Security Hazard
15.4  Medical or Psychological Treatment after Confinement at the Holding Center

**APPENDIX A – SEARCHES**

**APPENDIX B – CELLBLOCK RECORDS AND FORMS**

COB000426

1.0    **CITY COURT LOCK-UP**

1.1    ARRESTS MADE BY MEMBERS OF THE BUFFALO POLICE DEPARTMENT
Arrests made by members of the Buffalo Police Department will consist of two (2) phases:

    a.  Remanding of the prisoner to the City Court Cellblock;
    b.  Filing of accusatory instruments – preparation of court folders in City  Court Booking

1.2    REMANDING OF THE PRISONER TO THE CITY COURT LOCK-UP

    a.  Arresting Officer(s) will inform radio that they are preceding directly to the City Court Lock-up with their prisoner.

    b.  Officers will enter the garage and park their police vehicle. Access to the garage can be gained via the officer using his/her employee id card to "swipe" the card reader at the door

    **c.**  Officer(s) shall then exit the patrol vehicle and will secure their weapon(s) in the lockers provided in City Court Booking.  **NO WEAPONS OR AMMUNITION ARE TO BE BROUGHT INTO THE CELLBLOCK AREA. Gun Lockers are located immediately outside prisoner entrance, outside cellblock area in prisoner transport hallway, and inside the booking office area.**

    d.  Arresting Officer(s) shall thoroughly search the clothing and person of each prisoner before being placed in a cell or detention room.  This includes the booking room of City Court Booking.

    e.  Searching of a female prisoner shall be accomplished by a female Cell Block Attendant and/or a female Police Officer.

1.3    CIRCUMSTANCES PARTICULAR TO ARRESTS  HOSTILE/COMBATIVE PRISONERS

    A.  Officers shall inform radio that they have a combative and/or hostile prisoner.

    B.  Radio shall then call the City Court Lock-up and inform them of the situation.

    C.  The hostile/combative prisoner shall be taken immediately into the City Court Lock-up, via the sally port and metal detector, into the cellblock and placed in an isolation cell.

    D.  Buffalo Police Department personnel cannot leave the facility until they can obtain a property receipt and the copy of the P-163 and other necessary paperwork.

E.  Once the prisoner is placed in the isolation cell, the arresting Officer(s) will take their place   back in the booking line, if that is the case.

1.4     PRISONERS REQUIRING MEDICAL/PSYCHOLOGICAL TREATMENT PRIOR TO BOOKING

a.  Prisoners that are sick/injured, mentally ill, have ingested or are suspected of having ingested a foreign object or substance and prisoners whose ability is impaired by alcohol/drugs to the extent that they may be unconscious or semi-unconscious must be taken directly to ECMC, unless exigent circumstances exist, for medical treatment prior to being booked at the City Court Booking.

b.  The arresting officer(s) shall prepare a P-1261 (Request for Medical Examination of Prisoner form) leave a copy with the City Court Lock-up after the prisoner is booked.  The original P-1261 shall accompany the officer back and copies will be distributed per Department Policy.

c.  All policies pertaining to hospitalized prisoners shall remain in effect.

2.0     **ARRESTING OFFICER RESPONSIBILITIES**

2.1     POLICY
It is the policy of the Buffalo Police Department that unless directed otherwise by a higher ranking Officer, the care, safety and well being of a prisoner is the responsibility of the arresting Officer until such time as the prisoner is confined in the appropriate detention facility.

2.2     TRANSPORTING PRISONERS AFTER ARREST
A.  Upon Arrival at City Court Booking
    1.  Notify C.C.B. personnel of arrival by pressing the intercom
    2.  No weapons or ammunition allowed inside City Court Booking.  Weapons and ammunition shall be placed in a gun locker and locked. Key shall be taken by Officer.
    3.  All prisoners must be searched in the search room prior to admittance to City Court Booking (C.C.B.) If there is reasonable suspicion that the prisoner possesses a weapon and/or contraband, this search MUST be approved and witnessed by the on duty Lieutenant. ONLY FEMALE STAFF MAY SEARCH FEMALE PRISONERS.- See Appendix A.
    4.  Request entry to C.C.B. by pressing intercom on inner door.
    5.  Proceed to counter to begin processing.  If there is a back-up at processing, secure prisoner on the bench or in the holding cell until directed to remove and begin processing.

B.  Processing
    1.  Upon Entry, the Officer shall secure the prisoner to the bench located immediately inside the door. If the booking area is congested with Officers and prisoners, the arresting Officer may request central booking personnel to open the

group cell so the prisoner can be placed inside.

2. Prisoner shall be searched prior to being placed in a holding cell.

3. C.C.B. personnel shall inventory all property belonging to the prisoner. All money and such items as rings, watches and any other personal property shall be taken by City Court Booking personnel and witnessed by the prisoner and the arresting Officer. A receipt (form P-10cbb) shall be issued to the prisoner for all the property taken.

2.3     TRANSPORTING COMPLAINANTS/WITNESSES TO CITY COURT BOOKING

1. Complainant/witnesses should be directed to enter City Court Booking through the elevator located on W. Eagle Street (side of City Court).

2. Under no circumstances should a complainant or witness enter City Court Booking through the prisoner entrance.

2.4     DISPOSITION OF PRISONER AFTER BOOKING - MALES

A. Magnetometer

The prisoner will be required to pass through the magnetometer enroute to the cellblock. If the magnetometer alerts, Cellblock personnel shall be notified by the arresting officer and cellblock personnel will use a metal detector wand as part of their prisoner search process.

B. Accompanying Adult Male Prisoners to the Cellblock after Booking

After booking has been completed, all adult male prisoners who are to be incarcerated shall be taken to the cellblock for confinement. The prisoner's property receipt (form P-10cbb), a Prisoner Data Sheet (form P-163) completed on both sides, shall accompany the prisoner to the cellblock. All prisoners shall have a wrist band issued indicating their name, date of birth and Mug number.

C. No Weapons Allowed in City Court Lock-up

No weapons are allowed in the cellblock. Prior to any law enforcement Officer's entry into the City Court Lock-up, (s)he must deposit all weapons, including second weapons, outside City Court Booking, in the lockers provided for that purpose. The door to the City Court Lock-up shall not be unlocked until all weapons are secured in the gun locker.

D. Search by Cell Block Personnel

The Officer delivering the prisoner to the cell block shall witness the Cellblock Attendant's search of the prisoner and shall assist the Cellblock Attendant, but only if requested to do so.

1. Personal property that should have been seized at C.C.B. and later is discovered during the Cellblock Attendant's search shall be delivered to C.C.B. by the Officer who brought the prisoner to the cellblock.

a. C.C.B. personnel shall enter the additional property on the original prisoner's itemized receipt (Form -P10cbb). The additional property shall be placed in tamper proof property envelope and attached to the prisoner's original property envelope.

b. The Officer delivering the prisoner to the cell block shall record the additional property and shall enter the date and sign his/her name on the Prisoner's copy of the property receipt (Form -P10cbb).

2. If contraband is discovered, the property shall be seized by the Officer who delivered the prisoner to the cellblock. The property shall be processed as evidence and corresponding additional criminal charges shall be filed.

3. If practical, prisoners shall be fingerprinted and photographed prior to being placed in a cell. If not, the prisoner should be placed in the cell. If requested, the Officer delivering the prisoner to the cellblock shall assist the Cellblock Attendant with this task. Once inside the cell, the custody of the prisoner becomes the responsibility of cellblock personnel.

3.0  **SEARCHING PRISONERS IN THE CELLBLOCK**

3.1  POLICY
It is the policy of the Buffalo Police Department that Cellblock Attendants thoroughly search every adult prisoner before the prisoner is placed in a holding cell. Prisoners shall not be allowed to enter a cell while in possession of any article, substance or thing with which they may harm themselves or others, or with which they can cause damage to property.

3.2  CONDUCTING THE SEARCH
A.  Responsibility of Members Assigned to the Cellblock
Members of the Department assigned to the cellblock are responsible for conducting a thorough search of every male adult prisoner and female adult prisoner before the prisoner is placed in a cell. Belts, suspenders, shoelaces, and any other article, substance or thing with which the prisoner may harm himself or others, or cause damage to property, shall be taken away from the prisoner. If the prisoner should choose not to remove his shoe laces from his shoes, the prisoner may choose to relinquish the shoes with the laces and be issued a paper pair of foot coverings.

1. Members of the Department assigned to the cellblock shall immediately remove from a prisoner's possession, by force if necessary, any weapon or any other thing, which may potentially be used to cause damage to property, or physical injury or death.

B.  Prisoner's Property in the Cellblock
Belts, shoelaces, jackets and other items of personal property not allowed in a cell shall be stored in the shelves provided in the cellblock area.

C.  Search Methods
See Appendix A – Searches

4.0  **FINGERPRINTING AND PHOTOGRAPHING PRISONERS**

4.1    POLICY
It is the policy of the Buffalo Police Department to fingerprint and photograph eligible prisoners prior to their release from the City Court Cellblock.

4.2    FINGERPRINTING AND PHOTOGRAPHING PROCEDURES
A.  Members of the Department assigned to the City Court Cellblock shall be responsible for fingerprinting and photographing those prisoners who need to be so processed.

B.  After a prisoner is fingerprinted and photographed the Department member shall initial the P-19 under the fingerprint column.

C.  Photographs of the prisoner shall be taken with a pre-assigned Mug Shot Number. Mug numbers are assigned by City Court Booking.

D.  Each photo that is taken shall ensure that all facial features will be visible in the finished photo.  Additional photos will be taken of tattoos, etc.

E.  Females and Juveniles - Every effort shall be made to ensure that females and juveniles are visually separated from any males being processed or being held. This includes the use of the curtain in the fingerprint/photograph area.

5.0  **FEMALE PRISONERS**

5.1    POLICY
It is the policy of the Buffalo Police Department that female prisoners who are to be incarcerated shall be confined in the City Court female lock-up.

5.2    BOOKING PROCEDURES- FEMALES
A.  Females Booked at City Court Booking
Arresting Officers shall transport female prisoners to City Court Booking for processing.

B.  Searching Female Prisoners
Female prisoners shall be thoroughly searched by a female Cellblock Attendant or female Officer upon entering the CCB Booking Room.

C.  Fingerprinting and Photographing Female Prisoners
Upon completion of the required booking documents, the arresting Officers shall take the female prisoner to Cellblock for fingerprinting and photographing when required. Department members assigned to the cellblock shall immediately enter the required information on the Form P-19 reserved for female prisoners.

D.  Female Prisoners to Be Given Priority For Fingerprinting and Photographing
Female prisoners shall be given priority for fingerprinting and photographing.  In the event that a female and a male prisoner enter the cellblock almost simultaneously, the male prisoner shall be placed in a pre-assigned cell. The female prisoner shall be fingerprinted and photographed, and then transported by the arresting Officer to the City Court female lock-up.

E. Documents for Female Lock-up

A copy of the arrest card and the Information/Complaint will be provided to the arresting Officer for eventual delivery with the prisoner to the City Court female lock-up.

F. Females Who Cannot be Fingerprinted Immediately

If for some reason the female prisoner cannot be immediately fingerprinted and photographed (e.g. intoxicated, violent, etc.), then City Court Booking personnel shall note same on the P-19 and file. A copy of this report shall then be attached to the arrest information and arrest card and delivered to the female lock-up with the female prisoner.

5.3    SEARCHING FEMALE PRISONERS

Refer to Appendix A – Searches

5.4    HANDCUFFING FEMALE PRISONERS

Female prisoners shall be handcuffed behind their backs whenever possible. In those instances in which a female prisoner is arrested by male Officers, generally the search will not be as thorough and the necessity for adequately restraining the female prisoner with handcuffs is even greater.

5.5    TRANSPORTING FEMALE PRISONERS TO THE FEMALE LOCK-UP

A. It is the responsibility of the arresting Officers to transport the female prisoner to the City Court female lock-up. (Refer M.O.P. Chapter 3).

B. The arresting Officers shall upon completion of the booking process of a female prisoner, handcuff the female prisoner and proceed through the male lock-up (door F5) and then proceed directly out door through the male lock-up without stopping and exit through door (F7). Cellblock personnel will lower the hallway gates, at which time the female arrest will be escorted through door (F8), across hall, through door (F9) and proceed down hallway and through door (F10 and turn the female risoner over to the Cellblock Attendant's in the female lock-up.

6.0    **JUVENILES**

6.1    HANDLING JUVENILE OFFENDERS (AS DEFINED IN THE PENAL LAW)

A. Notification of Parents

After arresting a child who is categorized as a juvenile offender, the arresting Officer shall immediately notify the juvenile's parent, guardian, or other person responsible for the juvenile's care, and inform him/her of the juvenile's arrest and the location where the juvenile is detained. Juvenile delinquents are not to be processed at City Court Booking. They should be taken to the Juvenile Detention Facility at 766 E. Ferry for processing.

B. Booking Procedures

1. Juvenile offenders shall be restrained with handcuffs
2. Juveniles shall not be transported along with adult prisoners unless they are

related to the adult prisoner.

3. Juvenile offenders shall be taken to City Court Booking, but should not make entry through the same area as an adult prisoner. The Juvenile and arresting Officer shall enter City Court Booking via the outside elevator.

4. Juvenile offenders shall be thoroughly searched by the arresting Officer(s) and a Cellblock Attendant.  Female juvenile offenders shall be searched by a female Officer or a female Cellblock Attendant.

5. Upon entry to City Court Booking, every effort shall be made to keep the juvenile from making contact, visual or otherwise, with any adult prisoner.

6. The arresting officers shall prepare the Youth Referral (P-1294) and a Prisoner Data Report (P-163).

7. CCB shall prepare the arrest cards which are to accompany the juvenile as he/she is fingerprinted and photographed.

8. City Court Booking personnel shall contact the cellblock and make arrangements to have cellblock personnel fingerprint and photograph the juvenile.

9. Cellblock personnel shall verify no adult is in the fingerprint/photograph area before opening the door to allow the juvenile into the area

10. Cellblock personnel shall take care to allow only the juvenile and the arresting officer into the fingerprinting/photographing area. No adult prisoner is to be allowed in/out of the cellblock area while a juvenile is being fingerprinted and photographed.

11. The privacy curtain shall be extended and remain extended until the juvenile is fingerprinted and photographed and has left the room.

12. City Court Booking personnel shall assemble all related original arrest documents and place them in a court folder to be delivered to City Court.  CCB shall forward copies of the arrest documents to the Erie County Probation Department Intake, Room 502, at 25 Delaware Avenue.

13. If City Court is in session, the arresting Officer(s) shall transport the juvenile offender to City Court after processing has been completed.

14. If City Court is not in session, the juvenile offender shall be taken to the Detention Intake Office at 766 E. Ferry. Juvenile offenders are not to be placed in the cellblock or any other cell unless authorized by the New York State Office of Children and Family Services.

15. The Juvenile Referral Card (P-1294) shall be completed for juvenile offenders and a copy of all arrest documents shall be forwarded to SOS.

## 7.0  **CITY COURT CELLBLOCK**

### 7.1  POLICY

It is the policy of the Buffalo Police Department to use the City Court Cellblock as the primary facility for temporarily housing adult male and female prisoners who are arrested by members of this Department.

### 7.2  CITY COURT CELLBLOCK - GENERALLY

A. Adult Male Prisoners Only

The City Court male lock-up shall be used for the confinement of adult male prisoners who are arrested by members of this Department, and for adult male prisoners who have been turned over to this Department by another law enforcement

agency for confinement.

B. <u>Adult Female Prisoners Only</u>
The City Court female lock-up shall be used for the confinement of adult female prisoners who are arrested by members of this Department, and for adult female prisoners who have been turned over to this Department by another law enforcement agency for confinement.

C. <u>Responsibilities of Members Assigned</u>
Members of the Department assigned to the cellblock shall be responsible for:
   a. the care and safekeeping of prisoners confined to the cellblock;
   b. the cleanliness and good order of the cellblock area;
   c. the operation of the cellblock in conformance with all applicable Department rules and regulations and in conformance with the rules and regulations of the NYS Commission of Correction.

D. <u>Temporary Confinement Only</u>
Generally, adult male and female prisoners shall be confined in City Court Lock-up only until the next sitting of the court in which they are to appear.

E. <u>No Female Prisoners to be Confined in the Men's City Court Lock-up</u>

F. <u>No Male Prisoners to be Confined in the Female City Court Lock-up</u>

G. <u>No Juveniles to be Confined in City Court Lock-up</u>
Juveniles younger than sixteen (16) years old are to be confined in the E. Ferry Detention Facility. They are not to be confined in the City Court Lock-up. If after confinement, a prisoner is found to be under 16 years old, that prisoner shall be immediately removed from the cellblock and placed in the area for juveniles awaiting processing and arrangements be made to transport him to the juvenile detention facility.

H. <u>Medical Attention Necessary for Sick, Injured and Intoxicated Prisoners</u>
Prisoners that appear to be sick or injured, or are under the influence of alcohol/drugs to the extent that they pose a danger to themselves, or are unconscious or semi-conscious, or who may have ingested any foreign object or substance, shall not be confined in any Department operated cellblock without first having been examined by a physician.

I. <u>No Medication shall be given to a Prisoner unless Authorized or Prescribed by a Physician</u>

J. <u>Staffing Levels</u>
Staffing levels in both the male and female cellblocks during any tour of duty shall not fall below three (3) members. Members assigned to the cellblock shall not leave their posts until properly relieved.

K.  No Special Privileges for Prisoners
Members of the Department are prohibited from carrying messages, doing business for, or granting any special privileges to any prisoner, other than as outlined in these procedures, the Department's Rules and Regulations, or in rules instituted by the Inspector of Administration and Communication. Members shall not recommend, solicit business for, nor call any attorney regarding a prisoner, except upon specific request by the prisoner for the services of a particular attorney.

## 8.0  **CARE OF PRISONERS**

### 8.1  POLICY
It is the policy of the Buffalo Police Department to provide a safe and humane environment for prisoners who are confined in Department detention facilities and to afford them appropriate medical attention when needed.

### 8.2  EXAMINATION BEFORE CONFINEMENT
A.  The cellblock attendant will make an evaluation of the prisoner's general well being before the prisoner is admitted to a cell. (S)he shall, in addition, prepare form NYS 330 ADM, the NYS suicide screening form.  The suicide screening form shall accompany the female arrest to the female lock-up.

B.  No prisoner shall be placed into a cell for which there has not been prepared a corresponding Arrest Data Sheet (Form P-163) and a NYS suicide screening form (NYS 330 ADM). The suicide screening report is a state mandated report that is separate and distinct from the Arrest Data Sheet.

C.  Prisoners shall <u>not</u> be accepted for confinement in any Department operated cellblock without first receiving medical attention, if any of the following conditions exist:

1.  The prisoner appears sick, ill or injured.
2.  The prisoner appears to be mentally ill.
3.  The prisoner's ability is impaired by alcohol/drugs to the extent that he is unconscious or semi-conscious or he poses a danger to himself.
4.  The prisoner ingested or is suspected of having ingested any foreign object or substance.

D.  Prisoners that show suicidal inclinations shall be transported to the Erie County Medical Facility for evaluation.  Upon their return to the lock-up, they are to be reassessed to determine if constant watch supervision is necessary.

If constant supervision is necessary a Cellblock Attendant or the arresting Officer(s), shall be directed to situate him/her self directly outside the individual cell where they can keep the prisoner under constant observation.  They shall so notate the prisoner's condition in the "constant supervision log book" at intervals not to exceed 15.  e.g. sleeping, pacing back and forth, etc.

E.  The Cellblock Attendant is to make notations.

8.3    EXAMINATION AFTER CONFINEMENT

A. Members assigned to the cellblock shall be responsible for the care and safekeeping of prisoners that are confined in the City Court Lock-up.

B. Members assigned to the cellblock are required to check each cell at the start of the tour of duty and at least every thirty (30) minutes thereafter. All checks shall be documented in the "log book". The log book entry for the cell check must include: date; time of check; condition of prisoner(s) e.g. awake, sleeping etc.; other notations considered relevant. And the signature of the cellblock attendant making the check.

C. Prisoners that are suicidal, mentally ill, violent, under the influence of alcohol/drugs, or that exhibit bizarre shall be reported to the on duty Lieutenant who will make the determination if the prisoner should be under constant observation.

D. Members assigned to the cellblock are required to document the prisoner's condition each time the prisoner is checked, by noting the prisoner's condition in the "log book" at intervals not to exceed 30 minutes. Prisoners under constant watch are to have notations made in the "constant watch" log book at intervals not to exceed 15 minutes.

8.4    DANGEROUS PRISONERS

When a dangerous prisoner is confined in a Department detention facility, the Cellblock Attendant shall notify the on-duty Lieutenant who shall determine if a guard is necessary. If such a guard is necessary, the on-duty Lieutenant shall notify the senior command Officer of the unit making the arrest who will then detail a Police Officer for this purpose. In the event there is no available Officer from the unit making the arrest, an Officer from the B-District shall be assigned.

A. Use of Prisoner Restraint Chair –

When it is determined that the safest way to control a prisoner is the use of the prisoner restraint chair, the prisoner shall be placed and restrained in the chair by personnel that have been trained in the proper use of the prisoner restraint chair.

1. Location – The prisoner restraint chair is normally stored in the handicap cell. If the handicap cell is in use it will be re-located near the prisoner/attorney visitation area within the cellblock.

2. Authorization – The use of the restraint chair is authorized in circumstances where a prisoner exhibits violent uncontrollable behavior, to prevent self injury or suicide or to prevent damage to property when other control methods have proven or are reasonably believed not to be effective.

3. Approval to use – The on duty Lieutenant must approve the use of the restraint chair.

4. Procedure –

   i. Hoods, bags or other devices covering the head and face which may

interfere with normal breathing are prohibited.

ii. Prisoners shall not be restrained in unnatural positions or in such a fashion as would result in the impairment of circulation, hyperextension or torsion of the extremities

iii. The restraints shall not inflict unnecessary pain or disability.

iv. The restraint chair shall never be utilized for the convenience of staff or as punishment.

v. The restraint chair shall only be used in the upright position

vi. When possible the inmate should be handcuffed ( behind the back) and placed in leg shackles prior to being placed in the chair

vii. When practical, all loose jewelry, glasses and belt should be removed from the prisoner prior to his placement in the restraint chair. If it is not practical, all of the above must be removed immediately after placement in the restraint chair

viii. Have the prisoner sit in the seat, secure the lap belt into the lap belt buckle and pull the handle until snug.

ix. Remove the prisoner's shoes and socks

x. If the prisoner is wearing leg shackles, place the leg iron chain behind the chain retainer located behind the foot pad

xi. Attach the handcuff tether to the handcuff chain

xii. Release the right wrist from the handcuffs and secure it to the arm of the restraint chair with the right wrist strap. Pull the strap until snug

xiii. Release the left wrist from the handcuffs and secure it to the arm of the restraint chair with the left wrist strap. Pull the strap until snug.

xiv. Re-adjust the lap belt if necessary

xv. Fasten the shoulder straps by passing the free ends over the shoulders, under the armpits and securing them to the shoulder strap buckle located on the back of the restraint chair. Tighten by pulling down on the shoulder strap handle until snug. (NOTE: Never wrap the shoulder straps around the chest, head or neck )

xvi. Secure the ankle straps by passing the free end around the front of the ankles and securing the straps to the ankle strap buckle. Pull the strap handles until snug.

xvii. To loosen any of the restraining straps, insert a standard handcuff key into the buckle and push the key in while pulling slack back into the restraint strap.

xviii. Prisoners confined to the restraint chair shall be subject to one on one constant observation.

5. Duration –
Prisoners shall not be held in the restraint chair longer that necessary and, unless absolutely necessary and authorized by the on duty Lieutenant, no prisoner shall be held continuously for more than 2 hours in the restraint chair. Should the prisoner be held continuously for any more than 2 hours, the on duty lieutenant shall make arrangements to have the prisoner transported to a medical facility for a medical and/or mental evaluation by a qualified medical professional.

6. Documentation of Use -

Use of the restraint chair is considered and unusual incident and the procedures for documentation of unusual incidents including notifying NYS Commission of Correction should be followed. A note should also be placed in the cellblock log book indicating the use of the restraint chair to include date, time, prisoner name and administering Cellblock Attendants

7. Inspection –
   After each use, the restraint chair shall be inspected to determine if any component has suffered any damage or wear requiring repair or replacement. Any component found in need of repair or replacement shall immediately be reported in writing (P-73)  to the on duty lieutenant who shall immediately remove the restraint chair from service until the needed repair or replacement is made.

B. Use of Chemical Spray –
Use of chemical spray is only authorized when other methods to subdue have not proven effective. In non-emergency situations (i.e. prisoner is secured in a cell and the need for chemical use is not immediate), use of chemical spray must be approved by the on duty Lieutenant.  If it is determined that the use of chemical spray is necessary, only the department issued spray for use in the cellblock area shall be used. Only personnel trained in the use of this particular spray shall administer the spray.

Decontamination is achieved by administering large doses of water to the sprayed area. This can be achieved by escorting the prisoner to the eye wash/ shower room located in the intake area or the female lock-up.

8.5    TELEPHONE CALLS
There is a portable phone assigned to the City Court Lock-up.   Prisoners who request to make a telephone call will only be allowed to use the portable phone. Each telephone call shall be documented on Form P-19.

8.6    PRISONER SUPPLIES
Cellblock Attendants shall ensure that prisoners are adequately supplied with  toilet paper, blankets and sanitary pads/tampons as needed.

8.7    PRISONER'S MEALS
A.   Meal times shall be as follows:

|  |  |
|---|---|
| 1. 0001-0800 tour of duty | meal time between 0600 and 0730 |
| 2. 0800-1600 tour of duty | meal time between 1130 and 1230 |
| 3. 1600-2400 tour of duty | meal time between 1730 and 1830 |

B.   Meals are ordered and delivered weekly from the Buffalo Public School Nutrition Center located on Grider St., Buffalo, New York (716-816-3324). The meals shall be stored in a freezer and refrigerator located in area of the cellblock. If medical or religious beliefs require that a special meal be served to a prisoner, arrangements can be made by contacting the Erie County Holding Center and requesting an acceptable

meal.

These items of food are for the prisoners' consumption only. Members assigned to the cellblock are responsible for carefully checking the food for the presence of any contraband before it's distributed to the prisoners.

C. The meal and a drinking carton will be offered to each prisoner during each assigned meal time.  Cellblock Attendants are responsible to collect and food wrappings and the drinking cartons from the prisoners after the meal is consumed.

D. The member assigned to the cellblock shall make a notation on form P-19 indicating whether or not the prisoner accepted the meal.

## 8.8    PRISONERS REQUIRING MEDICAL OR PSYCHOLOGICAL ATTENTION

A. Medical Treatment

   1. Prisoners Sick or Injured While in Custody

      If while in custody, the prisoner complains of injury or appears to have an injury, illness, or pain that was not evident when the prisoner was taken into custody, the member of the Department assigned to the cellblock at the time shall immediately notify the on duty Lieutenant for further instructions.

   2. Prepare Form P-1261

      If the Lieutenant directs the removal of the prisoner to a hospital, the member of the Department assigned to the cellblock shall complete a Request for Medical Examination of Prisoner (Form P-1261), which shall accompany the prisoner to the hospital. Any medical care received must be documented and attached to the P-1261 and kept on file.

   3. Transportation to Medical Facility

      a. If treatment is not of an emergency nature, the arresting officer, if (s)he is readily available, shall return to the cellblock and transport the prisoner to the medical facility. If the arresting officer is not readily available, a member of his/her district or unit shall transport the prisoner. If neither the arresting officer nor a member of his/her unit (e.g. Detective Bureau) is available, a mobile patrol unit from "B" District shall transport the prisoner.

      b. If treatment is of an emergency nature, a mobile patrol unit from "B" District shall be dispatched to transport the prisoner. The arresting officer, or if (s)he is not readily available, a member of the arresting officers district or unit shall respond to the medical facility and  take custody of the prisoner from the transporting officers.

      c. Refer M.O.P. Chapter 8 regarding transporting persons of the opposite sex.

      d. If an ambulance is necessary, the prisoner shall be handcuffed to the stretcher and an Officer shall ride with him/her in the body of the ambulance.

   4. Responsibility for the Prisoner

The Officer having custody of the prisoner shall be responsible for the prisoner until properly relieved or until treatment is completed and then (s)he shall transport the prisoner back to the cellblock.

5.  <u>Instructions for Further Medical Treatment</u>
    All instruction for future medical treatment and medication shall be obtained in writing from the attending physician and shall accompany the prisoner to the cellblock.  Members of the Department assigned to the cellblock shall dispense medication in compliance with the physician's instructions.

6.  <u>Searching the Prisoner</u>
    The prisoner shall be searched before being placed in a police vehicle for transport back to the cellblock.

7.  <u>Hospitalized Prisoner</u>
    If the prisoner is unable to return to the cellblock, the Officer shall contact the on-duty Lieutenant for further instructions.

B.  <u>Prisoners Requiring Mental Observation</u>
    1.  <u>Irrational Prisoners in the Cellblock</u>
        If, after confinement, a prisoner appears mentally ill <u>and</u> his conduct is such that he may injure himself through irrational acts, the on-duty Lieutenant shall be notified immediately. This includes suicidal prisoners.

    2.  <u>Form P-1321 to be Prepared</u>
        If necessary, the on-duty Lieutenant shall direct the prisoner's removal to the Erie County Medical Center and the completion of a Request for Examination of Person Apparently Mentally Ill (Form P-1321).

    3.  <u>Transportation to ECMC</u>
        a.  If treatment is not of an emergency nature, the arresting officer, if (s)he is readily available, shall return to the cellblock and transport the prisoner to ECMC.  If the arresting officer is not readily available, a member of his/her district or unit shall transport the prisoner. If neither the arresting officer nor a member of his/her unit (e.g. detective squad) is available, a mobile patrol unit from "B" District shall transport the prisoner.
        b.  If treatment is of an emergency nature, a mobile patrol unit from "B" District shall be dispatched to transport the prisoner.  The arresting Officer, or if (s)he is not readily available, a member of the arresting Officers District or unit shall respond to ECMC and take custody of the prisoner from the transporting officers.
        c.  Refer to M.O.P. Chapter 8 regarding transporting persons of the opposite sex.
        d.  If necessary, an ambulance shall be summoned and the prisoner transported in medical restraints. In this case, a District Officer shall ride in the body of the ambulance along with the prisoner.

COB000440

    4.   Responsibility for the Prisoner

The Officer having custody of the prisoner pursuant to M.O.P. Chapter 4 above shall be responsible for the prisoner until properly relieved or until treatment is completed and then (s)he shall transport the prisoner back to the cellblock.(Refer M.O.P. Chapter 4).

**8.9**    PRISONERS RETURNED TO THE CELLBLOCK AFTER TREATMENT

Prisoners who have received treatment at a medical facility and who are returned to the cellblock for confinement, shall be reassessed by Cellblock personnel if constant supervision is necessary. If it is determined that constant supervision is necessary, the prisoner shall be placed in an individual cell and a Cellblock Attendant/Police Officer shall be stationed directly outside of the prisoner's cell where he/she can maintain a constant watch of the prisoner. Notations of the prisoner's actions shall be made in the "constant supervision" log book at intervals not to exceed 15 minutes.

**8.10**    ADMINISTERING MEDICATIONS

No medication shall be given to a prisoner unless authorized or prescribed by a physician. Arresting Officers shall be responsible for attempting to secure prescription medication required by the prisoner. Department members assigned to the cellblock shall dispense the medication according to the prescribed dosage.

Should a prisoner be admitted to the cellblock with medication, it is the responsibility of the cellblock attendant(s) to verify the validity of the medication by contacting the prescribing physician, the dispensing pharmacy, or searching the internet web site: www.drugs.com/pill identification.html prior to providing the medication to the prisoner.

**9.0**    **UNUSUAL INCIDENTS IN THE CELLBLOCK**

**9.1**    POLICY

It is the policy of the Buffalo Police Department to anticipate and to prevent unusual occurrences involving prisoners in the cellblock. When an unusual occurrence does take place the incident will be thoroughly investigated and a complete report made to the NYS Department of Corrections.

**9.2**    UNUSUAL OCCURRENCE - DEFINITION

An unusual occurrence is any incident involving a prisoner confined to a cell who:
1. escapes or attempts to escape;
2. commits suicide or attempts to commit suicide;
3. dies while in custody regardless of the cause of death;
4. causes injury to himself or to any other person, including members of the Department;
5. engages in any other conduct that may threaten the safety of himself or others, or causes substantial disruption in the cellblock.

**9.3**    UNUSUAL OCCURRENCE - PROCEDURE

A. Cellblock Attendants shall take immediate remedial action to resolve the unusual occurrence.

B. The Cellblock Attendant shall contact the on-duty Lieutenant as soon as practicable after having taken immediate action to resolve the unusual occurrence.

C. The Lieutenant on duty at the time of the unusual occurrence shall be responsible for conducting an appropriate investigation and making a full report of his/her findings.

9.4     UNUSUAL OCCURRENCE - REPORTING REQUIREMENTS
A. The Lieutenant on duty at the time of the unusual occurrence shall immediately complete form SCOC-501 and fax same to NY Commission of Corrections at 518-485-2467

B. The on-duty Lieutenant shall compile all reports, assemble witness's statements on an Intra-Departmental Memorandum (P-73) and collect all forms, exhibits, photographs and any other pertinent material. This packet shall be forwarded to the Commissioner through the Inspector of Administration and Communication.

C. The Commissioner's Office shall forward the packet to the NYS Commissioner of Corrections within thirty (30) days of the occurrence.

9.5     DEATHS IN THE CELLBLOCK - ADDITIONAL PROCEDURES
In all instances in which a prisoner dies while in custody in the headquarters cellblock, the Cell Block Attendant shall:

A. Contact the on-duty Lieutenant who shall contact the Duty Inspector and Internal Affairs.

B. The Homicide Squad shall be notified and shall investigate the death of an inmate in the cellblock. They shall be responsible for notifying next of kin.

C. The Lieutenant must notify the NYS Commission of Correction within six (6) hours of the death of any prisoner in the cellblock;

D. Cellblock personnel shall fully cooperate with the Homicide Squad and prepare all reports required by the investigating Officers;

E. The completed investigation must be forwarded to the Commission of Correction within ten (10) days of the occurrence.

9.6     ESCAPES
A. When a prisoner escapes from the cellblock, the Cell Block Attendant shall immediately request the Radio Dispatcher to broadcast a description of the suspect. If court is in session OCA shall be notified.

B. The Lieutenant shall immediately respond and begin a coordinated search of the City Court Building. The Lieutenant will also be responsible for conducting a complete investigation of the occurrence and preparing the reports required in M.O.P. Chapter 4.

C. The Supervisor on duty in "B" District shall respond and begin a coordinated search of the area outside the City Court building.

D. The Duty Inspector shall be notified and (s)he shall decide how extensive the search shall be.

9.7    REPORTING REQUIREMENTS
Non – Death unusual incidents must be reported via fax (518-485-2467) or by mail to NYS Commission of Corrections within 24 Hours.

Deaths, fire, escape; evacuation incidents must be reported immediately via phone to NYS Commission of Correction (518- 485-2346)

10.0    **CELLBLOCK SECURITY**

10.1    POLICY
It is the policy of the Buffalo Police Department to strictly maintain the security of the cellblock at all times while prisoners are confined therein.

10.2    DOORS TO BE LOCKED
A. The main doors of the City Court Cellblock shall be kept locked whenever prisoners are being confined.  They shall be opened only to allow authorized personnel entrance to and departure from the cellblock.
B. Doors to each individual cell and group cell shall be kept locked whether or not it is being used to confine a prisoner.

C. After each door in the cellblock is locked, the members of the department shall check it to make certain that it is secure.

10.3    KEY CONTROL
There shall be a current and accurate accounting of the location and possessor of all keys used in the cellblock. There shall be readily accessible, a duplicate key in the event that an emergency necessitates its use.

**male staff cannot possess keys to the female lock-up**

Cellblock Attendants are required to maintain keys on their person at all times while in the cellblock area.

10.4    RADIOS
Cellblock Attendants are required to maintain a charged, Buffalo Police portable radio on their person at all times while on duty.

10.5    EMERGENCIES
A. Members Needing Assistance
Members assigned to the City Court Lock-up shall be issued a portable radio by the on-duty Lieutenant.. They shall notify the radio dispatcher in the event of an emergency. In the event of an emergency in which personnel assigned to the cellblock

need immediate assistance, they shall push one of the panic alarm buttons. The Radio Dispatcher shall broadcast an alert requesting assistance from available B-District personnel and any other personnel in the immediate area. The on-duty Lieutenant shall immediately respond and shall assume command.  (S)he shall also be prepared to open the main cellblock door.

The panic alarm buttons shall be tested at least once each week to ensure that it is operating properly.

B.  Emergency Evacuation Route
As a normal course of business, prisoners will not be evacuated from the cellblock area in the event of a fire or emergency alarm. The on duty Lieutenant will confer with building security to ascertain if an actual emergency currently exists that would endanger the safety of the prisoners confined to the cellblock area.

In case of an actual fire, or other emergency requiring the evacuation of prisoners, the on duty Lieutenant shall contact dispatch and request the assistance of Police Officers to provide additional security during the evacuation of prisoners. The prisoners shall be handcuffed to each other and taken out the exit towards the route to City Court. Proceed either to the left or to the right to the stairwells leading to the first floor. Exit the stairwell on the first floor and then proceed to the nearest building exit onto Delaware Avenue.

Prisoners should be directed to proceed across W. Eagle St. and to the alley behind the Erie County Holding Center where they can be properly secured.  If it appears that the evacuation is to be long term, arrangement will need to be made with the Erie County Holding Center to secure prisoners.   Additionally, the City Court Booking supervisor will make arrangements with the Cheektowaga Police Department, Amherst Police Department and Tonawanda Police Department.

10.6  ESCORTING PRISONERS TO AND FROM CELLS
A.  Members of the Department shall never place a prisoner in a cell or remove a prisoner from a cell unless accompanied by another member of the Department.

B.  Members of the Department shall never enter a cell occupied by a prisoner unless accompanied by another Department member.

10.7  IDENTIFYING PRISONERS PRIOR TO RELEASE
Before a prisoner is to be released from a Department detention facility for any reason, the prisoner must be positively identified by a Department member.  All prisoners will be assigned a wrist band containing name, D.O.B., and mug number at the booking intake.

10.8  VISITING AND INTERVIEWING PRISONERS
A.  Only Authorized Persons Allowed in Cellblock
Cellblock attendants, and Department members on official business, shall be allowed access to Department detention facilities. No other unauthorized persons shall be allowed into the cellblock without written authorization from the City Court Booking Lieutenant.

B.  Police Interviews
Any member of the Department wishing to speak to, interview, or interrogate a prisoner confined in the Cellblock must first obtain a written order from the Lieutenant.

C.  Attorney or Clergy Visits
1.  The prisoner's attorney or a member of the clergy must first obtain a written order from the on-duty Lieutenant before being allowed to visit a prisoner.

2.  Visits from the prisoner's attorney or members of the clergy shall take place in the designated visitation area.

3.  The prisoner shall be escorted by a Cellblock Attendant to the visitation area.

4.  The Cellblock Attendant shall take up a position to foreclose any opportunity for escape but at the same time far away from the prisoner so that the conversation cannot be overheard.

D.  Pre-Trial District Attorney and Horizon Mental Health Personnel
Cellblock personnel shall maintain a current list of people affiliated with the District Attorney's Pre-Trial program and with the Horizon Mental Health organization, who are authorized to enter the cellblock to interview prisoners.  Persons associated with these programs will arrive each morning and are allowed access to prisoners. Cellblock personnel shall record the name of each person who appears in conjunction with these programs.  If prisoners are also being held elsewhere in the City Court facility, arrangements shall be made for access to these prisoners as well.

E.  Written Authorization Required
1.  No one other than members assigned to the cellblock, Pre-trial District Attorney personnel, and Horizon Mental Health personnel shall be allowed to visit a prisoner in the City Court cellblock without first having obtained written authorization from the Lieutenant.
2.  The cellblock shall maintain a copy of all authorizations signed by the Lieutenant.

## 11.0   **PRISONER'S RIGHTS**

## 11.1   POLICY
It is the policy of the Buffalo Police Department to treat prisoners who are confined in Department detention facilities, in a humane manner and to allow them to exercise the rights they are granted under the law.

## 11.2   SPECIFIC RIGHTS
A.  All prisoners are guaranteed a timely court appearance. Prisoners confined by this Department shall be delivered to the appropriate court when that court is next in session, if at all possible.

B.  Prisoners shall be released on Appearance Tickets whenever possible

C. Prisoners shall be able to consult with their attorneys in a manner that guarantees the confidentiality of such conversation.

D. In addition to telephone calls made on behalf of prisoners by City Court Booking personnel, prisoners shall have access to the telephones in the City Court Lock-up.

E. Prisoners are entitled to meals as specified above.  Meals shall be served three times daily.

## 12.0  PRISONER'S PROPERTY

### 12.1  POLICY
All property seized by the BPD, other than evidence, contraband, or instrumentalities of a crime, shall be relinquished to the prisoner upon his/her   release from custody.

### 12.2  RETURNING PRISONER'S PROPERTY
A prisoner who has been released from custody and appears at the City Court Booking to claim his/her property being held there shall be required to establish their identity as determined by the City Court Booking personnel. A copy of the identification presented shall be stapled to the Property Office copy of the P-10cbb(2).  Prisoners must sign the P-10cbb acknowledging that their personal property has been returned to them.  Property held in excess of 24 hours shall be delivered to Room 104 (Property Office) at 74 Franklin Street, where the prisoner(s) can pick-up there Monday through Friday (excluding holidays) during normal business hours.

## 13.0  INSPECTING CELLS AND CELLBLOCK AREAS

### 13.1  POLICY
It is the policy of the Buffalo Police Department to regularly inspect cells and cellblock areas and to maintain compliance with the requirements of the NYS Commission of Correction.

### 13.2  INSPECTION IMMEDIATELY BEFORE AND AFTER A CELL IS USED
A. The member of the Department assigned to the cellblock who places a prisoner in a cell shall be responsible for inspecting the cell for weapons and contraband and any other deficiencies before the prisoner is placed inside.

B. The member of the Department assigned to the cellblock who takes a prisoner out of a cell shall be responsible for inspecting the cell for weapons and contraband and any other deficiencies when the prisoner(s) is removed from the cell.

C. Discovered weapons and contraband or any other deficiencies shall be immediately reported to the on-duty Lieutenant by the attendant making the discovery.

D. Cells and cellblock corridors shall not be used to store any items or articles.

### 13.3  DAILY INSPECTION
Hourly, the on-duty Lieutenant shall make a visual inspection of the entire cellblock.

Such inspections will be noted in the cellblock log book. The Lieutenant conducting the inspection shall report any deficiencies to the Captain.

13.4     WEEKLY INSPECTION
At least weekly a thorough inspection of the entire cellblock shall be conducted by the day Lieutenant on duty. The inspection shall include checking bars, locks, walls, floors, ventilator covers, glass panels, access plates, protective screens, doors and other security devices for operational wear and detainee tampering. Occupied as well as unoccupied cells shall be inspected.  The results of this weekly inspection shall be documented on report BPD-44 and submitted to the Captain, who shall be responsible for arranging to correct any deficiencies.

13.5     CLEANING OF CELLS
It is essential that the cell blocks in the City Court Lock-up be cleaned on a daily basis. On weekends or holidays when a cleaner may not be regularly scheduled to work, the on-duty Lieutenant shall call a cleaner in on an overtime basis.

13.6     ACCOUNTING FOR TOOLS AND CULINARY EQUIPMENT
A. In the event that repair work is undertaken in the cellblock, the Lieutenant on duty shall account for all tools that are brought into, and taken out of, the cellblock. There shall be strict visual supervision of all repair work.

14.0     **CELLBLOCK RECORDS AND FORMS**

14.1     POLICY
It is the policy of the Buffalo Police Department to maintain records of cellblock operations.

14.2     INSPECTOR OF ADMINISTRATION AND COMMUNICATION RESPONSIBILITY
The Inspector of Administration and Communication shall be responsible for having those records prepared and maintained that are necessary for the efficient operation of Department detention facilities. (S)he shall also ensure that all records required by the NYS Commission of Correction are properly prepared.

14.3     SAFEGUARDING RECORDS
Records maintained in the course of operating Department detention facilities shall not be disseminated to anyone but authorized Department personnel.  Requests for such records by other than authorized Department personnel shall be referred to the Inspector of Administration and Communication.

14.4     CELLBLOCK PRISONER CONTROL FORM (P-19)
Members of the Department on duty in the Cellblock shall record the detention of prisoners on Form P-19.

A. The Cellblock Prisoner Control Form (P-19) shall contain the data necessary for the proper arraignment of prisoners in City Court.  It shall be prepared in quadruplicate on a daily basis.

B. A Control sheet shall be kept for each group cell, individual cells as a group, as well as an individual sheet for female prisoners.

C. Two (2) copies of this report shall be given at 0800hrs to the member of the Department assigned to the City Court Detail.  The original shall be forwarded to the Captain's office and the remaining copy shall be kept on file in the City Court Lock-up.

D. Detailed instructions for making entries on the Cellblock Prisoner Control Form can be found in Appendix B.

14.5   RECORDS REPORTING REQUIRED  -  NYS COMMISSION OF CORRECTION

A. A record of the number of male and female prisoners detained on a daily basis  shall be maintained  and be kept available at al times for review by Commission representatives

B. On or before the first day of February of each year, the Inspector of Administration and Communication shall submit a report to the Commission of the total number of male and female prisoners detained during the preceding calendar year. Form available at http://www.scoc.ny.gov/forms.htm

## 15.0   PRISONERS TO CITY COURT

15.1   POLICY

It is the policy of the Buffalo Police Department to transport prisoners to City Court from the cellblock whenever a prisoner has been properly processed and City Court is in session.

15.2   ILL, INJURED OR INTOXICATED PRISONERS

A. Prisoners who are ill or injured shall not be taken to court without first being provided with appropriate medical attention. Appearance tickets shall be issued where appropriate.
B. Intoxicated prisoners shall not be taken to court.  They shall be provided with medical attention where appropriate and they shall be held for the next sitting of court if necessary.

15.3   TRANSPORTING TO CITY COURT - PROCEDURE

A. City Court Detail
It shall be the responsibility of the cell block personnel to transport prisoners from the cellblock to City Court. In the event that additional personnel are needed to assist the cellblock personnel, or there are prisoners that need to be transported to City Court members of District "B" shall be assigned.

B. Prisoner Clothing
All prisoners must be properly clothed when taken to court. Members of the Department assigned to the cellblock shall notify the Lieutenant who shall make arrangements to secure clothes for prisoners when necessary or provide paper suit/gown as appropriate.

C. Handcuffing prisoners

All prisoners shall be handcuffed. When two or more prisoners are transported together they shall be handcuffed together in pairs.  If a dangerous prisoner is to be transported, leg irons shall also be used.

D. Court Documents and Prisoner Identification

All court documents and files necessary for the prisoner's court appearance shall be delivered to the Cell Block Attendants transporting the prisoner to court. The transporting Cell Block Attendants shall identify each prisoner through the corresponding court documents before the prisoner is removed from the cellblock and transported to the Court.   Transporting Cell Block Attendants shall be apprised of any information about a prisoner that may potentially create a problem (e.g. suicidal prisoners, violent prisoners, prisoners that are escape prone, prisoners on which there is a hold for another jurisdiction, etc.).

E. Prisoners Leaving Cellblock for City Court

When a group of prisoners is ready to leave the cellblock for City Court;

1. Cellblock personnel not assigned to transport will observe the cameras that observe the route to the Elevator to City Court.
2. When the route is clear of building personnel, cellblock personnel not assigned to transport  shall:
     i. Activate the system bringing down the gates in the building staff hallway
     ii. Open the sally port doors from the cellblock to the transportation route
     iii. Open the door to the prisoner elevator hallway
3.  The Cellblock Attendants assigned to court transport shall proceed as expeditiously as possible across the staff hallway and into the prisoner elevator hallway.
4. Once all prisoners are inside the prisoner elevator hallway, the cellblock personnel assigned within cellblock shall close and lock the prisoner elevator hallway door.
5. Court transport cellblock attendants shall request via intercom that the cellblock personnel within the cellblock open the prisoner elevator hallway door exit be opened as needed to board the elevator with prisoners. This step may need to be repeated if the number of prisoners exceeds the capacity of the elevator.

F. Notifying Court When the Prisoner Presents a Security Hazard

Whenever a prisoner presents a potential security hazard (e.g. violent prisoner, escape prone prisoners, suicidal prisoners, disruptive family and friends of the prisoner in the court room, etc.) the City Court Detail shall notify the City Court Judge in front of whom the prisoner will appear and the NYS O.C.A. Officer that is responsible for court security.

15.4  <u>MEDICAL OR PSYCHOLOGICAL TREATMENT AFTER CONFINEMENT AT THE HOLDING CENTER</u>

The same procedures outlined above relating to male prisoners shall be used for female prisoners. The Officer transporting the prisoner shall prepare the Request for Medical Examination of Prisoner (Form P-1261) or the Request for Examination of Person Apparently Mentally Ill (Form P-1321) as the case may be.

## Appendix A - Searches

### SEARCHING PRISONERS

Arresting officer(s), upon proper admission to the cellblock, SHALL remain with their prisoner through the search of the arrestee, and until the prisoner is placed in his cell. Any contraband found upon a prisoner subsequent to the cellblock attendants search shall be turned over to the arresting officer(s) for the filing of any additional charges.

All prisoners shall be thoroughly searched by the attendants before being placed in a cell. Belts, suspenders, shoe laces, etc. shall be removed from the prisoners.

Arresting officers will always view the search of an arrestee. Arresting officers will not conduct searches but may assist at the request of a cellblock attendant. Female attendants assigned to the cellblock will not conduct searches of a male arrestee, unless and emergency exists. No strip search is to be conducted without the approval of the Lieutenant on duty.

The Major area that Attendants fail to search male prisoners is in the groin area. This is and area that offenders often carry contraband and weapons. Attendants are to make a thorough search of the male prisoners paying special attention to the groin area. Be wary of the prisoner who makes statements about the Attendant's sexual orientation whenever the Attendant's hands get close to the genital area of the prisoner. This prisoner may be concealing evidence, contraband or a weapon in his groin area.

SPECIAL NOTE: If a prisoner, in the presence of and Attendant, attempts to secret a weapon which presents a clear and imminent threat of creating serious bodily injury or death ( handgun, straight razor, knife, etc.) the Attendant has the authority to immediately force removal of same.

The arresting Officer is responsible for the thorough search of the prisoner at City Court Booking. If additional property is found, upon the prisoner while being searched at the cellblock, the following procedure shall be followed:

- It will be the responsibility of the arresting officer to take possession of the property.
- The arresting officer shall make a notation on the prisoner's property receipt indicating the property taken and sign his/her name adjacent to the entry. This will indicate that the officer received the property.
- The prisoner property receipt will be given back to the prisoner.
- The officer will then be instructed to take the property to City Court Booking personnel to make the necessary notations on the original receipt of the prisoner property receipt.

### PRISONER'S PERSONAL PROPERTY

Belts, shoelaces, bra's, jackets etc., taken from a prisoner while housed in the cellblock, shall be stored in the cubicles located inside the cellblock area. Whenever a prisoner leaves the cellblock he shall be given his personal property that had been stored in the cellblock. It shall be the responsibility of the on-duty cellblock attendant to see that the property is returned to the rightful owner upon his release whether he is bailed, taken to court or released under other

circumstances.  WHEN TAKEN TO COURT – PROPERTY TAKEN FROM PRISONER IN CELLBLOCK TO GO WITH PRISONER

## GUIDELINES FOR BODY SEARCHES, STRIP/BODY CAVITY SEARCHES – MALES

### See separate section regarding Females

The integrity of and individual's person is a cherished value in our society, and a strip search or body cavity search is a significant intrusion into an individual's personal privacy.  Therefore, strip searches and body cavity searches should never be undertaken routinely, and never without clear, legal justification.

## DEFINITIONS OF TERMINOLOGY:

***STRIP SEARCH*** - The removal or rearrangement of any clothing which permits visual inspection of the genitals, buttocks, anus, or female breasts.

***PAT/FRISK SEARCH*** – A search during which a prisoner is not required to remove his/her clothing.

***BODY CAVITY SEARCH*** – A search or examination of any body cavity of an individual and is a substantial significant intrusion into a person's personal privacy.

**METAL DETECTOR SEARCH** – A search which requires an individual to either  "walk through" a metal detector, or that a hand held detector be passed over and around an individual's body to determine whether there are metal objects in their clothing or attached to their body.

**PROCEDURE**:
In order for the pat and strip searches to be successful in uncovering contraband, it is important for the Attendant to remember the following:

1.  The search must be systematic and orderly. If steps are missed, the search is likely to be a failure.
2.  The search must be conducted with great care and attention on the part of the attendant. Careless searches have been one of the leading causes for the introduction of dangerous drugs or weapons into lock-ups.
3.  The search must be conducted in an area where other prisoners are not present. This eliminates distractions by other prisoners and reduces the tension caused by embarrassment of the prisoner being searched.
4.  The Attendant must be objective and professional at all times. Personal remarks and gestures have no place in conducting searches.

## PAT SEARCH
The Pat search is a more common means of searching prisoners on a routine basis. This search will be conducted at the following times:
1.  Upon admittance before a prisoner enters the secure area of the lock-up
2.  During shakedowns, if the situations warrants, the Lieutenant on duty may order a strip search instead of a pat search.

3.  When a prisoner leaves the facility for any reason other than release, i.e. court, hospital.
4.  At any time the Lieutenant on duty feels that such a search is warranted.

The basic pat search will be conducted in the following manner:

1.  Have the prisoner empty all pockets, trousers, shirt, coat and jacket, etc. turning all pockets inside out. After the contents have been checked, the articles will be placed out of reach of the prisoner.
2.  Instruct the prisoner to stand approximately two feet from a wall., spread his legs and lean against the wall with his forehead touching it, arms extended outward (palms out). The prisoner would be directed not to remove his hands from the wall or move in any manner until so instructed. This is an advantageous position for the Attendant, should the prisoner display violent tendencies.
3.  Run the prisoner's shirt collar between fingers carefully feeling for small hidden wires, hacksaw blades, drugs, etc,
4.  Move hands downward, running over the shoulders, down the outside of the prisoner's arms to the armpits.
5.  Run hands down the shirt front, checking pockets and stopping at the beltline
6.  Run fingers around the inside of the waistband, feeling for any small articles hidden there are behind the belt.
7.  Run hands down the prisoner's buttocks all the time feeling for places which might contain hidden, illegal articles.
8.  Run hands carefully down the legs, checking all around them for concealed articles. Trouser cuffs should be checked carefully for contraband.
9.  Run hands over the prisoner's lower abdomen and crotch carefully, looking for concealed articles that may be taped to these areas.
10. Instruct the prisoner to remove his/her shoes. Look into the shoes and tap them firmly on the floor to dislodge any contraband that might possibly be secreted in them. Have the prisoner lift his feet so that the soles are revealed to ensure the absence of contraband i.e. drugs, knife etc.

## STRIP SEARCH

Upon approval of the Lieutenant on duty, **ALL** strip searches will be conducted in areas which will ensure the privacy of the inmate being searched.

Strip searches will be permissible at the following times:

1.  Upon admission for those prisoners charged with a felony/misdemeanor upon the reasonable suspicion that the arrestee is carrying or concealing contraband based on the crime charged.
2.  After a prisoner's return to the facility from outside i.e. court, hospital etc.
3.  At any time the Lieutenant on duty feels that this type of search is warranted during a "shakedown" instead of a pat search.

Attendants will use proper care in the handling of the prisoners clothing once it has been removed. As the prisoner removes an article of clothing, he/she will hand it to the Attendant who will search the clothing and set it aside, out of the reach of the prisoner, in an orderly manner. It

is advisable that the Attendant, conducting the strip search, wear protective gloves as a protective measure for him or herself.

A prisoner's clothing will be searched in the following manner:

1. Examine all pockets for contraband turning them inside out.
2. Run fingers over all linings to check for areas which might contain contraband
3. Check the fly, waistband, all cuffs, all seams, hatbands, and collars for concealed contraband.
4. Examine the soles, heels and inside of all shoes.
5. Examine socks turning them inside out

A strip search will be conducted as follows:

Instruct the prisoner to comb his fingers through his hair, bend his head down, and shake out his hair.

The Attendant will instruct the prisoner to turn his left side to him and pull his left ear down and let it up so that the Attendant can look into and behind it. The prisoner will follow the same procedure with the right ear. . The Attendant will next instruct the prisoner to face him and lift his head up so that he can look into his nostrils. He will then instruct the prisoner to open his mouth and wiggle his tongue back and forth. The Attendant will then ask the prisoner if he wears contacts or dentures. If the prisoner wears contacts, the Attendant will advise him that it will be responsibility to care for them in the detention area. If he wears dentures, the Attendant will ask the prisoner to remove them so they can be examined for contraband and then remind him that it will be his responsibility to care for them in the detention area.

Instruct the prisoner to face the wall, bend down and spread the cheeks of his buttocks. Next, the Attendant will instruct the prisoner to raise one foot at a time so that he can check the bottom and toes of each foot. A male prisoner will be required to lift his testicles in his hand. A female prisoner will be required to squat and cough. The prisoner will then be instructed to lift his arms above his head, so the armpits can be examined for contraband. Carefully examine the backs, palms, and between the fingers.

If the prisoner is wearing a cast or bandages, the Attendant will carefully inspect them for contraband. If the prisoner is wearing a brace or prosthesis, the Attendant will instruct the prisoner to remove either for examination.

NOTES: IT is imperative that the Attendant remain in visual contact with the prisoner at all times to prevent the prisoner from disposing of contraband. The Attendant conducting the search will be the same sex as the prisoner being searched. The prisoner should be observed by no more Attendants or Officers than necessary to conduct the search and maintain security.

**ALL BODY CAVITY SEARCHES WILL BE CONDUCTED BY A QUALIFIED PHYSICIAN AT THE ERIE COUNTY MEDICAL CENTER.**

**SEARCHING OF FEMALE PRISONERS:**

    A.   FEMALE PRISONERS MUST BE SEARCHED BY FEMALE STAFF.

B. MALE ATTENDANTS SHALL NOT SEARCH FEMALE PRISONERS EXCEPT IN ACCORDANCE WITH THE GUIDELINES FOR BODY SEARCHES; STRIP/BODY CAVITY SEARCHES OR IN THE CASE OF AN EMERGENCY. (I.E. IN THE PROCESS OF SECRETING WEAPONS/DRUGS UPON THEIR PERSON.)

C. If an evidentiary search is deemed necessary, a female Attendant, or if unavailable, a female Police Officer will be utilized to conduct the search.

D. If no female Attendants or female Police Officers are available in this department, the prisoner shall be taken to the Erie County Holding Center, after making arrangements with the E.C.H.C. and Sheriff's Office personnel will be requested to conduct the evidentiary search.

E. Strip search of female prisoners – See "Strip Search" These criteria must be met along with obtaining permission from the Lieutenant on duty.

## HANDCUFFING OF FEMALE PRISONERS

Inasmuch as female prisoners will not be thoroughly searched in most instances, arresting officers are to keep them handcuffed at all times.

## Appendix B – Cellblock Records and Forms

**CELLBLOCK PRISONER CONTROL - Form P-19**

Attendants on duty in the headquarters cellblock shall record the detention of the prisoners on form P-19.

A. Cellblock Prisoner Control form (P-19) shall be prepared, in quadruplicate, daily, by personnel of the male cellblock., containing the data necessary for the proper arraignment of prisoners in the City Court of Buffalo.

B. An individual sheet shall be kept for female prisoners who are printed at the cellblock and forwarded to the Erie County Holding Center (ECHC).

C. Two (2) copies of this report shall be given to the Attendants assigned to transport prisoners to the court. The original shall be forwarded to the Captain of C.I.R. and the duplicate kept in the cellblock.

D. After a prisoner is accepted into the cellblock, his personal information shall be accurately entered upon the P-19 Cellblock/Prisoner Control form.

**P-19 ENTRIES**

1. **TIME IN** – actual time prisoner is brought into the cellblock

2. **FINGERPRINT** – time prisoner is fingerprinted/photographed and the handwritten initials of the Attendant performing the task. The Attendant fingerprinting the prisoner shall be responsible for photographing the person.

3. **CELL ASSIGNED** - shall indicate in the first column the first cell into which a prisoner has been placed. In the event that a prisoner is moved to a different cell, the new cell number shall be inserted in the second column.

4. **ARREST CARD ARRIVAL TIME** – Attendants shall place the exact time of the arrival on the arrest card from City Court Booking

5. **DEFENDANT'S NAME** – enter last name, first name and middle initial

6. **MUG NO.** – shall indicate the prisoner's pre-assigned mug shot number. Mug numbers that have been assigned by City Court Booking shall be inserted.

7. **F/M/V** – shall indicate the class of the arrest. F= Felony, M= Misdemeanor, V= Violation. Also note that although a prisoner is held upon a misdemeanor or a violation it must be determined if he is to be held via a warrant.

8. **MEAL 8/4/12** – shall indicate whether a prisoner has received a meal during that tour of duty. A prisoner must be housed in a cell during the specific meal period and only one meal is allowed per tour. The meal times are as follows:

   0001-0800 hrs tour = 0600-0730 hrs meal

> 0800-1600 hrs tour = 1130-1230 hrs meal
> 1600-2400 hrs tour = 1730-1830 hrs meal

Cellblock Attendants shall make a notation of the prisoner's refusal or acceptance of a meal on Form P-19. This shall be accomplished in the following manner:

> A.  If the prisoner accepts the meal, the meal column on form P-19 shall be marked with a capital letter "Y" indicating that the meal was accepted.
>
> B.  If the prisoner refuses a meal, the meal column will be marked with a capital letter "N" indicating the prisoner refused a meal.

9.  **PHONE** - This column shall be used to indicate whether a prisoner has made a telephone call. It is NOT to be used to indicate if the prisoner was offered use of the phone or if a phone call was made at Booking for him or her. A YES or NO entry shall be made in this column signifying whether or not the prisoner made a phone call.

10. **MED** - Shall indicate whether or not the prisoner's P-153 interrogatory (suicide screening) indicates the prisoner's medical or prescription needs. Any notation to the affirmative shall cause a notation to be placed in the TURNKEY MEMO section indicating that particular prisoner's needs.

11. **HOLD** - Shall indicate ANY reason why a prisoner may not simply be released via an appearance ticket. Any notation to the affirmative shall cause a notation to be placed in the TURNKEY MEMO section indicating reason for that prisoner's hold; ( i.e. warrant, held for another agency, detainer). The notation shall indicate the agency causing the prisoner to be held via a warrant etc. In those cases where a prisoner is held via a detainer, a copy shall be held in the cellblock, one copy forwarded to the Lieutenant on duty and copy forwarded to Booking for placement in the arrest folder.

12. **TIME RELEASED** - AT/other/CT – shall indicate the time and reason for the release. AT = Appearance Ticket; other = released to another agency when held ONLY on their warrant or a prisoner has been released for medical treatment and is not to be returned to the cellblock or any other reason other than appearance ticket or for arraignment at Buffalo City Court; CT= Court, this column shall be used for any court appearance that the prisoner has been sent to.

13. **SEARCHING ATTENDANT** - shall indicate the Cellblock Attendant who was responsible for the search of that particular prisoner. All prisoners will have the metal detector scanned over their persons by the searching Attendant prior to being placed in a cell.

14. **DOCKET #** - No entry required. This is for City Court use only.

15. **TURNKEY MEMO** – a notation in the turnkey memo section of the P-19 indicating the reason for removing a prisoner from his cell, i.e. medical treatment, visitor or ANY reason other than for the purposes of photographing and/or fingerprinting.

A control sheet shall be kept for the cellblock as well as an individual sheet for female prisoners who are photographed/fingerprinted and forwarded to the Erie County Holding Center. (ECHC)

On duty Cellblock Attendants names shall be listed in the appropriate time slots.

**FORM #330**

Form #330 Suicide Prevention Form is to be completed for each prisoner before he is placed in a cell. See Department's Suicide Prevention Policy for Instructions regarding this form. Directions are also on back of form.

    A.  <u>Administration and Communication Command</u>
        The City Court Lock-up is under the command of the Inspector of Administration and Communication. The Inspector of Administration and Communication shall ensure that the facilities and procedures comply with the rules and regulations of the NYS Commission of Corrections, the rules and regulations of the Buffalo Police Department, and all other applicable laws.

# CHAPTER 5: EVIDENCE

## CONTENTS

**1.0    EVIDENCE**
1.1    Policy
1.2    Definitions
1.3    Evidence Processing - Generally
1.4    Services of the Crime Scene Unit
1.5    Central Police Services Forensic Laboratory
1.6    BPD Evidence and Recovered Property Control Procedures

**2.0    PROCESSING EVIDENCE AT THE CRIME SCENE**
2.1    Policy
2.2    Preserving the Crime Scene
      A.  Establishing the Crime Scene
      B.  Protecting the Crime Scene
2.3    Recognizing Evidence
2.4    Photographing Evidence and Crime Scenes
2.5    Collecting Evidence
      A.  Investigating Officer Responsibility
      B.  Careful Handling of Evidence
      C.  Preserving Evidence for Examination and Evaluation
      D.  Protecting Fragile Items
      E.  Preventing Chemical Change and Contamination
      F.   Calling the Crime Scene Unit
2.6    Marking Evidence
2.7    Packaging Evidence for Examination
2.8    Making a Record of Evidentiary Items
      A.  Recovered Property Report
      B.  Evidence Control Report
      C.  Inventory of Evidence Collected
2.9    Memorandum of Observations

**3.0    SUBMITTING EVIDENCE FOR TESTING AND STORAGE**
3.1    Policy
3.2    Chain of Custody
3.3    Storing Evidence in the Property Office
3.4    Delivering Evidence to the CPS Lab during Business Hours
3.5    Delivering Evidence to the CPS Lab during Non-Business Hours
3.6    Reporting Results of Testing

**4.0    TRANSFERRING EVIDENCE**
4.1    Policy
4.2    Release of Evidence to Police Personnel - Generally
4.3    Release of Evidence - Exceptional Circumstances
4.4    Procedure for Obtaining Evidence from the Property Office

4.5      Transferring Evidence to Court
4.6      Returning Evidence from Court

**5.0      <u>DOCUMENTARY EVIDENCE</u>**
5.1      Policy
5.2      Threatening and Annoying Letters
5.3      Suicide Letters
5.4      Fraudulent Instruments (Checks, Money Orders, etc.)
5.5      Counterfeit Money
          A.  Marking for Identification
          B.  Delivery to Property Office
          C.  Transfer to the Secret Service

**6.0      <u>FIREARMS, WEAPONS AND AMMUNITION</u>**
6.1      Policy
6.2      Safeguarding Weapons
6.3      Marking Firearms/Weapons and Ammunition
6.4      Delivering Firearms/Weapons and Ammunition to the CPS Lab
          A.  Delivery to the CPS Lab
          B.  Packaging Firearms/Weapons and Ammunition
          C.  Reports
          D.  When Examining Firearm is Prohibited
6.5      Testing and Checking Weapons and Ammunition
          A.  Ballistics Testing
          B.  CPS Lab
          C.  Computer Checks
          D.  Property Office
6.6      Bullets Recovered from Shooting Victim
6.7      Bombs, Grenades, Etc.

**7.0      <u>DRUGS AND DRUG PARAPHERNALIA</u>**
7.1      Policy
7.2      Field Drug Tests
7.3      Packaging Drug and Drug Paraphernalia
7.4      Submitting Drug Evidence to the CPS Lab
7.5      Taking Drug Evidence to Court

**8.0      <u>CASH</u>**
8.1      Policy
8.2      Seizing Cash as Evidence
8.3      Packaging and Delivery of Cash to the Property Office
8.4      Transferring Cash
8.5      Transferring Cash Evidence to Court
8.6      Cash Seized as Forfeiture Assets
          A.  Seizing Cash
          B.  Reports
          C.  Delivery of Cash to the Property Office During Non-Business Hours
          D.  Large Amounts of Cash

**9.0**   **SPECIAL PROCEDURES FOR PARTICULAR ITEMS OF EVIDENCE**

9.1   Policy
9.2   Blood, Semen and Other Body Fluids
9.3   Rape Kits
9.4   Alcoholic Beverages
9.5   Contaminated Food - Accidental Food Poisoning
9.6   Crimes Involving Poison and Other Deadly Substances
9.7   Fingerprints
     A.  Avoid Contaminating Fingerprint Evidence
     B.  Request for Fingerprint Examination
     C.  Additional Reports
     D.  Automobiles Held for Fingerprinting
     E.  Results of Fingerprint Examination
     F.  Evidence to Property Office After Fingerprint Examination
9.8   Processing Latent Fingerprints - Crime Scene Unit Responsibility

**10.0**   **VIDEO SURVEILLANCE CAMERA ROOM**

10.1   Policy
10.2   Regulation/Use of Surveillance Cameras, Surveillance Monitoring and Recording

## 1.0   EVIDENCE

1.1   POLICY
Because the successful solution of any criminal case, including the exoneration of innocent persons, is dependent on the evidence collected in the course of a police investigation, it is the policy of the Buffalo Police Department to collect all available evidence and to handle and process these items in a manner that ensures their evidentiary value.

1.2   DEFINITIONS

A.   Evidence
Evidence includes all the means possible for proving or disproving an alleged fact.

B.   Physical Evidence
Physical evidence includes any article, substance, thing or tangible object which is a means for proving or disproving an alleged fact.

C.   Testimonial Evidence
Testimonial evidence includes any statements, admissions, confessions, or witness accounts, whether given orally or in writing, which tend to prove or disprove an alleged fact.

D.   Direct and Indirect Evidence
Direct evidence is any evidence that tends to prove or disprove an alleged fact. Indirect evidence (circumstantial evidence) is any evidence, that while not proving or disproving the alleged fact in question, does tend to prove a separate fact, that separate fact tending to prove or disprove the alleged fact in question.

1.3   EVIDENCE PROCESSING - GENERALLY
The processing of evidence begins when the police first suspect that a crime has been committed. In general, the processing of evidence goes through a number of sequential phases:

A.   Preserving the scene of the crime to insure that evidence is not contaminated or that items not associated with the crime are not introduced into the crime scene.

B.   Recognizing what items at a crime scene may have evidentiary value.

C.   Photographing evidence before it is moved or handled.

D.   Marking evidence so it can be accurately identified at a later date, but doing so in such a way that its evidentiary value is not impaired.

E.   Packaging evidence so that if it requires testing and further analysis, the evidence is not tainted in any way during the packaging process.

F.   Keeping accurate accounts and inventories of all items seized in the evidence

collection process.

G.  Creating a memorandum of facts of the entire investigation and crime scene.

H.  Delivering evidence to the Property Office or CPS Lab for storage and/or testing.

I.  Transferring evidence from the Property Office or CPS Lab for further testing and analysis.

J.  Taking evidence to court.

K.  Returning the evidence after the court appearance or, in the alternative, delivering a receipt for the evidence to the unit from which it was taken.

1.4  SERVICES OF THE CRIME SCENE UNIT (formerly Evidence/Photography)

Certain members of the Crime Scene Unit have particular skills and knowledge that better enable them to deal with physical evidence.  The Unit has specialized equipment that is designed specifically to identify, collect, preserve, examine and evaluate different kinds of evidence. The Crime Scene Unit shall be requested whenever their services will materially enhance the investigation of an important police related incident.  Requests for the services of the Crime Scene Unit shall be channeled through the normal chain of command. In the event that the services of the Crime Scene Unit are needed at a time when no member of the Unit is on duty, the request shall be channeled through the senior on-scene Command Officer to the Duty Officer.    He shall contact the 911 Communications Lieutenant who shall call a Unit member for overtime. Additionally, some members of the Unit have unique skills and special equipment that enables them to photograph and videotape crime scenes. The services of the Crime Scene Unit shall be requested whenever a photographic record will be of material assistance in any important police related matter.  Photographing and videotaping of a crime scene generally shall take place before any evidence is moved or collected. When requesting the services of the Crime Scene Unit, the request shall be channeled through the chain of command.  In the event that the Crime Scene Unit is needed at a time when no member of the Unit is on duty, the request shall be channeled through the senior on-scene Command Officer to the Duty Officer who shall determine the propriety of calling in a Unit member on an overtime basis.  He shall contact the 911 Communications Lieutenant to contact the members.   Additionally, some members of the Unit have unique skills and special equipment that enables them to photograph and videotape crime scenes. The services of the Crime Scene Unit shall be requested whenever a photographic record will be of material assistance in any important police related matter.  Photographing and videotaping of a crime scene generally shall take place before any evidence is moved or collected.  When requesting the services of the Crime Scene Unit, the request shall be channeled through the chain of command.  In the event that the Crime Scene Unit is needed at a time when no member of the Unit is on duty, the request shall be channeled from the senior on-scene Command Officer through the 911 Communications Lieutenant who shall determine the propriety of calling in a Unit member on an overtime basis. Unless otherwise specifically permitted, the members of the Crime Scene Unit shall be the only Department members allowed to take photographs of any police related event while on duty.

1.5     CENTRAL POLICE SERVICES FORENSIC LABORATORY
The Central Police Services Forensic Laboratory is located at 45 Elm Street.  Members of the Department may contact the CPS Lab for information concerning the correct handling and disposition of any evidence that needs scientific testing.

1.6     BPD EVIDENCE AND RECOVERED PROPERTY CONTROL     PROCEDURES
The BPD Property Office has established guidelines governing the processing of recovered property and evidence.  The Property Office may be contacted by members of the Department who have questions concerning the control of evidence.

**2.0     PROCESSING EVIDENCE AT THE CRIME SCENE**

2.1     POLICY
It is the policy of the Buffalo Police Department to handle all evidence so as to protect it from contamination; to preserve it for necessary testing and evaluation; and to safeguard evidence so that its evidentiary value is in no way diminished or its authenticity questioned.

2.2     PRESERVING THE CRIME SCENE

    A.     Establishing the Crime Scene
The first member of the Department arriving to investigate the report of a crime must identify the crime scene.  The size of the crime scene will depend on the nature of the crime and the possible existence of items of evidentiary value. It may extend for entire city blocks (e.g. drive by shootings, bombings, etc.) or it may be confined to one small room of a building.

    B.     Protecting the Crime Scene
Once the extent of the crime scene has been established and clearly marked with crime scene tape, no unauthorized personnel shall be allowed entrance. The only Police personnel allowed to enter the crime scene shall be members of the Department who are directly involved in the investigation of the crime, or those involved with collecting evidence or photographing the scene (refer to the Crime Scene Integrity Report Sign-in Sheet Form P-296). **\* NO UNNECESSARY POLICE OFFICERS SHOULD ENTER THE SCENE.**

2.3     RECOGNIZING EVIDENCE
The evidence that is available will usually depend on the nature of the crime.  The more information that an investigating Officer can obtain from witnesses and complainants the better able (s)he will be to determine the evidentiary value of  items found at a crime scene.  All items of evidence must be collected and preserved regardless of whether they tend to exonerate or implicate a particular suspect.

2.4     PHOTOGRAPHING EVIDENCE AND CRIME SCENES
If evidence or a crime scene is to be photographed, the Crime Scene Unit shall be called.  The Crime Scene Technician shall maintain a log so that (s)he is:

    A. able to testify that the photo represents a true and accurate representation of  the

evidence at the time the photo was taken;

B. able to testify that the photo is free of distortion and does not misrepresent the scene or object depicted;

C. able to establish the continuity of the film/digital image from the time of its exposure to the time of its presentation in court;

D. able to establish each step used in transporting, processing and storing the film;

E. able to accurately testify to the following:

    1. the date and time the photo was taken;
    2. the camera location and the direction it was facing;
    3. the kind of film used;
    4. the kind of lighting used.

## 2.5    COLLECTING EVIDENCE

A. <u>Investigating Officer Responsibility</u>
Generally, the investigating Officer will determine the method of collecting evidence. In instances of less serious crimes, the investigating Officer shall collect the evidence himself/herself but only if (s)he has sufficient experience to ensure that the integrity of that evidence is not imperiled.

B. <u>Careful Handling of Evidence</u>
Evidence must be carefully handled so that its value is in no way jeopardized. If there is any question as to the proper handling of evidence, the Crime Scene Unit (851-4493) or the CPS Lab (858-7408) should be called. In the event that personnel of neither of these units are readily available, the inquiry should be directed to the Duty Officer.

C. <u>Preserving Evidence for Examination and Evaluation</u>
Evidence must be handled with care so that it can be properly evaluated and examined.

    1. The nature and source of the evidence must be precisely identified. In particular cases (e.g. hairs, fibers, fabrics, paint, glass, wood, soil, tool marks, etc.) like materials and substances shall be collected from a known source, when available. The materials and substances from the known source can then be compared by the CPS Lab with the physical evidence that was collected.

    2. Where possible, sufficient evidence shall be collected so that the CPS Lab has a large enough sample to conduct a proper examination.

    3. The chain of custody must be maintained. At every step of the evidence processing phase, it is imperative that the evidence be under the control of as few people as possible and it should not be outside the control of an

authorized member of the Department or CPS Lab. To maintain the chain of custody of evidence the Evidence Control Report (Form P-127) shall be prepared in all those instances described in M.O.P. Chapter 5.

D. <u>Protecting Fragile Items</u>
Evidence that is fragile or that is easily susceptible to destruction, particularly glass, paper, china and other similar items, must be protected from physical damage. It must be handled and packaged so that fingerprints, palm prints, tool marks or other traces of evidence are not damaged.

E. <u>Preventing Chemical Change and Contamination</u>
Perishable evidence, particularly blood and other substances of human origin must be protected against chemical change and contamination. Under no circumstances shall blood or other perishable evidence be subjected to unnecessary heat (i.e. exposed to direct sunlight or placed near an artificial heat source). The Crime Scene Unit shall be notified to preserve these types of items of evidence.

F. <u>Calling the Crime Scene Unit</u>
Refer to M.O.P. Chapter 5 for when the Crime Scene Unit is required.

2.6    <u>MARKING EVIDENCE</u>

A. <u>Marking the Evidence</u>
The member of the Department who collects an item of evidence shall promptly mark it for future identification. The marking shall be done so that there can be no mistake that it is the actual item of evidence that was collected. Generally, marking shall consist of inscribing on the piece of evidence the Officer's initials and the date the item was seized. When marking evidence, the member must be careful to not:

1. damage the evidence or property,
2. impair the value of the evidence or prevent its later processing by the CPS Lab or other unit, or
3. mark the evidence in a way in which the marks can be readily removed.

B. <u>Items that Cannot be Marked</u>
If marking will have a negative effect on the evidence, the item itself shall not be marked but it shall be secured in a sealed envelope or other type secure and sealed container and that sealed envelope or sealed container shall be marked. If the item is too large or bulky to be placed in an evidence envelope or sealed   container, an evidence label or tag shall be attached.

2.7    <u>PACKAGING EVIDENCE FOR EXAMINATION</u>

A. <u>Evidence Containers</u>
Size and circumstances permitting, evidence shall be placed into a Departmental evidence bag. Evidence that is too large to be placed in an evidence bag or whose evidentiary value would be diminished by being placed in an evidence bag, shall be placed in a clean container, or in clean wrapping paper. Each item of evidence shall

be packaged in a separate container. Evidence bags may be obtained from the 911 Lieutenant.  Refer to M.O.P. Chapter 5 for investigating Officer's responsibility for collecting evidence.

B. Liquids, Fragile Items and Unusual Items of Evidence
Some items of evidence need special packaging.

1. Liquids shall be sent in glass or plastic containers and the containers shall be carefully wrapped.
2. Items of evidence that may lose some of its properties through exposure to air shall be sealed in its container with tape or sealing wax.

## 2.8    MAKING A RECORD OF EVIDENTIARY ITEMS

A. Recovered Property Report
Whenever items of evidence are seized, except for drugs and DWI kits, the member of the Department collecting the evidence shall prepare a Recovered Property Report (Form P-10) or a Property Report (Firearms) (Form P-10A) if the evidence is a firearm.. The recovered Property Report shall include a complete description of the item including the make, model and serial number, if any. It shall also include the exact location from where the item was collected or the name of the person from whom the item was obtained.  A separate P-10 must be completed for each different event number.

B. Evidence Control Report
In the event that the custody of evidence is to be transferred from one Department employee to another, other than when being directly submitted to the Property Office or the CPS Lab, the employee originally having custody shall prepare an Evidence Control Report (Form P-127) for each item of evidence to be transferred.  The appropriate entries shall be recorded on the form for each subsequent transfer of custody.  The Evidence Control Report shall be attached to the P-10.

## 2.9    MEMORANDA OF OBSERVATIONS

A. It is of utmost importance that investigating Officers make complete and detailed notes of everything observed at a crime scene.  Mental impressions are often forgotten and details confused.  A memorandum may serve to refresh the recollection of the Officer.  In the event that the notes do not refresh the Officer's recollection, the notes themselves might be introduced as evidence.  Minimally, the memorandum should contain:

- date and time of arrival at the scene;
- location of the crime;
- name of the victim, if known;
- name of the suspect, if known;
- action taken at the scene;
- whether other units of the Department were called to assist in the investigation

(e.g. Homicide Squad, SOS, Crime Scene Unit, etc.) and  the name of the member who responded;

- whether the member personally seized any item of evidence.

B. If the Crime Scene Unit responded to the scene, the member of that unit shall prepare a report that includes: the time the request was initially received, the name of the investigating Officer, and the disposition of the evidence.

C. To comply with "Rosario" requirements, Officers must preserve all their <u>original</u> notes.  This includes preserving handwritten notes even if the handwritten notes are later transcribed and the Officer checks the transcription for accuracy. Sanctions for "Rosario" violations can be as severe as dismissal of the case.

## 3.0   <u>SUBMITTING EVIDENCE FOR TESTING AND/OR STORAGE</u>

### 3.1   <u>POLICY</u>
It is the policy of the Buffalo Police Department to sustain a strict chain of custody for all evidence collected and to safeguard and preserve evidence so that its evidentiary value and integrity is stringently maintained.

### 3.2   <u>CHAIN OF CUSTODY</u>
In order for an item to have any evidentiary value, there must be a strict accounting of the item's location and by whom it was possessed, beginning from the time it was initially collected as evidence until the time it is presented at a proceeding. This chain of custody must be clearly documented.  Whenever custody of evidence is transferred from one person to another, other than when being directly submitted to the Property Office or the CPS Lab, the proper entries must be made on the Evidence Control Report (P-127).

### 3.3   <u>STORING EVIDENCE IN THE PROPERTY OFFICE</u>

A. All property seized as evidence by a member of this Department that is not to be submitted to either the CPS Lab or the Crime Scene Unit for further processing, shall be submitted to the Property/Evidence Depository Room (Room 101). All such evidence shall be submitted to the Property/Evidence Depository Room prior to the expiration of the tour of duty of the Officer who seized the evidence.

B. The member of the Department submitting the evidence will be required to comply with the directions of Property Office personnel and to sign all required logs. The submitting Officer will receive in the business, a copy of the P-10 that has the stamped property number affixed or that has been signed and dated by a member of the Property Office.

C. When evidence is submitted directly to the Crime Scene Unit or the CPS Lab, the member submitting the evidence shall also deliver a copy of the P-10 to the Property Office, except that no P-10 must be submitted when the evidence constitutes drugs or DWI kits. During hours when the CPS Lab is open, the P-10 shall contain the Lab number assigned by the CPS Lab.

D. Evidence other than evidence submitted to the CPS Lab for testing, shall be stored in the Room 101. The member of the Department that collected the evidence shall deposit the evidence following the posted procedures in Room 101. All evidence must be submitted prior to the expiration of the Officer's tour of duty. Room 101 will be under constant video surveillance.

E. Each locker shall contain evidence from only one case. Items of evidence that are too large for the lockers shall be stored on the floor. Each item of evidence stored on the floor must have the proper forms attached. All reports must be typed or they must be printed legibly. The Officer submitting the evidence shall make a notation in the Property Custody Log in Room 101, indicating the exact location of the evidence (e.g. Locker #4 or shelf A-4). The submitting Officer will retain one copy of the P-10 as his/her receipt for the evidence.

3.4    DELIVERING EVIDENCE TO THE CPS LAB DURING BUSINESS HOURS
Drugs, DWI kits, blood, body fluids and other evidence that need scientific testing shall be submitted directly to the CPS Lab located at 45 Elm Street.

A. Request For Forensic Laboratory Examination (Form DCPS-L-1)
In every case in which evidence is submitted to the CPS Lab for examination, except for drugs and DWI kits, the Officer submitting the evidence, must prepare a Recovered Property Report (Form P-10) as well as a Request for Forensic Laboratory Examination (Form DCPS-L-1). An Evidence Control Report (P-127) shall also be prepared in those instances outlined in M.O.P. Chapter 5. The original DCPS-L-1 shall be submitted with the evidence to the Lab and a copy shall be retained for the Command file. The DCPS-L-1 must contain the following information:

1. A description of the evidence and where it was obtained;
2. The time and date of the occurrence and/or arrest;
3. Any identification marks on the evidence;
4. The type of examination requested.
5. Incident number

B. Submitting the Evidence to the Lab
During the hours that the CPS Lab is open, the member of the Department that collected the evidence shall deliver the evidence directly to the Lab along with form DCPS-L-1 completed in duplicate.

C. Recovered Property Report (P-10) to Property Office
Whenever evidence is delivered directly to the CPS Lab, except for drugs and DWI kits, a copy of the corresponding P-10 shall be immediately delivered to the Property Office and the P-10 shall include the corresponding control number assigned by the CPS Lab. The submitting Officer shall retain a copy of the P-10 for his/her command files.

3.5 <u>DELIVERING EVIDENCE TO THE CPS LAB DURING NON-BUSINESS HOURS</u>
Evidence that is delivered to the CPS Lab (i.e. drugs, DWI kits, blood, body fluids) during non-business hour shall be handled in the following manner.

A. The evidence and the original DCPS-L-1 shall be placed in a Central Police Services Property Envelope (DCPS-L-3) together with the P-10 and, if required, the P-127. The submitting Officer shall sign his/her name on the CPS Property Envelope that has been sealed with evidence tape.

B. The submitting Officer shall personally place the evidence into the evidence lockers. Only evidence that is to be examined by the CPS Lab shall be placed in the lockers (i.e. no fingerprints or other property).

C. Do not place evidence from more than one (1) case in any one envelope. Use separate envelopes for each case. If one envelope does not hold all the evidence, use as many envelopes as needed and mark them in numerical sequence next to the submitting Officer's signature.

D. Under no circumstances shall, bombs, explosives or large bulky items be placed in the evidence lockers. Refer to M.O.P. Chapter 11.

E. The evidence lockers shall <u>not</u> be used to return evidence that was signed out for presentation in court. During non-business hours refer to M.O.P. Chapter 5. This type evidence must be returned to the BPD Property Office in person.

F. The evidence lockers are available for use by all Criminal Justice agencies served by the CPS Lab. The CPS Lab is not open to private agencies.

3.6 <u>REPORTING RESULTS OF TESTING</u>
In each instance in which evidence is submitted for testing (e.g. drugs, fingerprints, firearms, etc.) the unit performing the requested examination shall forward a copy of the results of the test to the member of the Department who submitted the evidence.

## 4.0 <u>TRANSFERRING EVIDENCE</u>

4.1 <u>POLICY</u>
It is the policy of the Buffalo Police Department to maintain stringent controls whenever evidence is transferred from one location to another or from one person to another. The chain of custody must be preserved and meticulously documented.

4.2 <u>RELEASE OF EVIDENCE TO POLICE PERSONNEL - GENERALLY</u>

A. <u>Investigating Officer</u>
Items of evidence may be signed out of the Property Office by Police personnel for court, victim/witness identification, or evidence processing. The Officer listed in box 8 or 9 on the Recovered Property Report (P-10) or P-10a shall be the only Officer to whom the evidence shall be transferred.

B. <u>Final Release of Evidence</u>

Only the CCB Captain, or his/her designee, shall have the authority to approve final release of evidence. Before authorizing final release, the CCB Captain, or his/her designee, shall consult with the investigating Officer and the District Attorney's Office. No other members of the Department shall authorize the final release of evidence.

4.3    <u>RELEASE OF EVIDENCE - EXCEPTIONAL CIRCUMSTANCES</u>

In each instance in which the custody of evidence is transferred the proper entries must be recorded on the Evidence Control Report (Form P-127).

A. <u>Crime Scene Unit</u>

The Crime Scene Unit Commanding Officer or his/her designee may sign out evidence for identification, testing or drying purposes.

B. <u>Detectives Division Personnel</u>

Detective Division Personnel may sign out fraudulent checks, counterfeit bills, suspected stolen credit cards, suspected stolen money orders, and fraudulent identification used in the commission of a crime.

C. <u>Chief of Detectives</u>

The Chief of Detectives may sign out evidence for investigations, analysis, and/or the gathering of criminal intelligence.

D. <u>Internal Affairs Division</u>

The Commanding Officer of the Internal Affairs Division or his designate may sign out evidence for the purpose of conducting internal investigations.

E. <u>Accident Investigation Unit</u>

The member of the Accident Investigation Unit that is investigating an accident may sign out evidence, except cash, that is directly related to his/her specific AIU investigation.

F. <u>District Supervisor</u>

The Chief of the District or Unit that originally submitted the evidence may sign out evidence but only if the original Officer is unavailable.

G. <u>CPS Lab Personnel</u>

Technicians of the CPS Lab may sign out evidence for testing, analysis or storage.

H. <u>District Attorney Staff</u>

Whenever an employee of the District Attorney's Office requests the transfer of evidence, the evidence will only be released to the following persons, and then, only after they have displayed proper identification:

1. Assistant District Attorneys
2. Investigators from the District Attorney's Office
3. District Attorney Property Clerk's Office personnel.

4.4    PROCEDURE FOR OBTAINING EVIDENCE FROM THE PROPERTY OFFICE

    A.  Whenever evidence is signed out of the Property Office, the person taking custody of the property must complete and sign a Property Transfer Receipt (P-10-SUP1). The Property Office personnel will affix his/her signature and identification number on the line provided. All proper entries must also be made on the Evidence Control Report (Form P-127) when that form is required to be prepared (refer to M.O.P. Chapter 5).

    B.  Whenever evidence in the form of cash is removed from the Property Office the employee removing the money, along with the Property Office personnel shall count the money before it is signed out and then again after it has been signed back in. In the event that there appears to be a discrepancy, the CCB Captain and his/her Commanding Officer must be notified and an investigation commenced.

    C.  When sealed evidence is to be signed out of the Property Office and the evidence must be examined prior to removal, the seal may be broken but only if it is done in the presence of the employee removing the evidence and only while (s)he's in the company of the Property Office personnel. They will both examine the evidence and if there are any signs of tampering the CCB Captain and his/her commanding officer must be notified and an investigation commenced.

4.5    TRANSFERRING EVIDENCE TO COURT

When the Officer who seized the evidence is summoned to court the Officer will:

    A.  Immediately contact the Assistant District Attorney (ADA) to determine the need for presenting the evidence at the court proceeding;

    B.  If the ADA requests the presentation of evidence in court, the Officer will obtain the evidence from the Property Office and without delay, transfer it to the ADA. If the evidence is still at the CPS Lab the Officer shall sign the evidence out of the CPS Lab;

    C.  Whenever an Officer leaves evidence in the custody of an ADA, the Officer shall obtain a completed Property Transfer Receipt (P-10-Supp.1) signed by the ADA. This must be delivered to the Property Office as soon as possible as proof of transfer.

    D.  Drug Evidence. Refer to M.O.P. Chapter 5.

    E.  Cash Evidence. Refer to M.O.P Chapter 5.

    F.  In all instances in which the custody of evidence is transferred, the proper entries shall be made on the Evidence Control Report (Form P-127).

4.6    RETURNING EVIDENCE FROM COURT

    A.  During Regular Business Hours
        During regular business hours, evidence that is being returned from court, shall be

delivered to the unit from which it was obtained (i.e. Property Office or CPS Lab). Personal assigned to the unit to which the evidence is being returned will:

1. receive and process the evidence and inspect each envelope, bag, or package to ensure that all the evidence in its entirety has been returned and that it is properly identified, before it is re-admitted; and

2. provide the persons re-submitting the evidence a Property Transfer Receipt (P-10-Supp1) for the evidence returned and make the appropriate entries on the Evidence Control Report (P-127) where such form is required (refer to M.O.P. Chapter 5);

3. under no circumstances shall evidenced be returned by using the evidence lockers at the CPS Lab.

B. <u>During Non-Business Hours</u>
During non-business hours, all Officers will have access to the Evidence/Property Room via their BPD employee identification card.

This room will be utilized on a 24/7 basis, even during weekdays when the Property Office is open. (The Property Office will ensure that all items are processed and removed before the end of their shift each day). Do not bring the following items to Room 101:

1. drugs
2. drug facilitation kits (blood samples from DUI's, etc.)
3. mini bikes / ATV'S
4. any firearm used in a crime must go to the CPS Lab located at 45 Elm Street.

- Complete all necessary paperwork:
  a. P-10A – for all firearms not used in a crime
  b. P-10 – for all other items
  c. Various lab request forms for further analysis
  d. CCB2 Form for prisoner property

- Put completed paperwork and property inside a suitable locker (oversized items may be left on the floor).

- Enter transaction in log book on table.

- Place key in drop safe.

1. In the event that such evidence must be stored in the CPS Lab, Property Office personnel shall arrange to transfer the evidence to the CPS Lab on the next business day.

## 5.0    DOCUMENTARY EVIDENCE

5.1    POLICY
It is the policy of the Buffalo Police Department to process all available documentary evidence in a manner that best preserves its evidentiary value.

5.2    THREATENING AND ANNOYING LETTERS

A. Members of the Department shall safeguard fingerprints and other evidence which are on papers and letters involved in kidnapping and extortion cases, or that are on documents which contain libelous, obscene or otherwise criminal matter. Such items shall not be handled unnecessarily. The member of the Department assigned to investigate the case shall place the item in an envelope and personally deliver it to the Crime Scene Unit. During non-business hours the property shall be secured in a locker within the Property/Evidence Room (room 101). Accompanying the item shall be a fully completed Recovered Property Report (P-10), an Evidence Control Report (P-127) and a Request for Fingerprint Examination (P-77C). The Crime Scene Unit shall conduct the requested examination and then deliver the original to the Property Office along with the P-10. The Crime Scene Unit shall provide the investigating Officer with copies of the document.

B. When a series of letters is received, the complainant will be requested to not open the letters but to supply them to the investigating Officer unopened. The investigating Officer will open the letter in the complainant's presence, being especially careful to preserve any potential evidence. It is possible to make a fingerprint analysis and handwriting or typewriter comparisons from properly preserved documentary evidence.

5.3    SUICIDE LETTERS
Suicide letters shall be kept confidential and shall not be divulged for publication. Letters coming into the possession of Police personnel shall be delivered to the Medical Examiner and the Homicide Squad shall be provided with a copy.

5.4    FRAUDULENT INSTRUMENTS (CHECKS, MONEY ORDERS, ETC.)
All cases involving fraudulent checks, money orders, or similar items shall be reported without delay to the appropriate District Detectives by the investigating Officer. The complainant shall retain possession of the fraudulent instrument until (s)he hands it over to a member of the appropriate District Detectives.

5.5    COUNTERFEIT MONEY

A. Marking for Identification
A member of the Department coming into possession of counterfeit money shall have the person  who was last in possession of the counterfeit money, mark it for identification by having that person write his/her name and date across the face of the bill. The member of the Department shall also affix his/her name, rank, badge number, and the date on the face of the bill and (s)he shall notify the appropriate District Detectives.  In the event that it is a clean crisp counterfeit bill, it may be

possible to obtain fingerprints.  In such case no markings shall be made on the bill but shall be handled in a manner to preserve fingerprints.

B. Delivery to Property Office
The member of the Department coming into possession of counterfeit money shall prepare a complete report of the incident on an Intra-Departmental Memorandum and forward a copy to the appropriate District Detectives. The report shall include the names, addresses and telephone numbers of all persons involved.  In addition, the Officer shall prepare a P-10 listing the serial number of each individual counterfeit bill. The counterfeit money along with the P-10 and the Intra-Departmental Memorandum shall be delivered to the Property Office before the expiration of the investigating Officer's tour of duty.  During non-business hours the 911 Communications Lieutenant shall be contacted and the counterfeit money deposited in the evidence lockers in Room 101.

C. Transfer to the Secret Service
A member of the Property Office shall contact the Secret Service and request them to retrieve the counterfeit money. The Secret Service Agent will sign the original P-10 before the counterfeit money and the Intra-Departmental Memorandum are relinquished to him/her.

## 6.0    FIREARMS, WEAPONS AND AMMUNITION

6.1    POLICY
It is the policy of the Buffalo Police Department to process all weapons, firearms, and ammunition that represent evidence of a crime, in a manner that renders the weapons safe and that preserves the integrity of the evidence.

6.2    SAFEGUARDING WEAPONS
The member of the Department who comes into possession of a firearm/weapon shall first ensure that the weapon is unloaded and that it does not pose a threat to the safety of any person.  If the Officer is not familiar with the safe handling and clearing of a particular weapon, (s)he will allow someone to clear it who is familiar with that type weapon.

6.3    MARKING FIREARMS/WEAPONS AND AMMUNITION

A. The member of the Department seizing the firearm/weapon or ammunition shall mark the item permanently and in such a manner as to not impair its evidentiary value (i.e. DNA, fingerprints).  Marking generally consists of the member affixing his/her initials and the date.  If marking the item will negatively affect the evidence, the evidence shall be secured in a marked and sealed evidence envelope or other secure, sealed container and the container shall be marked. If the evidence is too large to be placed in an evidence envelope or other sealed container, it shall be marked by affixing an evidence tag or label to it.

B. Generally, cartridges and shells shall be marked on the side, not the base.    Spent bullets shall be marked on the base and not the side.

6.4    DELIVERING FIREARMS/WEAPONS AND AMMUNITION TO THE CPS LAB

A.  Delivery to the CPS Lab
All firearms, where there is an arrest, will be submitted directly to Erie County Central Police Services Laboratory located in the Public Safety Campus, 45 Elm Street. The weapons will be submitted utilizing the 1st floor evidence receiving lockers. Lockers A-G, hold long guns and lockers 1-50 will hold handguns. Multiple guns can be place in one locker providing it is from the same case.

Officers will ensure all firearms submitted to CPS are unloaded prior to submission. If there is any question about the loaded/unloaded status of a firearm, Officers will abide by posted instructions that will serve to identify a possible "loaded firearm" in a very obvious manner.

The Officer submitting the firearm must prepare a request for forensic laboratory examination (DCPS-L-1) and a Property Report Firearms (P-10-A).

Distribution of the Property Report Firearms P-10-A is:
Original to Property Office
Copy to CPS Laboratory
Copy to Command File

The original DCPS-L-1 shall be submitted with the firearm to CPS and a copy retained for the Command File.

Pellet guns, BB guns, and/or large quantities of ammunition will continue to be submitted to the Property Office.

B.  Delivery to BPD Property Office
All firearms being held for safe keeping will be submitted to the Property Office, Room 104 during regular business hours. When the Property Office is closed, all firearms being held for safe keeping will be delivered to Headquarters and the 911 Communications Lieutenant will be notified to secure the weapons in Room 101.

C.  Packaging Firearms/Weapons and Ammunition
All firearms must be unloaded and rendered safe before delivery. Ammunition shall be kept separate.

D.  Reports
For firearms, rifles and shotguns, a P-10A shall be prepared in lieu of a P-10 for each weapon. If more than one weapon is on the same Incident number, fill out only entries that differ from the first P-10A (Incident number must appear on each form). An Evidence Control Report (P-127) must also be prepared in circumstances specified in M.O.P. Chapter 5. In an incident in which a firearm, rifle, or shotgun is seized, the Officer making the seizure shall prepare a Premise Hazard File Entry Request (Form P-295).

E. Follow-up
Prior to submission personnel shall endeavor to ascertain the owner of the weapon. The Bureau of Administrative Services (Property Office) shall be notified by the submitting Officer when the property may be released, to whom it may be released and under what circumstances.

F. When Examining Firearms is Prohibited
Whenever firearms, rifles, or shotguns are secured in the CPS Lab or Headquarters, no members, other than members of the Property Office, the General Investigation Unit or CPS Lab, shall be allowed to examine that item without the express written consent of the Chief of Detectives, or his/her designee, and the Commissioner of Police.

6.5    TESTING AND CHECKING WEAPONS AND AMMUNITION

A. Ballistics Testing
Weapons and ammunition that have been seized as evidence and that require ballistics testing shall be submitted to the CPS Lab by the Property Office. The employee submitting the evidence to the Property Office is responsible    for preparing the P-10A, the DCPS-L-1, and the Evidence Control Report (Form P-127) when such form is required (refer to M.O.P. Chapter 5).

B. The CPS Lab
1. The CPS Lab shall make a thorough examination of each weapon and all ammunition submitted for testing. They shall conduct tests necessary to accurately identify the item of evidence submitted.
2. While the weapon or ammunition is in the CPS Lab, the Lab will be responsible for the custody of that evidence and shall maintain accurate records of its location and disposition.
3. The CPS Lab shall provide the Property Office with all information concerning the final disposition of the weapon.

C. Computer Checks
The Erie County Crime Analysis Center (ECCAC) will send electronic transmittals via the New York State eJustice Integrated Justice Portal, using the Criminal Gun Clearinghouse submission form.  This submittal will be performed for all crime guns recovered.  All printouts will be attached to the P10A and filed in the ECCAC office. A pistol permit search will be performed for all hand guns recovered.
The ECCAC will check all recovered firearms for stolen in the New York State eJustice Integrated Justice Portal, using the Stolen Gun submission form.  If not stolen, all firearms are to be entered as a "Recovered Gun".  If stolen a "Hit Confirmation" is to be sent to the agency that reported the firearm stolen.  Follow up to insure the stolen firearm is confirmed and cleared from NCIC.  The stolen firearm is to be entered as a "Recovered Gun".  A copy of the stolen gun information will be forwarded to the Property Office and to the command of the Officer who submitted the firearm.  Any firearm returned by the Property Office to the firearms owner is to be cleared in NCIC.  Any firearm reported stolen to the Buffalo Police Department will be entered into NCIC as stolen by ECCAC and kept on file in that office.  Any

report of a stolen gun taken by any command will be posted on the Administrative Bulletin Board of the e-mail system and sent to the ECCAC office for processing.

D. Property Office
The Property Office will forward copies of P-10a's to City Court Booking. City Court Booking will check the make, model, and serial number to determine whether or not the firearm has been reported stolen. A hard copy of all NCIC checks will be sent to the Property Room and attached   to the corresponding P-10a.

6.6   BULLETS REMOVED FROM A SHOOTING VICTIM
A member of the Department assigned to the investigation of a shooting shall obtain bullets that are removed from the victim.  (S)he shall instruct the doctor who removed the bullet(s) to place his/her initials on the base of the bullet (not on the side) so that the characteristic markings of the bullet are not obliterated.  In the event that marking the bullet in this manner may jeopardize the integrity of the item as evidence, the bullet shall be placed in a sealed evidence envelope and the doctor shall be requested to mark the evidence envelope. The member seizing the evidence shall deliver it to the CPS Lab with forms P-10, P-127 and a DCPS-L-1. A copy of the P-10 must be delivered to the Property Office without delay.

6.7   BOMBS, GRENADES, ETC.
Members of the Department learning of the presence of a bomb, grenade, unexploded shell, or other explosive or explosive device, shall not attempt to remove or handle it, but will immediately notify the 911 Communications Lieutenant through his/her Commanding Officer. The 911 Communications Lieutenant will take steps necessary to notify the Erie County Sheriff's Department and request the activation of their Bomb Disposal Unit.  No such items shall be stored in the Property Office.

**7.0   DRUGS AND DRUG PARAPHERNALIA**

7.1   POLICY
It is the policy of the Buffalo Police Department to process all drug and drug paraphernalia evidence in a manner that ensures the integrity of the evidence and that insulates members of the Department from accusations of tampering or other misconduct.

7.2   FIELD DRUG TESTS

A. Substances suspected of being illicit drugs and that have evidentiary value, shall only be field tested by qualified field drug test operators. Field drug test operators must use only those methods of testing approved by the Department.

7.3   PACKAGING DRUG AND DRUG PARAPHERNALIA

A. Drugs in pill, tablet or capsule form must be counted by the submitting member of the Department unless the drugs are in an original sealed manufacturer's container. When preparing form P-10, the member submitting the drugs shall indicate the number of each pill, tablet or capsule, in the quantity column.

B. Syringes needed as evidence must be sealed in a tube provided for this purpose by the Department.

C. All substances suspected of being illicit drugs and which are evidence, shall remain in the package in which they were discovered and placed in a numbered, self-sealing, clear plastic tamper evident evidence bag. Drug evidence shall be submitted separate from other evidence. The submitting Officer must place his/her initials, badge number, and the date across the evidence seal on the bag. Drugs submitted as evidence must be packaged and submitted separately from drugs that are for destruction only.

7.4    SUBMITTING DRUG EVIDENCE TO THE CPS LAB

A. In all cases
The submitting Officer shall write the number of the bag on the Request For Laboratory Examination (Form DCPS-1-L). In circumstances described in M.O.P. Chapter 5, the submitting Officer will prepare an Evidence Control Report (P-127) which must be submitted to the CPS Lab with the evidence.

B. When the CPS Lab is Open
Refer to M.O.P. Chapter 5.

C. When the Lab is Closed
Refer to M.O.P. Chapter 5.

7.5    TAKING DRUG EVIDENCE TO COURT

A. Subpoena Required
A member of the Department needing to present drugs as evidence in court must present a subpoena to the CPS Lab and the subpoena must specifically order that the drugs be made available.

B. No Subpoena
In those instances when a member has been given short notice concerning an impending court case and a subpoena for drug evidence has not been obtained, the CPS Lab must contact the District Attorney's Office to verify that the drugs are necessary for presentation in court.

C. Signing Drugs Out of the CPS Lab
Once the CPS Lab is satisfied that the drug evidence is needed in court, the evidence shall be signed out to court by the officers taking the drug evidence.

D. Returning Drug Evidence from Court
A member of the Department returning drug evidence after its presentation in court will deliver it to the CPS Lab and sign it back in. During non-business hours the members shall follow the guidelines outlined in M.O.P. Chapter 5.

E. Drug Evidence Retained by the Court or the District Attorney's Office
   As with all other evidence left in the custody of the District Attorney's Office, the member must obtain a completed Property Transfer Receipt (P-10-Supp.-1) signed by the Assistant District Attorney prosecuting the case. This must be immediately delivered to the CPS Lab as proof of transfer.

## 8.0    CASH

8.1    POLICY
       It is the policy of the Buffalo Police Department to process all money seized as evidence and to do so in a manner that preserves the integrity of the evidence and ensures that members of the Department are insulated from accusations of tampering or other misconduct.

8.2    SEIZING CASH AS EVIDENCE
       All money seized as evidence shall be counted in the presence of the owner and another witnessing Officer. The second Officer will recount the money in the presence of the owner to verify the amount. Both Officers will sign the P-10 and the owner will be requested to do so. If the owner refuses, the P-10 shall include a notation to that effect.

8.3    PACKAGING AND DELIVERY OF CASH TO THE PROPERTY OFFICE

   A. During normal business hours (Mon-Fri 0800-1200 hrs. and 1300-1600 hrs., closed on holidays) all cash seized as evidence must be delivered to the Property Office Room 104, prior to the expiration of the submitting Officer's tour of duty along with the proper paperwork. Cash must be recorded on a Recovered Property Report (P-10). The quantity of each denomination must be listed along with the total for that denomination. The total amount for all denominations combined, must also be reflected on the P-10. Under "Remarks" the P-10 must also reflect the reason why the cash is being held as evidence. An Evidence Control Report (P-127) must be prepared in those instances specified in M.O.P. Chapter 5.

   B. During non-business hours all cash seized as evidence shall be packaged in a self-sealing, tamper evident, numbered clear plastic bag separate from all other property. The number of the bag must be entered on the P-10. The Officer submitting the cash shall place his/her initials, badge number, and the date across the seal of the evidence bag. Foreign currency, U.S. currency, and counterfeit money must all be submitted in separate evidence bags but listed on one P-10. When the Property Office is closed, the submitting Officer shall contact the City Court Booking Lieutenant. The City Court Booking Lieutenant, while in the presence of the submitting Officer, will secure the cash and the accompanying P-10 in the safe located in the City Court Booking facility.

      The deposit of cash will be noted on the PROPERTY DROP SAFE DEPOSIT/REMOVAL LOG by the submitting Officer and initialed by the City Court Booking Lieutenant. The secured cash and the accompanying documentation will be forwarded to the Property Office by the City Court Lieutenant or the Captain of C.I.R. on the next regular business day.

8.4    TRANSFERRING CASH
       Refer M.O.P. Chapter 5.

8.5    TRANSFERRING CASH EVIDENCE TO COURT

       A.  Officers needing to present cash as evidence in court must present a subpoena to the
           Property Office specifically requesting that the cash evidence be made available. The
           Property Office will retain a copy of the subpoena until such time as the cash is
           returned.

       B.  No Subpoena
           If the Officer has been given a short notice concerning an impending court case and a
           subpoena for cash evidence has not been obtained, the Property Office Supervisor or
           the Police Officer assigned to the Property Office must contact the District Attorney's
           Office to verify that the cash is necessary for    presentation in court.

       C.  All other procedures for transferring cash evidence to and from court shall be the
           same as any other evidence except that cash must be counted by the withdrawing
           officer and the Property Office personnel turning over the cash, both before the cash
           is released for court and then again when it is returned from court.

8.6    CASH SEIZED AS FORFEITURE ASSETS

       A.  Seizing Cash
           When a member of the Department reasonably suspects that money is related to illicit
           drug activity, the member may seize the money for potential forfeiture purposes.

       B.  Reports
           When money is seized from a suspect for forfeiture purposes, the submitting Officer
           must complete a Record/Receipt of Seized Asset form, in addition to preparing a P-10
           (refer M.O.P. Chapter 5).  A copy of the Record/Receipt of  Seized Asset shall be
           forwarded to the Narcotics Section.

       C.  Delivery of the Cash to the Property Office During Non-Business Hours
           Refer M.O.P. Chapter 5.

9.0    **SPECIAL PROCEDURES FOR PARTICULAR ITEMS OF EVIDENCE**

9.1    POLICY
       It is the policy of the Buffalo Police Department to process evidence so that the integrity
       of the evidence is assured and that members of the Department are insulated from
       accusations of tampering and misconduct.

9.2    BLOOD, SEMEN AND OTHER BODY FLUIDS

       A.  Whenever there is blood, semen, or other body fluids present that may have some
           evidentiary value, the Crime Scene Unit shall be called to collect that evidence.
           Improper removal may destroy the evidence and could prove perilous to the member.

B. When blood samples are taken from a person at a medical facility the member shall follow the procedures outlined in M.O.P. Chapter 3.

C. Any property or evidence which may contain body fluids must be properly packaged, secured, and labeled with a BIOHAZARD LABEL.

D. Preserving blood stains. Refer M.O.P. Chapter 5.

E. Semen stains are readily subject to degradation. This can be minimized by properly drying the stained evidence in any normal ventilated room. Sunlight or heat should never be used to hasten drying because they may alter the item's chemical composition.

9.3    RAPE KITS

A. When taking a rape kit into custody from a hospital or other medical facility, the officer receiving the rape kit shall sign the Chain of Custody section on the face of the rape kit box.

B. Upon arrival at CPS Lab, the officers must complete an Erie County Central Police Services Forensic Laboratory: Request For Laboratory Examination - Form DCPS-L-1, and a BPD Property Report - Form P-10. Both reports must be completed in their entirety and all pertinent information shall be included.

C. In cases in which additional evidence is turned over to the officers along with the rape kit, the officers must include that additional evidence on the DCPS-L-1 and the P-10.

D. The rape kit, the completed forms, and any other additional evidence shall be submitted to the Property Office. Refer to M.O.P. Chapter 5.

E. The Property Office will forward a copy of the DCPS-L-1 and the P-10, with the assigned property number attached, to the Sex Offense Squad. SOS will determine which rape kits will be submitted to the CPS Lab for analysis.

F. If SOS determines that a rape kit needs to be analyzed by the CPS Lab, a member of that unit shall deliver the rape kit to the Lab. The SOS member shall comply with all instructions issued by the Property Office for the proper handling of the evidence and related paperwork.

G. After the CPS Lab has completed its analysis, it shall return the rape kit to the Property Office and shall forward a copy of the results to SOS.

9.4    ALCOHOLIC BEVERAGES

A. Opened Containers
When an opened container suspected of holding an alcoholic beverage represents evidence and the contents of the container need to be confirmed by the CPS Lab, the member shall seal the top of the container, label and mark the evidence, and deliver it

to the CPS Lab. The member must prepare a P-10 and a DCPS-L-1. A P-127 must also be prepared in circumstances specified in M.O.P. Chapter 5. During hours when the CPS Lab is open, the member shall obtain a lab number for the evidence and enter it in box 14 of the P-10 and then deliver the P-10 to the Property Office. When the CPS Lab is closed, the evidence shall be placed in the CPS Lab Lockers and a copy of the P-10 left in the Property Office's secure mail slot.

B. Unopened Containers
Unopened containers that do not need laboratory examination shall be delivered to the Property Office along with a completed P-10.

9.5     CONTAMINATED FOOD -  ACCIDENTAL FOOD POISONING
When there is a suspicion of accidental food poisoning or food infection, the member of the Department investigating the incident shall notify the Erie County Department of Health and request that an inspector be sent to the scene. The member shall ensure that the suspected food remains at the scene and shall be refrigerated if necessary. A receipt for any food taken by the Health Department inspector shall be obtained by the member.

9.6     CRIMES INVOLVING POISON AND OTHER DEADLY SUBSTANCES

A. Request for Assistance
The Homicide Squad shall be called in each instance in which a person's injuries are suspected of being the result of ingesting poison or other deadly substance, and the ingestion was other than accidental.

B. Custody of Evidence
Drugs, poisons, prescriptions, labels, and containers shall be seized as evidence and delivered to the CPS Lab along with a P-10, DCPS-L-1. A P-127 shall also be prepared in circumstances specified in M.O.P. Chapter 5.      When the CPS Lab is open, the member shall obtain a lab number and enter it in box 14 of the P-10. When the CPS Lab is closed the evidence shall be placed in the CPS Lab Lockers.

C. Information to Medical Personnel
Pertinent information, samples of materials, and the right to inspect labels, prescriptions, or containers, shall be afforded the attending physician and     other medical personnel, or the Poison Control Center of the Department of Health. Proper receipts must be obtained in all such cases.

9.7     FINGERPRINTS

A. Avoid Contaminating Fingerprint Evidence
Members of the Department must take precautions to avoid introducing misleading physical traces on a surface that is to be examined for fingerprints. This includes fingerprints of the member himself/herself or other members of the Department.

B. Request for Fingerprint Examination
Whenever there is evidence to be examined by the Crime Scene Unit for the presence of fingerprints, the member of the Department in charge of the case shall prepare a

Request for Fingerprint Examination (Form P-77C) in duplicate (original to Crime Scene Unit, copy to Command files). The P-77C shall contain the following information:

1. Description of the evidence and where it was obtained;
2. the time and date of the occurrence and/or the arrest;
3. identification marks on the evidence;
4. type of examination requested;
5. any known suspects.

C. <u>Additional Reports</u>
In addition to preparing the P-77C, the member in charge of the case must also prepare a P-10. A P-127 shall also be prepared in those circumstances specified in M.O.P. Chapter 5. A copy of the P-10 must be delivered to the Property Office.

D. <u>Automobiles Held For Fingerprinting/DNA</u>
Refer M.O.P. Chapter 2. Form P-77C shall be forwarded or faxed to the Evidence Collection Unit.

E. <u>Results of Fingerprint Examinations</u>
After the fingerprint examination has been completed, the Crime Scene Unit shall prepare Identification Bureau Latent Fingerprint Report (form P-77-B) and forward a copy to the member who submitted the evidence.

F. <u>Evidence to Property Office After Fingerprint Examination</u>
After the fingerprint examination has been completed the item shall be delivered to the Property Office. If fingerprints were found, or the item has evidentiary value other than fingerprints, the Property Office shall retain the item until disposal has been approved by the District Attorney's Office. If no fingerprints were found and the item has no independent evidentiary value, the Property Office shall arrange to return the property to its owner.

9.8 <u>PROCESSING LATENT FINGERPRINTS - CRIME SCENE UNIT RESPONSIBILITY</u>
The Commanding Officer of the Crime Scene Unit shall be responsible for developing written procedures for the proper handling, identification, labeling and storage of latent fingerprints.

## 10.0 <u>VIDEO SURVEILLANCE CAMERA ROOM</u>

10.1 <u>POLICY</u>
Video security surveillance systems are a resource used by the City of Buffalo Police Department at selected sites within the City of Buffalo. The Buffalo Police Department recognizes that video surveillance technology can greatly enhance law enforcement efforts and has a high potential to deter crime and assist in apprehension and prosecution of offenders. The Buffalo Police Department believes video surveillance will achieve several valid law enforcement goals such as: enhancing public safety, reducing the fear of crime, and identifying criminal activity and suspects. In the event of a reported or

observed incident, the review of recorded information may be used to assist in the investigation of the incident.

10.2    REGULATION/USE OF SURVEILLANCE CAMERAS, SURVEILLANCE MONITORING AND RECORDING

1. The Administration and Communications Unit will be responsible for the overall control and security of video surveillance systems and maintain a record of the camera locations.
2. The Communications Unit will be responsible for remaining up to date on laws or policies that may affect the monitoring protocol for the cameras. The department will also follow the video surveillance industry to stay abreast of technology changes and best practices in the industry.
3. Monitoring personnel will be trained and supervised in the appropriate use of the system. Monitoring personnel shall use the system for legitimate police purposes only. Personnel will receive ongoing training as needed.
4. The cameras will be clearly mounted and marked. Additionally, signs will be posted to inform persons they are entering areas that may be subject to video surveillance.
5. Monitoring is prohibited where persons have a reasonable expectation of privacy. Cameras will use masking technology to avoid shooting into private places, windows, and other areas where privacy is expected and should not be concerned with camera surveillance.
6. The cameras will be monitored from a restricted access location to be designated by the Commissioner of Police. Access to the camera images at remote locations, such as desktop computers and mobile computer terminals, will be restricted and password protected. Only the Commissioner of Police may authorize personnel that will have access to cameras from remote locations.
7. Data obtained and stored will be used exclusively for legitimate law enforcement purposes.
8. The storage of images will be in a secured area with restricted access. Only authorized personnel will have access and be able to retrieve images from the video system.
9. Images obtained through surveillance monitoring or recording will be retained by the department for a length of time deemed appropriate for the purpose of monitoring, but not to exceed 28 days, unless such images are being used for a criminal investigation. Images will self purge from the system if not needed for investigative purposes.
10. Any images retrieved and stored for investigative purposes will follow standard evidentiary procedures and retention requirements in place for the department.
11. The release of images will be governed by all applicable open records laws. Some images may be exempt from release under the open records laws if they deal with detection, investigation, or prosecution of crime.
12. Retrieval of stored images will be viewed by authorized personnel only. Copies (DVD) of stored images must be requested on form P-1378 (Camera Request), which must be filled out in its entirety and signed by the requesting officer. A log will be maintained of all copies made. The camera Administrator is responsible for dissemination and retrieval of images.

13. Employees may be subject to discipline if the system is used inappropriately and/or if information is inappropriately obtained, duplicated, or distributed in violation of policy.

# CHAPTER 6: COURTS

## CONTENTS

**1.0    COURT LIAISON UNIT**
1.1    Policy
1.2    Court Liaison Unit Responsibilities
1.3    Court Liaison Unit and Traffic Adjudication Bureau

**2.0    SUBPOENAS**
2.1    Policy
2.2    Subpoenas from the District Attorney's Office, the Corporation Counsel, or Other Criminal Justice or Correction Agency
    A.  Court Liaison Duties
    B.  Unit Duties
    C.  Serving the Subpoena
    D.  Procedure after Service of the Subpoena
    E.  Return of Unserved Subpoenas
    F.  Subpoenas from the DA or Corp. Counsel for Department Members
2.3    Subpoenas for Department Members from other than the District Attorney, the Corporation Counsel, or Other Criminal Justice of Correction Agency
    A.  All Cases
    B.  Criminal Cases
    C.  Civil Cases
    D.  Voluntary Appearances

**3.0    COURT ISSUED SUMMONSES IN CRIMINAL CASES**
3.1    Policy
3.2    Summons Defined
3.3    When Issued
3.4    Serving Summons
3.5    Fingerprinting After Arraignment
3.6    Maintaining Records of Summonses

**4.0    HANDLING ORDERS OF PROTECTION**
4.1    Policy
4.2    Orders of Protection
4.3    Ex Parte Orders of Protection

**5.0    CIVIL LAW SUITS AND CLAIMS**
5.1    Policy
5.2    Notice of Claim, Summons, Summons and Complaint, Subpoena Duces Tecum

**6.0    ARRESTING OFFICERS**
6.1    Policy
6.2    Officer in Charge of the Case
6.3    Officer in Charge of the Case to Sign All Arrest Documents

6.4     Preparing the Defendant Information - Form P-32
6.5     Arrests Related to Outside Employment


**7.0     COURT NOTIFICATIONS**
7.1     Policy
7.2     Court Notifications Generally
7.3     Court Liaison Duties
7.4     Duties of Departmental Units
7.5     Member's Responsibility


**8.0     GENERAL COURT PROCEDURES**
8.1     Policy
8.2     Preparation of Cases
8.3     Punctuality
8.4     Attire in Court
8.5     Conduct on the Witness Stand
8.6     Truthfulness Required
8.7     Plea Bargaining
8.8     On Duty Status


**9.0     ADJOURNMENTS**
9.1     Policy
9.2     Requests for Adjournments by Members
9.3     Members on Annual Vacation
9.4     Leave Requests When a Member is Scheduled for Court
9.5     Unexpected Closing of Courts and Administrative Bodies


**10.0     PAID COURT TIME**
10.1     Policy
10.2     Preparing the Request for Payment for Monetary Payment for an Authorized Off-     Duty Court Appearance (P-35)
10.3     Scanning In and Scanning Out
10.4     Appearances for Non-Duty Related Incidents
10.5     Monetary Payment for "Short Notice" Adjournments
10.6     Court Time While on Sick Leave or IOD Status
10.7     No Court Appearances When Suspended
10.8     Ineligibility for Court
10.9     Subpoenas


**11.0     RE - LAYING CHARGES**
11.1     Policy
11.2     Court Liaison Unit Responsibility
11.3     Re-Laying Criminal Charges
11.4     Requests for Additional Arrest Information

COB000488

## 1.0    COURT LIAISON UNIT

1.1    POLICY
It is the policy of the Buffalo Police Department that the Court Liaison Unit will coordinate all business between the Department and the various courts, regulatory bodies and administrative agencies.

1.2    COURT LIAISON UNIT AND TRAFFIC ADJUDICATION BUREAU
The Court Liaison Unit is located in the City Court Building, and at the Traffic Adjudication Bureau is located in the Ellicott Square Building. Both offices are open from 0830 to 1630 hrs. daily, Monday through Friday. Whenever either office is closed, any information pertaining to court appearances or adjournments shall be relayed to the 911 Communications Lieutenant.

1.3    COURT LIAISON AND TRAFFIC ADJUICATION DUTIES

A.  Act as the central distribution point for any business conducted between the Buffalo Police Department and all area courts and other regulatory and administrative agencies.

B.  Check the Payment Request for Authorized Off Duty Appearance (P-35) for completeness and accuracy.  The entering of the payroll data shall be completed by the Division of Administration and Communications.

C.  Check the Court registers periodically to ensure that Officers are entering the actual times that they sign "in" and sign "out" for Court Appearances.

D.  Receive and record all scheduling information including subpoenas, for appearances of members of the Department in courts, regulatory bodies and    administrative agencies ( i.e. court appearances, adjournments, etc.).

E.  Properly and promptly notify the various Departmental units of all such scheduling information.

F.  Receive, record and investigate all reports of Department members failing to appear in a court, regulatory body or administrative agency as scheduled and forward any discrepancies to IAD.

G.  Maintain such records, statistics and files that are necessary for the proper operation of the Court Liaison Unit.

## 2.0    SUBPOENAS

2.1    POLICY
It is the policy of the Buffalo Police Department that all subpoenas the Department receives from the District Attorney's Office, the Corporation Counsel, or other law enforcement or correction agencies, shall be channeled through the Court Liaison Unit and served in a proper and timely fashion.

2.2     SUBPOENAS FROM THE DISTRICT ATTORNEY'S OFFICE, THE CORPORATION COUNSEL, OR OTHER CRIMINAL JUSTICE OR CORRECTION AGENCIES

A.   Court Liaison Duties

1.   Receiving Subpoenas
All subpoenas received from the District Attorney's Office, the City of Buffalo Corporation Counsel, or other criminal justice or correction agencies, which are received by the Department to be served on a member of the Police Department, shall be channeled through the Court Liaison Unit.

2.   Recording
The Court Liaison Unit shall keep a record of all such subpoenas received, noting the date received, the persons named in the subpoena and the Departmental unit to which it was forwarded.

3.   Forwarding
After recording all necessary information, the subpoena shall be promptly forwarded through proper channels to the appropriate Department unit for service.

B.   Unit Duties
Commanding Officers of units receiving subpoenas shall ensure that the    following information is properly recorded in the Unit Command Warrant Book, P-1338.

1.   Date received;
2.   Name and address of the person named in the subpoena;
3.   Name of the Department member to whom the subpoena was assigned for service.

C.   Serving the Subpoena
Subpoenas shall be served personally on the witness by showing him/her the original and by delivering to, and leaving with the witness, a copy of the subpoena.

D.   Procedure After Service of the Subpoena

1.   Return to Court Liaison Unit
The member of the Department who served the subpoena shall immediately prepare the affidavit of service and return the original subpoena and affidavit to the Court Liaison Unit. The Court Liaison Unit shall record that the subpoena was served.  Original subpoenas and affidavits of service must be received at the Court Liaison Unit prior to the scheduled court date.

2.   Entries Required
The Unit Command Warrant Book, P-1338, shall be marked indicating the date on which the subpoena was served (in the date column), after which the name of the witness shall also be entered.

E.   Return of Unserved Subpoenas

1.   Action by Officer to whom the Subpoena was Assigned

If the member of the Department to whom the subpoena was assigned is unable to serve it, (s)he shall prepare a report on an Intra-Departmental Memorandum explaining the reason for his/her inability to serve the subpoena. Barring exceptional circumstances, unserved subpoenas shall be returned to the Court Liaison Unit along with the Intra-Departmental Memorandum, no later than 3 days prior to the date of appearance. The member shall then indicate in the Unit Command Warrant Book the date that the subpoena was returned.

2. <u>Court Liaison Unit Duties</u>
Upon receipt of the unserved subpoena, personnel of the Court Liaison Unit shall promptly return it to the issuing office and record the date on which they returned it.

F. <u>Subpoenas from the DA, Corp. Counsel, or Criminal Justice or Correction Agencies, for Department Members</u>
In addition to the above procedures for handling subpoenas, when a subpoena for a Department member is issued by the District Attorney's Office, the Corporation Counsel's Office, or other criminal justice or correction agency, the appropriate entries shall be made in the Unit Court Book. Grand Jury subpoenas shall be served in person on members of the Department and they shall be served by a Detective, Detective Sergeant or by an officer of the rank of Lieutenant or above.

2.3   <u>SUBPOENAS FOR DEPARTMENT MEMBERS FROM OTHER THAN THE DISTRICT ATTORNEY, THE CORPORATION COUNSEL, OR OTHER CRIMINAL JUSTICE OR CORRECTION AGENCIES</u>
When any member of the Department is served with a subpoena on behalf of a defendant in a criminal case or by any of the parties in a civil case, the member must comply with the following procedures.

A. <u>All Cases</u>
In all cases in which a member is issued a subpoena by other than the District Attorney's Office, Corporation Counsel's Office, a Criminal Justice or Corrections Agency; the member must report the facts to the Commissioner and the Corporation Counsel, who shall maintain a record of such subpoenas.

B. <u>Criminal Cases</u>
In criminal cases in which a member is served with a subpoena on behalf of a defendant, the member must also immediately notify and report the facts to the District Attorney or Corporation Counsel in charge of the case and obey his/her instructions in regard thereto. In addition, the member shall forward a copy of the subpoena to the Court Liaison Unit which shall maintain a record of such subpoena.

C. <u>Civil Cases</u>
In civil cases in which the member is issued a subpoena by other than the Corporation Counsel's Office, and the City may be involved as a party to the underlying law suit, the member must also notify and report the facts to the

Corporation Counsel in charge of the case and obey his/her instructions in regard thereto.  In addition, the member shall forward a copy of the subpoena to the Court Liaison Unit which shall maintain a record of the subpoena.

D.  Voluntary Appearances
A Department member, who has not been served with a subpoena, shall not voluntarily appear as a witness for the defense in a criminal case or as a witness in any case in which the City of Buffalo is a party.  If the member has been served with a subpoena on behalf of a defendant, (s)he must comply with paragraphs A, B, and C, above.

## 3.0   COURT ISSUED SUMMONSES IN CRIMINAL CASES

3.1   POLICY
It is the policy of the Buffalo Police Department to receive summonses issued by Buffalo City Court in criminal cases and to serve such summonses in a proper and timely fashion.

3.2   SUMMONS DEFINED
A summons is a process as determined in accordance with the NYS Criminal Procedure Law. (refer to CPL as needed)

3.3   WHEN ISSUED
A local criminal court may issue a summons in any case in which it is authorized to issue an arrest warrant pursuant to NYS CPL. (refer CPL as needed).

3.4   SERVING SUMMONS
A summons may be served by a Police Officer, or by a complainant at least eighteen (18) years of age, in accordance with the NYS CPL. (refer CPL as needed).

3.5   FINGERPRINTING AFTER ARRAIGNMENT
As a general rule, fingerprinting of defendants is accomplished by City Court Booking.

3.6   MAINTAINING RECORDS OF SUMMONSES

City Court Booking
Summonses shall be delivered each day to City Court Booking by a City Court Clerk. CCB shall be responsible for recording the summonses and forwarding them to the appropriate Departmental Unit.

City Court Booking Responsibility
Units receiving summonses for service shall make the appropriate entries in the District/Unit Warrant Book.  After the person has been located, the original summons shall be served on him/her.  The member serving the summons shall also complete the duplicate copy along with the summons/Disposition slip (P-58) and forward both in an envelope to CCB.  Barring exceptional circumstances, unserved summonses shall be returned to CCB no later than 3 days prior to the date of appearance.

**4.0    HANDLING ORDERS OF PROTECTION**

4.1    POLICY
It is the policy of the Buffalo Police Department to cooperate fully with the local and superior courts in the service and enforcement of Orders of Protection and to perform all requisite record keeping functions.

4.2    ORDERS OF PROTECTION

A.  Sex Offense Squad (SOS) Responsibility
All Orders of Protection received by the Department shall be forwarded to the Sex Offense Squad.  SOS will be responsible for:

1.  Entering the order in the NYSPIN system through Central Police Services;

4.3    EX PARTE ORDERS OF PROTECTION
Ex parte orders of protection are generally of short duration and are issued without the defendant/respondent's appearance in court.  They are used to protect the complainant/petitioner prior to the next scheduled court date.

A.  Recording Requirements
All Ex Parte Order of Protection shall be forwarded to SOS.  SOS will:

1.  Enter the Ex Parte order in NYSPIN through Central Police Services;
2.  Enter proof of service in NYSPIN through Central Police Services, after it has been served;
3.  Transmit proof of service to the court of origin.

B.  Service Requirements

1.  The Commanding Officer of SOS shall cause a member of his/her command to serve the Ex Parte Order of Protection as soon as practicable after it has been received;
2.  The member to whom the Ex Parte Order of Protection has been assigned shall exercise due diligence in locating the defendant/respondent and serving the order, or notify the Court if it cannot be served;
3.  The proof of service shall then be returned to the issuing Court;

**5.0    CIVIL LAW SUITS AND CLAIMS**

5.1    POLICY
It is the policy of the Buffalo Police Department to comply with the directives of the Corporation Counsel's Office when dealing with matters involving civil litigation.

5.2     NOTICE OF CLAIM, SUMMONS, SUMMONS AND COMPLAINT,
         SUBPOENA DUCES TECUM

    A.  When the Commissioner's Officer is served with a Notice of Claim, Summons, Summons and Complaint, or a Subpoena Duces Tecum, one copy shall be forwarded to the Corporation Counsel's Office and a second copy shall be forwarded to the Internal Affairs Division (IAD).

    B.  IAD shall maintain a log of all such documents.  If no IAD case is currently pending, IAD will review the documents to determine if there are any allegations which would also constitute a violation of Department Rules and Regulations.  If there does appear to be a disciplinary infraction, they will undertake an appropriate investigation.

    C.  IAD will examine the information for completeness and will forward a copy to the Corporation Counsel's Office or the District Attorney's Office, as the case may require.  IAD will also retain a copy of the assembled documents in any file that it may have opened.

## 6.0    ARRESTING OFFICERS

6.1     POLICY
         It is the policy of the Buffalo Police Department that when preparing arrest documents the Officer who has the most knowledge of the case shall be recorded as the arresting Officer.

6.2     OFFICER IN CHARGE OF THE CASE

    A.  In each and every arrest made by a member of the Department, whether the arrest involves multiple defendants and/or multiple charges, there shall be only one officer who is designated as the "Officer in charge of the case."

    B.  The "Officer in charge of the case" shall be that Officer who possesses the greatest knowledge of the circumstances surrounding the arrest.

    C.  In the event of an arrest in which the officer is the complainant and any of the offenses charged is a violation (i.e. an offense in which the maximum penalty does not exceed 15 days imprisonment), the "Officer in charge of the case" shall be that officer who is able to make allegations, based on personal knowledge, that establishes every element of the violation charged.

6.3     OFFICER IN CHARGE OF THE CASE TO SIGN ALL ARREST
         DOCUMENTS

    A.  The "Officer in charge of the case" shall sign all related arrest documents.  No other officer shall sign such documents. Information's, summonses (i.e. simplified information's), misdemeanor complaints, felony complaints and any other documents related to the arrest shall be signed exclusively by the "Officer in charge of the case."

B. For arrests alleging Driving While Intoxicated/Impaired, the "Officer in charge of the case" shall sign all summonses; shall witness the Breathalyzer Test or the Refusal to take the test, and sign corresponding paperwork; and (s)he shall sign all documents related to the arrest.

6.4    PREPARING THE DEFENDANT INFORMATION (P-32)

The Defendant Information (Form P-32) which is submitted to the District Attorney's Office in conjunction with each arrest shall contain the following:

A. The Officer having the greatest knowledge of the case shall always be designated as the "Officer in charge of the case."  His/her knowledge may be based on personal knowledge or on information and belief, including information obtained from fellow officers.

B. If the "Officer in charge of the case" did not personally witness the positive identification of the defendant, the officer who did witness such identification shall be listed as the second officer on the Defendant Information (P-32).  The initials "ID" shall be placed after his/her name.

C. If the "Officer in charge of the case" did not personally witness statements that were made by the defendant (i.e. CPL 710.30 information), the Officer who witnessed such statements shall be listed as the third Officer on the Defendant Information (P-32). The number "710.30" shall be placed after his/her name.

D. All other officers having relevant and material information concerning the arrest shall be included after the above mentioned three officers.

6.5    ARRESTS RELATED TO OUTSIDE EMPLOYMENT

When an off-duty Officer makes an arrest while employed outside the Department (s)he shall prepare all accusatory instruments in the following  manner:

A. Indicate that (s)he was employed outside the Department at the time of  the arrest.

B. Do not use Departmental titles, such as Police Officer, Lieutenant, Detective, etc. Use civilian status such as Mr., Mrs., Ms.

C. Do not use the Buffalo Police Department or any of its buildings as an address. Use the outside employer's address or the Officer's place of residence.

D. It shall be the duty and responsibility of all members involved in off-duty arrests and investigations, or who are witnesses to any incident not related to the Buffalo Police Department, to fully and actively cooperate with the affected agency.

E. Generally, a member making an off duty arrest while engaged in outside employment will not receive compensation for any off duty court appearances.

COB000495

## 7.0    COURT NOTIFICATIONS

7.1    POLICY

It is the policy of the Buffalo Police Department that all requests for a member's appearance in court or at a proceeding before any regulatory body or administrative agency, shall emanate from the Court Liaison Unit.

7.2    COURT NOTIFICATIONS GENERALLY

A. The District Attorney's Office has the authority to summon any officer it deems necessary to prosecute the case. The District Attorney's Office will contact the Court Liaison Office or the Officers Command.

B. Officers appearing in court in conjunction with any Department related arrest must first have their court appearance recorded at the Court Liaison Office, or in its absence, the 911 Communications Lieutenant.

C. In no instance shall an officer submit a P-35 "Payment Request for Authorized Off-Duty Appearance" for having performed any administrative function without first having obtained the permission of the Court Liaison Office.

7.3    COURT LIAISON DUTIES

A. It shall be the responsibility of the Court Liaison Unit to receive all requests from courts, regulatory bodies and administrative agencies, for the appearance of members of the Department.

B. The various Departmental units of members, who have been requested to appear, shall be notified by the Court Liaison Unit.

C. It is the responsibility of the CLU to forward the appropriate copies of the P-35 to the Division of Administration and Communications.

7.4    DUTIES OF DEPARTMENTAL UNITS

A. It shall be the responsibility of each Departmental unit to receive and record all notices sent by the Court Liaison Unit, that require the appearance of members of that command in court or at a regulatory body or administrative agency.

B. If any court, regulatory body or administrative agency makes a request directly to a member or the member's command, such requesting entity shall be requested to notify the Court Liaison Unit, or in its absence, the Communications Lieutenant. When the affected member or his /her command is unable to comply with the foregoing, the member shall honor the request to appear. However, (s)he shall contact the Court Liaison Unit at the earliest opportunity and advise them of the circumstances.

C. Upon receipt of official court notifications or adjournments, the senior on duty shift Supervisor or his/her designee shall enter the information in the unit's Court Book. The Court Book shall contain the following information:

    1. The name of the member who is requested to appear.
    2. The date the court notification was received by the unit and the initials of the member who received it.
    3. The name of the court, regulatory body or administrative agency the member is requested to appear in and the date and time of that appearance.
    4. The date that the member was notified of the requested court appearance and the name of the member who provided the notification.

D. The on duty shift Supervisor shall be responsible for checking the Court Book during each of his/her tours of duty and ensuring that members are given appropriate notification prior to the scheduled date of the court appearance.

If the Supervisor is unable to notify the affected member and (s)he is of the opinion that notification cannot be made in a timely fashion, the Supervisor shall arrange to have the Court Liaison Unit notified.

## 7.5 THE MEMBER'S RESPONSIBILITY

Upon receipt of an official and authorized notification, it is the responsibility of each member to show up at the proper time and place, and to be attired properly as determined by current directives and regulations.

A. If a member is personally requested by a court, regulatory body or administrative agency to appear before them, such requesting entity shall be asked to notify the Court Liaison Unit, or in its absence, the 911 Communications Lieutenant. If the requesting entity does not do so the member shall honor the request to appear. The member shall contact the Court Liaison Unit at the earliest opportunity so that the Court Liaison Unit can verify the request and make the proper recordings.

B. Because many members of the Department bear the same surname (e.g. Smith, Jones, etc.), it shall be the responsibility of the requested member to determine that each case for which (s)he has received notification is actually his/her case. If for any reason there is any doubt, the member shall make reasonable inquiries. If the case is for a member other than himself/herself, the member shall immediately contact the Court Liaison Unit.

C. If a member receives notices that would require him/her to appear in two different Courts, regulatory bodies or administrative agencies at the same time, and (s)he deems it necessary to re-schedule, the member shall contact Court Liaison Unit without delay. The Court Liaison Unit will re-schedule if necessary.

D. Members who, after receiving official and proper notification (i.e. at 72 hours notice to the member's unit), fail to appear at the date and time requested, may be the subject of disciplinary action. In such cases, the Court Liaison Unit shall make a thorough search of its records to determine if the affected member's command and/or the

member himself/herself was officially and properly notified. If the result is negative, the member shall be notified to relay the charges if possible. If the member's command and/or the member himself/herself were officially and properly notified, the Court Liaison Unit shall forward all pertinent information to the Internal Affairs Division for investigation.

E. At no time shall a member of the Department who is on official and authorized leave from the Department be cited for non-appearance, unless (s)he failed to notify the proper authority that (s)he is on such leave. For example: vacation, personal leave, etc. Refer to M.O.P. Chapter 6.

F. When a member of the Department is notified to appear before any court, regulatory body or administrative agency and the member knows or has reason to believe that (s)he cannot offer any testimony in the matter, (s)he shall, immediately upon receipt of the notification, contact the Court Liaison Unit; (i.e. when a member arrests a suspect on an outstanding warrant). In such cases, the Court Liaison Unit shall make inquiries of the requesting court, regulatory body or administrative agency to determine if the member is needed or is not needed.

## 8.0   GENERAL COURT PROCEDURES

8.1   POLICY
It is the policy of the Buffalo Police Department that when members appear in court, or at a hearing of a regulatory body or administrative agency, the member shall present him/herself in a timely fashion, properly attired and fully prepared to give competent testimony.

8.2   PREPARATION OF CASES

A. Prior to making his/her appearance in court or at a hearing of a regulatory body or administrative agency, the member shall review all facts and circumstances relevant to the case and be prepared to offer competent and credible testimony. The member must be prepared to present to the court, regulatory body or administrative agency, all notes, evidence and reports that have been prepared in relation to the arrest and investigation.

B. Members who have been authorized by the Court Liaison Unit to attend pre-trial conferences with personnel from the District Attorney's Office or the Corporation Counsel's Office shall be fully prepared to relate all facts and circumstances concerning the case. Information that tends to exonerate the defendant shall be revealed, as well as information that implicates the defendant.

C. Members must provide the names and addresses of all witnesses to members of the District Attorney's Office and the Corporation Counsel's Office.

8.3   PUNCTUALITY
Members of the Department who are under subpoena or who have been authorized to appear in court or at a hearing of a regulatory body or administrative agency shall:

    A. report at the specified time;

    B. remain in court until the case is disposed of, or until they are advised by a  competent authority that their appearance is no longer required.

## 8.4  ATTIRE IN COURT
Members of the Department must appear in full uniform or with a sport coat and dress slacks or suit and tie, (or the equivalent for female Police Officers) for any appearance in court. Members appearing in court while not wearing the regulation uniform shall wear their Department issued identification cards on their outermost garment.

## 8.5  CONDUCT ON THE WITNESS STAND
A member of the Department called upon to take the witness stand shall do the following:

    A. Take the witness stand immediately.

    B. Sit erect and direct his/her remarks to the jury.

    C. Furnish the court, regulatory body or administrative agency with all the evidence that is requested.

    D. Understand the question before making a reply. If in doubt, request that the question be repeated or clarified.

    E. Answer the question truthfully and completely, without volunteering additional information not required by the question.  If the member cannot answer the question, the member shall so state.

    F. Be impartial, calm, and speak in a clear and distinct voice.

## 8.6  TRUTHFULNESS REQUIRED

    A. Employees are reminded of their duty "to be truthful in speech and writing whether or not under oath." Refer to the Rules and Regulations, Chapter III, Section 3.5.

    B. Under no circumstances shall an officer be designated as the "Officer in charge of the case" or appear in court and present himself/herself as the officer possessing the greatest knowledge of the case when, in fact, (s)he does not possess such knowledge.

    C. Under no circumstances shall an officer claim to have witnessed a positive identification or appear in court characterizing himself/herself as having done so when, in fact, (s)he did not witness such positive identification.

    D. Under no circumstances shall an officer claim to possess 710.30 information or appear in court claiming to have 710.30 information when, in fact, (s)he does not possess such information.

8.7     PLEA BARGAINING
Members shall not engage in, nor recommend, approve or actively consent to, the reduction or changing of a charge against a defendant.

    A.  The member shall provide the court and the District Attorney's Office with all information (s)he has at his/her disposal, to assist them in making a proper determination, but the information must be factual and not an expression of an opinion.

    B.  The member must be careful to avoid any expression of approval or disapproval of the plea bargain.

    D.  Once the court has made its determination, the member should make no statement, nor express any opinion, regarding the decision.

8.8     ON DUTY STATUS
Members, while appearing in court or at a regulatory body or administrative agency in connection with Department business, are considered to be on duty and they shall be subject to all of the rules and regulations pertaining thereto.

**9.0     ADJOURNMENTS**

9.1     POLICY
It is the policy of the Buffalo Police Department that requests for adjournments of cases before a court, regulatory body, or administrative agency shall be requested only through the Court Liaison Unit.

9.2     REQUESTS FOR ADJOURNMENTS BY MEMBERS

    A.  Members who are absent or on leave but who are able to attend cases in court or at regulatory bodies and administrative agencies shall do so.

    B.  No member of the Department shall personally contact a court, regulatory body, or administrative agency or any of their representatives to request an adjournment, change of time, or a re-scheduling of any case.  All such requests shall be directed to the Court Liaison Unit, in writing, on an Intra-Departmental Memorandum, approved by their Commanding Officer.  Emergency requests may be made through the Court Liaison Unit via telephone.  All emergency requests shall be followed up by a report on an Intra-Departmental Memorandum to the Court Liaison Unit.  Emergency requests shall be made only for valid reasons.

    C.  If a member of the Department, for valid reason, is unable to appear before any court, regulatory body, or administrative agency on the scheduled date, (s)he may request that his/her partner or other member be allowed to appear in his/her place.  The partner or other member must be able to testify to all of the facts pertaining to the matter. In such cases, the member shall, as soon as possible, obtain permission for the substitution from the D.A.'s Office or the Corporation Counsel's Office through the Court Liaison Unit.  All such requests shall be made in writing on an Intra-

Departmental Memorandum, or by telephone followed up by an Intra- Departmental Memorandum.  All such requests must be approved by the Court Liaison Unit.

D. The Court Liaison Unit will arrange for adjournments in appropriate cases and notify the affected member of the adjourned date.

9.3   MEMBERS ON ANNUAL VACATION OR LEAVE OF ABSENCE
Members who routinely appear in court or possess knowledge that they have a pending case, shall notify the Court Liaison Unit on an Intra-Departmental Memorandum, ten (10) days before the beginning of their AV or other leave of absence from the Department.  If they want their cases adjourned, they shall so state.  Members who do not want their cases adjourned while they are on AV or other leave, shall not submit an Intra-Departmental Memorandum and it shall be their responsibility to remain available for all scheduled appearances.  If the Court Liaison Unit has no Intra-Departmental Memorandum in its file, it shall be assumed that the affected member is available for appearances.

9.4   LEAVE REQUESTS WHEN A MEMBER IS SCHEDULED FOR COURT

A. In an attempt to facilitate the granting of leave time when the leave would conflict with a member's scheduled appearance in a court or at a regulatory body or administrative agency, the member must indicate on his/her Leave Request (form P-12) that (s)he is scheduled for an appearance during  part of  the time for which (s)he is requesting the leave.

B. For purposes of this section, leave time shall include single vacation days, Veteran's days, and AWL- Blood days.  It does not include personal leave days or a full week of annual vacation.

C. In every such instance, the Superior Officer, prior to approving the leave request shall ensure that inquiry has been made to determine:

1. whether there is another member with knowledge of the case that can appear in place of the member requesting the leave and that such alternate has been verified by the Court Liaison Unit to be acceptable to the court, regulatory body or administrative agency; or, in the alternative,
2. whether the case can be adjourned to another date,
3. whether the Officer requesting leave intends/will attend the court appearance as scheduled.

D. In the event that the appearance of the alternate member is not a possible option and that the case cannot be re-scheduled, the Commanding Officer, absent exigent circumstances, must deny the leave time if the court action will be prejudiced or compromised. In extreme cases, the Commanding Officer may exercise his/her discretion in approving the requested leave time.

9.5   UNEXPECTED CLOSINGS OF COURTS AND ADMINISTRATIVE BODIES
In the event that any court or administrative body is closed because of a snow emergency,

severe weather condition, fire, some other natural disaster or for any other non scheduled court closing Court Liaison will:

1. notify each command by fax of the officers who were scheduled to appear;
2. Court Liaison, via telephone, will confirm the transmission and receipt of the fax with the on-duty supervisor of each command
3. It will be the responsibility of each command to notify the Officer of the cancellation of court and record such notification.
4. In such cases the Court Liaison Unit shall notify the Officer of the date to which the case has been adjourned.

In any event, the Officer will not be compensated for any off duty appearance when the court or administrative body in which (s)he was to appear is not in session.

## 10.0   PAID COURT TIME

10.1   POLICY
It is the policy of the Buffalo Police Department that when members are required to appear in court or before any regulatory or administrative agency at any time other than during their own regularly scheduled work period, and the purpose is to testify relative to their official duties, they shall be compensated in the manner specified in the collective bargaining agreement.

10.2   PREPARING THE REQUEST FOR MONETARY PAYMENT FOR AN AUTHORIZED OFF DUTY COURT APPEARANCE (P-35)

A. The member shall submit form P-35 only when requesting monetary payment for an authorized off duty court appearance.

B. Monetary payment shall be approved only if the following conditions are met:

1. The appearance must be authorized.
2. The appearance must be at a time other than during the member's regularly scheduled work period. Example: A member who is working the 0600hrs - 1600hrs shift shall receive payment only if (s)he is required to remain in court or at a regulatory body or administrative agency, beyond 1600hrs on a working day.  If a member is assigned to the 1600hrs - 0200hrs shift, his/her entitlement to court time pay ends at 1600hrs.
3. Form P-35 must be complete and properly certified.

C. If a member has more than one case during one day, (s)he shall check the appropriate box on form P-35 and include those cases on the form.  If additional space is needed, the member shall report the information on an Intra-Departmental Memorandum and submit it to the Court Liaison Unit with the green copy of form P-35.

D. Before a Superior Officer affixes his/her signature to form P-35, (s)he shall be responsible for ascertaining with certainty that the appearance of the member is

authorized and necessary during off - duty hours. All court slips <u>must</u> be signed by a Superior Officer (e.g. a Lieutenant cannot sign for a Lieutenant, etc.).

E.  Only the following officials shall be accepted as "Certifying Officials":

    1.  Judges of the Supreme Court, County Court, Family Court, or City Court.
    2.  Hearing Officers of regulatory bodies or administrative agencies.
    3.  The District Attorney or Corporation Counsel or their assistants.
    4.  The Duty Inspector or 911 Communications Lieutenant.

F.  If a member appears in both the morning and the afternoon on the same day, (s)he shall submit only <u>one</u> form P-35. The starting time shall be recorded as the time of the first appearance in the morning and the ending time shall be the time when (s)he is finished with the last case.

G.  Members who make an arrest while engaged in employment outside the Department shall not submit form P-35.

H.  If a member is issued a subpoena to appear as a witness in a criminal or civil matter, payment shall be awarded only if the member was on duty at the time that (s)he witnessed or investigated the matter and only if the matter before the court, regulatory body or administrative agency is a police related incident.

I.  Court time shall not be paid to an officer subpoenaed by the Union in a proceeding for the Union's interest.

J.  Compensatory time off shall not be awarded in lieu of paid court time.

10.3  <u>SCANNING IN AND SCANNING OUT</u>
Members requesting compensation for an off duty authorized appearance in a court, regulatory body or administrative agency must scan "in" before they make their appearance and they must scan "out" when they are finished.

A.  Members appearing at the NYS Traffic Violations Bureau (TVB) will scan "in" and scan "out" at that agency.  <u>THIS INCLUDES BOTH ON-DUTY AND OFF-DUTY MEMBERS MAKING A COURT APPEARANCE.</u>

B.  Members appearing in any other court, regulatory body or administrative agency, must scan "in" and scan "out" at the Court Liaison Unit in the City Court building.  <u>THIS INCLUDES BOTH ON-DUTY AND OFF-DUTY MEMBERS MAKING A COURT APPEARANCE.</u>

C.  Members appearing at parole hearings at a correctional facility or any other location outside the confines of downtown Buffalo need not scan "in" or scan "out" at the Court Liaison Unit.  Any member who makes such an appearance must complete and attach form P-35A to the court slip to be submitted for payment. Such slips for "outside" appearances must be signed by the person(s)

making the appearance request AND by Corporation Counsel under item #15 on the P-35 (court slip).

D.    Sworn members who necessarily remain in court after 1800hrs or appear at a time other than the normal Monday through Friday day time schedule must complete and attach form P-35A to the P-35 (court slip) and forward accordingly.

All members who make a request for payment for a court appearance <u>MUST </u>submit a completed form P-35 "Payment Request for Authorized Off-Duty Appearance" AND "scan in" and "scan out" (unless circumstances exist to require form P-35A).

Payment will not be made unless all procedures are complied with.

## 10.4    APPEARANCES FOR NON-DUTY RELATED INCIDENTS

A.    Off-duty members appearing in courts, regulatory bodies or administrative agencies located within the geographical limits of the City of Buffalo, or who appear at the request of an "outside agency" shall be awarded monetary court time payment only if the matter is related to a Buffalo arrest or investigation.

B.    Members appearing in courts, regulatory bodies or administrative agencies within the geographical limits of the City of Buffalo in a matter involving an off-duty arrest shall not be awarded compensation by the Department, except at the discretion of the Commissioner of Police.

C.    Generally, a member making an off duty arrest while engaged in outside employment will not receive compensation for any off duty court appearances.

## 10.5    MONETARY PAYMENT FOR "SHORT NOTICE" ADJOURNMENTS

Whenever a matter is adjourned, canceled or re-scheduled on "short notice" (less than twelve hours notice), the affected member shall be paid the minimum compensation as prescribed by the collective bargaining agreement. In such cases, the member may deliver in person or forward form P-35, to the Court Liaison Unit where it shall be certified by the Officer in charge and processed in the same manner as though the member had actually appeared in court.

## 10.6    COURT TIME WHILE ON SICK LEAVE OR IOD STATUS

Members who, while on sick leave or IOD leave status, are required by the City, the District Attorney's Office, any court or administrative agency to appear for any reason which relates to an incident, action or event involving the member acting within the performance of his/her duties as a member of the Buffalo Police Department (not while employed by another employer), must appear (if medically able). Such member shall be entitled to court time compensation.  If the member is medically unable to appear, reasonable advance notice of such fact must be given to the authority requiring his/her presence

COB000504

10.7    NO COURT APPEARANCES WHILE SUSPENDED
No sworn Officer shall appear in court for any reason while suspended without prior permission from the Commissioner.  This order applies whether the Officer is suspended with pay or without pay.

10.8    INELIGIBILITY FOR COURT

A. **Suspensions**:  Officers on suspension are <u>NOT</u> eligible for court pay (G.O. 2006-10).

B. **Unpaid Leave of Absence**:  Officers on an unpaid leave of absence are not on the payroll and are <u>NOT</u> eligible for court pay.

C. **Jury Duty**:  Officers on Jury Duty are <u>NOT</u> entitled to court appearance pay regardless of the time frame of their regular tour of duty.  Jury Duty takes place during day time hours and is paid accordingly for 10 hours each day under "Jury Duty" status.

D. **Military Time**:  Officers who use "Military Time" are not entitled to court appearance pay <u>IF</u> that appearance falls on a regular scheduled working day during which they are already being paid for 10 hours under "Military Time" status.

E. **Bereavement**:  Officers being paid under "Bereavement" status are <u>NOT</u> entitled to be paid for appearances in court as bereavement leave runs for a 24 hour time frame and the Officer is already being paid 10 hours under "bereavement leave" status.

\*\*Military time, jury duty, bereavement and suspension time run on a 24 hour cycle.

\*\*Officers cannot take overtime if they have a court appearance scheduled during the same time frame.

10.9    **SUBPOENAS**
Any Officer who receives payment (check/cash) with any subpoena <u>IS NOT</u> entitled to keep such payment as long as the Officer is on the payroll.  The Officer must forward that payment (check/cash) with a copy of the subpoena to the Legal Office, Room 231 in Headquarters who will then forward to Senior Budget Examiner, Room 120, Administration and Finance.

**11.0    RELAYING CHARGES**

11.1    POLICY
It is the policy of the Buffalo Police Department that the Court Liaison Unit will coordinate the relaying of criminal charges and the providing of additional arrest information, when required.

11.2    COURT LIAISON UNIT RESPONSIBILITY
The Court Liaison Unit shall receive and record all requests for providing additional arrest information and will notify the affected command of such request.  The Court Liaison Unit will also direct the relaying of criminal charges in appropriate cases.

11.3   <u>RE - LAYING CRIMINAL CHARGES</u>

A.  Charges shall be re-laid at the CCB Unit by preparing an Information/Complaint while the member is on duty. The completed Information/Complaint shall be forwarded to the Court Liaison Unit.

B.  Charges shall be re-laid as soon as possible in order to afford the defendant his/her right to a speedy trial, and in every instance, before the expiration of the statutory time limit.

11.4   <u>REQUESTS FOR ADDITIONAL ARREST INFORMATION</u>

When a member receives a request for arrest data from the Court Liaison Unit, (s)he shall strictly comply with the instructions on the request form. The arrest data must be returned to the Court Liaison Unit in a timely manner.

# CHAPTER 7: TRAFFIC

## CONTENTS

**1.0    TRAFFIC DIRECTION AND CONTROL**
1.1    Policy
1.2    Responsibility
1.3    Directing Traffic - Position
1.4    Directing Traffic - Hand Signals
1.5    Traffic Control Devices
1.6    Closing Streets
1.7    Restricting Parking

**2.0    HEAVY SNOW CONDITIONS**
2.1    Policy
2.2    Snow Emergencies
2.3    Closing the Skyway Complex
2.4    Monitoring Main Thoroughfares
2.5    Enforcing Illegal Parking Regulations
2.6    Towing Vehicles

**3.0    CLOSING THE SKYWAY COMPLEX**
3.1    Policy
3.2    911 Lieutenant's Responsibilities
3.3    Radio Dispatcher's Responsibility
3.4    District Commander's Responsibilities
3.5    Implementation of the Skyway Complex Emergency Closing Plans
3.6    Other Available Resources
3.7    Emergency Closing Notification List

**4.0    TRAFFIC ENFORCEMENT**
4.1    Policy
4.2    Traffic Bureau Responsibilities
4.3    Uniforms Required For Traffic Enforcement
4.4    Enforcement Options
4.5    To Whom Summonses May be Issued
4.6    Summonses - Specific Classes of Persons
4.7    Dealing with Motorists
4.8    Speed Enforcement
4.9    Radar
4.10   Speedometer Calibration
4.11   DWI Enforcement
4.12   Parking Enforcement

**5.0    TRAFFIC SUMMONSES**
5.1    Policy
5.2    Definitions
5.3    The TSLED/TVB Summons

5.4     Obtaining Traffic Summons Books
5.5     Units to Maintain A Record Of Traffic Ticket Books
5.6     Distributing Traffic Ticket Books to Individual Members
5.7     Care of Traffic Ticket Books by Individual Members
5.8     Preparing the Traffic Ticket
5.9     Personal Service Required
5.10    Personal Service Required
5.11    Summonses - Where Returnable
5.12    Disposition of Copies of Traffic Tickets
5.13    Daily Report of Summonses Issued (P-54)
5.14    Daily Traffic Summons and Arrest Report (P-1231)
5.15    Member's Appearance in Court
5.16    Lost, Mutilated, Void Tickets or Ticket Books
5.17    Responsibility of Traffic Records Office

**6.0     PARKING VIOLATIONS BUREAU SUMMONS (PARKING TAGS)**
6.1     Policy
6.2     Traffic Records Office Responsibility
6.3     Distribution of PVB Summons Books
6.4     Commanding Officer's Responsibility
6.5     Care of PVB Summons Book By Individual Members
6.6     PVB Summons - When Issued
6.7     Exempt Vehicles
6.8     Preparing the PVB Summons
6.9     Tagging Private Parking Areas
6.10    Forwarding Completed PVB Summons to the Traffic Records Office
6.11    Lost, Mutilated, Voided PVB Summonses
6.12    Scofflaws

**7.0     CIVILIAN SCHOOL CROSSING GUARDS (CSCG)**
7.1     Policy
7.2     Command
7.3     Authority of Civilian School Crossing Guards
7.4     Arrests by Civilian School Crossing Guards
7.5     Roster of Guards
7.6     Working Periods of Civilian School Crossing Guards
7.7     Civilian School Crossing Guards Absences
7.8     Civilian School Crossing Guard Injured on Duty
7.9     Replacing Absent Civilian School Crossing Guards
7.10    Precinct/District Supervisors to Check Guards
7.11    Accidents at Crossings Protected by Guards
7.12    Reassignment of Civilian School Crossing Guards
7.13    Cooperation with Civilian School Crossing Guards

**1.0**   **TRAFFIC DIRECTION AND CONTROL**

1.1   POLICY
It is the policy of the Buffalo Police Department to maintain a safe and even flow of vehicular traffic throughout the City so that accidents can be prevented and congestion avoided.

1.2   RESPONSIBILITY

  A.  The Police Department is responsible for supervising and controlling traffic in all public streets and public places in the City of Buffalo.

  B.  It is the responsibility of all uniformed personnel to actively participate in the supervision and control of traffic.

  C.  It is the responsibility of all members of the Department to impartially enforce the laws and ordinances relating to traffic.

1.3   DIRECTING TRAFFIC - POSITION
Only sworn members in police uniform shall direct traffic.

  A.  The position taken by a member directing traffic is a very important factor in properly controlling an intersection.  There is no single rule that applies to all circumstances.  The intersection design, the traffic pattern, the degree of regulation desired, and a host of other variables will influence the decision. In selecting a position, the member shall consider the following factors:

    1.  the personal safety of the member;
    2.  the ability of the member to see all the traffic;
    3.  the ability of motorists to see the member;
    4.  the non-obstruction of traffic;
    5.  the ability to effect control from that position.

  B.  The member directing traffic must be in control of the situation at all times.  (S)he must be ever aware of both vehicles and pedestrians.  It is essential that the member clearly communicate his/her directions.  Since traffic cannot be regulated vocally, the member must use hand signals.  To avoid confusion all members should use the same hand signals and gestures.  It is important that the member be in a position so that drivers can see the hand signals from a long distance.

1.4   DIRECTING TRAFFIC - HAND SIGNALS

  A.  Stance
While directing traffic, members should stand straight with weight evenly distributed on both feet. They must exhibit confidence.  When not signaling,

they should allow their hands to hang easily at the side. Member should not face vehicles that have been authorized to move but should stand with one side toward them. Above all, they should refrain from using excited, aimless, or incomprehensible gestures, or waving of the hands from the hipline.

B.  Stopping Traffic
Two (2) motions are used. First, the member should point with his/her arm and forefinger at the driver that (s)he wants to stop. Hold the point until it is seen by the driver. Then hold the palm up indicating to the driver that (s)he must stop. Because the member cannot look both ways at the same time, (s)he should stop traffic in one direction first before attempting to stop traffic in the opposite direction. After traffic is stopped in one direction, the member should continue to hold the palm up in the stop position and then turn his/her head to the other direction and repeat the process.

C.  Starting Traffic
To start traffic, the member should position himself/herself with his/her side toward the traffic to be started. The member should point his/her arm and forefinger toward the car that is to be started. That position should be held until the driver's attention is gained. Then with the palm facing up, the hand should be swung in an upwards motion, bending at the elbow and continuing in a circular motion making a full rotation. Once traffic is started in one direction, the same procedures should be used to start traffic in the opposite direction.

D.  Right Turns
When right turns are necessary, the arm the member signals with will be determined by the direction from which the vehicle is coming.  If it approaches from the right, the member should use the right arm, and if it approaches from the left, the left arm is used.  The arm should be bent at the elbow.  Vehicles approaching from the right will be directed by the right forefinger.  Vehicle approaching from the left will be directed by using the left thumb.

E.  Left Turns
In assisting a vehicle to make a left turn, the member must first halt the traffic in the lane through which the vehicle must pass.  If the vehicle making a left turn is approaching from the left, the right arm should be used to stop oncoming traffic.  The signal to stop should be maintained with the right arm while the left arm is used to indicate when the driver can make the left turn. If the vehicle is approaching from the right, the member should turn around so that (s)he is facing the direction in which the vehicle will turn and proceed as above.

F.  Traffic Directed by Two Officers
When two (2) members are assigned to a particular intersection, only one of

the members will originate all signals and gestures. The companion member only assists by helping to carry out the first members directions. The member doing the signaling should be in the most conspicuous and advantageous position.

G. Errant Drivers

If a driver has apparently ignored a member's hand signals, the member should not attempt to correct the driver by having him/her back the vehicle to the spot the member originally desired. This is dangerous and only serves to create additional traffic congestion. If a warning, traffic summons or arrest is necessary, the member shall direct the motorist to the nearest space at the curb or to a position where the vehicle will not interfere with traffic flow.

H. Caution Required

Members directing traffic shall take all necessary precautions for their safety. While directing traffic they should never step backwards without first being certain that it is safe to do so. They should not remain in the path of an approaching vehicle, relying on the assumption that the driver will see him/her. Reflectorized belt, coat or vest shall be worn.

1.5    TRAFFIC CONTROL DEVICES

A. Malfunctioning Traffic Signals

Whenever a member of the Department becomes aware that a traffic signal is out of order or is malfunctioning, the member shall immediately notify the Radio Dispatcher.

1. Dispatcher

The Radio Dispatcher shall promptly dispatch a crew from the Signal Division to make repairs. The Radio Dispatcher shall also dispatch a District sector car to the scene to determine if manual traffic control is necessary until the traffic control device is repaired. Portable four way stop signs should be used in lieu of manual traffic control    whenever possible. If manual traffic control is necessary, the Traffic Division shall be used for this purpose. If no member of the Traffic Division is available, the original District sector car shall remain on the scene.

2. Storms or Power Failures

If due to a storm or power failure, a number of traffic lights are not functioning properly or are out of order, portable four way stop signs shall be used wherever possible. Available members of the Department shall be assigned to intersections where the traffic is heaviest when portable four way stop signs are unavailable or impractical. Members of the Traffic Division shall be assigned first. If there is an insufficient number of members of the Traffic Division available, the Supervisor in the effected District shall detail available members of his/her own

command.

B.  Manually Controlling Traffic Signals
    Members of the Department assigned to the Traffic Bureau may manually control traffic signals for short periods of time when there is an excessively high volume of traffic that will result in extreme traffic congestion if not properly regulated (e.g. rush hour traffic at high volume intersections, special events, sporting events, etc.).

C.  Missing or Damaged Stop Signs

    1.  Notification
        When any member of the department is made aware that a Stop Sign is missing, knocked down, or for any reason, inoperable, (s)he shall immediately:

        a.  if between the hours or 0600 and 2200, request the Radio Dispatcher to contact Signal Truck 249;
        b.  at any other time, notify the Radio Dispatcher to have the sign replaced with a temporary Stop Sign.

    2.  Record
        The member of the Communication Center making such notification shall make a notation which shall contain the following information:

        a.  time of notification;
        b.  person notified;
        c.  location of damaged or missing Stop Sign;
        d.  the employee's name.

D.  Emergency Barricades
    1.  Whenever the need arises for emergency barricades, the requesting member shall contact the Radio Dispatcher or the 911 Supervisor.
    2.  The Dispatcher shall relay the information to the Signal Truck.
    3.  If the Signal Truck is unable to respond or has an insufficient number of barricades available, the Dispatcher, after gaining the approval of the 911 Lieutenant, shall contact the Flasher Handling Company and request the barricades. The Dispatcher shall apprise the Signal Truck of the location and number of barricades that were delivered.
    4.  Whenever it appears that the barricades are no longer needed and they have not yet been removed, the concerned command shall contact the Signal Division.

1.6    CLOSING STREETS

A.    Temporary Closing of Streets

1.    When the Mayor of the City of Buffalo authorizes the temporary closing of a street under the power granted him/her by the City Charter, the Commanding Officer of the Traffic Division shall notify the Commanding Officer of the District affected.

2.    The Commanding Officer of the District affected shall instruct their Patrol    Lieutenants to inspect the area for which the permit was granted and to ensure that the requirements are fulfilled.

B.    Emergency Closing of Streets

1.    Whenever streets are closed at the direction of the Mayor because of an emergency, or for public safety, or for any other impending necessity, the Commanding Officer of the District shall:

a.    promptly notify the 911 Lieutenant;
b.    detail sufficient members of his/her command to handle the situation;
c.    arrange for the delivery of proper equipment (e.g. barricades, etc.)
d.    assume command of the situation until relieved by higher authority.

2.    A Police Officer may temporarily close a street during a fire, automobile accident or special emergency. The street may be closed for only so long as is required for public safety and it may be closed to all or selected vehicle traffic and to pedestrian traffic. The Officer closing the street shall notify the Radio Dispatcher and request whatever assistance is necessary to aid him/her in closing the street.

1.7    RESTRICTING PARKING

A.    Authority

1.    The Commissioner of Police may make temporary regulations and orders to meet special conditions (e.g.. snow removal, leaf pickup, paving and street cleaning, parades, special events, etc.) regarding the parking and standing of motor vehicles on public streets or public places, within the City.

B.    Posting

1.    Whenever the Commissioner of Police exercises his/her authority to restrict parking, signs describing the type of restriction must be posted conspicuously, not later than twenty-four (24) hours preceding the beginning of the period of restriction.  Signs shall be made available at the Traffic Bureau.

2. The Commissioner may delegate to any other Department of the City of Buffalo, the authority to post streets in which parking or standing is to be restricted. The designated Department must notify the Commissioner of Police, or his/her designee, of the streets to be posted, the date of posting, the date and time when posting will be completed, and the date and time during which parking or standing will be regulated.

## 2.0   HEAVY SNOW CONDITIONS

2.1   POLICY
It is the policy of the Buffalo Police Department to use its authority to control traffic and to regulate parking during heavy snow conditions to effectuate the safe and expeditious movement of vehicles and pedestrians.

2.2   SNOW EMERGENCIES
Refer M.O.P. Chapter 11.

2.3   CLOSING THE SKYWAY COMPLEX
Refer M.O.P. Chapter 7.

2.4   MONITORING MAIN THOROUGHFARES
During heavy snow conditions:

A. uniformed members of the Traffic Division and Districts shall continuously monitor the condition of main thoroughfares and major intersections;

B. locations which are especially hazardous due to ice and snow shall be reported to the Dispatcher, who shall notify the Streets Department;

C. during heavy traffic conditions, members shall direct traffic at major intersections where their Lieutenant has determined it to be necessary.

2.5   ENFORCING ILLEGAL PARKING REGULATIONS
When directed to do so by their superiors, uniformed members of the Department shall strictly enforce illegal parking regulations during heavy snow conditions, paying particular attention to the following:

A. illegally parked vehicles on major thoroughfares and bus routes;

B. no standing on bus routes between 0130 and 0700hrs from November 15th through April 1st;

C. abandoned vehicles;

D. alternate side parking.

2.6     TOWING VEHICLES

    A. During heavy snow conditions, vehicles that are parked illegally and are impeding traffic or are hindering snow removal efforts shall be towed. Refer M.O.P. Chapter 2.

    B. When vehicles are towed due to heavy snow conditions, each District shall maintain a list of all vehicles towed and the location to which they were taken.

## 3.0     CLOSING THE SKYWAY COMPLEX

3.1     POLICY

It is the policy of the Buffalo Police Department to close the Skyway Complex whenever weather conditions deteriorate to the point that the health and safety of motorists may be placed in jeopardy.

    A. The 911 Lieutenant will cause a message to be sent via the E-Mail System announcing the closing and/or opening of the Skyway.

3.2     911 LIEUTENANT'S RESPONSIBILITIES

    A. The 911 Lieutenant after consultation with the most senior Headquarters command officer available shall be responsible for the closing and/or the opening of the Skyway, Father Baker Roadway, and the Fuhrmann Boulevard Complex.

        1. The Lieutenant of "A" District will monitor the Skyway Complex and advise the 911 Lieutenant via radio as to the prevailing weather and road conditions.

    B. The 911 Lieutenant shall, if necessary:

        1. Contact the Duty Deputy of the Buffalo Fire Department at the alarm office for activation of the Fire Department tow truck for Skyway use (856-5111).
        2. Contact the Erie County Sheriff's Department for the use of helicopters and/or snowmobiles (662-5554).

    C. The 911 Lieutenant will notify by telephone:

        1. The Buffalo Streets Department 851-5942 and NITTEC
        All other notifications that were previously made via telephone by the 911 Lieutenant (i.e. police departments, emergency service agencies, television and radio stations, etc.) will now be made automatically by a fax message system.

a. The fax message system is linked to the New York State Department of Transportation computer which is located in their Buffalo Office. When the Duty Inspector orders the closing or opening of the Skyway Complex, the computer system will activate the fax message system as well as activate the flashing light indicators on the Skyway Closing Signs.

D. The 911 Lieutenant will cause a message to be sent to surrounding police agencies via the NYSPIN terminal which is located in the E-Mail Office.

## 3.3    RADIO DISPATCHER'S RESPONSIBILITY
The Radio Dispatchers shall notify The Buffalo Police Department mobile radio units, that the closing plan is being implemented.

## 3.4    DISTRICT COMMANDER'S RESPONSIBILITIES
When the weather is threatening and there exists a definite possibility that the Skyway may need to be closed, the District Commanders whose Districts would be affected shall place on standby alert all members of their command who would be assigned to implement the closing plan.  In preparation, such members shall be properly equipped for the weather conditions.  Marked vehicles shall be fueled and the emergency lights, heater, etc., operational.

## 3.5    IMPLEMENTATION OF THE SKYWAY COMPLEX EMERGENCY CLOSING PLAN

A. The 911 Lieutenant, after consultation with the senior most Headquarters command Officer available, will be responsible for the activation and deactivation of the "Skyway Complex Closing Signs".  This system will, in turn, automatically activate the fax message notifications.

B. The "A-District" Lieutenant will ensure that all posts are covered within the snow emergency plan.  (S)he will monitor the complex during the shutdown period and will notify the 911 Lieutenant of any change in the prevailing weather or road conditions.

### *SNOW EMERGENCY PLAN*:

1. Tifft Street and Hopkins – one (1) Patrol car to stop any west bound traffic on Tifft Street

2. Tifft Street and Ohio Street – one (1) Patrol car at the traffic circle. This will stop any vehicles from entering the Skyway ramp from Ohio Street.  Stop traffic from going under the Skyway and accessing Fuhrmann Blvd, and also stop any vehicles that may have exited Route

5 after the Father Baker Bridge and attempting to get back onto the Skyway.

    3.  Ohio Street and Ganson – one (1) Patrol car to stop traffic southbound traffic on Ohio Street from entering the Skyway Complex.  This location also allows for the safety of the Officer as well as the Citizens who would have to turn around and exit the area.

    4.  Ohio Street at Sand Piles – one (1) Patrol car to stop any traffic inside the complex from accessing the elevated section of the Skyway.

    5.  On Route 5 just past the Father Baker Bridge – one (1) Patrol car (normally covered by LAPD but many times, they do not have the manpower) this will force any of the north bound traffic coming from the South towns to exit at Tifft Street and then exit the area.

C.  The "B-District" shall cover the following locations:

    1.  Delaware Avenue at the entrance of the Skyway

    2.  The 190 to the Route 5 merge onto the Skyway

3.6    <u>OTHER AVAILABLE RESOURCES</u>

A.  <u>U.S. Weather Bureau Information</u>      565-0013 *

                                        1-800-462-7751 *

B.  <u>Medical Resources</u>

    Red  Cross             886-7500

    Ambulance Dispatch and Erie County E.M.S.    898-3696

C.  <u>Food, Clothing, Shelter</u>

    Red Cross        886-7500

    Salvation Army      884-4798

    Traveler's Aid Society    854-8661

    Crisis Services      834-3131

D.  <u>Road Conditions</u>

    American Automobile Assoc. (AAA)    634-7900

| | |
|---|---|
| Erie County Sheriff's Department | 662-5554 |

E. Utility Emergencies

| | |
|---|---|
| National Fuel Gas | 822-1103 |
| National Grid (Electric) | 1-800-867-5222 |
| Verizon (Customer Service - Telephone) | 1-877-771-0771 |
| Time Warner (Cable/Internet/Phone) | 558-8921 |

**\* These telephone numbers are for <u>OFFICIAL USE ONLY</u>, and are <u>not</u> to be made public.**

3.7    EMERGENCY CLOSING NOTIFICATION LIST

A. In the event of an emergency closing of the Skyway Complex, the following police agencies, emergency service agencies, and television and radio stations will be notified via a fax message system.

B. When the 911 Lieutenant or his/her designee places a phone call to NITTEC and enters the proper code, the fax message system will automatically be activated and notification of the closing/opening of the Skyway Complex will be sent in the order as indicated below.

C. If for any reason the fax message system fails, it will be the responsibility of the 911 Lieutenant, to make the notifications by telephone.

D. Emergency Services

| AGENCY | PHONE NUMBER | FAX NUMBER |
|---|---|---|
| Buffalo Police Headquarters | 851-4444 | 851-4108 |
| A District Station | 851-4415 | 851-4848 |
| B District Station | 851-4403 | 851-4391 |
| State of NY DOT | 649-2157 | 649-2351 |
| Buffalo Fire Alarm Office | 856-5111 | 851-4155 |
| NYS Police and | 836-0240 <br> (0800-1600hrs) | 836-1809 |
| NYS Thruway Authority | 896-2525 | 436-2899 |

| | | |
|---|---|---|
| Lackawanna Police Department | 822-4900 | 827-6676 |
| Hamburg Town PD | 649-3800 | 648-4821 |
| Erie County Sheriff's Dept. | 662-5554 | 662-8477 |
| Ambulance Dispatch (A.D.I.) and Erie County E.M.S. | 898-3696 | 898-4958 |
| NFTA | 855-7326 | 855-6387 |

E.  Television and Radio Stations

| **TV/Radio Station** | **PHONE NUMBER** | **FAX NUMBER** |
|---|---|---|
| NFTA Traffic Central | 855-7318 | 855-6671 |
| WGRZ Television  (Channel 2) | 849-2200 | 849-7602 |
| WIVB Television   (Channel 4) | 876-7333 | 874-8173 |
| WKBW Television (Channel 7) | 840-7777 | 856-8784 |
| WBEN Radio | 843-0621 | 876-1344 |
| WGR | 843-0220 | 885-8255 |
| WNED | 845-7040 | 845-7043 |

## 4.0   TRAFFIC ENFORCEMENT

4.1   POLICY

It is the policy of the Buffalo Police Department to use its law enforcement authority to the extent necessary to provide safe, expeditious and convenient movement of traffic in the City of Buffalo.

4.2   TRAFFIC BUREAU RESPONSIBILITIES

The Traffic Bureau shall be responsible for:

A.  Analyzing traffic accidents in terms of:
1.  time
2.  place
3.  severity
4.  cause

B.  Analyzing traffic enforcement activities in terms of:
1.  type of violations
2.  severity of violations
3.  frequency of violations
4.  time and location of violations

C.  Implementing selective enforcement techniques based on:
1.  time and location of accidents
2.  time and location of violations
3.  traffic volume
4.  traffic conditions
5.  the needs of the community

D.  Deploying traffic personnel to accomplish specific enforcement objectives;

E.  Evaluating the effectiveness of the enforcement techniques implemented.

4.3    UNIFORMS REQUIRED FOR TRAFFIC ENFORCEMENT
Only sworn members in uniform and operating a marked patrol vehicle shall actively engage in traffic enforcement. Reflectorized vests shall be worn.

4.4    ENFORCEMENT OPTIONS
Generally, a member has three options when enforcing traffic laws and ordinances.

A.  Warnings
The member may issue a warning.  Warnings may be used when the violation was:

1.  inadvertent, and
2.  not serious or not likely to result in an accident; and,
3.  not frequent at that location; and,
4.  did not involve multiple violations.

B.  Traffic Summonses
The member may issue a traffic summons to the motorist.  Traffic summonses shall be issued in those circumstances in which there has been a violation of the traffic laws or ordinances and the motorist has not been issued a warning or has not been placed under arrest.

C.  Arrests
The member may make a physical arrest of the motorist. Physical arrests may be made whenever the traffic offense is:

1.  A misdemeanor or felony defined in the Vehicle and Traffic Law involving the use of alcohol and/or drugs;
2.  Felony Aggravated Unlicensed Operation First Degree defined in Section 511-3 VTL;
3.  One involving extenuating circumstances such as repeated suspensions by an Out-of-state driver or involving an accident or repeated violations of City Ordinance Section 437 (Hackers). The propriety of

making an arrest involving extenuating circumstances shall be determined by the City Court Booking Lieutenant.

4. A traffic infraction, coupled with a non-traffic offense for which the person may be arrested.

4.5    TO WHOM SUMMONSES MAY BE ISSUED

Traffic summonses may be issued to any person who is at least 16 years of age (Refer to M.O.P. Chapter 7).  They shall be issued for any violation of the Vehicle and Traffic Law, or City Ordinances relating to traffic, except those relating to parking, standing, or stopping for which a parking tag must be issued.  For violations involving driving during a snow ban, an Adjudication Summons shall be issued in lieu of a Traffic Summons. Refer M.O.P. Chapter 3.

4.6    SUMMONSES - SPECIFIC CLASSES OF PERSONS

A. Nonresidents

Non resident motorists shall be treated the same as residents except that members of the Department should use their discretion when enforcing traffic laws or ordinances that are peculiar to this state and not the nonresident's state.  Nonresidents who live in a state that is a member of the 1977 Nonresident Violator Compact shall not be detained nor required to furnish bail for any moving violation that is covered by the Compact.  If such motorist fails to appear as required, his/her license will be suspended by his/her home state until (s)he submits to the jurisdiction of the court or administrative tribunal in which the summons is returnable.

B. Juveniles

Juveniles less than sixteen (16) years of age cannot be issued a traffic summons.  Juveniles who have committed a traffic infraction shall be taken to the stationhouse of the District in which the infraction occurred and their parents, guardians, or other persons legally responsible for their care, shall be required to retrieve them.  Juveniles who have committed misdemeanors or felonies may be petitioned to Family Court.  (Refer M.O.P. Chapter 3).  In all cases Juvenile Referral Cards (P-1294) shall be completed.

C. Diplomats

Refer to M.O.P. Chapter 3.

D. U.S. Government and Military Vehicles

1. Whenever the operator of a vehicle owned by the U.S. Government is observed

2. committing a traffic offense, (s)he shall not be issued a traffic summons. Instead, the member shall obtain all the facts of the incident, and report them in writing to his/her Commanding Officer.

3. The Commanding Officer shall forward the report, through channels, to the branch of the U.S. Government to which the vehicle is assigned.

4.7    <u>DEALING WITH MOTORISTS</u>

1. Members of the Department who have stopped a motorists for having committed a traffic infraction must first establish control of the situation in a way that assures the safety of the member, the motorist and other people using the roadway.

2. The member must be ever mindful that (s)he must be courteous and polite and that the purpose of the enforcement action is to favorably alter the violator's driving habits.

3. If a traffic summons is issued to the motorist, the member must clearly explain to the motorist the following:

    a. the date, time and location the motorist is required to appear;
    b. how the motorist can answer the summons including whether or not the
    c. motorist can plead guilty by mail;
    d. any other information that may assist the motorist in dealing with the summons.

4.8    <u>SPEED ENFORCEMENT</u>
Excessive speed is often a contributing factor in motor vehicle accidents. Members of the Department shall diligently enforce laws and ordinances regulating speeding.

4.9    <u>RADAR</u>

A. <u>Training and Certification</u>
Before a member is authorized to use radar or other speed measuring devices, (s)he must have received proper training and be certified to operate that device and must keep his/her certification current. The member must comply with all required procedures for operating that device.

B. <u>When Radar is to be Used</u>
Radar and other speed measuring devices will be used in the following circumstances:

    1. In locations where there is a high incidence of accidents in which excessive speed is a contributing factor;
    2. In locations where speeding frequently occurs;
    3. In locations where citizen complaints indicate a high frequency of speeding violations.

C. <u>Selecting a Site</u>
In selecting a site the member of the Department using radar or other speed

enforcement device must give first priority to the safety of himself/herself, other members of the Department, other motorists, and the violator that is to be stopped. The member must check the location to be certain that it is properly posted.

4.10    SPEEDOMETER CALIBRATION

If a member is to appear at a hearing for a traffic summons (s)he issued for speeding, and the speeding charge was based on reading the speedometer when following the violator, the member must have proof of the accuracy of the speedometer. Such proof shall be secured prior to the scheduled hearing date and can be obtained from the Police Garage after garage personnel calibrate the speedometer.

4.11    DWI ENFORCEMENT

A.  All uniform members of the Department have a special responsibility to rigorously enforce laws prohibiting driving while intoxicated/impaired. Commanding Officers of Districts shall direct members of their command to carefully inspect locations in their Districts, at the time and place where there has been a past history of alcohol related accidents or alcohol related violations.

B.  The Commanding Officer of the Traffic Bureau shall be responsible for assigning members of his/her command to specifically enforce laws that prohibit driving while intoxicated/impaired. The members assigned to such enforcement shall be responsible for:

1.  enforcing alcohol/drug related traffic laws in those locations, and at those times, that have had a significant incidence of alcohol/drug related accidents or alcohol/drug related traffic offenses;
2.  to ascertain the characteristic violation profile of the offender by surveying those roadways on which there has been an unusual incidence of alcohol/drug related accidents;
3.  analyzing alcohol/drug related accident information.

4.12    PARKING ENFORCEMENT

All uniform members of the Department are responsible for enforcing laws and ordinances regulating parking and standing. Primary attention shall be devoted to enforcing those laws and ordinances that impact on the flow of traffic (e.g. double parking, no standing any time, fire lanes, etc.), those that are designed to facilitate snow removal or street cleaning (e.g. alternate parking, bus routes during the winter, etc.), and those parking violations that are the subject of citizen complaints.

**5.0**    **TRAFFIC SUMMONSES**

5.1    POLICY

It is the policy of the Buffalo Police Department that traffic summonses will be the primary accusatory instrument used to charge a person with a traffic offense whether a paper ticket or automated ticket.

5.2    DEFINITIONS

For purposes of this Chapter, terms shall be defined as follows:

A. Traffic Infraction: A violation of any provision of the Vehicle and Traffic Law, or any other law, ordinance, regulation, order, or rule regulating traffic, and which is not declared by law to be a felony or misdemeanor.

B. T.V.B.: New York State Traffic Violations Bureau.

C. Traffic Summons: Shall mean the six part TSLED/TVB Summons.

5.3    THE TSLED/TVB SUMMONS

The TSLED/TVB Summons is a six copy document which is color coded and identified as follows:

A. White with Red Stripe Copy - Simplified Information/Complaint

B. White with Blue Stripe Copy - Court Disposition Copy

C. Yellow Copy - Traffic Violations Bureau Copy (motorist)

D. White with Green Stripe Copy - Arrest Record (TSLED) Copy

E. White with Gold Stripe Copy - Uniform Traffic Ticket (City Court copy (motorist))

F. White Copy (card stock) - Officer's Copy

5.4    OBTAINING TRAFFIC SUMMONS BOOKS

A. The number of traffic summons books issued to any command will be determined by the Traffic Records Office and will be based on the number of summonses that that command has issued. Each unit will be held strictly responsible for the distribution and use of these books.

B. The following procedure will be followed when replacement books are required:

1. The Commanding Officer will cause to be prepared in duplicate, on an Intra-Departmental Memorandum, a listing of completed summons books. It shall show the beginning and ending number of each completed book.

2. One copy (gold stripe, yellow, or a photocopy of the Officer's copy) of each summons issued, securely bound together in numerical order, in lots of 20, and by book number, shall be taken to the Traffic Records Office along with the two copies of the Intra-Departmental Memorandum. Completed books shall be returned in lots of 5.

3. After checking the returns for accuracy, the second copy of the Intra-Departmental Memorandum shall be receipted by Records Office personnel, and returned to the delivering member for filing in the Command files.

4. New traffic summons books will be issued on the basis of the number of books returned (in sets of 5).

5. The member receiving the traffic summons books shall sign a receipt for books received, and then deliver the books to his/her Commanding Officer.

5.5     UNITS TO MAINTAIN A RECORD OF TRAFFIC SUMMONS BOOKS

A. When new traffic summons books are received at a Departmental unit, the Commanding Officer shall ensure that the books are checked for deficiencies. Each new book shall be listed by date received and by book number, in a journal provided for that purpose.

B. If any book is discovered to be deficient because of any missing summonses, misprints, or for other reasons, the deficiencies shall be listed on an Intra-Departmental Memorandum which shall be forwarded to the Traffic Records Office with all misprints and defectives or summonses/books containing deficiencies.

5.6     DISTRIBUTING TRAFFIC SUMMONS BOOKS TO INDIVIDUAL MEMBERS

A. When a book is issued to an Officer, his/her name, date of issuance, and the book number, shall be recorded in the traffic summons book journal maintained at their unit.

B. It will be at the discretion of each command as to how books are to be assigned (i.e. to individual officers, car crews, shift Lieutenants, etc.). New recruits shall not be assigned books on a personal basis until they have a permanent assignment. When a member is transferred or otherwise leaves his/her command, the Commanding Officer shall recall the Traffic Summons Book that was assigned to that member.

C. One book shall be maintained at the desk of each District in the event that it becomes necessary to issue a summons at the desk.

D. Commanding Officers shall direct that periodic inspections be  made of all traffic summons books that have been issued by his/her command.  The inspections shall seek to ensure compliance with existing procedures and to determine if members are using the books regularly.

5.7    CARE OF TRAFFIC SUMMONS BOOKS BY INDIVIDUAL MEMBERS

A. Members to whom traffic summons books are issued shall be strictly responsible for their care and use.

B. Upon receipt of a traffic summons book, the member shall carefully check it for completeness. If any deficiencies are found, they shall return the book to the Commanding Officer (refer to M.O.P. Chapter 5).

C. Traffic summons books shall be maintained in a secure place when not in use and they shall not be taken home nor left in any private vehicles.

5.8    PREPARING THE TRAFFIC SUMMONS
No Officer shall issue a traffic summons unless (s)he has received proper instruction through the Buffalo Police Training Academy and/or completely reviewed the training bulletins and instructions sheets provided by the Traffic Records Office.

A. Check carefully to ensure that no traffic summons has been inadvertently skipped over.

B. Use black ballpoint pens only (there are 6 copies so the writer must press very hard).

C. Print all entries except signatures.

D. Use the required code designations.

E. If the violator is to be cited for multiple traffic charges, prepare a separate traffic ticket for each offense. All charges shall be made returnable at the same tribunal for the same date.

F. Only those sections of the VTL indicated in the "Police Guide to the V&T Law" are valid. No other sections of the VTL may be cited.

G. Make sure that all the required information is provided and that the traffic summons is prepared completely and accurately.

5.9    PERSONAL SERVICE REQUIRED
All traffic summonses must be served personally on the offender when the traffic summons is issued.

5.10    SUMMONSES - WHERE RETURNABLE
Summonses shall be made returnable as follows:

A. City Court
1. misdemeanors relating to traffic
2. traffic infractions when coupled with a criminal offense or a misdemeanor,
3. summary arrests,
4. hitchhiking, 1157-A VTL
5. DWI and related alcohol/drug related traffic offenses,
6. truck mileage tax violations,
7. City Ordinance violations relating to cabbies,
8. Transportation Law
9. Tax Law

B. Traffic Violations Bureau (TVB)
1. traffic infractions except those relating to parking, standing, or stopping.
2. dimensions and weights of vehicles, 385 VTL (refer to "Police Guide to the V&T Law"),
3. registration of truck and trailers, 401-7&8 VTL (refer to the "Police Guide to the V&T Law"),

5.11    DISPOSITION OF COPIES OF TRAFFIC TICKETS

A. Traffic Violations Bureau Cases
If the defendant is required to appear at the Traffic Violations Bureau, the disposition of the copies is as follows:

1. The yellow (TVB) copy is the defendant's copy and is issued to the defendant.
2. The white with gold stripe (Uniform Traffic Ticket) becomes the District copy and is retained at the issuing member's command.
3. The white (Officer's) copy is retained by the issuing Officer.
4. The white with red stripe, white with blue stripe and white with green stripe are to be forwarded to the Traffic Records Office.

B. City Court Cases Processed Through City Court Booking
If the defendant is required to appear in City Court and has been processed through the City Court Booking Unit, the disposition of the Traffic Summons is as follows:

1. The white copies with red, blue and gold stripes remain intact and are placed into the arrest folder (the gold stripe is the defendant's copy and will be served by the Judge upon arraignment);
2. The white copy with green stripe (arrest record copy) is retained by City Court Booking, logged onto the "Summons Log" sheet and will be retrieved by the Traffic Records personnel;
3. The yellow copy becomes the District copy and is retained at the Officer's command;
4. The white (Officer's Copy) must be retained by the issuing Officer.

C. <u>City Court Cases Not Processed Through the City Court Booking Unit</u>
If the defendant is required to appear in City Court and has not been arrested and processed through City Court Booking, the disposition of the Traffic Summons is as follows:

1. Motorist is served with the white copy with gold stripe which shall have the address of City Court clearly indicated as well as a return date of 10 to 14 days from the date of issue (no weekends or holidays) at 9:30 am.
2. The white copies with red, blue and green stripes remain intact and are turned in to desk personnel at the end of each tour of duty and processed accordingly;
3. The yellow copy becomes the District copy;
4. The white (Officer's copy) is retained by the issuing Officer.

D. <u>Copies Retained at Issuing Officer's Command</u>
1. The Command shall designate an envelope for each traffic ticket book, with the beginning and ending numbers inscribed thereon. The remaining copy (golden stripe or yellow) shall be filed in numerical order in the appropriate envelope. The envelope shall be retained until all the summonses in the corresponding summons book have been issued.

2. Once a traffic summons book has been completed, the Command's copy of all the summonses shall be forwarded to the Traffic Records Office (refer M.O.P. Chapter 7).

## 5.12   <u>DAILY REPORT OF SUMMONSES ISSUED (P-54)</u>

A. Every day Districts, Traffic Division, MRU and Housing shall complete the Daily Report of Summonses Issued (Form P-54). The report shall record all summonses issued each day for a twenty-four hour period.

B. The original of Form P-54, together with the white copies with the red, blue and green stripes of the summons, shall be forwarded to the Traffic Records Office. If a summary arrest had been made, the words "summary arrest" shall

be noted on the report and no copies of the summons are forwarded to the Traffic Records Office.  The duplicate of Form P-54 shall be retained in the Command's files.

5.13   DAILY TRAFFIC SUMMONS AND ARREST REPORT (FORM P-1231)
Every day, in addition to the Daily Report of Summons Issued (P-54), the Traffic and MRU Division shall prepare the Daily Traffic Summons/Arrest and Tag Report (Form P-1231) for the twenty-four (24) hours period ending at 0001hrs. This report must accurately reflect the number of summonses issued in each category for the previous 24 hour period, as well as the cumulative total from the first of the year.

5.14   MEMBER'S APPEARANCE IN COURT
Members of the Department shall not appear in court or at any administrative agency in connection with a traffic summons that the member issued, without first having obtained the authorization of the Court Liaison Unit (refer M.O.P. Chapter 6).

5.15   LOST, MUTILATED, VOID TICKETS OR SUMMONS BOOKS

A.  If a summons ticket book is lost, the member to whom is it was assigned shall forward through the chain of command to the Inspector in charge of the Division of Administration and Communication, an Intra-Departmental Memorandum explaining the circumstances.

If the traffic summons book is subsequently located, it shall not be used unless first cleared through the Traffic Record and Control Office.

B.  If a single summons is lost, mutilated, damaged, or voided, the member who is responsible, shall forward through the chain of command to the Inspector in charge of the Division of Administration and Communication, an Intra-Departmental Memorandum explaining the circumstances.   Intermediate members of the chain of command shall review and sign all such reports and take appropriate action.  If the summons is mutilated, damaged or voided, all six copies must be attached to the Intra-Departmental Memorandum. A copy of the memorandum will be returned to the command after review and approval by the Inspector in charge of the Division of Administration and Communication and will be placed in the filing control envelope for accountability purposes.

5.16   RESPONSIBILITY OF TRAFFIC RECORDS OFFICE
The Traffic Records Office shall be responsible for:

A.  Acting as liaison between TSLED in Albany and the Police Department;

B.  Obtaining summons inventory and shipments from Albany;

C. Distribution of the Traffic Summons Books to the various Departmental units (refer M.O.P. Chapter 7).

D. The receipt, checking and forwarding of completed traffic summons to the appropriate administrative body.

E. The preparation of such reports as may be required by City Court, the Traffic Violations Bureau and by Departmental orders;

F. The systematic filing and retention of reports and forms in compliance with the directives of the Commissioner of Motor Vehicles and Departmental orders.

**6.0    PARKING VIOLATIONS BUREAU SUMMONS (PARKING TAGS)**

6.1    POLICY
It is the policy of the Buffalo Police Department to use Parking Violations Bureau (PVB) parking tags to enforce violations of laws, ordinances and statutes, that regulate the parking, standing, and stopping of vehicles.

6.2    TRAFFIC RECORDS OFFICE RESPONSIBILITY
The duties of the Traffic Records Office shall be as follows:

A. To act as the liaison between the Parking Violations Bureau and the Police Department;

B. To receive shipments of PVB parking tags from the Parking Violations Bureau and to keep necessary records of such parking tags;

C. To distribute PVB parking tag books to the various Departmental units;

D. To accept Daily Reports and sets of completed parking tags from the various Departmental units and to certify them as correct;

E. To deliver completed PVB parking tags that have been received from the various Departmental units to the Parking Violations Bureau;

F. To carry out any other orders and directives that may be necessary for the proper handling of PVB parking tags.

6.3    DISTRIBUTION OF PVB PARKING TAG BOOKS

A. PVB Parking Tag Books shall be distributed by the Traffic Records Office to the various Departmental units, as needed.

B. All PVB Parking Tag Books shall be charged to the Commanding Officer of

the unit receiving them and shall be signed for by an authorized member of that command.

6.4     <u>COMMANDING OFFICER'S RESPONSIBILITY</u>

A.  Commanding Officers shall be responsible for all PVB Parking Tag Books issued to their command.

B.  Commanding Officers shall maintain at all times a sufficient supply of PVB Parking Tag Books and Record Books.

C.  Commanding Officers shall distribute PVB Parking Tag Books, in numerical order, to members of their command.  A log indicating the first and last number in each tag book and the name of the Officer to whom the book is assigned must be kept at each location.

D.  If at a later date, the Parking Tag Book is transferred to another member, the name of the member to whom it was transferred, shall be recorded on said log.

E.  When a member is transferred or otherwise leaves his/her command, the Commanding Officer shall recall the PVB Parking Tag Book that was assigned to that member.

F.  When a member has had a PVB Parking Tag Book for six (6) months or longer and has not issued any parking tags, the Commanding Officer shall recall such book and reassign it to a more active member.

6.5     <u>CARE OF PVB PARKING TAG BOOKS BY INDIVIDUAL MEMBERS</u>

A.  Members to whom PVB Parking Tag Books are issued shall be strictly responsible for their care and use.

B.  Upon receipt of a PVB Parking Tag Book, the member shall carefully check it for completeness.  If any deficiencies are found, they shall return the book to their Commanding Officer with an Intra-Departmental Memorandum particularly describing the deficiencies.  The Memorandum shall be forwarded to the Traffic Records Office who shall determine if the parking tags are useable.

C.  PVB Parking Tag Books shall be maintained in a secure place when not in use and they shall not be taken home nor left in any private vehicles.

D.  Members having PVB Parking Tag Books shall use care so that the book does not become mutilated, lost, etc.

6.6    PVB PARKING TAGS - WHEN ISSUED

    A.    A Police Officer may issue a PVB parking tag to the owner/operator of a vehicle when that vehicle is standing, stopped or parked illegally on a highway, or when the vehicle is in a private/public lot or private/public garage which is properly posted.

    B.    Generally, a PVB parking tag is issued by affixing it to the vehicle which is the subject of the violation.

6.7    EXEMPT VEHICLES
Members shall not issue PVB parking tag in the following circumstances:

    A.    The vehicle is illegally parked on the Niagara Section of the New York State Thruway.

    B.    The vehicle is owned by the US Military or US Post Office.

    C.    The vehicle is a service/utility vehicle being used in emergency repair work.

    D.    The vehicle's owner is entitled to diplomatic immunity (refer M.O.P. Chapter 3).

    E.    The vehicle is bearing a special parking permit, placard, or NYS handicapped license plates and is parked in a permissive parking zone. This does not allow the driver of such a vehicle to violate other more restrictive provisions prohibiting or limiting the stopping, standing, or parking of vehicles.

    F.    The vehicle has been reported stolen.

6.8    PREPARING THE PVB PARKING TAG

    A.    Examine the vehicle before writing the PVB parking tag to be sure it is not a stolen or exempt vehicle (refer M.O.P. Chapter 7 - above).

    B.    Use PVB parking tags in numerical order using the lowest numbered summons first.

    C.    Use black or blue ink ballpoint pen.

    D.    Print all entries except the signature.

    E.    Use the approved style of letters and numbers

    F.    Darken all appropriate boxes to indicate the correct information.

G. Use numerals for the date (e.g. 12/25/85).

H. Use the VIOLATION NUMBER listed on the PVB parking tag to indicate the specific violation. Do not use the VTL section number.

I. Enter the issuing Officer's full name, or first initials and last name, followed by the D.I.D. number and unit they are assigned to.

J. Carefully separate the violator's copy from the parking tag book.

K. Securely attach the violator's copy to either the windshield wiper blade or front outside antenna.

L. At the expiration of the tour of duty, turn in the completed PVB parking tags at the member's command.

6.9    TAGGING PRIVATE PARKING AREAS

A. PVB parking tags may be issued for vehicles parked on private property but only if the property is posted in compliance with the requirements of the City Ordinances.

B. The person in control of the premises must sign the parking tag in the comments box before the PVB parking tag is issued.  The P-1349 form is no longer required.

6.10    FORWARDING COMPLETED PVB PARKING TAGS TO THE TRAFFIC RECORD OFFICE

A. PVB parking tags shall be arranged in numerical order beginning with the lowest numbered parking tag.

B. The Daily Report of PVB Parking Tags (Form P-188) shall be prepared daily, listing all PVB parking tags issued in the previous twenty-four hour period.

C. PVB Summonses shall be listed in numerical sequence.
For example: G671421
                     22
                     23

671608
     09

681591

692568

Double space to denote a break in sequence or the start of a new series.

**Note**:  Disregard the separated check digit at the end of the summons number (e.g. 771421 0). The "0" is the check digit and it is not used as part of the serial number but it must be included if reporting a parking tag loss or requesting that it be voided.

6.11    LOST, MUTILATED, VOIDED PVB PARKING TAGS
Whenever a PVB Parking Tag Book or PVB Parking Tag is lost, mutilated or voided, the member to whom the book or parking tag was assigned shall forward an Intra-Departmental Memorandum through the chain of command to the Traffic Records Office, explaining all the circumstances.  In the event that the    PVB parking tag was voided, the word "Void" shall be written on the PVB parking tag, along with the date, and the member's employee number and initials.  The Intra-Departmental Memorandum shall explain in detail the reason the PVB Parking tag was voided. Intermediate members of the chain of command shall review and sign the Memorandum and shall take appropriate action.  All available copies of the parking tag shall be forwarded in conjunction with the Intra-Departmental Memorandum.  One copy of the Memorandum shall be retained in the command's file.    Said memorandum must be addressed to the Director of Parking Enforcement, Attn:  Inspector of Administration and Communications.

6.12    SCOFFLAWS
Refer to M.O.P. Chapter 2.

**7.0    CIVILIAN SCHOOL CROSSING GUARDS (CSCG)**

7.1    POLICY
It is the policy of the Buffalo Police Department to use Civilian School Crossing Guards at busy intersections near grammar schools during the school year to assist young children to cross the street safely.

7.2    COMMAND

A. The Inspector of Administration and Communication shall be in overall command of the Civilian School Crossing Guards. (S)he shall be responsible for:

1. establishing qualifications and employment criteria in conjunction with the Buffalo Municipal Civil Service Commission;
2. designating the type of uniforms to be worn;
3. establishing criteria for determining the locations that require the presence of a Civilian School Crossing Guard;
4. conducting an annual review of locations that require the presence of a Civilian School Crossing Guard;
5. keeping accurate time records of all guards;

6. replacing absent guards

B. The Inspector of Administration and Communication shall exercise supervisory authority over the Civilian School Crossing Guards. The Inspector shall be directly responsible for the efficiency, good conduct and effectiveness of the Civilian School Crossing Guards.

C. The Inspector of Administration and Communication shall:

1. when a vacancy occurs, process and appoint a CSCG according to the rules and regulations set forth by the Commissioner of Police and the Buffalo Municipal Civil Service Commission;
2. arrange for the CSCG to obtain a uniform and to have uniforms repaired when necessary;
3. fully inform the CSCG of his/her duties and any other pertinent information and assign him/her to a school crossing;
4. spot check all CSCG locations to ensure compliance with current directives;
5. investigate all complaints against a CSCG and make a full report thereon to the Inspector of Administration and Communication;
6. conduct follow-up investigations of accidents and injuries of school children occurring at locations where a CSCG is assigned at the time of the incident (refer M.O.P. Chapter 2).

D. District Commanding Officers shall:

1. keep an accurate roster of all guards assigned to his/her command;
2. frequently have the guards in his/her District evaluated for ability and for their attention to duty.

7.3    AUTHORITY OF CIVILIAN SCHOOL CROSSING GUARDS

Civilian School Crossing Guards have the power and authority to control and stop the flow of traffic on the highway to which they are assigned, for the purpose of protecting school children going to and from school. They have no other police authority.

7.4    ARRESTS BY CIVILIAN SCHOOL CROSSING GUARDS

A. Civilian School Crossing Guards have no power of arrest other than that which is permitted to every other citizen.

B. Members of the Force who are requested by a CSCG to enforce any law, ordinance, or to effect an arrest shall promptly do so if in fact, an offense has occurred.

C. When it is necessary that a Traffic Summons be issued, or an arrest be made, the CSCG shall be the complainant. The CSCG will swear to the information and will testify in all court cases and administrative hearings.

D. The CSCG shall be rendered all necessary assistance in preparing required documents.

7.5    ROSTER OF GUARDS
Each District shall keep a roster of Civilian School Crossing Guards assigned to that command and the location to which each CSCG is assigned.  The office of Administration and Communication shall maintain accurate and up to date records of each period that each CSCG is on duty.

7.6    WORKING PERIODS OF CIVILIAN SCHOOL CROSSING GUARDS

A. Due to the variations of time in the convening and recessing of classes in the various schools, the working periods of the guards are not uniform and must remain flexible.

B. Civilian School Crossing Guards shall obtain from the principal of the school nearest to the location to which they are assigned, the opening and closing times of that school. This information shall be forwarded to the office of Administration and Communication.

C. Civilian School Crossing Guards shall be required to be on duty during the following times:

    1. when children are arriving at school;
    2. during noon recess, if any;
    3. when children are leaving from school.

D. Civilian School Crossing Guards shall not leave their post during the noon recess unless the children are dismissed by the school for the day.

E. When a school is dismissed for the day and all pupils have left, the guard may leave the crossing.

7.7    CIVILIAN SCHOOL CROSSING GUARDS ABSENCES

A. When a CSCG is unable to report for duty for any reason, (s)he shall notify the office of Administration and Communication. Such notice shall be made at least twenty-four (24) hours before the time (s)he is to report for duty except that, in the case of an emergency, such notice shall be given as soon as possible. The CSCG shall give his/her name, the location of the school crossing to which (s)he is assigned, and the reason for the absence.

B.  If a CSCG who has served for at least one (1) year in the City service and who is not otherwise eligible for leave under the City's policy regarding the Family Medical Leave Act may be granted a medical leave of absence without pay for a period not exceeding one (1) year.  A CSCG requesting a medical leave of absence shall be required to submit competent medical proof of illness or injury along with a completed P-12e (Leave of Absence Request Form) to Administration and Communication for approval.  If a CSCG is eligible for leave pursuant to the Family Medical Leave Act (FMLA) shall first be required to apply for and utilize such leave prior to requesting a medical leave of absence without pay.

## 7.8    CSCG INJURED ON DUTY

A.  A CSCG injured while on duty must immediately report the injury to the office of Administration and Communication. The CSCG must prepare form GU- 77 explaining in detail the nature of the injury and the manner in which it was incurred. If the CSCG is incapacitated and unable to prepare the report himself/herself, the Supervisor will direct that it be prepared on the CSCG's behalf.

B.  Copies of the report shall be forwarded to:

1.  The office of Administration and Communication
2.  Medical Records
3.  Division of Labor Relations

## 7.9    REPLACING ABSENT CIVILIAN SCHOOL CROSSING GUARDS

A.  In the event that a Civilian School Crossing Guard is absent, the office of Administration and Communication shall contact the extra guards assigned to the same District and direct them to fill the absence.

B.  If no extra guard is available, the office of Administration and Communication shall direct that a member of the Traffic Bureau be assigned to that crossing.  If no member of the Traffic Bureau is available, a Police Officer from the District shall be assigned.

## 7.10   DISTRICT SUPERVISORS TO CHECK CIVILIAN SCHOOL CROSSING GUARDS
The Supervisor on duty in each District shall frequently check the Civilian School Crossing Guards on duty in his/her command and shall report any infraction or dereliction, to the Inspector of Administration and Communication.

## 7.11   ACCIDENTS AT CROSSING PROTECTED BY CSCG GUARDS
Refer to M.O.P. Chapter 2.

7.12    <u>REASSIGNMENT OF CIVILIAN SCHOOL CROSSING GUARDS</u>
Civilian School Crossing Guards shall not be moved from their assigned locations to other locations without the approval of the member of the office of Administration and Communication having supervisory authority over the guards.

7.13    <u>COOPERATION WITH CIVILIAN SCHOOL CROSSING GUARDS</u>
All members of the Department shall at all times be polite and cooperative toward the Civilian School Crossing Guards.

# CHAPTER 8: PATROL

## CONTENTS

**1.0    THE PATROL DIVISION**
1.1    Policy
1.2    Chain of Command
1.3    District Chief
1.4    Duty Inspector
1.5    District Captains
1.6    District Lieutenants
1.7    Handling Special Events
1.8    Care of Police Buildings

**2.0    DISTRICT LIEUTENANTS**
2.1    Policy
2.2    Lieutenant's Command Responsibilities
2.3    Lieutenant's Duties
2.4    Relieving Prior Platoon
2.5    Lieutenant's Car Assignments
2.6    Expiration of Tour of Duty
2.7    Coordination and Control
2.8    Reports and Electronic Mail Messages

**3.0    DUTIES OF PATROL OFFICERS - GENERALLY**
3.1    Policy
3.2    Performance and Attention to Duty
3.3    Work Schedule
3.4    Uniform and Equipment to be Worn While on Duty
3.5    Investigating Complaints
3.6    Crime Scenes
3.7    Responsibility for Initial Investigation
3.8    Field Interviews
3.9    Entering Buildings
3.10   Discoverable/Preventable Burglary
3.11   Schools and Playgrounds
3.12   Taverns, Places of Amusement
3.13   Road Hazards
3.14   Stranded Motorists
3.15   Escorts

**4.0    PRELIMINARY INVESTIGATION**
4.1    Policy
4.2    Scope of Preliminary Investigation
4.3    Victim/Witness Assistance
4.4    Responsibility of Superior Officers

4.5     Requesting the Presence of District Detectives

**5.0     TYPES OF PATROL**
5.1     Policy
5.2     Purpose of Patrol
5.3     Motorized Patrol
5.4     Foot Patrol
5.5     K-9 Patrol
5.6     Bicycle Patrol
5.7     Motorcycle Patrol
5.8     Gem/Golf Cart/Segway Patrol
5.9     Helicopter Patrol

**6.0     MOTORIZED PATROL**
6.1     Policy
6.2     Establishing Mobile Patrol Posts
6.3     Driver's License Required
6.4     Responsibility of Senior Officer
6.5     Equipment in Mobile Patrol Units
6.6     Mobile Patrol Duty
6.7     Use of Seat Belts in Department Vehicles
6.8     Transporting Civilians in Police Vehicles
6.9     Ride along Program
6.10    Lunch Periods
6.11    Vehicle Maintenance

**7.0     RESPONDING TO CALLS**
7.1     Policy
7.2     Types of Response
7.3     Routine Response
7.4     Rapid Response
7.5     Emergency Response
7.6     Caution Required
7.7     General Procedures for Responding with Emergency Lights or Siren Activated

**8.0     BANK ALARM RESPONSE PLAN**
8.1     Policy
8.2     Objectives
8.3     Alarm Activation
8.4     Responsibility of Responding Officers
8.5     False/Accidental Bank Alarm
8.6     Alarm Tests

**9.0     POLICE PURSUIT**
9.1     Policy
9.2     Pursuit Defined

9.3     Decision to Initiate Pursuit
9.4     Department Guidelines: Pursuit Tactics
9.5     Abandoning Pursuit
9.6     Reporting Requirements
9.7     Pursuits into the City by Outside Agencies

**10.0    <u>CAR STOPS</u>**
10.1    Policy
10.2    Initial Stop
10.3    Approaching the Vehicle
10.4    Controlling the Driver and Occupants
10.5    Traffic Checkpoints

**11.0     <u>EXCESSIVE AVOIDABLE ALARMS</u>**
11.1     Policy
11.2     Avoidable Alarm Defined
11.3     Avoidable Alarms – Reporting Dispositions
11.4     Department Reports to Housing and Inspections

## 1.0   THE PATROL DIVISION

### 1.1   POLICY

It is the policy of the Buffalo Police Department to allocate a substantial complement of personnel to the Patrol Division. The Patrol Division shall be the primary unit of the Buffalo Police Department that is responsible for the initial delivery of police services to the public. Other Divisions and units within the Department shall supplement the Patrol Division and shall render assistance and expertise when appropriate.

### 1.2   CHAIN OF COMMAND

The Chain of Command in the Patrol Division shall be as indicated in the Organizational Chart of the Department.

### 1.3   DISTRICT CHIEFS

A.  District Chiefs be the Commanding Officer of their respective Patrol Districts.

B.  They shall have responsibility in their assigned Districts for the enforcement of the law, the efficiency and discipline of Department members under their command, and the compliance with the rules and orders of the Department.

C.  They shall exercise command authority and supervision over their assigned District.

D.  They shall be responsible for all Department equipment and property assigned to their command.

E.  They shall ensure that all reports are forwarded in a timely manner as directed by their superior officers.

F.  All others duties as assigned by the Commissioner of Police.

### 1.4   DUTY OFFICERS

The Inspector of Administration & Communications or The Inspector of Internal Affairs will serve as the Duty Officer during their normal tour of duty from 0645hrs-1645hrs. The on-duty Inspector serving as Duty Officer will notify the 911 Lieutenant that he/she is on the air and available. From 0645hrs-1645hrs the Duty Officer will have the radio designation of DO-1.

In the absence of the Inspector of Administration & Communications and the Inspector of Internal Affairs – there will not be a Duty Officer.

The Inspectors will serve as Duty Officers during their normal tour of Duty.

COB000542

If there is more than one (1) Inspector on duty, the Duty Officer position will be assumed by the senior on duty Inspector unless both on–duty Inspectors agree otherwise. In any event, the on-duty Inspector serving as Duty Officer will notify the 911 Lt. that he/she is the duty officer and is on the air and available.  The Duty Officer will have the radio designation of DO-5.

In the event there is no Inspector on duty, the most senior Patrol Captain on duty will assume the duties of the Duty Officer.

On those days and/or times when there will be no Inspector and no Patrol Captain on duty, it will remain the responsibility of the most senior on-duty Lieutenant assigned to the District in which an incident occurs to direct police activities at the scene of the incident until relieved by a superior officer.

Effective 1-15-07

1.5    DISTRICT CAPTAINS

POLICE CAPTAIN – DISTRICT  (added effective 01-15-2007)

A.  Duties

Duties are inclusive of, but not limited to, the following:

1.  Ensures vehicles are properly maintained;

2.  Monitors firearms qualifications and ensures all officers are qualified;

3.  Accounts for all inventories at the District level.  Including, but not limited to portable radios, MCT's, radar equipment, tint meters, armory, etc.;

4.  Ensures all members of the command are properly and timely notified of impending court cases;

5.  Tracks and ensures compliance with all in-service training programs. Coordinates training with Training Academy;

6.  Ensures an adequate supply of departmental forms and supplies are available;

7.  Ensures all confiscated property is properly delivered to the Property Office;

8.  Maintains accurate, up-to-date business card files;

9. Attends Community and Block Club meetings at the direction of the District Chief;

10. Responsible for District Detectives activities including review of progress on criminal investigations and forwarding reports to appropriate Chiefs.

11. Review motor vehicle accident by Officers and submit a P-73 with recommendations.

12. Investigate Citizen complaints.

13. Review "use of force" reports.

14. Review and make recommendations on all license applications.

1.6    DISTRICT LIEUTENANTS
Refer M.O.P. Chapter 8.

1.7    HANDLING SPECIAL EVENTS

A. District Responsibility
    1. It is the responsibility of the District Chiefs to ascertain the scheduling of events that will require police service within their respective areas of command.
    2. The Special Events Committee in City Hall shall be responsible for determining the level of Police involvement at any special event. The District Chief in which the event is scheduled to take place and/or the Commanding Officer of the Traffic Unit are the Police Commissioner's representatives on the Committee.
    3. The DPC coordinates planning for special events. Large events require that an Operations Order be prepared and forwarded to the DPC and to the Traffic/Special Events/MRU Inspector by the affected command. An After Action Report is required after the event so that any problems can be identified. The DPC retains files on operations, orders, events, permits, after action reports and schedules for events.

B. Police Coverage
    1. District Chiefs shall handle events within their respective Districts whenever possible.
    2. When requested by the District Chiefs, Traffic Bureau personnel may be used to augment the contingent of personnel from the District.
    3. The District Chiefs are responsible for ensuring that sufficient police personnel are assigned to such events.
    4. Parades and races are planned by the Traffic Bureau with the Districts augmenting the Traffic Bureau when necessary. The Traffic Bureau is also responsible for events at the Arena, the Baseball Stadium and

Kleinhans Music Hall.

C. <u>Details to Federal, State, County Property</u>
Members of the Department shall not be detailed to duty in any Federal, State, or County premises, except the Erie County Medical Center, without first having obtained permission of the Commissioner, a Deputy Commissioner, the District Chief or the Duty Inspector.

D. <u>Places of Public Amusement</u>
Members of the Department shall not be detailed to duty on any premises or in any building used for public amusement or entertainment, for which an admission is charged, except when the Commissioner of Police determines that such an assignment is necessary for the public welfare.

1.8    <u>CARE OF POLICE BUILDINGS</u>

A. <u>Responsibility</u>
The District Chiefs are responsible for the condition of all police facilities under his/her command, including the sidewalks and entranceways to the stationhouse. All police facilities shall be kept clean and in good repair, and requisitions for supplies, equipment, and repairs shall be timely made (refer M.O.P. Chapter 18).

B. <u>Winter Care</u>
District Chiefs or their on duty designees, shall, during the winter months:

1. Make arrangements with the Police Garage to clear snow from parking areas when necessary and shall facilitate this snow removal effort by arranging to have all vehicles moved from the area being plowed.

2. See to it that sidewalks and entranceways are kept free of snow and ice. This is a function that shall be performed by the Laborer assigned to the District.

C. <u>District Supervisor Responsibilities</u>
District Supervisors shall observe the condition of the sidewalk and entranceways. Where snow and ice conditions exist, they shall take appropriate action if needed. The District Supervisor actions may include contacting the Police Garage or contacting the District Chief.

## 2.0    **DISTRICT LIEUTENANTS**

2.1    <u>POLICY</u>
It is the policy of the Buffalo Police Department to provide high quality police patrol service in each of the Districts throughout the city. To do so, Patrol Lieutenants shall keep subordinates informed of their duties and other pertinent

Departmental information, create an atmosphere conducive to productive law enforcement, and conscientiously supervise subordinates, insisting on strict compliance with the Rules and Regulations of the Department.

2.2    <u>DISTRICT LIEUTENANT'S COMMAND RESPONSIBILITIES</u>

A.  In the absence of a higher ranking officer, the senior Lieutenant on duty within a District shall be in command of that District.

B.  The most senior on duty Lieutenant assigned to a particular work shift within a District, shall be in command of the personnel of that work shift during his/her tour of duty.

C.  When shifts overlap and only one Lieutenant is on duty that Lieutenant shall be in command of the personnel of both work shifts.

D.  If multiple Lieutenants are on duty during the overlap period but all of the on duty Lieutenants are regularly assigned to one work shift and none are regularly assigned to the other work shift, the second most senior on duty Lieutenant shall be in command of the personnel of the other shift during the overlap period.

2.3    <u>DISTRICT PATROL LIEUTENANT'S DUTIES</u>

A.  At the beginning of a tour of duty the Patrol Lieutenant in command of a work shift shall inspect the members of his/her work shift to ensure that all members have the necessary equipment and that they comply with the uniform and appearance requirements of the M.O.P. Chapter 12. Lieutenants are responsible for maintaining compliance with the uniform and appearance requirements throughout the tour of duty.  Patrol Lieutenants shall make sure all members are present for duty, and shall brief them on any important orders, issues, or matters as deemed appropriate by the District Chief, Commissioner, or other sources.   All Patrol Lieutenants are directly responsible for their subordinates' compliance with the Rules and Regulations of the Department.

B.  Patrol Lieutenants in command of a work shift are required to submit comments and recommendations for all IAD cases, police involved motor vehicle accidents, and IOD claims, that occur during their tour of duty.

C.  In compliance with current directives, the Patrol Lieutenant in command of a work shift shall accept complaints from citizens concerning police personnel.

D.  Patrol Lieutenants in command of a work shift shall continuously monitor the police radio and respond to, and assume command of, all serious incidents, including car and foot pursuits.

E.  The Patrol Lieutenant in command of a work shift shall make certain that personnel and vehicles are logged on and off the CAD/CHARMS System.

F.  Patrol Lieutenants in command of a work shift shall review projected work schedules and ensure that sufficient personnel is available for duty. Leave Requests (Form P-12) that would create a personnel shortage shall not be initialed by the Lieutenant but shall be forwarded to the Commanding Officer for review. The Patrol Lieutenant shall apprise the Commanding Officer when there is not sufficient personnel to grant leave requests.

G.  The Patrol Lieutenant in command of a work shift shall make whatever arrangements are necessary to ensure that the on coming work shift has sufficient personnel.

H.  The Patrol Lieutenant in command of a work shift shall verify the accuracy of the Daily Shift Report (Form P-3A) and verify its accurate entry into the CAD/CHARMS System. The P-3A is the basis for making payroll entries.

I.  The Patrol Lieutenant in command of a work shift shall inspect the District building, vehicles, portable radios, safety equipment, shotguns and other assigned equipment and report any deficiencies.

J.  The Patrol Lieutenant in command of a work shift shall inspect the Court Book for compliance with current directives and make certain that court notifications are properly made.

K.  The Patrol Lieutenant in command of a work shift shall track in-service training programs and firearms qualification schedules and they shall arrange for attendance of members of his/her work shift.

L.  The Patrol Lieutenant in command of a work shift shall monitor the CAD/CHARMS System to verify that entries are made accurately and that mobile units are following proper procedures.

M.  The Patrol Lieutenant in command of a work shift shall review and sign all reports and make certain that E-Mail messages are complete and accurate, and transmitted in a timely fashion.

N.  The Patrol Lieutenant in command of a work shift shall take steps necessary to provide an adequate stock of Departmental forms and supplies.

O.  Patrol Lieutenants shall assume any other duties assigned by his/her Commanding Officers or by Departmental directive.

P.  Patrol Lieutenants shall submit recommendations for commendations and Department awards when warranted.

Q. The Patrol Lieutenant in command of a work shift shall ensure that members of the shift using Departmental vehicles, inspect the vehicle before and after each shift and report any damage, mechanical malfunctions or missing equipment. (S)he shall also ensure that those vehicles not in use during the tour of duty are inspected.

2.4     RELIEVING PRIOR PLATOON

Patrol Lieutenants in command of a work shift shall not relieve the shift going off duty until the on coming shift is ready for duty. "Ready for duty", means that there are a sufficient number of members of the oncoming shift actually present; that they are in proper uniform, and if necessary they can immediately respond to calls for service.

2.5     LIEUTENANT'S RESPONSIBILITY FOR UNMARKED CARS

On duty Patrol Lieutenants shall not use any unmarked Departmental vehicle without prior approval of the Commanding Officer, the District Chief or the Deputy Police Commissioner.

2.6     EXPIRATION OF TOUR OF DUTY

The Patrol Lieutenant in command of a work shift shall, at the end of the tour of duty:

A. make certain that all personnel are present or otherwise accounted for;

B. review all radio logs, checking for accuracy and completeness, and also checking the level of productivity of members assigned to mobile units;

C. keep the Commanding Officer informed of any unusual or major incidents through written reports;

D. make certain that all calls for service dispatched to members of his/her work shift, especially those dispatched near the end of the tour of duty, receive proper attention;

E. not dismiss the work shift from duty until the on coming Lieutenant has properly relieved him/her.

F. Patrol Lieutenants shall complete the Lieutenant's daily activity report as required by current directives.

2.7     COORDINATION AND CONTROL

A. Absent a higher ranking officer on duty within the District, the most senior on duty Lieutenant within the District is in command. (S)he shall be responsible for coordinating and controlling all on duty members, including less senior Lieutenants.

B.   Those duties specified in M.O.P. Chapter 8 above, may be delegated to a less senior on duty Lieutenant. This delegation of authority may be made either by the most senior on duty Lieutenant, an on duty higher ranking officer, or the District Commanding Officer. Delegation of authority by the most senior on duty Lieutenant does <u>not</u> relieve him/her of the responsibility for their ultimate performance.

C.   All Patrol Lieutenants shall work cooperatively with each other and strive to promote cooperation between the different work shifts. During the overlap period there shall be an equitable allocation of Departmental vehicles, equipment, and resources amongst the two shifts.

D.   District Chiefs shall adopt policies and take necessary measures to enhance cooperation within his/her command.

2.8    <u>REPORTS AND ELECTRONIC MAIL MESSAGES</u>
Before approving any report by signing his/her name thereon, the Patrol Lieutenant must thoroughly review the report, checking for completeness and accuracy.

A.   <u>Generally</u>
Minimally, in all reports, including the p-1375, the Lieutenant must check:

1. to whom the report is being forwarded to;
2. the inclusion of an event number;
3. the name, address and phone number of the person who is the subject of the report;
4. the date, time and location of the event that took place;
5. the names of the investigating Officers;
6. that a clear, concise description of the event is included.

B.   <u>Electronic Mail Messages</u>
When Electronic mail messages are required, the Lieutenant should check for accuracy and completeness and make sure that they are transmitted in a timely manner:

1. The name of juvenile sex crime victims shall not be included in the message nor should there be any lurid detail or profane language.
2. Messages of members reporting sick shall be sent as soon as possible and should not include the member's telephone number or address.
3. There shall be separate messages for each member reporting injured on duty (IOD).

**3.0    DUTIES OF PATROL OFFICERS - GENERALLY**

3.1    POLICY
It is the policy of the Buffalo Police Department that members assigned to patrol duty are responsible for the initial delivery of police services to the public. In those instances in which specialized police units have been created, those specialized units shall use their particular expertise to supplement the patrol officer.

3.2    PERFORMANCE AND ATTENTION TO DUTY
Refer to Chapter II of the Rules and Regulations of the Buffalo Police Department.

3.3    WORK SCHEDULE

A.    The regular hours of daily work shall be consecutive except for interruptions for lunch.

B.    Sworn members of the Department working in a District shall be assigned to one of the following shifts:

0001hrs – 1000hrs
0600hrs – 1600hrs
1000hrs – 2000hrs
1530hrs – 0130hrs
2000hrs – 0600hrs

C.    The first fifteen minutes of each shift shall be designated as a briefing period. All members must be present daily for briefing unless otherwise excused by their Commanding Officer.

D.    Officers shall be allowed a one half hour lunch period during their ten (10) hour tour of duty. The lunch period shall be taken as permitted by their Superior Officer but not during the last one and one-half hours of the tour of duty.

E.    At the expiration of each tour of duty, members shall be present and accounted for. If circumstances arise which prevents their return to their respective stationhouse or office, the member shall contact his/her Supervisor and explain the circumstances.

3.4    UNIFORM AND EQUIPMENT TO BE WORN WHILE ON DUTY

A.    The uniform shall be in accordance with all existing directives and regulations. The Supervisor in charge of the shift in each District shall

determine, based on the weather, the type of authorized uniform (i.e. warm weather uniform or cold weather uniform) to be worn.

B. Members of the same car crew must be attired alike.

C. Members in uniform shall carry the following equipment:

1. Badge
2. Wreath
3. Regulation service firearm
4. Ball-point pen
5. Handcuffs
6. A working flashlight
7. Baton, unless otherwise directed by a Superior Officer
8. Regulation police hat
9. CAP Spray if authorized

D. Officers shall keep Department issued body armor readily available. It may be worn at the member's discretion except that during hazardous circumstances the Officer may be ordered to wear body armor by a Superior Officer.

3.5    INVESTIGATING COMPLAINTS
When a member sees, or receives information from any source that a crime has been attempted or committed, or that any other police incident has occurred, they shall immediately respond, and give such assistance or take such police action as the situation may require. All proper reports shall be completed. The member shall act courteously, but firmly and efficiently.

3.6    CRIME SCENES
The first member of the Department to arrive at a crime scene shall:

A. attend to the injured;
B. apprehend the suspect if at the scene;
C. establish and protect the crime scene ( refer M.O.P. Chapter 5);
D. identify, locate and isolate witnesses for later interviews and statements;
E. protect evidence ( refer M.O.P. Chapter 5);
F. prepare all necessary reports.

3.7    RESPONSIBILITY FOR INITIAL INVESTIGATION
The first member of the Department who has been directed to a crime scene shall be responsible for undertaking the initial investigation. Refer to M.O.P. Chapter 8.

3.8    FIELD INTERVIEWS
Members of the Department shall conduct field interviews when permitted to do so by law and they shall report the results of the interview on a Field Interview

Report (Form P-1371). The Field Interview Report will be forwarded to the Crime Analysis Unit through the District Detectives. Access to the Field Interview Report File may be gained through the Records Management System (RMS). Police Officers may conduct field interviews in the following circumstances.

A. Objective Credible Reason

The Officer may conduct a field interview based on an <u>objective credible reason</u>, that reason need not necessarily be indicative of criminal conduct (e.g. request for identification, request for an explanation of the person's presence in a particular area, etc.). Under this circumstance, the person cannot be asked incriminating questions nor questions that would lead a reasonable person to believe that (s)he is suspected of criminal activity. The person cannot be detained and is free to walk away from the Officer at any time.

B. Founded Suspicion that Criminal Activity is Afoot

The Officer may conduct a field interview based on a <u>founded suspicion that criminal activity is afoot</u>. The Officer may ask leading questions, the nature of which could lead a reasonable person to believe the (s)he was suspected of criminal activity. Under this circumstance, an Officer is not permitted to detain the person during the interview.

C. Reasonable Suspicion

The Officer may conduct a field interview based on his/her <u>reasonable suspicion</u> that the person has committed, is committing, or is about to commit an offense. "Reasonable suspicion" means that amount of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe that criminal activity is at hand. Under this circumstance, the person may be detained for a length of time sufficient for the Officer to obtain answers to questions relating to the conduct which gave rise to the stop. In addition, if during the stop, the Officer perceives a risk to his/her safety, the Officer may conduct a pat search of that person.

1. Vehicle stops must be based on reasonable suspicion that the operator or an occupant of the vehicle is, has been, or will be engaged in a violation of the law.

3.9    ENTERING BUILDINGS

A. A building that is found unsecured or burglarized shall not be entered by a lone Officer, except in an emergency situation.

B. The Officer shall request assistance in searching the building, keeping the premise under close surveillance until additional Officers arrive.

C. The owner of the premises shall be notified to secure the building. If the owner or other responsible person cannot be located, the District Supervisor

shall take such steps as are necessary to secure the building.

3.10    DISCOVERABLE/PREVENTABLE BURGLARIES

If a non-residence burglary occurs which, in the opinion of the District Supervisor, could have been discovered or prevented by the Officers assigned to the area, (s)he shall prepare a report on an Intra-Departmental Memorandum (P-73), outlining the facts and recommending disciplinary action for neglect of duty. The District Chief shall review the report, investigate the facts, and either recommend or not recommend the initiation of disciplinary charges. The report shall then be forwarded through channels to the Internal Affairs Division.

3.11    SCHOOLS AND PLAYGROUNDS

A.  Officers shall inspect, as frequently as possible, school buildings and facilities in their patrol area, during the hours that the schools are not in session.

B.  Officers shall visit parks and playgrounds in their patrol area and cooperate with Parks Department personnel in maintaining order, and in preventing damage to property.

3.12    TAVERNS, PLACES OF AMUSEMENT

While on duty, Officers shall not enter any premise where alcoholic beverages are served, or a theater, or other place of amusement, except in the discharge of their duty, or upon direction of a Superior Officer.

3.13    ROAD HAZARDS

Officers shall check roadways and sidewalks in their patrol area for defects and for other conditions that may create a hazard for motorists and pedestrians and report them to the proper agency for correction. Such defects and hazardous conditions shall include but not be limited to:

A.  debris in the roadway;

B.  malfunctioning or missing traffic control devices

C.  street lamps out

D.  pot holes or other large obstructions in the road

E.  foliage obstructing traffic signs;

F.  illegally parked or abandoned vehicles creating a hazard;

G.  cracked sidewalks

A call will be made to 311 (the Mayor's "Call and Resolution Center") reporting

these hazards. The District log book will be notated that 311 was notified if a Citizen reports the hazard to the District.

3.14    STRANDED MOTORISTS

Members of the Department shall assist motorists that are stranded or whose vehicles are disabled.

A. Members shall summon an ambulance in the event that medical services are required, or the Fire Department if there is a threat of fire.

B. When the motorist's safety is jeopardized because (s)he is in a dangerous location (e.g. high speed restricted access highway, etc.) the member shall either transport the motorist to a safe place, or remain with the motorist until the problem is resolved.

C. Members shall aid motorists in obtaining the towing or mechanical repair services of the motorist's choice, and may transport the motorist to the stationhouse to make such arrangements.

3.15    ESCORTS

A. Emergency Escorts

Members of the Department shall not routinely escort civilian vehicles under emergency circumstances. It is an extremely dangerous practice and should be avoided whenever possible. In cases of medical emergencies it is generally better to have the patient transported by ambulance. Emergency escorts of civilian vehicles shall be provided only in those instances in which the danger associated with providing the escort is clearly and substantially outweighed by the fatal consequences of not providing such an escort. When escorting civilian vehicles under these circumstances, the member shall:

1. notify the radio dispatcher and inform him/her of the destination;
2. activate the siren and flashing lights;
3. travel at a speed that is prudent under the circumstances and which does not endanger the vehicle being escorted, or other motorists on the road;
4. stop at all stop signs and red lights, making sure that the intersection is clear for both the police vehicle and the civilian vehicle to pass through.

B. Non-Emergency Escorts

All requests for escorts of a non-emergency nature shall be forwarded to the Commanding Officer of the Traffic Bureau. If the request is approved, the Commanding Officer of the Traffic Bureau shall assign members of his/her command to handle the escort. Escorts of this kind include, but are not limited to the following:

1.  funerals
2.  dignitaries and public officials
3.  oversize vehicles
4.  vehicles with hazardous or unusual cargo.

## 4.0    PRELIMINARY INVESTIGATION

4.1    POLICY
It is the policy of the Buffalo Police Department that the preliminary investigation of crimes and occurrences is the responsibility of the Patrol Division, and that Patrol Officers shall take all necessary steps to dispose of cases where appropriate.

4.2    SCOPE OF PRELIMINARY INVESTIGATION
Describing the limits of a preliminary investigation in concrete terms is difficult, but it will generally include the following steps:

A.  Obtaining aid for the injured;

B.  Determining if a crime has been committed, and if so, what crime;

C.  Apprehending the suspect if (s)he is at the scene, or pursuing the suspect if there is any indication that immediate pursuit might result in apprehension;

D.  Informing the dispatcher of descriptions, direction of flight, and any other information that would assist in apprehending the suspect;

E.  Searching for suspects and witnesses, and obtaining complete and accurate information relating to the identity, address, and other pertinent information, concerning the suspect, victim and witnesses;

F.  Determining what information about the crime that the victim and each witness possess;

G.  Determining in detail how the crime was committed, what evidence is available, and the extent of injury and loss;

H.  Recording all information clearly and accurately on the appropriate report forms, including P-1375.

I.  Causing E-Mail messages to be sent regarding suspects and wanted persons, when it is justified by the circumstances.

4.3    VICTIM/WITNESS ASSISTANCE
As part of the preliminary investigation, the investigating officer must pay particular attention to the needs of the victims and witnesses and shall:

A. Provide victims and witnesses with information concerning community and social services that are available to them (e.g. medical attention, Crime Victims Compensation, etc.);

B. Advise victims or witnesses to immediately contact the Department if they are threatened or otherwise intimidated by the suspect, the suspect's family, or the suspect's associates;

C. Provide victims or witnesses with the event number and inform them of the necessary steps to prosecute the case;

D. Provides victims or witnesses with a telephone number so that they can contact the officer who will be conducting the follow-up investigation.

4.4   RESPONSIBILITY OF SUPERIOR OFFICERS

A. The final responsibility for the preliminary investigation rests with the District Supervisor on duty at the time.

B. Supervisors shall ensure that investigating officers conduct the preliminary investigation in an amount of time appropriate to the type of incident. Serious offenses will require a more comprehensive investigation while minor offenses need less time to investigate. In any event, the preliminary investigation should be thorough and complete.

C. Supervisors shall:

1. Ensure that the proper investigatory units are summoned to the crime scene in cases in which the preliminary investigation reveals the need for immediate follow-up investigation (e.g. homicides, fatal accidents, sex offenses, etc.), and notify the Duty Inspector or the 911 Lieutenant when specialized units need authorization prior to responding;

2. Inform on-coming Supervisors of preliminary investigations that need to be continued over into the next shift.

3. Inform the Duty Inspector or the 911 Lieutenant of all crime scenes involving deaths, rapes, holdups and kidnappings; or of any natural or man made disasters; or, whenever an employee of the Department is seriously injured in the performance of duty.

4. Review reports as soon as possible to:
   a. determine that all proper investigatory steps have been taken, and
   b. assures that the report reflects the correct crime classification that it is legible, and that sufficient information has been

included.

D. Superior Officers who feel that the solvability factors that are listed by the investigating Officer lack the quality and quantity of investigative leads that would result in a possible solution of the offense, and the offense is one that shall still be investigated by the District Detectives.

E. In those instances in which the Superior Officer finds that no valid solvability factors are listed on the report by the investigating officer and (s)he feels that the case should be investigated further, the Superior Officer shall refer the case to the District Detectives for further investigation.

F. District Commanding Officers shall daily examine all messages and reports of investigations within their respective commands, carefully inspecting them for compliance with existing procedures. Reports failing to meet the requirements shall be returned to the concerned Officer with recommendations for further action.

4.5    REQUESTING THE PRESENCE OF DISTRICT DETECTIVES
If a District Detective is on duty, (s)he may be summoned to a crime scene by either the Patrol Officer or by any Superior Officer. If the preliminary investigation can be completed by the Patrol Officer, and there is no need for immediate follow-up investigation, Detectives need not be summoned to the crime scene.

**5.0    TYPES OF PATROL**

**5.1    POLICY**
It is the policy of the Buffalo Police Department to use patrol as the primary method of delivering police services to the people in the City of Buffalo.

5.2    PURPOSE OF PATROL
The primary purpose of patrol is to:

A.  prevent and detect crime;

B.  preserve the peace;

C.  protect life and property;

D.  enforce laws and ordinances;

E.  apprehend violators of the law;

F.  render assistance to the public

COB000557

5.3     MOTORIZED PATROL
        Refer M.O.P. Chapter 8.

5.4     FOOT PATROL

    A.  Designing Foot Patrol Posts
        The Chief in charge of each of the Patrol Districts shall be responsible for
        coordinating the design of foot patrol posts within his/her respective
        command.

    B.  Route to Foot Patrol Post
        1.  Officers that are assigned to a foot patrol post shall proceed directly to
            their post without delay unless an extenuating police related matter
            prevents them from doing so.
        2.  Officers shall not use a private vehicle to get to, or to leave from their
            post, or while on foot post duty, unless they have the explicit
            permission of a Superior Officer, or there is an emergency situation.

    C.  Duties While on a Foot Patrol Post
        1.  Officers shall constantly and alertly inspect all parts of their posts,
            paying particular attention to those areas most vulnerable to the
            commission of crime. They shall afford special attention to places
            which are frequented by gamblers, prostitutes, drug abusers, drunks, or
            criminals and they shall attempt to prevent illegal activity.
        2.  Officers shall devote their full attention to their duties and they shall
            comply with all applicable Rules and Regulations of the Department.
        3.  Officers shall acquaint themselves with the habits, occupations, and
            comings and goings of the residents, business people and other
            habitués of their posts. During hours that businesses are closed, they
            shall check the security of accessible doors, windows, transoms and
            gratings, as often as possible.
        4.  Officers shall report all defective street lights, traffic lights, fire
            hydrants, water lines, streets, sidewalks, or any other condition that
            may prove hazardous and they shall take appropriate action to protect
            the public.
        5.  Officers shall carefully monitor all places suspected of fostering illegal
            vice activity or other suspicious behavior, and they shall report their
            observations to their Superior Officer and the appropriate investigative
            unit.
        6.  Officers shall assist police vehicles, fire apparatus, and ambulances,
            when those vehicles are being operated in emergency circumstances.
        7.  Officers becoming aware of any incident or circumstance needing
            police intervention on his/her post shall immediately respond to the
            scene and render assistance and take appropriate police action.
        8.  If due to a police related necessity, an Officer is required to leave
            his/her assigned foot patrol post, the Officer shall first notify his/her

Superior Officer, the Radio Dispatcher or his/her stationhouse. If the exigency of the circumstances makes such notification impractical, the Officer shall make the required notification immediately upon his/her return.

D.  Equipment
Refer to M.O.P. Chapter 8.

E.  Lunch Periods
Officers on a foot patrol post shall be allowed a one half hour lunch period during their ten (10) hour tour of duty. The lunch period shall be taken as directed by the Officer's Supervisor.

F.  Officer's Bearing
While on a foot patrol post, Officers shall maintain an erect posture, avoiding a slouching or slovenly appearance. They shall not lean against poles, trees, or buildings nor shall they carry any type of merchandise not directly connected to normal police activity.

5.5  K-9 PATROL
Both the Officer and the dog assigned to K-9 patrol must be properly trained and certified. In addition to other duties which may be assigned, K-9 patrol will be as follows:

A.  Motorized Patrol
An Officer and his/her K-9 dog may be assigned to motorized patrol by his/her Supervisor. They shall be assigned to a specific geographic area and shall augment the District patrol Officers in that area. In such cases the district supervisor shall be notified of the K-9 Officer's presence in the supervisor's district.

B.  Foot Patrol Posts
An Officer and his/her K-9 dog may be assigned to a foot patrol post and will comply with M.O.P. Chapter 8. In such cases the district supervisor shall be notified of the K-9 Officer's presence in the supervisor's district.

C.  Bomb Detection
An Officer and his/her K-9 dog, who have been trained and certified in bomb detection shall respond to such incidents when directed (refer M.O.P. Chapter 11).

D.  Illicit Drug Detection
An Officer and his/her K-9 dog, who have been trained and certified in detecting illicit drugs, shall conduct such searches when directed by a Superior Officer.

E. <u>Riots, Civil Unrest, Large Unruly Crowds, etc.</u>
During riots and civil unrest, or when confronted by large unruly crowds or gatherings, the Superior Officer on the scene may request that the Duty Inspector or the 911 Communications Lieutenant order K-9 dogs and their handlers to assist in controlling the situation and dispersing the crowd.

F. <u>Building Searches and Tracking Suspects</u>
An Officer and his/her K-9 dog may be called to locate a suspect when it is believed that the suspect is trapped in a building or (s)he may be called when there is a possibility that the suspect may be tracked by the K-9 dog.

G. <u>K-9 Demonstrations</u>
Public demonstrations of the capabilities of K-9 dogs may be scheduled to showcase the K-9 dog and his/her handler.

5.6    <u>BICYCLE PATROL</u>
Bicycle patrol may be implemented in those areas that are less accessible to car patrol and which require greater mobility than can be provided by foot patrol (e.g. the pedestrian mall, parking lots, parks, bicycle paths, etc.). Bicycle patrol may also be used to provide increased visibility at large gatherings or special events.

A. Officers on bicycle patrol shall be conspicuously attired in a readily distinguishable police uniform and shall be equipped with a portable police radio.

B. Officers assigned to bicycle patrol shall be responsible for complying with M.O.P. Chapter 8.

5.7    <u>MOTORCYCLE PATROL</u>
Only Officers that have the appropriate NYS license, and the appropriate training, shall be assigned to motorcycle patrol. Motorcycle patrol may be used as follows when weather conditions permit:

A. Escorting parades, funerals, foot races, etc.;

B. Traffic enforcement, including directing traffic, issuing traffic summonses and issuing parking summonses;

C. Ceremonial events.

5.8    <u>GEM/GOLF CART/SEGWAY PATROL</u>
Only those members of the Department who have the necessary NYS license, and who have been afforded the proper training, shall be assigned to GEM/GOLF CART/SEGWAY patrol. GEM/GOLF CART/SEGWAY patrol shall be used to patrol parks, playgrounds, bicycle paths and other areas less accessible to car patrol.

5.9    HELICOPTER PATROL
A member of the Department may be designated to accompany the Erie County Sheriff Department's helicopter patrol. The member so designated shall assist the Deputy Sheriff in rendering police assistance in remote areas of the City and in maintaining surveillance of suspects fleeing from crime scenes.

## 6.0    MOTORIZED PATROL

6.1    POLICY
It is the policy of the Buffalo Police Department to use motorized car patrol as the primary method of patrolling the City of Buffalo.

6.2    ESTABLISHING MOBILE PATROL SECTORS
It shall be the responsibility of the District Chief to establish, with the approval of the Commissioner, mobile patrol unit sectors within his/her command.

6.3    DRIVER'S LICENSE REQUIRED
All persons driving mobile units must possess a valid New York State driver's license which qualifies him/her to operate a vehicle of that type in New York State.

6.4    RESPONSIBILITY OF OPERATOR (when applicable)
The operator on duty in each mobile patrol unit shall be in charge of the unit and shall be responsible for the activity of the unit during that tour of duty. In addition, the operator is responsible for the care of the vehicle and shall ensure that:

    A.    At the beginning of the tour the vehicle is inspected for defects and cleanliness, and that all required equipment is accounted for;

    B.    The absence of any equipment, or any defect in the vehicle, noted during the inspection at the beginning of the shift is promptly reported to the Supervisor and a notation is made on the Radio Log (Form P-1124);

    C.    The radio dispatcher is notified whenever it is necessary to take the unit out of service;

    D.    His/her Supervisor is notified when the mobile unit needs servicing and that this information is recorded on the Radio Log (Form P-1194).

    E.    All required reports, forms, summonses, etc., are submitted prior to the expiration of the tour of duty.

6.5    EQUIPMENT IN MOBILE PATROL UNITS

    A.    The following equipment shall be carried in a mobile patrol unit:

1. Reflectorized traffic vests (2)
2. Sharpes container and Sharpes safety tongs
3. Crime scene tape
4. Flares (20)

B. In addition to emergency lights and siren the following are installed on many marked police vehicles:

    1. Public Address System - it may be used for car stops, for giving warnings and directions during an evacuation, or when attempting to communicate with a group of people;

    2. Alley Lights and Spotlights - they may be used while checking buildings or, when necessary, as an additional source of lighting at an incident, except that they should be used sparingly on high volume roadways because the intensity of the light might temporarily impair the vision of other drivers.

C. Members assigned to a mobile patrol unit shall complete the reverse side of the Radio Log (Form P-1124) each tour of duty.


6.6    MOBILE PATROL DUTY

A. Radio Contact
Members assigned to a mobile patrol unit shall at all times remain in radio contact during their tour of duty.

B. Manner of Patrol
Mobile patrol units shall not be driven about aimlessly, but shall be used for transportation from the scene of one police duty to another. During those times when they are not occupied with handling calls for service, members shall:

    1. frequent those locations where crime is known to occur;
    2. check the security of commercial establishments;
    3. check suspicious persons and vehicles;
    4. monitor their area of assignment for violations of law or for conditions that endanger the safety and welfare of the public;
    5. perform any other duties assigned by a Superior Officer or the Radio Dispatcher.
    6. engage in community policing activities such as visiting schools, satellite stations, businesses, and block clubs.

C. Leaving the Area of Assignment
Mobile patrol units shall not leave their assigned area of patrol unless directed to do so by a Superior Officer or the Radio Dispatcher. They may also leave

their assigned area of patrol in emergency situations or to perform a police function but only after having first notified the Radio Dispatcher.

D. Incidents in Adjoining Districts

Mobile patrol units dispatched to, or coming upon an incident requiring police attention which is on or near a boundary line of an adjacent district, shall handle the call and forward any reports to the proper district. Mobile patrol units shall not instruct members of the public to wait for the appearance of a mobile patrol unit from the appropriate district to handle the call but shall immediately take all appropriate police action.

E. Unattended Patrol Vehicles

1. When a vehicle is left unattended the ignition shall be turned off. The keys shall be removed and carried by the operator. When the vehicle is to be left for an extended length of time, or the vehicle is located in an area where vandalism is likely to occur, the windows shall be closed and the doors locked.

2. At the expiration of the tour of duty, the keys shall be turned in at the member's command.

F. Leaving the City

Mobile patrol units shall not be driven beyond the limits of the City of Buffalo except:

1. if involved in a continuous close pursuit; or,
2. under extreme emergencies; or,
3. at the direction of the Radio Dispatcher; or,
4. with the permission of the Duty Officer and in the furtherance of a valid police purpose.

In any circumstance in which a mobile patrol unit is permitted to travel beyond the city limits, the Radio Dispatcher must first be notified.

G. Reports

Members of mobile patrol units shall complete a Radio Log (P-1124) and all other reports that are necessary for the proper reporting of incidents and conditions encountered during the tour of duty.

6.7    USE OF SEAT BELTS IN DEPARTMENT VEHICLES

Due to the significant number of injuries and fatalities experienced by Police Officers as a result of motor vehicle collisions, all members of the Department are encouraged to use seat belts while in Department vehicles. Refer M.O.P. Chapter 3.

6.8    TRANSPORTING CIVILIANS IN POLICE VEHICLES

    A.  General Guidelines
        While on duty, members of the Department shall not routinely transport civilians in police vehicles. In the following circumstances a Department vehicle may be used to transport a civilian:

        1.  The civilian's safety or well-being is in jeopardy and there is no reasonable alternative (e.g. stranded motorist on an expressway or in a high crime area).
        2.  It is necessary to carry out a police related function (e.g. transporting witnesses, complainants, prisoners).
        3.  A Superior Officer authorizes the transport of a civilian in a specific case.
        4.  The civilian is participating in a ride-along program and prior approval has been obtained from the Commanding Officer in charge of the Police Academy.

    B.  Sick and Injured Persons
        Procedures for transporting sick and/or injured persons are outlined in M.O.P. Chapter 3.

    C.  Safety Belts Required
        Civilians shall wear safety belts while being transported in Departmental vehicles.

    D.  Procedures For Transporting Civilians While on Duty
        1.  On duty members will notify the Radio Dispatcher any time they are transporting civilians. They shall advise him/her of the reason and their destination.
        2.  Members shall proceed without delay to the destination by the most direct route and notify the Radio Dispatcher upon their arrival.
        3.  Members shall not engage in any emergency or pursuit driving nor respond to any calls or police service, except under circumstances where it is necessary for the preservation of life.

    E.  Transporting Persons of the Opposite Gender
        When transporting a person who is not the same gender as any other person in the police vehicle, the member shall inform the Radio Dispatcher of their location, their destination, and the odometer reading. Upon arrival at the destination, the member shall inform the Dispatcher of the mileage and request a time check.

6.9    RIDE-ALONG PROGRAM

    A.  The Captain assigned to the Police Academy shall be responsible for

approving requests from the public to accompany Department members while on patrol (i.e. ride-alongs). Approval shall be denied if it comes to the attention of the Captain assigned to the Academy that the person making the request is not of good moral character or has a prior criminal record that would make approving the request inappropriate.

B. A Release of Liability Form must be completed and signed by any person before (s)he is allowed to accompany Department members on patrol. Forms may be obtained from the Police Academy.

C. Riders shall be assigned to marked police vehicles.

D. Riders must be clearly instructed that they:

1. may not carry or use any weapon (except that law enforcement officers authorized to be in possession of a weapon may be permitted to carry his/her weapon as permitted by law);
2. will not expose themselves to any unnecessary risks and will remain in the police vehicle at in-progress calls or when instructed by the Police Officer to do so;
3. will maintain confidentiality of police information;
4. will take no action unless specifically directed to do so by a Police Officer;
5. will be given a bullet-proof vest to wear while on ride-along.

6.10   <u>LUNCH PERIODS</u>
Members of a mobile patrol unit may suspend their patrol duty for lunch within or near their assigned area, for a period not to exceed thirty (30) minutes. Members must first obtain the permission of the Radio Dispatcher and the lunch period may not be taken during the last one and one half (1 1/2) hours of the tour of duty. During lunch periods, units must remain in radio contact. In the event that there is a priority 1 or priority 2 call pending and there are no other cars available in the district to cover the call, a unit that is on lunch may be required to interrupt their lunch and respond to the call when directed by the Radio Dispatcher. In such event, the unit will be allowed to take their lunch later on in their tour of duty.

6.11   <u>VEHICLE MAINTENANCE</u>

A. <u>Preventative Maintenance</u>
1. Commanding Officers of all Departmental units to which vehicles are assigned shall be responsible for ensuring that vehicles are sent to the Police Garage for preventative maintenance in a timely fashion.

2. Members assigned to mobile units shall be responsible for notifying their immediate superior when vehicles are in need of preventative maintenance.

3. Patrol Lieutenants on duty during day shifts shall arrange to have vehicles taken to the Police Garage whenever they are due for servicing. Only one member shall be assigned to such duty and Lieutenants shall not assign this duty to themselves.

4. Members shall be responsible for notifying their immediate superior when MCT's are in need of repair.

B. Fueling Vehicles
1. Members assigned to mobile patrol units shall not allow fuel levels to get below one quarter of a tank at any time. An adequate supply of gas shall be left in the tank for the relieving crew.

2. Mobile patrol units shall obtain clearance from the Radio Dispatcher before leaving their assigned area of patrol for fuel.

3. Units going for fuel shall remain in radio contact and shall be available to respond to calls at the direction of the Radio Dispatcher.

C. Reserve Vehicles
1. In reporting the manpower for each tour of duty, the 911 Lieutenant shall be made aware of all marked police vehicles that are not in use and that are available for patrol duty.

2. If any command has an insufficient number of cars available for patrol duty, the 911 Lieutenant shall direct them to pick up a spare vehicle from the closest source.

3. Vehicles so loaned as replacement vehicles shall be returned at the expiration of the tour of duty unless directed otherwise.

D. Speedometer Calibration
Speedometers are routinely calibrated by police garage personnel as part of the Preventative Maintenance Inspection (PMI). Calibration cards are forwarded to the Traffic Violations Bureau in the Ellicott Square Building.

## 7.0    RESPONDING TO CALLS

7.1    POLICY
It is the policy of the Buffalo Police Department that when members are directed to respond to a call for service, they shall proceed to the scene without delay, taking the most direct route. The swiftness of the response will be determined by the nature of the call. In every instance the member is required to use due care when operating a Department vehicle.

7.2    <u>TYPES OF RESPONSE</u>
There are basically three types of response to incidents requiring the police:

A.  Routine Response

B.  Rapid Response

C.  Emergency Response

7.3    <u>ROUTINE RESPONSES</u>
Routine responses are those in which there is no need for an immediate police presence at the scene. Examples include: reporting property crimes; assisting motorists; loud music; gangs; etc. Members shall respond to routine calls as expeditiously as their other assigned police related duties permit. The use of emergency lights or the siren should not be used.

7.4    <u>RAPID RESPONSES</u>
A rapid response is one in which the presence of the police is needed without delay, under non-emergency circumstances. In these type calls there is no imminent threat of death or injury, nor does it involve a serious crime in progress or the flight of a violent felon. Examples include: alarms, domestic disputes, prowlers, suspicious persons, etc. The use of emergency lights and siren will be determined by the information received from the Radio Dispatcher.

7.5    <u>EMERGENCY RESPONSES</u>
An emergency response is one in which the presence of the police is needed immediately under emergency circumstances. These type calls involve an imminent threat of death or injury, serious crimes in progress, the flight of a violent felon or the imminent threat of severe property damage. Examples include: Officers in trouble, shootings, burglary/robbery in progress, assault in progress, etc. Emergency lights and/or siren shall be used when engaged in this type response.

7.6    <u>CAUTION REQUIRED</u>

A.  Members operating a Department vehicle with emergency lights or siren activated must exercise due regard for the safety of all persons including the Officers themselves.

B.  Members operating a police vehicle when emergency lights and/or siren is activated, must drive cautiously, traveling at a reasonable and prudent speed, and at all times maintaining control of the vehicle. They shall not proceed through intersections in which they face a red light, flashing red light, stop sign or yield sign, without first stopping the police vehicle and checking to make sure that cross traffic has halted and it is safe to continue. When two or more emergency vehicles approach an intersection simultaneously, the

emergency vehicle which otherwise would have had the right of way shall proceed first.

C. While Officers are afforded exemptions from certain traffic laws while operating a police vehicle with emergency lights or siren in operation, it specifically precludes them from operating the police vehicle in a reckless manner.

D. No Departmental vehicle shall be used in an emergency response mode unless it is equipped with an operable siren and visible emergency signaling devices.

7.7    GENERAL PROCEDURES FOR RESPONDING WITH EMERGENCY LIGHTS OR SIREN ACTIVATED

A. Emergency lights and/or siren must be activated when making an emergency response.

B. Emergency lights and/or siren may be activated when making a rapid response and such emergency devices are needed to safely traverse heavily congested roadways and intersections.

C. Emergency overhead lights or siren must be in operation any time a police vehicle proceeds past a red light, flashing red light, stop sign or yield sign, or whenever it exceeds the maximum speed limit.

D. Only the mobile patrol unit assigned to the call, and back up units specifically authorized by the Radio Dispatcher, shall use emergency lights and/or siren when responding to a call.

E. Emergency lights and/or siren may be deactivated when nearing the scene so as not to alert suspects of the impending arrival of the police but they cannot be deactivated, if the public will be endangered by so doing.

## 8.0    BANK ALARM RESPONSE PLAN

8.1    POLICY
It is the policy of the Buffalo Police Department to adhere to the Erie County Bank Alarm Response Plan as set out below. The safety of bank employees, the general public, and the Officers themselves take priority over the immediate apprehension of the suspect.

8.2    OBJECTIVES
The objectives of the Bank Alarm Response Plan are threefold:

A. To institute a procedure to provide protection and safety to bank employees, the general public, and to the responding police officers.

B. To enable responding officers to reach a predetermined location quickly and with minimal detection, as well as affording them maximum concealment while they observe the entire bank.

C. To effect safe apprehension of the offender.

8.3    ALARM ACTIVATION
The alarm system is to be activated only in the event of a robbery in progress while the robbers are still in the bank or shortly after their departure. (This, of course, is the ideal situation. False alarms will in fact occur due to either mechanical problems or human error).

8.4    RESPONSIBILITY OF RESPONDING OFFICERS
The responsibility of responding to bank robberies, as well as the follow-up investigation, will be the duty of the District Detectives in which the robbery occurred.

911 will notify the Detectives in the District that a bank robbery occurred. A minimum of one (1) District Detective shall respond to the robbery scene. In the event a manpower shortage at the District level, the District Detective will be called for overtime to respond to the scene. The call-out is for one (1) Detective; any need for additional Detectives shall be at the discretion of the Duty Officer. If no District Detective is available for call-out, the District Sergeant may be called out.

Overtime will be granted in accordance with departmental guidelines regarding seniority.

The follow-up investigation remains within the District in which the robbery occurred.

The major goal is a quick and effective response to bank robberies, and to be able to do complete and total investigations of each such occurrence.

A. When responding to bank alarms, discretion should be used in activating emergency lights and siren. Sirens should not be used if possible. However, vehicles shall be operated with safety as the highest priority.

B. All other non-responding units should limit their radio transmissions until either a false alarm notification is made or the call is completed.

C. Responding units shall observe the bank exits from a location from which the officers cannot be seen from inside the bank. They shall notify the Radio Dispatcher when they are on location and in position.

D. No responding units shall approach the bank itself until the Radio Dispatcher

has confirmed the nature of the bank alarm or the presence or absence of a suspect. The Radio Dispatcher is the only person authorized to permit access to the bank. <u>Do not</u> approach the bank without the permission of the Dispatcher.

E.  In the event of an actual robbery, the suspects will be allowed to exit the bank before the police take any action to terminate the robbery or take the suspects into custody.

**NOTE**: In the event of extenuating circumstances (e.g. shots being fired inside, etc.) notify the Dispatcher immediately.

F.  Subsequent to the robbery, bank personnel have been instructed to complete a "Bandit Description Report" (provided by the bank). They will also protect the crime scene and secure all exit doors. One designated bank employee will stand by the entrance door to meet the Officers and advise them of the situation.

8.5    <u>FALSE/ACCIDENTAL BANK ALARMS</u>

A.  All bank alarms will be considered as legitimate until confirmed as being false or accidental.

B.  All bank alarms will be confirmed through the Dispatcher prior to Officers approaching the bank.

C.  Once a bank alarm has been determined to be false, accidental, or a circuit problem, the bank manager will complete an "Alarm Activation Report" (provided by the bank). A copy of this form will be given to the responding Officer and should be forwarded to the Division of Administration and Communication.

8.6    <u>ALARM TESTS</u>
When a test of a bank's alarm system is required, the following procedures will be used:

A.  Bank officials will contact the Radio Dispatcher through the 911 complaint writers and give his/her name, the bank location and state his/her intention to test the alarm.

B.  The Radio Dispatcher will send a patrol unit to the bank.

**9.0    POLICE PURSUIT**

9.1    <u>POLICY</u>
It is the policy of the Buffalo Police Department that vehicular pursuit of suspects

in motor vehicles shall be limited to those circumstances in which the life or safety of any person is in imminent danger, or in which the person being pursued is suspected of having committed a violent felony. Even in these limited circumstances, the pursuit must be discontinued whenever the risk to the Officers or to the public engendered by the pursuit, outweighs the benefit of immediately apprehending the suspect.

9.2    PURSUIT DEFINED

For purposes of this section, pursuit is defined as an attempt by a Police Officer, while driving a marked police vehicle, to arrest a suspect who is driving a motor vehicle and who is attempting to avoid capture by the use of evasive driving tactics which violate the law, and thereby willfully and knowingly fails to yield to the Officer's use of emergency lights and siren.

9.3    DECISION TO INITIATE PURSUIT

A. The decision to pursue shall only be made after a careful consideration of all of the following relevant factors:

   1. Nature of the offense
   2. Time of day
   3. Weather conditions
   4. Geographic location/population density
   5. Familiarity with the area
   6. Vehicle capability and reliability.

B. Pursuit shall not be initiated if the reason for the attempted stop is only for VTL violations, misdemeanors, or other non-violent felonies. This specifically prohibits pursuits for UUV's, possession of stolen property (MV) or Grand Larceny of a motor vehicle.

C. Any police vehicle directly involved in a pursuit must use emergency lights and siren. Police vehicle windows shall be closed so that transmissions between the pursuing members and the Radio Dispatcher are more clearly audible.

D. Police motorcycles or unmarked police vehicles shall not engage in pursuits. They may follow a suspect vehicle until a marked vehicle arrives and then yield and not participate any further. Members shall not violate the VTL while in unmarked vehicles or on motorcycles.

9.4    DEPARTMENT GUIDELINES: PURSUIT TACTICS

A. The unit that initiated the pursuit shall be the "Primary Unit" and shall broadcast all pertinent information regarding the pursuit.

B.  The Radio Dispatcher is responsible for limiting the number of cars cleared to participate in the pursuit to one primary and one secondary unit. Other units may monitor the chase from their assigned sectors. Only the primary unit will communicate with the Dispatcher. These two units, along with a Supervisor, shall be the only units to engage in the pursuit. A Supervisor or Dispatcher may specifically authorize additional units to parallel the pursuit to the point of termination, but only if:

1.  the reason for the pursuit involved a crime of sufficient gravity, and
2.  the additional authorized units are at a safe distance and do not directly participate in the pursuit.

C.  Units that are not directly involved shall remain in their patrol sector but shall monitor the pursuit and be prepared to provide assistance if directed to do so.

D.  Discharging a Firearm or Shoulder Weapon:  DO NOT FIRE WARNING SHOTS

1.  Where feasible and consistent with personal safety, give some warning, other than a warning shot, before using deadly physical force against another person.
2.  Do not discharge a firearm or shoulder weapon from or at a moving vehicle or its occupants unless the occupants of the other vehicle are using deadly physical force against you or another person by means other than the vehicle.  Members shall not discharge their  firearms at or from a moving vehicle when the consequences of so doing will jeopardize the safety of other members of the Department or innocent bystanders.
3.  Do not use deadly physical force when it appears likely that an innocent person may be injured as a result.  Reckless conduct which harms an innocent person is not justified under the Penal Law.

E.  Members shall not bump or ram the suspect vehicle to terminate a pursuit. Barricading a roadway (road blocks) is impermissible unless:

1.  the suspect is being pursued for an offense or under circumstances for which the use of deadly physical force is permitted; and,
2.  the location of the barricade would permit the suspect vehicle sufficient time after having first seen the roadblock, to stop without crashing; and,
3.  the location of the barricade is in an isolated area that eliminates danger to the public; and,
4.  the vehicles used to barricade the roadway are unoccupied, marked police vehicles, with emergency lights in operation (except that one vehicle located a sufficient distance behind the barricade shall be occupied and ready for pursuit in the event the suspect vehicle makes

it past the barricade); and,

5. prior approval has been expressly granted by the Duty Inspector, 911 Communications Lieutenant, or a District Supervisor and they have not subsequently reversed that order.

F. Members driving a police vehicle while involved in a pursuit shall drive with caution, traveling at a reasonable and prudent speed, and at all times maintaining control of the police vehicle. Pursuing members shall not proceed through intersections in which they face a red light, flashing red light, stop sign, or yield sign, without first stopping the police vehicle and checking to make sure that cross traffic has halted and it is safe to continue. When two or more emergency vehicles approach an intersection simultaneously, the emergency vehicle which otherwise would have had the right of way shall proceed first.

9.5    ABANDONING PURSUIT

A. The primary purpose of a motor vehicle pursuit is to arrest fleeing suspects, using the least amount of force necessary, while minimizing the risk of harm to persons and property. As a consequence, members who are involved in pursuit must continuously evaluate whether the seriousness of the violation reasonably warrants continuation of the pursuit.

B. The decision to engage in pursuit is not irreversible and it is the prudent Officer who knows when to terminate the chase. The immediate apprehension of an offender is never more important then the safety of innocent motorists and pedestrians, or the Officers themselves.

C. A pursuit **must** be abandoned:

1. Immediately, when ordered to do so by a Superior Officer (First Line Supervisors are required to respond and monitor pursuits.);
2. When Officers lose visual contact with the suspect vehicle;
3. When there is a clear and unreasonable danger to the Officer or other users of the roadway (A clear danger exists when speeds dangerously exceed the normal flow of traffic or when vehicular or pedestrian traffic necessitates dangerous maneuvering which is beyond the capabilities of the police vehicle or the driver);
4. When the offender can be sufficiently identified so that an apprehension can be more safely made at a later time.

D. When pursuit is terminated, pursuing police vehicles will acknowledge that they have terminated their pursuit and will notify the Radio Dispatcher of their location before returning to their assigned patrol sector.

9.6     REPORTING REQUIREMENTS

    A.  In all pursuits, the Senior on duty Supervisor will cause an investigation to be made and will report the results of the investigation, together with his/her recommendations, to the Commissioner of Police.

    B.  Members initiating a pursuit will file a pursuit form prior to the end of the tour of duty.

9.7     PURSUITS INTO THE CITY BY OUTSIDE AGENCIES
When an outside law enforcement agency pursues a vehicle into the City of Buffalo:

    A.  The Buffalo Police Radio Dispatcher may assign <u>one</u> unit to assist the outside agency;

    B.  The Supervisor on duty in the locale where the pursuit terminates will respond to the site of termination;

    C.  The Buffalo Police Department members involved in the chase shall be responsible for complying with all existing pursuit procedures.

## 10.0    CAR STOPS

10.1    POLICY
It is the policy of the Buffalo Police Department that when members stop vehicles for any police related purpose they shall do so in a manner that protects the safety of the member, the motorist, and the general public.

10.2    INITIAL STOP
Car stops are inherently dangerous police actions and should be undertaken with extreme caution. Members shall:

    A.  Decide where there is a safe location to stop the vehicle;

    B.  Activate the emergency lights and direct the vehicle's driver to pull over;

    C.  Inform the Radio Dispatcher of his/her location, the license plate number, the number of occupants, and the reason for the stop;

    D.  Position the police vehicle so that it is approximately three feet to the left and one car length behind the suspect vehicle with the spotlight or other lighting equipment illuminating the suspects;

    E.  If necessary, order the suspects to remain inside the vehicle until directed otherwise.

10.3  APPROACHING THE VEHICLE

    A.  The member's attention shall be focused on the occupants while approaching the vehicle, being alert for any suspicious or sudden movement;

    B.  The member who was driving the police vehicle shall approach the suspect vehicle from the left and shall stop slightly behind the front door;

    C.  In a two member police vehicle, the member riding on the passenger side shall approach the vehicle from the right and shall position himself/herself behind the suspect vehicle and slightly to its right, at all times closely monitoring back seat occupants and being aware of any suspicious or sudden movements by any of the occupants.

10.4  CONTROLLING THE DRIVER AND OCCUPANTS

    A.  Department members shall immediately establish control over the driver and occupants of the suspect vehicle in a way that ensures the safety of the Officers, the vehicle's occupants, and the public.

    B.  While members must always be courteous and polite, in this circumstance they must also be authoritative so that their commands to the occupants of the suspect vehicle are promptly obeyed.

    C.  If it is necessary to remove occupants from the suspect vehicle, the Officer shall do so only when (s)he knows it can be done safely. If it cannot be done safely, the Officer shall request and await the arrival of assistance.

    D.  Occupants who have been removed from a suspect vehicle shall be kept under control and shall not be allowed to wander.

10.5  TRAFFIC CHECKPOINTS

Members of the Department may establish traffic checkpoints but only with the express permission of a Inspector, a Chief, a Deputy Police Commissioner, or the Police Commissioner. The purpose of a checkpoint is to stop motorists and to methodically evaluate their compliance with the law. The superior officer shall document any such activity in his/her activity report, and shall also prepare a "Buffalo Police Department Traffic Checkpoint Form" (also referred to as a Roadblock Form), as directed by the DPC.  The purpose of the directive is to ensure roadway safety.  Officers shall:

    A.  Make the traffic checkpoint (roadblock) obvious.  Overhead flashing lights must be activated on all vehicles taking part in the roadblock.

    B.  The traffic checkpoint (roadblock) must not be unreasonably intrusive to the motorists.

C.  Set the traffic checkpoint (roadblock) in a way that minimizes the possibility of avoiding it.

D.  Conduct a traffic stop on any vehicle that attempts to avoid the traffic checkpoint (roadblock). Officers are permitted to check the motorist for valid license, registration, and insurance documentation and also to make inquiry as to why the motorist avoided the roadblock.

E.  During the traffic checkpoint (roadblock), check all drivers and passengers for proper wearing of seatbelts.

F.  During the traffic checkpoint (roadblock), check all vehicles for proper registration and vehicle inspection stickers affixed to the windshield.

G.  Act upon any and all "probable cause" situations arising from information obtained from the "mobile plate reader" and/or from "officer initiated plain view" observations.

H.  Prepare and issue traffic summonses for any violations of law observed during the traffic checkpoint (roadblock).

I.  The traffic checkpoint (roadblock) must begin and end at the predetermined times listed on the form.

J.  All officers involved in the traffic checkpoint (roadblock) shall be given a copy of the form prior to the actual roadblock taking place.

Also to be considered and followed:

K.  The site selected shall be an area where the risk to the Officers and the public can be minimized.

L.  Check points (roadblocks) shall be established during those times of day when interference with traffic flow will be minimized.

M.  Flares, checkpoint warning signs, police vehicles with emergency lights in operation, and/or traffic cones, will be used to alert traffic of the existence of the checkpoint (roadblock) and to direct traffic to the checkpoint (roadblock) area in a safe manner.

## 11.0  **EXCESSIVE AVOIDABLE ALARMS**

11.1  POLICY
Avoidable alarms, including intrusion alarms, hold-up alarms, and other types of alarms, contribute to the ineffective utilization of Department personnel. They require an emergency response which jeopardizes the safety of the responding

officers and the public; they may interfere with or delay a response to a genuine emergency; and they often produce unnecessary noise in the surrounding community. It is the policy of the Buffalo Police Department to fully cooperate with Director of Housing and Inspections, as well as other city employees, in enforcing Chapter 263, Section 263-12 of the City Ordinances.

11.2    AVOIDABLE ALARM DEFINED
An "avoidable alarm" means any activation of an alarm device or system through intentional or accidental activation, mechanical or electronic failure, malfunction, improper installation, improper maintenance or the negligence of the owner, user, custodian or lessee of an alarm system or his/her employees or agents which through notification to the Department of Police indicates that an emergency situation exists requiring an emergency response in the City of Buffalo when in fact an emergency situation does not exist. It does not include alarms activated by acts of God, such as hurricanes, tornadoes or earthquakes.

11.3    AVOIDABLE ALARMS - REPORTING DISPOSITIONS
When sworn members respond to a business alarm, residential alarm or bank alarm and they determine that the alarm was avoidable as described above, they shall indicate such disposition to the Dispatcher and the reason for concluding that the alarm was avoidable.

11.4    DEPARTMENT REPORTING TO HOUSING AND INSPECTIONS
Dispositions indicating an avoidable alarm shall be recorded through the CAD/CHARMS System. The Division of Communications and Records shall regularly forward a record of such dispositions to the Director of Housing and Inspections. Avoidable alarms in excess of three per year starting from the date the permit was issued shall be subjected to fines as specified in the City Charter.

# CHAPTER 9: COMMUNICATIONS AND RECORDS

## CONTENTS

**1.0**   **RECORDS GENERALLY**
1.1   Policy
1.2   Purpose for Maintaining Records
1.3   Discriminate Collection and Use of Information
1.4   Records Repositories
1.5   Maintaining Security of Department Records

**2.0**   **DISSEMINATION OF DEPARTMENT RECORDS**
2.1   Policy
2.2   Records That Are To Be Made Available For Public Inspection Generally
2.3   Certain Department Records to be Disclosed
2.4   Restricted Access to Certain Department Records
     A.  Records Involving Juvenile
     B.  Records Pertaining to the Active Investigation of Crimes
     C.  Where the City is a Party
     D.  Criminal History and Record Information
     E.  DMV Information
2.5   Disclosing Criminal Records
2.6   City Court Booking Unit - Clearing House Function
2.7   Hours When Records Are Available to the Public
2.8   Fees for Records
2.9   Records Access Officer
2.10  Denial of Access to Records and Appeal to the Corporation Counsel
2.11  Availability of Records to Department Personnel

**3.0**   **STORAGE AND DISPOSAL OF DEPARTMENT RECORDS**
3.1   Policy
3.2   Definitions
     A.  City Records Disposition Officer
     B.  Custodian of Records
     C.  Department Contact Person
3.3   Disposal of Records Generally
3.4   Retention Periods
3.5   Procedure for Disposal of Records
3.6   Procedure for Storage and Retention of Records

**4.0**   **MAINTAINING RECORDS OF POLICE RELATED INCIDENTS**
4.1   Policy
4.2   Incident Numbering
4.3   Report Numbering
4.4   Police Related Incidents
4.5   Responsibility

4.6     District Complaint File

**5.0     POLICE REPORTS**
5.1     Policy
5.2     Preparing Police Reports
5.3     Completed Staff Work
5.4     Preparing Reports of Incidents Outside the Command
5.5     Distribution of Reports
5.6     Storage and Disposal of Police Reports
5.7     Uniform Crime Reporting

**6.0     VERBAL AND WRITTEN COMMUNICATION**
6.1     Policy
6.2     Chain of Command
6.3     Official and Unofficial Communications
6.4     Circumventing the Chain of Command - Extenuating Circumstances
6.5     Basic Requirements of Verbal Communications
6.6     Written Communication and Correspondence
6.7     Preparing Intra-Departmental Correspondence
6.8     Preparing Reports - Desk Personnel Responsibility
6.9     Responsibilities of Intermediate Members of the Chain of Command
6.10    Correspondence to Government Agencies and Businesses
6.11    Correspondence Sent in Response to Complaints
6.12    Forwarding Daily Business
6.13    Assembling the Daily Business
6.14    Handling the Daily Business

**7.0     USING DEPARTMENT TELEPHONES**
7.1     Policy
7.2     The Department 911 System
7.3     Proper Use of Department Telephones
7.4     Voice Mail and Answering Machines
7.5     Long Distance Telephone Calls
7.6     Permission to use Department Telephones
7.7     Duties of Personnel Assigned to CENTREX
7.8     Requests for Information from the Telephone Company

**8.0     COMPUTERIZED INFORMATION SYSTEMS**
8.1     Policy
8.2     Computerized Information Systems
            A. Buffalo Police Department Systems
                1.  Computer Aided Dispatch
                2.  Records Management System
                3.  Lotus Notes
            B. Non-Departmental Computer Information Systems
                1.  The Empire System

P-COB000579

2.  NYSPIN
3.  NCIC
4.  NLETS
8.3    Mobile Computer Terminals (MCT'S)
8.4    Management Information Section
8.5    Responsibility for Operating NYSPIN
8.6    Use and Dissemination Agreements
8.7    Use of Social Media

**9.0    RADIO COMMUNICATIONS**
9.1    Policy
9.2    FCC Authorization
9.3    Instructions from Radio Dispatcher
9.4    Duties of Radio Dispatchers
9.5    Radio Dispatcher's Guide
9.6    Assigned Radio Call Numbers
9.7    Radio Channels
9.8    Nature of Broadcasts
9.9    Types of Broadcasts
9.10    Direct Broadcasts
9.11    Simulcasts
9.12    Prioritizing Calls for Service
9.13    Responsibility of Radio Units
9.14    Operating the Mobile Unit Police Radio
9.15    The Identity and Location of 911 Caller Not to be Revealed
9.16    Missed Runs
9.17    Portable Radios
        A.  Issuance of Portable Radios
        B.  Portable Radio Call Numbers
        C.  Radio Contact
        D.  Responsibility of Commanding Officers

**10.0    CRIME ANALYSIS**
10.1    Policy
10.2    Source of Criminal Information
10.3    Crime Analysis Unit
10.4    Factors Used in Crime Analysis
10.5    Annual Report

**11.0    BUSINESS FILES**
11.1    Policy
11.2    District Responsibility
11.3    Methods for Updating the Business Files

**1.0  RECORDS GENERALLY**

1.1  POLICY

It is the policy of the Buffalo Police Department to continuously enhance its ability to render effective law enforcement services to the public by keeping complete and accurate records. Such records shall be kept secure and access to them will be closely regulated by the Department. The collection, maintenance and security of all such records will be in compliance with federal, state and local law.

1.2  PURPOSE FOR MAINTAINING RECORDS

The purpose of the Department in maintaining complete and accurate records can be described as follows:

A.  To enable the Department to assess where and when there is the greatest need for law enforcement services and to deploy resources accordingly;

B.  To determine the Department's effectiveness in dealing with particular law enforcement issues;

C.  To provide investigative assistance:

D.  To accurately inform the public of pertinent law enforcement issues;

E.  To comply with federal, state and local laws requiring the recording of certain information.

1.3  DISCRIMINATE COLLECTION AND USE OF INFORMATION

The Buffalo Police Department, as a law enforcement agency, is in a position to collect and maintain a wide variety of information. If collected indiscriminately, the sheer volume of information could prove counter-productive by overtaxing the Department's ability to handle it appropriately. Only information that appreciably enhances the Department's ability to provide effective law enforcement services should be collected. Factors to be considered include:

A.  Federal, state and local statutes requiring the collection of the information;

B.  How often the information is used and by whom it is used;

C.  The relative importance of the information in enabling the Department to perform its functions;

D.  Whether the effort expended in collecting and handling the information justifies the benefits that accrue;

E.  The availability of the information from sources outside the Department;

F. The existence of files with similar information that are being maintained elsewhere in the Department;

1.4    RECORDS REPOSITORIES

A. The City Court Booking Unit will be responsible for retaining all offense reports, City Court Booking, traffic accidents reports, incident reports (e.g. aided case reports, etc.) and all other records as specified by the Inspector in command of the Division of Administration and Communication.

B. Records of traffic summonses and traffic tags will be kept in the Traffic Records Office;

C. Arrest records and criminal history data will be retained in the City Court Booking unit;

D. Reports concerning evidence and property will be retained in the Property Office;

E. Reports concerning Department finances will be retained in the Office of Administrative Services;

F. All other reports and records shall be retained as specified by the Commissioner.

1.5    MAINTAINING SECURITY OF DEPARTMENT RECORDS

A. All Commanding Officers will take appropriate steps to insure that Department records are secure from scrutiny by unauthorized personnel. Locking devices on files or office doors shall be used whenever necessary.

B. Those areas in which records are retained in units serving as record repositories as specified in 9/1.12 above shall be accessible only to persons specifically assigned to those units. Other personnel may be admitted but only with the permission of an employee assigned to that unit.

C. The Management Information Section shall install sufficient safeguards to insure that records accessible by computer are made available only to authorized personnel.

2.0    **DISSEMINATION OF DEPARTMENT RECORDS**

2.1    POLICY
The Common Council of the City of Buffalo has deemed that "government is the public's business and the public, individually and collectively, should have access to the records of government as freely as possible," (refer to City Charter Chapter

361, Article II, section 361-12 B). It is the policy of the Buffalo Police Department to comply with the Common Council's mandate to the extent that law enforcement operations are not unnecessarily impeded.

2.2    <u>RECORDS THAT ARE TO BE MADE AVAILABLE FOR PUBLIC INSPECTION GENERALLY</u>
The Department shall make available for public inspection and copying all records <u>except</u> records or portions thereof which:

A.  Are specifically exempted from disclosure by state or federal statute;

B.  If disclosed, would constitute an unwarranted invasion of personal privacy;

    1.  For purposes of this section an unwarranted invasion of personal privacy includes but is not limited to:

        a.  Disclosure of employment, medical or credit histories or personal references of applicants for employment;
        b.  The sale or release of lists of names and addresses if such lists would be used for commercial or fundraising purposes;
        c.  Disclosure of information of a personal nature when disclosure would result in economic or personal hardship to the subject party and such information is not relevant to the work of the agency requesting or maintaining it;
        d.  Disclosure of information of a personal nature reported in confidence to an agency and not relevant to the ordinary work of such agency;
        e.  Disclosure of items involving medical or personal records of a client or patient in a medical facility;

    2.  Disclosure shall not be construed to be an unwarranted invasion of privacy if:

        a.  the identifying details are deleted;
        b.  the person to whom the record pertains consents in writing to disclosure;
        c.  upon presenting reasonable proof of identity, the person is seeking access to records that pertain to himself;

C.  If disclosed, would impair present or imminent contract awards or collective bargaining negotiations;

D.  Are compiled for law enforcement purposes and which, if disclosed, would:

    1.  Interfere with law enforcement investigations or judicial proceedings;
    2.  Deprive a person of a right to a fair trial or impartial adjudication;

3. Identify a confidential source or disclose confidential information relating to a criminal investigation;
4. Reveal criminal investigative techniques or procedures, except routine techniques and procedures;

E. If disclosed, would endanger the life or safety of any person;

F. Are interagency or intra-agency materials which are not:

1. Statistical or factual tabulations of data;
2. Instructions to staff that affect the public; or
3. Final agency policy determinations;

2.3   CERTAIN DEPARTMENT RECORDS TO BE DISCLOSED

A. The Common Council has determined that upon payment of the required fee a diligent search shall be made of Police Department records and that the following records shall be disclosed, (Refer to City Ordinances, Chapter 361, Article V, section 361-22):

1. If a motor vehicle has been stolen, recovered or involved in a crime;
2. The owner or owners of a motor vehicle or other pertinent information to that owner or owners;
3. If motor vehicle license plates have been lost, stolen or recovered;
4. Copies of motor vehicle accident reports.

2.4   RESTRICTED ACCESS TO CERTAIN DEPARTMENT RECORDS
Certain Department records are permitted only restricted access and shall not be disclosed to the public or shall be disclosed only with prior approval of higher authority or with approval of the District Attorney or Corporation Counsel.

A. Records Involving Juveniles
1. Employees of the Department shall not reveal to the public any information that tends to reveal the identity of a person designated as a "juvenile delinquent," "neglected" or "abused child," " a person in need of supervision", a juvenile victim of a sexual offense, or a "youthful offender" as that terms is defined in section 720 of the Criminal Procedure Law.
   a. The identity of "juvenile offenders" as that term is defined in Article 10, section 18 of the NYS Penal Law is not confidential.
2. Juvenile records are to be kept separate from other Department records. The Juvenile Unit will be responsible for the collection, dissemination and retention of juvenile records as required by applicable statutes.
3. Original reports shall include the name of any juvenile who may be

involved either as a witness, victim, suspect, complainant or perpetrator, however, copies of reports containing the names of juveniles shall be redacted (i.e. the juvenile's name and other identifying data shall be removed) prior to release.

    a. Juvenile records are not open for public inspection and may only be released pursuant to a written court order.

   4. Fingerprints and mug shots - Refer to M.O.P. Chapter 3.

B. <u>Records Pertaining to the Active Investigation of Crimes</u>

All records, including confessions or admissions, pertaining to any criminal case under active investigation or awaiting court action shall not be disclosed to any attorney or any other person without first obtaining the permission of the District Attorney's Office.

C. <u>Where the City May Be a Party</u>

All requests for records pertaining to cases in which the City may be named as a party in a civil law suit shall be referred to the Corporation Counsel's Office.

D. <u>Criminal History Record Information</u>

Criminal history record information accessed through the Erie County Department of Central Police Services, the NY State Police or the National Crime Information Center shall only be disclosed when such disclosure is permitted by the dissemination agreements in effect between the Department and these agencies. Under no circumstances shall any employee of the Department disseminate any criminal history record information to any person not authorized to receive such information (refer to M.O.P. Chapter 9). Generally the dissemination agreements allow disclosure:

   1. only to qualified criminal justice agencies; and,
   2. then only on a strictly "right to know;" and,
   3. a "need to know" basis; and,
   4. the information must serve a valid criminal justice purpose.

E. <u>D.M.V. Information</u>

Any employee of the Department requesting any computerized D.M.V. data from the Buffalo Police Department must have a "right to know" and a "need to know" for requesting and receiving this information. Under no circumstances will personnel of the Buffalo Police Department release this information to an unauthorized person.

2.5   <u>DISCLOSING CRIMINAL RECORDS</u>

A. <u>Criminal Records</u>

For purposes of this section, criminal records include, but are not limited to:

   1. arrest reports

2. court commitments and releases
3. prisoner property records
4. photographs
5. fingerprints
6. NYSIS and FBI reports
7. disposition data

B. <u>Who May View Criminal Records</u>
The New York State Division of Criminal Justice Services has established guidelines for disseminating criminal records. Criminal records shall be revealed only to those persons or agencies, and under those circumstances, that have been authorized by DCJS. Generally, criminal records may be viewed by:

1. Police Departments having general responsibility for the enforcement of criminal law;
2. agencies responsible for conducting criminal investigations;
3. courts that have criminal jurisdiction;
4. correction departments, parole commissions and probation departments.

C. <u>Photocopying Criminal History Printouts is Forbidden</u>
Criminal history printouts shall not be photocopied. They are for the exclusive use of Buffalo Police Department personnel except that in the case of an arrest, one copy shall be forwarded to the arraigning court in the prisoner's court file.

D. <u>Who May Obtain Record Checks But Not View Criminal Records</u>
1. A military branch of the United States Government or the State of New York may be provided a criminal records check if the subject of the request has forwarded a signed and notarized statement authorizing the disclosure of such information.
2. Private citizens may request a record check on themselves. The person making such a request shall explain the reason therefore on the form that (s)he is required to prepare by the City Court Booking Unit. The person must also display proper identification.
3. The Civil Service Administration may, with a signed release, obtain a record check of a potential City of Buffalo employee.
4. Requests for record checks shall result in the search of local arrest records only.

E. <u>Mug Shots</u>
1. Mug shots may be used for investigative purposes or for court presentation by law enforcement or criminal justice agency officials.
2. Mug shots may not be used for unofficial purposes.
3. Only the Commissioner, the Deputy Commissioners, the Chiefs, the

Public Communications Officer, or a Department employee acting at their direction may release a mug shot to the media (refer M.O.P. Chapter 14).

F.  Commanding Officer of City Court Booking
All questions concerning the propriety of releasing criminal record information shall be referred to the Commanding Officer of City Court Booking. Also the CHRI Section of the Department of Criminal Justice Services can be contacted by calling 518-457-6077.

2.6   CITY COURT BOOKING - CLEARING HOUSE FUNCTION
City Court Booking shall be the clearing house for all record requests. All requests for records shall be referred to that unit. If the record requested is not stored at City Court Booking and is of a type that must be disclosed, City Court Booking shall refer the person making the request to the appropriate records repository. If the record is one which need not be disclosed the person making the request shall be so informed by City Court Booking personnel. Refer to M.O.P. Chapter 9.

2.7   HOURS WHEN RECORDS ARE AVAILABLE TO THE PUBLIC
Records shall be maintained and made available for public inspection Monday – Friday between the hours of 7:00 a.m. and 5:00 p.m.

2.8   FEES FOR RECORDS

A.  The Department shall charge the following fees for producing records:

1. Accident and crime reports          25 cents per page or per photocopy
2. Criminal Records                    10 Dollars

B.  Exemptions from fees for records specified in M.O.P. Chapter 9 shall be as follows:

1.  A fee shall not be charged to any law enforcement agency or authority;
2.  The following shall be entitled to a search, report and copies without payment of fees:

a.  American Red Cross
b.  Big Brother/Big Sister
c.  Catholic Charities of Buffalo
d.  Children's Aid and the Society for the Prevention of Cruelty to Children
e.  Civil Air Patrol
f.  International Institute
g.  Jewish Federation for Social Service
h.  Joint Charities and Community Fund

    i.   Salvation Army

    j.   In-Home Support Services Corporation of Western New York

    k.  Part-time employees of the Lighted School House Program shall not be charged a fee for a police records search in connection with their initial application for employment.

    l.   Compeer - United Way

    m. U.S. Military Organizations

    n.  Sheriffs Department

    o.  Outside governmental agencies

## 2.9    RECORDS ACCESS OFFICER

A. <u>Designation</u>

The Department shall designate one employee to act as a records access officer for the purpose of complying with Chapter 361, Article II of the City Ordinances. Generally, the Commanding Officer of the City Court Booking unit shall be designated as the records access officer.

B. <u>Powers and Duties</u>

1.  The records access officer shall prepare and keep current a reasonably detailed list of records by subject matter. This list shall be updated not less than every six (6) months, and the date of the most recent updating shall appear on the first page. (S)he shall make such list available for inspection and copying in City Court Booking.

2.  The records access officer shall also ensure that:

    a.  the person making the request is assisted in identifying the requested records;

    b.  a search for identifiable records is conducted;

    c.  upon locating the requested records:

        i.  a determination is made whether the record may be accessed under the law and if so, the record is produced;

        ii.  ii. any material not available by law or regulation is deleted and the remainder of the record is promptly produced;

        iii.  the person making the request is denied access to any records to which (s)he is not entitled;

    d.  Upon request for copies of records:

        i.  the cost is calculated and the person making the request is advised of the total cost and copies are produced upon payment or offer to pay any fees;

        ii.  pen, paper and similar materials are made available to copy records;

    e.  Upon request, have the accuracy and completeness of the copy certified;

    f.  Upon failure to locate records, have certified in writing that:

1) the agency is not the legal custodian of such records;
2) the agency is the legal custodian of such records but the records cannot be found;
3) the records do not exist;

3. Unless otherwise specified the records access officer shall ensure that a response to a request for records is produced within five (5) working days.

    a. The Records Access Officer may take longer than 5 working days if:

        i. The requested records require examination and evaluation by personnel having the necessary competence and discretion to determine if the records are exempt from disclosure under the Freedom of Information Act or other statute;

        ii. The requested records involve the responsibility of another agency whose assistance is being sought in processing the request;

        iii. The requested records exist but are presently in use by another party;

        iv. The requested records have not been located in the course of a routine search and additional efforts are being made to locate them;

        v. The request requires the accumulation of a substantial number of specified records and such accumulation will take longer than five days;

        vi. The requested records are stored at locations other than the office in receipt of the request and more than five days will be required to obtain them.

    b. If for any of the above reasons the records cannot be produced within five days, the record access officer shall ensure that receipt of the request is acknowledged within five days and such acknowledgment shall include a brief explanation of the reason for the delay.

2.10 **DENIAL OF ACCESS TO RECORDS AND APPEAL TO CORPORATION COUNSEL**
Each denial of access to a Department record shall be in writing and shall state that the person making the request has the right to appeal to the Corporation Counsel of the City of Buffalo.

2.11    AVAILABILITY OF RECORDS TO DEPARTMENT PERSONNEL

    A.    Records retained in City Court Booking are available to Department personnel on a twenty-four hour basis.

    B.    Records shall only be released to Department personnel if the employee is actively engaged in an authorized Buffalo Police Department investigation to which the records may have some relevance. Access to sensitive files shall be strictly limited by the Commanding Officer of the unit in which the files are maintained.

**3.0    STORAGE AND DISPOSAL OF DEPARTMENT RECORDS**

3.1    POLICY
It is the policy of the Buffalo Police Department to store and retain records in a manner that is consistent with existing laws and statutes.

3.2    DEFINITIONS

    A.    City Records Disposition Officer - the City Clerk has been designated to fulfill the duties of the City Records Disposition Officer.

    B.    Custodian of Records - the Inspector in charge of the Division of Administration and Communication has been designated as the Custodian of Records.

    C.    Department Contact Person - The Commanding Officer in charge of City Court Booking shall be the Department Contact Person.

3.3    DISPOSAL OF RECORDS GENERALLY

    A.    No records may be destroyed without prior permission.

    B.    City Court Booking may be consulted regarding the length of time that different records must be retained and the procedure for disposal.

    C.    City Court Booking will maintain a permanent record of all records that have been destroyed or otherwise disposed of.

3.4    RETENTION PERIODS

    A.    Retention periods for records vary in length from less than one year to permanency. City Court Booking will keep on file a schedule of the length of time the various kinds of records must be retained.

    B.    Duplicate copies (i.e., made at the time that the original was made) may only

be destroyed if their disposal is authorized by the City Records Disposition Officer and a record is kept of their disposal. These duplicate copies may be destroyed at any time so long as the requisite permission is obtained and the disposition record is retained. The permanent disposition record will be kept on file in City Court Booking.

3.5    PROCEDURE FOR DISPOSAL OF RECORDS

The following procedure shall be used when a unit of the Department wishes to dispose of records:

A.  The Commanding Officer of the City Court Booking unit will be contacted to determine if the records can be legally destroyed;

B.  If the records can be destroyed, the Document Disposition Form will be forwarded to the command that requested their destruction. The requesting command will prepare the form and return four copies to City Court Booking.

C.  The Document Disposition Form will be signed by the Commanding Officer of City Court Booking and the Custodian of Records (i.e., Inspector in charge of the Division of Administration and Communication). City Court Booking will forward the completed Document Disposition Form to the City Records Disposition Officer (i.e., City Clerk);

D.  If the City Clerk grants permission for the forms to be destroyed (s)he shall sign the Records Disposition Form and return three copies to City Court Booking;

E.  City Court Booking will keep one copy of the Records Disposition Form for permanent retention and forward the remaining two copies to the requesting command;

F.  The requesting command will deliver the two copies of the Records Disposition Form along with the records to be disposed of to the Property Office;

G.  The Property Office will enter the required information on the Records Disposition Form and provide the requesting command with one copy;

H.  The Property Office will then be responsible for the destruction of the records. No records shall be destroyed by the Property Office unless these procedures are followed.

3.6    PROCEDURE FOR STORAGE AND RETENTION OF RECORDS

In the event that records are to be stored in headquarters by any unit in the Department, the Document Disposition Form will be completed at the time of storage. One copy of the Document Disposition Form will be retained with the

stored records and a second copy will be retained by City Court Booking. In the event that these records are to be destroyed at a later date, the procedure outlined in M.O.P. Chapter 9 shall be followed.

## 4.0  MAINTAINING RECORDS OF POLICE RELATED INCIDENTS

4.1  POLICY
It is the policy of the Buffalo Police Department to create a record of all police related events and to maintain such records in accord with necessity and statute.

4.2  INCIDENT NUMBERING

A.  All police incidents shall be assigned an event number. Event numbers are assigned by the CAD system and shall reflect the year, the day, and the number of the incident on that day. Records of such police related incidents may be accessed by referral to the event number. The event numbering system is designed so that each incident receives a number, that no numbers are omitted and no numbers are duplicated.

B.  The event number is configured as follows:

1.  The first two digits of the event number reflect the last two digits of the current year (e.g. 2011 is 11);
2.  the next three digits of the event number represent the Julian calendar date which is actually the number of the day of the year (e.g. January 15 is 015, February 1 is 032, etc.);
3.  The next series of numbers reflect the number of the event for that day.

4.3  REPORT NUMBERING

A.  The CAD System will automatically assign a report number to every incident that requires that a report be completed and filed by Department personnel.

B.  The report number will be configured as follows:

1)  The first two digits of the report number reflect the last two digits of the year in which the report number was created.
2)  The next three digits represent the Julian calendar date.
3)  The remaining digits of the report number are sequential.

4.4  POLICE RELATED INCIDENTS
For purposes of the event numbering system a police related incident shall be issued an event number for:

A.  Calls For Service
A call for service is any police response documented by a record in the CAD

System.

B. Complaints

A complaint is an allegation of an improper or unlawful act or omission which relates to the business of the Department or any condition that necessitates investigation by the Department to determine if any unlawful act or omission has occurred.

C. Employee Initiated Service Resulting in the Filing of a Report

D. Any Other Police Related Incident

Any other police related incident in which an employee performs a law enforcement function or renders a specific police service at a particular time and location; or, one that requires a preliminary or follow-up investigation.

E. Traffic Tags and Summonses Not Included

The issuance of a traffic tag or traffic summons generally does not require the assignment of an event number. If a traffic tag or summons is issued in conjunction with any of the circumstances outlined in A, B, C, or D above, then an event number may be assigned.

4.5    RESPONSIBILITY

All calls for service, police related incidents, or complaints shall be addressed expeditiously by the employee to whom it was referred. (S)he shall take reasonable police action with respect thereto including action to achieve a resolution or to prevent a recurrence.

4.6    DISTRICT COMPLAINT FILE

A. Each district shall maintain a complaint file which shall include all complaints of ongoing criminal activity, breaches of the peace, or other activity of interest to law enforcement operations. Examples include gangs, corner lounging, persistent parking and driving violations and any unwholesome condition that might exist in the district.

B. At the start of each shift, the shift Lieutenant shall apprise the members of his/her platoon of current complaints contained in the complaint file.

C. This file shall not include reports of individual crimes for which a crime report has been completed.

## 5.0    POLICE REPORTS

5.1    POLICY

It is the policy of the Buffalo Police Department that Department employees shall prepare police reports in a complete and thorough manner, paying strict attention

to detail, and such reports, shall be submitted in a timely fashion to their superiors for approval.

5.2     PREPARING POLICE REPORTS

A. The Department has designed various forms for use in particular circumstances. Employees are to be familiar with the use of such forms and shall refer to the Manual of Procedure, General Orders and current directives for guidance. In preparing any Department report the employee shall minimally:

    1. Make a complete and thorough investigation of the circumstances and include in the report detailed, accurate information;

    2. The report shall be submitted to the employee's supervisor in a timely fashion and if there is to be a delay, a reasonable explanation of the delay must be submitted to the supervisor prior to the expiration of the employee's tour of duty.

B. Reports that have been submitted to supervisors for approval shall be carefully inspected by the supervisor, who shall pay particular attention to accuracy, completeness and timeliness. Deficient reports shall be returned to the employee who submitted the report and (s)he shall be apprised of the deficiencies and given instructions for correction. In the event that the supervisor is advised that the submission of a report is to be delayed, (s)he shall assess the reasonableness of the delay and shall take action to ensure that the report is submitted as soon as possible. The supervisor may direct the employee to complete the report at the next earliest date possible or (s)he may assign it to another employee for completion. With the supervisor's approval, it is then to be entered into CHARMS via ICR (in-car reporting).

5.3     COMPLETED STAFF WORK

Any employee who has been delegated to perform a task shall complete the task to the fullest possible extent so that the superior officer's only remaining function would be to approve the work performed. In projects that require that a selection be made from amongst several different possible alternatives the employee shall:

A. collect all pertinent facts and verify their authenticity and accuracy;

B. illustrate all possible alternatives and the relatives merits and faults of each;

C. recommend the best possible alternative and the reasons for such recommendation;

D. present the results in a clear and concise report.

5.4    PREPARING REPORTS FOR INCIDENTS OUTSIDE THE COMMAND

    A.  Whenever an incident requires the completion of a police report and the incident has occurred outside of the district in which it is being reported, the member receiving the information shall complete the report and take whatever immediate police action is required. If no immediate action is required, the report shall be forwarded to the district of occurrence.

    B.  When citizens are attempting to report an incident at a police facility other than the district of occurrence, they shall not be routinely sent to the district of occurrence to file the report.   The report shall be taken and immediately forwarded in person to the District of occurrence where complete entry of the incident and a crime message shall be sent.

5.5    DISTRIBUTION OF REPORTS
Completed reports shall be distributed as designated on the form itself, or if such distribution guidelines are absent it shall be distributed as directed by the Manual of Procedure or the applicable General Order.

5.6    STORAGE AND DISPOSAL OF POLICE REPORTS
All police reports shall be stored and/or disposed of in accordance with M.O.P. Chapter 9.

5.7    UNIFORM CRIME REPORTING
The Department participates in reporting Part I and Part II Offenses to the Federal Bureau of Investigation. The Division of Administration and Communication shall be responsible for compiling the statistical information that is necessary to complete these uniform crime reports. Such reports shall be submitted to the FBI on a monthly basis.

**6.0    VERBAL AND WRITTEN COMMUNICATION**

6.1    POLICY
To be effective, organizations require the free and open flow of information throughout their organizational structure. The Department encourages such free and open communication but to facilitate order and direction it has created official channels through which all formal Department communication must flow. It is the policy of the Buffalo Police Department that all official Departmental communications be sent through the chain of command.

6.2    CHAIN OF COMMAND
The chain of command is that line of authority, in either ascending or descending order, extending from the Commissioner through every level of command, as indicated by the Organizational Chart of the Department. The chain of command, delineates lines of authority and responsibility; facilitates the orderly flow of orders and information; accommodates the expertise of lower ranking employees

in decision making; and, permits supervisors and lower ranking commanding officers some latitude in managing their units.

In order to mitigate the tendency of the chain of command to delay and distort communication, each member in the chain must be especially vigilant in expediting communications and ensuring clarity. Failure to do so could negate the benefits the chain of command is designed to provide.

6.3    OFFICIAL AND UNOFFICIAL COMMUNICATIONS
While the chain of command can be an effective tool in bringing order and direction to the communication process its rigid structure may tend to discourage free and open discussion of issues pertinent to the Department. To accommodate these competing interests the Department requires that only official communication be sent through the chain of command.

A.    Official Communication
For purposes of this Chapter, official communications includes all written reports and electronically transmitted documents, and all verbal communications that have a direct and identifiable impact on any Department unit or personnel. All official communication must be transmitted through the chain of command. When a question arises as to whether a communication should be classified as "official" or "unofficial," it should be considered "official" and sent through the chain of command.

B.    Unofficial Communication
For purposes of this Chapter, unofficial communications include any private, personal, or non-Departmental discussions; Department related discussions merely exploring potential alternatives or involving only preliminary suggestions; or any Department related discussions that do not have a direct and identifiable impact on any Department unit or personnel.

6.4    CIRCUMVENTING THE CHAIN OF COMMAND - EXTENUATING CIRCUMSTANCES
Employees shall not routinely circumvent the chain of command. There may however exist, certain extenuating circumstances in which strict adherence to the chain of command would be impractical or counter-productive. The chain of command may be circumvented in the following circumstances:

A.    When there exists an emergency circumstance in which strict adherence to the chain of command would have a substantial negative impact on the successful resolution of the emergency;

B.    When an employee becomes aware of a violation of law by a Department employee or a serious violation of the rules, regulations, directives or procedures of the Department and (s)he has a reasonable and articulable suspicion that the allegations will not be appropriately addressed if strict

adherence to the chain of command is required.

6.5    BASIC REQUIREMENTS OF VERBAL COMMUNICATION
Official verbal communication must be clear and precise. Pertinent components shall be fully explained and no material details omitted. The speaker must make an extra effort to ensure that what was said is what the listener heard.

6.6    WRITTEN COMMUNICATION AND CORRESPONDENCE

A.  Language
When preparing written correspondence, the writer shall use plain and concise language so that meanings are clear. (S)he shall make certain that the report is complete; that each paragraph concerns only one subject; and, that the form of the correspondence is proper and orderly. The correspondence shall be prepared in a manner that precludes the possibility of misunderstanding. The body of the correspondence shall explain "when," "where," "who," "what," "why," and "how."

B.  Use of Personal Names
When any person is mentioned in the body of the correspondence for the first time, his/her full name and title shall be used. Full name means the person's first name, middle initial and last name (i.e. surname). If the person mentioned is an employee of the Department, his/her rank and place of assignment shall be included with his/her full name. Subsequent mention of the person requires only the use of his/her surname and title. If the person has no official title his/her surname shall be preceded by the abbreviations Mr., Mrs., Ms., as the case may be.

C.  Signature
The writer shall sign his/her full name at the end of the correspondence, on the right hand side of the page and immediately above his/her rank. Rubber stamps or other facsimiles of a writer's signature shall not be used on official correspondence except that officers of the rank of Inspector and above may use such devices for routine reports.

D.  Official Letterhead
   1.  The official letterhead of the Buffalo Police Department shall be that which has been approved by the Commissioner of Police.
   2.  No member of the Department shall use official letterhead stationary for private correspondence, or for making recommendations of any person, employee, article, product, etc.

E.  Twenty-four (24) Hour Military Time Clock
For the purpose of reporting the time of an event on various Department forms, Military Time shall be used in lieu of the Standard 12 hour clock method. Military time uses a four digit number. The first two digits on the left

reflect the hour of the day and the two digits on the right reflect the minutes in the hour. Hours are designated as a number from zero through twenty-four beginning at midnight. The minutes of the hour are designated zero through fifty-nine.

F. <u>File Copies</u>
A copy of all official communications shall be retained in a file at the unit from which the correspondence was sent.

6.7     <u>PREPARING INTRA-DEPARTMENTAL CORRESPONDENCE (P-73)</u>

A. "Intra-Departmental Correspondence" shall be used for all official communications in the Department except where printed forms ( e.g., crime reports, death reports, aided cases, accident reports, etc.) have been instituted.

B. "Intra-Departmental Correspondence" shall clearly identify at the top of the page:
    1.  to whom the correspondence is directed;
    2.  from whom the correspondence is being sent;
    3.  the date the correspondence is being prepared;
    4.  the subject matter of the correspondence;
    5.  the event number if one applies.

C. If the correspondence is directed to anyone other than the author's immediate commanding officer, the name of each intermediate member of the chain of command must be referenced in the lower left hand corner of the correspondence.

6.8     <u>PREPARING REPORTS - DESK PERSONNEL RESPONSIBILITY</u>

A. Employees assigned to desk duty or clerical duty in any Department unit shall keep all books, records and files, and shall make all reports pertaining to their respective commands, in conformance with the rules, regulations, and directives of the Department and the orders of their superiors.

B. Employees assigned to desk duty or clerical duty in any Department unit shall be responsible for the handling of all mail and Department business received by their command and shall be responsible for its care until delivered to their Commanding Officer.

C. Employees assigned to desk duty or clerical duty in any Department unit shall ensure that all correspondence displays the event number when such number is required.

D. When an official communication, record or report is removed from a file, employees assigned to desk duty or clerical duty in the unit from which the

COB000598

report is removed shall ensure that a memorandum is left in its place. The memorandum shall indicate the date and time that the report was removed and who removed it.

6.9    RESPONSIBILITIES OF INTERMEDIATE MEMBERS OF THE CHAIN OF COMMAND

A. As correspondence passes through each intermediate level of the chain of command, that member must carefully examine the correspondence for completeness and accuracy and if any deficiencies are detected it must be returned to the author for correction.

B. When "Intra-Departmental Correspondence" is forwarded through the chain of command, each intermediate member of the chain must make a recommendation and the reasons for that recommendation, prior to affixing his/her signature thereto. No "Intra-Departmental Correspondence" shall be forwarded without the required recommendations.

C. All intermediate members of the chain of command must conform to their duty to submit "completed staff work" (refer to M.O.P. Chapter 9).

6.10    CORRESPONDENCE TO GOVERNMENT AGENCIES AND BUSINESSES

A. All correspondence forwarded or delivered to the Common Council of the City of Buffalo, or to any City Department, or to any other government agency must first receive the approval of the Commissioner unless the Commissioner specifically directs otherwise.

B. All correspondence regarding official Department business which is sent to individuals, businesses, or other organizations shall be signed by the Commissioner unless the Commissioner specifically directs otherwise.

C. Correspondence described in "A" and "B" above shall be prepared for the Commissioner's signature and forwarded to his/her office for action.

D. The above provisions do not apply to the Deputy Police Commissioners, Chiefs, the Chief of Detectives, or Inspectors. In dispatching any correspondence over their own signatures however, officers of these ranks must be aware that they are speaking on behalf of the Department and must be judicious and temperate in their remarks. A copy of the correspondence shall be forwarded to the Commissioner's office so that (s)he can remain informed concerning Department business.

6.11    CORRESPONDENCE SENT IN RESPONSE TO COMPLAINTS
When correspondence is sent in response to a complaint, it is imperative that each allegation that has been alleged is answered; that the type of Department action, if

any, is clearly specified; that the status of the case is explained; and, that recommendations are made where required.

6.12   FORWARDING DAILY BUSINESS

Commanding Officers shall forward daily, before 0630 hours (except that on Sundays it shall be forwarded before 1000 hours) all reports and official communications that have been prepared in their commands during the previous twenty-four (24) hour period. These reports and communications shall be delivered to the business boxes on the 2nd floor of Police Headquarters located next to room 230.

6.13   ASSEMBLING THE DAILY BUSINESS

Correspondence, reports, forms and all other mail from the Districts and any other unit having a black leather business pouch, shall be delivered to the E-Mail unit in the following manner:

A.   Desk personnel on duty between the hours of 2100hrs and 0730hrs in the various precincts/districts shall place the daily reports in the leather business envelope. Forms shall be arranged in numerical order placing the lowest numbered form on top and the highest numbered form on the bottom. Small items such as envelopes, leaves of absence requests, etc., shall be bound and placed on top of the regular business. Before forwarding, the employee assembling the business shall ensure that reports requiring a signature are appropriately signed.

B.   Uniform Traffic Summons and PVB Tags shall be attached with paper clips to forms P-54 and P-188 respectively.

C.   Routine intra-departmental correspondence shall be forwarded in reusable envelopes if possible. If the correspondence is of a confidential nature, it shall be enclosed in an official white envelope.

D.   Large items shall be wrapped separately and placed outside the business pouch.

E.   The Commanding Officers of both the E-Mail Unit and the individual Department units shall take appropriate steps to ensure that the business is kept in a secure area and only desk personnel and officers of the rank of Lieutenant and above have access to it while it in their command.

6.14   HANDLING THE DAILY BUSINESS

A.   By 1230hrs daily, except Sunday, the E-Mail unit shall place mail and correspondence for each district and other selected units in the business pouches provided for that purpose.

B. Between 1230hrs and 1400hrs daily, except Sunday, a designated member of each Precinct/ District shall pick up the daily business at the E-Mail unit.

C. While business pouches are in route to their destination, they shall not be left unattended by any employee of the Department.

D. When the daily business is delivered to the various districts, the desk personnel on duty there shall sort through it and distribute it according to existing procedures.

E. When the business envelopes are received at the E-Mail unit in the morning, they shall be opened, the contents removed and mail and other correspondence sorted and placed in the proper mail slots.

F. Department business envelopes shall be kept at the E-Mail unit when not in use.

## 7.0   USING DEPARTMENT TELEPHONES

7.1   POLICY
It is the policy of the Buffalo Police Department to use telephones to carry out its legal duties whenever the use of this type communication device enhances the effectiveness and efficiency of the Department and their use does not unduly impair relations with the public.

7.2   THE DEPARTMENT'S 911 SYSTEM

A. The County wide 911 emergency system is the manner in which citizens can contact the Department for emergency services. By agreement with Erie County, the county staffs the 911 emergency call center and receives all calls over 911 telephone lines. These calls for emergency services are then assessed by county personnel and forwarded to the Buffalo Police Department Radio Dispatchers for radio broadcast to Buffalo Police personnel.

B. The Central Police Services/911 Call Center (CPS) can be contacted at 853-2222 for service of a non-emergency nature.

7.3   PROPER USE OF DEPARTMENT TELEPHONES

A. When answering Department telephones, employees shall inform the caller of the unit (s)he has reached, the employee's rank and surname. (e.g. "B" District, Officer Jones).

B. Employees shall answer the telephone promptly and shall refrain from lengthy and unnecessary conversations.

C. Employees shall not use Department telephones for private business except in an emergency.

D. The Division of Administration and Communication issues the Department Telephone Directory. All units of the Department shall keep the Directory readily available at all times.

E. Problems with telephones shall be reported to the Communication Section. If emergency repairs are required after regular business hours, the 911 Lieutenant shall be called.

F. If the phone lines are down, send an Administrative message indicating the phones are not working via Lotus Notes.

7.4     VOICE MAIL AND ANSWERING MACHINES

A. Units may requisition voice mail systems through their District/Division Chief.  If approved by the District/Division Chief, such requisitions shall be forwarded to the Division of Administration and Communication for consideration. District Chief's shall not frivolously approve these requests and must specifically state the reasons for their approval.

B. All voice mail and all messages left on answering machines shall be responded to promptly once personnel have returned to the office.

7.5     LONG DISTANCE TELEPHONE CALLS
When Department business makes it necessary for an employee of the Department to place a long distance telephone call, the following procedure shall be used:

A. The employee shall first obtain permission from his/her on duty Lieutenant, squad leader, or immediate supervisor;

B. Once permission has been obtained the employee shall dial 4447 to contact City Court Booking. (S)he shall give the operator his/her name, rank, place of assignment, telephone extension from which the call is being made, the long distance number (including the area code) to which the call is being made, the name of the person or agency that is being called, and the reason for the call.

C. City Court Booking will log all of the above information and then make the call as required. The information shall be logged in a day book provided for that purpose.

D. City Court Booking shall maintain a complete, accurate, and continuous log of all long distance phone calls.

E. The Commanding Officer of City Court Booking shall frequently monitor the long distance telephone logs to ensure compliance with all applicable procedures. (S)he shall conduct a monthly audit and shall promptly report any discrepancies to the Inspector assigned to the Division of Administration and Communication.

## 7.6   PERMISSION TO USE DEPARTMENT TELEPHONES

A. Generally, Department telephones are to be used only by employees of the Department for Department related business. Employees of the following organizations are also allowed to use police telephones in connection with their work:

1. city, state and federal governments
2. providers of community and social services
3. news media, press, radio, television
4. public utilities
5. medical personnel
6. persons making emergency calls.

B. Persons who are not employees of the Department shall not be permitted to place long distance telephone calls unless they have obtained the prior approval of a superior officer who holds the rank of Lieutenant or higher.

## 7.7   DUTIES OF PERSONNEL ASSIGNED TO CITY COURT BOOKING
City Court Booking is the central phone center for the Department.

A. Employees assigned to City Court Booking shall answer telephone calls immediately and shall answer by saying, "Buffalo Police". If the caller wishes to report an emergency, (s)he shall immediately be referred to the complaint desk. Non- emergency calls shall be forwarded to the appropriate Department unit.

B. When a telephone connection is requested, the employee assigned to City Court Booking shall monitor the call until the connection is made. Once the connection is made, the employee assigned to City Court Booking shall not listen in on such conversation.

C. When receiving orders or requests to make a telephone connection, the employee assigned to City Court Booking shall repeat the order or request to make certain that it was correctly understood. His/her attention shall be constantly directed at promptly completing connections and keeping lines clear.

D. Employees assigned to City Court Booking shall be courteous, prompt, and alert while attending the phone lines. An abrupt, brusque or uncivil demeanor

shall not be tolerated.

E. No person shall be permitted to overhear the transaction of official Police business by telephone.

F. Information relating to police business shall not be given to any person other than the employee of the Department for whom it was intended.

G. At least one employee must be at the front desk of City Court Booking at all times to answer calls.

H. The employee assigned to City Court Booking shall also be responsible allowing entry into the headquarters building and for providing passes to visitors.

## 8.0  COMPUTERIZED INFORMATION SYSTEMS

8.1  POLICY

The proper use of information, from whatever source received, is one of the most essential ingredients in delivering effective and efficient police services to the public. Collecting, preserving, analyzing, collating and disseminating information can be a complex and time consuming task. To better manage the information that is available, it is the policy of the Buffalo Police Department to use computerized systems to handle its information needs. The use of the computerized information systems is regulated by the "Buffalo Police Department Computer Use Policy". Users of the computerized information systems are required to be familiar with this policy and to accept the terms and conditions contained therein.

A. **General:**  Computer use by Buffalo Police Department personnel shall be subject to all the Buffalo Police Department Computer Use Policy as follows:

**Policy Specifics**:

1. **Computer access is limited to official work-related research or communications.**

2. Software, program downloads and other programs not specifically approved by the Commissioner of Police or his designee are prohibited. Approvals should be requested through the Office of Administration & Communications

3. The Department reserves the right to remove or limit access to material posted on Department computers when City Policies or codes, contractual obligations or state or federal laws are violated or if Departmental rules and regulations are violated.

4. The Department reserves the right to limit access to its computers, network systems, or the Internet when City Policies or codes, contractual obligations or state or federal laws are violated or if Departmental rules and regulations are violated.

**5. All Internet and E-mail access and messages, records of such messages and Internet and E-mail use are subject to monitoring and review by the Department at any time. All records of Internet and E-mail access are subject to inspection and review by the Department at any time.**

**Policy Violations:**

1. The computer network may not be used:

    a. For private business solicitations, for social activities or for department-wide personal messages except with written permission of the Commissioner of Police.

    b. To harass, threaten, or otherwise cause harm to a specific individual whether by direct or indirect references.

    c. To download or post to Departmental Systems or transport across City Systems material that is illegal, proprietary, or in violation of City policies, codes, contractual obligations, state or federal laws, or Departmental rules or regulations.

    d. To download or view pornographic or prurient materials, **<u>except</u>**:

        1. as might be done by the Narcotics, Intelligence and Vice Enforcement Unit in performance of their duties.

        2. as specifically authorized by the expressed **written** permission of the Commissioner of Police

    e. To post information not directly related to Buffalo Police Department business including information containing a personal view, opinion, or remark.

**Anyone who violates this policy will be subject to appropriate disciplinary action.**

8.2    <u>COMPUTERIZED INFORMATION SYSTEMS</u>

A. <u>Buffalo Police Department Systems</u>
The Buffalo Police Department has several inter-related information systems that specifically serve the needs of the Department.

1. Computer Aided Dispatch (CAD)
   The Computer Aided Dispatch system is designed to assist Radio Dispatchers in assigning calls for service to specific mobile patrol units. It designates which mobile patrol unit is to be assigned the call and whether the District Lieutenant needs to respond; it alerts the responding officers to the existence of any known hazards; and, it provides a mapping function to assist the officers in handling the call. The CAD system will assign an event number, record the time the call was dispatched and the time the officers arrive on scene, record the time the officers completed the call and the disposition of that call. The CAD system is integrated into the Record Management System and the AVL System.

2. Records Management System
   The Record Management System (CHARMS), is a comprehensive Information system that integrates much of the Department's record keeping function into an easily accessible and simple to use program.

3. Lotus Notes
   Lotus Notes is a computerized system used for conducting intra-Department communication. It enables the user to send electronic mail to a specific list or location or to an electronic bulletin board on which pertinent Department information can be posted. The bulletin boards are grouped into fourteen different subject matters for easy use.

   a. Administrative - scheduled events and messages of importance/interest to all employees of the Department;
   b. Arrests
   c. Felony Crimes
   d. General Orders
   e. Special Orders
   f. Stolen vehicles
   g. Missing Persons
   h. Job Postings
   i. Local 650 - news, notices, etc
   j. PBA - news, notices, etc.
   k. Training Bulletins
   l. Training Classes
   m. District Bulletin Boards
   n. Departmental Forms

B. Non-Departmental Computer Information Systems
   The Buffalo Police Department can access several different law enforcement related computer information systems:

1. The Empire System
   This is a computerized law enforcement information network operated by the Erie County Department of Central Police Services. It provides all local police and Criminal Justice Agencies with instantaneous data on wanted/warrants, stolen vehicles, driver and vehicle identification, criminal history, and orders of protection. This system can also provide incident data, arrest data, accident information and several different types of administrative programs that are of interest to various agencies.

2. The NYSPIN System
   The Buffalo Police Department has a terminal on the New York State Police Information Network. This is a computerized information system that provides information on stolen guns, license plates, vehicles, missing persons, wanted persons, arrest histories, etc. It also provides a computer interface with the New York State Division of Criminal Justice Services, (DCJS) the New York State Department of Motor Vehicles (DMV), the National Crime City Information Center (NCIC) in Washington D.C., and the National Law Enforcement Telecommunications System (NLETS) located in Phoenix, Arizona.

3. The National Crime Information Center (NCIC)
   The National Crime Information Center is a computerized law enforcement information system located in Washington D.C. This system has a computer interface with NYSPIN, which, in turn, interfaces with the Empire System. This center provides information on wanted persons on a nationwide basis as well as information on vehicles.

4. The National Law Enforcement Telecommunications System (NLETS)
   The National Law Enforcement Telecommunications System located in Phoenix, Arizona, is a computerized system having a direct computer interface with NYSPIN. This system can provide national DMV data to all inquiring police agencies.

8.3  MOBILE COMPUTER TERMINALS (MCT'S)
Marked police vehicles used by the Patrol Division for responding to calls for police service are equipped with mobile computer terminals (MCT'S). These are laptop computers which can be used for a wide variety of purposes as well as for receiving dispatched calls and entering crime reports. MCT's enable the user to indicate the time of arrival on the scene of a call by a mere push of a button. The disposition of the call and the unit's return to service can also be entered via the MCT.  As the records management program continues to evolve, the capabilities of the MCT's for entry and retrieval of data will expand. The use of MCT's does require the following:

A. Every user will have a unique password for which they are responsible and which they shall keep confidential;

B. Information requested from NYSPIN can only be for official police investigations. Dissemination and use must be in accord with NYSPIN rules and regulations, New York State Laws, and Department policy. NYSPIN transactions will be monitored and are subject to audit by the Department and New York State;

C. The Commanding Officer of each district will be responsible for maintaining a record, listing all MCT's assigned to his/her command, the serial number of each, its current location ( e.g. the car in which it is installed, repair shop), and its condition (e.g. operable, malfunctioning, etc.).

D. Commanding Officers or their designee are responsible for notifying MIS of MCT failures.

E. No software or information of any type shall be loaded into a MCT without prior written authorization from the Commissioner or a Chief. The concern is that a virus could be inadvertently introduced into the system or that other functions of the system could be adversely affected;

F. Vehicles in which a MCT has been installed must be locked at all times when unattended;

G. Only authorized materials shall be used to clean the MCT screen;

H. In cold weather, vehicles should be warmed up prior to activating the MCT;

I. The Radio Repair Shop should be called whenever a MCT is malfunctioning. since most problems will be with the radio and modem. Malfunctions involving the laptop itself will be handled by MIS.

8.4    <u>MANAGEMENT INFORMATION SECTION (MIS)</u>
The Management Information Section is a unit managed by City Hall's MIS Department. It shall be responsible for assisting in the design and implementation of information management systems that have been adopted by the Department. The Management Information Section shall maintain up to date instructional and operational manuals that can be referred to by systems users.

8.5    <u>RESPONSIBILITY FOR OPERATING NYSPIN</u>
City Court Booking/Information Center shall be responsible for receiving and transmitting messages over NYSPIN. NYSPIN is divided into file classifications as follows:

File 1: Stolen motor vehicles and motorcycles

File 2: Motor vehicles - information requests

File 4: Hit and run drivers

File 5: Persons - Wanted or escaped

File 6: Persons - Missing

File 7: Burglary

File 8: Robbery and holdup

File 9: Property - Lost or missing

File 10: Property - Stolen

File 11: Assaults

File 12: Homicide

File 13: General Police Information

File 15: Requests for information (miscellaneous)

File 16: Lost or stolen license plates

File 25: Miscellaneous messages

8.6    <u>USE AND DISSEMINATION AGREEMENTS</u>

All requests for criminal history records information shall be made pursuant to the use and dissemination agreements in effect between the Buffalo Police Department and the Erie County Department of Central Police Services, the New York State Police and the National Crime Information Center. These agreements stipulate that only qualified Criminal Justice Agencies may access this data and then only a strictly "right to know" and "need to know" basis and that a valid criminal justice purpose is served.

8.7    <u>USE OF SOCIAL MEDIA</u>

<u>POLICY</u>

Social media provides a new and potentially valuable means of assisting the Department and its personnel in meeting community outreach, problem-solving, investigative, crime prevention, and related objectives. This policy identifies potential uses that may be explored or expanded upon as deemed reasonable by administrative and supervisory personnel. The Department also recognizes the role that these tools play in the personal lives of some Department personnel. The

personal use of social media can have bearing on Departmental personnel in their official capacity. As such, this policy provides information of a precautionary nature as well as prohibitions on the use of social media by Department personnel.

PURPOSE

The Department endorses the secure use of social media to enhance communication, collaboration, and information exchange; streamline processes; and foster productivity. This policy establishes this Department's position on the utility and management of social media and provides guidance on its management, administration, and oversight. This policy is not meant to address one particular form of social media, rather social media in general, as advances in technology will occur and new tools will emerge.

DEFINITIONS

A. Blog: A self-published diary or commentary on a particular topic that may allow visitors to post responses, reactions, or comments. The term is short for "Web log."

B. Page: The specific portion of a social media website where content is displayed, and managed by an individual or individuals with administrator rights.

C. Post: Content an individual shares on a social media site or the act of publishing content on a site.

D. Profile: Information that a user provides about themselves on a social networking site.

E. Record: Any information kept, held, filed, produced or reproduced by, with or for an agency or the state legislature, in any physical form whatsoever including, but not limited to, reports, statements, examinations, memoranda, opinions, folders, files, books, manuals, pamphlets, forms, papers, designs, drawings, maps, photos, letters, microfilms, computer tapes or discs, rules, regulations or codes (§86 (4) NYS Public Officers Law).

F. Social Media: A category of Internet-based resources that integrate user-generated content and user participation. This includes, but is not limited to, social networking sites (Facebook, MySpace), micro-blogging sites (Twitter, Nixle), photo and video-sharing sites (Flickr, YouTube), wikis (Wikipedia), blogs, and news sites (Digg edit).

G. Social Networks: Online platforms where users can create profiles, share information, and socialize with others using a range of technologies.

H. Speech: Expression or communication of thoughts or opinions in spoken words, in writing, by expressive conduct, symbolism, photographs, videotape, or related forms of communication.

I. Web 2.0: The second generation of the World Wide Web focused on shareable, user-generated content, rather than static web pages. Some use this term inter-changeably with social media.

J. Wiki: Web page(s) that can be edited collaboratively.

<u>PROCEDURES</u>

Department Sanctioned Presence – Official Use

1. Determine Strategy:

   a) Where possible, each social media page shall include an introductory statement that clearly specifies the purpose and scope of the agency's presence on the website.

   b) Where possible, the page(s) should link to the Department's official website.

   c) Social media content will be designed with the specific target audience in mind.

2. Content Procedures:

   a) All Department social media sites or pages must be approved by the Commissioner of Police or their designee

   b) Content originators are responsible for ensuring accuracy of their content.

   c) Where possible, social media pages shall clearly indicate that they are maintained by the Department and will have Department contact information displayed prominently.

   d) Social media content shall adhere to applicable laws, regulations and policies, including all information technology and records management policies.

      1) Content is subject to public records laws. The MU-1 Records Retention and Disposition Schedule indicates the minimum length of time that public officials must retain their records before they may be disposed of legally. Relevant sections apply

to social media content.

2) Content may be subject to applicable Freedom of Information Law (F.O.I.L) regulations as required by the NYS Public Officers Law §87.

3) Content that is specific to a criminal investigation should be retained in the appropriate case file and is likely discoverable and, as such, should be brought to the prosecutor's attention.

4) Content must be managed, stored, and retrieved in compliance with open records laws, e-discovery laws and policies.

e) Social media pages should state that opinions expressed by visitors to the page do not reflect the opinions of the Department.

1) Pages will clearly indicate that posted comments will be monitored and that the Department reserves the right to remove obscenities, off-topic comments, and personal attacks.

2) Pages shall clearly indicate that any content posted or submitted for posting is subject to public disclosure.

3. Posting Procedures:

Personnel representing the Department will:

1. Comply with all Departmental standards of conduct, conventionally accepted protocols and proper decorum.

2. Identify themselves as a member of the Department.

3. Not make comments or statements regarding their opinion of the guilt or innocence of any suspect, arrestee or defendant.

4. Not post, transmit, or otherwise disseminate confidential information, including photographs or videos of Departmental training activities, other Departmental activities, or work related assignments without express permission

5. Not conduct political activities or private business.

1. The use of Department computers by Department personnel to access social media is prohibited without authorization.

2. The use of personally owned devices to manage the Department's social media is prohibited without express permission [*agencies may consider requiring written permission*].

3. Personnel shall observe and abide by all copyright, trademark and service mark restrictions when posting materials to social media.

4. Undercover Profiles:

   a. Nothing in this policy will prohibit the use of a fictitious name, identity, business or organization strictly for official investigative purposes **with** prior authorization by the Commissioner of Police. In all such cases members will secure an incident number and adopt a criminal investigation case number containing all relevant information on the identity used and members responsible for such investigation.

   b. Undercover profiles should not be accessed from personal computers, laptops, devices or Departmental PC, laptops or devices that utilize a Departmental or government IP address.

5. Potential Official Uses

   Investigative tool:

   1. Missing persons

   2. Wanted persons

   3. Gang participation

   4. Online crime (cyber-bullying, cyber-stalking, etc.)

   5. Source of photo or video evidence posted by observer or participant

   6. Criminal intelligence gathering

   7. Creation or corroboration of an undercover or fictitious identity for official use and when expressly authorized by the Department.

2. Community Outreach and Engagement:

    1. Crime prevention tips

    2. Online reporting opportunities

    3. Data sharing (crime maps, statistics, etc.)

    4. Soliciting crime information and tips

    5. Customer satisfaction surveys

    6. Employee recognition

    7. Monitoring and responding to community concerns with the Department

    8. Time sensitive notifications:

       a. Road closures

       b. Special events

       c. Weather emergencies

       d. Missing or endangered persons

3. Agency Employee Recruitment:

    1. Employment opportunities

    2. Hiring process preparation aids

4. Applicant background investigation:

    1. Pre-employment investigations may include internet-based content related to the potential employee

    2. Searches should be conducted by personnel who do not otherwise influence hiring decisions. Any reference to a candidate's protected class status should be filtered from the search results prior to their submission to personnel making hiring decisions.

    3. Those authorized to conduct online background searches should be deemed to hold a sensitive position.

    4. Searches will be conducted in accordance with applicable laws.

5. Uniform vetting techniques will be applied to all candidates, making every effort to validate internet based information considered during the hiring process.

6. Personal Use:

1. Precautions and Prohibitions: Absent State law or binding labor agreements to the contrary, Department personnel shall abide by the following when using social media:

   a. Department personnel are free to express themselves as private citizens on social media sites to the degree that their speech does not impair the working relationships of this Department for which trust and confidentiality are important, impede the performance of duties, impair discipline and harmony among coworkers, or negatively affect the public perception of the Department.

   b. Leader and Subordinate relationships: Because of the nature of social media, formal leaders may interact and function in the same social media spaces as their subordinates. It is suggested that the online relationship function in the same manner as the professional relationship.

   c. As public employees, Department personnel are cautioned that speech, on or off duty, made pursuant to their official duties – that is, that owes its existence to the employee's professional duties and responsibilities – is not protected speech under the First Amendment and may form the basis for discipline if deemed detrimental to the Department. Department personnel should assume that their speech and related activity on social media sites would reflect upon their office and this Department. Speech and conduct should be representative of Departmental values.

   d. Department personnel are prohibited from creating a fictitious identity under the auspices of conducting duty related activities without express authorization. Such activities would be governed by the official Department use provisions of this policy.

   e. Department personnel shall not post, transmit, or otherwise disseminate any information or imagery, such as arrest photos, accident scene photos, crime scene photos, official or unofficial reports, or information gained in their official capacity to which they have access as a result of their employment without

written permission from the Commissioner of Police or their designee.

f.  For safety and security reasons, Department personnel are cautioned not to disclose their employment with this Department, nor shall they post information pertaining to any other member of the Department without their permission.

   1.  As such, Department personnel are cautioned not to:

      a.  Display Departmental logos, uniforms, or similar identifying items on personal web pages.

      b.  Post personal photographs or provide similar means of personal recognition that may cause them to be identified as a police officer of this Department. Officers who are, or who may reasonably be expected to work in undercover operations, shall not post any form of visual or personal identification.

   2.  Members should be alert to the content and nature of their postings including online conversations and those of family and friends. When certain strings of information are compiled, persons viewing such information may be able to identify shift schedules, location of your residence, when the residence is unoccupied, family members, vacations and other private information.

g.  When using social media, Department personnel should be mindful that their speech becomes part of the worldwide electronic domain.  Therefore, adherence to the Department's code of conduct is required in the personal use of social media. In particular, Department personnel are prohibited from the following:

   1.  Speech containing obscene or sexually explicit language, images, acts, statements or other forms of speech that ridicule, malign, disparage, or otherwise express bias against any race, any religion, or any protected class of individuals.

   2.  Speech involving themselves, or other Department personnel, reflecting behavior that might reasonably be considered reckless or irresponsible.

h. Engaging in prohibited speech noted herein may provide grounds for undermining or impeaching an officer's testimony in criminal proceedings. Department personnel thus sanctioned are subject to discipline up to and including termination of office.

i. Personnel may not divulge information gained by reason of their authority without express authorization from the Commissioner of Police.

j. This includes, but is not limited to:

    1. Any statements, speeches, appearances or endorsements;

    2. Publishing materials that could reasonably be considered to represent the views or positions of this Department.

2. Department personnel should be aware that they may be subject to civil litigation for:

a. Publishing or posting false information that harms the reputation of another person, group or organization (defamation);

b. Publishing or posting private facts and personal information about someone without their permission that has not been previously revealed to the public, is not of legitimate public concern, and would be offensive to a reasonable person;

c. Using someone else's name, likeness, or other personal attributes without that person's permission for an exploitative purpose; or

d. Publishing the creative work of another, including trademarks, or certain confidential business information without the permission of the owner.

e. Department personnel should be aware that privacy settings and social media sites are constantly changing and they should never assume that personal information posted on such sites is protected.

f. Department personnel should expect that the Department, at any time and without prior notice, might access any information created, transmitted, downloaded, exchanged

or discussed in a public online forum.

3. Reporting Violations: Any employee becoming aware of or having knowledge of a posting or of any website or web page in violation of the provisions of this policy shall immediately notify their supervisor.

## Appendix A

### Legal Issues

The use of social media has presented personnel conduct challenges for law enforcement executives that have resulted in employee discipline and terminations.  There are many examples of employee misconduct across the United States.  These cases highlight the issues associated with such misconduct.

Garcetti v. Ceballos, 126 S. Ct. 1951 (2006)

A deputy district attorney filed a §1983 complaint against county and supervisors at district attorneys' office, alleging that he was subject to adverse employment actions in retaliation for engaging in protected speech, that is, for writing a disposition memorandum in which he recommended dismissal of a case on the basis of purported governmental misconduct.

The Court held that: (a) when public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline; and (b) here, district attorney did not speak as a citizen when he wrote his memo and, thus, his speech was not protected by the First Amendment.

City of San Diego v. Roe, 125 S. Ct. 521 (2004)

Police officer (Roe) who was discharged for offering home-made, sexually explicit videos (in a police uniform) for sale on online auction site sued police department, city, and his supervisors under §1983, alleging that his off-duty, non-work-related activities could not be grounds for terminating his employment.

The uniform apparently was not the specific uniform worn by the San Diego police, but it was clearly identifiable as a police uniform. Roe also sold custom videos, as well as police equipment, including official uniforms of the San Diego Police Department, and various other items such as men's underwear. Roe's eBay user profile identified him as employed in the field of law enforcement

The Court held that officer's speech did not touch on a "matter of public concern" (that is, subject of legitimate news interest or general interest, and of value and concern to public activities); and officer's activities, though outside the workplace and purportedly about

subjects not related to his employment, had injurious effect on mission of his employer. Therefore were not entitled to First Amendment protection.

Brady v. Maryland, 83 S.Ct. 1194(1963); Giglio v United States, 92 S.Ct. 763(1972).

Prosecutor must disclose evidence or information that would prove the innocence of the defendant or would enable the defense to more effectively impeach the credibility of government witnesses. This disclosure requirement may apply to social media communications made by Police Officers.

## Resources

Designing Social Media Policy for Government – Eight Essential Elements  Center for Technology in Government – University of Albany

International Association of Chiefs of Police (IACP) Model Policy

Handbook for Social Media – US GSA (General Services Administration)

Navigating the Social Network – US Air Force

US Army Social Media Handbook – US Army

Facebook Safety for Law Enforcement. (2010). IACP. Available at www.IACPsocialmedia.org

Law Enforcement Executives' Social Media Top Ten. (2011). IACP.

Social Media Fact Sheet. (2011). IACP.

IT Policy: Social Media - State of New York Office for Technology

Center for Technology in Government – One day training in Social Media

IACP Center for Social Media

Social Media Site Guidelines

> Facebook
> Flickr
> Twitter
> YouTube
> Wikipedia

**9.0    RADIO COMMUNICATIONS**

9.1    POLICY

It is the policy of the Buffalo Police Department that the police radio system continues to be the primary medium for voice communication between the Radio Dispatcher and officers in the field.

9.2    FCC AUTHORIZATION

The Buffalo Police Department Radio Station is licensed by the Federal Communications Commission.  It has been assigned call letters KSO-552 for regular police broadcasts.

9.3    INSTRUCTIONS FROM RADIO DISPATCHER

A.  All messages transmitted over the Police Radio Station shall be direct and concise and shall conform to all Departmental radio procedures and the rules and regulations of the Federal Communications Commission.

B.  No officer shall fail to obey or refuse to take cognizance of any communication transmitted by the Radio Dispatcher, unless they are specifically so ordered by a superior officer. Superior Officers shall be held strictly accountable for any communication/order that they countermand.

9.4    DUTIES OF RADIO DISPATCHERS

A.  Radio Dispatchers shall operate the Department base radio and the Computer Aided Dispatch (CAD) system. They shall maintain radio contact with all mobile and portable units on the frequencies allocated to the Buffalo Police Department. They shall also maintain contact with mobile unit MCT's through the CAD system as well as monitoring AVL.

B.  Radio Dispatchers shall comply with all orders and directives in the Radio Dispatcher's Guide (BPD) as well as with all orders and directives they receive from superior officers in their chain of command.

9.5    RADIO DISPATCHER'S GUIDE

The Captain in charge of communications shall be responsible for making all necessary updates to the Buffalo Police Department's Radio Dispatcher's Guide. The Guide shall be readily accessible to 911 personnel and they shall be familiar with its contents.

9.6    ASSIGNED RADIO CALL NUMBERS

An accurate master list of all radio-equipped police vehicles and their assigned call numbers shall be maintained in the office of the Inspector, Division of Administration and Communication. A copy of the list shall be maintained in the 911Emergency Control Center. The list shall include all Department vehicles as

well as non-Department vehicles authorized by the Commissioner.

9.7    RADIO CHANNELS
The Department has been allocated six radio channels over which to broadcast police related communications:

Channel 1: used for car to car transmissions and may also be used for special events.

Channel 2: used for broadcasting routine police calls to units in the B and D Districts.

Channel 3: used for broadcasting routine police calls to units in the C and E Districts.

Channel 4: used for broadcasting routine police calls in the A-District and Administration.

Channel 5: used for car to car transmissions.

Channel 6: is the Central Police Services channel and can be used for contacting other law enforcement agencies throughout the county.

Channel 7: used for contact with the Erie County Sheriff's Department.

9.8    NATURE OF BROADCASTS

A. The Radio Dispatcher shall transmit only those calls originating through 911, the Commissioner, the Deputy Commissioners, the Chiefs, the Inspectors, or as otherwise provided for by Department order.

B. All radio broadcasts shall be stated in clear, concise English, and shall be as brief as possible.

C. Only those calls which are related to police business shall be transmitted.

9.9    TYPES OF BROADCASTS
There are two general types of police radio broadcasts:

A. Direct Broadcasts
B. Simulcasts

9.10    DIRECT BROADCASTS
Direct broadcasts are those that are intended for a specific mobile unit.

A. Direct Broadcasts

Direct broadcasts are used for all calls. In addition to transmitting the call over the CAD System through the mobile patrol unit's MCT, the Radio Dispatcher will dispatch the call over the police radio. The unit receiving the call will acknowledge its receipt through the MCT and, in addition, acknowledge its receipt using the police radio. Mobile patrol units should acknowledge on route and on scene.

9.11    SIMULCASTS

A. Simulcasts are radio broadcasts to all cars and are handled in the following manner:

1. The Radio Dispatcher shall first announce the time and then alert all cars of the impending simulcast. The subject matter of the simulcast shall then be announced.
2. After a five second pause the above procedure shall be repeated.
3. Simulcasts shall be used in the following circumstances:

1. BOLO's, pickups, and attempts to locate
2. shootings
3. serious assaults
4. shots fired
5. other calls of a serious nature, particularly if they are in close proximity to other districts
6. disasters (i.e. explosions, Haz-Mat incidents, etc.).
7. Administrative broadcasts

B. A member may notify the Dispatcher by radio of his/her request for a simulcast. The Radio Dispatcher shall include the identity of the originating unit as part of the simulcast.

C. Simulcasts designed to locate or pick-up persons or vehicles shall include:

1. the reason for the simulcast, and if for a crime, the nature and degree thereof;
2. as complete a description as possible of the person, or the vehicle and the vehicle's contents, and particularly describing whether the persons are armed or are to be considered dangerous;
3. the action to be taken, or the member to be notified, if the person or vehicle is found;
4. any additional information which may be helpful in locating the person or vehicle, such as last known location, direction of travel, etc.

D. The employee providing the information upon which a simulcast is based shall as soon as possible, and in any event, no later than the expiration of

his/her tour of duty, cause a message to be transmitted over the Department's electronic mail system. The message shall minimally include:

1. the date, time, and place of the incident, if any;
2. the name of the complainant, if any;
3. a complete description of the vehicle and its occupants, if any;
4. all facts relating to the case including the reason for the simulcast;
5. the action to be taken if the person or vehicle is found;
6. the rank, name, and assignment of the originating employee.
7. Dispatcher shall enter the information into the message board.

E. When a member locates or picks-up a person or vehicle that is the subject of a simulcast (s)he shall:

1. have the Radio Dispatcher void the locate/pick-up over the police radio;
2. notify the originating officer or take such action as was directed in the original broadcast;
3. have the electronic mail message canceled.

9.12 PRIORITIZING CALLS FOR SERVICE
As part of the CAD System, calls are assigned one of eight different priorities. Priority one calls are the most urgent and require an immediate emergency response. Priorities two through five are calls that have a descending order of urgency and are dispatched accordingly. Priority six is designated for ambulance and fire calls, priority seven is for traffic stop and priority eight is traffic pursuits. The Captain in charge of Communications shall maintain a list of all calls and their corresponding priorities. This list shall also be available in the 911 Emergency Control Center. (Refer to M.O.P. Chapter 8 RESPONDING TO CALLS).

9.13 RESPONSIBILITY OF RADIO UNITS

A. For purposes of this section, a radio unit shall mean any member or members of the Patrol Division who have been assigned to a mobile patrol unit and whose primary responsibility is responding to calls for service.

B. Upon receipt of a call by Direct Broadcast (i.e. either by police radio or MCT) from the Radio Dispatcher, the unit shall immediately acknowledge receipt of that call. All calls shall be acknowledged by use of voice. For priority one and two calls, units must acknowledge the call by use of the voice radio and the MCT. All calls must be acknowledged within one minute from the time they were originally transmitted.

C. After receipt of the call, the unit shall immediately proceed by the most direct

route, to the location of the call. As soon as the unit arrives at the location, such fact shall be acknowledged by using the MCT.

D.  While at the scene, the unit shall take appropriate police action.

E.  For priority one and priority two calls, the first unit on the scene shall give the Radio Dispatcher a preliminary assessment of the circumstances (e.g. fake call, additional assistance required, ambulance needed, etc.). The unit assigned the call by the Dispatcher will be responsible for taking all appropriate police action following this initial assessment.

F.  Upon completion of the call, the unit shall immediately notify the dispatcher and then enter the call's disposition through the MCT. Units must notify the Radio Dispatcher within twenty minutes from the time they received the call, that they have either completed the call or that additional time is required. .

G.  Units shall maintain a complete, legible, Radio Log Sheet (P-1124), recording the time a call was received; the type of call; the time of arrival on scene; the time the call was completed; and, the disposition of each call. The contents of each Simulcast shall also be recorded on the Radio Log.

H.  Units must respond to all transmissions from the Radio Dispatcher whether or not they are currently handling a call for service. A unit may be required to leave a call of lower priority in which they are currently involved, to respond to a call of a higher priority.

I.  Units shall not leave their assigned area of patrol during their tour of duty unless they are involved in police business and have first obtained the permission of a superior officer and they have notified the Radio Dispatcher.

J.  Units must inform the Radio Dispatcher whenever they leave their mobile patrol unit.

K.  Units not assigned to a particular call and who are in close proximity, may assist the unit to which the call was assigned, but only after informing the Radio Dispatcher of such assistance.

9.14  OPERATING THE MOBILE UNIT POLICE RADIO

A.  Transmitting Messages
    1.  The microphone shall be removed from its holder and held approximately six inches from the speaker's mouth.
    2.  The microphone button shall be depressed and the member shall speak slowly and distinctly and in a normal tone of voice.
    3.  After the member completes the message the microphone button shall be released. When the conversation with the Radio Dispatcher has

been completed, the microphone must be replaced in its holder. Do not place the microphone on the seat or floor since this might result in an "open mike" which could interfere with other police radio transmissions.

4. Except in emergency circumstances, broadcasts already in progress shall not be interrupted.

5. Police radio communication facilities and equipment are to be used exclusively for police related business. Joking, ribbing and other unprofessional conduct will not be tolerated.

6. The Standard Phonetic Alphabet shall be used when using the Police Radio:

| | | |
|---|---|---|
| A - ADAM | J - JOHN | S - SAM |
| B - BOY | K - KING | T - TOM |
| C - CHARLIE | L - LINCOLN | U - UNION |
| D - DAVID | M - MARY | V - VICTOR |
| E - EDWARD | N - NORA | W - WILLIAM |
| F - FOX | O - OCEAN | X - XRAY |
| G - GEORGE | P - PAUL | Y - YOUNG |
| H - HENRY | Q - QUEEN | Z - ZEBRA |
| I - IDA | R – ROBERT | |

B. Calling the Radio Dispatcher

1. When making radio contact with the Dispatcher, the unit shall first identify itself by providing its call number and then directing its communication to the Dispatcher (e.g. "car 111 to radio").

2. The Radio Dispatcher shall acknowledge by repeating the call number and advising the unit to proceed with its transmission (e.g. "go ahead car 111").

3. After the unit has transmitted its message, the Dispatcher shall indicate that it was received and understood.

C. Calling Another Unit

When one radio unit wishes to make radio contact with another radio unit, it shall:

1. Identify itself and then direct its transmission to the intended unit (e.g. "car 111 to car 109").

2. When the unit being called responds, it shall direct the calling unit to switch to the appropriate radio channel (e.g. " Car 111 go to channel 1").

3. After the conversation has been completed, both units shall return to the primary channel and so advise the Dispatcher (e.g. "car 111 is back on channel two).

9.15  THE IDENTITY AND LOCATION OF A 911 CALLER NOT TO BE REVEALED

A.  The Enhanced 911 (E-911) system enables Department employees to know the location from which a 911 call originated. MCT's in mobile patrol units provide the same information. No employee of the Department shall divulge the identity or location of any 911 caller except as otherwise described in this section, without having first been served with a valid subpoena issued by an appropriate court and signed by a judge or having been served with some other court order. Furthermore, members at the scene of a 911 call shall do nothing that might implicitly indicate the caller's identity or location (e.g. walking up to the caller's door).

B.  In the event that a person believes that (s)he is the subject of fake calls to 911, a crime report shall be prepared and forwarded to the District Detectives for investigation. As part of the investigation, the Detectives may ascertain the location from which the 911 calls originated. The location or identity of the caller shall not be revealed except to assist in the prosecution of the case or for other valid police purposes.

C.  Citizen requests or routine investigatory requests for caller/location information shall be referred to the Division of Administration and Communication. All such requests shall be in writing specifying the reason and necessity for such information.

9.16  MISSED RUNS

Responding to calls for service is the most basic function of the Police Department. To do so effectively, it is absolutely critical that mobile patrol units immediately acknowledge all direct broadcasts transmitted to them and that they apprise the Dispatcher when they have completed an assigned call. Failure to do so shall constitute a "missed run."

A.  Responsibility of Superior Officers Generally

It is the responsibility of all superior officers to monitor radio and MCT transmissions, and to take such action as may be required when cases of missed runs, or other infractions, come to their attention.

B.  Specific Responsibility of Superior Officers

Superior Officers in each district shall frequently monitor radio and MCT transmissions directed to units under their command and shall closely scrutinize radio logs and unit histories. They shall also take whatever other action may be required whenever any other infractions come to their attention.

C.  Responsibility of 911

Whenever a unit fails to properly acknowledge a direct broadcast or fails to inform the Radio Dispatcher that the call to which it was assigned is

completed, the 911 Lieutenant shall prepare a Missed Run Report (P-109). The report shall be forwarded through the chain of command to the Internal Affairs Division for investigation.

9.17   PORTABLE RADIOS

A. Issuance of Portable Radios
   1. No portable radio shall be used by a Department employee unless such use has been expressly approved by his/her immediate superior.
   2. Portable radios shall be assigned to Department employees. The member will be held responsible for this Departmental equipment. They must be signed for and returned at the time that the member is separating from service.
   3. No portable radio shall be used or issued to a member of another Command without the express approval of the Commanding Officer responsible for the portable radio. Such assignment shall be for a single tour of duty and the portable radio shall be returned at or before the end of that tour. (Refer to M.O.P. Chapter 8 for the removal or transfer of Department property to another unit.)
   4. Members assigned to mobile patrol units shall be issued a portable radio. Members assigned to foot patrol or a special detail may be issued a portable radio at the discretion of their superior officer.
   5. 911 Communications Lieutenant has spare portable radios if a member's radio should fail.

B. Portable Radios - Call Numbers
   1. When members assigned to a particular mobile patrol unit transmit a message using a portable radio they shall use the radio call number assigned to their mobile patrol unit.
   2. Superior Officers in command of a large or special detail may use portable radio call numbers of 1 through100 for the duration of the event.

C. Radio Contact
   1. When members are away from their mobile patrol units for any reason, they shall notify Dispatch, and they shall continue to monitor police radio broadcasts with their portable radio.
   2. Members who have been assigned a portable radio shall be responsible for its care and custody and they shall not leave it unattended at any time.

D. Responsibility of Commanding Officers
   1. Commanding Officers are responsible for the care and custody of all radio equipment assigned to members of their command.
   2. Commanding Officers shall without delay, have any malfunctioning portable radios taken in for repair.

3.  Commanding Officers shall during the month of November and at any other time as requested by the Inspector in charge of the Division of Administration and Communication, provide an accurate inventory of all portable radios and auxiliary radio equipment assigned to their commands.

## 10.0  CRIME ANALYSIS

10.1  POLICY
It is the policy of the Buffalo Police Department to collect, collate, analyze and disseminate information concerning crime, criminals and criminal trends so that the Department is better able to prevent and suppress crime and to apprehend offenders.

10.2  SOURCES OF CRIMINAL INFORMATION
While information concerning crime and criminals can come from a wide variety of sources, the major sources of such information in the Buffalo Police Department shall be:

A.  Crime Reports

B.  Arrest Reports

C.  Calls for Service

D.  Criminal Histories

F.  Field Interview Reports

G.  Reports of suspected criminal activity and hazards submitted by the various units in the Department

H.  Information provided by other law enforcement agencies regarding regional crime problems.

10.3  CRIME ANALYSIS UNIT
The Crime Analysis Unit is a unit within the Division of Administration and Communication and works in conjunction with the Erie Crime Analysis Center (ECAC).   Its primary responsibilities are to:

A.  Based on the information available to it, identify individuals with criminal propensities and profile their potential victims; analyze methods of operation of particular criminals; identify emerging crime patterns; assist in on going investigations; assess the success or failure of particular law enforcement techniques; and estimate future crime trends.

B.  Provide written information, maps and other graphic data that illustrate the occurrence of particular types of crime based on location and time.

C.  Provide commanding officers of the various districts and other units throughout the Department with information concerning crime so that their units are better able to fulfill their respective law enforcement functions.

D.  Fully cooperate with the commanding officers of the various districts and other units throughout the Department so that the type of criminal analysis with which they are being provided is specifically adapted for the special needs of their individual units.

E.  Through the chain of command, keep the Commissioner informed of major crime trends and serial type crimes of which the public should be informed.

10.4   FACTORS USED IN CRIME ANALYSIS
       Minimally, the following factors shall be considered when analyzing crime:

A.  the frequency with which particular types of crimes are committed;

B.  the location where crimes are committed;

C.  the time that particular crimes are committed, including the time of day, the day of the week, the day of the month, and the season of the year;

D.  the type of victim;

E.  possible suspects;

F.  possible suspected vehicles used;

G.  modus operandi factors:

H.  physical evidence information.

**11.0   BUSINESS FILES**

11.1   POLICY
       It is the policy of the Buffalo Police Department to maintain accurate and current information concerning emergency contact persons associated with businesses that are located in each of the patrol districts.

11.2   DISTRICT RESPONSIBILITY

A.  Each district shall maintain a file containing:
    1.   the name and telephone number of each business operating within their

boundaries;

2. the name of the owner of the business, the location of his/her residence, and the resident phone number;

3. the name, telephone number and the location of the residence of at least one person who the Department can notify in case of an emergency.

B. The Commanding Officer of each district shall endeavor to keep business files accurate and current.

C. Business files may be maintained in hardcopy or in a database.

## 11.3   METHODS FOR UPDATING BUSINESS FILES

Business files may be updated by:

A. Having the owner or manager of a business register in person at the appropriate district stationhouse;

B. Having the owner or manager of a business complete the Department's business form and send or deliver it to the appropriate district stationhouse;

C. The District's Commanding Officer shall be responsible for delegating a member of his/her command to receive and maintain the business emergency data.

**CHAPTER 10: WORK HOURS, VACATIONS, TIME OFF, RECORD KEEPING**

CONTENTS

**1.0     LABOR RELATIONS**
1.1     Policy
1.2     Collective Bargaining
1.3     Contract Management
1.4     Wages, Hours and Terms and Conditions of Employment
1.5     Retirement Program
1.6     Health and Life Insurance Programs
1.7     Disability
1.8     Uniforms, Equipment and Clothing Allowance
1.9     Educational Incentives
1.10    Civil Indemnification

**2.0     WORK SHIFTS - PBA MEMBERS**
2.1     Policy
2.2     Department Calendar
2.3     Work Hours for PBA Represented Employees
2.4     Unreported Absences and Tardiness
2.5     Shift Time - PBA
2.6     Overtime Compensation - PBA
2.7     Overtime Procedure - PBA
2.8     Pre-Approved Overtime Required in Certain cases
2.9     Minimum Overtime - Hazardous Duty Squads
2.10    Preferred Overtime - PBA

**3.0     WORK HOURS - LOCAL 650**
3.1     Policy
3.2     Work Hours - Local 650 Members
3.3     Overtime Local 650 Members
3.4     Minimum Overtime Compensation
3.5     Pre-Approved Overtime Required in Certain Cases
3.6     Holidays - Local 650 Members

**4.0     WORK HOURS - LOCAL 264 MEMBERS**
4.1     Policy
4.2     Work Hours - Local 264 Members
4.3     Overtime - Local 264 Members
4.4     Minimum Overtime Compensation - Local 264 Members
4.5     Overtime Procedure
4.6     Pre-Approved Overtime Required in Certain Cases
4.7     Holidays - Local 264 Members
4.8     Employee Absence - Local 264 Members

**5.0**   **VACATIONS**
5.1   Policy
5.2   Vacation Entitlement
5.3   Vacation Periods
5.4   Drawing for Annual Vacations
5.5   Annual Vacation Scheduling - PBA
5.6   Annual Vacation Scheduling - Local 650 and Local 264
5.7   Scheduling Limitations
5.8   Preparing Request for Leave of Absence (P-12)
5.9   Changing Vacation Schedules
5.10   Vacation Carryover - PBA Members
5.11   Vacation Accumulation - Local 650 and Local 264

**6.0**   **LEAVES OF ABSENCE - WITH PAY**
6.1   Policy
6.2   Personal Leave Time - PBA Members
6.3   Personal Leave Time - Local 650 and Local 264
6.4   Union Release Time
6.5   Bereavement Leave - PBA Members
6.6   Bereavement Leave - Local 650 Members
6.7   Bereavement Leave - Local 264 Members
6.8   Jury Duty
6.9   Civic Duty - Local 264 Members
6.10   Blood Days
6.11   Veteran's Days
6.12   Preparing Request for Leave of Absence (P-12)

**7.0**   **LEAVES OF ABSENCE - WITHOUT PAY**
7.1   Policy
7.2   Unpaid Leaves of Absence - Generally
7.3   Returning From an Unpaid Leave of Absence
7.4   Failure to Return from an Unpaid Leave of Absence - PBA
7.5   Failure to Return from an Unpaid Leave of Absence - Local 650
7.6   Failure to Return from an Unpaid Leave of Absence - Local 264
7.7   Election or Appointment to Public Office - PBA Members
7.8   Election or Appointment to Public Office - Local 650 and Local 264
7.9   Employment Opportunities - Local 650 and Local 264 Members
7.10   Educational Leave - Local 650 and Local 264 Members
7.11   Unpaid Leaves of Absence - Union Business
7.12   Maternity Leave - Local 650 and Local 264 Members
7.13   Maternity/Paternity Leave - PBA Members
7.14   Family and Medical Leave Act
7.15   Departmental Property and Service Weapons

**8.0**   **MILITARY LEAVE**
8.1   Policy

8.2    Members Entering the Military
8.3    Military Leave under Section 242 of the NYS Military Law

**9.0    ADDITIONAL EMPLOYMENT**
9.1    Policy
9.2    Limitations on Additional Employment
9.3    Filing Additional Employment Forms
9.4    Restrictions Imposed by the Alcohol Beverage Control Law

**10.0    TRANSFERS**
10.1    Policy
10.2    Transfer Procedure - PBA Members

**11.0    RECORD KEEPING**
11.1    Policy
11.2    Official Time Records
11.3    Distribution of Paychecks
11.4    Income Tax Deductions
11.5    Payroll Deductions
11.6    Current Address and Telephone Numbers Must be Filed with the Department
11.7    Resignations
11.8    Applying for Reinstatement

**12.0    GRIEVANCES AND ARBITRATION**
12.1    Policy
12.2    Grievances - PBA
12.3    Grievances - Local 650
12.4    Grievances - Local 264

P-COB000633

**1.0     LABOR RELATIONS**

1.1     POLICY
The City of Buffalo Department of Human Resources shall be the City agency primarily responsible for carrying out all those duties regularly regarded as being part of the labor relations function. It is the policy of the Buffalo Police Department to assist and advise the Department of Human Resources as it relates to Police Department matters and to actively participate, in conjunction with the Department of Human Resources, in all labor relations functions.

1.2     COLLECTIVE BARGAINING

A. The City of Buffalo Department of Human Resources is responsible for engaging in collective bargaining with the various collective bargaining representatives of Police Department employees. The Commissioner shall designate one or more persons to represent the Department's interest in any such negotiations.

B. The four major collective bargaining units representing members of the Police Department are as follows:

1. The Buffalo Police Benevolent Association
2. The American Federation of State, County, and Municipal Employees, AFL-CIO – Local 650
3. The American Federation of State, County, and Municipal Employees, AFL- CIO – Local 264
4. Buffalo Crossing Guards Association

C. The Department will advise and assist the Department of Human Resources and will actively participate in good faith negotiations with respect to wages, hours and other terms and conditions of employment.

D. The Department will abide by all laws and ground rules for collective bargaining that arise out of, or pertain to, the collective bargaining process and labor arbitration.

E. The Department will abide, in both the letter and the spirit, of all collective bargaining agreements, interest arbitration and grievance arbitration awards.

1.3     CONTRACT MANAGEMENT

A. The Commissioner shall designate a person who shall be primarily responsible for ensuring compliance with collective bargaining agreements, interest arbitration awards, grievance arbitration awards, and related court orders. Such person shall work in conjunction with the City of Buffalo Department of Human Resources in performing this function.

B.  Such person shall maintain copies of all current collective bargaining agreements, interest arbitration awards, grievance arbitration awards and court orders, that impact on the wages, hours and terms and conditions of employment of Department employees.

C.  Such person shall be responsible for amending all written directives and procedures to reflect the terms of collective bargaining agreements, interest arbitration awards, grievance arbitration awards and court orders.

D.  Such person shall communicate to bargaining unit members any changes in wages, hours and terms and conditions of employment by which the member may be affected and such person shall provide to the members' managers and supervisors, a written copy of such changes.

1.4    WAGES, HOURS AND TERMS AND CONDITIONS OF EMPLOYMENT
Members of the Department are entitled to those wages, hours and terms and conditions of employment that are required by collective bargaining agreements, interest arbitration awards, grievance arbitration awards, court orders and applicable statutes. Questions concerning wages, hours and terms and conditions of employment shall be forwarded to that person whom the Commissioner has designated as being responsible for contract compliance (refer 10/1.9A above).

1.5    RETIREMENT PROGRAM
All employees of the Department are members of the New York State Retirement System. Information concerning retirement programs is available through the Department of Human Resources or directly through the New York Retirement System.

1.6    HEALTH AND LIFE INSURANCE PROGRAMS
Employees of the Department are entitled to health insurance and life insurance as specified in the respective collective bargaining agreements. Questions concerning applicability and coverage should be directed to the Department of Human Resources.

1.7    DISABILITY
Employees of the Department are entitled to disability benefits as specified in the respective collective bargaining agreements. Questions concerning disability shall first be directed to the 1st Deputy Commissioner.

1.8    UNIFORMS, EQUIPMENT AND CLOTHING ALLOWANCE
Uniforms, equipment and clothing allowance shall be provided to members of the Department in accord with the terms of the respective collective bargaining agreements. Refer to M.O.P. Chapter 12 - Uniforms and Equipment. Questions concerning uniforms and equipment shall be directed to the Department's Quartermaster.

1.9    EDUCATIONAL INCENTIVES
Educational incentives for Department members shall be as specified in the respective collective bargaining agreements. Questions concerning such benefits shall be directed to the Department of Human Resources.

1.10    CIVIL INDEMNIFICATION
General Municipal Law section 50-j together with the collective bargaining agreement between the City and the PBA, dictate the terms for civil indemnification for PBA members.

## 2.0    WORK SHIFTS - PBA MEMBERS

2.1    POLICY
It is the policy of the Buffalo Police Department to work cooperatively with the collective bargaining representatives of its employees so that personnel resources may be allocated in a manner that is most conducive to the efficient and effective provision of police services to the citizens of the City of Buffalo.

2.2    DEPARTMENT CALENDAR
For purposes of the Buffalo Police Department the daily, weekly and annual calendars are configured as follows:

A.  The calendar day begins at 0001hrs and ends at 2400hrs each day.

B.  The calendar weeks begin at 0001hrs each Sunday and end at 2400hrs the ensuing Saturday.

C.  Pay periods begin at 0001hrs on a Monday and continue for fourteen days concluding at 2400hrs on a Sunday.

D.  The calendar years begin at 0001hrs on January 1st and ends at 2400hrs on the ensuing December 31st.

E.  The fiscal year begins on July 1st and ends on the ensuing June 30th.

2.3    WORK HOURS FOR PBA REPRESENTED EMPLOYEES
Members of the Department represented by the Buffalo Police Benevolent Association shall work those hours that have been agreed upon pursuant to the Collective Bargaining Agreement.

A.  The regular hours of work shall be consecutive except for interruptions for lunch.

B.  Members of the Department represented by the PBA and assigned to Patrol Districts shall work a ten hour work shift, working four consecutive tours of duty followed by three days off, and then working another four consecutive

tours of duty followed by four days off (i.e., 4-3, 4-4).

C. Members of the Department who are represented by the PBA and who are not assigned to a ten hour work shift shall be assigned to an eight hour work shift as described in the collective bargaining agreement.

D. Except for emergency situations, as declared by the Commissioner of Police, as outlined in paragraph "E" below, work shift schedules shall not be changed by the Commissioner of Police unless the changes are mutually agreed upon. Work shift schedules shall not be changed as a disciplinary measure, or for the purpose of depriving an employee of a benefit to which (s)he would otherwise be entitled.

E. Whenever public demands require the Commissioner of Police to suspend any vacation or any WV day or to increase any tour of duty, all employees affected thereby shall be paid for such suspended vacation and/or leave, or increased tour of duty, at the rate of time and one half.

## 2.4  UNREPORTED ABSENCES AND TARDINESS

A. Unless otherwise directed, members are required to report to a superior officer on duty in the command to which the member is assigned, all unscheduled absences from work. Such report shall be made no later than the beginning of the member's regularly assigned starting time. In the event that a superior officer is not readily available, the member shall contact the ***911 Lieutenant who shall in turn, notify the members command***.

B. A member failing to report an absence shall be deemed to be absent without leave.

C. A member who is scheduled to work and reports for duty within one (1) hour of the regularly assigned starting time shall not be considered absent without leave. Such member shall be considered tardy.

D. Unreported absences and tardiness may result in disciplinary action.

## 2.5  SHIFT TIMES – SWORN

A. For members of the Department represented by the PBA and assigned to Patrol Districts, shift times shall be as follows:

| | |
|---|---|
| Second Platoon | 2400hrs - 1000hrs |
| Third Platoon | 0600hrs - 1600hrs |
| Fourth Platoon | 1530hrs – 0130hrs |
| Fifth Platoon | 2000hrs – 0600hrs |

B. The first fifteen (15) minutes of each shift shall be designated as briefing times. Employees must be present daily for briefing time unless otherwise excused by their Commanding Officer.

C. For members of the Department represented by the PBA who are assigned to the first shift in headquarters and who are working an eight-hour schedule, their starting time shall begin no earlier than 0600hrs and no later than 1000hrs, consistent with current practice.

2.6    OVERTIME COMPENSATION – SWORN

A. Whenever any employee represented by the PBA is required to remain on duty or report for duty in excess of a regular work shift, such employee shall be compensated at the rate of time and one-half (1 1/2) for the time worked in excess of the regular work shift.

B. Overtime shall consist of all work performed in excess of eight (8) hours performed in any eight (8) hour tour of duty and ten (10) hours in any ten (10) hour tour of duty or in excess of forty (40) hours per week. Overtime shall be earned in multiples of fifteen (15) minutes periods.

C. Members who are off duty and are called into work because of a shortage of manpower, other than members of the URRT, SWAT, CMT, and K-9 will receive a minimum of four (4) hours pay at the rate of time and one-half. Members reporting for work after the time they are requested shall receive compensation (four hour minimum at the rate of time and one-half) starting at the time of their actual arrival.

2.7    OVERTIME PROCEDURE – SWORN

A. In the event that the Commissioner of Police determines overtime is required, the opportunity to work overtime shall be offered as follows:

1. The senior off duty Police Officer assigned to the District, in which the manpower shortage occurs, shall be offered the opportunity to work overtime. If that off-duty Police Officer declines to accept the overtime the opportunity to work the overtime shall be given to the next most senior off-duty Police Officer within the District. Said opportunity shall likewise pass through the District based on seniority.

2. If no Police Officer who is assigned to the District or Bureau in which the manpower shortage occurs accepts the overtime, then the most junior Police Officer assigned to that District or Bureau would be assigned to fill the vacancy. In instances of emergency, and upon approval of the Commanding Officer, the junior Officer may obtain a replacement to fill the vacancy.

3. In case of emergency, where a command Officer cannot readily contact a Police Officer pursuant to this section, then the command Officer may retain Police Officers from the platoon which is then on duty, based on seniority as contained herein.

4. The Police Officer who created the manpower shortage will not be considered to fill the vacancy, except those on regularly scheduled annual vacation of one (1) or more weeks

5. For purposes of overtime, seniority shall be based upon the length of a Police Officer's service in that rank, beginning with the date of appointment to that rank.

6. When there is a requirement to replace an absent Detective or Detective Sergeant, the most senior Officer, of the rank to be replaced, and in the assignment, shall be given the first opportunity to work overtime. Said opportunity shall likewise pass through the assignment based on seniority. If the overtime is not accepted pursuant to this section, the least senior Officer within the assignment shall fill the vacancy.

   a. In the event Department wide general Detective duty is required, selection shall be made from the general roster of Detectives beginning with the most senior Detectives and progressing down the seniority list of such Officers. The least senior Detective shall fill the vacancy in those instances where overtime is declined pursuant to this section.

7. In the event of the necessity to replace an absent Lieutenant, the most senior Lieutenant within the assignment concerned shall be given the first opportunity to work overtime. Said opportunity shall likewise pass through the assignment based on seniority. If the overtime is not accepted pursuant to this Section, the least senior Officer within the assignment shall fill the vacancy.

8. In the event of the necessity to replace a Captain or Inspector, the most senior Officer, of the rank to be filled within that assignment, shall be given the first opportunity to work overtime, and said opportunity shall likewise pass through the applicable rank based on seniority. If the overtime is not accepted pursuant to this section, the least senior Officer within the applicable rank shall fill the vacancy.

9. 16 Hour Rule – In no instances shall a sworn Officer work more than 16 hours in a 24 hours period.

B. In the event of the necessity to replace a member consistent with the

provisions contained in "A" above, the opportunity to work overtime shall <u>not</u> be offered:

1. to members on personal leave days until all other eligible members have first been offered the opportunity;

2. to members on single AV days until all other eligible members including members on personal leave days, have first been offered the opportunity;

3. to members who have availed themselves of the "Preferred Overtime" incentive until all other eligible members including members on personal leave days and members on single AV days, have first been offered the opportunity;

4. to members who have been off due to sickness or injury within fourteen (14) days of the overtime opportunity, until all other eligible members including members on personal leave days, members on single AV days, and members who have availed themselves of the "Preferred Overtime" incentive, have first been offered the opportunity.

5. to members on military leave, bereavement leave, leave of absence, sick leave, maternity leave, or on a limited duty assignment, under any circumstances.

2.8    <u>OVERTIME PRE-APPROVAL REQUIRED IN CERTAIN CASES</u>

In order to provide some auditing capability and some documentation, overtime must be pre-approved. This pre-approval requirement does not apply to instances of overtime which are authorized to fill minimum staffing levels, late 911 calls, late arrests, and call outs of specialized units (i.e. SWAT, CMT, URRT, Det. Division Squads, K-9, etc.).

A. After the individual command determines that overtime is necessary, the District Commander or his/her designee shall prepare the Authorization For Overtime form and forward it to the appropriate Chief/DPC/or Police Commissioner. This form should be forwarded well in advance of the date for which overtime is requested.

B. The request is reviewed and the approval or disapproval is faxed or e-mailed to the requesting command the same day.

C. If overtime has been approved the Officer working the overtime prepares form P-77 that is forwarded to the Chief's Office along with a copy of the approval and a copy of form P-3 for the tour worked.

D. Upon verification by the Chief the documentation is delivered to the Office of

Fiscal Management for entry into the payroll system.

2.9    MINIMUM OVERTIME - HAZARDOUS DUTY SQUADS
Unit members who perform hazardous duties in SWAT, URRT, CMT and K-9 Bomb Detection shall receive the minimum pay guarantee as noted below:

A. If the team member is on duty and participates in the operation, (s)he shall be granted four (4) hours of straight time pay, at his/her regular hourly rate. If the member is on duty, reports to the scene but does not participate, (s)he is not entitled to any additional stipend.

B. If a team member is off duty, is called in and participates in an operation, (s)he shall receive eight (8) hours of overtime pay at the rate of time and one-half which shall begin from the time of the call. The foregoing eight (8) hours shall include that time the team member actually works.

C. If a team member is off duty and the operation exceeds eight (8) hours in duration, (s)he shall receive overtime at the rate of time and one-half for all time worked.

D. If a team member is off duty, is called in but does not participate in the operation, (s)he shall be granted four (4) hours of overtime pay, at the rate of time and one-half, which shall begin from the time of the call.

2.10    PREFERRED OVERTIME - SWORN
The "Preferred Overtime" incentive is a program that may be used by PBA members in anticipation of retirement. Generally, it allows them to work on an overtime basis when they would otherwise be scheduled on AV's and/or PL's. The details and requirements of the "Preferred Overtime" incentive are fully described in the collective bargaining agreement.

**3.0    WORK HOURS - LOCAL 650 MEMBERS**

3.1    POLICY
It is the policy of the Buffalo Police Department to work cooperatively with the collective bargaining representatives of its employees so that personnel resources may be allocated in a manner that is most conducive to the efficient and effective provision of police services to the citizens of the City of Buffalo.

3.2    WORK HOURS - LOCAL 650 MEMBERS
Members of the Department represented by Local 650 shall work as follows:

A. The regular hours of daily work shall be consecutive except for interruptions for lunch. Each employee who works a minimum of four hours is entitled to a one hour lunch period. In addition, employees are entitled to a fifteen-minute rest period during each one-half shift.

B. Employees shall be scheduled to work at a regular work shift as determined by the Commissioner, which work shift shall have a regular starting and quitting time. Except where otherwise agreed to by the City and the member's bargaining representative, each member shall work a five day, eight hour work schedule, with two off days per week.

3.3    OVERTIME - LOCAL 650 MEMBERS

A. Members of Local 650 shall be compensated at the rate of time and one-half for:

1. All work performed in excess of eight hours in any workday and all work performed in excess of forty hours in any workweek;
2. All worked performed before or after any scheduled work shift;
3. All work performed on the sixth and seventh day of their regular workweek;
4. All work performed on holidays.

B. For the purpose of this section, excused absence or sick leave within a regularly scheduled five day workweek shall be counted as days worked for the purpose of computing overtime compensation.

C. No overtime compensation shall be made unless the overtime work has been specifically authorized by the Commissioner or his/her designee.

D. At the option of the individual employee, compensation for overtime worked may be taken in the form of either time or money.  Compensation time is set at a maximum of 48 hours per fiscal year (which is cumulative), once the maximum number of hours is met within the fiscal year, money must be taken in lieu of time.

E. A record of overtime hours worked by each Local 650 member shall be posted by the Department and maintained on a weekly basis on the bulletin boards of each effected unit.

3.4    MINIMUM OVERTIME COMPENSATION
Local 650 employees called to work outside their regularly scheduled shift shall be paid for at least four (4) hours work at their straight time rate of pay, whether the entire four (4) hours are worked or not. Those employees who work in excess of two and three-fourths (2 3/4) hours shall be compensated at  time and one-half (1 1/2) for all time worked.

3.5    PRE-APPROVED OVERTIME REQUIRED IN CERTAIN CASES
Refer to M.O.P. Chapter 10 above.

3.6    HOLIDAYS - LOCAL 650 MEMBERS

    A.  The following days are paid holidays for Local 650 members:

| | |
|---|---|
| New Year's Day | Columbus Day |
| Dr. Martin Luther King Day | General Election Day |
| President's Day | Veteran's Day |
| Good Friday | Thanksgiving Day |
| Memorial Day | Friday after Thanksgiving |
| Independence Day | Christmas Day |
| Labor Day | |

    B.  Whenever any of the holidays listed above shall fall on a Sunday, the succeeding Monday shall be observed as the paid holiday. Whenever any of the holidays listed above shall fall on Saturday, the preceding Friday shall be observed as the paid holiday.

    C.  Any employee who is required to work on any of the holidays listed above shall be compensated at the rate of time and one-half in addition to the holiday pay.

    D.  For the purpose of computing overtime compensation, all holiday hours, whether worked or not worked, for which a member is compensated, shall be regarded as hours worked.

    E.  Should any of the holidays listed above occur during an employee's vacation period, his/her vacation shall be extended by the number of days equal to the number of holidays falling within that vacation period

## 4.0  WORK HOURS - LOCAL 264 MEMBERS

4.1    POLICY
It is the policy of the Buffalo Police Department to work cooperatively with the collective bargaining representatives of its employees so that personnel resources may be allocated in a manner that is most conducive to the efficient and effective provision of police services to the citizens of the City of Buffalo.

4.2    WORK HOURS - LOCAL 264 MEMBERS

    A.  The normal workweek for members represented by Local 264 shall consist of five (5) consecutive, eight (8) hour days, including a lunch period, Monday through Friday, inclusive. In the case of members assigned to perform radio dispatching duties, cell block related duties, or maintenance related duties in Police Headquarters or in the various stationhouses, the Commissioner may negotiate with the collective bargaining representative of Local 264 to create a schedule other than a Monday through Friday schedule.

B. All employees represented by Local 264 shall be scheduled to work at a regular work shift as determined by the Commissioner, which work shift shall have a regular starting or quitting time, except for emergency situations or seasonal operations as declared by the Commissioner. Work shift schedules shall not be changed except when the change is mutually agreed upon.

C. The work schedules for employees represented by Local 264 shall provide for a fifteen (15) minute rest period during each one-half (1/2) shift. The rest period shall be scheduled at the middle of the one-half (1/2) shift whenever feasible. Under no condition shall a member receive less than two (2) fifteen minute rest periods during any one (1) complete work shift. Members who for any reason work beyond their regular quitting time into the next shift shall receive a fifteen (15) minute rest period before beginning work on the next shift. In addition, they shall be granted the regular rest periods that occur during the said shift.

D. Employees represented by Local 264 shall be granted a fifteen (15) minute personal clean up period prior to the end of each work shift. In the event that the employee works beyond his/her regular quitting time, the personal clean up period will be taken prior to their leaving work.

4.3   OVERTIME - LOCAL 264 MEMBERS

A. No overtime payment shall be made unless the work has been specifically ordered by the Commissioner or his/her designated representative.

B. Members of Local 264 shall be compensated at the rate of time and one-half (1 1/2) for any of the following work:

   1. all work performed in excess of eight (8) hours in any workday;
   2. all work performed in excess of forty (40) hours in any workweek;
   3. all work performed before or after any scheduled work shift;
   4. all work performed on  Saturday or Sunday by any member who's work shift does not regularly include the Saturday or Sunday in which (s)he was requested to work;
   5. for members who are regularly scheduled to work on Saturday or Sunday, all work performed on the sixth or seventh day of their regular workweek;
   6. all work performed on any of the holidays listed in M.O.P. Chapter 10.

C. Compensatory time off shall not be used in lieu of overtime pay.

D. For purposes of this section, excused absences or paid sick leave within a regularly scheduled five (5) day work week shall be counted as days worked for the computation of overtime pay.

4.4    <u>MINIMUM OVERTIME COMPENSATION</u>

    A.  Employees represented by Local 264 who are called in to work outside of their regularly scheduled shift, from Monday through Friday, shall be paid for at least two (2) hours at their overtime rate whether the entire two (2) hours are worked or not.

    B.  Employees represented by Local 264 who are called in to work outside of their regularly scheduled shift on Saturdays, Sundays and holidays shall be paid at least (4) hours at their overtime rate whether the entire four (4) hours are worked or not.

4.5    <u>OVERTIME PROCEDURE - LOCAL 264 MEMBERS</u>

    A.  Overtime shall be shared equally by all members working within the same job classification within the Department.

    B.  The opportunity to work overtime shall be offered to members within the same job classification on a rotation basis. Members who are offered overtime work on this basis but who decline to accept shall be considered to have worked overtime for the purpose of determining equal distribution of overtime.

    C.  Except in cases of emergency, overtime work shall be voluntary and there shall be no discrimination against any employee who declines to work overtime.

    D.  In emergency circumstances, the Commissioner may direct employees to work overtime for reasonable periods.

    E.  A record of the overtime hours worked by each member represented by Local 264 shall be posted and maintained on a weekly basis on a Department bulletin board.

4.6    <u>PRE-APPROVED OVERTIME REQUIRED IN CERTAIN CASES</u>
    Refer M.O.P. Chapter 10 above.

4.7    <u>HOLIDAYS - LOCAL 264 MEMBERS</u>

    A.  Employees represented by Local 264 shall be eligible for holiday pay if:

        1.  the employee would have been scheduled to work on such day if it had not been observed as a holiday unless the employee is on a day off, vacation, layoff, or sick leave, and

        2.  the employee worked his/her last scheduled workday prior to the holiday unless (s)he is excused by the City or if (s)he was absent for

any reasonable purpose.

B.  If a holiday is observed during an employee's vacation period, the employee shall be given an additional day off.

C.  In addition employees represented by Local 264 are entitled to the same holiday benefits enumerated in M.O.P. Chapter 10.

4.8    EMPLOYEE ABSENCE

A.  Unless otherwise directed employees represented by Local 264 shall report all absences from work to their Superior Officer no later than the beginning of the employee's regularly assigned starting time.

B.  Any employee who fails to report an absence will be considered absent without leave.

C.  An employee who reports for work within thirty (30) minutes of the regularly assigned starting time shall not be considered as having an unreported absence but instead, shall be considered tardy.

D.  Anticipated tardiness must be reported to the employee's Superior Officer no later than the beginning of the member's assigned starting time.

E.  Unreported absences and tardiness will result in disciplinary action.

**5.0    VACATIONS**

5.1    POLICY
The Department recognizes that vacation time is an important benefit to its employees and that it is an integral part of the work environment. It is the policy of the Department to balance the need to provide police service to the public, with the employee's entitlement to vacation, and to do so in a manner consistent with the collective bargaining agreement.

5.2    VACATION ENTITLEMENT
Vacation time shall be granted in compliance with the collective bargaining agreements in existence between the City of Buffalo and the respective bargaining units (i.e., PBA, Local 650 and Local 264).

5.3    VACATION PERIODS

A.  Vacation periods shall be divided into Spring, Summer, and Fall vacation periods.

B.  Before the first of December of each year, the Commissioner will designate

the dates and times of each vacation period.

5.4    DRAWING FOR ANNUAL VACATIONS

A. Annual vacations shall be granted on the basis of seniority in grade, within the respective Departmental units.

B. Selection of vacation shall be made under the supervision of the respective Commanding Officers, and posted in the command, not later than January 15th of each year.

C. Vacation schedules shall be submitted to the respective Division/District Commanders for final approval, not later than January 10th of each year.

D. Vacation selections shall be made during the month of December, for the following year.

5.5    ANNUAL VACATION SCHEDULING - SWORN
Annual vacation scheduling for members represented by the PBA shall be as follows:

A. The most senior member in grade in each platoon or unit shall select his/her vacation first. In Patrol Districts in which each platoon is divided into two wheels, the most senior member in each wheel will select his/her vacation first. Other members shall then select in order of seniority.

B. Generally, a maximum of two full weeks may be taken during the summer vacation period. For members working an eight-hour schedule this is equivalent to ten, eight-hour days. For members working a ten-hour schedule, it is equivalent to eight, ten-hour days. However, if, after all members of the platoon/wheel/unit have had an opportunity to make their vacation selections and there continues to exist vacancies in the summer vacation period, they may be filled on the basis of seniority. In such case only one additional week may be allowed in the summer vacation period (i.e., five, eight hour days for members on the eight-hour schedule, and four, ten hour days for members on the ten hour schedule).

C. A member represented by the PBA may use at his/her option up to five (5) single AV days for ten-hour employees, or ten (10) single AV days for eight-hour members, one at a time, during the months of June, July and August. These single AV days may be taken in addition to any other scheduled summer vacation, provided they are not taken in consecutive units.

D. Captains shall choose their annual vacations, by seniority, from within their respective commands. No more than one Captain from any one command shall be on annual vacation at the same time.

5.6    ANNUAL VACATION SCHEDULING - LOCAL 650 AND LOCAL 264

    A. Vacations for members of Local 650 and Local 264 shall be granted for the period requested by the employee, subject to the approval of the Commissioner. Such approval shall not be unreasonably withheld. If it is necessary to limit the number of employees on vacation at the same time, the employee with the greater seniority with the City shall be given his/her choice of vacation period. No vacation request shall exceed more than twenty-five (25) consecutive days at one time.

    B. Employees represented by Local 264 may take vacation leave in units of four (4) hours or eight (8) hours.

5.7    SCHEDULING LIMITATIONS

    A. Commanding Officers shall designate the number of members in each unit who may be on annual vacation at one time.

    B. In platoons, work wheels, or groups, of sixteen members or less, no more than two members may be on annual vacation at one time.

    C. In platoons, work wheels, or groups, of more than sixteen members, no more than three persons may be on annual vacation at one time.

    D. Only one Lieutenant per platoon in a district shall be on annual vacation at one time.

    E. Commanding Officers shall be responsible for regulating vacation schedules so that manpower requirements can be adequately met.

5.8    PREPARING REQUEST FOR PAID LEAVE OF ABSENCE (P-12)

    A. An employee must prepare a Request for Leave of Absence (Form P-12) in every instance in which (s)he is taking vacation time.

    B. The employee's immediate superior shall in all cases forward the P-12 to his/her Commanding Officer.

    C. Requests for single AV days that would create a personnel shortage shall not be initialed by the immediate superior but shall be forwarded to the Commanding Officer for review. The immediate superior shall apprise the Commanding Officer when there is not sufficient personnel to grant such request.

    D. Any personnel submitting a request for a leave with pay due to City business, must submit a Request for Leave of Absence (P-12) requesting such leave. The P-12 must include the following:

COB000648

1. the location of City business
2. the time
3. a description of the request must be filled in under the "reason" portion of the leave slip.

The completed P-12 MUST be submitted to the Police Commissioner or a Deputy Police Commissioner prior to the City business leave date(s) for authorization.

5.9   CHANGING VACATION SCHEDULES

A. Employee's annual vacations shall not be changed, except by mutual consent of the employee and the employee's Commanding Officer (Captain or above).

B. Employees shall take their annual vacations as scheduled unless they have previously asked for, and received permission from, their Division/District Commanding Officer (Captain or above) to change their vacation schedule. Other employees of the unit affected by the changes must also consent. In any other case, other than in those specific instances in which an employee is allowed to carry vacation over to the next consecutive year, employees will forfeit their vacation unless it is taken as scheduled.

C. Except upon promotion, a transferred employee shall retain his/her selected annual vacation. Promoted employees shall retain their selected annual vacation whenever possible.

5.10   VACATION CARRYOVER - SWORN MEMBERS
The Commissioner shall allow vacation time to be carried over into the next year consecutive year for members represented by the PBA when:

A. the Commissioner requests or requires a member to forego scheduled vacation in order that the Department may provide and maintain adequate service to the public;

or

B. the member is unable to take his/her annual vacation as scheduled due to being injured in the discharge of his/her duties.

5.11   VACATION ACCUMULATION - LOCAL 650 AND LOCAL 264 MEMBERS
Members represented by Local 650 and Local 264 are entitled to accumulate vacation time. In no instance shall any member be allowed to exceed the maximum bank allotment. The maximum bank allotment is described in the collective bargaining agreement between the City and Local 650 and the City and Local 264. The Commissioner at his/her sole discretion may allow a maximum of ten (10) additional vacation days to accumulate in excess of the maximum bank allotment but only in the following circumstances.

A. The Commissioner requested and the employee agreed to forego scheduled vacation in order that the Department could provide and maintain adequate service to the public.

B. The employee became ill or incapacitated prior to taking such vacation and the illness or accident is medically verified by the attending physician or a physician designated by the City, who specifies the nature and date of the disability.

C. The employee was injured during the discharge of his/her duties.

## 6.0    LEAVES OF ABSENCE - WITH PAY

6.1    POLICY

The Department recognizes that occasionally there may arise circumstances in which its members require time off from work, separate and apart from their regularly scheduled vacations. It is the policy of the Buffalo Police Department to grant these leaves of absence consistent with existing laws and applicable collective bargaining agreements so long as granting the leave request does not diminish the Department's ability to adequately provide police services to the public.

6.2    PERSONAL LEAVE TIME - SWORN MEMBERS

A. Members may utilize Personal Leave Time to the extent of their personal leave allotment as specified in the Collective Bargaining Agreement.

B. Personal leave time may not be taken in units of less than one-half (1/2) of a working day.

C. Members must prepare and submit a Request for a Leave of Absence (Form P-12) at least forty-eight (48) hours in advance of the leave.

D. When an emergency situation makes the giving of the required forty-eight (48) hour notice impossible, the member may request to be allowed to take the personal leave time on an emergency basis. The request for an Emergency Personal Leave must be made to either the member's Lieutenant, Captain or District Chief, or in their absence, the *Senior on duty Command Officer*. Said emergency personal leave day may be granted provided sufficient documentation of the emergency is produced upon request.

6.3    PERSONAL LEAVE TIME - LOCAL 650 AND LOCAL 264 MEMBERS

A. Employees represented by Local 650 and Local 264 may use personal leave to the extent of their personal leave allotment as specified in the existing collective bargaining agreement. It may be used at the employee's discretion

so long as the absence will not seriously hamper or impede the necessary work of the Department.

B. Personal leave may not be taken in units of less than one-half (1/2) of a working day.

C. Employees must prepare and submit form P-12 at least twenty-four (24) hours in advance of the leave except where an emergency situation makes the giving of notice impossible.

6.4     UNION RELEASE TIME
Accredited union representatives shall be allowed time off consistent with the existing collective bargaining agreements and release time agreements.

6.5     BEREAVEMENT LEAVE - PBA MEMBERS

A. Each permanent Department member represented by the PBA is entitled to forty (40) hours of bereavement leave for a death of an immediate family member. This bereavement leave is non-cumulative and is non-chargeable to any other leave and if taken, must commence on the day of death and continue on consecutive calendar days.

B. If a member was on regularly scheduled WV's during the time of bereavement, the WV's shall be canceled and the member placed on Bereavement Leave. The WV's that were canceled may be taken at the end of the bereavement leave or within the ensuing sixty (60) days.

C. The member must cause a Request for Leave of Absence (P-12) to be prepared and is required to attend the funeral or memorial service.

D. The immediate family includes the spouse, grandparent, parent, child, grandchild, brother, sister, father-in-law, mother-in-law, sister-in-law, brother-in-law, daughter-in-law, son-in-law, and any other relatives of the employee or of the employee's spouse residing in the household of the employee. Step relatives are defined as stepparent, stepbrother, stepsister and stepchild.

6.6     BEREAVEMENT LEAVE - LOCAL 650 MEMBERS

A. Employees of the Department represented by Local 650 are entitled to five (5) consecutive calendar days off for a death in their immediate family (except as specified in subsection F, below).

B. The first day of the bereavement leave is as follows:

    1. the day of death provided the death occurs during those hours which are considered the member's hours of work, regardless if the member

is actually scheduled to work;

2. the day following the death when the death occurs subsequent to those hours which are considered the member's hours of work, regardless of whether the employee is actually scheduled to work.

C. This bereavement leave is noncumulative and non-chargeable to any other leave.

D. The employees must cause a P-12 to be prepared and must attend the funeral or memorial service.

E. The immediate family of the employee or his/her spouse shall include the spouse, grandparent, parent, child, grandchild, brother, sister, father-in-law, mother-in-law, sister-in-law, brother-in-law, or step-relatives, and any other relatives of the employee or of his/her spouse residing in the household of the employee. Step-relatives are defined as follows: stepparents, stepbrother, stepsister, stepchildren, and step grandchildren, step grandparents.

F. One day of bereavement leave shall be allowed for the death of an aunt, uncle, niece, or nephew.

6.7    BEREAVEMENT LEAVE - LOCAL 264 MEMBERS

A. Employees represented by Local 264 who are absent from duty on account of a death in his/her immediate family of his/her spouse's family shall received his/her established compensation for a period not exceeding five (5) days for each such death (except as specified in subsection E and F, below).

B. Bereavement leave is noncumulative and non-chargeable to any other leave.

C. The employee must cause a form P-12 to be prepared, attend the funeral or the memorial service, and shall upon request of the Department, submit proof of the relationship to the deceased.

D. Immediate family shall include the spouse, grandparent, parent, child, grandchild, brother, sister, father-in-law, mother-in-law, step relatives and any other relatives of the employee or their spouse residing in the household of the employee. Step relatives are defined as step grandparents, stepparents, stepbrother, stepsister, stepchildren and step grandchildren.

E. Bereavement leave for the employee's or their spouse's brother-in-law and sister-in-law shall be three (3) consecutive days.

F. In the event that death occurs to the employee's aunt, uncle, niece or nephew, (s)he shall be entitled to one (1) day's absence with pay. Such excused day shall be the day of the funeral or burial service.

6.8    <u>JURY DUTY</u>

Employees of the Department with at least thirty (30) days of service who are required to serve for jury duty shall be granted a leave of absence with pay on the date(s) on which they actually serve.

6.9    <u>CIVIC DUTY - LOCAL 264 MEMBERS</u>

Employees represented by Local 264 who are required to appear before a court or other public body on any matter not related to their work and in which they are not personally interested shall be granted a leave of absence therefore. The City will pay them the difference, if any, between the compensation they receive from the court or other public body and their regular wages for each day of service.

6.10    <u>BLOOD DAYS</u>

Each employee of the Department who makes a blood donation to the Red Cross, UNYTS or Roswell Park, shall be entitled to a leave of absence of one tour of duty for each donation, limited to a maximum of two (2) tours of duty per calendar year. All such leave time must be used within sixty (60) days of the date of the donation.

6.11    <u>VETERAN'S DAYS</u>

A.  <u>Independence Day</u>

1.  Each Officer and employee of the Department who was a member of the national guard or naval militia or a member of the reserve corps at a time when the United States was not at war and who has been honorably discharged there from, shall, in so far as practicable, be entitled to absent himself/herself from his/her duties or service, with pay, on July fourth of each year, (refer section 249 New York State Military Law).

2.  Members who are represented by the PBA and who are eligible to be off on July fourth   because of their military status and who are either scheduled for duty on that day or who are not on duty on that day for a reason other than a Vet's day (e.g., WV, AV, PL, sick leave), shall be entitled to defer that Vet's day for a reasonable time.

B.  <u>Memorial Day and Veteran's Day</u>

1.  Employees of the Department who qualify by virtue of their military service shall be entitled to a leave of absence with pay for the observance of Memorial Day and Veteran's Day.

2.  Generally, to be entitled to be off on Memorial Day and Veteran's Day, an employee must have served on active duty in the army, navy, Marine Corps, air force, or coast guard, of the United States, and must have been honorably discharged or separated from the service under honorable conditions. Refer to NYS Public Officers Law section 63, for a more detailed listing of eligible employees.

3. Members who are represented by the PBA and who are eligible to be off on Memorial Day and Veteran's Day because of their military status and who are either scheduled for duty on either of those days or who are not on duty on either of those days for a reason other than a Vet's day (e.g., WV, AV, PL, sick leave), shall be entitled to defer that Vet's day for a reasonable time.

6.12   PREPARING REQUEST FOR LEAVE OF ABSENCE (FORM P-12)

A. A Request for Leave of Absence (Form P-12) shall be prepared in duplicate for all leaves of absence and it shall be submitted to the employee's immediate superior. Leave requests shall be submitted at least forty-eight (48) hours before the start of such leave unless indicated otherwise.

B. The immediate supervisor shall initial the P-12 if there is sufficient manpower and the Commanding Officer shall sign such request if (s)he deems the member entitled to such leave.

C. Leave requests that would create a personnel shortage shall not be initialed by the immediate superior but shall be forwarded to the Commanding Officer for review. The immediate superior shall apprise the Commanding Officer when there is not sufficient personnel to grant leave requests.

## 7.0   LEAVES OF ABSENCE - WITHOUT PAY

7.1   POLICY

The Department recognizes that occasionally circumstances may arise in which its members require time off from work without pay. It is the policy of the Buffalo Police Department to grant these leaves of absence without pay for good cause, consistent with existing laws and applicable collective bargaining agreements. However, granting such leave requests must be balanced against the Department's ability to adequately provide police services to the public.

7.2   UNPAID LEAVES OF ABSENCE – GENERALLY

A. The Commissioner may grant unpaid leaves of absence. Leaves of absence shall not exceed one (1) year, however, such leave may be renewed or extended.

B. Requests for leaves of absence in excess of thirty (30) days that have the consent of the Commissioner shall be filed with the City Clerk for presentation to the Common Council. The certificate shall set forth the date on which the leave of absence begins and ends.

C. Whenever a leave of absence without pay is granted to an employee of the Department, the Commissioner shall file a certificate with the Municipal Civil

Service Commission, showing the starting and ending dates of the leave.

7.3    RETURNING FROM AN UNPAID LEAVE OF ABSENCE

A. Employees of the Department who have been on an unpaid leave of absence of thirty (30) days or more shall contact their Commanding Officer at least one day prior to the employee's return to duty.

B. Employees of the Department who have been on an unpaid leave of absence of ten (10) days or more and who wish to return to duty prior to the scheduled expiration of their leave, shall apply to the Commissioner for permission on an Intra-Departmental Memorandum, at least three (3) days before his/her anticipated return to duty.

7.4    FAILURE TO RETURN FROM AN UNPAID LEAVE OF ABSENCE - SWORN

Members of the Department represented by the PBA who fail to return from an authorized leave of absence without pay within five (5) days subsequent to the expiration of the leave shall be terminated by the Department without a hearing. Such termination shall be final without recourse to the disciplinary procedures contained in the collective bargaining agreement.

7.5    FAILURE TO RETURN FROM AN UNPAID LEAVE OF ABSENCE - LOCAL 650   MEMBERS

Failure to report for duty within five consecutive working days of the expiration of an unpaid leave of absence, or any extension thereof, shall be deemed a resignation from the Department. The Department may commence a disciplinary hearing against the employee in accordance with Section 75 of the NYS Civil Service Law.

7.6    FAILURE TO RETURN FROM AN UNPAID LEAVE OF ABSENCE - LOCAL 264

Failure to report for duty immediately following the expiration of a leave of absence without pay or any extension thereof will be deemed a resignation from the Department. Twenty (20) days prior to the expiration of the leave, the employee will be notified by registered mail, return receipt requested, that if (s)he fails to return to work immediately upon the expiration of the leave, (s)he will be terminated.

7.7    ELECTION OR APPOINTMENT TO PUBLIC OFFICE - SWORN MEMBERS

Any permanent member of the Department represented by the PBA who is elected or appointed to public office shall, at the discretion of the Commissioner, be granted a leave of absence without pay for a period of not more than one (1) year from the effective date of his/her election or appointment to such public office. Such leave of absence shall be renewable for successive periods of not more than one (1) year in the sole discretion of the Commissioner.

7.8    ELECTION OR APPOINTMENT TO PUBLIC OFFICE - LOCAL 650 AND
       LOCAL 264 MEMBERS

   A.   Any permanent employee of the Department who is represented by either
        Local 650 or Local 264 and who is elected to any public office or is appointed
        to public office in the City service shall be granted a leave of absence without
        pay for the duration of the term of that public office.

   B.   Any permanent employee of the Department who is represented by Local 650
        and who is elected to any public office which is not in the City service shall be
        granted a leave of absence without pay for not more than one (1) year. If
        requested by the employee, successive periods of not more than one (1) year
        may be granted in the sole discretion of the Commissioner.

   C.   Any permanent employee of the Department who is represented by Local 264
        and who is appointed to a public office which is not in the City service shall
        be granted a leave of absence without pay for not more than one (1) year. If
        requested by the employee, successive periods of not more than one (1) year
        may be granted in the sole discretion of the Commissioner.

7.9    EMPLOYMENT OPPORTUNITIES - LOCAL 650 AND LOCAL 264
       Employees of the Department represented by Local 650 or Local 264 who are
       permanently classified in subordinate positions shall be granted a leave of absence
       without pay to enable such employee to serve temporarily, provisionally, for trial
       periods, or for periods necessary to qualify for permanent appointment to
       competitive class, as long as the employment is with an agency of the City. In
       addition, employees represented by Local 650 shall be granted a leave of absence
       without pay for periods necessary to qualify for permanent appointment to a
       position of a higher class that requires such condition to be met, or where an
       employee is offered a job on a permanent transfer, so long as said employment is
       with any agency of the City.

7.10   EDUCATIONAL LEAVES - LOCAL 650 AND LOCAL 264 MEMBERS
       Employees of the Department represented by Local 650 or Local 264 may take a
       leave of absence without pay for educational purposes in accord with the
       provisions of their respective collective bargaining agreements.

7.11   UNPAID LEAVES OF ABSENCE - UNION BUSINESS
       Employees of the Department engaged in union business may be granted unpaid
       leaves of absence in accord with the terms of the existing collective bargaining
       agreements.

7.12   MATERNITY LEAVES - LOCAL 650 AND LOCAL 264 MEMBERS
       Unpaid maternity leaves not to exceed six (6) months shall be granted upon the
       request of the Department employee. Unpaid maternity leaves shall, upon the
       request of the employee, be extended or renewed for an additional period not to

exceed six (6) months.

7.13  MATERNITY/PATERNITY LEAVES - PBA MEMBERS
Unpaid maternity/ paternity leaves, not to exceed six (6) months, shall be granted upon the request of a member represented by the PBA. Unpaid maternity/paternity leaves shall, upon the request of the member, be extended or renewed for an additional period not to exceed six (6) months. Unpaid maternity/paternity leave shall be granted upon the request of the member when a child is adopted and the adopted child is less than two (2) years of age.

7.14  FAMILY AND MEDICAL LEAVE ACT
Refer to M.O.P. Chapter 13.

7.15  DEPARTMENTAL PROPERTY AND SERVICE WEAPONS
Members of the Department on an unpaid leave of absence of more than thirty (30) days shall surrender all Department owned firearms, weapons, badges, wreaths, Departmental identification, radios and cap spray to the Property Office with a P-10.   All other Department property should be secured in the individual's police locker.  Firearms owned by a member who does not have a valid pistol permit shall be turned in to the Property Office for safekeeping or otherwise properly disposed of.  *In the event of an emergency (i.e., Military Leave) the property and P-10 shall be given to the Commanding Officer who will forward it to the Property Office.*

## 8.0  MILITARY LEAVE

8.1  POLICY
The Buffalo Police Department recognizes that some of its employees must fulfill military obligations that require them to be away from duty. It is the policy of the Department to grant military leave time in a manner consistent with law and consistent with existing collective bargaining agreements.

8.2  EMPLOYEES ENTERING THE MILITARY
An employee of the Department who enters into active service in the armed forces of the United States while in the employ of the Department shall:

A. submit an Intra-Departmental Memorandum requesting a leave of absence without pay for the duration  of his/her active military duty

B. immediately present the military orders directing that (s)he report for active duty to his/her Commanding Officer;

C. be granted a leave of absence without pay for the period of his/her military service;

D. be allowed to exhaust his/her vacation and personnel leave benefits prior to

entry.

8.3    MILITARY LEAVE UNDER SECTION 242 OF THE NEW YORK STATE
       MILITARY LAW

A.   Employees of the Department covered by section 242 of the New York State
     Military Law are entitled to a maximum of either thirty (30) calendar days or
     twenty-two (22) working days, leave of absence with pay per year, for
     military duty.

B.   To be eligible employees must be performing "ordered military duty."
     Ordered military duty means:
     "*Any military duty performed in the service of the state or of the United States,
     including but not limited to attendance at any service school or schools
     conducted by the armed forces of the United States, by a public officer or
     employee as a member of any force of the organized militia or of any reserve
     force or reserve component of the armed forces of the United States, pursuant
     to orders issued by competent state or federal authority, with or without the
     consent of such public officer or employee. Participation in routine reserve
     officer training corps training is not considered military duty except when
     performing advanced training duty as a member of a reserve component of the
     armed forces*."

C.   An employee of the Department ordered to report for military duty shall
     immediately present the military orders to his/her Commanding Officer.

D.   Form P-12 shall be completed a sufficient time prior to the effective date of
     the leave.

E.   Employees of the Department who are ordered to report for military duty are
     subject to a limit of thirty (30) calendar days or twenty two (22) working days,
     per year, whichever is greater.

**9.0    ADDITIONAL EMPLOYMENT - SWORN PERSONNEL**

9.1    POLICY
       It is the policy of the Buffalo Police Department that all employment outside of
       the Department by sworn members must be pre-approved by the Commissioner of
       Police. The Commissioner will not unreasonably or arbitrarily withhold his/her
       consent.

9.2    LIMITATIONS ON ADDITIONAL EMPLOYMENT
       A sworn member of the Department shall not engage in any outside employment
       or business enterprise that will:

A.   Exceed twenty (20) hours per week;

B. Conflict with a member's regular duties;

C. Conflict with a member's availability for emergency duty;

D. Affect his/her physical condition so as to impair his/her ability to efficiently perform his/her duties.

E. violate State or Federal law.

9.3    FILING ADDITIONAL EMPLOYMENT FORMS

A. Sworn members of the Department shall file with his/her Commanding Officer, Form P-1295 (additional Employment), completely filled out, attested to and signed.

B. Sworn members shall not commence any outside employment or business enterprise, nor change such employment or business enterprise, without first having filed an application with the Commissioner and receiving the Commissioner's permission.

C. Sworn members terminating or changing employment or business enterprises shall submit a new Form P-1295 as outlined in subparagraph "A" above.

D. Sworn members having no additional employment shall note this fact on Form P-1295.

E. In any case involving the application or interpretation of this section, the judgment of the Commissioner shall be final.

9.4    RESTRICTIONS IMPOSED BY  THE ALCOHOL BEVERAGE CONTROL LAW

Sections 128 and 128-a of the Alcohol Beverage Control Law preclude a sworn member from being "...either directly or indirectly interested in the manufacture or sale of alcoholic beverages or to offer for sale, or recommend to any licensee any alcoholic beverages" except that "...it shall not be unlawful for a police officer employed in this state, having written permission and consent from his commanding officer, to work in a premises licensed to sell beer at retail for off-premises consumption under section fifty-four..." of the ABC Law.

**10.0    TRANSFERS**

10.1    POLICY

It is the policy of the Buffalo Police Department to assign its employees to the position to which they are best suited, consistent with the terms of the collective bargaining agreement.

10.2    TRANSFER PROCEDURE – PBA MEMBERS

    A.    Members of the Department represented by the PBA who wish to be transferred to a specific assignment shall submit an automated Transfer Request Form. The automated form can be located in the Department's computerized information system (Lotus Notes) within the "*Departmental Forms on BPDNOTES*" tab. The form must be signed by the member requesting the transfer and the date/time must be stamped at the Commissioner's Office. From the Commissioner's Office a receipted copy will be sent back to the Officer. To be included on that month's Transfer Request List, transfer requests must be received in the Commissioner's Office no later than 1200hrs on the first payday (Thursday) of the month.

    B.    Based on the transfer requests received in the Commissioner's Office a Transfer Report will be generated on the first Friday after the first payday of the month and posted on the Administrative Bulletin Board in Lotus Notes. The Transfer Report will list all transfer requests to a particular unit in order of rank date. A copy of this will also be provided to the PBA Office.

    C.    Once a member is transferred under this procedure all other transfer requests become null and void. This occurs even if the member is transferred to an assignment other than his/her first preference. A new transfer request on an Intra-Departmental Memorandum must be submitted if the member is to be considered for transfer to an alternate assignment.

    D.    When a member submits a transfer request, all prior transfer requests will be deleted.

    E.    Requests for transfers that also include a request for a particular shift and/or platoon cannot be honored.

    F.    Transfer requests will be kept on file until either a member is transferred (at which point all other transfer requests are automatically deleted) or until the individual member rescinds his/her request. To rescind a transfer request, the member must submit such rescission request to the Commissioner's Office. A receipted copy of this rescission request will be returned to the member once it has been received and entered into the transfer request system.

**11.0    RECORD KEEPING**

11.1    POLICY
It is the policy of the Buffalo Police Department to maintain complete, accurate and current records of hours worked by its members.

11.2    OFFICIAL TIME RECORDS
The Commanding Officer of each individual Department unit shall cause accurate

records to be maintained showing the time worked by each employee of his/her command. The records shall be maintained on official forms and in a manner prescribed by the Department. All entries shall be made on a daily basis.

11.3    DISTRIBUTION OF PAYCHECKS

A.  Paychecks are distributed in twenty-six (26) equal payments from the Office of the City Treasurer on a bi-weekly basis according to a schedule set up each fiscal year by the City Controller.

B.  Commanding Officers of payroll units or his/her designee, upon notice from the payroll office that paychecks are ready, shall obtain them in the Administration and Finance Office (Room 120). The Commanding Officer or his/her designee shall sign for the paychecks.  Members on long-term (over 1 year) IOD status shall pick their paychecks up in the IAD Office.

C.  Pay checks shall be personally delivered to desk personnel in units in which desk personnel are assigned, or to employees specifically designated to handle the paychecks in units where desk personnel are not assigned. Desk personnel or employees specifically designated to handle paychecks, shall distribute the paychecks to the persons to whom they are issued.

D.  No paycheck shall be distributed to any person other than the payee named thereon, or a person authorized by the payee in writing. A person who has been authorized by the payee in writing shall personally sign for it on Form P-1284. However, when the payee is on sick leave, the Commanding Officer may direct that the paycheck be delivered to the payee by an employee of his/her command.

E.  Paychecks not claimed within five (5) days shall be returned to the City Treasurer's Office accompanied by an Intra-Departmental Memorandum stating the reason for the return. One copy of the letter shall be receipted by the person at the Treasurer's Office who receives the returned paycheck and this copy shall be returned to the employee's Commanding Officer.

11.4    INCOME TAX DEDUCTIONS

A.  Upon appointment to the Department, employees shall be required to file with the Fiscal Management Section a completed Employees Federal Withholding Tax Certificate (Form W-4).

B.  An updated Form W-4 shall be filed with the Fiscal Management Section whenever an employee's family status changes.

11.5   PAYROLL DEDUCTIONS

    A. Employees desiring to have payroll deductions made from their pay check shall contact the Fiscal Management Section and shall file all the necessary forms with that office.

    B. Employees wishing to discontinue payroll deductions shall forward the request on an Intra-Departmental Memorandum to the Fiscal Management Section.

11.6   CURRENT ADDRESS AND TELEPHONE NUMBER MUST BE FILED WITH THE  DEPARTMENT

    A. It is the responsibility of all members to keep the Department informed of his/her current address and telephone number, where (s)he can be notified in case of emergencies.

    B. All notices of change of address and/or telephone number shall be filed with the Commissioner within ten (10) days of the effective date of the change.

    C. Form P-24 (Change of Residence) shall be completed and forwarded through the chain of command to the Office of Administration and Finance when reporting a member's new address.

    D. An electronic message identifying the change of address must be posted in the "Administrative Bulletin Board" by the member's command.  The new address must be incorporated within the message.

11.7   RESIGNATIONS
An employee of the Department desiring to resign his/her position shall prepare Form P-30 (Resignation Form) in accordance with the instructions printed on the form, and shall forward the completed form through channels to the Commissioner.

11.8   APPLYING FOR REINSTATEMENT AFTER RESIGNATION
Persons who have resigned from the Department may apply for reinstatement after one year of their resignation. The request shall be made in writing to the Commissioner. Such request is subject to the approval of the Commissioner and the Municipal Civil Service Commission.

**12.0   GRIEVANCES AND ARBITRATION**

12.1   POLICY
It is the policy of the Buffalo Police Department to adhere to the respective collective bargaining agreements as they apply to grievances and arbitration.

12.2    <u>GRIEVANCES AND ARBITRATION - PBA</u>

For members of the Department represented by the PBA, grievances and arbitration shall be governed by Article XI of the collective bargaining agreement between the City of Buffalo and the Police Benevolent Association.

12.3    <u>GRIEVANCES AND ARBITRATION - LOCAL 650</u>

For employees of the Department represented by Local 650, grievances and arbitration shall be governed by Article XIX of the collective bargaining agreement between the City of Buffalo and Local 650, American Federation of State, County, and Municipal Employees, AFL-CIO.

12.4    <u>GRIEVANCES AND ARBITRATION - LOCAL 264</u>

For employees of the Department represented by Local 264, grievances and arbitration shall be governed by Article XXI of the collective bargaining agreement between the City of Buffalo and Local 264, American Federation of State, County, and Municipal Employees, AFL-CIO.

# CHAPTER 11: PUBLIC ASSEMBLAGES AND EMERGENCIES

## CONTENTS

**1.0    PUBLIC ASSEMBLAGES**
1.1    Policy
1.2    District Responsibilities
1.3    Traffic Bureau Responsibilities
1.4    Members' Duties at Public Assemblages
1.5    Security Requirements for Public Amusement and Entertainment
1.6    Enforcement Responsibility
1.7    Games of Chance
           A.  Background Investigations
           B.  Issuance of License
           C.  District Lieutenants' Responsibility
1.8    Dances


**2.0    PARADES, MARCHES, MOTORCADES, RACES**
2.1    Policy
2.2    Permits
2.3    Traffic Bureau Responsibility
2.4    Members' Duties


**3.0    LABOR DISPUTES**
3.1    Policy
3.2    District Commander's Responsibility
3.3    Members' Duties at Strikes/Lockouts
3.4    Arrests


**4.0    MASS DEMONSTRATIONS**
4.1    Policy
4.2    Command Responsibility
4.3    Members' Duties at Mass Demonstrations
4.4    Videotaping Demonstrations
4.5    Dispersing an Unlawful Assembly
4.6    Mass Arrests


**5.0    FIRES**
5.1    Policy
5.2    Fires Discovered by Department Members
5.3    Duties at the Scene after the Fire Department's Arrival
5.4    Traffic Control at Fire Scenes
5.5    Multiple Alarm Fires
5.6    Reports
5.7    Arson Investigations
5.8    Notification of Owners/Occupants

**6.0    DISASTER RESPONSE**
6.1    Policy
6.2    Disaster - Definition
6.3    Senior on duty Command Officer Responsibility
6.4    City of Buffalo Comprehensive Emergency Management Plan
6.5    Controlling Access to the Scene
6.6    Perimeter Control
6.7    Declaration of State of Emergency

**7.0    EMERGENCY MOBILIZATION PLAN**
7.1    Policy
7.2    Activation of Emergency Mobilization Plan
7.3    Three Levels of Mobilization
7.4    Notification of Off Duty Personnel - Phase 2
7.5    Notification of Off Duty Personnel - Phase 3
7.6    Members' Duties
7.7    Reporting for Duty at the Nearest District
7.8    Annual Emergency Mobilization Plan Testing

**8.0    RIOTING**
8.1    Policy
8.2    Monitoring Communities
8.3    Preventative Action
8.4    Early Stages of Rioting
8.5    Widespread Rioting
8.6    Command Post
8.7    Additional Personnel
8.8    Personnel Assignments
8.9    Equipment
8.10    Communications
8.11    Closing Major Thoroughfares
8.12    Curfew
8.13    Gun Dealers, Liquor Stores, Gas Stations
8.14    Escorting Fire Department and Medical Personnel
8.15    Tactical Considerations
8.16    Use of Force
8.17    Mass Arrests
8.18    Communications with the Media

**9.0    SNOW EMERGENCY**
9.1    Policy
9.2    Authority of the Mayor
9.3    Implementation of City of Buffalo Comprehensive Emergency Management Plan
9.4    When Additional Personnel is Required
9.5    Other Applicable Procedures

**10.0  AIRCRAFT CRASHES**
10.1  Policy
10.2  Call Takers' Responsibility
10.3  Dispatcher's Responsibility
10.4  Responding Officers
10.5  Supervisors' Responsibility
10.6  Securing the Scene of the Aircraft Crash Site
10.7  Identifying Passengers
10.8  Moving the Aircraft
10.9  Military Aircraft Crashes

**11.0  BOMBINGS AND BOMB THREATS**
11.1  Policy
11.2  Definitions
11.3  Call Takers' Responsibilities
11.4  Dispatchers' Responsibilities
11.5  Responding Officers' Responsibilities
11.6  Supervisors' Responsibilities
11.7  K-9 Officers' Responsibilities
11.8  Media
11.9  Investigative Units
11.10  Subject Holding Bomb

**12.0  HAZARDOUS MATERIALS**
12.1  Policy
12.2  Hazardous Material - Definition
12.3  Implementing the City's Comprehensive Emergency Management Plan
12.4  Responding Officers
12.5  Supervisor's Duties
12.6  CHEMTREC
12.7  Identification Placards
12.8  Hydrocyanic Acid
12.9  Dangerous Cases - US Weather Bureau Wind Forecasts

**13.0  HIGH RISK INCIDENTS**
13.1  Policy
13.2  High Risk Incidents Defined
13.3  General Guidelines for High Risk Incidents
13.4  First Responding Officers
13.5  Supervisor's Responsibilities
13.6  Radio Dispatcher's Responsibilities
13.7  SWAT Responsibilities
13.8  CMT Responsibilities
13.9  Duty Officers Responsibilities
13.10  Reports Required

**14.0**  **SPECIAL WEAPONS AND TACTICS UNIT (SWAT)**
14.1  Policy
14.2  Command
14.3  SWAT Responsibilities
14.4  Activating the SWAT Team
14.5  Qualifications, Selection and Training
14.6  SWAT Team Roster
14.7  Equipment
14.8  Evaluation

**15.0**  **CRISIS MANAGEMENT TEAM (CMT) (also referred to as the Dignitary Protection Unit)**
15.1  Policy
15.2  Command
15.3  CMT Responsibilities
15.4  Activating CMT
15.5  Qualifications, Selection and Training
15.6  CMT Roster
15.7  Equipment
15.8  Evaluation
15.9  Dignitary Protection

**16.0**  **UNDERWATER RESCUE AND RECOVERY TEAM (URRT)**
16.1  Policy
16.2  Command
16.3  URRT Responsibilities
16.4  Activating URRT
16.5  Qualifications, Selection and Training
16.6  URRT Roster
16.7  Equipment
16.8  Evaluation
16.9  Vehicles Recovered

**17.0**  **MUTUAL AID**
17.1  Policy
17.2  Emergency Requests for Assistance
17.3  Non-Emergency Requests for Assistance

## 1.0    PUBLIC ASSEMBLAGES

1.1    POLICY
It is the policy of the Buffalo Police Department to maintain the peace and to protect the rights of all citizens at any scheduled meeting or gathering that is likely to attract a large number of persons.

1.2    DISTRICT RESPONSIBILITIES

A.  District Chiefs shall keep fully and accurately informed of all scheduled meetings or gatherings within his/her District that are likely to attract a large number of persons.

B.  Whenever possible, Chiefs shall police such events within their respective District with personnel of their own command.

C.  In the event that there is insufficient personnel scheduled to be on duty to adequately police the event, the Chief may request, through channels, that the Traffic Bureau provide additional personnel.

1.3    TRAFFIC BUREAU RESPONSIBILITIES

A.  The Traffic Bureau shall have primary responsibility for staffing events at:

1.  HSBC Arena,
2.  Coca Cola Field,
3.  Kleinhans Music Hall.

B.  If additional staffing is required for any of these venues, on duty personnel assigned to Districts "A" and "B" may be used.

1.4    MEMBERS' DUTIES AT PUBLIC ASSEMBLAGES

A.  Police Officers detailed to public assemblages shall direct their entire attention to their assigned duties and shall not permit themselves to be distracted by surrounding events.

B.  Police Officers maintaining police lines shall face the spectators whenever possible.

C.  Police Officers shall prevent any interference with the orderly progress of the event, or any interference with the principals involved.

D.  In events likely to create traffic congestion, Police Officers assigned to the event shall assist with traffic control.

1.5    SECURITY REQUIREMENTS FOR PUBLIC AMUSEMENT AND ENTERTAINMENT

    A. No member of the Department shall be detailed for duty on any premises or in any building used for public amusement or entertainment for which admission is charged without permission of the Commissioner of Police.

    B. If such amusement or entertainment, or the place or premise is licensed by the city, it shall be the duty of the Commissioner to certify to the Director of Licenses that in the interests of peace and good order the licensee should employ at his/her expense such number of security officers as the Commissioner shall specify to do police duty upon such premises or in such building during the giving of entertainments thereon or therein. (City Ordinance Article 2 section 241).

    C. It is the responsibility of the licensee to fully comply with security requirements. Failure to provide the required number of security guards shall terminate the validity of the license, and may result in the suspension of the event until security requirements are met.

    D. The decision to suspend or terminate an event for non-compliance with the required security arrangements shall be made only after consulting with the District Chief or the Duty Inspector.

1.6    ENFORCEMENT RESPONSIBILITY

District Chiefs shall direct personnel assigned to their command to enforce the security provisions for public assemblages.

1.7    GAMES OF CHANCE

Background Investigations

When an organization applies for a license to conduct "Games of Chance," it must submit to the City of Buffalo Director of Licenses an application for a "Games of Chance" license. On the application the organization must furnish a complete list of the members in charge and the assistant members in charge of games (i.e., all workers). The Director of Licenses will submit this list of workers to the Commissioner, who in turn will forward it to City Court Booking where a local computer check on the background of each individual will be done.

    A. Issuance of License

       If a license to conduct "Games of Chance" is approved by the Director of Licenses, it will be sent to the Police Commissioner's Office.

       Distribution:   Copy - Police Commissioner's Office
       Copy - District in which the "Games of Chance" are to be played.

B.  District Lieutenant's Responsibility

    1.  The District Supervisor will prepare one copy of the "Games of Chance" inspection check list (Form BPD-2) for each day of the license period.

    2.  The Supervisor shall request that the member in charge accompany him/her during the inspection.

    3.  If any violations are detected, the Supervisor shall attempt to have them corrected on site. In such case, the Supervisor shall prepare an Intra-Departmental Memorandum explaining the nature of the violation and the remedial action taken.

    Distribution:  Original with BPD-2 attached - To the Director of Licenses, signed by the Commissioner and forwarded by his/her Office

                Copy - Police Commissioner's Office

                Copy - Command File

## 1.8    DANCES

A.  Members of the Department have the power and the responsibility to enforce the provisions of Chapter 150 of the City Ordinances - Dance and Dance Halls.

B.  The District Supervisor in which the dance occurs or in which the dance hall is located shall inspect each such dance or dance hall to determine if a valid permit has been issued and whether all the requisite conditions are being met.

C.  City issued permits are required for all dances as specified in Chapter 150 section 2 of the City Ordinances except those types of dances which are specifically exempted by Chapter 150 section 14. Events lacking the required permit shall be terminated.

D.  A dance shall be vacated whenever any provision of any ordinance with regard to public dances is being violated or whenever any indecent or immoral act is committed or whenever any disorder of a gross, violent or vulgar character takes place therein with the knowledge or consent of the owner or lessee or his agent or other person in charge of the dance. (Refer City Ordinances 150-9A).

E.  In every instance in which there is a violation of those City Ordinances regulating dances and dance halls, a complete report an Intra-Departmental Memorandum shall be forwarded through the normal chain of command to the City's Director of Licenses.

**2.0    PARADES, MARCHES, MOTORCADES, RACES**

2.1    POLICY
It is the policy of the Buffalo Police Department to safeguard participants of parades, marches, motorcades and races and to the extent possible under the circumstances, provide for a safe and even flow of vehicular traffic that prevents accidents and avoids congestion.

2.3    PERMITS
All required permits and licenses must be obtained by the event organizer prior to the date of the scheduled event. Parade permits for parades, marches, motorcades, etc. are issued by the office of the Commanding Officer of the Traffic Bureau. After preparation, permits are forwarded to the applicant and a copy is sent to the Commanding Officer of the District in which the event is to occur.

2.4    TRAFFIC BUREAU RESPONSIBILITY

A. The Commanding Officer of the Traffic Bureau shall be responsible for arranging for the policing of all parades, marches, motorcades, races, etc.

B. Plans for policing major parades, marches, motorcades, races, etc., that entail the assignment of a large contingent of personnel, shall be forwarded to the Deputy Commissioner of Operations for review.

2.5    MEMBERS ' DUTIES

A. Members assigned to parades, marches, motorcades, races, etc., shall safeguard the route along which the event travels by preventing vehicular traffic from moving along that section of the route on which the event is currently proceeding.

B. Members shall prevent any interference with participants by spectators and shall promptly act to prevent any unruly activity along the event's route.

C. The route shall be reopened to vehicular traffic as soon as possible without unnecessarily jeopardizing the safety of the event's participants.

**3.0    LABOR DISPUTES**

3.1    POLICY
It is the policy of the Buffalo Police Department to maintain peace and order, and to protect the safety and property of all parties when called upon to handle labor disputes. The Department acknowledges the right of strikers to protest peacefully but it will not hesitate to impartially enforce the law when statutes are violated.

3.2     DISTRICT COMMANDERS' RESPONSIBILITY

A. District Commanding Officers are responsible for taking all action necessary in handling strikes and labor disputes which occur within their District.

B. District Commanding Officers or a Lieutenant whom (s)he delegates shall meet with the parties to the labor dispute and attempt to work out ground rules that the parties would be expected to follow. The member must insist that the labor dispute not involve unlawful activity.

C. Lieutenants assigned to Districts in which a strike or lockout is in progress, shall be required to keep their Commanding Officer fully apprised of:

   1. the number of pickets,
   2. any crimes that are reported at the strike site,
   3. any injuries or damage to property that occurs,
   4. any arrests made at the strike or lockout site,
   5. any impairment of vehicular or pedestrian traffic flow,
   6. any unusual or noteworthy incident that may occur at the strike or lockout site.

D. In strikes or lockouts that are particularly contentious and where violence can be anticipated, the Commanding Officer at the scene shall assign an Officer to guard the police vehicles and equipment.

3.3     MEMBERS' DUTIES AT STRIKES/LOCKOUTS

A. Members assigned must remain neutral and must avoid even the appearance of partiality toward one side or other. Members should not fraternize with any of the parties to the dispute.

B. Members shall refrain from unnecessarily displaying or brandishing their weapons.

C. When it becomes necessary to breach a picket line in order to allow entry to, or exit from a place of business, members shall:

   1. first request that pickets permit entry or exit,
   2. if the pickets fail to voluntarily comply, members shall create an opening in the picket line in a concerted, coordinated fashion,
   3. members shall face pickets so that the members can safeguard their weapons and so that they can observe any unlawful activity.

D. Any persons involved in a labor dispute who attempts to injure a member of the Department or attempts to prevent a member of the Department from performing his/her duty shall be immediately arrested. In making the arrest,

Officers shall use only that amount of force which is necessary to take the person into custody.

3.4    ARRESTS

    A. Generally, the enforcement of minor infractions (e.g. littering, open fire, etc.) would unnecessarily divert police resources away from the primary goal of maintaining the peace, and should not be enforced.

    B. Any offense involving destruction of property or injury to persons must be enforced swiftly and certainly.

    C. Arrested persons shall be removed from the immediate area as soon as possible.

**4.0    MASS DEMONSTRATIONS**

4.1    POLICY
It is the policy of the Buffalo Police Department to maintain peace and order, and to protect the safety and property of all parties when called upon to handle a mass demonstration. The Department acknowledges the right of demonstrators to protest peacefully but it will not hesitate to impartially enforce the law when statutes are violated.

4.2    COMMAND RESPONSIBILITY
Command responsibility depends in large part upon the number of demonstrators involved and whether the demonstration was anticipated by the Department.

    A. When the number of demonstrators is not excessively large the on duty District Chief shall be initially responsible for handling the demonstration.

    B. When a demonstration has been unanticipated, and there is a large number of demonstrators, and the District Chief is not on duty, the Senior on duty Command Officer of the District shall assume command of the demonstration.

    C. When the Department has advanced warning of a large demonstration, the District Chief of the District the demonstration is scheduled to occur, shall assume command of the demonstration. Prior to the date of the demonstration, the District Chief shall attempt to meet with the representatives of the demonstrators to determine the scope of the police operation that will be needed. If large numbers of arrests are anticipated, (s)he shall alert the City Court Booking.

4.3    MEMBER'S DUTIES AT MASS DEMONSTRATIONS
Same as those outlined in M.O.P. Chapter 11 above.

4.4   VIDEOTAPING DEMONSTRATION
To document criminal conduct on the part of demonstrators and to allay claims of inappropriate conduct by members of the Department, the Crime Scene Technician shall be requested to videotape mass demonstrations in which significant arrests can be anticipated, or in which there is substantial acrimony between opposing participants or between participants and the police. The Crime Scene Technician shall videotape:

A.  any warnings and orders to disperse issued by the Police;

B.  any arrests made;

C.  any criminal conduct by the demonstrators;

D.  any other occurrences of significance.

4.5   DISPERSING AN UNLAWFUL ASSEMBLY
When a crowd of demonstrators has gathered in violation of any law or court order and it is necessary to disperse the crowd, the Commanding Officer shall:

A.  assemble sufficient personnel and resources to carry out the order to disperse, including having personnel on standby;

B.  fully inform all personnel of the methods to be used to disperse the crowd;

C.  order the demonstrators to disperse, making sure that the order is given in a manner that permits all demonstrators to hear the order;

D.  after a sufficient time has elapsed from the giving of the order to disperse, order the members under his/her command to initiate the pre-determined dispersal maneuvers, moving the demonstrators toward viable escape routes;

E.  if arrests become necessary, leaders and agitators shall be targeted first;

F.  once the crowd is initially dispersed, smaller groups shall be prevented from reforming.

4.6   MASS ARRESTS
In circumstances where large numbers of arrests are anticipated, the Chief or his designate in command at the scene shall proceed as follows:

A.  Preliminary Preparations
Prior to making mass arrests the Chief shall:
1.  Make arrangements for the transportation of prisoners from the scene to the City Court Booking.

B. Preparing to Make Mass Arrests

Arrests shall be made only if authorized by the Chief or his designate in charge at the scene.

1. The Chief or his designate shall authorize arrests only if there are sufficient police personnel available.
2. The Chief or his designate shall authorize mass arrests only if all necessary arrangements have been made for prisoner transport and busses are on immediate stand-by.
3. If an order to disperse is required or advisable, such order shall be given prior to the arrest of any demonstrator. The order must be given in a manner so that it can be received by all the demonstrators.

C. Making Arrests

1. Officers taking a person into custody shall advise the person of the nature of the violation for which (s)he is being arrested and they shall make a note of the time of the arrest.
2. The Officer physically placing the defendant under arrest shall be designated as the arresting officer and will sign all related documents.
3. The defendant shall be taken to the designated booking area where booking procedures will take place.
4. The prisoner, together with the arresting officer, will be photographed by the Crime Scene Technician. Each prisoner shall be assigned a three digit control number beginning with 001 and proceeding in sequence through the last defendant.

## 5.0 FIRES

5.1 POLICY

It is the policy of the Buffalo Police Department to assist the Fire Department at fire scenes by directing vehicular traffic away from the incident, providing crowd control, protecting fire equipment from theft and vandalism and by ensuring that no-one interferes with the firefighters while they are performing their firefighting operations.

5.2 FIRES DISCOVERED BY DEPARTMENT MEMBERS

When a member of the Department discovers a fire (s)he shall:

A. immediately notify the Fire Department by the quickest possible means, making certain that firefighters are directed to the exact location of the fire;

B. activate the police vehicle's overhead lights and siren in an attempt to alert occupants of the building;

C. attempt to determine if the structure is occupied and if occupants of neighboring structures are endangered;

D. alert and rescue occupants that may be in danger, being mindful that the Fire Department will soon be arriving with appropriate rescue equipment.

5.3    DUTIES AT THE SCENE AFTER THE FIRE DEPARTMENT'S ARRIVAL

A. Members shall at all times cooperate fully with the Fire Department and shall prevent any interference with firefighters who are engaged in extinguishing the blaze.

B. After the Fire Department has arrived at the scene of a fire, members of the Department shall not enter the structure unless requested by a member of the Fire Department.

C. Members shall immediately clear the adjacent area of crowds and obstructions and shall establish fire lines a safe distance from the scene.

D. Members shall not let unauthorized persons pass through fire lines. Authorized persons include:

1. Mayor
2. Firefighters and Police Officer
3. Medical personnel
4. Disaster Coordinator and his/her staff
5. Technicians called to the scene
6. Public utility workers who are on duty
7. Representatives of the media holding valid press cards
8. Owners or lessees of property involved in the fire.

D. Render reasonable and courteous assistance to persons whose property is involved or endangered.

E. Divert vehicular traffic away from the scene.

5.4    TRAFFIC CONTROL AT FIRE SCENES

A. Members shall be assigned to intersections to detour all vehicular traffic away from streets on which firefighting operations are taking place.

B. Members shall direct traffic at these intersections so as to facilitate easy ingress and egress for fire apparatus, utility vehicles, ambulances, etc.

C. Members shall not permit vehicular traffic to cross fire hoses lying in the roadway

D. Members shall remain on the scene and continue to detour vehicular traffic away from the incident until firefighting operations have concluded, or the

Fire Department Officer in charge of the scene indicates that the services of the Police are no longer needed.

5.5    MULTIPLE ALARM FIRES

The Senior on duty Command Officer within a District shall respond to all multiple alarm fires or those involving a small contingent of police personnel, in instances of major fires in involving a large number of police personnel requiring a higher level of control and coordination, the Senior on duty Command Officer within a District shall assume command of the Police operation. The Senior on duty Command Officer within a District shall:

A.  establish a command post along with that of the Fire Department;

B.  assign a member to maintain communications with the Radio Dispatcher and to perform all recording functions;

C.  arrange to have police personnel of  sufficient numbers dispatched to the scene to adequately handle the incident;

D.  notify the Commissioner and the Deputy Commissioners, if in his/her judgment the nature or scope of the incident warrants such notification;

E.  inform the Radio Dispatcher of the anticipated duration of the incident;

F.  relieve units who are no longer needed, as soon as possible.

5.5    REPORTS

A.  In the event a fire results in a death, the District unit that was first dispatched to the fire scene shall be responsible for preparing a Death Report (Form P-178).

B.  In cases of automobile fires in which the Fire Department determines the cause of the fire to be arson, the unit dispatched to the fire scene shall prepare an Incident/Crime Report.

5.7    ARSON INVESTIGATIONS

The Fire Department Fire Marshalls Office shall be responsible for investigating incidents of arson within the City. The  Homicide Squad and the Fire Department Fire Marshalls Office shall be summoned to fire scenes in which a person is seriously injured or killed as a result of a fire. The 911 Communications Lieutenant shall notify the proper units when requested to do so.

5.8    NOTIFICATION OF OWNERS/OCCUPANTS

When a fire occurs in a closed place of business or unoccupied structure, personnel assigned to desk duty in the District in which the fire occurred shall

attempt to notify the owner, occupant, or other person responsible for the structure. In the event that Department members are unable to notify the owner, occupant or other person responsible for the building, the Supervisor on duty in the District shall take reasonable measures to protect the property from further damage, vandalism and looting.

## 6.0    DISASTER RESPONSE

### 6.1    POLICY

It is the policy of the Buffalo Police Department to work in concert with other federal, state and municipal agencies to protect life and property during disaster conditions and to assist in bringing about a successful and expeditious resolution of the event.

### 6.2    DISASTER - DEFINITION

"Disaster" means occurrence or imminent threat of wide spread or severe damage, injury, or loss of life or property resulting from any natural or man-made causes, including, but not limited to fire, flood, earthquake, hurricane, tornado, high water, landslide, mudslide, wind, storm, wave action, volcanic activity, epidemic, air contamination, blight, drought, infestation, explosion, radiological accident or water contamination.

### 6.3    SENIOR ON DUTY COMMAND OFFICER RESPONSIBILITY

If the Buffalo Fire Department has not already done so, the Senior on duty Command Officer shall request the activation of the City of Buffalo Comprehensive Emergency Management Plan (separate book) in the event of a disaster.

### 6.4    CITY OF BUFFALO COMPREHENSIVE EMERGENCY MANAGEMENT PLAN

The City of Buffalo has created a Comprehensive Emergency Management Plan that shall be activated in the event of a disaster or hazardous material accident. All commanding Officers shall make themselves familiar with this plan.

### 6.5    CONTROLLING ACCESS TO THE SCENE

The primary responsibility of Police Department members participating in the City Comprehensive Emergency Management Plan is to control access to the scene of the incident.   One of the most pressing problems which must be considered in the first few minutes of a disaster is Traffic Control. In reviewing various disaster scenes, it was discovered that serious problems often arose because traffic control was not quickly established. In some situations emergency vehicles were available but were unable to reach the scene due to traffic congestion. It is of critical importance to implement traffic control as soon as possible.

6.6     PERIMETER CONTROL
        Request the on duty Officer through the 911 Communications Lieutenant.  If
        more Officers are needed, call-in from the list provided to the 911 Lieutenant.

6.7     DECLARATION OF STATE OF EMERGENCY
        The chief executive may proclaim a local state of emergency or disaster within
        any part or all of the territorial limits of local government of the chief executive.

**7.0     EMERGENCY MOBILIZATION PLAN**

7.1     POLICY
        It is the policy of the Buffalo Police Department to be prepared to handle
        emergencies by expeditiously supplementing the number of existing on duty
        personnel.

7.2     ACTIVATION OF EMERGENCY MOBILIZATION PLAN
        The Emergency Mobilization Plan may be activated in emergency situations, as
        declared by the Commissioner of Police, where the public demands require the
        Commissioner to suspend any vacation or WV day or to increase any tour of duty
        so as to provide sufficient police personnel to handle the emergency.

7.3     THREE LEVELS OF THE MOBILIZATION
        There are three distinct phases of the Department's Emergency Mobilization Plan:

        A.  Phase 1
            Phase 1 includes the extension of the tour of duty of the on duty shift (i.e.
            holdover).

        B.  Phase 2
            Phase 2 expands Phase 1 and includes calling in off duty personnel from
            selected  Departmental units and the early call in of the next scheduled shift.

        C.  Phase 3
            Phase 3 expands Phase 2 and includes the call-in off all sworn members and
            selected support staff.

7.4     NOTIFICATION OF OFF DUTY PERSONNEL - PHASE 2
        A.  If the Emergency Mobilization Plan reaches Phase 2, the 911
            Communications Lieutenant shall:

            1.  keep the Commissioner informed of all important developments;
            2.  notify the Deputy Police Commissioners and the Chiefs;
            3.  contact the on duty Commanding Officer of the unit from which
                personnel are to be called in;

B. The on duty Commanding Officer will assign a member of his/her command to notify members who are assigned to that shift but who are on vacation or are on WV, to report for duty as required. All members assigned to the ensuing shift, including members who are on vacation or on WV, shall be directed to report at a time earlier than their normal starting time if necessary.

C. If members of SWAT, CMT, URRT, or K-9 are required to report for duty, they shall be notified in accord with existing procedures.

D. The member making the notifications shall:

    1. maintain a record of the date and time each member was called and the disposition of each call, disposition shall include:

        a. that the member was contacted and is reporting for duty;
        b. that the member was contacted but is unable to report and the reason for his/her inability to report for duty;
        c. that there was no answer or the member could not be contacted;
        d. that a message was left on an answering machine;
        e. that a family member was contacted who will relay the message to the member.

    2. The member making contact shall advise the member contacted where to report and any hazards, obstacles, or routes to avoid.

## 7.5 NOTIFICATION OF OFF DUTY PERSONNEL - PHASE 3

A. If the Emergency Mobilization Plan reaches Phase 3, the 911 Communications Lieutenant will again contact the on duty Commanding Officer of units currently on duty. The 911 Communications Lieutenant shall also direct the on duty, Duty Inspector to assign a member of his/her command to call in off duty personnel assigned to the Detective Division.

B. The on duty Commanding Officer of each unit will assign a member of his/her command to begin notifying all members of the unit to immediately report for duty.

## 7.6 MEMBER'S DUTIES

A. Once having been contacted, the member shall report for duty immediately and in full uniform, if possible.

B. Unless otherwise directed, members shall report to their place of assignment.

C. Members who report for duty at a site other then their regular assignment shall be under the direction and control of the Commanding Officer of the site at which they report.

7.7    REPORTING FOR DUTY AT THE NEAREST DISTRICT

A. When, due to extenuating circumstances (e.g. blizzard), it is impracticable for a member to report to his/her normal assignment, the member shall be directed to report for duty to the nearest district. Members who reside within the City shall report to the District in which they reside.

B. The Commanding Officer of each unit shall maintain accurate time records of all members who have reported to his/her command for duty under the Emergency Mobilization Plan.

**8.0    RIOTING**

8.1    POLICY
It is the policy of the Buffalo Police Department to recognize and to mitigate those conditions and circumstances that could lead to rioting. If rioting does occur, the Buffalo Police Department will protect life and property and will work in a coordinated manner to arrest lawbreakers so that peace can be restored.

8.2    MONITORING COMMUNITIES
While rioting may seem to occur spontaneously, it usually is the result of a series of incidents or a set of conditions that tend to escalate the tension level in a community. District Commanding Officers must continuously monitor the communities under their command for conditions that could precipitate rioting.

8.3    PREVENTIVE ACTION

A. It is not uncommon for an unpopular police incident to serve as the precipitating event for rioting. Commanding Officers shall strive to ensure that members of their command use common courtesy when dealing with the public and to inform their members that rude and inciting conduct cannot be tolerated.

B. Commanding Officers shall remain in contact with community leaders so that they can be aware of underlying problems that could potentially lead to community unrest. Commanding Officers shall also elicit the help of community leaders to assist them in calming tensions and preventing trouble.

C. Locations where existing conditions could inflame tensions and cause rioting must be identified and heavily patrolled.

COB000681

D.  Members of the community who have a propensity for violence and who may be potential ringleaders should be identified.

8.4    EARLY STAGES OF RIOTING
The objective is to contain the rioting to the smallest possible area. The key is to be able to respond to an incident with sufficient personnel in a short period of time so that rioting does not expand beyond the initial incident.

A.  Recognizing Incidents that Have the Potential For Creating Rioting
Because rapid response to incidents with sufficient personnel is the key to controlling rioting, District Lieutenants must be able to quickly recognize those factors that indicate that rioting is imminent. Some of these factors are:

1.  assaults on police;
2.  firearms discharged;
3.  hostile crowd incidents;
4.  interracial assaults;
5.  isolated incidents of looting;
6.  random attacks against motorists.

B.  Responsibility of On Scene Commanding Officer
The failure to take action to control an incident at its onset can result in the uncontrolled expansion of rioting. The on scene Commanding Officer cannot wait for directions from a Superior Officer but must take immediate action to limit the scope of the incident.

C.  Requesting Reinforcements
Once a riot provoking incident does occur, the District Lieutenant must immediately call for reinforcements so that there is sufficient personnel on hand to deal with the incident. The 911 Communications Lieutenant shall also be notified.

D.  Isolating the Trouble Zone
The trouble zone must be sealed off and vehicular and pedestrian traffic must be prevented from entering.

E.  Communications
To avoid confusion created by excessive radio transmissions, all communications from the scene of the incident shall be broadcast through the Commanding Officer on the scene on a designated detail channel.

F.  Arrests
Illegal conduct will not be tolerated. Once there is sufficient personnel on hand and the trouble zone has been sealed off, arrests shall be made by teams of Police Officers and the defendants removed from the scene as   quickly as possible.

COB000682

8.5    WIDESPREAD RIOTING
In the event that rioting spreads beyond the initial incident and there occurs widespread or severe damage, injury, or loss of life or property, or a threat thereof, the **Senior on duty Command Officer shall request that** the City of Buffalo Comprehensive Emergency Management Plan **be implemented**.

8.6    COMMAND POST
During widespread rioting, the stationhouse of the District in which the riot is occurring shall serve as the command post when practicable. The Commanding Officer shall ensure that the command post is secure and that there is sufficient administrative staff on hand to assist him/her with his/her duties. In the event that rioting transcends District boundaries, the **Senior on duty Command Officer** shall designate which of the stationhouses is to serve as the command post. Commanding Officers shall be diligent in maintaining a detailed written record of the incident. The Division of Administration and Communication shall make maps available to the command post and other personnel, as needed.

8.7    ADDITIONAL PERSONNEL
If the severity of the riot creates an emergency that requires supplemental personnel, the senior on duty Command Officer shall request that the Emergency Mobilization Plan be implemented.

8.8    PERSONNEL ASSIGNMENTS
During widespread rioting personnel will be assigned as follows:

A. Patrol Division personnel will be used as the primary force in the riot area.

B. Plainclothes Officers may be allowed to operate in the area but solely as an intelligence gathering unit. They will not make arrests unless the urgency of the circumstances allows for no other viable alternative and then they shall do so only when accompanied by a marked unit.

C. Specialized units will serve in maintaining the perimeter, transporting prisoners, escorting Fire Department and medical personnel, and all other support type activity.

D. SWAT will be used for snipers and barricaded persons, and for armed rioters who have fired upon police, fire, or medical personnel.

8.9    EQUIPMENT

A. Bullet Proof Vests
All sworn members of the Department actively engaged in operations to quell rioting shall be required to wear their bulletproof vest.

B. Crowd Control Van
The Crowd Control Van containing helmets, riot shields, disposable cuffs, batons, video camera and other crowd control equipment shall be activated during civil disturbances. The 911 Communications Lieutenant shall be responsible for activating the Crowd Control Van.

1. If the Crowd Control Van is activated on Monday through Thursday between 0800hrs and 1700hrs, the Lieutenant and Police Officer assigned to the Property Office shall transport the van from the Seneca Street Garage to the location requested. They shall be responsible for distributing the equipment, maintaining accurate records, and for retrieving the equipment when the incident ends.

2. If activation occurs other than during the hours specified above, the Lieutenant assigned to "B" District shall be directed to proceed to the 911 Lieutenant and obtain the key, the alarm deactivator and the swipe card for the Seneca Street Garage. (S)he shall drive the Crowd Control Van from the  Seneca Street Garage to the site specified by the Commanding Officer in charge. At the direction of the **Senior on-scene Commander**, the "B" District Lieutenant will distribute the equipment and maintain accurate records until properly relieved. The B-District Lieutenant also will be responsible for retrieving the equipment when the incident ends.

3. Any time the Crowd Control Van is called into service, the 911 Lieutenant or his/her designee shall notify the Deputy Commissioner of Operations.

8.10   COMMUNICATIONS

A. Citizens requesting police assistance shall be informed that due to rioting, non-essential services are being temporarily curtailed.

B. Radio communications shall be avoided by units directly involved in riot suppression operations. Telephones, cell phones and MCT's will be the preferred method of communication.

8.11   CLOSING MAJOR THOROUGHFARES
Traffic on major thoroughfares shall be diverted away from those areas that are experiencing rioting. Only vehicles and equipment that are involved in quelling the rioting shall be allowed into the area.

8.12   CURFEW
The existing curfew law as expressed in the City Ordinances shall be rigorously enforced. Any other curfew that is imposed as a result of the rioting shall also be rigorously enforced.

8.13   GUN DEALERS, LIQUOR STORES, GAS STATIONS
       Gun dealers, liquor stores and gas stations in the area marked by rioting shall be
       closed and to the extent possible safeguarded from theft and vandalism.

8.14   ESCORTING FIRE DEPARTMENT AND MEDICAL PERSONNEL
       During widespread rioting, all Fire Department and Medical personnel dispatched
       to incidents within the trouble area will be escorted by Police personnel.

8.15   TACTICAL CONSIDERATIONS

       A.  A riot is not one single large engagement but rather a series of skirmishes.
           The Commanding Officer must be prepared to deal with a number of separate
           individual incidents, some of them occurring simultaneously in different
           locations.

       B.  It is not necessary to have overall superiority in numbers but it is absolutely
           essential to have at each separate incident a force of sufficient size to handle
           that incident.

       C.  The Patrol Force must be highly mobile so that there can be a rapid response
           to each incident with sufficient personnel.  A rapid response serves to prevent
           the incident from expanding uncontrollably.

       D.  If, at any one incident, there is insufficient personnel available, members
           should await the arrival of additional personnel, and they should retreat if
           waiting will unnecessarily endanger their safety.

       E.  The chain of command must be clear and unambiguous. Each member shall
           report to only one superior officer.

       F.  Orders must be clear so that they are readily understood and are simple to
           carry out.

       G.  Members shall operate as part of a team and each team must have a clear
           objective. Each member of the team must be fully aware of what role (s)he is
           expected to play.

       H.  Members shall make sufficient arrests at each incident to prevent the crowd
           from regrouping.

       I.  A sufficient number of personnel shall be kept in reserve to deal with
           unanticipated contingencies.

8.16   <u>USE OF FORCE</u>
There shall be no change in the Department's use of force procedures during riot conditions.

8.17   <u>MASS ARRESTS</u>
During widespread rioting where mass arrests are anticipated, the Department's Mass Arrest procedures shall be implemented. (Refer to M.O.P. Chapter 11).

8.18   <u>COMMUNICATIONS WITH THE MEDIA</u>
During widespread rioting, communications with the media shall emanate exclusively from the person designated as the Public Communications Coordinator. No other police personnel, other than the Commissioner or Deputy Police Commissioners, are authorized to speak to the media concerning the rioting. (Refer to M.O.P. Chapter 14 and the City of Buffalo Comprehensive Emergency Management Plan).

## 9.0   SNOW EMERGENCY

9.1   <u>POLICY</u>
During a snow emergency it is the policy of the Buffalo Police Department to work closely with other state, federal and municipal agencies to protect life and property, and to rigorously enforce laws relating to parking and traffic in an effort to facilitate snow plowing operations.

9.2   <u>AUTHORITY OF THE MAYOR</u>

A. <u>Declaration of Emergency</u>
The Mayor may declare that an emergency exists in the City of Buffalo, or in a section or sections thereof, whenever snow, freezing rain, sleet, ice, snow drifts, or other natural phenomenon creates, or, in the judgment of the Mayor, is likely to create, hazardous road conditions impeding or likely to impede the free movement of fire, health, police, emergency, or other vehicular traffic, vital to the health, safety and welfare of the community.

B. <u>Duration of Emergency</u>
The emergency period shall be for a seventy - two (72) hour period, unless terminated earlier.

C. <u>Notice of Emergency</u>
The Mayor shall request the cooperation of the local press, and radio and television stations to announce that a snow emergency has been declared and the time that it becomes effective. Such announcement by two local radio stations, or two local television stations, or in a daily newspaper published in the City of Buffalo, shall constitute notice to the public of the declaration of the emergency.

D. Snow Emergency Streets
   One hour after the notice of a snow emergency has been issued; the City Ordinances concerning snow emergency routes becomes effective.

9.3   IMPLEMENTATION OF DISASTER RESPONSE PLAN
      In the event that a snow emergency has been declared, the City of Buffalo Comprehensive Emergency Management Plan shall be implemented.

9.4   WHEN ADDITIONAL PERSONNEL IS REQUIRED
      When a snow emergency has been declared and additional police personnel are required, the Emergency Mobilization Plan may be implemented (M.O.P. Chapter 11).

9.5   OTHER APPLICABLE PROCEDURES
      In addition to the procedures outlined above, the procedures for operating in heavy snow conditions as outlined in M.O.P. Chapter 7 shall also be implemented.

**10.0   AIRCRAFT CRASHES**

10.1   POLICY
       In the event of an aircraft crash, it is the policy of the Buffalo Police Department to work cooperatively with other federal, state and municipal agencies to assist the injured and to preserve evidence. It's primarily role will be to regulate traffic so that rescue and medical personnel have unobstructed access to the scene. The Department is also responsible for erecting police lines so that spectators cannot obstruct rescue operations and so that evidence remains tamper free.

10.2   CALL TAKERS' RESPONSIBILITY
       Any member of the Department receiving a call of an aircraft crash shall attempt to determine the exact location of the crash. (S)he shall have the dispatcher start emergency rescue personnel to the scene and shall then attempt to determine the nature and extent of injuries and damage.

10.3   DISPATCHERS' RESPONSIBILITY
       In the event of an aircraft crash the Radio Dispatcher shall:

       A. immediately broadcast the call as a priority one call;

       B. notify emergency medical personnel, ambulances and Fire Department personnel as needed;

       C. dispatch sufficient personnel consistent with the requests of the on scene commanding officer;

D. assist the on-scene command officer with communications in any manner (s)he may require, including designating a separate communications channel for exclusive use when the magnitude of the damage and injuries require it.

10.4 RESPONDING OFFICERS

In the event of an aircraft crash the first Officers responding to the incident shall:

A. determine the exact location of the crash and make a quick and preliminary assessment of the number of persons killed and injured and the extent of the damage;

B. based on the initial assessment, request whatever additional assistance is required (i.e., fire department, ambulances, additional officers, etc.);

C. assist in evacuating the aircraft and rendering assistance until the arrival of the Fire Department;

D. apprise the District supervisor of any actions taken before the Supervisor's arrival and follow any instructions (s)he may issue.

10.5 SUPERVISORS' RESPONSIBILITY

In the event of an aircraft crash which involves casualties and property damage, the Buffalo Fire Department will be in overall command at the crash site until all fires and threats thereof are extinguished and rescue operations have been completed. The District Supervisor shall:

A. assume overall command of police operations at the scene of an aircraft crash until relieved by the Commissioner or his designee;

B. provide whatever assistance that is requested by the fire department;

C. ensure that police vehicles are not parked so that they obstruct the ingress and egress of rescue vehicles;

D. assign police personnel to traffic control so that rescue vehicles are able to arrive at the scene and so that spectators are prevented from congregating at the scene and obstructing rescue efforts;

E. establishing police lines so that spectators cannot obstruct rescue operations;

F. assist as requested, ensure that evidence is safeguarded and make certain that required reports are completed.

G. in the event of an aircraft crash that results in widespread or severe damage, injury or loss of life or property, or a threat thereof, the Senior Command Officer shall request the implementation of the City of Buffalo

Comprehensive emergency Management Plan if not done so by the Fire Department

H. the Senior on-scene Commander shall authorize the notification of the Federal Aviation Administration at 626-1750.

## 10.6 SECURING THE SCENE OF THE AIRCRAFT CRASH SITE

The Federal Aviation Agency is responsible for investigating all civilian aircraft accidents. The police role is to secure the scene of the crash so that the integrity of the evidence is not jeopardized.  The Commanding Officer in charge at the scene shall direct personnel under his/her command to:

A. exclude all unauthorized persons from the crash site;

B. prevent the removal of any items from the crash site, including parts of the aircraft or the personal effects of passengers and crew.

## 10.7 IDENTIFYING PASSENGERS

In the event of an aircraft crash resulting in death or injury, the on scene commander shall assign police personnel to all hospitals to which the victims have been taken.  The Officers so assigned shall attempt to determine the following information:

A. the name, date of birth, address, telephone number and extent of injuries;

B. whether the person was traveling with a non-ticketed infant;

C. the location of the victim on the aircraft and the victim's observations before, during and after the crash;

D. a means of contacting the victim for follow-up investigation.

## 10.8 MOVING THE AIRCRAFT

Only the FAA is authorized to move parts of the aircraft. However, in the following circumstances the aircraft or any of its parts may be moved.

A. To prevent further injury, the aircraft or its parts may be moved.

B. The aircraft is creating a traffic hazard because of its position in a street or public highway.

C. The aircraft is positioned in a navigable waterway so that it is impeding or endangering navigation.

10.9   MILITARY AIRCRAFT CRASHES
Because of the possibility that the crash of military aircraft may compromise the integrity of classified military equipment or information, the military will assume responsibility for investigating these incidents. The Police Department's Commanding Officer shall:

A. take extra precautions to keep spectators a sufficient distance from the site;

B. record the name and address of any unauthorized person who is taking photographs and inform him/her that the photographs are to be submitted to military personnel investigating the accident ( the photos will be released if they do not contain classified information).

## 11.0   BOMBINGS AND BOMB THREATS

11.1   POLICY
It is the policy of the Buffalo Police Department that when responding to incidents of bombings or bomb threats, the highest priority be given to minimizing danger to life and property.  As a secondary consideration, disruption to the community resulting from these type incidents should be reduced to the greatest possible extent.

11.2   DEFINITIONS:
**Bomb** - any article, device, instrument, mixture or thing which contains explosive or incendiary material which is, or is suspected of being capable of causing an explosion, but not including fireworks.

11.3   CALL TAKERS' RESPONSIBILITIES:

A. Bomb Threats
Any member of the Department receiving a call of a bomb threat shall elicit as much information as possible including, but not, limited to:

1. Exact location of the bomb
2. Type of bomb
3. Time of anticipated explosion
4. The location and identity of the person calling in the bomb threat

B. Bomb Detonations
Any member of the Department receiving a call of a bombing where the bomb has already detonated, shall quickly attempt to determine the nature and extent of injuries and damage and have the dispatcher start emergency rescue personnel to the scene.

C. <u>Information Collection</u>
The member of the Department receiving a call of a bomb threat or a bomb detonation in which the caller is suspected of being involved in making the threat or planting the bomb, shall retain the caller on the line as long as possible and should attempt to make note of any characteristics that would establish his/her identity, location or purpose. These notes should include but not be limited to:

1. Date, time of call, and the time the caller hung up
2. Age, sex, race and any other distinguishing voice features
3. Background noise
4. Reason for the bomb.

11.4    <u>DISPATCHERS' RESPONSIBILITIES</u>:

A. <u>Bomb Threats</u>
In incidents involving bomb threats, the dispatcher shall:

1. Immediately transmit the call as a priority two call to the nearest available patrol unit.
2. Immediately dispatch the District supervisor to the scene.
3. By telephone, provide the supervisor with all available information.
5. Relay requests from the on scene supervisor for specialized personnel to the appropriate units (e.g.. bomb detection K-9 dogs and the Erie County Bomb Squad)
6. Instruct units responding to the call to turn off all radio equipment and cellular phones once they have arrived at the scene. Voice communications will be used at the scene and non-cellular phones will be used to communicate with the dispatcher.

B. <u>Bomb Detonations</u>:
In incidents involving bomb detonations, the dispatcher shall:

1. Immediately transmit the call as a priority one call.
2. Notify emergency medical personnel, ambulances and the Fire Department as needed.
3. Dispatch sufficient police personnel consistent with the requests of the on scene commanding officer.

11.5    <u>RESPONDING OFFICERS' RESPONSIBILITIES</u>

A. <u>Bomb Threats</u>
The first Officers responding to a bomb threat incident shall:

1. Locate and make contact with the person in charge of the facility.

   2. If the bomb threat was made to a person other than a Department member, locate and make contact with that person.
   3. Assist the district supervisor as (s)he directs.
   4. Prepare the crime/incident report.

B. Bomb Detonations

The first Officers responding to an incident in which a bomb has detonated shall:

   1. Quickly make a preliminary evaluation of the number of deaths, if any, the nature and extent of injuries and property damage and the existence of any condition that might further jeopardize life or property. Based on this initial assessment, request whatever additional assistance required, (i.e. fire department, ambulances, additional officers, etc.)
   2. Assist in evacuating the premises and render assistance to the injured until the arrival of the fire department.
   3. Apprise the District supervisor of any actions taken before the supervisor's arrival and follow any instructions that (s)he may have.
   4. Responding Officers should be aware of the possibility of secondary explosive devices.

11.6   SUPERVISORS' RESPONSIBILITIES

A. Bomb threats

In incidents involving bomb threats, the supervisor shall:

   1. Apprise the person in charge of the building of the circumstances surrounding the incident.
   2. If the bomb threat call was made to a person other than a Department member, identify the person who received the call and elicit as much information as possible.
   3. Determine whether the building manager wishes to evacuate the building. A decision on evacuation will often be based on the information received from the phone call when the bomb threat was made. The responsibility for determining whether to evacuate the building rests solely with the building manager. If the building manager needs guidance, (s)he shall be advised that his/her decision should be based on the highest regard for preserving the health and safety of the building occupants.
   4. If the building manager chooses evacuation, render assistance in evacuating the building and establish a perimeter around the threatened bombing site of sufficient distance to ensure safety.
   5. Prevent re-entry into the site and divert traffic as needed.
   6. Based on the information available, the on scene supervisor will determine the extent and nature of the bomb search.

a. When a bomb detection K-9 dog is readily available and its arrival will not be unduly delayed, the Supervisor should request the services of the K-9.

b. When a bomb detection K-9 dog is not readily available, the supervisor will, based on the information available to him/her, determine whether the threat to health and safety warrants the use of a bomb detection K-9 dog. The more serious the threat, the greater the need for the use of a bomb detection dog. When (s)he determines that a bomb detection dog is necessary, (s)he shall make his/her request through the 911 Communications Lieutenant..

c. When no bomb detection K-9 dog is used, the supervisor shall coordinate a search of both the outside and inside of the premises, using the building manager or the building manager's designee, to pinpoint any items that appear unusual or out of place. The search shall be conducted in an orderly and coordinated manner using a minimum of personnel.

d. In instances in which the bomb threat includes a projected time of detonation, no search will be made of the building during the period from one hour before the projected time of detonation until one hour after the projected time of detonation.

7. In the event that a bomb or suspicious object is found, evacuation of the building is mandatory and a perimeter of no less than 100 hundred yards should be maintained around the site. 100 yards is a minimum perimeter and should be expanded when safety requires.

8. If a bomb or suspicious object is found, the supervisor shall notify the 911 Communications Lieutenant and request him/her to contact the Erie County Sheriff's Bomb Disposal Unit at 858-2903. NO MEMBER OF THIS DEPARTMENT WILL ATTEMPT TO DISARM OR REMOVE A SUSPICIOUS DEVICE.

9. If no bomb or other suspicious device is found after a search is completed, the supervisor should inform the building manager of such information. The decision whether to have occupants re-enter the building is the sole responsibility of the building manager. Members of the Department shall in no way lead the building manager to conclude that the building is safe merely because no bomb discovered.

10. Instruct all officers at the scene to reactivate their police radios.

B. Bomb detonations

In incidents involving bomb detonations, the supervisor shall:

1. Take overall command of police operations at the scene until relieved by the Commissioner or his designee. The Fire Department will be in

overall command at the bombing scene until all rescue and firefighting operations have been completed.

2. Assign police personnel to traffic control so that emergency and rescue vehicles have unobstructed access to the scene.

3. Establish police lines so that spectators do not interfere with rescue and firefighting efforts.

4. In bombings of large magnitude where the assistance of a significant contingent of personnel will be needed, the supervisor shall establish a command post in conjunction with the fire department.

5. decide whether the use of an alternate radio frequency is advisable depending on the size of the emergency operation;

6. request the implementation of the City of Buffalo Comprehensive Emergency Management Plan if not done so by the fire Department;

7. request the appearance of the appropriate investigative units (e.g. Evidence, Crime Scene Technician);

8. the FBI and ATFE should also be notified;

9. Remain on the scene and assist. The supervisor shall also establish the crime scene and take steps to insure that evidence is preserved and necessary reports are completed by personnel under his/her command.

11.7    K-9 OFFICERS' RESPONSIBILITIES:
When a K-9 officer with a bomb detection dog responds to an incident involving a bomb threat, (s)he shall consult with the supervisor on the scene to determine the most effective manner of conducting the search.

11.8    MEDIA
Media requests for information and updates shall be referred to the Public Communications Coordinator or, in his/her absence, Commissioner or the Deputy Commissioner. No other Department personnel shall provide any information to the media at the scene of a bomb detonation. Once the crime scene has been established, no media representatives shall allowed into the crime scene. The Special Assistant to the Commissioner for Communications or, in his/her absence, Commissioner or the Deputy Commissioner, as the case may be, shall verify the accuracy of all information before revealing it to the media.

11.9    INVESTIGATIVE UNITS

1. In incidents involving death or serious physical injury, the Homicide Squad will be the lead investigative unit. All other department units will assist the Homicide Squad as needed.

2. In incidents in which there are no deaths or serious physical injuries, the District Detectives will be the lead investigative body. All other Department units will assist the District Detectives as needed. The District Detectives will cooperate fully with any federal investigative agency.

3. The Commissioner of Police, after consultation with the US Attorney and the County District Attorney, will decide whether the Department will retain investigative jurisdiction over the crime scene or whether such jurisdiction shall be relinquished to federal authorities.

11.10  SUBJECT HOLDING BOMB
In incidents in which a person is threatening to detonate what appears to be a bomb and the bomb is in the person's possession, officers shall:

1. Isolate the person and establish a perimeter of sufficiently safe distance.
2. Request the presence of the district supervisor, the CMT and SWAT.
3. The District Supervisor, CMT and SWAT will handle the incident consistent with guidelines for handling high risk incidents (refer M.O.P. Chapter 11).

**12.0  HAZARDOUS MATERIALS**

12.1  POLICY
It is the policy of the Buffalo Police Department to assist the Fire Department in minimizing the risk to life and property that may result from a hazardous material accident.

12.2  HAZARDOUS MATERIAL - DEFINITION
Hazardous material (Haz-Mat) means any element, compound, mixture, solution or substance which, when spilled or released into the air or into or on any land or waters of the city, may present a substantial danger to the public health, safety, welfare or to the environment.

12.3  IMPLEMENTING THE CITY'S COMPREHENSIVE EMERGENCY MANAGEMENT PLAN
In the event of a hazardous material exposure the City of Buffalo Comprehensive Emergency Management Plan shall be implemented. The Buffalo Fire Department will be in overall command at the scene of a hazardous material incident and police personnel will render all possible assistance.

12.4  RESPONDING OFFICERS
In instances involving hazardous material the responding officers shall take the following action:

A. Remain in the police vehicle with windows closed, if possible.

B. Protect persons at the scene by minimizing exposure and remaining upwind.

C. Request the assistance of the Fire Department.

D.  Request the presence of the supervisor.

E.  Attempt to ascertain the nature of the hazardous material.

F.  Refrain from handling any suspected hazardous material.

G.  In instances involving persons who are believed to be alive and trapped near the source of the hazardous material, the responding officers may attempt to rescue the victim but only if:

   1.  the officers do not unduly jeopardize their own safety; and
   2.  immediate rescue is absolutely essential to preserve the victim's life; and
   3.  the victim will expire before the arrival of the Fire Department.

Generally, rescue efforts shall be conducted by members of the Fire Department. They have the proper equipment and training to conduct such operations.

H.  Remove the injured from the immediate area, avoiding direct contact as much as possible.  Segregate and retain the people who have had possible contact with the hazardous material until they can be examined further.  Ambulance attendants and hospital personnel must be informed of the victim's possible exposure to a hazardous material before treating the victim.

I.  Do not eat, drink, or smoke in the area or use food or drinking water that may have been in contact with the hazardous material.

## 12.5   SUPERVISOR'S DUTIES

In the event of a hazardous material incident the District Supervisor shall take the following action:

A.  Establish a command post in conjunction with the Fire Department and take command of the police operation at the scene. The Fire Department is in overall command of hazardous material incidents.

B.  Establish a perimeter of sufficient distance from the source of the hazardous material to minimize contamination.

C.  Assign police personnel to traffic control to detour traffic away from the scene of the incident.  Request a perimeter if necessary.

D.  Coordinate the activity of the officers under his/her command in effecting evacuation when evacuation is necessary.

E.  Notify the 911 Lieutenant when the incident poses a danger to civilians.

12.6  <u>CHEMTREC</u>
The Chemical Transportation Emergency Center (CHEMTREC) is a resource available to provide technical instructions in handling spillage, fire, etc., involving a chemical substance, 1-800-424-9300.

12.7  <u>IDENTIFICATION PLACARDS</u>
Diamond shaped placards are required by Federal and State laws when hazardous materials are transported. Placards are coded for ready identification:

A.  Red: flammable or combustible materials; e.g.. gasoline, kerosene, gasohol.

B.  White: substance may present a severe health hazard; e.g.. poison, chlorine.

C.  Green: substance is highly pressurized and could explode in the heat of a fire.

D.  Orange: substance is an explosive or blasting agent; e.g.. dynamite

E.  Yellow: substance that may react violently with other chemicals producing toxic or flammable gases.

F.  Blue: substance that reacts violently with water.

12.8  <u>HYDROCYANIC ACID</u>

A.  Hydrocyanic acid is handled by railroads in tank cars that are painted white with a wide red stripe around each end and a red stripe lengthwise around the tank.  Large painted placards with the words "Poison Gas", are on both  sides and ends.

B.  This acid is extremely dangerous when mixed with the atmosphere and officers must take proper precautions to safeguard themselves and others in the event that one of these tank cars is derailed or catches fire.

C.  Description of material and danger potential is as follows:

1.  Extremely toxic. Inhalation of minute amounts may prove fatal.
2.  Conventional canister type gas masks are ineffective. Only self contained breathing apparatus is safe.
3.  Material is under pressure in cars and turns from liquid to vapor at 80 degrees Fahrenheit.
4.  No known antidote for a lethal dose.
5.  Human contact with vapor is detected by a bitter almond taste and odor, followed by a painful tingling of the lips and nostrils.
6.  The material is flammable and will burn furiously - vapors are explosive.
7.  If the material leaks and catches fire, let it burn.

8. In the event of an incident involving a train, and the train has a car containing this material, it is extremely important that everyone be kept away from the car until it is determined that the car is not leaking. Train crews are equipped with the proper breathing apparatus and acid proof clothing to approach the car and have been instructed as to the proper procedure in obtaining services of the shippers to ascertain the danger involved.

9. No one should approach the car until it is established that the car is not involved, and then, only with extreme caution, and upwind if possible.

12.9    DANGEROUS CASES - US WEATHER BUREAU WIND FORECASTS
The National Weather Service (565-0802) will provide this Department with wind forecasts, and forecasts of the stability of the air near ground, on a 24 hour per day basis. This information will be of invaluable assistance in predicting the movement of escaping gases from ruptured tank cars, pipes, etc. and in planning evacuation and traffic re-routing in the danger area.

## 13.0    HIGH RISK INCIDENTS

13.1    POLICY
It is the policy of the Buffalo Police Department when engaged in high risk incidents, to afford the highest regard to the life and safety of all involved and to employ deadly physical force only when no viable alternative is readily available.

13.2    HIGH RISK INCIDENTS DEFINED
A high risk police incident is any circumstance involving a subject who poses an imminent risk to the life and safety of an officer or other person and where:

A. the subject may be armed and has taken a hostage; or,

B. the subject may be armed and has barricaded himself or others; or,

C. the subject is a sniper, or has fired at an officer; or,

D. the subject, whether armed or not, by nature of the circumstances poses a danger to life and safety, and special weapons or specially trained SWAT and/or CMT officers are needed.

13.3    GENERAL GUIDELINES FOR HIGH RISK INCIDENTS

A. SLOW EVERYTHING DOWN. Rarely will there be a necessity for making an immediate assault.

B. At all times, maintain strict firearms discipline and avoid cross fire situations.

C. Prior to the arrival of CMT, in-depth negotiations should be avoided and first contact should be geared toward situation assessment.

D. Do not trade weapons or other persons for hostages. When an immediate demand of this type is made, the armed subject must be advised that only the Commanding Officer can make such an arrangement.

E. In a face to face confrontation with an armed subject, and the use of physical force is inadvisable, the officers will withdraw if possible, and only when they are safe from immediate danger, will they lower their weapons.

F. Absent the consent of the CMT Unit, civilians should not be allowed to communicate with the armed subject. The civilian may be the source of the problem.

G. Only the personnel authorized by the Commissioner should provide information to the media from the scene.

H. High risk incidents shall not be handled as routine police matters in which officers generally resolve the situation themselves. CMT and SWAT Units must be called to deal with these incidents.

I. Plainclothes officers shall not be assigned to secure the inner or outer perimeter nor shall they be involved in any other activity in which their status as a law enforcement officer must be readily ascertainable.

13.4 <u>FIRST RESPONDING OFFICERS</u>
Members of the Department encountering a high risk incident shall:

A. take up a position that minimizes danger to themselves, and prevents the situation from deteriorating further;

B. request the assistance of the supervisor and additional police personnel;

C. evacuate seriously injured or wounded persons if such can be accomplished without unduly endangering the lives of the officer or the injured parties;

D. refrain from initiating any other action that would cause the situation to deteriorate even further or that may jeopardize the life and safety of any person, including that of the officer;

E. detain any person who might have knowledge of the incident, location, or people involved, for briefing by CMT and/or SWAT.

13.5 <u>SUPERVISOR'S RESPONSIBILITIES</u>
In a situation involving a high risk incident, the Supervisor shall:

A.  immediately respond to the scene and verify the incident, giving the Radio Dispatcher all pertinent information;

B.  if SWAT, CMT, URRT or perimeter control are needed, request that the 911 Communications Lieutenant authorize the activation of those units and also request that the DPC of Operations appear at the scene;

C.  surround the premises to foreclose escape routes and establish an inner perimeter (The inner perimeter shall be marked off using yellow crime scene tape. Officers must remain under cover and out of view of the suspects. This area is to remain sterile. NO ONE is allowed to enter except CMT, SWAT, and URRT personnel. Protection of the inner perimeter will remain with the officers originally assigned until they are properly relieved by members of SWAT);

D.  carefully instruct all officers that they are  to maintain strict firearms discipline and they are to avoid crossfire situations;

E.  establish an outer perimeter to detour any vehicular or pedestrian traffic away from the scene (The outer perimeter shall be as far away as practical for controlling vehicular and pedestrian traffic and must also be marked off using yellow crime scene tape.  It is important that the outer perimeter remain intact until the area is completely secure and  supervisors must ensure that once the area is taped, officers remain on the tape line to prevent it from being compromised);

F.  evacuate surrounding buildings if necessary but only if the evacuation can be accomplished without unduly jeopardizing life and safety;

G.  establish a command post in a safe location and apprise the radio dispatcher of its location;

H.  arrange for the Fire Department, ambulances, public utilities and other units that may prove helpful, to be on stand-by;

I.  secure a separate radio frequency;

J.  collect all pertinent information concerning the incident, the subject, the hostages, weapons, and the physical lay-out of the premises;

K.  prevent media representatives from infiltrating the outer perimeter.

L.  fully inform the DPC of Operations, the SWAT, CMT and URRT Commanders;

M. be responsible for maintaining a log of all personnel, their assignments, status and any occurrences;

N. if the armed subject is taken into custody, assign members of his/her command to assume custody of the prisoner and prepare all arrest documents, medical/psychological reports and guard the prisoner at a hospital if necessary.

13.6   RADIO DISPATCHER RESPONSIBILITIES
Having been informed of a situation involving a high risk incident, the Radio Dispatcher shall:

A. immediately notify the 911 Communications Lieutenant, who in turn will notify the DPC of Operations;

B. notify the SWAT Commander and/or the CMT Commander when either or both of these units are requested;

C. broadcast an alert on all channels for any members of SWAT or CMT currently on duty;

D. at the direction of the SWAT and/or CMT Commander, designate a member of these respective units to transport the required vehicle and equipment to the scene;

E. at the direction of the SWAT and/or CMT Commander, request the 911 Communications Lieutenant to activate additional off duty members of these units;

F. provide whatever other radio and communications assistance that may be necessary to resolve the incident;

G. be responsible for knowing the status and location by maintaining a log.

13.7   SWAT RESPONSIBILITIES

A. The SWAT Commander shall determine at what point a sufficient number of properly equipped SWAT members are on the scene to handle the incident.

B. The SWAT Commander shall be fully briefed by the district supervisor and shall relay pertinent information to members of the SWAT Team.

C. The SWAT Commander shall deploy his/her members in strategic locations, first taking over control of the inner perimeter from district officers.

D. SWAT members must maintain strict firearms discipline, taking up positions that minimize danger to civilians and other officers.

E. While the CMT is attempting to negotiate the suspect's surrender, the role of the SWAT Team is to prevent the suspect's escape. Where the suspect attempts to escape, SWAT Team members shall take the suspect into custody. In preventing an escape, SWAT Team members shall use only the degree of physical force that they reasonably believe necessary to accomplish this purpose, and they may use deadly physical force when their lives or the lives of others are in imminent danger.

F. If the CMT Commander deems it highly unlikely that members of his/her unit will be able to successfully resolve the incident, the SWAT Commander after consulting the CMT Commander will take the suspect into custody.

G. Under the direction of the SWAT Commander, the SWAT Team will then take whatever steps are necessary to secure the custody of the armed subject.

H. An after action report shall be submitted after each high risk operation.

## 13.8   CMT RESPONSIBILITIES

A. The CMT Commander shall determine at what point a sufficient number of properly equipped CMT members are on the scene to handle the incident.

B. The CMT Commander shall be fully briefed by the district supervisor and shall relay pertinent information to members of the CMT Unit.

C. The CMT Commander will assume command of the negotiations phase of the incident and members of CMT will attempt to establish communications with the armed subject.

D. Members of CMT will attempt to persuade the subject to surrender and to otherwise resolve the incident peacefully.

E. In incidents in which it is highly unlikely that the armed subject can be persuaded to surrender, or where the life or safety of any person will be further jeopardized by continuing the negotiations, the CMT Commander must apprise the Duty Officer of these facts, and with the Duty Officer's permission, relinquish the operation to the SWAT Commander.

F. An after action report must be submitted after each high risk incident.

## 13.9   DUTY OFFICERS RESPONSIBILITIES

A. Authorize activation of the SWAT Team and/or CMT in appropriate cases.

B. The Duty Officer shall respond to the scene of each high risk incident and assume overall command of the operation. During the negotiation phase, when the CMT is attempting to peacefully resolve the incident, the CMT Commander shall be in charge of negotiations and related components of the operation. During the SWAT phase, the SWAT Commander shall be in charge of the SWAT operation and related components.

C. Before the arrival of the CMT Unit, the Duty Officer shall supervise attempts by Officers to initiate communication with the armed subject or attempts at preliminary dialogue.

D. The Duty Officer shall determine the need for any specialized equipment.

E. The Duty Officer shall cooperate with other agencies or jurisdictions and coordinate operations of specialized units.

F. The Duty Officer shall order unneeded personnel back to their regular assignments.

G. In high risk incidents in which the suspect is killed or seriously wounded, the Duty Officer shall order the Homicide Squad to conduct a follow up investigation.

H. The Duty Officer shall request the assistance of the Internal Affairs Division at the scene of any high risk incident in which (s)he believes there exists the possibility that Departmental Rules or Regulations have been transgressed or that Department members have violated any criminal statutes stemming from the incident.

13.10  REPORTS REQUIRED

A. After each high risk incident in which they were involved, the following members shall submit reports to the Commissioner's Officer through the chain of command:

   1. CMT Commander
   2. SWAT Commander
   3. District Supervisor
   4. the initial responding officers.

B. The CMT Commander and the SWAT Commander will critique each high risk incident with members of their respective units as well as with the DPC and the District Chief, and make recommendations for handling future high risk incidents.

C. The District Chief shall be responsible for seeing that necessary crime reports and other Departmental reports are completed.

## 14.0   SPECIAL WEAPONS AND TACTICS UNIT (SWAT)

14.1   POLICY
It is the policy of the Buffalo Police Department to maintain a group of specially trained and equipped members who, in addition to their regular assignments, can be used during high risk incidents and during other police operations in which their specialized training and equipment can reduce the risk of harm to other members of the Department.

14.2   COMMAND

A. Members of the Special Weapons and Tactics Unit will be under the direction of the DPC of Operations.

B. The Commissioner of Police will designate a member of the Department as the SWAT Commander.

C. During a SWAT operation, unit members shall be under the direction of the SWAT Commander or a designated squad leader present at the scene.

14.3   SWAT RESPONSIBILITIES

A. The SWAT Team shall be activated whenever there is a high risk incident as outlined in M.O.P. Chapter 11.

B. The DPC, Duty Inspector, **or higher authority**, may activate the SWAT Team in any of the following circumstances;

1. searches for armed suspects; or,
2. conducting raids or serving warrants, that may involve armed subjects; or,
3. dignitary protection; or,
4. any police operation that may pose significant danger to members of the Department and for which the SWAT Team, by virtue of training and equipment, is better able to deal with.

14.4   ACTIVATING THE SWAT TEAM

A. Upon request of the District Supervisor at the scene of a high risk incident, the SWAT Team may be activated by the DPC, Duty Inspector, or higher authority in appropriate cases. (Refer to M.O.P. Chapter 11)

B. In other circumstances, a Supervisor or Commanding Officer may request the assistance of the SWAT Team by notifying the District Chief, or in his/her absence, the DPC or the Duty Inspector.

C. The Commanding Officer of any Departmental Unit involved in regularly conducting raids shall work closely with the SWAT Commander in determining the propriety of using the SWAT Team.

14.5    QUALIFICATIONS, SELECTION AND TRAINING

A. Qualifications for members of the SWAT Team shall be established, based on the recommendations of the SWAT Commander. These qualifications will be kept on file in the Police Commissioner's Office and in the Police Academy and will be reviewed periodically.

B. The SWAT Commander shall be responsible for recommending the selection of team members from amongst those applicants who possess the established qualifications. The final determination in the selection process rests with the Commissioner.

C. The SWAT Commander will provide the members of the SWAT Team with the necessary training and ensure that each member maintains the required qualifications.

D. The SWAT Commander shall be responsible for ensuring that training files of all SWAT Team members are maintained in the Police Academy. These files must include:

1. copies of all relevant training certificates members receive;
2. notations of all regular training sessions;
3. a brief description of any special training sessions.

14.6    SWAT TEAM ROSTER
The SWAT Commander shall maintain a current roster of all SWAT Team members. The roster shall contain each member's name, address, telephone number and pager number (if applicable).  This roster shall be kept on file with the 911 Communications Lieutenant.

14.7    EQUIPMENT
SWAT Team members shall be provided with, and trained in the use of, specialized equipment to enable them to perform their required functions.  The SWAT Commander shall be responsible for maintaining a current inventory of all equipment assigned to the Team.

14.8   EVALUATION
       After every operation in which the SWAT Team is involved, the SWAT
       Commander, along with members of the team, shall critique the operation for the
       purpose of improving future performance.

**15.0   CRISIS MANAGEMENT TEAM (CMT)**

15.1   POLICY
       It is the policy of the Buffalo Police Department to maintain a group of specially
       trained and equipped negotiators, who in addition to their regular assignments,
       can be used during high risk operations to attempt to negotiate a peaceful
       resolution of the incident.

15.2   COMMAND

       A. Members of the Crisis Management Team (also referred to as the Diginitary
          Protection Unit) shall be under the direction of the DPC.

       B. The Commissioner of Police will designate a member of the Department as
          the CMT Commander.

       C. During a high risk operation, unit members will be under the direction of the
          CMT Commander or a designated squad leader present at the scene.

15.3   CMT RESPONSIBILITIES

       A. The CMT shall be activated whenever there is a high risk incident as outlined
          in M.O.P. Chapter 11.

       B. The CMT is responsible for dignitary protection.

       C. The CMT shall assist other members of the Department whenever their
          services may prove beneficial.

15.4   ACTIVATING CMT

       A. Upon the request of the District Supervisor at the scene of a high risk incident,
          the 911 Communications Lieutenant shall activate the CMT in appropriate
          cases.  (Refer to M.O.P. Chapter 11)

       B. In other circumstances, a Supervisor or Commanding Officer may request the
          assistance of the CMT by notifying the DPC or the Duty Inspector.

15.5    QUALIFICATIONS, SELECTION AND TRAINING

A.  Qualifications for members of the CMT shall be established, based on the recommendations of the CMT Commander. These qualifications shall be maintained on file in the Police Commissioner's Office and the Police Academy and shall be reviewed periodically.

B.  The CMT Commander shall be responsible for recommending the selection of team members from amongst those applicants who possess the established qualifications. The final determination in the selection process rests with the Commissioner.

C.  The CMT Commander will provide the members of the CMT with the necessary training and ensure that each member maintains the required qualifications.

D.  The CMT Commander shall be responsible for ensuring that training files of all CMT members are maintained in the Police Academy. These files must include:

1.  copies of all relevant training certificates received by members;
2.  notations of all regular training sessions;
3.  a brief description of any special training sessions.

15.6    CMT/DIGNITARY PROTECTION UNIT  ROSTER

The CMT Commander shall maintain a current roster of all CMT members. The roster shall include each member's name, address, telephone number and pager number (if applicable). The roster shall be kept on file with the Radio Dispatchers and in the shift Office.

15.7    EQUIPMENT

CMT members shall be provided with, and trained in the use of, specialized equipment to enable them to perform their required functions.  The CMT Commander shall be responsible for maintaining a current inventory of all equipment assigned to the team.

15.8    EVALUATION

After every operation in which the CMT is involved, the CMT Commander, along with members of the team, will critique the operation for the purpose of improving future performance.

15.9    DIGNITARY PROTECTION

A.  The Commissioner shall delegate a single member of the CMT to coordinate all the security arrangements for a visiting dignitary.

B. The member in command of a dignitary protection detail shall assure that sufficient personnel have been assigned and that proper equipment, vehicles and weapons have been provided.

C. The itinerary of the dignitary must be carefully reviewed and security plans designed in relation thereto.

D. Travel routes must be inspected and alternative routes designated in the case of an unanticipated contingency.

E. The member in command of a dignitary protection detail shall coordinate the operations of Buffalo Police Department units as they function in conjunction with outside agencies.

F. The nearest emergency first-aid, ambulance and medical facility must be identified in the event of a medical emergency.

G. The member in command of a dignitary protection detail shall coordinate with the Captain in charge of Communications to provide an exclusive radio frequency or other form of secure communication.

H. For members not attired in uniform, the member in command of a dignitary detail must arrange a method for readily identifying members of the detail.

## 16.0  UNDERWATER RESCUE AND RECOVERY TEAM (URRT)

16.1  POLICY
It is the policy of the Buffalo Police Department to maintain a group of specially trained and equipped members who, in addition to their regular assignments, can respond to incidents in which underwater recovery is necessary.

16.2  COMMAND

A. Members of the Underwater Rescue and Recovery Team will be under the direction of the DPC of Operations.

B. The Commissioner of Police will designate a member of the Department as the URRT Commander.

C. During a URRT operation, unit members will be under the direction of the URRT Commander or a designated squad leader present at the scene.

16.3     URRT RESPONSIBILITIES

    A. The URRT shall be activated whenever there is a report of a person having just disappeared under the surface of any body of water under circumstances that would indicate a likelihood of drowning.

    B. The URRT may be activated to search for weapons or other evidence whenever there is a high degree of certainty that such weapons or evidence have been discarded in an identifiable area in a body of water.

    C. The URRT may be activated to locate and recover vehicles that have been discarded or abandoned in a body of water.

    D. The URRT may be activated whenever a police operation requires the use of underwater support personnel.

16.4     ACTIVATING URRT

    A. In the circumstance described in M.O.P. Chapter 11 above, where a person is in any body of water and there is a likelihood of drowning, on-duty URRT members will be requested to respond. URRT will be activated by the District Supervisor on the scene, by relaying the request through a radio broadcast. If no response, the URRT Commander shall be contacted and advised of the situation. If activated by the District Supervisor, the Radio Dispatcher shall:

        1. immediately notify the 911 Supervisor;
        2. notify the URRT Commander
        3. broadcast an alert on all channels for any members of the URRT currently on duty;
        4. at the direction of the URRT commander, designate a member of the URRT to transport the required vehicles and equipment;
        5. at the direction of the URRT Commander, request the 911 Supervisor to activate additional off duty URRT members;
        6. provide whatever other radio and communications assistance that may be necessary.

    B. In other circumstances, a Supervisor or Commanding Officer may request the assistance of the URRT by notifying the DPC, or the Duty Inspector.

16.5     QUALIFICATIONS, SELECTION AND TRAINING

    A. Qualifications for members of the URRT shall be established, based on the recommendations of the URRT Commander. These qualifications shall be maintained on file in the Police Commissioner's Office and in the Police Academy and they shall be reviewed periodically.

B. The URRT Commander shall be responsible for recommending the selection of team members from amongst those applicants who possess the established qualifications. The final determination in the selection process rests with the Commissioner.

C. The URRT Commander will provide the members of the URRT with the necessary training and ensure that each member maintains the required qualifications.

D. The URRT Commander shall be responsible for ensuring that training files of URRT members are maintained in the Police Academy. These files must include:

    1. copies of all relevant training certificates received by members;
    2. notations of all regular training sessions;
    3. a brief description of any special training sessions.

16.6 URRT ROSTER
The URRT Commander shall maintain a roster of current URRT members. The roster shall contain each member's name, address, telephone number, and pager number (if applicable).  The roster shall be kept on file with the Radio Dispatchers.

16.7 EQUIPMENT
URRT members shall be provided with, and trained in the use of, specialized equipment to enable them to perform their required functions. The URRT commander shall be responsible for maintaining a current inventory of all equipment assigned to the team.

16.8 EVALUATION
After each operation involving the URRT, the URRT Commander, along with members of the team, will critique the operation for purposes of improving future performance.

16.9 VEHICLES RECOVERED

A. When a vehicle is removed from a body of water, in addition to preparing the Recovered Vehicle Report (P-31), the URRT commander will prepare an Intra-Departmental Memorandum noting the number of officers involved in the dive and the number of hours each officer spent during the operation.
        Intra-Departmental Memorandum Distribution:
        Original and copy to Fiscal Management
        Copy to URRT Command files

B. The Office of Fiscal Management will calculate the cost factor of the dive and include this information on the Intra-Departmental Memorandum submitted

COB000710

by the URRT Commander. The original Intra-Departmental Memorandum will be forwarded to the Parking Violations Bureau.

**17.0    MUTUAL AID**

17.1    POLICY
It is the policy of the Buffalo Police Department to assist surrounding Police Agencies when called upon to do so, to the extent that the Department's personnel resources are not dangerously depleted.

17.2    EMERGENCY REQUESTS FOR ASSISTANCE
In emergency circumstances when surrounding municipalities request the assistance of the Buffalo Police Department, a DPC, Duty Inspector, or higher authority shall arrange for such assistance to the extent that there are adequate police personnel remaining on duty in the City to meet the emergency needs of its residents.

17.3    NON - EMERGENCY REQUESTS FOR ASSISTANCE
In non-emergency circumstances, all requests by municipalities for assistance from the Buffalo Police Department shall be directed to the Commissioner for determination. Such assistance will not be unreasonably withheld.

## CHAPTER 12: UNIFORMS AND EQUIPMENT

CONTENTS

**1.0    UNIFORMS**
1.1    Policy
1.2    Standardization of Uniform
1.3    Uniforms to Be Kept Available
1.4    Inspection and Approval
1.5    Uniforms to Be Worn Properly
1.6    Uniforms, When Worn
1.7    Wearing the Uniform Hat
1.8    Attire While Receiving Court Time Pay
1.9    Restrictions on Wearing Uniforms
1.10   Distribution, Repair, and Replacement of Uniforms and Equipment
1.11   Return of Uniform and Equipment

**2.0    TYPES OF UNIFORM**
2.1    Specifications
2.2    Basic Uniform - Police Officers
           A.  Basic Regulation Uniform
           B.  Warm Weather Uniform
           C.  Cold Weather Uniform
2.3    Uniform for Lieutenants and Higher Ranking Officers
2.4    Office Uniforms
2.5    Members Assigned to Plain Clothes Duty
2.6    Report Technician Uniform
2.7    Dispatcher Uniforms
2.8    Uniforms for Maintenance and Cleaning Personnel

**3.0    BADGES AND WREATHS**
3.1    Type
3.2    How Worn
3.4    Care of Badges and Wreaths
3.5    Lost Badges/Wreaths
3.6    Damaged Badges and Wreaths
3.7    Issuance, Records and Control of Badges/Wreaths
3.9    Purchasing Badges upon Retirement

**4.0    INSIGNIA, SERVICE RIBBONS AND MEDALS**
4.1    Insignia
4.2    General Guidelines - Wearing Insignia
4.3    Insignia of Rank
4.4    Service Ribbons and Medals
           A.  How Worn
           B.  When Worn

**5.0**    **IDENTIFICATION CARDS AND NAME TAGS**
5.1    Identification Card
5.2    Name Tags
5.3    Missing or Damaged Items

**6.0**    **DAMAGED OR WORN UNIFORMS**
6.1    Replacement
6.2    Claims for Reimbursement

**7.0**    **PERSONAL APPEARANCE**
7.1    Application
7.3    General Guidelines
7.4    Responsibility of Superior Officers

**8.0**    **FIREARMS**
8.1    Regulation Service Firearm
8.2    Off Duty Officers
8.3    Wearing the Service Weapon
8.4    Carrying Additional Firearms While on Duty
8.5    Qualification with Firearms
8.6    Registration of Firearms
8.7    Lost or Stolen Firearms
8.8    Suspension of Authority to Carry a Firearm

**9.0**    **RESTRAINING EQUIPMENT**
9.1    Authorized Restraining Equipment

**1.0**　**UNIFORMS**

1.1　POLICY

It is the policy of the Buffalo Police Department to field a force of well groomed Officers attired in neat and meticulously maintained uniforms that reflect the Department's high standards of competence, discipline and professionalism.

1.2　STANDARDIZATION OF UNIFORMS

All members of the Department shall be governed by the dress and appearance standards of this Chapter. Uniforms for males and females shall be the same except:

A. maternity uniforms may be worn by female Officers who are pregnant;

B. female Report Technicians may wear a skirt rather than trousers.

1.3　UNIFORMS TO BE KEPT AVAILABLE

Members shall have available at all times the uniform prescribed for their rank or assignment.

1.4　INSPECTION AND APPROVAL

Articles of uniform shall be inspected daily by the Superior Officer of the unit to which the Officer is assigned.

1.5　UNIFORMS TO BE WORN PROPERLY

A.　Uniform shirts shall be securely buttoned and worn properly at all times.

B.　When worn, caps and hats shall be positioned squarely on the head, with the center of the peak over the nose.

C.　Ties shall be the breakaway type and shall be worn snug to the collar.

D.　Uniforms shall be clean, well pressed, and in good repair. Leather shoes shall be highly polished, and leather articles kept in good repair.

E.　Uniforms shall be worn exactly as prescribed, and no unauthorized insignia shall be worn.

F.　Badges, whether the shield type or the sew on variety, must always be displayed on the outer most garment.

G.　Name tags must always be displayed on the outer most garment.

1.6 UNIFORMS, WHEN WORN

Except for plainclothes Officers, or those excepted by the Commissioner, all members of the Department of the rank of Captain and below shall wear the prescribed uniform when:

A.  on duty, or

B.  appearing at Department trials, or

C.  required to report to the Commissioner, a Deputy Commissioner, Chief or an Inspector, unless specifically excused from so doing by the Officer to whom they are  to report, or

D.  directed to do so by a Superior Officer.

1.7 WEARING THE UNIFORM HAT

Uniformed members of the Department are encouraged to wear the regulation police hat whenever they are outside and in public view. From May through October, the eight point cloth cap, and from November through April, either the eight point cloth cap, insulated winter knit hat or the Trooper Cap must be worn. Any other form of headwear may be approved at the discretion of the Commissioner:

A.  at the direction of a Supervisory or Commanding Officer;

B.  at all high visibility functions;

C.  while on a walking post or a traffic post;

D.  at parades, funerals or other formal Department functions;

1.8 ATTIRE WHILE RECEIVING COURT TIME PAY

Members of the Department must appear in full uniform or with a sport coat, dress slacks or suit and tie or shirt with collar and dress pants and shoes (or the business professional equivalent for female Police Officers) for any appearance in court (NO JEANS, SHORTS, T-SHIRTS OR SNEAKERS). Members appearing in court who are not wearing the regulation uniform shall wear their Department issued identification card on their outermost garment.

1.9 RESTRICTIONS ON WEARING UNIFORMS

A.  Except as outlined in M.O.P. Chapter 12 above, members shall wear their uniform only while on actual duty, or in going to, or returning from, duty.

B.  Members shall not wear their uniform in Canada unless they have the permission of the Commissioner and the Canadian authorities.

C. Members under suspension shall not wear their uniform, or any part thereof, except when appearing at a Departmental hearing or trial.

D. Members shall wear the uniform only as prescribed, without any unauthorized insignias or embellishments.

E. While in public, members shall not wear a combination of part civilian dress together with a readily identifiable part of the regulation uniform.

1.10   DISTRIBUTION, REPAIR, AND REPLACEMENT OF UNIFORMS AND EQUIPMENT

The Administration and Finance Lieutenant shall be responsible for the distribution, repair, and replacement of all badges, uniforms and equipment, except firearms and chemical sprays. The Administration and Finance Lieutenant shall maintain all necessary records and files to facilitate this responsibility.

1.11   RETURN OF UNIFORM AND EQUIPMENT

All items of uniform and equipment shall be returned to the Department whenever a sworn member ends his/her employment with the Department, whether by retirement or otherwise, or whenever a member of the Department takes an unpaid leave of absence in excess of thirty (30) days (refer M.O.P. Chapter 9). The member is responsible for returning all Department issued items of uniform and equipment and for having form BPD-24 completed as (s)he returns each item. The member shall attest to the fact that all items have been returned by signing the bottom of the BPD-24.

## 2.0   TYPES OF UNIFORM

2.1   SPECIFICATIONS

Members shall wear only those items of uniform issued by the Department or that have been authorized by the Department to be worn, and which meet specifications. Specifications for uniform articles are on file in the Administration and Finance Lieutenant Office.  Members shall not remove any authorized patch or insignia; nor shall they add any patch, insignia or other item to the uniform; nor shall they alter or cause to be altered any item of uniform or equipment. Authorized alterations will be performed exclusively through the Department.

2.2   BASIC UNIFORM - POLICE OFFICERS

A. The basic regulation uniform shall consist of the following items:

1. Class A – navy blue color pants with piping
2. Class B – navy blue colored pants with side pockets
3. Class A & B - navy blue color long sleeve shirt
4. Class A & B - navy blue color short sleeve shirt
5. navy blue color turtleneck shirt
6. black 4 in hand fabric tie (breakaway type)

7.  belt, black leather, plain metal buckle
8.  black boot and low quarter shoe (members, at their own choosing, may wear a plain black sneaker type shoe so long as the exterior of the shoe does not exhibit any names, stripes or logos)
9.  eight point cloth hat with silver hat band and Department buttons, or the Trooper Cap
10. winter coat
11. light weight jacket
12. police style rain coat and rain cap
13. name tags (sewn on shirts, jackets and coats)
14. gun belt with holster
15. firearm
16. handcuffs
17. badge (a Department issued sewn on badge is available at the Officer's option)
18. wreath
19. bullet proof vests
20. black leather gloves

B.  <u>WARM WEATHER UNIFORM</u>
    During warm weather the following articles of uniform shall be worn:

    1.  short sleeve shirt, open collar, white crew neck t-shirt, no tie
    2.  low quarter shoes, or black sneaker type shoes,
    3.  when the hat is worn it must be the eight point cloth cap.

C.  <u>COLD WEATHER UNIFORM</u>
    During cold weather the following articles of uniform shall be worn:

    1.  long sleeve shirt, with collar buttoned, and tie,
        a.  the collar shall not be buttoned nor a tie worn if the turtle neck is worn, (the turtleneck shirt is only to be worn when covered by the long sleeve shirt, and is never to be worn alone or as an outer garment),
    2.  the light weight jacket or winter coat,
    3.  boots, low quarter shoes, or black sneaker type shoes,
    4.  either the eight point cloth cap or the Trooper Cap ( the perforated eight point cloth hat is no longer in use),
    5.  military commando style V neck sweater in navy blue or black is optional but must be purchased by the Officer,
    6.  black leather gloves,
    7.  scarves and ear muffs are not issued, but if worn they must be solid black or navy blue.
    8.  turtlenecks may be worn but only by Police Officers and Lieutenants and only while they are assigned to street duty ( desk officers and

personnel assigned to inside duties will wear the regulation office uniform).

2.3   UNIFORM FOR LIEUTENANTS AND HIGHER RANKING OFFICERS

The uniform for Officers of the rank of Lieutenant and above is basically the same as that for Police Officers except that:

A. shirts are white in color (Lieutenants also may wear a white turtle neck in the manner prescribed in M.O.P. Chapter 12 above),

B. the eight point cloth cap has a gold hat band with gold Departmental buttons,

C. the badge and wreath shall be appropriate for each specific rank and are gold in color,

D. Officers of the rank of Captain and above may opt to wear the dress blouse.

2.4.   OFFICE UNIFORMS

A. Lieutenants assigned to office duty shall wear the regulation Police Lieutenant uniform.

B. Police Officers assigned to office duty, desk duty or clerical duty shall wear the regulation Police Officer uniform, including badge, shoulder patch, name tag, etc.

C. Turtlenecks shall not be worn when members are assigned to office duty, desk duty, or clerical duty.

2.5.   MEMBERS ASSIGNED TO PLAIN CLOTHES DUTY

A. Sworn members of the Department assigned to plainclothes duty shall be clean and neatly attired in conventional business professional attire.

B. Plainclothes other than the type specified above may be worn but only with the permission of the Officer's Chief or higher authority.

C. Between June 1st and September 1st, male plainclothes Officers may wear business professional attire that includes a traditional style sport or golf style shirt.

2.6.   REPORT TECHNICIAN UNIFORM

A. The basic regulation uniform for Report Technicians shall consist of the following:

1. shirt - white uniform long sleeve, shoulder straps, pocket flaps, badge tabs or navy/light blue polo/golf style shirt with embroidered BPD insignia. Shirts shall be tucked in. No shoulder patch.
2. trousers/slacks/skirts as specified,
3. tie (male) black four-in-hand, fabric, (female) black cross over, fabric
4. belt - black leather, plain metal buckle
5. socks – black stockings - (female) neutral color hose
6. shoes (male), black color, smooth finish, tip of toe shall be plain with no design, (female) black color, smooth finish, toes and heels shall be closed, tip of toe shall be plain, heels shall not exceed 2 1/2" in height, die work, ornamentation, fabric, western style or boots, sneakers, or clogs shall not be worn
7. name plate centered on the right shirt pocket flap, with the retaining pins positioned so that the top of the name plate shall not be more than one-half  (1/2) inch below the top of the right shirt pocket flap.

### B. WARM WEATHER UNIFORM
1. short sleeve shirt
2. no tie

### 2.7   DISPATCHER UNIFORMS
The basic uniform for dispatchers is:

1. Pants: dickies or equivalent, cotton/poplin, khaki in color
2. Shirts: Outer Banks or equivalent, 100% cotton, green in color. Each shirt shall be embroidered with the official communications emblem on the front left breast. Shirts may be long or short sleeve.
3. Belts:  black leather belts to be worn with regulations pants
4. Shoes: black shoes, sneakers or boots

### 2.8   UNIFORMS FOR MAINTENANCE AND CLEANING PERSONNEL
The basic uniform for maintenance and cleaning personnel:

1. Pants:  Dickies or equivalent, cotton/poplin, khaki in color. During the summer months shorts of the same make and color may be worn.
2. Shirts:  Dickies or equivalent, cotton/poplin, black in color. Shirts may be long or short sleeve.
3. Belt:  black leather belts will be worn with issued pants or shorts
4. Shoes:  black shoes, sneakers or boots. Employees are encouraged to wear safety shoes.
5. Ties:  not required

**3.0**    <u>**BADGES AND WREATHS**</u>

3.1    <u>TYPE</u>

Badges and wreaths for all ranks shall be of the type prescribed by the Commissioner. Sew on badges are available from the Department and may be used at the Officer's option.

3.2    <u>HOW WORN</u>

A. When on duty in uniform, sworn members must wear the badge on the outside of the outer most garment, over the left breast, so that the entire surface of the badge is distinct and may be easily seen.

B. When necessary for purposes of identification, plainclothes Officers shall display the badge over the left breast, on the outside of the outer most garment.

C. When in uniform and the regulation hat is worn, members shall wear the wreath clearly displayed on the front of the prescribed head gear (except helmets).

3.3    <u>CARE OF BADGES AND WREATHS</u>

A. The police badge and wreath are the property of the Department and not of any individual member. They shall be carefully safeguarded.

B. Members shall not:
   1. wear any badge or wreath other than the one that they are assigned;
   2. give, loan or relinquish possession of their badge or wreath to any other person for any reason;
   3. willfully damage, mutilate, or alter in any manner, the badge and wreath that were issued to them.

3.4    <u>LOST BADGES/WREATHS</u>

A. <u>Reporting A Badge Or Wreath As Missing</u>
   1. Members of the Department missing their Police badges or wreaths shall report the loss or theft to their immediate supervisor as soon as the member becomes aware that the item is missing;
   2. members shall prepare a complete report on an Intra-Departmental Memorandum, directed to the Internal Affairs Divisions (IAD) and sent through the chain of command, detailing the circumstances surrounding the missing badge or wreath;
      a. the District Chief or Commanding Officer shall review the report and submit comments and recommendations;

        b.  IAD shall review the report and recommend appropriate action to the Commissioner;

    3.  an electronic message shall be transmitted reporting the loss or theft.

B.  <u>Duty Assignments For Those Officers Missing A Badge Or Wreath</u>
Members who have lost their badges and do not have the sew on badge attached to their outer most garment shall be assigned to duty that does not generally put them in public view.  Members who have lost their wreaths shall not be assigned to duty where it is possible that they may be required to wear the regulation police hat.

C.  <u>Issuance Of New Badges/Wreaths</u>
    1.  A replacement badge or wreath shall be obtained from the Quartermaster as soon as possible after the item has been reported missing and in no event, later than the next business day.
    2.  A replacement badge or wreath shall not be issued without a written order from the Officer's immediate superior.
    3.  IAD will review circumstances regarding loss of badge and authorize replacement of the badge.

D.  <u>Loss Due to Carelessness</u>
If in the judgment of the Commissioner, the loss was due to the carelessness of the member, the member will be required to pay for the lost badge or wreath in addition to whatever disciplinary action the Commissioner may order.

## 3.5  <u>DAMAGED BADGES AND WREATHS</u>

A.  Damaged badges and wreaths shall be returned to the Administration and Finance Lieutenant. If the damage can be repaired, the Administration and Finance Lieutenant shall loan the Officer an appropriate badge/wreath until repairs are made.

B.  If the damage cannot be repaired, the badge/wreath shall be replaced.

C.  The Administration and Finance Lieutenant shall maintain a record of the Officer's name and rank, the number of the badge loaned, date loaned and date returned.

D.  If it appears that the damage to the badge or wreath was caused by carelessness or by deliberate mutilation, the member shall be required to submit a report on an Intra-Departmental Memorandum to the District/Division Chief through channels, explaining the damage.  If the report does not satisfactorily explain the damage, the member shall be required to pay for the item's replacement, in addition to whatever disciplinary action may be taken.

3.6    ISSUANCE, RECORDS AND CONTROL OF BADGE/WREATHS

All badges and wreaths shall be issued only through the Administration and Finance Lieutenant, who shall maintain complete, accurate and current records of all such items.

3.7    PURCHASING BADGES UPON RETIREMENT

At the discretion of the Commissioner, members in good standing who have left the employ of the Department, may be allowed to purchase their badges. Purchases of the badges are contingent upon the following conditions which the requesting Officer must agree to, and acknowledge in writing:

A.  the total cost of the badge must be paid for by the Officer;

B.  the badge must be mounted on some sort of plaque; (plaque and mounting not provided by BPD)

C.  the Officer may not loan, give, or in any manner, relinquish possession of the badge;

D.  if the badge is used in any manner other than as specified above, or is misused in any way, the Department retains the right to retake possession of the badge.

**4.0    INSIGNIA, SERVICE RIBBONS AND MEDALS**

4.1    INSIGNIA

Insignia are those emblems that denote rank. The insignia of rank of members of the Department shall be only as specified by this section, subject to the orders of the Commissioner. Only members of the rank of Lieutenant and above shall wear insignia.

4.2    GENERAL GUIDELINES - WEARING INSIGNIA

A.  On each collar of the shirt, the insignia of rank shall be placed in the center of the collar between the tip and neck line, approximately one-quarter (1/4) inch in from the front edge of the collar.

B.  On each shoulder of the outer most garment, ( rainwear and uniform shirt excepted) the insignia of rank shall be placed with outer edge one (1) inch above sleeve seam, centered over the shoulder seam, parallel to sleeve seam. When the uniform shirt is the outermost garment, the insignia shall be worn on the collar as described in A, above.

C.  Adjustable gold band on hat, to extend across peak, attached with 2 ligne gilt Department buttons.

4.3    INSIGNIAS OF RANK

    A.  Lieutenants - single military gilt bar.

    B.  Captains - double military gilt bar

    C.  Inspectors - gold eagles

    D.  Chiefs - 2 gold stars

    E.  Deputy Commissioners - three gold stars

    F.  Commissioner - four gold stars

4.4    SERVICE RIBBONS AND MEDALS

    A.  When Worn
        1.  Departmental awards and ribbons may be worn on either the dress or duty uniform.
        2.  Other award ribbons and medals may be worn but only with the permission of the Commissioner.

    B.  How Worn
    Service ribbons and medals are to be worn on the outermost garment and shall be centered on the pocket seam just below the nametag on the right hand side of the shirt or jacket.

## 5.0    IDENTIFICATION CARDS AND NAME TAGS

5.1    IDENTIFICATION CARD

    A.  While on duty all employees of the Department shall have in their immediate possession their Official Departmental Laminated Identification Card.

    B.  No identification card shall be replaced without written authorization of the employee's Superior Officer and the Internal Affairs Division.

    C.  Wearing The Identification Card:
        1.  How Worn
        The identification card shall be worn in a clearly visible position, above the waist, and preferably over the upper left quadrant of the chest.
        2.  When Worn
        The identification card shall be worn in Police Headquarters and all other police buildings.
        3.  By Whom Worn

All members of the Department not wearing a uniform shall wear the identification card.

5.2    NAME TAGS

A.    By Whom Worn
While on duty all employees of the Department who are assigned to uniform duty, either office or patrol, shall wear the personal identification nametag on the outside of the outer most garments (rainwear excepted).

B.    How Worn
The personal identification nametag shall be worn on the right quadrant of the chest, immediately above, and centered directly over the right pocket flap.

5.3    MISSING OR DAMAGED ITEMS
All employees shall be responsible for the security of their identification cards and nametags. The loss, destruction, or mutilation of these items must be immediately reported to IAD on an Intra-Departmental Memorandum, sent through the chain of command. The District/Division Chief shall make recommendations.  If, in the judgment of the Commissioner, carelessness was involved, the member shall be required to pay for the replacement of these items, in addition to whatever disciplinary penalty that may be imposed.

**6.0    DAMAGED OR WORN UNIFORMS**

6.1    REPLACEMENT

A.    Items of uniform and equipment that were provided to sworn members, will be replaced by the Department when necessary.  An Officer reporting a worn or damaged item shall:

1.    present the deficient item to the Quartermasters Office for decision on replacement;
2.    if after initial inquiry, the Quartermaster suspects that the items to be repaired or replaced are due to the carelessness of the member, the investigation shall be forwarded to the IAD;
3.    if in the judgment of the Commissioner, the items to be repaired or replaced are due to the deliberate carelessness of the member, the member may be required to compensate the Department for the loss in addition to whatever disciplinary action that may be taken.

B.    If an item of uniform or equipment is lost or stolen, an Intra-Departmental Memorandum explaining the circumstances surrounding the loss/theft shall be forwarded through the chain of command to the Internal Affairs Division.  In such cases, IAD will determine whether the Department will replace the item. An electronic message must also be sent detailing loss/theft.

6.2   <u>CLAIMS FOR REIMBURSEMENT</u>

Claims by members of the Department for the reimbursement of Department authorized property or equipment (ex. eyeglasses, flashlight, etc...) owned by the member, that was damaged or destroyed in the performance of duty, shall be prepared on claim forms supplied by the Corporation Counsel and available in the Administration and Finance office.

The claimant shall obtain a written appraisal or receipt from replacement of damaged item. The original appraisal/receipt shall be attached to the original claim form and shall be sent to the Administration and Finance office.

The Administration and Finance office will review and forward for approval by the Commissioner of Police. If denied, documentation will be returned to member with explanation for denial. If approved, Administration and Finance office will submit the original and three copies to Corporation Counsel for review, approval and processing for payment.

All claims must be submitted within fifteen (15) days of the date of occurrence of the damage or destruction.

## 7.0   <u>PERSONAL APPEARANCE</u>

7.1   <u>APPLICATION</u>

All members of the Department shall be neat and clean while on duty. Personnel shall comply with the grooming standards listed below except that Commanding Officers may authorize some deviation by plainclothes Officers but only when the particular job assignment requires it.

7.2   <u>GENERAL GUIDELINES</u>

A.  <u>HAIR</u>

Hair shall be neatly cut and trimmed. Hairstyles shall be conservative and not excessive in length. The maximum possible bulk of hair shall be approximately two (2) inches in thickness on top and approximately one and one-half (1 1/2) inches in thickness at the back and sides of the head.  In no event shall any hairstyle or thickness of hair interfere with the proper wearing of the uniform headgear. The hairstyle shall not extend over the collar line or any part of the ear.  In no event shall ponytails or other styles of lengths of hair be permitted which may be readily grabbed by a suspect or defendant.

1. Hair longer than that specified above may be worn but it must be pulled back away from the face and secured under the uniform cap so that it does not touch the collar.
2. Items used to hold hair up must blend with the hair.
3. Decorative articles may not be worn in the hair.

B. <u>SIDEBURNS</u>
Sideburns shall be neatly trimmed, and may extend no further than the bottom of the ear lobe, and trimmed level therewith. Sideburns shall be squared off, and not flared or tapered to a point, nor connected to the mustache.

C. <u>MUSTACHES</u>
Mustaches, if worn, shall not extend over the top of the upper lip.

D. <u>BEARDS - GOATEES</u>
Beards and goatees are not permitted without the permission of the Commissioner.

E. <u>MAKE-UP</u>
Female Officers may wear make-up while in uniform, as long as it is worn in moderation. False eyelashes shall not be worn while on duty.

F. <u>FINGERNAILS</u>
Fingernails man not extend more than 1/8 inch from tip of finger.

G. <u>JEWELRY</u>
Uniformed Officers shall not wear any items of jewelry which may jeopardize their safety.

1. Earrings or choker chains shall not be worn while on duty.
2. Outlandish or excessively ornate jewelry shall not be worn while on duty (I.E. large medallions, bracelets, etc.).

H. <u>EXCEPTIONS</u>
Exceptions to these guidelines may be made when necessary to accomplish a police purpose.

7.3    <u>RESPONSIBILITY OF SUPERIOR OFFICERS</u>

A. Whenever a member appears for duty whose appearance is, in the opinion of a Superior Officer, in violation of Department Rules and/or procedures, the Superior Officer shall call the matter to the attention of the member, with directions to comply.

B. If the member refuses to comply, disciplinary action shall be initiated.

## 8.0    <u>FIREARMS</u>

8.1    <u>REGULATION SERVICE FIREARM</u>
The Regulation Service Firearm shall be as specified by the Police Commissioner. Specifications for the Regulation Service Firearm shall be kept on file in the Firearms Unit. Except as otherwise permitted in this Chapter, no other firearms

may be carried, and only authorized ammunition used, by sworn members of the Department while on duty.  Civilian members of the department are not to carry a weapon while on duty.

8.2   <u>OFF DUTY OFFICERS</u>

Off duty Officers may carry any legal firearm, provided that the weapon is properly registered with the State of New York and the Buffalo Police Department Firearms Unit. If a member uses a firearm in a law enforcement capacity while on or off duty, the member must be proficient in the use of that firearm.

8.3   <u>WEARING THE SERVICE WEAPON</u>

While on duty, uniform members shall carry their firearms fully loaded. The weapon shall be worn on the strong arm side, in a holster attached to a belt at the hip.

Plainclothes Officers shall carry their weapons fully loaded and concealed on their person in a manner of their choice as long as the weapon is readily available and safe for carrying and drawing.

8.4   <u>CARRYING ADDITIONAL FIREARMS WHILE ON DUTY</u>

Members are permitted to carry an additional weapon, at their own expense, while on duty, subject to the following provisions:

A.  Sworn members desiring to carry an additional weapon while on duty shall first obtain the written permission of their Commanding Officer.

B.  The requesting Officer must then take their Commanding Officer's written permission to the Firearms Unit and qualify with the weapon. Qualification and requalification will be during the requesting Officer's non-duty hours and at the Officer's personal expense. The standards for qualification and requalification shall be the same as those required for the Service Firearm. Requalification with the additional weapon is required annually and must be accomplished during the same time frame required for the Service Firearm.

C.  The additional weapon must be of a type and caliber approved by the Firearms Unit.

D.  Firearms Unit personnel will forward the member's original request to the Deputy Commissioner for approval. The approval or denial of the Deputy Commissioner will be returned to the member and his/her command. No member is authorized to carry an additional weapon without written approval from the Deputy Commissioner or Commissioner.

E. The additional weapon, when carried, must be carried on the person of the Officer in such a way that it is completely concealed from view. In no event shall shoulder holsters be worn by uniformed officers if it is exposed to view.

F. The Firearms Unit shall maintain a record of all members of the Department who are authorized to carry an additional weapon while on duty and the type of weapon they are authorized to carry.  Each individual Command shall maintain a record of those Officers assigned to that Command who are authorized to carry an additional weapon while on duty and the type of weapon they are authorized to carry.

8.5    QUALIFICATION WITH FIREARMS

A. Every sworn member of the Department authorized to carry a firearm shall be required to qualify at the Firearms Unit at least once each year with:

   1. the Regulation Service Weapon,
   2. any additional weapon (s)he has been authorized to carry on duty,
   3. a Department issued shotgun if the Officer has been authorized to use a shotgun while on duty.

B. Failure To Qualify
   1. An Officer who fails to qualify with any weapon as specified in "A" above will not be authorized to use that firearm until the Officer is able to qualify.
   2. If the weapon with which the Officer fails to qualify is the Regulation Service Weapon, the Department shall:

      a. assign the member to administrative duty;
      b. allow the member to take additional supervised training with the
      c. Firearms Unit;
      d. if the member fails to qualify within ten (10) business days of the first attempt, IAD shall initiate an investigation to determine if the member is competent to continue as a member of the Department (This does not  preclude the member from attempting to qualify during the pending investigation).

C. Firearms Qualification Scheduling
   1. The Commanding Officer of the Police Academy shall be responsible for establishing and posting a schedule so that all sworn members of the Department fulfill the requirement of qualifying at least once each year.
   2. The Firearms Unit shall maintain all necessary records and files.

   3. The Commanding Officer of the Police Academy shall notify the District/Division Chief of members who have failed to qualify or have not appeared for qualification as required. (S)he shall also notify IAD whenever any member fails to qualify within ten (10) days of the member's initial attempt.

D. Inspection and Instruction by the Firearms Unit

   1. Firearms Unit personnel shall be responsible for instructing members of the Department in the proper use and handling of firearms.

   2. Police Academy personnel shall, at least once each year, instruct members on Department policies concerning the use of force and deadly physical force.

   3. During the member's annual firearms qualification, Firearms Unit personnel shall inspect each weapon used by the member for law enforcement purposes. The Firearms Unit shall maintain a record of each such inspection.  Members shall not be allowed to continue using any firearm in which a deficiency is detected.

## 8.6   REGISTRATION OF FIREARMS

A. Sworn members must promptly report to the Department all acquisitions or dispositions of firearms (as the term "firearm" is defined in the NYS Penal Law) on NYS Police Form "C".  Failure to comply is a Class "A" Misdemeanor.

   1. Form "C" shall be completed by the member and forwarded through the chain of command to the Firearms Unit.

   2. The Firearms Unit shall time stamp Form "C" and:
      a. retain one copy for filing
      b. transmit one copy to the State Police
      c. forward one copy to the member submitting the report.

   3. If the member submitting Form "C" does not receive a copy from the Firearms Unit within ten (10) days, (s)he shall make inquiry and must obtain the copy.

B. The Firearms Unit shall maintain a record on Form P-17A , of all firearms (as that term is defined in the NYS Penal Law) purchased or in the  possession of a sworn member of the Department The registration shall include:

   1. members' name, rank, command, employee number and badge number,
   2. brand name of the weapon (manufacturer's name),
   3. model of weapon,
   4. length of barrel,
   5. serial number,
   6. finish (blue, nickel, stainless steel, etc.).

C. Changes or alterations in a weapon that have been previously registered by the member must be reported to the Firearms Unit so that the weapons report (P-17A) can be amended accordingly. Examples of changes or alterations that must be reported include shortening the barrel or changing the finish.

8.7    <u>LOST OR STOLEN FIREARMS</u>

A. Sworn members of the Department losing or having their firearms stolen, shall promptly report the incident to their immediate superior. In addition, the member shall prepare an Intra-Departmental Memorandum describing the weapon, make, model, serial number and type of finish and the circumstances surrounding the incident.

   1. If the weapon was lost or stolen outside of the City of Buffalo, the member shall also promptly report the loss to the Police Agency having jurisdiction of the incident. That agency shall be responsible for preparing the general offense report and for entering a report of the loss into the NYSPIN Teletype Firearms Record System.

B. The member's Commanding Officer, upon receipt of the initial report from the member, shall direct that an E-Mail message reporting the loss be sent. An event number shall be obtained in all cases.

C. The member's Commanding Officer shall initiate an investigation of the loss of the firearm and shall file a written report of his findings, with recommendations as to the propriety and nature of disciplinary action. The report shall be forwarded to the IAD through the chain of command.

D. If a member is reimbursed for the loss of a firearm (i.e. by an insurance company), the Officer must prepare the NYS Police Form "C" as outlined in M.O.P. Chapter 14 above. No "C" Form need be prepared if the member is not reimbursed or refuses settlement, since the member in that case retains title even though the firearm is missing.

8.8    <u>SUSPENSION OF AUTHORITY TO CARRY A FIREARM</u>

A. A sworn member's authority to possess a BPD owned firearm as a sworn officer is automatically suspended whenever the member is suspended from duty or takes a leave of absence from the Department. Members may continue to possess weapons, other than those issued by the Department, but only if the firearms are duly registered on a valid pistol permit.

B. An Officer's authority to possess a firearm may be suspended for good cause at the discretion of the Commissioner.

C. When an Officer's authority to possess a firearm is suspended:

1.  a P-10A shall be prepared,
2.  the weapons turned over to the member's Superior Officer, and
3.  the weapons safeguarded in the Property Office.

## 9.0    RESTRAINING EQUIPMENT

9.1    AUTHORIZED RESTRAINING EQUIPMENT
Members of the Department shall use only that type of restraining equipment specifically authorized by the Department and for which they have received proper training.  Any other type of restraining equipment is prohibited (e.g. metal knuckles, blackjacks, saps, sap gloves, stun guns, etc.), except with the written approval of the Commissioner.

A.  The Department has authorized the following types of restraining equipment:

1.  metal handcuffs and Department issued plastic type restraining cuffs;
2.  Department issued police baton and/or ASP;
3.  Department issued chemical spray.

# CHAPTER 13: LEAVES AND INJURED ON-DUTY

## CONTENTS

**1.0     SICK LEAVE - GENERALLY**
1.1     Policy
1.2     Sick Leave Entitlements
1.3     Eligibility for Sick Leave
1.4     Light Duty
1.5     Notification Requirement
1.6     Notification When an Injury is Suffered While on Sick Leave
1.7     Reporting Sick While on Annual Vacation
1.8     Reporting Sick While on Duty
1.9     Place of Confinement - Sworn Members
1.10    Duty to Remain in Place of Confinement - Sworn Members
1.11    Electronic Mail Message to be Transmitted
1.12    Returning to Duty from Sick Leave
1.13    Medical Leave of Absence
1.14    Unpaid Maternity/Paternity Leave

**2.0     FAMILY AND MEDICAL LEAVE ACT POLICY**
2.1     Police
2.2     Definitions
2.3     Coverage and Eligibility
2.4     Intermittent or Reduced Leave
2.5     Substitution of Paid Vacation Time
2.6     Notice Requirement
2.7     Medical Certification
2.8     Effect of Benefits
2.9     Job Protection

**3.0     SERVICE CONNECTED INJURIES - INJURED ON DUTY**
3.1     Policy
3.2     Reporting a Service Connected Injury/Illness - Sworn Members
3.3     Department's Designated Medical Providers Role
3.4     Required Reports - Sworn Members
3.5     Supervisor's Duty to Investigate - Sworn Members
3.6     Determination by the Commissioner - Sworn Members
3.7     Treatment of Service Connected Injuries/Illness - Sworn Members
3.8     Treatment by Private Physician - Progress Reports
3.9     Claims for Treatment - Sworn Members
3.10    Charges and Bills - Sworn Members
3.11    Examination by Department's Designated Medical Provider - Sworn Members
3.12    Discontinuance of Medical Service - Sworn Members
3.13    Return to Duty - Sworn Members
3.14    General Municipal Law (GML) Section 207-c – Hearing Procedure

3.15    Service Connected Injury/Illness - Civilian Employees
3.16    Exposure to Contaminants
3.17    Reporting Service Connected Injury/Illness to the State

**4.0**    **ASSISTANCE TO THE FAMILY OF MEMBERS BECOMING SERIOUSLY ILL, INJURED OF KILLED WHILE ON DUTY**
4.1    Policy
4.2    Confidential in Line of Duty, Sudden Deaths/Serious Injury Form
4.3    Notification
4.4    Assisting the Family at the Hospital
4.5    Assistance to Co-Workers
4.6    Pre-Funeral Arrangements
4.7    Liaison Officer's Responsibilities
4.8    Line of Duty Funerals
4.9    Post Funeral Family Support

**5.0**    **MONITORING SICK AND INJURED MEMBERS**
5.1    Policy
5.2    Member's Responsibility
5.3    Supervisor's Responsibilities
5.4    Commanding Officer's Responsibilities
5.5    Internal Affairs Division Responsibilities
5.6    Medical Records Unit

**6.0**    **LIGHT DUTY ASSIGNMENTS - SWORN MEMBERS**
6.1    Policy
6.2    Fitness for Light Duty
6.3    Placement in Light Duty Assignment
6.4    Outside Employment Restrictions
6.5    Service Connected Injury/Illness

**7.0**    **PREGNANCY, CHILDBIRTH AND RELATED MEDICAL CONDITIONS**
7.1    Policy
7.2    Applicability of Chapter 13 M.O.P.
7.3    Duty to Notify
7.4    Complications during Pregnancy
7.5    Use of Sick Leave
7.6    Unpaid Maternity Leave

**8.0**    **EMPLOYEE ASSISTANCE PROGRAM (EAP)**
8.1    Policy
8.2    Employee Assistance Program
8.3    Confidentiality
8.4    Accessing EAP

**9.0**    **DRUG TESTING OF SWORN MEMBERS**

**1.0**   **SICK LEAVE - GENERALLY**

1.1   POLICY
It is the policy of the Buffalo Police Department to grant to its employees sick leave in accord with the terms of existing collective bargaining agreements and consistent with current state and federal mandates.

1.2   SICK LEAVE ENTITLEMENTS
Employees of the Department are entitled to sick leaves benefits as specified in their respective collective bargaining agreements.

1.3   ELIGIBILITY FOR SICK LEAVE
Employees of the Department shall be eligible for sick leave only when suffering from an illness or off duty injury that would prevent the performance of their duties. Sickness or disability shall not be feigned, nor shall any employee attempt to deceive any Department affiliated health care provider or Superior Officer concerning his/her physical condition. Employees who misuse or abuse sick leave privileges, may be subject to disciplinary action.

1.4   LIGHT DUTY - SWORN MEMBERS
Sworn members who are disabled due to sickness or injury will be permitted to return to work in a light duty assignment in lieu of using sick leave, subject to a determination by the treating Physician that the sworn member can perform light duty.  Light-duty (and limited light-duty for IOD related members only) Officers are NOT to be given permission to leave their place of assignment during their tour of duty with the exception of the light-duty, full shift Officers who may leave for lunch.  If the full-shift, light-duty Officers choose to leave their place of assignment for lunch they must sign out/in.  *__Also, under no circumstances should any light-duty or limited/light-duty Officer be allowed to use a City of Buffalo or Police Department vehicle.__*

1.5   NOTIFICATION REQUIREMENT
All employees who are absent due to illness or injury are to report such absence to their appropriate Superior Officer on or before the first day of such absence and the Department may require reasonable proofs of illness (or injury). In the event of a failure to comply with the notice requirements, the employee's absence may be considered as unauthorized leave. Abuse of sick leave provisions may be cause for disciplinary action.

A. Sworn members who anticipate being absent from work due to injury or illness must make every reasonable effort to give notice to their commanding officer as far in advance as possible prior to the start of their shift time.

B. For employees represented by Local 650 and Local 264, a physician's certificate may be required after an absence of three (3) consecutive workdays.

C. For employees represented by Local 264, if a member is on paid sick leave for two (2) consecutive work days twice in any three (3) consecutive month period, the Department may require a physician's certificate for the employee for the next two (2) consecutive work day absence on paid sick leave occurring within that same three (3) consecutive month period.

1.6    NOTIFICATION WHEN AN INJURY IS SUFFERED WHILE ON SICK LEAVE

Whenever any employee is injured in any manner while on sick leave, (s)he, or a member of his/her family or other responsible person, shall immediately report or cause to be reported through the chain of command to the employee's Superior, the circumstances and the nature of the injury. Consistent with existing directives, the Superior shall have form P-169C (Commanding Officer Sick/Injury Investigation) prepared and an electronic mail message transmitted. If the injury is related to a prior service connected injury, such fact shall be made known and the necessary reports prepared (a P-73 and medical documentation from treating Physician substantiating the exacerbation). If such injury or illness was incurred while the employee was on second front employment, the Commissioner or his/her designee shall be notified.

1.7    REPORTING SICK WHILE ON ANNUAL VACATION

Employees reporting sick while on annual vacation shall complete their scheduled vacation leave before being placed on sick leave.

1.8    REPORTING SICK WHILE ON DUTY

Whenever employees become sick while on duty to the extent that they are rendered incapable of properly performing their duties, they shall notify their Superior Officer who shall have form P-169C prepared. Sworn members shall then proceed directly to their place of confinement. Employees of the Department represented by Local 650 may use sick time in two-hour increments. Employees of the Department represented by Local 264 can use sick time in increments of either four or eight hours. PBA members may only use sick time in increments of full shifts (i.e. eight hours or ten hours depending on whether they are working the eight hour or ten hour schedule, **exception to this – see IOD Procedures).**

1.9    PLACE OF CONFINEMENT - SWORN MEMBERS

Place of confinement will normally be the sworn member's legal residence.  In circumstances where a sworn member is sick or is injured and resides or is confined at a location other than his/her legal residence, except if confined to a hospital, medical facility, or other treatment center, the sworn member shall notify his/her command of the location of confinement and shall submit immediately thereafter, an intra-departmental memorandum to the Police Commissioner indicating the purpose and need for the confinement at that location.  Any subsequent change of location, including a change to his/her legal residence shall be subject to the same notification requirement.  The sworn member's command will be responsible for transmitting the appropriate electronic mail message to the

sick/iod bulletin board indicating any change in the sworn member's place of confinement.

1.10    DUTY TO REMAIN IN PLACE OF CONFINEMENT-SWORN MEMBERS

A.  Except as provided in this section, sworn members, while they are on sick *or IOD* leave or they are absent due to a service connected injury/illness shall not absent themselves from their place of confinement during those tours of duty for which they were originally scheduled to work.

B.  They may absent themselves from their place of confinement:

1.  With permission of their Division Chief, a Deputy Police Commissioner or Internal Affairs Division by calling 851-5750 and such permission has been documented. When extenuating circumstances exist permission may be obtained from the Duty Officer and the Duty Officer shall document such permission on the Duty Officer's Activity Report;

2.  To obtain professional medical treatment;

3.  To perform exercise prescribed in writing by their physician, this is part of their recovery treatment provided that a copy is submitted to IAD prior to commencing such exercise.

   a.  This does not authorize sworn members to absent themselves from their place of confinement at all times but only during those times when they are performing the exercise prescribed in writing by their physician.

4.  While on approved unchallenged injured on duty status, the Commissioner may grant a waiver of confinement. The Commissioner's determination shall be made on a case-by-case basis;

   a.  Sworn members may apply for this waiver by submitting their request on an Intra-Departmental Memorandum and forwarding it through channels to the Commissioner or his/her designee.

1.11    ELECTRONIC MAIL MESSAGE TO BE TRANSMITTED
Whenever an employee reports off duty on sick leave or returns to duty from sick leave, an electronic mail message shall be transmitted directly to the Sick/IOD mailing list. The message shall be sent as soon as possible after notification of the member's absence from, or return to, duty. The message shall include:

1.  Name

    2. Rank
    3. Command
    4. Manpower
    5. Sick Plan
    6. Date/Time Report Off
    7. Place of confinement - Only if place of confinement is not the primary address (must report the address)

## 1.12   RETURNING TO DUTY FROM SICK LEAVE

A. <u>Two Hour Notification Requirement</u>
Personnel wishing to return to duty from sick leave must notify their command at least two (2) hours before the start of the tour for which they are returning.

B. <u>Reporting Back to Duty at the Command of Assignment</u>
Personnel who wish to return to full duty from sick leave shall report back to their command with proper documentation, which they shall give to the Command Officer. The Command Officer will sign it and forward the documentation (P-169 or medical documentation from attending Physician) to Administration and Finance.

C. <u>Required Documentation</u>
    1. Employees who are participants in the six-month sick plan as well as the Accumulated Sick Leave Plan (15 day plan) may be required to submit medical documentation if their sick leave exceeded three consecutive days.

D. <u>Electronic Mail Message</u>
Whenever an employee returns to duty from sick leave an electronic mail message shall be transmitted at or near the beginning of the shift indicating his/her return to duty, (refer M.O.P. Chapter 13).

## 1.13   MEDICAL LEAVE OF ABSENCE

A. Upon qualification under the General Guidelines of the Collective Bargaining Units, may request a medical leave of absence without pay for a period not to exceed six (6) months with supporting medical documentation.

B. Medical leaves shall upon the request of the employee, be extended or renewed for an addition period not to exceed six (6) months.

C. Before any member may return to work from a medical leave of absence, a medical release from the attending <u>Physician must be provided to the 1st Deputy Commissioner's Office.</u>

1.14 UNPAID MATERNITY/PATERNITY LEAVE

Unpaid maternity leaves, not to exceed six (6) months, shall be granted upon request of an employee. Maternity leaves shall, upon the request of the employee, be extended or renewed for an additional period not to exceed six (6) months (refer M.O.P. Chapter 10).

A. At their sole discretion, employees may use vacation time, personal leave time, or compensatory time before being taken off the payroll and going on unpaid maternity leave.

B. Employees may return to full duty prior to the expiration of the maternity leave.

C. Employees desiring to use the additional six (6) month period of maternity leave must notify the Department ten (10) days prior to the expiration of the original six month maternity leave.

D. Vacation carryover shall be allowed only in those circumstances specifically permitted by the respective collective bargaining agreement. No personal leave carryover shall be allowed.

E. An employee's vacation entitlement and vacation anniversary date shall be adjusted in accord with the respective collective bargaining agreements.

## 2.0 FAMILY AND MEDICAL LEAVE ACT POLICY

2.1 POLICY

In compliance with the Family and Medical Leave Act (herein referred to as "FMLA"), which was signed into law August 5, 1993, with an implementation/effective date of February 5, 1994, the City of Buffalo will grant job protected unpaid family and medical leave to eligible male or female employees for up to 12 weeks per 12 month period for any one or more of the following reasons:

A. The birth of a child and in order to care for such child or the placement of a child with the employee for adoption of foster care (leave for this reason must be taken within the 12-month period following the child's birth or placement with the employee; or

B. In order to care for an immediate family member (spouse, child or parent) of the employee if such immediate family member has a serious health condition; or

C. The employee's own serious health condition that prevents the performance of at least one of the essential functions of his/her position.

The FMLA pre-empts only those aspects of collective bargaining agreements that are less beneficial than the rights provided for in the FMLA.

2.2    <u>DEFINITIONS</u>

A. "<u>12-Month Period</u>" - means a rolling 12-month period measured backward from the date leave is taken and continuous with each additional leave taken.

B. "<u>Spouse</u>" - can include common-law relationships. There is, however, a special limitation when both spouses are eligible employees of the City of Buffalo. In this case, both employees are limited to a combined total of 12 work weeks of leave if the leave is taken because of a birth or placement of a child or the care of a parent with a serious health condition.

C. "<u>Child</u>" - means a child either under 18 years of age, or 18 years of age or older who is incapable of self-care because of a mental or physical disability. An employee's child is one for whom the employee has actual day-to-day responsibility for care and includes a biological, adopted, foster or step-child.

D. "<u>Serious Health Condition</u>" - of an employee, spouse, child or parent is defined as an illness, injury, impairment, or physical or mental condition of that person which involves:

**EITHER**

A. <u>In patient care</u> involving at least an overnight stay in a hospital, hospice or residential medical care facility.

**OR**

B. <u>Continuing treatment</u> by a health care provider in any one or more of the circumstances described below:

a. A period of incapacity of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition that also involves:

i. treatment two or more times by a health care provider, (or by others under the supervision of, or on orders of, or referral, by a health care provider), **or**

ii. treatment by a health care provider on at least one occasion that results in a regimen of continuing treatment under the supervision of the health care provider.

b.  Any period of incapacity due to pregnancy, or for prenatal care.

c.  Any period of incapacity, or treatment for such incapacity, due to a "chronic serious health condition," which is defined as one that:

a.  requires periodic visits to a health care provider; and
b.  continues over an extended period of time; and
c.  may cause episodic rather than a continuing period of incapacity.

d.  A period of incapacity which is permanent or long term due to a condition for which treatment may not be effective. The employee or immediate family member must be under the continuing supervision of, but need not be receiving treatment by, a health care provider. (i.e. Alzheimer's, severe stroke or the terminal stages of a disease.

2.3    COVERAGE AND ELIGIBILITY
To be eligible for family/medical leave an employee must:

A.  have worked for the City of Buffalo for at least 12 months:

AND

B.  have worked at least 1250 hours over the previous 12 month period.

2.4    INTERMITTENT OR REDUCED LEAVE

A.  An employee may take leave intermittently (a few days or a few hours at a time) or on a reduced leave schedule to care for an immediate family member's or the employee's own serious health condition, when "medically necessary." "Medically necessary" means that there must be a medical need and that the leave can best be accomplished through an intermittent or reduced leave schedule.

B.  The employee may be required to transfer temporarily to a position with equivalent pay and benefits that better accommodates recurring periods of leave when the leave is planned based on scheduled medical treatment.

C.  An employee may take leave intermittently or on a reduced leave schedule for the birth or placement for adoption or foster care of a child only with the

consent and approval by the Commissioner.

D. For part-time employees and those who work variable hours, family and medical leave entitlements are calculated on a pro-rata basis. A weekly average of the hours worked in the 12 weeks preceding the start of the leave should be used for calculating the employee's normal workweek.

2.5    SUBSTITUTION OF PAID VACATION TIME

A. An employee will be required to substitute accrued vacation time for any part of a family/medical leave taken for any reason.

B. If an employee has exhausted accrued paid vacation time prior to or will exhaust during a portion of family/medical leave, the employee may request an additional period of unpaid leave to be granted so that the total of paid and unpaid leave provided equals 12 weeks.

2.6    NOTICE REQUIREMENT

A. An employee is required to give 30 days notice in the event of a foreseeable leave. A "request for Family/Medical Leave" form should be completed by the employee and returned to the Division of Labor Relations. In unexpected or unavoidable situations, an employee should provide as much notice as is practicable, usually verbal notice within one or two business days of when the need for leaves becomes known to be followed by a completed "Request for Family/Medical Leave" form.

B. If an employee fails to give 30 days notice for a foreseeable leave with no reasonable excuse for the delay, the leave will be denied until 30 days after the employee provides notice.

2.7    MEDICAL CERTIFICATION

A. For leaves taken because of the employee's or a covered family member's serious health condition, the employee will be required to submit a completed "Physician/Practitioner Certification" form and the return the certification to the Division of Labor Relations.  Medical certification must be provided by the employee within 15 days after requested, or as soon as is reasonably possible.

B. The City may require a second (or third) opinion at it's own expense, periodic reports on the employee's status and intent to return to work, and a fitness-for duty report to return to work.

All documentation related to an employee's or family member's medical condition will be held in strict confidence and maintained in a separate

employee medical records file.

2.8    EFFECT OF BENEFITS

A.  A full time employee granted a leave under this policy will continue to be covered under the City's group medical and life insurance plans with the same conditions as coverage would have been provided if they had been continuously employed during the leave period.

B.  Any employee contributions (where applicable) will be required either through payroll deduction or by direct payment to the City. The employee will be advised in writing at the beginning of the leave period as to the amount and method of payment. Employee contribution amounts are subject to any change in rates as may occur while the employee is on leave.

C.  If an employee's contribution is more than 30 days late, the City may terminate insurance coverage.

D.  If the City pays the employee contributions missed by the employee while on leave, the employee will be required to reimburse the City for all delinquent payments (through a payroll deduction schedule) upon return from leave. The employee will be required to sign a written statement at the beginning of the leave period authorizing the payroll deduction for delinquent payments.

E.  If the employee fails to return from family/medical leave for reasons other than (1) the continuation of a serious health condition of the employee or a covered family member thereof, or (2) circumstances beyond the control of the employee (certification required within 30 days of failure to return for either reason), the City may seek reimbursement from the employee for the portion of the premiums paid by the City on behalf of that employee during the leave period.

F.  Family/medical leave will be treated as continuous service (i.e. no break in service) solely for purposes of vesting and eligibility to participate in an applicable retirement program.

G.  Employees do not receive or accrue any other employment benefits while on Family/Medical leave, and accrue no seniority, unless specifically provided for by a collective bargaining agreement. However, to the extent that an employee is taking an otherwise available leave concurrent with Family/Medical leave, any benefits or accruals which may be associated with the available leave will be in effect for the duration of that leave period.

2.9    JOB PROTECTION

A. If the employee returns to work following the conclusion of family/medical leave, (maximum of 12 weeks) (s)he will be reinstated to his/her former position or an equivalent position with equivalent pay, benefits and status.

B. The employee's restoration of rights are the same as they would have been as if the employee had not been on leave. Thus, if the employee's position would have been eliminated or the employee would have been terminated but for said leave, the employee would not have the right to be reinstated upon return from the leave in these instances.

C. If the employee fails to return following the conclusion of a family/medical leave, the employee will be reinstated to his/her same or similar position, only if available, in accordance with applicable laws. If the employee's same or similar position is not available, the employee may be terminated.

## 3.0 SERVICE CONNECTED INJURIES - (INJURED ON DUTY)

3.1 POLICY

The Department recognizes that from time to time employees may become sick or injured as a result of the performance of their duties. It is the policy of the Buffalo Police Department to extend to its employees all those benefits that have been agreed to in the respective collective bargaining agreements as well as benefits granted by state and federal law. Strict adherence to applicable Departmental procedures is required. (Refer to General Municipal Law 207-c)

3.2 REPORTING A SERVICE CONNECTED INJURY/ILLNESS – SWORN MEMBERS

An Officer shall report any on duty injury or illness, no matter how minor, to their supervisor and the Commissioner of Police within 72 hours of the occurrence and shall seek immediate medical treatment. Notification of the injury/illness shall be made on the required reports (see section 3.4 below). In the event an Officer is physically unable to submit the required reports, the on-duty supervisor, a family member, union representative or, other designee may do so on their behalf.

A. Non-Traumatic or Non-Life Threatening Injury/Exposure/Illness:

- Injured/ill Officer shall immediately advise their on-duty supervisor of any injure/illness and shall seek immediate medical treatment at Erie County Medical Center. The injured Officer shall report and be seen at either:

ECMC                                ECMC
Great Lakes Physicians/             Emergency Room Department
Occupational Health                 462 Grider Street
462 Grider Street                   Buffalo, NY  14215
Buffalo, NY  14215                  24 hours/7 days a week
0800-1600 hours

- Each injured/ill Officer must be initially examined by ECMC Emergency Room or Great Lakes Physicians/Occupational Health after incurring a service related injure/illness.
- The injured Officer must complete the following required documents:

   A. Form P-62 – Accident Injure/Illness Report-Service Connected
   B. Form P-169 – Report of Commanding Officer on Member Requesting Injured on Duty Status
   C. Form P-73 – Intra-departmental Correspondence from injured Officer and each Witness
   D. "Order Regarding Medical Treatment While Injured on Duty" compliance letter

The above forms and letters are available at each Command.  The injured Officer's immediate supervisor shall review, sign and fax (851-8012) all paperwork immediately to the 1st Deputy Police Commissioner.  Signed and completed hard copies (originals) shall be immediately forwarded via intra-departmental business to the 1st Deputy Police Commissioner.

- At the conclusion of medical treatment, the Officer shall notify his/her on-duty supervisor as to his/her work status by providing a copy of the discharge instruction paperwork.  This paperwork is given to each Officer and documents the Officer's ability to work (i.e. return to full duty, limited duty, ordered off duty).  The Supervisor shall immediately review, fax (851-8012) and forward the paperwork to the 1st Deputy Police Commissioner.

- All injuries must be reported via an electronic e-mail message by the end of the injured Officer's shift.

- If the injured/ill Officer chooses to follow-up with his/her primary physician, the injured Officer shall:

   - Notify the Commissioner of Police at (716) 851-4588 with the name of the treating physician within 72 hours of the occurrence.

   - Notify the Commissioner of Police at (716) 851-4588 with the name of any specialists their primary physician refers them to within 72 hours of the referral.

- The City of Buffalo may require an injured Officer to submit to one or more medical examinations to determine eligibility, the existence of a disability, continued eligibility, proper treatment, and related issues.

- Failure to submit the required paperwork within 72 hours of the injury/illness OR failure to receive an immediate medical examination, shall preclude any award of benefits pursuant to GML 207C.

- IOD status will be reviewed by the IOD Committee and determined by the Commissioner within 21 calendar days from the **receipt** of the required documents for Police Officers and within 10 calendar days from the **receipt** of the required documents for Probationary Police Officers.

- Written notice of the Police Commissioner's determination concerning an Officer's eligibility for NYS GML Section 270-c benefits shall be provided to the affected Officer and to the Police Benevolent Association (PBA).

B. Traumatic or life-threatening injury/illness:

- In the event that an Officer has life threatening or severe injuries or illness he/she shall seek immediate medical treatment at the closest appropriate facility.

- The on-duty supervisor shall fill out the required injured on duty paperwork and the same requirements shall be followed as set forth under the non-traumatic injuries/illness section.

C. Recurrence or aggravation of a prior service connected injury/illness:

- In the event an Officer claims a recurrence or aggravation of a prior approved GML Section 207-c injury, he/she shall notify his/her supervisor and shall comply with Departmental procedures as set forth under Section 3.2

3.3  **THE DEPARTMENT'S DESIGNATED MEDICAL PROVIDERS' ROLE**
The ***department's designated medical provider's role*** is primarily an evaluation and consulting service that advises the Department in dealing with the medical problems of Department employees.  It provides medical documentation for claims of service-connected injuries/illnesses. It determines appropriate courses of medical treatment and it reviews medical reports from various sources. At the option of the employee it may also provide medical treatment for those employees incurring service-connected injuries/illness. While it is a requirement that each sworn member must be examined by ***designated medical provider*** after incurring a service related injury/illness that requires medical attention, the sworn member may opt to be treated by a primary care physician of his/her own choosing.

3.4  REQUIRED REPORTS - SWORN MEMBERS
In all cases in which a sworn member claims a service connected injury/illness, the following reports must be completed.

A. Form P-62 (Accident Injury/Illness Report – Service Connected) shall be completed by the member claiming the service connected injury/illness or recurrence or aggravation of a prior service connected injury/illness. It shall be prepared on the member's behalf by his/her supervisor, family member, union representative or other designee if the member is physically unable to do so. The responsibility for ensuring the P-62 is properly prepared and forwarded always rests with the member claiming the service connected injury/illness.

B. Form P-169D (Report of Commanding Officer on Member Requesting Injured on Duty Status). The report must specify the exact nature of the injury and it shall recite in detail how the injury/illness was incurred. This form shall be signed by the on-duty supervisor.

C. Form P-73 – the sworn member shall prepare an Intra-Departmental Memorandum in which (s)he shall submit a complete report of all the circumstances relating to his/her claim of a service connected injury/illness or a claim of recurrence or aggravation of a prior service connected injury/illness. Included in the report shall be a statement by the supervisor as to whether the injured/ill sworn member complied with all Departmental procedures.

D. A statement on an Intra-Departmental Memorandum (P-73) shall be completed by each witness to the incident.

E. The "Order and Directive Regarding Medical Treatment While Injured on Duty" compliance letter must be signed and dated by the sworn member claiming a service connected injury/illness.

F. A copy of the P-62, P-169D, all related Intra-Departmental Memoranda (P-73) and the signed compliance letter shall be faxed to the Commissioner or his/her designee prior to 0800 hours of the ensuing business day at (716) 851-8012.

G. An electronic mail message shall be transmitted. Included in the message shall be:

    1. Name
    2. Rank
    3. Command/assignment
    4. Manpower
    5. Incident number
    6. Time and date of injury
    7. Location of treatment
    8. Remained on duty (yes or no)
    9. Summary

3.5    SUPERVISOR'S DUTY TO INVESTIGATE - SWORN MEMBERS

A.  In every instance of a sworn member's claim of a service connected injury/illness or a claim of a recurrence or aggravation of a prior service connected injury/illness, the sworn member's Supervisor shall immediately conduct a thorough investigation of the incident and shall report his/her findings in writing (refer M.O.P. Chapter 13). Included in the Supervisor's investigation shall be statements from all witnesses to the incident (refer M.O.P. Chapter 13). The final determination as to the validity of the injured on duty claim rests solely with the Police Commissioner or his/her designee.

B.  The Supervisor of a sworn member claiming a service connected injury/illness or recurrence or aggravation of a prior service connected injury/illness is responsible for overseeing the sworn member's compliance with all applicable reporting procedures.

3.6    DETERMINATION BY COMMISSIONER - SWORN MEMBERS

All reports concerning claims of service connected injuries/illness or claims of recurrence or aggravation of a prior service connected injury/illness of sworn members will be used by the Commissioner or his/her designee for final determination on the injury claim. Whenever a question arises as to whether or not the injury/illness was incurred in the performance of duty, or the available information does not clearly indicate the injury/illness was the result of the performance of duty, the Commissioner or his/her designee may call for such additional reports, and enlist such assistance as (s)he may deem necessary, to aid in making a determination. The Police Commissioner may require the member to submit to one or more medical examinations prior to his/her determination.  Upon the completion of his/her review, the Commissioner or his/her designee shall make the determination a permanent part of the record of the case. No sworn member is to be carried on the roles as being on IOD status until such determination has been made by the Commissioner or his/her designee.

A.  The Police Commissioner and/or his/her designee shall render a determination within 21 calendar days after his/her **receipt** of all required reports and documentation for Police Officers claiming a service connected injury/illness.

B.  The Police Commissioner and/or his/her designee shall render a determination within 10 calendar days after his/her **receipt** of all required reports and documentation for Probationary Police Officers claiming a service connected injury/illness.

C.  In the event that the Commissioner of his/her designee fails to make a determination on the injured member's IOD status within the designated time frames, IOD status will be automatically granted to the injured member.

D. Sworn members whose claims for service connected injury/illness are denied by the Department are entitle to a GML Section 207-c hearing as detailed in Section 3.14 and shall be afforded the opportunity to work in a light duty assignment upon a request by the sworn member to the Commissioner of Police.

3.7    TREATMENT OF SERVICE CONNECTED INJURIES/ILLNESS-SWORN MEMBERS

A. Department's designated medical provider

1. At the option of the sworn member, the **department's designated medical provider** may provide the regular medical care for those sworn members incurring a service connected injury /illness.

2. When the **designated medical provider** recommends that other and/or additional medical attention be furnished to the sworn member, such medical service shall be provided and paid for by the City, when approved by the Commissioner or his/her designee, and audited by the City Auditor.

B. Private Physician
Sworn members incurring a service connected injury/illness may select a physician or surgeon of their own choosing when medical or surgical attention is necessary.

If the injured/ill member chooses to follow-up with his/her own physician, that injured/ill member **shall**:

1. Notify the Commissioner of Police at (716) 851-4588 with the name of the treating physician within 72 hours of the injury/illness occurrence.

2. Notify the Commissioner of Police at (716) 851-4588 with the name of any specialist that their primary physician refers them to within 72 hours of the referral.

C. Prior Authorization Required
Authorization must be obtained in writing from the Commissioner or his/her designee **prior** to any elective (non-emergency) treatment, procedure or diagnostic test pertaining to a service connected injury/illness. Prior authorization is also required for all specialist referrals. Written authorization must be presented to all health care providers that are attending to the member's service connected injury/illness, **prior** to providing services.

3.8    TREATMENT BY PRIVATE PHYSICIAN - PROGRESS REPORTS
Whenever a sworn member elects to consult a private physician for a service connected injury/illness, the private physician will be required to submit periodic

reports detailing the nature and frequency of treatment, the member's medical progress, his/her availability for full or limited duty, and any other pertinent information concerning the service connected injury/illness. After review by the Commissioner or his/her designee, such reports shall become a part of the member's medical record.

3.9     CLAIMS FOR TREATMENT - SWORN MEMBERS
No claims for medical or surgical treatment for a service connected injury/illness shall be valid and enforceable against the City unless prior authorization (refer M.O.P. Chapter 13) had been provided to the service provider.

3.10    CHARGES AND BILLS - SWORN MEMBERS

A.  All fees and charges for the medical or surgical treatment of a sworn member incurring a service connected injury/illness shall be limited to such charges as listed in the NYS Compensation Schedule for similar treatment, and the fees and charges must be reasonable and a direct result of necessary treatment.

B.  For purposes of the City Audit Department's requirement, all fees and charges must be clearly itemized and they must be accompanied by the attending physician's or emergency room treatment reports which clearly state and explain the treatment administered.

C.  In cases in which the member or his/her physician has failed to comply with all applicable procedures, or when there is some question about the charges or fees, the bills together with an explanation of the circumstances shall be submitted to the Commissioner or his/her designee for determination.

3.11    EXAMINATION BY THE ***DEPARTMENT'S DESIGNATED MEDICAL PROVIDER***- SWORN MEMBERS
Upon notice, the Commissioner or his/her designee shall be entitled to have any sworn member claiming a service connected injury/illness, be examined by the ***department's designated medical provider*** or a physician/surgeon recommended by the ***designated medical provider***. A refusal by the injured/ill sworn member to submit to such examination(s) shall be deemed a waiver of the member's rights under General Municipal Law 207c, including the right to receive salary and the right to have the City of Buffalo pay for medical/healthcare expenses related to the service connected injury/illness.

3.12    DISCONTINUANCE OF  MEDICAL SERVICE - SWORN MEMBERS
The Commissioner or his/her designee, upon the recommendation of the ***designated medical provider***, may notify in writing the attending physician or surgeon to discontinue such services at City expense and thereafter the City shall be relieved of any further responsibility for payment of additional medical or surgical service rendered after the date of notification.

COB000749

3.13    RETURN TO DUTY - SWORN MEMBERS

    A. Sworn members incurring a service connected injury/illness shall return to full duty when they have recovered and are physically able to perform their duties. In the event that the member's treating physician or the ***department's designated medical provider*** or a physician or surgeon ***examining the officer on behalf of the department*** certifies that the sworn member has recovered and is physically able to perform his/her duties, the sworn member will be removed from IOD status and returned to duty. If, however, the sworn member's private physician disputes such certification, the sworn member is entitled to a hearing before his/her return (see Section 3.14).

    B. If as a result of the hearing it is determined that the sworn member has recovered and is able to perform his/her duties, and the sworn member continues to refuse to return to work, the sworn member shall be deemed to have waived his/her rights to expenses for medical treatment and/or hospital care rendered and for salary and wages payable after such refusal. Sworn members may appeal an adverse ruling by initiating an Article 78 proceeding in State Supreme Court.

    C. Sworn members incurring a service connected injury/illness that have recovered sufficiently to perform light/limited duties, may be assigned to perform light/limited duties consistent with the nature of their physical restrictions. In the event that a treating physician or the ***department's designated medical provider*** or a physician or surgeon ***examining the officer on behalf of the department*** certifies that the sworn member has sufficiently recovered and is physically able to perform light/limited duties, the member may be removed from IOD status and assigned to a light/limited duties, the sworn member will be removed from IOD status and assigned to a light/limited duty assignment. If, however, the sworn member's private physician disputes such certification, the sworn member is entitled to a hearing before his/her return (see section 3.14).

    D. All sworn members of the Department who are returning to duty (full or light/limited) from a service connected injury/illness must provide medical clearance to the Commissioner or his/her designee from an authorized physician, ***prior*** to returning to such duty. The Commissioner or his/her designee shall then notify the proper Command, by way of E-mail, of the member's return to duty.

    E. All injured/ill members shall, within 48 hours of receipt of any documentation concerning a change in their duty status (i.e. released for full or light/limited duty), notify and provide such documentation to the Commissioner of his/her designee.

    F. Sworn members shall not be allowed to return to duty (full or light/limited)

until a release has been signed by a competent medical authority which authorizes the members return to duty and the Commissioner or his/her designee has notified the Command.

3.14 GENERAL MUNICIPAL LAW ("GML") SECTION 207-c HEARING PROCEDURE

In the event a sworn Officer of the Police Department is adversely affected by a determination of the City of Buffalo or Police Department, regarding initial eligibility, case management decisions, or return to work orders concerning General Municipal Law Section 207-c, he/she may contest the adverse determination in accordance with the hearing procedure agreement between the City of Buffalo and the PBA.

A. Any sworn Officer contesting a City decision shall, individually or through his/her bargaining representative, submit a written request, to the Commissioner of Police or his/her designee, for a hearing within 20 calendar days of receipt of the notice of any adverse determination, specifying the basis for the challenge to the determination and attaching documentation from a treating physician supporting the Officer's request.

B. Failure to submit a written request as set forth herein shall constitute acceptance of the City's decision unless excused by the Commissioner.

C. At least two weeks prior to the scheduled hearing, absent extenuating circumstances, an Officer shall submit to the City his/her medical documentation in support of his/her claim.

D. The Officer may appeal an adverse decision by the hearing Officer pursuant to the provisions of Article 78 of the New York State Civil Practice Law and Rules.

3.15 SERVICE CONNECTED INJURY/ILLNESS - CIVILIAN EMPLOYEES

Civilian members of the Department who incur a service connected injury/illness are governed by the NYS Workmen's Compensation System and their respective collective bargaining agreements.

A. In the event that a civilian employee sustains a service connected injury/illness, the employee must:

   1. immediately notify his/her superior;
   2. seek medical treatment if required;
   3. prepare form GU-77.

B. A copy of form GU-77 will be forwarded to Administration and Finance for filing in the member's personnel file. That unit shall also send the original to the City of Buffalo Division of Labor Relations who then will become

responsible for handling all matters concerning the injured/ill employee. Civilian employees incurring a service connected injury/illness shall fully cooperate with the Division of Labor Relations.

C. All civilian employees of the Department who are returning to duty from a service connected injury/illness must first provide a full duty clearance to the Commissioner or his/her designee, prior to returning to duty. Civilian members shall not be allowed to return to duty until a release has been signed by competent medical authority which authorizes the civilian member's return to duty.  An e-mail message should be sent and the release should then be forwarded the Office of Administration and Finance (personnel records) for filing purposes.

3.16  EXPOSURE TO CONTAMINANTS
Whenever employees of the department become exposed to blood, air borne pathogens, chemical contaminants, or any other type of noxious material they shall:

A. immediately notify their Superior Officer;

B. if (s)he is a sworn member, prepare form P-1370 (Exposure Incident Report) and form P-62 (Accident Injury/Illness - Service Connected);
   1. if the sworn member is reporting off duty with a service connected injury/illness as a result of the exposure, form P-169D and an Intra-Departmental Memorandum must also be prepared, and the sworn member must complete all other IOD procedures (refer to M.O.P. Chapter 13);

C. if (s)he is a civilian employee, prepare form P-1370 and GU-77;

3.17  REPORTING SERVICE CONNECTED INJURY/ILLNESS TO THE STATE
Commanding Officers of all units shall be responsible for making the required entries on form DOSH-400 (NYS Department of Labor Log and Summary of Occupational Injuries and Illnesses).

A. Posting Requirements
During the entire month of February of each year a copy of the totals and the information contained on the right half of form Dosh-400 must be posted in each command in a place where notices to members are customarily posted. Even if there were no illnesses or injuries during the year, zeros must be entered on the totals line, and the form posted.

B. Commanding Officer to Certify Totals
The Commanding Officer of each unit shall be responsible for compiling the annual summary totals on form DOSH-400 and shall certify that the totals are true and complete by signing at the bottom of the form.

**4.0    ASSISTANCE TO THE FAMILY OF MEMBERS BECOMING SERIOUSLY ILL, INJURED OR KILLED WHILE ON DUTY**

4.1    POLICY

It is the policy of the Buffalo Police Department to assist and support family members and co-workers of Department employees who become seriously ill or injured, or who die while on duty. The Department will notify family members and next of kin in person. In cases of line of duty death, the Department will assign a member to act as a liaison with the family.

4.2    CONFIDENTIAL IN LINE OF DUTY SUDDEN DEATHS/SERIOUS INJURY FORM

A. The Department has instituted a Confidential In Line of Duty Sudden Death/Serious Injury form:

1. Participation in completing the form is optional and is solely within the discretion of each Department employee. Employees are strongly urged to complete the form. It could prove to be of invaluable assistance and comfort to family members during a very difficult time.

2. All completed forms will be handled in a confidential manner. After the employee completes the form (s)he will be provided with an envelope in which the form is to be placed. The employee will seal the envelope and then place his/her initials on the closure flap. The form will not be reviewed nor the envelope opened unless the employee is seriously injured or killed on duty.

3. All sealed and initialed envelopes containing completed forms will be secured in a locked file cabinet in the 911office.

4. A roster of the employees who have completed this form will be kept by the Duty Officer and the P.B.A. The roster will be maintained by the Administration and Communications Division.

5. In the event of an emergency, serious injury or death, ***the Duty Officer***, together with an on duty P.B.A. delegate, will open the sealed envelope and review the contents of the form.

6. This form is not a legal or binding document.

7. Any changes in the information contained on the form require that an

entirely new form is completed. When a new form has been completed, the employee must seal and initial the new envelope and report in person to the Administration and Communications Division Office, Room #228, during business hours. The new form will be placed in the file and the unopened envelope containing the old form will be handed to the employee. The roster of participants will then be updated by the Administration and Communication Division.

8. Employees who complete the form will have the option of having this form delivered to their family in the event of an <u>off duty</u> incident resulting in serious injury or death.

B. Members who opt not to participate in this program are highly encouraged to discuss their plans and wishes with their families in the event of such a catastrophic event. Families of police officers seriously injured or killed in the line of duty frequently become the forgotten victims whose grief and anguish is virtually inconsolable.

4.3   <u>NOTIFICATION</u>
The first news that a Department employee has been seriously injured, taken seriously ill, or killed while on duty is an event that will stay with the family members for the rest of their lives. For this reason, the notification procedure must be performed with compassion, dignity and sensitivity.

A. Unless relieved by higher authority, the ***Senior on duty Command Officer*** shall be responsible for ensuring that the next of kin is notified. In the event that an employee becomes seriously ill, seriously injured or dies while on duty, the ***senior on duty Command Officer through the Duty Officer*** shall notify the Commissioner, the Deputy Commissioners and the Employee Assistance Coordinator. It is of great comfort to the family that such news be delivered by the highest possible ranking Officer.

B. The news media shall not be informed of the employees name until the family has been notified. Photographing the injured/dead employee shall be precluded to the extent possible. If the news media has obtained the name of the injured/dead employee, they shall be requested to refrain from publicizing his/her identity until the family has been notified. Police radio communications concerning notification of next of kin shall be avoided to the extent possible.

C. Notification must always be made in person. In the event that next of kin lives too far away to be notified in person by a member of the Buffalo Police Department, the law enforcement agency in that jurisdiction shall be requested to make the notification. Under these circumstances the notifying law enforcement agency shall be requested to make telephone contact with the Buffalo Police Department while they are making notification to the family.

This will enable the family to have their questions and concerns addressed immediately.

D.   The Commissioner, Deputy Commissioner, Police Chaplain, or close friend of the family should be present at the notification if possible. If there is a possibility of getting the family to the hospital before the employee's death, or if none of the above people are readily available, notification should not be delayed.

E.   Two Officers shall be sent to the home of the next of kin. At least one of the officers must be of the rank of Lieutenant or higher. The Officers shall each use a separate Department vehicle in the event that one may be delayed at the home.

F.   The Officers should attempt to determine if the next of kin has any medical problems. If so, medical personnel should be available at the residence to coincide with the notification.

G.   Notification should not be made at the next of kin's doorstep. The Officers should ask to be admitted to the house and should request that the family be seated. Family members shall be told slowly and clearly that the employee has been taken seriously ill, has been seriously injured, or has been killed, as the case may be. If the employee has been killed, family members shall not be given a false sense of hope. The words "died" or "dead" shall be used. As many details as possible about the incident shall be revealed. Graphic or gruesome details shall be handled with utmost sensitivity. A deceased employee shall be referred to by name and never referred to as his/her "body."

H.   Family members should be transported to the hospital in Department vehicles. The police radio shall be shut off and all communication shall be conducted by phone or MCT. The hospital should be notified that the family is en route. If the family insists on driving in their own vehicle, an officer should accompany them.

I.   If young children are at the home, arrangements must be made for childcare.

J.   The seriously ill, seriously injured or dead employee's parents should also be afforded the courtesy of personal notification if possible.

K.   In the event that the Commissioner was not able to make the notification, (s)he shall respond to the residence or the hospital to meet with the family, as quickly as possible.

4.4   <u>ASSISTING THE FAMILY AT THE HOSPITAL</u>

A.   The ***Senior on duty Command Officer*** shall assign an Officer of the rank of

Lieutenant or above to coordinate police operations at the hospital. This officer has the following responsibilities:

1. Arrange with the hospital staff to provide a waiting room to be used by the family, the Commissioner, the officers making the notification and any other person requested by the family.

2. Set aside an area where fellow officers and friends can gather.

3. Establish a media staging area.

4. Update the family concerning the incident and the employee's condition upon the family member's arrival at the hospital.

5. The employee's family shall be the first to be provided with information concerning the employee's medical condition.

6. Arrange for transportation of the family back to their residence.

B. Family members should be provided with the opportunity to see a seriously ill or seriously injured, or dead employee. A police official shall prepare the family member for what (s)he might encounter. The police official shall accompany the family member into the room.

C. The officers making the initial notification shall remain at the hospital while the family is present.

4.5   ASSISTANCE TO CO-WORKERS

A. Employees who were on the scene or who arrived immediately after an employee was critically injured or killed shall be relieved of their assigned duties as quickly as possible after the incident. They shall be allowed to go to the hospital where their co-worker was taken.

B. The Department Employee Assistance Program (EAP) Coordinator will immediately initiate arrangements to tend to the emotional needs of employees adversely impacted by such an event.

4.6   PRE-FUNERAL ARRANGEMENTS

A. The Commissioner, along with the liaison officer (refer M.O.P. Chapter 13), and the Chief of the respective District designated to coordinate funeral arrangements, shall meet with the members of the deceased employee's family at the family's residence. The Commissioner shall explain the arrangements and accommodations the Department is able to provide. The family shall be offered the option of a police funeral with full honors. The needs and wishes

of the family shall prevail over those of the Department.

B. Unless the family objects, a police officer shall be detailed to guard the family home of the deceased member until after the date of the funeral. If the family resides in the area but outside the city, a request shall be made to the appropriate law enforcement agency to provide this service.

C. With the permission of the family, the Commissioner shall designate a liaison officer who shall assist the family.

4.7    **LIAISON OFFICER'S RESPONSIBILITIES**
The liaison officer will serve to facilitate communication between the employee's family and the Department.

A. The liaison Officer will keep the family up to date concerning the death of the employee and the ensuing investigation.

B. The liaison Officer will assist the family in making funeral arrangements. If the family chooses to have a police funeral with full honors, the liaison officer will explain all the attendant rituals and ceremonies. The type of funeral arrangements is strictly a family decision.

C. The liaison Officer shall be available for the family at all times. (S)he shall render all possible assistance including arranging for food, child care and transportation needs. (S)he shall also assist with arranging travel and lodging for out-of-town family members.

D. The liaison Officer shall assist the family in securing all financial benefits that accrue as a result of the employee's death. A printout of such benefits shall be provided.

E. The liaison Officer shall arrange to return the deceased employee's personal affects to the family.

F. The liaison Officer shall notify Concerns of Police Survivors (C.O.P.S.), (573) 346-4911. This organization has people available to assist the families of slain officers.

G. The liaison Officer shall maintain periodic contact with the family for at least one year after the employee's death.

H. In the event that there are criminal charges resulting from the employee's death, the liaison officer shall:

1. Keep the family informed of any new developments prior to the issuing of any press releases.

2. Keep the family informed of any court proceedings or parole hearings.

3. Work with crime victim assistance specialists to assist the family.
4. Accompany family members to any court proceedings related to the employee's death.

5. After the conclusion of the trial, have Department investigators meet with the family to answer any questions.

4.8     LINE OF DUTY FUNERALS
Refer to M.O.P. Chapter 16.

4.9     POST FUNERAL FAMILY SUPPORT

A. The grieving process has no definitive timetable. Therefore the Department must remain sensitive to the needs of the deceased employee's family long after the tragedy has occurred.

B. Department employees, especially those who were close friends and co-workers of the deceased employee, are encouraged to keep in touch with the family. This is particularly true during holidays when survivors are most vulnerable.
C. Survivors should continue to be made to feel that they are still part of the Department. They should be regularly invited to police activities.

D. The Commissioner should observe the employee's date of death by sending a note to the family and/or by having flowers placed on the grave.

**5.0     MONITORING SICK AND INJURED MEMBERS**

5.1     POLICY
It is the policy of the Buffalo Police Department to closely monitor those members on sick leave as well as those members absent from duty as a result of a service connected injury/illness.

5.2     MEMBERS RESPONSIBILITIES

A. Sworn members who are absent for fourteen consecutive days or more due to a service connected injury/illness, shall contact the Internal Affairs Division one time weekly between 0800 - 1200 hours, Monday through Thursday.

B. For the first instance in which a member fails to contact IAD as required above, a written notice will be sent to the member citing his/her failure to make the required contact, reminding him/her of the requirement to contact IAD weekly, and warning him/her that a subsequent failure will result in

disciplinary charges being preferred.

### 5.3  SUPERVISOR'S RESPONSIBILITIES - SWORN MEMBERS

A. Supervisors and the Internal Affairs Division shall have concurrent jurisdiction in enforcing the Department's rules, regulations, policies and procedures involving the use of sick leave, particularly as they apply to the requirement that sworn members, while on sick leave, must remain in their place of confinement during each tour of duty for which the sworn member would otherwise have been scheduled to work.  If a sworn member must be out of confinement due to sickness or injury (s)he must contact 851-5750.

B. In those instances in which a Supervisor believes that a member is in any way abusing sick leave privileges or privileges associated with service connected injury/illness, the Supervisor shall prepare a report on an Intra-Departmental Memorandum and forward it to IAD through the chain of command. In cases in which immediate investigation is necessary, the Supervisor shall contact IAD, or if after office hours, the ***Duty Officer***, who shall contact IAD.

### 5.4  COMMANDING OFFICERS' RESPONSIBILITIES

A. Commanding Officers shall closely monitor the amount of time each employee under his/her command is on sick leave or is absent from duty due to a service connected injury/illness.

B. When a Commanding Officer suspects that an employee under his/her command is using inordinate amounts of sick leave or that the employee is using sick leave in a manner which would make the Commanding Officer question the legitimacy of its use (e.g. immediately after payday, during and around holidays, when the member has exhausted all vacation and personal leave time, etc.) the Commanding Officer shall meet with the employee and instruct him/her concerning the proper use of sick leave. A report of such meeting shall be summarized on an Intra-Departmental Memorandum and forwarded through channels to IAD for filing. Cases of continued suspected abuse of sick leave by the member shall be forwarded to IAD for investigation.

### 5.5  INTERNAL AFFAIRS DIVISION RESPONSIBILITIES

A. IAD shall maintain a list of employees who are currently on sick leave and employees who are currently absent due to a service connected injury/illness. They shall provide related statistical data that the Department deems beneficial.

B.  IAD shall conduct all investigations of suspected abuse of sick leave or abuse of leaves due to service connected injury/illness.

C.  IAD shall randomly check the place of confinement of sworn members during the hours when home confinement is required.

D.  IAD and/or the 1st D.P.C.'s Office shall expeditiously present to the Commissioner or his/her designee all reports concerning claims of service connected injury/illness so that the propriety of the claim can be determined (refer M.O.P. Chapter 13 above).

E.  IAD shall convey all necessary instructions to employees concerning sick leave and absences due to service connected injury/illness.

F.  IAD shall act as a liaison for the Department with **the department's designated medical provider.**

5.6    1st DEPUTY POLICE COMMISSIONER'S OFFICE

A.  The 1st D.P.C.'s Office shall record all E-Mail messages reporting and canceling sick leaves and absences due to service connected injury/illness.

B.  The 1st D.P.C.'s shall maintain complete, accurate and confidential files of all reports and records relating to sick leaves and leaves due to service connected injury/illness.

C.  Upon receipt of the reports by a member claiming a service connected injury/illness (refer M.O.P. Chapter 13 above), the 1st D.P.C.'s shall file with the New York State Comptroller within 90 days of the incident, the report required by Section 63 of the laws pertaining to the New York State Retirement System. The member claiming the service connected injury/illness shall be provided with a copy of the receipt which New York State forwards to the Department to acknowledge that the State has received form P-62.

**<u>NOTE</u>**:

No application for Accidental Disability Retirement shall be approved unless the Office of the State Comptroller is notified <u>within ninety (90) days</u> after the incident, setting forth:

1.  the time and place where the incident occurred;
2.  the particulars thereof;
3.  the nature and extent of injuries;
4.  the alleged incapacity.

D.  All medical records shall be held in strict confidence by the 1st Deputy Commissioner's Office. Medical records shall not be released without written

COB000760

authorization of the Commissioner or his/her designee. Only the Commissioner, Deputy Commissioners, IAD personnel and employees assigned to the 1st Deputy Commissioner's Office shall have access to an employee's medical records.

E. The 1st D.P.C.'s Office shall notify the Commanding Officer of any employee who's sick leave is about to expire. The Commanding Officer shall be responsible for forwarding this information to the individual employee.

## 6.0     LIGHT DUTY ASSIGNMENTS- SWORN MEMBERS

6.1     POLICY

It is the policy of the Buffalo Police Department to provide light duty assignments, if available, to sworn members of the Department who are restricted by physical illness/injury from performing the full range of their law enforcement related duties. Such light duty shall be consistent with the member's physical restrictions and shall be granted for a reasonable amount of time.

6.2     FITNESS FOR LIGHT DUTY

The Department's health care provider must certify that a sworn member is capable of performing light duty and shall specify those restrictions that apply to the sworn member's duties.

6.3     PLACEMENT IN LIGHT DUTY ASSIGNMENT

The Commissioner or his/her designee shall review the certification provided by the Department's health care provider and shall place the sworn member in an assignment that is consistent with the restrictions that apply to the member's duties. Sworn members placed in a light duty assignment shall be medically re-evaluated periodically to determine their fitness for return to full duty.

A. Hours of Work for Light/Limited Duty Assignments

Sworn members working light/limited duty as a result of a work related injury (IOD), and who are working less than a full shift and utilize sick leave, vacation time and personal leave time shall be charged only the actual hours assigned to light duty work (i.e. if assigned to work 0600-1100 hrs., and are IOD from 1100-1600 hrs., you would be charged for 5 hours of paid leave time.

***This rule does NOT apply to sworn members that are working light duty as a result of a non-work related injury/illness.***

6.4     OUTSIDE EMPLOYMENT RESTRICTIONS

No sworn member of the Department placed in a light duty assignment shall be allowed to work a second front job.

6.5     SERVICE CONNECTED INJURY/ILLNESS

A. If a sworn member of the Department is not eligible for or is not granted an accidental disability retirement allowance or retirement for disability incurred in the performance of duty allowance or similar accidental disability pension and is nevertheless, in the opinion of the Department's health care provider, unable to perform his/her regular duties as a result of such service connected injury/illness but is able, in their opinion, to perform specific types of limited police duty, payment of the full amount of regular salary or wages shall be discontinued with respect to such sworn member if (s)he shall refuse to perform such limited duty, (refer General Municipal Law 207-C,3).

B. In the event that a treating physician or the ***department's designated medical provider*** or a physician or surgeon recommended by ***department's designated medical provider*** certifies that the sworn member has recovered sufficiently and is able to perform light/limited duties, the member may be removed from IOD status and assigned to a light/limited duty assignment.  If, however, the sworn member's private physician has submitted adequate documentation disputing such certification, the sworn member is entitled to a hearing before his/her return.

C. Sworn members placed in a light duty assignment must follow the procedures outlined in M.O.P. Chapter 13 above, if they are rendered incapable of performing their light duties due to a recurrence or aggravation of the prior service connected injury/illness.

## 7.0    PREGNANCY, CHILDBIRTH AND RELATED MEDICAL CONDITIONS

### 7.1    POLICY
It is the policy of the Buffalo Police Department to allow its members to use their allotment of sick leave during pregnancy, childbirth and related medical conditions when such pregnancy, childbirth and related medical conditions prevent them from performing their duties.

### 7.2    APPLICABILITY OF CHAPTER 13
All the procedures outlined in this Chapter concerning sick leave shall also apply in circumstances of pregnancy, childbirth and related medical conditions.

### 7.3    DUTY TO NOTIFY
It shall be the duty of the affected member to immediately notify her Commanding Officer when it is determined by her physician that she is pregnant. Notification shall be a written statement from the employee's physician verifying the pregnancy. The Commanding Officer shall immediately notify the Commissioner or his/her designee who shall arrange to assign the employee to duty that is consistent with the physical limitations of the employee's condition.

### 7.4    COMPLICATIONS DURING PREGNANCY
An employee may continue working during pregnancy unless medical or

obstetrical complications arise. A statement from the attending physician concerning such complications shall be submitted to the Commissioner or his/her designee.

7.5    USE OF SICK LEAVE

Employees may use their allotment of sick leave during pregnancy, childbirth and related medical conditions when they are unable to perform their duties or when continued work would unnecessarily jeopardize their health or the health of their unborn baby. Using sick leave will be based on the advice of the employee's private physician. Unless there are complications which are substantiated in writing by the employee's private physician, the general principle is that an employee may use their allotment of sick leave to report off duty four (4) weeks prior to delivery and four (4) weeks after delivery.

## 8.0    EMPLOYEE ASSISTANCE PROGRAM (EAP)

8.1    POLICY

The Department acknowledges that its employees are its most important asset. It recognizes that from time to time employees may be adversely affected by circumstances beyond their control. It is the policy of the Buffalo Police Department to have in place an employee assistance program to administer to the needs of its employees.

8.2    EMPLOYEE ASSISTANCE PROGRAM (EAP)

A. The Department utilizes the Employee Assistance Program to administer to the needs of Department employees. It is available to Department employees as well as their immediate family members to provide confidential assistance and referral in the areas of mental health, stress related problems, family/marital problems, alcohol/substance abuse, financial/legal related issues, stress management and critical incident stress debriefing services.

B. The role of EAP is to serve as a source of information and to refer the employee and his/her family to appropriate resources within the community. All professionals have been screened so that employees can be afforded the best possible care.

8.3    CONFIDENTIALITY

All calls and information shared by employees with EAP representatives is kept strictly confidential and cannot be released without the employee's written consent. An employee who voluntarily seeks assistance will not jeopardize his/her job security or promotional opportunities in any way.

8.4    ACCESSING EAP

Employees may request further information concerning EAP through the Police Academy or they can directly contact the EAP coordinator for information or

confidential assistance at Palladian Health EAP, 2732 Transit Road, West Seneca, NY 14224, phone number 712-2777.

**9.0    DRUG TESTING OF SWORN MEMBERS**

Refer to separate drug testing manual.

## CHAPTER 14: COOPERATION WITH OTHER AGENCIES

CONTENTS

**1.0    COOPERATION WITH OTHER AGENCIES**
1.1    Policy

**2.0    DEPARTMENTAL ORGANIZATIONS**
2.1    Policy
2.2    Citizen Advisory Group
2.3    Citizen Police Academy
2.4    Block Clubs

**3.0    CITY/MUNICIPAL AGENCIES**
3.1    Policy
3.2    Buffalo Board of Education
3.3    City Clerk
3.4    Buffalo City Court
3.5    Department of Administration and Finance
         A.  Division of Budget and Management
         B.  Division of Administrative Adjudication
         C.  Division of  Treasury
         D.  Division of Parking Enforcement
3.6    Department of Human Resources
3.7    Department of Permit and Inspection Services
3.8    Fire Department
3.9    Department of Community Services
3.10   Department of Law
3.11   Department of Public Works, Parks and Streets
         A.  Division of Buildings
         B.  Division of Engineering
         C.  Division of Parks and Recreation
         D.  Division of Water
         E.  Play Streets
         F.  Division of Streets

**4.0    ERIE COUNTY AGENCIES**
4.1    Policy
4.2    Central Police Services (CPS)
4.3    District Attorney
4.4    Erie County Board of Elections
4.5    Erie County Health Department
4.6    Erie County Medical Center
4.7    Erie County Sheriff's Department
4.8    Juvenile Detention Home
4.9    Medical Examiner
4.10   Pistol Permit Clerk

4.11     Public Administrator
4.12     Probation Department
4.13     Department of Senior Citizens


**5.0     STATE AGENCIES**
5.1      Policy
5.2      Alcohol Beverage Control Board
5.3      Attorney General of New York State
5.4      Commission of Corrections
5.5      Crime Victim's Compensation Board
5.6      Department of Environmental Conservation
5.7      Division of Human Rights
5.8      Office of Mental Health
5.9      Department of Motor Vehicles
5.10     Division of Parole
5.11     State Police
5.12     Department of State
5.13     State College Public Safety
5.14     State University Public Safety
5.15     Thruway Authority
5.16     Department of Transportation
5.17     Division for Youth


**6.0     FEDERAL AGENCIES**
6.1      Policy
6.2      Armed Forces
6.3      Border Patrol
6.4      United States Customs
6.5      Federal Aviation Agency
6.6      Federal Bureau of Investigation (FBI)
6.7      Secret Service
6.8      US Army Corp of Engineers
6.9      US Marshals
6.10     Veteran's Administration Hospital
6.11     Weather Bureau


**7.0     COMMUNITY BASED ORGANIZATIONS**
7.1      Policy
7.2      American Red Cross
7.3      Child and Family Services
7.4      Crisis Services
7.5      City Mission
7.6      Compass House
7.7      Erie County Rehabilitation Center (291 Elm Street)
7.8      Haven House
7.9      Salvation Army

7.10    Traveler's aid
7.11    Native American Community Services
7.12    Saint Vincent de Paul Society
7.13    Deaf Adult Services

**8.0    NEWS MEDIA**
8.1     Policy
8.2     Generally
8.3     Information that May be Released
8.4     Information that Should Not be Released
8.5     Information to be Released Only by Higher Authority
8.6     Media Access to Scenes of Incidents
8.7     Duties of the Public Communications Coordinator
8.8     On-Scene Senior Command Officer Responsibilities

**9.0    PUBLIC TRANSPORTATION**
9.1     Policy
9.2     Niagara Frontier Transportation Authority (NFTA)
9.3     NFTA Police

**10.0   PUBLIC UTILITIES**
10.1    Policy
10.2    Cable Television
10.3    Electric Service
10.4    Natural Gas Service
10.5    Telephone Service
           A.  Unlisted Telephone Numbers

**11.0   AUTOMOBILE REPOSSESSORS**
11.1    Policy
11.2    Notices to Police
11.3    Notices to the Department of Motor Vehicles
11.4    District Responsibility

**12.0   COOPERATING WITH OTHER LAW ENFORCEMENT AGENCIES INVOLVED IN PERSONNEL INVESTIGATIONS**
12.1    Policy
12.2    Misconduct - Defined
12.3    Reporting Misconduct
12.4    Full Cooperation Required

P-12OB000767

## 1.0    COOPERATION WITH OTHER ORGANIZATIONS

1.1    POLICY
As a law enforcement agency, the Buffalo Police Department is often required to provide information and services to other organizations in the community. These organizations very often provide the Department with information and services as well. The interdependent relationship between the Department and these organizations requires cooperation and courtesy.  It is the policy of the Buffalo Police Department to cooperate with these other organizations to the extent possible and to foster courteous and harmonious relations with them.

## 2.0    DEPARTMENTAL ORGANIZATIONS

2.1    POLICY
Within the structure of the Buffalo Police Department are several civilian organizations that are designed to enhance the Department's ability to provide quality law enforcement services to the community.  The members of these organizations are concerned unpaid civilians who have volunteered their time and effort for the good of the Department.  It is the policy of the Buffalo Police Department that all Department employees be courteous and cooperative when dealing with members of these organizations.

2.2    CITIZEN ADVISORY GROUP
The Citizen Advisory Group is an organization of civilian volunteers which acts as a liaison between the Commissioner and citizens. Members represent a cross section of the city and are responsible for advising the Commissioner concerning pertinent issues involving the Department and the community.

   A.  Youth Police Academy
The Youth Police Academy is a program sponsored by the Citizen's Advisory Group - Youth and Police Committee.  It is a one-day training session designed to introduce seventh and eighth grade students to law enforcement issues that have special relevance for the youth of the community.

2.3    CITIZEN POLICE ACADEMY
The Citizen Police Academy is a ten-week training session operated by the Buffalo Police Academy.  It is designed to introduce citizens to the operations and functions of law enforcement. The goal of the program is to foster understanding through education.

2.4    BLOCK CLUBS
Block clubs are civilian organizations made up of groups of people living on a specific city block or living in a defined geographic area. The purpose of these clubs is to deal with persistent community problems with which the neighborhood is confronted.

**3.0**     **CITY/MUNICIPAL AGENCIES**

3.1     POLICY
The municipal agencies of the City of Buffalo are all designed to provide services to those people living, working and visiting the City. To provide the highest quality of services, it is the policy of the Buffalo Police Department to fully cooperate with each of these other municipal agencies as they perform their respective duties.

3.2     BUFFALO BOARD OF EDUCATION

A. Emergency Notifications
In case of an emergency involving a school under the jurisdiction of the Buffalo Board of Education, either the Engineer, Assistant Principal or Principal shall be notified by the District concerned. The business file of each District must be kept current and it must contain the names, locations and telephone numbers of all schools within the District. It must also contain a roster of personnel to be notified in case of emergency and the address and telephone number of each such person

B. Protecting School Property
Refer M.O.P. Chapter 8.

3.3     CITY CLERK
Among other duties, the City Clerk is the City Records Disposition Officer. No Department records may be destroyed without the approval of the City Clerk.

3.4     BUFFALO CITY COURT
City Court has original jurisdiction of all offenses committed within the City of Buffalo and trial jurisdiction over all offenses other than felonies. It handles landlord/tenant disputes, housing code violations, small claims court matters and it exercises jurisdiction over civil matters as prescribed in the Civil Practice Rules and Procedures. Within the City Court Building can also be found:

A. The City Marshals' Office

B. Victim/Witness Protection

C. The Warrant Clerk's Office.

3.5     DEPARTMENT OF ADMINISTRATION AND FINANCE
The following divisions are part of the Department of Administration and Finance:

A. Division of Budget and Management
The annual Police Department budget must be submitted to the Budget Division for approval. The Budget Division will also assist in reallocating funds and positions as it becomes necessary throughout the budget year.

B. Division of Administrative Adjudication
The Division of Administrative Adjudication shall have the jurisdiction to conduct proceedings for the adjudication of code and/or ordinance violations regarding conditions which constitute a threat or danger to the public health, safety or welfare for which civil penalties may be imposed.

C. Division of the Treasury
The Division of the Treasury is responsible for collecting all taxes and fees owing to the City of Buffalo and for issuing Department paychecks.

D. Department of Parking
The Parking Violations Bureau is responsible for enforcing parking regulations, collecting fines, towing and storing vehicles and conducting hearings.

3.6    DEPARTMENT OF HUMAN RESOURCES
Refer to M.O.P. Chapter 10. This Division also handles workmen compensation claims, health insurance, medical benefits and retirement
.

    1. The division is responsible for classifying positions, establishing minimum qualifications, testing candidates, certifying eligibility lists, assessing fitness for duty and in some circumstances, hearing appeals.

3.7    DEPARTMENT OF PERMITS AND INSPECTION SERVICES
The Department of Permits and Inspection Services is the unit responsible for issuing licenses and permits which are required by the City Ordinances. Police Department members shall refer to the specific provision in the City Ordinances to determine the necessity of, and the procedure for, obtaining licenses and permits.

    1. Investigation of Applicants
Prior to the issuance of specific types of license and permits the Director of License may require a police background investigation. Upon receipt of such application from the Police commissioner's Office, a Captain assigned to the District shall cause an investigation to be made. The investigation shall be limited in scope to:

        a. The character, record and reputation of the applicant,
        b. His/her method of conducting business, and
        c. His/her compliance with the law.

Whenever a condition is detected that falls within the purview of another agency, that condition shall be noted in the investigation report with a request that the matter be referred to the proper agency for further action.

2. <u>Reports Required</u>
Upon completion of the investigation, Captains assigned to the District shall either approve or disapprove and shall sign his/her name before forwarding the application to the Commissioner's Office.  If the application is disapproved, or if any other relevant information needs to be included with the application, the Captain shall prepare a report on Intra-Departmental Memorandum and submit it along with the application to the Commissioner's Office.

3. <u>Captains Responsibilities</u>
Captains to whom license applications are sent for investigation shall be responsible for the completeness and accuracy of related reports.

4. <u>Request for Hearings</u>
Whenever sufficient cause exists, Captains may request, through channels, that a hearing be held by the Director of Licenses to determine if a city issued license should be revoked.  Such request shall be made in writing on an Intra-Departmental Memorandum and it shall contain all the facts on which a request for a hearing is based. The report shall be forwarded through to the Commissioner's Office through the chain of command, and the Commissioner's office will forward it to the Director of Licenses.

5. <u>Dance Permits</u>
Refer to M.O.P Chapter 11.

3.8   <u>FIRE DEPARTMENT</u>
The Fire Department is responsible for performing firefighting and rescue operations, providing first aid to injured persons, managing radioactive and hazardous material leaks, and performing fire prevention duties. It conducts arson investigations. Unless otherwise indicated, the Fire Department is the lead agency in the City of Buffalo Comprehensive Emergency Plan.

3.9   <u>DEPARTMENT OF COMMUNITY SERVICES</u>
The following are some of the Divisions within the Department of Community Services:

A.  Division of Senior Services

B.  Division of Substance Abuse

C.  Division for Youth

D.  Division of Disabled Persons Advocacy

E.  Division of Youth Court

3.10   DEPARTMENT OF LAW
Legal services required by the City of Buffalo are provided by the Corporation Counsel and his/her staff.

A.  Civil Law Suits and Claims
Refer to M.O.P. Chapter 6.

B.  Release of Information, City Involved Cases
Employees shall not divulge to any but authorized persons, information concerning any incident or investigation in which the City of Buffalo is, or could become, an interested party. All inquiries regarding such matters shall be referred to the Corporation Counsel.

C.  Requests for Legal Opinions
All requests for opinions from the Corporation Counsel on matters pertaining to police business shall be made in writing and forwarded through the chain of command to the Police Commissioner's Office. If appropriate, the Commissioner shall forward the request to the Corporation Counsel. Members of the Department shall not contact the Corporation Counsel or his/her assistants by telephone asking for legal opinions, except at the direction of the Commissioner or his/her designee.

3.11   DEPARTMENT OF PUBLIC WORKS, PARKS AND STREETS
Following are some of the Divisions within the Department of Public Works, Parks and Streets:

A.  Division of Buildings

1.  Repairs to Police Department Facilities
Refer to M.O.P. Chapter 18.
2.  Unsafe Buildings
Employees of the Police Department having knowledge of any building or structure that is dangerous or unsafe shall prepare a report on an Intra-Departmental Memorandum requesting that the Division of Buildings be notified. The report shall be forwarded through channels to the Division of Administration and Communication Inspector, who shall forward the report to the Division of Buildings.
3.  Vacating Buildings
In cases of imminent danger to life or property, the Commissioner of Public Works may order any building to be immediately vacated, and

may, if necessary, temporarily close streets, sidewalks, or adjacent buildings or structures, and prohibit them from being used.

B. <u>Division of Engineering</u>

The Division of Engineering is responsible for the care and repair of City assets at the Erie Basin Marina, the canal at the Buffalo River as well as City streets and sidewalks, paving, repairing potholes, bridge maintenance, traffic engineering, traffic signals, and traffic signs.  Reports of any dangerous or defective condition on any street or sidewalk shall be reported to the Division of Engineering (851-5636).

C. <u>Division of Parks and Recreation</u>

The Division of Parks and Recreation is responsible for the care and upkeep of all city parks, playgrounds and golf courses.

1. The bureau of Forestry is a unit within the division of Parks and Recreation and is responsible for the planting, care and removal of city planted trees.
2. The bureau of Recreation is a unit within the Division of parks and Recreation and is responsible for city swimming pools, ice rinks and recreation centers.  It issues permits for the use of baseball diamonds and other such athletic fields.

D. <u>Division of Water</u>

The Division of Water is responsible for the construction, care and maintenance of all public water lines in the City Of Buffalo, water meter repairs, and the pumping and filtration of water.

1. <u>Open Hydrants</u>

All open hydrants shall be reported to the Water Department Dispatcher.

2. <u>Reporting Damaged Hydrants</u>

Any Police Department employee having knowledge of a damaged fire hydrant shall notify the Water Department Dispatcher (851-4747) and apprise him/her of all pertinent facts. A notation shall be made indicating the location of the hydrant, the date and time reported to the Division of Water, the member of the Division of water notified, and the employee of the Police Department making the notification.

a. If the damage was caused other then by a vehicular accident a complete report of the incident shall be prepared on an Intra-Departmental Memorandum.
b. if the damage was the result of a vehicular accident, refer to M.O.P. Chapter 2.

E. <u>Play Streets</u>
The Commissioner of Public Works, with written approval of the Mayor, is authorized to designate from time to time, streets or parts of streets in the city as play streets to be devoted during designated hours of the day to use by children for playing of safe, innocent and wholesome games. Refer Chapter 413 section 39 of the City Ordinances.

F. <u>Division of Streets</u>
The Division of streets is responsible for collecting garbage and trash, plowing streets, street cleaning, leaf pickup, recycling and rodent control. In addition, the Small Animal shelter and Animal Control are under its authority.

   1. <u>Detailing an Officer to the Division of Streets</u>
At the request of the Commissioner of Streets a Lieutenant and/or a Police Officer may be temporarily detailed to the Division of Streets during a snowstorm or other emergency.

   2. <u>Small Animal Shelter and Animal Control</u>
Refer M.O.P. Chapter 2.

## 4.0    <u>ERIE COUNTY AGENCIES</u>

4.1    <u>POLICY</u>
Agencies operating under the auspices of the County of Erie are designed to provide services to those people living, working and visiting the county. It is the policy of the Buffalo Police Department to cooperate with each of these county agencies as they perform their respective duties.

4.2    <u>CENTRAL POLICE SERVICES (CPS)</u>
Central Police Services is a county agency that is able to provide certain types of assistance to local law enforcement agencies within Erie County.

A. <u>911</u>
It operates the 911 Emergency Call-Taking System for the City of Buffalo.

B. <u>Information Services</u>
It is able to provide crime statistics and other relevant statistical information concerning law enforcement.

C. <u>Forensic Laboratory</u>
It operates a forensic (crime) lab located at 45 Elm Street, which is capable of performing scientific evaluation of evidence, weapons, drugs, etc.

D. <u>S.A.F.I.S.</u>
This is a service provided by CPS that is capable of computerized matching of fingerprints.

4.3     DISTRICT ATTORNEY
        The District Attorney is responsible for the prosecution of all offenses defined by
        state law. Employees of the Buffalo Police Department shall fully cooperate with
        the District Attorney's Office in the prosecution of any offense and shall notify the
        Assistant District Attorney handling any case in which the employee has been
        issued a subpoena by a defendant in a criminal prosecution.

4.4     ERIE COUNTY BOARD OF ELECTIONS
        The Erie County Board of Elections is responsible for conducting all elections for
        public office within the county. Employees of the Buffalo Police Department shall
        cooperate with the Board of Elections to ensure that the integrity of each citizen's
        right to vote is not breached.

4.5     ERIE COUNTY HEALTH DEPARTMENT
        The Health Department is responsible for containing the spread of infectious
        diseases as well as preventing rabies. All dog bites must be reported to the Health
        Department as well as any animal suspected of being rabid.

        A.  Unsanitary Conditions
            Unsanitary conditions which cannot be immediately corrected and which
            menace the health of the community shall be reported on an Intra-
            Departmental Memorandum which shall be forwarded through channels to
            the Erie County Health Department. In cases of emergency, the investigating
            officer shall contact the Health Department directly and shall follow up with
            the required report.

4.6     ERIE COUNTY MEDICAL CENTER
        The Erie County Medical Center is a county sponsored hospital which provides a
        full range of medical services. In addition to all the other medical services it
        provides, the hospital serves as the area's regional burn treatment center.

4.7     ERIE COUNTY SHERIFF'S OFFICE
        The Erie County Sheriff's Office has criminal jurisdiction countywide. It provides
        law enforcement protection to those areas of the county that has no local law
        enforcement agency. The Sheriff's Office is also responsible for the custody of
        prisoners who have been arraigned and are awaiting trial and for prisoners who
        have been convicted and are sentenced to a county detention facility. The
        Sheriff's Office has a civil division that handles specified matters pertaining to
        civil legal proceedings. The Bomb Detection Unit, the helicopter and the
        detention facility for females, are services provided by the Sheriff's Office that are
        frequently used by the Buffalo Police Department.

4.8     JUVENILE DETENTION HOME
        The Juvenile Detention Home is located at 766 E. Ferry and is used to house
        runaways, persons in need of supervision, and juveniles accused of juvenile
        delinquency. Refer to M.O.P. Chapter 3.

4.9     MEDICAL EXAMINER
        Refer to M.O.P. Chapter 2.

4.10    PISTOL PERMIT CLERK
        The Pistol Permit Clerk is responsible for the issuance and revocation of pistol
        permits in Erie County. Background investigations of applicants for pistol permits
        are to be performed by the Lieutenant of Investigative Services consistent with the
        provisions of Section 400 of the NYS Penal Law. Instances in which a pistol
        permit holder is suspected of violating the terms of the permit shall be reported on
        an Intra-Departmental Memorandum which shall be forwarded through channels
        to the Pistol Permit Clerk.

4.11    PUBLIC ADMINISTRATOR
        Refer to M.O.P. Chapter 2.

4.12    PROBATION DEPARTMENT
        The Probation Department prepares and reviews pre-sentence reports and
        supervises the probation of offenders within the county.

4.13    SENIOR CITIZENS (DEPARTMENT OF)
        The Erie County Department of Senior Citizens provides services to the elderly
        within the county. It operates the Meals on Wheels Program, the Going Places
        Van, and the Protective Services Divisions which cares for older people who are
        at risk and who have no one else to care for them. The Department also runs an
        information and referral service which handles calls from seniors and their
        families.

**5.0     STATE AGENCIES**

5.1     POLICY
        Agencies operating under the auspices of the State of New York are designed to
        provide services to those people living, working and visiting the state. It is the
        policy of the Buffalo Police Department to cooperate with each of these state
        agencies as they perform their respective duties.

5.2     ALCOHOL BEVERAGE CONTROL BOARD
        The Alcohol Beverage Control Board is responsible for regulating the sale and
        distribution of alcoholic beverages.   It issues licenses and permits to
        manufacturers, distributors, wholesalers and retailers. The Board investigates
        complaints and conducts disciplinary hearings related to its regulation of alcoholic
        beverages.

5.3     ATTORNEY GENERAL OF NEW YORK STATE
        The Attorney General is the head of the New York State Department of Law.
        (S)he prosecutes and defends legal actions in which the state is a party. (S)he also
        prosecutes criminal violations involving violations of labor laws, worker
        compensation and unemployment insurance. The Law Department may also be

involved in other criminal prosecutions at the request of the governor. The Attorney General has the authority to press for both civil and criminal penalties in regard to pollution, anti-trust violations and consumer fraud.

5.4     <u>COMMISSION OF CORRECTIONS</u>
The Commission of Corrections oversees all state and local correctional facilities. It establishes minimum standards for the care, custody, treatment, supervision and discipline of prisoners. The Commission visits and inspects all institutions used for the detention of sane adults charged with or convicted of a crime. It aids in securing suitable conditions for the accommodation of inmates and it insures that basic sanitary conditions are provided.

5.5     <u>CRIME VICTIMS COMPENSATION BOARD</u>

A.  The Crime Victims Compensation Board provides compensation to qualifying crime victims in certain circumstances.  Generally, the crime victim must:

    1.  be an innocent victim;
    2.  report the crime to the appropriate law enforcement agency within one week of the event; and
    3.  file the compensation claim within one year of the event.

B.  Qualifying victims include:

    1.  the crime victim who,
        a.  has sustained physical injuries; or
        b.  an elderly or disabled victim, not necessarily physically injured but who has suffered a loss or damage to an article of essential personal property;
    2.  a surviving spouse, parent, child or person dependent on the victim who died as a result of a crime;
    3.  a person who has paid or incurred the burial expense of a victim;
    4.  a child who is a victim or witness to a crime or the child's parents, guardians or siblings.

C.  Some of the benefits provided by the Board include:

    1.  the payment of medical bills other than those bills paid by insurance,
    2.  the payment of lost earnings up to a maximum of $600.00 per week and
        $30,000.00 per year,
    3.  the payment of burial expenses,
    4.  the cost of occupational rehabilitation,
    5.  the cost of counseling services.

5.6    DEPARTMENT OF ENVIRONMENTAL CONSERVATION
The DEC enforces of all laws regulating hunting and fishing. It deals with air and water pollution and the cleanup of hazardous waste sites. The DEC regulates the storage of petroleum and hazardous chemicals and it responds to chemical spills.

5.7    DIVISION OF HUMAN RIGHTS
The Division of Human Rights investigates complaints of discrimination involving employment, housing, public accommodation and credit.

5.8    OFFICE OF MENTAL HEALTH
The Office of Mental Health operates a number of mental health facilities throughout the state. It also is responsible for monitoring the extensive system of decentralized care that is now being furnished to mental health patients.

5.9    DEPARTMENT OF MOTOR VEHICLES
The Department of Motor Vehicles (DMV) registers all motor vehicles in New York State including snowmobiles, all terrain vehicles, motor powered boats and motorbikes. It records titles, liens and insurance information. It issues license plates, specialized license plates for the disabled and it inspects motor vehicle repairs shops. DMV is responsible for issuing, suspending and revoking driver's licenses and permits.

5.10    DIVISION OF PAROLE
The Division of Parole maintains information on all inmates which are under the jurisdiction of the Department of Corrections. It supervises parole and it investigates and prosecutes parole violations.

5.11    STATE POLICE

A. The State Police provide law enforcement services for rural and unincorporated areas of the state which are not covered by a local law enforcement agency. They provide investigative service through its Bureau of Criminal Investigation.

B. Troop "A" is located at 4225 West Saile Dr. Batavia, NY, (716) 343-2200. It is responsible for providing law enforcement services to Alleghany, Cattaraugus, Chatauqua, Erie, Genessee, Niagara and Orleans counties.

C. Through its C-Net program, the State Police provides under cover drug investigators to local municipalities.

D. The State Police operate NYSPIN which allows local law enforcement agencies to access information concerning vehicles, drivers, wanted and escaped criminals, and stolen property.

E. "T" Troop has traffic law enforcement jurisdiction on the entire NYS Thruway including that section which runs through the City of Buffalo. Refer to M.O.P. Chapter 3. Under no circumstances shall any ambulance be dispatched by any employee of the Buffalo Police Department to an accident reported to have occurred on the NYS Thruway. Employees shall notify the NYS Police who will dispatch an ambulance.

F. Arrests made by the State Police within the limits of the City of Buffalo shall be booked at City Court Booking and prisoners shall be held in the City Court Lock-up.

## 5.12    DEPARTMENT OF STATE

A. The Department of State is responsible for licensing the following:

1. Barbers
2. Real Estate - brokers and salespersons
3. Hairdressing and cosmetology
4. Notaries Public
5. Private Investigators
6. Upholstery and bedding
7. Security Guards

B. Whenever there appears to be a violation that would involve any of the above listed persons, a complete report shall be prepared on an Intra-Departmental Memorandum and forwarded through channels to the Police Commissioner. The Office of the Police Commissioner shall notify the office of the NYS Secretary of State concerning these occurrences.

## 5.13    STATE COLLEGE PUBLIC SAFETY

A. State College Public Safety is a full service police department responsible for the law enforcement needs of the entire campus of the State University College at Buffalo. The Officers are fully trained as police officers and they provide all necessary police services on their respective campus.

B. State College Public Safety uses the BPD City Court Lock-up for in custody arrests. In other cases they are authorized to issue Appearance Tickets returnable at Buffalo City Court.

C. In instances in which State College Public Safety requires the assistance of the BPD, they will contact the "D" District on duty supervisor. With proper authorization BPD specialized units (e.g. Homicide, SOS, Photo, Evidence, etc.) shall assist with serious felony investigations. The BPD may also assist with off campus investigations when requested.

5.14    STATE UNIVERSITY PUBLIC SAFETY

    A.  The South Campus of the State University is located at Main and Bailey and is entirely within the geographical limits of the City of Buffalo.  State University Public Safety is a full service police department with fully trained police officers responsible for the delivery of law enforcement services on the State University at Buffalo campuses. The Public Safety office is located on the north campus in Amherst, NY.

    B.  State University Public Safety processes their own arrests and my use  the City Court Lock-up for in custody arrests made on the South Campus. In other cases occurring on the South Campus they are authorized to issue Appearance Tickets returnable at Buffalo City Court.

    C.  In instances in which State University Public Safety requires the assistance of the BPD, they will contact the "E" District on duty supervisor. In cases of major incidents, (i.e. civil disturbances, etc.) the BPD may be requested to assist State University Public Safety. State University Public Safety will notify the "E" District supervisor of any investigations occurring off campus.

5.15    THRUWAY AUTHORITY
    All maintenance, repairs, snow and ice removal, and traffic control devices on the Thruway are the responsibility of the Thruway Authority. The local office is located on the Thruway at Walden Avenue.

5.16    DEPARTMENT OF TRANSPORTATION
    The NYS Department of Transportation (DOT) is responsible for the care and maintenance of state roadways. The Skyway Complex, the Kensington Expressway, the Scajaquada Expressway, and their respective entrance and exit ramps are all maintained by DOT. This includes snow and ice removal.

5.17    DIVISION FOR YOUTH
    The NYS Division for Youth is responsible for the care and rehabilitation of juveniles who have been adjudicated juvenile delinquents, juvenile offenders or persons in need of supervision. It maintains residential facilities and it provides assistance to localities in establishing local residential facilities.

**6.0    FEDERAL AGENCIES**

6.1    POLICY
    Agencies operating under the auspices of the federal government are designed to provide services to those people living, working and visiting the United States.  It is the policy of the Buffalo Police Department to cooperate with each of these federal agencies as they perform their respective duties.

6.2   ARMED FORCES

    A.   Military Plane Crashes

        In the event of a crash of a military aircraft, Air Force personnel at the Niagara Falls Air Base shall be notified. They have clearly defined responsibilities in incidents of this type. Refer to M.O.P. Chapter 11.

    B.   Military Deserters/Absentees

       1.   Whenever a sworn member of the Department apprehends a military deserter/absentee, (s)he shall contact the 911 Communications Lieutenant and provide him/her with all relevant information.

       2.   The 911 Communications Lieutenant shall contact the appropriate branch of the military and the deserter/absentee shall be handled in accord with their directions.

          a.   If detention is necessary, the military deserter/absentee shall be held in the Headquarters Cellblock until arrangements can be made with the affected military authorities to retrieve the prisoner.

          b.   Unless there are extenuating circumstances, military deserters/ absentees shall not be held in City Court Lock-up for longer than a period of 24 hours. If the military authorities cannot guarantee that the military deserter/absentee will be retrieved within that 24 hour time span, the military deserter/absentee shall be released from custody.

6.3   BORDER PATROL

The Border Patrol is an agency of the Department of Homeland Security. It is primarily responsible for preventing immigrants from unlawfully entering the United States. Any circumstances which involve illegal aliens shall be referred to the Border Patrol. This includes arrests involving defendants who are suspected of being illegal aliens.

6.4   UNITED STATES CUSTOMS

The U.S. Customs Service is an agency of the Department of Homeland Security. Its purpose is to ensure that all goods entering the United States do so in accordance with federal laws and regulations.  The Customs Service enforces U.S. laws intended to prevent illegal trade practices.  It protects the American public and environment from the introduction of prohibited hazardous and noxious products.  It assesses and collects revenues in the form of duties, taxes and fees on imported merchandise and it regulates the movement of persons, carriers, merchandise, and commodities between the United States and other countries.

6.5    FEDERAL AVIATION AGENCY
The Federal Aviation Agency is responsible for investigating all civilian aircraft mishaps and crashes. In the event of any such incident within the City of Buffalo, the FAA at the Control Tower of the Buffalo International Airport shall be immediately notified. Refer to M.O.P. Chapter 11.

6.6    FEDERAL BUREAU OF INVESTIGATION (FBI)

A.  Jurisdiction
The FBI has jurisdiction only for those matters specifically prescribed by federal statute. Generally they investigate organized crime, counter-terrorism, financial crime, foreign counterintelligence, consumer tampering, crimes aboard aircraft, interstate theft, unlawful flight to avoid prosecution, bank robberies and offenses involving violations of civil rights.

B.  Services Provided by the FBI
The FBI provides forensic laboratory services which can be used for specialized scientific investigation. The agency is the repository for fingerprints from throughout the nation. In addition they can assist in the identification of victims of disasters such as plane crashes and explosions. Advanced training in law enforcement techniques and management principles is provided by the FBI Academy.

C.  Uniform Crime Reports
The FBI issues periodic unified crime reports based on statistical information provided by law enforcement agencies through the country. The Buffalo Police Department's Division of Administration and Communication shall be responsible for compiling the requisite statistical information and for preparing those reports required by the FBI for production of these unified crime reports.

D.  Notifying the FBI
Employees of the Department shall notify the FBI of any crime coming within that agency's jurisdiction.

6.7    SECRET SERVICE
The Secret Service is an agency of the Treasury Department. It has primary responsibility for the protection and safety of the President, Vice-President, and their families. It is also responsible for dealing with federal crimes involving coins, currency, stamps, government bonds, checks, credit/debit card fraud, computer fraud and false identification. Refer to M.O.P. Chapter 5.

6.8    U.S. ARMY CORP OF ENGINEERS
During natural disasters the Army Corp of Engineers conducts emergency operations to protect lives, alleviate suffering, and remediate damage.

6.9    U.S. MARSHALS
The US Marshals Service is a division of the Justice Department. It is responsible for providing security in all federal courts and for protecting federal witnesses.  It serves federal warrants and tracks down prisoners escaped from federal institutions. The Marshals Service operates a prisoner airline which transports federal prisoners between jurisdictions within the United States. At the request of local law enforcement agencies it also transports state prisoners from one jurisdiction to another. The seizure and management of asset forfeitures also comes within its jurisdiction.

6.10    VETERAN'S ADMINISTRATION HOSPITAL
The Veteran's Administration Hospital is located at 3495 Bailey Avenue. Refer to M.O.P. Chapter 3.

6.11    WEATHER BUREAU
Refer to M.O.P. Chapter 11.

**7.0    COMMUNITY BASED SERVICE ORGANIZATIONS**

7.1    POLICY
Community based service organizations that are aimed at alleviating particular social problems are in existence throughout the county.  It is the policy of the Buffalo Police Department to fully cooperate with these agencies as they provide services to the community and to utilize the services provided by these agencies to assist it in carrying out its police functions.

7.2    AMERICAN RED CROSS
The Red Cross provides emergency disaster services which encompass providing food, shelter, clothing and medical care to disaster victims.  This includes victims of fires, floods, explosions, snow and ice storms, and power failures.

7.3    CHILD AND FAMILY SERVICES
Child and Family Services of Erie County will provide shelter for lost, destitute, or abandoned children, or children left without proper supervision. They will also investigate cases of cruelty to, or neglect of, children. Refer M.O.P. Chapter 2.

7.4    CRISIS SERVICES
Certain members of the staff of the Emergency Outreach Service of Crisis Services have been designated by the Erie County Director of Community Service as persons empowered to direct the removal of apparently mentally ill persons to a hospital.  These staff members carry appropriate identification with them at all times. A staff member will personally appear at the location from which the apparently mentally ill person is to be transported and will accompany the person to the hospital. The Outreach staff member will present to the officer a form entitled "Request to Take Mentally Ill Person into Custody."  The Emergency

Outreach Service is an invaluable resource when dealing with persons having emotional and psychological problems. Refer to M.O.P. Chapter 3.

7.5    CITY MISSION
The City Mission is a resource that is available to provide food and temporary lodging to persons who are destitute.

7.6    COMPASS HOUSE
The Compass House is an organization that provides temporary shelter and guidance to teenagers with problems. Under no circumstances shall the telephone numbers (370 Linwood Avenue - 886-0935 or 1451 Main Street - 886-1351) or locations of this facility be revealed to members of the public. Prior to placing a teenager at this facility, the Department employee shall telephone the Compass House to determine if the facility has room to accommodate the teenager.

7.7    ERIE COUNTY REHAB CENTER (291 ELM ST.)
The Erie County Rehabilitation Center (854-2997) provides services, including lodgings, to clients suffering from alcohol dependency.

7.8    HAVEN HOUSE
Haven House is a shelter for battered spouses and their children. The shelter is staffed 24 hours a day and provides in-take services on an emergency basis in cooperation with the police and other social service agencies. Under no circumstances shall the location or telephone number (884-6000) of Haven House be revealed to members of the public.

7.9    SALVATION ARMY
When family groups are stranded without funds or are made homeless for any reason the Salvation Army will provide food and shelter. The Salvation Army (886-5772) also provides a mobile canteen service for Police and Firefighters at the scene of major fires and other disasters.

7.10    TRAVELER'S AID
Travelers in difficulty or who are stranded without funds may be directed to the Traveler's Aid Society can be contacted via Western New York 2-1-1 services during business hours.

7.11    NATIVE AMERICAN COMMUNITY SERVICES
The Native American Community Center is located at 1005 Grant Street, 874-4460. It provides Native Americans with the following services: crime victim assistance, alcohol and substance abuse prevention, assistance to the elderly, family services, youth services, employment assistance, and assistance to the mentally retarded and those with developmental disabilities.

7.12   SAINT VINCENT DE PAUL SOCIETY
       The St Vincent de Paul Society is located at 1298 Main Street, 882-3360, fax 882-3556.   It is a charitable organization involved in assisting all types of needy people. The St Vincent de Paul Society provides the following services: hot lunches 1100hrs to 1230hrs Friday through Tuesday; distribution of prepackaged bags of food during regular business hours; issues vouchers for clothing; and, has an inventory of used furniture available

7.13   DEAF ADULT SERVICES
       Deaf Adult Services is that agency responsible for assisting the Buffalo Police Department in dealing with the hearing impaired. In many cases it is inappropriate for family members and friends to interpret for the hearing impaired. When dealing with persons who are hearing impaired, and other means of communication have proven ineffective, the Buffalo Police Department member shall be responsible for securing the assistance of Deaf Adult Services.  After gaining the approval of their immediate supervisor, members shall contact Deaf Adult Services. During the week between 0830 and 1630 they may be contacted at 874-6011.  Member shall contact Crisis Services (834-3131) at all other times and Crisis Services will make contact. Deaf Adult Services shall be instructed to bill the Buffalo Police Department, Attn: Budget Office, 74 Franklin Street, Buffalo, NY 14202. The Police Supervisor on duty who authorized the request for assistance from Deaf Adult Services shall prepare a memo detailing  all the circumstances and shall forward that memo to the Budget Office -  Attention: Senior Budget Examiner.

**8.0   NEWS MEDIA**

8.1   POLICY
      To the extent that the release of information to the media does not unnecessarily infringe on the legitimate safety or privacy interests of any person, nor impede the Department in fulfilling its mission, it is the policy of the Buffalo Police Department to fully and accurately inform the public, through the news media, of all matters of interest involving the Department.

8.2   GENERALLY:

      A.  All Department members below the rank of Chief shall refrain from speaking to the media directly, unless directed to do so by the Commissioner, the Deputy Commissioners, or the Public Communications Coordinator.   All inquiries from the media should be referred to the Public Communications Coordinator.

      B.  Information shall be released to the media as promptly as circumstances allow, without partiality and in as objective a manner as possible.

C. Whenever any member of the Department releases information to the public (s)he shall make a conscientious effort to verify the accuracy of the information to be released.

D. Sensitive criminal intelligence information, information that would compromise the integrity of an active investigation, information that would jeopardize a defendant's right to a fair trial, or information that would imperil legitimate safety or privacy concerns shall not be revealed

E. The Department member shall only release information to those persons who are bona fide reporters or photographers employed by agencies of the electronic or print media. In handling telephone inquiries, members shall take reasonable steps to establish that the caller is a bona fide reporter.

F. Any member of the Department becoming aware of information that may have media interest, shall promptly notify the Public Communications Coordinator, or in his/her absence, the senior on duty Command Officer.

## 8.3    INFORMATION THAT MAY BE RELEASED:

A. Non - criminal Incidents:
   Only members of the Department with the rank of Chief or above shall provide the media with information regarding non-criminal incidents, (e.g. accidents, aided cases, floods, fires, natural disasters, etc.). Names of the parties involved, addresses and a description of the incident shall be provided.

   1. In cases in which death results, victim identification shall be withheld pending notification of family. Inquiries may be referred to the Medical Examiner's Office.

B. Criminal Incidents:

   1. Prior to Arrest
      If a crime has been committed and an arrest has not yet been made, members of the Department with the rank of Chief or above, shall provide the media with the victim's name, address and a description of the details of the crime. Information that may unnecessarily imperil a successful investigation or prosecution shall not be revealed.

   2. After Arrest
      After arrest, the following information may be released:
      a. Facts and circumstances surrounding the crime and arrest. (i.e. time and place of arrest, resistance encountered, if suspect was armed, etc.).
      b. Identity of arresting officers and their assignments.
      c. Brief description of any evidence seized.

      d.  Suspect's name, address, age and occupation.

    3.  <u>After Commencement of Court Action</u>
        Once court action begins, all inquiries regarding the case shall be referred to the agency prosecuting the case (e.g. District Attorney, U.S. Attorney, etc.).

C.  All members of the Department of the rank of Chief or above are authorized to release routine information about criminal and non-criminal incidents except when:

    1.  Media representatives appear at the scene of a criminal or non-criminal incident, a Chief or above at the scene shall provide the information to the media.

    2.  Another Departmental unit is in charge of the investigation, media inquiries shall be referred to that other Departmental unit.

    3.  Media inquiries regarding investigations conducted jointly with other law enforcement agencies, the media shall be referred to the agency in control of the investigation subject to an agreement approved by the Police Commissioner.

D.  Uncertainty about releasing information to the media shall be resolved by seeking guidance from the Public Communications Coordinator, or in his/her absence, a member with the rank of Chief or above.

E.  <u>Requests for Interviews</u>

    1.  <u>On Duty Members</u>
        On-duty Officers, must obtain the permission from an Officer in the rank of Chief or above, before being interviewed, or making statements to the media other than in those circumstances specified in 8.9A and 8.9B above.

    2.  <u>Off Duty Members</u>
        Any member of the Department who is off duty and elects to provide information to the media concerning any issue relating to the Police Department, either in writing, by interview, or otherwise, and has not received permission from the Police Commissioner, the Deputy Police Commissioner or the Public Communications Coordinator, must include a statement that they are not representing the Police Department and are not speaking on its behalf.

F.  Statements by members of the Department must conform to the guidelines established by existing Rules and Regulations of the Department, specifically:

1. Chapter III, section 3.5 - TRUTHFULNESS
2. Chapter III, section 3.7 - DISCUSSING EVIDENCE
3. Chapter III, section 3.8 - DIVULGING POLICE INFORMATION
4. Chapter III, section 3.9 - INFORMATION WHERE THE CITY IS AN INTERESTED PARTY
5. Chapter III, section 3.10 - SPEECHES, STATEMENTS, ETC.
6. Chapter III, section 3.13 - TESTIMONY

8.4    <u>INFORMATION THAT SHOULD NOT BE RELEASED</u>

A. Information that will jeopardize an investigation, or impair a defendant's right to a fair trial, or unnecessarily intrude on the privacy of an individual shall not be revealed. These include but are not limited to:

1. Any prior criminal record of a defendant or implication that (s)he has one;
2. The identity and/or address of any witness;
3. The possibility of the defendant pleading guilty to a lesser charge;
4. Any opinion, stated or implied, as to the guilt or innocence of the accused or the quality of evidence collected;
5. Statements as to the character or reputation of a suspect, witness or victim or the credibility of any potential testimony;
6. Any possible connection with any uncharged crime or crime pattern;
7. The results of, or the refusal to take any test/examination (e.g. polygraph, paraffin, etc.)
8. Any admissions or statements made by the defendant;
9. The identity of a victim of a sex crime;
10. The identity of a suicide victim.

B. Juveniles and Youthful Offenders - Incidents or arrests involving juveniles or arrests, for which a person could be adjudicated as a youthful offender, shall be handled in the same manner as adults except that the suspect's name, address, photograph and any other identifying information shall not be released.

C. Members shall not pose any suspect, defendant, or witness for photographing by the media. Generally, members shall neither assist nor prevent media representatives from photographing an accused person who is in a public place while in police custody. Where identification of the defendant by witnesses is an integral component of the criminal prosecution, Department employees shall take necessary precautions to prevent the media from photographing the defendant's face.

D. Where the City is, or may become, a party in a law suit, the advice of the Corporation Counsel shall be sought prior to releasing any information.

8.5    INFORMATION TO BE RELEASED ONLY BY HIGHER AUTHORITY

A.    The following types of information shall be released to the media only by the Police Commissioner, the Deputy Police Commissioner, the Public Communications Coordinator, or a member of the Department acting at their direction:

1.    Statistical information other than that which is contained in the Annual Report
2.    Information necessary to alert the public of measures for their personal protection;
3.    Mug shots or composites;
4.    Departmental photographs (e.g. crime scenes, accidents, personnel, etc.)
5.    Written press releases.
6.    Investigations by the Internal Affairs Division.

B.    Media Releases:
Written media releases will be considered when:

1.    an incident generates public or media attention, or to respond to public concern; or
2.    the Department is seeking assistance in solving a crime/incident; or
3.    the Department wishes to publicize an upcoming Department sponsored event or occurrence.

All media releases shall be approved by the Police Commissioner or his designee, prior to release to the media. The Public Communications Coordinator shall then forward the release to the appropriate media representatives.

C.    Press Conferences:
The decision to arrange a press conference rests with the Commissioner.  The Public Communications Coordinator will notify the media and assist in coordinating the conference.

8.6    MEDIA ACCESS TO SCENES OF INCIDENTS

A.    Media Representatives at the Scene of an Incident

1.    Restricting Access to Crime Scenes
Regardless of whether a member of the media possesses a "Media Credentials" identification card, (s)he shall be restricted from entering the scene if:
a.    the scene is a private premises and the person in control of the premises has not authorized entry by the media,
b.    the scene has open access but the presence of the media will:

       i.  interfere with the police/emergency operation,
      ii.  jeopardize the integrity of evidence,
    iii.  endanger the safety of the media representative or others.

B. Photographs

Members of the media and the public may take photographs and videos of events occurring in public places subject to the above. Refer to M.O.P. Chapter 11.

C. Explain Reason for Restricted Access

In instances in which media representatives with "working press" identification cards are restricted from entering a scene, the officer in charge of the operation shall explain to them the reason for the restriction.

## 8.7    DUTIES OF THE PUBLIC COMMUNICATIONS COORDINATOR

A. The Public Communications Coordinator shall:

1. Assist news personnel in covering routine stories and at the scene of incidents;
2. Prepare and distribute news releases;
3. Arrange for and assist at news conferences;
4. Assist in crisis situations;
5. Coordinate the release of authorized information concerning departmental investigations and operations;
6. Issue written or verbal news releases to include problem traffic areas, temporary policy changes, etc., on an as-needed basis;
7. Assume control over the release of information to the news media and/or the public in the event of an exceptional incident;
8. Coordinate the release of information on departmental news meant to generate public interest;
9. Periodically meet with and maintain liaison with representatives of the media to resolve differences and improve relations between the media, the public and the Department;
10. Prepare informational articles, releases and demonstrations in order to more fully educate the public as to the mission of the Department;
11. Respond to questions and advise members of the Department concerning media relations and release of information.

B. The existence of a Public Communications Coordinator does not relieve any member of the Department from cooperating with the media.

## 8.8    ON-SCENE SENIOR COMMAND OFFICER'S RESPONSIBILITIES

The senior on-scene Command Officer shall:

A. Keep the Police Commissioner, Deputy Commissioners and Public Communications Coordinator informed of the progress of any significant police/emergency operation in which they are involved, as well as any information that might generate public interest.

B. When in command of any incident, keep the media informed, consistent with this policy.

C. In the absence of the Public Communications Coordinator, make decisions on the release of information to the media consistent with this policy.

## 9.0 PUBLIC TRANSPORTATION

9.1 POLICY
The Niagara Frontier Transit Authority is responsible for public transportation in Erie and Niagara Counties. It is the policy of the Buffalo Police Department to fully cooperate with the NFTA as it carries out its functions.

9.2 NIAGARA FRONTIER TRANSPIRATION AUTHORITY (NFTA)
The NFTA operates the downtown bus terminal, the airport, the light rail rapid transit, the port of Buffalo and most of the bus service throughout Erie and Niagara Counties. It also operates its own police force.

9.3 NFTA POLICE
The NFTA Police have full police authority to exercise jurisdiction on any NFTA property. Incidents occurring on any NFTA bus or light rail rapid transit car or on NFTA property shall be handled by the NFTA Police. Employees of the Buffalo Police Department shall assist the NFTA Police whenever they are called upon to do so.

## 10.0 PUBLIC UTILITIES

10.1 POLICY
It is the policy of the Buffalo Police Department to fully cooperate with the public utilities as their personnel provides service to the public.

10.2 CABLE TELEVISION
Cable television service for the City of Buffalo is provided by Time Warner Cable (888-892-2253). Members shall fully cooperate with security personnel of Time Warner in the investigation of the theft of cable television service.

10.3 ELECTRIC SERVICE
National Grid (1-800-867-5222) is the public utility that provides electricity to the city. In instances in which electrical wires are down or arcing, or lamp poles are down or are not operating, National Grid should be called. Employees of the

Department shall cooperate with National Grid security personnel in the investigation of claims of theft of electrical service.

10.4   NATURAL GAS SERVICE
National Fuel Gas (800-444-3130) is the public utility responsible for providing natural gas service to the city. In all instances of natural gas leaks, National Fuel Gas shall be called immediately. Employees of the Department shall cooperate with National Fuel Gas security personnel in the investigation of claims of natural gas service.

10.5   TELEPHONE SERVICE
Verizon, Time Warner and V.O.I.P. are the public utilities responsible for providing local telephone service to the City. In all instances in which telephone lines are down, your corresponding service provider shall be called.

A.   Unlisted Telephone Numbers
In emergency circumstances, the telephone company will reveal information concerning an unlisted telephone number. The 911 Communications Lieutenant can contact the carrier and request the information. Refer to M.O.P. Chapter 9.

**11.0   AUTOMOBILE REPOSSESSORS**

11.1   POLICY
Taking repossession of automobiles is a civil remedy available to certain lien holders. It requires that the repossession take place without a breach of the peace. It is the policy of the Buffalo Police Department to refrain from aiding a person in repossessing any item. The sole function of the Department in these circumstances is to prevent a breach of the peace.

11.2   NOTICES TO POLICE
Any person or representative of a firm or corporation responsible for retaking a motor vehicle pursuant to the provisions of law shall, immediately following such repossession, personally appear at the police stationhouse in the locality where such repossession occurred and give notice of that fact.

11.3   NOTICES TO THE DEPARTMENT OF MOTOR VEHICLES
Such person or representative repossessing a motor vehicle shall, within twenty-four (24) hours, notify the Department of Motor Vehicles in the form required by the Commissioner of Motor Vehicles.

A.   Delivery of Number Plates to DMV
The repossessor shall deliver the number plates of such motor vehicle to the local office of DMV and give notice of the repossession, including the name and address of the person or firm repossessing the vehicle.
B.   Notice to Owner

The owner of such repossessed vehicle shall be notified by the repossessor within twenty-four (24) hours either personally or by registered or certified mail directed to his/her last know address.

C. <u>Method or Repossession</u>
Unless the motor vehicle can be repossessed without a breach of the peace, it shall be repossessed or retaken by legal process. Under no circumstances is a violation of the criminal law permissible.

11.4   <u>DISTRICT RESPONSIBILITY</u>

A. Department employees receiving notice of a repossession shall make a note of:

1. the date, time and place of repossession,
2. the date and time reported to the police,
3. the person repossessing the vehicle including, the firm's name and address,
4. the location where the vehicle was taken to,
5. the vehicle owner's name and address,
6. a description of the repossessed vehicle including make, model, color, year and plate number.

B. The above information shall be immediately reported to City Court Booking. The employee making the notification shall make a note of the name of the person in the Auto Registration Unit to whom the information was given.

## 12.0   COOPERATING WITH OTHER LAW ENFORCEMENT AGENCIES INVOLVED IN PERSONNEL INVESTIGATIONS

12.1   <u>POLICY</u>
It is the policy of the Buffalo Police Department to fully cooperate with outside law enforcement agencies as those agencies investigate misconduct by their own members.

12.2   <u>MISCONDUCT - DEFINED</u>
For purposes of this section misconduct shall include any behavior that would constitute an offense, or any other behavior that would bring discredit to the employee's law enforcement agency.

12.3   <u>REPORTING MISCONDUCT</u>

A. Whenever an on duty employee of the Buffalo Police Department becomes aware of misconduct involving an employee of an outside law enforcement

agency, the misconduct shall be immediately reported to the **_Internal Affairs Division_** through the chain of command.

B.  In the event that an on duty employee becomes involved in an investigation alleging misconduct by an employee of an outside law enforcement agency and the employee of the outside agency is present, the District Supervisor shall be called and the Supervisor shall take appropriate action.

C.  The **_IAD Inspector_** will be responsible for contacting the outside employee's agency and apprising them of all pertinent facts and of any action taken by the Buffalo Police Department.  **_The IAD Inspector_** shall also forward to the Commissioner a complete written report of the circumstances.

D.  The Commissioner shall forward a copy of the **_IAD_** Inspector's report to the Chief/Commissioner of the outside agency.

12.4  <u>FULL COOPERATION REQUIRED</u>

When an outside law enforcement agency is conducting an internal investigation concerning allegations of misconduct by one of its members, it is the duty of all employees of the Buffalo Police Department to extend their fullest cooperation to the member of the outside agency conducting the investigation.

# CHAPTER 15: DISCIPLINE AND DISCHARGE

## CONTENTS

**1.0**   **DISCIPLINE - GENERALLY**
1.1   Policy
1.2   Discipline - Definition
1.3   Law Enforcement Code of Ethics
1.4   Police Officer's Bill of Rights
1.5   Time Limitations
1.6   Disciplinary Penalties
1.7   Supervisor/Superior Officer Responsibilities
1.8   Probationary Employees

**2.0**   **INTERNAL AFFAIRS DIVISION**
2.1   Policy
2.2   IAD to Report Directly to Commissioner
2.3   Cooperation With Labor Relations Division
2.4   IAD Investigations
2.5   Civil Law Suits and Claims
2.6   Authority of IAD
2.7   Confidential Records
2.8   Annual Reports
2.9   IAD Assistance to Other Units
2.10  Blatantly False Claims

**3.0**   **INVESTIGATING COMPLAINTS AND VIOLATIONS**
3.1   Policy
3.2   Where Complaints May be Received
3.3   Subordinates to Notify Supervisor/Superior Officer
3.4   Citizen Complaints - Supervisor/Superior Officer Responsibilities
3.5   Handling Minor Violations
3.6   Complaints Against Superior Officers
3.7   Determining Which Command is to Investigate the Complaint
3.8   Conducting the Investigation
3.9   Lines of Authority
3.10  Conclusions of Fact

**4.0**   **SUSPENSIONS PRIOR TO DISCIPLINARY HEARINGS**
4.1   Policy
4.2   Authority to Suspend From Duty
4.3   Procedure for Suspending an Employee
4.4   Return of Benefits if Charges Not Sustained

**5.0**   **CHARGES AND HEARINGS**
5.1   Policy

5.2     Preparing the Charges
5.3     Serving the Charges
5.4     Answer to Charges
5.5     Amendments to the Charge
5.6     Informal Conference
5.7     Uniforms to Be Worn
5.8     Rights of the Accused Employee
5.9     Subpoenas
5.10    Adjournment: Absence of Witnesses
5.11    Recording the Formal Hearing
5.12    Rules of Evidence
5.13    Review of the Hearing Officer's Decision
5.14    Termination Conference
5.15    Seeking Intercession on Behalf of the Accused
5.16    Affect of Finding of Guilt Limited to Two Years
5.17    Resignations, Separation for Cause


**6.0     PREVENTING DISCRIMINATION BASED ON RACE, COLOR,
          RELIGION, SEX OR NATIONAL ORIGIN IN THE WORKPLACE**
6.1     Policy
6.2     Complaint Procedure
6.3     Timeliness for Initiating Complaints or Grievances
6.4     Internal Affairs Division as Central Repository
6.5     Investigation
6.6     Commissioner's Determination
6.7     Responsibility of Supervisors/Superior Officers


**7.0     PREVENTING SEXUAL HARASSMENT IN THE WORKPLACE**
7.1     Policy
7.2     Definition of Sexual Harassment
7.3     Conduct Constituting Sexual Harassment
7.4     Complaint Procedure
7.5     Timeliness of Initiating Complaints of Grievances
7.6     Internal Affairs Division as Central Repository
7.7     Investigation
7.8     Commissioner's Determination
7.9     Responsibility of Supervisors/Superior Officers
7.10    Consistency with the City Of Buffalo Sexual Harassment Policy

**1.0    DISCIPLINE - GENERALLY**

1.1    POLICY

It is the policy of the Buffalo Police Department to maintain a highly disciplined work environment that induces individual employees to reach their fullest potential; that creates a sense of esprit de corps; and that gains the trust and respect of the community.

1.2    DISCIPLINE - DEFINITION

Discipline in its broadest sense means all those methods that can be used to train employees to fully comport with Department rules, regulations and procedures and which encourage employees to perform their jobs to the fullest extent of their natural talents. Discipline may be either positive or negative in nature. Positive discipline entails teaching, training and encouragement. Negative discipline involves the use of punitive measures to gain compliance.

1.3    LAW ENFORCEMENT CODE OF ETHICS

Rules, regulations and procedures generally establish the minimum level of conduct and performance that the Department can tolerate. In contrast, the Law Enforcement Code of Ethics sets the ideal standards which all members should strive to attain.

**LAW ENFORCEMENT CODE OF ETHICS**

As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all persons to liberty, equality and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my Department. Whatever I see or hear of a confidential nature or that is confided in me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will

constantly strive to achieve these objectives and ideals, dedicating myself before God and to my chosen profession...law enforcement.

1.4    POLICE OFFICER'S BILL OF RIGHTS

By agreement with the PBA the Police Officer's Bill of Rights has been adopted as part of the collective bargaining agreement. It establishes guidelines to be followed by superior officers in conducting investigations arising from a member's conduct as a police officer.

A.  Informing the Member

1.  The member shall be informed of the rank, name, and command of the officer in charge of the investigation, as well as the rank, name and command of the interrogating officer, and all persons present during the investigation. If a member is directed to leave his/her post and report for interrogation to another command, his/her own command shall be promptly notified of his/her whereabouts.

2.  The member shall be informed of the nature of the investigation before any interrogation begins, including the name of the complainant. The addresses of the complainant and/or witnesses need not be disclosed. However, the member shall be given sufficient information to reasonably apprise him/her of the allegations.

3.  If it is known that the member is to be interrogated only as a witness, (s)he shall be so informed at the initial notification to appear.

4.  If the member is under arrest, or is likely to be ( that is, if (s)he is a suspect or the target of a criminal investigation), (s)he shall be informed of, and given, all his/her rights, pursuant to the "Miranda" decision as set forth by the Supreme Court of the United States.

B.  Conduct of the Investigation

1.  These guidelines shall be observed by all superior officers in conducting investigations of actions of members of the police force.

2.  The interrogation of a member shall be at a reasonable hour, preferably when the member is on duty, unless the exigencies of the investigation dictate otherwise. Where practicable, interrogations should be scheduled for the daytime and the reassignment of the member to the day shift should be employed.  If any time is lost, the member shall be compensated.

3.  The interrogation shall take place at a location designated by the investigating Officer.  Usually it will be at the command to which the investigating Officer is assigned, or at the District stationhouse within which the incident allegedly occurred.

4. The questioning shall not be overly long. Reasonable respites shall be allowed. Time shall be provided for personal necessities, meals, telephone calls, and reasonable rest periods.

5. The member shall not be subjected to offensive language, nor shall (s)he be threatened with transfer, dismissal, or other punishment. No promises or reward shall be made as an inducement to answer questions.

6. The complete interrogation shall be recorded, either mechanically or by a stenographer. There will be no "off the record" questions. All recesses called during the questioning shall be recorded.

7. If a member so requests, (s)he shall be given the opportunity to consult with counsel before being questioned concerning a serious violation of the Departmental rules, provided the interrogation would not be delayed unduly thereby. In such cases, the interrogation may not be postponed past 1000hrs of the day following the notification of the interrogation. Counsel, if available, and a representative of a line organization may be present during the interrogation.

8. Members represented by the PBA and covered by the collective bargaining agreement shall not be ordered to submit to a polygraph test.

C. <u>Minor Violations</u>
In cases of investigations of minor violations of Departmental rules, requests to consult with legal counsel or with a line organization representative will be denied unless sufficient reasons are advanced. In cases of minor violations, the investigating officer shall have discretion as to whether or not the interrogation shall be recorded.

D. <u>Disciplinary Action</u>
In any case, the refusal to answer pertinent questions may result in disciplinary action.

1.5    <u>TIME LIMITATIONS</u>
No disciplinary proceeding shall be commenced more than one year after the occurrence of the wrongdoing complained of or its discovery, if later. However, such limitation shall not apply where the wrongdoing complained of would, if proved in a court of appropriate jurisdiction, constitute a crime.

1.6    <u>DISCIPLINARY PENALTIES</u>
A permanent employee shall be subjected to departmental discipline, and termination where appropriate, as provided for in the respective collective bargaining agreements, departmental regulations, and applicable laws. A

permanent employee subjected to disciplinary charges shall be afforded all rights to a hearing process as established in the respective collective bargaining agreements, departmental regulations, and applicable laws. Sworn members are also subject to removal for a conviction for any felony, or any crime involving moral turpitude as provided in the Public Officers Law, or any other violation of law that carries a mandatory forfeiture of employment as a remedy. Examples of mandatory forfeiture include, but are not limited to, residency violations as outlined in the NYS Public Officers Law.

Disciplinary actions or measures shall consist only of the following in accordance with existing collective bargaining agreements and appropriate laws:

1. Reprimand,
2. A fine not to exceed one hundred dollars ($100.00) to be deducted from salary or wages,
3. Suspension without pay not to exceed sixty (60) days,
4. Demotion in grade and title,
5. Dismissal from the service.

As a guideline in determining the form of discipline and/or severity of punishment, if any, the department should consider all relevant factors. Minimally, those factors should include:

1. the severity of the transgression and the extent of injury or damage to any victim;
2. the extent of damage to the professional reputation of the department;
3. the employee's past work record including any past disciplinary action and any instances of meritorious work;
4. the impact of the discipline on other members of the department;
5. the affect of the discipline in deterring the offending employee from engaging in future acts of misconduct.

## 1.7    SUPERVISORS/SUPERIOR OFFICER RESPONSIBILITIES

Department Rules and Regulations
Refer to Chapter VII of the Buffalo Police Department Rules and Regulations.

For Whom Supervisors/Superiors Must Initiate Disciplinary Action
1. Whenever the level of performance falls below acceptable limits, supervisors/superior officers are responsible for initiating disciplinary action if:

   a. the employee is assigned to their command; or
   b. the employee is temporarily assigned to their command, however briefly;  or
   c. the employee is assigned to another command but the

substandard performance occurred in the supervisor's/superior officer's presence.

2. Whenever facts come to the supervisor's/superior officer's attention that indicate that the standards of conduct of the department have been violated by an employee of another command, the supervisor/superior officer shall prepare an Inter-Departmental memorandum detailing the nature of the employee's conduct, and shall forward the memorandum through channels to IAD, with one copy being sent to the command of the employee who is alleged to have violated the Department standards of conduct.

Positive Discipline

A supervisor/superior officer can implement positive discipline by using all the means at his/her disposal to teach, train and encourage employees to become the best employees that their natural talents allow. This is a constant and continuing process that requires the supervisor/superior officer to be aware of the employee's daily performance. Positive discipline shall be used in cases in which an employee's performance is somehow deficient or it may be used when there are minor violations of Department rules, regulations and procedures..

Formal Discipline

The formal disciplinary process shall be invoked for all major violations of department standards of conduct, for cases in which a disciplinary may be an appropriate remedy, for cases involving complex investigations or when further investigation is required. The formal disciplinary process requires that IAD open a case file; that a    thorough and complete investigation be undertaken; and that there be a conclusion of fact at the end of the investigation. In such cases the supervisor/superior officer shall:

1. inform the employee of the nature of the substandard performance,  telling him/her that it is unacceptable, and provide remedial instruction  so that conduct of a similar nature is not repeated in the future;
2. prepare a memorandum, or in the case of a complaint from a citizen, a Citizen Complaint Form, detailing the nature of the violation of Department standards of conduct;
3. Call upon IAD for assistance and guidance as to suspend the employee when required. IAD can always be contacted through the 911 Communications Lt.

E. Major vs Minor Violations

It is difficult to draw a clear line distinguishing minor violations of Department standards of conduct from major ones. Major violations will tend to seriously impair the on going operation of the unit or they may have a substantial adverse impact on the Department. Major violations include allegations of criminal conduct, moral turpitude, insubordination, misuse of

Department property or equipment, or repeated documented minor violations of Department standards of conduct. Minor violations might include slovenly appearance, coarse or harsh language, tardiness, poor service, etc. Supervisors/superior officers must use their best judgment in determining these distinctions. IAD is available for assistance as to determining major or minor violations as they case may be.

1.8    PROBATIONARY EMPLOYEES
A probationary employee is not guaranteed continued employment but merely has an expectation of appointment to a permanent position. The department has wide latitude in deciding to either retain or dismiss these employees while they are serving their probationary period.

Monitoring
During an employee's period of probation his/her performance shall be closely monitored by his/her immediate supervisor. The supervisor shall immediately correct deficiencies and shall periodically report on the probationary employee's progress to the Police Academy and other departmental units as determined by the Commissioner from time to time on the appropriate forms as the case may be.

Police Academy
The Police Academy shall be responsible for the oversight of all probationary employees. They shall prepare and disseminate forms designed to assess the progress of such employees. They shall carefully review completed progress reports and shall stay in close contact with the supervisor of any probationary employee who is exhibiting sub-standard performance levels.

Termination
Probationary employees who the Commissioner believes will not be able to raise their performance to an acceptable level may have their appointment to the position rescinded at any time prior to the expiration of the probationary period. Such probationary employee shall be given the opportunity to address the Commissioner on his/her own behalf prior to such rescission. All Departmental property, identification and equipment must be promptly returned by any employee who has had his/her appointment rescinded.

Department of Human Resources
The Commissioner's office shall promptly notify the Department of Human Resources in writing whenever a probationary employee is dropped from the rolls.

**2.0    INTERNAL AFFAIRS DIVISION**

2.1    POLICY
It is the policy of the Buffalo Police Department to maintain a Internal Affairs Division whose primary function is to ensure that all Department personnel achieve high standards of personal integrity, discipline and professional conduct.

2.2    I.A.D. TO REPORT DIRECTLY TO COMMISSIONER

Because of the sensitivity and potential impact of investigations involving the internal affairs of the Department, the commanding officer of IAD shall report directly to the Commissioner.

The commanding officer of IAD shall keep the Commissioner informed of the nature and progress of all on going investigations.

The commanding officer of IAD shall immediately notify the Commissioner of:

1. any credible allegation of a Department employee's commission of a crime, or any offense involving moral turpitude;
2. any incident allegedly involving misconduct by a Department employee which is likely to generate substantial public attention.

Based on the investigation of the internal affairs incident and the recommendation of IAD, the Commissioner shall determine the appropriate disposition of each such incident.

2.3    COOPERATION WITH LABOR RELATIONS DIVISION

In cases involving discrimination in the workplace based on race, color, religion, sex or national origin, or cases involving sexual harassment, or disciplinary cases in which Departmental charges are preferred, IAD shall keep the Division of Labor Relations informed and shall extend to that Division their fullest cooperation.

2.4    I.A.D. INVESTIGATIONS

IAD shall coordinate the investigation of disciplinary infractions. They may designate the offending employee's command to conduct the investigation of minor violations. The employee's command will report the results of the investigation to IAD and recommend appropriate remedial measures.

All major violations shall be investigated by IAD. Investigations that are particularly complex or that involve allegations of discrimination based on race, color, religion, sex or national origin, or that involve allegations of sexual harassment, shall be investigated by IAD.

Subject to review by the Commissioner, the Commanding Officer of IAD shall have the authority to determine which departmental unit is to conduct employee investigations.

2.5    CIVIL LAW SUITS AND CLAIMS

Refer M.O.P. Chapter 6.

2.6    AUTHORITY OF I.A.D.
In pursuit of employee investigations, the Commanding Officer of IAD is authorized to transgress District and Division boundaries and lines of authority and (s)he shall be given complete cooperation by all department employees.

2.7    CONFIDENTIAL RECORDS
The Internal Affairs Division shall maintain a record of all complaints against the Department or its employees and shall be the central repository for all such complaints. These records shall be kept confidential and shall be separate and apart from regularly maintained personnel files.

All records concerning allegations of violations of Department standards of conduct which do not result in the lodging of Department charges shall be expunged after five years. In cases in which the employee is a party to a law suit involving his/her employment with the City or the City is also a named party, IAD records shall be maintained until the law suit has been concluded or until five years have expired from the date of the complaint, whichever is later.

Records concerning violations of Department standards of conduct which result in the preferring of Department charges, shall be maintained permanently in the employee's IAD file.

2.8    ANNUAL REPORTS
The Internal Affairs Division shall annually prepare statistical summaries of the activities of the unit.

2.9    I.A.D. ASSISTANCE TO OTHER UNITS
IAD is always available for advice and assistance. The 911 Communication Lt. shall be contacted when circumstances arise outside normal business hours. The 911 Communications Lt. may contact the on-call IAD investigator for further assistance should circumstances so require.

2.10    BLATANTLY FALSE COMPLAINTS
In those instances in which there are grossly or blatantly false accusations concerning employee misconduct and there exists evidence of intentional misrepresentation or the filing of false statements, the Commanding Officer of IAD shall recommend to the Commissioner that criminal action be pursued against the complainant.

**3.0    INVESTIGATING COMPLAINTS AND VIOLATIONS**

3.1    POLICY
It is the policy of the Buffalo Police Department to thoroughly investigate **ALL** complaints, from whatever source derived, and to investigate all allegations of misconduct or infractions of department standards of conduct. Each such investigation shall result in an appropriate disposition.

3.2    <u>WHERE COMPLAINTS MAY BE RECEIVED</u>

Citizen complaints concerning Department employees will be accepted at **ALL** police facilities in which sworn members are assigned regardless of whether the employee who is the subject of the complaint is assigned to that facility. Complaints may be made in person or over a telephone or through the mail, fax, departmental website, or in some instances through a third party as the case may be.

3.3    <u>SUBORDINATES TO NOTIFY SUPERVISOR/SUPERIOR OFFICER</u>

Subordinates becoming aware of complaints regarding an employee of the department, in whatever manner received, shall immediately notify his/her supervisor/superior officer.

3.4    <u>CITIZEN COMPLAINTS - SUPERVISOR/SUPERIOR OFFICER RESPONSIBILITIES</u>

It is the responsibility of every supervisor/superior officer to personally accept citizens' complaints concerning employees of the department. In those circumstances in which the supervisor/superior officer is away from the building/office, (s)he shall be requested to return immediately.

In every case in which a citizen makes a complaint concerning an employee of the department, the complainant shall be provided with the pamphlet entitled "How the Buffalo Police Department Complaint Process Works." The complainant shall also be allowed to read and review the departmental copy of the IAD Complaint Investigation Manual located at each District.

Often a complaint may result from a lack of understanding of the law or of police procedures. Complaints of this nature in which there is no basis for an allegation of misconduct or where there is obviously no violation of department standards of conduct, shall be resolved by the supervisor/superior officer if possible. The supervisor/superior officer need not prepare a Citizen Complaint Form (P-294) if the citizen is satisfied with the resolution and there are no grounds for further investigation. If the citizen cannot be satisfied or there may be a reason for further investigation, the supervisor/superior officer shall complete and forward a Citizen Complaint Form.

In cases in which a citizen alleges conduct by a department employee and the conduct, if true, would constitute any violation of department standards of conduct, the supervisor/superior officer must complete a Citizen Complaint Form.

A.    If the alleged conduct of the employee would constitute a minor violation but it is not of a repetitive nature, the supervisor/superior officer shall attempt to resolve the complaint. If (s)he is able to successfully resolve the complaint and the citizen is satisfied with the disposition, the supervisor/superior shall note his/her actions on the

Citizen's Complaint Finding Form (P-294b).

B. In cases alleging infractions of law, major violations of Department standards of conduct, minor violations of a repetitive nature, or other misconduct, the supervisor/superior shall complete and forward the Citizen Complaint Form to the Internal Affairs Division and no attempt shall be made to resolve the complaint at this time.

C. In cases in which the allegations, if proven, would constitute a crime (i.e. misdemeanor or felony), the supervisor/superior officer shall also prepare an incident report.

When a Citizen Complaint Form is completed concerning conduct of an employee not of the supervisor/superior officer's command, the supervisor/superior officer shall also forward a copy of the form to the employee's command.

Citizens shall not routinely be referred to IAD concerning a complaint against a departmental employee without first having completed a Citizen Complaint Form.

3.5    <u>HANDLING MINOR VIOLATIONS</u>

Minor violations of Department standards of conduct which are isolated incidents and which are not the subject of a citizen complaint may be handled with positive discipline.

In cases of minor violations of Department standards of conduct which are not isolated instances, supervisor/superior officer shall:

1. Prepare a memorandum detailing the incident. Upon giving remedial instruction, the supervisor/superior officer will include in the memorandum the nature of the remedial instruction provided;

2. A copy of the memorandum shall be issued to the employee. The employee may choose to respond in writing and the employee's response will be attached to each copy of the supervisor/superior officer's memorandum.

3. The memorandum shall be forwarded to IAD through the chain of command. The memorandum shall include a suggested disposition of the case from each of the superior officers in the chain of command including the initiating supervisor/superior officer. The memorandum and the employee's response, if any, will be filed in IAD.

4. The Commanding Officer of IAD will decide whether a IAD case file will be opened and the formal disciplinary process invoked.

3.6    <u>COMPLAINTS AGAINST SUPERIOR OFFICERS</u>

If a subordinate employee becomes aware that a superior officer has violated department standards of conduct, the subordinate shall notify IAD either in writing or in person. This does not permit subordinate employees to initiate complaints that they know are capricious, unjustifiable and without any basis in fact.

If a citizen attempts to lodge a complaint against a superior officer:

1.  The Superior Officer who is the subject of the complaint shall refer the complaint to an on-duty Supervisor of a higher rank than (s)he assigned to that command; or

2.  If no Supervisor of a higher rank assigned to that command is on duty, the Duty Officer or Captain assigned as the Duty Officer should investigate the complaint; or

3.  If there is no Duty Officer or Captain assigned as the Duty Officer on Duty, the complainant shall be referred to IAD.

3.7   DETERMINING WHICH COMMAND IS TO INVESTIGATE THE COMPLAINT

Upon receipt of a Citizen Complaint Form or a Department memorandum detailing allegations of substandard conduct, IAD will review the documents and determine which would be the best unit to handle the investigation. If accusations of a serious nature are alleged, IAD will investigate the case. The employee's command may be designated to investigate complaints that are minor in nature. The Commanding Officer of IAD, subject to the review of the Commissioner, shall determine which unit handles the investigation.

3.8   CONDUCTING THE INVESTIGATION

A.  When an employee investigation is assigned to the employee's command, the Chief or superior in charge of that command will be responsible for its completion. The Chief or superior in charge may delegate authority to lesser ranking superior officers of his/her command to pursue the investigation however, the ultimate responsibility for its completion rests with the Chief or superior in charge.

B.  All investigations targeting sworn members of the department must be conducted in conformance with the Police Officer's Bill of Rights. Investigations shall also be conducted as determined by the IAD Office Investigation Manual.

C.  All evidence must be thoroughly evaluated and witnesses must be carefully interviewed. Statements of witnesses shall be taken in appropriate cases.

D. In all cases, the complainant will be contacted and apprised of the results of the investigation. This may be done in writing or telephonically. A record of such contact must be noted on form P-294b.

E. All superior officers in the employee's chain of command will submit in writing their recommendations concerning the disposition of the case. In cases of citizen complaints this will be done on form P-294b. For non-citizen complaints the recommendations will be forwarded on an Intra-Departmental memorandum.

F. Cases shall be resolved within thirty (30) days. If additional time is required, a request in writing must be submitted to the Commanding Officer of IAD and approved by the Commissioner.

**NOTE**: If an employee's command conducts the investigation, the Command Officer conducting the investigation must speak with the complainant as part of their investigation.

3.9    <u>LINES OF AUTHORITY</u>
The Commanding Officer of IAD shall have authority to transgress District and Division boundaries, and lines of authority. In pursuit of such investigations, (s)he shall be given complete cooperation by department employees. Chiefs and other Superior Officers should not encroach on the command of their peers except in emergency circumstances (e.g. when the police purpose or good order of the department would be jeopardized by failure to take immediate action).

When minor complaints affect more than one command, the investigation shall be conducted by one Chief or superior in charge of the command, with the active cooperation of other affected Chiefs or superior in charge of the command. Recommendations shall reflect the combined thinking of the concerned Chiefs or superior's in charge of the commands.

3.10    <u>CONCLUSIONS OF FACT</u>
At the completion of each formal investigation the department shall reach one of the following conclusions of fact concerning the allegations:

SUSTAINED - Sufficient evidence exists to clearly prove the allegations.

EXONERATED - The alleged facts did occur but were justified and proper.

NOT SUSTAINED - Insufficient evidence exists to clearly prove the allegations.

UNFOUNDED - The alleged facts did not occur or the accused officer was not involved.

**4.0    <u>SUSPENSIONS PRIOR TO DISCIPLINARY HEARINGS</u>**

4.1    POLICY

Whenever there is an allegation of misconduct against a Department employee, it is the policy of the Buffalo Police Department to suspend that employee from duty prior to a disciplinary hearing, consistent with existing collective bargaining agreements, if the employee's continued presence on the job will disrupt the operations of the unit to which (s)he is assigned; or it will have an adverse impact on the Department; or the alleged violation is of a serious nature.

4.2    AUTHORITY TO SUSPEND FROM DUTY

Prior to Service of Charges

All officers of the rank of lieutenant and above are authorized to immediately suspend a subordinate for violations of department standards of conduct which are deemed to be of a serious nature including appearing for duty under the influence of alcohol. Such suspensions shall be with pay pending service of departmental charges.

1.    Consistent with the Department Drug Testing policy, sworn members appearing for duty under circumstances in which there exists reasonable cause to believe that they are under the influence of drugs shall be directed to submit to a "reasonable cause" drug test. They shall be relieved from duty and placed on administrative leave of absence with pay pending receipt of test results and the completion of any investigation conducted by the City. Refer to the Buffalo Police Department Drug Testing Policy.

After Service of Charges

After service of Departmental charges an employee may be suspended without pay for a period not to exceed thirty (30) days. Such suspension shall be at the direction of the Commissioner.

1.    Employees represented by Local 264 may be suspended without pay after service of charges only if their continued presence on the job would represent a potential danger to persons or property or would severely interfere with operations.

2.    All other employees of the Department may be suspended without pay after service of charges if their continued presence on the job would have an adverse impact on the Department.

4.3    PROCEDURE FOR SUSPENDING AN EMPLOYEE

Suspension With Pay Prior to Service of Charges - Civilian Employees

If a civilian employee is immediately suspended with pay prior to service of charges, the superior officer making the suspension shall inform the employee

that (s)he is suspended and the reason therefore.

<u>Suspension With Pay Prior to Service of Charges - Sworn Members</u>
Supervisors/superior officers contemplating suspending an employee prior to service of charges shall, absent exigent circumstances, first consult with IAD. If a sworn member of the Department is to be suspended prior to service of charges, the superior officer that suspends the sworn member shall:

1. inform the sworn member that (s)he is suspended and the reason therefore;

2. obtain the sworn member's badge and identification card;

3. if possible, ascertain if the sworn member has a valid pistol permit;
   a. if no permit is presented, obtain all handguns owned by the sworn member,
   b. if a valid permit is presented, obtain all Department issued weapons only;

4. prepare forms P10 and/or P-10a for the officer's weapons, badge and identification and deliver the property to the Property Office consistent with current directives;

5. notify IAD if IAD personnel are on duty, or notify the 911 Communications Lieutenant. when no IAD personnel are working and in such case the 911 Communications Lt. will notify the on-call IAD investigator;

6. prepare a memorandum detailing the conduct or activities for which the employee was suspended. Copies of the memorandum must be forwarded to IAD prior to the expiration of the suspending officer's tour of duty. A copy shall also be forwarded through the normal chain of command.

<u>Suspension Without Pay After Service of Charges</u>
Employees who are to be suspended without pay after service of charges shall first be served with the charges. The employee shall be allowed to review them and cite any inaccuracies before the suspension occurs.

4.4    <u>RETURN OF BENEFITS IF CHARGES ARE NOT SUSTAINED</u>
If the charges are not sustained, the accused person shall be restored to his/her position with full pay for any period of suspension less the amount of compensation for that period:

A.   which (s)he may have earned in any other occupation or employment;
B.   received from unemployment benefits

**5.0**     <u>**CHARGES AND HEARINGS**</u>

5.1     <u>POLICY</u>
When disciplinary charges are to be lodged against a Department employee, it is the policy of the Buffalo Police Department to prepare and serve the charges on the accused employee and to present evidence concerning the charges before the hearing officer designated to try the case.

5.2     <u>PREPARING THE CHARGES</u>

<u>Commissioner's Determination</u>
If after a thorough and complete employee investigation, the conclusion of fact results in a finding of "sustained," the Commissioner may direct, in his/her sole discretion, that Departmental charges be preferred against the accused employee. If the Commissioner determines that departmental charges are not to be preferred, (s)he shall direct that appropriate action be taken to insure that the employee's conduct is corrected and that the likelihood of recurrence is minimized. Any action directed by the Commissioner shall be consistent with the terms of the applicable collective bargaining agreement.

<u>Charges and Specifications Defined</u>
    1. The charge is the designation of the specific standard of conduct which the accused is charged with violating.

    2. The specification is a statement of facts which in law constitute the offense charged. Specifications should be drawn in clear and concise language and should contain the following information:

       a. rank, name and command of the accused;
       b. date, time and place of the alleged offense, (approximate entries will be acceptable);
       c. if the offense was committed more than once, or in more than one way, there shall be distinct specifications;
       d. each specification shall be complete in itself and not refer to facts or particulars of other specifications;
       e. specifications under each charge shall be numbered consecutively.

5.3     <u>SERVING THE CHARGES</u>
IAD shall prepare a "Notice of Charges" which shall be attached to the charges.

IAD shall issue or cause to be issued to the accused employee, a copy of the charges and "Notice of Charges."

If the charges are issued in person to the accused employee, the employee shall acknowledge receiving the charges by signing his/her name and the date thereon.

If the charges are not issued in person to the accused employee, the officer delivering the charges shall certify in writing on the original copy, the time, date, place and manner in which the charges were delivered. If the charges cannot be personally issued to the accused employee, charges may be issued by:

1. delivering the charges personally to some person of suitable age and discretion at the accused employee's place of residence; or
2. if the place of residence cannot be located, then by personally posting the charges in a conspicuous place in the stationhouse or office to which the accused employee is assigned.

In all cases, the employee's collective bargaining agent must also be served with the charges.

5.4    ANSWER TO CHARGES
The accused employee shall have ten (10) days, exclusive of the date of service, in which to answer the charges.

The answer must be in writing and must be served on the Commissioner.

Failure to serve a written answer within the time provided shall be deemed an admission of the charges. However, where the accused defaults in answering, (s)he shall be permitted to show matters in mitigation of any punishment which may be imposed.

5.5    AMENDMENTS TO THE CHARGE
After charges have been preferred, they may be altered or amended by the Commissioner, or (s)he may cause new charges to be prepared.  Slight errors in names, dates and amounts may be corrected by the Commissioner on motion.

All causes for complaints against the accused employee arising from the same incident and not covered by the original or amended charges shall be forever barred.

5.6    INFORMAL CONFERENCE
Within ten (10) days after the receipt of the written answer to the charges preferred, or if the accused employee defaults in answering, within ten (10) days after his/her time to answer has expired, the Commissioner shall conduct an informal conference upon the charges. At such conference the accused employee shall have the opportunity to be represented by his/her collective bargaining agent or by legal counsel. (S)he may,  if (s)he desires, present witnesses on his/her behalf. The Commissioner shall have the power to dismiss or withdraw the charges if the conference so warrants, or accept a plea of guilty.
In all cases where the accused employee enters a plea of guilty, the Commissioner shall receive evidence showing all the circumstances of mitigation or aggravation which accompanied the offense, unless they are fully disclosed in the

specifications.

In the event that the charges are not withdrawn or dismissed after such conference or if a plea of guilty has not been entered, a formal hearing shall then be held upon the charges before a hearing officer mutually selected by the parties. Such hearing officer shall be deemed to be the person designated by the Commissioner for that purpose within the meaning Section 75 of the Civil Service Law of the State of New York. In the case of a sworn member, where the parties are unable to agree upon a hearing officer, or, where the hearing officer agreed upon is or becomes unable or to act, then the parties shall mutually apply to the Supreme Court of the State of New York for the appointment of a hearing officer.

5.7    <u>UNIFORMS TO BE WORN</u>
Uniformed employees of the Department shall appear at the Informal Conference and/or Formal Hearing and shall do so in uniform.

Officers assigned to Detective or plainclothes duty, Officers on long time sick and IOD status and non-uniform civilian employees, need not appear in uniform at the Informal Conference and/or Formal Hearing however, shall appear in acceptable attire as if attending court. (See M.O.P. Chapter 6)

5.8    <u>RIGHTS OF THE ACCUSED EMPLOYEE</u>
The accused employee is entitled to the following, as a matter of right:

A reasonable time in which to prepare for trial;

To be present at the trial;

To be heard in person and by counsel and to give and furnish evidence in  his/her defense;

To reasonable adjournments in order to be able to prepare for trial;

(S)he shall not be compelled in advance of the trial to disclose the names of any of his/her proposed witnesses;

Upon application, the Commissioner shall issue blank subpoenas in which the accused or his/her attorney may insert the name of any person (s)he desires to attend and give evidence.

The burden of proving the charges shall rest with the Department.

5.9    <u>SUBPOENAS</u>
The Commissioner shall have the power to administer oaths and issue subpoenas. In case any witness shall refuse to appear or answer any proper question, (s)he may be ordered to do so by a justice of any court of record, and punished for

his/her disobedience of any such order in accordance with law.

The impartial hearing officer selected to conduct the formal hearing shall be vested with all the powers of the Commissioner in conducting the hearing.

5.10    ADJOURNMENT: ABSENCE OF WITNESSES
Upon application by the accused for adjournment of the formal hearing because of the absence of a witness for the accused, it should distinctly appear upon his/her oath that:

The witness is material, and why;

The accused employee has used due diligence to require the attendance of the witness;

The accused has reasonable grounds to believe that (s)he will be able to procure such attendance within a reasonable time. If the absence of a witness is caused by sickness, the accused employee must produce a certificate from the attending physician to that effect.

5.11    RECORDING THE FORMAL HEARING
All formal hearings must be recorded.

If the accused employee is found guilty, a copy of the charges, his/her written answer, a transcript of the hearing, and the final determination itself shall be placed in the employee's personnel file. A copy thereof shall also be filed with the Municipal Civil Service Commission.

A copy of the transcript of the hearing shall, upon the request of an accused employee who has been found guilty, be furnished without charge.

5.12    RULES OF EVIDENCE
Compliance with the technical rules of evidence during a formal disciplinary hearing is not required.

5.13    REVIEW OF THE HEARING OFFICER'S DECISION
After the formal hearing, the impartial hearing officer shall make findings and recommendations which shall be referred to the Commissioner for review and decision. The judgment of the Commissioner will be set forth as an order or resolution and will become part of the record of the case.

If the PBA disagrees with the decision of the Commissioner of Police to change the decision recommended by the Hearing Officer concerning a sworn member of the Department, the PBA may seek review of such change in decision. The parties, through the American Arbitration Association and within seven days of the Commissioner's decision, shall mutually select an arbitrator to review the

case. It is understood that such arbitrator shall not be authorized to conduct a rehearing of the matter, but only to review the record of the proceeding to determine whether the change in decision by the Commissioner was supported by substantial evidence in the record. If the arbitrator so determines, (s)he shall have the authority to award an appropriate remedy which shall be final and binding upon the parties and the sworn   member involved. It is further understood that the cost of such arbitration shall be shared equally between the parties.

Any employee believing himself/herself aggrieved by a penalty or punishment of demotion in or dismissal from the service, or suspension without pay, or a fine imposed pursuant to the provisions of the collective bargaining agreement, may appeal from such determination either by an application to the Buffalo Municipal Civil Service Commission or by an application to the Supreme Court in accordance with the provisions of Article 78 of the Civil Practice Laws and Rules. If such person elects to appeal to the Commission, (s)he shall file such appeal, in writing within twenty (20) days after receiving written notice of the determination to be reviewed. In accordance with the provisions of Subdivision 76 of the Civil Service Law, the decision of the Commission shall be final and conclusive and not subject to further review in court.

5.14    TERMINATION CONFERENCE
If an employee's dismissal results from disciplinary action or for violation of the Department's Drug Testing Policy, a termination conference shall be held. At this conference the employee facing dismissal shall be:

Informed of the reason for the dismissal;

 Informed of the effective date of the dismissal;

 Informed of the status of fringe benefits and retirement benefits;

Informed of the contents of his/her personnel file as it relates to the cause of dismissal;

 Required to return all Department property and equipment.

5.15    SEEKING INTERCESSION ON BEHALF OF THE ACCUSED
Employees against whom charges have been preferred, shall not in any manner, or at any time, cause any person to intercede for them, personally or otherwise.

5.16    AFFECT OF A FINDING OF GUILT LIMITED TO TWO YEARS
After a lapse of two (2) years, a determination that an accused employee was guilty of the charges preferred against him/her shall not be considered upon application for promotion made by him/her, nor shall it affect any right or privilege to which (s)he would otherwise be entitled were it not for such determination. A lapse of two years shall be deemed to have occurred two years

from the date that the Department accepts a plea of guilty to the charges, or two years after the Commissioner receives the findings and recommendations of the hearing officer.

5.17    RESIGNATIONS, SEPARATION FOR CAUSE

The Commissioner shall caused to be placed in the personnel file of any employee resigning or separating from the Department for cause, all the facts pertinent to the action.

## 6.0    PREVENTING DISCRIMINATION IN THE WORKPLACE

6.1    POLICY

It is the policy of the Buffalo Police Department to treat all employees fairly and to seek out and prevent discrimination to or by its employees that is based upon race, color, religion, sex or national origin.

6.2    COMPLAINT PROCEDURE

Department employees who feel aggrieved because of discrimination that is based upon race, color, religion, sex or national origin, which occurs in the work place, may make their concerns known by any of the following means.

Aggrieved employees who feel comfortable doing so may directly inform the person engaging in the discriminatory conduct that the conduct is discriminatory and that it must stop.

Aggrieved employees who do not wish to communicate directly with the person engaged in the discriminatory conduct, or if direct communication with the offending party has proved unavailing, may contact either their own immediate supervisor or the offending party's immediate supervisor. The supervisor shall immediately prepare a memorandum detailing the allegations of the subordinate and have such report delivered to IAD prior to the start of the next business day. Copies of the memorandum shall be forwarded through the chain of command to the offending party's District/Division Chief or Commanding Officer. Minimally the report shall include:

1. the date of receipt of the complaint;
2. identification of the complainant;
3. identification of the party or parties and the action complained of, including all relevant background facts and circumstances;
4. a statement detailing the scope of the preliminary investigation that had been undertaken and the results thereof;
5. a statement of corrective measures pursued, the dates such measures were undertaken and the results achieved.

Aggrieved employees who do not wish to communicate directly with the person engaged in the discriminatory conduct and who do not chose to contact their own

immediate supervisor or the offending party's immediate supervisor, may as an alternative, directly contact the Labor Relations Division.

Aggrieved employees who do not choose to directly confront the person engaging in the discriminatory conduct, or who do not choose to contact their own immediate supervisor or the offending party's immediate supervisor, or contact the Labor Relations Division, may prepare a memorandum detailing their allegations and forward the memorandum directly to IAD.

Aggrieved employees alleging discriminatory conduct by anyone with supervisory authority, or the failure by supervision to take immediate action on the employee's complaint, may also file a formal grievance in accord with the provisions of the appropriate collective bargaining agreement grievance procedure.

6.3     <u>TIMELINESS FOR INITIATING COMPLAINTS OR GRIEVANCES</u>
There are no express time limits for initiating complaints under this policy, however, every effort should be made to file such complaints as soon as possible, while facts and potential testimony of witnesses, if any, are still fresh.

Employee grievance procedures under collective bargaining agreements have time limits. If the employee submits a grievance alleging discrimination based upon race, color, religion, sex or national origin and the grievance procedure outlined in the appropriate collective bargaining agreement is invoked, time limits must be observed.

Complaints to the Equal Employment Opportunity Commission must be filed within one hundred eighty (180) days.

6.4     <u>INTERNAL AFFAIRS DIVISION AS CENTRAL REPOSITORY</u>
IAD shall be the unit for channeling and recording all complaints against Department employees involving allegations of discrimination based upon race, color, religion, sex or national origin. IAD shall be responsible for insuring that all complaints are dealt with fairly, effectively, and in accord with Department policies and procedures.

Upon receipt of such a complaint, IAD shall immediately notify the Division of Labor Relations. IAD shall fully cooperate with the Division of Labor Relations in handling complaints of this nature.

IAD shall maintain such records, establish such systems, and adopt such procedures that are necessary to handle complaints involving allegations of discrimination in the workplace that are based on race, color, religion, sex or national origin.

If the Commissioner determines that a complaint would best be processed under the grievance procedures outlined in the respective collective bargaining

agreements, (s)he shall refer the complaint to the appropriate collective bargaining agent.

6.5    INVESTIGATION

All complaints alleging discrimination in the workplace that are based upon race, color, religion, sex, or national origin shall be thoroughly and completely investigated by IAD. IAD shall interview all witnesses, Department personnel, persons named in the complaint, and any other person who may have pertinent information. All relevant evidence shall be carefully examined. At the completion of the investigation, IAD shall report their findings and make appropriate recommendations to the Commissioner.  Cases shall be resolved within thirty (30) days, with extensions granted by the Commissioner based upon good cause.

The Commanding Officer of IAD shall keep the Commissioner informed at all times of the progress of the investigation.

The Commanding Officer of IAD shall have authority to transgress District and Division boundaries and lines of authority. In pursuit of such investigations (s)he shall be given complete cooperation by Department employees.

6.6    COMMISSIONER'S DETERMINATION

The Commissioner shall make a determination as to the validity of the complaint, based upon the report of IAD. If the Commissioner determines that the complaint may be valid, (s)he shall determine the best course of action.

The Commissioner's choices include, but are not limited to, preferring charges against employees violating Department standards of conduct; amending rules, regulations, policies and procedures; or referring the complainant to the grievance process outlined in the appropriate collective bargaining agreement if the time limits for filing the grievance have not yet expired. In every case, the complaining employee shall be provided with the written determination of  the Commissioner.

6.7    RESPONSIBILITY OF SUPERVISORS/SUPERIOR OFFICERS

It is the responsibility of supervisors/superior officers to prevent, report and uncover instances in the workplace in which discrimination based on race, color, religion, sex or national origin occurs. They shall take prompt remedial measures commensurate with the level of authority vested in their rank and position. Such remedial measures shall be consistent with current directives and shall not breach the applicable collective bargaining agreement.

## 7.0    PREVENTING SEXUAL HARASSMENT IN THE WORKPLACE

7.1    POLICY

It is the policy of the City of Buffalo (hereafter "City") and the Buffalo Police Department to provide a business and employment environment free of unwelcome sexual advances, requests for sexual favors and other verbal or

physical conduct or communications, which have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment constituting sexual harassment as defined and otherwise prohibited by state and federal statutes.

7.2    DEFINITION OF SEXUAL HARASSMENT
The U.S. Equal Employment Opportunity Commission (EEOC) has issued guidelines interpreting Section 703 of Title VII as prohibiting sexual harassment (29 CFR 1604.11). Sexual harassment is defined in these guidelines as follows:

> ...Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Further, New York State Human Rights Law prohibits discrimination on the same basis as covered by Title VII, including sexual harassment.

7.3    CONDUCT CONSTITUTING SEXUAL HARASSMENT
An employee's engaging in sexual harassment in the workplace brings discredit to the Department as well as the offending employee and it is prejudicial to the Department's good order, discipline and reputation.   Sexual harassment is prohibited and employees shall not:

1.  Make sexual advances or request sexual favors when submission to, or rejection of, such advances or requests is the basis for either implicitly or explicitly recommending, imposing, granting, withholding or refusing terms and conditions that either favor or adversely affect the employment of the employee or individual;

2.  Recommend, impose, grant, withhold or refuse to take any personnel or other action consistent with the offending employee's duties and responsibilities because of sexual favors or as a reprisal against an employee or other individual who has rejected or reported sexual advances;

3.  Disregard and fail to investigate allegations of sexual harassment whether reported by the employee or individual who is the subject of the alleged harassment or a witness, and fail to take immediate corrective action in the event misconduct has occurred.

Employees shall not abuse any other person through conduct or communication of

a sexual nature and constituting sexual harassment as defined in section M.O.P. Chapter 15 above. Whenever such conduct exists, prompt and corrective action is required.

Whenever there is reason to believe disciplinary action is warranted, the supervisor or other responsible individual is required to take prompt and corrective action commensurate with the authority vested in his/her rank and position. Such remedial action shall be consistent with Department directives and shall not breach the applicable collective bargaining agreement.

The violation of this policy can result in discipline and discharge for employees pursuant to Section 75 of the Civil Service Law and the discipline clause of the appropriate collective bargaining agreement, if applicable; and such penalties, sanctions and impositions against other individuals or parties          as may be available to the City, given the nature of the contractual or business relationship that may be established with such parties or individuals.

7.4    <u>COMPLAINT PROCEDURE</u>
Department employees who feel aggrieved because of sexual harassment may make their concerns known by any of the following means.

Aggrieved employees who feel comfortable doing so may directly inform the person engaging in sexual harassment conduct or communications that the conduct is offensive and that it must stop.

Aggrieved employees who do not wish to communicate directly with the person whose conduct or communication is offensive, or if direct communication with the offending party has proved unavailing, may contact either their own immediate supervisor or the offending party's immediate supervisor. The supervisor shall immediately prepare a memorandum detailing the allegations of the subordinate and have such report delivered to IAD prior to the start of the next business day. Copies of the memorandum shall be forwarded through the chain of command to the offending party's District/Division Chief or Commanding Officer. Minimally the report shall include:

1. the date of receipt of the complaint;
2. identification of the complainant;
3. identification of the party or parties and the action complained of, including all relevant background facts and circumstances;
4. a statement detailing the scope of the preliminary investigation that had been undertaken and the results thereof;
5. a statement of corrective measures pursued, the dates such measures were  undertaken and the results achieved.

Aggrieved employees who do not wish to communicate directly with the person engaged in the sexual harassment conduct or communications and who do not

chose to contact their immediate supervisor or the offending party's immediate supervisor, may as an alternative directly contact the Labor Relations Division.

Aggrieved employees who do not choose to directly confront the person engaging in the discriminatory conduct, or who do not choose to contact their immediate supervisor or the offending party's immediate supervisor, or contact the Labor Relations Division, may prepare a memorandum detailing their allegations and forward the memorandum directly to IAD.

Aggrieved employees alleging sexual harassment by anyone with supervisory authority, or the failure by supervision to take immediate action on the employee's complaint, may also file a formal grievance in accord with the provisions of the appropriate collective bargaining agreement grievance procedure.

7.5    TIMELINESS FOR INITIATING COMPLAINTS OR GRIEVANCES

There are no express time limits for initiating complaints alleging sexual harassment however; every effort should be made to file such complaints as soon as possible, while facts and potential testimony of witnesses, if any, are still fresh.

Employee grievance procedures under collective bargaining agreements have time limits. If the employee submits a grievance alleging sexual harassment in the workplace and the grievance procedure outlined in the appropriate collective bargaining agreement is invoked, time limits must be observed.

Complaints to the Equal Employment Opportunity Commission must be filed within one hundred eighty (180) days.

7.6    INTERNAL AFFAIRS DIVISION AS CENTRAL REPOSITORY

IAD shall be the unit for channeling and recording all complaints against Department employees alleging sexual harassment in the workplace. IAD shall be responsible for insuring that all complaints are dealt with fairly, effectively, and in accord with Department policies and procedures.

Upon receipt of such a complaint, IAD shall immediately notify the Division of Labor Relations. IAD shall fully cooperate with the Division of Labor Relations in handling complaints of this nature.

IAD shall maintain such records, establish such systems, and adopt such procedures that are necessary to handle complaints involving sexual harassment in the workplace.

7.7    INVESTIGATION

IAD shall conduct a thorough and complete investigation of all complaints alleging sexual harassment in the workplace. IAD shall interview all witnesses, Department personnel, persons named in the complaint, and any other person who may have pertinent information. All relevant evidence shall be carefully

examined. At the completion of the investigation, IAD shall report their findings and make appropriate recommendations to the Commissioner. Cases shall be resolved within thirty (30) days, with extensions granted by the Commissioner for good cause.

The Commanding Officer of IAD shall keep the Commissioner informed at all times of the progress of the investigation.

The Commanding Officer of IAD shall have authority to transgress District and Division boundaries, and lines of authority. In pursuit of such investigations (s)he shall be given complete cooperation by Department employees.

7.8     COMMISSIONER'S DETERMINATION
The Commissioner shall make a determination as to the validity of the complaint, based upon the report of IAD. If the Commissioner determines that the complaint may be valid, (s)he shall determine the best course of action. The Commissioner's choices include, but are not limited to, preferring charges against employees violating Department standards of conduct; amending rules, regulations, policies and procedures; or referring the complainant to the grievance process outlined in the appropriate collective bargaining agreement if the time limits for filing the grievance have not yet expired. In every case, the complaining employee shall be provided with the written determination of the Commissioner.

7.9     RESPONSIBILITY OF SUPERVISORS/SUPERIOR OFFICERS
It is the responsibility of supervisors/superior officers to prevent, report and uncover instances in the workplace involving sexual harassment. They shall take prompt remedial measures commensurate with the level of authority vested in their rank and position. Such remedial measures shall be consistent with current directives and shall not breach the applicable collective bargaining agreement.

7.10    CONSISTENCY WITH CITY OF BUFFALO SEXUAL HARASSMENT POLICY
Nothing in the Police Department's Sexual Harassment Policy shall be construed to be inconsistent with the principles outlined in the City of Buffalo Sexual Harassment Policy. The Police Department's policy adapts the City policy to the needs peculiar to the Police Department.

# CHAPTER 16: COURTESIES AND RECOGNITION

## CONTENTS

**1.0   COURTESY**
1.1   Policy
1.2   Attitude and Impartiality
1.3   Assistance to Citizens
1.4   Titles
1.5   Reporting to Superior Officers
1.6   Addressing plain clothes officers
1.7   Assistance to Fellow Employees

**2.0   HONORS AND SALUTES**
2.1   Policy
2.2   Executing the Hand Salute
2.3   Saluting During the National Anthem
2.4   Saluting the American Flag

**3.0   DISPLAYING THE AMERICAN FLAG**
3.1   Policy
3.2   Displaying the American Flag - Generally
3.3   Displaying the American Flag for Deceased Members

**4.0   AWARDS**
4.1   Policy
4.2   Awards Board
4.3   Reports of Meritorious Service
4.4   Reporting Citizens' Meritorious Service
4.5   Presentation of Awards
4.6   Types of Awards
          A.  Medal of Honor
          B.  Medal of Valor
          C.  Distinguished Service Award
          D.  Commissioner's Leadership Award
          E.  Mayor's Award of Merit
          F.  Expert Marksmanship Award
          G.  Physical Fitness Award
          H.  Civilian Distinguished Service Award
          I.   The Mayor's Civilian Award of Merit
4.7   Wearing of Ribbons and Medals
4.8   Commendations to be Retained in Personnel Folder
4.9   Rewards, Gratuities and Gifts

**5.0   COURTESIES TO DECEASED MEMBERS**
5.1   Policy

COB000823

5.2     Notice of Death
5.3     Display of American Flag
5.4     Deaths of Active Members
5.5     Deaths of Retired Members

**6.0     LINE OF DUTY DEATHS - FUNERAL SERVICES**
6.1     Policy
6.2     Assistance to the Family of Members Who Were Killed in the Line of Duty
6.3     Choice of Funeral Services
6.4     Teletype Message
6.5     Coordinating Funeral Services - Chief of Patrol
            A.  Commanding Officer of the Traffic Bureau
            B.  Public Information Officer
            C.  Commanding Officer of the Police Honor Guard
6.6     Pre-Funeral Planning
6.7     Casket Watch
6.8     Uniforms to be Worn at Police Funerals
6.9     Attending the Funeral Service

**7.0     LINE OF DUTY DEATH OUTSIDE THE BPD**
7.1     Policy
7.2     Geographic Area
7.3     Responsibilities of Police Honor Guard Commander
7.4     Volunteers
7.5     Transportation
7.6     Reimbursement Forms
7.7     Limitation on the Number of Attendees

P-00B000824

### 1.0 COURTESY

1.1 POLICY

It is the policy of the Buffalo Police Department that its employees perform their duties in an efficient, courteous, and orderly manner using patience and good judgment at all times. They shall be courteous and considerate to the public, to their superior officers and to their fellow employees. They shall not use harsh, profane, or insolent language. They shall be tactful in the performance of their duties and they are expected to exercise the utmost patience and discretion even under the most trying circumstances.

1.2 ATTITUDE AND IMPARTIALITY

Employees, while vigorous and unrelenting in the enforcement of the law, must maintain a strictly impartial attitude toward complainants, violators, witnesses and suspects.

1.3 ASSISTANCE TO CITIZENS

Employees shall, in accordance with policies and procedures of the Department, render all possible police service to any citizen seeking information or assistance.

1.4 TITLES

A. Superior officers shall be addressed by their correct title and surname at all times.

B. When answering Department telephones, employees shall apprise the caller of the employee's rank and surname.

1.5 REPORTING TO SUPERIOR OFFICERS

A. Unless expressly authorized to the contrary, Department employees desiring to confer with a superior officer (refer M.O.P. Chapter 9 concerning "official" and "unofficial" communications) who is not their immediate superior, shall first obtain their immediate superior's permission. The integrity of the chain of command is essential to the good order of the Department and it should not be breached unnecessarily.

B. When reporting to a superior officer, employees of the Department must show all due deference to that superior Officer.

1.6 ADDRESSING PLAIN CLOTHES OFFICERS

Unless addressed first, Department employees shall not address or call attention to plain clothes officers while the plainclothes officers are in the performance of duty. This is to ensure the safety of the plainclothes officers.

1.7    ASSISTANCE TO FELLOW EMPLOYEES
In accordance with established procedures, employees shall come to the aid of, and assist and protect their fellow employees to the fullest extent practicable.

## 2.0    HONORS AND SALUTES

2.1    POLICY
It is the policy of the Buffalo Police Department that all employees exhibit proper respect during the playing of the national anthem and when acknowledging the display of the American flag. Uniform members of the Department shall use the hand salute during these instances and also when encountering a superior officer.

2.2    EXECUTING THE HAND SALUTE
Uniformed members of the Department shall render the hand salute by raising the right hand smartly until the tip of the forefinger touches the lower part of the headdress or forehead above the right eye. The thumb and forefinger shall be extended and joined with the palm facing to the left.  The hand, wrist and forearm shall be aligned and inclined about 45 degrees. The salute shall be executed while looking at the person or object that is being saluted. When the salute has been returned, or recognition acknowledged, the hand shall be dropped smartly to the side in one smooth motion. Salutes shall only be rendered from the position of "attention."

2.3    SALUTING DURING THE NATIONAL ANTHEM

A.    Uniformed Members
When the National Anthem is played, uniformed members of the Department shall face the American flag, assume the position of "Attention," and execute the hand salute until the Anthem is completed. The baton, if carried, shall be placed under the left arm while the salute is being executed.

B.    Plain Clothes Employees
When the National Anthem is played, non-uniformed employees of the Department shall remove their hat, if any, and place it over the left breast. If no hat is worn, they shall place their right hand over the left breast.

2.4    SALUTING THE AMERICAN FLAG

A.    Uniformed Members
Upon the approach of the American flag, uniformed members of the Department shall assume the position of "Attention." The hand salute shall be executed when the flag is six paces away and shall be held until it has gone six paces past. When indoors, the hand salute shall be executed when the flag is carried into any room or building in which the uniformed member is present. If the member is carrying a baton, the baton shall be placed under the left arm while the salute is being executed.

B. <u>Non-uniformed Employees</u>
Upon the approach of the American Flag, non-uniformed employees of the Department shall remove their hat, if any, and hold it over the left breast. If no hat is worn, they shall place the right hand over the left breast.

## 3.0    DISPLAYING THE AMERICAN FLAG

3.1    <u>POLICY</u>
It is the policy of the Buffalo Police Department that the American Flag will be displayed on all Department buildings in a manner consistent with proper flag etiquette.

3.2    <u>DISPLAYING THE AMERICAN FLAG - GENERALLY</u>

A. The American Flag shall be displayed in a manner consistent with flag etiquette. It shall never be dipped to any person or any thing.

B. Beginning at sunrise and ending at sunset the American Flag will be flown daily on all Department buildings, except during inclement weather.

C. On Memorial Day, the flag will be flown at half staff from sunrise until noon, and at full staff from noon until sunset.

D. Public Law 103-322 directs that the flag of the Unite States be displayed at half staff on all government buildings on May 15, National Peace Officers Memorial Day.

3.3    <u>DISPLAYING THE FLAG FOR DECEASED MEMBERS</u>

A. <u>Death of an Active Sworn Member</u>
When an active sworn member dies, the American Flag shall be flown at half staff at all Department buildings from the time of the member's death until sunset on the day of the funeral.

B. <u>Death in the Line of Duty</u>
When a sworn member is slain in the line of duty, the American Flag will be flown at half staff at all Department buildings from the time of death until sunset of the day of the funeral. At the stationhouse to which the member was assigned, the American Flag shall be flown at half-staff from the time of death until ten (10) days thereafter.

## 4.0    AWARDS

4.1    <u>POLICY</u>
It is the policy of the Buffalo Police Department to bestow recognition to members of the Department and to the community, who engage in noteworthy

law enforcement related actions. Awards of this type are not only a credit to the individual member but reflect positively on the Department as a whole.

4.2    AWARDS BOARD

The Department Awards Board shall be comprised of seven sworn members of the Department.

The Board shall consist of the seven appointed Chiefs.

A. Chief assigned to the Awards Board shall serve as the Chairperson and make final determinations as to its members.

B. The Awards Board will review and evaluate all nominations submitted.

C. The Awards Board will make recommendations to the Commissioner concerning the presentation of the various Departmental Honors. For awards presented by outside agencies, the Awards Board will make recommendations when the outside agency requests that the Department submit nominations.

4.3    REPORTS OF MERITORIOUS SERVICE

A. Superior Officers shall prepare and forward to the Chairperson or any member therein, a complete report of any meritorious or outstanding police service performed by a subordinate which has come to the Superior Officer's attention.

B. Any employee may submit a report to the Awards Board recognizing any meritorious or outstanding police service performed by himself/herself or another member, and which the employee believes worthy of attention.

C. All reports shall be prepared on Intra-Departmental Memorandum and shall be forwarded through the chain of command to the Awards Chairperson.

4.4    REPORTING CITIZEN'S MERITORIOUS ACTIONS

A. Any member of the Department having knowledge of any meritorious service performed by a civilian in furtherance of law enforcement, shall call it to the attention of their Commanding Officer.

B. The Commanding Officer shall prepare a report on Intra-Departmental Memorandum and forward the report to the Awards Board for review. The report may contain a request that the civilian be commended in the name of the Department for his/her actions.

4.5    PRESENTATION OF AWARDS

The Commissioner shall present the awards at least three times annually. They shall be presented during the months of  January, May and September of each year or at any other time deemed appropriate by the Commissioner.

4.6    TYPES OF AWARDS

A.    Medal of Honor

The Medal of Honor is the Department's highest award. It shall be presented to a member of the Department who, in the line of duty, distinguishes himself/herself by performing an extraordinary act of bravery while consciously disregarding actual and serious imminent danger to his/her life. This award shall be presented annually or at any other time deemed appropriate by the Commissioner. The award shall consist of a medal attached to a red, white and blue ribbon.

B.    Medal of Valor

The Medal of Valor is awarded for an action in which the member places his/her life in jeopardy while performing either a life saving action, preventing a serious crime, or effecting the arrest of an armed and dangerous felon. The Medal of Valor may be presented to a civilian for an action in which the civilian jeopardizes his/her own safety to assist a member of the Buffalo Police Department. This award shall be presented three times annually or at any other time deemed appropriate by the Commissioner. The award shall consist of a medal attached to a red and white ribbon.

C.    Commissioner's Medal of Commendation

The Commissioner's Medal of Commendation is awarded to members of the Department who exemplify outstanding police work. It shall be presented to Officers for recognition of their hard work and dedication to their sworn profession as Police Officers. This award shall be presented three times annually to a member of each District and special unit to recognize their excellence in service and devotion to duties. The Award shall consist of a medal attached to a blue and white ribbon.

D.    Distinguished Service Award

The Distinguished Service Award shall be presented to members of the Department who have provided exceptional police service throughout their career that evokes merit to themselves and the Department. This award shall be presented to members who have served on the Department for a minimum of ten years and continue to provide distinguished service. This award shall be presented annually or at any other time deemed appropriate by the Commissioner. The award shall consist of medal attached to a blue and red ribbon.

E.  Commissioner's Leadership Award
The Commissioner's Leadership Award shall be presented to those members of the Department who have displayed the leadership and dedication that exemplify the mission and values of the Buffalo police Department. The award shall be presented annually or at any other time deemed appropriate by the Commissioner and shall consist of a green and gold medal.

F.  Mayor's Award of Merit
The Mayor's Award of Merit shall be presented by the Mayor to those members who have performed meritorious police service that reflects credit on themselves and the Department. This award shall be presented annually or at any other time deemed appropriate by the Commissioner and shall consist of a blue and gold medal.

G.  Civilian Distinguished Service Award
The Civilian Distinguished Service Award shall be presented to those civilian members of the Department who have performed acts of distinguished service that reflect beneficially on themselves and the Department. This award shall be presented annually or at any other time deemed appropriate by the Commissioner and shall consist of a plaque.

H.  The Mayor's Civilian Award of Merit
The Mayor's Civilian Award of Merit shall be presented to any member of the public who has engaged in any meritorious service that assists the Buffalo Police Department. This award shall be presented annually or at any other time deemed appropriate by the Commissioner and shall consist of a plaque.

I.  Expert Marksmanship Award
The Expert Marksmanship Award shall be presented to members who have attained a score of at least 225 out of a possible 250 (or comparable scoring method) on the BPD firearms requalification course. This award will be presented at the time the Officer qualifies and only upon verification of Firearms Unit Personnel. It will be renewed each year provided the minimum score is achieved. The award shall consist of a medal.

J.  Physical Fitness Award
The Physical Fitness Award shall be presented to members who voluntarily take a physical fitness test and achieve a predetermined score, as witnessed by the Officer designated to implement the program. The award shall consist of a medal.

4.7  WEARING OF RIBBONS AND MEDALS
Refer to M.O.P. Chapter 12.

4.8     COMMENDATIONS TO BE RETAINED IN PERSONNEL FOLDER
All reports of commendations, from whatever source received, shall be retained in the member's permanent personnel file.

4.9     REWARDS, GRATUITIES AND GIFTS

A.  Any member receiving a reward, gratuity or gift, as a consequence of his/her status as a member of the Department or for any service provided in the performance of duty, shall through his/her Commanding Officer, promptly forward it to the Commissioner, together with a written report explaining the reason and the nature of the services for which such reward, gift or gratuity was received.

B.  The Commissioner at his/her discretion, may permit a member to retain the reward, gift or gratuity, for meritorious or extraordinary service rendered by the member in the discharge of the member's duty.

**5.0     COURTESIES TO DECEASED MEMBERS**

5.1     POLICY
It is the policy of the Buffalo Police Department to pay tribute to its deceased members.

5.2     NOTICE OF DEATH

A.  Active Members
Upon receipt of official notice of the death of an active member of the Department, an Officer of higher rank shall cause to be transmitted over the electronic mail system, a Special Order showing the deceased member's name, address, place of assignment and the time and place of death.

B.  Retired Members
Upon receipt of official notice of the death of a retired member of the Department, an Officer of higher rank shall cause to be transmitted over the electronic mail system, a message showing the deceased retired member's name, address, and the time and place of death.

5.3     DISPLAY OF AMERICAN FLAG
Refer to M.O.P. Chapter 15.

5.4     DEATHS OF ACTIVE MEMBERS

A.  Officers of the Rank of Inspector and Above
With the permission of the deceased member's family, and at the direction of the Commissioner or his/her designee, the Police Honor Guard shall be present for the viewing and the funeral services of any officer of the rank of

Inspector and above.  A military flag folding ceremony and rifle salute will be performed.

B.  <u>All Other Sworn Members of the Department</u>
Upon the request of a deceased member's family, the Department will provide the following funeral rites:

1.  The Honor Guard Commander will provide uniformed or non-uniformed pallbearers drawn from on-duty personnel.  If the deceased member's family requests a particular member to serve as a pallbearer and the requested member is off duty, it will be the responsibility of the deceased member's family to contact the member so requested.  There will be no overtime pay or compensatory time given to such off duty members.

2.  The Commanding Officer of the Police Honor Guard will also direct eight (8) members of the Honor Guard to escort the casket from the funeral home to the church and then to the place of interment. If no church ceremony is held, that step will be omitted. A military flag folding ceremony and rifle salute will be performed.

3.  A casket watch may be provided by uniformed officers on a volunteer basis during the hours of the wake.

5.5  <u>DEATHS OF RETIRED MEMBERS</u>

A.  <u>Retired Officers of the Rank of Inspector and Above</u>
With the permission of the deceased member's family, and at the direction of the Commissioner or his/her designee, the Police Honor Guard shall be present for the viewing and the funeral services of any officer of the rank of Inspector and above. On the day of the funeral eight (8) members of the Honor Guard will escort the funeral from the church to the place of interment. A military flag folding ceremony and rifle salute will be performed.

B.  <u>All Other Retired Sworn Members of the Department</u>
At the request of the deceased member's family, the Department will provide the following funeral rites.

1.  The designated Protocol Officer shall direct the Commanding Officer of the Police Honor Guard to assign four (4) members of the Honor Guard to represent the Buffalo Police Department on the day of the funeral. At the discretion of the family, the Honor Guard may act as casket watchers, or in an escort capacity. Upon request, a military flag folding ceremony will be presented.

2.  At the request of the family, the Protocol Officer will attempt to obtain

volunteer on duty members to act as pallbearers for the deceased retired member of the Department. If no volunteers can be obtained, the family of the deceased member shall be so notified and it shall then be the responsibility of the family to obtain the pallbearers.

**6.0    LINE OF DUTY DEATHS - FUNERAL SERVICES**

6.1    POLICY
It is the policy of the Buffalo Police Department to offer to the family of a sworn member killed in the line of duty, a police funeral with full honors.

6.2    ASSISTANCE TO THE FAMILY OF MEMBERS WHO WERE KILLED IN THE LINE OF DUTY
Refer to M.O.P. Chapter 13.

6.3    CHOICE OF FUNERAL SERVICES
The choice of funeral services will always rest with the family of the officer killed in the line of duty. The needs and wishes of the family shall prevail over those of the Department. The Commissioner, along with the liaison officer, and the Protocol Officer who has been designated to coordinate funeral arrangements shall meet with the family at a location convenient for the family and they shall explain the arrangements and accommodations that the Department can provide including the option of a Police funeral with full honors (refer M.O.P. Chapter 13).

6.4    E-MAIL MESSAGE
The E-Mail unit shall as soon as possible transmit a national teletype message which includes the following information:

A.  the name of the deceased officer;

B.  the date and time of death and the circumstances surrounding the incident;

C.  funeral arrangements;

D.  the Protocol Officer's name and contact information.

6.5    COORDINATING FUNERAL ARRANGEMENTS – PROTOCOL OFFICER
If the slain member's family opts for a Police funeral with full honors, the Commissioner shall delegate a Protocol Officer to coordinate the funeral arrangements. The Protocol Officer shall make the following assignments:

A.  Commanding Officer of the Traffic Bureau
The Commanding Officer of the Traffic Bureau shall be made responsible for:

1.  traffic movement in the vicinity of the funeral home during viewing

hours;

2. planning the route from the funeral home to the funeral service and then to the place of interment;
3. facilitating the movement of the funeral procession;
4. coordinating funeral related posting, and parking enforcement with the Parking Violations Bureau;
4. coordinating the placement of the various law enforcement agencies at the sight of the funeral, in the funeral procession and at the place of interment;
5. arranging to have a tow truck assigned to the route of the funeral procession.

B. Protocol Officer
   The Protocol Officer shall be responsible for:

   1. maintaining a roster of all Police Departments sending representatives and for including on that roster:

      a. the name and address of the responding agency,
      b. the name of its Chief of Police or Commissioner,
      c. the number of officers from each agency attending the funeral,
      d. the number of vehicles;

   2. assisting members of outside agencies in making necessary arrangements for food and lodging;

   3. providing for police personnel to act as ushers during the funeral service;

   4. directing the seating and movement of all police personnel at the funeral
      service;

   5. ensuring that the surviving parents are afforded recognition and that proper placement is arranged for them during the funeral and the funeral procession;

   6. arranging for medical services to be on stand-by for the slain officer's family, if necessary.

   7. conveying funeral arrangements to the public, particularly as they relate to:

      a. viewing hours;
      b. the route of the funeral procession;

   c. parking restrictions;
   d. who the point of contact will be for outside agencies.

 8. The Protocol Officer will also be the point of contact for the media and will maintain a list of dignitaries attending the funeral

C. <u>Honor Guard Commander</u>
 The Commander of the Police Honor Guard shall be responsible for:

 1. arranging for the casket watch (refer M.O.P. Chapter 16 below);
 2. arranging for pallbearers (i.e. members of the command to which the slain
   officer was assigned);
 3. obtaining an American Flag;
 4. coordinating the activities of the Honor Guard at the funeral home, the funeral
   service and at the place of interment;
 5. providing for a rifle salute, the playing of taps and the presentation of the flag;
 6. coordinating any special requests from the family at the funeral service (e.g.
   music).

D. <u>The Public Communications Coordinator</u>
 The Public Communications Coordinator shall be responsible for:

 1. The Public Information Officer shall be responsible for conveying funeral arrangements to the public, particularly as they relate to:

   a. viewing hours;
   b. the route of the funeral procession;
   c. parking restrictions.
   d. who the point of contact will be for outside agencies

 2. The Public Information Officer will also be the point of contact for the media and will maintain a list of dignitaries attending the funeral.

6.6 <u>PRE-FUNERAL PLANNING</u>
The following persons shall meet to coordinate funeral arrangements and to establish an itinerary:

A. Police Department representatives:

 1. Protocol Officer coordinating funeral arrangements,
 2. Commanding Officer of the Traffic Bureau
 3. Honor Guard Commander

    4.  Public Communications Coordinator

B.  Funeral Director

C.  Clergy who will be conducting the service

D.  Director of the place of interment.

6.7    <u>CASKET WATCH</u>

A.  The casket watch shall be comprised of officers from the Police Honor Guard or officers from the command to which the slain officer was assigned.

B.  The Officers performing casket watch duties must be well groomed and they must be neatly attired in the uniform as outlined in M.O.P. Chapter 16.

C.  The watch shall be divided into shifts of 30 minutes. Officers shall be positioned at the head and foot of the casket. Officers shall remain on watch until relieved by their successor officer.

6.8    <u>UNIFORMS TO BE WORN AT FUNERALS</u>

A.  When attending funerals while in uniform, members shall present a neat appearance and all items of uniform and equipment shall be clean and in optimum condition.

B.  The uniform to be worn at funerals shall be as follows:

    1.  Spring and Fall - Long sleeve shirt and tie with waist length jacket
    2.  Summer - Long Sleeve shirt and tie
    3.  Winter - Long sleeve shirt and tie with winter coat
    4.  Pallbearers shall wear white gloves
    5.  All members shall wear a black sash across the badge.

6.9    <u>ATTENDING THE FUNERAL SERVICE</u>

A.  Members of the Department attending the funeral shall report for inspection and briefing at an assembly point away from the place of the service.

B.  From the point of assembly, the members shall travel together to the place of the
service.

C.  Upon entering the building, members shall remove their uniform hats and place them under their left arm, hat brim forward. They shall move in an orderly manner to the place to which they are directed by the ushers.

D. Members shall remain standing until all members are in their places and the Commanding Officer of the Police Honor Guard gives the order "BE SEATED."

E. When seated, members shall sit with their hats upright on their laps, maintaining a military bearing throughout.

F. At the end of the service, the Commanding Officer of the Police Honor Guard will give the command, "OFFICERS RISE." The members shall rise in unison and place their hats under their left arm as before. They will maintain the hat in this position until they file past the casket and are outside the building.

G. Members shall put on the uniform hat and then assemble outside the building as directed by members of the Traffic Bureau.

H. When the casket comes into view as it emerges from inside the building, members will be ordered to, "ATTENTION" by the Commanding Officer of the Police Honor Guard. The next order (s)he will give is "PRESENT ARMS," at which time all members will salute. The salute will be held until the casket is placed in the hearse and the command "ORDER ARMS" is given.

I. Members will break ranks in a quiet and orderly manner and will then head to their place in the motorcade after the Commanding Officer of the Police Honor Guard gives the order "OFFICERS DISMISSED."

J. Members shall re-assemble at the grave sight and assume a location as directed by personnel of the Traffic Bureau. Members shall remain at the gravesite until the order "OFFICERS DISMISSED" is given by the Commanding Officer of the Police Honor Guard.

## 7.0    LINE OF DUTY DEATH OUTSIDE THE BPD

7.1    POLICY
It is the policy of the Buffalo Police Department to dispatch a four (4) member contingent of the Police Honor Guard to attend the funeral services of Law Enforcement Officers of other agencies who have been killed in the line of duty. Permission for this detail must be obtained through the Protocol Officer. The Department will also attempt to accommodate other members of the Department volunteering to attend these services.

7.2    GEOGRAPHIC AREA
The four member contingent of the Police Honor Guard will be dispatched to funerals, for in the line of duty deaths, for all police jurisdictions within New York State. Attendance at out of state, in the line of duty deaths, shall be limited to a 300 mile radius of the City of Buffalo. The Commissioner, in special

circumstances, may authorize the attendance of the Police Honor Guard at funerals wherever (s)he deems appropriate.

7.3    RESPONSIBILITIES OF POLICE HONOR GUARD COMMANDER
The Commander of the Police Honor Guard shall be responsible for notifying, assembling, coordinating and directing the activities of the Police Honor Guard.

7.4    VOLUNTEERS

A.    The Police Benevolent Association will compile a list of volunteers who wish to remain available to represent the Department at the funeral of a law enforcement officer killed in the line of duty. The PBA will establish the format and procedures by which this list is utilized.

B.    Volunteer members who wish to attend funeral services will do so on their own time and at their own expense.  A volunteer who is on duty may be granted release time to attend the funeral, provided it does not adversely affect manpower requirements.

C.    Uniformed volunteer officers will maintain an excellent personal appearance. Uniforms and equipment must be in outstanding condition.  All officers will be attired alike and in the uniform as outlined in M.O.P. Chapter 16.

D.    Volunteer officers who wish to attend these services will assemble at a designated location for inspection and briefing by the Honor Guard Commander. They will depart as one contingent.

7.5    TRANSPORTATION
The Police Honor Guard will use marked Buffalo Police Department vehicles as their means of transportation to the funeral site. Police vehicles will be provided for volunteers but only if doing so will not unduly disrupt normal Department operations. Requests for police vehicles must be made through the Patrol Chiefs. Each vehicle shall be fueled and washed prior to departure.

7.6    REIMBURSEMENT FORMS
In special circumstances, where extensive travel is involved, all necessary travel and reimbursement forms will need prior approval by the Commissioner.

7.7    LIMITATION ON THE NUMBER OF ATTENDEES
The Department specifically reserves the right to limit the number of uniformed officers representing the Department at any such funeral.

# CHAPTER 17: INVESTIGATIONS

## CONTENTS

**1.0    RESPONSIBILITY FOR INVESTIGATIONS**
1.1    Policy
1.2    Preliminary Investigations
1.3    Case Management
      A.  Case Status
      B.  Responsibility for Follow-up Investigations
1.4    Assigning Cases
1.5    Follow-Up Investigations
1.6    Preparing Supplementary Reports
1.7    Case Status at the Conclusion of the Follow-up Investigation
1.8    Felony Case Enhancement
1.9    Victim/Witness Assistance during the Follow-up Investigation
1.10   Supervising Investigations
1.11   Public Morals
      A.  Definition
      B.  Duty of Sworn Members
      C.  Conducting Public Morals Investigations

**2.0    DETECTIVE DUTY**
2.1    Policy
2.2    General Instructions
2.3    District Detectives to Frequently Attend Pre-Tour Briefing
2.4    Maintaining Case Files
2.5    Daily Activity Reports
2.6    Monthly Activity Reports
2.7    Detectives Chronological Case Record
2.8    On-Call Rosters

**3.0    INTERVIEWS AND INTERROGATIONS**

**4.0    LINE-UPS AND EYEWITNESS IDENTIFICATION**

**5.0    SEARCHES AND SEIZURES**

**6.0    DEALING WITH EVIDENCE**

**7.0    CRIME SCENE TECHNICIAN**

**8.0    INFORMANTS**
8.1    Policy
8.2    Informants - Generally
      A.  Definition

       B.  Cooperating Individual Agreement
       C.  Meeting with Informants
       D.  Significant Information From and Informant Must be Reported
       E.  Foregoing, Reducing and Withdrawing Criminal Charges Prohibited
8.3     Establishing a Person as an Informant
8.4     Maintaining Informant Files
       A.  Separate File for Each Informant
       B.  Informant Code File
       C.  Master Roster of Active Informants
       D.  Quarterly Review of Active Informant Files
8.5     Informant File - Security
8.6     Use of Juvenile Informants
8.7     Use as Informants of Persons on Probation or Parole

**9.0**    **CONFIDENTIAL FUNDS**
9.1     Policy
9.2     Definitions
9.3     Disbursement of Confidential Funds - Prior Approval Required
9.4     Expending Confidential Funds
9.5     Receipts for Purchase of Information (P-173)
9.6     Receipts for Purchase of Services
9.7     Payments to Informants
9.8     Accounting and Control Procedures
9.9     District Detective Units and Other Detective Units Use of Confidential Funds
9.10    Narcotics and Vice Enforcement Confidential Funds

**10.0**   **COVERT POLICE OPERATIONS**
10.1    Policy
10.2    Covert Police Operations - Definition
10.3    Analyzing Crimes, Victims and Suspects
10.4    Determining Legal Ramifications
10.5    Tactical Preparation

**11.0**   **SURVEILLANCE**
11.1    Policy
11.2    Surveillance - Definition
11.3    Objectives of Surveillance
11.4    Prior Approval Required
11.5    Investigating Officers' Responsibility
11.6    Supervisor/Superior Officer Responsibilities
11.7    Use of Surveillance Equipment

**12.0**   **POLYGRAPH**
12.1    Policy
12.2    Limitations on Use of the Polygraph
12.3    Propriety of Using the Polygraph

12.4    Requesting a Polygraph Examination
12.5    Pre-Test Preparation

**13.0    GAMBLING INVESTIGATIONS**
13.1    Policy
13.2    Receiving Complaints of Illicit Gambling Activity
13.3    Known Gambler File
13.4    Gambling Arrests

**14.0    LIQUOR INVESTIGATIONS**
14.1    Policy
14.2    Forwarding Information to the Narcotics and Vice Enforcement
14.3    Handling Evidence - Liquor Violations
14.4    Liquor Law Related Arrests
14.5    Requests for Hearing Before the Alcohol Control Board

**15.0    NARCOTICS INVESTIGATIONS**
15.1    Policy
15.2    Receiving Complaints Regarding Illicit Drugs
15.3    Responsibility of Narcotics and Vice Enforcement
15.4    Handling Drug Evidence and Drug Paraphernalia
15.5    Seizing Cash as Forfeiture Assets
15.6    Seizing Vehicles as Forfeiture Assets
15.7    Analysis Anonymous
15.8    Informing the Commissioner of Major Drug Investigations

**16.0    CRIMINAL INTELLIGENCE**
16.1    Policy
16.2    Criminal Intelligence - Definition
16.3    Forwarding Criminal Intelligence Information
16.4    Processing Criminal Intelligence Data
16.5    Criminal Intelligence Files

**17.0    HOMICIDES, SUICIDES, SERIOUS ASSAULTS**
17.1    Policy
17.2    Preliminary Investigation
17.3    Homicide Squad - Follow-up Investigation
17.4    Evidence Collection
17.5    Searching the Deceased
17.6    Dying Declarations
17.7    Services of the Clergy
17.8    Medical Examiner
17.9    Notifying Next of Kin
17.10   Written Report of the Preliminary Investigation
17.11   Post Mortem Examination

**18.0   SEX OFFENSE INVESTIGATIONS**
18.1   Policy
18.2   Preserving Evidence
18.3   Recording Facts of the Crime
18.4   Written Notification of the Nearest Rape Crisis Center
18.5   Statements of Victims and Witnesses
18.6   Medical Examination of Victim
18.7   Requesting the Sex Offense Squad
18.8   Written Report of Preliminary Investigation

**19.0   MISSING PERSON INVESTIGATIONS**

**20.0   CHILD ABUSE/CHILD NEGLECT INVESTIGATIONS**

**21.0   PAROLEES**
21.1   Policy
21.2   Liaison with State Parole
21.3   Arrest of Parole Violators
21.4   Reporting Parole Violations

**22.0   FEDERAL FUGITIVES AND WITNESSES**
22.1   Policy
22.2   Fugitive Felon
          A.  Violation
          B.  Initiating Prosecution
          C.  Requesting FBI Assistance
          D.  Report Required
          E.  Channeling Reports
          F.  Discontinuance
22.3   Fugitive Witnesses

**23.0   EXTRADITION**
23.1   Policy
23.2   Fugitive from another State - Extradition Waived
23.3   Fugitive from another State - Refusal to Waive Extradition
23.4   Governor's Warrant
23.5   Fugitive Wanted In NYS - Located in another State
23.6   Fugitives Wanted in NYS Who Waive Extradition
23.7   Fugitives Wanted in NYS Who Have Refused Extradition
23.8   Extraditing Fugitives from a Foreign Country

**24.0   TASK FORCES**
24.1   Policy
24.2   Task Force - definition
24.3   Creating a Task Force

## 1.0   RESPONSIBILITY FOR INVESTIGATIONS

1.1   POLICY

It is the policy of the Buffalo Police Department to conduct a preliminary investigation of all crimes reported to the Department and in those cases where there exist sufficient solvability factors, there shall also be a thorough and complete follow-up investigation.

1.2   PRELIMINARY INVESTIGATION

Refer to M.O.P. Chapter 8.

1.3   CASE MANAGEMENT

A.  Case Status - Preliminary Investigation

At the conclusion of the preliminary investigation the investigating officer must indicate the current status of the case.

1.  "CLEARED" - A case is cleared when there has been an arrest made for the crime that was being investigated or when a warrant card is issued.

2.  "EXCEPTIONALLY CLEARED" –A case is exceptionally cleared whenever there is a refusal to prosecute.

3.  "CLOSED" - A case is closed when there are no solvability factors.

4.  "ACTIVE" - A case is active when at the conclusion of the preliminary investigation:

a.  there exists at least one solvability factor;
b.  there are no solvability factors but the offense is one which arouses public sensibilities because of the time or manner in which it was committed, the type of victim, or where media attention might assist in   the solution of the case, and the investigating officer's supervisor has approved the case's "ACTIVE" status;
c.  the crime is a burglary;
d.  the crime is a type which is investigated by the Homicide Squad or Sex Offense Squad.

5.  "UNFOUNDED" - A case is unfounded when at the conclusion of the preliminary investigation it is determined that no crime was committed within the City of Buffalo.

B.  Responsibility for follow-up investigation

    1.  Except for felony case enhancement or for cases involving extenuating circumstances, cases whose status is "CLEARED," "EXCEPTIONALLY CLEARED," "CLOSED," or "UNFOUNDED" need no follow-up investigation.

    2.  Crimes that fall under the exclusive jurisdiction of a specialized unit shall be investigated by a member of the specialized unit. When requested to do so members shall render all possible assistance to members of specialized units in the investigation of such crimes.

    3.  Except for street corner drug activity, all narcotic related investigations shall be conducted by Narcotics and Vice Enforcement, including the investigation of "drug houses."

## 1.4  ASSIGNING CASES

A.  All follow-up investigations shall be referred to the District Detective Unit of the District in which the incident occurred, except those types of incidents which are handled by specialized Detective Units (e.g. forgery is handled by the Homicide Squad, rapes are handled by S.O.S., gambling is handled by Narcotics and Vice Enforcement, etc.).

B.  Supervisors of Detective Units shall be responsible for equitably distributing the case load amongst assigned personnel. In assigning cases, consideration should be given to:

    1.  the specialized skills of the investigator;
    2.  the need for an expedited investigation;
    3.  the current caseload of each investigator;
    4.  any other factor that would enhance the quality and efficiency of the investigation.

C.  The Supervisor shall maintain a record of the name of the Officer to whom the case was assigned as well as the date of that assignment.

## 1.5  FOLLOW-UP INVESTIGATIONS

The type and extent of the follow-up investigation will be determined to a great extent by the nature of the underlying incident and the thoroughness of the preliminary investigation. In general, the follow-up investigation should include:

A.  A review and analysis of all:

    1.  previous reports stemming from the preliminary investigation,
    2.  pertinent Department records,
    3.  results from laboratory examinations, if any;

B.  Conducting additional interviews and interrogations;

C.  Seeking additional information from witnesses, informants and Department employees;

D.  Collecting physical evidence if there is any physical evidence to collect;

E.  Planning, organizing and conducting searches when necessary;

F.  Identifying and apprehending suspects;

G.  Determining the involvement of the suspects in any other offenses;

H.  Checking suspects' criminal history;

I.  Preparing cases for court presentation;

J.  Keeping complainants and investigating officers apprised of the status of the case.

1.6     PREPARING SUPPLEMENTARY REPORTS

A.  The officer who is assigned to conduct a follow-up investigation shall be responsible for preparing the supplementary reports.

   1.  Supplementary reports need not be routinely prepared in cases that are "CLEARED," "CLOSED," or "UNFOUNDED."
   2.  A supplementary report must be prepared for each case that has been referred for follow-up investigation.

B.  Within ten (10) days from the date the case was originally assigned to him/her, the officer conducting the follow-up investigation must submit a supplementary report. If the follow-up investigation has not yet been concluded, the officer may continue the investigation but the required report must be submitted within the ten day time frame. Additional P-1375's may be submitted at any time.

C.  For instructions for properly completing supplementary reports, officers shall refer to G.O. No. 86-6.

1.7     CASE STATUS AT THE CONCLUSION OF THE FOLLOW-UP INVESTIGATION

At the conclusion of the follow-up investigation the status of the case will be designated as follows:

A. <u>Active</u>
A case is designated as being "active" whenever it is not "cleared," "exceptionally cleared," "closed," or "unfounded."

B. <u>Cleared</u>
A case is designated as being "cleared" when an arrest has been made.

C. <u>Exceptionally Cleared</u>
A case is exceptionally cleared when a warrant card is issued.

D. <u>Closed</u>
A case is designated as being "closed" when:

   1. results have been obtained in full, or in part and no further results can be obtained;
   2. no results can be obtained;

E. <u>Unfounded</u>
A case is "unfounded" when no crime has, in fact, been committed in the City of Buffalo.

1.8   <u>FELONY CASE ENHANCEMENT</u>
Criminal investigations do not end with the arrest of a suspect. Equally as important is the preparation of the case for trial after an arrest has been made. The Detective unit that would normally be assigned the case shall be responsible for enhancing or improving the quality of every felony arrest that has been made, regardless of the assignment of the arresting officer. (For example, an arrest for a sex crime made by a patrol officer shall be enhanced by the Sex Offense Squad; a burglary arrest by a patrol officer shall be enhanced by the District Detectives, etc.) The case, when finally presented to the Assistant District Attorney should be as complete and well prepared as is possible given the facts of the case. Ideally, the case should be so complete and so well prepared that the only logical outcome is a guilty verdict after trial. Where possible, Detectives who are enhancing a felony case should minimally:

A. obtain written, sworn statements and/or admissions from the suspect and witnesses.

B. collect all available evidence and have it examined by the Crime Scene Unit.

C. contact the Assistant District Attorney assigned to the case to review with him/her all arrest data, including statements and evidence to ensure that they are complete, accurate and admissible, and that they are able to withstand attacks by the defendant's counsel;

1.9    <u>VICTIM/WITNESS ASSISTANCE DURING THE FOLLOW-UP INVESTIGATION</u>

    A. The employee conducting the follow-up investigation shall periodically contact victims and witnesses to determine if their needs are being met. In those instances in which the impact on the victim/witness is unusually severe, the employee shall put him/her in contact with the Victim Witness Assistance Unit of the District Attorney's Office or other service agency that provides assistance to that type crime victim.

    B. If it does not unnecessarily jeopardize the successful outcome of the case, the employee conducting the follow-up investigation shall explain to the victims and witnesses the procedures involved in a criminal prosecution and the role that they are expected to play.

    C. If possible, the scheduling of appearances requested by the police (e.g. line-ups, interviews, etc.) shall be at the victim/witness's convenience. Transportation shall be provided when required.

    D. Property seized as evidence shall be returned to the victim/witness as soon as possible as permitted by law.

    E. Actual line-up procedures are handled by the Crime Scene Unit with authorization through the Chief of Detectives office.

1.10    <u>SUPERVISING INVESTIGATIONS</u>
The supervisor of each Detective Unit shall be responsible for overseeing all investigations being conducted by members of his/her command. The Supervisor shall ensure that:

    A. the case is within the purview of his/her unit and not some other specialized unit;

    B. that each investigation is conducted in a timely fashion;

    C. that the investigation is thorough and complete;

    D. that all investigative leads are followed;

    E. that all information is properly recorded;

    F. that all reports are properly submitted.

1.11    PUBLIC MORALS

A.  Definition
As used in this chapter, public morals shall pertain to all violations of the law relating to vice, drugs, controlled substances, liquor, gambling, lewdness, pornography and other specified immoral conduct.

B.  Duty of Sworn Members
1.  All Sworn Members
Whenever a sworn member of the Department reasonably believes that any premises are being used in conjunction with the violation of any laws relating to public morals, it shall be his/her duty to report such belief to the appropriate investigative unit. Such report shall be prepared on an Intra-Departmental Memorandum and forwarded through the chain of command.

2.  Commanding Officer's Responsibility
a.  In those areas under their command, District Commanding Officers will be held strictly accountable for the stringent and impartial enforcement of the laws dealing with public morals.
b.  Commanding Officers shall regularly apprise those under their commands of the responsibility, obligation and duty that each member has in enforcing the laws concerning public morals.
c.  Commanding Officers are not relieved of their responsibility merely      because of the assignment of a specialized unit to deal with public morals. Commanding Officers may request the assistance of such specialized units to assist him/her in investigating and suppressing incidents involving public morals.

C.  Conducting Public Morals Investigations

1.  Revealing Information
Employees of the Department investigating complaints involving public morals shall not show the complaint to the persons being complained of, nor will they inform them that such complaint has been made, nor shall they identify the complainant.

2.  Inquiries
Department employees will be careful in their inquiries so that they do not unnecessarily endanger the reputation of any person who may be the subject of their investigation. Hasty and unsubstantiated conclusions concerning persons under investigation shall not be made.

3. Interviewing
   Employees of the Department receiving complaints of violations of laws involving public morals shall fully interview the complainants and shall attempt to elicit as much information about the alleged violations as possible.

## 2.0 DETECTIVE DUTY - GENERALLY

2.1 POLICY
   It is the policy of the Buffalo Police Department to use members assigned to the rank of Detective and Detective Sergeant to conduct follow-up investigations of crimes reported to the Department and to carry out investigative functions associated with on-going criminal activity (i.e. vice, narcotics, public morals, etc.). Follow-up investigations of specified traffic related incidents shall be conducted by the Accident Investigation Unit.

2.2 GENERAL INSTRUCTIONS
   Members assigned to the rank of Detective and Detective Sergeant shall:

   A. Work such hours, perform such duties, and submit such reports as may be required by their superiors and by the rules, regulations, directives, procedures and orders of the Department, consistent with the collective bargaining agreement;

   B. Acquire a thorough knowledge of investigative techniques, interrogation, and the gathering , preservation, and presentation of evidence;

   C. Pursue each case and investigation assigned to them, or for which they are responsible, until final disposition;

   D. Advise complainants at reasonable intervals of the status of investigations;

   E. Suppress vice, gambling and liquor law violations within their respective jurisdiction; maintain constant vigilance over all suspected premises; and obtain evidence and make arrests of operators of such premises where possible;

   F. Promptly serve all legal papers directed to them and execute required returns in compliance with Department procedures;

   G. Actively cooperate with prosecutors in preparing cases, and present evidence and testimony thoroughly and efficiently;

   H. Be careful in their inquiries to not unnecessarily endanger the reputation of any person who may be the subject of an investigation;

I.   Obtain permission from a superior Officer prior to conducting an investigation outside the city limits;

J.   Under no circumstances make public any information that might jeopardize the successful completion of an investigation, or the apprehension of a suspect;

K.   Render assistance when requested, to other employees of the Department, but they shall not interfere with, or work independently upon any case, except by direction of their superior Officer;

L.   Scan in at the beginning and end of their tour of duty.

2.3   DISTRICT DETECTIVES TO FREQUENTLY ATTEND PRE-TOUR BRIEFING

A.   District Commanding Officers shall require investigative personnel assigned to their command to frequently attend pre-tour briefings. This will give investigative personnel an opportunity to establish a rapport with patrol personnel and to exchange information that may prove beneficial to all parties.

B.   Commanding Officers of specialized detective units shall encourage members of their command to attend pre-tour briefings in Districts in which they have on-going investigations.

2.4   MAINTAINING CASE FILES

A.   Each unit conducting follow-up investigations shall maintain a file of all cases to which it has been assigned to investigate.

B.   Minimally the file shall include:

1.   a copy of the original crime report;
2.   a copy of all notes or reports of the officer conducting the preliminary investigation;
4.   statements of victims, witnesses and suspects;
5.   results of examinations performed on any physical evidence;
6.   copies of all reports prepared by the investigator performing the follow-up investigation;
7.   any other written material that would assist in conducting the follow-up investigation.

C.   Access to case files shall be limited to members of the unit to which the follow-up investigation was assigned.

D.   Case files shall be maintained for as long as is required by law (refer to M.O.P. Chapter 9).

2.5     DAILY ACTIVITY REPORTS

The Commanding Officers of the various branches of the Detective Division and Districts may require their subordinates to submit daily activity reports. These reports shall provide a record of the Detective's activity for each tour of duty worked. The type of data to be submitted on such reports shall be determined by the unit's Commanding Officer.

2.6     MONTHLY ACTIVITY REPORTS

The completion and submission of the Detectives Monthly Activity Report (form P-1375) by the supervising officer of each Detective unit throughout the Department, is mandatory. The report must be forwarded to the Chief of Detectives no later than the third business day of the ensuing month. The purpose of the report is threefold:

A.  It serves as a monthly record of the activities performed by each detective;

B.  It shows the actual caseload of each Detective, his/her warrant and arrest activity, and especially, the ratio of cases assigned to cases cleared;

C.  It allows the Chief of Detectives, District Commanding Officers and Detective supervisors to measure the efficiency and productivity of each of the investigators assigned to his/her command.

Detective supervisors shall refer to G.O. 86-6, Part II, pp 29-30 for instructions for preparing the Detectives monthly Activity Report.

2.7     DETECTIVES CHRONOLOGICAL CASE RECORD

The Detective supervisor of each of the Detective units throughout the Department shall be responsible for maintaining the Detectives Chronological Case Record (Form P-1193). The purpose of this report is to:

A.  establish a chronological record of cases for each of the Department's detective units;

B.  indicate the cases that each unit is responsible for;

C.  assist in the equitable assignment of cases to individual detectives;

D.  reflect the current status of each case;

E.  enable Detective supervisors:

1.  to scrutinize the performance of each Detective;
2.  to accurately measure each Detective's productivity; and,
3.  to make Detectives more accountable for their case loads.

For the proper completion of the Detectives Chronological Case Record, Detective supervisors can refer the G.O. 86-6, Part II, pp 27-28.

2.8    ON - CALL ROSTERS
Those Detective units that do not function on a 24 hour basis and whose personnel may be needed after regular business hours shall maintain a roster of on-call members (e.g. Homicide Squad, Crime Scene Unit, etc.). A copy of such roster shall be filed with the 911 Lieutenant.

**3.0    INTERVIEWS AND INTERROGATIONS**
Refer to M.O.P. Chapter 3 and M.O.P. Chapter 8 (Field Interviews).

**4.0    LINE-UPS AND EYEWITNESS IDENTIFICATION**
Refer M.O.P. Chapter 3.

**5.0    SEARCHES AND SEIZURES**
Refer to M.O.P. Chapter 3.

**6.0    DEALING WITH EVIDENCE**
Refer to M.O.P. Chapter 5.

**7.0    CRIME SCENE TECHNICIAN**
Refer to M.O.P. Chapter 5.

**8.0    INFORMANTS**

8.1    POLICY
It is the policy of the Buffalo Police Department to use all sources of information, including informants, to carry out its law enforcement responsibilities. Informants provide a wealth of raw and uncorroborated criminal intelligence information. Because of the nature of the information they provide    and because the credibility and motivation of informants may be suspect, the use of informants by Department members must be strictly controlled.

8.2    INFORMANTS – GENERALLY

A.    Informant - Definition
An informant is any person who provides criminal intelligence information in exchange for consideration of any sort. Consideration may include foregoing the prosecution of a criminal charge; reducing or dismissing criminal charges; paying money; or any other form of compensation.

B.    Cooperating Individual Agreement
Before a person is established as an informant, (s)he must sign a "Cooperating Individual Agreement." The officer establishing the person as an informant must discuss with him/her the contents of the "Cooperating Individual

Agreement," most especially emphasizing that the informant is not permitted:

1. to claim that (s)he is a member of the Buffalo Police Department or has any official employment relationship with the Department;
2. to act as a Police Officer or Peace Officer;
3. to participate in acts of violence;
4. to use any unlawful techniques to obtain information;
5. to conspire or engage in criminal activity except as specifically authorized by the Department and then only as is necessary to obtain information or evidence that is required for a prosecution.

C. <u>Meeting With Informants</u>
Whenever practicable an officer shall meet with an informant only when accompanied by at least one other officer. If not practicable, an officer may meet with an informant, unaccompanied by another officer, but only if such meeting was authorized by the officer's superior. Investigating officers shall take additional precautions when dealing with informants of the opposite sex or any other informant who may make an investigation more susceptible to compromise through alleged improprieties.

D. <u>Significant Information From an Informant Must be Reported</u>
Any significant criminal intelligence information that results from a meeting with an informant must be reported in writing to the officer's supervisor.

E. <u>Foregoing, Reducing and Withdrawing Criminal Charges Prohibited</u>
1. Except as specifically authorized, no member of the Department shall enter into any agreement, expressed or implied, with an informant to withhold or forego arrest or prosecution for a crime, in exchange for information concerning any other crime or criminal, or for any other reason. The prosecution of criminal charges is a prosecutorial prerogative that can only be made by the office responsible for prosecuting the case (i.e. District Attorney's Office, U.S. Attorney's Office, State Attorney General's Office). In circumstances in which a reliable informant facing criminal prosecution has valuable criminal intelligence information, the investigating officer may, after consulting with his/her supervisor, contact a member of the prosecuting attorney's office and advise him/her of all facts relevant to the case. The decision to forego prosecution, or to reduce or dismiss criminal charges lies exclusively with the prosecutor.

2. For narcotics cases in which the informant may have engaged in conduct that would constitute a misdemeanor, the Narcotics Lieutenant or Captain of the Detective Division may authorize that the arrest be deferred if the informant provides reliable information that results in the arrests of others for felony crimes or results in the seizure of a large quantity of drugs or cash. Such authorization shall be in writing

and shall be retained in the informant's file. In any such case, the District Attorney's Office shall be apprised of such arrangement.

F. Nothing in this chapter prohibits or restricts employees of the Department from using street sources, citizen sources, or non-compensated persons who provide information.

8.3    ESTABLISHING A PERSON AS AN INFORMANT

To ensure the personal safety of officers and to protect them from unjustified claims of improper, unethical or illegal conduct, all informants shall be under the control of the Department and not the individual officer. Officers are required to properly establish all informants with the Department. To establish a person as an informant with the Department, an officer must:

A. Prepare a "Cooperating Individual Agreement" that is signed by the informant (refer M.O.P. Chapter 17 above).

B. Prepare an "Informant Establishment Report," and include information to identify and locate the informant.

C. Prepare an Informant I.D. Signature Card which contains the informant's picture and signature.

D. Check the informant's criminal background by using all available criminal indices. If a verified FBI or NYSID number is available, request a copy of the criminal records from the FBI or DCJS. Where a verified FBI or NYSID number is not available, the informant should be fingerprinted with a copy sent to the FBI and DCJS for analysis. The informant may be used on an interim basis while awaiting the response from the FBI or DCJS.

E. Assign an informant code name or code number to each person established as an informant to protect his/her identity.

F. Inform the Chief of Detectives' Office of the informant's name, aliases or nicknames; the name of the officer who established the informant; and the unit in which the informant file is being maintained. The Chief's Office must also be notified whenever an informant is deactivated if not used for a period of six months.

8.4    MAINTAIN INFORMANT FILES

Once an informant has been established by the Department, records and files pertinent to that informant must be maintained by the Detective unit to which the officer establishing the informant is assigned. The specific records and files may vary from unit to unit but must, at minimum, include the following:

A. <u>A Separate File for Each Informant</u>:
   For each informant there shall be a separate file which includes:

   1. Informant Payment Record which is kept at the top of the file. This report provides a summary of informant payments;
   2. The Informant Establishment Report;
   3. A current photograph and fingerprint card (or FBI/State Criminal Identification Number);
   4. A "Cooperating Individual Agreement;"
   5. "Receipt for Purchase of Information;"
   6. Copies of all debriefing reports every 90 days;
   7. Copies of case initiation reports bearing on the utilization of the informant;
   8. Copies of statements signed by the informant (unsigned copies will be placed in appropriate investigative files);
   9. Any administrative correspondence pertaining to the informant, including documentation of any representations made on his/her behalf or any other non-monetary considerations furnished;
   10. The Informant I.D. Card with the signature of the informant;
   11. Any deactivation report or declaration of an unsatisfactory informant.

B. <u>Informant Code File</u>
   Each Detective Unit shall maintain an informant code file or book controlled exclusively by the commanding officer of the unit or a supervisor whom (s)he designates, containing:

   1. the informant's code name or code number;
   2. type of informant (i.e. informant, informant/defendant, restricted use informant);
   3. informant's true name;
   4. name of officer establishing the defendant;
   5. the date the establishment of the informant is approved by the authorizing supervisor;
   6. the date that the informant is deactivated.

C. <u>Master Roster of Active Informants</u>
   The Chief of Detectives Office shall maintain a roster of all active informants. The roster shall include the informant's name, including any aliases or nicknames, the officer establishing the informant and the unit in which the informant file is being maintained. Access to this master roster shall be limited to the Chief of Detectives and Commanding Officers in the Detective Division having at least the rank of Captain.

D. <u>Quarterly Review of Active Informant Files</u>
   The officer registering an informant who is still in active status must review the informant file on at least a quarterly basis. The review shall assure that the

file contains all relevant and current information. Where a material fact concerning the informant has changed (e.g. a change in criminal status, the means of locating him/her, etc.) a supplemental report shall be submitted with the correct information.

8.5    INFORMANT FILE – SECURITY

Informant files shall be kept in a separate and secure storage receptacle, segregated from other files, and under the exclusive control of the unit commanding officer or a supervisor (s)he designates. The receptacle shall be locked at all times when unattended. Access to these files shall be limited to those employees who have a necessary and legitimate need. An informant file shall not leave the immediate area except for review by a supervisor. A sign-out log shall be maintained so that any time that an informant file is removed from the storage receptacle, the officer withdrawing the file and the supervisory officer authorizing such removal shall sign the log and enter the time and date taken and time and date returned.

8.6    USE OF JUVENILE INFORMANTS

In addition to all procedures outlined above, whenever an informant is a juvenile (less than 18 years of age), the establishing officer must also:

A. obtain prior permission from the officer's supervisor before the juvenile is established as an informant;

B. have the "Cooperating Individual Agreement" signed by both the juvenile and his/her parent or legal guardian;

C. arrange to have the parent/guardian present at all meetings between the juvenile informant and the establishing officer, and if the parents decline to be present, such fact shall be duly noted;

D. if the juvenile informant is a ward of the courts or has charges pending in any court, obtain court permission (preferably in writing).

8.7    USE AS INFORMANTS OF PERSONS ON PROBATION OR PAROLE

The use as informants of persons who are on probation or parole requires the permission of the person's probation or parole officer. If the use of the informant violates the terms of a person's parole, permission is also required of the Parole Board.

**9.0    CONFIDENTIAL FUNDS**

9.1    POLICY

It is the policy of the Buffalo Police Department to allocate funds which are to be designated as "confidential funds." These confidential funds are to be strictly monitored so that a complete and accurate accounting can be made at all times.

Strict conformance with the guidelines established for the disbursement of confidential funds is absolutely essential to avoid impugning the integrity of the Department or any of its employees.

9.2     DEFINITIONS

A. Confidential Funds - Confidential funds are those monies that have been allocated for purchasing services, evidence, or specific information. These funds shall only be used when the particular merits of an investigation warrant such an expenditure.

1. Purchase of Services (P/S):
This category includes the purchase of travel or transportation for an Officer or informant; the lease of an apartment, business front, luxury-type automobile, aircraft or boat, or similar effects which create or establish the appearance of affluence; and the purchase, within reasonable limits, of meals, beverages, entertainment and similar expenses for undercover purposes.

2. Purchase of Evidence (P/E):
This category includes the purchase of evidence and/or contraband such as narcotics and dangerous drugs, firearms, stolen property, counterfeit tax stamps, etc., which are required to determine the existence of a crime or to establish the identity of a participant in a crime.

3. Purchase of Specific Information (P/I):
This category includes the payment of money to an informant for specific criminal intelligence information.  All other types of informant expenses fall in the category of purchase of services and should be accounted for accordingly.

B. Fund Custodian:
The fund custodian is the Chief of Detectives. Only upon the order of the Commissioner or other duly designated Superior Officer is the fund custodian authorized to issue confidential funds. Confidential funds shall be issued to the Detective Division Captain designated to administer that particular fund. Once issued the funds may be retained in a financial institution (e.g. bank, credit union, etc.) as needed.

C. Bookkeeper:
The bookkeeper is the Captain of the Detective Division who is designated to distribute the funds to the requesting officers. The Captain of the Detective Division designated as the bookkeeper, shall be responsible for preparing a monthly report outlining monthly expenditures. Such report shall be forwarded through the respective Detective Division Captain to the Chief of

Detectives.

9.3     DISBURSEMENT OF CONFIDENTIAL FUNDS-PRIOR APPROVAL
        REQUIRED

A.  Use of confidential funds is subject to prior approval based on a finding that
    they are a reasonable and necessary element of an investigation. The
    approving supervisor must also insure that the controls over disbursement of
    confidential funds are adequate to safeguard against misuse of such funds.
    Approval of the disbursement of confidential funds must be in writing.

B.  In exercising authority to give prior approval to the use of confidential funds,
    the superior officer giving such approval should consider:

    1.  the significance of the investigation;
    2.  the need for the requested expenditure to further the investigation;
    3.  the anticipated expenditures in other investigations.

C.  The authority to grant prior approval for the disbursement of confidential
    funds is as follows:

    1.  A Lieutenant assigned to the Detective Division section to which the
        funds are assigned has authority to approve disbursement of
        confidential funds in the amount of $1000.00 or less;
    2.  The Captain in command of the Detective Division Unit to which the
        funds are assigned has authority to approve disbursement of
        confidential funds in the amount of $2000.00 or less.
    3.  The Chief of Detectives has authority to approve disbursement of
        confidential funds in the amount of $10,000.00 or less.
    4.  Any disbursement of confidential funds in excess of $10,000.00 must
        be approved by the Deputy Commissioner overseeing the Detective
        Division and then only after having informed the Commissioner of
        such disbursement.

D.  The authorization to disburse confidential funds must specify the information
    that is to be received, the amount of the disbursement, and when dealing with
    an informant, the informant's assumed name or code number.

9.4     EXPENDING CONFIDENTIAL FUNDS

A.  If prior approval has been received, confidential funds for the purchase of
    services, the purchase of evidence or the purchase of information, shall be
    advanced to the officer on receipt form P-173A

B.  After receiving the confidential funds from his/her supervisor, the
    investigating officer must make the payments as specifically directed.

Confidential funds for the purchase of services, the purchase of evidence, or the purchase of information are advanced to an Officer for a specific purpose. If the funds are not expended for that purpose, they must be returned to the supervisor. Confidential funds shall not be used for another purpose without first being returned and being subjected to the prior approval process for the new purpose.

1. Confidential funds that have been advanced to an officer in an amount of more than $50.00 may be held outstanding for no more than 48 hours. If it becomes apparent at any point within the 48 hour period that the expenditure will not materialize, then the funds must be returned as soon as possible to the supervisor who advanced the funds.

2. An extension to the 48 hour limit may be granted by the level of management that approved the advance. Factors to be considered in making such an extension are:

   a. the amount of funds involved;
   b. the degree of security under which the funds are being held;
   c. how long of an extension is required;
   d. the significance of the expenditure.

3. Regardless of the circumstances, within 48 hours of making the advance of confidential funds, the supervisor disbursing the funds must be presented with either:

   a. the unexpended funds,
   b. an executed P-173 for payment of information or purchase of evidence
   c. written notification that an extension of the time limit has been granted.

4. For confidential funds that have been advanced in the amount of $50.00 or less there shall be a seven day limit instead of the 48 hour limit. All other applicable procedures must be followed.

5. When confidential funds are issued to an officer, any part of those funds which are unspent shall be returned to the supervisor. The date and amount returned shall be noted on form P-173. A copy shall be retained by the Officer as a record of returned funds.

C. When purchasing evidence (P/E) or purchasing information (P/I) the payments should be made and witnessed by two law enforcement officers. In unusual circumstances, a non-sworn employee or an officer of another law enforcement agency may serve as the witness. Documentation of payments to

informants is critical and shall be accomplished on a receipt for purchase of information (form P-173). In all instances, the original signed receipt must be submitted to the section supervisor for review and record keeping.

9.5     RECEIPTS FOR PURCHASE OF INFORMATION (P-173)
The officer expending funds to pay an informant must prepare a "Receipt for Purchase of Information" (form P-173). A Receipt for Purchase of Information shall identify the exact amount paid to and received by the informant on the date the form was executed. Cumulative or anticipatory receipts are not permitted. The receipt shall not be altered in any way once it has been completed.

A.  The Receipt For Purchase of Information shall contain:

1.  The Detective Division Section initiating the payment;
2.  A description of the information/evidence received;
3.  The amount of payment, both in numerical and word form;
4.  The date on which the payment was made;
5.  The signature of the informant/payee;
6.  The signature of the officer making the payment;
7.  The signature of at least one other officer witnessing the payment;
8.  The signature of the first line supervisor authorizing and certifying payment.

B.  The Officer shall forward to his/her supervisor the receipt signed by the informant payee together with a memorandum detailing the information that was received. The supervisor shall compare the informant's signature on the receipt with the informant's signature contained in the informant file. The supervisor shall also evaluate the quality of information provided by the informant in relation to the degree of expense the Department incurred and such evaluation shall be included with the report prepared by the officer making the payment.

9.6     RECEIPTS FOR PURCHASE OF SERVICES
When confidential funds are used for the purchase of services, such purchases need to be supported by canceled tickets, receipts, lease agreements, etc., unless by so doing the personal safety of the officer or informant is unduly jeopardized. If such supporting documentation is not obtained, the Detective Division Unit Captain, or his/her immediate subordinate, must certify in writing that the expenditures were necessary and (s)he must proffer an explanation why the documents were not obtained.

9.7     PAYMENTS TO INFORMANTS

A.  Any person who is to receive payments which are to be charged against PE/PI funds should be established as an informant (refer M.O.P. Chapter 17). This includes persons who may otherwise be categorized as sources of information

or informants under the control of another agency. The amount of payment must be commensurate with the value of services and/or information provided by the informant. Consideration should be given to:

1. the level of the targeted individual, organization or operation;
2. the amount of the actual or potential seizure;
3. the significance of the contribution made by the informant to the desired objectives.

B. There are various circumstances in which payments to informants may be made:

   1. <u>Payments for Information and/or Active Participation</u>
      When an informant assists in developing an investigation, either through supplying information or actively participating in it, (s)he may be paid for his/her service either in lump sum or in staggered payments. Payments should be held to a minimum in circumstances in which information leads to a seizure but there are no arrests involved.

   2. <u>Payments for Informant Protection</u>
      When an informant needs protection, the Department may absorb reasonable costs for his/her relocation. These expenses may include travel for the informant and his/her immediate family, moving and storage of household goods, and living expenses at the new location for a specific period of time (not to exceed 6 months). Payments for these expenses may be either lump sum or as they occur, and should be neither excessive nor extraordinary.

   3. <u>Payments to Informants of Another Agency</u>
      When a payment is to be made to another agency's informant, the informant must first be established with the Buffalo Police Department. These payments should not be a duplication of a payment from another agency, however, the sharing of a payment with another agency is acceptable.

9.8   <u>ACCOUNTING AND CONTROL PROCEDURES</u>
All Commanding Officers in whose units a confidential fund has been established shall be responsible for maintaining the following minimum accounting and control procedures:

A. there shall be an accurate and up to date record which identifies funds received, funds expended and the current balance;

B. records shall identify the source and documentation of funds received;

C. the person authorizing each disbursement of funds shall be indicated;

D.  records shall reflect the name of the Department employee to whom the funds were disbursed and the purpose for which the funds were expended;

E.  all receipts and/or other documentation for expenditure of funds must be retained;

F.  all expenditures must be correctly attributed to the proper account (i.e. PE/PI/PS);

G.  a monthly accounting of all funds received and expended must be provided.

9.9     DISTRICT DETECTIVE UNITS AND OTHER DETECTIVE UNITS USE OF CONFIDENTIAL FUNDS
From time to time Detectives and other detective units that do not have an established confidential fund may need access to such funds. In these instances the investigating officer needing such funds shall, through his/her commanding officer, forward a request to the Chief of Detectives. If the Chief of Detectives believes that the expenditure is justified (s)he shall arrange to appropriate such funds. All the rules and procedures outlined in this section will govern the use of such funds by District detective units and any other unit that does have an established confidential fund.

9.10    NARCOTICS AND VICE ENFORCEMENT CONFIDENTIAL FUNDS
The Narcotics and Vice Enforcement shall establish procedures for handling confidential funds consistent with the above guidelines. The "Fund Custodian" shall be the Commanding Officer of the Narcotics and Vice Enforcement, and the "Bookkeeper" shall be the Narcotics and Vice Lieutenant who has been designated to distribute the funds.

## 10.0    COVERT POLICE OPERATIONS

10.1    POLICY
It is the policy of the Buffalo Police Department to employ covert police operational methods whenever such methods are best suited to accomplish a recognized law enforcement objective. Covert police operations are dangerous, time consuming and susceptible to claims of impropriety, and as a result must be closely supervised.

10.2    COVERT POLICE OPERATIONS – DEFINITION
Covert police operations entail all those investigative methods in which an investigation is conducted clandestinely or in which the investigator is undetected or his/her status as a law enforcement officer is not revealed. Covert police operations include among other things, undercover and decoy operations.

10.3    ANALYZING CRIMES, VICTIMS AND SUSPECTS
Prior to conducting a covert police operation a supervisor must identify the types

of crimes that are to be investigated, the victims usually associated with these types of crimes, and suspects that may be responsible. Based on these factors, the supervisor must determine the type of police operation best suited to accomplish his/her objective. Covert police operations shall not be undertaken frivolously and shall be employed only when other more traditional police methods would not serve equally well.

## 10.4   DETERMINING LEGAL RAMIFICATIONS

A. Prior to employing a covert police operation, the supervisor must carefully consider all potential legal consequences. (S)he must not only consider the nature of the evidence that needs to be collected but also the manner in which it is obtained, so that it can successfully withstand legal challenge. For example, in a decoy operation the officer-decoy should not entrap an otherwise unwilling subject, or in an investigation using electronic eavesdropping, the supervisor must ensure that the investigating officers strictly comply with all legal requirements in obtaining and executing the court order.

B. The supervisor must also be aware of any potential for illegal or unethical conduct on the part of the investigating officers which could arise due to the nature of the covert operation and (s)he must minimize this potential.

## 10.5   TACTICAL PREPARATION

A. Based on the attendant circumstances the supervisor must prepare detailed procedures for the execution of the covert operation, including procedures for foreseeable contingencies. Whatever the procedures adopted, foremost in the planning shall be consideration for the safety of the officers involved. Covert operations shall not pose an undue risk to the safety of an officer or cooperating witness.

B. Only one supervisor shall be in charge of the covert operation and such supervisor shall provide close supervision. Due to the nature of covert operations it is imperative that participating officers strictly comply with all the procedures that have been established by the supervisor. In the event that the covert operation is being conducted in conjunction with another agency, the Supervisor will act as the liaison with the outside agency.

C. When necessary, supervisors shall arrange to provide appropriate undercover vehicles, communications equipment, disguises, and false identities to members of the covert operation.

D. Supervisors must arrange for the funds necessary for the officers involved in the covert operation (refer to M.O.P. Chapter 17 above).

E. Supervisors must determine how communications are to be conducted and must provide a means of emergency communications.

F. The supervisor shall thoroughly familiarize members of a covert operation with the operational plan and its objectives, the target area, potential suspects and any dangers they may confront.

## 11.0 SURVEILLANCE

11.1 POLICY
It is the policy of the Buffalo Police Department to use surveillance techniques to collect information when necessary and appropriate. Surveillance operations as described in this section must be approved by a superior officer. Department members must fully comply with all legal requirements associated with non-consensual electronic surveillance.

11.2 SURVEILLANCE – DEFINITION
For purposes of this section, surveillance shall mean the gathering of information concerning the activities and identities of individuals by covertly observing and/or listening to targeted persons, places, vehicles or things. It does not include the routine observation of persons, places, vehicles or things that occur during police patrol.

11.3 OBJECTIVES OF SURVEILLANCE

A. Gathering Criminal Intelligence
Gathering criminal intelligence is the most common form of surveillance. Its purpose is to gather as much information as possible about a crime, activity, person, place, vehicle or thing. It is used for:

1. developing leads and information received from other sources,
2. uncovering evidence of criminal activity,
3. assessing the reliability of informants,
4. locating targeted persons by surveilling their associates and usual haunts or verifying the whereabouts of individuals during specific times,
5. locating hidden contraband,
6. obtaining information to be used in applications for electronic surveillance,
7. obtaining information to be used in subsequent interviews or interrogations,
8. obtaining admissible legal evidence for subsequent court use.

B. Protecting Undercover Officers or Informants
Surveillance may be used to protect an undercover officer and to corroborate their testimony.

11.4   PRIOR APPROVAL REQUIRED

Because surveillance, as defined in this section, is an investigative method that is time consuming and manpower intensive, it must be approved by a superior officer. The superior officer must decide if surveillance is the best investigative method to use under the circumstances and whether the commitment of time and personnel justifies the anticipated results. Approval for surveillance must be granted in writing.

11.5   INVESTIGATING OFFICERS RESPONSIBILITIES

If a surveillance operation has been approved by a superior officer, the investigating officers shall:

A. familiarize themselves with all pertinent information concerning the target of the surveillance and the surveillance operation;

B. familiarize themselves with the location of the surveillance, the surrounding area, potential escape routes, and the type of inhabitants, including their peculiar linguistic characteristics and manner of dress;

C. be familiar with the circumstances under which the surveillance may be broken off to respond to crimes in progress;

D. be familiar with the circumstances under which it is necessary to make an immediate arrest;

E. secure necessary equipment, supplies, vehicles and funds;

F. attire themselves in clothing that is appropriate for that type of operation (Department identification shall be carried with the surveilling officers unless precluded by the type of operation) and attempt to blend into the area;

G. prepare reports that minimally include:

   1. the identity and a detailed description of persons and vehicles observed;
   2. any activity that occurred;

H. keep their supervisor informed of any relevant information or developments.

11.6   SUPERVISOR/SUPERIOR OFFICER RESPONSIBILITIES

If a surveillance operation has been approved by a supervisor/superior officer the supervisor/superior officer shall:

A. determine if any other unit or agency is surveilling the same target;
B. collect information concerning the individuals and locations targeted, minimally including:

1. background and history of the target,
2. arrest and criminal history data,
3. associates,
4. place frequented,
5. mannerisms and habits,
6. vehicles used and routes traveled,
7. weapons possessed;

C. formulate the method for conducting the operation;

D. select the surveillance team;

E. secure all required surveillance equipment and funds;

F. thoroughly brief the surveillance team.

11.7    USE OF SURVEILLANCE EQUIPMENT

A. All surveillance equipment shall be maintained by the **Chief of Detectives or his designee**. **The Chief of Detectives or his designee** shall be responsible for the security, maintenance and use of such equipment. (S)he shall conduct periodic inventories to insure that all surveillance equipment is properly accounted for.

B. Only those employees who are familiar with the use of surveillance equipment shall be allowed to operate such equipment.

C. Employees requesting the use of surveillance equipment must submit their request to **the Chief of Detective or his designee.** Such equipment shall be signed out when being used and signed back in when it is no longer needed. Requests for Penn registers and telephone surveillance shall be submitted at least ten days prior to the anticipated date of use so that necessary arrangements can be made with the telephone company.

## 12.0    **POLYGRAPH**

12.1    POLICY
Polygraph examinations are to be considered only one of a variety of methods in conducting an investigation. In conducting criminal investigations, it is the policy of the Buffalo Police Department to use polygraph examinations only after all investigative leads have been exhausted and all other investigative methods have proven fruitless.

12.2    LIMITATIONS ON USE OF THE POLYGRAPH
The polygraph shall be used only in the following circumstances:

A.  Criminal investigations being conducted by a sworn member of the Buffalo Police Department;

    1.  Polygraph examinations shall be used only after all investigative leads have been exhausted and all other investigative methods have proven fruitless;

    2.  No victim of a sexual assault will be asked to submit to a polygraph examination to determine the truth or falsity of statements made by the victim (refer CPL 160.45);

    3.  Juveniles shall not be administered a polygraph examination unless their parent, guardian, or other person responsible for their care has given written consent and such parent, guardian or other person responsible for their care is present during the examination;

    4.  The Polygraph Protection Act of 1988 prohibits an employer from taking any action (e.g. discipline, discharge, denial of employment, denial of promotion, etc.) against an employee based solely on the employee's refusal to submit to, or his/her failure of, a polygraph examination. For this reason, no employee of the Department shall discuss the results of a polygraph examination, or in any manner convey information concerning the results of that examination to the person's employer. Any report generated as a result of a criminal investigation during which a polygraph examination was administered may indicate that the examination was conducted, but it may not include the results of that examination.

B.  Criminal investigations being conducted by an outside law enforcement agency.
Where possible the Department shall assist outside law enforcement agencies in conducting polygraph examinations, however, no such examination shall be conducted when the investigation involves employee related crimes.

C.  Screening of applicants.
At the request of a sworn member of the Department, a polygraph examination may be administered to screen applicants seeking employment with the Department.

D.  Internal Department Investigations of Non-Sworn Personnel.
Polygraph examinations may be administered to non-sworn Departmental personnel in the conduct of internal investigations. The use of the results of the examination or the employee's failure to take such test shall comport with all applicable laws.

By virtue of the collective bargaining agreement between the City and the

COB000867

Police Benevolent Association, all members of the PBA are exempt from submitting to a polygraph examination.

12.3   PROPRIETY OF USING THE POLYGRAPH

A. The use of the polygraph is a time consuming process. It entails extensive pre-test preparation, the administering of the test itself, and then careful interpretation of the test results. Investigating officers contemplating the use of a polygraph examination shall be very selective in determining who should be subjected to such a test. Usually, time constraints in a particular case will preclude all suspects associated with that case from being examined.

B. The use of a polygraph examination is an alternative when:

   1. all leads have been exhausted, and
   2. all other investigative techniques have proven fruitless, and
   3. there are logical suspects that have not been eliminated, or
   4. the statement of a suspect or victim contradicts all or most of the evidence.

12.4   REQUESTING A POLYGRAPH EXAMINATION

A. An investigating officer wishing to make use of a polygraph examination shall forward a written request to the Chief of Detectives through his/her own commanding Officer. The request shall include the name of the subject to be tested, the Event number and a general description of the circumstances upon which the test will be based.

B. If the Chief of Detectives approves the request, (s)he shall notify the investigating officer and arrange for the services of the polygraph examiner. The polygraph examiner shall be furnished with the investigating officer's original request.

12.5   PRE-TEST PREPARATION

A. At least one day prior to the scheduled examination date, there shall be a pre-test conference between the investigating officer and the polygraph operator. At this pre-test conference the investigating officer shall be prepared to furnish the examiner with all information concerning every detail of the case under investigation. This pre-test conference may be dispensed with at the discretion of the polygraph operator, if (s)he is satisfied that (s)he has sufficiently detailed information to conduct a meaningful examination.

B. A subject shall not ordinarily be scheduled for a polygraph examination unless accompanied by an investigating officer familiar with the case. Investigative reports alone are usually not sufficiently comprehensive to provide the

examiner with an accurate background of the case.

C. Persons who are to be subjected to a polygraph examination must be mentally alert and free from mental defects. They cannot be under the influence of alcohol or drugs while being tested.

## 13.0    GAMBLING INVESTIGATIONS

13.1    POLICY
It is the policy of the Buffalo Police Department that even though gambling investigations are to be conducted by the Narcotics and Vice Enforcement, other sworn members are not relieved of their obligation to enforce laws relating to illicit gambling operations. Refer to M.O.P. Chapter 17 above.

13.2    RECEIVING COMPLAINTS OF ILLICIT GAMBLING ACTIVITY

A. Any information or any complaint concerning illicit gambling activity shall be referred to Narcotics and Vice Enforcement for further investigation. If the information is from an employee of the Department, the employee shall prepare an Intra-Departmental memorandum that is to be forwarded to the Narcotics and Vice Enforcement through his/her own commanding officer. The report shall be as detailed as possible.

B. Narcotics and Vice Enforcement shall maintain a file for any information or complaint concerning illicit gambling activity. These files shall be kept confidential and the information shall be disseminated to other law enforcement officers outside of Narcotics and Vice Enforcement only on a need to know basis. The information contained in these files shall be reviewed annually and any unsubstantiated information that has been in the file for more than two years shall be purged.

C. The file shall indicate the name of Narcotics and Vice Enforcement Officer who was assigned to investigate and the results of that investigation. Each complaint shall be investigated to the fullest possible extent.

D. The file shall also contain a record of information conveyed to and received from outside agencies.

13.3    GAMBLING ARRESTS
When a gambling arrest is made by a sworn member not assigned to the Narcotics and Vice Enforcement, the arresting officer shall forward through the chain of command to the Narcotics and Vice Enforcement, a copy of the arrest documents. If there is any pertinent information concerning the arrest that is not included in the arrest documents, the arresting officer shall also forward through the chain of command an Intra-Departmental Memorandum relating those facts.

**14.0    LIQUOR INVESTIGATIONS**

14.1    POLICY

It is the policy of the Buffalo Police Department that even though liquor law investigations are to be conducted by Narcotics and Vice Enforcement, other sworn members are not relieved of their obligation to enforce laws relating to violations of the Alcohol Beverage Control Law. Refer to M.O.P. Chapter 17 above.

14.2    FORWARDING INFORMATION TO THE NARCOTICS AND VICE ENFORCEMENT

Any suspected violation of the liquor laws that requires further investigation shall be forwarded through the employee's commanding officer to Narcotics and Vice Enforcement section.

14.3    HANDLING EVIDENCE - LIQUOR VIOLATIONS

At least two ounces from each container having illicit alcohol shall be obtained and submitted as evidence. Refer to M.O.P. Chapter 5.

14.4    LIQUOR LAW RELATED ARRESTS

A.  Any sworn member of the Department making an arrest for a liquor law violation may request the assistance of Narcotics and Vice Enforcement.

B.  The Commanding Officer of any unit other than Narcotics and Vice Enforcement, whose members make an arrest for a liquor law violation shall forward to Narcotics and Vice Enforcement, an Intra-Departmental Memorandum which minimally contains the following:

1.  the name of the person arrested;
2.  the name of the person in charge of the premises at the time of the arrest;
3.  the address of the place of arrest;
4.  the location of the premises in the building;
5.  the liquor license number, if any;
6.  any pertinent information related to the arrest.

C.  Information concerning the violation of federal liquor laws shall be referred to the Bureau of Alcohol, Firearms and Tobacco.

14.5    REQUESTS FOR HEARING BEFORE THE ALCOHOL CONTROL BOARD

A.  When sufficient cause exists, the Commanding Officer of the District in which there arises a problem with a person licensed to distribute liquor, shall forward an Intra-Departmental Memorandum to the Police Commissioner requesting a hearing before the Alcohol Control Board. The   reasons for the request shall

be outlined in detail. The Commanding Officer of Narcotics and Vice Enforcement may also submit such a request to the Commissioner.

B. If the Commissioner approves of such request, it shall be forwarded to the ABC Board and the State Liquor Authority. The Commissioner's Office shall notify the Commanding Officer of the date of any scheduled hearing.

C. No member of the Department shall voluntarily appear as a witness for the licensee when a hearing is initiated by this Department. If a member is subpoenaed to appear at such a hearing as a witness for the licensee, the member shall notify his/her commanding officer and be guided by his/her instructions.

## 15.0 NARCOTICS INVESTIGATIONS

### 15.1 POLICY

It is the policy of the Buffalo Police Department that even though investigations of illicit drug are to be conducted by Narcotics and Vice Enforcement, other sworn members are not relieved of their obligation to enforce laws relating to drugs.  Refer to M.O.P. Chapter 17 above.

### 15.2 RECEIVING COMPLAINTS REGARDING ILLICIT DRUGS

A. Any information or any complaint regarding illicit drugs shall be referred to Narcotics and Vice Enforcement for further investigation. If the information is from an employee of the Department, the employee shall prepare an Intra-Departmental memorandum that is to be forwarded to Narcotics and Vice Enforcement through his/her own commanding officer. The report shall be as detailed as possible.

B. Narcotics and Vice Enforcement shall maintain a file of any information or complaints regarding illicit drugs. These files shall be kept confidential and the information shall be disseminated to other law enforcement officers only on a need to know basis. The information contained in these files shall be reviewed annually and any unsubstantiated information that has been in the file for more than two years shall be purged.

C. The file shall indicate the name of the Narcotics and Vice Enforcement Officer who was assigned to investigate and the results of that investigation. Each complaint shall be investigated to the fullest possible extent.

D. The file shall also contain a record of information conveyed to and received from outside agencies.

15.3 **RESPONSIBILITY OF NARCOTICS AND VICE ENFORCEMENT FOR DRUG INVESTIGATIONS**

Narcotics and Vice Enforcement shall be responsible for all ongoing investigations regarding illicit drugs. Persons not assigned to that unit shall not actively engage in drug investigations without the explicit permission of their Commanding Officer and the permission of the Commanding Officer of Narcotics and Vice Enforcement. All search warrants involving narcotics must be executed with the assistance of the Narcotics and Vice Enforcement and must be done in accordance with that units guidelines and procedures.

15.4 **HANDLING DRUG EVIDENCE AND DRUG PARAPHERNALIA**

Refer to M.O.P. Chapter 5.

15.5 **SEIZING CASH AS FORFEITURE ASSETS**

Refer to M.O.P. Chapter 5.

15.6 **SEIZING VEHICLES AS FORFEITURE ASSETS**

Refer to M.O.P. Chapter 2.

15.7 **INFORMING THE COMMISSIONER OF MAJOR DRUG INVESTIGATIONS**

The Commanding Officer of Narcotics and Vice Enforcement shall keep the Chief of Detectives informed of all substantive ongoing drug investigations. Through the chain of command, the Chief of Detectives shall keep the Commissioner informed of all major ongoing drug investigations.

**16.0 CRIMINAL INTELLIGENCE UNIT**

16.1 **POLICY**

It is the policy of the Buffalo Police Department to collect and preserve criminal intelligence information regarding specific persons, places and crimes and to disseminate this information in a manner that is useful to investigative units throughout the Department.

16.2 **CRIMINAL INTELLIGENCE – DEFINITION**

Criminal intelligence is any information, from whatever source received, that implicates a person or place as being involved in an ongoing criminal activity, or is information directly related to the criminal activity of any person or place. It includes information concerning organized crime, vice, illicit drug activity, terrorism, gangs, civil disorders, etc. Personal information that has no bearing on any criminal activity shall not be collected by employees of this Department.

16.3 **FORWARDING CRIMINAL INTELLIGENCE INFORMATION**

Employees of the Department who come into possession of criminal intelligence information shall report all pertinent facts in explicit detail on an Intra-Departmental Memorandum. The report shall be forwarded through the chain of command to the Intelligence Unit. Unless the information is time sensitive it shall

be reported on the monthly criminal intelligence report.

16.4   PROCESSING CRIMINAL INTELLIGENCE DATA

A. The Intelligence Unit shall be responsible for gathering, investigating and disseminating criminal and other pertinent intelligence information as appropriate throughout the Department and to other local, state and federal agencies.  Members assigned to this unit will be responsible for initiating, developing and investigating information sources in the areas including but not limited to; criminal gang, biker organizations, organized crime and Homeland Security intelligence.  Members will serve as a resource to other Department members for undercover surveillance and technology.  Members wil be assigned case investigations, surveillance as well as other duties as directed by their Commanding Officer.

B. Raw data shall be evaluated and verified when possible. Unverified raw data shall be classified as such and shall be used only with the utmost care. Criminal intelligence data shall be filed in a manner so that it is cross-referenced and easily retrievable.

C. All existing Department record systems (i.e. arrests, calls for service, crime reports, etc.) should be reviewed in conjunction with data obtained in the field, to generate useful criminal intelligence.

D. For covert operations refer to M.O.P. Chapter 17 above.

E. For surveillance operations refer to M.O.P. Chapter 17 above.

F. Criminal intelligence information shall be disseminated to the appropriate investigative units when it appears that such information has a bearing on current criminal activity or may prove useful in an active investigation.

16.5   CRIMINAL INTELLIGENCE FILES
Criminal intelligence files contain highly sensitive information. These files must be kept separate from other Department files and their confidentiality must be strictly maintained. The Commanding Officer of the Intelligence Unit shall specify which employees have access to the criminal intelligence files and only those authorized employees will be granted access. Dissemination of information to an outside law enforcement agency shall be made only on a need to know basis.

**17.0   HOMICIDES, SUICIDES, SERIOUS ASSAULTS**

17.1   POLICY
It is the policy of the Buffalo Police Department to thoroughly investigate all possible criminal activity that results in death or serious physical injury to any person. This includes the identification and processing of all potential evidence.

The Homicide Squad shall be responsible for investigating all criminal cases resulting in death and criminal cases involving serious physical injuries that may result in death. It is the duty of all members of the Department to cooperate with members of the Homicide Squad.

17.2 <u>PRELIMINARY INVESTIGATION</u>

Successful homicide investigation often depends upon the initial actions taken by patrol officers. A rapid and intelligent response is imperative to preserve the crime scene. While in route to the scene of a possible homicide or of a serious assault in which death may result, the responding officers shall be observant for anyone acting in a suspicious manner or of any suspicious vehicle. The five primary responsibilities at the crime scene are as follows:

A. <u>Determine if the victim is alive or dead (refer to M.O.P. Chapter 2)</u>

If life is detected, render all possible aid to the victim and summon an ambulance. If the victim is to be taken to a medical facility, or any other place, make an outline of the body before it is moved.

B. <u>Take Immediate Steps to Apprehend the Perpetrator</u>

1. If the suspect has left the scene and his/her identity is known or if there is a description of a suspect, such information shall be immediately broadcast along with the direction of flight, a description of any vehicle, the suspect's possible destination, and any other pertinent information.

2. If a suspect is at the scene (s)he shall be detained for the Homicide Squad.

    a. Patrol Officers shall not discourage suspects from talking but they also shall <u>not</u> interrogate them. Generally, they shall wait for a member of the Homicide Squad to advise the suspects of their Miranda rights. In the event that a member of the Homicide Squad is not immediately available and a suspect <u>insists</u> on confessing or telling his/her side of the story, the patrol officer shall at that point advise the suspect of his/her Miranda rights and ensure that such rights are clearly understood and knowingly waived. The Patrol Officers shall attempt to get the suspect to a Detective of the Homicide Squad as soon as possible.

    b. If a patrol officer is requested to transport a homicide suspect, they shall not interrogate him/her. If the suspect volunteers information or talks about the case, the officers shall listen, remember and later make notes of any statements said to them.

c. <u>Safeguard the Crime Scene and Detain all Possible Witnesses and Suspects</u>

1. The immediate crime scene is the location where the body has been discovered. Additional crime scenes may include:
   a. the location from where the body was moved;
   b. the location where the assault actually occurred;
   c. the location of a vehicle used to transport the body.

   It is important that responding officers be aware of the possibility that there are other related crime scenes and that they take steps to effectively secure these scenes.

2. It is often difficult to determine exact boundaries of a crime scene but they generally include the site where the initial action took place; the escape route; and the location where any physical or trace evidence may be located. Any area considered to be a crime scene shall be secured by using crime scene tape. In determining the crime scene patrol officers shall:

   a. make a quick and objective evaluation of the scene based upon:

   i. location of the body
   ii. presence of physical evidence
   iii. eyewitness statements
   iv. presence of natural boundaries (e.g. room, house, enclosed area, etc.).
   b. secure the largest possible area because the scene can always be narrowed later;

3. In any event, the patrol officers shall not examine the contents of a crime scene. The scene should be stabilized by isolating the body and the immediate area, including any visible evidence from any other person. It is imperative that the body and the immediate surrounding area be preserved exactly as they were when first discovered.

4. No unauthorized or unnecessary person may be allowed into the crime scene. Only those persons with a valid and specific investigatory or medical purpose shall be permitted entry. Other patrol officers, including supervisory personnel, who do not have a legitimate investigatory or medical purpose for entering the crime scene must be excluded. It will be the responsibility of the first patrol officers on the scene to document all entries into the crime scene on the "Crime Scene Integrity Control/Sign in Sheet" (Form P-296).

5. A great deal of attention usually attends a homicide investigation. This attention may make it difficult to properly safeguard the crime scene. In such cases it may be necessary to established a secondary secure area where police personnel and other officials may assemble without disturbing the crime scene.

6. If witnesses are detained they shall not be allowed to move around or to engage in conversation with each other.

   A. <u>Notify the Immediate Supervisor</u>
      The first officers on the scene shall contact their immediate supervisor. The immediate supervisor will be responsible for requesting the assistance of the Homicide Squad. If members of the Homicide Squad are not on duty, the supervisor shall contact the 911 Communications Lieutenant who will determine whether the Homicide Squad is needed. The on-call Homicide Squad members will respond when summoned by the Duty Inspector or on-duty Captain performing Duty Officer responsibilities and they shall request the Crime Scene Technician, Crime Scene Unit and Medical Examiner in appropriate cases. The first Officer on the scene shall be in charge until the arrival of the immediate supervisor.

   B. <u>Take Notes of all Pertinent Facts</u>
      The first officers on the scene shall make a note of all pertinent facts including:

      a. the time they were first notified, their location, and from whom the report was received;
      b. the time, light conditions, the weather and other pertinent environmental factors at the crime scene;
      c. the names and addresses of witnesses and any other person who may have information concerning the incident;
      d. the identity of the victim if such can be determined without in any way, disturbing the body;
      e. any conversations the officer had with the suspect or any witnesses, or any conversations between suspects or witnesses that the officer may have overheard;

## 17.3   HOMICIDE SQUAD - FOLLOW UP INVESTIGATION

   A. <u>Homicide Squad Responsibility</u>
      The Homicide Squad shall be notified and will be responsible for the follow up investigation of all:

1. suicides,
2. serious assaults in which the life of the victim is in jeopardy,
3. deaths resulting from criminal activity,
4. deaths occurring under suspicious circumstances,
5. unidentified dead bodies,
6. police related shootings that result in injury to any person,
7. cases assigned by the Commissioner or the Chief of Detectives.
8. deaths occurring while the person was in the custody of the Department.
9. infant and child deaths excluding those resulting from motor vehicle accidents.

B. Homicide Squad in Charge at the Scene
The ranking member of the Homicide Squad who is at the scene shall be the Officer in charge, subject to oversight by the Commissioner, Deputy Commissioners or Chiefs. (S)he shall lead the investigation and all Department members will work under his/her direction.  All members of the Department shall extend their utmost cooperation to the Homicide Squad.

C. Crime Report and Death Report
It is the responsibility of the Homicide Squad to prepare the Death Report (Form P-178) and the Crime Report (P-1191). Electronic Mail messages shall be sent by the Homicide Squad and that squad shall also forward appropriate forms to the respective districts.

D. Documentation of the Scene
The documentation of the scene by photographs and/or video will be performed by the Photography Unit in all those incidents cited in section A, above.

17.4    EVIDENCE COLLECTION
The Crime Scene Unit shall be exclusively responsible for collecting and processing all evidence involving incidents specified in M.O.P. Chapter 5.

17.5    SEARCHING THE DECEASED
Only the Medical Examiner, and no one else, shall search the body of the deceased. An Officer at the scene shall witness the search and, at the request of the Medical Examiner, sign the property envelope which lists the items found on the body. The Medical Examiner will retain the envelope and the property but (s)he shall not take or retain evidence.

17.6    DYING DECLARATIONS

A. When Taken
A member of the Department investigating an incident in which the victim is mortally injured and will probably not survive, shall attempt to obtain a dying

declaration.

B. <u>Requirements</u>
Before a dying declaration is admissible in court it must appear that:

1. the victim would have been a competent witness had (s)he lived;
2. the victim was at the point of death;
3. the victim sensed his/her impending death and had no hope of recovery;
4. the declaration related to the cause of the victim's death;
5. the victim died as a result of the injuries.

C. <u>Questions to be Asked</u>
If it appears that the victim believes (s)he is about to die, the member shall take the victim's dying declaration. If a doctor is available, the doctor should be asked to inform the victim that (s)he is about to die and that there is no hope of recovery. Witnesses shall be secured if possible. Leading questions should not be asked. The following preliminary questions need be asked:

1. What is your name?
2. Where do you live?
3. Do you believe that you are now about to die?
4. Do you have any hope of recovering from your injuries?
5. Are you willing to make a true statement of how you were injured?

D. <u>Signature of Victim and Witnesses</u>
The questions and answers shall be reduced to writing and signed by the victim if possible. Even if the victim dies without signing the statement, each witness shall sign his/her name and address in the lower left corner under the caption "Witnesses."

17.7 <u>SERVICES OF THE CLERGY</u>
Refer M.O.P. Chapter 2.

17.8 <u>MEDICAL EXAMINER</u>
Refer M.O.P. Chapter 2.

17.9 <u>NOTIFYING NEXT OF KIN</u>
Refer M.O.P. Chapter 2.

17.10 <u>WRITTEN REPORT OF THE PRELIMINARY INVESTIGATION</u>
The member of the Department conducting the preliminary investigation prior to the arrival of the Homicide Squad shall prepare an Intra-Departmental Memorandum (P-73 – there is an on-line form available for homicides on Departmental Forms in Lotus Notes) relating in specific detail all of his/her observations and any other matter pertinent to the investigation. This report shall

be forwarded to the Homicide Squad.

17.11    POST MORTEM EXAMINATION

A.    Observer Required
Post mortem examinations involving deaths being investigated by the Homicide Squad shall be observed by a qualified member of the Unit designated by the Commanding Officer. A Crime Scene Technician and/or a member of the Crime Scene Unit may also be requested to attend the post mortem, if the Homicide Squad determines it to be necessary.

B.    Cooperation
The member designated to observe a post mortem examination shall fully cooperate with the pathologist, the Medical Examiner and the District Attorney.

C.    Written Account
The member designated to observe a post mortem examination shall prepare a detailed, written, accurate memorandum that reflects all pertinent details of the examination.

D.    Objects Removed from the Deceased
The member designated to observe a post mortem examination shall obtain all objects of evidentiary value that are removed from the victim. These items of evidence will be handled in conformance with procedures previously outlined in this Chapter. If a member of the Crime Scene Unit is present (s)he shall maintain possession.

E.    Reports
The member designated to observe a post mortem examination shall prepare sufficient copies of written reports (e.g. autopsy report, etc.) regarding the post mortem examination to supply all authorized personnel and the CPS Lab with a copy.

**18.0    SEX OFFENSE INVESTIGATIONS**

18.1    POLICY
It is the policy of the Buffalo Police Department to thoroughly investigate all incidents involving sex offenses and to identify and process all evidence that might have an impact on such cases. The investigation of sex offenses will be conducted by the Sex Offense Squad and it is the duty of all members of the Department to fully cooperate with members of this unit.

18.2    PRESERVING EVIDENCE
Sworn members responding to a complaint of a sexual assault shall:

A.  Identify and preserve evidence;

B.  Advise the victim to refrain from:

    1.  Washing, showering or bathing;
    2.  Changing clothes;
    3.  Douching;
    4.  Using a mouthwash.

18.3   <u>RECORDING FACTS OF THE CRIME</u>
Officers must diligently make a detailed record of the offense, paying particular attention to any fact which may aid in the identification of the perpetrator or which may assist further investigation. The modus operandi of the sex offender is especially important since the offender tends to repeat his/her actions.

18.4   <u>WRITTEN NOTIFICATION OF NEAREST RAPE CRISIS CENTER</u>
Section 642(2b) of the NYS Executive Law requires that the Department provide victims of sexual offenses with a written notification of the address and telephone number of the nearest rape crisis center. When a member of this Department is called upon to investigate a sexual offense, (s)he shall provide the victim a copy of form P-164. If the victim is a juvenile, the member shall give a copy of the form to the parent, guardian, or other person responsible for the juvenile's care.

18.5   <u>STATEMENTS OF VICTIMS AND WITNESSES</u>

A.  <u>Detailed Information Required</u>
Statements shall contain detailed information concerning the description of clothing, the vehicle, the perpetrator, jewelry worn, tattoo marks, etc.. The actual words used by the perpetrator to warn, coax, or intimidate the victim are crucial.

B.  <u>Taking Statements Generally</u>
Refer M.O.P. Chapter 3.

C.  <u>Taking Statements From Juveniles</u>

    1.  The Department shall make a good faith effort to have a juvenile victim of a sex offense interviewed by a Department member who is the same gender as the victim except where, for good cause, the Sex Offense Squad member doing the interview determines that an alternate procedure would be more effective. Any alternative procedure must protect the sensitivity and dignity of the victim.
    2.  Every attempt shall be made to have a relative of the juvenile victim present during questioning.
    3.  Whenever possible, interviews with juvenile victims shall be conducted at the Child Advocacy Center.

18.6    MEDICAL EXAMINATION OF VICTIM

     A.  Written Consent Required
        Prior to a medical examination after a sexual assault, the victim must sign a
        written consent form. If the victim is a minor, the parent, guardian, or other
        person responsible for the minor's care, must sign the form. Forms are
        available at the hospital.

     B.  Hospitals
        Victims may be taken to any hospital for treatment and examination, except
        that minors shall be taken to Children's Hospital or to a child advocacy center
        after SOS has been notified.

     C.  Rape Kits
        Refer M.O.P. Chapter 5.

18.7    REQUESTING THE SEX OFFENSE SQUAD
The member of the Department first arriving on the scene of a sex offense shall
request the presence of the Sex Offense Squad (SOS). (S)he shall preserve the
scene until a member of that unit arrives. The member of the SOS shall determine
if it is necessary to have the Crime Scene Unit respond. The ranking member of
the SOS will lead the investigation and members will be under his/her direction.
All members of the Department shall extend their utmost cooperation to the SOS
in these matters.

18.8    WRITTEN REPORT OF PRELIMINARY INVESTIGATION
The member of the department conducting the preliminary investigation before
the arrival of the Sex Offense Squad, shall prepare an Intra-Departmental
Memorandum (P-73) relating the physical and mental condition of the victim
and/or suspect and shall include any remarks that victim and/or suspect may have
made.  This report shall be forwarded to the Sex Offense Squad.

**19.0   MISSING PERSON INVESTIGATIONS**
Refer to M.O.P. Chapter 2.

**20.0   CHILD ABUSE/NEGLECT INVESTIGATIONS**
Refer to M.O.P. Chapter 2.

**21.0   PAROLEES**

21.1    POLICY
It is the policy of the Buffalo Police Department to fully cooperate with the NYS
Division of Parole as the Division of Parole fulfills its obligation to supervise
parolees, and investigate and prosecute parole violations. Any information that
tends to indicate the occurrence of a parole violation shall be forwarded to the
NYS Division of Parole.

21.2    LIAISON WITH STATE PAROLE

   A. The Correspondence and Extradition Unit shall act as the liaison between the Department and the NYS Division of Parole.
   B. The NYS Division of Parole shall forward a duplicate copy of their warrants along with warrant form CPS-IS 313 to the City Court Booking for all parole violators wanted by their agency.

   C. City Court Booking shall maintain records of the wanted parole violators sent to them by the NYS Division of Parole.

21.3    ARREST OF PAROLE VIOLATORS

   A. When a sworn member of this Department arrests a parole violator it shall be the responsibility of City Court Booking to cancel the parole violation warrant and to notify the NYS Division of Parole as soon as possible. City Court Booking shall also notify the District in which the parolee resided.

   B. When a sworn member of the Department arrests a parolee and the parolee is charged with an offense in addition to the parole violation, a copy of the parole warrant shall be lodged as a detainer and forwarded with the prisoner to City Court.

   C. If the NYS Division of Parole makes the arrest, it shall be their responsibility to recall and/or cancel the violation of parole warrant and to notify City Court Booking.

   D. Persons arrested for parole violations are not entitled to bail.

21.4    REPORTING PAROLE VIOLATIONS
   Employees of the Department shall not visit the home or place of employment of a parolee for the purpose of exercising supervision over that person. However, whenever possible, the habits and conduct of parolees should be discreetly observed. Any violation by a parolee of the terms or conditions of parole which are observed by Department employees should be reported to the Chief of Detectives by forwarding a Intra-Departmental Correspondence through the chain of command. The Chief of Detectives shall notify the NYS Division of Parole of the violation.

**22.0    FEDERAL FUGITIVES AND WITNESSES**

22.1    POLICY
   It is the policy of the Buffalo Police Department to enlist the aid of the FBI in cases in which defendants facing felony criminal charges in New York State leave the state to avoid prosecution.

22.2    FUGITIVE FELON

A.  Violation
It is a violation of the United States Code, Title 18, Section 1073, for a person to leave the state to avoid prosecution for, or custody or confinement after conviction of, a felony or an attempted felony.

B.  Initiating Prosecution
When possible, prosecution against the fugitive shall be commenced in the courts of this state prior to the request for FBI assistance. However, if prompt action is necessary and it is impossible to immediately obtain court process, the investigating officer shall telephone the required information to the Correspondence and Extradition Unit. As soon as possible thereafter, (s)he shall then obtain the necessary court process and forward an Intra-Departmental Memorandum to the Correspondence and Extradition Unit confirming the telephone request.

C.  Requesting FBI Assistance
The FBI may be called for assistance when:

1.  the crime was a felony or attempt to commit a felony; and
2.  all means of apprehending the suspect have been exhausted; and
3.  there exists reasonable grounds to believe that the suspect has fled the state;  and
4.  the District Attorney's Office has given assurance that it will extradite the suspect if (s)he is apprehended outside the state.

D.  Report Required
In requesting the assistance of the FBI in the apprehension of a fugitive felon, the investigating officer shall prepare a complete report on an Intra-Departmental Memorandum containing the following information:

1.  Identity of the fugitive;
2.  Personal criminal history (BPD No., FBI No. Photographs and Fingerprints, if available);
3.  Crime charged;
4.  Type and status of court process outstanding;
5.  Name of Assistant District Attorney agreeing to extradite;
6.  Probable location of the fugitive, his/her destination, movements, relatives, associates, persons (s)he might contact to aid his/her flight, and any other information that may expedite apprehension.

E.  Channeling the Reports
1.  The Report shall be forwarded to the Correspondence and Extradition Unit and the investigating officer shall retain one copy for the Command files.

2. The Correspondence and Extradition Unit shall prepare a written application for the Chief of Detectives Office and forward the application to the District Attorney's Office, requesting that the facts be presented to the United States Attorney for issuance of a federal complaint.

3. Any additional information received by the investigating officer shall be forwarded to the Correspondence and Extradition Unit on an Intra-Departmental Memorandum. The Correspondence and Extradition Unit shall forward the information to the FBI.

F. Discontinuance

If the District Attorney no longer desires to return the fugitive, it shall be the duty of that office to notify the U.S. Attorney and the Correspondence and Extradition Unit. The Correspondence and Extradition Unit will notify the investigating officers.

22.3  FUGITIVE WITNESSES

A person who leaves this state to avoid giving testimony in a felony case can be returned by federal removal proceedings (United States Code, Title 18, Section 1073). In order to obtain the assistance of the FBI in these cases, the following conditions must be met:

A. Initiating Removal Proceedings

1. Criminal proceedings must have been actually instituted in a New York State action.

2. The witness must be under subpoena;

3. There must exist evidence to indicate that the witness fled to avoid giving testimony.

B. Report Required

When the above conditions have been satisfied, the investigating officer shall notify the Correspondence and Extradition Unit in the same manner as (s)he would for a fugitive felon (refer M.O.P. Chapter 17). The Correspondence and Extradition Unit shall promptly refer to the investigating officers any information received from the FBI or any other sources.

C. Return of Witness

When information has been received that the fugitive witness has been apprehended, the Correspondence and Extradition Unit shall notify the Chief of Detectives and the District Attorney's Office. The Chief of Detectives and the District Attorney's Office shall take the appropriate action to obtain the return of the witness.

**23.0    EXTRADITION**

23.1    POLICY
It is the policy of the Buffalo Police Department to fully cooperate with the District Attorney's Office, the United States Attorney's Office and the FBI in the handling of extradition matters and to fully comply all applicable laws.

23.2    FUGITIVE FROM ANOTHER STATE - EXTRADITION WAIVED

A.    Preliminary Action
When a fugitive from another state is arrested in this City on information furnished by the demanding state, the preliminary action shall be the same as if the prisoner had been arrested for a crime committed here (i.e. (s)he shall be fingerprinted, photographed and booked in the usual manner). In all arrest related documents it shall be indicated that the defendant is a "fugitive" for the demanding state consistent with CPL 570.34.

B.    Arraignment
The prisoner shall be taken with all practicable speed for arraignment before a Judge assigned to a Special Term of Erie County Court. Arraignment shall be made upon a complaint made under oath by a member of the Correspondence and Extradition Unit.

C.    Waving Extradition
The fugitive must be specifically asked by the arraigning judge if (s)he is willing to waive extradition. Any attempted waiver of extradition is invalid unless done so before the arraigning judge.

D.    Commitment
After arraignment of the fugitive in Erie County Court, the presiding Judge commits the prisoner to the custody of the Erie County Sheriff's Department who in turn, delivers him/her to the Erie County Holding Center pending the arrival of Officers from the demanding state.

E.    Notification of Demanding State
The Correspondence and Extradition Unit shall notify the authorities from the demanding state that they must retrieve the prisoner.

F.    Surrender of Fugitive
When notified, a member of the Correspondence and Extradition Unit shall appear in the District Attorney's Office to complete the formalities of returning the fugitive to the agents of the demanding state.

23.3    FUGITIVE FROM ANOTHER STATE - REFUSAL TO WAIVE EXTRADITION

A. If a prisoner from another state refuses to waive extradition at his/her arraignment before a Judge of the Special Term in Erie County Court, the Correspondence and Extradition Unit shall immediately contact the authorities of the demanding state and instruct them to initiate extradition proceedings.

B. Upon receipt of a New York State Governor's warrant and a Governor's warrant from the demanding state, the warrants shall be taken to the District Attorney's Office. The District Attorney's Office then makes arrangements for the arraignment of the fugitive on the Governor's warrant in Erie County Court.

C. If the fugitive waives his/her right to a hearing on the Governor's warrant, the prisoner shall be turned over to the agents of the demanding state, if they are present. If the agents of the demanding state are not present, the fugitive shall be committed to the custody of the Erie County Sheriff's Department pending the arrival of the agents from the demanding state. The demanding state shall be notified of the fugitive's availability by the Correspondence and Extradition Unit.

D. The District Attorney's Office shall see that the proper papers are returned to the agent of the demanding state. These shall include the authorization slip which accompanies the Governor's warrant and which directs the delivery of the fugitive to the agent named therein.

23.4    GOVERNOR'S WARRANT
The District Attorney's Office must petition the Governor's Executive Office for a Governor's warrant. The Governor's warrant must be returned to the Governor's Executive Chambers within 30 days of the final action thereon. Therefore, within 5 days of the conclusion the extradition process, the District Attorney's Office shall return such warrant, together with the report of action taken thereon, to the Executive Chambers in Albany.

23.5    FUGITIVE WANTED IN NYS - LOCATED IN ANOTHER STATE
Refer to CPL 570.

A. Check List of Requirements
When a prisoner wanted in NYS is to be extradited from another state, the Correspondence and Extradition Unit shall:

1. If the defendant is not yet under indictment, deliver all the necessary documents to the District Attorney's Office so that an indictment may be obtained.

2. In the case of a "John Doe" indictment warrant, submit to the District

Attorney's Office proof that the fugitive is the defendant named in the "John Doe" indictment warrant.

3. If the fugitive is already under indictment, notify the District Attorney's Office of the fugitive's apprehension and the state in which (s)he is being held in custody.

4. Obtain the District Attorney's authority to proceed with extradition and have him/her approve an expense account for such undertaking.

5. Obtain all legal documents associated with the extradition procedure including a certified copy of the indictment warrant and the complaint.

6. Contact the police authorities in the jurisdiction in which the fugitive is being held to determine whether (s)he is willing to waive extradition.

7. If the fugitive is not yet in custody, request the arrest of the fugitive pending the sending of extradition papers. Identification information shall be sent to the affected police authorities.

23.6   FUGITIVES WANTED BY NYS WHO WAIVE EXTRADITION

A. When the Correspondence and Extradition Unit receives rendition papers signed by a fugitive who has waived extradition, that unit shall notify the District Attorney's Office, the Chief of Detectives and the Officer in charge of the case.

B. The Correspondence and Extradition Unit shall prepare all necessary correspondence and requisitions and it shall furnish a copy of written instructions to the person who has been assigned to transport the prisoner from the place of detention to Buffalo.

C. If a sworn member of the BPD is assigned to retrieve the fugitive (s)he shall:

1. Proceed directly to the place where the prisoner is detained and present his/her credentials and the indictment warrant to the local police of that jurisdiction;

2. Upon the officer's arrival in the state where the fugitive is being held (s)he shall inform the BPD Correspondence and Extradition Unit of his/her location and the time (s)he expects to leave with the fugitive;

3. If there arise any legal technicalities that prevent release of the fugitive, the officer shall request the assistance of the local District Attorney, and if necessary, notify the Chief of Detectives, or in his/her absence, the 911 Communications Lieutenant.

4. The officer should be prepared to leave with the fugitive immediately after gaining custody;

5. Upon the officer's return to Buffalo, (s)he shall furnish the Correspondence and Extradition with all accompanying legal documents, which unit shall then forward them to the District Attorney's Office;

6. If there is a necessity to lodge the fugitive in a jail while transporting him/her to Buffalo, the officer shall contact the police authorities at the place of layover. The officer shall produce his/her credentials, the signed extradition papers and (s)he shall request that they lodge the fugitive until such time as the officer can resume his/her journey.

7. The Chief of Detectives or the 911 Communications Lieutenant shall be informed immediately of any delay caused by unusual incidents or circumstances.

23.7    <u>FUGITIVES WANTED BY NYS WHO HAVE REFUSED TO WAIVE EXTRADITION</u>

A. When a fugitive has been arrested in another state and refuses to sign a waiver of extradition, the Correspondence and Extradition Unit shall notify the District Attorney's Office and the officer in charge of the case. If the District Attorney's Office decides to go forward with the extradition process that office will prepare a demand form, etc. and request that a Governor's warrant be issued by the Executive Office in Albany.

B. The District Attorney's Office, in its petition for a Governor's warrant, must prepare:

1. The DA's application for issuance of a Governor's warrant,
2. Copy of the indictment,
3. Copy of the indictment warrant resulting from the indictment,
4. Affidavit of the complainant,
5. Photographs of the defendant (if available),
6. Affidavit of Officers having knowledge as to the place of confinement of the defendant,
7. Names of the person who will retrieve the fugitive,
8. Copy of the Statutes defining the crimes with which the fugitive is charged.

C. If not done so by the Executive Office, the Governor's warrant shall be forwarded to the asylum state by the District Attorney's Office.

D. Upon notification by the asylum state that the fugitive is available for return to NYS, the District Attorney's Office shall contact the Correspondence and Extradition Unit. The Correspondence and Extradition Unit shall notify the Chief of Detectives and arrangements shall be made to retrieve the prisoner.

E. When officers are assigned to retrieve a fugitive they shall follow the guidelines set forth in M.O.P. Chapter 17 above.  After returning to Buffalo with the fugitive, the officer shall deliver the remaining copy of the papers to the District Attorney's Office. The officer shall obtain receipts for all expenses incurred and these receipts shall be delivered to the Department's Fiscal

Management Section.

23.8  EXTRADITING FUGITIVES FROM A FOREIGN COUNTRY

A.  When a fugitive is to be extradited from another country, the District Attorney's Office forwards all legal documents to the NYS Executive Office and requests that a President's warrant be issued. The NYS Executive Office petitions the United States Secretary of State requesting that a President's warrant be issued. Upon issuance of a President's warrant, the U.S. Secretary of State forwards the warrant to the U. S. Ambassador in the asylum country. The U.S. Ambassador in the asylum country presents the warrant to the executive head of the asylum country. The executive head of the asylum country then forwards the President's warrant to the proper authorities within that country.

B.  Upon notification by the authorities in the asylum country that the subject is able to be retrieved, the DA's Office shall notify the Correspondence and Extradition Unit which shall arrange for the fugitive's retrieval.

**24.0  TASK FORCES**

24.1  POLICY
It is the policy of the Buffalo Police Department to employ task forces, or to participate in task forces with other law enforcement agencies, when the Commissioner determines that a task force is the best means available to combat a particular police problem in a clearly defined geographical area.

24.2  TASK FORCE – DEFINITION
For purposes of this section a task force is the temporary assignment of personnel from various units or various Departments, who ideally possess unique talents peculiarly suited to address a clearly identified police problem in a given geographic area.

24.3  CREATING A TASK FORCE
Any time that the Commissioner determines that an intra-Departmental task force, or participation in a task force with other law enforcement agencies, is the best means to combat a particular police problem in a clearly defined geographical area, there shall be a written directive that:

A.  Identifies the particular problems the task force will address;

B.  Defines the authority and responsibility of the task force and its members and includes any written agreements with outside law enforcement agencies;

C.  Establishes what results the task force is expected to achieve;

D.  Identifies all resources that will be available to the members of the task force;

E.  Establishes a method for periodically evaluating the progress of the task force and the necessity for its continued existence.

## CHAPTER 18: BUDGET, SUPPLIES, PROPERTY, TRAVEL

### CONTENTS

**1.0   DEPARTMENT BUDGET**
1.1     Policy
1.2     Police Commissioner's Responsibility
1.3     Inspector Administration and Communication
1.4     The Role of Commanding Officers
1.5     Justifying Budget Requests
1.6     Budget Requests: Categories
        A.  Personal Services
        B.  Utility Services
        C.  Travel and Transportation
        D.  Materials and Supplies
        E.  Purchase of Services
        F.  Capital Outlay
1.7     Budget Submission Timetable
1.8     Administration and Finance
1.9     Classifying Appropriations and Expenditures
1.10    Petty Cash Account and Criminal Process Fund
1.11    Confidential Funds
1.12    Auditing

**2.0   PURCHASES**
2.1     Policy
2.2     Formulating Rules to Govern Purchases
2.3     Authorization for Purchases
2.4     Purchase Requests
2.5     Receipt of Purchases
2.6     Contracts and Competitive Bidding
2.7     Petty Cash

**3.0   SUPPLIES**
3.1     Policy
3.2     Commanding Officer Responsibility
3.3     Monthly Requisition (Supplies)
3.4     Monthly Requisition (Paper and Printed Forms)
3.5     Requisition Form (P-1024)

**4.0   DEPARTMENT OWNED PROPERTY**
4.1     Policy
4.2     Operational Readiness
4.3     Annual Inventory
4.4     Unserviceable and Surplus Property

4.5    Removal or Transfer of Equipment
4.6    Culpable Damage

**5.0    <u>DEPARTMENT FACILITIES</u>**
5.1    Policy
5.2    Patrol Lieutenants' Responsibility to Inspect Department Buildings
5.3    Care of Police Buildings
5.4    Capital Improvements
5.5    Repairs

**6.0    <u>TRAVEL EXPENSES</u>**
6.1    Policy
6.2    Out of Town Travel Defined
6.3    Requesting Permission For Out of Town Travel
6.4    Approval of the Commissioner Required
6.5    Mayoral Approval Required
6.6    After Mayoral Approval Has Been Received
6.7    Expense Guidelines
        A.  Advanced Payments
        B.  Transportation
    C. Telephone/Fax Charges
    D. Lodging
    E. Meals
    F. Unreimbursable Expenses
6.8    Getting Reimbursed For Expenses

**7.0    <u>LOST AND FOUND PROPERTY</u>**
7.1    Policy
7.2    Definitions
        A.  Property
        B.  Lost Property
        C.  Found Property
        D.  Property Held for Safekeeping
7.3    Report to the Police Required
7.4    Deposit of Property with the Police
7.5    Preparing the Property Form (P-10)
7.6    Return to Owner Prior to Delivery to Property Office
7.7    Packaging Property for Delivery to the Property Office
7.8    Submitting Property to the Property Office during Regular Business Hours
7.9    Property Received During Hours When the Property Office is Closed
7.10   All Property to be Stored in a Secured Area by Property Office
7.11   Special Handling Instructions for Particular Items of Property
        A.  Alcohol and Other Consumable Beverages
        B.  Audio/Video Tapes and Computer Software
        C.  Bicycles
        D.  Cash

E. Drugs
F. Fireworks and Explosives
G. Guns and Ammunition
H. Jewelry
I. Knives, Razors and Sharp Objects
J. Perishable Property
K. Syringes

7.12 Notifying Owners after Submission to the Property Office
7.13 Return of Property to Owner by the Property Office
7.14 Conflicting Claims
7.15 Unclaimed Property
7.16 Unclaimed or Unclaimable Guns
A. Conversion to Department Use
B. Destruction of Firearms
7.17 Disposing of Eligible Property within Twelve Months
7.18 Weekly Accounting
7.19 Inspecting the Property Office
7.20 City Employees Not Entitled to Found Property
7.21 Handling Prisoner's Property
7.22 Handling Reports of Lost Property

COB000893

**1.0    DEPARTMENT BUDGET**

1.1    POLICY

It is the policy of the Buffalo Police Department to submit to the Mayor's Office an annual operating budget and an annual capital improvement budget, each budget reflecting the projected financial needs of the Department for the ensuing fiscal year.

1.2    POLICE COMMISSIONER'S RESPONSIBILITY

By virtue of his/her authority to manage all facets of Police Department operations, the Police Commissioner has the authority and responsibility for the fiscal management of the Department.

1.3    INSPECTOR ADMINISTRATION AND COMMUNICATION

The Inspector assigned to the Division of Administration and Communication, under the direction of the Commissioner, shall prepare the annual operating budget and the annual capital improvement budget. In preparing these budgets, the Inspector shall utilize the services of the Department's Administration and Finance Unit. All members of the Department, regardless of assignment, shall fully cooperate with the Inspector in the preparation of these budgets. After consultation with the City Budget Office and approval from the Commissioner of Police, during times of extreme fiscal hardship, the Inspector of Administration and Communication may suspend any or all parts of the following budget process. If this is the case, the budget would be prepared by various headquarters Command Staff in conjunction with personnel from the Administration and Finance Unit.

1.4    THE ROLE OF COMMANDING OFFICERS

A. During the month of November of each year, all Commanding Officers in charge of a District, Unit, Bureau, Division or Specialized Squads (i.e. SWAT, CMT,URRT), shall fully assess the needs of their units for the ensuing fiscal year. They shall submit their budget requests based on the needs that they have established through this assessment process and based on the goals and objectives they have outlined for their respective units. Their budget requests shall be submitted on forms supplied by the Division of Administration and Communication in accord with the timetable established by the Commissioner.

B. Appropriations for each unit will be based on the budget requests submitted by the above Commanding Officers. If the Commanding Officer does not submit a budget, or if the budget submitted does not accurately reflect the needs of the unit, then requisitions or requests submitted during the budget year for additional resources or equipment may have to be denied due to lack of budgeted funds.

1.5    JUSTIFYING BUDGET REQUESTS

After the Department formulates its budget, it is reviewed by the City's Budget Office and the Common Council. The justification for any particular budget request often determines whether the budget request will survive this review process. As a consequence it is imperative that budget requests be accompanied by detailed justifications that adequately illustrate:

A. that the request significantly enhances police operations; or,

B. that the request improves efficiency and results in cost savings; or,

C. that the request is mandated by law, rule or regulation (e.g. OSHA regulations, state mandated training, etc.).

Justifying a budget request by simply relying on a previous year's appropriation is generally insufficient and risks elimination or reduction during the budget review process.

1.6    BUDGET REQUESTS: CATEGORIES

There are six general categories of budget requests that are delineated on forms provided by the Division of Administration and Communication.

A. Personnel Services

The personal services category includes:

1. requests for new positions:

a. requests for new positions must be specifically justified and shall include whether any position can be eliminated by virtue of the creation of the new position;
b. projected salary and general duties must also be included in such a request.

2. requests for additions to the existing manpower level.

B. Utility Services

The utility services category encompasses any new utility services, including gas, electric, water, and phone, which are not included in the current year's budget. An example would be any utility costs associated with a new COPS substation within the command.

C. Travel and Transportation

The travel and transportation category includes any expected travel and training costs anticipated in the ensuing fiscal year.

D. <u>Materials and Supplies</u>
The materials and supplies category includes anything that would normally be ordered from the **designated** Office Supply Catalog and any additional supplies and materials that may be needed in the ensuing fiscal year.

E. <u>Purchase of Services</u>
The purchase of services category includes services such as window washing, consulting services, maintenance agreements on equipment, etc. Funding for additional or new services, not included in the current budget,  must be submitted for inclusion in the next fiscal year budget requests.

F. <u>Capital Outlay</u>
The capital outlay category includes furniture, equipment, materials, and supplies that are not considered consumable or are expected to last more than one budget year. Examples include police radios, computer equipment and office furniture. In addition to forwarding Capital requests with other budget items to Administration and Finance Unit, the following must also be completed:

1. Requests for computer equipment shall be forwarded to the Commanding Officer of the Management Information Section.
2. Requests for communication equipment (e.g. telephones, radios, radio equipment, etc.) shall be forwarded to the Commanding Officer in charge of Communications.
3. Requests for building improvements should be submitted to the Commanding Officer in charge of Planning and Analysis.
4. Requests for vehicles should be forwarded to the Superintendent of Motor Vehicles.

1.7     BUDGET SUBMISSION TIMETABLE
Budget requests shall be submitted in accordance with the following timetable:

A. In the first week of December of each year, the Administration and Finance unit will   forward a budget packet to all Commanding Officers in charge of a District, Unit, Bureau, Division or Specialized Squad (i.e. SWAT, CMT, URRT), which will include a cover letter, timetable and forms for each of the budget categories above.

B. By the end of the third week in December, all Commands will submit a completed budget packet to the Administration and Finance Unit.

C. Throughout the first two weeks of January, Administration and Finance personnel review all budget requests and prepare budget summaries for all categories.

D. Throughout the second and third weeks of January, Administration and

Finance personnel work with the Inspector of Administration and Communication and Commanding Officer of Planning Analysis to prepare preliminary budget. At this point, budget packets are reviewed and additional information is obtained from various Commands if needed.

E. By the end of the third week of January, a preliminary budget is presented to the Commissioner of Police for review and any necessary changes are determined and re-calculated.

F. During the last week in January, the proposed Budget is finalized and is submitted by January 31st of each year to the City Budget Office through entry into the applicable accounting program.

G. As soon as possible after the adoption of the City Budget (after June 10th of each year), units will be apprised by Administration and Finance of the status of their budget requests.

1.8    ADMINISTRATION AND FINANCE

A. The Administration and Finance unit shall be responsible for accounting for all revenues and expenditures during the course of the fiscal year. They shall forward to the Commissioner through the chain of command, monthly reports reflecting the status of each major account. These monthly reports must minimally show:

1. the initial appropriation for each account;
2. the balances at the commencement of the monthly period;
3. expenditures and encumbrances made during the period;
4. the unencumbered balance.

B. The Commissioner shall be immediately notified of projected shortfalls, or of any irregularities associated with accounts contained in the Department's budget.

C. After consulting with the Administration and Finance unit personnel on the availability of funding; allocations of funds to any Department unit for any purchase of goods or services must first be approved by the Inspector of Administration and Communication.

D. Any expenditure of funds by a Department unit must be in strict accordance with existing guidelines and Department accounting practices.

1.9    CLASSIFYING APPROPRIATIONS AND EXPENDITURES
The Police Budget shall be divided into various accounts. These accounts shall accurately reflect the major functions of the Department.  In order to accurately track the flow of funds within the Department and to better analyze the

effectiveness of specific Department units, appropriations and expenditures must be accurately attributed to the appropriate account.

1.10    PETTY CASH ACCOUNT AND CRIMINAL PROCESS FUNDS
The Commanding Officer of each unit in the Department where cash accounts are maintained or where employees are permitted to receive, maintain or disburse cash shall:

   A.  maintain a system that clearly identifies the initial balance, any cash received, any cash spent, and the current balance on hand;

   B.  ensure that all cash received is accompanied by appropriate identifying documents and that there are receipts for all cash spent;

   C.  ensure that all cash disbursements have been given prior approval and that the approval is accompanied by all documents justifying the expenditure;

   D.  designate those members of his/her command who are authorized to disburse or accept cash;

1.11    CONFIDENTIAL FUNDS
Refer to M.O.P. Chapter 17.

1.12    AUDITING
The Division of Audit within the City Comptroller's Office holds the legal responsibility for conducting periodic audits of the Department's finances. Employees of the Department shall not unnecessarily interfere with the Division of Audit as it undertakes an examination of the Department's financial condition.

**2.0    PURCHASES**

2.1    POLICY
In order to maintain fiscally sound accounting practices and in order to ensure that purchases are made consistent with Departmental need, it is the policy of the Buffalo Police Department that all purchases must be approved by the Department's Administration and Communication Division and must conform to guidelines established by the City Director of Purchase and/or the City Audit Department.

2.2    FORMULATING RULES TO GOVERN PURCHASES
The City Director of Purchase, with the cooperation of the Department's Administration and Finance Unit, shall establish rules and conditions for the purchase of materials, supplies and equipment for Department use.

2.3    AUTHORIZATION FOR PURCHASES
No employee shall purchase, or enter into any agreement to purchase, any product

or service of any kind, without the written approval of the Inspector of Administration and Communication. All major purchases must be approved by the Commissioner of Police.

2.4    PURCHASE REQUESTS

Requests for purchases shall be submitted through the chain of Command to the Administration and Finance Unit on form P-1024 (Requisition Form), specifying the reason for the purchase. Attached to the requisition shall be any supporting documentation that may be necessary (e.g. copies of catalogue pages, specification sheets, vendor  information, etc.). The Administration and Finance Unit shall be responsible for forwarding approved requests to the City Division of Purchase.

2.5    RECEIPT OF PURCHASES

A.    Units that submitted a requisition requiring the purchase of an item by the City shall be notified by the Administration and Finance Unit upon delivery of the item to Police Headquarters. Administration and Finance personnel will secure any packing slip or delivery information regarding the shipment. A representative from the ordering unit must make arrangements to pick up the delivery and sign any applicable paperwork verifying delivery and pick up of the merchandise. If purchased items are delivered directly to a unit or location other than police headquarters, Administration and Finance must be notified immediately and any original packing slips or delivery information must be signed and forwarded to Administration and Finance personnel. If a packing slip is unavailable or lost, a signed copy of the requisition indicating the items were received shall be utilized instead.

B.    Employees of the Department accepting delivery of purchases shall sign the delivery slips in duplicate, returning one copy of the delivery slip to the vendor and forwarding the second copy to the Administration and Finance Unit. The member receiving the item shall inspect it to ensure that it conforms to specifications and report any defect in the item or any deviation from required specifications immediately to the Administration and Finance Unit.

2.6    CONTRACTS AND COMPETITIVE BIDDING

State law requires that single or cumulative purchases of more than $10,000.00 of like items, and all public works contracts and services in excess of $20,000.00, must be advertised for competitive bidding unless available on NYS Contract. This involves public advertising, the receiving of sealed bids, and the award of a contract to the lowest responsible bidder. For purchase of physical goods, this process is carried out by the City Division of Purchase. The role of Police Department employees is to recommend to the Division of Purchase specifications for the required item and to advise that Division of which bid best fulfills those specifications. The Division of Purchase shall be responsible for the

preparation of the actual specifications and the selection of a vendor.

A.  Purchase Order Procedures
For the purchase of items other than services, bids are awarded to the lowest responsible bidder who meets the specifications. Bid solicitations and responses are a part of the award process and are subject to review by the Audit Division. All specifications and bids will be retained in accordance with the Record Retention Schedule.

1.  Formal Bids
The City's Division of Purchase is responsible for all formal bids. The purchase of any items other than services, whose value is, or exceeds, ten thousand ($10,000.00) dollars, requires that formal specifications be advertised in the newspaper, and that sealed bids be submitted and that these bids be opened publicly. Depending on the nature of the transaction there are other City Charter and City Ordinances requirements that need be met. Administration and Finance Unit personnel must be involved in this type of purchase along with City Division of Purchase personnel.

2.  Informal Bids
For the purchase of items whose value is less than ten thousand ($10,000.00) dollars, in addition to M.O.P. sections 2.9 and 2.12, the Administration and Finance unit personnel is responsible for the following:
a.  obtaining a minimum of three written quotes
i.  in emergency situations for orders less than $1,000, three verbal quotes may be obtained with contact person, company name, date and price recorded for each. This would be done by Administration and Finance personnel in conjunction with City Division of Purchase personnel.

B.  Service Order Procedures
For the purchase of services, bids are awarded to the lowest responsible bidder who meets the specifications. Bid solicitations and responses are a part of the award process and are subject to review by the City of Buffalo's Audit Division. All specifications and bids will be retained in accordance with the Record Retention Schedule.

1.  Formal Bid
a.  The purchase of services whose value is, or exceeds, twenty thousand ($20,000.00) dollars requires that an RFP be prepared by the ordering Department;
b.  It shall then be submitted to Law Department to approve as

to form and forward back to Administration and Finance;

c. The Administration and Finance office will then forward to the City's Budget Office to verify sufficiency of funds, once verified; it will then be forwarded back to Administration and Finance;

d. Administration and Finance will then send it to the City's Division of Purchase for review and assistance with forwarding to prospective applicants.

Additional forms and procedures are necessary and detailed instructions for this process are available from Administration and Finance unit personnel.

2. <u>Informal Bid</u>
For the purchase of services whose value is less than twenty thousand ($20,000.00) dollars, in addition to M.O.P. sections 2.9 and 2.12, the following requirements apply:

a. minimum of three written quotes

b. in emergency situations for orders less than $1,000, three verbal quotes may be obtained with contact person, company name, date and price recorded for each. This would be done by the Administration and Finance personnel in conjunction with the City's Division of Purchase personnel.

2.7    <u>PETTY CASH</u>

A. The Administration and Finance Unit shall maintain a petty cash fund which shall serve as a small cash reserve for the purchase of urgently needed essential items. The Commanding Officer of the Administration and Finance Unit shall serve as the custodian of the petty cash fund and (s)he shall authorize (or his/her designee) all expenditures from such fund. Individual purchases from such fund are limited to $50.00.

**3.0    <u>SUPPLIES</u>**

3.1    <u>POLICY</u>
It is the policy of the Buffalo Police Department to provide adequate supplies and equipment to the various units so that they can perform their assigned functions in an effective and efficient manner.

3.2    <u>COMMANDING OFFICER RESPONSIBILITY</u>
It is the duty of the Commanding Officers of the various units in the Department to submit proper and timely requisitions for supplies and equipment and to take all necessary steps to ensure that assigned supplies and equipment are properly cared for and are used in a manner consistent with Department guidelines. Commanding Officers are responsible for the prudent and economical use of all

supplies, printed forms and paper products that are furnished to them.

3.3     BASIC OFFICE SUPPLY REQUISITIONS

Commanding Officers shall, when deemed necessary, submit requisitions (on-line or via the Buffalo Police Department E-mail system through Lotus Notes) to the Administration and Finance Unit for basic office supplies needed by their respective commands. Office supplies must be ordered from the ***designated*** office supply catalog.

3.4     MONTHLY REQUISITION (PAPER AND PRINTED FORMS)

A. Requisitioning Paper and Printed Forms

1. Requisitions for printed forms shall be submitted to the Administration and Finance Unit for approval. Administration and Finance unit will forward the requisition to the City Hall Print Shop for processing.

2. Copy paper will be stored and distributed by the Department's Administration and Finance Office.

B. Receiving Paper and Printed Forms

1. The City Hall Print Shop will contact the requisitioning unit when the order is ready to be retrieved. The requisitioning unit will then be responsible for picking up the printed forms from the City Hall Print Shop.

3.5     REQUISITION FORM (P-1024)

1. Each requisition shall be dated and the type of requisitions (i.e. Supplies, Work Order, or Purchase Order) shall be checked in the appropriate box.

2. The type of supplies, equipment or work must be specifically described.

a. Monthly requisitions for basic office supplies shall particularly describe the item required, using catalog numbers, etc.

b. Purchase requisitions shall specifically and accurately describe the article to be purchased, including model number, type, cost, etc. The reason for the purchase shall be entered under "Remarks." Refer M.O.P. Chapter 18.

3. All requisitions must be signed by the person preparing them and submitted through the proper chain of command for approval.

4. Approved requisitions are to be submitted to the Administration and

COB000902

Finance Office for review, proper funding is to be verified, and approval from Inspector of Administration and Communication is obtained.

5. Approved requisitions are then entered into purchasing program by Administration and Finance personnel in accordance with City Purchase guidelines (section 2.18) and Audit Department procedures.

6. The Administration and Finance Office will perform a yearly audit of office supply usage and distribution. Abnormalities will be forwarded to the Commissioner's Office of the Unit/District for review.

## 4.0 DEPARTMENT OWNED PROPERTY

### 4.1 POLICY

It is the policy of the Buffalo Police Department to be able to account for all Department owned property; to maintain Department property in a state of operational readiness; and to replace unserviceable property when necessary.

### 4.2 OPERATIONAL READINESS

The Commanding Officer of each Department unit is responsible for ensuring that all equipment assigned to his/her command is in good operating order. In addition, all Department equipment that is currently not in use and that is being stored must be maintained in a state of operational readiness. Commanding Officers shall conduct periodic inspections to ensure the operability of all equipment assigned.

### 4.3 ANNUAL INVENTORY

The Commanding Officer of each Departmental unit shall conduct an annual inventory of all Department owned property assigned to his/her command. The inventory shall be conducted during the month of November each year and shall account for all vehicles, radio and communications equipment, office furniture, computers and all other assigned equipment. The City property number shall be noted during the inventory.

A. The inventory shall be reported on Intra-Departmental memoranda and shall include the date the item was inventoried and its condition.

B. Unserviceable items shall be duly noted and their replacement may be requested in the annual budget request.

C. Items that cannot be located shall be duly noted and an Intra-Department Memoranda must be submitted explaining all pertinent details surrounding its absence.

D. The inventory report shall be forwarded through the chain of command to the

Division/District Inspector. The Division/District Inspector shall review the report and take appropriate action when necessary.

E.  The Division/District Inspector shall forward one copy of the annual inventory to the Commanding Officer of the Administration and Finance unit who shall maintain a file of all Department equipment.

4.4    UNSERVICEABLE AND SURPLUS PROPERTY

A.  Commanding Officers shall be responsible for returning all unserviceable or surplus property to the unit from which it was originally received (i.e. computer equipment to the Management Information Section, vehicles to the Police Garage, radio equipment to the radio repair shop, etc.).

B.  When a sufficient amount of such property has been accumulated by the unit to which it was returned, the unit Commanding Officer shall contact the Commanding Officer of the Administration and Finance Unit who shall take appropriate steps to dispose of the property. The disposal of Departmental property must be conducted in accord with existing rules and statutes.

4.5    REMOVAL OR TRANSFER OF EQUIPMENT

A.  Department equipment shall not be transferred to another command or unit without prior approval:

1.  the transfer of any communications equipment, including telephones, portable radios, car radios, pagers, cell phones, etc., requires the approval of the Commanding Officer of the Communications unit;

2.  the transfer of any computer equipment, including computers, lap top computers, computers installed in police vehicles, printers, modems, monitors, etc., requires the approval of the Commanding Officer of the Communications Unit or the Management Information Systems Unit;

3.  the transfer of any vehicle requires the approval of the Inspector in charge of  Administration and Communication;

4.  the transfer of any other equipment, including, but not limited to fax machines, copy machines and typewriters, requires the approval of the Commanding Officer of  the Administration and Finance unit.

B.  Whenever any Department equipment or property is moved from one command or unit to another, the Officer authorizing the transfer shall make a note for his/her files showing:

1.  the old and new location and the date transferred;

2. the type of equipment;

3. the Department inventory number;

4. the name of the Officer authorizing the transfer.

4.6    CULPABLE DAMAGE
Whenever Departmental property is damaged or destroyed through the carelessness or culpable negligence of an employee, his/her Commanding Officer shall file a complete report on Intra-Departmental memoranda.
Distribution:  Original to Commissioner
Copy to:  Division/District Commander
Copy to:  Administration and Finance Unit

## 5.0    DEPARTMENT FACILITIES

5.1    POLICY
It is the policy of the Buffalo Police Department to maintain its buildings and facilities in a neat, clean and operable condition.

5.2    PATROL LIEUTENANTS' RESPONSIBILITY TO INSPECT DEPARTMENT BUILDINGS
The Patrol Lieutenant in charge of a work shift is responsible for inspecting the District building to which (s)he is assigned. Refer M.O.P. Chapter 8.

5.3    CARE OF POLICE BUILDINGS
Refer to M.O.P. Chapter 8.

5.4    CAPITAL IMPROVEMENTS
Requests for major capital improvements to any police facility shall be submitted by the Commanding Officer consistent with guidelines established in M.O.P. Chapter 18.

5.5    REPAIRS

A.  Building Repairs

1. During regular business hours the Commanding Officer of the District/Unit shall notify the Commanding Officer of Administration and Finance of any repairs necessary to their respective facility.

2. The Commanding Officer in charge of the Administration and Finance unit who serves as the Department's liaison, shall contact the Division of Buildings with the request for repairs, explaining the extent of the repairs required, and shall coordinate the repair schedule with ***Division of Buildings*** personnel.

3. When emergency repairs are needed during non-business hours, the **Division of Buildings** shall be contacted directly by the 911 Lieutenant. **The Division of Buildings**, upon being notified, shall make arrangements to have the emergency repair work completed.

B. Requisition Required
A requisition (Form P-1094) must be submitted to the Commanding Officer of the Administration and Finance Unit in each case of a work order request.

## 6.0 TRAVEL EXPENSES

6.1 POLICY
It is the policy of the Buffalo Police Department to allow selected employees to travel out of town on business when the travel is directly related to some essential police function (e.g. retrieving a prisoner, conducting an investigation, etc.), or the travel involves attending a training session and such training will enhance the performance of the Department in some appreciable way.

6.2 OUT OF TOWN TRAVEL DEFINED
"Out of town travel" means "a trip lasting more than three hours and where the destination is more than fifty miles beyond the City limits." All out of town travel requires the prior approval of the Mayor. Travel within this area requires prior approval of the Commissioner of Police. (Travel within the 50 mile radius requires only the prior approval of the Commissioner).

6.3 REQUESTING PERMISSION FOR OUT OF TOWN TRAVEL
A. The employee requesting permission for out of town travel shall submit a formal request to the Commissioner through the chain of command. The request shall include the following:

1. a description of the nature of the trip ( If the trip involves a seminar or other police related course, the course announcement must be submitted with the request);

2. an estimate of the total cost of the trip including transportation ( i.e. airfare, gas, tolls, etc.), lodging and meals (excluding any covered by the registration fees) and any other foreseeable costs associated with the trip;

3. whether a rental car will be needed (see M.O.P. Chapter 18);

4. a justification for the trip based on the benefits that the Department will receive as a result, including a detailed description of how any information received by the employee will be disseminated on his/her return. The justification section will weigh heavily in determining whether the travel request is approved or disapproved.

B. It is important that requests be submitted as far in advance as possible so that advance payments can be made for items such as tuition, airline tickets, etc. Normally three weeks advance notice is needed in order for any advance payments to be made.

C. Costs incurred by any employee for business related travel will not be reimbursed if the employee has not received the approval of the Mayor in advance.

6.4    APPROVAL OF THE COMMISSIONER REQUIRED

A. If the request for permission for out of town travel is approved by each commanding officer in the chain of command, the request will be submitted to the Commissioner. The Commissioner will then make the final Departmental determination.

B. If the employee's request is denied by the Commissioner or any Commanding Officer in the chain of command, the requesting employee shall be so notified.

6.5    MAYORAL APPROVAL REQUIRED

All out of town travel requires the prior approval of the mayor. If the employee's request is approved by the Commissioner, the Commissioner's Office shall prepare the "Approval for Travel" form and forward it to the Mayor's Office for consideration. A copy of the unsigned form shall also be forwarded to Administration and Finance unit.

Once (or if) the Mayor signs the "Approval for Travel" form, the signed copy shall be forwarded to the Commissioner's Office who will then disseminate a copy to the requesting individual and the Administration and Finance unit along with any other applicable paperwork and approvals for further processing.

6.6    AFTER MAYORAL APPROVAL HAS BEEN RECEIVED

The Senior Budget Examiner will review the employee's request and provide him/her with a "Review of Travel Procedures." It is the responsibility of the employee who is traveling to familiarize himself/herself with these Department guidelines. The requesting employee will also be responsible for making all necessary travel arrangements. All travel arrangements must comport with Department guidelines.

6.7    EXPENSE GUIDELINES

It is the responsibility of the employee traveling on out of town business to comply with the Department's travel guidelines. Only expenses covered by these guidelines will be reimbursed.

A. Advanced Payments

If the travel request was submitted in a timely fashion, the Department will

make advance payments for registration fees and transportation (such as airlines), whenever possible <u>The Department cannot make a cash advance to the employee to cover travel expenses.</u>

B. <u>Transportation</u>

    1. The City will allow payment for a rental car only if the conference is being held at a site other than the employee's place of lodging. Reimbursement will be at the rate for compact or economy vehicles. The Division of Audit requires that the use of a rental car be approved by them in advance of the employee's travel. If it is anticipated that a rental car will be necessary the employee shall include such fact in his/her request.

    2. The City is self-insured and as a result will not reimburse any travel or car insurance costs (liability and collision).

    3. If a Department vehicle is used, the employee will be reimbursed for gas, tolls and parking.

    4. If the employee's private vehicle is used, (s)he shall be reimbursed for mileage according to the current USGS Administration standard which can be located on the GSA.GOV website. Confirmation of distance travelled may be required. If desired, reimbursement can be determined by receipts for actual fuel, tolls and parking in lieu of the above standard.

C. <u>Telephone/Fax Charges</u>

Telephone and fax charges are reimbursable if made between the employee's destination and his/her place of work. Normally, the employee may make one telephone call per day to his/her home. These charges are to be itemized on the final summary of travel expenses submitted by the employee upon his/her return.

D. <u>Lodging</u>

    1. Whenever practical, the employee shall stay at a hotel/motel which provides a government rate. If no such lodging is available (s)he shall stay in a moderately price hotel/motel.

    2. The employee shall use the City's Sales Tax Exemption Certificate when paying for hotel/motel costs within New York State.

    3. If the room is shared with someone not on authorized "City Business," reimbursement will be limited to the standard single occupancy rate.

    4. Whenever possible, employees traveling together shall share the same hotel/motel room. Employees traveling together who are not of the

same sex and who are not related to one another shall use separate rooms.

E.  Meals
Meal reimbursement will be based on receipts up to a maximum of $51 per day. This allowance is reduced proportionately where the meal is included in the fee for the conference/seminar attended, or when the employee is traveling for only part of the day. The reduction is as follows:

| | |
|---|---|
| Breakfast | $10.00 |
| Lunch | $15.00 |
| Dinner | $26.00 |

F.  Unreimbursable Expenses
The City will not reimburse an employee for the following:

1.  travel insurance

2.  alcoholic beverages

3.  laundry, valet and other personal services

4.  individuals not authorized to travel.

6.8  GETTING REIMBURSED FOR EXPENSES
Upon completion of travel, the employee must obtain from and submit to the Administration and Finance Unit, a summary of the travel expenses form with all original receipts attached. Using this information, the Administration and Finance Unit will prepare a "Travel Reimbursement Summary." The completed "Travel Reimbursement Summary" will be returned to the employee for his/her review and signature. The employee signed "Travel Reimbursement Form" is then submitted to the Administration and Finance Office which is then forwarded to the Commissioner of Police for approval and then to the City Division of Audit for authorization for reimbursement.

**7.0  LOST OR FOUND PROPERTY**

7.1  POLICY
It is the policy of the Buffalo Police Department to provide for the security and control of all abandoned, lost or found property and evidence that comes into the custody of the Department, and all property that is seized for safekeeping. Such property shall be returned to its rightful owner when possible and if the rightful owner cannot be identified or located, the property will be disposed of in accordance with existing laws.

7.2     <u>DEFINITIONS-</u>

    A.  <u>Property</u> - For purposes of this section property means an article, substance or thing, including money that has value. It does not include:

        1.  animals

        2.  wrecks governed by the navigation law

        3.  vehicles governed by the Vehicle and Traffic Law

        4.  written instruments. A written instrument is any writing, paper or document, other than money, which represents, evidences or embodies a chose in action, or a right with respect to, or interest in, property or an enterprise. Written instruments shall not be returned to the finder thereof but must be returned to the owner.

    B.  <u>Lost Property</u>
For purposes of this section lost property means any property that an owner has been separated from unknowingly and involuntarily other than having it stolen, and that the owner wants to regain possession of but has no knowledge or recollection of its whereabouts.

    C.  <u>Found Property</u>
For purposes of this section found property is any property that has been recovered by a member of the Department or turned over to a member of the Department, that by the nature of the circumstances would indicate that it was lost by the owner thereof.

    D.  <u>Property Held for Safekeeping</u>
For purposes of this section property held for safekeeping means any property that has been seized by an employee of the Department for the purpose of protecting it from harm, or property that could potentially be used to cause harm to others.

7.3     <u>REPORT TO THE POLICE REQUIRED</u>
All property found in the City of Buffalo must be immediately reported to the Police Department.

7.4     <u>DEPOSIT OF PROPERTY WITH THE POLICE</u>

    A.  Employees of the Department will assume responsibility for all property that comes into their possession in the course of their official duties. This responsibility continues until the Property Office takes custody of the property after it has been delivered to them by the employee.

B. In every case in which an employee of the Department comes into possession of found property (s)he must prepare form P-10. If the found property is turned over to the Department by a civilian, the civilian shall be provided with a copy of the P-10 as a receipt for the property.

7.5    PREPARING THE PROPERTY FORM (P-10)

A. A Separate P-10 shall be used for each different owner.

B. Cash - refer to M.O.P. Chapter 18.

C. Drugs - refer to M.O.P. Chapter 18.

D. Guns - refer to M.O.P. Chapter 18.

7.6    RETURN TO OWNER PRIOR TO DELIVERY TO PROPERTY OFFICE

A. If possible, property not required as evidence shall be returned to its rightful owner prior to its submission to the Property Office. The owner must produce picture identification which shall be photocopied and attached to the P-10. The P-10 must indicate this return of property and must be signed by the owner.

B. The submission of property to the Property Office shall not be delayed past required time limits in anticipation that the owner will retrieve the property.

C. Found property delivered to the Property Office shall indicate whether it is possible to determine the owner, and if so, whether the owner was located or notified.

7.7    PACKAGING PROPERTY FOR DELIVERY TO THE PROPERTY OFFICE
Some property by its very nature needs to be packaged prior to delivery to the Property Office.

A. Small items that can be easily lost shall be placed in a marked sealed envelope.

B. Cash and valuables must be packaged in self-sealing, tamper evident, numbered, clear plastic bags.

C. Any property taken into custody which may contain body fluids must be properly packaged, secured and labeled with a Bio-Hazard Label.

7.8   SUBMITTING PROPERTY TO THE PROPERTY OFFICER DURING
      REGULAR BUSINESS HOURS

A.  During regular business hours when the Property Office is open, any
    employee of the department coming into possession of found property, or
    who has seized property for safe keeping, shall deliver the property to the
    Property Office prior to the expiration of his/her tour of duty. The property
    must be properly packaged and be accompanied by a P-10 or P-10a.

B.  The Property Clerk will initial and date the P-10 or P-10a and stamp it with a
    property number. The submitting employee is provided with a copy of the
    initialed and dated P-10 or P-10a as a receipt which shall be filed at his/her
    command.

C.  Using the assigned property number as a reference, the Property Clerk will
    log the property into the computer in numerical order. A description of the
    property shall also be entered in alphabetical order into the Name log book.

D.  The assigned property number shall be stamped or attached to the property
    itself and the location where it is being stored in the Property Office shall be
    noted on the Property Office copy of the P-10 and computer access file.

7.9   PROPERTY RECEIVED DURING HOURS WHEN THE PROPERTY OFFICE
      IS CLOSED
      Property shall not be stored at the command but shall be handled in the following
      manner:

A.  The employee of the Department receiving the property shall, after apprising
    his/her immediate superior of the circumstances, contact the 911
    Communications Lieutenant and advise him/her that there is property that
    needs to be stored in the Property Office.

B.  The 911 Communications Lieutenant shall be the only person on duty who
    has the ability to gain access to the Property Office (Room 101). (S)he shall
    log in every time (s)he enters the room and (s)he shall log out every time
    (s)he leaves. In addition, any employees entering the Property Room with the
    911 Communications Lieutenant shall also log in and log out. The 911
    Communications Lieutenant is responsible for all items left in Room 101 until
    they are removed by the Property Office staff.  The 911 Communications
    Lieutenant must be present at all times whenever another member of the
    Department is depositing property in Room 101 during non-business hours.

C.  Property placed in lockers must be accompanied by the corresponding P-10 or
    P-10a. Property that is too large for the lockers shall be stored on the shelves
    or floor. Each item of property stored on the shelves or the floor must be
    labeled with the event number, the submitting Officer's name and his/her

assignment.

D. The employee submitting the property shall make a notation in the Property Custody Log in Room 101, indicating the exact location of the property (e.g. locker #4, shelf A-4, etc.).

E. The 911 Communications Lieutenant shall sign and date the P-10 or P-10a as the case may be, and the submitting employee will retain one copy as his/her receipt for the property.

7.10    ALL PROPERTY TO BE STORED IN A SECURED AREA BY PROPERTY THE OFFICE
The Property Room is that area used by the Property Office to maintain custody of property and evidence. It is a secure area. Entry to the Property Room and any other secure area maintained by the Property Office is restricted to authorized members assigned to the Property Office. Other Department employees may be allowed access to these areas but only when on official Department business and only when accompanied by an authorized Property Clerk. All personnel entering the Property Room or any   other secure area must sign the register when entering and leaving.

7.11    SPECIAL HANDLING INSTRUCTIONS FOR PARTICULAR ITEMS OF PROPERTY
In addition to the procedures listed above certain items of property require special handling:

A. Alcohol and Other Consumable Beverages
All alcoholic and other beverages that are found property or are seized for safekeeping shall be taken to the Property Office with an accompanying P-10.

B. Bicycles
1. Whenever a bicycle comes into the possession of the Department, the employee receiving it shall prepare a P-10 and shall be sure to include the serial number, make, color, size, and the owner's name if known at the time, the owner's name etc.

2. The Property Clerk receiving the bicycle at the Property Office shall ensure that all pertinent data is included in the P-10, and if the bicycle is classified as evidence or "found" property, (s)he shall check the serial number against the serial numbers on the list of stolen bicycles.

3. A property tag with the property number shall be attached to the bicycle. The property tag shall indicate that the bicycle is found property.

4. When evidence is signed out of the Property room, it should never be

left in the overnight room.  The Officer who signed it out has to sign it back in.

C. <u>Cash</u>

1. Whenever cash is found or is seized for safekeeping, the employee gaining custody shall count the money in the presence of the person who is turning it over to the Department and (s)he shall have that person sign the P-10. If the money is found by a Department employee it shall be counted in the presence of a second Department employee in order to ensure accuracy and to guard against claims of unlawful appropriation. If the amount exceeds $5,000.00 the employees' superior will also count the money and verify its accuracy by signing the P-10.

2. All cash will be separated from all other evidence or property. Foreign currency, food stamps, etc., must each be separately packaged with separate P-10's, using the same event number if all the property was recovered at the same time.

3. Employees submitting cash must list the quantity of each denomination, the total value of each denomination, and the total amount of cash being submitted.

4. Cash shall not be stored at the employee's command but must be delivered immediately to the Property Office. Refer M.O.P. Chapter 18. During non-business hours, the 911 Communications Lieutenant, while in the presence of the employee submitting the cash, shall place it in a locker in Room 101. The deposit of cash will be noted on the PROPERTY DROP SAFE DEPOSIT/REMOVAL LOG by the submitting employee and initialed by the 911 Communications Lieutenant.

5. If cash in excess of $5,000.00 is seized during normal business hours, the Superior Officer in charge of the Property Office as well as a second member of the Property Office shall, together, count the money to verify the amount.

6. If cash in excess of $5,000.00 is seized during non - business hours, the 911 Communications Lieutenant shall call in the Property Office supervisor or the Property Office supervisor's designee, who shall assume control of the property.  The money should be counted in front of the person turning it in or the 911 Lieutenant.

7. All cash that is to be retained in the Property Office after processing shall be kept in the Property Office safe.

COB000914

D. <u>Drugs</u>

1. Whenever prescription drugs or over the counter medications are turned over to the Department as found property, the employee receiving such drugs shall prepare a P-10 specifically listing the quantity (i.e. number of pills, tablets, etc.). The person turning in the drugs shall sign the P-10.

   a. The employee receiving such drugs shall attempt to return the drugs to their rightful owner. Failing this they shall be submitted to the Property Office by the end of his/her shift. Refer to M.O.P. Chapter 18.
   b. The Property Office shall attempt to return the drugs to their owner and if such cannot be accomplished within a reasonable time, they shall be forwarded to the CPS Lab for destruction.

2. Whenever illicit drugs are found or turned over to an employee of the Department, a P-10 shall be prepared and it must clearly state that the drugs have been submitted for destruction. Form DCPS-1-L shall also be prepared requesting that the drugs be destroyed.

   a. During normal business hours the drugs shall be submitted directly to the CPS Lab.
   b. During non-business hours the drugs shall be deposited in the evidence depository at the CPS Lab, 45 Elm Street together with the related paperwork.
   c. If large quantities of illicit drugs are found, Narcotics and Vice Enforcement shall be notified by the employee taking them into his/her custody.

E. <u>Fireworks and Explosives</u>

1. Small quantities of fireworks may be submitted to the Property Office. The 911 Communications Lieutenant shall contact the Erie County Sheriff Department's Bomb Squad when large quantities of fireworks come into the Department's possession.

2. Home made fireworks, explosives or suspected explosive devices shall not be stored in the Property Office unless they have been defused and rendered safe.

F. <u>Guns and Ammunition</u>

For purposes of this section guns include all firearms, rifles and shotguns.

1. Guns that are found, turned in to the Department, or that are seized for safekeeping will only be handled by sworn members of the Department. The member must first ensure that the gun is unloaded

and that it does not pose a danger to the safety of any person. Officers that are not familiar with the safe handling and clearing of a particular weapon shall allow some one more familiar with the weapon to clear it. All weapons must be unloaded and rendered safe prior to delivery to the Property Office.

2. The member of the Department taking custody of the weapon or ammunition shall deliver it to the Property Office prior to the expiration of his/her tour of duty. During non-business hours, the 911 Communications Lieutenant shall be notified and the item will be deposited in an evidence locker in Room 101(refer M.O.P. Chapter 18). If no evidence locker is available the 911 Communications Lieutenant shall retain custody of the weapon in a secure place until it is deposited in the Property Office.

3. For firearms, rifles and shotguns, a P-10a shall be prepared in lieu of a P- 10. In any incident in which a firearm is seized from a premise for safekeeping, the Officer shall prepare a Premise Hazard File Entry Request (form P-295).

4. When firearms, rifles or shotguns are secured in the Property Office or CPS Lab, no members, other than members of the Property Office or the CPS Lab, shall be allowed to examine the item without the express written consent of the Property Office Commanding Officer and Commissioner of Police.

5. The Property Office will forward a monthly gun count to the Commissioner's Office. Copies of P-10a's are forward to ATF, where they will verify or determine ownership of the weapon through NCIC, or, in the case of a handgun, by transmitting a letter to the New York State Police Pistol Permit Section. A hard copy of all NCIC checks will be sent to the Property Office and attached to the corresponding P-10a. P10a's of all weapons turned into the CPS Lab are faxed daily to the Officer in the Property Office to be stamped with a property number.

6. Before a firearm, rifle or shotgun can be returned to the owner, the Property Office shall:

   a. if the P-10a lists the owner as being unknown, it must verify ownership of the weapon;
   b. check to determine if the owner has been convicted of a felony or serious  offense and if so, return of the weapon must be denied;
   c. examine the circumstances under which the Department assumed custody of the weapon to

determine if it can be classified as a nuisance under Penal Law Section 400.05-1 (weapons so classified must be destroyed);

d. if the weapon was taken into custody for safekeeping, the owner must get a letter from the submitting officer indicating his/her approval of the gun's release;

e. if a Premise Hazard File Entry (Form P-295) was attached to the P-10a, the Property Office must contact the submitting officer to determine whether release of the weapon contributes to the listed hazard;

G. Jewelry

1. Costume jewelry shall be handled just as any other property and requires no special handling.

2. When dealing with real jewelry the P-10 must describe the jewelry with sufficient specificity to enable the Property Office staff to readily identify the item. It should also give the Property Office staff an estimate of the value of the item.

H. Knives, Razors and Sharp Objects

Knives with closed blades may be packaged in envelopes. Knives with open blades must have the blades covered (with cardboard and heavy tape) or packaged in a box with the word "KNIFE" clearly written on the top and side of the box. Razors and other sharp objects must be packaged in a box with the word "SHARPS" clearly written on the top and side of the box.

I. Perishable Property

Perishables shall not be accepted by the Property Office. Department employees must attempt to locate the owner and if the owner cannot be located or if (s)he is unable to make arrangements to retrieve the property. When property is disposed of, the P-10 must indicate such.

J. Syringes

Syringes not needed as evidence shall be deposited in an infectious waste "SHARPS" container. A P-10 need not be prepared for found syringes.

7.12   NOTIFYING OWNERS AFTER SUBMISSION TO THE PROPERTY OFFICE

A. When found property or property being held for safekeeping is turned into the Property Office, the member of the Property Office receiving it shall attempt to contact the owner. If telephone contact is not made during the member's shift, (s)he shall send a letter to the owner notifying him/her to retrieve the property.

B. The P-10 will be stamped and dated and shall be marked "Letter Sent," and a

　
copy of the P-10 and the notification letter should be filed in the Monthly Folder according to the month under which the property is to be held.

7.13    RETURN BY THE PROPERTY OFFICE OF LOST/FOUND PROPERTY AND PROPERTY HELD FOR SAFEKEEPING

A.  Return of Property Generally

1.  The owner must also sign and date the numerical log book;

2.  If the P-10 has been stamped "Letter Sent," the copy of the P-10 and the notification letter contained in the Monthly Folder must be removed and discarded;

3.  The P-10 must be stamped Final Disposition and placed in the Inactive file.

B.  Identification Required
When found property and property seized for safekeeping is to be returned to the owner, the owner shall be required to furnish proper identification. The identification will be photocopied and attached to the P-10 retained by the Property Office. For property that is being retrieved by a person other than the owner thereof, that person must have the written notarized authorization of the owner as well as proper identification.

C.  Shipment of Property
1.  The item is to be packaged, labeled and shipped by UPS and must be prepaid by the owner by the Carrier of their choice.

D.  Cash
1.  Cash can be released directly to the owner if the money has not yet been deposited. The Property Clerk shall check the P-10 and verify the amount and the owner's name, address and identification prior to release with written release from the DA's Office, Police Officer or Court Order.

2.  Amounts already deposited may be released only by check. The Property Clerk will check the P-10 to verify the amount, the owner's name and address, and (s)he shall inform the owner that a check will be sent in the mail.

a.  A check request is sent to the City Hall Treasury Department.
b.  No check can be issued unless the cash has been deposited in the T&A Account.
c.  The City Audit Department issues the check and is

mailed from them.

E. Guns
  Refer to M.O.P. Chapter 18.

7.14 CONFLICTING CLAIMS FOR PROPERTY
When conflicting claims are made to property that is being held by the Property Office, the Commanding Officer of that unit shall retain the property and advise the claimants to submit their dispute to a court of competent jurisdiction. The Commanding Officer of the Property Office shall comply with all court orders concerning the disputed property and shall solicit the assistance of the Corporation Counsel if needed.

7.15 UNCLAIMED PROPERTY

A. If the owner of property, other than guns, is unknown or cannot be located; or, has failed to retrieve the property after proper notification; or, the finder of the property has not claimed it; or, the finder is the City of Buffalo; the property shall be disposed of according to the following schedule:

| Amount | Retention Time |
|---|---|
| Under $100.00 | 3 months and 10 days |
| $100.00 - $499.00 | 6 months and 10 days |
| $500.00 - $4999.00 | 1 year and 10 days |
| Over $5,000.00 | 3 years and 10 days |

When cash has cleared the above time schedule it will be converted according to law.

B. Property that remains unclaimed for the required length of time shall be inspected by the Property Office staff and a determination will be made as to the appropriate disposition. If the value of the property is less than $10.00 it shall be discarded. If it has auction value it will be retained until sale at the next auction.

C. Unclaimed property, other than cash and guns, that is eligible to be disposed of shall be sold at public auction. Notice of the time and place of the auction must be published in an official publication or a publication designated by the Common Council. The proceeds of the auction shall be paid to the City Treasurer, accompanied by a certificate stating the sale price and the reasonable expense incurred by the Department in the seizure and preservation of the property and the conduct of the audit.

7.16   UNCLAIMED OR UNCLAIMABLE GUNS

A.  Conversion to Department Use

1.  In cases when it is determined that a gun that is set for destruction can serve the interests of the Department, the officer requesting conversion must submit an Intra-Department memoranda through the chain of command to the Supervisor of the Property Office. Only members of SWAT or the Firearms Unit may request such a conversion. The memoranda must state the purpose of the conversion and to whom it will be assigned. The Supervisor of the Property Office will forward the request through his/her chain of command to the Commissioner. All Commanding Officers in the chain of command must approve the request. Final approval for such conversion must be given by the Police Commissioner.

2.  If the conversion is approved by the Commissioner, the commanding officer of the unit that is to receive the weapon must sign for it and take physical possession.

3.  A complete list of all firearms converted for Department use shall be maintained in the Firearms Unit and the Property Office. The P-10a will be marked "Conversion for BPD Use" and the date, time and the signature of the commanding officer taking possession will be marked thereon. The P-10a will then be filed in the Inactive File.

B.  Destruction of Firearms
1.  All firearms not otherwise disposed of will be kept for a minimum period of 2 years. At the specific request of the District Attorney's Office, a firearm that is part of an active case will be retained until that office authorizes release or destruction. At the end of the two year period these firearms will be destroyed.

2.  Prior to the destruction of a firearm, the Property Office will request that City Court Booking run a final NCIC check. Any "hits" for stolen firearms will be immediately reported to the Property Office.

3.  A list of weapons to be destroyed will be compiled and sent to Albany in conformance with state law.

4.  The Property Room Supervisor will approve, witness, and supervise the destruction of all firearms in conjunction with the CPS Lab. After a firearm's   destruction, the P-10a will be marked "Destroyed" and it will be placed in the Inactive File according to the year of disposition.

5.  Pellet guns, air guns, etc., are disposed of according to the guidelines

established for other property.

7.17   <u>DISPOSING OF ELIGIBLE PROPERTY WITHIN TWELVE MONTHS</u>
To the extent possible, the Commanding Officer of the Property Officer shall attempt to dispose of all property within 12 months from the date that it becomes eligible for disposal.

7.18   <u>WEEKLY ACCOUNTING</u>
The property log book in the Property Office shall be checked at least once each week for entries involving money. Envelopes in the Property Office safe will be checked to make sure that they coincide with entries in the log book and with their corresponding P-10. The weekly accounting will be done by two different employees working independently of one another.  When the total amount of money reaches $10,000.00 it will be deposited at City Hall.

7.19   <u>INSPECTING THE PROPERTY OFFICE</u>

A. The Commanding Officer of the Property Office shall conduct periodic inspections of his/her unit no less than quarterly for the purpose of:

　　1.  determining that the property room is clean and is being maintained in an orderly condition;

　　2.  determining if the integrity of the property is being maintained;

　　3.  determining if all procedures, orders and directives are being followed;
　　4.  ensuring that property is protected from damage and/or deterioration;

　　5.  ensuring that property is disposed of when it become eligible for disposable.

B. An inventory of the Property Office shall be conducted whenever the Commanding Officer of that unit is re-assigned. This inventory is to be conducted jointly by the out-going and the in-coming Commanding Officers.

C. It will be the responsibility of the Inspector assigned to the Division of Administration and Communications to periodically order the auditing of property and evidence maintained by the Property Office. The Inspector may conduct the audit himself/herself or (s)he may designate a Captain or a Lieutenant assigned to his/her Division  to do so. These audits shall be random and unannounced and shall be conducted on a    semi-annual basis.

　　　　a.  The audit will include a comparison of property contained on randomly selected P-10's with the property they represent. It will minimally include random selections from found property, cash and evidence.

      b.  A report detailing the results of the audit will be forwarded to the Police Commissioner no later than 10 days after the audits completion.

    D.  The Internal Affairs Division shall conduct an annual, unannounced audit of the Property Office which will include a sampling of property and evidence sufficient to determine the integrity of the system.  A report detailing the results of such an audit shall be forwarded to the Commissioner's Office within 10 days of the audit's completion.

7.20    <u>CITY EMPLOYEES NOT ENTITLED TO FOUND PROPERTY</u>
City of Buffalo employees who find or recover property during the course of their employment with the City cannot claim that property.

7.21    <u>HANDLING PRISONER'S PROPERTY</u>
Refer M.O.P. Chapter 3.

7.22    <u>HANDLING REPORTS OF LOST PROPERTY</u>
All District Stations have P1376 Forms which are filled out for cell phones and forwarded to the Property Office.  No reports are taken nor are any forms filled out for "lost" property.

**INDEX**

**9**

911 CALLER - IDENTITIY AND LOCATION NOT TO BE REVEALED ...........................................380
911 SYSTEM.......................................................355

**A**

ABSENCES AND TARDINESS - UNREPORTED ...........................................................................391
ACADEMY ...........................................................51
ACCIDENTS AT CROSSING PROTECTED BY CSCG GUARDS ..............................................291
ACCIDENTS AT OR NEAR A SCHOOL CROSSING.......................................................65
ACCIDENTS ON THE NYS THRUWAY...............66
ACCIDENTS ON THE SKYWAY, ROUTE 33 OR ROUTE 198 .........................................................73
ACCIDENTS REPORTED AT THE STATIONHOUSE .................................................66
ADDITIONAL EMPLOYMENT - FILING FORMS ...........................................................................413
ADDITIONAL EMPLOYMENT - LIMITATIONS ...........................................................................412
ADDITIONAL EMPLOYMENT - SWORN PERSONNEL ...................................................412
ADDRESS AND TELEPHONE NUMBER...............416
ADDRESSING PLAIN CLOTHES OFFICERS ....579
ADJUDICATION SUMMONS ...............................175
ADJUDICATION SUMMONS - PREPARING.....176
ADJUDICATION SUMMONS - VOIDING..........177
ADJUDICATION SUMMONS BOOKS - DISTRIBUTION OF.........................................175
ADJUDICATION SUMMONS BOOKS - OBTAINING .....................................................175
ADJUDICATION SUMMONS BOOKS - UNITS TO MAINTAIN A RECORD ................................175
ADJUDICATION SUMMONS BOOKS BY INDIVIDUAL MEMBERS - CARE OF BY INDIVIDUAL MEMBERS ...............................176
ADJUDICATION SUMMONSES - ISSUING TO VIOLATORS ....................................................176
ADJUDICATION SUMMONSES – PROCESSING, COMMAND/UNIT RESPONSIBILITIES ........177
ADJUDICATION SUMMONSES - WHERE RETURNABLE ................................................177
ADMINISTRATION AND FINANCE ..........523, 651
ADMINISTRATION AND OPERATION OF THE ACADEMY ........................................................52

ADMINISTRATIVE ADJUDICATION BUREAU SWORN MEMBERS APPEARANCE ............. 177
ADULT ARRESTS - PROCEDURES................... 134
ADULTS - FOUND WITH MEMORY LOSS ISSUES ................................................................ 88
AGREEMENTS - USE AND DISSEMINATION SEE USE AND DISSEMINATION AGREEMENTS
AID FOR SICK OR INJURED PERSON................ 76
AIRCRAFT CRASH - IDENTIFYING PASSENGERS................................................... 443
AIRCRAFT CRASH - MOVING THE AIRCRAFT ............................................................................ 443
AIRCRAFT CRASH SITE - SECURING THE SCENE .............................................................. 443
AIRCRAFT CRASHES .......................................... 441
AIRCRAFT CRASHES - MILITARY................... 444
ALARM ACTIVATION........................................ 323
ALARM TESTS - BANKS.................................... 324
ALARMS - EXCESSIVE AVOIDABLE .............. 330
ALCOHOL BEVERAGE CONTROL BOARD .... 530
ALCOHOL CONTROL BOARD - REQUESTS FOR HEARING...................................................... 624
ALCOHOLIC BEVERAGES ................................ 236
AMBER ALERT - CHANNELING REPORTS ...... 96
AMBER ALERT - DUTIES OF THE CITY COURT BOOKING UNIT .................................................. 94
AMBER ALERT - RECEIVING AN ALERT FROM NYSP ...................................................................... 94
AMBER ALERT - SEX OFFENSE SQUAD RESPONSIBILITY ............................................. 96
AMBER ALERT ACTIVATION PROCEDURE - INVESTIGATING AGENCY ............................. 92
AMBER ALERT ACTIVATION PROTOCOL IN NYS...................................................................... 91
AMBER ALERT REPORTING PROCEDURE FOR ABDUCTED CHILDREN ................................... 90
AMERICAN FLAG - DISPLAYING DISPLAYING THE AMERICAN FLAG......... 581
AMERICAN FLAG - DISPLAYING THE FLAG FOR DECEASED MEMBERS ......................... 581
AMERICAN FLAG - SALUTING SALUTING THE AMERICAN FLAG............. 580
AMERICAN RED CROSS .................................... 537
ANALYZING CRIMES, VICTIMS AND SUSPECTS ............................................................................ 616
ANIMAL BITE CASES........................................... 78
ANIMAL CRUELTY  - REPORT TO SPCA .......... 80
ANIMALS - DESTRUCTION OF INJURED ......... 80
ANIMALS - STRAY, INJURED OR DEAD .......... 80
ANIMALS - VICIOUS, WILD OR RABID ........... 79

APPEALS TO THE DEPARTMENT OF HUMAN RESOURCES – CIVIL SERVICE ADMINISTRATION ...............................................51
APPEARANCE TICKETS ....................................173
APPEARANCE TICKETS - ISSUING AT CITY COURT BOOKING............................................174
APPOINTMENT TO THE POLICE DEPARTMENT ...............................................................................51
APPROACHING THE VEHICLE ........................329
ARMED FORCES..................................................535
ARREST - ENTERING PREMISES .....................110
ARREST - FOREIGN NATIONALS .....................154
ARREST BOOKING PROCEDURES ...................136
ARREST DOCUMENTS - PREPARING AND HANDLING ......................................................139
ARREST OF OPERATORS OF COMMON CARRIERS ........................................................156
ARREST WARRANTS...........................................168
ARREST WARRANTS - DISTRIBUTION OF .....169
ARREST WARRANTS - RESPONSIBILITY FOR SERVING ..........................................................170
ARREST WARRANTS TO BE PROCESSED AT CITY COURT BOOKING ...............................169
ARREST WITH A WARRANT .............................110
ARREST WITHOUT A WARRANT......................109
ARRESTED PERSON - UNCONDITIONAL RELEASE...........................................................110
ARRESTING OFFICER RESPONSIBILITIES .....183
ARRESTING OFFICERS ......................................248
ARRESTS  - HOSTILE/COMBATIVE PRISONERS ...............................................................................137
ARRESTS  - HOSTILE/COMBATIVE PRISONERS ...............................................................................182
ARRESTS - CITY COURT BOOKING.................136
ARRESTS - HOMICIDE.........................................153
ARRESTS BY A PRIVATE PERSON BOOKING PRISONERS .....................................................140
ARRESTS FOR DWI / DWAI ..............................142
ARRESTS MADE BY MEMBERS OF THE BUFFALO POLICE DEPARTMENT...............182
ARRESTS ON CITY WARRANTS BY OUTSIDE AGENCIES.......................................................173
ARRESTS RELATED TO OUTSIDE EMPLOYMENT.................................................249
ARSON INVESTIGATIONS ..................................431
ASSIGNING CASES..............................................598
ASSISTANCE - EMERGENCY REQUESTS .......465
ASSISTANCE - NON-EMERGENCY REQUESTS ...............................................................................465
ASSISTANCE TO CITIZENS ...............................579
ASSISTANCE TO FELLOW EMPLOYEES.........579
ASSISTANCE TO THE FAMILY OF MEMBERS BECOMING SERIOUSLY ILL, INJURED OR KILLED WHILE ON DUTY............................507

ASSISTANT ACCOUNTANT ................................. 15
ATTEMPTED SUICIDE - ALTERNATE PROCEDURES................................................. 161
ATTEMPTED SUICIDE - REQUIRED FORMS.. 161
ATTEMPTED SUICIDES ...................................... 161
ATTITUDE AND IMPARTIALITY ..................... 579
ATTORNEY GENERAL OF NEW YORK STATE ............................................................................. 531
AUDITING .............................................................. 652
AUTHORITY AND RESPONSIBILITY ............... 42
AUTOMOBILE REPOSSESSORS ....................... 546
AVOIDABLE ALARMS - REPORTING DISPOSITIONS ............................................... 331
AWARDS - PRESENTATION............................... 583
AWARDS - TYPES ................................................ 583
AWARDS BOARD.................................................. 582

---

**B**

BADGE/WREATHS - ISSUANCE, RECORDS AND CONTROL .......................................................... 476
BADGES - PURCHASING UPON RETIREMENT ............................................................................. 476
BADGES AND WREATHS .................................... 474
BADGES AND WREATHS - CARE OF .............. 474
BADGES AND WREATHS - DAMAGES DAMAGES BADGES AND WREATHS......... 475
BADGES/WREATHS - LOST LOST BADGES/WREATHS............................. 474
BANK ALARM RESPONSE PLAN ..................... 322
BASIC RECRUIT TRAINING................................ 53
BASIC REQUIREMENTS OF VERBAL COMMUNICATION ........................................ 351
BEREAVEMENT LEAVE - LOCAL 264 MEMBERS ....................................................... 406
BEREAVEMENT LEAVE - LOCAL 650 MEMBERS ....................................................... 405
BEREAVEMENT LEAVE - PBA MEMBERS..... 405
BICYCLE PATROL ..........SEE PATROL, BICYCLE
BLOOD DAYS ........................................................ 407
BOARD OF ELECTIONS ...................................... 529
BODY SEARCHES, STRIP/BODY CAVITY SEARCHES – MALES ..................................... 206
BOMB - SUBJECT HOLDING BOMB ............... 449
BOMB DETECTION - K-9 OFFICERS' RESPONSIBILITIES ...................................... 448
BOMB DETONATIONS ........................................ 447
BOMBINGS AND BOMB THREATS.................. 444
BOMBS, GRENADES, ETC. ................................ 232
BOOKING PROCEDURES IN PARTICULAR CASES ............................................................ 153
BORDER PATROL ................................................ 535
BREATHALYZER TESTING................................ 143
BREATHALYZER TESTING ALTERNATIVE .. 145

BREATHALYZER TESTING PROCEDURE.......144
BROADCASTS - DIRECT ......................................375
BROADCASTS - NATURE OF............................375
BROADCASTS - TYPES......................................375
BUDGET - DEPARTMENT ..................................648
BUDGET - INSPECTOR ADMINISTRATION AND
    COMMUNICATION........................................648
BUDGET - JUSTIFYING BUDGET REQUESTS 649
BUDGET - POLICE COMMISSIONER'S
    RESPONSIBILITY..........................................648
BUDGET - ROLE OF COMMANDING OFFICERS
    .......................................................................648
BUDGET REQUESTS: CATEGORIES .................649
BUDGET SUBMISSION TIMETABLE................650
BUFFALO BOARD OF EDUCATION .................523
BUFFALO CITY COURT.....................................523
BULLETS REMOVED FROM A SHOOTING
    VICTIM ..........................................................232
BURGLARIES -
    DISCOVERABLE/PREVENTABLE................307
BUSINESS FILES.................................................383
BUSINESS FILES - DISTRICT RESPONSIBILITY
    .......................................................................383
BUSINESS FILES - METHODS FOR UPDATING
    .......................................................................384

C

CABLE TELEVISION ...........................................545
CALENDAR - DEPARTMENT............................390
CALLS FOR SERVICE - MISSED RUNS ...........380
CALLS FOR SERVICE - PRIORITIZING ...........377
CAMERA SYSTEMS ADMINISTRATOR.............17
CAPITAL IMPROVEMENTS OF POLICE
    FACILITY .......................................................659
CAPTAIN ...................................................................9
CAPTAIN – DISTRICT .........................................297
CAR STOPS .........................................................328
CARE OF POLICE BUILDINGS ..................299, 659
CARE OF PRISONERS ........................................189
CASH SEIZED AS FORFEITURE ASSETS.........235
CASKET WATCH ................................................590
CELLBLOCK  - ESCAPES...................................197
CELLBLOCK - DEATHS IN THE CELLBLOCK -
    ADDITIONAL PROCEDURES ........................196
CELLBLOCK - ESCORTING PRISONERS TO AND
    FROM CELLS .................................................199
CELLBLOCK - INSPECTING CELLS AND
    CELLBLOCK AREAS......................................201
CELLBLOCK - KEY CONTROL...........................198
CELLBLOCK - RADIOS.......................................198
CELLBLOCK - REPORTING REQUIREMENTS 197
CELLBLOCK - UNUSUAL INCIDENTS.............196

CELLBLOCK - UNUSUAL OCCURRENCE -
    REPORTING REQUIREMENTS .....................196
CELLBLOCK - VISITING AND INTERVIEWING
    PRISONERS ...................................................199
CELLBLOCK ATTENDANT ..................................18
CELLBLOCK EMERGENCIES............................198
CELLBLOCK PRISONER CONTROL - FORM P-19
    .......................................................................210
CELLBLOCK PRISONER CONTROL FORM (P-19)
    .......................................................................202
CELLBLOCK RECORDS AND FORMS ............202
CELLBLOCK SECURITY ....................................197
CENTRAL POLICE SERVICES (CPS) ................528
CENTRAL POLICE SERVICES FORENSIC
    LABORATORY...............................................218
CHAIN OF COMMAND ................................40, 296
CHEMICAL SPRAY - USE OF ...........................129
CHEMICAL TEST – COMPELLING SUBMISSION
    - FATAL AND SERIOUS PHYSICAL INJURY
    ACCIDENTS ...................................................146
CHEMICAL TEST - DEFENDANT'S REFUSAL TO
    SUBMIT TO ...................................................146
CHEMTREC ........................................................451
CHIEF OF DETECTIVES .......................................43
CHIEFS OF POLICE ................................................6
CHILD - CARE OF FOUND ..................................87
CHILD - DISPOSITION OF FOUND CHILD ........87
CHILD ABUSE/NEGLECT ....................................98
CHILD ABUSE/NEGLECT - REMOVAL OF THE
    CHILD FROM THE HOME .............................100
CHILD ABUSE/NEGLECT INVESTIGATIONS. 635
CHILD AND FAMILY SERVICES .....................537
CHILDREN - FOUND............................................87
CHILDREN AND ADULTS FOUND ADULTS
    WITH MEMORY LOSS ISSUES......................86
CIRCUMVENTING THE CHAIN OF COMMAND -
    EXTENUATING CIRCUMSTANCES ............350
CITIZEN COMPLAINT - CONDUCTING THE
    INVESTIGATION ...........................................561
CITIZEN COMPLAINT - DETERMINING WHICH
    COMMAND IS TO INVESTIGATE THE
    COMPLAINT...................................................561
CITIZEN COMPLAINTS ......................................559
CITIZEN COMPLAINTS - CONCLUSIONS OF
    FACT ..............................................................562
CITIZEN COMPLAINTS - LINES OF AUTHORITY
    .......................................................................562
CITY CLERK ........................................................523
CITY COURT BOOKING - CLEARING HOUSE
    FUNCTION.....................................................341
CITY COURT BOOKING - DUTIES OF
    PERSONNEL..................................................357
CITY COURT CELLBLOCK.................................188
CITY COURT LOCK-UP......................................182

CITY COURT LOCK-UP - REMANDING OF THE
PRISONER ...................................................182
CITY INVOLVED ACCIDENTS ............................63
CITY MISSION.................................................538
CIVIC DUTY - LOCAL 264 MEMBERS...............407
CIVIL INDEMNIFICATION ...............................390
CIVIL LAW SUITS AND CLAIMS ......241, 247, 557
CIVILIAN SCHOOL CROSSING GUARD-
INJURED ON DUTY .......................................291
CIVILIAN SCHOOL CROSSING GUARDS -
ARRESTS BY ...............................................289
CIVILIAN SCHOOL CROSSING GUARDS -
AUTHORITY .................................................289
CIVILIAN SCHOOL CROSSING GUARDS -
COOPERATION WITH ....................................292
CIVILIAN SCHOOL CROSSING GUARDS -
REPLACING ABSENT GUARDS ...................291
CIVILIAN SCHOOL CROSSING GUARDS -
WORKING PERIODS.....................................290
CIVILIAN SCHOOL CROSSING GUARDS (CSCG)
.....................................................................288
CIVILIAN SCHOOL CROSSING GUARDS
ABSENCES ..................................................290
CLASSIFYING APPROPRIATIONS AND
EXPENDITURES...........................................651
CLERGY - SERVICES .........................................632
CLERGY - SERVICES OF .....................................77
CLOSING STREETS...........................................267
CLOSING THE SKYWAY - 911 LIEUTENANT'S
RESPONSIBILITIES.....................................269
CLOSING THE SKYWAY - DISTRICT
COMMANDER'S RESPONSIBILITIES...........270
CLOSING THE SKYWAY - EMERGENCY
CLOSING NOTIFICATION LIST ...................272
CLOSING THE SKYWAY - IMPLEMENTATION
OF EMERGENCY CLOSING PLAN ...............270
CLOSING THE SKYWAY - RADIO
DISPATCHER'S RESPONSIBILITY...............270
CLOSING THE SKYWAY COMPLEX ..................269
CMT - ACTIVATING...........................................460
CMT - DIGNITARY PROTECTION
DIGNITARY PROTECTION............................461
CMT - EQUIPMENT ...........................................461
CMT - EVALUATION..........................................461
CMT - QUALIFICATIONS, SELECTION AND
TRAINING ...................................................461
CMT ROSTER ...................................................461
COLLECTIVE BARGAINING...............................388
COMMENDATIONS...........................................585
COMMISSION OF CORRECTIONS ....................531
COMMISSIONER OF POLICE ..................................5
COMMISSIONER'S OFFICE ..................................43
COMMUNICATIONS - OFFICIAL AND
UNOFFICIAL................................................350

COMMUNITY BASED SERVICE
ORGANIZATIONS .......................................... 537
COMMUNITY GRANT COORDINATOR ............ 19
COMMUNITY SERVICES - DEPARTMENT OF 525
COMPASS HOUSE................................................ 538
COMPLAINTS AGAINST SUPERIOR OFFICERS
..................................................................... 561
COMPLETED STAFF WORK.............................. 348
COMPREHENSIVE EMERGENCY
MANAGEMENT PLAN .................................. 432
COMPUTER - MOBILE TERMINALS ............... SEE
COMPUTER - MOBILE TERMINALS (MCT)
COMPUTER AIDED DISPATCH (CAD) ............ 360
COMPUTER INFORMATION SYSTEMS - NON-
DEPARTMENTAL........................................... 360
COMPUTER POLICY .......................................... 358
COMPUTER POLICY VIOLATIONS................... 359
COMPUTERIZED INFORMATION SYSTEMS. 358,
359
CONFIDENTIAL FUNDS..............594, 610, 612, 652
CONFIDENTIAL FUNDS - ACCOUNTING AND
CONTROL PROCEDURES ............................. 615
CONFIDENTIAL FUNDS - DETECTIVE UNITS 616
CONFIDENTIAL FUNDS - EXPENDING........... 612
CONFIDENTIAL FUNDS -
NARCOTICS/INTELLIGENCE/VICE
ENFORCEMENT ............................................ 616
CONFIDENTIAL FUNDS- PRIOR APPROVAL
REQUIRED................................................... 612
CONSTITUTIONAL GUARANTEES.................. 114
CONSULAR NOTIFICATION AND ACCESS.... 154
CONTAMINATED FOOD -  ACCIDENTAL FOOD
POISONING ................................................... 237
CONTRACT MANAGEMENT............................. 388
CONTRACTS AND COMPETITIVE BIDDING . 653
CONTROLLING THE DRIVER AND OCCUPANTS
..................................................................... 329
COOPERATING WITH OTHER LAW
ENFORCEMENT AGENCIES INVOLVED IN
PERSONNEL INVESTIGATIONS ................... 547
COOPERATION WITH OTHER ORGANIZATIONS
..................................................................... 522
CORRESPONDENCE SENT IN RESPONSE TO
COMPLAINTS ............................................... 353
CORRESPONDENCE TO GOVERNMENT
AGENCIES AND BUSINESSES ..................... 353
COUNTERFEIT MONEY .................................... 228
COURT - ADJOURNMENTS
ADJOURNMENTS.......................................... 254
COURT - ATTIRE............................................... 253
COURT - CONDUCT ON THE WITNESS STAND
..................................................................... 253
COURT - DUTIES OF DEPARTMENTAL UNITS
..................................................................... 250

COURT - LEAVE REQUESTS WHEN A MEMBER IS SCHEDULED FOR COURT ..........................255
COURT - MEMBERS ON ANNUAL VACATION OR LEAVE OF ABSENCE..............................255
COURT - MONETARY PAYMENT FOR "SHORT NOTICE" ADJOURNMENTS ..........................258
COURT - ON DUTY STATUS...............................254
COURT - PAID COURT TIME ..............................256
COURT - PLEA BARGAINING..............................254
COURT - PREPARING THE REQUEST FOR MONETARY PAYMENT FOR AN AUTHORIZED OFF DUTY COURT APPEARANCE ( ...............................................256
COURT - SCANNING IN AND SCANNING OUT ........................................................................257
COURT - THE MEMBER'S RESPONSIBILITY ..251
COURT - TRUTHFULNESS REQUIRED ............253
COURT - UNEXPECTED CLOSINGS OF COURTS AND ADMINISTRATIVE BODIES.................255
COURT APPEARANCES FOR NON-DUTY RELATED INCIDENTS ....................................258
COURT APPEARANCES WHILE SUSPENDED 259
COURT INELIGIBILITY .......................................259
COURT LIAISON AND TRAFFIC ADJUICATION DUTIES ...........................................................243
COURT LIAISON DUTIES ...................................250
COURT LIAISON UNIT AND TRAFFIC ADJUDICATION BUREAU ...........................243
COURT LIAISON UNIT RESPONSIBILITY .......259
COURT NOTIFICATIONS.....................................250
COURT PROCEDURES.........................................252
COURT TIME WHILE ON SICK LEAVE OR IOD STATUS .............................................................258
COURTESIES TO DECEASED MEMBERS ........585
COVERT POLICE OPERATIONS ........................616
COVERT POLICE OPERATIONS - DETERMINING LEGAL RAMIFICATIONS ..............................617
COVERT POLICE OPERATIONS -TACTICAL PREPARATION ...............................................617
CRIME ANALYSIS ...............................................382
CRIME ANALYSIS - FACTORS USED...............383
CRIME ANALYSIS UNIT......................................382
CRIME ANALYST ................................................20
CRIME SCENE TECHNICIAN ..............21, 593, 606
CRIME SCENE UNIT - PROCESS LATENT FINGERPRINTS ............................................238
CRIME SCENE UNIT - SERVICES OF................217
CRIME SCENES ...................................................305
CRIME VICTIMS COMPENSATION BOARD....531
CRIMINAL COMPLAINT FILED - RIGHT TO COUNSEL ......................................................117
CRIMINAL INTELLIGENCE ................................626
CRIMINAL INTELLIGENCE DATA - PROCESSING .................................................627

CRIMINAL INTELLIGENCE FILES ....................627
CRIMINAL INTELLIGENCE INFORMATION - FORWARDING....................................................626
CRIMINAL RECORDS - DISCLOSING ...............339
CRISIS MANAGEMENT TEAM ............................44
CRISIS MANAGEMENT TEAM (CMT...............460
CRISIS SERVICES ..............................................537
CURFEW ...............................................................438

---

## D

DAILY BUSINESS - ASSEMBLING ...................354
DAILY BUSINESS - FORWARDING .................354
DAILY BUSINESS - HANDLING .......................354
DANCES................................................................424
DANGEROUS CONDITIONS AND HAZARDOUS MATERIALS .................................................75
DEAD BODY - NOTIFICATION OF CLERGY .... 83
DEAD BODY - NOTIFICATION OF NEXT OF KIN ............................................................................82
DEAD HUMAN BODY .........................................80
DEAD HUMAN BODY - UNIDENTIFIED ..........82
DEAF ADULT SERVICES ...................................539
DEALING WITH EVIDENCE ...................... 593, 606
DEALING WITH MOTORISTS ...........................276
DEATH - REPORTABLE TYPES .........................84
DEATHS - SUDDEN..............................................84
DEATHS OF ACTIVE MEMBERS .......................585
DEATHS OF RETIRED MEMBERS .....................586
DECLARATION OF STATE OF EMERGENCY STATE OF EMERGENCY...............................433
DEFENDANT INFORMATION - PREPARING (P-32) ........................................................................ 249
DELIVERING FIREARMS/WEAPONS AND AMMUNITION TO THE CPS LAB ................ 230
DENIAL OF ACCESS TO RECORDS AND APPEAL TO CORPORATION COUNSEL ..... 343
DEPARTMENT FACILITIES ................................659
DEPARTMENT OF MOTOR VEHICLES............532
DEPARTMENT OF STATE..................................533
DEPARTMENT RECORDS - DISSEMINATION OF ............................................................................ 336
DEPARTMENT RECORDS - RESTRICTED ACCESS............................................................338
DEPARTMENT RECORDS TO BE DISCLOSED338
DEPUTY COMMISSIONER OF OPERATIONS ... 43
DEPUTY POLICE COMMISSIONER.....................5
DETECTIVE SERGEANT ...................................12
DETECTIVES........................................................13
DETECTIVES - DAILY ACTIVITY REPORTS .. 605
DETECTIVES - MONTHLY ACTIVITY REPORTS ............................................................................ 605
DETECTIVES - ON - CALL ROSTERS...............606

DETECTIVES CHRONOLOGICAL CASE
RECORD ..........................................605
DETERMINING ELIGIBILITY FOR
APPOINTMENT .................................49
DIPLOMATIC IMMUNITY ....................113
DIRECTING TRAFFIC...........................263
DIRECTING TRAFFIC - HAND SIGNALS .........263
DIRECTION DEFINED ...........................45
DISABILITY .........................................389
DISASTER - PERIMETER CONTROL ...............433
DISASTER RESPONSE ..........................432
DISASTER RESPONSE PLAN -
IMPLEMENTATION OF .....................441
DISCIPLINARY ACTION - TERMINATION
CONFERENCE ...................................569
DISCIPLINARY ACTION - TIME LIMITATIONS
.............................................................553
DISCIPLINARY CHARGES - ADJOURNMENT:
ABSENCE OF WITNESSES ............................568
DISCIPLINARY CHARGES - INFORMAL
CONFERENCE ...................................566
DISCIPLINARY CHARGES - RIGHTS OF THE
ACCUSED EMPLOYEE.....................567
DISCIPLINARY CHARGES - SUBPOENAS.......567
DISCIPLINARY CHARGES AND HEARINGS...565
DISCIPLINARY CHARGES INFORMAL
HEARING - UNIFORMS TO BE WORN ........567
DISCIPLINARY HEARING - AFFECT OF A
FINDING OF GUILT LIMITED TO TWO
YEARS ...............................................569
DISCIPLINARY HEARING - REVIEW OF THE
HEARING OFFICER'S DECISION .................568
DISCIPLINARY HEARING - RULES OF
EVIDENCE ........................................568
DISCIPLINARY HEARINGS - RECORDING THE
FORMAL HEARING .........................568
DISCIPLINARY PENALTIES.............................553
DISCIPLINE..............................................551
DISCRIMINATE COLLECTION AND USE OF
INFORMATION.................................335
DISCRIMINATION - COMMISSIONER'S
DETERMINATION.............................572
DISCRIMINATION - COMPLAINT PROCEDURE
.............................................................570
DISCRIMINATION - INTERNAL AFFAIRS
DIVISION AS CENTRAL REPOSITORY .......571
DISCRIMINATION - INVESTIGATION .............572
DISCRIMINATION - RESPONSIBILITY OF
SUPERVISORS/SUPERIOR OFFICERS .........572
DISCRIMINATION - TIMELINESS FOR
INITIATING COMPLAINTS OR GRIEVANCES
.............................................................571
DISCRIMINATION IN THE WORKPLACE -
PREVENTING ...................................570

DISPATCHERS DUTIES ........................ 60
DISPERSING AN UNLAWFUL ASSEMBLY..... 428
DISPOSITION OF PRISONER AFTER BOOKING -
MALES ................................................ 184
DISTRICT ATTORNEY ........................ 529
DISTRICT CHIEFS ................................ 296
DISTRICT COMPLAINT FILE ................ 347
DISTRICT DETECTIVES TO FREQUENTLY
ATTEND PRE-TOUR BRIEFING ................... 604
DIVISION FOR YOUTH ....................... 534
DIVISION OF ADMINISTRATION AND
COMMUNICATIONS ......................... 43
DIVISION OF PARKING ENFORCEMENT ......... 72
DIVISION OF PAROLE
PAROLE - DIVISION OF ............................... 532
DOCUMENTARY EVIDENCE ............................ 228
DOG CONTROL VIOLATION SUMMONS.......... 78
DOMESTIC DISPUTE - 911 PROCEDURES ...... 148
DOMESTIC DISPUTE - DUTIES OF
COMMANDING OFFICERS AND/OR
DISTRICT CHIEFS ............................ 152
DOMESTIC DISPUTE - FORMS TO BE
COMPLETED.................................... 150
DOMESTIC DISPUTE - INTERNAL AFFAIRS
DIVISION – RESPONSIBILITIES ................. 152
DOMESTIC DISPUTE - INVOLVED MEMBER'S
RESPONSIBILITY ............................ 152
DOMESTIC DISPUTE - RESPONDING OFFICER
PROCEDURES.................................. 148
DOMESTIC DISPUTE - SUPERVISOR'S DUTIES -
DEPARTMENT MEMBERS INVOLVED ...... 151
DOMESTIC DISPUTE - VICTIM
ASSISTANCE/CRIME PREVENTION ........... 150
DOMESTIC DISPUTES INVOLVING
DEPARTMENT MEMBERS.......................... 151
DOMESTIC DISPUTES INVOLVING
DEPARTMENT MEMBERS.......................... 151
DOMESTIC VIOLENCE INCIDENTS................. 147
DROWNINGS ...................................... 77
DRUG AND DRUG PARAPHERNALIA -
PACKAGING .................................... 232
DRUG EVIDENCE - SUBMITTING IT TO THE
CPS LAB............................................ 233
DRUG EVIDENCE - TAKING DRUGS TO COURT
.............................................................. 233
DRUG EVIDENCE AND DRUG
PARAPHERNALIA........................... 626
DRUG TESTING OF SWORN MEMBERS ........ 518
DRUGS AND DRUG PARAPHERNALIA ......... 232
DUTY INSPECTORS............................. 7
DUTY OFFICERS ................................. 296
DWI / DWAI - ARRESTS ...................... 142
DWI ENFORCEMENT .......................... 277
DYING DECLARATIONS OF VICTIM .............. 631

# E

EDUCATIONAL INCENTIVES............................390
EDUCATIONAL LEAVES - LOCAL 650 AND
    LOCAL 264 MEMBERS...................................410
ELECTION OR APPOINTMENT TO PUBLIC
    OFFICE - LOCAL 650 AND LOCAL 264
    MEMBERS.........................................................410
ELECTION OR APPOINTMENT TO PUBLIC
    OFFICE - SWORN MEMBERS.........................409
ELECTRIC SERVICE..........................................546
ELECTRICAL HAZARDS .....................................76
EMERGENCY MOBILIZATION PLAN ..............433
EMERGENCY REQUESTS FOR ASSISTANCE .465
EMPIRE SYSTEM ...............................................361
EMPLOYEE ABSENCE - LOCAL 264................400
EMPLOYEE ASSISTANCE PROGRAM (EAP) ..517
EMPLOYMENT OPPORTUNITIES - LOCAL 650
    AND LOCAL 264..............................................410
ENFORCING ILLEGAL PARKING
    REGULATIONS................................................268
ENTERING BUILDINGS .....................................306
ENVIRONMENTAL CONSERVATION ..............532
EQUAL EMPLOYMENT OPPORTUNITY PLAN.49
EQUIPMENT - ANNUAL INVENTORY .............657
EQUIPMENT - CULPABLE DAMAGE ...............659
EQUIPMENT - OPERATIONAL READINESS....657
EQUIPMENT - REMOVAL OR TRANSFER.......658
ERIE COUNTY AGENCIES .................................528
ERIE COUNTY REHAB CENTER (291 ELM ST.)
    ............................................................................538
ESCAPED PRISONERS .......................................135
ESCORTS.............................................................308
ESCORTS - NON-EMERGENCY ........................308
EVIDENCE..........................................................216
EVIDENCE - CASH .............................................234
EVIDENCE - CHAIN OF CUSTODY ..................222
EVIDENCE - COLLECTING ...............................219
EVIDENCE - DELIVERING TO THE CPS LAB
    DURING BUSINESS HOURS...........................223
EVIDENCE - DELIVERING TO THE CPS LAB
    DURING NON-BUSINESS HOURS .................224
EVIDENCE - FIREARMS, WEAPONS AND
    AMMUNITION.................................................229
EVIDENCE - MARKING .....................................220
EVIDENCE - PACKAGING AND DELIVERY OF
    CASH TO THE PROPERTY OFFICE ..............234
EVIDENCE - PACKAGING FOR EXAMINATION
    ............................................................................220
EVIDENCE - PROCEDURE FOR OBTAINING
    EVIDENCE FROM THE PROPERTY OFFICE
    ............................................................................226
EVIDENCE - RECOGNIZING ..............................218

EVIDENCE - RELEASE EVIDENCE OF IN
    EXCEPTIONAL CIRCUMSTANCES ............. 225
EVIDENCE - RELEASE TO POLICE PERSONNEL
    - GENERALLY.................................................. 224
EVIDENCE - REPORTING RESULTS OF TESTING
    ............................................................................ 224
EVIDENCE - RETURNING IT FROM COURT .. 226
EVIDENCE - SPECIAL PROCEDURES FOR
    PARTICULAR ITEMS ...................................... 235
EVIDENCE - STORING IN THE PROPERTY
    OFFICE .............................................................. 222
EVIDENCE - SUBMITTING FOR TESTING
    AND/OR STORAGE ......................................... 222
EVIDENCE - TRANSFERRING........................... 224
EVIDENCE - TRANSFERRING CASH EVIDENCE
    TO COURT ........................................................ 235
EVIDENCE - TRANSFERRING TO COURT ...... 226
EVIDENCE AND CRIME SCENES -
    PHOTOGRAPHING ......................................... 218
EVIDENCE AND RECOVERED PROPERTY
    CONTROL    PROCEDURES ......................... 218
EVIDENCE COLLECTION ................................. 631
EVIDENCE PROCESSING - GENERALLY........ 216
EVIDENTIARY ITEMS - MAKING A RECORD 221
EX PARTE ORDERS OF PROTECTION............. 247
EXPOSURE TO CONTAMINANTS .................... 506
EXTRADITING FUGITIVES FROM A FOREIGN
    COUNTRY ........................................................ 643
EXTRADITION.............................................. 173, 639
EXTRADITION - REFUSAL TO WAIVE FROM
    ANOTHER STATE ........................................... 640
EXTRADITION WAIVED - FUGITIVE FROM
    ANOTHER STATE ........................................... 639
EYEWITNESS IDENTIFICATION ...................... 122

# F

FALSE/ACCIDENTAL BANK ALARMS ........... 324
FAMILY AND MEDICAL LEAVE ACT POLICY
    ............................................................................ 492
FCC AUTHORIZATION...................................... 374
FEDERAL AGENCIES ........................................ 534
FEDERAL AVIATION AGENCY ........................ 536
FEDERAL BUREAU OF INVESTIGATION (FBI)
    ............................................................................ 536
FEDERAL CASES .............................................. 112
FEDERAL CRIMES ............................................. 112
FEDERAL CRIMINAL CASES - COURTS AND
    MAGISTRATES ............................................... 113
FEDERAL FUGITIVES AND WITNESSES ........ 636
FEDERAL LANDS/PROPERTY .......................... 113
FEES FOR RECORDS ......................................... 341
FELONY CASE ENHANCEMENT...................... 600
FEMALE PRISONERS ........................................ 186

FEMALE PRISONERS - HANDCUFFING ..........187
FEMALE PRISONERS - SEARCHING ................187
FEMALE PRISONERS - TRANSPORTING TO THE
    HOLDING CENTER ..........................................187
FIELD DRUG TESTS ............................................232
FIELD SOBRIETY TESTS - CONDUCTING.......143
FILING OF ACCUSATORY INSTRUMENTS –
    PREPARATION OF COURT FOLDERS ........137
FINGERPRINTING AND PHOTOGRAPHING
    PRISONERS ..............................................140, 185
FINGERPRINTS ...................................................237
FIRE - TRAFFIC CONTROL AT SCENE.............430
FIRE DEPARTMENT ............................................525
FIREARM - REGULATION SERVICE ................480
FIREARM - SUSPENSION OF AUTHORITY TO
    CARRY .............................................................484
FIREARMS - DESTRUCTION OF.......................674
FIREARMS - LOST OR STOLEN.........................484
FIREARMS - QUALIFICATIONS ........................482
FIREARMS - REGISTRATION ............................483
FIREARMS CARRYING ADDITIONAL WHILE
    ON DUTY ..........................................................481
FIREARMS, DISCHARGE OF - REPORTING
    REQUIREMENTS..............................................131
FIRES .....................................................................429
FIRES - MULTIPLE ALARM ...............................431
FIRES - NOTIFICATION OF
    OWNERS/OCCUPANTS ..................................431
FIRES DISCOVERED BY DEPARTMENT
    MEMBERS..........................................................429
FIRST DEPUTY POLICE COMMISSIONER.........43
FOLLOW-UP INVESTIGATION - CASE STATUS
    AT CONCLUSION.............................................599
FOLLOW-UP INVESTIGATION -
    VICTIM/WITNESS ASSISTANCE ..................601
FOLLOW-UP INVESTIGATIONS.........................598
FOLLOW-UP INVESTIGATIONS - DETECTIVE
    DUTY .................................................................603
FOLLOW-UP INVESTIGATIONS - PREPARING
    SUPPLEMENTARY REPORTS .......................599
FUGITIVE FELON .................................................637
FUGITIVE WANTED IN NYS - LOCATED IN
    ANOTHER STATE .............................................640
FUGITIVE WITNESSES ........................................638
FUGITIVES WANTED BY NYS WHO HAVE
    REFUSED TO WAIVE EXTRADITION..........642
FUGITIVES WANTED BY NYS WHO WAIVE
    EXTRADITION ..................................................641
FUNERAL ARRANGEMENTS – PROTOCOL
    OFFICER ...........................................................587
FUNERAL SERVICE - ATTENDING .................590

**G**

GAMBLING ACTIVITY - COMPLAINTS OF
    ILLICIT................................................................ 623
GAMBLING ARRESTS ........................................ 623
GAMBLING INVESTIGATIONS ........................ 623
GAMES OF CHANCE .......................................... 423
GASOLINE SPILLS ................................................ 75
GEM/GOLF CART/SEGWAY PATROL ............. 314
GENERAL ORDERS ............................................... 47
GEOGRAPHICAL AREA OF JURISDICTION ....... 5
GOVERNOR'S WARRANT................................... 640
GRIEVANCES AND ARBITRATION - LOCAL 264
    ........................................................................... 417
GRIEVANCES AND ARBITRATION - LOCAL 650
    ........................................................................... 417
GRIEVANCES AND ARBITRATION - PBA ...... 417

**H**

HAND SALUTE - EXECUTING ........................... 580
HANDCUFFING OF FEMALE PRISONERS ...... 209
HANDLING ACCIDENT VICTIM'S PROPERTY. 66
HAVEN HOUSE ................................................... 538
HAZARDOUS MATERIALS - HYDROCYANIC
    ACID
    HYDROCYANIC ACID.................................... 451
HAZARDOUS MATRIALS - IDENTIFICATION
    PLACARDS ...................................................... 451
HEAD JANITOR ..................................................... 22
HEALTH AND LIFE INSURANCE PROGRAMS
    ........................................................................... 389
HEALTH DEPARTMENT .................................... 529
HEAVY SNOW CONDITIONS ............................ 268
HELICOPTER PATROL....................................... 315
HIGH RISK INCIDENTS - FIRST RESPONDING
    OFFICERS ........................................................ 453
HIGH RISK INCIDENTS - SWAT
    RESPONSIBILITIES ........................................ 455
HIGH RISK INCIDENTS........................................ 452
HIGH RISK INCIDENTS - CMT
    RESPONSIBILITIES ........................................ 456
HIGH RISK INCIDENTS - DUTY OFFICERS
    RESPONSIBILITIES ........................................ 456
HIGH RISK INCIDENTS - GUIDELINES .......... 452
HIGH RISK INCIDENTS - RADIO DISPATCHER
    RESPONSIBILITIES ........................................ 455
HIGH RISK INCIDENTS - REPORTS REQUIRED
    ........................................................................... 457
HIT AND RUN ACCIDENTS ................................ 62
HOLIDAYS - LOCAL 264 MEMBERS................ 399
HOLIDAYS - LOCAL 650 MEMBERS................ 397
HOMICIDE - NOTIFYING NEXT OF KIN ......... 632
HOMICIDE - POST MORTEM EXAMINATION 633

HOMICIDE - SEARCHING THE DECEASED ....631
HOMICIDE SQUAD - FOLLOW UP
    INVESTIGATION...............................................630
HOMICIDES - PRELIMINARY INVESTIGATION
    .....................................................................628
HOMICIDES, SUICIDES, SERIOUS ASSAULTS
    .....................................................................627
HONORS AND SALUTES ....................................580
HOURS WHEN RECORDS ARE AVAILABLE TO
    THE PUBLIC..................................................341
HOUSING UNIT (BPD HU) ....................................45
HUMAN RESOURCES - DEPARTMENT OF .....524
HUMAN RIGHTS - DIVISION OF .......................532

**I**

I.A.D. - AUTHORITY ...........................................558
I.A.D. - CONFIDENTIAL RECORDS...................558
I.A.D. - COOPERATION WITH LABOR
    RELATIONS DIVISION..................................557
I.A.D. ASSISTANCE TO OTHER UNITS ............558
I.A.D. INVESTIGATIONS ...................................557
IDENTIFICATION CARD.....................................477
IDENTIFICATION/NAME TAGS - MISSING OR
    DAMAGED ITEMS .........................................478
IDENTIFICATIONS - DEFENDANT'S RIGHT TO
    COUNSEL AT LINE-UP ..................................124
IDENTIFICATIONS - LINE-UP.............................123
IDENTIFICATIONS - PHOTO ARRAY ...............122
IDENTIFICATIONS - SHOW - UP ......................122
IDENTIFYING PRISONERS PRIOR TO RELEASE
    .....................................................................199
ILLICIT DRUGS - RECEIVING COMPLAINTS .625
IN LINE OF DUTY SUDDEN DEATHS/SERIOUS
    INJURY FORM ...............................................507
INCIDENTS INVOLVING ANIMALS ...................77
INCOME TAX DEDUCTIONS .............................415
INFORMANT - ESTABLISHING A PERSON AS
    .....................................................................608
INFORMANT - MAINTAIN A FILE ....................608
INFORMANT FILE – SECURITY ........................610
INFORMANTS ......................................................606
INFORMANTS - JUVENILE ................................610
INFORMANTS - PAYMENTS TO........................614
INFORMANTS OF PERSONS ON PROBATION OR
    PAROLE ........................................................610
INJURY/ILLNESS - SERVICE CONNECTED.....515
INJURY/ILLNESS - SERVICE CONNECTED -
    CIVILIAN EMPLOYEES .................................505
INJURY/ILLNESS SERVICE CONNECTED --
    REPORTING TO THE STATE.........................506
IN-SERVICE TRAINING .......................................53
INSIGNIA, SERVICE RIBBONS AND MEDALS476
INSIGNIAS OF RANK ..........................................477

INTERMEDIATE MEMBERS OF THE CHAIN OF
    COMMAND - RESPONSIBILITIES................ 353
INTERNAL AFFAIRS DIVISION ........................ 556
INTERNATIONAL BOUNDARY - CITY, STATE
    AND FEDERAL BOUNDARIES..................... 112
INTERROGATIONS .............................................. 114
INTERROGATIONS - CUSTODIAL ................... 115
INTERROGATIONS - NON-CUSTODIAL ......... 114
INTERVIEWS AND INTERROGATIONS .. 593, 606
INTRA-DEPARTMENTAL CORRESPONDENCE
    (P-73) - PREPARING ...................................... 352
INVESTIGATING COMPLAINTS....................... 305
INVESTIGATING COMPLAINTS AND
    VIOLATIONS................................................. 558
INVESTIGATIONS - MAINTAINING CASE FILES
    .................................................................... 604
INVESTIGATIONS - SUPERVISING.................. 601
IOD - CHARGES AND BILLS - SWORN
    MEMBERS .................................................... 503
IOD - CLAIMS FOR TREATMENT - SWORN
    MEMBERS .................................................... 503
IOD - DEPARTMENT'S DESIGNATED MEDICAL
    PROVIDERS' ROLE ...................................... 499
IOD - DETERMINATION BY COMMISSIONER -
    SWORN MEMBERS ....................................... 501
IOD - DISCONTINUANCE OF MEDICAL
    SERVICE - SWORN MEMBERS .................... 503
IOD - EXAMINATION BY THE DEPARTMENT'S
    DESIGNATED MEDICAL PROVIDER- SWORN
    MEMBERS .................................................... 503
IOD - GENERAL MUNICIPAL LAW ("GML")
    SECTION 207-C HEARING PROCEDURE.... 505
IOD - REPORTING A SERVICE CONNECTED
    INJURY/ILLNESS – SWORN MEMBERS ..... 497
IOD - REQUIRED REPORTS - SWORN MEMBERS
    .................................................................... 499
IOD - RETURN TO DUTY - SWORN MEMBERS
    .................................................................... 504
IOD - SERVICE CONNECTED INJURIES.......... 497
IOD - SUPERVISOR'S DUTY TO INVESTIGATE -
    SWORN MEMBERS ....................................... 501
IOD - TREATMENT BY PRIVATE PHYSICIAN -
    PROGRESS REPORTS ................................... 502
IOD - TREATMENT OF SERVICE CONNECTED
    INJURIES/ILLNESS-SWORN MEMBERS..... 502

**J**

JOB CLASSIFICATIONS - SWORN MEMBERS ... 5
JURY DUTY........................................................... 407
JUVENILE - HANDLING PETTY OFFENDERS 162
JUVENILE ARRESTS ......................................... 136
JUVENILE DELINQUENTS ................................ 163
JUVENILE DETENTION HOME......................... 530

JUVENILE OFFENDERS - HANDLING (AS DEFINED IN THE PENAL LAW)....................166
JUVENILES ............................................................187
JUVENILES - ARRANGING FOR DETENTION FOR JUVENILES...............................166
JUVENILES - INTERVIEWING ...........................167
JUVENILES IN TROUBLE WITH THE LAW .....162
JUVENILES UNDER THE INFLUENCE OF ALCOHOL/DRUGS.........................................167

## K

K-9 PATROL............................................................313

## L

LABOR DISPUTES ...............................................425
LABORER I ..............................................................23
LABORER II .............................................................24
LAW- DEPARTMENT OF ....................................526
LAW ENFORCEMENT CODE OF ETHICS ........551
LEAVE OF ABSENCE - FAILURE TO RETURN FROM UNPAID - LOCAL 264.......................409
LEAVE OF ABSENCE - FAILURE TO RETURN FROM UNPAID - LOCAL 650.......................409
LEAVE OF ABSENCE - FAILURE TO RETURN FROM UNPAID - SWORN..............................409
LEAVE OF ABSENCE - MEDICAL MEDICAL LEAVE OF ABSENCE .................491
LEAVE OF ABSENCE - RETURNING FROM UNPAID ..........................................................409
LEAVE OF ABSENCE - UNPAID MATERNITY/PATERNITY LEAVE MATERNITY/PATERNITY LEAVE - UNPAID ................................................................492
LEAVE OF ABSENCE (P-12) - PREPARING REQUEST ..........................................................402
LEAVES OF ABSENCE - UNPAID.....................408
LEAVES OF ABSENCE - UNPAID - UNION BUSINESS........................................................410
LEGAL ADVISOR..................................................45
LEGAL AFFAIRS ...................................................45
LIEUTENANT .......................................................11
LIEUTENANT - COORDINATION AND CONTROL.........................................................302
LIEUTENANT - EXPIRATION OF TOUR OF DUTY ...............................................................302
LIEUTENANT - REPORTS AND ELECTRONIC MAIL MESSAGES...........................................303
LIEUTENANT'S - DISTRICT COMMAND RESPONSIBILITIES........................................300
LIEUTENANTS - DISTRICT ...............................299
LIEUTENANT'S - DISTRICT PATROL DUTIES 300

LIEUTENANT'S RESPONSIBILITY FOR UNMARKED CARS .........................................302
LIGHT DUTY - FITNESS FOR ...........................515
LIGHT DUTY - SWORN MEMBERS..................488
LIGHT DUTY ASSIGNMENT ............................515
LIGHT DUTY ASSIGNMENTS- SWORN MEMBERS ......................................................515
LINE OF DUTY DEATH OUTSIDE THE BPD... 591
LINE OF DUTY DEATHS - FUNERAL SERVICES ............................................................587
LINE-UPS AND EYEWITNESS IDENTIFICATION ...................................................593, 606
LIQUOR INVESTIGATIONS ..............................624
LIQUOR INVESTIGATIONS - FORWARDING INFORMATION TO THE NARCOTICS INTELLIGENCE VICE ENFORCEMENT ...... 624
LIQUOR LAW RELATED ARRESTS ................ 624
LIQUOR VIOLATIONS - HANDLING EVIDENCE ............................................................624
LOTUS NOTES .....................................................360

## M

MAINTAINING SECURITY OF DEPARTMENT RECORDS ......................................................336
MAJOR DRUG INVESTIGATIONS- INFORMING THE COMMISSIONER.....................................626
MAJOR ORGANIZATIONAL COMPONENTS ... 42
MANAGEMENT INFORMATION SECTION (MIS) ...............................................................362
MANDATORY NOTIFICATION COUNTRIES AND JURISDICTIONS ...................................155
MASS ARRESTS ..................................................428
MASS DEMONSTRATIONS ...............................427
MASTER FILE ........................................................48
MATERNITY LEAVES - LOCAL 650 AND LOCAL 264 MEMBERS ...............................................410
MATERNITY/PATERNITY LEAVES - PBA MEMBERS ......................................................411
MEDIA ACCESS TO SCENES OF INCIDENTS. 543
MEDICAL EXAMINER..........................83, 530, 632
MEDICAL OR PSYCHOLOGICAL TREATMENT AFTER CONFINEMENT AT THE HOLDING CENTER ..........................................................204
MEMORANDA OF OBSERVATIONS ...............221
MENTAL HEALTH - OFFICE OF ......................532
MENTAL HYGIENE WARRANTS ....................158
MENTALLY ILL....................................................156
MENTALLY ILL - APPREHENDING ESCAPEES FROM A MENTAL HEALTH FACILITY ......157
MENTALLY ILL - ARMED AND DANGEROUS MENTALLY ILL PERSONS ............................159
MENTALLY ILL - DISPOSITION OF PROPERTY ............................................................159

MENTALLY ILL - EMERGENCY ADMISSIONS BY POLICE OFFICERS....................................157

MENTALLY ILL - EMERGENCY ADMISSIONS BY THE DIRECTOR OF COMMUNITY SERVICES....................................157

MENTALLY ILL - HANDLING ...........................158

MENTALLY ILL - IF CRIMINAL CHARGES ARE PLACED................................................160

MENTALLY ILL - IF NO CRIMINAL CHARGES ARE PLACED ......................................159

MENTALLY ILL - REFUSED ADMISSION .......160

MENTALLY ILL - SEARCHING .........................159

MENTALLY ILL - TRANSPORTING.................159

MENTALLY ILL - USING FORCE AND USING RESTRAINTS ...................................158

MERITORIOUS ACTIONS - CITIZENS ..............582

MERITORIOUS SERVICE...................................582

MILITARY LEAVE.................................................411

MINIMUM OVERTIME - HAZARDOUS DUTY SQUADS ..........................................395

MINIMUM OVERTIME COMPENSATION - LOCAL 264 .....................................399

MINIMUM OVERTIME COMPENSATION - LOCAL 650 .....................................396

MINOR VIOLATIONS - DEPARTMENT STANDARDS..................................560

MISSING PERSON INVESTIGATIONS ......596, 635

MISSING PERSONS, RUNAWAYS, AND ABDUCTED CHILDREN...................................88

MISSION STATEMENT ..............................................4

MOBILE COMPUTER TERMINALS (MCT'S)...SEE COMPUTER - MOBILE TERMINALS (MCT)

MOBILE PATROL DUTY.....................................316

MOBILE PATROL UNITS - EQUIPMENT..........315

MONITORING SICK AND INJURED MEMBERS ..............................................................512

MOTOR EQUIPMENT MAINTENANCE SUPERVISOR ....................................27

MOTOR EQUIPMENT MECHANIC.....................28

MOTOR VEHICLE ACCIDENTS.........................59

MOTOR VEHICLE ACCIDENTS CREATING DANGEROUS CONDITIONS...........................65

MOTOR VEHICLE ACCIDENTS INVOLVING TRUCKS OR BUSES ...........................................63

MOTORCYCLE PATROL....................................314

MOTORIZED PATROL .......................................315

MUTUAL AID .......................................................465

NAME TAGS ........................................................478

NARCOTICS/VICE ENFORCEMENT FOR DRUG INVESTIGATIONS..................................626

NARCOTICS INVESTIGATIONS ........................625

NATIONAL CRIME INFORMATION CENTER (NCIC).................................................. 361

NATIONAL LAW ENFORCEMENT TELECOMMUNICATIONS SYSTEM (NLETS) .............................................................. 361

NATIONAL WEATHER BUREAU WIND FORECASTS ...................................... 452

NATIVE AMERICAN COMMUNITY SERVICES .............................................................. 538

NATURAL GAS LEAKS ........................................ 75

NATURAL GAS SERVICE ................................... 546

NEW YORK STATE THRUWAY JURISDICTION .............................................................. 111

NEWS MEDIA ...................................................... 539

NEWS MEDIA - INFORMATION THAT MAY BE RELEASED: ...................................... 540

NEWS MEDIA - INFORMATION THAT SHOULD NOT BE RELEASED ........................................ 542

NEWS MEDIA - INFORMATION TO BE RELEASED ONLY BY HIGHER AUTHORITY .............................................................. 543

NFTA POLICE .................................................... 545

NIAGARA FRONTIER TRANSPIRATION AUTHORITY (NFTA)....................................... 545

NON-VEHICULAR ACCIDENT REPORTS ......... 74

NON-VEHICULAR ACCIDENTS........................ 74

NOTICE OF CLAIM, SUMMONS, SUMMONS AND COMPLAINT, ......................................... 248

NYS AMBER ALERT ACTIVATION PROTOCOL .............................................................. 91

NYS STATE CLEAR ROAD POLICY ON NYS THOROUGHFARES ........................................... 69

NYSPIN - RESPONSIBILITY FOR OPERATING .............................................................. 362

NYSPIN SYSTEM................................................ 361

O

OF POLICE HONOR GUARD COMMANDER .. 592

OFFICER IN CHARGE OF THE CASE ............... 248

OFFICER IN CHARGE OF THE CASE TO SIGN ALL ARREST      DOCUMENTS ................... 248

OFFICIAL LETTERHEAD ................................... 351

ORDERS OF PROTECTION ....................... 153, 247

ORDERS OF PROTECTION - HANDLING 153, 247

ORDERS OF PROTECTION, ENFORCING – ARREST ........................................................ 153

ORGANIZATIONAL CHART................................ 40

OTHER WRITTEN ORDERS ................................. 48

OUTSIDE EMPLOYMENT RESTRICTIONS ..... 515

OVERTIME - LOCAL 264 MEMBERS ............... 398

OVERTIME - LOCAL 650 MEMBERS ............... 396

OVERTIME COMPENSATION – SWORN......... 392

OVERTIME PRE-APPROVAL REQUIRED IN CERTAIN CASES ...............................394
OVERTIME PROCEDURE - LOCAL 264 MEMBERS.....................................399
OVERTIME PROCEDURE – SWORN ................392

## P

PARADES, MARCHES, MOTORCADES, RACES ...................................................425
PARADES, MARCHES, MOTORCADES, RACES - PERMITS...............................425
PARKING ENFORCEMENT ....................................72
PARKING ENFORCEMENT ....................................277
PARKING VIOLATIONS AND MINI-TOWS........71
PARKING VIOLATIONS BUREAU SUMMONS (PARKING TAGS)..............................284
PAROLE VIOLATIONS - REPORTING ..............636
PAROLE VIOLATORS - ARREST OF ..................636
PAROLEES ........................................................635
PAROLEES - LIAISON WITH STATE PAROLE 636
PAT SEARCH OF PRISONERS............................206
PATROL - FOOT ..............................................312
PATROL - PURPOSE ..........................................311
PATROL - TYPES ...............................................311
PATROL DISTRICTS ............................................43
PATROL DIVISION .............................................296
PATROL LIEUTENANTS' RESPONSIBILITY TO INSPECT DEPARTMENT BUILDINGS .........659
PATROL -LUNCH PERIODS ...............................319
PATROL OFFICERS - DUTIES............................304
PATROL OFFICERS - WORK SCHEDULE ........304
PATROL, BICYCLE......... SEE PATROL, BICYCLE
PATROL, GEM/GOLF CART/SEGWAY ...........SEE GEM/GOLF CART/SEGWAY PATROL
PATROL, HELICOPTER........... SEE HELICOPTER PATROL
PATROL, K-9.................................SEE K-9 PATROL
PATROL, MOBILE DUTY.. SEE MOBILE PATROL DUTY
PATROL, MOTORCYCLE...... SEE MOTORCYCLE PATROL
PATROL, MOTORIZED ............ SEE MOTORIZED PATROL
PAYCHECKS - DISTRIBUTION...........................415
PAYROLL DEDUCTIONS.....................................416
PEACE BRIDGE JURISDICTION ........................112
PERMITS AND INSPECTION SERVICES ..........524
PERSONAL APPEARANCE..................................479
PERSONAL APPEARANCE - GUIDELINES ......479
PERSONAL LEAVE TIME - LOCAL 650 AND LOCAL 264 MEMBERS...................................404
PERSONAL LEAVE TIME - SWORN MEMBERS ........................................................................404

PERSONAL PROPERTY IN A TOWED VEHICLE ................................................................ 72
PERSONS IN NEED OF SUPERVISION (PINS) - HANDLING...................................... 162
PETTY CASH...................................................... 655
PETTY CASH ACCOUNT AND CRIMINAL PROCESS FUNDS................................ 652
PLAIN CLOTHES DUTY ..................................... 472
POISON AND OTHER DEADLY SUBSTANCES ................................................................ 237
POISON CONTROL............................................... 77
POLICE INSPECTOR .............................................. 6
POLICE OFFICER ................................................ 14
POLICE OFFICER'S BILL OF RIGHTS .............. 552
POLICE PURSUIT ............................................... 324
POLICE RELATED INCIDENTS ......................... 346
POLICE REPORTS .............................................. 347
POLICE REPORTS - PREPARING ...................... 348
POLICE REPORTS - STORAGE AND DISPOSAL ................................................................ 349
POLICE SURVEILLANCE CAMERA MONITOR 29
POLICE/PEACE OFFICERS - POWERS AND DUTIES................................................ 157
POLYGRAPH....................................................... 620
POLYGRAPH - LIMITATIONS ON USE............. 620
POLYGRAPH - PRE-TEST PREPARATION ...... 622
POLYGRAPH - PROPRIETY OF USING............ 622
POLYGRAPH - REQUISTING AN EXAMINATION ................................................................ 622
PORTABLE RADIOS ........................................... 381
PORTABLE RADIOS - CALL NUMBERS.......... 381
POSITION MANAGEMENT SYSTEM ................. 42
POST ARREST PROCEDURES - LOCAL CRIMINAL COURT WARRANTS.................. 171
POST ARREST PROCEDURES - SUPERIOR COURT WARRANTS ....................................... 171
POWER AND AUTHORITY TO ARREST.......... 109
POWERS OF THE BUFFALO POLICE DEPARTMENT .................................... 4
PREFERRED OVERTIME - SWORN .................. 395
PRE-FUNERAL ARRANGEMENTS ................... 510
PRE-FUNERAL PLANNING ............................... 589
PREGNANCY, CHILDBIRTH AND RELATED MEDICAL CONDITIONS ............................... 516
PRELIMINARY INVESTIGATION 81, 309, 597, 632
PRELIMINARY INVESTIGATION - SCOPE OF 309
PREPARATION AND HANDLING OF ACCIDENT REPORTS ................................... 67
PRESERVING THE CRIME SCENE .................. 218
PRISONER - USE OF CHEMICAL SPRAY ........ 192
PRISONER RESTRAINT CHAIR - USE OF........ 191
PRISONER SUPPLIES......................................... 193
PRISONER -TELEPHONE CALLS....................... 193
PRISONER'S PERSONAL PROPERTY .............. 205

PRISONERS - ADMINISTERING MEDICATIONS .................................................195
PRISONERS - DANGEROUS ..............................190
PRISONERS - EXAMINATION AFTER CONFINEMENT..............................................190
PRISONERS - EXAMINATION BEFORE CONFINEMENT..............................................189
PRISONERS CHARGED BY THE BUFFALO POLICE WHO ARE ALSO WANTED BY AN OUTSIDE AGENCY ........................................140
PRISONER'S MEALS...........................................193
PRISONER'S PROPERTY ...........................141, 200
PRISONER'S PROPERTY - DESCREPANCY CLAIMS AND MISSING..................................141
PRISONER'S PROPERTY - RETURNING..........141
PRISONERS REQUIRING MEDICAL OR PSYCHOLOGICAL ATTENTION ..................193
PRISONERS REQUIRING MEDICAL/PSYCHOLOGICAL TREATMENT AFTER CONFINEMENT IN THE CITY COURT LOCK-UP ......................................138
PRISONERS REQUIRING MEDICAL/PSYCHOLOGICAL TREATMENT PRIOR TO BOOKING ..............................138, 182
PRISONERS RETURNED TO THE CELLBLOCK AFTER TREATMENT.....................................195
PRISONER'S RIGHTS ...........................................200
PRISONERS TO CITY COURT ...........................203
PRISONER'S VEHICLES .....................................142
PRIVATE TOW TRUCKS .......................................73
PROBATION DEPARTMENT ...............................530
PROBATIONARY EMPLOYEES ........................556
PROBATIONARY STATUS ...................................51
PROCESS FOR DETERMINING ELIGIBILITY....50
PROCESSING EVIDENCE AT THE CRIME SCENE .................................................218
PROPERTY - CITY EMPLOYEES NOT ENTITLED TO FOUND .................................................676
PROPERTY - CONFLICTING CLAIMS ..............673
PROPERTY - DEPARTMENT OWNED .............657
PROPERTY - DEPOSIT OF PROPERTY WITH THE POLICE...................................................664
PROPERTY - HANDLING PRISONER'S.............676
PROPERTY - HANDLING REPORTS OF LOST PROPERTY ...................................................676
PROPERTY - INSPECTING THE OFFICE ..........675
PROPERTY - LOST OR FOUND..........................663
PROPERTY - NOTIFYING OWNERS AFTER SUBMISSION TO THE PROPERTY OFFICE.671
PROPERTY - PACKAGING PROPERTY ............665
PROPERTY - REPORT TO THE POLICE REQUIRED ................................................664

PROPERTY - RETURN OF LOST/FOUND PROPERTY AND          PROPERTY HELD FOR SAFEKEEPING ........................................ 672
PROPERTY - RETURN TO OWNER PRIOR TO DELIVERY TO PROPERTY OFFICE............. 665
PROPERTY - SPECIAL HANDLING INSTRUCTIONS FOR PARTICULAR ITEMS667
PROPERTY - SUBMITTING TO THE PROPERTY OFFICER DURING REGULAR BUSINESS HOURS .......................................................... 666
PROPERTY - UNCLAIMED ................................ 673
PROPERTY - WEEKLY ACCOUNTING ............ 675
PROPERTY AND SERVICE WEAPONS - DEPARTMENTAL............................................ 411
PROPERTY FORM (P-10) - PREPARING........... 665
PROPERTY IN A SECURED AREA BY PROPERTY THE OFFICE ............................... 667
PROPERTY RECEIVED DURING HOURS WHEN THE PROPERTY OFFICE IS CLOSED .......... 666
PROPERTY -UNCLAIMED OR UNCLAIMABLE GUNS ............................................................. 674
PUBLIC ADMINISTRATOR......................... 85, 530
PUBLIC ADMINISTRATOR - NOTIFICATION OF ...................................................................... 85
PUBLIC ADMINISTRATOR - UNAVAILABILITY OF .................................................................. 86
PUBLIC ADMINISTRATOR'S SERVICES REQUIRED ...................................................... 85
PUBLIC ASSEMBLAGES ................................... 422
PUBLIC COMMUNICATIONS COORDINATOR ...................................................................... 544
PUBLIC MORALS ............................................... 602
PUBLIC SAFETY DISPATCHER ......................... 30
PUBLIC TRANSPORTATION ............................ 545
PUBLIC UTILITIES............................................. 545
PUBLIC WORKS, PARKS AND STREETS ........ 526
PURCHASE - FORMAL BIDS ............................ 654
PURCHASE - INFORMAL BIDS......................... 654
PURCHASE ORDER PROCEDURES................. 654
PURCHASE REQUESTS ..................................... 653
PURCHASES........................................................ 652
PURCHASES - AUTHORIZATION.................... 652
PURCHASES - RECEIPT OF .............................. 653
PURSUIT - ABANDONING ................................ 327
PURSUIT - DECISION TO INITIATE ................. 325
PURSUIT - REPORTING REQUIREMENTS ...... 328
PURSUIT TACTICS - DEPARTMENT GUIDELINES ................................................. 325
PURSUITS INTO THE CITY BY OUTSIDE AGENCIES ..................................................... 328
PVB PARKING TAG - PREPARING................... 286
PVB PARKING TAG BOOKS - CARE OF BY INDIVIDUAL MEMBERS............................... 285

PVB PARKING TAG BOOKS - COMMANDING OFFICER'S RESPONSIBILITY ........................285
PVB PARKING TAG BOOKS - DISTRIBUTION284
PVB PARKING TAGS - EXEMPT VEHICLES ...286
PVB PARKING TAGS - FORWARDING TO THE TRAFFIC RECORD OFFICE ...........................287
PVB PARKING TAGS - LOST, MUTILATED OR VOIDED ..............................................................288
PVB PARKING TAGS - TAGGING PRIVATE PARKING AREAS.........................................287
PVB PARKING TAGS - WHEN ISSUED.............286

## R

RADAR ................................................................276
RADIO - CALLING ANOTHER UNIT..................379
RADIO - CALLING THE RADIO DISPATCHER379
RADIO - OPERATING THE MOBILE POLICE UNIT..............................................................378
RADIO CALL NUMBERS ....................................374
RADIO CHANNELS..............................................375
RADIO COMMUNICATIONS ...............................374
RADIO DISPATCHER - INSTRUCTIONS FROM ...........................................................................374
RADIO DISPATCHERS - DUTIES........................374
RADIO DISPATCHER'S GUIDE ...........................374
RADIO UNITS - RESPONSIBILITY ....................377
RAPE KITS ..........................................................236
RE - LAYING CRIMINAL CHARGES.................260
RECEIPTS FOR PURCHASE OF INFORMATION (P-173) ..........................................................614
RECEIPTS FOR PURCHASE OF SERVICES......614
RECORDS  AVAILABILITY TO DEPARTMENT PERSONNEL.................................................344
RECORDS - MAINTAINING OF POLICE RELATED INCIDENTS ....................................346
RECORDS - PROCEDURE FOR DISPOSAL........345
RECORDS - PROCEDURE FOR STROAGE AND RETENTION ........................................345
RECORDS - PURPOSE FOR MAINTAINING......335
RECORDS - RETENTION PERIODS ....................344
RECORDS - STORAGE AND DISPOSAL ...........344
RECORDS ACCESS OFFICER.............................342
RECORDS GENERALLY .....................................335
RECORDS MADE AVAILABLE FOR PUBLIC INSPECTION GENERALLY...............................337
RECORDS MANAGEMENT SYSTEM.................360
RECORDS REPORTING  REQUIRED  -  NYS COMMISSION OF CORRECTION.................202
RECORDS REPOSITORIES ..................................336
RECOVERED STOLEN VEHICLES ......................73
RECRUITERS.........................................................49
RECRUITING AND SELECTING POLICE OFFICER CANDIDATES....................................49

REINSTATEMENT AFTER RESIGNATION...... 416
RELAYING CHARGES ......................................... 259
RELIEVING PRIOR PLATOON .......................... 302
REMANDING OF THE PRISONER TO THE CITY COURT LOCK-UP ........................................... 136
REPAIRS - BUILDING......................................... 659
REPORT NUMBERING ....................................... 346
REPORT TECHNICIAN ........................................ 31
REPORT TECHNICIAN - WARM WEATHER UNIFORM ....................................................... 473
REPORT TECHNICIAN (SPANISH SPEAKING). 32
REPORTING TO HOUSING AND INSPECTIONS ........................................................................ 331
REPORTING TO SUPERIOR OFFICERS............ 579
REPORTS - DESK PERSONNEL RESPONSIBIL-PREPARINGITY ........................................... 352
REPORTS - DISTRIBUTION .............................. 349
REPORTS - PREPARING FOR INCIDENTS OUTSIDE THE COMMAND ........................... 349
REQUESTING THE PRESENCE OF DISTRICT DETECTIVES.................................................. 311
REQUESTS FOR ADDITIONAL ARREST INFORMATION FROM COURT LIAISON.... 260
REQUISITION (PAPER AND PRINTED FORMS) ........................................................................ 656
REQUISITION FORM (P-1024) .......................... 656
RESCUE SQUAD CALLS AND ROUTINE AMBULANCE CALLS ..................................... 77
RESIGNATIONS................................................... 416
RESIGNATIONS, SEPARATION FOR CAUSE.. 570
RESPONDING OFFICERS ..................................... 60
RESPONDING OFFICERS - BANK ROBBERIES ........................................................................ 323
RESPONDING TO CALLS.................................. 320
RESPONDING WITH EMERGENCY LIGHTS OR SIREN ACTIVATED........................................ 322
RESPONSE - TYPES OF ..................................... 321
RESPONSES - EMERGENCY............................... 321
RESPONSES - RAPID ......................................... 321
RESPONSES - ROUTINE..................................... 321
RESPONSIBILITY FOR INITIAL INVESTIGATION ........................................... 305
RESPONSIBILITY OF COMMANDING OFFICERS ........................................................................ 48
RESPONSIBILITY OF THE 1ST DEPUTY POLICE COMMISSIONER OF ADMINISTRATION FOR RECRUITMENT................................................. 49
RESTRAINING EQUIPMENT .............................. 485
RESTRICTING PARKING ................................... 267
RESTRICTIONS IMPOSED BY  THE ALCOHOL BEVERAGE CONTROL................................... 413
RETIREMENT PROGRAM .................................. 389
REWARDS, GRATUITIES AND GIFTS ............. 585
RIDE-ALONG PROGRAM................................... 318

COB000936

RIOTING ................................................ 435
RIOTING - CLOSING MAJOR THOROUGHFARES
.............................................................. 438
RIOTING - COMMUNICATIONS ......................... 438
RIOTING - EARLY STAGES ................................. 436
RIOTING - EQUIPMENT ...................................... 437
RIOTING - ESCORTING FIRE DEPARTMENT
AND MEDICAL PERSONNEL ......................... 439
RIOTING - GUN DEALERS, LIQUOR STORES,
GAS STATIONS ............................................. 439
RIOTING - MONITORING COMMUNITIES ...... 435
RIOTING - PREVENTIVE ACTION ..................... 435
RIOTING - TACTICAL CONSIDERATIONS ...... 439
RIOTING - USE OF FORCE .................................. 440
RIOTING - WIDESPREAD .................................... 437
ROAD HAZARDS .................................................. 307
ROLL CALL TRAINING ........................................ 53
RULES TO GOVERN PURCHASES .................... 652
RUNAWAYS ............................................................ 97

## S

SAINT VINCENT DE PAUL SOCIETY ............... 539
SALUTING DURING THE NATIONAL ANTHEM
.............................................................. 580
SALVATION ARMY ............................................... 538
SCHOOLS AND PLAYGROUNDS ...................... 307
SEARCH FOR PERSONS UNDER TWELVE
YEARS OF AGE ................................................ 95
SEARCH WARRANT REQUIREMENT -
EXCEPTIONS ................................................. 118
SEARCH WARRANTS  - EXECUTING -  LEGAL
REQUIREMENTS ............................................ 120
SEARCH WARRANTS - EXECUTING -
STRATEGIC PLANNING ................................ 120
SEARCH WARRANTS - OBTAINING ................ 120
SEARCHES AND SEIZURES ....... 103, 118, 593, 606
SEARCHING OF FEMALE PRISONERS ............ 208
SEARCHING PRISONERS .................................... 205
SEARCHING PRISONERS IN THE CELLBLOCK
.............................................................. 185
SEAT BELTS IN DEPARTMENT VEHICLES .... 317
SECRET SERVICE ................................................. 536
SECRETARY TO THE COMMISSIONER ............. 34
SECURITY REQUIREMENTS FOR PUBLIC
AMUSEMENT AND ENTERTAINMENT ...... 423
SEIZING CASH AS EVIDENCE .......................... 234
SEIZING CASH AS FORFEITURE ASSETS ....... 626
SEIZING VEHICLES AS FORFEITURE ASSETS
.............................................................. 626
SENIOR BUDGET EXAMINER ............................ 34
SENIOR PUBLIC SAFETY DISPATCHER ........... 37
SERIOUS INJURY - ASSISTANCE TO CO-
WORKERS ...................................................... 510

SERIOUS INJURY - ASSISTING THE FAMILY AT
THE HOSPITAL ............................................... 509
SERIOUS INJURY - NOTIFICATION TO FAMILY
.............................................................. 508
SERIOUS PHYSICAL INJURY OR FATAL
ACCIDENTS ...................................................... 65
SERVICE FIREARM - OFF DUTY OFFICERS ... 481
SERVICE ORDER - FORMAL BID ..................... 654
SERVICE ORDER - INFORMAL BID ................ 655
SERVICE ORDER PROCEDURES ....................... 654
SERVICE RIBBONS AND MEDALS ................. 477
SERVICE WEAPON - WEARING ....................... 481
SEX OFFENSE - MEDICAL EXAMINATION OF
VICTIM .............................................................. 635
SEX OFFENSE - PRELIMINARY
INVESTIGATION ............................................ 635
SEX OFFENSE - PRESERVING EVIDENCE ..... 633
SEX OFFENSE - RECORDING FACTS OF THE
CRIME ............................................................... 634
SEX OFFENSE - STATEMENTS OF VICTIMS
AND WITNESSES ............................................ 634
SEX OFFENSE - WRITTEN NOTIFICATION OF
NEAREST RAPE CRISIS CENTER ................ 634
SEX OFFENSE INVESTIGATIONS .................... 633
SEX OFFENSE SQUAD - REQUESTING THE
SQUAD .............................................................. 635
SEX RELATED OFFENSES ................................. 156
SEXUAL HARASSMENT - COMMISSIONER'S
DETERMINATION .......................................... 576
SEXUAL HARASSMENT - CONDUCT
CONSTITUTING ............................................. 573
SEXUAL HARASSMENT - INTERNAL AFFAIRS
DIVISION AS CENTRAL REPOSITORY ...... 575
SEXUAL HARASSMENT - INVESTIGATION .. 575
SEXUAL HARASSMENT - RESPONSIBILITY OF
SUPERVISORS/SUPERIOR OFFICERS ......... 576
SEXUAL HARASSMENT - TIMELINESS OF
INITIATING COMPLAINTS OR GRIEVANCES
.............................................................. 575
SEXUAL HARASSMENT IN THE WORKPLACE -
PREVENTING .................................................. 572
SEXUAL HARASSMENT POLICY ..................... 576
SEXUAL HARRASMENT - COMPLAINT
PROCEDURE ................................................... 574
SHERIFF'S OFFICE ............................................. 529
SHIFT TIMES – SWORN ..................................... 391
SICK  - REPORTING WHILE ON DUTY ........... 489
SICK  LEAVE - REPORTING WHILE ON
ANNUAL VACATION .................................... 489
SICK AND INJURED PERSONS ........................... 76
SICK LEAVE - ELIGIBILITY ............................. 488
SICK LEAVE - NOTIFICATION OF INJURY .... 489
SICK LEAVE - NOTIFICATION REQUIREMENT
.............................................................. 488

SICK LEAVE - RETURNING TO DUTY .............491
SICK LEAVE/IOD - DUTY TO REMAIN IN PLACE
    OF CONFINEMENT-SWORN MEMBERS .....490
SICK LEAVE/IOD - ELECTRONIC MAIL
    MESSAGE TO BE TRANSMITTED.................490
SICK LEAVE/IOD - PLACE OF CONFINEMENT -
    SWORN MEMBERS.........................................489
SNOW EMERGENCY ...............................................440
SNOW EMERGENCY - AUTHORITY OF THE
    MAYOR.............................................................440
S N O W   E M E R G E N C Y   P L A N ...........2 7 0
SOCIAL MEDIA - USE ..........................................363
SOURCES OF CRIMINAL INFORMATION .......382
SPAN OF CONTROL ...............................................40
SPECIAL EVENTS ..................................................298
SPECIAL ORDERS ...................................................47
SPECIAL WEAPONS AND TACTICS TEAM .......44
SPECIAL WEAPONS AND TACTICS UNIT
    (SWAT).............................................................458
SPECIALIZED ASSIGNMENTS TO BE
    REVIEWED ANNUALLY...................................42
SPECIALIZED TRAINING .....................................54
SPEED ENFORCEMENT.......................................276
SPEEDOMETER CALIBRATION .........................277
SPONTANEOUS ADMISSIONS ...........................115
STATE AGENCIES.................................................530
STATE COLLEGE PUBLIC SAFETY ..................533
STATE POLICE.......................................................532
STATE UNIVERSITY PUBLIC SAFETY ............534
STATEMENT - CPL 710.30 REQUIREMENT .....117
STATEMENTS - TAKING STATEMENTS
    GENERALLY....................................................115
STATEMENTS - WRITTEN ..................................116
STATEMENTS OF COMPLAINANTS AND
    WITNESSES......................................................117
STRANDED MOTORISTS......................................308
STRIKE FORCE TASK FORCE..............................45
STRIKES/LOCKOUTS - MEMBERS DUTIES ....426
STRIP SEARCH OF PRISONERS ........................207
STRUCTURING WRITTEN ORDERS ..................46
SUBPOENAS ..................................................243, 259
SUBPOENAS FOR DEPARTMENT MEMBERS
    FROM OTHER THAN THE DISTRICT
    ATTORNEY, THE CORPORATION COUNSEL,
    OR OTHER CRIMINAL JUSTICE OR
    CORRECTION AGENCIES ..............................245
SUBPOENAS FROM THE DISTRICT
    ATTORNEY'S OFFICE, THE CORPORATION
    COUNSEL, OR OTHER CRIMINAL JUSTICE
    OR CORRECTION AGENCIES .......................244
SUCCESSION OF COMMAND...............................45
SUICIDE PREVENTION FORM FOR PRISONERS
    FORM #330 .......................................................212

SUMMONSES - COURT ISSUED IN CRIMINAL
    CASES .............................................................. 246
SUMMONSES - MAINTAINING RECORDS ..... 246
SUMMONSES ISSUED - DAILY REPORT (P-54)
    ............................................................................ 282
SUPERINTENDENT OF FLEET MAINTENANCE
    .............................................................................. 38
SUPERIOR OFFICERS - RESPONSIBILITY ...... 310
SUPPLIES................................................................ 655
SUPPLIES - COMMANDING OFFICER
    RESPONSIBILITY ........................................... 655
SUPPLY - BASIC OFFICE SUPPLY
    REQUISITIONS ............................................... 656
SURVEILLANCE.................................................... 618
SURVEILLANCE - INVESTIGATING OFFICERS
    RESPONSIBILITIES ........................................ 619
SURVEILLANCE - OBJECTIVES ........................ 618
SURVEILLANCE - PRIOR APPROVAL
    REQUIRED....................................................... 619
SURVEILLANCE - SUPERVISOR/SUPERIOR
    OFFICER RESPONSIBILITIES........................ 619
SURVEILLANCE CAMERAS, SURVEILLANCE
    MONITORING AND RECORDING................ 239
SURVEILLANCE EQUIPMENT.......................... 620
SUSPEND FROM DUTY -AUTHORITY ............ 563
SUSPENDING AN EMPLOYEE - PROCEDURES
    ............................................................................ 563
SUSPENSIONS PRIOR TO DISCIPLINARY
    HEARINGS....................................................... 563
SWAT - EQUIPMENT .......................................... 459
SWAT - EVALUATION ........................................ 460
SWAT - QUALIFICATIONS, SELECTION AND
    TRAINING........................................................ 459
SWAT TEAM - ACTIVATING ............................ 458
SWAT TEAM ROSTER ........................................ 459

---

**T**

---

TACTICAL SERVICES .......................................... 44
TASK FORCE - CREATING ................................ 643
TASK FORCES ...................................................... 643
TAVERNS, PLACES OF AMUSEMENT............. 307
TELEPHONE CALLS - LONG DISTANCE ........ 356
TELEPHONE SERVICE ........................................ 546
TELEPHONES - PERMISSION TO USE
    DEPARTMENT PHONES............................... 357
TELEPHONES - PROPER USE............................ 355
TELEPHONES - USING DEPARTMENTAL
    PHONES ........................................................... 355
TESTING AND CHECKING WEAPONS AND
    AMMUNITION ............................................... 231
THE ACCIDENT INVESTIGATION UNIT .......... 44
THRUWAY AUTHORITY .................................... 534
TIME RECORDS - OFFICIAL.............................. 414

TOW TRUCK OPERATOR .......................................39
TOWING - RESPONSIBILITIES AFTER..............73
TOWING PROCEDURES ........................................69
TOWING PROCEDURES IN SPECIFIC CASES ...69
TOWING VEHICLES .............................................269
TRAFFIC - ENFORCEMENT OPTIONS..............274
TRAFFIC - SUMMONSES - SPECIFIC CLASSES
    OF PERSONS ....................................................275
TRAFFIC - TO WHOM SUMMONSES MAY BE
    ISSUED ..............................................................275
TRAFFIC BUREAU..................................................44
TRAFFIC BUREAU RESPONSIBILITIES ...........273
TRAFFIC CHECKPOINTS.....................................329
TRAFFIC CONTROL DEVICES............................265
TRAFFIC DIRECTION AND CONTROL ............263
TRAFFIC ENFORCEMENT...................................273
TRAFFIC ENFORCEMENT - UNIFORMS
    REQUIRED ........................................................274
TRAFFIC RECORDS OFFICE - RESPONSIBILITY
    OF .......................................................................283
TRAFFIC SUMMONS - LOST, MUTILATED,
    VOID TICKETS OR SUMMONS BOOKS ......283
TRAFFIC SUMMONS - MEMBER'S
    APPEARANCE IN COURT ..............................283
TRAFFIC SUMMONS AND ARREST REPORT
    DAILY (FORM P-1231)....................................283
TRAFFIC SUMMONS BOOKS, CARE OF BOOKS
    BY INDIVIDUAL MEMBERS .........................280
TRAFFIC SUMMONS BOOKS, DISTRIBUTING
    TO INDIVIDUAL...............................................279
TRAFFIC SUMMONS BOOKS, OBTAINING.....278
TRAFFIC SUMMONS BOOKS, UNITS TO
    MAINTAIN A RECORD ...................................279
TRAFFIC SUMMONS, PREPARING ...................280
TRAFFIC SUMMONSES ......................................278
TRAFFIC SUMMONSES - PERSONAL SERVICE
    REQUIRED ........................................................281
TRAFFIC SUMMONSES - WHERE RETURNABLE
    ...........................................................................281
TRAFFIC TICKETS, DISPOSITION OF COPIES 281
TRAINING ...............................................................51
TRAINING BULLETIN............................................48
TRAINING INSTRUCTORS ...................................52
TRAINING RECORDS.............................................52
TRANSFER PROCEDURE – PBA MEMBERS ...414
TRANSPORTATION - DEPARTMENT OF .........534
TRANSPORTATION OF SICK OR INJURED.......76
TRANSPORTING CIVILIANS IN POLICE
    VEHICLES .........................................................318
TRANSPORTING COMPLAINANTS/WITNESSES
    TO CITY COURT BOOKING ...........................184
TRANSPORTING HANDICAPPED PRISONERS
    ...........................................................................135

TRANSPORTING PRISONERS - PRELIMINARY
    SEARCHES ...................................................... 133
TRANSPORTING PRISONERS - RESTRAINTS 134
TRANSPORTING PRISONERS AFTER ARREST
    ............................................................... 133, 183
TRANSPORTING PRISONERS OF THE OPPOSITE
    GENDER............................................................ 135
TRANSPORTING PRISONERS TO CITY COURT –
    PROCEDURE .................................................... 203
TRAVEL - ADVANCED PAYMENTS ................ 661
TRAVEL - AFTER MAYORAL APPROVAL HAS
    BEEN RECEIVED............................................. 661
TRAVEL - APPROVAL OF THE COMMISSIONER
    REQUIRED........................................................ 661
TRAVEL - GETTING REIMBURSED FOR
    EXPENSES ........................................................ 663
TRAVEL - LODGING............................................ 662
TRAVEL - MAYORAL APPROVAL REQUIRED
    ........................................................................... 661
TRAVEL - MEALS ................................................ 663
TRAVEL - OUT OF TOWN DEFINED............... 660
TRAVEL - REQUESTING PERMISSION FOR
    OUT-OF-TOWN ............................................... 660
TRAVEL - TELEPHONE/FAX CHARGES ......... 662
TRAVEL - UNREIMBURSABLE EXPENSES .... 663
TRAVEL EXPENSE GUIDELINES ..................... 661
TRAVEL EXPENSES ............................................ 660
TRAVELER'S AID ................................................ 538
TSLED/TVB SUMMONS ..................................... 278
TWENTY-FOUR (24) HOUR MILITARY TIME
    CLOCK ............................................................. 351

## U

U.S. ARMY CORP OF ENGINEERS ................... 537
U.S. MARSHALS ................................................... 537
UNDERWATER RESCUE AND RECOVERY
    TEAM (URRT) .................................................... 44
UNDERWATER RESCUE AND RECOVERY
    TEAM (URRT) .................................................. 462
UNIFORM - COLD WEATHER ........................... 471
UNIFORM - REPORT TECHNICIAN
    REPORT TECHNICIAN UNIFORM ............... 472
UNIFORM - WARM WEATHER ......................... 471
UNIFORM AND EQUIPMENT TO BE WORN
    WHILE ON DUTY ............................................ 304
UNIFORM CRIME REPORTING......................... 349
UNIFORM FOR LIEUTENANTS AND HIGHER
    RANKING OFFICERS ...................................... 472
UNIFORM HAT ..................................................... 469
UNIFORM/ATTIRE - WHILE RECEIVING COURT
    TIME PAY ......................................................... 469
UNIFORMS ........................................................... 468

UNIFORMS - CLAIMS FOR REIMBURSEMENT ...............................................479
UNIFORMS - DAMAGED OR WORN.................478
UNIFORMS - DISPATCHER ...............................473
UNIFORMS - DISTRIBUTION, REPAIR, AND REPLACEMENT OF UNIFORMS AND EQUIPMENT ................................................470
UNIFORMS - INSPECTION AND APPROVAL ...468
UNIFORMS - MAINTENANCE AND CLEANING PERSONNEL................................................473
UNIFORMS - OFFICE..........................................472
UNIFORMS - RESTRICTIONS ON WEARING ..469
UNIFORMS - TYPES ...........................................470
UNIFORMS - WHEN WORN ...............................469
UNIFORMS TO BE WORN AT FUNERALS.......590
UNIFORMS TO BE WORN PROPERLY .............468
UNIFORMS, EQUIPMENT AND CLOTHING ALLOWANCE ................................................389
UNION RELEASE TIME ......................................405
UNITED STATES CUSTOMS ..............................535
UNITED STATES MARSHALS - U. S. WARRANTS ....................................................112
UNSERVICEABLE AND SURPLUS PROPERTY ...............................................................658
URRT - ACTIVATING.........................................463
URRT - EQUIPMENT ..........................................464
URRT - EVALUATION.........................................464
URRT - QUALIFICATIONS, SELECTION AND TRAINING ......................................................463
URRT - VEHICLES RECOVERED ......................464
URRT ROSTER ....................................................464
USE AND DISSEMINATION AGREEMENTS ...363
USE OF FIREARMS.............................................127
USE OF FORCE ...................................................124
USE OF FORCE - ANNUAL INSTRUCTION......133
USE OF FORCE - PERSONS INJURED RESULTING FROM .........................................129
USE OF FORCE - PERSONS KILLED OR SERIOUSLY INJURED AS A RESULT OF THE USE OF DEADLY PHYSICAL FORCE ..........131
USE OF FORCE - USE OF DEADLY PHYSICAL FORCE ............................................................126
USE OF FORCE CONTINUUM............................125
USE OF FORCE OR INJURIES TO CIVILIANS - REPORTING REQUIREMENTS.....................128

## V

VACATION - ANNUAL SCHEDULING - LOCAL 650 AND LOCAL 264.......................................402

VACATION - ANNUAL SCHEDULING - SWORN ...............................................................401
VACATION - CHANGING SCHEDULES........... 403
VACATION - SCHEDULING LIMITATIONS .... 402
VACATION ACCUMULATION - LOCAL 650 AND LOCAL 264 MEMBERS ................................. 403
VACATION CARRYOVER - SWORN MEMBERS ............................................................... 403
VACATION ENTITLEMENT .............................. 400
VACATION PERIODS ......................................... 400
VACATIONS - DRAWING FOR ANNUAL ........ 401
VEHICLE MAINTENANCE................................. 319
VEHICLE TOWING AND STORAGE.................. 67
VEHICLES - FUELING ....................................... 320
VEHICLES - RESERVE........................................ 320
VERBAL AND WRITTEN COMMUNICATION 349
VESSELS OF UNITED STATES OR FOREIGN REGISTRY ....................................................... 112
VETERAN'S ADMINISTRATION HOSPITAL... 537
VETERAN'S DAYS .............................................. 407
VICTIM/WITNESS ASSISTANCE ...................... 309
VIDEO SURVEILLANCE CAMERA ROOM...... 238
VIDEOTAPING DEMONSTRATION.................. 428
VOICE MAIL AND ANSWERING MACHINES 356

## W

WAGES, HOURS AND TERMS AND CONDITIONS OF EMPLOYMENT ................ 389
WARRANT - PERSONS TURNING THEMSELVES IN ........................................................................ 139
WARRANT ARRESTS FOR OUTSIDE AGENCIES ............................................................... 172
WARRANT LOG - DISTRICT/UNIT RESPONSIBILITY ........................................... 169
WARRANT/WANT FORM .................................. 170
WARRANTS - TRANSFER OF........................... 172
WARRANTS - UNSERVED ................................. 172
WEAPONS - DRAWING ...................................... 127
WEARING OF RIBBONS AND MEDALS .......... 584
WEATHER BUREAU .................................. 452, 537
WELFARE ABUSES............................................. 153
WHEN VEHICLES MAY BE TOWED ................. 68
WORK HOURS - LOCAL 264 MEMBERS ......... 397
WORK HOURS - LOCAL 650 MEMBERS ......... 395
WORK HOURS FOR PBA REPRESENTED EMPLOYEES ................................................... 390
WORK SHIFTS - PBA MEMBERS ..................... 390
WRITTEN COMMUNICATION AND CORRESPONDENCE ..................................... 351
WRITTEN ORDERS .............................................. 46

# **B**UFFALO **P**OLICE **D**EPARTMENT



# **RULES & REGULATIONS**

COB000941

**TABLE OF CONTENTS**

Page(s)

ATTESTATION                                              1

LAW ENFORCEMENT CODE OF ETHICS                          2

INTRODUCTION                                            3

DEFINITIONS & GLOSSARY                                 5-8

CHAPTER I - ORDERS & DISCIPLINE

|      |                                            |     |
|------|--------------------------------------------|-----|
| 1.1  | Obedience to Laws, Ordinances & Rules      | 9   |
| 1.2  | Familiarity with the Laws, Ordinances, Rules | 9 |
| 1.3  | Obedience to Orders                        | 9   |
| 1.4  | Issuance of Orders                         | 9   |
| 1.5  | Unlawful Orders                            | 9   |
| 1.6  | Unjust or Improper Orders                  | 10  |
| 1.7  | Conflict of Orders                         | 10  |
| 1.8  | Instructions From Radio Dispatcher         | 10  |
| 1.9  | Effectiveness of Orders                    | 10  |
| 1.10 | Insubordination                            | 10  |
|      |                                            | 10  |

CHAPTER II - PERFORMANCE OF AND ATTENTION TO DUTY

|      |                                            |     |
|------|--------------------------------------------|-----|
| 2.1  | General Duties                             | 11  |
| 2.2  | Respond When Directed                      | 11  |
| 2.3  | Reporting for Duty                         | 11  |
| 2.4  | Attention to Duty                          | 11  |
| 2.5  | Devotion to Duty                           | 11  |
| 2.6  | Absence from Duty                          | 11  |
| 2.7  | Action Request Regardless of Assignment    | 11  |
| 2.8  | Seeking Information Regarding Duties        | 11  |
| 2.9  | Driving Private Vehicle to Post            | 11  |
| 2.10 | Inspecting Area of Assignment              | 12  |
| 2.11 | Leaving Area of Assignment                 | 12  |
| 2.12 | Attitude And Impartiality                  | 12  |
| 2.13 | Courtesy                                   | 12  |
| 2.14 | Assistance To Fellow Employees             | 12  |
| 2.15 | Assistance To Citizens                     | 12  |
| 2.16 | Civil Disputes                             | 12  |
| 2.17 | Medical Attention for Ill/Injured Persons  | 12  |
| 2.18 | Serving Warrants/Subpoenas                 | 12  |
| 2.19 | Taking Arrested Persons to Headquarters    | 12  |
| 2.20 | Appearances Required                       | 13  |
| 2.21 | Loitering Or Sleeping On Duty/Congregating | 13  |
| 2.22 | Conducting Private Business or Association on Duty | 13 |
| 2.23 | Reading On Duty                            | 13  |
| 2.24 | Meal Periods and Personal Services         | 13  |
| 2.25 | Commanding Officers Addressed by Title     | 13  |

COB000942

CHAPTER II – PERFORMANCE OF AND ATTENTION TO DUTY (CONT'D)

2.26  Concealment                                    13
2.27  Civilian Passengers In Police Vehicles         13

CHAPTER III – GENERAL CONDUCT

3.1   Responsibility                                 14
3.2   Conduct                                        14
3.3   Frequenting Unlawful Establishments            14
3.4   Personal Associations                          14
3.5   Truthfulness                                   14
3.6   Unnecessary Force                              14
3.7   Discussing Evidence                            14
3.8   Divulging Police Information                   15
3.9   Information Where City Is Interested Party     15
3.10  Speeches, Statements, Etc.                     15
3.11  Forwarding Information                          15
3.12  Independent Investigations                     15
3.13  Testimony                                      15
3.14  Accepting Rewards, Gratuities, Etc.            15
3.15  Testimonials, Solicitations, Etc.              15,16
3.16  Membership and Organizations                   16
3.17  Political Activity                             16
3.18  Seeking/Accepting Compensation For Damages
         Or Injury                                   16
3.19  Debts                                          16
3.20  Expenditures Of Department Funds               16
3.21  Correspondence, Letterheads                    16
3.22  Personal Cards                                 17
3.23  Found, Recovered Property                      17
3.24  Use of Alcoholic Beverages                     17
3.25  Use of Tobacco                                 17
3.26  Controlled Substance                           17
3.27  Use of Force                                   17
3.28  Firearms and Ammunition                        17
3.29  Applications for Pistol Permits                17,18
3.30  Uniforms                                       18
3.31  Non-Uniform Attire                             18
3.32  Outside Employment                             18
3.33  Sick Leave                                     18

CHAPTER IV – USE OF OFFICIAL POSITION

4.1   Use of Badge Or Position For Personal Gain     19
4.2   Disclosing Name and Badge Number               19
4.3   Courtesy Cards                                 19
4.4   Using Photograph For Commercial Purpose        19
4.5   Using Influence of Office For Political Gain    19
4.6   Recommending Attorneys                         19
4.7   Giving Surety or Bail For Persons In Custody    19
4.8   Withdrawing Charges                            19
4.9   Communicating Information To Aid Evasion        19

COB000943

CHAPTER IV - USE OF OFFICIAL POSITION (CONT'D)

| 4.10 | Warrants For Personal Assaults | 20 |
| 4.11 | Civil Cases | 20 |
| 4.12 | Appearing As Witness; For Defense or Civil Case | 20 |
| 4.13 | Communication Between Prisoners and Attorneys | 20 |
| 4.14 | Unlawful Compromise | 20 |
| 4.15 | Plea Bargaining | 20 |
| 4.16 | Connection With Liquor Estabishment | 20 |

CHAPTER V - DEPARTMENTAL PROPERTY

| 5.1 | Use and Responsibility | 21 |
| 5.2 | Reporting Loss Or Damage | 21 |
| 5.3 | Qualification Required | 21 |
| 5.4 | Property Not To Be Removed | 21 |
| 5.5 | Return Of Issued/Assigned Property | 21 |
| 5.6 | Unauthorized Communication Devices | 21 |
| 5.7 | Departmental Buildings | 21,22 |

CHAPTER VI - REPORTS, RECORDS AND COMMUNICATIONS

| 6.1 | Altering, Delaying, Removing or Falsifying Reports | 23 |
| 6.2 | Inspection; Copying of Reports | 23 |
| 6.3 | Departmental Business; Timeliness of Reports | 23 |
| 6.4 | Reporting Violations | 23 |
| 6.5 | Reporting Illegal Activities | 23 |
| 6.6 | Unauthorized Gifts, Gratuity, Etc. | 23 |
| 6.7 | Testimony For Defense | 24 |
| 6.8 | Information Regarding Crime | 24 |
| 6.9 | Arrests and Court Actions | 24 |
| 6.10 | Address and Telephone Number | 24 |
| 6.11 | Civil Suits; Claims For Loss or Personal Injury | 24 |

CHAPTER VII - SUPERIOR OFFICERS/SUPERVISORS

| 7.1 | Duties and Responsibilities; General | 25 |
| 7.2 | Abuse of Subordinates | 25 |
| 7.3 | Duty to Investigate and Report Misconduct | 25 |
| 7.4 | Exemplary Conduct Expected | 25 |
| 7.5 | Duty to Discover | 25 |

COB000944

## ATTESTATION

By virtue of the authority vested in the Commissioner of Police by the Charter of the City of Buffalo, I hereby order the adoption of the following Rules and Regulations for the government and discipline of the Buffalo Police Department.

The precepts in the introduction are also incorporated as a part of the Rules and Regulations.

These Rules and Regulations supersede any previously issued. The right to amend or revoke these Rules and Regulations at any time is reserved to the Commissioner of Police.

Buffalo, New York
　　1997

　　　　　　　　　　R. Gil Kerlikowske
　　　　　　　　　　Commissioner of Police

1

COB000945

## LAW ENFORCEMENT CODE OF ETHICS

AS A LAW ENFORCEMENT OFFICER, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all persons to liberty, equality and justice.

I WILL keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my Department. Whatever I see or hear of a confidential nature or that is confided in me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I WILL never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I RECOGNIZE the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession .... law enforcement.

2

COB000946

## INTRODUCTION

A police organization is established by law. Its employees serve those whose personal conduct they may be called upon to regulate by enforcing laws and ordinances passed by the representatives of these same people. The primary objectives of the Police Department include: protecting life and property, preventing crime, suppressing criminal activity, apprehending and prosecuting violators of the law, regulating non-criminal conduct, and preserving the peace.

In our democratic society the legislature frames and constructs the law while the judiciary interprets the law and imposes the necessary penalties upon transgressors. It is the police, however, who have the sworn duty to directly apply and execute the law fairly and objectively for the benefit of the entire community. This task has become one of the most difficult and most demanding responsibilities in the public service.

The letter of the law indicates what a member does to discharge the obligations imposed by the oath of office, but it does not encompass the consequences which may arise from the universal application of these laws. Since it is not possible to anticipate every situation that may arise, or to prescribe the specific course of action required for each case, the exercise of common sense and good judgment by those entrusted with law enforcement is necessary to make the police service equitable and effective.

An understanding of human behavior and the application of the principles of common acceptance will go far towards the realization of the primary police objectives but these two qualities alone are not sufficient to ensure the proper handling of every incident. There must also be standards of quality and general rules governing the conduct of personnel to serve as guides.

The Charter of the City of Buffalo, the contents of this manual and the Manual of Procedures, and the orders, directives and authoritative instructions of the Police Department regulate the manner in which Buffalo Police Department employees execute their specific duties.

Employees of the Police Department will be governed by specific and various rules, regulations and procedures, and violations will constitute a basis for disciplinary action.

Many of the Rules and Regulations which appear to have been deleted from the previous edition, have actually been incorporated with others and/or rephrased, i.e., rules may have undergone a change in form but not in substance. Many other rules and regulations may appear in other authoritative sources, for example, the Manual of Procedures, and have been deleted from this edition solely because of redundancy. The same high standards and intent of previous editions remain in effect.

If any section, subsection, paragraph, sentence, clause, or phrase of this Manual of Rules and Regulations for any reason is held to be invalid or unconstitutional, such decision shall not affect the validity of the remaining portions or sections of these Rules and Regulations.

This Manual is delivered to you with the requirement that you study it carefully and be fully aware of its contents and meaning. The Rules and Regulations contained are designed to fulfill a two-fold mission: first, they form the basic framework of authority within which the operating procedures and policies of the Police Department are developed and second, they are designed to provide employees with a clear guide to acceptable standards of conduct and behavior.

Nothing in this Manual of Rules and Regulations is limited in the sense of prohibiting the disciplining of, or the filing of charges against, employees because the alleged act or omission does not specifically appear herein.

3

COB000947

## DEFINITIONS AND GLOSSARY

### ACTING

Serving temporarily in a position to which the employee is not ordinarily assigned, usually in a position of higher authority. All the authorities, responsibilities, and duties of the higher position become the responsibility of the acting employee.

### ASSIGNMENT

Any personnel placement made by established authority.

### AUTHORITY

Legal or rightful power; a right to command or act.

### AUTHORITATIVE INSTRUCTION

Any order, either verbal or written, governing policy, procedure, rules or regulations.

### CHAIN OF COMMAND

In descending or ascending order of rank, the line of authority, extending from the Commissioner through every level of Command, as indicated by the Organizational Chart of the Department.

### COMMANDING OFFICER

The term "commanding officer" as used herein shall refer to all employees holding a higher supervisory or command position.

### CRIME

As used herein, an act or commission of an act that is forbidden or the omission of a duty that is commanded by law which makes the offender liable to punishment by law; a violation of law.

### DEPARTMENT

The term "Department" as used herein shall refer to the Buffalo Police Department.

### DUTY

Includes those tasks required by one's assignment, rank or status.

### EMPLOYEE

The word "employee" as used herein shall include all sworn and non-sworn personnel assigned to the Department.

COB000948

## GENDER

The use of the masculine gender shall also include, when appropriate, the female gender.

## IMMEDIATELY

The term "immediately" means as soon as possible without unnecessary delay.

## INCOMPETENCE

Being incapable of the satisfactory performance of duties, which may include a lack of initiative, diligence, sound judgment, ability to take decisive action or any other trait which demonstrates incapacity or ineptness in the performance of assigned tasks.

## INSUBORDINATION

The failure or deliberate refusal to promptly obey a lawful order given by a commanding/superior officer or employee; ridiculing a superior officer/employee or the superior's orders; any disrespectful, insolent, or abusive language or action toward any commanding officer.

## MALFEASANCE

The doing of an unlawful act in office.

## MAY

The word "may" as used herein shall mean that the action indicated is permissible.

## MEMBER

The word "member" as used herein shall include any person duly appointed to the Department as a sworn police officer. Police Recruits/Probationary Police Officers are included in this definition.

## MISFEASANCE

The wrongful doing of a lawful act in office.

## NEGLECT OF DUTY

Failure to give suitable attention to the performance of duty. Failure to take appropriate action on the occasion of a crime, disorder, or other act or condition requiring police attention. Failure to perform duties.

6

COB000949

## NONFEASANCE

The omission of an act which should have been done while in office.


## OFF DUTY

That period of time which excludes the assigned work period. The period of time during which an employee would not normally be required to actively engage in the performance of his assigned duties.


## OFFICER IN CHARGE

The member having the highest Civil Service rank. Members of the same grade shall assume charge according to the date of appointment to that rank unless otherwise ordered by the Commissioner of Police.


## ON DUTY

That period of time when an employee is actively engaged in the performance of his assigned duties.


## ORDERS

An order is a command; a directive (either oral or written) given by one in authority and directed to a subordinate(s).

General Order: Written orders issued by the Commissioner outlining policy on matters which affect the entire Department. A General Order is the most authoritative directive issued by the Department and may be used to amend, supersede, or cancel any other rule, regulation, or order. General Orders are permanent Departmental policy and remain in full force and effect until amended, superseded, or cancelled by the Commissioner.

Lawful Order: Is any written or oral directive issued by any commanding officer to any subordinate or group of subordinates in the course of police duty which is not in violation of any law or ordinance or any Departmental rule, procedure or instruction.

Special Order: Is a written directive issued by established authority outlining instructions covering particular situations.


## POLICY

Any governing principal, broad plan, or course of action, either oral or written, designed to accomplish the Department's goals.


## PROCEDURE

The official method of dealing with any given situation as prescribed by General Orders, Special Orders, Manual of Procedures, Training Bulletins or other directives.


## REPORT

A written communication unless otherwise specified.

COB000950

## RULES AND REGULATIONS

The terms "rules" and "regulations" as used herein are interchangeable since both indicate basic internal departmental legislation. They refer to broad precepts of authority, responsibility or conduct. They carry the full force and effect of a direct order from the Commissioner and stand until cancelled or superseded by a direct order of the Commissioner.

## SHALL/WILL

The words "shall" or "will" as used herein shall indicate that the action specified is mandatory.

## SICK LEAVE

That period during which an employee is excused from duty under the applicable provisions of current regulations and/or prevailing contract.

## SUPERVISOR

Any person designated to act in a supervisory capacity.

## THROUGH OFFICIAL CHANNELS

In descending or ascending order of rank. Synonymous with "Chain of Command".

8

COB000951

## RULES AND REGULATIONS

The terms "rules" and "regulations" as used herein are interchangeable since both indicate basic internal departmental legislation. They refer to broad precepts of authority, responsibility or conduct. They carry the full force and effect of a direct order from the Commissioner and stand until cancelled or superseded by a direct order of the Commissioner.

ns of

July 3, 1990

General Order No. 90-7

TO:        ALL MEMBERS OF THE DEPARTMENT

SUBJECT:   Changes in the Rules & Regulations

PURPOSE:   To Conform with Rulings of the State Public Employment Relations Board

A.  Rule 1.1(a) of the Rules & Regulations is rescinded in its present form.

Rule 1.1(a) is hereby amended to read "Employees shall not violate any law of the United States, the State of New York, or the ordinances of the City of Buffalo."

B.  Rule 3.10(b) is hereby rescinded.

All members of the Department are directed to note the changes in their copies of the Rules & Regulations, and cite the number of this General Order in the margin next to each rule.

No new pages will be issued at this time.

EFFECTIVE   This General Order is effective immediately.
DATE:

Ralph V. Degenhart, Commissioner

## CHAPTER I - ORDERS AND DISCIPLINE

### 1.1      OBEDIENCE TO LAWS, ORDINANCES AND RULES

a)  Deleted as per PERB decision of 6/25/90.

b)  Employees shall obey all the Rules and Regulations, General Orders, and authoritative instructions of the Department. (In order to constitute a violation of this rule, it is not necessary that a complaint be filed with the Department or with a criminal court, but only that the facts exist which would constitute a violation of the law, ordinance, rule, or authoritative instruction).

### 1.2      FAMILIARITY WITH THE LAWS, ORDINANCES, RULES

Employees shall study and become familiar with the Rules and Regulations, orders, directives and policies of the Department, City Ordinances, and State and Federal Laws affecting their duties.

a)  Returning from absence:

Employees returning to duty from any absence shall acquaint themselves with all amendments, additions, orders, and other authoritative instructions of the Department which have been issued in their absence.

b)  Unfamiliarity No Defense:

In the event of a breach of discipline, unfamiliarity with or ignorance of Rules and Regulations or General Orders shall not constitute a defense.

c)  Making Changes as Directed:

It shall be the responsibility of every employee to promptly make all directed changes in any manual, text, or reference book issued to them by the Department.

### 1.3      OBEDIENCE TO ORDERS

Employees shall comply with all lawful orders.

### 1.4      ISSUANCE OF ORDERS

Orders, written or verbal, from any supervisor to any subordinate in the Department, shall be in clear, understandable language, civil in tongue and issued in pursuit of Departmental business in accordance with all legal requirements.

### 1.5      UNLAWFUL ORDERS

No superior officer/supervisor shall knowingly issue any order which is a violation of any law, ordinance or Departmental Rule or Procedure.  Obedience to any unlawful order is never a defense for an unlawful action; therefore, no employee is required to obey any order which is contrary to Federal, State or local law or ordinance.  Responsibility for refusal to obey any unlawful order rests with the employee to whom such order was given. The employee shall be strictly required to just such action.

9

COB000953

1.6       <u>UNJUST OR IMPROPER ORDER</u>

When lawful orders which appear to be unjust or improper are given, the employee to whom the order is given shall respectfully notify the superior officer/supervisor issuing such order of its impropriety. If the order is not corrected, then the order is to be carried out. After carrying out the order, the employee to whom the order was given may file a written report to the Commissioner via the Chain of Command indicating the circumstances and reasons for questioning the order, along with a request for clarification of Departmental Policy. An employee who performs an order found to be unjust or improper by the Commissioner, but otherwise lawful, will not be held responsible for carrying out such order.

1.7       <u>CONFLICT OF ORDERS</u>

Employees who are given any instruction or order which conflicts with any previously received instruction or order shall call this fact to the attention of the person issuing the second order. If so directed, the latter order shall be obeyed. Previous orders or instructions shall be countermanded only when necessary. The supervisor issuing the countermanding instructions or order shall be held responsible for that action.

1.8       <u>INSTRUCTIONS FROM RADIO DISPATCHER</u>

All messages transmitted over the Police Radio System shall be direct and concise and shall conform with all Departmental radio procedures and the Rules and Regulations of the Federal Communications Commission.

No officer shall fail to obey or refuse to take cognizance of any communication transmitted by the Radio Dispatcher, unless directed to do so by a superior officer. Superior Officers shall be held strictly accountable for any communication/order countermanded by them.

1.9       <u>EFFECTIVENESS OF ORDERS</u>

All General Orders, Special Orders, Directives, Training and Legal Bulletins, Memorandums or other orders in writing that have been approved or authorized by the Commissioner, shall have the force and effect of a Departmental Rule or Regulation and shall be obeyed as such.

1.10      <u>INSUBORDINATION</u>

Employees shall not be insubordinate.

10

COB000954

## CHAPTER II - PERFORMANCE OF AND ATTENTION TO DUTY

2.1     GENERAL DUTIES

Members shall protect life and property, preserve the peace, prevent crime, detect and arrest violators of the law and enforce those laws of the United States, the State of New York, and Ordinances of the City of Buffalo over which the Department has jurisdiction.

2.2     RESPOND WHEN DIRECTED

Employees shall respond as directed by established authority.

2.3     REPORTING FOR DUTY

Members shall report for duty promptly at the time and place required by their assignment or as otherwise directed by the Commissioner or their Commanding Officer. They shall be properly uniformed and suitably equipped, ready to immediately assume their duties. While on duty, they shall avoid any activities not directly related to their duties and responsibilities and shall not absent themselves from duty without leave. Members unable to report for duty because of sickness or injury shall notify, or cause to be notified, their commanding officer/supervisor as soon as possible prior to the start of their tour of duty. It shall be the commanding officer's responsibility to make note of tardiness and to keep a record of all tardiness.

2.4     ATTENTION TO DUTY

Members shall at all times be alert and vigilant in the performance of their duties and shall respond prudently but decisively when police action is required.

2.5     DEVOTION TO DUTY

Members, while on duty, shall devote their full time and attention to the service of the Department and to the citizens of the community.

2.6     ABSENCE FROM DUTY

Employees shall not be absent from duty without obtaining permission from their supervisor in accordance with current directives.

2.7     ACTION REQUIRED REGARDLESS OF ASSIGNMENT

Members shall take appropriate action regarding any violation of law they observe, or which is brought to their attention regardless of their assignement or duties. Exceptions may be made for persons on special duties or assignments.

2.8     SEEKING INFORMATION REGARDING DUTIES

Employees who are in doubt as to the nature or detail of their assignment shall immediately seek such information from their supervisor.

2.9     DRIVING PRIVATE VEHICLE TO POST

Members will not drive, use, or park a private vehicle in the vicinity of their post, except with permission of their commanding officer.

11

2.10    ## INSPECTING AREA OF ASSIGNMENT

Employees will inspect their areas of assignment as soon as possible after beginning their tour of duty and as often as possible during their tour of duty, reporting any condition requiring police attention or the attention of any other city department or agency.

2.11    ## LEAVING AREA OF ASSIGNMENT

Employees shall not leave their area of assignment unless:

a) on assignment from the radio dispatcher;
b) authorized by a commanding officer;
c) an incident outside of their immediate area requires police attention;
d) in close pursuit of a violator of the law.

2.12    ## ATTITUDE AND IMPARTIALITY

Employees, while vigorous and unrelenting in the enforcement of the law, must maintain a strictly impartial attitude toward complainants, violators, witnesses and suspects.

2.13    ## COURTESY

Employees shall perform their duties in an efficient, courteous, and orderly manner using patience and good judgment at all times. They shall be courteous and considerate to the public, to their superior officers and to their fellow employees. They shall not use harsh, profane, or insolent language. They shall be tactful in the performance of their duties and are expected to exercise the utmost patience and discretion even under the most trying circumstances.

2.14    ## ASSISTANCE TO FELLOW EMPLOYEES

Employees shall aid, assist and protect their fellow employees to the full extent of their capability in times of need and in accordance with established procedures.

2.15    ## ASSISTANCE TO CITIZENS

Employees shall, in accordance with policies and procedures of the Department, render all possible police service to any citizen seeking information or assistance.

2.16    ## CIVIL DISPUTES

Members shall take a neutral position in any dispute of a civil nature, acting only to prevent or control any breach of the peace that may arise.

2.17    ## MEDICAL ATTENTION FOR ILL/INJURED PERSONS

Employees shall insure that any injured or ill person is given the opportunity for medical attention.

2.18    ## SERVING WARRANTS/SUBPOENAS

Employees are to serve all warrants and subpoenas in accordance with current statutes and directives.

2.19    ## TAKING ARRESTED PERSONS TO HEADQUARTERS

Employees taking custody of arrested persons will send or take these persons to the place of booking immediately unless directed otherwise a commanding officer or when medical attention is required.

COB000956

2.20      APPEARANCES REQUIRED

a) Employees, when notified by competent authority, shall appear promptly at the appointed time and place before any court or tribunal. If subpoenaed, they shall notify their supervisor and other authority as required. They shall not absent themselves from any trial or hearing except for good cause in which case they shall notify either the Assitant District Attorney, the Court Attendant or whoever is in authority over the hearing board or internal investigative body.

b) Employees must respond to inquiries when ordered to appear before any authorized investigating body, judicial tribunal, hearing board, or persons authorized to take testimony. All employees shall be dressed in accordance with current directives when testifying and be punctual in attendance.

2.21      LOITERING OR SLEEPING ON DUTY/CONGREGATING

a) Employees shall not loiter or sleep on duty.

b) While on duty, employees shall not congregate about public places or engage in recreation or games of chance unless necessary in the performance of duty and approved by a supervisor.

c) Off-duty employees shall not congregate or loiter about public places while in recognizable uniform.

2.22      CONDUCTING PRIVATE BUSINESS OR ASSOCIATION ON DUTY

Employees shall not devote any of their on-duty time to the pursuit of any private business, private enterprise or personal association.

2.23      READING ON DUTY

Employees shall not, to the detriment of their duties or in public view, read newspapers, periodicals, or books while on duty. Publications and material pertaining to the police field may be read or studied as long as proper and efficient performance of assigned duties is not impaired.

2.24      MEAL PERIODS AND PERSONAL SERVICES

Employees shall obtain meal periods and personal services in compliance with current directives.

2.25      COMMANDING OFFICERS ADDRESSED BY TITLE

Employees, while on duty, shall address commanding officers by title.

2.26      CONCEALMENT

Employees shall not conceal themselves while on duty except for a police purpose.

2.27      CIVILIAN PASSENGERS IN POLICE VEHICLES

Members shall not transport nor allow any civilian to enter or ride in a police vehicle without first notifying and obtaining the permission of the Radio Dispatcher. If permission is granted by the Radio Dispatcher, the officer requesting permission shall announce the departure and destination points and the beginning and ending vehicle mileage. The Radio Dispatcher will announce the times of departure and arrival.

COB000957

# CHAPTER III - GENERAL CONDUCT

### 3.1    RESPONSIBILITY

a)  It shall be the responsibility of every member of the Department to familiarize themselves with the rules, regulations, orders and procedures of the Department, particularly as they relate to the position the member holds, and to obey them.

b)  Employees shall have a thorough knowledge of the duties of the position they hold and shall perform those duties with diligence.

c)  Every member of the Department shall be competent to perform the duties of the position he/she holds.  Manifest inability, failure, or neglect to perform the duties incumbent upon him by virtue of his/her position or assignment shall be the subject of disciplinary action.

d)  Members assigned to temporary "Acting" duty shall have the same authority and responsibility as the regularly assigned member, and shall perform their duties with diligence.

### 3.2    CONDUCT

a)  Employees shall so conduct themselves in both their private and professional lives as to avoid bringing discredit upon the Department.

b)  No employee shall conduct himself in such a manner, or perform any act, which is prejudicial to the good order, discipline or reputation of the Department, although such action is not specifically prohibited by any rule or order; and this whether the employee is on or off duty.

### 3.3    FREQUENTING UNLAWFUL ESTABLISHMENTS

Employees shall not knowingly enter or remain in any premise wherein the laws of the Unites States, the State, or the local jurisdiction are violated, except in the direct performance of their duties.

### 3.4    PERSONAL ASSOCIATIONS

Deleted as per PERB decision of 6/25/90.

### 3.5    TRUTHFULNESS

Employees are required to be truthful in speech and writing whether or not under oath.

### 3.6    UNNECESSARY FORCE

Members shall not use unnecessary force or violence toward any person, but shall use only such force as may be necessary to accomplish their lawful purpose and in conformity with existing law.

### 3.7    DISCUSSING EVIDENCE

Employees shall not discuss with the media, or any other person, the evidence arising out of a criminal investigation or civil proceeding without the knowledge and permission of their commanding officer or established authority or unless otherwise mandated by law.

14

COB000958

## 3.8    DIVULGING POLICE INFORMATION

Employees shall not divulge police information to which they have access or which may come to their attention, nor shall they make any information contained in police records available to anyone except as provided by law or established authority.

## 3.9    INFORMATION WHERE CITY IS INTERESTED PARTY

Employees shall not divulge to any but authorized persons, information concerning any incident or investigation in which the City of Buffalo is, or could become, an interested party.  All inquiries regarding such matters shall be referred to the Corporation Counsel.

## 3.10    SPEECHES, STATEMENTS, ETC.

a)  Employees shall not fill speaking engagements, nor cause to be published, any article or writing, nor permit their names or photographs to be used in connection with any commercial advertising or promotion, as a representative or spokesman for the Department, without the approval of the Commissioner.

b)  Deleted as per PERB decision of 6/25/90.

## 3.11    FORWARDING INFORMATION

Employees having information on any police matter, in which they are not directly concerned, shall forward, through their commanding officer, all such information to the Departmental subdivision concerned.  Such information shall not be withheld under any circumstances.

## 3.12    INDEPENDENT INVESTIGATIONS

Except in circumstances requiring immediate police action; employees shall not conduct independent investigations outside their regularly assigned duties, without authority of a higher commanding officer. If, due to exigent circumstances, such an investigation is initiated, that fact, together with all information gathered, will be communicated to the employee's supervisor or other affected unit at the earliest possible opportunity.

## 3.13    TESTIMONY

When called upon to do so, employees shall give testimony completely, impartially, and without reservation, and with no desire or design to influence the result.

## 3.14    ACCEPTING REWARDS, GRATUITIES, ETC.

Employees shall not accept any reward, gift or gratuity as a result of any services rendered in the line of duty without first obtaining the permission of the Commissioner of Police.

## 3.15    TESTIMONIALS, SOLICITATIONS, ETC.

a)  Employees shall not bestow testimonials or gifts on other employees of the Department without the permission of the Commissioner.

b)  Employees shall not collect money, nor circulate subscription papers nor sell tickets or solicit donations, prizes or gifts for charitable or any other purpose, except upon prior permission of the Commissioner.

COB000959

c) Employees shall not resort to the use of telephone, mail or handbill, or any program or advertisement in such program, or any form of printed admission, when, in so doing, the name of the Buffalo Police Department or any of the Police subdivisions, is used in furtherance of such sale or solicitation, except with the express written permission of the Commissioner.

d) Employees shall not retain any promoter or promotional agency for the purpose of solicitation or sale of tickets or other form of admission, or any program, or advertisement in such program for the benefit of the Department or any of its members, by using the Department name as a means of effecting or promoting such sale.

e) Employees shall not cause or permit to be printed or otherwise manufactured, any ticket or other form of admission, program, or other matter for the purpose of sale or solicitation, on which the name of the Department is used, without first obtaining the permission of the Commissioner.

## 3.16    MEMBERSHIP AND ORGANIZATIONS

a) Employees shall not join or be a member of any organization or society whose object or purpose, either directly or indirectly, would adversely affect the discipline or conduct of the employee or Department.

b) Employees shall not knowingly be connected with or be a member of any subversive organization except in the line of duty and with the knowledge and consent of the Commissioner.

## 3.17    POLITICAL ACTIVITY

a) Employees shall not join, or become members of any political club, association, society, or committee, or engage in any political activity, except as is permitted by law, and in no event if such membership or activity would interfere with or adversely affect, the performance of their Departmental duties.

## 3.18    SEEKING/ACCEPTING COMPENSATION FOR DAMAGES OR INJURY

Employees shall not seek, claim, litigate, or solicit, nor shall they accept from any person or agency any money or compensation for damages, expenses or injury incurred by them in the line of duty without prior written permission of both the Commissioner of Police and the Corporation Counsel.

## 3.19    DEBTS

Employees shall pay all just debts and satisfy legal liabilities incurred by them.

## 3.20    EXPENDITURES OF DEPARTMENT FUNDS

Employees shall not spend any monies or incur any financial obligations in the name of the Department without prior knowledge and permission of the Commissioner of Police.

## 3.21    CORRESPONDENCE, LETTERHEADS

a) All correspondence leaving the Department shall be issued only with the signature of the Commissioner of Police or as authorized by the Commissioner of Police.

b) The official letterhead of the Department shall not be used for unofficial correspondence.

16

COB000960

3.22      PERSONAL CARDS

Employees shall not possess or use business cards or any other identification cards bearing Departmental affiliation and/or rank, except as authorized by the Commissioner of Police.

3.23      FOUND, RECOVERED PROPERTY

Employees shall, in accordance with current directives, transmit immediately to the custody of the Bureau of Administrative Services all found, confiscated, or recovered property coming into their possession.

3.24      USE OF ALCOHOLIC BEVERAGES

a)  Employees shall not drink, purchase or have in their possession any alcoholic beverage while on duty, except in the performance of their official duty, nor shall any alcoholic beverage be brought into any police facility except in the performance of duty.

b)  Employees who are off duty in uniform or in any recognizable part of their uniform, shall not drink alcoholic beverages in public view.

c)  Employees, while off duty, shall not drink any alcoholic beverages to the extent which renders them unfit to perform or report for duty or which results in the commission of an act which might tend to discredit the Department.

3.25      USE OF TOBACCO

Employees shall not chew or smoke tobacco while on duty and in public view, in such a manner as to adversely affect the professional image of the Department.

3.26      CONTROLLED SUBSTANCE

Employees, whether on or off duty, shall not possess or use any non-prescribed controlled substance, except for that possession occuring in the line of official duty.

3.27      USE OF FORCE

Employees shall use force only as necessary and in accordance with current law and directives.

3.28      FIREARMS AND AMMUNITION

a)  The indiscriminate and careless use of firearms is strictly prohibited.

b)  Employees shall be responsible for the security of their firearms at all times.

c)  Employees shall immediately report the loss, theft, sale or disposal of a firearm capable of being concealed on the person.

d)  Sworn members of the Department shall report the acquisition of any firearm capable of being concealed on the person, or the alteration of any such weapon already possessed, to the Firearms Unit for recording of same.

e)  While on duty, Officers shall wear their sidearm in the prescribed manner.  When off-duty, they may carry their sidearm concealed on their person, in any manner they select.

f)  While on duty, Officers shall only carry, use or discharge those firearms which have been duly approved and registered with the Firearms Unit.  Officers must be qualified by the Firearms Unit for any weapon(s) possessed or carried by them while on duty.

COB000961

g) While on duty, Officers shall carry, use or discharge only those types of ammunition which have been duly approved by the Buffalo Police Department.

h) While on duty, Officers are restricted from dry-firing or other forms of practice with a firearm, except under the personal direction of a Firearms Instructor.

i) Firearms shall not be used against another person except in extreme cases and only then if in conformity with the provisions of Penal Law, Article 35, "Defense of Justification". The discharge of a firearm at or from a moving vehicle is strictly forbidden except when justified within Article 35 of the Penal Law.

j) Members shall use their utmost discretion in discharging their firearms. If a member discharges his firearm for any reason, he/she shall immediately report same to his superior Officer and shall complete and file all reports as required by current directives.

k) No employee, other than a sworn member of the Department, shall possess or carry any type of firearm while on duty, except with the express written permission of the Commissioner.

### 3.29    APPLICATIONS FOR PISTOL PERMITS

Employees shall not endorse applications for pistol permits as character references.

### 3.30    UNIFORMS

Employees whose assignment requires the wearing of a uniform shall wear such uniform in the manner prescribed.

### 3.31    NON-UNIFORM ATTIRE

Employees working in non-uniform assignments shall wear attire appropriate to their duties and assignments in a manner prescribed by current directives.

### 3.32    OUTSIDE EMPLOYMENT

Employees may engage in outside employment subject to the approval of the Commissioner of Police and in accordance with law and current directives.

### 3.33    SICK LEAVE

Employees on sick leave shall not leave their place of residence except in accordance with current directives.

COB000962

## CHAPTER IV - USE OF OFFICIAL POSITION

4.1        **USE OF BADGE OR POSITION FOR PERSONAL GAIN**

Employees shall not use, or attempt to use, their offical position, badge or credentials for personal or financial gain or for personal vengeance. Employees shall not permit any other person to use their badge or credentials for any purpose whatsoever.

4.2        **DISCLOSING NAME AND BADGE NUMBER**

Members shall give their name and badge number to any person requesting such information.

4.3        **COURTESY CARDS**

No employee of the Department, either individually or representing any organization within the Department, shall give or issue to any person, other than a member of the Department, active or retired, any card, button or device which could be construed as granting to, or requesting for, the holder, any special privilege or consideration.

4.4        **USING PHOTOGRAPH FOR COMMERCIAL PURPOSE**

Employees shall not, without the permission of the Commissioner of Police, allow their names or photographs to be used in any commercial enterprise which alludes to their employment with the Department.

4.5        **USING INFLUENCE OF OFFICE FOR POLITICAL PURPOSE**

Employees shall not use the influence of their office or position for political purpose.

4.6        **RECOMMENDING ATTORNEYS**

Employees shall not solicit, suggest, recommend, advise or counsel the engagement or retention of any specific attorney, legal firm, bail bondsman, company, or of any other person or firm for any person as a result of police business. This prohibition shall not apply to employees making such recommendations to their relatives.

4.7        **GIVING SURETY OR BAIL FOR PERSONS IN CUSTODY**

Employees shall not offer or give surety or bail for any persons in custody except with the permission of the Commissioner of Police or such other person authorized by the Commissioner to give such approval. This prohibition shall not apply to employees giving surety or bail for their relatives.

4.8        **WITHDRAWING CHARGES**

Employees shall not, except as provided by the Criminal Procedure Law, withdraw arrest charges, solicit withdrawals or void traffic charges unless approved by competent authority in conformity with existing regulations and procedures.

4.9        **COMMUNICATING INFORMATION TO AID EVASION**

Employees shall not communicate any information which may enable persons to evade arrest and/or punishment or enable them to dispose of or secrete any evidence or contraband.

COB000963

### 4.10    WARRANTS FOR PERSONAL ASSAULTS

Members shall not apply for a warrant for an assault upon themselves, without first reporting the circumstances, through their Commanding Officer, to the Commissioner and obtaining his permission.

### 4.11    CIVIL CASES

Employees shall not use the powers of their office to render assistance in the pursuit of matters which are strictly private or civil in nature except in those matters where they are required by law to so exercise their powers or where a breach of the peace has occurred or is imminent.

### 4.12    APPEARING AS WITNESS; FOR DEFENSE OR CIVIL CASES

Employees shall not appear as a witness for the defense in any criminal case, or in any legal proceeding in which the City of Buffalo is, or may become, a party, without first complying with Departmental Orders governing such cases.

### 4.13    COMMUNICATION BETWEEN PRISONERS AND ATTORNEYS

Employees shall not communicate any message between prisoners and attorneys without permission of their Commanding Officer. Employees may contact an attorney requested by a prisoner; but only for the purpose of advising the attorney of the arrest of the prisoner.

### 4.14    UNLAWFUL COMPROMISE

Employees shall not participate, directly or indirectly, in any unlawful compromise between complainants and offenders.

### 4.15    PLEA BARGAINING

Members shall not engage in, nor recommend, approve or actively consent to, the reduction or changing of a charge against a defendant.

### 4.16    CONNECTION WITH LIQUOR ESTABLISHMENT

Members shall not own, operate, or in any way be connected, either directly or indirectly, with any business where intoxicating liquors or beverages are manufactured or sold except in conformity with existing statutes.

COB000964

# CHAPTER V - DEPARTMENTAL PROPERTY

### 5.1         USE AND RESPONSIBILITY

Departmental property shall be employed only for Departmental purposes and in conformity with the use for which it was intended. Employees shall be held responsible for the proper care and use of property and equipment assigned to or used by them. When investigation reveals that loss or damage of Departmental property or equipment was due to the negligence or carelessness of an employee or that such loss or damage was deliberately caused, such employee may be required to compensate the Department for the loss or damage.

### 5.2         REPORTING LOSS OR DAMAGE

a)  Employees shall immediately report in writing to their superiors whenever Departmental property becomes unserviceable or lost or damaged while in their possession or use.

b)  Superiors shall investigate and report in writing, through regular channels, whenever Departmental property is damaged, lost or destroyed due to negligence or lack of exercise of due care on the part of any employee.

### 5.3         QUALIFICATION REQUIRED

Employees shall not operate any item of Departmental equipment unless they are fully qualified and authorized to do so.

### 5.4         PROPERTY NOT TO BE REMOVED

Departmental property shall not be removed from the place to which it is assigned without proper authorization.

### 5.5         RETURN OF ISSUED/ASSIGNED PROPERTY

Departmental property entrusted, issued or assigned to an employee shall be returned by him/her upon separation from the Department.   Compensation due may be withheld until he complies with this requirement.

### 5.6         UNAUTHORIZED COMMUNICATION DEVICES

No employee of the Department, while on duty, shall use, carry or have in his possession or under his control, any communicaton device of any nature (one or two-way radio, pager, beeper, etc.) except as authorized or issued by the Department.

### 5.7         DEPARTMENTAL BUILDINGS

a)  Employees shall maintain Departmental buildings, offices and equipment in a clean and orderly condition.

b)  No persons, other than employees of the Department, or persons on business, shall be permitted to remain or loiter in Police buildings, except by permission of the member in charge.

c)  Only persons authorized by the Commanding Officer shall be allowed behind the desks of the various station houses, except by permission of the Officer in charge.

d)  Department buildings shall not be used for other than police business, except by permission of the Commissioner.

COB000965

e) No materials such as poster, pamphlets, leaflets, handbills, circulars, including, but not limited to, political posters, advertisements, announcements, etc., can be posted, displayed or distributed to the public or to Departmental employees on police property unless such materials are first approved by the Commissioner of Police.   Commanding Officers of Precincts/buildings shall forward all such materials to the Commissioner, who will determine if such materials can be distributed or displayed on Police Department property.

f) No television sets shall be played, kept, or stored in any Police Department building without the express written permission of the Commissioner of Police.

COB000966

## CHAPTER VI - REPORTS, RECORDS AND COMMUNICATIONS

6.1        ALTERING, DELAYING, REMOVING OR FALSIFYING REPORTS

a)  Employees shall not alter, delay, falsify, withdraw, remove, or request that any other person alter, delay, falsify, remove, or withdraw any report, letter, request, or other communication that is being forwarded through the chain of command.  This shall not preclude the correction of errors.

b)  Employees shall not dissuade any other employee from originating and submitting any lawful or proper report, whether on criminal or disciplinary matters.

c)  Employees shall not falsely make or submit any type of official report or knowingly enter or cause to be entered any inaccurate, false or improper information on the records of the Department.

d)  Employees shall not remove, or permit to be removed, any Departmental record, communication or report from any file or place where they are kept, without permission of the member in charge.  They shall give a receipt for the same whenever such record is removed.

e)  No Departmental record shall be altered, destroyed, or permanently removed, except in compliance with law and by direction of the Commissioner.

6.2         INSPECTION; COPYING OF REPORTS

None but persons authorized by law, Departmental Rule or Order, shall be permitted to see, examine or copy any Departmental record or report.  Supervisors of the various branches of the Department shall establish, in conformity with existing law, rule and/or order, the conditions necessary to effect compliance with this rule.

6.3         DEPARTMENTAL BUSINESS; TIMELINESS OF REPORTS

Departmental reports shall be made at the times specified and in the manner prescribed.  Departmental business shall be conducted through official channels in conformity with the Chain of Command and channeled throughout the Department in conformity with the Organizational structure of the Department.

6.4         REPORTING VIOLATIONS

Deleted as per PERB ruling of 6/25/90.

6.5         REPORTING ILLEGAL ACTIVITIES

a)  Members shall report to their supervisors all suspected places of illegal activity discovered or coming to their attention while on or off duty.

b)  Members shall take note of and investigate all suspicious persons and vehicles and report same in accordance with current directives.

6.6         UNAUTHORIZED GIFTS, GRATUITY, ETC.

Employees shall report in writing, to the Commissioner of Police, any offer or attempt to offer a gift, loan, fee or gratuity in violation of the Rules and Regulations.

COB000967

6.7     TESTIMONY FOR DEFENSE

a) Employees who are requested or subpoenaed to testify or who intend to testify on behalf of the defense against the Department, the City of Buffalo, the "People of the State of New York", or in any criminal action shall immediately notify their supervisor and the prosecuting attorney of such request, subpoena, or intention to testify prior to testifying.

b) Employees who are requested or subpoenaed to testify against the Department of the City of Buffalo in any civil action shall immediately notify both their supervisor and the Corporation Counsel's Office of such request or subpoena.

c) The employee shall forward this information in both "a" and "b" above to the Professional Standards Division.

6.8     INFORMATION REGARDING CRIME

Employees, whether on or off duty, shall communicate promptly to their supervisors, all information on crimes, criminal activity or important happenings of which they have knowledge.

6.9     ARRESTS AND COURT ACTIONS

Deleted as per PERB decision of 6/25/90.

6.10     ADDRESS AND TELEPHONE NUMBER

a) Employees shall report their place of residence or change of residence to their Commanding Officer and to the Bureau of Administrative Services within forty-eight (48) hours of such change.

b) Employees shall report their telephone number or change in telephone number to their Commanding Officer and to the Bureau of Administrative Services within twenty-four (24) hours of such change.

6.11     CIVIL SUITS; CLAIMS FOR LOSS OR PERSONAL INJURY

a) Employees shall report any claims for damage to clothing or other personal property belonging to the employee caused by the performance of duty in conformity with the provisions of the Manual of Procedures.

b) Employees shall not seek in any way, nor accept from any person, money or compensation for damages sustained or expenses incurred by them in the line of duty without first reporting in writing to the Commissioner their intention of doing so and obtaining his permission to do so.

c) Employees who have received municipal salaries or sick benefits for illness or for personal injury sustained while either on or off duty shall report according to existing Departmental regulations any intent to seek, solicit or accept compensation/reimbursement as damages for such illness or injury. The report shall be filed before the action is taken which shall include the facts of the claim and the name of the defendant or party. The Commissioner shall be kept informed of the status of the case/claim and the final court determination or settlement.

COB000968

## CHAPTER VII - SUPERIOR OFFICERS/SUPERVISORS

### 7.1    DUTIES AND RESPONSIBILITIES; GENERAL

Superior Officers/Supervisors are charged with the duty and responsibility to properly and adequately supervise employees under their authority at all times to insure compliance with all Departmental Rules, Regulations and Orders in order to insure fair and effective discipline and to promote the mission of the Department. In furtherance of that goal and to fulfill their responsibility, Superior Officers/Supervisors shall:

a) Provide that their subordinates are properly instructed in all their duties and shall be responsible for the enforcement of the law and compliance with Departmental Rules, Procedures and Orders by their subordinates.

b) Be responsible for the discipline and conduct of their subordinates and for the quality and effectiveness of the service rendered by them. In that regard, they shall thoroughly acquaint themselves with the capabilities of the personnel under their jurisdiction and shall report thereon when required.

c) At all times, strictly and impartially enforce the observance of high ethical standards of their subordinates.

d) Be responsible to insure that orders given to subordinates are properly carried out.

### 7.2    ABUSE OF SUBORDINATES

Superior Officers/Supervisors shall not injure or abuse subordinates by tyrannical, arbitrary or capricious conduct or by abusive language and shall avoid censuring them in the presence of others.

### 7.3    DUTY TO INVESTIGATE AND REPORT MISCONDUCT

Superior Officers/Supervisors shall thoroughly investigate and take proper action in conformity with existing procedures whenever a complaint is made against an employee of the Department and shall file, according to existing procedures, a complete report thereon.

### 7.4    EXEMPLARY CONDUCT EXPECTED

In furtherance of their obligation to "lead by example", Superior Officer/Supervisors shall, at all times, conduct themselves in a manner which furthers the goals and mission of the Department and which sets a proper example of conduct, decorum and attention to duty that is expected of all employees of the Department.

### 7.5    DUTY TO DISCOVER

It is not enough for a superior officer to only investigate or report on misconduct or transgressions which are brought to his/her attention. It is also his/her responsibility to discover these acts, especially where a pattern or trend has developed, and a reasonable man should have been expected to discover such acts.

COB000969