# EXHIBIT 110



**SUNY Buffalo Law School**

*The State University of New York*

518 John Lord O'Brian Hall, Buffalo, NY 14260-1100
Tel: (917) 583-5849 ɫ anjana.malhotra@gmail.com

August 30, 2017

Eric Schneiderman, New York State Attorney General
State of New York
Office of the Attorney General l
Civil Rights Bureau
120 Broadway, 23rd Floor
New York, NY 10271-03332

Dear Attorney General Schneiderman:

      This complaint, submitted by undersigned counsel on behalf of Black Lives Matter-Buffalo ("BLM") and a coalition of residents of Buffalo, New York, alleges the Buffalo Police Department ("BPD") has engaged in a repeated, persistent and widespread pattern of unconstitutional policing, one which has specifically and disproportionately targeted people of color. These tactics, directed in predominantly minority areas, have unnecessarily funneled thousands into the criminal justice system.  Additionally, the City and all oversight agencies have abdicated their responsibilities to hold individual officers accountable for systematic misconduct, thereby allowing habitual offenders to stay on the police force without sanction. With no independent accountability mechanism, BPD officers are frequently cleared of wrongdoing—even where the Department of Justice ("DOJ") or courts have later found such officers at fault. Accordingly, we request the New York Attorney General's Office conduct an investigation into the Buffalo, New York Police Department pursuant to its authority under NYS Executive Law § 63.[1]

      This problem is not new, and this complaint is a long time coming--and, in some ways, a last resort. As in Buffalo's history, illegal, discriminatory police practices in Buffalo have intensified with Buffalo's latest "resurgence," as the BPD has been on the frontline of the City's "urban renewal" program. Further, for years, community activists have been putting forth effective research-based proposals for change that have not just been ignored by City leaders, who have denied and failed to acknowledge the existence of this problem, but have been met with retaliation. As of this writing, 3 of the 5 individuals from Buffalo who attended the Black Lives Matter or the Law for Black Lives convenings in July 2015, and who have been highly effective in advancing police accountability work, have been fired from their respective organizations and institutions.

      BPD's discriminatory policies and practices trace back to 2006, when the City of Buffalo adopted a targeted and aggressive Broken Windows policing program to support new development and residents.  This program was instituted by then newly-elected Mayor Byron Brown and implemented under the direction of BPD Commissioner Daniel Derenda. The program has involved a "Zero Tolerance" campaign to "clean up

---

[1] The Civil Rights Bureau's power to investigate and prosecute illegal discrimination is provided by Executive Law § 63(12). Under this provision, the NY AG is "given broad authority to investigate and prosecute repeated or persistent illegal acts." State v. Solil Mgmt., 491 N.Y.S.2d 243, 246 (Sup. Ct. 1985).

1

Buffalo," explicitly "to support urban renewal,"[2] and bring "new residents and businesses" to Buffalo.[3] These tactics immediately began increasing racial disparities throughout the criminal justice system.

In January 2012, following Governor Andrew Cuomo's announcement of the Buffalo Billion[4] , the City intensified the "Zero Tolerance" program; the BPD thereby became the City's first line to advance a racialized urban renewal agenda. At the Direction of Mayor Brown, BPD Commissioner Derenda, and BMHA officials, BPD officers saturated minority neighborhoods and used *per se* unconstitutional tactics including suspicionless crime suppression vehicle checkpoints and "vertical walk ups" and "walk throughs" of predominantly minority housing projects run by the City, in violation of the Fourth and Fourteenth Amendments. There was an uptick in highly publicized incidents of excessive force, and recently fatalatities and retaliatory tactics. The City also expanded the police force considerably, giving low-level officers unbridled discretion and incentives to increase arrests for minor offenses, substantially increasing racial disparities in arrests as well as the risk of constitutionally defective policing.

Specifically, the BPD has engaged in:

- Routine, unjustified pedestrian stops and arrests made without reasonable suspicion of criminal activity, much less probable cause, along with improper and frisks and searches;
- Suspicionless trespass enforcement policy in BMHA[5] buildings, including routine, unwarranted stops and detentions, vertical patrols of BMHA buildings, and harassment of guests and visitors;
- Routine, daily suspicionless crime-suppression checkpoints, without <u>any</u> individualized suspicion, in BMHA public housing and predominately minority-populated areas, such as the "East Side" of Buffalo[6] -- which have contributed to a 65% increase in BPD-issued tickets in the two years after the program was implemented;
- Systematic and persistent excessive use of force in violation of the Fourth Amendment, including documented law enforcement beatings of unarmed minorities;[7]
- Racial profiling, targeting and disparities resulting in part from intentional racial bias in violation of the Equal Protection Clause of the Fourteenth Amendment.

As described below, the BPD has engaged in a pattern and practice of race-based policing, in violation of the Equal Protection Clause of the U.S. and New York Constitution. Data establishes clear racial disparities adversely impacting African Americans and Latinos – and sharp increases in these disparities as Buffalo has moved further towards its most recent urban renewal program. The evidence below further shows that the City acted with discriminatory intent in implementing these Zero Tolerance policing programs disproportionately in communities of color.

---

[2] While the study period for this complaint dates is from January 1, 2013, this context is paramount to understand the current unconstitutional practices  as several of the practices and programmatic violations here date back to 2006
[3] "Buffalo Fights Crime," Nayor Byron Brown, Moving Buffalo Forward: Policy Briefs from the Brown Administration: Vol. 1.2, June 2007, available at https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/BuffaloFightsCrime.pdf
[4] New York State, *Buffalo Billion* (available at buffalobillion.ny.gov ); NYS Governor's Office, *Governor Cuomo Presented with Buffalo Billion Investment Development Plan*, (Dec 4. 2012) (available at https://www.governor.ny.gov/news/governor-cuomo-presented-buffalo-billion-investment-development-plan ). *See also* http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2012/01/04/new-york-state-of-the-state-address-2012 )
[5] Note: BMHA residents are 87% minority and 75% Black.
[6] Lou Michel, *City's homicide toll down - but still 47 too many [JUMP]Police report progress against gun violence; Police report progress against gun violence*, THE BUFFALO NEWS, Jan. 2, 2014, at D, D; p. 27.
[7] http://mobile.buffalonews.com/?articleRedirect=1&url=http%3A%2F%2Fwww.buffalonews.com%2Fcity-region%2Fpolice-courts%2Fracial-profiling-a-lingering-issue-in-buffalo-20140608

2

Racial disparities in arrests and the criminal justice system have grown substantially, especially for youth—even for crimes committed at similar rates by whites and African Americans. For example, in Buffalo:

- By 2014, African Americans were 5 times more likely to be arrested (up from 4.25 in 2010), and 14.3 times more likely to be detained (up from 10.6 in 2010) than similarly-situated Whites.[8]
- Between 2006 and 2015, African Americans in Buffalo were 7 times more likely to be arrested than Whites for misdemeanor marijuana possession (up from 4 from 1996-2005).[9]
- Similarly, Latinos, who had approximately the same arrest rate as Whites from 1996-2005, are now more than twice as likely to be arrested for lowest level misdemeanor marijuana possession.[10]
- From 2013-2015, African Americans accounted for 81.4% of all lowest-level misdemeanor marijuana possession arrests, even though surveys consistently show that Whites use marijuana as much or more than Blacks.[11]

In addition, in 2013 the BPD began operating daily crime suppression checkpoints, imposing a substantial and disproportionate financial burden on Buffalo's African American residents. In just two years following the implementation of daily Strike Force checkpoints, the BPD issued 25,000 more traffic tickets than the previous two years (2011-2012). The number grew from 40,761 to 65,862, a 62% increase.[12]

For the last decade, police officers have stopped and improperly arrested thousands of people without any objective reason to suspect them of wrongdoing. Further, instead of working to correct and remedy such misconduct, the City and elected officials have not only turned a blind eye to this abuse, failed to discipline officers, and actively resisted calls for increased community policing, but have, in fact, explicitly directed law enforcement officers to engage in systematic programs that routinely violate the constitutional rights of Buffalo's minority residents, increasing minority contact with the police and pulling more people into the justice system. This police culture assumes that people of color, and specifically African Americans are more likely to be involved in criminal activity because of their race and representation in crime data, in contravention of the Equal Protection. As a result, the presumption of fairness and innocence has been erased in these communities.

These discriminatory Broken Windows policing efforts have not just had a substantial toll on minorities and their constitutional safeguards throughout Buffalo, but they have also been ineffective and counterproductive. Not only has the murder rate continued to remain high, but these policies have also pushed higher rates of people of color, particularly youths, into the criminal justice system, often due to broad brush discriminatory policing tactics. For example, in 2014, when false trespass arrests and BPD checkpoints were growing, the City of Buffalo had the highest murder rate since 2004.[13] The rate at which the BPD has solved murders has not improved either. As of March 2015, the BPD had only cleared thirty-

---

[8] Erie County Juvenile Justice Profile: Data Sources. Arrest/Criminal Activity - NYS Division of Criminal Justice Services (DCJS), Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems JO Arrests - DCJS Computerized Criminal History (CCH) System.

[9] DCJS, Computerized Criminal History system.

[10] DCJS, Computerized Criminal History system.

[11] *Id.*

[12] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*, (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf); Buffalo Financial Stability Authority, *Agenda and Final 2016-2017 Adopted Budget*, at 81 (*available at* http://www.bfsa.state.ny.us/meetings2016/BoardBook/BoardBook0621.pdf); City of Buffalo (at 137) (available at https://www.ci.buffalo.ny.us/files/1_2_1/Comptroller/2015CAFR.pdf )

[13] http://www.city-data.com/crime/crime-Buffalo-New-York.html

3

nine percent of homicides over the previous five years.[14] Further, the murder clearance rate had been steadily dropping to just twenty-three percent in 2014.[15] More generally, only two out of every ten crimes is solved.[16]

The Attorney General's intervention and investigation is necessary because, despite years of studies and community efforts to address the substantial toll of unconstitutional and discriminatory policing, City, BPD and BMHA officials deny there is any problem and refuse to take any action to remedy these widespread illegal police tactics. For example, when, in 2014-2015, BMHA residents and advocates complained about the widespread false trespass arrests and constant harassment of African American youth and simultaneous underpolicing to the Mayor and Common Council in multiple meetings and requested that the Common Council terminate its contract with the BPD for services, the City refused. Instead, in 2016, the Common Council increased the amount it paid to the BPD HU for its services—from 660,000 to $1 million. The City of Buffalo is directly liable for these deep racial divides and police violence; City and BMHA officials could have listened to and acted upon residents' and advocacy organizations' persistent and serious concerns, as well as empirical reports of widespread unconstitutional policing issues with impunity, and heeded their urgent call for accountability.  Advocates offered proposals, which fell on deaf ears.

Recent tragic events in Buffalo highlight the critical importance and need for police accountability. The recent tragic deaths this year of two young men of color, Wardel Davis and Jose Hernandez-Rossy, at the hands of police, and the routine unjustified brutality stemming from disproportionate contact with communities of color, and absence of any responsibility, underscore the life-or-death consequences in failing to act on reform.  Over the past months following these incidents, Buffalo residents and advocates—worried about their sons, daughters, families, and neighbors—have come together to remind City and Police officials that "Black Lives Matter." While the response of people of color and allies have been inspirational, reaffirming, and proactive, with concrete changes proposed, the City, Common Council, BPD and its officials have responded with the same racially-biased narrative that blames the victims of police brutality for their death because of their past, even using false reports and evidence to absolve officers of any liability. Not only did government officials not express comfort or reach out to the families of these tragedies, the City retaliated against the family members of friends of the victims by subjecting them to harsh interrogations.

The City's policy response and narrative was the same and steeped in racial bias, with City officials ignoring their deaths, the deep constitutional issues raised, and even engaging in "blame the victim" character assassination and retaliation against the victims' families. In the Mayor's State of the City address just weeks after Mr. Davis' death, instead of expressing concern about the death, the need to investigate the situation, or addressing proposals for affirmative changes to the use of force and BPD's systematic accountability issues, the Mayor did not even mention Wardel's name. Rather, Mayor Brown announced that the City was increasing the BPD budget and adding two new police substations in gentrifying areas that were about to receive additional state Buffalo Billion funds for development. The only people who did raise concerns were dozens of community members protesting in and outside The State of The City. All the activists arrested have, for over a year, been to the Common Council to raise these issues, but their concerns have been ignored. In a police oversight meeting just two weeks before Wardel's death, community members and experts presented anecdotal and empirical evidence of the BPD's systemic policing problems and the distrust it has generated, along with comprehensive proposals. City officials minimized the time for presentations and ignored these proposals, clinging to the reasoning that there is no problem with policing in Buffalo because there have been no deaths—even today, after our community have lost two young men of color.

---

[14] Jim Heaney, *Council's slow motion response to murder crisis*, Investigative Post, March 11, 2015.
[15] *Id.*
[16] http://www.investigativepost.org/2016/03/14/real-state-of-the-city/

4

Unfortunately, BPD officers have only been held to account when residents file civil rights suits or the DOJ has intervened to investigate and bring federal criminal civil rights charges following a high profile, typically, videotaped incident of police misconduct. Further, each time local federal agencies would investigate officers following such incidents, investigators uncovered previous police misconduct, often similar in nature, by the very same officers they were investigating that had gone unpunished by the police officials—indicating a culture of officers acting with impunity.

The misconduct described herein is recent, not historical—although unfortunately it reflects the history of discrimination in Buffalo. This report is based on two years of interviews, and a review of court cases and BPD records. It documents how the human toll of the BPD's routine and pervasive stops without suspicion, and false arrests of Buffalo residents without any legitimate basis, is substantial, and exacerbates pre-existing inequalities in Buffalo. Accordingly, we hereby request the New York Attorney General's Office Civil Rights Division and Housing Unit conduct an investigation into the Buffalo, New York Police Department.

Sincerely,

/s/ Anjana Malhotra

_____

Anjana Malhotra, Associate Professor of Law
State University of Buffalo Law School
518 O'Brian Hall
Buffalo, NY 14260
P: 917-583-5849
E-mail: anjana.malhotra@gmail.com

/s/ Parker R. MacKay

_____

Parker R. MacKay, Esq.
3110 Delaware Ave.
Kenmore, NY 14217
P: 716-803-8166
E-mail: parker@mackaylawoffice.com

Attorneys for Black Lives Matter-Buffalo

5



**SUNY Buffalo Law School**

*The State University of New York*

**Unchecked Authority without Accountability in Buffalo, New York:**
**The Buffalo Police Department's Widespread Pattern and Practice of Unconstitutional**
**Discriminatory Policing, and the Human, Social and Economic Costs**

**August 30, 2017**
Submitted to the New York State Attorney General
Office of Civil Rights On Behalf of Black Lives Matter-Buffalo

Anjana Malhotra, Associate Professor of Law
State University of Buffalo Law School
518 John Lord O'Brian Hall, Buffalo, NY 14260-1100
Tel: (917) 583-5849 ⌁ anjana.malhotra@gmail.com

1

## Executive Summary and Key Findings

**"The officer's first question is, typically, "What are you doing out here? Wrong place, wrong neighborhood, wrong time. [Race-based stops] happens to so many people."[1]**

-       Former Buffalo Police Department commissioner H. McCarthy Gipson, who is African American, describing his experiences for being pulled over in Buffalo for "driving while black"

-       **"Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited."** — United States v. Broomfield, 417 F.3d 654, 655 (7th Cir. 2005) (Posner, J.)

Over at least the last ten years, the City of Buffalo's law enforcement practices have prioritized revenue and a racialized urban renewal initiative over the public safety needs and constitutional rights of its residents, and the African American and racial minority communities in particular. The City's leadership and the Buffalo Police Department's emphasis on "cleaning up" Buffalo through a Broken Windows, Zero Tolerance policing policy since 2006 to "make the safer City for new residents" and raise revenue for the city.[2] This program focused first on aggressive low-level misdemeanor and then around 2012 intensified enforcement of traffic laws disproportionately, and almost only, in the neighborhoods and public housing developments of communities of color – fueling growing racial disparities in traffic and discretionary misdemeanor arrests the criminal justice system.

With the announcement of the Buffalo Billion[3] , in 2012 and a new "urban renewal" period, Mayor Byron Brown, BPD Commissioner Derenda and BMHA officials designed and implemented new systemic unconstitutional policing tactics, including suspicionless checkpoints for the express unconstitutional purpose of crime suppression[4] and suspicionless trespass sweeps, almost exclusively in minority neighborhoods and in and around predominantly minority public housing developments it has sought to develop with private developers.

- By 2014, African American youth were 5 times more likely to be arrested, compared to 4.25 in 2010 under the federally calculated minority disproportionate contact rate, and 14.3 times more likely to be detained than similarly-situated Whites, compared to 10.6 in 2010).[5]
- During the implementation of BPD's Zero Tolerance policing, between 2006 and 2015, African Americans in Buffalo were **seven times more likely to be arrested than Whites for misdemeanor marijuana possession,** up from 4 from 1996-2005.[6] Similarly, Latinos, who had approximately the same arrest rate as Whites from 1996-2005, are now more than twice as likely to be arrested for lowest level misdemeanor marijuana possession.[7]

---

[1] Ilene Fleischmann, *Expert's analysis highlights 'Stop and Frisk' Forum*, UB Reporter (March 27, 2014), available at http://www.buffalo.edu/ubreporter/campus.host.html/content/shared/university/news/ub-reporter-articles/stories/2014/March/stop_frisk.detail.html#sthash.Xgr3syjSt.dpuf

[2] "Buffalo Fights Crime," Nayor Byron Brown, Moving Buffalo Forward: Policy Briefs from the Brown Administration: Vol. 1.2, June 2007, available at https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/BuffaloFightsCrime.pdf . While the study period for this complaint dates is from January 1, 2013, this context is paramount to understand the current unconstitutional practices as several of the practices and programmatic violations here date back to 2006

[3] New York State, *Buffalo Billion* (available at buffalobillion.ny.gov ); NYS Governor's Office, *Governor Cuomo Presented with Buffalo Billion Investment Development Plan*, (Dec 4. 2012) (available at https://www.governor.ny.gov/news/governor-cuomo-presented-buffalo-billion-investment-development-plan ) *See also* http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2012/01/04/new-york-state-of-the-state-address-2012 )

[4]

[5] Erie County Juvenile Justice Profile: Data Sources. Arrest/Criminal Activity - NYS Division of Criminal Justice Services (DCJS), Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems JO Arrests - DCJS Computerized Criminal History (CCH) System.

[6] DCJS, Computerized Criminal History system.

[7] *Id.*

2

- Since 2012, while overall arrests fell during this period, tickets surged following the BPD's implementation of daily crime suppression checkpoints in minority neighborhoods in 2013, imposing a substantial and disproportionate financial burden on Buffalo's African American residents. In just two years following the implementation of daily Strike Force checkpoints, the BPD issued 25,000 more traffic tickets than the previous two years (2011-2012) prior to the implementation of checkpoints. The number grew from 40,761 to 65,862, a 62% increase.[8] For many, this has exacerbated financial racial inequalities through substantial tickets, towing costs, fines and fees, thereby cementing a cycle of poverty. Public defenders report that in some courts, 85% of their criminal docket is traffic-related cases.

 The BPD's conduct has compromised the institutional character of Buffalo's police department, lead to distrust and has contributed to a pattern or practice of unconstitutional policing that has had profound and unnecessary harm to Buffalo's residents.

These policies have meant that, for the last decade, police officers have stopped and improperly arrested thousands of innocent people without any objective reason to suspect them of wrongdoing. The City and elected officials have not only turned a blind eye to this abuse by failing to discipline officers and actively resisting calls for increased community policing, but have, in fact, explicitly designed and directed law enforcement officers to engage in systematic programs that routinely violate the constitutional rights of Buffalo residents, particularly minorities. In minority communities throughout Buffalo, the BPD has stopped thousands of people while walking and driving through systematic and individual discriminatory policies— not because of any evidence of criminal activity. Both the City's and BMHA's policies and individual conduct of Buffalo law enforcement officers has led to a culture that policing is predicated on the assumption that minorities are more likely to be involved in criminal activity because of their race and representation in crime data.  As a result, the presumptions of fairness and innocence have been erased in these communities.

In light of these systemic problems, and the vested interests of the largely white-lead non-profit community in Buffalo that have been largely resistant to structural change, in 2015, the University of Buffalo Law School Human Rights Clinic undertook this investigation to document BPD's practices, and was eventually joined by faculty and students in the Cornell Law School Clinical program under the supervision of Associate Professor Anjana Malhotra and Cornell Law Professors Gerald Torres and Beth Lyon. This report is the culmination of our findings, and documents how the BPD has engaged in a pattern and practice of conduct that violates the U.S. Constitution or federal law, as well the Constitution and laws of New York State. Specifically, we found that the BPD engages in a pattern or practice of:

1) making unconstitutional stops, searches, and arrests;

2) using racially-targeted enforcement strategies that produce severe and unjustified disparities in the rates of stops, searches and arrests of African Americans, Latinos and racial minorities in Buffalo, driven at least in part by racial bias;

3) excessive use of force, particularly against individuals of color; and

4) retaliating against people engaging in constitutionally protected expression and lack of redress.

This pattern or practice is driven by prioritization of policing policies on revenue and a racialized "urban renewal" campaign, as well as clear and systematic deficiencies in BPD's policies, supervision and accountability

---

[8] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*, (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf)*;* Buffalo Financial Stability Authority, *Agenda and Final 2016-2017 Adopted Budget*,  at 81 (*available at* http://www.bfsa.state.ny.us/meetings2016/BoardBook/BoardBook0621.pdf)*;* City of Buffalo (at 137) (available at https://www.ci.buffalo.ny.us/files/1_2_1/Comptroller/2015CAFR.pdf )

structures that both direct and allow officers to use policing strategies in violation of fundamental constitutional guarantees with impunity. The BPD and City fail to provide officers with policing directives within the strictures of the constitution and fail to hold officers accountable for misconduct.

As a result of these practices, community members perceive the Buffalo Police Department as overly aggressive, unresponsive, out of touch with the community, and able to act with impunity for disregarding the rights of Buffalo's communities of color. The City's policing policies essentially criminalize a whole race and community of people just for going to work, the grocery store, or visiting relatives, . These practices have left innocent Buffalo residents distrustful of the police, unsure whether an encounter with them will lead to them being "protected and served" or beaten and arrested without basis. Based on our interviews and independent surveys and reports, community members agree that the BPD has significant problems that have undermined its efforts to police constitutionally and effectively, leading to a profound lack of trust between the police and community members.

The absence of accountability has reached crisis-level proportions in Buffalo. Just this year, two men of color have been killed, and countless others brutally beaten, as a matter of course. Instead of expressing concern for these individuals and their friends or family, the City has deflected any responsibility by defending its officers with patently false information and narratives about these individuals . Instead of disciplining the officers, the City allows them to continue working with full pay—putting others in full danger. Instead of providing comfort to the victim's loved ones, the police has interrogated them and retaliated against them as if they are the suspects. Due to the City's continued protection of its police officers, the BPD is no longer protecting the public, particularly minority residents.

Further, Buffalo's policing practices both reflect and exacerbate existing racial bias, including the BPD's routine, systematic use of racial stereotypes associating racial minorities with criminality in violation of the Fourteenth Amendment.  Buffalo's own data establishes that clear racial disparities adversely impact African Americans and Latinos. The BPD's new systematic unconstitutional programs in predominantly minority neighborhoods lead to sharp increases racial disparities in the criminal justice system as Buffalo launched its Buffalo Billion, and private, investments.  As Buffalo has increasingly stepped up its Zero Tolerance policies, Buffalo's own data establishes clear and sharply increasing racial disparities that adversely impact Buffalo's African American, Latino and minority residents, and particularly Buffalo's youth in the last ten years— substantially increasing minority contact with the police, and bringing in more residents of color into the criminal justice system.  The evidence below further shows that the City acted with discriminatory intent in directing and implementing these Zero Tolerance policing programs disproportionately in communities of color directly contributed to these growing disparities, particularly for Buffalo's minority youth.

Currently, the BPD disproportionately arrests African-Americans, and disproportionately young, in relation to their representation in the community. Racial disparities in BPD arrests have discretionary arrests have increased over time--even for crimes committed at similar rates by Whites and African Americans. BPD disproportionately arrests African Americans. Data collected by the Buffalo Police Department from 2013 to 2015 shows that African Americans accounted for 52.06% (11,975) of all 22,648 misdemeanor arrests made by BPD officers, despite comprising only 38% of Buffalo's population. [9] As of the 2014 American Community

---

[9] DCJS, Adult Arrests Reported by Buffalo City PD, DCJS Computerized Criminal History system (as of 4/21/2016).

Survey, Buffalo has a population of 258,699, 55% of which are people of color.[10] Thirty seven percent of the population in the City of Buffalo is African American, 10.5% is Hispanics, while 47% is white. [1112]

- **The racial disparities for youth are even steeper than adult arrests**: of BPD arrests of African American youth ages 16-17 accounted for 68.8%, or 721, of the 1,048 16-17 year olds arrested for misdemeanors by BPD officers, while Whites comprised only 15.8% of arrests. [13]
- The average arrest rate during the study period was also higher for African American youth than whites, and significantly higher than for adults: African American 16-17 year olds arrest rates *stand* at 70.74/10,000, more than twice the rate of whites (29.31). [14] Controlling for population, the BPD misdemeanor arrest rate from 2013-2015 for African Americans (44/10,000) was almost twice as high as whites (25/10,000). [15]
- Overall, African American youth under 16 comprised 75% of all arrests BPD made of children under 16 ("juvenile arrests") from 2013 to 2015. From 2013-2015, the BPD arrested 2,242 African American children under 16, out of a total of 2,980 juvenile arrests, while only 702 arrests of whites under 16.[16] Despite comprising 42% of the population, 84% of all Youth Offender arrests made by the BPD were racial minorities. 71% of all Youth Offenders were African American—nearly double the population.[17]
  From 2013-2015 African Americans accounted for 81.4% of all low-level misdemeanor marijuana possession arrests from 2013-2015;[18] of the 1562 people BPD arrested for the low level marijuana misdemeanor offenses during the study period, 1,271, were African American, while only 12%, or 191 were White.[19]

---

[10] G. Scott Thomas, *Minority groups account for 55% of Buffalo's residents, says new federal report*, Buffalo Business First (Sept 22, 2015) (*available at* https://www.bizjournals.com/buffalo/blog/morning_roundup/2015/09/minority-groups-account-for-55-of-buffalo-s.html). As of 2016, Buffalo had a total population of 256,902. United States Census Bureau, State & County Quickfacts: Buffalo (city), New York, *available at* https://www.census.gov/quickfacts/fact/table/buffalocitynewyork/PST045216

[11] Tracey Ross, *Health Equity: The Path to Inclusive Prosperity in Buffalo* (summary), PolicyLink, at 18 (May 2017) (*available at* https://ppgbuffalo.org/files/documents/health/health_disparities/health_health_equity_the_path_to_inclusive_prosperity_in_buffalo.pdf ).

[12] *Id*. Note, the African American population declined for the first time in Buffalo's history in the 2010 census and has continued to decline. In 2010 just over 45% (45.8) of the population is white, while 38.6% wasAfrican American, and 10.5% Hispanic or Latino. *Id*. According to the 2014 Community Survey, 115,697 (44.7 percent) of residents are white, 93,464 (36.1 percent) are Black, 27,708 (10.7 percent) are Hispanic, 14,554 (5.6 percent) are Asian, including Pacific Islanders, 5,178 (2.0 percent) are multiracial, 1,099 (0.4 percent) are Native American, and 999 (0.4 percent) are some other race.G. Scott Thomas, *Minority groups account for 55% of Buffalo's residents, says new federal report*, Buffalo Business First (Sept 22, 2015) (*available at* https://www.bizjournals.com/buffalo/blog/morning_roundup/2015/09/minority-groups-account-for-55-of-buffalo-s.html).

[13] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[14] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[15] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[16] DCJS, Uniform Crime/Incident-Based Reporting system (as of 5/2/2016)

[17] Youth Offender status is available, as per Article 720 of the Criminal Procedure Law, following the conviction of youth under 15, of Juvenile Offenders, and of 16-18 year-olds for misdemeanors and most felony offenses. Only 4% of those eligible were granted YO status in Buffalo.

[18] DCJS, Computerized Criminal History system.

[19] DCJS, Computerized Criminal History system. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )

**Table 1: Buffalo Police Department Misdemeanor arrests Rates: 2013-2015**

|  | Whites | African Americans |
|---|---|---|
| Population in Buffalo | 48.6% | 38% |
| Adult Misdemeanor Arrest Rate[20] | 25/10,000 | 44/10,000 |
| BPD arrests of 16-17 years old youth [21] | 29.31/10,000 | 70.74/10,000 |
| Adult Misdemeanor Arrests [22] |  | 52.06% (11,975) |
| **BPD Arrests of Youth ages 16-17** | 15.8% | **68.8% 721** |
| **BPD Arrests of Children under 16[23]** | 12.2% 702 | 75% 2,242 |
| BPD Marijuana Misdemeanor Arrests[24] | 12% 191 | 81.4% 1,562 |

---

[20] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[21] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[22] DCJS, Adult Arrests Reported by Buffalo City PD, DCJS Computerized Criminal History system (as of 4/21/2016).

[23] *Id.*; DCJS, Uniform Crime/Incident-Based Reporting system (as of 5/2/2016).

[24] DCJS, Computerized Criminal History system. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )

**Increases over time**

Racial disparities in federally calculated disproportionate minority contact rate and detention rate, which controls for crime, have increased over time.

- In 2014, African American youth aged 7-15 were 5.04 more times as likely to be arrested than similarly-situated Whites, increasing from 4.25 in 2010, and 14.3 times more likely to be detained than Whites (up from 10.6 in 2010). [25]

- Despite consistent surveys showing similar marijuana use rates by Whites, **African Americans in Buffalo were <u>seven times more likely to be arrested by for misdemeanor marijuana possession in the last ten years (2006-2015), compared to only four times as likely to be arrested as Whites in the ten years prior to Mayor Brown's election and launch of Buffalo's Zero Tolerance Plan (1996-2005).</u>** [26] Similarly, Latinos, who had approximately the same arrest rate as Whites from 1996-2005, are now more than twice as likely to be arrested for low level misdemeanor marijuana possession since Brown was elected (2006-2015). [27]

  - The numbers are staggering: since the City implemented its Broken Windows policing tactics under Mayor Brown in 2006, BPD arrested 4,501 African Americans for lowest-level misdemeanor offenses--almost double the 2,341 arrested in the previous ten years, while tripling the arrests of Hispanics during this period from 105 to 349. In contrast, the number of BPD arrests of Whites for marijuana misdemeanors decreased from 792 during 1996 to 2005 to 786 during 2006 to 2016 . [28]

As the table below demonstrates, almost immediately in 2006, the number of lowest-level marijuana possession arrests began to decline for whites while increasing for Blacks.

---

[25] Erie County Juvenile Justice Profile: Data Sources. Arrest/Criminal Activity - NYS Division of Criminal Justice Services (DCJS), Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems. JO Arrests - DCJS Computerized Criminal History (CCH) System. The City of Buffalo is located within Erie County, which is the largest county outside of the New York City area, with a population of 919,040. Approximately 80% of Erie County's African American population lives within the City of Buffalo.

[26] DCJS, Computerized Criminal History system.

[27] DCJS, Computerized Criminal History system.

[28] DCJS, Computerized Criminal History system.

7

Table 2: Yearly arrests for lowest-level marijuana possession by race-1977-2015



Table 3: Lowest-level Marijuana Misdemeanor Arrests 2013-2015, by Race



8

**0013**

These discriminatory Broken Windows policing efforts have not just had a substantial toll on minorities and their constitutional safeguards as they walk, live and travel throughout Buffalo, but they have also been ineffective and counterproductive. Not only has the murder rate continued to remain high, but these policies have also pushed higher rates of people of color, particularly youths, into the criminal justice system, often due to broad brush discriminatory policing tactics. For example, in 2014, when false trespass arrests and BPD checkpoints were growing, the City of Buffalo had the highest murder rate since 2004.[29] The rate at which the BPD has solved murders has not improved either. As of March 2015, the BPD had only cleared thirty-nine percent of homicides over the previous five years.[30] Further, the murder clearance rate had been steadily dropping to just twenty-three percent in 2014.[31] More generally, only two out of every ten crimes is solved.[32] While violent and property crime have fallen in Buffalo at the same rate as the rest of the nation,  the murder rate climbed in 2014 at the peak of its implementation of systematic suspicionless checkpoints and trespass cases, suggesting that Buffalo is distracting much needed resources for actual policing. Further, residents of color have consistently complained that the BPD is unresponsive when they call—even in the Commodore Perry Housing Project, where the BPD HU and Operation Strikeforce officers are located.

At the same time, multiple surveys and our interviews have found that minorities consistently report negative interactions to the police and that these policing tactics have undermined trust A recent survey of 2,000 residents found that while 74 percent of respondents said they respect the police, 57 percent of people polled feel that police do not respect people of color and half of respondents said they feel police do not respect young people.[33] Only 30 percent of black residents said the police works well with their neighborhood, compared to 82 percent of white residents.  Further, only 44 percent said they trust the police enough to call them in an emergency. According to Buffalo State Professor Steve Peraza, who co-authored the report, fear of contacting the police is partly attributable to largely negative interactions many residents have with police. He found that '[a] significant part of the community does not trust the police department because they only encounter them in enforcement circumstances. .. Until we can get the community to feel like the police is not just targeting them, the relationship will remain the way it is. That's kind of why we're tempting a Ferguson."[34]

The City and police departments stated interest in "public order" for minority residents is further belied not just by ineffective policing tactics that systematically disregard the dignity--and fundamental constitutional rights of Buffalo's residents of color, but also by examining how the City, working with the state, has followed its historical discriminatory investment and displacement patterns by directing the billions of dollars of "urban renewal" funds to benefit white communities and financial interests, while neglecting communities of color that need it most; 40% of African Americans, and 46% of Latinos in Buffalo live at our below the poverty level—twice the level of whites, and face similar stark disparities in unemployment (add numbers) . Like the City's policing patterns, these investment patterns have not just failed to benefit Buffalo's residents of color but as in Buffalo's history, is at the expense and high toll to the African American community.

**Urban Renewal, Intensification of Systematic, Unconstitutional Broken Windows Policing**

---

[29] http://www.city-data.com/crime/crime-Buffalo-New-York.html

[30] Jim Heaney, *Council's slow motion response to murder crisis*, Investigative Post, March 11, 2015.

[31] *Id.*

[32] http://www.investigativepost.org/2016/03/14/real-state-of-the-city/

[33] https://openbuffalo.org/files/documents/cp_report_final.pdf

[34] Daniela Porat, *Tempting a Ferguson in Buffalo*, Investigative Post (Oct. 31, 2016) (available at http://www.investigativepost.org/2016/10/31/tempting-ferguson-buffalo/ )

In January 2012, Governor Cuomo committed one billion dollars of funding to Buffalo in his annual State of the State address. Over the next decade, and especially after "urban renewal" became front and center in Buffalo with the State's announcement of the "Buffalo Billion" plan, City officials ((the BPD and BMHA included) not only intensified discriminatory policing tactics, but initiated new systematic unconstitutional tactics targeting minorities and their communities, including suspicion-less trespass sweeps and checkpoints targeting minority communities and housing projects. The City of Buffalo has a long history of racial discrimination and displacement of people of color in the name of "progress," with that progress often translating into progress only for whites. As many have documented, in terms of distribution, the Buffalo Billion has been no different.[35] At the direction of the highest city officials, the BPD has been on the frontlines of this racialized renewal agenda through highly destructive and patently unconstitutional programs targeting the City's minority neighborhoods. The resulting serious human costs have increased racial disparities throughout the criminal justice system, cutting off the lives of people of color.

*Operation Strike Force Checkpoints*

In June 2012, the City announced the launch of the BPD "Strike Force Unit"[36] as a "pilot program,"[37] to target gangs and drug operations.[38]  A central policing tactic Strike Force adopted was vehicle checkpoints to target minority communities for the express purpose of crime control.  Despite the U.S. Supreme Court's clear rule that vehicle checkpoints for the primary purpose of general crime deterrence are *per se* unconstitutional, BPD Commissioner Derenda and Mayor Brown made clear that the primary purpose of the checkpoints was general crime suppression, guns, drugs, and "surprising the criminal element.[39] By 2013, the City made the Strike Force Unit permanent,[40] and conducted these *per se* unconstitutional checkpoints every day for the express purpose of fighting crime every day in predominantly minority communities.[41] According to BPD Commissioner Derenda, by January 2014 "Strike Force officers are conducting daily roadblocks" for the purpose of "surprising the criminal element."[42]

The cost of these illegal checkpoints was substantial, and borne primarily and disproportionately by African American and Latino residents – exacerbating pre-existing income (Whites make twice as much as African Americans, a gap which is increasing), poverty measures and job access opportunities.

Although arrests leveled, in the two years following the implementation of daily Strike Force checkpoints (2013-2014), the BPD issued more than 25,000 more traffic tickets than the previous two years (2011-2012). The

---

[35] Jim Heaney, *Buffalo Recovery a Tale of Two* Cities, Investigative Post, June 18, 2016) (available at http://www.investigativepost.org/2014/06/18/buffalo-recovery-tale-two-cities/)

[36] Andrew Wheeler and Scott Phillips, *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY*, at 1 (May 17, 2016). (available at http://ssrn.com/abstract=2781126) ("New locations were chosen on a daily basis over a two month period in 2013, and the intervention was referred to as Operation Strikeforce.").

[37] https://www.bpdny.org/files/1_2_1/Mayor/CitiStat/NewCitiStatPresentation_revised.pdf

[38] *WBFO Newsroom*, *Police "Strike Force" begins patrols Monday*, WBFO (June 11, 2012) (available here http://news.wbfo.org/post/police-strike-force-begins-patrols-monday).

[39] According to Commissioner Derenda "Strike Force officers are conducting daily roadblocks" for the purpose of Lou Michel, *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

[40] Mike Desmond, Joint Police Effort Targets City Crime, WBFO (July 17, 2013) (available at http://news.wbfo.org/post/joint-police-effort-targets-city-crime).

[41] Lou Michel,  *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

[42] Lou Michel,  *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

10

number had grown from 40,761 to 65,862, representing a staggering 62% increase in tickets.[43] These checkpoints were primarily in minority neighborhoods.

- For example, in only two months, from April and May of 2013, the Buffalo Strike Force officers issued over 6,000 traffic tickets, and made a number of arrests for outstanding warrants, and confiscated "several firearms and vehicles."[44] They conducted 67 roadblocks in 46 different locations; all but two of which were in minority neighborhoods.[45] During this period, the BPD made clear that all checkpoints "primary goal was to deter crime and disorder."[46]

---

[43] Buffalo Financial Stability Authority, *Annuaal Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*, (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf); Buffalo Financial Stability Authority, *Agenda and Final 2016-2017 Adopted Budget*, at 81 (*available at* http://www.bfsa.state.ny.us/meetings2016/BoardBook/BoardBook0621.pdf); City of Buffalo (at 137) (available at https://www.ci.buffalo.ny.us/files/1_2_1/Comptroller/2015CAFR.pdf )

[44] Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[45] Eleven of the locations were targeted at least twice over the two month study period, and three locations were targeted four separate times. Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[46] Wheeler, Andrew Palmer and Phillips, Scott W., *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY* (May 17, 2016). (available at http://ssrn.com/abstract=2781126). Note that the Strike Force roadblocks examined in the study largely had similar features to routine BPD roadblocks documented in cases and reports but varied from standard procedures in that officers in the study relied only on automated license plate readers (APLR) to determine who to detain. That is, the study-group Strike Force officers stopped vehicles only if they were flagged by the ALPR either in the roadblock or in surrounding streets (to detect vehicles attempting to evade the checkpoint) if they are "associated with warrants or having a revoked license (for the owner of the vehicle), or if the vehicle itself was stolen;" the study-roadblocks are designed to slow cars down so officers can conduct an APLR analysis either within the roadblock or in surrounding streets. *Id.* at 3-4. If there is no APLR hit, the car is waived on with no further interaction.

11

Figure 1: Roadblock locations in Buffalo, NY



Our analysis of BPD tickets issued revealed that the increase in tickets was not fueled by safety considerations—while tickets for DWIs fell. Following the implementation of daily checkpoints, the BPD tripled the number of tickets it issued for tinted window violations tripled, from 400 in 2011-2012 to 1,358 in 2013-2014. In 2013-2014, the BPD's 1,358 tinted windows-related tickets and arrests comprised 22.2% of all BPD's tickets and violations, compared to 10.6 % of all BPD tinted-window related offenses in the two years prior to the daily checkpoints[47]-- even though in 2014, tinted-windows was among the lowest reasons for accidents; of 254,829 accidents in New York State, only 32 were caused by tinted windows.[48]

**In contrast, BPD tickets for genuine safety-related violations that cause fatal or serious vehicle crashes[49]. fell during this period.** In the two years following daily checkpoints:

- **BPD Driving While Intoxicated tickets and arrests dropped 10.3% following the daily checkpoints even though Erie County experiences approximately 16.2 DWI deaths per year.** [50] The BPD made 416 DWI arrests from 2011-2012, compared to 373 arrests for DWI in 2013-2014. Notably, a disproportionate number of whites are arrested for DWIs; although comprising 47.5% of the population, whites comprised 54.5% of all DWI offenses from 2013-2014.
- The BPD's issued 23% <u>less</u> tickets for vehicles passing a red signal in the two years following BPD's daily Strikeforce checkpoints, falling from 91-50,[51] even though overall, in New York State 10,370 ,or 4% of all accidents in 2013 were caused by individuals disregarding traffic controls, resulting in 74 fatalities and 6,240 personal injuries. [52]
- The number of BPD tickets and arrests for operating mobile phones also fell by  35% between 2014 and 2011; falling from 101 tickets from 2011-2012 to 76 in 2013-2014. [53] As of 2014, there were more 708 cell phone-related accidents, resulting in 3 fatalties and 318 personally injured. [54] BPD also issued less tickets and made less arrests for criminal investigatory tickets, falling from 30 arrests and tickets for leaving the scene of an accident in 2011-2012 to 17 in 2013-2014.[55]

---

[47] New York State Department of Motor Vehicles, *Traffic Tickets Issued: Four Year Window, 2011-2014* (filtered for Buffalo Police Department only. (*available at* https://data.ny.gov/Transportation/Traffic-Tickets-Issued-Four-Year-Window/q4hy-kbtf ).

[48] New York State Department of Motor Vehicles,  *Summary of Motor Vehicle Crashes, 2014 Statistical Summary* at 4
 (*available at https://dmv.ny.gov/statistic/2014-nyscrashsummary.pdf ).*

[49] New York State Department of Motor Vehicles, *Summary of Motor Vehicle Ceashes, Summary of Motor Vehicle Crashes,* at 4
(*available at* https://dmv.ny.gov/statistic/2014-nyscrashsummary.pdf )

[50] NAACP Report (https://www.scribd.com/document/342186194/Upstate-Transit-Landscape-and-The-Need-For-Ridesharing ) (citing

http://www.syracuse.com/politics/index.ssf/2015/06/new_york_state_dwi_deaths_by_county_who_has_the_most_fatalities.html )

[51] New York State Department of Motor Vehicles, *Traffic Tickets Issued: Four Year Window, 2011-2014* (filtered for Buffalo Police Department only. (*available at* https://data.ny.gov/Transportation/Traffic-Tickets-Issued-Four-Year-Window/q4hy-kbtf ).

[52] New York State Department of Motor Vehicles,  *Summary of Motor Vehicle Crashes, 2014 Statistical Summary* at 4
 (*available at https://dmv.ny.gov/statistic/2014-nyscrashsummary.pdf ).*

[53] New York State Department of Motor Vehicles, *Traffic Tickets Issued: Four Year Window, 2011-2014* (filtered for Buffalo Police Department only. (*available at* https://data.ny.gov/Transportation/Traffic-Tickets-Issued-Four-Year-Window/q4hy-kbtf ).

[54] New York State Department of Motor Vehicles,  *Summary of Motor Vehicle Crashes, 2014 Statistical Summary* at 4
 (*available at https://dmv.ny.gov/statistic/2014-nyscrashsummary.pdf* ). This figure includes accidents attributed to hand held and hands free cell phone use and texting.

[55] New York State Department of Motor Vehicles,  *Summary of Motor Vehicle Crashes, 2014 Statistical Summary* at 4
 (*available at https://dmv.ny.gov/statistic/2014-nyscrashsummary.pdf* ). This figure includes accidents attributed to hand held and hands free cell phone use and texting.

13

**Financial burden: Consequences**

These checkpoints are situated to target largely only minority residents going into their neighborhoods; Buffalo is the nation's sixth most segregated city, and is considered a hypersegregated city and has one of the highest dissimilarity indexes in the country.[56] The majority of Buffalo's African American population lives on the "East Side," which is East of Main Street, which is where almost all of the checkpoints are located.[57] For many, this has exacerbated financial racial inequalities through substantial tickets, towing costs, fines and fees, thereby by cementing a cycle of poverty.

- The number of people with suspended licences grew by 58% in the two years following BPD's implementation of the checkpoint program. From 2013-2014, the BPD increased the number of tickets and arrests it issued for revoked, suspended and other licence violations by 58% compared to two years prior.[58] From 2011-2012, the BPD issued 783 such violations, compared to 1,240 from 2013-2014, when BPD daily roadblock program were implemented daily.
  - According to the DMV data, there are currently 2,745 suspended licences for cars registered to Buffalo as of earlier this year.[59]
  - Since Buffalo assumed authority over ticket adjudication in July 1, 2015, from that date to Feb. 2016, the BTVA has already moved to suspend the licenses of 4,400 drivers.[60]

These checkpoints exact a serious financial and psychological toll on African American and people of color, who already make half as much as whites in this region; and as African Americans are more than twice as likely to be in poverty. Public defenders report that in some courts, 85% of their criminal docket is traffic-related cases.

  - The City's revenue from towing grew by five times, or $7 million dollars 2006-2008, between the first three years of Zero Tolerance campaign, 2006-2008, and 2013-2015--from $1.44 million in to $8.39 million from 2013-2015.
  - According to Parking Commissioner Kevin Helfer, the City's revenue from its impound lot has more than doubled from 2012- 2013 due to the Strike Force initiative.[61] In 2013, revenue at the lots was $1.1 million, up from $461,724 the year before. According to Helfer, "the city's Strike Force initiative, which also began in 2012 and cracks down all types of crimes, is responsible for nearly all of that increase." [62]

The financial burden that people of color suffer from these crime suppression checkpoints is especially heavy given: not only do African American and Latinos in the Buffalo region suffer twice the poverty rate and

---

[56] http://buffalonews.com/2015/07/08/tackling-the-regions-racial-divide/

[57] University at Buffalo Regional Institute's '*A Community Report- City Of Buffalo (East Of Main Street)*' (February 2014) available at http://regional-institute.buffalo.edu/wp-content/uploads/sites/3/2014/06/Strengthening-WNYs-Safety-Net-Buffalo-East.pdf at

[58] Available at https://data.ny.gov/Transportation/Vehicle-Snowmobile-and-Boat-Registrations/w4pv-hbkt ) ("This dataset contains the file of vehicle, snowmobile and boat registrations in NYS. Registrations expired more than 2 years are excluded. Records that have a scofflaw, revocation and/or suspension are included with indicators specifying those kinds of records.")

[59] Available at https://data.ny.gov/Transportation/Vehicle-Snowmobile-and-Boat-Registrations/w4pv-hbkt ) ("This dataset contains the file of vehicle, snowmobile and boat registrations in NYS. Registrations expired more than 2 years are excluded. Records that have a scofflaw, revocation and/or suspension are included with indicators specifying those kinds of records.")

[60] Matthew Spina, *Behind Buffalo's Rise in Traffic Tickets*, The Buffalo News, Feb. 6, 2016 (*available at* http://www.buffalonews.com/city-region/behind-buffalos-dramatic-rise-in-traffic-tickets-20160206 *);*

[61] http://buffalonews.com/2013/08/11/allegations-of-police-shakedowns-add-to-buffalos-tow-truck-wars/

[62] http://buffalonews.com/2013/08/11/allegations-of-police-shakedowns-add-to-buffalos-tow-truck-wars/

14

half the median income as whites, but these disparities have been accelerating, despite substantial public and private investment in Buffalo.  According to the 2017 Urban Institute's annual State of Black America report, the white median household income in the Buffalo region rose from $55,822 to $58,998, while the African American median household income fell from $28,976 in 2016 to $26,936 in 2017[63]. As a result, Buffalo fell to the 6th most racially unequal region in the in the nation for the black-white income disparity, falling from 46th in the nation to 66. The racial disparity in child poverty is even larger with child poverty. Buffalo also has the third highest child poverty rate among American cities. with almost half of Buffalo's children living under the poverty rate (47.6%)[64] Despite substantial state and private investments, in Buffalo the racial inequality unemployment index from the 27th "most equal" region America last year to 57.  White unemployment rates fell from 5.2% to 4.2%, while Black unemployment remained stagnant at 11.2%. [65] As a result, the Black-White Inequality Index in the region fell from 46.4% to 37.5%--about half of the national average.


The level of racially concentrated poverty has also increased over time. The overall concentration of African-American poverty in the Buffalo-Niagara Falls metro area jumped about 16 percent from 2000 to 2013; in 2000, it was 30.8 percent and in 2013 it was 46.4 percent. For Hispanics, concentrated poverty rose from 39.4 percent to nearly 41.6 percent.[66]The City of Buffalo also has one of the nations the highest concentration of minorities who live in poverty, with some minority neighborhoods with poverty rates of 60-80 percent – nearly double the rate of neighborhoods in 2000. [67] On the East Side, where 90% of the African American residents in Erie County live, people of color are 30% more likely to live at 0-138% of the federal poverty line than whites. Whites are also more likely to own a home; 57% of whites are homeowners, compared to people of color whose home ownership rate is 37%.[68]

### BPD Housing Unit Unconstitutional Trespass Sweeps

Similarly, beginning in 2013, the BPD Housing Unit, comprised of twenty-one officers assigned to provide policing to BMHA residents within Buffalo, also began conducting suspicionless checkpoints, sometimes jointly with Strike Force, as well as suspicionless trespass stops and related "sweeps" in and around predominantly minority BMHA buildings. The BPD Housing Unit conducted these unconstitutional checkpoints, false trespass arrests and trespass sweeps with no reasonable suspicion in predominantly African American and minority public housing projects.[69] In 2015, a court found the BPD Housing Unit's suspicionless trespass sweeps and stops unconstitutional. And by 2014, BMHA trespass arrests were "mostly all getting dismissed" by judges for violating Fourth Amendment rights.[70] Further, a court also held a March 2015 BPD Housing Unit checkpoint

---

[63] Urban League, *State of Black America Report* at 21  (available at http://soba.iamempowered.com/sites/soba.iamempowered.com/themes/soba/pdf/SOBA2017-black-white-index.pdf) . These figures are based on an assessment of the Buffalo metropolitan area, which includes Buffalo-Cheektowaga-Niagara Falls, NY.
[64] G. Scott Thomas, *Poverty rate for Buffalo children approaches 50%, the third-worst mark among major cities*, Buffalo Business First (June 25, 2015) (available at https://www.bizjournals.com/buffalo/news/2015/06/24/childpoverty1.html).
[65] Urban League, *State of Black America Report* at 21  (available at http://soba.iamempowered.com/sites/soba.iamempowered.com/themes/soba/pdf/SOBA2017-black-white-index.pdf) . These figures are based on an assessment of the Buffalo metropolitan area, which includes Buffalo-Cheektowaga-Niagara Falls, NY.
[66] Callan Gray, *New study shows Buffalo has one of the highest minority poverty rates*, WIVB, Channel 4 (Sept. 7, 2015) (available at http://wivb.com/2015/09/07/new-study-shows-buffalo-has-one-of-the-highest-minority-poverty-rates/)
[67] *Id.*
[68] Neighborhood Preservation Coalition of New York State. *Housing and Poverty Snapshot: Buffalo, East Side, NY* at 3 (*available at* http://npcnys.org/wp-content/uploads/2016/03/EAST_BUFFALO_snapshot.pdf)
[69] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.").
[70] Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, The Buffalo News (December 17, 2014) (*available at* http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 ).

15

unconstitutional under the Fourth Amendment. [71]   During both hearings, BPD Housing Unit officers testified to conducting "hundreds" of checkpoints and trespass sweeps similar to those found unconstitutional, with no guidelines or rules.[72] Despite these rulings, in 2016, BMHA had proposed a codification of a suspicionless trespass rule in its Admissions and Continued Occupancy Plan. [73]

The scope of the BPD Housing Unit's efforts and unconstitutional tactics has been substantial, and has had a severe disproportionate effect on Buffalo's residents of color.  Even though BMHA residents comprised 2.6% of all Buffalo residents (12,000), the BPD Housing Unit's records show that:

- The BPD Housing Unit made 2,399, or <u>28%</u> of all misdemeanor arrests in and around BMHA buildings from May 2013 to May 2014. [74]
- Traffic misdemeanor arrests comprised the largest category of arrests.  From 2013 to 2014, the BPD Housing Unit made 1,650 arrests for traffic misdemeanors, comprising 44% of all BPD Housing Unit arrests.[75]
- Further, they recovered only 18 guns, less than 3% of the 607 guns recovered in Buffalo in 2014.[76]

Following the implementation of trespass sweeps in 2013, the number of overall BPD trespass arrests and racial disparities in trespass arrests increased. The number of trespass arrests for African Americans and Latinos increased, while falling for whites.

- The proportion of African Americans and Latinos arrested by BPD for trespass offenses grew from 63.79% in 2011-2012 to 67.85% in 2013-2015.
- The number of whites arrested for trespass offenses fell by 3 (192-180), while increasing 17% for African Americans (318-372), and 37% for Latinos (46-63).
- Legal Aid represented 67% more defendants accused of trespass, increasing from 162 between 2010-2012 to 271 from 2013-2015.[77]

Beginning in 2014, BMHA residents launched a campaign to terminate the City and BMHA's contract with BPD set to expire in 2015, because of strong concerns with unjustified stops, sweeps and arrests and harassment of minority youth—and high levels of underpolicing and unresponsiveness to legitimate security concerns.  BMHA tenants, their lawyers and advocates testified, wrote op eds and letters about the BPD's misconduct and requested at Common Council hearings that the City terminate its contract with BPD from 2013-

---

[71] *People v. Dzielski*, Docket No. CR-16851-15, Order at 2 (Buffalo City Court, May 3, 2016); *Michigan v. Sitz*, 496 U.S. 444, 455 (1990) (upholding a sobriety checkpoint at which all motorists are briefly stopped for preliminary questioning and observation for signs of intoxication only because it adopted standarized guidelines that minimized arbitrary individual discretion).

[72] *Id*.

[73] City of Buffalo, *5-Year Public Housing Authority Plan to the Department of Housing and Urban Development beginning for Fiscal Years 2016-2020*, Buffalo Municipal Housing Authority, at 26-32 (available at https://www.ci.buffalo.ny.us/files/1_2_1/BMHA/NY002_AGENCY_PLAN_revised.pdf). The policy, broadly applies to "walksways, grasses, playgrounds, parking loits, drives and other common areas defines BMHA grounds to be both in buildings." *Id*.

74 *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brinkworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.

[75] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014. . In 2013-2014, the BPD HU arrested 2,172 individuals for misdemeanor arrests in and around BMHA, (which accounted for 28% of all of Buffalo's misdemeanor arrests during this period despite the fact that BPD residents comprise only 2.6% of Buffalo's population).

[76] Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Office of Strategic Intelligence and Information, *2014 New York Firearms Trace Data*, DOJ-ATF Firearms Tracing System, 10 (available at https://www.atf.gov/about/docs/report/new-york-firearms-trace-data-%E2%80%93-2014/download ).

[77] Email from Rebecca Town to Anjana Malhotra, Legal Aid BPD Trespass cases 2010-2016 (September 2016) (on file with author)

16

2015. In January 2015, Tenant council leader Sam Smith stated in a letter to the executive director of the BMHA, the president of the Jurisdiction-Wide Resident Council informing her that the BPD Housing Unit was not meeting its contractual duties to provide more than baseline services and to communicate with residents, develop a security program, and use community policing,[78] and that "[w]e do not want the contract to go forward because it's a waste of taxpayer dollars," said Sam Smith.[79] BMHA residents, their criminal defense attorneys and civil rights lawyers and organizations in Buffalo have stated that they are receiving frequent reports from BMHA residents of these illegal enforcement tactics. For example, in January 2015, Attorney and National Lawyers Guild leader John Lipsitz testified to the Common Council on this issue:

> BMHA residents... have expressed concern that their children, themselves, and their guests are unfairly stopped, questioned, and arrested for trespass. People report being stopped repeatedly and asked to produce identification, questioned because of lack of identification, stopped because of use of the public outdoor spaces around the buildings, and subjected to other troubling encounters with police officers who regularly patrolled the buildings.[80]

Similarly, Joseph Kelemen of the Western New York Law Center and the Buffalo Chapter of the National Lawyers Guild testified at a meeting with the Police Oversight Committee on November 5, 2014 and voiced concerns about the lack of security in BMHA properties. He stated "Many residents and their guests have reported that they are repeatedly stopped, questioned, and arrested for trespass. Interactions of this kind erode the legitimacy of the police in the eyes of the community and keep victims and witnesses from reporting crimes, thus fueling a downward spiral in police community relations." [81] In 2016, despite widespread opposition and hearings, the Common Council ignored residents concerns, and reapproved the BPD contract to police BMHA, increasing its payment for services from $600,000 to $1 million. That same year, BMHA and City officials proposed codifying its suspicionless trespass policies into BMHA rules. [82]

### *Racial Bias*

Also reflecting the City's larger racial bias, in January 2014, BMHA and the City of Buffalo submitted a controversial proposal to HUD to transform one of its prime waterfront public housing properties, the Commodore Perry Homes, into a destination of "choice" by explicitly proposing to "decrease the concentration of minority (African American) population in the Perry neighborhood." BMHA and the City relied on race-based

---

[78] Letter from Sam Smith, President, Jurisdiction Wide Resident Council, to Dawn Sanders-Garrett, Executive Director, Buffalo Municipal Housing Authority. (quoted in PPG Policy Brief, Poverty, Race, and Community Policing in Buffalo, Partnership for Public Good at 2 (March 27, 2015)

[79] Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, The Buffalo News (December 17, 2014) (*available at* http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 ).

[80] Megan Williams, *Buffalo's Stop and Frisk Problem*, The Public, Jan. 13, 2015 available at http://www.dailypublic.com/articles/01132015/buffalos-stop-and-frisk-problem

[81] Megan Williams, *Buffalo's Stop and Frisk Problem*, The Public, Jan. 13, 2015 available at http://www.dailypublic.com/articles/01132015/buffalos-stop-and-frisk-problem . John Lipsitz of the National Lawyers Guild similarly testified that "[t]he constant policing, involving frequent stopping and questioning for innocent behavior, commonly referred to as stop and frisk, has led to community concern, and general distrust of the police on BMHA property." *Id.*

[82] City of Buffalo, *5-Year Public Housing Authority Plan to the Department of Housing and Urban Development beginning for Fiscal Years 2016-2020*, Buffalo Municipal Housing Authority, at 26-32 (available at https://www.ci.buffalo.ny.us/files/1_2_1/BMHA/NY002_AGENCY_PLAN_revised.pdf). The policy, broadly applies to "walkways, grasses, playgrounds, parking loits, drives and other common areas defines BMHA grounds to be both in buildings." *Id.*

17

stereotypes in advancing the proposal[83], entitled the Perry Choice Transformational Plan ("the Plan"). The Plan sought to redesign the Commodore Perry Homes, which is located on the Erie Canal in the southern portion of Buffalo's predominantly African American "East Side." Currently, 80% of Perry's 971 residents are African American, 14% are Latino and the remainder o is White.[84] Approximately 42% of the residents live at or below the poverty line.

The Plan fund sought to "revitalize" Perry and the surrounding neighborhood with commercial development, additional units and more White and mixed-income families. It explicitly included as one of its "Goals"[d]ecreas[ing] [the] concentration of [the] minority (African American) population in the Perry Neighborhood"  to "mak[e] it similar to [the] rate in the city as whole," and to decrease the number of tenants who receive federal benefits -- e.g. food stamps.[85] In a BMHA Council meeting, BMHA Executive Director Modesto Candelario confirmed that the plan would require displacing African American residents, even though the plan proposed replacing the existing 222 public housing units with 414 public housing units and an additional 415 mixed-income units.[86]

The Plan justifies the displacing of African American and minority tenants from public housing through a "diversity rationale," and a problematic, racially-coded notion that increasing the number of White and middle-income residents can approve the standard of living for minority residents. Specifically, the Plan suggests that exposing African American residents and youth to "community norms, standards and values," ostensibly created by the new White, middle class residents, will improve the neighborhood-level crime problems among minority youth and "low-aspirational level among many blacks and Latinos." Specifically, the Plan states the strategy will be effective because the new, White "community residents will engage young people in a battle of ideas, with the goal of getting them to adopt community norms standards and values." Noting that neighborhood development and public safety must march in tandem, the proposal called for increased "hot spot" policing strategies, which are already in place in Buffalo. In 2014, HUD rejected the Plan because, according to the Buffalo News, the Plan "stated that diluting the concentration of African Americans was an objective of the project."[87]

As BMHA was developing the Plan, and even after its submission in January 2014, BMHA also began moving ahead with it by closing an increasing number of units and/or letting units go into disrepair, resulting in the displacement of hundreds of tenants to other Perry apartments and to BMHA units. 92% of those tenants are in African American neighborhoods—despite having a waitlist that has been closed since 2014/  After the Plan

---

[83] Buffalo Municipal Housing Authority, *Perry Choice Neighborhood Transformation Plan* at 30, 34. (June 2013). (*available at* https://ubwp.buffalo.edu/aps-cus/wp-content/uploads/sites/16/2015/04/BMHA_Buffalo_Perry_Choice_Transformation_Plan_FINAL-June-27-2013.pdf). BMHA began developing the plan in 2012 with UB's Center for Urban Studies after securing a $250,000 Housing and Urban Development Choice Neighborhoods planning grant. Despite the racially exclusionary provisions, the resulting Perry Choice Neighborhood redevelopment plan, chad a number of positive aspects by seeking to create an environment that will improve the lifestyle and opportunities of public residents; according to Dr. Henry Taylor, director of the  UB Center for Urban Studies and an author of the plan, "the plan will help neighborhood residents "develop high levels of critical consciousness" so they can understand the economic and political forces at work in their community." *See* Office of Policy Development and Research, *University at Buffalo Supports Neighborhood and Regional Growth*, U.S. Department of Housing and Urband Development Office of Policy Development and Research (available at https://www.huduser.gov/portal/casestudies/study_03242014_1.html ).

[84] Buffalo Municipal Housing Authority, *Perry Choice Neighborhood Transformation Plan* at 3-5, 47-8. (June 2013).. (*available at* https://ubwp.buffalo.edu/aps-cus/wp-content/uploads/sites/16/2015/04/BMHA_Buffalo_Perry_Choice_Transformation_Plan_FINAL-June-27-2013.pdf). The median income for Commodore Perry Householdsis about $9,500 annually and the average is $11,300. *Id*.

[85] *If.* The plan also sought to decrease the number of tenant households receiving benefits and participating in safety net program, as measured by the percent of households enrolled in food stamps, TANF, and SSI—in direct contravention to the purpose of public housing.

[86] Harold McNeil, *Plan to 'diversify' Perry neighborhood raises fears*, The Buffalo News, Jan. 26, 2014 (available at http://mobile.buffalonews.com/?articleRedirect=1&url=http%3A%2F%2Fwww.buffalonews.com%2Fcity-region%2Fbuffalo%2Fplan-to-diversify-perry-neighborhood-raises-fears-20140126 ). Notably, the plan had several positive features to improve the life of Perry residents

[87] The Buffalo News (April 11, 2015)

18

was rejected, in February 2014, BPD Housing Unit Chief Patrick Roberts met with BMHA Deputy Director Modesto Candeleria for the first time regarding "day to day operations of the Buffalo Police Department's Housing Unit." [88] This is the first and only meeting listed with Mr. Candeleria, and it was followed by intensified illegal trespass stops and arrests. Additionally, Chief Roberts met with BMHA General Counsel David Rodriguez. Following that meeting, BPD stepped up policing and illegal trespass sweeps and arrests in the Perry Housing Projects.

Further, during this period of BPD's aggressive, low level broken-windows policing in BMHA, the City began an unprecedented number of eviction proceedings against BMHA residents and advanced a redevelopment plan that explicitly called for displacing minority residents. In 2014, BMHA filed 4026 civil suits in New York state courts,[89] which were largely eviction proceedings against BMHA tenants.[90] The high number of BMHA eviction cases is significant, as BMHA only had 4,332 units in 2014. Put differently, BMHA 4,026 represented 93% of all BMHA tenant units. BMHA filed so many lawsuits that year that it ranked as the Ninth most prolific civil filer in New York State; ranking above NYCHA. [91] Legal service directors and tenants both confirm BMHA has initiated an increasing (and record) number of eviction suits against tenants since 2012, leaving hundreds of BMHA's overwhelmingly African American and Latino residents and families without homes. From 2010 to 2014, the BMHA tenant docket for Neighborhood Legal Services, the area's largest indigent legal service provider for BMHA tenants, grew by 87%, from 770 in 2010 to 1441 in 2014. [92] During the three full years of the study period (January 1, 2013 to January 1, 2016), Western New York Legal Services represented tenants in 3,940 eviction proceedings, i.e. 32% (900) more than the 2,988 cases it handled in the three years prior to the study period.[93]

Resullting racial disparities

- **The racial disparities for youth area even steeper than adult arrests**: of BPD arrests of African American youth ages 16-17 accounted for 68.8%, or 721, of the 1,048 16-17 year olds arrested for misdemeanors by BPD officers, while Whites comprised only 15.8% of arrests. [94]
- The average arrest rate during the study period was also higher for African American youth than whites, and significantly higher than for adults: African American 16-17 year olds arrest rates *stand* at 70.74/10,000, more than twice the rate of whites (29.31). [95]
- Controlling for population, the BPD misdemeanor arrest rate from 2013-2015 for African Americans (44/10,000) was almost twice as high as whites (25/10,000). [96]
- Overall, African American youth under 16 comprised 75% of all arrests BPD made of children under 16 ("juvenile arrests") from 2013 to 2015. From 2013-2015 period, the BPD arrested 2,242 African American children under 16, out of a total of 2,980 juvenile arrests, while only 702 arrests of whites under

---

[88] *Buffalo Police Department Housing Statistic Report for February 1, 2014 to February 28, 2014*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brinkworth, Housing Chief, dated March 2, 2014. (on file with author) (Report author's name redacted).

[89] Chris Albin-Lackey, *Rubber Stamp Justice: U.S. Courts, Debt Buying Corporations, and The Poor*, Human Rights Watch, at 14-15 *available at* https://www.hrw.org/sites/default/files/report_pdf/us0116_web.pdf (last visited Feb. 18, 2016).

[90] Chris Albin-Lackey, *Rubber Stamp Justice: U.S. Courts, Debt Buying Corporations, and The Poor*, Human Rights Watch, at 14-15 *available at* https://www.hrw.org/sites/default/files/report_pdf/us0116_web.pdf (last visited Feb. 18, 2016).

[91] HUD OIG, available at https://www.hudoig.gov/sites/default/files/documents/2015-NY-1003.pdf

[92] Interview and emails with Buffalo Neighborhood Services Supervising attorney Grace Andriette, January 29, 2016 (emails on file with author).

[93] Interview and emails with Buffalo Neighborhood Services Supervising attorney Grace Andriette, January 29, 2016 (emails on file with author).

[94] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[95] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[96] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

16.[97] Despite comprising 42% of the population, 84% of all Youth Offender arrests made by the BPD were racial minorities. 71% of all Youth Offenders were African American—nearly double the population.[98]

Discretionary Misdemeanors
- From 2013-2015 African Americans accounted for 81.4% of all low-level misdemeanor marijuana possession arrests from 2013-2015;[99] of the 1562 people BPD arrested for the low level marijuana misdemeanor offenses during the study period, 1,271, were African American, while only 12%, or 191 were White.[100]

The BPD's aggressive policing tactics have also contributed to a substantial increase in the number, disparity and comparative arrest rate of racial minorities for lowest-level marijuana misdemeanor possession, while largely remaining stable or falling for Whites.

- Despite consistent surveys showing similar marijuana use rates by Whites, **African Americans in Buffalo were <u>seven times more likely to be arrested by for misdemeanor marijuana possession in the last ten years (2006-2015), compared to only four times as likely to be arrested as Whites in the ten years prior to Mayor Brown's election and launch of Buffalo's Zero Tolerance Plan (1996-2005).</u>** [101] Similarly, Latinos, who had approximately the same arrest rate as Whites from 1996-2005, are now more than twice as likely to be arrested for low level misdemeanor marijuana possession since Brown was elected (2006-2015). [102]

As the table below shows, the BPD increased the number of African Americans it arrested for lowest level marijuana misdemeanor possession immediately in 2006, while declining for whites.

If the aim of Mayor Brown's and the BPD's Zero Tolerance policing strategy is truly about improving the public order, this goal could be achieved with investment, urban renewal projects in minority areas, home ownership programs, job training, social workers and resources towards education. Instead, these tactics have needlessly brought countless – and increasing numbers – of Buffalo's minority residents into the criminal justice system, while diverting resources from effective and targeted problem-based policing. Further, as described above, these tactics have undermined community trust and the legitimacy of Buffalo's police. Minority residents report routine slow response times to 911 calls, high numbers of unsolved serious crimes, and continuing violence. As one African American Buffalo resident described, the BPD has been setting up daily illegal roadblocks and public housing sweeps while-literally they are unavailable.

<u>**Failure of Accountability Mechanisms and oversight**</u>

Unfortunately, as described in more detail below, BPD officers are rarely held accountable for citizen-or even minority police officers-complaints. The internal grievance system rarely finds anyone accountable, and the oversight body, appointed by the Mayor, has completely abdicated its statutory duties. BPD officers have only

---

[97] DCJS, Uniform Crime/Incident-Based Reporting system (as of 5/2/2016)
[98] Youth Offender status is available, as per Article 720 of the Criminal Procedure Law, following the conviction of youth under 15, of Juvenile Offenders, and of 16-18 year-olds for misdemeanors and most felony offenses. Only 4% of those eligible were granted YO status in Buffalo.
[99] DCJS, Computerized Criminal History system.
[100] DCJS, Computerized Criminal History system. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )
[101] DCJS, Computerized Criminal History system.
[102] DCJS, Computerized Criminal History system.

been held accountable when the DOJ intervened to investigate, and to file federal civil rights suit. As described in more detail below, resident's complaints about misconduct and brutality are not only ignored, but are met with brutality. Generally, this happens after a high profile, typically, videotaped incident of police misconduct. Each time federal agencies investigate officers following such incidents, investigators uncover similar prior police misconduct by the same officers that had gone unpunished—indicating a culture of impunity.

The City has treated both African Americans and people of color with contempt, erasing any countenance of innocence, treated the Constitution with contempt, and has inflected great harms to the community. Further, this broken windows policing strategy prevented the BPD's office from solving actual crimes in minority areas, creating a wall of distrust that has significantly compromised BPDs ability to provide police protection to Buffalo's residents of color. The most destructive part of Buffalo's broken windows campaign and direction of resources towards unconstitutional crackdowns in predominantly minority neighborhoods is that the City did it at the expense of conducting actual policing, letting serious crimes go uninvestigated and the murder rate grow.

In the name of "urban renewal," City and BPD officials launched even more systemic aggressive "Zero Tolerance" campaign, targeting Buffalo's minority communities for heavy misdemeanor arrests and traffic violations. While there is nothing legally problematic of saturating areas in their zeal to "clean up Buffalo," the City, BMHA and BPD implemented systematic illegal, unconstitutional tactics to target and maximize the number of African Americans and Hispanics – especially in gentrifying and predominantly areas—and generate revenue from these communities.

The City of Buffalo is facing a crisis of police accountability, that has lead to serious harm to Buffalo residents—and even the death of two young men of color just this year. Our research found that BPD has no accountability mechanisms and that there are numerous habitually violent, discriminatory brutal police officers that are the subject of repeated citizen complaints, court cases, and DOJ investigations – but have never been met with any penalty. Civilian and even minority officer's complaints but are usually protected by their fellow officers and by the shoddiness of internal police investigations. Victims of police misconduct, and their family members, who seek redress faces obstacles at every point in the process, ranging from overt retaliation intimidation to the reluctance of local and federal prosecutors to take on brutality cases. Severe abuses persist because overwhelming barriers to accountability make it all too likely that officers who commit human rights violations escape due punishment to continue their abusive conduct.

In the midst of these repeated highly publicized, and recently even lethal encounters between police  and residents of Buffalo, Buffalo residents, have expressed serious concerns about high levels of violent unconstitutional policing at every stage of government in Buffalo, to no avail. Activists, roundtables of experts have introduced multiple proposals to advance police reform, but all requests have fallen on deaf ears. They have no one left to protect them from the City's failure to afford them equal treatment under the law, or basic justice.

In the last decade, the City of Buffalo and BPD has made superficial attempts to increase oversight of the Buffalo Police Department, often as a result of highly publicized police misconduct---but the BPD and other government officials have actively resisted any attempt at change—and denied there was any problem, leaving outside observers befuddled. In 2010 the Buffalo Common Council established the Joint Police Reform Commission to assess police practices and develop recommendations for reform. Staffed by Council and mayoral appointees, 42 among them H. McCarthy Gipson, former Commissioner of the BPD, and Thomas F. Higgins, former Erie County Sherriff, the Commission was created to assess police practices and develop recommendations for reform. But the Commission was shrouded in controversy from its inception.

For example, Terry O'Neil, a criminal justice expert and former advisor to the late Governor Mario Cuomo, who served on the Buffalo Police Department Reorganization Commission that was set up to implement community policing, testified recently in Albany to the New York State Senate about the entrenched obstacles to reforming the Buffalo Police Department. The Buffalo Common Counsel had created the BPD Reorganization

Commissioned in 2010, in response to a shooting the BPD was unable to solve, involving 8 people were shot, four fatally outside the City Grill in downtown Buffalo. Despite the fact that there were over one hundred witnesses, most of whom were African American, no one would cooperate with the BPD. [103]

The BPD, however, "offered no meaningful cooperation" with the Commission throuughout its deliberations nor did they take any suggestions, claiming that it had sufficient community policing resources with "two community police officers" assigned to each of the five districts, or ten community officers out of almost 800 sworn officers.  O'Niell refuted the BPD's logic that  two agents assigned to each district's "expertise on community policing will affect the department through some process of osmosis .. is nonsense." [104]

> Commissioner Derenda believes the fact that he has assigned--two officers out of a force of some eight hundred sworn police officers – two "community police officers" to each of the five very large and populous police districts in the city constituytes the delivery of neighborhood policing. That is utter nonsense. In Albany, nearly 10 % of the APD's workforce is assigned full-time to provide community policing in eighteen neighbourhood beats.[105]

Instead of abiding by these comprehensive proposals, the City, BPD and BMHA appear to be doing the exact opposite by further expanding and militarizing the police force. The Mayor and Common Counsel, to oinstead of expanding the BPD's community resources, has done the exact opposite by investing more and more resources each year to expand the Poilce force – even as Buffalo's population falls.

In 2014, the Buffalo Common Council reestablished its Police Oversight Committee in response to several cases of police misconduct. Councilmember David Rivera, a former police officer, was selected to serve as the chair. The Committee has met with police on a semi-regular basis to discuss structural and policy changes but has not yet issued a set of recommendations. Nor has the Police Oversight Committee effectively monitored key police activities like improved weapons training. The Investigative Post has reported that, despite awarding the BPD with $60,000 for training, the Committee has not tracked how those funds were spent. According to a recent report by the *Investigative Post*, "the [Buffalo Common] Council's Police Oversight Committee and the Commission on Citizens' Rights and Community Relations have been unwilling or unable to use their powers to monitor police conduct." The Police Oversight Committee, does not seek to hold the department accountable. Committee Chairman David Rivera has made clear that 'We're an advisory committee. We don't run the Buffalo Police Department,'he committee's effectiveness is also limited by its sporadic meeting schedule. The first meeting of the year was held Jan. 24; its next scheduled one is July 18. "

**One year later,** in May 2015, the Buffalo Common Council considered a resolution that stated that the Commission on Citizen's Rights and Community relations "lacks the power and resources needed to effectively advocate for the public in a meaningful way." Neither of these initiatives have not proven successful. This leaves Buffalo residents with little recourse.


The magnitude of this accountability crisis is represented by how it is tragically and insidiously repetitive. The actions leading to the death of Wardel Davis in February 2017 were tragically similar to those that lead to the BPD's fatal shooting of Jose Hernandez-Rossy in May 2017, and the police response: the questionable circumstances justifying the stop, the routine use of brutal excessive force against detainees.

Despite these obstacles, discriminatory arbitrary police violence and arrests is by no means a new phenomenon in the Buffalo, nor are the persistent efforts to reduce such systematic police misconduct misconduct. Violence has accelerated, and in recent years, however, more people of color and allies have been

---

[103] Terry O'Neill, *Statement of Terry O'Neill, Director of The Constantine Institute Statement to the Joint Legislative Fiscal Committee Hearing Executive Budget on Public Protection*, The Constantine Institute, 5-7 (Feb. 26, 2015) (available at: http://assembly.state.ny.us/2016budget/testimony/20160204_pubprot/20160204-PublicProtection-O%27Neill.pdf )

[104] *Id.*

[105] *Id.*

22

organizing around race and supporting Black Lives Matter and Just Resisting to challenge discriminatory policing. Advocates, residents have repeatedly made the BPD's routine police abuse, often targeted in the African American community, know to city government officials. Despite the City's widespread and growing recognition of the gravity of the problem and the need for radical changes in law enforcement practices, police officers are still rarely held accountable for their actions. After four years of demonstrations and prosecutions, the police are continuing, and, disturbingly, expanding the same gratuitous, lawless arrests and violence that has damaged the lives of Buffalo's residents of color, and exacerbated pre-existing inequalities.

**Full Summary of Unconstitutional Practices**:

The problematic and systematically unconstitutional Zero Tolerances policing policies adopted by the City, BPD and BMHA include:

- BPD Housing Unit Unlawful Trespass Enforcement, Arrest and Sweep policy: The BPD Housing Unit engages in unconstitutional trespass stops and related "sweeps" through BMHA properties without reasonable suspicion and trespass and related arrests without probable cause in predominantly minority BMHA buildings. During the study period, particularly beginning in 2013, the BPD Housing Unit has engaged in a pattern of unlawful stops, searches, and arrests ostensibly to enforce the prohibition against trespassing in predominantly minority BMHA buildings.

  o According to BPD Housing Unit records, BPD officers use systematic unconstitutional stop tactics, including "vertical sweeps," "warrant checks" and other tactics throughout BMHA buildings. From 2013-2015, BPD Housing Unit daily logs indicate that BPD engaged in routine, daily suspicion-less search tactics, including vertical patrols, where police officers conduct floor-by-floor sweeps of public housing buildings and systematically question those they encounter. The officers have arrested individuals unable to prove that they are either residents or invited guests; individuals for outstanding warrants; and other offenses requiring a stop. The systematic nature of these stops indicates that these routine encounters are often predicated on nothing more than the suspect's presence in the building. These tactics have been confirmed by interviews, BPD officer testimony and court decisions. According to BPD records and testimony by the BPD Housing Unit officers, BPD Housing Unit's routine stop and enforcement tactics often lack reasonable suspicion.

  o BMHA has proposed codifying its current trespass policy by allowing police to stop anyone in or around BMHA buildings and demanding their identification, and proof that they have a specific, legitimate purpose on BMHA premises—even if an individual is doing nothing wrong. In its most recent Admissions and Continued Occupancy Plan ("ACOP") submitted to HUD as part of its public housing authority five-year plan, the policy requires anyone located on BMHA property or in buildings "to identify himself or herself by showing appropriate written identification, and to prove specific legitimate purpose to be on the development premises." [106] The policy provides that if the officer determines that an individual does not have a "specific legitimate purpose "or has a legitimate purpose but is subject to one of the expansive list of criminal behavioral bars, the officer will issue a "Trespass Warning" and place the individual on a "Trespass list." If they return to the development without a specific legitimate purpose, they are arrested and barred from entering BMHA properties for up to three years from their first offense. The arrest can also result

---

[106] City of Buffalo, *5-Year Public Housing Authority Plan to the Department of Housing and Urban Development beginning for Fiscal Years 2016-2020*, Buffalo Municipal Housing Authority, at 26-32 (available at https://www.ci.buffalo.ny.us/files/1_2_1/BMHA/NY002_AGENCY_PLAN_revised.pdf). The policy, broadly applies to "walkways, grasses, playgrounds, parking loits, drives and other common areas defines BMHA grounds to be both in buildings." *Id*.

23

in eviction for the tenant they are visiting.[107] The proposed policy would apply "retroactively and prospectively "to all tenants living in units within those developments." The policy contains no guidelines delineating how an individual may obtain or establish a "legitimate purpose" and contains no limiting or identifying criteria specifying who should be stopped. It directly authorizes the BPD to stop and question everyone on or in BMHA premises, to establish their identity with written identification and to prove that they have a legitimate purpose. Thus, this policy violates the Fourth Amendment.[108]

- Unlawful trespass arrests: BPD officers arrest individuals for being lawfully within their buildings or on public sidewalks for "trespassing" or other misdemeanor offenses following these stops.

    - The BPD Housing Unit, at the Direction of the City and BMHA, engages in a pattern or practice of unlawfully stopping and arresting individuals for being lawfully within their buildings or on public sidewalks for "trespassing" or other misdemeanor offenses. Although there is no "stop card" data, from 2010-2014, legal aid attorney Rebecca Town reported that the BPD Housing Unit made 315 trespass arrests from 2010-2014, and by 2014, they are "mostly all getting dismissed" by judges, often for Fourth Amendment violations.[109] According to Ms. Town, judges were not only dismissing trespass cases for improper questioning, but were finding evidence that the defendant lived in the building where the trespass was said to have occurred. During this time, the number of **Legal Aid trespass cases increased by 67% in 2013-2015 (271) from 62 between 2010-2012 to 271 from 2013-2015.[110]** BPD records confirms Ms. Town's records.

    - Legal Aid lawyer Rebecca Town, who represents tenants and individuals criminally arrested in and around BMHA for trespass, and attends BMHA tenant meetings to listen and address residents' concerns, has confirmed increased legally unjustified trespass stops and arrests in and around BMHA. From 2010 to 2014, she reported that the BPD Housing Unit made 315 trespass. Since 2013, judges began frequently dismissing these charges. by 2014, Ms. Town reported thatBPD Housing Unit trespass charges were "mostly all getting dismissed" by judges.[111] According to Ms. Town, judges were not only dismissing trespass cases for improper questioning, but were finding evidence that the defendant lived in the building where the trespass was said to have occurred. BPD records confirms the same.

    - From May 2013 to May 2014, despite the fact that BMHA residents comprise 2.6% of all Buffalo residents, the BPD Housing Unit made 2,399, or 28% of all misdemeanor arrests in and around

---

[107]

[108] The BPD's trespass practices and policy also violate New York State's stop and frisk law, which requires reasonable suspicion before a police officer requests a name, address, and purpose that without a warrant. Specifically, CPL § 140.50 provides that "a police officer may stop a person . . . when he reasonably suspects that such person is committing, has committed, or is about to commit" a crime, "and may demand of him his name, address and an explanation of his conduct." *Id*. *See also Ligon*

[109] Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, The Buffalo News (December 17, 2014) (*available at* http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 ).

[110] Email from Rebecca Town to Anjana Malhotra, Legal Aid BPD Trespass cases 2010-2016 (September 2016) (on file with author)

[111] Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, The Buffalo News (December 17, 2014) (*available at* http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 ).

24

BMHA buildings.[112] But they recovered only 18 guns—less than 3% of the 607 guns recovered in Buffalo in 2014.[113]

- Vehicle Stops: the BPD conducted frequent, even daily, unconstitutional crime suppression vehicle checkpoints during the study period in predominantly African American and minority neighborhoods.[114] BPD Strike Force officers have conducted at least 380 unconstitutional crime suppression vehicle checkpoints, resulting in at least approximately 36,000 vehicle stops with no individualized suspicion from January 1, 2013 to the present.

  o According to BPD officers, the BPD Housing Unit similarly conducted "hundreds" of vehicle checkpoints with no guidelines or rules in violation of the Fourth Amendment. The BPD Strike Force and Housing Unit teams concentrate these roadblocks in predominantly minority neighborhoods, and maintain City towing teams ready to tow vehicles following an arrest or impound.  Police and City officials have explicitly made clear that these checkpoints are conducted for the impermissible purpose of general crime suppression [115] and, even when administered for another purpose, are not conducted pursuant to written guidelines or uniform rules, in contravention of the Fourth Amendment.[116]

  o According to BPD records and testimony, the BPD Housing Unit has engaged in routine unconstitutional checkpoints, resulting in a high volume of arrests; from 2013 to 2014, the BPD Housing Unit made 1,650 arrests traffic misdemeanors, comprising 44% of all BPD Housing Unit arrests. Traffic misdemeanor arrests comprised the largest category of arrests by the BPD Housing Unit. From 2013 to 2014, the BPD Housing Unit arrested 2,172 individuals for misdemeanor arrests in and around BMHA, which accounted for 28% of all of Buffalo's misdemeanor arrests during this period despite the fact that BPD residents comprise only 2.6% of Buffalo's population.[117]

- Operation Strike Force Checkpoints: In 2012, the City launched "Operation Strike Force," which involved aggressive, high-saturation patrols designed to combat drugs and guns. Operation Strike Force involved frequent, routine, and even daily crime suppression traffic checkpoints and roadblocks in African American neighborhoods on the East Side and other predominantly minority neighborhoods.[118]  The operation was part of the City's Zero Tolerance campaign and consistent with the Mayor's original Strike Force, designed to (1) identify and target gang members; (2) target and eliminate high crime areas in the city; (3) remove illegal guns and illegal drugs; (4) strictly enforce the Zero Tolerance Law Enforcement

---

[112] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brinkworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.

[113] Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Office of Strategic Intelligence and Information, *2014 New York Firearms Trace Data*, DOJ-ATF Firearms Tracing System, 10 (available at https://www.atf.gov/about/docs/report/new-york-firearms-trace-data-%E2%80%93-2014/download ).

[114] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.").

[115] *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) (vehicle checkpoint set up for the "primary purpose [of] detect[ing] evidence of ordinary criminal wrong-doing" (here interdicting illegal narcotics) does not fall within the highway safety or border patrol exception to the individualized suspicion requirement, and hence violates the Fourth Amendment").

[116] *People v. Dzielski*, Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016); *Michigan v. Sitz*, 496 U.S. 444, 455 (1990) (upholding a sobriety checkpoint at which all motorists are briefly stopped for preliminary questioning and observation for signs of intoxication only because it adopted standardized guidelines that minimized arbitrary individual discretion).

[117] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.

[118] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.")

Initiative; and (5) improve the city's quality of life.[119] From its initiation, the City announced that the primary purpose of these roadblocks was crime suppression, in direct contravention of the Fourth Amendment. Further, the City and BMHA saturated the BPD roadblocks in minority neighborhoods.All crime suppression vehicle checkpoints and roadblocks were located in Buffalo's predominantly African American East Side and in other predominantly minority neighborhoods throughout Buffalo.[120] According to Commissioner Derenda, by January 2014, "Strike Force officers [were] conducting daily roadblocks" for the purpose of "surprising the criminal element." [121] Derenda emphasized that the purpose of these checkpoints was to proactively identify and deter violent crimes.  He also asserted that they were effective in doing so because after a year of daily checkpoints, he argued, "people are now less likely to carry guns knowing that they may be stopped at a safety checkpoint." [122]

- o  BPD Strike Force Teams conduct frequent, even daily, unconstitutional crime suppression vehicle checkpoints during the study period, predominantly and sharply disproportionately in African American neighborhoods and other minority neighborhoods. [123]  BPD Strike Force Officers have conducted at least 380 unconstitutional crime suppression vehicle checkpoints resulting in at least approximately 36,000 vehicle stops with no individualized suspicion from January 1, 2013 to the present. According to BPD officers, the BPD Housing Unit similarly conducted "hundreds" of vehicle checkpoints with no guidelines or rules in violation of the Fourth Amendment. The BPD Strike Force and Housing Unit teams concentrate these roadblocks in predominantly minority neighborhoods, and maintain City towing teams ready to tow vehicles following an arrest or impound.  Police and city officials have explicitly made clear that these checkpoints are conducted for the impermissible purpose of general crime suppression [124] and, even when administered for another purpose, are not conducted pursuant to written guidelines or uniform rules, in contravention of the Fourth Amendment. [125]

- o  According to Commissioner Derenda by January 2014, "Strike Force officers are conducting daily roadblocks" for the purpose of "surprising the criminal element." [126] Derenda emphasized that the purpose of these checkpoints was to proactively identify and deter violent crimes, and asserted that they were effective in doing so, stating that after a year of daily checkpoints, he argued, "people are now less likely to carry guns knowing that they may be stopped at a safety checkpoint." [127]

---

[119]https://www.ci.buffalo.ny.us/Home/Leadership/Mayor/Archive_Press_Releases/2006_Archives/September_2006/MAYOR_BR OWN_ANNOUNCES_OPERATION_STRIKE_FORCE

[120] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.")

[121] Lou Michel,  *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

[122] *Id*

[123] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.").

[124] *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) (vehicle checkpoint set up for the "primary purpose [of] detect[ing] evidence of ordinary criminal wrong-doing" (here interdicting illegal narcotics) does not fall within the highway safety or border patrol exception to the individualized suspicion requirement, and hence violates the Fourth Amendment.).

[125] People v. Dzielski, Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016); *Michigan v. Sitz*, 496 U.S. 444, 455 (1990) (upholding a sobriety checkpoint at which all motorists are briefly stopped for preliminary questioning and observation for signs of intoxication).

[126] Lou Michel,  *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

[127] Lou Michel,  *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

0031

- o These roadblocks have resulted in a significant financial and personal toll on all Buffalo residents, and particularly the African American and minority residents living in these communities. Not only have these roadblocks resulted in a substantial increase in the number of arrests and police contact, but the resulting high numbers of tickets on the east side creates a substantial financial burden. The Buffalo police department issued more than 25,100 more tickets for traffic violations in the two years following the BPD's implementation of daily Strike Force crime suppression checkpoints (2013-2014) compared to the previous two years—representing a 62% increase.[128] The BPD issued a total of 65,862 traffic tickets in 2013-2014 ("post-daily checkpoint") compared to 40,761 in 2011-2012.[129]

- o In only two months, April and May of 2013, the Buffalo Strike Force officers issued over 6,000 traffic tickets, and made a number of arrests for outstanding warrants, and confiscated "several firearms and vehicles"[130] in 67 roadblocks in 46 different locations; all but two of which were in minority neighborhoods.[131] During this period, the BPD made clear that all checkpoints' "primary goal was to deter crime and disorder."[132]

- o In addition, the BPD's abysmally poor "hit rates" for weapons recovery further expose the ineffectiveness and constitutional deficiencies in such practices.[133] *Add data*

- Searches: During stops, BPD officers frequently pat down or frisk individuals and search cars as a matter of course, without having or identifying the necessary ground to believe the person is armed and dangerous or any other clear constitutional justification. Even where an initial frisk is justified, BPD officers would violate the Constitution by exceeding the frisk's permissible scope.  Further, BPD and Strike Force logs indicate that the BPD frequently lacked any individualized justification to engage in a search of the driver or vehicle, much less the passenger.

---

[128] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*, (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf)*;* Buffalo Financial Stability Authority, *Agenda and Final 2016-2017 Adopted Budget*,  at 81 (*available at* http://www.bfsa.state.ny.us/meetings2016/BoardBook/BoardBook0621.pdf).
[129] City of Buffalo (at 137) (available at https://www.ci.buffalo.ny.us/files/1_2_1/Comptroller/2015CAFR.pdf )
[130] Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).
[131] Eleven of the locations were targeted at least twice over the two month study period, and three locations were targeted four separate times. Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).
[132] Wheeler, Andrew Palmer and Phillips, Scott W., *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY* (May 17, 2016). (available at http://ssrn.com/abstract=2781126). Note that the Strike Force roadblocks examined in the study largely had similar features to routine BPD roadblocks documented in cases and reports but varied from standard procedures in that officers in the study relied only on automated license plate readers (APLR) to determine who to detain.  That is, the study-group Strike Force officers stopped vehicles only if they were flagged by the ALPR either in the roadblock or in surrounding streets (to detect vehicles attempting to evade the checkpoint) if they are "associated with warrants or having a revoked license (for the owner of the vehicle), or if the vehicle itself was stolen;" the study-roadblocks are designed to slow cars down so officers can conduct an APLR analysis either within the roadblock or in surrounding streets. *Id.* at 3-4. If there is no APLR hit, the car is waived on with no further interaction In contrast, in standard Buffalo Strike Force checkpoints are implemented consistent with BPD's Zero Tolerance policing policy: police briefly detain all drivers and inspect their registration and pull over, question and frequently arrest individuals based on any indication of criminal or civil violations, consistent with the Zero Tolerance Policing policy.

[133] *See, e.g., United States v. McCrae*, No. 07-CR-772 (JG), 2008 WL 115383, at *3 (E.D.N.Y. Jan 11, 2008) ("indicia of weapon possession that are correlated with actual weapon possession only one in 30 times are clearly constitutionally insufficient to justify an investigative detention") (*citing City of Indianapolis v. Edmond*, 531 U.S. 32, 34-36, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000) (invalidating program of roadblocks conducted for law enforcement purposes even though approximately 9% of the stops led to arrests)_

- o In vehicle stops, BPD officers frequently searched not just the driver without justification, but also the passengers in a car based on no justification or impermissibly imputing the driver's suspicion to the passengers.

- o Searches of car occupants without suspicion. According to BPD records, Strike Force and other officers would frequently arrest passengers in cars following a stop based on charges that would require searches of the occupants.

## Disparities and Discrimination in violation of the Fourteenth Amendment

The BPD systematic suspicion-less tactics described above have been impermissibly directed in Buffalo's minority communities in violation of their state and federal constitutional protections guaranteeing equal treatment under the law. In predominantly minority communities, the BPD does not rely on the constitutionally required individualized evidence of criminal wrongdoing to justify a stop (reasonable suspicion) or an arrest (probable cause). Rather, the City, BPD and BMHA have applied and institutionalized systematic suspicion-less stop programs and practices that disproportionately affect minority communities, in violation of the Fourth and Fourteenth Amendment. In other words, the City substituted race for individualized reasonable suspicion as a marker of wrongdoing throughout the City of Buffalo. Further, the pervasive nature of BPD's discriminatory treatment of African Americans and people of color reflects and has institutionalized a general culture of impermissible racial bias within BPD.

Mayor Brown and Commissioner Derenda directed "Zero Tolerance" policies – predominantly, if not exclusively in minority and African American neighborhoods.  Brown and Derenda directed BPD officers to saturate minority neighborhoods, in this ostensible crime-reduction campaign, by using a variety of enforcement strategies that raise serious constitutional issues. Low-level officers were given unbridled discretion and incentivized to proactively identify and make aggressive low-level arrests, substantially increasing the number of minorities arrested for discretionary crimes as well as the risk of constitutionally defective policing. Under this policy, Buffalo police departments arrested primarily African American and Hispanic men and youth in poor neighborhoods.  These arrests are often for loitering, disorderly conduct, and possessing tiny amounts of marijuana, thereby pushing these men into the criminal justice pipeline.  BPD's targeted policing of minority Buffalo neighborhoods with systematic per se unconstitutional suspicion-less vehicle and pedestrian stops, frisks and arrests and routine race-based conduct with minimal oversight or accountability results in disproportionate harm to African-American and Latino residents. Significantly, racially disparate impact is present at every stage of BPD's enforcement actions, from the initial decision to stop individuals on Buffalo streets to searches, arrests, and uses of force.

- Racially disproportionate checkpoints: the City and BPD engaged in racial profiling by targeting racially-defined groups for unjustified and unconstitutional stops based on their explicitly-racialized urban agenda. For example, the City directed 92% of the unconstitutional, suspicion-less Strike Force crime suppression checkpoints in minority neighborhoods and public housing complexes, while not implementing them in the same manner in similarly-situated White neighborhoods. These unconstitutional checkpoints, implemented on a "daily basis," beginning in 2013, contributed to a 62% increase in BPD traffic arrests in the two years after the "daily checkpoints" were initiated.[134]

- o During the study period, BPD records indicate that it implemented 32 unconstitutional crime suppression checkpoints in African American and racial minorities' communities, resulting in disproportionate enforcement of traffic violations in predominantly minority communities and heavy fines.

---

[134] New York State Department of Motor Vehicles, *Traffic Tickets Issued: Four Year Window, 2011-2014* (filtered for Buffalo Police Department only. (*available at* https://data.ny.gov/Transportation/Traffic-Tickets-Issued-Four-Year-Window/q4hy-kbtf ).

- Racially-targeted Trespass sweeps: The BPD Housing Unit's suspicionless illegal trespass stops, searches and arrests, "warrant checks" and sweeps exclusively in BMHA residences where the majority of residents are nonwhite, and none in public housing residences that are primary white despite similar crime rates.[135]

  - BPD "vertical patrol" policy and trespass arrest practices disproportionately violate the rights of minority BMHA residents. These policies are conducted in the absence of individualized, objective facts regarding actual criminal activity. Defendants have failed to guide, supervise, and train BPD officers.[136] The specific targeting of racial minorities violates their rights under the Fourth and Fourteenth Amendments.[137] The BPD applied the vertical patrol policy and trespass arrest practices against plaintiffs in a deliberately discriminatory and race-based way.[138] The City and BMHA implemented, enforced, and encouraged practices, policies, and customs that targeted communities of color, in the absence of unreasonable suspicion and did not sufficiently train, monitor, and discipline police officers.[139]

- Pedestrian stops/raids on the East Side: the City has adopted a policy of indirect racial profiling by targeting racially defined groups for routine unconstitutional stops, searches and frisks based on local crime suspect data. This has resulted in the disproportionate and discriminatory stopping of African Americans and Hispanics in violation of the Equal Protection Clause.

  - Geographic concentration: BPD's pedestrian stops are concentrated primarily in minority communities. BPD made roughly 28 percent of its arrests in two small, predominantly African-American districts that contain only 2.8 percent of the City's population.

  - Consequently, hundreds of individuals—nearly all of them African American—were stopped on at least 10 separate occasions from 2010–2015. Indeed, seven African-American men were stopped more than 30 times

- Deliberate Indifference:

  - Despite persistent complaints, testimony in Buffalo's Common Council and letters from BMHA residents, leaders and attorneys requesting that the City terminate the BPD's contract with the Housing authority, both the City and Housing Authority has intentionally allowed the deliberately disparate impact of these policies on BMHA residents to persist.[140]

  - Inference: Both Buffalo and BMHA was fully aware of residents' public complaints about its racially discriminatory trespass enforcement activities in BMHA residences," and repeatedly requested that

---

[135] *Id.* 31-32.

[136] *See id.* at 39.

[137] *Id.*; *Davis v. City of N.Y.*, 959 F. Supp. 2d 324, 360-64 (S.D.N.Y. 2013) (denying City summary judgment on plaintiffs equal protection complaint for discriminatory trespass enforcement)

[138] *Id.*

[139] *Id.* at 43.

[140] John Lipschitz and Sam Smith, *Another Voice: Buffalo Police must address of BMHA Residents Before Agreement is Renewed*, The Buffalo News (Jan 29, 2015) (*available at* http://www.buffalonews.com/opinion/another-voice/another-voice-buffalo-police-must-address-concerns-of-bmha-residents-before-agreement-is-renewed-20150129); Matt Gyrta, *Kenfield-Langfield residents ask for more police presence*, The Buffalo News (Sept 3, 2015) (*available at* http://buffalonews.com/2015/03/14/kenfield-langfield-residents-ask-for-more-police-presence/ ). The Buffalo Common Council even recognized the severity of these problems, but nonetheless renewed the BPD-BMHA contract in 2015. For example, in response to community concerns, Council President Darius G. Pridgen stated: "If we know we have a problem [with the BPD BMHA Unit] and the system we have right now is not working, then you don't continue the same system and leave people as almost prisoners in their homes." *Id.* Then University District Councilman Rasheed N.C. Wyatt stated: "I've been to Kenfield-Langfield, and talked to the people. "We have to listen to them, so people feel comfortable and safe. Right now they don't feel safe." *Id.*

29

the City terminate the contract. The Common Counsel nonetheless continued the BPD's contract with BMHA, and increased the contract amount from $600,000 to $1 million. The City's failure to take adequate steps to address those complaints, "lead[s] to an inference that it intended the racially discriminatory practices to continue." [141]

As described below, discriminatory intent is also established by 1) the scope of disparities in arrests; 2) direct policies by police and government officials exclusively or disproportionately that target minority communities and exhibit racial bias, particularly against African Americans and Latinos; 3) the consistent use of harmful racial stereotypes by government and BPD and the resulting pattern and practice of impermissible race-based stops; 4) the pervasive irregularities in and substantive departures from BPD's purpose, specifically its contractual agreement to engage in Community Policing at the Buffalo Municipal Housing Authority; 5) the current and historical context, surrounding BPD's racially disparate enforcement practices; and 6) the fact that City officials failed to take any meaningful steps to evaluate or address the race-based impact of its law enforcement and discriminatory policing tactics practices despite longstanding and widely reported racial disparities and community complaints.

Buffalo's targeted high-level and frequently unconstitutional policing of predominantly high-concentration minority neighborhoods and public housing buildings with minimal oversight or accountability disproportionately harms African American and Latino residents. As a result of these practices, racially disparate impact is present at every stage of BPD's enforcement actions, from the neighborhoods and public housing residences targeted in the frequent and systematic unconstitutional policing efforts described above to arrests and uses of excessive force.  These disparities and tactics have eroded community trust essential for effective policing and crime-solving. The overwhelming evidence below establishes a clear violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

BPD arrests for misdemeanors are disproportionately African-American, and disproportionately young, in relation to their representation in the community. Racial disparities in BPD arrests have grown significantly in the last ten years—even for crimes committed at similar rates by Whites and African Americans. These aggressive policing tactics have substantially increased the number, disparity and comparative arrest rate of racial minorities for lowest-level marijuana misdemeanor possession, while largely remaining stable or falling for Whites. Despite consistent surveys showing similar marijuana use rates by Whites, African Americans in Buffalo were seven times more likely to be arrested for misdemeanor marijuana possession in the last ten years (2006-2015), compared to only four times as likely to be arrested as Whites in the ten years prior to Brown's election (1996-2005). [142] Similarly, Latinos, who had approximately the same arrest rate as Whites from 1996-2005, are now more than twice as likely to be arrested for low level misdemeanor marijuana possession since Brown was elected (2006-2015). [143] African Americans accounted for 81.4% of all low-level misdemeanor marijuana possession arrests from 2013-2015;[144] of the 1562 people BPD arrested for the low level marijuana misdemeanor offenses during the study period, 1,271, were African American, while only 12%, or 191 were White.[145]

- BPD disproportionately arrests African Americans. Data collected by the Buffalo Police Department from 2013 to 2015 shows that African Americans accounted for 52.06% (11,975) of all 22,648 misdemeanor arrests made by BPD officers, despite comprising only 38% of Buffalo's population. [146]

---

[141] *Davis v. City of N.Y.*, 959 F. Supp. 2d 324, 360-64 (S.D.N.Y. 2013) (denying City summary judgment on plaintiff's equal protection complaint for discriminatory trespass enforcement)

[142]  DCJS, Computerized Criminal History system.

[143]  DCJS, Computerized Criminal History system.

[144]  DCJS, Computerized Criminal History system.

[145] DCJS, Computerized Criminal History system. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )

[146] DCJS, Adult Arrests Reported by Buffalo City PD, DCJS Computerized Criminal History system (as of 4/21/2016).

- o Controlling for population, the misdemeanor arrest rate for African Americans (44/10,000) was almost twice as high as whites (25/10,000).

- For minority youth, these racial disparities are even steeper: African American youth accounted for 68.8%, or 721, of the 1,048 16-17 year olds arrested for misdemeanors by BPD officers, while Whites comprised only 15.8% of arrests. [147]

    - o The average arrest rate during the study period was also higher for African American youth than whites, and significantly higher than for adults: African American 16-17 year olds arrest rates *stand* at 70.74/10,000, more than twice the rate of whites (29.31). [148]

    - o Overall, African American youth comprised 75% of all arrests BPD made of children under 16 ("juvenile arrests") from 2013 to 2015.  During the three-year study period, the BPD arrested 2,242 African American children under 16, out of a total of 2,980 juvenile arrests, while only 702 arrests of whites under 16.[149]

    - o Despite comprising 42% of the population, 84% of all Youth Offender arrests made by the BPD were racial minorities. 71% of all Youth Offenders were African American—nearly double the population.[150]

    - o Notably, the racial disparities in youth contact, arrests and detention have steepened over time. In 2014, the federally calculated disproportionate minority contact rate for youth aged 7-15 – which controls for crime – indicated that African Americans were 5.04 more times as likely to be arrested than similarly-situated Whites (up from 4.25 in 2010), and 14.3 times more likely to be detained than Whites (up from 10.6 in 2010). [151]

    - o Further, racial disparities in youth incarceration are significantly higher—almost three times higher—than national averages: While, nationally, African American youth are <u>five times</u> as likely to face incarceration,[152] in the Buffalo region, African American youth in the Buffalo region are 14.3 times more likely to face incarceration compared to their White peers. [153]

- Racial disparities in the BPD's arrests are especially pronounced for lowest-level misdemeanor marijuana possession arrests, even though government surveys indicate that marijuana use rates are similar among race.

---

[147] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).
[148] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).
[149] DCJS, Uniform Crime/Incident-Based Reporting system (as of 5/2/2016)
[150] Youth Offender status is available, as per Article 720 of the Criminal Procedure Law, following the conviction of youth under 15, of Juvenile Offenders, and of 16-18 year-olds for misdemeanors and most felony offenses. Only 4% of those eligible were granted YO status in Buffalo.
[151] Erie County Juvenile Justice Profile: Data Sources. Arrest/Criminal Activity - NYS Division of Criminal Justice Services (DCJS), Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems. JO Arrests - DCJS Computerized Criminal History (CCH) System.
[152] Annie E. Casey Foundation: Reducing Youth Incarceration in the United States. February 2013 Kids Count Data Snapshot. Available at: http://www.aecf.org/m/resourcedoc/AECFDataSnapshotYouthIncarceration-2013.pdf
(last accessed Jan. 1 2017)
[153] Erie County Juvenile Justice Profile: Data Sources. Arrest/Criminal Activity - NYS Division of Criminal Justice Services (DCJS), Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems. JO Arrests - DCJS Computerized Criminal History (CCH) System.

31

o   African Americans accounted for 81.4% of all lowest-level misdemeanor marijuana possession arrests from 2013 to 2015.[154] The BPD arrested African Americans for misdemeanor marijuana possession at <u>seven times the rate of Whites</u> during this period.

o   Of the 1,562 individuals the BPD arrested for the lowest level of marijuana misdemeanor offenses during the study period, 81%, or 1,271, were African American, while only 12%, or 191, were White.[155] [156]

o   Youth are particularly affected: in 2014, for example, of the BPD's 504 marijuana misdemeanor arrests, more than 80 percent (392) of those arrested were individuals under 29, with almost 40 percent (187) between the ages of 21 and 25.[157]

o   Further, Brown's Broken Windows aggressive policing tactics have substantially increased the number, disparity and comparative arrest rate of racial minorities for lowest-level marijuana misdemeanor possession, while largely remaining stable or falling for whites.

`Over time: Since 2006, the number and arrest rate of African Americans for low-level marijuana offenses has grown considerably, while the number of arrests has fallen for Whites and the arrest rate has remained stable; African Americans in Buffalo are <u>seven times more likely to be arrested than Whites for misdemeanor marijuana possession based in the last ten years (2006-2015), compared to only 4 times as likely to be arrested as whites in the ten years prior to Brown's election (1996-2005)</u>.  Similarly, Latinos, who had approximately the same arrest rate as whites from 1996-2005, are now more than twice as likely to be arrested for lowest level misdemeanor marijuana possession since Brown was elected (2006-2015).

o   The BPD arrest rate for lowest-level marijuana misdemeanor possession for African Americans more than doubled from 1996 to 2005, at 18.5 per 10,000 to 38.64 in the last ten years, while nearly tripling for Latinos, rising from 4.4 to 11.16. For Whites, the arrest rate rose only slightly for whites, from 4.3 to 5.72 – despite no change in survey data establishing marijuana use rates are the same.

o   The numbers are staggering: since the City implemented its Broken Windows policing tactics under Mayor Brown in 2006, BPD arrested 4,501 African Americans for lowest-level misdemeanor offenses--almost double the 2,341 arrested in the previous ten years, while tripling the arrests of Hispanics during this period from 105 to 349. In contrast, the number of BPD arrests of Whites for marijuana misdemeanors decreased from 792 during 1996 to 2005 to 786 during 2006 to 2016 .

The BPD continues to arrest large numbers of individuals for low level misdemeanors and public order offenders—rather than issuing warnings or implementing alternative problem-solving techniques.. However, both Buffalo's crime trends and recent analysis of cities with Broken Windows policy  show little evidence that it has worked as intended.  Buffalo's Zero Tolerance policing strategy has led to a breakdown in police-community relations in Buffalo and created a pattern of routine unconstitutional policing aimed at African-Americans and Hispanics. The strategy is more about statistics and revenue than reducing violent crime. This has also resulted in a severe burden on minorities.

---

[154]   DCJS, Computerized Criminal History system (as of 3/24/2015). (4th and 5th degree possession).
[155]   DCJS (as of [DATE-AM]. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *Id*. *See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at <u>http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue</u> )
[156] *Id*.
[157]   DCJS, Computerized Criminal History system (as of 3/24/2015).

**Retaliating against individuals who question or film police actions with impunity**

The BPD routinely retaliates against individuals who criticize its police practices, including practices relating to its discriminatory treatment of African Americans. They subject critics to retaliatory unjustified ticketing, arrests, criminal investigations, lawsuits and other baseless complaints. Reflecting its paramilitary approach and culture of impunity, BPD officers, and the City go through great lengths to suppress dissent amongst officers within the BPD, "suspects" who resist arrest, and witnesses who videotape and/or speak out against police misconduct. These tactics are designed to create fear and suppress all resistance, thereby creating a chilling effect of such expression. In violation of the First Amendment, BPD officers have detained and arrested individuals who lawfully object to police actions or behave in a way that officers perceive as disrespectful.

- We documented 13 cases of unjustified retaliation against residents who exercised their First Amendment rights.  In none of these cases, the BPD officers involved were never internally disciplined or reprimand.

Similarly, the BPD's racially discriminatory conduct and practices exhibits contempt for the rule of law and the constitution, and raises serious issues for people of color in Buffalo. This conduct has undermined the public's trust,  and reduced the legitimacy of the police. Buffalo residents of color now question whether– anyone can protect them with policing.

These are urgent issues because of the pervasive racism and callous disregard for black and brown lives – and their constitutional rights in Buffalo, at the direction and with the complicity of the City's highest leaders. The BPD is not accredited. It has no independent accountability mechanism. And when such free-flowing, unhinged police misconduct is directed—or even permitted with no consequence to the officers involved in these routine constitutional deprivations—acceptance for police misconduct, discriminatory policing and racial violence have become institutionalized within the Buffalo Police Department.

**Background: Demographics, Racial Geography and Zero Tolerance Policing**

## Demographics and Geography

As of the 2014 American Community Survey, Buffalo has a population of 258,699, 55% of which are people of color.[73] Thirty seven percent of the population in the City of Buffalo is African American, 10.5% is Hispanics, while **46% is white.**[74] (Policy link 18)-2014 data.[75]

The City of Buffalo is located within Erie County, which is the largest county outside of the New York City area, with a population of 919,040. Approximately 80% of Erie County's African American population lives within the City of Buffalo.

## Geography and Segregation

Buffalo is considered one of the most segregated cities in America. According to 2016 data, "there are several ways to measure segregation, and Buffalo has among the most severe divisions along racial lines no matter the measure."[76] Given the stark racial concentration, Buffalo is the nation's sixth most segregated city, known as a a hypersegregated city;[77] as of 2010, the Buffalo region ranked as the 6th most segregated region of the 102 largest metros under the whites and African American index, and ranked the highest in the country on the White-Asian index *(22-one region forward)*. Using the exposure and isolation indexes, which measures segregation, only 5% of all white interactions in a given day are with their fellow black residents. Indeed, Buffalo the one of the highest isolation indexes of the country. For example, in 2010, a white resident's typical neighborhood was 88% white, 5% black, 3% Latino and 2% Asian Pacific Islander (23 one region).

The majority of Buffalo's African American population lives on the "East Side," which is East of Main Street and stretches to the Cheektowaga border in the West.[80] Whites are concentrated primarily in the Elmwood area (central), north Buffalo and in south Buffalo. Latinos and Asians are heavily concentrated on the Western border of Buffalo, which borders Lake Erie. [81]In most of the East Side census tracts, more than

---

[73] G. Scott Thomas, *Minority groups account for 55% of Buffalo's residents, says new federal report*, Buffalo Business First (Sept 22, 2015) (*available at* https://www.bizjournals.com/buffalo/blog/morning_roundup/2015/09/minority-groups-account-for-55-of-buffalo-s.html). As of 2016, Buffalo had a total population of 256,902. United States Census Bureau, State & County Quickfacts: Buffalo (city), New York, *available at* https://www.census.gov/quickfacts/fact/table/buffalocitynewyork/PST045216

[74] Tracey Ross, *Health Equity: The Path to Inclusive Prosperity in Buffalo* (summary), PolicyLink, at 18 (May 2017) (*available at* https://ppgbuffalo.org/files/documents/health/health_disparities/health_health_equity_the_path_to_inclusive_prosperity_in_buffalo.pdf ).

[75] *Id.* Note, the African American population declined for the first time in Buffalo's history in the 2010 census and has continued to decline. In 2010 just over 45% (45.8) of the population is white, while 38.6% wasAfrican American, and 10.5% Hispanic or Latino. *Id.* According to the 2014 Community Survey, 115,697 (44.7 percent) of residents are white, 93,464 (36.1 percent) are Black, 27,708 (10.7 percent) are Hispanic, 14,554 (5.6 percent) are Asian, including Pacific Islanders, 5,178 (2.0 percent) are multiracial, 1,099 (0.4 percent) are Native American, and 999 (0.4 percent) are some other race.G. Scott Thomas, *Minority groups account for 55% of Buffalo's residents, says new federal report*, Buffalo Business First (Sept 22, 2015) (*available at* https://www.bizjournals.com/buffalo/blog/morning_roundup/2015/09/minority-groups-account-for-55-of-buffalo-s.html).

[76] Michael B. Sauter and Thomas C. Frohlich, *America's Most Segregated Cities*, 24-7 Wall Street (September 8, 2016) (*available at* http://247wallst.com/special-report/2016/09/08/americas-most-segregated-cities-2/5/). ("While nationwide 23.9% of African Americans live in primarily black neighborhoods, in Buffalo 42.2% live in primarily African American neighborhood.")

[77] http://buffalonews.com/2015/07/08/tackling-the-regions-racial-divide/

[80] University at Buffalo Regional Institute's '*A Community Report- City Of Buffalo (East Of Main Street)*' February 2014) (available at http://regional-institute.buffalo.edu/wp-content/uploads/sites/3/2014/06/Strengthening-WNYs-Safety-Net-Buffalo-East.pdf )

[81] U.S. Housing and Urban Development Department, *Affirmatively Furthering Fair Housing*

34

85% of the population is African American,[82] with many neighborhoods comprised of 92 percent people of color. (AI).[83]

Under federal HUD standards, almost 90% of all block units in Buffalo, or 253, are considered racially and/or ethnically concentrated. Approximately 83% (210) of these racially concentrated areas are also considered low- and moderate concentrated areas. AI at 24. Approximately 37% of all block groups, or 107 of 292, are considered racially concentrated with African Americans; all of these areas are on the East Side of Buffalo.[84] In addition, 15%, or 45, of all block groups are Hispanic-concentrated located in the West and North..[85] The East and North East section of the city remains mostly Black and the east and southeast mostly White,[86] with pockets of Hispanic-concentrated areas (AI-).

## Buffalo Municipal Housing Authority BMHA

The Buffalo Municipal Housing Authority (BMHA) was created as part of a depression-era New Deal in 1934 by Buffalo's Common Council, and was granted the power to operate as a separate and independent government body by New York State Legislation enacted that same year.[87] The BMHA's mission is to provide "safe and affordable housing," and "to preserve as many public housing and affordable units as possible to create self-sufficient opportunities for our residents."[88]

The BMHA is controlled and managed by a board of seven members: five are appointed by the Mayor of Buffalo and who are elected at-large from the tenant population.[89]  The BMHA currently owns, manages, and operates 4,307 units in 27 different developments. The BMHA also distributed 1,372 housing vouchers through the Federal Section 8 housing program, which differs from project-based subsidized housing in that it allows recipients to rent from qualified private landlords using these housing vouchers.[90]

According to BMHA data, in 2015, 87% of BMHA residents were racial minorities. 75% are African American, and 12% are Latino. The average household size two, in a one-bedroom apartment. The three highest family types throughout the projects are: Non-Elderly, with children, non-disabled (32%), Female head of household with children (32%), and Non-elderly, no children, non-disabled (23%). Apartment sizes range from efficiencies (one person) to six bedrooms.[91] Most residents are living in deep poverty, with 73%

---

*Map Tool*, Map 1- Race/Ethnicity, (July 2016), (available at https://egis.hud.gov/affht/#. )

[82] Jerry Zremski, *Tackling the region's racial divide*, The Buffalo News (July 8, 2015) (*available at* http://buffalonews.com/2015/07/08/tackling-the-regions-racial-divide/ ).

[83] As of 2000, over 85% of blacks lived east of Main Street. Li Yin, *The Dynamics of Residential Segregation in Buffalo: an Agent-based Simulation*, Urban Studies 46(13), 2749-2770, December 2009.

[84] The City has defined a racially concentrated area to be any area in which the percentage of a single ethnic or minority group is at least 10 percentage points higher than across the City overall. 2014 A Impediments at 24.

[85] AI 24. Under Buffalo's definition of racially concentrated block groups, in a Hispanic-concentrated block group at least 21% of the population is Hispanic. 2014 AI at 24.

[86] Tracey Ross, *Health Equity: The Path to Inclusive Prosperity in Buffalo* (summary), PolicyLink, at 9 (May 2017) (*available at* https://ppgbuffalo.org/files/documents/health/health_disparities/health_health_equity_the_path_to_inclusive_prosperity_in_buffalo.pdf ). The data is based on a PolicyLink/PERE analysis of data from The Reinvestment Fund and the U.S. Census Bureau. The "[d]ata on population by race/ethnicity reflects a 2010 through 2014 average. LSAs are defined as areas where residents must travel significantly farther to reach a supermarket than the "comparatively acceptable" distance traveled by residents in well-served areas with similar population densities and car ownership rates.". *Id.*

[87] Aimee Hopkins, *Buffalo Municipal Housing Authority: History, Demographics, and Governance* (March 12, 2015)

[88] Id.

[89] Hopkins, Aimee, *Buffalo Municipal Housing Authority: History, Demographics, and Governance* (March 12, 2015)

[90] BMHA Four Year Plan, *available at* https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/FourYearPlan2014/BMHA_Four_Year_Plan.pdf

[91] Hopkins, Aimee, *Buffalo Municipal Housing Authority: History, Demographics, and Governance* (March 12, 2015)

35

having an extremely low income (0% to 30% of the area median), 18% having a very low income (31% to 50% of median), and 7% having a low income (51% to 80% of the area median).[92]

**Buffalo Police Department**

The City of Buffalo operates and maintains the City of Buffalo Police Department (hereinafter "BPD"), located at 74 Franklin Street, City of Buffalo, County of Erie, State of New York. The Buffalo Police Department is the principal law enforcement agency of the City of Buffalo. It serves the residents of the City of Buffalo, which is approximately 260,000 people in a geographic area of approximately 41 square miles. As of 2015, the BPD has 780 sworn officers.[93]

As the head of BPD, Commissioner Derenda is vested with the authority to set its policies and procedures, which he implements both individually and through his officers

*BPD Strikeforce Unit*

The City and BPD previously initiated an "Operation Strike Force" from August-November 2016, when launching its Zero Tolerance policing program. From August 12 to November 19, 2006, the City's Operation Strike Force made 1,848 arrests, impounded 1,071, seized $173,272 in cash and confiscated 69 guns. This unit was turned into the "Mobile Response Unit, consisting of a team of 30 officers focused on removing illegal guns, targeting gangs and drug traffickers." [94]

*BPD Housing Unit*

In 2010, the City entered into an agreement[95] with the BPD to provide policing services. Under this contract, the Buffalo Municipal Housing Authority residents paid the City of Buffalo $650,000 for police to work "above and beyond baseline services." The agreement requires the police are to provide a "comprehensive security strategy" that includes community policing. Following the enactment of the agreement, Mayor Brown announced the creation of the BPD Housing Unit to enforce the agreement. BPD Housing Unit officers are assigned to patrol the *27* Buffalo Municipal Housing Authority properties located in Buffalo. In exchange, BMHA agreed to pay $63.96 per officer hour, with court time costs separately billed, and total compensation not to exceed $650,000 per year.[96] It has since increased to over $1 million a year. BPD maintains a substation, entitled the Housing Unit located at the Buffalo Municipal Housing Authority's Commodore Perry Homes, 312 Perry Street, City of Buffalo, County of Erie, State of New York.

---

[92] Buffalo Municipal Housing Authority, "Resident Characteristics Report" (March 11, 2015), PPG, Report. *Available at http://www.openbuffalo.org/files/documents/community_policing.pdf*

[93] DCJS, Uniform Crime Reporting system (as of 4/27/2015); Mayor Byron Brown's Adopted 2014-2015 Budget for the Buffalo Police Department, (*available at* http://city-buffalo.com/files/1_2_1/Mayor/2014-2015AdoptedBudget/Police.pdf ). The DCJS data includes law enforcement employees on each agency's payroll as of October 31. It excludes employees assigned to jail duties.  Note that some of the 2015 figures are estimates that were available at the time of the Mayor's issuance of the most recent budget for the City of Buffalo.

[94]Common Council of the City of Buffalo, NY, *Action Plan for the City of Buffalo for the Fiscal Year 2007-2008* (April 2, 2007) (available at   https://www.ci.buffalo.ny.us/files/1_2_1/common_council/2007-08%20Council%20Action%20Plan.pdf )

[95] 41 See BMHA-BPD Contract, available at http://bflopoverty.
wikispaces.com/BMHA+Contract+with+City+of+Buffalo+for+Policing)

.

[96] 41 See BMHA-BPD Contract, available at http://bflopoverty.
wikispaces.com/BMHA+Contract+with+City+of+Buffalo+for+Policing)

.

Beginning in 2013, and especially in 2014-2015, BMHA residents, attorneys and advocates lodged serious public complaints with every level of government about the BPD Housing Unit's discriminatory and unjustified stop and search tactics, false arrests and simultaneous failure to unresponsiveness to calls although neither the City, BMHA or BPD has taken any action—and in fact the City has expanded the BPD's presence in predominantly minority housing units. The tenants requested that the Common Council and Mayor end the contract with BPD for policing services. However, instead of responding to residents' concerns at multiple Common Council hearings, the City renewed the BPD Housing Unit contract in 2015 and increased the payment to BPD for security services to $1 million a year.

Beginning in 2013, BMHA residents launched a campaign to terminate the City and BMHA's contract with BPD because of strong concerns of unjustified stops, sweeps and arrests and harassment of minority youth—while also a high level of under policing and unresponsiveness to legitimate security concerns. During this time, BMHA tenants, their lawyers and advocates repeated testimony about the BPD's behavior and requests at Common Council hearings to end the City's "community policing" contract with BPD from 2014-2015. In January 2015, Tenant council leader Sam Smith stated in a letter to the executive director of the BMHA, the president of the Jurisdiction-Wide Resident Council informing her that the BPD Housing Unit was not meeting its contractual duties to provide more than baseline services and to communicate with residents, develop a security program, and use community policing.[97] He made clear that "[w]e do not want the contract to go forward because it's a waste of taxpayer dollars," said Sam Smith.[98] BMHA residents, their criminal defense attorneys and civil rights lawyers and organizations in Buffalo have stated that they are receiving frequent reports from BMHA residents of these illegal enforcement tactics. For example, in January 2015, Attorney and National Lawyers Guild leader John Lipsitz testified to the Common Council on this issue:

> BMHA residents... have expressed concern that their children, themselves, and their guests are unfairly stopped, questioned, and arrested for trespass. People report being stopped repeatedly and asked to produce identification, questioned because of lack of identification, stopped because of use of the public outdoor spaces around the buildings, and subjected to other troubling encounters with police officers who regularly patrolled the buildings.[99]

Similarly, Joseph Kelemen of the Western New York Law Center and the Buffalo Chapter of the National Lawyers Guild testified at a meeting with the Police Oversight Committee on November 5, 2014 and voiced concerns about the lack of security in BMHA properties. He stated "Many residents and their guests have reported that they are repeatedly stopped, questioned, and arrested for trespass. Interactions of this kind erode the legitimacy of the police in the eyes of the community and keep victims and witnesses from reporting crimes, thus fueling a downward spiral in police community relations."[100] In a Fall 2013 Common Council held a public meeting about the BMHA Agreement, residents raised concerns about aggressive

---

[97] Letter from Sam Smith, President, Jurisdiction Wide Resident Council, to Dawn Sanders-Garrett, Executive Director, Buffalo Municipal Housing Authority. (quoted in PPG Policy Brief, Poverty, Race, and Community Policing in Buffalo, Partnership for Public Good at 2 (March 27, 2015)
[98] Buffalo Municipal Housing Authority needs to hire its own police force
BY: Rod Watson
[99] Megan Williams, *Buffalo's Stop and Frisk Problem*, The Public, Jan. 13, 2015 available at http://www.dailypublic.com/articles/01132015/buffalos-stop-and-frisk-problem
[100] Megan Williams, *Buffalo's Stop and Frisk Problem*, The Public, Jan. 13, 2015 available at http://www.dailypublic.com/articles/01132015/buffalos-stop-and-frisk-problem . John Lipsitz of the National Lawyers Guild similarly testified that "[t]he constant policing, involving frequent stopping and questioning for innocent behavior, commonly referred to as stop and frisk, has led to community concern, and general distrust of the police on BMHA property." *Id.*

37

policing tactics and the BPD Housing Unit's lack of security, fearful of both BPD officers and criminals.[101] When residents raised their concerns again during a Common Council hearing last May, Recently *Former* University District Councilman Rasheed Wyatt said he had visited and talked with Kenfield-Langfield residents and reported "They don't feel safe."[102] In Fall 2013, Council President Darius Pridgen further expressed concerns that the BPD BMHA policies essentially "leave people as almost prisoners in their homes," and called on fellow councilmembers to address the problem.[103] In March 2014, former BMHA tenant-elected member submitted a letter to the Common Council requesting that the City and BMHA rescind its contract with the BPD in light of these issues.[104]

Instead of responding to residents' concerns at multiple Common Council hearings, the City renewed the BPD Housing Unit contract in 2015 and increased the payment to BPD for security services to $1 million a year.

**Racialized Urban Renewal Agenda**

**BMHA**

Similarly, beginning in 2013, the BPD Housing Unit, comprised of 21 officers assigned to the provide policing to BMHA residents within Buffalo, also began engaging in unconstitutional checkpoints, as well as as suspicionless trespass stops and related "sweeps" in predominantly minority BMHA buildings. The BPD HU also conducted unconstitutional checkpoints and false trespass arrests and trespass sweeps without any reasonable suspicion almost exclusively in predominantly African American and minority public housing projects.[105] In 2014, a court found the BPD HU suspicionless trespass sweeps unconstitutional, and by 2014 the increasing number of BMHA trespass arrests were "mostly all getting dismissed" by judges, either for improper stops or wrongful arrests of residents, in violation Fourth Amendment violations.[106] A court also ruled that a March 2015 BPD HU checkpoint unconstitutional under the Fourth Amendment.[107] During both hearings BPD Housing Unit officers testified to conducting "hundreds" of similar checkpoints and trespass sweeps to those found unconstitutional, with no guidelines or rules.[108] By 2016, BMHA had proposed a codification of a suspicionless trespass rule in the ACOP.

---

[101] John Lipschitz and Sam Smith, *Another Voice: Buffalo Police must address of BMHA Residents Before Agreement is* Renewed, The Buffalo News (Jan 29, 2015) (*available at* http://www.buffalonews.com/opinion/another-voice/another-voice-buffalo-police-must-address-concerns-of-bmha-residents-before-agreement-is-renewed-20150129).

[102] Matt Gyrta, *Kenfield-Langfield residents ask for more police presence*, The Buffalo News (Sept 3, 2015) ("If we know we have a problem [with the BPD BMHA Unit] and the system we have right now is not working, then you don't continue the same system and leave people as almost prisoners in their homes "I've been to Kenfield-Langfield, and talked to the people," said University District Councilman Rasheed N.C. Wyatt. "We have to listen to them, so people feel comfortable and safe. Right now they don't feel safe." )

[103] Matt Gyrta, *Kenfield-Langfield residents ask for more police presence*, The Buffalo News (Sept 3, 2015) ("If we know we have a problem [with the BPD BMHA Unit] and the system we have right now is not working, then you don't continue the same system and leave people as almost prisoners in their homes "I've been to Kenfield-Langfield, and talked to the people," said University District Councilman Rasheed N.C. Wyatt. "We have to listen to them, so people feel comfortable and safe. Right now they don't feel safe." )

[104]

[105] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.").

[106] http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217

[107] *People v. Dzielski*, Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016); *Michigan v. Sitz*, 496 U.S. 444, 455 (1990) (upholding a sobriety checkpoint at which all motorists are briefly stopped for preliminary questioning and observation for signs of intoxication only because it adopted standardized guidelines that minimized arbitrary individual discretion).

[108] *People v. Dzielski*, Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016); *Michigan v. Sitz*, 496 U.S. 444, 455 (1990) (upholding a sobriety checkpoint at which all motorists are briefly stopped for preliminary questioning and observation for signs of intoxication only because it adopted standardized guidelines that minimized arbitrary individual discretion).

0043

The scope of BPD HU's efforts and unconstitutional tactics has been substantial, and has had a severe disproportionate effect on Buffalo's residents of color. According to the BPD HU's records, from May 2013-May 2014, even though BMHA residents at that time comprised 2.6% of all Buffalo residents (12,000), the BPD Housing Unit made 2,399, or 28% of all misdemeanor arrests in Buffalo in and around BMHA buildings[109] --- but recovered only 18 guns—less than 3% of the 607 guns recovered in Buffalo in 2014.[110] Traffic misdemeanor arrests comprised the largest category of arrests, from 2013-2014, the BPD Housing Unit made 1,650 arrests traffic misdemeanors comprising 44% of all BPD Housing Unit arrests..[111] In 2015, despite widespread opposition and hearings, the Common Council reapproved the BPD contract to police BMHA.

Further, and as evidence of the City's racial bias, during this time the City and BMHA targeted residents in minority buildings – in gentrihying areas- for mass evictions and advanced a redevelopment plan that explicitly called for displacing minority residents – revealing Buffalo's racial bias in renewal. In 2014; brown appointing general counsel; hired outside firms improperly to evict tenants-4039 civil suits] In February 2014, for the first time, BPD Housing Unit Chief Patrick Roberts met with BMHA Deputy Director Modesto Candeleria regading "day to day operations of the Buffalo Police Department's Housing Unit."[112] This is the first and only meeting listed with Mr. Candeleria. In adition, Chief Roberts met with BMHA General Counsel David Rodriguez. Following that meeting, BPD stepped up policing and illegal trespass sweeps and arrests in Perry.

In 2014, during this period of accelerated aggressive, low level broken-windows and, frequently unconstitutional, policing in BMHA, the BMHA began bringing an unprecedented number of eviction proceedings against BMHA residents . In 2014, BMHA filed 4026 civil law suits in New York state courts[113] which, according to housing attorneys and a review of court records, were largely eviction proceedings against BMHA tenants.[114] The high number of BMHA eviction cases is significant, as BMHA only had 4,332 units in 2014. Put differently, BMHA 4,026 represented 93% of all BMHA tenant units. BMHA filed so many lawsuits that year that it ranked as the Ninth most prolific civil filer in New York State; ranking BMHA above NYCHA.[115]

*Tenants and leading housing legal service attorneys note that the number of BMHA civil eviction proceedings may not represent the number of individuals who faced eviction because during this time, BMHA often sued tenants multiple times for back rent.* Legal housing service directors and tenants both confirm BMHA has initiated an increasing and record number of eviction civil suits against tenants since

---

109 *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.
110 Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Office of Strategic Intelligence and Information, *2014 New York Firearms Trace Data*, DOJ-ATF Firearms Tracing System, 10 (available at
https://www.atf.gov/about/docs/report/new-york-firearms-trace-data-%E2%80%93-2014/download ).
111 *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014. . In 2013-2014, the BPD HU arrested 2,172 individuals for misdemeanor arrests in and around BMHA, (which accounted for 28% of all of Buffalo's misdemeanor arrests during this period despite the fact that BPD residents comprise only 2.6% of Buffalo's population).
112 *Buffalo Police Department Housing Statistic Report for February 1, 2014 to February 28, 2014*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brinkworth, Housing Chief, dated March 2, 2014. (on file with author) (Report author's name redacted).
113 Chris Albin-Lackey, *Rubber Stamp Justice: U.S. Courts, Debt Buying Corporations, and The Poor*, Human Rights Watch, at 14-15 *available at* https://www.hrw.org/sites/default/files/report_pdf/us0116_web.pdf (last visited Feb. 18, 2016).
114 Chris Albin-Lackey, *Rubber Stamp Justice: U.S. Courts, Debt Buying Corporations, and The Poor*, Human Rights Watch, at 14-15 *available at* https://www.hrw.org/sites/default/files/report_pdf/us0116_web.pdf (last visited Feb. 18, 2016).
115 HUD OIG, available at https://www.hudoig.gov/sites/default/files/documents/2015-NY-1003.pdf

39

2012 leaving hundreds of BMHA's overwhelmingly African American and Latino residents and families without homes.  From 2010-2014, for example the BMHA tenant docket for Neighborhood Legal Services, the largest area free legal service providers for BMHA tenants, grew by 87%, or from 770 in 2010 to 1441 in 2014.[116]

> o **During the  three full years of the study period (1/1/13-1/1/16), WNY Legal Services represents tenants in 3940 eviction proceedings, increasing by more than 900 (32%) over the 2988 cases it handled the three years prior to the study period.**[117]

**BMHA Explicitly Racially Discriminatory Perry Plan**

Also reflecting the City's larger racial bias, in January 2014, the Buffalo Municipal Housing Authority (BMHA) and the City of Buffalo submitted a controversial proposal to HUD to transform one of its prime waterfront public housing properties, Perry Commodore Homes into a destination of "choice" by explitictly proposing to "decrease the concentration of minority (African American) population in the Perry neighborhood." Not only is this goal unconstitutional, but the City and BMHA proposal relied on race-based stereotypes in justifying this "deconcentration plan."[118] The proposal, entitled the Perry Choice Improvement Plan sought to redesign Perry, which is located on the Erie Canal in the southern portion of Buffalo's predominantly African American East Side. Currently, 80% of Perry's 971 residents are African American, 14% are Latino and the remainder of the population is white,[119]  and approximately 42% of the residents live at or below the poverty line,

The Perry Transformation Plan fund sought to "revitalize" of Perry and he surrounding neighborhood with commercial development, additional units and more white and more mixed income families. It explicitly included as one of its "Goals,  Outcomes and Metrics" the plan's goal of "[d]ecrease concentration of minority (African American) population in the Perry Neighborhood" for the long term goal of "making it similar to [the] rate in the city as whole," and to decrease the number of tenants who receive federal benefits and are enrolled in food stamps.[120] In a BMHA Council meeting, BMHA Executive Director Modesto Candelario confirmed that the plan would requiring displacing African American residents, even though the plan proposed replacing the existing 222 public housing units with 414 public housing units and an additional 415 mixed-income units.[121]

---

[116] Interview and emails with Buffalo Neighborhood Services Supervising attorney Grace Andriette, January 29, 2016 (emails on file with author).

[117] *Id*.

[118] Buffalo Municipal Housing Authority, *Perry Choice Neighborhood Transformation Plan* at 30, 34. (June 2013). (*available at* https://ubwp.buffalo.edu/aps-cus/wp-content/uploads/sites/16/2015/04/BMHA_Buffalo_Perry_Choice_Transformation_Plan_FINAL-June-27-2013.pdf). BMHA began developling the plan in 2012 with UB's Center for Urban Studies after securing a $250,000 Housing and Urban Development Choice Neighborhoods planning grant. Despite the racially exclusionary provisions, the resulting Perry Choice Neighborhood redevelopment plan, chad a number of positive aspects by seeking to create an environment that will improve the lifestyle and opportunities of public residents; according to Dr. Henry Taylor, director of the  UB Center for Urban Studies and an author of the plan, "the plan will help neighborhood residents "develop high levels of critical consciousness" so they can understand the economic and political forces at work in their community." *See* Office of Policy Development and Research, *University at Buffalo Supports Neighborhood and Regional Growth*, U.S. Department of Housing and Urband Development Office of Policy Development and Research (available at https://www.huduser.gov/portal/casestudies/study_03242014_1.html ).

[119] Buffalo Municipal Housing Authority, *Perry Choice Neighborhood Transformation Plan* at 3-5, 47-8. (June 2013).. (*available at* https://ubwp.buffalo.edu/aps-cus/wp-content/uploads/sites/16/2015/04/BMHA_Buffalo_Perry_Choice_Transformation_Plan_FINAL-June-27-2013.pdf). The median income for Commodore Perry Householdsis about $9,500 annually and the average is $11,300. *Id*.

[120] *If*. The plan also sought to decrease the number of tenant households receiving benefits and participating in safety net program, as measured by the percent of households nenrolled in food stamps, TANF,  and SSI—in direct contravention to the purpose of public housing.

[121] Harold McNeil, *Plan to 'diversify' Perry neighborhood raises fears*, The Buffalo News, Jan. 26, 2014 (available at http://mobile.buffalonews.com/?articleRedirect=1&url=http%3A%2F%2Fwww.buffalonews.com%2Fcity-

The Plan justifies the displacing African American and minority tenants from public housing through a "diversity rationale," and through a problematic racially coded notion that increasing the number of white and middle-income residents can approve the standard of living for minority residents. Specifically, the Plan suggests that exposing African American residents and youth to "community norms, standards and values," ostensibly created by the new white, middle class residents will improve the neighborhood-level crime problems among minority youth and "low-aspirational level among many blacks and Latinos." Specifically, the Plan states the strategy will be effective because the new, white "community residents will engage young people in a battle of ideas, with the goal of getting them to adopt community norms standards and values." Noting that neighborhood development and public safety must march in tandem, the proposal called for increased "hot spot" policing strategies, which are already in place in Buffalo. In 2014, HUD rejected the Perry Plan because, according to the Buffalo News, the Plan "stated that diluting the concentration of African Americans was an objective of the project."[132]

As BMHA was developing the Perry Choice Plan and even after its submission in January 2014, BMHA also began moving ahead with it by closing an increasing number of units and and letting units go into disrepair, resulting in the displacement hundreds of tenants to other Perry apartments and to BMHA units, 92% of which are in African American neighborhoods—despite having a waitlist.

---

region%2Fbuffalo%2Fplan-to-diversify-perry-neighborhood-raises-fears-20140126 ). Notably, the plan had several positive features to improve the life of Perry residents

[132] The Buffalo News (April 11, 2015)

**Broken Windows and Urban Renewal Policing Strategy: Scope and Costs**

For the last ten years, Buffalo has implemented an aggressive "Zero Tolerance" enforcement policing strategy that it accelerated in 2012 with systematic unconstitutional policing tactics, directing officers making large numbers of stops, searches and arrests—and often resorting to force—with no justification – and with minimal training and inadequate or no oversight from supervisors or through accountability structures. These practices have led to repeated violations of the constitutional and statutory rights, particularly of Buffalo's minority residents, **and institutionalized a culture of disregard for minorities' constitutional rights**. These tactics were implemented when current Buffalo Mayor Byron Brown took office in 2006. Mayor Brown was elected in 2005 and took office in 2006 under a "Tough on Crime" platform focused on generating revenue through fines and increasing investment into Buffalo through urban renewal.[123]

Following his election, Mayor Byron immediately announced and implemented a concerted "Zero Tolerance" campaign "clean up Buffalo," explicitly to support "urban renewal" the City in 2006.[124] Mayor Brown specifically made clear the primary purpose of this campaign was to make the City safe for "new residents," to bring in "new residents and businesses" to Buffalo. In 2006, Mayor Brown announced his "Zero Tolerance Action Plan," which served as the flagship policing strategy throughout his tenure in office. He implemented his plan by working in close collaboration first with Police Commissioner H. McCarthy Gipson, and then with Current Police Commissioner Daniel Dorinda,[125] who replaced him in 2007, who provided Police Department chiefs with "specific goals and measurable statistical objectives." Mayor Brown's objectives included "stepped-up enforcement of violations of all city ordinances that relate to quality of life issues[,]" drug crimes, as well as "existing city parking regulations and ordinances."[126] Other areas of focus for the Zero Tolerance campaign included youth curfew enforcement; prostitution; street gambling; illegal weapons; panhandling; illegal street vending; littering; open container laws; and obstruction of sidewalks/storefronts."[127] To ensure compliance with the plan, "[e]ach District [was] required to provide information weekly on the number of violations enforced and the number of violations enforced per shift."[128] The City also incorporated the CitiStat tracking system, modeled after the Baltimore Police Department's CitiStat program.[129]

Mayor Brown and Commissioner Derenda made clear that the Zero Tolerance plan took the form of a Broken Windows policing strategy, which targeted primarily minority neighborhoods and public housing developments. While in his policy and public statements, Mayor Brown asserted that increased policing was necessary to increase the "quality of life for all," the BPD policing tactics made he and Derenda adopted made clear that a primary goal was to ensure that there was no deterrent effect to <u>new residents</u>, or "individuals, families and business from locating in or investing in "unsafe areas."[130] The City's policy

---

[123] Mayor Byron W. Brown
https://www.ci.buffalo.ny.us/Home/Leadership/Mayor/Mayor_s_Plans_and_Proposals/LawEnforcementActionPlan
[124] While the study period for this complaint dates is from January 1, 2013, this context is paramount to understand the current unconstitutional practices as several of the practices and programmatic violations here date back to 2006
[125] *Id*.
[126]
[127] *Id*.
[128] *Id*.
[129] Mayor Byron W. Brown, *Mayor Brown Announces Zero Tolerance Plan: Law Enforcement Plan Addresses Quality of Life Crimes*, City of Buffalo Press Release (March 8, 2006). (available at
https://www.ci.buffalo.ny.us/Mayor/Home/Leadership/PublicRelations/Archive_Press_Releases/2006_Archives/March_2006/MayorBrownAnnouncesZeroTolerancePlan )
[130] "Buffalo Fights Crime," Mayor Byron Brown, Moving Buffalo Forward: Policy Briefs from the Brown Administration: Vol. 1.2, June 2007 (available at https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/BuffaloFightsCrime.pdf )

0047

priority was on crime and economic issues that "compromises the quality of life for all and discourages individuals, families and business from locating or investing in unsafe areas."[131]  ("For Buffalo to be competitive with other regions, reducing its crime rate is imperative and bolstering the police force is one of our prime opportunities for advancement.")[132]  In launching the program, the Mayor stated that "[f]or Buffalo to be competitive with other regions, reducing its crime rate is imperative and bolstering the police force is one of our prime opportunities for advancement."[133]

While Brown and Derenda announced that the plan was to be implemented throughout the city, the BPD's Zero Tolerance enforcement has focused on minority communities, and particularly the City's East Side which is predominantly minority.  Mayor Brown and Commissioner Derenda directed "Zero Tolerance" policies – predominantly, if not exclusively in minority neighborhoods, and mostly Buffalo's East Side, which is 90% African American.  Brown and Derenda directed BPD officers to saturate minority neighborhoods in this ostensible crime-reduction campaign, by using a variety of enforcement strategies that involved stopping innocent residents without any reasonable suspicion. Low-level officers were directed to conduct suspicionless vehicle stops and sweeps in minority neighborhoods, and given unbridled discretion and incentivized to proactively identify and make aggressive low-level arrests, substantially increasing the number of minorities arrested for discretionary crimes as well as the risk of constitutionally defective policing. Under this policy, by an overwhelming and disproportionate majority, Buffalo police departments arrested primarily African American and Hispanic men and youth in poor neighborhoods.  Often these arrests have been for loitering, possessing tiny amounts of marijuana, pushing these men into the criminal justice pipeline.

Unfortunately, the City, BMHA, and BPD's adherence to the City's Zero Tolerance approach to policing indicates that the BPD appear to be under the misapprehension they can randomly "sweep" certain ethnic and racial groups and impose roadblocks and checkpoints based on generalized stereotype and presumption that all African Americans and minorities could be criminals-- with impunity, provided the goals sought are laudable in and of themselves.

---

[131] "Buffalo Fights Crime," Nayor Byron Brown, Moving Buffalo Forward: Policy Briefs from the Brown Administration: Vol. 1.2, June 2007, available at https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/BuffaloFightsCrime.pdf

[132] "Buffalo Fights Crime," Nayor Byron Brown, Moving Buffalo Forward: Policy Briefs from the Brown Administration: Vol. 1.2, June 2007, available at https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/BuffaloFightsCrime.pdf

[133] "Buffalo Fights Crime," Nayor Byron Brown, Moving Buffalo Forward: Policy Briefs from the Brown Administration: Vol. 1.2, June 2007, available at https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/BuffaloFightsCrime.pdf

**Police Expansion: Tax Burden**

The City's Broken Windows strategy has not only targeted the African American community, but also been costly to all Buffalo residents tax payers and counterproductive; the City has substantially increased the BPD's budget, personnel and significant overtime costs over the last ten years – even as the population in the City of Buffalo has decreased. During the study period, the City increased spending on the Police Department by $13 million, spending $241.5 million from 2013-2015, compared to $228.4 million the previous 3 years (2010-2013).[134]

The number of sworn full time BPD officers increased by 10.1% from 708 in 2007 to 780 in 2015.[135] Just in the last three years, the BPD tripled new hires and recruitment class his tripled, from 32 in 2012 to 80 in 2015,[136] and the number of sworn full-time BPD officers rose from 741 to 780,[137] Simultaneously, even as BPD personnel increased as the Buffalo population declined, the City's spending on salary and overtime costs has grown at an even faster rate than the number of new officers. While BPD officers increased by 10% between 2007-2015, Police overtime costs more than doubled from $4.6 million in 2007 to a projected $9.2 million in 2015 while spending for BPD Patrol salaries increased by 56.1%.

In September 2016, the Buffalo Department of Audit and Control (DAC) conducted an audit of the overtime usage at the Buffalo Police Department for Fiscal Years 2014 – 2016 and found substantial and increasing expenditures on BPD overtime.[138] During this period, the BPD averaged approximately $13.8 million and 291,000 hours annually for FY 2014-2016. Just over the last three years, BD overtime costs as a percentage of base pay has increased from 19% in 2014 to over 26% in 2016.[139] That is—despite the increased number of officers, BPD officers' pay increased, more than one quarter of earned through overtime.

- During this time, BPD police officers had the highest average overtime hours, working an average of 101,302 overtime hours annually .

---

[134] City Budgets; Buffalo Comptroller BPD Overtime Report. Notably, the audit report did not examine whether police overtime was justified, but instead concluded that the BPD was understaffed: "[t]he BPD is understaffed by as many as 130 employees or 15% of the workforce." It found that "[a]fter 6 weeks of OT, the BPD would save money by hiring a new officer, as opposed to paying current officers OT to cover a shift," and suggested that the BPD increase its police force. The report did, however, note "that the City of Rochester Police Department has more officers per citizen, but lower total pay and less OT per employee compared to BPD" and, further, that "Rochester has one third less civilian support staff." Despite these variances, "[d]uring the Audit time frame, civilian employees averaged 450 hours of OT, while sworn officers averaged 280 hours of OT.
"

[135] Mayor Byron Brown's Adopted 2014-2015 Budget for the Buffalo Police Department, (*available at* http://city-buffalo.com/files/1_2_1/Mayor/2014-2015AdoptedBudget/Police.pdf ) . Note that some of the 2015 figures are estimates.

[136] Mayor Byron Brown's Adopted 2014-2015 Budget for the Buffalo Police Department, (*available at* http://city-buffalo.com/files/1_2_1/Mayor/2014-2015AdoptedBudget/Police.pdf ) . Note that some of the 2015 figures are estimates.

[137] DCJS, Uniform Crime Reporting system (as of 4/27/2015); Mayor Byron Brown's Adopted 2014-2015 Budget for the Buffalo Police Department, (*available at* http://city-buffalo.com/files/1_2_1/Mayor/2014-2015AdoptedBudget/Police.pdf ). The DCJS data includes law enforcement employees on each agency's payroll as of October 31. It excludes employees assigned to jail duties.  Note that some of the 2015 figures are estimates that were available at the time of the Mayor's issuance of the most recent budget for the City of Buffalo.

[138] Buffalo Comptroller BPD Overtime Report, September 2016 (on file with author)., Notably, the audit report did not examine whether police overtime was justified, but instead concluded that the BPD was understaffed: "[t]he BPD is understaffed by as many as 130 employees or 15% of the workforce." It found that "[a]fter 6 weeks of OT, the BPD would save money by hiring a new officer, as opposed to paying current officers OT to cover a shift," and suggested that the BPD increase its police force. The report did, however, note "that the City of Rochester Police Department has more officers per citizen, but lower total pay and less OT per employee compared to BPD" and, further, that "Rochester has one third less civilian support staff." Despite these variances, "[d]uring the Audit time frame, civilian employees averaged 450 hours of OT, while sworn officers averaged 280 hours of OT.
"

[139] (FY 2016 estimated based on information through Quarter 3).

44

- In FY 2016, 25% of the BPD workforce earned more than $25,000 in OT.

Crime data, including BPD's own statistics confirm that Buffalo continues to have a crime problem, and that eight of every 10 crimes in the city goes unsolved. [140] While the BPD has aggressively focused on misdemeanors, Buffalo's violent crime rate is 8th highest among 77 cities with a population between 200,000 and 500,000 and has the 19th worst clearance rate.. Of these cities, Buffalo has the 8th highest murder rate, and it's clearance rate ranked second-to last.

## Revenue

The City of Buffalo and Buffalo Police Department had two revenue-related priorities in implementing these zero tolerance "crime suppression" directives and policing practices. First, the City was focused on generating revenue from increasing fines from increased arrests and ticketing for traffic, criminal and civil "quality of life" violations.  Relatedly the City put the BPD on the front lines of a racialized gentrification agenda. From the outset of his tenure, Mayor Brown and Captain Derenda, and other government officials explicitly recognized the importance of generating revenue in presenting various broken windows policing strategies. Notably, however, this was a toll primarily exacted on Buffalo's communities of color,

From the outset of the implementation, the City measured the effectiveness of its various Zero Tolerance Policing initiatives not just by crime reduction or arrests, but in monetary terms—how much these "Zero Tolerance Policing" efforts generated revenue for the City's coiffers. Increased broken windows policing in Buffalo targeting minority neighborhoods has caused many residents, and particularly minority residents in Buffalo to also be caught up in a cycle of tickets and license suspensions that raise serious due process concerns. These drivers  become caught up in a cycle where a compilation of prior tickets from traffic infractions, or driving without insurance to leads to high numbers of points and subsequent license suspensions.

- The number of tickets BPD issued for traffic violations increased substantially, especially after the daily vehicle checkpoints.  Since 2006, the BPD has issued a total 339,362 tickets[141] -- almost half of which were issued since 2013, when the BPD started implementing daily checkpoints on the East Side on a "daily basis" in 2013. From 2013-2016, the BPD issued 161,559 tickets – or more than 70,000 more tickets, than the previous four years (91,532 from 2009-2012)--a 77.6% increase in tickets.In just one year, between 2013-2014, the BPD Patrol Unit issued 13,840 more traffic summons increasing from 21,115 in 2013 to 34,955 in 2014-–– a 65 % increase.[142] The City has continued to make clear that it is increasing BPD ticketing throughout Buffalo to raise funds.[143]
- BPD maintains tow trucks at every checkpoint, and according to witness accounts, checkpoint and parking databases, regularly tos vehicles during checkpoints. As a result of this increased enforcement, Buffalo residents have also had to pay significant and substantially increased fines and fees related to towing costs. The City's revenue from towing totaled $8.39 million during the study

---

[140] Jim Heaney, *Buffalo: Real State of the City*, Investigative Post, March 14, 2016 (*available at* http://www.investigativepost.org/2016/03/14/real-state-of-the-city/ ) (last visited March 16, 2016).
[141] Buffalo Financial Stability Authority, *Annual Report of the Buffalo Fiscal Stability Authority for Fiscal Year Ended June 30, 2016 available at* https://www.bfsa.state.ny.us/reports/fye2016AnnualReport.pdf).
[142] Mayor Byron Brown's Adopted 2014-2015 Budget for the Buffalo Police Department, (*available at* http://city-buffalo.com/files/1_2_1/Mayor/2014-2015AdoptedBudget/Police.pdf ) . Note that some of the 2015 figures are estimates.
[143] http://thefreethoughtproject.com/city-strapped-cash-sends-cops-rob-poor-people-issuing-thousands-extra-tickets/

45

period (2013-2015). This is five times the revenue, or approximately $7 million more from just $1.44 million in revenue from 2006-2008. Mayor Brown's first three years in office.

- Overall, the City's revenue for fines grew by more than one-third, increasing from $8.5 million in 2012[144] to $12.3 million  - 2015.[145] During the study period, the City collected almost $30 million in fines overall.[146] Buffalo's revenue from parking enforcement also rose by 5 million, from $33.2 million from 2007-2010 to $38.6 million from 2013-2015.

The BPD's revenue increased by more than 10 times since the City began implementing Zero Tolerance policies, increasing ng from $279,688 in 2006 to a projected $2.84 million last year. From 2013-2016, the BPD generated $8.4 million in revenue, compared to $6.7 million in revenue in Brown's first three years in office 2006-2009.  The BPD's revenue from fines continued to increase throughout Brown's tenure. During the study period, the BPD brought in $1,543, 612 in tickets, fines and fees—a 27% increase compared to $917,254 from the first three years of Brown's Zero Tolerance policing strategy (2006-2008).[147]

The BPD's revenue increased by more than 10 times since the City began implementing Zero Tolerance policies, increasing ng from $279,688 in 2006 to a projected $2.84 million last year. From 2013-2016, the BPD generated $8.4 million in revenue, compared to $6.7 million in revenue in Brown's first three years in office 2006-2009.  The BPD's revenue from fines continued to increase throughout Brown's tenure. During the study period, the BPD brought in $1,543, 612 in tickets, fines and fees—a 27% increase compared to $917,254 from the first three years of Brown's Zero Tolerance policing strategy (2006-2008).[148]

---

[144] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2013*,  at 46 (*available at* http://www.bfsa.state.ny.us/reports/fye2013AnnualReport.pdf).

[145] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*,  at 54 (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf).

[146] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*,  at 54 (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf); Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2014*,  at 52 (*available at* http://www.bfsa.state.ny.us/reports/fye2014AnnualReport.pdf).

[147] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*,  at 54 (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf); City Budgets.

[148] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*,  at 54 (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf); City Budgets.

46

## II. The BPD Engages in a Pattern of Unconstitutional Stops, Frisk and Arrests in Violation of the Fourth Amendment

"The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society." [149]

In Buffalo, far too many people live without this basic freedom in Buffalo, often divided by race. The City, BPD's and BMHA's prioritization of urban renewal and revenue generation through zero tolerance policing has fostered practices in BPD's policing practices that are themselves unconstitutional or that contribute to constitutional violations. The BPD has engaged in a widespread pattern of effecting stops, searches and arrests in violation of the Fourth Amendment. These practices have increasingly targeted and disproportionately harmed African Americans, Latinos and racial minorities, increasing racial disparities over the last ten years. Our interviews, cases, and BPD data establish that BPD officers routinely stop, detain, search, and arrest Buffalo and BMHA residents without any legal justification – particularly in minority neighborhoods. These practices are in direct violation of their Fourth Amendment right to be free from unreasonable searches and seizures. *Terry v. Ohio* (1968) (holding that a police officer who reasonably believes that criminal activity is occurring or about to occur is authorized to stop whoever they suspect of participating in the criminal activity; in such stops, officers are only allowed to conduct a limited search of the suspect's outer clothing if they reasonably feel their safety is endangered.). The BPD's unlawful and harmful policing and in BMHA erode police legitimacy and community trust, making police in Buffalo policing pracless fair, less effective at promoting public safety.

While the BPD does not document details of its daily stops, the BPD Housing Unit records "sweeps," and many residents report, and cases and BPD logs confirm, that they have being victims of illegal seizures during the course of their daily business. These tactics often happen while residents are walking in their neighborhoods, to and from their apartments, or to friends' houses. Especially troubling, the BPD targets these tactics happen in predominantly minority neighborhoods and public housing residences. In some cases, police officers had no reason for stopping the arrestees. They also gave no reason to the arrestees for why they been stopped or arrested. In other cases, the reasons officers provided were false or inaccurate. Troublingly, the BPD often stopped individuals claiming they fit a suspect's description when the only shared characteristic between the stopped individual and the suspect was the description of their race.[150] Not only are BPD officers routinely not held accountable for these routine infractions of minority communities' rights, but thousands of these routine unconstitutional stops and arrests were explicitly directed by City and BMHA officials.

The City's and Housing Authority's leadership have adopted policing programs and explicitly instructed officers to make frequent, and often per se unconstitutional stops, searches and arrests of people in minority neighborhoods with no suspicion of wrongdoing, resulting in routine and even daily suspicionless stops in violation of the Fourth Amendment. In developing and implementing these improper policing strategies the BPD has not just run roughshod over Buffalo residents' rights, but has also failed to give sufficient, and in some cases, any consideration to whether this enforcement strategy promotes public safety or is responsive to community needs, or comports with the constitution. Rather, residents have consistently reported, and BPD records and statistics confirm, that the BPD's indiscriminate dragnet suspicionless stop, search and arrest techniques without any objective legitimate basis have distracted the police resources from ensuring public safety, solving crimes, responding to

---

[149] Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).

[150] As noted in the methodology and accountability section, *Because BPD does not collect data on stops and searches, our evidence of such routine violations is derived from interviews with Buffalo residents, reviewing court cases and complaints filed during this period and BPD data.*

47

calls for assistances – and ultimately diminishing public trust.  These unconstitutional directives have contributed to a culture of *disregard* for Buffalo residents' Fourth Amendment rights, which combined with an absence of independent or effective accountability mechanisms for misconduct, have lead to a pattern or practice of constitutional violations.

As described below, the BPD has routinely violated residents' rights under the Fourth Amendment both pursuant to City policy and direction, and on their own volition in four key ways:

- stop, searches and arrests with improper justification throughout Buffalo
  - Buffalo residents were detained on suspicion of having committed a crime, with no articulation or an inadequate articulation in BDP's own records of the basis for the officer's suspicion.
- Unconstitutional Trespass Policies in BMHA: Systematic  "vertical patrols," walkthroughs, walk ups and "suspicion person checks," particularly in predominantly minority  public housing buildings in violation of the Fourth Amendment
- Suspicionless vehicle roadblocks and checkpoints: The BPD Housing Unit and Strikeforce engaged in unjustified checkpoints and roadblocks of thousands of drivers  for the express impermissible purpose of crime suppression, predominantly in minority communities, often on a daily basis in violation of *Indianapolis v. Edmonds*. BPD officers further routinely searched cars, drivers and even passengers without individualized suspicion.
- Routine excessive force in these tactics

### 1.  <u>Warrantless pedestrian stops: Routine pedestrian stops of innocent Buffalo residents, primarily of Buffalo's minority residents and on Buffalo's East Side</u>

The BPD  engages in a pattern, practice or policy of indiscriminate stops of innocent Buffalo residents without individualized or reasonable suspicion of criminal wrongdoing, particularly in minority communities and housing developments.  Although the BPD does not record it's stops on stop cards, this complaint documents multiple incidents of stops without <u>any</u> legitimate basis throughout Buffalo, based on our interviews with residents, BPD daily logs and records, criminal and civil court cases, settlements, and DOJ Criminal Civil Rights criminal charges and convictions since January 1, 2013.

Further, many residents report, and cases and BPD logs confirm, that they have being victims of illegal seizures during the course of their daily business.  These tactics often happen while residents are walking in their neighborhoods, to and from their apartments, or to friends' houses.  More importantly, these tactics happen *in predominantly minority neighborhoods.*  In some cases, police officers had no reason for stopping the arrestees.  They also gave no reason to the arrestees for why they been stopped or arrested.  In other cases, the reasons officers provided were false or inaccurate.  Troublingly, the BPD often stopped individuals claiming they fit a suspect's description when the only shared characteristic between the stopped individual and the suspect was the description of their race.[150]

BPD officers frequently use post-hoc rationalizations or "fits description" to cover up for the absence of reasonable suspicion at the time of the stop. For example, both as a policy and on the street, BPD officers frequently justify dragnet unconstitutional stops on he basis of unconstitutional factors including that an individual was in a "high crime area" or "fits description," when there is no similarity in the description of the suspect except for race.

### *Legal Standards*

---

[150] As noted in the methodology and accountability section, *Because BPD does not collect data on stops and searches, our evidence of such routine violations is derived from interviews with Buffalo residents, reviewing court cases and complaints filed during this period and BPD data.*

The touchstone of the Fourth Amendment is "individualized suspicion" and reasonableness. The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, [152] provides "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ."[153] The essential purpose of the Fourth Amendment is "to impose a standard of 'reasonableness' upon the exercise of discretion" by officers in order to protect against arbitrary intrusions into the privacy of individuals.[154]

**Arrests**

The Supreme Court has interpreted the Fourth Amendment as prohibiting arrest without probable cause and presumptively requires a warrant for such arrests. States may impose greater restrictions on police conduct than those established by the Fourth Amendment, but may not authorize police conduct which trenches upon Fourth Amendment rights. Under New York law, the justifications required for different levels of police intrusion were established in *People v. De Bour*. In that case, the Court of Appeals established that police require an "articulable reason" before searching anyone.[155]

Absent probable cause, the Fourth Amendment permits law enforcement officers to briefly detain individuals for investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion must be supported by articulable facts particular to the detained individual, which, combined with "rational inferences from those facts, reasonably warrant an intrusion." *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994). To justify a Terry stop, officers must possess "more than a hunch" that an individual may engage in wrongdoing. *Id.* at 840. Notably, the suspected behavior must constitute an actual violation of the law. If a police officer incorrectly interprets the law in seizing a person, a Fourth Amendment violation has occurred even if the officer's factual observations were correct or the officer's interpretation of the law was made in good faith. *See United States v. Lopez-Valdez*, 178 F.3d 282, 288 (5th Cir. 1999) (finding that stop reliant upon officer's mistaken interpretation of state traffic law violated the Fourth Amendment because "the legal justification [for a stop] must be objectively grounded," internal quotation marks omitted).

The test for whether a *Terry* stop has taken place outdoors is whether a reasonable person would feel free to disregard the police and go about his business. Whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person. Police questioning, by itself, is unlikely to result in a Fourth Amendment violation unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded. The United States Court of Appeals for the Second Circuit has held that a seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained. Both *Terry* stops and arrests constitute "seizures" under the Fourth Amendment.

The Second Circuit has also limited an officer's search capacity to when he believes she is in danger. Expressly that an "investigating officer may frisk an individual for weapons if the officer reasonably believes that person to be armed and dangerous" *citing Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) and *McCardle v. Haddad*, 131 F.3d 43, 49 (2d Cir. 1997). United States v. Colon, 250 F.3d 130, 134 (2d Cir. 2001).

**State law**

---

[152] See Maryland v. Pringle, 540 U.S. 366, 369, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003) (citing Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 86 Ohio Law Abs. 513 (1961)); Gilles v. Repicky,511 F.3d 239, 245, 246 (2d Cir. 2007).

[153] U.S. Const. amend. IV.

[154] Delaware v. Prouse, 440 U.S. 648, 653- 55, 99 S.Ct. 139, 1395-97, 59 L.Ed.2d 660 (1979).

[155] <u>People v. De Bour</u>, 40 N.Y.2d 210, 213 (N.Y. 1976)

The state provides broader protections from the right against arbitrary seizures, and the fundamental right of individuals to be let alone.[156]

The failure to stop or co-operate by identifying oneself or answering questions cannot be the predicate for an arrest absent other circumstances constituting probable cause. This is because the failure to answer cannot constitute a criminal act. Nor can the failure to stop or co-operate by identifying oneself or answering questions be the predicate for an arrest absent other circumstances constituting probable cause [157] In the absence of evidence of criminal activity, flight alone, even in conjunction with other factors, provided a lawful basis does not provide grounds for the pursuit and seizure of individuals.[158]  In People v. Wilkerson, when police officers unlawfully told the defendant, "Police, don't move!," the defendant turned to face them and reached into the waistband of his trousers. The Court of Appeals found that the reaching into the waistband was spontaneous and was precipitated by the unlawful police command. In both cases, the court concluded that there was no attenuation of the taint of illegal police conduct, and the gun that was recovered was suppressed[159]

In New York, "the rule is.. that the objective evidence necessary to support a stop and seizure short of an arrest is reasonable suspicion [160] Reasonable suspicion represents that "quantum of knowledge sufficient to induce an ordinarily prudent and cautious [person] under the circumstances to believe criminal activity is at hand." [161]

## Routine Unjustified Stops, Searches and Arrests

Despite these bedrock state and federal constitutional safeguards protecting against arbitrary seizures, many of BPD's arrests demonstrate that BPD engaged in racial profiling based on a pre-disposition held by BPD's overwhelmingly white law enforcement officers.  Indeed, BPD officer conduct assumes that minorities, and particularly African-American males, are engaged in criminal activities.  Therefore, minorities are stopped and searched without probable cause or reasonable suspicion.  This means that, BPD officers have unconstitutionally stopped, questioned, frisked individuals, and even arrested them based on stereotypical biases.

---

[156] People v. Howard, 50 N.Y.S.2d 583, 586, 430 N.Y.S.2d 578, 581, 408 N.E.2d 908, 910 (1980)

[157] People v Samuels, 50 NY2d 1035; People v Berck, 32 NY2d 567, 574, cert den 414 U.S. 1093; Brown v Texas, 443 U.S. 47, supra; ALI Model Code of Pre-Arraignment Procedure [1975], p 300; but see 1 La Fave, Search and Seizure, § 3.6, subd [f], pp 673-675). This is because the failure to answer "cannot constitute a criminal act" ( People v Schanbarger, 24 NY2d 288, 292, supra).

[158] People v. Martinez, 80 N.Y.2d 444, 445, 591 N.Y.S.2d 823, 823, 606 N.E.2d 951, 951 (1992) (citing ( People v Hollman, 79 NY2d 181; People v Howard, 50 NY2d 583, 449 US 1023; People v Leung, 68 NY2d 734; People v Grimsley, 156 AD2d 714; People v McRay, 51 NY2d 594; People v Kosciusko, 149 AD2d 620.)) (In the absence of evidence of criminal activity, the court below erred as a matter of law in holding that defendant's flight, in conjunction with other factors, provided a lawful basis for the pursuit and seizure of this defendant.). Under New York State constitutional law, flight alone would not justify a stop or pursuit. The Court of Appeals has made clear that even when there is a sufficient basis to allow a common law inquiry, individuals have "the right not to answer, [and] running did not, absent any indication that any crime had been or was about to be committed, permit detention." Thus, the Court of Appeals has made clear that there was no probable cause for defendant's arrest".

[159] People v. Wilkerson, 64 N.Y.2d 749, 485 N.Y.S.2d 981, 475 N.E.2d 448 (1984);
See also, People v. Smalls, 83 A.D.3d 1103, 922 N.Y.S.2d 461 (2d Dep't 2011); People v. Nasario, N.Y.L.J., July 29, 1994 (Sup. Ct. New York County).

[160] *People v. Martinez*, 80 N.Y.2d 444, 448 (1992) *citing People v De Bour*, ; *People v Leung*, ).

[161] *People v. Martinez*, 80 N.Y.2d 444, 448 (1992) *citing People v Cantor*, 36 NY2d 106, 112-113.

50

In our research, we documented 92 cases of unjustified stops during the study period. Public defenders report that they routinely have cases dismissed because police officers improperly engaged in "stop and frisk" tactics, in violation of their Fourth Amendment rights.[162]

During the course of these unconstitutional stops, BPD officers have also routinely used unjustified excessive force, as well as degrading, demeaning threats and even race-based insults. For example, on November 10th, 2015, at approximately 6:00 p.m., five youth members of PUSH-Buffalo, four Sudanese boys and one Burmese boy aged 14-16, had just left and were standing outside the doors of the PUSH Grant Street Neighborhood Center. A BPD officer drove by, stopped, and ordered the boys not leave. The officer provided no explanation.[163] Within a few minutes, five additional BPD cars arrived at the PUSH Neighborhood Center with their lights flashing. The police officers approached the five kids and told them that they had committed a robbery and would go to jail if they didn't admit it.[164] Without informing the youth of their rights, the officers handcuffed each teen's hands behind their backs and placed each of them in separate police cars for more than 90 minutes. Meanwhile, BPD officers interrogated the boys about a bike and iPhone stolen more than an hour prior to their arrest and approximately one mile away from the Center.[165]

As the kids were being arrested, three PUSH Green employees, John Washington, Organizing Director, Luana Dejesus, Green Community Energy Advocate, and volunteer Ivy Yapelli, came outside to help the children. A BPD officer approached them to ask whether anyone had brought a bike into the center to hide. The officer claimed there were more bikes and that someone may have kept it in the Center. Mr. Washington told the officer that no one had a bike in the center. Further, he told the officer that all of the boys had been present at the center during the time of the robbery.[166]

Mr. Washington approached a white female BPD officer to find out what was going and inform her of the alibi. The following conversation ensued:

Mr. Washington: "Are the kids being arrested?"

BPD Officer: "It is none of your business"

Mr. Washington: "It is [my concern] because this is happening in front of where I work. [The] kids have been in our community center for a while, so if whatever they are being accused of happened within the past hour, they couldn't have done it. Their rights are being violated and I want to try to contact their parents and see if they have attorneys if they are going to be arrested."

BPD Officer: "That's what you're worried about -- someone got robbed at gunpoint and all you care about is getting these punks lawyers? You are the problem with society. You should be worried about the people that got robbed, not these kids."

[162] Michael Wooten, *Buffalo's Top Cop Admits Police Have Used "Stop and Frisk,"* WGRZ (Nov. 5, 2015) (available at http://www.wgrz.com/news/crime/buffalos-top-cop-admits-police-have-used-stop-and-frisk/272864688) According to John Lipsitz, who represents the local chapter of the National Lawyer's Guild, "The current prevalence of reports of unjustified stops and ticketing by the Buffalo Police Department is unacceptable."

[163] Email from Lou DeJesus, Program Assistant, to John Washington, PUSH Organizing Director, dated Nov. 12 2015) (email on file with author) ; Statement by Ivy Yapelli on PUSH youth arrests, dated Nov. 12 2015 (on file with author).

[164] Statement by Ivy Yapelli on PUSH youth arrests, dated Nov. 12, 2015 (on file with author).

[165] Email from John Washington to Anjana Malhotra, dated Nov. 12, 2015. (email on file with author); Email from Lou DeJesus, Program Assistant, to John Washington, PUSH Organizing Director, dated Nov. 12 2015) (email on file with author)

[166] Email from John Washington to Anjana Malhotra, dated Nov. 12, 2015. (email on file with author).

51

Mr. Washington: "First, I didn't know someone got robbed until you just said so. Second, if you would tell me when this happened I can tell you they were here and you can go look for who really did this."[167]

The BPD Officer walked away while Mr. Washington spoke. When she returned, Mr. Washington continued to ask about the kids to determine what exactly they were being charged with. The BPD Officer replied: "[G]o back inside and mind your own business or we will find something to charge you with."[168]

Despite the intimidation, Mr. Washington, Ms. Dejesus, and Ms. Yapeli remained at the scene out of concern for the kids.  Mr. Washington heard an officer say, "We should get these kids out of the cars [because] it's starting to smell." Within about an hour, another police car pulled up with the crime victims, a Caucasian woman and a child.  The BPD officers pulled the five detained PUSH youth from the police cars and "use[d] flashlights to light up their faces."  The officers asked the woman and the child if any of the teens were the perpetrators.  They both said no each time.

The kids were eventually released. Each of the teenagers told Mr. Washington that they "were threatened from the moment they were approached and that the police asked them leading questions, presuming their guilt about accusations without any explanation." According to Mr. Washington, "[t]he teens genuinely had no idea what [the officers] were talking about and said they didn't know what to do or say because the police didn't believe them."

Later, Ms. Yapelli observed: "It was extremely upsetting and disturbing to have witnessed such callous treatment of innocent children and the subsequent aggressive behavior towards a citizen whose sole interest was the safety and Constitutional rights of the children."  According to Ms. DeJesus, the BPD officers' aggressive and wrongful targeting of minority youth is common—especially at community centers. "The pattern of behavior by these officers .. is consistent with what has happened at other neighborhood centers for youth that serve predominantly children of color, which is that police officers stake out those areas the time at which the children are leaving, and target them for harassment."[169]

Our research confirms that the PUSH youth's traumatic experience with the BPD is not an anomaly. Wrongful and arbitrary seizures without basis or consideration of age are common among minority youth – in clear violation of the Fourth and Fourteenth Amendments.  The BPD often targets youth of color where the only based on a description where the only similarity is the race.  In fact, one of the PUSH teens was subsequently arrested on an unrelated charge.  Further, once the organizers vouched for their whereabouts, their handcuffed, humiliating experience could have been avoided.

For example, on December 2, 2013, Jeffery E. Campbell II, an African American teenager, was walking home from a friend's house on the East Side in the Bailey-Winspear area was falsely stopped, questioned, and ultimately arrested by BPD officers on who used excessive force.[170] He was initially approached by a BPD officer who informed Mr. Campbell he was investigating a burglary, to which

[167] Email from John Washington to Anjana Malhotra, dated Nov. 12, 2015. (email on file with author); Statement by Ivy Yapelli on PUSH youth arrests, dated Nov. 12 2015 (on file with author).

[168] Email from John Washington to Anjana Malhotra, dated Nov. 12, 2015. (email on file with author); Email from Lou DeJesus, Program Assistant, to John Washington, PUSH Organizing Director, dated Nov. 12 2015) (email on file with author)

[169] Email from Lou DeJesus, PUSH Program Assistant, to John Washington, PUSH Organizing Director, dated Nov. 12 2015. (email on file with author); Statement by Ivy Yapelli on PUSH youth arrests, dated Nov. 12 2015 (on file with author)

[170] Susan Schulman, *Racial Profiling a lingering issue for Buffalo*, The Buffalo News, June 8th, 2014 (*available at* http://www.buffalonews.com/city-region/police-courts/racial-profiling-a-lingering-issue-in-buffalo-20140608 ); Luke Moretti, *Alleged Victim files new lawsuit against BPD*, WIVB-4, May 28, 2014 (*available at* http://wivb.com/2014/05/28/alleged-victim-files-new-lawsuit-against-bpd/ )

Campbell responded "I look like a burglar?" The BPD officer responded by saying "Maybe. Do you?"[171] The officer followed Campbell for almost two miles as he walked home. Mr. Campell protested, and told the officers to "Quit (expletive) harassing me." Subsequently, two more BPD officers arrived, forced him against a police vehicle, and arrested him and charged him with seven criminal counts, including harassment, resisting arrest, loitering, disorderly conduct and obstructing justice. The BPD failed to find any illegal evidence on Campbell.[172] When he asked what the officers were arresting him, the officers refused. During the encounter, they hit him and struck him in the face times.[173]

Three months and four court dates later, a Judge dismissed all Campbell's charges. Mr Cambpell has since filed a 1983 action alleging Fourth Amendment violations. [174]

Unfortunately, like many minority youth in Buffalo, this was not Mr. Campbell's first constitutionally defective encounter with the BPD. In 2014, the Department of Justice filed charges against three BPD officers for using excessive force and violating the civil rights of Mr. Campbell, then 13, and three other teens in 2009. During the encounter, two BPD officers shot one of the teens with a BB gun, <u>while he was handcuffed and in a police car</u> and later assaulted the teens while they were in custody at the police station, requiring them to seek medical treatment. Two of the teens filed a civil suit against the BPD, which the City settled for $75,000 each in 2013.[175] Then then BPD officers Gregory Kwiatkowski, 49, Raymond Krug, 36,[176] and Joseph Wendel, 37, involved in this incident have been involved with previous instances of unconstitutional policing yet stayed on the force for years, and faced separate criminal charges.[177]

When the DOJ was investigating these incidents, they identified several additional incidents of false arrests and excessive force by the same employees. In 2015, DOJ also charged and obtained a conviction Officer Krug based on another excessive force and false arrest incident involving a assaulting an arrestee with a flashlight that took place on February 4, 2011, at approximately 11:04 pm. [178] In that incident, Officer Krug was one of several officers who responded to radio call of a "suspicious person in the vicinity of 68 Bissell in the City of Buffalo. After the police units arrived and were located on Bissell avenue, D.R. was walking north on Bissell, from towards his residence at 79 Bissell after completing his shift at a local steak shop. D.R., who was listening to music with ear buds, observed police cars in the area as he continued walking towards his residence. After two police cars passed him, Officer Krug drove by in his police car and called out to D.R. Krug then got out of the vehicle and approached D.R, placed D.R. against the patrol car, patted him down, and found a diet pill on D.R. Officer KRUG then kicked D.R.'s legs out from under D.R. and D.R. fell to the ground. While D.R. was on the ground, the Krug put his knee in D.R.'s chest and hit D.R. once with his flashlight in the area of D.R.'s right eye which caused him to bleed and resulted in a

---

[171] Id.

[172] Id.

[173] Luke Moretti, Alleged Victim files new lawsuit against BPD, WIVB-4, May 28, 2014 (available at http://wivb.com/2014/05/28/alleged-victim-files-new-lawsuit-against-bpd/ )

[174] Id.

[175] Lou Raguse, BPD Officers allegedly shot teens with a BB gun, WIVB 4, May 28, 2014 (available at https://www.justice.gov/usao-wdny/pr/buffalo-police-officer-charged-using-excessive-force-chippewa-street-early-thanksgiving )

[176] Lou Raguse, BPD Officers allegedly shot teens with a BB gun, WIVB 4, May 28, 2014 (available at https://www.justice.gov/usao-wdny/pr/buffalo-police-officer-charged-using-excessive-force-chippewa-street-early-thanksgiving )

[177] Kwiatkowski was suspended in 2010 for a physical confrontation with another officer; and struck another officer as another officer, Cariol Horne, tried to remove him from choking a handcuffed African American suspect. Kwiaktowski has been in trouble with the department in the past. In 2010 that he had been involved in a confrontation with another officer at a district station house. At the time, he was already at the center of an internal investigation following a fight in May 2010 involving other officers at Page's Grill and Bar in Lancaster.

[178] Government's Response to Defendant's Pretrial Motions And Government's Cross Motion for Discovery, *United States v. Krug*, at 9 No 15-CR-157 A, Dkt. No. 17 , Jan. 14, 2016 (W.D.N.Y. filed 2014?)

scar).[179] Officer Krug handcuffed D.R. and placed D.R. in the patrol car. [180] Shortly thereafter, Krug's partner, BPD Officer William Rezabek, who Krug had dropped off a few blocks away prior to Krug's encounter with D.R.,. KRUG told Officer Rezabek that D.R. had been combative and that he, had hit D.R. on the head. KRUG and Officer Rezabek transported D.R. downtown to police headquarters where D.R. was charged with criminal offenses, processed and held overnight. After D.R. was released the following morning, he went to the emergency room for treatment and was given paid medication. [181]

---

[179] Government's Response to Defendant's Pretrial Motions And Government's Cross Motion for Discovery, *United States v. Krug*, at 9 No 15-CR-157 A, Dkt. No. 17 , Jan. 14, 2016 (W.D.N.Y. filed 2014?)

[180] Government's Response to Defendant's Pretrial Motions And Government's Cross Motion for Discovery, *United States v. Krug*, at 9 No 15-CR-157 A, Dkt. No. 17 , Jan. 14, 2016 (W.D.N.Y. filed 2014?)

[181] Government's Response to Defendant's Pretrial Motions And Government's Cross Motion for Discovery, *United States v. Krug*, at 9 No 15-CR-157 A, Dkt. No. 17 , Jan. 14, 2016 (W.D.N.Y. filed 2014?)

54

**False "Fits Description"**

The BPD has similarly justified stops and searches of adults by using a "suspect description" that is wrong, pretextual or based on nothing more than the color other than race, and sometimes no reasons were provided. We documented dozens individuals who faced illegal stops, arrests for <u>mistaken</u> identity with strikingly similar patterns. Notably, as described below, the only thing shared characteristic individuals had with the proffered "description" was their race. Similar to the arrest of the PUSH youth and Mr. Campbell, the unlawful stops we documented were undertaken without any suspicion of wrongdoing, but rather on a generalized fishing expedition for any possible *wrong doing.*

- For example, Buffalo resident Darin Thomas described 3 similar "mistaken identity" unlawful stops by the BPD since Jaury 1, 2013.[182] According to Mr. Thomas, each time the police claimed justification for the stop was that "You fit the description of XYZ,"[183] which proved to be pretextual and resulted in a fishing expedition. On one occasion, BPD officers detained Mr. Thomas for 20 minutes while he was on his way home.[184] They illegally searched him and found and seized "1 bag of weed, dumped it" and proceeded to "check for warrants.[185] In response to a question about how the police should be reformed, Mr. Thomas critiqued the BPD dragnet in the African American community as counterproductive: "We need police that works with the community not arrest every

- For example, the BPD has stopped and questioned, Christina Valentin, an African American resident of Buffalo, 15 times since Jan. 1, 2013, only providing consent for 5 of the encounters.[186] Each time, the BPD officials erroneously alleged that she "fit the description" of a suspect and proceeded to question and interrogate her even after it became clear she didn't match the description, as if to search for a justification.[187] In one of the stops, Ms. Valentin sustained injuries when BPD officers forcefully arrested her after she refused to answer questions about a crime that she was being accused of committing which she had no knowledge. Following her (honest) response to the BPD Officer's questions, he During the arrest, he harshly bent her arms during the arrest.[188]

- The BPD also illegally detained African American Buffalo resident, John Doe 1, four times in the last two years without his consent, based on an erroneous suspect match and even for no reason at all.[189] In each of these encounters, BPD officers spent little time asking questions regarding the claimed suspect match, but rather "ask[ed] if I had anything like guns, drugs, asked where I was coming from where I was going."[190] Similar to Jeffrey Campbell's encounter with the BPD, when they "pressed [him] to answer questions about a crime he didn't commit, BPD officers "followed and harassed" him.[191] He has been arrested and cleared of false charges. In reflecting on his experiences with the BPD, he noted that"[t]hey are very unfair to People of color and low income people of color"

- David Russell, an African American local freelance photo journalist and editor, reports that "profiled all the time. .. It's not a good feeling. I get pointed out a lot fo times [by the BPD], just for no

---

[182] IHRC/PUSH Interview with Darin Thomas, January 29, 2016. (Interview notes on file with author)
[183] IHRC/PUSH Interview with Darin Thomas, January 29, 2016. (Interview notes on file with author)
[184] IHRC/PUSH Interview with Darin Thomas, January 29, 2016. (Interview notes on file with author)
[185] IHRC/PUSH Interview with Darin Thomas, January 29, 2016. (Interview notes on file with author)
[186] IHRC/PUSH Interview with Christina Valentin, November 21, 2015. (Interview notes on file with author)
[187] IHRC/PUSH Interview with Christina Valentin, November 21, 2015. (Interview notes on file with author)
[188] IHRC/PUSH Interview with Christina Valentin, November 21, 2015. (Interview notes on file with author)
[189] PUSH/IHRC Interview, November 21, 2015. (Interview notes on file with author)
[190] PUSH/IHRC Interview, November 21, 2015. (Interview notes on file with author)
[191] PUSH/IHRC Interview, November 21, 2015. (Interview notes on file with author)

55

reason." Mr. Russell reported that the BPD has targeted him and made a presumption of his guilt and wrongdoing since he was a young teen, in a middle class street in North Buffalo; like the PUSH youth, the BPD would question him about where he got his bicycle, implying (he responded "I think my parents bought it at Sears").[192]

- Several BPD officers similarly stopped and searched African American Cameron Pritchett, 17, and three other African American friends without justification got off the subway at the University station on their way to step practice.  Pritchett recounted how the BPD officers "pulled us aside and patted us down. We didn't have anything. They wanted to interrogate us."

- The BPD also illegally detained African American Buffalo resident, John Doe 1, four times in the last two years without his consent, based on an erroneous suspect match and even for no reason at all.[193] In each of these encounters, BPD officers spent little time asking questions regarding the claimed suspect match, but rather "ask[ed] if I had anything like guns, drugs, asked where I was coming from where I was going." Similar to Jeffrey Campell's encounter with the BPD, when they "pressed [him] to answer questions about a crime he didn't commit, BPD officers "followed and harassed" him. He has been arrested and cleared of false charges.   In reflecting on his experiences with the BPD, he noted that "[t]hey are very unfair to People of color and low income people of color."[194]

Post Hoc Justification, False Arrests

The BPD has also commonly used evidence to improperly charge individuals following an improper stop and temporary detention of Buffalo residents by engaging in unlawful searches, questioning and even dangerous pursuits of individuals with no legitimate justification proceeding the stop. That is, the BPD has justified investigatory *Terry* stops with evidence gathered post hoc during the improper search or stop, in clear violation of the Fourth Amendment. As a result, courts have issued numerous decisions in recent years suppressing the City's use of evidence from illegal BPD stops, searches and arrests. Further, the BPD has detained and searched Buffalo residents, with no articulation or an inadequate articulation in BDP's own records of the basis for the officer's suspicion.

These tactics violate the Fourth Amendment, which requires that "reasonable  suspicion must arise before a search or seizure is actually effected", and "the reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." United States v. Swindle, 407 F.3d 562, 568 (2d Cir. 2005) (quoting Florida v. J.L., 529 U.S. 266, 271, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000)).

*Walking down the street*
The BPD Strike Force has even arrested individuals after "proactively" approaching them for assistance in a manner that raises serious constitutional issues.

- For example, on May 8, 2014 a BPD Strike Force Detail approached Rebecca I. Misenheimer, age 29, who, according to the officers "appeared distraught while walking on the sidewalk in the area of

---

[192] Eileen Buckley, *Members of the African American Community live with profiling*, WBFO, Jan 26, 2015 (*available at* http://news.wbfo.org/post/members-african-american-community-live-race-profiling#stream/0 ).
[193] PUSH/IHRC Interview, November 21, 2015. (Interview notes on file with author)
[194] PUSH/IHRC Interview, November 21, 2015. (Interview notes on file with author)

Wilson Street" in Buffalo." Without identifying the intervening events, the officers indicated that Ms. Misenheimer had 8 active warrants associated for misdemeanor drug charges.[195]

The BPD has similarly temporarily detained Buffalo residents for reasons as innocuous as "Staring at a BPD Officer in a high Crime Area, in violation of the Fourth Amendment. For example, on January 18, 2013 at around 6:30, **Damone Savage** was walking with two other men on the East Side in a BPD-designated "high crime area," when two BPD officers conducting a traffic stop at a gas station across the street,[196] saw Mr. Savage "staring at [he officer] and his partner or at the marked patrol vehicle." Based on this information, the BPD officers approached Mr. Savage and his friends in their patrol car following the stop. The BPD officers pulled up to Mr. Savage and the other men, rolled down their window and asked "what's up guys?" Mr. Savage started walking away from the officers. One BPD officer then allegedly saw Mr. Savage drop a gun holster and eventually a handgun in nearby bushes. The BPD arrested and charged him with criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]), which he pleaded guilty and was sentenced to seven years in prison.

During his criminal proceedings, the Fourth Appellate Department found that the BPD violated the Fourth Amendment because they lacked an objective, credible reason to justify stopping Mr. Savage from the inception of the encounter. The Court underscored that a "high crime area" designation alone was insufficient to authorize a stop without particularized suspicion, and granted Mr. Savage's motion to suppress the handgun and subsequent statements, reversing his conviction. Specifically, the court held that:

> We conclude that merely staring at or otherwise looking in the direction of police officers or a patrol vehicle in a high crime area while continuing to proceed on one's way, absent any indicia of nervousness, evasive behavior, or other movements in response to seeing the police, i.e., "attendant circumstances . . . sufficient to arouse the officers' interest" (*De Bour*, 40 NY2d at 220), is insufficient to provide the police with the requisite "objective, credible reason, not necessarily indicative of criminality" to justify a level one encounter[.] Here, beyond the fact that defendant had stared at the police in a "higher crime area" while continuing to walk down the sidewalk, the officers testified to no further observations of defendant or the other men that drew their attention.[197]

The Court found that even though there is "a low bar for an initial encounter" ((*citing People v Barksdale*, 26 NY3d 139, 143)), it is "crucial whether a nexus to [defendant's] conduct existed, that is, whether the police were aware of or observed conduct which provided a particularized reason to request information. The fact that an encounter occurred in a high crime vicinity, without more" is insufficient.[198] Thus, the Fourth Department suppressed the evidence and statements the BPD obtained through improper means, vacated his guilty plea, and dismissed his indictment.[199]

The Court in Mr. Savage's case ruled that the conduct of the police officers "was not justified from its inception." The Court concluded that "merely staring at or otherwise looking in the direction of police

[195] Michael Cerretto, NYS Troop A Commander, *Troopers working with the Buffalo Strike Force Detail assist pedestrian and find she has 8 active warrants*, New York State Press Release available at https://www.nyspnews.com/article_print.cfm?article_id=37961 )

[196] *State of NY v. Savage*, No KA 13-02055 (4th Dept. March 25, 2016). (available at http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2016/03-25-16/all_decisions.pdf).

[197] *State of NY v. Savage*, No KA 13-02055 (4th Dept. March 25, 2016) (citations omitted). (available at http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2016/03-25-16/all_decisions.pdf) .

[198] *State of NY v. Savage*, No KA 13-02055 (4th Dept. March 25, 2016). (available at http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2016/03-25-16/all_decisions.pdf).

[199] *State of NY v. Savage*, No KA 13-02055 (4th Dept. March 25, 2016). (available at http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2016/03-25-16/all_decisions.pdf).

officers or a patrol vehicle in a high crime area while continuing to proceed on one's way, absent any indicia of nervousness, evasive behavior, or other movements in response to seeing the police" was not sufficient to justify the officers' encounter with the men. Under the fruit of the poisoners tree doctrine, the Court suppressed all of the evidence that was recovered, the handgun as well as Mr. Savage's statement.[200]

**Marcos Mueses**

Similarly, in October 2015, the Fourth Department found that two Buffalo Police officers improperly pursued and detained Buffalo resident Marcos Mueses without sufficient legal justification in violation of the Fourth Amendment. The two BPD officers began pursuing Mr. Mueses on foot after seeing him run across a street, causing a car to stop to avoid hitting him, allegedly for disorderly conduct; the Officers also alleged that they saw him carrying a bulky object as he ran.[201] The officers lost sight of him momentarily and then apprehended him a few months later a vacant lot. The BPD officers charged him with disorderly conduct in violation of NY Penal Law § 240.20(5)[202] and searched him and found a bag of cocaine. They subsequently searched the lot, and found a gun under a rock Mr. Mueses later identified was his. The BPD officers then arrested and subsequently indicted with criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]) and criminal possession of a controlled substance in the seventh degree (§ 220.03),[203] and disorderly conduct.[204]


During his criminal proceedings, the City conceded that that the BPD unlawfully pursued him because his conduct did not constitute disorderly conduct.[205] The Erie County Supreme Court found that the police lacked probable cause to arrest defendant for disorderly conduct and therefore suppressed the gun and cocaine resulting from the unlawful pursuit and arrest.[206]The City only appealed the ruling regarding the gun charges on the grounds that he had abandoned it, and the Fourth Department sustained the suppression and finding that the BPD violated Mr. Mueses' rights.

Similarly, in March 2013, the Fourth Department found that the BPD had insufficient evidence for stopping, searching and arresting Michael Rollins without sufficient probable cause on illegal gambling charges.[207] Mr. Rollins was sitting on a friends' porch when BPD officers approached them based on a report of gambling. The BPD saw Mr. Rollins and the men near some money and open alcoholic containers and one officer observed Mr. Rollins drop a pair of dice on the ground. The officer ordered Mr. Rollins off the porch, and arrested him for possession of a gambling device (§ 225.30 [a] [2]) and disorderly conduct (§ 240.20

---

[200] Andrew Stengel, *No, Police May Not Search You For Staring: New York Court Suppresses Handgun Found After Man Stares at Police*, The Huffington Post (March 31, 2016) (available at http://www.huffingtonpost.com/andrew-stengel/-no-police-may-not-search_b_9581534.html ).

[201] *State v. Mueses*, Dkt No. KA 14-1543 (N.Y.4th Dpt. October 2, 2015) *available at* http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2015/10-02-15/PDF/0927.pdf

[202] *State v. Mueses*, Dkt No. KA 14-1543 (N.Y.4th Dpt. October 2, 2015) *available at* http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2015/10-02-15/PDF/0927.pdf

[203] *State v. Mueses*, Dkt No. KA 14-1543 (N.Y.4th Dpt. October 2, 2015) *available at* http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2015/10-02-15/PDF/0927.pdf
[204] *State v. Mueses*, Dkt No. KA 14-1543 (N.Y.4th Dpt. October 2, 2015) *available at* http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2015/10-02-15/PDF/0927.pdf

[205] *State v. Mueses*, Dkt No. KA 14-1543 (N.Y.4th Dpt. October 2, 2015) *available at* http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2015/10-02-15/PDF/0927.pdf

[206] *State v. Mueses*, Dkt No. KA 14-1543 (N.Y.4th Dpt. October 2, 2015) *available at* http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2015/10-02-15/PDF/0927.pdf
[207] *New York v Rollins*, Dkt No, 13-00583 (4th Dept. Feb 13, 2015) available at http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2015/02-13-15/all_decisions.pdf (p120)

[5]). In searching Mr. Rollins, BPD officers found a gun and a crack cocaine in his shirt pocket, and he was subsequently charged and found guilty of criminal possession of a controlled substance in the seventh degree (Penal Law § 220.03) and criminal possession of a weapon in the second degree (§ 265.03 [3]). The Fourth Department reversed a denial of Mr. Rollins' suppression motion based on a finding that his initial arrest violated the Fourth Amendment because the BPD did not have sufficient evidence that Mr. Rollins was engaged in illegal gambling. Specifically, the Court found:

> Here, there was no evidence before the suppression court that defendant was anything more than a contestant or player in a game of dice (see Penal Law §§ 225.00, 225.30 [a] [2]; Victor M., 9 NY3d at 87). The observing officer did not see defendant holding money, exchanging money with the other men in the group, or even rolling the dice (cf. People v Wilder, 38 AD3d 263, 263, lv denied 8 NY3d 951; Matter of Curtis H., 216 AD2d 173, 174). Therefore, contrary to the determination of the suppression court, the officer did not have "knowledge of facts and circumstances 'sufficient to support a reasonable belief' " that defendant was using the dice in the advancement of a gambling activity (Maldonado, 86 NY2d at 635; see §§ 225.00 [3], [4]; 225.30 [a] [2]).[208]

Thus, the Court concluded the *City* Court erred in denying Mr. Rollins' motion to suppress the gun, the cocaine and defendant's statement on the ground that the BPD officers lacked sufficient probable cause to arrest Mr. Rollins for gambling, in violation of the Fourth Amendment.

*Frisks*
*Marijuana*
According to public reports, the BPD also routinely frisks individuals without suspicion which has lead to misdemeanor marijuana and drug charges. As described above, in order for police to frisk or "pat down," individuals during a stop based on a brief, *Terry* stop, the police officer must have reasonable suspicion that he is in danger of being targeted.

For example, on August 13, 2017, the BPD approached Joe Matthews near his home on East Delavan because they were going to issue him a violation-ticket for drinking. However, according to the Buffalo News, "[o]fficers on patrol approached Joe Matthews of east Delavan Avenue to write him up for a violation, but found marijuana inside his left cargo pocket."[209] Notably, the officers did not report to the Buffalo News what lead them to search him, that lead to finding the marijuana.

## BPD Officers Routinely Abuse the "Obstruction of Justice" Charge

The BPD has also engaged in frequent Fourth Amendment violations is enforcing Obstructing Governmental Administration criminal charges A defendant may not be convicted of Obstructing Governmental Administration in the **Second Degree** unless a police officer was engaged in authorized conduct. The "graveman of the charge is the obstruction, impairment and perversion of administration of law preventing police officers from performing their authorized duty,"[210] NYS PL 195.05. That is, to be charged with Obstructing Governmental Administration , the individual must be interfering with an <u>authorized official function,</u> or a legitimate stop and arrest with founded on reasonable suspicion or probable cause.

---

[208] *New York v Rollins*, Dkt No, 13-00583 (4th Dept. Feb 13, 2015) available at
http://www.nycourts.gov/courts/ad4/Clerk/Decisions/2015/02-13-15/all_decisions.pdf (p120)

[209] Jonathan Epstein, *East Delavan Ave man faces drug charge*, The Buffalo News (Aug. 14, 2017) (available at
    http://buffalonews.com/2017/08/14/beer-drinker-street-found-weed/ ).

[210] *State v. Schuta*, No. CR-07976-16, Decision and Order (Sept. 13, 2016 Buffalo City Court) (Keane, J.) (citing *People v. Longo*, 71 Misc2d 385 (County Court, Onondaga County 1971).

Despite this requirement, officers rely heavily on this charge to arrest individuals who do not do what they ask, even when refusal is not a crime.

Many cases initiated under this provision begin with an officer ordering an individual to stop despite lacking objective indicia that the individual is engaged in wrongdoing. However, the order to stop is not a "lawful order" under those circumstances because the officer lacks reasonable suspicion that criminal activity is afoot.[211] Despite these clear principles, when individuals do not stop in those situations, BPD officers treat that conduct as a failure to comply with a lawful order, and make arrests. Such arrests violate the Fourth Amendment because they are not based on probable cause that the crime of Obstruction of Justice has been committed.[212]

For example, in 2016, BPD Housing Unit Officer Sean McCabe arrested Matthew Schuta while he was on 246 Perry Properties on trespassing and obstructing governmental justice charges. As described above, the Court dismissed the trespass charges on the ground that the Officer/s questioning and demand for information was unwarranted. The Court also, however, rejected the obstruction charges. The government justified the obstruction charges on the ground that the Officers asked Schuta multiple times what he was doing in "the projects," and Mr. Schuta would not respond. After repeating the question, BPD officers told Mr. Schuta to put his hands on the car and separate his legs, and Mr. Schuta again refused, claiming Mr. Schuta struggled. The Court dismissed the charges, finding that Mr. Schuta's conduct did not meet any of the elements required for an arrest or conviction; he did not use violence or physical force and the arrest and request for information was not authorized or legal. In essence, the BPD did not have any individualized reason to stop Mr. Schuta and question him regarding trespassing, or in the arrest, and further, Mr. Schuta did not use any physical force in refusing to comply. Thus, the Court dismissed the government's charge against him with Obstructing Government Administration (as well as his trespass charge).

Justin Levy

In July 2016, a jury awarded $320,000 to **Justin Levy**, a young African American man based on its finding the City liable for his false arrest, malicious prosecution, and unlawful imprisonment by a white Buffalo Police officer, Raymond Harrington.[213] The damages stem from the BPD's unjustified arrest of Mr. Levy after he and his mother went to his aunt's house, Sonja Long, after his cousin, Sydney, called him and his mother to assist his Aunt with a medical emergency in January 2009. When Mr. Levy and his mother arrived at her house, BPD Officer Raymond Harrington prevented Mr. Levy from entering by pushing him away from the door and down the stairs. Mr. Levy then waited by his car and spoke with other BPD officers while waiting for an update on his Aunt, who suffers from mental illness. After 5 or 10 minutes, his Aunt was carried out on a stretcher and placed in an ambulance. The officers assured Mr. Levy that his Aunt was going to be alright.

After the ambulance left the scene, the officers who waited with Mr. Levy by his car began walking back towards their own vehicles when BPD Officer Harrington came out of the house and walked up to Mr. Levy. Without any provocation, warrant, reasonable suspicion or probable cause, BPD Officer Harrington ordered Mr. Levy to come with him to his police car, placed him up against his police car, handcuffed and arrested him on charges of **obstruction of justice and disorderly conduct**. BPD Officer Harrington and his partner, BPD Officer Anthony Marshall, took him to the Erie County Holding Center. He was arraigned and released the next day. The City alleged that Mr. Levy "attempted to interfere" with an altercation they were having with his aunt and charged him with disorderly conduct and obstruction of justice charges. All charges against Mr. Levy were subsequently dismissed. and his record were sealed.

---

[211] *United States v. Brignoni-Ponce*, 422 U.S. 873, 882-83 (1975).

[212] *Dunaway v. New York*, 442 U.S. 200, 208 (1979).

[213] Phil Fairbanks, *Jury awards $320,000 in Buffalo Police Civil Rights case,* The Buffalo News (July 13, 2016). (available at http://buffalonews.com/2016/07/13/jury-awards-320000-in-buffalo-police-civil-rights-case/)

Mr. Levy brought a civil rights suit alleging that the City and BPD Officer Harrington were liable false arrest, false imprisonment, malicious prosecution, unreasonable seizure, deprivation of liberty without due process. In July 2016, following a trial, an all white Jury found against the City, and that that BPD officer Harrington had falsely arrested, wrongly imprisoned, prosecuted and deprived of his liberty in violation of state law and his Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable search, seizure and detention,[214] and awarded him $320,000. In December 2016,  Common Council approved $290,000 in damages to settle the case.[215]

Following are additional examples of the BPD making arrests for obstructing government administration without having facts that meet the elements.

- On December 2, 2013, Jeffery E. Campbell II, an African American teenager , was walking home from a friend's house on the East Side in the Bailey-Winspear area when A BPD officer falsely stopped, questioned, and ultimately arrested Mr. Campbell on obstruction and a number of charges while using excessive force against him.[216] The BPD officer initiated the encounter by informing Mr. Campbell he was investigating a burglary, to which Campbell responded "I look like a burglar?" The BPD officer responded by saying "Maybe. Do you?"[217] The officer followed Campbell for almost two miles as he walked home. Mr. Campell protested, and told the officers to "Quit (expletive) harassing me." Subsequently, two more BPD officers arrived, forced him against a police vehicle, and arrested him and charged him with obstructing justice as well as harassment, resisting arrest, loitering, disorderly conduct and. The BPD failed to find any illegal evidence on Campbell.[218]. When he asked what the officers were arresting him, the officers refused to inform him. During the encounter, they hit him and struck him in the face times.[219]  Three months and four court dates later, a Judge dismissed all Campbell's charges. Mr. Cambpell has since filed a S 1983 action against the BPD. [220]
- In another case, on August 29, 2010, at around 10:30 pm, Officer Krug was one of several BPD cars to respond to a radio call of a possible domestic disturbance involving a male (tee shirt and shorts) waving a gun at a female (white shirt and skirt) in the vicinity of 52 Langmeyer. When the BPD officers arrived on the scene, they saw Marcus Worthy, who matched the description of the male described in the radio call, standing in front of 46 Langmeyer conversing with a female. M.W. who working two jobs at ECMC and BryLin Hospitals, and had no criminal record also possessed a firearms license, and a legally possessed a gun which was concealed under his shirt. Officer Melinda Jones, approached M.W. with her gun drawn and yelling words to the effect that M.W. put his hands up in the air. With Officer Krug and others present, BPD Officers Herbert and Joseph Paszkiewicz

---

[214] Susan Schulman, *Two police settlements will cost City of Buffalo $515,000*, The Buffalo News ( Nov. 14, 2016) (available at https://buffalonews.com/2016/11/14/two-police-settlements-will-cost-city-buffalo-515000/)

[215]The City of Buffalo, *Agenda Item 16-2360, Justin Levy, $290,000*, Buffalo Common Council (Nov. 10, 2016; approved Nov. 15, 2016) (available at http://buffalony.iqm2.com/Citizens/Detail_LegiFile.aspx?ID=2539&highlightTerms=levy );  Susan Schulman, *Two police settlements will cost City of Buffalo $515,000*, The Buffalo News ( Nov. 14, 2016) (available at https://buffalonews.com/2016/11/14/two-police-settlements-will-cost-city-buffalo-515000/).

[216] Susan Schulman, *Racial Profiling a lingering issue for Buffalo*, The Buffalo News, June 8th, 2014 (*available at* http://www.buffalonews.com/city-region/police-courts/racial-profiling-a-lingering-issue-in-buffalo-20140608* ); Luke Moretti, *Alleged Victim files new lawsuit against BPD*, WIVB-4, May 28, 2014 (*available at* http://wivb.com/2014/05/28/alleged-victim-files-new-lawsuit-against-bpd/ )

[217] Id.

[218] Id.

[219] Luke Moretti, Alleged Victim files new lawsuit against BPD, WIVB-4, May 28, 2014 (available at http://wivb.com/2014/05/28/alleged-victim-files-new-lawsuit-against-bpd/ )

[220] Id.

61

grabbed M.W. and placed him against a car; Officer Herbert saw M.W.'s gun, took the gun from his possession and was handcuffed. During the encounter, at least two civilians and other officer saw Officer Krug struck M.W. in the head with his flashlight *while he was handcuffed*. With Worthy bleeding and brutalized, Officers Krug and his partner, BPD Officer William Macy took M.W. to ECMC where M.W. had to received 3 staples in his scalp. Despite Mr. Worthy's lack of struggle and lawful firearm, the BPD t charged Worthy with Criminal Possession of a Weapon 2nd, Menacing of a Police Officer, Menacing 2nd, and Obstructing Governmental Administration 2nd. The charges were dismissed on all charges on February 5, 2011. M.W. has a civil suit pending against the City of Buffalo.

The BPD has also reported numerous arrests on obstruction charges where there do not appear to be facts that rise to the level of obstruction. For example, on March 5, 2017, BPD stopped a car in for speeding in Buffalo's East Side. According to the BPD, the Buffalo police officers arrested one of the passengers, Aaron Mack, after he got out of the car and ran down Broadway.[221] Without citing a reason, the BPD gave chase and found a handgun on his person and arrested him for second-degree criminal possession of a weapon and obstruction of justice. [222]
**Check state law for passenger rights**

### BPD Housing Unit Trespass Enforcement and Sweep policy:

The BPD Housing Unit engages in an unconstitutional pattern or practice of making trespass stops without reasonable suspicion and trespass arrests without probable cause in BMHA buildings. During the study period, and <u>particularly beginning in 2013 and early 2014</u>, the BPD Housing Unit has engaged in a pattern of practice amount of unlawful stops, searches, and arrests without any legitimate constitutional basis, ostensibly to enforce the prohibition against trespassing in predominantly minority BMHA buildings. This BMHA-BPD trespass policy has resulted in routine suspicionless investigatory detention and questioning of residents, guests and their visitors without any individualized suspicion, frisks without any indication the officer was in danger, numerous false trespass and other arrests without probable cause, and even unwarranted brutality in violation of the Fourth Amendment to the United States Constitution, which guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures." According to residents,  BPD records and BPD officer sworn testimony, these unjustified stops involve BPD officers routinely, even daily, stopping residents and their family and visitors without reasonable, and often, any suspicion of wrongdoing, ostensibly for trespass questioning. These unjustified stops have led BPD officers to engage in "fishing expeditions," improper searches and ultimately unjustified and false arrests on trespass and other minor charges. As described below, BPD officecrs have testified, and records confirm that the BPD are routinely using policies to engage in suspicionless stops and searches in and around BMHA, including "vertical patrols," "warrant checks," "clean sweeps" and other techniques to enforce trespass. This policy has been embraced by the City and BMHA, which promulgated an explicit suspicionless trespass policy in 2016 that it submitted to HUD.

---

[221] Matt Gyrta, *Car passenger arrested on felony weapons charge*, The Buffalo News (March 5, 2017) (available at http://buffalonews.com/2017/03/05/car-passenger-arrested-felony-weapons-charge/ ).
[222] *Id.*

Although the BPD has signed an agreement with the City of Buffalo[23] to provide comprehensive community-based policing to the public housing properties owned and operated by the Buffalo Municipal Housing Authority BPD officers have enforced a disproportionately high level of Buffalo's misdemeanor arrests in and around minority BMHA Buildings using unconstitutional tactics. Specifically, the BPD engages in routine unlawful stops, searches, and arrests on a programmatic basis in violation of the tenants, their relatives and guests, and neighbors in violation of the Fourth Amendment to the United States Constitution, which guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures." Further, the BPD and BMHA's exclusively targets these unconstitutional tactics disproportionately in minority neighborhoods practices and are based on racial discrimination against African Americans and Latinos, and thus violate the Fourteenth Amendment, which guarantees "the equal protection of the laws." Specifically, according to the BPD Housing Unit's own logs records, BPD sworn statements, as well as BMHA tenants, legal defenders, community reports, and court cases the BPD has systematically engaged in a pattern and practice of unjustified stops, searches, and seizures in and around BMHA and in surrounding areas through two key tactics: 1) an unconstitutional trespass policy through using systemic "vertical patrols" and "walk ups" to stop individiuals in and around BMHA buildings with no individualized suspicion; and 2) routine crime suppression and/or unregulated vehicle checkpoints and roadblocks throughout BMHA properties, and as described below, exclusively in minority communities. These policies of indiscriminate questioning violate the fundamental Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures."[24]

According to BPD Housing Unit records, BPD officers use systematic unconstitutional stop tactics, including "vertical sweeps," "warrant checks" and other tactics throughout BMHA buildings. From 2013-2015, BPD Housing Unit daily logs indicate that BPD engaged in routine, daily suspicionless search tactics, including vertical patrols, where police officers conduct floor-by-floor sweeps of public housing buildings and systematically question those they encounter. The officers have then arrested individuals unable to prove that they are either residents or invited guests; individuals for outstanding warrants; and other offenses requiring a stop. The systematic nature of these stops—and BPD testimony and records--indicates that these routine encounter is often predicated on nothing more than the suspect's presence in the building. These tactics have been confirmed by interviews, BPD officer testimony and court decisions. According to BPD records and testimony by the BPD Housing Unit officers, BPD HU's routine stop and enforcement tactics often lack reasonable suspicion.

The following section describes these dragnet, discriminatory unjustified stops and seizures and how they have caused great harm to residents, relatives including the indignity of routine unjustified encounters with the police, as well as false arrests, and even brutality. Described in more detail in the Equal Protection section, the BPD Housing Unit is also violating the Fourteenth Amendment by targeting predominantly minority buildings for suspicionless searches, and the basic tenants of community policing explicitly required by the Common Council contract by this routine, even daily misconduct, but also making residents feel unsafe to call the police for fear of harassment. Rather, these tactics have served to inflate the city's budget at the toll of the predominantly minority community, while providing no tangible benefits to the targeted communities—and seriously damaging trust.

<u>Scope of Arrests</u>

---

[23] 41 See BMHA-BPD Contract, available at http://bflopoverty.
wikispaces.com/BMHA+Contract+with+City+of+Buffalo+for+Policing)
.
[24]

63

According to BPD's Housing Unit monthly housing statistic reports from May 2013-May 2014, BMHA issued more than 10,533 tickets and made 3,761 arrests—accounting for 35% of all of Buffalo's misdemeanor arrests.[225] Almost 90% of the Housing Unit's arrests were for either misdemeanors or violations; the biggest category for minor traffic crimes or misdemeanors, with the largest group of arrests was for Traffic misdemeanors (44%, 1650), followed by 1,552 arrests for other Misdemeanors (41 %), and 157 arrests for Violations.. BPD also issued 10,533 tickets during this same year year.[226]

What is particularly striking about the BPD BMHA's high level arrests compared to the population they are policing and ostensibly protecting; BPD BMHA's 3,700 misdemeanor arrests comprised 37%[227] of all BPD's 8,624 misdemeanor arrests during this period[228] ---even though BMHA tenants only comprise 2.2% of Buffalo's population.[229]

Even controlling for arrests only in BMHA locations, the BPD Housing Unit made 28% of all BPD Housing Unit misdemeanors. As described below, one –quarter, or 970 of the BPD Housing Unit's arrests were more than ½ mile away of any BMHA Unit . Even controlling for these non-BMHA arrests, BMHA BPD made 28% of all misdemeanor arrests by the BPD, for  that year.
.

## BPD Housing Unit Unconstitutional Practices

The BPD Housing Unit, at the Direction of the City and BMHA, engages in a pattern or practice of unlawfully stopping and arresting individuals for being lawfully within their buildings or on public sidewalks for "trespassing" or other misdemeanor offenses. Although there is no "stop card" data, from 2010-2014, legal aid attorney Rebecca Town reported that the BPD Housing Unit made 315 trespass arrests from 2010-2014, and by 2014, they are "mostly all getting dismissed" by judges, often for Fourth Amendment violations.[230] According to Ms. Town, judges were not only dismissing trespass cases for improper questioning, but were finding evidence that the defendant lived in the building where the trespass was said to have occurred. BPD records confirms Ms. Town's records.

Ms. Town, who represents tenants and individuals criminally  arrested in and around BMHA for trespass  and attends BMHA Tenant meetings to listen to and address residents' concerns, has confirmed increased legally unjustified trespass stops and arrests in and around BMHA, and BPD records confirms the same. According to BPD Housing Unit record logs, from 2013-2014, the BPD arrested 19 BMHA residents for trespass violation, which accounted for 20% of BMHA's trespass arrests that year.[231]

[225] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.

[226] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted).

[227] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted).

[228] DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.

[229] U.S. Census*; Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.

[230] http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217

[231] *Id*. at 31. The rules further provide for penalties if the "trespasser" returns: "In the event that the barred person is a household member, family member, fried, guest or otherwise connected with a BMHA tenant, BMHA shall provide written notice to the tenant that said person has been barred from BMHA property and shall state the duration of the bar, as wekll as the possible penalties for the tenant's failure to cooperate with the barment, which may include eviction." (31) . In addition, Section 10 provides that "a tenant's assistance in violation of this policy by another tenant or by a non tenant shall constitute a material lease

64

### *Tenant Reports of Stop and Frisk Practices*

Tenants and community leaders confirm that the BMHA's trespass enforcement activities in BMHA buildings have resulted in a large number of BMHA residents being impeded in coming and going freely from their homes and having guests. Many of these stops have been based on suspicion of trespass, but lacked the factual basis to support a reasonable suspicion of trespass needed to support a stop.

Specifically, beginning in 2013, BMHA residents and their attorneys have testified, filed civil and court challenges about this policy and spoken out at public forums and in the press about the BPD's widespread practice of making unlawful stops and arrests on suspicion of trespass in, outside and around building and simultaneous underpolicing—and failure to respond to calls for assistance or solve crimes. According to BMHA tenant Sam Smith, who is also chairman of the Jurisdiction Wide Resident Council, "Housing Unit officers "strike" BMHA grounds, to stop, question and arrest residents and their guests for trespass."[232] In a December 2014 during a tenant roundtable, tenant leaders from five BMHA developments described the frequent stop-and-frisk harassment of themselves, other tenants, relatives and visitors.  During these stops, tenants and their guests are "stopped repeatedly and asked to produce identification, questioned because of lack of identification, stopped because of use of the public outdoor spaces around the buildings, "and subjected to other troubling encounters with police officers who regularly patrolled the buildings," according to civil rights attorney and National Lawyers Guild leader John Lipsitz.

Tenant Leader Sam Smith reports that "residents have been falsely accused of trespassing for doing nothing more than walking to or from their apartments" and how "[s]ome residents have even been arrested for trespassing in their own homes." According to residents, BPD officers state that they "don't need reasonable suspicion because it's "public" property,"[233] in direct contravention of the Fourth Amendment.

### *Proposed BMHA-BPD Suspicionless Trespass policy*

Tenants' reports are consistent with a recently proposed  formal BMHA trespass policy codifying its current unconstitutional trespass practices allowing police to stop anyone in or around BMHA buildings, demand their identification, and prove that they have a specific legitimate purpose on BMHA premises—even if an individual is doing nothing wrong. In its most recent Admissions and Continued Occupancy Plan (ACOP) submitted to HUD as part of its PHA five year plan, the policy requires anyone located on BMHA property or in buildings "to identify himself or herself by showing appropriate written identification, and to prove specific legitimate purpose to be on the development premises."[234] If the officer determines that an individual does not have a "specific legitimate purpose "or has a legitimate purpose but is subject to one of the expansive list of criminal behavioral bars, the officer will issue a "Trespass Warning" and place the individual on a "Trespass list"; if they return to the development without a specific legitimate purpose, the are arrested and barred from entering BMHA properties for up to three years for their first offense. The arrest

---

violation, the penalty of which may include eviction. This Policy shall be incorporated, through appropriate language, in all tenant leases or addendums.." (32

[232] John Lispsitz and Sam Smith, *Another Voice: Buffalo Police must address of BMHA Residents Before Agreement is* Renewed, The Buffalo News (Jan 29, 2015) *available at* http://www.buffalonews.com/opinion/another-voice/another-voice-buffalo-police-must-address-concerns-of-bmha-residents-before-agreement-is-renewed-20150129 ) As discussed below, he also noted how Housing Unit is now located with the department's Strike Force Unit, which aggressively targets illegal guns and drugs, and is being used in the same way as the Strike Force, in violation of the community policing agreement.

[233] Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, The Buffalo News (December 17, 2014) (*available at* http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 )

[234] City of Buffalo, *5-Year Public Housing Authority Plan to the Department of Housing and Urban Development beginning for Fiscal Years 2016-2020*, Buffalo Municipal Housing Authority, at 26-32 (available at https://www.ci.buffalo.ny.us/files/1_2_1/BMHA/NY002_AGENCY_PLAN_revised.pdf). The policy, broadly applies to "walksways, grasses, playgrounds, parking loits, drives and other common areas defines BMHA grounds to be both in buildings." *Id.*

65

can also result eviction for the tenant they are visiting.[235] The proposed policy would apply "retroactively and prospectively,: to " to all tenants living in untis within those developments." The policy contains no guidelines delineating how an individual may obtain or establish a "legitimate purpose" and contains or limiting or identifying criteria specifying who should be stopped; it directly authorizes the BPD to stop and question everyone on or in BMHA premises, regardless of reasonable or any suspicion to establish their identity with written identification and prove that they have a legitimate purpose, in direct violation of the Fourth Amendment.[236]

**Further, BPD officers have testified, and courts have found, the BPD has already been implementing this broad discretion in and around BMHA properties on  a routine basis in violation of the Fourth Amendment constraints on police stops of probable cause and reasonable suspicion, leading to false and even brutal arrests.** Legal Aid lawyer Rebecca Town, who represents tenants and individuals criminally  arrested in and around BMHA for trespass,  and attends BMHA Tenant meetings to listen to and address residents' concerns, has confirmed increased legally unjustified trespass stops and arrests in and around BMHA., From 2010-2014, she reported that  the BPD Housing Unit made 315 trespass arrests from 2010-2014, and since around 2013 Judges began frequently dismissing these charges; by 2014, Ms. Town reported  that BPD Housing Unit trespass charges were "mostly all getting dismissed" by judges.[237] According to Ms. Town, judges were not only dismissing trespass cases for improper questioning, but were finding evidence that the defendant lived in the building where the trespass was said to have occurred. BPD records confirms the same. According to BPD Housing Unit records, from 2013-2014, the BPD arrested 19 BMHA residents for trespass violation, which accounted for *20% of BMHA's trespass arrests that year.*[238]

Court cases and incidents

Courts have found that the BPD has stopped, questioned and even falsely arrested on trespass charges without any individualized suspicion of wrongdoing in and around BMHA properties.  For example, on May 3, 2014 at around 4:30 P.M., BPD Housing Unit Officer William Macy was conducting a "vertical foot patrol" at 305 Perry Sweep in response to "general resident complaints*"* when he saw Raymon Richardson exit an elevator in the building.[239] Without having any reason to suspect Mr. Richardson of trespass or wrongdoing,[240] Officer Macy approached Mr. Richardson and asked him whether he lived in the housing project.[241] Mr. Richardson informed Officer Macy that he did not live there. Officer Macy continued to press Mr. Richardson with further questions, but Mr. Richardson replied by stating that he would not respond because "this was harassment."[242]   At that point, Officer Macy informed Mr. Richardson that because he said

---

[235]

[236] The BPD's trespass practices and policy also violate New York State's stop and frisk law, which prequires reasonable suspicion before a police officer requests  a name, address, and purpose.that without a warrant. Specifically, CPL § 140.50 provides that "a police officer may stop a person . . . when he reasonably suspects that such person is committing, has committed, or is about to commit "a crime, "and may demand of him his name, address and an explanation of his conduct." *Id. See also Ligon*

[237] http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217

[238] *Id*. at 31. The rules further provide for penalties if the "trespasser" returns: "In the event that the barred person is a household member, family member, fried, guest or otherwise connected with a BMHA tenant, BMHA shall provide written notice to the tenant that said person has been barred frok BMHA property and shall state the duration of the bar, as wekll as the possible penalties for the tenant's failure to cooperate with the barment, which may include eviction." (31) . In addition, Section 10 provides that "a tenant's assistance in violation of this policy by another tenant or by a non tenant shall constitute a material lease violation, the penalty of which may include eviction. This Policy shall be incorporated, through appropriate language, in all tenant leases or addendums.." (32

[239] *People v. Raymon Richardson*, Docket No. 14M6557, Decision and Order at 3 (Buff. City Court 2015).

[240] *Id*. Officer Macy testified he did not know 2/3 of the residents of Perry and did not observe the limited-access door propped open on this day. *Id*.

[241] Id.

[242] Decision and Order, *People v. Raymon Richardson*, Docket No. 14M6557

66

that he did not live there, he was no longer free to leave and arrested him and took him custody to the BPD Housing Unit headquarters. After an hour, Mr. Richardson informed the officers that his children may be home alone.[243] BPD officers then accompanied Mr. Richardson to his home, saw that his two children were indeed alone, and subsequently charged him with Endangering the Welfare of a Child and two counts of Trespass.[244]

During his criminal proceedings, the Judge dismissed Mr. Richardson's charges on the basis that the BPD officer violated his Fourth Amendment rights.  Although the  court found that the officer's initial inquiry was constitutional, the it found Macy's secondary more accusatory questioning and subsequent detention unconstitutional because Mr. Richardson's conduct did not present the "individualized" circumstances necessary to show "that criminal activity was afoot." The Judge found that the fact that the defendant did not live in the high rise and that he decided to stop answering the officer's questions was insufficient for an investigatory detention and arrest. In dismissing the charges based on BPD's illegally obtained evidence, the court underscored "[t]he fact that an encounter occur[ing] in a high crime vicinity, without more, has not passed *De Bour and Hollman* scrutiny" for even the lowest-level of inquiry. The Court made clear that "simply put, police encounters with civilian subjects must be proportionate to the concerns raised by the subject's observed conduct."

### Theo Brown-Harris

In routine patrols even outside BMHA buildings, BPD Housing Unit officers that the BPD Housing Unit officers have routinely stopped, questioned, falsely arrested and even used unwarranted force against their family members and friends while they have tried to visit them.  At the time of the stops or arrests, the targeted individuals were not engaged in illegal activity, and after their arrests, all of the charges were dismissed. For example, on Feb. 11, 2014, Theo Brown-Harris went to BMHA Schaffer Village upon hearing that a relative was being arrested.[245] Upon arriving, a BPD officers at the instructed him to leave the area and he immediately complied. However, as he was walking away, two additional BPD officers confronted him; the first, who he believed to be BPD Officer William Macey, requested his name and address and the second demanded that he remove his hands from his pockets. Mr. Brown-Harris immediately complied with the directives by putting his hands over his head, but one of the BPD Officers struck him over the head from behind, causing him to lose consciousness.

When he regained consciousness, Mr. Brown-Harris was lying on his stomach being "beaten, kneed and kicked about the face, head and person"[246] by several officers, including BPD Officers Macey, John Breyers and Hassan. BPD officers then handcuffed Mr. Brown-Harris, and Officers Macey, Breyers, Hassan and other officers continued to assault him. Subsequently, BPD Officer Breyers transported Mr. Brown Harris to the BPD Housing Unit Office at BMHA's Commodore Perry Homes (which is also known to Operation Strike Force) with two other arrestees. En route, Mr. Brown-Harris, who was in pain and bleeding from several places on his face, head and mouth, asked to be taken to the hospital, which the BPD transporting officer denied.[247] Mr. Brown-Harris then asked the BPD officer for his name, and the BPD Officer  responded "For example, on Feb. 11, 2014, Theo Brown-Harris walked to BMHA's Schaffer Village after hearing that a relative who lived in Schaffer was being arrested.[248] Immediately upon arriving at Shafer, a BPD officer instructed him to leave the area. Mr. Brown-Harris immediately complied. However, as he was walking away, two additional BPD officers confronted him. The first, who he believed was BPD Officer William Macey, asked him his name and address. The second officer demanded that he remove his hands

---

[243] Id.
[244] Id.
[245] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015)
[246] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015)
[247] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015)
[248] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015)

67

from his pockets. Mr. Brown-Harris immediately complied with the directive by putting his hands over his head. Almost instantaneously, one of the BPD Officers hit him over the head from behind, causing him to lose consciousness.

by verbally assaulting and threatening"[249] him.  At no point was he informed of his charges.

When he arrived at the substation, his ordeal did not end. After arriving at the BMHA substation, BPD *Breyers* took him outside, still handcuffed, and placed him in the back seat of a BPD police car and questioned him.[250] When Mr. Brown-Harris explained that he had no knowledge of any illegal activity, *BPD Officer Breyers* opened the door of the police car and began to repeatedly kick the Plaintiff in the face and side of his body.  Instead, BPD officers took him to the Erie County Holding Center , where he was charged with various crimes all of which were dismissed.[251] In Feb. 2015, Brown-Harris brought a civil suit against the City and BPD officers for millions of dollars, alleging violations of his Fourth and Fourteenth Amendment rights.[252]

In his civil rights complaint against the City of Buffalo and the Police Department, Harris alleged that the BPD "had a policy and custom of unreasonably seizing and detaining citizens; unreasonably questioning detainees; use of excessive force and of generally disregarding the rights of citizens under the United States Constitution."

## BPD Testimony and Daily Logs

Unfortunately, Mr Raymond's case is not isolated; **Officer Ryan himself testified to making "hundreds of arrests."** Rather, the BPD Housing Unit's unjustified questioning, detention and arrest of Mr. Raymond is consistent with both tenant reports of BPD tactics and BPD records.The BPD Housing Unit monthly records listing BPD HU's daily activities report indicates that from January 1, 2013-June 1, 2014, the BPD HU officers conducted 47 "walk throughs" and 27 "walk ups." in 8 different BMHA complexes. The Housing Unit also conducted three "sweeps or "clean sweeps" in BMHA buildings. Few , if any of the patrols were initiated by a specific criminal complaint or criminal investigation; rather, BPD Housing Unit officers seems seemed to engage in these patrols . These patrols raise similar concerns to Mr. Richardson's case based on the trespass and other offenses that BPD HU made following the sweeps; the most recurring arrests following these initiatives are charges including trespassing and outstanding warrants, both of which require time. Although individuals may have given consent, between Mr. Raymonds case combined with the sheer scope of complaints,  requires questioning, brief or prolonged detention, to investigate or charge. The most frequent charge BPD HU has arrested individuals for is testimony, officers would make frequent trespass arrests and arrests for other offenses that require intensive questioning, temporary detention or searches. and summons. For almost all of these patrols, the record. Nonetheless, these patrols resulted in frequent arrests which require questioning or searches, including trespass ; outsanding warrants ; and marijuana possession arrests [253].

The BPD HU daily logs indicate that similar to Mr. Richardson's and Mr. Brown's experiences, BPD officers conducted unconstitutional questioning during these patrols in and around BPD properties. The BPD officers conducting walk throughs and walk ups routinely arrested individuals for low-level offenses, that could only be identified through effecting a stop and questioning or searching individuals, which require individualized suspicion such as trespass. Residents reports are consistent with Mr. Richardson's experiences: police stop and question residents and their visitors on a daily  basis, frequently forcing them to justify their presence within their own apartment buildings. The vertical patrols, police officers conduct

---

[249] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015)
[250] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015)
[251] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015)
[252] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015)
[253]

68

floor-by-floor sweeps of public housing buildings and systematically question those they encounter. The officers then arrest individuals unable to prove that they are either residents or invited guests. The systematic nature of these stops means that the initial encounter is often predicated on nothing more than the suspect's presence in the building.

For example, during walk ups, the BPD Housing Unit officers reported regular of arrests for individuals with outstanding warrants – which requires both questioning and detention to obtain the name of an individual and conduct a computerized search of the individual's name to identify the outstanding warrant, as wll as routine marijuana possession arrests. While the BPD HP unit listed some tip or prior evidence for targeted searches, there is no indication that the walk throughs and resulting arrests were prompted by any particular complaint, and nor did the BPD list any indication of individualized suspicion prior to these arrests.

Courts have made clear that "[t]o the extent that . . . in public housing the police routinely engage in random, unjustified questioning — and there is evidence that they do — the practice would amount to a systematic violation of *De Bour*."[264] Despite this rule, the BPD's disproportionate unconstitutional trespass and suspicionless stop policy resulted in hundreds of arrests, according to BMHA records. For example

- May 3, 2014 "walk up" lead to arrests for trespass anda n outstanding warrant
- May 11, 2014 "warrant arrest" from patrols
- May 17, 2014 high visibility patrols lead to 2 "warrant arrests" at Kelly Gardens and LaSalle
- May 18, 2014, four warrant arrests in Schwabb Terrace and one in Msgr. Geary.
- May 20, 2014 – during a late night walk through in Perry to address "quality of life issues," BPD made one warrant arrest
- April 27, 2014 –walk ups in Perry lead to four arrests for Trespass and Obstruction. In addition, the BPD recovered one pound of marijuana "from suspect admitting possession."
- March 4, 3, 2014 during walk throughs of Perry, BPD made 3 narcotics possession arrests
- March 19, 2014 Walk lthrough of Schaffer village resulted in trespass arrest; walk up in Perry resulted in two marijuana arrests
- [finish March; check Feb]
- January 4, 2014 walk throughs resulted in 3 trespass arrests and narcotics possession in Lakeview.
- In April 2014, BPD conducted "daily walk throughs" The BPD records conducted these walk throughs and suspicionless questioning on a daily basis.
-

Of course, because questions and requests concerning purpose and identity could be carried out in such a manner that a reasonable person would feel free to terminate the encounter, not all questioning carried out in walk ups or walk throughs is categorically a "seizure," and thus may be either inside or outside the scope of Fourth Amendment protection. The level of coercive effect for purposes of the Fourth Amendment depends on the totality of the circumstances, including, for example, "'the threatening presence of several officers; . . . language or tone indicating that compliance with the officer was compulsory; [or] prolonged retention of a person's personal effects, such as . . . identification.'" However, BMHA residents, guests and visitors, as well as cases and reports indicate that officers have been routinely and systematically implementing the draft BMHA policy by enforcing stops as seizures in a similar manner as Officer Macy's stop of Mr. Richardson.

The BPD HU data is also consistent with BMHA tenants' reports of report routine suspicionless, systematic stops, searches and arrests of them, family members and visitors on a widespread basis in violation of the Fourth Amendment. In a round-table discussion in December 2014 tenant leaders from five

---

[264] ." People v. Ventura, 30 Misc. 3d 587, 547 913 N.Y.S.2d 543, 546-47 (Sup. Ct. N.Y. Co. 2010). (citing Adam Carlis, The Illegality of Vertical Patrols, 109 Colum. L. Rev. 2002 (2009)).

69

BMHA developments described frequent stop-and-frisk harassment of themselves, other tenants, relatives and visitors.[255] In January 2015, Attorney and National Lawyers Guild leader John Lipsitz testified to the Common Council describing how "BMHA residents.. have expressed concern that their children, themselves, and their guests are unfairly stopped, questioned, and arrested for trespass." He described how "[p]eople report being stopped repeatedly and asked to produce identification, questioned because of lack of identification, stopped because of use of the public outdoor spaces around the buildings, and subjected to other troubling encounters with police officers who regularly patrolled the buildings.[256] Similarly, Joseph Kelemen, Legal Director  the Western New York Law Center, which represents tenants *and the Buffalo Chapter of the National Lawyers Guild rconfirmed these reports in* testifying at a meeting with the Buffalo Common Council Police Oversight Committee that "[m]any residents and their guests have reported that they are repeatedly stopped, questioned, and arrested for trespass. Interactions of this kind erode the legitimacy of the police in the eyes of the community and keep victims and witnesses from reporting crimes, thus fueling a downward spiral in police community relations."[257]

In a recent study of BMHA residents evaluating the Community Policing agreement, even seniors who want increased police presence for their safety were reluctant to call the police because "the current police force doesn't respect residents, harass youth, and are in need of sensitivity training."  The study found that Youth at the Perry Projects "police did little to make the neighborhood safer and perceived them as… racially prejudiced. the Report concluded that "Residents believe the police use excessive force on the youth and residents of the development and do not trust the security camera system on the site."[258]

Together, the BPD Housing Unit evidence described above establishes how BPD BMHA officers routinely stop, detain, and arrest BMHA Buffalo residents without individualized suspicion, in violation of the Fourth Amendment. This practice is in direct violation of their Fourth Amendment right to be free from unreasonable searches and seizures. *Terry v. Ohio* (1968) (holding that a police officer who reasonably believes that criminal activity is occurring or about to occur is authorized to stop whoever they suspect of participating in the criminal activity; in such stops, officers are only allowed to conduct a limited search of the suspect's outer clothing if they reasonably feel their safety is endangered. Regardless, man residents report being victims of illegal seizures and seizures during the course of their daily business—often while they are walking to and from their apartments.  Stopping and detaining, and often arresting Buffalo residents, their guests, family members and visitors for going about their daily business—often while they are walking to and from their BMHA apartments or to visit family and friends—violates their Fourth Amendment right to be free from unreasonable searches and seizures.

### BPD Housing Unit Suspicionless Vehicle Checkpoints

The BPD Housing Unit has engaged in routine biweekly or even suspicionless vehicle checkpoints, almost exclusively in minority neighborhoods and minority public housing buildings. According to BPD Housing Unit officers, as of March 2016, the BPD Housing Unit has conducted "hundreds" of roadblocks— with no routine procedures and arbitrary rules.[259] According to BPD HU logs, from May 2013-May 2014, the

[255] Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, The Buffalo News (December 17, 2014) (*available at* http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 )

[256] Megan Williams, *Buffalo's Stop and Frisk Problem*, The Public, Jan. 13, 2015 available at http://www.dailypublic.com/articles/01132015/buffalos-stop-and-frisk-problem

[257] Megan Williams, *Buffalo's Stop and Frisk Problem*, The Public, Jan. 13, 2015 available at http://www.dailypublic.com/articles/01132015/buffalos-stop-and-frisk-problem . John Lipsitz of the National Lawyers Guild similarly testified that "[t]he constant policing, involving frequent stopping and questioning for innocent behavior, commonly referred to as stop and frisk, has led to community concern, and general distrust of the police on BMHA property." *Id.*

[258]

[259] People v. Scott, 63 N.Y.2d 518, 526, 483 N.Y.S.2d 649, 473 N.E.2d 1 (1984).

70

BPD Housing implemented at least 24 unconstitutional checkpoints exclusively in and around BMHA properties that were predominantly African American, Latino and other racial minorities' communities, including 15 joint checkpoints with Operation Strike Force [260]

Of serious concern, the BPD Housing Unit has made a staggering number of traffic misdemeanor arrests and issued traffic tickets. While BPD HU is charged with providing police services to only 2.6% of Buffalo's residents (12,000), according to BPD Housing Unit's monthly housing statistic reports from May 2013-May 2014, the Housing Unit issued more than 10,533 tickets---more than half of all tickets issued by the BPD that year. Although the Housing Unit records do not indicate whether all the tickets were based on checkpoints, the BPD Housing Unit made substantial numbers of traffic misdemeanor arrests, which can only be effectuated through a roadblock or other vehicle stop. Overall, the BPD Housing Unit made 3,761 arrests, 90% of which were misdemeanor—accounting for 36% of all of Buffalo's misdemeanor arrests. [261] Of the Housing Unit's 2,172 misdemeanor arrests, the largest group of arrests were for traffic misdemeanors 44%, 1650.  Overall, based on BPD HU records from January 2013-June 2014, the BPD Housing Unit police arrested 1,866 people for traffic misdemeanor arrests both in and around BPD properties and throughout Buffalo.

Law

As described above, Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Given the Fourth Amendment's core purpose of protecting against arbitrary intrusions by government officials, see Delaware v. Prouse, 440 U.S. 648, 653-54, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." United States v. Fraire, 575 F.3d 929, 931 (9th Cir. 2009) (citing City of Indianapolis v. Edmond, 531 U.S. 32, 37, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000)). Because stopping an automobile and detaining its occupants, "even if only for a brief period and for a limited purpose," constitutes a "seizure" under the Fourth Amendment, Whren v. United States, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996), an official must have individualized "reasonable suspicion" of unlawful conduct to carry out such a stop. See Prouse, 440 U.S. at 663; United States v. Brignoni-Ponce, 422 U.S. 873, 884-86, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975).

The Court suggested in Prouse and Edmond that law enforcement to set up roadblocks on highways for the purpose of checking drivers' licenses and vehicle registration, only if the officers involved do not act with "'standardless and unconstrained discretion.'" Edmond, 531 U.S. at 39, 121 S. Ct. at 453 (quoting Prouse, 440 U.S. at 661, 99 S. Ct. at 1400). (HN3)

Analysis

There are no written guidelines for BPD Housing Unit roadblocks, and according to BPD Housing Unit officers, they are not conducted under any uniform manner. [262] According to BPD officers, there are no uniform criteria for how BPD HU checkpoints are conducted and which drivers are stopped, other than a general policy to stop individuals who evade the checkpoint. BPD Housing Unit Lieutanant Russo recently testified when he administers a checkpoint "all cars are checked" but "not all cars are stopped [for secondary

---

[260] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014; *People v. Dzielski*, Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016).

[261] BPD Housing Unit records (on file with author)

[262] People v. Dzielski, Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016).

inspection]..it's more of a rolling process."[263] According to Russo, BPD officers have unconstrained authority to decide who to stop, and use exercise independent discretion in deciding which cars to stop for further questioning. According to Russo, officers "rely on ordinary police instincts;" BPD officers will pull a car over if "something else is drawn to [the officers'] attention" based on their general "reasonable suspicion" training."[264] However, BPD Housing Unit officer William Robinson, who who has conducted "hundreds of checkpoints," stated that he "stop[s] every single car for safety and equipment violations."[265] BPD Housing Unit officer William Robinson testified on March 14, 2016 to participating in over a hundred similar checkpoints.[266]


The BPD Housing Unit reports confirm the officers' testimony and suggest that low-level housing units used unbridled discretion in conducting vehicle checkpoints.[267] They contain no evidence or reference to any standard procedures or authorization by leadership as to when or how to conduct a vehicle and traffic checkpoint. Rather, the BPD Housing Unit Report monthly reports appears as if as if the individual low-level officers on duty selected the time, location and manner of checkpoints at their discretion. The logs list vehicle checkpoints in daily entries with other routine suspicionless enforcement activities Housing Unit officers would conduct, including "walk throughs," suspicion person searches, and "walk ups."


However, the Buffalo City Court recently found a BPD Housing Unit roadblock stop conducted in September 11, 2015 to violate the Fourth Amendment because it was conducted without any "nonarbitrary, nondiscriminatory and nonuniform procedure."[268] On September 11, 2015, the BPD Housing Unit initiated a "safety checkpoint" at the intersection of Crowley and Rano in Buffalo. During the checkpoint at around 7:00p.m., BPD Housing Unit Officer William Robinson stopped Stephen Dzielski in his vehicle as he went through the checkpoint for questioning, as he testified he did with every driver. During the stop, Officer Robinson observed an open contained of beer in plain view in defendant's lap and conducted a DWI investigation; Offivcer Robinson subsequently placed Mr. Dzielski under arrest for a DWI charge.


During his criminal proceedings, Mr. Dzielski filed a motion to suppress all evidence and gained from the unlawful roadblock stop, which the Court granted, finding the BPD Housing Unit Roadblock stop to violate the Fourth Amendment because the BPD conducted the stop without individualized suspicion and the checkpoint without standardized rules.[269] The Court noted how the Supreme Court has made clear that even in the narrow circumstances when roadblocks are authorized, written rules are a constitutionally mandated component for vehicle roadblocks or checkpoints to be constitutional to safeguard against arbitrary conduct. Despite these strict requirements, BPD officers were not provided with sufficient procedures or instructions other than the location and time of the checkpoint[270] and that therefore "the police had no right to stop and to arrest the defendant." Specifically, the Court held that even in the narrow circumstances when roadblocks are authorized, eg stops for "traffic checks," <u>clear, uniform, written rules are a constitutionally mandated component to avoid arbitrary conduct.</u>

[263] *Id.*

[264] *People v. Dzielski,* Docket No. CR-16851-15, Docket No. Dzielski Motion to Suppress at 7 (filed DATE). Lt Russo stated that officers knew who to stop based on their standard training ("These are trained police officers . . . well aware of what consituttes [reasonable suspicion].").

[265] *People v. Dzielski,* Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016).

[266] *People v. Dzielski,* Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016).

[267] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.

[268] *People v. Dzielski,* Docket No. CR-16851-15, Docket No. Dzielski Motion to Suppress (filed DATE).

[269] *People v. Dzielski,* Docket No. CR-16851-15, Docket No. Dzielski Motion to Suppress (filed DATE).

[270] *People v. Dzielski,* Docket No. CR-16851-15, Docket No. Dzielski Motion to Suppress (filed DATE).

In Mr. Dzielski's case, the Court relied on the fact that BPD officers' were not provided with any procedures or instructions other than the location and time of the checkpoint.[271] Lieutenant Russo stated that he had a written directive that he discussed orally, but did not give to BPD officers and instead stated that it was "put into a binder like that for access for corporate purposes."[272] The Court found that the directive "on file" was ambiguous and did not contain any clear criteria on who to stop, other than noting that officers should conduct a traffic stop on any vehicle that attempts to avoid the roadblock"[273] Further, the directive, nor Russo gave "specific verbal or written instructions as to the procedures to be used at the checkpoint, including, among other things, the nature of the question to be asked of every motorist."[274] Further, the BPD Housing Unit to implement the roadblock unconstitutionally, by failing to provide "evidence of signs, safety devices, flares or police cars stationed in place to alert pmotorists that they were approaching a checkpoint." Instead, when the arresting officer conducting the stop was asked whether he had been given instructions, he replied that they use discretion because they were routine: "we [BPD Housing Unit Officers] generally know what we're doing. So when we're told to do a checkpoint, it's do a checkpoint here at this time because we've done, I don't know, a hundred of them … We stop every single car for safety and equipment violations, make sure we have our overhead lights on, and it's got to be a safe spot."[275] Therefore, Judge Keane found that the BPD Housing Unit roadblock stop was unconstitutional because the BPD had failed to establish that the checkpoint established and operated in a manner that complied with constitutional requirements" and held that "the police had no right to stop and to arrest the defendant" [276]

The BPD officers testified that the BPD HU has conducted "hundreds of such roadblocks" The Buffalo residents subjected to these roadblocks were not engaged in illegal activity warranting even a justification for a temporary stop.

BPD daily records confirm that during these checkpoints BPD Housing Units made various arrests, impounds and summons Of serious concern is the staggering number of traffic arrests and tickets the BPD HU made from both these checkpoints and other suspicionless stops. Although the BPD HU is charged with providing police services to only 2% of Buffalo's residents (12,000), according to BPD Housing Unit's monthly housing statistic reports from May 2013-May 2014, the Buffalo police issued more than 10,533 tickets and made 3,761 arrests—accounting for 35% of all of Buffalo's misdemeanor arrests.[277] Of the Housing Unit's 2,172 arrests, the largest group of arrests were for Traffic misdemeanors 44%, 1650.

While the Judge did not address this argument, the BPD Housing Unit checkpoint program also violates the Fourth Amendment under *City of Indianapolis v. Edmond* because the City's and BPD's express primary purpose of its roadblock checkpoint program is crime control and deterrence. **These checkpoints are similar to the checkpoint program in *Indianapolis* found to be unconstitutional because the primary purpose of the program is to find illegal narcotics, guns or gangs. As the Court held in Indianapolis, these checkpoints violate residents' Fourth Amendment rights because the vehicle stops were not based on individualized suspicion of criminal activity or one of the limited permissible exceptions .** This is explained in more detail below in the Strike Force checkpoint section.

---

[271] *People v. Dzielski,* Docket No. CR-16851-15, Docket No. Dzielski Motion to Suppress (filed DATE).
[272] *Id.*
[273] *People v. Dzielski,* Docket No. CR-16851-15, Docket No. Dzielski Motion to Suppress (filed DATE).
[274] *People v. Dzielski,* Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016).
[275] *People v. Dzielski,* Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016).
[276] *People v. Dzielski,* Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016).
[277] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.

0079

**Operation Strikeforce Checkpoints**

In 2012, the City launched "Operation Strikeforce", which involved aggressive high saturation patrols designed to combat drugs and guns, as well as frequent, routine, and even daily crime suppression traffic checkpoints and roadblocks in African American neighborhoods on the East Side and predominantly minority neighborhoods.[278] The Campaign was part of the City's Zero Tolerance" campaign and consistent with the Mayor's original Strikeforce designed to identify and target gang members; target and eliminate high crime areas in the city; remove illegal guns and illegal drugs; strictly enforce the Zero Tolerance Law Enforcement Initiative; and improve the city's quality of life.[279] From its initiation, the City announced that the primary purpose of these roadblocks was crime suppression, in direct contravention of the Fourth Amendment under *Edmonds*.[280]

Beginning in 2013, BPD Strikeforce teams conducted daily crime suppression traffic checkpoints and roadblocks in African American neighborhoods on the East Side and other predominantly minority neighborhoods.[281] The high frequency Strike Force checkpoints have resulted in a large number of tickets and arrests and a financial burden on residents subjecting residents to frequent fees. Similar to the BPD Housing Unit checkpoints, which participated in 15 Strikeforce roadblocks from 2013-2014, the BPD Strike Force checkpoints violate the Fourth Amendment because they were expressly initiated to reduce crime, drugs and guns in violation of *Edmonds*. Unfortunately, not only were these roadblocks presumptively unconstitutional and subjected thousands of minorities to suspicionless stops*,* searches and arrests, but similar to the BPD Housing Unit checkpoints, they did little to reduce crime or net guns, and instead exacted a financial toll on minority communities.

During the study period, BPD Strikeforce teams stopped thousands of drivers in African American and Latino neighborhoods in hundreds, and often daily crime-suppression roadblocks in primarily African American and Latino neighborhoods under Operation Strikeforce. In 2013 alone, BPD conducted more than 370.

In launching the Operation Strikeforce vehicle roadblock initiative and throughout its implementation, Mayor Brown and Police Commissioner Daniel Derenda made clear that the primary purpose of the checkpoints and roadblocks were to "proactively" address crime, guns and drugs.[282] Funded in part with New York State Operation Impact funding, the Buffalo Strikeforce unit[283] collaborated with Erie County and State Police officers to coordinate and conduct frequent and intensive vehicle checkpoints and coordinated over 40 Strikeforce officers to implement roadblocks throughout the City of Buffalo.[284]

From the initial roadblocks launched in 2012, BPD Strike Force teams were aggressive, conducting a high volume of checkpoints and arrests, although recent data indicates that Strikeforce roadblocks were primarily focused on vehicle-related infractions and revenue. These roadblocks also raised constitutional issues. In one of the first Strikeforce roadblocks in June 2012 at the intersection of Grant and Ferry in Buffalo's predominantly minority West side, Commissioner Derenda reported making 22 arrests, seizing two

---

[278] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.")

[279] https://www.ci.buffalo.ny.us/Home/Leadership/Mayor/Archive_Press_Releases/2006_Archives/September_2006/MAYOR_BRO WN_ANNOUNCES_OPERATION_STRIKE_FORCE

[280] *City of Indianapolis v. Edmond,* 531 U.S. 32 (2000).

[281] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.")

[282] Darryl Granger,  *"Strike Force" makes Heroin and Handgun Arrests*, WGRZ-2 (June 24, 2012) (*available at* http://southbuffalo.wgrz.com/news/news/67151-strike-force-makes-heroin-and-handgun-arrests ) (last visited June 6, 2016)

[283] http://www.criminaljustice.ny.gov/crimnet/ojsa/impact/2013annualreport.pdf

[284] http://news.wbfo.org/post/police-strike-force-begins-patrols-monday#stream/0

75

guns and eleven bags of heroin. [285] The BPD made seven of the 22 arrests from pursuing and stopping two cars that attempted to avoid a police checkpoint; the BPD arrested two individuals in pursuing a vehicle on heroin charges, and five people in the second car, who the BPD say were found in possession of a loaded handgun. [286] These initial stops highlighted a further concern for further Fourth Amendment violations following stops and arrests— 1) the BPD's authority to arrest individuals who evade the roadblocks; 2) the BPD's problematic justification for arresting the driver and all four passengers for ownership of just one gun.

According to news reports of the initiation of the Strikeforce Checkpoints: "[a] multiagency police strike force has made 145 arrests and seized nearly $2,500 in cash during the first 10 days of an effort to target crime hot spots across Buffalo. […]. The Mayor praised the crime suppression checkpoints, stating that "[t]his is sending out a very strong message to the crime element," the mayor said. "Don't do it because we're watching, and our police officers are out there, and it's just a matter of time before we arrest you and put you in jail."[287] In just two months, 1000 people were arrested and more than 350 cars were seized. According to news reports: "With nearly 1,000 people arrested, more than 350 cars seized and more than 2,400 summonses issued in less than two months of operation, the multi-agency Buffalo Strike Force is having a "phenomenal" impact on overall crime in the city, Mayor Byron W. Brown and Police Commissioner Daniel Derenda say."[288] City officials asserted that Strike Force teams are effective because they are "highly visible, arresting suspects, conducting roadside stops and collecting criminal intelligence for future use."[289]

The Strikeforce roadblocks and checkpoints are operated with little consistency. A recent report on 66 BPD Strikeforce checkpoints in April-May 2013 indicated that BPD officers set up the roadblock for 90 minutes and use a APLR check every vehicle that passes through the roadblock, and those in the vicinity, and conduct longer secondary inspections that come up with an APLR "hit." However, the 6000 traffic tickets Strikeforce issued are inconsistent with that procedure and suggest that BPD was pulling over individuals for routine traffic violations . In addition, the BPD Housing Unit officers, who routinely conduct joint checkpoints with Strikeforce officers do not use an APLR, but rather stop every car to check for vehicle violations and proceed to investigate the driver further if there are vehicle compliance issues have any suspicions about wrongdoing.

In only two months, from April-ay t 2013, Buffalo Strikeforce officers conducted 67 roadblocks in 46 different locations and issued 6,000 traffic tickets, while noting made a number of arrests for outstanding warrants, and confiscated "several firearms and vehicles"[290] in; all but two of which were in minority neighborhoods [map?] [291] During this period, the "primary goal was to deter crime and disorder"[292] In January 2014, BPD Commissioner Darenda said that BPD Strikeforce Unit operated at roadblocks on a daily basis. If BPD had similar outcomes as the pilot program roadblocks conducted every day in 2013, BPD Strikeforce

---

[285] http://origin.wgrz.com/news/local/story.aspx?storyid=172450

[286] New York State Division of Criminal Justice Services, Motor Vehicle Theft and Insurance Fraud Prevention Board 2012 Annual Report to the Governor and Legislation, at 68 (available at http://www.criminaljustice.ny.gov/ofpa/pdfdocs/2012_MVTIF_Program_Annual_Report.pdf). In August 2012, the Buffalo PD worked with Cheektowage police department to conduct a traffic checkpoint that examined 181 cars and seven motorcycles (check Juneteenth!?_

[287] Matt Gryta, *Police strike force targets hot spots in city, cites 145 arrests in 10 days*, THE BUFFALO NEWS, June 22, 2012, at LOCAL; p. D10.

[288] Matt Gryta, *Officials praise results of strike force*, THE BUFFALO NEWS, Aug. 5, 2012, at LOCAL; p. B3.

[289] Mike Desmond, *Joint Police Effort Targets Crime* , WBFO (July 17, 2013) (available at http://news.wbfo.org/post/joint-police-effort-targets-city-crime#stream/0)

[290] Andrew Wheeler and Scott W. Phillips, *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY* (May 17, 2016) (available at http://ssrn.com/abstract=2781126).

[291] Eleven of the locations were targeted at least twice over the two month study period, and three locations were targeted four separate times. Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[292] *Id.*

76

officers would have issued approximately 36,000 tickets in almost 400 checkpoints, through these suspicionless stops in predominantly, if not exclusively, in minority neighborhoods.[293] According to the study on the effectiveness of BPD Strike Force Roadblock during this period, compared to the rest of the city, roadblock locations "had larger proportions of black residents."

By 2013, Mayor Brown and Derenda made Strike Force checkpoints permanent, and saturated minority neighborhoods with <u>daily</u> crime-suppression vehicle roadblocks and checkpoints. Both Derenda and Brown have continued to underscore that Strikeforce officers made frequent, high saturation unconstitutional checkpoints on a regular, and even on a daily basis in minority neighborhoods for the express purpose of deterring and controlling crime. Mayor Brown explained that he made the Strike Force checkpoint campaign permanent "to put a lot of pressure on criminals" designed to "send a clear and ongoing message that criminal activity is not going to be tolerated in Buffalo."[294] By January 2014, Commissioner Derenda stated that "Strike Force officers are conducting daily roadblocks" that were designed to "surprise[e] the criminal element."[295] Derenda underscored that the purpose of these checkpoints were to proactively identify and deter violent crimes, and asserted that they were effective in doing so. After a year of daily checkpoints, he argued, "people are now less likely to carry guns knowing that they may be stopped at a safety checkpoint."[296]

In December 2016, BPD Strike Force Officer Michael Acquino testified that he continues to conduct roadblocks "every day,"[297] consistent with reports by Buffalo residents' of continued regular checkpoints on the East Side.


These checkpoints systematically violated the Fourth Amendment. First, the City's <u>stated primary purpose</u> for the BPD;'s checkpoints is to search for narcotics and weapons, which the Supreme Court has held to be per se unconstitutional under Indiana v. Edmunds. The Mayor, Derenda, and BPD records make clear that the checkpoints were designed for "crime control" and to deter drugs and guns. They publicly announced the roadblocks were "successful" based on crime figures. The Court has made clear that crime suppression checkpoints are per se unconstitutional. This is because they would "swallow the Fourth Amendment" and subject every person to be subkect to the routine suspicionless stops. This, however, is precisely what the BPD did: during these checkpoints and roadblocks, Buffalo police officers subjected every driver to a suscpcionless stop and arrested those that tried to evade the checkpoint.

Mayor Brown explained that he made the Strike Force checkpoint campaign permanent "to put a lot of pressure on criminals" designed to "send a clear and ongoing message that criminal activity is not going to be tolerated in Buffalo." The number of stops, and violations stemming from these suspicionless checkpoints—as well as City profits is stunning, as is the revenue for the City. In 2016, researchers from

---

[293] During 2013, the BPD spent $2.42 million in salary for the 23 officers to the Strike Force Unit. http://data.buffalonews.com/
[294] Lou Michael, *Anti-crime task force back for* good, The Buffalo News (March 31, 2013); Lou Michel, *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016); Mayor Byron W. Brown, *Mayor Brown Celebrates Progress in Buffalo*, City of Buffalo Press Release (Feb. 22, 2013) (available at http://www.ci.buffalo.ny.us/Home/Leadership/Mayor/Archive_Press_Releases/2013Archives/February2013/ProgressBuffalo)
[295] Lou Michel, *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).
[296] *Id*.
[297] *U.S. v. Jordan*, No. 16-CR-93, Dkt. No. __, Tr. of BPD Officer Acquino testimony at Dec. 8, 2016 suppression hearing), at __ (W.D.N.Y. filed _____) (available at https://www.scribd.com/document/343929863/BPD-Testimony-in-U-S-v-Jordan-suppression-hearing-Dec-8-2016 ); Aaron Lowinger, *The Arthur Jordan Case: Free Speech, Privacy, and the Police*, The Public, Dec. 13, 2016 (*available at* http://www.dailypublic.com/articles/12142016/arthur-jordan-case-free-speech-privacy-and-police)

77

Buffalo State released a study on the BPD Strikeforce Checkpoint Program that it did in collaboration with BPD, and based on BPD Data. According to the study, the checkpoints were based on crime statistics, and designed to deter crime. Specifically, the study described the BPD's process of selecting locations for Operation Strikeforce Checkpoint in the following manner: "[T]he Buffalo Police Department (BPD) identified problem areas (i.e., locations with a high number of robberies, burglaries, criminal mischief, and drug activity) and then would use high visibility roadblocks at different locations throughout the city." [298] The Study was based on 67 BPD Strikeforce Checkpoints in 45 different locations conducted from April-May 2013, and the "primary goal was to deter crime and disorder."[299]. The study confirmed that the BPD ordered checkpoints to be located at "hotspots" for crime.[300]

 In only two months, from April and May of 2013, the Buffalo Strike Force officers issued over 6,000 traffic tickets, and made a number of arrests for outstanding warrants, and confiscated "several firearms and vehicles"[301] in 67roadblocks in 46 different locations; all but two of which were in minority neighborhoods [map?] [302] During this period, the BPD made clear that all checkpoints "primary goal was to deter crime and disorder"[303]

 Of the 67 checkpoints, 59, or 88% were conducted on Buffalo's predominantly African American East Side.[304] Further, the authors observed that compared to the rest of the city, the Checkpoint Program locations "had larger proportions of black residents." [305] The study found that the BPD was unequivocally targeting Buffalo neighborhoods with larger proportions of African Americans. Specifically, it found that

---

[298] Andrew Wheeler and Scott Phillips, *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY*, at 1 (May 17, 2016). (available at http://ssrn.com/abstract=2781126) ("New locations were chosen on a daily basis over a two month period in 2013, and the intervention was referred to as Operation Strikeforce.").

[299] *Id*. at 3 (May 17, 2016). ("The Buffalo police worked with Erie County Sheriff's deputies and New York State troopers, and specifically aimed to make the roadblocks high-visibility, with the primary goal of deterring crime and disorder."). The authors further noted that one of the reasons for using an Automated License Plate Reader ("ALPR") at checkpoints is that "APLR can identify vehicles (and persons associated with those vehicles) with more significant criminal histories it is possible such an intervention could deter more serious criminals from visiting the roadblock locations." *Id*. at 5.

[300] *Id*. at 5-6.

[301] Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[302] Eleven of the locations were targeted at least twice over the two month study period, and three locations were targeted four separate times. Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[303] Andrew Palmer Wheeler and Scott W. Phillips, *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY* (May 17, 2016). (available at http://ssrn.com/abstract=2781126). Note that the Strike Force roadblocks examined in the study largely had similar features to routine BPD roadblocks documented in cases and reports but varied from standard procedures in that officers in the study relied only on automated license plate readers (APLR) to determine who to detain.  That is, the study-group Strike Force officers stopped vehicles only if they were flagged by the ALPR either in the roadblock or in surrounding streets (to detect vehicles attempting to evade the checkpoint) if they are "associated with warrants or having a revoked license (for the owner of the vehicle), or if the vehicle itself was stolen;" the study-roadblocks are designed to slow cars down so officers can conduct an APLR analysis either within the roadblock or in surrounding streets. *Id.* at 3-4. If there is no APLR hit, the car is waived on with no further interaction In contrast, in standard Buffalo Strike Force checkpoints are implemented consistent with BPD's Zero Tolerance policing policy: police briefly detain all drivers and inspect their registration and pull over, question and frequently arrest individuals based on any indication of criminal or civil violations, consistent with the Zero Tolerance Policing policy.

[304] Andrew Wheeler and Scott Phillips, *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY* (May 17, 2016). (available at http://ssrn.com/abstract=2781126). (**"The Buffalo Police Department, with assistance from State Police and the Erie County Sheriff, conducted more than 60 checkpoints across 45 locations. Each checkpoint remained in place for more than90 minutes and all but 8 of them occurred on Buffalo's predominately African American eastside.**").

[305] *Id*. at 6.

78

"[c]ompared to the rest of the city, roadblock locations had a smaller total population, and had larger proportions of black residents and female headed households."[306]

**Examples and Consequences**

This has had serious consequences for Buffalo residents. For example, in 2014, Thomas Lovelace was driving his blue 1984 BMW 325i on Bailey Avenue on the East Side of Buffalo when he encountered a cluster of police vehicles with flashing lights and officers in the street near the E-district station house.[307] Mr. Lovelace, who is African American, csaid his status as a driver and vehicle registration was in good order, but he was asked to pull over anyway. [308].According to Mr. Lovelace, "I didn't know my rights then, they said something about it being a suspicious vehicle that might be transporting drugs." Without any explanation, the BPD officers "literally ripped my car apart looking for drugs. They broke my laptop. [The computer] just happened to be in my trunk and they just threw it on the ground."[309].

Mr. Lovelace, who is a computer programmer, was never compensated for the computer but he created a Facebook group he set up to raise awareness and track the kind of checkpoints that ensnared him in 2014.[310]

East Side resident, Madlyn Smith, who has been stopped by a roadblock "more than a dozen times," recently described her deep concerns with the routine BPD checkpoints and roadblocks for her and her neighbors in a letter to the Editor to the East Side's African American community newspaper. Criticizing what she believed to be significant ticketing activities in the area, Ms. Smith lamented BPD's actions in misdirecting police resources to checkpoints while crime goes unsolved. In one particularly jarring experience, Ms. Smith described a night where the BPD had set up a roadblock on the same day a person had been killed in BMHA Langfield. As Ms. Smih states, " . . . the police officers were standing there when maybe they could have stopped a killer. Instead they had cars lined up for daily inspection."

The BPD's unconstitutional "random" checkpoints have also lead to low-level criminal charges in violation of the Fourth Amendment, as well as federal forfeiture actions to obtain cash from drivers who have stopped—usually on the constitutionally dubious ground that the cash was intended for/related to drug dealing, and thus subject of forfeiture under 21 U.S.C. 881(a)(6). For example, on June 4, 2014, Buffalo Police Department officers stopped a car driven by Jermaine Ellison with a female passenger at a "random checkpoint." The government did not provide any individualized evidence of wrongdoing to justify stopping the car, other than the fact that it had South Carolina license plates which were registered to Hertz, LLC.[311]

Upon being stopped, Mr. Ellison told the officers he did not have a valid license and was not listed on the vehicle's agreement. The BPD officers then asked Ellison to get out of the vehicle. According to the government, when he complied, he was "observed reaching into his pocket and attempting to discard a plastic baggie." [312] The officers recovered the bag and found that "it contained less than an eighth of an ounce

[306] Andrew Palmer Wheeler and Scott W. Phillips, *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY* (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[307] Aaron Lowinger and Justin Sondel, *Checkpoint: Buffalo Police Practices Questioned*, The Public, July 13, 2016 (available at http://www.dailypublic.com/articles/07132016/checkpoint-buffalo-police-practices-questioned )

[308] Aaron Lowinger and Justin Sondel, *Checkpoint: Buffalo Police Practices Questioned*, The Public, July 13, 2016 (available at http://www.dailypublic.com/articles/07132016/checkpoint-buffalo-police-practices-questioned )

[309] Aaron Lowinger and Justin Sondel, *Checkpoint: Buffalo Police Practices Questioned*, The Public, July 13, 2016 (available at http://www.dailypublic.com/articles/07132016/checkpoint-buffalo-police-practices-questioned )

[310] Aaron Lowinger and Justin Sondel, *Checkpoint: Buffalo Police Practices Questioned*, The Public, July 13, 2016 (available at http://www.dailypublic.com/articles/07132016/checkpoint-buffalo-police-practices-questioned )

[311] *U.S. v. $3,049.00 United States Currency*, Case No. 1:15cv21, Dkt. 1, Verified Complaint for Forfeiture [of currency seized from Jermaine Ellison P 3-6 (filed Jan. 7, 2015, W.D.N.Y.).

[312] *U.S. v. $3,049.00 United States Currency*, Case No. 1:15cv21, Dkt. 1, Verified Complaint for Forfeiture [of currency seized from Jermaine Ellison P 3-6 (filed Jan. 7, 2015, W.D.N.Y.).

of crack cocaine."[313]  The BPD officers then searched the vehicle and allegedly found a digital scale with cocaine residue on the driver's side door. They also searched Mr. Ellison and found $3,049.00 in Mr. Ellison's pants pocket. In response to the officers' questions regarding the source of the money, Mr. Ellison initially did not tell them, and later said :he was "holding it" for his girlfriend.[314] The BPD arrested Mr. Ellison for misdemeanor offenses: Criminal Possession of a Controlled Substance- 7th Degree; misdemeanor Criminal Use of Drug Paraphernalia-2nd Degree ; misdemeanor Unauthorized Use of a Vehicle; misdemeanor Obstruction of Governmental Administration; and driving without a license (VTL 0509 SUB 01). [315]

In addition, in January 2015, while his charges were still pending the federal government moved through an In Rem motion to seize the money obtained from Mr. Ellison during his arrest.[316] The government argued that the facts, charges—and the fact that Mr. Ellison's cash was in small bills, that there was a "preponderance of the evidence that the defendant currency was furnished or intended to be furnished in exchange for a controlled substance, are proceeds traceable to such exchanges, and/or were used or intended to be used to facilitate a violation of Title 21, United States Code, Subchapter I of Chapter 13, Section 801 et. seq. Thus, the government argued, that it had the right to seized Mr. Ellison's money. 21 U.S.C. 881(a)(6) United States Code, Section 881(a)(6). [317]
Check outcome


**Financial toll**

These roadblocks have resulted in a significant financial and personal toll on all Buffalo residents, and particularly the African American and minority residents living in these communities**.** Not only have these roadblocks resulted in a substantial increase in the number of arrests and police contact,  but the resulting high numbers of tickets on the east side creates a substantial financial burden.
- In the two years following the BPD's implementation of daily Strike Force checkpoints, the BPD issued an additional 25,100 tickets and 27,267 traffic summons compared to the two previous years.
  - In the two years following the BPD's implementation of daily Strike Force checkpoints to Buffalo residents, a staggering 62% increase over the two years prior to the BPD's daily checkpoints.[318] The BPD issued a total of 65,862 traffic tickets in 2013-2014 ("post-daily checkpoint") compared to 40,761 in 2011-2012.[319]

---

[313] *Id.*

[314] *U.S. v. $3,049.00 United States Currency*, Case No. 1:15cv21, Dkt. 1, Verified Complaint for Forfeiture [of currency seized from Jermaine Ellison P 3-6 (filed Jan. 7, 2015, W.D.N.Y.).

[315] *Id.* The BPD specifically charged Mr. Ellison with: Criminal Possession of a Controlled Substance- 7th Degree (NYS PL 220.03); misdemeanor Criminal Use of Drug Paraphernalia-2nd Degree (NYS PL 220.50 SUB 03); misdemeanor Unauthorized Use of a Vehicle (NYS PL 165.05 SUB 01); misdemeanor Obstruction of Governmental Administration- 2nd Degree (NYS PL 195.05); and driving without a license (VTL 0509 SUB 01).

[316] *U.S. v. $3,049.00 United States Currency*, Case No. 1:15cv21, Dkt. 1, Verified Complaint for Forfeiture [of currency seized from Jermaine Ellison P 3-6 (filed Jan. 7, 2015, W.D.N.Y.).

[317] *U.S. v. $3,049.00 United States Currency*, Case No. 1:15cv21, Dkt. 1, Verified Complaint for Forfeiture [of currency seized from Jermaine Ellison] P 8-11 (filed Jan. 7, 2015, W.D.N.Y.).  Mr. Ellison's cash was in the following denominations: 2- One hundred dollar bills; 11- Fifty dollar bills; 112- Twenty dollar bill; 2- Ten dollar bills; 5- Five dollar bills; and 14- One dollar bills. The government alleged that this served as evidence that he was engaged in drug dealing because "[c]ash is the almost exclusive medium of exchange among drug dealers," and that "[t]he abundance of smaller bills is significant in that law enforcement believes, due to previous investigations and experience, that the predominance of these bills is characteristic of currency received by drug distributers from their customers and provided to them by their suppliers, as payment for past or future deliveries of controlled substances." It is problematic the government is using such a speculative standard to associate cash with drug dealing.

[318] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*, (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf); Buffalo Financial Stability Authority, *Agenda and Final 2016-2017 Adopted Budget*,  at 81 (*available at* http://www.bfsa.state.ny.us/meetings2016/BoardBook/BoardBook0621.pdf).

[319] City of Buffalo (at 137) (available at https://www.ci.buffalo.ny.us/files/1_2_1/Comptroller/2015CAFR.pdf )

o During this time, the BPD also significantly increased the number of traffic summons. In the two years following BPD's daily checkpoints, the Division of Patrol Services[320] issued 27,267 more traffic summons,  increasing from 39,357 from 2011-2012 to 66,624 traffic summons following the daily roadblocks in 2013-2014.

> The BPD also issued 27, 267 more traffic summons in the two years following BPD's daily checkpoints, increasing from 39,357 from 2011-2012 to 66,624 traffic summons following the daily roadblocks in 2013-2014.

- Under Brown and Derenda's tenure, the overall number of BPD-issued traffic violations increased  substantially, and City officials have made clear that it will continue to increase the amount of tickets it issues.
  o From 2006-2016, the BPD issued a total 339,362 tickets – increasing considerably after the institution of daily check points almost half of which were in just the last four years. During the 2013-2016 study period, the BPD issued 161,559 tickets – more than 70,000 more tickets, or a 77.6% increase, than the tickets the BPD issued over the previous four years (91,532 from 2009-2012). [321]

  o In only two months, from April and May of 2013, the Buffalo Strike Force officers issued over 6,000 traffic tickets, and made a number of arrests for outstanding warrants, and confiscated "several firearms and vehicles"[322] in 67 roadblocks in 46 different locations; all but two of which were in minority neighborhoods [map?] [323] During this period, the BPD made clear that all checkpoints "primary goal was to deter crime and disorder." [324]

## Legal Analysis

[319] The BPD Patrol Services Unit includes the Housing Unit, Strikeforce and the Districts.

[320] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*, (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf); Buffalo Financial Stability Authority, *Agenda and Final 2016-2017 Adopted Budget*,  at 81 (*available at* http://www.bfsa.state.ny.us/meetings2016/BoardBook/BoardBook0621.pdf).

[321] Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[322] Eleven of the locations were targeted at least twice over the two month study period, and three locations were targeted four separate times. Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[323] Wheeler, Andrew Palmer and Phillips, Scott W., *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY* (May 17, 2016). (available at http://ssrn.com/abstract=2781126). Note that the Strike Force roadblocks examined in the study largely had similar features to routine BPD roadblocks documented in cases and reports but varied from standard procedures in that officers in the study relied only on automated license plate readers (APLR) to determine who to detain.  That is, the study-group Strike Force officers stopped vehicles only if they were flagged by the ALPR either in the roadblock or in surrounding streets (to detect vehicles attempting to evade the checkpoint) if they are "associated with warrants or having a revoked license (for the owner of the vehicle), or if the vehicle itself was stolen;" the study-roadblocks are designed to slow cars down so officers can conduct an APLR analysis either within the roadblock or in surrounding streets. *Id.* at 3-4. If there is no APLR hit, the car is waived on with no further interaction In contrast, in standard Buffalo Strike Force checkpoints are implemented consistent with BPD's Zero Tolerance policing policy: police briefly detain all drivers and inspect their registration and pull over, question and frequently arrest individuals based on any indication of criminal or civil violations, consistent with the Zero Tolerance Policing policy.

81

The BPD's suspicionless vehicle checkpoints violate the Fourth Amendment in two separate ways. First, given BPD Commissioner and Byron Brown's explicit justification of the checkpoints' purpose to deter crime generally, they violate the Court's clear mandate that roadblocks set up for the purposes of general crime suppression are per se unconstitutional because they detain without any particularized suspicion of wrongdoing in violation, in direct contravention of the Fourth Amendment. Second, to the extent they are set up as a narrow exception to the Fourth Amendment for brief "vehicle and traffic" checks, as a recent Court found BPD is conducting the roadblocks in an *unregulated and* give BPD officers and Strike Force teams unbridled discretion regarding which cars to stop, making the checkpoint unconstitutional.

First, the BPD's policy also conflicts with the Court's clear holding in *City of Indianapolis* that vehicle checkpoints for general crime control – or drugs and drug trafficking - are constitutionally unreasonable under the Fourth Amendment. As described above, the cornerstone of the Fourth Amendment is individualized suspicion. The Fourth Amendment applies to any seizure of an individual occurs "when there is a governmental termination of freedom of movement through means intentionally applied." A roadblock or checkpoint stop is a seizure of both the driver and any passengers within the meaning of the Fourth Amendment.[325] Thus, any traffic stop of a vehicle conducted by law enforcement is a Fourth Amendment seizure, and must be based on an officer's "reasonable" individualized suspicion of criminal activity,[326] with very narrow exceptions.

**The Court has held that checkpoints justified for general purposes for crime suppression are per se unconstitutional under the Fourth** Amendment when they are justified based on general purposes of crime control because they lack individualized suspicion,[327] except in very narrow circumstances—and subject to specific regulations--such as a DWI[328], border patrol checkpoints[329] or informational checkpoints seeking <u>specific information about a particular crime.</u>[330]

---

[325] *Michigan v. Sitz*, 496 U.S. 444, 455 (1990). *See also People v. Scott*, 63 N.Y.2d 518 (1984); *In the Matter of Muhammad F.*, 94 N.Y.2d 136 (1999).

[326] *Delaware v. Prouse*, 440 U.S. 648 (1979).

[327] *Delaware v. Prouse*, 440 U.S. 648 (1979).' *City of Indianapolis v. Edmond*, 531 U.S. 32, 41, 44, 121 S. Ct. 447, 454, 455, 148 L. Ed. 2d 333, 343, 345 (2000) ("We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing"; drug interdiction checkpoint violates Fourth Amendment). *See also United States v. Huguenin*, 154 F.3d 547, 553–63 (6th Cir. 1998) (holding invalid stop without reasonable suspicion at checkpoint on airport road because although ostensibly sobriety checkpoint, real purpose was drug interdiction).

[328] *Michigan v. Sitz*, 496 U.S. 444, 455 (1990) (upholding a sobriety checkpoint at which all motorists are briefly stopped for preliminary questioning and observation for signs of intoxication).

[329] *United States v. Martinez-Fuerte*, 428 U.S. 543, 566, 546 (1976) (ipholding border patrol checkpoint, over 60 miles from the border, for questioning designed to apprehend illegal aliens). See also United States v. Flores-Montano, 541 U.S. 149 (2004) (upholding a search at the border involving disassembly of a vehicle's fuel tank)..

[330] *Delaware v. Prouse*, 440 U.S. 648 (1979). *See also City of Indianapolis v. Edmond, 531 U.S. 32 (2000).*

United States v. Martinez-Fuerte, 428 U.S. 543, 566, 546 (1976); Michigan v. Sitz, 496 U.S. 444, 455 (1990). *City of Indianapolis v. Edmond,* 531 U.S. 32 (2000) (vehicle checkpoint set up for the "primary purpose [of] detect[ing] evidence of ordinary criminal wrong-doing" (here interdicting illegal narcotics) does not fall within the highway safety or border patrol exception to the individualized suspicion requirement, and hence violates the Fourth Amendment.) Edmond was distinguished in Illinois v. Lidster, 540 U.S. 419 (2004), upholding use of a checkpoint to ask motorists for help in solving a recent hit-and-run accident that had resulted in death. The public interest in solving the crime was deemed "grave," while the interference with personal liberty was deemed minimal.)

In such limited exceptions such as vehicle checks, police are permitted to stop the individual only briefly to see the driver's license, registration, and other relevant information, such as an insurance card.[331]  However, even these checkpoints are not permissible if they are pretext for general crime control. [332]

Relevant to the BPD's checkpoint program, in *Indiana v. Edmond*, the Supreme Court found a routine drug checkpoint to violate the Fourth Amendment because it constituted an unreasonable seizure lacking individualized suspicion pursuant to the general justification of crime control. In *Edmonds*, the police set up an Indianapolis checkpoint to detect unlawful drugs, and briefly stopped and asked each driver to produce a driver's license and registration.[333] The officers looked for any signs of impairment and conducted a plain view examination of the can, and narcotics detection dog walked around the outside of each vehicle.  Each stop was conducted in the same manner and lasted five minutes or less. The Court concluded that a roadblock to check for narcotics was an investigation for general criminal activity. Specifically, the Court held:

> We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized ever present possibility that interrogation and inspection may reveal that any given motorist has committed some crime. however, by holding that checkpoints created for general crime control (including drug enforcement) are not constitutional.[334]

Under the Court's holding in *Edmonds*, there is a two-step analysis applicable to Fourth Amendment checkpoint cases. The first issue is whether the primary purpose of the checkpoint was to advance the general interest in crime control. If so, then the stop is per se unconstitutional under the Fourth Amendment. If the checkpoint is not per se invalid as a crime suppression device, then the question is the checkpoint's reasonableness on the basis of the individual circumstances that weighs gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. However, even if the checkpoint is for a narrow permissible purpose, suspicionless roadblocks must be conducted in random and non-discriminatory manner within predetermined written guidelines that minimize intrusion into freedom of individual and strictly limit discretion of officers at scene so as to avoid arbitrary and discriminatory enforcement.

The BPD's justification for its Strike Force Checkpoint program is similar to the Indianapolis checkpoint program found unconstitutional where the primary purpose was to find illegal narcotics.Thus, under *Indiana*, the BPD violated the Fourth Amendment rights of all motorist stops because the vehicle stops were not based on individualized suspicion of criminal activity and do not meet the limited exceptions set forth in by the Supreme Court. As Judge Cohern recently commented in finding a similar New York policy unconstitutional "Although laudable in purpose, the checkpoint program at issue is ultimately for the purpose of crime control.  The impact of this program upon all citizens in this neighborhood is egregious and violates the Fourth Amendment."[335]

---

[331] New York v. Class, 475 U.S. 106, 106 S. Ct. 960, 89 L. Ed. 2d 81 (1986) (permitting officers to conduct limited search of vehicle to gain access to vehicle identification number (VIN), stating "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic stop").

[332] *See, e.g., United States v. Huguenin*, 154 F.3d 547, 553–63 (6th Cir. 1998) (holding invalid stop without reasonable suspicion at checkpoint on airport road because although ostensibly sobriety checkpoint, real purpose was drug interdiction).

[333] *City of Indianapolis v. Edmond,* 531 U.S. 32 (2000).

[334] *City of Indianapolis v. Edmond,* 531 U.S. 32 (2000).

[335] *People v. April Pope*, (Cohen J.) (holding unconstitutional an NYPD Model Block Program police checkpoints to screen traffic on high-crime blocks to counbter prostitition and drug dealing are unlawful because they are subjecting citizens to illegal searches and seizures for the impermissible purpose of crime control)

83

As the court made clear in *Edmonds,* when law enforcement authorities pursue primarily general crime control purposes at checkpoints, stops can only be justified by some quantum of individualized suspicion. As the *Edmonds* court concluded, "[w]here the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes, we cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." Id. U.S. at 44. Like the roadblocks in Edmond, the Strike Force checkpoints were investigatory in nature, that is, they were little more than a dragnet established by police "to detect evidence of ordinary criminal wrongdoing." [336]

In In re Muhammed F.,  New York Court of Appeals found that a "safety check" planned stops of a predetermined number of vehicles by plainclothes officers on roving patrol was unconstitutional because it promoted unfair and arbitrary enforcement. In addition, the BPD stops of individuals avoiding an impermissible roadblock is not a reasonable suspicion to stop an individual, much less arrests and ticketing**.** Commonwealth v. Scavello, 557 Pa. 429, 734 A.2d 386, 387–388 (1999) . See also*State v. Levitt*, 73 S.W.3d 159, 169–176 (Tenn. Ct. Crim. App. 2001) (evasion of non-obvious roadblock without violating the law not reasonably suspicious); State v. Badessa, 185 N.J. 303, 885 A.2d 430, 437 (2005) (stop of vehicle was improper based on legal turn to avoid roadblock when warning sign did not indicate that avoiding checkpoint was prohibited; exclusionary rule prohibited use of officer's observations of motorist after stop as basis for probable cause to demand chemical test, and conviction for refusing test was reversed)

Further, the City cannot now claim that the roadblocks were for a permissible purpose post-hoc. In Indiana, the Court was clear that the deficiency cannot be cured by merely by calling the roadblock a "sobriety checkpoint" when in fact its real purpose is crime control. *City of Indianapolis v. Edmond*, supra. In Indiana, the Court required that the government has the burden of prove the primary purpose of the checkpoint by presenting  the testimony of a high-ranking police official involved in policy making, not merely an officer who conducted the checkpoint. City of Indianapolis v. Edmond. Here, BPD Commissioner Derenda, Buffalo Mayor Byron Brown have all publicly justified the entire Strikeforce program as crime-suppression.

Nor can the government defend the checkpoints based on the "effectiveness of ensuring public safety." Not is only is the effectiveness of checkpoints disputed by the paltry number of firearms collected, but effectiveness is irrelevant to the constitutional analysis. In *Edmond v. Goldsmith*, for example the Court held that a roadblock solely to catch drug offenders was unconstitutional, despite the "high 'hit' rate [5%] and the only modestly intrusive character of the stops" because the roadblock "is meant to intercept a completely random [set] of drivers" and "there is neither probable cause not articulable suspicion to stop any given driver." The Court reasoned that the roadblock was not an urgent one, which might justify mass stops, nor was it justified by non-law enforcement concerns, in the form of "special needs." The purpose behind the roadblock was critical to its legality, and in this case it failed. The program must be a bona fide effort to implement an authorized regulatory policy rather than a pretext for a dragnet search for criminals.

## The City Is Liable for Violating Buffalo Residents' Fourth Amendment Rights

The City is liability for the BPD's violation of their Fourth Amendment rights under two  different theories: first, there is ample evidence that senior officials in the City and at the BPD both directed and were were deliberately indifferent to officers conducting unconstitutional stops and arrests; and second, the

---

[336] Edmond, 531 U.S. at 41, 121 S. Ct. at 454.

practices resulting in widespread pedestrian and vehicle stops aree sufficiently widespread that they had the force of law.

Relevant to this analysis, the BPD expressed no concern that any municipal agency may show toward constitutional violations by its employees. The BPD's and City's senior officials have acted with deliberate indifference routine and programattic unconstitutional stops, frisks, searches, and arrests.

They have received both actual and constructive notice since at least 2013 of widespread Fourth Amendment violations occurring as a result of the BPD's stop and frisk practice—and directed such tactics as wells. Despite this notice, as the City and BMHA coordinated with the DA to maintain, deny and even intensifypractices that predictably resulted in even more widespread Fourth Amendment violation. The BPD has repeatedly turned a blind eye to clear evidence of unconstitutional stops and frisks.

Despite the BPD's deliberate failure to collect accurate data regarding stops that violate the Fourth Amendment after Buffalo residents consistently brought it to their attention, there is sufficient evidence to establish liability for the City and its highest officials because their "practices so persistent and widespread as to practically have the force of law." As described above, the likely number of stops lacking reasonable suspicion stands at approximately 200,000 The BPD's practice of making stops without any individualized reasonable suspicion has been so pervasive and persistent as to become not a part of the BPD's standard operating procedure—and a lived daily reality, in many predominantly minority neighborhoods. Two Courts evaluating these tactics found them unconstitutional based on officials' testimony, noting that officials provided sworn testimony to the court that they routinely engage in practices in the precise same manner.

85

## THE BPD DISCRIMINATES AGAIN AGAINST AFRICAN AMERICANS IN ITS ENFORCEMENT ACTIVITIES

As described above, this report documents how the City of Buffalo, the Buffalo Municipal Housing Authority and their agent the BPD, violated both the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

From at least January 2013 to the present, the BPD has engaged in a serious, widespread practice of discriminatory policing against people of color, particularly African Americans, in violation of the Equal Protection Clause of the Fourteenth Amendment, the New York Constitution[137], **as well as federal and state laws and regulations. Since the City launched its racially targeted Zero Tolerance policies targeting minority neighborhoods, and intensified in 2012, the BPD has normalized and institutionalized the systematic use of unjustified suspicionless stop and arrest policies and practices in minority communities throughout Buffalo.** The BPD's own data demonstrates that the Buffalo police intrude disproportionately upon the communities and lives of people of color at every stage of its enforcement activities, and the racial disparities throughout the criminal justice system continue to widen. BPD officers direct unconstitutional suspicionless checkpoints and trespass sweeps, l disproportionately, and almost eexclusively in communities and public housing that is predominantly African Americans or racial minorities; and arrest them at rates that significantly exceed relevant benchmarks for criminal activity. These racial disparities have sharpened significantly since the Brown administration initiated Broken Windows policing, and there is ample evidence that they were motivated by intentional racial bias.

**The Fourteenth Amendment's guarantee of equal protection of the laws and the Fourth Amendment's protection against unreasonable searches and seizures are fundamental constitutional rights that safeguard individuals from unjustified treatment by the police.** The BPD routinely violates these core protections by unlawfully targeting people of color in its law enforcement operations. The evidence described below demonstrates that the City, BMHA and BPD intentionally and expressly targets African Americans and Latinos, and that their policies and practices are driven by racial bias.

The Brown administration's BPD's Broken Windows policies have relentlessly and disproportionately targeted communities of color with both aggressive police enforcement against minor offenders, or for no reason at all, by use of systematic and unconstitutionally discriminatory dragnet, suspicionless tactics that result in thousands of innocent Buffalo residents in minority communities coming into contact with the police, without any evidence of wrongdoing. In fact, the Brown administration explicitly and substantively took a direct page from the systemic discriminatory policies pioneered by New York City Mayors Guiliani and Michael Bloomberg, and Police Commissioner Bill Bratton, that have been struck down as unconstitutional in New York City--as well as in Ferguson, Baltimore, LA, Boston and Newark. Specifically, the highest leadership of the City of Buffalo and the Buffalo Municipal Housing Authority directed BPD directing policies and practices in minority communities that involved targeting thousands of people without any individualized evidence of suspicion, including: 1) suspicionless trespass enforcement sweeps, "vertical patrols" and other tactics without any evidence of wrongdoing, disproportionately targeting minority public housing residences, similar to those held unconstitutional; 2) per se unconstitutional suspicionless checkpoints, similar to Guiliani's *green zone*; 3) stop and frisk policies, similar to Floyd. **[CITES]**

---

[137] New York Constitution, article I, § 11

The sharp – and increasing -- racially disparate impact of Buffalo's practices is driven, at least in part, by intentional discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and **NYS Art.**. Taken together, racial bias and impermissible stereotyping is evident from evidence detailed below that includes: 1) the consistency and magnitude of the racial disparities found throughout police and court enforcement actions; 2) the selection and execution of direct racially biased policies by police and government officials, which exclusively or disproportionately target minority communities, particularly African Americans and Latinos; 3) the widespread use of harmful denigrating racial stereotypes and racial slurs by government and BPD officials shaping behavior and resulting in a pattern and practice of impermissible race-based stops; 4) the pervasive irregularities in and substantive departures from BPD's purpose to effectively protect and serve all communities equally and its contractual agreement to engage in **Community Policing** at the Buffalo Municipal Housing Authority; 5) the current and historical context surrounding BPD's racially biased enforcement practices, and specifically the historical and contemporary animus towards African Americans and people of color in Buffalo, which continues to motivate government policies. ; and 6) the fact that City, police, and court officials failed to take any meaningful steps to address, or even evaluate the race-based impact of its law enforcement and discriminatory policing tactics practices despite longstanding and widely reported racial disparities and community complaints. In addition, we have also documented explicit racial bias by police and government officials, and that some officials rely racial stereotypes, rather than facts, to explain the harm African Americans experience due to Buffalo's approach to law enforcement.

The presumption of minority criminality underlying these discriminatory policing tactics both reflects and has infected the deep BPD culture of racial bias, which, combined with the absence of accountability for wrong doing, which in turn has lead the BPD to discard with the constitutional requirement of individualized suspicion in minority communities.  By formally discarding with the normal requirements of reasonable individualized suspicion, the City has reinforced and set a permissive norm of racially biased policing and treating Buffalo residents of color based on their racial representation in suspect data. The BPD has thus institutionalized a discriminatory, impermissible racial bias that presumes criminality—and violence--of residents in minority communities throughout Buffalo, regardless of any individual wrongdoing.

**Further, the BPD's racially biased dragnet tactics are ineffective. These repeated illegal tactics alienate minority communities from the Buffalo law enforcement, hinders community policing efforts, and causes law enforcement to lose credibility and trust among the people they are sworn to protect and serve. The community relies on the police to protect them from harm and promote fairness and justice in our communities. But pervasive racial bias within the BPD has led countless minorities to live in fear, casting entire communities as suspect simply because of their race and racial codes:** *what they look like and what kind of clothes they wear and cars they drive.*

The Fourteenth Amendment's guarantee of equal protection of the laws and the Fourth Amendment's protection against unreasonable searches and seizures are fundamental constitutional rights that safeguard individuals from unjustified treatment by the police. The BPD routinely violates these core protections by unlawfully targeting people of color in its law enforcement operations. The evidence described below demonstrates that the City, BMHA and BPD intentionally and expressly discriminates against African Americans and Latinos in violation of the Fourteenth Amendment .

**<u>Law</u>**

The Equal Protection Clause of the Fourteenth Amendment guarantees to every person the equal protection of the laws and prohibits discriminatory state action. [138] Similarly, the Equal Protection clause of the New State Constitution expressly prohibits discrimination based on race, color, creed or religion,[139] and provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof."[140] [141]The Equal Protection Clause in the state and federal constitutions are "essentially a direction that all persons similarly situated should be treated alike."[142] The Supreme Court, Second Circuit and NYS Court of Appeals instruct there are several ways to establish intentional discrimination in violation of the Equal Protection Clause in two ways relevant to this analysis.

First, a policy practice is unconstitutional discriminatory on its face if it expressly classifies persons on the basis of race;[143] such an express classification is subject to "strict judicial scrutiny," which means to be constitutional, the "classification must further a compelling state interest and be narrowly tailored to accomplish the purpose." [144] Second, a police department or government entity violates the Equal Protection Clause if "a facially neutral law or policy that has been applied in an intentionally discriminatory manner."[145] Third, an equal protection violation can be established, with "a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." [146]The Second Circuit has made clear that there is no obligation to establish "a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection."[147]

With regard to the second two theories, to establish a violation of the Equal Protection Clause, the challenged official action need not rest solely on racially discriminatory purposes or even that such discriminatory purpose "was the 'dominant' or 'primary'" factor driving the alleged conduct. [148] Rather, official action violates the Equal Protection Clause if it is motivated, at least in part, by discriminatory purpose-- which requires evidence that a city or state actor "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." The Court has made clear that "[b]ecause discriminatory intent is rarely susceptible to direct proof, litigants may make "a

[138]

[139] *People v. Kern,* 75 N.Y.2d 638, 651 (1990). The Civil Rights Clause is not self-executing and prohibits discrimination only as to civil rights, which are "elsewhere declared" in the Constitution, statute, or common law. *Id. See also, Dorsey v. Stuyvesant Town Corp.,* 299 NY 512, 531, 87 N.E.2d 541 (1949).

[140] New York Constitution, article I, § 11

[141] *People v. Kern,* 75 N.Y.2d 638, 651 (1990), "The term "civil rights" as it was understood by the delegates at the 1938 Constitutional Convention. (quoting, 4 Rev. Record of New York State Constitutional Convention, 1938, at 2626 [statement of Delegate H.E. Lewis] ). The Court of Appeals has defined "civil rights," secured under the State Constitution, to mean "those rights which appertain to a person by virtue of his citizenship in a state or community."

[142] *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).

[143] Brown, 221 F.3d at 337 (quoting Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)). Pyke II, 567 F.3d at 77 (citing Loving v. Virginia, 388 U.S. 1, 11, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967)

[144] Pyke II, 567 F.3d at 77 (citing Shaw v. Hunt, 517 U.S. 899, 908, 116 S. Ct. 1894, 135 L. Ed. 2d 207 (1996)). Johnson v. California, 543 U.S. 499, 505, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005) (holding that "all racial classification" imposed by government "must be analyzed by a reviewing court under strict scrutiny")); Fisher v. University of Texas at Austin, 133 S. Ct. 2411, 2419, 186 L. Ed. 2d 474 (2013); Fisher v. University of Texas at Austin, 133 S. Ct. 2411, 2419, 186 L. Ed. 2d 474 (2013) ("[A]ny official action that treats a person differently on account of his race or ethnic origin is inherently suspect.") (quotation marks and citation omitted).

[145] *Floyd v. City of N.Y.,* 959 F. Supp. 2d 540, 571 n.89 (S.D.N.Y. 2013) (citing Brown, 221 F.3d at 337 (citing Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S. Ct. 1064, 30 L. Ed. 220 (1886))). The Second Circuit has laid out several ways that intentional discrimination violates the Equal Protection Clause, but this Complaint focuses on the intentional application because as of yet we have insufficient evidence that BPD engaged in an impermissible facial classification. Brown, 221 F.3d at 337 (quoting Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)).

[146] *Floyd v. City of N.Y.,* 959 F. Supp. 2d 540, 571 n.90 ( citing Id. (citing Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977); Johnson v. Wing, 178 F.3d 611, 615 (2d Cir. 1999)).

[147] The Second Circuit has laid out several ways that intentional discrimination violates the Equal Protection Clause, but this Complaint focuses on the intentional application because as of yet we have insufficient evidence that BPD engaged in an impermissible facial classification. Brown, 221 F.3d at 337 (quoting Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)).

[148] Floyd v. City of N.Y., 959 F. Supp. 2d 540, 571 n.92 (S.D.N.Y. 2013) (citing Paterson, 594 F.3d at 163 (quoting Arlington Heights, 429 U.S. at 265)).

sensitive inquiry into such circumstantial and direct evidence of intent as may be available[349] *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  Because there is rarely direct proof of discriminatory intent, circumstantial evidence of such intent is permitted**. "**

The impact and consequences of the official action — whether it bears more heavily on one race than another — may provide an important starting point" and serve as evidence of discriminatory intent.[350] In addition to evidence of disparate impact, other factors that demonstrate intent include: direct statements and conduct that exhibit bias; substantive irregularities; an agency's; departures from its own procedures and accepted practices in the field; and the relevant historical context.[351]

---

[349] Paterson, 594 F.3d at 163  (quoting Arlington Heights, 429 U.S. at 266).

[350] *United States v. Lopez*, 321 Fed. App'x 65, 67 (2d Cir. 2009) (quoting Arizona v. Johnson, 555 U.S. 323, 326-27, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009)).

[351] . Arlington Heights, 429 U.S. at 266–68;

89

**The consistency and magnitude of the racial disparities found throughout police and court enforcement actions: Buffalo's law enforcement practices overwhelmingly and disproportionately impact African Americans and Latinos, particularly minority youth.**

The Supreme Court has held that in assessing whether an official action was motivated in part by discriminatory intent, the actual impact of the action and whether it "bears more heavily on one race or another" may "provide an important starting point."[352] In rare cases, statistical evidence of discriminatory impact may be sufficiently probative to itself establish discriminatory intent.[353] BPD's practices have lead to sharp race-based disparities that are neither isolated nor aberrational; rather, they exist in nearly every aspect of Buffalo's police, court and even school related operations. The magnitude of the racial differences in BPD's stops and arrests are evidence that BPD's disproportionate enforcement is intentionally discriminatatory. As laid out below, we found
consistent racial disparities in the location of BPD's stops without justification and arrests that are not attributable to population patterns, crime rates, or other race-neutral factors.

Demographically, Buffalo has 261,310 residents, 45.8% of the population is white, while 38.6% is African American and 10.5% is Hispanic or Latino.[354][355] Although African Americans make up 38.6 percent of the population, African Americans accounted for 58.5% percent of BPD misdemeanor arrests in 2014.[356] In contrast, Whites comprise 45.8% of the population but accounted for only 29.1 % of arrests.

- **BPD disproportionately arrests African Americans and Latinos. Data collected by the Buffalo Police Department from 2013 to 2015 shows that African Americans accounted for 52.06% (11,975) of all 22,648 misdemeanor arrests made by BPD officers, despite comprising only 38% of Buffalo's population.[357]**
  - Controlling for population, the misdemeanor arrest rate for African Americans (44/10,000) was almost twice as high as whites (25/10,000).
  - Similar disparities are found in the sentencing phase. During the report study period, only 32% served of Whites convicted of misdemeanors served prison or jail time, while 39% of African Americans and 47% of Latinos convicted of misdemeanors received or served prison or jail time.[358] Conversely, whites were more likely to be conditional discharged; 47% of all whites that were convicted were conditionally discharged, while only 38% of African Americans and 39% of Latinos received conditional discharges.

**For minority youth, these racial disparities are even steeper. In the Buffalo region,** African American children ages 16-17 are <u>six times as likely</u> to be arrested than their white peers, while the arrest rate for children of color is four times the rate of white children ages 16-17 greater for children of color

---

[352] Vill. of Arlington Heights, 429 U.S. at 266 (internal citations and quotation marks omitted) (noting in the Title V context that where "gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination")..

[353] *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307-08 (1977)

[354] Supra, note 9.

[355] United States Census Bureau, State & County Quickfacts: Buffalo (city), New York, *available at* http://quickfacts.census.gov/qfd/states/36/3611000.html.

[356] Buffalo News

[357] DCJS, Adult Arrests Reported by Buffalo City PD, DCJS Computerized Criminal History system (as of 4/21/2016). Note this data only includes partial year data for 2015 (check for update).

[358] DCJS

90

overall.[359] The arrest rate for African American children ages 7-15, is nearly <u>five times</u> as great than their white peers—and has grown in just the past five years. Overall, children of color are more than three times likely to be arrested than their white peers. [360]

- For minority youth, these racial disparities are even steeper African American youth accounted for 68.8%, or 721, of the 1,048 16-17 year olds arrested for misdemeanors by BPD officers, while whites comprised only 15.8% of arrests. [361]
    - The average arrest rate during the study period was also higher for African American youth than whites, and significantly higher than for adults: African American 16-17 year olds arrest rates *stand* at 70.74/10,000, more than twice the rate of whites (29.31). [362]

  - Overall, African American youth comprised 75% of all arrests BPD made of children under 16 ("juvenile arrests") from 2013-2015.  During the the study period, the BPD arrested 2,242 African American children under 16, out of a total of 2,980 juvenile arrests, while only 702 arrests of whites under 16.[363]
    - Despite comprising 42% of the population, 84% of all Youth Offender arrests made by the BPD were racial minorities. 71% of all Youth Offenders were African American—nearly double the population.[364]
  - Notably, the racial disparities in youth contact, arrests and detention have steepened since the City launched Strike Force. In 2014, the federally calculated disproportionate minority contact rate for youth aged 7-15 – which controls for crime – indicated that African Americans were 5.04 more times as likely to be arrested than similarly situated whites Whites (up from 4.25 in 2010), and 14.3 times more likely to be detained than Whites (up from 10.6 in 2010). [365]

Equally troubling, Erie County has the highest average daily median incarceration levels of 16- and 17-year-olds of any County in the state outside of New York City-and significantly higher levels than the detained population under City.

- The median daily population of 16- and 17-year-olds in Erie county jails is 65 in Erie County—the highest in New York State outside of New York City. Most of these detainees are pre-trial.[366]

[359] Greater Buffalo Racial Equity Roundtable, *The Racial Equity Dividend: Buffalo's Great Opportunity*, at 34 (September 2016) (available at https://racialequitybuffalo.org/files/documents/report/theequitydividendfinalseptember2016.pdf)

[360] Greater Buffalo Racial Equity Roundtable, *The Racial Equity Dividend: Buffalo's Great Opportunity*, at 34 (September 2016) (available at https://racialequitybuffalo.org/files/documents/report/theequitydividendfinalseptember2016.pdf)

[361] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[362] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[363] DCJS, Uniform Crime/Incident-Based Reporting system (as of 5/2/2016).

[364] Youth Offender status is available, as per Article 720 of the Criminal Procedure Law, following the conviction of youth under 15, of Juvenile Offenders, and of 16-18 year-olds for misdemeanors and most felony offenses. Only 4% of those eligible were granted YO status in Buffalo.

[365] Erie County Juvenile Justice Profile: Data Sources. ■ Arrest/Criminal Activity - NYS Division of Criminal Justice Services (DCJS), Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems ■ JO Arrests - DCJS Computerized Criminal History (CCH) System.

[366] New York State Division of Criminal Justice Services, "Non-NYC Daily Jail Populations for Sixteen- and Seventeen-Year-Olds by Facility," daily

counts for the time period June 1, 2014, to October 24, 2014, Daily Jail Population database. Source: Arrest/Criminal Activity Relative Rate Index – NYS Division of Criminal Justice Services (DCJS); Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems; Centers for Disease Control and Prevention, Division of Vital Statistics. National Center for Health Statistics.

These high levels of youth incarceration in Erie County are also troubling because of steep—and growing--racial disparities in juvenile detention rates. According to federally calculated detention disparity rate in juvenile detentions, African American 16 and 17 year olds are 15.9 times more likely to be detained than similarly situated whites, up from 11.25 times in 2011. [367] In 2014, Hispanics were 5.5 times more likely to be detained than similarly situated than whites, up from 3.97 in 2011. [368] The number of admissions into the juvenile justice system by police have increased considerably- increasing 971% just in the last year.

Although these disparity rates are for Erie County, they are relevant to measuring racial disparities for Buffalo, as 81% of Erie County's African American population lives in Buffalo; 99164 of the County's of the 122,658 African Americans live in Buffalo. [369]

## Schools

The growing racial disparities and adverse impact on youth of color has coincided with a the City's significant expansion of police officers in Buffalo Public Schools, which are 70% minority. In 2010, Mayor Byron Brown, Buffalo Police Department Commissioner Daniel Derenda, and then-Buffalo Board of Education Superintendent James A. Williams announced the expansion of police presence in Buffalo schools, known as the School Resource Unit. [370] The unit consists of 12 full-time BPD officers, with 10 fulltme School Resource Officers, a Chief of School Safety and Security, and a Lieutenant. The unit is also supported by four off-duty BPD officers assigned to Bennett and East High School, one BPS supervisor, three attendance teachers, one nurse and one school psychologist. [371] BPD Chief Deranda praised the expansion of the police department in the schools, stating "[w]e have literally expanded the footprint of the Buffalo Police Department out into the community and I'm very pleased with the immediate impact the unit has had throughout the school district," while Mayor Brown praised the expansion of Buffalo's police school force as having "an immediate impact on supporting the safety of our school children. Buffalo has increased it's allocation for school security from 2,875,180 in 2012 to 3,304,956 in 2014-2015 [372] The City's expenditures for public safety twice as high as guidance services ($1.4 million, down from $2million). [373]

In Buffalo, there is a clear a disparate application of school discipline toward students of color. As a Buffalo-focused report recently found, "[t]hese early interactions at the school level often lead to uneven outcomes within the criminal justice system."

- African Americans, who make up 56% of the students, incurred 74% of the suspensions.

---

[367] NYS Division of Criminal Justice Services, Office of Justice Research and Performance, County Juvenile Justice Profiles on at 8 (July 1, 2016) (Detention Disparity Rate Sources) – NYS Office of Children and Family Services, Juvenile Detention Automated System (JDAS); and Woods and Poole (population data)) (available at http://www.criminaljustice.ny.gov/crimnet/ojsa/jj-reports/erie.pdf)

[368] *Id.* Juvenile detention rates for Hispanics compared to whites fell slightly in 2015 to 4.3, but still higher than 2011-2013 levels which all remained under 3.87

[369] Compare U.S. Census, , American Factfinder Quickfacts for Buffalo, available here (https://www.census.gov/quickfacts/fact/table/buffalocitynewyork/PST045216 ) with. U.S. Census, American Factfinder Quickfacts for Erie County, NY (available here https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkmk)

[370] Eileen Buckley, *More police added to patrol city schools*, WBFO (DATE) (*available at* http://news.wbfo.org/post/more-police-added-patrol-city-schools#stream/0*)* (last visited February 10, 2016).

[371] Buffalo Public Schools, *Expanded School Officer Resource Unit*, 2010 (available at http://www.buffaloschools.org/news.cfm?story=2098)

[372] Mayor's adopted Budget for 2014-206, Section VI Board of Education *available at* https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/2014-2015AdoptedBudget/Section_VI_Board_Education.pdf

[373] Mayor's adopted Budget for 2014-206, Section VI Board of Education *available at* https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/2014-2015AdoptedBudget/Section_VI_Board_Education.pdf

0097

- In 2012-2013, there were 10,048 short-term suspensions from Buffalo public schools.  The district has only 33,743 students.
- The Buffalo Police Department has served as the disciplinary unit for Buffalo schools since 2000.  African American students comprise 53% of the total student population and incurred 74% of the suspensions.

As a recent report by the Buffalo Racial Equity Roundtable recently found in explaining these deep disparities: "Cultural and media messages that ingrain notions of people of color as criminals create a social context where actions of people of color are viewed through this lens, while these same actions by whites are much more likely to be seen as lapses in judgment or even just harmless mischief."[374] The report further found that these disparities have long term, substantial impacts on youth of color. The Buffalo Racial Equity Roundtable concluded that the "inequitable treatment to which these factors contribute has substantial impacts on the trajectory of people's lives from youth through adulthood. People of color are arrested at greater rates, by far, than whites in Buffalo Niagara. People of color also face increased rates of convictions and much harsher sentencing than whites for similar infractions. In addition to reduced educational opportunities at an early age, criminal records have a major influence on the ability to find employment at every age."[375] Mayor Byron Brown is a member of the roundtable.[376]

The Roundtable report further noted the deep impact of racial bias in policing children—"that equate youth of color with criminal activity."[377] "For many children of color, childhood indiscretions that happen at an early age have been found to set in place a trajectory informed by systemic cultural biases that equate youth of color with criminal activity."  The Report found that "[t]he criminalization of youth has impacts on theperceptions held — and the actions which are taken or not taken — by community members, by law enforcement, or by the courts."[378]

Just this month, when the Buffalo Police officers met with the students at Burgard Vocational High School, who are mostly African American and male, and asked them "How many people here have been stopped by the police?" nearly every student raised their hand.[379]

An important aspect of this disparity is the "school-to-prison" pipeline.  According to our research, this well-known phenomenon has been instituted in Buffalo's high-minority schools. In order to accomplish this the City expanded the number of BPD officers in Buffalo schools in 2010.[380] The City also increased its allocation for school security by almost 87%, from $2,875,180 in 2012 to $3,304,956 in 2014-2015. The expenditure is particularly concerning because it forced cuts in various essential services: guidance services (from 2mi to $1.4mil), educational support ($162,550 to a projected $160,350), student services ($500,750 to $404,015), and youth services (from $180,901 to $71,967[381]).

[374] Greater Buffalo Racial Equity Roundtable, *The Racial Equity Dividend: Buffalo's Great Opportunity*, at 30 (September 2016) (available at https://racialequitybuffalo.org/files/documents/report/theequitydividendfinalseptember2016.pdf)

[375] Greater Buffalo Racial Equity Roundtable, *The Racial Equity Dividend: Buffalo's Great Opportunity*, at 31 (September 2016) (available at https://racialequitybuffalo.org/files/documents/report/theequitydividendfinalseptember2016.pdf)

[376] Greater Buffalo Racial Equity Roundtable, Members (*available at* https://racialequitybuffalo.org/our-work/roundtable-members/ )

[377] Greater Buffalo Racial Equity Roundtable, *The Racial Equity Dividend: Buffalo's Great Opportunity*, at 32 (September 2016) (available at https://racialequitybuffalo.org/files/documents/report/theequitydividendfinalseptember2016.pdf)

[378] Greater Buffalo Racial Equity Roundtable, *The Racial Equity Dividend: Buffalo's Great Opportunity*, at 32 (September 2016) (available at https://racialequitybuffalo.org/files/documents/report/theequitydividendfinalseptember2016.pdf)

[379] Jay Rey, *Cops tell Burgard Students How to Deal With Police Encounters*, The Buffalo News, Jan. 12, 2017 (available at http://buffalonews.com/2017/01/12/law-enforcement-share-advice-dealing-police-encounters/amp/ )

[380] Eileen Buckley, *More police added to patrol city schools*, WBFO (DATE) (*available at http://news.wbfo.org/post/more-police-added-patrol-city-schools#stream/0*) (last visited February 10, 2016).

[381] Mayor's adopted Budget for 2014-206, Section VI Board of Education *available at* https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/2014-2015AdoptedBudget/Section_VI_Board_Education.pdf

93

The issues in Buffalo are similar to what has been documented -- bationally, schools with embedded police officers — referred to as "School Resource Officers," as in Buffalo — see five times the number of arrests for "disorderly conduct" than schools without them. According to the Justice Policy Institute, in schools where SROs are allowed to arrest or refer children to the juvenile justice system, kids are getting criminal records for low-level status offenses — that is, offenses that are only illegal because of their status as a juvenile, including wildly subjective charges like "disruptive behavior." As in Buffalo, SRO policing happens primarily in low-income schools attended by children of color.

While kids from financially stable families in predominantly white schools go to the principal's office, kids from these poorer schools go to lock-up. Worse still, these kids find themselves subject to the same kinds of violent police behavior that plagues the rest of the criminal justice system. These criminalizing, dehumanizing, and ineffective responses to childish behavior are the core the school-to-prison pipeline. And once a child has contact with the juvenile legal system, studies show it's very hard for them to get out. The recidivism rate for juveniles is reported to be as high as 70 percent, with the initial detention being the most significant factor affecting recidivism.

Despite these deep disparities, Buffalo has continued to keep Police in schools, when school administrators and counselors should be properly trained to treat trauma and address more holistically and correctively the complex stressors that more acutely affect children living in poverty. Also, policies should explicitly address the unique stressors and dangers to girls, particularly girls of color.
More broadly, in their efforts to address behavior that breaks or challenges school rules, schools should shift to restorative justice models that focus on relationship building among students, teachers, and administrators. Given these troubling disparities, schools should not be utilizing out-of-school suspensions and expulsions, but rather nurturing, safe, learning environments — especially for our most at-risk student populations.

Marijuana Misdemeanor Arrests
In Buffalo, disproportionate numbers of arrests and sentencing outcomes are seen between races even when infractions are known to occur at roughly the same rate. While Whites and African Americans use drugs—and marijuana-- at almost exactly the same rates. Despite the consistent government surveys finding that marijuana use does not vary by race, nevertheless, the BPD arrests African-Americans for lowest level marijuana misdemeanor possession at seven times the rate of whites. Racial disparities in BPD's arrests are especially pronounced for lowest-level misdemeanor marijuana possession arrests, even though government surveys indicate that marijuana use rates are similar.

Marijuana usage, for instance, is known to occur in similar proportions in whites as in people of color, and yet people of color are many times more likely to be arrested for possession of marijuana than whites. But, when arrested, people of color are also much more likely to be charged with more severe crimes than whites.
The City's increasing arrests from racially targeted broken windows policing tactics combined with the use of incarceration for marijuana misdemeanor offenses has had a particularly severe effect on minorities, and minority youth. African American and Latinos are sharply disproportionately arrested for marijuana misdemeanor possession offenses, even though government surveys indicate that marijuana use rates are similar. Marijuana arrests from 2006-2015 fell substantially for whites but grew for African Americans—and the likelihood that African Americans were arrested for possession grew from five times as likely than whites in 2006 to more than seven times as likely than whites in 2015.

94

- From 2013-2015, African Americans accounted for 81.4% of all lowest-level misdemeanor marijuana possession arrests from 2013-2015.[382] The BPD arrested African Americans for misdemeanor marijuana possession at <u>seven times the rate of whites</u> during this period.

  ▪ Of the 1562 people BPD arrested for the lowest level of marijuana misdemeanor offenses during the study period, 81%, 1,271, were African American, while only 12%, or 191 were White.[383]

  ▪ **Youth are particularly affected**: in 2014, of BPD's 504 marijuana misdemeanor arrests, more than 80 percent (392) of those arrested were individuals under 29, with almost 40 percent (187) between the ages of 21 and 25.[384]

- The severe effect of Mayor Brown's racially targeted broken windows policing tactics can be sharply seen in the substantial increase in the number, disparity and the comparative arrest rate of racial minorities for lowest-level marijuana misdemeanor possession, while largely remaining stable or falling for whites. Since 2006, the number and arrest rate of African Americans for low-level marijuana offenses has grown considerably, while the number of arrests has fallen for whites and the arrest rate has remained stable:

  o African Americans in Buffalo are now <u>seven times more likely to be arrested than whites to be arrested by the Buffalo Police Department for misdemeanor marijuana possession over the last ten years (2006-2015), compared to only 4 times as likely to be arrested than whites in the ten years prior to Brown's election (1996-2005).</u>
    ▪ Add numbers

    ▪ Similarly, Latinos, who had approximately the same arrest rate as whites from 1996-2005, are now more than twice as likely to be arrested for lowest level misdemeanor marijuana possession since Brown was elected (2006-2015).

  o As a result of these policies, the arrest rate of racial minorities grew considerably over this time, while largely remaining stable for whites; the BPD arrest rate for lowest level marijuana misdemeanor possession for African Americans more than doubled from 1996-2005 at 18.5 per 10,000 to 38.64 in the last ten years, while nearly tripling for Latinos - rising from 4.4 to 11.16. For whites, the arrest rate rose only slightly for whites, from 4.3 to 5.72 -- despite no change in survey data establishing marijuana use rates are the same.

- The raw numbers behind these racially disparate arrest rates are staggering: since the City implemented its broken windows policing tactics under Mayor Brown in 2006, the BPD arrested 4,501 African Americans for lowest level misdemeanor offenses--almost double the 2,341 arrested in the previous ten years, while tripling the arrests of Hispanics during this period from 105 to 349. In contrast, <u>the number of BPD arrests of white for marijuana misdemeanors decreased from 792 from 1996-2005 to 786 from 2006-2015</u> [385]

---

[382] DCJS, Computerized Criminal History system (as of 3/24/2015). (4th and 5th degree possession).

[383] DCJS (as of [DATE-AM]. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *Id. See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )

[384] DCJS, Computerized Criminal History system (as of 3/24/2015).

[385] DCJS

95

The profound racial imbalance in marijuana enforcement in black neighborhoods suggests a "doubling down" of street-level policing in places already subject to heightened scrutiny for weapons and overbroad sweeps and raids, a link suggesting that the policing of marijuana may be pretextual. Indeed, Buffalo's programmatic documents reveal that many of these high impact raids have lead to arrests for marijuana-related offenses.

- Sharp and growing disparities in marijuana possession misdemeanor arrests, with a particular impact on minority youth: Increases in marijuana arrests combined with the use of incarceration for marijuana misdemeanor offenses has had a particularly severe effect on minorities, and minority youth. African American and Latinos are sharply disproportionately arrested for marijuana misdemeanor possession offenses, even though government surveys indicate that marijuana use rates are similar. Marijuana arrests from 2006-2015 fell substantially for whites but grew for African Americans—and the likelihood that African Americans were arrested for possession grew from five times as likely than whites in 2006 to more than seven times as likely than whites in 2015.

  - African Americans accounted for 81.4% of all lowest-level misdemeanor marijuana possession arrests from 2013-2015.[386] The BPD arrested African Americans for misdemeanor marijuana possession at seven times the rate of whites during this period.

    - Of the the 1562 people BPD arrested for the lowest level of marijuana misdemeanor offenses during the study period, 1,271, or 81%, were African American while only 12%, or 191 were White.[387],[388]
    - Youth are particularly affected: in 2014, of BPD's 504 marijuana misdemeanor arrests, more than 80 percent (392) of those arrested were individuals under 29, with almost 40 percent (187) between the ages of 21 and 25.[389]
    - 

  - Further, Brown's broken windows aggressive policing tactics has substantially increased the number, disparity and comparative arrest rate of racial minorities for lowest-level marijuana misdemeanor possession, while largely remaining stable or falling for whites.
  - Over time: Since 2006, the number and arrest rate of African Americans for low-level marijuana offenses has grown considerably, while the number of arrests has fallen for whites and the arrest rate has remained stable; African Americans in Buffalo are seven times more likely to be arrested than whites to be arrested by the Buffalo Police Department for misdemeanor marijuana possession based in the last ten years (2006-2015), compared to only 4 times as likely to be arrested as whites in the ten years prior to Brown's election (1996-2005). Similarly, Latinos, who had approximately the same arrest rate as whites from 1996-2005, are now more than twice as likely to be arrested for lowest level misdemeanor marijuana possession since Brown was elected (2006-2015).

The severe effect of Mayor Brown's and Commissioner Derenda's racially targeted broken windows policing tactics can be sharply seen in the substantial increase in the number, disparity and the comparative

---

[386] DCJS, Computerized Criminal History system (as of 3/24/2015). (4th and 5th degree possession).

[387] DCJS (as of [DATE-AM]. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *Id. See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )

[388] *Id.*

[389] DCJS, Computerized Criminal History system (as of 3/24/2015).

0101

arrest rate of racial minorities for lowest-level marijuana misdemeanor possession, while largely remaining stable or falling for whites. Since 2006, the number and arrest rate of African Americans for low-level marijuana offenses has grown considerably, while the number of arrests has fallen for whites and the arrest rate has remained stable:

- o African Americans in Buffalo are now seven times more likely to be arrested than whites to be arrested by the Buffalo Police Department for misdemeanor marijuana possession over the last ten years (2006-2015), compared to only 4 times as likely to be arrested than whites in the ten years prior to Brown's election (1996-2005).
    - ▪ Add numbers

    - ▪ Similarly, Latinos, who had approximately the same arrest rate as whites from 1996-2005, are now more than twice as likely to be arrested for lowest level misdemeanor marijuana possession since Brown was elected (2006-2015).

- o As a result of these policies, the arrest rate of racial minorities grew considerably over this time, while largely remaining stable for whites; the BPD arrest rate for lowest level marijuana misdemeanor possession for African Americans more than doubled from 1996-2005 at 18.5 per 10,000 to 38.64 in the last ten years, while nearly tripling for Latinos - rising from 4.4 to 11.16. For whites, the arrest rate rose only slightly for whites, from 4.3 to 5.72 -- despite no change in survey data establishing marijuana use rates are the same.

    - The BPD arrest rate for lowest level marijuana misdemeanor possession for African Americans more than doubled from 1996-2005 at 18.5 per 10,000 to 38.64 in the last ten years, while nearly tripling for Latinos - rising from 4.4 to 11.16. For whites, the arrest rate rose only slightly for whites, from 4.3 to 5.72 -- despite no change in survey data establishing marijuana use rates are the same.
    - The numbers are staggering: since the City implemented its broken windows policing tactics under Mayor Brown in 2006, BPD arrested 4,501 African Americans for lowest level misdemeanor offenses--almost double the 2,341 arrested in the previous ten years, while tripling the arrests of Hispanics during this period from 105 to 349. In contrast, the number of BPD arrests of white for marijuana misdemeanors decreased from 792 from 1996-2005 to 786 from 2006-2016

- o As a result of these policies, the number and arrest rate of racial minorities grew considerably over this time, while largely remaining stable for whites; the BPD arrest rate for lowest level marijuana misdemeanor possession for African Americans more than doubled from 1996-2005 at 18.5 per 10,000 to 38.64 in the last ten years, while nearly tripling for Latinos - rising from 4.4 to 11.16. For whites, the arrest rate rose only slightly for whites, from 4.3 to 5.72 -- despite no change in survey data establishing marijuana use rates are the same.

- o That is, the comparative likelihood that African Americans were arrested for lowest level misdemeanor marijuana possession grew considerably since Mayor Brown worked with the BPD to implement these policies; African Americans in Buffalo are now <u>seven times as likely to be arrested than whites for marijuana possession based on the last ten years (2006-2015), compared to only 4 times as likely to be arrested as whites in the ten years prior to Brown's election (1996-2005).</u> Similarly, Latinos, who had approximately the same arrest rate as

97

whites from 1996-2005, are now more than twice as likely to be arrested for lowest level misdemeanor marijuana possession since Brown was elected (2006-2015).

- From 2013-2015, African Americans accounted for 81.4% of all lowest-level misdemeanor marijuana possession arrests (4ᵗʰ and 5ᵗʰ degree possession).[390]
  - Specifically, of the 1562 people BPD arrested for the lowest level of marijuana misdemeanor offenses during the study period, 81%, 1,271, were African American, while only 12%, or 191 were White.[391],[392]
  - From 2013-2015, African Americans comprised 38.6% of the population in Buffalo, but comprised 81% of all lowest-level misdemeanor marijuana possession arrests, while whites comprised only 12% of all arrests.[393]

- Most of those arrested are young; 2014, of BPD's 504 marijuana misdemeanor arrests, more than 80 percent (392) of those arrested were individuals under 29, with almost 40 percent (187) between the ages of 21 and 25. This disparity is esepecially troubling because local and federal data establishes that Whites smoke marijiuana in higher or the same rates as African Americans.[394]
  - Since the City implemented its broken windows policing tactics under Mayor Brown in 2006, BPD arrested 4,501 African Americans for lowest level misdemeanor offenses--almost double the 2,341 arrested in the previous ten years, while tripling the arrests of Hispanics during this period from 105 to 349. In contrast, the number of BPD arrests of white for marijuana misdemeanors decreased from 792 from 1996-2005 from to 786 2006-2016

  - Over time: Since 2006, the number and arrest rate of African Americans for low-level marijuana offenses has grown considerably, while the number of arrests has fallen for whites and the arrest rate has remainded stable; the BPD arrest rate for lowest level **marijuana misdemeanor possession from African Americans more than doubled from 1996-2005 at 18.5 per 10,000 to 38.64 in the last ten years, while nearly tripling for Latinos - rising from 4.4 to 11.16, while rising only slightly for whites, from 4.3 to 5.72 -- despite no change in survey data establishing marijuana use rates are the same. Marijuana arrests from 2006-2015 fell substantially for whites but grew for African Americans.**

- There is also substantial evidence that the large racial disparities in BPD's enforcement of marijuana and drug possession statutes are not explained by rates of drug usage. While survey data on marijuana usage shows that African Americans use banned substances at rates similar to or slightly higher than other population groups, BPD arrested African Americans for simple marijuana possession at seven times the rate at which it arrested white. BPD also arrested African Americans for drug possession offenses several times more often than law enforcement agencies in cities with similar crime rates and demographic and economic characteristics.
  - **GEOGRAPHIC CONCENTRATION**

- The raw numbers behind these racially disparate arrest rates are staggering: since the City implemented its broken windows policing tactics under Mayor Brown in 2006, the BPD arrested 4,501 African Americans for lowest level misdemeanor offenses--almost double the 2,341 arrested in the previous ten years, while tripling the arrests of Hispanics during this period from 105 to 349. In

---

[390] DCJS, Computerized Criminal History system (as of 3/24/2015).

[391] DCJS (as of [DATE-AM]. These arrest numbers include misdemeanor possession in the 4ᵗʰ and 5ᵗʰ Degree. *Id. See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )

[392] *Id.*

[393] DCJS, Computerized Criminal History system (as of 3/24/2015).

[394] DCJS, Computerized Criminal History system (as of 3/24/2015).

contrast, the number of BPD arrests of white for marijuana misdemeanors decreased from 792 from 1996-2005 to 786 from 2006-2015 [395]

The profound racial imbalance in marijuana enforcement in black neighborhoods suggests a "doubling down" of street-level policing in places already subject to heightened scrutiny for weapons and overbroad sweeps and raids, a link suggesting that the policing of marijuana may be pretextual.  Indeed, Buffalo's programmatic documents reveal that many of these high impact raids have lead to arrests for marijuana-related offenses.

Together, these staggering disparities provide substantial evidence that BPD's disparate stops, searches, and misdemeanor arrests of African Americans are not the result of a calibrated, equal or proportionate strategy for responding to criminal activity. BPD's disproportionate enforcement against African Americans also suggests intentional discrimination because the racial disparities are greatest for enforcement activities that involve higher degrees of officer discretion. In the five years of arrest data we reviewed, African Americans accounted for a larger share of charges for highly discretionary misdemeanor offenses than for other offenses, including: *62 percent of those charged solely with trespassing, 80 percent of obstructing justice, or failing to obey an officer's orders, 70 percent of those arrested solely for disorderly conduc. tNotably, criminal charges were dismissed for a higher portion of African Americans on these particular criminal charges.*This pattern indicates both systematic unconstitutional targeting, and also that when BPD officers have more discretion to make arrests, they exercise that discretion to arrest African Americans, Latinos and others disproportionately.

These disparities provide clear evidence of the BPD's unconstitutional racially discriminatory intent. As the Supreme Court has made clear, the "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions*." [396]*These disparities are unexplainable on grounds other than race and evidence that racial bias, has impermissibly shaped law enforcement conduct.


## Summary

The Court and Second Circuit have established three ways to demonstrate a violation of the Equal Protection Clause of the Fourteenth Amendment. The Second Circuit has held that "[r]acial profiling constitutes intentional discrimination in violation of the Equal Protection Clause if it involves any of the following: an express classification based on race that does not survive strict scrutiny; the application of facially neutral criminal laws or law enforcement policies "in an intentionally discriminatory manner;" or a facially neutral policy that has an adverse effect and was motivated by discriminatory animus." [397] Below, we document how the City of Buffalo and BMHA is legally liable for the BPD's routine violation of Buffalo's minority residents' right to equal protection using both of these analysis.

[395] DCJS

[396] *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997); see also Davis, 426 U.S. at 242 ("An invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another.").

[397] Floyd v. City of New York, 959 F. Supp. 2d 540, 660 (S.D.N.Y. 2013) (internal quotes omitted) (*citing* Brown, 221 F.3d at 337 (citing Yick Wo, 118 U.S. at 373–74, 6 S.Ct. 1064); Whren, 517 U.S. at 813, 116 S.Ct. 1769 ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause."); *Melendres v. Arpaio*, No. 07 Civ. 02513, 2013 WL 2297173, at *67–68 (D.Ariz. May 24, 2013).
756

99

**Policy of Indirect Racial Profiling: Intentionally Discriminatory Application of Facially Neutral Checkpoint and Trespass Policies**

To establish an equal protection violation based on an intentionally discriminatory application of a facially neutral policy, requires evidence that the contested government actions "had a discriminatory effect and were motivated by a discriminatory purpose."[398] First, the City and BMHA have demonstrated unconstitutional racial bias by creating and directing a BPD policy of indirect racial profiling based on criminal suspect data,[399] and acted with deliberately indifference to the widespread intentionally discriminatory application of these tactics to improperly stop and arrest Buffalo residents of color.[400]

Here, there is ample evidence that both BPD's checkpoint and trespass enforcement programs had a discriminatory effect. First, it is clear that the BPD carries out more checkpoints and trespass stops where there are more African American and Latino residents, even controlling for other variables including crime. Of the 492 Strike Force and BPD HU checkpoints we documented since 2014, 94% have been in predominantly minority neighborhoods—and primarily on the boundriessof the Black and White communities. Because these checkpoints are directed at the boundaries of white neighborhoods going into minority neighborhoods, and because of Buffalo's hypersegregation and racialized highway system,  drivers subjected to these checkpoints are primarily residents—and therefore people of color. In addition to statistical evidence, there is ample evidence from the BPD and anecdotoal evidence that officials chose these locations based on crime data.

Similarly, the BPD's Housing Unit suspicionless illegal trespass stops, searches and arrests, "warrant checks" and sweeps exclusively in BMHA residences where the majority of residents are nonwhite, and none in public housing residences that are primary white despite similar crime rates.[401] These programmatic suspicionless "trespass enforcement" and "warrant check" tactics, involve "vertical patrols" where BPD officers "sweep" the halls, stairwells, and outside public areas and stopping and searches.  The BPD vertical patrol policy and trespass arrest practices disproportionately violate the rights of minority BMHA residents. These policies are conducted in the absence of individualized, objective facts about actual criminal activity, and defendants fail to guide, supervise, and train BPD officers.[402] The specific targeting of racial minorities violates minorities' protected rights under the Fourth and Fourteenth Amendments.[403] The BPD specifically applied the vertical patrol policy and trespass arrest practices against plaintiffs in a deliberately discriminatory and race-based way.[404] The City and BMHA, implemented, enforced, and encouraged practices, policies, and customs that targeted implementation of sweeps and arrests in communities of color in the absence of unreasonable suspicion and did not sufficiently train, monitor, and discipline police officers.[405]

The evidence is clear: the BPD carries out more stops where there are more black and Hispanic residents, even when other relevant variables are held constant.

As described above, to establish discriminatory intent, requires a showing that the government officials responsible for the profiling did so "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" the profiled racial groups.  Plaintiffs are not required to prove that race was the sole, predominant, or determinative factor in a police enforcement action, nor must discrimination be based on ill will or hostility. Here, BPD Commissioner Derenda and Mayor Byron Brown have made clear that the BPD

[398] Floyd v. City of New York, 959 F. Supp. 2d 540, 661 (S.D.N.Y. 2013)

[399] *Floyd v. City of New York,* 959 F. Supp. 2d 540, 661–62 (S.D.N.Y. 2013).

[400] *Id.*

[401] *Id.* 31-32.

[402] *See id.* at 39.

[403] *Id.*; *Davis v. City of N.Y.*, 959 F. Supp. 2d 324, 360-64 (S.D.N.Y. 2013) (denying City summary judgment on plaintiffs equal protection complaint for discriminatory trespass enforcement)

[404] *Id.*

[405] *Id.* at 43.

100

has chosen these locations to target people of color, and specifically, young black and Hispanic men because these groups are heavily represented in criminal suspect data. Under the BPD's policy, targeting the "high crime" suspects means stopping people in part because of their race – reflecting an impermissible stereotyped, described in more detail below. Together with explicit references to race discussed in the next section and irregularities, there is a sufficient basis for inferring discriminatory intent. In sum, the City's impermissible discriminatory intent is also evident from how government officials have justified thousands of stops in without any evidence of objective wrongdoing only in Buffalo's minority neighborhoods based on their racial representation in crime suspect data.[406]

Specifically, the BPD has engaged in a pattern and practice of violating Buffalo's minority residents' rights through directing officers conducting routine trespass stops and vehicle roadblock stops without individualized reasonable suspicion in African American and Latino neighborhoods and public housing buildings, but rather based on generalized crime data. The BPD violated the Fourteenth Amendment by maintaining a policy of indirect racial profiling based on criminal suspect data.[407] The BPD has directed officers to employ suspicionless stop tactics targeting minorities and their neighborhoods, not based on individualized suspicion, but because these groups are heavily represented in criminal suspect data — the reliability of which is questionable. The BPD has positioned almost all of its vehicle checkpoints of these predominantly African America, Latino neighborhoods  By placing these checkpoints exclusively in minority neighborhoods, in practice, BPD officers to stop, question and arrest African Americans and Latinos who would not have been stopped if they were white.   Together with the steep disparities, race-based statements and stereotypes described below, provide clear proof of discriminatory intent.

Although the Second Circuit has approved the use of race appropriately when a description of a specific criminal suspect includes the fact and other factors align, the Second Circuit has specifically rejected racial profiling and racial bias as a law enforcement tool: that is, imputing criminality to a suspect based on his race rather individualized evidence to justify a stop. This evidence establishes impermissible discrimination, similar to unconstitutional discrimination the Court found in Floyd:

> Whether through the use of a facially neutral policy applied in a discriminatory manner, or through express racial profiling, targeting young black and Hispanic men for stops based on the alleged criminal conduct of other young black or Hispanic men violates bedrock principles of equality. Two young men in the 81st Precinct who are similarly situated in every way, except that one is black and the other white, are similarly situated for the purposes of equal protection and must be treated alike. .. The Equal Protection Clause does not sanction treating similarly situated members of different racial groups differently based on racial disparities in crime data. ,, such treatment would eviscerate the core guarantees of the Equal Protection Clause.[408]

As described above, in 2012, the City launched "Operation Strike Force," a crime suppression vehicle checkpoint policy[409] and by 2014, Commissioner Derenda stated they were conducting these roadblocks

---

[406] *Id.* at 10, 67, 70.

[407] *Id.* at 181.

[408] *Floyd v. City of New York*, 959 F. Supp. 2d 540, 664 (S.D.N.Y. 2013) ("If equal protection means anything, it means that individuals may not be punished or rewarded based on the government's views regarding their racial group, regardless of the source of those views.")

[409] Matt Gryta, *Officials praise results of strike force*, The Buffalo News, Aug. 5, 2012, at LOCAL; p. B3. ("According to Commissioner Derenda said, "Our Strike Force officers are conducting daily roadblocks at multiple locations and surprising the criminal element. Because of that people are now less likely to carry guns knowing that they may be stopped at a safety checkpoint."); Lou Michael, *Anti-crime task force back for* good, The Buffalo News (March 31, 2013); Lou Michel,  *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-

101

checkpoints daily for general crime suppression.[400]  In December 2016, a Strike Force officer testified that Strike Force continues to conduct these checkpoints daily. During the study period, BPD Strikeforce teams stopped thousands of drivers in African American and Latino neighborhoods in hundreds, and often daily crime-suppression roadblocks in primarily African American and Latino neighborhoods under Operation Strikeforce.

-    According to BPD records analyzed by two professors from Buffalo State, from April and May of 2013, the BPD Strike Force conducted 67 roadblocks in 46 different locations with a "primary goal was to deter crime and disorder."[411] All but two of which were in predominantly minority neighborhoods [map?] [412] During this period, officers wrote over 6,000 traffic tickets, and made a number of arrests for outstanding warrants, and confiscated "several firearms and vehicles."[413]

In implementing the suspicionless Strike Force checkpoints in minority neighborhoods Commissioner Derenda and Mayor Brown not only made clear that they had a primary unconstitutional purpose of crime control as described above,[414]  but also that they were set up to "send[] a very strong message to the crime element.[415]

       As additional evidence of discriminatory intent, Buffalo officials have also relied on generalized crime data in responding to minority residents' complaints of racial profiling, unjustified stops and harassment and vast racial disparities for arrests. For example, in responding to citizen complaints about racial profiling, Police Commissioner Derenda has explained that the BPD's policing tactics are not based on

region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016); Mayor Byron W. Brown, *Mayor Brown Celebrates Progress in Buffalo*, City of Buffalo Press Release (Feb. 22, 2013) (available at http://www.ci.buffalo.ny.us/Home/Leadership/Mayor/Archive_Press_Releases/2013Archives/February2013/ProgressBuffalo)

[400] By January 2014, Commissioner Derenda stated that "Strike Force officers are conducting daily roadblocks" that were designed to "surprise[e] the criminal element." ; Lou Michel, *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

[411] Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126). Note that the Strike Force roadblocks examined in the study largely had similar features to routine BPD roadblocks documented in cases and reports but varied from standard procedures in that officers in the study relied only on automated license plate readers (APLR) to determine who to detain.  That is, the study-group Strike Force officers stopped vehicles only if they were flagged by the ALPR either in the roadblock or in surrounding streets (to detect vehicles attempting to evade the checkpoint) if they are "associated with warrants or having a revoked license (for the owner of the vehicle), or if the vehicle itself was stolen;" the study-roadblocks are designed to slow cars down so officers can conduct an APLR analysis either within the roadblock or in surrounding streets. *Id.* at 3-4. If there is no APLR hit, the car is waived on with no further interaction In contrast, in standard Buffalo Strike Force checkpoints are implemented consistent with BPD's Zero Tolerance policing policy: police briefly detain all drivers and inspect their registration and pull over, question and frequently arrest individuals based on any indication of criminal or civil violations, consistent with the Zero Tolerance Policing policy.

[412] Eleven of the locations were targeted at least twice over the two month study period, and three locations were targeted four separate times. Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[413] Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[414] Matt Gryta, *Officials praise results of strike force*, The Buffalo News, Aug. 5, 2012, at LOCAL; p. B3. ("With nearly 1,000 people arrested, more than 350 cars seized and more than 2,400 summonses issued in less than two months of operation, the multi-agency Buffalo Strike Force is having a "phenomenal" impact on overall crime in the city, Mayor Byron W. Brown and Police Commissioner Daniel Derenda say.")

[415] Matt Gryta, *Police strike force targets hot spots in city, cites 145 arrests in 10 days*, The Buffalo News, June 22, 2012, at LOCAL; p. D10 ("A multiagency strike force has made 145 arrests and seized nearly $2,500 in cash during the first 10 days of an effort to target crime hot spots across Buffalo. […]"This is sending out a very strong message to the crime element," the mayor said. "Don't do it because we're watching, and our police officers are out there, and it's just a matter of time before we arrest you and put you in jail.")

102

race, but rather "data driven" and "response to complaints." [416] Commissioner' Darenda's response, however, is actually further evidence of intentional discrimination.  As the Court found in Floyd: "To say that black people in general are somehow more suspicious than white people is not a race-neutral explanation for unjustified racial disparities in arrests: it is itself a racially biased explanation. This explanation is especially troubling because it echoes the stereotype that black men are more likely to engage in criminal conduct than others." [417]

In practice, these policies lead BPD officers to stop blacks and Hispanics who would not have been stopped if they were white. It is clear that a person's race, like a person's height or weight, is a permissible consideration where a stop is based on a specific description of a suspect. However, the equal protection clause does not permit subjecting all members of a racially defined group to heightened police enforcement with no individualized evidence, because some members of that group appear more frequently in criminal complaints. The Equal Protection Clause does not permit race-based suspicion.

Finally, high-ranking officials both directed and were aware of, directed these practices, and acted deliberately indifferently to low level racially biased policing practices. [418] Courts have held that the Fourteenth Amendment's Equal Protection Clause does not allow race-based suspicion. [419]  The City also violated Art. 1, Sec. 11 of the New York Constitution by applying their checkpoint, trespass sweeps and pedestrian policies and practices in a racially discriminatory manner, targeting minority communities for focused implementation of constitutionally suspect stops and searches, and creating and enforcing these policies. As the Court held in *Floyd*, "[t]he Equal Protection Clause does not sanction treating similarly situated members of different racial groups differently based. Indeed, such treatment would eviscerate the core guarantees of the Equal Protection Clause. If equal protection means anything, it means that individuals may not be punished or rewarded based on the government's views regarding their racial group, regardless of the source of those views.

**The toll of these policies is substantial;** the BPD made clear that zero tolerance tactics in communities of color prioritized officers making large numbers of stops and arrests for minor offenses, despite knowing the potential impact of these practices. For example, in the approximately 18 months of data we examined, BPD made 10,000 misdemeanor arrests in and around BMHA buildings with a population that are predominantly minority, comprising 28% of all BPD's misdemeanor arrests from 2013-2014.  Although there are only 10,000 residents in BMHA, comprising 2.6% of Buffalo's population, [420] the  BPD Housing Unit made 38.6% of all misdemeanor arrests in Buffalo, or 3,329 misdemeanor arrests from May 2013-May 2014,. [421] The BPD made 2,359 misdemeanor arrests in and around BMHA properties, comprising 27.4% of all misdemeanor arrests in Buffalo [422] Over 90% of these arrests during this time period were for either misdemeanors or low-level non-criminal violations. The largest group of arrests were for traffic

---

[416] http://townhall.com/tipsheet/cortneyobrien/2014/12/17/at-community-forum-buffalo-police-explain-patrols-are-not-racist-theyre-datadriven-n1933066 ("It's not stereotyping, it's where we respond to complaints," Derenda said. "It's data-driven. Every day we look at where the crime is occurring, and where the reported crime is occurring. It's not White or Black, it's not anything, it's data.")

[417] *Floyd*, 959 F. Supp. 2d at 664.

[418] *Id.* at 83, 87, 88.

[419] *Id.* at 11.

[420] 2010 Census; HUD BMHA Data; BPD Housing Unit Records, 2013-2014 (On file with Author); DCJS, BPD Misdemeanor Arrests. To determine the number of overall misdemeanor arrests by the Buffalo Police Department during this period, the authors averaged the misdemeanor arrests in FY 2013 and FY 2014.

[421] *Buffalo Police Department Housing Statistic Report,* directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014; *see also* supra note (on racial composition of BMHA).

[422] *Id*.

misdemeanors (44% or 1650), followed by 1,552 arrests for other misdemeanors (41%), and 157 arrests for traffic violations.[423]

Put differently, BPD made 28% of all misdemeanor arrests in the predominantly African American BMHA buildings, and almost half of all tickets issued by BPD during this period.

**2)  Express classification**

**3)  BPD Express Racial Bias, Stereotypes and Race Based Arrests**

This presumption of minority criminality underlying these broad suspicionless and illegal BPD tactics throughout the East Side and other minority communities has infected the entire BPD culture by emphasizing to officers to focus not on individual characteristics or reasonable suspicion, but rather on individuals in certain racial categories based on their racial representation in suspect data and other forms of racial bias. Specifically, BPD encounters with people of color make clear they commonly employ the stereotypes people of color, and particularly all young black males, as "criminal predator,": gang affiliated, gun toting and presumptively dangerous. Alternatively, City officials and private investors often blame minorities for being undermployed because of their comparative lack of personal responsiblity. This broad brush depiction is not just wrong, but it serves as evidence of the BPD's discriminatory intent. By doing so, the BPD has applied a presumption of criminality to minority communities throughout Buffalo.

In addition, BPD and government officials have used explicitly discriminatory remarks about racial minorities, reflecting the prevalent presumption of black criminality and negative racial stereotypes. In public statements and court hearings, law enforcement personnel, as well as BMHA and Board of Education officials expressed discriminatory views and intolerance with regard to race and national origin. Their statements are unequivocally deragotory, dehhmanizing and demonstrative of unconstitutional bias. The Buffalo Police Department and Buffalo officials have consistently also used explicitly denigrating and disparaging language and relies on impermissible racial stereotypes about criminality when referring to minorities and in police enforcement.

The BPD's presumption that minorities are prone to crime and more violent is consistent with reports from community members, as well as cases and interviews that BPD officers use racial stereotypes during routine police practices that presumes that they are guilty not based on their individual conduct, but rather only their race.

The explicit bias police and government officials is best demonstrated in an October 2016 anonymous letter sent by an anonymous law enforcement officer sent to City of Buffalo Common Councilmember Ulysees Wingo after Wingo made a symbolic gesture of solidarity during the Pledge of Allegiance following the police shooting of Terrence Crutcher.[424] In the letter, he referred to African Americans as "niggers" and "underperforming niggers." The police officer further expressed a racial stereotype that African Americans engage in "shooting and looting" and he is thus passed over for jobs, when he suggested that "[m]aybe white people should start shooting and looting when they are passed over for hiring."

"I can't sign my name as I am in Law Enforcement. It took me over 30 tests and 11 years to get a job. I was never prejudiced until I started being passed over by underperforming niggers

---

[423] *Id.*; DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014; *see also* supra note (on racial composition of BMHA).

[424] after seeing the video of the police shooting of Terrence Crutcher, an unarmed African American man shot by police with his hands up in Tulsa, Oklahoma who were responding to his request for roadside assistance.

104

[who] take a test, pushed through remedial training and become a cop, firefighter or teacher in Bflo [] while keeping other white candidates from getting hired. Maybe white people should start shooting and looting when they are passed over for hiring. I went to Bflo Public schools same as all your minorities. Why do they get an advantage. They had the same opportunities. .. Good Black people cant stand a nigger like you because it reflects on them while they try to do good on their own."[425]

- In July 2016, following the shooting of Dallas Police, the BPD reportedly received threats from African Americans. One longtime BPD officer stated:  "I'm not going to sugarcoat it. There are people using these police shooting incidents to let their ***own natural instincts come out and ... they have no respect for human life***."[426]

- Another Police Another Buffalo officer said of black lives matter activists:  "<u>They</u> are making assumptions that every police shooting is bad. I'm not saying all shootings are justified but there are some that are justified. .. They want the police to be guilty until proven innocent."[427]

BPD officers have also routinely used racial epithets and violence with impunity. For example, in March 2013, the City paid $49,000 to settle[428] a civil rights suit brought against the City and two BPD Officers brought by African American Buffalo resident Yevette Paulding on behalf of herself and her then 15-year old son, Javon Fogan for discriminatory and false arrest, excessive force and using racial epithets against them. **J**avon Fogan, then a high school student at Bennett High School, was walking down Shirley Avenue on Buffalo's East Side from his friend's house to his house for dinner when BPD Officer John Beyer drove by on May 31, 2009 at approximately 6:30 p,m. BPD Officer Beyer, who allegedly was responding to a call regarding a nearby fight, yelled from his car and ordered Javon to stop.  Having no reason to believe Beyer was talking him, Jovan continued walking. BPD Officer Beyer then drove his patrol car in front of Javon, yelled for him to get down on the ground. When Jovan asked Officer Beyer why, Beyer immediately threw him to the ground and kicked and punched him on his hand, face and body. [429] Lt. Thomas Leatherbarrow and other BPD Officers then then arrived on the scene, with other witnesses.

The BPD Officers then handcuffed Javon and took him to the BPD E District headquarters, where they yanked him out of the car and then interrogated him without his parents or counsel present or being advised of his Miranda rights. Throughout his interrogation and detention,  BPD officers used racial epithets against him, including calling him "boy" and "nigger.[430] When Jovan told police officers his name, one of them commented, "Nice nigger name your Mom gave you." He was then taken to BPD headquarters on Franklin, where officers continued to interrogate him without his parents or counsel being present. The officers continued to use racial epithets towards Javon; one of the officers pointed at him as he was walking past the

---

[425] Alan Bedenko, *Racist Letter Proves Councilman Ulysees Wingo's Point*, The Public, Oct. 7, 2016 (available at http://www.dailypublic.com/articles/10072016/racist-letter-proves-councilman-ulysees-wingos-point ).
[426] Lou Michel, *National events, local death threats concern area police*, The Buffalo News (July 9, 2016).
[427] Lou Michel, *City activist says deeper problems lie beneath tensions*, The Buffalo News (July 9, 2016).
[428] *Paulding v. City of Buffalo. et. al.*, No. 1:10cv712, Docket No. 52, Order acknowledging Settlement; Docket No. 61, Stipulation of Dismissal (W.D.N.Y. filed Aug. 27, 2010); Jill Terreri, Council wants UB to talk about Fruit Belt Development, The Buffalo News (March 19, 2013) (available at http://buffalonews.com/2013/03/19/council-wants-ub-to-talk-about-fruit-belt-development/)
[429] *Paulding v. City of Buffalo et. al.*, Case No. 1:10cv712, Docket No. 20, Am. Compl. ¶¶ 31-35 (W.D.N.Y. filed Aug. 27, 2010); *Paulding v. City of Buffalo*, No. 10CV712S, 2011 U.S. Dist. LEXIS 126098, at *1-3 (W.D.N.Y. Nov. 1, 2011).
[430] *Paulding v. City of Buffalo et. al.*, Case No. 1:10cv712, Docket No. 1, Compl. ¶¶ 72-75, Docket No. 20, Am. Compl. ¶¶ 22-29 (W.D.N.Y. filed Aug. 27, 2010); *Paulding v. City of Buffalo*, No. 10CV712S, 2011 U.S. Dist. LEXIS 126098, at *1-3 (W.D.N.Y. Nov. 1, 2011).

0110

room where he was being held and stated "Look at those niggers in the room."[431] Javon was then falsely charged with resisting arrest and obstruction of governmental administration.[432] All charged eventually were dismissed.[433]

The BPD Officers then also falsely arrested Ms. Paulding, and made denigrating remarks to her. Just after BPD Officer Breyer threw Jovan on the ground mother, Ms. Paulding came outside from preparing dinner after Jovin's girlfriend told her that Jovan was being arrested. When BPD, came out and saw her son on the ground and identified herself as Jovan's mother, to which BPD Officer Beyer responded "Shut the fuck up. Back the fuck up." After seeing blood coming from Jovan's mouth, Ms. Paulding asked BPD Officer Breyer who punched her son, and Breyer admitted that he had. She then asked the BPD officers at the scene, who refused to tell her.   Following Jovan's arrest, Ms. Paulding saw that her brother, who was holding his baby daughter, had come out to help Jovan and was getting agitated, which lead to BPD Officer Beyer pulling his gun on her brother and her niece. Ms. Paulding intervened and told her brother to back off and not be provoked. BPD Officer Beyer then called her a "fat bitch" and told her to take her "fat ass in the house."  Then, without any legal justification, BPD Officer Breyer arrested Ms. Paulding, without being advised of her rights or being told why she or her son were under arrest.[434] After being placed in BPD Lieutenant Leatherman's car, Ms. Paulding asked him if she could tell her brother to get her other 12 year old son, to which BPD Lt. Leatherman responded "Fuck him." After being transported to the police station, Lt. Leatherman left her left handcuffed in the police car, before being transported to the Holding Center, where she was held overnight with no charges or bail. No charges were ever filed against Ms. Paulding.[435]

In their civil suit against the City, Leatherman and Breyer, Ms. Paulding alleged, among other, things that BPD discriminated against them based on their race in violation of their rights under the Equal Protection Clause of the Fourteenth Amendment by singling out them out for discriminatory treatment. Specifically, they alleged impermissibly racial discrimination because: 1) BPD Officer Breyer considered Jovan a suspect in the fight, solely because of his race; 2) BPD Officers use of denigrating terms towards Ms. Paulding, including calling her a "fat bitch,"; 3) BPD officer's use of racial epithets towards Jovan, including calling him "nigger" and "son"  and 4) their arrest without justification.[436] In March 2013, the City settled the case for $49,000.

*Govt officials*

In addition to the state sanctioned discriminatory police practices, the BPD, as well as Buffalo Housing Authority and Education government officials explicit discriminatory remarks about racial minorities, reflecting the prevalent presumption of black criminality and negative racial stereotypes among city officials throughout Buffalo. In public statements and court hearings, law enforcement personnel, as well as BMHA and school personnel expressed discriminatory views and intolerance with regard to race and national origin. Their statements are unequivocally deragotory, dehhmanizing and demonstrative of unconstitutional bias. The comments and conduct made by public officials and police in Buffalo about people of color are negative and stigmatizing, which is "evidence of racism"[437] and discriminatory intent.

---

[431] *Paulding v. City of Buffalo et. al.,* Case No. 1:10cv712, Docket No. 1, Compl. ¶¶ 72-75;  Docket No. 20, Am. Compl. ¶¶ 31-35 (W.D.N.Y. filed Aug. 27, 2010); *Paulding v. City of Buffalo,* No. 10CV712S, 2011 U.S. Dist. LEXIS 126098, at *1-3 (W.D.N.Y. Nov. 1, 2011).
[432] Jovan was charged with violations of NYPL 205.30 (Resisting Arrest) and 195.05 (Obstructing Governmental administration in the Second Degree) in Family Court. *Paulding v. City of Buffalo et. al.,* Case No. 1:10cv712, Docket No. 1, Compl. ¶¶ 31 (W.D.N.Y. filed Aug. 27, 2010); *Paulding v. City of Buffalo,* No. 10CV712S, 2011 U.S. Dist. LEXIS 126098, at *1-3 (W.D.N.Y. Nov. 1, 2011).
[433] *Id.* at ¶¶ 33-35.
[434] *Id.* ¶¶ 37-50.
[435] *Id.* ¶ 52.
[436] *Paulding v. City of Buffalo et. al.,* Case No. 1:10cv712, Docket No. 1, Compl. ¶¶ 31 (W.D.N.Y. filed Aug. 27, 2010);
[437] Doe v. Vill. of Mamaroneck, 462 F. Supp. 2d 520, 549 (S.D.N.Y. 2006)

While the City, BMHA and BPD vigorously deny that race has anything to do with the ongoing unremitting hostility and brutality they displayed toward people of color, the evidence -- including the race-conscious nature of the routine suspicionless law enforcement campaign waged against people of color in their neighborhoods -- directly undercuts their argument.

The racism within BPD culture, of course, is not limited to the BPD and government officials. In two recent studies, Buffalo and Western New York ranked as one of the most racist areas in the country.[438] In one study, Buffalo ranked above the mean for google searches of a racial epithet.[439] Last year there were so many incidents of elected officials making racist comments that the local paper, *The Public*, named Buffalo 2015 "The year of the racist."

## Routine racial profiling: Stereotypes at work

In addition to having a trespass and vehicle checkpoint policy that treats African Americans as presumptively criminal, BPD officers also operate on these stereotypes that reflect denigrating views that minorities are subhuman—leading to systematic constitutional violations in routine policing and arrests with no probable cause. BPD officers have acknowledged that the BPD routinely profiles and treats differently African Americans and Latinos:

- For example in publicly responding to allegations of racial profiling acknowledged that BPD officers use race-base presumptions Deputy BPD Commissioner Kim Beaty,: "I think sometimes officers, they do get caught up. A neighborhood may look a certain way, like what the demographics are. This is an all-black neighborhood. This person looks a little bit out of place. But then we have to remind them this is the year 2015. People can be where ever they want."[440]

- BPD Officer Floyd: "I understand their anger. I grew up in these communities prior to becoming a police officer, and I was the subject of racial profiling and harassment. You're upset. There was a lack of trust, especially when you experience it and you know it is for no other reason than your skin color." Officer Floyd, who grew up in Buffalo's East Ferry-Fillmore neighborhood, observed that "[m]any of the young people today have the same experience we had when we grew up," which "frustration over officers it seemed might have been harassing individuals who may or may not have been up to no good, and an overall disconnect between law enforcement and the community."

  • Former Buffalo police commissioner H. McCarthy Gipson, who is African American, acknowledged that the BPD frequently and impermissibly associates minorities—inany Buffalo neighborhood—as suspect while in a non-white area. He recently recounted a recent BPD encounter and pulled over for "driving while black." He described the officer's first question to typically be  "What are you doing out here?"  He stated that this was an issue of "Wrong place, wrong neighborhood, wrong time. .. It happens to so many people."[441]

[438] Chae DH, Clouston S, Hatzenbuehler ML, Kramer MR, Cooper HLF, Wilson SM, et al. (2015) Association between an Internet-Based Measure of Area Racism and Black Mortality. PLoS ONE 10(4): e0122963. doi:10.1371/journal.pone.0122963

[439] http://wivb.com/2015/05/05/study-says-western-new-york-is-one-of-the-most-racist-in-the-country/

[440] Luke Moretti, *Police fee; the heat on the street: Use of force questions prompt national conversation,*" WIVB4.com   (October 5, 2016) (*available at* http://wivb.com/investigative-story/police-feel-the-heat-on-the-street/ ).

[441] Ilene Fleischmann, *Expert's analysis highlights 'Stop and Frisk' Forum,* UB Reporter (March 27, 2014), available at http://www.buffalo.edu/ubreporter/campus.host.html/content/shared/university/news/ub-reporter-articles/stories/2014/March/stop_frisk.detail.html#sthash.Xgr3sySt.dpuf

107

The BPD, however, continues to hold negative views about people of color. One Buffalo police officer stated to Rebeckah Williams, a youth organizer for Push-Buffalo in response to her questions about racial profiling and police misconduct: "I'm tired of appeasing black people." [442]

High crime: As with the case of Wardel Davis, police have justified improper arrests of African Americans without evidence  because they were directed at "high-crime" people and neighborhoods, which are poor, undereducated, African American and minority males who live in the City's East Side or who look as if they do.

There is also clear evidence, that the City, BMHA and the BPD adopted policies and practices that equated African Americans and people as presumptively criminal suspects. See Yonkers, 837 F.2d at 1226 ("Given the district court's finding ... that racial animus was a significant factor motivating those white residents ... the City may properly be held liable for the segregative effects of a decision to cater to this 'will of the people.' ").

There is also evidence in the record that the City of Buffalo residents share this sentiment and are deeply, driving residents to be hesitant or resistant to change. See Doe v. Vill. of Mamaroneck, 462 F.Supp.2d 520, 549 (S.D.N.Y.2006) (finding that comments made by public official about day laborers that were "negative and stigmatizing" constituted "some evidence of racism"). Further, there is also significant evidence that despite persistent community requests for increased traffic regulation enforcement in other areas of the City that are predominantly white, the checkpoints were almost exclusively directed to minority areas See id. at 546–57 (evidence that Village "aggressive[ly] ticketed" Hispanic day laborers but " 'did not strictly enforce, and sometimes ignored, traffic and parking infractions that occurred in other part of the Village' could lead to an inference of discrimination"). Finally, Plaintiffs have proffered evidence that the area around the Building housed the majority of the Hispanic population of Farmingdale. (Pls.' Ex. 63 at 6.) Rivera v. Inc. Vill. of Farmingdale, 784 F. Supp. 2d 133, 150 (E.D.N.Y. 2011)

As a result of these discriminatory tactics, being African American or a person of color in Buffalo often means your fundamental right to move freely, without a modicum of suspicion before is taken away. By engaging in these race based stops and wrote suspicionless enforcement tactics exclusively towards minorities and in communities of color, the BPD as a policy and practice automatically assigns suspicion to people of color. This is literally costing Black and Brown people, children their dignity, fundamental constitutional rights, and their livelihoods.

## Community experiences and perceptions of BPD routine use of discriminatory stereotypes, misconduct

Community members also confirm both systematically in surveys and anecdotally that the BPD's use of these same stereotypes of minority criminality towards Buffalo residents. For example, **Cambridge**

---

[442] Karen Robinson, *Community organizations offer forum on police violence against Blacks*, The Buffalo News (Aug. 30, 2014) (available at http://buffalonews.com/2014/08/30/community-organization-offers-forum-on-police-violence-against-blacks/ ); see also Comment by willrich354, The Buffalo News DISQUS Comment for "Community organization offers forum on police violence against Blacks" (*available at* https://disqus.com/home/discussion/buffalonews/community_organization_offers_forum_on_police_violence_against_blacks/#comment-1570232143).

**Boyd**,[443] a 33 year old African American minister at True Bethel said "he has had many conversations with young African-American people about how they feel they're perceived when they wear something as mundane as a hooded sweatshirt." According to Mr. Boyd, community members find the BPD's use of steretypes challenging and frustrating: "They kept telling me, 'Because I wear a hoodie, they think I'm a gangster. 'Why do they associate that with me? I'm good. I'm in school. I don't do the gang thing. But because I wear a hoodie, I'm automatically labeled.' That's a gross injustice."[444]

People of color throughout Buffalo have similarly reported that they have been subject to routine racial targeting and profiling by the BPD.  For example, David Russell, an African American local freelance photo journalist and editor, described: "I get profiled all the time. .. It's not a good feeling. I get pointed out a lot of times [by the BPD], just for no reason." Mr. Russell described how Buffalo police officers have targeted him and made a presumption of his guilt and wrongdoing since he was a young teen in a middle class street in North Buffalo. Similar to the PUSH youth, he recalled a specific incident where a Buffalo Police officer asked him where he got his bicycle, assuming it was stolen. Mr. Harris responded "I think my parents bought it at Sears").[445]

Community residents have also reported the BPD to take a discriminatory and intimidating approach to law enforcement, and retaliates against anyone who challenges them:

- "Draw your gun, curse everyone out, tell everyone to mind their business, pulling everyone, be derogatory, be inflammatory. This is the norm for the Buffalo Police Department." - Desmond Abrams, a community organizer involved in activism against police misconduct.[446]

- Shenita Ann McLean, a 25 year old doctoral student at the University at Buffalo and member of the Malcolm X/Marcus Garvey Day Organizing Committee described how she sees and experiences racial profiling and false arrests routinely in Buffalo. She stated: "Black people are not considered people. .. To have to continue to look over your shoulder makes for a poor quality of life. .. It doesn't matter what color the police department officers are. We're not talking about an individual, but a system that has patterns of behaviors. We see it happening in the Buffalo community all the time."[447]

- In response to the forum, another African American Masters and Doctorate student at SUNY Buffalo described how "over four time over the past 3 years that I've had guns pulled on me or been physically assaulted by police because "I fit a description," noting that he "wears cartoon tee shirts and non baggy tees all the time." He critiqued the common assumption "that all (or at least most) [racial minorities] these people being arrested, beat, or killed deserve it. He observed that  "[m]y degrees, research publications, or close to standard English accent doesn't protect me from police brutality so what hope does random working class black girl/guy have?"[448]

Residents interviewed in our surveys and by other surveys, including the UB Urban Institute in the predominantly African American East Side consistently indicated that racial profiling is a common concern,

---

[443] Rallying around the hoodie; Area protesters are using clothing to speak out against the racial profiling that some say killed Trayvon Martin

[444] Rallying around the hoodie; Area protesters are using clothing to speak out against the racial profiling that some say killed Trayvon Martin

[445] Eileen Buckley, *Members of the African American Community live with profiling*, WBFO, Jan 26, 2015 (*available at* http://news.wbfo.org/post/members-african-american-community-live-race-profiling/stream/0 ).

[446] Daniela Porat, *Tempting a Ferguson in Buffalo*, Investigative Post (Oct. 31, 2016) (available at http://www.investigativepost.org/2016/10/31/tempting-ferguson-buffalo/ )

[447] Karen Robinson, *Community organizations offer forum on police violence against Blacks*, The Buffalo News (Aug. 30, 2014) (available at http://buffalonews.com/2014/08/30/community-organization-offers-forum-on-police-violence-against-blacks/ ).

[448] Karen Robinson, *Community organizations offer forum on police violence against Blacks*, The Buffalo News (Aug. 30, 2014) (available at http://buffalonews.com/2014/08/30/community-organization-offers-forum-on-police-violence-against-blacks/ ).

which as discussed below also raises serious issues with underpolicing**. "To the police, everybody looks suspicious, even the caller. Also, unless the person is actually committing a crime, who's to judge what suspicion looks like?"**[449]

- Respondents directly critiqued the BPD for relying on racial stereotypes. One resident reported that the BPD "[s]tereotyped and falsely accused my son of a violation and hurt him"[450]
- Even respondents who had good interactions with police officers noted harassment and concerns. One resident who reported having a good interaction with BPD officer responded that "[a] lot of my friends are black, hispanic officers, the white ones stereotype."[451]
- Others reported that the law enforcement officers called them names while riding by.[452]

A recent survey of 2,000 residents found that while 74 percent of respondents said they respect the police, 57 percent of people polled feel that police do not respect people of color and half of respondents said they feel police do not respect young people. Only 30 percent of black residents said the police works well with their neighborhood, compared to 82 percent of white residents

According to residents, the checkpoints are there not for public safety and instead are a form of harassment meant to further make community members, and specifically African Amercians, feel uncomfortable in the area in which they have long lived, and to tax them disproportionately. As a result, community members have reported that these checkpoints have undermined trust while distracting much needed resources to crime solving and effectively responding to residents calls reporting and responding real public safety issues. This programmatic and discretionary use of racial stereotypes contravenes the Fourteenth Amendment's command for equal protection under the law. "That law in this country should tolerate use of one's ancestry as probative of possible criminal conduct is repugnant under any circumstances."

These negative interactions between people of color and the BPD has seriously eroded trust: Only 44 percent said they trust the police enough to call them in an emergency.
According to Buffalo State Professor Steve Peraza, who co-authored the report, fear of contacting the police is partly attributable to largely negative interactions many residents have with police. He found that '[a] significant part of the community does not trust the police department because they only encounter them in enforcement circumstances." He concluded that "[u]ntil we can get the community to feel like the police is not just targeting them, the relationship will remain the way it is. That's kind of why we're tempting a Ferguson."[453]

### Race Based Incidents with Impunity

The BPD has also engaged in a pattern or practice of racial profiling based on a pre-disposition held by law enforcement officers who are overwhelemingly white, who believe that minorities, and particularly African-American males, are engaged in criminal activities and violence than whites and therefore, they are stopped

---

[449] UB Regional Institute, *Buffalo Promise Neighborhood Community Needs and Perceptions Survey: Summary of findings* SUNY Buffalo, at 31 (Spring 2014). *Available at* (https://ubwp.buffalo.edu/ubri/wp-content/uploads/sites/3/2015/05/Buffalo-Promise-Neighborhood-Community-Survey-Summary-of-Findings-Spring-2014.pdf)
[450] *Id*. at 36.
[451] UB Regional Institute, *Buffalo Promise Neighborhood Community Needs and Perceptions Survey: Summary of findings* SUNY Buffalo, at 35 (Spring 2014). *Available at* (https://ubwp.buffalo.edu/ubri/wp-content/uploads/sites/3/2015/05/Buffalo-Promise-Neighborhood-Community-Survey-Summary-of-Findings-Spring-2014.pdf) (last visited March 1, 2016).
[452] *Id*. at 36.
[453] Daniela Porat, *Tempting a Ferguson in Buffalo*, Investigative Post (Oct. 31, 2016) (available at http://www.investigativepost.org/2016/10/31/tempting-ferguson-buffalo/ )

and searched without probable cause or reasonable suspicion. This widely held perspective is in line with the same premise underlying the City, BMHA's and BPD's suspicionless mass saturation tactics in minority communities. During such interactions, BPD officers have decided whom to stop, search, or arrest based on race, rather than upon the appropriate consideration of reasonable suspicion or probable cause. Further, when residents have lodged complaints, the BPD has failed to investigate and resolve complaints of racial slurs and racial bias, allowing a culture of racial bias to persist unabated.

**Race Based arrests**

The BPD routinely used a mistaken "dark skinned" or "black male description" as sufficient justification unconstitutionally stop, search and arrest men of color in Buffalo. The Second Circuit has made clear that law enforcement cannot stop a racial minority relying on a tip where the "only obvious physical characteristic" the individual shares with a suspect is the color of their skin. That is, a description based on race and gender alone does not provide sufficient individualized to support reasonable suspicion to justify a stop, much less probable clause for an arrest, and further violates the Equal Protection Clause of the Fourteenth Amendment. [454]

**As a result, African American and Latino community members face constant race based stops, on the street, in their homes, and in their hallways . In practice and in discretionary policing, the BPD applied the same broad stereotyped presumption of criminality to people of color on the East Side, and throughout Buffalo, by subjecting residents of color to arbitrary stops searches, and seizures with no legal justification.**

**Fits description**

The BPD also routinely uses a mistaken "dark skinned" or "black male description" as sufficient justification unconstitutionally stop, search and arrest men of color in Buffalo in violation of the Fourteenth Amendment. The Supreme Court and this Court has made clear that race, when considered by itself and sometimes even in tandem with other factors, is not sufficient to establish reasonable suspicion for a stop and violates the Fourteenth Amendment. [455] Further, the Second Circuit has made clear that law enforcement cannot stop a racial minority relying on a tip where the "only obvious physical characteristic" the individual shares with a suspect is the color of their skin. That is, a description based on race and gender alone does not provide sufficient individualized to support reasonable suspicion to justify a stop, much less probable clause for an arrest, and further violates the Equal Protection Clause of the Fourteenth Amendment. [456]

---

[454] *United States v. Swindle*, 407 F.3d 562, 568 (2d Cir. 2005) (defendant's "entering a known drug house does not suggest that a crime was afoot.").; *Brown v. City of Oneonta*, New York, 221 F.3d 329, 334 (2d Cir. 2000) (allowing plaintiffs to proceed with their Fourth Amendment claims in 42 U.S.C. 1983 suit against city because plaintiffs were apparently seized on account of race, and a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure).

[455] *Id.*; See, e.g., Whren, 517 U.S. at 810 (referring to race as a decidedly impermissible factor[] on which to exclusively base a stop); United States v. Brignoni-Ponce, 422 U.S. 873, 885-87 (1975) (holding that apparent Mexican ancestry of car occupants did not justify stop based on suspicion that they were illegal aliens); Brown v. City of Oneonta, New York, 221 F.3d 329, 334 (2d Cir. 2000) (allowing plaintiffs to proceed with their Fourth Amendment claims in 42 U.S.C. 1983 suit against city because plaintiffs were apparently seized on account of race, and a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure); United States v. Montero-Camargo, 208 F.3d 1122, 1135 (9th Cir. 2000) (en banc) (Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required. ); United States v. Roberson, 90 F.3d 75 (3d Cir. 1996) (no reasonable suspicion to conduct investigatory stop where police relied solely on anonymous tip identifying black man in certain attire and location as drug dealer, and where police officers observed no behavior justifying stop); United States v. Rias, 524 F.2d 118, 121 (5th Cir. 1975) (finding no reasonable suspicion for stopping two back men driving a Chevrolet where sole justification for stop was fact that men fitting that description were suspects in robbery that occurred two to four weeks before stop).

[456] *United States v. Swindle*, 407 F.3d 562, 568 (2d Cir. 2005) (defendant's "entering a known drug house does not suggest that a crime was afoot.").; *Brown v. City of Oneonta*, New York, 221 F.3d 329, 334 (2d Cir. 2000) (allowing plaintiffs to proceed with

111

Discriminatory policing may also take the form of bias-based profiling, in which an officer impermissibly decides whom to stop, search, or arrest based upon race or other protected characteristics, rather than upon the appropriate consideration of reasonable suspicion orprobable cause.

The BPD has consistently engaged in a pattern of wrongful arrests of presumed suspects who, other than being a person of color, did not fit the descriptions. *T*he BPD has frequently justified stops and searches of minorities by using a "suspect description" that is wrong, pretextual or based on nothing more than the color other than race, and sometimes no reasons were provided.  We documented dozens individuals who faced illegal stops, arrests for <u>mistaken</u> identity with strikingly similar patterns. Notably, as described below, the only thing shared characteristic individuals had with the proffered "description" was their race.

Similar to the arrest of the PUSH youth, we documented the BPD making unlawful stops without any suspicion of wrongdoing of young African Americans, but rather on a generalized fishing expedition for any possible *wrong doing, while treating them as if they are assumed to be criminals.*  The following stories were part of a larger  pattern of intrusive law enforcement stops and seizure sof numerous innocent persons on the basis of suspicions rooted principally in the race of "the suspects.

For example, on December 2, 2013, Jeffery E. Campbell II, an African American teenager , was walking home from a friend's house on the East Side in the Bailey-Winspear area was falsely stopped, questioned, and ultimately arrested by BPD officers on who used excessive force.[457] A BPD officer initially approached him, stating to Mr. Campbell that he was investigating a burglary. Mr, Campbell responded "I look like a burglar?" The BPD officer responded by saying "Maybe. Do you?"[458] The officer followed Campbell for almost two miles as he walked home. Mr. Campell protested, and told the officers to "Quit (expletive) harassing me." Subsequently, two more BPD officers arrived, forced him against a police vehicle, and arrested him and charged him with seven criminal counts, including harassment, resisting arrest, loitering, disorderly conduct and obstructing justice. The BPD failed to find any illegal evidence on Campbell.[459]

When he asked what the officers were arresting him, the officers refused. Instead, the officers hit him and struck him in the face times. All charges against Mr. Campbell were dismissed.[460] But Campbell's attorney sees it differently. The police lieutenant approached Campbell because the young black man fit the lieutenant's stereotype of a burglar, he said. Mr. Campbell filed a complaint and brought a lawsuit against the City and policies officers for violating his civil rights. According to his attorney, "I feel this was a classic case of being a young black man in America. That he followed him for 2 miles proves that."

**Eric Hubbard**

their Fourth Amendment claims in 42 U.S.C. 1983 suit against city because plaintiffs were apparently seized on account of race, and a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure.

[457] Susan Schulman, *Racial Profiling a lingering issue for Buffalo*, The Buffalo News, June 8, 2014 (*available at* http://www.buffalonews.com/city-region/police-courts/racial-profiling-a-lingering-issue-in-buffalo-20140608 ); Luke Moretti, *Alleged Victim files new lawsuit against BPD*, WIVB-4, May 28, 2014 (*available at* http://wivb.com/2014/05/28/alleged-victim-files-new-lawsuit-against-bpd/ )
[458] Id.
[459] Id.
[460] Luke Moretti, Alleged Victim files new lawsuit against BPD, WIVB-4, May 28, 2014 (available at http://wivb.com/2014/05/28/alleged-victim-files-new-lawsuit-against-bpd/ )

0117

On June 19, 2014 Eric Hubbard was walking on Gennesee Street, on Buffalo's East side when BPD officers drove by on routine patrol[461] and saw him. The BPD officers subsequently[462] pulled over, got out of their car and approached Mr. Hubbard to ask him for his identification. They subsequently temporarily detained him, in what a Court would later characterize as a *Terry* stop, "and the series of events ended with officers recovering a loaded handgun from the front of defendant's waistband,"[463] for which he was arrested.

In his criminal proceedings, Mr. Hubbard moved to suppress his statements because the BPD officers had engaged in an unconstitutional *Terry* stop without reasonable suppression in violation of the Fourth Amendment. In an order clarifying the grounds for suppression, the Court interpreted the "critical" constitutional issue to turn on "what drew the officers' attention and whether the officers engaged in any coercive conduct."

- Buffalo resident **Darin Thomas** described 3 similar "mistaken identity" unlawful stops by the BPD since Ja,uary 1, 2013.[464] According to Mr. Thomas, each time the police claimed justification for the stop was that "You fit the description of XYZ,"[465] which proved to be pretextual and resulted in a fishing expedition. On one occasion, BPD officers detained Mr. Thomas for 20 minutes while he was on his way home.[466] They illegally searched him and found and seized "1 bag of weed, dumped it" and proceeded to "check for warrants."[467] In response to a question about how the police should be reformed, Mr. Thomas critiqued the BPD dragnet in the African American community as counterproductive: "**We need police that works with the community not arrest every black person you see**."[468]

- Several BPD officers similarly stopped and searched Cameron Pritchett, 17, and three friends got off the subway at the University station on their way to step practice. Pritchett recounted how the BPD officers "pulled us aside and patted us down. We didn't have anything. They wanted to interrogate us."

- The BPD has stopped and questioned, **Christina Valentin**, an African American resident of Buffalo, 15 times since Jan. 1, 2013, only providing consent for 5 of the encounters.[469] Each time, the BPD officials erroneously alleged that she "fit the description" of a suspect and proceeded to question and interrogate her even after it became clear she didn't match the description, as if to search for a justification.[470] In one of the stops, Ms. Valentin sustained injuries when BPD officers forcefully arrested her after she refused to answer questions about a crime that she was being accused of committing which she had no knowledge. Following her (honest) response to the BPD Officer's questions, he During the arrest, he harshly bent her arms during the arrest.[471]

[461] *United States v. Hubbard*, 2015 U.S. Dist. LEXIS 168241 Note judge is presuming—which presumably means routine patrol by car—

[462] United States v. Hubbard, 2015 U.S. Dist. LEXIS 168241 Note-the judge is presuming. The felony complaint does not describe what caught the officers' attention, and it implies that the

[463] and the series of events ended with officers recovering a loaded handgun from the front of defendant's waistban

[464] IHRC/Cornell Law Interview with Darin Thomas, January 29, 2016. (Interview notes on file with author)

[465] *Id*.

[466] *Id*.

[467] *Id*.

[468] *Id*.

[469] IHRC/PUSH Interview with Christina Valentin, November 21, 2015. (Interview notes on file with author)

[470] IHRC/PUSH Interview with Christina Valentin, November 21, 2015. (Interview notes on file with author)

[471] IHRC/PUSH Interview with Christina Valentin, November 21, 2015. (Interview notes on file with author)

113

- The BPD also illegally detained African American Buffalo resident, John Doe 1, four times in the last two years without his consent, based on an erroneous suspect match and even for no reason at all.[472] In each of these encounters, BPD officers spent little time asking questions regarding the claimed suspect match, but rather "ask[ed] if I had anything like guns, drugs, asked where I was coming from where I was going."[473] Similar to Jeffrey Campell's encounter with the BPD, when they "pressed [him] to answer questions about a crime he didn't commit, BPD officers "followed and harassed" him.[474]   He has been arrested and cleared of false charges.   In reflecting on his experiences with the BPD, he noted that"[t]hey are very unfair to People of color and low income people of color"

Unfortunately, there are numerous other reported similar examples of the BPD's unjustified suspicionless and arbitrary stops, false arrest, of African Americans and people of color with brutal excessive. Many of these encounters were unprovoked, or based on the BPD's generalized.  For example, on Feb. 11, 2014, Theo Brown-Harris went to BMHA's Schaffer Village upon hearing that a relative was being arrested.[475] Upon arriving, a BPD officer the instructed him to leave the area. As he was walking away, two additional BPD officers confronted him; the first, who he believed to be BPD Officer William Macey, requested his name and address and the second demanded that he remove his hands from his pockets. Mr. Brown-Harris immediately complied with the directives by putting his hands over his head. Unprovoked, one of the BPD Officers struck him over the head from behind, causing him to lose consciousness. Upon regaining consciousness, Mr. Brown-Harris was lying on his stomach being "beaten, kneed and kicked about the face, head and person"[476] by several officers, including BPD Officer Macey.

BPD Officers then handcuffed Mr. Brown-Harris and transported him to the BPD Housing Unit Office at BMHA Commodore Perry Homes (which is also ho me to Operation Strike Force). En route, Mr. Brown-Harris asked to be taken to the hospital because he was in pain and bleeding from several places on his face, head and mouth, which the BPD Officer denied.[477] Mr. Brown-Harris then asked the BPD officer for his name, to which the BPD Officer "replied by verbally assaulting and threatening"[478] him.  When he arrived at the substation, his ordeal did not end: not only was Mr. Brown-Harris denied medical treatment when he complained of dizziness, pain and continued bleeding, but BPD officers continued to beat and interrogated him, handcuffed, and falsely arrested him.[479] BPD Officer *Breyers* took him outside, while still handcuffed, and placed him in the back seat of a BPD police car and questioned him.[480] When Mr. Brown-Harris explained that he had no knowledge of any illegal activity, *BPD Officer Breyers* opened the door of the police car and began to repeatedly kick the Plaintiff in the face and side of his body.  Instead, BPD officers took him to the Erie County Holding Center , where he was charged with various crimes all of which were dismissed.[481]

---

[472] PUSH/IHRC Interview, November 21, 2015. (Interview notes on file with author) – [Lawrence Chatmon-consent not given]

[473] PUSH/IHRC Interview, November 21, 2015. (Interview notes on file with author) – [Lawrence Chatmon-consent not given]

[474] PUSH/IHRC Interview, November 21, 2015. (Interview notes on file with author) – [Lawrence Chatmon-consent not given]

[475] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015) – check status/docket
[476] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015) – check status/docket
[477] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015) – check status/docket
[478] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015) – check status/docket
[479] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015) – check status/docket
[480] Before he was questioned, a BPD officer took him to the bathroom to attempt to remove blood from his face and clothing.

[481] *Brown-Harris v. City of Buffalo, et al*, Dkt. No. 1:15-cv-00122 (W.D.N.Y., filed Feb. 10. 2015) – check status/docket

-  On April 19th, 2013, John Willet, after feeling from police while possessing illicit drugs following a vehicle stop ecided to surrender to the Buffalo Police Officer giving chase[482]. Subsequently, the arresting officer John Cirulli tackled then John Willet and proceeded to "slap" and "kick" Willet repeatedly[483]--after he was handcuffed.

-  On August 29th, 2010, Marcus A. Worthy, a security guard trainee, was standing on the porch of private property with a licensed pistol on his hip in its holster, when he was approached by Buffalo Police Officers Krug, Macy, Herbert, Paskiewicz, and Jones, who were all responding to a domestic dispute that had taken place at a nearby location[484]. The domestic dispute call concerned a man brandishing a sword[485]. Upon seeing Mr. Worthy, the Officers knocked him down by striking him from behind, placed him in handcuffs, seized his firearm, and struck him in the head multiple times using the Police-Issued metal flashlights[486]. Prosecutors presented possible charges against Worthy to a Grand Jury, including Resisting Arrest and Obstructing Governmental Administration, but the Grand Jury voted to dismiss all charges against Mr. Worthy[487].

## Express Classification: BMHA and the BPD Housing Unit, and Irregularities/Mass Evictions

Also reflecting the City's larger racial bias, in January 2014, the Buffalo Municipal Housing Authority (BMHA) and the City of Buffalo submitted a controversial proposal to HUD to transform one of its prime waterfront public housing properties, Perry Commodore Homes into a destination of "choice" by explicitly proposing to "decrease the concentration of minority (African American) population in the Perry neighborhood," and relied on race-based stereotypes in advancing the proposal[488] The proposal, entitled the Perry Choice Improvement Plan sought to redesign Perry, which **is** located on the Erie Canal in the Southern portion of Buffalo's predominantly African American East Side.

Currently, 80% of Perry's 971 residents are African American, 14% are Latino and the remainder of the population is white,[489] and approximately 42% of the residents live at or below the poverty line.

The Perry Transformation Plan fund sought to "revitalize" of Perry and he surrounding neighborhood with commercial development, additional units and more white and more mixed income families. It explicitly included as one of its "Goals, Outcomes and Metrics" the plan's goal of "[d]ecrease concentration of minority (African American) population in the Perry Neighborhood" for the long term goal of "making it similar to [the] rate in the city as whole," and to decrease the number of tenants who receive federal benefits

---

[482] Luke Moretti, Man speaks out after alleged police brutality, WIVB (April 28, 2014, 12:37 PM) http://wivb.com/2014/04/28/man-speaks-out-after-alleged-police-brutality/

[483] Id.

[484] Decision and Order, Worthy v. City of Buffalo, et al., Docket No. 11-CV-872A (SR) (W.D.N.Y. Sept. 16, 2014)

[485] Id.

[486] Id.

[487] Id.

[488] Buffalo Municipal Housing Authority, *Perry Choice Neighborhood Transformation Plan* at 30, 34. (June 2013). (*available at* https://ubwp.buffalo.edu/aps-cus/wp-content/uploads/sites/16/2015/04/BMHA_Buffalo_Perry_Choice_Transformation_Plan_FINAL-June-27-2013.pdf). BMHA began develolping the plan in 2012 with UB's Center for Urban Studies after securing a $250,000 Housing and Urban Development Choice Neighborhoods planning grant. Despite the racially exclusionary provisions, the resulting Perry Choice Neighborhood redevelopment plan, chad a number of positive aspects by seeking to create an environment that will improve the lifestyle and opportunities of public residents; according to Dr. Henry Taylor, director of the UB Center for Urban Studies and an author of the plan, "the plan will help neighborhood residents "develop high levels of critical consciousness" so they can understand the economic and political forces at work in their community." *See* Office of Policy Development and Research, *University at Buffalo Supports Neighborhood and Regional Growth*, U.S. Department of Housing and Urband Development Office of Policy Development and Research (available at https://www.huduser.gov/portal/casestudies/study_03242014_1.html ).

[489] Buffalo Municipal Housing Authority, *Perry Choice Neighborhood Transformation Plan* at 3-5, 47-8. (June 2013).. (*available at* https://ubwp.buffalo.edu/aps-cus/wp-content/uploads/sites/16/2015/04/BMHA_Buffalo_Perry_Choice_Transformation_Plan_FINAL-June-27-2013.pdf). The median income for Commodore Perry Householdsis about $9,500 annually and the average is $11,300. *Id.*

115

and are enrolled in food stamps.[490] In a BMHA Council meeting, BMHA Executive Director Modesto Candelario confirmed that the plan would requiring displacing African American residents, even though the plan proposed replacing the existing 222 public housing units with 414 public housing units and an additional 415 mixed-income units.[491]

The Plan justifies the displacing African American and minority tenants from public housing through a "diversity rationale," and through a problematic racially coded, denigrating notion that increasing the number of white and middle-income residents can approve the standard of living for minority residents. Specifically, the Plan suggests that exposing African American residents and youth to "community norms, standards and values," ostensibly created by the new white, middle class residents will improve the neighborhood-level crime problems among minority youth and "low-aspirational level among many blacks and Latinos." Specifically, the Plan states the strategy will be effective because the new, white "community residents will engage young people in a battle of ideas, with the goal of getting them to adopt community norms standards and values." Noting that neighborhood development and public safety must march in tandem, the proposal called for increased "hot spot" policing strategies, which are already in place in Buffalo. In 2014, HUD rejected the Perry Plan because, according to the Buffalo News, the Plan "stated that diluting the concentration of African Americans was an objective of the project."[492]

As BMHA was developing the Perry Choice Plan and even after its submission in January 2014, BMHA also began moving ahead with it by closing an increasing number of units and and letting units go into disrepair, resulting in the displacement hundreds of tenants to other Perry apartments and to BMHA units, 92% of which are in African American neighborhoods—despite having a waitlist.

- In January 2014, both elected and appointed BMHA Tenant Council members criticizedthe Perry Plan as a racially discriminatory effort to displace the predominantly African American current residents[493] Despite these concerns, BMHA submitted the plan to HUD in January 2014, which it rejected shortly thereafter.

Despite HUD's rejection of this plan, the BMHA has continued to pursue this racially biased plan both formally in seeking funding, but also through engaging in intensified suspicionless policing and illegal stops and trespass arrests (as described above), as well as mass evictions. Beginning in 2013, BMHA began an unprecedented number of eviction proceedings against BMHA residents . In 2014, BMHA filed 4026 civil law suits in New York state courts[494] which, according to housing attorneys and a review of court records, were largely eviction proceedings against BMHA tenants.[495] The high number of BMHA eviction cases is significant, as BMHA only had 4,332 units in 2014. Put differently, BMHA 4,026 represented 93% of all BMHA tenant units. BMHA filed so many lawsuits that year that it ranked as the Ninth most prolific civil filer in New York State; ranking BMHA above NYCHA.[496]

---

[490] *If.* The plan also sought to decrease the number of tenant households receiving benefits and participating in safety net program, as measured by the percent of households nenrolled in food stamps, TANF, and SSI—in direct contravention to the purpose of public housing.

[491] Harold McNeil, *Plan to 'diversify' Perry neighborhood raises fears*, The Buffalo News, Jan. 26, 2014 (available at http://mobile.buffalonews.com/?articleRedirect=1&url=http%3A%2F%2Fwww.buffalonews.com%2Fcity-region%2Fbuffalo%2Fplan-to-diversify-perry-neighborhood-raises-fears-20140126 ). Notably, the plan had several positive features to improve the life of Perry residents

[492] The Buffalo News (April 11, 2015)

[493] Harold McNeil, *Plan to 'diversify' Perry neighborhood raises fears*, The Buffalo News, Jan. 26, 2014 (available at http://mobile.buffalonews.com/?articleRedirect=1&url=http%3A%2F%2Fwww.buffalonews.com%2Fcity-region%2Fbuffalo%2Fplan-to-diversify-perry-neighborhood-raises-fears-20140126 )

[494] Chris Albin-Lackey, *Rubber Stamp Justice: U.S. Courts, Debt Buying Corporations, and The Poor*, Human Rights Watch, at 14-15 *available at* https://www.hrw.org/sites/default/files/report_pdf/us0116_web.pdf (last visited Feb. 18, 2016).

[495] Chris Albin-Lackey, *Rubber Stamp Justice: U.S. Courts, Debt Buying Corporations, and The Poor*, Human Rights Watch, at 14-15 *available at* https://www.hrw.org/sites/default/files/report_pdf/us0116_web.pdf (last visited Feb. 18, 2016).

[496] HUD OIG, available at https://www.hudoig.gov/sites/default/files/documents/2015-NY-1003.pdf

116

Notably, tenants and leading housing legal service attorneys note that the number of BMHA civil eviction proceedings may not represent the number of individuals who faced eviction because during this time, BMHA often sued tenants multiple times for back rent.  Nonetheless, legal service directors and tenants both confirm BMHA has initiated an increasing and record number of eviction civil suits against tenants since 2012 leaving hundreds of BMHA's overwhelmingly African American and Latino residents and families without homes.   From 2010-2014, for example the BMHA tenant docket for Neighborhood Legal Services, the largest area free legal service providers for BMHA tenants, grew by 87%, or from 770 in 2010 to 1441 in 2014.[497] During the three full years of the study period (1/1/13-1/1/16), WNY Legal Services represents tenants in 3940 eviction proceedings, increasing by more than 900 (32%) over the 2988 cases it handled the three years prior to the study period.[498]


## The Historical Background and Sequence of Events Leading Up to Unconstitutional Zero Tolerance Tactics Demonstrates The City of Buffalo's Racial Animus

The historical background of discriminatory policies or practices against a protected group is evidence of discriminatory intent, "particularly if it reveals a series of official actions taken for invidious purposes." Arlington Heights, 429 U.S. at 267; Mamaroneck, 462 F. Supp. 2d at 548 (village had been historically tolerant of day laborers until laborer population shifted from Caucasian to Latinos); Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish, No. 06cv7185, 2011 WL 4915524, at *3 (E.D. La. Oct. 17, 2011) (predominantly Caucasian Parish took multiple
**The "specific sequence of events leading up the challenged decision" is also relevant to discriminatory motive**. Id. Reitman v. Mulkey, 387 U.S. 369, 373-376, 87 S.Ct. 1627, 1629-1631, 18 L.Ed.2d 830 (1967); Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936).


## History and Contemporary Context of Discrimination, Inequality: The pattern and practice of BPD misconduct mirrors historic racial discrimination against people of color based on their race

The City of Buffalo anti-African American and anti-minority racial animus is not new. Unfortunately, the City of Buffalo has a long history of similar discrimination – especially during times of inequality, which is considered evidence of impermissible racial animus in violation of the Equal Protection Clause and Arlington Heights analysis. See White, 412 U.S. at 765-69 (holding that the "totality of circumstances," including Texas's long history of discrimination against African-Americans and Latinos in the political process, demonstrated that the election scheme was "used invidiously" to dilute minority voting strength); Hunter, 471 U.S. at 229 (considering evidence that "the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks"). The racial disparities and discrimination "exist in the context of the BPD's long history of biased policing activity and targeting innocent residents based on their representation on crime data[499]

The population of Buffalo, like other Northeastern and Midwestern rust belt cities,  peaked in 1950, and the minority population (the substantial majority of whom are African American), has consistently

---

[497] Interview and emails with Buffalo Neighborhood Services Supervising attorney Grace Andriette, January 29, 2016 (emails on file with author).

[498] Interview and emails with Buffalo Neighborhood Services Supervising attorney Grace Andriette, January 29, 2016 (emails on file with author).

[499] Davis v. City of N.Y., 959 F. Supp. 2d 324, 362-64 (S.D.N.Y. 2013) (denying City's motion for summary judgment on Equal Protection Claims)

117

increased over the past several decades—until the last census, where the African American population fell for the first time in Buffalo's history. According to the 2010 census, Buffalo is now multiracial majority: Just below 46% of the city today is white, with African Americans and Latinos making up roughly 37% and 10% of the population, respectively.

Contemporary context

As a result of these policies, Buffalo is the nation's sixth most segregated city, and is considered a hypersegregated city.[500] The majority of Buffalo's African American population lives on the "East Side," which is East of Main Street.[501]  Buffalo also has the third highest poverty rate of U.S. major cities, and child poverty rate, with a *31.4%* poverty rate. Minorities are more likely to live under the poverty rate: 39.8% of African Americans and 47.8 % of Latinos residents in Buffalo live under the poverty line, [502] compared to 19% of whites[503] *In the 2000 census, 18.3% of whites, and 34.4% of African Americans lived under the poverty rate.  As of 2014, 41.2% of African Americans and 47% of Hispanics live under the poverty line, cinoared ti 19% iof whites*

Not only do African American and Latinos in the Buffalo region suffer twice the poverty rate and half the median income as whites, but these disparities have been accelerating, despite substantial public and private investment in Buffalo.  According to the 2017 Urban Institute's annual State of Black America report, the white median white household income in the Buffalo region rose from $55,822 to $58,998, while the African American median household income fell from $28,976 in 2016 to $26,936 in 2017. As a result, Buffalo fell to the 6th most racially unequal region in the in the nation for the black-white income disparity, falling from 46th in the nation to 66. The racial disparity in child poverty is even larger with child poverty. Buffalo also has the third highest child poverty rate among American cities. with almost half of Buffalo's children living under the poverty rate (47.6%)[504] Despite substantial state and private investments, in Buffalo the racial inequality unemployment index from the 27[a] "most equal" region America last year to 57.  White unemployment rates fell from 5.2% to 4.2%, while Black unemployment remained stagnant at 11.2%. [505] As a result, the Black-White Inequality Index in the region fell from 46.4% to 37.5%--about half of the national average.

The level of racially concentrated poverty has also increased over time. The overall concentration of African-American poverty in the Buffalo-Niagara Falls metro area jumped about 16 percent from 2000 to 2013; in 2000, it was 30.8 percent and in 2013 it was 46.4 percent. For Hispanics, concentrated poverty rose from 39.4 percent to nearly 41.6 percent.[506]The City of Buffalo also has one of the nations the highest concentration of minorities who live in poverty, with some minority neighborhoods with poverty rates of 60-

---

[500] http://buffalonews.com/2015/07/08/tackling-the-regions-racial-divide/

[501] University at Buffalo Regional Institute's '*A Community Report- City Of Buffalo (East Of Main Street)*' (February 2014) available at http://regional-institute.buffalo.edu/wp-content/uploads/sites/3/2014/06/Strengthening-WNYs-Safety-Net-Buffalo-East.pdf at

[502]G. Scott Thomas, *Buffalo's poverty rate tops 30 percent, making it America's third-poorest city*, Buffalo Business First (Jan. 2 2014) (available at https://www.bizjournals.com/buffalo/news/2014/01/02/buffalos-poverty-rate-tops-30.html ). ("Business First used raw data from the Census Bureau's five-year American Community Survey to calculate poverty rates for the country's 74 major cities, defined as those cities with populations in excess of 250,000.)

[503] NYS Community Action Poverty Report at 76 (2017) (available at http://nyscommunityaction.org/PovReport/2016/Poverty%20Report_2017_Master%20Doc.pdf)

[504] G. Scott Thomas, *Poverty rate for Buffalo children approaches 50%, the third-worst mark among major cities*, Buffalo Business First (June 25, 2015) (available at https://www.bizjournals.com/buffalo/news/2015/06/24/childpoverty1.html).

[505] Urban League, *State of Black America Report* at 21  (available at http://soba.iamempowered.com/sites/soba.iamempowered.com/themes/soba/pdf/SOBA2017-black-white-index.pdf) . These figures are based on an assessment of the Buffalo metropolitan area, which includes Buffalo-Cheektowaga-Niagara Falls, NY.

[506] Callan Gray, *New study shows Buffalo has one of the highest minority poverty rates*, WIVB, Channel 4 (Sept. 7, 2015) (available at http://wivb.com/2015/09/07/new-study-shows-buffalo-has-one-of-the-highest-minority-poverty-rates/)

118

80 percent – nearly double the rate of neighborhoods in 2000.[507] On the East Side, where 90% of the African American residents in Erie County live, people of color are 30% more likely to live at 0-138% of the federal poverty line than whites. Whites are also more likely to own a home; 57% of whites are homeowners, compared to people of color whose home ownership rate is 37%.[508]

**History**

These inequalities are rooted in Buffalo's deep history of racist private and public actors; the City, Common Council and Housing Authority, as well as the police have passed laws and policies and engaged in practices designed to exclude, demean and systematically target people of color based on community animus, fear, and prejudice. Courts and society have repudiated those past episodes of unequivocal discrimination, recognizing that racial equality is core to a democratic system and many of those projects unconstitutionally discriminatory. The animus motivating the Buffalo police practice reflects the same kind of animus that motivated racially discriminatory policies and laws of the City's past. The City has, for decades intentionally discriminated and harmed Buffalo's African American community through disinvestment and misguided and illegal policies which have displaced and isolated Buffalo's minority residents from access to opportunity.

From the outset of its public housing program, the City, with federal officials, engaged in persistent and widespread formal and informal discrimination against African Americans. Practices dating back to the 1930s, such as redlining, which excluded African American households from getting home loans, helped create "a permanent low-income African American community on Buffalo's east side." Likewise,as described below the expansion of the highway system following World War II cut a path through neighborhoods of color, destroying businesses and displacing residents in the process. By the mid-1930s, it had several public housing developments throughout the city, but the City prohibited African Americans to live in any of the developments except for Willet Park, located on the lower East Side of Buffalo, which was then predominantly African Americans. As public housing expanded in 1941-1942, white people in Buffalo borhoods throughout Buffalo mobilized to successfully prevent any additional public housing buildings in their neighborhoods – even for African American veterans; after white residents opposed, the new public housing development was placed adjacent to Willet.

Historian Mark Goldman history recounts Buffalo at Mid-Century as a city rife with racial tension, discrimination and high levels of segregation. During with Second Great Migration, he describes the rush of whites to leave the City: "[b]etween the end of the war and 1950, whites were leaving the city at the rate of twenty-two per day, a more rapid rate, according to the Urban League, than any other city in the country."[509] When white families left the East Side to the suburbs, African Americans were able to buy their homes – mostly on the East Side. Between 1940 to 1970, approximately 198,000 whites left Buffalo, while 75,000 African Americans moved to Buffalo, increasing the proportion of African Americans from 2.4 percent to 20.4 percent of the overall population. [510]

The City's early racially discriminatory anti-integration sentiment cemented segregation, but the City has continued to advance complete segregation in public housing. In 1989, civil rights advocates sued the BMHA and HUD for intentionally discriminatory practices that resulted in the systematic segregated African Americans and people of color by enforcing segregation from whites. *Comer v. Kemp*, 824 F. Supp. 111). The plaintiffs argued that they were denied equal access to public housing; African Americans in Buffalo

---

[507] Callan Gray, *New study shows Buffalo has one of the highest minority poverty rates*, WIVB, Channel 4 (Sept. 7, 2015) (available at http://wivb.com/2015/09/07/new-study-shows-buffalo-has-one-of-the-highest-minority-poverty-rates/)

[508] Neighborhood Preservation Coalition of New York State. *Housing and Poverty Snapshot: Buffalo, East Side, NY* at 3 (*available at* http://npcnys.org/wp-content/uploads/2016/03/EAST_BUFFALO_snapshot.pdf)

[509] Mark Goldman, City on the Edge: Buffalo, New York (Amherst, New York: Prometheus Books, 2007), 154.

[510] http://history.buffalo.edu/wp-content/uploads/sites/30/2016/02/FINAL-Segregation-Along-Highway-Lines-by-Will-Fox.pdf

119

had far more limited access to and long waits for Section 8 assistance, whereas White residents were provided many more affordable housing opportunities. The BMHA settled the case in 1997 through a consent decree in favor of the plaintiffs. However racial segregation has persisted – and as described above policing of predominantly minority communities with unconstitutional tactics has persisted. Numerous studies have documented both persistent public and private housing discrimination and lending practices, and perceptions among people of color that they do not feel that they can access all white neighborooods without attracting police attention.[511]

In addition, just as in today, the City's last Urban Renewal program in the 1950s and 1960s also negatively and disproportionately harmed African Americans. Both elected city officials and business designed plans to "clean up" (105) Buffalo and the downtown area by displacing thousands of African Americans through a demolition project completed in 1961.  The Project displaced 2219 families, over 80% of who were African Americans in a 36-square block area on the lower east side. However, after demolition, the City kept the land vacant –pushing more African American families into more concentrated poverty on the East Side. (105)

This history is especially relevant here because City officials, in advocating in favor of broken windows policing, has explicitly invoked these same sentiments in the last period of the City's renewal.

As these changes were occurring, City officials also engaged in racial discrimination in the distribution of resources locally, with African American neighborhoods historically receiving a disproportionately low investment, compared to large investments in predominantly white areas. The City has a history-that continues into today of "failing to pave streets, fix sidewalks, or maintain streetlights or parks," leading to a lower quality of life.[512] When the City directed and allowed capital investment in predominantly minority communities, was not and has not been positive and minorities have seen another round of displacement.

Further, in designing Buffalo's emerging highway infrastructure, the City and other government officials "decimate[d] communities and break up emerging bases of political and economic power within the minority community." The construction of Buffalo's highways "served to displace and disconnect emerging bases of African-American political power, .. undercut economic opportunities and activity within [minority] neighborhoods by allowing traffic (and customers) to quickly bypass  [East Side] neighborhoods for new autocentric commercial development." (31) The construction of the old Humboldy Parkway, or Route 33 (also known as the Kensington Expressway) was especially damaging to Buffalo's African American community because it cut off-and right through-African American communities on the East Side, including BMHA developments. The  old Hunbold Parkway, designed by Frederick Law Olmsted as a series of public parks, connected the East Side to the West Side by a wide, three lined parkway. This was was "the spine of emerging black middleclass neighborhood of Hamlin Park and its link to the great public spaces of The Parade (now MLK Park) and Delaware Park." *Id.* at 30-31.

In the 1950s and 60s, City planners and officials developed and agreed to replace this beautiful linear tree-lined Parkway with a concrete limited-access highway. Before the expressway was built, "Humboldt Park was one of Buffalo's only integrated, middleclass neighborhoods." The highway was completed in 1967—around the same time of several major civil rights demonstrations in Buffalo. The civil rights protests and "riots" emerged in part due to the persistent Public and private continued discrimination in lending, housing, and education, coupled with a Buffalo's ongoing urban renewal projects that uprooted and displaced many low-income minority neighborhoods. The racial tension prompted even more discrimination,

[511] Daniel Trudeau, *The Persistence of Segregation in Buffalo* (available at https://ppgbuffalo.org/files/documents/equality_civil_rights/race/equalitycivilrights-_the_persistence_of_segregation_in_buffalo__new_york.pdf); Race and Space
[512] One Region Forward http://uploads.oneregionforward.org/content/uploads/2015/01/FHEA.pdf

as "planning officials allowed concrete barriers and high-speed traffic to split the economic and social fabric of several East Side neighborhoods." (Inequity in Planning at 3)

Similar, the design and construction of Interstate I-190 divided and disrupted communities on the west side. It was created simultaneously to "urban renewal projects" described above that sectioned off low-income, predominantly minority subsidized housing from the rest of the city. The expressway severed these communities access to downtown, and divided West Side neighborhoods from the waterfront. Further, the 190 has lead to persistent environmental racism. The highway connects to the Peace Bridge connecting the US to Canada, which has become a central route for large trucks bringing freight across countries. As a result minority populations in that area are now subjected to high volumes of car and truck emissions. Studies have shown that this has had a serious health impact and that "increased exhaust exposure to communities impacted by international trade expansion through exposure to black carbon, particulate matter and ultra-fine particulates." (OR 31)

As in Buffalo's history when de jure inequality was legal, local and state public officials and private actors continue to-and even work together to actively and intentionally discriminate against African Americans and Latinos in violation of the Equal Protection of the Fourteenth Amendment. The City of Buffalo, working with other government actors have developed and implemented policies that have been **increasing racial inequalities.** The driving forces behind this are both public and private discrimination and the adoption of pernicious racial stereotypes deeming African Americans and people of color in Buffalo as inferior and incapable.

## BPD's and BMHA's Discriminatory Policing Involves Irregularities and Departures from Official BPD Policies and Procedures

Under *Arlington Heights*, departures from normal procedures are relevant evidence in determining the existence of invidious discriminatory intent. "Substantive departures exist when 'factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached." Magee, 835 F. Supp. 2d at 1186 (quoting Arlington Heights, 429 U.S. at 267). Further. evidence that a decision-making body's challenged conduct does not further its own interests supports a finding of discriminatory intent. *Id.* Below are examples of BMHA and BPD's significant departures from prior substantive and procedural sequences, which point toward invidious discriminatory purpose.

These irregularities and departures include:

- BPD HU has departed from its statutory and contractual agreement to engage in Community Policing at the Buffalo Municipal Housing Authority, and instead focusing on mass arrests, checkpoints and and illegal sweeps. In addition, BMHA residents and the East Side generally report consistently long wait times. [513]
  - Highly disproportionate arrests by BPD HU

---

[513] § 13-9 ("The department of police shall be charged with the power and duty to preserve peace and good order in the city, to prevent so far as possible violations of law, to detect and apprehend all persons violating the law, to protect the rights of persons and property and to safeguard the public health."),

0126

- Departure of the BPD to get Accredited, in violation of the Common Council Charter's requirement that it is accredited[314]

- Failure of BPD Commissioner Derenda to hold any officer to account (until this week), despite the fact that it his  primary duties of Commissioner under Buffalo City Code[315]

- Departure from its substantive duty to solve crimes: In 2014, Buffalo had its highest homicide rate, with 62 killed (notably this was while the BPD was conducting daily checkpoints and wrote a record number of tickets). However, the BPD only solved 14 of those 62 killings - less than a 25 percent clearance rate. [316]

- Abdication of Citizens Commission-the only watchdog within the BPD to conduct its statutorily proscribed duties.

- Fostering mistrust; authorities attribute the low clearance rate largely to a lack of cooperation among people of color. According to Caitlin Blue, of Just Resisting: "We're seeing people who are scared to call the police because they don't know what type of officer we're going to get,"" she said. "Are they going to get somebody who is willing to be patient with them, to de-escalate or are they going to get somebody who is going to escalate the situation and somebody ends up dead?"

**Undermined public safety, failed to take-and even obstructed action**

Further, the City and BMHA has demonstrated deliberate indifference to the ineffectiveness of these tactics on public safety. Community members, local organizations, and even political candidates have both repeatedly raised serious concerns and proposed solutions to Mayor Brown and the Common Council that the City's broken windows practices have undermined and distracted from public safety. For example, two separate think tank reports, and Mayor Brown's opponents in the 2013 election have all recommended that uniformed police walking a beat in a neighborhood would be an important first step towards real public safety, community-responsive policing, and restoring trust.

As further proof of discriminatory intent, the City's highest officials have not only directed racially discriminatory practices, but have turned a blind eye to the consistent reports, testimony and cases that BPD officers are conducting trespass enforcement and other practices in a racially discriminatory manner. In BMHA and City's rush to promulgatie policies that saturate minority communities they believe to make the City safe for "new residents and businesses," they have willfully ignored overwhelming proof that the policy of targeting racial minorities is racially discriminatory and therefore violates the Fourteenth Amendment. Further, these policies have not just been ineffective, but have hurt minority communities and imposed a substantially financial and personal toll on minority communities.

The Buffalo Common Council recognized the severity of the BPD's discriminatory unconstitutional conduct based on testimony of residents, lawyers and advocates, as well as multiple lawsuits, but nonetheless not only failed to take action but renewed the BPD-BMHA contract in 2015 after repeated complaints to

---

[314] § 13-18 ("The commissioner of police shall seek, obtain and maintain accreditation of the department of police by an agency or organization generally recognized and accepted by law enforcement officials in New York for certifying compliance with generally accepted law enforcement training, policies and procedures and other relevant techniques and methods of operation."

[315] Buffalo CC § 13-4 ("The commissioner of police shall be charged with the power and duty of governing and disciplining the department and the members of the police force and all subordinates and employees of the department, and to that end may, from time to time, make and enforce orders, rules and regulations not inconsistent with this act or any general law, which orders, rules or regulations shall have the same force and effect as if herein specially enacted. Existing rules and regulations shall continue until changed.").

[316] Lou Michel, *Buffalo homicides spike, claiming 62 lives in 2014*, The Buffalo News (Jan. 13, 2015).

0127

Common Council and the Mayor. The Buffalo Common Council even recognized the severity of BPD misconduct, but nonetheless renewed the BPD-BMHA contract in 2015. For example, in response to community concerns, Council President Darius G. Pridgen stated: "If we know we have a problem [with the BPD BMHA Unit] and the system we have right now is not working, then you don't continue the same system and leave people as almost prisoners in their homes." [517]. Then University District Councilman Rasheed N.C. Wyatt stated:  "I've been to Kenfield-Langfield, and talked to the people. "We have to listen to them, so people feel comfortable and safe. Right now they don't feel safe." [518] Nonetheless, the Common Council approved the renewa, and increased its payment to the BPD from $660,000 to $1,000,000.

## First Amendment-Retaliation

"The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." [519]

**BPD officers also routinely infringe on the public's First Amendment rights by retaliating against those who speak out and preventing people from recording and photographing their activities.** The First Amendment "prohibit[s] the government from limiting the stock of information from which members of the public may draw." [520]

- In July 2017, the Buffalo Police Department's (BPD) retaliated against Dorethea Franklin for appearing on a TV interview on June 23, 2017 critiquing the BPD's use of checkpoints. She described how there was a checkpoint outside her house every Sunday for four years, and how it made her feel like she was in a "police state."  The interview was with TWC-Spectrum News, a local news channel that has 24 hour local news and was aired on June 23, 2017 in a segment entitled, entitled "Are Buffalo Check Points Targeting the East Side?" [521] During her television appearance, Ms. Franklin made statements critical of the checkpoints and described how the BPD operated a checkpoint outside Ms. Franklin's house every Sunday since around 2013. She was the only non-government or political official featured in the segment. Mayor Brown appeared in the segment right after her interview, defending the BPD Checkpoint Program as non-discriminatory.
  - Following her interview, the next time BPD officers set up a checkpoint, it was on a Friday and they entered her property and issues four civil violations during the checkpoint: ticketing a car parked in her driveway, and three other civil violations, for offenses including her sidewalk in disrepair, misplaced trash can, and long grass in her backyard.

**The BPD has also engaged in a pattern and practice of retaliation against Buffalo residents who have witnessed, recorded or tried to intervene in incidents of police misconduct**

Federal courts have found that the First Amendment "unambiguously" establishes a

---

[517] Matt Gyrta, *Kenfield-Langfield residents ask for more police presence*, The Buffalo News (Sept 3, 2015) (*available at* http://buffalonews.com/2015/03/14/kenfield-langfield-residents-ask-for-more-police-presence/ )/

[518] Matt Gyrta, *Kenfield-Langfield residents ask for more police presence*, The Buffalo News (Sept 3, 2015) (*available at* http://buffalonews.com/2015/03/14/kenfield-langfield-residents-ask-for-more-police-presence/ )/

[519] Hill, 482 U.S. at 463.

[520] First Nat'l Bank v. Belloti, 435 U.S. 765, 783 (1978).

[521] LaMonica Peters, *Are Buffalo Check Points Targeting the East Side?*, Spectrum-TWC News (June 23, 2017) (available at http://www.twcnews.com/nys/buffalo/news/2017/06/22/buffalo--east-side--dorethea-franklin--byron-brown--mayor--taniqua-simmons--mark-schroeder--betty-jean-grant--traffic--check-points--tickets--police.html ).

123

constitutional right to videotape police activities. [522] Indeed, as the ability to record police activity has become more widespread, the role it can play in capturing questionable police activity, and ensuring that the activity is investigated and subject to broad public debate, has become clear. Protecting civilian recording of police activity is thus at the core of speech the First Amendment is intended to protect.[523]

In Buffalo, however, officers routinely violate the First Amendment by seizing cameras, and even arresting those who videotape the police, without any factual support that the use of camera phones endangers officer safety. Sometimes, officers offer no rationale at all. Video recordings and numerous incidents establish that BPD routinely violates individuals' rights to record police activity.

BPD's suppression of speech reflects a police culture that relies on the exercise of police power—however unlawful—to stifle unwelcome criticism. Recording police activity and engaging in public protest are fundamentally democratic enterprises because they provide a check on those "who are granted substantial discretion that may be misused to deprive individuals of their liberties." [524] The Supreme Court has made clear that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."[525]

- On Dec. 7, 2016, now former BPD Officer Roger Eloff was sentenced to three months in jail followed by three months of home confinement for false imprisonment and illegally retaliating against Donald Hall, a witness to a fatal incident at Molly's Pub. The incident occurred in May 2014, while BPD Officer Eloff was off-duty and working as a security guard at Molly's Pub. During the incident, the bar manager, Jeffrey Basil, pushed William Sager, Jr. down a flight of stairs, who died soon after the incident. When Donald Hall, a friend of Mr. Sager's attempted to help his friend, BPD Officer Eloff handcuffed and falsely arrested him for trespassing. The DOJ subsequently brought criminal civil rights violations against Eloff, who *subsequently pleaded guilty*[526] and is currently serving his sentence
.

- On March 16, 2014, Buffalo police officer Robert Eloff grabbed and destroyed phone a woman's phone cellphone as she was using it to record Buffalo police officers "slam a woman down on the ground."[527] The woman, who wished to remain anonymous, told local news that she was coming out of a bar and saw that a "female was slammed to the ground" by a Buffalo Police officer as police were breaking up a fight.[528]  The woman, who had just seen the video from the BPD's violent arrest of Mr.

---

[522] Glik v. Cunniffe, 655 F.3d 78, 82 (1st Cir. 2011); see also ACLU v. Alvarez, 679 F.3d 583, 600 (7th Cir. 2012) (issuing a preliminary
injunction against the use of a state eavesdropping statute to prevent the recording of public
police activities); Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a First Amendment right to film police carrying out their public duties); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000) (recognizing a First Amendment right "to photograph or videotape police conduct").

[523] Cf. Branzburg v. Hayes, 408 U.S. 665, 681 (1972) (First Amendment protects "news gathering"); Mills v. Alabama, 384 U.S. 214, 218 (1966) (news gathering enhances "free discussion of governmental affairs"). "In a democracy, public officials have no general privilege to avoid publicity and embarrassment by preventing public scrutiny of their actions." Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005).

[524] Glik, 655 F.3d at 82.

[525] Hill, 482 U.S. at 463.

[526] Evan Anstey, Former Buffalo cop sentenced for wrongful arrest, News 4, WIVB (Dec. 7, 2016) (available at http://wivb.com/2016/12/07/former-buffalo-cop-sentenced-for-wrongful-arrest/?platform=hootsuite )

[527] Luke Moretti and Rose Ciotta, *Buffalo Police investigates woman's claims that police stopped video by knocking phone from her hand*, WIVB (May 2014) (available at http://wivb.com/2014/05/02/woman-claims-police-stopped-video-by-knocking-phone-from-her-hand/). See also Cop Block of WNY, *BPD Caught Abusing Power Again* (May 2, 2014) (available at https://www.youtube.com/watch?v=IC7dePFY33Y).

[528] Luke Moretti and Rose Ciotta, *Buffalo Police investigates woman's claims that police stopped video by knocking phone from her hand*, WIVB (May 2014) (available at http://wivb.com/2014/05/02/woman-claims-police-stopped-video-by-knocking-phone-from-her-hand/)

124

Willet, said that's when she started taking video of the police encounter with her cellphone camera. Soon after she began fimiling, BPD Officer Eloff approached her and grabbed the cellphone from her hands. Then, she stated that "[h]e knocked the phone out of my hand and stomped on it and he wouldn't take his foot off my phone." [529] The woman "had to like push his foot off my phone in order to get [her] phone back." [530] Though the phone broke on impact, BPD Officer Eloff nonetheless pursued her and demanded that she hand over the phone "for evidence," but refused to tell her why. [531] She told him it was dead and refused to hand it over, and BPD Officer Eloff then directed to delete the video footage. As she described: "he started coming after me demanding that I hand over my phone and I wouldn't. And then I kept going on and he kept following me and then he eventually stopped." [532] In response, Buffalo Police Commissioner Daniel Derenda told the woman to file a complaint with police Internal Affairs. The woman, who insisted on anonyminity, did not file a complaint. During her interview, she said: "I was scared. The officer supposed to be protecting us. And for him to disrespect me like that was…it's scary." [533]

- On April 19th, 2013, John Willet, after feeling from police while possessing illicit drugs, made a conscious decision to surrender to the Buffalo Police Officer giving chase[534]. Subsequently, the arresting officer John Cirulli tackled then handcuffed John Willet, placed him on the ground and proceeded to "slap" and "kick" Willet repeatedly[535]. During this encounter, a bystander took a cellphone video of Buffalo Police Officer John A. Cirulli striking Willet, a handcuffed man lying facedown on in Buffalo in the Black Rock neighborhood. Police approached him After the video circulated, the federal government brought criminal civil rights charges against Cirulli. He later resigned, pleaded guilty to federal charges and was sentenced to probation.[536]
- On April 7, 2014 **Jamie Diaz O'Niell**[537] had a prototypical experience with the BPD: he went to the BPD lnternal Affairs Division to file a complaint against BPD officers an April 4, 2015 incident involving BPD officers who illegally detained him, searched his car and improperly confiscated money, and used excessive force against him, which required him to be treated at the hospital. When he first visited the BPD OAD to file a complaint, he allged that a BPD employee tried to write a false report. [538] He then received a letter under his door requesting that he contacts a Mr. Robert Rosenwie from the internal affairs department of the BPD. Mr. Diaz-Oneill alleged that he met with Mr. Rosenwie, but he would not let him review the file and beat his fist on the table when Mr. Diaz tried to request; he ultimately accused Mr Rosenwie of "obstructing justice." On June 16, 2014, he went to the BPD headquarters to file a complaint against the officers. According to Mr. Diaz, the BPD officer at the front desk refused to assist him with his request, and instead began to hit and push him and said "motherfucker get out of here now." When Mr. Diaz asked why, the BPD officer again

---

[529] *Id.*

[530] *Id.*

[531] *Id.*

[532] *Id.*

[533] *Id.*

[534] Luke Moretti, Man speaks out after alleged police brutality, WIVB (April 28, 2014, 12:37 PM) http://wivb.com/2014/04/28/man-speaks-out-after-alleged-police-brutality/

[535] Id.

[536] Lou Michel, Hochul adamant on withholding attack video; Comparisons debated on releases in other cases, The Buffalo News (June 19, 2016)

[537] *Diaz Oneill v. City of Buffalo et al*, Docket No. 1:14-cv-00570, Complaint 11, (W.D.N.Y. Jul 15, 2014) (dismissed Apr. 30, 2015 for failure to comply with order to provide addresses for service) Order, *Diaz Oneill v. City of Buffalo et al*, Docket No. 1:14-cv-00570 (W.D.N.Y. Jul 15, 2014) (entered 4/30/2015).

[538] *Diaz Oneill v. City of Buffalo et al*, Docket No. 1:14-cv-00570, Complaint 11, (W.D.N.Y. Jul 15, 2014).

stated  "you bastard go," and "pushed him out of the station and threw chemical in his eyes, and hit again." The injuries required him to go the hospital.assault and robbery" by the BPD Officers.

**Absence of oversight and effective accountability mechanisms: No One to Call**

As described above, every level of government, the City of Buffalo has demonstrated a widespread disregard for the Fourth Amendment, which protects against unreasonable searches and seizures by the government and unjustified use of force, the Fourteenth Amendment's equal protection clause, and First Amendment which protects against state retaliatory conduct. For much of the last decade, and accelerating in 2012, BPD officers have stopped innocent people without any objective reason to suspect them of wrongdoing only in the East Side and minority areas-in complete disregard for residents lives. However, this conduct is not limited to BPD officers. The city's highest officials have both directed discriminatory policies, and have turned a blind eye to evidence of persistent evidence that BPD officers are employing policing tactics in a racially discriminatory member  – allowing the BPD to act with impunity and defending them— even when there is loss of life.[539]

Policing problems have been magnified because the BPD has deficient training and no independent, transparent accountability mechanisms and a culture of allowing officers act with impunity.  In fact, structurally, and in reality, BPD officers have operated with complete impunity and carte blanche in their policing practices.  For example, the Mayor appoints and funds the city Commission on Citizens Rights and Community Relations ("CCR" or "Commission") charged with overseeing the BPD. Because the Commission is completely under the Mayor's discretion, it creates internal conflicts of interest in the discovery, investigation, and resolution of potential and actual violations. Although the Mayor and Common Counsel have repeatedly tried to downplay this conflict by calling for accountability and oversight, they have failed to fulfill this goal. This means that Buffalo residents do not have a fair and open mechanism to voice complaints. The entire process aggravates distrust, increases perceptions of racial discrimination, and thwarts justice.

For example, BPD Officer Leone, who had been with the BPD since 2007 testified in a federal court trial that he had not read the full Buffalo Police Department Manual of Procedures during his tenure at the BPD. He testified that he only started reading the manual a month before his testimony in 2010 I actually started reading it about a month ago because I'm studying for the lieutenant's exam.[540]

Policing problems have been magnified because the BPD has deficient training and no independent, transparent accountability mechanisms and a culture of allowing officers act with impunity.  In fact, structurally, and in reality, BPD officers have operated with complete impunity and carte blanche in their policing practices.  For example, the Mayor appoints and funds the city Commission on Citizens Rights and

---

[539] Daniela Porat, *City Hall in No Rush to Improve Police Training*, Investigative Post (Dec. 14, 2016) (available at http://www.investigativepost.org/2016/12/14/city-hall-in-no-rush-to-improve-police-training/?utm_source=facebook&utm_medium=social&utm_campaign=ipost )

[540] USA v. Lawson, No 1:11cr266, Transcript of Proceedings as to Larry Vincent Lawson held on 3/16/12 (W.D.N.Y., Aug 30, 2011, filed).

126

Community Relations ("CCR" or "Commission") charged with overseeing the BPD. Because the Commission is completely under the Mayor's discretion, it creates internal conflicts of interest in the discovery, investigation, and resolution of potential and actual violations. Although the Mayor and Common Counsel have repeatedly tried to downplay this conflict by calling for accountability and oversight, they have failed to fulfill this goal. This means that Buffalo residents do not have a fair and open mechanism to voice complaints. The entire process aggravates distrust, increases perceptions of racial discrimination, and thwarts justice.

### Habitual Offenders: Cleared internally, later held accountable by courts and the DOJ

The City has also settled or been found guilty in multiple civil rights suits alleging that BPD has been negligent in its training by allowing officers to use excessive force in making arrests and failing to discipline officers who used excessive force in making arrests. In addition, plaintiffs have alleged that BPD leadership tolerates the behavior of officers who retaliate against suspects who fail to immediately give requested information to police officers; and failed to enforce proper use of force criteria guidelines
Further the DOJ has found, and court cases confirm, that many of the BPD officers involved with misconduct cases had prior reports of misconduct filed against them, which the officer was either cleared on – and further failed to trigger any internal mechanism within the BPD to prevent police officers guilty of serious abuse from continuing to police Buffalo residents.

Inadequate grievances

There have been hundreds of grievances filed against the BPD in recent years, and the DOJ Civil Rights Division have filed more than fifteen criminal civil rights complaints against BPD officers juste, although the BPD's bad behavior is not a new phenomenon.[141] Unfortunately, BPD officers have only been held to account when the DOJ has intervened to investigate and bring federal criminal civil rights charges following high profile, typically, videotaped incident of police misconduct to file federal criminal civil rights charges or in civil suits. Further, each time the FBI or DOJ would investigate officers following such incidents, investigators uncovered multiple incidents of previous police misconduct, often similar in nature, by the same BPD officers they were investigating that had gone unpunished by the police officials— indicating a culture of officers acting with impunity.

- Just between 2013-2016m the WDNY U.S. Attorneys Office obtained 18 criminal convictions against 9 different BPD officers for enaging in misconduct.

  o For the last several years, the Buffalo Police Department has come under scrutiny for its "culture of misconduct." The Department of Justice has even brought federal charges against five Buffalo police officers for using excessive force in three separate incidents.
    ▪ In one case, the Department of Justice said an officer hit and kicked a man while he was handcuffed and complying with the officer's orders.
    ▪ In another incident, an officer was accused of shooting a young man with a BB gun while he was handcuffed in the back of a police car.
    ▪ And in a third case, prosecutors said an officer pushed a man to the ground and then repeatedly struck his legs with a baton until another officer yelled at him to stop.
- During this period, The Police Department and City has also had to pay out $2.7 million to settle civil suits during the study period for police misconduct.

---

[141] Matthew Spina, *Culture of Misconduct in Buffalo Police Department has Existed for Years*, The Buffalo News (May 24, 2014 5:23PM) *available at* http://www.buffalonews.com/city-region/police-courts/culture-of-misconduct-in-buffalo-police-department-has-existed-for-years-20140524

127

In numerous cases, police officers were convicted of repeatedly not just falsely arresting individuals for no wrongdoing, but brutally physically assaulting individuals <u>after they were in handcuffs when they were restrained and already suffering.</u>  For example, officer faced 3 different counts of striking arrestees in the head with a flashlight <u>after they were handcuffed and restrained.</u> After investigating these incidents repeat, the DOJ found that many offenders remain on the force and continue to violate basic Constitutional rights in policing.[542] Officer Gregory Kwiatkowski is emblematic of this faulty system. In 2006, Buffalo Police Officer Cariol Horne, a 19-year veteran of the force, assisted Kwiatkowski on a domestic violence call.[543] Upon arriving at the scene of the crime, Officer Horne discovered Kwiatkowski punching the handcuffed suspect, Neal Mack. Kwiatkowski was unrelenting in his assault and went as far as choking Mr. Mack. In order to stop the assault, Officer Horne grabbed Kwiatkowski's arm. In return, Kwiatkowski turned and punched Officer Horne. The beating required Officer Horne to have the bridge of her nose replaced.[544] Instead of reprimanding Kwiatkowski, the BPD fired Officer Horne. Kwiatkowski went as far suing Officer Horne for defamation. Kwiatowski was promoted, and continued his pattern of misconduct and police violence; in 2015  the DOJ criminally charged him with BPD officers Raymond Krug, 36,[545] and Joseph Wendel, 37, on criminal for using excessive force and violating the civil rights of four teens, one of whom was shot by BPD officers with a BB gun, <u>while he was handcuffed and in a police car</u> and later assaulted while they were in custody at the police station, requiring them to seek medical treatment. Two of the teens filed a civil suit against the BPD, which the City settled for $75,000 each in 2013.[546]


Although there have been some attempts to remedy the situation, these attempts have not proven successful and reflect a "words not actions" apathetic approach to serious reports of police misconduct and deliberate indifference to the BPD's pattern and practice of unconstitutional policing. For example, The Buffalo Common Council, in May of 2014, reinstated its "Police Oversight" Committee in order to address a need to review the Buffalo Police Department's formal training of police officers as it pertains to search and seizure, use of force, and the constitutional rights of detainees. However, the Committee has held few meetings and not issued any guidelines.
Police Accountability Committee
**Recent Oversight Efforts**
In the last decade, the City of Buffalo and BPD has made superficial attempts to increase oversight of the Buffalo Police Department, often as a result of highly publicized police misconduct---but the BPD and other government officials have actively resisted any attempt at change—and denied there was any problem, leaving outside observers befuddled. In 2010 the Buffalo Common Council established the Joint Police Reform Commission to assess police practices and develop recommendations for reform. Staffed by Council and mayoral appointees, 42 among them H. McCarthy Gipson, former Commissioner of the BPD, and Thomas F. Higgins, former Erie County Sherriff, the Commission was created to assess police practices and develop recommendations for reform. But the Commission was shrouded in controversy from its inception.

Terry O'Neil, a criminal justice expert and former advisor to the late Governor Mario Cuomo, who served on the Buffalo Police Department Reorganization Commission that was set up to implement community policing, testified recently in Albany, recently testified to the New York State Senate the entrenched obstacles to reforming the Buffalo Police Department. The Buffalo Common Counsel created the

---

[542] <u>Id.</u>
[543] Jen Hayden, Former Buffalo Cop Fights for Pension after Exposing Brutality, Daily Kos (Dec. 12, 2014, 11:19 AM) http://www.dailykos.com/story/2014/12/19/1352929/-Former-Buffalo-cop-fights-for-pension-after-exposing-brutality
[544] Id.
[545] Lou Raguse, BPD Officers allegedly shot teens with a BB gun, WIVB 4, May 28, 2014 (available at https://www.justice.gov/usao-wdny/pr/buffalo-police-officer-charged-using-excessive-force-chippewa-street-early-thanksgiving )
[546] Lou Raguse, BPD Officers allegedly shot teens with a BB gun, WIVB 4, May 28, 2014 (available at https://www.justice.gov/usao-wdny/pr/buffalo-police-officer-charged-using-excessive-force-chippewa-street-early-thanksgiving )

0133

BPD Reorganization Commissioned in 2010, in response to a shooting the BPD was unable to solve, involving 8 people were shot, four fatally outside the City Grill in downtown Buffalo. Despite the fact that there were over one hundred witnesses, most of whom were African American, no one would cooperate with the BPD.

The BPD, however, "offered no meaningful cooperation" with the Commission throuughout its deliberations nor did they take any suggestions, claiming that it had sufficient community policing resources with "two community police officers" assigned to each of the five districts, or ten community officers out of almost 800 sworn officers.  O'Niell refuted the BPD's logic that  two agents assigned to each district's "expertise on community policing will affect the department through some process of osmosis .. is nonsense."

Commissioner Derenda believes the fact that he has assigned--two officers out of a force of some eight hundred sworn police officers – two "community police officers" to each of the five very large and populous police districts in the city constituytes the delivery of neighborhood policing. That is utter nonsense. In Albany, nearly 10 % of the APD's workforce is assigned full-time to provide community policing in eighteen neighboorhood beats.[547]

Instead of abiding by these comprehensive proposals, the City, BPD and BMHA appear to be doing the exact opposite by further expanding and militarizing the police force. The Mayor and Common Counsel, tooinstead of expanding the BPD's community resources, has done the exact opposite by investing more and more resources each year to expand the Poilce force – even as Buffalo's population falls.

In 2014, the Buffalo Common Council reestablished its Police Oversight Committee in response to several cases of police misconduct. Councilmember David Rivera, a former police officer, was selected to serve as the chair. The Committee has met with police on a semi-regular basis to discuss structural and policy changes but has not yet issued a set of recommendations. Nor has the Police Oversight Committee effectively monitored key police activities like improved weapons training. The Investigative Post has reported that, despite awarding the BPD with $60,000 for training, the Committee has not tracked how those funds were spent. According to a recent report by the *Investigative Post*, "the [Buffalo Common] Council's Police Oversight Committee and the Commission on Citizens' Rights and Community Relations have been unwilling or unable to use their powers to monitor police conduct." The Police Oversight Committee, does not seek to hold the department accountable. Committee Chairman David Rivera has made clear that 'We're an advisory committee. We don't run the Buffalo Police Department,'he committee's effectiveness is also limited by its sporadic meeting schedule. The first meeting of the year was held Jan. 24; its next scheduled one is July 18.

**Citizen's Commission on Citizen's Rights and Community Relations**

**One year later,** in May 2015, the Buffalo Common Council considered a resolution that stated that the Commission on Citizen's Rights and Community relations "lacks the power and resources needed to effectively advocate for the public in a meaningful way." Neither of these initiatives have not proven successful. This leaves Buffalo residents with little recourse.

**Further, the BPD Complaint Process is not Independent or Transparent.** The Commission on Citizens Rights and Community Relations ("CCR") established by sec. 18-20 of the Buffalo City Charter is the closest thing to an independent complaint board within the city's municipal government. The

[547] Terry O'Neill, *Statement of Terry O'Neill, Director of The Constantine Institute Statement to the Joint Legislative Fiscal Committee Hearing Executive Budget on Public Protection*, The Constantine Institute, 5-7 (Feb. 26, 2015) (available at: http://assembly.state.ny.us/2016budget/testimony/20160204_pubprot/20160204-PublicProtection-O%27Neill.pdf )

129

Commission is composed of 11 members, appointed by the Mayor and confirmed by the Common Council. It is required to meet a minimum of four times a year. The CCR must also submit at least one yearly report on its activities. The report discusses the state of community relations in the city; the state of BPD's initial and ongoing training programs in community relations and respect for citizens' rights and standards and procedures for investigating and acting upon complaints of police misconduct; and significant issues that have arisen concerning any of the foregoing matters.

Because the Mayor controls CCR's appointment process—as well as the police--CCR's autonomy is severely limited. For example, a person cannot independently join the Commission. Instead, members must be nominated by the Mayor and confirmed by the City's Common Council. Further, the Mayor determines the Commission's Budget. CCR's members make a request to the Mayor's office, which then makes a recommendation to the Common Council as part of his proposed city budget. The Common Council then votes to approve or deny the Mayor's budget. This budget determines CCR's ability to hire the executives charged with administering the Commission's business and for carrying out such other duties as may be delegated. This means that, structurally, the sole process designed to allow citizens to grieve complaints is appointed by and controlled by the Mayor and has no independent, separate accountability mechanism.

**The CCR is also not effective and in compliance with the law. Although the Buffalo Commission on Citizen's Rights and Community Relations is required to report on its activities, the last public annual report was published in 2008-2009.**[548] Within this last report, the Commission made several relatively simple recommendations. First, the CCR "highly recommend(ed)" that the Buffalo Police Department obtain New York State Law Enforcement Accreditation certifying that the department is in "compliance with generally accepted law enforcement training, policies and procedures and other relevant techniques and methods of operations." Second, the CCR recommended that BPD undergo training in diversity, topics of use of excessive force, and Emotionally Disturbed Persons (EDP). Lastly, the CCR recommended that the Mayor request funding for the Commission to hire an independent investigator. Astoundingly, some of these recommendations remain unfulfilled almost eight years later. Indeed, the BPD remains without the New York State Law Enforcement Accreditation.

**The Complaint Process is Ineffective.**

Grievances against BPD are filed by going to any BPD precinct and requesting to speak with a supervisor; calling the Internal Affairs Division; or by writing a letter to the Mayor-appointed Commissioner of Police. Following the submission of a grievance, a supervisor conducts an interview with the aggrieved party. During this interview it is common practice for the supervisor to attempt to explain the officer's behavior. If after the interview the aggrieved is still unsatisfied, then a citizen's complaint form is filled out and sent to the Department's Internal Affairs Division. A commanding officer then decides whether the complaint should be investigated by the involved officer's command or by investigators assigned by the Internal Affairs Division. After the investigation has concluded, the Police Commissioner is charged with the final disposition. However, according to residents, this is rarely completed.

The BPD statistics confirm this: citizens filed 102 complaints alleging excessive use of force by Buffalo police from 2014 to mid-September 2016, and few were sustained.[549] As the Investigate Post reports: "There is currently no way to get independent review of a complaint against the BPD. In order to initiate the grievance process, the Commission requires an individual to lodge two complaints. One is the complaint with the CCR. The other is a formal complaint with the Professional Standards Division of the BPD. Because

[548] City of Buffalo, Commission on Citizens Rights and Community Relations annual reports website (available at https://www.ci.buffalo.ny.us/Home/City_Departments/Citizens_Rights_and_Community_Relation/BrochuresAnnualReports)
[549] http://www.investigativepost.org/2017/02/15/scant-oversight-of-buffalo-police/

0135

the CCR has no mechanism to oversee the adjudicatory process, the Internal Affairs Division retains full control over the outcome of investigations."

Another recent report by the *Investigative Post*, "the [Buffalo Common] Council's Police Oversight Committee and the Commission on Citizens' Rights and Community Relations have been unwilling or unable to use their powers to monitor police conduct. The Police Oversight Committee, despite its title, does not seek to hold the department accountable. Committee Chairman David Rivera has made clear that 'We're an advisory committee. We don't run the Buffalo Police Department,' Committee Chairman David Rivera said in an interview last fall. The committee's effectiveness is also limited by its sporadic meeting schedule. "

Finally, we documented 14 cases were the BPD did not sustain an internal complaint, only to be found to have violated (in some cases egregiously) residents' rights.

**<u>Excessive force: The BPD has also routinely illegally arrested and used force against people of color, and particularly African American men without any legal justification.</u>**

Under the Fourth Amendment, the use of force by police is only permitted under specific circumstances, such as self-defense.The standard has broad parameters, The level of force an officer uses will varies based on the situation. Because of this variation, guidelines for the use of force are based on many factors, including the officer's level of training or experience. In any situation, an officer's goal is to regain control as soon as possible while protecting the community. The use of force should always be an officer's last option—and only when other practices are ineffective.

**<u>Excessive Force</u>**
- On Thanksgiving day in November 2014, a local news cameraman for WKBW-TV recorded BPD Officer Corey R. Krug slamming a man onto the hood of a car, pushing him to the pavement and beating him with a nightstick while two officers watched—without any justification. The was broadcast on television and posted on the internet. In August 2015, the DOJ brought criminal civil rights charges against BPD Officer Krug, which he was convicted of the following year. [550]

- On June 9, 2016, the DOJ charged BPD cell block attendant Matthew Jaskula with beating and dragging Shaun Porter, a handcuffed suspect, as two other BPD officers watched. Porter suffered a broken nose, bruised ribs, and sprained hand and neck.

- In 2014, the City of Buffalo settled a lawsuit with Laura Spear, who was physically abused by police while she was working at Buffalo Auto Recovery Service, an automobile repossession business[551]. The incident began when a debtor seeking to retrieve personal belongings from his vehicle arrived at after 3pm, which was after the company's business hours[552]. The debtor, after being denied entry, called Buffalo Police. Upon arrival, Officer Hazlett entered the business and demanded that Spear return the debtor's personal belongings[553]. After Spear denied Officer Hazlett, Hazlett allegedly grabbed Spear and "Swung [her] around like a rag doll"[554]. The business owner Tim Hunter called 911 to request an ambulance for Spear, who was subsequently diagnosed with three damaged disc in her upper spine

---

[550] http://wivb.com/2015/08/12/suspended-buffalo-cop-corey-krug-charged-with-using-excessive-force/
[551] Decision and Order, Spear v. City of Buffalo, Docket No. 11-CV-00012A(F) (W.D.N.Y. Mar. 18, 2014)
[552] Id.
[553] Id.
[554] Id.

131

following the incident, However, Officer Hazlett, over the police radio, cancelled the dispatch of the requested medical services[555].

- In July 2016, a jury awarded $320,000 to **Justin Levy**, a young African American man and found the City and Buffalo Police officer, Raymond Harrington[556] liable for his false arrest, malicious prosecution, and unlawful imprisonment. The damages stem from the BPD Officer Harrington's unjustified arrest of Mr. Levy after he went with his mother to his aunt's house, after his cousin, called him to assist her with a medical emergency. As soon as he arrived, Officer Raymond Harrington physically barred Mr. Levy from entry and pushed him down the stairs. Mr. Levy waited downstairs for an update with other BPD officers, and his Aunt was eventually taken to the hospital in an ambulance. BPD Officer Harrington, and his partner Anthony Marshal subsequently arrested him without provocation and charged him with disorderly conduct and obstruction of justice charges. All charges against Mr. Levy were subsequently dismissed, and his record was sealed. [557] The jury found that BPD Officer Harrington violated Mr. Levy's civil rights by falsely arresting and unlawfully imprisoned him. In December 2016,  Common Council approved $290,000 in damages to settle the case.[558]

---

[555] Id.

[556] Phil Fairbanks, *Jury awards $320,000 in Buffalo Police Civil Rights case,* The Buffalo News (July 13, 2016). (available at http://buffalonews.com/2016/07/13/jury-awards-320000-in-buffalo-police-civil-rights-case/)

[557] Susan Schulman, *Two police settlements will cost City of Buffalo $515,000*, The Buffalo News ( Nov. 14, 2016) (available at https://buffalonews.com/2016/11/14/two-police-settlements-will-cost-city-buffalo-515000/)

[558]The City of Buffalo, *Agenda Item 16-2360, Justin Levy, $290,000*, Buffalo Common Council (Nov. 10, 2016; approved Nov. 15, 2016) (available at http://buffalony.iqm2.com/Citizens/Detail_LegiFile.aspx?ID=2539&highlightTerms=levy ); Susan Schulman, *Two police settlements will cost City of Buffalo $515,000*, The Buffalo News ( Nov. 14, 2016) (available at https://buffalonews.com/2016/11/14/two-police-settlements-will-cost-city-buffalo-515000/).

0137