# EXHIBIT 270



**SUNY Buffalo Law School**

*The State University of New York*

**Unchecked Authority without Accountability in Buffalo, New York:
The Buffalo Police Department's Widespread Pattern and Practice of Unconstitutional
Discriminatory Policing, and the Human, Social and Economic Costs**

**August 30, 2017**

Submitted to the New York State Attorney General
Office of Civil Rights On Behalf of Black Lives Matter-Buffalo

Anjana Malhotra, Associate Professor of Law
State University of Buffalo Law School
518 John Lord O'Brian Hall, Buffalo, NY 14260-1100
Tel: (917) 583-5849 ꞁ anjana.malhotra@gmail.com

1

PLAINTIFFS_GENERIC-00002698

## Executive Summary and Key Findings

> **"The officer's first question is, typically, "What are you doing out here? Wrong place, wrong neighborhood, wrong time. [Race-based stops] happens to so many people."[1]**
> - Former Buffalo Police Department commissioner H. McCarthy Gipson, who is African American, describing his experiences for being pulled over in Buffalo for "driving while black"

> - **"Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited."** — United States v. Broomfield, 417 F.3d 654, 655 (7th Cir. 2005) (Posner, J.)

Over at least the last ten years, the City of Buffalo's law enforcement practices have prioritized revenue and a racialized urban renewal initiative over the public safety needs and constitutional rights of its residents, and the African American and racial minority communities in particular. The City's leadership and the Buffalo Police Department's emphasis on "cleaning up" Buffalo through a Broken Windows, Zero Tolerance policing policy since 2006 to "make the safer City for new residents" and raise revenue for the city.[2] This program focused first on aggressive low-level misdemeanor and then around 2012 intensified enforcement of traffic laws disproportionately, and almost only, in the neighborhoods and public housing developments of communities of color – fueling growing racial disparities in traffic and discretionary misdemeanor arrests the criminal justice system.

With the announcement of the Buffalo Billion[3], in 2012 and a new "urban renewal" period, Mayor Byron Brown, BPD Commissioner Derenda and BMHA officials designed and implemented new systemic unconstitutional policing tactics, including suspicionless checkpoints for the express unconstitutional purpose of crime suppression[4] and suspicionless trespass sweeps, almost exclusively in minority neighborhoods and in and around predominantly minority public housing developments it has sought to develop with private developers.

- By 2014, African American youth were 5 times more likely to be arrested, compared to 4.25 in 2010 under the federally calculated minority disproportionate contact rate, and 14.3 times more likely to be detained than similarly-situated Whites, compared to 10.6 in 2010).[5]
- During the implementation of BPD's Zero Tolerance policing, between 2006 and 2015, African Americans in Buffalo were **seven times more likely to be arrested than Whites for misdemeanor marijuana possession,** up from 4 from 1996-2005.[6] Similarly, Latinos, who had approximately the same arrest rate as Whites from 1996-2005, are now more than twice as likely to be arrested for lowest level misdemeanor marijuana possession.[7]

---

[1] Ilene Fleischmann, *Expert's analysis highlights 'Stop and Frisk' Forum*, UB Reporter (March 27, 2014), available at http://www.buffalo.edu/ubreporter/campus.host.html/content/shared/university/news/ub-reporter-articles/stories/2014/March/stop_frisk.detail.html#sthash.Xgr3sySt.dpuf

[2] "Buffalo Fights Crime," Nayor Byron Brown, Moving Buffalo Forward: Policy Briefs from the Brown Administration: Vol. 1.2, June 2007, available at https://www.ci.buffalo.ny.us/files/1_2_1/Mayor/BuffaloFightsCrime.pdf . While the study period for this complaint dates is from January 1, 2013, this context is paramount to understand the current unconstitutional practices as several of the practices and programmatic violations here date back to 2006

[3] New York State, *Buffalo Billion* (available at buffalobillion.ny.gov ); NYS Governor's Office, *Governor Cuomo Presented with Buffalo Billion Investment Development Plan*, (Dec 4. 2012) (available at https://www.governor.ny.gov/news/governor-cuomo-presented-buffalo-billion-investment-development-plan ). *See also* http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2012/01/04/new-york-state-of-the-state-address-2012 )

[4]

[5] Erie County Juvenile Justice Profile: Data Sources. Arrest/Criminal Activity - NYS Division of Criminal Justice Services (DCJS), Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems JO Arrests - DCJS Computerized Criminal History (CCH) System.

[6] DCJS, Computerized Criminal History system.

[7] *Id.*

2

PLAINTIFFS_GENERIC-00002699

- Since 2012, while overall arrests fell during this period, tickets surged following the BPD's implementation of daily crime suppression checkpoints in minority neighborhoods in 2013, imposing a substantial and disproportionate financial burden on Buffalo's African American residents. In just two years following the implementation of daily Strike Force checkpoints, the BPD issued 25,000 more traffic tickets than the previous two years (2011-2012) prior to the implementation of checkpoints. The number grew from 40,761 to 65,862, a 62% increase.[8] For many, this has exacerbated financial racial inequalities through substantial tickets, towing costs, fines and fees, thereby by cementing a cycle of poverty. Public defenders report that in some courts, 85% of their criminal docket is traffic-related cases.

The BPD's conduct has compromised the institutional character of Buffalo's police department, lead to distrust and has contributed to a pattern or practice of unconstitutional policing that has had profound and unnecessary harm to Buffalo's residents.

These policies have meant that, for the last decade, police officers have stopped and improperly arrested thousands of innocent people without any objective reason to suspect them of wrongdoing. The City and elected officials have not only turned a blind eye to this abuse by failing to discipline officers and actively resisting calls for increased community policing, but have, in fact, explicitly designed and directed law enforcement officers to engage in systematic programs that routinely violate the constitutional rights of Buffalo residents, particularly minorities. In minority communities throughout Buffalo, the BPD has stopped thousands of people while walking and driving through systematic and individual discriminatory policies— not because of any evidence of criminal activity. Both the City's and BMHA's policies and individual conduct of Buffalo law enforcement officers has led to a culture that policing is predicated on the assumption that minorities are more likely to be involved in criminal activity because of their race and representation in crime data. As a result, the presumptions of fairness and innocence have been erased in these communities.

In light of these systemic problems, and the vested interests of the largely white-lead non-profit community in Buffalo that have been largely resistant to structural change, in 2015, the University of Buffalo Law School Human Rights Clinic undertook this investigation to document BPD's practices, and was eventually joined by faculty and students in the Cornell Law School Clinical program under the supervision of Associate Professor Anjana Malhotra and Cornell Law Professors Gerald Torres and Beth Lyon. This report is the culmination of our findings, and documents how the BPD has engaged in a pattern and practice of conduct that violates the U.S. Constitution or federal law, as well the Constitution and laws of New York State. Specifically, we found that the BPD engages in a pattern or practice of:

1) making unconstitutional stops, searches, and arrests;

2) using racially-targeted enforcement strategies that produce severe and unjustified disparities in the rates of stops, searches and arrests of African Americans, Latinos and racial minorities in Buffalo, driven at least in part by racial bias;

3) excessive use of force, particularly against individuals of color; and

4) retaliating against people engaging in constitutionally protected expression and lack of redress.

This pattern or practice is driven by prioritization of policing policies on revenue and a racialized "urban renewal" campaign, as well as clear and systematic deficiencies in BPD's policies, supervision and accountability

---

[8] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*, (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf)*;* Buffalo Financial Stability Authority, *Agenda and Final 2016-2017 Adopted Budget*, at 81 (*available at* http://www.bfsa.state.ny.us/meetings2016/BoardBook/BoardBook0621.pdf)*;* City of Buffalo (at 137) (available at https://www.ci.buffalo.ny.us/files/1_2_1/Comptroller/2015CAFR.pdf )

3

PLAINTIFFS_GENERIC-00002700

structures that both direct and allow officers to use policing strategies in violation of fundamental constitutional guarantees with impunity. The BPD and City fail to provide officers with policing directives within the strictures of the constitution and fail to hold officers accountable for misconduct.

As a result of these practices, community members perceive the Buffalo Police Department as overly aggressive, unresponsive, out of touch with the community, and able to act with impunity for disregarding the rights of Buffalo's communities of color. The City's policing policies essentially criminalize a whole race and community of people just for going to work, the grocery store, or visiting relatives, . These practices have left innocent Buffalo residents distrustful of the police, unsure whether an encounter with them will lead to them being "protected and served" or beaten and arrested without basis. Based on our interviews and independent surveys and reports, community members agree that the BPD has significant problems that have undermined its efforts to police constitutionally and effectively, leading to a profound lack of trust between the police and community members.

The absence of accountability has reached crisis-level proportions in Buffalo. Just this year, two men of color have been killed, and countless others brutally beaten, as a matter of course. Instead of expressing concern for these individuals and their friends or family, the City has deflected any responsibility by defending its officers with patently false information and narratives about these individuals . Instead of disciplining the officers, the City allows them to continue working with full pay—putting others in full danger. Instead of providing comfort to the victim's loved ones, the police has interrogated them and retaliated against them as if they are the suspects. Due to the City's continued protection of its police officers, the BPD is no longer protecting the public, particularly minority residents.

Further, Buffalo's policing practices both reflect and exacerbate existing racial bias, including the BPD's routine, systematic use of racial stereotypes associating racial minorities with criminality in violation of the Fourteenth Amendment.  Buffalo's own data establishes that clear racial disparities adversely impact African Americans and Latinos. The BPD's new systematic unconstitutional programs in predominantly minority neighborhoods lead to sharp increases racial disparities in the criminal justice system as Buffalo launched its Buffalo Billion, and private, investments.  As Buffalo has increasingly stepped up its Zero Tolerance policies, Buffalo's own data establishes clear and sharply increasing racial disparities that adversely impact Buffalo's African American, Latino and minority residents, and particularly Buffalo's youth in the last ten years—substantially increasing minority contact with the police, and bringing in more residents of color into the criminal justice system.  The evidence below further shows that the City acted with discriminatory intent in directing and implementing these Zero Tolerance policing programs disproportionately in communities of color directly contributed to these growing disparities, particularly for Buffalo's minority youth.

Currently, the BPD disproportionately arrests African-Americans, and disproportionately young, in relation to their representation in the community. Racial disparities in BPD arrests have discretionary arrests have increased over time--even for crimes committed at similar rates by Whites and African Americans. BPD disproportionately arrests African Americans. Data collected by the Buffalo Police Department from 2013 to 2015 shows that African Americans accounted for 52.06% (11,975) of all 22,648 misdemeanor arrests made by BPD officers, despite comprising only 38% of Buffalo's population. [9] As of the 2014 American Community

---

[9] DCJS, Adult Arrests Reported by Buffalo City PD, DCJS Computerized Criminal History system (as of 4/21/2016).

PLAINTIFFS_GENERIC-00002701

Survey, Buffalo has a population of 258,699, 55% of which are people of color.[10] Thirty seven percent of the population in the City of Buffalo is African American, 10.5% is Hispanics, while 47% is white. [11][12]

- **The racial disparities for youth are even steeper than adult arrests**: of BPD arrests of African American youth ages 16-17 accounted for **68.8%, or 721, of the 1,048 16-17 year olds arrested for misdemeanors by BPD officers, while Whites comprised only 15.8% of arrests.** [13]

- The average arrest rate during the study period was also higher for African American youth than whites, and significantly higher than for adults: African American 16-17 year olds arrest rates *stand* at 70.74/10,000, more than twice the rate of whites (29.31). [14] Controlling for population, the BPD misdemeanor arrest rate from 2013-2015 for African Americans (44/10,000) was almost twice as high as whites (25/10,000). [15]

- Overall, African American youth under 16 comprised 75% of all arrests BPD made of children under 16 ("juvenile arrests") from 2013 to 2015. From 2013-2015, the BPD arrested 2,242 African American children under 16, out of a total of 2,980 juvenile arrests, while only 702 arrests of whites under 16.[16] Despite comprising 42% of the population, 84% of all Youth Offender arrests made by the BPD were racial minorities. 71% of all Youth Offenders were African American—nearly double the population.[17]

  From 2013-2015 African Americans accounted for 81.4% of all low-level misdemeanor marijuana possession arrests from 2013-2015;[18] of the 1562 people BPD arrested for the low level marijuana misdemeanor offenses during the study period, 1,271, were African American, while only 12%, or 191 were White.[19]

---

[10] G. Scott Thomas, *Minority groups account for 55% of Buffalo's residents, says new federal report*, Buffalo Business First (Sept 22, 2015) (*available at* https://www.bizjournals.com/buffalo/blog/morning_roundup/2015/09/minority-groups-account-for-55-of-buffalo-s.html). As of 2016, Buffalo had a total population of 256,902. United States Census Bureau, State & County Quickfacts: Buffalo (city), New York, *available at* https://www.census.gov/quickfacts/fact/table/buffalocitynewyork/PST045216

[11] Tracey Ross, *Health Equity: The Path to Inclusive Prosperity in Buffalo* (summary), PolicyLink, at 18 (May 2017) (*available at* https://ppgbuffalo.org/files/documents/health/health_disparities/health_health_equity_the_path_to_inclusive_prosperity_in_buffalo.pdf ).

