# EXHIBIT 322

# Buffalo police who cross the line

**iP** **investigativepost.org**/2017/09/20/buffalo-police-who-cross-the-line

September 20, 2017

Courts records show Strike Force, Housing Unit conduct illegal searches, sometimes submit dubious testimony

By Daniela Porat

Mayor Byron Brown established the Strike Force and Housing units to address the scourge of gangs, drugs and guns in Buffalo. While few argue with the mission of these police units, the way they go about their job is raising alarm, with some defense attorneys characterizing Strike Force and Housing Unit officers as "vigilantes" with a "cowboy mentality."

"I think they have a complete disregard for the Constitution of the United States, and most importantly, the Fourth Amendment," said Michael Stachowski, a Buffalo defense attorney. "They just seem to roust kids in the street, chase people, and hope they find contraband."

Investigative Post reviewed ten criminal court cases involving Strike Force and the Housing Unit in which judges tossed out evidence seized by officers on the grounds police had no reasonable justification to conduct the searches. In two of those instances, judges raised questions about the testimony of officers because of conflicting video evidence or its sheer implausibility.

While these cases represent only a fraction of arrests made by these units, defense attorneys said these incidents illustrate a wider pattern of misconduct by a group of Strike Force and Housing Unit officers.

"I call it stalk and frisk," said James Auricchio, a former state and federal prosecutor and the head of the criminal division of the Assigned Counsel, which provides legal representation to indigent defendants in Erie County.

## Listen to Daniela Porat's story that aired Sept. 21 on WBFO

Audio Player

Interviews with seven defense attorneys and a review of court documents, including hearing transcripts, arrest records and judicial decisions, reveal numerous examples of unconstitutional tactics and other misconduct.

For example, Strike Force officers threatened a mother with a visit from Child Protective Services if she didn't consent to a warrantless search of her house.

1/10

BLRR-00000001

In another incident, they burst into a home without justification and put people in chokeholds.

And in a separate episode, officers punched someone in the head who was already in handcuffs and subdued by pepper spray.

"They are paid to supposedly get guns and drugs off the street and their way of doing that is to just hop out on every black or brown person they see," said Shaketa Redden, co-founder of Just Resisting, a racial and criminal justice group that promotes the empowerment of people of color.

Natasha Soto, the other co-founder, said these officers patrol "assuming everyone's guilty and waiting to be proven right."

**Jim Heaney and Susan Arbetter discuss story on Capitol Pressroom.**

Audio Player

It's not just lawyers and activists crying foul. Judges in the criminal cases reviewed have criticized the way in which these officers have conducted stops and searches, eventually suppressing the gun or drugs found on the defendant.

In one decision, a State Supreme Court judge wrote, "the officer's conduct was not justified from its inception." In another case, an Erie County court judge described an officer's testimony as "inventive."

Police Commissioner Daniel Derenda denied a request from Investigative Post to speak with individual officers or a department representative to discuss specific incidents. Lieutenant Jeffrey Rinaldo, a police spokesperson, said the department is not aware of a pattern of unconstitutional searches or problematic testimony involving members of either unit.

"We would never sacrifice constitutionality for a greater mission of getting guns, or violent offenders off the street," he said. "It does no good to make arrests that are not going to hold up in court."

But that's not the kind of behavior some East Side residents say they see when they interact with these officers. One, whose house was subject to a search in 2015 that a judge subsequently ruled was not permissible, testified that a Strike Force officer brushed off protests with a declaration: "We work for the mayor. We're Strike Force. We can do whatever the fuck we want to do."

**Proactive policing**

BLRR-00000002

Strike Force and the Housing Unit have distinctive roles in the police department.

Unlike a regular unit, Strike Force can patrol anywhere in the city. Its 20 officers are deployed to high-crime neighborhoods, and they routinely conduct traffic checkpoints. Strike Force also partners with other law enforcement agencies to gather intelligence.

While Strike Force bears most of the responsibility for implementing what Rinaldo called a "proactive" policing mission, Housing Unit officers at times work with Strike Force. The Housing Unit was created in 2010 and is made up of 18 officers who are responsible for patrolling the complexes of the Buffalo Municipal Housing Authority.

"This is another effort that continues our commitment to reducing crime, apprehending anyone involved in criminal activity and improving our law abiding residents' quality of life," Brown said in a press release when the Housing Unit was established.

Stay informed
Our weekly newsletter recaps our reporting and other must-read coverage of local issues. Delivered Sundays.
[nm-mc-form fid="2"]

A dozen officers in the Housing Unit and in Strike Force, both led by Chief Aaron Young, were involved in the cases reviewed by Investigative Post.

Together, Strike Force and the Housing Unit made 1,826 arrests, 120 of them gun related, between July 2016 to July 2017, the only year of data police provided to Investigative Post.

