# EXHIBIT 323

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
LAW ENFORCEMENT MISCONDUCT INVESTIGATIVE OFFICE

December 28, 2023

Commissioner Joseph A. Gramaglia
Buffalo Police Department

*Via Email*

    Re:    Letter regarding Executive Law 75(5)(b) Referral of Police Officer Davon Ottey
              OAG Matter No. 1-793388607

Dear Commissioner Gramaglia,

    We have reviewed your agency's referral of Police Officer Davon Ottey pursuant to Executive Law Section 75(5)(b). Based on our review, we conclude that that Officer Ottey engaged in a pattern of Fourth Amendment violations and First Amendment retaliation. All of the incidents that constitute this pattern occurred while Officer Ottey was assigned to the Housing Unit, which has since been disbanded. According to BPD, Officer Ottey has not been the subject of another complaint since the Housing Unit was disbanded and he returned to patrol on June 15, 2020.

### I.    Overview of Investigation

    The February 5, 2022 referral was based on seven complaints, five of which are described in detail below. Following receipt of the referral, OAG reviewed the agency's internal investigative and disciplinary files associated with the complaints, as well as policies that governed the alleged misconduct and Officer Ottey's personnel file. From November through December 2022, OAG personnel interviewed several of the complainants and civilian witnesses to the conduct. On July 14, 2023, OAG personnel interviewed Officer Ottey.

### II.    Findings

#### A.    Complaint 1, IO2019-070

##### *1.    Factual Background*

    On June 21, 2019, Officer Ottey and his partner Officer Patina Daniel pulled over Complainant 1's son for a traffic violation in the vicinity of Ontario Street and Skillen Street at approximately 8 pm. Complainant 1, who was nearby, witnessed the encounter and approached

her son's vehicle. According to Complainant 1 and her son, Officer Ottey told her to get back into her car, to which she responded that she was only asking whether the officers needed her information, as the car her son was driving belonged to her. Officer Ottey again told her to get back into her car, to which she responded, "fuck the police you cannot even ask a question."

Complainant 1 then got into her car and drove to her home, which was approximately a mile away. Officer Ottey ticketed Complainant 1's son for window tints.

According to both the police report and the information/complaint written by Officer Ottey on June 21, 2019, Complainant 1 approached her son's vehicle, when Officers Ottey and Daniel repeatedly told her to get back into her vehicle. Complainant 1 began to use profanities, stating "these fucking assholes won't let me walk up to your car" and "fuck the police." After repeatedly telling Complainant 1 to get back into her vehicle, and once she began driving away, the officers "began to order her back to get her identification."[1] In his interview with OAG personnel, Officer Ottey explained that he does not allow people to approach his traffic stops, out of a concern that he could lose control of the situation.

Officers Ottey and Daniel then drove to Complainant 1's home. Complainant 1's mother saw the officers outside and notified Complainant 1, who was inside with her approximately 5-year-old daughter but stepped outside to talk to the officers.

According to Complainant 1, Officer Ottey stepped close to her so that his face was near hers and proceeded to yell at her using profanities, telling her to retrieve her "fucking ID." Complainant 1 responded that she would retrieve her identification from inside, and asked Officer Ottey why he needed it. Officer Ottey then grabbed Complainant 1's arm and twisted it behind her back, pushed her approximately five feet into a brick wall, pushed her onto her car, then finally onto the ground, where he handcuffed her. According to Complainant 1's mother, who witnessed the incident, Officer Ottey "rammed [Complainant 1] against the wall" of a brick building and held her there for several minutes. According to both Complainant 1 and her mother, Officer Ottey threatened to arrest Complainant 1's mother after Complainant 1's mother asked what he was doing to her daughter.

According to Officer Ottey, he repeatedly asked Complainant 1 for her identification, and she refused to provide it. He then grabbed Complainant 1's arm, turned her around, put her against a wall and held her there while his partner handcuffed her.

Officer Ottey arrested Complainant 1 for obstructing governmental administration in the second degree and disorderly conduct. These charges were ultimately dismissed.

