# EXHIBIT 327

# FROM REACTION TO INTERACTION: COMMUNITY POLICING IN BUFFALO

Caryn Blair, Kerry Battenfeld, Erin Carman, and Sam Magavern

DRAFT: February 10, 2016

1

COB464816

# EXECUTIVE SUMMARY

[to be completed later]

# TABLE OF CONTENTS

[to be completed later]

COB464817

# HISTORY OF COMMUNITY POLICING

### CHANGING TIMES AND CHANGING POLICE PRACTICES

Community policing is often cited as a solution to the discord between police and communities of color that has gained national attention in recent years.[1] It is important to note that community policing is not defined as a discrete set of practices; rather, it is best described as a philosophy of policing that emphasizes police and community collaboration.[2] This approach focuses on community-driven responses to issues of public safety and recognizes the unique skills and expertise of police to promote safety and crime prevention, as well as their role as public servants, who should ultimately be accountable to the people they serve. Community policing is best implemented when civilians are empowered to take proactive roles in promoting public safety, and have the authority to inform policing priorities and strategy. Further, this style of policing calls upon officers to develop relationships with the people, businesses, and organization in the communities they serve so that they can engage in problem-solving to address public safety issues, enhance police legitimacy, and respond to incidents of crime using effective, and constitutional, techniques.



Figure 1: Fundamentals of Community-Policing

In the 1970s, San Diego became the first municipality to report on community-oriented policing (COP) practices, in which officers were required to become familiar with specific geographic locations, their demographics, topography, and history of service calls, and develop customized strategies for their specific beats.[3] The San Diego study found that this type of policing that made officers familiar with both people and place brought more satisfaction to police work and built greater respect and relationships between residents and officers.[4]

3

COB464818

At the end of the 1970s, Herman Goldstein developed the "problem-oriented policing" (POP) model, which encouraged police officers to consider problem resolution as part of their purpose.[5] Patrol officers would identify "hot spots" based on the number of service calls and crime rates and attempt to develop ways to reduce the number of calls received and overall criminal activity, making police more actively involved in the criminal investigation process due to their increased knowledge of crimes in specific areas.[6] At the same time, foot patrol experiments in Newark, New Jersey and Flint, Michigan proved to reduce crime levels and increase citizens' approval and feelings of security while improving morale for officers.[7]

The War on Drugs and the philosophy of "broken windows" played a key role in the changing perceptions of police over the last few decades. As Michele Alexander documents in *The New Jim Crow*, the War on Drugs led to a massive increase in the number of arrests and convictions for drug offences, with dramatic racial disparities at every stage in the process, and to the federally sponsored militarization of local police forces. Meanwhile, the newly popular broken windows theory focused on eliminating "visible signs of disorder"—the types of disorder that were highly visible in public housing and low-income neighborhoods.[8] The two trends combined in important ways, as police focused on low-level crimes that were common offenses in these areas and made arrests to a disproportionate number of African American males in the process, failing to approach the situation proactively as problem solvers. In too many cities and towns, the War on Drugs became a war on people and neighborhoods, in which police were feared as an occupying force.

### COPS PROGRAM AND FEDERAL RESPONSE TO POLICING

The Community Oriented Policing Services (COPS) program was initiated under the Clinton administration's Violent Crime and Law Enforcement Act of 1994 as a 6-year, $9 billion dollar plan[9] to increase the interaction between police and the communities they served, increase the number of officers on the streets, and utilize new technology and information sharing to reduce crime (Figure 1).[10] Approximately one third of available funding was dedicated to the 1% of jurisdictions with the highest crime rates.[11]

4

COB464819

The COPS program endorsed a model of community-policing in which partnerships between multiple interest groups are used to solve public safety issues by taking preventative measures rather than having the police only react to incidents as they occur. [12]  But for many low-income, minority communities there have been struggles in creating partnerships during the COPS program due to an inability to work towards common agendas, share power, and make joint decisions.[13]

## CURRENT CHALLENGES WITH POLICING

### RENEWED NATIONAL FOCUS ON POLICING

The death of Travon Martin in early 2012, at the hands of community watch member George Zimmerman, renewed a national conversation on racial tension in communities and the disparate treatment of racial minorities, both offenders and victims, in the criminal justice system. In July 2014, the death of Eric Garner after a New York Police Department (NYPD) officer used an illegal choke-hold to arrest him[14] shifted the focus toward officer misconduct, brutality, and impunity. The subsequent deaths of Michael Brown, Walter Scott, Freddie Gray, Tamir Rice, and Sandra Bland during run of the mill encounters with police, brought national attention to the pervasive level of distrust and fear of law enforcement within communities of color across the country.

In response to mounting tension, on December 18, 2014, President Barack Obama established the Task Force on 21st Century Policing via executive order.[15] The Task Force's sought to identify best practices in policing to improve safety while also building trust within communities. In its final report, the task force identified community policing as an important "guiding philosophy" for both law enforcement and community stakeholders.[16] The report's authors further noted the importance of incorporating community and particularly youth perspectives into policing efforts, so that community safety efforts reflect the needs of residents, and promote the dignity of society's most vulnerable members.[17]

5

COB464820

Meanwhile, in Buffalo, a series of police misconduct cases (detailed below), and a report documenting the racial disparities in the local criminal justice system, have highlighted the need for new approaches to policing. During the years 2007-2011, African Americans accounted for 42.6% of arrests in Erie County despite being just less than 14% of the population, and Hispanics accounted for 7% of arrests and comprised 4.7% of the population.[18]  In 2010, African Americans were arrested for marijuana possession in Buffalo at 5.7 times the rate of Caucasians, despite near equal usage by Caucasians and African Americans.[19]

> During the years 2007-2011, African Americans accounted for 42.6% of arrests in Erie County despite being just under 14% of the population.

The following report seeks to identify challenges faced by Buffalo police and provide recommendations for building upon existing community policing efforts. These recommendations are derived from recent research and reports on effective programs that have been implemented in cities across the country. Specific focus is given to policing of Buffalo Municipal Housing Authority (BMHA) properties, which have experienced high levels of violent crime, as well as ongoing tension between residents and police. For this reason, BMHA communities offer a unique opportunity to implement expanded community policing practices on a smaller scale. In addition, BMHA's current community policing efforts offer an example of how residents have benefited from the efforts of a dedicated Community Police Officer.

### History of Buffalo Police Misconduct

Over the last decade, a number of disturbing allegations of Buffalo Police misconduct have come to the public's attention, the Willet-Cerulli case being a recent and well-documented example.[20] In April of 2014, John Willet was signaled to pull over while driving in the neighborhood around Shaffer Village, one of BMHA's developments.  After he was stopped and found in possession of narcotics, he was placed in handcuffs.  A bystander captured the incident on video, in which Willet can be seen lying on the ground handcuffed while one of six responding officers physically attacks him while he is prone, restrained, and asking repeatedly for the officer to stop. The perpetrator, officer John Cerulli, resigned from the force and pled guilty to federal charges.[21] The image of Buffalo Police Officers behaving in the matter was unsettling, and pushed Buffalo Common Council to re-establish the defunct Police Oversight Commission, with Councilmember

6

COB464821

David Rivera selected to serve as the chair.[22] The commission has met with police on a semi-regular basis to discuss means to avoid instance of excessive use of force through structural and policy changes. The Committee has limited ability to enforce change within the department, and needs to either gain more robust public support for police reform, or support from within BPD and the mayor's office to push for reform.

Current Police Commisioner, Daniel Derenda has emphasized that the vast majority of officers are dedicated professionals and that the police administration works hard to hold those who are not accountable.[23] He has reportedly reached out to the FBI to assist with investigation of police abuse when warranted.[24] While it is likely true that the number of officers who engage in misconduct is small when compared to the entire force, the severity of the brutality in some cases, and the impunity with which some officers have acted, suggests an ongoing need for a cultural change within the force. Further, several of the officers involved in publicized incidents were later found to have been involved in prior incidents of discourtesy and misconduct. Escalation of unprofessional and violent behavior indicates that, at least for some officers, problem behavior goes unnoticed and unreported, or discipline fails to deter future misconduct and correct behavior.

To cite several examples, Buffalo Officer Greg O'Shei was accused of abusing his power by coercing two women into having sex with him on multiple occasions.[25] One woman reported that he would come to her home, bang on the door and shine his flashlight into her home, and threaten to call CPS on her if she resisted him.[26] O'Shei resigned from his post and pled guilty to two misdemeanors in 2006.[27] He was given only probation.[28] Officer Gregory Kwiatkowski was allegedly involved in three instances of violence against other officers—assaulting an officer who attempted to stop him from choking a handcuffed suspect, choking another officer, and punching a third officer while off-duty.[29] He was eventually suspended and forced to resign, but not before he was charged with civil rights violations for allegedly holding down a teenaged suspect and shooting him with a BB gun.[30] Kwiatkowski's case is particularly worrisome because even the allegations of violence against other officers was not enough to call attention to the fact that this was a person who should not be on the force. In addition, Carol Horne, the officer Kwiatkowski attacked when she told him to stop choking a handcuffed suspect, was fired

COB464822

for obstruction for purportedly jumping on Kwiatkowski's back and pulling him off the suspect, though Kwiatkowski himself denied in a sworn statement that Horne jumped on him.[31] Horne continues to fight to get her pension restored. Her treatment may serve as a warning to other officers, discouraging them from stepping forward to report abuse.

In a more recent example, Robert Eloff was indicted on federal civil rights violations following an incident at a bar where he was moonlighting as a bouncer. The bar owner pushed a patron down a flight of stairs and Eloff handcuffed the unconscious man, Sager, who was in grave need of medical attention and later died. Eloff is currently suspended and awaiting trial.[32] Eloff previously served as police officer with the BMHA until the housing authority dissolved its police force. He then went to work as an officer for SUNY Buffalo, where he was forced to resign following several incidents of using excessive force with students and abusing sick leave and overtime.[33] Following that, he was hired by Buffalo Police after passing a civil service test. Former BMHA officers were not subjected to the same background screenings as other officers, and BPD never requested Eloff's personnel files from his time at UB.[34] While with BPD, he was accused of knocking a phone out of a woman's hand and attempting to confiscate it while she attempted to record another officer pushing a suspect up against a car.[35]

Other upsetting incidents include Officer Porzio, who was videotaped in 2010 striking a handcuffed suspect in view of two other officers. The incident only recently came to BPD and the mayor's attention after the video was posted and caught their attention.[36] In May 2012, a Buffalo officer was arrested and later convicted on drug charges, for harvesting marijuana, even checking on his operation while on duty.[37] In October 2014, a female officer was fired following a disciplinary hearing for allegedly threatening to kill a woman who she believed was flirting with her boyfriend, another BPD officer. She was accused of leaving her patrol to track the woman down at her work and home.[38] In June 2015, a Buffalo officer was fired after he was convicted of stealing $50 from a lost wallet that was turned into him by a civilian.[39]

Following the discovery of the Porzio video, Mayor Byron Brown emphasized that "Ninety-nine percent of our police officers do the right thing for the residents of this community…In those incidents where the right thing is not done our department has taken swift action."[40] However,

8

the public has limited means to assess the truth of this assertion. New York Civil Rights Law § 50-a limits the disclosure of police disciplinary and other personnel records, except through carefully defined court process. This means that the records are not subject to NYS FOIL requests, and citizens are thereby limited in their ability to accurately assess administrative responses to instances of police misconduct.[41] The NYS Court of Appeals has stated that the purpose of the bill is to "prevent the potential use of information in the records in litigation to degrade, embarrass, harass or impeach the integrity of the officer."[42] While there is merit to this concern, recent abuses of power and officer misconduct both nationally and in the city of Buffalo highlight the need for increased transparency and more civilian involvement in the oversight process.

