# EXHIBIT 329

**One Region Forward**

**Fair Housing Equity Assessment**

**Public Comment Draft**
**June 18, 2014**

A host of systemic factors have led to the extreme geographic segregation and racial and ethnic disparities in educational attainment, wealth, and quality-of-life throughout the Buffalo Niagara Region.

These factors have included local, state and federal policy and investment decisions, discriminatory practices within the private sector and individual actions and biases.

Some of these policies and practices have been discontinued, outlawed or overturned, but there has not been a systemic response of the scale and scope necessary to overcome generations of ingrained inequality.

The decision-making framework within the region needs to be more intentionally inclusive and reflective of the pervasive challenges of geographic, racial and ethnic disparities.

PLAINTIFFS_GENERIC-00004868

**One Region Forward**

**Fair Housing Equity Assessment**

**Public Comment Draft**
**June 18, 2014**

**TABLE OF CONTENTS:**

**Chapter 1: Executive Summary**...............................................................................4

**Chapter 2: Background and Introduction**...............................................................15

**Chapter 3: Regional Segregation**..........................................................................20

**Chapter 4: Racially and Ethnically Concentrated Areas of Poverty**....................63

**Chapter 5: Opportunity Areas**................................................................................89

**Chapter 6: Physical Infrastructure and Public Investment**.................................106

**Chapter 7: Fair Housing Infrastructure**................................................................119

**Chapter 8: Summary, Recommendations, Next Steps & 1RF integration**.......129

PLAINTIFFS_GENERIC-00004869

## List of Tables, Figures, Appendices

**Tables**

| # | Descrtiption |
|---|---|
| 3-1 | 10 Slowest Growing Large US Metros |
| 3-2 | Buffalo-Niagara Population Change by Race and Ethnicity 1980-2010 |
| 3-3 | Population Change by Age Cohort 2000-2010 |
| 3-4 | Share of Population by Race/ Ethnicity for Selected Geographies, 2010 |
| 3-5 | Metro Ranking by % Racial & Ethnic Share of Population (of 100 largest metros), 2010 |
| 3-6 | Buffalo-Niagara Indices of Dissimilarity, 2010 |
| 3-7 | 2010 Buffalo-Niagara Racial/Ethnic Exposure Index |
| 3-8 | Buffalo-Niagara Total Foreign-Born Population |
| 4-1 | Population Living in Racially and Ethnically Concentrated Areas of Poverty by Race and Ethnicity |
| 4-2 | Number of Vehicles Available to Occupied Housing Units |
| 5-1 | Disparities in Access to Neighborhood Opportunity by Race and Ethnicity |
| 5-2 | Extent of Opportunity Disparities; Racial and Ethnic Minorities Compared to Whites |
| 6-1 | GBNRTC Forecasted Transportation Investments 2008-2018 |
| 7-1 | Housing Discrimination Cases Filed with the U.S. Department of Housing and Urban Development 2004 - 2013 |

**Figures**

| # | Descrtiption |
|---|---|
| 3-1 | Percent Change in Population by Municipality 1990-2010 |
| 3-2 | Scatterplot image of Racial and Ethnic Distribution in Buffalo-Niagara 2010 |
| 3-3 | Change in percent share of population of racial and ethnic minorities by Municipality 1990-2010. |
| 3-4 | Change in Racial Composition by Census Tract 1990-2010. |
| 3-5 | Typical Neighborhood Composition by Race/Ethnicity, 2010 |
| 3-6 | Deviation from Predicted Racial Composition, White Popultion 2010 |
| 3-7 | Black/African-American Population Change, City of Buffalo, 2010 |
| 3-8 | 1937 Home Owners' Loan Corp. Residential Security Map. |
| 4-1 | Erie County Racially/ Ethnically Concentrated Areas of Poverty |
| 4-2 | Niagara County Racially/ Ethnically Concentrated Areas of Poverty |
| 4-3 | Poverty Rates by Census Tract, 2012 |
| 4-4 | Number of Public Housing Units by Census Tract |
| 4-5 | Buffalo Tree Conditions Survey |
| 5-1 | Buffalo-Niagara School Proficiency Index |
| 5-2 | Buffalo-Niagara HUD-Poverty Index |
| 5-3 | Buffalo-Niagara Labor Market Index |
| 5-4 | Buffalo-Niagara Job Access Index |
| 5-5 | Buffalo-Niagara Housing Stability Index |
| 5-6 | Buffalo-Niagara Food Access Index |
| 5-7 | Buffalo-Niagara Environmental Health Index |
| 5-8 | Buffalo-Niagara Opportunity Index |
| 5-9 | Community Congress Feedback Map |
| 5-10 | FHEA Opportunity Areas |
| 6-1 | WNYREDC Opportunity Agenda Strategies |
| 6-2 | HUD Public Housing Units |
| 6-3 | Low-Income Housing Units funded by Low-Income Housing Tax Credits |
| 7-1 | Distribution of Mortgage Interest Deduction by Economic Strata |

**Appendices**

| # | Descrtiption |
|---|---|
| 2-A | List of FHEA Committee Participants and Invitees |
| 3-A | Racial and Ethnic Concentrations by Census Tract, 2010 |
| 3-B | Racial and Ethnic Change by Municipality 1990-2010 |
| 3-C | Deviation from Predicted Racial Share by Municipality, 2010 |

PLAINTIFFS_GENERIC-00004870

**CHAPTER 1: Executive Summary**

**Background**

One Region Forward is a broad-based, collaborative effort to promote more sustainable forms of development in the Buffalo Niagara Region: in land use, transportation, housing, energy and climate, access to food, and more. It combines research and public engagement with planning and action to help the region meet the combined economic, environmental, and social challenges of the 21st century.

Within the One Region Forward context, the Fair Housing Equity Assessment (FHEA) is a comprehensive examination of the current state of racial, ethnic and geographic inequality within the region designed to inform strategy development, priority setting and investment recommendations to alleviate these inequalities and provide opportunities to all residents.

The FHEA takes into account current barriers to opportunity as well as historic causes of segregation and exclusion. Through the FHEA, One Region Forward hopes to:

1. **Understand** the historical, current and future context for equity and opportunity in the region and the data and evidence that demonstrates those dynamics
2. **Engage** regional leaders and stakeholders on findings and implications of analysis
3. **Integrate** knowledge developed through the FHEA into the strategy development process (e.g., priority setting and decision making)

As with the One Region Forward process in total, the Fair Housing Equity Assessment started with an acknowledgement of the tremendous amounts of previous planning work as well as other initiatives already taking place.  Rather than ignoring or duplicating that work, the FHEA attempts to build on these efforts to create a more robust, informed and rounded document about equity in the region. In addition to this wealth of recent analysis and public input, the Fair Housing Equity Assessment was informed by a broad range of equity stakeholders through its own distinct FHEA Advisory Committee and through direct public engagement at five Community Congresses and through print and on-line surveys distributed by our partners.

**Equity**

In order to examine equity throughout the region, though, the FHEA partners first came to a shared understanding of what equity means for the region. Together,

PLAINTIFFS_GENERIC-00004871

they developed a definition that has its roots in federally and state civil rights protected classes, but uses plain language to establish a vision for us to strive toward:

*Buffalo Niagara will be an equitable community when all people – regardless of how they look, who they know or who they love, what language they speak, what they believe, whatever their level of means or ability, when or where they were born, where they live, where they go to school or why or how long they've called this place home – have the opportunity, resources and tools needed to achieve their potential, to lead healthy and fulfilling lives with rewarding work, and to access, experience, and participate in all our region has to offer while ensuring others – now and in future generations – can do the same.*

A thorough analysis of current conditions throughout the region confirmed what participants within the FHEA process already had voiced as major challenges: Buffalo Niagara as it exists today and as it has existed in the past is far from equitable.  Gross discrepancies persist between races, ethnicities and geographies.  We continue to be a region where color of skin, country of origin, language and place of birth are major determinants in access to opportunity and life outcomes.

**Segregation and Discrimination**

Buffalo Niagara is a region that continues to lose population, experiencing an ongoing net population loss each decade since 1970.  But in the midst of overall loss, we are also experiencing major demographic shifts, becoming both older and more diverse.[1]

However, this increase in diversity, much like our population loss, is not uniform throughout the two-county region. Nationally, the Buffalo Niagara Metropolitan Statistical Area (MSA) ranks high in segregation – as 6th most segregated on the White-Black index of the 102 largest metros, 21st in White-Hispanic segregation and as the most segregated on the White-Asian index – and employment and achievement statistics are skewed against minorities.

The consequences of racial and ethnic segregation and discrimination directly impact individuals, neighborhoods and the region as a whole.  However, these conditions did not develop in a vacuum. A host of systemic and individual factors – governmental, institutional, personal – have contributed to and sustain a

---

[1]  From 1980 through 2010, the White Non-Hispanic share of the region's population fell from 88.3% to 79.5% while every other major racial and ethnic group saw significant increases.

5

PLAINTIFFS_GENERIC-00004872

system that perpetuates inequality and the cycle of poverty. Many of the factors contributing to segregation are buried under assumptions, stereotypes and misinformation so that the victims of an unequal system are too often blamed for its outcomes.

In the housing field in particular, multiple institutions, agencies and individual actors have contributed to racial and geographic segregation and discrimination. The influence of the federal government, private lending and real estate industries – practices such as redlining, blockbusting and racial steering, speculation and disinvestment, and a lack of regulatory enforcement – each played explicit and interconnecting roles in the decline of urban areas, especially where minority populations are concentrated.

Local power brokers and municipal policies also directly limited the neighborhoods where minorities were able to access housing, and residency requirements, local zoning and housing covenants were some of the tools used to those ends.

Simultaneously, a variety of other factors further limit housing and neighborhood choice, such as exclusionary restrictive zoning regulations, NIMBYism (a Not In My Back Yard mentality), a lack of regional capacity to sufficiently combat instances of housing discrimination, and a limited local housing support and delivery system.

Various regulations have been put in place to make access to housing more accessible and to eliminate discrimination in lending, but the pervasive influence of the finance, insurance and real estate (FIRE) sectors continue to create a racial and geographic imbalance of opportunity.

Other major employers and institutions have also perpetuated actions negatively impacting minority populations from disinvesting or avoiding neighborhoods to direct actions of discrimination. A refusal of companies to hire or to promote minority candidates, for instance, led to at least one major settlement in the 1970s with a large industrial employer.

In addition to the housing sector, disadvantaged populations also face challenges in spatial mismatches of jobs and services, of transportation challenges, of language and cultural barriers. Environmental burdens more heavily impact low-income and minority communities. Inequitable enforcement within the criminal justice system places an incredible burden on individuals, families and communities both during and after incarceration.

Meanwhile, people in poverty, and particularly people in poverty living in poor neighborhoods, face increased costs for daily items and services. Mainstream

6

PLAINTIFFS_GENERIC-00004873

services are often unavailable as banks, supermarkets and established retailers have either left or will not enter impoverished communities. This forces residents, who often don't have access to private transportation, to accept inferior or more expensive products than people with more resources and a greater ability to be selective about where they spend their money.

In the public realm, political decisions skew the distribution of resources and both investment and disinvestment were at play. Disinvestment, the failure to pave streets, fix sidewalks, or maintain streetlights or parks, for example, contributed heavily to a lesser quality of life in low-income and minority communities.  But major capital investment that did come to these same communities was not necessarily positive.  New highways, for example, were constructed through neighborhoods, decimating communities while breaking up emerging bases of minority political and economic power.

Historically, these decisions played off of and into national trends of deindustrialization and suburbanization which pulled economic activity out of central cities and disbursed it throughout the region – farther from the neighborhoods where minority populations were able to live.  As a rush of population shuffling occurred, the settlement of almost exclusively white suburbs also created conditions for a large segment of the population to distance themselves physically and financially from the plight of minority communities and the conditions of aging urban infrastructure and institutions.

This reinforced a "small-box" delivery system for public services throughout the region that became very separate and very unequal. The discrepancies in the public education system in the region, for example, are a product of and contributor to segmentation and segregation of the population.  But the conditions of streets, sidewalks, parks and community centers are also physical manifestations of the disparities that this population reshuffling has created.

Controlling for the economic conditions, the vast majority of municipalities in the region have populations that are whiter than their predicted racial share, another stark example of the deep divisions within the region.

The overall poverty statistics for Buffalo-Niagara mask incredible disparities largely defined – or at least heavily influenced – by geography and race.

The poverty rate of the white population in the region is only 9.6%, but for African-Americans it is 36.1%, for Hispanic/Latino populations it is 35.8%, Asian/Pacific Islander 25.6%, Native American 23.5% and some other race is 44.5% while two or more races is 28.6%.[2]

---

[2]     US Census Bureau, American Community Survey Five Year Estimates, 2007-2011.

PLAINTIFFS_GENERIC-00004874

Fully 49% of the people in poverty in the region reside in the City of Buffalo, even though the City as a whole only represents only 23% of the regional population. Together with Niagara Falls, Lackawanna and Lockport, these core cities house 62% of the region's poor but 31% of the population. These four cities have a combined poverty rate of nearly 28%, while all other areas of the region have a combined poverty rate of less than 8%.

Still, the region as a whole is diversifying and, in the process, the overall levels of segregation are primarily decreasing. Though some areas are diversifying more than others, nearly every town, city and village in the region has a smaller percentage of white population than in 1990, and a larger percentage of black and Latino populations.[3] However, the region is still highly segregated compared to other areas of the country.

**Racially and Ethnically Concentrated Areas of Poverty**
As a measure of ingrained segregation and lack of opportunity, HUD strictly defines Racially and Ethnically Concentrated Areas of Poverty (R/ECAPs) by standardized metrics.  These include the portion of residents of the tract that are racial or ethnic minorities, and the portion of families in the census tract that live below the poverty level.[4] By this measure there are sixteen Racially or Ethnically Concentrated Areas of Poverty tracts within the region.

The sixteen R/ECAP tracts are heavily concentrated in the City of Buffalo, but also appear in Lackawanna and Niagara Falls.[5] 4.1% of the regional population (46,203) lives in these communities.

The host of factors contributing to segregation and concentrated poverty in the region played a role in the development of the R/ECAPs in the region, and are in many ways compounded in high poverty minority neighborhoods.  Siting

---

[3]    With the exceptions of Brant and the Village of Farnham which have each shown 1% decrease in black population.

[4]    R/ECAP tracts must display 50% or more minority population and must be three-times the average percentage of families in poverty (37.6% or more for Buffalo Niagara).

[5]  Twelve R/ECAPs are found within the City of Buffalo limits – along the city's western edge and throughout the east side. Five of the six western tracts are mixed-race concentrations, while one is majority Hispanic/Latino. Five RCAPs on the east side are majority black, while one just east of downtown is mixed-race. The remaining R/EACP tracts are tract 174 in Lackawanna (mixed race) on the southern border of Buffalo, 202 and 206 in Niagara Falls (both majority black) and 9041 in the Tonawanda Reservation (with a small population that is exclusively native).  Additionally, there are three tracts in the region that are above the poverty threshold, but are not 50% minority. Of those, Tract 209 in Niagara Falls is 49.3% minority, Tract 55 in Buffalo is 44.4% minority and Tract 83 in Tonawanda is 24.2% minority.

PLAINTIFFS_GENERIC-00004875

decisions and concentrations of public housing, often in sites that were undesirable for private development have played an additional role in segregating poverty.

However, knowledge from within communities regularly point out the assets and amenities not usually captured by statistics alone: the community cohesion and engagement, a historic park or neighborhood institutions, the spirit of hope and renewal that generates excitement and confidence.

Yet these communities face the challenge of an un-level playing field, a lack of resources and support and, historically, a lack of political will – whether on a the part of the larger community, the metropolitan power structure or amongst public officials specifically – to ensure equity of investment and emphasis.

**Areas of Opportunity**

In contrast to the R/ECAPs, where residents have fewer options and opportunities than the regional average, there are also Areas of Opportunity throughout the region: geographies where residents have greater access and amenities than the regional average.

No one factor alone can represent opportunity, but the FHEA examines school proficiency, poverty, labor market access, housing stability, job access, environmental health and food access.

What emerged was a complex picture but, generally, areas of highest opportunity within the region are the second ring suburbs that continue to develop new housing and new infrastructure. These areas, generally wealthier and whiter than the region as a whole, outperform the region on a host of indicators.

This FHEA considered three benchmarks of increased opportunity: above average opportunity areas, high opportunity areas and highest opportunity areas. [6] While 56% of the region's population lived in above average opportunity areas, 65% of whites did, while only 25% of Hispanic/Latinos and 10% of the region's black population did as well.

The discrepancies were higher for high opportunity areas, where 19% of the region's population lived, but 22% of whites, 25% of Asian/Pacific Islanders population but only 7.2% of the region's Hispanic/Latino population, 6.2% of the Native population and 2.6% of the black population.

_____

[6] On a 100 point opportunity index, neighborhoods scoring above 60 are considered above average opportunity areas, those above 80 are high opportunity areas, and those above 90 are the highest opportunity areas.

PLAINTIFFS_GENERIC-00004876

For the highest opportunity areas the discrepancies were higher still. The highest opportunity areas are home to 4% of the region's population and 5% of the white population, but only 1.5% of the region's Hispanic/Latino population and 0.5% of the black population.

**Public Investment**

For decades, public investment decisions in the region, and the regulatory framework guiding development, encouraged and induced sprawl at the expense of traditional neighborhoods and the urban core. This pattern of investment has resulted in many of the yawning inequities identified within the region today.

In the past decade, however, initial strides have been made. In 2006, Erie and Niagara Counties affirmed a bi-county plan (the Erie-Niagara Framework for Regional Growth) that had at its core developing a common understand and collective strategy for growth and development within the region that would reverse negative trends and contribute to the economic and social well-being of region.

The Western New York Regional Economic Development Council (WNY REDC) has established guiding principles for supported projects based on: inclusivity, promotion of smart growth, orientation toward young adults, building upon strengths, regional in impact, and improvement upon region's image.

Governor Andrew Cuomo made a commitment in 2012 to strategically invest one billion dollars in the Buffalo area economy, including a Revitalization Fund with the specific goals of promoting smart growth/spatial efficiency, enhancing the region's competitive edge, increasing collaboration between public and private sector investments within the context of strategic investments within the city of Buffalo.

Yet, there is substantial ground to cover to develop an investment and regulatory structure that affirmatively promotes equity throughout the region. Disparate local, state and federal investment decisions and approvals do not have a mechanism for rooting individual projects within a coordinated regional frame. Barring this, the ability to evaluate the equity of these projects and actions will remain tenuous and equally disparate. The challenges within the realm of Fair Housing exemplify these obstacles.

**Fair Housing**

Fair Housing regulations are in place at the federal and state levels, but local ordinances do not apply in each municipality and are often uneven or outdated. Enforcement is even more scattered. There are a host of individuals and several

PLAINTIFFS_GENERIC-00004877

organizations dedicated to furthering Fair Housing within the region (HOME and the Erie County Fair Housing Partnership, for example), but the resources both within and outside of government are limited and often inadequate to the challenge.

Even where proper regulations are in place, then, the letter of the law may be too easily broken or skirted. At a certain size of development or due to the high profile and capacity of the entities involved, some instances of discrimination become part of an enforcement action and some even part of a public dialogue. However, it is difficult to quantify or qualify how many other lower-profile developments may face similar challenges, and continue to go unnoticed or unchecked because of a lack of scrutiny or support. This type of discriminatory action is in some ways more challenging to address, because it requires knowledge of rights, regulations and remedies on the part of the applicant as well as the diligence of underfunded agencies to monitor developments and municipal actions, placing themselves in an adversarial position to often powerful influence and structures within the region.

Though no new regulation or law can ensure that localities will abide by their federally mandated legal requirement to affirmatively further Fair Housing, local Fair Housing Ordinances can provide a strong statement of principle and a clear framework for action for municipalities, their departments and agencies. Updating and strengthening the existing municipal Fair Housing regulations within the region is therefore one of the recommended actions for advancing fair housing in Buffalo-Niagara.

### Summary Recommendations

Throughout the course of the Fair Housing Equity Assessment, it has become clear that the region faces tremendous challenges to equity and opportunity. Ingrained policies and practices within the public and private sectors will not be easy to overcome.

Even where certain discriminatory actions have been abolished, their impacts are felt still, as the long-term intergenerational impacts of the poverty and inequality to which they contributed have not been erased, nor has any affirmative response to these issues been of the scale or magnitude necessary to erase the legacy of injustice.

Members of the FHEA committee expressed that, while the ongoing and current causes of segregation and discrimination are multiple and varied, ultimately, underlying the inability of the region to combat these ills is a general lack of personal and political awareness, understanding and will. Current discussions of discrimination and segregation or of race in general, when they do happen, are

PLAINTIFFS_GENERIC-00004878

often uncomfortable and halting. A lack of a common discourse around these issues contributes, but so do heavily ingrained prejudices that are manifest in both obvious and subtle ways.    Some have suggested that overcoming discrimination will require each governmental decision to be evaluated within the context of whether it will affirmatively further equity or reinforce existing patterns of segregation.

No single action or single intervention can be expected to turn the tide of segregation. The fight for equality has been ongoing for generations, and future generations will need to bear this mantle as well. What is set out in these recommendations are a series of steps that can be taken by the stakeholders involved in the One Region Forward initiative – whether as a collective effort or within their own institutions – to continue, and hopefully accelerate, the progress that has been made.

On a high level, these recommendations include:

**Ensure public input on public investment**
Decision-making in the region needs to be inclusive, representative and responsive
- increase diversity on local boards and commissions
- ensure easy access and transparency of public records, meetings, proceedings and proposals
- enhance public process and outreach mechanisms in local planning practices: capital plans, comprehensive plans, HUD consolidated planning, etc.
- institute participatory budgeting processes which elevate the concerns of the people who have intimate knowledge about neighborhoods

**Ensure equitable distribution of, and access to, public resources and service delivery**
Agencies should develop policies that target public investment to traditionally underserved populations, for instance:
- ensure new affordable housing is not solely located in high poverty neighborhoods, but provides residents access to areas of opportunity, balanced against need for accessible services, transportation options, etc.
- focus public investment in urban core and in established neighborhoods not just downtown, waterfront and industry clusters
- implement neighborhood specific investment strategies that capitalize on the localized assets, historical significance and current residents' vision for their communities developed through a public process
- institute contractually obligated performance measures to ensure local

PLAINTIFFS_GENERIC-00004879

residents participate in the impact of public projects and developments
- integrate transportation investment with neighborhood improvement, with less emphasis on throughput, which has been so detrimental to minority communities, and more emphasis on creating complete communities
- enhance public transportation options and flexibility, particularly within Racially and Ethnically Concentrated Areas of Poverty (R/ECAPs), to provide access to job centers
- address the gross inequities in education through a region-wide systems reform effort
- focus job training and workforce development in Racially and Ethnically Concentrated Areas of Poverty

**Building Capacity**
- Strengthen Fair Housing infrastructure and the affordable housing sector
- Establish independent accountability mechanisms to ensure projects and public investments are proactively contributing to a more equitable region
- Develop citizen champions and strong organizational voices for equitable and sustainable development

**Regulatory reform & monitoring**
- Reform the local framework for development, land use and zoning, and land use approvals process
- Monitor and regulate finance and real estate transactions and practices

**Public education and promotion**
- Work to change public perception of equity and opportunity at the neighborhood level

Yet, even with the implementation of these recommendations, the struggle for equity and opportunity for all residents in the region will remain just that – a struggle.  It will require bold stances in the face of opposition to changing the status quo. It will require that difficult conversations and topics are broached honestly, openly, regularly and intentionally to inform the regional dialogue and highlight these which for too long have oppressed groups of people and the region as a whole.

If we, as a region, value diversity, inclusion and opportunity, these tenets must be

13

PLAINTIFFS_GENERIC-00004880

supported. It must also me acknowledged that this will require resources: resources in time, money and personnel. While citizen engagement and broad based involvement is crucial, for monitoring, goal setting and internal and external accountability, there must also be professional and institutional commitment to these causes.

Agencies dedicated to these issues – both within government and outside of government – largely operate on a shoestring and are often not at the table for decisions having to do with housing, economic development, education, financial policies. And local support for these efforts, with limited exceptions, has often been relegated to an afterthought, a remainder, or a court-appointed settlement. For any real hope of achieving progress on these entrenched problems, first and foremost, this needs to change.

14

PLAINTIFFS_GENERIC-00004881

**CHAPTER 2: Background & Introduction**

In 2009, the administration of President Barack Obama launched the Partnership for Sustainable Communities as a signature initiative across federal departments to improve access to affordable housing, improve transportation options, and improve regional environmental performance.  The Department of Housing and Urban Development (HUD), the US Department of Transportation (DOT), and the Environmental Protection Agency (EPA) are working together to coordinate federal investments and encourage intra-regional cooperation around a series of six livability principles.

A consortium of agencies, municipalities and non-profits locally applied to the HUD Sustainable Communities program and was awarded a major regional planning grant in late 2011.  Selection for the planning process means the region is also designated with Preferred Sustainability Status from HUD, thereby making projects that are consistent with the direction of the regional plan eligible for bonus points within the grant application process.

Headed by the local Metropolitan Planning Organization, the Greater Buffalo Niagara Regional Transportation Council (GBNRTC), facilitated by the Niagara Frontier Transportation Authority (NFTA), and supported by the staff of the University at Buffalo Regional Institute (UBRI), the Regional Planning Consortium began meeting in early 2012.  The Consortium has since overseen a large-scale review of existing plans from the region and initiated a public sector and private sector council as well as a robust direct public engagement program.  Now known as One Region Forward (1RF), the effort is moving swiftly form public orientation into developing the plan itself. A series of five working teams were established in April 2013, including: Housing and Neighborhoods, Land Use and Development, Food Access and Food Justice, Transportation and Climate Change.  These Working Teams have worked closely with project staff to analyze existing conditions and public input to draft a vision for the region and propose implementation steps to be undertaken across public, private and non-profit sectors to achieve these goals.

Within the One Region Forward context, the Fair Housing Equity Assessment (FHEA) is a comprehensive examination of the current state of racial and ethnic inequality within the region to inform strategy development, priority setting and investment recommendations in the regional plan. Though HUD believes many issues and activities may be rightfully examined or carried out at the local level, the FHEA process acknowledges others require a geographically broader scope and level of analysis.

The FHEA examination takes into account current barriers to opportunity as well

15

PLAINTIFFS_GENERIC-00004882

as historical causes of segregation and exclusion. Ultimately, the goal of the FHEA is to help guide strategy development within the regional planning process to alleviate geographic inequalities and provide opportunities to all residents. Through the FHEA, HUD expects communities will:

1. **Understand** the historical, current and future context for equity and opportunity in the region and the data and evidence that demonstrates those dynamics
2. **Engage** regional leaders and stakeholders on findings and implications of analysis
3. **Integrate** knowledge developed through the Regional FHEA exercise into the strategy development process (e.g., priority setting and decision making)

To do so, the FHEA includes a regional assessment of patterns, policies and programs leading to segregation and regional disparities (Chapter 3); areas of racially and ethnically concentrated poverty (Chapter 4); areas of high opportunity throughout the region (Chapter 5); public investment structures and decisions (Chapter 6); and Fair Housing trends, systems and challenges (Chapter 7). From this analysis, the FHEA concludes with a series of recommendations aimed at helping to alleviate the disparities present within the region (Chapter 8).

This FHEA is required of Sustainable Communities Planning Grantees, but does not replace localities' obligation to perform an Analysis to Impediments. The Analysis to Impediments (AI) process, which is required of jurisdictions participating in the Community Development Block Grant (CDBG) program, is the means by which these entities consider and plan to rectify Fair Housing challenges within their footprints under the guidance Fair Housing Act.

However, though a Regional Analysis to Impediments is allowed under HUD rules, it has rarely been undertaken. HUD does permit, however, the scope of the FHEA to be expanded into a Regional AI to fill this role. Not all jurisdictions would need to agree to participate in the Regional AI and forego their own AI processes in order for it to move forward. However, if the Regional AI is completed it would be able to serve as the Analysis to Impediments for those communities choosing to sign on.

While this version of the FHEA does not fulfill the requirements of the Regional AI, several stakeholders have indicated an interest in building upon the work of this FHEA in the context of their future Analysis to Impediments work. Additional elements that would be necessary to convert this document into a Regional AI include, for instance, an analysis of familial status and disability status in addition to the racial and ethnic analysis required and already performed under the FHEA process. To convert to a Regional AI the document would also by required to

16

PLAINTIFFS_GENERIC-00004883

provide strategies and an action plan for overcoming Fair Housing challenges.

**FHEA Process**

As with the One Region Forward process in total, the Fair Housing Equity Assessment process started with an acknowledgement of the tremendous amount of previous planning work completed as well as efforts currently in motion. Rather than ignoring or duplicating that work, the FHEA attempts to build on these efforts to create a more robust, informed and rounded document about equity in the region. Two of these major initiatives regarding regional equity and access to opportunity include the Mobile Safety Net Project and Open Buffalo.

The Mobile Safety Net effort was launched by the John R. Oishei Foundation in 2009 in response to the economic downturn, which saw the region shed thousands of jobs and saw the demand for basic human needs services increase dramatically. This shift accelerated the changing face of poverty in the region and as increases in poverty rate began to materialize, The John R. Oishei Foundation formed a team of individuals and organizational partners to not only research the metrics behind the impacts of the downturn but to talk directly to service providers and those in needs about the services that do exist and the challenges they face. The University at Buffalo Regional Institute was enlisted as a major partner in data analysis and reporting of the initiative's findings.

Open Buffalo is a civic initiative launched in the summer of 2013 with funding from Open Society Foundations to explore ways to make Buffalo a more equal, just and free city. Though the focus of this work is the City of Buffalo, the inequities and solutions that it explored are regionally based. In acknowledging areas of relative strength contrasted against the immense poverty of the core, notions of equality and institutional and systemic inequity rose to the fore. Through a robust public outreach and engagement process that included a host of organizations and individuals, Open Buffalo stressed the importance of capturing the community's vision of an open and just society while simultaneously crowd-sourcing innovation solutions and ideas to trigger that transformation.

Work derived from both of these efforts and others will be highlighted in the data and research portion of this report, however, it is also important to note the community-minded, grassroots insight that helped inform and inspire the tenor and intent of this document directly. In addition to the wealth of recent analysis and public input, the Fair Housing Equity Assessment was informed by a broad range of equity stakeholders through its own distinct FHEA Advisory Committee. A list of participating and invited committee members is attached as Appendix 2-A. Outreach to the general public was also conducted at the One Region Forward Community Congresses in November 2013, a series of five large scale public meetings throughout the region; via web poll on the oneregionforward.org

17

PLAINTIFFS_GENERIC-00004884

site and as a paper survey shared at various One Region Forward events and through our partner organizations and their constituencies.

Data compilation for the FHEA was begun by Beverly Mclean, a Research Assistant Professor at the University at Buffalo Department of Architecture and Planning in 2012.  Make Communities, LLC was hired in mid-2013 to direct the development of the FHEA and to help guide public input around the document. In August 2013, the One Region Forward Steering Committee received a presentation on the requirements of the FHEA as well as a draft timeline and process outline.  The Steering Committee was also asked to recommend equity stakeholders to serve on the FHEA Advisory Committee.

An Advisory Committee was assembled and met in September to begin the process of identifying and cataloguing historical and current drivers of segregation and barriers to equality and opportunity. The Advisory Committee also discussed the drafting of a shared vision of equity based on a series of precedent-setting local documents and plans and examples from other Sustainable Communities planning grant awardees.  In October the committee met again to review that vision, to establish an outline for the report and to discuss research and data regarding the levels of segregation, poverty and opportunity throughout the region and its neighborhoods.

In early November, questions of equity and neighborhood opportunity were posed to participants at five regional visioning sessions referred to as Community Congresses.  At these meetings, community members placed land use 'chips' on a map of Erie and Niagara Counties in order to paint a scenario of where future population growth may occur.  Participants were also asked to weigh in on their own neighborhood, outlining any strengths and weaknesses they perceived within their communities, and weighing in on whether and how their neighborhoods presented a different level of access and opportunity as compared to other communities in the region.  Participants were asked to write their zip codes on sticker dots and assign those dots to areas that they felt captured the assets and needs within their own neighborhoods; including Economy & Access to Jobs, Housing, Education, Transportation, Access to Healthy Foods or Something Else. Survey collection on these same topics continued through March of 2014.  More about residents' input can be found in the opportunity area chapter.

In late-January 2014, the Advisory Committee met for the third time. This meeting focused on reviewing the draft narrative, providing feedback and insight on its comments, and developing recommendations to combat the challenges uncovered throughout this process. Throughout February and March, the One Region Forward Steering Committee was kept apprised of progress on the draft and reviewed the draft recommendations flowing from the report.

PLAINTIFFS_GENERIC-00004885

Early June saw the release of this Public Review Draft. After a 30-day comment period, the FHEA Advisory Committee will meet again to review feedback and make any changes to the document necessary before sending a final report to the One Region Forward Steering Committee for approval and submittal to HUD.

**A Shared Definition of Equity**

The FHEA advisory committee advanced the following vision of an equitable Buffalo-Niagara based on a multi-layered consideration of existing and ongoing planning and public engagement work throughout the region:

> *Buffalo Niagara will be an equitable community when all people – regardless of how they look, who they know or who they love, what language they speak, what they believe, whatever their level of means or ability, when or where they were born, where they live, where they go to school or why or how long they've called this place home – have the opportunity, resources and tools needed to achieve their potential, to lead healthy and fulfilling lives with rewarding work, and to access, experience, and participate in all our region has to offer while ensuring others – now and in future generations – can do the same.*

This vision encompasses notions of federal and state protected classes, yet goes further in broadening the scope of what it means to be fair, equitable and just in a region currently beset by gross geographic, racial and ethnic inequality.  For long-time residents to new Americans, the vision attempts to peel back the social, educational, neighborhood and economic cliques and barriers which can compound the physical and logistical barriers to opportunity that stem from the region's hyper-segregated settlement patterns. Keeping this vision at the forefront of the One Region Forward process, and decisions made during the implementation phase of this regional plan, will be crucial to ensuring that the regional plan advances the interests of all residents, particularly those underserved and marginalized within the current and historic development paradigms.

19

PLAINTIFFS_GENERIC-00004886

## CHAPTER 3: Demographic Trends & Regional Segregation

Buffalo Niagara has a long history of segregation. Development patterns fueled by deindustrialization and suburbanization have been facilitated and accelerated by systemic discrimination by public, private and institutional actors. As the region continues to lose population but also diversify, the face of Buffalo Niagara now and in the future will look radically different from the region of the last 60 years. Actions taken now to accommodate demographic change and promote equity and opportunity will have a profound impact on the success of the region for decades to come.

### Local Demographics

Buffalo Niagara has experienced an ongoing net population loss each decade since 1970, for a cumulative regional decline of 15.8% as of 2010 (falling from a population of 1,349,211 to 1,135,509). Much of the early decline was due to the collapse of local heavy manufacturing sector, particularly the steel industry, but from 1979 through 2010, the region's 10% population decline should also be placed in contrast to the country's 38% population increase to understand the extent to which the fortunes of the region have diverged from the nation.[1]

Even amongst peer post-industrial Great Lakes metros, Buffalo Niagara is unique in its persistent regional population decline. Detroit, for instance, first lost metro-population from 2000-2010 (-3.5%). Pittsburgh faced regional losses in each decade from 1970-2000, however that region gained significant population from 2000-2010 (8.6%). The Cleveland region reversed its declining trend to gain population between 1990-2000, before losing population again in the following decade. From

### 10 Slowest Growing Large U.S. Metros*, 2000-2010

| Rank | Metro | % Change in Population |
|---|---|---|
| 91 | Providence-New Bedford-Fall River, RI-MA | 1.1 |
| 92 | Scranton--Wilkes-Barre, PA | 0.5 |
| 93 | Dayton, OH | -0.8 |
| 94 | Toledo, OH | -1.2 |
| *95* | *Buffalo-Niagara Falls, NY* | *-3.0* |
| 96 | Pittsburgh, PA Metro | -3.1 |
| 97 | Cleveland-Elyria-Mentor, OH | -3.3 |
| 98 | Detroit-Warren-Livonia, MI | -3.5 |
| 99 | Youngstown-Warren-Boardman, OH-PA | -6.2 |
| 100 | New Orleans-Metairie-Kenner, LA | -11.3 |

*100 most populated U.S. metropolitan areas (Population over 514,100),
Source: U.S. Census Bureau, Decennial Census, 2000 & 2010; author's calculations

Table 3-1: 10 Slowest Growing Large U.S. Metros, 2000-2010, See footnote 2.

