# Exhibit C

**Black Love Resists in the Rust, et al., v. City of Buffalo, et al.**
**30(b)(6) Deposition Subtopic List**

I.     **Topic 1 (Derenda):** The purpose and role of the Strike Force, including but not limited to, the reasons for its creation, its role in traffic enforcement, its operation of Checkpoints, the decision to disband the Strike Force in March 2018, the reasons for the decision, and the bases upon which former Strike Force officers were reassigned following such dissolution.

        A.     The patrol locations of the Strike Force, the persons responsible for and data used in their determination.

II.     **Topic 2 (Derenda):** The role of the Housing Unit in enforcing the Vehicle and Traffic Law in and around Buffalo Municipal Housing Authority (BMHA) properties, including, but not limited to: (a) Operation of Checkpoints, either alone or jointly with the Strike Force; (b) The specific procedures followed when the Housing Unit operated Checkpoints without the Strike Force, including the setting of Checkpoint locations, use of forms and directives, and reporting; (c) The ticketing of parked vehicles in BMHA housing lots; (d) The process and criteria for determining whether tickets issued for violations of the Vehicle and Traffic Law would be processed as parking tickets or traffic tickets.

        A.     The process and criteria used for positioning checkpoints and traffic enforcement in, around, and outside of BMHA complexes;

        B.     Whether the Housing Unit issued checkpoint directives when operating checkpoints without the Strike Force;

        C.     The methods used to record and verify ticketing, arrest, and other data reported on the Housing Unit monthly and annual reports;

        D.     The use and adoption of any form of trespass and gang lists in traffic enforcement.

III.     **Topic 3 (Derenda):** The use of traffic enforcement as a general (i.e., non-traffic-offense) crime control strategy, including but not limited to, by the Strike Force and Housing Unit.

        A.     The use of traffic enforcement to investigate and target gang members and people with criminal backgrounds, including the creation and use of Gangstar and gang-related lists.

IV.     **Topic 4 (Derenda):** The policies, procedures, and training materials for the operation, supervision, and oversight of Checkpoints and the issuance of Checkpoint Directives, including ticketing, searches, seizures, and impounding of vehicles at Checkpoints.

        A.     Any changes to the policies, procedures, and training that Defendants made in response to this lawsuit or other legal decisions concerning Checkpoints.

EXHIBIT
**2**
01-23-2024

V.     **Topic 5 (Derenda):** The reasons for employing Checkpoints, and the process for
       determining where Checkpoints would be held, including, without limitation, interaction
       with and use of information supplied by the Erie Crime Analysis Center, traffic safety
       information, the 311-complaint system, and/or BPD's internal crime data analysis, in
       each of the following periods:  (a) From April 2013 to June 30, 2017; (b) From July 1,
       2017 to March 12, 2018; (c) After March 12, 2018.

    A.     The persons responsible, by name and job title, for checkpoint location selection,
       and the time period (including year at minimum) in which they were involved,
       and why.

VI.    **Topic 6 (Derenda):** The procedures for, and any information and reports generated
       from, monitoring compliance with the policy that "[m]embers of the Department may
       establish traffic checkpoints but only with the express permission of a[n] Inspector, a
       Chief, a Deputy Police Commissioner, or the Police Commissioner."

VII.   **Topic 7 (Derenda):** Any and all evaluations of the effectiveness of the Checkpoints
       program, including the rubrics and statistics used to judge effectiveness.

VIII.  **Topic 8 (Derenda):** Any and all evaluations of the impact of Checkpoints on people of
       color in Buffalo, including without limitation Black and Latinx Buffalo residents, and
       the rubrics and statistics used in the evaluation.

    A.     A description of any studies or analyses that the City commissioned regarding the
       racial impact of the BPD's checkpoint program, and if no such analyses were
       conducted, why not;

    B.     Defendants' and SUNY Buffalo Law School's response to, analysis of, and non-
       privileged communications concerning former UB Law professor Anjana
       Malhotra's research and analysis of the Checkpoints, including the following: (1)
       Document COB061153, and (2) Document COB082897.

IX.    **Topic 9 (Derenda):** The factual bases, if any, upon which Defendant City of Buffalo
       asserts that the location and operation of Checkpoints complied with constitutional
       standards.

X.     **Topic 10 (Derenda):** The response to, including, without limitation, any investigation
       into the accuracy of, complaints about and discussion of checkpoints on public and/or
       social media platforms, including but not limited to, (a) Facebook pages
       (https://www.facebook.com/WNYPoliceCheckpoint/ and
       https://www.facebook.com/groups/900023690055629/), (b) the Daily Public
       (http://www.dailypublic.com/articles/07132016/check-point-buffalo-police-practices-
       questioned), (c) Twitter.

XI.    **Topic 11 (Derenda):** The response to, including, without limitation, any investigation
       into the accuracy of, complaints about and discussion of Checkpoints by State,
       municipal, and/or locally elected officials, including but not limited to: (a) The
       Buffalo Common Council, (b) Police Advisory Board, (c) The Attorney General of

the State of New York's investigation into BPD Checkpoint practices.

    A.    The City's efforts, if any, to investigate whether checkpoints were disproportionately placed in Black and Brown neighborhoods;

    B.    The BPD's response to the Common Council's request to disclose three years of checkpoint locations;

    C.    The BPD's creation of tally sheets, and the purpose and uses of those tally sheets;

    D.    The City's December 20, 2017 response to The Attorney General of the State of New York's December 6, 2017 letter informing the City it was being investigated regarding a pattern of unconstitutional vehicle checkpoints;

    E.    The City's response to recommendations of the Police Advisory Board, NYS Attorney General, and community members for an independent board or alternative measures to address complaints related to checkpoints and other complaints.

**XII.**    **Topic 18 (Derenda):** BPD policies, practices, procedures, rules, guidance, training materials, etc., concerning the issuance of multiple tickets in a single vehicle stop.

    A.    The BPD's policies and practices regulating the number of tickets (of any variety) that can be issued during a single stop, inclusive of any guidance provided to BPD officers;

    B.    Any policy changes, procedures, or investigations that Defendants have adopted or undertaken concerning BPD officers' issuance of multiple tickets at a single stops in response to the filing of this lawsuit;

    C.    Whether BPD officers currently retain the discretion or ability to issue multiple tickets at a single traffic stop.

**XIII.**    **Topic 22 (Derenda):** Any and all evaluations of the impact of traffic enforcement, ticketing, or towing practices on people of color in Buffalo, including without limitation Black and Latinx Buffalo residents, and the rubrics and statistics used in the evaluation.

    A.    A description of any studies or analyses that the Mayor / the BPD commissioned regarding the racial impact of the BPD's traffic enforcement practices, and if no such analyses were conducted, why not.