# EXHIBIT 357

≡ Nonprofit, nonpartisan, fact-based news

DONATE >    SUBSCRIBE >

📅

Jul 20 2020

# Police misconduct costing Buffalo millions

Taxpayers have paid $11.9 million since 2015 to settle lawsuits, mostly involving officer misconduct or reckless driving.

By Phil Gambini



A cop shooting and paralyzing a teenage driver.

A police tow truck driver running a red light and slamming into a passenger car.

A cell block attendant ramming a handcuffed detainee's face into a door at Central Booking.

PLAINTIFFS_GENERIC-00025905

Nonprofit, nonpartisan, fact-based news



DONATE >    SUBSCRIBE >

Those figures trouble Samuel Davis, a local defense attorney.

"I find it alarming that that much money has been paid out," he said.

Davis called the settlements the "tip of the iceberg" when it comes to problematic interactions with the police. Indeed, only about 1.1 percent of people who believe they have experienced misconduct decide to sue, according to a survey conducted by the U.S. Department of Justice.

Capt. Jeff Rinaldo, the police spokesman, said the data compiled by Investigative Post suggests the force is doing a "very good job" considering the department responds to 250,000 to 300,000 calls per year.

The city is defending three additional cases brought by the relatives of men of color who died in encounters with police, two of them shot as they fled. A fourth suit relates to an officer who drowned during a training exercise.

The court orders and settlements have fiscal implications for a city struggling to close budget deficits, as well. Buffalo has spent $5.3 million on settlements in the past year-and-a-half alone.

The settlements don't cost cops or the police department money; they are paid for out of the city budget's general fund. Nor do officers or their union pay for the vast majority of legal costs defending lawsuits; the city picks up the tab.

University Common Council Member Rasheed Wyatt said the mounting settlement costs should concern city lawmakers. The city's financial situation is such that another multi-million dollar settlement "would probably devastate us," Wyatt said.

## Taxpayers cover cost of settlements

Investigative Post reviewed city and court records, as well as press accounts, to determine how much the city has paid to satisfy claims of misconduct against officers and other department

PLAINTIFFS_GENERIC-00025906

0002

Nonprofit, nonpartisan, fact-based news



litigation, but views the settlement total is not an indictment of the state of policing in Buffalo.

"It says for the most part the Buffalo Police Department is doing a very good job," he told Investigative Post.

"What people have to recognize is, over the course of the five-year span that you looked at, there's probably well over two million interactions between the police and the public that occur in that time span."

## Weekly updates delivered to your inbox

**Email Address**

**First Name**

☐ Yes, I'd like to receive weekly newsletters on Sundays from the Investigative Post

SUBSCRIBE

John Evans, president of the Police Benevolent Association, was reluctant to speak at length on the settlements. He said it was the purview of the Corporation Counsel's office.

"We have nothing to do with that," he said of the settlements. "It's the city that does that. If they chose to allocate that money, those funds, that's their business."

Buffalo does not carry insurance to cover settlement claims. It's self-insured, so payments are made out of general operating funds. That's taken a chunk out of city finances of late. City savings are dwindling after being used to keep down property taxes for years and covering miscalculations that overestimated other revenues. As a result, the city was facing a deficit estimated at $16 million to $30 million for the fiscal year that ended June 30.

PLAINTIFFS_GENERIC-00025907

0003

Nonprofit, nonpartisan, fact-based news



Miles Gresham, a member of the local activist group pushing for police reforms, Free the People Western New York pointed to the Morales's payout and contrasted the sum with what's budgeted to provide services to city youth and job seekers, including:

- $401,000 for youth programming.
- $118,000 for recreational programming.
- $202,000 for workforce development and training.

The costs of settlement would swallow those budgets and impact "people who had nothing to do with the fault found with the city or with its police officers," Gresham said.

"This is costing real services," he said.

Wyatt, the Council member, said it's one thing to litigate claims that result from police performing their duties; it's another thing entirely when cops flout policy or the law. The Morales case is an example of the city being on the hook for an officer who acted outside the scope of his duties, he said.

"This person shot into a moving van," he said. "That's against police policy. That shouldn't have happened."

However, Wyatt and Niagara Common Council Member David Rivera, chairman of the Council's Police Oversight Committee, were hesitant to draw conclusions on the state of policing in Buffalo based solely on the total settlement amounts.

"It's a difficult question to answer," Rivera said. "Every case is individual."

It's difficult to compare the cost of settlements in Buffalo with other cities. But when Buffalo data is contrasted with a 2016 study done by a University of California professor Joanna Schwartz, it suggests by one metric City Hall is paying more than some other large cities to settle police lawsuits.

PLAINTIFFS_GENERIC-00025908

0004



| City | Amount |
|---|---|
| New York City | $4,694 |
| Chicago | $3,958 |
| Buffalo | $3,353 |
| Los Angeles | $3,064 |
| Philadelphia | $2,242 |
| Cleveland | $1,668 |
| Indianapolis | $1,503 |
| Atlanta | $1,113 |
| Phoenix | $976 |
| Dallas | $811 |
| Tucson | $379 |
| Miami-Dade County | $296 |
| Raleigh | $145 |

Note: Data drawn from study published in UCLA Law Review that considered settlements from 2012-14. Study did not include Buffalo. Buffalo data based on settlements from 2015 to 2020.

