# EXHIBIT 409





# THE CONSTANTINE INSTITUTE, INC.
## 102 WILLETT STREET
## ALBANY, NEW YORK 12210
### 518-465-4413
### TERRYONEILLESQ@AOL.COM
### WWW.CONSTANTINE-INSTITUTE.ORG

## JOINT LEGISLATIVE FISCAL COMMITTEE HEARING
## EXECUTIVE BUDGET
## PUBLIC PROTECTION
## 4 FEBRUARY 2016
## STATEMENT OF TERRY O'NEILL, DIRECTOR
## THE CONSTANTINE INSTITUTE, INC.

### INTRODUCTION

The Constantine Institute, Inc. has been organized to promote the highest constitutional, legal, ethical and professional standards in law enforcement; to encourage innovation in public safety strategy, tactics, training and education and to foster a seamless continuum of cooperation, support and mutual respect among public safety agencies and organizations.

As most of you know, our eponymous patron Tom Constantine, former New York State Police Superintendent, Drug Enforcement Administration chief and Oversight Commissioner for the Reform of the Police Service of Northern Ireland, died unexpectedly and untimely this past May. All the more reason to act decisively and promptly to cement and pay forward his extraordinary legacy of achievement in law enforcement. In addition to bringing down the leaders of the largest and most powerful criminal syndicate in history and ending more than three decades of terrorist violence in Northern Ireland, among Mr.

PLAINTIFFS_GENERIC-00025833

Constantine's accomplishments was to have made the New York State Police a powerful force in combating the ravages of the crack epidemic of the 1980s in the state's most distressed and neglected communities -- our inner cities. He did this by redoubling the NYSP's efforts to recruit minorities into the ranks. The result was his signature program the Community Narcotics Enforcement Teams that swept the streets of inner city neighborhoods of the very people that residents all knew were the drug dealers and violent criminals who were making their lives miserable. He did this without indiscriminate stopping and frisking or other heavy-handed policing practices that have come to be so resented by communities of color. At a time when the Mayor of Albany is being shouted down by protesters from the Black Lives Matter movement, our effort to hold up Tom Constantine as the paradigm of a police leader who could fight violent crime and drug trafficking so effectively while remaining respectful of the needs, concerns, rights and sensibilities of communities of color is especially timely and uniquely meaningful.

### CRISIS IN POLICE/COMMUNITY RELATIONS

Conflict that erupted across the nation over the past two years between police agencies and communities of color brought to light the execrable state of police/community relations that has evolved over the past two decades. The Black Lives Matter movement was catalyzed, as is well known, by the Ferguson MO and Staten Island deaths of young men of color at the hands of police officers. Similar cases have occurred in communities across the nation with depressing regularity.

Based on my experience as a lawyer and legal reform consultant, including several years as a criminal justice advisor to the administration of Governor Mario Cuomo, I have three recommendations to make regarding criminal justice reform in the State of New York that would address this situation in a sweeping and meaningful way that befits its status as the most urgent civil rights issue of the day.

First, over the past two decades, a once vibrant movement toward community policing -- police service founded on true partnership with community stakeholders -- has been all but totally eclipsed by the kind of data-driven policing that Bill Bratton debuted in New York City in 1994. I am a witness to the fact that this style of numbers-driven policing was aggressively promoted throughout the nation and has been hugely influential. It has fundamentally changed the relationship between municipal police agencies and the public they serve and not for the better.

While many credit Bratton's COMPSTAT and other policing tactics that are descended from it for the historic reductions in crime nationwide, this style of policing has driven a wedge between police and communities of color. Crime may be going down, but public dissatisfaction has been skyrocketing. That is what protesters across the nation are saying. That is what New York City voters were saying when they elected Bill de Blasio. Their complaint is both legitimate and urgent. Whomever is tasked as the state's primary responder to this phenomenon should be given a clear mandate to reignite the community policing movement. That belongs in this Budget. Sadly, Governor Cuomo has proposed nothing dramatic to respond to this crisis.

PLAINTIFFS_GENERIC-00025834

Second, former Governor Mario Cuomo, may he rest in peace, signed into law Chapter 55 of the Laws of 1983, the Neighborhood Preservation Crime Prevention Act (NPCPA). This DCJS-administered program was intended to foster the creation of an infrastructure of community-based nonprofit organizations that could access new resources and collaborate with police and other municipal agencies to improve quality of life in neighborhoods that otherwise would slide into decay and criminality. That there would be a state program to to promote this purpose would give it a sense of order and purpose that would benefit communities all over the state. This inspired piece of legislation would have empowered neighborhoods and their residents to have a major impact on the quality of life in their communities. Unfortunately, for whatever reason, NPCPA was never funded, staffed, implemented.

The kind of community-based infrastructure NPCPA would have created would have helped neighborhoods and police agencies work together in productive partnership. This law is still on the books. As the Legislature and the administration of Governor Andrew Cuomo move forward in developing its response to the police/community relations crisis, I would strongly suggest taking up this piece of Mario Cuomo's legacy and fulfilling its promise at last. Last year, the governor created the Office of Faith-Based Community Development. I believe that office could be the vehicle for achieving just that. .

My recommendation to the Legislature is to  ensure that a portion of that appropriation for this office be expressly applied to encouraging community policing initiatives jointly pursued by law enforcement and community stakeholders. As I have repeatedly pointed out to the governor and his successive advisors and commissioners in the field of public safety, they need only look out their Second Floor windows to see the innovations that the Albany Police Department has implemented over the past five years with dedicated and sustained support and collaboration of our Albany Community Policing Advisory Council (ACPAC). Entities like ACPAC should be encouraged and given financial and technical assistance.

Third, for over half a century, the decision of the US Supreme Court in *Gideon v. Wainwright* has guaranteed that poor persons who get swept up in the machinery of the criminal justice system should have effective legal representation. As all know, this promise has not been kept. Certainly, were we to address this decisively and dramatically, we would be leveling the playing field between the poor accused and the police and prosecutors who arrest them in their tens of thousands and force them into plea bargains that ruin their lives.

Any thoughtful person who contemplates the many decades over which this issue has been left on the backmost burner can only condemn the total lack of engagement by the Executive, the Legislature, and the Bar in doing what is so obviously the right thing. The shameful fact is that there has been no meaningful judicial reform in New York since the administration of Nelson A. Rockefeller and he accomplished what he did because he made it a top personal goal of his own. I ask Governor Cuomo and this Legislature to accept the challenge of *Gideon* right now when doing so would do the most good.

