# EXHIBIT 416

# Interim Report of the Evaluation of the New York State's Gun Involved Violence Elimination (GIVE) Initiative



John Klofas, Ph.D.
Director of Center for Public Safety Initiatives
Rochester Institute of Technology
(585) 475-6386
john.klofas@rit.edu

Lisa Clark
Senior Researcher

Ashley Vasquez
Associate Researcher

December 2014

COB218784
COB218784

**Interim Report of the Evaluation of the New York State**

**Gun Involved Violence Elimination Initiative (GIVE)**

## Contents

Part 1: Introduction .................................................................................................................... 2

Recommendations ...................................................................................................................... 2

GIVE Background and Evaluation Methods .............................................................................. 6

Assessing Readiness for Implementation: ................................................................................. 9

Considering the Evidence-Based Strategies ............................................................................ 11

Problem-Oriented Policing (POP) .......................................................................................... 14

Hot Spots Policing ................................................................................................................... 14

Crime Prevention Through Environmental Design (CPTED) ................................................. 15

Focused Deterrence .................................................................................................................. 16

Procedural Justice .................................................................................................................... 16

Street Outreach ........................................................................................................................ 17

Summary on Issues Related to Implementation Effectiveness ............................................... 17

Innovative Practices ................................................................................................................ 18

Jurisdiction name: Erie County .............................................................................................. 21

Appendix A: Jurisdiction Results: Violence Reduction Assessment Tool .............................. 28

Appendix B. Jurisdiction Gun Crime Data (Green Book Data) .............................................. 29

Appendix C: Implementation Assessment Review .................................................................. 31

Appendix D: Strategies Check List ......................................................................................... 34

Appendix E: The Violence Reduction Assessment Tool (VRAT) ........................................... 36

1

COB218785

COB218784

**Interim Report of the Evaluation of the New York State**

**Gun Involved Violence Elimination Initiative (GIVE)**

December 2014

**Part 1: Introduction**

This interim report of the evaluation of New York's Gun Involved Violence Elimination (GIVE) initiative provides a preliminary assessment of the implementation of the program and its evidence-based interventions across the 17 participating program sites. Following the list of recommendations below, the report is divided into two major sections. The first section describes the evaluation procedures and covers issues as they are relevant across all of the program sites. The second part provides individual reviews of each of the program sites. Appendices provide data relevant to the qualitative discussion in the report.

In this ongoing evaluation project we are grateful to DCJS Executive Deputy Commissioner Michael Green, Deputy Commissioner of Public Safety Michael Wood, Deputy Commissioner for Justice Research and Performance Terry Salo, and key DCJS staff that have provided information and guidance to us in this process. We are especially appreciative of the efforts put forth by Charles Tyree Jr., Associate Training Technician, in his ongoing work with the evaluation team. We are also thankful for the support and participation from each of the 17 program sites and particularly from the liaisons to the research team from each of the sites. These individuals have been gracious and considerate in our, always frank, conversations about the programs. We also want to acknowledge Don Pryor of the Center for Governmental Research for his work on the evaluation of the Monroe County GIVE program. His high quality contribution provides a means of addressing any potential conflict of interest for the rest of the Rochester based evaluation team.

**Recommendations**

We recognize that we are now less than half way through the first year in a major transition to the adoption of evidence-based interventions by the project sites. As a result the evaluation must focus on early stages in the process of implementation. At the same time we also appreciate that preparations are now being made for the second year of the program. With that we are guided by the goal of providing

2

COB218786

COB218784

feedback that may be useful in shaping next year's effort and in providing assistance in the continuing process of implementation. Below we will discuss the issues that we have identified as significant at this point and the recommendations which, we believe flow from them.

**From Tactical to Strategic Thinking.** The identification of six evidence based intervention strategies and the grounding of those strategies in the concepts of people, places, alignment and engagement provided a useful roadmap to assist program jurisdictions in moving forward. One consequence however, has been a tendency to view the strategies as independent or stand-alone projects. As a result many sites chose a large number of strategies and either have not implemented some or have implemented them in isolation of one another.

It would be beneficial for the sites to emphasize strategies as part of a coordinated and comprehensive plan for reducing gun related violence. Although multiple strategies may still be used they should be defended as addressing component parts of the overall problem. In the first year, applications emphasized the separate contributions the strategies could make. The separation of strategies from one another may mean they are treated more as tactics than governing strategies. It may now be useful to encourage the integration of strategies as parts of a comprehensive plan that takes into account the jurisdiction particular crime patterns and their resources for addressing them. This could include consideration of how strategies relate to one another.

Another practical matter related to strategic thinking involves assessment of the time period covered by GIVE funding. Expansion beyond the one year application cycle with the inclusion of a process of self-assessment and refinement of program strategies may be a practical and useful approach to maintaining program momentum.

**The importance of Procedural Justice.** Strategic choices and their implementation are best thought of as processes that must respond to developing science and other external circumstances. Such circumstances have made clear the importance of issues of procedural justice and of beliefs and expectations about fairness. This perspective could be further incorporated in GIVE in a variety of ways. For example, GIVE could encourage local partners to periodically assess public perspectives of local justice practice and to consider the potential impact of strategy and tactics on those perspectives. At the most basic level strategies could

3

COB218787

COB218784

0004

incorporate principles of procedural justice, monitor their implementation and develop outcome measure to assess their effectiveness.


**Problem Analysis.** The GIVE applications emphasized analysis of local gun violence data. The analyses used categories including offense definitions, the distribution of events over time and their distribution across space, using data mapping. This provided a useful foundation for project development. But that level of analysis may not be sufficient to guide implementation of complex interventions. All of the strategies require closer examination of the crime problem. That may include identification of specific local factors associated with gun crime in very small micro locations, or detailed understandings of group dynamics in gangs, or intricate knowledge of offender criminal backgrounds. All of those require that analysis goes beyond what have become the usual tools of crime analysis.

There are similar issues with regard to data tracking during implementation and using data feedback to influence program processes. It would be useful for local jurisdictions to identify and track process and outcome measures that are particular to the chosen strategies and local communities. This should also include analyses of patterns of crime displacement and the spread of program benefits beyond targeted intervention sites.

Although there is variation across the sites, it would be generally helpful for crime analysis to include examinations that go beyond the basics that helped define the problem originally. The analyses needed to support strategy implementation go beyond those needed for strategy selection. This suggests a more important role for crime analysis and the need for related training.


**Program Site Organization.** One of the most significant differences between GIVE and earlier DCJS supported local crime reduction approaches has been in the roles of the partner agencies. Under IMPACT agencies applied jointly and shared a vision of their crime problem but also took semi-independent roles in addressing it. GIVE assumes a far more coordinated effort. To the extent that has been addressed across jurisdictions it has largely reflected pre-existing relationships or informal agreements rather than conscious decisions. It may be more useful to more clearly define an operational leadership role and expectations, and to support local GIVE

4

COB218788

COB218784

teams in selecting an operational leader. This will allow clear expectations to be integrated into the role within the existing agency partnerships. This may, in turn, support greater local team ownership of GIVE.

**Training.** As a significant advancement in crime reduction efforts in the State, GIVE has appropriately emphasized training. That emphasis has included reliance on technical assistance from experts and broad communication through a very effective and well received GIVE conference. Moving forward these can remain effective processes but the repertoire may also be expanded to emphasize cultivation of local expertise. Three elements to such an approach could be considered; 1) development of regional teams of technical assistance providers, 2) Train the trainer approaches can be utilized. This, combined with existing approaches could develop regional or local trainers who can provide periodic training enhancements or training for new staff members. Finally, 3) there may be some value in developing on-line communications strategies to allow DCJS and the program sites to discuss a wide range of relevant topics including project successes and problems, or new innovations. This should include an online collection of key resources and information on strategies. It would also provide a place to share innovative practices as discussed below. The development of such a network could have broad ranging benefits. Additionally, it may be desirable to provide additional direct training of agency leaders to give them additional guidance and resources to lead the effort.

Moving forward DCJS may also wish to expand the training emphasis to include lessons regarding implementation. This could include increased opportunities for sites to discuss implementation related issues that they have faced under GIVE, including implementation successes and difficulties.

**College and University Research Partnerships.** The US Department of Justice has endorsed the model of research partnership with criminal justice agencies as a best practice. DCJS has also made significant commitments to such partnerships at the local level. Even now several GIVE sites have incorporated research partners although this has not been a general component of the initiative. There may be benefits to exploring ways to encourage and support such partnerships under GIVE. Research partners' contributions to local jurisdictions could include supplementing crime analysis efforts with longer term analyses, developing and sharing, locally

5

COB218789

COB218784

or regionally, expertise on the evidence-based interventions and feeding back data on processes and outcomes over the course of GIVE programs.  There are also additional roles researchers could play in training, in assessing community opinions, and in providing information on developments in the evidence regarding crime reduction interventions across the country.  All sites and all colleges and universities may not be equally well prepared to incorporate research partnerships but the model has potential for contributing to the goals of the GIVE initiative.

