UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

BLACK LOVE RESISTS IN THE RUST, *et al.*,
individually and on behalf of a class of all others
similarly situated,

          Plaintiffs,

    v.

CITY OF BUFFALO, N.Y., *et al.*,

          Defendants.

---

No. 1:18-cv-00719-CCR

**MEMORANDUM OF LAW OF PLAINTIFFS AND
PROPOSED INTERVENORS MARKEL NANCE AND
THOMAS CHRISTOPHER WILLIAMS, JR. IN SUPPORT
OF THEIR MOTION TO INTERVENE AS PLAINTIFFS
AND REPRESENTATIVES OF THE TRAFFIC
ENFORCEMENT CLASS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

THE PROPOSED INTERVENORS ...................................................................................... 1

I.    Markel Nance ............................................................................................................... 1

II.   Thomas Christopher Williams, Jr. .............................................................................. 3

ARGUMENT ......................................................................................................................... 7

I.    This Court Should Grant the Motion to Intervene. ..................................................... 7

    A.    This Court Should Grant Intervention as of Right Under Rule
        24(a)(2) Because the Proposed Intervenors, as Members of
        the Currently Uncertified Traffic Enforcement Class, Lack
        Adequate Representation ...................................................................................... 8

        1.    This Motion is a Timely Response to the Court's
               Order on Class Certification. ................................................................. 8

        2.    The Intervenors Have an "Interest" in the Action
               Because They Assert Claims Against the Same
               City Policies and Practices That Form the Basis of
               the Main Action. ................................................................................. 11

        3.    The Intervenors' Interests Will Be Impaired if
               Their Request to Intervene to Serve as Class
               Representatives Is Denied. ................................................................. 11

        4.    In Light of the Court's Order on Class
               Certification, No Plaintiff Adequately Represents
               the Intervenors' Interests. ................................................................. 13

    B.    In the Alternative, Permissive Intervention Should Be
        Granted Under Rule 24(b) .................................................................................. 13

II.   The Proposed Intervenors Satisfy the Rule 23(a) Factors and Should Be Appointed
    Representatives of the Traffic Enforcement Class. .................................................... 15

CONCLUSION .................................................................................................................... 18

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Chen-Oster v. Goldman, Sachs & Co.*,
  2015 WL 4619663 (S.D.N.Y. Aug. 3, 2015) ................................................... 7, 9, 11

*CWCapital Cobalt Vr Ltd. v. U.S. Bank Nat'l Ass'n*,
  790 F. App'x 260 (2d Cir. 2019) .............................................................. 8

*Deposit Guaranty Nat. Bank v. Roper*,
  445 U.S. 326 (1980) ..................................................................... 13

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
  149 F.R.D 55 (S.D.N.Y. 1993) ............................................................... 7

*Extenet Sys., LLC. v. Vill. of Kings Point*,
  2023 WL 4044076 (2d Cir. June 16, 2023) .................................................. 13

*Floyd v. City of New York*,
  770 F.3d 1051 (S.D.N.Y. 2014) ............................................................ 17

*German by German v. Fed. Home Loan Mortg. Corp.*,
  896 F. Supp. 1385 (S.D.N.Y. 1995) ........................................................ 14

*Granite State Ins. Co. v. KM Tactical, LLC*,
  2025 WL 1502019 (S.D.N.Y. May 27, 2025) ................................................ 14

*Guadagna v. Zucker*,
  2021 WL 4150802 (E.D.N.Y. July 9, 2021) ............................................. 11, 12

*Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*,
  134 F.4th 73 (2d Cir. 2025) ............................................................... 11

*In re Holocaust Victim Assets Litig.*,
  225 F.3d 191 (2d Cir. 2000) ............................................................... 8

*Jamie Music Publishing Co. v. Roc-A-Fella Records, LLC*,
  2007 WL 1129333 (S.D.N.Y. Apr. 12, 2007) ............................................... 14

*Koike v. Starbucks Corp.*,
  602 F. Supp. 2d 1158 (N.D. Cal. 2009) .................................................... 12

*Leslie v. Starbucks Corp.*,
  2022 WL 5434278 (W.D.N.Y. Oct. 7, 2022) ......................................... 8, 14, 15

*Page*

*Ligon v. City of New York,*
    288 F.R.D. 72 (S.D.N.Y. 2013) ................................................................................17

*Marisol A. v. Giuliani,*
    126 F.3d 372 (2d Cir. 1997) ....................................................................................17

*N.J. Carpenters Health Fund v. Residential Cap., LLC,*
    2010 WL 5222127 (S.D.N.Y. Dec. 22, 2010) ........................................ 7, 10, 11, 12

*Nat'l Cong. for Puerto Rican Rts. v. City of New York,*
    75 F. Supp. 2d 154 (S.D.N.Y. 1999) .......................................................................17

*Nat'l Fuel Gas Distribn. Corp. v. Templeton Energy, Inc.,*
    1986 WL 12486 (W.D.N.Y. Nov. 7, 1986) ...............................................................9

