UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

---

BLACK LOVE RESISTS IN THE RUST, *et al.*, individually and on behalf of a class of all others similarly situated,

Plaintiffs,

v.

CITY OF BUFFALO, N.Y., *et al.*,

Defendants.

No. 1:18-cv-00719-CCR

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION (1) TO RECONSIDER THE DENIAL OF THE MOTION TO CERTIFY THE TRAFFIC ENFORCEMENT CLASS PURSUANT TO RULE 54(B), OR IN THE ALTERNATIVE, (2) TO RENEW THE MOTION TO CERTIFY PURSUANT TO RULE 23(C)(1)(C)

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.    The Legal Standards Relevant to Reconsideration and Renewal ........................................ 2

    A.    Reconsideration Under Rule 54(b) ............................................................... 2

    B.    Renewal Under Rule 23(c)(1)(C) ................................................................. 3

II.    Reconsideration Should Be Granted On the Standing Portion of the Class
Certification Decision For Two Independent Reasons. ....................................................... 3

    A.    The Court Incorrectly Restricted Its Injunctive Standing Analysis to
Checkpoints, Overlooking Plaintiffs' Broader Claims................................................ 4

        1.    The Standing Portion of the Decision Considered Only the
Checkpoint Claims. ........................................................................ 4

        2.    Plaintiffs' Injunctive Claims Challenge Unlawful and
Discriminatory Traffic Enforcement Broadly, Not Merely at
Checkpoints. ................................................................................. 5

            (a)    The Amended and Supplemental Complaint Alleges
Ongoing Discriminatory Traffic Enforcement Outside of
Checkpoints. ....................................................................... 5

            (b)    The Class Certification Record Contained Ample
Evidence of Ongoing Discriminatory Traffic Enforcement
Outside of Checkpoints. ......................................................... 7

    B.    The Court Improperly Analyzed Checkpoints Standing Based on
Post-2018 Events. ................................................................................ 10

III.    On Reconsideration, the Court Should Hold That Plaintiffs Have Standing
to Assert Their Injunctive Claims and Should Certify the Traffic
Enforcement Class........................................................................................ 12

    A.    Several Plaintiffs Have Standing to Assert the General Injunctive
Claim on Behalf of the Traffic Enforcement Class. .................................................. 13

    B.    Several Plaintiffs Have Standing to Assert the Checkpoints Injunctive
Claim on Behalf of the Traffic Enforcement Class. .................................................. 16

IV.    This Court Should Grant Plaintiffs' Renewed Motion for Certification of
the Traffic Enforcement Class Under Rule 23(c)(1)(C)..................................................... 17

    A.    The Intervention of Additional Named Plaintiffs Justifies Renewal........................ 18

    B.    New and Developing Evidence of BPD's Ongoing Program of
Racially Discriminatory Pretext Stops Also Justifies Renewal................................ 19

    C.    The 2025 Stops of Plaintiffs Hall and Bonds Further Support Class
Certification................................................................................... 21

D.    This Court Should Certify the Traffic Enforcement Class Pursuant to
       Rule 23(a) and (b)(2). ............................................................................... 22

CONCLUSION.................................................................................................................... 23

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ala. Legis. Black Caucus v. Alabama,*
  575 U.S. 254 (2015)................................................................................5

*Ballew v. City of Pasadena,*
  642 F. Supp. 3d 1146 (C.D. Cal. 2022) ..............................................20

*Charlot v. Ecolab, Inc.,*
  97 F. Supp. 3d 40 (E.D.N.Y. Mar. 27, 2015)......................................11

*Chen-Oster v. Goldman, Sachs & Co.,*
  251 F. Supp. 3d 579 (S.D.N.Y. 2017)..................................................10

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983)..........................................................................15, 16

*Cody v. City of St. Louis,*
  103 F.4th 523 (8th Cir. 2024) ................................................................3

*Comer v. Cisneros,*
  37 F.3d 775 (2d Cir. 1994)........................................................11, 12, 16

*In re Currency Conversion Fee Antitrust Litig.,*
  2005 WL 3304605 (S.D.N.Y. Dec. 7, 2005) ........................................18

*Davis v. Fed. Election Comm'n,*
  554 U.S. 724 (2008)..............................................................................10

*Democratic Cong. Campaign Comm. v. Kosinski,*
  614 F. Supp. 3d 20 (S.D.N.Y. 2022)....................................................13

*Doe v. McDonald,*
  128 F.4th 379 (2d Cir. 2025) ....................................................10, 12, 17

*Duke v. Luxottica U.S. Holdings Corp.,*
  2024 WL 4904509 (E.D.N.Y. Nov. 27, 2024)........................................9

*Floyd v. City of New York,*
  283 F.R.D. 153 (S.D.N.Y. 2012) ..........................................4, 14, 15, 16

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.,*
  991 F.3d 370 (2d Cir. 2021)..................................................................11

*Hargrove v. Sleepy's LLC*,
    974 F.3d 467 (3d Cir. 2020)..........................................................................................3

*Hyland v. Navient Corp.*,
    48 F.4th 110 (2d Cir. 2022) .......................................................................................13

*In re Initial Pub. Offering Secs. Litig.*,
    483 F.3d 70 (2d Cir. 2007).........................................................................................3

*Javier H. v. Garcia-Botello*,
    239 F.R.D. 342 (W.D.N.Y. 2006).............................................................................11

*Kamerman v. Steinberg*,
    123 F.R.D. 66 (S.D.N.Y. 1988) ................................................................................18

*Levy v. U.S. Gen. Acct. Off.*,
    175 F.3d 254 (2d Cir. 1999)......................................................................................11

*Lewis v. Casey*,
    518 U.S. 343 (1996)..................................................................................................10

*Ligon v. City of New York*,
    288 F.R.D. 72 (S.D.N.Y. 2013) ...............................................................................14

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................10

*Martinez v. Malloy*,
    350 F. Supp. 3d 74 (D. Conn. 2018)........................................................................10

*Micolo v. Fuller*,
    2017 WL 2297026 (W.D.N.Y. May 25, 2017).........................................................2

*Murthy v. Missouri*,
    603 U.S. 43 (2024)....................................................................................................14

*Nat'l Cong. for Puerto Rican Rts. v. City of New York*,
    75 F. Supp. 2d 154 (S.D.N.Y. 1999)..................................................................14, 16

*Plaintiffs #1-21 v. Cnty. of Suffolk*,
    2021 WL 11629176 (E.D.N.Y. Aug. 5, 2021).........................................................19

