# EXHIBIT 1

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

---

BLACK LOVE RESISTS IN THE RUST by and through MARIELLE SHAVONNE SMITH and CHARIS HUMPHREY on behalf of its members; SHAKETA REDDEN; DORETHEA FRANKLIN; TANIQUA SIMMONS; DE'JON HALL; JOSEPH BONDS; CHARLES PALMER; SHIRLEY SARMIENTO; EBONY YELDON; and JASMINE HALL, individually and on behalf of a class of all others similarly situated,

*Plaintiffs*,

- vs -

CITY OF BUFFALO, N.Y.; BYRON B. BROWN, Mayor of the City of Buffalo, in his individual and official capacities; BYRON C. LOCKWOOD, Commissioner of the Buffalo Police Department, in his individual and official capacities; DANIEL DERENDA, former Commissioner of the Buffalo Police Department, in his individual capacity; AARON YOUNG, KEVIN BRINKWORTH, PHILIP SERAFINI, ROBBIN THOMAS, UNKNOWN SUPERVISORY PERSONNEL 1-10, UNKNOWN OFFICERS 1-20, each officers of the Buffalo Police Department, in their individual capacities.

*Defendants.*

MARKEL NANCE; and THOMAS CHRISTOPHER WILLIAMS JR., individually and on behalf of a class of all others similarly situated,

*Plaintiffs-Intervenors*,

- vs -

CITY OF BUFFALO, N.Y.,

*Defendant.*

**Case No. 1:18-cv-00719-CCR**

**[PROPOSED] CLASS ACTION COMPLAINT IN INTERVENTION**

---

Plaintiffs-Intervenors allege:

1.      This Complaint in Intervention seeks injunctive and declaratory relief on behalf of Plaintiffs-Intervenors individually, and on behalf of the "Traffic Enforcement Class," against Defendant the City of Buffalo, N.Y.

2.      Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, Plaintiffs-Interve-

nors adopt by reference Paragraphs 1–23 and 35–205 of the Amended and Supplemental Com-

plaint (ECF No. 63) in this action.

## CLASS ACTION ALLEGATIONS

3.      Plaintiffs-Intervenors seek certification under Fed. R. Civ. P. 23(b)(2) of a "Traffic

Enforcement Class" defined as: All Black and/or Latino individuals who have been or will be

subjected to traffic stops, traffic tickets, and "traffic safety" vehicle checkpoints by the BPD.

(a)     The Traffic Enforcement Class contains over 10,000 current members, as well as many more who "will be" subjected to BPD traffic stops, traffic tickets, and/or Checkpoints. Joinder of all members of the Traffic Enforcement Class would be impracticable.

(b)     The claims of the individual Plaintiffs-Intervenors share common issues of law and/or fact with those of the other members of the Traffic Enforcement Class and the Traffic Enforcement Class as a whole, including without limitation:

    (i)      Whether the City maintains a policy, custom, or practice of dispro-portionately subjecting Black and Latino motorists to traffic en-forcement on the basis of their race or ethnicity;

    (ii)     Whether the City is deliberately indifferent to the need to address and correct such practices and to the risk that BPD officers are en-gaging in ongoing, racially-discriminatory traffic enforcement prac-tices;

    (iii)    Whether the City has failed to monitor, supervise, and train officers with regard to racially discriminatory policing and traffic enforce-ment;

    (iv)     Whether the City has failed adequately to investigate allegations of discriminatory policing and/or to discipline officers engaged in ra-cially discriminatory traffic enforcement, thus allowing such prac-tices to continue;

    (v)      Whether the City's actions and inactions have facilitated and create a realistic and substantial risk that class members will continue to face racially discriminatory traffic enforcement, including via Checkpoints and multiple tinted windows ticketing, in the future; and

    (vi)     Whether the BPD continues to receive federal funding.

(c)     The claims of the individual Plaintiffs-Intervenors are typical of those of the other members of the Traffic Enforcement Class and the Traffic Enforcement

Class as a whole, in that they all seek the same general relief against the same ongoing practices.

(d)     The individual Plaintiffs-Intervenors can and will adequately represent the other members of the Traffic Enforcement Class and the Traffic Enforcement Class as a whole.

