UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

BLACK LOVE RESISTS IN THE RUST, *et al.*,
individually and on behalf of a class of all others
similarly situated,

               Plaintiffs,

    v.

CITY OF BUFFALO, N.Y., *et al.*,

               Defendants.

No. 1:18-cv-00719-CCR

## DECLARATION OF THOMAS CHRISTOPHER WILLIAMS, JR.

Thomas Christopher Williams, Jr. declares, under penalty of perjury and pursuant to 28 U.S.C. §1746:

    1.    My name is Thomas Christopher Williams, Jr., and I go by Christopher. I am a 20-year-old African American man.

    2.    I make this declaration in support of my Motion to Intervene. I also wish to serve as a representative for the Traffic Enforcement Class.

    3.    I currently live on the East Side of Buffalo, New York where I was born and raised.

    4.    I am currently studying engineering and work part-time at a hotel in the Buffalo area.

    5.    On March 26, 2024, I was going to get some donuts on my way home from work and the gym with a friend, who I had just dropped off. At around 11:30 p.m., while waiting for

1

a light on East Delavan and Olympic Avenue, I saw a Buffalo Police Department ("BPD") cruiser driving in the opposite direction of me on East Delavan Avenue. A white BPD officer in the vehicle made eye contact with me and looked at me with a hostile expression, like he would kill me or like I wasn't supposed to be there.

6. Once I saw that expression on his face, I was afraid for my life and decided to not take any chances. I changed my plans and decided to drive home, which was about three minutes away, instead of getting donuts. I then saw the officers make a U-turn at the next street, Bailey Avenue, and drive up behind me. Their actions made me feel even more scared and anxious. The officers followed me as I took a right onto my street, Northumberland Ave., and as I pulled into the end of my driveway.

7. The BPD officers pulled up all the way behind me in my driveway, which is long and narrow, and blocked my car. Upon information and belief, the officers did not activate their lights until they pulled into my driveway and kept their lights activated throughout the entire stop.

8. I was prepared to comply with any and all police orders, so I rolled down both my windows and began to pull out my driver's license, insurance, registration, and my father's police business card, which was with my paperwork. That card indicates that my father, Thomas Williams, Sr. is a Sergeant with the Police Department in Anne Arundel County, Maryland and includes his full contact information. My father had instructed me to be prepared and take these steps if I was ever stopped by the police to avoid any problems.

9. I saw two white officers, who I now know were Ronald Ammerman and Jonathan Crawford, get out of their car. One officer approached me on the driver's side, while the other came up to the passenger side of the car. One of the officers asked, "Do you live here,

brother?" I said yes. This statement made me feel uncomfortable and belittled, but I was focused on why they stopped me in my backyard and making sure I was prepared. I gave my license, paperwork, and my father's card to the officers. I had never been pulled over, but my father had taught me to act in this manner if I were ever stopped by police officers.

10. The officers began interrogating me. One of the officers asked me if I lived at my house and told me that they just had one of these cars stolen. I confirmed that I lived there, the car was not stolen and registered to my father, who I said was a police Sergeant in Maryland. He said that I "scared him" by pulling all the way into my driveway, which I didn't understand because he didn't activate his lights until he was in my driveway, and I was parking my car there. The officers continued to question me about where I was coming from. Officer Crawford asked me about my father, specifically about how long he had been an officer and whether he was going to retire or come home. By their questions and tone, they didn't seem to believe he was a police officer. I did not argue or push back because I did not do anything wrong, and I answered all of their questions calmly and respectfully, addressing them as "Sir."

11. Even though the officers had my driver's license and papers, they asked me if I knew what street I was on and for my address. After telling me that they believed the car was stolen, one of the officers then claimed I didn't use my blinker when I turned. After that comment, the officer called me by a different name, James. I was confused about why they would get my name wrong when they had my license. The officers also asked about my gym, where I was going to school, whether I liked school, what I was studying, and even about my grades. Because of their questions, tone, and the fact that they barricaded me at the end of my driveway, I felt like they thought I was a criminal suspect that they were investigating for no reason.

3

12. The officers also asked why I was nervous or "super shaky," and I told them it was the first time I was pulled over. One of the officers told me they were going to have to run my license. For no reason, he asked if I had warrants or if I had been on probation or parole. I told them I had no warrants and had never been on probation or patrol.

13. I felt scared and uncomfortable because I felt like they stopped and were questioning and harassing me for no reason other than the fact that I am Black.

