# EXHIBIT B

```
 1      UNITED STATES DISTRICT COURT

 2      FOR THE WESTERN DISTRICT OF NEW YORK

 3      -------------------------------------------------

 4      BLACK LOVE RESISTS IN THE RUST, et al.,
        individually and on behalf of a class of
 5      all others similarly situated,

 6                              Plaintiffs,

 7       -vs-                            1:18-cv-00719-CCR

 8      CITY OF BUFFALO, N.Y., et al.,

 9                              Defendants.
        -------------------------------------------------
10

11

12           ORAL EXAMINATION OF DANIEL DERENDA

13              APPEARING REMOTELY FROM

14                 BUFFALO, NEW YORK

15

16

17              November 10, 2021

18              At 9:00 a.m.

19              Pursuant to notice

20

21      REPORTED BY:

22      Rebecca L. DiBello, RPR, CSR(NY)

23      APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK
```

```
 1          R E M O T E   A P P E A R A N C E S

 2   APPEARING FOR THE PLAINTIFFS:

 3              NATIONAL CENTER FOR LAW AND
                ECONOMIC JUSTICE
 4              BY:  CLAUDIA WILNER, ESQ.,
                275 Seventh Avenue, Suite 1506
 5              New York, New York 10001
                (212) 633-6967
 6
                CENTER FOR CONSTITUTIONAL RIGHTS
 7              BY: A. CHINYERE EZIE, ESQ.
                666 Broadway, 7th Floor
 8              New York, New York 10012
                (212) 614-6475
 9
     APPEARING FOR THE DEFENDANTS:
10
                CITY OF BUFFALO LAW
11              DEPARTMENT
                BY: ROBERT E. QUINN,
12              ASSISTANT CORPORATION COUNSEL
                1100 City Hall
13              65 Niagara Square
                Buffalo, New York 14202
14              (716) 851-4326

15

16   ALSO PRESENT:

17          KARINA TEFFT, ESQ.,
            ANJANA  MALHOTRA, ESQ.,
18          RANIT PATEL
            National Center for Law and Economic
19          Justice

20

21

22

23
```

DANIEL DERENDA

1       visibility to curtail a lot of those
2       activities.
3    Q. So when you were picking specifically
4       intersections for traffic checkpoints what
5       information was going into selecting the
6       specific intersections?
7    A. I don't recall picking specific intersections.
8       Are you talking about MRU now or Strike Force?
9    Q. I believe I'm talking about the early days of
10      the Strike Force.
11   A. So in Strike Force I believe I wasn't -- I
12      would occasionally tell them to be in this
13      certain area, but I don't recall specifically
14      on a day-to-day routine of picking locations
15      and/or places.  I believe Lockwood was doing
16      the locations of the roadblocks.  I did for
17      MRU way back as deputy commissioner and,
18      actually, the lieutenants at times picked the
19      locations specific for roadblocks.
20          We would pick the areas that I wanted
21      them to target, meaning what was going on,
22      based on what was going on, is what I best
23      recall.

DANIEL DERENDA

1    Q.  And so that would include, for example, ECAC
2        hotspot data?
3    A.  Yes.  It would include different data from the
4        crime analyst center, complaints from the
5        block clubs, multiple sources.  Council
6        people.  Multiple sources would go into
7        requests for Strike Force in their area.
8    Q.  While they were in a certain area they would
9        run a checkpoint there?
10   A.  Correct, in most cases.
11   Q.  And you would leave it to the discretion of
12       the lieutenants to determine where within the
13       areas they would set the checkpoints?
14   A.  I believe -- the actual location meaning what
15       corner?
16   Q.  Correct.
17   A.  I'm sure sometimes I requested it to be in
18       some areas.  I'm sure chiefs did or the deputy
19       did, but I believe at times they had the
20       discretion to determine where to put the
21       checkpoints, but I'm also sure that on
22       occasions that command staff also did based on
23       whatever information that was coming through

DANIEL DERENDA

1  Once I became commissioner MRU
2  disappeared and we disbanded the unit and we
3  re-formed the Strike Force.  I don't know how
4  many years in between.  I didn't have -- it
5  was no longer my job to be assigning them to
6  different locations.  You have deputy
7  commissioner of operations.  Lockwood overseen
8  the housing.  We put him in charge of housing,
9  Strike Force and the schools because we put
10 him all together so he overseen those units
11 and, generally speaking, he would assign them
12 where they would be.
13     Occasionally maybe I would chime in
14 based on something, based on somebody
15 requesting that I knew about, but the
16 day-to-day stuff I didn't handle.  I had too
17 many other things on my plate that I didn't
18 have years before.
19 Q. Now, you expected Strike Force officers to
20    issue a lot of traffic tickets, right?
21 A. I expected Strike Force officers to be
22    proactive and out doing their job making
23    arrests, writing summonses, writing parking

