UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BLACK LOVE RESISTS IN THE RUST by and
through its Co-Directors Natasha Soto and Shaketa
Redden and on behalf of its members; DORETHEA
FRANKLIN; TANIQUA SIMMONS; DE'JON HALL;
JOSEPH BONDS; CHARLES PALMER; SHIRLEY
SARMIENTO; EBONY YELDON; and JANE DOE,
individually and on behalf of a class of all others
similarly situated;

Plaintiffs,

v.                                                                    Civil No.: 1:18-cv-00719-CCR

CITY OF BUFFALO, NY; BYRON B. BROWN,
Mayor of the City of Buffalo, in his individual and
official capacities; BYRON C. LOCKWOOD,
Commissioner of the Buffalo Police Department, in
his individual and official capacities; DANIEL DERENDA,
former Commissioner of the Buffalo Police Department,
in his individual capacity; AARON YOUNG, KEVIN
BRINKWORTH, PHILIP SERAFINI, ROBBIN
THOMAS, UNKNOWN SUPERVISORY
PERSONNEL 1-10, UNKNOWN OFFICERS 1-20,
each officers of the Buffalo Police Department, in their
individual capacities.

Defendants.

---

**REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**HODGSON RUSS LLP**
*Attorneys for Defendants City of Buffalo, NY, Byron B. Brown, Byron C. Lockwood, Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, and Unknown Officers 1-20*
Hugh M. Russ III, Esq.
Peter Sahasrabudhe, Esq.
Cheyenne N. Freely, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000
hruss@hodgsonruss.com
psahasra@hodgsonruss.com
cfreely@hodgsonruss.com

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION ..................................................................................................................1

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ........................................................................................................................2

POINT I.    PLAINTIFFS' MOTION PAPERS CONTAIN IMPROPER
EVIDENCE WHICH SHOULD BE DISREGARDED BY THE
COURT ......................................................................................................2

    A.    The Declaration of the IAD Witness Should Not Be Considered by
this Court....................................................................................................2

    B.    Plaintiffs' Anecdotal Evidence is Irrelevant to the Motion for
Summary Judgment and Contradicts Plaintiffs' Class Certification
Arguments...................................................................................................3

    C.    Plaintiffs' Historical "Evidence" is Irrelevant to the Resolution of
this Motion..................................................................................................4

    D.    Plaintiffs' Expert Reports Do Not Support their Claims. ...........................5

    E.    The Timing of the City's Motion is Proper and Appropriate. ....................5

POINT II.    PLAINTIFFS CONCEDE THAT CERTAIN DEFENDANTS
SHOULD BE DISMISSED AND THAT BLRR LACKS
STANDING ................................................................................................6

POINT III.    THE CITY HAS SATISFIED ITS PRIMA FACIE BURDEN ON
SUMMARY JUDGMENT .........................................................................7

    A.    The City Adequately Addressed the Discriminatory Intent Element
of Plaintiffs' Claims...................................................................................7

    B.    The City Met its Burden with respect to Plaintiffs' Tinted
Windows Claim. .......................................................................................11

    C.    The City Has Sufficiently Shown that it is Entitled to Judgment as
a Matter of Law on Plaintiffs' Due Process Claims. ...............................12

POINT IV.    THE CITY IS ENTITLED TO JUDGMENT AS A MATTER OF
LAW ON PLAINTIFFS' CLAIMS ..........................................................13

i

# TABLE OF CONTENTS - cont'd

PAGE

A.     Plaintiffs' Due Process Claim Fails as a Matter of Law. ...........................13

B.     Plaintiffs' Equal Protection Claim Fails as a Matter of Law. ...................18

C.     Plaintiffs' Title VI Claim Fails as a Matter of Law. ................................21

D.     Plaintiffs Abandoned their Non-Checkpoint Fourth Amendment
       Claims. ....................................................................................................23

E.     Plaintiffs' Checkpoint-Related Fourth Amendment Claims Should
       be Dismissed. ..........................................................................................23

POINT V.     FORMER MAYOR BROWN SHOULD BE DISMISSED FROM
             THIS ACTION ..............................................................................39

POINT VI.    PLAINTIFFS' INJUNCTIVE RELIEF CLAIMS MUST BE
             DISMISSED ..................................................................................43

A.     Denial of Certification for the Traffic Enforcement Class was not
       Clearly Erroneous. ..................................................................................44

B.     No New Evidence Warrants Reconsideration. ..........................................48

C.     Plaintiffs Cannot Show a Realistic Threat of Future Injury. ...................49

D.     Plaintiffs Seek Prohibited "Obey the Law" Injunctive Relief. .................51

POINT VII.   DEFENDANTS BROWN, LOCKWOOD, AND DERENDA ARE
             ENTITLED TO QUALIFIED IMMUNITY ..................................53

A.     As a Matter of Law, the Individual Defendants Did Not Violate
       Plaintiffs' Clearly Established Rights. ......................................................54

CONCLUSION ...................................................................................................55

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Ben-Levy v. Bloomberg L.P.*,
    2012 WL 2477685, at *4 (S.D.N.Y. June 26, 2012) ......................................................... 37

*Bentley-Ammonds v. Northwell Health, Inc.*,
    2022 WL 893716, at *1 (2d Cir. Mar. 28, 2022) .................................................................... 7

*Bhanusali v. Orange Reg'l Med. Ctr.*,
    2012 WL 13059694, at *8 (S.D.N.Y. Jan. 20, 2012) ........................................................... 22

*Black Lives Matter Los Angeles v. City of Los Angles*,
    113 F. 4th 1249, 1263 (9th Cir. 2024) ................................................................................ 20

*Black Lives Matter v. Town of Clarkstown*,
    354 F. Supp. 3d 313, 322 (S.D.N.Y. 2018) ........................................................................... 6

*Brown v. Tex.*,
    443 U.S. 47, 50-51 (1979) .................................................................................................. 33

*Brucker v. City of Doraville*,
    38 F.4th 876 (11th Cir. 2022) ................................................................................ 14, 15, 16

*Burton v. City of Belle Glade*,
    178 F.3d 1175 (11th Cir. 1999) ........................................................................................... 53

*Bustamante v. KIND, LLC*,
    100 F.4th 419, 432 (2d Cir. 2024) ........................................................................................ 7

*Celotex Corp v. Catrett*,
    477 U.S. 317, 325 (1986) ................................................................................................. 7, 54

*Chandler v. Miller*,
    520 U.S. 305, 306 (1997) ................................................................................................ 32, 34

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .................................................................................................. 46, 49, 50

*Coleman v. Town of Brookside*,
    663 F. Supp. 3d 1261, 1272 (N.D. Ala. 2023) ................................................................... 15

*Collins v. City of N.Y.*,
    295 F. Supp. 3d 350, 361 (S.D.N.Y. 2018) ..................................................................... 7, 23

*Comer v. Cisneros*,
    37 F.3d 775 (2d Cir. 1994) ............................................................................................ 46, 47

## <u>TABLE OF AUTHORITIES - cont'd</u>

<u>PAGE</u>

*Doe v. McDonald*,
128 F.4th 379, 384 (2d Cir. 2025) ................................................ 46

*Evolution Mkts., Inc. v. Alpental Energy Partners, LLC*,
221 F. Supp. 3d 361, 363 (S.D.N.Y. 2016) ............................ 3

*Ezeh v. McDonald*,
2015 WL 13951087, at *1 (W.D.N.Y. May 20, 2015)................ 54

*Faulk v. N.Y.C. Dep't of Cor.*,
2014 WL 239708, at *10 (S.D.N.Y. Jan. 21, 2014) ............... 40

*Ferguson v. City of Charleston*,
532 U.S. 67, 82 (2001)................................................ 30, 32

*First State Ins. Co. v. Ferguson Enters., Inc.*,
2019 WL 2521838, at *5 (D. Conn. June 18, 2019)................ 48

*Floyd v. City of N.Y.*,
283 F.R.D. 153, 169 (S.D.N.Y. 2012) ............................ 51

*Grandy v. Manhattan & Bronx Transit Operating Auth.*,
2018 WL 4625768, at *3 (S.D.N.Y. Sep. 26, 2018)................ 23

*Grullon v. City of New Haven*,
720 F.3d 133, 138-139 (2d Cir. 2013) ............................ 40

*Gumbs*,
2018 WL 558526, at *11 ................................................ 30, 31

*Harewood v. N.Y.C. Dep't of Educ.*,
2021 WL 673476, at *7 (S.D.N.Y. Feb. 22, 2021)................ 54

*Hawthorne by Hawthorne v. Cnty. of Putnam*,
492 F. Supp. 3d 281, 294 (S.D.N.Y. 2020) ...................... 39, 40

*Jackson v. Mastrangelo*,
582 F. Supp. 3d 91, 99 (W.D.N.Y. 2022)............................ 7

*Jobie O. v. Spitzer*,
2007 WL 4302921, at *10-11 (S.D.N.Y. Dec. 5, 2007)................ 45, 46, 47, 48

*Joyce v. Remark Holdings, Inc.*,
2022 WL 179839, n.1 (S.D.N.Y. Jan. 20, 2022) ................ 44

*Knelman v. Middlebury Coll.*,
898 F. Supp. 2d 697, 708 (D. Vt. 2012) ............................ 7

## TABLE OF AUTHORITIES - cont'd

PAGE

*Ladner v. City of N.Y.*,
  20 F. Supp. 2d 509, 519 (E.D.N.Y. 1998) ................................................ 41

*League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*,
  737 F.2d 155, 10 (2d Cir. 1984) ............................................................... 6

*Ligon v. City of N.Y.*,
  288 F.R.D. 72, 81 (S.D.N.Y. 2013) .......................................................... 51

*Luna v. Pico*,
  356 F.3d 481, 490 (2d Cir. 2004) ............................................................ 54

*Lusardi v. Xerox Corp.*,
  975 F.2d 964, 983 (3d Cir. 1992) ............................................................ 47

*Lynch v. City of N.Y.*,
  589 F.3d 94, 102 (2d Cir. 2009) .............................................................. 27

*MacIsaac v. Town of Poughkeepsie*,
  770 F. Supp. 2d 587, 601 (S.D.N.Y. 2011) ............................................. 50

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290, 307 (2d Cir. 2008) ............................................................ 16

*Malley v. Briggs*,
  475 U.S. 335, 341 (1986) ......................................................................... 54

*Manza v. Newhard*,
  915 F. Supp. 2d 638, 650 (S.D.N.Y. 2013) ....................................... 53, 54

*Marshall v. Jerrico*,
  446 U.S. 238 (1980) ................................................................................. 15

*Mateo v. Fischer*,
  682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) ............................................. 40

*McCleskey v. Kemp*,
  481 U.S. 279, 298, n.20 (1987) ..................................................... 4, 20, 21

*McLennon v. City of N.Y.*,
  171 F. Supp. 3d 69, 79 (E.D.N.Y. 2016) ................................................ 49

*Mich. Dep't of State Police v. Sitz*,
  496 U.S. 444, 445 (1990) ......................................................................... 27

*Miller v. Sutton*,
  2016 WL 3976540, at *10 (D. Conn. July 21, 2016) .............................. 44

**TABLE OF AUTHORITIES - cont'd**

PAGE

*Moore v. City of N.Y.*,
  2017 WL 35450, at *11 (S.D.N.Y. Jan. 3, 2017) ................................................. 22

*Moore v. Bitca*, 19-cv-00035, 2020 WL 5821378, at *23 (D. Vt. Sep. 30, 2022) ............11

*Murphy v. City of Rochester*,
  986 F. Supp. 2d 257, 273 (W.D.N.Y. 2013)................................................. 7, 23

*NAACP Del. v. City of Wilmington*,
  2025 WL 1927620, at *4 (D. Del. July 14, 2025) ................................................. 50

*Nat'l Treasury Emps. Union v. Von Raab*,
  489 U.S. 656, 665-666 (1989) ................................................. 32, 34

*Navarro v. McCarthy*,
  2023 WL  8375858, at *21-22 (W.D.N.Y. Dec. 4, 2023) (Wolford, C.J.)................. 20, 21

*Nelsen v. King Cnty.*,
  895 F.2d 1248, 1251 (9th Cir. 1990) ................................................. 50

*Neubecker v. N.Y.S.*,
  387 F. Supp. 3d 302, 303-304 (W.D.N.Y. 2019) ................................................. 44

*Nick's Garage Inc. v. Progressive Cas. Ins. Co.*,
  875 F.3d 107, 115-116 (2d Cir. 2017) ................................................. 8, 9

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)................................................. 46, 49

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
  322 F.3d 147, 167 (2d Cir. 2003) ................................................. 43

*Omidian v. Bd. of Educ. of New Hartford Cent. Sch. Dist.*,
  2009 WL 904077, n. 13 (N.D.N.Y. Mar. 31, 2009) ................................................. 41

*Outerbridge v. City of N.Y.*,
  2015 WL 5813387, at *4 (S.D.N.Y. Sep. 30, 2015)................................................. 41

*People v. Edwards*,
  101 A.D.3d 1643, 1644 (4th Dep't 2012)................................................. 31

*People v. Edwards*,
  2012 WL 13168759 (4th Dep't Nov. 26, 2012) ................................................. 32

*People v. Pastrana*,
  41 N.Y.3d 23, 27 (2023)................................................. 25

## TABLE OF AUTHORITIES - cont'd

PAGE

*People v. Scott*,
  63 N.Y.2d 518, 527 (1984) ........................................................................... 35, 37

*Peregrine Myanmar Ltd. v. Segal*,
  89 F.3d 41, 51 (2d Cir. 1996) ............................................................................. 51

*Prouse*,
  440 U.S. 648 ................................................................................... 35, 37, 25

*Pyke v. Cuomo*,
  1995 WL 694624, at *4 (N.D.N.Y. 1995) ........................................................... 19

*Quire v. City of New York*,
  2021 WL 293819, at *6 (S.D.N.Y. Jan. 28, 2021) ............................................... 14

*report and recommendation adopted by*,
  2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017) ..................................................... 22

