UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

BLACK LOVE RESISTS IN THE RUST, *et al.*, individually and on behalf of a class of all others similarly situated,

        Plaintiffs,

    v.

CITY OF BUFFALO, N.Y., *et al.*,

        Defendants.

No. 1:18-cv-00719-CCR

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

SUMMARY JUDGMENT STANDARD ........................................................................ 2

ARGUMENT ........................................................................................................ 3

I.    DEFENDANTS HAVE FAILED TO CARRY THEIR INITIAL BURDEN AT SUMMARY JUDGMENT WITH RESPECT TO SEVERAL OF PLAINTIFFS' CLAIMS ................................................................................ 3

    A.    Defendants Have Failed to Meet Their Initial Burden Regarding the BPD's Policy of Intentional Discrimination ................................ 4

    B.    Defendants Have Failed to Engage With the Actual Tinted Windows Equal Protection Claims, So These Claims Must Proceed to Trial ................................... 5

    C.    Defendants Also Failed to Address Plaintiffs' Actual Due Process Claims, So These Claims Should Proceed to Trial ................................ 6

    D.    Mayor Brown is a Proper Defendant for Checkpoint-Related Claims ................... 7

II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE FOURTH AMENDMENT CLAIMS SHOULD BE DENIED, AND PLAINTIFFS SHOULD BE AFFIRMATIVELY GRANTED SUMMARY JUDGMENT UNDER RULE 56(A) AND (F) .................................................................. 8

    A.    The Checkpoint Program is Unconstitutional Because Its Primary Purpose Is Crime Control ................................ 10

        1.    The Checkpoint Program Had an Admitted Crime Control Focus ........... 11

            (a)    Crime Control Was Also the Programmatic Focus of the BPD Units That Operated the Checkpoints ........................... 12

            (b)    Race and Crime, Not Traffic Safety Considerations, Drove the Selection of Checkpoint Locations ................................ 12

            (c)    White Neighborhoods Where Traffic Violations Occurred Were Not Prioritized for Checkpoints ................................... 13

            (d)    The Success of the Checkpoint Program Was Measured by Crime, Not Safety Data, and Checkpoint Procedures Reflected the Same Focus ............................................ 13

        2.    High Visibility Policing Is Also A Prohibited Crime Control Purpose .... 15

        3.    Defendants' "Traffic Safety" Justification for the Checkpoint Program Is Also an Impermissible Law Enforcement Purpose ................................... 16

    B.    The Checkpoint Program Fails the Special Needs Balancing Test ....................... 18

        1.    The Gravity of the Public Interest is Not Clear Based on the Record ...... 19

        2.    The Checkpoint Program Intrudes Upon Motorists' Reasonable Expectation of Privacy ............................................ 19

        3.    The Checkpoint Program Was Objectively and Subjectively Intrusive ... 20

            (a)    The Visibility of the Checkpoints Is A Matter of Dispute ........... 20

(b) The Checkpoint Program's "Standard Procedures" Were Burdensome and Oppressive........................................................ 21

(i) The Checkpoint Program Selectively Targeted Black and Latino Motorists for Suspicionless Traffic Stops and Burdened Their Constitutional Right to Travel ............... 21

(ii) The Checkpoint Program Was Characterized by Long Wait Times.................................................................................. 23

(iii) The Checkpoint Program Imposed Unique and Excessive Financial Burdens on Black and Latino Motorists ........... 23

(iv) The Checkpoint Program Stoked Fear and Concern Among Black and Latino Motorists.............................................. 24

4. The Checkpoint Program Was Ineffective at Advancing Its Purported Public Interest ............................................................................ 25

III. GENUINE ISSUES OF MATERIAL FACT CONCERNING DISCRIMINATORY INTENT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' EQUAL PROTECTION CLAIMS ............................... 26

A. The Equal Protection Standard ........................................................... 26

B. All of the Challenged Practices Had and Have a Racially Discriminatory Impact ................................................................................................. 28

1. Checkpoint Siting Was Discriminatory Even Controlling for Crime and Accidents, the Only Race-Neutral Justifications Ever Offered for Siting Decisions................................................................................. 29

2. Multiple Tinted Windows Ticketing Shows Clear Disparities That Cannot Be Explained on Any Basis Other Than Race ........................................ 30

3. The City Continues to Conduct Racially Discriminatory Ticketing and Traffic Stops of Black and Latino Motorists ............................................. 32

(a) The BPD's Ticketing Statistics Demonstrate Ongoing and Statistically Significant Racial Disparities Based on Driver Race 32

(b) The BPD's Traffic Stop Receipt Data Also Reveal Racial Disparities .................................................................... 33

(c) Defendants' Complete Absence of Statistical Proof.................... 34

4. For Years, BPD Has Maintained an Ongoing Program of Racially Discriminatory Pretextual Traffic Stops .................................................... 34

(a) The Emerging Statistical Evidence Confirms that the BPD Regularly Subjects Black and Latino Motorists to Suspicionless Vehicle Stops in Violation of Law and Policy.............................. 36

(b) The Emerging Video Evidence Already Confirms the Extensive Use of Pretext, Both in Initial Traffic Stops and in Extending the Stops for Searches and Interrogations............................................. 38

5.      Plaintiffs' Unrebutted Statistical Evidence Is "Actual Evidence" of Discriminatory Intent .............................................................. 42

        (a)     In the Second Circuit, Statistical Evidence Alone Can Establish Discriminatory Intent ............................................. 43

        (b)     The Checkpoint and Multiple Tinted Windows Ticketing Data Satisfy the *Burgis* Standard and Thus Constitute Evidence of Discriminatory Intent ............................................. 44

C.      The Evidence of Discriminatory Intent Is Overwhelming ..................................... 45

        1.      As to BPD's Overall Racially Discriminatory Traffic Enforcement Practices ...................................................................... 45

                (a)     Plaintiffs Have Direct Evidence of Intentional Discrimination .... 45

                        (i)     A 25-Year Veteran of the BPD Will Testify to Extensive Racial Discrimination in Traffic Enforcement Across Decades ............................................................ 45

                        (ii)    Policymaker Admissions of Racism in the BPD .............. 46

                        (iii)   Evidence of Intentional Discrimination by Policymakers 46

                (b)     Defendants' Use and Tolerance of Racial Slurs and Stereotypes Is Evidence of Discriminatory Intent ................................. 47

                (c)     Defendants' Deliberate Indifference to Complaints of Racial Discrimination and Failure to Monitor, Supervise, Investigate, Discipline, and Train Creates an Inference of Discriminatory Intent ............................................................................. 50

                (d)     The Well-Documented History of Intentional Racial Discrimination by the City of Buffalo Supports a Finding of Discriminatory Intent in this Case ................................. 55

        2.      As to the Checkpoints and Tinted Windows Claims ................................ 57

                (a)     The Evidence That Checkpoints Failed "Special Needs", Along With the Overwhelming Prevalence of Checkpoint and Patrol Siting in Black Neighborhoods and at Black Festivals, Provides Strong Evidence of Discriminatory Intent ................................. 57

                (b)     Anecdotal Evidence of Disparate and Discriminatory Treatment at Checkpoints Bolsters a Finding of Discriminatory Intent ............ 58

                (c)     Derenda and Lockwood Maintained a Widespread Custom and Practice of Discriminatory Tinted Windows Stops ..................... 59

                (d)     Defendants' Substantive Departures and Misrepresentations Provide Evidence of Discriminatory Intent ................................. 62

                        (i)     Shifting Justifications and Misrepresentations Relating to Checkpoints .......................................................... 62

    (ii) Disregard of Expert Policing Advice and Community Complaints ...................................................................... 64

    (iii) Prioritization of Ticket Counts over Public Safety ........... 65

  3. The BPD's Ongoing Traffic Enforcement Program Is Intentionally Discriminatory ........................................................................................ 66

    (a) The BPD's Use of Race-Based Presumptions Evinces That Pretext Stops Are Motivated by Discriminatory Intent............................ 67

    (b) The GIVE Daily Reports Confirm that the BPD Regularly Subjects Black and Latino Motorists to Suspicionless Vehicle Stops ........ 71

    (c) The BPD's Pretextual Policing Program Departs from Substantive Norms, Creating an Inference of Intentional Discrimination ....... 72

      (i) The BPD's Pretextual Policing Program Encourages Racially Discriminatory Traffic Enforcement and Departs from its Own Traffic Enforcement Policy ........................ 72

      (ii) The BPD Has Disregarded the Procedural Safeguards Recommended by the GIVE Program Experts and its Own Police Advisory Board to Reduce the Risk of Discriminatory Policing ..................................................... 74

    (d) Expert and Anecdotal Evidence Substantiates That the City is Liable for a Widespread Pattern and Practice of Racially Discriminatory Traffic Enforcement............................................. 75

    (e) The Existence of Reasonable Suspicion to Stop an Individual Does Not Obviate a Claim of Racial Profiling, and Defendants' Erroneous Understanding of this Precept Is Evidence of Discriminatory Intent .................................................................... 81

    (f) *Floyd* Strongly Supports Plaintiffs' Equal Protection Claims ...... 82

 D. Genuine Disputes of Material Fact Preclude Summary Judgment on the Individual Plaintiffs' Equal Protection Claims ........................................................................ 83

IV. PLAINTIFFS' TITLE VI CLAIMS SHOULD ALSO PROCEED TO TRIAL.................................... 85

V. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' DUE PROCESS CLAIMS ...................................................................................................... 87

 A. The Due Process Clause Prohibits Pecuniary Interests from Biasing Police Officers' Decisions ................................................................................................. 87

 B. BPD Officers Had a Personal Pecuniary Interest in Traffic Enforcement in Violation of the Due Process Clause ........................................................................ 89

  1. The City Maintained a Policy or Practice of Personally Incentivizing BPD Officers to Issue Traffic Tickets and Impound Vehicles .......................... 89

  2. There Is at Least a Triable Issue of Fact as to Whether BPD Officers' Personal Financial Interest Violated the Due Process Clause ................. 95

C.  BPD Officers Had an Institutional Pecuniary Interest in Traffic Enforcement in Violation of the Due Process Clause ..................................................................... 98

1.  The City Used Traffic Enforcement to Generate Revenue Through Policing Targeted at Buffalo's Minority Neighborhoods ......................... 98

2.  The City Established the BTVA and Other Ad Hoc Programs To Maximize Its Retention of Traffic-Related Revenues ............................ 100

3.  Institutional Pressure Was Applied on the BPD to Generate Revenue .. 101

4.  There Is at Least a Triable Issue of Fact As to Whether BPD Officers' Institutional Financial Interest Violated the Due Process Clause ........... 103

VI.  DEFENDANTS ARE INDIVIDUALLY AND MUNICIPALLY LIABLE ON PLAINTIFFS' DAMAGES CLAIMS .................................................................................................................... 103

A.  The Individual Defendants Are Not Entitled to Qualified Immunity ................. 104

B.  The City of Buffalo is Municipally Liable for Constitutional Violations .......... 105

VII.  PLAINTIFFS HAVE STANDING TO PURSUE THEIR INJUNCTIVE CLAIMS ............................ 106

A.  The Court's Prior Standing Ruling Should Not Be Treated as Law of the Case 106

1.  The Court Committed Clear Errors When It Failed to Analyze Plaintiffs' General Traffic Enforcement Claims and Failed to Analyze Standing as of the Claim Commencement Date ............................................................... 107

2.  Applying the Law of the Case Doctrine Here Would Result in Manifest Injustice ............................................................................................... 108

3.  The Law of the Case Doctrine Does Not Apply Because Newly Available Evidence Forecloses Mootness Arguments ........................................... 109

B.  Plaintiffs Have Injunctive Standing to Challenge Defendants' General Traffic Enforcement Practices ....................................................................................... 109

C.  Plaintiffs Have Injunctive Standing to Challenge the BPD's Checkpoint Policy ............................................................................................................................ 112

D.  Plaintiffs Injunctive Claims Are Not Moot ........................................................ 113

1.  Defendants Cannot Meet the Requirements of the Doctrine of Voluntary Cessation .............................................................................................. 113

2.  The Traffic Enforcement Practices that Plaintiffs Seek to Enjoin Remain Ongoing ................................................................................................ 115

E.  Summary Judgment Is Also Premature Under Rule 56(d) Because Merits Discovery Relevant to Mootness Is Still Ongoing ............................................. 116

VIII.  PLAINTIFFS SEEK APPROPRIATELY TAILORED INJUNCTIVE RELIEF & REMEDIAL PROCESSES THAT COMPORT WITH RULE 65(D), NOT AN OBEY THE LAW INJUNCTION ...................... 117

CONCLUSION .................................................................................................................... 119

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*219 S. Atl. Blvd. Inc. v. City of Ft. Lauderdale,*
239 F Supp.2d 1265, 1276–77 (S.D. Fla. 2002). .............................................................. 28

*Airbnb, Inc. v. City of N.Y.,*
373 3 467, 492 (S.D.N.Y. 2019) .................................................................................... 17

*Alexis v. McDonald's Restaurant of Massachusetts,*
67 F.3d 341 (1st Cir. 1995) .......................................................................................... 78

*Ali v. Connick,*
136 3 270, 280 (E.D.N.Y. 2015) .................................................................................... 78

*Allen v. Nassau County Exec. Office,*
2011 WL 1061019 (E.D.N.Y. Feb. 15, 2011) ................................................................. 86

*Am. Soc'y for Prevention of Cruelty to Animals v. Animal & Plant Health*
*Inspection Servs.,*
60 F.4th 16 (2d Cir. 2023) ........................................................................................... 117

*Ammons v. Dade City, Fla.,*
783 F.2d 982 (11th Cir. 1986) ...................................................................................... 57

*Amnesty Am. v. Town of W. Hartford,*
361 F.3d 113 (2dCir. 2004) .................................................................................... 84, 106

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................. 3, 21, 23, 116

*Andrew v. White,*
145 S. Ct. 75 (2025) ................................................................................................... 104

*Ash v. Tyson Foods, Inc.,*
546 U.S. 454 (2006) ..................................................................................................... 78

*Askins v. Doe No. 1,*
727 F.3d 248 (2d Cir. 2013) ................................................................................. 87, 89, 106

*Ave. 6E Invs., LLC v. City of Yuma,*
818 F.3d 493 (9th Cir. 2016) ............................................................................. 65, 72, 75

*Balk v. New York Inst. of Tech.,*
683 F App'x 89, 95 (2d Cir. 2017). ................................................................................ 10

*Ballew v. City of Pasadena,*
642 F. Supp. 3d 1146 (C.D. Cal. 2022) ....................................................... 35, 43, 75, 83

*Barrett v. Orange Cnty. Hum. Rts. Comm'n,*
    194 F.3d 341 (2d Cir. 1999) ........................................................ 106

*Bloomberg v. N.Y.C. Dep't of Educ.,*
    119 F.4th 209 (2d Cir. 2024) ........................................................ 86

*Brown v. City of Oneonta, N.Y.,*
    221 F.3d 329 (2nd Cir. 2000) ................................................ 26, 105

*Brown v. Texas,*
    443 U.S. 47 (1979) ...................................................................... 18

*Brown v. Vance,*
    637 F.2d 272 (5th Cir. 1981) ...................................................... 89

*Brucker v. City of Doraville,*
    38 F.4th 876 (11th Cir. 2022) ..................................................... 88

*Buck v. Davis,*
    580 U.S. 100 (2017) ............................................................. 50, 71

*Build of Buffalo, Inc. v. Sedita,*
    441 F.2d 284 (2dCir. 1971) .................................................. 55, 56

*Burgis v. N.Y.C. Dep't of Sanitation,*
    798 F.3d 63 (2d. Cir. 2015) ................................................... 43, 44

*Burton v. City of Belle Glade,*
    178 F.3d 1175 (11th Cir. 1999) ................................................ 118

*Bush v. Vera,*
    517 U.S. 952 (1996) .................................................................... 71

*Cangemi v. United States,*
    13 F.4th 115 (2d Cir. 2021) ...................................................... 106

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009) .................................................................... 97

*Cassidy v. Chertoff,*
    471 F.3d 67 (2d Cir. 2006) .................................................. 17, 19

*Castaneda v. Partida,*
    430 U.S. 482 (1977) .................................................................... 43

*Ceglia v. Zuckerberg,*
    287 F.R.D. 152 (W.D.N.Y. 2012) ............................................ 105

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................. 3, 4, 9

*Cent. Alabama Fair Hous. Ctr. v. Magee*,
   835 F. Supp. 2d 1165 (M.D.Ala. 2011), *overruled on other grounds*, 2013
   WL 2372302 (11th Cir. May 17, 2013) ............................................................ 74

*Chandler v. Miller*,
   520 U.S. 305 (1997) .......................................................................... 16, 17, 25

*Chen-Oster v. Goldman, Sachs & Co.*,
   251 F Supp. 3d 579, 589-90 (S.D.N.Y. 2017). ................................................ 108

*Chinese Am. Citizens All. of Greater N.Y. v. Adams*,
   116 F.4th 161 (2d Cir. 2024) ..................................................................... 26, 42

*Christopher v. Nestlerode*,
   373 F.Supp.2d 503, 509 (M.D.Pa. 2005). ......................................................... 78

*City of Chicago v. Morales*,
   527 U.S. 41 (1999) ......................................................................................... 70

*City of Indianapolis v. Edmond*,
   531 U.S. 32 (2000) ................................................................................*passim*

*City of Mesquite v. Aladdin's Castle, Inc.*,
   455 U.S. 283 (1982) ..................................................................................... 114

*City of St. Louis v. Praprotnik*,
   485 U.S. 112 (1988) ....................................................................................... 47

*Coach Leatherware Co. v. AnnTaylor, Inc.*,
   933 F.2d 162 (2d Cir. 1991) ............................................................................ 10

*Cole v. City of Memphis, Tenn.*,
   108 F. Supp. 3d 593 (W.D. Tenn. 2015), *aff'd* 839 F.3d 530 (6th Cir.
   2016) ........................................................................................................ 117

*Cole v. Fischer*,
   379 F. App'x 40, 43 (2d Cir. 2010). ................................................................. 78

*Coleman v. Town of Brookside*
   663 F. Supp. 3d 1261, 1272 (N.D.Ala. 2023) .................................................... 88

*Columbus Bd. of Educ. v. Penick*,
   443 U.S. 449 (1979) ................................................................................. 27, 62

*Colvin v. Keen*,
   900 F.3d 63 (2d Cir. 2018) ............................................................................ 107

*Comer v. Cisneros*,
   37 F.3d 775 (2d Cir. 1994) ................................................ 107, 108, 112, 113

*Connally v. Georgia*
   429 U.S. 245, 250 (1977) ............................................................................... 96

*Coward v. Town & Vill. of Harrison*,
    665 F. Supp. 2d 281 (S.D.N.Y. 2009)................................................................ 80

*Crawford-El v. Britton*,
    523 U.S. 574 (1998).......................................................................................... 27

*Crudup v. D.C.*,
    2023 WL 2682113 (D.D.C. Mar. 29, 2023)................................................. 31, 43

*Davis v. 2191 Niagara St., LLC*,
    2025 WL 959829 (W.D.N.Y. Mar. 31, 2025)................................................. 116

*Davis v. City of N.Y.*,
    959 F. Supp. 2d 324 (S.D.N.Y. 2013)........................................................*passim*

*Delaware v. Prouse*,
    440 U.S. 648 (1979)............................................................................. 19, 25, 26

*Democratic Cong. Campaign Comm. v. Kosinski*,
    614 F. Supp. 3d 20, 38 (S.D.N.Y. 2022). ............................................... 106, 112

*Deshawn E. by Charlotte E. v. Safir*,
    156 F.3d 340 (2d Cir. 1998)........................................................................... 116

*Doe v. Deloitte LLP Grp. Ins. Plan*,
    2025 WL 586670 (S.D.N.Y. Feb. 24, 2025)..................................... 8, 58, 71, 79

*Doe v. McDonald*,
    128 F.4th 379 (2d Cir. 2025) ........................................................ 107, 109, 114

*Doe v. Vill. of Mamaroneck*,
    462 F.Supp.2d 520 (S.D.N.Y. 2006)....................................... 26, 58, 79, 80

*Donachie v. Liberty Life Assur. Co. of Bos.*,
    745 F.3d 41 (2d Cir. 2014)............................................................................... 9

*Duke v. Luxottica U.S. Holdings Corp.*,
    2024 WL 4904509 (E.D.N.Y. Nov. 27, 2024)...................................... 107, 108

*E.E.O.C. v. KarenKim, Inc.*,
    698 F.3d 92 (2d Cir. 2012)............................................................................ 113

*East v. City of Chicago*,
    719 F.Supp. 683 (N.D.Ill. 1989) ..................................................................... 48

*Edmond. Mills v. D.C.*,
    571 F.3d 1304 (D.C. Cir. 2009) ..................................................................... 15

*FBI v. Fikre*,
    601 U.S. 234 (2024)............................................................................ 113, 114

*Ferguson v. City of Charleston,*
532 U.S. 67 (2001) .................................................................................*passim*

*Fero v. Excellus Health Plan, Inc.,*
304 F. Supp. 3d 333, 341-43 (W.D.N.Y. 2018) ..................................... 108, 109

*Fiacco v. City of Rensselaer, N.Y.,*
783 F.2d 319 (2d Cir.1986), *cert. denied*, 480 U.S. 922 (1987) ....................... 53

*Flora v. Sw. Iowa Narcotics Enf't Task Force,*
292 F. Supp. 3d 875 (S.D.Iowa 2018) ............................................................ 96

*Floyd v. City of N.Y.,*
813 F. Supp. 2d 417 ...............................................................................*passim*

*Floyd* v. *City of N.Y.,*
959 F. Supp. 2d 540, 666 (S.D.N.Y. 2013) ...................................................... 50

*Floyd v. City of New York,*
959 F. Supp. 2d 668 (S.D.N.Y. 2013) .................................................... 117, 118

*Foster v. Chatman,*
578 U.S. 488 (2016) ..................................................................................... 27

*Fox v. City of Wichita,*
No. 12-1271-CM, 2012 WL 6217384 (D. Kan. Dec. 13, 2012) ........................ 78

*Gebser v. Lago Vista Indep. Sch. Dist.,*
524 U.S. 274 (1998) ..................................................................................... 85

*Gelb v. Bd. of Elections of City of N.Y.,*
224 F.3d 149 (2d Cir. 2000) ............................................................................ 3

*Giron v. City of Alexander¸*
693 F. Supp. 2d 904 (E.D.Ark. 2010) ....................................................... 28, 80

*Gomillion v. Lightfoot,*
364 U.S. 339 (1960) ..................................................................................... 43

*Goodall v. N.Y. State Dep't of Corr. & Cmty. Supervision,*
725 F. Supp. 3d 248 (N.D.N.Y. 2024) .............................................................. 7

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.,*
641 F. Supp.2d 563, 570–72 (E.D.La. 2009). ................................................. 48

*Griffin v. Daubert Chem. Co.,*
2005 WL 1563212 (N.D.Ill. June 2, 2005) ..................................................... 48

*Hall v. Warren,*
2022 WL 2356700 (W.D.N.Y. June 30, 2022) ................................................ 80

*Harjo v. City of Albuquerque*,
   326 F. Supp. 3d 1145 (D.N.M. 2018) ........................................................... 103

*Harris v. Provident Life & Acc. Ins. Co.*,
   310 F.3d 73 (2d Cir. 2002) ............................................................................. 34

*Hellstrom v. U.S. Dep't of Veterans Affairs*,
   201 F.3d 94 (2d Cir. 2000) ........................................................................... 116

*Henrietta D. v. Giuliani*,
   246 F.3d 176 (2d Cir. 2001) ......................................................................... 118

*Holden v. Port Auth. of N.Y. & N.J.*,
   521 F. Supp. 3d 415 (S.D.N.Y. 2021) ........................................... 71, 74, 76, 80

*Hollingsworth v. Wagoner*,
   1990 WL 187125 (4th Cir. 1990) ................................................................... 74

*Holt Civic Club v. City of Tuscaloosa*,
   439 U.S. 60 (1978) ....................................................................................... 118

*Hope v. Pelzer*,
   536 U.S. 730 (2002) ..................................................................................... 104

*Hunter v. Underwood*,
   471 U.S. 222 (1985) ....................................................................................... 28

*Husain v. Springer*,
   494 F.3d 108 (2d Cir. 2007) ......................................................................... 105

*Hyland v. Navient Corp.*,
   48 F.4th 110 (2d Cir. 2022) .......................................................................... 106

*Illinois v. City of Chicago*,
   2019 WL 398703 (N.D. Ill. Jan. 31, 2019) .................................................. 118

*Illinois v. City of Chicago*,
   No. 17-CV-6260 ............................................................................................ 118

*Illinois v. Lidster*,
   540 U.S. 419 (2004) ................................................................................. 18, 23

*Jasinski v. Adams*,
   781 F.2d 843 (11th Cir. 1986) ....................................................................... 22

*Javier H. v. Garcia-Botello*,
   239 F.R.D. 342 (W.D.N.Y. 2006) ................................................................. 108

*Jean v. Nelson*,
   711 F.2d 1455 (11th Cir. 1983) ..................................................................... 57

*Jian Yang Lin v. Shanghai City Corp,*
    950 F.3d 46 (2d Cir. 2020)..................................................................................9

*Jingrong v. Chinese Anti-Cult World All. Inc.*,
    16 F.4th 47 (2d Cir. 2021) ......................................................................... 13, 14

*Johnson v. California,*
    543 U.S. 499 (2005)..........................................................................................70

*Jones v. Cnty. of Suffolk,*
    936 F.3d 108 (2d Cir. 2019)................................................................... 8, 17, 18

*Jones v. N.Y.C. Health & Hosp. Corp.*,
    2003 WL 21262087 (S.D.N.Y. May 29, 2003) ........................................... 6, 19

*Kennedy Park Homes Ass'n v. City of Lackawanna,*
    N. Y., 436 F.2d 108 (2d Cir. 1970)...................................................................62

*King v. City of Eastpointe*,
    86 F.App'x 790 (6th Cir. 2003) .......................................................................78

*King v. New Rochelle Mun. Hous. Auth.*,
    442 F.2d 646 (2d Cir. 1971)..............................................................................22

*Kistner v. City of Buffalo,*
    2022 WL 16797986 (W.D.N.Y. Nov. 8, 2022) ................................................51

*Kistner v. City of Buffalo,*
    2023 WL 144915 (W.D.N.Y. Jan. 10, 2023), *appeal dismissed*, 2024 WL
    2525332 (2d Cir. May 24, 2024) ......................................................................51

*Lackey v. Stinnie*,
    145 S. Ct. 659 (2025)......................................................................................113

*Lalonde v. City of Ogdensburg,*
    662 F. Supp. 3d 289 (N.D.N.Y. 2023) ...........................................................103

*Laurencin v. Town of W. Hartford*,
    2023 WL6312348 (D.Conn. Sept. 28, 2023) ............................................ 75, 85

*LeClair v. Saunders*,
    627 F.2d 606 (2d Cir. 1980)............................................................................105

*Lewis v. City of Albany Police Dep't*,
    547 F.Supp.2d 191 (N.D.N.Y. 2008), *aff'd*, 332 F.App'x 641 (2dCir. 2009)........ 53, 77, 85

*Ligon v. City of New York*,
    288 F.R.D. 72 (S.D.N.Y. 2013) .....................................................................110

*Lucente v. Cnty. of Suffolk*,
    980 F.3d 284 (2dCir. 2020)........................................................................ 53, 80

*Lynch v. City of N.Y.*,
    589 F.3d 94 (2d Cir. 2009)............................................................. 15

*MacWade v. Kelly*,
    460 F.3d 260 (2d Cir. 2006)........................................................... 18

*Major Tours, Inc. v. Colorel*,
    799 F. Supp. 2d 376 (D.N.J. 2011) ................................................ 46

*Maneely v. City of Newburgh*,
    208 F.R.D. 69 (S.D.N.Y. 2002) ............................................. 112, 114

*Marshall v. Columbia Lea Reg'l Hosp.*,
    345 F.3d 1157 (10th Cir. 2003) ........................................ 31, 70, 77

*Marshall v. Jerrico, Inc.*,
    446 U.S. 238 (1980)............................................................. *passim*

*Martin v. Conner*,
    882 F. Supp.2d 820, 839–41 (D.Md. 2012). .................................. 78

*Martinez v. Vill. of Mount Prospect*,
    92 F.Supp.2d 780 (N.D.Ill. 2000) .................................................. 51

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................... 3

*Matusick v. Erie Cnty. Water Auth.*,
    757 F.3d 31 (2d Cir. 2014)....................................................... 53, 61

*McLennon v. City of N.Y.*,
    171 F. Supp. 3d 69 (E.D.N.Y. 2016) ..................................... *passim*

*McNeil v. City of Buffalo*,
    2023 WL 2574954 (W.D.N.Y. Feb. 24, 2023) ............................... 51

*McNeil v. Cmty. Prob. Servs., LLC*,
    2021 WL 365844 (M.D.Tenn. Feb. 3, 2021) ........................... 88, 96

*Melendres v. Arpaio*,
    2013 WL 5498218, . (D. Ariz. Oct. 2, 2013), *aff'd in part, vacated in part*,
    784 F.3d 1254 (9th Cir. 2015) .................................................... 117

*Melendres v. Arpaio*,
    989 F. Supp. 822 (D. Ariz. 2013) .............................. 54, 71, 73, 81

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016)................................................. *passim*

*Michigan Dep't of State Police v. Sitz*,
    496 U.S. 444 (1990).............................................. 20, 23, 24

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003).............................................................................. 74

*Mitchell v. Fuentes*,
    2013 WL 2253585 (D.N.J. 2013) ..................................................... 78

*Moll v. Telesector Res. Grp., Inc.*,
    94 F.4th 218 (2d Cir. 2024) .....................................................*passim*

*Monell v. City of N.Y. Dep't. of Social Services*,
    436 U.S. 658 (1978)................................................................ 105, 106

*Moore v. Bitca*,
    2020 WL 5821378 (D. Vt. Sept. 30, 2020)...................................... 42

*Morrison v. Booth*,
    763 F.2d 1366 (11th Cir. 1985) ....................................................... 74

*Murphy v. City of New York*,
    719 F.Supp.3d 357 (S.D.N.Y. 2024)................................................. 53

*Myers v. County of Nassau*,
    2024 WL 3675815 (E.D.N.Y. Aug. 6, 2024)..................................... 43

*N.C. State Conf. of the NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ........................................................... 67

*Nat'l Ass'n for the Advancement of Colored People, Inc. by & through Myrtle
    Beach Branch v. City of Myrtle Beach*,
    476 F. Supp. 3d 308 (D.S.C. 2020)................................................... 48

*Nat'l Cong. for Puerto Rican Rts. v. City of New York*,
    75 F. Supp. 2d 154, 160 (S.D.N.Y. 1999) .............................. 110, 111

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
    875 F.3d 107 (2d Cir. 2017)............................................................... 4

*Nunez v. NYC Dep't of Correction*,
    758 F. Supp. 3d 190 (S.D.N.Y. 2024).............................................. 118

*O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    642 F.3d 110 (2d Cir. 2011)............................................................. 27

*Osegueda v. Stanislaus Cnty. Pub. Safety Ctr.*,
    2017 WL 1348943 (E.D.Cal. Apr. 11, 2017).................................... 70

*Ottaviani v. State Univ. of N.Y. at New Paltz*,
    875 F.2d 365 (2d Cir. 1989)............................................................. 29

*Outlaw v. City of Hartford*,
    884 F.3d 351 (2d Cir. 2018)........................................................... 104

*Pappas v. Giuliani*,
  290 F.3d 143 (2dCir 2002) ................................................................. 66

*Peña-Rodriguez v. Colorado*,
  580 U.S. 206 (2017) ......................................................................... 50

*People of the State of N.Y v. Dzielski*,
  Docket No. CR-16851-15 (Buffalo City Ct. May 3. 2016) ........................ 20, 21

*People v. Gumbs*,
  2018 WL 558526 (V.I. Super. Jan. 23, 2018) .................................... 12, 13

*People v. Trotter*,
  28 A.D.3d 165 (4th Dep't 2006) ............................................................ 12

*Peregrine Myanmar Ltd. v. Segal*,
  89 F.3d 41 (2d Cir. 1996) ................................................................. 118

*Pinter v. City of New York*,
  976 F. Supp.2d 539, 567 n.127 (S.D.N.Y. 2013) ................................. 80

*Pipitone v. City of New York*,
  57 F.Supp.3d 173 (E.D.N.Y. 2014) ..................................................... 53

*Plaintiffs #1-21 v. Cnty. of Suffolk*,
  2021 WL 11629176 (E.D.N.Y. Aug. 5, 2021) ................................ 33, 35, 42

*Proctor v. LeClaire*,
  846 F.3d 597 (2d Cir. 2017) ................................................................. 3

*Ramirez v. City of San Jose*,
  No. 21-CV-08127-VKD, 2022 WL 3139521 (N.D.Cal. Aug. 5, 2022) ........... 78

*Raymond v. N.Y. State Dep't of Corr. & Cmty. Supervision*,
  749 F. Supp. 3d 290, 308 (N.D.N.Y. 2024). ...................................... 114

*Red Ball Interior Demolition Corp. v. Palmadessa*,
  908 F. Supp. 1226, 1244 (S.D.N.Y. 1995) ........................................ 6, 7

*Reeves v. Sanderson*,
  530 U.S. 133 (2000) ..................................................................... 62, 64

*Reno v. Bossier Par. Sch. Bd.*,
  520 U.S. 471 (1997) ......................................................................... 57

*Reyes-Herrera v. Flaitz*,
  539 F.Supp.3d 290 (W.D.N.Y. 2021) .............................................. 73, 77

*Richardson v. City of N.Y.*,
  2018 WL 4682224 (S.D.N.Y. Sept. 28, 2018) ...................................... 43

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993)..................................................................................... 108

*Rodriguez v. U.S.*,
  575 U.S. 348 (2015)............................................................................... 36, 40, 72

*Rule v. Brine, Inc.*,
  85 F.3d 1002 (2d Cir. 1996).................................................................................. 27

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
  241 F.3d 232 (2d Cir. 2001).................................................................................. 117

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................................. 64

*Santiago v. Miles*,
  774 F. Supp. 775 (W.D.N.Y. 1991)................................................................. 47, 76

*Savino v. Town of Se.*,
  572 F. App'x 15 (2d Cir. 2014) ........................................................................... 105

*Scott v. Harris*,
  550 U.S. 372 (2007)........................................................................................ 13, 15

*Selevan v. N.Y. Thruway Authority*,
  711 F.3d 253 (2d Cir. 2013)................................................................................. 22

*Semedo v. Elliott*,
  2012 WL 2449912 (D.Mass. June 28, 2012) ...................................................... 80

*Shain v. Ellison*,
  356 F.3d 211 (2d Cir. 2004)................................................. 106, 110, 111, 112

*Shaw v. Reno*,
  509 U.S. 630 (1993)............................................................................................. 50

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995).................................................................................. 107

*Sloley v. VanBramer*,
  945 F.3d 30 (2d Cir. 2019)................................................................................. 104

*Smith v. Rochester Tel. Bus. Mktg. Corp.*,
  786 F. Supp. 293 (W.D.N.Y. 1992), *aff'd*, 40 F.3d 1236 (2d Cir. 1994) ......... 10

