UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BLACK LOVE RESISTS IN THE RUST by and :
through MARIELLE SHAVONNE SMITH and  :
CHARIS HUMPHREY on behalf of its         :
members; SHAKETA REDDEN; DORETHEA    :
FRANKLIN; TANIQUA SIMMONS; DE'JON    :
HALL; JOSEPH BONDS; CHARLES            :
PALMER; SHIRLEY SARMIENTO; EBONY     :
YELDON; and JANE DOE,                       :
individually and on behalf of a class of all others :     Civil No.: 1:18-cv-00719-CCR
similarly situated;                             :
                                                :
              Plaintiffs,                       :     ECF Case
                                                :
       v.                                       :
                                                :
CITY OF BUFFALO, NY; BYRON B.              :
BROWN, Mayor of the City of Buffalo, in his  :
individual and official capacities; BYRON C.  :
LOCKWOOD, Commissioner of the Buffalo     :
Police Department, in his individual and official :
capacities; DANIEL DERENDA, former         :
Commissioner of the Buffalo Police Department, :
in his individual capacity; AARON YOUNG,   :
KEVIN BRINKWORTH, PHILIP SERAFINI,    :
ROBBIN THOMAS, UNKNOWN                 :
SUPERVISORY PERSONNEL 1-10,            :
UNKNOWN OFFICERS 1-20, each officers of :
the Buffalo Police Department, in their         :
individual capacities.                          :
                                                :
              Defendants.                       :
                                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFFS' COUNTER-STATEMENT IN RESPONSE TO DEFENDANTS'
STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56(a)(2) AND
ADDITIONAL MATERIAL FACTS**

Pursuant to Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure and Rule 56(a)(2) of

the W.D.N.Y Local Rules of Civil Procedure, Plaintiffs Black Love Resists in the Rust, Shaketa

Redden, Dorothea Franklin, Taniqua Simmons, De'Jon Hall, Joseph Bonds, Charles Palmer,

Shirley Sarmiento, Ebony Yeldon, and Jasmine Evans respectfully submit the following Counter-Statement in Response to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56(a)(2), and Additional Material Facts Preventing Entry of Summary Judgment for Defendants, in opposition to Defendants' Motion for Summary Judgment. All declarations and exhibits referenced herein are filed contemporaneously herewith.

## I.    Policies of the Buffalo Police Department ("BPD")

1.    All officers are expected to comply and act in accordance with the BPD's Manual of Procedures ("MoP"). [Declaration of Peter A. Sahasrabudhe dated February 7, 2025 (hereinafter "Sahasrabudhe Decl."), Exhibit 6 dated September 22, 2023 (hereinafter "Gramaglia Dep. 1") at 178:22-180:1.][1]

**Plaintiffs' Response**: Dispute. The BPD does not always expect officers to comply and act in accordance with the MoP.

For example, the MoP prohibits the use of "harsh, profane, or insolent language," but:

- "Probably every officer" used the n-word when dealing with Black members of the public.

- Internal Affairs Captain Rosenswie stated that the Manual "is just a guide" when asked about an officer who called an individual "a fucking asshole and smart ass."

- Commissioner Gramaglia permitted officers to use profanity "on the street" to "develop a rapport."

Ex. 105,[2] BPD MoP Ch. 16 § 1.2; Ex. 37, Rosenswie Oct. 2, 2023 Dep. at 239:5-13; Ex. 102, Gennaco Report at 83, 99; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 137:9-11, 140:13-23; Ex. 45, Whelan Apr. 26, 2022 Dep. at 39:13-21, 45:16-18, 137:8-141:11; Ex. 46, Whelan June 8, 2022 Dep. at 363:17-364:2, 373:17-374:12, 378:23-379:12, 381:2-17, 382:9-11, 400:11-16.

The BPD routinely fails to investigate officers for potential violations of the MoP's Traffic Enforcement Policy. *See* Ex. 102, Gennaco Report at 50-58.

The BPD does not use accountability tools (such as performance evaluations, early warning systems, or audits of body-worn camera footage) to ensure compliance with the MoP. *See*

---

[1] All citations listed in footnotes in Defendants' Statement of Undisputed Facts have been included herein in brackets immediately following the statement that they were offered to support.
[2] Unless otherwise noted, all "Ex." references refer to exhibits attached to the Declaration of Andrew J. Timmick dated May 30, 2025, filed in opposition to Defendants' Motion for Summary Judgment.

Ex. 102, Gennaco Report at 107-19; Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 191:16-196:3, 202:1-13.

The BPD does not train supervisors on identifying and correcting racially discriminatory behavior by officers or on responding to civilian complaints of discrimination, rudeness, discourtesy, or poor service. Ex. 102, Gennaco Report at 97-98.

Though the MoP requires that officers be courteous and considerate to the public, Commissioner Lockwood could not recall any specific instance in which a complaint of rudeness or discourtesy received a guilty plea or finding. Ex. 23, Lockwood Aug. 17, 2023 Dep. at 256:2-19, 258:5-14; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 137:5-6.

2.    Section 2.12 of the BPD's Manual of Procedures ("MoP"), entitled "Attitude and Impartiality" states the following: "Employees while vigorous and unrelenting in the enforcement of the law, must maintain a strictly impartial attitude toward complainants, violators, witnesses and suspects." [Sahasrabudhe Decl., Exhibit 39, p. 16.]

**Plaintiffs' Response**: Admit that the cited exhibit includes the quoted language but dispute its relevance. The cited exhibit is from 1997, but the BPD updated the MoP in 2013. *See* Ex. 105, BPD MoP. The relevant time period for this lawsuit is June 2015 to present.

Plaintiffs further dispute that the MoP accurately reflects the BPD's customs, policies, or practices or was enforced. At least 73 individuals filed Internal Affairs complaints alleging that BPD officers did not treat them with impartiality during traffic stops. Ex. 102, Gennaco Report at 15 & Appendix C.

Employees investigating complaints did not always maintain an impartial attitude towards and sometimes disparaged complainants. The BPD relied on officers' reputations rather than "a factual record developed during a fair and thorough investigation" to dispose of complaints. When reviewing complaints about questionable traffic stops and searches, BPD Commissioners Derenda, Lockwood, and Gramaglia erred on the side of the officers, even repeat offenders. Commissioner Derenda used terms like "gangbanger" and "thug" to refer to young Black men. Ex. 102, Gennaco Report at 37-43, 58-68, 82, 84; IAD Witness Decl. ¶¶ 8, 25-26.[3]

3.    Section 3.2(b) of the MoP, entitled "Conduct," states the following: "No employee shall conduct himself in such a manner, or perform any act, which is prejudicial to the good order, discipline or reputation of the Department, although such action is not specifically prohibited by any rule or order . . . ." [*Id.* at p. 18.]

**Plaintiffs' Response**: Admit that the cited exhibit includes the quoted language but dispute its relevance. The cited exhibit is from 1997, but the BPD updated the MoP in 2013. *See* Ex. 105, BPD MoP. The relevant time period for this lawsuit is June 2015 to present. The

---

[3] Unless otherwise indicated, all declaration cites refer to declarations filed in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

updated MoP does not include a section entitled "Conduct" with the above language as quoted. *See* Ex. 105, BPD MoP.

Plaintiffs further dispute that the cited language accurately reflects the BPD's actual customs, policies, or practices or was enforced. From 2013 to the present, Mayor Brown and Commissioners Derenda, Lockwood, and Gramaglia have received multiple complaints from the public via town halls, forums, reports, and the media involving allegations that BPD officers were and are engaging in racially discriminatory policing and traffic enforcement, which is prejudicial to the good order, discipline or reputation of the Department. *See, e.g.,* Ex. 102, Gennaco Report at 15-22 & Appendix C; Ex. 103, Am. Silverman Report at 30-31.

Plaintiffs also incorporate by reference their Responses to Statements 1 and 2.

4.    In 2021, the BPD issued General Order 2021-009 (the "Order"). [Sahasrabudhe Decl., Exhibit 40.]

**Plaintiffs' Response**: Admit.

5.    The Order sets forth the following Core Principles of BPD's Traffic Enforcement Policy:

Traffic Enforcement and Safety. The purpose of conducting traffic enforcement is to favorably alter the violator's future driving behavior and to foster public safety. Members shall engage in traffic enforcement for public safety purposes and not for the purpose of making an arrest.

Constitutional Stops. Members may conduct a brief vehicle stop for a traffic violation when the member has Probable Cause to believe that the driver has committed a traffic violation. The stop may last no longer than the time reasonably required to issue a summons for the violation.

Procedural Justice. Procedural justice refers to the perception of fairness in an encounter. Members shall treat all persons with dignity and respect, give persons a voice during encounters, be impartial in their decision making, and convey trustworthy motives.

Non-Discriminatory Policing. Members shall not consider demographic category (including but not limited to race, ethnicity, national origin, religion, gender, sexual orientation, age, disability, gender identity or expression, or affiliation with any other similar identifiable group) as a factor in conducting a vehicle stop.

Targeting specific neighborhoods for traffic enforcement based on these demographic categories is a form of discriminatory policing and is prohibited.

Least Intrusive Response. Considering the circumstances presented at the time, members should always take the least intrusive action, consistent with the goal of public safety. For most minor violations, warrantless arrest is not the preferred option, and certain violations only allow for the issuance of a traffic summons or a traffic stop receipt (P-1389) and not arrest. A member should issue a summons or make an arrest only when doing so directly

4

advances the goal of public safety, and the situation cannot be effectively resolved in a less intrusive manner with the issuance of a traffic stop receipt. [*Id.*]

**Plaintiffs' Response**: Dispute in part. Admit that the Order so states; however, the Order dates from May 2021. Prior to May 2021, the BPD had no formal written policy explicitly prohibiting racially biased traffic enforcement. Moreover, the BPD still does not have a general policy explicitly prohibiting racially discriminatory policing, including the use of racial slurs and racially derogatory language. Ex. 102, Gennaco Report at 20, 22, 50.

Plaintiffs further dispute that the Order accurately reflects the custom, policy, or practice of the BPD. BPD officers frequently engage in racial profiling with the full knowledge, acceptance, and encouragement of BPD leadership. IAD Witness Decl. ¶¶ 8-12.

After issuing the Order, the BPD failed to train officers on how to implement it. In contrast, when the BPD launched a body-worn camera program, it provided training to officers. Ex. 102, Gennaco Report at 58, 97-98; Ex. 16, Gramaglia Jan. 24, 2024 30(b)(6) Dep. at 17:22-18:16, 20:11-22:9; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 60:9-61:1.

The only mechanism to enforce the Order is the Internal Affairs complaint process. Moreover, the BPD fails to investigate and discipline officers for violations of the Order. Nor does the BPD take any affirmative steps to promote compliance with the Order. The BPD does not train supervisors on identifying and correcting racially discriminatory behavior by officers or on responding to civilian complaints of discrimination, rudeness, discourtesy, or poor service. Ex. 102, Gennaco Report at 50-58, 97-98, 119; Ex. 16, Gramaglia Jan. 24, 2024 30(b)(6) Dep. at 26:22-27:11; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 38:6-21, 119:4-17, 206:8-207:10; Ex. 6, Brown Nov. 6, 2023 Dep. at 38:19-39:11; Ex. 8, Derenda Dec. 23, 2021 Dep. at 293:16–294:14; Ex. 23, Lockwood Aug. 17, 2023 Dep. at 230:15-231:12.

## II.    The Strike Force & Housing Unit

6.    In 2012, the BPD created the Strike Force and Housing Unit. [Sahasrabudhe Decl., Exhibit 11 dated November 10, 2021 (hereinafter "Derenda Dep. 1") at 16:8-16; Gramaglia Dep. 1 at 14:2-12.]

**Plaintiffs' Response:** Dispute in part. Admit that the Strike Force was created in 2012, but the Housing Unit was established in 2010. Ex. 62, Derenda Nov. 10, 2021 Dep. Exhibit 18; Ex 58, COB003842 at 1.

7.    The units were created in response to residential complaints concerning traffic safety. [*See* Sahasrabudhe Decl., Exhibit 10 dated November 6, 2023 (hereinafter "Brown Dep.") at 57:4-58:1.]

**Plaintiffs' Response**: Dispute. The statement lacks evidentiary foundation because the only testimony Defendants cited in support was *retracted as inaccurate*. Further dispute because the Strike Force was created to target violent crime in hot spots, including by gang members, and to remove illegal guns from the streets of Buffalo. The Housing Unit was created to prevent crime in and around Buffalo Municipal Housing Authority ("BMHA")

housing complexes. Neither was created in response to traffic safety complaints. Ex 6, Brown Nov. 6, 2023 Dep. at 71:9-19; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 17:23-19:23, 20:1-4, 28:3-14, 29:20; Ex. 70, Derenda Jan. 23, 2024 30(b)(6) Dep. Exhibit 3; Ex. 105, BPD MoP Ch. 1 §§ 8.5-8.6; Ex. 7, Derenda Nov. 10, 2021 Dep. at 17:3-18:20; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 48:14-19; Ex. 27, Miller June 2, 2023 Dep. at 59:12-62:18.

8.      These units were proactive in that they were not "tied to the radio." [*Id.*]

        **Plaintiffs' Response**: Admit.

9.      The Strike Force was designed to respond to citizen complaints, enforce the Vehicle and Traffic Law (the "VTL"), and reduce gang and gun violence throughout the City. [*Id.*]

        **Plaintiffs' Response:** Admit that the Strike Force was designed to reduce gang and gun violence, with clarification that the Strike Force primarily targeted crime hot spots. Admit that the Strike Force frequently enforced the VTL. Dispute that the Strike Force was designed to respond to citizen complaints, as the Strike Force was not "tied to the radio." *See, e.g.,* Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 17:23-19:23; Ex. 70, Derenda 30(b)(6) Dep. Exhibit 3; Ex. 105, BPD MoP Ch. 1 § 8.6; Ex. 7, Derenda Nov. 10, 2021 Dep. at 17:3-18:20.

10.     The Strike Force was mainly responsible for patrolling areas with high crime rates and locations where recent crimes had occurred. [Sahasrabudhe Decl., Exhibit 12 dated December 23, 2021 (hereinafter "Derenda Dep. 2"). at 279:16-280:14.]

        **Plaintiffs' Response:** Dispute in part. The Strike Force mainly patrolled Black and Latino neighborhoods like the East Side. Although Strike Force patrols were at times driven by their crime fighting priorities, when the Strike Force and Housing Unit operated Checkpoints, the racial demographics of a census tract, not crime trends, were the strongest predictor of Checkpoint locations. *See, e.g.,* Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 71:4-7, 146:7-147:21, 164:14-18, 168:2-9, 168:21-169:5; Ex. 40, Serafini Dec. 27, 2021 Dep. at 68:19-69:9; Ex. 101, Bjerk Report ¶¶ 33-34, 311-319; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 39:16-40:6; Ex. 33, Quinn Apr. 1, 2022 Dep. at 36:13-23; Ex. 47, Wigdorski May 24, 2023 Dep. at 75:14-17.

11.     The Buffalo Municipal Housing Authority (the "BMHA") contracted with the City to create the Housing Unit. [Gramaglia Dep. 1 at 17:17-18:7.]

        **Plaintiffs' Response**: Admit.

12.     The Housing Unit patrolled the BMHA properties and responded to issues and resident complaints there on the properties. [*Id.*; Sahasrabudhe Decl., Exhibit 13 dated April 29, 2022 (hereinafter "Russo Dep.") at 99:18-100:9; 102:14-103:16.]

        **Plaintiffs' Response:**  Dispute. The Housing Unit patrolled BMHA properties only selectively—focusing on properties that had the largest percentage of Black and Latino residents—where they engaged in unconstitutional traffic stops and racial targeting. The

Housing Unit also had citywide jurisdiction and was responsible for operating the BPD Checkpoint Program in Black and Latino neighborhoods in tandem with the Strike Force. The Housing Unit chronically failed to respond to the complaints and concerns of BMHA residents. BMHA residents lobbied for the Housing Unit to be disbanded because of these practices, and in 2020 the Housing Unit's contract to police BMHA properties expired without renewal. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 28:6-29:13, 71:4-7, 147:18-21; Ex. 23, Lockwood Aug. 17, 2023 Dep. at 217:5-218:5; Ex. 107, PLAINTIFFS_GE-NERIC-1309, at 4-6; Ex. 40, Serafini Dec. 27, 2021 Dep. at 157:22-158:3; Ex. 108, COB252511 at 526 (noting focus on 6 BMHA properties); Ex. 109, COB256275; Ex. 110, Letter from Black Lives Matter-Buffalo to N.Y. Att'y Gen. (Aug. 30, 2017) at 29-30; Ex. 111, Rod Watson, *Buffalo Municipal Housing Authority needs to hire its own police force*, BUFFALO NEWS (Dec. 17, 2024), https://buffalonews.com/news/local/buffalo-municipal-housing-authority-needs-to-hire-its-own-policeforce/article_49085bd3-008f-501e-b74b-a37c5c632c18.html; Ex. 112, Matt Gyrta, *Kenfield-Langfield residents ask for more police presence*, BUFFALO NEWS (Sept. 3, 2015), http://buffalonews.com/2015/03/14/kenfield-langfieldresidents-ask-for-more-police-presence; Ex. 113, Justin Sondel, *Buffalo's public housing tenants bear the brunt of police crackdown*, CITY & STATE (July 27, 2016), cityandstateny.com-Buffalos-public-housing tenants-bear-the-brunt-of-police-crackdown; Ex. 114, John Lipsitz & Sam Smith, *Another Voice: Buffalo police must address concerns of BMHA residents before agreement is renewed*, BUFFALO NEWS (Jan. 29, 2015), https://buffalonews.com/opinion/another-voice-buffalo-police-must-address-concerns-of-bmha-residents-beforeagreement-is-renewed/article_d79a53 56-c04 7 -Sd29-b458-a8ed bf794a1a.html.

13.    The Housing Unit's patrols involved intended to be highly police visible within the BMHA properties in order to reduce and deter crime. [Sahasrabudhe Decl., Exhibit 23 dated December 27, 2021 (hereinafter "Serafini Dep.") at 41:1-6.]

   **Plaintiffs' Response:** Admit insofar as high visibility policing was an avowed crime prevention and suppression strategy with the BPD, and the Housing Unit engaged in high visibility policing around BMHA properties as well as at Checkpoints it operated. Ex. 7, Derenda Nov. 10, 2021 Dep. at 21:6-18 (equating "high visibility" with "stop[ping] a crime from ever happening), 64:19-65:2, 65:13-66:16, 94:16-22; Ex. 60, Derenda Nov. 10, 2021 Dep. Exhibit 10; Ex. 8, Derenda Dec. 23, 2021 Dep. at 282:10-19; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 65:5-67:6, 78:14-79:1, 100:5-20; Ex. 27, Miller June 2, 2023 Dep. at 48:22-49:11; Ex. 35, Roberts Apr. 20, 2022 Dep. at 99:16-100:10; Ex. 115, COB053666.

14.    The Housing Unit proactively enforced the VTL in and around BMHA properties. [Sahasrabudhe Decl., Exhibit 20 dated November 8, 2023 (hereinafter "Miller Dep.") at 48:22-49:11.]

   **Plaintiffs' Response:** Admit.

### III.    Vehicle and Traffic Safety Checkpoints

15.    Both the Strike Force and Housing Unit conducted vehicle and traffic safety Checkpoints (the "Checkpoints"). [*See* Derenda Dep. 1 at 74:13-14; 92:8-12.]

**Plaintiffs' Response:** Dispute in part. Admit that the Strike Force and Housing Unit ran Checkpoints as part of the BPD Checkpoint Program; dispute that the Checkpoints referenced were "vehicle and traffic safety Checkpoints" since their primary purpose was crime control, deterrence, and suppression.

The primary purposes of the Checkpoints was not "traffic safety and high visibility to curtail the unsafe operation of vehicles"; the primary purpose of the Checkpoints was crime control, deterrence, and suppression. *See, e.g.*, Ex. 153, Defs.' Mar. 18, 2024 Am. Response to Pls. First Set of RFAs, at 3-10; Ex. 8, Derenda Dec. 23, 2021 Dep. at 282:10-283:18, 296:15-297:21, 311:1-3; Ex. 60, Derenda Nov. 10, 2021 Dep. Exhibit 10; Ex. 7, Derenda Nov. 10, 2021 Dep. at 65:13-66:16; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 22:18-24:18, 49:3-15, 71:4-7, 146:7-147:21, 196:21-197:14, 207:20-210:1; Ex. 99, Serafini Dec. 27, 2021 Dep. Exhibit 12; Ex. 40, Serafini Dec. 27, 2021 Dep. at 69:17-72:1, 130:16-131:11, 137:3-144:21, 148:8-20; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 65:5-67:6, 73:1-74:20, 78:14-79:1, 80:16-81:3, 95:3-12, 96:20-97:5, 100:5-20; Ex. 42, Skipper Mar. 5, 2021 Dep. at 48:8-21, 50:16-51:18, 51:21-52:9; Ex. 100, Young Oct. 26, 2022 Dep. Exhibit 5; Ex. 50, Young Oct. 26, 2022 Dep. at 37:4-49:17, 54:13-56:5; Ex. 52, Brinkworth Dep. Exhibit 9; Ex. 53, Brinkworth Mar. 16, 2022 Dep. Exhibit 12 ; Ex. 54, Brinkworth Mar. 16, 2022 Dep. Exhibit 13 ; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 37:19-22, 60:1-61:22, 66:9-70:3; Ex. 45, Whelan Apr. 26, 2022 Dep. at 86:1-87:13, 120:10-121:1, 121:20-122:3; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 59:23-60:6, 61:15-62:6, 63:6-19; Ex. 27, Miller June 02, 2023 Dep. at 48:22-49:11, 85:21-86:3; Ex. 95, Roberts Apr. 20, 2022 Dep. Exhibit 8; Ex. 35, Roberts Apr. 20, 2022 Dep. at 100:11-101:8; Ex. 116, COB226142; Ex. 115, COB053666; Ex. 117, COB276276; Ex. 118, COB221057; Ex. 119, COB256354; Ex. 120, COB263608; Ex. 121, COB022527; Ex. 122, COB215219; Ex. 129, COB222550; Ex. 123, COB222673; Ex. 124, COB224759; Ex. 125, COB234488; Ex. 126, COB040949; Ex. 71, COB041712; Ex. 51, Brinkworth Mar. 16, 2022 Dep. Exhibit 8; Ex. 127, COB237180; Ex. 128, COB246427; Ex. 129, COB465854; Ex. 130, COB592436; Ex. 131, COB634845; Ex. 132, COB459967; Ex. 133, COB040392; Ex. 134, COB213729; Ex. 135, COB040616; Ex. 136, COB056123; Ex. 137, COB041717; Ex. 138, COB232166; Ex. 139, COB038698; Ex. 140, COB236452; Ex. 141, COB018645; Ex. 142, COB235272; Ex. 143, COB018352; Ex. 144, COB017671; Ex. 145, COB041693; Ex. 146, COB221203; Ex. 147, COB053632; Ex. 148, COB215625; Ex. 149, COB459487; Ex. 150, COB253727; Ex. 151, COB018380; Ex. 97, Roberts Apr. 20, 2022 Dep. Exhibit 42.

16.  The primary purposes of the Checkpoints were traffic safety and high visibility to curtail the unsafe operation of vehicles. [Derenda Dep. 1 at 21:6-18; Russo Dep. at 194:13-21; Sahasrabudhe Decl., Ex. 41.]

     **Plaintiffs' Response:** Dispute. *See* Response to Statement 15, which Plaintiffs incorporate by reference.

17.  The BPD issued Roadblock Directives governing the operation of Checkpoints. [Sahasrabudhe Decl., Ex. 41.]

     **Plaintiffs' Response:** Dispute in part. Admit that Roadblock Directives existed. Dispute that they accurately reflect the custom, policy, or practice of the Buffalo Police Department

with respect to Checkpoints. Dispute that the BPD ever issued Roadblock Directives for Checkpoints operated exclusively by the Housing Unit. Ex. 7, Derenda Nov. 10, 2021 Dep. at 80:16-81:10; Ex. 50, Young Oct. 26, 2022 Dep. at 31:13-32:15; Ex. 27, Miller June 2, 2023 Dep. at 96:21-97:16; Ex. 40, Serafini Dec. 27, 2021 Dep. at 91:9-23, 120:17-122:18, 152:1-15; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 86:12-87:21, 90:3-91:9.

18.    The stated purpose of the Checkpoints was "roadway safety." [*Id.*]

**Plaintiffs' Response**. Dispute in part. Admit that the cited exhibit (ECF No. 252-42) contains the stated reference, albeit in quotation marks, which suggests it is pretextual. Dispute that the actual purpose of the Checkpoints was roadway safety; the primary purpose of the Checkpoints was crime control, deterrence, and suppression. *See, e.g.*, Ex. 153, Defs.' Mar. 18, 2024 Am. Response to Pls. First Set of RFAs, at 3-10; Ex. 8, Derenda Dec. 23, 2021 Dep. at 282:10-283:18, 296:15-297:21, 311:1-3; Ex. 60, Derenda Nov. 10, 2021 Dep. Exhibit 10; Ex. 7, Derenda Nov. 10, 2021 Dep. at 65:13-66:16; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 22:18-24:18, 49:3-15, 71:4-7, 146:7-147:21, 196:21-197:14, 207:20-210:1; Ex. 99, Serafini Dec. 27, 2021 Dep. Exhibit 12; Ex. 40, Serafini Dec. 27, 2021 Dep. at 69:17-72:1, 130:16-131:11, 137:3-144:21, 148:8-20; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 65:5-67:6, 73:1-74:20, 78:14-79:1, 80:16-81:3, 95:3-12, 96:20-97:5, 100:5-20;  Ex. 42, Skipper Mar. 5, 2021 Dep. at 48:8-21, 50:16-51:18, 51:21-52:9; Ex. 100, Young Oct. 26, 2022 Dep. Exhibit 5; Ex. 50, Young Oct. 26, 2022 Dep. at 37:4-49:17, 54:13-56:5; Ex. 52, Brinkworth Mar. 16, 2022 Dep. Exhibit 9; Ex. 53, Brinkworth Mar. 16, 2022 Dep. Exhibit 12; Ex. 54, Brinkworth Mar. 16, 2022 Dep. Exhibit 13; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 37:19-22, 60:1-61:22, 66:9-70:3; Ex. 45, Whelan Apr. 26, 2022 Dep. at 86:1-87:13, 120:10-121:1, 121:20-122:3; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 59:23-60:6, 61:15-62:6, 63:6-19; Ex. 27, Miller June 02, 2023 Dep. at 48:22-49:11, 85:21-86:3; Ex. 95, Roberts Dep. Exhibit 8; Ex. 35, Roberts Apr. 20, 2022 Dep. at 100:11-101:8; Ex. 116, COB226142; Ex. 115, COB053666; Ex. 117, COB276276; Ex. 118, COB221057; Ex. 119, COB256354; Ex. 120, COB263608; Ex. 121, COB022527; Ex. 122, COB215219; Ex. 129, COB222550; Ex. 123, COB222673; Ex. 124, COB224759; Ex. 116, COB226142; Ex. 125, COB234488; Ex. 126, COB40949; Ex. 71,COB041712; Ex. 51, COB591045; Ex. 127, COB237180; Ex. 128, COB246427; Ex. 129, COB465854; Ex. 130, COB592436; Ex. 131, COB634845; Ex. 132, COB459967; Ex. 133, COB040392; Ex. 134, COB213729; Ex. 97, COB017662; Ex. 135, COB040616; Ex. 136, COB056123; Ex. 137, COB041717; Ex. 138, COB232166; Ex. 139, COB038698; Ex. 140, COB236452; Ex. 141, COB018645; Ex. 142, COB235272; Ex. 143, COB018352; Ex. 144, COB017671; Ex. 145, COB041693; Ex. 146, COB221203; Ex. 147, COB053632; Ex. 148, COB215625; Ex. 149, COB459487; Ex. 150, COB253727; Ex. 151, COB018380; Ex. 97, Roberts Dep. Exhibit 42.

19.    BPD policy required that all officers assigned to the Checkpoints be given a copy of the Directives prior to the Checkpoint's operation. [*Id.*]

**Plaintiffs' Response:** Admit that the cited exhibit (ECF No. 252-42) so states. Dispute that it accurately reflects the BPD's custom, policy, or practice or was enforced. Dispute that Directives were ever issued in connection with Checkpoints operated exclusively by the Housing Unit. Ex. 50, Young Oct. 26, 2022 Dep. at 32:20-23; Ex. 38, Russo, Apr. 29, 2022 Dep. at 147:7-150:13.

20.    The Directives instructed officers as follows:

- Make the roadblock obvious. Overhead flashing lights must be activated on all ve-
  hicles taking part in the roadblock.

- The roadblock must not be unreasonably intrusive to motorists.

- Set the roadblock up in a way that minimizes the possibility of avoiding it.

- The above roadblock must begin at the above stated times. [*Id.*]

**Plaintiffs' Response:** Admit that the cited exhibit (ECF No. 252-42) so states and that the
BPD set Checkpoints in a way that minimized the possibility of avoiding them. Otherwise
dispute. Roadblocks were not always obvious; BPD did not always activate overhead flash-
ing lights, and roadblocks were unreasonably intrusive to motorists. Ex. 50, Young Oct. 26,
2022 Dep. at 32:20-23; ECF No. 252-42, Buffalo Police Department Roadblock Directive
at 2. Bassett Decl. ¶¶ 8, 12, 19; Palmer Decl. ¶ 6; IAD Witness Decl. ¶ 16; Franklin Decl.
¶¶ 6-7, 11-15; Evans Decl. ¶ 9; Bonds Decl. ¶¶ 7, 19, 24; Simmons Decl. ¶¶ 3-11; Redden
Decl. ¶¶ 5, 7, 11.

21.    At the outset, former Commissioner Derenda established the locations for Checkpoints.
[Sahasrabudhe Decl., Exhibit 14 dated March 16, 2022 (hereinafter "Brinkworth Dep.") at
73:17-21.]

**Plaintiffs' Response:** Admit.

22.    Former Commissioner Derenda based his location decisions on a variety of factors includ-
ing citizen complaints received, where BMHA properties were located, and where Strike
Force officers were assigned to patrol. [Derenda Dep. 1 at 50:9-14; 96:3-97:2.]

**Plaintiffs' Response:** Dispute in part. Admit that Checkpoint locations, like Strike Force
patrols, were frequently driven by the Strike Force and Housing Unit's crime fighting pri-
orities. Dispute that Checkpoint locations were based on citizen complaints.  Dispute that
East Side residents requested or supported the Checkpoint Program in their community.
The racial demographics of a neighborhood, not crime or traffic safety trends, were ulti-
mately the strongest predictor of Checkpoint locations. Ex. 152, Pls. First Set of RFAs, at
3-10; Ex. 153, Defs.' Mar. 18, 2024 Am. Response to Pls. First Set of RFAs, at 3-10; Ex.
101, Bjerk Report ¶¶ 34, 311-324; Ex. 8, Derenda Dec. 23, 2021 Dep. at 282:10-283:18,
296:15-297:21, 311:1-3; Ex. 60, Derenda Nov. 10, 2021 Dep. Exhibit 10; Ex. 7, Derenda
Nov. 10, 2021 Dep. at 65:13-66:16; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 22:18-
24:18, 49:3-15, 71:4-7, 146:7-147:16, 196:21-197:14, 207:20-210:1; Ex. 99, Serafini Dec.
27, 2021 Dep. Exhibit 12; Ex. 40, Serafini Dec. 27, 2021 Dep. at 69:17-72:1, 130:16-
131:11, 137:3-144:21, 148:8-20; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 65:5-67:6, 73:1-
74:20, 78:14-79:1, 80:16-81:3, 95:3-12, 96:20-97:5, 100:5-20; Ex. 42, Skipper Mar. 5,
2021 Dep. at 48:8-21, 50:16-51:18, 51:21-52:9; Ex. 100, Young Oct. 26, 2022 Dep. Exhibit
5; Ex. 50, Young Oct. 26, 2022 Dep. at 37:4-49:17, 54:13-56:5; Ex. 52, Brinkworth Mar.
16, 2022 Dep. Exhibit 9; Ex. 53, Brinkworth Mar. 16, 2022 Dep. Exhibit 12; Ex. 54,

Brinkworth Mar. 16, 2022 Dep. Exhibit 13; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 37:19-22, 60:1-61:22, 66:9-70:3; Ex. 45, Whelan Apr. 26, 2022 Dep. at 86:1-87:13, 120:10-121:1, 121:20-122:3; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 59:23-60:6, 61:15-62:6, 63:6-19; Ex. 27, Miller June 02, 2023 Dep. at 48:22-49:11, 85:21-86:3; Ex. 95, Roberts Apr. 20, 2022 Dep. Exhibit 8; Ex. 35, Roberts Apr. 20, 2022 Dep. at 100:11-101:8; Ex. 116, COB226142; Ex. 115, COB053666; Ex. 117, COB276276; Ex. 118, COB221057; Ex. 119, COB256354; Ex. 120, COB263608; Ex. 121, COB022527; Ex. 122, COB215219; Ex. 129, COB222550; Ex. 123, COB222673; Ex. 124, COB224759; Ex. 125, COB234488; Ex. 126, COB040949; Ex. 71, COB041712; Ex. 51, COB59591045; Ex. 127, COB237180; Ex. 128, COB246427; Ex. 129, COB465854; Ex. 130, COB592436; Ex. 131, COB634845; Ex. 132, COB459967; Ex. 133, COB040392; Ex. 134, COB213729; Ex. 135, COB040616; Ex. 136, COB056123; Ex. 137, COB041717; Ex. 138, COB232166; Ex. 139, COB038698; Ex. 140, COB236452; Ex. 141, COB018645; Ex. 97, Roberts Dep. Exhibit 42, COB017662; Ex. 142, COB235272; Ex. 143, COB018352; Ex. 144, COB017671; Ex. 145, COB041693; Ex. 146, COB221203; Ex. 147, COB053632; Ex. 148, COB215625; Ex. 149, COB459487; Ex. 150, COB253727; Ex. 151, COB018380; Ex. 255, Checkpoint Compilation; Simmons Decl. ¶¶ 5, 11-12; Palmer Decl. ¶ 6; Franklin Decl. ¶ 16; Bassett Decl. ¶ 14.

23.   Complaints included reports of individuals driving without licenses, speeding, and engaging in other unsafe driving behaviors. [Derenda Dep. 1 at 96:3-97:2.]

      **Plaintiffs' Response:** Dispute. Defendants never adopted a policy of establishing checkpoints based on traffic safety data or complaints and cannot identify a single instance where a checkpoint was established on that basis. Ex. 152, Pls. First Set of RFAs, at 3-10; Ex. 153, Defs.' Mar. 18, 2024 Am. Response to Pls. First Set of RFAs, at 3-10; Ex 4, Brinkworth Mar. 16, 2022 Dep. at 67:5-20; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 73:1-74:20; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 207:20-210:19.

      Further dispute for the reasons stated in Plaintiffs' Response to Statement 22, which Plaintiffs incorporate by reference.

24.   The City Defendants received many complaints from residents in the East Side of Buffalo, a community with majority Black residents. [*See* Brown Dep. at 57:4-58:21, 15:15-22.]

      **Plaintiffs' Response:** Dispute. The statement lacks evidentiary foundation because the only testimony Defendants cited in support was *retracted as inaccurate*. Ex. 6, Brown Nov. 11, 2023 Dep. at 71:10-19.

      Further dispute because East Side residents did not request or support the Checkpoint Program in their communities. Simmons Decl. ¶¶ 5, 11-12; Palmer Decl. ¶ 6; Franklin Decl. ¶ 16; Bassett Decl. ¶ 14; Sarmiento Decl. ¶ 9; Hall Decl. ¶¶ 13-14; Bonds Decl. ¶ 23; Evans Decl. ¶¶ 6, 16; Redden Decl. ¶¶ 4-5; Yeldon Decl. ¶ 4.

      Further dispute for the reasons stated in Plaintiffs' Responses to Statements 22-23, which Plaintiffs incorporate by reference.

25.   After some time in operation, BPD lieutenants began setting Checkpoint locations based on the aforementioned factors. [Brinkworth Dep. at 73:17-21.]

**Plaintiffs' Response:** Dispute. *See* Responses to Statements 22-24, which Plaintiffs incorporate by reference.

26.    Checkpoints were established at intersections and heavily trafficked roads. [Sahasrabudhe Decl., Ex. 41.]

**Plaintiffs' Response:** Admit, with clarification that BPD also established Checkpoints on side streets in areas where motorists could not avoid them until it was too late. Evans Decl. ¶¶ 8-9.

27.    In keeping with the Directives, BPD would place several squad cars in the center of or on the side of the street with their lights on, so that the Checkpoint was visible from a distance. [Sahasrabudhe Decl., Exhibit 9 (hereinafter "Hy Dep.") at 22:2-19.]

**Plaintiffs' Response:** Dispute. The BPD did not consistently turn on the lights of their patrol car when operating Checkpoints, nor did they consistently take other steps to give motorists notice or fair warning of Checkpoints (i.e. using signs or flares). *See, e.g.,* Simmons Decl. ¶ 6; Franklin Decl. ¶ 6; Bonds Decl. ¶ 7; Redden Decl. ¶ 7; Evans Decl. ¶ 9; Hall Decl. ¶ 11.