[12] *Id*. Note, the African American population declined for the first time in Buffalo's history in the 2010 census and has continued to decline. In 2010 just over 45% (45.8) of the population is white, while 38.6% wasAfrican American, and 10.5% Hispanic or Latino. *Id*. According to the 2014 Community Survey, 115,697 (44.7 percent) of residents are white, 93,464 (36.1 percent) are Black, 27,708 (10.7 percent) are Hispanic, 14,554 (5.6 percent) are Asian, including Pacific Islanders, 5,178 (2.0 percent) are multiracial, 1,099 (0.4 percent) are Native American, and 999 (0.4 percent) are some other race.G. Scott Thomas, *Minority groups account for 55% of Buffalo's residents, says new federal report*, Buffalo Business First (Sept 22, 2015) (*available at* https://www.bizjournals.com/buffalo/blog/morning_roundup/2015/09/minority-groups-account-for-55-of-buffalo-s.html).

[13] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[14] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[15] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[16] DCJS, Uniform Crime/Incident-Based Reporting system (as of 5/2/2016)

[17] Youth Offender status is available, as per Article 720 of the Criminal Procedure Law, following the conviction of youth under 15, of Juvenile Offenders, and of 16-18 year-olds for misdemeanors and most felony offenses. Only 4% of those eligible were granted YO status in Buffalo.

[18] DCJS, Computerized Criminal History system.

[19] DCJS, Computerized Criminal History system. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )

5

PLAINTIFFS_GENERIC-00002702

**Table 1: Buffalo Police Department Misdemeanor arrests Rates: 2013-2015**

|  | **Whites** | **African Americans** |
|---|---|---|
| Population in Buffalo | 48.6% | 38% |
| Adult Misdemeanor Arrest Rate[20] | 25/10,000 | 44/10,000 |
| BPD arrests of 16-17 years old youth [21] | 29.31/10,000 | 70.74/10,000 |
| Adult Misdemeanor Arrests [22] |  | 52.06% (11,975) |
| **BPD Arrests of Youth ages 16-17** | 15.8% | **68.8%** <br> **721** |
| **BPD Arrests of Children under 16**[23] | 12.2% <br> 702 | 75% <br> 2,242 |
| BPD Marijuana Misdemeanor Arrests[24] | 12% <br> 191 | 81.4% <br> 1,562 |

---

[20] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[21] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[22] DCJS, Adult Arrests Reported by Buffalo City PD, DCJS Computerized Criminal History system (as of 4/21/2016).

[23] *Id.*; DCJS, Uniform Crime/Incident-Based Reporting system (as of 5/2/2016).

[24] DCJS, Computerized Criminal History system. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )

6

PLAINTIFFS_GENERIC-00002703

**Increases over time**

Racial disparities in federally calculated disproportionate minority contact rate and detention rate, which controls for crime, have increased over time.

- In 2014, African American youth aged 7-15 were 5.04 more times as likely to be arrested than similarly-situated Whites, increasing from 4.25 in 2010, and 14.3 times more likely to be detained than Whites (up from 10.6 in 2010). [25]

- Despite consistent surveys showing similar marijuana use rates by Whites, **African Americans in Buffalo were <u>seven times more likely to be arrested by for misdemeanor marijuana possession in the last ten years (2006-2015), compared to only four times as likely to be arrested as Whites in the ten years prior to Mayor Brown's election and launch of Buffalo's Zero Tolerance Plan (1996-2005).</u>** [26]   Similarly, Latinos, who had approximately the same arrest rate as Whites from 1996-2005, are now more than twice as likely to be arrested for low level misdemeanor marijuana possession since Brown was elected (2006-2015). [27]

    - The numbers are staggering: since the City implemented its Broken Windows policing tactics under Mayor Brown in 2006, BPD arrested 4,501 African Americans for lowest-level misdemeanor offenses--almost double the 2,341 arrested in the previous ten years, while tripling the arrests of Hispanics during this period from 105 to 349. In contrast, the number of BPD arrests of Whites for marijuana misdemeanors decreased from 792 during 1996 to 2005 to 786 during 2006 to 2016 . [28]

As the table below demonstrates, almost immediately in 2006, the number of lowest-level marijuana possession arrests began to decline for whites while increasing for Blacks.

---

[25] Erie County Juvenile Justice Profile: Data Sources. Arrest/Criminal Activity - NYS Division of Criminal Justice Services (DCJS), Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems. JO Arrests - DCJS Computerized Criminal History (CCH) System. The City of Buffalo is located within Erie County, which is the largest county outside of the New York City area, with a population of 919,040. Approximately 80% of Erie County's African American population lives within the City of Buffalo.

[26] DCJS, Computerized Criminal History system.

[27] DCJS, Computerized Criminal History system.

[28] DCJS, Computerized Criminal History system.

PLAINTIFFS_GENERIC-00002704

Table 2: Yearly arrests for lowest-level marijuana possession by race-1977-2015



Table 3: Lowest-level Marijuana Misdemeanor Arrests 2013-2015, by Race



PLAINTIFFS_GENERIC-00002705

These discriminatory Broken Windows policing efforts have not just had a substantial toll on minorities and their constitutional safeguards as they walk, live and travel throughout Buffalo, but they have also been ineffective and counterproductive. Not only has the murder rate continued to remain high, but these policies have also pushed higher rates of people of color, particularly youths, into the criminal justice system, often due to broad brush discriminatory policing tactics. For example, in 2014, when false trespass arrests and BPD checkpoints were growing, the City of Buffalo had the highest murder rate since 2004.[29] The rate at which the BPD has solved murders has not improved either. As of March 2015, the BPD had only cleared thirty-nine percent of homicides over the previous five years.[30] Further, the murder clearance rate had been steadily dropping to just twenty-three percent in 2014.[31] More generally, only two out of every ten crimes is solved.[32] While violent and property crime have fallen in Buffalo at the same rate as the rest of the nation, the murder rate climbed in 2014 at the peak of its implementation of systematic suspicionless checkpoints and trespass cases, suggesting that Buffalo is distracting much needed resources for actual policing. Further, residents of color have consistently complained that the BPD is unresponsive when they call—even in the Commodore Perry Housing Project, where the BPD HU and Operation Strikeforce officers are located.

At the same time, multiple surveys and our interviews have found that minorities consistently report negative interactions to the police and that these policing tactics have undermined trust A recent survey of 2,000 residents found that while 74 percent of respondents said they respect the police, 57 percent of people polled feel that police do not respect people of color and half of respondents said they feel police do not respect young people.[33] Only 30 percent of black residents said the police works well with their neighborhood, compared to 82 percent of white residents.  Further, only 44 percent said they trust the police enough to call them in an emergency. According to Buffalo State Professor Steve Peraza, who co-authored the report, fear of contacting the police is partly attributable to largely negative interactions many residents have with police. He found that '[a] significant part of the community does not trust the police department because they only encounter them in enforcement circumstances. .. Until we can get the community to feel like the police is not just targeting them, the relationship will remain the way it is. That's kind of why we're tempting a Ferguson."[34]

The City and police departments stated interest in "public order" for minority residents is further belied not just by ineffective policing tactics that systematically disregard the dignity--and fundamental constitutional rights of Buffalo's residents of color, but also by examining how the City, working with the state, has followed its historical discriminatory investment and displacement patterns by directing the billions of dollars of "urban renewal" funds to benefit white communities and financial interests, while neglecting communities of color that need it most; 40% of African Americans, and 46% of Latinos in Buffalo live at our below the poverty level— twice the level of whites, and face similar stark disparities in unemployment (add numbers) . Like the City's policing patterns, these investment patterns have not just failed to benefit Buffalo's residents of color but as in Buffalo's history, is at the expense and high toll to the African American community.

**Urban Renewal, Intensification of Systematic, Unconstitutional Broken Windows Policing**

---

[29] http://www.city-data.com/crime/crime-Buffalo-New-York.html

[30] Jim Heaney, *Council's slow motion response to murder crisis*, Investigative Post, March 11, 2015.

[31] *Id*.

[32] http://www.investigativepost.org/2016/03/14/real-state-of-the-city/

[33] https://openbuffalo.org/files/documents/cp_report_final.pdf

[34] Daniela Porat, *Tempting a Ferguson in Buffalo*, Investigative Post (Oct. 31, 2016) (available at http://www.investigativepost.org/2016/10/31/tempting-ferguson-buffalo/ )

9

PLAINTIFFS_GENERIC-00002706

In January 2012, Governor Cuomo committed one billion dollars of funding to Buffalo in his annual State of the State address. Over the next decade, and especially after "urban renewal" became front and center in Buffalo with the State's announcement of the "Buffalo Billion" plan, City officials ((the BPD and BMHA included) not only intensified discriminatory policing tactics, but initiated new systematic unconstitutional tactics targeting minorities and their communities, including suspicion-less trespass sweeps and checkpoints targeting minority communities and housing projects. The City of Buffalo has a long history of racial discrimination and displacement of people of color in the name of "progress," with that progress often translating into progress only for whites. As many have documented, in terms of distribution, the Buffalo Billion has been no different.[35] At the direction of the highest city officials, the BPD has been on the frontlines of this racialized renewal agenda through highly destructive and patently unconstitutional programs targeting the City's minority neighborhoods. The resulting serious human costs have increased racial disparities throughout the criminal justice system, cutting off the lives of people of color.

*Operation Strike Force Checkpoints*

In June 2012, the City announced the launch of the BPD "Strike Force Unit"[36] as a "pilot program,"[37] to target gangs and drug operations.[38] A central policing tactic Strike Force adopted was vehicle checkpoints to target minority communities for the express purpose of crime control. Despite the U.S. Supreme Court's clear rule that vehicle checkpoints for the primary purpose of general crime deterrence are *per se* unconstitutional, BPD Commissioner Derenda and Mayor Brown made clear that the primary purpose of the checkpoints was general crime suppression, guns, drugs, and "surprising the criminal element.[39] By 2013, the City made the Strike Force Unit permanent,[40] and conducted these *per se* unconstitutional checkpoints every day for the express purpose of fighting crime every day in predominantly minority communities.[41] According to BPD Commissioner Derenda, by January 2014 "Strike Force officers are conducting daily roadblocks" for the purpose of "surprising the criminal element."[42]

The cost of these illegal checkpoints was substantial, and borne primarily and disproportionately by African American and Latino residents – exacerbating pre-existing income (Whites make twice as much as African Americans, a gap which is increasing), poverty measures and job access opportunities.

Although arrests leveled, in the two years following the implementation of daily Strike Force checkpoints (2013-2014), the BPD issued more than 25,000 more traffic tickets than the previous two years (2011-2012). The

---

[35] Jim Heaney, *Buffalo Recovery a Tale of Two Cities*, Investigative Post, June 18, 2016) (available at http://www.investigativepost.org/2014/06/18/buffalo-recovery-tale-two-cities/)

[36] Andrew Wheeler and Scott Phillips, *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY*, at 1 (May 17, 2016). (available at http://ssrn.com/abstract=2781126) ("New locations were chosen on a daily basis over a two month period in 2013, and the intervention was referred to as Operation Strikeforce.").

[37] https://www.bpdny.org/files/1_2_1/Mayor/CitiStat/NewCitiStatPresentation_revised.pdf

[38] *WBFO Newsroom, Police "Strike Force" begins patrols Monday*, WBFO (June 11, 2012) (available here http://news.wbfo.org/post/police-strike-force-begins-patrols-monday).

[39] According to Commissioner Derenda "Strike Force officers are conducting daily roadblocks" for the purpose of Lou Michel, *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

[40] Mike Desmond, Joint Police Effort Targets City Crime, WBFO (July 17, 2013) (available at http://news.wbfo.org/post/joint-police-effort-targets-city-crime).

[41] Lou Michel, *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

[42] Lou Michel, *Buffalo's homicide toll down in 201-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

PLAINTIFFS_GENERIC-00002707

number had grown from 40,761 to 65,862, representing a staggering 62% increase in tickets.[43] These checkpoints were primarily in minority neighborhoods.