A coalition of lawyers and activists, citing a two-year study by University of Buffalo and Cornell law schools, asked the state attorney general in August to investigate what they contend is a pattern of illegal searches, discriminatory policing and other misconduct by the Buffalo Police Department.

"[Buffalo] took a page from Rudy Giuliani's campaign in New York City," Anjana Malhotra, one of the co-authors of the study, said at a press conference in September. "It took actual techniques that have been ruled unconstitutional and is applying them with impunity top-down."

Strike Force and Housing Unit officers are cited as perpetrators of this kind of conduct.

---

## Daniela Porat discusses her story on WBFO's Press Pass

---

Audio Player
00:00
00:00
Use Up/Down Arrow keys to increase or decrease volume.

One mother of a young black man who was arrested by Strike Force officers said she's not against the mission of these units. She's glad they got her son's gun.

"They want it off the street. I want it off the street. I don't want it in my son's pocket. They don't want it in his pocket," said the woman, who spoke on the condition she would not be identified  because she fears police retaliation.

But, she said, these officers are "supposed to uphold the law at all times."

"And it seems really like they're a gang against the community."

Rinaldo, the police spokesman, disagreed.

"Is it something where the department encourages people to go out and violate rights? Of course not. Our goal is to make the city as safe of a place as we can."

Scott Decker, a professor of criminology at Arizona State University, who has studied the gang strategies of police across the country, said arrest and prosecution are necessary for a successful law enforcement response to violent crime.

But, he added, "If it's the only thing done after a short term it loses effectiveness. It begins to undermine confidence in the position of police on the part of the community."



Shaketa Redden, co-founder of Just Resisting.

## Illegal searches

4/10

BLRR-00000004

**0004**

Police encounters with the public are governed by the Constitution and legal precedents that have established when, how and to what extent a police officer can question, detain or search an individual.

The types of questions officers can ask, whether they can pursue someone who is fleeing or pat down someone they have stopped, for example, depend on whether they suspect a crime has happened, or is about to.

But reasonable suspicion of criminal activity "is not satisfied by a hunch, intuition, or inchoate suspicion," wrote federal Magistrate Judge Kenneth Schroeder in a decision earlier this year in which he recommended to rule out as evidence a gun because it was seized in an illegal search.

Strike Force and Housing Unit officers don't always stick to these principles, however.

"Their job [as officers see it] is to go out and prevent crime just about by any means necessary," said Kevin Stadelmaier, the chief of criminal defense at the Legal Aid Bureau, a public defenders office in Buffalo. "And if that means you violate the constitutional rights of an entire group of people, that's what they're going to do."

For example, Housing Unit officers scoping out a liquor store for underage patrons would likely have the authority to ask customers for their age or identification. But on an evening in April 2011, one officer took it a step too far, according to the judge's ruling, by searching the backpack of a man without any justification as he was trying to leave the store.

Although the officer seized a gun, Erie County Judge Michael Pietruszka ruled that the officer had no authority to ask permission to search because there was no evidence of criminal activity or danger to the officers. The case was dismissed.

In another case, Erie County Judge Thomas Franczyk suppressed evidence of a gun because the officers justified their pursuit and eventual arrest of a young black man because he was walking near a store where black men have congregated in the past and, at times, engaged in illicit drug activity.

"Proactive police work in the face of burgeoning gun and drug crimes is commendable," wrote Franczyk in his decision, "but must be tempered by the Fourth Amendment lest the right to inquire be confused with the right to seize just because a person happens to be walking in the vicinity of a location where drugs are known to be sold."

Judges also need to assess the entire context of an encounter in determining whether a search is lawful. But these determinations are not always clear cut.

In 2012, a man was stopped and searched by Housing Unit officers because he fit the description of a suspect described in a 911 call – a man wearing a blue hoodie and blue jeans. He initially pled guilty to criminal possession of a weapon.

But the plea was vacated in 2015 by the Appellate Division. In the ruling, the judges acknowledged that police had a right to stop and ask the man basic questions because he fit the description of the suspect. But the search was ruled improper because the suspect did not do anything to raise suspicion or make the police feel threatened.

In several cases reviewed by Investigative Post, the person arrested had had previous encounters with police – not surprising for a unit targeting potentially violent offenders. But the justification to stop or search an individual must be in the moment, not based on a past interaction or assumption.

"You just can't stop me because you knew I had a gun last week. You can't stop me today to see if I have a gun," said Phillip Dabney, a local criminal defense attorney. "There has to be some articulated, independent basis for that type of approach to me on this new day."

In a 2015 incident, a Strike Force officer, after spotting a man they had prior encounters with hanging out on a porch, entered the East Side house on the premise he heard a baby crying.