Both Complainant 1 and her mother reported that Complainant 1 was in physical pain and was extremely upset after the incident. According to Complainant 1, her whole body ached, she was unable to go to work the next day, and she feared any interaction with the police afterwards.

---

[1] Officer Ottey wrote in his P-73 dated October 14, 2019, approximately four months after the incident, that he and Officer Daniel ordered Complainant 1 back to obtain her identification before she drove away, and the officers put their lights and sirens on in an attempt to stop her vehicle, but she continued to drive away.

2

Complainant 1 filed a complaint with BPD on June 28, 2019. The agency conducted a unit-level investigation led by Captain Scott Testa. Captain Testa's investigation consisted of speaking with Complainant 1 and Officer Ottey. On October 23, 2019, Captain Testa recommended exoneration of Officer Ottey, concluding that Complainant 1 "acted inappropriately" and that he "believe[d] [Officer Ottey's] account of the incident [wa]s accurate," as he had "worked with PO Ottey and [] always found him to be respectful and professional." Captain Testa also "advised [Complainant 1] how to conduct herself in the future in case she was involved in a similar situation."

As described below, Captain Testa reached this conclusion shortly after BPD had disciplined Officer Ottey for engaging in an off-duty fight, during which he had displayed a knife (*see* Complaint 2).

### 2. OAG Conclusions

Officer Ottey lacked the requisite probable cause to arrest Complainant 1 for disorderly conduct and likely lacked probable cause to arrest her for obstruction of governmental administration.

While Complainant 1 used profanities towards Officers Ottey and Daniel, it is undisputed that the profanities were only directed towards the officers and that Complainant 1's conduct amounted to nothing beyond a few brief statements. Under these circumstances, Officer Ottey lacked probable cause to arrest Complainant 1 for disorderly conduct, as her conduct did not cause any threat of public harm. *People v. Baker*, 20 N.Y.3d 354, 360 (2013) ("a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem"); *see also People v. Gonzalez*, 25 N.Y.3d 1100, 1101 (2015). Like in *Baker*, the interaction took place during daylight hours on a public street, the statements were directed at a police officer, were brief, and were not accompanied by menacing conduct. *Id*. at 362. As the Court of Appeals concluded in *Baker*, the fact that Complainant 1's abusive statements "were directed exclusively at a police officer—a party trained to defuse situations involving angry or emotionally distraught persons—further undermines any inference that there was a threat of public harm." *Id.* at 363.

It is also likely that Officer Ottey did not have probable cause to arrest Complainant 1 for obstruction of governmental administration in the second degree, as Complainant 1 did not possess the requisite intent for this offense. "The plain meaning of the statute and the accompanying commentary clearly demonstrate that the *mens rea* of [obstruction of governmental administration in the second degree] is an intent to frustrate a public servant in the performance of a specific function." *People v. Brooks*, 171 A.D.3d 778, 780, 97 N.Y.S.3d 254, 255 (2d Dep't 2019). Here, by all accounts, Complainant 1 approached her son's vehicle because she was concerned he had been pulled over, she ultimately departed the scene and returned home after the officers told her to leave, and according to both Complainant 1 and her son, she was attempting to provide information to the officers.[2]

---

[2] Complainant 1's verbal statements were protected by the First Amendment. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we

3

We also conclude that Officer Ottey used excessive force against Complainant 1 while effecting her arrest in violation of the Fourth Amendment and BPD policies and procedures. *See Graham v. O'Connor*, 490 U.S. 386 (1989); Buffalo Police Department Manual of Procedures, Chapter III, Sections 6.1 and 6.2. The Supreme Court established in *Graham v. O'Connor* four factors that should be considered in determining whether constitutionally excessive force has been used by an officer: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. 386 (1989).