Past attempts at police oversight were met with resistance from police and suffered from poor leadership and scandal. In late 2010, the Buffalo Common Council authorized the formation of a Joint Police Reform Commission to be staffed by council and mayoral appointees.[43] The Commission was to spend a year assessing police practices and develop recommendations moving forward. Appointed to the commission were H. McCarthy Gipson, former Commissioner of BPD, and Thomas F. Higgins former Erie County Sherriff. Both resigned after the commission's interim chair, community activist Ricky Allen Sr., was arrested on federal drug charges in March 2011.[44] Joe Mascia, a BMHA commissioner, took over the role of interim commissioner but claimed that BPD had been uncooperative in handing over requested information to conduct an assessment and resident survey on crime and policing in Buffalo. Masica, was recently involved in a scandal of his own; he was recorded during summer 2015 having a conversation in which he used racial slurs in reference to elected city officials. He has been suspended from his position as commissioner with BMHA and is awaiting a decision from the mayor's office as to whether or not he will be fired.[45]

## POLICING OF BMHA PROPERTIES

The policing of Buffalo Municipal Housing Authority properties offers a particularly important set of challenges and opportunities.  In 2010 the BMHA, having eliminated its own police force in a cost-saving move, entered into a contract with the Buffalo Police Department (BPD) to create a housing unit to provide "above baseline" police services at BMHA developments,

9

COB464824

particularly those five BMHA sites considered to be the most afflicted by crime: Commodore Perry, Kenfield-Langfield, Shaffer Village, Ferry Grider Homes, and Jasper Parrish Homes.[46] As part of this service agreement, the captain of the housing unit police is required to "initiate and monitor ongoing lines of communication with public housing resident leaders to effectively employ community policing concepts and to address in a timely manner the concerns raised by such leaders."[47] Despite the reference to community policing, the Housing Unit operates more as a strike force, with a strong focus on proactive stops and arrests. Both for officers and residents, the relationship of the Housing Unit to the precinct officers is somewhat blurry, as both have duties within the same geographic areas. One Housing Unit officer has chosen to become a community police officer, joining the two community police officers currently assigned to each of Buffalo's five precincts. The other Housing Unit officers do not appear to work in close relationship to BMHA resident organizations, staff, or other community groups, but rather to operate in a surprising degree of isolation.

More than four years after the contract was adopted, residents have aired various complaints about the BPD's role under the contract. At a community forum held in late 2014, residents in attendance cited that they, visitors, and relatives were often subjected to stop-and-frisk treatment for merely walking around, and that responses to service calls were taking too long and sometimes resulted in police barging into their homes.[48] Other residents have been told to call 911 despite the Housing Unit officer being onsite.[49] This treatment leads to a lack of mutual respect and trust, and an *us versus them* mentality. People begin to feel more like prisoners on BMHA properties and become fearful to reach out to the police with information.

One concern is with residents or their visitors, especially African-Americans, being arrested for trespass, loitering, or other petty crimes.

COB464825



Figure 2 Trespass Incidents at BMHA Sites *Statistics are for trespass incidents alone and do not include trespasses associated with other criminal activity. Source: BMHA.

Common law and lease agreements grant residents the right to peaceful enjoyment of property as well as the right to have visitors.[50]  The Housing Act of 1937 states that public housing tenants shall be provided with "reasonable accommodation of their guests" as part of their lease agreement.[51]  Further, some argue that certain police practices are a violation of both the Fourth and Fourteenth Amendments.  The Fourth Amendment protects citizens from unreasonable search and seizures, while the Fourteenth Amendment grants equal protection under the law.

BMHA residents have also expressed concern that police spend too much time and effort on traffic and parking infractions. The case of John Willet is one incident where a traffic stop resulted in much more than the issuing of a ticket.

11

COB464826



Figure 3 Traffic infractions issued by BPD Housing Unit for reporting period December 2012-May 2014. *Numbers attributed to BMHA are within a ½ mile of BMHA property. Source: Buffalo Police Department.



Figure 4 Traffic infractions issued by BPD Housing Unit for reporting period December 2012-May 2014. *Numbers attributed to BMHA are within a ½ mile of BMHA property. Source: Buffalo Police Department.

.

COB464827

As can be seen in the graphs below (Figures 4 and 5), Housing Unit police are making a large number of felony and misdemeanor arrests on BMHA sites, as well. Beyond a doubt, crime and safety remain huge problems for BMHA residents. The question is whether the current, strike-force model of policing is the best solution, or whether a more community-oriented model might yield better results: for residents, officers, taxpayers, and the general public.



Figure 5 Felony arrests made by BPD Housing Unit for reporting period December 2012-May 2014. *Numbers attributed to BMHA are within a ½ mile of BMHA property. Source: Buffalo Police Department.



Figure 5 Misdemeanor arrests made by BPD Housing Unit for reporting period December 2012-May 2014. *Numbers attributed to BMHA are within a ½ mile of BMHA property. Source: Buffalo Police Department.

13

COB464828

## COMMUNITY POLICING IN BUFFALO

Buffalo's community policing efforts are headed by Lieutenant Steve Nichols, who oversees the city's eleven community police officers. Two officers are assigned to each of the five districts and another to the BMHA sites. Lt. Nichols describes community policing as "engaging with the community," and "taking time to sit with people and listen to them," and emphasizes the importance of having designated community officers within the force.[52] In contrast to patrol officers, who respond to calls and deal with various crises over the course of their shifts, community police officers are able to focus their efforts on relationship development and direct community engagement.[53]

Community Police Officers attend block club meetings and partner with local groups to organize or sponsor community events. During the 2015 holiday season, BPD community officers were present at neighborhood holiday events to hand out bicycles to community members. Throughout Summer 2016, the Community Policing Unit will utilize state funding from a Give Grant to organize corner barbeques in selected neighborhoods. BPD plans to partner with Buffalo Peacemakers and SNUG to do the cooking, and Nichols hopes to invite representatives from the District Attorney's office and state and county officials to participate in these events.[54]

Events like the corner barbeques, and attendance at block club meetings are essential to community policing initiatives—they bring together law enforcement, community organizations and local government in non-confrontational settings where residents have an opportunity to speak to those who police their communities. However, these practices fall short of a fully integrated approach to community policing. Nichols and others within BPD, such as Deputy Commissioner Kimberly Beaty, would like to an increase in community policing practices in Buffalo. Beaty has emphasized her desire to see community policing expanded to include all officers, not just those who are designated community police officers.[55] Implementing this approach will require ongoing training and true culture change within BPD, because, as discussed in more detail below, there exists a stark difference in the approaches presently taken by community oriented officers and patrol officers in Buffalo.

COB464829

**STRATEGIES FOR BUFFALO POLICE DEPARTMENT**

Implementing effective community policing practices in Buffalo will require commitment from BPD administration and leadership, dedicated efforts to refocus training and hiring efforts, and changing incentive structures and promotional criteria. Yet, the burden to change does not lie entirely with police. City officials have a role in identifying policy changes that impact policing—for example, amending laws that have disparate impacts on racial minorities and strengthening civilian oversight mechanisms. Community members must be willing to play their part as well, by continually voicing their concerns, as well as proposed solutions. The following report highlights best practices from around the nation, demonstrating that community-policing in public housing and other low-income communities can work. Trust does not happen overnight, but can occur with incremental steps and the cooperation of various community stakeholders. Public housing, in particular, provides an opportunity to implement more innovative community policing strategies on a small scale, to later be expanded to the rest of the city. It is important that the community-policing process be ongoing, with consistent monitoring and input from the communities served.

# 1. PROMOTE COMMUNITY ORIENTED POLICING THROUGH CULTURE CHANGE AND TRAINING

## Training Community Oriented Officers

In order for community policing to thrive, the culture of police departments must change. Everyone from tenured officers to new recruits must accept and be trained in this model of policing. Community policing must be integrated throughout the entire police force, rather than relegated to a particular department. This ensures that community policing is not viewed as secondary and reduces the likelihood that community policing practices will be scaled back in times of budgetary crisis.[56] Community policing should be the core approach that guides decision-making among everyone from upper level administration to the officers on patrol.

Currently, the NYS Municipal Police Training Council mandates a minimum 649 hours of basic training.[57] Only 2 hours of instruction time are dedicated to community policing, and 5 to cultural diversity/bias issues.[58] Buffalo has made it mandatory that officers take part in a

15

COB464830

minimum of 21 hours of diversity, ethics, and use-of-force training per year, largely due to the John Willet case.[59]  Perhaps even more important than training, however, are positive interactions between police and community, especially across color lines, and consistent practices that reinforce and incentivize community policing behaviors among all officers – not just those designated as community police officers.

 While basic training does include 40 hours of interpersonal skills training, this is focused on arrest techniques, and the instruction is led by a defensive tactics instructor.[60] Along with new training procedures there must be new standards of evaluation and new sets of incentives.  Police should be rewarded for preventing and solving problems and for improving community relations, not just for making arrests.  Becoming a community police officer, or adding more community policing to officer's normal practices, should be incentivized through pay and promotional criteria as well as through recognition and praise.[61]

---

**Case Example: Relationship-based Policing in Watts**[62]

The Public Housing in the Watts neighborhood of L.A. experienced significant crime rate—with over 800 violent crimes reported in 2010, due largely to gang activity. AP Urban Peace conducted a survey of residents and identified fear of gangs and mistrust of police and housing authority staff as major issues. LAPD, the housing authority, AP Urban Peace and residents came together to develop a Community Safety Partnership  to increase safety that focused largely on relationship-based policing. The three goals were "1) long-term relationship development; 2) community-capacity development; 3) and community partnering and input." The police identified officers committed to relationship-based policing and offered incentives through pay and promotion to hire officers to police the public housing units. AP Urban Peace, a civil rights organization, provided a substantial portion of the relationship-based training, and officers were encouraged to collaborate with residents to solve problems, rather that focus on crime suppression and arrests. The program led to a 50% reduction in violent crime over the first three years. Key strategies identified included: 1) careful recruitment of officers and incentives; 2) training in communication skills, adolescent development, and the impact of trauma on communities; 3) asset-mapping, relationship building, and spending time with community

---

COB464831

members; 4) ongoing data collection and assessment to identify strengths and weakness and improve accountability.