---

[1]      PERE USC Program for Environmental & Regional Equity, Open Places Initiative: Equity Indicators for the Buffalo Region. Manuel Pastor, Jennifer Ito, Rhonda Ortiz Justin Scoggins, Mirabai Auer, Anthony Perez. Derived from US Bureau of Economic Analysis data

PLAINTIFFS_GENERIC-00004887

2000-2010 Buffalo Niagara was among the 6th slowest growing large U.S. metro areas and one of only eight large metro areas to lose population. [see Table 3-1].[2]

But Buffalo Niagara's loss has not been uniform throughout the region. In fact, outward migration continues to consume additional land and expand the urbanized footprint as new housing and commercial areas develop on the region's fringe.

Overall from 1990-2010, 14 of the region's towns and cities lost population while 29 gained. 11 municipalities lost more than 1,000 people while 11 municipalities gained more than 1,000. The City of Buffalo has lost 20.4% and the City of Niagara Falls has lost 18.8% of their respective populations during that time, while the three smaller cities in the region also lost double digit population counts (North Tonawanda -15.2%, City of Tonawanda -12.5%, Lackawanna -11.9%). Still, outer ring suburbs have seen and continue to see dramatic increases in population (i.e. Lancaster +29.3%, Clarence +53.0%, Wheatfield +62.9%).[3]



Figure 3-1: Percent Change in Population by Municipality 1990-2010

These shifting intra-regional settlement patterns continue to challenge older communities as housing stock goes vacant and municipal tax bases weaken. Excess infrastructure, institutions and facilities place an increasing expenditure demand on fewer, often poorer, residents. Meanwhile, newly developed areas are tasked with creating similar amenities and infrastructure to accommodate the influx of new residents.

The areas of steepest decline, though, are largely and traditionally home to the region's minority populations, and the shrinking municipal tax bases place a higher burden on these residents while decreasing the quality of services that these

---

[2]    Population Trends in Buffalo Niagara. Partnership for the Public Good Buffalo Brief. Ramon Garcia. October, 2012. P.2.

[3]    Census 1990, 2010

21

PLAINTIFFS_GENERIC-00004888

municipalities are able to offer.  Meanwhile, inner-ring suburbs and rural communities have also begun to see significant population decreases (see Figure 3-1), threatening the level of service and stability these communities can provide at the same time these communities are beginning to significantly diversify.

Yet the trends from the most recent decade show much different patterns than those from the prior ten years.  From 1990-2000, thirteen municipalities lost population, while thirty grew – ten of them by more than 10%, five of those by more than 20%. From 2000 -2010, twenty-two municipalities lost population, and only two (Wheatfield and Clarence) showed and increase of more than 10%, with neither more than 20%. It is likely that the real estate and economic crises at the end of the decade were contributing factors as migration nationally slowed considerably. Indeed, the Intercensal Population Estimates show a slowing and then leveling off the region's population losses beginning in 2007.[4]  While it is uncertain if these regional trends will continue, the American Community Survey estimated a slight (.02%) population increase for the region from 2011-2012.

|  | Total Population | Non Hispanic White | Non Hispanic Black | Hispanic | Asian | Other Races |
|---|---|---|---|---|---|---|
| 1980 | 1,242,756 | 1,097,873 | 112,887 | 16,206 | 5,775 | 10,015 |
|  |  | 88.3% | 9.1% | 1.3% | 0.5% | 0.8% |
| 1990 | 1,189,288 | 1,025,984 | 120,213 | 24,347 | 10,804 | 7,940 |
|  |  | 86.3% | 10.1% | 2% | 0.9% | 0.7% |
| 2000 | 1,170,111 | 965,233 | 140,496 | 33,967 | 17,328 | 13,087 |
|  |  | 82.5% | 12% | 2.9% | 1.5% | 1.1% |
| 2010 | 1,135,509 | 903,063 | 144,455 | 46,425 | 29,505 | 12,061 |
|  |  | 79.5% | 12.7% | 4.1% | 2.6% | 1.1% |

Table 3-2: Buffalo Niagara Population Change by Race and Ethnicity 1980-2010
Source: Brown University: US2010 Discover America in a New Century

As the region has lost population over the decades, it has also diversified.  From 1980 through 2010, the White Non-Hispanic share of the region's population fell from 88.3% to 79.5% while every other major racial and ethnic group saw significant increases (see Table 3-2).

Even though the overall population has fallen, the increase in diversity and in minority population actually masks a larger population decline among the white population throughout the region. From 1990 to 2000, for instance, the White population of Buffalo Niagara dropped nearly 61,000 people, but the overall loses were offset by a total increase of 41,550 people in Black, Latino, Asian/Pacific Islander and Other Race categorizations.[5]

---

[4]    Garcia, p.4.

[5]    USC Program for Environmental & Regional Equity (PERE), derived from US Census

22

PLAINTIFFS_GENERIC-00004889

However, this increase in diversity, much like the population loss, is also not uniform throughout the two county region. A current snapshot of racial and ethnic settlement patterns reveal clear concentrations of the black population in the City of Buffalo – particularly on the city's east side and to an extent on the city's west side – and in the City of Niagara Falls – mostly on that city's west side and near the downtown core. Hispanic/ Latino population in the region is centered on the city of Buffalo's west side, while the Asian – Pacific Islander population is also on Buffalo's west side in addition to portions of Amherst and the northern Erie suburbs. Native populations are concentrated in southwestern Erie County – in and around the Cattaraugus Reservation and at the eastern end of the Erie-Niagara border, close to the Tonawanda Reservation. [see Appendix 3-A for a series of maps representing the concentrations of race and ethnicity in the region by census tract].



Figure 3-2: Scatter Plot image of Racial and Ethnic Distribution in Buffalo Niagara 2010

On the whole, Buffalo Niagara is more integrated than in previous decades, yet large-scale separation and segregation persists within the region.

Since 1990 the region has seen an increase of roughly 8.5% points in the overall share of the population claiming racial or ethnic heritage (up from 11.9% to 20.5% in 2010). The share of racial and ethnic minorities has increased in every municipality, however the increases are far from uniform. From a high in Buffalo (+20.5%) to a low in Elma (+1.2%), the majority of the larger increases (10% and greater) are centered in the region's inner cities (Buffalo, Niagara Falls, Lackawanna) and older first ring suburbs (i.e., Cheektowaga, Amherst). The outlier to this trend is Collins (+12.4%) in southern Erie County, which is home to a New York State correctional facility.  Alden, in eastern Erie County, home to both the Erie County Correctional Facility and (until 2012) the Erie County Home and Infirmary, also saw a relatively large increase in population share of racial and ethnic minorities for a rural community (+7.3%). Villages range from a percentage share increase of 8.0% in Williamsville to a low of 1.3% in the Village of Hamburg. The region's three reservations showed either no

Bureau ; Woods & Poole Economics

23

PLAINTIFFS_GENERIC-00004890

Buffalo Niagara One Region Forward Fair Housing Equity Assessment
PUBLIC REVIEW DRAFT

change or a small net loss of racial and ethnic minorities.   A full map set of
demographic change by racial and ethnic group by municipality is available in
Appendix 3-B.

Though driven by external systemic factors that will be discussed later, the cases of
Collins and Alden nonetheless highlight the fact that even within municipalities



Figure 3-3: Change in percent share of population of racial and
ethnic minorities by Municipality 1990-2010.
Source: 1990 US Census and Census2010 figures

Figure 3-4. Change in Racial Composition by Census Tract 1990-
2010.
Source: University at Buffalo Regional Institute, 1990 US Census
and Census2010 figures.

demographic change has not been
uniform. Examining the changes by census tract reveals that most sub-areas have
gained percentage share of racial and ethnic minorities, but to varying degrees. In the
City of Niagara Falls for instance, larger increases can be seen on the city's west side
and downtown. Cheektowaga has seen the greatest increase along its western edge
as well.  Amherst has seen the greatest changes on its southwestern quadrant – both
closest to Buffalo and in proximity to the SUNY at Buffalo campus. Within the city of
Buffalo, increases in diversity can be seen on the city's west side, north Buffalo,
south Buffalo and along it's eastern edge.  However, some of the tracts representing
the highest historic concentration of black families on the city's near east side actually

24

PLAINTIFFS_GENERIC-00004891

lost percentage share of minority population over that 20 year span [see Figure 3.4].

In addition to the racial and ethnic changes occurring within the region, Buffalo Niagara is seeing a shift in the age of the population. The Buffalo Niagara region is older (Median Age of 40.6) than the country as a whole (37.2) and older than New York State (38.0). From 2000-2010, while the region's population shrank by 34,602 people, the population 18 years and over actually grew by 4,751. The loss in population, then, was entirely attributable to children under the age of 18, of which there were 39,353 (-14%) fewer in 2010 than in 2000. Only two municipalities (Clarence and Wheatfield) gained children throughout the decade, while central cities and rural areas – particularly in southern Erie County – suffered the greatest losses. Throughout New York the overall number of children also shrank during this period, though not as extreme as in Buffalo Niagara. Nationally, the number of people under 18 grew, but not as fast as the over 18 cohort.

Table 3-3: Population Change by Age Cohort 2000-2010

|  | Total Population | | 18 Years and Over | | Under 18 Years | |
|---|---|---|---|---|---|---|
|  | number | % change | number | % change | number | % change |
| **Buffalo Niagara** | (34,602) | -3% | 4,751 | 1% | (39,353) | -14% |
| **New York** | 401,645 | 2.1% | 766,823 | 5.4% | (365,178) | -7.8% |
| **United States** | 27,323,632 | 9.7% | 25,435,977 | 12.2% | 1,887,655 | 2.6% |

Source: 2000, 2010 US Census

Though the region's median age in 2010 was 40.6, only three municipalities have a median age under 40. Even with a 20% loss in children throughout the decade, Buffalo is the youngest municipality with a median age of 33.2, followed after a large gap by the City of Lockport (38.1) and then the City of Niagara Falls (39.8), while the City of Lackawanna has a median age of 40.0. Yet each of the region's three reservations which register populations in the Census count have median ages of 33 or under.

This demographic difference is reflected in the percentage of pre-school aged children, with Buffalo, (6.7%), Lackawanna (6.5%), City of Lockport (6.4%) and Niagara Falls (6.1%) registering the highest municipal percentages of children under 5 years old. In the elementary-aged (5-9) population, however, Buffalo falls to 9th (6.3%), behind Clarence (7.7%), Orchard Park (6.7%), Royalton (6.7%), Boston (6.6%), Concord (6.5%), Lancaster (6.4%), Wheatfield (6.4%) and Aurora (6.4%) and equal to Newfane and Hartland. Niagara Falls and City of Lockport fall to 16th (6.0%), and Lackawanna into 22nd (5.9%).

For the entire school-aged cohort (5 to 19), Buffalo Niagara has 219,260 children representing 19.3% of the population. Clarence (23.9%) remains the highest municipal percentage, followed by a clustering of Niagara County towns (Somerset, Cambria, Hartland, Pendleton). Buffalo (20.9%) ranks 6th while the City of Lockport

25

PLAINTIFFS_GENERIC-00004892

(18.8%) is 30th, Niagara Falls (18.6%) is 33rd, and Lackawanna (18.0%) is 36th of 43 municipalities.  The Reservations show high percentages in this age cohort – each exceeding Clarence's percentage.[6]

Even in growing areas, the unstable numbers of school-aged population creates immense challenges for school districts often drawn along municipal lines. Regionally, the number of children enrolled in public schools has dropped much more quickly than regional population. Overall the metro area had 29,385 fewer students – a loss of more than 16% in the decade, and 35 of Buffalo Niagara's 38 school districts had fewer students enrolled in 2011 than 2001.[7] While Clarence, Lancaster and Starpoint districts gained students during that period, the most recent New York State Education department district report cards (2011-2012) show enrollment declines in each of these districts over the period from 2009-2012.[8]

For the elderly cohort, Buffalo Niagara has 216,489 residents 65 or older, composing 19.0% of the population compared to a 13% national average and a 13.5% New York State average.  Heavy concentrations of elderly populations are found in the earlier developed, primarily inner-ring suburbs of both Erie and Niagara County – including Lewiston (25.4%), West Seneca (24.2%), and Cheektowaga (23.9%). The central cities are fairy underrepresented in this cohort, with the City of Buffalo (14.0%) ranked 42 of the 43 municipalities, second only to Collins (13.0%) where the demographics are skewed by a proportionally large prison population.

For national context, of the 100 largest metro areas in the U.S., Buffalo Niagara ranks 20th in highest percentage of white population (79.6%). Across upstate NY, peer metros of Syracuse (#7) and Albany (#10) also rank high in the percentage of white population with Rochester slightly lower (#27).  Medium size metropolitan areas throughout neighboring Pennsylvania and Ohio, including Pittsburgh (#2), the Youngstown-Warren metro spanning Ohio and Pennsylvania (#6), Akron (#12), Cincinnati (#14), Dayton (#23) also rank high in this metric.

---

[6]      The Tuscarora tract registers 25.4% 5-19 year olds, Cattauragus 25.7% and the Erie County tract of the Tonawanda Reservation records 41.1%, though the total population is only 34 people.

[7]      Thomas, G. Scott. "WNY school enrollment drops by 43,000 students in 10 years." . Business First, 20 Aug. 2012. Web. 17 Mar. 2014. <http://www.bizjournals.com/buffalo/news/2012/08/20/wny-school-enrollment-drops-by-43000.html?appSession=686126710768160&RecordID=&PageID=2&PrevPageID=2&cpipage=5&CPISortType=desc&CPIorderBy=County>.

[8]      The New York State Report Card. New York State Education Department. https://reportcards.nysed.gov,
          Clarence: 2009/10 – 5,101; 2010/11 – 5,024; 2011/12 – 4916
          Lancaster: 2009/10 – 6,170; 2010/11 – 6,108; 2011/12 – 5,990 self-reported 5,812 on its website for 2013/2014
          Starpoint: 2009/10 – 2,757; 2010/11 – 2,788; 2011/12 – 2,710 self-reported 2,656 on its website for 2013/14

26

PLAINTIFFS_GENERIC-00004893

Upstate New York's metro areas are not as diverse as the top 100 metro areas in the country, nor as the country as a whole.  In comparison, New York State is significantly more diverse across all races and ethnicities, except for share of American Indian or Alaskan Native population and share of Two of More Races. Buffalo Niagara, however, is comparable to or slightly more diverse than most other upstate metro areas:

| Table 3-4: Share of Population by Race/ Ethnicity for Selected Geographies, 2010 | | | | | | |
|---|---|---|---|---|---|---|
| 2010 | White (Non-Hispanic) | Black (Non-Hispanic) | Hispanic | Asian or Pacific Islander (Non-Hispanic) | American Indian or Alaska Native (Non-Hispanic) | Two or More Races (Non-Hispanic) |
| US* | 63.7% | 12.2% | 16.3% | 4.9% | 0.7% | 1.9% |
| New York State** | 58.3% | 14.4% | 17.6% | 7.3% | 0.3% | 1.7% |
| Buffalo Metro | 79.6% | 11.9% | 4.1% | 2.3% | 0.6% | 1.5% |
| **Other Upstate Metros** | | | | | | |
| Albany Metro | 83.1% | 7.4% | 4.1% | 3.3% | 0.2% | 1.9% |
| Binghamton Metro | 88.4% | 3.7% | 3.0% | 3.0% | 0.2% | 1.8% |
| Elmira Metro | 87.5% | 6.3% | 2.5% | 1.2% | 0.2% | 2.3% |
| Glens Falls Metro | 94.4% | 1.8% | 2.0% | 0.6% | 1.0% | 0.2% |
| Ithaca Metro | 80.4% | 3.8% | 4.2% | 8.7% | 0.3% | 2.7% |
| Rochester Metro | 78.3% | 11.1% | 6.1% | 2.6% | 0.2% | 1.7% |
| Syracuse Metro | 83.9% | 7.7% | 3.4% | 2.4% | 0.7% | 1.9% |
| Utica-Rome Metro | 87.3% | 4.8% | 4.0% | 2.3% | 0.2% | 1.4% |
| All data from DiversityData.org except as otherwise noted. | | | | | | |
| * US Census2010, DP-1 Profile of General Population and Housing Characteristics: 2010. 2010 Demographic Profile Data. Data set also reports .2% of population as "some other race alone" nationally. | | | | | | |
| ** US Census2010, DP-1 Profile of General Population and Housing Characteristics: 2010. 2010 Demographic Profile Data. Data set also reports .4% of population as "some other race alone" within New York. | | | | | | |

| Table 3-5: Metro Ranking by % Racial & Ethnic Share of Population (of 100 largest metros), 2010 | | | | | | |
|---|---|---|---|---|---|---|
| 2010 | White (Non-Hispanic) | Black (Non-Hispanic) | Hispanic | Asian or Pacific Islander (Non-Hispanic) | American Indian or Alaska Native (Non-Hispanic) | Two or More Races (Non-Hispanic) |
| Buffalo Metro | 20 | 43 | 86 | 64 | 12 | 76 |
| **Selected Regional Peer Metropolitan Areas** | | | | | | |
| Albany Metro | 10 | 62 | 85 | 41 | 76 | 31 |
| Rochester Metro | 27 | 45 | 69 | 56 | 62 | 50 |
| Syracuse Metro | 7 | 60 | 91 | 60 | 10 | 29 |

PLAINTIFFS_GENERIC-00004894

| Cleveland, OH Metro | 42 | 22 | 80 | 72 | 87 | 67 |
|---|---|---|---|---|---|---|
| Pittsburgh, PA Metro | 2 | 55 | 100 | 83 | 98 | 79 |
| Youngstown, OH Metro | 6 | 46 | 94 | 100 | 88 | 70 |
| Diversity Data.org | | | | | | |

Nationally, the Buffalo Niagara MSA also ranks high in segregation. Based on 2010 data, Buffalo Niagara is 6th most segregated on the White-Black index of the 102 largest metros, ranks 21st in White-Hispanic segregation and is the most segregated on the White-Asian index.[9]

This heightened level of segregation is matched by levels of discrimination and disparities in opportunity. Though the local manifestations will be discussed in greater detail later in this document, several indicators stand out as outliers within the national context. As of the 2006-2010 American Community Survey, Buffalo Niagara was equal to the national average (13.8%) for share of population living in poverty, yet poverty in the region is tilted toward minority populations in greater numbers than across the country.[10]

In that same timeframe, the Buffalo Niagara region had a lower instance of unemployment by whites than the national average, but all other racial and ethnic groups (Black, Latino, Asian/ Pacific Islander, Native American, and Other) had higher levels of unemployment than their peer cohorts across the country.[11] Compounding these stats, through, is a preponderance of part-time work vs. the national average. While this disparity is small for whites (30% vs. 29% nationally), each other racial and ethnic group except Native American faces a greater disparity than the national average by at least 4 and as many as 8 percentage points.[12]

**Segregated Areas and Areas of Increasing Diversity**

As noted earlier in this chapter, the Buffalo Niagara MSA also ranks high in segregation against national statistics, and the level of segregation varies for each racial and ethnic group. Based on a 2010 index of the 102 largest metros, Buffalo Niagara is 6th most segregated on the White-Black, ranks 21st in White-Hispanic segregation and is the most segregated on the White-Asian index.[13]

---

[9]    Dissimilarity Index by William H. Frey, Brookings Institution and University of Michigan Social Science Data Analysis Network's analysis of 2010 Census Data

[10]    2006-2010ACS 5-year estimates, B17001, POVERTY STATUS IN THE PAST 12 MONTHS BY SEX BY AGE. Universe: Population for whom poverty status is determined

[11]    Open Places Initiative: Equity Indicators for the Buffalo Region. PERE USC Program for Environmental and Regional Equity. P.42,

[12]    Open Places Initiative: Equity Indicators for the Buffalo Region. PERE USC Program for Environmental and Regional Equity. P.44. Black 37% BN/39% US avg; Latino 39%/ 31%; API 35%/ 27%, Native American 34%/ 37%; Other 38%/ 34%.

[13]    Dissimilarity Index by William H. Frey, Brookings Institution and University of Michigan

28

PLAINTIFFS_GENERIC-00004895

The absolute levels of segregation for minorities within the region are most severe for African-American.. But research from the USC Program for Environmental and Regional Equity (PERE) for Open Buffalo and Brown University's US2010 project reveal deep divisions among demographic groups within the Buffalo Niagara and no group is more severely isolated than the white population.

The Regional Index of Dissimilarity measures how one group is distributed throughout the region as compared to another group to gauge the level of segregation. Essentially this measure conveys the percentage of one group that would need to move in order to achieve perfect integration with another group. With a scale from 0-100, 60 being considered a very high level of segregation, the divide between black and white is largest of any differential in Buffalo Niagara at 71. The other comparison considered very highly segregated was Black-Asian at 64. Each of the other values for 2010 were relatively more moderate levels of segregation (see Table 3.6).[14]

Table 3.6: **Buffalo Niagara Indices of Dissimilarity, 2010**

| | |
|---|---|
| White-Black/ Black-White | 71 |
| White-Hispanic/ Hispanic-White | 50.7 |
| White-Asian/ Asian-White | 51 |
| Black-Hispanic/ Hispanic-Black | 54.4 |
| Black-Asian/ Asian-Black | 64 |
| Hispanic-Asian/ Asian-Hispanic | 46.7 |

Source Data – Brown University US2010

PERE and Brown assembled exposure indices for Whites, Blacks, Latinos and Asian/ Pacific Islanders. The exposure index describes both the probability of meeting someone of the same race/ ethnicity (the isolation index) as well as those of other races/ ethnicities (exposure to other races) within one's own census tract. The isolation index reveals that while the levels have decreased somewhat since 1980, on a 100-point scale with 100 being entirely isolated, the index for whites is roughly 88. For the black population, the index is 54.  Though it is much lower for the smaller population segments of Hispanics (14) and Asian/ Pacific Islanders (8), these groups do not show the same downward trend, likely because of their relative growth in share of the region's population.[15]

The exposure to other races index is the converse to the isolation index – a measure of how likely it is for a member of one racial or ethnic group to encounter a member of another particular group. This metric is also impacted by the geographic distribution of the population as well as the population size of the comparison group.  This data

---

Social Science Data Analysis Network's analysis of 2010 Census Data

[14]      Brown University 2010: Discover America in a New Century data portal; http://www.s4.brown.edu/us2010/segregation2010/msa.aspx?metroid=15380. Retrieved November 28, 2013.

[15]      Manuel Pastor, Jennifer Ito, Rhonda Ortiz Justin Scoggins, Mirabai Auer, Anthony Perez . Open Places Initiative: Equity Indicators for the Buffalo Region. USC Program for Environmental and Regional Equity. 6/21/2013. P.62.

PLAINTIFFS_GENERIC-00004896

shows the white population of the region is less likely to encounter a member of any one and cumulatively all different ethnic groups. Table 3.7 contains the values for each comparison.

Table 3.7: **2010 Buffalo Niagara Racial/Ethnic Exposure Index**

|  | White | Black | Hispanic | Asian |
|---|---|---|---|---|
| White | 87.9 | 5.8 | 3.1 | 2.3 |
| Black | 36.1 | 54.1 | 6.1 | 2.7 |
| Hispanic | 60.8 | 19.1 | 14.4 | 4.2 |
| Asian | 71 | 13.2 | 6.6 | 8.4 |

Source data; Brown US2010 and PERE. Races / Ethnicities  The full exposure index for each racial ethnic group will add to 100, however, data for Native American and Other exposure were not included in the source data.

To translate this index into a more relatable metric, PERE also provided a cross section of typical Neighborhood Composition by Race/ Ethnicity using these exposure indices between races and ethnicities. In 2010, a typical neighborhood for a white resident, for instance, was comprised of 88% whites, 5% black, 3% Latino and 2% Asian Pacific Islander. Figure 3.5 represents in graphic form the complete breakdown of typical neighborhood composition for each major racial and ethnic group.[16]



Figure 3.5: Typical Neighborhood Composition by Race/Ethnicity
Source Data: USC PERE report for Open Buffalo

Segregation is at times justified or explained away by economic factors. Statistically speaking, the proportion of minority populations in lower-income bands is higher than that of white population. Given that some areas have higher housing costs, these areas would then be less accessible to people of limited means and, thus, would be home to a smaller share of the minority population. A method for testing this assertion, though, is to control for the economic conditions in each municipality and develop a predicted racial share.

---

[16]    Manuel Pastor, Jennifer Ito, Rhonda Ortiz Justin Scoggins, Mirabai Auer, Anthony Perez. Open Places Initiative: Equity Indicators for the Buffalo Region. USC Program for Environmental and Regional Equity. 6/21/2013. P.63.

30

PLAINTIFFS_GENERIC-00004897

For instance, assume the portion of black households represents 15% of the regional total earning less than $50,000 annually, 10% of the regional households making $50,000 - $100,000 and 5% of the households earning $100,000 or more. If income were the only factor at play, the number of black households in any municipality would be comprised of 15% of households in the municipality earning fewer than $50,000, 10% of the households earning $50,000-$100,000 and 5% of the households earning $100,000 or more. By adding up these categories, an economically predicted racial share is derived that we can then compare against the actual share of the households that are black.



Figure 3.6: Deviation from Predicted Racial Composition, White Population 2010.
The maps represents an analysis of actual white population predicted share compared to that predicted by economic composition for each municipality in Buffalo Niagara.

The vast majority of municipalities in the region outside of the core are either approximate to their predicted share of whites or are much whiter than their economically predicted racial share (see Figure 3.6). Only the municipalities of Buffalo and Niagara Falls are extremely below their predicted share for whites, while the white share is moderately below predicted in Amherst and slightly below predicted in the Cities of Lockport and Lackawanna, and the towns of Cheektowaga, Grand Island and Niagara.

For Black households, all of the region's municipalities are extremely below their predicted share, with the exception of the cities of Lockport and Lackawanna, which are moderately below predicted, the city of Niagara Falls, which approximates predicted, and the City of Buffalo which is significantly above its predicted share.

This general pattern of racial and ethnic diversity being concentrated primarily in the cities of Buffalo and Niagara Falls,

31

PLAINTIFFS_GENERIC-00004898

with the smaller cities of Lockport and Lackawanna also represented repeats itself, though not in such extremes, for the Hispanic population and races categorized as "Other". Asian households are underrepresented in the majority of region, but are overrepresented in the northern Erie County suburbs of Amherst, Cheektowaga, and Grand Island, while the native population is overrepresented in portions of Niagara County and in the municipalities proximate to the Reservations in the region. A full set of maps for this topic is available as Appendix 3-C.

Multiple national studies have examined the influence of individual preference in the segregation of neighborhoods, and have determined that preference for diversity, and measured by "ideal" neighborhood composition varies by race.[17] Generally speaking, black residents, for instance, expressed a preference for mixed-race neighborhoods but 80% of black respondents preferred non-black majority neighborhoods.[18] Whites, on the other hand, expressed a lower preference for the portion of black families in their communities.[19] However, these opinions varied within demographic groups,[20] and also by place of residence within the metro area. Though neighborhood composition preference appears to play a role in the segregation of communities, it is not uniform and reviewers of these studies also call into question how influenced respondents were by their preference for diversity versus their impressions of the conditions of a neighborhood that was a higher percentage white or minority, or the perception of acceptance or discrimination within these neighborhoods.

As the region as a whole is diversifying and, in the process, the overall levels of segregation are primarily decreasing, every town, city and village in the region has a smaller percentage of white population than in 1990, and a larger percentage of black and Latino populations (with the exception of Brant and the Village of Farnham which have each shown 1% decrease in black population). However, the region is still highly segregated compared to other areas of the country. Additionally, some areas are diversifying more than others. The trends are not yet established to the point of being able to declare if the neighborhoods experiencing the most identifiable racial and ethnic change are truly integrating or if they are within the first stages of population turnover similar to that which was experienced in previous decades.

---

[17]    Residential segregation and preference misalignment. *J.L. Vigdor.  Journal of Urban Economics 54 (2003) 587–609.  p.588.*

[18]    p.592.

[19]    p. 599. Specifically, "[o]n average, Black respondents place about four more Black households [out of 15, or 33% of total households] in their ideal neighborhood than do White respondents."

[20]    p.597. This particular analysis found, "Full-time workers are more likely to select Black neighbors. Educational attainment displays a nonlinear relationship with neighborhood preferences. Female heads of household express a preference for more Black neighbors, other things equal. Finally, preferences for Black neighbors are strongest amongst the younger and older members of the sample, with individuals close to age 45 having the weakest tastes for Black neighbors."

PLAINTIFFS_GENERIC-00004899

However, looking at the City of Buffalo – the long-standing center of black population within the region – there were distinct population shifts in the African-American population between 2000-2010.  Overall, the black population in the city declined 7.5% in the decade, with the steepest decreases coming from some of the areas on the east side of Buffalo that have been primarily black neighborhoods.  The tracts around Broadway-Fillmore, for instance lost more than 40% (-1,095) of their black population in the decade.  However, this loss was relatively consistent with the overall population loss in these tracts that are home to significant blight and property abandonment. Tract 16, for instance, lost 47% of its population from 2000-2010, but has lost 72% of its population since 1970 – falling from 8,727 to 2,283 residents.



Figure 3-7: Black/African-American Population Change, City of Buffalo, 2010
Source: Buffalo LISC, Census 2010

Some areas of the city that were previously primarily white have shown large percentage increases of African-American population, however the starting points for comparison in many places were very low.  For instance, tract 17 – immediately adjacent to tract 16 – gained 105 black residents in the decade, but this represented a 47% increase.  In nearby tract 23 an increase of 201 African-Americans represented and increase of more than 500% and in tract 19, an increase of 66 African-Americans represented an increase of more than 700%. In 2000, only 36 (1.3%) of 2,707 residents in adjacent tract 167 were African-American. An influx of only 96 black residents – after accounting for the loss of 408 white residents – more than quadrupled this percentage by 2010. In tract 163, the percentage of black population increased from 2.9% to 10.3% as an aggregate of 162 black residents moved in and 899 whites moved out.

Buffalo Niagara does benefit from foreign-born immigration, however, those levels have been lower than the nation and the state, which sees immigration numbers heavily skewed toward the New York City Area.  At the same time, refugees have made up a larger share of immigrants in Buffalo Niagara than in New York or in the

PLAINTIFFS_GENERIC-00004900

Country as a whole.[21] The countries of origin for the region also differ substantially from the nation. From 2003-2006, for example, none of the top five countries of origin for Buffalo Niagara immigrants were ethnically Hispanic/Latino: Canada, Yemen, India, China and the Ukraine. Meanwhile the highest number of immigrants to New York State came from the Dominican Republic, China, Jamaica, India and Guyana; and Mexico, India, China, the Philippines and the Dominican Republic for the U.S.[22]

Of the 66,509 foreign-born residents in the Buffalo Niagara MSA, 24,587 are from Asia, 20,097 are from Europe, 16,451 from the Americas, 5,215 from Africa, and 159 from Oceania.

There are eight tracts in the region with a foreign born population greater than 20%. These include two tracts (91.09 and 91.15) adjacent to the University Buffalo North (Amherst) Campus, and two tracts (93.01 and 46.01) adjacent to the University at Buffalo South (Main Street) Campus, as well as three tracts (66.01, 69.01 and 71.01) on Buffalo's west side and one tract (27.02) in the Broadway-Fillmore area of Buffalo's east side.

In addition, a clustering of tracts on Buffalo's west side, extending into north Buffalo, as well as a corridor connecting the University at Buffalo's two campuses and extending further north into Amherst have foreign born percentages between 10 and 20%. The western-most tract in Lackawanna (174) and the two tracts comprising downtown Niagara Falls (211 and 212) also register in this range, as do tract 244.04 in Lewiston, 97.01 in Cheektowaga and 9400 in the Cattaraugus Reservation.

The cluster of tracts on Buffalo's west side has a foreign born total of 18.9%, with 5,632 foreign born residents. Approximately 39% of these residents were born in Asia – primarily South Eastern Asia, including concentrations from

| Table 3.8: Buffalo Niagara Total Foreign-Born Population | 66,509 |
|---|---|
| Europe: | 20,097 |
| Asia: | 24,587 |
| Eastern Asia: | 7,430 |
| South Central Asia: | 8341 |
| South Eastern Asia: | 4,748 |
| Western Asia: | 3,961 |
| Asia,n.e.c. | 107 |
| Africa: | 5,215 |
| Oceania: | 159 |
| Americas: | 16,451 |
| Latin America: | 9,146 |
| Central America: | 1,346 |
| Caribbean: | 4,754 |
| South America: | 3,046 |

[21]     31% of foreign-born immigrants to the region were refugees from 2003-2006, compared to 10% for New York State and 12% for the U.S.A. as a whole. Upstate's Recent Arrivals. The Regional Institute
        University at Buffalo. January 2008. P.2.
[22]     31% of foreign-born immigrants to the region were refugees from 2003-2006, compared to 10% for New York State and 12% for the U.S.A. as a whole. Upstate's Recent Arrivals. The Regional Institute University at Buffalo. January 2008. P.1.

34

PLAINTIFFS_GENERIC-00004901

Burma and Thailand, though with significant representation from Western Asia, South Central Asia and East Asia as well. 40% of foreign born west side residents were born in Africa – primarily from Eastern Africa, but with some representation from North, West and Middle Africa. About 13% of foreign born west side residents are from Latin America – primarily the Caribbean.

In North West Buffalo there is a concentration for Eastern European immigrants in Riverside (tract 58.01) and a concentration of residents from South Central Asia in Black Rock (tracts 55, 56 and 69).

The corridor between and surrounding the University at Buffalo campuses contains nineteen tracts with more than 10% of population foreign born. Combined, these tracts are 16.2% foreign born.  Of the 14,426 foreign born residents, 59% are Asian, with concentrations from Eastern Asia (China – 1,931, Korea – 1,137), South Central Asia (India – 2,514), with lesser amounts from South East Asia and Western Asia. Roughly 22% of the immigrants in this corridor are from Europe, 7% from Latin America, 6% from Canada, and 5% from Africa.

Though adjacent, the foreign born trends in tracts 27.02 and 16 in Broadway Fillmore are much different. Together these tracts have a foreign born share of 18% comprised of 73% Asian born residents. 631 of the immigrant population live in tract 27.02 north of Broadway and 283 are in tract 16 south of Broadway. North of Broadway, there are 159 Bangladeshi residents, 93 Pakistani, and 63 Indian residents. In contrast no Bangladeshi and no Pakistani residents live south of Broadway and only 10 Indians do. However, 162 Vietnamese residents live in the southern section of the neighborhood and none live in the northern section. The Yemeni population is somewhat more split with 79 in the northern section and 21 in the southern. 108 Africans live in the northern section and 10 live in the southern section.  Broadway Fillmore is also home to 55 Latin Americans, all from Guyana and all living in the northern tract.

In Lackawanna, the R/ECAP neighborhood (tract 174) is 20% foreign born (750 of 3764 residents). 86% of these foreign born residents are from Asia – almost exclusively Yemen (628 out of 642). The only other significant cluster in the area is Latin America, specifically roughly 50 residents from Trinidad and Tobago.