The New York City Police Department, the nation's largest, paid out the most, according to the study. Chicago was next and Buffalo third, ahead of such big-city departments as Los Angeles and Philadelphia.

It's not a direct comparison. The 2016 study covered the years 2012-14. Investigative Post reviewed payments from the last five years.

Schwartz cautioned against using the settlement totals as a strict measure of police conduct. State law and local judicial systems in respective cities all play a role, she said.

## Crashes, excessive use of force claims

PLAINTIFFS_GENERIC-00025909

0005

Nonprofit, nonpartisan, fact-based news



death. Three settlements exceeded $1 million.

Morales's settlement was approved in February. It stemmed from an incident in 2012 when Morales, then a 17-year-old student, was shot and paralyzed by a police officer.

The officers involved, Jason Whitenight and Karl Schultz, said they pursued Morales for driving erratically at high speed. Though the officers had a prisoner in the backseat of their unmarked vehicle, they chose to divert their route and chase Morales.

Morales, who said he did not realize the unmarked car pursuing him was a police vehicle, sped away from what he thought was an aggressive driver. The chase ended when Morales lost control of his minivan, hopped a curb and came to a stop. Whitenight and Schultz pulled up behind. They exited the vehicle. As they did, Morales pulled his minivan backward. The officers began shooting and struck Morales, according to court records.

The next largest settlements were paid to twins, Brigette and Kristen Brzezniak. The sisters, then 24, were struck by a police tow truck in 2013. Both suffered severe back injuries that required numerous surgeries to correct. Brigette received $2.25 million and Kristen $1 million from the city in 2017.

In another settlement of note, Garry Connors brought a lawsuit against the police department and City Hall for his late son, Matthew. Matthew Connors was shot and killed during an encounter with Officer James Reese in 2009. Reese said Connors was suspected of a robbery and had tracked him to his apartment.

## Police settlements paid by Buffalo, 2015 to 2020

| Year | Name | Amount | Type |
|---|---|---|---|
| 2020 | Wilson Morales, Jr. | $4,500,000 | Excessive force |
| 2019 | Shaun Porter | $300,000 | Excessive Force |
| 2019 | Jerome Thagard | $250,000 | Wrongful imprisonment |
| 2019 | Estate of Ida Murphy | $125,000 | Wrongful Death |

PLAINTIFFS_GENERIC-00025910

0006



| | | | |
|---|---|---|---|
| 2018 | Diane Peach | $175,000.00 | Vehicular crash |
| 2017 | Brigette Brzezniak | $2,250,000 | Vehicular crash |
| 2017 | Kristen Brzezniak | $1,000,000 | Vehicular crash |
| 2017 | Rachel Redgos | $750,000 | Vehicular crash |
| 2017 | Estate of Matthew Connors | $600,000 | Excessive force |
| 2016 | Justin Levy | $290,000 | Wrongful Imprisonment |
| 2016 | Timothy Monahan | $225,000 | Vehicular crash |
| 2015 | Lynn Dejac-Peters | $735,000 | Wrongful Imprisonment |
| 2015 | Laura Spear | $350,000 | Excessive force |

*Source: Investigative Post research.*

An altercation took place at the residence. Reese said Connors brandished a handgun and a fight ensued. The family contended Connors had back injuries that would have prevented him from fighting in the way Reese described. The weapon turned out to be a pellet gun. The family received a $600,000 settlement.

Another costly settlement involved a $300,000 payment to Shaun Porter. He was standing handcuffed with his back to multiple officers inside a room in Central Booking in 2016 when cellblock attendant Matthew Jaskula grabbed him by the shoulders, threw him face first into a metal door and dragged him down a hallway by his wrists.

## City defending other lawsuits

Four high-profile lawsuits concerning allegations of city police misconduct are pending. Another likely plaintiff, Quentin Suttles, has signaled his intent to sue over police misconduct allegations with a notice of claim filed in June. All but one of the lawsuits involve men of color.

Wardel "Meech" Davis, 20, was stopped by police in February 2017 by Officers Nicholas Parisi and Todd McAlister. Police said Davis fled and resisted arrest, so he was chased, detained and

PLAINTIFFS_GENERIC-00025911

0007



The state Attorney General's Office concluded the officers were not responsible for Davis's death. They noted, however, that the officers involved refused to cooperate with the investigators' requests for interviews. The report faulted the department for not outfitting its officers body cameras or squad cars with dash cameras. It also took issue with protocols of the Erie County Medical Examiner's Office.

The Davis family's lawsuit is ongoing. The family's attorney, Robert Perk, declined to comment.