PLAINTIFFS_GENERIC-00025835

COMMUNITY POLICING

The concept of community policing has been widely known for nearly three decades. It is based on a police agency's building and working in partnership with community stakeholders to identify and solve problems that degrade quality of life and create an environment in which crime thrives. It has never been systematically promoted by the state of New York. Governor Cuomo's budget proposal offers nothing explicit to suggest that will change. The epidemic of drug-fueled violence that took hold in the 1980s resulted in the lion's share of public safety resources being invested in prison capacity during the administration of Governor Mario M. Cuomo. The Pataki years saw the emergence of Operation IMPACT as the state's primary local assistance program for law enforcement derived from the widely influential, statistics-driven, technology-based policing made popular under the administration of New York City Mayor Rudolph Giuliani and his first Police Commissioner Bill Bratton under the name COMPSTAT in the mid-1990s.

The popularity of this style of enforcement nationwide has effectively driven police agencies apart from the communities they serve and stymied the growth of the community policing movement. More recently, the "controversial stop and frisk" practice that was the hallmark of NYPD Commissioner Ray Kelly's long tenure evolved into a serious irritant in police/community relations. It has also, as research first published in 2010 by Dr. Eli Silverman Professor Emeritus of John Jay College and Dr. John Eterno of Molloy College has indicated, resulted in downgrading of felonies and discouraging victims from filing complaints by commanders who are under relentless pressure to report steadily declining rates of crime. I would commend to your attention a book these scholars brought out just four years ago greatly expanding upon their research. (See: ***The Crime Numbers Game: Management by Manipulation, Advances in Police Theory and Practice***, Eli Silverman and John Eterno, CRC Press, 2012.) (See also: ***The NYPD Tapes: A Shocking Story of Cops, Cover-ups, and Courage***, Graham A. Rayman, Palgrave MacMillan, 2013)

Leading figures in contemporary policing have been saying loudly and clearly that police/community partnership has become severely attenuated. We have turned police cars into rolling high-tech offices. Now, officers won't get out of the "office" and interact with the public. Bernard Melekian, former Director of the US Justice Department's COPS program has noted that while the numbers show that cities have grown safer, opinion polls confirm that Americans still fear crime.

Even more emphatically, we have seen the New York City Police Department finally brought to heel with respect to that most egregious and widespread abuse of the data-driven policing tactics that debuted under former Mayor Rudolph Giuliani — i.e. "Stop-and-Frisk". I have characterized Judge Shira Scheindlin's landmark decision in ***Floyd v. City of New York*** as the most significant court decision affecting police management, supervision and training since the 1978 US Supreme Court ruling in ***Monell v. Department of Social Services of the City of New York.***

At this writing, critics of the NYPD and the tactics that characterize the now global "Bratton Brand" of policing have turned their focus toward "Broken Windows", a policing tactic that uses the full force and power of the police to discourage minor public order offenses that are thought to give rise to more serious crime. That assertion remains far from proven. One

PLAINTIFFS_GENERIC-00025836

would say that the unchallenged assertion by proponents of the Bratton Brand that the combination of COMPSTAT, Stop-and-Frisk and Broken Windows is primarily responsible for declining rates of crime over the past two decades are guilty of the logical fallacy of *post hoc ergo propter hoc* in a very big way. They are also forgetting the historic intervention made by this Legislature with the 1991 Safe Streets/Safe City Act that reversed the decimated condition in which the NYPD and other agencies of NYC government had been left by the fiscal crisis of the mid-1970s.

In Albany, recent years have seen an extraordinary community discussion on the direction we want our police department to take. This was catalyzed by a number of tragic homicides involving victims and perpetrators of a very young age. These kids are not statistics. In a small city like ours, they have names. The kids in our neighborhoods and schools know them. For nearly four years, however, we had a chief of police who was addicted to the flashy technology we got through Operation IMPACT, created a "strike force" and responded to expressions of public dissatisfaction with the department's service and performance by citing statistics from DCJS indicating a decline in reported crime.

In 2010, Albany went through a very public process of searching for and selecting a new police chief. The people had the opportunity to tell the search committee empanelled by the mayor what kind of chief they wanted. At the same time, the interim team managing the Albany Police Department worked closely with the Common Council to develop a framework for designing and implementing a community policing plan. That plan is now in place. It has as its most visible component the establishment of Neighborhood Engagement Units that have divided the city into eighteen police beats with permanently assigned officers who have a community policing mandate. Fully ten percent of the department's manpower is committed full-time to this program. Officers in these units are in constant communication with patrol and investigative units making theirs a most valuable contribution to our innovative practice of Intelligence-led Policing.

I have the honor of having served on the Buffalo Police Department Reorganization Commission which has a mandate to review the organization and geographic deployment of the department and to develop a plan for the implementation of community policing. Your colleague Assemblymember Michael Kearns was a key player in getting this commission going. A major impetus for the creation of this panel was the notorious City Grill Massacre that took place outside a popular downtown nightclub in August 2010. Eight people were shot, four of them fatally. Though there were over one hundred witnesses to this shocking crime, no one would cooperate with the department's investigation. Obviously, in the city of Buffalo relations between the police and the community had reached a very attenuated state. The Common Council subsequently adopted a resolution creating the commission. The management of the Buffalo PD asserts that it has community policing. I disagree. Buffalo is divided into five large police districts. Two "community police officers" are assigned to each and I've been told that their expertise on community policing will affect the department through some process of osmosis. This is nonsense. Buffalo has almost eight hundred sworn officers. Only ten are assigned to this program.

Unfortunately, while our commission had a panel of dedicated and capable volunteers to accomplish its task, it had no meaningful resources or administrative support. As the time drew near for producing the commission's mandated report, I wrote to DCJS Executive

PLAINTIFFS_GENERIC-00025837

Deputy Commissioner Michael Green requesting that his agency provide that support under a long-extant statutory program ( Executive Law §837(5)) that provides advice and technical support for county and municipal police agencies under the rubric "management studies." I was subsequently informed by DCJS that this program can only be used at the specific request of the chief executive of a police agency. Unlike what happened in Albany and in several other instances I've been involved in that directly and successfully addressed a poor state of police/community relations through a concerted dedication to community input, the management of the Buffalo PD offered no meaningful cooperation with the commission. We were not able to hold the kind of public hearings and community forums that worked so well in Albany. Commissioner Daniel Derenda believes that the fact that he has assigned -- out of a force of some eight hundred sworn police officers -- two "community police officers" to each of five very large and populous police districts in the city constitutes the delivery of neighborhood policing. That is utter nonsense. In Albany, nearly 10% of the Albany Police Department's workforce is assigned full-time to provide community policing in eighteen neighborhood beats.