**GIVE Background and Evaluation Methods**

Research in effective policing has supported two key findings: 1) Communities can reduce crime and violence through data driven processes and evidence-based strategies; and 2) Effective implementation of these processes and strategies is central to crime reduction. Building on these findings, in 2014, New York State launched the Gun Involved Violence Elimination (GIVE) Initiative with the goal of reducing shootings and homicides through the implementation of one or more integrated, evidence-based strategies:

1. Problem-Oriented Policing (POP)
2. Hot Spot Policing
3. Focused Deterrence
4. Street Workers
5. Crime Prevention Through Environmental Design (CPTED)
6. Procedural Justice

Project GIVE is designed to build upon the success of Project IMPACT which had been in existence since 2004 and was successful in reducing crime by 14% in the 17 counties that accounted for the majority of crime outside New York City. Operation IMPACT sought to expand the cooperative partnering of federal, state, and local law enforcement agencies while using data driven practices. While IMPACT was successful in reducing overall crime, shootings and gun-related homicides remained above average. In 2014, New York State embarked upon Project GIVE that would build upon

6

COB218790

COB218784

IMPACT's success and use best practices and six evidence-based strategies to reduce and eliminate gun involved crime.

According to the GIVE Grant RFP, GIVE projects and the use of evidence-based strategies must be grounded in the following four core elements:

1. People – GIVE jurisdictions will target the key individuals and groups, also known as the Top Offenders, responsible for most gun violence.

2. Places – GIVE jurisdictions will target the key locations, or Hot Spots where most violence is occurring.

3. Alignment – GIVE jurisdictions will align their efforts and coordinate strategies with other local violence-prevention efforts.

4. Engagement – GIVE jurisdictions will engage key stakeholders and the community at large, communicating and coordinating with them to ensure wide-ranging support.

In February 2014, county leaders representing crime reduction agencies in jurisdictions eligible for GIVE funding attended a Division of Criminal Justice Services (DCJS) sponsored forum or bidder's conference in Albany that provided information about the strategies and project requirements. During the bidder's conference, experts in each evidence-based strategy shared information and described how that strategy is effective in reducing gun crime. From this information, leaders in each jurisdiction selected one or more evidence-based strategies and discussed how they would use the selected strategies to reduce gun violence in conjunction with the community's law enforcement partners.

Rochester Institute of Technology (RIT) Center for Public Safety Initiatives (CPSI) was selected to conduct a process evaluation of the GIVE project for 16 of the 17 sites. Center for Governmental Research (CGR) was selected to conduct the evaluation of Monroe County's GIVE project using methodology described in this report. RIT researchers are in contact with CGR researchers and CGR has written the Monroe County summary in Part Two of this report.

The evaluation methodology is a mixed methods approach utilizing both qualitative and quantitative data with an emphasis on qualitative data collection. A goal of this evaluation is to tell the story of each jurisdiction's progress with implementing GIVE and to provide general information that holistically describes implementation across all sites. That is, to shed light on how the strategies are put into practice.

COB218791

COB218784

0008

Monthly site visits occur with almost all jurisdictions receiving funding. Quarterly visits are conducted with several sites receiving more limited funding through the program. During a site visit, the researcher may: meet with the GIVE site liaison(s) and/or GIVE partners, attend the jurisdiction's monthly GIVE meeting, attend a GIVE event, participate in a ride along, or attend GIVE training sessions. Weekly phone calls with the site liaison occur with all sites regardless of funding. Some sites have opted to hold weekly conference calls and invite all GIVE partners to participate while others have one designated liaison who fields all inquiries.

A time series design is utilized to demonstrate how a jurisdiction is implementing GIVE strategies over time. Data collected from site visits and phone calls is entered into the Implementation Assessment Review (IAR) template and the Strategies. Both document templates are included in the appendices. Developed by RIT researchers, these documents are the basis for the written evaluation for each site in part two of this report. A time series chart that demonstrates each site's progress with GIVE strategies over time will be provided in the GIVE Final Report. Attempting to report the results in this Interim Report would be premature given the brief amount of time that GIVE projects have been implemented.

Each jurisdiction is required to designate one person from each GIVE partner to complete the Violence Reduction Assessment Tool (VRAT). The instrument measures a site's readiness to implement the evidence-based strategies. A comprehensive VRAT score is generated for each jurisdiction. The comprehensive score and recommendations to facilitate strategies implementation will be shared with GIVE liaison(s).

Information and data included in this report are primarily based on information collected from site liaison(s) and observations. Additional sources of data (meeting minutes and agendas, bulletins, observations, and discussions with partners) are also used, but liaison(s) observations and comments are key.  Each site's liaison serves as the primary contact for researchers and information included in this report directly reflects information received from the liaison.

It is important to note that because this Interim Report reflects GIVE implementation since July 1, 2014, information for all strategies selected by a jurisdiction may not be provided. For some sites, the implementation of a strategy may be in its infancy or may not have begun at all. Depending on when a liaison was assigned to researchers, information may not yet be reported because of the short time frame between data collection and the writing of the Interim Report.

The evaluation component of GIVE is unique, as little information exists in academic literature about the implementation of evidence-based strategies on a statewide scale to reduce gun violence. This

COB218792

COB218784

0009

Interim Report is a first look into how the evidence-based strategies are implemented through a coordinated, state-wide effort.

**Assessing Readiness for Implementation:**

In light of the significance of the change to GIVE and the aggressive timeline it is not surprising that some GIVE partners do not have a strong understanding of the relevant research. Program sites have moved forward well but are not necessarily fully implementing the strategies. Greater progress will take additional time and careful consideration. This is to be expected, as most jurisdiction personnel began implementing the strategies without the benefit of extensive training and are learning about the strategies as they implement. Furthermore, the approach to implementation largely assumed the existing local structure was sufficient and implementation issues were not explicatively addressed in advance of the program.

The Violence Reduction Assessment Tool (VRAT) tool was developed by Michigan State University working under the auspices of the US Bureau of Justice Assistance. The goal of the project is to reduce the likelihood of implementation failure by assessing factors seen as related to project success and providing a means to identify and address any related concerns. This evaluation included the beta testing of the tool. A GIVE grant requirement is that one individual from each funded partner in a jurisdiction completes the VRAT. Based on individual responses, a comprehensive score is calculated for each funded jurisdiction. This score along with recommendations that support effective implementation are shared with each jurisdiction liaison(s).

The VRAT considers four dimensions relevant to the implementation process:

1. **Governance and Project Management** is comprised of Commitment and Leadership and Management and Decision Making.
2. **Partnerships** is comprised of Multi-Agency Partnerships, Criminal Justice Partnerships, and Community Partnerships.
3. **Data and Analysis** is comprised of Research and Analytic Capacity, Data Availability, and Data Access and Sharing.
4. **Feedback and Awareness.** Use of information to improve interventions.

The VRAT supports Strategic Crime Reduction Efforts (SCRE). These refer to multi-agency crime and violence reduction efforts that engage people in the community and rely on data-driven

9

COB218793

COB218784

strategic processes to enhance and support prevention and crime control. Ideally, stakeholders from local government, law enforcement, prosecution, corrections, and other criminal justice partners, social services, community groups, the faith community, and similar community stakeholders participate and complete the VRAT survey.

Minimally, the primary law enforcement agency and key criminal justice partners should complete the VRAT in order to assess local capacity for SCRE. At least one representative from each stakeholder group should complete the VRAT survey and multiple representatives can complete the survey. Recognizing that not all respondents will be in position to answer all the questions, respondents should feel comfortable selecting "don't know" as appropriate. For communities falling low on some dimensions, The VRAT tool provides resources and suggestions for increasing capacity. The VRAT can be repeated to provide a measure of progress in capacity building.

With the exceptions of Rockland County and Westchester County, a representative from each funded partner in each GIVE jurisdiction completed The VRAT. Specific information regarding the individuals who completed the VRAT in each jurisdiction is provided in site summaries in part two of this report. The VRAT instrument and a histogram displaying the comprehensive score and how that score compares with the average score of all jurisdictions are provided in the appendices. The following should be considered when interpreting VRAT results:

1. A potential exists for respondents to skew positive and display their organization in a more positive light due to limited understanding of strategies and what they entail.
2. Training incorporates the scores of law enforcement and prosecution only, as per the design of The VRAT.
3. The results are the perceived, not actual assessment of respondents' preparedness to engage in GIVE.

**VRAT Results**

In general, most sites rated Data Availability and Data Access and Sharing as meets needs or mature, while multi-agency partnerships and training opportunities were rated weak to basic. Data availability focused on the capacity of the jurisdiction's major law enforcement agency to provide basic and detailed crime incident data. Data access and sharing included partner willingness to share data and information. Examples of multi-agency partnerships included: Community Oriented Policing (COPS), Community Prosecution Programs, Weed and Seed, and Project Safe Neighborhoods (PSN). Examples of training opportunities included: Problem Solving, Hot Spots Policing, Youth Problems, agency capacity for providing training, and proximity of a training facility.