*Pike Co. v. Universal Concrete Prods., Inc.,*
    284 F. Supp. 3d 376 (W.D.N.Y. 2018) .................................................................8, 10

*Plaintiffs #1-21 v. Cnty. of Suffolk,*
    2021 WL 1255011 (E.D.N.Y. Mar. 12, 2021) .........................................................17

*Range v. Nat'l R.R. Passenger Corp.,*
    176 F.R.D. 85 (W.D.N.Y. 1997) ...........................................................................8, 10

*Rogers v. Paul,*
    382 U.S. 198 (1965) ..................................................................................................7

*Stinson v. City of New York,*
    282 F.R.D. 360 (S.D.N.Y. 2012) .............................................................................17

*Trief v. Dun & Bradstreet Corp.,*
    144 F.R.D. 193 (S.D.N.Y. 1992) ........................................................................7, 15

*U.S. Parole Comm. v. Geraghty,*
    445 U.S. 388 (1980) ................................................................................................13

*United States v. State of New York,*
    820 F.2d 554 (2d Cir. 1987) ......................................................................................8

*Walker v. Teachers Ins. & Annuity Ass'n of America-Coll. Ret. & Equities Fund,*
    2011 WL 13077069 (D. Vt. Aug. 26, 2011) ...........................................................14

**Other Authorities**

U.S. CONST. amend. XIV .............................................................................................17

Fed. R. Civ. P. 23 .............................................................................. 10, 15, 16, 17

*Page*

Fed. R. Civ. P. 24 ................................................................................................. *passim*

## INTRODUCTION

Plaintiffs and Proposed Intervenors Markel Nance and Thomas Christopher Williams, Jr. respectfully submit this Memorandum of Law in support of their Motion to Intervene in this action as Plaintiffs and proposed representatives of the Traffic Enforcement Class. Similar to the named Plaintiffs, each of the Proposed Intervenors is a Black individual with personal experience of the Buffalo Police Department's ("BPD's") racially discriminatory traffic enforcement practices who drives regularly in the City of Buffalo and wishes to represent the interests of the Traffic Enforcement Class.

The Intervenors seek intervention as of right pursuant to Rule 24(a)(2), because this Court's denial of the motion to certify the Traffic Enforcement Class, ECF 261, means that, if the Court's decision remains in place, nobody in the action will adequately represent their interests in asserting the claims of that Class. In the alternative, the Proposed Intervenors seek permissive intervention under Rule 24(b).

This motion for intervention is made in conjunction with Plaintiffs' motion (1) to reconsider denial of class certification for the Traffic Enforcement Class, or in the alternative, (2) to renew the motion to certify the Traffic Enforcement Class (the "Motion for Reconsideration"). As explained in that motion, intervention provides one of several bases for Plaintiffs' renewed request to certify the Traffic Enforcement Class. But regardless of how the Court rules on the Motion for Reconsideration, intervention is appropriate.

## THE PROPOSED INTERVENORS

### I.    Markel Nance

Markel Nance is a 25-year-old Black man and a current and lifelong Buffalo resident. Declaration of Markel Nance ("Nance Decl.") ¶¶ 1, 3. On May 22, 2021, around 4:00 AM while returning from a meal with his girlfriend at the time, Mr. Nance was subjected to a BPD traffic stop.

*Id.* ¶ 5. The BPD officer, Patrick Eck, who is White, told Mr. Nance that he had been stopped for speeding, which the officer had measured using his own vehicle's speed. *Id.* ¶¶ 5– 6. Mr. Nance was driving a luxury vehicle at the time, and he felt that the fact that he was a young Black man driving a luxury vehicle made him "stand out" to the BPD. *Id.* ¶ 7.

Though the officer ostensibly pulled Mr. Nance over for speeding, he asked Mr. Nance to step out of his vehicle, searched him, and detained him in the back of the police vehicle. *Id.* ¶ 9. During the stop, the officer referred to Mr. Nance using racially-discriminatory and demeaning language and gestures. *Id.* ¶¶ 8, 11 (officer using belittling voice while referring to Mr. Nance as "dog," "my man," and "my guy"), 12 (calling Mr. Nance a "smartass"), 15 (officer saying "[p]eace out, homie" to Mr. Nance at the conclusion of the traffic stop). The officer also made explicit race-based statements to Mr. Nance, including stating that his supervisor "is Black, so you guys will have a great conversation." *Id.* ¶ 13. At the conclusion of the stop, the officer issued Mr. Nance three traffic tickets. *Id.* ¶ 14. Mr. Nance filed a complaint with the BPD's Internal Affairs Department ("IAD") alleging that Officer Eck subjected him to a racially discriminatory traffic stop. *Id.* ¶ 16.  While IAD interviewed Mr. Nance, they never reached out to interview his girlfriend, who was a witness to the traffic stop, before closing the complaint. *Id.* ¶¶ 16–17.