*Plaintiffs #1-21 v. Cnty. of Suffolk*,
    2021 WL 1255011 (E.D.N.Y. Mar. 12, 2021).........................................................14

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)......................................................................................11

*Savinova v. Nova Home Care, LLC*,
   2024 WL 3552425 (D. Conn. July 26, 2024) .................................................................3, 18

*Shain v. Ellison*,
   356 F.3d 211 (2d Cir. 2004)........................................................................13, 15, 16

*Shrader v. CSX Transp., Inc.*,
   70 F.3d 255 (2d Cir. 1995).........................................................................................2

*Stinson v. City of New York*,
   282 F.R.D. 360 (S.D.N.Y. 2012) ............................................................................14

*United States v. Moore*,
   716 F. Supp. 3d 415 (E.D. Va. 2024) ......................................................................15

*Vega v. Semple*,
   2023 WL 5395479 (D. Conn. Aug. 22, 2023) ..........................................................18

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
   956 F.2d 1245 (2d Cir. 1992)...............................................................................2, 12

*Warth v. Seldin*,
   422 U.S. 490 (1975)..................................................................................................10

*Whren v. United States*,
   517 U.S. 806 (1996)..................................................................................................19

*Wilder v. News Corp.*,
   2015 WL 5853763 (S.D.N.Y. Oct. 7, 2015) ............................................................11

*Wilkins v. City of Chicago*,
   736 F. Supp. 3d 616 (N.D. Ill. 2024) .......................................................................20

**Other Authorities**

U.S. Const. amend. IV ....................................................................................................5, 19

U.S. Const. amend. XIV ................................................................................................6, 19

Fed. R. Civ. P. 54 ...............................................................................................1, 2, 17, 18

Fed. R. Civ. P. 15 ..............................................................................................................11

Fed. R. Civ. P. 17 ..............................................................................................................11

Fed. R. Civ. P. 21 ..............................................................................................................11

Fed. R. Civ. P. 23 .......................................................................................................*passim*

18 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE.............................................................2

## INTRODUCTION

Plaintiffs respectfully move, pursuant to Federal Rule of Civil Procedure 54(b), to reconsider Section II.B of this Court's Decision and Order denying certification of the Traffic Enforcement Class (the "Decision") (ECF 261) or, in the alternative, pursuant to Rule 23(c)(1)(C), to renew their motion for class certification (*see* ECF 202). Plaintiffs seek certification of a Traffic Enforcement Class defined as "[a]ll Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." ECF 211 at 3.

The Court denied certification of the Traffic Enforcement Class for the sole reason that it concluded that the Named Plaintiffs lack standing to seek prospective injunctive relief. Plaintiffs respectfully submit that the Court's standing analysis contained two significant errors. First, the Decision treated Plaintiffs' injunctive relief claim as though it were limited to Checkpoints, overlooking that Plaintiffs pleaded and submitted evidence in support of a broader challenge to unlawful and racially discriminatory traffic enforcement ***in general*** (stops and ticketing). Second, the Court evaluated Plaintiffs' standing on the basis of recent events, whereas the settled law of this Circuit is that courts must determine standing as of the time the action was commenced. Each of these errors justifies reconsideration. Upon reconsideration, the Court should conclude that the original Named Plaintiffs ***do*** have standing to seek prospective injunctive relief and that the Traffic Enforcement Class is properly certified under Rule 23(b)(2).

In the alternative, Plaintiffs seek to renew their motion for certification of the Traffic Enforcement Class on the basis of two new developments: (1) new evidence of the City's ongoing program of racially discriminatory pretext stops, developed after the original certification motion was briefed, argued, and submitted; and (2) a motion to intervene, filed simultaneously herewith

by members of the putative Traffic Enforcement Class who indisputably have standing to pursue the injunctive relief sought by Plaintiffs and the putative Class.

Because the original Named Plaintiffs and the Intervenors all have standing to seek prospective injunctive relief, and the Traffic Enforcement Class satisfies Rule 23(a) and (b)(2), this Court should grant class certification.

## ARGUMENT

### I.    The Legal Standards Relevant to Reconsideration and Renewal

#### A.    *Reconsideration Under Rule 54(b)*

Rule 54(b) allows district courts to reconsider interlocutory decisions.[1] *Micolo v. Fuller*, 2017 WL 2297026, at *1–*2 (W.D.N.Y. May 25, 2017). Thus, a class certification order may, under Rule 54(b), "be revised at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities." The doctrine of law-of-the-case applies, however, and "[t]he major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 4478 at 790). Reconsideration is also available if "the moving party can point to controlling decisions or data that the court overlooked— matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (citations omitted).

---

[1] This District does not have a local rule governing motions for reconsideration. *Compare* S.D.N.Y. L. R. CIV. P. 6.3 *and* D. VT. L. R. CIV. P. 7(c) *with* W.D.N.Y. L. R. CIV. P. 7.

### B.    *Renewal Under Rule 23(c)(1)(C)*

A more lenient standard applies to reconsideration of class certification decisions than to other types of interlocutory decisions. Under Rule 23(c)(1)(C), a class certification order "may be altered or amended before final judgment." Courts of Appeal have held that Rule 23(c)(1)(C) explicitly "allows for multiple bites at the apple throughout the litigation" and "does not impose an additional requirement on parties to prove a change in law or show new evidence to succeed on a renewed motion for certification." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 476 (3d Cir. 2020); *accord Cody v. City of St. Louis*, 103 F.4th 523, 529 (8th Cir. 2024). Rather, courts should treat renewed motions for class certification "like any other for class certification" and "apply the usual Rule 23 standard." *Hargrove*, 974 F.3d at 476. While the Second Circuit has not squarely addressed the Rule 23(c)(1)(C) standard, both *Hargrove* and *Cody* cited Second Circuit law in support of their holdings,[2] and at least one district court in this Circuit has cited the same authority for the proposition that one purpose of Rule 23(c)(1)(C) "is to allow plaintiffs to address district courts' concerns after initial denials of class certification." *Savinova v. Nova Home Care, LLC*, 2024 WL 3552425, at *7 (D. Conn. July 26, 2024).

## II.    Reconsideration Should Be Granted On the Standing Portion of the Class Certification Decision For Two Independent Reasons.

Reconsideration of the Court's decision denying certification of the Traffic Enforcement Class is warranted because the Court's standing analysis (A) overlooked Plaintiffs' allegations and evidence challenging discriminatory traffic enforcement outside Checkpoints, and (B) is contrary to controlling Second Circuit authority.