4.      As alleged herein, Defendant City of Buffalo has acted and failed to act on grounds that apply generally to the Traffic Enforcement Class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Traffic Enforcement Class as a whole.

## ALLEGATIONS OF NAMED PLAINTIFFS-INTERVENORS

### *Markel Nance*

5.      Plaintiff-Intervenor Markel Nance is a 25-year-old Black man. He currently lives in Buffalo, New York, where he was born and raised.

6.      In the last four years, Mr. Nance has experienced five BPD traffic stops. The stops each involved some combination of pretextual policing, racially biased treatment, racial profiling, unjustified detention, unjustified searches of his vehicle, and/or excessive multiple ticketing. Twice, Mr. Nance complained to the Internal Affairs Division ("IAD"), but no BPD officer received any formal discipline as a result of his complaints.

7.      On May 22, 2021, at around 4:00 a.m., Mr. Nance and his girlfriend at the time were on their way home after getting food from McDonald's. Mr. Nance was a young Black man driving a luxury brand car (an Infiniti Q50), which made him a target for the police.

8.      Patrick Eck, a White BPD officer, pulled them over at the intersection of Main and Allen Streets.

9.      This was a discriminatory pretextual stop, meaning that Officer Eck stopped Mr. Nance for a traffic violation with the aim of uncovering additional criminal activity. The officer had no reason to suspect Mr. Nance of criminal activity, other than his race.

10.    Officer Eck approached the driver's side window and told Mr. Nance that he had pulled him over for speeding. Mr. Nance asked Officer Eck how he had measured Mr. Nance's speed, and Officer Eck responded that he had used his own car's speed to measure that of Mr. Nance's.

11.    Officer Eck then asked Mr. Nance to step out of the vehicle, and Mr. Nance complied.

12.    Officer Eck then patted down Mr. Nance for weapons and placed him in the back of the patrol car.

13.    At the time of the pat-down, Officer Eck did not have reasonable suspicion that Mr. Nance was armed or dangerous and had no other basis either for the pat-down or to detain Mr. Nance in the patrol car.

14.    Throughout the stop, Officer Eck spoke to Mr. Vance in a demeaning manner, addressing him as "my man," "my guy," and "dog."

15.    While Mr. Nance was in the back of the patrol car, his partner questioned his girlfriend, who was still in his car and had done nothing to justify the questioning.

16.    While detained, Mr. Nance said, "Let's take this to court." Officer Eck responded, "Damn. I'll gladly go to court. You're getting me paid, my guy."

17.    Mr. Nance requested a lieutenant, and Officer Eck mockingly told the dispatcher, "This knowledgeable young male that knows everything wants to talk to a supervisor." He also called Mr. Nance a "smartass."

18.    Officer Eck also accused Mr. Nance of being a racist. When Mr. Nance responded that he couldn't be racist because he is Black, Officer Eck responded, "Must be nice." Officer Eck also commented that his supervisor "is Black, so you guys will have a great conversation."

19.     Officer Eck issued Mr. Nance three tickets for "speed not reasonable and prudent," failing to observe a traffic signal—both of which were unjustified—and unlicensed operation.

20.     At the end of the stop, Officer Eck told Mr. Nance, "Peace out, homie," and flashed a peace sign, which is condescending and racially charged behavior and not something a White person should say to a Black person.

21.     Officer Eck's questionable stop of Mr. Nance, as well as his unjustified frisk, prolonged detention, and demeaning and racially offensive language, indicates that the traffic stop was yet another discriminatory and pretextual BPD traffic stop targeting Black and Latino motorists based on racial stereotypes. The officers' language and prolonged stop also violated BPD rules designed to prevent discriminatory traffic enforcement.

22.     Shortly after this encounter, Mr. Nance went to IAD and alleged that he had experienced a racially discriminatory traffic stop. IAD reached out to him to set up an interview, and he met with an investigator to give a statement. However, they never reached out to or interviewed Mr. Nance's girlfriend. Mr. Nance later received a letter stating that the Police Commissioner would determine what disciplinary action the officer should face, though he was never informed if any such disciplinary action was taken.