14. A few minutes after the police pulled me over, my mother, Janeen JV Greene, and aunt came out of the house. My mother told them that I was her son and that she owned the house and questioned why they were pulling me over. She seemed afraid for me and my life.

15. While talking to the officers, my mother called my father, Thomas Christopher Williams Sr., who was working in Maryland. She handed the phone to one of the officers. My parents told me right after the stop that they told the officers it was their car, and the officers told them that they stopped me because a very similar vehicle was stolen, and that I pulled all the way down into my driveway. The officer told my father that many cars like this were stolen and that it wasn't the "right one." Even though both my father and mother confirmed the car ownership, the officers did not seem to believe them and told my father he was still going to make sure that I did not have any wants or warrants. The officers seemed very dismissive of my father for no reason. Even though Officer Ammerman had my father's business card indicating he worked for the Anne Arundel County police department, the officer asked my father twice to confirm where he worked.

16. The officers eventually returned my license and paperwork, but they did not return my father's police business card.

17. The officers did not give me a traffic ticket or stop receipt for this traffic stop.

4

18. After this stop, my family contacted the Chief of my District (E District), Todd McAllister, because they were concerned about the officers' racially discriminatory and unjustified traffic stop, false accusations, and treatment of me during this stop.

19. Chief McAllister came to our house the next day to speak to us about what happened. He met with me, my mom, grandmother, sister, aunt, and my dad and brother (who attended over facetime) for about 45 minutes and took notes during the meeting. We described the officers' stop and conduct to him in detail, and how terrifying it was for me. Chief McAllister stated that it was a bad stop, that they should not have done it, and that it was not fair to me. He also said that he had looked into it and the car that was reported stolen that evening was a Dodge Charger, and not a Hyundai like the car I was driving. He described how the E District has had racial profiling problems in part because there are no Black officers that work at night, and that he has been trying to make improvements to the BPD since he became Chief. Chief McAllister said it sounded like the officers did a lot of things wrong, including pulling all the way into our driveway and that any court would see that as a problem. He also told us that this could be a racial discrimination case with the BPD Internal Affairs Division ("Internal Affairs" or "IAD") if I decided to file a complaint. I agreed to file a complaint, and he said he would file the complaint with Internal Affairs on our behalf, and it would then be out of his hands and IAD would contact us. We also asked for my fathers' business card back, and he told us that he would get back to us on that.

20. Chief McAllister later contacted me and my family, and he told us that the officers dropped the card in the yard. I then found the card in our backyard on the grass. I believe the officers dropped it purposefully, because they didn't seem to believe me or care about it that much.

5

21. The BPD subsequently contacted me and my parents, and on April 29, 2024, we went to the BPD Internal Affairs Division for our interview. Unfortunately, I could tell as soon as I shared my story that the complaint would go nowhere because of the types of questions the BPD Internal Affairs Lieutenant asked me and his indifferent attitude. I felt like I was just another story to him. The interview was short and lasted around ten minutes.

22. The BPD's Internal Affairs Lieutenant then interviewed my father while I was present. My father told the BPD IAD Lieutenant that my mother called him during the stop, and that he talked to one of the officers and identified himself as a police officer in Maryland. He described how the officer told him how they stopped the car because they thought it was stolen, and my father told them it was not stolen. My father described how the officer said that they were still going to run a warrant check on me, and my father believed that they didn't have probable cause to do the check and continue to detain me because the car was not stolen. My father also described how they had plenty of time to run my plate before stopping me to see if the car was stolen. He told the IAD Lieutenant that the officers should have gotten off the property at that time and their actions were not constitutional. The interview was short, about four minutes, and the IA Lieutenant didn't ask him any follow-up questions.

23. Six weeks later, around mid-June 2024, I received a letter from BPD informing me that the officers were exonerated. I was disappointed, but not surprised, given the IAD Lieutenant's indifferent attitude and the way he questioned me. I was disappointed because they wasted my time and made me retell this encounter for no reason. They should have just told me from the beginning that my complaint would go nowhere.

24. To this day, I don't know the real reasons why Officers Ammerman and Crawford stopped me. The officers kept giving different reasons for the stop, saying– that they

were looking for a stolen car, that many cars like mine were stolen, that I pulled all the way into my driveway, and that I did not use my blinker when turning. I was terrified by this stop and the police officers' actions because there was no reason or explanation for them to make a U-turn, follow me, and stop me in my driveway. They had time to check my plates before they stopped me, and even after my parents confirmed that the car wasn't stolen, they continued to run my name for warrants and treat me with suspicion, with no basis at all. Their questions were accusatory and demeaning. I believe the officers presumed I had warrants, was on probation, or stole the car only because I am Black.