DANIEL DERENDA

1    tickets, writing city ordinances to be visible
2    and out doing their job proactive, correct.
3         MR. QUINN:  Form to the last question.
4  Q. And you mentioned a number of kinds of things
5    you expected them to do; summonses, parking
6    tickets, city ordinances.
7         What are city ordinances?
8  A. City ordinance could be anything from whether
9    -- high grass was one of them.  We used to
10   have specific details and walk through
11   neighborhoods writing summonses based on city
12   ordinances.  Loud music, high grass, whatever
13   it may be, and the purpose for that was to get
14   officers out of their cars walking down the
15   streets, getting back to what we talked about,
16   high visibility.
17        So when they're out doing something,
18   when they're out walking, when they're out
19   stopping vehicles for traffic violations,
20   they're highly visible and I believe that has
21   a major effect in reducing overall crime and
22   other things.
23 Q. When you felt that Strike Force officers had

Case 1:18-cv-00719-CCR   Document 331-2   Filed 08/01/25   Page 8 of 10
104

DANIEL DERENDA

1  low production you let them know, didn't you?
2             MR. QUINN:  Object to the form.
3     A.  If I seen a report and I seen that they
4     weren't doing anything, so if you have ten
5     officers working on a shift and you don't see
6     any arrests and there's no summonses, then
7     they're telling me they're not out doing what
8     they need to be doing, so yes, I would let
9     somebody know if I didn't think they were
10    being out there.
11            Again, when you're not tied to the radio
12    and you're not answering calls you have a lot
13    of time to be proactive and enforce traffic
14    laws, do other things and when you're not --
15    again, I always had the philosophy of what
16    gets measured gets done, so they were forced
17    to do reports every shift and you can see if
18    they're doing things or they're not doing
19    things and there's times depending on holidays
20    or whatever you'd see low numbers because of a
21    couple of reasons.
22            Probably low manpower and people are
23    home and not driving and nobody is out and

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

DANIEL DERENDA

1   about and things aren't happening.  Crime is
2   not happening.  So there's reasons sometimes
3   why they're not, but there's other times that
4   you see low numbers in general and you start
5   to wonder if they're out on the street being
6   visible doing what they're supposed to be
7   doing.
8  Q. So the traffic summonses, the tickets, parking
9   tags, the city ordinances, all of that is a
10  way for you to tell whether the Strike Force
11  officers are out there in the street?
12 A. If they're out there zero tolerance enforcing
13  laws, violations, if they're out there about
14  on the street at times walking, at times
15  driving, whatever, that tells me they're out
16  working.
17       MR. QUINN:  Form of the last question.
18 Q. And you also had to report those numbers up to
19  the mayor, correct?
20 A. I didn't have to report the numbers up to the
21  mayor.  Did I report numbers up to the mayor?
22  I'm sure I did.  But no, I didn't have to
23  report numbers to the mayor.

```
 1       STATE OF NEW YORK)

 2       COUNTY OF ERIE    )

 3


 4
           I, Rebecca Lynne DiBello, CSR, RPR, Notary
 5       Public, in and for the County of Erie, State of
         New York, do hereby certify:
 6

 7         That the witness whose testimony appears
         hereinbefore was, before the commencement of
 8       their testimony, duly sworn to testify the
         truth, the whole truth and nothing but the
 9       truth; that said testimony was taken pursuant
         to notice at the time and place as herein set
10       forth; that said testimony was taken down by me
         and thereafter transcribed into typewriting,
11       and I hereby certify the foregoing testimony is
         a full, true and correct transcription of my
12       shorthand notes so taken.

13
           I further certify that I am neither counsel
14       for nor related to any party to said action,
         nor in anyway interested in the outcome
15       thereof.

16
           IN WITNESS WHEREOF, I have hereunto
17       subscribed my name and affixed my seal this
         14th of November, 2021.
18

19
                        *Rebecca L. DiBello*
20
                      _____
21                       Rebecca Lynne DiBello, CSR, RPR

22

23
```

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544