*Reynolds v. Sch. Dist.*
  *No. 1*, 69 F.3d 1523, 1532 (10th Cir. 1995) ...................................................... 22

*Robidoux v. Celani*,
  97 F.2d 931 (2d Cir. 1993) ................................................................................. 46

*Rodriguez v. City of N.Y.*,
  2023 WL 3304565, at *4 (S.D.N.Y. Jan. 20, 2023) ...................................... 40, 41

*Saucier v. Katz*,
  533 U.S. 194, 202 (2001) ................................................................................... 54

*Shain v. Ellison*,
  356 F.3d 211 (2d Cir. 2004) ............................................................................... 46

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255, 257 (2d Cir. 1995) ......................................................................... 44

*Souza v. Exotic Island Enters., Inc.*,
  68 F.4th 99, 108 (2d Cir. 2023) ............................................................................ 7

*Stinson v. City of N.Y.*,
  282 F.R.D. 360, 382 (S.D.N.Y. 2012) ................................................................. 51

*that were presented to it on the underlying motion." Perreca v. Gluck*,
  262 F. Supp. 2d 269, 272 (S.D.N.Y. 2003) ........................................................ 45

*Torcivia v. Suffolk Cnty., N.Y.*,
  17 F.4th 342, 359 (2d Cir. 2021) .................................................................. 33, 34

**TABLE OF AUTHORITIES - cont'd**

<u>PAGE</u>

*Torres v. City of New York*,
  590 F. Supp. 3d 610, 621-624 (S.D.N.Y. 2022) ............................................................. 13, 14

*Travelers Indem. Co. v. Northrop Grumman Corp.*,
  3 F. Supp. 3d 79, 97 (S.D.N.Y. 2014),
  *aff'd*, 677 F. App'x 701 (2d Cir. 2017) ....................................................................... 1, 23

*Trotter*,
  28 A.D.3d 165 ................................................................................................ 30, 31, 32

*Tumey v. State of Ohio*,
  273 U.S. 510, 523 (1927) ............................................................................................. 15

*Turner*,
  2020 WL 733187 at *4 ................................................................................................. 27

*U.S. v. Bernacet*,
  724 F.3d 269, 273 (2d Cir. 2013) ................................................................................. 25

*U.S. v. Bowman*,
  496 F.3d 685 (D.C. Cir. 2007) ............................................................................. 30, 31, 25

*U.S. v. Davis*,
  270 F.3d 977 (D.C. Cir. 2001) ..................................................................................... 30

*U.S. v. Faulkner*,
  450 F.3d 466, 472-473 (9th Cir. 2006) .......................................................................... 36

*U.S. v. Fraire*,
  575 F.3d 929, 933 (9th Cir. 2009) ........................................................................... 35, 36

*U.S. v. Henson*,
  351 F. App'x 818, 821 (4th Cir. 2009) ...................................................................... 25, 55

*U.S. v. Hudson*,
  2007 WL 1656282 (D.D.C. June 5, 2007) ....................................................................... 36

*U.S. v. McFayden*,
  865 F.2d 1306, 1313 (D.C. Cir. 1989) ....................................................................... 55, 25

*U.S. v. Regan*,
  218 F. App'x 902, 904 (11th Cir. 2007) ..................................................................... 25, 27

*U.S. v. Whiton*,
  48 F.3d 356, 358 (8th Cir. 1995) ................................................................................. 19

*Vaughn v. Consumer Home Mortg. Co., Inc.*,
  297 F. App'x 23, n.2 (2d Cir. 2008) ............................................................................. 47

## <u>TABLE OF AUTHORITIES - cont'd</u>

<u>PAGE</u>

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
  956 F.2d 1245, 1255 (2d Cir. 1992) ..................................................... 43

*Vitolo v. Guzman*,
  999 F.3d 353, 362 (6th Cir. 2021) ....................................................... 11

*Wagner II*,
  2012 WL 1077527, (2d Cir. Mar. 17, 2012) ...................................... 28

*Wagner v. Swarts*,
  827 F. Supp. 2d 85, 94 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F.
  App'x 500 (2d Cir. 2012) ............................................................ passim

*Wakefield v. Scott*,
  2021 WL 10342467 (D. Vt. June 24, 2021) ....................................... 52

*Walker v. City of Calhoun, Ga.*,
  682 F. App'x 721, 724 (11th Cir. 2017) ............................................. 53

*Wilkins v. City of Chicago*,
  736 F. Supp. 3d 616, 622 (N.D. Ill. 2024) ......................................... 23

*Williams v. City of Aurora*,
  2024 WL 1195515, at *9 (N.D.Ill. Mar. 20, 2024) ............................ 49

**Rules & Regulations**

Fed. R. Civ. P. 65(d) .......................................................................... 51

Fed. R. Civ. P. 105 ............................................................................. 54

ix

**INTRODUCTION**

The City of Buffalo, former Mayor Byron B. Brown, Byron C. Lockwood, Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, and Unknown Officers 1-20 (collectively "the City" or "the City Defendants"), respectfully submit this reply memorandum of law in response to Plaintiffs' opposition and in further support of their Motion for Summary Judgment.

**PRELIMINARY STATEMENT**

If a party's entitlement to summary judgment were measured in the number of pages filed, or pounds of paper submitted, this motion would be no contest: Plaintiffs would dominate. Their 121-page brief and 104-page Rule 56 Statement of Facts, in particular, dwarf the City's corresponding papers. But volume is not as important as content, as this Court well knows. Another court has explained:

> The mere fact that submissions on summary judgment are extensive. . . does not mean that there is a genuine issue for trial. Such extensive submissions may mean that the record is simply a large one. The facts material to resolution of the motion may nonetheless be undisputed by competent evidence. The size of submissions may also be tactical—meant by the non-movant to convey a sense that "there must be *something* that would preclude summary judgment in here!"

*Travelers Indem. Co. v. Northrop Grumman Corp.*, 3 F. Supp. 3d 79, 97 (S.D.N.Y. 2014), *aff'd*, 677 F. App'x 701 (2d Cir. 2017)(emphasis in original). The volume of Plaintiffs' submissions in opposition to the City's Motion does not, in and of itself, create an issue of fact. Neither does the content of the submissions. Plaintiffs use their Opposition as an opportunity to inundate the

Court with purported issues they intend to raise, rather than arguments that actually address those proffered by the City in its Motion.

Setting aside the volume of Plaintiffs' submissions, Plaintiffs' arguments in opposition are riddled with cherry-picked, misleading quotations from authority and the record; distortions of the record evidence; and feigned issues of fact that do not bear on the claims actually before the Court. Plaintiffs' arguments do not preclude summary judgment. For the reasons provided here, as well as in the City's Memorandum of Law in Support of its Motion for Summary Judgment and Memorandum of Law in Opposition to Plaintiffs' Partial Motion for Summary Judgment, the City respectfully requests that the Court grant the City's Motion and dismiss Plaintiffs' claims.

## **ARGUMENT**

**POINT I.**     **PLAINTIFFS' MOTION PAPERS CONTAIN IMPROPER EVIDENCE WHICH SHOULD BE DISREGARDED BY THE COURT**

Plaintiffs' opposition papers are replete with inappropriate and prejudicial materials. The Court should not consider the materials which are not properly part of the summary judgment record.

### **A.**     **The Declaration of the IAD Witness Should Not Be Considered by this Court.**

The Court should not consider the Declaration of the IAD Witness that Plaintiffs purport to file under seal. *See* Dkt. No. 296. As Plaintiffs' counsel should know, per W.D.N.Y. Local Rule 5.3, a party seeking to have a document filed under seal must make a motion to seal. Plaintiffs have not done so here. "There is a presumption of public access to documents filed in

connection with judicial proceedings, which means that no litigant in a court of law has a right to keep evidence secret and no filing may be made under seal without the permission of the court." *Evolution Mkts., Inc. v. Alpental Energy Partners, LLC*, 221 F. Supp. 3d 361, 363 (S.D.N.Y. 2016). Courts within this Circuit are "particularly hostile" to efforts like those demonstrated by Plaintiffs to "litigate in secret and under seal." *Id.* The Court should reject Plaintiffs' improper submission filed "under seal."

**B.**     **Plaintiffs' Anecdotal Evidence is Irrelevant to the Motion for Summary Judgment and Contradicts Plaintiffs' Class Certification Arguments.**

In Section C (3)(d) of their opposition brief, Plaintiffs, openly announce, "Plaintiffs' trial presentation will include expert and anecdotal evidence demonstrating a widespread custom and practice of racially discriminating traffic enforcement." Dkt. No. 321, pp. 75-76. They also use "anecdotal evidence" as a title in their Rule 56 statement. *See* Dkt. No. 319, p. 67. The phrase "anecdotal evidence" appears to involve the telling of individual stories concerning examples of alleged discrimination. By its very definition "anecdotal evidence" implicates individual, and not common, review and analysis.

For the following reasons, the City does not believe that anecdotal evidence is necessary, or even relevant, in resolving Plaintiffs' claims. As a matter of law, the Court can and should rule in the City's favor regardless of Plaintiffs' anecdotal evidence. However, if the Court were to believe Plaintiffs' argument that anecdotal evidence is relevant to the resolution of Plaintiffs' claims, that would directly contradict the arguments Plaintiffs made in favor of class certification.   As many times as Plaintiffs try to convince this Court that common questions predominate, their accounts of the evidence they plan to introduce confirm that there is no

predominance. In their Rule 56 Statement of Facts, for example, Plaintiffs describe the claims of

Quentin Suttles (Dkt. No. 319, p. 52); Bruce McNeil (*Id.* at p.72); Michael Taylor (*Id* at p. 73)

and several more unnamed individuals (*Id.* at p.74). Each claim is different. Each involves

different actors and circumstances. Each  requires an individual inquiry to determine whether

discriminatory intent, ***by a specific officer***, motivated the encounter in the first instance.

These accounts really have no bearing on summary judgment, but they do on class

certification. There is no predominance of common questions on liability. And, since the

circumstances are different for each individual, there are no common questions for damages,

either.  In short, while not necessarily relevant to this motion, it is plain that Plaintiffs misled the

Court when they argued that they would try to prove their claims with common evidence on

issues that predominate for all class members.

**C.      Plaintiffs' Historical "Evidence" is Irrelevant to the Resolution of this Motion.**

Plaintiffs extensively recount the history of Buffalo's development and growth as

a city. In particular, through the report of Dr. Silverman, they relate the history of segregation

and the resulting establishment of the virtually all-Black neighborhoods on the East Side.

Plaintiffs recount the structural racism that continues to shape life in Buffalo, despite the

considerable efforts of its government and citizens to transform these institutions. While the

history can be fascinating, with all due respect, the history is entirely irrelevant to these

proceedings.  *McCleskey v. Kemp*, 481 U.S. 279, 298, n.20 (1987) (analyzing claim of State-wide

discrimination and explaining "unless historical evidence is reasonably contemporaneous with

the challenged decision, it has little probative value"). What is relevant involves considering what motivated individual officers in the stops challenged and what transpired in their stops.

## D.    **Plaintiffs' Expert Reports Do Not Support their Claims.**

Plaintiffs extensively rely upon their purported experts, Michael Gennaco and David Bjerk, to support their arguments and to bolster their Local Rule 56 Statement of "Facts". Gennaco provided, as fact, his opinion that BPD policies and practices have contributed to racially disparate and disproportionate policing. *See* Dkt. No. 273-1, p. 20. Dr. Bjerk offered "statistical analysis" in an effort to demonstrate that the sum total of discretionary actions on the part of Buffalo police officers amounts to discriminatory treatment. *See* Dkt. Nos. 268-12; 273; 317-10. While such musings might assist a jury, if we ever get there, they have no place in the summary judgment calculus. Their pronouncements are not facts—these individuals have no personal knowledge of any interaction that have taken place between a potential class member and a BPD officer. Especially irrelevant are the comparisons of Buffalo to other cities. How these comparisons have any relevance to these proceedings is baffling. Also irrelevant is the statement that Buffalo's Black community "distrusts" the Buffalo Police Department. *See* Dkt. No. 273-1, p. 35. Again, their characterizations add nothing to the summary judgment analysis. They are designed only to inflame this Court and to prejudice the City.

## E.    **The Timing of the City's Motion is Proper and Appropriate.**

Plaintiffs contend that summary judgment is premature, because they continue to engage is discovery. Dkt. No. 321, p. 116. Although Plaintiffs may want to obtain further discovery from the City, that discovery is not necessary. It is superfluous. Up to the time of this

writing, Plaintiffs continue to request police bodycam footage from transactions in 2024 and 2025. At the same time, they argue that the proposed classes be determined as of the time of their complaint in 2018. Plaintiffs have taken seven years and demanded more from the City in this case than has ever been demanded from it in any other litigation.  Information concerning transactions which occurred years after the complaint cannot possibly be relevant, especially now that there is no class-wide injunctive relief at issue given the Court's ruling on Plaintiffs' Motion for Class Certification.

**POINT II.**    **PLAINTIFFS CONCEDE THAT CERTAIN DEFENDANTS SHOULD BE DISMISSED AND THAT BLRR LACKS STANDING**

At the outset, Plaintiffs explicitly conceded to the dismissal of Defendants Chief Aaron Young ("Chief Young"), Lieutenant Kevin Brinkworth ("Lt. Brinkworth"), Captain Philip Serafini ("Capt. Serafini"), Officer Robbin Thomas, and the 10 Unknown Officers and Supervisors. Dkt. No. 321, pp. 3-4. Without hesitation, these Defendants should be dismissed from this action.

Additionally, and tellingly, in their hundreds of pages, Plaintiffs fail entirely to address the City's argument that Plaintiff Black Love Resists in the Rust ("BLRR") lacks standing to assert the rights of Black and Latino residents and motorists within the City of Buffalo. As a matter of law, BLRR does not have standing to assert the rights of its members in § 1983 cases because "the rights § 1983 secures are personal to those purportedly injured." *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 322 (S.D.N.Y. 2018) (citing *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 10 (2d Cir. 1984)). Plaintiffs' failure to address this argument should be deemed an abandonment of their

claims insofar as they are asserted by BLRR. *See Murphy v. City of Rochester*, 986 F. Supp. 2d 257, 273 (W.D.N.Y. 2013); *Collins v. City of N.Y.*, 295 F. Supp. 3d 350, 361 (S.D.N.Y. 2018). Because Plaintiffs fail to contest this issue, BLRR should be dismissed from this action for lack of standing, and thereby removed as a plaintiff.