*Sorlucco v. N.Y. City Police Dep't*,
  971 F.2d 864 (2d Cir. 1992)................................................. 47, 58, 61, 77

*Sourovelis v. City of Philadelphia*,
  103 F. Supp. 3d 694 (E.D.Pa. 2015) ................................................................... 89

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
  736 F.3d 198 (2d Cir. 2013) ............................................................... 107, 109

*Stinson v. City of New York*,
  282 F.R.D. 360 (S.D.N.Y. 2012) ................................................................. 110

*Sunrise Dev., Inc. v. Town of Huntington*,
  62 F. Supp. 2d 762 (E.D.N.Y. 1999) ............................................................. 75

*Sykes v. City of Henderson*,
  738 3 1344, 1352–53 ...................................................................................... 80

*Tchatat v. City of New York*,
  2015 WL 5091197 (S.D.N.Y. Aug. 28, 2015) ............................................... 78

*Terrence Byrd v. United States*,
  584 U.S. 395 (2018) ....................................................................................... 20

*Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*,
  113 F. 4th 511 (5th Cir. 2024) ....................................................................... 97

*Tolan v. Cotton*,
  572 U.S. 650 (2014) ............................................................................... 104, 105

*Torcivia v. Suffolk County, N.Y.*,
  17 F.4th 342 (2d Cir. 2021) ........................................................................... 18

*Treasury Employees v. Von Raab*,
  489 U.S. 656 (1989) ......................................................................................... 8

*Tumey v. State of Ohio*,
  273 U.S. 510 (1927) ................................................................................. 87, 96

*U.S. v. Martinez-Fuerte*,
  428 U.S. 543 (1976) ......................................................................... 20, 22, 23

*United States v. Andrews*,
  2005 WL 4753403 (D. Neb. Nov. 1, 2005), *aff'd*, 465 F.3d 346 (8th Cir.
  2006) ................................................................................................ 75, 77, 78

*United States v. Bishop*,
  959 F.2d 820 (9th Cir. 1992), *overruled on other grounds by United States
  v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) ..................................................... 68

*United States v. Bowman*,
  496 F.3d 685 (D.C. Cir. 2007) ................................................................. 12, 20

*United States v. Davis*,
  270 F.3d 977 (D.C. Cir. 2001) ....................................................................... 12

*United States v. Fraire*,
  575 F.3d 929 (9th Cir. 2009) ......................................................................... 25

*United States v. Gomez,*
  877 F.3d 76 (2d Cir. 2017)..................................................................... 36, 40, 72

*United States v. Goulbourne,*
  2023 WL 6387123 (S.D.N.Y. Sept. 29, 2023)................................................. 16

*United States v. Hudson,*
  2007 WL 1656282 (D.D.C. June 5, 2007).......................................... 13, 19, 25

*United States v. Huguenin,*
  154 F.3d 547 (6th Cir. 1998) ..................................................................... 13, 14

*United States v. Moore,*
  716 F. Supp. 3d 415 (E.D. Va. 2024) ........................................................ 57, 85

*United States v. Morales-Zamora,*
  974 F.2d 149 (10th Cir. 1992) ......................................................................... 13

*United States v. Parks,*
  2022 WL 1819383 (W.D.N.Y. June 3, 2022).................................................... 72

*United States v. Quiros,*
  2020 WL 519807 (D.Vt. Jan. 28, 2020) .......................................................... 88

*United States v. Scopo,*
  19 F.3d 777 (2d Cir. 1994)............................................................................... 81

*United States v. Stein,*
  435 F. Supp. 2d 330 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2dCir. 2008) ....... 87

*United States v. Taveras,*
  585 F. Supp.2d 327, 338–39 (E.D.N.Y. 2008). ............................................... 70

*United States v. Turner,*
  2020 WL 733187 (M.D. Ala. Jan. 27, 2020) ................................................... 16

*United States v. Yonkers Bd. of Educ.,*
  837 F.2d 1181 (2d Cir. 1987)..................................................................... 56, 60

*Veasey v. Abbott,*
  830 F.3d 216 (5th Cir. 2016) .......................................................................... 64

*Vernonia Sch. Dist. 47J v. Acton,*
  515 U.S. 646 (1995)........................................................................................ 17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977)................................................................................*passim*

*Vitolo v. Guzman,*
  999 F.3d 353 (6th Cir. 2021) .......................................................................... 44

*Wagner v. Sprague*
    489 F.App'x 500 (2d Cir. 2012) ................................................................. 16

*Wagner v. Swarts,*
    827 F.Supp.2d 85 (N.D.N.Y. 2011). .................................................... *passim*

*Wakefield v. Scott,*
    2021 WL 10342467 (D.Vt. June 24, 2021) ........................................ 117, 118

*Ward v. Vill. of Monroeville, Ohio,*
    409 U.S. 57 (1972).............................................................................. 97, 103

*Washington v. Davis,*
    426 U.S. 229 (1976)............................................................................. 27, 42

*Weyant v. Okst,*
    101 F.3d 845 (2d Cir. 1996)...................................................................... 104

*Whren v. United States,*
    517 U.S. 806 (1996)......................................................................... *passim*

*Wilkins v. City of Chicago,*
    736 F. Supp. 3d 616 (N.D. Ill. 2024) ................................................ 35, 62, 67

*Williams v. Dart,*
    967 F.3d 625 (7th Cir. 2020) ...................................................................... 68

*Williams v. Kaufman Cty.,*
    352 F.3d 994 (5th Cir.2003) ...................................................................... 78

*Williams v. Smith,*
    781 F.2d 319 (2d Cir. 1986)....................................................................... 53

*Wolkenstein v. Reville,*
    694 F.2d 35 (2d Cir. 1982)......................................................................... 89

*Yick Wo. v. Hopkins,*
    118 U.S. 356 (1886)......................................................................... 43, 105

*Young v. U.S. ex rel. Vuitton Et Fils S.A.,*
    481 U.S. 787 (1987)................................................................................. 97

*Zeno v. Pine Plains Cent. Sch. Dist.,*
    702 F.3d 655 (2d Cir. 2012)....................................................................... 54

**Statutes**

28 U.S.C. § 1983.............................................................................................. 103

42 U.S.C. § 2000d............................................................................................. 86

N.Y. State VTL ....................................................................................... *passim*

**Other Authorities**

Fourth Amendment ................................................................................................*passim*

Fourteenth Amendment ........................................................................................*passim*

Fed. R. Civ. P. 15 ...................................................................................................... 108

Fed. R. Civ. P. 21 ...................................................................................................... 108

Fed. R. Civ. P. 56 ..................................................................................................*passim*

Fed. R. Civ. P. 65 .............................................................................................. 117, 118

## INTRODUCTION

The City of Buffalo has long maintained two sets of traffic enforcement policies and practices—one for Black and Latino motorists, and one for everyone else. The single, dominant theme tying together each of the challenged practices is long-term institutional and intentional racism within the City and the Buffalo Police Department ("BPD")—fueled by racial stereotypes about criminality—and an understanding that harvesting revenue from Black and Brown motorists through ticketing and traffic stops could solve the City's budget problems while enticing BPD officers with the promise of overtime. This action challenges these policies and practices pursuant to the Fourth Amendment, the Fourteenth Amendment Equal Protection and Due Process Clauses, and Title VI of the Civil Rights Act.

As set forth in Plaintiffs' Amended and Supplemental Complaint, ECF 63 ("ASC"), and as amply demonstrated by the massive evidentiary record accumulated over seven years of litigation, Defendants Byron Brown, the longtime Mayor of Buffalo, BPD Commissioners Daniel Derenda and Byron Lockwood, and the City of Buffalo ("Defendants") have:

- Erected a blatantly unconstitutional, multi-year crime suppression Checkpoint Program targeting motorists from Black and Latino neighborhoods for suspicionless stops, paused only due to impending litigation; *see* Secs. II, III.B.1, III.B.5, III.C.2;

- Incentivized officers to write excessive numbers of traffic tickets to raise revenue for the City on the backs of Black and Latino motorists; *see* Secs. III.B.2 & 3, VI;

- Blanketed Black and Latino motorists with multiple tinted window tickets—frequently as many as four in a single stop—in a manner that has no race neutral explanation; *see* Secs. III.B.2 & 5(b); and,

- Disproportionately and intentionally selected Black and Latino neighborhoods and motorists for traffic stops and enforcement—both at and *outside* of Checkpoints—not for the purpose of enforcing traffic laws, but to investigate them for crime, guns, gang involvement, and drugs, motivated by the same racially discriminatory presumption of Black criminality animating the Checkpoints, *see* Secs. II.A, III.B.5, III.C.

***These practices are not merely historical.*** The evidence at trial—including a bombshell cache of newly discovered evidence still under production that supplements the overwhelming record evidence of discriminatory intent—will be that discriminatory and pretextual traffic enforcement is rampant and ongoing, motivated by the same discriminatory intent as the Checkpoint

1

Program. That evidence, set forth in great detail below, will establish beyond peradventure that the principal traffic offense committed in the City of Buffalo—historically, currently and, unless enjoined, into the future—is Driving While Black or Latino.

Defendants' principal pushback in defense of their practices is that statistics aren't everything. Intent matters, too; of course it does. But contrary to their blithe assertion that there is "no evidence" of their intent to discriminate on the basis of race, Plaintiffs have amassed evidence of discriminatory intent that is multi-faceted, detailed, and overwhelming. While some of this evidence is statistical proof—at times showing such stark and severe patterns, unexplainable on grounds other than race, that it is relevant and decisive evidence of discriminatory intent—much of it is not.

This brief takes apart each of Defendants' asserted bases for summary judgment and demonstrates that triable issues of fact exist with respect to all but Plaintiffs' Fourth Amendment Checkpoint claim, for which Plaintiffs are entitled to judgment as a matter of law. *See* Mem. of Law in Support of Pls.' Mot. for Partial Sum. J. (ECF 253-1) ("PMSJ"). Accordingly, for the reasons set forth below and in Plaintiffs' Counter-Statement in Response to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56(A)(2) and Statement of Additional Material Facts ("PSAMF"), and the Declarations, Exhibits, and Expert Reports filed herewith, Defendants' Motion for Summary Judgment (ECF 252-46) ("DMSJ") should be denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted only where "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[1] If the movant meets its burden with a properly supported motion, the burden then shifts to the non-movant to present specific facts that show there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "Summary judgment should be denied where there are genuine issues of material fact that "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

The Court must view all facts in the light most favorable to the non-moving moving party and draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017). Therefore, "summary judgment is generally inappropriate where questions of intent and state of mind are implicated." *Gelb v. Bd. of Elections of City of N.Y.*, 224 F.3d 149, 157 (2d Cir. 2000). "Finally, an extra measure of caution is merited before granting or affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare." *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024).

### ARGUMENT

## I.   Defendants Have Failed to Carry Their Initial Burden at Summary Judgment with Respect to Several of Plaintiffs' Claims

As an initial matter, the bulk of Defendants' motion should be denied because Defendants[2] have failed to carry their "initial responsibility" of showing the absence of a genuine issue of material fact as to most of Plaintiffs' claims. *Celotex*, 477 U.S. at 323.

---

[1] Internal citations, internal quotations, and alterations are omitted throughout unless otherwise indicated. In addition, all references to ECF-filed materials such as the PMSJ and DMSJ refer to the page numbers appearing in the footer of the document, not the ECF header.

[2] Discovery has revealed that Defendants Derenda and Brown designed and maintained the Checkpoint Program, and Defendants Derenda and Lockwood oversaw the BPD's tinted (continued…)

### A.    Defendants Have Failed to Meet Their Initial Burden Regarding the BPD's Policy of Intentional Discrimination

Defendants move for summary judgment on the grounds that Plaintiffs have adduced "no evidence" that Defendants "sought to disadvantage or negatively impact minority motorists." DMSJ at 21. Defendants' motions should be denied for the threshold reason that they have failed to carry their initial burden under Rule 56(a). The Second Circuit has made clear that, on a motion for summary judgment, "unless the moving defendant cites portions of the record that show its entitlement to judgment, an assertion by the defendant that the plaintiff has not produced any evidence, without more, does not show that the plaintiff has insufficient evidence." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115-16 (2d Cir. 2017). Rather, "[s]uch a statement fails to show either that there is no genuine dispute as to any material fact or that the defendant is entitled to judgment as a matter of law." *Id.* at 116.

Defendants' intent argument (DMSJ at 20-28) relies almost entirely on bald assertions about purported lack of evidence while failing to engage meaningfully with the record. Defendants do not cite any contention interrogatory responses, 30(b)(6) deposition testimony, or other material that traditionally supports a post-discovery *Celotex* assertion that there is "no evidence" of discriminatory intent. *See Nick's Garage*, 875 F.3d at 116-17. Essentially, Defendants cite only two things in support of their intent argument. First, Defendants allege that the Checkpoint Program was established in response to traffic safety complaints by East Side Residents, citing deposition testimony from Derenda and Brown. DSMJ at 21. In reality, however, Brown's testimony concerns the impetus for the Strike Force, ***not*** the Checkpoint Program. *Id.* (citing ECF 252-11 at 57:4-58:21). Brown also ***retracted the testimony as inaccurate the very same day***—acknowledging that the Strike Force was created in response to ***crime***, and

---

windows ticketing practices, but the remaining individual defendants served in a more ministerial capacity. Plaintiffs therefore consent to the dismissal of Defendants Young, Brinkworth, Serafini, Thomas, and the 10 unknown officers and supervisors.

that Vehicle and Traffic Law ("VTL") enforcement was "*separate from the Strike Force*" mission. Ex. 6, Brown Nov. 6, 2023 Dep. at 71:10-19, 99:2-12. Similarly, Derenda's testimony concerns roadblocks run by the BPD's defunct Mobile Response Unit *prior* to the Strike Force's creation. DSMJ at 21 (citing ECF 252-12 at 96:3-97:2). Thus, Defendants' "evidence" that the Checkpoint Program was not driven by racial bias is *not* evidence *at all*.[3]

Second, Defendants highlight the fact that despite being unwavering in their belief that their traffic stops and tickets were the product of racial discrimination, some of the Plaintiffs also committed VTL violations. DSMJ at 25-28. Nothing about this shows a lack of discriminatory intent since traffic stops can violate Equal Protection even when they are backed by probable cause. *Whren v. United States*, 517 U.S. 806, 813 (1996). Indeed, the record is filled with evidence showing that Defendants' traffic enforcement policies and practices—including the traffic stops and ticketing that Plaintiffs experienced in and out of Checkpoints—were motivated at least *in part* by race. *See* Sec. III, *infra*. Defendants' failure to meet their initial burden precludes their motion as to Plaintiffs' Equal Protection claims.

### B.    Defendants Have Failed to Engage With the Actual Tinted Windows Equal Protection Claims, So These Claims Must Proceed to Trial

Plaintiffs' Amended and Supplemental Complaint ("ASC"), ECF 63, alleges that "the City of Buffalo has a policy, custom or practice of targeting non-White individuals for multiple tickets in a manner not applied to White individuals" (ASC ¶ 427), and the Motion for Class Certification sought (and has now obtained) certification of a "Tinted Windows Class" of "All Black and/or Latino individuals who received multiple tinted windows tickets in a single traffic stop on or after June 28, 2015." (ECF 211 at 3.) Plaintiffs explained that the Equal Protection claim of the Tinted Windows Class hinges on the City's "widespread custom and practice of

---

[3] Regrettably, Defendants cite this retracted and mischaracterized testimony throughout their brief. *See* DMSJ at 5, 7, 21, 29, 38.

targeting Black and brown drivers for multiple tinted windows tickets—often issuing four or more tinted windows tickets in a single stop—both at and outside of Checkpoints." (*Id.* at 40.)

Defendants completely fail to address this claim. They point out that multiple tinted windows ticketing is permissible under the VTL and discretionary with the ticketing officer (DMSJ at 10) but they do not engage at all with the allegations in the ASC that "BPD officers routinely exercise that discretion in favor of ticketing people of color" (ASC ¶ 112), and that "[o]n the rare occasions that White motorists *are* ticketed by the BPD for tinted windows, they can be expected to receive about 23% fewer tickets per incident than non-White motorists can." (*id*. ¶ 116.) The closest Defendants come is an assertion that "if one group of motorists is more distrustful of police, this may lead to them driving with tinted windows at a higher rate than other groups," DMSJ at 23. but this statement does not address *multiple* tinted windows ticketing at all, let alone the racially disparate multiple tinted windows ticketing alleged in the ASC and demonstrated in the Expert Report of Dr. David Bjerk. Ex. 101, Bjerk Report at 43, 55-56, 100-107. For this reason, too, summary judgment as to the Tinted Windows Equal Protection claim should be denied. *Red Ball Interior Demolition Corp. v. Palmadessa*, 908 F.Supp. 1226, 1244 (S.D.N.Y. 1995) (summary judgment improper on claim "made up of multiple allegations not addressed in this motion for summary judgment"); *Jones v. N.Y.C. Health & Hosp. Corp*., 2003 WL 21262087, *1 (S.D.N.Y. May 29, 2003) ("Since defendants did not address the issue explicitly in their motion for summary judgment, they did not meet their burden … and thus that claim remains for trial.").

### C.    Defendants Also Failed to Address Plaintiffs' Actual Due Process Claims, So These Claims Should Proceed to Trial

This Court should deny summary judgment as to Plaintiffs' Due Process claims for similar reasons: Defendants do not address Plaintiffs' actual Due Process claims, much less carry their burden to show why summary judgment is appropriate. Defendants' motion focuses entirely on garden variety procedural and substantive due process claims, but Plaintiffs do not

assert such claims. Rather, as Plaintiffs explained in connection with their motion for class certification (ECF 211 at 38-40), Plaintiffs assert due process claims based on conflicts of interest, pursuant to *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980); *accord* ASC ¶¶ 445-50. Because Defendants do not address, much less rebut, these claims, Plaintiffs' Due Process Clause claims should proceed to trial. *Palmadessa*, 908 F.Supp. at 1244.

### D.    Mayor Brown is a Proper Defendant for Checkpoint-Related Claims

Defendants concede that Commissioner Derenda created and implemented the Checkpoint Program, but question whether Mayor Brown is also a proper defendant for Checkpoint-related claims. DMSJ at 55-57. The answer is unequivocally yes. Defendant Brown, who served as Mayor and Chief Executive Officer for the City of Buffalo for almost two decades, was a final policymaker for the City who worked with BPD Commissioners to set policy for the BPD. PSAMF ¶¶ 85-86. Mayor Brown approved of the Checkpoint Program in all respects during his tenure as Mayor and continued to support the Program even amidst a surge of civilian complaints and discrimination concerns. PSAMF ¶¶ 86-87, 309, 311. Brown never issued any formal directives to terminate the Checkpoint Program or to prevent it from restarting, despite having the authority to do so. PSAMF ¶ 87. Instead, Brown joined Derenda in an elaborate pretextual coverup to conceal the racially discriminatory impact of the Program—which they well knew—from the public. PSAMF ¶¶ 286-295. Brown even personally reached out the University of Buffalo in an effort to quash a UB Law School professor's public criticism of the Checkpoints. PSAMF ¶¶ 293-95. Brown's direct participation in the Checkpoint Program makes him a proper defendant who can be held individually liable for constitutional violations associated with the Checkpoints. *See Goodall v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 725 F. Supp. 3d 248, 269 (N.D.N.Y. 2024) ("personal involvement can be established by evidence of an official's creation of a policy or custom under which unconstitutional practices occurred.").

## II. Defendants' Motion for Summary Judgment on the Fourth Amendment Claims Should Be Denied, and Plaintiffs Should Be Affirmatively Granted Summary Judgment Under Rule 56(a) and (f)

Plaintiffs and Defendants have cross-moved for summary judgment on Plaintiffs' Fourth Amendment Checkpoint claim. *See* PMSJ. "[W]here, as here, the motion and cross-motion seek a determination of the same issues, the Court may consider them together," although the ordinary rules regarding inferences and the construing of evidence apply. *Doe v. Deloitte LLP Grp. Ins. Plan*, 2025 WL 586670, at *3 (S.D.N.Y. Feb. 24, 2025). Defendants' motion for summary judgment must be denied, and Plaintiffs' motion for partial summary judgment should be granted, because as a program of suspicionless seizures devised by the City and its key policymakers, Commissioner Derenda and Mayor Brown, the BPD Checkpoint Program is presumptively unreasonable under the Fourth Amendment. *See* PMSJ at 8-10. Defendants are liable unless an exception to the individualized suspicion requirement applies, and here there is none. *Id.* at 10-20.

Defendants invoke the special needs exception but fail to demonstrate as a matter of law that the Checkpoints served such needs. *See Jones v. Cnty. of Suffolk*, 936 F.3d 108, 115 (2d Cir. 2019) (doctrine only applies in "exceptional circumstances" and burden rests with the government); *accord Ferguson v. City of Charleston*, 532 U.S. 67, 84 (2001) (calling the doctrine a "closely guarded category"). A court's analysis of the special needs doctrine proceeds in two parts: *First*, courts determine whether "special needs, beyond the normal need for law enforcement," justify waiving the Fourth Amendment's ordinary requirement of individualized suspicion. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000); *accord Treasury Employees v. Von Raab*, 489 U.S. 656, 665–66 (1989). To qualify, a suspicionless seizure program must have a primary and immediate objective that is "divorced from the State's general interest in law enforcement." *Ferguson*, 532 U.S. at 79, 84; *accord Jones*, 936 F.3d at 115 ("substantial non-law enforcement" justification required). If the government fails to make the initial

showing that a special need exists, the suspicionless seizure is unconstitutional and the court's inquiry ends. *Edmond*, 531 U.S. at 37, 47; *Ferguson*, 532 U.S. at 83–84. *Second*, if this preliminary showing is made, courts apply a balancing test that examines whether the suspicionless seizure program was constitutionally reasonable in light of the "competing interests at stake and the effectiveness of the program." *Edmond*, 531 U.S. at 47.

Defendants' argument fails at the threshold because *all three* of the Checkpoint Program's admitted purposes— "high police visibility," the "reduction of drug, gun, and gang activity," and "enforcement of the New York State Vehicle and Traffic Laws or VTL"—are impermissible law enforcement objectives, not special needs. Secs. II.A.1-3, *infra*.[4] Since there is no genuine dispute that all of the purposes of the Checkpoint Program were prohibited law enforcement purposes, the only question posed by the record is a purely academic one: which of the Checkpoint Program's three *prohibited* law enforcement purposes should be considered primary.[5] Accordingly, Defendants' summary judgment motion must be denied.

In addition, Plaintiffs are entitled to an affirmative grant of summary judgment on their Fourth Amendment claim pursuant to Rule 56(a) and (f)(1) because, despite having the "opportunity to place all relevant evidence in the record," Defendants have failed to show there is any set of facts which could entitle them to judgment as a matter of law. *Donachie v. Liberty Life Assur. Co. of Bos.*, 745 F.3d 41, 45 n.3 (2d Cir. 2014). Rule 56(f) recognizes the authority of district courts to enter summary judgment against a movant *sua sponte. Jian Yang Lin v. Shanghai City Corp*, 950 F.3d 46, 49 (2d Cir. 2020) (discussing Rule 56(f)); *Celotex Corp. v.*

---

[4] Plaintiffs' Motion for Partial Summary Judgment and accompanying 56.1 Statement of Undisputed Material Facts set forth all of the relevant facts and legal arguments supporting the argument in exhaustive detail. *See generally* PMSJ (ECF 253-1); Pls.' 56.1 Stmt. of Undisputed Material Facts (ECF 253-2).

[5] Defendants' acknowledgement that high visibility policing was a primary purpose of the Checkpoint Program (DMSJ at 43) makes the answer to this question all but immaterial, since high visibility policing is indistinguishable from crime control. *See* Sec. II.A.2.

*Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*"); *Smith v. Rochester Tel. Bus. Mktg. Corp.*, 786 F. Supp. 293, 303 (W.D.N.Y. 1992), *aff'd*, 40 F.3d 1236 (2d Cir. 1994) ("The making of a motion for summary judgment exposes the moving party to the risk that summary judgment will be granted against him, if the submissions make clear that there is no genuine issue as to any material fact.").[6]

Even if Defendants could establish that the Checkpoint Program advanced a permissible special need—which they cannot—the design and operation of the Checkpoint Program and its focused daily targeting of Black and Latino motorists over a five-year period renders it unreasonable under the special needs balancing test or, at a minimum, creates triable issues of fact. *See* Sec. II.B, *infra*. Therefore, Defendants' motion should be denied with respect to Plaintiffs' Fourth Amendment claim, and judgment should be entered for Plaintiffs.[7]

### A.    The Checkpoint Program is Unconstitutional Because Its Primary Purpose Is Crime Control

Defendants' reliance on *Wagner v. Swartz*, 827 F. Supp. 2d 85 (N.D.N.Y. 2011), is misplaced because, unlike the plaintiff in *Wagner*, Plaintiffs have amassed a substantial body of evidence, including admissions, deposition testimony, and documentary evidence, showing that the Checkpoint Program's admitted crime control purpose of targeting "drug, gun, and gang activity" was its primary purpose from its very inception. PSAMF ¶¶ 88-108. This renders the Program *per se* unconstitutional. *Edmond*, 531 U.S. at 44 (invalidating program whose

---

[6] Because Defendants affirmatively moved for summary judgment on the Fourth Amendment claim, they have already had a "full and fair opportunity to present all evidence" relevant to the Court's determination. *Balk v. New York Inst. of Tech.*, 683 F. App'x 89, 95 (2d Cir. 2017). Accordingly, all of the prerequisites for a *sua sponte* judgment have been met, and Plaintiffs are entitled to an affirmative grant of summary judgment here. *Id.*; *accord Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) (approving of *sua sponte* determinations "based on issues identical to those raised by the moving party").

[7] As discussed in Sections I.D and VI, the personal involvement of Brown and Derenda, final policymakers for the City and the BPD, in the Checkpoint Program also serves as a proper basis for both individual and municipal liability for which qualified immunity does not apply.

primary purpose was "indistinguishable from the general interest in crime control"); *Ferguson*, 532 U.S. at 82–84 (same).

### 1.    The Checkpoint Program Had an Admitted Crime Control Focus

First, the Checkpoint Program was a centerpiece of BPD Commissioner Derenda and Buffalo Mayor Brown's plan to curb gang and gun violence in the City of Buffalo, and had an admitted focus of reducing "drug, gun, and gang activity." PSAMF ¶¶ 92-99. The Checkpoint Program was funded in part by the New York State Gun Involved Elimination ("GIVE") Initiative as a zero-tolerance crime control measure. *Id.* ¶ 92. The Program continued Commissioner Derenda's longstanding practice of deploying checkpoints specifically for the purpose of seizing guns and contraband and preventing shootings and gang activity. *Id.* ¶ 93. Defendants Derenda and Brown also acknowledged the primacy of the Checkpoint Program's crime prevention and suppression purpose when speaking to press. *Id.* ¶ 96, 98. Derenda stated that the Checkpoints were "surprising the criminal element" and making people "less likely to carry guns." *Id.* Mayor Brown applauded the Strike Force initiative for its "phenomenal" impact on crime, and for "send[ing] a clear and ongoing message that criminal activity is not going to be tolerated in Buffalo." *Id.* ¶ 98.

BPD records overwhelmingly confirm that Checkpoints were deployed as a crime prevention strategy to address shootings, homicides, crime hot spots, gang violence, and criminal activity, and to intercept drugs and guns. PSAMF ¶¶ 99-108. BPD officers with direct involvement in the Checkpoint Program testified that the Checkpoints formed part of a crime prevention strategy. *Id.* ¶ 99. Mayor Brown also acknowledged that the Checkpoint Program reflected "an intersection of different missions," including the Strike Force's mission of addressing "shootings, homicides, gang violence, drug dealing." *Id.* ¶ 97.

(a)    Crime Control Was Also the Programmatic Focus of the BPD
Units That Operated the Checkpoints

Second, the Checkpoint Program was operated by the Strike Force and Housing Unit,

BPD police units whose unambiguous focus was crime control, not traffic safety. PSAMF ¶¶

88-91. This is strong evidence that the Checkpoint Program had an unlawful *primary* purpose.

*See, e.g.*, *United States v. Davis*, 270 F.3d 977, 981 (D.C. Cir. 2001) (the programmatic purpose

of the municipal program running checkpoints is relevant in determining primary purpose);

*Ferguson*, 532 U.S at 82 (rejecting a special needs argument in part because the preeminent

role of police and prosecutors in administering a policy undermined its asserted health and

safety aims); *United States v. Bowman*, 496 F.3d 685, 693 (D.C. Cir. 2007) (checkpoints run

by a drug and gun interdiction police unit were not clearly traffic and safety checkpoints subject

to the special needs exception); *People v. Gumbs*, 2018 WL 558526, at *11 n.130 (V.I. Super.

Jan. 23, 2018) (same); *People v. Trotter*, 28 A.D.3d 165, 171 (4th Dep't 2006) (checkpoints

were unconstitutional where they were "an inseparable part of the Rochester Initiative, the pur-

pose of which was to detect and deter violent crime and drug trafficking in the target area"). The

central role of the Strike Force and Housing Unit in the BPD Checkpoint Program distinguishes

this case from *Wagner*, where non-traffic safety personnel were only occasionally on hand and

never took part in inspections or interacted with motorists. *Wagner*, 827 F. Supp. 2d at 94 n.10.

(b)    Race and Crime, Not Traffic Safety Considerations, Drove the
Selection of Checkpoint Locations

Third, Defendants never adopted a policy of establishing checkpoints based on traffic

safety concerns and cannot identify a single instance where a Checkpoint was established on

that basis. PSAMF ¶¶ 102-105, 282, 284. Instead, race was ultimately the strongest predictor

for Checkpoint placement. *Id.* ¶ 22, 159-162. To the extent data was used to determine Check-

point locations, it was crime data including gang intelligence, crime statistics, hot spot maps,

reports of recent shootings or violence, or the Strike Force's crime fighting priorities. *Id.* ¶ 105.

This evidence wholly contradicts Defendants' claim that traffic safety was the Checkpoint Program's primary aim. *See Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021) (courts should disregard factual assertions "blatantly contradicted by the record") (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Courts have also found checkpoints to be crime control checkpoints in violation of *Edmond* where, as here, crime considerations drove Checkpoint placement decisions. *See, e.g.*, *Gumbs*, 2018 WL 558526, at *11 (checkpoints were "located where a series of serious gun-related incidents"—not traffic safety incidents—"recently occurred"); *United States v. Hudson*, 2007 WL 1656282, at *2, *6 (D.D.C. June 5, 2007) (checkpoint locations corresponded to "crime initiative," not speeding complaints).

(c)    White Neighborhoods Where Traffic Violations Occurred Were Not Prioritized for Checkpoints

Fourth, Checkpoints were virtually non-existent in majority-White communities, even though the BPD has "no data to suggest" that Black drivers commit more traffic violations than White drivers. PSAMF ¶¶ 130-139. Instead, Defendants placed Checkpoints almost exclusively in Black and Latino neighborhoods until public criticism reached a crescendo and the Buffalo Common Council launched an inquiry. *Id.* ¶¶ 130-137. While the racial disparities in the BPD's Checkpoint sitings constitute a separate equal protection violation, they also underscore the fact that the purported traffic safety rationale for the Checkpoints is legal subterfuge. *See United States v. Morales-Zamora*, 974 F.2d 149, 152-53 (10th Cir. 1992) (invalidating checkpoint stop where traffic safety justification was pretextual); *United States v. Huguenin*, 154 F.3d 547, 554-55 (6th Cir. 1998) (same).

(d)    The Success of the Checkpoint Program Was Measured by Crime, Not Safety Data, and Checkpoint Procedures Reflected the Same Focus

Further undermining any argument that traffic safety was the impetus for the Checkpoints, Defendants *never* conducted any analyses to determine whether the Checkpoint

13

Program improved traffic safety. PSAMF ¶ 106. When asked to explain why no such analyses were done, BPD Commissioner Derenda testified as the City's 30(b)(6) representative:

> We had a focus of **reducing crime** throughout the city which we accomplished. Traffic safety, if we came across numbers of accidents the chief said, oh, if we're having numerous accidents here, we would address it with **different issues**.

*Id.* ¶ 107 (emphasis added). Defendants' 30(b)(6) admission that the success of the Checkpoint Program was measured by crime, not safety data, all but proves that its primary focus was crime control, and that the Program lacked the "close connection" to roadway safety required for the special needs doctrine to apply. *Edmond*, 531 U.S. at 43; *Huguenin*, 154 F.3d at 555 (in determining primary purpose, "actions speak louder than words").

Consistent with this crime control purpose, Commissioner Derenda instructed the BPD officers conducting Checkpoints to "impound as many vehicles as legally possible," and to "make arrests and write traffic summons as many as possible," based in part on his discriminatory belief that such practices would mean "that "individuals who deal in narcotics do not have access to their vehicles"… and "cannot drive around and kill people." PSAMF ¶ 108. Commissioner Derenda also demanded daily reporting on officers' Checkpoint activities, and scrutinized officers for their low "production" whenever their numbers dropped. *Id.* ¶¶ 37-39, 700-709. The procedures that officers followed at Checkpoints—peering into motorists' cars and asking them questions that had nothing to do with traffic safety, like where they were coming from and going to—also suggested a broader crime investigation purpose. *Id.* ¶¶ 68, 126-127, 532-538, 658-659. *See, e.g.*, *McLennon v. City of N.Y.*, 171 F. Supp. 3d 69, 86 (E.D.N.Y. 2016) (finding sobriety rationale for checkpoints pretextual where officers engaged in similar behavior); *Huguenin*, 154 F.3d at 558-560 (same).

In light of the aforementioned evidence, Defendants' assertion that Checkpoints were principally driven by traffic safety considerations is so thoroughly contradicted that no reasonable jury could believe it. *Jingrong*, 16 F.4th at 57 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record … a court should not adopt that

14

version of the facts for purposes of ruling on a motion for summary judgment.") (citing *Scott*, 550 U.S. at 380).[8] Because virtually all the documentary evidence concerning the Checkpoint Program confirms that its primary purpose was the detection and suppression of crime, Defendants' motion for summary judgment fails, and Plaintiffs are entitled to judgment instead.

2.    *High Visibility Policing Is Also A Prohibited Crime Control Purpose*

The Checkpoint Program is unconstitutional under the Fourth Amendment for the independent reason that Defendants concede that a *primary* purpose of the Checkpoints was preventing and suppressing crime through "high visibility" policing. DMSJ at 6 (admitting "high visibility" was a primary purpose). BPD officers including Commissioner Derenda uniformly testified that the "high visibility" purpose of the Checkpoints was a crime control and deterrence strategy aimed at curtailing crime and disrupting gang activity, weapons offenses, and criminal behavior. PSAMF ¶¶ 15, 100-101.

Courts have recognized that crime deterrence is indistinguishable from crime control for purposes of *Edmond*. *Mills v. D.C.*, 571 F.3d 1304, 1306, 1312 (D.C. Cir. 2009) (collecting cases and enjoining "high police visibility" checkpoints). Accordingly, because an admitted *primary*—not secondary—purpose of the BPD Checkpoint Program is a prohibited crime control purpose, DMSJ at 6, Defendants' motion for summary judgment must be denied, and Plaintiffs are entitled to an affirmative grant of Judgment under Rules 56(a) and 56(f). *See Edmond*, 531 U.S. at 46–47 (checkpoints with an illicit primary purpose are per se unconstitutional, even if traffic safety checks are attached); *Lynch v. City of N.Y.*, 589 F.3d 94, 102 (2d Cir. 2009) (affirming *Edmond*'s prohibition and noting that multipurpose checkpoints are only permissible under the special needs doctrine where "crime control is *one* purpose—but not the *primary* purpose").