28.    All vehicles approaching the Checkpoint would drive up to the officer or officers stationed at the Checkpoint for an initial visual inspection. [*See id.*]

**Plaintiffs' Response:** Admit, with the clarification that the "initial visual inspection" always took place without any individualized suspicion. Further, the BPD chased down and conducted traffic stops on any motorists who appeared to attempt to avoid the Checkpoints. *See, e.g.,* Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 157:19-158:3; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 261:1-10; Ex. 6, Brown Nov. 6, 2023 Dep. at 223:6-224:11; Ex. 105, BPD MoP Ch. 8 § 10.5(D); Ex. 50, Young Oct. 26, 2022 Dep. at 52:12-16; Ex. 7, Derenda Nov. 10, 2021 Dep. at 83:19-84:2; Ex. 154, COB060320.

29.    Officers assigned to Checkpoints were directed to:

- Check all drivers and passengers for seatbelts.

- Check all vehicles for valid registration stickers.

- Check all vehicles for valid inspection stickers.

- Act on any and all probable cause resulting from information obtained from the mobile plate reader or from plain view observations.

- Write summons for all who are in violation of any of the above or other NYS Vehicle & Traffic Laws.

**Plaintiffs' Response:** Defendants do not cite any evidentiary support for this proposition, therefore no response is required. Fed. R. Civ. P. 56(e); W.D.N.Y. Local R. 56(a)(1). However, admit that the Checkpoint Directive so states.

30.    If motorists did not have any visible traffic violation, they were immediately directed to proceed through the Checkpoint. [*See* Hy Dep. at 22:2-19.]

**Plaintiffs' Response:** Dispute to the extent the statement suggests Checkpoint stops were based on individualized suspicion; at Checkpoints, the BPD stopped all motorists without individualized suspicion. Dispute that motorists were always directed to proceed through the Checkpoint if they did not have visible traffic violations. *See, e.g.*, Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 157:19-158:3; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 261:1-10; Ex. 6, Brown Nov. 6, 2023 Dep. at 223:6-224:11; Ex. 105, BPD MoP Ch. 8 § 10.5; Ex. 50, Young Oct. 26, 2022 Dep. at 52:12-16; Simmons Decl. ¶¶ 7-10; Franklin Decl. ¶ 11; Yeldon Decl. ¶¶ 4-5; Evans Decl. ¶ 7; Bassett Decl. ¶ 10.

31.    A substantial number of motorists received no tickets and were stopped for only brief periods of time at the Checkpoints. [*See* Sahasrabudhe Decl., Exhibit 15 dated July 18, 2023 (hereinafter "Domaracki Dep.") at 36:13-37:10.]

**Plaintiffs' Response:** Admit that the Checkpoints were not an effective or productive means of advancing traffic safety because they generated a low yield of tickets relative to the frequency that motorists were stopped. Dispute that motorists were stopped for only brief periods of time in instances where they were not ticketed. Simmons Decl. ¶¶ 7-10, 16; Franklin Decl. ¶ 11.

32.    If an officer observed a VTL violation, the officer instructed the motorist to pull to the side of the road. The officer would then issue a traffic summons. [Hy Dep. at 23:15-24:13; 31:9-32:6.]

**Plaintiffs' Response:** Dispute to the extent the statement suggests Checkpoint stops were based on individualized suspicion; at Checkpoints, the BPD stopped all motorists without individualized suspicion. Dispute that motorists were always directed to proceed through the Checkpoint if they did not have visible traffic violations. Dispute that all motorists who were pulled to the side of the road were issued traffic summons. *See, e.g.*, Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 157:19-158:3; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 261:1-10; Ex. 6, Brown Nov. 6, 2023 Dep. at 223:6-224:11; Ex. 105, BPD MoP Ch. 8 § 10.5; Ex. 50, Young Oct. 26, 2022 Dep. at 52:12-16; Simmons Decl. ¶¶ 8-9; Franklin Decl. ¶ 11.

33.    If no probable cause for an arrest arose or was observed by the officer during the interaction, the motorist was permitted to drive away. [*Id.*]

**Plaintiffs' Response:** Dispute. Derenda instructed officers to "impound as many vehicles as legally possible," and officers impounded many vehicles at Checkpoints. Officers routinely impounded vehicles for minor violations such as an expired registration or inspection sticker. These violations do not provide probable cause for an arrest, yet motorists were not permitted to drive away. Ex. 59, COB279173; Ex. 155, COB027566; Ex. 45, Whelan Apr. 16, 2022 Dep. at 193:10-194:21; Ex. 40, Serafini Dec. 27, 2021 Dep. at 97:6-98:5; Franklin Decl. ¶ 8; N.Y. Veh. & Traf. Law § 512 (McKinney 2025).

34.    The Strike Force and Housing Unit were both disbanded under former BPD Commissioner Byron Lockwood's tenure in early 2018. [*See* Sahasrabudhe Decl., Exhibit 22 dated April

1, 2022 (hereinafter "Quinn Dep.") at 16:12-14 (Strike Force); Sahasrabudhe Decl., Exhibit 19 dated August 17, 2023 (hereinafter "Lockwood Dep. 2") at 217:5-218:5 (Housing Unit).]

**Plaintiffs' Response:** Dispute in part. Although the Strike Force was disbanded in 2018, the Housing Unit was not disbanded until 2020. *See, e.g.*, Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 40:9-19.

35. Following former Commissioner Lockwood's tenure, former Commissioner Gramaglia did not reinstate the Checkpoints during his time as Commissioner. [*See* Gramaglia Dep. 1 at 181:19-182:10.]

**Plaintiffs' Response:** Admit with the clarification that the BPD Manual of Procedures still contains provisions authorizing the Checkpoint Program, and nothing prevents the BPD from reinstating the Checkpoint Program. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 198:4-199:3; Ex. 6, Brown Nov. 6, 2023 Dep. at 238:15-16; Ex. 105, BPD MoP Ch. 8 § 10.5; Ex. 156, *Buffalo Police Strike Force being disbanded*, SPECTRUM NEWS (Feb. 09, 2018), https://spectrumlocalnews.com/nys/buffalo/news/2018/02/10/buffalo-police-strike-force-disband; Ex. 157, Maki Becker, *Buffalo Police to end Strike Force unit, put focus on community policing*, BUFFALO NEWS (Feb. 9, 2018), buffalonews.com/news/local/crime-courts/buffalo-police-to-end-strike-force-unit-put-focus-on-community-policing/article_519d04c0-db7f-5ecf-80ed-01bc13c1779b.html.

36. Current BPD Commissioner Alfonso Wright will not reinstate Checkpoints during his tenure. [*Id.*]

**Plaintiffs' Response:** The evidence cited by Defendants does not provide evidentiary support for this proposition; therefore no response is required. Fed. R. Civ. P. 56(e); W.D.N.Y. Local R. 56(a)(1).

Dispute in any event because the BPD Manual of Procedures still contains provisions authorizing the Checkpoint Program, and nothing prevents the BPD from reinstating Checkpoint Program. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 198:4-199:3; Ex. 6, Brown Nov. 6, 2023 Dep. at 238:15-16; Ex. 105, BPD MoP Ch. 8 § 10.5; Ex. 156, *Buffalo Police Strike Force being disbanded*, SPECTRUM NEWS (Feb. 09, 2018), https://spectrumlocalnews.com/nys/buffalo/news/2018/02/10/buffalo-police-strike-force-disband; Ex. 157, Maki Becker, *Buffalo Police to end Strike Force unit, put focus on community policing*, BUFFALO NEWS (Feb. 9, 2018), buffalonews.com/news/local/crime-courts/buffalo-police-to-end-strike-force-unit-put-focus-on-community-policing/article_519d04c0-db7f-5ecf-80ed-01bc13c1779b.html.

## IV. Traffic Enforcement and Tinted Windows

37. Two of the goals for the BPD's traffic enforcement efforts are **"**to favorably alter the violator's future driving behavior and to foster public safety." [Sahasrabudhe Decl., Ex. 40.]

**Plaintiffs' Response**: Admit that the cited exhibit so states. However, the exhibit was created in May 2021 and these goals were not articulated prior to May 2021. Ex. 158, COB-

Hodgson_00093; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 83:16-87:13; Ex. 16, Gramaglia Jan. 24, 2024 30(b)(6) Dep. at 28:3-31:4.

Dispute that the exhibit accurately reflects BPD custom, policy and practice from 2015 to present. BPD trained officers that a goal of traffic enforcement was to generate revenue. BPD officers also engaged in traffic enforcement with a goal of suppressing crime, inter-dicting guns and drugs, and satisfying the production expectations of BPD Commissioners, who rewarded them with overtime. Ex. 7, Derenda Nov. 10, 2021 Dep. at 36:6-17; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 150:13-18; Ex. 59, Derenda Nov. 10, 2021 Dep. Exhibit 8; Ex. 102, Gennaco Report at 102; Ex. 29, Nigrelli Oct. 11, 2024 Dep. at 330:1-333:16; Ex. 14, Gennaco Oct. 4, 2024 Dep. at 131:17-133:22; Ex. 31, Palizay Sept. 06, 2024 30(b)(6) Dep. at 120:18-121:5, 123:15-124:21, 127:17-128:22; Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 140:2-142:7; Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 62:15-23, 64:4-7, 67:8-22; Ex. 77, Gramaglia Mar. 14, 2024 30(b)(6) Dep. Exhibit 4; Ex. 159, Derenda Dec. 23, 2021 Exhibit 31; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 51:10-52:3; Ex. 40, Serafini Dec. 27, 2021 Dep. at 257:8-259:1; Ex. 160, COB016282; Ex. 121, COB022527; Ex. 161, COB406079; Ex. 42, Skipper Mar. 5, 2021 Dep. at 115:9-116:11; Ex. 162, COB053652; Ex. 163, COB052637; Ex. 164, COB052709; Ex. 126, COB040949; Ex. 165, COB058264; Ex. 166, COB056235; Ex. 167, COB056243; Ex. 168, COB056484; Ex. 169, COB275648; Ex. 170, COB053677; Ex. 171, COB041081; Ex. 172, COB042199; Ex. 173, COB051485; Ex. 174, COB052690; Ex. 176, COB052661; Ex. 176, COB051545; Ex. 177, COB056134; Ex. 178, COB056326; Ex. 179, COB063330; Ex. 180, COB056535; Ex. 181, COB042029; Ex. 182, COB042046; Ex. 182, COB042046; Ex. 183, COB042047.

Dispute that the BPD's traffic enforcement practices further the stated goals. For example, the BPD has a policy and practice of issuing multiple tinted windows tickets to Black and Latino drivers, but there is no public safety benefit to issuing multiple tinted windows tick-ets in a single stop. Ex. 102, Gennaco Report at 102; Ex. 29, Nigrelli Oct. 11, 2024 Dep. at 330:1-333:16; Ex. 101, Bjerk Report ¶¶ 151, 294-95, & Figure 14.

38.    The BPD does not require officers to meet any ticket quotas. [Sahasrabudhe Decl., Exhibit 28 dated November 4, 2021 (hereinafter "Wilcox Dep.") at 133:18-134:1.]

    **Plaintiffs' Response:** Dispute.  Strike Force and Housing Unit officers were instructed to keep their "numbers" high, and the Commissioner criticized them when their "production" dropped. Sometimes officers had to meet numerical goals. Ex. 184, COB018251; Ex. 185, COB018355; Ex. 186, COB018361; Ex. 187, COB018565; Ex. 7, Derenda Nov. 10, 2021 Dep. at 102:19-105:16; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 157:6-23; Ex. 188, COB042018; Ex. 136, COB056123; Ex. 189, COB345889.

39.    BPD command did not advise officers that they would receive overtime for writing more tickets. [*See* Sahasrabudhe Decl., Exhibit 24 dated March 5, 2021 (hereinafter "Skipper Dep.") at 119:14-120:7; Sahasrabudhe Decl., Exhibit 25 dated March 23, 2023 (hereinafter "Thomas Dep.") at 116:7-117:12; Ex. 40, Serafini Dec. 27, 2021 Dep. at 261:19-23.]

    **Plaintiffs' Response**: Dispute. BPD leadership tied overtime expectations to high ticketing numbers. Leadership communicated, and officers understood, that overtime was a reward

for "production" and overtime shifts needed to produce high numbers of tickets and impounds. Ex. 160, COB016282; Ex. 121, COB022527; Ex. 161, COB406079; Ex. 164, COB052709; Ex. 42, Skipper Mar. 5 2021 Dep. at 115:9-116:11; Ex. 162, COB053652; Ex. 163, COB052637; Ex. 126, COB040949; Ex. 165, COB058264; Ex. 190, COB052633; Ex. 40, Serafini Dec. 27, 2021 Dep. at 241:6-242:8; Ex. 191, COB016235; Ex. 192, COB017429.

40.     Officers did not receive overtime pay for writing more tickets. [*Id.*]

**Plaintiffs' Response**: Dispute. Writing tickets led to "court time" for which officers could receive overtime compensation. Ex. 166, COB056235; Ex. 167, COB056243; Ex. 177, COB056134; Ex. 178, COB056326; Ex. 179, COB063330; Ex. 180, COB056535; Ex. 181, COB042029; Ex. 182, COB042046; Ex. 182, COB042046; Ex. 183, COB042047; Ex. 171, COB041081; Ex. 59, COB279173; Ex. 33, Quinn Apr. 1, 2022 Dep. at 77:2-6.

41.     BPD command did not pressure officers to write more tickets. [*See* Wilcox Dep. at 133:18-134:12; Hy Dep. at 30:7-16; Thomas Dep. at 118:15-119:13.]

**Plaintiffs' Response**: Dispute. BPD leadership pressured officers to write as many tickets as possible. Ex. 59, Derenda Nov. 10, 2021 Dep. Exhibit 8; Ex. 40, Serafini Dec. 27, 2021 Dep. at 140:2-141:9, 231:22-234:7, 238:20-242:8; Ex. 45, Whelan Apr. 26, 2022 Dep. at 257:8-264:2; Ex. 160, COB016282; Ex. 121, COB022527; Ex. 161, COB406079; Ex. 42, Skipper Mar. 5, 2021 Dep. at 116:3-11; Ex. 162, COB053652; Ex. 163, COB052637; Ex. 126, COB040949; Ex. 165, COB058264; Ex. 166, COB056235; Ex. 167, COB056243; Ex. 168, COB056484; Ex. 169, COB275648; Ex. 170, COB053677; Ex. 164, COB052709; Ex. 171, COB041081; Ex. 172, COB042199; Ex. 173, COB051485; Ex. 174, COB052690; Ex. 176, COB052661; Ex. 176, COB051545; Ex. 7, Derenda Nov. 10, 2021 Dep. at 102:19-103:2, 128:5-17; Ex. 43, Tedesco July 11, 2023 Dep. at 195:3-196:4; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 161:12-19, 281:1-16.

42.     Officers retain the discretion to write as many tickets for tinted windows as there are tinted windows on a vehicle. [*See* Lockwood Dep. 1 at 73:16-74:16.]

**Plaintiffs' Response**: Admit.

## V.     The Buffalo Traffic Violations Agency ("BTVA")

43.     In 2015, the New York State Legislature created the BTVA to assist the Buffalo City Court in adjudicating noncriminal traffic infractions within the City of Buffalo. [Sahasrabudhe Decl., Exhibit 21 dated May 26, 2022 (hereinafter "Morgera Dep.") at 18:2-5; 19:20-20:3.]

**Plaintiffs' Response**: Dispute in part. Admit that the BTVA was created in 2015 but: (1) it was also created by the Buffalo City Council with Mayor Brown's sign-off; and (2) it was also created with the purpose of generating revenue for the City. Ex. 193, COB095635; Ex. 194, COB088494; Ex. 195, COB094962; Ex. 196, COB094964; Ex. 197, COB094966; Ex. 198, COB075236; Ex. 199, COB067689; Ex. 200, COB095082 at 1, 3-5; Ex. 201, COB063519; Ex. 202, COB095030; Ex. 203, COB121555; Ex. 204, COB047699; Ex. 205, COB123717; Ex. 206, COB120438; Ex. 207, COB094495; Ex. 208, COB261063; Ex. 209,

COB067730; Ex. 210, COB223189; Ex. 211, COB112220; Ex. 212, COB112221; Ex. 213, COB091732; Ex. 214, COB067739; Ex. 215, COB067740; Ex. 216, COB098942; Ex. 217, COB073331, Ex. 218, COB073332; Ex. 219, COB114658; Ex. 220, COB231866; Ex. 221, COB091747; Ex. 222, COB239572; Ex. 223, COB091754; N.Y. Gen. Mun. Law §§ 370, 374-a (McKinney 2017, 2013); Buffalo, N.Y., City Charter § 6-24 (2015).

44.    The BTVA was designed to give ticketed motorists alternatives to resolve their tickets, as is done in almost all town and village courts across the State. [Sahasrabudhe Decl., Exhibit 26 dated June 8, 2023 (hereinafter "Villegas Dep.") at 39:8-40:16.]

   **Plaintiffs' Response**: Dispute in part. First, only three other municipalities across the state have traffic violation agencies established by New York State (Nassau County, Suffolk County, and the City of Rochester). Second, the BTVA was also created to provide the City of Buffalo with additional revenue. Ex. 223, COB091754; Ex. 276, Composite Exhibit – BPD Budgets; Ex. 221, COB091747; Ex. 225, COB091749; Ex. 226, COB088497; Ex. 227, COB094904; Ex. 207, COB094495; Ex. 228, COB094352; Ex. 229, COB091719; Ex. 230, COB093060; Ex. 231, COB094070; Ex. 232, COB093194; Ex. 193, COB095635; Ex. 194, COB088494; Ex. 195, COB094962; Ex. 196, COB094964; Ex. 197, COB094966; Ex. 198, COB075236; Ex. 199, COB067689; Ex. 203, COB121555; Ex. 204, COB047699; Ex. 205, COB123717; N.Y. Gen. Mun. Law § 370 (McKinney 2017); Art. 6 § 6-24, Amending Charter of City of Buffalo re Establishment of Buffalo Traffic Violations Agency, City of Buffalo Proceedings (June 2, 2015 Special Session).

45.    The BTVA processes all traffic tickets issued within the City of Buffalo. [*Id.* at 43:21-45:9.]

   **Plaintiffs' Response**: Dispute. The BTVA only processes non-criminal traffic offenses within the City of Buffalo. It does not handle criminal offenses, such as DUIs, and it does not handle non-moving violations. N.Y. Gen. Mun. Law § 371 (McKinney 2024); Ex. 28, Morgera May 25, 2022 Dep. at 18:2-23.

46.    Motorists can take a plea offer or proceed to a hearing before a judicial hearing officer. [Morgera Dep. at 26:6-23.]

   **Plaintiffs' Response**: Dispute in part. Nearly all motorists plead guilty: in practice, the option to proceed to hearing before a judicial hearing officer is not an effective alternative. Ex. 28, Morgera May 25, 2022 Dep. at 29:20-30:2; Ex. 233, 2017 BTVA Annual Report (showing 25,830 tickets disposed of by plea bargain in 2017 while only 759 tickets were disposed of by not guilty disposition or dismissal in that same year).

47.    Judicial hearing officers render final determinations for a ticketed motorists' infraction(s). [*Id.*]

   **Plaintiffs' Response**: Dispute. Judicial Hearing Officers do not render final determinations for motorists that take plea offers. Ex. 28, Morgera May 25, 2022 Dep. at 30:7-31:21, 46:1-6; Ex. 234, COB091753; Ex. 233, 2017 BTVA Annual Report at 3.

48.    Ticketed motorists may appeal a hearing officer's final determination in Erie County Court. [Sahasrabudhe Decl., Ex. 42.]

**Plaintiffs' Response**: Dispute because this statement contains a general legal conclusion, the accuracy of which cannot be determined without additional details about the circumstances of the relevant motorist. In any event, the statement is immaterial.

Further dispute for the reasons stated in Plaintiffs' Responses to Statement 47, which Plaintiffs incorporate by reference.

49.   Motorists can also challenge a ticket or traffic enforcement action through a New York CPLR Article 78 proceeding. [*See* N.Y. CPLR 7801(1)]

**Plaintiffs' Response**: Dispute because this statement contains a general legal conclusion, the accuracy of which cannot be determined without additional details about the circumstances of the relevant motorist. In any event, the statement is immaterial.

50.   Certain named Plaintiffs in this case had their tickets dismissed by utilizing procedures available to them through the BTVA and New York State law. [Sahasrabudhe Decl., Exhibit 38 dated December 15, 2022 (hereinafter "Bonds Dep." At 77:20-78:1; Sahasrabudhe Decl., Exhibit 33 dated September 6, 2023 (hereinafter "Redden Dep.") at 74:11-75:8; Sahasrabudhe Decl., Exhibit 30 dated December 13, 2022 (hereinafter "Yeldon Dep.") at 99:17-21.]

**Plaintiffs' Response**: Admit, but immaterial.

51.   Prior to the creation of the BTVA, all revenue derived from traffic tickets went to the State. [Morgera Dep. at 22:8-12.]

**Plaintiffs' Response**: Admit.

52.   Under State law, the operation of the BTVA allows the City to keep most of the revenue derived from the adjudication of traffic tickets. [*Id.* at 21:11-22:7.]

**Plaintiffs' Response**: Admit.

53.   Other municipalities throughout the State, including Nassau County, Suffolk County, and Rochester, also have similar traffic violations agencies. [N.Y. Gen. Mun. Law § 370 (McKinney); *see also* Villegas Dep. at 31:7-22.]

**Plaintiffs' Response**: Dispute as vague because this statement does not define or describe what it means by "similar" or elaborate on the traffic violations agencies alleged similarities.

## VI.   Facts Related to Plaintiffs' Claims of Intentional Discrimination

54.   BPD's Checkpoint directive and traffic enforcement policies are race neutral in that they do not classify motorists based on their race. [Sahasrabudhe Decl., Ex. 41; Ex. 40; Ex. 39 at pp. 16, 18.]

**Plaintiffs' Response**: Dispute for lack of evidentiary foundation. The City cited the 2021 Traffic Enforcement Policy, but that Policy was not created until May 2021. Prior to May 2021, the BPD had no formal written policy explicitly prohibiting racially biased policing or traffic enforcement. The City's other evidentiary support is a 1997 version of the MoP that was superseded in 2013. The pages the City cited do not address traffic enforcement. *See* Ex. 105, BPD MoP; Ex. 158, COB-Hodgson_00093; Ex. 102, Gennaco Report at 20 n.10, 50.

Further dispute because the BPD's Checkpoint directive and traffic enforcement policies are not race neutral in practice. The BPD disproportionately erected Checkpoints in Black and Latino neighborhoods, so the directive to "[c]heck all drivers and passengers" meant that officers primarily stopped Black and Latino drivers. The BPD conducted over 80% of Checkpoints in Black and Latino neighborhoods. Differences in population size, crime rates, and accident rates could not explain the disparity in Checkpoint locations. Ex. 1, Acquino Sept. 5, 2023 Dep. at 56:5-12; Ex. 8, Derenda Dec. 23, 2021 Dep. at 282:1-6; Ex. 33, Quinn Apr. 1, 2022 Dep. at 35:22-36:4; Ex. 94, Quinn Apr. 1, 2022 Dep. Exhibit 43; Ex. 101, Bjerk Report ¶¶ 34, 331.

In addition, the BPD disproportionately issued tinted windows tickets—especially multiple tinted windows tickets—to Black and Latino drivers. There is no race neutral explanation for this disparity. Ex. 101, Bjerk Report ¶¶ 151, 294-95, & Figure 14.

The BPD currently maintains a policy under which officers employ pretextual traffic stops to target "gang members," as well as "individuals that are highly likely to engage in gun activities," "person[s] of interest," "hot people," and "high-risk individuals." The BPD considers the general demographic of gang members in Buffalo to be Black or Latino men ages 17-27. The only online and paper form that the BPD utilizes for officers "to submit information identifying a gang member" contains "Black" pre-filled for race. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 123:15-19, 127:17-128:22, 136:22-137:8, 158:6-164:13; Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 55:4-59:1; Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 30:23-32:14, 42:7-18, 46:5-47:17, 49:22-50:21, 54:9-55:1; Ex. 83, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 1, at 6; Ex. 235, COB-Hodgson_0031967, at 10-12.

Further dispute for the reasons stated in Plaintiffs' Additional Material Facts ¶¶ 516-29, which Plaintiffs incorporate by reference.

55.     Members of the Buffalo Police Department are not supposed to consider a motorist's race when making traffic stops. [*Id.*; Derenda Dep. 2 at 258:7-258-14, 312:10-312:18.]

**Plaintiffs' Response**: Admit that it is a well-established constitutional violation to consider a motorist's race when making traffic stops. Dispute that BPD practice conformed to constitutional requirements. The BPD Police Academy trained officers with an incorrect definition of biased policing. And within the BPD, officers received annual training which taught that officers do not engage in racial bias when traffic stops are supported by probable cause. *See* Ex. 102, Gennaco Report at 95-96; Ex. 236, COB287615 at 2; Ex. 16, Gramaglia Jan. 24, 2024 30(b)(6) Dep. at 20:22-23:4.

In addition, the BPD selected Checkpoint locations, targets motorists for multiple tinted windows tickets, and engages in pretextual policing based on race for the reasons stated in Plaintiffs' Response to Statement 54. The City's evidentiary support for the proposition also lacks foundation for the reasons stated in Plaintiffs' Response to Statement 54.

56.    In general, traffic stops can only be made by BPD officers for visible violations of the New York State Vehicle and Traffic Law. [*Id.*]

**Plaintiffs' Response**: Admit that this is an accurate description of BPD's constitutional mandate related to traffic stops.  Dispute that the BPD applied this mandate at Checkpoints where every car was stopped without individualized suspicion of VTL violations. *See* Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 157:19-158:3; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 261:1-10; Ex. 6, Brown Nov. 6, 2023 Dep. at 223:6-224:11; Ex. 105, BPD MoP Ch. 8 § 10.5; Ex. 50, Young Oct. 26, 2022 Dep. at 52:12-16.

Further dispute for the reasons stated in Plaintiffs' Additional Material Facts ¶¶ 516-29, which Plaintiffs incorporate by reference.

57.    Officers of the Buffalo Police Department are not allowed to use race as a basis to stop a vehicle at a Checkpoint or in a routine traffic stop. [Derenda Dep. 2 at 258:7-258:14, 312:10-312:18.]

**Plaintiffs' Response**: Dispute for the reasons stated in Plaintiffs' Responses to Statements 54-56, which Plaintiffs incorporate by reference.

58.    All Plaintiffs in this case were cited for violations of the New York State Vehicle and Traffic Law, which are race neutral laws. [Sahasrabudhe Decl. Ex. 37 ("Evans Dep.") at 77:10-77:14; 82:14-82:2; 58:10-58:14; Ex. 38 ("Bonds Dep."), at 84:21-85:3; Ex. 31 ("Simmons Dep."), at 25:14-25-18; Ex. 3 ("Compl.") ¶ 246 (admitting Redden committed a VTL violation); Ex. 36 ("Franklin Dep."), at 43:13-44:12; Ex. 30 ("Yeldon Dep."), at 87:3-87:5; Ex. 34 ("Palmer Dep.") at 65:10-65:21; 67:2-67:7; 112:11-112:21; Ex. 32 ("Sarmiento Dep")., at 45:16-45:18; 46:17-45:22.]

**Plaintiffs' Response**: Admit that the VTL is race neutral on its face. Dispute that all Plaintiffs were cited for VTL violations. Plaintiff De'Jon Hall did not receive a traffic ticket pursuant to the VTL. *See* ECF No. 252-3, Am. Compl. ¶¶ 259-61; Hall Decl. ¶ 12.

59.    Jasmine Evans (formerly identified as Jane Doe), Joseph Bonds, Shaketa Redden, and Taniqua Simmons received tickets at checkpoints. [*See* Evans Dep. at 77:10-77:14; 82:14-82:2; 58:10-58:14; Bonds Dep., at 84:21-85:3; Simmons Dep., at 25:14-25-18; Compl. ¶ 246.]

**Plaintiffs' Response**: Admit that Plaintiffs Evans, Redden, and Simmons were ticketed at Checkpoints. Dispute that Plaintiff Bonds was ticketed at a Checkpoint.  In the Fall of 2016, Plaintiff Bonds was ticketed during a traffic stop across the street from a Checkpoint. ECF No. 252-39, Bonds Dep. at 63:10-13, 67:7-70:11, 79:15-89:7.

60.    Evans was ticketed for three seat belt violations associated with her own lack of a seat belt, improper car seats for her two children, and for driving on a learner's permit. [*See* Evans Dep. at 77:10-77:14; 82:14-82:2; 58:10-58:14.]

**Plaintiffs' Response**: Admit.

61.    Evans admitted these violations were legitimate at the time she was ticketed for them. [*Id.*]

**Plaintiffs' Response**: Dispute. Plaintiff Evans testified that the seatbelt violation was *not* legitimate because she removed her seatbelt only *after* being stopped at the Checkpoint, in order to retrieve her license and insurance documents. The City's evidentiary support does not show that Plaintiff Evans admitted to driving without a seatbelt. ECF No. 252-38, Evans Dec. 15, 2022 Dep. at 81:18-82:15; Evans Decl. ¶ 12.

62.    Bonds alleges that he was ticketed for expired insurance and an expired inspection sticker. [*See* Bonds Dep., at 84:21-85:3.]

**Plaintiffs' Response**: Admit.

63.    Bonds admitted that his inspection sticker was, in fact, expired when he received these tickets. [*Id.*]

**Plaintiffs' Response**: Admit with clarification that Plaintiff Bonds' vehicle was unlawfully ticketed while parked on private property at his home, Marine Drive Apartments, in a parking space for which he had a valid parking pass, where he left his vehicle because it was not drivable and he could not afford to repair it. ECF No. 252-39, Bonds Dec. 15, 2022 Dep. at 82:8-22, 84:17-85:3; ECF No. 252-3, Am. Compl. ¶¶ 330-37; Bonds Decl. ¶¶ 26-30.

64.    Shaketa Redden was ticketed for an expired inspection sticker and admitted that her inspection sticker was expired at the time she received the ticket for that infraction. [Compl. ¶ 351.]

**Plaintiffs' Response**: Admit with clarification that Plaintiff Redden was unaware that her inspection had lapsed the day before receiving the ticket.  ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 61:13-18; ECF No. 252-3, Am. Compl. ¶ 351.

65.    Simmons was ticketed for having an expired inspection sticker. [Simmons Dep., at 25:14-25-18.]

**Plaintiffs' Response**: Admit.

66.    Simmons has since admitted that she had an expired inspection sticker when she received the ticket. [Compl. ¶ 246.]

**Plaintiffs' Response**: Dispute.  Plaintiff Simmons did not recall whether she had an expired inspection sticker when she received the ticket. Defendants cited the Amended Complaint, ¶ 246, as support but that paragraph states that Plaintiff Simmons "received a ticket for

having an expired inspection sticker," not that she admitted to the sticker being expired. ECF No. 252-32, Simmons May 6, 2023 Dep. at 25:19-26:8.

67. Other than Defendant, Robbin Thomas, none of the officers involved in the above-listed Checkpoint tickets are parties to this case. [*Id.*]

**Plaintiffs' Response**: Admit.

68. Evans, Simmons, Bonds, and Redden have adduced no evidence demonstrating that any officer took action against them based on their race. [*See generally*, Evans Dep., Bonds Dep, Redden Dep., Simmons Dep.]

**Plaintiffs' Response**: Dispute. Plaintiffs Evans, Simmons, Bonds, and Redden all endured BPD Checkpoints on the East Side of Buffalo, the locations of which were racially motivated. Each Plaintiff personally observed Checkpoints only in Black neighborhoods, never in non-minority neighborhoods, and felt racially targeted by the Checkpoints based on that observation. *See* Plaintiffs' Responses to Statements 10, 22, and 54, which Plaintiffs incorporate by reference; *also* Bonds Decl. ¶ 5; Evans Decl. ¶¶ 5, 16; Simmons Decl. ¶¶ 5, 11-15, 18; Redden Decl. ¶¶ 4, 14.

BPD officers treated Plaintiff Evans disrespectfully during Checkpoint stops. They improperly searched her vehicle, questioned where she was going, and treated her like a criminal. Evans Decl. ¶ 16.

During Checkpoint stops, BPD officers improperly asked Plaintiff Simmons where she was going and used flashlights to peer into her vehicle. Plaintiff Simmons also witnessed BPD officers brutalizing and abusing other Black motorists at Checkpoints, including snatching them out of their cars and breaking the windows of their vehicles. Simmons Decl. ¶¶ 13-15.

The BPD stopped Plaintiff Bonds and his son for no reason, interrogated them about where they were going, treated them like criminals, and issued Plaintiff Bonds a ticket for expired insurance even though Plaintiff Bonds showed them proof that he had renewed his insurance earlier that day. Plaintiff Bonds believed the stop was based on his race, his son's race and appearance, and the fact that he drove a Cadillac in a Black neighborhood. The BPD also repeatedly and unlawfully ticketed Bonds' car while it was parked at his BMHA residence. Plaintiff Bonds believed these tickets were racially motivated based on his observation that most residents of his housing complex were Black people and people of color, and other people of color in his housing complex also experienced excessive ticketing while parked in the BMHA lot. Bonds Decl. ¶¶ 6-17, 26-32.

At a Checkpoint, Plaintiff Redden observed that BPD officers only pulled over Black drivers, allowing white drivers to pass through. On another occasion, a BPD officer followed and stopped Plaintiff Redden after a vigil for Rafael Rivera, a man the BPD had killed. During the stop, the officer treated Plaintiff Redden disrespectfully, chuckling as he towed her vehicle. He issued her six tickets for an accidental traffic violation (the tickets were later dismissed). Plaintiff Redden believed the officer's rudeness and excessive ticketing were racially motivated. Redden Decl. ¶¶ 11, 14-23.

69.   Plaintiffs Dorothea Franklin, Charles Palmer, and Ebony Yeldon were stopped and given tickets for tinted windows. [Franklin Dep., at 43:13-44:12; Yeldon Dep., at 87:3-87:5; Palmer Dep. at 65:10-65:21; 67:2-67:7; 112:11-112:21.]

   **Plaintiffs' Response**: Admit that Plaintiffs Franklin, Palmer, and Yeldon each received multiple tinted window tickets in a single stop. Yeldon Decl. ¶ 9 (issued two tinted windows tickets in a single stop); Palmer Decl. ¶¶ 10-12 (issued two tinted windows tickets, in one stop, four tickets, in another stop, and four tickets in a third stop); Franklin Decl. ¶ 21 (issued two tinted windows tickets in a single stop).

70.   Franklin admitted that her windows were tinted. [Franklin Dep., at 43:13-44:12.]

   **Plaintiffs' Response**: Admit with clarification that Plaintiff Franklin's windows were lawfully tinted in connection with a medical condition, and the tickets she received were dismissed on that basis. Franklin Decl. ¶ 21; ECF No. 252-37, Franklin May 13, 2023 Dep. at 44:8-12.

71.   Yeldon admitted that her windows were tinted. [Yeldon Dep., at 87:3-87:5.]

   **Plaintiffs' Response**: Admit that Plaintiff Yeldon testified that the windows were lightly tinted but dispute that a tint level of 17%, which the officer testified at the BTVA hearing was the level he measured, is a violation of the VTL.  Plaintiff Yeldon was driving a taxi owned by Cold Spring Cab Company and was not the owner of the vehicle. ECF No. 252-3, Am. Compl. ¶¶ 271-81; ECF No. 252-31, Yeldon Dec. 13, 2022 Dep. at 80:7-20; Yeldon Decl. ¶¶ 13-16.

72.   Palmer admitted his windows were tinted. [Palmer Dep. at 65:10-65:21; 67:2-67:7; 112:11-112:21]

   **Plaintiffs' Response**: Admit with clarification that Plaintiff Palmer is a disabled veteran who tinted his windows for medical reasons related to his vision. Palmer Decl. ¶¶ 1, 8; ECF No. 252-35, Palmer Sept. 14, 2023 Dep. at 65:10-16.

73.   None of the officers who wrote the above-listed tinted windows tickets are parties to this case. [*See generally*, Compl.]

   **Plaintiffs' Response**: Admit.

74.   Yeldon, Franklin, and Palmer have adduced no evidence suggesting that any officer took action against them due to their race. [*See generally*, Yeldon Dep, Franklin Dep., Palmer Dep.]

   **Plaintiffs' Response**: Dispute. Plaintiffs Yeldon, Franklin, and Palmer all received multiple tinted windows tickets in a single stop pursuant to the BPD's racially motivated policy and practice of subjecting Black and Latino drivers to such treatment. Yeldon Decl. ¶¶ 9-11; Franklin Decl. ¶ 21; Palmer Decl. ¶¶ 10-12.

Plaintiff Yeldon received multiple tinted windows tickets while driving her taxi in a predominately white neighborhood. The officer did not use a tint meter and treated her in a "rude and demeaning" manner, telling her she was "lucky" to receive two tickets instead of four. He later testified that her vehicles had a 17% tint, which is not illegal. Yeldon Decl. ¶¶ 6-18; N.Y. Veh. & Traf. Law § 375 (McKinney 2024).

During Plaintiff Franklin's tinted window stop, the officer acted aggressively and seemed to be fishing for a reason to ticket her. He disregarded her explanation that she needed tints for medical reasons, forcing her to go to court to get the tickets dismissed. She felt degraded and treated like a criminal. Franklin Decl. ¶¶ 20-22. The BPD frequently ran Checkpoints outside of her home, causing her to pass through dozens of Checkpoints just to go in and out of her driveway. When she passed through Checkpoints, officers asked her intrusive questions, scrutinized the inside of her vehicle, and checked her passengers' identification. Plaintiff Franklin observed horrific abuse of Black motorists at Checkpoints, while white motorists were waved through, and she perceived the Checkpoints as a form of state-sponsored abuse of Black people. Franklin Decl. ¶¶ 3-18.