- For example, in only two months, from April and May of 2013, the Buffalo Strike Force officers issued over 6,000 traffic tickets, and made a number of arrests for outstanding warrants, and confiscated "several firearms and vehicles."[44] They conducted 67 roadblocks in 46 different locations; all but two of which were in minority neighborhoods.[45] During this period, the BPD made clear that all checkpoints "primary goal was to deter crime and disorder."[46]

---

[43] Buffalo Financial Stability Authority, *Annuaal Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*, (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf)*;* Buffalo Financial Stability Authority, *Agenda and Final 2016-2017 Adopted Budget*, at 81 (*available at* http://www.bfsa.state.ny.us/meetings2016/BoardBook/BoardBook0621.pdf)*;* City of Buffalo (at 137) (available at https://www.ci.buffalo.ny.us/files/1_2_1/Comptroller/2015CAFR.pdf )

[44] Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[45] Eleven of the locations were targeted at least twice over the two month study period, and three locations were targeted four separate times. Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[46] Wheeler, Andrew Palmer and Phillips, Scott W., *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY* (May 17, 2016). (available at http://ssrn.com/abstract=2781126). Note that the Strike Force roadblocks examined in the study largely had similar features to routine BPD roadblocks documented in cases and reports but varied from standard procedures in that officers in the study relied only on automated license plate readers (APLR) to determine who to detain.  That is, the study-group Strike Force officers stopped vehicles only if they were flagged by the ALPR either in the roadblock or in surrounding streets (to detect vehicles attempting to evade the checkpoint) if they are "associated with warrants or having a revoked license (for the owner of the vehicle), or if the vehicle itself was stolen;" the study-roadblocks are designed to slow cars down so officers can conduct an APLR analysis either within the roadblock or in surrounding streets. *Id*. at 3-4. If there is no APLR hit, the car is waived on with no further interaction.

11

PLAINTIFFS_GENERIC-00002708

Figure 1: Roadblock locations in Buffalo, NY



12

PLAINTIFFS_GENERIC-00002709

Our analysis of BPD tickets issued revealed that the increase in tickets was not fueled by safety considerations—while tickets for DWIs fell. Following the implementation of daily checkpoints, the BPD tripled the number of tickets it issued for tinted window violations tripled, from 400 in 2011-2012 to 1,358 in 2013-2014. In 2013-2014, the BPD's 1,358 tinted windows-related tickets and arrests comprised 22.2% of all BPD's tickets and violations, compared to 10.6 % of all BPD tinted-window related offenses in the two years prior to the daily checkpoints[47]-- even though in 2014, tinted-windows was among the lowest reasons for accidents; of 254,829 accidents in New York State, only 32 were caused by tinted windows.[48]

**In contrast, BPD tickets for genuine safety-related violations that cause fatal or serious vehicle crashes[49]. fell during this period.** In the two years following daily checkpoints:

- **BPD Driving While Intoxicated tickets and arrests dropped 10.3% following the daily checkpoints even though Erie County experiences approximately 16.2 DWI deaths per year.** [50] The BPD made 416 DWI arrests from 2011-2012, compared to 373 arrests for DWI in 2013-2014. Notably, a disproportionate number of whites are arrested for DWIs; although comprising 47.5% of the population, whites comprised 54.5% of all DWI offenses from 2013-2014.

- The BPD's issued 23% <u>less</u> tickets for vehicles passing a red signal in the two years following BPD's daily Strikeforce checkpoints, falling from 91-50,[51] even though overall, in New York State 10,370 ,or 4% of all accidents in 2013 were caused by individuals disregarding traffic controls, resulting in 74 fatalities and 6,240 personal injuries.[52]

- The number of BPD tickets and arrests for operating mobile phones also fell by  35% between 2014 and 2011; falling from 101 tickets from 2011-2012 to 76 in 2013-2014.[53] As of 2014, there were more 708 cell phone-related accidents, resulting in 3 fatalties and 318 personally injured.[54] BPD also issued less tickets and made less arrests for criminal investigatory tickets, falling from 30 arrests and tickets for leaving the scene of an accident in 2011-2012 to 17 in 2013-2014.[55]

---

[47] New York State Department of Motor Vehicles, *Traffic Tickets Issued: Four Year Window, 2011-2014* (filtered for Buffalo Police Department only. (*available at* https://data.ny.gov/Transportation/Traffic-Tickets-Issued-Four-Year-Window/q4hy-kbtf ).

[48] New York State Department of Motor Vehicles,  *Summary of Motor Vehicle Crashes, 2014 Statistical Summary* at 4
 (*available at https://dmv.ny.gov/statistic/2014-nyscrashsummary.pdf* ).

[49] New York State Department of Motor Vehicles, *Summary of Motor Vehicle Ceashes, Summary of Motor Vehicle Crashes,* at 4
(*available at* https://dmv.ny.gov/statistic/2014-nyscrashsummary.pdf )

[50] NAACP Report (https://www.scribd.com/document/342186194/Upstate-Transit-Landscape-and-The-Need-For-Ridesharing )
(citing

http://www.syracuse.com/politics/index.ssf/2015/06/new_york_state_dwi_deaths_by_county_who_has_the_most_fatalities.html )

[51] New York State Department of Motor Vehicles, *Traffic Tickets Issued: Four Year Window, 2011-2014* (filtered for Buffalo Police Department only. (*available at* https://data.ny.gov/Transportation/Traffic-Tickets-Issued-Four-Year-Window/q4hy-kbtf ).

[52] New York State Department of Motor Vehicles,  *Summary of Motor Vehicle Crashes, 2014 Statistical Summary* at 4
 (*available at https://dmv.ny.gov/statistic/2014-nyscrashsummary.pdf* ).

[53] New York State Department of Motor Vehicles, *Traffic Tickets Issued: Four Year Window, 2011-2014* (filtered for Buffalo Police Department only. (*available at* https://data.ny.gov/Transportation/Traffic-Tickets-Issued-Four-Year-Window/q4hy-kbtf ).

[54] New York State Department of Motor Vehicles,  *Summary of Motor Vehicle Crashes, 2014 Statistical Summary* at 4
 (*available at https://dmv.ny.gov/statistic/2014-nyscrashsummary.pdf* ). This figure includes accidents attributed to hand held and hands free cell phone use and texting.

[55] New York State Department of Motor Vehicles,  *Summary of Motor Vehicle Crashes, 2014 Statistical Summary* at 4
 (*available at https://dmv.ny.gov/statistic/2014-nyscrashsummary.pdf* ). This figure includes accidents attributed to hand held and hands free cell phone use and texting.

13

PLAINTIFFS_GENERIC-00002710

**Financial burden: Consequences**

These checkpoints are situated to target largely only minority residents going into their neighborhoods; Buffalo is the nation's sixth most segregated city, and is considered a hypersegregated city and has one of the highest dissimilarity indexes in the country.[56] The majority of Buffalo's African American population lives on the "East Side," which is East of Main Street, which is where almost all of the checkpoints are located.[57] For many, this has exacerbated financial racial inequalities through substantial tickets, towing costs, fines and fees, thereby by cementing a cycle of poverty.

- The number of people with suspended licences grew by 58% in the two years following BPD's implementation of the checkpoint program. From 2013-2014, the BPD increased the number of tickets and arrests it issued for revoked, suspended and other licence violations by 58% compared to two years prior.[58] From 2011-2012, the BPD issued 783 such violations, compared to 1,240 from 2013-2014, when BPD daily roadblock program were implemented daily.
  - According to the DMV data, there are currently 2,745 suspended licences for cars registered to Buffalo as of earlier this year.[59]
  - Since Buffalo assumed authority over ticket adjudication on July 1, 2015, from that date to Feb. 2016, the BTVA has already moved to suspend the licenses of 4,400 drivers.[60]

These checkpoints exact a serious financial and psychological toll on African American and people of color, who already make half as much as whites in this region; and as African Americans are more than twice as likely to be in poverty. Public defenders report that in some courts, 85% of their criminal docket is traffic-related cases.

  - The City's revenue from <u>towing grew by five times, or $7 million dollars 2006-2008</u>, between the first three years of Zero Tolerance campaign, 2006-2008, and 2013-2015--from $1.44 million in to $8.39 million from 2013-2015.
  - According to Parking Commissioner Kevin Helfer, the City's revenue from its impound lot has more than doubled from 2012- 2013 due to the Strike Force initiative.[61] In 2013, revenue at the lots was $1.1 million, up from $461,724 the year before. According to Helfer, "the city's Strike Force initiative, which also began in 2012 and cracks down all types of crimes, is responsible for nearly all of that increase."[62]

The financial burden that people of color suffer from these crime suppression checkpoints is especially heavy given: not only do African American and Latinos in the Buffalo region suffer twice the poverty rate and

[56] http://buffalonews.com/2015/07/08/tackling-the-regions-racial-divide/

[57] University at Buffalo Regional Institute's '*A Community Report- City Of Buffalo (East Of Main Street)*' (February 2014) available at http://regional-institute.buffalo.edu/wp-content/uploads/sites/3/2014/06/Strengthening-WNYs-Safety-Net-Buffalo-East.pdf at

[58] Available at https://data.ny.gov/Transportation/Vehicle-Snowmobile-and-Boat-Registrations/w4pv-hbkt ) ("This dataset contains the file of vehicle, snowmobile and boat registrations in NYS. Registrations expired more than 2 years are excluded. Records that have a scofflaw, revocation and/or suspension are included with indicators specifying those kinds of records.")

[59] Available at https://data.ny.gov/Transportation/Vehicle-Snowmobile-and-Boat-Registrations/w4pv-hbkt ) ("This dataset contains the file of vehicle, snowmobile and boat registrations in NYS. Registrations expired more than 2 years are excluded. Records that have a scofflaw, revocation and/or suspension are included with indicators specifying those kinds of records.")

[60] Matthew Spina, *Behind Buffalo's Rise in Traffic Tickets*, The Buffalo News, Feb. 6, 2016 (*available at* http://www.buffalonews.com/city-region/behind-buffalos-dramatic-rise-in-traffic-tickets-20160206 *);*

[61] http://buffalonews.com/2013/08/11/allegations-of-police-shakedowns-add-to-buffalos-tow-truck-wars/

[62] http://buffalonews.com/2013/08/11/allegations-of-police-shakedowns-add-to-buffalos-tow-truck-wars/

PLAINTIFFS_GENERIC-00002711

half the median income as whites, but these disparities have been accelerating, despite substantial public and private investment in Buffalo.  According to the 2017 Urban Institute's annual State of Black America report, the white median white household income in the Buffalo region rose from $55,822 to $58,998, while the African American median household income fell from $28,976 in 2016 to $26,936 in 2017[63]. As a result, Buffalo fell to the 6th most racially unequal region in the in the nation for the black-white income disparity, falling from 46th in the nation to 66. The racial disparity in child poverty is even larger with child poverty. Buffalo also has the third highest child poverty rate among American cities. with almost half of Buffalo's children living under the poverty rate (47.6%)[64] Despite substantial state and private investments, in Buffalo the racial inequality unemployment index from the 27th "most equal" region America last year to 57.  White unemployment rates fell from 5.2% to 4.2%, while Black unemployment remained stagnant at 11.2%.[65] As a result, the Black-White Inequality Index in the region fell from 46.4% to 37.5%--about half of the national average.


The level of racially concentrated poverty has also increased over time. The overall concentration of African-American poverty in the Buffalo-Niagara Falls metro area jumped about 16 percent from 2000 to 2013; in 2000, it was 30.8 percent and in 2013 it was 46.4 percent. For Hispanics, concentrated poverty rose from 39.4 percent to nearly 41.6 percent.[66] The City of Buffalo also has one of the nations the highest concentration of minorities who live in poverty, with some minority neighborhoods with poverty rates of 60-80 percent – nearly double the rate of neighborhoods in 2000.[67] On the East Side, where 90% of the African American residents in Erie County live, people of color are 30% more likely to live at 0-138% of the federal poverty line than whites. Whites are also more likely to own a home; 57% of whites are homeowners, compared to people of color whose home ownership rate is 37%.[68]

### BPD Housing Unit Unconstitutional Trespass Sweeps

Similarly, beginning in 2013, the BPD Housing Unit, comprised of twenty-one officers assigned to provide policing to BMHA residents within Buffalo, also began conducting suspicionless checkpoints, sometimes jointly with Strike Force, as well as suspicionless trespass stops and related "sweeps" in and around predominantly minority BMHA buildings. The BPD Housing Unit conducted these unconstitutional checkpoints, false trespass arrests and trespass sweeps with no reasonable suspicion in predominantly African American and minority public housing projects.[69] In 2015, a court found the BPD Housing Unit's suspicionless trespass sweeps and stops unconstitutional. And by 2014, BMHA trespass arrests were "mostly all getting dismissed" by judges for violating Fourth Amendment rights.[70] Further, a court also held a March 2015 BPD Housing Unit checkpoint

---

[63] Urban League, *State of Black America Report* at 21  (available at
http://soba.iamempowered.com/sites/soba.iamempowered.com/themes/soba/pdf/SOBA2017-black-white-index.pdf) . These figures are based on an assessment of the Buffalo metropolitan area, which includes Buffalo-Cheektowaga-Niagara Falls, NY.
[64] G. Scott Thomas, *Poverty rate for Buffalo children approaches 50%, the third-worst mark among major cities*, Buffalo Business First (June 25, 2015) (available at https://www.bizjournals.com/buffalo/news/2015/06/24/childpoverty1.html).
[65] Urban League, *State of Black America Report* at 21  (available at
http://soba.iamempowered.com/sites/soba.iamempowered.com/themes/soba/pdf/SOBA2017-black-white-index.pdf) . These figures are based on an assessment of the Buffalo metropolitan area, which includes Buffalo-Cheektowaga-Niagara Falls, NY.
[66] Callan Gray, *New study shows Buffalo has one of the highest minority poverty rates*, WIVB, Channel 4 (Sept. 7, 2015) (available at http://wivb.com/2015/09/07/new-study-shows-buffalo-has-one-of-the-highest-minority-poverty-rates/)
[67] *Id*.
[68] Neighborhood Preservation Coalition of New York State. *Housing and Poverty Snapshot: Buffalo, East Side, NY* at 3 (*available at* http://npcnys.org/wp-content/uploads/2016/03/EAST_BUFFALO_snapshot.pdf)
[69] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.").
[70] Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, The Buffalo News (December 17, 2014) (*available at* http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 ).