The officer encountered a mother who was getting a bottle for her baby and began searching the house. Officers found a gun in the front closet.

During his testimony, Michael Acquino, one of the officers, referred to the woman as a "baby mama." Acquino said officers acted to prevent harm to the child in the home.

The woman, however, described the incident differently on the witness stand. She testified that officers threatened to call Child Protective Services if she did not fill out papers saying she had consented to the search and the removal of the firearm. She said officers told her what to write in the forms.

"I just did what I was told because at that point I was afraid about losing my kids," she said.

This case is active again after the Appellate Division said a court needed to determine whether the fact that the defendant did not live in the house that was searched has any bearing on the legality of the search.

BLRR-00000006



## Problematic testimony

Investigative Post's review of ten cases involving improper searches found two instances where inconsistencies in officer's testimony contributed to the judge's decision to suppress evidence. Again, defense attorneys said this represents a wider problem.

Called "Blackman and Robin" on the street, officers Mark Hamilton, who is black, and Michael Acquino, are two of the most well-known Strike Force officers.

In one case, Hamilton said that he and Acquino saw two men playing dice on the street and once their patrol car approached, one of the men switched drugs from one pocket to another and ran inside a house. The officers followed and seized marijuana and crack cocaine.

Witnesses told another story.

One testified that a group of people, not just the two men, were on the front yard. The defendant testified that he was on his way back from the store and was later tackled inside the home by several officers, one of whom put a gun to his face. Officers put other men in the house in chokeholds, according to testimony by the eyewitness.

The judge pointed out the implausibility of Hamilton's description of events in his decision to suppress evidence of the drugs.

"The act of exposing contraband for the officers to see, by someone who is no stranger to law enforcement, makes no sense," Franczyk wrote in his decision.

BLRR-00000007

"In this court's view, the claimed observation of the drugs was more "inventive" than "preventive" and this court cannot help but conclude that the officers, having dealt with the defendant before, decided to play the odds that he was up to no good and would be in possession of contraband."

Rinaldo, the police spokesman, said that, generally speaking, discrepancies in testimony can be explained this way: "You have to remember each officer testifies to what he or she observed, so if you're coming at a situation from three different points of view, there's obviously going to be different testimony."

Thomas Burton, an attorney for the Police Benevolent Association, declined to discuss individual cases involving Strike Force and the Housing Unit.

In no other case reviewed was the difference between the evidence and the testimony provided by officers so stark as in the arrest of Arthur Jordan.



After two incidents nationally involving officers shooting black civilians were caught on video last summer, Jordan posted "Let's Start Killin Police Lets See How Dey Like It" on his Facebook page. He shared a second post, according to court records, that apparently referred to a specific Buffalo police officer.

The FBI notified the Buffalo Police Department that Jordan was wanted for questioning, but it did not issue a warrant for his arrest.

BLRR-00000008

One Strike Force officer testified that while Jordan and two others were walking on Main Street, they started to walk quickly and turn their heads after noticing the police patrol. But, as Schroeder, the federal magistrate judge, noted, video footage shows the men "walking at an almost leisurely pace and conversing with one another" and never once looking behind them.

Another Strike Force officer testified that once inside the store, Jordan rested against the counter and gripped it so tightly that he had "like a white knuckle." Instead, as Schroeder pointed out, the video shows Jordan standing casually.

The officer testified that Jordan was physically resisting a search. Again, the video undercuts this testimony. Both Michael Acquino and his brother Joseph Acquino are seen grabbing and pushing Jordan while he has his hands up.

While Jordan is restrained, the video shows another officer pepper-spraying Jordan in the eyes. After Jordan is in handcuffs, both Acquino brothers punch Jordan in the head, which Michael said was necessary to "effect the arrest."

In his decision to suppress evidence of the gun found on Jordan, Schroeder wrote that "the officers' conduct in manhandling Jordan and frisking him went far beyond the circumstances that justified Jordan's initial detention." While Schroeder acknowledged that officers might have "subjectively suspected" Jordan posed a threat, "Officers Acquino and Hamilton failed to articulate facts" to justify the search.

Whether Jordan's Facebook comments are protected by the First Amendment will be determined in future court proceedings. A federal judge must first decide whether Schroeder's recommendation stands later this year. Jordan remains in the Erie County Holding Center without bail.

Dabney said he views these practices by select members of Strike Force and the Housing Unit as a danger not just to the "would-be criminal" but to society at large, specifically communities of color.

"I think that the danger is not that you're actually defeating crime," he said. "I think that the danger becomes that you are bullying a community."

Support us and invest in a better Buffalo
Our award-winning journalism exposes problems and points towards solutions. Make a tax-deductible donation today and help us tell the stories that need to be told.
Donate Now

9/10

BLRR-00000009



BLRR-00000010

0010