An application of the factors enunciated in *Graham* makes clear that the force used by Officer Ottey was excessive. First, disorderly conduct (a violation) and obstruction of governmental administration in the second degree (a misdemeanor) are both low-level offenses. Second, Complainant 1 posed little to no threat to the safety of the officers or others. She did not make any threats to officers or others, nor did she engage in any physical acts; she merely used profanities towards the officers and left the scene after twice being asked to do so. Even according to Officer Ottey's contemporaneous paperwork, Complainant 1 at no point actively resisted arrest or attempted to evade arrest by flight. At her son's car stop, Complainant 1 had been told by the officers repeatedly to get back into her car, which she ultimately did. When Officers Ottey and Daniel arrived at her home—the location at which force was ultimately used—she came outside to meet them and did not attempt to leave or retreat into her home.

      B.      Complaint 2, IC2019-065

            1.      *Factual Background*

On August 19, 2019, Complainant 2 and his brother-in-law were pulled over by Officers Ottey and Daniel for a traffic violation in the vicinity of Suffolk Street and Hempstead Avenue. Officers Ottey and Daniel searched the vehicle. According to Complainant 2's brother-in-law, Officer Ottey asked whether he or Complainant 3 had any marijuana. Officer Ottey saw a small amount of marijuana on the floor of the vehicle, ordered Complainant 2 and his brother-in-law out of the vehicle, placed them in the back of the police car, and proceeded to search their vehicle. Officers Ottey and Daniel wrote Complainant 2's brother-in-law a ticket for the traffic violation and allowed them to leave. Neither Officer Ottey nor Officer Daniel was interviewed by BPD regarding the traffic stop, and when OAG interviewed Officer Ottey, he was unable to clearly recall why he ordered Complainant 3 and his brother-in-law out of the vehicle or searched the vehicle, but also stated, "I always check in the car."

While searching the vehicle, Officer Ottey apparently dropped his cell phone. When he realized this, Officer Ottey called his phone, which was answered by Complainant 2. Officer Ottey made plans with Complainant 2 to retrieve his phone at Complainant 2's mother's home after his shift. He arrived in the early morning hours of August 20th.

---

distinguish a free nation from a police state." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462–63, 472 (1987); *see also* Buffalo Police Department Manual of Procedures, Chapter III, Section 6.2 (prohibiting the use of retaliatory force for First Amendment protected activities).

The ensuing events were captured on Complainant 2's security camera, which included visual, but not audio, footage. Complainant 2's disabled[3] mother stepped out of Complainant 2's car, where she and her son were waiting, to give Officer Ottey his cell phone. The two began talking. According to Complainant 2's mother, she told Officer Ottey that she hoped he would offer to others the same courtesy her son was extending to him, after which Officer Ottey responded with something along the lines of, "how are you going to fucking approach me like that?" According to Officer Ottey, Complainant 2's mother stated that he should be careful who he pulls over, and that she knew he had a wife and kids, which he interpreted as a threat.

Officer Ottey then began recording Complainant 2's mother with his cell phone. Complainant 2's mother waved her hand in front of the cell phone camera to block it from recording, when Officer Ottey admittedly struck her hand with his hand. At this time, Complainant 2 exited his car. The two began to fight, and Officer Ottey punched Complainant 2 in the jaw. At some point, Officer Ottey stepped on Complainant 2's mother's foot. Complainant 2's brother, upon seeing them fight, came toward the fight and became involved. Officer Ottey then pulled out a knife. Complainant 2, his brother, and his mother retreated, and Officer Ottey drove away. Complainant 2 reported that he sustained a cervical neck sprain while his mother's foot was fractured during the encounter. Complainant 2's mother stated to OAG personnel that she experienced PTSD from the incident. Officer Ottey stated to OAG personnel that, during the fight, Complainant 2 used racial slurs toward him.

Officer Ottey initially told IAD investigators that he never had or pulled out a knife, but ultimately admitted that he did have and did pull out a knife during the incident. He subsequently pled guilty to violating Chapter I, Section 1.1b and Chapter III, Section 3.2a and/or 3.2b of the Rules and Regulations for the Government and Discipline of the City of Buffalo Police Department by using unnecessary force and violence and failing to complete a Use of Force report. He was disciplined with six days without pay.