Hands-on training and interaction with community members tends to be more effective than drier, classroom-style lectures. Officer training should combine topics such as adolescent development and the impact of trauma with concrete communication and de-escalation skills. This information should then be put to use in role-playing scenarios where officers interact with trained community members in scenarios where they must employ community policing skills and receive feedback on their implementation. This approach has been shown to have a lasting impact on officer behavior in a study focusing on officer interactions with persons with mental illness.[63]

**Building Relationships and Developing Assets to Encourage Problem-solving**

Police officers must be given the tools and incentives to take more community-policing, non-enforcement action at their designated sites.  Districts should engage in regular asset mapping to identify community resources and deficits.[64] Officers should develop direct contacts at asset organizations and businesses to promote collaborative problem solving. Similarly, police should identify community deficits that may contribute to problems of crime. Efforts should be directed not only at responding to crime, but identifying ways to work with existing agencies to respond to issues of public safety. For example, if panhandling is an issue, can officers refer people to a local organization rather than issuing a citation or making an arrest. Police should look to ways they can collaborate with organizations working with youth, the mentally ill, the homeless, and those with addiction issues to proactively address public safety, rather that only responding to crime after the fact. Specific examples of these proactive efforts are discussed below.

COB464832

*Case Study: The 11th Street Corridor Program, Philadelphia, Pennsylvania*

Suffering from crime, Philadelphia's 11th Street Corridor, through the collaboration of housing residents, the Philadelphia Housing Authority, the Housing Authority Police, and Temple University, devised a two-part strategy to increase public safety: community-policing and resident empowerment. Site-specific problem-solving groups were formed that included residents, site management, members of the police department, local service providers, and meeting facilitators. The meeting facilitators developed programs around the goals of the 11th Street Corridor Initiative. On-site teams were formed that allowed residents to voice their concerns and connect with proper service providers and local organizations.[65] Mechanisms to address public safety and problem-solving with the existing resources of the team members were identified, and proper training and support was provided to sustain group interactions without meeting facilitators. Sites were encouraged to communicate their successes and failures with other public housing sites participating in the initiative to develop better problem-solving activities.[66]

[Discuss CDC options in LEAD study; Seattle LEAD program—"cooperation is possible even where adversarial relationships exist[67]]

*Case Study: Neighborhood Resource Team, Miami-Dade County, Florida*

A troubled public housing site developed a Neighborhood Resource Team composed of a police officer, a housing representative, a social worker, a public health nurse, and a teacher to assist with a two-part strategy of family-centered intervention and community-wide intervention, rooted in community-policing. With the combined skills of the Neighborhood Resource Team, residents were able to be trained to perform maintenance, security, and social worker tasks within the community. A partnership was developed with the Perrine County CDC to provide further assistance with employment, senior and youth programs, housing, transportation, legal aid, health care, and neighborhood infrastructure improvements. By forming key partnerships with residents, multiple agencies, and stakeholders, and making personal commitments to the community, Perrine Gardens saw crime drop by over 50% in the first 5 years of the program and improved maintenance of the site's buildings.[68]

COB464833

## Make Officers More Accessible

Some citizens feel threatened and intimidated by the police in their communities. Police must work with the community to build the trusting relationships necessary for community policing. Each officer should be assigned to a specific neighborhood and put on permanent beats to gain familiarity with the area and its residents as a first step to increasing accessibility. This would also help officers learn who does and does not live in a neighborhood such as a public housing development, and decrease the number of stops of lawful residents and their visitors for alleged trespass. In some successful initiatives of community-policing, officers have given their direct contact information to residents. This shows a true willingness and dedication to the community.

[Discuss incentive for living in city, BMHA, among others]

---

*Case Study: Perrine Gardens, Dade County, Florida*

The residents in Miami's Perrine Gardens decided they wanted to "take back their community" after a beloved resident was murdered by local drug dealers. After years of grassroots organizing, a two-part strategy of family-centered intervention and community-wide intervention rooted in community-policing was developed. Police were assigned to long-term duty in specific areas in which they shared personal contact information with residents, kept offices open to the public, attended meetings, and became involved with community organizations, churches, and businesses. [69]

---

Accessibility could be better facilitated with the greater use of foot and bike patrols. As previously noted, there is dissatisfaction with the amount of time BPD officers spend in their cars and the amount of traffic tickets they dole out. Foot and bike patrols would give police the opportunity to meet residents and become recognized faces in the community, build trust, and gain input from residents.

19

COB464834

> ***Case Study: 22nd District Foot Patrols, Philadelphia, Pennsylvania***
>
> Philadelphia's 22nd District is one of the roughest in the city and also home to Temple University. Temple's Center for Security and Crime Science spearheaded an experiment in 2009 to determine the effectiveness of foot patrols, and after seeing a 23% drop in violent crime rates, the 22nd District police continued walking their beats. It was previously assumed that foot patrols only decreased people's perceptions of crime and not the actual levels of criminal activity, but this experiment has shown that implementing foot patrols in areas that are statistically more prone to criminal activity allows cops to take a more proactive role in fighting crime.[70]

Building trust and creating an environment where community engagement can occur will allow the police to form community partnerships. Police must not only interact with residents, they must also look to multiple agencies and stakeholders in the community to address neighborhood conditions and create strategies to achieve community goals. Local businesses, churches, schools, and social service providers have concerns within the community that can also be addressed through community-policing efforts.

### Incentivizing Problem Solving and Relationship Building

The organizers behind the Watts relationship-based policing curriculum noted the importance of institutionalizing incentives to engage in community-oriented policing and ensure that these practices becomes engrained in police department culture.[71] Institutionalizing these practices can be achieved through hiring and promotional criteria that are determined by officer's understanding of and dedication to community policing practices. Annual reviews should include measures of effectiveness in solving problems, fostering relationships with residents and businesses, and partnering with community organizations to address issues in the community.

COB464835

> *Case Study: Niagara Falls, NY Annual Performance Evaluations for Sworn Personnel*
>
> Niagara Falls Police Department conducts formal annual performance evaluations of all sworn officers.[72] In line with the department's community policing plan, the evaluation includes categories such as:[73]
>
> **Relationships with citizens**: officer "employee deals well with the public overall, striving to present a favorable image of the Department as well as demonstrate a caring and courteous demeanor"
>
> **Relationships with ethnic groups other than own**: officer demonstrates "ability and desire to interact with members of [other] ethnic groups" and demonstrates "cultural understanding;"
>
> **Proactively patrols beat or zone**: officer does "more than just respond to radio calls….establishes relationships with members of the community and identifies their needs;"
>
> **Applies Community Oriented Policing and Problem Oriented Policing Strategies**: officer "recognizes and responds to problem situations" and "identifies/evaluates issues, reaches sounds conclusions, generates alternatives, understands consequences."
>
> These criteria are in addition to other criteria regarding professionalism, appropriate use of force, initiative and willingness to participate in professional development, among others. Five ratings are used for each of the performance areas: Exemplary, Superior, Competent, Needs Improvement, and Unsatisfactory. Depending on the outcome of the evaluation, a supervisor will outline steps for officer improvement and an anticipated timeline.

## BMHA

Similar to the Watts program, Buffalo Police should consider implementing new training protocols to better equip officers to practice community oriented policing—specifically relationship building and problem-solving. Focusing these efforts on officers assigned to BMHA properties offers an opportunity to implement such a program on a smaller scale and evaluate outcomes before expanding efforts to the rest of the city. BPD officers should have consistent interactions with BMHA staff.

21

COB464836

---

**Case Study: City Public Housing Initiative, Fort Myers, Florida**

In Fort Myers the problems of crime, especially youth crime, were plaguing various public housing sites. After evaluating seven public housing sites that varied in size, demographics, and location, individual recommendations and strategies were developed to solve the prevailing issues in a City Public Housing Initiative. The Initiative was a partnership between the community, police department, and Housing Authority. Police officers became active in the tenant associations, followed up on service calls, reviewed lease violations, helped place new families in developments, worked alongside personnel dealing with juvenile justice and youth services, and were active in Crime Prevention through Environmental Design projects. Residents petitioned for a site-wide youth ordinance that gave police officers the ability to reduce youth criminal offenses at all housing authority developments. The sites saw notable decreases in crime and increases in community involvement.[74]

---

BMHA's contract calls for increased policed collaboration with public housing residents, and tenant councils have taken their own steps to incentive community policing. One property tenant council purchased bicycles for officers, to encourage officers to get out of their vehicles and interact with residents more.[75] However, officers reportedly used these bikes for a period of several weeks before reverting back to using their cars for patrols.

The community officer currently assigned to BMHA properties has made efforts to engage directly with tenant councils, attends their meetings and has developed programming for resident youth. One tenant council president commented that this officer is dedicated and well respected by residents.

---

**Case Study: Police Neighborhood Resource Center (PNRC) Program, Greensboro, North Carolina**

The PNRC is an initiative that began 25 years ago to address problems in some of Greensboro's public housing sites. "Storefront police stations" were established at selected public housing sites with two officers assigned to each one to address both crime and quality of life issues.[76] Part of the initiative focuses on positive outcomes for youth in the community, and the police take an active role in ensuring that. Police officers help children with schoolwork, act as summer

---

COB464837

camp counselors, and coordinate various events and activities to keep local children from engaging in dangerous activities while also building their trust in the officers.[77]

**Recommendations**

- Assign officers to permanent beats
- Create substations at BMHA sites
- Increase time spent outside of patrol cars with foot and bike patrols
- Officers should develop relationships with residents and other community stakeholders and organizations
- Become a link between residents, BMHA, and the rest of the community
- Officers should be present at community meetings and events when possible

## 2. INCREASE DIVERSITY AND CULTURAL COMPETENCY OF THE FORCE

### Diversity of the Police Force

Diversity is necessary for successful, unbiased police training and operations – diversity not just of race, but also religion, gender, age, and sexual orientation.[78]  Interacting and engaging with a diverse group while working towards the same goals within the police department can positively influence perceptions and decrease prejudices that affect police behavior and be useful in real-life training situations.[79]



The lack of diversity within the BPD force does not help the existing biases. Buffalo's population is nearly 50% minority (36% black, 10.5% Hispanic, 3.2% Asian).[80] As of 2014, the force was comprised of 735 sworn officers, 157 (21.36%) of whom were black.[81] Fifty-four officer (7.35%) were Hispanic, and 2 officers (0.27%) were Asian. Seventy percent of the force was white.

23

COB464838

The Buffalo Police Department recently implemented a police academy scholarship program intended to increase the diversity of the force and make it more representative of the city by recruiting more minorities, women, and immigrants.[82] The program is called BPD21C (Buffalo Police Department 21st Century). Fifty scholarships were made available to cover tuition at the local police academy, books, and uniforms (a total of $6,800). The program will place candidates in a better position to pass the civil service exam and facilitate training and hiring. Once hired by Police, candidates will only need to undergo firearms training and homeland security training. Recruitment was targeted to minority communities, with recruitment officers placed on various days at supermarkets, coffee shops, community centers, churches, movie theatres, and local colleges. Recruiting events were communicated via social media.[83]

To be eligible, applicants must be between the ages of 19 and 35, be able to pass a criminal background check, and have a high school diploma or GED.[84] Previously, the Buffalo Police department required that candidates have 60 college credits, or two years of uninterrupted military service, or 6 years uninterrupted active reserve duty.[85] Lowering the education requirements reflects an understanding that life experience can be equally, if not more useful, that formal higher education when it comes to policing.[86] Other major municipalities in the state such as Syracuse and Rochester require only a high school diploma or equivalency certificate for recruits to sit for the exam.[87][88]

In New York City, the offices of Brooklyn and Manhattan Borough Presidents recommended raising the age of eligibility for the recruitment examination from 35 to 45 to increase force diversity and competence.[89] This would allow individuals with backgrounds in fields such as education, community organizing, or youth development to bring their knowledge of the community and years of experience to the police force.[90] The authors noted that in Brooklyn and Manhattan, peace officer forces and ancillary forces working in schools or for transit authorities were more diverse that the NYPD and suggested allowing individuals with two years of experience in these forces to apply to the



24

COB464839

municipal force, even if they did not have the necessary 60 college credit hours. Buffalo Police did something similar in the past, facilitating the process for former BMHA officers to enter the force. However, incidents involving those hires indicates need to do thorough background checks and job history screenings to avoid hiring individuals with troubling disciplinary histories.[91] Still, Buffalo could explore whether ancillary security and police forces might provide a diverse recruitment pool and develop a means to pull recruits from those areas.