**Regional Segregation**
Segregation throughout the region is widespread, pervasive and long standing. Many of the factors contributing to segregation are buried under assumptions, stereotypes and misinformation so that the victims of an unequal system are too often blamed for its outcomes. The legacy of segregation of in the region – and indeed in the country – cannot be pinned on one single factor or one single actor or sector.  A combination of

PLAINTIFFS_GENERIC-00004902

0035

activities, policies, actions and inactions by all levels of government, the private sector and conscious and subconscious individual acts have created and continue to perpetuate a highly uneven playing field that has resulted in vicious disparities between races and geographies.

The consequences of racial and ethnic segregation and discrimination directly impact individuals as well as entire neighborhoods and the region as a whole. Minority populations in the region suffer from reduced opportunity and outcomes in academic and occupational achievement, suffer poorer personal health and reduced quality of life. The lack of economic vibrancy in poor neighborhoods reduces the municipal tax base making it more challenging for local governments to provide adequate levels of services, amenities and infrastructure throughout the region. The inability to access employment, or additional challenges faced in accessing employment, in economically isolated neighborhoods means direct costs to government in the form of increased public assistance. Concentrations of poverty and lack of mainstream economic opportunity have also led to higher areas of crime, reflecting an increased burden on the criminal justice system. However, disparities in law enforcement skewed against minority populations have also created huge familial and social strains within minority communities as a disproportionate number of families lose loved ones to incarceration. Sanctioned and covert institutional financial policies and practices and the distorted economies of low-income neighborhoods further restrict access to the main stream economy and compound the difficulty of breaking the generational cycle of poverty.

### A Legacy of Discrimination

Multiple institutions, agencies and individual actors contributed to the development of racial and geographic segregation and discrimination in the region, and the housing sector is a prime example. The federal government, private lending and real estate industries each played explicit and interconnecting roles in the decline of urban areas, particularly where minority populations resided, throughout the 20th century.

### Housing

One glaring and overt example is the practice of redlining, a practice of denying services to an area or a population, or of providing a lesser grade or higher cost service. For decades, redlining was practiced widely in determining where and to whom home mortgages would be made. In short, living in a neighborhood where were minorities present made it exceedingly difficult to get a loan. First implicitly prohibited under the Fair Housing Act in 1968, for most of the 1900s there were no regulations limiting or outlawing the practice. Though it was not always the case that banks would make no loans within "risky" neighborhoods, when they did, a body of evidence suggests, these loans were made on less favorable terms than other lending.

Redlining appears to have been widespread as early as the 1920s, but became much

36

PLAINTIFFS_GENERIC-00004903

more prevalent in the 1930s as "real estate agents, appraisers, and lenders all became obsessed with neighborhood risk ratings, in part because they blamed poor real estate appraisal methods for their Depression losses and in part because they adopted the long-term [15- or 30-year] mortgage as the standard"[23] spurred largely by the backing of these loans by new and expanded federal agencies.  This shift



increased lenders' focus on the trajectory of neighborhoods over the long term and many developed their own mechanisms for forecasting trends within areas where they were being asked for loans.  Far from being an innocuous way to protect their investments, however, this practice of redlining restricted the flow of capital to many neighborhoods, essentially sealing their fate as communities of decline. Terms such as "protection from adverse influences" and "infiltration of inharmonious racial or nationality groups" were at best thinly veiled phrases used to delineate of minority neighborhoods where banks were advised or self-determined not to lend or to lend sparingly.[24]

Figure 3-8: 1937 Home Owners' Loan Corp. Residential Security Map.

The Federal Home Loan Banking Board (FHLBB) and its subsidiary the Homeowners Loan Corp (HOLC) are often called out as the primary drivers of widespread redlining because of a series of green, blue, yellow and red color-coded maps created during the mid-1930s to represent increasing levels of risk in lending. Others have argued that the Federal Housing Administration "did more to institutionalize redlining than any other agency by categorizing mortgages according to their risk level and encouraging

---

23     Amy E. Hillier, Redlining and the Homeowners' Loan Corporation. Copyright Sage Publications. Postprint version. Published in Journal of Urban History, Volume 29, Issue 4, 2003, pages 394-420. University of Pennsylvania, 5-1-2003. p.414.
24     Hiller, p. 403

PLAINTIFFS_GENERIC-00004904

private lenders who wanted insurance for their mortgages to do the same".[25] Whatever the division of blame, however, biased theories of infiltration and inevitable neighborhood decline, "racial prejudice, and real estate and appraisal industry codification of all these sentiments in combination with federal endorsement and promotion of them… caused urban decline"[26]. Furthermore, as will be evidenced later in this document, the harm caused by this decline was both individual and collective, immediate and long-term, impacting at first housing but eventually nearly every facet of access and opportunity for communities of color across the country and specifically in Buffalo Niagara.

Though case law has concluded that redlining was outlawed in the 1968 Fair Housing Act, accountability measures were lacking until the 1977 Community Reinvestment Act. Applicable to banks receiving FDIC deposit insurance, the Community Reinvestment Act (CRA) established a federal protocol for ensuring that banks are providing loans to all areas in which they operate and are providing for the needs of low- and moderate-income customers. Still, across a large volume of studies, "black and racially mixed neighborhoods receive less private credit, fewer federally insured loans, fewer home improvement loans, and less total mortgage money than socioeconomically comparable white neighborhoods."[27] Thus, many housing advocates contend, the Community Reinvestment Act has not gone far enough to force accountability for banks and that the bar is set too low for CRA examinations to determine banks' real commitment to equal lending.

In addition to the explicit redlining policies that persisted from the 1930s through the 1970s, blockbusting contributed heavily to neighborhood turnover, destabilization and segregation. The real estate industry, particularly the residential sales component of the industry, is transactional. The industry at large and real estate agents individually benefit whenever a property is sold from one party to another. The more homes that sell, the more profit is produced for agents and their companies. With the impetus to induce heavy turnover, and thereby more commissions on sales, real estate agents engaged in a practice of blockbusting.

The general technique of blockbusting is as simple as it is harmful and unethical: 1) succeed in selling one home in a neighborhood, or on a block, to a black-family; 2) create fear within white residents that home values will now plummet, insisting that the sooner they sell, the more chance they will have to get a good price for their home; 3) list and sell more houses while accelerating the outflow of existing homeowners. Some real estate agents and their accomplices in the practice would take the exploitive practices a step further by undervaluing and purchasing homes at

---

[25]     Hiller, p. 415

[26]     Hiller, p. 413

[27]     Douglas S. Massey and Nance A. Denton, American Apartheid: Segregation and the Making of the Underclass. Harvard University Press.  Cambridge, MA. 1998.  P. 106.

PLAINTIFFS_GENERIC-00004905

a discount from white families and then inflating the prices and reselling to black families, thereby making egregious profits on the difference.

The practice was widespread in the 1950s and 1960s as the post-war wave of suburbanization was in effect. New purchase mortgages through the FHA and other federally backed sources (such as the Veteran's Administration) were easy to obtain for whites and, thus, making it easy for whites families to flee urban neighborhoods for new suburban developments.

The Masten District was the target of heavy blockbusting in his time period. So much so that the Masten District Community Relations Council undertook a campaign to halt the practice as early as 1958.[28]  In 1964 the City of Buffalo Common Council passed an anti-blockbusting ordinance that carried the threat of a fine and/or imprisonment for engaging in the practice. However, without an enforcement mechanism or a real commitment to implementation, the law ultimately had questionable effect.[29]

As late as the 1970s, Buffalo residents were still actively combating blockbusting in their communities. In the Kensington-Bailey neighborhood in the north-east section of Buffalo, as instances and evidence of blockbusting began to occur, neighbors organized to petition the Attorney Genera's office to issue a real estate non-solicitation order for the neighborhood, making it a crime for a real estate agent to initiate contact with residents in an attempt to get them to list their homes for sale.

In the post-war period, suburbanization was not a forgone conclusion, nor was it simply a product of individual choice and a free market. In fact, federal policies heavily skewed millions of individual (primarily white) families' decisions toward the choice of suburbanization. While some of the residents of diversifying city neighborhoods were content to live in integrated communities, others fled because they did not want to live near blacks. And while some preferred the allure of the white picket fence, others' hands were forced by a slew of programs and regulations that severely restricted their options. White flight from the city was aided and abetted by the previously mentioned government backed mortgage insurance providers, with the FHA wielding a heavy influence. In addition to the redlining practices that the agency institutionalized, additional FHA policies drove investment away from home renovation projects, multiple unit dwellings, attached housing and houses on small lots – essentially most forms of urban development.  The combination of low interest rates, low down payments and new construction techniques additionally made it cheaper in many cases to buy a home in the suburbs than to rent a home in the

---

[28]     Neil Kraus. Race, Neighborhoods and Community Power: Buffalo Politics 1934-1997. State university of New York Press. 2000. P. 103.

[29]     Neil Kraus. Race, Neighborhoods and Community Power: Buffalo Politics 1934-1997. State university of New York Press. 2000. P. 103-4.

PLAINTIFFS_GENERIC-00004906

city.[30]

Meanwhile, many properties in the city fell into a cycle of disinvestment. The housing stock of the city of Buffalo is comprised primarily of detached single- and two-family houses, with relatively few buildings containing more than four apartments.[31] Though boasting an incredible number of stately Victorian-era housing, much of the housing stock, particularly in neighborhoods that have since become predominantly minority, was also built for lower-income industrial workers and not designed to last without rigorous and constant maintenance. As of the 2010 Census, Buffalo's housing stock was oldest in the nation among large cities, with 64% built prior to 1939.[32] In Niagara Falls, 54% of the housing stock was built prior to 1939, and the city is also largely single and two-family homes.[33]

This type of housing stock has proven difficult to regulate and difficult to preserve as it has aged, in part because of a large and dispersed ownership of often under-capitalized and inexperienced landlords.  In a city of larger apartment buildings, an enforcement action (i.e., housing code violation citation or court case) against a landlord may impact an average of 5, 10 or many more units.  However, in Buffalo or Niagara Falls, each action may only impact one or two units on average. Further, though larger apartment buildings generally require some substantial capital outlay for acquisition, as the city's neighborhoods' housing markets have fallen into decline, many houses have been purchased for a few thousand or even hundreds of dollars.

This has made real estate speculation rampant in some areas.  With low levels of initial investment (and, hence, little risk), exploitative landlords have milked properties of their value by failing to perform maintenance or make repairs but meanwhile collecting rents until the properties become unlivable. At this point, some of these

---

[30]    Douglas S. Massey and Nance A. Denton, American Apartheid: Segregation and the Making of the Underclass. Harvard University Press.  Cambridge, MA. 1998. Pp 53-54.

[31]    2012 American Community Survey 1-Year Estimates. 72.8% of all units are in single family detached or 2-family structures, second only in percentage to Bakersfield, CA for cities with more than 100,000 housing units.  Buffalo is 1st in the country for percentage of 2-unit structures among the 561 included in the 2012 American Community Survey at 40.2% of units. The next closest city is Paterson, NJ at 35.5% and among those with 100,000 or more units, Jersey City is second at only 23.9%. For more than 4 units, Buffalo has the second smallest percentage (15.8%) of cities with more than 100,000 units, once again behind Bakersfield (13.2%).

[32]    2012 American Community Survey 1-Year Estimates. For cities with more than 100,000 units, Boston was second at 55.2%. For all 561 cities in the survey Buffalo was 4th behind Lynn (66.8%) and Somerville (67.5%), MA and Cicero, Il (75.3%).

[33]    American Community Survey 2008-2012 5-year estimates. While only 16% of the housing units in Niagara Falls are in 2-unit structures, 57% are in single-family detached homes. For the smaller regional cities, the pattern of older housing stock and dispersed units also holds – Lackawanna: 41% pre-1939, 68% single-family detached and 2-family homes; Lockport: 54% pre-1939, 74% single-family detached and 2-family; Tonawanda: 40% pre-1939, 86% single-family detached and 2-family.

PLAINTIFFS_GENERIC-00004907

owners simply stop paying taxes and walk away, having profited from their transaction, leaving the City, the neighborhood and the neighbors to deal with the problems they have created. Others have sold these properties to unsuspecting buyers, often from out of the area, which has triggered a rash of fraudulent flipping in recent years.

The city of Buffalo's housing stock suffered from various other forms of abuse. Both based on need for additional housing as the city grew substantially in the first half of the 20th century, and based on inability to maintain the large Victorian-era structures as the depression hit. Many of the city's older and larger homes were subdivided, often unsympathetically and often illegally, into rooming houses, from one unit to two units or from two-units to four. This has resulted in a slew of substandard housing, much of which falls outside of code compliance and suffers from poor management. Yet the ability of landlords to derive two rental payments instead of one, or four rental payments instead of two, greatly skews the value of these properties from an income versus value perspective. Since these properties would require substantial capital investment to reverse the damage done by subdividing, restoration of this housing stock to original configurations has been a rare occurrence.

But it wasn't just the combination of public policy and the spin off-market dynamics that led to regional disparities in the housing sector. Public housing, from its earliest days in Buffalo, was an intentional contributor to segregation. Initially, this took the form of legal and sanctioned discrimination but later, discriminatory practices continued illegally.

The Depression era public housing built in Buffalo was located in several neighborhoods throughout the city, however, the Buffalo Municipal Housing Authority refused to admit black residents to these early projects. Eventually, BMHA constructed the Willert Park apartments on the city's lower east side, where the city's black residents were already concentrated, exclusively for African-American residents.[34]

The Federal Government's 1940s era neighborhood composition rule reinforced this early discrimination by declaring that developments should not alter the racial make up of communities. However, loose interpretation of the rule allowed Buffalo to nominally consider each development site a "neighborhood" instead of considering what was, in the case of Willert Park, a somewhat racially mixed surrounding community. By making the single public housing development on Buffalo's east side available to blacks and only blacks, it has been argued that this policy essentially

---

[34]    Neil Kraus, Local policymaking and concentrated poverty: the case of Buffalo, New York, Cities, Volume 21, Issue 6, December 2004, Pages 481-490, ISSN 0264-2751, http://dx.doi.org/10.1016/j.cities.2004.08.004.
(http://www.sciencedirect.com/science/article/pii/S0264275104000964). P. 487.

PLAINTIFFS_GENERIC-00004908

determined the east side would be Buffalo's black neighborhood.[35]

In Niagara Falls, the rise of industrial areas in the northern portion of the city, along with the development of two sets of housing projects by the Niagara Falls Housing Authority led to a major shift in the settlement patterns of African-Americans within the city during and after World War II.[36]  The two segregated housing projects, Hyde Park Village (1943) and Center Court Housing in Highland, were of varying quality, but the lack of additional housing options for black residents during the Great Migration led to overcrowding and slum-like conditions, particularly as the number of units fell when Hyde Park Village was demolished in the early to mid-1950s.[37]

Though the Fair Housing Act as well as internal policy directives within HUD disallowed segregation in publicly funded housing, these practices continued in Buffalo long after they were legal. In 1989 local civil rights organizations and Fair Housing advocates filed a lawsuit against HUD, the Buffalo Municipal Housing Authority (BMHA), local Section 8 administrators, and the New York State Division of Housing and Community Renewal for multiple violations of the Fair Housing Act. These included the perpetuation of segregated developments within the BMHA, unequal conditions at primarily black and primarily white developments, the exclusion of public housing tenants from Section 8 vouchers, and the steering of white voucher recipients to the suburbs and black recipients to the city.[38] The case was settled in 1996 after various changes to local programming that would ensure more fair treatment of minorities within the local affordable housing system. The settlement also included the creation of a community housing center[39] to help residents gain awareness of opportunities for housing in a variety of neighborhoods that provided the amenities and opportunities that they sought.  HOME has operated the Greater Buffalo Community Housing Center since its inception in 1999.

*The Role of Local Politics*
The direct influence of local politics as a contributor to segregation and discrimination

---

[35] Kraus, Neil. Race, Neighborhoods, and Community Power, Buffalo Politics, 1934-1997. State University of New York Press. Albany, NY. 2000. P.79-80.

[36] Boston, Michael B. Blacks in Niagara Falls, New York: 1865 to 1965, a survey. Afro-American Historical Association of the Niagara Frontier, Inc. July 1, 2004.
http://www.thefreelibrary.com/Blacks+in+Niagara+Falls%2c+New+York%3a+1865+to+1965%2c+a+survey.-a0128705070

[37] Boston, Michael B. Blacks in Niagara Falls, New York: 1865 to 1965, a survey. Afro-American Historical Association of the Niagara Frontier, Inc. July 1, 2004.
http://www.thefreelibrary.com/Blacks+in+Niagara+Falls%2c+New+York%3a+1865+to+1965%2c+a+survey.-a0128705070

[38] Neil Kraus. Race, Neighborhoods and Community Power: Buffalo Politics 1934-1997. State University of New York Press. 2000. P. 195.

[39] Neil Kraus. Race, Neighborhoods and Community Power: Buffalo Politics 1934-1997. State University of New York Press. 2000. P. 206.

PLAINTIFFS_GENERIC-00004909

in its own right merits an explicit mention. Politics, including racial and ethnic politics, has played a heavy role in the distribution of resources locally, and has likewise impacted housing policies and their relative enforcement (or lack thereof). As Neil Kraus, author of a *Race, Neighborhoods, and Community Power* puts it:

> "The black community's lack of political influence over key decisions affecting African-American residential neighborhoods (political isolation) led to both tangible physical changes in and the increasing segregation of the lower/middle east side (spatial isolation), and eventually to decreasing economic activity and opportunity there (economic isolation)."[40]

Both public investment and public disinvestment played a role. Disinvestment, the failure to pave streets, fix sidewalks, or maintain streetlights or parks, for example, is one way in which low income communities were burdened with a lesser quality of life, but major capital investment that did come to these same communities was not necessarily positive. Urban Renewal may be the most clear cut – and in many ways extreme – case of the exercise of political power to displace residents and break up communities. Entire neighborhoods were dubbed blighted and demolished wholesale. But emerging highway infrastructure (described in further detail below) was also used to decimate communities and break up emerging bases of political and economic power within the minority community. Though the devastation created by these investments was large and lingers to this day, others that were planned but defeated would have compounded this harm and spread it to additional neighborhoods and populations.

However, less visible but no less tangible forms of political power preference and prejudice also boosted those communities in power over those left out. To the victors of elections went the spoils, particularly in the form of patronage jobs. As industry began to wane, blue-collar municipal employment provided a cushion for many who happened to be affiliated with the right political machine at the right time. However, even this safety net disappeared as municipal budget crunches began to eviscerate the local public sector workforce, a phenomenon that slightly preceded the rise of African-American political power in the region's largest city.

### Highways and Auto-Centric Development

The post-war era was one of prosperity, but also of racial and normative change. Public officials leveraged massive public works projects aimed to facilitate the rise of the automobile and expedite suburban commuting to additional end: the construction of highways through urban neighborhoods served to displace and disconnect emerging bases of African-American political power. At the same time these interventions undercut economic opportunities and activity within neighborhoods by allowing traffic (and customers) to quickly bypass city neighborhoods for new auto-centric commercial development. The legacy of these roadways has further created

---

[40]    Neil Kraus. Race, Neighborhoods and Community Power: Buffalo Politics 1934-1997. State university of New York Press. 2000. p.25.

PLAINTIFFS_GENERIC-00004910

communities of environmental justice concerns where low-income and minority populations are now subjected to high volumes of car and truck emissions.

Nowhere in Buffalo was the intrusion of highways on neighborhoods more apparent than the construction of Route 33. Also known as the Humboldt Expressway, this highway was named after the grand Olmsted-designed Humboldt Parkway that was torn out for its construction.  Humboldt Parkway was the spine of emerging black middle-class neighborhood of Hamlin Park and its link to the great public spaces of The Parade (now MLK Park) and Delaware Park. However, the local (white) power elite welcomed the destruction as a sign of progress.  In fact, as New York State footed the lion's share of the bill for the project, Buffalo's then-mayor Steven Pankow reportedly proclaimed, "Never has Buffalo been offered so much for so little".[41]

North and east of the portion of the highway which replaced the grand parkway, Route 33 continues to cut through several east side communities, included multiple current and past subsidized housing developments concentrated along it's route to the airport in Cheektowaga.

Interstate I-190 likewise divided communities on the west side, where it was paired with urban renewal projects that ultimately constructed ghettos of low-income subsidized housing cordoned off from the rest of the city.  In addition to the expressway cutting the neighborhood off from the riverfront to the west, the creation of two very large off-ramps from the Virginia Street exit, separated this neighborhood lengthwise, severing connections to downtown. The southern boundary of these West Side neighborhoods is also hemmed in by a web of off-ramps at Church Street. Meanwhile, four-lane arterials create boundaries to the east (Niagara Street) and the north (Porter Avenue).

Further north, the expressway continues to divide west side neighborhoods from the waterfront, while also intersecting with the Peace Bridge to Canada. Though built initially as a connection for residents traveling primarily between southern Ontario and Buffalo (privately built on the strength of the bi-national connection largely centered on recreation and beach traffic to Canada), in the years since the implementation of the North American Free Trade Agreement (NAFTA), the Peace Bridge has become a frequent international crossing for freight from throughout the continent. Numerous studies have demonstrated the health impacts of increased exhaust exposure in communities impacted by international trade expansion through exposure to black carbon, particulate matter and ultra-fine particulates.[42]

---

[41] G. Scott Thomas. Work of art: Demolition of Larkin Building was key loss for preservation advocates. Business First. Oct 11, 2004.
http://www.bizjournals.com/buffalo/stories/2004/10/11/story3.html?page=all
[42] Martha Matsuoka, Andrea Hricko, Robert Gottlieb, Juan De Lara. Global Trade Impacts: Addressing the Health, Social and Environmental Consequences of Moving International Freight through Our Communities. Occidental College &University of Southern California. March 2011.

PLAINTIFFS_GENERIC-00004911

The portion of I-190 running east of downtown also casts a shadow over the Commodore Perry housing development, and, south of this, the Route 5 expressway forms a barrier between working class neighborhoods and the Lake Eire waterfront through Buffalo and Lackawanna before becoming a narrower and slower speed roadway known as Lakeshore Drive in Hamburg.

One major investment that had been promised to reverse or at least mollify the damaging effects of auto-centric development in the region was an expansive light rail system for the region. After the decision to locate the expanded SUNY at Buffalo (UB) campus in suburban Amherst was handed down (see below), a train system to connect this campus to the downtown core, and downtown to the suburbs to the north, east, and south was conceived. The trunk line of the system was built under and along Main Street and opened in the mid-1980s. Though designed to accommodate multiple feeder lines, to UB North Campus, the airport, the Southtowns and the Tonawandas, the single six-mile Main line is all that has ever been built. UB North campus continues to draw investment and spur office parks in its close proximity, but the ability of urban residents without cars to access these opportunities remains weak. Currently, however, the NFTA is undergoing an alternatives analysis to strengthen transit in the Main Street to UB corridor, while the school itself is making a major investment in creating an addition campus adjacent to downtown Buffalo.

### The Public Education System

The public education system in the region played a major role in segmentation and segregation of the population.  Buffalo maintained neighborhood-based system for school placement through the 1960s that, due to the segregated nature of the city, led to segregated schools.  However, as the population began to shift, the school system began to game the rules of placement in order to maintain segregated schools.  In 1964, the school board voted 6-1, with all white members for and the sole black member against, to draw a catchment area for a newly constructed middle school that encompassed only primarily black elementary schools.[43]   The decision sparked opposition that eventually led to a federal lawsuit that culminated in the forced desegregation of the school system under an order by Judge John Curtin in 1976.

However, the desegregation order impacted only the Buffalo Public School system and quickly demonstrated the inability to address a regional problem on a local scale. Though the Buffalo Public Schools was and is the most populous system within the region by far, the boundaries of its jurisdiction are, ultimately, easily skirted. Many families who did not want their children bussed to unfamiliar areas of the city and

---

Pp. 15-18.

[43] G. Scott Thomas.  Black and White: Woodlawn Junior High vote put city on road to federal court. Business First. Monday, November 1, 2004.
http://www.bizjournals.com/buffalo/stories/2004/11/01/story2.html?page=all

PLAINTIFFS_GENERIC-00004912

0045

others who did not want to send their children to integrated schools instead sent their children to private schools or moved from the city entirely. In an era of rapid change, massive suburbanization, and auto-centric development, ties to friends, family and employment were no longer necessarily centered at the neighborhood level. The timing of the forced changes within the school system also coincided with massive industrial job losses. Though it is not possible to determine what portion of the population is attributable to one factor or another, from 1970 – 1980 the city's population plummeted from 462,661 to 357,800 – a 23% decrease – far outstripping the losses in number and in percentage of any decade before or since.

Though conducted under judicial order and far from smooth or easy, the integration of the Buffalo Public Schools was still held up as a model in contrast to efforts in other cities that experienced extended protests and instances of violence. The district's performance was initially lauded, but in the intervening years, the school district has continued to lose enrollment at a rate faster than the rate of population loss. Achievement within the district has also declined and, throughout this time, the district has become increasing poor and increasingly minority.

Across Buffalo Niagara today, 28% of children enrolled in public school districts are non-white. In Buffalo, 78% of students are non-white and Niagara Falls has the second highest portion of minority students at 48%. Yet, 22 of the 38 districts have student populations made up of at least 90% whites. Eleven primarily rural or outer ring suburban districts, such as Holland, Eden, Alden, East Aurora, Lancaster, Orchard Park, and Starpoint – are comprised of 95% or more white students.[44]

Nearly 40 years after Judge Curtin's ruling the debate about whether the Buffalo Public Schools are truly desegregated has not abated,[45] but it is clear that the public education system in Buffalo Niagara as a whole is far from integrated.

*Environmental Justice*

But neighborhood locations influence far more than educational opportunities, including health outcomes. The EPA defines Environmental Justice as: "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies".[46] In that regard, the region has a long history of environmental harms disproportionately impacting low-income communities and people of color.

_____

[44] Compilation of data from New York State Education Department 2011-2012 District Report Cards for Public School Districts in Erie and Niagara Counties.

[45] Mary Pasciak. Has desegregation worked in Buffalo? March 23, 2011.
http://blogs.buffalonews.com/school_zone/2011/03/has-desegregation-worked-in-buffalo.html
[46] U.S. Environmental Protection Agency Environmental Justice Main Page.
http://www.epa.gov/environmentaljustice/. Retrieved February 10, 2014.

PLAINTIFFS_GENERIC-00004913

As a region built on heavy industry, particularly adjacent to major waterways and growing up along rail corridors, the release of pollutants often impacted the working class residents surrounding these site. Even as industry has waned, the legacy of this contamination continues to haunt communities. The region also experiences a high incidence of external waste being imported into the region for disposal. In addition, some of the mid-century infrastructure decisions, particularly those related to highway construction and expansion, continue to burden low-income communities with poor air quality and other environmental nuisances. For instance, "Hispanic residents have the highest asthma rates in Buffalo, roughly twice that of other residents; the problem is particularly severe close to the Peace Bridge complex and major roadways feeding into it."[47]

Another major contributor to poor environmental health includes the preponderance of houses, particularly in low-income neighborhoods within the region's cities, which contain lead-based paint, which is poisonous to all people but can be particularly damaging to childhood development. This problem is particularly acute in the region, which has the highest percentage pre-war housing stock in the nation, and a large percentage of residences built of wood as opposed to masonry meaning the threat of flaking paint is present both inside and outside. "[E]ight of the highest risk zip codes for lead poisoning in New York" State are in Buffalo Niagara[48]. Further, "the four [local] zip codes with the highest rates of lead poisoning coincide with the predominantly African-American neighborhoods of Buffalo, with incidence rates between three and five times higher than Erie County's average."[49] 95% of all cases of hazardously elevated blood levels and 23 of the highest 25 high-risk tracts are in Buffalo.[50]

Evidence of the burdens of current toxic releases, legacy contamination sites, and poor health outcomes can be seen in the Environmental Health Index in Chapter 5 of this document which explores areas of opportunity within the region.

The region, though, also has a strong history of environmental justice activism, beginning with the Love Canal disaster in the 1970s and continuing through the 858 East Ferry superfund site battles, current challenges of industrial and freight related pollution along the Niagara River, efforts to improve access to healthy foods in low-

---

[47] Environmental Health and Racial Disparities in Buffalo, excerpted from Missing the Target, *How Economic Development Programs Have Failed to Revive Buffalo's Most Challenged Neighborhoods*, by Sam Magavern et al, Partnership for the Public Good (2009). P.2.
[48] Community Foundation for Greater Buffalo, Green and Healthy Homes Initiative. http://www.cfgb.org/leadership/green-and-healthy-homes-initiative/. Retrieved February 10, 2014.
[49] Environmental Health and Racial Disparities in Buffalo, excerpted from Missing the Target, *How Economic Development Programs Have Failed to Revive Buffalo's Most Challenged Neighborhoods*, by Sam Magavern et al, Partnership for the Public Good (2009). P.2.
[50] Environmental Health and Racial Disparities in Buffalo, excerpted from Missing the Target, *How Economic Development Programs Have Failed to Revive Buffalo's Most Challenged Neighborhoods*, by Sam Magavern et al, Partnership for the Public Good (2009). P.1.

PLAINTIFFS_GENERIC-00004914

income food deserts, and combating lead paint and other health hazards through the Green and Healthy Homes Initiative.[51]

*Private Sector Elitism & Institutional Disinvestment*

In addition to the physical effects on communities, major employers and institutions have also been at fault for perpetuating actions negatively impacting the socio-economic status of minority populations. This has taken the form of neighborhood disinvestment or avoidance as well as direct individual discrimination.  A clear-cut and admitted case of racial discrimination and disinvestment occurred at Bethlehem Steel where 20,000 people were once employed.  The US government brought an anti-discrimination suit against the company and its associated unions in 1970 and "[t]he evidence of racial discrimination at Bethlehem was so convincing that the company did not contest the government's claims. The primary question for resolution, therefore, was the nature of the remedy."[52] The ability for minority workers to gain opportunity, let alone parity within the plant, however, never emerged as "[s]hortly after the suit… the company started a process of reducing its workforce by thousands"[53].

Arguably, New York State and the State University of New York's 1964 decision to expand the University at Buffalo in Amherst is another such case of institutional disinvestment. Built on a greenfield site five miles from the existing campus on the northern edge of the City of Buffalo and some 11 miles from the central business district rather than proposed locations within the city, the University's North Campus location created mass amounts of spin-off development including major suburban job centers in close proximity to the university. Access to these large and growing job centers (let alone the thousands of staff, faculty and service jobs at the campus itself) are largely inaccessible to city residents without a car.

Public investment in suburban academic campuses continues to be a contentious issue. For example, beginning in 2011 a group of residents and politicians to fought a plan by Erie Community College to build a health sciences building in suburban Amherst. Opponents contended this location was largely inaccessible to residents without a private automobile, and that the growth and investment in medical facilities and research occurring adjacent to Buffalo's downtown core at the Buffalo Niagara

---

[51] Western New York Environmental Alliance Environmental Justice Working Group.
http://growny.org/issues/environmental-justice. Retrieved February 10, 2014.

[52] Neil Kraus, Local policymaking and concentrated poverty: the case of Buffalo, New York, Cities, Volume 21, Issue 6, December 2004, Pages 481-490, ISSN 0264-2751, http://dx.doi.org/10.1016/j.cities.2004.08.004.
(http://www.sciencedirect.com/science/article/pii/S0264275104000964). P. 487

[53] Neil Kraus, Local policymaking and concentrated poverty: the case of Buffalo, New York, Cities, Volume 21, Issue 6, December 2004, Pages 481-490, ISSN 0264-2751, http://dx.doi.org/10.1016/j.cities.2004.08.004.
(http://www.sciencedirect.com/science/article/pii/S0264275104000964). P. 487

PLAINTIFFS_GENERIC-00004915

Medical Campus made an investment in the ECC downtown campus more sensible. Ultimately, after additional studies were commissioned at the request of the Erie County Executive, plans for the $50 million facility remained anchored at the suburban site.


*Ongoing Challenges of Disparity and Discrimination in Housing and Neighborhoods*
Though they may continue to evolve, clearly the ills of public policy and discriminatory practices have not been erased. For instance, a HUD-commissioned study of national lending patterns confirms that even when controlling for credit scores, minority applicants, and particularly African-American applicants are unable to access the same levels of mortgage credit that whites can in either purchase or refinance lending.[54] This was manifest across the country during the subprime lending and foreclosure crisis in the previous decade.  Though by official metrics, the region was spared the worst of the sub-prime lending schemes of the Great Recession, the influence of the finance, insurance and real estate (FIRE) industries is still at play in discrimination and segregation in the region.

In part because of Buffalo Niagara's relatively low housing values, conventional lending is not prevalent in the region – particularly the lowest valued communities. Home Mortgage Disclosure Act (HMDA) data suggests a much lower rate of lending here than the national average. In fact, half of the mortgages filed in Erie County are not HMDA-reportable.[55] However, less visible and regulated entities may be more prevalent as a result and therefore predatory lending practices in the region may be going underreported.

The Western New York Law Center undertook a foreclosure study of Erie County in 2007-8 that attempted to catalogue every recorded mortgage note and foreclosure action by examining all related documents filed with the County Clerk.[56]  The study revealed 5,023 lis pendens filings for 2007 and 2008, 27% of which (1,345) were for subprime mortgages.  However, the percentage of subprime lis pendens filings as a percentage of all lis pendens filings varied widely by municipality. In the Town of Tonawanda, for instance, the number of subprime foreclosures was 4% of filings, while in the City of Tonawanda 97% of filings were subprime. All other municipalities, however, ranged between 19% and 56% of filings as subprime.

---

[54] Risk or Race: An Assessment of Subprime Lending  Patterns in Nine Metropolitan Areas Prepared for: U.S. Department of Housing and Urban Development, Washington, D.C. Prepared by: William C. Apgar Jr.,Christopher E. Herbert, Priti Mathur. August 2009. p. iii.
http://www.huduser.org./Publications/pdf/risk_race_2011.pdf

[55] Foreclosing Erie County, Erie County, NY Foreclosure Study: Years 2007-2008. Western New York Law Center. 2009. P. ii.

[56] Foreclosing Erie County, Erie County, NY Foreclosure Study: Years 2007-2008. Western New York Law Center. 2009.

PLAINTIFFS_GENERIC-00004916

The number of annual subprime lis pendens filings per housing units with a mortgage also varied widely by municipality. The Erie County average was 4.2 per thousand units. On the high end, the City of Tonawanda experienced 14.6 per thousand, with Buffalo second at 8.0 per thousand. On the low end, the Town of Tonawanda experienced 0.6 subprime filings per thousand while Aurora (1.6), Holland (1.6) and Wales (1.7) also experienced less than 2 per thousand.[57]

At a finer grain, an analysis of the top twenty zip codes for lis pendens filings by zip code reveals significant racial and ethnic disparities. Though the county had an average of 15.5 annual filings per 1,000 mortgaged units, of these 20 zip codes, the highest rates of filings were in 14211 with 57.9 per 1,000, 14213 at 55.4 and 14215 at 50.0. These three zip codes were also the highest racial and ethnic minority zip codes amongst the study set (14211 – 81%, 14213 – 61%, 14215 – 84%).[58]

While not conclusive, this pattern of disparity suggests the possibility of targeted predatory lending in the region. Predatory lending, when geographically based, has also been referred to as reverse redlining. Reverse redlining generally implies targeting specific geographies based on their race, ethnicity or income – neighborhoods that have traditionally had difficulty accessing capital – and offering to lend, typically with aggressive or deceptive marketing. The practice impacted Buffalo neighborhoods in many of the same ways it impacted other communities during the rampant subprime mortgage lending and foreclosure practices of the first decade of 2000s.

A pattern of national and local studies throughout the country show that minority applicants are subject to a much higher denial rate for mortgage applications than whites among conventional lenders. Add to this a biased appraisal methodology, which creates a chicken-and-egg scenario for neighborhood housing valuations, FHA Private Mortgage Insurance requirements that drive up the cost of housing, and insurance redlining in distressed communities, and the challenges of securing decent, affordable housing in impacted neighborhoods becomes even more daunting.