Two months later in 2017, Jose Hernandez-Rossy, 26, was shot by Officer Justin Tedesco while fleeing police after a traffic stop. Tedesco and the other officer on scene, Joseph Acquino, "mistakenly" believed Hernandez-Rossy to have a gun, according to the AG's report. State investigators concluded his death was the result of "a calamitous confluence of events." No charges were filed. The lawsuit is ongoing, according to attorney Nelson Torre.

The most recent death was that of Rafeael "Pito" Rivera, 32, who was shot and killed by Officer Elnur Karadzhaev on the city's West Side in 2018. Surveillance video captured a portion of the events. The video shows Rivera running away from officers, who shot him three times. Police claim Rivera was armed, so the AG's office did not investigate his death.

The family of a deceased officer is also suing the department and city. Craig Lehner, a 35-year-old officer, drowned in 2017 during a training exercise in the Niagara River's fast-moving water. The lawsuit alleges the department "violated and departed from" the rules and regulations that guide police in dive training.

In court papers, the city has disputed allegations in all four cases.

## Challenges faced by plaintiffs

Preparing and litigating cases comes with challenges, multiple attorneys told Investigative Post. Protracted cases in civil court will cost the plaintiff in money and the attorney in time. The Morales case, for instance, took eight years to conclude from the time of the incident to the settlement.

PLAINTIFFS_GENERIC-00025912

0008



"Lawyers fight tooth and nail when you file something of that nature," he said.

Steve Cohen, the Rivera family's attorney, said civilians must face off in court against the budgetary resources of the city. Plaintiffs are also hampered by what Cohen described as good officers' reluctance to speak out about the transgressions of their colleagues. Colloquially, it's called the "blue wall of silence."

"There's an entire machine designed to defeat these claims," Cohen said.

Until the law was repealed in June, a police officer's disciplinary history, known technically as "50-a material," was not regularly admissible in court. Plaintiffs had to convince a judge to make the records available and police departments usually fought disclosure. The majority of the time judges ruled that the records are not relevant to the case at hand, Cohen said.

"Forget about allowing it to be seen by a jury — that comes later," Cohen said.

Davis said there are complications for individuals who sustain injuries during arrest and are subsequently charged with a crime. A common mantra attorneys repeat to clients is: if you want to pursue a civil case you cannot take a plea for criminal charges, he said.

For a person whose jury trial carries the risk of lengthy incarceration, forgoing a plea deal is a big risk.

"To take any sort of plea, that's an admission of guilt," Davis said. "It's a sort of, 'You asked for it' scenario, many times."

One of the unique protections afforded to police in civil court, and one of the reasons they rarely pay as individuals, is a judicial doctrine known as "qualified immunity." The doctrine is intended to shield government officials from legal harassment while performing their duties.

In a recent contribution to the Washington Post, Schwartz, the UCLA professor, described the doctrine as a shield for government officials that protects against "liability for damages, even if they have violated the constitution."

PLAINTIFFS_GENERIC-00025913

0009

Nonprofit, nonpartisan, fact-based news



## Merits of reforms are debated

Schwartz said ending qualified immunity an important first step in decreasing legal costs for plaintiffs and defendants and increasing police accountability. It's one of the few steps that could have immediate impact nationwide if taken, she said.

"I don't think that it's a cure all," she said, "(but) it would have some important effects."

Evans, the PBA president, disagreed.

"If those components were to end I'd have to say you'd have to be a moron to take this job," he said. "Because on the next call you went on, you could lose everything you have sacrificed and worked for in an instant. Attorney fees alone could destroy you financially. Forget about an adverse civil court decision."

Gresham, the defense attorney and activist, supports doing away with the doctrine. He said he understands protecting police, like most city workers, from being pursued for minor property damage or similar tort claims.

"But when we talk about killing people, maiming people, scarring people and their families for life — no, I don't think cops should be protected from that," he said. "Cops that can't be trusted to do their job without doing those kinds of things on a regular basis, they should absolutely quit."

Wyatt said police reform discussion requires being open to diverse proposals. The union's voice should be part of that, he said.

"At the end of the day, we want good police. We want officers to follow policy," he said. "We cannot continue to payout the millions of dollars we've been paying."

*posted 3 years ago - July 20, 2020*

PLAINTIFFS_GENERIC-00025914

0010

Nonprofit, nonpartisan, fact-based news

 

- License plate readers target minority neighborhoods
- Mayor's half-baked paid leave report
- Misconduct allegations against 'Falls mayoral candidate
- City Hall clerk paid not to work



## About Us

The organization
Staff
Board of directors
Major donors
Journalism awards

## Free weekly newsletters

Delivered to your inbox every Sunday morning.

Email Address



SIGN UP

Investigative Post
487 Main Street • Suite 300
Buffalo, NY 14203
Phone: 716-831-2626
info@investigativepost.org

PLAINTIFFS_GENERIC-00025915

0011

Nonprofit, nonpartisan, fact-based news

 DONATE >

 SUBSCRIBE >

PLAINTIFFS_GENERIC-00025916

0012