Clearly, Executive Law §837(5)) needs to be amended to give DCJS a mandate to respond to requests from municipal authorities other than the police department for assistance in reviewing police management issues.

What we need to do in this year's budget is to take a good hard look at the local assistance we send to local law enforcement. Governor Cuomo re-branded Operation IMPACT to focus on gun-related crime where it heretofore emphasized subsidized police overtime and acquisitions of pricey technology. We should respond to his willingness to sharpen the program's focus and his funding for the non-police Operation SNUG anti-violence program that existed during one budget cycle during the Paterson administration by opening the door even wider. We should be providing leadership from the state level that encourages local law enforcement to move in the direction of community policing and partnership with neighborhood stakeholders. Communities with a healthy sense of trust and partnership with their law enforcement agencies are attractive to home-buyers, business investment and tourism. There should be a strong state program to encourage it as a essential component of our economic development efforts in all our distressed communities.

THE CONSTANTINE INSTITUTE

In 1999, then Assemblyman Edward Griffith, a longstanding member of the Ways and Means Committee celebrated for his conscientiousness and his ethical punctiliousness, paid his first visit in many years to his native Panama. On his return, he told me that he had been shocked and appalled to see the war damage still evident in Panama City from the military incursion that President George H. W. Bush had ordered to effect the arrest of Panamanian strongman and drug trafficker Manuel Antonio Noriega ten years earlier. I explained to him that United States had had to take action because Noriega had basically allowed Colombian and Mexican drug cartels use his country's financial institutions as piggy banks and money laundries. (See: *Our Man in Panama*, John Dinges, Random House, 1990) In fact, sovereign governments of many small nations in the Caribbean Basic were and remain vulnerable to this phenomenon. Mr. Griffith wanted to do something.

PLAINTIFFS_GENERIC-00025838

At Mr. Griffith's request, I developed a legislative proposal that would mobilize the intellectual resources of our state's great public university system to develop recommendations to guide the state and the nation on confronting transnational organized crime. In its current iteration, this proposal is appended to this written testimony in the form of draft legislation. I offer it to the committees for your consideration and we would be happy to work with any and all of you. What Mr. Griffith wanted to do in 1999 is still as well-considered and even more timely today that it was then.

It has been my ambition for twenty-five years now to make New York a center for research and development on cutting-edge ideas in public safety, tackling problems ranging from youth gangs and street crime to transnational organized crime and terrorism. These difficult times challenge us to be resourceful in finding the means to create and sustain new programs and initiatives. We must be creative in looking at resources we possess of which we have not realized their maximum value. We do, in fact possess a unique and untapped resource of great value in the unique and pioneering record of the New York State Police and our eponymous (i.e., the person our organization is named for) patron the late Tom Constantine himself.

In 1957, the NYSP made history when it exposed the existence of organized crime in an incident known as the Appalachin organized crime meeting. That incident sparked a historic engagement on the part of the federal government and law enforcement agencies all over the nation to confront and combat what has today grown into a global network of criminal enterprises. (See: ***McMafia: A Journey through the Global Criminal Underworld***, Misha Glenny, Vintage Books, 2009) The United Nations estimates that criminal organizations worldwide profit over $2 trillion a year, twice what all the nations on earth spend on their annual military budgets.

In 1991, under the leadership of then State Police Superintendent Tom Constantine, the operations of Colombia's Cali Cartel were exposed in New York after a six-year investigation that began with the 1985 discovery of a cocaine processing lab in rural Montgomery County. Four years later, as head of the Drug Enforcement Administration, Constantine presided over the dismantling of the cartel and the capture, extradition, sentencing and imprisonment of its leaders and the forfeiture of some $8 billion of their criminal assets. The Cali Cartel is acknowledged to have been the largest and most powerful criminal conspiracy in history. (See: ***Drug Lords: The Rise and Fall of the Cali Cartel, the World's Richest Crime Syndicate*** , Ron Chepesiuk, MILO Books Ltd., 2003) An alumnus of our New York State Police took it down. And the New York State Troopers who exposed the old Mafia in 1957 dragged the New Mafia out into the light of day in 1991.

Between 2000 and 2003, Constantine, serving as Oversight Commissioner for reform of the Police Service of Northern Ireland, played a major role in ending more than three decades of terrorist violence in the British Isles by giving the people of the province a police service that is committed to the highest legal and ethical principals, excellence in professionalism and the philosophy of community policing. This is a remarkable achievement and it stands as a model of what needs to be achieved in many areas of the globe that do not have so trusted an institution to maintain public order.

PLAINTIFFS_GENERIC-00025839

This unique and internationally acknowledged legacy of pioneering achievement is an asset of considerable but unrealized value for purposes of developing a privately-funded and ultimately self-sustaining endowment to support research, development, training and education in the struggle against transnational organized crime and terrorism.

The Constantine Institute proposed for the SUNY system by the appended draft legislation will marshal the intellectual resources of our great public university system and serve as a focal point for research and deliberation on the control of transnational organized crime and terrorism. Modeled on the prestigious Nathanson Centre for Transnational Human Rights, Crime and Security established in 1997 at Osgoode Hall Law School at York University in Toronto (http://nathanson.osgoode.yorku.ca/), the institute will sponsor a diverse research program that will reflect a balance among the issues relating to legal, operational, social, political, and economic aspects of responding to these threats. It will organize conferences and symposia that will bring together the best minds among academics, law enforcement professionals, the military services, the intelligence community, lawmakers, the diplomatic corps and the business and financial sectors to develop strategies, tactics, relationships and legal and diplomatic frameworks for more effective international cooperation.

Since its inception in 1987, the Lt. Col. Henry F. Williams Homicide Investigation Seminar hosted by the New York State Police has brought together thousands of what have become known as Williams Associates, a powerful network of professional colleagues from all over America and a growing number of foreign nations. We envision an even more capable global network of Constantine Fellows composed of alumni of our future series of annual conferences on transnational organized crime and global terrorism.

## MENTOR INTERNATIOINAL

In 1988, I had the pleasure of meeting John Heritage a career New York State Trooper when he was appointed by Governor Mario Cuomo to head the Bureau for Municipal Police at the Division of Criminal Justice Services. One of John's top priorities was to bring the Drug Abuse Resistance Education Program (D.A.R.E.) to the schoolchildren of New York. This program, which had been pioneered by the Los Angeles Police Department a few years earlier, marked a positive new departure in our society's struggle against drug abuse and addiction. It was all the more historic because it came at a time of raging urban violence fueled by the crack cocaine epidemic of the 1980s. John succeeded in achieving his goal within a very short time. It wasn't long before successive cohorts of D.A.R.E officers from police agencies around the state were being trained, certified and deployed in classrooms across the state. In its time, D.A.R.E. was a true innovation and a hopeful new approach to the problem of youth drug involvement.