COB218794

COB218784

0011

In some ways, VRAT results are consistent with researchers' other qualitative findings. Most jurisdictions provided evidence of rich data availability, information sharing among partners, and explained that partners are no longer operating as distinct silos. Information sharing to varying degrees was demonstrated during GIVE monthly meetings, during site visits and weekly phone calls, and through written communication and bulletins. Clearly, jurisdictions are recognizing the value of collaboration, the use of data, the important role of Crime Analysis Centers and Intel Centers, and are proud of their efforts in these areas. Crime Analysis Centers are currently in operation in Albany, Broome, Erie, Monroe, and Onondaga counties. Downstate, Intel Centers are operating in Nassau County, Suffolk County, and Westchester County.

Low ratings on multi-agency partnerships and training opportunities were also consistent with researchers' findings. Several jurisdictions have not fully participated in multi-agency partnerships and training was described as a strong need in each jurisdiction. Ratings regarding Governance and Project Management were most often meets needs.

Researchers found that commitment and leadership and management and decision making varied among jurisdictions and this was more pronounced than reported by jurisdictions in the VRAT. Some jurisdictions had strong leadership, management, and decision making, while for others, this was an area of weakness. Detailed information pertinent to each jurisdiction is provided in Part II of this report. Differences noted between VRAT results and researcher observations will be described in greater detail in the final evaluation report.

Although variation across sites is shown in the individual site analyses in Part 2 of this report, the overall data suggest some areas may deserve attention through training, feedback and additional self-assessment. In particular programs differ in the strength of partnerships and in the type and extent of leadership the program which depends on those partnerships. Training was also recognized an area for continued emphasis.

**Considering the Evidence-Based Strategies**

Jurisdictions are making the transition from IMPACT to GIVE with varying degrees of success. All sites recognize that GIVE is different from IMPACT in some ways given the emphasis on the use of evidence-based strategies and the focus on gun violence. As detailed in Part Two of this report, some site personnel view GIVE as the new IMPACT, some recognize that GIVE is different from IMPACT, and all site personnel are actively connecting what they know about IMPACT and prior knowledge of strategies to implement GIVE. Liaisons and partners in all jurisdictions are on the cusp of understanding

11

COB218795
COB218784

that conceptually, GIVE is very different from IMPACT as it uses strategies that have been studied and grounded in academic research. As the individual site reviews indicate some programs have rolled strategies over to GIVE from their IMPACT programs and have not made clear connections to their selected evidence based strategies.

A related issue may be the number of strategies selected by the sites. Figure 1 provides a chart of selected evidence-based strategies by jurisdiction and indicates whether the selected strategies are currently being implemented. As the chart shows four sites selected all six strategies and five sites selected five of the six available strategies. In all 9 0f the 17 or 53% select all or almost all strategies. The chart also shows that a total of seven sites have not yet begun to implement some of their selected strategies. This suggests that there may a greater need for the integration of strategies into a comprehensive plan to combat the view that the strategies should be implemented independently.

**Figure 1**

**Jurisdiction Selections of Evidence-based Strategies**

**X = Selected in application**

**√ = Implementation in progress**

12

COB218796

COB218784

| Jurisdiction | Problem Oriented Policing | Hot Spot Policing | CPTED | Focused Deterrence | Procedural Justice | Street Outreach |
|---|---|---|---|---|---|---|
| Albany | X √ | X √ | X √ | X √ | X √ | X √ |
| Broome | X√ | X√ | X√ | X | X | X |
| Chautauqua | X √ | X √ | | | X | |
| Dutchess | X √ | X √ | X √ | | | |
| Erie | X √ | X√ | X√ | X√ | | X √ |
| Monroe | X√ | X√ | | X√ | X√ | X√ |
| Nassau | X√ | X√ | | | | X√ |
| Niagara | X√ | X√ | | X | | X |
| Oneida | | X√ | X√ | X | | |
| Onondaga | X√ | X√ | X√ | X√ | X√ | X√ |
| Orange | X | X√ | X√ | X | X | |
| Rensselaer | X√ | X√ | | X√ | X | X√ |
| Rockland | X√ | X√ | | | | |
| Schenectady | X√ | X√ | X√ | X | X√ | |
| Suffolk | X√ | X√ | X | X | X√ | X |
| Ulster | | X√ | X√ | | | |
| Westchester | X√ | X√ | X | X√ | | |

The depth of understanding of strategies is varied across all jurisdictions. There are pockets of individuals who have received extensive training in some of the strategies, while some individuals believe they have a strong understanding of strategies because they are familiar with them, have implemented a variation of one or more strategies under Project IMPACT, have observed one or more strategies in use, and others who have little to no knowledge of some strategies. As detailed in Part Two, some jurisdictions believe that they are effectively implementing a strategy, when they are implementing what they believe or perceive to be a strategy based on limited information or misinformation. This leads to fidelity concerns, that is, whether sites are effectively implementing their selected strategies based on protocols described in research or implementing a variation of the actual strategy.

The evidence-based strategies overlap and in many instances, a clear delineation of strategies is not possible. For example, Niagara County cites their Pastors on Patrol initiative as an example of both Problem-Oriented Policing and Street Outreach effort as this activity addresses both police and community relations issues. To address the overlap, researchers have an inclusive view of strategies and when writing this report have allowed for the presence of an activity in more than one strategy category. In addition, jurisdictions are encouraged to have a targeted, cohesive plan that implements each selected

13

COB218797

COB218784

0014

strategy as part of an overall plan rather than distinct entities and employing an inclusive view of implementation will facilitate this goal.

During the brief time period that we've collected data regarding implementation, the following is noted. As sites are becoming more involved with implementation and are receiving training and jurisdiction personnel are realizing that what they viewed as effective or adequate implementation early needed strengthening. Since researchers' ratings of implementation are primarily based on liaisons' perceptions and other observations, the effective implementation of strategies fluctuates over time. It is anticipated that the implementation will become more consistent among sites as implementation continues. For example, a site might express to researchers that their implementation of Hot Spots Policing is effective, but after attending Hot Spots Policing training, realize that they have more work to do in this area. This leads to fluctuations in IAR ratings over time.

Most jurisdictions are not implementing strategies as part of a cohesive plan for reducing gun violence. Strategies may be viewed independent of each other, and implementation is conducted separately. Understanding that the strategies should be used together in a comprehensive plan to reduce gun violence is expected to increase as implementation continues and partners participate in training opportunities.


**Problem-Oriented Policing (POP)**

With POP's focus on problems, rather than individual crimes, some jurisdictions described how the problem-solving model SARA (Survey, Analysis, Response, Assessment) has been in use for several years. In several jurisdictions, POP is described as an approach to policing that law enforcement has used for many years. As the sites analyses suggest, however, this recognition does not necessarily mean that the sites have completed thorough and detailed problem analyses. With the exception of Ulster County and Oneida County, all jurisdictions are implementing POP to some extent. Some jurisdictions describe POP as data-led policing and intelligence-led policing because of the use of the SARA model. Both Chautauqua County and Dutchess County reported that they are using a scaled-down version of POP and the SARA model because of a lack of resources and funding. POP approaches are common across the program but the detailed analyses expected under it are less common.

**Hot Spots Policing**

Hot Spots Policing, POP, and Focused Deterrence are the most common strategies in place in several jurisdictions prior to GIVE. All jurisdictions chose to implement Hot Spots Policing. For many, Hot

COB218798

COB218784

Spots Policing strategy was implemented during Project IMPACT, was facilitated through the use of Crime Analysis Centers (CAC) and is being refined under GIVE.

All sites report satisfaction with their crime analysis capabilities and some have expressed that they didn't know how they conducted police work prior to the advent of CAC. Jurisdiction personnel describe the use of Hot Spots under GIVE as being much more focused than under IMPACT. For example, Newburgh Police Department personnel explained how they conduct weekly meetings each Monday morning to review crime data from the previous week to make decisions about where they will deploy patrols in the upcoming week.

Under IMPACT, meetings were held monthly to review data and Hot Spots had a wider focus. With GIVE, Hot Spots are defined narrowly, and positive results are realized. The focus of Erie County's GIVE strategy is E-District and Hot Spots are focused on E1 and E2 areas. Gun crime in these areas has decreased since the start of GIVE's implementation. This strategy in particular, is described by many sites as common sense policing. But this view may result in underestimating the complexity of systematic analyses called for in the strategy.  Consistent with Hot Spots Policing strategy, most sites have developed Top Offenders and/or Hot People and Hot Spots Lists. These Lists identify individuals who are associated with high levels of shootings and gun-related crimes and are distributed to law enforcement officers and officials in the jurisdiction.  One issues related to implementation of Hots Spots Policing is the limited extent, beyond mapping, of documentation of analyses and planning that is included in implementation.