On January 6, 2022, Mr. Nance again had an encounter with the BPD while driving a rental vehicle. *Id.* ¶ 18. Even though Mr. Nance had committed no visible traffic infraction, he was pulled over after his passenger leaned his head out the car window near a different, ongoing traffic stop. *Id.* ¶¶ 18, 20. The officers questioned Mr. Nance about whether his name was on the rental agreement, and issued him a ticket for unlicensed operation, despite the fact that he had a valid license at the time, because he only had his learner's permit in his possession. *Id.* ¶¶ 20–21. The officers also issued Mr. Nance three other tickets, including one for running a stop sign, which he did not

do. *Id.* ¶ 20. When he told them he was going to file a complaint with Internal Affairs, the officers responded: "Go to IA. I don't give a fuck. What are they going to do?" *Id.* ¶ 22. Mr. Nance filed a complaint, and IAD again neither interviewed a witness who was present at the incident nor informed him of the outcome. *Id*. ¶ 23.

Mr. Nance subsequently experienced multiple similar stops. A few months later, in March 2022, he was pulled over while driving a rental car without having committed any traffic infraction. *Id.* ¶ 25. The officer issued Mr. Nance one ticket for failing to make a complete stop at a stop sign, which was ultimately dismissed when Mr. Nance contested it in court. *Id.* In November 2023, BPD officers stopped him again when he was attempting to go around a car that was turning. *Id*. ¶ 26. Two White BPD officers made a U-turn and stopped him, and two other officers joined them later. *Id.* The officers detained Mr. Nance in the back of a police car and searched his car for no reason. *Id*. ¶ 27.

Mr. Nance believes that the BPD finds any reason to stop Black men, and that his experiences being stopped while driving high-end vehicles and rental cars and were discriminatory in their targeting of Black men for traffic enforcement. *Id.* ¶ 28.

## II.    Thomas Christopher Williams, Jr.

Thomas Christopher Williams, Jr. is a 20-year-old African American man and student who lives on the East Side of Buffalo, where he was born and raised. Declaration of Thomas Christopher Williams, Jr. ("Williams Decl.") ¶¶ 1, 3–4. On the evening of March 26, 2024, Mr. Williams encountered BPD officers while on his way to buy donuts. *Id.* ¶ 5. While waiting for a light to turn green, Mr. Williams saw a White BPD officer driving in the opposite direction who looked at him with a hostile expression, which made him afraid. *Id.* ¶¶ 5. He changed his plans and began to drive home instead, which was a few minutes away. *Id.* ¶ 6. The officers made a U-turn and followed Mr. Williams home and pulled into his driveway, activated their lights, and

blocked him in with their vehicle. *Id*. ¶ 6–7. Despite his fear, Mr. Williams gathered his identification, insurance, registration, and his father's police business card indicating he was a Sergeant in the Anne Arundel County Police to give to the officers, and rolled down his windows. *Id.* ¶ 8.

The two BPD officers, Ronald Ammerman and Jonathan Crawford, both of whom are White, approached Mr. Williams' car, and he gave them his papers and license. *Id.* ¶ 9. The officers asked him whether he lived at his home where they were currently parked and whether the car was stolen, telling him that they "just had one of these cars stolen," and that he had "scared" the officer by pulling all the way into his driveway, which confused Mr. Williams because the officers did not activate their lights until they were in his driveway. *Id.* ¶ 10. Mr. Williams confirmed that he lived there and that his father owned the car. *Id.*

Despite having Mr. Williams' paperwork that confirmed his identity and the vehicle ownership and registration, the officers continued to pepper him with intrusive questions, inquiring about where he was coming from, his gym, where he worked, where he attended school, his grades, what he studied, whether his father was going to move back to Buffalo or retire, and whether he had any warrants or was on probation or parole. *Id*. ¶¶ 10–12. Mr. Williams answered calmly and respectfully, referring to the officers as "Sir." *Id.* ¶ 10. The officers used racially coded and belittling language. *Id.* ¶¶ 9, 13.

The officers also called him by an incorrect name even though they had his license ("James"), *id.* ¶ 11, and gave different explanations for the stop, including that Mr. Williams had failed to use his blinker before turning, that he pulled all the way into his driveway, that they just had one of these cars stolen, and that they were looking for a stolen car but that this was not the "right one." Id. ¶¶ 10–11, 15.

The officers told him they were going to run his license and asked Mr. Williams why he appeared "super shaky," and Mr. Williams explained that this was the first time he had been pulled over. *Id.* ¶ 12. As Officer Crawford continued to interrogate Mr. Williams, his mother came out of the house with his aunt and confirmed to Officer Ammerman that Mr. Williams was her son and that she owned the house. *Id.* ¶ 14. While Officer Ammerman was checking his license, registration, and arrest information, Mr. Williams' mother called Mr. Williams' father and put him on the phone with Officer Ammerman. *Id.* ¶ 15. The officer told him that many similar cars had been stolen, and although he confirmed it was his car, the officers told him he still needed to run Mr. Williams' identification and check to see if he was not wanted by law enforcement and did not have any warrants. *Id.* ¶¶ 15. The officers did not issue him a stop receipt or traffic ticket, in violation of BPD rules. *Id.* ¶ 17. Mr. Williams felt that he was being stopped, questioned, harassed, and treated like a criminal only because he is Black. *Id.* ¶¶ 11, 13.