---

[2] *Hargrove*, 974 F.3d at 476 (citing *In re Initial Pub. Offering Secs. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007) ("District courts have ample discretion to consider . . . a revised class certification motion after an initial denial.")); *Cody*, 103 F.4th at 529 (same).

### A. The Court Incorrectly Restricted Its Injunctive Standing Analysis to Checkpoints, Overlooking Plaintiffs' Broader Claims.

#### 1. The Standing Portion of the Decision Considered Only the Checkpoint Claims.

At the outset of its "forecast [of] the likelihood of future constitutional violations," ECF 261 at 9, the Decision framed the dispute between the parties as follows:

> Defendants argue that, because the City ceased using Checkpoints as of January 2018 and disbanded the Strike Force, the Traffic Enforcement Class lacks standing to pursue injunctive relief as any future injury is purely speculative. Plaintiffs respond that Defendants have not disavowed the Checkpoints, which could resume at any time, and that the potential for their revival poses a non-speculative threat of constitutional violations.

*Id.* at 10. This portion of the Decision relates to Checkpoints and only to Checkpoints.

The Court then noted that "[s]everal individual Plaintiffs in the Traffic Enforcement Class attest to having received multiple traffic citations unrelated to Checkpoints" but dismissed this evidence as "past harm" that does not show "that BPD has taken steps to resume" the Checkpoints. *Id.* at 11. Next, the Court laid out the facts of *Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012), pointing out that "[t]he challenged governmental policy at issue in *Floyd* was ongoing at the time of the lawsuit," and concluded:

> Unlike in *Floyd*, the Checkpoints at issue in this case ceased in 2018, the Strike Force disbanded, and none of the Plaintiffs' attestations pertain to Checkpoints that took place in the past two years. Instead, Plaintiffs rely on the speculative possibility that, at some uncertain date in the future, the Checkpoints may resume. This will not suffice for standing for injunctive relief.

*Id.* at 12. These two paragraphs also relate only to Checkpoints.

The Decision next addressed Plaintiffs' reliance "on evidence that non-white motorists are statistically more likely to receive a traffic infraction ticket than white motorists, and to receive multiple tickets if cited," ECF 261 at 12 (citing ECF 63 ¶ 110), and asserted that this argument does not change the conclusion reached in the previous paragraph. The clear implication is that the Decision is referring to—and only to—the possibility of injury **by a resumption of Checkpoints**.

    2.    *Plaintiffs' Injunctive Claims Challenge Unlawful and Discriminatory Traffic Enforcement Broadly, Not Merely at Checkpoints.*

    (a)    The Amended and Supplemental Complaint Alleges Ongoing Discriminatory Traffic Enforcement Outside of Checkpoints.

Critically, Plaintiffs' Amended and Supplemental Complaint ("ASC") alleged racially discriminatory ticketing **in general**, not merely at Checkpoints. This claim stands on its own; it does not depend either on Fourth Amendment violations at Checkpoints or on racially discriminatory siting of Checkpoints. The fact that the Court's standing decision failed to evaluate all of Plaintiffs' traffic-enforcement related claims is a basis for reconsideration. *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263–64 (2015) (reversing standing dismissal because district court misconstrued nature of claim).

Plaintiffs' claim to enjoin ongoing racially discriminatory traffic enforcement is set forth in Paragraphs 91, 102–10, 118, 190–91, 195–97, 200–04, 441, and 443 of the ASC. ECF 63. Paragraphs 91 and 102 establish the basic claim as including discriminatory **non-Checkpoint enforcement** as well as enforcement at Checkpoints (emphasis added throughout):

    91.    BPD **also** disproportionately and intentionally targets neighborhoods and drivers of color for **traffic enforcement outside of Checkpoints**.

    . . .

    102.    Ticketing data received in discovery in this action confirm the existence and vast extent of **racially discriminatory traffic enforcement by the Buffalo Police Department, both at and away from Checkpoints**.

The ASC supports those allegations with ticketing data current as of March 31, 2019. *See* ECF 63 ¶¶ 103–08. That data showed gross disproportionality in tickets given to residents of the four most highly non-White zip codes of Buffalo versus the four most highly White zip codes, *id.* ¶¶ 103–06, with the number of non-White people living in a zip code being "by far, the strongest predictor of the number of tickets BPD issued to residents of the zip code." *Id.* ¶ 107(a). After

additional paragraphs alleging statistical disparities related to non-Checkpoint ticketing, Paragraph 118 asserts:

> 118.    ***The BPD's racially discriminatory traffic enforcement is not merely historical; it has continued to present, notwithstanding the dissolution of the Strike Force in March 2018.*** The most recent ticketing data available for the post-Strike Force period continue to show disparities so large that they are explainable only on the basis of intentional racial discrimination.

Four of the newly added Plaintiffs specifically alleged that they had experienced racially discriminatory ticketing occurring at a location ***other than*** a Checkpoint. *See id.* ¶¶ 269–96 (Yeldon); ¶¶ 302–08 (Palmer); ¶¶ 317–23 (Bonds)[3]; ¶¶ 352–58 (Redden). And Paragraph 204 of the ASC alleges specifically that City policies, customs, and practices "will continue to cause the BPD to issue thousands of traffic violations, and to make arrests and impound vehicles, motivated by pecuniary interests and racial profiling and discrimination."

Moving from the facts alleged to the claims for relief, the Second Claim asserts (again, with emphasis added throughout):

> 441.    BPD's constitutional abuses and violations were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendants City, Brown, Lockwood and Derenda, including: (1) the sanctioning and encouragement of, and the failure to rectify, BPD's targeting of Black and Latino neighborhoods for aggressive, <u>punitive</u> traffic enforcement (***including <u>but not limited to</u> the use of Checkpoints and multiple ticketing for tinted windows*** and seatbelt violations); and (2) the failure to train, supervise, monitor and discipline BPD officers engaged in such traffic enforcement.
>
> . . .
>
> 443.    Defendants ***continue*** to target Black and Latino neighborhoods for aggressive, punitive traffic enforcement. ***Because Plaintiffs and class members continue to drive in these neighborhoods, they face the real and immediate threat that, unless enjoined by this Court, Defendants will again violate their Fourteenth Amendment rights.***

---

[3] The Bonds stop is pleaded as a Checkpoint stop, but Mr. Bonds' deposition testimony (ECF 252-39 at 67:10–71:10) clarified that he did not actually go through a Checkpoint but was separately pulled over by officers who were running a Checkpoint across the street. *See* ECF 63 ¶ 318.