23.     On January 6, 2022, Mr. Nance was driving a rental car down Hagen Street with a friend during a snowstorm. Two officers were conducting a traffic stop with a driver in another vehicle, and Mr. Nance's friend stuck his head out the window to see what was happening. One officer saw and asked Mr. Nance and his friend, "Did you say something?" The two officers then pulled Mr. Nance over, and Mr. Nance told the officers that he and his friend had not said anything. This was another discriminatory and pretextual stop.

24.     While Mr. Nance had a valid driver's license, he only had a permit in his possession at the time. The officers issued Mr. Nance a ticket for unlicensed operation and three other tickets. One of the other tickets was for failing to stop at a stop sign, but the officers lied about observing that, since that did not happen. The officers also questioned Mr. Nance about whether his name was on the vehicle's rental agreement.

25.     Mr. Nance told the officers that he was going to IAD to file a complaint, and one officer told him something along the lines of, "Go to IA. I don't give a fuck. What are they going to do?"

26.     Mr. Nance filed a complaint with IAD, but so far as he is aware it was never investigated after he provided a recorded statement. IAD never reached out to Mr. Nance's friend for a statement.

27.     A couple of months later, in March 2022, Mr. Nance experienced yet another discriminatory pretextual BPD traffic stop. He was driving a rental car near Kehr and Fougeron Streets on the way to his grandmother's house when he saw a patrol car driving in the opposite direction on the same road. He committed no traffic infractions, but officers still pulled him over. The officer told Mr. Nance that he did not make a complete stop at the stop sign, which was untrue, but the officer still issued him a ticket for failing to stop. Mr. Nance went to court, and his case was eventually dismissed.

28.     On November 24, 2023, officers stopped Mr. Nance at the intersection of Walden and Fay while he was on his way home. There was a car that was turning right, so he moved his vehicle to the left slightly to get around the car. Two nearby White officers saw him do that and made a U-turn to pull him over. This was another discriminatory and pretextual stop.

29.     Two more officers arrived at the scene along with a lieutenant that Mr. Nance requested. The officers approached Mr. Nance and asked him to exit his car. They then placed him in the back of the patrol car while they searched his car without justification or permission. They found nothing incriminating in the car. Then, they issued him two tickets for imprudent speed and unsafe lane movement and told him he was free to go.

30.     In March 2024, Mr. Nance was driving on William Street when he was pulled over. At the time of the stop, his insurance had lapsed. The officers issued him six tickets, including two misdemeanors, for that single insurance lapse.

31.     The BPD's repeated stops of Mr. Nance and officers' words, aggressive demeanor, and demeaning treatment are part of an ongoing municipal custom, practice, and policy whereby BPD officers use any available reason to target Black motorists for discriminatory traffic stops and tickets.

32.     Mr. Nance's experiences as a Black motorist in Buffalo also confirm that Defendant City of Buffalo continues to allow BPD officers to engage in constitutional violations in the context of traffic enforcement without applying appropriate disciplinary measures to prevent discriminatory policing, effectively ratifying officer misconduct since nothing comes from the complaint process.

33.     Mr. Nance has suffered emotional distress and financial harm as a result of his experiences being stopped and ticketed by BPD officers based on race pursuant to municipal custom, practice, and policy. He has also faced obstacles when looking for opportunities to work as a truck driver because of points he received on his license when he was unable to pay for his tickets in a timely manner.

34.     Mr. Nance continues to drive in the City of Buffalo and is at imminent risk of ex-periencing additional instances of unlawful and discriminatory BPD traffic enforcement.

***Thomas Christopher Williams, Jr.***

35.     Plaintiff-Intervenor Thomas Christopher Williams, Jr. is a 20-year-old African American man. He lives on the East Side of Buffalo, where he was born and raised. Mr. Williams is currently studying engineering and works part-time in the hospitality industry.

36.     On March 26, 2024 at around 11:30 p.m., Mr. Williams was waiting for a light on East Delavan and Olympic Avenue, and made eye contact with a White BPD Officer driving in the opposite direction of him on East Delavan Avenue. The officer looked at him with a hostile expression that made Mr. Williams fear for his life and then proceeded to make a U-turn and pulled up behind Mr. Williams.