25.     I was traumatized by this encounter because the officers' actions were so arbitrary and racially discriminatory, and I feared for my life. After this stop and meeting with Chief McAllister, I had to take off from work and leave Buffalo to visit my brother in Virginia. I got sick, and I was hospitalized twice in 24 hours because I couldn't move. I experienced physical pain because I was feeling emotionally and physically drained by the officers' discriminatory and aggressive treatment of me during the traffic stop. I was afraid that it could happen again. The doctors gave me medication to treat my pain.

26.     After this encounter, I continued to think about this encounter daily for about eight months and would feel agitation and frustration when I thought about it. It has been difficult for me to process the way the officers treated me because I know I did not deserve it. Each time I thought about it, it would ruin my day.

27.     Even now when I see a police officer, it brings me back to that moment and those feelings of agitation and frustration. I am a good and cautious driver, but I am anxious about making sure that I follow all traffic rules. Before this encounter, I was never scared of a police officer and would even defend broad criticisms of them, saying that they were both good

officers and bad officers. I am now very scared of the police in Buffalo. I had experienced and heard from family and friends that I should not drive after 9:00 p.m. because the BPD goes out "hunting" and pulls over and even physically harms and roughs up Black men, but I did not want to generalize police behavior. Since this stop, I try not to drive after 9:00 p.m.

28. Within a month after I received the letter from IAD exonerating the officers, Officer Ammerman shot and killed a young Black man, Daevon Roberts, during a traffic stop. I felt that this was unfortunate, and it made me even more scared because it could have been me. I felt if the BPD had held Officer Ammerman accountable for violating my civil rights it may have even prevented this death.

29. This traffic stop was unfortunately not my only encounter with the BPD. On September 21, 2024, the BPD pulled over my brother while I was one of two passengers in a car while we were driving on the East Side of Buffalo. We are all African American. My brother was driving his friends' car, a convertible BMW M8, which is a sports car worth about $100,000, and we had the top down. After he allegedly ran a stop sign, two police cars stopped the car, one in front and one in back. Four white officers approached us and questioned my brother, commenting on how expensive the car was and asking him how he got it, who it belongs to, and how he was driving it. The officers questioned me and the other passenger and asked for all of our driver's licenses for no reason at all. One of the officers said to me, "You look familiar. Have I seen you before?" I had never seen him or had any other negative encounter with the police outside the stop described above, so I felt that he was associating me with criminal activity with his comments. After checking our identification, they let us go. I felt the officers were being racially discriminatory because of the way they treated us, the comments they made about the car, the questions they asked, and running our identification documents.

The officers seemed to presume we were suspicious and needed to be investigated simply because we were Black and driving a nice car on the East Side of Buffalo.

30. These discriminatory experiences with the BPD have been traumatizing, harrowing, and have made me anxious and scared of the police.

31. BPD's traffic stops have also impacted my trust and perception of BPD officers. I now feel I need to act with extreme caution around officers because they are predisposed to think Black people are criminals or suspicious, and it is so hard to counter BPD officers' strong discriminatory presumptions.

32. I continue to work and go to school in the Buffalo area, which requires me to drive regularly in Buffalo. However, I fear another police encounter and traffic stop. To avoid the police, I try to get home early and try to no longer drive after 9:00 p.m. when BPD officers are "hunting," but it is impossible to do sometimes because of my work and school schedule. I try to take the expressway and avoid main roads, especially Bailey Avenue, for fear of being racially profiled again by the Buffalo Police Department, but it is also not possible for me to stay on the highway all the time.

33. I understand that this case was brought as a class action.

34. I am willing to serve as a representative for the Traffic Enforcement Class on behalf of myself and other people whose facts and circumstances are similar to mine. I understand that the Traffic Enforcement Class is seeking a court order declaring the City of Buffalo's traffic enforcement practices unlawful and ordering the City to change its practices.

35. I understand that as a class representative I have a responsibility to protect the interests of the entire class, not just my own interests, and to ensure that my counsel prosecutes the case vigorously and in the interest of all class members. I understand I have an obligation to

communicate with class counsel and participate actively in the litigation. I agree to fulfill my responsibilities as a class representative.

Dated: July 3, 2025

_____
Thomas Christopher Williams, Jr.