**POINT III.**     <u>**THE CITY HAS SATISFIED ITS PRIMA FACIE BURDEN ON SUMMARY JUDGMENT**</u>

**A.**     <u>**The City Adequately Addressed the Discriminatory Intent Element of Plaintiffs' Claims.**</u>

Plaintiffs' first argument in opposition to the City's Motion is misguided and flatly contradicted by well-established law. "On a motion for summary judgment, a defendant 'may discharge its burden of proof merely by pointing to an absence of evidence to support an essential element of Plaintiff's claim.'" *Jackson v. Mastrangelo*, 582 F. Supp. 91, 99 (W.D.N.Y. 2022); *see also Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case."); *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 708 (D. Vt. 2012) (C.J. Reiss). Several subsequent Second Circuit cases have confirmed this principle of law. *See, e.g.*, *Bustamante v. KIND, LLC*, 100 F.4th 419, 432 (2d Cir. 2024); *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023); *Bentley-Ammonds v. Northwell Health, Inc.*, 2022 WL 893716, at *1 (2d Cir. Mar. 28, 2022). By ignoring this standard, Plaintiffs misunderstand the City's arguments in support of its Motion.

First, the City does not argue that Plaintiffs failed to produce any evidence of discriminatory intent. The City argues that there *is* no evidence of discriminatory intent. Specifically, the City maintains that "Plaintiffs *have* no evidence that BPD implemented a policy that classified individuals based on their race." Dkt. No. 252-46, p. 31; *see also id.* ("The evidence fails to show any discriminatory intent by City Officials."); *id.* at p. 32 ("As revealed through discovery, there is no evidence that any BPD Commissioner or official sought to disadvantage or negatively impact minority motorists."). By advancing this argument, the City discharged its burden of proof by pointing to a total absence of evidence to support Plaintiffs' Equal Protection Clause claim. In *Nick's Garage Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115-116 (2d Cir. 2017)—the case Plaintiffs tout as being fatal to the City's Motion—the Second Circuit held that the movant's summary judgment papers were deficient, because the movant "merely asserted—without support or explanation" that the non-movant had failed to produce evidence to support its claims. That is far from what the City has done here. The City's Motion explains, at length, how there is no evidence to support Plaintiffs' discriminatory intent element of their Equal Protection Claim, how the evidence Plaintiffs have gathered does not support an inference or finding of discriminatory intent, and how this overall lack of evidence entitles the City Defendants to summary judgment. That is a far cry from a mere assertion without support or explanation.

Second, even if the City's argument were that Plaintiffs had not produced any evidence to support their claim, that would still be enough to satisfy the City's *prima facie* burden on summary judgment. Plaintiffs contend that the Second Circuit's language is that "unless the moving defendant cites portions of the record that show its entitlement to judgment,

8

an assertion by the defendant that the plaintiff has not produced any evidence, without more, does not show that the plaintiff has insufficient evidence" and "such a statement fails to show either that there is no genuine dispute as to any material fact or that the defendant is entitled to judgment as a matter of law." Dkt. No. 321, p. 4. But this cherry-picked quotation from *Nick's Garage* distorts the actual standard applied in that case, which is consistent with the Second Circuit's prior and subsequent holdings. "A moving defendant's mere assertion that a plaintiff 'has not produced' evidence that could prove its claims fails to show that the plaintiff lacks the necessary evidence, *unless* defendant also shows that plaintiff was obligated by discovery demand or court order to produce the evidence or that he voluntarily undertook to make the showing." *Nick's Garage*, 875 F.3d at 115. Plaintiffs are under such an obligation here. In the City's First Request for Production of Documents, the City requested, among other things, "Each and every document upon which Plaintiffs rely on, or intend to rely on at trial, in support of the allegations in the Amended Complaint." *See* Sahasrabudhe Decl., Exhibit H, p. 7. Even though Plaintiffs have contributed thousands of pages to this record, their showing on this issue is insufficient.  Size does not replace content.

Third, even if the City's Motion were deemed deficient for this reason—which it is not—"[a] plaintiff confronted with such a facially deficient motion sometimes cures defendant's error by undertaking to set forth the totality of its evidence in its opposition papers." *Id.* at 116. Plaintiffs' extensive submissions in opposition would clearly serve that purpose. As the Court no doubt recognizes, Plaintiffs dedicate nearly sixty pages of their Memorandum of Law to arguing that genuine issues of material fact preclude summary judgment on their Equal Protection Claims. *See* Dkt. No. 321 § III. Subsection III.C. of their argument brags that

"Plaintiffs have amassed a powerful evidentiary record" to show discriminatory intent and that

such evidence is "overwhelming." *Id.* at p. 45. Plaintiffs proceed to offer evidence that they

claim supports a finding of discriminatory intent. Any perceived "deficiency" in the City's

Motion has been cured by Plaintiffs' exhaustive submission of their evidence they intend to use

to support their claim. That evidence serves to demonstrate what is missing from Plaintiffs'

arsenal. For the reasons outlined in the subsequent sections of this Reply, this evidence does not

raise a genuine issue of material fact, and the Court should grant the City's Motion.

Beginning with their erroneous interpretation of *Nick's Garage*, Plaintiffs argue

that the City failed to show evidence of a lack of discriminatory intent. Continuing, Plaintiffs

attempt to minimize and misinterpret the deposition testimony of former Mayor Byron Brown

and former Commissioner Daniel Derenda. This attempt is unpersuasive. Contrary to Plaintiffs'

argument, Mayor Brown did not retract his testimony that the Checkpoints were inspired by

citizen complaints. He clarified that he was "misinterpreting the purpose of the traffic stops and

the Strike Force. The purpose of the traffic stops were for vehicle and traffic issues. The Strike

Force was a proactive unit that was designed to address crime overall and in general."

Declaration of Peter A. Sahasrabudhe, dated August 1, 2025 (hereinafter "Sahasrabudhe Decl."),

Exhibit A, dated November 6, 2023 (hereinafter "Brown Dep.") at 71:14-19. This purpose is

made clear in Mayor Brown's subsequent testimony: "It is my testimony that there were a large

number of complaints from residents about speed, running through red lights, running through

traffic signals, speeding in neighborhoods, speeding past schools and endangering the

community. Initially traffic interdiction, traffic checkpoints, were established to address those

issues . . ." Dkt. No. 252-11 at 111:17-112:1. Confirming the Mayor's testimony, former

Commissioner Derenda's testimony reflects that citizen complaints drove Checkpoints. *See*

Sahasrabudhe Decl., Exhibit B, dated November 10, 2021 (hereinafter "Derenda Dep. 1") at

97:11-98:7 (discussing how Strike Force checkpoint locations were chosen based on "different

data from the crime analyst center, complaints from block clubs, multiple sources. Council

people."). As will be explained, the evidence does not show that the City's traffic enforcement

policies or practices were motivated by race at all.[1]

### B.      The City Met its Burden with respect to Plaintiffs' Tinted Windows Claim.

Throughout the course of this litigation, Plaintiffs have repeatedly changed the

nature of their claims in response to the City's arguments regarding deficiencies in those claims.

A moving target is hard to hit.  One example is Plaintiffs' tinted windows claim. The City

adequately addressed Plaintiffs' tinted windows claim in its Motion. This claim hinges

exclusively upon statistical disparities in the numbers of tinted window tickets given to Black

and Latino drivers as opposed to white drivers. Again, statistical disparities alone are insufficient

to prove intentional discrimination under the Equal Protection Clause. Dkt. No. 252-46, pp. 22-

23 (citing *Vitolo v. Guzman*, 999 F.3d 353, 362 (6th Cir. 2021); *Moore v. Bitca*, 19-cv-00035,

2020 WL 5821378, at *23 (D. Vt. Sep. 30, 2020). The Court even addressed this issue during

oral argument of the Class Certification Motion, especially, where as here, all relevant factors are

---

[1]      Plaintiffs state "Second, Defendants highlight the fact that despite being unwavering in
their belief that their traffic stops and tickets were the product of racial discrimination. . ."
Dkt. No. 321, p. 5. While the City believe this statement was likely inadvertent, to avoid
any doubt, the City's position is that it did not, nor does it currently, have any traffic
enforcement policies, practices, or customs motivated by a discriminatory purpose or
discriminatory intent.

not measured. *See* Sahasrabudhe Decl., Exhibit C (hereinafter "Class Cert. Transcript") at 18:10-19:17.

**C.**     **The City Has Sufficiently Shown that it is Entitled to Judgment as a Matter of Law on Plaintiffs' Due Process Claims.**

In perfunctory fashion, Plaintiffs argue that the City did not address "Plaintiffs' actual Due Process claims, much less carry their burden to show why summary judgment is appropriate." Dkt. No. 321, p. 6. Plaintiffs suggest that they do not make "garden variety procedural and substantive due process claims," rather, they make a "conflict of interest" Due Process claim, as outlined in their Motion for Class Certification. They insist the City does not address that claim. *Id.* at pp. 6-7 (citing Dkt. No. 211 at 47-49[2]). But that is wrong. Plaintiffs' "conflict of interest" Due Process claim centers on Plaintiffs' allegation that the City created financial incentives through overtime opportunities for officers writing more tickets. *See* Dkt. No. 211, p. 48. As briefed by the City, BPD did not incentivize or pressure officers into writing more tickets, and overtime was not used as a reward for writing more tickets. Dkt. No. 252-46, pp. 20-21, As further discussed immediately below, there is no evidence to support Plaintiffs' argument to the contrary, and their position is untenable as a matter of law.

---

[2]     Plaintiffs' due process argument of their Memorandum of Law in Support of their Motion for Class Certification appears at pages 38-40 per Plaintiffs' document pagination, which translates to pages 47-49 per the Court's pagination.

**POINT IV.    THE CITY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' CLAIMS**

**A.    Plaintiffs' Due Process Claim Fails as a Matter of Law.**

Plaintiffs' argument opposing dismissal of their procedural due process claim fails.  Plaintiffs effectively concede that the process afforded to them by the BTVA and New York law is constitutionally sufficient for the reasons articulated in *Torres v. City of New York*, 590 F. Supp. 3d 610, 621-624 (S.D.N.Y. 2022).  When a motorist in the City of Buffalo is given a traffic ticket, the case is prosecuted by a lawyer whose salary is fixed and who has no financial stake in the outcome. *See* Sahasrabudhe Decl., Exhibit D at 32:22-34:2.  The ticket is adjudicated by a neutral hearing officer who, again, has no financial stake in the outcome of the proceedings. Further, if the motorist is unsatisfied with the outcome of the proceedings before the BTVA, she can either file a CPLR Article 78 challenge to the hearing officer's determination or commence an appeal in County Court.  *See* CPLR 7801(1). There can be no dispute that these procedures satisfy minimal constitutional requirements and afford citizens all the process that is "due" under the Constitution.  *Torres*, 590 F. Supp. 3d at 621-624.  Many of the named Plaintiffs in this lawsuit utilized these very procedures and obtained resolutions which resulted in them receiving no penalty or fine associated with their traffic-related citation—even though they had committed the infraction for which they were cited.

Recognizing that the procedures afforded to motorists in Buffalo—of all races— are eminently fair and satisfy constitutional requirements, Plaintiffs pivot to an obscure, infrequently invoked position.  Plaintiffs argue that, although the procedures themselves are fair and constitutionally sufficient, adjudication of traffic violations in Buffalo is so plagued by

personal bias that it violates the Due Process Clause.  This argument is belied by the record as well as the applicable authority. As an initial matter, *Torres* makes clear that Article 78 and other New York procedures adequately account for potential bias, and thus are sufficient to deal with the "issues" Plaintiffs raise.  *Id.* at 622.  *Torres* explained: "even if Plaintiffs had pleaded sufficient facts to show that [decision makers] acted with bias as to Plaintiffs, ***their claims would still fail because the availability of Article 78 proceedings adequately serves as a mechanism to cure any bias*.**"  *Id.* (emphasis added) (citing  *Quire v. City of New York*, 2021 WL 293819, at \*6 (S.D.N.Y. Jan. 28, 2021) ("[T]he fact that the [administrative] proceeding was conducted before an allegedly biased administrative law judge ... does not mean that [the plaintiff]'s pretermination hearing was constitutionally insufficient" because "an Article 78 proceeding in state court constitutes such a wholly adequate post-deprivation hearing")).  Under this settled law, even if Plaintiffs were correct that the record demonstrated bias in adjudication of traffic tickets (which it absolutely does not), their Due Process claim would still fail as matter of law. New York law provides Plaintiffs and others similarly situated with constitutionally sufficient process to challenge any determination which might potentially be afflicted by bias.  *Id.*  This system alone requires dismissal of Plaintiffs' due process claim.

Cases from outside of this Circuit which do not involve New York law also demonstrate why Plaintiffs' bias-based due process theory is infirm.  The best example is *Brucker v. City of Doraville*, 38 F.4th 876 (11th Cir. 2022), where a municipality faced allegations that, because eleven to twenty five percent of its revenue consisted of fines, the municipality's procedures for adjudicating those tickets were unconstitutionally biased and thus in violation of the Due Process Clause.  *Id.* at 880.   Further, the police officers who wrote the

14

tickets which generated the penalties and fees sometimes prosecuted their own cases in the

municipality's court, and their department's budget relied on the penalties and fees they were

seeking to enforce. *Id.* at 881. Even with such a conflicted situation present, the Eleventh

Circuit held that the proceedings were not sufficiently biased to give rise to a Due Process claim.