---

[8] As previously noted, Defendants have not cited a single piece of evidence that corroborates that the Checkpoint Program arose because of traffic safety complaints; instead they mischaracterize the prior testimony of Brown and Derenda. *See* Sec. I.A, *supra*.

### 3.    Defendants' "Traffic Safety" Justification for the Checkpoint Program Is Also an Impermissible Law Enforcement Purpose

Unable to escape this mountain of evidence, Defendants concede that the checkpoints served numerous crime control purposes, including "high police visibility" and the "reduction of drug, gun, and gang activity." DMSJ at 43. But cognizant of *Edmond*'s rule that crime control checkpoints are per se unconstitutional, Defendants contend that traffic safety and high visibility policing were primary purposes while others were secondary. *Id.* Given all the crime control evidence that Plaintiffs have amassed and the fact that an acknowledged *primary* purpose of the Checkpoints, high visibility policing, is a *prohibited* crime control purpose, this argument fails. *See* Secs. II.A.1–2; *Ferguson*, 532 U.S. at 81 (courts do not "simply accept the State's invocation of a special need"; instead, they conduct a "close review of the scheme at issue") (citing *Chandler v. Miller*, 520 U.S. 305, 322 (1997)).

Furthermore, even Defendants' pretextual "traffic safety" justification of enforcing the entirety of the New York State Vehicle and Traffic Laws is an impermissible law enforcement purpose as Plaintiffs' motion for partial summary judgment sets forth in detail. *See, e.g.*, PMSJ at 11–16; PSAMF ¶¶ 109-110. The sweeping law enforcement goal of the Checkpoint Program distinguishes it from *Wagner* and other cases where checkpoints have been upheld.[9] *See McLennon*, 171 F. Supp. 3d at 85 (stating programs must be "narrowly tailored" to pass constitutional muster); *United States v. Goulbourne*, 2023 WL 6387123, at *3 (S.D.N.Y. Sept. 29, 2023) (constitutionality of alleged traffic safety checkpoint was called into doubt where it did

---

[9] The checkpoints upheld in *Wagner v. Swarts*, 827 F.Supp.2d 85 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F.App'x 500 (2d Cir. 2012), did not share the BPD Checkpoint Program's sweeping law enforcement aims: they arose in response to "an alarming increase in motorcycle crashes", were narrowly focused on motorcycle safety violations, registration, and licensure, and only seventeen checkpoints were performed as part of the initiative. *Id.* at 89, 91, 96. The Checkpoints upheld in *United States v. Turner*, 2020 WL 733187 (M.D. Ala. Jan. 27, 2020) also had more focused aims: "enforcement of equipment violations, driver's license and permit violations, insurance violations, outstanding warrants and laws against driving while impaired." *Id.* at *1.

not serve "a *discrete* safety objective like drunk driving) (emphasis added); PMSJ at 16–20 (collecting cases).

Defendants have not cited any authority to support the proposition that police officers can sidestep the requirements of the Fourth Amendment for the sake of stopping motorists without any individualized suspicion "to methodically evaluate their compliance with the law," PSAMF ¶ 109 (citing Ex. 105, BPD MOP Ch. 8 § 10.5), and indeed there is none. The special needs doctrine does not apply where the government's asserted interest is "isomorphic with law enforcement needs." *Cassidy v. Chertoff*, 471 F.3d 67, 81 (2d Cir. 2006); *accord Ferguson*, 532 U.S. at 79-80; *Chandler*, 520 U.S. at 313-314. *See also Airbnb, Inc. v. City of N.Y.*, 373 3 467, 492 (S.D.N.Y. 2019) (special needs doctrine did not apply to program whose sweeping purpose was to "identify and pursue violators of the Multiple Dwelling Laws"). Plaintiffs are entitled to an affirmative grant of summary judgment on that basis. *See* PMSJ at 8–20.

VTL enforcement is a routine police function within the BPD that officers could readily perform in adherence with the Fourth Amendment's requirements of individualized suspicion. PSAMF ¶ 110. Indeed, Checkpoint ticketing focused on violations like tinted windows that are plainly observable to officers and do not pose a serious traffic safety concern. PSAMF ¶¶ 111-113. This evidence is fatal to Defendants' attempt to evoke the special needs exemption, as it shows that nothing about the aims of the Checkpoint Program necessitated Defendants' whole-sale, multi-year suspension of the Fourth Amendment's ordinary requirements with respect to Black and Latino motorists. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (limiting the special needs doctrine to circumstances where compliance with the Fourth Amendment is impracticable); *Jones*, 936 F.3d at 115 (same).

In conclusion, since broad VTL enforcement is definitionally not a "special need[] be-yond the normal need for law enforcement" that is incompatible with the ordinary requirement

17

of individualized suspicion, *Edmond*, 531 U.S. at 37, Defendants' motion for summary judgment must be denied and Plaintiffs' motion for summary judgment should be granted.

### B. The Checkpoint Program Fails the Special Needs Balancing Test

Even if Defendants could demonstrate a special need—which they *cannot*—the Checkpoint Program would not be "automatically, or even presumptively constitutional." *Jones*, 936 F.3d at 118. Instead, this Court would assess whether the Checkpoint Program was reasonable under the Fourth Amendment using a multi-part balancing test. *Id.* Traditionally, this test has looked at "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Illinois v. Lidster*, 540 U.S. 419, 426–27 (2004) (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)). However, the Second Circuit has adopted a slightly restated four-part test, as follows:

> "(1) the weight and immediacy of the government interest, (2) the nature of the privacy interest allegedly compromised by the [seizure], (3) the character of the intrusion imposed by the [seizure], and (4) the efficacy of the [seizure] in advancing the government interest."

*Torcivia v. Suffolk County, N.Y.*, 17 F.4th 342, 359 (2d Cir. 2021) (quoting *MacWade v. Kelly*, 460 F.3d 260, 269 (2d Cir. 2006)); *accord Jones*, 936 F.3d at 118 (citation omitted). The key difference in the Second Circuit's test is that considers an additional factor, "the nature of the privacy interest allegedly compromised by the [seizure]." *Torcivia*, 17 F.4th at 359.

Although Defendants claim that the special needs balancing test favors them, crucially they failed to address the operative Second Circuit balancing test, and their arguments each rely on disputed evidence. *Moll*, 94 F.4th at 227 (forbidding the weighing of evidence). Defendants also minimize the distinctive features of the BPD Checkpoint Program which distinguish it from checkpoint programs upheld in the past. Thus, when the special needs balancing test is appropriately applied, and all reasonable inferences are drawn in Plaintiffs' favor, triable

18

issues of fact exist concerning whether the Checkpoint Program was unreasonable under the Fourth Amendment. *Id.*

### 1. The Gravity of the Public Interest is Not Clear Based on the Record

The first prong of the balancing test does not favor Defendants because although promoting traffic safety is a legitimate government interest, Defendants' proffered justification for the Checkpoint Program is something else entirely—enforcement of the New York State Vehicle and Traffic Law writ large. *See* Sec. II.A.3, *supra*. Since ordinary law enforcement goals are not "special needs," *Cassidy*, 471 F.3d at 81, this purpose is neither grave nor weighty. Moreover, unlike in *Wagner*, where "defendants submitted statistics to substantiate their assessment of the motorcycle safety problem," 827 F. Supp. 2d at 96, Defendants here have not offered any empirical evidence of a traffic safety problem in Buffalo, nor corroboration that Checkpoint locations were driven by traffic concerns or complaints. *See* Sec. I.A, *supra*; *Hudson*, 2007 WL 1656282, at *7–8 (finding similar evidentiary gaps precluded a finding for defendants). Nor is there evidence that the Checkpoint Program advanced the interest in traffic safety, as (1) the success of the Program was measured in terms of its impact on crime alone, and (2) "different" tools were deployed by the BPD where traffic safety was concerned. PSAMF ¶¶ 106-107. Accordingly, Defendants cannot establish that the Checkpoint Program advanced a grave or weighty purpose at the summary judgment stage.

### 2. The Checkpoint Program Intrudes Upon Motorists' Reasonable Expectation of Privacy

The second factor of the Second Circuit's balancing test, not considered by Defendants, is the privacy interests implicated by the suspicionless seizure. *Jones*, 936 F.3d at 118–19. This element clearly favors Plaintiffs because motorists have a well-settled expectation of privacy to be free from suspicionless seizures upon which the Checkpoint Program intruded. *See, e.g.*, *Delaware v. Prouse*, 440 U.S. 648, 662–63 (1979) (recognizing privacy right and noting "[w]ere the individual subject to unfettered governmental intrusion every time he entered an

automobile, the security guaranteed by the Fourth Amendment would be seriously circum-scribed"); *Terrence Byrd v. United States*, 584 U.S. 395, 404–09 (2018) (motorists enjoy a reasonable expectation of privacy even when driving unlawfully).

   3.   *The Checkpoint Program Was Objectively and Subjectively Intrusive*

To determine the intrusiveness of a suspicionless checkpoint program, courts consider several objective factors. These include whether the checkpoints: (1) are "clearly visible"; (2) are "part of some systematic procedure that strictly limits the discretionary authority of police officers"; and (3) detain motorists "no longer than is reasonably necessary to accomplish their purpose unless other facts come to light creating a reasonable suspicion of criminal activity." *Wagner*, 827 F. Supp. 2d at 97 (citing *Bowman*, 496 F.3d at 692) (cleaned up). Courts also consider a number of subjective factors, including "the fear and surprise engendered in law-abiding motorists by the nature of the stop," *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 452 (1990), and their impact on motorists as a class, *U.S. v. Martinez-Fuerte*, 428 U.S. 543, 559 (1976). As explained below, the balancing test factors weigh in Plaintiffs' favor.

   (a)   The Visibility of the Checkpoints Is A Matter of Dispute

Plaintiffs have amassed evidence that the Checkpoints lacked the hallmarks of notice or visibility required under the Fourth Amendment to eliminate undue surprise to motorists. PSAMF ¶¶ 27, 123, 590. *See McLennon*, 171 F. Supp. 3d at 86 (asking whether motorists lacked any advance notice of the program); Ex. 260, *People of the State of N.Y v. Dzielski*, Docket No. CR-16851-15, at *4 (Buffalo City Ct. May 3. 2016) ("*Dzielski* Order") (suppressing evidence obtained from BPD Checkpoint on Fourth Amendment grounds because these was no evidence "that police had signs, safety devices, flares, or police cars stationed in place to alert motorists that they were approaching a checkpoint as required").[10] This alone is

---

[10] While Defendants attempt to dispute this fact, Plaintiffs' evidence must be credited. *Moll*, 94 F.4th at 227-28 (courts "must disregard all evidence favorable to the moving party that the jury is not required to believe").

sufficient to call into doubt the constitutionality of the Checkpoint Program. Ex. 260, *Dzielski* Order at *4–5; *see McLennon*, 171 F. Supp. 3d at 86 (sustaining Fourth Amendment claim where checkpoints were not marked by lights, cones, or flares or otherwise clearly visible).

(b)     The Checkpoint Program's "Standard Procedures" Were Burdensome and Oppressive

Although the parties agree that the Checkpoint Program followed a set of standard procedures, ECF 211 at 5, this portion of the intrusiveness standard also favors Plaintiffs because aspects of the Checkpoint Program's design made them burdensome and oppressive.

(i)     *The Checkpoint Program Selectively Targeted Black and Latino Motorists for Suspicionless Traffic Stops and Burdened Their Constitutional Right to Travel*

A defining feature of the BPD Checkpoint Program is its selective racial enforcement of Vehicle and Traffic Laws. As a matter of formal policy and widespread practice, the BPD erected suspicionless checkpoints almost exclusively in Black and Latino communities. PSAMF ¶¶ 54, 115-116, 130-137. This practice persisted despite Defendants' acknowledgement that Black motorists do not commit traffic offenses or even tinted window infractions more frequently than White motorists, and that White neighborhoods are a site of both traffic safety violations and citizen traffic complaints. *Id.* ¶¶ 132-139. Defendants also acknowledged the existence of racial discrepancies their brief, and their awareness that under the Checkpoint Program, "more minorities would be ticketed." DMSJ at 32.[11]

Plaintiffs and other Black and Latino motorists were often targeted for suspicionless seizures as they traveled to and from work, school, and church, impeding their Constitutional right to travel. PSAMF ¶¶ 118, 532, 540-542, 552-553, 652-657, 661. The Checkpoints also made Plaintiffs late to work (so often some got reprimanded), made them miss doctors'

---

[11] Although Defendants try to justify these trends, their excuses are not even supported by their own citations to evidence as noted above, and Plaintiffs are entitled to all reasonable inferences at the summary judgment stage. *Anderson*, 477 U.S. atat242, 255; *Moll*, 94 F.4th at 227-28.

21

appointments, ruined their groceries, strained their family relationships and cost them business opportunities by discouraging visitors, further demonstrating the Checkpoint Program's burdensome and oppressive nature. *Id. See King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) (acknowledging that the constitutional right to interstate travel has a "correlative constitutional right to travel within a state"); *Selevan v. N.Y. Thruway Authority*, 711 F.3d 253, 257 (2d Cir. 2013) (same). Because the Checkpoints were a regular fixture in Black and Latino communities—taking place almost daily, up to 4 times a day, with more than 1,600 Checkpoints occurring over a five-year period, Black and Latino motorists were often subjected to suspicionless Checkpoint stops repeatedly. PSAMF ¶¶ 96, 114, 117. Plaintiff Taniqua Simmons was stopped at BPD Checkpoints on *forty* different occasions, while Plaintiff Dorthea Franklin was stopped so many times, she "lost count." *Id.* ¶ 117. None of the cases Defendants cite sustaining checkpoints arose in a scenario like this one,[12] and the prolonged and recurrent nature of the Checkpoints brings them squarely within *Martinez-Fuerte*'s prohibition on checkpoints that "bear[] arbitrarily or oppressively on motorists as a class." 428 U.S. at 559.

These features of the Checkpoint Program violate a core tenant of the Supreme Court's jurisprudence on suspicionless seizures, which has only endorsed "reasonably-located checkpoints" that do not arbitrarily burden motorists as a class. *Martinez-Fuerte*, 428 U.S. at 562; *accord Jasinski v. Adams*, 781 F.2d 843, 850 (11th Cir. 1986) (checkpoints failed the intrusiveness prong of the special needs test where they showed "indifference to the rights of the motoring public" and officials failed to consider whether the "operation of the checkpoint was unduly burdensome and [] make adjustments").

---

[12] *See Wagner*, 827 F. Supp. 2d at 91 (checkpoints sustained occurred 17 times as part of a Statewide Motorcycle Enforcement and Education Initiative).

(ii)    *The Checkpoint Program Was Characterized by Long
Wait Times*

The Checkpoint Program was also objectively burdensome and intrusive because Plaintiffs and other motorists experienced long wait times even when they were not ultimately ticketed—sometimes in excess of 45 minutes. PSAMF ¶ 120.[13] This is a significant intrusion on the liberty of motorists and sets the BPD Checkpoint Program apart from any of the checkpoint programs that the Supreme Court has upheld as constitutional. *See, e.g.*, *Sitz*, 496 U.S. at 448, 452 (measuring the "objective" intrusion of checkpoints by the duration of the seizure, and permitting checkpoint with delays of 25 seconds); *Lidster*, 540 U.S. at 427–28 (sustaining checkpoint where wait times were "a few minutes at most" and police questioning lasted "only a few seconds"); *Martinez–Fuerte,* 428 U.S. at 547 (permitting checkpoint that lasted only three to five minutes).

(iii)    *The Checkpoint Program Imposed Unique and Excessive
Financial Burdens on Black and Latino Motorists*

Another of the "standard procedures" that Defendants tout was the Checkpoint Program's requirement that motorists be ticketed for every conceivable VTL violation, and that officers make as many arrests and impounds as possible. *See* PSAMF ¶¶ 108, 121. The Checkpoint Program's "maximum ticketing" requirement differs from the BPD's ordinary regime for traffic enforcement, where officers could decide *whether* to issue tickets, and the *number* of tickets to issue, as a matter of discretion—even though the custom and practice of the Department was to excessively ticket Black motorists.[14] *Id.* ¶¶ 121-122; *see also* Sec. III.B.2–3. Defendants' maximum ticketing requirement at Checkpoints created unique financial burdens for

---

[13] Although Defendants characterize checkpoint wait times as brief, this is clearly disputed so Plaintiffs' evidence must be credited. *Anderson,* 477 U.S. at 255; *Moll*, 94 F.4th at 227-28.

[14] While multiple ticketing was not required outside of Checkpoints as a matter of formal policy, it was nevertheless a municipal custom and practice with respect to Black and Latino motorists due to racial bias and an improper pecuniary interest. *See* Secs. III-V, *infra.*

Black and Latino motorists while raising significant revenue for the City and generating over-time and court appearance income for ticketing officers. *Id.* ¶¶ 38-41, 141-142, 692, 699-709.

Although Defendants attempt to justify this policy of maximum ticketing, they do not dispute that it existed. DMSJ at 40-41. Plaintiffs are entitled to an inference that the BPD's maximum ticketing requirement made the Checkpoint Program impermissibly intrusive, especially since these practices support a separate constitutional violation. *See* Sec. V, *infra*. *See also Moll*, 94 F.4th at 227 (instructing courts to "*draw all reasonable inferences in favor of the nonmoving party*, even though contrary inferences might reasonably be drawn.").

(iv)  *The Checkpoint Program Stoked Fear and Concern Among Black and Latino Motorists*

Finally, the Checkpoint Program was subjectively intrusive because Plaintiffs and other Black and Latino motorists felt fear and anxiety while passing through Checkpoints, even when their conduct was perfectly lawful. PSAMF ¶ 125, 438, 658-659. This was in part because motorists reported being treated "like criminals" at Checkpoints and subjected to prolonged stops and questioning that had nothing to do with traffic safety even in instances they were not ticketed. *Id.* ¶¶ 68, 126-127, 432, 537-538, 658-659. The fear and anxiety that motorists felt was heightened by their awareness that the Checkpoints constituted a racially selective law enforcement practice. *Id.* ¶¶ 115-116, 125-127. Cognizant of the fact that Checkpoints primarily targeted motorists in Black and Latino neighborhoods, the Checkpoints made Plaintiffs and other Black and Latino motorists feel stigmatized and discriminated against because of their race. *Id.* ¶ 115-117. Plaintiffs also worried that their police encounters would jeopardize the safety of themselves and their friends and families—fears that were reasonable given the history of discriminatory policing and police violence that Black and Latino people have faced in Buffalo, oftentimes to deadly effect. *Id.* ¶¶ 126-128, 222-223, 539, 660-661. Accordingly, a key factor supporting previous checkpoint programs—that "the fear and surprise engendered in law-abiding motorists" will be minimal—is absent here. *Sitz*, 496 U.S. at 452.

4.    *The Checkpoint Program Was Ineffective at Advancing Its Purported Public Interest*

The Checkpoint Program fails the final prong of the special needs balancing test because the tenuous connection between the Checkpoint Program and its alleged traffic safety objective dooms Defendants' argument that they were "closely related to addressing [] concerns over traffic safety." DMSJ at 39. The Checkpoint Program was not a response to an empirical traffic safety problem in Buffalo; it was a response to reports about crime, and traffic safety considerations were conspicuously absent from the program's design.[15] *See* Sec. II.A, *supra*; PSAMF ¶¶ 15, 22,-23, 88-108; *Chandler*, 520 U.S. at 319 (refusing to apply special needs doctrine where, *inter alia*, "lacking in [the government's] presentation is any indication of a concrete danger demanding departure from the Fourth Amendment's main rule").

Defendants' admission that crime reports, not traffic safety studies, were used as the metric to measure the program's success further corroborates that the Checkpoints lacked a traffic safety objective. PSAMF ¶¶ 107-108. Nor is there any evidence that the Checkpoints provided a traffic safety benefit beyond what the BPD could have achieved through ordinary traffic stops based on probable cause, "[t]he foremost method of enforcing traffic and vehicle safety regulations," *Prouse*, 440 U.S. at 659, especially given the fact that tinted window tickets, which are plainly observable and do not pose traffic safety concerns, saw the most exponential rise in connection with the Checkpoints. *See* DMSJ at 10; PSAMF ¶¶ 111-113. *See Chandler*, 520 U.S. at 320 (special needs doctrine did not apply where, *inter alia*, the government "offered no reason why ordinary law enforcement methods would not suffice"); *Hudson*, 2007 WL 1656282, at *7 (fact that police targeted a "readily observable problem that can be effectively controlled by means other than a roadblock" weighed against the checkpoint's

---

[15] Defendants' claim that Checkpoints were driven by traffic safety considerations is unsubstantiated at best. *See* Sec. II.A.1 & 2, *supra*. Defendants' failure to show that a "significant" problem existed prior to the establishment of the Checkpoint Program also distinguishes this case from *United States v. Fraire*, 575 F.3d 929, 934 (9th Cir. 2009).

25

constitutionality). These facts preclude any claim that at the summary judgment stage that the Checkpoint Program promoted traffic safety in a "sufficiently productive" fashion to be reasonable for purposes of this test. *Prouse*, 440 U.S. at 660.

In conclusion, because triable issues of fact exist concerning whether the burden and intrusiveness of the Checkpoint Program outweighs its purported benefit for purposes of the special needs balancing test, Defendants' motion for summary judgment must be denied. *Moll*, 94 F.4th at 227 (material disputes of fact preclude summary judgment).

### III. Genuine Issues of Material Fact Concerning Discriminatory Intent Preclude Summary Judgment on Plaintiffs' Equal Protection Claims

The Equal Protection claims in this action challenge three BPD traffic enforcement policies, practices, and customs that target Black and Latino drivers based on race: (1) crime suppression Checkpoints; (2) multiple tinted windows ticketing; and (3) ongoing racially discriminatory ticketing and pretextual traffic stops. Injunctive relief is sought on all three claims; damages are sought on the first two. Defendants' motion for summary judgment must be denied because copious evidence supports Plaintiffs' Equal Protection claims, and Defendants cannot show they "are entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

#### A. The Equal Protection Standard

To prevail on the Equal Protection claims at trial, Plaintiffs must prove that Defendants intentionally discriminated against them on the basis of race. *Brown v. City of Oneonta*, *N.Y.*, 221 F.3d 329, 337 (2nd Cir. 2000). Plaintiffs may establish intentional discrimination by showing either that Defendants applied a facially neutral policy in an intentionally discriminatory manner or that Defendants' facially neutral policy had an adverse impact and was motivated by discriminatory animus. *Id*. Plaintiffs here advance both theories.

Adverse impact is most often shown by statistical proof, although if discriminatory intent is clear, aggregate proof as to the class as a whole is not required. *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 171 (2d Cir. 2024); *Doe v. Vill. of Mamaroneck*,

462 F.Supp.2d 520, 549 (S.D.N.Y. 2006) (upholding a race discrimination claim against police enforcement without statistical proof). Discriminatory intent may be inferred from the "totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Because "smoking gun" evidence is rare, courts must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), and may rely on circumstantial evidence alone to find discriminatory intent. *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016).

The Supreme Court has laid out a number of areas of inquiry for evaluation of discriminatory intent, including: (1) the historical context; (2) substantive and procedural departures from norms and values generally followed by the decision-maker; (3) the sequence of events leading up to the challenged conduct; (4) contemporary statements of decisionmakers, including stereotypes and code words; (5) misrepresentations and pretextual rationales; (6) the foreseeability of discriminatory impact; and (7) anecdotal evidence and deliberate indifference, including the inadequacy of remedial steps. *Arlington Heights*, 429 U.S. at 265–68; *Foster v. Chatman*, 578 U.S. 488, 513–14 (2016); *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464–65 (1979); *Floyd v. City of N.Y.*, 813 F. Supp. 2d 417, 452–53, *on reconsideration,* 813 F. Supp. 2d 457 (S.D.N.Y. 2011). Such a multi-factor weighing and balancing is ill-suited for summary judgment, particularly since improper intent is "a pure issue of fact." *Crawford-El v. Britton*, 523 U.S. 574, 589 (1998). Further, resolving whether Defendants' policies are motivated, at least in part, by racial considerations, necessarily requires the precise type of credibility determinations that Rule 56 forbids. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); *Moll,* 94 F.4th at 228.

The standard is no different where, as here, a portion of the case is to be tried to the Court. *E.g.*, *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 642 F.3d 110, 116 (2d Cir.

2011) ("[T]he district court's task on a summary judgment motion—even in a nonjury case—is to determine whether genuine issues of material fact exist for trial, not to make findings of fact").

Defendants argue that Plaintiffs' assertion that Checkpoints' primary programmatic purpose was crime control is "inconsistent and fatal to their Equal Protection claim" (Br. at 22), but this argument is simply wrong. As *Arlington Heights* makes clear, Plaintiffs do ***not*** need to show that a discriminatory purpose "solely, primarily, or even predominantly" motivated Defendants' conduct; rather, it is sufficient that race served as "*a* motivating factor." *Arlington Heights*, 429 U.S. at 266. That crime control was the *primary* programmatic purpose of the Checkpoints is completely consistent with Checkpoints' *also* being motivated, in part, by discriminatory intent. *Hunter v. Underwood*, 471 U.S. 222, 232 (1985) ("[A]n additional purpose to discriminate against poor whites would not render nugatory the purpose to discriminate against all blacks[.]"); *Giron v. City of Alexander*¸ 693 F. Supp. 2d 904, 939 (E.D.Ark. 2010) (officer's motivations "to find favor with his superiors and to assist the City in raising money, does not justify or diminish his ethnic animus").[16]

## B.    All of the Challenged Practices Had and Have a Racially Discriminatory Impact

Defendants do not challenge the Equal Protection claims on grounds of lack of adverse impact, asserting only that there is "no evidence" of discriminatory intent. Nevertheless, a clear understanding of Defendants' discriminatory practices is important, both on its own and because it frames the discussion of discriminatory intent.

---

[16] The only case cited by Defendants on this issue, *219 S. Atl. Blvd. Inc. v. City of Ft. Lauderdale*, 239 F.Supp.2d 1265, 1276–77 (S.D. Fla. 2002), is not a race discrimination case and has nothing to do with *Arlington Heights.* The court there simply upheld city ordinances as rationally related to the goals of curbing underage drinking and preventing crime and public disruption. The plaintiff did not allege, and the court did not evaluate, whether the ordinances were motivated by race or by any other protected status.

1.    *Checkpoint Siting Was Discriminatory Even Controlling for Crime and Accidents, the Only Race-Neutral Justifications Ever Offered for Siting Decisions*

Prof. Bjerk's statistical analysis of the BPD Checkpoint locations found that the BPD "overwhelmingly" located checkpoints in Black and Latino neighborhoods compared to other neighborhoods. PSAMF ¶ 159b. From January 2013 to June 2017, BPD placed 1201 Checkpoints wholly within High Minority neighborhoods and only 131 within "Low Minority" neighborhoods.[17] PSAMF ¶ 159a. That is nearly a ten-fold difference in a city that is just slightly less than 50% Black or Latino. PSAMF ¶ 148. Differences in population size, crime rates, and accident rates could not explain the disparity. PSAMF ¶ 159e, 160, 161. Race was a "much stronger predictor" of Checkpoint location than violent crime rates PSAMF ¶ 159e. Accident rates did not predict Checkpoint locations *at all*. PSAMF ¶¶ 160, 282, 284. Bjerk's Checkpoint results are statistically significant not merely at the 5% level that is most frequently used in this Circuit, *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 371 (2d Cir. 1989), but in fact at the stronger 1% level.[18] PSAMF ¶ 162.

---

[17] Black and Latino individuals in Prof. Bjerk's report are referred to as "Minority"; everyone else is referred to as "Non-Minority." PSAMF ¶ 147.

[18] "Statistical significance" refers to the likelihood that an observed phenomenon will have arisen by chance. In *Ottaviani v. State Univ. of N.Y. at New Paltz*, the court held that a 0.05 level of statistical significance—meaning that the phenomenon was only 5% likely to have been due to chance—" can provide indirect support for the proposition that disparate results are intentional rather than random." 875 F.2d 365, 371 (2d Cir. 1989). Bjerk's analysis shows an even higher level of significance here, at 0.01, indicating that the phenomenon was only 1% likely to have been due to chance. *Id.* [19] Prof. Bjerk analyzed general multiple ticketing patterns as well as those for tinted windows specifically. Throughout the period studied, multiple ticketing in general—that is, the issuance of more than one ticket in a given traffic stop, regardless of the nature of the tickets—was consistently and statistically significantly racially disparate, with Minorities being 12%-20% more likely than non-Minorities to receive multiple tickets in a single stop. PSAMF ¶ 158. There is no separate damages claim for overall multiple ticketing, but the overall disparate impact of such ticketing has existed in all periods studied and, unless enjoined, will continue into the future.

2. *Multiple Tinted Windows Ticketing Shows Clear Disparities That Cannot Be Explained on Any Basis Other Than Race*[19]

In the six months prior to the advent of the Strike Force, the BPD issued only 597 tinted windows tickets in total, and there were only 110 incidents in which more than one such ticket was issued, and with no significant racial disparities. PSAMF ¶¶ 156a, 157a. The picture changed dramatically in June 2012, with the launch of the Strike Force and Derenda's enhanced "production" expectations.[20] From June 2012 to July 2015, tinted windows ticketing rates stayed relatively flat in predominately White neighborhoods but grew by a factor of *eight* in neighborhoods that were 60-80% Black or Latino and *thirteen* in neighborhoods that were 80-100% Black or Latino. PSAMF ¶ 156c.. From July 2012 to January 2018, BPD executed 15,319 traffic stops in which at least one tinted windows ticket was issued and the driver's race was recorded, 84.7% of which stops involved Black or Latino drivers. PSAMF ¶ 156d. Those stops resulted in 32,146 tinted window citations to Black and Latino drivers, but only 4,898 to drivers of other races (and 6,827 to drivers whose race was not recorded). PSAMF ¶ 156e.

In addition to the racial disparity in the raw number of tickets for tinted windows, the data show a significant racial disparity in the issuance of *multiple* tickets for tinted windows arising from a single stop. Prior to June 2012, drivers from different racial groups received multiple tinted windows tickets at approximately the same 20-25% rate. PSAMF ¶ 157b. With the advent of the Strike Force, the proportion of tinted windows incidents resulting in *multiple* tinted windows tickets rose drastically for all drivers but now with a significant racial

---

[19] Prof. Bjerk analyzed general multiple ticketing patterns as well as those for tinted windows specifically. Throughout the period studied, multiple ticketing in general—that is, the issuance of more than one ticket in a given traffic stop, regardless of the nature of the tickets—was consistently and statistically significantly racially disparate, with Minorities being 12%-20% more likely than non-Minorities to receive multiple tickets in a single stop. PSAMF ¶ 158. There is no separate damages claim for overall multiple ticketing, but the overall disparate impact of such ticketing has existed in all periods studied and, unless enjoined, will continue into the future.

[20] *See generally* Section V.[21] Defendants' expert admitted that he could not point to any academic studies to support this conjecture. Banks Dep. at p. 133:7–134:7.

differential. From July 2012-June 2015, the multiple tinted window rate exploded to almost *65%* for Black and Latino motorists, as compared to just over 50% for other motorists. PSAMF ¶ 157c. The rates went to 90% and 75%, respectively, from July 2015-January 2018, and the rates and racial differentials remained almost as high through 2019. PSAMF ¶ 157d.

These racial disparities are highly statistically significant. PSAMF ¶ 157g. And while BPD officers may not have known every motorist's race prior to making the initial traffic stop, they unquestionably had ample opportunity to observe each motorist's race prior to deciding how many tickets to issue. An officer's effort to ascertain motorist's race prior to taking action is plainly probative of discriminatory intent. *E.g.*, *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1169 (10th Cir. 2003); *see also Crudup v. D.C.*, 2023 WL 2682113, at *12 (D.D.C. Mar. 29, 2023) ("[S]tatistics demonstrate a pattern of behavior from which an unconstitutional policy of discriminatory intent or purpose can be inferred."). In thousands of incidents from June 2012 to December 2019, comprising the issuance of tens of thousands tinted window tickets, BPD officers routinely and intentionally issued more tinted windows tickets to Black and Latino drivers than to their non-Minority counterparts.

There is no race-neutral explanation for the disparity. PSAMF ¶ 157h. As Bjerk explained, nearly all cars eligible for one tinted windows ticket should be eligible for multiple tickets, given that it is extremely unlikely that a person of any race would tint just one window. PSAMF ¶ 157j. Nor is it likely that driver behavior changed significantly between 2012 and 2016. PSAMF ¶ 157i. Accordingly, the rise in racially disparate multiple tinted windows ticketing must have derived from a change in *officer* behavior—specifically, the intentional issuance of *multiple* tinted windows tickets to Black and Latino drivers as opposed to drivers of other races.

Defendants' argument that "if one group of motorists is more distrustful of police, that might lead to them driving with tinted windows at a higher rate than other groups" (DMSJ at

31

23) is not responsive to this claim.[21] Plaintiffs' tinted windows claim is that *within the group of people who received tinted windows tickets*, Defendants disproportionately issued *multiple* tickets to Black and Latino drivers, whereas drivers of other races were more likely to receive only one ticket. Defendants' expert did not dispute Bjerk's analysis on this point. PSAMF ¶ 157m. To the contrary, Banks conceded that the pattern of racially disparate *multiple* tinted windows ticketing "cannot be explained by a change in the underlying infraction rate." PSAMF ¶ 157i. Defendants have advanced no race neutral justification for the statistically significant disparity Plaintiffs have shown, and none exists. PSAMF ¶¶ 157h-m. The undisputed statistical evidence thus shows a clear pattern of disparate treatment that is "unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266.

3.  *The City Continues to Conduct Racially Discriminatory Ticketing and Traffic Stops of Black and Latino Motorists*

The claim for ongoing racially discriminatory traffic enforcement is set forth succinctly in paragraphs 91, 102-110, and 118 of the ASC. The unrebutted expert evidence establishes that the disparities existed, continue to exist, and are so large as to support an inference of intentional racial discrimination.

(a)  The BPD's Ticketing Statistics Demonstrate Ongoing and Statistically Significant Racial Disparities Based on Driver Race

Bjerk's Report and two Supplemental Reports demonstrate an ongoing pattern of racially discriminatory traffic enforcement against Black and Latino drivers from 2012 through December 31, 2024.[22] Throughout that period, ***driver-race disparities***—that is, the differences

---

[21] Defendants' expert admitted that he could not point to any academic studies to support this conjecture. Banks Dep. at p. 133:7–134:7.