The BPD officers who issued multiple tinted windows tickets to Plaintiff Palmer asked him unwarranted questions that had nothing to do with traffic safety. Plaintiff Palmer later learned that other people in his community faced the same kind of ticketing and harassment as he did, which convinced him that the BPD targeted people of color like him. Palmer Decl. ¶¶ 10-11, 16.

75. De'Jon Hall never received a ticket from a Buffalo police officer or received any traffic related penalty for which he is bringing suit. Rather, Hall was briefly stopped at one Checkpoint and did not receive a ticket. [Sahasrabudhe Decl. Exhibit 40 (hereinafter "Hall Dep.") at 31:19-32:21.]

**Plaintiffs' Response**: Dispute in part. Plaintiff Hall received an unjustified, racially motivated ticket from a BPD officer when parked in the Pearl Street Brewery parking lot, where he had briefly stopped to send a text message. The officer looked into the vehicle and ascertained his race before issuing the ticket. Hall Decl. ¶¶ 26-27. Admit that Hall does not seek monetary damages for this incident or for his experience at the Checkpoint.

76. The officers who stopped Hall at the Checkpoint are not parties to this case. [*Id.*]

**Plaintiffs' Response**: Admit.

77. Hall has adduced no evidence of any Buffalo police officer taking action against him because of his race. [*See generally* Hall Dep.]

**Plaintiffs' Response**: Dispute. Plaintiff Hall endured a BPD Checkpoint on the East Side of Buffalo, the location of which was racially motivated. Hall also received an unjustified, racially motivated ticket while parked at the Pearl Street Brewery. *See* Plaintiffs' Responses to Statements 10, 22, 54, and 75, which Plaintiffs incorporate by reference.

In February 2025, two white BPD officers subjected Plaintiff Hall to an unjustified, pretextual traffic stop. BPD officers first saw Hall's teenage brother, who is Black and wore a

hoodie, get out of Hall's car and go into the corner store. The officers then followed Hall for several blocks before pulling him over for no reason. An officer claimed Hall failed to signal, but Hall had been traveling straight and had no need to signal. The officer ran Hall's license and then let him go without issuing a ticket or a stop receipt. Hall believes the true reason for the stop was racial profiling, based on his and his teenage brother's race and the way that his brother dressed. Hall Decl. ¶¶ 24-25.

78.   Shirley Sarmiento alleges that she received tickets while her car was parked. [Sarmiento Dep. at 48:14-16.]

      **Plaintiffs' Response**: Admit.

79.   Sarmiento admits that these tickets were for legitimate violations. [Sarmiento Dep., at 45:16-45:18; 46:17-45:22.]

      **Plaintiffs' Response**: Admit that Plaintiff Sarmiento acknowledged having an expired inspection sticker. Dispute that the tickets were for "legitimate violations." Plaintiff Sarmiento's vehicle was parked on private property at her residence, Marine Drive Apartments, in her parking space with a valid parking pass. ECF 252-33, Sarmiento Dec. 13, 2022 Dep. at 49:10-16; ECF No. 252-3 ¶¶ 361, 363-65; Sarmiento Decl. ¶¶ 11-17.

80.   The officers who wrote Sarmiento's tickets are not parties to this action. [*See generally*, Compl.]

      **Plaintiffs' Response**: Admit.

81.   Sarmiento has adduced no evidence that a Buffalo police officer took action against her due to her race. [*See generally*, Sarmiento Dep.]

      **Plaintiffs' Response**: Dispute. Plaintiff Sarmiento was targeted for ticketing as a BMHA resident because "the BPD tried to get money from the Black residents in Buffalo." Plaintiff Sarmiento only saw Black people when she went to BTVA traffic court. In addition, the BPD took action against Plaintiff Sarmiento and other Black people in Buffalo by operating Checkpoints in Black neighborhoods. Sarmiento Decl. ¶¶ 6-9, 17-18; Bonds Decl. ¶¶ 5-7; Yeldon Decl. ¶ 5.

82.   There is no evidence that any of the traffic enforcement actions concerning which Plaintiffs complain were carried out pursuant to a federally funded program. [*See* Sahasrabudhe Decl., Ex. 41; Ex. 40; Ex. 39 at pp. 16, 18.]

      **Plaintiffs' Response**: Dispute. The BPD has received federal funds from the Department of Justice from at least 2015 to the present. These grants specifically funded the BPD's traffic enforcement activities. For example, the BPD received Justice Assistance Grants ("JAG") from the U.S. Department of Justice. The BPD used JAG funds for "increased directed/tactical patrols targeting high risk crime areas," specifically "assigning officers on overtime to directed patrol activities in 'hot spot' and high crime areas to investigate not only suspicious activities, but to spotlight enforcement strategies on guns, drugs, gangs, and other violent crime." The assigned officers included members of the Strike Force and

Housing units. Former Commissioner Lockwood testified that both the Strike Force Unit and the Housing Unit engaged in pretextual traffic stop tactics of conducting "traffic stops for violations like seatbelt and tinted window so that [officers] can check for warrants and search vehicles and seize guns and inhibit the movement of suspected gang members." Ex. 153, Defs.' Mar. 18, 2024 Am. Response to Pls. First Set of RFAs, at 16 (Request No. 40); Ex. 238, COB_INC_00000044, at 1, 7-8; Ex. 239, COB_INC_00000041 at 6; Ex. 240, COB_INC_00000038, at 12-13; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 81:3-23.

## VII.    Additional Material Facts Preventing Entry of Summary Judgment for Defendants

### A.    The Checkpoint Program was a Municipal Policy Approved by Derenda and Brown, Final Policymakers for the City and BPD

83.    BPD Commissioner Derenda created and oversaw the Checkpoint Program. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 174:9-175:9; Ex. 105, BPD MoP Ch. 1 § 3.2.

84.    As Commissioner, Derenda established final policy for the BPD. Buffalo, N.Y., City Charter Art. 13 §§ 13-1, 13-4; Ex. 105, BPD MoP Ch. 1 § 3.2.

85.    Byron Brown served as the longstanding Mayor of the City of Buffalo and its Chief Executive Officer during the time period from 2012 to 2017. Ex. 6, Brown Nov. 6, 2023 Dep. at 8:14-21, 13:7-16:19, 22:16-20.

86.    As Mayor, Brown had managerial duties over the BPD, inclusive of approving departmental policies, and he approved of the Checkpoint Program in all respects. Ex. 6, Brown Nov. 6, 2023 Dep. at 13:7-16:19, 22:16-20, 238:7-16.

87.    Brown continued to support the Checkpoint Program after being regularly informed about its activities, as well as civilian complaints and discrimination concerns, and "never issued any directives prohibiting the checkpoint program from continuing." Ex. 6, Brown Nov. 6, 2023 Dep. at 50:13-20, 238:12-16; Ex. 3, COB086916.

### B.    The Primary Programmatic Purpose of the Checkpoints Was Crime Control

88.    The founding and enduring mission of the Strike Force was to "target and eliminate high crime areas throughout the city," target crime hot spots and gang activity, and remove illegal guns from the streets of Buffalo. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 17:23-19:23; Ex. 70, COB060319; Ex. 105, BPD MoP Ch. 1 § 8.6; Ex. 7, Derenda Nov. 10, 2021 Dep. at 17:3-18:20, 112:5-18; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 39:7-40:21.

89.    The mission of the Housing Unit was crime prevention in and around Buffalo Municipal Housing Authority ("BMHA") housing complexes. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 28:3-10, 29:20; Ex. 105, BPD MoP Ch. 1 § 8.5; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 66:9-67:20.

90.    Traffic safety did not appear in either the Strike Force or Housing Unit's mission statements. Ex. 70, COB060319; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 20:1-4; Ex. 105, BPD MoP Ch. 1 §§ 8.5-8.6; Ex. 6, Brown Nov. 6, 2023 Dep. at 99:2-12.

91.   The BPD Strike Force and Housing Unit conducted Checkpoints as part of the Checkpoint Program, although any unit of the BPD could have performed them. Ex. 105, BPD MoP Ch. 8 § 10.5(G); Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 71:4-7, 146:7-147:15, 147:18-21; Ex. 40, Serafini Dec. 27, 2021 Dep. at 68:19-69:9.

92.   The "reduction of drug, gun, and gang activity" was an admitted focus of the Checkpoint Program, and it was funded in part by the New York State Gun Involved Elimination (GIVE) Initiative, where Defendants described it as a zero-tolerance crime control measure targeting gang and gun activity. ECF No. 252-46, DMSJ at 43; Ex. 50, Young Oct. 26, 2022 Dep. at 37:4-49:17; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 65:13-71:2; Ex 241, COB463302; Ex 242, COB-Hodgson_0043502 at 18-19, 27-28.

93.   The Checkpoint Program continued Commissioner Derenda's longstanding practice of deploying checkpoints and traffic enforcement details specifically for the purpose of seizing guns, contraband, and preventing shootings and gang activity. Ex. 243, COB245089; Ex. 244, COB245091; Ex. 149, COB459487, Ex. 245, COB261847; Ex. 246, COB218966; Ex. 247, COB254541; Ex. 248, COB217369; Ex. 249, COB016038.

94.   Officers conducting Checkpoints could investigate motorists for potential criminal wrongdoing. Ex. 154, COB060320; Ex. 105, BPD MoP Ch. 8 § 10.5(G); Ex. 6, Brown Nov. 6, 2023 Dep. at 222:11-224:2; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 37:9-22; Ex. 50, Young Oct. 26, 2022 Dep. at 44:21-47:22; Ex. 100, Young Oct. 26, 2022 Dep. Exhibit 5.

95.   BPD Commissioner Derenda and Buffalo Mayor Brown made the Checkpoint Program the centerpiece of their plan to curb gang and gun violence in the City of Buffalo, and part of the Mayor Brown's Zero Tolerance on Crime Policy. *See* Ex. 116, COB226142; Ex. 129, COB222550; Ex. 6, Brown Nov. 6, 2023 Dep. at 104:12-106:3; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 49:3-15.

96.   Commissioner Derenda acknowledged the primacy of the Checkpoint Program's crime prevention and suppression purpose when speaking to press, stating "Strike Force officers are conducting daily roadblocks" for the purpose of "surprising the criminal element," and that "people are now less likely to carry guns knowing that they may be stopped at a safety checkpoint." Ex. 250, Lou Michel, *Buffalo's homicide toll down in 2013 but still 47 too many*, BUFFALO NEWS (Jan. 1, 2014), https://buffalonews.com/news/local/buffalo-s-homicide-toll-down-in-2013-but-still-47-too-many/article_7ade8f66-85ad-5621-b22e-f4dc9c930859.html.

97.   Mayor Brown acknowledged the Checkpoint Program reflected "an intersection of different missions," including the Strike Force's mission of addressing "shootings, homicides, gang violence, drug dealing." Ex. 6, Brown Nov. 6, 2023 Dep. at 221:22-222:10, 234:4-9.

98.   In statements to the press, Brown applauded the Strike Force initiative for its "phenomenal" impact on crime, and for "send[ing] a clear and ongoing message that criminal activity is not going to be tolerated in Buffalo." Ex. 251, Matt Gyrta, *Officials praise results of strike force*, BUFFALO NEWS (Aug. 5, 2012), https://buffalonews.com/news/article_7f6dda3b-7a2d-520d-860d-80524e368e80.html; Ex. 252, Lou Michel, *Anti-crime task force back for*

*good*, BUFFALO NEWS (Mar. 31, 2013), https://buffalonews.com/news/anti-crime-task-force-back-for-good/article_ceb1dd40-40e9-5a87-ac89-23e104f0a0d7.html.

99.     Checkpoints were deployed as a crime prevention strategy, as BPD officers with direct involvement in the Checkpoint Program, including Chief Young and Captain Serafini, even acknowledged, to address shootings, homicides, crime hot spots, gang violence, criminal activity, and to interdict drugs and guns. Ex. 129, COB465854; Ex. 116, COB226142; Ex. 129, COB222550; Ex. 131, COB634845; Ex. 130, COB592436; Ex. 123, COB222673; Ex. 124, COB224759; Ex. 125, COB234488; Ex. 128, COB246427; Ex. 115, COB053666; Ex. 144, COB017671; Ex. 145, COB041693; Ex. 147, COB053632; Ex. 136, COB056123; Ex. 148, COB215625; Ex. 99, COB016252; Ex. 253, COB016040; Ex. 151, COB018380; Ex. 97, Roberts Apr. 20, 2022 Dep. Exhibit 42; Ex. 40, Serafini Dec. 27, 2021 Dep. at 69:17-72:1, 130:16-131:11, 137:3-144:21, 148:8-20; Ex. 50, Young Oct. 26, 2022 Dep. at 37:4-49:17, 54:13-56:5; Ex. 140, Young Oct. 26, 2022 Dep. Exhibit. 5; Ex. 122, COB215219; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 59:23-60:6, 61:15-62:6, 63:6-19; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 73:1-74:20; Ex. 45, Whelan Apr. 26, 2022 Dep. at 86:1-87:13, 120:10-121:1, 121:20-122:3; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 66:9-67:20.

100.    "High visibility" was a *primary* purpose of the Checkpoints. ECF No. 252-46, DMSJ at 43.

101.    The "high visibility" purpose of the Checkpoints was a crime control and deterrence strategy, aimed at curtailing crime and disrupting gang activity, weapons offenses, and criminal behavior. *See, e.g.*, Ex. 7, Derenda Nov. 10, 2021 Dep. at 21:6-18, 64:19-65:5, 65:13-66:16, 94:16-21; Ex. 60, Derenda Nov. 10, 2021 Dep. Exhibit 10; Ex. 8, Derenda Dec. 23, 2021 Dep. at 282:10-283:18, 296:15-297:21; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 65:5-67:6, 73:1-74:20, 78:14-79:1, 80:16-81:3, 95:3-12, 96:20-97:5, 100:5-20; Ex. 128, COB246427; Ex. 27, Miller June 02, 2023 Dep. at 48:22-49:11; Ex. 35, Roberts Apr. 20, 2022 Dep. at 99:2-101:8; Ex. 115, COB053666.

102.    Defendants never adopted a policy of establishing checkpoints based on traffic safety concerns, and its personnel cannot identify a single instance where a checkpoint was established on that basis. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 207:20-210:19; Ex. 153, Defs.' Mar. 18, 2024 Am. Response to Pls. First Set of RFAs at 3-10; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 73:1-74:20.

103.    When traffic concerns were reported to the BPD or called into 311, Strike Force and Housing Unit Checkpoints were not deployed as a response strategy. Ex. 8, Derenda Dec. 23, 2021 Dep. at 282:10-283:18; Ex. 254, COB052638; Ex. 121, COB022527; Ex. 120, COB263608; Ex. 9, Derenda 30(b)(6) Jan. 23, 2024 Dep. at 196:21-197:14; Ex. 255, Checkpoint Compilation.

104.    Checkpoint locations were driven by the Strike Force and Housing Unit's crime fighting priorities and patrol locations, *not* traffic complaints. Ex. 8, Derenda Dec. 23, 2021 Dep. at 296:15-297:21, 310:16-311:3; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 164:14-18, 168:5-9, 168:21-169:5; Ex. 40, Serafini Dec. 27, 2021 Dep. at 136:17-137:2.

105.    To the extent data was used to determine Checkpoint locations, it was crime data including gang intelligence, crime statistics, hot spot maps, and reports of recent shootings or violence. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 211:15-20; Ex. 40, Serafini Dec. 27, 2021 Dep. at 142:8-143:17; Ex. 50, Young Oct. 26, 2022 Dep. at 37:4-49:17; Ex. 126, COB040949; Ex. 71, COB041712; Ex. 100, COB228535; Ex. 51, COB591045.

106.    Defendants used crime trends, not traffic safety outcomes, to measure the success of the Checkpoint Program, and never conducted any analyses to determine whether the Checkpoint Program improved traffic safety. Ex. 153, Defs.' Mar. 18, 2024 Am. Response to Pls. First Set of RFAs at 10 (RFA 17); Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 194:23-195:22, 196:21-197:14, 248:20-249:1; Ex. 136, COB056123.

107.    When asked to explain why no such analyses were done, BPD Commissioner Derenda testified as the City's 30(b)(6) representative: "We had a focus of reducing crime throughout the city which we accomplished. Traffic safety, if we came across numbers of accidents the chief said, oh, we're having numerous accidents here, we would address it with different issues." Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 196:21-197:14.

108.    Commissioner Derenda instructed the BPD officers conducting Checkpoints to "impound as many vehicles as legally possible" and to "make arrests and write traffic summons as many as possible," based in part on his discriminatory belief that such practices would mean that "individuals who deal in narcotics do not have access to their vehicles" and "cannot drive around and kill people."  Ex. 256, COB040275; Ex. 257, Roberts Apr. 20, 2022 Dep. Exhibit 22.

109.    The only traffic-related purpose of the Checkpoint Program was "enforcement of the New York State Vehicle and Traffic Law*,*" and "to methodically evaluate [motorists'] compliance with the law." Ex. 105, BPD MoP Ch. 8 § 10.5(H); Ex. 237, Defs.' Feb. 20, 2024 Rog. Resp. at 2; Ex. 7, Derenda Nov. 10, 2021 Dep. at 85:15-17; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 102:19-103:4, 149:5-8, 248:6-249:1; Ex. 6, Brown Nov. 6, 2023 Dep. at 102:6-7; Ex. 50, Young Oct. 26, 2022 Dep. at 32:9-19; Ex. 40, Serafini Dec. 27, 2021 Dep. at 67:15-20; Ex. 154, COB060320.

110.    Enforcing the vehicle and traffic law was one of the ordinary law enforcement duties of BPD officers, and traffic stops were known to require individualized suspicion outside of Checkpoints. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 46:21-47:9, 49:8-15, 71:8-12, 71:20-72:5, 73:13-74:1; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 25:2-12; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 50:1-16; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 162:3-9; Ex. 258, COB041743; Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 32:17-33:8, 40:9-13.

111.    Once the Checkpoint Program began, tinted window tickets were the most frequently issued ticket by the BPD. Ex. 82, Lockwood Aug. 17, 2022 Dep. Exhibit 32; Ex. 23, Lockwood Aug. 17, 2023 Dep. at 200:1-201:8.

112.   Tinted windows are plainly observable to officers. Ex. 42, Skipper Mar. 5, 2021 Dep. at 63:15-64:1, 153:7-18; Ex. 47, Wigdorski May 24, 2023 Dep. at 97:3-16; Ex. 43, Tedesco July 11, 2023 Dep. at 116:13-21; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 104:18-105:19.

113.   Tinted windows do not cause many traffic accidents, so the BPD considered tinted windows to present an officer safety issue, not a traffic safety issue. Ex. 23, Lockwood Aug. 17, 2023 Dep. at 200:1-201:13; Ex. 82, Lockwood Aug. 17, 2022 Dep. Exhibit 32.

### C.    The Checkpoint Program Fails the Special Needs Balancing Test

114.   The BPD operated Checkpoints one to four times per day except when there were intervening manpower or weather concerns and conducted more than 1,600 Checkpoints over a five-year period. Ex. 40, Serafini Dec. 27, 2021 Dep. at 118:23-119:12, 120:4-121:2; Ex. 68, COB041705; Ex. 101, Bjerk Report ¶¶ 158, 311; Ex. 51, COB591045; Ex. 59, COB279173.

115.   Plaintiffs and other motorists observed and understood that Checkpoints primarily targeted motorists in Black and Latino neighborhoods, and it made them feel stigmatized and discriminated against because of their race. Ex. 8, Derenda Dec. 23, 2021 Dep. at 232:9-14, 308:3-14; Simmons Decl. ¶¶ 3-5, 12; Ex. 259, Aaron Lowinger & Justin Sondel, *Checkpoint: Buffalo Police Practices Questioned*, THE PUBLIC (July 13, 2016), http://www.dailypublic.com/articles/07132016/checkpointbuffalo-police-practices-questioned;  Franklin Decl. ¶¶ 3-4, 8; Bassett Decl. ¶¶ 7, 19; Bonds Decl. ¶ 5; Evans Decl. ¶¶ 5, 16; Palmer Decl. ¶¶ 4-6; Sarmiento Decl. ¶ 8; Hall Decl. ¶¶ 6 -7, 10, 13-14, 17, 19, 25, 27; Myree Decl. ¶ 25; Garland Decl. ¶ 4.

116.   Plaintiffs and Black and Latino motorists primarily saw Black people going through Checkpoints and observed disparate treatment of Black drivers. Evans Decl. ¶ 16; Sarmiento Decl. ¶ 8; Franklin Decl. ¶¶ 9, 22; Bonds Decl. ¶ 21; Simmons Decl. ¶¶ 12-15.

117.   Black and Latino motorists were often subjected to repeated Checkpoint stops, as well as multiple Checkpoint stops a day. Plaintiff Taniqua Simmons was subjected to forty Checkpoint stops. Plaintiff Dorethea Franklin was subjected to so many Checkpoint stops she "lost count." Simmons Decl. ¶¶ 4-5; Franklin Decl. ¶ 5; Bassett Decl. ¶¶ 5, 9; Palmer Decl. ¶¶ 4-7.

118.   Checkpoints impeded motorists' travel to and from home, work, school, the grocery store, church, and other routine activities of daily life. Simmons Decl. ¶¶  3-5; Franklin Decl. ¶¶ 5, 7; Bassett Decl. ¶¶  5, 9; Bonds Decl. ¶ 6; Myree Decl. ¶ 26.

119.   Plaintiffs and other Black and Latino motorists worried that their police encounters would jeopardize the safety of themselves and their friends and families. Franklin Decl. ¶ 13; Hall Decl. ¶¶ 9, 13, 15; Ex. 103, Am. Silverman Report at 24-33 (discussing history of discriminatory policing in Buffalo).

120.   Plaintiffs and other motorists experienced long wait times at Checkpoints even when they were not even being ticketed, sometimes in excess of 45 minutes. Franklin Decl. ¶ 11; Simmons Decl. ¶ 8.

121. At Checkpoints, BPD officers were instructed to issue tickets for as many violations as possible. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 167:13-168:1, 279:5-20.

122. Outside of Checkpoints, BPD officers had discretion to decide *whether* to issue tickets and the *number* of tickets to issue. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 167:13-168:1, 279:5-20.

123. The BPD did not consistently employ flares, signs, warning lights, or otherwise give motorists advance warning that Checkpoints were taking place. Simmons Decl. ¶ 6; Franklin Decl. ¶ 6; Bonds Decl. ¶ 7; Redden Decl. ¶ 7; Evans Decl. ¶ 8; Ex. 260, *New York v. Dzielski*, No. CR-16851-15 at 4 (Erie Cnty. Ct. May 3, 2016) (no evidence that motorists were alerted to BPD checkpoints).

124. Officers operating Checkpoints did not consistently use Checkpoint Directives, and Directives were never used at Checkpoints operated by the Housing Unit. Ex. 50, Young Oct. 26, 2022 Dep. at 32:9-15; Ex. 40, Serafini Dec. 27, 2021 Dep. at 92:13-23.

125. Plaintiffs and other Black and Latino motorists felt fear and anxiety while driving due to the Checkpoint Program, even when their conduct was perfectly lawful. Hall Decl. ¶¶ 14, 29; Evans Decl. ¶ 26; Palmer Decl. ¶ 6; Simmons Decl. ¶ 13; Bonds Decl. ¶ 23; Bassett Decl. ¶ 15.

126. Plaintiffs and other Black and Latino motorists described how BPD officers running Checkpoints would question them aggressively and treat them "like criminals," were "abusive to Black motorists," and made them feel "ashamed, humiliated, and racially discriminated against," "terrorized," "targeted," "unsafe," and in a "constant state of stress and dread." Simmons Decl. ¶¶ 9-14; Franklin Decl. ¶ 16; Redden Decl. ¶ 22; Bonds Decl. ¶¶ 15-17; Bassett Decl. ¶¶ 15, 17, 19.

127. At Checkpoints, officers peered into motorists' cars and asked motorists and their passengers questions that had nothing to do with traffic safety, like where they were coming from and going to. Franklin Decl. ¶ 12; Bonds Decl. ¶ 9; Simmons Decl. ¶ 13.

128. Since 2015, BPD officers have killed or severely injured Black and Latino Buffalo motorists and residents during encounters alleged to be discriminatory. Suttles Decl. ¶¶ 3-5, 10-15, 22-36, 50-53; Redden Decl. ¶ 22; ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 75:11-76:11; Ex. 43, Tedesco July 11, 2023 Dep. at 307:11-308:23, 317:22-318:8, 321:10-14; Ex. 50, Young Oct. 26, 2022 Dep. at 64:11-14.

129. In many cases, the BPD officers involved in these incidents were never disciplined. Suttles Decl. ¶¶ 10-15, 52-53; Ex. 43, Tedesco July 11, 2023 Dep. at 313:2-313:8, 315:6-316:5, 321:10-14.

**D.    The BPD's Discriminatory Placement of Checkpoint Locations**

130. The East Side of Buffalo is a predominately Black neighborhood and most of its residents are law-abiding citizens. *See, e.g.*, Ex. 6, Brown Nov. 6, 2023 Dep. at 10:18-11:6; Ex. 50, Young Oct. 26, 2022 Dep. at 50:10-51:10, 56:22-57:1, 74:8-10; Ex. 8, Derenda Dec. 23,

2021 Dep. at 255:21-256:17; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 57:4-58:1; Ex. 35, Roberts Apr. 20, 2022 Dep. at 232:12-233:3; Ex. 103, Am. Silverman Report at 3.

131.    North Buffalo, which falls into the BPD's D-District, and South Buffalo, which falls into the BPD's A-District, are predominately white neighborhoods. Ex. 40, Serafini Dec. 27, 2021 Dep. at 16:5-18, 157:9-13; Ex. 45, Whelan Apr. 26, 2022 Dep. at 121:10-12; Ex. 6, Brown Nov. 6, 2023 Dep. at 10:18-11:1.

132.    Traffic safety violations and traffic complaints occur in North and South Buffalo. Ex. 8, Derenda Dec. 23, 2021 Dep. at 256:2-9; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 125:2-4; Ex. 45, Whelan Apr. 26, 2022 Dep. at 126:1-15; Ex. 35, Roberts Apr. 20, 2022 Dep. at 65:23-66:5, 233:4-13; Ex. 120, COB263608; Ex. 117, COB276276; Ex. 254, COB052638.

133.    North and South Buffalo have violent crime, drug trafficking, shooting, and gang activity. Ex. 40, Serafini Dec. 27, 2021 Dep. at 25:21-27:2; Ex. 4, Brinkworth Mar. 16, 2022 Dep. at 21:21-22:12; Ex. 8, Derenda Dec. 23, 2021 Dep. at 256:10-17; Ex. 50, Young Oct. 26, 2022 Dep. at 74:18-75:1; Ex. 261, COB263554; Ex. 104, COB263556.

134.    However, the BPD rarely placed Checkpoints in North or South Buffalo prior to July 2017. Ex. 45, Whelan Apr. 26, 2022 Dep. at 88:8-10, 125:17-23; Ex. 40, Serafini Dec. 27, 2021 Dep. at 227:7-16; Ex. 35, Roberts Apr. 20, 2022 Dep. at 233:14-23; Ex. 36, Roberts Sept. 23, 2023 Dep. at 454:3-16; Ex. 33, Quinn Apr. 1, 2022 Dep. at 32:11-35:1, 45:2-47:9, 135:9-136:4; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 261:11-262:2, 271:1-7; Ex. 8, Derenda Dec. 23, 2021 Dep. at 282:1-6; Ex. 6, Brown Nov. 6, 2023 Dep. at 217:2-220:5; Ex. 255, Checkpoint Compilation; Ex. 55, Brown Nov. 6, 2023 Dep. Exhibit 16 at 2; Ex. 56, Brown Nov. 6, 2023 Dep. Exhibit 17; Ex. 101, Bjerk Report ¶¶ 311-317; Ex. 403, Krugman Class Cert. Decl. ¶ 67; Bassett Decl. ¶ 7; Palmer Decl. ¶ 6; Franklin Decl. ¶¶ 4, 17-18; Hall Decl. ¶ 13; Evans Decl. ¶ 5; Bonds Decl. ¶ 5; Sarmiento Decl. ¶ 8; Simmons Decl. ¶¶ 20-21; Yeldon Decl. ¶ 5; Redden Decl. ¶ 4.

135.    From January 2013 to June 2014, when Derenda personally controlled Checkpoint locations and Strike Force patrols, the BPD placed at least 78.1% of the Checkpoints in neighborhoods consisting of more than 60% Black and Latino residents. Ex. 403, Krugman Class Cert. Decl. ¶ 67; Exhibit 8, Derenda Dec. 23, 2021 Dep. at 282:1-6; Ex. 64, Derenda Dec. 23, 2021 Dep. Exhibit 47; ECF No. 252-45, Defs.' Stmt. of Undisputed Facts ¶ 21.

136.    After June 2014, Strike Force lieutenants generally chose their own patrol and checkpoint locations following Derenda's pattern and model. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 21:13-22, 24:19-25:9; Ex. 33, Quinn Apr. 1, 2022 Dep. at 36:5-12; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 18:2-10.

137.    Derenda monitored the Strike Force and Housing Unit patrol and Checkpoint locations using daily reports BPD officers sent, and would have corrected the officers if they did not set Checkpoint locations according to his policy. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 24:19-25:9, 36:5-22; 71:4-7.

138.    Black motorists in the City of Buffalo neither commit more traffic violations nor tint their windows more often than white motorists do. Ex. 15, Gramaglia Sept. 22, 2023 Dep. at

207:11-15; Ex. 10, Domaracki July 18, 2023 Dep. at 67:11-22; Ex. 50, Young Oct. 26, 2022 Dep. at 80:14-16; Ex. 27, Miller June 2, 2023 Dep. at 220:14-20; Ex. 43, Tedesco July 11, 2023 Dep. at 179:4-6; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 96:15-18; Ex. 101, Bjerk Report ¶ 151.

139.    The BPD has "no data to suggest" that Black drivers commit more traffic violations than white drivers do. Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 207:11-15.

140.    Instead, Black motorists receive the disproportionate share of BPD traffic tickets, including for tinted windows. Ex. 22, Lockwood Aug. 10, 2023 Dep. at 96:15-97:6; Ex. 10, Do-maracki July 18, 2023 Dep. at 67:4-22; Ex. 101, Bjerk Report ¶¶ 11-18, 23, 30-31, 269-72, 285-99 & Tables 11, 13, 14; Ex. 262, Krugman Class Cert. Decl. Exhibit 13; Ex. 110, Letter from Black Lives Matter-Buffalo to N.Y. Att'y Gen. (Aug. 30, 2017) at 13 & n.47.

141.    The BPD's traffic enforcement and ticketing practices had a significantly greater impact on Black and Latino motorists relative to non-minority drivers. Ex 101, Bjerk Report ¶¶ 11-15, 23, 30, 269-272, 285-99 & Tables 11, 13, 14.

142.    The BPD's racially discriminatory traffic enforcement and ticketing practices place unique financial burdens on Black and Latino motorists, even though the City is aware that the Black poverty rate is 36.4%, compared to the white poverty rate, which is only 9.7%. Ex. 403, Krugman Class Cert. Decl. ¶¶ 57-58; Palmer Decl. ¶ 13; Evans Decl. ¶¶ 16-21; Ex. 263, BLRR-00000110; Ex. 264, COB387121; Ex. 265, Plaintiffs_Generic-00025799; Ex. 266, COB278415; Ex. 267, COB237562, Ex. 268, COB237565; Ex. 269, COB_INC_00000043, at 3-4 (recognizing poverty rates); Ex. 270, Plaintiffs_Generic-00002698 at 14-15.

### E.    The Checkpoint Program Was Only Temporarily Paused

143.    The Checkpoint Program was paused in November 2017, after Plaintiffs began threatening litigation against the City. Ex. 258, COB041743; Ex. 5, COB209694.

144.    However, the BPD announced that the Checkpoint Program would continue even after the dissolution of the Strike Force in February 2018. Ex. 157, Maki Becker, *Buffalo Police to end Strike Force unit, put focus on community policing*, BUFFALO NEWS (Feb. 9, 2018), buffalonews.com/news/local/crime-courts/buffalo-police-to-end-strike-force-unit-put-fo-cus-on-community-policing/article_519d04c0-db7f-5ecf-80ed-01bc13c1779b.html.

145.    The BPD's current manual of procedures also authorizes Checkpoints to be performed by all BPD units, not just the Strike Force. BPD MoP, Ch. 8, § 10.5.

### F.    Unrebutted Expert Statistical Evidence Creates and Supports an Inference of Discriminatory Intent

146.    Plaintiffs' data expert, Dr. David Bjerk, performed a statistical analysis of the BPD's traffic enforcement practices between January 2012 and December 2024. Ex. 101, Bjerk Report; Ex. 12, Bjerk 2024 Supp. Report; Ex. 521, Bjerk 2025 Supp. Report.

147. Black and Latino individuals in Prof. Bjerk's report are referred to as "Minority"; everyone else is referred to as "Non-Minority." Ex. 101, Bjerk Report ¶ 12.

148. During the period studied, the population of the City of Buffalo was slightly less than 50% Black or Latino. Ex. 101, Bjerk Report ¶ 15.

149. Defendants' statistical expert, Dr. David Banks, did not perform his own statistical analysis of Bjerk's data. Ex. 2, Banks Sept. 27, 2024 Dep. at 46:26-48:15, 50:7-10.

150. With respect to the BPD's general ticketing practices:

   a) From 2012 through 2022, Black and Latino drivers received approximately 75% of citations, even though they accounted for less than half of Buffalo's population. Ex. 101, Bjerk Report ¶¶ 14-15.

   b) From 2012 through 2022, relative to their proportion of the population, Black and Latino drivers were ticketed at 3.2 times the rate of other drivers. Ex. 101, Bjerk Report ¶¶ 14-15.

   c) The rate of ticketing of Black and Latino drivers relative to their population percentage was about 1.5, *i.e.*, 75% ÷ 50%, whereas that of other drivers was about 0.5, *i.e.*, 25% ÷ 50%, so the ratio of the two rates is about 3 (1.5 ÷ 0.5) or, using more exact percentages, 3.2. Ex. 101, Bjerk Report ¶ 15.

   d) In the "Current Era" (February 2020 through the end of 2024), the citywide "Population Adjusted Monthly Average Ticketing Rate" for Minority drivers is *2.3 times* that of Non-Minority drivers, up from 2.1 times at the end of 2022. Ex. 101, Bjerk Report ¶ 85 (defining time eras) & Table 11; Ex. 521, Bjerk 2025 Supp. Report at Table 11.2.

151. The disparities are independently statistically significant for each time era and exist throughout the period studied. Ex. 101, Bjerk Report ¶¶ 15, 23, 269-73 & Table 11; Ex. 521, Bjerk 2025 Supp. Report Table 11.2.

152. Since June 2020, the BPD has required officers to issue Traffic Stop Receipts to all people subjected to a traffic stop but not issued a ticket. Ex. 102, Gennaco Report at 116-17; Ex. 16, Gramaglia Jan. 24, 2024 30(b)(6) Dep. at 155:8-17.

153. The Traffic Stop Receipts must record the race of the person stopped and the reason for the stop. Ex. 102, Gennaco Report at 116-17; Ex. 16, Gramaglia Jan. 24, 2024 30(b)(6) Dep. at 44:16-22, 155:8-17, 157:6-12.

154. Bjerk analyzed the BPD's Traffic Stop Receipt practices from June 2020 through March 31, 2025. Ex. 101, Bjerk Report ¶¶ 300-10.

155. With respect to the issuance of Traffic Stop Receipts:

a) The BPD conducted three times as many stops in the district with the highest Black and Latino population as it did in those with the lowest. Ex. 101, Bjerk Report ¶ 302 & Table 15.

b) Black and Latino drivers were stopped more than twice as often as other drivers. Ex. 101, Bjerk Report ¶¶ 303, 309.

c) Stops based on purported equipment violations or failure to use a turn signal accounted for a disproportionate share of stops in high-Minority neighborhoods and of Minority drivers. Ex. 101, Bjerk Report ¶ 302 & Table 15.

d) BPD stopped a disproportionately higher number of motorists who were non-Minority or lived in non-Minority neighborhoods for erratic driving or failure to stop at a stoplight or stop sign. Ex. 101, Bjerk Report ¶¶ 307-09.

156. With respect to tinted windows ticketing generally:

a) From January to June 2012, the BPD issued only 597 tinted windows tickets in total. Ex. 262, Krugman Class Cert. Decl. Exhibit 13, Summary of Tinted Windows Incidents and Tickets.

b) Prior to June 2012, the BPD evenly distributed tinted windows tickets across the city "with no significant disparity" by race of neighborhood. Ex. 101, Bjerk Report ¶ 195 & Figure 4a.

c) From June 2012 to July 2015, tinted windows ticketing rates stayed relatively flat in predominately white neighborhoods but grew by a factor of eight in neighborhoods that were 60-80% Black or Latino and thirteen in neighborhoods that were 80-100% Black or Latino. Ex. 101, Bjerk Report ¶ 195 & Figure 4a.

d) From June 2012 to January 2018, BPD executed 15,319 traffic stops in which at least one tinted windows ticket was issued and the driver's race was recorded, 84.7% of which stops involved Black or Latino drivers. Ex. 262, Summary of Tinted Windows Incidents and Tickets; Ex. 101, Bjerk Report ¶ 85 (defining time eras).

e) Those stops resulted in 32,146 tinted window citations to Black and Latino drivers, but only 4,898 to drivers of other races (and 6,827 to drivers whose race was not recorded). Ex. 262, Summary of Tinted Windows Incidents and Tickets; Ex. 101, Bjerk Report ¶ 85 (defining time eras).