15

PLAINTIFFS_GENERIC-00002712

unconstitutional under the Fourth Amendment.[71]  During both hearings, BPD Housing Unit officers testified to conducting "hundreds" of checkpoints and trespass sweeps similar to those found unconstitutional, with no guidelines or rules.[72] Despite these rulings, in 2016, BMHA had proposed a codification of a suspicionless trespass rule in its Admissions and Continued Occupancy Plan.[73]

The scope of the BPD Housing Unit's efforts and unconstitutional tactics has been substantial, and has had a severe disproportionate effect on Buffalo's residents of color.  Even though BMHA residents comprised 2.6% of all Buffalo residents (12,000), the BPD Housing Unit's records show that:
- The BPD Housing Unit made 2,399, or 28% of all misdemeanor arrests in and around BMHA buildings from May 2013 to May 2014.[74]
- Traffic misdemeanor arrests comprised the largest category of arrests.  From 2013 to 2014, the BPD Housing Unit made 1,650 arrests for traffic misdemeanors, comprising 44% of all BPD Housing Unit arrests.[75]
- Further, they recovered only 18 guns, less than 3% of the 607 guns recovered in Buffalo in 2014.[76]

Following the implementation of trespass sweeps in 2013, the number of overall BPD trespass arrests and racial disparities in trespass arrests increased. The number of trespass arrests for African Americans and Latinos increased, while falling for whites.
- The proportion of African Americans and Latinos arrested by BPD for trespass offenses grew from 63.79% in 2011-2012 to 67.85% in 2013-2015.
- The number of whites arrested for trespass offenses fell by 3 (192-180), while increasing 17% for African Americans (318-372), and 37% for Latinos (46-63).
- Legal Aid represented 67% more defendants accused of trespass, increasing from 162 between 2010-2012 to 271 from 2013-2015.[77]

Beginning in 2014, BMHA residents launched a campaign to terminate the City and BMHA's contract with BPD set to expire in 2015, because of strong concerns with unjustified stops, sweeps and arrests and harassment of minority youth—and high levels of underpolicing and unresponsiveness to legitimate security concerns.  BMHA tenants, their lawyers and advocates testified, wrote op eds and letters about the BPD's misconduct and requested at Common Council hearings that the City terminate its contract with BPD from 2013-

---

[71] *People v. Dzielski*, Docket No. CR-16851-15, Order at 2 (Buffalo City Court, May 3, 2016); *Michigan v. Sitz*, 496 U.S. 444, 455 (1990) (upholding a sobriety checkpoint at which all motorists are briefly stopped for preliminary questioning and observation for signs of intoxication only because it adopted standardized guidelines that minimized arbitrary individual discretion).
[72] *Id*.
[73] City of Buffalo, *5-Year Public Housing Authority Plan to the Department of Housing and Urban Development beginning for Fiscal Years 2016-2020*, Buffalo Municipal Housing Authority, at 26-32 (available at https://www.ci.buffalo.ny.us/files/1_2_1/BMHA/NY002_AGENCY_PLAN_revised.pdf). The policy, broadly applies to "walkways, grasses, playgrounds, parking loits, drives and other common areas defines BMHA grounds to be both in buildings." *Id*.
[74] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brinkworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.
[75] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014. . In 2013-2014, the BPD HU arrested 2,172 individuals for misdemeanor arrests in and around BMHA, (which accounted for 28% of all of Buffalo's misdemeanor arrests during this period despite the fact that BPD residents comprise only 2.6% of Buffalo's population).
[76] Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Office of Strategic Intelligence and Information, *2014 New York Firearms Trace Data*, DOJ-ATF Firearms Tracing System, 10 (available at https://www.atf.gov/about/docs/report/new-york-firearms-trace-data-%E2%80%93-2014/download ).
[77] Email from Rebecca Town to Anjana Malhotra, Legal Aid BPD Trespass cases 2010-2016 (September 2016) (on file with author)

16

PLAINTIFFS_GENERIC-00002713

2015. In January 2015, Tenant council leader Sam Smith stated in a letter to the executive director of the BMHA, the president of the Jurisdiction-Wide Resident Council informing her that the BPD Housing Unit was not meeting its contractual duties to provide more than baseline services and to communicate with residents, develop a security program, and use community policing,[78] and that "[w]e do not want the contract to go forward because it's a waste of taxpayer dollars," said Sam Smith.[79]BMHA residents, their criminal defense attorneys and civil rights lawyers and organizations in Buffalo have stated that they are receiving frequent reports from BMHA residents of these illegal enforcement tactics. For example, in January 2015, Attorney and National Lawyers Guild leader John Lipsitz testified to the Common Council on this issue:

> BMHA residents... have expressed concern that their children, themselves, and their guests are unfairly stopped, questioned, and arrested for trespass. People report being stopped repeatedly and asked to produce identification, questioned because of lack of identification, stopped because of use of the public outdoor spaces around the buildings, and subjected to other troubling encounters with police officers who regularly patrolled the buildings.[80]

Similarly, Joseph Kelemen of the Western New York Law Center and the Buffalo Chapter of the National Lawyers Guild testified at a meeting with the Police Oversight Committee on November 5, 2014 and voiced concerns about the lack of security in BMHA properties. He stated "Many residents and their guests have reported that they are repeatedly stopped, questioned, and arrested for trespass. Interactions of this kind erode the legitimacy of the police in the eyes of the community and keep victims and witnesses from reporting crimes, thus fueling a downward spiral in police community relations." [81] In 2016, despite widespread opposition and hearings, the Common Council ignored residents concerns, and reapproved the BPD contract to police BMHA, increasing its payment for services from $600,000 to $1 million. That same year, BMHA and City officials proposed codifying its suspicionless trespass policies into BMHA rules. [82]

### Racial Bias

Also reflecting the City's larger racial bias, in January 2014, BMHA and the City of Buffalo submitted a controversial proposal to HUD to transform one of its prime waterfront public housing properties, the Commodore Perry Homes, into a destination of "choice" by explicitly proposing to "decrease the concentration of minority (African American) population in the Perry neighborhood." BMHA and the City relied on race-based

---

[78] Letter from Sam Smith, President, Jurisdiction Wide Resident Council, to Dawn Sanders-Garrett, Executive Director, Buffalo Municipal Housing Authority. (quoted in PPG Policy Brief, Poverty, Race, and Community Policing in Buffalo, Partnership for Public Good at 2 (March 27, 2015)

[79] Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, The Buffalo News (December 17, 2014) (*available at* http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 ).

[80] Megan Williams, *Buffalo's Stop and Frisk Problem*, The Public, Jan. 13, 2015 available at http://www.dailypublic.com/articles/01132015/buffalos-stop-and-frisk-problem

[81] Megan Williams, *Buffalo's Stop and Frisk Problem*, The Public, Jan. 13, 2015 available at http://www.dailypublic.com/articles/01132015/buffalos-stop-and-frisk-problem . John Lipsitz of the National Lawyers Guild similarly testified that "[t]he constant policing, involving frequent stopping and questioning for innocent behavior, commonly referred to as stop and frisk, has led to community concern, and general distrust of the police on BMHA property." *Id*.

[82] City of Buffalo, *5-Year Public Housing Authority Plan to the Department of Housing and Urban Development beginning for Fiscal Years 2016-2020*, Buffalo Municipal Housing Authority, at 26-32 (available at https://www.ci.buffalo.ny.us/files/1_2_1/BMHA/NY002_AGENCY_PLAN_revised.pdf). The policy, broadly applies to "walkways, grasses, playgrounds, parking loits, drives and other common areas defines BMHA grounds to be both in buildings." *Id*.

17

PLAINTIFFS_GENERIC-00002714

stereotypes in advancing the proposal [83], entitled the Perry Choice Transformational Plan ("the Plan"). The Plan sought to redesign the Commodore Perry Homes, which is located on the Erie Canal in the southern portion of Buffalo's predominantly African American "East Side." Currently, 80% of Perry's 971 residents are African American, 14% are Latino and the remainder o is White. [84] Approximately 42% of the residents live at or below the poverty line.

The Plan fund sought to "revitalize" Perry and the surrounding neighborhood with commercial development, additional units and more White and mixed-income families. It explicitly included as one of its "Goals"[d]ecreas[ing] [the] concentration of [the] minority (African American) population in the Perry Neighborhood"  to "mak[e] it similar to [the] rate in the city as whole," and to decrease the number of tenants who receive federal benefits -- e.g. food stamps.[85] In a BMHA Council meeting, BMHA Executive Director Modesto Candelario confirmed that the plan would require displacing African American residents, even though the plan proposed replacing the existing 222 public housing units with 414 public housing units and an additional 415 mixed-income units. [86]

The Plan justifies the displacing of African American and minority tenants from public housing through a "diversity rationale," and a problematic, racially-coded notion that increasing the number of White and middle-income residents can approve the standard of living for minority residents. Specifically, the Plan suggests that exposing African American residents and youth to "community norms, standards and values," ostensibly created by the new White, middle class residents, will improve the neighborhood-level crime problems among minority youth and "low-aspirational level among many blacks and Latinos." Specifically, the Plan states the strategy will be effective because the new, White "community residents will engage young people in a battle of ideas, with the goal of getting them to adopt community norms standards and values." Noting that neighborhood development and public safety must march in tandem, the proposal called for increased "hot spot" policing strategies, which are already in place in Buffalo. In 2014, HUD rejected the Plan because, according to the Buffalo News, the Plan "stated that diluting the concentration of African Americans was an objective of the project."[87]

As BMHA was developing the Plan, and even after its submission in January 2014, BMHA also began moving ahead with it by closing an increasing number of units and/or letting units go into disrepair, resulting in the displacement of hundreds of tenants to other Perry apartments and to BMHA units. 92% of those tenants are in African American neighborhoods—despite having a waitlist that has been closed since 2014/  After the Plan

---

[83] Buffalo Municipal Housing Authority, *Perry Choice Neighborhood Transformation Plan* at 30, 34. (June 2013). (*available at* https://ubwp.buffalo.edu/aps-cus/wp-content/uploads/sites/16/2015/04/BMHA_Buffalo_Perry_Choice_Transformation_Plan_FINAL-June-27-2013.pdf). BMHA began developing the plan in 2012 with UB's Center for Urban Studies after securing a $250,000 Housing and Urban Development Choice Neighborhoods planning grant. Despite the racially exclusionary provisions, the resulting Perry Choice Neighborhood redevelopment plan, chad a number of positive aspects by seeking to create an environment that will improve the lifestyle and opportunities of public residents; according to Dr. Henry Taylor, director of the  UB Center for Urban Studies and an author of the plan, "the plan will help neighborhood residents "develop high levels of critical consciousness" so they can understand the economic and political forces at work in their community." *See* Office of Policy Development and Research, *University at Buffalo Supports Neighborhood and Regional Growth*, U.S. Department of Housing and Urband Development Office of Policy Development and Research (available at https://www.huduser.gov/portal/casestudies/study_03242014_1.html ).

[84] Buffalo Municipal Housing Authority, *Perry Choice Neighborhood Transformation Plan* at 3-5, 47-8. (June 2013).. (*available at* https://ubwp.buffalo.edu/aps-cus/wp-content/uploads/sites/16/2015/04/BMHA_Buffalo_Perry_Choice_Transformation_Plan_FINAL-June-27-2013.pdf). The median income for Commodore Perry Householdsis about $9,500 annually and the average is $11,300. *Id*.

[85] *If*. The plan also sought to decrease the number of tenant households receiving benefits and participating in safety net program, as measured by the percent of households enrolled in food stamps, TANF, and SSI—in direct contravention to the purpose of public housing.