2.   *OAG Findings*

We agree with the agency that Officer Ottey violated BPD policy. Although the matter was not referred to the Erie County District Attorney's Office, this conduct potentially could have subjected Officer Ottey to criminal charges.

In addition, if Complainant 2's brother-in-law's description of the initial car stop was accurate, Officer Ottey unlawfully questioned and seized Complainant 2 and his brother-in-law and unlawfully searched their vehicle during the initial car stop.[4] Officer Ottey allegedly placed

---

[3] Complainant 2's mother, who was 47 years old at the time of the incident, told OAG personnel that she had sepsis and was also recovering from a knee surgery at the time of the incident, and as the video footage depicted, she appeared to have difficulty walking.

[4] Officer Ottey allegedly immediately asked Complainant 2 and his brother-in-law whether they had any marijuana after pulling them over for a VTL violation. Officer Ottey would not have had founded suspicion to ask this question, as required under the law. *See People v. Garcia*, 20 N.Y.3d 317, 324 (2012); *People v. Freeman*, 144 A.D.3d 1650, 1651 (4th Dep't 2016).

5

Complainant 2 and his brother-in-law in the backseat of the police vehicle, which would have constituted a level three temporary detention under *DeBour*, requiring that the officer had a "reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor." *People v. DeBour*, 40 N.Y.2d 210, 223 (1976); *People v. Solivan*, 156 A.D.3d 1434, 1436 (4th Dep't 2017). The possession of a small amount of marijuana constituted only a violation at the time of the incident; as such, Officer Ottey would have lacked the requisite reasonable suspicion to detain the individuals in the patrol vehicle.

According to Complainant 2's brother-in-law, Officer Ottey searched the vehicle because he saw a small amount of marijuana. Officer Ottey did not arrest, and displayed no intent to arrest, Complainant 3 or his brother-in-law. Accordingly, neither the automobile exception nor the search incident to arrest exception to the warrant requirement would have applied. *See People v. Reid*, 24 N.Y.3d 615, 619 (2014) ("where no arrest has yet taken place, the officer must have intended to make one if the 'search incident' exception is to be applied"); *People v. English*, 64 Misc. 3d 1226(A), 117 N.Y.S.3d 802 (New York Co. 2019) ("the People failed to meet their burden of demonstrating the propriety of the search . . . under the automobile exception, as this search occurred independent of any arrest" and "when alleged marijuana was seen prior to the search . . . it was not removed from the car nor were any of the occupants arrested for its possession").[5] In addition, in February 2019, months before this incident, Mayor Byron Brown had issued a directive ending the enforcement of low-level marijuana possession offenses by the Buffalo Police Department, prohibiting the officers from arresting Complainant 2 or his brother-in-law or searching their vehicle at the time.[6]

### C. Complaint 3, EF2019-026

#### 1. Factual Background

On October 13, 2019, Officers Ottey and Daniel pulled over Complainant 3 and his passenger on South Park Avenue for failing to wear a seat belt. While sitting in his vehicle and waiting for the officers to generate a summons, Complainant 3 yelled, "hurry the fuck up," and when they returned with his summons he stated to the officers, "go fuck yourselves," and began to drive away. The officers then directed Complainant 3 to stop his vehicle. Officer Ottey placed Complainant 3 under arrest for disorderly conduct and issued him four additional tickets for unsafe tires, in addition to a ticket for failure to wear a seat belt. Officer Ottey explained to OAG personnel regarding the four additional tickets for unsafe tires, "I was going to give him a break and then I didn't give him a break after that [profanities were used] because I didn't think he deserved the break."

---

[5] We note that Officer Ottey's statement to OAG personnel that he "always check[s] in the car" raises concerns around his understanding of Fourth Amendment protections against such unjustified intrusions.

[6] Available at https://www.buffalony.gov/DocumentCenter/View/5414/SOTC-PressRelease-2019?bidId=.