BPD can increase the diversity of its hiring by targeting recruitment efforts to communities that are underrepresented on the force and by implementing residency requirements and/or incentives for all new recruits. BPD should also focus efforts on recruiting from immigrant and refugee communities to increase the number of bilingual officers. Shifting the focus of promotional criteria to relationship building and engagement and crime prevention would potentially encourage officers to take more ownership of the communities they serve. Doing so would create incentives for people living in public housing and other underserved communities to join the force and remain in their communities as officers.

**Implicit Bias Training**

Recent studies have shown that police, and people in general, are subject to "implicit bias," a subconscious process allowing one to make generalizations, associations, and quick decisions.[92] Everyone holds implicit biases. In fact, researchers believe implicit bias is now more common than explicit bias, and more predictive of behavioral responses to minority individuals.[93] One can hold implicit biases against those of a different race or ethnicity, or those of the same race or ethnicity (for example, many African Americans have implicit biases against other African Americans, although not as severe as held by whites).[94] Gaining an understanding of implicit bias is a first of many steps toward identifying and responding to gaps in policing services.

Implicit bias can result in decreased legitimacy of police, reduced community trust, and harm to individuals and families interacting with police.[95] When an officer misjudges a civilians actions

COB464840

for criminal activity, the officer's behavioral response can mean the difference between life and death. [96]

Individuals are more likely to experience heightened perception of threat when a scenario involves a black individual. Common behavioral responses of law enforcement officials influenced by implicit bias include shooter bias and racial profiling.[97] Shooter bias involves the decision to shoot and the reaction time it takes to shoot an individual. Blacks are disproportionately likely to be shot by police, in part due to implicit bias. Exercising cognitive control can reduce shooter bias. However, cognitive control can be shaken under perceived threat of harm, fatigue, or cognitive overload; thus training to exercise deliberative cognitive monitoring while under stress is required.[98]

Implicit bias trainings, organizational evaluations, and policies that create department responsibility to address implicit bias in policing can strengthen policing. Bias researchers understand biases to be malleable, and thus, trainings are designed to develop awareness of implicit biases, understanding of the impact, and ways to minimize harmful reactions.[99] Positive contact with groups that have been stereotyped and counter-stereotyping are two prime methods for developing the necessary skills to prevent harm resulting from reactions to implicit biases.[100] Counter-stereotyping involves exposure to information contrary to the stereotype.

---

**Case Study: Elements of Implicit Bias Training**

The Office of Community Oriented Policing Services has previously partnered with nationally researcher and trainer Lori Fridell of Fair and Impartial Policing organization, which has developed a series of evidence-based implicit bias trainings that include workshops for Managers, Supervisors, and Line Officers.[101] The St. Louis police department was one of many local departments to receive training from this organization.[102] Town of Cheektowaga police Chief David Zack has received implicit bias training through Lorie Fridell and has publicly recounted the ways in which it has helped him and his police force.[103] The Fair and Impartial Policing training curriculum focuses on three components: (1) understanding the basic science of implicit bias, (2) the impact on individuals and the organization, and (3) position-specific training (ie. line officer, supervisor, or manager).[104]

---

COB464841

In addition to participation in evidence-based training, The Center for Policing Equity (CPE) and Office of Community Oriented Policing Services (COPS) encourage collection of data to more carefully analyze policing services. CPE conducts free research with interested police departments to allow for local police to contribute to research on policing equity. On a national level, the Department of Justice launched the National Initiative for Building Community Trust and Justice. Six pilot cities nationwide are currently participating in this initiative over a three year period in order to gather data that will better inform interventions in criminal justice. The initiative is very new, but upcoming reports on the pilot city studies may prove helpful in identifying best practices for tracking data, policing effectively, and training to mitigate behavioral responses to implicit biases. Minneapolis is one of the six pilot cities and has identified a goal to improve community/ police relations.[105]

**Language Access**

Buffalo has a significant immigrant population, in large part because the low cost of living and available housing stock makes it an ideal destination city for refugee resettlement. Buffalo's immigrant community is made up of various Hispanic groups, Burmese, Nepali, Iraqi, and Somali refugees, to name just a few of the many groups. The changing demographic make-up of the city requires that police be able to respond appropriately and effectively to immigrant victims of crime. This means that officers must develop a degree of cultural competency and basic knowledge of these populations. But perhaps most important, officer must be able to communicate effectively with limited English community members.

Over the past two years, Buffalo Burmese refugee community has been the target of a series of home burglaries. Many of these incidents went unreported to police, largely because victim with limited English language abilities were unable to communicate their situation to police. Leaders in the immigrant and refugee communities responded by coordinating with immigrant service providers and local attorneys to develop a language access plan and collaborate with police. Community police officers held meeting in the neighborhoods impacted by these crimes and discussed the importance of calling 911 and communicating, at minimum their address and language spoken, so that an officer could be dispatched. Officers also involved representative

27

COB464842

from local banks given that members of the community were targeted for keeping large quantities of money in their homes, rather than depositing the money into a bank account. There continue to be issues with robberies, and police believe that this has to do with reluctance to identify known perpetrators in the community.

In October 2015, three Refugee-led community organizations (Burmese Community Services, Karen Society of Buffalo, and the Bhutanese-Nepali Community of Buffalo) submitted a proposal for a language access plan (LAP) to BPD.  Based on their review of LAPs in New York and nationally, the group developed plan for LAP procedures, training of law enforcement, and record keeping. The plan called for BPD to develop language identification cards to be distributed to members of immigrant communities. Immigrant community members can hand these cards to a responding officer to inform them of their language, so that the officer may begin the process of contacting an interpreter.  In addition, the plan calls for BPD to maintain list of all qualified bilingual staff as determined by thorough testing procedures. These officers are the first choice for interpretation. If a bilingual officer is not available, the officer should attempt to contact a Qualified Civilian Interpreter (trained and certified community member), an interpreter from an in-person interpretation service provider, or, as a last resort, telephonic interpretation. Officer must take reasonable steps to ensure that the interpreter does not know the parties. Importantly, the plan makes clear that family members, neighbors, bystanders are not to be used except in exigent circumstances.  The plan recommends an in-service training every two years to refresh officers on how to properly work with interpreters and access language line, as well as a language access liaison to coordinate and monitor the plan.

BPD is currently implementing some aspects of the plan. BPD has been working with the office of New Americans out of the Mayor's office to develop language identification cards based of a sample from a local refugee resettlement agency. Officers have also gone into immigrant communities to give talks on how to call 911, emphasizing the importance of stating an address and a language so that police can follow up on emergency calls with limited English callers. BPD should build on this momentum and adopt the full plan recommended by the three organizations.  BPD should be sure to train officers on what constitute "exigent circumstances" using real life scenarios as they would other training, to ensure that officers are clear on the

COB464843

limited number of situations in which it might be acceptable to use community members or person know to the victim as an interpreter.

**Cultural Competency**

Community policing is a means to establish trust and improve safety outcomes through collaboration and relationship building between police and communities. These communities include minority groups, youth, the LGBTQ community, people with disabilities, people experiencing homelessness, and the diverse immigrant and refugee communities in Buffalo. Fear of law enforcement based on bad personal experiences with law enforcement in the U.S., or experience with abusive and corrupt police forces in one's country of origin, as well as confusion about the immigration enforcement role that local and federal officers play, can fuel mistrust within immigrant communities and make immigrant reluctant to reach out to report crime. Lack of cultural competency and poor or inconsistent language access on the part of police leads to negative interaction, compounding frustration and distrust of police.

The Vera Institute of Justice conducted research on policing in immigrant communities and identified eight key principles that law enforcement must incorporate into their public safety efforts in immigrant communities:[106] 1) get to the root causes of threats to safety and barriers to trust; 2) maximize resources; 3) leverage partnerships; 4) focus on vulnerable populations; 5) engage in broad outreach; 6) offer training for law enforcement and the community; 7) monitor successes and failures; 8.) sustain programs that work. These principles are equally applicable to other vulnerable communities.

One key strategy is for the BPD to hire community liaisons to aid in their community policing efforts in various neighborhoods, including BMHA developments and neighborhoods with high numbers of foreign-language speakers. Liaisons can either be sworn officers or civilians, with pros and cons (knowledge of police culture vs. approachability in the community) to both that warrant consideration. An alternative is to hire a police social worker, who would be fully a staff person, but has the training to work across cultures and the skills necessary to build rapport with isolated communities. An added benefit is that social workers placed in police departments can

COB464844

help build relationships with community organization and provide useful insight into how to best interact with vulnerable populations.

---

**Case Study: Community Liaisons in Brooklyn Park and Brooklyn Center, Minnesota**[107]

Two suburban Minneapolis communities experienced an increase in noise complaints in Liberian neighborhoods that did not resolve despite repeated police calls. In fact, some interactions with police resulted in heated confrontation and increased tension with the community. Police hired civilian community liaisons to conduct direct outreach to those communities. Liaisons began by hosting neighborhood meeting to inform residents of their role and the role of the police in the community. This was followed by Q&A session with police where it was discovered that the immigrant community was largely unfamiliar with city ordinances. Police developed informational flyers to hand out in the community on these ordinances, and made the liaisons available to answers questions in the future. Ordinance violations decreased following these efforts. To continue and expand upon this successful effort, the police departments developed a multicultural advisory committee made up of immigrant and native born community members. The committee meets monthly to discuss to advise police on public safety issues and how to best address them. The board helps with police driven community and outreach events, and provide feedback on recruitment and training materials.

---

Other cities such as Chelsea, Massachusetts, have adopted formal policies as sanctuary cites, and hired newcomer advocates to do outreach in immigrant communities and facilitate relations with the police. The advocates in Chelsea have held trainings for both immigrant and police to teach each population about the other's culture. Newly arrived immigrant learn about policing, and police have the opportunity to hear from immigrants about their past experiences with and perceptions of law enforcement. [108]

Whatever policy approach is adopted, it is important for police to sustain ongoing contact and communication with vulnerable communities, rather than conduct outreach only when problems arise.[109] Buffalo is fortunate to have a vibrant and engaged immigrant community that draws support not only from the four resettlement agencies that assist newly arrived refugees, but also from immigrant and refugee-led community groups. BPD community officers have worked with

COB464845

these organizations and cultural community leaders in the past to address public safety issues. A more formal and sustained effort would strengthen these relationships, and potentially provide members of these communities and regular officers more direct contact and positive interactions with each other. The many cultural events held throughout the year provide opportunities for BPD to get to know the immigrant community. BPD should not only participate in these events, but should more actively publicize its participation in these efforts when it does.