Supporting low- and moderate-income residents outside of the private market, however, is also challenging. Throughout the assemblage of this report, members of the FHEA advisory committee expressed the ways in which the current structure of the non-profit and public sector housing support and delivery system is ineffective in combating segregation and providing opportunity for all residents. Though all saw

---

[57]    Statistics regarding municipal lis pendens filings and subprime lis pendens filings are derived from raw data contained within the WNY Law Center Foreclosing Erie County report in addition to Census figures from the 2005-2009 American Community Survey.

[58]    Statistics regarding zip code level lis pendens filings are derived from raw data contained within the WNY Law Center Foreclosing Erie County report in addition to Census figures from the 2007-2011 American Community Survey.

PLAINTIFFS_GENERIC-00004917

value within the system, a general consensus arose that the system is in need of reform. The identified reforms fall primarily into the categories of policies and regulation, resource availability and allocation, and information sharing and education.

There is a dearth of high capacity CDCs locally and scare and shrinking resources for affordable housing production and assistance has historically created a scarcity mentality and a competitive atmosphere amongst agencies.  Without sufficient resources to ensure operations, non-profits are backed into a corner of concentrating on keeping the doors open rather than expanding programs or coming up with innovative solutions for their neighborhoods.

There is no continuum of care for housing assistance. Though there have been some attempts in recent years to collaborate, centralize or streamline some services, low internal capacity and shifting priorities from funders at philanthropic and governmental agencies have often led to short-lived initiatives. The small-box non-profit delivery system also means that various agencies can only offer certain grant-funded programs within certain communities and often in a time- and resources-limited way. Program staff are often not up to date about what may available at other agencies and the associated web of eligibility requirements for these programs.

Similarly, other places that residents turn to for assistance or direction – social service agencies, legislative representatives, etc. – may be uneducated on programs and may miss the opportunity for referrals or may set unrealistic expectations about what an agency can provide. Once a client has been disappointed by the support system, it is less likely that they will attempt to receive assistance that may be available to them, contributing to a disconnect or level of distrust between agencies and community and contributing to further ineffectiveness of the system.

However, housing providers on the FHEA advisory committee also cited the overlapping and sometimes conflicting regulations that make the entire system difficult to understand for those who are not immersed within it on a daily business. The restrictive regulations too often also limit providers' abilities to meet the specific situations of families in need.  Generally these issues fell into the categories of income restrictions that penalize applicants or tenants for gaining better employment and a higher income, along with hard lines for eligibility rather than a sliding scale that would broaden participation and link benefit with need. Conventional interpretations of family structure also create issues, particularly in diverse communities such as the growing refugee and immigrant community in the city of Buffalo.

The siting of affordable housing developments continues to be an issue. Whether because of available land or cost of land, opposition to development in higher income neighborhoods, zoning restrictions limiting affordable types of development, providers see a lack of options and a concentration of affordable housing developments.

51

PLAINTIFFS_GENERIC-00004918

On the purchase side, because of the region's and particularly the larger cities' low housing purchase prices, even with heavy purchase subsidies, families purchasing housing in distressed communities have too often paid more for their houses than the market price for housing in the neighborhood. Though providing a quality residence, placing homeowners into underwater mortgages does not have the desired impact of building equity and assets for low- and moderate-income families.

Meanwhile, instances of housing discrimination persist throughout Buffalo Niagara. An analysis of local Fair Housing enforcement from 2004- 2012, reveals concerning trends in the region's capacity to sufficiently process and record alleged instances of discrimination. The analysis suggests complaint intake records during the period were not maintained by the City of Buffalo or other local agencies due to reductions in funding and staff members dedicated to these activities.[59]

Progress on Fair Housing issues is further complicated through various levels of influence which localities are able to exert on their own. Though the city of Buffalo passed a fair housing ordinance in 2006, which includes protections for certain residents above and beyond the scope of the federal fair housing statutes (such as non-discrimination based on source of income, i.e., public assistance), the capacity to enforce that law has been limited due to staff turnover and a general lack of staff capacity to perform these duties. Though the ordinance requires an annual report on Fair Housing activities, no report has been produced to date.[60] The study's authors indicate that the issues faced in Buffalo are in fact indicative of the issues faced not just locally and regionally, but nationally due to the nature of the methods prescribed and lack of resources used to implement fair housing activities, including the amorphous requirements and tracking of the HUD Analysis to Impediments and their relationship to the CDBG allocation process.[61]

The city, and indeed the region's, housing stock also complicates the reach of Fair Housing regulations. The City of Buffalo is comprised primarily of single and two-unit structures.  As the earlier federal fair housing laws and even the City's 2006 ordinance excludes these housing types, a large portion of the not subject to the protections they would otherwise afford.

---

[59]    Robert Mark Silverman, Kelly L. Patterson, Jade Lewis ; Chasing a Paper Tiger: Evaluating Buffalo's Analysis of Impediments to Fair Housing Choice. Current Urban Studies 2013. Vol.1, No.3, 28-35 Published Online September 2013. P.31.
[60]    Robert Mark Silverman, Kelly L. Patterson, Jade Lewis ; Chasing a Paper Tiger: Evaluating Buffalo's Analysis of Impediments to Fair Housing Choice. Current Urban Studies 2013. Vol.1, No.3, 28-35 Published Online September 2013. P.33.
[61]    Robert Mark Silverman, Kelly L. Patterson, Jade Lewis ; Chasing a Paper Tiger: Evaluating Buffalo's Analysis of Impediments to Fair Housing Choice. Current Urban Studies 2013. Vol.1, No.3, 28-35 Published Online September 2013. P.33.

PLAINTIFFS_GENERIC-00004919

Further, in almost all municipalities in the region, it is still legal to discriminate against potential tenants based on source of income. Applicants may be denied an apartment because of deriving their income from Social Security, housing vouchers or TANF funds, for instance. The only localities that have made this practice unlawful are Buffalo, Hamburg and West Seneca.

The local Fair Housing landscape is discussed further in Chapter 7.

The limitation of housing types through exclusionary zoning is another major challenge to housing choice within the region.  Many local zoning ordinances are decades old and need to be amended to allow for a more diverse and inclusive style of development. Though an analysis of Niagara County zoning is not readily available, the most recent Erie County Analysis to Impediments examined zoning ordinances throughout the Erie County CDBG consortium, broken out into the village, town and city level.

Though many villages noted a need for affordable housing, the average minimum lot size was roughly 11,000 square feet, with an additional 2,000 square feet per unit. Some villages indicated that a lack of a sewer system impeded more dense development.[62] Towns, meanwhile, had a minimum lot size average of around 26,000 square feet, but with variations from 7,200 square feet in an inner ring suburb to 3 acres in a rural town. Multifamily home zoning was substantially higher on average, at 14,000 square feet plus 4,000 square feet per unit. Sewer system availability and open space protections also impacted lot sizes in the towns. But towns meanwhile indicated a need for additional affordable housing.[63]

For the two cities of the Erie County consortium, Tonawanda and Lackawanna, the study indicates small minimum lot sizes (6,000 and 7,500 feet respectively) with an extra 3,000 square feet per unit, and a high density district in Lackawanna that does not limit unit number once a site is in excess of 20,000 square feet.[64]

This study also noted the high preponderance of white males on zoning and planning

---

[62] Kelly L. Patterson, Ph.D., Robert M. Silverman, Ph.D., Scott W. Gehl, Kenneth J. Gholston, Analysis of Impediments to Fair Housing Choice in Erie County, NY. Erie County Community Development Block Grant (CDBG) Consortium, and the towns of Amherst, Cheektowaga, and Tonawanda. November 2008. p.48

[63] Kelly L. Patterson, Ph.D., Robert M. Silverman, Ph.D., Scott W. Gehl, Kenneth J. Gholston, Analysis of Impediments to Fair Housing Choice in Erie County, NY. Erie County Community Development Block Grant (CDBG) Consortium, and the towns of Amherst, Cheektowaga, and Tonawanda. November 2008. p. 48

[64] Kelly L. Patterson, Ph.D., Robert M. Silverman, Ph.D., Scott W. Gehl, Kenneth J. Gholston, Analysis of Impediments to Fair Housing Choice in Erie County, NY. Erie County Community Development Block Grant (CDBG) Consortium, and the towns of Amherst, Cheektowaga, and Tonawanda. November 2008. p. 49

PLAINTIFFS_GENERIC-00004920

boards, but did make note of some progress.  The Town of Clarence, for instance, was credited with updating zoning regulations that promoted affordable infill housing development in its hamlets through a Traditional Neighborhood District zoning with lower parking requirements, lesser setbacks and smaller minimum lot sizes.[65] The Town of Amherst has also instituted a Traditional Neighborhood Business Zoning Overlay to "encourage mixed-use and pedestrian-oriented redevelopment" in an attempt to meet the Town's comprehensive plan goal of revitalizing older commercial areas.[66]

Since early 2010, the City of Buffalo has been engaged in a rewrite of its long standing zoning code. Dubbed the Green Code, this effort intends to replace a largely suburban style code that from the mid-20th century with one that encourages a more urban, inclusive and environmentally friendly development pattern.

A concerted effort needs to be made throughout the region to promote a variety of housing types, accessible by a variety of transportation means and at a variety of incomes. In addition to reducing restrictive barriers to multifamily housing and denser forms of development, revised zoning ordinances should be going beyond permissive to implement inclusionary zoning provisions to affirmatively further opportunity in the region.

NIMBYism, or Not In My Back Yard sentiment, continues to be an issue throughout the region in constructing affordable housing and special needs housing, particularly in areas of higher opportunity.  Two such instances which gained headlines in recent years include People, Inc.'s attempt to build a senior housing complex in Orchard Park and Belmont Housing Resources construction of a Shawnee Landing, a Low Income Housing Tax Credit funded housing development in Wheatfield. Through various stages of the developments the projects faced hurdles due to concerns about the "types of people" these new housing units would accommodate – Belmont faced severe challenges once the project was already in construction, whereas in Orchard Park, after repeated attempts the project was never approved by the planning board under questionable pretense. These instances will also be discussed further in Chapter 7.

The provision of affordable housing has created controversy in the region, but the influx of higher-income housing within low- or moderate-income neighborhoods has also been problematic for some neighborhoods. The solution to this problem,

---

[65] Kelly L. Patterson, Ph.D., Robert M. Silverman, Ph.D., Scott W. Gehl, Kenneth J. Gholston, Analysis of Impediments to Fair Housing Choice in Erie County, NY. Erie County Community Development Block Grant (CDBG) Consortium, and the towns of Amherst, Cheektowaga, and Tonawanda. November 2008. p.49

[66] Town of Amherst Planning Department. Amherst Traditional Neighborhood Zoning Project. http://www.amherst.ny.us/govt/govt_dept.asp?dept_id=dept_15&div_id=div_22&menu_id=menu_20. Retrieved 3 March 2014.

PLAINTIFFS_GENERIC-00004921

however, is not to keep poor neighborhoods exclusively poor. As evidenced throughout the FHEA process, and reflected in this document, there remain huge disparities in the quality-of-life related conditions and the ability to access opportunity at the neighborhood level for neighborhoods that are isolated in poverty.

Yet, in areas of the region that are rebounding from decades of neglect, such as Buffalo's West Side, the specter of gentrification has been raised. Through various viewpoints, definitions and interests, gentrification can be seen as both a good thing and a bad thing for neighborhoods long in decline. However, delving into terms that are more concrete often provides a greater level of agreement. Most agree, for example, that displacement of low-income and minority populations is not a desirable outcome of neighborhood change. When debates on the topic focus on this piece of the broader and charged dialogue around gentrification, it is possible to develop, strategies and outcomes to meet these ends within the context of an improving neighborhood.

But as noted by the FHEA Advisory Committee, if mixed-income, mixed-race and ethnicity neighborhoods are the goal, there are barriers and complications to achieving it. The current structure and nature of housing assistance, programs, for instance, do not necessarily fit the needs of upwardly mobile residents. Many who are caught in between the ability to pay market rates in appreciating or stronger neighborhoods, but do not qualify under income limits for state and federally sponsored programs are left out. Anecdotally, some have even faced the choice of accepting a raise or a new position and having to find a new home or new neighborhood because of the income limits on their current housing.

Because of the disparities known all-to-well to individuals and communities in Buffalo Niagara, achieving economic integration is necessarily linked to achieving racial and ethnic integration within the region. Ultimately programs and interventions within neighborhoods need to focus on the people who live within these neighborhoods, ensuring there is a secure place for them as conditions improve.


*Other On-going Barriers to Op*portunity and Inclusion
       *Language Access*
According to the American Community Survey, about 96,000 people (9% of the population) in the region speak a language other than English at home.  Of these, 32,000 people speak English less than "very well".  For roughly 3% of the population, then, full participation in the local economy can be a major challenge due to limited English proficiency (LEP). As the Department of Justice states it, "Language for LEP individuals can be a barrier to accessing important benefits  or services, understanding and   exercising important rights, complying   with applicable responsibilities, or  understanding other information provided by Federally funded

PLAINTIFFS_GENERIC-00004922

programs and activities."[67]

Stemming from regulations outlined in Title VI of the Civil Rights Act of 1964, "Recipients of Federal financial assistance have an obligation to reduce language barriers that can preclude meaningful access by LEP persons to important government services."[68]

While some agencies and local governments have made strides in attempting to provide reliable access for Spanish speakers, only about 9,000 of the LEP segment of the population people speak Spanish and the remaining 23,000 speak a language other than Spanish or English.[69]  A disproportionate portion of these residents (63% of LEP Spanish speakers and 38% of LEP non-Spanish speakers) live in the City of Buffalo. The Census further reveals 20% of LEP Spanish speakers are foreign born, 82% of LEP non-Spanish speakers are foreign born.

The International Institute of Buffalo indicates that a broad array of countries and places of origin are represented for recent arrivals to the Buffalo region, with a diverse set of languages and dialects including Spanish, Arabic, Dinka, Thai, Moldovian, Romanian, Somali, Mai Mai, Bhutanese, Nepali, Burmese, Karen, Chin, Karenni, French, French Creole, Russian, Ukrainian, Swahili, Kiswahili, Farsi, Grebo, and Vietnamese.[70]

Though the International Institute and other agencies locally provide translation services for a number of clients, previous research indicates a dearth of LEP plans produced by local governments within the region.[71]  However, the federal government provides suggestions for agencies attempting to meet the requirements of LEP access, including:

- Produce essential written materials in both English and other languages regularly encountered in advance.

---

[67] DEPARTMENT OF JUSTICE.  Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons. Federal Register/ Vol. 67, No. 117 / Tuesday, June 18, 2002/ Notices. P. 41457. http://www.gpo.gov/fdsys/pkg/FR-2002-06-18/pdf/02-15207.pdf

[68] DEPARTMENT OF JUSTICE.  Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons. Federal Register/ Vol. 67, No. 117 / Tuesday, June 18, 2002/ Notices. P. 41457. http://www.gpo.gov/fdsys/pkg/FR-2002-06-18/pdf/02-15207.pdf

[69] US Census Bureau, American Community Survey Five Year Estimates, 2007-2011.

[70] LEP need statement provided by International Institute of Buffalo.  The countries and places of origin referenced include: Puerto Rico, Peru, Cuba, Dominican Republic, Mexico, Bhutan, Burma, Egypt, Sudan, Thailand, Moldovia, Somalia, Kenya, Rwanda, Cameroon, Russian, Ukraine, Swahili, Iran, Liberia, Haiti, and Vietnam.

[71] Amanda Schieber, Limited English Proficiency Access in Buffalo and Erie County. Partnership for Public Good Fact Sheet. May 2, 2009. p.4.

PLAINTIFFS_GENERIC-00004923

Buffalo Niagara One Region Forward Fair Housing Equity Assessment
PUBLIC REVIEW DRAFT

- Advertise and offer free translation of any written document upon request; particularly in languages that are encountered less frequently.
- Hire bilingual staff members.
- Advertise free interpreters for situations where LEP individuals might have trouble understanding the conversation.[72]

### Criminal Justice

Open Buffalo recently released a report that clearly delineated disparities within the criminal justice system in Erie County. *ALARMING DISPARITIES: The Disproportionate Number of African American and Hispanic People in Erie County Criminal Justice System* compiles information about arrest, conviction and sentencing rates between whites, blacks and Hispanics over five years. Not only did the report find that disparities exist within the system, it found that the disparities actually "grow worse at each stage of the process".[73]

*Alarming Disparities* reveals that African-Americans and Hispanics make up a disproportionate share of arrests, convictions and sentences. Though African-Americans make up only 13.9% of the county population, and 33.1% of the population in poverty, they comprise 42.6% of arrests, and 41.1% of convictions and sentences. Hispanics constitute 4.6% of the population and 11.2% of those in poverty but roughly 7% of arrests, convictions and sentences. While whites comprise 77.5% of the population, they represent only 48.4% of the population below poverty and 48-50% of arrests, convictions and sentences. These minority populations are further disproportionately charged with more serious crimes, and "once the sentencing stage is reached, whites are more likely to get the lesser sentences of discharge or probation, whereas African-Americans are more likely to receive prison or jail time."[74]

Contributing factors which *Alarming Disparities* attributes to this inequality include data-and quota-driven law enforcement, differences in police practices in neighborhoods of concentrated poverty (where minority populations disproportionately live), broad prosecutorial discretion in the pre-trial process, an overburdened public defender's office, implicit or unconscious bias in judicial sentencing, and the compounding impacts of three strikes and minimum sentencing regulations.[75] In addition, the racial bias within the justice system also manifests itself in the location of detention centers, which have been disproportionately located in rural, mainly white, areas. In this way, the proliferation of incarceration of primarily

---

[72] Amanda Schieber, Limited English Proficiency Access in Buffalo and Erie County. Partnership for Public Good Fact Sheet. May 2, 2009. P.2.

[73] *ALARMING DISPARITIES: The Disproportionate Number of African American and Hispanic People in Erie County Criminal Justice System*. Erin Carman. Open Buffalo. November 2013. P. 3.

[74] Carman. P.9.

[75] Carman. Pp.13-14

PLAINTIFFS_GENERIC-00004924

low-income minorities has become a perverse form of economic development by providing employment opportunities in primarily low-income white communities.

Not only does this system discrimination within criminal justice affect those who are charged or incarcerated during their sentences, the impact of having a criminal record continues to impede individuals' abilities to find employment or housing after they have been released.

As Chris Berardi notes for the Partnership for Public Good:

> There has been a vast proliferation of new civil penalties for convicted criminals that act as barriers for them to contribute formally to the economy. These penalties, which nominally exist to protect law-abiding citizens and to prevent recidivism, have made it difficult or impossible for ex-cons to obtain public or private housing, receive federal financial aid, or sometimes even obtain a driver's license. Some experts believe that this makes it even harder for the urban poor (especially minority males) to rejoin their families or communities in an honest or productive fashion. Instead, these individuals are often forced back into acting within the informal economies (like illicit drugs) that got them into trouble in the first place.[76]

The City of Buffalo passed a "Ban the Box" law in 2013. This legislation makes it illegal for employers with at least 15 employees to ask questions regarding previous criminal history at the application stage for job seekers. Though there are exceptions for police and fire, as well as occupations that supervise or work with children or vulnerable populations, this legislation joins others like it throughout the country in attempting to reopen the door to opportunity to those who have paid their social debts for previous illegal acts.

### The Education System

New York State's "small-box" delivery system for governmental services was developed in a much different era, yet the effects of this fractured governance model contribute heavily to many of the disparities within the region. Nowhere may those disparities be as extreme as in the public schools systems throughout the region. There are 38 public school districts in the two-county region, now enrolling less than 150,000 students for an average of less than 4,000 students each. However, this number is heavily skewed by the Buffalo Public Schools which are home to more than 31,000 students. At the other end of the spectrum, rural districts in North Collins (~600), Barker (~940) and Holland (~960) are home to fewer than 1,000 students each.[77]

---

[76] Informal Economies. Chris Berardi. PPG Policy Briefs and Fact Sheets. 11/20/2008. P. 6-7.

[77] G. Scott Thomas. WNY school enrollment drops by 43,000 students in 10 years. Business First. Aug 20, 2012. http://www.bizjournals.com/buffalo/news/2012/08/20/wny-school-enrollment-drops-by-43000.html?appSession=686126710768160&RecordID=&PageID=2&PrevPageID=2&cpipage=5&CPISortType=desc&CPIorderBy=County.

PLAINTIFFS_GENERIC-00004925

Studies have shown that children's socio-economic status greatly affects their performance in school. Simply put: poverty puts students at a disadvantage. But even more compelling is research that suggests concentrated poverty within a school impacts the performance of all students. As summarized by the Partnership for Public Good:

- Most successful schools are those in which the middle class is the majority.
- Success starts turning to failure when the school becomes 50% low income.
- When half a student body is poor, then all students' achievement will be depressed.
- When 75% is poor, then all students' achievement will be "seriously" depressed.
- A district with over 60% poor children "can no longer rely solely on its own internal efforts" to avoid failure.[78]

Clearly the impacts of a fractured education system in Buffalo Niagara seem to validate these assertions. The Buffalo Public Schools, while enrolling only 21% of public school students in the region, enroll 40% of all students receiving free or reduced lunches and 59% of all non-white students. The Buffalo Public Schools are persistently among the lowest performing, followed by other districts in the region with high levels of poverty: Lackawanna (85% free or reduced lunch); Niagara Falls (74% free or reduced lunch).

However, the deconcentration of poverty across school district lines has not been a high priority discussion in the region. Currently the Buffalo Public Schools are obligated to offer transfers to students who request them in schools labeled failing. But there are not enough spots within high-performing schools in the district to accommodate the number of requests made. This has created some dialogue about these students transferring out of the district, particularly in light of the declining enrollment in students throughout the region. The Diocese of Buffalo has been attempting to arrange an agreement that would see scholarships paying for students that have requested transfers to attend Catholic schools, in part to prevent or limit the closure of diocesan schools.[79] In addition, other public school districts in the region have also indicated a willingness to discuss accepting transfer students from Buffalo.[80]

*The Cycle of Poverty*

---

[78]    Concentrated Poverty and Public Education. Partnership for Public Good. April 17, 2012. P. 2.
[79]    Tiffany Lankes . Diocese waits on Buffalo school chief about sending some city students to Catholic schools. January 8, 2014 . http://www.buffalonews.com/city-region/buffalo-public-schools/diocese-waits-on-buffalo-school-chief-about-sending-some-city-students-to-catholic-schools-20140108
[80]    Denise Jewell Gee. Suburban districts explore accepting Buffalo students. The Buffalo News. November 3, 2013. http://www.buffalonews.com/city-region/schools/suburban-districts-explore-accepting-buffalo-students-20131103

PLAINTIFFS_GENERIC-00004926

0059

People in poverty, and particularly people in poverty living in poor neighborhoods, face increased costs for daily items and services. Mainstream services are often unavailable as banks, supermarkets and established retailers have either left or will not enter impoverished communities. This forces residents, who often don't have access to private transportation, to accept inferior or more expensive products than people with more resources and a greater ability to be selective about where they spend their money.  While higher income customers may have stores and service providers offering deals, promotions and incentives to gain their business, the poor seldom catch a break. Rent-to-own stores, check cashing operations, high interest mortgage and car loans and pawnshops may be the only financial services open to residents in poverty. In a special report on the topic, The Buffalo News called this "a kind of Alice-in-Wonderland reality where those who can afford the least pay the most."[81]

Concentrated poverty and the lack of options in poor neighborhoods put residents in the position of choosing between the lesser of two undesirable options; pay more for groceries at a corner store or bear the time and expense of getting to a supermarket and back, for example. In addition to proximity, financial history also limits options the poor. Check Cashing operations and corner stores often charge illegally high fees – draining large amounts from families' earnings, but some must keep their money out of main stream institutions for fear of it being seized for past debts  Others don't have the necessary paperwork to open an account. Those who do open accounts face higher fees and fewer benefits than higher income earners.[82] Credit histories and neighborhood demographics even impact non-financial services, such as auto and homeowners insurance where credit scores and neighborhood characteristics can heavily impact the rates people can expect to pay.[83]

The higher costs that those in poverty face make it more difficult to get ahead, essentially trapping people in a cycle of poverty. As concentrated areas of poverty are skewed toward minority populations (see demographics above and Racially/ Ethnically Concentrated Areas of Poverty below), these impacts disproportionately impact families of color.

**Open Dialogue and Political Will**

Members of the FHEA committee expressed that, while the ongoing and current causes of segregation and discrimination are multiple and varied, ultimately, underlying the inability of the region to combat these ills is a general lack of personal

---

[81] Rod Watson and Jonathan D. Epstein. Special Report: The High Cost Of Being Poor; Editor's Note.  Buffalo News. 6/18/2006. http://www2.buffalonews.com/editorial/20060618/1046303.asp

[82] Rod Watson and Jonathan D. Epstein. Buffalo News Special Report: Reprinted From June 18 - 21, 2006.. Pp4-5.

[83] Rod Watson and Jonathan D. Epstein. Buffalo News Special Report: Reprinted From June 18 - 21, 2006. P. 18.

PLAINTIFFS_GENERIC-00004927

and political awareness, understanding and will. Certainly this deficit is not unique to Buffalo Niagara. The policies, practices and political tone of the nation do not significantly contribute to the lessening of racial and ethnic divides. Any conversations on topics of discrimination and segregation – or of race in general – are often uncomfortable and halting. A lack of a comfortable language around these issues contributes to this discomfort, but so do heavily ingrained systemic prejudices that are manifest in both obvious and subtle ways.

The Buffalo Niagara region is certainly not immune from what's been called "Dog-Whistle Politics" – coded language used publicly that is somewhat innocuous on face value but stokes racial and ethnic bias. Politically, the region's hyper-segregation has provided the opportunity for the suppression or compartmentalization of minority influence. Either through the redrawing of legislative districts or through the indifference of certain seats when uncontested elections for local seats in minority districts suppress turnout in region-wide races. By limiting the political strength and relevance of engaging a broad and diverse constituency, the need to deal with issues of inequality and lack of opportunity are often made to be 'someone else's problem'.

While very few politicians have broached the yawning disparities between urban and suburban residents – a topic that could be seen as a veritable third-rail of local politics – non-profit advocacy groups and state agencies tasked with advancing equality are largely over-subscribed and under-resourced. However, many problems that were formerly consigned to the category of "urban" (read: black/minority) issues have begun to manifest themselves in the suburbs as the region continues to sprawl outward. Additional communities are now feeling the strains of shrinking resources and disinvestment. Whether vacant properties, crime, chronic unemployment or increasing social service needs, the realization that no municipalities in the region are immune from these challenges, may help set the stage to forge common and collective solutions. The recently formed land bank to approach vacant property reclamation is one example that provides some evidence that this is already starting to occur.

However, additional education, outreach and understanding is needed, particularly on issues of race. As evidenced by the large number of factors elucidated above, powerful systems are in place that have fostered and perpetuate segregation and discrimination. These systems have been shaped by individual bias and perception, but they have also shaped individual bias and perception. This self-reinforcing cycle of racism will not fade on its own. Nor will it be diminished by pushing the issue back to the margins or proclaiming false progress. A concerted and collective effort to promote the true individual and societal benefits of inclusion and opportunity for all must be undertaken and must be reflected in the public realm. Governments, individuals, businesses and institutions have all played a role in creating an un-level playing field and two sets of rules, and all must be involved in removing these barriers.

PLAINTIFFS_GENERIC-00004928

Community change in the region has often been negative. Fifty years since the onset of deindustrialization, Buffalo Niagara has yet to experience revitalization on a large scale. Some neighborhoods may wrongly associate an increase in diversity with a downward community trajectory. However, residents need to have a sense that their own culture and traditions will be preserved, even as communities change and evolve. Getting communities to understand and value the introduction other cultures or backgrounds that come into their communities is vitally important, especially in the current wave of demographic change that is already happening throughout the nation as well as locally. The consequences of failing to foster a welcoming and open region would be hugely detrimental to individual neighborhoods and the trajectory of the region as a whole.

PLAINTIFFS_GENERIC-00004929

**CHAPTER 4: Racially /Ethnically Concentrated Areas of Poverty**

As noted in Chapter 3, the overall poverty statistics for Buffalo-Niagara mask incredible disparities largely defined – or at least heavily influenced – by geography and race.  In 2010, the national poverty rate was 15.3% while Buffalo-Niagara's was only 13.8%.   However, the City of Buffalo's was tremendously higher than the regional average: 29.6%. The City of Niagara Falls (21.7%) was also elevated, as were the cities of Lockport (20.6%) and Lackawanna (20.4%).  The Tuscarora and Cattaraugus Reservations also had high poverty levels at 22.7% and 18.9%, respectively. The only other community in the region with a poverty rate above the national average was the rural town of Somerset (16.2%), and the only other community higher than the regional average was Hartland (14.5%).[1]

Fully 49% of the people in poverty in the region reside in the City of Buffalo, even though the City as a whole only represents 23% of the regional population. Together with Niagara Falls, Lackawanna and Lockport, these core cities house 62% of the region's poor but only 31% of the population. These four cities have a combined poverty rate of nearly 28%, while all other areas of the region have a combined poverty rate of less than 8%.

By race and ethnicity the disparities are no less stark.  The poverty rate of the white population in the region is only 9.6%, but for African-Americans it is 36.1%, for Hispanic/Latino populations it is 35.8%, Asian/Pacific Islander 25.6%, Native American 23.5%.  The portion in poverty for those classified as "Some other race" is 44.5% while the portion for those classified as "Two or more races" is 28.6%.[2]

These numbers are even more striking for children.  For all races, the region has a child poverty rate of 20.3%.  However, the region's white population under the age of 18 has a poverty rate of 12.6%, while 47.8% of African-American children live in poverty, as do 42.7% of Latino children, 26.2% of Asian/ Pacific Islander, 30.1% of Native Americans, and 53.5% of children of some other race and 31.9% of children of two or more races.[3]

By municipality, the City of Buffalo has a 44% child poverty rate, while Lackawanna is at nearly 39%, followed by the cities of Lockport (31.4%) and Niagara Falls (30.5%). At the other end of the spectrum, the town of Aurora had a child poverty rate of just 2.1%, while Orchard Park (2.8%) was only slightly higher. The towns of Eden (3.0%), Holland (3.1%), Wheatfield (3.4%), Cambria (3.7%) and Clarence (3.8%) all had child poverty rates less than 4%.

--------------------------------------------------

[1] US Census Bureau, American Community Survey Five Year Estimates, 2007-2011.

[2] US Census Bureau, American Community Survey Five Year Estimates, 2007-2011.

[3] US Census Bureau, American Community Survey Five Year Estimates, 2007-2011.

PLAINTIFFS_GENERIC-00004930

But poverty is not uniform within municipal borders either. To understand neighborhoods of entrenched poverty, HUD strictly defines Racially and Ethnically Concentrated Areas of Poverty by standardized metrics. These include the portion of residents of the tract that are racial or ethnic minorities, and the portion of residents of the census tract that are below the poverty level. For all regions, the threshold for portion of minority residents is set at 50% of the tract population. The poverty threshold is set at the lower of 40% of families living in poverty or 300% of the regional family poverty average. Since the family poverty level for Buffalo-Niagara is 12.54%, the threshold for family poverty within a tract to qualify in Buffalo Niagara is 37.6% or more.

**Erie County Racially and Ethnicly Concentrated Areas of Poverty**



Using the HUD-established threshold, there are sixteen Racially/ Ethnically Concentrated Areas of Poverty in the region and 4.1% of the regional population (46,203) lives in these communities. R/ECAP tracts are heavily concentrated in the City of Buffalo. Twelve of these are found within the city limits – along the city's western edge and throughout the east side. Five of the six western tracts are mixed-race concentrations, while one is majority Hispanic/Latino. Five R/ECAPs on the east side are majority black, while one just east of downtown is mixed-race.

The remaining R/EACP tracts are tract 174 in Lackawanna (mixed race) on the southern border of Buffalo, 202 and 206 in Niagara Falls (both majority black) and 9041 in the Tonawanda Reservation (with a small population that is exclusively native).

Figure 4-1: Erie County Racially/ Ethnically Concentrated Areas of Poverty

Additionally, there are three tracts in the region that are above the poverty threshold, but are not 50% minority. Of those, Tract 209 in Niagara Falls is

PLAINTIFFS_GENERIC-00004931

49.3% minority, Tract 55 in Buffalo is 44.4% minority and Tract 83 in Tonawanda is 24.2% minority.



Figure 4-2: Niagara County Racially/ Ethnically Concentrated Areas of Poverty

Though 40% is the Census defined measure for extreme poverty neighborhoods, throughout the Buffalo-Niagara FHEA process several participants remarked on the high threshold that must be met in order to qualify as an R/ECAP. The region – particularly the region's core areas – have many census tracts that are segregated and impoverished. With a somewhat lower poverty threshold of, for instance, 30% – one that the Annie E. Casey Foundation's KidsCount metrics has used to designate concentrated poverty[4] – the pattern of racially concentrated poverty expands considerably to include an additional ten census tracts, all within the city of Buffalo.  Seven additional tracts have a minority concentration of 50% or more and between 25% and 30% family poverty – also all within the city of Buffalo.

While the "right" definition of concentrated poverty is ultimately subjective, looking at a wider gradient of poverty levels within the region is important to understanding the broad stretches of the central cities that are beset with challenges of entrenched poverty and a lack of access to opportunity.  The tracts that are between 25% and 37% family poverty rate are contiguous with the strictly defined R/ECAPs and inform a view of an entrenched pattern of racial and economic segregation that has been prevalent in the region for decades.

Using the broader concentrated poverty definition, a large portion of the east side of Buffalo is revealed as an area of concentrated African-American poverty, starting at the southern edge of the central business district and stretching outward to the northeast.  Also beginning at the southern edge of downtown and spreading to the

---

[4] Annie E. Casey, KidsCount Data Snapshot On High-Poverty Communities. February 2012. P.1. The report further references additional research suggesting poverty rates of 20% begin to impact individual outcomes for all families who live within a neighborhood, not-just families that are poor.

PLAINTIFFS_GENERIC-00004932

northwest along the Niagara River is an area of mixed-race poverty.  The two concentrations are separated by an inverted cone of relative affluence that begins in the Allentown neighborhood, heading northward with the Elmwood Village neighborhood on the west and Main Street on the east.  These concentrated areas of poverty are separated from largely white-working class neighborhoods to the south by a vast network of rail-lines, waterways and stretches of industrial and post-industrial land.

In Niagara Falls, though not technically qualifying as an R/ECAP because it is not 50% minority, tract 209 has a 40% family poverty rate and was 49.3% minority as of 2010. Further, tracts 211 and 212, which have family poverty rates of greater than 30%, also have minority percentages of 49% and 47% respectively. Adjacent tracts 205 and 213 each have family poverty rates of 27% and are 47% and 40% minority, respectively.  However, each of these tracts has shown a substantial and continual trend of increasing minority population, suggesting that if these tracts are not already majority minority, they likely will be in the near term.



Figure 4-3: Poverty Rates by Census Tract, 2012

Highland, the northern area of concentrated poverty in Niagara Falls (tract 202, specifically), is separated from the historic DeVeaux neighborhood by a rail corridor and is interspersed with and ringed by industrial and post-industrial lands. Moving south, tract 206, centered around Gluck Park, is buffeted to the west by the Main Street commercial area and major public facilities including the Niagara Falls Library. Further toward downtown, these areas flow into the tracts comprising the Falls precinct near the Falls themselves and the state park, but also the entertainment district and casino area.

In Lackawanna, tract 174 encompasses a significant

66

PLAINTIFFS_GENERIC-00004933

swath of primarily vacant, post-industrial land adjacent to Lake Erie – the site of a massive former steel manufacturing company.  East of here, the residential portion of this tract – the bulk of which is known as Lackawanna's First Ward neighborhood – is wedged in between the Hamburg Turnpike to the west and an expansive rail corridor to the east that divides this portion of Lackawanna from the remainder of the city. Industrial areas also abut the tract to the north and south, and a stream bisects the area laterally.