As the years have gone by, much has changed in our knowledge of and attitudes toward the epidemic of drug addiction. Indeed, much about addiction has changed, as well. Today, abuse of prescription drugs is on the rise and the problem has moved from inner cities to suburbs and rural communities. We are re-thinking many of the harsh penal policies we adopted at the height of the crack epidemic. We have also increasingly come to view the problem of chemical dependency as a public health, rather than a public safety, issue. To

PLAINTIFFS_GENERIC-00025840

that end, many of us involved in the process of making public policy on drug abuse prevention have been looking for a next generation of strategies for reaching young people with an effective anti-drug abuse message. I am convinced that we have found one.

In 2010, at the invitation of His Excellency Jonas Hafström, then Ambassador of Sweden, I was introduced to Mentor International. Her Majesty Queen Silvia of Sweden established Mentor International in 1994 in collaboration with the World Health Organization. Since then, the organization has grown to provide support to youth in over 80 countries reaching more than 6 million children. Mentor International, together with Mentor Foundation USA and the other affiliated Mentor organizations around the world, is today the leading international not-for-profit network empowering youth and preventing substance abuse. Its mission is to prevent drug abuse among youth while helping them identify and pursue their goals. Mentor views drug prevention and the success of our youth as a collective civil responsibility. Therefore, it partners with the business community, government agencies, schools, and parents to create healthy and productive pathways for youth. Since opening its offices in Washington DC in 2010, Mentor Foundation USA has reached more than 140,000 youth across the United States.

This past November, with funding from the Rip Van Winkle Foundation, an organization dedicated to promoting preventive medicine and headquartered in Hillsdale, Columbia County, Mentor was debuted in three Columbia County high schools. Some 1,300 students participated. More recently, Mentor Foundation USA has announced that it is the recipient of a grant from the Conrad N. Hilton Foundation that will directly support the research efforts of "an innovative new substance misuse prevention program (i.e.; Mentor) in Columbia County, Hudson Valley, NY, that builds on the power of positive peer-to-peer messaging and peer driven community initiatives." The research will measure how Counter Marketing Prevention through positive peer-to-peer messaging can help offset the negative messages that youth are influenced by on a daily basis. Counter Marketing Prevention uses commercial marketing tactics to combat negative media influences, increase positive health messages, and reduce the prevalence of substance misuse in the state and its communities.

Mentor is taking a profoundly new direction in youth substance abuse prevention, one that is very much in line with the positive and progressive view that society's problem with drugs is a public health issue, not a criminal justice issue. The recently released report of the Assembly Minority's Task Force on Opiate Addiction trenchantly makes the point that peer-to-peer approaches to drug abuse make abundant sense in reaching a high school aged audience. I would strongly recommend that this year's budget contain funding for evaluating Mentor's innovative peer-to-peer approach to youth anti-drug abuse programming.

## THE NEIGHBORHOOD PRESERVATION CRIME PREVENTION ACT

As I mentioned in my introduction, there is a moribund statutory framework in New York to promote a type of community-based problem-solving that focuses on neighborhood preservation and renewal. It is the Neighborhood Preservation Crime Prevention Act (NPCPA) (Chapter 55, Laws of 1983). It was intended to promote the creation of an infrastructure of community-based nonprofits that would partner with local police and other

PLAINTIFFS_GENERIC-00025841

municipal agencies to preserve and renew neighborhoods and thereby reduce crime. DCJS was charged with administering the NPCPA and tasked with awarding small grants and providing technical assistance to the nonprofits encouraged by the program.

This forward-looking legislation, which Albany County District Attorney David Soares has called "one of the most brilliant pieces of legislation ever drafted, empowering neighborhoods and empowering people," was never implemented. In fact, early in the Mario Cuomo administration, DCJS' entire community crime prevention program was abruptly terminated. But neighborhood deterioration, specifically the abandoned building problem, continues to be a major criminogenic problem in all of our in all of our cities. We should, if not activate the NPCPA, at least come up with a program that fully integrates neighborhood preservation into our overall crime-fighting strategy. As I have suggested, Governor Cuomo's Office of Faith-Based Community Development Services can be easily adapted to fulfill this purpose.

## PRISON INMATE RE-ENTRY

Between 1983 and 1994, the population of the state prison system exploded from 17,000 to 71,000 at its peak. Today, the Department of Correctional Services releases almost as many individuals in a year as were in prison in 1983. Very slowly has our system moved to put in place the network of community resources that are needed to ensure that these people make a successful transition back to the community. Since former President George Bush proposed and Congress passed the Second Chance Act, there has been positive development in this direction. In New York, DCJS has administered funding to support prisoner re-entry task forces in a number of the state's counties. President Obama has empanelled a Cabinet-level re-entry task force to co-ordinate programs of a range of federal agencies in support of state and local re-entry efforts.

Several years ago, I worked with Albany County District Attorney David Soares on an effort to integrate an inmate re-entry program into the county's total public safety strategy. In Albany County, there are some 600 persons under parole supervision at any given time. The problem of caseload overburdening of parole officers leading to lax supervision of parolees is well known. The rate of recidivism of ex-convicts can rise to two-thirds in many places. These facts cannot be responsibly ignored by any subdivision's public safety authorities.

In the course of developing a proposal for Mr. Soares, I learned that there are many organizations in the community that collectively offer a full range of services that transitioning inmates need. It has become increasingly accepted that generic transition programs are not the most effective. Each returning inmate has different needs. Each is most effectively served by a program individually tailored to meet those needs. It is in our interest to have available the widest array of options out of which to fashion individual reentry programs. To date, the established providers have not been coordinated, they have competed against one another for resources and clients and some large providers have monopolized the field. The county re-entry task forces have begun the process of cataloging and coordinating services. But we think we could do something more.

PLAINTIFFS_GENERIC-00025842

For decades now, our distressed and mostly minority neighborhoods have produced most of our prison population. These neighborhoods, which, outside of New York City, Have very often been Operation IMPACT zones, are where most individuals under parole supervision cluster. They are also the neighborhoods where lie much of the abandoned housing stock in our cities. We need a program that brings together the problem of abandoned properties and people who come out of our prison system needing shelter, job training and employment. Investment in neighborhood preservation, perhaps by providing job training in the building trades for returning inmates, a win-win-win situation.