The question of crime displacement as a result of Hot Spots Policing is one discussed by jurisdictions. Some sites have reported a modest increase in crime on streets bordering designated hot spots. While other sites report little to no displacement. Erie County has reported some displacement of crime in the E1 Bailey Area as a result of proactive policing on Shirley Avenue. An increase in crime has been observed in areas bordering E1. Erie County personnel believe that although individuals with a propensity for criminal behavior who moved out of the Hot Spots Areas experienced a disruption, they have moved to areas surrounding the Hot Spots.  The issue of displacement and/or the spread of beneficial effect should be addressed more directly through the GIVE program

**Crime Prevention Through Environmental Design (CPTED)**

Several cites selected CPTED, and prior to training, many did not view this strategy as a comprehensive approach to the reduction of gun violence. At the start of GIVE, many sites viewed this strategy as installing cameras in Hot Spot areas to track crime or electing to cut back brush or cleaning an area in a neighborhood. As researchers are discussing the components of CPTED as outlined in the

15

COB218799

COB218784

strategies' checklists during phone calls and site visits, and personnel are attending training sessions, they are understanding that CPTED is a process strategy tool that takes a great deal of time, collaboration, and resources to implement effectively. Full implementation of CPTED is anticipated as implementation activities and training continues.  This is a strategy area, however, where some sites have not fully incorporated the complex analyses, non-criminal justice partner roles, and documented planning that is consistent with the evidence-based approach.

**Focused Deterrence**

Implementation of Focused Deterrence emphasizes a broad-based effort to deter crime by specific individuals or groups and to provide alternative paths.   Offender Call-in forums are a part of this larger theoretical approach.  The danger is, however, that the call-in is seen as they only component of the intervention. While 12 sites have selected this strategy in their GIVE application, implementation varies across jurisdictions based on understanding of the strategy, training provided, resource availability, and cooperation among partners. This strategy can be difficult to implement effectively because there are several components that need to be addressed to be successful.

Some sites are implementing some of the components of this strategy and some are implementing all of the components. Several personnel have expressed their concerns about the long-term effectiveness of this strategy because of the heavy amount of resources required to sustain the short-term effect while conducting new Offender Forums. Sites report that they are seeing a reduction in gun violence four to eight weeks after a Call-In, but are not realizing long-term benefits and are questioning the benefit of the strategy. Both Erie County and Onondaga County are investigating the long-term effectiveness of the strategy through partnerships with universities and research foundations.

**Procedural Justice**

Procedural Justice has the most inconsistent application across all jurisdictions. Some sites are implementing or trying to implement Procedural Justice Call-ins, some are trying to use Procedural Justice Theory as a foundation for their work in law enforcement, and others view this strategy as nothing new because they believe that they are already following the law and treating people fairly and justly. More training and a greater understanding of how procedural justice should be implemented and how it is different from abiding by existing laws and following concepts of fairness are needed.

Many believe that Procedural Justice has the greatest potential for improving and promoting positive relationships among community residents and law enforcement personnel. Procedural Justice, however, seems to be the strategy about which there is the most limited clarity and the greatest

16

COB218800

COB218784

misunderstanding.  Jurisdictions need more information regarding the nuts and bolts of how to implement this strategy effectively and a greater understanding of the Theory behind the strategy.


**Street Outreach**

In general, larger jurisdictions have selected to implement Street Outreach initiatives.  In all cases, however, this is dome through programs external to the local criminal justice system.  This is not true of other strategies.  Initiatives include The Council of Thought and Action (COTA) re-entry program that employs individuals who were incarcerated to reach out to offenders in Nassau County, The Cure Violence SNUG program with violence interrupters in several jurisdictions, and community outreach initiatives in Suffolk County. Several jurisdictions have a strong commitment to Community-based Policing models and are actively engaged in community based youth and adult initiatives. Programs aimed to support troubled youth and adults are present in each GIVE community to varying degrees.


**Summary on Issues Related to Implementation Effectiveness**

Implementation effectiveness varies across all sites based not only on the understanding of strategies but also on leadership, politics, and the culture of the jurisdiction. In general, in jurisdictions that have strong executive leaders who are committed to GIVE, have collaborative partnerships with the community and law enforcement partners, and have participated in training, greater implementation of strategies is occurring.

In many jurisdictions, there is an over commitment to implementing five or six of the strategies. This is contributing to a lack of deep implementation as sites do not have the time to develop a thorough understanding of strategies. Several jurisdictions have recommended changing the grant cycle from one year to two or three years so they have the opportunity for planned, effective, and thorough implementation. For some sites, implementation is a mile long and an inch thick. Focusing on a few strategies will aid jurisdictions in the development of an overall comprehensive plan.

Confusion among partners about implementation of strategies is common. Some site personnel have expressed that they are not knowledgeable about implementation of strategies among partners because of the way GIVE funding was divided as each partner received funding rather than the county receiving a lump sum.

COB218801

COB218784

0018

Across every jurisdiction there is a need for individualized training opportunities. Some sites reported that presentations of strategies are not effective in helping them understand how to implement strategies. For example, Ceasefire Academy provided a conceptual overview of Focused Deterrence Call-ins, but did not provide detailed information about how to conduct a Call-in from start to finish.

Sites need training opportunities where they can meet with academics and other criminal justice or law enforcement partners who have expertise in the strategy to ask questions, make connections to what they already know, and learn from others who have had success with the strategy, as a way to ensure that they are successful with implementation. This is consistent with the tenets of adult learning theory. Adults learn best through experiences that are problem-based and collaborative, rather than didactic. Effective adult professional development opportunities emphasize a focus on small group, collaborative, and active learning rather than large group, lecture style, passive learning.

There is a wealth of knowledge and expertise of effective policing and law enforcement practices in New York State. As can be expected, some jurisdictions have questioned the effectiveness of training sessions hosted by GIVE presenters from cities in other states and have expressed a desire to learn from their colleagues across the state. All jurisdictions tout innovative practices and are proud of their efforts to identify novel and creative ways to reduce crime and violence. These practices are explained in greater detail in this report.

Some sites are struggling with GIVE's focus on gun violence and believe that gun violence is an outcome of drug problems. Some jurisdictions have suggested that next year's RFP should include an emphasis on the elimination of guns and drugs. This is especially true in smaller jurisdictions where gun violence is not experienced on the scale that it is in larger jurisdictions and GIVE funding is limited.

**Innovative Practices**

Our regular contact with the GIVE sites has shown variation in approaches to implementation and in activities related to the same underlying strategies. The diversity of approaches in the context of broad shared goal of reducing gun violence and a small number of well documented approaches has also supported innovation across the sites. We had not anticipated the need to collect information on innovative practices but we have come to regard the task as part of reporting on the products of the overall GIVE program. Below are descriptions of some GIVE jurisdiction practices we see as innovative.

18

COB218802
COB218784

**Suffolk County Felony Youth Court**

Felony Youth Court is a partnership with the court system and law enforcement agencies to assist youth ages 17 and older charged with Class B, C, D, and E felonies. As they are no longer eligible for family court and with few resources available to these young offenders, they are referred to Criminal Court. Felony Youth Court provides training and education to the offender as an alternative to jail and as a means to reduce or eliminate further criminal activity.

Felony Youth Court is staffed by Judge Fernando M. Camacho, a prosecutor and a senior probation officer. Judge Camacho began this program as a judge in New York City and brought it to Suffolk County. This innovative practice is a component of Suffolk County's GIVE Problem-Oriented Policing Strategy and appears to be a novel program not available elsewhere in New York State or in the United States. A key to its success is the close cooperation of partners and frequent contact with youthful offenders in the program. The program has strong support from the Suffolk County District Attorney's office.

**Albany County To Reach and Connect (TRaC) Community Outreach Expansion**

TRaC operates with the oversight of two police officers and is focused on providing services and assistance to youth ages 13-17 that have had minor contact with law enforcement agencies. Program participants are identified from recognition that an individual is experiencing difficulty in school, home, or the community.

**Chautauqua County Database**

Chautauqua County is in the beginning stages of sharing a database of records and information with Erie County and other jurisdictions around the state.

**Dutchess Targeted Arrest Notification (TAN) System**

Targeted Arrest Notification (TAN) System is a new initiative funded through GIVE that e-mails information about arrests to members of the Field Intelligence Group while individuals are in custody. TAN is connected to the Chronic Offender Hot List that was undertaken near the end of IMPACT. Individuals included on the Chronic Offender Hot List are identified through information from probation and parole and TAN provides another avenue to nominate individuals to this list.

**Erie County Funeral Home Brochure**

19

COB218803
COB218784

0020

Each year, guns that are not properly sold or surrendered, fall into the hands of criminals who use them to commit violent crimes.  Erie County Sheriff's Office, Buffalo Police Department, and the City of Buffalo collaborated to create a brochure that explains what to do when loved ones pass away and leave behind a gun.