After the traffic stop, Mr. Williams' family contacted E District Chief Todd McAllister with their concern about officers' racially discriminatory treatment of Mr. Williams. *Id.* ¶ 18. Chief McAllister came to their house the next day to speak to them about the incident, confirmed that the officers acted improperly by stopping him and pulling into the driveway, and confirmed that Mr. Williams' vehicle did not match the vehicle that was stolen. *Id.* ¶ 19. Chief McAllister acknowledged that the E District has had a racial profiling problem and that no Black officers work at night. *Id.* He told them that he would file a complaint with the BPD IAD, and that IAD could treat his complaint as a racial discrimination case. *Id.* When IAD eventually interviewed him and his father, the IAD Lieutenant was indifferent, and the interview lasted only around ten minutes. *Id.* ¶ 21. Mr. Williams' father's interview lasted only about four minutes, with no

follow-up questions. *Id.* ¶ 22. Six weeks later, Mr. Williams and his family were informed that the officers involved were exonerated. *Id.* ¶ 23.

On September 21, 2024, two BPD police vehicles pulled over a car driven by Mr. Williams' brother on Buffalo's East Side, blocking the vehicle in. *Id.* ¶ 29. Mr. Williams and another young Black man were passengers in the vehicle at the time. *Id.* The officers stated the reason for the stop was that Mr. Williams' brother had not stopped at a stop sign. *Id.* Mr. Williams' brother was driving his friend's convertible BMW M8, worth over $100,000. *Id.* Four White officers approached them, commenting on how expensive the car was and asking Mr. Williams' brother how he got it, who it belonged to, and how he was driving it. *Id.* The officers also questioned Mr. Williams and the other passenger and took and ran their licenses, asking Mr. Williams: "You look familiar. Have I seen you before?" *Id.* Mr. Williams felt this question was race-based because he had never seen this officer before. *Id.*

Following these encounters, Mr. Williams was traumatized and feared for his life. *Id.* ¶¶ 25, 28, 30 (Mr. Williams' fear increased after the same officers who stopped him shot and killed a young Black man during a traffic stop). He believes the officers stopped him and treated him and his family as they did simply because he is Black and they predetermined him to be a criminal or suspect for no other reason than his race. *Id.* ¶ 11, 13, 24. Mr. Williams fears future interactions with the BPD based on his prior interactions with them, and now tries to avoid main roads. *Id.* ¶ 32.  However, he must continue to drive in the City despite his fears because he continues to live, work, and attend school in Buffalo. *Id.*

**ARGUMENT**

**I.    This Court Should Grant the Motion to Intervene.**

"Intervention of class representatives to ensure adequate class representation is highly de-
sireable [sic]." *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 202 (S.D.N.Y. 1992) (citing
MANUAL FOR COMPLEX LITIGATION (SECOND) § 30.15). Intervention is routinely granted to absent
class members "since members of a class are normally bound by the judgment in the class action."
*Chen-Oster v. Goldman, Sachs & Co.*, 2015 WL 4619663, at *4 (S.D.N.Y. Aug. 3, 2015) (quoting
*Diduck v. Kaszycki & Sons Contractors, Inc.*, 149 F.R.D 55, 58 (S.D.N.Y. 1993)). And it is com-
mon to permit intervention in a class action in order to cure a deficiency in the ability of the named
plaintiffs to represent the class. *See, e.g.*, *Rogers v. Paul*, 382 U.S. 198, 199 (1965) (per curiam)
(allowing class members to intervene where original plaintiffs' claims were moot); *N.J. Carpen-
ters Health Fund v. Residential Cap., LLC*, 2010 WL 5222127, at *2, *7 (S.D.N.Y. Dec. 22, 2010)
(allowing intervention where original plaintiff lacked standing as to certain claims); *Diduck*, 149
F.R.D. at 58–59 (allowing intervention in class action where original plaintiff could no longer
represent the class's interests).

Rule 24 contemplates two types of intervention: intervention as of right (Rule 24(a)) and
permissive intervention (Rule 24(b)). First, the court "must permit" intervention as of right when
the intervenors "claim[] an interest relating to . . . the action, and [are] so situated that disposing
of the action may as a practical matter impair or impede [their] ability to protect [their] interest,
unless existing parties adequately represent that interest." FED. R. CIV. P. 24(a)(2). Second, the
court "may permit" intervention when the intervenors have "a claim or defense that shares with
the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1)(B). As explained
below, intervention of the Proposed Intervenors is appropriate under both subsections of Rule 24.

**A.    This Court Should Grant Intervention as of Right Under Rule 24(a)(2) Because the Proposed Intervenors, as Members of the Currently Uncertified Traffic Enforcement Class, Lack Adequate Representation.**

To intervene as of right under Rule 24(a)(2), an intervenor must: "(1) file[] a timely motion; (2) assert[] an interest related to the transaction underlying the action; (3) [be] situated so that, without intervention, the disposition of the action may impair or impede its ability to protect its interest; and (4) ha[ve] an interest that the parties do not adequately represent." *Leslie v. Starbucks Corp.*, 2022 WL 5434278, at *1 (W.D.N.Y. Oct. 7, 2022) (citing *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994)).