And consistent with all of this, the relief sought goes far beyond Checkpoints, including requests to enjoin Defendants:

> b.  From continuing the policy, practice, and custom of ***conducting traffic stops*** and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of their race and ethnicity;
>
> . . .
>
> e.  To institute and implement policies and programs with respect to training, supervision, and discipline that will ***eliminate the policy, pattern, practice, and custom of*** . . . (ii) ***enforcing traffic laws*** in a manner that targets Buffalo residents on the basis of their race and ethnicity;
>
> . . .
>
> g.  To implement appropriate measures to ***ensure that BPD officers and personnel document all traffic stops*** and vehicle Checkpoints in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act;
>
> h.  To implement appropriate measures to ensure that ***documentation of all traffic stops*** and vehicle Checkpoints is retained in a single, up-to-date computerized database . . . .

*Id.* at 73–74 (Relief Requested).

> (b)  The Class Certification Record Contained Ample Evidence of Ongoing Discriminatory Traffic Enforcement Outside of Checkpoints.

Likewise, Plaintiffs' Motion for Class Certification for the Traffic Enforcement Class was not premised solely on Checkpoints; it advanced a claim of racially discriminatory traffic enforcement both at and outside of Checkpoints. *See generally* ECF 211. Nor did the motion merely rest on the allegations of the ASC; instead, Plaintiffs made a comprehensive evidentiary presentation to establish: (a) the existence of a longstanding and ongoing policy, custom, and practice of discriminatory traffic stops and ticketing to which City policymakers have been and are deliberately indifferent, supported by expert findings; (b) the existence of historical, statistical, and anecdotal evidence (including use of racial slurs) that such discriminatory traffic enforcement was motivated by discriminatory intent; (c) that such policies, customs, and practices began prior to the filing of

the original Complaint in 2018 and continue to the present day; and, (d) that such policies, customs, practices, and deliberate indifference raise questions common to all Traffic Enforcement Class members and are redressable with a single injunction. *Id.* at 2–3, 13–22; Andrew J. Timmick Declaration in Support of Motions to Reconsider and to Intervene, Exhibit 2, Appendix C to the May 2024 Report of Michael Gennaco (Redacted).

Each Plaintiff submitted a declaration in support of the class certification motion, and Plaintiffs Redden, Yeldon, Palmer, and Bonds each attested that their pleaded non-Checkpoint traffic stops had in fact occurred. ECF 202-1, 202-5, 202-6, 202-9. The class certification motion specifically identified the importance of the non-Checkpoint claims, arguing that Plaintiffs' individual claims met the typicality requirement because all Plaintiffs have "the same interest in challenging the BPD's unconstitutional policy of ***targeting Black and Latino drivers for traffic stops, traffic tickets,*** and vehicle Checkpoints." ECF 211 at 31 (emphasis added). All Plaintiffs testified that they are Black individuals who plan to continue to drive in the City of Buffalo, and thus they face the real and immediate risk of experiencing additional instances of unlawful and discriminatory traffic enforcement. ECF 202-1–202-9.

In addition to evidence from class representatives, Plaintiffs submitted reports from three experts evidencing discriminatory traffic stops and ticketing outside of Checkpoints, and Plaintiffs' briefing discussed this evidence in detail. Under a heading referring to "Shocking Racial Disparities in the BPD's Traffic Enforcement Practices," Plaintiffs' opening brief presented Dr. Bjerk's "statistical analysis of the BPD's ***traffic ticketing practices*** from 2012-22," and one similarly detailed paragraph on "Dr. Bjerk['s] . . . separate analysis of incidents in which BPD stopped motorists but did not issue a ticket." ECF 211 at 13–14 (emphasis added). The brief contained a full section on Mr. Gennaco's analysis of the City's "[f]ail[ure] to Act to Prevent Officers from

Engaging in Racially Discriminatory Traffic Enforcement," which contained multiple references to ticketing and traffic enforcement but only a single reference to Checkpoints, and analyzed the 73 complaints about BPD's traffic enforcement practices and the City's inadequate investigation, oversight, management, and supervision. ECF 211 at 16–21. And naturally, the historical patterns of segregation and discrimination discussed in Prof. Silverman's report, as well as Mr. Gennaco's discussion of racially biased statements and slurs, provide evidence of the City's discriminatory intent that reverberate far beyond Checkpoints. *See* ECF 203-3; ECF 211 at 14–16.

Moreover, the Court's assertion that all of Plaintiffs' statistical evidence "reflects past alleged harms," ECF 261 at 12, is incorrect. Dr. Bjerk's report demonstrated ***ongoing*** racially disparate ticketing from 2012 through 2022—and, with the inclusion of Dr. Bjerk's two Supplemental Reports, ECF 224-1, 317-10, through March 31, 2025. Plaintiffs' class certification reply papers explained that "statistically significant racial disparities persisted throughout ***2023, the most recent period for which data [was then] available***," and that the City's standing argument "completely disregard[ed] the record of past injuries ***and continuing policies and practices, including ongoing racial disparities***." ECF 223 at 22–23 (emphasis added).

Since Plaintiffs have consistently alleged and presented evidence of constitutional violations related to traffic enforcement outside of Checkpoints pursuant to municipal customs, policies, and practices that have continued to this day, the Decision clearly erred and worked a manifest injustice by holding that Plaintiffs lacked standing and denying certification of the Traffic Enforcement Class. *See Duke v. Luxottica U.S. Holdings Corp.*, 2024 WL 4904509, at *5–*8 (E.D.N.Y. Nov. 27, 2024) (granting motion to reconsider standing decision premised on an erroneous reading of the complaint).

**B.      The Court Improperly Analyzed Checkpoints Standing Based on Post-2018 Events.**

Reconsideration is appropriate for the independent reason that the Decision erroneously determined standing based on recent events. Because standing "is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), the standing inquiry depends on the nature and scope of the claim being asserted, and by whom. *See Martinez v. Malloy*, 350 F. Supp. 3d 74, 85 (D. Conn. 2018) ("[T]he standing inquiry 'often turns on the nature and source of the claim asserted.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). For the original Named Plaintiffs, it is settled law in this Circuit that "'standing is to be determined as of the commencement of suit,' even for plaintiffs seeking forward-looking relief." *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *accord Chen-Oster v. Goldman, Sachs & Co.*, 251 F. Supp. 3d 579, 589–90 (S.D.N.Y. 2017) (class plaintiffs had standing to seek injunctive relief against former employer because they were employed at the time of the commencement of the action).

Events after the commencement of the action "***do not pertain to standing***; the only question is whether they render [a] case moot." *Doe*, 128 F.4th at 384 (emphasis added). In post-complaint proceedings (e.g., summary judgment or, as here, class certification), the standing analysis may consider evidence beyond the allegations of the complaint, but the question always remains the same: "whether the party invoking jurisdiction had the requisite stake in the outcome ***when the suit was filed***." *Id*. (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)) (emphasis added).