37.     Mr. Williams changed his plans to buy donuts after a long day at work and the gym, and instead drove home, which was about three minutes away. The BPD officers, Ronald Ammer-man and Jonathan Crawford, both of whom are White, followed him to his house and into his long driveway to his backyard, barricading his car in the driveway. The officers did not activate their lights until they turned onto his driveway.

38.     The officers approached Mr. Williams' vehicle after barricading Mr. Williams in his driveway, and said, "You live here, brother?" using racially coded language. Mr. Williams confirmed that he did, but the officers' language made Mr. Williams feel belittled and uncomfort-able.

39.     Mr. Williams handed them his license, registration, and insurance information. He also handed them his father's business card indicating that his father was a Sergeant with the Police

Department of Anne Arundel County, Maryland, taking all the steps his father had taught him to take in a police encounter.

40.    The officers interrogated Mr. Williams and asked him what he was doing, where he was coming from, whether he lived in his house, and why he wasn't wearing a coat. They also questioned him about his gym, his school, his areas of study, his grades, why he was nervous, and if the car was stolen, among other things. Mr. Williams answered all the officers' questions respectfully and told them he was nervous because it was the first time he was pulled over. The officers asked if he had warrants or had been on probation or parole, to which he responded no, and told him they had to run his license. Even though the officers had his driver's license and papers, they referred to him by the wrong name, "James."

41.    The officers told Mr. Williams that they had just had one of these cars stolen and that Mr. Williams "scared" the officer by pulling into his driveway, which Mr. Williams did not understand because he did not see the officers activate their lights until he pulled into the driveway, and he always parked his car at the end of the driveway.

42.    The officers gave different reasons for stopping Mr. Williams, claiming that multiple cars like his were reported stolen, even though they acknowledged that Mr. Williams' car wasn't the "right one," that he hadn't used his blinker, that he had pulled all the way into his driveway and appeared nervous, and that they were not sure if he lived in his house. And later, the officers even claimed (falsely) that Mr. Williams was speeding before his turn.

43.    While Officer Crawford continued to question Mr. Williams, his mother, Janeen JV Greene, and aunt came out of the house very concerned. Ms. Greene confirmed to Officer Ammerman that Mr. Williams was her son and that she owned the house. Officer Ammerman told

her that they thought it was a stolen car, and, after she told him it was not, he went to his car to check Mr. Williams' license, registration, and his booking/arrest history.

44.     Ms. Greene subsequently put Mr. Williams' father, Sergeant Thomas Christopher Williams Sr., who was in Maryland, on the phone with Officer Ammerman. Sergeant Williams Sr. confirmed that Mr. Williams was his son and that he was driving the family car. Officer Ammerman told his father that a similar vehicle to his (and multiple others) was stolen, that he thought it was one of those cars, and that Mr. Williams drove "quickly" down the driveway. Even though both of Mr. Williams' parents confirmed that he was their son and that he was driving the family car, not one that was stolen, Officer Ammerman told the parents he was still going to run Mr. Williams name and license to do a warrant check because he "hadn't had a chance to," even though he had already checked his license and name against a booking/arrest history. Officer Ammerman returned to his car to proceed with the warrant and background check of Mr. Williams.

45.     The officers had no legal basis to prolong the stop to run a background check and ask extensive questions unrelated to the stop, which also violated BPD's internal rules designed to prohibit discrimination. Particularly, once they confirmed ownership of the car, it was clear they had no probable cause or reasonable suspicion of wrongdoing.

46.     After the officers completed their multiple checks and interrogation of Mr. Williams, they left without issuing Mr. Williams a traffic ticket or a stop receipt in violation of BPD rules.

47.     This was a racially discriminatory and pretextual traffic stop. The officers' decision to make a U-turn after making eye contact and verifying Mr. Williams' race, unwarranted hostile expression, decision to follow him without justification, aggressively stop and barricade him in his own driveaway, prolonged and incessant questioning, unnecessary background checks, and their

-10-

shifting, unfounded justifications indicate that that the stop was pretextual and that their actions were based on a racial stereotype that Mr. Williams had likely stolen the car or was criminally suspicious because he was Black.