*Id.* at 888. The Court granted summary judgment to the municipality, emphasizing that the police

had no direct financial interest in the outcome of traffic citations, and that they were never

threatened to be terminated if they did not write more tickets or issue more citations. *Id.*

      As should be apparent, the case for summary judgment is even stronger here than

it was in *Brucker*. The fines and fees collected by the small Georgia municipality in *Brucker*

constituted eleven to twenty five percent of the municipality's total revenue. *Id.* In Buffalo, the

traffic fines and fees constitute less—about one to three percent of Buffalo's revenue. *See*

Sahasrabudhe Decl., Exhibit E, pp. 5-6.[3] Moreover, officer salaries and pay rates remain fixed

regardless of how many tickets they write. *See* Sahasrabudhe, Exhibit F, dated July 11, 2023

(hereinafter "Tedesco Dep.") at 196:11-23. And, as in *Brucker*, there is absolutely no evidence

that BPD officers have ever been threatened with termination or any other discipline if they do

not meet a ticket quota or threshold. *See* Sahasrabudhe Decl., Exhibit G, dated March 5, 2021

---

[3]    A similar statistic was found by the Supreme Court to be insufficient as a matter of law to support a "bias" based due process claim. *Marshall v. Jerrico*, 446 U.S. 238 (1980) ("As we have noted, the civil penalties [at issue] . . . represent substantially less than 1% of the budget of the ESA. . . .[therefore] it is plain that the enforcing agent is in no sense financially dependent on the [penalties at issue]." This statistic further renders other authority relied on by Plaintiffs inapposite, as those cases dealt with small municipalities where fines and penalties constituted a massive portion of municipal revenue. *See, e.g., Coleman v. Town of Brookside*, 663 F. Supp. 3d 1261, 1272 (N.D. Ala. 2023); *Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927).

(hereinafter "Skipper Decl.") at 150:16-151:4. There is also no evidence that BPD even benefits from any of the revenue generated by tickets written by its police officers. Rather the revenue from traffic tickets goes to the City's General Fund.[4]  Just as the Court granted summary judgment in *Brucker*, this Court should grant summary judgment to the City on Plaintiffs' Procedural Due Process claim here.

   Grasping at straws, Plaintiffs essentially ignore applicable authority and argue that processes for adjudication of traffic tickets in Buffalo are unconstitutionally biased, because some officers in Strike Force and Housing eagerly participated in overtime shifts where they were paid at a time and a half rate.  This argument is a red-herring and the Court should reject it. First, Plaintiffs' opposition neglects to mention that overtime for all units of the BPD has always been based on seniority. Tedesco Dep. at 188:21-189:21. To obtain an overtime shift, an officer would have to rely on more senior officers passing up on the shift first.  Thus, under Plaintiffs' misguided theory, officers would have to write a ticket hoping not only that the ticket would lead to the availability of an overtime shift (which never happened), but also that more senior officers would pass up on those shifts, which would then become available to them.  *See id.* No evidence suggests that this practice ever occurred, and such misguided speculation is insufficient to create a triable issue of fact sufficient to survive summary judgment.  *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 307 (2d Cir. 2008) ("the non-moving party may not rely on conclusory allegations or unsubstantiated speculation [to defeat a motion for summary judgment]").  Plaintiffs offer no evidence—zero—suggesting any understanding by patrol

---

[4]  BTVA was not created because of requests from BPD officials. It was created at the behest of democratically elected New York State legislators.

officers that writing more tickets during *regular shifts* would lead to overtime shifts.  The many officers who were asked if such an arrangement existed universally denied that it did, and they even found such questions comical. *See* Dkt. No. 252-26 at 116:23:117:12; Tedesco Dep. 196:11-196:23.

To support their invented bias-based Due Process claim, Plaintiffs misleadingly cite testimony regarding the expectation supervisors had of officers *during* their overtime shifts, and officers' understanding of what they were supposed to do *while* they worked overtime.  *See* Tedesco Dep. at 195:3-196:4; Skipper Dep. 115:16-116:11; Derenda Dep. 1 at 102:19-105:7. When viewed in the proper context, the testimony on which Plaintiffs rely is unremarkable and uncontroversial—it certainly does not support a claim of widespread Due Process violations throughout the second largest municipality in New York.

The testimony cited by Plaintiffs shows only that, when officers were awarded an overtime shift, supervisors expected them to actually do their job rather than doing nothing.  *Id.* In other words, officers understood that, when they were working overtime and being paid time and a half, it was expected that they would actually enforce the law as opposed to sitting around at their station houses.  *Id.*  As this Court recognized during class certification oral argument, expecting productive law enforcement activity from police officers working an overtime shift is not unique or uncommon.  *See* Class Cert. Transcript at 26:1-24. And if such expectations are unconstitutional, as Plaintiffs claim, then essentially every municipal police department in the country is continuously violating the Constitution.  *Id.*  Every time an officer on an overtime traffic detail writes a ticket for a traffic violation consistent with orders from a superior, under Plaintiffs' view, the Due Process Clause is somehow implicated.  There is no authority standing

for such a preposterous proposition.  No authority supports the position that an expectation for officers be productive during overtime shifts somehow gives them a direct pecuniary interest in the adjudication or outcome of a traffic ticket.  Plaintiffs' Due Process claim must therefore be dismissed, despite their admirable and creative attempts at obfuscation.   The procedures afforded to Plaintiffs and others similarly situated are not only constitutionally sufficient, they are indisputably fair.

**B.**     **Plaintiffs' Equal Protection Claim Fails as a Matter of Law.**

As to Plaintiffs' equal protection claim, the City Defendants rely principally on the points they made in their initial motion papers.  Those points and arguments entitle the City Defendants to summary judgment on the Equal Protection claim.  However, two aspects of Equal Protection require further discussion, and they are addressed immediately below.

1.     The Court should focus only on BPD conduct during Checkpoints and when writing tinted window tickets

Plaintiffs seek to save their Equal Protection claim through the "throw everything at the wall and see what will stick" tactic.  Determined to prove their scandalous claims that the City of Buffalo and its Police Department are racist, Plaintiffs recount a host of incidents and events where BPD officers allegedly engaged in racial discrimination. *See generally* Dkt. No. 319. So many of these incidents or events have nothing to do with Checkpoints or tinted window citations that they do not even warrant discussion in the already too voluminous briefing filed in connection with this Motion.  Remote events or enforcement actions that do not involve conduct or situations similar to those challenged in this case are not relevant to, and have no bearing on, Plaintiffs' Equal Protection claim and the City Defendants' defenses to it.  Discussion of

18

dissimilarly situated individuals—individuals who were not stopped at a Checkpoint or did not receive a tinted window ticket—have no bearing whatsoever on Plaintiffs' Equal Protection claim. *See Pyke v. Cuomo*, 1995 WL 694624, at *4 (N.D.N.Y. 1995) (citing *U.S. v. Whiton*, 48 F.3d 356, 358 (8th Cir. 1995) (explaining that "dissimilarly situated persons" do not implicate that Equal Protection clause). The Court should thus disregard all of Plaintiffs' "evidence" that does not involve Checkpoints or tinted windows—the only types of traffic enforcement actions being challenged on a class-wide basis after the Court's class certification ruling.

Another aspect of Plaintiffs' irrelevant arguments as to BPD's alleged racial discrimination requires discussion. Plaintiffs argue that BPD currently allows and tolerates the use of the "N-word." That argument is absolutely false, irresponsible, and is not supported by the record. Plaintiffs, as they have for years now, both in filings with this Court and in statements to the media, cite as "support" for this assertion deposition testimony by former BPD Lieutenant Thomas Whelan. But Lieutenant Whelan did not testify that any member of the Strike Force or Housing Unit used the N-word when those units were in operation. In fact, he testified that strict professional behavior was expected from these units, and use of the N-word would not have been tolerated. *See* Sahasrabudhe Decl., Exhibit J, dated April 26, 2022 (hereinafter "Whelan Dep.") at 138:17-139:5. Reenforcing this perspective, BPD Commissioners unequivocally testified that use of racial slurs is not currently tolerated. *See* Sahasrabudhe Decl., Exhibit I, dated December 23, 2021, (hereinafter "Derenda Dep. 2") at 384:3-13; Sahasrabudhe Decl., Exhibit K, dated September 22, 2023 (hereinafter "Gramaglia Dep.") at 122:14-124:13. The Commissioners both testified that, if it were proven an officer used a racial slur, it would automatically result in discipline for the officer. *See id.* There is no true evidence that BPD

officials allow the use of the N-word by any officer or department member, and the Court should summarily reject Plaintiffs' misleading suggestion otherwise.

2.    <u>Plaintiffs' claims fail because they do not demonstrate that *they* specifically suffered from racial discrimination</u>

As to Plaintiffs' actual Equal Protection claims, which are limited to Checkpoint stops and tinted window tickets given the Court's class certification ruling, no Plaintiffs have shown evidence that the decision makers or officers who stopped or ticketed *them* acted with a discriminatory purpose.  This failure is fatal to their Equal Protection claim.  Both in this Motion and in the briefing on their Motion for Class Certification, Plaintiffs have argued that they do not need to show that a discriminatory intent or purpose on the part of the police officers with whom they interacted.  This position is rejected by Supreme Court precedent.  *McCleskey*, 481 U.S. at 292-296.  In M*cCleskey*, the Court explained that, where a plaintiff challenges a discretionary decision made by a government actor, in the Equal Protection context, he must show that the decisionmaker acted with a discriminatory purpose in ***his*** case.  *Id.* at 292 (rejecting Equal Protection claim and explaining that plaintiff offered "***no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence***"); *see also Navarro v. McCarthy*, 2023 WL  8375858, at *21-22 (W.D.N.Y. Dec. 4, 2023) (Wolford, C.J.); *Black Lives Matter Los Angeles v. City of Los Angles*, 113 F. 4th 1249, 1263 (9th Cir. 2024) ("plaintiffs   . . . must show that the [defendant's] policies caused every class member's injury . . . . [this] is harder when plaintiffs challenged informal policies, ***or stem from discretionary decisions"***).  The Supreme Court also explained that for decisions involving discretion, plaintiffs cannot simply rely on statistical evidence and then force the decision makers to defend their decisions "years after they were made."  *McCleskey*, 481 U.S. 279 at 297.  The Court further

explained that, if there was a plausible, legitimate, non-racial explanation for the decision

maker's action, an Equal Protection claim would not lie absent an individualized showing of

motivation by a discriminatory purpose.  *Id.*

        The Court should apply the rationale in *McCleskey* here, which would result in

dismissal of the named Plaintiffs' Equal Protection claim.  Despite the scattershot, wide-cast net,

leave no stone unturned recitation of "evidence" submitted to oppose Defendants' request for

dismissal of this claim, Plaintiffs have done nothing to rebut the City Defendants' showing that

each of their traffic related interactions with BPD were done for legitimate, non-racial purposes.

*See* Dkt. No. 252-45, pp. 12-16.  Each Plaintiff that was ticketed admitted receiving a ticket for a

legitimate traffic related offense.  No Plaintiff offered any testimony or other evidence to even

suggest that the officers with whom they interacted knew, let alone were motivated by their race.

For this reason alone, Plaintiffs' equal protection claim fails and must be dismissed.  *Navarro*,

2023 WL  8375858, at *21-22.

**C.**    **Plaintiffs' Title VI Claim Fails as a Matter of Law.**

        For this same reason, Plaintiffs' Title VI claim should be dismissed. Plaintiffs fail

to establish intentional discrimination by the City and BPD.

        Plaintiffs' opposition confirms that summary judgment is appropriate as to their

Title VI claim for an additional, independent reason.  Plaintiffs argue that, because the City of

Buffalo and BPD receive federal funding, and because they allege racial discrimination by the

City and BPD, their Title VI claim should automatically be permitted to proceed.   Dkt. No. 321,

pp. 85-86.  In Plaintiffs' view, the actions of BPD that they challenge do not need to be connected to the federal funds received by the City and BPD.  *Id.*

Plaintiffs' position is rejected by applicable case-law from within this Circuit. For a Title VI claim to proceed, a showing that the contested action has a causal nexus between, or has been done in furtherance of, a federally funded program is necessary.  *Moore v. City of N.Y.*, 2017 WL 35450, at *11 (S.D.N.Y. Jan. 3, 2017) (finding allegations "upon information and belief," that City and Department of Corrections "receive federal financial assistance and funds ... earmarked primarily for employment" failed to sufficiently plead "a primary objective of the Federal financial assistance is to provide employment"), *report and recommendation adopted by*, 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017); *Bhanusali v. Orange Reg'l Med. Ctr.*, 2012 WL 13059694, at *8 (S.D.N.Y. Jan. 20, 2012) (plaintiff did not plausibly allege any "***logical nexus between the use of federal funds and the practice toward which agency action [wa]s directed***") (emphasis added) (citing *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1532 (10th Cir. 1995)).

In their opposition, Plaintiffs' do not even attempt to argue that the VTL enforcement actions they challenge have a nexus to the federal grant money received by the City and BPD. Despite exhaustive and exhausting discovery, Plaintiffs made no showing that any federal funds received by the City or BPD have been used to execute VTL enforcement measures of any kind, let alone those at issue in this litigation.  For this simple reason, the Court should grant summary judgment to the City on Plaintiffs' Title VI claim.

Lest there be any doubt, in a recent case involving allegations almost identical to those raised here, the Northern District of Illinois dismissed a Title VI claim against the City of

22

Chicago at the pleadings stage. *Wilkins v. City of Chicago*, 736 F. Supp. 3d 616, 622 (N.D. Ill. 2024). Because Chicago is a municipality not a federally funded "program" or "activity" that falls with in Title VI's purview, the court ruled that a Title VI Claim could not proceed, even at the pleadings stage. *Id.* The same result is required in this case. Plaintiffs' Title VI claim against the City of Buffalo must be dismissed.