[22] Prof. Bjerk's initial report is dated May 29, 2024 (ECF 203-1) and covers the period from 2012 through the end of 2022. It has since been updated twice, once to add coverage through June 30, 2024, and again to add coverage through year-end 2024. PSAMF ¶ 146. In each supplement, Bjerk determined that none of his conclusions had changed materially. Ex. 12, Bjerk 2024 Supp. Report ¶ 7; Ex. 521, Bjerk 2025 Supp. Report ¶ 7. Accordingly, our citations to (continued…)

between the numbers of citations issued to Minorities and those issued to Non-Minorities—*have __always__ been large and have __always__ been statistically significant*. PSAMF ¶ 151. In particular, over the entire eleven-year period from 2012 through the end of 2022, Minority drivers received approximately 75% of citations, even though they accounted for slightly less than half of Buffalo's population (PSAMF ¶¶ 150a) and thus were ticketed at *3.2 times* the rate of Non-Minority drivers relative to their respective proportions of the population. PSAMF ¶¶ 150b-c . In the "Current Era" (early 2020 through the end of 2024), the citywide "Population Adjusted Monthly Average Ticketing Rate" for Minority drivers is *2.3 times* that of Non-Minority drivers, up from 2.1x at the end of 2022. PSAMF ¶ 150d. Both ratios are significant at better than the .01 level, and the trend is upwards. These disparities occur even though the BPD has "no data to suggest" that Black drivers commit more traffic violations than White drivers do. PSAMF ¶ 139.

(b)    The BPD's Traffic Stop Receipt Data Also Reveal Racial Disparities

In June 2020, Buffalo instituted its Traffic Stop Receipt ("TSR") policy mandating that BPD officers record the race and reason for stopping every motorist to whom they did not issue a ticket. PSAMF ¶¶ 152-53.[23] Since 2020, the BPD has conducted three times as many stops in the district with the highest Minority population as it did in the lowest, with stops based on purported equipment violations or failure to use a turn signal accounting for a disproportionate share of stops in high-Minority neighborhoods (50% of all stops), compared to predominantly

---

Bjerk's narrative conclusions will generally be to the original report, whereas citations to data or statistics will be from the original or one of the supplements as appropriate.

[23] Notably, this data is incomplete: in contravention of BPD rules, approximately 20 percent of stop receipts did not include race, PSAMF ¶ 234, and some officers testified they did not routinely issue Stop Receipts. PSAMF ¶ 235. This by itself is evidence of discriminatory intent. *Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 11629176, at *4 (E.D.N.Y. Aug. 5, 2021). The broader issue of the ongoing overall pattern and practice in which BPD officers have routinely violated BPD policy by effecting *thousands* of traffic stops in which *neither* a ticket nor a TSR is issued, is addressed in the Krugman SJ Dec.

White neighborhoods (35% of all stops). PSAMF ¶ 155c. Bjerk found the same disparities when he performed the analysis by race of driver (Black and Latino drivers were stopped more than twice as often as other drivers). PSAMF ¶ 155b. In contrast, BPD stopped a disproportionately higher number of motorists who were non-Minority or lived in non-Minority neighborhoods for erratic driving or failure to stop at a stoplight or stop sign. PSAMF ¶ 155d. The racial disparities in type of stop strongly suggest disparate treatment.

(c)    Defendants' Complete Absence of Statistical Proof

Defendants have not put any affirmative statistical proof into the record to rebut Plaintiffs' claims. Nor could they, because they chose *not* to ask their expert, Dr. David Banks, to conduct his own statistical analyses of the Buffalo data, PSAMF ¶ 149; Dr. Banks merely offered various theories to try to explain the data without analyzing whether those speculations were correct as applied to the facts here. Relying on Dr. Banks, Defendants argue that "there are many reasons why one group of motorists may be ticketed at a higher rate than another that have nothing to do with race" (DMSJ at 23), but Prof. Bjerk gave reasons at his deposition why he thought it implausible that police behavior was not a significant factor in the variations he saw in the data. Ex. 460, Bjerk Dep. at 43-46. Such a disagreement between experts simply "underscores the existence of a factual dispute, which a jury will have to decide." *Floyd*, 813 F.Supp.2d at 450; *accord Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002) (summary judgment disfavored when parties present conflicting expert reports).

4.    *For Years, BPD Has Maintained an Ongoing Program of Racially Discriminatory Pretextual Traffic Stops*

The City has long used pretextual traffic stops targeting minority neighborhoods and motorists in selected units like the Strike Force and Housing Unit. PSAMF ¶ 324.[24]

---

[24] As set forth in the Krugman SJ Declaration, the City's haphazard and massively delayed production of so-called Gun Violence Elimination program ("GIVE") materials and repeatedly deficient Rule 30(b)(6) testimony forestalled inquiry into this area for years, but the logjam has finally been broken.

"Pretextual" traffic enforcement involves stopping cars for minor traffic violations to look for guns, drugs, ask questions to gain intelligence, and potentially investigate the driver and passengers for other crimes unrelated to the traffic stop. PSAMF ¶ 323. Such stops do not violate the Fourth Amendment if based on individualized suspicion and limited to the time it takes to issue a traffic ticket, but they do violate the Equal Protection Clause if race is a basis for the stop. *Wren*, 517 U.S. at 813; *Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 11629176, at *8 (E.D.N.Y. Aug. 5, 2021); *Ballew v. City of Pasadena*, 642 F. Supp. 3d 1146, 1195 (C.D. Cal. 2022); *Wilkins v. City of Chicago*, 736 F. Supp. 3d 616, 623–24 (N.D. Ill. 2024).

Defendants' discriminatory traffic stop program consists of two key policies and practices: (1) targeting Black and Latino drivers for pretextual traffic stops based on racial profiling and stereotypes, PSAMF ¶¶ 337-43, 351-53, 366-67, 370-77, 380-87, 391-92; and (2) saturating "hot spots" and large "gang areas" in Black and Latino neighborhoods with pretextual traffic stops to target drivers in the hot spot. PSAMF ¶¶ 326-335. Since the suspension of Checkpoints, the City has significantly increased funding for directed pretextual patrols and now practices pretext policing across the BPD. PSAMF ¶¶ 326-328, 348-350. As the BPD escalated its pretext policing directives and stops to investigate Black and Latino motorists, so did complaints to BPD Commissioners about such stops and "the racist stereotype widely held by many officers and supervisors that Black and Latino residents are presumptive criminals," although discipline was rare. IAD Witness Decl. ¶¶ 17-18. If the Court hears echoes of the Checkpoints Program in this form of policing, its hearing is appropriately acute.

The BPD often performs pretextual stops under the auspices of the state-funded GIVE program, which provides funds for locally-designed policing strategies, including policing in identified "hot spots." PSAMF ¶¶ 325-26. According to former Commissioner Gramaglia, GIVE hot spots are "largely" or "exclusively" in predominantly Black and Latino communities. PSAMF ¶ 332. The BPD directs officers on GIVE patrols to target specific "hot spot" areas

35

and to stop and investigate drivers traveling in the hot spot. PSAMF ¶ 334. BPD policymakers direct officers on GIVE patrols to target "hot people" including "gang members," "gang associates," "suspected gang members," "high-risk individuals," and "individuals identified to potentially carry weapons." PSAMF ¶ 337. Similarly, the BPD has identified broad "gang areas" that cover large swaths of Buffalo with predominantly Black populations. PSAMF ¶ 333. Within these areas, the BPD runs Gang Details in which officers "proactively" enforce traffic laws, because "traffic stops" are "one of the best ways to gather information"—even though only a "very small number" of individuals are gang members. PSAMF ¶¶ 346-47.

The Constitution[25] and the BPD's own Traffic Enforcement Policy limit the time of traffic stops to the time needed to issue traffic citations,[26] and prohibit race-based stops. *Whren*, 517 U.S. at 813. But, as discussed more fully in Section III.C.3 below, the directive establishing BPD's pretextual policing program inherently requires officers to depart from these requirements when conducting GIVE and gang patrols in Black and Latino neighborhoods and when applying pretextual tactics outside those areas.

> (a)    The Emerging Statistical Evidence Confirms that the BPD Regularly Subjects Black and Latino Motorists to Suspicionless Vehicle Stops in Violation of Law and Policy

As set forth in detail in the Krugman Summary Judgment Declaration ("Krugman SJ Decl.") filed herewith, the data analysis that became possible after the Macy and Palizay depositions last Summer and Fall provides strong reason to believe that BPD routinely conducts racially disproportionate traffic stops without constitutionally sufficient bases for doing so.

---

[25] *Edmond*, 531 U.S. at 37.

[26] *Rodriguez v. U.S.*, 575 U.S. 348, 354-55 (2015) (Fourth Amendment requires duration of stop to be limited to time necessary to "address the traffic violation that warranted the stop and attend to related safety concerns… Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed" unless there is new probable cause to extend the stop). *See also United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017).

Specifically, Capt. Palizay confirmed that there are two categories of traffic stops for which one cannot determine without further information that a sufficient basis exists:

- Stops in which a single ticket was issued, which ticket was for operating a motor vehicle without a valid driver's license ("unlicensed-driver-only" or "ULD-only" stops)
    - Although an officer can generally determine from external observation (running the license plate through the DMV system) whether the car is registered and/or inspected and/or has insurance, one does not know who is driving it, or the status of that person's driver's license, without stopping the car and asking the driver. Ex. 29, Palizay dep at 45:7-46:4].
    *(a)-and-*
- Stops in which neither a ticket nor a traffic stop receipt was issued ("no-tix/no-TSR" stops)
    - A stop in which neither a summons nor a traffic stop receipt was issued violates an express BPD policy that *every* traffic stop must be documented by one or the other. PSAMF ¶ 152. An officer who violates this express policy deliberately prevents the creation of a documentary basis for determining the reason for the stop.

PSAMF ¶ 516. There are about 3,000 no-tix/no-TSR stops, plus an additional 350 or so ULD-only stops *each year*. PSAMF ¶ 517.

Because there is in general to way to determine from BPDs datasets of tickets, TSRs, and traffic stops whether a given stop in fact had a permissible basis, and because the race of the driver being stopped is not recorded for no-tix/no-TSR stops (race *is* recorded for ULD-only stops), Plaintiffs requested that the City produce the body-camera videos from all such stops in the last six months of 2024. PSAMF ¶¶ 518-20. From those videos, one can determine the race of the driver and, at least, whether the officer effecting the stop asserted that the stop had a basis and, if so, what that basis was. That video production began in December 2024 and is ongoing. PSAMF ¶ 521.

As noted, race *is* recorded for ULD-only stops, so Plaintiffs were able analyze the race data for such stops. The results are stunning: ***The ULD-only stops were overwhelmingly of Minority Drivers***. PSAMF ¶¶ 522. Even in Low Minority tracts, Minority drivers constituted the vast majority of drivers who were subject to ULD-only stops—stops that by their very

nature suggested the absence of a proper basis and, in any event, whose recorded outcome (in terms of citations or TSRs issued) did not reflect whatever basis there may have been. *Id*.

| Year/Driver | Tract Type | | | Total |
| | Low Min | Mixed | High Min | |
| --- | --- | --- | --- | --- |
| *2022* | *82* | *15* | *133* | *230* |
| Min | 60 | 11 | 78 | 149 |
| Non-Min | 9 | | 11 | 20 |
| Not Coded | 13 | 4 | 44 | 61 |
| *2023* | *179* | *31* | *187* | *397* |
| Min | 129 | 18 | 145 | 292 |
| Non-Min | 25 | 8 | 8 | 41 |
| Not Coded | 25 | 5 | 34 | 64 |
| *2024 (6 mos.)* | *78* | *33* | *87* | *198* |
| Min | 57 | 24 | 67 | 148 |
| Non-Min | 13 | 7 | 5 | 25 |
| Not Coded | 8 | 2 | 15 | 25 |
| **Total** | **339** | **79** | **407** | **825** |

Unfortunately, as noted, no-tix/no-TSR stops do not come with race-of-driver information already coded. PSAMF ¶ 519. For those stops, the race of the driver can only be established by examining the video record of the stop. *Id.* Nevertheless, there is strong reason to believe that the racial profile of the no-tix/no-TSR stops will be similar to that of the ULD-only stops. *A priori*, ULD-only stops and no-tix/no-TSR stops are identical: in both instances, all the officer knows at the time of the stop is the race of the driver and the occupants and that the stop itself lacked a permissible basis—or, in any event, lacked a basis on which the officer felt it worthwhile to issue even a TSR, let alone a citation. That lack of basis is a characteristic of the stop at the outset; it is not affected by whether the officer later found out that the driver of the car was unlicensed.

>   (b)    The Emerging Video Evidence Already Confirms the Extensive
>           Use of Pretext, Both in Initial Traffic Stops and in Extending
>           the Stops for Searches and Interrogations

The December 2024 production, fragmentary though it was, revealed a third reason as to why the video evidence was likely to be central to Plaintiffs' injunctive case. **PSAMF ¶ 524.** While we were aware of numerous complaints and lawsuits challenging discriminatory pretext

stops, this production revealed numerous, repeated instances in which the stop itself may technically have had a permissible basis, but that basis appeared to have been a pretext for engaging in crime-control tactics such as interrogations, weapons pat-downs, and vehicle searches. *Id.* In other words, Pretext Stops.

In several stops, for example, BPD officers pull over a car driven by a young Black man, ostensibly on the basis that the car has tinted windows. PSAMF ¶ 525. The officers then pull the driver out of the car, pat him down, and place him in the back of the police cruiser while they search the car or ask him what he knows about drug sales. *Id*. Based on the sample reviewed thus far, this does not happen with White drivers. PSAMF ¶ 526.

Five examples of Pretext stops disclosed by the videos reviewed are included in the PSAMF. In each example, the driver—a Black man—was removed from the car, patted down, and placed in the back of the cruiser while the officers undertook a search of the car that revealed nothing. PSAMF ¶ 527. Two of these examples are of stops where the purported basis was tinted windows—one a ULD-only stop and the other a no-tix/no-TSR stop. If the tints were the actual reason for the stop, why was no summons issued? And if the officers simply wanted to warn the driver to get the tints taken care of, ***why did they not issue a TSR, as BPD policy required when no summons was issued?*** Indeed, the officer in the no-tix/no-TSR stop confirmed pretext when he told the driver, "So, just so you know, the reason for the stop is the window tint. Not a huge deal. I'm not gonna write you a ticket for that or nothing like that. Okay?" PSAMF ¶ 527b; Krugman SJ Decl. ¶ 48.

Other situations likewise give rise to strong inferences that the officers are seeking pretexts to search the cars or otherwise investigate Black people. It bears repeating that, under *Whren*, a pretext stop supported by probable cause is valid under the Fourth Amendment, but a ***racially targeted program of pretext stops*** is a flat-out Equal Protection violation. *Whren*, 517 U.S. at 813. In the third example, officers found a Black man asleep in a car pulled over

by the side of the road, woke him up, asked him if he had been drinking, and got the response, "No. I smoked some weed, but that's it."[27] PSAMF ¶ 527d. Under *Rodriguez* and *Gomez,* the detention should have ended right there, but the officers pulled the driver out of the car, patted him down, put him in the back of the cruiser, and searched the car. *Id.* Only when the search turned up nothing did they let the driver go.[28] *Id.*

Only a fraction of even the already-produced videos has been reviewed, and there are many more videos yet to be produced. PSAMF ¶ 528. Nevertheless, the statistics compiled from the produced videos are suggestive. For example, tabulating the no-tix/no-TSR stops reviewed to date in terms of location-of-stop, race-of-driver, purported basis for stop, and whether the car was searched, one obtains:

| | No-Tix/No-TSR Stops | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Car IS NOT Searched | | | | | | | | | NO Total | Car IS Searched | | | | | | | | | YES Total | Grand Total |
| Purported Basis for Stop | Low Minority Tract | | | Mixed Tract | | | High Minority Tract | | | | Low Minority Tract | | | Mixed Tract | | | High Minority Tract | | | | |
| | Min | Non Min | Total | Min | Non Min | Total | Min | Non Min | Total | | Min | Non Min | Total | Min | Non Min | Total | Min | Non Min | Total | | |
| Tints | - | - | - | 1 | - | 1 | - | - | - | 1 | 1 | - | 1 | - | - | - | 2 | - | 2 | 3 | 4 |
| Tints + Other | - | 2 | 2 | - | - | - | - | - | - | 2 | - | - | - | - | - | - | - | - | - | - | 2 |
| ALPR/Plates | - | 1 | 1 | 1 | - | 1 | 7 | 2 | 9 | 11 | - | - | - | - | - | - | 7 | - | 7 | 7 | 18 |
| Lights/Signal/ Passing/One-Way | 2 | 4 | 6 | 1 | - | 1 | 9 | 1 | 10 | 17 | - | - | - | - | - | - | 1 | - | 1 | 1 | 18 |
| Reckless/Speed | - | 2 | 2 | 2 | - | 2 | 2 | - | 2 | 6 | - | - | - | - | - | - | 2 | - | 2 | 2 | 8 |
| Red Light/Stop Sign | 2 | 3 | 5 | 2 | 2 | 4 | 6 | 6 | 12 | 21 | - | - | - | - | - | - | 1 | 1 | 2 | 2 | 23 |
| Suspected DWI | - | - | - | - | - | - | - | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | 1 |
| BOLO | 3 | - | 3 | - | - | - | - | - | - | 3 | - | - | - | - | - | - | - | - | - | - | 3 |
| Other | - | 4 | 4 | - | - | - | 3 | 1 | 4 | 8 | 2 | - | 2 | - | - | - | 4 | 1 | 5 | 7 | 15 |
| No Basis | - | - | - | - | - | - | - | - | - | 3 | - | - | - | - | - | - | 2 | - | 2 | 3 | 3 |
| **Grand Total** | **7** | **16** | **23** | **7** | **2** | **9** | **27** | **11** | **38** | **70** | **3** | **1** | **4** | **-** | **-** | **-** | **19** | **2** | **21** | **25** | **95** |

The pretextual nature of these stops leaps off the page. In ***none*** of these stops was the ostensible basis for the stop deemed sufficient to warrant even the issuance a traffic ticket, and the officer also chose (in violation of BPD policy) not even to issue a TSR. Nevertheless, BPD searched the cars in over a quarter of the stops (25/95), and fully 22 out of the 25 searches (90.1%) involved Black or Latino drivers.

---

[27] Many videos reflect that the BPD understands that marijuana usage is now legal in New York and that BPD officers correctly treat the presence or usage of small amounts of marijuana as not a matter of law enforcement concern.

[28] The final example is a no-tix/no-TSR stop in which the pretext was a missing license plate.

The numbers are not materially different if one includes the ULD-only stops. Again, whatever the purported bases for these stops may have been, ***those bases did not result in the issuance of either a ticket or a TSR***. All that happened was issuance of some form of citation for driving without a valid license:

| Purported Basis for Stop | Car IS NOT Searched | | | | | | | | | NO Total | Car IS Searched | | | | | | | | | YES Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Low Minority Tract | | | Mixed Tract | | | High Minority Tract | | | | Low Minority Tract | | | Mixed Tract | | | High Minority Tract | | | | |
| | Min | Non Min | Total | Min | Non Min | Total | Min | Non Min | Total | | Min | Non Min | Total | Min | Non Min | Total | Min | Non Min | Total | | |
| Tints | - | - | - | 1 | · | 1 | - | - | - | 1 | 1 | - | 1 | - | · | - | 7 | - | 7 | 8 | 9 |
| Tints + Other | - | 2 | 2 | - | · | - | - | - | - | 2 | - | · | - | - | · | - | - | - | - | - | 2 |
| ALPR/Plates | 1 | 3 | 4 | 1 | · | 1 | 9 | 2 | 11 | 16 | - | · | - | - | · | - | 10 | - | 10 | 10 | 26 |
| Lights/Signal/ Passing/One-Way | 2 | 4 | 6 | 1 | · | 1 | 10 | 1 | 11 | 18 | - | · | - | - | · | - | 2 | - | 2 | 2 | 20 |
| Reckless/Speed | - | 2 | 2 | 2 | · | 2 | 3 | 2 | 5 | 9 | - | · | - | - | · | - | 4 | - | 4 | 4 | 13 |
| Red Light/Stop Sign | 2 | 3 | 5 | 2 | 2 | 4 | 8 | 6 | 14 | 23 | - | · | - | - | · | - | 1 | 1 | 2 | 2 | 25 |
| Suspected DWI | - | · | - | - | · | - | - | 1 | 1 | 1 | - | · | - | - | · | - | - | - | - | - | 1 |
| BOLO | 3 | - | 3 | - | · | - | 1 | - | 1 | 4 | - | · | - | - | · | - | - | - | - | - | 4 |
| Other | 1 | 6 | 7 | 2 | · | 2 | 3 | 1 | 4 | 13 | 2 | 1 | 3 | - | · | - | 6 | 1 | 7 | 10 | 23 |
| No Basis | - | 1 | 1 | - | · | - | - | - | - | 1 | 1 | 1 | 2 | - | · | - | 2 | - | 2 | 4 | 5 |
| **Grand Total** | **9** | **21** | **30** | **9** | **2** | **11** | **34** | **13** | **47** | **88** | **4** | **2** | **6** | **-** | **·** | **-** | **32** | **2** | **34** | **40** | **128** |

Here, the search rate has moved up to 31% (40/128), and 36 out of those 40 searches involved Black or Latino drivers.

The videos reflect that many (but not all) of the searches happened after the officers ran the driver's license and learned that it had been suspended or revoked. There is clearly a widespread belief in the BPD that a suspended license is a sufficient basis to trigger a search of the car. Krugman SJ Decl. ¶ 35. Plaintiffs disagree with that legal conclusion under the Fourth Amendment, but the disagreement is immaterial to analysis of racial disparities in pretext stops under the *Fourteenth* Amendment where, as here, it is so frequently the case that (a) no citation or TSR is issued for the ostensible original basis of the stop, and (b) the overwhelming majority of drivers whose cars are searched are Black or Latino. In the videos reviewed to date, 20 out of the 27 Minority drivers with suspended licenses had their vehicles searched; in the case of Non-Minority drivers, it was only 3 out of 10. PSAMF ¶ 523.

41

5. *Plaintiffs' Unrebutted Statistical Evidence Is "Actual Evidence" of Discriminatory Intent*

Defendants wrongly contend that Plaintiffs' evidence of statistically significant racial disparities is not "actual evidence" of discriminatory intent. (DMSJ 22). To the contrary, "circumstantial evidence of disparate impact" is an "important starting point" in evaluating discriminatory intent, and "aggregate disproportionate impact on a particular racial group *may* be evidence of discriminatory animus." *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 172 (2d. Cir. 2024) (citing *Arlington Heights*, 429 U.S. at 266; *Washington*, 426 U.S. at 242 (discriminatory intent "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another").

Particularly in policing, the discriminatory impact of departmental policy is an important piece of the intent analysis that commonly contributes to denials of summary judgment to municipalities. *See, e.g.*, *Plaintiffs 1-21 v. Cnty. of Suffolk*, 2021 WL 11629176, at *8 (E.D.N.Y. Aug. 5, 2021) (statistical showing "supports a theory of ongoing, and widespread biased policing practices"); *Davis v. City of N.Y.*, 959 F. Supp. 2d 324, 362 (S.D.N.Y. 2013) (statistical evidence "provides a starting point for an examination of circumstantial and direct evidence of intent."); *Floyd*, 813 F. Supp. 2d at 452-53 (statistical evidence combined with "the inadequacy of the City's efforts to take remedial steps to reduce the racial disparity of stops" created inference of intentional discrimination).

Defendants rely on *Moore v. Bitca*, 2020 WL 5821378 (D. Vt. Sept. 30, 2020) (Reiss, J.) (motion to dismiss), but it is not to the contrary. The *Moore* complaint was "bereft of plausible allegations of discriminatory intent," and video evidence clearly refuted the plaintiff's claim that the police officer prolonged the traffic stop based on his race. *Id.* at =22-3. This Court noted that under these circumstances "disparate impact alone does not establish intentional discrimination," but that does not mean that statistical disparities can never *support* an inference of intentional discrimination. *Id.* at 23.

(a)    In the Second Circuit, Statistical Evidence Alone Can Establish
Discriminatory Intent

Indeed, in *Arlington Heights*, the Supreme Court reaffirmed its previous precedent that severe disproportionate impact may suffice to prove intent. 429 U.S. at 266 (citing *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Yick Wo. v. Hopkins*, 118 U.S. 356, 373–74 (1886)). The Second Circuit has similarly held that "statistics alone may be sufficient." *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 (2d. Cir. 2015); *Accord Floyd*, 813 F.Supp.2d at 452 ("For an Equal Protection claim, discriminatory purpose may be proven through statistics alone."). The *Burgis* standard is admittedly a high bar. "The statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely." *Burgis*, 798 F.3d at 69. *See also Castaneda v. Partida*, 430 U.S. 482, 494 n.13 (1977) (holding that "[i]f a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors" played a role).

A number of courts have found statistical evidence sufficient to infer discriminatory intent in policing contexts comparable to Buffalo. In *Crudup v. D.C.*, 2023 WL 2682113, at *2 (D.D.C. Mar. 29, 2023), the court addressed allegations that "ninety-three percent of stop and frisks and eighty-seven percent of non-traffic stops were of Black individuals," among similar statistical evidence, and found: "These statistics demonstrate a pattern of behavior from which an unconstitutional policy of discriminatory intent or purpose can be inferred." *Id.* at 12. In *Ballew*, 642 F. Supp. 3d at 1194-95, the court held that evidence that a police gang unit almost exclusively targeted Black and Latino motorists for traffic stops supported an inference of purposeful discrimination. *See also Myers v. County of Nassau*, 2024 WL 3675815, at *7 (E.D.N.Y. Aug. 6, 2024) (holding statistical evidence met *Burgis* where police hiring was roughly three times higher for White than Black applicants); *Richardson v. City of N.Y.*, 2018 WL 4682224, at *7 (S.D.N.Y. Sept. 28, 2018) (plaintiffs met *Burgis* with statistics

demonstrating that FDNY hired far fewer Black employees than other agencies using the same applicant lists). Even the sole case cited by Defendants, *Vitolo v. Guzman*, 999 F.3d 353, 362 (6th Cir. 2021), acknowledges that "extreme differences among races may permit an inference of intentional discrimination." *Id.*

> (b)   The Checkpoint and Multiple Tinted Windows Ticketing Data
> Satisfy the *Burgis* Standard and Thus Constitute Evidence of
> Discriminatory Intent

Not only were the statistical disparities in Checkpoints siting data overwhelmingly racially disparate, but Prof. Bjerk showed that they were highly significantly so ***even taking into account the purported race-neutral justifications*** BPD has offered for its siting decisions.

Likewise, the explosion of tinted windows ticketing shows such a disparate impact on its face that it supports an inference of discriminatory intent. From July 2012 through February 2020, there were 41,749 tinted windows citations where race could be determined, 36,264 of which—***86.9%***—went to minorities. PSAMF ¶ 165. And the prevalence of ***multiple*** tinted windows citations during that period was consistently 10-12 percentage points higher for Minorities than for Non-Minorities. PSAMF ¶ 157f. Not only are those results significant at the strong 0.01 level (*id.*) but—crucially for *Burgis*—***Dr. Banks could not provide a race-neutral explanation for the disparities.*** PSAMF ¶¶ 157h-m.

Here, Plaintiffs meet the *Burgis* standard by showing extreme statistical disparities and the lack of any reasonable explanation for them. Plaintiffs' statistical evidence alone thus suffices to raise a material dispute as to the racially discriminatory intent underlying the City's policing practices. Even if the Court were to conclude that the *Burgis* standard is not met here, the statistical evidence supports an inference of discriminatory intent in light of all of the other evidence discussed below.

### C.     The Evidence of Discriminatory Intent Is Overwhelming

In addition to the statistical evidence, Plaintiffs have amassed a powerful evidentiary record that would permit a reasonable factfinder to conclude that Defendants have been motivated, at least in part, by race when subjecting Black and Latino motorists to differential treatment involving Checkpoints, multiple tinted window ticketing, general traffic enforcement, and pretextual policing.

### 1.     As to BPD's Overall Racially Discriminatory Traffic Enforcement Practices

#### (a)     Plaintiffs Have Direct Evidence of Intentional Discrimination

##### (i)     A 25-Year Veteran of the BPD Will Testify to Extensive Racial Discrimination in Traffic Enforcement Across Decades

Plaintiffs have secured important testimony from a 25-year veteran of the BPD—a former high-ranking member of the Internal Affairs Department ("IAD") who witnessed countless instances of racial discrimination over her BPD career. In her Declaration, the IAD Witness provides evidence, based on her personal knowledge, that throughout her 25 years on the force working with BPD Commissioners Derenda, Lockwood, and Gramaglia:

- BPD officers frequently engaged in racial profiling, viewing it as an effective form of policing, with the full knowledge, acceptance, and encouragement from BPD leadership, despite citizen complaints. Officers believe that if they stop enough cars containing young Black men, they will find something. IAD Witness Decl. ¶ 11-12;

- Racist stereotypes of Black criminality were deeply ingrained in the BPD's culture, leading to racial profiling and profound failures of accountability for racial discrimination. *Id.* ¶¶ 5, 7, 9, 18-21;

- Members of BPD leadership—including Commissioner Derenda and supervisory personnel responsible for officer training—used racially derogatory language to refer to Black and Latino people, and treated them like presumptive criminals without facing meaningful discipline. *Id.* ¶¶ 7-9;

- BPD Commissioners imposed little to no discipline in response to complaints of racial discrimination at traffic stops, and even officers with repeated complaints were protected and promoted. The lack of accountability caused a vicious cycle of repeated violations and civilian complaints. *Id.* ¶¶ 23-33;

- BPD officers targeted Black motorists for revenue raising through the issuance of traffic summons, a practice known as "collars for dollars." Tinted windows ticketing was a revenue generator targeted at Black motorists. *Id.* ¶¶ 34-38.

45

The IAD Witness's sworn testimony demonstrates how racial-bias permeated the BPD, thanks in part to BPD Policymaker's own embrace of racial stereotypes and race-based views, and became a moving force behind the BPD's focused targeting of Black and Latino motorists for discriminatory traffic enforcement. *See, e.g., Major Tours, Inc. v. Colorel*, 799 F. Supp. 2d 376, 395–96 (D.N.J. 2011) (evidence that officials performed inspections of Black bus operators at a much higher rate than White operators, and were pleased with biased statements, was sufficient equal protection claim on racial profiling).

### (ii)    Policymaker Admissions of Racism in the BPD

Former Mayor Brown also admitted that racial discrimination plagues the Buffalo Police Department. In 2020, he reported to the Menino Survey of Mayors that police treatment of White people in his city is "somewhat better" than for Black people and indicated that "racism on the police force" had contributed to police violence in the City. PSAMF ¶¶ 166-67.

At a community event in July 2019, D-District Chief Barba admitted that the BPD had disbanded the Strike Force because of racial profiling. PSAMF ¶ 168.

### (iii)    Evidence of Intentional Discrimination by Policymakers

Other parts of this brief recount specific examples of intentional discrimination by the BPD's highest policymakers. These include:

- Commissioner Derenda's use of derogatory terms like "gangbanger" and "thug" to refer to young Black men, Section III.C.1.(b), his endorsement of aggressive traffic enforcement and impounds as a way to deprive drug dealers of their cars, PSAMF ¶ 108, and his disparagement of complainants as members of the "criminal element," Section III.C.1.(b);
- Commissioner Derenda's personal selection of Checkpoint locations and assignment of the Strike Force to conduct Checkpoints in Black neighborhoods and to police Black festivals and events, but not similarly situated White neighborhoods or festivals, Section III.C.2.(a);
- Commissioner Derenda and Lockwood's intentional failure to rein in multiple tinted windows ticketing targeted at Black and Latino motorists, Section III.C.2.(c);

46

- Commissioner Gramaglia's embrace of pretextual policing tactics grounded in race-based stereotypes of Black criminality and gang membership. Section III.C.3.[29]
- All BPD Commissioners' directives to target Black and Latino neighborhoods based on general profiles of criminality, rather than individualized suspicion, and their deliberate indifference to the foreseeable and widespread practice of racial profiling, Section III.C.1.(c), III.C.2.(a), III.C.3.

In short, the record contains many examples of direct racial discrimination at the policymaker level, entitling Plaintiffs to a trial on their Equal Protection Claims.

> (b)    Defendants' Use and Tolerance of Racial Slurs and Stereotypes Is Evidence of Discriminatory Intent

BPD policymakers and command have used and tolerated a widespread custom of racial slurs and stereotypes of criminality directed at Black and Latino motorists. BPD policymakers' participation in and acceptance of these behaviors is itself evidence of discriminatory intent. *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 872–73 (2d Cir. 1992) (evidence "that bias existed throughout the department" relevant to finding discriminatory intent); *Santiago v. Miles*, 774 F. Supp. 775, 800 (W.D.N.Y. 1991) ("overwhelming" evidence of "an entrenched attitude of discrimination and racism … strongly supports the inference [of] intentional discrimination.").

Lieutenant Thomas Whelan, who supervised the Strike Force and administered checkpoints from 2013-16, testified that he heard racial epithets and the n-word from "probably every officer" he worked with, including in the presence of Captains. PSAMF ¶¶ 1, 170-73. Whelan testified that he himself used the n-word as a Lieutenant and that such racially biased language was "unavoidable," and in some cases "acceptable" and "effective" in gaining compliance. PSAMF ¶¶ 170, 172. Whelan could not recall anyone being disciplined for this conduct, and he never reported anyone for using racial slurs despite BPD rules requiring such reporting.

---

[29] Gramaglia succeeded Lockwood as BPD Commissioner, so his official actions bind the City during the period of his tenure. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability").

PSAMF ¶ 174-75. *See, e.g.*, *East v. City of Chicago*, 719 F.Supp. 683, 687 (N.D.Il1. 1989) (use of racial slurs by one officer could imply racial animus on the part of others who are present).[30] As Plaintiffs' police practices expert Michael Gennaco observed, "[w]hen supervisors ignore misconduct that is occurring in their presence, it sends a message to line officers that the 'rules' do not really apply or at least that there will be no consequences for failing to follow them" and can lead to "a broken system of accountability and professionalism." Ex. 102, Gennaco Report at 100.

Other BPD officers corroborated Whelan's testimony. The IAD Witness heard Derenda and other officers use code words equating race with criminality, like referring to young Black men as "gangbanger"[31] and "thug." PSAMF ¶¶ 2, 177. Multiple BPD Supervisors and officers, including Community Policing Lieutenant Steve Nichols and former Internal Affairs Chief Harold McLellan, have used other racially derogatory words to refer to Black people, including "thug life," "ghetto," "baby mama," "and "baby daddy." **PSAMF** ¶ 179. Some of this language even appeared in official GIVE reports. **PSAMF** ¶ 178. Some officers testified that they did not find these words racially offensive.[32] **PSAMF** ¶ 181. Gennaco found that "examples of bias in these emails is part of a broader pattern at the BPD of applying negative racial stereotypes, rather than facts, to explain complaints about the harm Black and Latino residents experience in Buffalo." PSAMF ¶ 185. *Mhany Mgmt.*, 819 F.3d at 609 ("[R]acially charged code words

---

[30] Although residents lodged more than 20 complaints about BPD officers using the n-word and other racial slurs, the BPD never disciplined any officers for such conduct. PSAMF ¶ 435.

[31] *Griffin v. Daubert Chem. Co.*, 2005 WL 1563212, at *1, 4 (N.D.Ill. June 2, 2005) (denying summary judgment on plaintiffs' hostile work environment claim where plaintiff was subjected to racial statements including "gangbanger").

[32] Courts have found such references to be evidence of discriminatory intent. *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F.Supp.2d 563, 570–72 (E.D.La. 2009) (references to ghetto, crime, drugs, violence evidence of discriminatory intent); *Nat'l Ass'n for the Advancement of Colored People, Inc. by & through Myrtle Beach Branch v. City of Myrtle Beach*, 476 F. Supp. 3d 308, 324 (D.S.C. 2020) (finding sufficient evidence of discriminatory intent where government official thanked community member who wanted to keep Black motorcycle rally from turning Myrtle Beach into a "slum only thugs would support").

may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications.").