157. With respect to the issuance of *multiple* tinted windows tickets in a single stop:

a) From January to June 2012, there were only 110 incidents in which more than one tinted windows ticket was issued. Ex. 262, Summary of Tinted Windows Incidents and Tickets.

b)  From January to June 2012, drivers from different racial groups received multiple tinted windows tickets at approximately the same 20-25% rate. Ex. 101, Bjerk Report, ¶ 295 & Table 14.

c)  From July 2012 to June 2015, the multiple tinted window rate exploded to almost 65% for Black and Latino motorists, as compared to just over 50% for other motorists. Ex. 101, Bjerk Report ¶¶ 85 (defining time eras), 295 & Table 14.

d)  The rates went to 90% and 75%, respectively, from July 2015 to January 2018. Ex. 101, Bjerk Report ¶¶ 85 (defining time eras), 295 & Table 14.

e)  The rates and racial differentials remained almost as high through 2019. Ex. 101, Bjerk Report ¶¶ 85 (defining time eras), 295 & Table 14.

f)  Black and Latino drivers were 10-12% more likely than other drivers to receive multiple tinted window tickets in stops in which at least one tinted windows ticket was issued. Ex. 101, Bjerk Report ¶¶ 295, 299 & Table 14.

g)  The racial disparities in multiple tinted windows ticketing were statistically significant at the 1% level. Ex. 101, Bjerk Report ¶ 299 & Table 14.

h)  There is no race-neutral explanation for the racial disparities in multiple tinted windows ticketing. Ex. 101, Bjerk Report ¶¶ 151, 293-95.

i)  It is unlikely that driver behavior changed significantly between 2012 and 2016. Ex. 101, Bjerk Report ¶ 295; Ex. 2, Banks Sept. 27, 2024 Dep. at 167:7-22 (change in ticketing windows ticketing patterns over time "cannot be explained by a change in the underlying infraction rate").

j)  Almost every car that is eligible for one tinted window citation should be eligible for multiple tinted window citations. Ex. 101, Bjerk Report ¶ 293.

k)  No evidence suggests that, among drivers who tint their windows, non-Black and/or Latino drivers are more likely than Black and/or Latino drivers to tint only one window. Ex. 101, Bjerk Report ¶¶ 151, 293-95.

l)  It would be very odd for a driver of any race to tint only one window. Ex. 101, Bjerk Report ¶¶ 151, 293-95.

m)  Defendant's statistical expert, Dr. David Banks, could not identify flaws in the assumptions underlying Dr. Bjerk's conclusions with respect to multiple tinted windows ticketing. Ex. 2, Banks Sept. 27, 2024 Dep. at 158:15-160:21, 167:7-22; Ex. 13, Banks Report.

158.  As to multiple ticketing in general (for all types of tickets, not restricted to tinted windows):

a)  Black and Latino drivers were 10-20% more likely than other drivers to receive multiple tickets in a single stop. Ex. 101, Bjerk Report ¶¶ 290-92 & Table 13.

b) The disparities in multiple ticketing rates are statistically significant at the 0.01 level. Ex. 101, Bjerk Report ¶¶ 290-92 & Table 13.

159. As to BPD's choice of Checkpoint locations (Ex. 101, Bjerk Report ¶¶ 158-64, 311-31):

a) From January 2013 to June 2017, BPD placed 1201 Checkpoints wholly within "High Minority" neighborhoods (>60% Minorities) and only 131 within "Low Minority" neighborhoods (<40% Minorities). Ex. 403, Krugman Class Cert. Decl. ¶ 67 (columns 1.00 and 3.00).

b) The BPD overwhelmingly located checkpoints in Black and Latino neighborhoods compared to other neighborhoods. Ex. 101, Bjerk Report ¶ 311.

c) High-Minority tracts experienced over 33 more checkpoints each than would be predicted by how such checkpoints were allocated in Low-Minority tracts. Ex. 101, Bjerk Report ¶ 322 & Table 18.

d) The average number of Checkpoints in each High-Minority HVC tract was over seven times higher than in each Low Minority HVC tract. Ex. 101, Bjerk Report ¶ 319 & Table 17.

e) Race was a much stronger predictor of Checkpoint location than violent crime rates. Ex. 101, Bjerk Report ¶ 316.

160. Accident rates did not predict Checkpoint locations at all. Ex. 101, Bjerk Report ¶¶ 321, 331, & Table 18.

161. Differences in population size, crime rates, and accident rates could not explain the disparity in Checkpoint locations. Ex. 101, Bjerk Report ¶¶ 34, 331.

162. Excluding the period from July to October, 2017, Bjerk's Checkpoint findings are statistically significant at the 1% level. Ex. 101, Bjerk Report Table 17 (differences column), Table 18 (bottom panel "High Minority"), Table 19 (right-hand column, p-value = 0.000).

163. As to the period July-October 2017, Bjerk found markedly different behavior from that reflected in the period through July 2017. Ex. 101, Bjerk Report ¶¶ 317, 324, 329.

164. Until the July 2017 Buffalo Common Council Resolution that raised concerns about racial discrimination with respect to the use of checkpoints, the BPD located far more checkpoints in neighborhoods with a high Minority make- up than neighborhoods with low levels of Minorities. These discrepancies cannot be fully explained by differences in the rates at which criminal incidents or traffic accidents occurred between High-Minority neighborhoods and Low-Minority neighborhoods. Ex. 101, Bjerk Report ¶ 331.

165. From July 2012 through February 2020, there were 41,749 tinted windows citations where race could be determined, 36,264 of which—*86.9%*—went to minorities. Ex. 262, Krugman Class Cert. Decl. Exhibit 13.

### G.    Policymaker Admissions of Racial Discrimination

166.    In 2020, Mayor Brown reported to the Menino Survey of Mayors that police treatment of white people in his city is "somewhat better" than police treatment of Black people. Ex. 18, Brown 2020 Menino Survey of Mayors Responses at 19, 34.

167.    Mayor Brown also reported to the Menino Survey of Mayors that "racism on the police force" had contributed "[a] moderate amount" to police violence in his city. Ex. 18, Brown 2020 Menino Survey of Mayors Responses at 20, 35.

168.    At a community meeting on July 10, 2019, held in response to a recent shooting, D District Chief Barba stated that the BPD had disbanded the Strike Force because of racial profiling. Hall Decl. ¶ 19.

### H.    Use of Racial Slurs and Stereotypes within the BPD

169.    In 2022, BPD Captain Amber Beyer used the n-word and launched a racist rant in front of her subordinate team members. Ex. 102, Gennaco Report at 21; Ex. 34, COB-Hodgson_0013506 at 6-7, 12-21; Ex. 39, COB-Hodgson_01246-04422, at 8-9, 13-21, 63-64, 67-68.

170.    Former BPD Lieutenant Thomas Whelan used the n-word as a Lieutenant. Ex. 46, Whelan June 8, 2022 Dep. at 378:23-379:12.

171.    Whelan supervised the Strike Force and administered Checkpoints from 2013–2016. Ex. 45, Whelan April 26, 2022 Dep. at 39:16-21, 41:15-22, 45:16-18.

172.    Whelan found use of the n-word "unavoidable" and in some cases "acceptable" and "effective" in gaining compliance. Ex. 46, Whelan June 8, 2022 Dep. at 371:4-373:23, 403:11-19.

173.    BPD officers used the n-word at events where BPD Captains were present. Ex. 46, Whelan June 8, 2022 Dep. at 368:5-14, 370:9-12381:6-20.

174.    Whelan never reported anyone for using racial slurs, despite BPD rules requiring such reporting. Ex. 46, Whelan June 8, 2022 Dep. at 375:6-14, 401:3-402:21; Ex. 102, Gennaco Report at 99; Ex. 105, BPD MoP Ch. 15 § 1.7.

175.    Whelan could not recall any BPD officer being disciplined for use of the n-word. Ex. 45, Whelan Apr. 26, 2022 Dep. at 139:6-13; Ex. 102, Gennaco Report at 99.

176.    "When supervisors ignore misconduct that is occurring in their presence, it sends a message to line officers that the 'rules' do not really apply or at least that there will be no consequences for failing to follow them" and can lead to "a broken system of accountability and professionalism." Ex. 102, Gennaco Report at 101.

177.    BPD Commissioner Daniel Derenda used the terms "gangbanger" and "thug" to refer to young Black men within the BPD and publicly. IAD Witness Decl. ¶ 8; Ex. 41, Aaron

Lowinger, *The Arthur Jordan Case: Free Speech, Privacy, and the Police*, THE PUBLIC (Dec. 26, 2023), at 2, www.dailypublic.com/articles/12142016/arthur-jordan-case-free-speech-privacy-and-police.

178.    The BPD used the terms "gang[]banger," "thug," and "thug life" in its GIVE documents and reports. Ex. 49, COB052805 at 3; Ex. 224, COB640015 at 2.

179.    BPD officers and supervisors, including former Internal Affairs Chief Harold McLellan and Community Policing Lieutenant Steve Nichols, have used derogatory language, including the words "ghetto," "baby daddy," and "baby mama," at times explicitly referring to Black people and Buffalo residents. IAD Witness Decl. ¶ 8; Ex. 321, COB056309; Ex. 46, Whelan June 8, 2022 Dep. at 376:6-12; Ex. 26, McLellan Sept. 11, 2023 Dep. at 324:11-328:18; Ex. 21, Hy July 19, 2023 Dep. at 246:11-13, 247:4-248:3; Ex. 1, Acquino Sept. 5, 2023 Dep. at 137:10-15; Ex. 322, BLRR-00000001 at 6; Ex. 323, Letter from Tyler Nims, Chief, Law Enf't Misconduct Investigative Office, New York State Office of the Att'y Gen., to Joseph Gramaglia, BPD Comm'r, at 8-9 (Dec. 28, 2023).

180.    BPD Chief Brian Patterson used "thug" in an email to all Lieutenants to describe who they should target in a traffic enforcement detail, stating that they should "[u]se vehicle and traffic stops to find and confiscate weapons used by gangs and thugs." Ex. 324, COB459664.

181.    Some BPD officers did not consider these terms offensive. Ex. 46, Whelan June 8, 2022 Dep. at 376:6-12; Ex. 21, Hy July 19, 2023 Dep. at 244:21-245:1, 246:21-247:21.

182.    Both former Internal Affairs Directors sent or received and did not report emails containing derogatory racial stereotypes. Ex. 102, Gennaco Report at 100-01; Ex. 37, Rosenswie Oct. 2, 2023 Dep. at 310:7-311:17; Ex. 26, McLellan Sept. 11, 2023 Dep. at 324:11-328:18; Ex. 87, McLellan Sept. 11, 2023 Dep. Exhibit 24.

183.    Former Internal Affairs Inspector Harold McLellan forwarded an email to Training Captain Patrick Mann, Chief of Detectives Dennis Richards, and Captain Mark Markowski containing coded racist stereotypes, including "[t]hugs will always use their momma's address," "[a] thug will always be a thug," "[w]omen that are receiving government assistance are very fertile," and "[n]o matter how fair you are, cops will always be viewed as racist." Ex. 26, McLellan Sept. 11, 2023 Dep. at 324:11-328:18; Ex. 26, McLellan Sept. 11, 2023 Dep. Exhibit 24.

184.    Former Internal Affairs Inspector Rosenswie received an email from an officer that contained derogatory racial stereotypes about Muslims "grow[ing] poppies," "hav[ing] more wives than teeth," "own[ing] a $3,000 machine gun and $5,000 rocket launcher and ammo, but [not being able to] afford shoes," and "refin[ing] heroin." Ex. 37, Rosenswie Oct. 2, 2023 Dep. at 310:7-311:17; Ex. 325, COB406111; Ex. 102, Gennaco Report at 100-01.

185.    The "examples of bias in these emails [are] part of a broader pattern at the BPD of applying negative racial stereotypes, rather than facts, to explain complaints about the harm Black and Latino residents experience in Buffalo." Ex. 102, Gennaco Report at 101.

186.  In 2022, BPD Captain Beyer used the n-word and launched a racist rant in front of her subordinate team members. Ex. 39, COB-Hodgson_01246-04422 at 8, 63-64; Ex. 102, Gennaco Report at 21-22 & Appendix C.

187.  Beyer stated: "White [o]fficers get PTSD from working in Black neighborhoods—like the East Side of Buffalo—but Black officers do not because they are used to violence and Black people commit more violent crime than White people." Ex. 39, COB-Hodgson_01246-04422 at 63-64.

188.  "If she saw a Black man in her neighborhood, she would be suspicious." Ex. 39, COB-Hodgson_01246-04422 at 63-64.

189.  The officers should "try hard to understand why people are racist, and that the criminality of Black people justified some racism." Ex. 39, COB-Hodgson_01246-04422 at 63-64.

190.  For example, "[i]f a White person is robbed by a Black person . . . it would be logical for that White person to have racist views." Ex. 39, COB-Hodgson_01246-04422 at 63-64.

191.  "Black men cheat . . . more than White men," and that "[a]ll the Black police officers she knows are unfaithful." Ex. 39, COB-Hodgson_01246-04422 at 63-64.

192.  During an IAD investigation of her use of the n-word, Beyer explained: BPD officers who work on the East Side "start to think that all [B]lack people have guns or all [B]lack people commit crimes which it[']s not appropriate for them to think that that's just what happens with this job." Ex. 34, COB-Hodgson_0013506 at 52.

193.  Gramaglia denied she was racial stereotyping and instead defended her statement by saying she heard these things from individuals that work in predominantly minority districts where there is a "propensity for gun violence." Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 322:7-21.

194.  Black officers who heard Beyer's rant expressed that they were "used to [racism] in this department" and "[t]his is not the first" time "racial things have been said"; instead, it was "the icing on the cake." Ex. 34, COB-Hodgson_0013506 at 18, 20.

195.  The racist stereotype that "Black and Latino residents are presumptive criminals" was "simply part of the culture of the BPD." IAD Witness Decl. ¶ 18.

**I.  The BPD's Deliberate Indifference to Complaints of Racial Discrimination and Failure to Monitor, Supervise, Investigate, Train, and Discipline Creates an Inference of Discriminatory Intent**

196.  From 2014 to the present, the City has received a steady stream of complaints and protests from the public—via town halls, forums, academic and institutional reports, clergy, Buffalo's own advisory boards, and the media—that BPD officers were and are engaging in racially discriminatory policing and traffic enforcement. Ex. 102, Gennaco Report at 15-19; Ex. 103, Silverman Report at 30-31; Hall Decl. ¶¶ 6-7, 16-17, 19-20, 22; Ex. 267, COB237562; Ex. 268, COB237565; Ex. 326, COB464814; Ex. 327, COB464816 at 6-10;

Ex. 266, COB278415; Ex. 328, COB371356; Ex. 329, Plaintiffs_Generic-00004868 at 57; Ex. 330, Plaintiffs_Generic-00004772 at 37; *see generally,* Ex. 270, Plaintiffs_Generic-00002698.

197. From 2012 to the present, at least 123 people filed 126 complaints to Internal Affairs alleging racial discrimination, 84 of which were in the context of traffic enforcement. Gennaco based his report on a review of 73 racial bias complaints from January 2013 through March 2024. 37 of these complaints plausibly allege racially discriminatory traffic enforcement prior to June 2018. *See* Ex. 102, Gennaco Report at Appendix. C; Perera Decl.

198. Within the last year, complaints from the public about racial profiling and slurs have not abated. *See* Ex. 332, COB-Hodgson_0054048 at 9 (allegation that officer said "black fuck"); Ex. 333, COB-Hodgson_0054158 at 33-36 (racial profiling); Ex. 334, COB-Hodgson_0054815; Ex. 335, COB-Hodgson_0054821 (racial profiling).

199. In recent years, at least 40 individuals have filed lawsuits and/or notices of claim against the BPD, many alleging that BPD engaged in civil rights violations, including racial bias. *See* Ex. 336, COB-Hodgson_0052190; Ex. 337, COB-Hodgson_0017566.

200. At least 14 of these lawsuits or notices of claims have included allegations that involve racially biased conduct, 11 of which were in the context of traffic stops. *See* Ex. 338, COB559604 at 4; Ex. 340, COB-Hodgson_01493 at 7; Ex. 341, COB-Hodgson_0030499; Ex. 342, COB329949;  Ex. 343, COB-Hodgson_0030418; Ex. 344, COB-Hodgson_0045010; Ex. 345, COB-Hodgson_0051712; Ex. 346, COB-Hodgson_0051708; Ex. 347, COB-Hodgson_0052766; Ex. 348, COB-Hodgson_0053135; Ex. 349, COB-Hodgson_0053039; Ex. 350, COB-Hodgson_0043286; Ex. 351, COB-Hodgson_0044983; Ex. 352, COB-Hodgson_0053434; Ex. 353, Amended Complaint, *Hawkins et. al. v. City of Buffalo et. al*, No. 22-cv-905, ECF 43 (Jan. 23, 2025); Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF 1 (W.D.N Y. July 31, 2020).

201. The City has paid out more than $6.9 million to settle civil rights cases involving police misconduct since 2015, including at least three cases involving racial bias. Ex. 354, COB-Hodgson_0045080 at 1-2; Ex. 355, Dec. 28, 2021 Buffalo Common Council Minutes at 11, 12; Ex. 356, May 11, 2021 Buffalo Common Council Minutes at 14; Ex. 357, Plaintiffs_Generic-00025905.

202. Since 2013, at least 30 people have filed Commission on Citizens' Rights and Community Relations (CCRCR) complaints against the BPD. Ex. 358, COB041169 at 1-2; Ex. 359, COB041108 at 6-7; Ex. 360, COB041345 at 11-12; Ex. 361, COB041179 at 14-16; Ex. 362, COB041128 at 1-2; Ex. 363, COB-Hodgson_0018249 at 3-5; Ex. 364, COB-Hodgson_0018241 at 3-4; Ex. 365, COB041094 at 4-7; Ex. 366, COB041177 at 1-2; Ex. 367, COB041311 at 1-5; Ex. 368, COB041220 at 2-4; Ex. 369, COB041217 at 1-2; Ex. 370, COB041366 at 25-27; Ex. 371, COB041226 at 2-3; Ex. 372, COB041202 at 1-3; Ex. 373, COB041175 at 1-2; Ex. 374, COB012178; Ex. 375, COB041166 at 1-3; Ex. 376, COB-HODGSON_0018257 at 5-8; Ex. 377, COB041136 at 1-2; Ex. 378, COB041141 at 1-2; Ex. 379, COB012769; Ex. 380, COB429220 at 1-2; Ex. 333, COB-Hodgson_0054158 at 5-8; Ex. 381, COB-Hodgson_0054878 at 20-21;  Ex. 382, COB075351 at 13.

203.  The CCRCR is a commission that is supposed to provide oversight over discrimination by City agencies, including the police. Ex. 102, Gennaco Report at 120; Ex. 382, Whitaker Feb. 8, 2024 30(b)(6) Dep. Exhibit 54.

204.  The CCRCR is an all-volunteer commission appointed by the Mayor. Ex. 102, Gennaco Report at 121; Ex. 382, Whitaker Feb. 8, 2024 30(b)(6) Dep. Exhibit 54.

205.  However, the CCRCR "has no power" and "does not have the authority to investigate" complaints, and therefore "cannot serve as a meaningful check on BPD . . . [or] address in any meaningful way complaints about bias-based policing." Ex. 102, Gennaco Report at 122; Hall Decl. ¶¶ 6, 16.

206.  "Despite the ineffectiveness of this Commission and repeated proposals and calls by Common Council members, the Police Advisory Board, and other organizations, Mayor Brown and Police Commissioner Gramaglia continue to oppose any form of civilian oversight into the BPD's disciplinary process . . . and Commissioner Gramaglia recently asserted that it is impossible for civilians to evaluate police, a stance which departs from practices throughout the country and New York State." Ex. 102, Gennaco Report at 121-22; Hall Decl. ¶¶ 20-21.

207.  In recent years, several judicial decisions have found that BPD officers engaged in unconstitutional traffic enforcement. *See* Ex. 102, Gennaco Report at 35-36.

208.  Three successive BPD Commissioners maintained that they could not and cannot address racial discrimination other than by investigating individual IAD complaints. Ex. 102, Gennaco Report at 119; Ex. 8, Derenda Dec. 23, 2021 Dep. at 293:16-294:9; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 38:6-15, 119:4-17, 206:8-207:10; Ex. 23, Lockwood Aug. 17, 2023 Dep. at 230:15-231:12.

209.  The BPD has "inadequate and deficient [IA] practices, policies, and procedures that frequently depart from accepted standards and are indicative of an environment that disregards concerns about racially biased policing." Ex. 102, Gennaco Report at 6; Ex. 14, Gennaco Oct. 4, 2024 Dep. at 72:4-18.

210.  The City had the "worst" and most "deficient" complaint investigation practices Gennaco had ever seen. Ex. 14, Gennaco Oct. 4, 2024 Dep. at 72:15-73:23.

211.  The BPD "has uniformly failed to conduct effective and objective investigations." Ex. 102, Gennaco Report at 8; Ex. 14, Gennaco Oct. 4, 2024 Dep. at 72:4-18.

212.  The BPD's ineffective investigative process "prevents the BPD from identifying and taking effective remedial action to address racially biased policing." Ex. 102, Gennaco Report at 7.

213.  "Without a functioning investigative process, instances of biased policing cannot be identified, and effective remedial action cannot occur." Ex. 102, Gennaco Report at 23.

214. The BPD's practices and "inadequate complaint investigation and supervision systems that fall below generally accepted practices[] create an institutional culture whereby officers can engage in biased traffic enforcement with little concern for detection[,] . . . perpetuating the risk of racially biased misconduct and eroding public trust in the BPD." Ex. 102, Gennaco Report at 14.

215. The BPD has never issued formal discipline against an officer for engaging in racially discriminatory policing, for failing to treat civilians with courtesy and respect, nor for not recording the race of people given stop receipts. Ex. 102, Gennaco Report at 10, 84, 92 & Appendix C; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 232:18-233:14; Ex. 16, Gramaglia Jan. 24, 2024 30(b)(6) Dep. at 163:19-23; Ex. 23, Lockwood Aug. 17, 2023 Dep. at 256:2-19, 258:5-14; Ex. 46, Whelan June 8, 2022 Dep. at 400:11-16.

216. All of the above conduct violates the Manual of Procedures, including the Traffic Enforcement Policy, and therefore could form the basis for discipline. *See* Ex. 158, COB-Hodgson_00093; Ex. 105, BPD MoP Ch. 15 § 1.7, Ch. 16 § 1.1; Ex. 102, Gennaco Report at 116-17.

217. The IAD Witness managed over 600 complaints over 12 years under BPD Commissioners Derenda, Lockwood, and Gramaglia. IAD Witness Decl. ¶¶ 4, 23.

218. The IAD witness joined the force just as the consent decree ended and observed how this led the BPD to shift back to being a predominantly white workforce. IAD Witness Decl. ¶ 6.

219. The IAD witness observed openly racist white supervisors and officers who harassed Black officers and treated "Black community members like presumptive criminals, without showing them humanity and respect." IAD Witness Decl. ¶¶ 6-7.

220. The IAD witness experienced the harassment too: a B District Lieutenant nicknamed and called her "Kizzy," after a runaway slave girl in Roots. IAD Witness Decl. ¶ 8.

221. "Many Black and Latino complainants alleged that BPD officers treated them like criminals" during traffic stops, and "presumed they had guns, drugs, and warrants without any justification." IAD Witness Decl. ¶¶ 9, 17-20, 24.

222. As the BPD escalated its pretext policing directives and stops to investigate Black and Latino motorists, so did complaints to BPD Commissioners about such stops, although discipline was rare.  IAD Witness Decl. ¶¶ 17-18.

223. Almost all of the IAD complaints the BPD receives alleging abusive treatment by BPD officers and officer misconduct during traffic stops, vehicle searches, traffic and non-traffic arrests, and impounds come from Black and Latino complainants. IAD Witness Decl. ¶ 24.

224. The Commissioners "rarely" imposed discipline on officers for the complaints against them. IAD Witness Decl. ¶¶ 9-10, 18, 22, 24, 25.

225. Instead, the Commissioners "err[ed] on the side of officers" and dismissed cases regardless of "clear [and] indisputable evidence of white officers engaging in misconduct against Black IAD complainants" and "rarely, if ever, held officers accountable for engaging in racial bias or misconduct." IAD Witness Decl. ¶¶ 25-26.

226. "The BPD Commissioners' failure to impose discipline allowed officer misconduct to continue without consequences," leading to "repeat civilian complaints" and officers who were "frequent flyers" IAD Witness Decl. ¶¶ 24-27.

227. In December 2023, the New York State Attorney General's Chief of the Law Enforcement Misconduct Investigative Office found that BPD Officer Davon Ottey engaged in a pattern of civil rights violations where he "repeatedly escalated . . . ordinary traffic stops involving minor VTL violations into unlawful seizures and the unnecessary use of force," for which the BPD did not impose proper discipline. Ex. 323, Letter from Tyler Nims, Chief, Law Enf't Misconduct Investigative Office, New York State Office of the Att'y Gen., to Joseph Gramaglia, BPD Comm'r at 10 (Dec. 28, 2023).

228. The BPD has not conducted performance evaluations of its officers. Ex. 102, Gennaco Report at 108; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 182:15-183:1; Ex. 21, Hy July 19, 2023 Dep. at 191:21-192:1; Ex. 35, Roberts Apr. 20, 2022 Dep. at 131:8-10; Ex. 37, Rosenswie Oct. 2, 2023 Dep. at 80:7-9, 95:2-5; Ex. 40, Serafini Dec. 27, 2021 Dep. at 63:1-10; Ex. 45, Whelan Apr. 26, 2022 Dep. at 68:22-69:10.

229. The BPD has repeatedly promoted officers despite extensive complaints about racial bias or other misconduct, including Officers Michael Acquino, Charles Miller, Justin Tedesco, Robbin Thomas, and Richard Hy. Ex. 102, Gennaco Report at 12, 110; Ex. 23, Lockwood Aug. 17, 2023 Dep. at 251:4-252:14.

230. "By failing to seriously consider officers' complaint and disciplinary history around bias, BPD runs the risk of elevating officers who will model and allow racially discriminatory policing." Ex. 102, Gennaco Report at 110.

231. The City has enacted policies requiring officers to issue stop receipts and fix it tickets. Ex. 102, Gennaco Report at 106-07, 116-18.

232. However, the City has failed to train officers on stop receipts and fix it tickets policies, ensure compliance, or audit stop receipt data for patterns indicative of discrimination, departing from accepted practices. Ex. 102, Gennaco Report, at 106-07, 117-18; Ex. 27, Miller June 2, 2023 Dep. at 323:7-9, 324:8-325:1.

233. While Buffalo policies specify that BPD is required to issue fix-it tickets to help alleviate the financial burden of Buffalo citizens, Gramaglia testified the BPD plays no role in issuing tickets. Ex. 102, Gennaco Report at 106-07; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 80:4-81:2.

234. Based on available data after 2020, officers did not enter a race on the stop receipts 20% of the time. Ex. 101, Bjerk Report ¶ 300; Ex. 16, Gramaglia Jan. 24, 2024 30(b)(6) Dep. at 158:3-11.

235.  Some BPD Lieutenants and officers did not routinely issue Stop Receipts or monitor offic-
      ers under their supervision to issue stop receipts. *See* Ex. 27, Miller June 2, 2023 Dep. at
      321:23-322:7, 322:16-323:6; Ex. 21, Hy July 19, 2023 Dep. at 176:20-177:5.

236.  The Commissioners rarely sanctioned officers for racial profiling, leading to numerous re-
      peat offenders. IAD Witness Decl. ¶¶ 25-27.

237.  The Buffalo Police Advisory Board conducted numerous hearings and issued a report con-
      cerning racism and white supremacy within the BPD. *See, e.g.*, Ex. 102, Gennaco Report
      at 16 & § I.B; *see* Ex. 383, COB214284.

**J.    The Well-Documented History of Intentional Racial Discrimination by the
        City of Buffalo**

238.  Black communities in the City of Buffalo have faced a history of discriminatory policing.
      Ex. 103, Am. Silverman Report at 24-33.

239.  The City of Buffalo's policies contributed to segregation in housing on the East Side. Ex.
      103, Am. Silverman Report at 6-11; *see also* Ex. 384, Plaintiffs_Generic-00004583 at 3
      (noting how the Buffalo's construction of public housing on the East Side displaced hun-
      dreds of residents).

240.  The City of Buffalo's policies also contributed to segregation in education on the East Side.
      Ex. 103, Am. Silverman Report at 12-17.

241.  The City's policies in education and housing led to significant inequalities in income and
      poverty, economic distress, education, access to jobs, opportunities, unemployment, food
      deserts, and targeted, disproportionate policing, ticketing, and arrests for Black Buffalo
      residents, which has entrenched poverty on the East Side. Ex. 103, Am. Silverman Report
      at 6-17, 19, 20; *see also* Ex. 327, COB464816 at 9-10.

242.  Historically, the only way that the City of Buffalo's discrimination has been remedied was
      through court intervention and monitoring. Ex. 103, Am. Silverman Report at 34-37.

243.  Even with court intervention and monitoring, the City has resisted efforts to change its
      discriminatory practices and policies. Ex. 103, Am. Silverman Report at 34-36.

244.  In 1967, Black Buffalo residents engaged in an uprising to protest the Buffalo Police De-
      partments' widespread racially discriminatory and often unjustified stops, searches, and
      detentions targeting the Black community, derogatory language and slurs (including use of
      the "n word" and "boy"), stereotyped perceptions of black people, and an absence of ac-
      countability mechanisms or discipline. Ex. 103, Am. Silverman Report at 25-27.

245.  The 1967 protest led to a class action lawsuit challenging widespread discriminatory po-
      licing practices. Ex. 103, Am. Silverman Report at 25-27.

246. In 1971, the Second Circuit reversed the district court's dismissal of those claims against the BPD. Ex. 103, Am. Silverman Report at 27 (citing *BUILD of Buffalo, Inc. v. Sedita*, 441 F.2d 284 (2d Cir. 1971)).

247. The Department of Justice brought a lawsuit shortly after the *BUILD of Buffalo* case settled. Ex. 103, Am. Silverman Report at 27 (citing *United States v. City of Buffalo*, 457 F. Supp. 612 (W.D.N.Y. 1978)).

248. The Department of Justice's case successfully established widespread racially discriminatory practices within the BPD, including the use of slurs and stereotypes and evidence of white officers engaging in race-based stops of Black officers and civilians. Ex. 103, Am. Silverman Report at 27-29.

249. The BPD "hid[] behind a paper policy of racial tolerance" and did not take steps to address complaints. Ex. 103, Am. Silverman Report at 28-29.

250. The Court ordered remedies and court supervision for the City of Buffalo. Ex. 103, Am. Silverman Report at 29.

251. The City's patterns of racially discriminatory policing, both in and outside of the East Side, continued despite the lawsuits addressing those concerns. Ex. 103, Am. Silverman Report at 29-31.

252. The BPD engaged in traffic stops based on racial stereotypes of Black residents on the East Side of Buffalo as an "everyday practice." Ex. 103, Am. Silverman Report at 30; IAD Witness Decl. ¶¶ 12, 35.

253. Even former Police Chief, H. McCarthy Gipson, a Black man, described that he was frequently pulled over for "driving while Black." Ex. 103, Am. Silverman Report at 30.

254. When the IAD Witness worked in the A District in 1996-97, the witness was assigned to desk duty for six months for writing tickets to the "wrong people"—i.e. white people. IAD Witness Decl. ¶ 36.

255. The BPD's practices have resulted in deep levels of distrust of the police by the Black community into the last decade, when the BPD was conducting checkpoints. Ex. 103, Am. Silverman Report at 30-31.

### K.    Intentional Discrimination Related to Checkpoints

256. In 2013 and 2014, Derenda specifically directed the Strike Force to patrol the Juneteenth Festival. Ex. 385, COB016023; Ex. 386, COB015968; Ex. 8, Derenda Dec. 23, 2021 Dep. at 276:18-277:1, 323:8-15.

257. In 2013, Derenda specifically directed the Strike Force to patrol the Gus Macker Basketball Tournament. Ex. 385, COB016023; Ex. 8, Derenda Dec. 23, 2021 Dep. at 277:2-6.

258.   Both the Gus Macker Basketball Tournament and Juneteenth Festival are heavily attended by Black people. Ex. 8, Derenda Dec. 23, 2021 Dep. at 276:2-17; Ex. 387, Emma Sapong, *Community groups look for ways to fill void left by loss of Macker basketball tourney*, BUFFALO NEWS (June 1, 2025), https://buffalonews.com/news/local/article_8bb2a7ce-565e-554a-a7d6-1ae45a83f6cf.html.

259.   In the City's request for GIVE funds, the BPD described the Gus Macker Basketball Tournament and Juneteenth Festival events as "susceptible to gang activity," without providing additional explanation to justify this conclusion. Ex. 388, COB463230 at 13.

260.   Chief Patterson created a "Gus Macker Tournament Gang Interdiction Strategy" with the stated goals "to prevent gang fights" and "proactively look[] for gang buildup," with no stated basis for suspecting gang activity. Ex. 389, COB341331; Ex. 390, COB344045.

261.   Derenda did not assign the Strike Force to festivals primarily attended by white or mixed-race residents, including Dingus Day (Polish), July 4th, or St. Patrick's Day. Ex. 8, Derenda Dec. 23, 2021 Dep. at 319:2-326:1; Ex. 64, Derenda Dec. 23, 2021 Dep. Exhibit 47.

262.   St. Patrick's Day generated "numerous issues" including "drinking, fights, all kinds of things." Ex. 8, Derenda Dec. 23, 2021 Dep. at 320:17-19, 322:9-11.

263.   Derenda also did not assign Strike Force to other events that the BPD considered security risks, including First Night (New Year's Eve Ball Drop), Allentown Arts Festival, and Taste of Buffalo. Ex. 238, COB_INC_00000044 at 9; Ex. 64, Derenda Dec. 23, 2021 Dep. Exhibit 47.

264.   Chief Patterson requested eight officers to address "[g]ang violence" at the Kinfolk Soul Food Festival, without any stated basis. Ex. 391, COB340458.

265.   Kinfolk Soul Food Festival is a national food festival intended to provide the public with "life changing knowledge" about health, family intervention, financial literacy, and workforce development. Ex. 392, COB340459 at 5.

266.   The City received multiple complaints about Checkpoints. *See, e.g.*, Ex. 102, Gennaco Report Appendix C at 8, 12-13; Ex. 6, Brown Nov. 6, 2023 Dep. at 214:1-215:4; Ex. 55, Brown Nov. 6, 2023 Dep. Exhibit 16; Ex. 393, COB221459.

267.   There was a City-sponsored community forum on December 16, 2014 at Mt. Olive Baptist Church. Ex. 65, COB266951 at 2.

268.   A Black resident at the forum asked: "[W]hy does it seem that police checks happen only in [B]lack neighborhoods and rarely in white neighborhoods? What efforts will you make to make sure that police checks happen in all neighborhoods equally?" Ex. 8, Derenda Dec. 23, 2021 Dep. at 308:3-7; Ex. 65, COB266951 at 10.

269.   Derenda responded: "Whether they were in white neighborhoods or [B]lack neighborhoods, the residents generally wanted us to be there and liked us being there. The criminal element did not." Ex. 8, Derenda Dec. 23, 2021 Dep. at 308:8-14.

270.   Lieutenant Whelan knew that Black members of the community were angry about Checkpoints. Ex. 45, Whelan Apr. 26, 2022 Dep. at 129:9-13.

271.   Whelan dismissed their concerns: "I think some of the loudest people were the people who ended up going to jail or their family members." Ex. 45, Whelan Apr. 26, 2022 Dep. at 129:9-20.

272.   Whelan admitted that he did not have a basis for thinking people who complained about Checkpoints were "people who ended up going to jail or their family members." Ex. 45, Whelan Apr. 26, 2022 Dep. at 130:11-17.

273.   Whelan primarily worked in Black neighborhoods. Ex. 45, Whelan Apr. 26, 2022 Dep. at 133:15-16.

274.   After initially claiming that he "wouldn't know" the race of people who complained to him on the street about Checkpoints, Whelan conceded that most complainants were Black. Ex. 45, Whelan Apr. 26, 2022 Dep. at 133:10-134:2.

275.   Captain Roberts derided complainants as people who "lacked a great deal of personal responsibility" such as "a career criminal, smoking crack." Ex. 35, Roberts Apr. 20, 2022 Dep. at 154:8-16.

276.   By assuming complainants must be criminals and summarily dismissing their allegations of discrimination, the BPD "does not just depart from accepted practices, but also both models and exacerbates racial bias within the Police Department." Ex. 102, Gennaco Report at 19.