[86] Harold McNeil, *Plan to 'diversify' Perry neighborhood raises fears*, The Buffalo News, Jan. 26, 2014 (available at http://mobile.buffalonews.com/?articleRedirect=1&url=http%3A%2F%2Fwww.buffalonews.com%2Fcity-region%2Fbuffalo%2Fplan-to-diversify-perry-neighborhood-raises-fears-20140126 ). Notably, the plan had several positive features to improve the life of Perry residents

[87] The Buffalo News (April 11, 2015)

18

PLAINTIFFS_GENERIC-00002715

was rejected, in February 2014, BPD Housing Unit Chief Patrick Roberts met with BMHA Deputy Director Modesto Candeleria for the first time regarding "day to day operations of the Buffalo Police Department's Housing Unit." [88] This is the first and only meeting listed with Mr. Candeleria, and it was followed by intensified illegal trespass stops and arrests. Additionally, Chief Roberts met with BMHA General Counsel David Rodriguez. Following that meeting, BPD stepped up policing and illegal trespass sweeps and arrests in the Perry Housing Projects.

Further, during this period of BPD's aggressive, low level broken-windows policing in BMHA, the City began an unprecedented number of eviction proceedings against BMHA residents and advanced a redevelopment plan that explicitly called for displacing minority residents.  In 2014, BMHA filed 4026 civil suits in New York state courts,[89] which were largely eviction proceedings against BMHA tenants.[90] The high number of BMHA eviction cases is significant, as BMHA only had 4,332 units in 2014. Put differently, BMHA 4,026 represented 93% of all BMHA tenant units. BMHA filed so many lawsuits that year that it ranked as the Ninth most prolific civil filer in New York State; ranking above NYCHA.[91] Legal service directors and tenants both confirm BMHA has initiated an increasing (and record) number of eviction suits against tenants since 2012, leaving hundreds of BMHA's overwhelmingly African American and Latino residents and families without homes.  From 2010 to 2014, the BMHA tenant docket for Neighborhood Legal Services, the area's largest indigent legal service provider for BMHA tenants, grew by 87%, from 770 in 2010 to 1441 in 2014.[92] During the three full years of the study period (January 1, 2013 to January 1, 2016), Western New York Legal Services represented tenants in 3,940 eviction proceedings, i.e. 32% (900) more than the 2,988 cases it handled in the three years prior to the study period.[93]

Resulting racial disparities

- **The racial disparities for youth area even steeper than adult arrests**: **of BPD arrests of African American youth ages 16-17 accounted for 68.8%, or 721, of the 1,048 16-17 year olds arrested for misdemeanors by BPD officers, while Whites comprised only 15.8% of arrests.** [94]
- The average arrest rate during the study period was also higher for African American youth than whites, and significantly higher than for adults: African American 16-17 year olds arrest rates *stand* at 70.74/10,000, more than twice the rate of whites (29.31). [95]
- Controlling for population, the BPD misdemeanor arrest rate from 2013-2015 for African Americans (44/10,000) was almost twice as high as whites (25/10,000). [96]
- Overall, African American youth under 16 comprised 75% of all arrests BPD made of children under 16 ("juvenile arrests") from 2013 to 2015.  From 2013-2015 period, the BPD arrested 2,242 African American children under 16, out of a total of 2,980 juvenile arrests, while only 702 arrests of whites under

---

[88] *Buffalo Police Department Housing Statistic Report for February 1, 2014 to February 28, 2014*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brinkworth, Housing Chief, dated March 2, 2014. (on file with author) (Report author's name redacted).

[89] Chris Albin-Lackey, *Rubber Stamp Justice: U.S. Courts, Debt Buying Corporations, and The Poor*, Human Rights Watch, at 14-15 *available at* https://www.hrw.org/sites/default/files/report_pdf/us0116_web.pdf (last visited Feb. 18, 2016).

[90] Chris Albin-Lackey, *Rubber Stamp Justice: U.S. Courts, Debt Buying Corporations, and The Poor*, Human Rights Watch, at 14-15 *available at* https://www.hrw.org/sites/default/files/report_pdf/us0116_web.pdf (last visited Feb. 18, 2016).

[91] HUD OIG, available at https://www.hudoig.gov/sites/default/files/documents/2015-NY-1003.pdf

[92] Interview and emails with Buffalo Neighborhood Services Supervising attorney Grace Andriette, January 29, 2016 (emails on file with author).

[93] Interview and emails with Buffalo Neighborhood Services Supervising attorney Grace Andriette, January 29, 2016 (emails on file with author).

[94] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[95] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

[96] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).

19

PLAINTIFFS_GENERIC-00002716

16.[97] Despite comprising 42% of the population, 84% of all Youth Offender arrests made by the BPD were racial minorities. 71% of all Youth Offenders were African American—nearly double the population.[98]

Discretionary Misdemeanors
- From 2013-2015 African Americans accounted for 81.4% of all low-level misdemeanor marijuana possession arrests from 2013-2015;[99] of the 1562 people BPD arrested for the low level marijuana misdemeanor offenses during the study period, 1,271, were African American, while only 12%, or 191 were White.[100]

The BPD's aggressive policing tactics have also contributed to a substantial increase in the number, disparity and comparative arrest rate of racial minorities for lowest-level marijuana misdemeanor possession, while largely remaining stable or falling for Whites.
- Despite consistent surveys showing similar marijuana use rates by Whites, **African Americans in Buffalo were <u>seven times more likely to be arrested by for misdemeanor marijuana possession in the last ten years (2006-2015), compared to only four times as likely to be arrested as Whites in the ten years prior to Mayor Brown's election and launch of Buffalo's Zero Tolerance Plan (1996-2005).</u>**[101] Similarly, Latinos, who had approximately the same arrest rate as Whites from 1996-2005, are now more than twice as likely to be arrested for low level misdemeanor marijuana possession since Brown was elected (2006-2015).[102]

As the table below shows, the BPD increased the number of African Americans it arrested for lowest level marijuana misdemeanor possession immediately in 2006, while declining for whites.

If the aim of Mayor Brown's and the BPD's Zero Tolerance policing strategy is truly about improving the public order, this goal could be achieved with investment, urban renewal projects in minority areas, home ownership programs, job training, social workers and resources towards education. Instead, these tactics have needlessly brought countless – and increasing numbers – of Buffalo's minority residents into the criminal justice system, while diverting resources from effective and targeted problem-based policing. Further, as described above, these tactics have undermined community trust and the legitimacy of Buffalo's police. Minority residents report routine slow response times to 911 calls, high numbers of unsolved serious crimes, and continuing violence. As one African American Buffalo resident described, the BPD has been setting up daily illegal roadblocks and public housing sweeps while-literally they are unavailable.

**<u>Failure of Accountability Mechanisms and oversight</u>**

Unfortunately, as described in more detail below, BPD officers are rarely held accountable for citizen-or even minority police officers-complaints. The internal grievance system rarely finds anyone accountable, and the oversight body, appointed by the Mayor, has completely abdicated its statutory duties. BPD officers have only

---

[97] DCJS, Uniform Crime/Incident-Based Reporting system (as of 5/2/2016)
[98] Youth Offender status is available, as per Article 720 of the Criminal Procedure Law, following the conviction of youth under 15, of Juvenile Offenders, and of 16-18 year-olds for misdemeanors and most felony offenses. Only 4% of those eligible were granted YO status in Buffalo.
[99] DCJS, Computerized Criminal History system.
[100] DCJS, Computerized Criminal History system. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )
[101] DCJS, Computerized Criminal History system.
[102] DCJS, Computerized Criminal History system.

20

PLAINTIFFS_GENERIC-00002717

been held accountable when the DOJ intervened to investigate, and to file federal civil rights suit. As described in more detail below, resident's complaints about misconduct and brutality are not only ignored, but are met with brutality. Generally, this happens after a high profile, typically, videotaped incident of police misconduct. Each time federal agencies investigate officers following such incidents, investigators uncover similar prior police misconduct by the same officers that had gone unpunished—indicating a culture of impunity.

The City has treated both African Americans and people of color with contempt, erasing any countenance of innocence, treated the Constitution with contempt, and has inflected great harms to the community. Further, this broken windows policing strategy prevented the BPD's office from solving actual crimes in minority areas, creating a wall of distrust that has significantly compromised BPDs ability to provide police protection to Buffalo's residents of color. The most destructive part of Buffalo's broken windows campaign and direction of resources towards unconstitutional crackdowns in predominantly minority neighborhoods is that the City did it at the expense of conducting actual policing, letting serious crimes go uninvestigated and the murder rate grow.

In the name of "urban renewal," City and BPD officials launched even more systemic aggressive "Zero Tolerance" campaign, targeting Buffalo's minority communities for heavy misdemeanor arrests and traffic violations. While there is nothing legally problematic of saturating areas in their zeal to "clean up Buffalo," the City, BMHA and BPD implemented systematic illegal, unconstitutional tactics to target and maximize the number of African Americans and Hispanics – especially in gentrifying and predominantly areas—and generate revenue from these communities.

The City of Buffalo is facing a crisis of police accountability, that has lead to serious harm to Buffalo residents—and even the death of two young men of color just this year. Our research found that BPD has no accountability mechanisms and that there are numerous habitually violent, discriminatory brutal police officers that are the subject of repeated citizen complaints, court cases, and DOJ investigations – but have never been met with any penalty. Civilian and even minority officer's complaints but are usually protected by their fellow officers and by the shoddiness of internal police investigations. Victims of police misconduct, and their family members, who seek redress faces obstacles at every point in the process, ranging from overt retaliation intimidation to the reluctance of local and federal prosecutors to take on brutality cases. Severe abuses persist because overwhelming barriers to accountability make it all too likely that officers who commit human rights violations escape due punishment to continue their abusive conduct.

In the midst of these repeated highly publicized, and recently even lethal encounters between police  and residents of Buffalo, Buffalo residents, have expressed serious concerns about high levels of violent unconstitutional policing at every stage of government in Buffalo, to no avail. Activists, roundtables of experts have introduced multiple proposals to advance police reform, but all requests have fallen on deaf ears. They have no one left to protect them from the City's failure to afford them equal treatment under the law, or basic justice.

In the last decade, the City of Buffalo and BPD has made superficial attempts to increase oversight of the Buffalo Police Department, often as a result of highly publicized police misconduct---but the BPD and other government officials have actively resisted any attempt at change—and denied there was any problem, leaving outside observers befuddled. In 2010 the Buffalo Common Council established the Joint Police Reform Commission to assess police practices and develop recommendations for reform. Staffed by Council and mayoral appointees, 42 among them H. McCarthy Gipson, former Commissioner of the BPD, and Thomas F. Higgins, former Erie County Sherriff, the Commission was created to assess police practices and develop recommendations for reform. But the Commission was shrouded in controversy from its inception.

For example, Terry O'Neil, a criminal justice expert and former advisor to the late Governor Mario Cuomo, who served on the Buffalo Police Department Reorganization Commission that was set up to implement community policing, testified recently in Albany to the New York State Senate about the entrenched obstacles to reforming the Buffalo Police Department. The Buffalo Common Counsel had created the BPD Reogranization

21

PLAINTIFFS_GENERIC-00002718

Commissioned in 2010, in response to a shooting the BPD was unable to solve, involving 8 people were shot, four fatally outside the City Grill in downtown Buffalo. Despite the fact that there were over one hundred witnesses, most of whom were African American, no one would cooperate with the BPD. [103]

The BPD, however, "offered no meaningful cooperation" with the Commission throuughout its deliberations nor did they take any suggestions, claiming that it had sufficient community policing resources with "two community police officers" assigned to each of the five districts, or ten community officers out of almost 800 sworn officers. O'Niell refuted the BPD's logic that two agents assigned to each district's "expertise on community policing will affect the department through some process of osmosis .. is nonsense." [104]

> Commissioner Derenda believes the fact that he has assigned--two officers out of a force of some eight hundred sworn police officers – two "community police officers" to each of the five very large and populous police districts in the city constituytes the delivery of neighborhood policing. That is utter nonsense. In Albany, nearly 10 % of the APD's workforce is assigned full-time to provide community policing in eighteen neighborhood beats.[105]

Instead of abiding by these comprehensive proposals, the City, BPD and BMHA appear to be doing the exact opposite by further expanding and militarizing the police force. The Mayor and Common Counsel, to oinstead of expanding the BPD's community resources, has done the exact opposite by investing more and more resources each year to expand the Poilce force – even as Buffalo's population falls.

In 2014, the Buffalo Common Council reestablished its Police Oversight Committee in response to several cases of police misconduct. Councilmember David Rivera, a former police officer, was selected to serve as the chair. The Committee has met with police on a semi-regular basis to discuss structural and policy changes but has not yet issued a set of recommendations. Nor has the Police Oversight Committee effectively monitored key police activities like improved weapons training. The Investigative Post has reported that, despite awarding the BPD with $60,000 for training, the Committee has not tracked how those funds were spent. According to a recent report by the *Investigative Post*, "the [Buffalo Common] Council's Police Oversight Committee and the Commission on Citizens' Rights and Community Relations have been unwilling or unable to use their powers to monitor police conduct." The Police Oversight Committee, does not seek to hold the department accountable. Committee Chairman David Rivera has made clear that 'We're an advisory committee. We don't run the Buffalo Police Department,'he committee's effectiveness is also limited by its sporadic meeting schedule. The first meeting of the year was held Jan. 24; its next scheduled one is July 18. "

**One year later,** in May 2015, the Buffalo Common Council considered a resolution that stated that the Commission on Citizen's Rights and Community relations "lacks the power and resources needed to effectively advocate for the public in a meaningful way." Neither of these initiatives have not proven successful. This leaves Buffalo residents with little recourse.