According to Complainant 3, Officer Ottey aggressively pulled him out of the vehicle, dragged him to the back of the car, handcuffed him, and hurt his hand in the process, causing him to experience numbness in his left thumb. According to Officer Ottey, no force was used, and Complainant 3 did not at any point try to resist arrest.

The Internal Affairs Division made a finding of "not sustained" and recommended a conference with Officer Ottey. In his interview with OAG personnel, Officer Ottey stated that at his conference with the deputy commissioner following this investigation, he was told to make better decisions and better choices. Officer Ottey also recalled a conversation with his supervisor during which he learned that he did not have to arrest Complainant 4 or give him the extra tickets.

2. *OAG Findings*

Officer Ottey unlawfully arrested Complainant 3 in violation of the Fourth Amendment and BPD policies and procedures. *See* U.S. Const. amend. IV; N.Y. Const., Art. I, § 12; Buffalo Police Department Manual of Procedures, Chapter III, Sections 2.1, 2.2, and 4.1.

While Complainant 3 used profanities towards Officers Ottey and Daniel, it is undisputed that the profanities were only directed towards the officers and that his conduct amounted to nothing beyond a few brief statements. Under these circumstances, Officer Ottey lacked probable cause to arrest Complainant 3 for disorderly conduct because his conduct did not cause any threat of public harm. New York's Court of Appeals explained in *People v. Baker*, "a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem." 20 N.Y.3d at 360; *see also People v. Gonzalez*, 25 N.Y.3d at 110. Like in *Baker*, the interaction took place during daylight hours on a public street, the statements were extremely brief, lasting only seconds, and the statements were not accompanied by menacing conduct. 20 N.Y.3d at 362. Further, the fact that the complainants' abusive statements "were directed exclusively at a police officer—a party trained to defuse situations involving angry or emotionally distraught persons—further undermines any inference that there was a threat of public harm." *Id.* at 363.

Complainant 3's verbal statements criticizing the police were protected by the First Amendment. *City of Houston, Tex. v. Hill*, 482 U.S. at 462–63, 472; *see also* Buffalo Police Department Manual of Procedures, Chapter III, Section 6.2 (prohibiting the use of retaliation for First Amendment protected activities).

We also note that Officer Ottey's decision to issue Complainant 3 four additional tickets was, at least in part, retaliatory, in light of Officer Ottey's statement that "I was going to give him a break and then I didn't give him a break after that [profanities were used] because I didn't think he deserved the break." While there is no specific BPD policy on ticketing, Buffalo Police Department Manual of Procedures, Chapter XVI, Section 1.1 provides, "[i]t is the policy of the Buffalo Police Department that its employees perform their duties in an efficient, courteous, and orderly manner using patience and good judgment at all times." A practice of issuing a significant number of tickets to drivers not only can impose an unnecessary financial burden on

community members, but also can erode community trust in law enforcement and create the potential for retaliatory and biased policing.[7]

        D.        Complaint 4, IO2020-005

        1.        Factual Background

On December 20, 2019, Officer Ottey pulled over Complainant 4 at Moselle Street and McKibben Street for window tints. Officer Ottey asked for Complainant 4's driver's license.

According to Complainant 4, after running his license, Officer Ottey returned and stated that Complainant 5 had an order of protection against him from "his baby mama." Complainant 4 stated that the woman in the passenger's seat of his vehicle was not the person who had the order of protection against him. Officer Ottey then stated, "How many baby mamas do you have?" Complainant 4 asked why this mattered, then Officer Ottey "jumped up and down" and told Complainant 4 he was about to write him a bunch of tickets. Complainant 4 then asked to speak with a supervisor and Officer Ottey denied this request. Officer Ottey did not use a window tint meter to measure the window tints.

According to Officer Ottey, after coming back from checking Complainant 4's license, he asked whether Complainant 4 knew he had an order of protection against him. Complainant 4 said yes, and Officer Ottey began to ask whether the female passenger was the person who had an order of protection against him. Complainant 4 then said, "wrong baby mama buddy, you thought you had something." Officer Ottey then took measurements of his window tints and printed his tickets.