---

*Case Study: Mobile Policing Units in Storm Lake, OH*

[develop from VERA report—broadly, police drive a mobile unit into a community and operate command from that location for a few hours, hand out ice cream, play with kids, get to know people and provide an opportunity for informal interaction]

---

Recommendations:

- Incorporate anti-bias training into training procedures
- Recruit more officers that represent Buffalo's diversity
- Implement the LAP plan in full and provide ongoing training to officers and evaluation to ensure its successful implementation.
- Recruit civilian liaisons, or possibly hire a police social worker and have these duties fall under that role.
- Is Buffalo a Sanctuary City?
- Policies on consular notification? See: http://www.vera.org/files/consularnotification.pdf

## 3. IMPROVE TRANSPARENCY AND INFORMATION-SHARING

### Civilian Oversight of Law Enforcement

The Final Report of the President's Task Force on 21st Century Policing emphasized the importance of civilian oversight of law enforcement to improve trust and legitimacy of police forces in the eyes of their communities.[110] Communities and police that have participated in citizen review note various benefits.[111] Citizens indicate feeling validated when a complaint

COB464846

allegation is upheld, and even in instances where that has not happened, they have appreciated the opportunity to speak with an impartial party or with the officer involved during mediation.[112] Police, for their part, have indicated that citizen review can improve community relations, enhance a community's understanding of police work and police procedures, and demonstrate to the public that police departments take allegations of misconduct seriously.[113]  Police have also reported that citizen review boards can have a positive impact through policy recommendations, and oversight can improve the quality of misconduct investigations.[114]

The President's Task Force Report noted that oversight processes must be adapted to the particular needs and resources in the community, arise from a collaborative effort with police, and seek to enhance procedural justice.[115] In the 2001 National Institute of Justice report, *Citizen Review of Police: Approaches and Implementation*, the authors noted that "the talent, fairness, dedication, and flexibility of the key participants…are more important to the procedure's success than is the system's structure."[116]

> The NIJ report identified four types of police oversight initiatives:[117]
>
> **Type 1**: Citizens investigate police misconduct and make recommendations to the chief of police or sheriff.
> **Type 2**: Police, through Internal Affairs (IA), investigate allegations of misconduct; then citizens review the findings and advise the chief or sheriff to accept or reject the findings.
> **Type 3**: Complainants may appeal IA investigation results to a citizen review board that reviews the investigation and makes recommendations to the chief or sheriff.
> **Type 4**: Citizens audit the IA process for fairness and thoroughness.

---

**Case Study: Citizen Review of Police in Rochester, NY**

Rochester, NY employs a type 2 civilian review process[118] operated by the Center for Dispute Settlement (CDS) which provides trained, impartial panelists to conduct oversight of police investigations.[119] The Rochester Civilian Review Board is comprised of "three (3) individuals who are selected on a rotating basis from a pool of qualified people of varied ethnic, racial, age and gender backgrounds."[120] The panelists receive 40 hours of training on civil rights and police policies and procedures,[121] and complete an 8 hour ride along with an officer on

---

COB464847

shift.[122] These CDS staff review IA investigations for "thoroughness and fairness" and make recommendation to the sheriff or police chief.[123] The Board can request additional investigation from IA if needed,[124] or, if the panel is satisfied with the quality of the investigation, it makes a determination, based on a preponderance of the evidence standard,[125] of sustained, unprovable, unfounded, or exonerated.[126] Based on investigation review, the panel may recommend policy changes or additional training for officers, or suggest a verbal reprimand or that a "memorandum of record" on the incident be placed in an officer's file.[127] The final decision rests with the chief of police.[128]

For complaints that do not involve "use of force, criminal activity or other serious procedural matters," the CDS offers a voluntary and confidential mediation process in which citizens and officers can speak to each other with the help of a neutral party and try to find common ground.[129]

Because the CDS believes that "extensive community outreach and accessibility are key factors for ensuring citizens are aware of the police oversight programs and complaint process," the community advocate and other CDS staff provided over 130 information session in 2014, focused on underserved and marginalized areas of the city.[130]

Buffalo's Commission on Citizen's Rights (CCR) is authorized to assist residents to file complaints against Buffalo Police and conducts reviews of police Internal Affairs (IA) investigations. The CCR is empowered to assist residents to file claims of discriminatory treatment or harassment against any city official, and has subpoena power, but limited enforcement authority. The bulk of the CCR's investigatory work is done by the Department Head with occasional assistance from city interns. The Department Head can review IA investigations and recommend more training and oversight for a particular officer if she notices a pattern of misconduct, or sees a particular officer's name come across in multiple incident reports. An obvious limitation of the CCR's oversight authority is that the commission only sees cases that are brought by residents to its office. The CCR is not notified of every instance of police misconduct or discourtesy that IA investigates. This means that overarching trends will be difficult to spot, and problematic officers may not always be subject to civilian review.

COB464848

In contrast, cities such as Berkeley California require IA to pass along all investigations to their oversight board. Other cities, like Rochester, require IA to refer all cases that involve accusations of excessive force, officer criminal conduct, and other cases at the police chief's discretion. Orange County, FL and San Francisco require all firearms discharge incidents to go before their civilian review boards.[131] Portland uses random audits to identify trends in civilian concerns and make recommendation for policy changes. This approach allowed the city's oversight committee to identify a problematic trend where officers were asked for their badge number and refused to give it based on a technicality (they had ID numbers, not badge numbers). The oversight committee made a recommendation that officers be instructed to interpret badge number requests as a request for their ID number. [132]

Another method to promote oversight is hosting regular meetings for civilians.[133] Police and oversight commission members attend to discuss recent development and hear concerns from the community. This not only promotes regular contact between police and citizens, but creates opportunities for officers to clarify department policy and inform citizens of their rights and responsibilities when interacting with police. The CCR could accomplish this by partnering with each of the five districts and participating in their monthly community meetings in which the station chiefs provide updates and solicit concerns from the community. Adding in a non-police presence would provide more oversight and encourage follow up on community concerns. Furthermore, it would and raise community awareness of the CCR's role and provide opportunities to address concerns of police discourtesy and misconduct to an outside entity. In addition, cities such as Rochester and Portland issue annual reports to the public on their committees' finding, to improve public trust. The CCR is already obligated under its charter to issue reports, though new reports have not been published to its website in several years.[134]

The CCR could also partner with local restorative justice coalitions to offer confidential conciliation between officers and civilians in lower level incidents. Rochester does something similar by offering certified mediators as an initial step on the oversight process, to help civilians and accused police officers attempt to come to a place of mutual respect and understanding.[135] These practices are discussed in more detail below.

34

COB464849

Buffalo could strengthen existing oversight structures by incorporating the above practices—specifically, and by altering the CCR's charter to include more enforcement powers, and requiring IA to refer more of its cases to the CCR for review. The CCR would likely also benefit from additional staffing to take on these expanded responsibilities. Currently, the CCR has a staff of one, and its board operates at less than full capacity. Board members are appointed by the mayor. Political appointments raise issues of whether the appointees are working for the people or those who put them in power, and the city should consider a more impartial process for hiring board members. Last, issuing annual report to the public would keep citizens better informed, and have the potential increase public trust in police by assuring citizens that an outside entity is monitoring civilian grievances.

The Buffalo Human Rights Center has recommended that the City of Buffalo amend Section 18 of the City Charter to transform the Commission on Citizens' Rights and Community Relations into a broader, more effective Commission on Human Rights for the City of Buffalo. The Charter amendments would:

- enhance the political independence and rights-based profile of Commission members;
- expand the Commission's mandate and powers, empowering it to take on the full set of human rights concerns relevant to the city, including, inter alia, affordable housing, redlining, healthcare, living wages, racial justice, food security, gender equity, LGBT rights (i.e., in addition to complaint-based racial discrimination and police misconduct); and
- significantly strengthen and expand its promotional and investigatory powers.


### Documenting Police Stops

Accessing criminal justice information is difficult in Buffalo and other local municipalities. The public should be able to view records regarding arrests, violations lists, and criminal activities, especially if their name is listed anywhere within these records. Among other changes, this would require police to document all stops. Having documentation of all stops would enable a correlation to be made between stop-and-frisk and *Terry* stop practices and the rates of crime in

COB464850

public housing and underserved neighborhoods.  Similar studies have found little correlation between these police practices and crime, which might give impetus to shifting police efforts towards community-policing over maximizing stops and arrests.

As part of community-policing, all of this information must be open to the public for discussion and commentary.  Public meetings should be held where the information is shared with all community stakeholders.  Social media should also be used for those who cannot attend meetings or are concerned about privacy.  Mayor Brown recently partnered Buffalo with Nextdoor.com, a private social network for neighborhood residents to share information.  In public housing and poverty stricken neighborhoods, internet access is not always readily available within households to use sites like Nextdoor, so further strategies are needed, including personal contact, radio programs, and community substations that can allow people to use technology to gain and share information with each other and community police officers.

The potential successes of community policing policies and practices are impressive, but careful monitoring of their implementation will always be necessary. Policies must be in place to ensure that the practices do not employ racial profiling or generate increased arrests for petty offenses. The New York Police Department has recently implemented a practice of issuing receipts to persons stopped, but not arrested, by police. The receipt policy was proposed by the federal monitor assigned to oversee NYPA stop and frisk practices following the court's decision in *Floyd v. City of New York.*[136] The receipts explain police policy on stops, and require that the officer document the justification for the stop, and provide name and badge number.[137] Among the justifications are, "Concealing or possessing weapon," "Engaging in a drug transaction," "Proximity to the scene of a crime," Matches specific suspect description," "acting as a lookout" among others.[138] Officers can no longer cite "making a furtive movement" or "being in a high crime area" as justifications for a stop.[139] Similarly, Illinois recently enacted legislation changing its criminal procedure law to require officers to provide a "stop receipt" to persons who are stopped and frisked or searched.[140]  The officer must provide his or her name, badge number, and a reason for the stop.[141]

36

COB464851

> **Case Study: Community Policing In Camden, NJ Highlights Positive and Negative**
>
> In 2013, Camden, New Jersey eliminated its municipal police force and turned responsibility for public safety over to the County.[142] Camden County implemented a community policing initiative that included opening two new police stations, putting more officers on the streets,[143] and encouraging officers to interact with community members through meet-the-officer fairs and at local baseball games.[144] The county put ice cream trucks out in areas where police were on foot patrols and encouraged citizens to get free ice cream.[145]  In addition, Camden promoted civilian participation in policing efforts; civilian ambassadors conduct strolls through business districts, and community leaders can view surveillance footage from home to monitor for crime.[146] Camden's community policing program demonstrates the potential benefits of community policing for crime reduction—a 10-19% reduction in crime and a 51% reduction in violent crime have been credited to the increased use of foot patrols.[147] But the program also highlights a need for caution in implementing community policing initiatives. More police on the streets means more interaction with offenders, and low-level offenders in particular. The president of the local ACLU chapter noted a significant increase in arrests and summons for crimes such as having tinted windows (a 381% increase) and disorderly conduct (43% increase).[148]

## Use of Body Cameras

With the recent deaths of people of color during police interactions, and the acquittal of police involved in these cases, many have touted body cameras as one answer to the problem.  Because they are new technology and costly to implement, it is difficult to accurately gauge their effectiveness, although there are some encouraging results from early adopters.  Cameras have been found in some studies to increase transparency and trust of police officers and decrease excessive force, and they have proven helpful when cases end up in court.