Tract 9401 of the Tonawanda Reservation, is comprised of members of the Tonawanda Band of Seneca Indians, and is also categorized as an R/ECAP. Certainly the factors leading to the concentration of poverty among Native populations, particularly on reservations have a long-standing history in prejudice, discrimination and conflict predating the American Revolution. Treaties of the 19th century, whose enforcement was questionable at best, led to the establishment of the Tonawanda Reservation. However, the Tonawanda Reservation is spread among three counties: Erie and Niagara but primarily Genesee. There is no population recorded on the Niagara County portion of the Reservation and only 34 residents in the Erie portion, not even 10% of the total population of the reservation. Further, as an independent nation that lies primarily outside of the geographic scope of this regional planning effort, the governance of the reservation has not been engaged in the One Region Forward process. For the purposes of this study, these factors make much meaningful analysis of this tract difficult.

Though there are a larger number of individual tracts categorized as R/ECAP tracts, there are essentially, then, four major R/ECAPs in the region located in East Buffalo, West Buffalo, Niagara Falls and Lackawanna's First Ward. East Buffalo is primarily comprised of African-American residents (74%) and a smaller number of Hispanics (7%). West Buffalo is a diverse, mixed race and ethnicity neighborhood with a large representation of Hispanics (38%), Blacks (24%), and Asians (8%).  The Niagara Falls R/ECAP tracts are primarily African-American (70%), and Lackawanna is mixed between Black (33%), Hispanic (13%), and multi-racial (5%).

West Buffalo is commonly and colloquially separated into two broad neighborhoods: the Lower West Side (from City Hall north to Porter Ave) and the West Side (or middle West Side, from Porter north to Forest Ave or Scajaquada Creek).

The strictly defined R/ECAP areas on the East Side of Buffalo can be separated into the cluster of communities on the Lower East Side (just east of downtown, including the Perry Neighborhood, Willert Park, and Larkinville), the Fruit Belt/ Medical Campus (northeast of downtown, east of Main Street, and northwest of the Kensington Expressway), Broadway Fillmore (approximately 1.5 miles east of downtown, centered on the intersection of Broadway and Fillmore Avenue, bounded by a series of railroad tracts), and Kenfield-Langfield (in the northeast section of the City, a single tract comprised primarily of public housing).

67

PLAINTIFFS_GENERIC-00004934

The Niagara Falls R/ECAP, has two sub-areas: the Highland neighborhood (tract 202), which is comprised of residential uses on its southern end and industrial land to the north, and the Gluck Park Neighborhood (tract 206 – 11th St, to Niagara Avenue to 18th Street to Whitney), which is closer to the city core, but this relatively small area (roughly 25 blocks) is somewhat isolated from the active commercial corridors in the city.

The portion of each demographic group that lives within racially and ethnically concentrated areas of poverty varies widely – from a low, for the white population, of 1.2%, to a high of 22.5% for the Hispanic/ Latino population.  The percentage of all non-whites who reside in R/ECAPs is 15.2%, slightly lower than the percentage for African Americans (15.6%).  However, 45.3% of all R/ECAP residents are black.

In fact, nearly two-thirds of black residents in the region live in census tracts where more than 20% of the population lives in poverty, as do more than 50% of Hispanic residents, while less than 10% of whites do.

As detailed in Chapter 3, the factors contributing to segregation and concentrated poverty are varied, complex and many. Each of these factors, both systematic and individual have played a role in the development of the R/ECAPs in the region.

However, specific actions and siting decisions have intensified poverty concentrations in certain R/ECAPs. In particular, the location of public housing facilities has been a major factor. In each of the 15 tracts identified as Racially or Ethnically Concentrated Areas of Poverty,[5] the percentage of HUD supported units is higher than the regional average.  The combined average of HUD supported units in these tracts is 28% of the total number of units (6,668 of 23,974).  This represents 23% of all HUD supported units in the region even though, these tracts contain less

Table 4-1: Population Living in Racially and Ethnically Concentrated Areas of Poverty by Race and Ethnicity

| | Population Residing in R/ECAP neighborhoods | % of the regional population share that lives in R/ECAPs | % of R/ECAP residents that are of specific race |
|---|---|---|---|
| Total | 46,203 | 4.1% | 100.0% |
| White | 10,814 | 1.2% | 23.4% |
| Black | 20,948 | 15.6% | 45.3% |
| Native | 394 | 5.4% | 0.9% |
| API | 2,195 | 8.6% | 4.8% |
| Other | 135 | 11.2% | 0.3% |
| Multi-Racial | 1,264 | 7.3% | 2.7% |

_____

[5] Excluding tract 9401 on the Tonawanda Reservation, which has no supported units among the 10 total units in the tract.

PLAINTIFFS_GENERIC-00004935

than 5% of all units in Buffalo Niagara.[6] Tract 44.02, Kenfield-Langfield, represents the highest percentage of subsidized units with 80% of all units in the tract (1015 of 1275), and 99% of this tract's residents are non-white. More than 50% of all units in tracts 71.02, 14.02, and 202 are subsidized. Each of these tracts has a residential minority rate in excess of 75% (76%, 97%, and 89%, respectively).

2,632 of the 7,618 low-income units in local Low Income Housing Tax Credit (LIHTC) developments are located in R/ECAP census tracts. This represents 34.5% of all low-income LIHTC units even though, again, only 5% of all units in the region are located in R/ECAPs. However, it appears as though the region's largest LIHTC projects are credits that have gone toward renovating or replacing public housing, so there is significant overlap in these numbers, particularly in R/ECAPs.



Figure 4-4: Number of Public Housing Units by Census Tract

## R/ECAP Trends
### Housing
Housing in Buffalo Niagara is characterized by trends that long pre-date the sub-prime mortgage foreclosure crisis at the end of the 2000s. Buffalo Niagara has been losing population since the 1970s, meanwhile the production of new units, particularly on the urbanizing fringe, has continued unabated. Urbanized land tripled from 1950 to 2000 (from 123 square miles to 367 square miles) while the population increased by 7%.[7] This has necessitated additional infrastructure, has increased the overall tax burden and placed a tremendous strain on

---

[6] Census 2010 & HUD Picture of Subsidized Households, 2012 Based on 2010 Census, http://www.huduser.org/portal/datasets/picture/yearlydata.html
[7] Erie County and Niagara County. Erie-Niagara Framework for Regional Growth, Final Report. May 2006. P .15

PLAINTIFFS_GENERIC-00004936

municipal resources.  It has also heavily impacted the private housing market. Because of the surplus of units created by new construction greatly exceeding household formation, housing values have been depressed and large numbers of vacancies have developed particularly in low-income minority communities.

The R/ECAPS in the region are among the hardest hit by the regional imbalance, as vacancy rates are particularly high and housing prices especially low.  These depressed market conditions contribute to a spiral of decay and abandonment as it becomes less financially viable to invest in maintenance or significant repairs of a home in these neighborhoods.  The cost of a new roof, for instance, could easily outstrip the resale price of a home in Buffalo's Broadway-Fillmore neighborhood.

According the Census estimates, 32% of the owner-occupied housing units in Buffalo had a value of less than $50,000 and more than 73% were worth less than $100,000, [19% / 73% for Lackawanna and 27% / 86% for Niagara Falls].[8]  While these statistics are for the city at as a whole, the R/ECAP neighborhoods carry a disproportionate share of houses worth below these thresholds.

The continual regional population decline, the higher rate of population decline in cities – and in particular low-income urban neighborhoods – and the continual development of new housing on the region's fringe has manifest itself in a crisis of vacant and abandoned property. Not only do vacant properties decrease quality of life and destabilize property values, they create additional expenses and opportunities for illegal activity in communities, leading to more abandonment and fueling the cycle of decay.

According to US Postal Service undeliverable address rates, Erie County's total of chronically undeliverable addresses (those addresses not collecting mail for three months or more) skyrocketed from 26,018 in 2005 (5.9% of all addresses) to 37,584 (8.3%) in 2012.  The City of Buffalo bore a shift in undelieverable addresses from 15,651 (11.4%) to 21,249 (15.4%) – an increase of 5,598 properties in this time period (+36%). The remainder of the county went from 10,367 (3.4%) to 16,335 (5.2%) chronically undeliverable units – an increase of 5,968 (+58%).[9]

R/ECAPs in Buffalo saw a significant change in composition.  Based on the decrease in total residential addresses, approximately 5% of all addresses in the R/ECAPs in the city were demolished from 2007-2012.  However, this was not uniform throughout the R/ECAPS. Tracts in the Broadway Fillmore neighborhood had a much higher rate of address loss – with Tract 29 (-19%) and Tract 16 (-16%) experiencing the highest

---

[8] US Census Bureau, American Community Survey Five Year Estimates, 2006-2010.

[9] Anthony Armstrong, Buffalo LISC. *Buffalo and Erie County's Spreading Population Decline and Vacant Property Crisis.* March 2013.

PLAINTIFFS_GENERIC-00004937

losses.[10]

Yet these numbers suggest, but fail to take into account, the preponderance of vacant land that has previously been cleared of vacant and dilapidated structures. Between 1999 and 2007, for example, the City of Buffalo saw an increase of 500 acres of vacant land (2,722 to 3,222).[11]

*Employment Access*
As examined in the next chapter, throughout the region, racial and ethnic minorities score relatively well on indices of job access, a measure of proximity and convenience to jobs in the region.  In fact, of the seven indices used to calculate the opportunity index for this FHEA (job access, poverty, school proficiency, labor market engagement, housing stability, food access and environmental health) job access is one of two indicators (the other being food access) in which the white population scores (49) below the regional average (51) on a 100 point scale.  Though the black population (48) scores slightly lower than whites, the Hispanic (51), Asian (56) and Native (59) populations score somewhat higher. However, the proximity of jobs does not necessary translate into the ability to acquire those position. The labor market engagement index reveals vast regional racial and ethnic disparities, with whites (61) ranking higher than Asian-Pacific Islanders (58) and much higher than Native (37), Hispanic (36) and black (27) demographics.

Similarly, the R/ECAPs in Buffalo-Niagara score relatively high on the employment access indices.  The overall average for the job access index amongst people living in R/ECAPS is 54 – somewhat above the regional average of 51. However, the labor market engagement for the R/ECAPs is a paltry 9, and poverty is a shocking 4 out of 100.

The R/ECAP areas within the city of Buffalo have relatively easy access to the job centers within the Central Business District and the Buffalo-Niagara Medical Campus – where a growing portion of the region's health care related jobs are located. However, a recent report by the Brookings Institute, indicates that the number of jobs within three miles of the Central Business District has fallen substantially over a ten year period.  In 2000 these jobs (approximately 102,800) accounted for 21.6% of jobs within the metro region.  However, by 2010, the overall job count within the region as well as the percentage of jobs near the CBD both fell, leaving roughly only 82,500 (18.1%) jobs within 3 miles of the CBD. In raw numbers, the jobs located 3 to 10 miles from the core also fell from 238,500 to 233,900, while jobs between 10 and 35 miles from the CBD grew from 134,700 to 139,500.[12] Compared to the national

---

[10] Analysis of US Postal Service Undeliverable Address Data, Q4 2007, Q4 2012.

[11] Urban Design Project. Groundwork Buffalo Feasibility Study. 2009 P. 5.

[12] Elizabeth Kneebone. Job Sprawl Stalls: The Great Recession and Metropolitan Employment Location. Brookings. April, 2013.

PLAINTIFFS_GENERIC-00004938

average, Buffalo has a smaller share of jobs within 3 miles of the CBD, but a larger share between 3 and 10 miles than beyond 10 miles.

What is especially problematic about this trend of employment disbursement is the low level of vehicle access within the City of Buffalo (30% of households have no access to a vehicle, another 43% have one vehicle[13]) and particularly within R/ECAPS in the city (49% have no access, and 37% have one vehicle, see Table 4-2 for details of all R/ECAPs). While Buffalo-Niagara's transit system, which is primarily designed as a hub based system centered on downtown Buffalo, is relatively good at facilitating commuter traffic from the suburbs into the core city, it is not as well equipped to connect city residents with jobs in the suburbs. Jobs that are off-hours, not 9 to 5 during the week, are even more problematic to reach by public transit.

| Table 4-2: Number of Vehicles Available to Occupied Housing Units | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Vehicles | Buffalo-Niagara Total | Lower East Side R/ECAP | Broadway-Fillmore R/ECAP | FruitBelt/ BNMC R/ECAP | Kenfield/ Langfield R/ECAP | Lower West Side R/ECAP | Middle West Side R/ECAP | Lackawanna R/ECAP | Niagara Falls R/ECAP |
| 0 | 13% | 46% | 50% | 45% | 61% | 55% | 46% | 27% | 31% |
| 1 | 38% | 42% | 37% | 42% | 32% | 33% | 38% | 51% | 54% |
| 2 | 36% | 10% | 10% | 9% | 7% | 8% | 13% | 14% | 13% |
| 3 | 10% | 2% | 2% | 0% | 0% | 2% | 2% | 6% | 1% |
| 4 | 3% | 0% | 0% | 1% | 0% | 1% | 0% | 2% | 0% |
| 5 | 1% | 0% | 1% | 3% | 0% | 0% | 1% | 0% | 0% |
| Source: U.S. Census Bureau, American Community Survey 2012, 5-Year Estimates | | | | | | | | | |

The challenge of job access via transit from Niagara Falls is even more difficult. Transit access is especially problematic as travel to a suburban job center may require first a trip into the City of Buffalo and then back out again – taking up to two hours one way.[14] Though there are several major employers in Niagara Falls – Seneca Niagara Casino & Hotel, Niagara Falls City School District, Niagara Falls Memorial Medical Center – with less than 20,000 total jobs in the city, the vast majority of regional employment is located elsewhere. As indicated in the Oishei Foundation's Mobile Safety Net report for Niagara Falls, for the jobs that are in the city, only 32% of the jobs paying $40,000 a year or more are held by Niagara Falls residents.[15] The report further states:

> "Niagara Falls' distance from job centers in Erie County creates barriers, too. According to a major employment and training provider, there is a perception among job seekers in Niagara

---

[13] 2012 American Community Survey, 1-year estimates

[14] University at Buffalo Regional Institute, Strengthening WNY's Safety Net: A Community Report, City of Niagara Falls (draft). June 2013. p. 22.

[15] University at Buffalo Regional Institute, Strengthening WNY's Safety Net: A Community Report, City of Niagara Falls (draft). June 2013. p.10.

PLAINTIFFS_GENERIC-00004939

> Falls, even those with a car, that anything beyond the Grand Island Bridge is too far.
> Residents say, however, that with the price of gas, it's too expensive to drive longer distances
> and public transit oftentimes isn't available for those who work nights and weekends."[16]

When seeking work in Erie County, residents of Niagara Falls also perceive discrimination for simply having a Niagara Falls address. Members of a focus group addressing barriers to unemployment attributed this to employer concerns about reliability and access given the distance of a potential commute.[17]

*Education*
In both chapter 3 of this FHEA, the impacts of a small-box delivery system of public education are discussed. As such, the public education system continues to be a major challenge for each of the jurisdictions in which R/ECAPs are located in Buffalo Niagara.  In the Buffalo Public School System (which encompasses both the East and West Buffalo R/ECAPS) 78% of students in the system are minority, 77% of students are of low-income families that qualify for free or reduced price lunch and 11% of students are categorized as having limited English proficiency (LEP). In Lackawanna, the district is 70% white, while 85% of students qualify for free or reduced lunch and 8% of the students are LEP. In Niagara Falls, the district enrolls approximately 7,300 students and is 48% minority.  74% of students qualify for free or reduced lunch, and 1% are LEP.[18] BusinessFirst of Buffalo ranked all 97 districts in the eight counties of Western New York Schools and Niagara Falls (#93), Lackawanna (#96), and Buffalo (#97) were ranked the lowest of any in Buffalo-Niagara.[19]

*Infrastructure*
The region has suffered the effects of sprawl without growth for more than 40 years. Though the regional population has shrunk during that time frame, the urbanized area has tripled. This tremendous dispersal of the population has created a vast oversupply of infrastructure that has increased the tax burden on all residents and made maintenance of existing infrastructure and replacement of aging infrastructure, particularly for older communities, challenging at best.

A tree-conditions analysis included in the City of Buffalo's Comprehensive Plan, for

---

[16]      University at Buffalo Regional Institute, Strengthening WNY's Safety Net: A Community Report, City of Niagara Falls (draft). June 2013. p. 6.
[17]      University at Buffalo Regional Institute, Strengthening WNY's Safety Net: A Community Report, City of Niagara Falls (draft). June 2013. p. 17.
[18]      New York State Education Department 2011-12 District Report Cards. https://reportcards.nysed.gov/.
[19]      G. Scott Thomas. 2013 Western New York school district rankings. Oct 7, 2013. http://www.bizjournals.com/buffalo/feature/schools/2013-upstate/2013/10/2013-western-new-york-school-district.html?page=all Analysis based on four years of academic performance of standardized tests as reported by the New York State Education Department, with scores weighted at 10% for Regents diploma graduation rates, 50% for high school test scores and 40% for elementary and middle school test scores.

PLAINTIFFS_GENERIC-00004940



Figure 4-5: Buffalo Tree Conditions Survey
Source: City of Buffalo Comprehensive Plan,

instance, reveals poor conditions in many low-income city neighborhoods particularly within the R/ECAPs on the east side (see Figure 4-5), while an analysis of existing green infrastructure (parks, playgrounds, etc) also reveals a deficit in the west side R/ECAP areas.[20] Vacant lots form the highest instance of open space in these neighborhoods, but that does not mean that these lots are a positive influence. Generally unkempt, these lots often serve as illegal dumping grounds or as breeding grounds for rodents. Though no comprehensive database of vacant urban parcels exists throughout the region, a 2007 analysis revealed more than 3,200 acres of vacant parcels in the city of Buffalo.[21]

Meanwhile, 20th century investments in infrastructure have had a detrimental impact on several of the R/ECAP areas in the region. High volume roadways have impacted the R/ECAPs on the west side detrimentally, as both the Peace Bridge to Canada and the I-190 form a barrier between the neighborhood and the waterfront. The west side also experiences high levels of asthma and respiratory illness that have been attributed in some studies to the impacts of emissions from heavy commercial traffic on these roads. The Lower East Side R/ECAP is also impacted by an interstate as I-190 cuts through the community as it heads east/west between downtown and the suburban communities east of the city. The Commodore Perry housing development, in particular is notably in the shadow of the elevated portion of the highway. In Kenfield-Langfield, the New York State Route-33 Kensington Expressway forms the northern border of the tract, in another example of public housing in this community bring located along an elevated highway connecting downtown and the suburbs. Though not an expressway all the way through the community, Route 5 through Lackawanna also forms a high-speed barrier hemming in the First Ward. Not only do these roadways contribute noise and air pollution to these neighborhoods and cut them off from other communities, but they also divert traffic that formerly flowed down neighborhood commercial streets.  This diversion of customers was a detriment to

---

[20] City of Buffalo. Queen City in the 21st Century. P.48-9.

[21] The Urban Design Project. Groundwork Buffalo Feasibility Study. April, 2009. P. v.

PLAINTIFFS_GENERIC-00004941

neighborhood economies from which these and other commercial strips have not recovered.

The legacy of heavy rail in the region has also limited access to and from these communities. Though formerly a lucrative source of jobs for working class areas, the decline of both passenger and freight rail left these areas isolated without the benefits of nearby employment. Broadway-Fillmore, in particular, is impacted by many rail lines, as well as the loss of direct employment, and the spinoff industries that were associated with the region's main passenger terminal that was formerly located in the community. A rail line also forms a barrier between Highland at the northern end of the Niagara Falls R/ECAP and the center city and between the neighborhood and the higher income DeVeaux neighborhood to the west, while the First Ward in Lackawanna faces a similar situation – separated from the core of the city by a rail line to the east and Smoke Creek to the South.

The Highland tract in Niagara Falls and the First Ward tract in Lackawanna possess a large portion and acreage of brownfield sites. According to a comprehensive Brownfield Opportunity Area nomination document, 275 of the 560 acres in the Highland community are classified as brownfields. [22] The study calls out the main challenges within the neighborhood: isolation, visual blight (image, 200 acres of vacant or abandoned property), environmental uncertainty, fragmented land ownership, land use conflict between heavy industry and residential properties, and social issues (including steep population decline, an aging population, the highest poverty levels in the city, low educational attainment, low housing values and crime). [23]

*Neighborhood organizations and capacity*
Generally, Buffalo Niagara has had a low capacity Community Development system that has not produced sustained or targeted housing production in keeping with a broader plan for individual neighborhood improvement.

At the onset of CDBG funding, in the early years of community development, Buffalo was praised as a model for neighborhood participation in planning activities and project development.  A disbursed system of intensely neighborhood-based organizations arose.  However, as organizations grew stronger and developed substantial membership bases, they grew inherent political power that at times threatened the status quo within the operations of the city. Drastic changes to how funding was prioritized ensued, followed later by massive reductions in community development funding in general. Lacking a centralized support agency, in the intervening years these organizations have become generally much less relevant and effective as compared to their peers in many other cities. Yet, programs at the state

---

[22] Highland Community Area BOA Nomination Document. August 2011.p. 6.

[23] Highland Community Area BOA Nomination Document. August 2011.p.7-8.

PLAINTIFFS_GENERIC-00004942

and local level continue to support minimum operations of multiple agencies and the dispersed nature of community development activity has not been substantially altered. With infrequent exceptions, Buffalo maintains a host of small neighborhood based CDCs that run a program or two, or manage or develop a limited number of housing units but lack the ability to be truly comprehensive community development practitioners.

Peer cities such as Rochester and Syracuse have had success in implementing backbone or support organizations which are able to assist smaller neighborhood based Community Development Corporations (CDCs) implement housing redevelopment at a larger scale than would be possible if these smaller organizations were working in isolation. The Greater Rochester Housing Partnership and Syracuse Home Headquarters, for instance, are able to provide in-house expertise and technical assistance, while the cities' other CDCs provide direct connection to communities necessary for neighborhood based knowledge, need and asset evaluation, project identification and prioritization.

The issue has been studied in depth in the Buffalo region. In November 2005, the *Housing Service Agency Structural Definition Report* for Buffalo was completed by Kelly L. Patterson, Ph.D. and Robert M. Silverman, Ph.D. from the Center for Urban Studies at the University at Buffalo with support by the Buffalo Branch of the Federal Reserve Bank of New York in partnership with the Margaret L. Wendt Foundation and the City of Buffalo, Office of Strategic Planning. The report evaluated the current community development landscape in Buffalo and made recommendations to transform the system into a higher-production model through the lens of best practices in other similarly positioned cities and it emphasized the roles of intermediary organizations.

Ultimately this report called for the incremental implementation of:

- a public/private housing fund,
- an intermediary organization to manage that fund,
- increased monitoring and capacity building among community based housing organizations.[24]

Without implementing these recommendations, the report suggests "efforts to increase the scale of affordable housing production will be hampered, and Buffalo's affordable housing crisis will become more acute."[25]

---

[24] Kelly L. Patterson, Ph.D. and Robert M. Silverman, Ph.D. *Housing Service Agency Structural Definition Report. University at Buffalo Center for Urban Studies. November 2005.p.vi.*

[25] Kelly L. Patterson, Ph.D. and Robert M. Silverman, Ph.D. *Housing Service Agency Structural Definition Report. University at Buffalo Center for Urban Studies. November 2005.p.i.*

PLAINTIFFS_GENERIC-00004943

Several attempts have been made to change this community development paradigm within the R/ECAPs to varying degrees of success.

Many non-profit agencies have a presence on the West Side of Buffalo, but often a different focus and, historically, a different approach or vision for the community. Beginning in roughly 2001, a host of community organizations came together to begin a collective planning process to work more collaboratively to address the condition of the middle West Side neighborhood.  The West Side Community Collaborative was the result, and it took a block-by-block approach to improving the neighborhood through a comprehensive strategy of building from areas of strength.

The Collaborative succeeded in changing the dynamics of multiple blocks close to Richmond Avenue, restoring market confidence in the neighborhood while refocusing City attention on code enforcement, crime abatement and public infrastructure investment.   Later, the collaborative helped launch the West Side Housing Partnership in an attempt to create a continual dialogue and coordinated action plans amongst the multiple organizations providing housing services on the West Side. Among others, these groups include: Heart of the City Neighborhoods, Habitat for Humanity, Homefront, Inc., Hispanic United of Buffalo (HUB), Jericho Road, the Westminster Economic Development Initiative, West Side Neighborhood Housing Services and PUSH Buffalo.

People United for Sustainable Housing Buffalo (PUSH) emerged in the neighborhood in the mid-2000s and would grow into a powerful and convening organization that brings new voices into the planning and implementation of community change. The multi-partner, multi-faceted approach took participatory and measured steps to revitalizing the neighborhood.  PUSH employs a collaborative effort that involves non-profit investment and public sector investment in infrastructure and amenities, as well as direct action campaigns to hold institutional influences accountable for their effects on the community.

While PUSH emerged with a core strength in organizing, and is developing larger capacity in rental housing development and green jobs creation, other non-profit partners bring complimentary aspects to the project area.  Homefront, Inc. and Habitat for Humanity, for example, bring homeownership opportunities for low, moderate and first time homebuyers. The Massachusetts Avenue Project has a focus on youth development and local food production. Others bring recreation, education and more to the table.  However, the initiatives that have been implemented are derived from a ground-up process that identifies community concerns around the mantra of "we know what we need where we live".

This metered, inclusive and comprehensive approach is showing impressive results in the target neighborhood.  Vacancy levels in the target area are decreasing and property values have risen consistently in the ensuing years, with new private and

PLAINTIFFS_GENERIC-00004944

public investment in the community and the work of PUSH Buffalo and its partners now a common sight.  The Green Development Zone is also drawing national attention, including an international Changemakers award sponsored by HUD, the American Institute of Architects and a major national foundation.

On the Lower West Side, Heart of the City – a New York State designated Neighborhood Preservation Company – focuses on housing quality standards and energy efficiency for owner-occupied singles, doubles and triples. In addition to owner occupied housing rehabs they also offer a program that reclaims vacant homes that are later completely renovated and sold to income-qualified first-time home buyers. Hispanics United of Buffalo offers a transitional housing component as well as social services primarily for the large Hispanic community that has historically been centered in this neighborhood.  HUB has experienced organizational challenges in recent years that have threatened its operations.  Recently, however, the organization has aligned with Acacia Network – a large multi-faceted non-profit agency based in New York City that has substantial operations in housing and medical care. Acacia is providing financial stability and operating support to HUB, and the agency plans to be able to ramp up its operations in both of these fields to provide enhanced assistance to the residents of the Lower West Side. Other agencies, such as the Father Belle Center, provide direct services as well as serving as partners with these groups.

The R/ECAP neighborhoods on the East Side of Buffalo are serviced by a variety of organizations, some of whom also have overlapping geography.

The Lower East Side is served by Ellicott District Community Development, Inc., which was founded in 1973 as Ellicott District Concerned Taxpayers, Inc.  It has been known by its current name since 1982, and both of its staff members have been with the agency ever since.  Its focus has been primarily on owner-occupied rehab and housing service provision, such as homebuyer education, rather than acquisition-rehab or new construction.[26] The Lower East Side also contains a large amount of public and subsidized housing, much of it under the management of the Buffalo Municipal Housing Authority.  The neighborhood is also the subject of a recent Choice Neighborhoods Study that boasts backing by a large number of institutions and partners with the Buffalo Municipal Housing Authority and the University at Buffalo School of Architecture and Planning's Center for Urban Studies as the project leads. The plan, which focuses on the neighborhood, housing and people, was also supported by the City of Buffalo Office of Strategic planning as well as a host of non-profits and some key business partners in the neighborhood.[27]  Together, they will

---

[26] According to its website, Ellicott District has built 10 homes, improved 1,237 owner occupied houses and supported 1,907 families with services since its inception. http://www.edcd.org/ retrieved December 17, 2013.

[27] Buffalo Municipal Housing Authority. Perry Choice Neighborhood Transformation Plan,

PLAINTIFFS_GENERIC-00004945

direct their efforts through the principles of resident engagement, high environmental standards, placing children and families first, spurring healthy lifestyles and continually taking a collaborative approach to neighborhood development.[28]

The Fruit Belt neighborhood is home to St. John's Baptist Church and its affiliated community development corporations.  St. John's is responsible for the McCarley Gardens Housing Complex, St. John Tower Senior housing, Smith Family Life Center, St. John Christian Academy and the Aloma D. Johnson Charter School, a Hopsice facility and several scatter-site new build single-family homes and Low-Income Housing Tax Credit townhouse developments. St. John's has also been a member of the Jeremiah Partnership, a collaborative effort of several faith-based CDCs to build collective development capacity. St. John's also operates in partnership with the Buffalo Niagara Medical Campus (BNMC), an organization comprised of the executives of the major medical service providers at the campus on the neighborhood's western edge. Because of its location adjacent to downtown and the Medical Campus, the Fruit Belt has been under intense pressure from outside forces including redevelopment plans and land speculation for many years.  Other groups such as the Fruit Belt Coalition also function in the neighborhood.  Recently the institutional partners at BNMC have provided training for a variety of stakeholders within the neighborhood and have seeded the Orchard Community Initiative to form an umbrella group of community voices.

The Broadway-Fillmore neighborhood is primarily served by two main housing organizations, Broadway-Fillmore NHS (which has affiliated with Homefront, Inc.) and the Lt. Colonel Matt Urban Center (the Urban Center). The Urban Center provides a host of social services for area residents in addition to its housing services, weatherization program, receivership program, acquisition-rehab programs, supportive housing partnerships and new build development projects.  Many of these development projects are done in conjunction with other non-profit or institutional partners, including the current proposal for a facility devoted to housing homeless women. The Urban Center also operates a senior housing rental building, apartments for youth transitioning out of foster care, apartments targeted for refugee families in the neighborhood and administers an owner-occupied rehab program funded through the City of Buffalo and New York State.

Homefront, Inc. is a citywide housing agency that has affiliated with both Lovejoy NHS and Broadway-Fillmore NHS, giving it a targeted geography on the far east side of the city of Buffalo.  The agency manages affordable apartments in the renovated former School 62 building and is currently offering rehab assistance through a grant from the NYS Affordable Housing Corp. Homefront offers pre-purchase counseling, a

---

Enhanced Executive Summary. June 2013. Pp. 3-5, 47-48.
[28] Buffalo Municipal Housing Authority. Perry Choice Neighborhood Transformation Plan, Enhanced Executive Summary. June 2013. Pp.10-11.

PLAINTIFFS_GENERIC-00004946

matched savings homebuyers club, and closing cost assistance for those who qualify financially. Homefront has also recently secured a grant from the Environmental Protection Agency (EPA) to help re-envision the Fillmore corridor, which has been heavily impacted by vacant buildings and lots.  Homefront has also formed the Fillmore Corridor Neighborhood Coalition to bring together stakeholders in the community.  Kenfield/Langfield is also within the service area of the combined agency, though as a tightly defined geography, the majority of the housing units within the tract are managed by the Buffalo Municipal Housing Authority in the Kenfield/Langfield development.

In Niagara Falls, the City is a direct recipient of CDBG and HOME dollars and works through their community development department with local based non-profits to administer programs and services to residents. However, in the 2010 Census, Niagara Falls' population dipped to 50,193 from 55,593 in 2000 and an all time Census recorded high of 102,392 in 1960.  A dip in population below 50,000 could threaten the Community Development Block Grant resources received by the city which are now determined through the statutory formula but would become subject to the small cities program.

The Center City Neighborhood Development Corporation serves the portion of the Niagara Falls R/ECAP comprised of census tract 206, but not the northern portion represented by tract 202. With a staff of four, City Center NDC offers affordable apartment rentals, housing counseling services, a combination grant and loan program funded through the City of Niagara Falls, and New York State Affordable Housing Corporation and Division of Housing and Community Renewal, as well as a rental housing rehab program.

Niagara Falls Neighborhood Housing Services, Inc. (NFNHS) has a 9 person staff that serves the entire city of Niagara Falls. Operating in Niagara Falls since 1979, the organization considers incentives for homeowners and homebuyers the "cornerstone" of its efforts.  Since 1989, NFNHS has operated a 39-unit apartment building for senior citizens, and also operates 13 units of affordable housing for families. They administer home rehab loans with funding from City of Niagara Falls Department of Community Development and State of New York Housing Trust Fund and offer a variety of home owner counseling services including: credit counseling, first time homebuyer education, and closing cost assistance for income qualified buyers within the City of Niagara Falls.[29]

The City of Lackawanna is a member of the Erie County CDBG and HOME investment partnership consortium. As such, housing redevelopment activity in the city is administered through the Erie County Department of Environment and Planning. The consortium funds owner-occupied rehab loans, rental rehab and

---

[29] http://niagarafallsnhs.org

PLAINTIFFS_GENERIC-00004947

housing accessibility programs through the CDBG and HOME programs. The County also administers a targeted Home Improvement Program for owner-occupied one- and two-family homes within Lackawanna's First Ward with a combination of CDBG and State Affordable Housing Corporation (AHC) funding.  Through a loan forgivable after 10 years, this program can fund: "roofing, energy conservation, siding repair and/or replacement, and upgrading of mechanical systems such as plumbing, heating, and electric".[30]  The Lackawanna Housing Development Corporation (LHDC) was created by the Lackawanna Community Development Corporation in 1990. The LHDC provides housing support services such as financial literacy, home maintenance and first-time homebuyer education.  It also provides down payment and closing costs assistance and minor owner-occupied rehab loans.  In the fall of 2013, LHDC announced funding had been secured for 48 new single-family homes in the First Ward neighborhood. The $12 million project is supported through New York State Office of Homes and Community Renewal, the City of Lackawanna and Erie County and will begin construction in 2014 in partnership with the NRP Group, LLC. Residents will be able to purchase the homes upon completion of the 15-year LIHTC compliance period.[31]


**A History of Regional Significance**

The Buffalo Niagara Region has a rich history of arts and culture as well as economic and social innovation. A legacy of early 20th century wealth has bestowed the region with a wealth of cultural institutions and architectural resources. The 2011 National Trust for Historic Preservation Conference was held in Buffalo and explored assets throughout the region that have significance locally, nationally and internationally.

The R/ECAPs throughout Buffalo Niagara are each located in well-established communities that are steeped in history and the legacy of the region's cultural and industrial heritage.

The Lower East Side of Buffalo, for instance, contains the Michigan Avenue Baptist Church, the birthplace of the Niagara Movement, forerunner to the NAACP. The Lower East Side was home to the Larkin Company, whose executives were pioneers in the Arts and Crafts movement and benefactors of Frank Lloyd Wright – commissioning some of his most important work in the Larkin Administration Building and the Darwin Martin House. The shipping industry that occupied the Buffalo River also gave rise to the invention and preponderance of grain elevators that inspired the early architectural modernists and heavily influenced what become known as the

---

[30] Erie County Home Improvement Program Brochure.
http://www2.erie.gov/environment/sites/www2.erie.gov.environment/files/uploads/Housing_6_Lac kawannaEvansHomeImprov_2013.pdf
[31] Community Leaders Gather to Celebrate Lackawanna Homes Project. Monday, October 7th, 2013. http://www.nysenate.gov/press-release/community-leaders-gather-celebrate-lackawanna- homes-project

PLAINTIFFS_GENERIC-00004948

International Style of architecture.

Broadway-Fillmore, also known as Old Polonia, was the Polish working class neighborhood in the city in the early part of the 20th century, supported by the industry by which it is ringed, particularly the rail industry.  It is also home to Buffalo's counterpoint to Grand Central Station, the Art Deco Buffalo Central Terminal, formerly the city's main passenger station, which was also built by the New York Central Railroad.  Though now severely impacted by blight and abandonment, the area was once a thriving commercial center, second only to Buffalo's downtown.  The city's only remaining public market – The Broadway Market – still operates here. Annually the neighborhood becomes a regional center for Easter activities and the Polish-American holiday known and Dyngus Day that brings thousands of revelers to the community for a post-Lenten celebration complete with a Monday evening parade.