THE MISSING AND EXPLOITED CHILDREN'S CLEARINGHOUSE FUND

In the late summer of 1994, a little girl named Sara Anne Wood disappeared from the roadside in Herkimer County. Her disappearance was hugely newsworthy and sparked a lengthy and large-scale investigation and search by the New York State Police. The man who took Sara Anne was caught and convicted. Sadly, Sara Anne has never been found. (See: *Little Girl Lost*, http://www.constantinescircus.org/bkch06.htm)

This case got so much publicity at the time that an obscure DCJS program, the Missing and Exploited Children's Clearinghouse, became the subject of considerable media attention. An unexpected result was that the program started receiving offers of contributions from concerned members of the public. There being no mechanism for accepting and spending such gifts, I consulted the offices of sympathetic legislators. The result was the creation of the Missing and Exploited Children's Clearinghouse Fund in the custody of the State Comptroller. It accepts gifts, grants and bequests which are to be expended on advertising and public education efforts to better protect children.

In recent years, the fund has been receiving around $300,000 in the form of state income tax return check-offs. I bring it up here because it has repeatedly come to my attention over the years since its creation that large amounts of money have accrued to this fund that have either not been expended or, more objectionably, have been expended for purposes not authorized by the statute. More recently, State Comptroller Tom DiNapoli issued a report on the performance if this and several other taxpayer gift funds authorized by law. He found that they have been steadily declining in public support. One strongly suspects that the reason for this is that the agencies responsible for spending these monies are not doing so in a very newsworthy way. Let's find a way to show the public that some bang is being got for its bucks.


TRIAD -- PROTECTING OUR GROWING POPULATION OF ELDERS

In December 1991, I read an article in *The New York Times* about the nature and extent of elder abuse and many forms it takes. As the state had no public safety program to address this problem, I set out to find one. I almost immediately encountered the Triad program, the joint creation of the American Association of Retired Persons, the National Sheriffs' Association and the International Association of Chiefs of Police Since it was first proposed in 1988, Triad has evolved into the nation's preeminent public safety program focused on the needs and concerns of our rapidly growing population of senior citizens. Working with

PLAINTIFFS_GENERIC-00025843

then Assemblymember RoAnn Destito, we prevailed upon the Legislature to send Governor Mario Cuomo a bill (Chapter 111, Laws of 1993) that gave DCJS a mandate to promote the Triad program throughout the state.

When Chapter 111 was enacted in 1993, we knew the proportion of our state's population over the age of 65 was exploding and the exposure of this population to a variety of criminal and other forms of victimization was increasing exponentially. Indeed, violent victimizations of the elderly are currently on the rise, according to a new study released by the federal Bureau of Justice Statistics (BJS). Rates of nonfatal violent crime against Americans age 65 or older increased 27 percent from 2003 to 2013, from 3.4 to 4.4 victimizations per 1,000 people. About 2 percent of all violent crimes involved elderly victims between 2003 and 2013, according to the study, which is based on data from BJS's National Crime Victimization Survey (NCVS), which measures nonfatal crimes. Nonfatal violent crime includes rape or sexual assault, robbery, aggravated assault and simple assault.

Since 1993, there has been a statutory framework for addressing this rising tide of elder victimization in the Executive Law as the result of this Legislature's enactment of Chapter 111. This is a time when we should be calling upon Governor Cuomo's to find creative ways to use the vast network of OGS resources throughout the state to encourage the formation and flourishing of Triad programs statewide. With Chapter 111 on the books, the governor does not have, as bureaucrats say, to "re-invent the wheel." He merely has to issue a directive through his executive budget proposal in January to encourage DCJS and other agencies and organizations to devote fresh attention to the cause of promoting this program. The Triad concept was fresh, innovative and endlessly adaptable in 1993 when it was signed into law. It still has those qualities and the need, as we foresaw, continues and has grown greater over time.


CAMPUS/HOMELAND SECURITY

In the recent past, I assisted the union that represents police supervisors for the State University Police in promoting their proposal to centralize the administration of all the SUNY campus police departments In investigating their issue, Chief Frank Wiley of SUNY Albany Police Department brought a very important problem to my attention that affects all of New York's institutions of higher learning. Simply put, campus security agencies are not eligible for federal homeland security funding – even those whose officers have full statutory police status as do the SUNY Police. I believe, and I hope you will agree, we should be working with our Congressional delegation to change that.

Our institutions of higher learning constitute an engine of future economic development and prosperity for the state and people of New York. The SUNY system alone is comprised of some 1.6 million students, faculty, scientists, researchers, administrators and many others who live, learn and work on its campuses. These campuses house billions worth of sophisticated equipment, laboratories and other critical infrastructure. They are developing valuable intellectual property that is a target for theft, espionage, sabotage and worse. Our investment in this infrastructure of higher learning and research and development is critical to national security and to our state's continued economic competitiveness. These institutions need to be better protected.

PLAINTIFFS_GENERIC-00025844

CIGARETTE TAXES

The illicit trafficking of tobacco -- much of it in the form of counterfeited name-brand products -- is a multibillion-dollar global business today, fueling organized crime and corruption, robbing governments of tax revenue, and spurring addiction and disease. So profitable is the trade that tobacco is the world's most widely smuggled legal substance. It is estimated that fully half the cigarettes sold in New York alone are untaxed. The association representing convenience store owners estimates that the state loses $1.7 billion a year in lost revenue from untaxed cigarette sales. And they know nothing of the revenues lost through bootleg tobacco traffic. This fixation that we have on the state's Native American communities and their refusal to collect and remit state taxes misses the point entirely. Bootleg tobacco products are produced and trafficked by powerful organized crime syndicates in many nations, most notably the Peoples Republic of China and North Korea.

New York has to recognize that every time we jack up the taxes on cigarettes, as we did three years ago, we increase the value of this form of contraband quite considerably, drive the expansion of the black market, contribute to the profitability of criminal enterprises the world over and, yes, we support terrorist organizations. Having gone forward with this dubious initiative, we should, at the very least, turn the Petroleum, Alcohol and Tobacco Bureau (PATB) of the Department of Taxation and Finance, which investigates revenue crimes, into a fully empowered and capable police agency because its employees are facing on a day to day basis increasingly powerful and vicious criminal organizations engaged in ever-growing and lucrative contraband trafficking. It's not the Indians they're up against. It's the global Mafia. Under current law, PATB investigators are rather confusingly classified as both police and peace officers with complicated restrictions on the exercise of the powers of both. (See: CPL, section 1.20 (34) (q),;CPL, section 2.10 (47)

With respect to this issue, let me make a personal note. On 9/11, I lost a very dear colleague and friend who was an employee of the Department of Taxation and Finance. Charles M. Mills was head of the Petroleum, Alcohol and Tobacco Bureau. Friends who communicated with him in his last moments that morning tell us that he stayed on the scene coordinating the evacuation of many people from the building until it was too late for him to save himself. Mr. Mills had had a most distinguished career as a police officer and police executive in the many years before he died leading PATB. Nonetheless, the committee charged with approving additions to the Roll of Honor of the State of New York Police Officers' Memorial at Empire State Plaza has, for all these years, disallowed the addition of Mr. Mills' name to the memorial. If it takes an amendment to the law to right this wrong, please do it forthwith!