**Schenectady County Camera Project**

Schenectady's Intelligence Analyst Supervisor and Senior Probation Officer are currently working on a project to attain access to the cameras of businesses within the three, DDACTS identified, Hot Spots. They are currently in the collection phase and have finished with the data collection for one of the Hot Spots. Once the data is collected for the other two Hot Spots, and the three Hot Spots are exhausted, business cameras will be mapped and overlapped with the citywide camera system. Probation will continue to update data collection as she obtains information from the businesses.

By implementing this initiative, the Schenectady Police Department will have additional avenues available to them to aid their investigations and the Schenectady County District Attorney's Office will have video to use during prosecution. This initiative falls under part of the CPTED section of the Schenectady GIVE application, to engage business owners in order to inventory all existing surveillance resources.

**Rensselaer County Camera Project**

Rensselaer County is investigating the purchase of cameras for patrol cars to record police officer activity and interaction with public.

**Onondaga County collaboration with Liberty United**

Syracuse Police Department is involved in a partnership with Liberty United, an organization that turns unwanted guns and ammunition into jewelry, and returns a portion of the proceeds from the sale of jewelry to local non-profit organizations working to reduce gun violence.

COB218804

COB218784

0021

**Jurisdiction Information**

**Jurisdiction name: Erie County**

**Jurisdiction Overview**: The City of Buffalo located in Upstate New York has a population of 259,000. This has decreased 11.4% since 2000, approximately 50% from its highest level in the 1950 census. In 2013, Buffalo, NY experienced 3,249 violent crimes. Out of those violent crimes, 951 or 29.3% were firearm related. Out of the firearm related crimes, there were 171 incidents that involved injury. In 2013, Buffalo, NY experienced 3,249 violent crimes. Out of those violent crimes, 951 or 29.3% were firearm related. Out of the firearm related crimes, there were 171 incidents that involved injury. Binghamton had a total of 47 homicides with 35 or 74.5% of the homicides being firearm related.

**Partners:** City of Buffalo Police Department, Erie County Department of Central Police Services, Erie County Sheriff's Office, Erie County District Attorney's Office, Erie County Probation Department

**Evidence-based strategies selected:** Problem-oriented Policing, Hot Spot Policing, CPTED, Focused Deterrence, Street Outreach

**VRAT summary:** A VRAT was completed by: John Glascott (Commissioner, Erie County Central Police Services), Kathleen Pilecki, (Grant Procurement Specialist, Erie County Probation Department), Daniel MIlbrandt (Deputy, Erie County Sheriff's Office), Joseph Spino (Grant Coordinator, District Attorney's Office), Carmen Menza (District Chief, City of Buffalo Police Department)

From the results of the VRAT summaries, a comprehensive VRAT analysis for Erie County was completed. Both the Governance and Project Management and Data and Analysis Dimensions received a rating of *meets needs to mature*. Categories within Feedback and Awareness and Partnerships dimensions were rated *meets needs to mature* with the exception of Multi-agency Partnerships and Training. Both Multi-agency Partnerships and Training opportunities received a *weak to basic* rating.

**Liaison(s):** Deputy Police Commissioner Beaty and Ms. Maureen Oakley

**Implementation Challenges**

The following are implementation challenges for Erie County:

1. Changing culture is a process, and seeing immediate results is difficult.
2. Limited resources of time and money.
3. Possible crime displacement in E1 and E2 areas.

COB218805

COB218784

0022

**Assessment**

1. VRAT
   a. Partner ratings of the jurisdiction's readiness to implement the strategies are accurate. Data and Analysis of areas of strength for Erie County especially because of Erie County Crime Analysis Center (ECAC).
   b. Governance and Project Management are effective with strong leadership demonstrated in E-District.
   c. In-depth training regarding how to implement strategies is needed.
2. Overall Implementation
   a. Under GIVE, the following has occurred:
      i. GIVE leadership and crime analysis are two major strengths in Erie County. Erie County's GIVE project is unique in that it is focused solely on E-district. Positive results of this laser-like focus are being realized. Shootings and violence on Shirley Avenue in E-district are significantly reduced.
      ii. DCJS is more involved with implementation in terms of performance and evaluation.
      iii. The very best of IMPACT is brought to the implementation of GIVE. Examples include: Saturation details and Hot Spots, Homicide and Intel detectives working together, Homicide and Patrol working together.
      iv. Collaboration and communication among all partners have increased.
      v. A sense of hopefulness that more intelligence will lead to more solvability.

**Expectations for Upcoming Months**

In the upcoming months, Erie County expects to see the following:

1. Erie County has a body of data regarding long-term impacts of Focused Deterrence Offender Call-Ins and are continuing to track this data.
2. Crime displacement in the streets surrounding GIVE zones will be tracked.

22

COB218806
COB218784

## Key Areas

**Program Information and knowledge**

Most participants have some knowledge of GIVE, however, it is unclear how much in-depth knowledge they have. During an August meeting, GIVE was described as the new IMPACT and as staff members are actively making connections between what they know from IMPACT to GIVE requirements, a recognition that GIVE is different from IMPACT is in place. During a ride along with an E-District Captain, similarities and differences between GIVE and IMPACT were discussed with the researcher.

**Linkage of problem and intervention**

The problem and intervention are highly linked. This is evident as the focus of GIVE are the hot spots areas E1 Bailey Area and E2 Delavan Area. Most GIVE resources are used to reduce gun violence in these two hot spot areas. The use of strategies are frequently discussed during monthly GIVE meetings and during phone calls, and are discussed within the context of people, places, alignment, and engagement.

**Implementing structure and leadership**

Clear structure, strong executive involvement, and strong participation of others are observed. In the GIVE organizational tree diagram, Buffalo Police Commissioner and Erie County District Attorney are listed as GIVE co-chairs. The Erie Crime Analysis Center (ECAC) Director is listed as the point person who connects GIVE Co-chairs with Buffalo Police Department, District Attorney, Erie County Sheriff's Office, Probation, Central Police Services, and Federal and State Partners.

The E-District Chief, Central Police Services Commissioner, Chief of Detectives, ECAC Director, and a representative from Probation regularly participate in weekly phone calls. The Deputy Police Commissioner who serves as GIVE liaison is present for GIVE monthly meetings and occasionally participates in weekly phone calls. William Hochul, U.S. Attorney for the Western District is invited and attends GIVE monthly meetings as his schedule allows. Excellent attendance and participation of partner representatives at monthly GIVE meetings are the norm. Partner representatives provide monthly updates and progress reports. E-District Chief is clearly the leader for GIVE in E-District and this is evident by his knowledge of the area and his role as the go to person for GIVE.

Connections between suspects who commit crimes in Buffalo and live in Niagara Falls are highlighted during GIVE meetings. The Deputy Commissioner stated that she would like to have a representative from Erie attend Niagara Falls GIVE meetings and vice versa. Niagara Falls GIVE

23

COB218807

COB218784

leadership is amenable to this collaboration. A backlash is reported from the community toward police department leadership that is demonstrated by the community's reluctance to assist with solving crimes because the community does not feel supported by police.

**Role and activity of partners**

Partner roles are integrated in implementation. This is evident as the Sheriff's Office, Probation, and Buffalo Police Department conduct search warrants in E1 and E2. Probation has a case load explorer tool that is shared with ECAC and regularly partners with the police department and sheriff's office to conduct routine home visits.

Partners listed on Erie County GIVE Flowchart are: ECAC, police department, DOCCS, SNUG (Buffalo Peacemakers), and District Attorney's Office. Each month, micro-hotspotting of gun related incidents is mapped and measured monthly by ECAC and this information is shared with Buffalo Police Department and is used to inform the implementation of CPTED and lighting. Shooting victim packets are developed by ECAC with the goal of gathering all available resources to prevent further violence and this information is shared with DOCCS and Operation SNUG personnel. Top Gun Offender Lists are created and shared with appropriate ADAs.

**Working group processes**

Leadership groups meet frequently and an active working group makes operational decisions. A consortium group of leaders is not in place for GIVE. The working group are the partners who participate in GIVE meetings. Members of the Police Department and Sheriff's Office are working with the County Clerk to update their systems to alert family members of deceased relatives that they could be in possession of a firearm owned by the deceased. Through GIVE, a pamphlet was created for distribution at funeral homes that advises family members about what to do if someone leaves behind a firearm.

Caseloads for two probation officers are established that are based on top offender lists and distribution between gun related and non-gun related offenders. Probation is seeking to map where people in the two caseloads are living the way that Parole does (off of the CHARM system), and to be able to use this information in the event of a triggering homicide. Various participants, including crime analysts, spoke about this being similar to a model being used in Philadelphia where if a shooting is 100 feet away from a probationer, based on residence and locations, law enforcement can legally interview the probationer about the shooting. The GIVE Assistant District Attorney spoke to this model from a prosecutor's perspective speaking about using 60% of resources and being able to use probationers and parolees during the prosecution process.