*1.    This Motion is a Timely Response to the Court's Order on Class Certification.*

A district court has "broad discretion" when assessing the timeliness of a motion to intervene. *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 198 (2d Cir. 2000). The analysis is "flexible" and "certainly is not confined strictly to chronology." *CWCapital Cobalt Vr Ltd. v. U.S. Bank Nat'l Ass'n*, 790 F. App'x 260, 263 (2d Cir. 2019) (quoting *Floyd v. City of New York*, 770 F.3d 1051, 1058 (S.D.N.Y. 2014)). Instead, the court's determination should be made "based on all the circumstances of the case." *United States v. State of New York*, 820 F.2d 554, 557 (2d Cir. 1987) (citing *Nat'l Ass'n for the Advancement of Colored People v. New York*, 413 U.S. 345, 365 (1973)). Courts in this district routinely grant motions to intervene filed within a few months of the applicant receiving notice that their interest might be affected. *See Pike Co. v. Universal Concrete Prods., Inc.*, 284 F. Supp. 3d 376, 394–96 (W.D.N.Y. 2018) (motion timely filed within approximately five months after notice); *Range v. Nat'l R.R. Passenger Corp.*, 176 F.R.D. 85, 88–89 (W.D.N.Y. 1997) (motion timely filed less than three months after receiving notice).

Often, an intervenor will not learn that their interest might be affected until long after the filing of the complaint or the date the intervenor becomes aware of the lawsuit's existence. *Chen-Oster*, 2015 WL 4619663, at *6–*7; *Nat'l Fuel Gas Distrib. Corp. v. Templeton Energy, Inc.*, 1986

WL 12486, at *1 (W.D.N.Y. Nov. 7, 1986). Where a potential intervenor's interest is "subsumed by that of a representative litigant, the trigger requiring intervention does not occur until it is apparent that the representative no longer protects the intervenor's interest." *Chen-Oster*, 2015 WL 4619663, at *6. This rule has "particular significance" in the context of class actions, where so long as "the interests of the class members are fully represented by the named plaintiffs, there is no incentive, and therefore no obligation, to intervene." *Id.* For example, in *Chen-Oster v. Goldman, Sachs & Company*, it was not until the court concluded that the named plaintiffs lacked standing to seek certain injunctive relief that "any absent class member with notice of the determination would understand that her interest in obtaining injunctive relief could not be advanced by the current plaintiffs." *Id.* at *7.

Here, the earliest date the Intervenors could have become aware that their interests were no longer being protected was April 22, 2025, when the Court denied certification of the Traffic Enforcement Class. *See* ECF 261. Until that date, the named Plaintiffs adequately protected the Intervenors' interests in the relief sought by the Traffic Enforcement Class. Only when the Court determined that the named Plaintiffs lacked standing to seek prospective injunctive relief did the Intervenors' and other absent class members' interests become vulnerable. *See Chen-Oster*, 2015 WL 4619663, at *7 (holding that the "triggering event" when the intervenors could have become aware their interests were affected was when the court held that the named Plaintiffs lacked standing to seek an injunction).

Plaintiffs and Intervenors filed this motion as soon as practicable given the time required to identify and engage the Intervenors and obtain their declarations while simultaneously preparing substantial filings in opposition to Defendants' Motion for Summary Judgment and in opposition to Defendants' Petition for Permission to Appeal the District Court's Class Certification Order

Pursuant to Federal Rule of Civil Procedure 23(f). *See* ECF 265 (filed May 6, 2025); 268–322 (filed May 30, 2025); Decl. of Andrew J. Timmick ("Timmick Decl.") ¶¶ 5–6. Plaintiffs and Intervenors also filed this motion well within the time period where courts in this district routinely consider applications to intervene to be timely. *See Pike Co.*, 284 F. Supp. 3d at 394–95 (motion timely filed within approximately five months after notice); *Range*, 176 F.R.D. at 88–89 (motion timely filed less than three months after receiving notice).

An examination of any potential prejudice to the parties also militates in favor of granting the Intervenors' motion. *See N.J. Carpenters Health Fund*, 2010 WL 5222127, at *2 (noting that courts consider "prejudice to existing parties resulting from any delay" and "prejudice to the applicant if the motion is denied" as part of the timeliness analysis). Here, the Intervenors have incorporated into their Complaint in Intervention *the same allegations* as Plaintiffs have already made in this action, and they seek the same relief. Timmick Decl., Ex. 1 ¶ 2 (adopting by reference the Amended Complaint's allegations that the BPD has violated the civil rights of Black and Latino drivers through systemic discriminatory policing policies, practices, and customs). Defendants also continue to produce discovery materials related to the traffic stops related to Plaintiffs' injunctive case, which forms the basis of the Intervenors' participation in the action. *See* ECF 287. Defendants have had ample notice of these claims, *see id.*, and therefore are not prejudiced. *See, e.g., N.J. Carpenters Health Fund*, 2010 WL 5222127, at *3.