For Plaintiffs who joined the action after the original filing date, the Second Circuit's strict rules against relation back of amendments adding new parties come into play.[4] Except in the very rare instances where claims of new parties do relate back, standing for new plaintiffs is governed by the date on which they sought leave to join the action. *See Comer v. Cisneros*, 37 F.3d 775, 791, 801 (2d Cir. 1994) (assessing standing based on two dates: the date the suit was filed for original plaintiffs, and the date new plaintiffs sought to intervene); *Robidoux v. Celani*, 987 F.2d 931, 938 (2d Cir. 1993) (same); *see also Javier H. v. Garcia-Botello*, 239 F.R.D. 342, 346 (W.D.N.Y. 2006) (although Rule 15(a) generally governs complaint amendments, Rule 21 controls amendments that seek to add new parties).

Accordingly, the relevant dates for assessing standing are (i) June 28, 2018 (the date the action was commenced), *see* ECF 1, for Plaintiffs Simmons, Franklin, Evans, and Hall; (ii) April 23, 2020 (the date of the motion for leave to file an Amended and Supplemental Complaint), *see* ECF 57, 63, for Plaintiffs Bonds, Yeldon, Sarmiento, and Redden; and (iii) July 11, 2025 for the proposed Intervenors.

The Decision, however, did not analyze standing that way. Instead, the Court looked to current, post-2018, and post-2020 events to determine standing (emphasis added):

- Decision at 12:  "[N]one of Plaintiffs' attestations pertain to Checkpoints that took place *in the past two years*."

- Decision at 11:  "[Plaintiffs] cite no evidence that BPD ***has taken steps***" to resume Checkpoints.

---

[4] Relation back of claims of a new plaintiff in an amended complaint is permitted in narrow exceptions. One is instances where the newly added plaintiff was omitted from the original complaint by a "mistake," within the meaning of Fed. R. Civ. P. 15(c)(1)(C)(ii). *Levy v. U.S. Gen. Acct. Off.*, 175 F.3d 254, 255 (2d Cir. 1999) (per curiam); *see*, *e.g.*, *Wilder v. News Corp.*, 2015 WL 5853763, at *14–*16 (S.D.N.Y. Oct. 7, 2015) (explaining *Levy*); *Charlot v. Ecolab, Inc.*, 97 F. Supp. 3d 40, 82–83 (E.D.N.Y. Mar. 27, 2015) (same). The other is when there is a real-party-in-interest substitution under Rule 17(a). *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 389 (2d Cir. 2021).

In so doing, the Decision conflicted with settled Second Circuit law. *See, e.g., Doe*, 128 F.4th at 384 ("Standing is determined as of the filing of the complaint"); *Comer*, 37 F.3d at 801 (an intervenor's standing is determined as of the date the motion to intervene was filed).

Reconsideration is warranted to correct this clear legal error and prevent manifest injustice. Upon reconsideration, the Court should evaluate whether the original Named Plaintiffs had standing to enjoin Checkpoints as of June 28, 2018—which they did, for the reasons stated in Part III.B of this motion and Part VII.C of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("SJ Opp."). ECF 321.[5]

## III.    On Reconsideration, the Court Should Hold That Plaintiffs Have Standing to Assert Their Injunctive Claims and Should Certify the Traffic Enforcement Class.

Plaintiffs seek reconsideration only of the Court's standing determination and the resulting denial of class certification for the Traffic Enforcement Class.[6] As shown below and in Part VII to Plaintiffs' SJ Opp., there were and are individual Plaintiffs with standing to seek prospective injunctive relief, both as to traffic enforcement in general and Checkpoints in particular. Once standing is resolved in Plaintiffs' favor, certification of the Traffic Enforcement Class follows for the reasons set forth in Plaintiffs' prior briefing, *see* ECF 202–211, 223, 241, which Plaintiffs incorporate by reference here. Accordingly, the Traffic Enforcement Class should be certified pursuant to Rule 23(a) and (b)(2).

---

[5] Reconsideration is also warranted because of "the availability of new evidence," *Virgin Atl. Airways*, 956 F.2d at 1255, as described in Section IV.B–C below.

[6] Having found a lack of standing for prospective injunctive relief, the Court did not consider whether the Traffic Enforcement Class satisfies Rule 23(a) and 23(b)(2). The Decision also addressed whether Plaintiffs sought an obey-the-law injunction but did not deny certification on this basis; instead, it said that "to the extent" that Plaintiffs sought an obey-the-law injunction, such relief would not be available. ECF 261 at 9. Plaintiffs have shown that they have *not* sought an obey-the-law injunction, and that argument is incorporated by reference here. *See* ECF 321 at 117–18.

### A. Several Plaintiffs Have Standing to Assert the General Injunctive Claim on Behalf of the Traffic Enforcement Class.

The key element for injunctive standing is "injury in fact," which is defined as a "substantial risk of future harm" arising from "an official policy or its equivalent." *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 38 (S.D.N.Y. 2022) (citing *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004)). Only one named plaintiff needs standing in class actions. *Hyland v. Navient Corp.*, 48 F.4th 110, 117–18 (2d Cir. 2022).

As set forth above, Plaintiffs have alleged that BPD intentionally and disproportionately targets neighborhoods and drivers of color for traffic enforcement outside of Checkpoints (ECF 63 ¶ 91) and that such racially discriminatory traffic enforcement "is not merely historical" but "has continued to [the date of the ASC] notwithstanding the dissolution of the Strike Force in March 2018" (*id.* ¶ 118). Plaintiffs further alleged that centralized City policies, customs, and practices caused the BPD to engage in racial profiling and discriminatory ticketing (*id.* ¶ 204), thus meeting the "official policy or its equivalent" requirement.

Here, the likelihood of future harm is ***not***, "Will there ever be another Checkpoint?" Rather it is, "Did Plaintiffs, who are Black and Latino motorists, face a non-speculative future risk of being stopped and/or ticketed by the BPD based on race circa 2018 and 2020?" In light of the evidentiary record before the Court on class certification, the answer can only be "yes."