48.    Mr. Williams was terrified, and the next day, Mr. Williams and his family got in touch and met with the Chief of their District (E District), Todd McAllister, at their house. They shared the underlying facts and serious concerns about the officers' racially discriminatory traffic stop, stereotyped presumptions of criminality, and demeaning and unconstitutional treatment of Mr. Williams. Chief McAllister told them that it was an unfair and bad stop, that the officers did a lot of things wrong, and that they should not have stopped Mr. Williams or pulled into his drive-way.

49.    Chief McAllister had looked into the matter, and the only car reported stolen that evening was a Dodge Charger, not a Hyundai like the car Mr. Williams was driving. The Chief described how the E District has had a racial profiling problem in part because that there are no Black officers who work at night and that he was trying to make improvements. He also told them that he would file a complaint with the BPD IAD and that this could be considered a racial dis-crimination complaint.

50.    Six weeks later, a BPD IAD Lieutenant conducted short interviews with Mr. Wil-liams and his family. The BPD IAD Lieutenant used an indifferent and curt tone with Mr. Williams and his father that made Mr. Williams feel like his complaint would go nowhere. All the officers were exonerated.

51.    Because the BPD officers acted in a racially discriminatory manner by following Mr. Williams, barricading him in his own driveway, interrogating him, and conducting criminal background checks after arbitrarily predetermining him as a criminal or suspect for no reason other

than his race without any consequence or recourse from Defendant, Mr. Williams experienced emotional, physical, and psychological distress. The stop left Mr. Williams feeling emotionally and physically drained and in ongoing fear that a similar incident would happen again.

52.     Even today, when seeing a BPD officer, Mr. Williams experiences that same agitation and frustration and, despite being a cautious driver, feels heightened anxiety about ensuring he is following every traffic rule.

53.     Less than a month after BPD exonerated Officer Ammerman for Mr. Williams' traffic stop, Officer Ammerman shot and killed a young Black man, Daevon Roberts, during a traffic stop. This made Mr. Williams even more scared, because he felt that it could have been him. Mr. Williams was also upset because he felt that, if the BPD had held Officer Ammerman accountable for violating his civil rights, it may have even prevented this death.

54.     It has been publicly reported that multiple Black and minority civilians have filed serious complaints against Officer Ammerman alleging racial profiling, bias, and other misconduct in traffic encounters. Plaintiffs' police practices expert, Michael Gennaco, reviewed five other complaints alleging Officer Ammerman engaged in racially discriminatory traffic stops since 2019, including a brutal stop of Quentin Suttles in 2019 where Ammerman wrongly insisted that Mr. Suttles had drugs when he did not. Nonetheless, the BPD has never held Officer Ammerman accountable for racially biased policing for any of those stops.

55.     The BPD's failure to enforce its own rules or hold officers accountable for racially biased traffic enforcement is consistent with Mr. Gennaco's findings in reviewing 73 civilian complaints regarding racially discriminatory policing, and the City's deliberate indifference to widespread discriminatory traffic enforcement.[1]

---

[1] *See* ECF No. 203-2, App. C.

56.    On September 21, 2024, the BPD pulled over Mr. Williams' brother, who was driving, Mr. Williams, and one other passenger, all of whom are Black, on the East Side of Buffalo. Mr. Williams' brother was driving his friend's car, a convertible BMW M8, which is worth about $100,000, and they had the top down. Two police cars stopped their car and aggressively sandwiched them in, with one in front and one in back, alleging that the driver did not stop for a stop sign. However, this reasoning appeared to be pretextual and discriminatory, because four White officers approached and made comments to Mr. Williams' brother about how expensive the car was, asking him how he got it, who it belongs to, and how he was driving it. Without any probable cause or reasonable suspicion of any criminal activity, the officers prolonged the stop and questioned Mr. Williams and the other passenger, directing them to produce their drivers' licenses. One of the officers also said to Mr. Williams, "You look familiar. Have I seen you before?" Mr. Williams told the officer that he had never seen him before.