**D.    Plaintiffs Abandoned their Non-Checkpoint Fourth Amendment Claims.**

Plaintiffs failed to address the City's argument regarding their non-Checkpoint Fourth Amendment claims. The City demonstrated that the Fourth Amendment claims concerning BPD traffic stops conducted outside of Checkpoints must be dismissed. *See* Dkt. No. 252-46, pp. 52-54. By failing to respond, Plaintiffs have abandoned these claims, and they should be terminated accordingly. *See Murphy*, 986 F. Supp. 2d at 273; *Collins*, 295 F. Supp. 3d at 361; *see also Grandy v. Manhattan & Bronx Transit Operating Auth.*, 2018 WL 4625768, at *3 (S.D.N.Y. Sep. 26, 2018) (dismissing Plaintiff's claims as abandoned and noting ". . .as the non-moving party, Plaintiff had an obligation to defend her claims with legal arguments and citations to the record in her memoranda of law. . .").

**E.    Plaintiffs' Checkpoint-Related Fourth Amendment Claims Should be Dismissed.**

The City has satisfied its *prima facie* burden with respect to Plaintiffs' Checkpoint-Related Fourth Amendment claims. In response, Plaintiffs have failed to demonstrate any genuine issues of material fact. Though Plaintiffs offer voluminous evidence supposedly in opposition, that evidence does not support their position. That evidence is irrelevant to the resolution of the Fourth Amendment claims. *See Travelers Indem.*, 3 F. Supp. 3d

at 97 ("Of course, contested facts unnecessary to resolution of this motion do not create triable

issues."). Again, volume does not equal relevance.

1.    Vehicle and Traffic Safety was the Primary Purpose of the Checkpoints

Contrary to their unsupported assertions, the Checkpoints are constitutional. The

evidence unequivocally shows that, consistent with the special needs doctrine, the primary

purpose of the Checkpoints was traffic safety. *See, e.g.*, Dkt. Nos. 252-42; 252-12 at 21:6-18;

252-14 at 194:13-21. The depositions of dozens of City employees and BPD officers and the

Roadblock Directive governing the Checkpoints uniformly show that the primary purpose was

vehicle and traffic safety.[5] Vehicle and traffic safety is a "special need" that has been repeatedly

---

[5]    *See. e.g.*, Dkt. Nos. 252-42; 252-11 at 107:1-2 (". . . the primary purpose of checkpoints
was traffic safety.", 111:17-113:6 ("It is my testimony that there were a large number of
complaints from residents about speed, running through red lights, running through
traffic signals, speeding in neighborhoods, speeding past schools and endangering the
community. Initially traffic interdiction, traffic checkpoints, were established to address
those issues and as a secondary purpose it was found that caught in those traffic
checkpoints were people with criminal backgrounds, with illegal guns, with illegal drugs
that were threatening the safety of the community and that was also a major concern of
residents of the City of Buffalo."); 252-12 at 21:6-18 ("Well, the roadblocks were
primarily for traffic safety, but what they also accomplished is high visibility. When
they're out there they're being seen and that's part of their mission. It isn't written down.
It's the high visibility of the Strike Force because in my opinion I'd rather stop a crime
from ever happening than investigate one later, so the more visible officers are, less likely
that a crime will be occurring in front of them, but I always thought traffic roadblocks,
again traffic safety with the positive benefit of high visibility."), 78:23-79:2 (". . .
Specific purpose is traffic safety in our case with the additional benefit of high
visibility."); 252-14 at 194:13-21 (". . . the checkpoint is for V&T, but we also wanted it
for the high visibility and if that resulted in various things, you know, keeping the
residents happy or ultimately deterring crime, that was certainly a bonus, too."); 252-15
at 55:19-56:3 (testifying that the primary purpose of the checkpoints was to enforce the
traffic laws, check registrations, inspections, tints, and seatbelts); 252-16 at 28:5-23
("The safety checkpoints were to ensure there was no expired inspections, registrations,
things of that nature."); 252-17 at 32:12-18 (testifying that the checkpoints were not
conducted to target gang activity, but rather "[t]hey were very specific on those vehicle

recognized as one that goes beyond the need for normal law enforcement. *See, e.g.*, *Wagner v. Swarts*, 827 F. Supp. 2d 85, 94 (N.D.N.Y. 2011) (hereinafter "*Wagner I*"), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012) (hereinafter "*Wagner II*"); *U.S. v. Henson*, 351 F. App'x 818, 821 (4th Cir. 2009); *Regan*, 218 F. App'x at 905; *see also People v. Pastrana*, 41 N.Y.3d 23, 27 (2023) (holding roadway safety to be a permissible "special need").[6]

      a.    The City's Statements Support the Checkpoints' Vehicle and Traffic Safety Primary Purpose

Throughout their summary judgment briefing, Plaintiffs have repeatedly tried to distort the primary purpose of the Checkpoints. Specifically, Plaintiffs point to the "admitted purposes" of "high police visibility," "the reduction of drug, gun, and gang activity," and "enforcement of the New York State Vehicle and Traffic Laws or VTL" as improper primary purposes. *See* Dkt. No. 321, p. 9. But these distortions are not supported by the actual record. They are the product of active imaginations and selective quotations.

As to the Checkpoints' primary purpose—vehicle and traffic safety—Plaintiffs' arguments that "high police visibility" and VTL enforcement are improper primary purposes rely

---

and traffic, roadway safety. They were specific on vehicle and traffic violations."); 252-18 at 48:9-16 (testifying that the checkpoints were safety checkpoints to ensure vehicle equipment was in order).

[6]    See also *U.S. v. Bowman*, 496 F.3d 685, 692 (D.C. Cir. 2007) ("[A] roadblock is constitutionally permissible where its principal purpose is to regulate vehicular traffic by allowing police to check driver's licenses and vehicle registrations."); *U.S. v. McFayden*, 865 F.2d 1306, 1313 (D.C. Cir. 1989); *Del. v. Prouse*, 440 U.S. 648, 663 (1979) (noting that a traffic safety roadblock to question all oncoming traffic regarding their drivers' licenses and vehicle registrations would be constitutional); *U.S. v. Bernacet*, 724 F.3d 269, 273 (2d Cir. 2013).

on selective quotations and misunderstandings of law. In footnote 5 of Plaintiffs' Opposition, Plaintiffs argue that "Defendants' acknowledgement that high visibility policing was a primary purpose of the Checkpoint program" effectively concedes that high visibility policing was the primary purpose, making it indistinguishable from crime control. *See* Dkt. No. 321, p. 9. Contrary to Plaintiffs' claims, that is not what the City's Statement of Material Facts, as properly supported, states. Instead, it states: "The primary purposes of the Checkpoints were traffic safety and high visibility to curtail the unsafe operation of vehicles." Dkt. No. 252-45 ¶ 16. In that vein, the high visibility is distinguishable from general crime control, as the high visibility was intended as a deterrent to curtail the unsafe operation of vehicles in furtherance of the primary traffic safety purpose.

Additionally, as briefed in the City's Opposition to Plaintiffs' Motion for Partial Summary Judgment, the City's interrogatory response regarding the primary purpose of the Checkpoints did not just state "enforcement of the New York State Vehicle and Traffic Laws or VTL." Including the language Plaintiffs conveniently omit, the City provided "that the primary programmatic purpose of checkpoints conducted by the Strike Force and Housing Unit was **vehicle and traffic safety and the enforcement of the New York State Vehicle and Traffic Law** . . ." Dkt. No. 254-13 (emphasis added). Plaintiffs' deliberate omission of the "vehicle and traffic safety" language in their brief is telling and deliberately misleading. Plaintiffs' misstatement of the City's pleadings aside, enforcement of the VTL inherently promotes vehicle and traffic safety and vice versa. An asserted special need is not simply disqualified because it enforces the law. Plaintiffs' assertion to the contrary is illogical and contradicted by authority. *Wagner I*, 827 F. Supp. 2d at 94; *Wagner II*, 489 F. App'x at 500-501 (upholding motorcycle

26

checkpoints designed to detect safety violations and ensure proper registration, thereby enforcing the VTL); *U.S. v. Regan*, 218 F. App'x 902, 904 (11th Cir. 2007) (upholding road safety checkpoint used to enforce compliance with general traffic laws); *see also Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 445 (1990) (upholding sobriety checkpoints designed to enforce traffic law prohibiting the operation of a motor vehicle while intoxicated).

Contrary to Plaintiffs' view, the reduction of drug, gun, and gang activity was an admitted *secondary* purpose. *See* Dkt. Nos. 252-11 at 58:12-21; 252-12 at 21:6-18; 252-7 at 15:13- 16:6, 16:10-17:4. "The special needs doctrine applies to any program of searches whose primary purpose is a government interest other than crime control, and the mere fact that crime control is *one* purpose—but not the primary purpose—of a program of searches does not bar the application of the special needs doctrine." *Wagner II*, 489 F. App'x at 501 (citing *Lynch v. City of N.Y.*, 589 F.3d 94, 102 (2d Cir. 2009)) (emphasis in original); *see also Turner*, 2020 WL 733187 at *4 (holding that primary purpose of checkpoints was traffic safety, even though individuals were arrested for non-safety violations at the checkpoints). As this authority establishes, the drug, gun, and gang activity secondary purposes do not transform the Checkpoints' primary vehicle and traffic safety purpose into one of general crime control.

   b. <u>There is No Triable Issue of Fact Regarding the Checkpoints' Primary Purpose</u>

Try as they might to characterize the evidence and authority otherwise, the primary purpose of the Checkpoints was the permissible special need of vehicle and traffic safety.

Plaintiffs argue that *Wagner* is distinguishable because here, "Plaintiffs have "amassed a substantial body of evidence" showing that the Checkpoints' primary purpose was general crime control. *See* Dkt. No. 321, p. 10. This argument hardly engages with *Wagner*, let alone meaningfully distinguishes it. In fact, the *Wagner* plaintiffs also asserted a similar argument: "The record in this case is replete with evidence the primary purpose of the checkpoints was not to mitigate the alleged recent increase in motorcycle crashes but to harass intimidate and attempt to find criminal wrongdoing." Plaintiffs' Br. at pp. 43-44, *Wagner II*, 2012 WL 1077527, (2d Cir. Mar. 17, 2012) (No. 11-5277-cv). Moreover, Plaintiff's evidence, interpreted in the light most favorable to them, shows that crime control was *a* purpose of the Checkpoints, not the primary purpose. Denying Plaintiffs' accusation, neither former Commissioner Derenda nor former Mayor Brown testified that the Checkpoint Program was the "centerpiece" of a plan to reduce drug, gun, and gang activity. None of the evidence Plaintiffs cite supports this characterization of the Checkpoints. In that same vein, whether Brown applauded the Checkpoints for their impact on crime is immaterial to their primary purpose. Under Plaintiffs' reading of the evidence and authority, to comply with the Fourth Amendment, the *only* purpose of a Checkpoint must be a special need. The cases do not support this distorted view, however.

Similarly, in *Wagner I*, the plaintiffs pointed to a litany of evidence that they claimed created a factual dispute as to the primary purpose of the checkpoints. There, the plaintiffs rested their argument on the following "undisputed" facts:

> (1) the checkpoints were not explicitly recommended by the National Highway Traffic Safety Administration;

(2) the checkpoints did not "address" speed and alcohol;

(3) the defendants considered portions of the motorcycle community to be "outlaw bikers" and gang members;

(4) the monitoring and participation in the checkpoints by the New York State Police Investigation Unit and gang task force;

(5) the recommendation that SIU officers conduct more thorough inspections of any suspect motorcycle, particularly relating to non-traffic offenses; and

(6) a report indicating that the grant money used to fund the program included funding for overtime for intelligence gathering and subsequent criminal and traffic enforcement.

*Wagner I*, 827 F. Supp. 2d at 94. While undisputed, the Court held that all of these facts were "unequivocally immaterial." *Id.* Plaintiffs offer similar "undisputed facts" here. For example, Plaintiffs argue that the Checkpoints' partial funding by the New York State Gun Involved Elimination ("GIVE") Initiative demonstrates that the primary purpose of the Checkpoints was general crime control. *See* Dkt. No. 321, p. 11. But the funding for the checkpoints in *Wagner I* also included funding for general crime control tasks like intelligence gathering and criminal law enforcement. *See* 827 F. Supp. 2d at 94-95. The Court found the funding immaterial to the checkpoints' primary purpose. *Id.* A focus on non-safety violations did not render the checkpoints unconstitutional. This Court should hold the same here. Plaintiffs also recount statements that Checkpoints would "surprise the criminal element," were "part of a crime control strategy," and made people "less likely to carry guns." *See* Dkt. No. 321, p. 11. Like the recommendation that SIU officers perform more thorough inspections to uncover criminal wrongdoing in *Wagner I*, again, a focus on non-safety violations by the BPD does not transform the primary purpose of the Checkpoints.

No doubt recognizing the distinct factual similarities between *Wagner I* and this case, Plaintiffs argue that the units conducting the Checkpoints distinguish them from the checkpoints in *Wagner I*. To support this argument, Plaintiffs cite *U.S. v. Davis*, 270 F.3d 977 (D.C. Cir. 2001); *Ferguson v. City of Charleston*, 532 U.S. 67, 82 (2001); *U.S. v. Bowman*, 496 F.3d 685 (D.C. Cir. 2007); *Gumbs*, 2018 WL 558526, at *11; *Trotter*, 28 A.D.3d 165. But these cases are readily distinguishable. None of these cases stand for the proposition that the nature of the police units should be imputed into the primary purpose of checkpoints they conduct. In *Davis*, the Court afforded the factual findings of the district court great deference in holding that the roadblocks were conducted "for the principal purpose of vehicular regulation in conjunction with a police program to increase police presence and to curb drug activity." 270 F.3d at 980. The D.C. Circuit remanded the case for a determination regarding the primary purpose of the roadblock in light of several clarifications of law and words of caution. Plaintiffs fail to acknowledge the Court's critical words of caution, crucial to that case:

> Whenever something is done for several reasons, it might not have been done in the absence of any one of those reasons. If there had not been drug dealing in the neighborhood, the *McFayden* roadblock would not have been placed there, yet its primary purpose dealt with vehicular safety. *The assumption underlying the search for the "primary purpose" is that several purposes might have moved the police to set up a particular roadblock.* This is why finding the primary or predominant purpose will often prove difficult, as the Supreme Court acknowledged in *Edmond,* 531 U.S. at 46–47, 121 S.Ct. 447.