In 2022, BPD Captain Amber Beyer used the n-word and launched a racist rant in front of her subordinate team members, asserting among other things that "the criminality of Black people justified some racism" and "[W]hite officers get PTSD from working [on the East Side] because of all of the violent crime there, but Black officers do not." PSAMF ¶ 187. During the subsequent IAD investigation, Beyer elaborated on her views, expressing that officers who work on the East Side "start to think that all Black people have guns or all Black people commit crimes which it's not appropriate for them to think that's just what happens with this job." PSAMF ¶ 192. In his deposition, Gramaglia denied Beyer was racial stereotyping and defended her by saying she heard these things from individuals that work in predominantly minority districts where there is a "propensity" of gun violence. PSAMF ¶ 193.

Moreover, Beyer's statement and Gramaglia's "propensity" reference reveal that she and other BPD officers, up to and including the Commissioner, harbored pernicious stereotypes of Black people. According to the IAD Witness, BPD officers and command had a "pervasive attitude" that "Black people, especially Black men and boys, were presumed to be criminals," and routinely acted in line with these race-based invidious stereotypes when conducting traffic stops. IAD Witness Decl. ¶¶ 3-5, 9, 12. BPD officers would "paint Black motorists with a broad brush with the belief that if you stop enough cars containing Black men, you will eventually hit something," which led officers to take "every opportunity they could to get into and search peoples' cars for guns and drugs," even when officers are not allowed to do so for "tinted windows or an expired inspection." *Id.* ¶ 12.

Almost all of the complaints the IAD Witness received about traffic enforcement abuses came from Black and Latino drivers, and many complainants described how the BPD treated them as criminal suspects and as if they had guns and drugs without any justification. PSAMF

49

¶¶ 221, 223. When BPD directs its officers to flood Black and Latino neighborhoods and targets Black and Latino motorists for pretextual stops on the ground that they are necessary to detect and prevent crime, BPD conveys the invidious stereotyped message that Black and Latino people are suspicious as a group and likely to be engaged in wrongdoing. This contravenes the Supreme Court's longstanding rejection of government action based on "impermissible racial stereotypes." *Shaw v. Reno*, 509 U.S. 630, 647–48 (1993); *see also Peña-Rodriguez v. Colorado*, 580 U.S. 206, 209 (2017) (invalidating conviction of Mexican defendant because juror relied on racial stereotypes, including "nine times out of ten Mexican men were guilty of being aggressive toward women and young girls"); *Buck v. Davis*, 580 U.S. 100, 121, (2017) (expert testimony that "appealed to a powerful racial stereotype—that of black men as violence prone" which "coincided precisely with a particularly noxious strain of racial prejudice" required reversal of death penalty).

> (c)    Defendants' Deliberate Indifference to Complaints of Racial Discrimination and Failure to Monitor, Supervise, Investigate, Discipline, and Train Creates an Inference of Discriminatory Intent

Considerable record evidence shows Defendants have been on notice and failed to address the frequent complaints of BPD's biased policing practices. The evidence of the BPD's deliberate indifference to racially biased policing is overwhelming and at minimum raises a genuine dispute of material fact as to discriminatory intent. *Floyd* v. *City of N.Y.*, 959 F. Supp. 2d 540, 666–67 (S.D.N.Y. 2013) (deliberate indifference constitutes evidence of discriminatory intent)*.*

From at least 2014 to the present, the City has received a steady stream of complaints and protests from the public—via town halls, forums, academic and institutional reports, clergy, Buffalo's own advisory boards, and the media—that BPD officers were and are engaging in racially discriminatory policing and traffic enforcement. PSAMF ¶ 196. In addition, from 2012 to the present, at least **123** people filed complaints to IAD of racial discrimination; **84**

complaints arose in the context of traffic enforcement. PSAMF ¶ 197. In the last few months, Mayor Brown has left office, but the complaints from the public about racial profiling and slurs have not abated. PSAMF ¶ 198.

In recent years, at least 30 people have filed civil rights complaints against the BPD with Buffalo's Commission on Citizens' Rights and Community Relations ("CCRCR"). PSAMF ¶ 202. And at least 40 people have filed lawsuits and notices of claim alleging that the BPD violated their civil rights since 2017, including 14 involving racial discrimination. PSAMF ¶ 199. Several judicial decisions have found evidence that the City or BPD officers engaged in unconstitutional traffic enforcement,[33] and the City has paid more than $6.9 million to settle numerous cases alleging civil rights violations. PSAMF ¶ 201.

Plaintiffs' expert Michael Gennaco reviewed 73 complaints alleging racially discriminatory traffic enforcement from January 2013 through March 2024.[34] He found that the BPD receives more complaints of racially discriminatory traffic enforcement than comparable municipalities. PSAMF ¶ 429.

Although BPD policymakers and officials have repeatedly testified that the only way they can address discrimination is through the Internal Affairs ("IA") system (PSAMF ¶ 208),

---

[33] *See, e.g., McNeil v. City of Buffalo,* 2023 WL 2574954, at *7 (W.D.N.Y. Feb. 24, 2023) (denying Buffalo's motion to dismiss Black motorists' claim that City was liable for having "a policy and/or custom to target minorities for traffic infractions and reward officers for writing as many tickets as possible in low income areas"). *See also Kistner v. City of Buffalo*, 2022 WL 16797986, at *15 (W.D.N.Y. Nov. 8, 2022) (denying Buffalo's summary judgment motion where evidence showed that Lockwood ratified the officers' actions and Buffalo "was deliberately indifferent in supervising and disciplining BPD officers or had an informal policy of not disciplining its officers" based on failure to adequately investigate and disciplinary records of BPD officers); *Kistner v. City of Buffalo*, 2023 WL 144915, at *16 (W.D.N.Y. Jan. 10, 2023), appeal dismissed, 2024 WL 2525332 (2d Cir. May 24, 2024) (same).

[34] This is not a full accounting of such complaints. The BPD destroyed numerous files between 2012-2018, contrary to accepted police practices, and many individuals forego the complaint process entirely because of institutional barriers and retaliation. Gennaco Report at 10, 24-30. "The reality is that very few innocent victims of racial profiling ever come forward with complaints. Instead, these victims simply retain vivid memories of their police encounter for future reference." *Martinez v. Vill. of Mount Prospect*, 92 F.Supp.2d 780, 783 (N.D.Ill. 2000).

Gennaco found through his review of 73 racial bias traffic complaints that the BPD has "inadequate and deficient [IA] practices, policies, and procedures that frequently depart from accepted standards and are indicative of an environment that disregards concerns about racially biased policing" and that it "has uniformly failed to conduct effective and objective investigations of the allegations." PSAMF ¶ 209, 211. Indeed, the City had the "worst" and most "deficient" complaint investigation practices Gennaco had ever seen.[35] PSAMF ¶ 210. "Without a properly functioning investigative process, BPD cannot detect and address instances of racially biased policing," and instead "creates an institutional culture whereby officers can engage in biased traffic enforcement with little concern for detection... perpetuating the risk of racially biased misconduct and eroding public trust in the BPD." PSAMF ¶ 212-14.

The IAD Witness, who managed over 600 complaints over 12 years under BPD Commissioners Derenda, Lockwood, and Gramaglia, confirmed that many Black and Latino complainants alleged that BPD officers treated them like criminals during traffic stops, and presumed they had guns, drugs, and warrants without any justification, and that the Commissioners rarely imposed discipline." PSAMF ¶ 217, 221-22. Instead, the Commissioners erred on the side of officers" and dismissed cases regardless of "clear [and] indisputable evidence of White officers engaging in misconduct against Black IAD complaints" and "rarely, if ever, held officers accountable for engaging in racial bias or misconduct." IAD Witness Decl. ¶¶ 25-26; PSAMF ¶ 224-25. According to the IAD Witness, the "[t]he BPD Commissioners' failure to impose discipline allowed officer misconduct to continue without consequences," leading to "repeat civilian complaints" and officers who were "frequent flyers" *Id*. ¶ 24-26; PSAMF ¶ 226. The New York State Attorney General's Chief of the Law Enforcement Misconduct Investigative Office made similar observations in a December 2024 report, finding that BPD

---

[35] Contrary to Defendants' assertion (DMSJ at 2-3), it is not that the City did not follow "best practices, but rather, as Gennaco found, it did not follow *accepted* practices. PSAMF ¶ XX.

Officer Davon Ottey engaged in a pattern of civil rights violations where he "repeatedly escalated ... ordinary traffic stops involving minor VTL violations into unlawful seizures and the unnecessary use of force," for which the BPD did not impose proper discipline. PSAMF ¶ 227.

The high volume of repeated incidents and complaints about discriminatory traffic enforcement, and the BPD's wholly inadequate investigation of those complaints, is highly probative of Defendants' discriminatory intent,[36] as is the fact that the BPD has never issued formal discipline against an officer for engaging in racially discriminatory policing practices and has numerous repeat offenders.[37] PSAMF ¶¶ 215, 226.

Mr. Gennaco also found that Defendants' supervision and monitoring practices are "largely nonexistent, fall well below accepted practices, [and] are wholly inadequate to address the serious problems and risk of racially biased traffic enforcement," Ex. 102, Gennaco Report at 11, as the BPD failed to adopt standard, accepted supervision and oversight measures to reduce racially bias policing, including early warning systems, and auditing of stop data and body camera footage. PSAMF ¶ 1. In short, the BPD did no monitoring "to determine whether operations as a whole, or individual officers participating in operations, demonstrated patterns

---

[36] *See, e.g., Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 298, 306 (2dCir. 2020) (denying summary judgment based on municipality's indifference to pattern of discriminatory harassment of female inmates); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62–63 (2d Cir. 2014) (inferring discriminatory intent from County's deliberate indifference to repeated complaints about harassment); *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (a supervisory official "may be personally involved in a constitutional deprivation" if "after learning of the violation through a report or appeal [they] failed to remedy the wrong"); *Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 328 (2d Cir.1986), ("[w]hether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force"), *cert. denied*, 480 U.S. 922 (1987); *Lewis v. City of Albany Police Dep't*, 547 F.Supp.2d 191, 200 (N.D.N.Y. 2008), *aff'd*, 332 F.App'x 641 (2dCir. 2009) (denying City's post-trial motion, finding that its failure to address multiple alleged violations of African–American suspects' constitutional rights sufficient to establish discriminatory intent).

[37] *Murphy v. City of New York*, 719 F.Supp.3d 357, 373–74 (S.D.N.Y. 2024) (City's targeting of Black and Latino residents in social distancing restrictions, failure to train or supervise police tasked with enforcing restrictions measures sufficient to support City's liability for discriminatory intent); *Pipitone v. City of New York*, 57 F.Supp.3d 173, 191 (E.D.N.Y. 2014) (pattern of failure to discipline can amount to a discriminatory policy).

of racial bias." *Melendres v. Arpaio*, 989 F. Supp. 822, 903 (D. Ariz. 2013). The overwhelming evidence of the City's deliberate indifference to racial profiling, especially given how many times Black and Latino community members have raised it, is strong evidence of discriminatory intent.[38]

Instead of taking real remedial action to prevent discrimination, the City took only ineffective half-measures. Its 2021 Traffic Enforcement Policy was ostensibly enacted to address discriminatory policing, but the City failed to train officers on the policy and has failed to enforce it notwithstanding the numerous complaints about racially biased policing since its enactment, and as discussed above, established a pretextual policing targeting minorities that program. PSAMF ¶ 1, 5, 393. The City has enacted policies requiring officers to issue fix-it tickets and stop receipts recording the race of drivers when it does not issue tickets, but it has failed to train officers on these policies, ensure that officers comply with them, or audit this data for patterns indicative of discriminatory traffic stops. PSAMF ¶ 231-32. The inadequacy of these remedial steps is further evidence from which a jury could infer discriminatory intent. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669–71 (2d Cir. 2012) (upholding Equal Protection jury verdict because "jury could have reasonably found that the District's additional remedial actions were little more than half-hearted measures"); *Melendres*, 989 F. Supp. 2d at 902–03 (cosmetic changes to alter appearance of racial profiling, but not actual practice, is evidence of discriminatory intent). All these issues of fact are probative of discriminatory intent. Individually and together, they require denial of summary judgment.

---

[38] *Floyd*, 959 F.Supp.2d 540, 665; *Davis v. City of New York*, 959 F.Supp.2d 324, 363 (S.D.N.Y. 2013).

(d)    The Well-Documented History of Intentional Racial
Discrimination by the City of Buffalo Supports a Finding of
Discriminatory Intent in this Case

The historical background of the disputed action is important in a discriminatory intent analysis, "particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. As laid out in the unrebutted Expert Report of Dr. Robert Silverman, the City has a longstanding and persistent history of directing and condoning racial discrimination against Black residents in policing, education, and housing policies that have produced profound, devastating, and continuing inequalities on the Black community.

Dr. Silverman found that the City's discriminatory practices took root in housing policies excluding Black Buffalo residents and evolved into divestment and demolishment practices that have led to severe and persisting segregation and poverty on the East Side, all of which has impacted Buffalo's racially biased policing and education practices. PSAMF ¶ 241. He also found that Buffalo has historically resisted and ignored community calls for changes to its racist practices for decades until required to by court intervention, even after the imposition of consent decrees, because of Buffalo's entrenched and active racism. PSAMF ¶ 242-43.

The BPD's historical discriminatory policing practices and patterns have strikingly similar features to today.. Dr. Silverman traces these patterns back to 1967, when Black Buffalo residents engaged in an uprising to protest the Buffalo Police Departments' widespread racially discriminatory and often unjustified stops, searches, and detentions targeting the Black community, derogatory language and slurs (including use of the n word and "boy") both with civilians and the BPD, stereotyped perceptions of black people, and an absence of accountability mechanisms or discipline. PSAMF ¶ 244. This led to a class action lawsuit challenging widespread discriminatory policing practices, and the Second Circuit's reversal of a district court's dismissal in 1971. PSAMF ¶¶ 245-46. *Build of Buffalo, Inc. v. Sedita*, 441 F.2d 284 (2dCir. 1971). Silverman documented multiple other lawsuits challenging the City's racially

discriminatory practices, including a lawsuit brought by the Department of Justice shortly after *Build of Buffalo*, where the court found widespread racially discriminatory practices, including use of slurs and stereotypes and evidence that White officers engaged in race-based stops of civilians and Black officers. *Id.* Silverman also noted how although the BPD showed some superficial evidence of investigation, it "hid[] behind a paper policy of racial tolerance" and failed to take effective action to address complaints, and, as a result, was subject to court supervision. PSAMF ¶ 249.

Silverman found the City's patterns of racially discriminatory policing continued despite these lawsuits over the next few decades, based on historical evidence that BPD engaged in traffic stops based on stereotyping of black residents on the East Side of Buffalo as an "every day practice," repeated complaints about racial targeting of Black drivers both in and outside of the East Side, and that even former Police Chief H. McCarthy Gipson, who is Black, has described being frequently pulled over for "driving while Black." PSAMF ¶¶ 252-53. He found that this has resulted in deep levels of distrust of the police by the Black community into the last decade, when the BPD was conducting Checkpoints. PSAMF ¶ 255.[39]

This historical and continuing evidence of discrimination creates a genuine issue of material fact that the documented discriminatory impact resulting from the City's policing practices stems from intentional discrimination. *See, e.g., United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1221–22 (2d Cir. 1987) (extensive history of discriminatory housing decisions

---

[39] The IAD Witness confirmed Silverman's findings of discriminatory ticketing practices in the 1990s. When she worked in the predominantly White A District in 1996-97, her Captain wrote her up for routinely issuing traffic tickets to and impounding cars of White drivers. PSAMF ¶ XX. She was assigned to desk duty for ticketing and impounding the cars of the "wrong people." *Id.*; PSAMF ¶ 254. She joined the force just as the consent decree ended, and observed how this led the BPD to shift back to being a predominantly White workforce, with openly racist White supervisors and officers who harassed Black officers and treated "Black community members like presumptive criminals, without showing them humanity and respect." *Id.* ¶ 7; PSAMF ¶¶ 218-19. She experienced this too: a B District Lieutenant nicknamed and called her "Kizzy," after a runaway slave girl in Roots. PSAMF ¶ 220.

relevant to finding discriminatory intent); *United States v. Moore*, 716 F. Supp. 3d 415, 430 (E.D. Va. 2024) (Richmond's historical segregation and policing tactics combined with statistical disparities sufficient to find discriminatory intent); *Ammons v. Dade City, Fla.*, 783 F.2d 982, 988 (11th Cir. 1986) (historical evidence covering "practically every aspect of municipal conduct in Dade City throughout its history" supports discriminatory intent). Silverman's findings of repeated complaints and litigation challenging Buffalo's racially discriminatory policing practices, and the City's disregard and continuing policies more generally, provide an "unrebutted and unexplained …historical pattern of discrimination" that is probative of discriminatory intent past and present. *Jean v. Nelson*, 711 F.2d 1455, 1491 (11th Cir. 1983).

### 2.     As to the Checkpoints and Tinted Windows Claims

(a)     The Evidence That Checkpoints Failed "Special Needs", Along With the Overwhelming Prevalence of Checkpoint and Patrol Siting in Black Neighborhoods and at Black Festivals, Provides Strong Evidence of Discriminatory Intent

As set forth in detail Section II.B.3 above, the Checkpoint Program was objectively and subjectively intrusive. But it was not merely intrusive; ***it was intrusive to Black and brown people***. And everyone knew it. Derenda personally established Checkpoint locations, oversaw the Program, and closely monitored the Strike Force and Housing Unit officers who ran the program. PSAMF ¶¶ 21, 83, 700-702. Derenda was personally and ultimately responsible for the dramatically racially disparate Checkpoint siting decisions Bjerk documented in his report. PSAMF ¶¶ 21, 83, 159-162. Indeed, Bjerk's evidence not only describes the results of the BPD's Checkpoint siting decisions but sheds light on Defendants' intent. As the Supreme Court has explained, "[t]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997). In this case, a reasonable jury could see the stark effects of Defendants' policy and conclude that it must have been motivated by and/or implemented with a discriminatory purpose.

As an example, Derenda specifically directed that the Strike Force patrol events heavily attended by Black people, such as the Juneteenth Festival—an important celebration of Black freedom and liberation—and the Gus Macker Basketball Tournament, because the events were purportedly "susceptible to gang activity." PSAMF ¶¶ 256-60. Yet Derenda did not assign the Strike Force to festivals primarily attended by White or mixed-race residents like St. Patrick's Day and Dingus Day, despite reports of "numerous issues" including "drinking, fights, all kinds of things." PSAMF ¶¶ 261-63. Lower-level commanders parroted Derenda's unwarranted assumptions of Black criminality, such as a chief increasing police presence to address an unwarranted assumption of "gang violence" at the Kinfolk Soul Festival. PSAMF ¶¶ 264.

That officials at the highest level of the BPD expressed a negative and stigmatizing stereotype about Black residents of the East Side by presuming they were gang members—whether through actions or express or coded language—is particularly probative of discriminatory intent and presents triable issues of material fact. *See, e.g., Sorlucco*, 971 F.2d at 872–73 (inferring discriminatory intent from policymaker's presumption that female complainant and was lying); *Doe*, 462 F. Supp. 2d at 549 (reliance on "negative and stigmatizing" comments provided evidence of discriminatory intent).

> (b)    Anecdotal Evidence of Disparate and Discriminatory Treatment at Checkpoints Bolsters a Finding of Discriminatory Intent

Anecdotal evidence of BPD's disparate and discriminatory Checkpoint tactics is also probative of discriminatory intent. *See, e.g., Doe*, 462 F. Supp. 2d at 547 (anecdotal evidence of officers treating minority and White drivers differently evidence of discriminatory intent). Many plaintiffs and Buffalo residents noticed that the BPD only seemed to run Checkpoints in Black and Latino neighborhoods, not White neighborhoods, and interpreted the disparity as race-based selective enforcement. PSAMF ¶ 115. Plaintiffs and witnesses primarily saw Black people going through Checkpoints, and they saw differential treatment of White drivers. PSAMF ¶ 116. According to Plaintiff Dorethea Franklin, who often observed Checkpoints in

front of her own home, "on the rare occasions that White motorists passed through, the BPD treated them completely differently—often just waving them through. Watching this racist abuse of power was incredibly demoralizing." Franklin Decl. ¶ 9.

The record contains many examples of Black and Latino people who witnessed and/or personally experienced biased treatment at Checkpoints. Plaintiffs [and residents ] described how BPD officers running Checkpoints "would question them aggressively" and treat them like "criminals," were "abusive to Black motorists," and made them feel "ashamed, humiliated, and racially discriminated against," "terrorized," "targeted," "unsafe," and in a "constant state of stress and dread." PSAMF ¶ 126.

From inception, the City received and ignored a steady stream of complaints about the Checkpoints from those forced to endure them. PSAMF ¶¶ 266, 268, 270, 274. Yet rather than taking their concerns seriously, Derenda dismissed complainants as representatives of "the criminal element." PSAMF ¶ 269. Other high-ranking BPD officers similarly derided Checkpoint complainants as criminals. PSAMF ¶¶ 270-75. By "reflexively assuming" that people who do not like being subjected to routine violations of their Fourth Amendment rights at Checkpoints must be part of the "criminal element," Defendants not only summarily discounted their complaints as baseless, but engaged in racial stereotyping, employing "criminal element" as a code word for Black people generally. Ex. 102, Gennaco Report at 101. *See, e.g., Mhany Mgmt.*, 819 F.3d at 609 (finding discriminatory intent in part based on "code words" for racial animus).

> (c)    Derenda and Lockwood Maintained a Widespread Custom and Practice of Discriminatory Tinted Windows Stops

As the data reflects, BPD Commissioners Derenda and Lockwood presided over a massive increase in tinted windows ticketing directed almost exclusively at Black and Latino drivers. PSAMF ¶ 156. Defendants received complaints from Black and Latino drivers about this practice, and they recognized the practice was harmful but failed to address it. PSAMF ¶¶ 297-

303. Based on this evidence, a reasonable jury could conclude that Derenda and Lockwood knew that the BPD's multiple tinted windows ticketing practices predominantly impacted Black and Latino drivers and intentionally maintained the practice. *Yonkers Bd. of Educ.*, 837 F.2d at 1228 (City acted with discriminatory intent in part because it was "foreseeable to the Board that adherence to its [] policy would further lock the Yonkers school system into its segregated patterns").

Derenda's deposition testimony revealed that he *knew* that BPD officers regularly issued multiple tinted windows tickets in a single stop and *expected* multiple ticketing to occur as a byproduct of his proactive policing policy, which he directed at Black and Latino neighborhoods. PSAMF ¶¶ 156, 297, 299. Derenda also knew about the racial implications of the BPD's multiple tinted window ticketing policies. When asked at his deposition whether as Commissioner he took "any affirmative steps" to identify racial profiling among officers, he testified that any steps "would have been based on complaints" and gave the example of "writing numerous tickets for one car for tinted windows." PSAMF ¶ 298.

According to the IAD Witness, the "IAD complainants who had multiple tinted window tickets were mostly Black." IAD Witness Decl. ¶ 38. She described how it was "common knowledge within the BPD that tinted window tickets primarily went to Black drivers, even though motorists of all races have tints." *Id*. ¶ 37. Black motorists experienced multiple tinted windows ticketing as racially discriminatory. PSAMF ¶ 304.

One man interviewed by the WGRZ described repeated stops, allegedly for his factory solar-tinted windows, which were legal; he believed he was stopped because of his race. PSAMF ¶ 304-05. During one of those stops, the officer allegedly removed him from his vehicle, took his cell phone, detained him for 20 minutes, searched and impounded his vehicle, then issued multiple tinted windows tickets that a court eventually dismissed. PSAMF ¶ 306. This is a prime example of a discriminatory practice the IAD Witness also confirmed: BPD officers'

improperly using tinted windows as an excuse (*i.e.*, a pretext) to search people's cars for drugs and guns. PSAMF ¶ 307. The emerging video evidence confirms that this practice is ongoing. *See* Section III.B.4.c.

Not only did Derenda and Lockwood know all about the BPD's multiple tinted windows ticketing practices and the impact on minority drivers—they knew the practices were wrong. Derenda described the officers as "padding their numbers" and believed officers should issue no more than one tinted window ticket per stop. PSAMF ¶¶ 299, 301. Lockwood similarly testified that he was "not a fan" of multiple tinted windows ticketing—but did nothing to stop it. PSAMF ¶ 300, 302g-j. In 2017, Derenda made an ineffective attempt to limit multiple tinted windows ticketing to one per stop, issuing a verbal directive through the chain of command. PSAMF ¶ 302a-f. Derenda did not issue a written order, nor did he check to see whether officers obeyed his instruction. PSAMF ¶¶ 302e-f. They did not. PSAMF ¶ 156. Derenda's listless effort provides additional proof of discriminatory intent. *Sorlucco*, 989 F.Supp.2d at 873 (insufficient investigation into bias claim constituted evidence of bias).

Commissioner Lockwood, Derenda's successor, deliberately chose not to order an end to multiple tinted windows ticketing. PSAMF ¶ 302g-i. He acceded to his officers' desire to continue the discriminatory practice, defending his deliberate inaction by explaining "it's part of the V&T so they can do it." PSAMF ¶ 302i. Lockwood, and his successor Gramaglia, allowed multiple ticketing of Black and Latino drivers to continue even after the practice was exposed in *The Buffalo News*, and after the filing of the original Complaint in this matter and the ASC, which detailed the racial disparities caused by the BPD's tinted windows ticketing practices. PSAMF ¶ 302j.

Courts find discriminatory intent when misconduct is pervasive and fails to take action, thereby acquiescing in the discrimination. *Matusick*, 757 F.3d at 63–64 (2d Cir. 2014); *see Mhany. Mgmt.,* 819 F.3d at 606 ("sequence of events" can support an inference of

discriminatory intent); *Columbus Bd. of Educ.*, 443 U.S. at 450 ("[A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact of a forbidden purpose."); *Wilkins*, 736 F. Supp. 3d at 623 (holding that City's choice to continue pretextual traffic stop program, despite its harm to Black and Latino drivers and lack of measurable safety benefits, "supports a discriminatory purpose").

> (d)   Defendants' Substantive Departures and Misrepresentations Provide Evidence of Discriminatory Intent

In evaluating whether a decision was made with discriminatory intent, courts look to substantive departures from normal policies, practices, and other factors usually considered important to the decisionmaker. *Arlington Heights*, 429 U.S. at 267. *Kennedy Park Homes Ass'n v. City of Lackawanna,* N. Y., 436 F.2d 108, 113–14 (2d Cir. 1970). Pretextual justifications, as evidenced by false and misleading statements, are also probative of discriminatory intent. *Reeves v. Sanderson*, 530 U.S. 133, 134 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive.").

> (i)   *Shifting Justifications and Misrepresentations Relating to Checkpoints.*

At the inception of the Checkpoints program in 2012 and 2013, Defendants repeatedly promoted the Checkpoints as a way to reduce violent crime. PSAMF ¶¶ 95-99. Of, course, the statistical evidence contradicts this rationale, as the racial composition of Buffalo's neighborhoods best predicted Checkpoint locations. PSAMF ¶ 159e.

As public criticism of the Checkpoints as discriminatory mounted, Defendants' story shifted. By June 2017, Mayor Brown asserted that Checkpoints promoted traffic safety by addressing "speeding vehicles" and "blowing through stop signs. PSAMF ¶ 279. Brown doubled down on the traffic safety narrative as pressure built, eventually going so far as to tell the New York Attorney General, in response to investigation, that the City picked Checkpoint locations

based on accident data.[40] *Id.* ¶ 281. Deposition testimony proved these claims false, as Derenda and other high-level officials admitted that Checkpoints could not possibly address speeding and stop sign violations, nor did accident data have any bearing on Checkpoint locations. *Id.* ¶¶ 280, 282. Brown also asserted that the BPD ran Checkpoints on the East Side in response to community group requests for more traffic enforcement, but the City could not identify any specific incidents in which they ran a Checkpoint in response to such a complaint. *Id.* ¶¶ 102.

While it was saturating the East Side with Checkpoints, the BPD received multiple complaints from people in predominantly White neighborhoods requesting a greater police presence to address crime or traffic safety. PSAMF ¶¶ 284. Derenda did *not* place Checkpoints in those neighborhoods. *Id.* ¶¶ 284e, h. Instead, he purchased traffic calming equipment and at times ordered increased enforcement, based upon individualized suspicion, which addressed the safety concerns without subjecting the entire neighborhood to wholesale violations of the Fourth Amendment. PSAMF ¶¶ 284b, e, h.

Not only did Defendants dissemble about the purpose of Checkpoints, but they repeatedly gave out false information about Checkpoint locations. For example, in 2015 Brown told Spectrum News that Checkpoints took place "in all areas of the City" when in fact BPD erected 90% of Checkpoints in Black or Latino neighborhoods that year PSAMF ¶ 285e; in 2016, Brown repeated the fiction that Checkpoints were "all over the City" at a Father's Day event. PSAMF ¶ 285b. Later, in 2017, Derenda embarked on an astounding public relations subterfuge to conceal the truth about Checkpoint locations. PSAMF ¶ 286. That he knew it was fiction is apparent from Brown's earlier reaction to a July 2016 article in *The Public* documenting racial disparities in Checkpoint locations, citing the work of then-UB Law Professor Anjana Malhotra—rather than address the disparities, Brown demanded that the University modify the

---

[40] Although Derenda testified that the BPD considered crime control objectives, the City did not disclose that to the AG. PSAMF ¶¶ 104-06, 283.

findings publicized by the article. PSAMF ¶¶ 293-95. Checkpoints had become a political issue in the Mayoral primary race, with challengers to Mayor Brown arguing in the news media and at public debates that the Checkpoints were racially discriminatory. PSAMF ¶¶ 277-78. The Common Council twice requested the BPD disclose the Checkpoint locations, dates, and times, but Derenda falsely responded that the BPD did not keep such records. PSAMF ¶¶ 287.

Finally, as pressure mounted, the BPD embarked on a campaign to create a false narrative that Checkpoint siting was racially neutral. PSAMF ¶ 286. Only after mounting pressure and a Common Council inquiry, the BPD began in 2017 running more regular Checkpoints in majority White neighborhoods in which it had rarely, if ever, conducted checkpoints previously, then provided those locations to the news media. PSAMF ¶¶ 286d, 288. Mayor Brown appeared on television to thank the reporter for "presenting the information that we gave to you, to show Checkpoints are throughout the city." PSAMF ¶ 289. Derenda provided records of the pretextual Checkpoints to the Common Council. PSAMF ¶¶ 290-292. This subterfuge disseminated a false impression that the BPD had always operated Checkpoints evenly across the City.

A reasonable jury could determine that the BPD's choice of Checkpoint locations was a clear "substantive departure" from the BPD's previous practices, and that the City's patent misrepresentations and shifting explanations are highly probative of discriminatory intent and undermine the City's alleged traffic safety pretext. *See, e.g., Reeves*, 530 U.S. at 147; *Veasey v. Abbott*, 830 F.3d 216, 240–41 (5th Cir. 2016) (shifting rationales probative of discriminatory intent); *Saget v. Trump*, 375 F. Supp. 3d 280, 369 (E.D.N.Y. 2019), (evidence that agency contorted data evidence of discriminatory intent).

### (ii)    Disregard of Expert Policing Advice and Community Complaints

In another instance of departure from norms, the City countermanded the recommendations of its own expert bodies when creating the Housing Unit and Strike Force, and with the

adoption of "zero tolerance" policing policies. In 2010, the BPD's longstanding tensions with communities of color hit a crisis following an incident in which eight people were shot, four fatally, but not a single one of 100 primarily Black witnesses cooperated with the BPD's investigation. PSAMF ¶¶ 308a-c. In response, the Buffalo Common Council established the BPD Reorganization Commission, which recommended that the BPD adopt community policing methods to rebuild trust. PSAMF ¶ 308d. Derenda disregarded the recommendations, instead instituting the Housing Unit and Strike Force and implementing Checkpoints targeting the East Side—which had the opposite effect. PSAMF ¶ 308e. As early as 2014, community members complained that poor police-community relations engendered by Checkpoints and other aggressive tactics that had impeded the BPD's ability to solve crimes by undermining trust and distracting police from addressing crime. PSAMF ¶ 309. Indeed, during the Checkpoint years, homicide clearance rates trended down; by 2017, the BPD had just a 5.2% clearance rate for gang/drug-related homicides. PSAMF ¶ 310. By 2016, a survey of 2,000 residents found that only 12% of Black people surveyed agreed that the BPD respected people of color, and that 30% of Black residents said the police works well with their neighborhood, compared to 57% of White residents. PSAMF ¶ 312. The City's decision to ignore the advice of its own experts is itself probative of discriminatory intent. *See, e.g., Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 507–09 (9th Cir. 2016) (city's decision to disregard the zoning advice of its own experts can provide evidence of discriminatory intent).

### (iii)    Prioritization of Ticket Counts over Public Safety

At the same time that the BPD massively expanded tinted windows ticketing of Black and Latino motorists, true traffic safety enforcement—including for DWI, red light violations, and mobile phone use—declined. PSAMF ¶¶ 316-17. Tinted windows do not commonly cause traffic accidents, PSAMF ¶¶ 313-14, and the BPD considers tinted windows to pose an officer safety—but not traffic safety—concern. PSAMF ¶ 315.

In addition, as Plaintiffs' police practices expert Michael Gennaco stated—and Defendants' expert Steven Nigrelli did not disagree—there is no public safety benefit to issuing multiple tinted windows tickets when one would suffice. PSAMF ¶¶ 318. In fact, issuing multiple tinted windows tickets is counterproductive to the goal of reducing illegal tints on cars because motorists end up having to use their limited financial resources to pay fines rather than fixing their cars. PSAMF ¶¶ 319-20.

Finally, Plaintiffs' and Defendants' experts *agreed* that aggressive overpolicing of minor violations and the unequal imposition of tickets, fines, and fees can result in a loss of legitimacy and trust in law enforcement. PSAMF ¶ 321. Loss of legitimacy and trust, in turn, hinders the BPD in fulfilling its overall law enforcement mission. PSAMF ¶ 322. As the Second Circuit has recognized, "[t]he effectiveness of a [law enforcement agency] depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias." *Pappas v. Giuliani*, 290 F.3d 143, 146 (2dCir 2002). "If the police department treats a segment of the population of any race … with contempt, so that the particular minority comes to regard the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired." *Id*. at 146–47. Here, the sharp disconnect between Defendants' safety mission and their aggressive multiple tinted window ticketing practices targeting Black and Latino motorists suggests discriminatory intent.

### 3. The BPD's Ongoing Traffic Enforcement Program Is Intentionally Discriminatory

In addition to the evidence of discriminatory intent laid out in Section III.C.1, there is considerable specific evidence that the BPD's pretext stop program disproportionately targeting minorities is racially motivated. The BPD's highest officials have incorporated impermissible racial stereotypes in adopting a policy that directs and encourages a widespread practice of (1) saturating Black and Latino neighborhoods for pretextual traffic stops; and (2) targeting

motorists based on racial stereotypes and classifications for pretextual stops. *See* Section III.B.4. These discriminatory pretext stops and gang-focused patrols are concerned not with traffic safety, but with investigating and ferreting out information from or about minority motorists and their passengers. They reflect and reinforce the "pervasive attitude within the BPD [that] Black people, especially Black men and Boys, [are] simply presumed to be criminals" that results in the "frequent" use of racial profiling, that is viewed as an "effective form of policing with the full knowledge, acceptance, and encouragement from BPD leadership." IAD Witness Decl. at ¶¶ 9, 11.