277.   In the Spring and Summer of 2017, in the midst of the mayoral campaign, Mayor Brown received public criticism, highlighted in the media, about the Checkpoints' targeting of majority Black neighborhoods. Ex. 79, COB016339; Ex. 394, Lamonica Peters, *Are Buffalo Police Check Points Targeting the East Side*, SPECTRUM NEWS (June 23, 2017), https://spectrumlocalnews.com/nys/central-ny/news/2017/06/22/buffalo--east-side--dorethea-franklin--byron-brown--mayor--taniqua-simmons--mark-schroeder--betty-jean-grant--traffic--check-points--tickets--police; Ex. 395, Kelly Dudzik, *Buffalo Mayor answers questions about traffic checkpoints*, WGRZ (July 28, 2017), https://www.wgrz.com/article/news/local/buffalo-mayor-answers-questions-about-traffic-checkpoints/71-460311897; Ex. 396, Kelly Dudzik, *Getting answers about BPD checkpoints*, WGRZ (July 25, 2017), https://www.wgrz.com/article/news/getting-answers-about-bpd-checkpoints/71-459552430.

278.   During the 2017 mayoral primary campaign, political opponents to Mayor Brown argued in the news media and at mayoral debates that the Checkpoints were racially discriminatory. Ex. 79, COB016339; Ex. 394, Lamonica Peters, *Are Buffalo Police Check Points Targeting the East Side*, SPECTRUM NEWS (June 23, 2017), https://spectrumlocalnews.com/nys/central-ny/news/2017/06/22/buffalo--east-side--dorethea-franklin--byron-brown--mayor--taniqua-simmons--mark-schroeder--betty-jean-grant--traffic--check-points--tickets--police; Ex. 396, Kelly Dudzik, *Getting answers about BPD checkpoints*, WGRZ (July 25, 2017), https://www.wgrz.com/article/news/getting-answers-about-bpd-

checkpoints/71-459552430; *see also* Ex. 398, Video Interview, Lamonica Peters, *Are Buffalo Police Check Points Targeting the East Side*, SPECTRUM NEWS (June 23, 2017), https://spectrumlocalnews.com/nys/central-ny/news/2017/06/22/buffalo--east-side--dorethea-franklin--byron-brown--mayor--taniqua-simmons--mark-schroeder--betty-jean-grant--traffic--check-points--tickets--police; Ex. 519, Aug. 2017 Democratic Mayoral Debate (Aug. 7, 2017), https://www.wivb.com/news/watch-buffalo-mayoral-debate/; Ex. 399, Sept. 2017 Democratic Mayoral Debate (Sept. 6, 2017), https://www.wbfo.org/local/2017-09-06/watch-listen-democratic-primary-debate-forbuffalo.

279.  Mayor Brown told Spectrum News that the Checkpoints addressed "speeding vehicles" and vehicles "blowing through stop signs." Ex. 394, Lamonica Peters, *Are Buffalo Police Check Points Targeting the East Side*, SPECTRUM NEWS (June 23, 2017), https://spectrum-localnews.com/nys/central-ny/news/2017/06/22/buffalo--east-side--dorethea-franklin--byron-brown--mayor--taniqua-simmons--mark-schroeder--betty-jean-grant--traffic--check-points--tickets--police.

280.  However, Derenda testified that Checkpoints were not intended to and could not address speeding, stop sign, or red light violations. Ex. 7, Derenda Nov. 10, 2021 Dep. at 89:8-90:1.

281.  The City represented to the New York Attorney General that Checkpoint locations were based on accident data. Ex. 522, Derenda Dec. 23, 2021 Dep. Exhibit 68 at 5-6; Ex. 8, Derenda Dec. 23, 2021 Dep. at 366:18-367:3.

282.  The BPD did not use accident data to determine Checkpoint locations. Ex. 7, Derenda Nov. 10, 2021 Dep. at 88:14-17; Ex. 8, Derenda Dec. 23, 2021 Dep. at 365:15-18.

283.  The City did not disclose to the Attorney General that Checkpoint locations were based on crime control objectives. Ex. 8, Derenda Dec. 23, 2021 Dep. at 365:23-366:16; Ex. 522, Derenda Dec. 23, 2021 Dep. Exhibit 68.

284.  Defendants treated complaints about traffic safety from predominantly white areas differently than those from predominantly Black and Latino areas:

    a)  Parkside is in North Buffalo, a predominantly white neighborhood. Ex. 6, Brown Nov. 6, 2023 Dep. at 62:6-10; Ex. 45, Whelan Apr. 26, 2022 Dep. at 121:10-12.

    b)  In 2012, the BPD used "drug asset forfeiture money" to purchase "[r]adar signs to reduce speeding in neighbor[hood]s like Parkside" while he sent the Strike Force to the East Side. Ex. 400, COB060587 at 5.

    c)  In 2014 and 2015, Parkside residents (including the Parkside Community Association) repeatedly complained to Brown, Derenda, and D-District Captain Barba of "speeding, aggressive driving, and failure[s] to obey traffic lights and signs." Ex. 117, COB276276; Ex. 401, COB278537.

    d)  The complaints from Parkside were the types of complaints that Defendants claimed came from East Side block clubs, justifying Checkpoints. *See* Brown Nov.

6, 2023 Dep. at 61:8-62:10; ECF No. 252-45, Defs.' Stmt. of Undisputed Facts ¶¶ 22-23.

e)    Derenda responded to the complaints by directing officers to write more tickets, not set up Checkpoints. Ex. 401, COB278537.

f)    North Lincoln Parkway is also in North Buffalo, a predominantly white area of Buffalo. Ex. 45, Whelan Apr. 26, 2022 Dep. at 121:10-12; Ex. 120, COB263608 (North District Common Councilmember Golombek requesting traffic enforcement on North Lincoln Parkway).

g)    In 2014, Common Councilmember Golombek requested more traffic enforcement to curb speeding on North Lincoln Parkway. Ex. 120, COB263608.

h)    Derenda did not place a Checkpoint there and subject all the white residents to suspicionless stops but instead ordered increased ticketing. Ex. 120, COB263608; Ex. 255, Checkpoint Compilation.

285.    In 2015 and 2016, Brown disseminated false information about Checkpoint locations:

a)    In 2015, Brown told Spectrum News that Checkpoints occurred in all areas of the city. Ex. 394, Lamonica Peters, *Are Buffalo Police Check Points Targeting the East Side*, SPECTRUM NEWS (June 23, 2017), https://spectrumlocalnews.com/nys/central-ny/news/2017/06/22/buffalo--east-side--dorothea-franklin--byron-brown--mayor--taniqua-simmons--mark-schroeder--betty-jean-grant--traffic--check-points--tickets--police.

b)    In June 2016, at a Father's Day event, Brown again publicly stated that Checkpoints were "all over the city." Simmons Decl. ¶ 20.

c)    Before July 2017, "exceedingly few Checkpoints were set up in Low-Minority tracts, even Low-Minority tracts with relatively high rates of violent crime." Ex. 101, Bjerk Report ¶¶ 315-317 & Table 17.

d)    Prior to July 2017, the BPD ran "almost all" Checkpoints in High-Minority or Mixed-Race neighborhoods. Ex. 101, Bjerk Report ¶¶ 315-317 & Table 17.

e)    Of the 605 Checkpoints in 2015, 547 (90.4%) were in High Minority tracts (>60% Black and Latino). Ex. 255, Checkpoint Compilation; Ex. 523, Buffalo Census Tract_data.csv.

286.    Derenda and Brown actively concealed Checkpoint locations from the Common Council and the general public:

a)    On May 5, 2017, the Common Council emailed Derenda to request disclosure of checkpoint locations. Ex. 67, COB060322.

b)  Three days after the Common Council's email request for Checkpoints records, Captain Serafini emailed Derenda a list of Checkpoints conducted from January 1, 2017 to May 7, 2017. Ex. 68, COB041705 at 2-6.

c)  Derenda could not confirm that they provided the log of Checkpoints locations to the Council. Ex. 8, Derenda Dec. 23, 2021 Dep. at 339:6-14.

d)  On June 29, 2017, Lockwood ordered the Strike Force to conduct 21 Checkpoints per week, of which only four could take place on the East Side. Ex. 79, COB016339.

e)  On July 25, 2017, the Common Council passed a formal resolution demanding that the Commissioner disclose the "location, frequency, and results" of Checkpoints for the prior three years. Ex. 69, COB080149.

f)  The request for Checkpoint information was to ensure that the BPD's Checkpoints did not "disproportionately target certain neighborhoods." Ex. 69, COB080149.

g)  The BPD had records of the location and frequency of Checkpoints for the requested time period which would have revealed racial disparities in Checkpoint locations. Ex. 22, Lockwood Aug. 10, 2023 Dep. at 136:11-137:11; Ex. 80, COB251775.

h)  Derenda never gave the records to the Council. Ex. 8, Derenda Dec. 23, 2021 Dep. at 339:6-14.

287.  Derenda told the Council that he did not have information on Checkpoint "records" and agreed to provide data only going forward. Ex. 402, *Buffalo Common Council president calling for greater transparency about traffic stops*, WIVB 4 NEWS (Aug. 1, 2017), https://www.wivb.com/news/buffalo-common-council-president-calling-for-greater-transparency-about-traffic-stops/.

288.  The BPD provided the Checkpoint locations for the week of July 1-7, 2017, to the news media. Ex. 395, Kelly Dudzik, *Buffalo Mayor answers questions about traffic checkpoints*, WGRZ (July 28, 2017), https://www.wgrz.com/article/news/local/buffalo-mayor-answers-questions-about-traffic-checkpoints/71-460311897.

289.  Mayor Brown appeared on television to thank the reporter for "presenting the information that [the City] gave to [WGRZ News], to show [C]heckpoints are throughout the city." Ex. 395, Kelly Dudzik, *Buffalo Mayor answers questions about traffic checkpoints*, WGRZ (July 28, 2017), https://www.wgrz.com/article/news/local/buffalo-mayor-answers-questions-about-traffic-checkpoints/71-460311897.

290.  In August 2017, the BPD created a new "Checkpoint Tally Sheet" to record the results of the Checkpoints. Ex. 72, COB041731; *see* Ex. 81, COB003915.

291.  Derenda provided the newly created Tally Sheets for the period August 4 to September 20, 2017, to the Common Council. Ex. 81, COB003915.

292.    The percentage of Checkpoints in Black and Latino neighborhoods fell from 87.4% from the period immediately prior to March 2017 to only 26.4% after July 2017. Ex. 403, Krugman Class Cert. Decl. ¶ 67.

293.    A July 2016 article in *The Public* documented racial disparities in Checkpoint locations. Ex. 259, Aaron Lowinger & Justin Sondel, *Checkpoint: Buffalo Police Practices Questioned*, THE PUBLIC (July 13, 2016), http://www.dailypublic.com/articles/07132016/checkpointbuffalo-police-practices-questioned.

294.    The article quoted then-University of Buffalo Law Professor Anjana Malhotra. Ex. 259, Aaron Lowinger & Justin Sondel, *Checkpoint: Buffalo Police Practices Questioned*, THE PUBLIC (July 13, 2016), http://www.dailypublic.com/articles/07132016/checkpointbuffalo-police-practices-questioned.

295.    Brown reacted to the article by pressuring the University of Buffalo to modify the findings publicized by the article. Ex. 404, COB197376.

## L.    Intentional Discrimination Related to Multiple Tinted Windows Ticketing

296.    Commissioners Derenda and Lockwood knew about the BPD's multiple tinted windows ticketing practices. Ex. 7, Derenda Nov. 10, 2021 Dep. at 130:8-11; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 72:8-14.

297.    Derenda expected multiple ticketing to occur as a byproduct of his proactive policing policy. Ex. 7, Derenda Nov. 10, 2021 Dep. at 102:19-23, 127:5-10, 128:11-17.

298.    When asked at his deposition whether as Commissioner he took "any affirmative steps" to identify racial profiling among officers, Derenda testified that any steps "would have been based on complaints" and gave the example of "writing numerous tickets for one car for tinted windows." Ex. 8, Derenda Dec. 23, 2021 Dep. at 293:16-294:4.

299.    Derenda testified that BPD officers issued multiple tinted windows tickets in a single stop to "pad their numbers" and boost the appearance of productivity. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 281:7-11.

300.    Lockwood was "not a fan" of multiple tinted windows ticketing. Ex. 22, Lockwood Aug. 10, 2023 Dep. at 72:1-14.

301.    Derenda believed that officers should issue one tinted window ticket per stop. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 288:3-12.

302.    Commissioners Derenda and Lockwood affirmatively allowed multiple tinted windows ticketing to continue:

   a)    Derenda verbally instructed Strike Force Chief Aaron Young to ensure that officers issued only one tinted window ticket per stop. Ex. 7, Derenda Nov. 10, 2021 Dep. at 133:21-134:5; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 284:4-16.

b)    Chief Young testified that he did not recall discussing the tinted window policy change to one ticket per tinted window stop with Derenda nor issuing such an order. Ex. 50, Young Oct. 26, 2022 Dep. at 92:1-5.

c)    In March 2017, Captain Serafini directed Strike Force and Housing officers to issue two tinted windows tickets per stop. Ex. 405, COB016263.

d)    After Serafini's directive, officers continued issuing drivers up to four tinted windows tickets per stop. Ex. 403, Krugman Class Cert. Decl. ¶ 60.

e)    Officers either did not receive Derenda's message or viewed it as informal and thus nonbinding. *See, e.g.*, Ex. 21, Hy July 19, 2023 Dep. at 75:18-77:10; Ex. 27, Miller June 2, 2023 Dep. at 173:6-22; Ex. 44, Thomas Mar. 23, 2023 Dep. at 102:9-21; Ex. 47, Wigdorski May 24, 2023 Dep. at 74:4-20.

f)    Derenda did not ensure that officers followed his directive to only issue one ticket. Ex. 8, Derenda Dec. 23, 2021 Dep. at 248:1-249:21; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 286:8-21.

g)    Commissioner Lockwood did not instruct officers to stop the practice. Ex. 22, Lockwood Aug 10, 2023 Dep. at 72:15-19.

h)    Lockwood expressed to the Chief and Commissioner that the practice of multiple tinted windows tickets was unnecessary, but did not check whether the practice continued after expressing his dissatisfaction. Ex. 22, Lockwood Aug 10, 2023 Dep. at 72:17-19, 73:9-74:1.

i)    Lockwood allowed BPD officers to continue issuing multiple tinted windows tickets in a single stop because he believed "[i]t's part of the V&T so they can do it" and "it's part of their job." Ex. 22, Lockwood Aug 10, 2023 Dep. at 74:2-16.

j)    Lockwood, and his successor Gramaglia, allowed multiple ticketing of Black and Latino drivers to continue even after the practice was exposed in *The Buffalo News*, and after the filing of the Complaint and Amended Complaint in this matter, which detailed the racial disparities caused by the BPD's tinted windows ticketing practices. *See* ECF No. 252-2 ¶¶ 7-8; ECF No. 252-4 ¶¶ 8, 24, 111-16; *also* Ex. 524, Aaron Besecker, Buffalo's most issued traffic ticket is for tinted windows, BUF-FALO NEWS (May 13, 2019), at 2-4, https://buffalonews.com/news/local/buffalos-most-issued-traffic-ticket-is-for-tinted-windows/article_8f442207-b43f-5d62-bc3b-def1ac2cc2e6.html; Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 81:21-82:1; Ex. 23, Lockwood Aug. 17, 2023 Dep. at 220:4-12.

303.  The BPD received complaints from Black and Latino motorists about multiple tinted windows ticketing, which it did not address. IAD Witness Decl. ¶¶ 22, 37-38; Myree Decl. ¶¶ 18-22; Ex. 406, COB053610; Ex. 407, COB634588.

304.    Black motorists experienced multiple tinted windows ticketing as racially discriminatory. IAD Witness Decl. ¶¶ 22, 37-38; Myree Decl. ¶¶ 18-22; Palmer Decl. ¶¶ 14, 16; Ex. 408, Plaintiffs_Generic-00025469 at 1, 7; Ex. 406, COB053610.

305.    One Black man experienced multiple stops for his factory solar-tinted windows, which were legal. Ex. 408, Plaintiffs_Generic-00025469 at 7.

306.    During one of those stops, the officer removed him from his vehicle, took his cell phone, detained him for 20 minutes, searched and impounded his vehicle, then issued multiple tinted windows tickets that a court eventually dismissed. Ex. 408, Plaintiffs_Generic-00025469 at 7.

307.    BPD officers improperly used tinted windows as an excuse to get into people's cars to search for drugs and guns. IAD Witness Decl. ¶ 12.

**M.    Defendants' Substantive Departures and Misrepresentations Provide Evidence of Discriminatory Intent**

308.    The City countermanded the recommendations of its own expert bodies when creating the Housing Unit and Strike Force and adopting "zero tolerance" policing policies:

a)    In 2010, the BPD's tensions with communities of color hit a crisis following a shooting (referred to as the City Grill Massacre) in which eight people were shot, four fatally. Ex. 409, Plaintiffs_Generic-00025833 at 5.

b)    There were more than 100 witnesses to the shooting, most of whom were Black. Ex. 409, Plaintiffs_Generic-00025833 at 5; Ex. 270, Plaintiffs_Generic-00002698 at 22.

c)    After the shooting, no witnesses cooperated with the BPD's investigation. Ex. 409, Plaintiffs_Generic-00025833 at 5.

d)    In response, the Buffalo Common Council established the BPD Reorganization Commission, which recommended that the BPD adopt community policing methods to rebuild trust. Ex. 409, Plaintiffs_Generic-00025833 at 3, 5-6; Ex. 270, Plaintiffs_Generic-00002698 at 28-29.

e)    Derenda disregarded the recommendations, instead instituting the Housing Unit and Strike Force and implementing Checkpoints targeting the East Side. Ex. 409, Plaintiffs_Generic-00025833 at 5-6; Ex. 8, Derenda Dec. 23, 2021 Dep. at 282:1-6; Ex. 64, Derenda Dec. 23, 2021 Dep. Exhibit 47; ECF No. 252-45, Defs.' Stmt. of Undisputed Facts ¶¶ 15, 21-22.

309.    As early as 2014, community members complained that poor police-community relations engendered by Checkpoints and other aggressive tactics had impeded the BPD's ability to solve crimes by undermining trust and distracting police from addressing crime. Ex. 65, COB266951 at 12; Ex. 329, Plaintiffs_Generic-00004868; Bassett Decl. ¶ 18.

a)      For example, David Simmons wrote the Mayor about the need for the Buffalo police to improve relationship with the African American community to solve crimes. Ex. 410, COB277649.

b)      Another citizen wrote to urge Mayor Brown to focus on solving homicides rather than generating revenue through Checkpoints. Ex. 393, COB221459.

310.      Throughout the time period of the Checkpoint program, BPD experienced low, often falling, clearance rates for homicides and gun violence:

a)      Over the first few years of implementing Checkpoints, the BPD's homicide clearance rate fell to just 23% in 2014. Ex. 270, Plaintiffs_Generic-00002698 at 9.

b)      In 2015, BPD had a clearance rate of only 40% for gun-related homicides. Ex. 411, COB022393 at 5.

c)      By 2017, the BPD's overall homicide clearance rate had fallen to 21%, and the clearance rate for gang/drug related homicides was just 5.2%. Ex. 412, COB059976 at 2.

d)      The principal reason for the low clearance rates was lack of cooperation from victims and witnesses. Ex. 413, COB022397; Ex. 412, COB059976 at 1.

311.      In 2016, Partnership for the Public Good released a report stating that traffic enforcement, often at Checkpoints, may contribute to racial disparities and poor police-community relations. Ex. 66, Derenda Dec. 23, 2021 Dep. Exhibit 57 at 13-16.

312.      The Partnership for the Public Good found pervasive distrust of the BPD, especially among Black residents. Ex. 103, Am. Silverman Report at 30-31.

a)      Only 12 percent of Black people surveyed agreed that the BPD respected people of color. Ex. 66, Derenda Dec. 23, 2021 Dep. Exhibit 57 at 41.

b)      Only 20 percent of all people surveyed agreed that the BPD respected people of color. Ex. 66, Derenda Dec. 23, 2021 Dep. Exhibit 57 at 41.

c)      30% of Black people surveyed said the police worked well with their neighborhood, compared to 57% of white people surveyed. Ex. 66, Derenda Dec. 23, 2021 Dep. Exhibit 57 at 89-90.

313.      Tinted windows do not commonly cause traffic accidents. Ex. 23, Lockwood Aug. 17, 2023 Dep. at 200:14-201:8; Ex. 82, Lockwood Aug. 17, 2023 Dep. Exhibit 32 at 5.

314.      According to the New York State Department of Motor Vehicles, in 2014 tinted windows caused only 32 of the 254,829 traffic accidents that happened that year. Ex. 270, Plaintiffs_Generic-00002698 at 13.

315.    The BPD considers tinted windows to pose an officer safety issue, not a traffic safety concern. Ex. 23, Lockwood Aug. 17, 2023 Dep. at 200:16-201:13.

316.    In 2013 and 2014, while tinted windows tickets rose, BPD made 10.3% fewer DWI arrests, issued 23% fewer red light violations, and made 35% fewer tickets and arrests for mobile phone use while driving. Ex. 270, Plaintiffs_Generic-00002698 at 13.

317.    Red light violations caused 10,370 accidents in 2013 (including 74 fatalities), while distracted driving caused 708 accidents in 2014 (including three fatalities). Ex. 270, Plaintiffs_Generic-00002698 at 13.

318.    There is no public safety benefit to issuing multiple tinted windows tickets in a single stop. Ex. 102, Gennaco Report at 102; Ex. 14, Gennaco Oct. 4, 2024 Dep. at 131:17-133:11; Ex. 29, Nigrelli Oct. 11, 2024 Dep. at 330:3-332:19.

319.    Increasing the financial penalties for tinted windows violations by increasing the number of tickets issued in a single stop is counterproductive to the goal of reducing illegal tints on cars because motorists end up having to use their limited financial resources to pay fines rather than fixing their cars. Ex. 14, Gennaco Oct. 4, 2024 Dep. at 131:17-132:17.

320.    It would not be reasonable to conclude that issuing higher numbers of tinted windows tickets in a single stop would serve as a greater deterrent to driving around with illegally tinted windows. Ex. 14, Gennaco Oct. 4, 2024 Dep. at 132:18-133:11.

321.    "[A]ggressive over-policing of minor violations and the unequal imposition of tickets, fines, and fees" can lead to "a loss of legitimacy and trust in law enforcement." Ex. 102, Gennaco Report, at 102; Ex. 29, Nigrelli Oct. 11, 2024 Dep. at 330:3-333:16; Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 19:10-20:10; Ex. 323, Letter from Tyler Nims, Chief, Law Enf't Misconduct Investigative Office, New York State Office of the Att'y Gen., to Joseph Gramaglia, BPD Comm'r, at 7-8 (Dec. 28, 2023).

322.    Loss of legitimacy and trust, in turn, hinders the BPD in fulfilling its overall law enforcement mission. Ex. 102, Gennaco Report, at 102; Ex. 29, Nigrelli Oct. 11, 2024 Dep. at 330:3-333:16; Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 19:10-20:10.

**N.    The BPD's Ongoing, Discriminatory Pretextual Policing Program**

323.    "[P]retextual" or "investigative" traffic enforcement involves stopping cars for minor traffic violations in order to look for guns, drugs, and ask questions to gain intelligence and potentially investigate the driver and passengers for other crimes unrelated to the traffic stop. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. 120:18-121:5, 123:15-124:8, 127:22-128:4; Ex. 22, Lockwood Aug. 10, 2023 Dep. at 81:3-23; Ex. 397, Lockwood Aug. 10, 2023 Dep. Exhibit 11; Ex. 102, Gennaco Report at 103.

324.    The Strike Force and the Housing Unit engaged in pretextual traffic stops. Ex. 22, Lockwood Aug. 10, 2024 Dep. at 81:3-23; Ex. 40, Serafini Dec. 27, 2021 Dep. at 109:3-23; Ex. 415, COB443724 at 3; Ex. 323, Letter from Tyler Nims, Chief, Law Enf't Misconduct

Investigative Office, New York State Office of the Att'y Gen., to Joseph Gramaglia, BPD Comm'r, at 10 (Dec. 28, 2023).

325.    The Gun Involved Violence Elimination ("GIVE") Initiative is a New York State program that provides funds to local agencies to eliminate shootings, homicides, and violence, and allows local agencies to design their own policing tactics. Ex. 31, Palizay Sept. 6, 2024 Dep. at 13:3-11, 121:15-123:14; Ex. 90, Palizay Sept. 6, 2024 Dep. Exhibit 4; Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 36:12-18.

326.    Since 2014, the BPD has used GIVE funds to support pretextual policing in hot spots. Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 36:12-20, 62:15-23, 64:4-10; Ex. 31, Palizay Sept. 6 2024 30(b)(6) Dep. at 123:7-19, 127:22-128:9; Ex. 102, Gennaco Report at 104; Ex. 416, COB218784.

327.    Since suspending Checkpoints, the City has increased GIVE funding for pretextual patrols. Ex. 417, COB-Hodgson_0043549 at 22; Ex. 525, COB-Hodgson_0031280 at 3.

328.    Pretextual traffic stops increased after the BPD suspended Checkpoints. IAD Witness Decl. ¶ 17.

329.    The GIVE-funded patrols used "targeted traffic enforcement to target . . . hot[] spots, gangs, and guns in high crime areas." Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 62:15-23.

330.    The BPD directed officers to "go into the hot spots and crack down on traffic related violations" so that officers have the opportunity "to run warrant checks and make plain view automobile checks." Ex. 418, COB343327.

331.    Commissioner Gramaglia and BPD officials directed officers to use pretextual traffic stops "proactive[ly]" to "gain knowledge of individuals who are traveling together," "gather [gang] intel[ligence]," and "gather information on people active in the micro hot[]spot[s]." Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 135:18-22, 144:18-145:12, 148:12-149:16; Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 44:12-19, 81:15-23, Ex. 75, Gramaglia Mar. 14, 2024 30(b)(6) Dep. Exhibit 1; Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 123:15-124:8; Ex. 419, COB-Hodgson_0032900; Ex. 420, COB-Hodgson_0038359 at 109-110.

332.    GIVE hot spots are "largely" or "exclusively" in predominantly Black and Latino communities. Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 92:21-93:4.

333.    The BPD has identified broad "gang areas" which cover large swaths of Buffalo with predominantly Black populations. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 56:16-57:18; Ex. 421, COB637218 at 3; Ex. 422, COB637324 at 5.

334.    The BPD directs officers on GIVE patrols to target specific "hotspot" areas and to investigate drivers traveling in the hot spot. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 128:5–22; Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 92:18-20.

335. The more resources the BPD devotes to targeting people in hot spots, the more traffic violations it can find. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 204:19-205:9; 206:4-15.

336. Because there are many vehicle and traffic violations, an officer will nearly always be able to find a legal justification for a traffic stop. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 204:11-15; Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 198:13-199:18.

337. BPD policymakers direct officers on GIVE patrols to target "hot people" including "gang members," "gang associates," "suspected gang members," "high-risk individuals," and "individuals identified to potentially carry weapons." Ex.31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 136:22-137:8, 138:11-19; Ex. 423, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 7 at 2.

338. "Gang associates" has no formal definition but includes individuals who are "around" alleged gang members, such as being seen in a car with an alleged gang member more than twice. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 21:12-23:16.

339. "Suspected gang members" has no definition. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 140:11-19.

340. "Hot people" are identified on the BPD's Top Gun Offenders List. Ex. 31,  Palizay Sept. 6, 2024 30(b)(6) Dep. at 155:2-12; Ex. 93, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 9 at 1-3.

341. The BPD directs officers on GIVE patrols to target people on the Top Gun Offenders List for pretextual traffic stops. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 163:16-22.

342. The Top Gun Offenders list includes individuals who are gang members, "suspected gang members," and anyone associated with shooting incidents. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 162:23-164:13; Ex. 93, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 9 at 1-3.

343. The Top Gun Offenders list can also include a relative, employer, employee, child, doctor, or teacher of an offender. Ex. 93, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 9 at 1-3.

344. Gramaglia admonished officers who did not make enough traffic stops during Gang Details because "the mission of the gang car .. include[s] traffic stops which .. is one of the best ways to gather info and also issue summons." Ex. 76, Gramaglia Mar. 14, 2024 30(b)(6) Dep. Exhibit 2.

345. Gramaglia praised officers for traffic enforcement during Gang Details. Ex. 424, COB476483, Ex. 425, COB476484; Ex. 426, COB667932.

346. Gramaglia expected Gang Detail cars to "proactive[ly]" engage in traffic enforcement generally in areas of gang activity because "traffic stops . . . is one of the best ways to gather information." Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 43:8-47:14, 87:11-88:10; Ex. 76, Gramaglia Mar. 14, 2024 30(b)(6) Dep. Exhibit 2.

347. A "[v]ery small number" of individuals in "gang area[s]" are gang members. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 56:16-57:10.

348. BPD hot spot patrols are authorized to leave and do leave their assigned hot spot to conduct pretext stops in other neighborhoods, including "peripheral" streets and areas. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 130:21-132:10; Ex. 420, COB-Hodgson_0038359 at 26-28, 129-131, 175-76, 238-41; 269-271, 271-273.

349. BPD Officers practice pretextual policing both on GIVE patrols and away from GIVE patrols. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 140:2-142:10; IAD Witness Decl. ¶ 17.

350. Under BPD policy and practice, there is no distinction between pretextual policing practices on GIVE patrols and away from GIVE patrols. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 141:2-12.

351. Under BPD policy, a BPD officer can follow a "high risk individual" until they do something that provides probable cause for a traffic stop. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 142:4-14.

352. There are no limits on how long an officer can follow a high-risk individual before stopping them. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 142:21-143:11.

353. Commissioner Gramaglia testified that he believed there are no white gangs in Buffalo, although there are white gang members. Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 59:2-12.

354. Buffalo has predominantly white gangs. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 52:5-21; Ex. 45, Whelan Apr. 26, 2022 Dep. at 311:6-10.

355. Predominantly white gangs are listed in the official FBI gang book for Buffalo. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 51:17-52:21; Ex. 83, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 1 at 2, 117-132.

356. Some clubhouses belonging to predominantly white gangs are located on the East Side. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 52:22-53:4.

357. Buffalo has predominantly Latino Gangs listed in the FBI gang book, including the 7th Street Gang, 10th Street Gang. Latin Kings, and Delevan Congress Crew. Ex. 83, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 1 at 15, 18-22, 84-118.

358. Buffalo has a predominantly Asian gang known as the Korean Buffalo Boys / Karin Blood Brothers. Ex. 427, COB346078; Ex. 428, COB346083 at 11; Ex. 429, COB455406 at 1-2.

359. BPD officers have provided updates mentioning Latino and Asian gangs and gang members to Commissioner Gramaglia. Ex. 430, COB475317; Ex. 431, COB476573.

360. Only "documented, vetted gang members get posted" in the FBI gang book. Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 14:1-14:3.

361.    The FBI produces the gang book, but the information in the gang book comes from local police agencies like the BPD. Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 14:19-14:22.

362.    The BPD created a "Gang Intelligence Submission Form" for officers to "nominate an individual as a member of a Buffalo-based gang." Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 31:8-32:2, 47:8-14; Ex. 83, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 1 at 8.

363.    The Gang Intelligence Submission Form is the BPD's only official form for identifying gang members. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 42:7-18; 50:12-21.

364.    Macy adopted the Gang Intelligence Submission Form to ensure that gang members are properly vetted. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 42:7-15.

365.    The Gang Intelligence Submission Form contains the BPD's name and logo and the email address of BPD's Chief of Detectives. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 42:17-18; 46:5-10; Ex. 83, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 1 at 8.

366.    The race field of the Gang Intelligence Submission Form is pre-filled as "Black." Ex. 526, COB-Hodgson_0044552 at 8; Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 47:15-17, 50:17-21.

367.    The online and downloadable version of the Gang Intelligence Submission Form, available on the Erie Crime Analysis Center ("ECAC") website, also has the race field pre-filled as "Black." Ex. 235, COB-Hodgson_0031967 at 10; Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 54:23-55:1.

368.    The online and downloadable version of the Gang Intelligence Submission Form contains the BPD's logo. Ex. 235, COB-Hodgson_0031967 at 10.

369.    BPD officers use the online and downloadable version of the Gang Intelligence Submission Form to identify individuals who are gang members to ECAC and BPD's Special Investigations Unit. Ex. 235, COB-Hodgson_0031967 at 10; Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 33:7-14, 54:3-55:1.

370.    The BPD included the online ECAC Gang Intelligence Submission form pre-filled as Black on a slide entitled "Gang Member Vetting Process on ECAC Website" in a presentation for its Weekly Intelligence Meeting on February 21, 2022. Ex. 235, COB-Hodgson_0031967 at 1, 10.

371.    The February 21, 2022, Weekly Intelligence Meeting notes also instructed Detail car reports to include "Name, DOB, any address and gang connection." Ex. 235, COB-Hodgson_0031967 at 1, 3.

372.    The BPD's Weekly Intelligence Meeting was created for the BPD's Special Investigations Lieutenant and officers from all districts to share "actionable information" including alleged "people of concern," gang members, patterns, and hot spots. Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 49:2-17; Ex. 235, COB-Hodgson_0031967.

373. ECAC stores and maintains the list of vetted BPD gang members in PowerDMS, which is accessible to all BPD officers in the field through their cars on their remote terminals and online. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 31:8-35:16, 78:20-23.

374. Although Chief Macy testified that he has never received a Gang submission form, he has received at least one such form that included "Black" as the racial designation. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 46:21-23; Ex. 432, COB562205.

375. GIVE reports contain references to traffic stops of Black men between 17-29 who are labelled as gang members but not designated in the Gang Book. *Compare* Ex. 420, COB-Hodgson_0038359 at 143-44 (May 23, 2020 C District GIVE daily report describing traffic stop with no probable cause listed for alleged Humason gang members E.A. and J.B.) *with* Ex. 83, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 1 at 79-80 (E.A. or J.B. not listed in FBI gang book); *also* Ex. 420, COB-Hodgson_0038359 at 144 (May 20 traffic stop of "known bfl gang member" R.H.), *with* Ex. 83, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 1 at 27-28 (R.H. not in FBI gang book).

376. Black residents have complained to the BPD Internal Affairs Department ("IAD") that BPD officers assumed they were gang members, including during traffic stops:

   a)   For example, in one incident, a mother complained that BPD Housing Unit Officer John Beyer stopped her teenage sons near the Kenfield-Langfield projects and told them to "Shut the f--- up before I come pull you out of this car and f--- you up." Ex. 433, COB634262.

   b)   After realizing that they were from the Fruit Belt neighborhood, Beyer said, without any justification, "You guys got beef with these boys don't you? Let's see how you make it home from here." Ex. 433, COB634262.

   c)   Beyer then impounded the car, leaving them on the sidewalk. Ex. 433, COB634262.

   d)   Another Black man complained that two BPD Officers approached him in his parked vehicle and began cursing at him. Ex. 434, COB426093.

   e)   When the complainant stated told the officers they were "making him fear for his life and safety," they responded: "I thought you were a gangster, if you are going to be a gangster act like one, be a gangster!" Ex. 434, COB426093.

   f)   Captain Serafini dismissed the complaint, stating "He is a criminal..[e]very statement he makes should be considered suspect." Ex. 434, COB426093; Ex. 102, Gennaco Report at 59-60.

   g)   None of these individuals appear in the FBI Gang book as a gang member. Ex. 527, COB-Hodgson_0044725.

377. Within hot spots and gang areas, BPD officers prolonged ordinary traffic stops to ascertain the identity of drivers and passengers, to conduct background, warrant, probation, arrest, and gang affiliation checks, and to question them on topics unrelated to the traffic stop. Ex.

61

24, Macy Aug. 16, 2024 30(b)(6) Dep. at 153:1-167:20; Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 96:5-23, 98:2-12, 100:3-104:18, 108:3-16, 130:12-20; Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 81:14-83:19, 91:1-11; Ex. 76, Gramaglia Mar. 14, 2024 30(b)(6) Exhibit 2; Ex. 436, COB-Hodgson_0042023 at 101-04, 168-72; Ex. 420, COB-Hodgson_0038359 at 111-113; Ex. 86, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 14 at 57.

378.   It is not the BPD's "routine" practice to question passengers. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 132:20-134:16.

379.   Officers need probable cause in order to question passengers. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 116:7-11, 130:12-20; Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 151:20-152:12.

380.   During pretextual stops, however, officers regularly questioned passengers, gathering their race, address, date of birth, and arrest history and looking for gang affiliations. *See, e.g.*, Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 151:6-14, 211:2-22, 229:17-23, Ex. 86, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 14; Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 132:5-19; Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 95:21-97:14; Ex. 77, Gramaglia Mar. 14, 2024 30(b)(6) Dep. Exhibit 4 at 4-5; Ex. 91, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 6; Ex. 420, COB-Hodgson_0038359; Ex. 86, COB-Hodgson_0039976; Ex. 437, COB-Hodgson_0036646, at 32-33; Ex. 438, COB446798 at 2-3.

381.   Few of the passengers stopped under the GIVE program were gang members or had any intelligence. *See, e.g.*, Ex. 478, COB-Hodgson_0046390; Ex. 77, Gramaglia Mar. 14, 2024 30(b)(6) Dep. Exhibit 4 at 4; Ex. 420, COB-Hodgson_0038359; Ex. 86, COB-Hodgson_0039976; Ex. 438, COB446798 at 2-3.