The magnitude of this accountability crisis is represented by how it is tragically and insidiously repetitive. The actions leading to the death of Wardel Davis in February 2017 were tragically similar to those that lead to the BPD's fatal shooting of Jose Hernandez-Rossy in May 2017, and the police response: the questionable circumstances justifying the stop, the routine use of brutal excessive force against detainees.

Despite these obstacles, discriminatory arbitrary police violence and arrests is by no means a new phenomenon in the Buffalo, nor are the persistent efforts to reduce such systematic police misconduct misconduct. Violence has accelerated, and in recent years, however, more people of color and allies have been

---

[103] Terry O'Neill, *Statement of Terry O'Neill, Director of The Constantine Institute Statement to the Joint Legislative Fiscal Committee Hearing Executive Budget on Public Protection*, The Constantine Institute, 5-7 (Feb. 26, 2015) (available at: http://assembly.state.ny.us/2016budget/testimony/20160204_pubprot/20160204-PublicProtection-O%27Neill.pdf )

[104] *Id.*

[105] *Id.*

PLAINTIFFS_GENERIC-00002719

organizing around race and supporting Black Lives Matter and Just Resisting to challenge discriminatory policing. Advocates, residents have repeatedly made the BPD's routine police abuse, often targeted in the African American community, know to city government officials. Despite the City's widespread and growing recognition of the gravity of the problem and the need for radical changes in law enforcement practices, police officers are still rarely held accountable for their actions. After four years of demonstrations and prosecutions, the police are continuing, and, disturbingly, expanding the same gratuitous, lawless arrests and violence that has damaged the lives of Buffalo's residents of color, and exacerbated pre-existing inequalities.

**Full Summary of Unconstitutional Practices:**

The problematic and systematically unconstitutional Zero Tolerances policing policies adopted by the City, BPD and BMHA include:

- BPD Housing Unit Unlawful Trespass Enforcement, Arrest and Sweep policy: The BPD Housing Unit engages in unconstitutional trespass stops and related "sweeps" through BMHA properties without reasonable suspicion and trespass and related arrests without probable cause in predominantly minority BMHA buildings. During the study period, particularly beginning in 2013, the BPD Housing Unit has engaged in a pattern of unlawful stops, searches, and arrests ostensibly to enforce the prohibition against trespassing in predominantly minority BMHA buildings.

    - According to BPD Housing Unit records, BPD officers use systematic unconstitutional stop tactics, including "vertical sweeps," "warrant checks" and other tactics throughout BMHA buildings. From 2013-2015, BPD Housing Unit daily logs indicate that BPD engaged in routine, daily suspicion-less search tactics, including vertical patrols, where police officers conduct floor-by-floor sweeps of public housing buildings and systematically question those they encounter. The officers have arrested individuals unable to prove that they are either residents or invited guests; individuals for outstanding warrants; and other offenses requiring a stop. The systematic nature of these stops indicates that these routine encounters are often predicated on nothing more than the suspect's presence in the building. These tactics have been confirmed by interviews, BPD officer testimony and court decisions. According to BPD records and testimony by the BPD Housing Unit officers, BPD Housing Unit's routine stop and enforcement tactics often lack reasonable suspicion.

    - BMHA has proposed codifying its current trespass policy by allowing police to stop anyone in or around BMHA buildings and demanding their identification, and proof that they have a specific, legitimate purpose on BMHA premises—even if an individual is doing nothing wrong. In its most recent Admissions and Continued Occupancy Plan ("ACOP") submitted to HUD as part of its public housing authority five-year plan, the policy requires anyone located on BMHA property or in buildings "to identify himself or herself by showing appropriate written identification, and to prove specific legitimate purpose to be on the development premises." [106] The policy provides that if the officer determines that an individual does not have a "specific legitimate purpose "or has a legitimate purpose but is subject to one of the expansive list of criminal behavioral bars, the officer will issue a "Trespass Warning" and place the individual on a "Trespass list." If they return to the development without a specific legitimate purpose, they are arrested and barred from entering BMHA properties for up to three years from their first offense. The arrest can also result

---

[106] City of Buffalo, *5-Year Public Housing Authority Plan to the Department of Housing and Urban Development beginning for Fiscal Years 2016-2020*, Buffalo Municipal Housing Authority, at 26-32 (available at https://www.ci.buffalo.ny.us/files/1_2_1/BMHA/NY002_AGENCY_PLAN_revised.pdf). The policy, broadly applies to "walkways, grasses, playgrounds, parking loits, drives and other common areas defines BMHA grounds to be both in buildings." *Id*.

23

PLAINTIFFS_GENERIC-00002720

in eviction for the tenant they are visiting.[107] The proposed policy would apply "retroactively and prospectively "to all tenants living in units within those developments." The policy contains no guidelines delineating how an individual may obtain or establish a "legitimate purpose" and contains no limiting or identifying criteria specifying who should be stopped. It directly authorizes the BPD to stop and question everyone on or in BMHA premises , to establish their identity with written identification and to prove that they have a legitimate purpose. Thus, this policy  violates the Fourth Amendment.[108]

- Unlawful trespass arrests: BPD officers arrest individuals for being lawfully within their buildings or on public sidewalks for "trespassing" or other misdemeanor offenses following these stops.

    - The BPD Housing Unit, at the Direction of the City and BMHA, engages in a pattern or practice of unlawfully stopping and arresting individuals for being lawfully within their buildings or on public sidewalks for "trespassing" or other misdemeanor offenses. Although there is no "stop card" data, from 2010-2014, legal aid attorney Rebecca Town reported that the BPD Housing Unit made 315 trespass arrests from 2010-2014, and by 2014, they are "mostly all getting dismissed" by judges, often for Fourth Amendment violations.[109] According to Ms. Town, judges were not only dismissing trespass cases for improper questioning, but were finding evidence that the defendant lived in the building where the trespass was said to have occurred. During this time, the number of **Legal Aid trespass cases increased by 67% in 2013-2015 (271) from 62 between 2010-2012 to 271 from 2013-2015.[110]** BPD records confirms Ms. Town's records.

    - Legal Aid lawyer Rebecca Town, who represents tenants and individuals criminally arrested in and around BMHA for trespass, and attends BMHA tenant meetings to listen and address residents' concerns, has confirmed increased legally unjustified trespass stops and arrests in and around BMHA. From 2010 to 2014, she reported that the BPD Housing Unit made 315 trespass. Since 2013, judges began frequently dismissing these charges. by 2014, Ms. Town reported thatBPD Housing Unit trespass charges were "mostly all getting dismissed" by judges.[111] According to Ms. Town, judges were not only dismissing trespass cases for improper questioning, but were finding evidence that the defendant lived in the building where the trespass was said to have occurred. BPD records confirms the same.

    - From May 2013 to May 2014, despite the fact that BMHA residents comprise 2.6% of all Buffalo residents, the BPD Housing Unit made 2,399, or 28% of all misdemeanor arrests in and around

---

[107]

[108] The BPD's trespass practices and policy also violate New York State's stop and frisk law, which requires reasonable suspicion before a police officer requests a name, address, and purpose that without a warrant. Specifically, CPL § 140.50 provides that "a police officer may stop a person . . . when he reasonably suspects that such person is committing, has committed, or is about to commit "a crime, "and may demand of him his name, address and an explanation of his conduct." *Id. See also Ligon*

[109] Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, The Buffalo News (December 17, 2014) (*available at* http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 ).

[110] Email from Rebecca Town to Anjana Malhotra, Legal Aid BPD Trespass cases 2010-2016 (September 2016) (on file with author)

[111] Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, The Buffalo News (December 17, 2014) (*available at* http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217 ).

24

PLAINTIFFS_GENERIC-00002721

BMHA buildings.[112] But they recovered only 18 guns—less than 3% of the 607 guns recovered in Buffalo in 2014.[113]

- Vehicle Stops: the BPD conducted frequent, even daily, unconstitutional crime suppression vehicle checkpoints during the study period in predominantly African American and minority neighborhoods.[114] BPD Strike Force officers have conducted <u>at least</u> 380 unconstitutional crime suppression vehicle checkpoints, resulting in at least approximately 36,000 vehicle stops with no individualized suspicion from January 1, 2013 to the present.

  - According to BPD officers, the BPD Housing Unit similarly conducted "hundreds" of vehicle checkpoints with no guidelines or rules in violation of the Fourth Amendment. The BPD Strike Force and Housing Unit teams concentrate these roadblocks in predominantly minority neighborhoods, and maintain City towing teams ready to tow vehicles following an arrest or impound.  Police and City officials have explicitly made clear that these checkpoints are conducted for the impermissible purpose of general crime suppression [115] and, even when administered for another purpose, are not conducted pursuant to written guidelines or uniform rules, in contravention of the Fourth Amendment.[116]

  - According to BPD records and testimony, the BPD Housing Unit has engaged in routine unconstitutional checkpoints, resulting in a high volume of arrests; from 2013 to 2014, the BPD Housing Unit made 1,650 arrests traffic misdemeanors, comprising 44% of all BPD Housing Unit arrests. Traffic misdemeanor arrests comprised the largest category of arrests by the BPD Housing Unit. From 2013 to 2014, the BPD Housing Unit arrested 2,172 individuals for misdemeanor arrests in and around BMHA, which accounted for 28% of all of Buffalo's misdemeanor arrests during this period despite the fact that BPD residents comprise only 2.6% of Buffalo's population.[117]

- Operation Strike Force Checkpoints: In 2012, the City launched "Operation Strike Force," which involved aggressive, high-saturation patrols designed to combat drugs and guns. Operation Strike Force involved frequent, routine, and even daily crime suppression traffic checkpoints and roadblocks in African American neighborhoods on the East Side and other predominantly minority neighborhoods. [118]  The operation was part of the City's Zero Tolerance campaign and consistent with the Mayor's original Strike Force, designed to (1) identify and target gang members; (2) target and eliminate high crime areas in the city; (3) remove illegal guns and illegal drugs; (4) strictly enforce the Zero Tolerance Law Enforcement

---

[112] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brinkworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.

[113] Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Office of Strategic Intelligence and Information, *2014 New York Firearms Trace Data*, DOJ-ATF Firearms Tracing System, 10 (available at https://www.atf.gov/about/docs/report/new-york-firearms-trace-data-%E2%80%93-2014/download ).

[114] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.").

[115] *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) (vehicle checkpoint set up for the "primary purpose [of] detect[ing] evidence of ordinary criminal wrong-doing" (here interdicting illegal narcotics) does not fall within the highway safety or border patrol exception to the individualized suspicion requirement, and hence violates the Fourth Amendment").

[116] *People v. Dzielski*, Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016); *Michigan v. Sitz*, 496 U.S. 444, 455 (1990) (upholding a sobriety checkpoint at which all motorists are briefly stopped for preliminary questioning and observation for signs of intoxication only because it adopted standardized guidelines that minimized arbitrary individual discretion).

[117] *Buffalo Police Department Housing Statistic Report*, directed to Daniel Derenda, Police Commissioner, Byron Lockwood, Deputy Commissioner and Kevin Brkinworth, Housing Chief, for each month beginning 5/1/2013 ending on 6/4/14 (on file with author) (Report author's name redacted); DCJS, Buffalo Police Department Misdemeanor Arrests for 2013-2014.

[118] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.")

25

PLAINTIFFS_GENERIC-00002722

Initiative; and (5) improve the city's quality of life.[119] From its initiation, the City announced that the primary purpose of these roadblocks was crime suppression, in direct contravention of the Fourth Amendment. Further, the City and BMHA saturated the BPD roadblocks in minority neighborhoods.All crime suppression vehicle checkpoints and roadblocks were located in Buffalo's predominantly African American East Side and in other predominantly minority neighborhoods throughout Buffalo.[120] According to Commissioner Derenda, by January 2014, "Strike Force officers [were] conducting daily roadblocks" for the purpose of "surprising the criminal element."[121] Derenda emphasized that the purpose of these checkpoints was to proactively identify and deter violent crimes.  He also asserted that they were effective in doing so because after a year of daily checkpoints, he argued, "people are now less likely to carry guns knowing that they may be stopped at a safety checkpoint."[122]

o   BPD Strike Force Teams conduct frequent, even daily, unconstitutional crime suppression vehicle checkpoints during the study period, predominantly and sharply disproportionately in African American neighborhoods and other minority neighborhoods.[123]  BPD Strike Force Officers have conducted <u>at least</u> 380 unconstitutional crime suppression vehicle checkpoints resulting in at least approximately 36,000 vehicle stops with no individualized suspicion from January 1, 2013 to the present. According to BPD officers, the BPD Housing Unit similarly conducted "hundreds" of vehicle checkpoints with no guidelines or rules in violation of the Fourth Amendment. The BPD Strike Force and Housing Unit teams concentrate these roadblocks in predominantly minority neighborhoods, and maintain City towing teams ready to tow vehicles following an arrest or impound.  Police and city officials have explicitly made clear that these checkpoints are conducted for the impermissible purpose of general crime suppression[124] and, even when administered for another purpose, are not conducted pursuant to written guidelines or uniform rules, in contravention of the Fourth Amendment.[125]

o   According to Commissioner Derenda by January 2014, "Strike Force officers are conducting daily roadblocks" for the purpose of "surprising the criminal element."[126] Derenda emphasized that the purpose of these checkpoints was to proactively identify and deter violent crimes, and asserted that they were effective in doing so, stating that after a year of daily checkpoints, he argued, "people are now less likely to carry guns knowing that they may be stopped at a safety checkpoint."[127]

---

[119]https://www.ci.buffalo.ny.us/Home/Leadership/Mayor/Archive_Press_Releases/2006_Archives/September_2006/MAYOR_BROWN_ANNOUNCES_OPERATION_STRIKE_FORCE

[120] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.")