Officer Ottey issued Complainant 4 seven tickets—four for tinted windows and one each for inadequate equipment, no left side view mirror, and an obstructed driver's view. According to Complainant 5, the tickets cost him 500 to 600 dollars. According to Officer Ottey, he gave four tickets for tinted windows because Complainant 4 "wanted to be how he was and didn't want to cooperate with me and I just was doing my job so I just gave him the tickets." Officer Ottey explained in his interview with OAG personnel that the number of tickets to give out to an individual is fully within an officer's discretion at BPD. Officer Ottey further explained that at some point after the incident involving Complainant 4, his supervisor told him and other officers not to give out multiple tickets for the same offense (i.e., tints, unsafe tires, etc.) as a courtesy, which caused Officer Ottey to change his practices and generally give out the minimum.

---

[7] A single window tint violation can cost $340 in fines, fees, and surcharges in New York. *See* Chris Mai and Maria Rafael, *The High Price of Using Fines and Fees to Fund Government in New York*, Vera Institute of Justice (December 2020), 3, available at https://www.vera.org/downloads/publications/the-high-price-of-using-justice-fines-and-fees-new-york.pdf. The cost of multiple traffic tickets can range in the thousands, a cost that most households cannot afford. *See* Angela LaScala-Gruenewald, Katie Adamides, and Melissa Toback, *New York's Ferguson Problem*, Fines and Fees Justice Center, No Price on Justice (September 2020), 6, available at https://nopriceonjustice.org/wp-content/uploads/2020/09/New_York_Ferguson_Problem_NPJ_Report.pdf.

The agency conducted a unit-level investigation led by Captain Testa, who spoke with Complainant 4 and received a P-73 from Officer Ottey. Captain Testa recommended exoneration of Officer Ottey, explaining that he believed the officer's version of events to be more accurate than that of the complainant, because he could "hardly believe that the officer would 'literally' jump up and down and tell [Complainant 4] that he was about to give him a bunch of tickets," and he had "observed Officer Ottey during traffic stops in the past and ha[d] always found him to act in a professional manner."

### 2. OAG Findings

Officer Ottey's decision to issue Complaint 4 seven tickets for low-level equipment violations was, at least in part, retaliatory, in light of Officer Ottey's statement that Complainant 4 "wanted to be how he was and didn't want to cooperate with me and I just was doing my job so I just gave him the tickets." Officer Ottey's excessive ticketing should have been addressed by the agency following this incident as well as following Officer Ottey's encounter with Complainant 3. As explained above, excessive ticketing can impose an unnecessary financial burden on community members, erode community trust in law enforcement, and allow for retaliatory and biased policing.

## E. Complaint 5, EC2020-032

### 1. Factual Background

On April 25, 2020, Complainant 5's neighbors were having a cookout when some officers, including Officers Ottey and Daniel, arrived to talk with the neighbors. Complainant 5 began recording the officers with his cell phone. The cell phone footage depicts Officer Ottey walking toward Complainant 5 and asking if he wanted hand sanitizer, to which Complainant 5 responded, "no." Officer Ottey then sprayed Complainant 5 with the hand sanitizer. Complainant 5 repeatedly asked Officer Ottey for his badge number, but Officer Ottey did not provide it. According to Complainant 5, Officer Ottey sprayed him in the face, while according to Officer Ottey, he sprayed Complainant 5 on the hands.

Officer Ottey admitted to IAD investigators that he sprayed Complainant 5 without prompting or consent and that he did not provide his badge number when asked. Officer Ottey pled guilty to violating Chapter I, Section 1.1(b) and Chapter III, Sections 3.2a and 3.2b of the Rules and Regulation for the Government and Discipline of the Buffalo Police Department by spraying hand sanitizer onto a civilian and refusing to give his badge number upon request. He was assessed a penalty of a reprimand.