Video evidence is highly useful to citizen oversight committees as well. The NYC Civilian Complaint Review Board has credited the increased prevalence of video of police encounters (from civilians and security footage) with enabling the involved parties to meet the burden of

COB464852

proof in more cases, enabling the Board to substantiate more claims of excessive use of force.[149] At the same time, video evidence has been used to exonerate officers accused of misconduct.[150] The Board anticipates that the implementation of the city-wide body camera program in NYC will further their efforts to increase transparency and justice for citizens.

Cost is one of the issues that make police body cameras hard to implement.  The cost per device ranges from $120 to $2000.[151]  Expenses associated with body cameras extend beyond the cameras themselves; including: storage, accessory equipment, staff to handle implementation, and disclosure of recordings to the public.[152]

People on both sides of the camera worry about privacy.  The use of cameras can involve highly sensitive and compromising situations.  Already with dashboard cameras there have been instances of videos being released to embarrass people online or on televisions shows.[153]  More troubling incidents have involved deaths of civilians and officers being caught on tape and haphazardly released to the public. Policies must be put in place for receiving consent where appropriate and for determining when and what can be recorded, what can be released, and who can view these materials.

Policies around the use of body cameras must strike a balance between respecting the privacy of individual citizens, and avoiding biased representations of officer's use of force. The DC Metropolitan Police Department utilizes body-worn cameras and has proposed a tiered system regulating who has access to video recordings.[154] There would be no access for the general public, but U.S. Attorneys have full unrestricted access, and defense attorneys, litigants, auditors, involved parties and researchers have access limited to specific cases with some redactions. There would be some exceptions for cases of great public interest. However, incidents such as the killing of Laquan McDonald by Chicago police evidence the need for some level of public access to police body camera footage. Sarah Lustbader, a staff attorney with the Bronx Public Defenders office, has noted the failings of police-controlled body camera programs in cities like Chicago and New York City that give police ownership over video and lack procedures for ensuring oversight and transparency.[155] Lustbander states that NYPD's body camera policy emphasizes officer safety and prosecutorial evidence, not civilian safety or police oversight. She

38

argues that third-party control of body-camera footage is essential to ensure the effectiveness and legitimacy of body-camera programs.

Some guidelines for general public access proposed by scholars associated with the Urban Institute include:[156]

- Allow public access to footage, but restrict ability to reproduce. Access can be controlled and supervised by allowing a setting for viewing where cell phones and recording devices are not allowed. Viewers are informed of rights and responsibilities before viewing footage.
- Footage should be shown in its entirety—never edited prior to public viewing.
- Require those who wish to view the footage to provide a statement prior to viewing to discourage those looking to search the footage to support a misrepresentation of the events.
- Whether footage is openly released to the public should be assessed by an independent group of community representatives who can weigh the costs and benefits to public and private interest.



Source: nypost.com 1

In sum, body cameras appear to be a very promising technology, but Buffalo should be careful to create cost-effective policies that carefully address privacy concerns before implementing them.  In the meantime, other departments, such as Boston and New York, have developed excellent forms for recording information about police stops.  The use of these forms helps incentivize the following of correct procedures and provides invaluable evidence of racial and other patterns in police enforcement.

**Strengthening BMHA Oversight**

Creating a bottom-up policing process is a cost effective method that would help citizens feel more engaged in their communities and free up time for officers.  Community watch groups and citizen review boards should be established at BMHA sites with on-site offices directed by neighborhood volunteers and with the cooperation of community police officers.  In doing this,

COB464854

0039

education should be provided to tenants and community members about their rights, how to interact with the police, and complaint processes.

Recommendations:

- Strengthen civilian oversight mechanisms by requiring IA to hand over more investigations to the existing review board, and increasing outreach and reporting of oversight to the community.
- Consider amendment to transform the Commission on Civilian Rights into a broader and more effective Commission on Human Rights
- Develop a procedure for recording and reporting all police stops
- Research efficacy of body cameras
- Devise proper guidelines and protocol before implementing body cameras
- Develop guidelines for public access to footage

## 5. PROMOTE RESTORATIVE JUSTICE AND ALTERNATIVES TO ARREST TO CREATE SOCIAL CAPITAL AND PROCEDURAL JUSTICE

### Integrative Restorative Justice Practices into Policing

Restorative justice can help to foster necessary relationships between police officers and citizens. The restorative justice model approaches criminal behavior differently than the typical criminal justice approach.  Restorative justice holds offenders directly responsible to the communities they violate and allows those affected by crime to be involved in resolving conflicts and repairing the damage caused by crime.  The restorative justice approach looks to resources outside of the criminal justice system to solve problems and takes localized action to establish solutions.[157]

Buffalo's Community Police Officers should be trained in restorative justice practices, and develop strong relationships with Buffalo's restorative justice coalitions. Community Officers regularly interact with community members and block clubs to address community issues. These officers should be trained to identify conflicts that would be appropriate for restorative justice

40

COB464855

facilitation, and offer this as an alternative to neighbor disputes, and rather than issuing citations. Both community officers and patrol officers should be familiar with the restorative justice sites throughout the city and view these as potential referral options that would serve as alternatives to incarcerating juveniles, and minor non-violent offences involving adults.

---

**Case Study: Jefferson County, CO Juvenile Assessment Centers**[158]

Jefferson County Colorado operates a Juvenile Assessment Center (JAC) where services are focused on helping youth in danger of entering the juvenile justice systems.  Law enforcement can bring youth who have committed minor offenses to the JAC where staff conduct intakes using motivational interviewing techniques, and develop referral plans for the youth and discuss service options with the juvenile's guardian.  In cases where officers a required to detain the youth, an intake is conducted over the phone. The JAC also receives referrals from court to provide case management to first time offenders. In addition, some schools can refer youth to the JAC for temporary "time-out" services. So, rather than detention or action through the juvenile justice system, youth receive intermediate services to address immediate safety and behavioral concerns.

---

Youth are critical to community policing. Current tactics of police lead to distrust and fear of officers.  Police must act as youth mentors and establish relationships with community members of all ages.  Partnering with local organizations to create opportunities for police to be part of youth recreational and educational programs is a very important strategy. Some examples of this are ride-alongs, police participation in afterschool activities, and youth police academies.

**Alternatives to Arrest**

[Discuss officer discretion to arrest and cite to examples of efforts to codify this (eg, NYC legislation to move city ordinance violations out of criminal court to a admin court).]

41

COB464856

[Discuss how asset development and relationship building can play into this. When officers have strong relationship with community organizations that they can refer people to—eg, panhandlers, or street-based sex workers to these partners and work on addressing the underlying issues, such as poverty, addiction, etc. Takes a long-term approach to addressing public safety, less reactive and more respectful of individual dignity.]

[Discuss Ferguson fix it tickets mandate and version implemented in local municipality where officers hand out warnings rather than tickets for moving violations. Warning asks civilian to make a donation to a local homeless shelter.]

**Law Enforcement Assisted Diversion and Working with Vulnerable Populations**

As discussed throughout this report, community policing relies heavily on collaboration with community members. Certain members of the community, however, will have greater access to police and can place greater demands on police to respond to their needs. Business owners who express concerns about panhandlers bothering their clientele and harming business are likely to get a better response from police than the homeless individuals themselves. Nonetheless, these and other vulnerable populations—persons with mental health issues, persons with substance use problems, homeless youth, street-based sex workers—are deserving of respectful treatment from police and stand to benefit from community policing practices.

Law Enforcement Assisted Diversion (LEAD) refers to efforts by police to develop and implement alternatives to arrest through diversion to needed social services. Buffalo is currently considering efforts to implement an LEAD program to respond to the growing heroin epidemic. [Discuss task force being established and PAARI program]

*Case Study: Law Enforcement Assisted Diversion (LEAD), Seattle, Washington*

Seattle's LEAD program was devised as a response to the racial disparities in drug arrests.  It is a collaboration between the community, county and city attorneys, multiple local officials, the Department of Corrections, and American Civil Liberties Union.  Rather than arresting people for nonviolent offenses, specifically drug arrests, police direct offenders to services and

COB464857

treatment options.  The metrics for evaluating if a person is getting better are based not on passing a drug test but instead on reducing the problems associated with drug use—health, family life, and employment.  The area's drug arrests dropped 30% from 2010-2011.  The LEAD approach has been found to be beneficial to the community's health and safety and more cost effective, with the decreases in jail time and recidivism.[159]

There are also problems with how police officers deal with citizens with mental health issues. Due to inadequate public funding for community mental health systems, police officers often find themselves as the default responders to mental health problems.  Unfortunately, people suffering from mental illness are at increased risk of becoming both victims of crime and criminal offenders.[160]  BPD should provide mental health and crisis intervention training to all of its officers and team with mental health workers to provide coordinated responses to mental health issues and crises, many of which can be successfully de-escalated and solved without an arrest.  As part of training in both bias and mental health, realistic scenarios should be played out by police officers and community members.

**BMHA**

At BMHA sites where narcotics are the reason for a majority of arrests, this could be especially promising for those with drug problems and the communities plagued by the social issues associated with the drug trade.

[expand]

Recommendations:

- Consider options other than arrest
- Direct those in need to proper services or treatment
- Establish relationships with youth in the community by partnering with schools and community organizations

## 6. FIGHTING CRIME THROUGH ENVIRONMENTAL DESIGN

[to be added]

43

COB464858

## CONCLUSION

Buffalo police should revise their culture, practices, and programs to reflect the community-policing agenda.  In doing so they will make themselves more accessible to and familiar with residents; become mediators to help form necessary partnerships with themselves, community members and organizations, and BMHA; empower themselves and the community stakeholders to make informed decisions for the betterment of the community; make neighborhood information more readily available; and create an environment where there is mutual trust and respect.  The police will see themselves and will be seen by residents more as members of the communities they patrol, working for the greater good of residents.

COB464859

**NOTES**

_____

[1] Cite to President's report, verify cite to Ferguson Report

[2] Cite to textbook on COP.

[3] Ibid, 9.

[4] Ibid.

[5] Ibid.

[6] Ibid, 10.

[7] Ibid.

[8] Jeffrey Fagan, Garth Davies, and Adam Carlis, "Race and Selective Enforcement in Public Housing," *Journal of Empirical Legal Studies* 9 (2012): 700.

[9] "The United States Conference of Mayors, *Safer Neighborhoods through Community Policing: Volume I, Successful Initiatives in 72 Cities*, (2001), 2."

[10] "COPS Program Spurs Community Policing Nationwide, According to New Urban Institute Evaluation," Urban Institute, September 6, 2000, http://www.urban.org/publications/900043.html.

[11] Ibid.

[12] "Matthew C. Schneider, U.S. Department of Justice, "Commentary: Community Policing and Public Housing Authorities," *Cityscape: A Journal of Policy Development and Research* 15 (2013): 154.

[13] Urban Institute.

[14] Find cite

[15] Cite to Report of the President's Task Force on 21st Century Policing

[16] Ibid at ___

[17] Ibid at __

[18] Erin Carman, Open Buffalo, "Alarming Disparities: The Disproportionate Number of African Americans and Hispanics in the Erie County Criminal Justice System," (2013), 2, http://www.ppgbuffalo.org/wp-content/uploads/2013/03/Alarming-Disparities-in-EC-Criminal-Justice-System.pdf.