The West Side of Buffalo is among the oldest sections of the city.  The Lower West Side contains a historic district and houses the largest concentration of brick residences in the city.  However, large swathes of this community were leveled during Urban Renewal and replaced with concentrated subsidized housing developments that disrupted the traditional street network cutting these residents off from the rest of the city.  The neighborhood has been the heart of the Hispanic Community in the region, easily visible, in part, from the many locally owned shops along Niagara Street.  This is also a waterfront community and though the I-190 expressway and Peace Bridge Plaza restrict access, LaSalle Park and Front Park provide unparalleled public views of Lake Erie, the Niagara River and Canada.  Transforming this neighborhood into an international gateway has been a recurring planning theme that has failed to advance as more than a decade of planning for the Peace Bridge to Canada has been hampered by unresolved environmental and historic site impacts on the neighborhood.

The Middle West Side (north of Porter Ave.) is an area of growing vibrancy and growing diversity – with an influx of immigrant and refugee families and a renewed base of social capital and sense of community pride. The neighborhood has a tight-knit street grid and retains much of its original building stock, though much of it in need of investment. Grant Street, the neighborhood's main commercial strip, has been experiencing a revitalization with many international and ethnically based businesses reviving long vacant or neglected storefronts. Vestiges of the neighborhood's Italian-American history (such as Guercio's market) remain and provide anchors for the diversifying district. The neighborhood is bordered by the Niagara River to the west (albeit cut off from the neighborhood by the I-190 highway), the relatively affluent Elmwood Village neighborhood to the east and the historic Richardson/ Olmsted campus, which is currently undergoing a multimillion-dollar renovation and restoration after decades of neglect, to the north. Just north of that complex is Buffalo State College – part of the State University of New York, home to about 10,000 students on roughly 125 acres and looking to expand its footprint to

82

PLAINTIFFS_GENERIC-00004949

accommodate growth.

Kenfield / Langfield:
Because of the dominance of public housing in this census tract, the history of the area is dominated by the history of the developments.  Near the northeastern edge of the City of Buffalo, the Kenfield apartments were constructed by the Buffalo Municipal Housing Authority on formerly undeveloped land in 1939. There was controversy at that time because of the BMHA's refusal to rent to African-American families.  Though the Urban League was a strong advocate for the inclusion of blacks in public housing, the BHMA kept their tenant selection process for the new development secret and eventually admitted only whites.[32] By 1980, however, the Kenfield apartments were 80% black and the Lang Field Apartments were 76% black.[33]

Beginning in the 1930s, Niagara Falls' Highland neighborhood emerged as the center of the city of Niagara Falls' black community, spurred by the Great Migration and the proximity to the industrial jobs within the district.  The trend of black residents settling in the neighborhood continued into the 1960s and 1970s. The effects of deindustrialization beginning soon thereafter, however, have had a destabilizing effect on the community. [34]  The Highland master plan emphasizes respecting and capitalizing on this history while better connecting the neighborhood to the remainder of the city and the existing initiatives for tourism development and commercial revitalization, including the restoration of the "Customhouse, proposed Underground Railway Museum and on-going Main Street renewal".[35]

The R/ECAP centered around Lackawanna's Old First Ward is similarly positioned amongst a large amount of industrial and post-industrial land. The tract is home to the former site of Bethlehem Steel (previously named Lackawanna Steel), which was at one point the largest steel producing plant in the world. The site is considered a brownfield, but has been sparking new uses, including an urban windfarm on the shores of Lake Erie. To many the Steel Winds project, first built in 2007 and expanded in 2012, signals the shift from a grey to green economy as it towers above the local landscape. Though Lackawanna was embroiled in racial turmoil following the arrest and conviction of the Lackawanna Six in the early part of the 2000s, the First Ward elected the first Arab-American City Council Member in New York State in 2009.[36]

---

[32] Neil Kraus. Race, Neighborhoods and Community Power: Buffalo Politics 1934-1997. State university of New York Press. 2000. P.69.

[33] Neil Kraus. Race, Neighborhoods and Community Power: Buffalo Politics 1934-1997. State university of New York Press. 2000. P.181.

[34] Highland Community Area BOA Nomination Document. August 2011.p.8.

[35] Highland Community Area BOA Nomination Document. August 2011. P.120.

[36] Mayo, Nicki.  Lackawanna's first Arab councilman takes oath. January 3, 2010. http://buffalo.twcnews.com/content/news/492071/lackawanna-s-first-arab-councilman-takes-oath/.

PLAINTIFFS_GENERIC-00004950

**Suggested Approaches to R/ECAP Investments**

To varying degrees, each of the R/ECAPs in the region suffer from neglected infrastructure or decayed urban fabric. The need to address this infrastructure is clear but challenging given constrained local budgets and shrinking federal resources directed toward community development activity. The City of Buffalo, for instance is constrained to a capital budget of approximately $22 million/ year and the combination of the city's CDBG, HOME Emergency Solutions, and Housing Opportunities for Persons with AIDS budget has fallen by more than half in the last decade, from over $29 million in 2002[37] – approximately $37.5 million in inflation adjusted 2013 dollars – to an expected average of $16.5 million over the next five years.[38] In Niagara Falls, federal CDBG, HOME, HOPWA and ESG grant funding has fallen to approximately $2.7 million in FY2013[39] from an inflation adjusted $5.7 million in 2002 ($4.38 million in actual dollars).[40]

Meanwhile, regional inequities persist that date back decades to when the urban core was strong and the outlying areas were in need. As examples, Erie County maintains over 1,000 miles of roads within the county, but none of them are within the City of Buffalo.  And, because of a Dust Bowl era County Tax Act, towns are reimbursed by the county for any unpaid property taxes while the cities are not.

Even in the face of increasingly tight budgets, there are some new and unconventional opportunities arising to address the blight in distressed neighborhoods, but these are largely untested throughout the country and within the region.

Greening communities has been a major and growing component of vacant property revitalization nationally in recent years. However, the spectrum of greening is broad and even nebulous. At times greening is a temporary solution, at other times it is seen as a permanent resolution to vacancy problems, and many times it is somewhere in between.   Whether it is for stormwater management, ecological restoration and natural regeneration areas, side lot transfers to neighbors, enhanced park or playground space, pop-up markets or events or many other types of interventions, the notion that reuse does not necessarily mean brick-and-mortar redevelopment is a viable and practical response to challenging economic conditions and a surplus of available land. There are multiple organizations working on one or

---

[37] US Department of Housing and Urban Development. FY 2002 Formula Allocations for New York. http://archives.hud.gov/offices/cpd/about/budget/budget02/ny.cfm

[38] City of Buffalo Consolidated Plan 2013-2017 Draft. February 20, 2013. p.114.

[39] portal.hud.gov/hudportal/documents/huddoc?id=fy2013_allgrantees.xls

[40] US Department of Housing and Urban Development Archives: FY 2002 Formula Allocations for New York. http://archives.hud.gov/offices/cpd/about/budget/budget02/ny.cfm.

PLAINTIFFS_GENERIC-00004951

another facet of green infrastructure in the region and in these communities, including Grassroots Gardens of Buffalo, ReNU Niagara, Groundwork Buffalo, the Buffalo Sewer Authority and the City of Buffalo Office of Strategic Planning.

Infrastructure for alternative transportation is also an emergent area of policy change and investment. Enhancing pedestrian and bicycle infrastructure has become a priority of the City of Buffalo administration and Department of Public Works. In addition to projects already being implemented (such as bike lanes that were installed on South Park Avenue through the Lower East Side R/ECAP in 2013 and a planned bicycle lane project on Broadway through Broadway-Fillmore, both connecting these neighborhoods with downtown) a bicycle master plan is currently in development. These enhancements can be particularly important in low-income communities where the instance of car-ownership is very low. In addition, the NFTA, GBNRTC and the City of Buffalo are coordinating infrastructure investments along Niagara Street through the R/ECAP on the West Side.  This project will create the region's first priority bus corridor while enhancing livability and bicycle  and pedestrian access, adding a green infrastructure component as well.

The notion that the seeds of revitalization lie in the vacant and underutilized spaces that have been seen as liabilities rather than potential assets is beginning to take hold within communities. In Highland, through the Brownfield Opportunity Area nomination process, residents developed a vision for revitalization that emphasizes reclaiming the distressed physical space of the neighborhood and enhancing the infrastructure of the community:

> *Out of brownfields will emerge a better quality of life for residents, greater economic opportunities for businesses and a more positive image for the community as a whole. Highland will be transformed into a stable, attractive and prosperous neighborhood with a strong community base, diverse economy and a high qualify of life.[41]*

### Building from Assets
The R/ECAPs in the City of Buffalo and in Lacakwanna are far removed from the highest opportunity areas within the region. However, the west side R/ECAP tracts are within close proximity to some of the higher opportunity areas in the City of Buffalo. On the southern end of this R/ECAP cluster is 72.02, a tract that contains a high number of up-market condominiums as well as a clustering of publicly assisted housing. However, these areas are severly and intentionally disconnected. The higher end housing is separated from the lower west side R/ECAP neighborhoods by an elevated highway and a railroad track surrounded by a chain-link fence. Though the closest housing proximity in only several hundred feet, the only access to the higher income waterfront enclave is at the southern end of downtown, meaning the travel distance between these communities is in excess of a mile.

---

[41] Highland Community Area BOA Nomination Document. August 2011.p.10.

PLAINTIFFS_GENERIC-00004952

In the middle west side, Richmond Avenue has long been the dividing line between the Delaware district or Elmwood Village neighborhood and what's known as the "West Side". Though the divide my not be as pronounced as the Main Street divide separating the East Side, the West Side has long carried implications of poverty, race and social problems. In the course of the last decade, a concerted effort has been made by a variety of community and non-profit partners to overcome bias and fear of the West Side neighborhoods. This bias and fear was manifest in disinvestment, disinterest and avoidance. However, the neighborhoods assets: its diverse population, engaged residents, accessibility, affordability and classic 19th century urbanism provided a strong base for collective action and trends on the West Side are heading in a positive direction.

The relative strength that has characterized the adjacent Elmwood Village area has caused spikes in demand and in property values in recent years. This financial pressure, in addition to improvements in both the physical fabric and perceptions of the West Side, has created increased demand and spill over from the Elmwood Village. Problems still remain in the neighborhood, but those groups that have been working to improve the neighborhood are also actively working to ensure longtime residents as well as a diverse array of low- and moderate-income new comers have a permanent home on the West Side and are not pushed out by new investment and real estate pressure.

In Niagara Falls, the Highland R/ECAP is also physically proximate to one of the higher areas of opportunity in that city as well as relatively higher opportunity in the adjacent neighborhoods to the north in Lewiston.  The DeVaux neighborhood to Highland's west is separated from the community by industrial land and a rail bed with very few crossings.  To the north, the residential portion of Highland is buffered by more industrial land before the Campus of Niagara University and then a single access point – a four-lane highway over the Niagara Power Project reservoir channel followed by an interstate cloverleaf before actually reaching the residential communities of Lewiston.

*Managing Change in Severely Distressed Areas*
Particularly in areas of highly concentrated poverty where neighborhood blight is pervasive, it is important to consider the market forces and trends both throughout the region and within each neighborhood in trying to establish a realistic plan and set achievable goals.  Too often planning efforts have been pie-in-the-sky approaches that over-promised and under-delivered. Were it possible financially to rebuild every street and rehab every house, it is unlikely that the market would respond in each challenged neighborhood with an influx of new residents. And if a large influx of residents were drawn from a nearby community, it would very likely have a destabilizing effect on that neighborhood.  This caution, however, is not a call to do nothing.  In fact, implicit within this caution is a call to arms to do something differently

86

PLAINTIFFS_GENERIC-00004953

if for no other reason than the continued scattered shot approach of the last 40 years has done little to solve the issues facing these neighborhoods.

These neighborhoods need a strategy that is not inherently predicated on growth. Improvements and interventions within the community may, indeed, set the stage for an increase in population, however, short-term projects needs to be focused on an improvement in the quality of life and access to opportunity for the existing residents. If these communities are to once again grow, they first need to stop shrinking.

The Housing and Neighborhoods working group of One Region Forward has advanced a strategy of "better, not bigger" for severely distressed neighborhoods. *Rebuilding America's Legacy Cities,* a report by the American Assembly, lays out several principles for approaching areas where normal market forces are not functioning.  Some of the neighborhoods within Buffalo-Niagara's R/ECAP areas have slipped into this category, represented by large-scale population decline and real estate vacancy and abandonment.  Because of how much disinvestment has taken place in these communities, traditional community development strategies will not be enough to reverse the long-standing trends.  Though this lens, *Legacy Cities* offers a number of strategies that take a patient long-term approach aimed at stabilization and re-assessment:

> **"Get land under public control**
> *Cities should build their capacity to assemble, hold, and maintain vacant land, clear title, and dispose of property for non-market uses. Cities—enabled by their states— should employ land assembly tools including the aggressive use of tax foreclosure.*
>
> **Incentivize responsible property stewardship**
> *Property owners have responsibilities as well as rights. States should enact measures such as vacant property registration fees and aggressive code enforcement that press owners to restore vacant properties to productive use, maintain them responsibly, or relinquish them to others. At the same time, cities should provide incentives for owners willing to restore properties to use.*
>
> **Encourage alternative land uses**
> *Strategies for non-market areas should be designed to ensure that surplus land enhances the city's stronger neighborhoods and economic development strategies. Vacant land can be used for a wide range of both interim and permanent uses, including productive landscapes for environmental remediation, storm water management, habitat and wetland restoration, community gardening, recreational and cultural activities, and contemporary forms of homesteading.*
>
> **Encourage relocation where necessary**
> *In implementing their land use strategies, cities may seek to encourage residents and businesses left in largely vacant areas to relocate to more*

87

PLAINTIFFS_GENERIC-00004954

*populated neighborhoods with better amenities and services. This raises difficult issues, as many people, particularly older individuals, may be reluctant or unable to afford to move. Rather than forcing people to leave their homes and businesses, cities should provide sensitive, thoughtful incentives and support that enable them to relocate to communities that may offer a better quality of life or more viable business location. The critical goal is to offer residents and businesses choices, rather than impose "solutions" on them."[42]*

Resident engagement is and will continue to be paramount in designing strategies for neighborhood improvement and enhancing individual opportunity.  The Housing and Neighborhoods working group emphasizes the need for enhanced community based planning with residents and stakeholders on a neighborhood-by-neighborhood basis to maximize participation, leverage diffuse resources, and focus on quality of life improvements. Ultimately, community plans and investment must respect the knowledge, needs and aspirations of those who live there if they are to be successful.

---

[42] The 110th American Assembly. Reinventing America's Legacy Cities: Strategies for Cities Losing Population. 2011.  p. 11-12.

PLAINTIFFS_GENERIC-00004955

### CHAPTER 5. Disparities in Access to Opportunity

In contrast to the R/ECAPs, where residents have fewer options and opportunities than the regional average, there are Areas of Opportunity throughout the region: geographies where residents have greater access and amenities than the regional average. No one factor alone can represent opportunity, and HUD has prepared a series of indices that begin to round out relevant data points that signify high opportunity neighborhoods. These include: the school proficiency index, the poverty index, the labor market index, the housing stability index and the job access index.  HUD Sustainable Communities grantees have the option of adding additional factors to the Opportunity Area analysis. In keeping with One Region Forward's emphasis on sustainable food systems, the Buffalo-Niagara areas of opportunity indices also include food access as a factor. In addition, given our region's legacy of contamination and pollution, an environmental health index has also been created. From these indices, a combined score for access to opportunity has been created.

Though the FHEA Advisory Committee considered the inclusion of other metrics within the opportunity index – such as crime, municipal tax burden, transit access and others – ultimately these additional factors were hampered by data access or uniformity and/or regional applicability.

There are several ways to interpret and examine these data sets.  First, there is an examination of the average regional opportunity access for racial and ethnic groups.  Second, there is the identification of specific geographies for which the opportunity scores are highest: the areas of opportunity. Third, there is the examination of segregation or integration within the identified areas of opportunity.

Before exploring the combined factors that make up the combined opportunity index, each of the individual indices are described below. The maps below convert the 100-point index to a 10 threshold groupings for ease of interpretation. For each of the indices, the higher the score, the more desirable the characteristic.

PLAINTIFFS_GENERIC-00004956

Buffalo-Niagara One Region Forward Fair Housing Equity Assessment
PUBLIC REVIEW DRAFT

**The Opportunity Indices**

1. School Proficiency Index

The School Proficiency Index is examined at the district level and takes into account the performance on standardized tests. It factors in the district scores on reading and math compared to the statewide averages on both.



Figure 5-1: Buffalo-Niagara School Proficiency Index

90

PLAINTIFFS_GENERIC-00004957

2. Poverty Index

The Poverty Index is determined at the census tract level and examines two factors: the family poverty rate and the percent of households receiving public assistance.



Figure 5-2: Buffalo-Niagara HUD-defined Poverty Index

91

PLAINTIFFS_GENERIC-00004958

### 3. Labor Market Index

The Labor Market Engagement Index is a measure of labor force participation rate and unemployment rate, also factoring in educational attainment by including the percent of the population with a bachelor's degree or higher.



Figure 5-3: Buffalo-Niagara Labor Market Index

92

PLAINTIFFS_GENERIC-00004959

#### 4. Job Access Index

The Job Access Index is a measure of the jobs within close proximity, as well as the ability to reach jobs throughout the region, from any given tract. It includes: tract-level job counts, tract-level job worker counts, origin-destination flows, aggregate commute time, and tract-to-tract average commute time by mode of travel.



Figure 5-4: Buffalo-Niagara Job Access Index

93

PLAINTIFFS_GENERIC-00004960

Buffalo-Niagara One Region Forward Fair Housing Equity Assessment
PUBLIC REVIEW DRAFT

5. Housing Stability Index

The Housing Stability Index contains several factors at the tract or census block group level, including the homeownership rate and the (non-seasonal) housing vacancy rate, the percent of housing units that are categorized as crowded and two indicators of lending activity based on Home Mortgage Disclosure Act (HMDA) data: the percentage of refinance loans that are low cost and the percentage of new purchase loans that are low cost.



Figure 5-5: Buffalo-Niagara Housing Stability Index

PLAINTIFFS_GENERIC-00004961

**Buffalo-Niagara One Region Forward Fair Housing Equity Assessment**
PUBLIC REVIEW DRAFT

6. Food Access

The Food Access Index measures distance to the nearest healthy food provider
(supermarkets, grocery stores, fruit and vegetable markets) and unhealthy food
provider (convenience stores) for each block group. The Food Access Index was
created by the University at Buffalo Food Systems Planning and Healthy
Communities Lab.



Figure 5-6: Buffalo-Niagara Food Access Index

95

PLAINTIFFS_GENERIC-00004962

Buffalo-Niagara One Region Forward Fair Housing Equity Assessment
PUBLIC REVIEW DRAFT

7. Environmental Health

The Environmental Health Index builds on the HUD supplied Environmental Index that factors in the volume, toxicity and proximity of the industrial releases in the EPA Toxic Release Inventory. The One Region Forward Index then attempts to adjust for non-industrial pollutants by including the rate of youth asthma



Figure 5-7: Buffalo-Niagara Environmental Health Index

96

PLAINTIFFS_GENERIC-00004963

Buffalo-Niagara One Region Forward Fair Housing Equity Assessment
PUBLIC REVIEW DRAFT

**The Regional Opportunity Index**
The Regional Opportunity Index is a combination of the seven indicators outlined above. The combined scores for these indicators were then re-indexed, ranked, sorted and mapped by census block group. As with the individual indicators, a higher score indicates greater opportunity. The map below also converts the original100-point scale to clusters within a 10-point scale.



Figure 5-8: Buffalo-Niagara Opportunity Index

97

PLAINTIFFS_GENERIC-00004964

Buffalo-Niagara One Region Forward Fair Housing Equity Assessment
PUBLIC REVIEW DRAFT

In addition to the objective statistical analysis of neighborhood conditions, input from community members was collected at five regional community congresses in the fall of 2013 about specific neighborhood conditions. Almost 400 people attended one of the workshops held across the region, from Buffalo to Amherst, East Aurora, Niagara Falls and Lockport. In addition to an intensive mapping exercise about how they would like to see the region develop in the future, attendees were asked to share knowledge about their own neighborhoods. A large format poster contained categories that mirrored some of the indicators that comprise the overall opportunity index: Economy & Access to Jobs; Housing; Education; Transportation; Access to Healthy Foods. A "Something Else" category was also included. Participants were asked to write their zip code on a sticker and place it in those areas, either negative ("Needs Improvement") or positive ("Good Things"), that related to the conditions in their neighborhood.

Overall 198 responses were received, 91 positive and 107 negative. Each of the five set categories received a similar amount of votes (between 33 and 37), but the percentages of positive and negative comments varied widely. Economy & Job Access fared the worst with 70% of opinions weigh in on the "Needs Improvement" side. Education was next with 65% negative, and transportation was also tilted toward needing improvement albeit by a one vote margin (51%). Viewed more positively were access to healthy foods (58% positive) and housing, which was the most positive of all at 62% of votes in the category placed in "Good Things" about residents' neighborhoods.



Figure 5-9: Community Congress Feedback Map

Respondents in the "Something Else" category ranged from the need for bike lanes, pedestrian safety, public art and the need to clean up pollution to a recognition of specific physical assets and a sense of energy and enthusiasm. Overall, 38% of these "Something Else" comments were positive and 62% negative. More than 30 comments about how individual neighborhoods compare to the region were also captured and are included as Appendix X.

Of the 22 Zip Codes represented, 14213 on Buffalo's west side received the most input (34), followed by 14201 on Buffalo's lower west side (22), and 14222,

98

PLAINTIFFS_GENERIC-00004965

the Elmwood Village area of Buffalo (21), followed by the primarily city zip codes of 14215 (Ken-Bailey in the northeastern section of the city), 14202 (Downtown and the lower west side), 14214 and then 14221 (the village of Williamsville).

Mapped (Figure 5-9) are the portion of comments that were positive for each zip, and the number of responses for each zip.

**Disparity By Race and Ethnicity**

On a regional level, the majority of the indicators comprising the opportunity index (poverty, school proficiency, labor market engagement, housing stability, and environmental health) reveal a significant disparity among racial and ethnic groups.

As indicated previously in this FHEA, racial and ethnic minorities score relatively well on indices of job access and food access. But, of the indices used to calculate the opportunity index for this FHEA these are the only indicators in which the white population scores below the regional average (albeit slightly: -0.23 below for job access and -0.46 for food access). Still, the proximity of jobs does not necessary comport with those who fill these jobs job access and the labor market engagement index reveals large racial and ethnic disparities, with whites far outpacing Native, Hispanic and black populations. Additionally, even though the food access index shows a relatively consistent level of access across racial and ethnic groupings (with the exception being a -7 differential from the total regional score for Native populations), the relative proximity of healthy food options doesn't necessarily imply the ability to purchase healthy food.

*Disparities in Access to Neighborhood Opportunity*

| | Group Indices | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | All persons | White | Black /African American | Hispanic or Latino | Asian/ Pacific Islander | Native American | Other Race | Two Or More Races |
| Opportunity Dimensions: | | | | | | | | |
| Poverty Index | 55 | 61 | 25 | 33 | 53 | 45 | 43 | 44 |
| School Proficiency Index | 55 | 62 | 18 | 31 | 51 | 40 | 43 | 44 |
| Labor Market Engagement Index | 55 | 60 | 27 | 37 | 57 | 37 | 46 | 46 |
| Job Access Index | 51 | 51 | 50 | 53 | 59 | 59 | 53 | 52 |
| Housing Stability Index | 85 | 87 | 73 | 77 | 81 | 70 | 80 | 80 |
| Food Access Index | 55 | 54 | 57 | 56 | 55 | 48 | 55 | 55 |
| Environmental Health Index | 73 | 76 | 58 | 68 | 71 | 79 | 69 | 69 |

99

PLAINTIFFS_GENERIC-00004966

Buffalo-Niagara One Region Forward Fair Housing Equity Assessment
PUBLIC REVIEW DRAFT

| Blended Opportunity Index | 61 | 65 | 44 | 51 | 61 | 54 | 56 | 56 |
|---|---|---|---|---|---|---|---|---|

Table 5-1: Disparities in Access to Neighborhood Opportunity by Race and Ethnicity

| | Disparities | | | | | |
|---|---|---|---|---|---|---|
| | Black - White | Hispanic - White | API - White | Native American - White | Other Race - White | 2 Or More Races – White |
| Opportunity Dimensions: | | | | | | |
| Poverty Index | -36 | -28 | -8 | -16 | -18 | -18 |
| School Proficiency Index | -44 | -32 | -12 | -23 | -19 | -18 |
| Labor Market Engagement Index | -33 | -23 | -3 | -23 | -14 | -14 |
| Job Access Index | -1 | 2 | 8 | 8 | 1 | 1 |
| Housing Stability Index | -14 | -11 | -6 | -18 | -8 | -7 |
| Food Access Index | 3 | 2 | 1 | -6 | 1 | 1 |
| Environmental Health Index | -18 | -7 | -5 | 3 | -6 | -7 |
| **Blended Disparity Index** | **-21** | **-14** | **-4** | **-10** | **-9** | **-9** |

Table 5-2: Extent of Opportunity Disparities; Racial and Ethnic Minorities Compared to Whites

While many of the indices of opportunity are heavily tilted in favor of the region's white population, school proficiency reveals the most extreme disparity. Whereas the regional index for school proficiency was 55, the white population has a substantially higher score of 62, while the black population has a dramatically lower score of only 18. This enormous gulf in the access to well performing schools logically extends to similar but slightly smaller discrepancies in both labor market engagement and poverty levels.

As discussed previously in this FHEA, numerous studies have shown the impact of concentrated poverty on educational performance. In July 2013, Open Buffalo performed a local analysis of the correlation between poverty and test outcomes in Buffalo, Cheektowaga and Amherst. By plotting regional school rankings against percentage of students receiving free or reduced lunch, the report produced an $R^2$ regression value of 73.9%, indicating a very strong correlation between school performance and concentration of poverty.[1]

It should be unsurprising, then, that the Poverty Index is second most extreme

---

[1] Jacob Barnes. *Poverty Matters: The Correlation of Poverty to Test Outcomes in Buffalo, Amherst, and Cheektowaga Schools.* July 2013. Open Buffalo / Partnership for Public Good. P. 1.

PLAINTIFFS_GENERIC-00004967

0100

with a gap between white (indexed at 61) and black (25) of 36 points on the scale. The Hispanic population does not fare much better (33), with a 28-point deficit to the white index. Significant disparities also exist for the Native population (a 16-point deficit) and the Asian-Pacific Islander populations (an 8-point disadvantage). Other race populations and individuals of two or more races fare worse than whites as well (-18 each).

The Labor Market Engagement Index reveals disparities on a similar scale, with the neighborhood score for the white population (indexed at 60) far exceeding that of black neighborhoods (27) by 33 points. The Hispanic and Native populations' neighborhoods score marginally better, but still at a deficit of 23 points to the white neighborhoods. Some other race and two or more races each lag by 14 points. The API population's neighborhood scores are significantly better, however, nearly on par with white neighborhoods (scoring 57).

The Environmental Health Index also reveals more detrimental environmental conditions in neighborhoods where blacks and other minorities live compared to the neighborhoods where whites live.  Against an overall regional score on the index of 73, whites' neighborhoods are ranked at 76, while blacks' neighborhoods (indexed at 58) compare at an 18-point deficit. The deficit for Hispanics (68, 8 points lower than whites) is somewhat higher than blacks and roughly comparable with other race and two or more races (69). The Asian/ Pacific Islander score is slightly lower than the regional score (71, of 5 points lower than whites), and the neighborhoods of Native Americans (79) are slightly better than the white score and the regional average.

The HUD recommended factors for the Housing Stability Index (homeownership rate, housing vacancy rate, units over-crowding, and HMDA reportable low cost refinance loans and low-cost new purchase loans) do not indicate racial disparities at the same level of severity as many of the other indicators. Overcrowding does not appear to be much of a factor within Buffalo Niagara, perhaps because of relatively low housing costs due to the oversupply of housing within the region – even though these low costs are often associated with low-quality housing. As indicated elsewhere in this report, a significant number and proportion of the loans in the region are not HMDA reportable (including half of the loans in Erie County).[2]  Given the very low transactional levels of HMDA loans in the region, particularly in the most distressed, largely minority, neighborhoods – it is probable that high cost lending in these neighborhoods is not captured in this data set. Still, the housing stability index does show a significant disparity between the neighborhoods where whites reside (scoring 87 on the index) and the black population's neighborhoods (scoring 73), as well as the Native American (70), Hispanic (77), and Asian-Pacific Islander (81), some

[2]  Foreclosing Erie County, Erie County, NY Foreclosure Study: Years 2007-2008. Western New York Law Center. 2009. P. ii.

PLAINTIFFS_GENERIC-00004968

other race (80) and two or more races (80).

The Food Access Index shows a relatively equal picture throughout the region with 874 (92%) of 950 block groups scoring between 40 and 60 in the 100-point scale.  23 block groups (2%) fall below this threshold and 53 block group (6%) score above. In Erie County, all of the block groups scoring below 40 are in outer suburban and rural communities (for example, portions of Alden, Marilla, Sardinia, Clarence, Holland, Boston). In Niagara County, these low scores are mainly outlying communities – including Pendelton, Royalton, Somerset – and also block groups in Lewiston and the Tuscarora Reservation.  Of the higher scores in the region, 12 of the block groups are in the city of Buffalo, however, none are in Niagara Falls. The remaining 41 higher-scoring block groups are somewhat scattered throughout the region, but also include clusters in northern Niagara County as well as some southern Erie County locations. The racial share reflects this relatively even distribution, with a regional score of 55 and with all racial and ethnic groups scoring between 54 (whites) and 57 (blacks) except Native populations which scored significantly lower at 48.

441 of the region's 950 populated block groups show above average opportunity scores, that is above 60 on the blended opportunity index comprised of the combined scores on food access, job access, environmental health, housing stability, labor market engagement, poverty, and school proficiency. 633,314 (56%) of the region's 1.135 million residents occupy these block groups. However 65% (585,669) of the region's white population lives in these areas as do 52% (13,295) of Asian/Pacific Islanders.  Only 10% of the region's Black/ African-American population lives in these block groups, 25% of the Hispanic/ Latino population, 28% of the Native population and 37% and 38% of the "other race" and two or more races population.

214,513 people live in block groups that score among the high opportunity areas (80+ on the combined index). This represents 19% of the regional population and 22% (198,575) of the region's white population and 25% (6,532) of the Asian/Pacific Islander population. Only 2.6% (3,485) of the region's Black/ African-American population lives in these areas, as do 7.2% (3,352) of the Hispanic/Latino population, 6.2% (456) of the Native population, 13% (158) of "other race" and 11.2% (1955) of the two or more race population.

Only 4% (45,092) of the region's population lives in the highest opportunity block groups (90+ on the combined index). While this represents 5% (41,465) of the region's white population and 7% (1,735) of the Asian/Pacific Islander population, it represents 0.5% (678) of the region's black population and less than 1.5% (677) of the Hispanic/Latino population, less than 1% (65) of the Native population, less than 2% (21) of "other race" and 3% (451) of the two or more race population.

PLAINTIFFS_GENERIC-00004969



Figure 5-10: FHEA Opportunity Areas

103

PLAINTIFFS_GENERIC-00004970

**Opportunity Areas and Public Investment**

For decades, public investment decisions in the region, and the regulatory framework guiding development, encouraged and induced sprawl at the expense of traditional neighborhoods and the urban core. This pattern of investment has resulted in many of the yawning inequities identified within the region today.

In 2006, Erie and Niagara Counties affirmed a bi-county plan that had at its core developing a common understanding and collective strategy for growth and development within the region that would reverse negative trends and contribute to the economic and social well-being of both counties. Named the Erie-Niagara Framework for Regional Growth (The Framework), this plan explained that even in the face of national and global trends that worked to diminish the position of the region, local "decisions about the pace, pattern, and form of development have affected the region's ability to attract investment and retain talent."[3] It continues by listing the litany of problems to which these poor investment decisions and external forces have contributed. Together, these factors "reduced the livability of older neighborhoods, eroded the competitive position of traditional centers of commerce and industry; increased fiscal stress; isolated low income, minority and elderly residents; and threatened the resources that make the region an attractive place to live—river and lake fronts, historic city, town, and village centers, and rural landscapes."[4]

The Framework was built on the principles of A Vital Economy, Sustainable Neighborhoods, Strong Rural Communities, Improved Access & Mobility, Efficient Systems & Services, Effective Regional Stewardship, and Conserved Natural and Cultural Assets.[5] Though the challenges of a disbursed system of Home Rule decision-making were acknowledged, the Framework ultimately suggested a regional reinvestment strategy to meet these principles. Under this scenario, the region would focus development in a series of Centers and Corridors with existing infrastructure to support growth. 70% of development would be focused in developed areas, 15% in developing areas and 15% in rural areas. This scenario was forecast to save $800 million in infrastructure costs for the region over the 25-year horizon of analysis.[6]

Investment strategies in the intervening years since the completion of the Framework have been mixed, but generally seem to be showing positive trends particularly in State-sponsored economic development activities.

---

[3] Erie County and Niagara County. Erie-Niagara Framework for Regional Growth, Final Report. May 2006. P.2.

[4] *Ibid.* P.2.

[5] *Ibid.* Pp. 31-32.

[6] *Ibid.* P. 45.

PLAINTIFFS_GENERIC-00004971

Local Industrial Development Agencies (IDA) have engaged in a continuing dialogue about reinvestment strategies and the appropriateness of granting incentives across various sectors. Though local advocates question the effectiveness of current policies, the common dialogue about when and where to invest public resources represents tangible progress over the investment policies of past decades.

In 2011, New York State organized Regional Economic Development Councils (REDC) in order to guide State investment at the local level. The Western New York Economic Development Council has established guiding principles for scoring local projects proposed through the consolidated funding round for state grants and loans.  Those principles are: inclusivity, promotion of smart growth, orientation toward young adults, building upon strengths, regional in impact, and improvement upon region's image.  As the REDC continues to refine ways to operationalize these principles, including the introduction of a smart growth project scorecard, it appears as though state resources through the process are beginning to be redirected toward enhancing and reinforcing existing and traditionally neglected communities. This will be discussed in greater detail in Chapter 6 on Physical Infrastructure & Public Investment.

Governor Andrew Cuomo made a commitment in 2012 to strategically invest one billion dollars in the Buffalo area economy to create new jobs and spur large-scale private investment and increased economic activity. The plan envisions three enablers to achieve this aim: 1) investment in human capital; 2) innovation and entrepreneurship; and 3) efficient infrastructure, livable cities, and revitalized, inclusive communities.  The later acknowledges explicitly the necessity to reinvest in diverse communities, stating "[l]ow-cost energy and modern transportation systems can expand effective labor markets, allow firms to locate where it makes the most economic sense, and increase the return on capital equipment – in turn improving labor productivity.  By contrast, blighted neighborhoods, poorly developed or maintained community assets, and declining property values will greatly reduce the overall attractiveness of a region to businesses."[7]

As part of that commitment, the Governor has announced a Revitalization Fund under the Buffalo Billion Investment Development Plan with the specific goals of promoting smart growth/ spatial efficiency, enhancing the region's competitive edge, and increasing collaboration between public and private sector investments within the context of strategic investments within the city of Buffalo.

---

[7] *The Buffalo Billion Investment Development Plan.* Buffalo Billion: An Initiative of the WNY Regional Economic Development Council. February 2013. P.7.

PLAINTIFFS_GENERIC-00004972

**CHAPTER 6. Physical Infrastructure & Public Investment**

The Fair Housing Equity Assessment Committee further considered examples of and trends within major public investments. Examining government projects and policies reveals not only how past practices strongly influenced the current regional landscape, but how current investments may be exacerbating existing divisions or helping to alleviate these conditions.

What follows is a summary of major themes of physical, economic and community development within the region, including transportation, regional and local economic development structures and major place-based investments and subsidized housing investment.