THE NEW YORK STATE POLICE -- 1917-2017

On April 11, 1917, Governor Charles Whitman signed Chapter 161 of the Laws of 1917 which created the Department of State Police. Col. George Fletcher Chandler, the first Superintendent of State Police, set up shop in Room 100 of this very building a few weeks later. Two years hence, we will be celebrating the centennial of the NYSP here in Albany

PLAINTIFFS_GENERIC-00025845

and at troop headquarters and sites of significance in the history of the New York State Troopers all over the state. We have already begun laying plans to make the most of this occasion to project the prestige of the State Police, the dedicated service of generations of Troopers and the compelling saga of New York's pioneering history of leadership and achievement in advancing the best in policing. We look forward to years of exciting collaboration with the Legislature toward making this a celebration to remember.

## CONCLUSION

I thank you once again for this opportunity to appear before you and share some thoughts about the public protection aspects of this most challenging year of budget-making. I first sat through one of these hearings in 1984. At that hearing, on the dais sat Deputy Speaker Arthur Eve. Sitting where I now sit was Corrections Commissioner Thomas A. Coughlin, III. The two engaged in a memorable colloquy about the prison system budget at the very inception of the vast prison expansion we engaged in over the following decade. All the history I have witnessed since then has impressed upon me the great work that this Legislature undertakes to give form to the society we live in and rise to meet its ever-evolving challenges. It has always been a privilege to participate in this process. The result of your hard and diligent work has always worked out to the benefit of the state and people of New York. Steep declines in rates of crime in recent years has been the result. You are to be congratulated on this achievement. But you must also pay heed to the eruption of protest we have witnessed over the past two years by communities of color. The protesters are giving voice to legitimate concern over the kind of policing tactics that have become commonplace in America since their inception in New York City in 1994. People don't like being treated like dots on one of Bill Bratton's crime maps. Crime turned around in New York City when this Legislature acted to give the city the means to do the job. This rising chorus of dissatisfaction merits your attention just as urgently.

PLAINTIFFS_GENERIC-00025846

## MEMORANDUM IN SUPPORT OF LEGISLATION

**BILL NUMBER(S):**
**Senate No.**                                    **Assembly No:**

**SPONSOR(S):**
**In Senate:**                                    **In Assembly:**

**TITLE OF BILL:**

AN ACT in relation to establishing the Thomas A. Constantine Institute for the Study of
Transnational Organized Crime and Terrorism within the State University of
New York and making an appropriation therefor

**PURPOSE OF BILL:**

This legislation will establish a focal point for research and deliberation on the control of
transnational organized crime and terrorism. The institute will sponsor a diverse research
program that will reflect a balance among the issues relating to legal, operational, social,
political, and economic aspects of transnational organized crime and terrorism. It will
organize conferences and symposia that will bring together the best minds among
academics, law enforcement professionals, the military services, the intelligence community,
lawmakers, the diplomatic corps and the business and financial community to develop
strategies, tactics, relationships and legal and diplomatic frameworks for more effective
international cooperation in the control of transnational organized crime and terrorism. Its
ultimate goal is to be a valuable and practical resource for the world's law enforcement
agencies, governments and the international business community.

**SUMMARY OF PROVISIONS:**

Section 1 of the bill is a declaration of legislative findings and intent.

Section 2 of the bill establishes within the State University of New York the Thomas A.
Constantine Institute for the Study of Transnational Organized Crime and Terrorism. Such
institute shall organize conferences and seminars, develop training programs for law
enforcement officers, sponsor and promote research, publish its proceedings and maintain a
library. The bill directs that the Chancellor and Trustees of the State University shall appoint
a person well qualified by education and experience to administer such institute. Such
institute is authorized to establish a development program to build its own endowment.

Section 3 of the bill makes an appropriation of $500,000.

**JUSTIFICATION:**

Transnational society today includes multinational corporations, nongovernmental
organizations, criminal conspiracies and terrorists networks. In this environment, organized
crime has gone global. It is estimated that this global network of evil profits some $2 trillion
a year, more than twice the combined annual military budgets of every nation on earth. Were

PLAINTIFFS_GENERIC-00025847

it not for the existence of this shadowy empire, terrorist groups like al Qaeda would be unable to function. They would have no market for their contraband and no means of laundering their monies, moving their operatives or acquiring weapons and other war materiel.

With the internationalization of organized crime and the emergence of global terrorism, the challenge to law enforcement has grown exponentially. To meet that challenge, we must develop the legal and diplomatic frameworks within which the law enforcement authorities of many nations may cooperate along with the essential personal and professional relationships that build trust and unity of purpose. There is an urgent need for research, policy development, law reform, diplomatic initiatives and education to confront the threat of transnational organized crime and terrorism.

This legislation establishes the Thomas A. Constantine Institute for the Study of Transnational Organized Crime and Terrorism within the State University of New York. Inspired by Mr. Constantine's extraordinary career achievements and the international respect he has earned in the field of public security, this entity will provide a focus for research and deliberation on the control of these phenomena and for public education about their manifestations.

The institute will sponsor a diverse research program reflecting a balance among the issues relating to legal, social, political, and economic aspects of international organized crime and terrorism. It will organize conferences and symposia bringing together the best minds among academics, law enforcement professionals, the intelligence community, lawmakers, the diplomatic corps and the business and financial community to develop strategies, tactics, relationships and legal and diplomatic frameworks for more effective international cooperation in the control of transnational organized crime and terrorism.

The mission of the Constantine Institute is to serve as a valuable and practical resource for the world's public security agencies, governments and the international business community.

**LEGISLATIVE HISTORY:**

This is new legislation.

**FISCAL IMPACT:**

The bill appropriates $500,000 from the General Fund. These monies will fund a campaign to build an endowment for the Constantine Institute. It is projected that $3 million can be raised from private sources to support this initiative in perpetuity. To the maximum extent possible, the endowment campaign will draw upon the resources of the State University of New York and the efforts and talents of willing members of the university community.

**EFFECTIVE DATE:**

Immediately.