COB218808

COB218784

**Ongoing review and planning**

Review of data and processes is continual and revision is considered as a regular activity. Erie has a strong CAC that consistently reviews and shares data with partners. Data is shared among executive leaders and command staff in E-District and this information is used to make decisions at the operational level. Data is continually being reviewed. The monthly GIVE meeting is an ongoing assessment with all partners and includes E1 and E2 homicide chiefs and executive commanders. Measurements are taken during the crime period which is discussed among Police executive staff shared with Intel and Homicide under the direction of the Chief of Detectives. ECAC collects data for the entire department. Whether or not there is displacement of violence from E-district is described as debatable. People moving out of one area may not be comfortable moving into another due to change in dynamics and people that they know.

**Availability and use of data**

An abundance of data is regularly shared and used in decisions in implementation. ECAC regularly and consistently provides data to inform GIVE performance indicators. ECAC employs several crime analysts who provide data and answer questions as needed. The ECAC Director is both professional and approachable, and provides detailed responses to questions. At each GIVE monthly meeting, maps, statistics and data are presented that detail Part One crimes, firearm crimes, shootings with injury, shooting victims, gun arrests city wide and in hot spots.  Updates are provided regarding gang intelligence, GIVE Top Offenders, gun arrests, shooting victims and shooting suspects. Data from each partner agency is shared.

**Resource use**

Additional resources are used for ancillary related activity. As mentioned previously, a brochure will be distributed to funeral homes that explains what to do if a loved one leaves behind a weapon. The gun buy-back program is funded through asset forfeiture funds and taxpayer money is not used to support this program.

**Reporting out**

Local data beyond DCJS requirements are tracked and regularly used. Extensive data and information are presented at monthly GIVE meetings and this information is shared with all GIVE partners. Analysts track social media, look at specific crime types, assemble timelines on older cases to

COB218809

COB218784

help with prosecution, and create an information packet on each shooting victim to help law enforcement in efforts if there is a retaliation shooting.

## Evidence-based strategies

**Problem-oriented Policing and Hot Spot Policing**

Erie has received training through various grants including National Crime Prevention Council, COPS office and police forum on government. 48 police executives received POP training during a 5-week summer course. ECAC Director and Buffalo Police Department Deputy Commissioner shared their experiences and knowledge of this strategy with Erie personnel. At the command level, a lieutenant coordinates their POP effort. Crime maps are used to determine hot spots and many in Buffalo believe that the strategy is common sense. A problem is examined, a model to solve the problem is examined, and SARA is used. They believe that police officers have used these steps since the beginning of time.

Calls for service are used to determine locations. City Council members call the police to share their concerns. The E-District Chief reviews the SARA model and POP. Shirley Avenue is a success and they used the SARA model to to make changes. Through the use of street spots and making arrests, evictions occurred and street problems went way down. In the event of a homicide, patrols are placed in the designated area 16 hours a day and the DA's office is involved to prosecute the case.

There's been a major reduction in violent crime targeting a shopping plaza near Delavan and Cortland Avenues. Probation assists the police department and sheriff's office and piggybacks on training with sheriff's office and other police departments. Central police meets with the county clerk and they have a MOU to place pistol permit data into CHARMS. Programming to place mugshots into CHARMS is complete. In addition, the long-term impact of POP in E-District will be observed to determine if displacement of crime has occurred.

**Crime Prevention through Environmental Design (CPTED)**

CPTED training was held November 5th for Erie and surrounding jurisdictions. Individuals from Buffalo Police Department, ECAC, City of Buffalo, Citizens Services of City of Buffalo, Buffalo Sewer Authority, Mayors' Impact Team, and Back to Basics/SNUG were in attendance. The participation of these community partners in training was a new concept and well received by attendees.  E-2 area was chosen for CPTED implementation because it lent itself to a pilot project and is easily definable, had quantifiable gun crime and also, is an area that where results can be monitored once lighting in place. The Trade Fair Market area was targeted because it is a central crime generator in the E2 Delavan GIVE hotspot area.  Police can control some of the environmental issues in an area by working with the

26

COB218810

COB218784

landlord, public works, and Niagara Frontier Transportation Authority for bus shelter. Areas chosen for redesign are high crime areas.

**Focused Deterrence**

Erie County participated in training with David Kennedy several years ago. They have had no formal training in how to conduct notification sessions. DCJS is trying to schedule training this year, but Kennedy's schedule is full. In terms of the grant, a call-in will be scheduled before January 1st, 2015 and one will be scheduled later in the year. A goal is to schedule one call-in pre-training and one post-training and the compare the two. The U.S. Attorney's office handles all of the scheduling and coordination with participating agencies.

Key criminal justice and community partners are involved. The call-in is held in court, is properly managed, and data is recorded. Exit polling with offenders was conducted several years ago by Dr. Pam Beal, former University at Buffalo researcher and data was collected regarding offender referrals for services. ECAC continues to collect data from notification sessions and this information is analyzed to determine long-term effects.

**Street Outreach**

SNUG commenced August 18, 2014. Personnel include one full-time program manager, one full-time outreach worker supervisor and three full-time outreach workers and three part-time violence interrupters who are dispatched for street intervention. SNUG team has attended several neighborhood and community events and monitors hot spot areas. No technical training has been received, although two SNUG leaders attended CPTED training. SNUG coordinator and SNUG Pastor are working closely with police department. Everyone involved with SNUG understands his or her role. Erie County Medical Center is involved. Police officers in E-district are not aware of SNUG, and they are trying to remedy this. Intervention data is not provided to police department per SNUG program design. Statistics demonstrate that violent crime and shootings are both down. Probation exchanges data with them.

COB218811

COB218784

0028

Appendix A: Jurisdiction Results: Violence Reduction Assessment Tool



28

COB218812

COB218784

Appendix B.  Jurisdiction Gun Crime Data (Green Book Data)





COB218813

COB218784

0030



Crime Gun Traces Submitted to the ATF by Month: GIVE COUNTIES

GIVE START DATE: JULY 2014

30

COB218814

COB218784

0031

Appendix C: Implementation Assessment Review
Rochester Institute of Technology
Center for Public Safety Initiatives

Implementation Assessment Review (IAR)
August 19, 2014

This tool is a guide for interviews dealing with program implementation. The IAR is meant to assist researchers to assess program implementation by helping to structure their inquiry and their report.

The topic areas provide a focus for data collection on monthly visits and weekly phone calls. The topics should be covered in conversation and not necessarily used directly for questions.

These areas should provide structure for researchers' collection of data and completion of reports.

Comments should be detailed and include specific details.

Key Areas

1. Program Information and knowledge

2. Linkage of problem and intervention

3. Implementing structure and leadership.

4. Role and activity of partners

5. Working group processes

6. Ongoing review and planning

7. Availability and use of data

8. Resource use

9. Reporting out

Full Descriptions

1. Program Information and knowledge

This is an assessment of how much background information the program participants have. Who has it and how is it shared? Where did they get it? Have they sought and received technical assistance or training? Who has? What did they think of it?

31

COB218815

COB218784

0032

2.     Linkage of problem and intervention

This is an assessment of how well thought through the focus and strategy is and especially if and how program people think about and review the link during program operation.

3.     Implementing Structure and leadership.

This deals with program structure, management and leadership during implementation. Who leads? How active are they? What do they do? What styles of leadership do they use?

4.     Role and activity of partners

What is the role of partners? Who are they? What CJ system and non-system partners are there? What is their role? What do they do?

5.     Working Group Processes

This addresses ongoing program processes. Is there a leadership group? A working group? Who are the active workers and what do they do? How is program operation delegated?

6.     Ongoing Review and Planning

This focuses on the extent continued assessment and planning is a part of the process. Is there an ongoing assessment of how things are going and whether some changes are needed? Or does the program continue down the same path without significant review? Who leads any review or continued planning process? Is there a process of critical reflection and redirection.

7.     Availability and use of data

How much does data figure into the program as it is in operation? Are current data examined? What kinds of data? Is there and active crime analysis role? Are qualitative or quantitative data used? Who is data shared with? Are data used in assessments of how things are going? Are there regular analysis products?

8.     Resource Use

This addresses how resources are used and whether funding leverages other resources. What resources are used? Does this use change normal local operations or just add to them? Who brings additional resources to the program?

32

COB218816

COB218784

9.    Reporting out

This deals with tracking results and feedback (not just use of data for program direction). Is their data tracking used for something more than just reporting to DCJS. Are results discussed? By whom? Do they have an effect?