The Intervenors, on the other hand, would be greatly prejudiced by a denial of their motion. Forcing the Intervenors to prosecute their claims separately would be highly inefficient and create massive amounts of "duplicative work" that intervention would not require. *Id.*; *Chen-Oster*, 2015 WL 4619663, at *10. The Intervenors' motion is therefore timely.

2.    *The Intervenors Have an "Interest" in the Action Because They Assert Claims Against the Same City Policies and Practices That Form the Basis of the Main Action.*

An intervenor's interest in the case must be "direct, substantial, and legally protectable." *Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*, 134 F.4th 73, 79 n.3 (2d Cir. 2025). An intervenor has such an interest where their claims "arise out of the same transaction and occurrence that is the subject of the instant case." *N.J. Carpenters Health Fund*, 2010 WL 5222127, at *4 (citing *Mortg. Lenders Network, Inc. v. Rosenblum*, 218 F.R.D. 381, 384 (E.D.N.Y. 2003)). Class members who have "similar claims as named plaintiffs generally qualify as having an interest under Rule 24." *Guadagna v. Zucker*, 2021 WL 4150802, at *6 (E.D.N.Y. July 9, 2021).

That is plainly true here, where the Intervenors challenge the same BPD policies and practices of racially discriminatory traffic enforcement, rely on the same record evidence to demonstrate Defendants' discriminatory intent and *Monell* liability, and seek the same relief as the existing Plaintiffs. *See Guadagna*, 2021 WL 4150802, at *6 (finding an interest where intervenor sought the same declaratory relief as the named plaintiff); ECF 63 ¶¶ 435–54, 1–7 (Relief Requested); Timmick Decl., Ex. 1 ¶¶ 2, 59–79. The Intervenors have accordingly established an interest in the action under Rule 24.

3.    *The Intervenors' Interests Will Be Impaired if Their Request to Intervene to Serve as Class Representatives Is Denied.*

Class actions present a "common example of cases in which an adverse judgment would impair the movant" in their ability to protect their interest. *Guadagna*, 2021 WL 4150802, at *6. Even the possibility of *stare decisis* can constitute a sufficient risk of impairment to support intervention. *Id.* (citing *Oneida Indian Nation v. State of New York*, 732 F.2d 261, 265 (2d Cir. 1984)). Where an intervenor's claims "arise from the same course of conduct and assert the same legal theories" as the named plaintiffs', any disposition on the merits of the named plaintiffs' action

-11-

would "inevitably" impact the intervenor's interests. *N.J. Carpenters Health Fund*, 2010 WL 5222127, at *4.

Here, Plaintiffs' and the Intervenors' interests are inherently intertwined because their claims target the City's unitary racially discriminatory traffic enforcement policies, practices, and procedures. Plaintiffs and the Intervenors rely on the same legal theories and factual assertions about the City's conduct (other than the facts of their individual stops) to show that Defendants have established ongoing policies, patterns, and practices of systematic discriminatory traffic policing. *See* ECF 321 at 26–83. And like Plaintiffs, the Intervenors seek injunctive relief aimed at preventing the City and the BPD from carrying out discriminatory traffic enforcement practices in the future. ECF 63 ¶¶ 444, 3 (Relief Requested); Timmick Decl., Ex. 1 ¶¶ 64, 77. Any relief awarded to the Plaintiffs in this action would necessarily impact the relief available to the Intervenors, as would any failure to award relief.

Moreover, the Intervenors have an independent interest *in class certification* that will be impaired unless intervention is granted. While theoretically the Intervenors could file a new lawsuit to pursue their claims for injunctive relief, the expense and delay of starting over would greatly harm their interests—particularly given the substantial and imminent risk of harm to Intervenors caused by Defendants' ongoing policy and practice of discriminatory traffic enforcement. *See* Timmick Decl. ¶ 7; *Koike v. Starbucks Corp.*, 602 F. Supp. 2d 1158, 1161 (N.D. Cal. 2009) (granting intervention as of right in part based on financial benefits of intervention compared to starting a new action). The Intervenors also have a recognized interest in appealing the denial of class certification. *U.S. Parole Comm. v. Geraghty*, 445 U.S. 388, 404 (1980); *Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 336–37 (1980). But the Intervenors cannot appeal the denial of class certification unless they are parties to the action. Nor can they wait to intervene until final judgment

has been entered, because such a delay would violate the timeliness requirement. Accordingly, the Intervenors have demonstrated that unless intervention is granted now, their interests will be impaired.

    4.    *In Light of the Court's Order on Class Certification, No Plaintiff Adequately Represents the Intervenors' Interests.*

An intervenor as of right must show that their interest is "not protected adequately by the parties to the action." *Extenet Sys., LLC. v. Vill. of Kings Point*, 2023 WL 4044076, at *1 (2d Cir. June 16, 2023) (*citing In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 300 (2d Cir. 2003)). While the applicant has the burden of showing that representation is inadequate, the bar for that showing is "minimal" and can be satisfied by the "failure of the representative in the fulfillment of his duty." *Harris-Clemons*, 751 F. App'x at 85.