The record on class certification established that the BPD had adopted a discriminatory policy, practice, and custom of targeting Black and Latino motorists for traffic stops and punitive traffic enforcement *even away from* Checkpoints. *See supra* § II.A.2.B. That policy, practice, and custom satisfies the "policy or its equivalent" requirement of *Shain*, 356 F.3d at 216. It was in place in 2018 when the action was filed, in 2020 when the ASC was filed, and it remains in place now. As the Supreme Court recently explained, when plaintiffs can establish that past harms are

traceable to a governmental policy that remains ongoing, the past harm itself "can serve as evidence of expected future harm." *Murthy v. Missouri*, 603 U.S. 43, 70 (2024). The police practices standing cases cited in Plaintiffs' reply in support of class certification, ECF 223 at 21–23, likewise confirm that such a policy, in conjunction with repeated examples of the challenged conduct, establishes risk of future harm: "The possibility of recurring injury ceases to be speculative when ***actual repeated incidents*** are documented." *Floyd*, 283 F.R.D. at 169 (citation omitted) (emphasis added).[7]

The class certification record contained evidence of a policy, custom, and practice, including "actual repeated incidents," in abundance. The original complaint alleges an incident of multiple seatbelt ticketing related to Plaintiff Evans (originally appearing as Jane Doe, ECF 1 ¶¶ 211–18), and the ASC adds several more incidents of plausibly discriminatory pre-June-2018 traffic enforcement involving Plaintiffs Bonds, Yeldon, and Palmer. ECF 63 ¶¶ 317–23, 271–77, 302–07. Plaintiff Palmer was stopped three times between 2015 and 2017. ECF 63 ¶¶ 302–07; *compare id. with Floyd*, 283 F.R.D. at 169 (finding standing where one plaintiff was subject to repeated incidents even where other plaintiffs were not). These incidents were properly before the Court on class certification, as the individual Plaintiffs confirmed them in their declarations. ECF 202-1–202-9. Appendix C of the Gennaco Report enumerated 37 more instances of plausibly discriminatory traffic enforcement between 2012 and 2018. Ex. 2, App. C. An additional incident in September 2018 involving Plaintiff Redden, *see* ECF 63 ¶¶ 352–58, came before Redden's own entry into the action in the ASC and thus supports *her* standing, as well as that of Bonds, Yeldon, and Palmer, all of whose standing is measured as of April 23, 2020. The eleven additional Gennaco

---

[7] *Accord Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 1255011, at *10 n.39 (E.D.N.Y. Mar. 12, 2021); *Ligon v. City of New York*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013); *Stinson v. City of New York*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012); *Nat'l Cong. for Puerto Rican Rts. v. City of New York*, 75 F. Supp. 2d 154, 160–61 (S.D.N.Y. 1999).

incidents of plausibly discriminatory traffic enforcement occurring between 2018 and 2020 like-wise "count" for these Plaintiffs. *See* Ex. 2, App. C.

In addition to the pattern of discriminatory traffic enforcement recounted by Plaintiffs and in the Gennaco report, the City's deliberate indifference to that pattern, and the extensive proof of City-level intent to discriminate laid out in Point IV of the factual background of Plaintiffs' Motion for Class Certification, ECF 211 at 14–21, Plaintiffs' data and historical experts further demon-strated that discriminatory traffic enforcement practices outside of Checkpoints pre-existed June 2018 and April 2020. Dr. Bjerk showed that the Strikeforce, BTVA, and Post-Strikeforce Eras (2012-2019) each exhibited statistically significant racial disparities with respect to the locations at which tickets were issued, the number of tickets issued, the number of multiple-ticket incidents in general, and the number of multiple-tinted-window-ticket incidents in particular. ECF 203-1, Tables 5a, 7, 11, 13, 14. Virtually all of the patterns of segregation and discrimination described in the Silverman Report pre-dated 2018. *See* ECF 203-3; *cf. United States v. Moore*, 716 F. Supp. 3d 415, 430 (E.D. Va. 2024) (Richmond's historical segregation and policing tactics combined with statistical disparities sufficient to find discriminatory intent).

The racially discriminatory traffic enforcement claim in this case thus cannot be distin-guished from *Floyd* as not concerning a policy "ongoing" at the time of lawsuit. ECF 261 at 12. The policy of racially discriminatory punitive and aggressive traffic enforcement here ***is*** ongoing, and it was ongoing both in June 2018 and in April 2020. *Floyd* and the other police practices cases cited by Plaintiffs, *see supra* at 14 n.7, are directly on point.

Nor is this a case like *Lyons* or *Shain* where injunctive standing is speculative because it turns on a chain of unlikely events coming to pass, such as being "arrested in the future and pro-vok[ing] the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly

force or serious bodily injury," and/or being subjected to an illegal chokehold "without any prov-ocation whatsoever" in violation of express police policy. *City of Los Angeles v. Lyons*, 461 U.S. 95, 107–08 (1983); *see also Shain*, 356 F.3d at 213 (plaintiff was only subjected to unconstitutional strip search after threatening to commit domestic violence, being arrested, being arraigned, and being remanded to correctional center). Rather, for Plaintiffs and members of the Traffic Enforce-ment Class, the risk of future harm here is ever present because, as Defendants' 30(b)(6) repre-sentatives admitted, "it's pretty common for an officer to find a legal justification for pulling some-one over," even when the officer is engaging in racially discriminatory policing. ECF 269-10 at 204:11–205:23; 269-3 at 198:13–199:20. Thus, driving while Black or Latino in Buffalo carries with it a non-speculative risk of future harm in the form of improper traffic stops or tickets, the only injunctive standing prerequisite. *See, e.g.*, *Nat'l Cong. for Puerto Rican Rts.*, 75 F. Supp. 2d at 161 ("The fact that plaintiffs were stopped while engaging in everyday tasks further illustrates a realistic risk of future harm."); *Floyd*, 283 F.R.D. at 169–70 (same).

Accordingly, Plaintiffs Evans, Bonds, Yeldon, Palmer, and Redden have standing to pursue the injunctive claim on behalf of the Traffic Enforcement Class.

### B.   *Several Plaintiffs Have Standing to Assert the Checkpoints Injunctive Claim on Behalf of the Traffic Enforcement Class.*

As with the general injunctive claim, when the standing factors are properly applied to the Checkpoints injunctive claim, it is clear that Plaintiffs have demonstrated injury in fact. *See Comer*, 37 F.3d at 791; *Dem. Cong. Campaign Comm.*, 614 F. Supp. 3d at 39. As of June 2018, Plaintiffs Simmons, Evans, Hall, Franklin, Palmer, and Redden had each experienced one or more Check-point stops. ECF 63 ¶¶ 206–66, 297–314, 343–60, 378–97. The number of "actual repeated viola-tions" is staggering. *See, e.g.*, ECF 306 (Simmons Decl.) ¶¶ 4–5 (attesting to at least 40 Checkpoint

stops); 291 (Franklin Decl.) ¶ 5 (attesting to dozens of stops, "so many [] that I lost count"); 203-1 ¶ 311 (documenting more than 1,600 Checkpoints).