57.    This was a discriminatory and pretextual stop because of the way the officers automatically treated and questioned the driver and passengers as suspects with no legal basis and the comments they made about the expensive car, insinuating Mr. Williams' brother could not afford it, and the officers' allegation that Mr. Williams looked "familiar." The officers were acting on a racially stereotyped predisposition that the passengers were suspects because Mr. Williams and the other occupants were Black and driving a nice car.

58.    Mr. Williams' experiences of being repeatedly subjected to discriminatory and unjustified traffic stops by the BPD—in addition to causing Mr. Williams severe emotional distress—confirm the existence of an ongoing municipal custom, policy, and practice of targeting Black motorists for traffic enforcement based on race.

59.     Although Mr. Williams had never previously feared police officers and would even defend broad criticisms of them, he is now terrified of Buffalo police officers and does everything he can to avoid them. His experience confirms what he has heard from family and friends that BPD officers go "hunting" for Black men after 9:00 p.m., and Mr. Williams tries to avoid driving after 9:00 p.m. for fear of experiencing an aggressive traffic stop similar to those he has been subjected to previously. While he sometimes has to drive after 9:00 p.m. for work, he avoids taking expressways when he does so and instead only drives on local roads for fear of encountering the BPD. Because Mr. Williams continues to drive in the City of Buffalo, he remains at risk of experiencing the BPD's unlawful and discriminatory traffic enforcement practices.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### *Violation of the Fourteenth Amendment Equal Protection Clause*

60.     Defendant has devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of subjecting Plaintiffs and class members to aggressive, punitive traffic enforcement, including at Checkpoints, based on race and/or national origin. Defendant's policy, practice, and/or custom of targeting Black and Latino neighborhoods for such traffic enforcement amounts to racial and ethnic profiling.

61.     The BPD's constitutional abuses and violations were and are directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by Defendant City of Buffalo, including: (1) the sanctioning and encouragement of, and the failure to rectify, BPD's targeting of Black and Latino neighborhoods for aggressive, punitive traffic enforcement (including but not limited to the use of Checkpoints and multiple ticketing for tinted windows and seatbelt violations); and (2) the failure to train, supervise, monitor, and discipline BPD officers engaged in such traffic enforcement.

-14-

62.     Defendant has acted with deliberate indifference to the Fourteenth Amendment rights of Named Plaintiffs and class members. Defendant's acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' and class members' Fourteenth Amendment rights. By acting under color of state law to deprive Plaintiffs and class members of their Fourteenth Amendment rights, Defendant has violated 42 U.S.C. § 1983.

63.     Defendant continues to target Black and Latino neighborhoods for aggressive, punitive traffic enforcement. Because Plaintiffs and class members continue to drive in these neighborhoods, they face the real and immediate threat that, unless enjoined by this Court, Defendant will again violate their Fourteenth Amendment rights.

64.     As a direct and proximate result of Defendant's policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property, and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs, and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### *Violation of the Fourteenth Amendment Due Process Clause*

65.     Defendant has devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of subjecting Plaintiffs and class members to aggressive, punitive traffic enforcement in order to generate revenue for the City budget.

66.     The City's reliance on revenue from traffic tickets and associated Buffalo Traffic Violations Agency ("BTVA") fees creates an institutional incentive for the City, the BPD, and the BTVA to ticket, convict and fine Plaintiffs, regardless of the nature of their individual offenses. Defendant's pecuniary interests conflict with their obligations to be and appear disinterested and

to serve the interests of justice. The institutional incentive to generate revenue creates bias, and an appearance of bias, that deprives Plaintiffs and class members of due process of law.

67.     This violation of due process is directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by Defendant City of Buffalo, including: (1) the sanctioning and encouragement of, and the failure to rectify, BPD's aggressive, punitive enforcement of traffic laws in order to generate revenue; and (2) the failure to train, supervise, monitor, and discipline BPD officers engaged in such traffic enforcement.

68.     Defendant has acted with deliberate indifference to the Fourteenth Amendment rights of Named Plaintiffs and class members. Defendant's acts and omissions have directly and proximately caused, and will continue to cause, violations of Plaintiffs' and class members' Fourteenth Amendment rights. By acting under color of state law to deprive Plaintiffs and class members of their Fourteenth Amendment rights, Defendant has violated 42 U.S.C. § 1983.