*Id.* at 981 (emphasis added). This decision supports the rule that even though crime control may be *a* purpose of any particular checkpoint, that does not make it *the primary purpose*. In another decision, *Bowman*, the Court cited *Davis*, remanding the case back to the district court, since the

district court had failed to analyze evidence regarding the challenged roadblock's primary purpose. 496 F.3d at 693-694. Though the stated purpose of the unit running the roadblocks was one factor the district court should have weighed, the D.C. Circuit Court lists several other criteria that the district court should have considered. *See id.* at 693-695. Critically, the Court did not hold that the mission of the police units assigned to run the roadblocks was determinative of the primary purpose of the roadblocks themselves. Following these cases, that the Strike Force and Housing Unit officers conducting the Checkpoints were tasked with proactive policing—across criminal and vehicle and traffic law enforcement—does not transform the primary purpose of the Checkpoints into one of general crime control.

*Gumbs* and *Trotter* do not further Plaintiffs' argument, either. In *Gumbs*, officer testimony established that the "primary objective" of the challenged checkpoints was to look for serious crimes. 2018 WL 558526, at *9-10. Tellingly, the government failed to offer any evidence, such as a copy of the operational plan, to show that the primary purpose was to check for traffic violations. *Id.* at *10. In *Trotter*, the Court gave great deference to the hearing court and, in doing so, deferred to the hearing court's determination that the record established that the challenged checkpoint was part of a larger initiative to address general crime concerns. 28 A.D.3d at 170-171. No such initiative exists here. In fact, in *People v. Edwards*, 101 A.D.3d 1643, 1644 (4th Dep't 2012), the Fourth Department distinguished *Trotter* from the vehicle and traffic safety checkpoints conducted by the BPD's Mobile Response Unit ("MRU"), prior to the creation of the Strike Force and Housing Units. There, the plaintiff also argued that because the MRU's primary purpose was not roadblocks or checking licenses, the primary purpose of

MRU's checkpoints could not have been vehicle and traffic safety. *See* Respondent's Br. at *14, *People v. Edwards*, 2012 WL 13168759 (4th Dep't Nov. 26, 2012) (No. 12-00369).

While Plaintiffs link the Checkpoints to Mayor Brown's Zero Tolerance Crime Policy and analogize it to the initiative in *Trotter*, the two are easily distinguishable. Unlike the initiative in *Trotter*, Mayor Brown's Zero Tolerance Crime Policy encompassed vehicle and traffic enforcement. Brown at 69:23-70:11. By contrast, the purpose of the initiative in *Trotter* was to "deter violent crimes and drug trafficking," not vehicle and traffic safety enforcement. *See* 28 A.D.3d at 164.

Finally, *Ferguson* is readily distinguishable because of the vastly different context in which the special needs doctrine was invoked there. The Fourth Amendment special needs inquiry is a highly context-specific one. *See Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665-666 (1989); *see also Chandler v. Miller*, 520 U.S. 305, 306 (1997). In *Ferguson*, the Court determined that although the ultimate objective of a hospital's drug testing program was to promote the health of women and children, the immediate objective was gathering evidence of unlawful drug use. 532 U.S. at 82-84. To reach its decision, the Court considered that the hospital policy codifying this program referenced the police's operational guidelines but did not discuss treatment for either mother or infant; that police and prosecutors were extensively involved in the day-to-day administration of the policy; and that law enforcement helped determine procedures following the drug testing. *Id.* at 82. *Ferguson* involved searches and seizures at hospitals whose asserted primary purpose was healthcare, but the Court found direct evidence that the actual primary purpose of the program was law enforcement. The case at bar does not involve searches and seizures run by non-law enforcement personnel. Adoption of the

32

*Ferguson* rational here would advance Plaintiffs' erroneous understanding of the special needs doctrine, and it would upend the substantial body of case law allowing law enforcement to pursue suspicionless searches and seizures for specific law enforcement-related special needs. *See, e.g.*, *Wagner I*, 927 F. Supp. 2d at 94.

As a matter of law, the BPD's Checkpoints had a permissible primary purpose—vehicle and traffic safety—and Plaintiffs' arguments to the contrary are meritless.

2.    The Checkpoints Pass the Special Needs Balancing Test

After determining that the Checkpoints involve a special need, the next step in the Court's analysis implicates the reasonableness inquiry. As argued in the City's Motion and the City's Opposition to the Plaintiffs' Partial Summary Judgment Motion, the reasonableness inquiry involves a balancing test in which the Court weighs (a) the gravity of the public concerns served by the seizure; (b) the degree to which the seizure advances the public interest; and (c) the severity of the interference with individual liberty. *Wagner II*, 489 F. App'x at 501 (citing *Brown v. Tex.*, 443 U.S. 47, 50-51 (1979)).

Plaintiffs take issue with this standard, arguing that the Second Circuit uses a restated test, which analyzes (i) the weight and immediacy of the government interest; (ii) the nature of the privacy interest allegedly compromised; (iii) the character of the intrusion; and (iv) the efficacy in advancing the government interest. *See* Dkt. No. 321, p. 18 (citing *Torcivia v. Suffolk Cnty., N.Y.*, 17 F.4th 342, 359 (2d Cir. 2021). At first glance, it may appear as if there are inconsistencies in the Second Circuit's case law regarding whether the nature of the privacy interest is explicitly analyzed in a special needs inquiry; however, that is not the case.

33

First, as the City has repeatedly noted, the special needs inquiry is context-specific. *See Nat'l Treasury Emps. Union*, 489 U.S. at 665-666; *see also Chandler*, 520 U.S. at 306. *Torcivia* deals with the application of the special needs doctrine to a firearm-seizure policy for individuals who have been transported for involuntary psychiatric evaluations. *See* 17 F.4th at 350-351. *Wagner II* deals with vehicle and traffic safety checkpoints. 489 F. App'x at 501. It stands to reason that, to the extent the Court interprets these two standards to be in conflict, which they are not, the standard articulated in the case involving the same or very similar searches should prevail—the *Wagner II* standard.

Second, as a matter of procedure, *Torcivia* did not overturn *Wagner*, so that the two standards should not be read as being inconsistent with each other. Even assuming that Plaintiffs' view is correct, that the Second Circuit adds a fourth factor, their emphasis on the additional element is misapplied. Plaintiffs note that the "key difference" is the additional factor of the nature of the privacy interest. *Id.* In analyzing the severity of the interference with individual liberty, as articulated by *Wagner II*, courts must expressly determine what the nature of that individual liberty or privacy interest is. Thus, while the City's position is that the Court should use the standard articulated in *Wagner II*, the City will explicitly address the nature of the privacy interest involved here.

a.    The Gravity of Public Concerns

The record unequivocally establishes that the Checkpoints were implemented in certain locations to respond to residential complaints. *See* Dkt. Nos. 252-11 at 57:4-58:1; 252-24 at 67:15-68:12 (noting that Checkpoints were set up around BMHA properties in response to

34

complaints from residents); 252-7 25:13-26:9 at 25:13-26:9 (same). Plaintiffs' conclusory

statement to the contrary, without any cited evidence supporting that view, does not create an

issue of fact. Similarly, Plaintiffs' next conclusory statement challenging the validity of the

City's interest in vehicle and traffic safety is contrary to the law and logic. The City has a

sufficiently meritorious interest in "ensuring that only those qualified to do so are permitted to

operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing,

registration, and vehicle inspection requirements are being observed." *Wagner I*, 827 F. Supp. 2d

at 96.

The City has already addressed Plaintiffs' attack on the City's genuine public

concerns, without empirical evidence. *See* Dkt. No. 266, p. 14. In the first instance, the City

questions how accurate any such empirical data would be given that the City would have to

know how many vehicle and traffic infractions exist within the City at any given time to gather

empirical data on how effective the Checkpoints were. In other words, the City would have to

somehow know how many infractions existed before the Checkpoints were instituted and how

that number was impacted after the Checkpoints were instituted. That analysis is neither possible

nor practical. To reiterate, there is nothing in *Prouse* to suggest that the absence of empirical data

is a dispositive factor in this analysis. *See U.S. v. Fraire*, 575 F.3d 929, 933 (9th Cir. 2009); *see*

*also Prouse*, 440 U.S. 648; *Scott*, 63 N.Y.2d at 528-529 (noting that the government is entitled to

"to bring all resources to bear, without having to spell out the exact efficiency coefficient of each

component and of the separate effects of any particular component" of checkpoints in the interest

in the public safety). In *Fraire*, the government did not have any empirical evidence to justify its

checkpoints to prevent poaching at a national park, but the Court still upheld the program. 575

F.3d at 933. Common sense suggested they were a reasonably efficient tool to prevent poaching. *Id.* The same logic applies here. The public concern factor weighs in favor of the City.

      b.    <u>Advancement of the Public Interest</u>

The gravity of public concerns factor and advancement of public interest factor overlap here. For the reasons already articulated, *supra* Section IV(E)(2)(a), empirical evidence is not required for the Court to find that the Checkpoints advanced the public interest. No one contests that during the time the Checkpoints were conducted, the BPD detected thousands of VTL violations. Efficacy can be measured "by the relationship of the checkpoint to its objective, rather than by any measurable results, or by any results period." *Fraire*, 575 F.3d at 931 (citing *U.S. v. Faulkner*, 450 F.3d 466, 472-473 (9th Cir. 2006)).

Plaintiffs suggest that there was no traffic safety benefit beyond what the BPD could have achieved through ordinary traffic stops. *See* Dkt. No. 321, p. 25. That argument is plainly wrong. As the name implies, the Checkpoints functioned to allow officers to check for proper seatbelt usage, valid registration stickers, and valid inspection stickers. They detected thousands of violations. Unlike the speeding at issue in *U.S. v. Hudson*, 2007 WL 1656282 (D.D.C. June 5, 2007), such infractions are hardly "readily observable" by officers while on patrol. Additionally, Plaintiffs assert that this factor also weighs in their favor because tinted window tickets "do not pose traffic safety concerns." Plaintiffs do not cite to any record evidence or expert testimony for this proposition, and it should be readily disregarded by the Court. On balance, this factor also weighs in the City's favor.

c.     Severity of Interference with Individual Liberty.

The nature of the privacy interest at issue here involves simply a motorist's expectation of privacy. Contrary to Plaintiffs' narrative, that expectation of privacy is not absolute. *See, e.g.*, *Prouse*, 440 U.S. at 663 (acknowledging that questioning all oncoming traffic at roadblocks would not be unreasonable under the Fourth Amendment); *Wagner II*, 489 F. App'x at 500-501.

Under this factor, Courts analyze whether the checkpoints were (i) clearly visible; (ii) part of some systematic procedure that strictly limits the discretionary authority of officers; and (iii) detaining cars for no longer than reasonably necessary unless reasonable suspicion of criminal activity arises. *Wagner I*, 827 F. Supp. 2d at 97.  The visibility of the BPD Checkpoints cannot be genuinely disputed, and Plaintiffs' self-serving testimony attempting to create such a dispute should be disregarded. *See Ben-Levy v. Bloomberg L.P.*, 2012 WL 2477685, at *4 (S.D.N.Y. June 26, 2012). BPD policy required that the Checkpoints featured police vehicles with overhead flashing lights activated. Dkt. No. 252-42; *see also* Dkt. No. 252-10 at 22:2-5. Even if there were instances where BPD officers failed to follow policy by not activating their overhead lights, the clear presence of BPD officers and equipment is enough to establish visibility. *See Wagner I*, 827 F. Supp. 2d at 97.

Though Plaintiffs argue that they were fearful while going through these Checkpoints, "fright" and "annoyance" are obviated by visible signs of authority, including lighting, identifiable police vehicles, and the observable fact that cars are being uniformly stopped. *See People v. Scott*, 63 N.Y.2d 518, 527 (1984); *see also Wagner I*, 827 F. Supp. 2d at

97 ("While plaintiff Alpaugh claims he was surprised by, and apprehensive about entering the checkpoint, his claims are immaterial to the checkpoint's visibility.)[7]

Finally, BPD policy instructed that the Checkpoints could not be "unreasonably intrusive." Dkt. No. 252-42. In practice, initial stops were very brief—only a matter of seconds—and if an officer observed a VTL violation, the officer would direct the motorist to pull over for a secondary stop. *See* Dkt. Nos. 252-28 at 146:12-17; 252-16 at 36:13-37:10; 252-10. at 23:15-24:13, 31:9-32:6. The special needs analysis focuses on the initial, suspicionless stop. A secondary stop was only initiated after the observation of a VTL violation or other reasonable suspicion; therefore, it is not governed by the special needs doctrine. *See* Dkt. No. 252-10 at 23:15-24:13, 31:9-32:6. Plaintiffs cite the declarations of Plaintiffs Franklin and Simmons to support their argument that wait times at Checkpoints were sometimes in excess of 45 minutes. *See* Dkt. No. 321, p. 23 (citing Dkt. No. 319 ¶ 120). Perhaps purposefully, Plaintiffs do not specify whether those alleged extended wait times occurred during the initial stop or the secondary stop. Regardless, given the weight of the factors balancing in the City's favor and indicating the reasonableness of the Checkpoints, assuming for argument's sake the two extended waits did occur out of thousands of stops, that limited sample is insufficient to create an issue of triable fact regarding the reasonableness of the BPD's Checkpoint program.

---

[7]    To avoid any doubt, at oral argument for the Class Certification Motion, Plaintiffs stated that they are not seeking damages for the alleged anxiety and stress suffered while waiting in line at the Checkpoints. Though it appears references to such stress and anxiety are only in the context of the special needs balancing test, to the extent the Court consider any testimony regarding such anxiety or stress now, or at any future trial of this action, Plaintiffs should be estopped from seeking such damages.