(a)    The BPD's Use of Race-Based Presumptions Evinces That<br>Pretext Stops Are Motivated by Discriminatory Intent

The BPD directs officers on GIVE patrols to target specific "hot spot" areas and directs them to use traffic stop "proactive[ly]" to "gain knowledge of individuals who are traveling together," "gather [gang] intel[ligence],`" and "gather information on people active in the micro hot[]spot[s]." PSAMF ¶¶ 331. BPD policy permits officers to conduct pretext stops on any driver traveling in the hot spot. PSAMF ¶¶ 334. In his 30(b)(6) testimony, Commissioner Gramaglia testified that hot spots are "largely" or "exclusively" in Black and Latino communities. PSAMF ¶ 332.

Similarly, the BPD has identified broad "gang areas" that cover large swaths of Buffalo with predominantly Black populations (PSAMF ¶¶ 333), and it runs Gang Details in those areas in which officers "proactively" enforce traffic laws"—even though only a "very small number" of individuals are gang members —because "traffic stops" are "one of the best ways to gather information." PSAMF ¶ 346-47.

Courts have recognized that geography can be a proxy for race, which "raises an inference of impermissible intent and discriminatory purpose." *Wilkins*, 736 F. Supp. 3d at 623–24; *see also N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 214-15 (4th Cir. 2016) (policy's use of facially neutral criteria raises inference of impermissible intent when those

67

criteria map so closely onto racial divisions that they allow racial targeting "with almost surgical precision"); *Williams v. Dart*, 967 F.3d 625, 639 (7th Cir. 2020) (policy based on "racist assumptions about the likelihood that people from primarily African American neighborhoods pose a public safety risk or are likely to reoffend" could raise inference of discriminatory intent). Targeting entire neighborhoods for pretext stops reflects a presumption that people traveling within it are more likely to be gang members or criminal suspects and is thus an "invocation of residence that both reflects and conveys deeply ingrained and pernicious stereotypes." *United States v. Bishop*, 959 F.2d 820, 825 (9th Cir. 1992), *overruled on other grounds by United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010).

Commissioner Gramaglia, in his 30(b)(6) testimony on behalf of the City, stated that the general demographic of gang members in Buffalo is Black men ages 17-27, PSAMF ¶ 54, and that *he believed* there are no White gangs in Buffalo, although he admitted there are White gang members. PSAMF ¶ 353. However, a subsequent 30(b)(6) witness clarified that Buffalo also has predominantly White gangs, some headquartered on the East Side, and the FBI gang book lists a number of them. PSAMF ¶¶ 354-56. Buffalo also has predominantly Latino and Asian gangs. PSAMF ¶¶ 357-59.

The use of race-based criteria and stereotypes is evidence of intentional discrimination. Here, although there are White, Latino, and Asian gang members and gangs in Buffalo, PSAMF ¶¶ 354-59, the BPD's Gang Intelligence Submission form—BPD's *only* official form for designating an individual as a gang member—contains "Black" pre-filled for the race category. PSAMF ¶¶ 363, 366-67. The form appears in the joint FBI/BPD "gang book"[41] and

---

[41] Counsel for Defendants produced this form and gang book as the BPD's *only* official list of gang members, and Chief Macy testified as a 30(b)(6) witness that the BPD/FBI gang book and criteria was the only official way an individual could be designated as a gang member. **PSAMF ¶ 363.**

electronically in the ECAC[42] system. PSAMF ¶¶ 365, 367. The BPD presented this form in its February 21, 2022 weekly intelligence meeting, attended by the Special Investigations Lieutenant and officers from all BPD districts, with a reminder for officers in detail cars to include the relevant gang information. PSAMF ¶¶ 370-71.

At his deposition, Chief Macy expressed surprise at seeing that the form in the gang book was pre-filled with "Black." But even if the form were pre-filled in error, the mistake is telling because it reflects a presumption—verified by Commissioner Gramaglia in his 30(b)(6) testimony—that gang members in Buffalo are Black. The electronic, downloadable form on the ECAC website is identical to that in the gang book, and it also has the race field pre-filled with "Black." PSAMF ¶ 367. The ECAC form is used by officers in the field. PSAMF ¶ 369. The form contains the BPD logo and Chief Macy's email address, and Macy adopted it to ensure gang members were properly vetted. PSAMF ¶ 364-65, 368. Macy's flat denial of ever receiving the form from the field is contradicted by the record. PSAMF ¶ 374.

However "Black" may have gotten onto the form, it sends a powerful message to line officers as to who it is, precisely, that they are supposed to be policing. All the information from those entries gets stored by ECAC and is available on BPD's mobile platform that BPD officers can access in the field or on the web. PSAMF ¶ 373. Taking the form together with Commissioner Gramaglia's view on the "general demographic" of gang members, Plaintiffs are entitled to the inference on summary judgment that BPD had a ***race-based classification***, *i.e.*, a presumption that the primary targets for pretextual traffic enforcement are Black. This is concrete and specific evidence of intentional racial discrimination. "When government officials

---

[42] "ECAC" is the Erie Crime Analysis Center, which provides data and performs all sorts of analyses for BPD and other law enforcement agencies in Western New York. *See generally* ECF 91 at 7-10.

are permitted to use race as a proxy for gang membership and violence ... society as a whole suffers." *Johnson v. California*, 543 U.S. 499, 511 (2005).[43]

Moreover, the directive to use pretextual policing tactics reaches not only gang members but also "suspected gang members" (which is an undefined term) and "gang associates" (which the City's 30(b)(6) witness loosely defined as individuals who are "around" alleged gang members, such as being seen in a car with an alleged gang member more than twice).[44] PSAMF ¶¶ 337-39. The very vagueness of these definitions, coupled with BPD's directives and officers' unfettered license to use broad-based traffic enforcement to "gather intelligence" about gangs and guns, creates at least triable issue of fact as to whether Defendants use race as a marker of motorists' "participation in dangerous gang activity," in violation of the Fourteenth Amendment. *Taveras*, 585 F. Supp. 2d at 338. Here, as in *Floyd*, it "is impermissible to subject all members of a racially defined group to heightened police enforcement because some members of that group appear more frequently in criminal complaints." 959 F. Supp. 2d at 603.

The Court could find at trial that the BPD has directed officers to conduct invasive pretextual traffic stops in Black and Latino neighborhoods based on an impermissible racialized presumption that *any* person driving through that neighborhood could be a gang member, possess a gun, or have intelligence about a crime. Indeed, this is precisely what the

---

[43] *See also United States v. Taveras*, 585 F.Supp.2d 327, 338–39 (E.D.N.Y. 2008); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1170-71 (10thCir. 2003) (denying defendants' summary judgment motion in part because officer gratuitously included a racial marker that a driver was a Black male (B/M) in the gender box, when none was called for).

[44] The vagueness of these definitions, and the BPD's use in deciding where and who to target, raises concerns about discrimination and arbitrary enforcement. *Osegueda v. Stanislaus Cnty. Pub. Safety Ctr.*, 2017 WL 1348943, at *12 (E.D.Cal. Apr. 11, 2017) (allegation that suspicion of gang membership was a proxy for racial discrimination, and differential treatment of gang members of other races supports equal protection claim); *cf. City of Chicago v. Morales*, 527 U.S. 41, 51-52 (1999) (gang loitering statute is unconstitutionally vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests).

IAD Witness has said is the standard operating procedure at the BPD. PSAMF ¶¶ 221-23; *See generally* IAD Witness Decl.. The BPD's directives and express use of race functions similarly to Sheriff Arpaio's policy and practice in *Melendres v. Arpaio*, which "permitted officers to make racial classifications" in a way that "expressly incorporate[d] racial bias" and thus established discriminatory intent. 989 F. Supp. 2d 882, 899, 902 (D.Ariz. 2013).[45]

> (b)  The GIVE Daily Reports Confirm that the BPD Regularly Subjects Black and Latino Motorists to Suspicionless Vehicle Stops

The GIVE daily reports are replete with "sus veh" (suspicious vehicle) stops, which the BPD defines to mean that a vehicle aroused suspicion in some nebulous way *short of probable cause*, such as "cars sitting occupied that do not belong in a neighborhood." PSAMF ¶ 384. Supervisors are required to review these daily reports and address any errors, such as routine unlawful vehicle stops, but Gramaglia, who reviewed multiple "sus veh" stops of Black and Hispanic male drivers never did so, and there is no record of any policymaker or supervisor who did, demonstrating the City's intent that such stops should continue. PSAMF ¶¶ 388-92.

The Court could reasonably determine at trial that BPD's routinely and disproportionately subjecting Black and Latino motorists to unjustified stops, its policymakers' use of and reliance on racially biased statements and presumptions, its long history of discriminatory policing, misrepresentations and its other departures from BPD and legal rules, singly and together, create an inference of discriminatory intent. *See Doe,* 462 F. Supp. 2d at 542-53; *Holden v. Port Auth. of N.Y. & N.J.*, 521 F. Supp. 3d 415, 432-33 (S.D.N.Y. 2021).

---

[45] *See also Buck v. Davis*, 580 U.S. 100, 119, 121 (2017) (disallowing expert testimony of Black propensity for violence as unconstitutional because it "appealed to a powerful racial stereotype—that of black men as 'violence prone," which "coincided precisely with a particularly noxious strain of racial prejudice"); *Bush v. Vera*, 517 U.S. 952, 968 (1996) ("[T]o the extent that race is used as a proxy" for political tendencies, "a racial stereotype requiring strict scrutiny is in operation.").

(c)     The BPD's Pretextual Policing Program Departs from
Substantive Norms, Creating an Inference of Intentional
Discrimination

Under *Arlington Heights*, substantive and procedural departures from normal rules are

probable of discriminatory intent. 429 U.S. at 267; *Ave. 6E Invs., LLC,* 818 F.3d at 507–09

(city's decision to disregard the zoning advice of expert recommendations supports evidence of

discriminatory intent). Here, Defendants' program of pretextual traffic stops departs from both

its own advisory committee and GIVE's expert-based procedural justice policies and standards,

raising an inference of discriminatory intent.

(i)     *The BPD's Pretextual Policing Program Encourages*
*Racially Discriminatory Traffic Enforcement and*
*Departs from its Own*
*Traffic Enforcement Policy*

In 2021, the City promulgated a new Traffic Enforcement Policy following widespread

community protests of the death of George Floyd and police misconduct in Buffalo. PSAMF

¶¶ 393**.** The Traffic Enforcement Policy, ostensibly intended to reduce the risk of racially

discriminatory traffic enforcement, provides that officers may conduct a "brief" traffic stop

based on probable cause, which "may not last longer than the time reasonably required to issue

a summons for the violation."[46] PSAMF ¶ 5. The Policy also mandates that officers treat

individuals fairly and respectfully and forbids officers from conducting traffic enforcement on

the basis of race. PSAMF ¶ 5.

---

[46] The Policy follows the Supreme Court's ruling that the Fourth Amendment prohibits extending traffic stops for non-traffic related reasons without probable cause. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (Fourth Amendment requires duration of stop to be limited to time necessary to "address the traffic violation that warranted the stop and attend to related safety concerns…. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed" unless there is new probable cause to extend the search)*; see also United States v. Gomez*, 877 F.3d 76, 90-93 (2d Cir. 2017) (officer's extension of motor vehicle stop for five minutes to question driver about drugs and firearms violated the Fourth Amendment because it extended the stop for an unrelated criminal investigation); *United States v. Parks*, 2022 WL 1819383, at *7, *12 (W.D.N.Y. June 3, 2022) (invalidating stop where the officer extended traffic stop by asking the plaintiff unrelated questions about his travel itinerary and whether drugs were present in the car).

Mr. Gennaco found the Traffic Enforcement Policy "hollow in impact" due to lack of enforcement. Ex. 102, Gennaco Report at 13. As the court observed in *Melendres*, policy changes made "to present the appearance of racially-neutral operations without actually implementing such operations" evince discriminatory intent. 989 F. Supp. 2d at 902.

Here, Gramaglia supposedly promulgated the Traffic Enforcement Policy to reduce discrimination but effectively ordered his officers to violate that policy as applied to Black and Latino neighborhoods and motorists. Directing officers to use pretextual traffic stops "proactively," to "gain knowledge of individuals who are traveling together," "gather intelligence," and "gather information on people in the micro hot spot[s]," PSAMF ¶ 331, inherently requires officers to depart from the Policy by prolonging stops for investigatory purposes. The very directive to engage in these tactics means that BPD officers approach drivers armed with a presumption of guilt, that by definition is partial—the very opposite of the "impartial," fair, and non-race-based policing required by the Policy.

BPD's direction to learn about passengers and BPD officers' treatment of passengers involves particularly egregious departures from ordinary policy and practice and evidences discriminatory intent. The City's 30(b)(6) representative admitted that BPD and its officers do <u>not</u> have a "routine practice" of questioning passengers and that officers needed probable cause to do so. PSAMF ¶¶ 378-79. Yet as Defendants acknowledged, and GIVE daily reports confirm, officers routinely subject passengers—who are overwhelmingly Black and Latino— to questioning and background checks, gathering their race, date of birth, address and arrest history, and looking for gang affiliations.[47] PSAMF ¶¶ 380, 382. Few are gang members or have any information to share, demonstrating the overbroad and ineffective nature of the BPD's pretext policing program. PSAMF ¶¶ 381. The most common entry on a GIVE report for a

---

[47] *Reyes-Herrera v. Flaitz*, 539 F.Supp.3d 290, 299-302 (W.D.N.Y. 2021) (denying summary judgment because of disputed fact of whether officers' questioning of passenger was not a normal practice).

traffic stop was that the driver and/or passengers "checked ok." PSAMF ¶¶ 383. Rather than enforce their written policy, Gramaglia and other supervisors reviewed and even praised these ineffective, intrusive, and unconstitutional departures. PSAMF ¶¶ 345, 388, 390, .

Because this widespread practice strays so far from BPD's written policy, often violates the constitutional rights of motorists, and flaunts rules specifically designed to protect motorists from discrimination, it raises an inference of discriminatory intent. *Hollingsworth v. Wagoner*, 1990 WL 187125, at *2 (4th Cir. 1990) (deviations from prison policies can be evidence of discriminatory intent); ; *Holden*, 521 F. Supp. 3d at 427–28 (denying summary judgment where Defendants had a de facto policy of targeting of gay or gender non-conforming men in a manner that departed from routine practice); *Morrison v. Booth*, 763 F.2d 1366, 1373–74 (11th Cir. 1985); *see also Miller-El v. Cockrell*, 537 U.S. 322, 331–332 (2003) (racially disparate questioning practices are probative of discriminatory intent); *Cent. Alabama Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1189–91 (M.D.Ala. 2011) (finding discriminatory intent motivated Alabama law requiring schools to verify students' immigration status in part because law substantively departed from state's typical values of promoting welfare and unity of families), *overruled on other grounds*, 2013 WL 2372302 (11th Cir. May 17, 2013).

        (ii)     *The BPD Has Disregarded the Procedural Safeguards Recommended by the GIVE Program Experts and its Own Police Advisory Board to Reduce the Risk of Discriminatory Policing*

Defendants have also departed from much of the procedural justice guidance that the GIVE program has provided to reduce racially biased policing, as well as its own policies. GIVE recommendations are grounded in national expertise, and BPD purports to recognize the importance of these practices to maintain community trust, solve crime, and ensure non-discriminatory policing. PSAMF ¶¶ 396-400. One of the most salient of the GIVE guidelines limits traffic stops "to investigate the commission of criminal offenses in individual instances

when such offenses pose a threat to public safety." PSAMF ¶ 401a. Contrary to the GIVE guidance, the BPD has not adopted this, or any limit, to pretext stops. PSAMF ¶ 401.

In addition, the BPD has disregarded GIVE procedural justice benchmarks and strategies to reduce racial profiling through auditing field records of stops, adopting dashboard cameras, supervision metrics, effective accountability systems, and soliciting and incorporating community input into its substantive policies. PSAMF ¶¶ 402-26.

The City also disbanded and ignored the recommendations of the Common Council Police Advisory Board to create an independent accountability structure and reduce over-policing of communities of color, that numerous boards and individuals have requested to finally create some real accountability in Buffalo. PSAMF ¶¶ 420-21. The BPD's disregard of the recommendations and standards of state and national experts, as well as the City's own Advisory Board, to adopt measures to ensure fair and nondiscriminatory policing create triable issues of material fact. *Sunrise Dev., Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 775–76 (E.D.N.Y. 1999) (town's disregard of its own Citizen's Advisory Committee's recommendation supported evidence of discriminatory intent); *Ave. 6E Invs., LLC.*, 818 F.3d at 507–09 (disregard of zoning expert recommendations supports evidence of discriminatory intent).

> (d)    Expert and Anecdotal Evidence Substantiates That the City is Liable for a Widespread Pattern and Practice of Racially Discriminatory Traffic Enforcement

[48]In addition to the considerable evidence already discussed, Plaintiffs' trial presentation will include expert and anecdotal evidence demonstrating a widespread custom

---

[49] Courts have found such conduct evidence of racial profiling. *Laurencin*, 2023 WL 6312348 at *11 (denying the defendants' summary judgment motion on plaintiffs equal protection claim where one of the officers stared at the driver, made a U-turn, and then pulled the driver over and was demeaning during the stop); *Ballew*, 642 F.3d at 1157–58(finding evidence of discrimination where officers approached plaintiff from the opposite direction and made a U-turn and followed them before pulling them over); *United States v. Andrews*, 2005 WL 4753403, at *7 (D. Neb. Nov. 1, 2005), *aff'd*, 465 F.3d 346 (8th Cir. 2006) (officers' decision to follow Black driver after he saw him at a gas station and driver refused to make eye contact probative of discriminatory purpose).

and practice of racially discriminatory traffic enforcement. The court may consider "any relevant circumstantial proof that tends to show the state acted with a discriminatory motive." *Santiago*, 774 F.Supp. at 797, 800 (crediting testimony from "more than twenty witnesses, both present and former inmates as well as staff" who "testified to scores of incidents from which a clear pattern of racial animus emerges"); *Holden*, 521 F. Supp. 3d at 432–33 (denying summary judgment based on expert evidence of a historical "pattern" of police targeting that deviated from routine policing tactics).

As described above, the BPD has received at least 144 IAD complaints and lawsuits alleging racial bias, 99 of which were in the traffic context. PSAMF ¶¶ 197, 199. At trial, Mr. Gennaco will testify to "a high number of racial bias complaints and records suggesting multiple unjustified investigatory stops of Black and Hispanic drivers and passengers," including "demeaning and dehumanizing conduct" and "unnecessary or unlawful seizures and searches of drivers, passengers and vehicles." Ex. 102, Gennaco Report at 14. Gennaco documented 25 complaints by Black and Latino motorists alleging that "officers aggressively questioned, detained, or searched drivers and even passengers in routine traffic stops." *Id.* at 103 n.127, and "demeaning and dehumanizing conduct." *Id*. 13-14 Gennaco found that Commissioner Gramaglia "actively encouraged" such conduct and "did not advise, or provide any additional training or direction to the officers conducting these traffic stops," even when their reports revealed unlawful conduct. *Id.* at 104. Such a combination "runs the risk of racially unequal traffic enforcement." *Id.* at 105. Where individuals complained, none of the officers involved with these stops were ever held accountable for racially biased conduct; some were not even investigated. *Id*. at 103; 37-41;

Indeed, in reviewing complaints, Gennaco found that scores of Black and Latino plaintiffs, witnesses and complainants have confirmed how BPD officers engage in a widespread custom of racially discriminatory stops, operating on the presumption that anyone

who is Black or Latino is automatically suspect as they drive to work, to see family, to the store, or to church. Their stories contain strikingly similar indicia of discriminatory conduct and provide evidence of discriminatory intent. *See Lewis*, 547 F. Supp. 2d at 200; *Davis*, 959 F. Supp. 2d at 351-55; *Sorlucco Police Dep't*, 971 F.2d at 870-71.

One aspect of this pattern is that BPD officers frequently stop Black motorists *after* making eye contact with them and ascertaining their race, often conducting U-turns or other maneuvers to follow them, which signals an Equal Protection violation.[49] PSAMF ¶ 431. BPD officers prolong stops to run background checks and by asking unfounded, racially charged questions that convey a presumption of criminality without any basis, including questions about whether motorists have guns or drugs, their whereabouts, employment, and other activities[50] PSAMF ¶¶ 432. As a recent example, in February 2025 the BPD subjected Plaintiff De'Jon Hall to a pretextual stop in which officers: (1) observed him dropping his younger brother, a black male teenager in a hoodie, at the corner store; (2) made a U-Turn to follow him; (3) tailed him for blocks; (4) pulled him over under the false pretext of failing to signal; (5) took his

---

[49] Courts have found such conduct evidence of racial profiling. *Laurencin*, 2023 WL 6312348 at *11 (denying the defendants' summary judgment motion on plaintiffs equal protection claim where one of the officers stared at the driver, made a U-turn, and then pulled the driver over and was demeaning during the stop); *Ballew*, 642 F.3d at 1157–58(finding evidence of discrimination where officers approached plaintiff from the opposite direction and made a U-turn and followed them before pulling them over); *United States v. Andrews*, 2005 WL 4753403, at *7 (D. Neb. Nov. 1, 2005), *aff'd*, 465 F.3d 346 (8th Cir. 2006) (officers' decision to follow Black driver after he saw him at a gas station and driver refused to make eye contact probative of discriminatory purpose).

[50] Prolonged police stops that entail unfounded questions or accusations that reflect race-based stereotypes, aggressive behavior, criminal background checks is evidence of racial profiling. *See, e.g.*, *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1168–69 (10th Cir.2003) (questions and accusations about drugs evidence of discriminatory intent); *United States v. Andrews*, 2005 WL 4753403, at *7 (D.Neb. Nov. 1, 2005), *aff'd*, 465 F.3d 346 (8thCir. 2006) (departure from ordinary procedures for stop, including criminal background check evidence of intent); *Reyes-Herrera v. Flaitz*, 539 F. Supp. 3d 290 (W.D.N.Y.2021) (prolonged questioning of passenger about immigration status).

license to their vehicle, presumably to run a background check; and then (6) failed to give him

a ticket or a stop receipt, in derogation of the BPD's own rules. PSAMF ¶¶ 77, 577-82.

BPD officers also evince racial bias by making false accusations, resisting contrary

evidence, summarily rejecting protestations of innocence, and using racially charged language,

like "boy," "n*****r," "Spic" "animal," "criminal," or even unprovoked violence.[51] PSAMF

¶¶ 435. The aggressive demeanor of some officers has caused Black motorists to fear for their

lives during traffic stops—sometimes in front of their own children.[52] PSAMF ¶¶ 433. BPD

Officers frequently detain drivers and passengers during these stops, particularly Black men,,

and search and impound occupants and cars without any legal basis, PSAMF ¶¶ 437 which are

also markers of racially biased conduct.[53] Plaintiffs and witnesses have described these stops

---

[51] Police officers' "use of racial epithets may be regarded as direct evidence of racial animus and, when combined with physical abuse or other unlawful actions, may establish an equal protection violation." *Ali v. Connick*, 136 3 270, 280 (E.D.N.Y. 2015) (collecting cases). *Accord Williams v. Kaufman Cty.*, 352 F.3d 994, 1013 (5th Cir.2003) ("[R]acial epithets that accompany harassment or a violation of established rights may amount to a separate equal protection violation."); *Cole v. Fischer*, 379 F.App'x 40, 43 (2d Cir. 2010). *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) ("boy" can be probative of bias); *King v. City of Eastpointe*, 86 F.App'x 790 (6th Cir. 2003).(denying summary judgment based on whether police officer's reference to 13-year old African-American as "boy" was intended to be racially derogatory).

[52] See *Alexis v. McDonald's Restaurant of Massachusetts*, 67 F.3d 341, 353-54 (1st Cir. 1995) (officers' effectuation of an immediate seizure for a minor infraction or used excessive force evidence of discriminatory intent).

[53] *Marshall*, 345 F.3d at 1168–69; *United States v. Andrews*, 2005 WL 4753403, at *7 (departure from ordinary procedures for stop, including criminal background check evidence of intent); *Tchatat v. City of New York*, 2015 WL 5091197, at *6 (S.D.N.Y. Aug. 28, 2015), *on reconsideration in part*, 2015 WL 6159320 (S.D.N.Y. Oct. 20, 2015) (rude, dismissive, and aggressive tone and failure to attend to medical needs evidence of discriminatory intent); *Ramirez v. City of San Jose*, No. 21-CV-08127-VKD, 2022 WL 3139521, at *1 (N.D.Cal. Aug. 5, 2022) (presumption of criminality and gang membership without foundation and unjustified searches evidence of discriminatory intent); *Martin v. Conner*, 882 F.Supp.2d 820, 839–41 (D.Md. 2012) (potential invalidity of traffic stop and officers' extended record check and drug sniffing dog evidence of discrimination); *Mitchell v. Fuentes*, 2013 WL 2253585 (D.N.J. 2013) (condescending tone); *Christopher v. Nestlerode*, 373 F.Supp.2d 503, 509 (M.D.Pa. 2005), *aff'd*, 240 F.App'x 481 (3d Cir. 2007) (denying summary judgment on racial profiling claim where disputed issues of fact whether officer was verbally abusive and failed to disclose reason for stopping); *Fox v. City of Wichita*, No. 12-1271-CM, 2012 WL 6217384, at *3 (D.Kan. Dec. 13, 2012) (officers request to search without probable cause and unfounded citation for (continued…)

as "frequent [and] humiliating," "degrading," "intimidating," "terrifying," making them feel "fearful" and "inherently criminal or suspicious," "like animals and criminals" causing emotional distress, anxiety about driving or even living in Buffalo, and trauma. PSAMF ¶ 438.

Black and Latino motorists also report observing different stop patterns in predominantly Black areas of Buffalo compared to White areas, and even racial differences within stops. PSAMF ¶ 430. Plaintiff Dorethea Franklin drives throughout Buffalo and observed that traffic enforcement efforts are distinct on the East Side: "They treat Black people like criminals for no reason at all. It's degrading." Franklin Decl. ¶ 22. In *Doe*, the court relied on similar anecdotal evidence of differential treatment across races as part of the mosaic of evidence establishing an Equal Protection violation. 462 F. Supp. 2d at 547 (police officers ticketed Latino drivers for not wearing seatbelts but gave White drivers the opportunity to avoid a ticket by buckling up).

For example, in July 2017, Common Council President Darius Pridgen complained that the for the third time in three years, BPD officers harassed and required identification from his Black guests and denied many access to his July 4 party near the Buffalo waterfront, while the same officers allowed White guests of his White neighbors to enter freely. PSAMF ¶¶ 504-05. None of the officers were investigated or charged with racially biased policing for this discriminatory conduct. PSMF ¶¶ 507-08. In a June 2022 stop, BPD Officers stopped a vehicle driven by a White woman with two Black male passengers. PSAMF ¶¶ 495-503. According to the body camera footage, the officers aggressively asked to see the passengers' ID and questioned and berated them for 20 minutes, including falsely accusing one of raping and kidnapping a girl. PSAMF ¶¶ 497-98. In contrast, the officers removed the White female driver from the car and did not direct any derogatory language towards her. PSAMF 499, 501.She

---

registration supported plaintiffs' racial profiling claim). BPD officers also repeatedly target individuals for no reason, and even referencing their previous complaints.

later told IA that she felt like the officers were trying to get her away from two Black males. PSAMF ¶ 500. The officers were exonerated. PSAMF ¶ 503.

The BPD's differential treatment of the Black and White motorists during these stops creates an inference of the "race-based nature of the" practice. *Doe*, 462 F. Supp. 2d at 547; *Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 306 (S.D.N.Y. 2009) (arrest of Black person for conduct White parents engage in in park evidence of discrimination); *Sykes v. City of Henderson,* 738 3 1344, 1352–53 (D.Nev. 2024) (PD's assumption and treatment of Black witness as a suspect and criminal compared to White witness evidence of discriminatory intent).

These repeated complaints show a pervasive pattern of discriminatory conduct,[54] and are indicative of how discriminatory biases have become a fixed and impenetrable part of the BPD's "standard operating procedure." Regardless of the scope, strength, and volume of complaints and Defendants' "frequent and ongoing notice of troubling racial disparities in stops," none of the Policymaker defendants ever issued formal discipline against an officer for engaging in racially discriminatory policing ,and has long shown its lack of concern for racial profiling through … numerous failures of supervision, monitoring, training, and discipline discussed above," all of which supports a finding of discriminatory intent. *Floyd* , 959 F. Supp. 2d at 665–66; *Lucente*, 980 F.3d at 298 (denying summary judgment based on municipality's indifference to pattern of discriminatory harassment of female inmates); *Giron*, 693 F. Supp. 2d at 943; *Semedo v. Elliott,* 2012 WL 2449912, at *2 (D.Mass. June 28, 2012) (plaintiffs'

---

[55] Defendants' reliance on *Pinter v. City of New York*, 976 F.Supp.2d 539, 567 n.127 (S.D.N.Y. 2013), is misplaced. In *Pinter* plaintiffs alleged that NYPD was selectively targeting gay men for arrests, but did not provide any evidence of differential treatment between gay and straight men, or women. *Id*. at 568. Consistent with *Arlington Heights*, courts have not required evidence of an explicit race-based directive to find intentional discrimination, including courts that have applied *Floyd*. *See, e.g., Mhany Mgmt., Inc.*, 819 F.3d at 606 (coded language); *Holden*, 521 F Supp.3d at 427 (failure to supervise); *Hall v. Warren*, 2022 WL 2356700, at *7 (W.D.N.Y. June 30, 2022).

allegations that Police Department "widespread, systemic, and clear evidence that [it] had serious issues with discrimination, racial profiling, and other civil rights violations by its officers, and consciously failed to implement additional training or discipline in response" sufficient to deny City's motion to dismiss).

> (e)     The Existence of Reasonable Suspicion to Stop an Individual Does Not Obviate a Claim of Racial Profiling, and Defendants' Erroneous Understanding of this Precept Is Evidence of Discriminatory Intent

In addition, the City in its brief, and BPD as a matter of routine policy articulated by Commissioners and almost all command staff, continue to take the "unsupportable position that racial profiling cannot exist provided that a stop is based on reasonable suspicion," which courts have long recognized is "fundamentally inconsistent with the law of equal protection and represents a particularly disconcerting manifestation of indifference." *Floyd*, 959 F. Supp. 2d at 666–67.

The City's position reflects "clearly a limited and incorrect understanding" of the Fourteenth Amendment. *Melendres*, 989 F. Supp. 2d at 900. While the existence of bona fide individualized reasonable suspicion might preclude a Fourth Amendment claim that a stop was otherwise pretextual or based on race, the existence of individualized suspicion does not obviate a municipality's liability under the Fourteenth Amendment where there is sufficient evidence of a pattern and practice of using race as a motivating factor in stops. *Wren*, 517 U.S. at 813; *United States v. Scopo*, 19 F.3d 777, 786 (2d Cir. 1994) (Newman, J., concurring) (explaining constitutional dangers of racially pretextual arrests).

This misapprehension is widely held by policymakers and BPD officers (PSAMF ¶¶ 55, 427), and instead of being a defense is a fundamental and fatal error that is evidence of the BPD's ongoing discriminatory traffic enforcement practices and its deliberate indifference. *Floyd*, 959 F. Supp. 2d at 666–67. Given their erroneous understanding of the legal standard,

policymakers cannot adequately supervise, train, or hold accountable officers for discriminatory policing, as well documented in Gennaco's report.

Because there is substantial evidence that the City maintains a policy, practice, and custom of targeting Black and Latino drivers and neighborhoods for traffic enforcement motivated, at least in part, by discriminatory intent, this court should deny summary judgment on the Equal Protection claims.

(f)    *Floyd* Strongly Supports Plaintiffs' Equal Protection Claims

Defendants' attempt to distinguish *Floyd* does not stand up to scrutiny. Defendants recognize that the *Floyd* court found discriminatory intent based on racial disparities and a municipal policy encouraging officers to use race as a basis for stop and frisk tactics. DMSJ at 24. Defendants then assert, without foundation, that Plaintiffs have "absolutely no evidence that BPD command staff (or anyone at BPD for that matter) encouraged officers to make stops based on a motorist's race." *Id*. at 25. To the contrary, the record shows that BPD leadership directed officers to target young Black males for aggressive pretextual traffic stops based on an explicitly racialized profile similar to that used in *Floyd*. *See* III.B.4; III.C.3; *Floyd*, 959 F. Supp. 2d at 603. Similarly, Defendants' weak argument that the BPD made Checkpoint stops "without any regard for the race of the motorist inside the vehicle" (DMSJ at 25) disregards Plaintiffs' evidence that Defendants chose Checkpoint locations in part based on the racial demographics of Buffalo's segregated neighborhoods. *See* PSAMF ¶ 159e. Moreover, *Floyd*'s recognition that a policymaker's deliberate indifference to ongoing racial discriminatory traffic enforcement creates a strong inference of discriminatory intent, *Floyd*, 959 F. Supp. 2d at 665-66 —which Plaintiffs have amply demonstrated, *see* Section III.C.1.(c); III.C.3.(d), supports Plaintiffs' claims. Finally, Plaintiffs go beyond *Floyd* by presenting evidence of discriminatory intent not present in that case, including policymakers' use and approval of racist language and stereotypes, historical evidence of racial discriminatory policing and other policies, and

substantive departures from expert recommendations to reduce racially biased traffic enforcement. *See* Sec. III.C.1-2, *supra*. Given the strength of the intent evidence Plaintiffs have amassed, *Floyd* strongly supports the need for a trial here.[55]

### D. Genuine Disputes of Material Fact Preclude Summary Judgment on the Individual Plaintiffs' Equal Protection Claims

Although Defendants claim that "Plaintiffs have failed to adduce any evidence that the actual traffic enforcement actions taken against them had anything to do with their race," DMSJ at 25, they are incorrect. First, as detailed in Section III.C.3.(e), Plaintiffs' commission of traffic violations does not defeat their Equal Protection claims because a racially motivated stop is unconstitutional even if supported by probable cause. *Whren*, 517 U.S. at 813; *Floyd*, 959 F. *Whren*, 517 U.S. at at806, 813; *Floyd*, 959 F. Supp. 2d at 666–67; *see also Ballew*, 642 F. Supp. 3d at 1168 ("a traffic stop motivated, at least in part, by race still constitutes an equal protection violation, even if the officers also had a legitimate basis for the stop"). Indeed, as *Floyd* noted, targeting specific races creates a "self-perpetuating cycle" of disproportionate enforcement. 959 F. Supp. 2d at 667.