382.   The passengers stopped during GIVE patrols were overwhelmingly, if not exclusively, Black and Latino. *See, e.g.*, Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 79:1-11, 95:14-20, 103:21-104:2; Ex. 77, Gramaglia Mar. 14, 2024 30(b)(6) Dep. Exhibit 4; Ex. 76, Gramaglia Mar. 14, 2024 30(b)(6) Exhibit 2; Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 211:6-22; Ex. 86, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 14; Ex. 420, COB-Hodgson_0038359; Ex. 438, COB446798 at 2-3.

383.   The most common entry on a GIVE report for a traffic stop was that the driver and/or passengers "checked ok." *See, e.g.*, Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 205:5-10, 217-22; 225:8-17; Ex. 420, COB-Hodgson_0038359; Ex. 86, COB-Hodgson_0039976.

384.   A "sus veh" stop is an undefined term indicating that the vehicle stopped aroused suspicion in some nebulous way. *See* Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 94:9-95:2; Ex. 85, Macy Aug. 16, 2024 30(b)(6) Dep. Exhibit 13.

385.   The "sus veh" designation does not provide probable cause to stop a vehicle. Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 95:9-10; *see also* Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 207:8-9.

386. The only definition that BPD provided for "sus veh" defined it to mean "cars sitting occupied that do not belong in a neighborhood." Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 208:1-15; COB-Hodgson_0043834.

387. The GIVE daily reports contain many entries with a "sus veh" designation. *See, e.g.*, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 99:21-101:14; Ex. 77, Gramaglia Mar. 14, 2024 30(b)(6) Dep. Exhibit 4 at 4-5; Ex. 438, COB446798 at 1-3; Ex. 529, COB443353; Ex. 530, COB443364; Ex. 420, COB-Hodgson_0038359; Ex. 86, COB-Hodgson_0039976; Ex. 102, Gennaco Report at 104.

388. Supervisors have the responsibility of reviewing and approving GIVE daily reports. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 76:17-21, 102:9-15, 104:17-105:3; Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 207:17-23; Ex. 105, BPD MoP Ch. 8, § 2.3(M), Ch. 9, § 5.2(B).

389. The supervisors are expected to address any errors they find in the reports with the officers, such as unlawful stops. Ex. 24, Macy Aug. 16, 2024 30(b)(6) Dep. at 76:12-77:2, 102:9-15, 104:17-105:3; Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 209:11-14, 218:7-219:19; Ex. 105, BPD MoP Ch. 8, § 2.3(M), Ch. 9, § 5.2(B).

390. Gramaglia reviewed the GIVE daily reports. *See, e.g.*, Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 65:11-68:8; Ex. 77, Gramaglia Mar. 14, 2024 30(b)(6) Dep. Exhibit 4.

391. The GIVE daily reports detail many "sus veh" stops of Black and Hispanic male drivers. Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 108:18-4; *see, e.g.*, Ex. 438, COB446798 at 1-3; Ex. 529, COB443353; Ex. 530, COB443364; Ex. 420, COB-Hodgson_0038359; Ex. 86, COB-Hodgson_0039976.

392. Gramaglia never addressed the issue of unlawful stops with any officer who used a "sus veh" indicator, and there is no record of any other supervisor doing so. Ex. 17, Gramaglia Mar. 14, 2024 30(b)(6) Dep. at 108:10-110:20; Ex. 102, Gennaco Report at 104.

### O. The BPD Has Not Implemented Procedural Safeguards Recommended by the GIVE Program and Its Own Police Advisory Board

393. The City promulgated the 2021 Traffic Enforcement Policy following widespread community complaints and protests about the death of George Floyd in the Summer of 2020 and police misconduct in Buffalo. Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 65:19-66:1, 83:4-10; Ex. 27, Miller June 2, 2023 Dep. at 309:15-310:8; Ex. 158, COB-Hodgson_00093.

394. It is important to enforce the provisions in the 2021 Traffic Enforcement Policy to reduce the risk of racial profiling and bias. Ex. 16, Gramaglia Jan. 24, 2024 30(b)(6) Dep. at 23:5-27:23; Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 88:18-90:10.

395. The GIVE Program, using its Procedural Justice Self-Assessment Tool, provides the BPD with procedural justice standards and strategies. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 85:5-87:7; *see, e.g.*, Ex. 89, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 1; Ex. 92, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 8.

396.    GIVE procedural justice recommendations are grounded in national expertise. Ex. 30, COB467807 at 16.

397.    Procedural justice standards reduce the risk of nondiscriminatory policing and ensure residents are treated fairly and with respect. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 88:18-90:10.

398.    The procedural justice benchmarks that the GIVE program has recommended are important to maintaining community trust. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 90:3-91:2, 145:5-15, 183:17-184:16; Ex. 89, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 1.

399.    Implementing and enforcing the procedural justice standards could increase cooperation from the community with solving crimes. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 91:3-92:20, 211:9-212:6.

400.    The procedural justice benchmarks are especially important given the GIVE program's use of pretextual traffic stops to investigate crimes. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 145:16-23, 147:20-148:2.

401.    The BPD has not adopted recommended limits to traffic stops pursuant to GIVE guidance:

   a)    The GIVE program assesses whether the BPD has policies in place that limit investigatory stops "to investigate the commission of criminal offenses in individual instances when such offenses pose a threat to public safety." Ex. 92, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 8 at 4.

   b)    The BPD does not have a policy limiting investigatory stops to instances in which there is a threat to public safety. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 166:21-167:21, 169:3-19.

402.    The BPD has not adopted GIVE benchmarks related to auditing:

   a)    The BPD, in the self-assessment process, is asked whether it has "policies that [f]irst-line supervisors conduct audits of BWC footage to determine and evaluate if officers are employing procedurally just practices," and whether it makes those policies "publicly available." *See, e.g.*, Ex. 92, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 8 at 2.

   b)    Additionally, in June 2017, the Supervisor of New York State's Public Safety Programs conducted a study by the Center for Public Safety Initiatives at Rochester Institute Technology analyzing GIVE strategies. Ex. 439, COB020657; Ex. 440, COB020660.

403.    The study recommended that GIVE recipients audit "body camera footage internally to ensure police are acting ethically, respectful, and deescalating situations." Ex. 439, COB020657; Ex. 440, COB020660 at 2.

404.    The BPD does not audit body camera footage. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 202:1-13.

405.    Without supervisors physically present during GIVE patrols, there is no other way to ensure officers are not engaged in racially biased policing. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 202:14-21.

406.    Additionally, the GIVE program asks the BPD to report on the data collected "related to traffic and investigatory stops. Ex. 89, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 1 at 4.

407.    The BPD does not collect or analyze data on traffic or investigatory stops by race. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 188:5-189:17.

408.    The BPD has not adopted GIVE benchmarks related to dashboard cameras:

    a)    The GIVE program assesses whether the BPD has "policies regarding . . . vehicle-mounted cameras" *See, e.g.*, Ex. 89, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 1 at 3; Ex. 92, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 8 at 2.

    b)    The City acknowledges that vehicle-mounted cameras "are a good mechanism" to prevent "racially[]biased or unconstitutional activity." Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 174:12-175:21.

    c)    The BPD does not have vehicle-mounted cameras. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 174:2-11.

409.    The BPD has not adopted supervision metrics in line with GIVE guidance:

    a)    The BPD also reports to the GIVE program on whether it has an "early warning system" to "identify potential individual officer issues and broader trends/patterns that indicate a need to change policy." Ex. 89, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 1 at 2.

    b)    Having an early warning system could assist in identifying and preventing officers from engaging in repeated misconduct, like racially biased policing. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 193:22-194:19.

    c)    The BPD does not have an early warning system and does not monitor patterns of misconduct. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 191:16-196:3.

410.    The Procedural Justice Self-Assessment Tool also assesses whether the BPD "use[s] Field Interview Form data to monitor investigatory stops." Ex. 89, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 1 at 5.

411.    Officers on GIVE patrols fill out field interview forms while "conduct[ing] interviews, do[ing] checks[,] and investigat[ing] crimes." Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 95:14-96:4.

412.    The City does not use the field interview forms to monitor officers' investigatory stops. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 117:16-118:18, 201:6-23; Ex. 89, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 1 at 5.

413.    Monitoring the field interview forms could "allow the BPD to ensure that the stops [are] lawful." Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 119:8-20.

414.    Monitoring the field interview forms could identify possible discriminatory policing. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 119:21-120:1.

415.    The BPD has not adopted effective accountability systems pursuant to GIVE guidelines:

   a)    The BPD is asked to report on whether it has "adopted an accountability system … aligned with … procedural justice." *See, e.g.,* Ex. 92, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 8 at 3.

   b)    The BPD had not adopted an accountability system that is aligned with the principles of procedural justice. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 180:2-182:22.

416.    The BPD has not adopted recommendations to solicit community feedback pursuant to GIVE guidelines:

   a)    The GIVE program assesses whether the BPD has "solicited community input … when making or revising policies, especially those likely to substantially impact the community" or made department policies publicly available. *See, e.g.*, Ex. 92, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 8 at 1.

   b)    The BPD never solicited or incorporated community input into its policies or practices. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 190:7-191:10; Ex. 92, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 8 at 1; Ex. 89, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 1 at 1, 3.

417.    The GIVE program also questions whether the BPD "established a Community Advisory Board or other formal structure for community feedback," or "tracked community trust using data and surveys and incorporated the results into . . . policies and procedures." *See, e.g.*, Ex. 92, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 8 at 6.

418.    However, the BPD does not have a Community Advisory Board and does not use data and surveys to track community trust.  Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 185:1-189:3.

419.    The City disbanded the Common Council's Police Advisory Board. Hall Decl. ¶ 23.

420.    Before disbanding the Police Advisory Board, the City ignored the Board's recommendations to address racially biased policing by creating an independent accountability structure and reducing over-policing of communities of color. ECF No. 252-36, Hall May 17, 2023 Dep. at 17:23-20:13; Hall Decl. ¶¶ 20-21; Ex. 441, COB081231.

421.   The City also ignored similar recommendations by other organizations, which the City's leadership has said is "not helpful" and "impossible" for civilians to evaluate with police, "which departs from practices throughout the country and New York state." Ex. 102, Gennaco Report at 121-22.

422.   There have long been serious issues with community trust that have hindered the BPD's ability to solve crimes. *See* Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 210:20-211:8; Ex. 531, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 5 at 6; Ex. 442, COB417162 at 5; Ex. 411, COB022393 at 5; Ex. 66, Derenda Dec. 23, 2021 Dep. Exhibit 57 at 41.

423.   The BPD has had challenges solving shooting-related crimes because it has limited cooperation of witnesses. Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 210:20–211:8; Ex. 531, Palizay Sept. 6, 2024 30(b)(6) Dep. Exhibit 5 at 6.

424.   The BPD has recognized that communities may view the proactive GIVE patrols targeting minority drivers as "discriminatory," "heavy handed," and "hostile." Ex. 443, COB417160; Ex. 442, COB417162 at 5.

425.   The BPD also recognized that affected communities believe that they are the target of these GIVE initiatives, rather than the beneficiaries. Ex. 443, COB417160; Ex. 442, COB417162 at 5.

426.   In 2014, a GIVE review of Erie County found that "[a] backlash is reported from the community toward police department leadership that is demonstrated by the community's reluctance to assist with solving crimes because the community does not feel supported by police." Ex. 444, COB410609 at 25.

427.   BPD Commissioners testified that racial profiling or racially biased policing cannot exist provided that a stop is based on reasonable suspicion. *See, e.g.* Ex. 15, Gramaglia Sept. 22, 2023 Dep. at 145:1-14, 149:6-10; Ex. 8, Derenda Dec. 23, 2021 Dep. at 262:12-263:3; *see also* Ex. 102, Gennaco Report at 95-97; Ex. 236, COB287615 at 2.

428.   The BPD's misapprehension of racial bias is a fundamental driver of its ongoing discriminatory traffic enforcement practices and its failure to supervise, monitor, train, investigate, and hold officers accountable for discriminatory policing. Ex. 102, Gennaco Report at 93-99.

### P.    Anecdotal Evidence of Discriminatory Intent

429.   The BPD receives more complaints of racially discriminatory traffic enforcement than comparable municipalities. Ex. 14, Gennaco Oct. 4, 2024 Dep. at 65:17-68:1.

   a)   Numerous complaints by Black and Latino motorists alleged that officers aggressively questioned, detained, or searched drivers and even passengers in routine traffic stops. Ex. 102, Gennaco Report at 103 n. 127 & Appendix C.

   b)   Numerous complaints by Black and Latino residents alleged demeaning and dehumanizing conduct. Ex. 102, Gennaco Report at 14.

    c)    When individuals complained, none of the officers involved with these stops were held accountable for their conduct; some were not even investigated. Ex. 102, Gennaco Report at 37-41 & Appendix C.

430.    Black and Latino motorists observed and experienced different stop patterns in predominantly Black areas of Buffalo compared to white areas. Bassett Decl. ¶ 20; Franklin Decl. ¶ 22; Palmer Decl. ¶¶ 6, 14; Hall Decl. ¶ 17; Evans Decl. ¶¶ 5, 16; Bonds Decl. ¶ 5; IAD Witness Decl. ¶¶ 24-25; Simmons ¶¶ 12-15, 17-18.

431.    BPD officers frequently stop Black and Latino motorists after they make eye contact with them and ascertain their race, sometimes conducting U-turns or other maneuvers to follow them. Bassett Decl. ¶¶ 1, 22; Hall Decl. ¶¶ 1, 24-25; Clyburn Decl. ¶¶ 7-8; Davis Decl. ¶ 5; Ex. 445, COB-Hodgson_0013266 at 10; Ex. 446, COB-Hodgson_0031531; Ex. 447, COB011125 at 199; Ex. 448, COB424419; Ex. 363, COB-Hodgson_0018249; Ex. 449, COB-Hodgson_0031620; Ex. 450, COB-Hodgson_03857 at 6; Ex. 451, COB010539 at 8; Ex. 452, COB-Hodgson_0054983 at 2-20; Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1, ¶¶ 121-42 (W.D.N.Y. July 31, 2020); Ex. 454, *McNeil v. City of Buffalo*, 2023 WL 2574954, at *6 (W.D.N.Y. Feb. 24, 2023).

432.    BPD officers prolong traffic stops of Black and Latino motorists to ask unfounded, racially charged questions that convey a presumption of criminality, including whether they have guns or drugs, their whereabouts, travel plans, employment, and other activities. *See, e.g.,* Franklin Decl. ¶¶ 12, 20 (destination); Bonds Decl. ¶ 9; Evans Decl. ¶ 16; Simmons Decl. ¶ 13; Palmer Decl. ¶¶ 10-11; Yeldon Decl. ¶ 5; Myree Decl. ¶¶ 8-9, 13, 21; Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1, ¶¶ 120-42 (W.D.N.Y. July 31, 2020); Ex. 365, COB041094 at 6-7; Ex. 458, COB668806 at 8-9; Ex. 459, COB-Hodgson_0012922 at 6; Ex. 461, COB559954; Ex. 462, COB559957 (drugs); Ex. 463, Tedesco_00260 at 29; Ex. 374, COB012178 at 105 (Black man in white neighborhood); Ex. 466, COB-Hodgson_01159 at 0:41-1:26; Ex. 467, COB-Hodgson_01214 at 4 (prolonged stop); Ex. 451, COB010539 at 14 (questioned extensively without cause)*.*

433.    The aggressive demeanor of some officers has caused Black motorists to fear for their lives during traffic stops—sometimes in front of their own children. Clyburn Decl. ¶¶ 11-12, 16, 21-22; Davis Decl. ¶¶ 6, 8-9, 30; Griffin Decl. ¶¶ 8-9, 16-17, 26, 29-30.

434.    During traffic stops, BPD officers have treated Black and Latino motorists like criminals and even falsely accused them of engaging in criminal activity. Ex. 365, COB041094 at 4-6; Ex. 471, COB-Hodgson_04197 at 2-3, 7; Ex. 472, COB634200; Ex. 532, Miller_00042; Ex. 501, Miller_00339; Ex. 452, COB-Hodgson_0054983 at 2-20; Ex. 340, COB-Hodgson_01493-01874 at 7-10; Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1, ¶¶ 75-83, 120-142 (W.D.N.Y. July 31, 2020); Palmer Decl. ¶ 6; Bonds Decl. ¶¶ 15, 17; Griffin Decl. ¶¶ 16, 30; IAD Witness Decl. ¶¶ 10, 12, 17, 19, 24, 29-30; Clyburn Decl. ¶ 15; Franklin Decl. ¶¶ 12, 22; Simmons Decl. ¶ 13; Myree Decl. ¶¶ 21, 31; Davis Decl. ¶¶ 7-8, 19; Taylor Decl. ¶ 55.

435.    During traffic stops, BPD officers have used racially charged language, like "boy," "Spic," "n****r," "monkey," "animal," "homie," "you people," and "criminal." Lucas Decl. ¶¶ 11,

16, 22, 25 ("n-word," "bitch"); Ex. 374, COB012178 at 92-93 ("n-word"); Ex. 365, COB041094 at 6 ("spic"); Ex. 533, COB-Hodgson_02108 at 5 ("homie"); Ex. 534, COB012710 at 37 ("monkey," "animal," "f-word"); Ex. 535, COB-Hodgson_00911 (n-word); Ex. 472, COB634200 (officer used racial slurs); Ex. 473, COB426243 at 2 ("gang-ster"); Ex. 474, COB326548; Ex. 475, COB425919 ("you (racial epithet) need to stop what you are doing"); Ex. 476, COB047185 ("you people"); Ex. 477, COB-Hodgson_0053570 at 11, 14, 28-29 ("fat boy" and "fucking spics"); Ex. 536, COB-Hodgson_00491 "(n-word"); Ex. 479, COB010902 at 19 ("n-word"); Ex. 480, COB326608; Ex. 481, COB014841 ("boy"); Ex. 537, COB-Hodgson-012428 at 2 ("monkeys"); Ex. 483, COB326480 at 3 (officer used racial slurs); Ex. 484, COB-Hodgson_03866 ("n-word"); Ex. 485, COB668748 at 9 (officers used racial slurs); Ex. 486, COB-Hodgson_0013028 at 5 ("n-word"); *see* Ex. 102, Gennaco Report, Appendix C.

436.  During traffic stops complainants have alleged that BPD officers have used unjustified violence against Black and Latino motorists**.** Lucas Decl. ¶¶ 9-12; Clyburn Decl. ¶¶ 12, 21; Ex. 487, COB-Hodgson_02227 at 10-15, 18; Ex. 488, Tedesco_00371 at 6-7; Ex. 489, COB010588 at 13; Ex. 490, COB326606; Ex. 491, COB452061; Ex. 492, COB326477at 3; Ex. 493, COB-Hodgson_0030836 at 6, 15; Ex. 494, COB326504; Ex. 495, COB-Hodg-son_0031696 at 2-3; Ex. 340, COB-Hodgson_01493-01874; Ex. 488, Tedesco_00371 at 37-62; Ex. 333, COB-Hodgson_0054158 at 5-7, 18162-64, 175; Ex. 102, Gennaco Report Appendix C.

437.  During traffic stops, complainants have alleged that BPD officers have detained Black and Latino motorists and searched and impounded vehicles without any legal basis. Ex. 497, COB219460; Ex 445, COB-Hodgson_0013266 at 12; Ex. 488, Tedesco_00371 at 6-7; Ex. 498, COB-Hodgson_0012032 at 2-3, 8-9; Ex. 494, COB326504; Ex. 499, COB-Hodgson_0012820; Ex. 500, COB-Hodgson_00968; Ex. 501, Miller_00339 at 8, 20-21; Ex. 469, COB525080; Ex. 503, COB-Hodgson_00666; Ex. 502, COB421276; Ex. 322, BLRR-00000001; Ex. 349, COB-Hodgson_0053039 at 3-5; Ex. 504, COB042866; Ex. 453, Com-plaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1, ¶¶ 120-42 (W.D.N.Y. July 31, 2020);  Clyburn Decl. ¶¶ 12-14; Myree Decl. ¶¶ 12, 15-16; Taylor Decl. ¶¶ 29-49.

438.  Plaintiffs and class members have described these stops as:

    a)        frequent and humiliating, Hall Decl. ¶ 17;

    b)        "degrading," Franklin Decl. ¶ 22;

    c)        "intimidating," and terrifying, Davis Decl. ¶¶ 6, 8, 19, 30;

    d)        making them feel "scared" and fear for their lives, Griffin Decl. ¶ 17; Davis Decl. ¶ 9;

    e)        making them feel "inherently criminal or suspicious," like "criminals," Hall Decl. ¶ 17; Griffin Decl. ¶ 16; Bonds Decl. ¶¶ 15, 24;

f) causing emotional distress, anxiety about driving or even visiting or living in Buffalo, and trauma. Hall Decl. ¶¶ 14, 29; Clyburn Decl. ¶¶ 21-22; Myree Decl. ¶ 39; Davis Decl. ¶ 30.

439. On March 23, 2023, BPD Officer Jake Giarrano saw and smiled at a Black man driving a BMW, who had a Black male passenger, and then pulled him over for tinted windows, accompanied by Officer Ronald Ammerman. Ex. 445, COB-Hodgson_0013266 at 9-12, 17-18, 22.

440. The driver alleged that officers questioned him, including about whether he was on probation or parole, and the passenger, and detained and searched both him and his passenger, without legal justification. Ex. 445, COB-Hodgson_0013266 at 9-12.

441. The driver alleged that the officers aggressively and repeatedly searched the vehicle without justification as if they were looking for guns and drugs, causing an estimated $2,800 in damage. Ex. 445, COB-Hodgson_0013266 at 11.

442. When the passenger asked for Officer Ammerman's name and badge number, he threatened to arrest the driver. Ex. 445, COB-Hodgson_0013266 at 11-12; Ex. 102, Gennaco Report at 54-55, 69 n.72.

443. The driver complained about the officers' racial profiling and unlawful treatment, but in investigating the complaint, BPD IA failed to consider whether the officers had prolonged the stop in violation of BPD's 2021 purported Traffic Enforcement Procedural Justice Policy, asked superficial yes-no questions about the officers racial bias and did not follow up on the officers' gratuitous notation at the IA interview that the complainant was a rapper and an alleged gang member, "miss[ing] an opportunity to assess the officer's bias by not following up on this claim to ascertain what led the officer to believe that he was a gang member, and its relevance to the stop," and did not interview witnesses. Ex. 445, COB-Hodgson_0013266 at 11-12, 17-18; Ex. 102, Gennaco Report at 54-55, 69 n.72, 72.

444. The BPD IA also and failed to interview witnesses, or meaningfully probe whether the officers retaliated against the driver and passenger and illegally searched the driver, passenger, and driver's car, and neither the BPD Commissioner nor IA appeared to consider that Officers Ammerman or Giarrano were disciplined or subject to any corrective action for engaging in racially biased policing or prolonging the stop, conducting an unlawful search, or threatening retaliation. Ex. 445, COB-Hodgson_0013266 at 5, 7; Ex. 102, Gennaco Report at 54-55, 66-67, 69 n.72, 72.

445. Even though Officers Giarrano and Ammerman had 19 and 12 complaints, respectively, in the previous five years, including for racial profiling, illegal stops and arrest, harassment, and retaliation, neither Commissioner Gramaglia nor BPD IA appear to have considered this in deciding whether to impose any discipline. Ex. 445, COB-Hodgson_0013266 at 55-74.

446. On May 10, 2020, Quentin Suttles, a Black man, was getting gas with his girlfriend after celebrating Mother's Day when he saw a police cruiser pass by with an officer staring at

him. Ex. 505, Aff. of Quentin Suttles ISO Opp. Defs.' Mot. for Summ. J., *Suttles v. City of Buffalo*, 1:21-cv-00897-LJV-JJM, ECF No. 59 ¶ 14 (W.D.N.Y. Aug. 6, 2021).

447.  When he left the gas station, he saw the officers making a U-turn and heading back towards him for no apparent reason. Ex. 505, Aff. of Quentin Suttles ISO Opp. Defs.' Mot. for Summ. J., *Suttles v. City of Buffalo*, 1:21-cv-00897-LJV-JJM, ECF No. 59, ¶ 2 (W.D.N.Y. Aug. 6, 2021).

448.  Seeing the officers make the U-turn made Mr. Suttles fearful and question why he was targeted by these two white police officers, and he accidentally made a wrong turn on a one-way street. Ex. 505, Aff. of Quentin Suttles ISO Opp. Defs.' Mot. for Summ. J., *Suttles v. City of Buffalo*, 1:21-cv-00897-LJV-JJM, ECF No. 59 ¶¶ 5-6 (W.D.N.Y. Aug. 6, 2021).

449.  Before he could fully turn around, Lieutenant Ronald Ammerman and Officer Michael Scheu blocked his car, put their sirens on, approached Mr. Suttles, and asked him where he was going but did not ask about his accidental wrong turn and refused to listen to his explanation. Ex. 505, Aff. of Quentin Suttles ISO Opp. Defs.' Mot. for Summ. J., *Suttles v. City of Buffalo*, 1:21-cv-00897-LJV-JJM, ECF No. 59 ¶¶ 7-8 (W.D.N.Y. Aug. 6, 2021).

450.  Instead, the officer immediately asked Mr. Suttles if he had drugs in the car, and after he denied it, directed him to exit the vehicle and aggressively searched him, roughly grabbing his private parts, before tackling him to the ground hard, so he was lying on his stomach – even though he was complying with Scheu's orders. Ex. 505, Aff. of Quentin Suttles ISO Opp. Defs.' Mot. for Summ. J., *Suttles v. City of Buffalo*, 1:21-cv-00897-LJV-JJM, ECF No. 59 ¶¶ 14-19 (W.D.N.Y. Aug. 6, 2021).

451.  Officer Ammerman punched Mr. Suttles in the eyes and beat him, breaking his eye socket and his right shoulder blade, while Officer Scheu was on top of him, choking him and forcing his knee into his groin area near his tailbone extremely hard. Ex. 505, Aff. of Quentin Suttles ISO Opp. Defs.' Mot. for Summ. J., *Suttles v. City of Buffalo*, 1:21-cv-00897-LJV-JJM, ECF No. 59 ¶¶ 20, 22-24 (W.D.N.Y. Aug. 6, 2021).

452.  As the officers were choking and beating him and his eye swelled shut, even as Mr. Suttles obeyed every order, he began fearing for his life, and the driver called out for his girlfriend to record the assault while he fought to "just stay alive" and pleaded for his life. Ex. 505, Aff. of Quentin Suttles ISO Opp. Defs.' Mot. for Summ. J., *Suttles v. City of Buffalo*, 1:21-cv-00897-LJV-JJM, ECF No. 59 ¶¶ 20, 23-26 (W.D.N.Y. Aug. 6, 2021).

453.  After the officers found no drugs from him or his car, they arrested him, charged him with obstruction, resisting, and *tampering with evidence*, and Officer Ammerman sat in the backseat as they drove him to the station and continued to accuse him of having drugs and attempting to coerce him into confessing, and subjected him to a cavity search when he got to the BPD and then an x-ray below the waist at the hospital. Ex. 505, Aff. of Quentin Suttles ISO Opp. Defs.' Mot. for Summ. J., *Suttles v. City of Buffalo*, 1:21-cv-00897-LJV-JJM, ECF No. 59 ¶¶ 20, 33-34 (W.D.N.Y. Aug. 6, 2021).

454.  While at the hospital, Officer Giarrano threatened him to stay quiet and take down the video that was circulating about his beating to avoid charges, and has since continued to

harass him. Ex. 505, Aff. of Quentin Suttles ISO Opp. Defs.' Mot. for Summ. J., *Suttles v. City of Buffalo*, 1:21-cv-00897-LJV-JJM, ECF No. 59 ¶¶ 37, 39 (W.D.N.Y. Aug. 6, 2021).

455. A Judge released Mr. Suttles the next day, and he was never formally charged or given a ticket, but he had a broken shoulder and orbital bone and will never fully regain his vision, and because of this experience and similar brutal and unjust encounters with BPD, continues to fear for his life every time he sees a BPD car. Ex. 505, Aff. of Quentin Suttles ISO Opp. Defs.' Mot. for Summ. J., *Suttles v. City of Buffalo*, 1:21-cv-00897-LJV-JJM, ECF No. 59 ¶¶ 21, 38-39, 41 (W.D.N.Y. Aug. 6, 2021).

456. On May 27, 2019, BPD Officers Patrick Garry and John Davidson stopped Bruce McNeil, a Black man, for no apparent reason, requested his identification, and following a background check, returned and directed him to step out of the car, and handcuffed, searched, and detained him in their vehicle. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1 ¶¶ 20-39 (W.D.N.Y. July 31, 2020).

457. After he was detained, he disclosed in response to their questions that he may have marijuana ashes in his car, and the officers proceeded to search his car and eventually telling him they found no contraband and let him go, without ever telling him the reason for the stop and search. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1 ¶¶ 37-46 (W.D.N.Y. July 31, 2020).

458. After he was released, he learned there was damage to his hood and was upset about how he was treated, so he went to the C-District station to file a complaint. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1 ¶¶ 47-53 (W.D.N.Y. July 31, 2020).

459. The first time he attempted to file a complaint, Lt. Patrick Boice threatened to arrest him for marijuana ashes if he complained, even though he told him there was no marijuana in the car. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1 ¶¶ 53-59 (W.D.N.Y. July 31, 2020).

460. He returned shortly thereafter with his mother and uncle, and Lt. Jenny Velez and the officers arrested him, falsely alleging that he left crack cocaine in their patrol car. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1 ¶¶ 61-80 (W.D.N.Y. July 31, 2020).

461. The BPD publicized his arrest, and after months of adverse consequences, including calls from his son's teachers and public assistance, a jury eventually acquitted him on all charges in December 2019. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1 ¶¶ 96-111 (W.D.N.Y. July 31, 2020).

462. Mr. McNeil filed a complaint with BPD, but to date, no disciplinary action was taken against any of the officers, even after he was acquitted. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1 ¶¶ 112-13 (W.D.N.Y. July 31, 2020).

463. Almost a year later, on April 6, 2020, while driving with a passenger, the same complainant passed and made eye contact with Officer Garry, who then made a U-turn, drove over the median, followed the complainant, activated his sirens, and again stopped him again for no

reason, refusing to tell him the basis for the stop. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1 ¶¶ 120-26 (W.D.N.Y. July 31, 2020).

464. During this traffic stop, Officer Garry told him "I heard you didn't accept the plea deal," from last year, ordered Mr. McNeil and the passenger out of the car, handcuffed, detained him, noting he didn't see any drugs in the back of his vehicle "this time" in response to his initial refusal to get in the car, and searched his car again without legal justification. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF 1, ¶¶ 120-235 (W.D.N.Y. July 31, 2020).

465. Officer Garry released him after searching, and he filed another complaint with Internal Affairs about officer Garry's targeting and harassment, but the officer was not disciplined. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF 1, ¶¶ 135-40 (W.D.N.Y. July 31, 2020).

466. Mr. McNeil filed a federal lawsuit against the City of Buffalo, and the court rejected Buffalo's motion to dismiss, finding that the "vehicle stop that set in motion the series of events at issue in this action was the result of a policy and/or custom to target minorities for traffic infractions and reward officers for writing as many tickets as possible in low income areas is sufficient to satisfy the racial animus requirement," and that the City failed to investigate. Ex. 453, Complaint, *McNeil v. City of Buffalo*, No. 20-cv-998, ECF No. 1 ¶¶ 139-44 (W.D.N.Y. July 31, 2020).

467. On December 11, 2018, BPD Officer Justin Tedesco, who is white, followed and eventually stopped Michael Taylor, who is Black and asked for his license near his BMHA apartment in Kenfield-Langfield. Taylor Decl. ¶¶ 1, 4, 7, 9, 21.

468. Officer Tedesco had previously stopped Mr. Taylor multiple times, and this time claimed that the reason for the stop was the driver not having headlights on, but the driver had his headlights on automatic. Taylor Decl. ¶¶ 7-9.

469. Officer Tedesco approached Mr. Taylor with his gun in his hand, asked him for his license, and for him and his passenger, who is also Black, to exit the car or he would face an impound. Taylor Decl. ¶¶ 9-14.

470. Officer Tedesco then issued the driver two unjustified tickets, one for no headlights, and the other for no seatbelt, which he had only unbuckled to retrieve his license. Taylor Decl. ¶¶ 15-18.

471. When Mr. Taylor tried to explain that his factory settings cause the lights to automatically come on and about his seatbelt, Officer Tedesco dismissed all of his explanations, and said, "have a good day[,] boy." Taylor Decl. ¶¶ 18-21.

472. In 2019, Mr. Taylor was driving on the East Side with his brother, and BPD officers pulled him over again, alleging he failed to use his turn signal, which was incorrect. Taylor Decl. ¶¶ 29-32.

473.    The officers again asked him to step out for no reason, and when he initially said no, they called for backup, so Mr. Taylor agreed out of fear. Taylor Decl. ¶¶ 29-32.

474.    The officers then searched the car thoroughly, and after finding nothing, let Mr. Taylor and his brothers return. Taylor Decl. ¶¶ 29-32.

475.    On February 13, 2019, BPD officers stopped a young Black woman and college student when they were looking for a shooting suspect. Ex. 506, COB239058.

476.    Officers were looking for a Black female in a white hoodie, but the driver was wearing a pink coat. Ex. 506, COB239058.

477.    Approximately fifteen officers arrived at the scene, searched her car without justification, and treated her like a criminal suspect. Ex. 506, COB239058 at 2.

478.    She filed a complaint alleging that she was racially profiled, and felt humiliated, hurt, and traumatized by the experience. Ex. 506, COB239058 at 2.

479.    On December 15, 2018, a Black male observed Officer John Davidson looking into his vehicle while he was parked with two passengers in the car, both of whom were Black. Ex. 507, COB452059.

480.    After the driver drove off, Officer Davidson stopped him with no apparent justification and spoke to him in a rude and demeaning manner. Ex. 507, COB452059.

481.    Officer Davidson asked the driver to get out of the car, without providing a reason for the stop or why he needed to exit the car. Ex. 507, COB452059.

482.    Officer Davidson then threatened the driver with jail if he didn't get out of the car, while grabbing him by his clothes in the sternum area. Ex. 507, COB452059.

483.    The driver exited the car, and Officer Davidson searched him without any stated justification and then detained him in his patrol car. Ex. 507, COB452059.

484.    After Davidson denied the driver's request for a supervisor, he called 911 and spoke to Lt. Long, who advised him on how to make a complaint. Ex. 507, COB452059.

485.    The driver believed that Officer Davidson acted unprofessionally and treated him like a criminal or thug, stating that "not all young [B]lack men are criminals and thugs." Ex. 507, COB452059.

486.    He received tickets for improper or no signal and for moving from a lane unsafely. Ex. 491, COB452061 at 1-2.

487.    The City never investigated his complaint. *See* Ex. 507, COB452059.

488.    He subsequently sued the City for violating his civil rights, and the City settled the lawsuit. Ex. 338, COB559604; Ex. 356, May 11, 2021 Buffalo Common Council Minutes at 14.

489. On Sept. 14, 2015, Lieutenants Mark Vara and Kelly Craig pulled over a Black man and his fiancée over for running a red-light. Ex. 469, COB525080; Ex. 470, COB525081; Ex 508, COB423922.

490. The next day, the Black motorist filed a complaint, alleging that that Lt. Vara approached the driver with his hand over his gun, and when he went to retrieve his license, Vara told him to "keep your hands out of your pocket, don't you know what happened in Missouri" (referencing the murder of Michael Brown in Ferguson). Ex. 469, COB525080; Ex. 470, COB525081; Ex. 508, COB423922.

491. Lt. Vara called for backup when the driver reached in his coat for his license in response to his request, and subsequently ordered the driver and his fiancée out of the vehicle to detain him and search him "for his suspicious behavior." Ex. 469, COB525080; Ex. 470, COB525081; Ex. 508, COB423922.

492. According to the motorist, Vara said "I don't trust these two," and the officers commented deridingly about that his fiancée's skirt was too short and that she should not be wearing it Ex. 469, COB525080; Ex. 470, COB525081; Ex. 508, COB423922.

493. In his complaint, he stated that he felt that the BPD targeted him because he is African American and was disrespected by the officers throughout the stop, and that he feared for his life during this traffic stop. Ex. 469, COB525080; Ex. 470, COB525081.

494. Although the BPD deemed his complaint to be "racial profiling" it was not evaluated by Internal Affairs, the BPD did not obtain statements from witnesses, and waited two and a half months before getting a statements from the officers, in violation of BPD's Manual of Procedures and best practices. Ex. 102, Gennaco Report at 37-39, 60, 77; Ex. 508, COB423922; Ex. 510, COB326410; Ex. 469, COB525080; Ex. 470, COB525081.

495. In June 2022, BPD Officers Padriac Allman and Ronald Ammerman saw a Black young man entering a car with a white driver and another Black passenger near a corner store. Ex. 39, COB-Hodgson_01246-04197 at 6.

496. The officers misidentified the Black male passenger, followed the car for over two blocks, and eventually stopped them, allegedly for not signaling. Ex. 39, COB-Hodgson_01246-04197 at 6.

497. After referring to him by the wrong name, the officers questioned the passenger about his identity, which he did not provide. Ex. 39, COB-Hodgson_01246-04197 at 6-8.

498. Officer Ammerman questioned and berated the passenger, called him a "fucking nitwit," and falsely accused him of raping and kidnapping a girl. Ex. 39, COB-Hodgson_01246-04197 at 6-8.