[121] Lou Michel, *Buffalo's homicide toll down in 2013-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

[122] *Id*

[123] Eileen Buckley, *Mayor pleased with Strike Force Progress*, WBFO (June 21, 2012) (" The Force includes checkpoints on the city's East Side and road blocks, which will be set up without any warning in various city neighborhoods.").

[124] *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) (vehicle checkpoint set up for the "primary purpose [of] detect[ing] evidence of ordinary criminal wrong-doing" (here interdicting illegal narcotics) does not fall within the highway safety or border patrol exception to the individualized suspicion requirement, and hence violates the Fourth Amendment.).

[125] People v. Dzielski, Docket No. CR-16851-15, Order at 2 (Buffalo City Court May 3, 2016); *Michigan v. Sitz*, 496 U.S. 444, 455 (1990) (upholding a sobriety checkpoint at which all motorists are briefly stopped for preliminary questioning and observation for signs of intoxication).

[126] Lou Michel, *Buffalo's homicide toll down in 2013-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

[127] Lou Michel, *Buffalo's homicide toll down in 2013-but still 47 too many*, The Buffalo News (Jan. 1, 2014) (available at http://www.buffalonews.com/city-region/buffalo/buffalos-homicide-toll-down-in-2013-x2013-but-still-47-too-many-20140101 ) (last visited June 2, 2016).

26

PLAINTIFFS_GENERIC-00002723

- o These roadblocks have resulted in a significant financial and personal toll on all Buffalo residents, and particularly the African American and minority residents living in these communities. Not only have these roadblocks resulted in a substantial increase in the number of arrests and police contact, but the resulting high numbers of tickets on the east side creates a substantial financial burden. The Buffalo police department issued more than 25,100 more tickets for traffic violations in the two years following the BPD's implementation of daily Strike Force crime suppression checkpoints (2013-2014) compared to the previous two years—representing a 62% increase.[128] The BPD issued a total of 65,862 traffic tickets in 2013-2014 ("post-daily checkpoint") compared to 40,761 in 2011-2012.[129]

- o In only two months, April and May of 2013, the Buffalo Strike Force officers issued over 6,000 traffic tickets, and made a number of arrests for outstanding warrants, and confiscated "several firearms and vehicles"[130] in 67 roadblocks in 46 different locations; all but two of which were in minority neighborhoods.[131] During this period, the BPD made clear that all checkpoints' "primary goal was to deter crime and disorder." [132]

- o In addition, the BPD's abysmally poor "hit rates" for weapons recovery further expose the ineffectiveness and constitutional deficiencies in such practices.[133] *Add data*

- Searches: During stops, BPD officers frequently pat down or frisk individuals and search cars as a matter of course, without having or identifying the necessary ground to believe the person is armed and dangerous or any other clear constitutional justification. Even where an initial frisk is justified, BPD officers would violate the Constitution by exceeding the frisk's permissible scope. Further, BPD and Strike Force logs indicate that the BPD frequently lacked any individualized justification to engage in a search of the driver or vehicle, much less the passenger.

---

[128] Buffalo Financial Stability Authority, *Annual Report of the Buffalo fiscal Stability Authority for Fiscal Year Ended 2015*, (*available at* http://www.bfsa.state.ny.us/reports/fye2015AnnualReport.pdf)*;* Buffalo Financial Stability Authority, *Agenda and Final 2016-2017 Adopted Budget*, at 81 (*available at* http://www.bfsa.state.ny.us/meetings2016/BoardBook/BoardBook0621.pdf).

[129] City of Buffalo (at 137) (available at https://www.ci.buffalo.ny.us/files/1_2_1/Comptroller/2015CAFR.pdf )

[130] Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[131] Eleven of the locations were targeted at least twice over the two month study period, and three locations were targeted four separate times. Wheeler, Andrew Palmer and Phillips, Scott W., A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY (May 17, 2016). (available at http://ssrn.com/abstract=2781126).

[132] Wheeler, Andrew Palmer and Phillips, Scott W., *A Quasi-Experimental Evaluation Using Roadblocks and Automatic License Plate Readers to Reduce Crime in Buffalo, NY* (May 17, 2016). (available at http://ssrn.com/abstract=2781126). Note that the Strike Force roadblocks examined in the study largely had similar features to routine BPD roadblocks documented in cases and reports but varied from standard procedures in that officers in the study relied <u>only on</u> automated license plate readers (APLR) to determine who to detain.  That is, the study-group Strike Force officers stopped vehicles <u>only</u> if they were flagged by the ALPR either in the roadblock or in surrounding streets (to detect vehicles attempting to evade the checkpoint) if they are "associated with warrants or having a revoked license (for the owner of the vehicle), or if the vehicle itself was stolen;" the study-roadblocks are designed to slow cars down so officers can conduct an APLR analysis either within the roadblock or in surrounding streets. *Id*. at 3-4. If there is no APLR hit, the car is waived on with no further interaction In contrast, in standard Buffalo Strike Force checkpoints are implemented consistent with BPD's Zero Tolerance policing policy: police briefly detain all drivers and inspect their registration and pull over, question and frequently arrest individuals based on any indication of criminal or civil violations, consistent with the Zero Tolerance Policing policy.

[133] *See, e.g., United States v. McCrae*, No. 07-CR-772 (JG), 2008 WL 115383, at *3 (E.D.N.Y. Jan 11, 2008) ("indicia of weapon possession that are correlated with actual weapon possession only one in 30 times are clearly constitutionally insufficient to justify an investigative detention") (*citing City of Indianapolis v. Edmond*, 531 U.S. 32, 34-36, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000) (invalidating program of roadblocks conducted for law enforcement purposes even though approximately 9% of the stops led to arrests)_

27

PLAINTIFFS_GENERIC-00002724

o   In vehicle stops, BPD officers frequently searched not just the driver without justification, but also the passengers in a car based on no justification or impermissibly imputing the driver's suspicion to the passengers.

o   Searches of car occupants without suspicion. According to BPD records, Strike Force and other officers would frequently arrest passengers in cars following a stop based on charges that would require searches of the occupants.

**Disparities and Discrimination in violation of the Fourteenth Amendment**

The BPD systematic suspicion-less tactics described above have been impermissibly directed in Buffalo's minority communities in violation of their state and federal constitutional protections guaranteeing equal treatment under the law. In predominantly minority communities, the BPD does not rely on the constitutionally required individualized evidence of criminal wrongdoing to justify a stop (reasonable suspicion) or an arrest (probable cause). Rather, the City, BPD and BMHA have applied and institutionalized systematic suspicion-less stop programs and practices that disproportionately affect minority communities, in violation of the Fourth and Fourteenth Amendment. In other words, the City substituted race for individualized reasonable suspicion as a marker of wrongdoing throughout the City of Buffalo. Further, the pervasive nature of BPD's discriminatory treatment of African Americans and people of color reflects and has institutionalized a general culture of impermissible racial bias within BPD.

Mayor Brown and Commissioner Derenda directed "Zero Tolerance" policies – predominantly, if not exclusively in minority and African American neighborhoods. Brown and Derenda directed BPD officers to saturate minority neighborhoods, in this ostensible crime-reduction campaign, by using a variety of enforcement strategies that raise serious constitutional issues. Low-level officers were given unbridled discretion and incentivized to proactively identify and make aggressive low-level arrests, substantially increasing the number of minorities arrested for discretionary crimes as well as the risk of constitutionally defective policing. Under this policy, Buffalo police departments arrested primarily African American and Hispanic men and youth in poor neighborhoods. These arrests are often for loitering, disorderly conduct, and possessing tiny amounts of marijuana, thereby pushing these men into the criminal justice pipeline. BPD's targeted policing of minority Buffalo neighborhoods with systematic per se unconstitutional suspicion-less vehicle and pedestrian stops, frisks and arrests and routine race-based conduct with minimal oversight or accountability results in disproportionate harm to African-American and Latino residents. Significantly, racially disparate impact is present at every stage of BPD's enforcement actions, from the initial decision to stop individuals on Buffalo streets to searches, arrests, and uses of force.

•   Racially disproportionate checkpoints: the City and BPD engaged in racial profiling by targeting racially-defined groups for unjustified and unconstitutional stops based on their explicitly-racialized urban agenda. For example, the City directed 92% of the unconstitutional, suspicion-less Strike Force crime suppression checkpoints in minority neighborhoods and public housing complexes, while not implementing them in the same manner in similarly-situated White neighborhoods. These unconstitutional checkpoints, implemented on a "daily basis," beginning in 2013, contributed to a 62% increase in BPD traffic arrests in the two years after the "daily checkpoints" were initiated.[134]

o   During the study period, BPD records indicate that it implemented 32 unconstitutional crime suppression checkpoints in African American and racial minorities' communities, resulting in disproportionate enforcement of traffic violations in predominantly minority communities and heavy fines.

---

[134] New York State Department of Motor Vehicles, *Traffic Tickets Issued: Four Year Window, 2011-2014* (filtered for Buffalo Police Department only. (*available at* https://data.ny.gov/Transportation/Traffic-Tickets-Issued-Four-Year-Window/q4hy-kbtf ).

28

PLAINTIFFS_GENERIC-00002725

- Racially-targeted Trespass sweeps: The BPD Housing Unit's suspicionless illegal trespass stops, searches and arrests, "warrant checks" and sweeps exclusively in BMHA residences where the majority of residents are nonwhite, and none in public housing residences that are primary white despite similar crime rates.[135]

  o BPD "vertical patrol" policy and trespass arrest practices disproportionately violate the rights of minority BMHA residents. These policies are conducted in the absence of individualized, objective facts regarding actual criminal activity. Defendants have failed to guide, supervise, and train BPD officers.[136] The specific targeting of racial minorities violates their rights under the Fourth and Fourteenth Amendments.[137] The BPD applied the vertical patrol policy and trespass arrest practices against plaintiffs in a deliberately discriminatory and race-based way.[138] The City and BMHA implemented, enforced, and encouraged practices, policies, and customs that targeted communities of color, in the absence of unreasonable suspicion and did not sufficiently train, monitor, and discipline police officers.[139]

- Pedestrian stops/raids on the East Side: the City has adopted a policy of indirect racial profiling by targeting racially defined groups for routine unconstitutional stops, searches and frisks based on local crime suspect data. This has resulted in the disproportionate and discriminatory stopping of African Americans and Hispanics in violation of the Equal Protection Clause.

  o Geographic concentration: BPD's pedestrian stops are concentrated primarily in minority communities. BPD made roughly 28 percent of its arrests in two small, predominantly African-American districts that contain only 2.8 percent of the City's population.

  o Consequently, hundreds of individuals—nearly all of them African American—were stopped on at least 10 separate occasions from 2010–2015. Indeed, seven African-American men were stopped more than 30 times

- Deliberate Indifference:

  o Despite persistent complaints, testimony in Buffalo's Common Council and letters from BMHA residents, leaders and attorneys requesting that the City terminate the BPD's contract with the Housing authority, both the City and Housing Authority has intentionally allowed the deliberately disparate impact of these policies on BMHA residents to persist.[140]

  o Inference: Both Buffalo and BMHA was fully aware of residents' public complaints about its racially discriminatory trespass enforcement activities in BMHA residences," and repeatedly requested that

---

[135] *Id*. 31-32.

[136] *See id*. at 39.

[137] *Id*.; *Davis v. City of N.Y*., 959 F. Supp. 2d 324, 360-64 (S.D.N.Y. 2013) (denying City summary judgment on plaintiffs equal protection complaint for discriminatory trespass enforcement)

[138] *Id*.

[139] *Id*. at 43.