### 2. OAG Findings

We agree with the agency that Officer Ottey violated BPD policy. We also note that Complainant 5 recording police officers from a reasonable distance was activity protected by the First Amendment. *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("The filming of government officials engaged in their duties in a public place, including police officers performing their

9

responsibilities, fits comfortably within [First Amendment] principles."); *see also* Buffalo Police Department Manual of Procedures, Chapter III, Section 6.2.

### III.   Conclusion and Recommendations

#### A.   Officer Ottey Engaged in a Pattern of Misconduct

The incidents described above constitute a pattern of Fourth Amendment violations (wrongful arrests and excessive force) and First Amendment retaliation under Executive Law § 75(5)(b). Officer Ottey repeatedly escalated what should have been ordinary traffic stops involving minor VTL violations into unlawful seizures and the unnecessary use of force and violence, sometimes involving retaliation against protected speech. Officer Ottey followed Complainant 1 to her home and arrested her using excessive force, and unlawfully arrested Complainant 3, during the enforcement of routine VTL violations and after their exercise of First Amendment protected speech. While retrieving the cell phone that he inadvertently left in a vehicle during a traffic stop, Officer Ottey initiated a physical fight with Complainant 2 and his family, punching Complainant 2 and brandishing a knife. Finally, Officer Ottey sprayed Complainant 5 with hand sanitizer without his consent after seeing Complainant 5 record from a distance on his cell phone—a First Amendment protected activity.

Importantly, whether BPD found wrongdoing or not, Officer Ottey was not provided with supplemental training or resources to effectively change his behavior. While Officer Ottey bears responsibility for his past conduct, the agency is responsible for providing guidance, training, and supervision to its officers to ensure safe, equitable, and constitutional policing.

Further, two of the internal investigations addressed in this letter led by Captain Testa relied on the investigator's personal impressions of the subject officer, rather than an impartial analysis of the facts. The agency should provide training to Captain Testa on fairness and impartiality in investigations.

Finally, it bears noting that all of these incidents occurred while Officer Ottey was assigned to the specialized Housing Unit, which has since been disbanded, and that he apparently has not been subject to a civilian complaint since leaving that unit. Officer Ottey estimated to OAG personnel that, during his time in the Housing Unit, he conducted between 50 and 100 traffic stops per day. He further explained that the Housing Unit would learn "who is good and who is not," including those who had firearms or were involved in drug transactions, then wait for these individuals to commit traffic infractions and pull them over to obtain information. BPD bears responsibility for ensuring that its policies and practices protect civil liberties and provide equal protection under the law, and critically, for ensuring that its policies and practices are perceived as legitimate in the community. *See Constitutional Policing as a Cornerstone of Community Policing: A Report by the Police Executive Forum*, Office of Community Oriented Policing Services (April 2015).[8]

---

[8] Available at https://portal.cops.usdoj.gov/resourcecenter/ric/Publications/cops-p324-pub.pdf.

    B.  Recommended Remedial Actions

While the conduct described above is serious, we do not recommend specific disciplinary action against Officer Ottey because the eighteen-month statute of limitations under Civil Service Law Section 75 has expired for each of the incidents discussed in this report.

To prevent future misconduct, we recommend:

(1) BPD provide ongoing scenario-based trainings to Officer Ottey on the following topics:

  a. Fourth Amendment protections against unlawful searches and seizures,
  b. Use of force,
  c. De-escalation techniques,
  d. Levels of police intrusion permitted by *People v. DeBour*,
  e. Probable cause requirements for arrests for low-level offenses including disorderly conduct and obstruction of governmental administration; and

(2) BPD develop a plan for reviewing Officer Ottey's stops and uses of force for the next two years to ensure constitutional conduct.

We request that BPD inform the Office of the Attorney General within 90 days of the actions BPD is taking in connection with these recommendations, pursuant to Executive Law § 75(5)(c).

          Thank you,

          Tyler Nims
          Chief, Law Enforcement Misconduct Investigative Office
          New York State Office of the Attorney General