[19] Kelsey Garlock and Ammad W. Rafiqi, "White Paper on Preliminary Analysis and Findings

45

COB464860

on Racial Profiling and Law Enforcement Tactics Leading To Racial Disparities in The Erie County Criminal Justice System," (SUNY Buffalo Immigration and Human Rights Clinic, 2014), 7.

[20] [See *infra* notes 23-30].

[21] Brittni, November 5, 2014, http://wivb.com/2014/11/05/police-oversight-committee-begins-after-brutality-investigations/

[22] Personal Communication, David Rivera, Feb. 2, 2016.

[23] Matthew Spina, Culture of Misconduct in Police Department Has Existed for Years; 'Culture of Misconduct' Blamed on Superiors, Buffalo News, May 24, 2015. http://www.buffalonews.com/city-region/police-courts/culture-of-misconduct-in-buffalo-police-department-has-existed-for-years-20140524

[24] Matthew Spina, Culture of Misconduct in Police Department Has Existed for Years; 'Culture of Misconduct' Blamed on Superiors, Buffalo News, May 24, 2015. http://www.buffalonews.com/city-region/police-courts/culture-of-misconduct-in-buffalo-police-department-has-existed-for-years-20140524

[25] Matthew Spina, When a Protector Becomes a Predator, Buffalo News, November 22, 2015, http://projects.buffalonews.com/abusing-the-law/index.html

[26] Ibid, Spina.

[27] Ibid, Spina

[28] Ibid, Spina.

[29] Kendra Eaglin, Timeline leading up to firing of Buffalo cop, June 4, 2015, wkbw.com, http://www.wkbw.com/news/city-revisits-fired-buffalo-cop-case; Jen Hayden, Former Buffalo Cop Fights for Pension after Exposing Brutality, Dec. 19, 2014, dailykos.com, http://www.dailykos.com/story/2014/12/19/1352929/-Former-Buffalo-cop-fights-for-pension-after-exposing-brutality.

[30] Ibid, Eaglin.

[31] Ibid, Eaglin, Hayden—mention Kwiatkowski-Horne defamation suit (http://www.buffalonews.com/city-region/police-courts/older-case-on-bb-gun-shooting-casts-new-shadows-on-police-20140528).

[32] Buffalo Police officer indicted in connection to Molly's Pub incident, wgrz.com, July 16, 2015, http://www.wgrz.com/story/news/2015/07/15/buffalo-police-officer-robert-eloff-indicted-mollys-pub/30207371/

46

COB464861

[33] Lou Michel, Molly's Pub guard had record of abuse before his hiring: No background check for Molly's Pub Guard, Buffalo News, April 26, 2015, http://www.buffalonews.com/city-region/buffalo/mollys-pub-guard-had-record-of-abuse-before-his-hiring-20150426.

[34] Ibid, Michel.

[35] Pull citation from list in notes.

[36] Hannah Buehler, Buffalo police officer suspended without pay after video surfaces of him striking suspect, July 16, 2015, wkbw, http://www.wkbw.com/news/buffalo-police-officer-suspended-without-pay-after-video-surfaces

[37] Lou Michel, Fired officers wins back pay of $195,507 from Buffalo Police Department, Buffalo News, May 8, 2015, http://www.buffalonews.com/city-region/buffalo/fired-officer-wins-back-pay-of-195507-from-buffalo-police-department-20150508.

[38] Lou Michel, Buffalo police officer fired for allegedly threatening to kill woman: Saw car parked outside her boyfriend's home, Buffalo News, October 18, 2014.

[39] Buffalo Cop fired for stealing cash from wallet, June, 25, 2015, wkbw, http://www.wkbw.com/news/police-blotter/buffalo-cop-fired-for-stealing-cash-from-wallet

[40] http://www.wkbw.com/news/buffalo-police-officer-suspended-without-pay-after-video-surfaces

[41] Daily Gazette Co. v. City of Schenectady, 93 N.Y.2d 145, 710 N.E.2d 1072 (1999) (discussing the legislative history of the bill including justification and concerns from opposition).

[42] Daily Gazette at 158.

[43] Brian Meyer, http://www.buffalonews.com/Panel_to_assess_police_issues___Last_outside_review_was_done_in_apos90s.html

[44] T.J. Pignataro, city Police reorganization panel will survey residents about crime, Buffalo News July 1, 2011; Ashley Hassett, Man involved in police reorganization arrested, WBFO.org, http://news.wbfo.org/post/man-involved-police-reorganization-arrested; Phil Fairbanks, Former Buffalo Police Advisor pleads guilty to drug charge, Buffalo News, April 3, 2013, http://www.buffalonews.com/20130403/former_buffalo_police_adviser_pleads_guilty_to_drug_charge.html

[45] Claudine Ewing, Mascia vows to keep fighting for BMHA resident, December 13, 2015, WGRZ.com, http://www.wgrz.com/story/news/2015/12/30/joe-mascia-hearing-buffalo-bmha-racist-n-word/78077458/

[46] Jane Kwiatkowski Radlich, "Housing security at issue after teen is shot," *The Buffalo News*, March 8, 2015, http://www.buffalonews.com/city-region/buffalo/housing-security-at-issue-after-teen-is-shot-20150308?&sp-

COB464862

tk=F594FC454B237241D8EE375AF01BE31FCEEE3DEAAD41B74A6239C052E5EE749E458
0609FF64ED2364363EB7109EFC37469DD13AAB3CFBDF2D5DFFA2F2AE627920C03DEB
DDA7DFB98EF1FEA7665BA9AAC70071A697635DAAFA8C69E35003E15136C06D309210
DBEBABAF118D6D8318DEA15FE18E732A6C67F952A05BB110F2C7D76DCBC0EE78E01
C87F5E30D55FE9FADD6B1BFC62.

[47] *Agreement for Police Services between the Buffalo Municipal Housing Authority and the City of Buffalo*, December 30, 2010, 3.

[48] Rod Watson, "Buffalo Municipal Housing Authority needs to hire its own police force," *The Buffalo News*, December 17, 2014, http://www.buffalonews.com/columns/rod-watson/buffalo-municipal-housing-authority-needs-to-hire-its-own-police-force-20141217?sp-tk=B53DFA251F77D0C2D33318095951C116FBEEB4B318BF1327DB42EDE8032309DC251
32E75CDAFA6D2E5A879ED7CCA26B038464CF17F7FA538DE5B25D63E0E3EDD6F6448E
3C1F7CC7273765FD0982F32CAC2249E74B107A967C8844126988878B33653A49CAC5177
BA95958BD52B63CCF1C05D7FDF96E7D88A30902A78DF5655F5D0B7194B20F4E01FDC5
97E1815B498CF790E74EC.

[49] Megan Williams, "Buffalo's Stop and Frisk Problem," *The Public*, January 13, 2015, http://www.dailypublic.com/articles/01132015/buffalos-stop-and-frisk-problem.

[50] Elena Goldstein, "Kept Out: Responding to Public Housing No-Trespass Policies," *Harvard Civil Rights-Civil Liberties Law Review* 38,  (2003): 219-225.

[51] Ibid, 226.

[52] Personal communication with Nichols, 12/3/15

[53] Personal communication, Lt. Steven Nichols, Dec. 3, 15.

[54] Personal communication, Lt. Steven Nichols, Dec. 3, 15.

[55] Lou Michel, Feb. 10, 2015,  Greater Scrutiny from citizens makes police officers more mindful, cautious. http://www.buffalonews.com/city-region/east-side/greater-scrutiny-from-citizens-makes-police-officers-more-mindful-cautious-20150210

[56] Conversation with Susan Lee of Urban Peace Institute.

[57] New York State Division of Criminal Justice Services, Basic Course for Police Officers, http://www.criminaljustice.ny.gov/ops/training/bcpo/bcpo01.htm.

[58] New York State Division of Criminal Justice Services, Basic Course for Police Officers, Table of Contents, http://www.criminaljustice.ny.gov/ops/docs/training/pubs/basicpolice/bcpooutline.pdf, 7.

[59] Ashley Hirtzel, "City orders additional training for police officers," *WBFO 88.7*, November 6, 2014, http://news.wbfo.org/post/council-orders-additional-training-city-police-officers.

COB464863

[60] New York State Division of Criminal Justice Services, Basic Course for Police Officers, Table of Contents, http://www.criminaljustice.ny.gov/ops/docs/training/pubs/basicpolice/bcpooutline.pdf, 2.

[61] Conversation with Susan Lee, Urban Peace Institute.

[62] Constance Rice & Susan K. Lee, Relationship-based policing achieving safety in Watts. A report for the President's Task Force on 21st Century Policing. Josh Green and Melissa Nalani Ross (eds.)

[63] Krammedine, Y. I., & Silverstone, P. H. (2015). How to improve interactions between police and the mentally ill. *Frontiers in Psychiatry, 5*, 1-5. doi:

10.3389/fpsyt.2014.00186.

[64] Personal communication with Susan Lee, emphasize Watts training used significant asset mapping.

[65] Patricia Collins, Jack. R. Greene Ph.D., Robert Kane, Robert Stokes, and Alexis Piquero Ph.D., "Implementing Community Policing in Public Housing: Philadelphia's 11th Street Corridor Program," September 31, 1998, https://www.ncjrs.gov/pdffiles1/nij/grants/179980.pdf, 41

[66] Ibid, 42.

[67] Katherin Beckett, Seattle's Law Enforcement Assisted Diversion Program: Leassons Learned from the First Two Years, Ford Foundation, March 21, 2014.
[68] The United States Conference of Mayors, 25-27.

[69] The United States Conference of Mayors, 25-27.

[70] Thomas Ferrick, "Using data, Philly police bring major crimes to lowest levels in five years," *Axis Philly,* July 22, 2013, http://axisphilly.org/article/using-data-philly-police-bring-major-crimes-to-lowest-levels-in-five-years/.

[71] Personal communication with Susan Lee, Urban Peace Institute.

[72] Niagara Falls Police Department General Order, No. 120.00, Performance Evaluations: Sworn Personnel, Nov. 5, 2013, Appendix A: Training Manual, http://www.egovlink.com/public_documents300/niagarafalls/published_documents/Police/Administration%20Policies%202014/120_00%20Performance%20Evaluations.pdf

[73] Ibid.

[74] The United States Conference of Mayors, 22.

[75] Personal Communication, Leonard Williams, Dec. 3, 2015.

49

COB464864

[76] "Police Neighborhood Resource Program," Greensboro Police Department, 2014, http://www.greensboro-nc.gov/modules/showdocument.aspx?documentid=25787, 5.

[77] Ibid, 24.

[78] "The Police Responsibility to Community-Oriented Policing in a Diverse Society," in *Training the 21st Century Police Officer*, 99.

[79] Ibid.