**Transportation Investment**

The Greater Buffalo Niagara Regional Transportation Council (GBNRTC) serves as the Metropolitan Planning Organization (MPO) for the two-county Buffalo Niagara region. As an MPO, the organization is responsible for planning and coordination of transportation investments within the region, and is comprised of seven member agencies: the City of Buffalo, City of Niagara Falls, County of Erie, County of Niagara, NYS Thruway Authority, the Niagara Frontier Transportation Authority, and the NYS Department of Transportation. In addition, the Seneca Nation of Indians, the Buffalo-Niagara Partnership, and the Empire State Development Corporation are designated regional stakeholders that provide direct input to the GBNRTC Planning and Coordinating Committee.[1]

The GBNRTC is responsible for creating a long-range plan for the region in addition to a shorter-term investment plan, known as the Transportation Improvement Program (TIP) covering a five-year span of planned projects. Though the inclusion in a TIP does not guarantee projects will come to fruition, it is the closest policy document the region has prioritizing transportation projects and signaling intent to proceed. All projects within the TIP are intended to fit within the Long Range Transportation Plan (LRP). The high level objectives of the region's LRP are: Preservation of Existing Transportation Infrastructure; Improve Regional Mobility and Accessibility; Improve the Region's Economic Competitiveness; Enhance and Protect the Region's Natural Environmental Quality, Cultural and Historic Resources, and Communities; Improve Inter-Jurisdictional Transportation and Land Use Planning.[2]

---

[1] Greater Buffalo-Niagara Regional Transportation Council. http://www.gbnrtc.org/about-us/organization/

[2] Greater Buffalo-Niagara Regional Transportation Council. . Transportation Improvement Plan for the Federal Fiscal Years (FFY) October 1, 2013 – September 30, 2018 and the State Fiscal Years (SFY) April 1, 2013 – March 31, 2018. May, 2013. pp 3-6.

PLAINTIFFS_GENERIC-00004973

The last three regional TIPs (2008-12, 2011-15 and 2014-18) have included projects in eight broad categories: Bridge Infrastructure/ Maintenance; Highway (Roadway) Infrastructure/ Maintenance; Congestion Relief; Transit Improvements; Economic Development; Technology Implementation; Bicycle/ Pedestrian; Quality of Life. The TIP acknowledges that projects may fall into more than one outcome, but projects are categorized by their main objective. Throughout each TIP, approximately 70% of all funds were proposed to be directed towards Bridge, Highway and Congestion Relief projects.

| Buffalo-Niagara Transportation Investment Priorities | | | | | | |
|---|---|---|---|---|---|---|
| Project Type | 2008-2012 | % of total | 2011-2015 | % of total | 2014-2018 | % of total |
| Bride Infrastructure/ Maintenance | $270 | 24.1% | $440 | 42.3% | $230 | 37.5% |
| Highway Infrastructure/ Maintenance | $290 | 25.9% | $290 | 27.9% | $156 | 25.4% |
| Congestion Relief | $210 | 18.8% | $30 | 2.9% | $30 | 4.9% |
| Transit Improvements | $150 | 13.4% | $170 | 16.3% | $138 | 22.5% |
| Economic Development | $70 | 6.3% | $40 | 3.8% | $14 | 2.3% |
| Technology Implementation | $50 | 4.5% | $40 | 3.8% | $24 | 3.9% |
| Bicycle/ Pedestrian | $50 | 4.5% | $20 | 1.9% | $16 | 2.6% |
| Qualify of Life | $30 | 2.7% | $10 | 1.0% | $6 | 1.0% |
| **Total Projects** | **$1,120** | | **$1,040** | | **$614** | |

(Dollar amounts in Millions)
GBNRTC Transportation Improvement Program Project Summaries, 2008-2012; 2011-2015; 2014-2018
Table 6-1: GBNRTC Forecasted Transportation Investments 2008-2018

The dollar value of transit projects varied from 13% of total in 2008-2012 to 22% of total in 2014-2018, even though the dollar amount of projects proposed fell from $150 million to $138 million because the overall cost of projects proposed fell at a much faster rate.

A sizable portion of the transit projects proposed in the TIPs are dedicated to capital and ongoing maintenance of the vehicle fleet of light rail cars and city buses. The Niagara Frontier Transit Authority (NFTA) is also undergoing an alternatives analysis to improve service between the City of Buffalo and the northern suburban employment centers clustered around the University at Buffalo Amherst Campus, the transit agency's budget is continually in a perilous state as funding cuts or freezes force the agency to raise fares or cut services. As outlined in the R/ECAP and Opportunity Areas portions of this document, employment access remains an issue for low-income and minority populations as jobs continue to proliferate or relocate beyond the core areas of the region.

A multi-stakeholder Poverty Coalition, for instance, has recently submitted a request to Governor Cuomo, seeking an increase in the State Transit Operating

PLAINTIFFS_GENERIC-00004974

Assistance program, acknowledging the crucial role hat transit plays for people and communities of limited means. The Poverty Coalition also reiterated a call to the Governor to change or expand the composition of the NFTA board of directors to ensure that public transit riders are represented in the high level decision making of the organization.[3]

For the remaining categories (Economic Development; Technology Implementation; Bicycle/ Pedestrian; Quality of Life), each saw a marked drop in funding for project proposals and a drop in percentage of overall share of transportation funds.  For instance, bicycle and pedestrian funding went from a high of $50 million in projects in 2008-2012 to only $16 million in 2014-2018. Quality of Life projects fell from $30 million to $6 million in the same time period.

The 2014-2018 TIP contains funding proposals for Safe Routes to School across the region totaling just under $2,000,000.  $400,000 of this is allocated within the City of Buffalo and another $161,000 is programmed under an existing project with a local bicycle and pedestrian non-profit GObike Buffalo. The remaining programs are in higher income suburban municipalities such as Grand Island, Williamsville and Orchard Park. Gowanda and the town of Porter are rural areas that are also listed as Safe Routes to School projects.

Several dedicated facilities are also included in the TIP, including a Rails-to-Trails project in Tonawanda and Town of Evans has planned a multi-use path and there is a Bike/ Ped trail planned for the Niagara Gorge. This TIP does not contain any dedicated use facilities in the City of Buffalo. However, the City of Buffalo does have a Complete Streets policy, which puts the consideration of all users front and center any time a street is reconstructed or resurfaced.


### Economic Development
*The Regional Economic Development Council*
In 2011, New York State organized Regional Economic Development Councils (REDC) in order to guide State investment at the local level. The Western New York Regional Economic Development Council (WNYREDC) has established guiding principles for scoring local projects proposed through the consolidated funding round.  Those principles are: inclusivity; promotion of smart growth; orientation toward young adults; building upon strengths; regional in impact; and improvement upon region's image.

With this as an overlay, the WNYREDC has been promoting and supporting targeted projects throughout the region. Within the Smart Growth agenda,

---

[3] Poverty Coalition. Letter to Governor Andrew Cuomo. February 19, 2014.
http://www.ppgbuffalo.org/ppg-part-of-poverty-coalition-calling-for-equitable-funding-for-nfta-and-rider-representation-on-nfta-board/

PLAINTIFFS_GENERIC-00004975

projects such as streetscape enhancement and brownfield revitalization are creating higher quality of life and access to jobs in traditionally marginalized neighborhoods – such as the Complete Streets project through several Racially and Ethnically Concentrated Areas of Poverty (R/ECAP) tracts on Buffalo's west side, and the redevelopment of the former Bethlehem Steel site in the R/ECAP in Lackawanna.[4]

WNYREDC is also supporting workforce development and education programs, such as the Buffalo Arts and Technology Center, which is modeled on the successful Manchester-Bidwell program in Pittsburgh to take a multi-generational approach to breaking the cycle of poverty.  Located on Main Street in Buffalo, the center will connect with school aged youth in partnership with the Buffalo Public Schools and Say Yes Buffalo to provide opportunities for at risk youth, while simultaneously providing technical training to underemployed adults.[5]

In Niagara Falls, WNYREDC is investing in both workforce development and tourism in an attempt to capitalize on the millions of tourists who come to the city annually. The downtown area of Niagara Falls is a high poverty neighborhood and residents have indicated major challenges in accessing jobs in other parts of the region.[6] In addition to the newly competed Niagara County Community College Culinary Institute, a Small Business Development Center is opening in downtown Niagara Falls.[7]

The WNYREDC has acknowledged the issue of pervasive poverty in the region and has created an Opportunity Agenda with the goal to "address the challenges and barriers to job connectivity, economic self-sufficiency and equal access to resources for the most vulnerable populations in our region, including the formally incarcerated, the unemployed, individuals living in poverty and individuals with no work experience."[8] Though, as outlined in the Opportunity Area section of this report, proximity to jobs should provide opportunity to the region's diverse populations, the regional labor force is disproportionately white (85% compared to 64% in the US and 56% in New York State)[9] Various factors contribute to this disparity, but this disparity very clearly plays out in family outcomes and individual achievement. The multi-pronged approach outlined by the WNYREC includes initiatives in Foundational Support for Success; Education and Training; and Transportation.

---

[4] *Western New York Regional Economic Development Council.* Progress Report 2013. pp.6-7

[5] *ibid.* p.40

[6] Mobile Safety Net : need citation

[7] REDC p. 49.

[8] *ibid.*  P.98

[9] *ibid.* p. 98, For the WNY REDC and in this instance, the region refers to a five county area including Erie Niagara, Cattaraugus, Chautauqua and Wyoming Counties.

PLAINTIFFS_GENERIC-00004976

| WNY Regional Economic Development Council OPPORTUNITY AGENDA STRATEGIES | | |
|---|---|---|
| Foundational Support for Success | Education and Training | Transportation |
| Facilitate access to safe and affordable child care in distressed areas and rural communities Expand the availability and access to affordable quality housing options close to employment hubs Encourage job creation and business investment in areas of high unemployment and poverty | Expand apprenticeship models Establish a sourcing portal for jobs and training Increase support and accessibility for on-the-job training Create transferable skill training programs Invest in career talent pipeline initiatives | Increase access to public transportation in rural and other underserved areas Enhance coordination between public transportation service areas and employment hubs Improve transportation services for early morning/late night workers |
| *Western New York Regional Economic Development Council,* Progress Report 2013. Pp98-99. | | |
| Figure 6-1: WNYREDC Opportunity Agenda Strategies | | |

WNYREDC is supporting several projects that directly link the opportunity agenda with core strategies, such as:

- the Generations Forward program through the Buffalo Urban League which would combine "outreach, recruitment, assessment, screening, orientation, pre-manufacturing training, basic skill development, GED preparation, computer literacy, job readiness, career exploration, life skills (including financial literacy and health and wellness), and supportive services" to chronically unemployed and hard to employ populations
- the Immigrant and Refugee Manufacturing Employment Program with the International Institute of Buffalo and the Buffalo Niagara Partnership Manufacturing Council
- the Education to Employment "special programming designed to improve the retention and graduation rate of low-income single mother students attending Niagara County Community College" through the WNY Women's Foundation.[10]

*Buffalo Billion Investment Development Program*
Governor Andrew Cuomo made a commitment in 2012 to strategically invest one billion dollars in the Buffalo area economy, with the focus on the city itself, to create new jobs and spur large-scale private investment and increased economic activity.  The plan envisions three enablers to achieve this aim: investment in 1) human capital; 2) innovation and entrepreneurship; and 3) efficient infrastructure, livable cities, and revitalized, inclusive communities.  The later acknowledges

---

[10] *ibid.*  P. 102.

PLAINTIFFS_GENERIC-00004977

explicitly the necessity to reinvest in diverse communities, stating "[l]ow-cost energy and modern transportation systems can expand effective labor markets, allow firms to locate where it makes the most economic sense, and increase the return on capital equipment – in turn improving labor productivity. By contrast, blighted neighborhoods, poorly developed or maintained community assets, and declining property values will greatly reduce the overall attractiveness of a region to businesses."[11]

Projects announced to date total hundreds of millions in State investments, including State capital and tax credits.  A total of $225 million is being invested in the Buffalo High Tech Manufacturing Hub at RiverBend to spur a clean energy manufacturing cluster on a former brownfield along the Buffalo River south of downtown which will be owned by the State University of New York Research Foundation and leased by private firms.  Large-scale investments are also being made in the Buffalo Niagara Medical Campus, including what is being called the Buffalo Medical Innovation and Commercialization Hub where the state will also invest $50 million in infrastructure to lease to private firms.  $50 million has also been pledged to a partnership between the University at Buffalo and New York Genome Center in New York City.[12]  The State has also announced a $55 million commitment to build and purchase equipment for an "information technology hub" in downtown Buffalo which will be anchored by 500 new positions for IBM.[13]

The Buffalo Niagara Institute for Advanced Manufacturing Competitiveness is another initiative that will be at least temporarily located on the Buffalo Niagara Medical Campus.  This is initiative is geared toward product innovation for local manufacturers.  The state has already committed almost $10 million to the initiative and is expected to make multiple times that investment.  A firm has been selected to develop a business plan for the center and will be offering "resources and facilities that small- to mid-sized companies need – but often can't afford – to develop new products and other innovations".[14]

The State will also be investing in workforce training and development. The Buffalo Niagara Skills Partnership is to be designed as "the most flexible, inclusive and industry-driven workforce training environment".  Reflecting on the inequity in the region's educational attainment, the initiative plans to concentrate

---

[11] *The Buffalo Billion Investment Development Plan.* Buffalo Billion: An Initiative of the WNY Regional Economic Development Council. February 2013. P.7.

[12] David Robinson. Your guide to the Buffalo Billion. The Buffalo News. January 26, 2014. http://www.buffalonews.com/business/prospectus/your-guide-to-the-buffalo-billion-20140126

[13] Stephen T. Watson. Cuomo hails 'right project' with IBM for Buffalo tech hub that will bring 500 jobs. The Buffalo News. February 25, 2014. http://www.buffalonews.com/business/cuomo-hails-8216right-project8217-with-ibm-for-buffalo-tech-hub-that-will-bring-500-jobs-20140224

[14] David Robinson. Your guide to the Buffalo Billion. The Buffalo News. January 26, 2014. http://www.buffalonews.com/business/prospectus/your-guide-to-the-buffalo-billion-20140126

PLAINTIFFS_GENERIC-00004978

"efforts on specific geographic areas to target minority populations" particularly within the city of Buffalo.[15]

The Downtown Niagara Falls Development Challenge will target the under-utilized tourism area of the City of Niagara Falls to increase amenities and attractions for the millions of tourists who now visit the falls annually.  These direct investments and subsidies are intended to spark revitalization of downtown Niagara Falls, by attracting world class designers and operators, leading to increased visitors stays and spending thereby creating new employment opportunities and spin-off businesses.[16]  In addition to investment in the State Park, New York plans to invest $40 million over 5 years.[17]

As part of the Buffalo Billion commitment, the State has also announced a Revitalization Fund under the Buffalo Billion Investment Development Plan, "a public-private financing vehicle devoted to improving disadvantaged areas in the City of Buffalo and developing community-wide assets".[18]  The fund will have a competitive application process with goals of promoting smart growth/spatial efficiency, enhancing the region's competitive edge and increasing collaboration between public and private sector investments within the context of strategic investments within the city of Buffalo.

*Industrial Development Agencies*
Industrial Development Agencies (IDAs) are independent authorities that have the ability to grant tax breaks to businesses and development projects. The region has nine IDAs, six in Erie County and three in Niagara County. Town IDAs (Amherst, Clarence, Concord, Hamburg, Lancaster, Lockport, Niagara) have overlapping jurisdiction with County-wide IDAs. However, these IDAs can waive property tax, sales tax and mortgage recording tax – taxes that are normally distributed beyond their municipal borders. In this way, when a town IDA waves sales tax, for instance, various other municipalities and school systems lose revenue but have no say in these decisions.  When property is waived, the town IDA has the power to waive not just town taxes, but school district and county taxes as well, again without representation from these governments.

Supporters of this system of subsidy, point to net new tax revenue for the region

---

[15] *The Buffalo Billion Investment Development Plan.* Buffalo Billion: An Initiative of the WNY Regional Economic Development Council. February 2013. P. 45.

[16] *A Path to Renewal: The Buffalo Billion Investment Development Plan Executive Summary.* Buffalo Billion: An Initiative of the WNY Regional Economic Development Council. December 2012. P. 8.

[17] David Robinson. Your guide to the Buffalo Billion. The Buffalo News. January 26, 2014. http://www.buffalonews.com/business/prospectus/your-guide-to-the-buffalo-billion-20140126

[18] *A Path to Renewal: The Buffalo Billion Investment Development Plan Executive Summary.* Buffalo Billion: An Initiative of the WNY Regional Economic Development Council. December 2012. P. 11.

PLAINTIFFS_GENERIC-00004979

over what would be available if these projects were not built and the need for local jobs and investment.  Detractors of this system of subsidy point to a lack of accountability for project goals, a fee-based system of payment, where IDAs continue to operate by completing deals (which actually represents a portion of the tax break given to companies), subsidization of investments that couldn't conceivably be built elsewhere and the padding of sizable corporate profits, and even a race to the bottom or 'pirating' of companies across municipal borders, an overall subsidization of sprawling development away from the region's core and disadvantaged populations.[19]

An examination of regional exemptions from 2005, revealed an overall disproportionate share of tax exemptions in suburban communities.  Though exemptions in Niagara County favored the heavily distressed City of Niagara Falls, exemptions in Erie County showed a stronger bias toward suburban development.[20]  This report points to "communities with disproportionately high shares of IDA property tax deals are not only wealthier than the central cities, they are also whiter" and "disproportionate job loss at the core and disproportionate job subsidization in the suburbs hollows out the region, causing sprawling imbalances with all the resulting fiscal stress, concentrated poverty, and commuting problems."[21]  Since that time, several IDAs have come together to attempt to form a common policy framework for investment decisions. Meanwhile, several local and national organizations have called for changes to New York State IDA policy, but no legislative reforms have materialized.


### Place Based Initiatives

*Buffalo Niagara Medical Campus*
The Buffalo Niagara Medical Campus (BNMC) has been a regional investment priority throughout the last decade and has seen a large amount of public resources dedicated to new buildings and infrastructure on the campus.  The medical campus is both a place and an organization comprised of the health care and research facilities located within its borders.  Several hospitals, such as Buffalo General, Gates cardio-vascular center and Roswell Park are anchors of the district, and Women and Children's Hospital will be moving to the campus in the coming years.  The State University of New York at Buffalo is also in the process of building a new facility for its medical school on site.  Multiple projects are ongoing valued in the hundreds of millions of dollars each.  Tens of millions

---

[19] Sam Magavern, et. al. *Missing the Target: How Economic Development Programs Have Failed to Revive Buffalo's Most Challenged Neighborhoods.* Partnership for the Public Good. February 6, 2009. p.31-33.

[20] Allison Lack . Sprawling by the Lake: How IDA-Granted Property Tax Exemptions Undermine Older Parts of the Buffalo/ Niagara Metro Area. Good Jobs First. May 2007. Pp 3-4.

[21] Allison Lack . Sprawling by the Lake: How IDA-Granted Property Tax Exemptions Undermine Older Parts of the Buffalo/ Niagara Metro Area. Good Jobs First. May 2007. Pp. 11.

PLAINTIFFS_GENERIC-00004980

more in public and philanthropic funds are being dedicated to programs by individual donors and foundations.

The Medical Campus is located along Main Street near downtown Buffalo, stretching from Allentown on the west to the Fruit Belt neighborhood at Michigan Avenue on the east. The Fruit Belt is a primarily African-American Racially Concentrated Area of Poverty that shares a census tract (Erie County Tract 31) with the Campus. These high poverty numbers have made the campus and companies within its borders eligible for economic development incentives and programs.

Tension exists between the Campus and the community, and while new developments along Main Street facing the Allentown neighborhood are designed to create interaction between the buildings and the community, recent developments along Michigan Avenue (a nine-story parking ramp, for instance) have failed to create interaction or street life connecting the Campus and the neighborhood.  Tension also exists around the McCarley Gardens apartment complex, a series of approximately 150 low-rise units, situated on 15-acre plot of land adjacent to the existing medical facilities.  Owned by a church controlled CDC located in the Fruit Belt, a memorandum of understanding was signed with the University at Buffalo Foundation (UBF) that would see the residents relocated and the land turned over for redevelopment.

The sale contract states that UBF "will use reasonable efforts to proactively provide services and support to encourage the participation of minorities, women and persons with disabilities in any construction and vendor opportunities that occur on the Property and Purchaser will use its best efforts to encourage the recruitment, training, development and retention of residents within the neighborhoods immediately surrounding the Property".[22]  Also as a result of that agreement, the University at Buffalo and St. John's Baptist Church Economic Opportunity Panel was formed to explore ways in which the redevelopment of the site could enhance opportunities for local residents. That panel produced a report that recommended:

1. "Illuminate paths to good permanent jobs at UB by strengthening connections between residents and systems of education, job training, recruitment and placement that already exist.
2. Help minority and women owned firms – especially those based in the immediate neighborhood – form, grow and develop their businesses by securing business opportunities with UB for a wide range of routinely purchased goods and services and other ways.
3. Engage residents of McCarley Gardens and adjacent communities in planning for UB's

---

[22] Opening Economic Opportunity Around UB's Growing Downtown Presence. Report of the University at Buffalo and St. John Baptist Church Economic Opportunity Panel. 2011. http://www.buffalo.edu/content/dam/www/news/documents/UB-SJBC-EOP-Report.pdf. P.2.

PLAINTIFFS_GENERIC-00004981

Buffalo-Niagara One Region Forward Fair Housing Equity Assessment
PUBLIC REVIEW DRAFT

downtown expansion, especially to protect and enhance the values of their properties and neighborhood as UB continues to invest.

4.  Expand two-way communications between university and community that will be timely, transparent, participatory, and operating at multiple levels.

5.  Assign responsibility and create accountability for ongoing implementation of these recommendations to (1) a member of UB's senior leadership, and (2) to the UB 2020 Opportunities Advisory Council, or another appropriate entity with a charge to facilitate the role of UB and its medical campus partners in promoting economic development in the community.

6.  Facilitate collaborations in the implementation of these recommendations with UB partner institutions, Kaleida Health and Roswell Park, as well as Buffalo Niagara Medical Campus Inc."[23]

### Erie Canal Harbor Development Corporation

Another area of concentrated public investment in the region rests at the southern end of downtown, where Main Street meets the Buffalo River. Dubbed "Canalside", this portion of the city, though for decades tucked under a web of elevated highways and comprised largely of underutilized buildings and poorly kept parking lots, was the original commercial hub of the city of Buffalo. Earlier, its status as the terminus of the Erie Canal meant this area saw intense commerce and shipping related development and has a rich history encompassing legends of power brokers and violent canal era criminals.

The Erie Canal Harbor Development Corporation (ECHDC), an arm of the New York State economic development agency Empire State Development, has been funded through the New York Power Authority's federal relicensing agreement to focus revitalization efforts here on the downtown waterfront. Though this census tract is sparsely populated, a large concentration of poverty lies just east of here, and to the west a large of amount of public housing similarly contributes to a neighborhood of concentrated poverty.

Recent and current investments include the excavation of the canal terminus, the creation of a central wharf, historic street pattern and the creation of additional public spaces and canal infrastructure. Adjacent to the current Canalside footprint, a former state office building has been renovated by a private developer for a law firm and a hotel, and another project is being constructed that will house two indoor ice rinks, a hotel, retail space and a multi-level parking garage.

Given the massive amounts of public capital being spent at Canalside, a broad-based Canalside Community Alliance (CSCA) formed in 2010 to demand a Community Benefit Agreement for the development. After years of deliberation, ECHDC and CSCA released a consensus document outlining principles, action steps and accountability mechanisms for High Road Economic Development in

---

[23] Opening Economic Opportunity Around UB's Growing Downtown Presence. Report of the University at Buffalo and St. John Baptist Church Economic Opportunity Panel. 2011. http://www.buffalo.edu/content/dam/www/news/documents/UB-SJBC-EOP-Report.pdf. P.2.

PLAINTIFFS_GENERIC-00004982

July 2013. The agreement ensures the community will benefit from the development in a number of ways, including: the establishment of quality jobs; opportunities for local workers and local businesses; environmental performance; affordable housing and annual reporting requirements.[24]

**Housing and Community Development**
The location of HUD-sponsored housing and community development activities touches most reaches of Buffalo-Niagara, however, the bulk of these investments have contributed to the concentration of poverty, particularly within the most entrenched and segregated locations of the region.

Including public housing, housing choice vouchers, Section 8, Section 236, moderate rehab and other multi-family properties, there are 28,837 HUD-supported units of housing in Buffalo Niagara. This represents roughly 6% of the nearly 520,000 units in the region. However, in each of the 15 tracts identified as Racially or Ethnically Concentrated Areas of Poverty,[25] the percentage of HUD supported units is higher than the regional average. The combined average of HUD supported units in these tracts is 28% of total units, 6,668 of 23,974. This represents 23% of all HUD supported units in the region even though these tracts contain less than 5%



Figure 6-2: HUD Public Housing Units

---

[24] *A Public Statement of Principles For High Road Development of Buffalo's Waterfront.* Consensus Document Developed by Erie Canal Harbor Development Corporation and Canalside Community Alliance. 11 July 2013.
[25] Excluding tract 9401 on the Tonawanda Reservation, which has no supported units among the 10 total units in the tract.

PLAINTIFFS_GENERIC-00004983

of all units in the region.[26]

Tract 44.02, Kenfield-Langfield, represents the highest percentage of subsidization with 80% of units in the tract (1015 of 1275), and 99% of this tract's residents are non-white. Tracts 71.02, 14.02, and 202, are have more than 50% of units being subsidized. Each of these tracts has a residential minority rate in excess of 75% (76%, 97%, and 89%, respectively).

Low Income Housing Tax Credit (LIHTC) units are a competitive but flexible tool for creating affordable rental housing leveraging public-private partnerships. This type of development mechanism can be an effective tool for dispersing poverty and creating opportunities for low-income residents in high-opportunity neighborhoods. Though LIHTC has been used throughout Buffalo Niagara, an analysis of the units produced do date reveals that they are disproportionately concentrated in the central cities. Of the 107 developments in the region with a total of 7,618 low-income units (plus 300 unsubsidized units), 46 developments (43%) are located in Buffalo, representing 3,549 units (47%) of low-income housing, and 117 units of unsubsidized units. Of these, 23 developments are in R/ECAPs, comprising 2,175 low-income units.



Figure 6-3: Low-Income Housing Units funded by Low-Income Housing Tax Credits

13 developments (12%) are in Niagara Falls for 874 low-income units (11.4%) plus two unsubsidized units. Four of these developments are in R/ECAPs, comprising 450 low-income units.

---

[26] Census 2010 & HUD Picture of Subsidized Households, 2012 Based on 2010 Census, http://www.huduser.org/portal/datasets/picture/yearlydata.html

117

PLAINTIFFS_GENERIC-00004984

In Lackawanna, two developments with seven low-income units are in the City's R/ECAP tract, while a third development containing 67 low-income and seven non-subsidized units, the Victory Ridge senior apartments in a former Catholic hospital are located in tract 162 – a non-R/ECAP.

In total, 2,632 LIHTC subsidized units are located in R/ECAPs throughout the region. This represents 35% of all LIHTC subsidized units even though only 4% of all regional housing units are in R/ECAPs.

118

PLAINTIFFS_GENERIC-00004985

## CHAPTER 7. Fair Housing Infrastructure

HUD defines its pursuit of fair housing as a commitment "to eliminating racial and ethnic segregation, illegal physical and other barriers to persons with disabilities and other discriminatory practices in housing."[1]  HUD's obligation to affirmatively further fair housing stems from the Civil Rights act of 1968 and flows from HUD to all jurisdictions receiving funds from the department for housing purposes. As such, HUD requires grantees to:

- Analyze and eliminate housing discrimination in the jurisdiction
- Promote Fair Housing choice for all persons
- Provide opportunities for inclusive patterns of housing occupancy regardless of race, color, religion, sex, familial status, disability and national origin
- Promote housing that is structurally accessible to, and usable by, all persons, particularly persons with disabilities
- Foster compliance with the nondiscrimination provisions of the Fair Housing Act.[2]

For Buffalo-Niagara, these activities take a variety of formats and are conducted by a variety of agencies, governments and organizations. However, as Buffalo-Niagara remains a highly segregated and divided community, there is clearly more work to be done in this regard.   What follows is a look at the current state of Fair Housing complaints, activities, violations and concerns within the region.

**Housing Discrimination Cases Filed with the U.S. Department of Housing and Urban Development 2004 - 2013**

| Year | Erie County | Niagara County | Total Regional Cases Filed |
|------|-------------|----------------|----------------------------|
| 2004 | 40 | 6 | 46 |
| 2005 | 40 | 5 | 45 |
| 2006 | 33 | 3 | 36 |
| 2007 | 50 | 7 | 57 |
| 2008 | 30 | 7 | 37 |
| 2009 | 45 | 3 | 48 |
| 2010 | 36 | 4 | 40 |
| 2011 | 22 | 9 | 31 |
| 2012 | 27 | 3 | 30 |
| 2013 | 28 | 4 | 32 |
| 10 year total | 351 | 51 | 402 |

Source: HUD Office of Fair Housing and Equal Opportunity

Table 7.1: Housing Discrimination Cases

Assessing 10 years of data from the HUD Office of Fair Housing an Equal Opportunity, the region experienced 402 discrimination complaints from 2004-2013. 351 (87%) of these came from Erie County while 51 (13%) came from Niagara County. This compares to a regional population break down of roughly 81% in Erie County to 19% in Niagara County.

Based on the years of available data for complaints within the City of Buffalo (2004-2012), 53% of cases in Erie County and 46% of

---

[1] U.S. Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity. Fair Housing Planning Guide, Volume 1. 1998. P 1-1.
[2] U.S. Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity. Fair Housing Planning Guide, Volume 1. 1998. P 1-3.

PLAINTIFFS_GENERIC-00004986

those in region came from within the city. Given that the city of Buffalo represents roughly only 23% of the regional population, it appears, then that the higher urban population and the higher number of minority and disabled families and individuals within the city has skewed the complaints toward somewhat of an imbalance between Erie and Niagara Counties.   For this time period, the City of Buffalo had 6.6 complaints per 10,000 residents, while the remainder of Erie County had 2.3 per 10,000, and Niagara County had 2.2 per 10,000.

For the region, taking into account that each complaint can cite multiple violations of protected classes, the highest percentage of complaints involved discrimination based on disability (43% of all cases).  Race and/ or color was second most frequent, involved in 39% of all cases, while Familial Status was next at 30% of all cases. In contrast, 46% of cases in the City of Buffalo for the period 2004-2012 involved Race and 9% involved Color, 33% involved disability and 32% family status.

Regionally, 7% (37) of cases reported in this period remain open, while another 37% (149) were conciliated/ settled, issued a consent order or a finding of discrimination. 47% (188) of cases were found to be without cause, while just over 9%  (37) were closed administratively or judicially, or dismissed without finding of discrimination.

For those cases remaining open, that were conciliated/ settled, where discrimination was found or consent order issued, 39% involved disability, 37% involved familial status, and 32% involved race and/or color. 15% involved discrimination based on sex and 10% on national origin.


**Legal Framework**

As the Fair Housing Act of 1968 set the framework for federal regulations prohibiting discrimination in housing, the New York State Human Rights Law had been in place since 1963 in the form of the Metcalf-Baker Act which barred discrimination in the private housing market and covered activities from housing advertising to mortgage lending to the practices of real estate agents and developers.[3] The current New York State statute covers all of the protected classes enumerated in the federal regulation (race, color, religion, national origin, sex, disability or familial status) as well as marital status, age, military status and sexual orientation and also goes further in limiting exclusions to only two-family owner-occupied structures, the rental of rooms in common housing to people of one sex, and exclusions for age and familial status in housing designated for older residents.[4]

─────────────────

[3] The New York State Committee on Discrimination in Housing. Metcalf-Baker Implementation Memo #1. April 14, 1961.

http://metcouncilonhousing.org/our_history/early_organizing/metcalf_baker

[4] Kelly L. Patterson, Ph.D., Robert M. Silverman, Ph.D., Scott W. Gehl, Kenneth J. Gholston, Analysis of Impediments to Fair Housing Choice in Erie County, NY. Erie County Community Development Block Grant (CDBG) Consortium, and the towns of Amherst, Cheektowaga, and

PLAINTIFFS_GENERIC-00004987

The City of Niagara Falls passed the first Fair Housing Ordinance in the region in 1978. The ordinance covered "discrimination for reasons of race, color, creed, national origin, sex, marital status and physical disability" and allowed no exemptions based on number of units within a structure or any of the other carve outs that other regulations have permitted.  However, the ordinance sets a maximum penalty for violation of the ordinance at $200 and has not been updated since its initial passage.[5]

The Town of West Seneca passed a Fair Housing Ordinance in 1979 that covered state provisions at the time and additionally included "race, color, religion, national origin, sex, handicap (disability), age, marital status, the presence of children and source of income" and includes coverage for owner-occupied housing.[6]

In 1986, the Town of Hamburg passed a fair housing law, which was signed into effect by then supervisor and future Congressman Jack Quinn.  The law was most recently amended in 2005 and prohibits various forms of discrimination in housing against any persons based on "race, color, religion, sex, age, marital status, disability, national origin, source of income, sexual orientation or because the person has a child or children."[7]

Attempts were made to pass a fair housing ordinance in Buffalo on multiple occasions, but the ordinance was defeated in 1968 and 1979, and passed but vetoed 1980 and again in 1989.  After these attempts spanning decades of advocacy, the City of Buffalo passed a Fair Housing Ordinance in 2005 that included the protected classes represented in the State's Human Rights law and also added source of income as well as gender identification and expression.[8]  Although state and federal regulations exempt one- and two-family dwellings from provisions of the law, the preponderance of housing units in Buffalo fall within these categories.  A major goal of Fair Housing advocates, then, was to include these typologies in the local ordinance.[9]  However, the ordinance failed to live up to these aspirations, as owner-

Tonawanda. November 2008. Pp. 32-33.

[5] Niagara Falls – Analysis of Impediments to Fair Housing, Housing Opportunities Made Equal. May 2005. Pp. 54-55.

[6] Kelly L. Patterson, Ph.D., Robert M. Silverman, Ph.D., Scott W. Gehl, Kenneth J. Gholston, Analysis of Impediments to Fair Housing Choice in Erie County, NY. Erie County Community Development Block Grant (CDBG) Consortium, and the towns of Amherst, Cheektowaga, and Tonawanda. November 2008. P. 33.

[7] Town of Hamburg Fair Housing Ordinance General Code of the Town of Hamburg, Chapter 109, Fair Housing. Adopted by the Town Board of the Town of Hamburg, March 14, 2005. http://www.townofhamburgny.com/Fair-Housing-law-3122010.pdf

[8] This Doesn't Happen Here (2013), Filmmaker: Brian Milbrand.

[9] Neil Kraus, Local policymaking and concentrated poverty: the case of Buffalo, New York, Cities, Volume 21, Issue 6, December 2004, Pages 481-490, ISSN 0264-2751, http://dx.doi.org/10.1016/j.cities.2004.08.004.
(http://www.sciencedirect.com/science/article/pii/S0264275104000964). P. 488.

121

PLAINTIFFS_GENERIC-00004988

occupied dwellings of three and fewer units are exempted.