PLAINTIFFS_GENERIC-00025848

**30** Wednesday, March 16, 2011

**DAILY NEWS** NYDailyNews.com

Email to **voicers@nydailynews.com**, or send fax to **(212) 210-1505**, or post your letter to **Voice of the People, Daily News, 450 West 33rd Street, New York, NY 10001.**
Please include full name, address and daytime phone number. The Daily News reserves the right to edit letters.

# VOICE OF THE PEOPLE

# Put all 9/11 heroes on honor roll



Albany: I'm glad to read that retired FDNY Capt. James Corrigan is being honored for his sacrifice on 9/11. Perhaps the Daily News will now help me honor a beloved friend who lost his life that day, too. He was Charles M. Mills (photo), former No. 3 man with the old Transit Police and former police commissioner for the cities of Schenectady and Troy.

At the time of his death in the attack, he was head of the state Tax and Finance Department's unit that investigates revenue crimes. The statute that outlines his authority and law enforcement status in that capacity designated him a peace officer at all times and a police officer under certain circumstances. Those of us who knew and loved Charlie know that in time of deadly crisis, he was a cop through and through. The state Division of Criminal Justice Services has refused to put his name on the Police Officers Memorial of the State of New York. Let your Voices be heard. On Police Memorial Day this May, I want to see his name on the Roll of Honor.                    *Terry O'Neill*

PLAINTIFFS_GENERIC-00025849

Legislative Bill Drafting Commission
10913-01-5

S.         --------
           Senate
           --------

IN SENATE--Introduced by Sen

--read twice and ordered printed,
and when printed to be committed
to the Committee on

           -------- A.
           Assembly
           --------

IN ASSEMBLY--Introduced by M. of A.

with M. of A. as co-sponsors

--read once and referred to the
Committee on

\*APPR\*
\*NEYSUNIV\*
(Establishes the Thomas A. Constantine Institute for the study of transnational organized crime within the state university of New York; appropriation)

           --------

NEYSUNIV. Constantine Institute

AN ACT

in relation to establishing the Thomas A. Constantine institute for the study of transnational organized crime within the state university of New York and making an appropriation therefor

The People of the State of New York, represented in Senate and Assembly, do enact as follows:

---

## IN SENATE

Senate introducer's signature

The senators whose names are circled below wish to join me in the sponsorship of this proposal

| | | | |
|---|---|---|---|
| s15 Addabbo | s49 Farley | s63 Kennedy | s40 Murphy | s10 Sanders |
| s46 Amedore | s17 Felder | s34 Klein | s54 Nozzolio | s23 Savino |
| s11 Avella | s02 Flanagan | s29 Krueger | s58 O'Mara | s41 Serino |
| s42 Bonacic | s55 Funke | s24 Lanza | s62 Ortt | s29 Serrano |
| s04 Boyle | s59 Gallivan | s39 Larkin | s60 Panepinto | s51 Seward |
| s44 Breslin | s12 Gianaris | s37 Latimer | s21 Parker | s09 Skelos |
| s38 Carlucci | s22 Golden | s01 LaValle | s13 Peralta | s26 Squadron |
| s14 Comrie | s47 Griffo | s52 Libous | s30 Perkins | s16 Stavisky |
| s03 Croci | s20 Hamilton | s45 Little | s61 Ranzenhofer | s35 Stewart- |
| s50 DeFrancesco | s06 Hannon | s05 Marcellino | s48 Ritchie |  Cousins |
| s32 Diaz | s36 Hassell- | s43 Marchione | s33 Rivera | s32 Valesky |
| s18 Dilan |  Thompson | s07 Martins | s56 Robach | s08 Venditto |
| s31 Espaillat | s27 Hoylman | s25 Montgomery | s19 Sampson | s57 Young |

## IN ASSEMBLY

Assembly introducer's signature

The Members of the Assembly whose names are circled below wish to join me in the multi-sponsorship of this proposal:

| | | | |
|---|---|---|---|
| a049 Abbate | a053 Davila | a077 Joyner | a133 Nojay | a140 Schimming |
| a092 Abinanti | a094 DenDekker | a020 Kaminsky | a037 Nolan | a076 Seawright |
| a084 Arroyo | a054 Dilan | a094 Katz | a130 Oaks | a067 Sepulveda |
| a035 Aubry | a081 Dinowitz | a074 Kavanagh | a069 O'Donnell | a065 Silver |
| a120 Barclay | a147 DiPietro | a142 Kearns | a051 Ortiz | a027 Simanowit |
| a106 Barrett | a115 Duprey | a040 Kim | a091 Otis | a052 Simon |
| a060 Barron | a004 Englebright | a131 Kolb | a132 Palmesano | a036 Simotas |
| a282 Benedetto | a109 Fahy | a109 Lalor | a022 Palumbo | a104 Skartados |
| a042 Bichotte | a071 Farrell | a013 Lavine | a088 Paulin | a099 Skoufis |
| a079 Blake | a126 Finch | a134 Lawrence | a161 Peoples- | a022 Solages |
| a117 Blankenbush | a009 Fitzpatrick | a050 Lentol |  Stokes | a114 Stec |
| a062 Borelli | a124 Friend | a125 Lifton | a058 Perry | a110 Steck |
| a098 Brabenec | a095 Galef | a072 Linares | a059 Persaud | a127 Stirpe |
| a026 Braunstein | a137 Gantt | a102 Lopez | a086 Pichardo | a112 Tedisco |
| a044 Brennan | a007 Garbarino | a123 Lupardo | a089 Pretlow | a101 Tenney |
| a119 Brindisi | a148 Giglio | a010 Lopinacci | a073 Quart | a001 Thiele |
| a138 Bronson | a080 Gjonaj | a121 Magee | a019 Ra | a061 Titone |
| a046 Brook-Krasny | a066 Glick | a129 Magnarelli | a012 Raia | a031 Titus- |
| a093 Buchwald | a023 Goldfeder | a064 Malliotakis | a006 Ramos | a055 Walker |
| a118 Butler | a150 Goodell | a030 Markey | a078 Rivera | a146 Walter |
| a103 Cahill | a075 Gottfried | a090 Mayer | a128 Roberts | a141 Weinstein |
| a145 Ceretto | a005 Graf | a108 McDonald | a056 Robinson | a024 Weprin |
| a033 Clark | a100 Gunther | a014 McDonough | a068 Rodriguez | a113 Woerner |
| a047 Colton | a139 Hawley | a017 McKevitt | a067 Rosenthal | a143 Wozniak |
| a032 Cook | a083 Hexetiu | a107 McLaughlin | a025 Rozic | a070 Wright |
| a144 Corwin | a028 Hevesi | a038 Miller | a116 Russell | a096 Zebrowski |
| a085 Crespo | a048 Hikind | a015 Montesano | a149 Ryan | a043 |
| a122 Crouch | a018 Hooper | a136 Morelle | a009 Saladino | |
| a021 Curran | a097 Jaffee | a057 Mosley | a131 Santabarbara | |
| a063 Cusick | a011 Jean-Pierre | a039 Moya | a029 Scarborough | |
| a043 Cymbrowitz | a135 Johns | a003 Murray | a016 Schimel | |

1) Single House Bill (introduced and printed separately in either or both houses), Uni-Bill (introduced simultaneously in both houses and printed as one bill. Senate and Assembly introducer sign the same copy of the bill.