COB218817

COB218784

0034

Appendix D: Strategies Check List

**The researchers from RIT will utilize the above elements to assess implementation. This will be accomplished through meetings, on-site visits, and telephone**

**Focused Deterrence Call-Ins**

1. Received technical assistance and/or training

2. Call-ins scheduled at proper intervals

3. Identified gangs and gang members w/ analysis

4. Selected appropriate offender participants

5. Program coordinated by designated coordinator

6. Meetings of key presenters held to assure proper message

7. Key criminal justice system presenters involved

8. Key community partners involved

9. Held in high authority setting

10. Call-in event properly managed

11. Deterrence Message delivered

12. Service message delivered

13. Service follow-up completed

14. Call-in data recorded

**Hot Spot Policing**

1. Received technical assistance and/or training

2. Program coordinated appropriately

3. Analysis used to identify gun crime hot spots

4. Analysis used to identify hot people associated with hot spots

5. Enforcement partners participate in tactical planning

6. Clearly articulated enforcement strategies for hot people in hot spots

7. Strategies used at appropriate times

8. Enforcement partners participate in operations

9. Project data recorded

**Problem-Oriented Policing (POP)**

1. Received technical assistance and/or training

2. Program coordinated appropriately

3. Data used to select program locations

4. Program targeted in appropriate locations, by crime level, size, etc.

5. POP team selected for area

6. POP team trained

7. SARA process described and used (Survey, Analysis, Response, Assessment)

COB218818
COB218784

8. POP project data recorded, description of problem, intervention, effect received

9. Multiple POP projects underway, or completed

**Procedural Justice Call-ins**

1. Received technical assistance and/or training

2. Call-ins scheduled at proper intervals

3. Selected appropriate offender participants

4. Program coordinated by designated coordinator

5. Meetings of key presenters held to assure proper message

6. Key criminal justice system presenters involved

7. Key community partners involved

8. Held in appropriate, non-authority setting

9. Call-in event properly managed

10. Procedural fairness message delivered

11. Service message delivered

12. Service follow-up completed

13. Call-in data recorded

**Crime Prevention Through Environmental Design (CPTED)**

1. Received technical assistance and/or training
2. Program coordinated appropriately

3. Data used to identify CPTED work areas

4. Diagnoses of environmental issues completed

5. Work with appropriate partners (City Planners)

6. Use a systematic redesign process

7. CPTED data recorded appropriately

**Street Outreach**

1. Received technical assistance and/or training

2. Program coordinated appropriately

3. Coordination with existing outreach program

4. Clearly articulated model implemented

5. Program focused on appropriate target area

6. Appropriate relationship with police

7. Intervention data recorded by outreach program

COB218819
COB218784

Appendix E: The Violence Reduction Assessment Tool (VRAT)

### Introduction to Instrument

Research over the last several decades has revealed two key findings: 1) Communities can reduce crime and violence through data-driven processes and evidence-based strategies; and 2) Effective implementation of these processes and strategies is central to crime reduction. The difference between effective and ineffective implementation centers on several key dimensions. These include governance and project management, partnerships, and data and analysis.

The **Violence Reduction Assessment Tool (VRAT) is a planning, resource and support instrument** that assists communities assess their capacity for effective implementation and to identify concrete action steps to increase capacity and maximize the likelihood of effective implementation. The VRAT is intended to **assist local communities** assess their capacity for implementing Strategic Crime Reduction Efforts (SCRE). VRAT is a flexible support tool that can assist communities in developing both the commitment and the competence to successfully address crime and violence problems. The VRAT is based on lessons learned in practice and research related to effective implementation of strategies intended to reduce levels of crime and violence and promote public safety.

### How to Employ the VRAT

The VRAT supports Strategic Crime Reduction Efforts. These refer to multi-agency crime and violence reduction efforts that engage people in the community and rely on data-driven strategic processes to enhance and support prevention and crime control. Ideally, stakeholders from local government, law enforcement, prosecution, corrections, and other criminal justice partners, social services, community groups, the faith community, and similar community stakeholders will all participate and complete the VRAT survey. Minimally, the primary law enforcement agency and key criminal justice partners should complete the VRAT in order to assess local capacity for Strategic Crime Reduction Efforts. At least one representative from each stakeholder group should complete the VRAT survey and multiple representatives can complete the survey. Recognize that not all respondents will be in position to answer all the questions and thus should feel comfortable to respond "don't know" as appropriate.

Because communities are at varying capacity levels for implementation, the VRAT is conducted in Stages. Stage One should be completed before moving to Stage Two. For communities falling low on some dimensions, the VRAT tool provides resources and suggestions for increasing capacity. The VRAT can be repeated to provide a measure of progress in capacity building.

COB218820
COB218784

0037

**Definition**

Throughout the VRAT, we will refer to the **Strategic Crime Reduction Effort (SCRE). The Strategic Crime Reduction Effort refers to multi-agency crime and violence reduction efforts that engage people in the community and rely on data-driven strategic processes to enhance and support prevention and crime control.**

*Confidentiality Reminder - no individual questions will be identified, aggregate score created.*

## 1. DEMOGRAPHICS

Please provide some basic information about you and the agency you represent.

1) What is your name?
2) What agency do you represent?
3) Do you represent a governmental agency?
    a. No
    b. Yes
4) If yes, please indicate what kind of governmental agency:
    a. Federal government agency
    b. State government agency
    c. Local (City/Town) government agency
5) How would you characterize you agency?
    a. Criminal justice agency
    b. Community agency
    c. Social services agency
6) What is your title?
7) How many people work at your agency?
8) Who is the primary group you serve?
9) What is the size of the community you represent?
10) How would you characterize the geographic are you represent?
11) Who do you envision would be the lead entity for your SCRE?

37

COB218821

COB218784

0038

## 2. *GOVERNANCE AND PROJECT MANAGEMENT*

Research has demonstrated that successful implementation of a Strategic Crime Reduction Effort (SCRE) is strongly tied to the level of commitment and leadership of the participating agencies. Successful SCRE implementation requires the application of sound project management skills to the effort, the commitment of sufficient personnel and resources by relevant stakeholders for a period of time long enough to complete the project, and sound project governance. This type and length of commitment is needed to insure that problem assessment, program design, and program implementation occur. Support at the top of an organization for implementing evidence-based violence reduction strategies can be very important. This is a sensitive subject, but we recognize that there may be many reasons why an organization is not ready to take on this long and, perhaps, difficult task. This SCRE is likely one of many priorities.

The Management and Decision Making section of the VRAT is designed to help you assess the level of support within your organization for this project and to ensure accountability and responsibility. The questions draw upon research and what we have learned about why some programs are more successful than others. Forthright answers to them can help you avoid a misstep now and/or help you identify possible problems and solve them early. The questions below focus on the commitment to this work up and down the organization- in real, tangible ways. Your answers will also help measure the agency's capacity to implement SCRE . They may show you are ready to move forward or they can help identify areas that you can strengthen along the way. If you do not have enough information for an opinion on a question select "don't know."

### Commitment & Leadership

| | | Don't Know | Strongly Disagree | Disagree | Agree | Strongly Agree |
|---|---|---|---|---|---|---|
| 1) | My chief executive has committed to the SCRE for at least one year. | | | | | |
| 2) | Mid-level to senior managers in my agency are committed to the SCRE for at least one year. | | | | | |
| 3) | The rank-and-file personnel of my agency are committed the SCRE for at least one year. | | | | | |
| 4) | My agency is willing to commit existing resources to the SCRE for at least one year. | | | | | |
| 5) | My agency has sufficient personnel at this time to commit to the SCRE for at least one year. | | | | | |
| 6) | My chief executive has expressly stated that my agency will participate in the SCRE for at least one year. | | | | | |

3

### Management & Decision-Making

| | | Don't Know | Strongly Disagree | Disagree | Agree | Strongly Agree | |
|---|---|---|---|---|---|---|---|
| 1) | There is a designated individual who will be responsible for leading/managing/coordinating the SCRE. | | | | | | |
| 2) | There is an executive-level decision-making group in place to oversee the SCRE. | | | | | | |
| 3) | The executive-level decision-making group meets regularly. | | | | | | |
| 3a) | If you answered Disagree, Agree, or Strongly Agree, please define regularly | Weekly | Bi-weekly | Monthly | Quarterly | Semi-Annually | Ad Hoc |
| 4) | There is a day-to-day working group to manage and coordinate the SCRE? | | | | | | |
| 5) | The day-to-day working group meets regularly. | | | | | | |
| 5a) | If you answered Disagree, Agree, or Strongly Agree, please define regularly | Weekly | Bi-weekly | Monthly | Quarterly | Semi-Annually | Ad Hoc |

38

COB218822
COB218784

### 3. PARTNERSHIPS

The ability to communicate and establish partnerships with other law enforcement agencies, community interest groups, and governmental entities such as social service agencies is vital to the comprehensive nature of implementing a SCRE. Leveraging current partnerships and creating new ones when needed will increase the likelihood of success for your SCRE. This sections helps you examine the existence (or absence thereof) and depth of three partnership types relevant to a SCRE: (a) multi-partner crime prevention initiatives; (b) public criminal justice and related institutions; and (c) non-criminal justice-related (private, non-government, and public) institutions within the community.