In light of the Court's determination that the existing Plaintiffs lack standing to pursue the injunctive relief claims as representatives of the Traffic Enforcement Class, the Intervenors' interests as members of the Traffic Enforcement Class are not adequately protected by the existing Plaintiffs.[1]

**B.    In the Alternative, Permissive Intervention Should Be Granted Under Rule 24(b).**

In the event intervention is not granted as of right, permissive intervention is appropriate. *See Jamie Music Publishing Co. v. Roc-A-Fella Records, LLC*, 2007 WL 1129333, at *1 (S.D.N.Y. Apr. 12, 2007) (granting permissive intervention without deciding intervention as of right).

A court may permit anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact," so long as intervention will not "unduly delay or

---

[1] As explained in the Motion for Reconsideration, the existing Plaintiffs do have standing, and therefore the Court should grant certification of the Traffic Enforcement Class upon reconsideration or renewal. However, even if the Court grants the Motion for Reconsideration, permissive intervention would still be appropriate as discussed in Argument Part I.B.

prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), (b)(3). The factors for permissive intervention are substantially the same as those for intervention as of right, but courts may also consider: (1) "the nature and extent of the intervenor's interests," and (2) "whether the intervenor will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Leslie*, 2022 WL 5434278, at *3 (citing *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191–92 (2d Cir. 1978)). The inquiry for permissive intervention is holistic and does not fail simply because one criterion is not met. *Granite State Ins. Co. v. KM Tactical, LLC*, 2025 WL 1502019, at *4 (S.D.N.Y. May 27, 2025).

Here, in addition to meeting the factors for intervention as of right for the reasons explained above, the Proposed Intervenors also meet the two additional factors for permissive intervention.

First, as absent class members, the Intervenors raise "common questions of law and fact" which are sufficient to satisfy Rule 24(b). *Walker v. Teachers Ins. & Annuity Ass'n of America-Coll. Ret. & Equities Fund*, 2011 WL 13077069, at *2 (D. Vt. Aug. 26, 2011) (granting a motion to intervene under Rule 24(b) where there was "no question" that "a member of the proposed plaintiff class" had a claim with "a question of law or fact in common with the claims of the proposed class"); *German by German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1391–92 (S.D.N.Y. 1995) (granting permissive intervention motion for proposed intervenors who the court determined were "appropriate class members"). Permissive intervention is particularly appropriate where the sufficiency of class representation is under scrutiny. *Trief*, 144 F.R.D. at 202–03 (intervention as a class representative granted after defendants challenged the existing plaintiffs' ability to represent the class).

Second, the Intervenors will "contribute to the full development of the underlying factual issues" in the case by adding factual support to the claims that Plaintiffs have made on behalf of the Traffic Enforcement Class. *Leslie,* 2022 WL 5434278, at *3. In its decision denying class certification, the Court expressed concern that the named Plaintiffs had not experienced recent harm (though Plaintiffs Bonds and Hall have, as noted in Plaintiffs' Motion for Reconsideration). ECF 261 at 12. As detailed above, the Intervenors have each experienced recent instances of discriminatory traffic enforcement, including racial profiling, pretextual stops, and multiple ticketing, and their experiences illustrate the ongoing harms caused by the BPD's current policies and practices. *See supra* at 1–6. Accordingly, if intervention is not available as of right, permissive intervention should be granted under Rule 24(b).[2]

## II.    The Proposed Intervenors Satisfy the Rule 23(a) Factors and Should Be Appointed Representatives of the Traffic Enforcement Class.

After being permitted to intervene pursuant to Rule 24, the Intervenors should be appointed class representatives of the Traffic Enforcement Class. As explained in Plaintiffs' Motion for Reconsideration, the Traffic Enforcement Class should be certified, either pursuant to reconsideration or renewal. And the Intervenors are fit to serve as class representatives of the Traffic Enforcement Class either with the existing named Plaintiffs or in lieu of those Plaintiffs if the Court declines to reconsider its prior determination that the named Plaintiffs lack standing. The Intervenors have standing to seek prospective injunctive relief and meet all of the requirements of Rule 23(a).

---

[2] For example, if the Court grants reconsideration of its denial of certification of the Traffic Enforcement Class, intervention will no longer be available as of right, because the present Plaintiffs, as representatives of a certified Class, will adequately represent the interests of the Intervenors. Nevertheless, permissive intervention under Rule 24(b) should still be granted because the Intervenors will bring additional factual texture to the claims for injunctive relief, and intervention would not cause prejudice or any significant delay.