As of June 2018, the Checkpoint Program was also an ongoing policy of the BPD, ECF 261 at 12, authorized by and partially codified in the BPD's Manual of Procedures. ECF 273-4, Ch. 8, § 10.5. And although the Checkpoint Program was eventually paused, the pause only occurred after Plaintiffs began threatening litigation against the City. ECF 268-5, 280-17. Even then, Defendants took no steps to officially terminate the Checkpoint Program as evidenced by the statements of key municipal policymakers like Mayor Brown, who testified that he fully sanctioned the Checkpoint Program and never sought to prescribe BPD's practices related to traffic stops. ECF 268-3; 268-6 at 13:7–16:19, 22:16–20, 50:13–20, 238:7–16. Instead, City officials vowed that the pause was temporary and that the Checkpoints would resume even after the Strike Force was disbanded. ECF 273-4, Ch. 8, § 10.5; 275-16.

Here, as in *Maneely v. City of Newburgh*, the pause under threat of litigation does not destroy injunctive standing. 208 F.R.D. 69, 73–74 (S.D.N.Y. 2002) (plaintiff had standing to seek injunctive relief even where defendants suspended strip search policy litigation before lawsuit was filed). Accordingly, Plaintiffs have standing to pursue the Checkpoints injunctive claim.[8]

## IV. This Court Should Grant Plaintiffs' Renewed Motion for Certification of the Traffic Enforcement Class Under Rule 23(c)(1)(C).

In the alternative to reconsideration under Rule 54(b), Plaintiffs respectfully renew their motion to certify the Traffic Enforcement Class under Rule 23(c)(1)(C). The renewed motion for class certification does not duplicate any arguments previously rejected by this Court. As set forth

---

[8] Post-filing events, such as a defendant's voluntary cessation of illegal conduct, raise questions of mootness, not standing. *McDonald*, 128 F.4th at 384–85; *Maneely*, 208 F.R.D. at 73–74. Plaintiffs' claims are not moot, for the reasons stated in Section VII.D of their SJ Opp., which they incorporate by reference here.

in Section I.B above, substantial authority supports the proposition that a renewed motion for class certification under Rule 23(c)(1)(C) need not meet the requirements for reconsideration under Rule 54(b) and that one purpose of Rule 23(c)(1)(C) "is to allow plaintiffs to address district courts' concerns after initial denials of class certification," such as through intervention of new class representatives. *Savinova*, 2024 WL 3552425, at \*7. A renewed motion is also appropriate when Plaintiffs have new evidence to supplement the class certification record. *Vega v. Semple*, 2023 WL 5395479, at \*3 (D. Conn. Aug. 22, 2023). Both circumstances fit this case.

### A.    The Intervention of Additional Named Plaintiffs Justifies Renewal.

By separate motion filed concurrently, two individuals seek to intervene in this action to represent the interests of the Traffic Enforcement Class. The facts supporting the proposed Intervenors' claims are set forth in the Motion to Intervene, the proposed Complaint in Intervention, and their Declarations in Support of their Motion, so Plaintiffs do not repeat them here. The proposed addition of new class representatives to address deficiencies with the original representatives is a long-recognized basis for renewal of class certification. *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 2005 WL 3304605, at \*6 (S.D.N.Y. Dec. 7, 2005) ("Courts routinely allow the replacement of class representatives."); *Kamerman v. Steinberg*, 123 F.R.D. 66, 69–70 (S.D.N.Y. 1988).

In particular, the addition of the Intervenors as proposed Traffic Enforcement Class representatives should address any lingering concerns the Court may have with regard to standing to seek prospective injunctive relief. The standing of the proposed Intervenors is briefed in the Motion to Intervene. Each proposed Intervenor is a young Black man who has experienced multiple harrowing instances of racially discriminatory traffic enforcement within the last few years, all pursuant to ongoing BPD policies, customs, and practices, and each Intervenor plans to continue to drive within the City of Buffalo to meet work, family, and recreational needs. Each Intervenor

is thus at real and imminent risk of experiencing another racially discriminatory traffic enforcement incident.

### B.    New and Developing Evidence of BPD's Ongoing Program of Racially Discriminatory Pretext Stops Also Justifies Renewal.

Renewal is appropriate for the independent reason that Plaintiffs have developed new evidence—not available at the time of class certification and set forth in detail in the SJ Opp.—that the City maintains an ongoing policy, custom, and practice of conducting pretextual traffic stops of Black and Latino individuals on the basis of race. ECF 321 at 34–41. The Strike Force and the Housing Unit used pretextual stops as an investigative technique as early as 2014, but the BPD expanded the program under state "GIVE"[9] funding when public pressure forced the BPD to suspend Checkpoints. *Id.* at 34–36; ECF 319 ¶¶ 326–27. Like the Checkpoints, the City's pretextual stop program intentionally employs racially targeted traffic stops for general crime control purposes based on impermissible generalized race-based stereotypes that Black and Latino motorists are presumptively criminals. ECF 321 at 34–40, 45–50, 66–71.

"Pretextual" traffic stops involve stopping cars for minor traffic violations in order to investigate the driver and the passengers, to look for evidence of guns and drugs, and/or to engage in general criminal investigatory activities unrelated to traffic stops. *See id.* at 35. The law of pretext stops is clear: under *Whren v. United States*, 517 U.S. 806, 813 (1996), the existence of probable cause for the stop vitiates any *Fourth Amendment* violation, but racially discriminatory selective enforcement is still a violation of the Equal Protection Clause of the *Fourteenth Amendment. See also Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 11629176, at *8 (E.D.N.Y. Aug. 5,

---

[9] "GIVE" stands for Gun Involved Violence Elimination. *See Gun Involved Violence Elimination Initiative*, N.Y. STATE DIV. OF CRIM. JUST. SERVS., https://www.criminaljustice.ny.gov/ops/gunviolencereduction/ (last visited July 10, 2025). It is a program which awards state grant funding to police departments to apply specific law enforcement techniques to issues around gangs and guns. ECF 319 ¶ 325.

2021); *Ballew v. City of Pasadena,* 642 F. Supp. 3d 1146, 1195 (C.D. Cal. 2022); *Wilkins v. City of Chicago,* 736 F. Supp. 3d 616, 623–24 (N.D. Ill. 2024).