69.     Defendant continues to engage in aggressive, punitive traffic enforcement and continues to rely on ever-increasing traffic ticket revenue to balance the City budget. Because Plaintiffs and class members continue to drive, they face the real and immediate threat that, unless enjoined by this Court, Defendant will again violate their Fourteenth Amendment rights by subjecting them to traffic enforcement solely for pecuniary gain.

70.     As a direct and proximate result of Defendant's policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property, and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs, and attorneys' fees.

## THIRD CLAIM FOR RELIEF

### *Violation of Title VI of the Civil Rights Act of 1964*

71.     Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) *et seq.*, prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance, including law enforcement programs and activities. Title VI prohibits intentional discrimination on the basis of race or ethnicity. It prohibits law enforcement officers from conducting police activities in a manner that is motivated by race or ethnicity, or in a manner that has a discriminatory effect on a racial or ethnic group, or which is motivated by a discriminatory purpose.

72.     Defendant receives federal financial assistance, including financial assistance for law enforcement activities.

73.     Defendant devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of BPD officers and personnel operating Checkpoints and engaging in aggressive, punitive traffic enforcement in a manner that is motivated by race and ethnicity and results in a significant disparate impact on Black and Latino people. Defendant's policy, practice, and custom of targeting Black and Latino neighborhoods for aggressive, punitive traffic enforcement (including but not limited to Checkpoints) amounts to racial and ethnic profiling.

74.     As a direct and proximate result of Defendant's policies, practices, and/or customs, Plaintiffs and class members have suffered and will continue to suffer compensable harm, including financial harm, humiliation, emotional distress, loss of liberty, loss of property, and/or violations of their constitutional rights, and are entitled to declaratory relief, preliminary and permanent injunctive relief, damages, costs, and attorneys' fees.

**RELIEF REQUESTED**

Wherefore, Plaintiffs-Intervenors respectfully request that this Court:

75.    Issue an Order certifying the Traffic Enforcement Class pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure;

76.    Declare that Defendant City of Buffalo has violated the rights of Plaintiffs and class members under the Fourteenth Amendment to the U.S. Constitution and Title VI of the Civil Rights Act;

77.    Preliminarily and permanently enjoin Defendant:

(a)    From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of their race and ethnicity;

(b)    From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints for improper pecuniary purposes;

(c)    To institute and implement policies and programs with respect to training, supervision, and discipline that will eliminate the policy, pattern, practice, and custom of:

(i)    conducting vehicle Checkpoints for the purpose of general crime control; and

(ii)    enforcing traffic laws in a manner that targets Buffalo residents on the basis of their race and ethnicity or that reflects an improper pecuniary motive.

(d)    To implement appropriate measures to ensure that BPD officers and personnel document all traffic stops and vehicle Checkpoints in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act;

(e)    To implement appropriate measures to ensure that documentation of all traffic stops and vehicle Checkpoints is retained in a single, up-to-date computerized database.

78.    Award reasonable attorneys' fees to all Plaintiffs, pursuant to 42 U.S.C. § 1988;

79.    Award costs of litigation to all Plaintiffs, pursuant to 42 U.S.C. §§ 1920 and 1988; and

80.     Award such other relief as this Court may deem appropriate and in the interests

of justice.

Respectfully submitted this 11th day of July, 2025.

_____
Claudia Wilner
Anjana Malhotra
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
wilner@nclej.org
malhotra@nclej.org

Matthew A. Parham
WESTERN NEW YORK LAW CENTER
37 Franklin Street, 2nd Floor
Buffalo, NY 14202
(716) 828-8422
mparham@wnylc.net

Baher Azmy
A. Chinyere Ezie
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org
cezie@ccrjustice.org

Philip Irwin (*pro hac vice*)
Jordan S. Joachim (*pro hac vice*)
Christine Nelson (*pro hac vice*)
Andrew Timmick (*pro hac vice*)
COVINGTON & BURLING, LLP
620 Eighth Ave., Suite 4029
New York, NY 10018
212-841-1000
pirwin@cov.com
jjoachim@cov.com
cnelson@cov.com
atimmick@cov.com

*Attorneys for Plaintiffs and Proposed Interve-
nors*