While Plaintiffs argue that the BPD's actions were burdensome and oppressive, they do not dispute that the Checkpoints were part of a systematic procedure limiting the discretion of officers. In fact, Plaintiffs argue that the requirement that BPD officers were to ticket all visible infractions makes the Checkpoints unconstitutional. *See* Dkt. No. 321, p. 23. But that is contrary to the law. *See Wagner I*, 827 F. Supp. 2d at 98.

Plaintiff's remaining arguments regarding the purported burdensome and oppressive nature of the Checkpoints are unsupported. They do not pertain to any of the elements analyzed under this test and should be disregarded as irrelevant to this analysis.

Accordingly, the Checkpoints satisfy the special needs doctrine. Plaintiffs' Fourth Amendment claims concerning the Checkpoints should be dismissed.

## POINT V.    FORMER MAYOR BROWN SHOULD BE DISMISSED FROM THIS ACTION

For nearly twenty years, and most of the time covered in this action, Byron Brown was the Mayor of Buffalo. He is a named Defendant in this action. Mayor Brown cannot be held liable simply by virtue of his high position of authority. *See Hawthorne by Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 294 (S.D.N.Y. 2020). And yet, that is precisely what Plaintiffs seek to do. Plaintiffs' arguments for the Mayor's liability are meritless.

First, Plaintiffs argue that Mayor Brown was the final policymaker for the City who set policy for the BPD with the Commissioners. Dkt. No. 321, p. 7. But Mayor Brown's position and general exercise of authority are not enough to hold him liable. "Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own

individual actions, has violated the Constitution." *Rodriguez v. City of N.Y.*, 2023 WL 3304565,

at *4 (S.D.N.Y. Jan. 20, 2023). Sufficient personal involvement arises where the plaintiff shows

that:

> (i) the defendant participated directly in the alleged constitutional violation;
>
> (ii) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (iii) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (iv) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (v) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Hawthorne*, 492 F. Supp. 3d at 293. (citing *Grullon v. City of New Haven*, 720 F.3d 133, 138-

139 (2d Cir. 2013)). Merely being the final policymaker, having the ability to set policy, and

exercising that ability in other instances do not suffice.

Second, Plaintiffs argue that Mayor Brown never issued any formal directives

terminating the Checkpoints or preventing them from restarting. But even assuming, for the sake

of argument, that the Checkpoints were unconstitutional, "mere knowledge and acquiescence to

unconstitutional conduct, or mere failure to act on a complaint, without more, fails to state a

claim under Section 1983." *Hawthorne*, 492 F. Supp. 3d at 294 (citation modified) (citing *Faulk*

*v. N.Y.C. Dep't of Cor.*, 2014 WL 239708, at *10 (S.D.N.Y. Jan. 21, 2014)); *Mateo v. Fischer*,

682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010)).

Third, Plaintiffs argue that Mayor Brown "joined [Commissioner] Derenda in an elaborate pretextual coverup to conceal the racially discriminatory impact of the Program. . ." Dkt. No. 321, p. 7. This speculation is nothing more than a conclusory and prejudicial assertion unsupported by any testimony or other evidence. Without support, it should be disregarded. *Rodriguez*, 2023 WL 3304565, at *4 ("Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact."). Plaintiff's "evidence" of this alleged coverup, Dkt. No. 319 ¶¶ 286-295[8], does not show a coverup whatsoever. Plaintiffs trace the history of the Common Council requesting information on Checkpoint locations. Plaintiffs then state, "Derenda never gave the records to the Council," and citing to page 339, lines 6-14 of his December 23, 2021, deposition transcript. This clever phrasing insinuates that Derenda purposefully withheld information in furtherance of his "coverup." In reality, Derenda's deposition testimony reveals that he sent the Common Council's request for further information on the Checkpoints to Byron Lockwood, who was overseeing the Strike Force and Housing Unit at that time, for Lockwood to respond. *See* Derenda Dep. 2 at 338:7-340:6. Even though Derenda did not personally respond to the Common Council's inquiry, he commanded a ranking officer with knowledge to do it. Contrary to the Plaintiffs' speculative assertions, there is no evidence

---

[8]    Paragraphs 287-289, and 293-294 cite to news articles in support of the statements in those paragraphs. News articles such as these are inadmissible and cannot be used to oppose or support a motion for summary judgment. *See, e.g.*, *Outerbridge v. City of N.Y.*, 2015 WL 5813387, at *4 (S.D.N.Y. Sep. 30, 2015) ("newspaper articles offered for the truth of the matters asserted therein are inadmissible hearsay that may not be considered by the Court in deciding a motion for summary judgment."); *Ladner v. City of N.Y.*, 20 F. Supp. 2d 509, 519 (E.D.N.Y. 1998); *see also Omidian v. Bd. of Educ. of New Hartford Cent. Sch. Dist.*, 2009 WL 904077, n. 13 (N.D.N.Y. Mar. 31, 2009). As such, the Court should disregard these paragraphs and any and all such statements supported by inadmissible evidence.

that Derenda purposefully concealed or covered up the requested Checkpoint information. In a misguided effort, Plaintiffs also point to the tally sheets used to record the results of Checkpoints, which  Derenda provided to the Common Council. This information is irrelevant to the issues before this Court and certainly not evidence of an "elaborate coverup." Nor do these statements implicate Mayor Brown.

Plaintiffs also claim that Mayor Brown "personally reached out [to] the University at Buffalo in an effort to quash public criticism by UB Law School professor and Plaintiff's counsel, Anjana Malhotra, concerning the Checkpoints. Dkt. No. 319 ¶¶ 293-295." Dkt. No. 321, p. 7.[9] Again, this assertion is nothing more than Plaintiffs' exaggeration of the record evidence. In the referenced email exchange, there is no "pressure" exerted by Mayor Brown over UB Law School or Anjana Malhotra.[10] Instead, Mayor Brown states, "After hearing our concerns, some members of this committee sent the City the document this morning and have offered to meet, listen to the City's concerns and potentially make modifications before the document is released." Dkt. No. 310-13. Plaintiffs would have this Court believe that Mayor Brown was pressuring or coercing UB Law School to "quash" the article, but the documentary evidence does not support this exaggerated claim. More importantly, Plaintiffs' "evidence" does not show that Mayor Brown had sufficient personal involvement in traffic enforcement or the

---

[9]     Paragraphs 293 and 294 are inadmissible for the reasons articulated in footnote 8 and should not be considered by this Court.

[10]    It bears noting that Ms. Malhotra's quotations in the article referenced by Plaintiffs appear to rely upon her research on the Checkpoints. *See* Dkt. No. 319, ¶¶ 293-295. To the extent Plaintiffs rely on this report in opposition to summary judgment and in the event of a trial, the City questions the propriety of Ms. Malhotra's role as a witness and an advocate.

Checkpoints to warrant Section 1983 liability. Plainly, he did not. Accordingly, the Court should dismiss Mayor Brown as an improper defendant in Plaintiffs' Checkpoint claims.

### POINT VI.  <u>PLAINTIFFS' INJUNCTIVE RELIEF CLAIMS MUST BE DISMISSED</u>

On April 22, 2025, the Court issued its decision on Plaintiffs' Motion for Class Certification. *See* Dkt. No. 261. The Court denied certification of Plaintiffs' proposed Traffic Enforcement Class, which sought injunctive relief to limit the BPD's traffic enforcement policies and practices. *See* Dkt. No. 261, pp. 7-13 (citing Dkt. No. 63 at 73-74). In denying certification of this class, the Court held that "[t]o the extent Plaintiffs' injunctive relief requests 'obey the law' relief, it is not available under Rule 65(d)." "Plaintiffs have failed to establish that the members of the Traffic Enforcement Class have standing." *See id.* at pp. 9-13. The Court's decision with respect to the Traffic Enforcement Class is well-reasoned and properly grounded in law. The Court's denial of certification of the Traffic Enforcement Class constitutes the law of the case. It should not be reconsidered.

"[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003). And yet, that is precisely what Plaintiffs seek to do here. The Second Circuit has limited district courts' ability to reconsider their earlier decisions under the law of the case doctrine. *See id.* Prior district court rulings cannot be reviewed or changed by the district court unless there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." *See id.* (citing *Virgin Atl. Airways, Ltd. v. Nat'l*

43

*Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). Application of this standard is strict "and

reconsideration will generally be denied" absent satisfaction of one of the enumerated

preconditions. *See Neubecker v. N.Y.S.*, 387 F. Supp. 3d 302, 303-304 (W.D.N.Y. 2019) (citing

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). Contrary to Plaintiffs' argument

now, none of the circumstances recognized by the Second Circuit exists here. Reconsideration is

not warranted here.[11]

## A.    <u>Denial of Certification for the Traffic Enforcement Class was not Clearly Erroneous.</u>

The Court did not commit clear error in its denial of certification for the Traffic

Enforcement Class. Plaintiffs argue that the Court did, because it "focused its standing analysis

on the Checkpoint Program and treated all other allegations as derivative at best (ECF 261 at 1-

13)." Dkt. No. 321, p. 107. But that objection is flatly contradicted by the Court's decision. In

fact, the Court explicitly analyzed non-Checkpoint related allegations, holding that all of those

allegations, like the Checkpoint allegations, refer to past harm. *See* Dkt. No. 261, p. 11. The

Court also held that Plaintiffs' reliance on statistical disparities regarding traffic tickets—

regardless of whether received at Checkpoints or not—also reflected past alleged harm. *See id.* at

---

[11]    Despite their acknowledgement that neither the Court nor the City raise the issue of
mootness, Plaintiffs brief the issue. The Court should not even consider this argument as
the purpose of opposition papers is to oppose arguments and issues raised in support of
summary judgment. *See generally Joyce v. Remark Holdings, Inc.*, 2022 WL 179839, n.1
(S.D.N.Y. Jan. 20, 2022). Even if the Court does address this issue, "Defendants have
been found to satisfy their burden of establishing that the challenged conduct cannot
reasonably be expected to recur by, for example, submitting a sworn affidavit disavowing
any intent to ever repeat the challenged conduct." *Miller v. Sutton*, 2016 WL 3976540, at
*10 (D. Conn. July 21, 2016). That is what the City has done here with respect to the
Checkpoints. *See* Dkt. No. 252-6. Therefore, to the extent the Court evaluates mootness,
Plaintiffs' Checkpoint-related claims are moot.

p. 12. "Because no Plaintiff has established that he or she is 'immediately in danger of sustaining some direct injury as the result of the challenged official conduct, Plaintiffs have failed to establish that the members of the Traffic Enforcement Class have standing." *See id.* at p. 13. (internal citations omitted).

Plaintiffs also argue that the Court made a clear error since it evaluated injunctive standing as of the date of the class certification decision, as opposed to the date the original complaint was filed and the date additional plaintiffs sought leave to join the case. This proposition is untimely and incorrect. As to untimeliness, a district court should modify its judgment on the basis "only where the moving party demonstrates that the Court has overlooked factual matters or controlling decisions *that were presented to it on the underlying motion.*" *Perreca v. Gluck*, 262 F. Supp. 2d 269, 272 (S.D.N.Y. 2003) (citation omitted). This Court did not overlook anything with respect to its decision on the Traffic Enforcement Class. Plaintiffs cannot advance new issues or arguments not previously presented to the Court. These efforts are not a substitute for appeal. *See id.* (citations omitted). Plaintiffs did not make this argument in their Motion for Class Certification. *See generally* Dkt. No. 211; *see also* Dkt. No. 223, pp. 28-32. They should not be permitted to do so now.

Even if the Court considers this new argument, which it should not, Plaintiffs' proffered rule of law is inapplicable here. Where, as here, a complaint and the motion for class certification are not filed simultaneously, the timing of the motion for class certification is the material time for determining whether plaintiffs have standing. *See Jobe O. v. Spitzer*, 2007 WL 4302921, at *10-11 (S.D.N.Y. Dec. 5, 2007). This law is settled.

45

In *Jobie O.*, the Court held that the plaintiff lacked standing. *Id.* at *15. The Court reasoned that because the plaintiff "was no longer suffering the injury for which he seeks injunctive relief at the time he moved for class certification, in order to have standing, he would need to show that the threat of him suffering from the same injury is real and immediate, not conjectural or hypothetical." *Id.* at *14 (citing *Shain*, 356 F.3d at 215). Citing *Shain v. Ellison*, 356 F.3d 211 (2d Cir. 2004); *O'Shea v. Littleton*, 414 U.S. 488 (1974); and *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), the Court applied the well-settled rule that "[p]ast injury from challenged conduct does not, without more, provide a plaintiff with standing to seek to enjoin that conduct." This Court employed precisely the same analysis. *See* Dkt. No. 261, pp. 9-10. Because the plaintiff in *Jobie O.* could not demonstrate a sufficient likelihood that he would be subjected to the injury alleged in his complaint in the future, the Court held that he lacked standing to seek injunctive relief on behalf of the class at the time he moved for class certification. *Id.* at *10-11.

In support of their erroneous proposition, Plaintiffs cite *Robidoux v. Celani*, 97 F.2d 931 (2d Cir. 1993) and *Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994).[12] But *Comer* and *Robidoux*'s analysis of standing is inapplicable here. Timing is critical. *Jobie O.* extensively explains why. There, the plaintiffs also argued that under *Robidoux* and *Comer* standing should relate back to the date the action was commenced. *Id.* at *9-10. The Court disagreed, distinguishing *Comer* because the "thrust" of the Court's holding was that the plaintiffs moved

---

[12]    Plaintiffs also cite to *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025), which is inapposite because it does not deal with standing in the context of a class certification decision.

for class certification less than two months after filing their complaint, during which time, they still had live claims and controversies. *Id.*[13] Similarly, in *Robidoux*, the plaintiffs moved for class certification on the same date they filed their complaint. *Id.* at *10-11. The Court distinguished those cases from *Jobie O.*, since the plaintiff delayed in moving for certification nearly four years after commencing the action, during which time his claim was no longer a live controversy. *Id.* at *10. Just as in *Jobie O.*, the controlling distinction between *Robidoux* and *Comer* and this case is that the plaintiffs in *Robidoux* and *Comer* "still had live personal claims when they moved for class certification," which was close in time to the dates they commenced the actions. *Id.* at *11. That is not true here. Plaintiffs waited nearly six years from the date of commencement, and over four years from the date of amending their Complaint, to move for class certification.