Each of the Plaintiffs has adduced evidence that they were stopped and/or ticketed pursuant to a municipal policy, custom, or practice that intentionally targeted Black and Latino motorists for traffic stops based in part on race, both *inside* and outside of Checkpoints, *see generally* Sections III, VII.B & C (describing specific stops for each plaintiff), meaning that Defendants are liable for an Equal Protection violation regardless of individual officers' intent. *See, e.g.*, *Floyd*, 959 F. Supp. 2d at 661–67 (proof of a discriminatory municipal policy of stop

---

[55] Defendants' reliance on *Pinter v. City of New York*, 976 F.Supp.2d 539, 567 n.127 (S.D.N.Y. 2013), is misplaced. In *Pinter* plaintiffs alleged that NYPD was selectively targeting gay men for arrests, but did not provide any evidence of differential treatment between gay and straight men, or women. *Id.* at 568. Consistent with *Arlington Heights*, courts have not required evidence of an explicit race-based directive to find intentional discrimination, including courts that have applied *Floyd. See, e.g., Mhany Mgmt., Inc.*, 819 F.3d at 606 (coded language); *Holden*, 521 F Supp.3d at 427 (failure to supervise); *Hall v. Warren*, 2022 WL 2356700, at *7 (W.D.N.Y. June 30, 2022).

and frisks supplied plaintiffs with a meritorious Equal Protection claim); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2dCir. 2004) ("an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself"). Checkpoint ticketing (Plaintiffs Redden and Evans) clearly occurred pursuant to municipal policy and direction. PSAMF ¶¶ 21, 83, 700-02. Plaintiffs Franklin, Palmer, and Yeldon similarly have shown that they received multiple tinted-window tickets in single stops under a discriminatory municipal policy only explainable by race. Section. #. Defendants' argument that officers were unaware of Plaintiffs' race pre-stop is irrelevant, because the practice Plaintiffs challenge is discrimination in ticketing post-stop after discovery of their race.

Furthermore, while evidence of these discriminatory municipal policies obviates the need to prove individual discriminatory intent, see *Floyd*, 959 F. Supp. 2d at 661–67, Plaintiffs' stops independently show such intent. Joseph Bonds was stopped twice by White officers who treated him as a criminal suspect (despite being in church attire once and work uniform another time) and issued baseless tickets that were later dismissed. PSAMF ¶¶ 552-61. Charles Palmer was repeatedly stopped while driving on the East Side by White Strike Force and Housing Unit officers with bias complaints who questioned him about non-traffic matters and issued multiple tinted-window tickets despite having a disability that made him sensitive to light. PSAMF ¶¶ 617-25. Ebony Yeldon endured rude and demeaning treatment when she was stopped by a White BPD officer who ticketed her for driving without insurance (even though she was insured), and told her she was "lucky" he was issuing her two tinted window tickets instead of four (despite admitting that her tint level was legal). PSAMF ¶¶ 671-76, 683. Shaketa Redden was likewise subjected to rude and dismissive treatment by a White Strike Force officer who stopped her while she was leaving a police brutality protest, cut her off when she was speaking, issued her multiple tickets, and chuckled when she asked him how to retrieve her car after it was impounded. PSAMF ¶ 602-06.

The questionable basis of Plaintiffs' stops and tickets, the treatment they received, and/or the records of some of the ticketing officers all support an inference of discriminatory intent. *See, e.g.*, *Laurencin v. Town of W. Hartford*, 2023 WL6312348, at *11 (D.Conn. Sept. 28, 2023) (denying summary judgment on equal protection claim where officers refused to listen to drivers' explanations, spoke to him in a demeaning manner, and questions existed as to the validity of the stop); *United States v. Moore*, 716 F. Supp. 3d 415, 428 (E.D.Va. 2024) (finding indictment of Black man violated Equal Protection clause in light of evidence of Richmond's historical discriminatory policing tactics and statistical disparities); *Lewis v. City of Albany*, 547 F. Supp. 2d 191, 200–04 (N.D.N.Y 2008) (officers' repeated incidents of excessive force against minorities is evidence of discriminatory intent).

Finally, Plaintiffs have shown that BPD officers intentionally selected BMHA properties with high percentages of Black and Latino residents for punitive traffic enforcement, creating triable equal protection issues about tickets issued to Plaintiffs Sarmiento and Bonds in BMHA lots. PSAMF ¶¶ 558, 644-49. Accordingly, genuine questions of material fact preclude summary judgment on all of the individual Plaintiffs' Equal Protection claims.

## IV.     Plaintiffs' Title VI Claims Should Also Proceed to Trial

The City—the only Defendant sued under Title VI—contends that summary judgment is proper on Plaintiffs' claims because Plaintiffs have presented no evidence of intentional discrimination. DMSJ at 28-30. This argument fails for the reasons discussed above. *See* Secs. I.A & III.C; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 290 (1998) (Title VI liability is proper when official adopt a discriminatory policy or fail to "institute corrective measures"). As with Plaintiffs' Equal Protection claims, their Title VI claims present triable issues of fact about discriminatory intent that only a jury can resolve. *Moll*, 94 F.4th at 228.

The City's second argument for summary judgment on the Title VI claims revolves around the outlandish theory that Plaintiffs must establish that the discrimination occurred "in

furtherance of" a federally funded program. DMSJ at 30-31. This language appears nowhere in the statute or the case law. The City made it up out of whole cloth. Title VI provides:

> No person ... shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. This language establishes "an individual right to be free from intentional discrimination by federally funded entities." *Bloomberg v. N.Y.C. Dep't of Educ.*, 119 F.4th 209, 213 (2d Cir. 2024). And it "conveys the statute's intent to benefit a class of people — those who participate in or use federally funded programs." *Id.* From at least 2015 to the present, the Department of Justice has provided federal funds to the City to support the BPD's law enforcement efforts. PSAMF ¶ 82. Those grants have specifically funded the BPD's use of specialized units, including the Strike Force and Housing Unit, to engage in hot spot policing directed at curbing gun and gang violence. *Id.* The City and BPD are each a "program or activity" under the statute. 42 U.S.C. § 2000d-4a(1). Accordingly, if the City, through the BPD, has discriminated against class members, then the City has violated Title VI. *Bloomberg*, 119 F.4th at 213. Plaintiffs do not need to establish that the discrimination occurred "in furtherance of" a federally funded program—whatever that means.

Tellingly, *Allen v. Nassau County Exec. Office*, 2011 WL 1061019, at *11 (E.D.N.Y. Feb. 15, 2011), which the City references, does not contain the City's purported "in furtherance of" language. *Allen* involved a *pro se* plaintiff who complained about a loss of contract opportunities. *Id.* She did not herself use or benefit from the federal funds at issue; she merely wanted to provide paid services to federal beneficiaries, and the court held that Title VI did not reach her claims. *Id.* Here, in contrast, Plaintiffs and class members are Buffalo residents whom the BPD is supposed to serve and protect; therefore, they are the "intended beneficiar[ies]" of federally-funded services. *Id.* Therefore, Plaintiffs' Title VI claims must proceed to trial.

## V.    Genuine Disputes of Material Fact Preclude Summary Judgment on Plaintiffs' Due Process Claims

As explained above in Section I.C, Defendants failed to move for summary judgment on Plaintiffs' actual due process claims. But even if they had, summary judgment would be inappropriate because triable issues of fact exist and because the City of Buffalo—the sole Defendant against whom this claim is brought—is not entitled to judgment as a matter of law. *See Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) (Sec. 1983 claims "may proceed solely against the municipality.").

### A.    The Due Process Clause Prohibits Pecuniary Interests from Biasing Police Officers' Decisions

As the Supreme Court explained in *Marshall v. Jerrico*, the Due Process Clause guarantees "a person to an impartial and disinterested tribunal in both civil and criminal cases." 446 U.S. at 242. This requirement "helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law" and "preserves both the appearance and reality of fairness." *Id.* Accordingly, the Due Process Clause is violated when a person in a judicial or quasi-judicial position possesses a "direct, personal, substantial pecuniary interest in reaching a conclusion" against the person before them. *Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927); *see also United States v. Stein*, 435 F. Supp. 2d 330, 359–60 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2dCir. 2008) (same).

This safeguard extends not only to judges, but to other officials who "serve the public interest." *Marshall*, 446 U.S. at 249. For instance, in *Marshall*, the court explained that while prosecutors are afforded more discretion than judges, they are not immune from due process limitations: "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Id.* at 249–50. Because the decision to enforce "may itself result in significant burdens" on the person targeted "even

87

if he is ultimately vindicated in an adjudication," the broad discretion traditionally given to prosecutors and other law enforcement officials does not immunize them in situations where enforcement decisions "were motivated by improper factors." *Id.* at 249; *see also Brucker v. City of Doraville*, 38 F.4th 876, 887 (11th Cir. 2022) (applying impartiality requirement to prosecutors); *United States v. Quiros*, 2020 WL 519807, at *11 (D.Vt. Jan. 28, 2020) ("[D]ue process does require a disinterested prosecutor, but the requirements for prosecutors are different than the requirements for judges and juries.").

Police officers are likewise subject to an impartiality requirement akin to the standard applied to prosecutors. As the court in *Coleman v. Town of Brookside* explained, "constitutional scrutiny has also been applied to the pecuniary interest of prosecutors and police officers in enforcing the law." 663 F. Supp. 3d 1261, 1272 (N.D.Ala. 2023); *see also Brucker*, 38 F.4th at 887 (applying "the same standard of impartiality to [police] as we do to prosecutors"); *McNeil v. Cmty. Prob. Servs., LLC*, 2021 WL 365844, at *15 (M.D.Tenn. Feb. 3, 2021) ("[T]he neutrality requirement applies to officials performing quasi-judicial functions and those performing enforcement functions.").

An improper motivating factor may be either personal or institutional. A "personal interest can arise when the police officers' compensation is ... tied to the citations they issue or they are at risk of termination if they do not issue enough citations." *Coleman*, 663 F. Supp. 3d at 1272. In contrast, "an institutional interest can arise when a police department is funded based on the amounts of penalties it collected, or when a large part of the penalty funds goes to the police department rather than being spread out over several other departments." *Id.*

To determine whether an official's enforcement decisions are unconstitutionally motivated by improper factors, courts assess whether the risk of bias is "too remote and insubstantial to violate the constitutional constraints." *Marshall*, 446 U.S. at 243–44. Because the Due Process Clause protects against both the appearance and the reality of unfairness, the

test "is not whether a particular man has succumbed to temptation, but whether the economic realities make the design of the … system vulnerable to a possible temptation to the average man." *Brown v. Vance*, 637 F.2d 272, 284 (5th Cir. 1981).

Determining whether financial incentives unconstitutionally bias officials' judgment is a fact-intensive inquiry depending on the circumstances of each case. *See Sourovelis v. City of Philadelphia*, 103 F. Supp. 3d 694, 709 (E.D.Pa. 2015) (denying motion to dismiss a due process claim challenging the police and prosecutors' retention of forfeited property and its proceeds because whether the financial incentive distorted decision-making was "inherently a factual issue"); *see also Wolkenstein v. Reville*, 694 F.2d 35, 41 (2d Cir. 1982) (noting that "[w]hether a particular decisionmaking procedure is constitutionally defective for want of impartiality will depend on many factors"). As explained below, record evidence is more than sufficient to conclude that BPD officers were subject to improper personal and institutional pecuniary interests, and the City may be held liable for these Due Process violations in its own right. *Askins*, 727 F.3d at 254.

**B.     BPD Officers Had a Personal Pecuniary Interest in Traffic Enforcement in Violation of the Due Process Clause**

*1.     The City Maintained a Policy or Practice of Personally Incentivizing BPD Officers to Issue Traffic Tickets and Impound Vehicles*

Plaintiffs have amassed significant evidence that, as a result of the City's policies and practices, BPD officers had a personal financial interest to issue as many traffic tickets and impound as many vehicles as possible. PSAMF ¶¶ 688-709. This evidence shows that the City maintained a policy or practice of awarding overtime opportunities to BPD officers in exchange for high numbers of traffic tickets and impounds—a policy or practice that was communicated time and again in internal emails and other documents. *Id.* For example:

- In an April 2017 email, former BPD Captain Philip Serafini made clear that overtime shifts were considered a reward to officers for issuing summonses and tickets. He urged Lieutenants to "stress to [their] officers that we are looking for *production in the form of arrests, summonses*, etc." He also wrote that upcoming overtime "focus will

be the same as in the past: making arrests, *enforcing the V&T* and penal law within these locations, and also responding to calls for service when appropriate." He further noted that "[t]hese *overtime details* are starting a month ahead of when they were started last year. I believe this is a *reward for the good work* that all of our officers and Lieutenants perform on a daily basis." Ex. 161, COB016282 (emphasis added).

- In a March 2015 email, Chief Menza wrote: "... [O]fficers will be held accountable and *traffic summons will be expected* with a detail report reflecting daily stats. Please let the Officers know what will be *expected when calling in the overtime*." Ex. 178, COB022527 (emphasis added).

- In May 2013, Captain Roberts emailed Commissioner Derenda: "I have compiled the *stats* from the Housing Unit for the month of April 2013 and I believe they *are off the charts ...* Guys are highly motivated and I think *a great reward would be at least a limited daytime O.T. Detail*. They are jumping through hoops for us and think it would be great for morale." Ex. 168, COB018294 (emphasis added).

- In a January 2013 email, Captain Roberts asked for continued overtime for Strike Force officers, noting that they "have shown *great production* with regards to arrests, *V/T issuances, and vehicle impounds, more than paying back the city for its overtime expense*." Ex. 244, COB063327 (emphasis added).

- A 2012 email from former Chief Brian Patterson to BPD Lieutenants urged them to instruct officers working overtime details to log their ticket citations and parking violations because "hard work is lost when I cannot show *activity... we must be able to show that to keep our OT levels* where they are." Ex. 367, COB406079 (emphasis added).

- And former Commissioner Derenda confirmed that overtime was viewed as a "financial reward" because officers "did make more money by working overtime." Ex. 8, Derenda Dec. 23, 2021 Dep. at 241:18-242:4.

BPD officers heard this message loud and clear. Officers understood that they needed to justify lucrative overtime shifts with high numbers of tickets and impounds. Ex. 164, COB017429 ("Officers will be required to write V&T summonses, parking tags, impounds and city ordinances. Numbers will be expected to justify the overtime!"). For example, Charles Skipper testified that he understood Lieutenants' requests for "results" to mean that he was expected to issue tickets to justify his overtime pay. Ex. 40, Skipper Mar. 5, 2021 Dep. at 116:3-11. Justin Tedesco explained that superiors stressed the importance of generating tickets and impounds during overtime shifts, noting that this message was "spoken" to Strike Force officers because prior BPD units were disbanded for not working (i.e., not producing enough tickets and summonses). Ex. 41, Tedesco July 11, 2023 Dep. at 195:3-196:4. Lieutenant Quinn

noted his understanding that overtime would "probably" be limited if officers were not sufficiently productive (which he separately defined as "issuing more summonses").

This policy or practice of requiring high ticketing numbers for overtime shifts created a strong incentive to issue as many tickets and impound as many vehicles as possible. PSAMF ¶¶ 688-698. Overtime opportunities allowed BPD officers to materially increase their compensation as they were paid time and a half for overtime shifts. *Id.* ¶¶ 693-698. Numerous officers throughout the BPD considerably increased their salaries by working overtime. *Id.* In FY 2016, 25% of the BPD workforce earned more than $20,000 in overtime. [56] *Id.* ¶ 694. Lieutenant Russo, for example, said that overtime comprised a "pretty substantial" portion of his total pay. Ex. 36, Russo Apr. 29, 2022 Dep. at 87:14–88:11. Lieutenant Whelan earned $65,000 to $70,000 worth of overtime in one year and observed that overtime was generally "a big part" of Strike Force officers' salaries. Ex. 45, Whelan Apr. 26, 2022 Dep. at 295:22–296:1. Similarly, BPD Officer Richard Hy testified that he often sought out overtime for a "bump in [his] paycheck." Ex. 21, Hy July 19, 2023 Dep. at 96:10-23.

In addition to overtime shifts, BPD officers had incentives to issue tickets by receiving additional pay for court time, allowing officers to further increase their pay. PSAMF ¶ 694. For example, in one year, Officer Hy earned approximately $50,000 more than his salary between overtime shifts and court time. Ex. 21, Hy July 19, 2023 Dep. at 104:6-105:6. This compensation was important to officers; when they learned that the City would start adjudicating traffic violations, they expressed concern about the income they might lose if court

---

[56] Ex. 8, Derenda Dec. 23, 2021 Dep. at 243:21–244:6 ("Q: And some officers increased their salaries considerably with overtime, didn't they? A: Throughout the department, correct."); Ex. 33, Quinn Apr. 1, 2022 Dep. at 78:21-79:23 ("Q: Some officers increased their salaries considerably with overtime, correct? A: That's correct."); Ex. 50, Young Oct. 26, 2022 Dep. at 96:11-23 ("Q: And overtime details also gave officers the chance to increase their pensions, right? A: Yes. Q: And isn't it the case that some officers significantly increased their salary working overtime shifts? A: Overtime is based on seniority per the union, so yes."); Ex. 1, Acquino Sept. 5, 2023 Dep. at 102:19-23 ("I think anyone wants an excessive salary where they're at... yeah, if overtime is available and I can take it I'll take it.").

appearances were eliminated or reduced. Ex. 43, Whelan Apr. 26 Dep. at 283:16–286:3 ("And

that's the gist of his email here. He wants to know if we're still going to get called for the ...

Traffic Violations Bureau because he wants to know if he's going to get paid his court time.").

Overtime further benefited BPD officers by increasing their pensions. Officers'

pensions were generally based on the average of the highest-earning three years of their career,

so working overtime provided officers an opportunity to increase their pensions. PSAMF ¶¶

696-97. As officer Richard Hy acknowledged, officers sought out overtime because

"everybody wants ... more money ... and then you had the old timers who wanted their

retirement to reflect that as well." Ex. 21, Hy July 19, 2023 Dep. at 96:10-23.

The City's scheme to increase ticketing and impounding by granting overtime and tying

production to job performance was remarkably effective. From 2012 to 2016, the number of

traffic summons issued by the BPD more than doubled, while the amount of overtime

compensation doled out increased by more than 30% (*see* PSAMF ¶ 698):

| FY/CY Start | Division of Patrol Services Traffic Summons | Division of Traffic Services Traffic Summons | BPD Overtime Compensation (All Divisions) |
|---|---|---|---|
| 2012 | 21,115 | 2,069 | $9,314,035 |
| 2013 | 34,955 | 1,863 | $10,154,531 |
| 2014 | 31,629 | 384 | $11,579,702 |
| 2015 | 52,169 | 297 | $12,865,412 |
| 2016 | 51,878 | 163 | $13,666,454 |

Indeed, the BPD paid out so much overtime that the City conducted an audit of its overtime

practices. PSAMF ¶ 713. The audit found that overtime increased from 19% of officer base

pay in FY 2014 to 26% in FY 2016. *Id.* Additionally, BPD exceeded its overtime budget by

40% in FY 2015. *Id.*

The City further motivated officers by measuring officer job performance by the

number of tickets they issued and number of vehicles they impounded. Former Commissioner

Derenda testified that he "expected officers to be out there proactive, aggressive, doing their

job" and officers demonstrated that they were "doing their job" based on the number of

impounds, citations, and summonses they issued during their shifts. Ex. 7, Derenda Nov. 10, 2021 Dep. at 102:19-103:2; Ex. 9, Derenda Dec. 23, 2021 Dep. at 241:8-12. To ensure officers were meeting that expectation, BPD officials carefully monitored officer ticketing and impound numbers and patterns, including by reviewing daily and monthly reports. PSAMF ¶¶ 38-41, 700-709, 723. Officers were generally required to submit daily reports after every shift, detailing among other things how many tickets were issued. *Id.* ¶ 700. Lieutenant Russo confirmed that statistics were used to evaluate officers' performance: "Officers demonstrated they were 'doing their job' by producing "activity reports" that tracked how many tickets, impounds, and parking tags they made during a shift. Ex. 36, Russo Apr. 29, 2022 Dep. at 228:2-229:23; *accord* PSAMF ¶¶ 38-41, 700-709, 723.

Officers were keenly aware that leadership carefully tracked their ticketing, impound, and summons numbers. *See, e.g.*, PSAMF ¶¶ 38-41, 700-709, 723. For example, BPD Captain Serafini informed officers that "HQ wants us to compile the number and type of traffic violations, arrests, impounds, and seizures resulting from all of our traffic safety checkpoints." Ex. 196, COB041727. In addition to written reports, officers sometimes had to participate in a daily briefing during which "each officer was required to turn in an intelligence report with how many summonses, guns, impounds, how many misdemeanors, how many felonies ...." Ex. 33, Quinn Apr. 1, 2022 Dep. at 19:14-20:6. This reporting policy, designed to increase ticketing and impound numbers, was stressed from the top downwards because Commissioner Derenda believed "what gets recorded gets attention, so if people know you're watching what they're doing, they tend to do more work." Ex. 7, Derenda Nov. 10, 2021 Dep. at 113:19-114:3.

BPD leadership made clear to officers of all ranks that "good work" was determined by the number of citations, tickets, and impounds they issued. For instance:

- Captain Serafini testified that reports reflecting increases in summonses, impounds, and arrests were evidence of good work. Ex. 38, Serafini Dec. 27, 2021 Dep. at 243:13-19 ("Q: So when you saw evidence that summonses, impounds, arrests were increasing among the Housing and Strike Force Units, you saw that as evidence of the good work

that those units were doing in the city of Buffalo? A: Like I said, as long as it was done properly, yes, and lawfully."); *Id.* at 246:3-13 ("Q: So when statistics increased ... you viewed it as evidence of a job well done? A: Partially, yes.").

- Captain Serafini also agreed that it was "fair" to say that the "numbers" generated were one of the metrics that Commissioner Derenda used to evaluate whether his unit was "performing adequately." Ex. 38, Serafini Dec. 27, 2021 Dep. at 240:22-241:5.

  - In a March 2017 email to Chief Aaron Young and BPD Lieutenants, Captain Serafini wrote, "[T]hese yearly statistics are an important barometer to help the department understand the amount of good work both the Housing and Strike Force units are performing." Ex. 174, COB018565.

  - In an email, Captain Serafini praised Lieutenant Russo because the "Housing / Strike Force Annual Stats" showed that the number of tickets and parking violations doubled from 2013 to 2015. Ex. 173, COB018513. Serafini applauded officers for increasing statistics because it was "one measure of the work the officers [were] doing." Ex. 38, Serafini Dec. 27, 2021 Dep. at 246:3-9.

At the same time, BPD officials admonished subordinates when tickets and impounds did not meet expectations. For example, in an April 2012 email, Chief Beaty informed Lieutenants that BPD's "stats cannot suffer" in light of recent transfers and shift changes. Ex. 362, COB345889. She further instructed Lieutenants that each officer must "minimally" generate six parking tags, two VTL summons, and six ordination citations during their tour of duty, with "more in any category [being] better." *Id*. In another instance, Chief Young emailed BPD Lieutenants instructing them to "make sure to let [officers] know" to record tags, summonses and city ordinances. Ex. 214, COB052637. He added, "[c]onstant zero's [sic] in these categories is unacceptable." *Id*. Captains and Lieutenants were required to provide explanations to their superiors when tickets and impounds were lower than desired. PSAMF ¶¶ 38-41, 700-709, 723.

The pressure to produce "good results" was so strong that officers attempted to "pad their numbers" by issuing multiple tickets at a single stop, including through multiple tinted window tickets. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 281:1-16. Padded or not, the growth in multiple tinted windows ticketing in the Strike Force and Housing Unit was explosive. The average number of tinted window tickets per tinted window incident, over time, for each of the two units was:

| 6-mo.period | SF tix/inc | HU tix/in |
|---|---|---|
| 2012//2 | 1.00 | 1.33 |
| 2013//1 | 1.58 | 1.45 |
| 2013//2 | 2.12 | 2.20 |
| 2014//1 | 2.42 | 2.25 |
| 2014//2 | 2.68 | 2.62 |
| 2015//1 | 2.84 | 2.65 |
| 2015//2 | 2.84 | 3.05 |
| 2016//1 | 3.01 | 3.31 |
| 2016//2 | 3.04 | 3.33 |
| 2017//1 | 2.80 | 2.99 |
| 2017//2 | 2.90 | 3.03 |
| 2018//1 | 3.19 | 3.42 |

Or, graphically:



*See* Ex. 125, Krugman Class. Cert. Decl. ¶ 60..

> 2. *There Is at Least a Triable Issue of Fact as to Whether BPD Officers'*
> *Personal Financial Interest Violated the Due Process Clause*

The City's policy and practice of tying officer compensation and job performance to

ticketing and impounding resulted in a personal financial interest that is neither "remote" nor

"insubstantial." *Marshall*, 446 U.S. at 243–44. For example, in *Tumey*, the Supreme Court held that a local ordinance providing that the mayor would receive "his costs in each case, in addition to his regular salary, as compensation" for convicting defendants who appeared before him, violated the Due Process Clause. 273 U.S. at 519, 523, 531-34. Similarly, in *Connally v. Georgia*, the Supreme Court held that a statute created a "direct, personal, substantial, pecuniary interest" in violation of due process by awarding justices of the peace a small, $5 fee for approving search warrants and no fee for denying search warrants. 429 U.S. 245, 250 (1977). And in *Coleman*, the court explained that police officers have a personal pecuniary interest when their "compensation is ... tied to the citations they issue or they are at risk of termination if they do not issue enough citations." 663 F. Supp. 3d at 1272. Here, similar to *Tumey*, *Connally*, and *Coleman*, the City's policy and practice of rewarding officers who issue a high number of tickets with additional compensation creates a direct, personal, and substantial pecuniary interest.

At a minimum, there are material facts at issue precluding summary judgment on Plaintiffs' claims of a personal financial interest in violation of the Due Process. *See Moll,* 94 F.4th at 228 (summary judgment should be denied where "there are genuine issues of material fact that may reasonably be resolved in favor of either party"). Defendants likely contend that there was not a policy or practice of tying compensation to traffic ticket and impound production. Defendants also likely contend that BPD leadership did not pressure officers to issue more tickets or use ticket production as a measure of job performance. But for the reasons discussed above, there is more than sufficient evidence to create a genuine dispute on these issues. *See Flora v. Sw. Iowa Narcotics Enf't Task Force*, 292 F. Supp. 3d 875, 904–05 (S.D.Iowa 2018) (denying summary judgment and concluding there were "material facts at issue in determining" due process claim, including whether law enforcement officer and county attorney "stand to profit economically from vigorous enforcement of the law"); *McNeil*, 2021

96

WL 365844, at *17 (concluding that "Plaintiffs have come forward with substantial evidence creating a genuine issue of material fact" where plaintiffs presented evidence that the defendant, a probation supervision company, evaluated employee job performance based on their revenue collection rate).

The fact that tickets issued or impounds made by officers may have a valid justification does not alter this analysis. The inquiry is an objective one; actual bias or temptation need not be shown. *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883 (2009) ("[T]he Due Process Clause has been implemented by objective standards that do not require proof of actual bias."). Indeed, a "concern for actual prejudice in" circumstances where there is an interested public official "misses the point, for what is at stake is the public perception of the integrity of our criminal justice system." *Young v. U.S. ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 811–12 (1987).

Nor does the fact that motorists could challenge their tickets or impounds in court change this conclusion. *See, e.g.*, *Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 61 (1972) (rejecting argument that "any unfairness at the trial level [resulting from biased judges] can be corrected on appeal and trial de novo" because "the State's trial court procedure [can] be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication"); *Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*, 113 F. 4th 511, 526 (5th Cir. 2024) ("[T]he ability to petition the legislature and seek review in the courts does not obliterate Tesla's due process rights before the executive.").

"It is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters." *Young*, 481 U.S. at 810. Because there is evidence that the City created a "scheme injecting a personal interest, financial or otherwise, into the enforcement process" by tying ticket production to overtime and using it as a measure of job performance, Defendants'

motion for summary judgment as to Plaintiffs' Due Process Clause claim should be denied. *Marshall*, 446 U.S. at 249.

### C.    BPD Officers Had an Institutional Pecuniary Interest in Traffic Enforcement in Violation of the Due Process Clause

Plaintiffs have also amassed substantial evidence showing that the City created an improper institutional incentive for BPD officers to issue as many tickets and impound as many vehicles as possible. Defendants are not entitled to summary judgment because this evidence presents a genuine dispute of material fact. *Moll,* 94 F.4th at 228.

Led by Mayor Brown, the City embarked on a scheme of balancing its budget using revenue from traffic fees and fines. PSAMF ¶¶ 710-716. Buffalo's charter requires it to maintain a balanced budget, with revenues equaling expenditures. *Id.* ¶ 710. The City struggled to adhere to the charter, and the Mayor frequently relied on reserves to help balance the budget, using over $30 million in reserves in fiscal years 2017-2018 and 2018-2019. *Id.* ¶¶ 712-713. As the City Comptroller noted, the "inevitable result" of this practice was "total depletion of the City's reserves" with severe consequences including "credit rating downgrades, higher interest rates for borrowing, cash flow shortages, insolvency, and the return of the 'hard' control board." *Id.* ¶¶ 712-713. The City, however, had few options for actually generating the revenue required to balance the budget because Mayor Brown did not want to raise property taxes. *Id.* ¶ 714. Instead, Mayor Brown looked for other sources of revenue to offset the City's rising expenditures, and ultimately settled on increasing City revenue through fines and fees generated from traffic and parking enforcement. *Id.* ¶¶ 715-16.

### 1.    The City Used Traffic Enforcement to Generate Revenue Through Policing Targeted at Buffalo's Minority Neighborhoods

Under Mayor Brown's leadership, the City pursued an aggressive strategy of generating revenue through the collection of traffic fees and fines to address its budget problem. PSAMF ¶¶ 715-16. The Strike Force and Housing Unit were integral to this strategy. PSAMF ¶¶ 38-41,

700-709, 723. Derenda's directive that officers conducting Checkpoints impound as many vehicles and write as many tickets as possible made the Checkpoint Program a lucrative operation by design. ¶¶ 38-41, 700-709, 723. Strike Force and Housing Unit officers were pressured to generate large numbers of traffic summons and impounds, and required officers to regularly report out their total "numbers" to ensure that their "production" remained high. *Id.* When tickets numbers fell below expectations, former Commissioner Derenda (successfully) pressured the Unites to increase their "production." PSAMF ¶¶ 38-41, 700-709. Ex. 45, Whelan Apr. 26, 2022 Dep. at 257:8-264:2 ("Q: So when you received emails from … Commissioner Derenda that you had low production, was it common for you to focus your troops on increasing production? A: Yes."). Revenue generation was such a core function of the Strike Force that a lieutenant challenged a new policy that increased the administrative burden of impounding cars. In a May 2014 email to his superiors, Lieutenant Wilcox wrote: "Strike Force impounds more cars than any unit in the city.... This form will greatly reduce the impound numbers everyone has come to expect. *Less impounds equates to less revenue*." Ex. 155, COB027566 (emphasis added).

City officials like Mayor Brown and Kevin Helfer, the City Commissioner of Parking who went on to become Executive Director of the Buffalo Traffic Violation Authority ("BTVA"), also tracked statistics pertaining to the number of BPD traffic tickets and impounds. PSAMF ¶¶ 716, 723. Helfer even completed revenue projections for the City based specifically on Strike Force impounds. PSAMF ¶ 723. The Strike Force's ticketing results were both praised and relied upon by City officials for purposes of revenue-raising; Helfer projected the City would receive an additional $400,000 in revenue based on Strike Force impounds in 2013 alone. *Id.* ¶ 723.

2.    *The City Established the BTVA and Other Ad Hoc Programs To
Maximize Its Retention of Traffic-Related Revenues*

In 2015, the City and the State, with the support of Mayor Brown, established the BTVA

in order to "provide fiscal relief" to the City and "generate revenue." PSAMF ¶¶ 717-718, 721-

722. The creation of the BTVA transferred jurisdiction over certain traffic violations within the

City of Buffalo to the Buffalo City Court, along with *all associated revenue*. *Id.* ¶¶ 43, 44, 718.

And, even before the BTVA was established, Mayor Brown and City officers were focused on

the amount of revenue it would generate. *Id.* ¶ 716; Ex. 203, COB121555 (requesting "a ball

park of the revenue we would receive if Buffalo adjudicated its own moving violations" be-

cause the "mayor is going to Albany … and we need an approximation").

From its inception, the BTVA was viewed as a major source of income for the City,

and the BTVA proved to be highly efficient at turning traffic tickets into City revenue. PSAMF

¶¶ 721-732. Since BTVA revenue ultimately depended on the number of tickets issued by the

BPD, BTVA Executive Director Helfer and the City's Commissioner of Revenue carefully

tracked the BPD's production with respect to traffic fines and fees and court appearances, and

constantly assessed the impact of BPD ticketing practices on City revenue streams. *Id.* ¶¶ 726-

29. When revenue from BPD fines and fees dipped below expectations, Helfer expressed

concern and demanded an explanation. *See, e.g.*, *id.* ¶ 729; Ex. 207, COB094495 ("Get me

tickets! Only 895 from BPD this month"); Ex. 206, COB120438 (Helfer: "Money is way down.

We have to get to the bottom of this. Is it a[s] simple as tickets written have slowed down?").

The City and BTVA issued increasingly aggressive targets for traffic fines and fees

revenue in order to address shortfalls with the City's budget. *Id.* ¶ 732. To meet its aggressive

revenue goals, the BTVA also developed policies to further increase fines and fees revenue,

albeit at the expense of the Black and Brown Buffalo motorists overwhelmingly impacted by

the BPD's extractive ticketing practices. *Id.* ¶¶ 138-142, 647, 729-730. This included

prohibiting prosecutors in traffic court from offering plea deals to motorists, and making it

100

more difficult for motorists to get fee reductions based on financial hardship or indigency. *Id.* ¶ 730. Combined with the BPD's discriminatory revenue-harvesting practices, the BTVA substantially increased the annual revenue the City derived from traffic fines and fees—peaking at nearly $4 million in fiscal year 2016. *Id.* ¶ 731.

| FY Start | Tow and Storage Fee Gross Revenue | Traffic Violation Fines Gross Revenue |
|---|---|---|
| 2014 | $1,257,989 | $0 |
| 2015 (BTVA created) | $1,188,437 | $2,061,853 |
| 2016 | $1,140,166 | $3,993,940 |
| 2017 | $1,189,732 | $3,003,992 |
| 2018 | $1,347,569 | $2,883,600 |
| 2019 | $1,402,412 | $2,540,527 |
| 2020 | $1,621,462 | $2,518,530 |
| 2021 | $1,794,029 | $1,976,658 |
| 2022 | $2,054,647 | $1,689,265 |

After establishing the BTVA, the City continued to experiment with other initiatives in order to boost revenues through traffic enforcement. PSAMF ¶¶ 733-741. For example, in July 2018, the Common Council and Mayor submitted an ordinance amendment that would allow the BTVA to assess fourteen new fines and fees. *Id.* ¶ 733. One of the express goals of these fines and fees was to "defray costs," even though BTVA's revenues far exceeded its costs. *Id.* ¶ 734. Though the City stopped enforcing these fines and fees due to public outcry, the City failed to formally repeal them and they remain a potential source of revenue for the City should it choose to restart enforcement in the future. *Id.* ¶¶ 735-736.[57]

### 3. Institutional Pressure Was Applied on the BPD to Generate Revenue

After the City was forced to disband the BPD Strike Force due to public scrutiny, the City sought to increase its revenue from traffic fines and fees by applying pressure on the BPD in other ways. PSAMF ¶ 741. For example, in February 2018, the Commissioner of Administration and Finance, Donna Estrich, asked BPD Commissioner Lockwood to "review

---

[57] In 2020, the City also implemented a "school speed zone camera program" that the Mayor recognized as a "new revenue generator." PSAMF ¶¶ 738-739. But like the new fines and fees, the City abandoned the program after public outcry. *Id.* ¶¶ 740.

where they [sic] may be opportunities to increase revenue." Ex. 313, COB223195. Commissioner Estrich elaborated further at a November 7, 2018 Common Council Finance Committee meeting, explaining that "Traffic Violations is below budget, and, you know, we're working with Police. They just created a new traffic detail and put that out." Ex. 314, COB396698; PSAMF ¶ 741. Commissioner Estrich was kept apprised of information regarding the number of tickets BPD officers wrote and the revenue that they generated. PSAMF ¶¶ 729, 741. For example, after receiving a report on BPD ticketing statistics for the month of April 2018, Commissioner Estrich wrote "How can the officers only write one ticket in a month?" Ex. 222, COB239572.