499. In contrast, the officers removed the white female driver from the car. Ex. 39, COB-Hodgson_01246-04197 at 9.

500.  The white female driver later told Internal Affairs that she felt like the officers were trying to get her away from two Black males and that's why she was pulled over. Ex. 39, COB-Hodgson_01246-04197 at 9.

501.  The white female driver did not report any derogatory language being used towards her. Ex. 39, COB-Hodgson_01246-04197 at 9.

502.  The passenger filed a complaint with Internal Affairs, alleging racial profiling and discrimination. Ex. 39, COB-Hodgson_01246-04197 at 6.

503.  The officers were exonerated. Ex. 39, COB-Hodgson_01246-04197 at 2-3.

504.  In July 2017, Buffalo's then-Common Council President Darius Pridgen, who is Black, publicly reported that for the third time in three years when he held a Fourth of July party at his residence, BPD officers stopped and harassed many of the people of color who tried to attend, asked them for identification, threatened them with arrest, and denied them access, while allowing the white guests of his white neighbors to enter freely. Ex. 511, *Buffalo Council President says his party guests were unfairly treated by police*, 2WGRZ (July 5, 2017), https://www.wgrz.com/article/news/local/buffalo-council-president-says-his-party-guests-were-unfairly-treated-by-police/71-454313693.

505.  Council President Pridgeon said that was the third year in a row that BPD had selectively targeted his minority guests and had notified the police leadership in advance of his party, but when he went down to talk to the BPD officers, they even threatened him with arrest. Ex. 511, *Buffalo Council President says his party guests were unfairly treated by police*, 2WGRZ (July 5, 2017), https://www.wgrz.com/article/news/local/buffalo-council-president-says-his-party-guests-were-unfairly-treated-by-police/71-454313693.

506.  Following the incident, he posted two Facebook videos on the incident, where he suggested race was the factor, stating: "Why [are] the people who come to see me, or who look like me, why can't they turn the street? But everyone else did … .None of my neighbors, none of their guests were stopped … . [W]hat I experienced tonight, and what the people who came to see me experienced tonight, it's not fair, it's not right. … Canalside, the waterfront, cannot just be about one class, or group, or color of people." Ex, 511, WGRZ, *Buffalo Council President says his party guests were unfairly treated by police*, 2WGRZ (July 5, 2017), https://www.wgrz.com/article/news/local/buffalo-council-president-says-his-party-guests-were-unfairly-treated-by-police/71-454313693; Ex, 512, Al Vaughters, *Pridgen sets off fireworks over police handling his July 4th Visitors*, WIVB (July 5, 2017), https://www.wivb.com/news/pridgen-sets-off-fireworks-over-police-handling-his-july-4th-visitors/.

507.  Although Councilman Pridgen complained, and the matter raised serious allegations of racially biased traffic enforcement from an elected official, the BPD did not formally interview the Common Council President, the victims, or witnesses about the allegations of biased policing. Ex. 102, Gennaco Report at 21; Ex. 465, COB-Hodgson_01104.

508.  While the Commissioner is on record of finding the conduct "inexcusable," the allegations that caused him to make such a pronouncement were not pursued in any meaningful way,

and the consequences to the lieutenant and an officer in no way addressed the underlying concern of biased policing. Ex. 102, Gennaco Report at 21; Ex. 465, COB-Hodgson_01104.

509.    Lt Mark Swaggard, who had the altercation with Mr. Pridgen, had an extensive record of more than ten complaints prior to this incident, including three of which had been sustained. Ex. 465, COB-Hodgson_01104; Ex. 513, COB-Hodgson_01110-11.

510.    In June 2016, a Black man filed a complaint alleging that two BPD officers racially profiled him during a traffic stop while he was a rear seat passenger with two other white people in the car. Ex. 514, COB012083 at 37.

511.    The passenger claimed that the officers singled him out by removing him from the car, searching him, and detaining him for an extended amount of time. Ex. 514, COB012083 at 37.

512.    The white individuals were allowed to leave the scene. Ex. 514, COB012083 at 37.

513.    Another Black male complainant alleged that Officer William Hofstetter had been harassing him, conducting unlawful searches, issued him two summons, had called him a "drug dealing punk" and "you [racial epithet], you need to stop what you're doing." Ex. 473, COB426243.

514.    Without investigating the complaint, allegations of racial slurs, or the searches or summons, the Captain dismissed his complaint by citing his previous arrests and saying he shouldn't be offended by the "drug dealer" statement because he was one. Ex. 475, COB425919.

515.    This complainant does not appear in the FBI Gang book as a gang member. *See,* Ex. 435, COB-Hodgson_0044724.

## Q.    Ongoing Discovery Related to Plaintiffs' Injunctive Claim

516.    There are two types of traffic stops for which one cannot determine without further information that sufficient basis for the stop exists:

a)    Traffic stops where an officer issued only one ticket, and that ticket was for the unlicensed operation of a motor vehicle ("unlicensed-driver-only" or "ULD-only" stops). Ex. 403, Krugman Class Cert. Decl. ¶ 14; Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 25:5-11, 45:7-46:4.

b)    Traffic stops where an officer issued neither a traffic summons nor a traffic stop receipt ("no-tix/no-TSR" stops). Ex. 403, Krugman Class Cert. Decl. ¶ 14; Ex. 515, COB018701.

517.    Approximately 3,000 no-tix/no-TSR stops and approximately 350 ULD-only stops take place in Buffalo each year. Ex. 403, Krugman Class Cert. Decl. ¶ 17.

518.    BPD data related to tickets, TSRs, and traffic stops does not provide information sufficient to determine in a general way whether any given stop had a permissible basis. Ex. 403, Krugman Class Cert. Decl. ¶ 15 & n.6.

519.    Race data is generally contained in BPD data for ULD-only stops. Race data is not recorded for no-tix/no-TSR stops, and the only way to determine the race of driver for these no-tix/no-TSR stops is by examining the body-worn camera footage. Ex. 403, Krugman Class Cert. Decl. ¶¶ 15, 18, 20.

520.    Plaintiffs requested follow-on discovery consisting of body-worn camera videos associated with no-tix/no-TSR and ULD-only stops for the last six months of 2024 in order to determine the race of the driver in these incidents and whether BPD officers asserted any basis for these stops. Ex. 403, Krugman Class Cert. Decl. ¶¶ 21, 22.

521.    Defendants agreed to the production of those body-worn camera videos and began producing the materials in December 2024 and is ongoing. Ex. 403, Krugman Class Cert. Decl. ¶¶ 5-7, 11, 23.

522.    Plaintiffs have reviewed and analyzed only a fraction of the produced videos. Plaintiffs' analysis of the race of drivers subject to ULD-only stops in the reviewed subset of materials produced thus far shows that ULD-only stops were overwhelmingly of minority drivers. This is true even in Low Minority census tracts. The numbers do not materially change when ULD-only stops are added into the analysis. Ex. 403, Krugman Class Cert. Decl. ¶¶ 18-19, 32-35.

523.    In 20 out of the 27 Minority drivers with suspended licenses had their vehicles searched; in the case of Non-Minority drivers, it was only 3 out of 10. Ex. 403, Krugman Class Cert. Decl. ¶ 35.

524.    Defendants' production of these body-worn camera videos informed Plaintiffs of a third reason that the video evidence would likely be central to Plaintiffs' injunctive case. Plaintiffs' initial review showed instances where an initial stop itself may technically have had a permissible basis, but that basis appeared to have been pretext for engaging in crime-control tactics. Ex. 403, Krugman Class Cert. Decl. ¶¶ 26-27 (describing crime-control tactics including interrogations, weapons pat-downs, and vehicle searches), 32-35.

a)    Traffic stops where an officer issued only one ticket, and that ticket was for the unlicensed operation of a motor vehicle, are consistent with the practice of pretextual stops which lack a proper basis. Ex. 403, Krugman Class Cert. Decl. ¶¶ 12-13; Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 25:5-11, 45:7-46:4.

b)    Traffic stops where an officer issued neither a traffic summons nor a traffic stop receipt are consistent with the practice of pretextual stops which lack a proper basis. Ex. 403, Krugman Class Cert. Decl. ¶¶ 12-13; Ex. 31, Palizay Sept. 6, 2024 30(b)(6) Dep. at 25:5-11, 45:7-46:4.

525.    Plaintiffs' review identified several examples where BPD officers pulled over a car driven by a young Black male ostensibly on the basis that the car had tinted windows. The officers

then pull the driver out of the car, pat him down, and search the driver's car or interrogate him about drugs. Ex. 403, Krugman Class Cert. Decl. ¶¶ 27, 43-54; Krugman Decl. Exhibits S-W.

526.   Plaintiffs' review has identified that this pattern almost never takes place with White drivers. Ex. 403, Krugman Class Cert. Decl. ¶¶ 27, 40.

527.   Plaintiffs' review of body-worn camera footage has identified five examples of pretext stops:

   a)   In one video, a police vehicle comes across two cars parked in the same "No Standing" zone. A young White woman is in one of the vehicle and a young Black man is in the other. The officers approach the White woman and, in an interaction that takes 15 seconds, tell her she is in a No Standing zone and allow her to leave. The officers then approach the Black man, ask him to step out of the vehicle, pat him down, and place him in the back of the police vehicle while officers search his car and interrogate him about his potential involvement in drug sales. This interaction takes 15 minutes. Ex. 403, Krugman Class Cert. Decl. ¶¶ 43-45; Krugman Class Cert. Decl. Exhibit S.

   b)   In another example, BPD officers stop a Black male driver without informing him of the reason. The driver's license shows as suspended, and the driver indicates that he had cleared the suspension at the DMV. Rather than ask the driver if he had any proof that he had cleared the suspension, the officers pull him out of the car, pat him down, parked him in the back seat of the cruiser, and searched the car. When the search turned up nothing, the driver provided a paper from the DMV showing the cleared suspension and the officer responds "We didn't go through all that stuff" and informed the driver that "the reason for the stop is the window tint" and that the officer would not write the driver a ticket for the tint.  The officers then let the driver go. Ex. 403, Krugman Class Cert. Decl. ¶¶ 46-48; Krugman Class Cert. Decl. Exhibit T.

   c)   In a third example, BPD officers pull over a car with a Black driver for tinted windows. The driver's license was suspended. The officers pulled him and his passenger (who was on crutches) out of the car, patted them down, put them in the back seats of two of the cruisers that were on scene, and searched the car. After the search turned up nothing, they issued a violation-level citation for driving without a license and terminated the stop. Ex. 403, Krugman Class Cert. Decl. ¶ 49; Krugman Class Cert. Decl. Exhibit U.

   d)   In a fourth example, BPD officers come across a car parked on the side of the road with a Black man asleep in the driver's seat. The officers wake him up, ask him if he had been drinking, and the man replies "No. I smoked some weed, but that's it." The officers then pull the driver out of the car, pat him down, place him in a police vehicle, and search his car. After the search turns up nothing, they let the driver go. Ex. 403, Krugman Class Cert. Decl. ¶¶ 50-52; Krugman Class Cert. Decl. Exhibit V.

e)  In a fifth example, officers stop a car with two Black men in it because they could not see the front license plate.  The car had a license plate on the dashboard.  The driver and passenger were removed from the vehicle and patted down, and the driver was placed in a police vehicle.  The officers searched the car, which turned up nothing, and no ticket or TSR was issued for the stop. Ex. 403, Krugman Class Cert. Decl. ¶¶ 53-54; Krugman Class Cert. Decl. Exhibit W.

528.  Despite Plaintiffs' best efforts to gather this evidence, they have not had the opportunity to discover this evidence to date as much of the body-worn camera video remains unproduced by Defendants. Ex. 403, Krugman Class Cert. Decl. ¶¶ 5-13, 21-27; Krugman Class Cert. Decl. Exhibits A-C.

529.  This body-worn camera footage and related discovery is evidence of the City's liability as to Plaintiffs' claim for injunctive relief. Ex. 403, Krugman Class Cert. Decl. ¶¶ 5-13, 16-20, 27.

### R.  Plaintiffs' Experiences of Being Stopped and Ticketed by the BPD at and Outside of Checkpoints

<u>Plaintiff Dorethea Franklin</u>

530.  Dorethea Franklin is a 52-year-old Black woman, mother of seven, and small business owner who has lived on Buffalo's East Side for years. Franklin Decl. ¶¶ 1, 3, 17.

531.  Franklin has been subjected to discriminatory traffic stops inside and outside of Checkpoints. Franklin Decl. ¶¶ 3-14, 19-20.

532.  Franklin encountered BPD checkpoints "dozens of times" near her home by the Bailey Avenue exit of Route 33–so many times she "lost count." The Checkpoints disrupted her daily routines, including her commute to work, church, grocery stores, and her children's school. Franklin Decl. ¶¶ 4-5.

533.  The BPD frequently ran checkpoints on her street in front of her home near the Route 33 off-ramp, sometimes making it impossible for Franklin to exit her own driveway due to traffic backups. Franklin Decl. ¶ 7.

534.  Checkpoints appeared without warning—no lights, signs, or cones were used—with the only indication being unexpected traffic jams of Black motorists. Franklin Decl. ¶ 6.

535.  Franklin repeatedly observed BPD officer's conduct at Checkpoints since they were so frequently stationed near her home. She observed BPD officers exclusively pulling over, ticketing, and towing Black motorists at Checkpoints, while BPD officers waived white drivers through without scrutiny. Franklin Decl. ¶¶ 8-9.

536.  So many Black motorists would get ticketed or towed during the Checkpoints that the street would be lined with motorists awaiting secondary inspection or to be ticketed, and the auto repair business at the end of the block would frequently be filled with cars waiting to be impounded. Franklin Decl. ¶ 8.

537. The Checkpoints delayed Franklin for an average of 20 minutes per stop, even when no violations existed. On three occasions, officers detained her for 45 minutes without issuing a ticket, disrupting her work and appointments. Franklin Decl. ¶ 11.

538. Officers were also rude and degrading and treated Franklin and her passengers like criminals, demanding IDs from passengers, questioning their movements, asking intrusive questions like "Where are you going?" and "Where are you coming from?", and peering inside vehicles with flashlights. Franklin Decl. ¶ 12.

539. At Checkpoints on Broadway, Franklin witnessed BPD officers physically abusing Black motorists—dragging them from cars, breaking windows, and forcing them to lie on the ground. She never saw white drivers treated this way, and these incidents left her fearful for her community's safety. Franklin Decl. ¶10, 22.

540. Checkpoints caused Franklin to miss work appointments and lose clients and income for her home-based business, because travel to her neighborhood became both inconvenient and harrowing. Franklin Decl. ¶¶ 11, 14.

541. The Checkpoint Program also strained her relationships with her children because they stopped visiting her as often because they feared becoming targets of police harassment. Franklin Decl. ¶ 13.

542. The Checkpoint Program made Franklin feel dread, and made life on the East Side start to feel unbearable. Franklin and her Black neighbors viewed the Checkpoints as a form of state-sponsored abuse and revenue extraction. The program made residents feel imprisoned in their own neighborhood. She doesn't know anyone who supported them. Franklin Decl. ¶¶ 15-16.

543. Checkpoints continued to appear exclusively in Black neighborhoods until public outcry prompted token deployments in North Buffalo and the West Side. Checkpoints in white neighborhoods operated differently—involving minimal staffing and no enforcement, suggesting they were just a performative cover for the BPD's long history of discrimination. Franklin Decl. ¶¶ 17-18.

544. Ms. Franklin has also been subjected to recent traffic stops by the BPD outside of Checkpoints. Franklin Decl. ¶¶ 19-20.

545. In March 2023, a BPD officer pulled Ms. Franklin over while she was driving down Bailey Avenue with her daughter. The officer was very aggressive and refused to explain why he had initiated the stop. Franklin Decl. ¶ 20.

546. The Officer asked Franklin questions unrelated to traffic safety, such as why she was driving in that area, even though she had every right to travel freely. The interaction felt to her like the officer was fishing for a reason to issue tickets. Franklin Decl. ¶ 20.

547. Franklin was ultimately issued two tinted window tickets despite her medical justification. The tickets were later dismissed when she provided a doctor's note about her medical need for tints. Franklin Decl. ¶ 21.

548.    Franklin continues to observe disproportionate traffic stops targeting Black motorists on the East Side, even after the Checkpoint Program's pause. She remains wary of its potential return and the BPD's unchecked bias. Franklin Decl. ¶¶ 22-25.

549.    Franklin continues to be a resident of the East Side, and she is committed to fighting for change so that Black Buffalonians can start receiving equal protection under the law. Franklin Decl. ¶¶ 26-27.

Plaintiff Joseph Bonds

550.    Joseph Bonds is a 68-year-old Black Army veteran and minister who worked as a security guard and carpenter. He lived in BMHA housing before moving to veteran's housing and drove a Cadillac—a car he believes BPD associated with criminality. Bonds Decl. ¶¶ 1-14, 32.

551.    The BPD has stopped and ticketed Bonds numerous times inside and outside of Checkpoints, in a manner that made him feel racially targeted. He has also received multiple tickets while parked in BMHA parking lots. Bonds Decl. ¶¶ 6-38.

552.    In Fall 2016, Bonds was driving home from church in his Cadillac with his son, wife, and granddaughter on the East Side of Buffalo when he encountered a BPD checkpoint on the opposite side of the street at William Street and South Ogden Street. Bonds Decl. ¶ 6.

553.    When he tried to drive past, four BPD officers who were stationed at the Checkpoint turned on their sirens, pursued him, and subjected him to a sudden traffic stop. Bonds Decl. ¶¶ 8-9.

554.    Two white male officers approached Bonds' car. The officers shined lights into his car and questioned Bonds and his Black son (both wearing suits from church) about their whereabouts, treating them like criminal suspects. Bonds Decl. ¶¶ 15-16.

555.    The Officers claimed his insurance was expired and, even though he showed them his proof of payment, they issued him a ticket anyway. The ticket was eventually dismissed. Bonds Decl. ¶¶ 9-12.

556.    Bonds perceived his stop to be racial profiling because he hadn't committed a traffic violation. Instead, the officers automatically assumed that Bonds and his son were "criminals and drug dealers" because they were Black, driving a nice car in the wrong neighborhood. Bonds Decl. ¶¶13-17.

557.    In August 2017, Bonds encountered a Jefferson Avenue checkpoint with 10-12 patrol cars where only Black drivers were being pulled aside. Officers found no violations with his vehicle. Bonds Decl. ¶¶ 18-22.

558.    Between 2018-2019, BPD issued Bonds five tickets (about $1,000 total) for expired inspection while his car was parked, unused, at his BMHA property, where most residents are black. Mr. Bonds' Black neighbors experienced the same issues with multiple ticketing

by the BPD. The financial burden of receiving tickets on his parked car became so great that he eventually sold the car to avoid more tickets. Bonds Decl. ¶¶ 27-32.

559. After buying a new car, Bonds continued to be profiled and targeted for traffic stops by the BPD. Bonds Decl. ¶¶ 33-38, 41.

560. On March 17, 2025, two white BPD officers followed Bonds onto his workplace's private property. Despite his uniform, they questioned his employment before falsely claiming his insurance was expired. Bonds Decl. ¶¶ 33-35.

561. The officers acknowledged his active Progressive policy but still issued seven tickets (including for suspended license) that were all dismissed at his April 17, 2025 court hearing. Bonds Decl. ¶¶ 34-38.

562. Bonds now avoids night driving and main roads, taking longer alternate routes to evade BPD. The constant policing has made him alter basic life routines. Bonds Decl. ¶¶ 24-25.

563. Bonds continues driving in Buffalo but describes constant hypervigilance about police encounters. He keeps his current car meticulously documented to avoid pretexts for stops. Bonds Decl. ¶¶ 24-25, 42.

564. Bonds experiences at traffic stop have convinced him that BPD officers view Black men as criminal suspects, regardless of their profession, military service, or circumstances. Bonds Decl. ¶¶ 13-16, 32.

Plaintiff De'Jon Hall

565. De'Jon Hall is a 34-year-old Black man, Buffalo native, and Director of Policy for Rochester's Police Accountability Board. He is also a SUNY Buffalo School of Law graduate who served on Buffalo's Police Advisory Board for several years. Hall Decl. ¶¶ 1, 4-5.

566. As a Buffalo native and police accountability advocate, Hall has both documented BPD's pattern of discriminatory policing of Black and Latino motorists and BMHA housing residents, and experienced discriminatory Checkpoint stops and traffic stops firsthand. Hall Decl. ¶¶ 4, 6-19, 24-27.

567. Hall also witnessed how excessive fines at Checkpoints led to vehicle impounds, job losses, and cascading financial consequences for Black residents. Hall Decl. ¶ 27.

568. On April 26, 2017, Hall was stopped at a checkpoint on Comstock Avenue near Kensington Avenue where he observed approximately 10 officers with a tow truck exclusively stopping Black and Latino drivers. No white motorists were being inspected. Hall Decl. ¶¶ 10-12.

569. Though not ticketed, Hall felt "inherently criminal[ized]" by the checkpoint. He later avoided Checkpoint locations due to trauma from seeing cars impounded there during similar operations. Hall Decl. ¶¶ 13-14.

570. Hall co-authored a 2017 complaint to the City and the NY Attorney General documenting the incidence of racial profiling in BPD's Checkpoint Program. Hall Decl. ¶ 6.

571. On the Police Advisory Board, Hall heard countless complaints about BPD's racial profiling. However, despite Hall's efforts, no meaningful reforms were implemented, and discriminatory policing by the BPD has not improved. Hall Decl. ¶¶ 16-27.

572. Community complaints about discriminatory stops continued unabated during Hall's tenure on the Advisory Board from 2018-2021. The Police Advisory Board's recommendations for establishing independent oversight were ignored. Hall Decl. ¶¶ 16-25.

573. Hall resigned from the Board in 2021 because the City had blocked it from engaging in any meaningful oversight work. The Board ultimately disbanded without achieving substantive reforms. Hall Decl. ¶¶ 21-23.

574. As a result, the BPD continues to subject motorists like Hall to questionable stops and tickets to this very day. Hall Decl. ¶¶ 25, 29.

575. Hall received a parking ticket while temporarily stopped with hazard lights on at Pearl Street Brewery to respond to a text message. A parking enforcement officer observed him in the vehicle but still issued the ticket, which he paid despite disputing its validity due to lacking proper signage. Hall Decl. ¶ 26.

576. This incident made Hall feel racially targeted as a revenue source, mirroring his community's experiences with aggressive BPD ticketing. Hall Decl. ¶ 27.

577. And on Feb. 8, 2025, Hall saw two white officers pass his vehicle when he was dropping off his younger teenage brother, who was wearing a hoodie, at a nearby corner store on the East Side of Buffalo on his way to visit his cousin. Hall Decl. ¶¶ 24-25.

578. When Hall resumed driving, the same officers passed him in the opposite direction and shortly thereafter began following him, turned, and soon reappeared behind him, and activated their lights, pulling him over. Hall Decl. ¶ 24.

579. Hall was not committing any traffic violations at the time. Instead, Hall believes that officers targeted him after seeing his Black teenage brother exit his car in a hoodie and assuming he was a gang member, exemplifying racial profiling. Hall Decl. ¶¶ 24-25.

580. The officers falsely claimed that Hall did not use a turn signal at the last intersection, even though Hall had not made a turn. The officers asked for his license and took it back to his patrol car. Hall Decl. ¶ 24.

581. The officers returned and told him to use a signal, but did not give him a ticket or traffic stop receipt in lieu of a ticket in violation of BPD protocols. Hall Decl. ¶ 24.

582. Hall's 2025 traffic stop followed the same pretextual patterns he had documented years earlier—confirming to him that BPD officers still profile and target Black motorists without justification. Hall Decl. ¶¶ 23-25.

583.    Hall continues driving in Buffalo during weekly visits but experiences anxiety about pre-textual stops. He worries officers may escalate encounters with Black drivers like him. Hall Decl. ¶¶ 28-29.

## Plaintiff Shaketa Redden

584.    Plaintiff Shaketa Redden is a 42-year-old Black woman, born and raised in Buffalo, New York, and a co-founder of Black Love Resists in the Rust ("BLRR"). Redden Decl. ¶¶ 1, 3.

585.    Redden has been subjected to traffic stops inside and outside of Checkpoints and has been active in police accountability efforts in Buffalo. Redden Decl. ¶¶ 3-26; ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 22:2-23:10.

586.    In Redden's experience, the BPD operated checkpoints almost exclusively in Black neighborhoods on the East Side before there was community uproar.  Redden Decl. ¶¶ 4, 14.

587.    Officers stopped and harassed Black drivers, searched their vehicles without cause in hopes that they would find weapons, and issued them tickets. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 38:4-42:15.

588.    Redden learned from City budget records that the surge in Checkpoints targeting Black East Side neighborhoods coincided with traffic ticket revenue being redirected from the state directly to the City of Buffalo. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 65:2-66:23.

589.    On September 9, 2015, Redden was stopped at a BPD Checkpoint on New York State Route 33 near the Suffolk Street exit on Buffalo's East Side. Redden Decl. ¶ 6.

590.    The September 9, 2015 Checkpoint had no warning lights, flares, or signs, surprising Redden as she exited toward Suffolk Street. Redden Decl. ¶ 7.

591.    At the Checkpoint, Redden observed two officers at the ramp's top and one at the bottom stopping approximately four cars ahead of hers and several behind. Redden Decl. ¶ 8.

592.    Officers at the checkpoint made each driver roll down windows which gave her the opportunity to observe them. Redden Decl. ¶¶ 9-11.

593.    All of drivers being pulled over were Black, not white, confirming Redden's observation that the Checkpoint Program targeted motorists from Black communities. Redden Decl. ¶¶ 10-11, 14; ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 53:16-60:5, 101:5-102:12.

594.    During the checkpoint stop, officers asked Redden intrusive questions like "Where are you going?" and looked inside her car. Redden Decl. ¶ 11.

595.    During the Checkpoint stop, Redden received a ticket for a lapsed inspection. Her inspection had lapsed just one day prior. Redden Decl. ¶¶ 12-13.

596.     The BPD labeled the Checkpoint Program "proactive policing," but Redden experienced and witnessed officers using Checkpoints to racially profile Black residents. Officers stopped drivers for minor violations (e.g., expired inspections) while ignoring similar infractions in white neighborhoods. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 38:4-42:15, 67:12-69:23.

597.     Redden observed that BPD officers at checkpoints ticketed Black drivers for multiple violations at once (e.g., expired registration and inspection) to maximize revenue. White drivers received warnings or fewer citations. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 39:22-40:16, 63:5-70:8.

598.     The BPD Strike Force also conducted "hop-outs" (unjustified stops/frisks) in Black neighborhoods like the East Side. Redden witnessed officers jumping out of patrol cars to search Black pedestrians without cause. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 46:1-47:21.

599.     Redden observed the Checkpoint Program and "hop-outs" create lasting trauma for residents, and reinforce segregation, poverty, and fear in Black communities. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 104:3-105:8; Redden Decl. ¶ 24.

600.     Redden also experienced discriminatory traffic stops outside of BPD Checkpoints. Redden Decl. ¶¶ 15-23; ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 42:12-44:13, 49:22-51:22, 103:1-104:2.

601.     BPD officers frequently followed Redden, especially when she drove between the East and West Sides of Buffalo, and she experienced repeated stops while driving between East and West Buffalo. BPD officers followed her, questioned her destination, and in one instance, questioned her aggressively as she parked near her residence. She perceived these stops to be the result of racial profiling. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 42:12-44:13, 49:22-51:22, 103:1-104:2.

602.     On September 13, 2018, BPD Strike Force Officer Charles Skipper pulled Redden over at West Utica Street and Richmond Avenue immediately after she attended a vigil for Rafael Rivera, a Latino man killed by BPD. The vigil was organized by BLRR and was protesting racial discrimination and violence by the BPD, including by the Strike Force. Redden Decl. ¶¶ 15, 22; ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 75:11-76:20.

603.     Redden perceived the stop to be an instance of racial profiling by the BPD and retaliatory targeting for her activism, because Officer Skipper followed her from the vigil and stopped her even though she hadn't committed any moving violations. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 75:11–78:20, 85:5-89:5; Redden Decl. ¶¶ 21-22.

604.     The officer was also rude and dismissive during the traffic stop, and chuckled when she asked him how to retrieve her impounded car, further suggesting an improper motive for the stop. Redden Decl. ¶ 23; ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 77:4-78:20, 85:5-89:5; Redden Decl. ¶¶ 22-23.

605.    The stop caused Redden significant stress and anxiety because she delt targeted for her race and her activism, and she feared what might happen during and after the encounter. Redden Decl. ¶ 22.

606.    Officer Skipper issued Redden six tickets, including two for failure to notify DMV of an address change, even though she confirmed the following day that her address was correct. She also was ticketed for driving with a suspended registration. Skipper also impounded her vehicle despite her having a safe place to store it at a nearby church. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 80:23-81:4, 83:17–85:4; Redden Decl. ¶¶ 16-19.

607.    Redden recovered her impounded car after paying $140 in fees. Redden Decl. ¶ 19.

608.    When Redden retrieved her car, she found items displaced in the back seat, indicating it had been searched. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 83:17–85:4.

609.    On September 27, 2018, at her traffic court hearing, the judge later threw out some tickets but upheld others. In total, she paid $1,200 in fines. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 72:20–73:22, 74:11-75:10, 80:23-82:20; Redden Decl. ¶ 20.

610.    While fear of retaliation deterred Redden from filing individual complaints about her traffic stops with the BPD, she attempted to report harassment to Commissioner Lockwood in 2017–2018 alongside members of BLRR via letter, and by requesting an in-person meeting at headquarters. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 44:14-49:21.

611.    However, BPD officers approached Redden and the others while they were waiting in the lobby and threatened to arrest them if they didn't leave. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 44:14-49:21.

612.    Redden's interactions with the BPD have left her with lasting anxiety, which persisted even after she moved to Oakland. ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 97:10-100:19.

613.    Although Redden moved to Oakland in 2020, she returns to Buffalo once or twice yearly to see her family and friends. Redden typically stays in Buffalo for two to three weeks each visit, or four to six weeks a year. Redden Decl. ¶ 25; ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 31:21-32:5, 96:11-97:2.

614.    Redden continues to drive in Buffalo during these visits, using her father's car, and feels anxious and fearful while driving because she is at risk of being subjected to more of the BPD's discriminatory traffic enforcement practices. Redden Decl. ¶¶ 24-27; ECF No. 252-34, Redden Sept. 6, 2023 Dep. at 32:11-17, 97:3-98:4.

Plaintiff Charles Palmer

615.    Plaintiff Charles Palmer is a 41-year-old Black man, a disabled Air Force veteran, and former carpenter who lived in Buffalo for over 20 years before relocating to North Carolina in 2021. Palmer Decl. ¶¶ 1, 3.

616. Palmer frequently encountered BPD checkpoints on Buffalo's East Side, including on Suffolk Street, Bailey Avenue, and East Delavan, where he felt stigmatized as a Black motorist. He never saw similar checkpoints in white neighborhoods during his years of driving in Buffalo. Palmer Decl. ¶¶ 6, 10-12.

617. In November 2015, BPD Officer Jared Domaracki stopped Palmer on Suffolk Street and Hempstead Avenue, issuing three tickets (two for tinted windows, one for an address discrepancy), even though Palmer needed the window tints for medical reasons related to his disability. The officer asked questions unrelated to traffic safety, making Palmer feel like a criminal suspect. Palmer Decl. ¶¶ 7-8, 10.

618. In January 2016, BPD Officer Adam Wigdorski stopped Palmer on Newburgh and East Delavan, issuing five tickets (four for tinted windows, one for an address discrepancy), even though he still needed the window tints for medical reasons. The officer's questioning about Palmer's destination made him feel profiled. Palmer Decl. ¶¶ 7-8, 11, 14.

619. In June 2016, BPD Officer Charles Miller stopped Palmer on Bailey and Kensington, issuing five tickets (four for tinted windows, one for expired registration), even though he still needed the window tints for medical reasons. Palmer Decl. ¶¶ 7-8, 12.

620. Two of the officers who stopped Palmer, Officers Miller and Domaracki, have extensive records of complaints, including racial bias complaints. Ex. 102, Gennaco Report at 71, 87, 100, 110; Ex. 27, Miller June 2, 2023 Dep. at 127:3-129:5, 415:6-418:13; Ex. 516, Domaracki July 18, 2023 Dep. Exhibit 15.

621. For instance, Officer Miller has been the subject of 19 complaints, and has been accused of engaging in racially discriminatory policing in five percent of all of his traffic stops. In spite of this, Miller received no discipline, counseling, or supplemental bias training. Ex. 102, Gennaco Report at 71, 87, 100, 110; Ex. 27, Miller June 2, 2023 Dep. at 127:3-129:5; Ex. 32, Miller Nov. 8, 2023 Dep. at 415:6-418:13, 419:22-421:5.

622. The tickets that Palmer received were so costly that he could not afford to pay them immediately, and his license was suspended as a result. Mr. Palmer eventually paid $3,000 in veterans' benefits to clear the tickets and reinstate his license after two years. Palmer Decl. ¶ 13.

623. The repeated ticketing forced Palmer to return his car to the dealership because he could no longer afford the fines. Without a car, he lost carpentry jobs that required driving, causing stress and financial hardship. Palmer struggled to pay his bills as he supports his son and he faced adverse health consequences from stress related to his experiences with the BPD. Palmer Decl. ¶¶ 14-15.

624. Palmer believes that his traffic stops were the result of the BPD's policy of targeting motorists in communities of color, because he knows of many other motorists of color who have experienced the same kind of ticketing and police harassment that he has. Palmer Decl. ¶ 16.

625.    Palmer doubts white drivers would have received so many tickets for similar violations. Palmer Decl. ¶¶ 14-16.

626.    Palmer continues to visit Buffalo and drive there when visiting family and friends. He remains fearful of encountering BPD officers and being targeted again. Palmer Decl. ¶¶ 17-19.

Plaintiff Jasmine Evans

627.    Jasmine Evans is a 34-year-old Black woman and mother of four children who resides in Buffalo, New York, where she has lived her entire life. Evans was previously identified as "Jane Doe." Evans Decl. ¶¶ 1, 3.

628.    Evans works as a medical assistant and is pursuing a certificate in Diagnostic Medical Sonography, with an expected graduation date of May 2025. Evans Decl. ¶ 4.

629.    Evans passed through the Buffalo Police Department's BPD Checkpoints approximately thirteen times, either as a driver or passenger, all of which were located in Buffalo's predominantly Black East Side neighborhood. During the same period, she drove through predominantly white neighborhoods but never encountered Checkpoints there. Evans Decl. ¶ 5.

630.    The BPD Checkpoints disrupted Evans's daily routine, making simple activities like running errands or visiting family feel criminalizing, as though she needed police permission to move freely. She observed that the Checkpoints typically involved ten or more officers stopping every car, inspecting vehicles, and creating long lines of traffic. Evans Decl. ¶¶ 6-7.

631.    The Checkpoints were strategically placed on side streets near main roads, making them unavoidable once drivers turned onto those streets. One frequent location was Leslie Street and Scajaquada Street, where motorists received no advance warning and had no means of avoiding the Checkpoint after turning. Evans Decl. ¶¶ 8-9.

632.    On one occasion, BPD officers impounded Evans's car when the driver, who was unaware of his suspended license, was stopped at a Checkpoint. Her children, who were in the car during the incident, became upset as the officers took the vehicle. Evans Decl. ¶ 10.

633.    On July 2, 2015, Evans drove through a Checkpoint at Pershing Avenue and High Street with her two children, aged 3 and 4, secured in booster seats. At the time, she held only a learner's permit. After unbuckling her seatbelt to retrieve her registration, Officer Thomas cited her for three seatbelt violations for herself and her children and driving without a proper license. Evans Decl. ¶¶ 11-12.

634.    Following the incident, Evans purchased new booster seats and a five-point harness for her younger child, as she had been unaware of the seat requirements. She contested the tickets and received a hearing date. Evans Decl. ¶¶ 13-14.

635. After the July 2015 encounter, Evans subscribed to a Facebook page alerting her to Checkpoint locations, which she and her fiancé used to avoid them. Despite these efforts, they still encountered two additional unavoidable Checkpoints. Evans Decl. ¶ 15.

636. Evans believes the BPD engaged in discriminatory practices, as the Checkpoints were exclusively placed in Black neighborhoods, and officers treated her disrespectfully, questioning her and searching her car. She never observed white individuals being stopped at these Checkpoints. Evans Decl. ¶ 16.

637. At a March 10, 2017 hearing with the BTVA, Evans was not permitted to speak unless questioned, leaving her feeling unheard and dismissed. On March 20, 2017, the BTVA sent her a letter informing her that she had been found guilty of all violations, resulting in eight points on her license and $896 in fines and fees. Evans Decl. ¶¶ 17-18.

638. Unable to afford the fines while attending school full-time, Evans sought a payment plan, but the BTVA refused. Consequently, her learner's permit was suspended, forcing her to rely on her fiancé for transportation once she got a job in Williamsville. Evans Decl. ¶¶ 19-22.

639. In February 2018, Evans used her tax refund to pay the fines and reinstate her permit, diverting funds from necessities for her children and car repairs. She obtained her full driver's license in summer 2022 and continues to drive in Buffalo, though she avoids Leslie Avenue due to lingering anxiety from her experiences. Evans Decl. ¶¶ 23-26.

Plaintiff Shirley Sarmiento

640. Shirley Sarmiento is a 78-year-old Black retired social worker who lived in Buffalo's Marine Drive Apartments for over 40 years. Sarmiento observed BPD's disproportionate targeting of motorists in Black communities and BMHA public housing complexes. Sarmiento Decl. ¶¶ 1-18.