[140] John Lipschitz and Sam Smith, *Another Voice: Buffalo Police must address of BMHA Residents Before Agreement is Renewed*, The Buffalo News (Jan 29, 2015) (*available at* http://www.buffalonews.com/opinion/another-voice/another-voice-buffalo-police-must-address-concerns-of-bmha-residents-before-agreement-is-renewed-20150129); Matt Gyrta, *Kenfield-Langfield residents ask for more police presence*, The Buffalo News (Sept 3, 2015) (*available at* http://buffalonews.com/2015/03/14/kenfield-langfield-residents-ask-for-more-police-presence/ ). The Buffalo Common Council even recognized the severity of these problems, but nonetheless renewed the BPD-BMHA contract in 2015. For example, in response to community concerns, Council President Darius G. Pridgen stated: "If we know we have a problem [with the BPD BMHA Unit] and the system we have right now is not working, then you don't continue the same system and leave people as almost prisoners in their homes." *Id*. Then University District Councilman Rasheed N.C. Wyatt stated: "I've been to Kenfield-Langfield, and talked to the people. "We have to listen to them, so people feel comfortable and safe. Right now they don't feel safe." *Id*.

29

PLAINTIFFS_GENERIC-00002726

the City terminate the contract. The Common Counsel nonetheless continued the BPD's contract with BMHA, and increased the contract amount from $600,000 to $1 million. The City's failure to take adequate steps to address those complaints, "lead[s] to an inference that it intended the racially discriminatory practices to continue." [141]

As described below, discriminatory intent is also established by 1) the scope of disparities in arrests; 2) direct policies by police and government officials exclusively or disproportionately that target minority communities and exhibit racial bias, particularly against African Americans and Latinos; 3) the consistent use of harmful racial stereotypes by government and BPD and the resulting pattern and practice of impermissible race-based stops; 4) the pervasive irregularities in and substantive departures from BPD's purpose, specifically its contractual agreement to engage in Community Policing at the Buffalo Municipal Housing Authority; 5) the current and historical context, surrounding BPD's racially disparate enforcement practices; and 6) the fact that City officials failed to take any meaningful steps to evaluate or address the race-based impact of its law enforcement and discriminatory policing tactics practices despite longstanding and widely reported racial disparities and community complaints.

Buffalo's targeted high-level and frequently unconstitutional policing of predominantly high-concentration minority neighborhoods and public housing buildings with minimal oversight or accountability disproportionately harms African American and Latino residents. As a result of these practices, racially disparate impact is present at every stage of BPD's enforcement actions, from the neighborhoods and public housing residences targeted in the frequent and systematic unconstitutional policing efforts described above to arrests and uses of excessive force. These disparities and tactics have eroded community trust essential for effective policing and crime-solving. The overwhelming evidence below establishes a clear violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

BPD arrests for misdemeanors are disproportionately African-American, and disproportionately young, in relation to their representation in the community. Racial disparities in BPD arrests have grown significantly in the last ten years—even for crimes committed at similar rates by Whites and African Americans. These aggressive policing tactics have substantially increased the number, disparity and comparative arrest rate of racial minorities for lowest-level marijuana misdemeanor possession, while largely remaining stable or falling for Whites. Despite consistent surveys showing similar marijuana use rates by Whites, African Americans in Buffalo were seven times more likely to be arrested by for misdemeanor marijuana possession in the last ten years (2006-2015), compared to only four times as likely to be arrested as Whites in the ten years prior to Brown's election (1996-2005). [142] Similarly, Latinos, who had approximately the same arrest rate as Whites from 1996-2005, are now more than twice as likely to be arrested for low level misdemeanor marijuana possession since Brown was elected (2006-2015). [143] African Americans accounted for 81.4% of all low-level misdemeanor marijuana possession arrests from 2013-2015;[144] of the 1562 people BPD arrested for the low level marijuana misdemeanor offenses during the study period, 1,271, were African American, while only 12%, or 191 were White.[145]

- BPD disproportionately arrests African Americans. Data collected by the Buffalo Police Department from 2013 to 2015 shows that African Americans accounted for 52.06% (11,975) of all 22,648 misdemeanor arrests made by BPD officers, despite comprising only 38% of Buffalo's population. [146]

---

[141]*Davis v. City of N.Y.*, 959 F. Supp. 2d 324, 360-64 (S.D.N.Y. 2013) (denying City summary judgment on plaintiff's equal protection complaint for discriminatory trespass enforcement)

[142]  DCJS, Computerized Criminal History system.

[143]  DCJS, Computerized Criminal History system.

[144]  DCJS, Computerized Criminal History system.

[145] DCJS, Computerized Criminal History system. These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )

[146] DCJS, Adult Arrests Reported by Buffalo City PD, DCJS Computerized Criminal History system (as of 4/21/2016).

PLAINTIFFS_GENERIC-00002727

- o  Controlling for population, the misdemeanor arrest rate for African Americans (44/10,000) was almost twice as high as whites (25/10,000).

- For minority youth, these racial disparities are even steeper: African American youth accounted for 68.8%, or 721, of the 1,048 16-17 year olds arrested for misdemeanors by BPD officers, while Whites comprised only 15.8% of arrests. [147]

  - o  The average arrest rate during the study period was also higher for African American youth than whites, and significantly higher than for adults: African American 16-17 year olds arrest rates *stand* at 70.74/10,000, more than twice the rate of whites (29.31). [148]

  - o  Overall, African American youth comprised 75% of all arrests BPD made of children under 16 ("juvenile arrests") from 2013 to 2015.  During the three-year study period, the BPD arrested 2,242 African American children under 16, out of a total of 2,980 juvenile arrests, while only 702 arrests of whites under 16.[149]

  - o  Despite comprising 42% of the population, 84% of all Youth Offender arrests made by the BPD were racial minorities. 71% of all Youth Offenders were African American—nearly double the population.[150]

  - o  Notably, the racial disparities in youth contact, arrests and detention have steepened over time. In 2014, the federally calculated disproportionate minority contact rate for youth aged 7-15 – which controls for crime – indicated that African Americans were 5.04 more times as likely to be arrested than similarly-situated Whites (up from 4.25 in 2010), and 14.3 times more likely to be detained than Whites (up from 10.6 in 2010). [151]

  - o  Further, racial disparities in youth incarceration are significantly higher—almost three times higher—than national averages: While, nationally, African American youth are five times as likely to face incarceration,[152] in the Buffalo region, African American youth in the Buffalo region are 14.3 times more likely to face incarceration compared to their White peers. [153]

- Racial disparities in the BPD's arrests are especially pronounced for lowest-level misdemeanor marijuana possession arrests, even though government surveys indicate that marijuana use rates are similar among race.

---

[147] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).
[148] DCJS, Adult Arrests Reported by Buffalo City PD by Age and Race, DCJS Computerized Criminal History system (as of 4/21/2016).
[149] DCJS, Uniform Crime/Incident-Based Reporting system (as of 5/2/2016)
[150] Youth Offender status is available, as per Article 720 of the Criminal Procedure Law, following the conviction of youth under 15, of Juvenile Offenders, and of 16-18 year-olds for misdemeanors and most felony offenses. Only 4% of those eligible were granted YO status in Buffalo.
[151] Erie County Juvenile Justice Profile: Data Sources. Arrest/Criminal Activity - NYS Division of Criminal Justice Services (DCJS), Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems. JO Arrests - DCJS Computerized Criminal History (CCH) System.
[152] Annie E. Casey Foundation: Reducing Youth Incarceration in the United States. February 2013 Kids Count Data Snapshot. Available at: http://www.aecf.org/m/resourcedoc/AECFDataSnapshotYouthIncarceration-2013.pdf
(last accessed Jan. 1 2017)
[153] Erie County Juvenile Justice Profile: Data Sources. Arrest/Criminal Activity - NYS Division of Criminal Justice Services (DCJS), Uniform Crime Reporting (UCR) and Incident-Based Reporting (IBR) systems. JO Arrests - DCJS Computerized Criminal History (CCH) System.

PLAINTIFFS_GENERIC-00002728

o  African Americans accounted for 81.4% of all lowest-level misdemeanor marijuana possession arrests from 2013 to 2015.[154] The BPD arrested African Americans for misdemeanor marijuana possession at seven times the rate of Whites during this period.

o  Of the 1,562 individuals the BPD arrested for the lowest level of marijuana misdemeanor offenses during the study period, 81%, or 1,271, were African American, while only 12%, or 191, were White.[155] [156]

o  Youth are particularly affected: in 2014, for example, of the BPD's 504 marijuana misdemeanor arrests, more than 80 percent (392) of those arrested were individuals under 29, with almost 40 percent (187) between the ages of 21 and 25.[157]

o  Further, Brown's Broken Windows aggressive policing tactics have substantially increased the number, disparity and comparative arrest rate of racial minorities for lowest-level marijuana misdemeanor possession, while largely remaining stable or falling for whites.

`Over time: Since 2006, the number and arrest rate of African Americans for low-level marijuana offenses has grown considerably, while the number of arrests has fallen for Whites and the arrest rate has remained stable; African Americans in Buffalo are seven times more likely to be arrested than Whites for misdemeanor marijuana possession based in the last ten years (2006-2015), compared to only 4 times as likely to be arrested as whites in the ten years prior to Brown's election (1996-2005).  Similarly, Latinos, who had approximately the same arrest rate as whites from 1996-2005, are now more than twice as likely to be arrested for lowest level misdemeanor marijuana possession since Brown was elected (2006-2015).

o  The BPD arrest rate for lowest-level marijuana misdemeanor possession for African Americans more than doubled from 1996 to 2005, at 18.5 per 10,000 to 38.64 in the last ten years, while nearly tripling for Latinos, rising from 4.4 to 11.16. For Whites, the arrest rate rose only slightly for whites, from 4.3 to 5.72 – despite no change in survey data establishing marijuana use rates are the same.

o  The numbers are staggering: since the City implemented its Broken Windows policing tactics under Mayor Brown in 2006, BPD arrested 4,501 African Americans for lowest-level misdemeanor offenses--almost double the 2,341 arrested in the previous ten years, while tripling the arrests of Hispanics during this period from 105 to 349. In contrast, the number of BPD arrests of Whites for marijuana misdemeanors decreased from 792 during 1996 to 2005 to 786 during 2006 to 2016 .

The BPD continues to arrest large numbers of individuals for low level misdemeanors and public order offenders—rather than issuing warnings or implementing alternative problem-solving techniques.. However, both Buffalo's crime trends and recent analysis of cities with Broken Windows policy  show little evidence that it has worked as intended.  Buffalo's Zero Tolerance policing strategy has led to a breakdown in police-community relations in Buffalo and created a pattern of routine unconstitutional policing aimed at African-Americans and Hispanics. The strategy is more about statistics and revenue than reducing violent crime. This has also resulted in a severe burden on minorities.

---

[154]  DCJS, Computerized Criminal History system (as of 3/24/2015). (4th and 5th degree possession).

[155] DCJS (as of [DATE-AM]). These arrest numbers include misdemeanor possession in the 4th and 5th Degree. *Id*. *See* Aaron Lowinger, *Marijuana Arrests in Buffalo Become a Civil Rights Issue*, The Public, (available at http://www.dailypublic.com/articles/10262015/marijuana-arrests-buffalo-become-civil-rights-issue )

[156] *Id*.

[157]  DCJS, Computerized Criminal History system (as of 3/24/2015).

32

PLAINTIFFS_GENERIC-00002729

**Retaliating against individuals who question or film police actions with impunity**

The BPD routinely retaliates against individuals who criticize its police practices, including practices relating to its discriminatory treatment of African Americans. They subject critics to retaliatory unjustified ticketing, arrests, criminal investigations, lawsuits and other baseless complaints. Reflecting its paramilitary approach and culture of impunity, BPD officers, and the City go through great lengths to suppress dissent amongst officers within the BPD, "suspects" who resist arrest, and witnesses who videotape and/or speak out against police misconduct. These tactics are designed to create fear and suppress all resistance, thereby creating a chilling effect of such expression. In violation of the First Amendment, BPD officers have detained and arrested individuals who lawfully object to police actions or behave in a way that officers perceive as disrespectful.

- We documented 13 cases of unjustified retaliation against residents who exercised their First Amendment rights.  In none of these cases, the BPD officers involved were never internally disciplined or reprimand.

Similarly, the BPD's racially discriminatory conduct and practices exhibits contempt for the rule of law and the constitution, and raises serious issues for people of color in Buffalo. This conduct has undermined the public's trust,  and reduced the legitimacy of the police. Buffalo residents of color now question whether– anyone can protect them with policing.

These are urgent issues because of the pervasive racism and callous disregard for black and brown lives – and their constitutional rights in Buffalo, at the direction and with the complicity of the City's highest leaders. The BPD is not accredited. It has no independent accountability mechanism. And when such free-flowing, unhinged police misconduct is directed—or even permitted with no consequence to the officers involved in these routine constitutional deprivations—acceptance for police misconduct, discriminatory policing and racial violence have become institutionalized within the Buffalo Police Department.

PLAINTIFFS_GENERIC-00002730