[80] U.S. Census Bureau, Buffalo (city) New York. http://quickfacts.census.gov/qfd/states/36/3611000.html

[81] Gene Grabiner, March 2015, 18 Recommendations for Enhanced Police Practice. [Report]

[82] Lou Michel, Oct. 19, 2015, City hopes new initiative will lead to more minority police officers. The Buffalo News. http://www.buffalonews.com/city-region/city-hopes-new-initiative-will-lead-to-more-minority-police-officers-20151019

[83] Twitter account for BPD21C. @BPD21C https://twitter.com/bpd21c

[84] Wgrz.com. Buffalo Police Announce new recruitment program. Oct 19, 2015. http://www.wgrz.com/story/news/local/buffalo/2015/10/19/buffalo-police-announce-new-recruitment-program/74234744/

[85] Buffalo Police Department. 2011. Recruitment Exam Booklet. Available from: http://www.bpdny.org/files/pdf/10366_Test_booklet_mech.pdf.

[86] Conversation with Lieutenant Steve Nichol, Buffalo Police Department, Dec. 3, 2015.

[87] Syracuse Police department. 2015. Recruitment Flyer. Available from: http://www.syracusepolice.org/document/615.pdf

[88] City of Rochester. 2015. Rochester Police Department Police Officer Requirements. Available from: http://www.cityofrochester.gov/article.aspx?id=8589936732.+

[89] Offices of Brooklyn Borough President Eric L. Adams and Manhattan Borough President Gale A. Brewer and Attorney Norman Siegel. 2015. Improving Police Community Relations: A Report from a Series of Town Hall Meetings in Brooklyn and Manhattan.

[90] Ibid.

[91] Lou Michel, Molly's Pub guard had record of abuse before his hiring: No background check for Molly's Pub Guard, Buffalo News, April 26, 2015, http://www.buffalonews.com/city-region/buffalo/mollys-pub-guard-had-record-of-abuse-before-his-hiring-20150426.

[92] Lorie A. Fridell, "Racially Biased Policing: The Law Enforcement Response to the Implicit Black-Crime Association," http://fairandimpartialpolicing.com/docs/rbp-thelaw.pdf, 42.

COB464865

[93] Lorie Fridell, *This is Not Your Grandparents Prejudice: The Implications of the Modern Science of Bias for Police Training*, p.2 (2013). http://static1.squarespace.com/static/54722818e4b0b3ef26cdc085/t/5478b85ee4b0674c74c9f008/1417197662596/not-your-granparents-prejudice.pdf

[94] Sendhil Mullainathan, *Police Killings of Blacks: What the data says*, New York Times (October 16, 2015). http://www.nytimes.com/2015/10/18/upshot/police-killings-of-blacks-what-the-data-says.html?_r=0

[95] The Contract for Policing Justice, Consortium for Police Leadership in Equity, p. 4 (2010).

[96] Community Policing Dispatch, Office of Community Oriented Policing Services (February 2009).

[97] Cheryl Staats, Kelly Capatosto, Robin A. Wright, and Danya Contractor, *State of the Science: Implicit Bias Review 2015*, Kirwan Institute, p. 6 (2015).

[98] Id.

[99] Cheryl Staats, Kelly Capatosto, Robin A. Wright, and Danya Contractor, *State of the Science: Implicit Bias Review 2015*, Kirwan Institute, p. 65 (2015).

[100] Lorie Fridell, *This is Not Your Grandparents Prejudice: The Implications of the Modern Science of Bias for Police Training*, p.2 (2013).

[101] http://www.fairimpartialpolicing.com/training-programs/

[102] U.S. Department of Justice press release, U.S. Department of Justice holds two-day "Fair and Impartial Policing" training for St. Louis County Law Enforcement, November 2014. http://www.justice.gov/opa/pr/us-department-justice-holds-two-day-fair-and-impartial-policing-training-st-louis-county-law

[103] Rod Watson, *Police tackle problems of 'Implicit bias,'* Buffalo News (June 3, 2015).

[104] Sarah Green Carmichael, *Training Police Officers to Be Less Biased*, Harvard Business Review (March 3, 2015). https://hbr.org/2015/03/training-police-departments-to-be-less-biased

[105] Peter Callaghan, *Professors and Police, How Minneapolis Project May Change the Way Cops Everywhere Relate to the Public*, MinnPost (August 27, 2015). https://www.minnpost.com/politics-policy/2015/08/professors-and-police-how-minneapolis-project-may-change-way-cops-everywhere

[106] Vera Study on Effective Policing in Immigrant Communites.

COB464866

0051

[107] Pradine Saint-Fort, Noelle Yasso, & Susan Shah, Engaging Police in Immigrant Communities: Promising Practices from the Field, Vera Institute of Justice, October 2012, pp 9-10.

[108] Pradine Saint-Fort el at. Pp 16-17.

[109] Pradine Saint-Fort et al. pp 23.

[110] President's Task Force on 21 Century Policing. 2015. *Final Report of the President's Task Force on 21st Century Policing*. Washington, DC: Office of Community Oriented Policing Services.

[111] Peter Finn, Citizen Review of Police: Approaches and Implementation, Abt. Associates Inc., for National Institute of Justice, U.S. Department of Justice, March 2001.

[112] Finn supra note 3 at 7-8.

[113] Ibid, 8.

[114] Ibid.

[115] President's Task Force supra note 1 at 26.

[116] Fin supra note 3 at xi.

[117] Ibid. at vii.

[118] Rochester Police Community Relation Program: Civilian Review Board. 2014 Annual Report 2.

[119] Ibid.

[120] Programs: Police/Community Relations, Monroe County Sheriff Review Panel. Center for Dispute Settlement. http://www.cdsadr.org/programs/policecommunity-relations/monroe-county-sheriffs-review-panel-2/. See also Programs: Police/Community Relations, Rochester Civilian Review Board (CRB). Center for Dispute Settlement. http://www.cdsadr.org/programs/policecommunity-relations/rochester-civilian-review-board-crb/

[121] Rochester Police Community Relation Program supra note 5 at 14.

[122] Rochester Police Community Relation Program supra note 5 at 7.

[123] Programs: Police/Community Relations, Monroe County Sheriff Review Panel. Center for Dispute Settlement. http://www.cdsadr.org/programs/policecommunity-relations/monroe-county-sheriffs-review-panel-2/. See also Programs: Police/Community Relations, Rochester Civilian Review Board (CRB). Center for Dispute Settlement. http://www.cdsadr.org/programs/policecommunity-relations/rochester-civilian-review-board-crb/

[124] Rochester Police Community Relation Program supra note 5 at 14.

COB464867

[125] Ibid, 4.

[126] Ibid, 15.

[127] Ibid, 23.

[128] Ibid.

[129] Programs: Police/Community Relations, Police Conciliation Mediation. Center for Dispute Settlement. http://www.cdsadr.org/programs/policecommunity-relations/police_conciliation_mediation/

[130] Rochester Police Community Relation Program supra note 5 at 3.

[131] Berkely, Rochester, SF< and Orange Co examples—cite to DOJ report in notes.

[132] DOJ report

[133] DOJ report

[134] CCR websiter—verify.
[135] Cite to DOJ report and Rochester site.

[136] Joe Coscarelli, Stop-and-Frist rules Unconstitutional, But It Won't Stop, New York Magazine, Aug. 12, 2013, 11:03 AM, http://nymag.com/daily/intelligencer/2013/08/stop-and-frisk-ruled-unconstitutional.html.

[137] Caroline Bankoff, Don't Forget Your NYPD Stop-and-Frist Receipt, New York Magazine, Sept. 28, 2015, 1:36 PM, http://nymag.com/daily/intelligencer/2015/09/dont-forget-your-nypd-stop-and-frisk-receipt.html.

[138] Caroline Bankoff, Don't Forget Your NYPD Stop-and-Frist Receipt, New York Magazine, Sept. 28, 2015, 1:36 PM, http://nymag.com/daily/intelligencer/2015/09/dont-forget-your-nypd-stop-and-frisk-receipt.html.

[139] Caroline Bankoff, Don't Forget Your NYPD Stop-and-Frist Receipt, New York Magazine, Sept. 28, 2015, 1:36 PM, http://nymag.com/daily/intelligencer/2015/09/dont-forget-your-nypd-stop-and-frisk-receipt.html.

[140] Illinois Public Act 099-0352, http://www.ilga.gov/legislation/publicacts/99/PDF/099-0352.pdf.

[141] Illinois Public Act 099-0352, http://www.ilga.gov/legislation/publicacts/99/PDF/099-0352.pdf.

[142] Jeff Brady, Obama: Camden, N.J., Police A Model For Improving Community Relations, National Public Radio, May 22, 2015 4:26 PM, http://www.npr.org/2015/05/22/408824877/obama-camden-n-j-police-a-model-for-improving-community-relations.

COB464868

0053

[143] Ibid.

[144] Kate Zernike, Camden Turns Around With New Police Force, N.Y. Times, Aug. 31, 2014, http://www.nytimes.com/2014/09/01/nyregion/camden-turns-around-with-new-police-force.html?_r=0

[145] Jeff Brady, Obama: Camden, N.J., Police A Model For Improving Community Relations, National Public Radio, May 22, 2015 4:26 PM, http://www.npr.org/2015/05/22/408824877/obama-camden-n-j-police-a-model-for-improving-community-relations.

[146] Kate Zernike, Camden Turns Around With New Police Force, N.Y. Times, Aug. 31, 2014, http://www.nytimes.com/2014/09/01/nyregion/camden-turns-around-with-new-police-force.html?_r=0

[147] Jeff Brady, Obama: Camden, N.J., Police A Model For Improving Community Relations, National Public Radio, May 22, 2015 4:26 PM, http://www.npr.org/2015/05/22/408824877/obama-camden-n-j-police-a-model-for-improving-community-relations.

[148] Ibid.

[149] NYC Civilian Complaint Review Board. Semi-annual Report (January-June, 2015), pp. 1-2.

[150] Ibid at 2.

[151] *Implementing a Body-Worn Camera Program: Recommendations and Lessons Learned*, Community Oriented Policing Services, United States Department of Justice, 2014, 32.

[152] Ibid.

[153] Jay Stanley, American Civil Liberties Union, *Police Body-Mounted Cameras: With Right Policies in Place, a Win for All*, (2013), 3.

[154] Metropolitan Police Department. Body-worn Cameras: FAQ, http://mpdc.dc.gov/page/body-worn-cameras-faqs

[155] Sarah Lustbander, The Real Police-Video Problem, *Te new York Times*, Opinion, A27, Dec. 2, 2015.

[156] Dave McClure & Daniel Lawrence, Urban-Wire, Police body-camera footage: Why public should only kind of mean public. Urban Institute, Jul 8, 2015, http://www.urban.org/urban-wire/police-body-camera-footage-why-public-should-only-kind-mean-public

[157] *Community Policing a Foundation for Restorative Justice,* International Institute for Restorative Practices, August 12, 2000, http://www.iirp.edu/article_detail.php?article_id=NDc3.

COB464869

[158] Jefferson County Juvenile Assessment Center, What We Do, accessed Feb. 10, 2016. https://www.jeffcojac.org/what-we-do/
[159] "Law Enforcement Assisted Diversion," The Drug Alliance, February 2014, http://www.mayorsinnovation.org/images/uploads/pdf/5_-_DPA_Fact_sheet_Law_Enforcement_Assisted_Diversion_LEAD_Feb2014.pdf.

[160] Joel B. Plant and Michael S. Scott, U.S. Department of Justice, *Effective Policing and Crime Prevention: A Problem Oriented Guide for Mayors, City Managers, and County Executives,* August 2009.

COB464870

0055