**Organizational Infrastructure**

The Erie County Fair Housing Partnership (ECFHP) was formed as collective effort to affirmatively advance Fair Housing in Erie County. The partnership is comprised of non-profit, governmental and private sector representatives.  Though the Erie County Fair Housing Partnership has been in existence since 1997, it has its roots in a tradition of collective monitoring and collaboration on advancing Fair Housing issues dating back to the 1980s.  Under President Reagan, HUD created Community Housing Resource Boards that were intended to spur voluntary compliance with the Fair Housing law under a voluntary affirmative marketing agreement between HUD and National Association of Realtors.  Locally the Community Housing Resource Board eventually dissolved, but was resurrected by some of the participants as Erie County Fair Housing Partnership.  Much as the Community Housing Resource Board had previously, the work of the ECFHP is primarily centered on education and each of the members ensures participation in Fair Housing activities by their respective organizations.[10]

A member of the ECFHP, Housing Opportunities Made Equal (HOME), is the primary Fair Housing advocate and enforcement agency in Buffalo Niagara and throughout Western New York.  HOME started as an all-volunteer group in Buffalo even before the establishment of the state and federal Fair Housing laws, and has been fighting discrimination in the region since 1963.  HOME now operates a comprehensive set of Fair Housing activities in the seven county region.  Though funding limitations contain the focus of the organization's efforts to Erie and Niagara counties, HOME's service area also includes Orleans, Genesee, Wyoming, Chautauqua and Cattaraugus counties.  HOME offers a landlord and tenant training program, and a community education program that spans from workshops to publications for human service agencies, government and school groups.

Through their Fair Housing Unit, HOME also provides direct assistance to victims of housing discrimination, by investigating complaints, informing clients of the law and of their legal rights and helping them to navigate the system of enforcement. HOME also operates the Greater Buffalo Community Housing Center, which is an outgrowth of a 1996 federal consent decree (Comer vs. Kemp) resolving a class-action lawsuit that alleged that the publicly assisted housing in Buffalo was being carried out in a segregated and discriminatory manner. The settlement created a new set of Section 8 vouchers in an effort to promote choice and opportunity for recipients of public housing assistance.  The Community Housing Center was also established to help voucher recipients evaluate their housing and location options to determine what

---

[10] Personal interview with Scott Gehl, Executive Director Housing Opportunities Made Equal. December, 2014.

PLAINTIFFS_GENERIC-00004989

neighborhood(s) will provide them with the best housing options for them. Since its inception, the program has assisted more than 4,000 families.[11]

In Niagara County, the Niagara Community Action Program, Inc. also provides Fair Housing services to those who believe they have been discriminated against through their Fair Housing Advocacy Program. The program will investigate prepare and refer complaints to the appropriate agencies.[12]

Between 2008 and 2012, regional recipients of the HUD Fair Housing Initiatives Program grants included HOME and the Buffalo Urban League. For the years 2008 - 2010, HOME used funding from the program to provide Fair Housing enforcement services in the Buffalo Niagara region, investigating hundreds of allegations of discrimination; mediating discrimination complaints; and filing complaints with agencies as appropriate. HOME also used funding for Fair Housing testing as well as providing Fair Housing training. The Buffalo Urban League was awarded a grant in 2008 for education and outreach, using various print and media means to reach minority audiences and inform communities of Fair Housing rights. The program also included information on foreclosure prevention and predatory lending.[13]

Neighborhood Legal Services (NLS) has also been a consistent partner in providing legal representation to help combat housing discrimination in the region. NLS provides housing assistance in both Erie and Niagara Counties, representing tenants that are trying to avoid eviction, ensure safe and decent living conditions, or attempting to access or preserve public housing benefits or subsidies. NLS can provide advocacy, legal and negotiation services for tenants in both private and public housing.[14]

**Notable Fair Housing Issues and Challenges**

Throughout the last century, there have been multiple instances of institutional discrimination, some of which were ultimately overturned only upon judicial review. For instance, in the late 1990s, the Comer vs. Kemp case found various flaws and violations within the local landscape of federal housing assistance providers and the oversight of the agencies that funded the programs, including HUD, the Buffalo

---

[11] Housing Opportunities Made Equal, The Greater Buffalo Community Housing Center website. http://homeny.org/pages/programs/community-housing-center

[12] Niagara Community Action Program website: http://www.niagaracap.org/. Retrieved 2013 December 19.

[13] HUD FHIP grant information resources. http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp/partners/FHIP/fhip

[14] Neighborhood Legal Services Website: http://www.nls.org/Housing. Retrieved 2014 January 27.

PLAINTIFFS_GENERIC-00004990

Municipal Housing Authority, and the Erie County consortium.  Chapter 3 of this FHEA, provides greater detail of these actions, as do several external resources including a film entitled "*This Doesn't Happen Here*" produced in conjunction with the Erie County Fair Housing Partnership and available through their website.[15]  Through a history of advocacy and enforcement actions, progress has been made in creating Fair Housing opportunity by lessening the institutional barriers erected by housing providers, but certainly challenges remain.

More recent cases against municipal and institutional actors have been less systematic – involving allocation of dedicated housing resources – and more transactional – involving, instead, actions related to developments initiated by for-profit or non-profit developers.  For example, three incidents, one in the first ring suburbs of Buffalo (Collegiate Village), another in the second ring suburbs to the south of the city (People, Inc.), and one in exurban Niagara County (Shawnee Landing) exemplify the recent high profile cases of alleged discriminatory actions carried out or assisted wittingly or unwittingly by the actions of local governments and agencies.

The Town of Cheektowaga and the Village of Kenmore were charged by the New York State Division of Human rights in connection with their approvals and bond financing of a project known as Collegiate Village. This project displaced existing residents within a large apartment complex to a cluster of unimproved units that would be physically separated from refurbished housing units within the complex aimed exclusively at college students.  HOME also pursued a suit against the corporate entities involved.  Though both cases eventually settled out of court with the corporate entities implicated in the complaint, the state cited discriminatory actions based on race, familial status, race and age, stating the project had the effect of creating "separate and unequal housing, with predominantly single, white and young tenants in a newly renovated gated facility, and predominantly families [with children], minorities and seniors in… non-renovated housing on the other side of the wall".[16]

Another example in the Buffalo suburb of Orchard Park (which was 96% white non-Hispanic and less than 1% black as of the 2010 Census) consisted of a series of denials in 2009 of social service agency People, Inc.'s application to build a senior housing project in the town.  After issuing a letter of support for People, Inc.'s senior

---

[15] This Doesn't Happen Here (2013). Filmmaker: Brian Milbrand. Available through http://ecfhp.org/ or via direct link at: http://www.squeaky.org/channels/2013/thisdoesnthappenhere
[16] Kelly L. Patterson, Ph.D., Robert M. Silverman, Ph.D., Scott W. Gehl, Kenneth J. Gholston. Analysis of Impediments to Fair Housing Choice in Erie County, NY. Erie County Community Development Block Grant (CDBG) Consortium, and the towns of Amherst, Cheektowaga, and Tonawanda. November 2008. P. 27-28.

124

PLAINTIFFS_GENERIC-00004991

Buffalo-Niagara One Region Forward Fair Housing Equity Assessment
PUBLIC REVIEW DRAFT

housing grant application to HUD, the town denied a rezoning request for a 2-acre portion of the identified site, some of which was already appropriately zoned for multi-unit residential. The Town denied rezoning of the remainder of the site on the grounds that it was preserving vacant industrial land for future development. Critics, however, pointed out that the town's strategic plan cited the need for affordable senior housing and the land had already been rezoned for commercial use. Though denied by town board members and officials, certain comments – such as one published in the Buffalo News that "[w]e were hoping it would be for our own residents and not a lot of other people" – and a request for the zip codes of origin of a nearby People, Inc. project led HOME and People, Inc. to file discrimination complaints based on violations of protections for race, color and national origin with the Department of Housing and Urban Development.[17] That claim has yet to be settled, however, People, Inc. subsequently moved their 43-unit project to the Village of Springville to avoid forfeiting the grant funds due to extended project delays in Orchard Park.[18]

HOME had also filed suit in 2007 against the town of Wheatfield for actions related to delays in the construction of the Town Homes at Shawnee Landing, a Low Income Housing Tax Credit development in this ex-urban town in Niagara County. Shawnee Landing was designed as a mix of senior and low-income housing. Outcry in the form of neighborhood opposition led the town to hold a public hearing though construction of the development was already underway. According to the Buffalo News "...anonymous fliers were distributed, some of them asking: 'Did you know this project will bring people of all colors into our neighborhood, which would lower our property values and be beneath the high standard of living that we are trying to preserve?'.[19] Amidst the controversy, the Town issued a three week moratorium on all development projects, asked HUD and the state to delay funding for the project and blocked the single access road to the site.[20] Though the town cited site plan and traffic concerns for its actions, the site plan for the development had been approved by the town some three years prior.[21] The project was eventually completed with some modifications to the site plan.

As exemplified by the People, Inc. case, zoning and land use have been powerful

---

[17] Mary B. Pasciak. Orchard Park taken to task over housing. The Buffalo News. October 21, 2009.
[18] Barbara O'Brien. Springville warmly welcomes People Inc.'s senior housing plan. The Buffalo News. August 23, 2012.
[19] "HOME Charges Wheatfield with Discrimination". Insight: Western New York Fair Housing News. HOME Newsletter, Vol. 44 No. 1, Spring 2007.
http://www.homeny.org/document.doc?id=25. P.5.
[20] "HOME Charges Wheatfield with Discrimination". Insight: Western New York Fair Housing News. HOME Newsletter, Vol. 44 No. 1, Spring 2007.
http://www.homeny.org/document.doc?id=25. P.5.
[21] Rick Forgione. Demler calls out developers. Niagara Gazette. February 15, 2007.

PLAINTIFFS_GENERIC-00004992

tools to restrict the development of housing which doesn't fit the mold of single-family owner occupants. Because zoning and land use is controlled at the municipal level in New York State, it is no small challenge to reform these codes to encourage diverse and inclusive communities throughout the 48 individual municipalities of Buffalo Niagara.

Even where proper zoning is in place, however, the letter of the Fair Housing law may be too easily broken or skirted.  The cases referenced above rose to a high profile and were covered regularly in local media, in some regard due to the size of the developments and in other regards due to the high profile and capacity of the entities involved.  However, it is difficult to quantify or qualify how many other lower-profile developments may face similar challenges, and continue to go unnoticed or unchecked because of a lack of scrutiny or support.  This type of discriminatory action is in some ways more challenging to address than previous forms, because it requires knowledge of rights, regulations and remedies on the part of the applicant as well as the diligence of underfunded agencies to monitor developments and municipal actions, placing themselves in an adversarial position to often powerful influences and systems within the region.

Though no new regulation or law can ensure that localities will abide by their legal requirement to affirmatively further Fair Housing, local Fair Housing Ordinances can provide a strong statement of principle and a clear framework for action for municipalities, their departments and agencies. Updating and strengthening the existing municipal Fair Housing regulations within the region is therefore one of the recommended actions for advancing Fair Housing in Buffalo-Niagara.

However, regardless of the relative fault, innocence or indifference of the host municipalities, or what effect existing zoning regulations may have, the above incidents clearly highlight the challenges of providing affordable, accessible housing within the region when it is often opposed by vocal community members throughout Buffalo Niagara – including within the city of Buffalo. This phenomenon is commonly known as NIMBYism (Not In My Back Yard) and, much like individual cases of housing discrimination, it is often veiled in coded language, perhaps under the guise of traffic or infrastructure concerns or because of the cost to the government of subsidizing these units.  However, in the most flagrant cases, it can also by overt, direct, confrontational and even violent.

NIMBYism is rooted in an exclusionary, class-based settlement pattern (to which perceptions of race and ethnicity are major, if largely unspoken, contributors) and often driven by "fears that the presence of low-income households (and people of color) will increase crime rates, drive down property values, and fundamentally

126

PLAINTIFFS_GENERIC-00004993

change the neighborhood's character."[22]    However, "[c]ontrary to these common assumptions, several studies have consistently found that, if affordable housing is well designed, fits in with the surrounding neighborhood, and is well managed, there appear to be no negative impacts of that housing on the property values of neighboring houses."[23]

Similarly, arguments about the governmental cost of supporting affordable, inclusive housing fail to acknowledge that the federal home-mortgage interest tax deduction subsidizes housing for middle- and upper-income homeowners to the tune of $70 billion per year.  The bulk of these benefits (77%) accrue to upper income earners – those making $100,000 per year or more, with 35% going to those earning more than $200,000.  Homeowners earning less than $50,000 per year only received 3% of the total tax benefit.[24]  Yet there is little public opposition to this form of subsidy, even



though it represents well over $20 billion more than HUD's entire annual budget.[25]

TheOne Region Forward Housing and Neighborhoods Working Team has acknowledged that changing the public understanding and perception of housing assistance programs will be an important means to reaching a broader base of eligible recipients and securing a broader base of

Figure 7-1: Distribution of Mortgage Interest Deduction by Economic Strata
Source: Center on Budget and Policy Priorities

---

[22] A New Way to Diffuse NIMBYism? Posted by Laurie Goldman on July 3, 2013. Rooflines: the Shelterforce blog. http://www.rooflines.org/3301/a_new_way_to_diffuse_nimbyism/
[23] Rachel G. Bratt, Alexandra DeGenova, Brendan Goodwin, Shannon Moriarty, and Jeremy Robitaille. Fear of Affordable Housing: Perception vs. Reality. Shelterforce Summer 2012. http://www.shelterforce.org/article/2891/fear_of_affordable_housing_perception_vs._reality/
[24] Mortgage Interest Deduction Is Ripe for Reform: Conversion to Tax Credit Could Raise Revenue and Make Subsidy More Effective and Fairer. Will Fischer and Chye-Ching Huang. Center on Budget and Policy Priorities. Revise June 25, 2013.
[25] HUD's fiscal year 2012 represented "$47.8 billion in gross budget authority… offset by $6 billion in projected FHA and Ginnie Mae receipts credited to HUD's appropriations accounts, leaving net budget authority of $41.7 billion." HUD Secretary Shaun Donovan. Fiscal Year 2012 Budget Summary Message from Secretary Donovan. P.1. http://portal.hud.gov/hudportal/HUD?src=/fy2012budget

PLAINTIFFS_GENERIC-00004994

community support. This public acceptance will be crucial to opening areas of opportunity to low- and moderate-income families, particularly for racial and ethnic minorities.

Within the community development field, language changes have been used to attempt to overcome perception issues and loaded terms. "Workforce-housing", for instance, is a term that has been used primarily in high-expense markets to avoid using the term "affordable". "Housing that families can afford" has also been used. The term "cost-effective" housing has also been utilized. Regardless of the specific terminology, however, the clear acknowledgement that affordable housing suffers from a negative 'brand' is something that multiple agencies and organizations are attempting to overcome.

But the struggle to overcome this perception is not new. In fact, the collaborative HousingMinnesota partnership took on a three-year statewide effort in the early 2000s to try to combat negative public opinion of affordable housing. They employed a three-pronged approach of advertising, public relations, and grassroots outreach moving from public education to policy advocacy, and had three basic messages:

1) "people who need affordable housing are varied in their backgrounds and circumstances;
2) housing is fundamental to people becoming successful community members; and
3) the availability of housing, in various configurations and price levels, is important to strong communities."[26]

Even though there have been multiple steps taken to win support for individual housing developments, Buffalo-Niagara appears to lack a dedicated or coordinated strategy to changing public perceptions about the community development and housing field. This coordinated effort to combat NIMBYism is essential to create an environment which all people regardless of means, ability, race or ethnicity have quality choices for housing and neighborhoods.

---

[26] Chip Halbach. Affordable Housing... on Billboards? A grassroots coalition shapes a media campaign on the value of affordable housing. Shelterforce Online. Issue #122, Mar/Apr 2002. http://www.nhi.org/online/issues/122/organize.html.

PLAINTIFFS_GENERIC-00004995

### CHAPTER 8. Summary, Recommendations, Next Steps & 1RF Integration

Throughout the course of the Fair Housing Equity Assessment, it has become clear that the region faces tremendous challenges to equity and opportunity. Ingrained policies and practices within the public and private sectors will not be easy to overcome. Even where certain discriminatory actions have been abolished, their impacts are felt still, as the long-term intergenerational impacts of the poverty and inequality to which they contributed have not been erased, nor has any affirmative response to these issues been of the scale or magnitude necessary to erase this legacy of injustice.

That said, no single action or single intervention can be expected to turn the tide of segregation, and the recommendations listed in this chapter are not an all-encompassing solution. The fight for equality has been ongoing for generations, and future generations will need to bear this mantle as well. What is set out in these recommendations are a series of steps that can be taken by the stakeholders involved in the One Region Forward initiative – whether as a collective effort or within their own institutions – to continue, and hopefully accelerate, the progress that has been made.

However, as acknowledged regularly by various stakeholders throughout the development of this report and of these recommendations, the struggle for equity and opportunity for all residents in the region will be just that – a struggle.  It will require bold stances in the face of opposition to changing the status quo. It will require that difficult conversations and topics are broached honestly, openly, regularly and intentionally.. A regional dialogue needs to be created to highlight the factors, conditions and systems which for too long have oppressed groups of people and held back the region as a whole.

If we, as a region, value diversity, inclusion and opportunity, these tenets must be supported.  It must also be acknowledged that this will require resources: resources in time, money and personnel. While citizen engagement and broad based involvement is crucial, for monitoring, goal setting and internal and external accountability, there must also be professional and institutional commitment to these causes.  Agencies dedicated to these issues – both within government and outside of government – largely operate on a shoestring and are often not at the table for decisions having to do with housing, economic development, education, financial policies.  And local support for these efforts, with limited exceptions, has often been relegated to an afterthought, a remainder, or a court-appointed settlement.  For any real hope of achieving progress on these entrenched problems, first and foremost, this needs to change.

PLAINTIFFS_GENERIC-00004996

**Ensure public input on public investment**

Decision-making in the region needs to be inclusive, representative and responsive

■ *increase diversity on local boards and commissions*

Local boards and commissions, in particular those which govern land use, development and investment decisions, need to have a more inclusive and diverse representation.  The Citizen Planning School, now in development by the University at Buffalo School of Architecture and Planning and Regional Institute, has the potential to be a strong source of candidates to populate these boards, and the Open Buffalo collaborative effort launching a grassroots leadership development program is another.

■ *enhance public process and outreach mechanism in local planning practices: capital plans, comprehensive plans, HUD consolidated planning, etc.*

The mandated provisions of public outreach were created in a much different era and reflect the bare minimum effort required for compliance. Governments and agencies can be much more proactive in soliciting and actively seeking public input – particularly in marginalized communities.  Traditional public participation requires residents to not only seek out opportunities for input, but often to take blocks of time out of their days to attend a presentation on a topic or proposal. Low-income residents, are less likely to be able to participate in this format as the challenges of transportation costs, child care and work schedules which are not 9-5 present formidable challenges.

Some local governments have experimented with other, more flexible and accommodating forms of outreach and engagement, whether through technology (i.e., texting surveys) or in-person (i.e., outreach to existing meetings within block clubs, community centers and churches). The need to "meet people where they are" should be reflected in planning practices throughout the region.

■ *ensure easy access and transparency of public records, meetings, proceedings and proposals*

As part of a commitment to public inclusion, ready access to government information before, during and after the decision making process is vitally important to informed and empowered communities. Web-based platforms make this kind of transparency much more achievable, however, many local governments still struggle to find the resources to reach a high bar of information sharing.  Tech-savvy constituents in other regions have filled this gap on behalf of government, taking access to open data and information and creating locally specific tools and applications to bring knowledge of government directly to residents.  Making this data available allows the creativity of a region's residents to come to bear in way that generally exceed the capacity of governments with limited budgets.

PLAINTIFFS_GENERIC-00004997

■ *institute participatory budgeting processes which elevate the concerns of the people who have intimate knowledge about neighborhoods*

Multiple planning processes throughout the region have created an element of "planning fatigue" particularly in low-income communities where residents may succeed in having their knowledge and vision reflected in planning documents, but these have rarely resulted in direct, tangible neighborhood investment or change.

This cycle has created distrust, suppressed engagement – particularly among low-income and minority residents – and produced a cadre of "usual suspects" that tend to dominate public process. At the same time, capital investment for community development has too often benefited private interests without fundamentally addressing the concerns or needs of a neighborhood or catalyzing spin-off investment and long-term improvement.

Participatory budgeting is one method that is becoming increasingly popular throughout North America as a way to address those issues that people in neighborhoods are most concerned about. It is an open public process by which community members help determine allocation of municipal and agency capital budgets, special funds and legislative discretionary funds with a direct role in idea creation, project development and the prioritization and allocation of resources to address local needs.

Though Participatory Budgeting follows a general framework and protocol of: rule setting; public ideation; project refinement and evaluation; public prioritization; and award allocation, the process can be modified to fit local situations and has proven a successful tool for identifying critical and catalytic projects, expanding public participation, building civic capacity and creating political support in diverse communities. The White House has included Participatory Budgeting in the 2014 Open Government National Action Plan, specifically citing HUD Community Development funds as a potential funding source.

### Ensure equitable distribution of, and access to, public resources and service delivery

While recent years have brought improvements to the way public resource allocation is vetted and evaluated, there are systemic inequities that cannot be addressed by annual distributions within the current framework. The small-box delivery system for public services has evolved little in the well more than 100 years since its inception. As it exists, this system creates illogical and arbitrary divisions of responsibility that permit the persistence of gross inequities within a region that has simultaneously created more infrastructure and lost the means to maintain it.

PLAINTIFFS_GENERIC-00004998

The One Region Forward Land Use and Development Working Team acknowledges the challenges looming for this method of service delivery, with water, sewer, and transportation, as well as police, fire, and parks are all major and expanding cost centers throughout the region. The state of the education system is particularly alarming due to both the gross racial inequities in access and the increasing costs as enrollment declines in nearly every district. In addition to limiting the expansion of costly infrastructure into previously undeveloped areas, the potential impact of shared service agreements, partnerships, or consolidation need to be evaluated to begin to mitigate the disparities that are rife in Buffalo Niagara.

Agencies should develop policies that target public investment to traditionally underserved populations, for instance:

■ *ensure new affordable housing is not solely located in high poverty neighborhoods, but provides residents access to areas of opportunity, balanced against need for accessible services, transportation options, etc.*

A seeming paradox in Buffalo Niagara's housing stock in the low average cost of housing alongside the need for many more units of affordable housing. However, often times the low rents within a neighborhood are indicative of poor quality housing. A logical response to the poor quality of housing in these neighborhoods is the desire fill this need by building high-quality affordable housing for low-income people in the community.

However, focusing new low- and moderate-income housing in underserved communities has the effect of concentrating poverty and disallowing access to areas of opportunity throughout the region. Buffalo Niagara must take a regional approach to affordable housing production – one that considers communities' fair share of affordable housing provision while simultaneously creating access and linkages between low- and moderate-income families and job and opportunity centers and nodes throughout the region.

■ *focus public investment in urban core and in established neighborhoods not just downtown/ waterfront/ industry clusters*

The Framework for Regional Growth established a vision for Buffalo Niagara that created investment corridors and centers. These investment targets represented areas of existing infrastructure that could accommodate growth without further burdening the tax base. This reinvestment strategy planted the seeds of a sustainable development plan for the region. Downtown Buffalo and downtown Niagara Falls are seeing renewed investment on a scale not experienced in decades. The Niagara River and Lake Erie waterfronts are being transformed into a series of connected, accessible and user-friendly public spaces. Former industrial areas are being cleaned up and repurposed as new job centers.

132

PLAINTIFFS_GENERIC-00004999

But many neighborhoods are showing signs of strain, and others continue to struggle and decline. Neighborhoods need to have a strategic investment strategy on par with those for downtown, industry and the waterfront. Particularly as federal community development resources continue to shrink, marginal and disadvantaged neighborhoods need a specific focus on strategic and coordinated investment in order to benefit from a renewed sense of hope for the prospects of the region.

- ■ *implement neighborhood specific investment strategies that capitalize on the localized assets, historical significance and current residents' vision for their communities developed through a public process*

Successful redevelopment, especially in the face of diminished resources and a shrinking population base, cannot take a "peanut butter approach" of spreading investment dollars smoothly and evenly across the region. Investment in neighborhoods needs to be reflective of the specific assets, opportunities and challenges of each community. In short, investments need to be targeted and market conscious and must attempt to make simultaneous social, civic and economic progress by focusing on both people and place.

Though a baseline of current data and trends is crucial, just as important is the local knowledge and buy-in of the residents who make up the community. Neighborhood planning and investment strategies must strive to bring in new voices that have been absent from or ignored by previous efforts. This combination of solid objective information and intimate neighborhood knowledge needs to be combined to create a realistic, achievable and inclusive course of action for each neighborhood that carefully considers unique assets and anchors – either physical, social or otherwise – upon which to build.

- ■ *institute contractually obligated performance measures to ensure local residents participate in the impact of public projects and developments*

Women and Minority Owned Business requirements are common for government contracts and public projects, as are minority-hiring targets in larger projects. However, other regions have gone farther to implement Community Benefit Agreements to ensure those neighborhoods and individuals directly effected by development projects are sharing in the positive outcomes and are not just enduring a project's externalized costs.

Community Benefit Agreements (CBAs) vary by project, but can include such provisions as opportunities for local workers and local businesses and first source hiring; environmental performance measures; affordable housing and assurance of quality-jobs post-completion. CBAs are not general guidelines, they are legally enforceable contracts with performance measures, regular reporting requirements and consequences for failure to reach stated goals.

PLAINTIFFS_GENERIC-00005000

In addition to CBAs negotiated on a project-by-project basis, local governments and governmental agencies and authorities can establish standing policies to ensure inclusive high road economic development practices for all contracts they let.

■ *integrate transportation investment with neighborhood improvement, with less emphasis on throughput, which has been so detrimental to minority communities, and more emphasis on creating complete communities*

Infrastructure, particularly roadways and expressways, has served as a tool to divide, separate and isolate minority and low-income communities. By focusing on supplying infrastructure to speed traffic through and away from established neighborhoods, investment decisions have instigated or accelerated the decline of communities in the region.

Public Works Departments and Departments of Transportation need to focus not on vehicle level of service within urban environments, but on quality of life and equity of access. Accommodating all modes of travel – pedestrians, bicycles, transit users and autos – can provide not only a more balanced and safer right of way, but can also provide the spark to spur reinvestment and revitalization. While this can be accomplished in a large scale way be re-envisioning and reinventing the highways that have cut neighborhoods in half or separated them from other parts of the city (the Kensington and Scajaquada Expressways, for example), or major thoroughfares that divide communities (such as Main Street), it can also be accomplished through careful attention to making livable and inviting streets and public spaces along smaller commercial districts and within communities.

■ *enhance public transportation options and flexibility, particularly within Racially and Ethnically Concentrated Areas of Poverty (R/ECAPs), to provide access to job centers*

Buffalo Niagara's transit system is primarily hub based, with the most direct access within the region focused on downtown Buffalo, and with the most frequent access leading into the city in the morning rush hour and out of the city during the evening rush hour. However, the concentration of jobs in the core has fallen in the last decade, meaning a higher share of jobs are becoming more difficult to reach by public transit, and the challenge of job access via transit from Niagara Falls is even more difficult as it often requires a transfer through Buffalo to reach suburban locations.

What is especially problematic about this trend of employment disbursement is the lower level of vehicle access within the City of Buffalo and particularly within R/ECAPS in the city. While the long-term solution to these issues is a more

PLAINTIFFS_GENERIC-00005001

equitable land use pattern than reinvests in mixed-use centers, a shorter term solution is to continue to invest in a series of inventive and proactive transit solutions to facilitate job access in a variety of locations at a variety of times.

- ■ *address the gross inequities in education through a region-wide systems reform effort*

The cycle of poverty and oppression in the region can only be broken when low-income and minority populations have access to the one most powerful tool for advancing in society: a high quality education.  However, districts with high concentrations of poverty are persistently low-performing, and extreme clustering of impoverished students may actually be making achievement more difficult individually for students in poverty.

The current state of the Buffalo Public Schools reveals the trappings of high-poverty and low-performance.  The district is under obligation to accommodate students who request transfers out of low-performing schools to schools in good standing.  However, there are not enough slots in schools in good standing to fulfill all of the current requests.  It is not possible for the district to solve this problem on its own.

Simultaneously, nearly every district in the region is losing student population – even in towns with growing populations.  This has severe implications for sustainability and affordability of many districts.  There must be real and sustained effort to ensure an equitable, high quality public education for all students in Buffalo-Niagara and that effort needs to happen at a regional level in order to be successful for the long-term.

- ■ *focus job training and workforce development in Racially and Ethnically Concentrated Areas of Poverty (R/ECAPs)*

While an emphasis on education is crucial to provide opportunities for the region's next generation, in the decades of declining blue-collar industry that the region has faced, tens of thousands of people have been shut out of an opportunity to earn a decent wage.  With a dramatically lower demand for unskilled labor, an emphasis needs to be made to train the existing workforce, as well as those seeking employment, a new set of skills applicable in today's economy.

One such example of this is training and hiring people in high poverty neighborhoods to work directly within their own communities building, rehabilitating and retrofitting affordable housing and outdated infrastructure – a method which PUSH Buffalo has been employing on Buffalo's West Side through the Green Development Zone.

The Buffalo Niagara Skills Partnership, an initiative of New York State's Buffalo

PLAINTIFFS_GENERIC-00005002

Billion Investment Development Plan, seeks to create "the most flexible, inclusive and industry-driven workforce training environment". Acknowledging the vast disparities in educational attainment between white and minority residents, the initiative plans to "concentrate their efforts on specific geographic areas to target minority populations" particularly within the city of Buffalo.[1] Efforts must be made, then, to ensure a high rate of minority participation in these programs to fulfill the promise of a more equitable workforce.

**Education and Promotion**

Biases, misunderstandings and misperceptions need to be combated to advance progress within opportunity and equality

- *work to change public perception of equity and opportunity at the neighborhood level*

As demonstrated within this FHEA, access to housing is also about access to neighborhood services and quality-of-life. By increasing the options for living within high opportunity areas, the region can provide pathways to prosperity for traditionally marginalized individuals. However, the public narrative around housing subsidies is heavily tinged with negative perception and efforts to build quality affordable housing are too often met with neighborhood resistance.

A coordinated marketing and education campaign, with emphasis on equality and opportunity, is needed to cultivate a positive image and understanding of housing assistance programs to increase individual participation and community support. Within the community development field, language changes have been used to attempt to overcome perception issues and loaded terms. "Workforce-housing", for instance, is a term that has been used primarily in high-expense markets to avoid using the term "affordable". "Housing that families can afford" has also been used as well. Regardless of the specific terminology, however, the clear acknowledgement that affordable housing suffers from a negative 'brand' is something that multiple agencies and organizations must overcome to be effective.

**Build Capacity within the Housing and Equity Fields**

Enhance and enforce affirmative furthering of Fair Housing and the ability to develop and the deliver high-quality affordable housing

- *Strengthen Fair Housing infrastructure and the affordable housing sector*

---

[1] *The Buffalo Billion Investment Development Plan.* Buffalo Billion: An Initiative of the WNY Regional Economic Development Council. February 2013. P. 45.

136

PLAINTIFFS_GENERIC-00005003

Both the Fair Housing regulatory framework and enforcement system need to be strengthened.  Fair Housing regulations are in place and the federal and state levels which, taken together cover age, race, color, national origin, sex, sexual orientation, marital status, disability, military status, and other specified classes.  But local ordinances do not apply in each municipality and are often uneven or outdated.  Ideally new, updated Fair Housing ordinances may be adopted at the County level to provide uniformity, clarity and consistency for buyers, sellers, renters, agents and agencies.  By taking a market-wide approach, the regulations would be easier to perform education about, easier to comply with and easier to track.  However, gaining broad regional constituency may be a more time intensive or longer-term goal.  Municipalities should not necessarily be waiting on a more encompassing initiative, but could instead act unilaterally to promote Fair Housing within their jurisdictions with updated ordinances.

Fair Housing enforcement and education needs additional resources, collaboration and accountability.  The FHEA committee heard anecdotal evidence of a circular system of investigation and referrals with no clear criteria or end point for complaints of discrimination beset by overlapping yet unclear jurisdiction.  Though some complaints do result in enforcement, the ability to follow and track both individual cases and trends remains cumbersome and at times shrouded in mystery.  Though confidentiality for complainants should be respected, coordination and information sharing, public reporting and analysis need not be a contradictory aim.

The current resources for both governmental agencies and non-profit and collaborative organizations are inadequate to the task and the challenge in the region.  Entitlement communities and other local governments can show their commitment to Fair Housing by supporting these activities financially and collaboratively, both proactively (i.e., random audit testing for housing discrimination) and reactively (i.e., incident investigation and complaint-driven testing).

Though Fair Housing infrastructure is not the same as affordable housing infrastructure, in the absence of private sector developers willing to expand choice to diverse populations, a robust community development and affordable housing infrastructure needs to be supported to increase options for minorities, low-income families and other marginalized groups.  This includes a greater amount and flexibility of available resources, but it also means reforming the system to increase overall shared capacity while retaining local knowledge.

■ Establish independent accountability mechanisms to ensure projects and public investments are proactively contributing to a more equitable region

The process of the FHEA is based in the belief that issues of equity must be held

PLAINTIFFS_GENERIC-00005004

up and reinforced in regional deliberation and decision-making processes.  While this commitment is a strong first step in integrating equity concerns into a regional revitalization dialogue, there is a broader need to keep equity, opportunity and inclusion as a driving factor in the local dialogue around public investment and private actions.

While at this point unanswered, the question has been posed: How do we analyze and monitor plans and proposals?  Ultimately, within the development realm there needs to be an advocate for inclusion and opportunity regularly reviewing, participating in and holding local boards, agencies and developers accountable.  Additionally, much as Smart Growth is now framed as objective criteria within the Regional Economic Development Council process for State investment, objective criteria for equity and inclusion should be included in scoring on applications for State grants and local subsidies as well as any signals of support from the One Region Forward implementation construct.

■ *Develop citizen champions for equitable and sustainable development*
Through the One Region Forward planning process, the planning consortium has established a framework for empowering citizens to play an active role in shaping future development within Buffalo Niagara. The Citizen Planning School will have two components.

The first is a broad based curriculum ranging from topics on transportation and food systems, to the green economy and organizing for action.  This program will be held in person but also produced and posted online to make the information available to users from throughout the region.  The second component is the Champions for Change program in which select community members who have participated in the Citizen Planning School curriculum will also be able to receive direct support and technical assistance from the University at Buffalo School of Architecture and Planning to help shape an action plan for moving an issue campaign forward.

In order to promote equity within the region, the program should prioritize and recruit members of underserved communities and traditionally marginalized groups, including racial and ethnic minorities and low-income residents.

**Enhance and Enforce the Regulatory Structure**
Development and finance systems need to be modernized, enhanced and monitored

■ *Reform the local framework for development, land use and zoning, and land use approvals process*
Many local zoning ordinances are decades old and need to be amended to allow

PLAINTIFFS_GENERIC-00005005

for a more diverse and inclusive style of development. The towns of Clarence and Amherst have introduced measures of traditional neighborhood development into their recently revised ordinances, and the City of Buffalo is currently overhauling its outdated zoning code. But these communities, while not being the only municipalities making progress, are the exception rather than the rule.

A concerted effort needs to be made throughout the region to promote a variety of housing types, accessible by a variety of transportation means and at a variety of incomes. In addition to reducing restrictive barriers to multifamily housing and denser forms of development, revised zoning ordinances should be going beyond permissive to implement inclusionary zoning provisions to affirmatively further opportunity in the region.

■ *Monitor and regulate finance and real estate transactions and practices*
Many of the regulations contributing to inequality, particularly within the finance, insurance and real estate industries, have been promulgated by state and federal, rather than local, jurisdictions. As such, local advocates and local governments need to be engaged with statewide and national networks educating lawmakers and agency representatives about the detrimental impacts of these policies. Local partners must also propose regulations and policies that would help to ameliorate the decades of harm these practices have inflicted on low-income and minority communities.

At the same time, some localities have taken more proactive measures to ensure compliance and performance within their communities. These actions run the gamut from data gathering and analysis to increased regulations and new accountability measures for distressed property. Some local organizations have been pursuing the later, in the form of a responsible banking ordinance, while others have advocated and – on a small scale – implemented improved tracking mechanisms and data systems particularly at the county level in order to make it easier to follow and analyze patterns of abusive lending, leading to programmatic interventions.

PLAINTIFFS_GENERIC-00005006