2) Circle names of co-sponsors and return to introduction clerk with 2 signed copies of bill and 4 copies of memorandum in support (single house); or 4 signed copies of bill and 8 copies of memorandum in support (uni-bill).

LBDC 02/27/15

PLAINTIFFS_GENERIC-00025850

1   Section 1. Declaration of legislative findings and intent. Transna-

2   tional society today includes multinational corporations, nongovern-

3   mental organizations, criminals, and terrorists. In this environment,

4   organized crime, in particular, has gone global. It has emerged as the

5   mortal enemy of democratic institutions worldwide and it infects and

6   distorts world commerce and financial institutions. It has forged alli-

7   ances with terrorist organizations and links to outlaw states. It is

8   ruthless and inhuman and has raised a capital of such gargantuan

9   proportions that these organizations can make themselves masters of

10  governments through intimidation, violence and corruption.

11  New York has a unique and celebrated tradition of leadership in

12  confronting and eradicating organized crime. With the 1957 Apalachin

13  incident, the New York state police dramatically exposed the existence

14  of La Cosa Nostra to an unsuspecting world sparking decades of intense

15  effort to combat criminal conspiracies that had grown pervasive and

16  entrenched.

17  In 1991 the New York state police, under the leadership of Thomas A.

18  Constantine, exposed the operations of Colombia's Cali cocaine cartel

19  when the culmination of a six-year investigation disrupted a far-reach-

20  ing and sophisticated organization that had been established in the

21  state by the cartel. It was again the first time that a state law

22  enforcement agency had brought the secretive hierarchy of a major crimi-

23  nal conspiracy out into the light of day -- this time, one based on a

24  foreign country and with tentacles in many nations.

25  Mr. Constantine made further history when, as head of the US drug

26  enforcement administration, he oversaw an international effort that led

27  to the surrender of the Cali Cartel's leaders and the effective break-up

28  of its organization during the mid-nineties. This investigation stood in

PLAINTIFFS_GENERIC-00025851

0019

1  stark contrast to the previous effort to eradicate Pablo Escobar's
2  Medellin-based cartel which was prosecuted by the Colombian government
3  through paramilitary proxies and a campaign of horrific extra-legal
4  violence that cost the lives of many innocent civilians and brought
5  discredit on the government.

6  Mr. Constantine is a most accomplished and unique figure in American
7  law enforcement. Not only had he a hand in bringing down the Cali Cartel
8  -- generally acknowledged to have been the largest and most powerful
9  criminal conspiracy in history -- but soon after he retired from the
10 DEA, the British government recruited him to oversee the reform of the
11 royal Ulster constabulary and its reestablishment as the police service
12 of Northern Ireland. This reform was a major factor in ending more than
13 three decades of terrorist violence in Northern Ireland.

14 In both of these signature career accomplishments, Mr. Constantine
15 demonstrated that the key to successfully confronting the threats of
16 transnational organized crime and terrorism is honest, dedicated,
17 professional law enforcement operating within the bounds of the strict-
18 est constitutional, legal and ethical standards. Mr. Constantine is
19 recognized and respected worldwide among his peers as the paradigm of
20 that kind of professional law enforcement. The problem of transnational
21 criminal conspiracies is growing and metamorphosing at a frightening
22 rate. We are already in mortal confrontation with organizations that
23 threaten peace, prosperity and public confidence in law enforcement's
24 ability to protect our people, our democratic institutions and our
25 economic well-being. With the internationalization of organized crime
26 and the emergence of global terrorism, the challenge to law enforcement
27 has grown exponentially. To meet that challenge, we must develop the
28 legal and diplomatic frameworks within which the law enforcement author-

PLAINTIFFS_GENERIC-00025852

1  ities of many nations may cooperate along with  the  essential  personal

2  and  professional  relationships  that build trust and unity of purpose.

3  There is an urgent need for deliberation, research, policy  development,

4  law  reform and education to confront the threat of transnational organ-

5  ized crime and terrorism.

6     This legislation establishes the Thomas A. Constantine  Institute  for

7  the  Study  of Transnational Organized Crime within the state university

8  of New York. Inspired by Mr. Constantine's extraordinary career achieve-

9  ments and the international respect he has earned in the field of public

10  security, this entity will provide a focus for research and deliberation

11  on the control of these phenomena and for public education  about  their

12  manifestations. Its ultimate goal is to provide a valuable and practical

13  resource  for  the world's law enforcement agencies, governments and the

14  international business community.

15     § 2. There is hereby established within the state  university  of  New

16  York  the Thomas A. Constantine Institute for the Study of Transnational

17  Organized Crime. Such institute shall organize conferences and seminars,

18  develop training programs for  law  enforcement  officers,  sponsor  and

19  promote  research,  publish  its proceedings and maintain a library. The

20  chancellor and trustees of the state university shall appoint  a  person

21  well qualified by education and experience to administer such institute.

22  Such institute shall be authorized to establish a development program to

23  build its own endowment.

24     § 3.  The sum of five hundred thousand dollars ($500,000), or as much

25  thereof as may be necessary, is hereby appropriated to the state univer-

26  sity of New York from any monies in the state treasury  in  the  general

27  fund  for  the purposes of carrying out the provisions of this act. Such

28  sum shall be payable on the audit and warrant of the  state  comptroller

PLAINTIFFS_GENERIC-00025853

05/06/15                          5                    10913-01-5

1    on   vouchers   certified   or approved by the commissioner of taxation and

2    finance, or his duly designated representative in the manner provided by

3    law. No expenditure shall  be  made  from  this  appropriation  until  a

4    certificate  of  approval  of availability shall have been issued by the

5    director of the budget and filed with the state comptroller and  a  copy

6    filed  with  the  chairman of the state senate finance committee and the

7    chairman of the assembly ways and means committee.  Such  budget  and  a

8    copy  of  each such amendment shall be filed with the state comptroller,

9    the chairman of the state senate finance committee and the  chairman  of

10   the assembly ways and means committee.

11     § 4. This act shall take effect immediately.

PLAINTIFFS_GENERIC-00025854