It is important to note that scores for each category of partnership will be combined so no individual partnership responses will be identified.

| | Have you had prior experience with initiatives like | Don't Know | No | Yes |
|---|---|---|---|---|
| 1) | Byrne Criminal Justice Innovation (BCJI) Neighborhood Revitalization Initiative | | | |
| 2) | Comprehensive Anti-gang Initiative (CAGI) | | | |
| 3) | Community Oriented Policing (COPS) | | | |
| 4) | Community Prosecution | | | |
| 5) | Drug Market Intervention (DMI) | | | |
| 6) | Problem Solving Courts (e.g., community courts; drug courts; mental health courts) | | | |
| 7) | Project Safe Neighborhoods (PSN) | | | |
| 8) | Smart Policing Initiative (SPI) | | | |
| 9) | Weed and Seed | | | |

### Criminal Justice Partnerships

**Confidentiality Reminder- no individual questions will be identified, aggregate score created.**

| | | Don't Know | No history of partnership, we would have to start from scratch | History of partnership but it is problematic | Potential for partnership | Established partnership |
|---|---|---|---|---|---|---|
| 1) | Primary local-level law enforcement agency | | | | | |
| 2) | Other local/county/state law enforcement agencies | | | | | |
| 3) | United States Attorney's Office | | | | | |
| 4) | Other federal law enforcement agencies | | | | | |
| 5) | Primary local prosecutor's office | | | | | |
| 6) | Primary public defender's office | | | | | |
| 7) | Primary probation/parole/community corrections | | | | | |
| 8) | Local jail/DOC | | | | | |
| 9) | Code enforcement/nuisance abatement | | | | | |
| 10) | Public school police | | | | | |
| 11) | Public housing | | | | | |
| 12) | Juvenile court | | | | | |
| 13) | Judges | | | | | |
| 14) | Regional or state intelligence/fusion center | | | | | |
| 15) | Other (please specify) | | | | | |

39

COB218823

COB218784

**Community Partnerships**
**Confidentiality Reminder- no individual questions will be identified, aggregate score created.**

| | | Don't Know | No history of partnership, we would have to start from scratch | History of partnership but it is problematic | Potential for partnership | Established partnership |
|---|---|---|---|---|---|---|
| 1) | Social service providers | | | | | |
| 2) | Neighborhood groups (e.g., Crime Watch, Block Clubs, Neighborhood Associations) | | | | | |
| 3) | Schools | | | | | |
| 4) | Faith-based | | | | | |
| 5) | Business Groups | | | | | |
| 6) | Foundations | | | | | |
| 7) | Community coalitions (e.g., United Way; NAACP; NAMI; Crime Stoppers) | | | | | |
| 8) | Public housing | | | | | |
| 9) | Public health/hospitals | | | | | |
| 10) | Elementary/Middle/High schools | | | | | |
| 11) | Local college or university | | | | | |
| 12) | Youth service/mentoring agencies (e.g., Big Brothers/Big Sisters; YMCA/JCC; Boys and Girls Clubs) | | | | | |

*4. DATA AND ANALYSIS*

Successful implementation of a SCRE requires the capability to gather, share, and interpret vast quantities of criminal justice or other data to identify the setting of the violence and those involved with the violence, and to measure the progress and impact of the strategies. Although law enforcement agencies collect large amounts of data, the ability of an agency to analyze the data and the resources available to do so vary greatly across the country. It may be easy to overlook the information and data issues involved in this work but experience has shown them to be key factors in program success. The right information, shared with the right people, and analyzed well, will help you better understand the specific details of your crime problem, chart the best course forward, and measure your progress along the way. The questions below will help you assess the strength of your foundation by asking about the availability of the most useful data, how your partners share data, and the availability of skilled help for the analysis.

Your answer should reflect whether your agency has the ability to generate those analysis products rather than if they are currently being widely used. The research partner is typically defined as a professionally trained researcher, usually outside the agency, and can involve the work of graduate students under the supervision of a university-based researcher.

Providing such data refers to the capability to generate reliable data on measures connected to the effort (it may be that this is not currently occurring). Sharing such data refers to the ability and willingness to allow relevant partners access to the data.

**Research & Analytic Capacity**

| | | Don't Know | Strongly Disagree | Disagree | Agree | Strongly Agree |
|---|---|---|---|---|---|---|
| 1) | The primary law enforcement agency has a crime analyst(s) with the ability to analyze crime-related data. | | | | | |
| 2) | There are other crime analysis sources such as a regional or state fusion center. | | | | | |
| 3) | There is a research partner(s) available and committed to work with the SCRE. | | | | | |
| 4) | The primary law enforcement agency is able to generate trend analyses of crime incident data. | | | | | |
| 5) | The primary law enforcement agency is able to generate crime maps showing where crime incidents have occurred. | | | | | |

COB218824
COB218784

**0041**

**Data Availability**

|  |  | Don't Know | No | Yes |
|---|---|---|---|---|
| 1) | The primary law enforcement agency have the ability to provide basic UCR crime incident data? |  |  |  |
| 2) | Does the primary law enforcement agency have the ability to provide detailed incident data such as NIBRS (National Incident Based Recording Systems)? |  |  |  |
| 3) | Does the primary law enforcement agency (or an alternative source such as the Jail or Department of Corrections) have the ability to provide information on gangs? |  |  |  |
| 4) | Does the primary law enforcement agency conduct systematic incident reviews of specific crime incidents (e.g., systematic reviews of homicides or non-fatal shootings)? |  |  |  |
| 5) | Do law enforcement agencies at the county, regional or state level have the ability to share crime incident information? |  |  |  |
| 6) | Is the probation department able to provide data about their clients? |  |  |  |
| 7) | Is the parole agency able to provide data about their clients? |  |  |  |
| 8) | Is the school system(s) able to provide data about school based incidents? |  |  |  |
| 9) | Is the prosecutor's office able to provide data on cases referred for prosecution? |  |  |  |
| 10) | Are code enforcement data available? |  |  |  |
| 11) | Are there additional sources of geographic data (e.g. GIS layers) about the community such as locations of schools, public transportation, bars/taverns, hospitals, parks, etc.? |  |  |  |

**Data Access and Sharing**

|  |  | Don't Know | Strongly Disagree | Disagree | Agree | Strongly Agree |
|---|---|---|---|---|---|---|
| 1) | Are there existing processes for sharing crime information such as task force meetings, crime incident reviews, or regional data sharing processes? |  |  |  |  |  |
| 2) | Is the primary law enforcement agency willing to share these data with approved partners involved with the SCRE? |  |  |  |  |  |
| 3) | Is the probation department willing to share their data with approved partners involved with the SCRE? |  |  |  |  |  |
| 4) | Is the parole department willing to share their data with approved partners involved with the SCRE? |  |  |  |  |  |
| 5) | Is the prosecutor's office willing to share their data with approved partners involved with the SCRE? |  |  |  |  |  |

## 5. FEEDBACK AND AWARENESS

### Reporting

This section focuses on an organization's ability to provide accurate information to SCRE partners as well as the training components necessary to support the overall success of the Initiative. As the SCRE progresses it is crucial that partners provide feedback and share updates, both positive or negative. Sharing this information with all partners creates a field for continuous learning and improvement. Minor adjustments in this approach can bring major positive results. Additionally, it is imperative that the organization be able to provide the necessary training to partners, properly track output and outcome measures, and determine if resource allocation was effective. Feedback is important to keeping stakeholders on task and responsive to achieve the long-term goal. Ultimately, the goal of violent crime reduction can only be achieved through the openness that comes from group discussion, the calculated actions that come from continuous feedback, and the shared accountability created through the feedback and awareness process.

**In answering the following questions, please answer with respect to the SCRE. If it is too early to answer these questions for the SCRE, base your answer on similar crime reduction efforts that have been implemented in your community.**

41

COB218825
COB218784

| | | Don't Know | No | Yes |
|---|---|---|---|---|
| 1) | Are there routine reports developed for tracking the output and outcome measures for the SCRE? | | | |
| 2) | Are regular briefings or reports provided to the executive level group? | | | |
| 3) | Are regular briefings or reports provided to the working group? | | | |
| 4) | Are regular briefings or reports provided to the rank and file in partnering agencies? | | | |
| 5) | Are regular briefings or reports provided to the community? | | | |
| 6) | Are regular briefings or reports provided to other approved partners involved with the SCRE? | | | |

**Training**

| | | Don't Know | No | Yes |
|---|---|---|---|---|
| 1) | Have you or others in your agency participated in any of the following SCRE related training *beyond* the agency minimum training standards? | | | |
| | Problem-solving training | | | |
| | Hotspots identification training | | | |
| | Gangs training | | | |
| | Youth problems | | | |
| | Substance abuse | | | |
| | Diverse populations | | | |
| | Other (fill in) | | | |
| 2) | Is there a training facility available to provide briefings/trainings on the SCRE? | | | |
| 3) | In the past year has your agency provided multi-agency training related to the SCRE? | | | |

| | | No, unable to provide training | Willing to provide training | Have provided training in the past | Training currently planned |
|---|---|---|---|---|---|
| 4) | Does your agency have the capacity to provide trainings on the SCRE to: | | | | |
| | Agency executives, political and community leaders? | | | | |
| | Command staff and middle-level managers? | | | | |
| | Rank-and-file personnel? | | | | |
| | Community groups? | | | | |

42

COB218826
COB218784
0043

43

COB218827

COB218784

0044