*First*, both Intervenors have standing to seek injunctive relief against BPD's ongoing, racially discriminatory traffic enforcement practices. In its certification decision, the Court held that standing was absent for the named Plaintiffs because their injuries were sufficiently far in the past that none of them gave rise to an "immediate[] . . . danger of sustaining some direct injury as a result of the challenged official conduct." ECF 261 at 13 (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)).  As set forth above and in the Complaint in Intervention and Intervenors' declarations submitted herewith, each of the Proposed Intervenors is a Black individual who has been subject to a recent discriminatory traffic stop or ticketing by the BPD pursuant to an ongoing municipal policy, custom, or practice targeting Black and Latino motorists on the basis of race:

- Markel Nance was subjected to discriminatory stops by the BPD in 2021, 2022, 2023, and 2024. Nance Decl. ¶¶ 5, 18, 25, 26, 30. Mr. Nance asserts that in each instance, the BPD targeted and ticketed him because he was Black man. *Id.* ¶¶ 4, 28. During some of these stops, the BPD questioned, detained, and searched him and his car without basis based on racial stereotypes and used racially biased and demeaning language. *Id.* ¶¶ 8–9, 11–13, 15, 21–22, 27. When Mr. Nance filed an IAD complaint regarding his discriminatory treatment by the BPD, nothing was done. *Id.* ¶¶ 16–17, 22.

- Thomas Christopher Williams Jr. was subjected to two traffic stops by the BPD last year. Williams Decl. ¶¶ 5–7, 29. In March 2024, two White BPD officers made eye contact with Williams, engaged in a U-turn, followed him to his home, and barricaded his car in his driveway, all without any basis, and then subjected him to an unjustified interrogation. *Id.* ¶¶ 5–7, 10–12. After finding nothing, they left without issuing any tickets or a stop receipt. *Id.* ¶ 17. Although Mr. Williams filed an IAD complaint regarding the incident, the officers were exonerated. *Id.* ¶¶ 18–19, 23. In September 2024, the BPD stopped Mr. Williams while he was a passenger in an expensive car driven by his brother. *Id.* ¶ 29. Without any individualized suspicion, the officers questioned Mr. Williams and another Black passenger and took and ran their identifications. *Id.*

Because the racial discrimination asserted by the Intervenors is all of recent vintage, and it occurred pursuant to an ongoing City policy or practice, the Proposed Intervenors have standing to seek prospective injunctive relief. *See, e.g., Floyd*, 283 F.R.D. at 169–70; *Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 1255011, at *10 n.39 (E.D.N.Y. Mar. 12, 2021); *Ligon v. City of New York*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013); *Stinson v. City of New York*, 282 F.R.D. 360, 382

(S.D.N.Y. 2012); *Nat'l Cong. for Puerto Rican Rts. v. City of New York*, 75 F. Supp. 2d 154, 160 (S.D.N.Y. 1999).

*Second*, the Intervenors satisfy the Rule 23(a)(3) requirement of typicality. The claims of Intervenors are "typical of the claims … of the class," Fed. R. Civ. P. 23(a)(3), because they arise[] from the same course of events" and rely on "similar legal arguments" to prove the defendant's liability. *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). In particular, each Intervenor alleges that the BPD has subjected him to one or more racially motivated traffic stops, that their harms flowed directly from common municipal policies, customs, and practices, and that these policies, customs, and practices violate the Fourteenth Amendment Due Process and Equal Protection Clauses and Title VI of the Civil Rights Act. *See* Timmick Decl., Ex. 1 ¶¶ 60–74.

*Third*, the Intervenors satisfy the adequacy requirement of Rule 23(a). Each of the Intervenors will "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), because they have no conflicts of interest with unnamed class members and are willing to fulfill the duties required of a class representative. *See supra* at 10–11; Nance Decl. ¶¶ 33–34; Williams Decl. ¶¶ 34–35.

*Finally*, the Intervenors meet all the other Rule 23(a) requirements, including commonality, numerosity, and ascertainability for the reasons set forth in Plaintiffs' Motion for Class Certification. ECF 211 at 23–24, 28–29, 32–34. Indeed, the evidence developed since briefing and argument on that motion has raised even more common questions, including whether Defendant City of Buffalo maintains a policy or practice of intentionally targeting Black and Latino motorists and neighborhoods for racially discriminatory pretext stops in violation of the Equal Protection Clause. ECF 321 at 34–41.

## CONCLUSION

For the reasons set forth above, the Motion to Intervene should be granted and this Court should appoint the Intervenors representatives of the Traffic Enforcement Class.


Dated: July 11, 2025

Respectfully Submitted,


_____
Claudia Wilner
Anjana Malhotra
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
wilner@nclej.org
malhotra@nclej.org

Matthew A. Parham
WESTERN NEW YORK LAW CENTER
37 Franklin Street, 2nd Floor
Buffalo, NY 14202
(716) 828-8422
mparham@wnylc.net

Baher Azmy
A. Chinyere Ezie
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org
cezie@ccrjustice.org

Philip Irwin (*pro hac vice*)
Jordan S. Joachim (*pro hac vice*)
Christine Nelson (*pro hac vice*)
Andrew Timmick (*pro hac vice*)
COVINGTON & BURLING, LLP
620 Eighth Ave., Suite 4029
New York, NY 10018
212-841-1000
pirwin@cov.com
jjoachim@cov.com
cnelson@cov.com
atimmick@cov.com

*Attorneys for Plaintiffs and Proposed Intervenors*