Plaintiffs sought to develop evidence of the City's discriminatory pretextual traffic stop program for years, both through discovery of GIVE program documents and through deposition testimony. ECF 287 ¶¶ 7–15. Plaintiffs' amended 30(b)(6) deposition notice, issued in December 2020, indicated their intention to question the City on "[t]he use of traffic enforcement as a general (i.e., non-traffic-offense) crime control strategy, including but not limited to, by the Strike Force and Housing Unit." ECF 287-3. But due to the City's extensive delays in production, the deposition did not begin until January 2024. ECF 287 ¶¶ 10–11. Prior to the deposition, in November 2023, Plaintiffs had clarified that their examination would focus on "[t]he use of traffic enforcement to investigate and target gang members and people with criminal backgrounds, including the creation and use of Gangstar and gang-related lists." ECF 287 ¶ 11. Nevertheless, the City's designated 30(b)(6) witnesses were not fully informed on this topic, nor had Defendants produced all relevant documents. *Id.* ¶¶ 11–13. It was not until August and September 2024 that the City finally produced knowledgeable witnesses and many, though still not all, underlying documents. *Id.* By that time, the parties had already completed briefing on class certification. *See* ECF 223.

As laid out in Sections III.B.4 and III.C.3 of the SJ Opp., which Plaintiffs incorporate by reference, the 30(b)(6) testimony established that the BPD's discriminatory pretextual stop program extends beyond the GIVE Program to encompass a policy, custom, and practice of stopping Black and Latino individuals based on racial profiling and stereotypes of gang membership. An additional powerful body of evidence establishing the extent and breadth of discriminatory pretextual stops did not become available until December 2024, when the City started to produce

body-worn camera footage in response to follow-up requests from the deposition. ECF 287 ¶¶ 23, 28–35, 43–45. While the great bulk of the City's video production has yet to take place, *id.* ¶¶ 28–30, Plaintiffs already know that BPD conducts ***thousands*** of discriminatory pretext stops each year, overwhelmingly targeting Black and Latino drivers, disproportionately subjecting them to unjustified search and detention on the basis of racial stereotypes. *Id.* ¶¶ 17–20, 31–54. Plaintiffs also have confirmed that BPD directed officers to conduct pretextual stops targeting Black and Latino neighborhood and drivers and have been deliberately indifferent to the widespread practice of discriminatory stops, and the record is replete with evidence of discriminatory intent at the policymaker level and throughout the BPD. ECF 321 at 45–57, 66–83.

This new evidence supports Plaintiffs' motion for class certification by filling out the evidentiary picture of the BPD's traffic stop and ticketing practices after dissolution of the Strike Force and Housing Unit, as alleged in the ASC. Far from receding with the suspension of Checkpoints and the Strike Force, intentional racial discrimination is rampant, continuing, and incorporated into official BPD traffic enforcement policy.

### C.    The 2025 Stops of Plaintiffs Hall and Bonds Further Support Class Certification.

In February 2025, after class certification was briefed and argued, the BPD subjected Plaintiff Hall to a discriminatory pretextual and unjustified stop. ECF 294 ¶¶ 24–25. Two BPD officers followed Mr. Hall after witnessing him drop his brother (a Black teenager wearing a hoodie) at a corner store. *Id.* ¶ 24. After several blocks, the officers pulled Mr. Hall over, assertedly for failing to signal a turn, although Mr. Hall had not made any turns. *Id.* The officers took Mr. Hall's driver's license back to their cruiser; when they returned, they ended the stop without issuing either a citation or a traffic stop receipt, in violation of BPD policy. *Id.*

In March 2025, Mr. Bonds drove through the entrance gate of Unicell Truck Co., where he works as a security guard, and started to exit his car.[10] ECF 299 ¶¶ 4, 33. A BPD patrol vehicle followed him onto the property and stopped him. *Id.* ¶ 33. One of the officers asked Mr. Bonds if he worked at Unicell; Mr. Bonds, wearing his security guard uniform, answered, "Yes." *Id.* The officer stated that Mr. Bonds' insurance was expired but ultimately acknowledged that Mr. Bonds did have an active insurance policy. *Id.* ¶ 34. The officer took Mr. Bonds' license back to the cruiser and, when he returned, handed Mr. Bonds ***seven tickets***. *Id.* ¶¶ 34–35. The tickets all related to the cured insurance lapse, which had resulted in a suspended license. *Id.* ¶ 35. Five of the tickets were written as misdemeanors, not mere traffic violations. *Id.* On April 17, 2025, the Buffalo City Court dismissed all seven tickets. *Id.* ¶ 36.

These incidents provide additional evidentiary support, not available at the time of class certification, that the BPD continues to subject Black and Latino motorists to racially motivated traffic stops and excessive ticketing.

**D.    *This Court Should Certify the Traffic Enforcement Class Pursuant to Rule 23(a) and (b)(2).***

In support of their renewed motion for certification of the Traffic Enforcement Class, Plaintiffs rely on and incorporate by reference their prior class certification briefing and evidentiary submissions, ECF 202–211, 223, 241, the concurrently filed Memorandum in Support of the Motion to Intervene, which briefs the standing, typicality, and adequacy of the proposed Intervenors, and the Declarations of the Proposed Intervenors.

---

[10] After selling his car because he had received so many tickets while parked at his BMHA residence (ECF 202-1 ¶ 12; *see* Decision at 11), Mr. Bonds bought a new car and resumed daily driving in Buffalo—to drop off and pick up his granddaughter from school, to go to work and to the grocery store, and to run other errands. ECF 299 ¶ 41.

## CONCLUSION

The motion to reconsider or to renew should be granted, and the Traffic Enforcement Class should be certified pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

Dated: July 11, 2025

Respectfully Submitted,

_Claudia Wilner_ (signature)

Claudia Wilner
Anjana Malhotra
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
wilner@nclej.org
malhotra@nclej.org

Matthew A. Parham
WESTERN NEW YORK LAW CENTER
37 Franklin Street, 2nd Floor
Buffalo, NY 14202
(716) 828-8422
mparham@wnylc.net

Baher Azmy
A. Chinyere Ezie
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org
cezie@ccrjustice.org

Philip Irwin (*pro hac vice*)
Jordan S. Joachim (*pro hac vice*)
Christine Nelson (*pro hac vice*)
Andrew Timmick (*pro hac vice*)
COVINGTON & BURLING, LLP
620 Eighth Ave., Suite 4029
New York, NY 10018
212-841-1000
pirwin@cov.com
jjoachim@cov.com
cnelson@cov.com
atimmick@cov.com

*Attorneys for Plaintiffs and Proposed Interve-nors*