"Without a rule that plaintiff have a live claim at least when the motion to certify is filed, the 'case or controversy' requirement would be almost completely eviscerated in the class action context." *Jobie O.*, 2007 WL 4302921, at *16 (citing *Lusardi v. Xerox Corp.*, 975 F.2d 964, 983 (3d Cir. 1992)). Plaintiffs' advocacy for a different time frame is contrary to governing law. Given this reality, the Court's decision with respect to the Traffic Enforcement Class is not clearly erroneous, does not cause manifest injustice, and should not be reconsidered.

---

[13]    The plaintiffs in *Comer* "were *personally* injured by the government conduct they were not suing on the theory that other members of their racial group might be injured." *See Vaughn v. Consumer Home Mortg. Co., Inc.*, 297 F. App'x 23, n.2 (2d Cir. 2008). (distinguishing *Comer* because there, plaintiffs were still actively seeking housing subsidies when they moved for class certification on claims challenging rules that disadvantaged them in the subsidy process).

**B.**    **No New Evidence Warrants Reconsideration.**

In a cursory and conclusory paragraph, Plaintiffs weakly advance their argument that newly available evidence warrants reconsideration of denial of the Traffic Enforcement Class's certification. *See* Dkt. No. 321, p. 109. To qualify, newly available evidence must be relevant and material to the underlying ruling to justify reconsideration. *See First State Ins. Co. v. Ferguson Enters., Inc.*, 2019 WL 2521838, at *5 (D. Conn. June 18, 2019). Evidence previously in a party's possession before the Court's ruling is not considered "newly available evidence." *Id.*

Here, Plaintiffs primarily cite to declarations from Plaintiffs Hall and Bonds, who purport to have been stopped by BPD in February and March of 2025. *See* Dkt. No. 321, p. 115. The Court issued its decision as to Class Certification on April 22, 2025. Assuming, for the sake of argument, the truth of Plaintiffs' "new" evidence, Plaintiffs were in possession of this evidence before the Court's decision. Now, over a month after the Court's decision and nearly three to four months after the alleged incidents, Plaintiffs present this evidence and claim that it is new and justifies reconsideration. The proposed evidence is neither new nor compelling.

Moreover, the evidence is neither material nor relevant to the standing inquiry. Perhaps tellingly, Plaintiffs include this in their argument regarding mootness. As Plaintiffs acknowledge, subsequent interactions with the BPD implicate mootness, not standing. As previously discussed, for standing, a live claim has to exist when the motion to certify is filed. *See Jobie O.*, 2007 WL 4302921, at *16. Even if the Court were to consider Hall and Bonds' declarations with respect to standing and reconsider the Motion for Class Certification as of the

date of Plaintiffs' Opposition (May 30, 2025), Plaintiffs still encounter the same fatal deficiency: the alleged February 8, 2025 and March 17, 2025 incidents were *past conduct*. As noted in *Jobie O.*, to accept Plaintiffs' argument that they do not need a live claim at the time of the motion for class certification would be to overturn the traditional standing doctrine. The Court should decline to do so here.

### C.    Plaintiffs Cannot Show a Realistic Threat of Future Injury.

As the Court correctly held, Plaintiffs' incidents of past harm are not enough to establish standing to pursue Plaintiffs' requested, future injunctive relief. "[P]ast exposure to illegal conduct does not in itself present a case or controversy regarding injunctive relief. . . if unaccompanied by any continuing present adverse effects." *Williams v. City of Aurora*, 2024 WL 1195515, at *9 (N.D.Ill. Mar. 20, 2024) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-496 (1974)); *see also McLennon v. City of N.Y.*, 171 F. Supp. 3d 69, 79 (E.D.N.Y. 2016) (holding that plaintiffs seeking injunctive relief for suspicionless vehicle checkpoints lacked standing). In response to this settled rule of law, Plaintiffs now allege that some of them have been subjected to traffic stops in 2025. *See* Doc. No. 321, pp. 115. But this belated effort is not enough to show standing.

In *Lyons*, the Supreme Court held that the plaintiff did not have standing to seek an injunction barring the use of chokeholds during traffic stops in the future. 461 U.S. at 111. Addressing this situation, the Court reasoned that:

> In order to establish an actual controversy in this case, Lyons would have had *not only* to allege that he would have another encounter with the police *but also* to make the incredible assertion

> either (1) that all police officers in Los Angeles always choke any
> citizen with whom they happen to have an encounter, whether for
> the purpose of arrest, issuing a citation, or for questioning, or (2)
> that the City ordered or authorized police officers to act in such a
> manner.

*Id.* at 105-106 (emphasis added). To satisfy this difficult standard, Plaintiffs must show both that

it is likely they will find themselves in the same circumstances giving rise to the allegedly

unconstitutional conduct *and* that it is likely they will be subjected to the allegedly

unconstitutional conduct again. *See NAACP Del. v. City of Wilmington*, 2025 WL 1927620, at *4

(D. Del. July 14, 2025) (citation omitted).

      In *NAACP Del.*, the Court held that the plaintiffs who alleged causes of action

including racially discriminatory traffic stops did not have standing to pursue injunctive relief, in

part, because they did not plausibly allege that the officers always acted pursuant to a racially

discriminatory custom or policy or that the City ordered or authorized the officers to act in such a

manner. *Id.* at *5. Even if Plaintiffs have presented some threat of undergoing a traffic stop again

here, there is nothing to suggest that all officers always stop Black and Latino motorists pursuant

to a custom, practice, or policy of racial discrimination, or to suggest that the City ordered or

authorized such action. *See also MacIsaac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 601

(S.D.N.Y. 2011). While Plaintiffs point to the Gennaco report for statistics, a "probabilistic

estimate that the general circumstances to which the plaintiff is subject may produce future

harm," is not enough. *Nelsen v. King Cnty.*, 895 F.2d 1248, 1251 (9th Cir. 1990). Rather, "an

individualized showing that there is a very significant possibility that the future harm will ensue"

is required. Plaintiffs have not made that showing here.

These facts distinguish this case from Plaintiffs' cited authority where the challenged police practice was widespread *and* deemed unlawful. *See Floyd v. City of N.Y.*, 283 F.R.D. 153, 169 (S.D.N.Y. 2012) (noting plaintiff had been subjected to behavior previously deemed unconstitutional); *Ligon v. City of N.Y.*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013) (plaintiff had been subjected to repeated stops that the court deemed unconstitutional); *Stinson v. City of N.Y.*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012) (plaintiffs received summonses without probable cause).

Plaintiffs' argument on the Checkpoint-related injunctive relief is also meritless. As the Court noted, the Checkpoints ceased in 2018. The Strike Force was disbanded, and none of the Plaintiffs' attestations prove otherwise. *See* Dkt. No. 261, p. 12. In response, Plaintiffs mischaracterize the cessation of the Checkpoints as a "pause" and argue that the City vowed the pause was temporary. This argument cannot be credited, as it is supported by an inadmissible piece of evidence—a news article from 2018. *See* Dkt. No. 319 ¶ 144. It is also contrary to the sworn testimony of current BPD Commissioner Wright. Under oath, he swore that they did not and will not resume Checkpoints within his tenure. *See* Dkt. No. 252-6. Accordingly, Plaintiffs' arguments that the Checkpoints could resume at some unspecified time in the future remain speculative, at best, and unsupported by the facts, evidence, and history for the past seven years.

## D.    Plaintiffs Seek Prohibited "Obey the Law" Injunctive Relief.

Even if the Court reconsidered its standing decision, which it should not, Plaintiffs' injunctive relief claims still cannot proceed. "[A]n injunction must be more specific than a simple command that the defendant obey the law." *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) (citing Fed. R. Civ. P. 65(d)). Plaintiffs reiterate their same

unpersuasive arguments offered at the class certification stage, on paper and at oral argument. Ultimately, Plaintiffs still seek the same "obey the law" injunctive relief. Having been reminded that they cannot amend their complaint through briefing, *see* Dkt. No. 261, p. 8, Plaintiffs argue that the relief they seek differs from the obey the law injunction sought in *Wakefield v. Scott*, 2021 WL 10342467 (D. Vt. June 24, 2021), because their operative complaint seeks to enjoin "specific municipal policies." *See* Dkt. No. 321, p. 117. Literally, they seek to enjoin the City from "continuing the policy, practice, and custom of conducting vehicle Checkpoints for general crime control" and "conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of race and ethnicity." *See id.* First, these are not "specific municipal policies." Plaintiffs do not point to any evidence that shows that the City had a policy of unconstitutional Checkpoints or discriminatory traffic enforcement. Second, time and time again, Plaintiffs fail to recognize the central questions that would resolve these issues. If the Court were to hold that the Checkpoints were unconstitutional, would that result be redundant of a decision enjoining the City from conducting the Checkpoints? Similarly, if the Court were to hold that the City had engaged in discriminatory traffic enforcement, would that result be redundant of a decision enjoining the City from discriminatory traffic enforcement? The answer to both questions is unequivocally yes. By deeming a practice unconstitutional, the Court effectively forbids that practice. An injunction would have the same effect as a ruling directing the City to obey the law. Therefore, despite their arguments, Plaintiffs' requested relief is an impermissible "obey the law" injunction.

While Plaintiffs argue that they should not be constrained by their own Complaint, limiting them to types of injunctive relief they seek, *see* Dkt. No. 261, pp. 117-118,

this argument does not save their improper remedy. Even if the Court were to consider the injunctive relief Plaintiffs now request in their briefings, all of those requests are still no different than an order commanding the City to obey the law.

Plaintiffs' alternate argument, that the Court should tailor the injunctive relief, rather than dismissing it, attempts to place Plaintiffs' burden on the Court. Unlike in *Peregrine* and *Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999) where the Court was able to easily discern a more appropriate form of injunctive relief, a "plainly appropriate" injunction is not obvious here. In fact, it is so obscure that Plaintiffs remain unable to detail what their requested injunctive relief would entail, despite at least three requests by the Court. Plaintiffs' unspecified reforms and "joint remedial process" leave the Court without an "operative command capable of enforcement or review" and offer "no guidance on the minimal standards required by the Constitution." *Walker v. City of Calhoun, Ga.*, 682 F. App'x 721, 724 (11th Cir. 2017).

For the reasons articulated here as well as in the City's Memorandum of Law in Support of Summary Judgment, Dkt. No. 252-46, the City's Class Certification submissions, Dkt. Nos. 220, 245, the Court should dismiss Plaintiffs' injunctive relief claims as seeking impermissible "obey the law" injunctive relief.

## POINT VII.  DEFENDANTS BROWN, LOCKWOOD, AND DERENDA ARE ENTITLED TO QUALIFIED IMMUNITY

Municipal employees "whose conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" are shielded from liability by qualified immunity. *Manza v. Newhard*, 915 F. Supp. 2d 638, 650 (S.D.N.Y.

2013) (citation modified); *see also Saucier v. Katz*, 533 U.S. 194, 202 (2001). Second Circuit courts have repeatedly emphasized that the "scope of qualified immunity is broad, and it protects all but the plainly incompetent or those who knowingly violate the law." *Manza*, 915 F. Supp. 2d at 650 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (citation modified).  Under the qualified immunity doctrine, municipal employees are not liable if they (1) did not violate a clearly established law or (2) it was objectively reasonable for them to believe their conduct did not violate a clearly established law. *See Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004).

A.    **As a Matter of Law, the Individual Defendants Did Not Violate Plaintiffs' Clearly Established Rights.**

"On a motion for summary judgment, factual assertions that are not supported by admissible evidence must be disregarded." *Ezeh v. McDonald*, 2015 WL 13951087, at *1 (W.D.N.Y. May 20, 2015). In that same vein, if the evidence the non-movant proffers is "merely colorable. . . or is not significantly probative. . . summary judgment may be granted." *Harewood v. N.Y.C. Dep't of Educ.*, 2021 WL 673476, at *7 (S.D.N.Y. Feb. 22, 2021) (citing *Anderson*, 477 U.S. at 249-250). Plaintiffs' argument in opposition hinges on their unsupported assertion that the City violated their clearly established rights to be free from checkpoints with a primary purpose of crime control and unconstitutional discrimination via traffic enforcement generally and the execution of those Checkpoints. *See* Dkt. No. 321, pp. 104-105. Because the facts must be construed in their favor on summary judgment, Plaintiffs contend, summary judgment on qualified immunity must be denied. *Id.* at 105. For the reasons already provided, even when the facts are construed in the light most favorable to Plaintiffs, they do not establish a violation of clearly established rights.

For instance, the evidence does not show that the Checkpoints' primary purpose was crime control. The evidence shows that traffic safety was the primary purpose of the Checkpoints. There is no constitutional right against being subjected to vehicle checkpoints conducted for traffic safety purposes. Such checkpoints have been repeatedly upheld by federal courts.  *See, e.g.*, *Wagner I*, 827 F. Supp. 2d at 98-99; *Henson*, 351 F. App'x at 821; *McFayden*, 865 F.2d at 1313. Similarly, there is no evidence of a policy, custom, or practice of targeting Black or Latino motorists for discriminatory traffic enforcement. At best, there is simply evidence of statistical disparities in traffic enforcement that are not significantly probative of a discriminatory policy, custom, or practice.

## <u>CONCLUSION</u>

For these compelling reasons, the Court should grant the City's Motion for Summary Judgment in its entirety, and grant such further and additional relief as the Court may deem just and proper.

Dated:      Buffalo, New York
            August 1, 2025

**HODGSON RUSS LLP**

*Attorneys for Defendants City of Buffalo, NY, Byron B. Brown, Byron C. Lockwood, Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, and Unknown Officers 1-20*

By:  */s/ Peter A. Sahasrabudhe*
         Hugh M. Russ III, Esq.
         Peter Sahasrabudhe, Esq.
         Cheyenne N. Freely, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY 14202-4040
716.856.4000
hruss@hodgsonruss.com
psahasra@hodgsonruss.com
cfreely@hodgsonruss.com