The importance of generating revenue was also communicated to BPD officers. PSAMF ¶¶ 742-744. It was common knowledge within the BPD that revenue from VTL enforcement went to the City, and that revenue generation is one of the purposes of VTL enforcement. *Id.* ¶¶ 742-746. BPD Officers trained at the Erie County Law Enforcement Academy were even taught that one of the goals of traffic enforcement is to generate revenue. *Id.* ¶ 742.

Because the City was required to maintain a balanced budget, there were significant consequences if the BPD failed to bring in adequate revenue. If a department failed to bring in adequate revenue, the City would put a freeze on expenditures for the BPD or agencies citywide. PSAMF ¶¶ 741, 747–748. In the BPD's case, that potential "freeze" came in the form of limitations on overtime expenses, which were often explicitly conditioned on revenue generation. *Id.* ¶¶ 688-698, 748. In this way, the BPD's institutional motivations to generate City revenue supported and reinforced officers' individual incentives to ticket heavily. *See id.*; *Sec.* V.B., *supra*.

> 4. *There Is at Least a Triable Issue of Fact As to Whether BPD Officers'*
> *Institutional Financial Interest Violated the Due Process Clause*

In light of these facts, there is a substantial risk that BPD officers' "judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts." *Marshall*, 446 U.S. at 250. Given the importance to the City of generating fees through traffic fines and fees as discussed above, the "possible temptation" exists that BPD officers' judgment was motivated by the interest of raising revenue for the City rather than unbiased enforcement of the law. *Ward*, 409 U.S. at 60. Moreover, "there is a realistic possibility that [officers'] judgment[s] w[ere] distorted, because in effect, the more revenues [they raised], the more money [they] can spend." *Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145, 1195 (D.N.M. 2018). At a minimum, these facts create a genuine dispute of material fact as to whether the risk of institutional bias is more than "remote and insubstantial" and accordingly summary judgment should be denied. *Marshall*, 446 U.S. at 243.*Marshall*, 446 U.S. at 243–44.

## VI.    Defendants Are Individually and Municipally Liable on Plaintiffs' Damages Claims

Under 28 U.S.C. § 1983, a municipal official can be held individually liable for damages in instances where the official "creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or his subordinates) of which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 325-26 (N.D.N.Y. 2023); 28 U.S.C § 1983. Since Plaintiffs have already established such conduct on the part of Defendants Derenda, Brown, and Lockwood, who were each policymakers for the City and the BPD, *see* Sec. II-IV, *supra*, they can be held individually liable for damages unless qualified immunity applies. It does not.

### A.      The Individual Defendants Are Not Entitled to Qualified Immunity

At the summary judgment stage, courts evaluate qualified immunity pursuant to a two-part test that asks "(1) whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right and (2) whether the right in question was clearly established at the time of the violation." *Sloley v. VanBramer*, 945 F.3d 30, 36 (2d Cir. 2019) (citing *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014)). Courts can consider these questions in either order, but they may not weigh evidence or resolve disputes of fact in favor of the moving party. *Tolan*, 572 U.S. at 656-57. The Individual Defendants cannot carry their burden of establishing the affirmative defense on this record because of triable issues of fact. *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018).

Following the Supreme Court's holding in *Edmond*, 531 U.S. at 44, that suspicionless checkpoints whose primary purpose is general crime control violate the Fourth Amendment, Derenda, Brown, and any objectively reasonable official would have known that implementing checkpoints principally aimed at the "reduction of drug, gun, and gang activity" was unconstitutional—even if nominally framed as safety checks. *See also McLennon*, 171 F. Supp. 3d at 85 (noting the law under *Edmond* was clearly established). While Defendants may dispute the purpose of the Checkpoints as a factual matter, summary judgment is not available on qualified immunity grounds where the question turns on "whether one believes [Defendants'] version of the facts." *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir. 1996).

Likewise, any reasonable officer would have known that intentionally targeting Black and Latino motorists for discriminatory traffic enforcement is unconstitutional. "General legal principles can constitute clearly established law." *Andrew v. White*, 145 S. Ct. 75, 82 (2025); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."). In the Second Circuit, the right to be free from racially discriminatory enforcement

of neutral laws has been clearly established "beyond peradventure" for decades. *Savino v. Town of Se.*, 572 F. App'x 15, 16 (2d Cir. 2014) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886)), and *LeClair v. Saunders*, 627 F.2d 606, 610 (2d Cir. 1980), and noting "we could cite dozens of other cases for these same basic principles of equal protection"). The Supreme Court has clearly held *in the context of traffic enforcement* that the Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race," *Whren*, 517 U.S. at 806, 813, and the Second Circuit established the legal standard that applies to such claims in *Brown v. City of Oneonta, New York*, 221 F.3d at 337. Qualified immunity turns on whether Defendants had "fair warning . . . that their alleged [conduct] was unconstitutional." *Tolan*, 572 U.S. at 656. Here, Defendants cannot possibly have had any confusion about their constitutional obligation to refrain from intentional discrimination on the basis of race.

Thus, the only question that remains is whether, when facts are construed in Plaintiffs' favor, they can establish a violation of a federal right. *Id.* In light of the evidence that Plaintiffs have amassed that Defendants' traffic enforcement policies *both* had a disparate impact on Black and Latino motorists and were driven by discriminatory intent, Sections III.B-C, Defendants' motion for summary judgment on qualified immunity grounds must be denied. *See, e.g.*, *Tolan*, 572 U.S. at 657 ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard."); *Husain v. Springer*, 494 F.3d 108, 133 (2d Cir. 2007) (qualified immunity is inappropriate where material facts are in dispute).

### B.    The City of Buffalo is Municipally Liable for Constitutional Violations

Defendants' motion for summary judgment does not contest *Monell* liability with respect to any of Plaintiffs' claims, so Plaintiffs are not required to present argument on this point. *Ceglia v. Zuckerberg*, 287 F.R.D. 152, 162 (W.D.N.Y. 2012) (arguments not presented in an opening brief are waived). However, the evidentiary record in this case and the conduct

of municipal policymakers provide robust evidence that the actions challenged in this case on Fourth Amendment, Equal Protection, and Title VI grounds are policies, customs, and practices for which the City is municipally liable under *Monell v. City of N.Y. Dep't. of Social Services*, 436 U.S. 658 (1978). *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125-27 (2d Cir. 2004) (*Monell* liability can be premised on a *single* instance of action, inaction, or deliberate indifference); *Barrett v. Orange Cnty. Hum. Rts. Comm'n*, 194 F.3d 341, 349-50 (2d Cir. 1999) (municipalities can be held liable even where individual defendants are not). Finally, since qualified immunity does not apply to municipalities, it offers no defense to Plaintiffs' Fourth Amendment, Equal Protection, Title VI, and Due Process claims. *Askins*, 727 F.3d at 254.

## VII.    Plaintiffs Have Standing to Pursue Their Injunctive Claims

Defendants do not contest the individual Plaintiffs' standing for damages but do challenge their injunctive standing—specifically whether Plaintiffs can show an injury in fact.[58] For injunctive claims, an injury in fact is a "substantial risk of future harm" arising from "an official policy or its equivalent." *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 38 (S.D.N.Y. 2022) (citing *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004)). Only one named plaintiff needs standing in class actions. *Hyland v. Navient Corp.*, 48 F.4th 110, 117-18 (2d Cir. 2022). Defendants' challenge should be denied.

### A.    The Court's Prior Standing Ruling Should Not Be Treated as Law of the Case

Although the Court previously denied certification of Plaintiffs' Rule 23(b)(2) class for lack of standing, the law-of-the-case doctrine does not bar reconsideration here, because the doctrine is "discretionary and does not limit a court's power to reconsider its own decision prior to final judgment." *Cangemi v. United State*s, 13 F.4th 115, 140 (2d Cir. 2021) (citation

---

[58] Of the three traditional elements of standing—(i) an injury in fact, (ii) that is fairly traceable to the defendants, (iii) and that is likely to be redressed by a favorable decision, *see, e.g.*, *Mhany Mgmt.*, 819 F.3d at 600—Defendants have challenged only injury in fact. *See* DMSJ at 48-49. Accordingly, Plaintiffs confine their discussion to that issue.

omitted); *accord Colvin v. Keen*, 900 F.3d 63, 68 (2d Cir. 2018) (doctrine is not rigid). The Second Circuit has identified three "cogent" and "compelling" circumstances where departures from the doctrine are ordinarily warranted: cases involving (1) "an intervening change of controlling law," (2) "the availability of new evidence," or (3) "the need to correct a clear error or prevent manifest injustice." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 208 (2d Cir. 2013). Reconsideration is warranted here, because the Court committed two "clear errors" in its standing decision, and applying that decision would effect "manifest injustice."

> 1.   *The Court Committed Clear Errors When It Failed to Analyze Plaintiffs' General Traffic Enforcement Claims and Failed to Analyze Standing as of the Claim Commencement Date*

First, even though Plaintiffs alleged—and supplied proof—that Defendants had an ongoing policy and practice of targeting Black and Latino motorists for punitive traffic enforcement both at and outside of Checkpoints, the Court focused its standing analysis on the Checkpoint Program alone and treated all other allegations as derivative at best (ECF 261 at 10-13). This clear factual error is sufficiently grave to warrant reconsideration. *See, e.g.*, *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (approving of reconsideration where court overlooked data); *Duke v. Luxottica U.S. Holdings Corp.*, 2024 WL 4904509, at *6-8 (E.D.N.Y. Nov. 27, 2024) (granting motion to reconsider standing decision premised on an erroneous reading of the complaint).

Equally grave, the Court committed a clear error of law by evaluating injunctive standing based on the date of its class certification decision, rather than (1) the date the original complaint was filed and (2) the date that additional plaintiffs sought leave to join the case. *Compare* ECF 261 at 12 ("none of Plaintiffs' attestations pertain to Checkpoints that took place in the *past two years*") (emphasis added), *with Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025) ("Standing is determined as of the filing of the complaint"); *Comer v. Cisneros*, 37 F.3d 775, 801 (2d Cir. 1994) (an intervenor's standing is determined as of the date the motion to

intervene was filed); *Robidoux v. Celani*, 987 F.2d 931, 938 (2d Cir. 1993) (relevant inquiry for standing is whether "the original plaintiff at the time the complaint was filed, and each intervenor at the time of her motion to intervene, was . . . suffering injury capable of being redressed by declaratory or injunctive relief.").

Because the operative complaint in this action is a "Supplemental Complaint under Rule 15(d), as well as an Amended Complaint under Rule 15(a)," (ECF 57-1 at 8), a proper standing analysis turns on two dates: June 28, 2018, the date Plaintiffs Simmons, Franklin, Evans, and Hall filed the original complaint (ECF 1), and April 23, 2020, the date Plaintiffs Palmer, Sarmiento, Redden, Yeldon, and Bonds sought leave to join the case (ECF 57 at 1; ECF 57-4 at 1-2). *See Javier H. v. Garcia-Botello*, 239 F.R.D. 342, 346 (W.D.N.Y. 2006) (although Rule 15(a) generally governs complaint amendments, Rule 21 controls amendments that seek to add new parties); *Cisneros*, 37 F.3d at 791, 801 (assessing standing based on two dates: the date the suit was filed for original plaintiffs, and the date new plaintiffs sought to intervene); *Chen-Oster v. Goldman, Sachs & Co.*, 251 F. Supp. 3d 579, 589-90 (S.D.N.Y. 2017) (same).

### 2. *Applying the Law of the Case Doctrine Here Would Result in Manifest Injustice*

Second, as detailed below, revisiting the Court's standing ruling at this time is also necessary to prevent manifest injustice because when the standing analysis is properly applied, injunctive standing exists with respect to all of Plaintiffs' claims, meaning the Court's errors improperly prevented Plaintiffs' institutional reform case from proceeding. *See, e.g.*, *Fero v. Excellus Health Plan, Inc.*, 304 F. Supp. 3d 333, 341-43 (W.D.N.Y. 2018), *order clarified*, 502 F. Supp. 3d 724 (W.D.N.Y. 2020) (revisiting prior standing ruling to prevent inequity); *Duke*, 2024 WL 4904509, at *6-8 (same).

> 3.    *The Law of the Case Doctrine Does Not Apply Because Newly*
> *Available Evidence Forecloses Mootness Arguments*

Post-filing developments bear on mootness, not standing, *McDonald*, 128 F.4th at 384,

a principle which the original standing ruling appears to have overlooked. Plaintiffs' claims are

not moot here, *see* Sec. VII.D, *infra*—a fact that is reinforced by supplemental evidence not

available at the time of the class certification briefing. *See* Sec. VII.E, *infra*. This is an

additional reason why the law-of-the-case doctrine should not apply. *See Starbucks*, 736 F.3d

at 208 (doctrine can be set aside based on newly discovered evidence); *Fero*, 304 F. Supp. 3d

at 343 (evidence is newly discovered if it was not available during party's prior briefing).

## B.    Plaintiffs Have Injunctive Standing to Challenge Defendants' General Traffic Enforcement Practices

Plaintiffs' claim for ongoing racially discriminatory traffic enforcement is not limited

to Checkpoints. The ASC (ECF 63) explicitly alleges that Defendants, through the BPD, "***also***

disproportionately and intentionally targets neighborhoods and drivers of color for traffic en-

forcement ***outside of Checkpoints*** (¶ 91); that such "racially discriminatory traffic enforce-

ment" is of "vast extent" "***both at and away from Checkpoints***" (¶ 102) and "***is not merely***

***historical***" but "has continued to [the date of the ASC] ***notwithstanding the dissolution of the***

***Strike Force in March 2018*** (¶ 118); that "Defendants have devised, implemented, enforced,

encouraged, and sanctioned ***a policy, practice, and/or custom of subjecting Plaintiffs and***

***class members to aggressive, punitive traffic enforcement***, including at Checkpoints," (¶ 440);

that the BPD "target[s]BPD "target[s] . . . Black and Latino neighborhoods for aggressive, pu-

nitive traffic enforcement (*including **but not limited to** the use of Checkpoints and multiple*

*ticketing for tinted windows* and seatbelt violations)" (¶ 441); and that "***[b]ecause Plaintiffs***

***and class members continue to drive in these neighborhoods, they face the real and immedi-***

***ate threat that, unless enjoined by this Court, Defendants will again violate their Fourteenth***

***Amendment rights***" (¶ 443) (emphasis added). For ***this*** claim, the likelihood of future harm is

*not*, "Will there ever be another Checkpoint?" Rather it is, "Did Plaintiffs, who are Black and Latino motorists, face a non-speculative future risk of being stopped and/or ticketed by the BPD based on race circa 2018 and 2020?" In light of the evidentiary record, the answer at summary judgment is "yes."

Plaintiffs have amassed considerable proof—in the form of expert police practices evidence, expert statistical proof summarized in Section III.B.3, and the voluminous proof of discriminatory intent set forth in Section III.C—establishing that the BPD had adopted a discriminatory policy, practice, and custom of targeting Black and Latino motorists for traffic stops and punitive traffic enforcement *regardless* of Checkpoints. That policy, practice, and custom satisfies the "policy or its equivalent" requirement of *Shain*, 356 F.3d at 216. It was in place in 2018 when the action was filed, it was in place in 2020 when the ASC was filed, and it remains in place now. *See, e.g.*, PSAMF ¶¶ 196-237, 296-307, 323-93, 530-687; IAD Witness Decl. ¶¶ 1–39; Taylor ¶¶ 1-49; Suttles Decl. ¶¶ 1-55; Griffin Decl. ¶¶ 4-30; Franklin Decl. ¶¶ 20-27; Hall Decl. ¶¶ 24-29; Bonds Decl. ¶¶ 34-39; Krugman SJ Decl. ¶¶ 36-41.

The police practices standing cases confirm that such a policy, taken in conjunction with repeated examples of the challenged conduct, establishes risk of future harm: "The possibility of recurring injury ceases to be speculative when ***actual repeated incidents*** are documented." *Floyd*, 283 F.R.D. at 169 (emphasis added).[59]

And "actual repeated incidents" are present here in abundance. The original complaint alleges an incident of multiple seatbelt ticketing related to Plaintiff Evans (originally appearing as Jane Doe, ECF 1 ¶¶ 211-18; *see* PSAMF ¶¶ 633, 636; Evans Decl ¶ []; the ASC adds several more incidents of plausibly discriminatory pre-June 2018 traffic enforcement involving

---

[59] *Accord Plaintiffs #1-#21*, 2021 WL 1255011, at *10 n.39; *Ligon v. City of New York*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013); *Stinson v. City of New York*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012); *Nat'l Cong. for Puerto Rican Rts. v. City of New York*, 75 F. Supp. 2d 154, 160 (S.D.N.Y. 1999).

Plaintiffs Bonds, Yeldon, and Palmer, ASC ¶¶ 317-23, 271-77, 302-307; PSAMF ¶¶ 550-56, 564, 617-21, 624-25, 671-76; and the Gennaco Report adds 37 more. PSAMF ¶ 197; Ex. 102, Gennaco Report App. C. All of these incidents took place before this action was commenced and thus "count" as "actual repeated incidents" for standing purposes.[60] Some (not all) of these incidents happened at Checkpoints, but that does not matter for purposes of standing on Plaintiffs' general claim for injunctive relief.[61]

Accordingly, the Court's attempt to distinguish *Floyd* (ECF 261 at 12) on the basis that it concerned a policy "ongoing" at the time of lawsuit, whereas this case does not, no longer holds. The policy of racially discriminatory punitive and aggressive traffic enforcement *is* ongoing, Moreover, unlike in *Lyons* and *Shain*, both of which involved the possibility of future *arrests* as a predicate, the risk of future harm here is hardly speculative. Traffic stops are not arrests. As Defendants' 30(b)(6) representatives admitted, "it's pretty common for an officer to find a legal justification for pulling someone over." Ex. 29, Palizay Sept. 6, 2024 30(b)(6) Dep. at 204:11-15; Ex. 23, Macy 198:13-199:18, PSAMF ¶ 336. The risk here is ever present; being Black or Latino while driving is effectively the only prerequisite. *See, e.g.*, *Nat'l Cong. for Puerto Rican Rts.*, 75 F. Supp. 2d at 161 ("The fact that plaintiffs were stopped while engaging in everyday tasks further illustrates a realistic risk of future harm."); *Floyd*, 283 F.R.D. at 169–70 (same).

---

[60] All of these incidents are properly before the Court on summary judgment, as the individual Plaintiffs' incidents have been confirmed in their declarations. An additional incident in September 2018 involving Plaintiff Redden (PSAMF ¶¶ 600-08) is too late to be considered as one of the "repeated" incidents for purposes of Plaintiff Evans's standing, but it came before Redden's own entry into the action in the ASC and thus counts toward *her* standing, as well as that of the other newly added Plaintiffs, all of whose standing is measured as of April 25, 2020. The 11 additional Gennaco incidents occurring between 2018 and 2020 likewise "count" for these Plaintiffs. PSAMF ¶ 197; Ex. 102, Gennaco Report App. C.

[61] Just as a claim for multiple tinted windows tickets at a Checkpoint is separate from the claims that the stop violated the Fourth Amendment and that the location of the Checkpoint violated the Fourteenth, a claim for racially discriminatory ticketing is a claim for racially discriminatory ticketing, whether or not the tickets were issued at a Checkpoint.

C.    **Plaintiffs Have Injunctive Standing to Challenge the BPD's Checkpoint Policy**

When the standing factors are properly applied to the Checkpoints injunctive claim, it is clear that Plaintiffs have demonstrated injury in fact for purposes of injunctive standing at the summary judgment stage. As of June 2018, Plaintiffs Simmons, Evans, Hall, Franklin, Palmer, and Redden had each experienced one or more Checkpoint stops. PSAMF ¶¶ 532-33, 537-42, 568-69, 589-97, 616. The number of "actual repeated violations" is staggering. PSAMF ¶ 159; *see also* Simmons Decl. ¶¶ 4-5 (attesting to at least 40 Checkpoint stops); Franklin Decl. ¶ 5 (attesting to dozens of stops, "so many [] that I lost count"); Ex. 109, Bjerk Report ¶ 311 (documenting more than 1,600 Checkpoints).

As of June 2018, the Checkpoint Program was also an ongoing policy of the BPD, ECF 261 at 12, authorized by and partially codified in the BPD's Manual of Procedures. PSAMF ¶¶ 17, 20. And although the Checkpoint Program was eventually paused, the pause only occurred after Plaintiffs began threatening litigation against the City. PSAMF ¶ 143. Even then, Defendants took no steps to officially terminate the Checkpoint Program as evidenced by the statements of key municipal policymakers like Mayor Brown, who testified that he fully sanctioned the Checkpoint Program and never sought to prescribe BPD's practices related to traffic stops. PSAMF ¶¶ 86-87. Instead, City officials vowed that the pause was temporary and that the Checkpoints would resume even after the Strike Force was disbanded. PSAMF ¶¶ 144-45.

Here, as in *Maneely v. City of Newburgh*, 208 F.R.D. 69, 73-74 (S.D.N.Y. 2002), the pause under threat of litigation does not destroy injunctive standing. *Accord Cisneros*, 37 F.3d at 791 (injunctive standing was proper despite program modifications). Here, as in *Floyd*, "[t]he possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." 283 F.R.D. at 169; *accord Kosinski*, 614 F. Supp. 3d at 39 (collecting cases). Moreover, *Lyons* and *Shain* are inapplicable because as of 2018 there was "no chain of

112

contingencies" necessary for the harm to likely reoccur. Accordingly, Plaintiffs have standing to pursue the Checkpoints injunctive claim.

### D.    Plaintiffs Injunctive Claims Are Not Moot

Although neither the Court nor Defendants addressed the issue of mootness, substantial evidence—including witness declarations, supplemental expert reports, and discovery documents newly produced by Defendants pursuant to Rule 26(e)—also demonstrate that Plaintiffs' claims for injunctive relief are not moot.

#### 1.    Defendants Cannot Meet the Requirements of the Doctrine of Voluntary Cessation

Plaintiffs' Checkpoints injunctive claim is not moot, because a "court's power to grant injunctive relief survives discontinuance of the illegal conduct." *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012); *accord FBI v. Fikre*, 601 U.S. 234, 243-44 (2024). Defendants seeking to establish mootness by voluntarily ceasing the challenged conduct carry the "formidable burden of showing that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *Mhany Mgmt.*, 819 F.3d at 603-04; *Lackey v. Stinnie*, 145 S. Ct. 659, 669 (2025) (same); *accord Cisneros*, 37 F.3d at 800 (burden is "very heavy").

The rationale for the voluntary cessation doctrine is simple: "[w]ere the rule more forgiving, a defendant might suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off." *Fikre*, 601 U.S. at 241. Thus, "the rule traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Mhany Mgmt.*, 819 F.3d at 603. Having not even asserted mootness in their summary judgment motion, Defendants have certainly failed to carry this "formidable burden." *Id.*

The Supreme Court's 2024 decision in *Fikre* is instructive: there, a Muslim plaintiff challenged his inclusion on the FBI's no-fly list after he refused to serve as an FBI informant. 601 U.S. at 242. The FBI removed him from the no-fly list after he commenced litigation and

announced that it had no current plans to relist him. *Id.* at 242-43. The Supreme Court held that plaintiff's injunctive relief claim was *not* moot based on these facts, even though *eight years* had already elapsed since the plaintiff's removal from the list. *Id.* at 243. As the Court explained, "[a] case does not automatically become moot when a defendant suspends its challenged conduct and then carries on litigating for some specified period." *Id.*

The facts in this case are no different. Even though Plaintiffs' lawsuit is "long lingering," *see id.*, the Checkpoint Program is a longstanding municipal policy that Defendants only paused in response to litigation threats. **PSAMF** ¶ 143. Defendants have never formally repudiated this policy, and they have never amended the provision of the BPD manual of procedures that formally authorizes the Program's use by all BPD units, not just the Strike Force. PSAMF ¶ 144-45. *McDonald*, 128 F.4th at 385 (asking whether there was a "significant amendment or repeal" of the challenged provision); *Raymond v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 749 F. Supp. 3d 290, 308 (N.D.N.Y. 2024) (injunctive claim was not moot where challenged policy had not been formally revoked or amended).

Because nothing bars Defendants from restarting the Checkpoint Program "later at some more propitious moment," Plaintiffs' Checkpoint injunctive claims are not moot. *Fikre*, 601 U.S. at 241, 243; *accord City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (injunctive claims were not moot because "the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision" absent permanent injunction); *Mhany Mgmt.*, 819 F.3d at 604 (injunctive claims were not moot where changes to the challenged policy tracked the timeline of the litigation); *Maneely*, 208 F.R.D. at 73 (injunctive claims were not moot where defendants engaged in unconstitutional practice for five years and only stopped upon receipt of a notice of claim).

2.      *The Traffic Enforcement Practices that Plaintiffs Seek to Enjoin*
        *Remain Ongoing*

The claim to enjoin Defendants' policy and practice of targeting Black and Brown motorists—including Plaintiffs—for aggressive, punitive traffic enforcement is not moot because it ***continues unbroken to this day***. *See* VII.B, *supra*. Plaintiffs Hall and Bonds have both been subject to such stops ***in 2025***. PSAMF ¶¶ 560-61, 577-82. On February 8, 2025, Plaintiff Hall was followed and stopped by BPD officers shortly after they observed him and his younger brother, who was wearing a hoodie, near a corner store on Buffalo's East Side. *Id.* ¶¶ 577-79. The officers falsely claimed Hall had failed to use a turn signal—despite his not having turned. *Id.* ¶¶ 580, 582. On March 17, 2025, Plaintiff Bonds was stopped while pulling into work by two White BPD officers who questioned him about whether he worked there (while he was wearing his work uniform) and issued him seven tickets that were all later dismissed by a judge. *Id.* ¶¶ 560-61. The conduct is hardly an anomaly: the Gennaco Report lists at least 16 complaints of racially biased traffic enforcement since 2020, and at least 11 complaints by residents of repeated targeting. Ex. 102, Gennaco Report App. C. Recent GIVE discovery and body camera footage of related stops provide further evidence of that Defendants' policy of traffic enforcement and stops persist to this day. PSAMF ¶¶ 516-29. The IAD Witness also speaks to the prevalence of racial profiling within the BPD, and the fact that it took place with the knowledge, acceptance, and encouragement of BPD Commissioners, despite citizen complaints, because it was viewed as an effective form of policing. IAD Witness Decl. ¶¶ 11-14, 23-26.

The BPD's practice of subjecting Plaintiffs and other Black motorists to multiple ticketing also continues unbroken, as Plaintiff Bonds's recent traffic stop confirms. Nor is he the only Plaintiff to experience this type of recent harm: Plaintiff Franklin was issued multiple tinted window tickets in a 2023 traffic stop, despite needing tints for medical reasons; all the tickets were subsequently dismissed. **PSAMF ¶¶ 544-47.** Bjerk's May 2025 Supplemental

Expert Report confirms the extent to which racially disparate ticketing of minority drivers remains a current practice. PSAMF ¶¶ 150-51. Collectively, this evidence of ongoing practices defeats any mootness argument regarding Plaintiffs' injunctive claims about discriminatory non-Checkpoint traffic enforcement. *See Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 345 (2d Cir. 1998) (case not moot where "some injury remains that could be redressed").

    **E.    Summary Judgment Is Also Premature Under Rule 56(d) Because Merits Discovery Relevant to Mootness Is Still Ongoing**

Summary judgment on Plaintiffs' injunctive claims on mootness grounds is also improper under Rule 56(d) because Defendants' production of relevant evidence remains ongoing to this very day. PSAMF ¶¶ 516-29. Specifically, Defendants have yet to complete their supplemental production of video footage of traffic stops identified by Plaintiffs as likely to have been discriminatory and pretextual in nature, despite Plaintiffs' repeated efforts to obtain a timely production of these materials. PSAMF ¶¶ 516-29. As previously described in Section III.B.4, the BPD performs pretextual traffic stops predominantly directed towards Black and Latino individuals and communities under the GIVE program, which provides funds for crime-control policing related to gangs and gun violence. The outstanding evidence is both relevant to and supportive of Plaintiffs' injunctive relief claims because it will show that the City's policy of engaging in racially biased traffic enforcement outside of Checkpoints remains ongoing and continues to put Plaintiffs and other minority motorists at risk.

For all the reasons set forth elsewhere in this Brief, Defendants' motion for summary judgment should simply be denied. Even if that were not the case, however, summary judgment should be denied pursuant to Rule 56(d) because Plaintiffs lack access to "information that is essential to [their] opposition." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (quoting *Anderson*, 477 U.S. at 250 n.5); *Davis v. 2191 Niagara St., LLC*, 2025 WL 959829, at *4 (W.D.N.Y. Mar. 31, 2025) (courts should defer summary judgment if non-movant "reasonably advises" that needed discovery is pending).

## VIII.    Plaintiffs Seek Appropriately Tailored Injunctive Relief & Remedial Processes that Comport with Rule 65(d), Not an Obey the Law Injunction

Finally, Defendants renew their argument made at the class certification stage that Plaintiffs cannot obtain injunctive relief in this case because it will amount to an improper obey the law remedy.[62] This argument, which mischaracterizes the ASC, fails for three reasons.

First, unlike the plaintiff in *Wakefield v. Scott*, 2021 WL 10342467, at *4 (D.Vt. June 24, 2021), who requested only that defendants be directed "from violating the law," the ASC seeks to enjoin specific municipal policies and practices regarding traffic stops, Checkpoints, and revenue generation that harmed Plaintiffs and class members. *See* ASC ¶¶ 73-74 (seeking to enjoin, *inter alia*, "continuing the policy, practice, and custom of conducting vehicle Check-points for general crime control" and "conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of race and ethnicity"). Plaintiffs also request particularized BPD policy reforms on training, supervision, discipline, and traffic-stop documentation. *Id.* at 73-74.[63] This requested relief far exceeds a "simple command that the defendant obey the law," *Am. Soc'y for Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Servs.*, 60 F.4th 16, 22-23, n.8 (2d Cir. 2023) (rejecting bare "compliance with FOIA" request), and satisfies Rule 65(d)'s specificity requirement. *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240-41 (2d Cir. 2001).

---

[62] The court did not rule on Defendants' argument at that time, so no law of the case considerations apply. ECF 261 at 7-9.

[63] This type of injunctive relief is routinely made available to plaintiffs in policing reform cases. *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d 668, 676, 679–80 (S.D.N.Y. 2013) (enjoining relief regarding the use of stop and frisk, including the revision of policies and training regarding stops, searches, and racial profiling, and mandating the appointment of a monitor); *Melendres v. Arpaio,* 2013 WL 5498218, at *12–48. (D. Ariz. Oct. 2, 2013), *aff'd in part, vacated in part*, 784 F.3d 1254 (9th Cir. 2015) (enjoining racially discriminatory traffic enforcement and ordering changes to policies, training, supervision, officer discipline, and appointment of a monitoring team); *Cole v. City of Memphis, Tenn*., 108 F. Supp. 3d 593, 612 (W.D. Tenn. 2015), *aff'd* 839 F.3d 530 (6th Cir. 2016) (enjoining a unconstitutional police sweeps, mandating changes to training, and appointing monitor).

Second, a complaint's prayer for relief neither constrains available equitable remedies nor justifies the denial of relief altogether. *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 65-66 (1978) (courts may grant any relief "to which the party is entitled," regardless of pleadings) (citing Fed. R. Civ. P. 45(c)). Accordingly, even if the relief requested by Plaintiffs was overbroad (which it is not), the proper remedy would be to tailor the remedies—not deny relief entirely—as Defendants' own cases establish. *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) (remanding to narrow overbroad provisions); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (dismissal inappropriate where "complaint seeks one remedy rather than another plainly appropriate one") (citing *Holt*, 439 U.S. at 65); c*f. Wakefield*, 2021 WL 10342467, at *4 (dismissing on statute of limitations grounds, not overbreadth).

Finally, the injunctive remedies that Defendants challenge as overbroad are Plaintiffs' preliminary proposals for a joint remedial process, a well-established mechanism for crafting Rule 65(d)-compliant relief for which Defendants' own participation and counterproposals will be central. *See* DMSJ at 45-47. Such processes, employed effectively in *Floyd*, 959 F. Supp. 2d at 674; *Nunez v. NYC Dep't of Correction*, 758 F. Supp. 3d 190, 224–26 (S.D.N.Y. 2024); *Illinois v. City of Chicago*, 2019 WL 398703, at *2 (N.D. Ill. Jan. 31, 2019),[64] reflect the "path well-worn" in complex institutional reform cases. *Henrietta D. v. Giuliani*, 246 F.3d 176, 182 (2d Cir. 2001). Because a joint remedial process would align final injunctive relief with liability findings consistent with Rule 65(d) and provide Defendants' clear guidance on their obligations while preserving their appellate rights, *id.*, Defendants' request to strike Plaintiffs' injunctive proposals at this early stage is premature.

---

[64] Note, these processes were utilized even though the underlying complaints in those cases did not include express prayers for such relief. *See Illinois v. City of Chicago*, No. 17-CV-6260, Compl., ECF 1, at 34-35; *Floyd* Second Am. Compl., 1:08-cv-01034-SAS, ECF 50, at 44-47; *Nunez* Second Am. Compl., No. 11-CV-5845-LTS, ECF 34, at 91-96.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for summary judgment, and grant Plaintiffs' motion for summary judgment under Rule 56(f).

Dated:  May 30, 2025

Respectfully Submitted,

*s/ Claudia Wilner*
Claudia Wilner
Anjana Malhotra
Edward Krugman
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
wilner@nclej.net
malhotra@nclej.net
krugman@nclej.net

Baher Azmy
A. Chinyere Ezie
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org
cezie@ccrjustice.org

Matthew A. Parham
WESTERN NEW YORK LAW CENTER
37 Franklin Street, 2nd Floor
Buffalo, NY 14202
(716) 828-8422
mparham@wnylc.net

Philip Irwin (*pro hac vice*)
Jordan S. Joachim (*pro hac vice*)
Christine Nelson (*pro hac vice*)
Andrew Timmick (*pro hac vice*)
COVINGTON & BURLING, LLP
620 Eighth Ave., Suite 4029
New York, NY 10018
212-841-1000
pirwin@cov.com
jjoachim@cov.com
cnelson@cov.com
atimmick@cov.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2025, the above Stipulation Motion for Adjournment of Court-Ordered Deadlines was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System.

*/s/ Claudia Wilner*
Claudia Wilner