641. Sarmiento never saw Checkpoints in white neighborhoods, and she never saw white motorists stopped at Checkpoints. Sarmiento Decl. ¶ 8.

642. But when traveling to the East Side to visit family and friends, Sarmiento encountered Checkpoints two times. Sarmiento observed the BPD exclusively stopping Black drivers. Sarmiento Decl. ¶¶ 6-8.

643. Because Sarmiento feared being subjected to the police harassment of Black Buffalonians she repeatedly observed, she began rerouting her trips to avoid them. Sarmiento Decl. ¶ 7.

644. While Sarmiento was never ticketed at a Checkpoint, she repeatedly experienced excessive ticketing from the BPD as a Black BMHA resident. Sarmiento Decl. ¶¶ 10-17.

645. Between 2016 and 2019, the BPD ticketed Sarmiento's parked car six times for expired inspection stickers in the BMHA lot, costing her over $310 in fines—money she needed for car repairs. Sarmiento Decl. ¶¶ 13-16.

646.    In March 2018, Sarmiento found two identical tickets on her car for the same violation on the same day, forcing her to pay $80 to resolve what appeared to be duplicate ticketing. Sarmiento Decl. ¶ 14.

647.    At BTVA court, Sarmiento only saw Black defendants, which she perceived as evidence that the BPD was targeting Black motorists and their residences for revenue generation through excessive ticketing. Sarmiento Decl. ¶ 18.

648.    The repeated ticketing created a financial trap—Sarmiento couldn't afford repairs to pass inspection because she was paying tickets, leading to more tickets. The cycle of financial hardship was especially predatory for fixed-income seniors like Sarmiento who rely on Social Security as their sole income. Sarmiento Decl. ¶¶ 4, 16-18.

649.    The cost of BMHA tickets became so excessive she eventually parked her car at a friend's garage. Sarmiento Decl. ¶ 19.

650.    Sarmiento still maintains a valid license but remains fearful because, without reforms, there is nothing stopping the BPD from continuing to target Black motorists and from restarting the Checkpoint program. Sarmiento Decl. ¶¶ 20-21.

Plaintiff Taniqua Simmons

651.    Taniqua Simmons is a 50-year-old Black mother of seven who resides near Buffalo's East Side. Simmons Decl. ¶¶ 1, 3.

652.    Simmons was subjected to at least 40 Checkpoint stops at East Side locations under the Checkpoint Program, including East Ferry and Fillmore (approximately 10-15 times) and Bailey and East Delavan (three times). Simmons Decl. ¶ 4.

653.    The Checkpoint Program disrupted Simmons's life and family routines and burdened her ability to travel. Simmons encountered Checkpoints driving to home, work, church, her children's school, and local businesses. She never saw similar checkpoints in white neighborhoods. Simmons Decl. ¶¶ 3, 10-11, 18.

654.    Simmons' Checkpoint stops typically at least 15-20 minutes, though on five occasions her Checkpoint stops exceeded 45 minutes. Simmons was also subjected to long and arbitrary secondary stops, at times simply because BPD officers did not like her answers, for sometimes at no reasons at all. Most of those occasions Simmons left without tickets. Simmons Decl. ¶¶ 7-9.

655.    The checkpoints made Simmons late for work and appointments so often that she lost count. Simmons even missed doctors' appointments and got reprimanded at work for her lateness. Simmons Decl. ¶¶ 10-11.

656.    Once, when Simmons was stopped at a BPD checkpoint after leaving the grocery store, she was forced to wait so long that the popsicles she went to buy for her children were melted by the time she got home. Simmons Decl. ¶ 10.

657.    She describes the Checkpoints as a "time tax" on Black Buffalo residents, and doesn't know anyone on the East Side who supported them. Simmons Decl. ¶¶ 8, 11.

658.    Simmons felt terrorized and targeted by the Checkpoints because of the abusive treatment she witnessed and experienced at the hands of the BPD. Simmons Decl. ¶¶ 13-15.

659.    BPD officers treated Simmons, her friends, and family members like criminals during stops. Officers asked intrusive questions unrelated to traffic safety, such as "Where are you going?" and "What are you doing?" while peering inside her vehicle, sometimes using flashlights. These encounters left Simmons anxious and fearful of being arrested without cause, even when she knew she had violated no laws. Simmons Decl. ¶ 13.

660.    Simmons also witnessed BPD officers drag Black motorists from cars, break windows, and force people to lie on the ground—treatment she never observed toward white drivers. Simmons Decl. ¶¶ 14-15.

661.    The constant policing made Simmons feel like she needed "the BPD's permission just to leave the house." She describes the East Side as feeling like a "police state" during checkpoint operations. Simmons Decl. ¶¶ 5, 11.

662.    Because the Checkpoints were so burdensome on Black motorists, Simmons helped create a Facebook group to track checkpoint locations. But the BPD countered by implementing unpredictable "rolling checkpoints" that moved approximately every 15 minutes. Simmons Decl. ¶ 17.

663.    Once that BPD practice began, Simmons passed through two to three checkpoints in a single day when driving through Black neighborhoods, whereas when she drove through White neighborhoods, Checkpoints were still nowhere to be found. Simmons Decl. ¶ 18.

664.    Simmons testified before the Common Council and Community Oversight Committee about the discriminatory impact of checkpoints on Black residents' daily lives. Simmons Decl. ¶ 19.

665.    In June 2016, Simmons even complained about the Checkpoints to Mayor Brown directly at a Father's Day event. She notified him that the Checkpoints were racially discriminatory since 95% of the Checkpoints occurred on the East Side. Brown responded by claiming that Checkpoints occurred "all over the city, " even though that was not true. He also said he would "look into it," but Simmons continued to pass through checkpoints regularly through the summer of 2017. Simmons Decl. ¶ 20.

666.    Though checkpoints were paused, Simmons continues driving on the East Side with lingering anxiety. She fears they could restart at any time without policy changes. Simmons Decl. ¶¶ 22-23.

Plaintiff Ebony Yeldon

667.    Ebony Yeldon is a Black woman and resident of Buffalo who worked as both a school bus driver and taxi driver, giving her extensive experience driving throughout the City. Yeldon Decl. ¶¶ 1, 3.

668.    Yeldon has been stopped by the BPD inside and outside of Checkpoints. She has also received tickets while parked at BMHA properties. Yeldon Decl. ¶¶ 4-6, 32.

669.    Yeldon observed checkpoints concentrated in Black neighborhoods like the East Side, reinforcing her belief that the Checkpoint Program is racially discriminatory. Yeldon Decl. ¶¶ 4-5.

670.    Yeldon was stopped at BPD Checkpoints at least twice while driving on Buffalo's East Side, and she was subjected to a secondary stop, even though she was never ticketed. Yeldon Decl. ¶¶ 4-5; ECF No. 252-31, Yeldon Dec. 13, 2022 Dep. at 70:1-72:13.

671.    On December 18, 2017, BPD Officer Michael Healy, who is white, pulled over Yeldon while she was operating her taxi in South Buffalo, which is a predominantly white neighborhood. Yeldon Decl. ¶¶ 6, 8.

672.    Healy did not measure the tints on his car, he only wiped his hand on her window. However, he gave her two tickets for tinted windows, and one ticket for driving without insurance, despite her having valid coverage. Yeldon Decl. ¶¶ 6-11; ECF No. 252-31, Yeldon Dec. 13, 2022 Dep. at 76:5-77:10, 86:7-15.

673.    Officer Healy told Yeldon that she was "lucky that he only gave [her] two tinted windows tickets instead of four." Yeldon Decl. ¶ 11; *see also* ECF No. 252-31, Yeldon Dec. 13, 2022 Dep. at 77:5–77:8.

674.    The December 2017 traffic stop resulted in approximately $1,000 in fines from Officer Healy's citations. Yeldon Decl. ¶¶ 6, 12.

675.    At her hearing regarding the ticket, Officer Healy testified that he measured the tint level during the stop, which was untrue. Yeldon Decl. ¶ 14; ECF No. 252-31, Yeldon Dec. 13, 2022 Dep. at 86:7-15; 88:19-89:2.

676.    Officer Healy also falsely testified the taxi's tint measured 17%—a legal level under NY law. Yeldon Decl. ¶¶ 14-15.

677.    The BTVA sustained all of Yeldon's tickets at her hearing, despite lacking proof that she owned the vehicle or knew of any insurance lapse. Yeldon Decl. ¶¶ 16-19.

678.    Yeldon's license was immediately suspended after the wrongful conviction, causing her to lose both driving jobs. Yeldon Decl. ¶¶ 20-21.

679.    Yeldon spent months struggling financially to reinstate her license while supporting three children on no income. Yeldon Decl. ¶¶ 24, 27.

680. Without a license, Yeldon relied on public transit for her children's school and sports commutes, adding hours to their daily routines. Yeldon Decl. ¶ 28.

681. Yeldon now earns significantly less than her previous driving jobs and fears returning to taxi work due to BPD profiling. Yeldon Decl. ¶¶ 29, 31.

682. An appellate court reversed her conviction on the insurance violation. ECF No. 252-31, Yeldon Dec. 13, 2022 Dep. at 98:16-99:15; Yeldon Decl. ¶ 23.

683. The appellate court noted Yeldon proved the taxi was properly insured and owned by her employer. Yeldon Decl. ¶ 23.

684. But she still paid a fine on the tinted windows, even though she was driving her cab, not a personal car, and had the tinted windows removed after the stop. Yeldon Decl. ¶ 23; ECF No. 252-31, Yeldon Dec. 13, 2022 Dep. at 95:9-99:15.

685. In the summer of 2022, Yeldon received a ticket while her car was parked in the BMHA Ferry Grider Apartments parking lot. The ticket was later dismissed in court after photos proved her car was properly parked. Yeldon Decl. ¶ 32.

686. Yeldon drives regularly in Buffalo and plans to continue, making her susceptible to future discriminatory stops. Yeldon Decl. ¶ 33.

687. Yeldon also continues to observe arbitrary BPD policing on the East Side, making her fear future targeting. Yeldon Decl. ¶ 34.

**S.    The City of Buffalo Had a Policy or Practice of Linking Overtime to Expectations of High Ticketing and Impound Numbers**

688. The City of Buffalo maintained a policy or practice of incentivizing officers to produce a high number of tickets, impounds, summonses, and citations during overtime shifts. Ex. 160, COB016282; Ex. 121, COB022527; Ex. 190, COB052633; Ex. 161, COB406079; Ex. 164, COB052709; Ex. 192, COB017429; Ex. 43, Tedesco July 11, 2023 Dep. at 195:3-196:4.

689. BPD leadership communicated to officers the expectation that overtime should yield high ticketing and impound numbers. Ex. 160, COB016282; Ex. 121, COB022527; Ex. 190, COB052633; Ex. 161, COB406079; Ex. 162, COB053652; Ex. 163, COB052637; Ex. 164, COB052709; Ex. 126, COB040949; Ex. 165, COB058264; Ex. 33, Quinn Apr. 1, 2022 Dep. at 77:2-6; Ex. 43, Tedesco July 11, 2023 Dep. at 195:3-196:4; Ex. 42, Skipper Mar 5, 2021 Dep. at 115:9-116:11.

690. Some officers stated that high ticketing numbers financially justified overtime shifts. Ex. 192, COB017429; Ex. 190, COB052633; Ex. 271, COB018294; Ex. 42, Skipper Mar 5, 2021 Dep. at 115:9-116:11.

691. Additionally, BPD leadership communicated that high VTL numbers were necessary to maintain overtime opportunities. Ex. 190, COB052633; Ex. 160, COB016282; Ex. 272,

COB063327; Ex. 121, COB022527; Ex. 190, COB052633; Ex. 161, COB406079; Ex. 192, COB017429; Ex. 33, Quinn Apr. 1, 2022 Dep. at 77:2-6; Ex. 43, Tedesco July 11, 2023 Dep. at 195:3-196:4; Ex. 42, Skipper Mar 5, 2021 Dep. at 115:9-116:11.

692.    Tickets and impounds were used to generate revenue for the City, and officers understood this. Ex. 273, COB040356; Ex. 274, COB269541 at 2-3; Ex. 272, COB063327; Ex. 42, Skipper Mar 5, 2021 Dep. at 115:9-116:11; Ex. 40, Serafini Dec. 27, 2021 Dep. at 257:8-259:1.

### T.    Overtime was Used to Increase Officers' Pay

693.    BPD officers were/are paid time and a half for overtime work. Ex. 8, Derenda Dec. 23, 2021 Dep. at 243:21-23; Ex. 33, Quinn Apr. 1, 2022 Dep. at 78:21-79:23; Ex. 50, Young Oct. 26, 2022 Dep. at 96:11-13.

694.    Officers can increase their salaries through overtime opportunities and court time, and numerous BPD officers significantly increased their salaries though overtime. Ex. 8, Derenda Dec. 23, 2021 Dep. at 241:18-242:4, 243:21-244:6; Ex. 33, Quinn Apr. 1, 2022 Dep. at 78:21-79:23; Ex. 50, Young Oct. 26, 2022 Dep. at 96:11-21; Ex. 38, Russo, Apr. 29, 2022 Dep. at 87:14-88:11; Ex. 45, Whelan Apr. 26, 2022 Dep. at 283:17-286:3 ("And that's the gist of his email here. He wants to know if we're still going to get called for the . . . Traffic Violations Bureau because he wants to know if he's going to get paid his court time."), 295:22-296:1; Ex. 1, Acquino Sept. 5, 2023 Dep. at 99:8-13; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 181:2-7; Ex. 21, Hy July 19, 2023 Dep. at 96:10-23, 104:3-105:6, 110:4-11; IAD Witness Decl. ¶¶ 34 ("Officers knew that the more arrests and summons they made, the more court time they would receive, which translated into overtime income, particularly for officers who worked nights."), 35, 37; Ex. 275, COB264703 at 5 ("In FY 2016 25% of the BPD workforce earned more than $25,000 in OT.").

695.    Overtime opportunities were viewed as a reward or financial incentive to issue tickets and impounds. Ex. 8, Derenda Dec. 23, 2021 Dep. at 241:18-242:23 (overtime was viewed as a "financial reward"); Ex. 33, Quinn Apr. 1, 2022 Dep. at 78:21-79:23; Ex. 38, Russo, Apr. 29, 2022 Dep. at 87:14-88:11; Ex. 45, Whelan Apr. 26, 2022 Dep. at 295:22-296:1; Ex. 21, Hy July 19, 2023 Dep. at 96:10-23; Ex. 48, Wilcox Nov. 4, 2021 Dep. at 181:2-7; Ex. 42, Skipper Mar. 5, 2021 Dep. at 104:13-105:7; Ex. 40, Serafini Dec. 27, 2021 Dep. at 271:19-272:22; IAD Witness Decl. ¶ 34 ("Because BPD officers had a direct financial incentives for writing traffic summons and making arrests, making 'collars for dollars' was also a customary practice within BPD.").

696.    Officers could also increase their pensions by working overtime details. Ex. 8, Derenda Dec. 23, 2021 Dep. at 241:21-242:9; Ex. 35, Roberts Apr 20, 2022 Dep. at 29:8-22; Ex. 33, Quinn Apr. 1, 2022 Dep. at 79:9-11 (Q: "And working overtime also gave officers the opportunity to increase their pensions, correct?" A: "That's correct").

697.    BPD pensions are based on the average of the highest-earning three years of an officer's career. Ex. 8, Derenda Dec. 23, 2021 at 244:7-9; Ex. 35, Roberts Apr 20, 2022 Dep. at

29:8-22; *see also* Ex. 33, Quinn Apr. 1, 2022 Dep. at 79:9-11 (Q: "And working overtime also gave officers the opportunity to increase their pensions, correct?" A: "That's correct").

698. The City's policies and practices linking overtime to expectations of high ticketing numbers was effective as evidence by the fact that from 2012 to 2016 the number of traffic summonses issued by BPD more than doubled while overtime compensation increased by over thirty percent. Ex. 276, Composite Exhibit – BPD Budgets.

| FY/CY Start | Division of Patrol Services Traffic Summons | Division of Traffic Services Traffic Summons | BPD Overtime Compensation (All Divisions) |
|---|---|---|---|
| 2012 | 21,115 | 2,069 | $9,314,035 |
| 2013 | 34,955 | 1,863 | $10,154,531 |
| 2014 | 31,629 | 384 | $11,579,702 |
| 2015 | 52,169 | 297 | $12,865,412 |
| 2016 | 51,878 | 163 | $13,666,454 |

**U.    BPD Leadership Carefully Tracked Officers' Ticketing/Impounding Statistics To Ensure High Numbers**

699. The City incentivized BPD officers by using the tickets issued and vehicles impounded to measure job performance. Ex. 161, COB406079; Ex. 7, Derenda Nov. 10, 2021 Dep. at 102:19-103:2; Ex. 8, Derenda Dec. 23, 2021 Dep. at 241:8-12; Ex. 38, Russo, Apr. 29, 2022 Dep. at 223:11-224:2; Ex. 40, Serafini Dec. 27, 2021 Dep. at 140:15-141:9.

700. Former Commissioner Daniel Derenda required officers to complete and submit daily reports tracking impounds, tickets, and parking tags that were issued during a shift. Ex. 163, COB052637; Ex 277, Plaintiffs_Generic-00000452 (Housing Unit monthly reports); Ex. 278, COB016776 (Strike Force daily report); Ex. 279, Plaintiffs_Generic-00000546 (Housing Unit monthly reports); Ex. 280, COB016796 (Strike Force daily report); Ex. 281, COB039082 (Strike Force daily report); Ex. 33, Quinn Apr. 1, 2022 Dep. at 69:5-13; Ex. 21, Hy July 19, 2023 Dep. at 87:22-88:14; Ex. 7, Derenda Nov. 10, 2021 Dep. at 91:17-92:7; Ex. 282, COB041727; Ex. 38, Russo, Apr. 29, 2022 Dep. at 223:11-224:2; Ex. 161, COB406079; Ex. 40, Serafini Dec. 27, 2021 Dep. at 140:15-141:9.

701. Officers routinely recorded their ticketing and impound statistics after their shifts. Ex. 33, Quinn Apr. 1, 2022 Dep. at 69:5-13; Ex. 21, Hy July 19, 2023 Dep. at 87:22-88:14; Ex. 38, Russo, Apr. 29, 2022 Dep. at 223:11-224:2; Ex. 282, COB041727; Ex. 7, Derenda Nov. 10, 2021 Dep. at 91:17-92:7.

702. Lieutenants reviewed and compiled statistics and shared the information with former Commissioner Derenda. Ex. 283, COB042214; Ex. 538, COB042215; Ex. 277, Plaintiffs_Generic-00000452 (Housing Unit monthly reports); Ex. 278, COB016776 (Strike Force daily report); Ex. 279, Plaintiffs_Generic-00000546 (Housing Unit monthly reports); Ex. 280, COB016796 (Strike Force daily report); Ex. 281, COB039082 (Strike Force daily report);

Ex. 38, Russo, Apr. 29, 2022 Dep. at 223:11-224:2; Ex. 7, Derenda Nov. 10, 2021 Dep. at 91:17-92:7; Ex. 189, COB345889; Ex. 284, COB230548 (Strike Force daily report).

703.    BPD leadership monitored ticketing and impound statistics, including revenue generated. Ex. 211, COB112220; Ex. 212, COB112221; Ex. 285, COB056327; Ex. 166, COB056235; Ex. 167, COB056243; Ex. 168, COB056484; Ex. 286, COB040614; Ex. 287, COB056348; Ex. 191, COB016235; Ex. 288, COB039612; Ex. 188, COB042018; Ex. 289, COB054503; Ex. 182, COB042046; Ex. 183, COB042047; Ex. 172, COB042199; Ex. 283, COB042214; Ex. 538, COB042215; Ex. 63, COB042316; Ex. 517, COB042317; Ex. 173, COB051485; Ex. 38, Russo, Apr. 29, 2022 Dep. at 223:11-224:2; Ex. 7, Derenda Nov. 10, 2021 Dep. at 91:17-92:7; Ex. 284, COB230548 (Strike Force daily report); Ex. 290, COB264510; Ex. 155, COB027566.

704.    Officer job performance was evaluated, in part, based on the number of tickets they issued and/or vehicles they impounded, and BPD leadership equated good work with high numbers of tickets and impounds and communicated this expectation to officers.  Ex. 59, COB279173; Ex. 166, COB056235; Ex. 167, COB056243; Ex. 168, COB056484; Ex. 169, COB275648; Ex. 170, COB053677; Ex. 163, COB052637; Ex. 164, COB052709; Ex. 171, COB041081; Ex. 126, COB040949; Ex. 172, COB042199; Ex. 173, COB051485; Ex. 174, COB052690; Ex. 176, COB052661; Ex. 176, COB051545; Ex. 45, Whelan Apr. 26, 2022 Dep. at 125:13-16; Ex. 7, Derenda Nov. 10, 2021 Dep. at 102:19-103:2, 128:5-17; Ex. 8, Derenda Dec. 23, 2021 Dep. at 241:8-12; Ex. 38, Russo, Apr. 29, 2022 Dep. at 223:11-224:22, 240:15-243:5; Ex. 189, COB345889; Ex. 40, Serafini Dec. 27, 2021 Dep. at 240:17-241:5, 243:13-19, 246:3-14; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 161:12-19.

705.    BPD leadership encouraged high ticketing and impound numbers, because high numbers were seen as evidence of good work. Ex. 166, COB056235; Ex. 167, COB056243; Ex. 177, COB056134; Ex. 178, COB056326; Ex. 179, COB063330; Ex. 180, COB056535; Ex. 163, COB052637; Ex. 164, COB052709; Ex. 181, COB042029; Ex. 182, COB042046; Ex. 183, COB042047; Ex. 171, COB041081; Ex. 165, COB058264; Ex. 59, COB279173 (June 2012 email from Derenda to Roberts listing that officers should "impound as many vehicles as legally possible" and have "zero tolerance [and] make as many arrests and issue traffic summons, as many as possible" as "key point[s] to address with Lts and Officers"); Ex. 40, Serafini Dec. 27, 2021 Dep. at 243:13-19 (Q: "So when you saw evidence that summonses, impounds, arrests were increasing among the Housing and Strike Force Units, you saw that as evidence of the good work that those units were doing in the city of Buffalo?" A: "Like I said, as long as it was done properly, yes, and lawfully."), 246:3-13 (Q: "So when statistics increased . . . you viewed it as evidence of a job well done?" A: "Partially, yes."), 240:17-241:5; Ex. 187, COB018565; Ex. 291, COB018513; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 161:12-19 (noting it was "on the directive to write as many tickets and violations as you see"); Ex. 7, Derenda Nov. 10, 2021 Dep. at 128:5-17.

706.    One reason statistics were tracked was to encourage officers to issue more tickets and impounds. Ex. 45, Whelan Apr. 26. 2022 Dep. at 257:8-264:2, 264:10-14 ("Q: So when you received emails from . . . Commissioner Derenda that you had low production, was it common for you to try to focus your troops on increasing production? A: Yes.").

707.  As a result of the pressure to show high ticketing and impound numbers, some officers issued multiple tickets in a single stop. Ex. 165, COB058264; Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 281:1-16, 161:12-19; Ex. 7, Derenda Nov. 10, 2021 Dep. at 123:6-16, 128:5-17.

708.  Former Commissioner Derenda believed the practice of issuing multiple tickets was due to officers' desire to "pad" their ticketing numbers. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 281:1-16.

709.  To encourage high ticket numbers, BPD leaders admonished subordinates and requested explanations when ticket and impound numbers were deemed too low to meet expectations. Ex. 189, COB345889; Ex. 191, COB016235; Ex. 40, Serafini Dec. 27, 2021 Dep. at 238:20-240:7; 241:6-242:8; Ex. 46, Whelan June 8, 2022 Dep. at 257:8-264:2.

**V.    Buffalo relied on revenue from parking and traffic violations to balance its budget**

710.  The Buffalo City Charter requires the City to maintain a balanced budget, wherein expenditure equal revenues. Ex. 11, Estrich July 12, 2023 Dep. at 22:4-11; Buffalo, N.Y., City Charter §§ 20-3B, 20-32A(1) (2015).

711.  When unable to adhere to the Charter budget requirements, the Mayor relied on reserves to balance the budget. Ex. 219, COB114658; Ex. 292, COB114659; Ex. 293, COB168947 at 2.

712.  The City Comptroller noted that the City's reliance on reserves to balance the budget would deplete the City's reserves and lead to severe consequences. Ex. 292, COB114659 (City of Buffalo Budget Response 2017-2018 Fiscal Year & 2018-2021 Four Year Financial Plan).

713.  At times, the City relied on "dramatically overestimated" revenues to close its budget gap, while underestimating key expenses such as overtime pay for City employees. Ex. 293, COB168947 at 2; Ex. 293, COB168947 at 3 (showing City comptroller calculation of a $33-plus million overestimation in City revenue for fiscal year 2018-2019); Ex. 293, COB168947 at 6 (showing overtime expense of approximately $16 million for fiscal year 2018-2019 despite previous years' data indicating overtime expenses nearly twice that amount); Ex. 294, COB140553 at 5 (showing overtime expenses under-budgeted by an estimated $5 million in fiscal year 2020-2021).

714.  When Mayor Brown needed to balance the budget, he did not want to raise property taxes. Ex. 11, Estrich July 12, 2023 Dep. at 23:15-24:10, 64:21-67:16; Ex. 295, COB372293 at 3-4.

715.  Mayor Brown opted to balance the City's budget by increasing the revenue generated by fines and fees from traffic and parking violations. Ex. 11, Estrich July 12, 2023 Dep. at 25:1-14, 24:11-25:15; Ex. 295, COB372293 at 4.

716.  Mayor Brown was interested in how much revenue traffic violations could generate for the City and requested report outs on the Strike Force's traffic summons and impound totals

(in addition to arrest data). Ex. 203, COB121555; Ex. 205, COB123717; Ex. 210, COB223189; Ex. 214, COB067739; Ex. 215, COB067740.

**W.    The Buffalo Traffic Violations Bureau**

717.    In 2015, the City and the State, with the support of Mayor Brown, established the Buffalo Traffic Violations Agency ("BTVA"). Ex. 200, COB095082 at 1; N.Y. Gen. Mun. Law § 370(4)  (McKinney 2017).

718.    The creation of the BTVA transferred jurisdiction over certain traffic violations within the City of Buffalo to the Buffalo City Court while allowing the City to keep most of the revenue derived from the adjudication of traffic tickets. DMSJ at 11. Ex. 200, COB095082 at 5; N.Y. Gen. Mun. Law §§ 371(2-a) (McKinney 2019); Art. 6 § 6-24, Amending Charter of City of Buffalo re Establishment of Buffalo Traffic Violations Agency, City of Buffalo Proceedings (June 2, 2015 Special Session).

719.    The BTVA operated a public office where members of the public could answer traffic summonses in person, by mail, or by telephone via a plea of guilty, not guilty, or a plea to reduced charges. Ex. 200, COB095082 at 3-6.

720.    Motorists who pled not guilty were scheduled for an appearance before a Judicial Hearing Officer where they could present their case, with a similar set of outcomes available. Ex. 200, COB095082 at 6.

721.    The BTVA was created "to provide fiscal relief" to Buffalo. Art. 6 § 6-24, Amending Charter of City of Buffalo re Establishment of Buffalo Traffic Violations Agency, City of Buffalo Proceedings (June 2, 2015 Special Session); Ex. 295, COB372293; Ex. 11, Estrich July 12, 2023 Dep. at 177:2-21; Ex. 198, COB075236.

722.    One of the express purposes of the BTVA was to "generate revenue." Ex. 276, Composite Exhibit – BPD Budgets at 20-24; Ex. 28, Morgera May 25, 2022 Dep. Exhibit 4 at 41.

723.    The City pressured and relied on Strike Force officers issuing high numbers of traffic violations in part because fines and fees from the violations increased the City's revenue. Kevin Helfer, the former Commissioner of Parking for the City and former Executive Director of the BTVA, projected the City would receive an additional $400,000 in revenue based on Strike Force impounds in 2013 alone. Ex. 198, COB075236; Ex. 273, COB040356; Ex. 22, Helfer June 22, 2022 Dep. at 10:23-11:20.

724.    Between July 2015, when the BTVA opened its doors, and October 2016, the BTVA's monthly gross revenue grew more than tenfold. Ex. 276, Composite Exhibit – BPD Budgets at 20-24 (showing increase in revenue from $33,165 to $355,444).

725.    Revenues collected by the BTVA were directed to the City's General Fund, which covered BPD expenses, including officer salary and overtime, and the BTVA's expenses. Ex. 296, COB123536; Ex. 276, Composite Exhibit – BPD Budgets at 20-24; Ex. 19, Helfer June 22, 2022 Dep. at 102:18-103:3.

726.  The BTVA's Executive Director and the Commissioner of Revenue, and the Mayor care-fully tracked revenue being generated from traffic fines and fees. Ex. 207, COB094495 (Morgera: "We are at $231,252 for the month"; Helfer: "Get to 300!!!!"; Morgera: "Get me tickets! Only 895 from BPD this month"); Ex. 209, COB067730; Ex. 210, COB223189; Ex. 211, COB112220; Ex. 212, COB112221; Ex. 221, COB091747; Ex. 213, COB091732; Ex. 214, COB067739; Ex. 215, COB067740; Ex. 216, COB098942; Ex. 217, COB073331; Ex. 290, COB264510; Ex. 99, COB016252; Ex. 219, COB114658; Ex. 220, COB231866.

727.  They also tracked when officers did not show up to traffic court because officer absences led to tickets being dismissed. Officers faced discipline for missing court dates. Ex. 297, COB112666; Ex. 298, COB120020; Ex. 299, COB461200; Ex. 300, COB201049; Ex. 301, COB201105; Ex. 302, COB665427; Ex. 303, COB665511; Ex. 539, COB201041.

728.  BTVA's revenue depended in part on the number of tickets issued by BPD officers. A BTVA administrator observed that BTVA's revenue "directly reflects the number of tick-ets issued on a 2-month delay." Ex. 221, COB091747; Ex. 233, 2017 BTVA Annual Report (showing 25,830 tickets disposed of by plea bargain in 2017 while only 759 tickets were disposed of by not guilty disposition or dismissal in that same year); Ex. 155, COB027566; Ex. 220, COB231866.

729.  When traffic violation revenue was lower than expected, the BTVA Executive Director and the Commissioner of Revenue demanded explanations for the relatively low fine and fee collections. Ex. 206, COB120438 (Helfer: "Money is way down. We have to get to the bottom of this. Is it a[s] simple as tickets written have slowed down?"); Ex. 219, COB114658 ("Sooner or later I will be asked about the drop in revenue for last month and we are trending lower this month as well."); Ex. 207, COB094495; Ex. 221, COB091747; Ex. 222, COB239572; Ex. 304, COB094874.

730.  The BTVA developed policies designed to increase revenue, including: collecting partial payments; requiring paperwork and hearings to establish indigency for reduced fines; and prohibiting traffic prosecutors from making plea deals at court. Ex. 305, COB109102; Ex. 20, Helfer June 29, 2022 Dep. at 265:17-266:9; Ex. 306, COB097507; Ex. 307, Helfer June 29, 2022 Dep. Exhibit 39.

731.  The BTVA allowed the City to increase its revenue, as designed. Ex. 276, Composite Ex-hibit – Buffalo Revenue Sources:

| FY Start | Tow and Storage Fee Actual | Traffic Violation Fines Actual |
|---|---|---|
| 2010 | $442,027 | $725,961 |
| 2011 | $461,724 | $558,506 |
| 2012 | $1,131,038 | $603,858 |
| 2013 | $1,249,531 | $503,494 |
| 2014 | $1,257,989 | $0 |
| 2015 (BTVA created) | $1,188,437 | $2,061,853 |
| 2016 | $1,140,166 | $3,993,940 |

| FY Start | Tow and Storage Fee Actual | Traffic Violation Fines Actual |
|---|---|---|
| 2017 | $1,189,732 | $3,003,992 |
| 2018 | $1,347,569 | $2,883,600 |
| 2019 | $1,402,412 | $2,540,527 |
| 2020 | $1,621,462 | $2,518,530 |
| 2021 | $1,794,029 | $1,976,658 |
| 2022 | $2,054,647 | $1,689,265 |

732.    As the BTVA's revenue increased, the City and the BTVA increased their estimates for the revenue generated by fines and fees. Ex. 219, COB114658; Ex. 292, COB114659.

## X.    Additional Revenue Generation Schemes

733.    In July 2018 Common Council and the Mayor adopted an ordinance amendment creating fourteen new traffic violation fines and fees. Ex. 308, COB009536.

734.    One of the express goals of the new traffic fines and fees was to "defray costs" despite BTVA's revenue substantially exceeding its costs. Ex. 309, COB094741; Ex. 276, Composite Exhibit – BPD Budgets at 27-30.

735.    The City stopped enforcing the fines and fees due to public outcry. Ex. 310, Plaintiffs_Generic-00025966; Ex. 19, Helfer June 22, 2022 Dep. at 180:6-8.

736.    The City Ordinance establishing the additional traffic fines and fees has not been repealed. Ex. 308, COB009536; Buffalo Munic. Code Ch. 175, §§ 6-24, 307-8.

737.    The City implemented a school speed zone camera program in March 2020. The program centered on using speed cameras to enforce school zone speed limits. Ex. 311, COB354496; 19-111 Ordinance Amendment Ch. 479; Ex. 73, Estrich Sept. 15, 2020 Dep. Exhibit 34.

738.    The Mayor viewed the school speed zone camera program as a "new revenue generator." Ex. 312, COB352060 at 20; Ex. 73, Estrich Sept. 15, 2020 Dep. Exhibit 34; Ex. 311, COB354496.

739.    In the fourth quarter of 2020 the school speed zone camera program generated $1,601,198 in net revenue. Ex. 312, COB352060 at 20.

740.    In March 2021 the City ended the school speed zone program because of public criticism. Ex. 311, COB354496.

741.    The City also applied pressure on the BPD to increase revenue from traffic fines and fees. Ex. 313, COB223195; Ex. 314, COB396698; Ex. 222, COB239572; Ex. 67, COB060322; Ex. 315, Buffalo Council Common Council Committee on Finance Council Committee Meeting (Nov. 7, 2018), https://buffalony.iqm2.com/Citizens/SplitView.aspx?Mode=Video& MeetingID=1579&Format=Minutes; Ex. 316, COB221148.

742. BPD officers received training instructing them that revenue generation was one of the purposes of law enforcement. Ex. 159, Derenda Dec. 23, 2021 Dep. Exhibit 31 at 1-2.

743. Deputy Commissioner Lockwood agreed that revenue generation is one goal of VTL enforcement. Ex. 22, Lockwood Aug. 10, 2023 Dep. at 51:10-52:3.

744. Additionally, it was common knowledge that revenue from VTL enforcement went to the City. Ex. 40, Serafini Dec. 27, 2021 Dep. at 257:8-259:1.

745. The BPD purchased automatic plate readers ("LPRs"), which assisted with revenue generation by allowing officers to easily identify violations. Ex. 317, COB047751; Ex. 318, COB056249.

746. The City upgraded its software to the Traffic and Criminal Software System ("TRaCS"), which made it easier and quicker for officers to fill out tickets for traffic law violations. Ex. 43, Tedesco July 11, 2023 Dep. at 127:8-128:19; Ex. 8, Derenda Dec. 23, 2021 Dep. at 225:3-9.

747. If BPD did not generate enough revenue, the City had the power to freeze the agency's expenditures. Ex. 11, Estrich July 12, 2023 Dep. at 62:9-15.

748. The BPD experienced an expenditure freeze due to its inability to generate sufficient revenue. Ex. 11, Estrich July 12, 2023 Dep. at 62:16-21; Ex. 319, COB016042.

749. Derenda required Strike Force and Housing Unit officers to submit daily reports that logged the number of felony and misdemeanor arrests they made, traffic summons issued, impounds performed, and guns and cash seized while on patrol, including at Checkpoints. Ex. 9, Derenda Jan. 23, 2024 30(b)(6) Dep. at 25:12:-27:6, 36:23-37:8; Ex. 40, Serafini Dec. 27, 2021 Dep. at 231:22-234:7; Ex. 320, COB029724.

Dated: May 30, 2025

Respectfully Submitted,

_s/ Claudia Wilner_
Claudia Wilner
Anjana Malhotra
Edward Krugman
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
wilner@nclej.net
malhotra@nclej.net
krugman@nclej.net

Baher Azmy
A. Chinyere Ezie
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org
cezie@ccrjustice.org

Matthew A. Parham
WESTERN NEW YORK LAW CENTER
37 Franklin Street, 2nd Floor
Buffalo, NY 14202
(716) 828-8422
mparham@wnylc.net

Philip Irwin (_pro hac vice_)
Jordan S. Joachim (_pro hac vice_)
Christine Nelson (_pro hac vice_)
Andrew Timmick (_pro hac vice_)
COVINGTON & BURLING, LLP
620 Eighth Ave., Suite 4029
New York, NY 10018
212-841-1000
pirwin@cov.com
jjoachim@cov.com
cnelson@cov.com
atimmick@cov.com

_Attorneys for Plaintiffs_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2025, the above Rule 56.1 Counterstatement of Material Fact in Opposition to Defendants' Motion for Summary Judgment was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System and via secure electronic file transfer.

_/s/ Claudia Wilner_
Claudia Wilner
