UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

BLACK LOVE RESISTS IN THE RUST, *et al.*,
individually and on behalf of a class of all others
similarly situated,

        Plaintiffs,

    v.

CITY OF BUFFALO, N.Y., *et al.*,

        Defendants.

No. 1:18-cv-00719-CCR

## DECLARATION OF ██████████

██████████ declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746:

1.    I am ██████████. I am a 49-year old Black woman, a mother, and a native of Buffalo, New York. I am one of the Witnesses in this action.

2.    I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

3.    I am a long-time member of the Buffalo Police Department (BPD). I began my career at the BPD in 1996 in an administrative role and was sworn in as an officer one year later in 1997. I began my career as a police officer in C District, but later I worked in A District, B District, and E District.

4.    I took a leave of absence from the BPD between 2004 and 2008 to pursue a graduate degree. Between 2010 and 2011, I joined the BPD Internal Affairs Division (IAD), and

in 2014, I was promoted to the rank of Lieutenant. I retired from the force in 2023 as a Lieutenant in IAD.

5.      Although I wanted to believe in the mission of the BPD, the culture of the BPD was consistently racist, sexist, and toxic over my 25+ years on the force. Unfortunately, these problems even extended to BPD leadership.

6.      Although I joined the BPD during a period when federal court orders, including orders issued by Judge Curtin, ushered in a period of racial diversity in the BPD, the expiration of those orders, coupled with the disparate treatment of Black and Latino officers, gradually led the BPD to return to being a predominantly white police force. Specifically, I observed Black and Latino BPD officers face harassment and mistreatment by their white peers, including supervisory personnel, and get passed over for promotions without accountability, which led to officer attrition.

7.      In addition, BPD supervisors—including Lieutenants responsible for training new recruits or for supervising officers at the District level—were openly racist. Some of these individuals led predominately White officer platoons that often treated Black community members like presumptive criminals, without showing them humanity or respect.

8.      I am aware of instances where white BPD officers used racial slurs when speaking to Buffalo residents from minority backgrounds—including Black, Latino, and Arab people— through my experience working in IAD and doing outreach in the community. I have heard BPD officers and supervisors use derogatory language and the word "ghetto," "baby daddy," and "baby mama" to refer to Black Buffalo residents. I have heard former Commissioner Daniel Derenda use terms like "gangbanger" and "thug" to refer to young Black men. I also experienced some of this conduct firsthand: a B District Lieutenant nicknamed me "Kizzy" after a runaway slave girl who was depicted in the book Roots.

9.     I am not aware of officers ever being punished for behavior like this. But unfortunately, these were not merely words: they reflected a pervasive attitude within the BPD where Black people, especially Black men and boys, were simply presumed to be criminals. Even Black male college students were treated like "gangbangers" and criminals by members of the BPD and its leadership in instances where there was no justification. These pervasive attitudes had real consequences.

10.     During my time on the force, I observed Black and Latino Buffalo residents experience discriminatory and abusive treatment by white BPD officers and supervisors, including at traffic stops, without ever being held accountable.

11.     And as much as the BPD says they decry racial profiling, during my time on the force and in the IAD, I observed BPD officers do it frequently, viewing it as an effective form of policing with the full knowledge, acceptance, and encouragement from BPD leadership, despite citizen complaints.

12.     In my experience, BPD officers paint Black motorists, especially young Black men, with a broad brush with the belief that if they stop enough cars containing Black men, they will eventually hit something. I observed BPD officers use the broadness of the VTL to justify stops and criminal investigations. BPD officers also took every opportunity they could to get into and search peoples' cars for guns or drugs during traffic stops. For instance, even though officers are not allowed to do vehicle searches because a car has tinted windows or an expired inspection sticker, that is nevertheless something that occurred.

13.     When Joseph Gramaglia was appointed to Commissioner, I felt markedly concerned, because I knew he endorsed this aggressive style of policing from our time working

together in B District, where I observed him conducting questionable searches and arrests of Black and Latino motorists.

14.     The Checkpoint Program, which focused on the predominately Black C and E districts and encompassed the East Side, where I lived for some time, made these long-standing police practices worse.

15.     The Checkpoint Program negatively impacted the quality of life of Black motorists. You could count on seeing Checkpoints on the East Side which was majority Black, but would rarely see Checkpoints in neighborhoods like North or South Buffalo where White motorists predominated. Because it was widely known that the Checkpoints targeted Black motorists, I can't think of anyone on the East Side who supported them.

16.     I frequently ran into Checkpoints on Bailey Avenue or Grider going or coming from my mother's house. Even as a law enforcement officer who ultimately got waived through Checkpoints without undergoing the typical inspection, I found the Checkpoints inconvenient due to the obligatory wait times, so I actively tried to modify my travel routes to avoid them.

17.     After the Checkpoint Program was paused, I observed a rise in traffic stops of Black and Latino motorists where probable cause was non-existent or manufactured after the fact, just so officers could stop Black and Latino motorists and investigate them for crime, guns, or drugs possession. I also saw a rise in complaints regarding the same while working in IAD.

18.     These complaints were reviewed by IAD personnel as well as the BPD Commissioners, although instances of discipline were rare. This was in line with my observations that the racist stereotype widely held by many officers and supervisors that Black and Latino residents are presumptive criminals was tolerated, as it was simply part of the culture of the BPD.

19.     For example, just last year in 2024, I supported a family friend in filing an IAD complaint against Officer Ronald Ammerman and his partner after they performed an improper traffic stop of my friend's son, ███████████████████, a young Black man from the East Side who goes by ███████. Ammerman made eye contact with ███████ while he was driving home to the East Side, and even though ███████ had not committed a traffic infraction, Ammerman made a U-turn and followed ███████ all the way to his house where he lives with his mother, and pulled the BPD squad car into ███████ driveway after he parked there. First, Ammerman accused ███████ of stealing the vehicle without any evidence. Ammerman appeared to believe the car was stolen only because ███████ was Black. Ammerman also accused ███████ of failing to signal, which he denied.

20.     The police encounter only ended after ███████ parents, including his father who is a police officer in Maryland, intervened. ███████ parents filed an IAD complaint against Ammerman, but it was dismissed. This incident—and the BPD IAD's dismissal of his complaint—is typical of both the racial profiling and racist stereotypes that BPD officers use when targeting Black and Latino drivers, and the IAD's failure to address such officer conduct.

21.     Indeed, although I joined the IAD hoping that I could prevent practices such as these and improve the cultural problems within the BPD, I came to understand that problems of racism within the BPD and the lack of accountability were structural.

22.     IAD personnel did not determine whether BPD officers should be disciplined; only individuals at the Commissioner level did. So, despite being a Lieutenant responsible for investigating BPD officers for misconduct as a member of IAD, I experienced significant constraints and limitations on my ability to hold officers accountable for misconduct or discriminatory behavior.

23.     Over the course of my IAD career, I managed upwards of 600 cases under Commissioners Daniel Derenda, Byron Lockwood, and Joseph Gramaglia. Despite the different individuals holding the Commissioner role, their tenures were more or less the same when it came to IAD complaints.

24.     Almost all of the IAD complaints we received alleging abusive treatment by BPD officers and officer misconduct during traffic stops, vehicle searches, traffic and non-traffic arrests, and impounds were from Black and Latino complainants. Very few white residents complained about officers' conduct at traffic stops. Many Black and Latino complainants alleged that BPD officers treated them like criminals and presumed they had guns, drugs, and warrants without any justification. Although the BPD Commissioners received these complaints, they rarely resulted in officer discipline during my time in IAD.

25.     Each Commissioner marked the vast majority of IAD cases as "not sustained," "unfounded," or "exonerated," regardless of the strength of the investigation preceding it. I saw cases with clear, indisputable evidence of white officers engaging in misconduct against Black IAD complainants—including video evidence—get dismissed through loopholes. This included cases involving "frequent flyers" to the IAD—officers who amassed dozens of civilian complaints that were substantiated by bankers' boxes of investigative files. Many of the frequent flyers to the IAD were members of the Housing Unit and Strike Force.

26.     In reviewing complaints, including complaints about questionable traffic stops and searches, BPD Commissioners Derenda, Lockwood, and Gramaglia would err on the side of the officers. Because of the Commissioners' control over case outcomes, the IAD rarely, if ever, held officers accountable for engaging in racial bias or misconduct. Instead, when white officers engaged in misconduct against Black civilians, they escaped any serious discipline.

6

27.     The BPD Commissioners' failure to impose discipline allowed officer misconduct to continue without consequences, at times leading to repeat civilian complaints. These practices even persisted under Buffalo's Black Mayor.

28.     At one point during my time in IAD, the U.S. Department of Justice initiated a special review of the BPD's complaint investigations due to the volume and consistency of complaints against certain BPD officers, most of which were brought by people of color.

29.     Although instances of serious discipline against officers were rare particularly in the context of traffic stops of Black motorists, the one instance I can recall an officer being disciplined was a case that I was assigned to as lead investigator, and it required a tremendous amount of advocacy with the Commissioner. In that case, a Black motorist driving a high-end car, an Audi, was pulled over by BPD officers who accused him of stealing the car and being in possession of a controlled substance without any supporting evidence. The Black motorist was arrested and lost his job as a youth coach as a result.

30.     The motorist filed an IAD complaint that was assigned to me, and I reviewed body camera footage, radio transmissions, the officers' charging instrument, and other case materials. My file review showed that despite conducting a field drug test that came back negative and expressing doubt that the motorist was in possession of a controlled substance, the officers still arrested the motorist and improperly charged him with felony possession of a controlled substance. Subsequent lab tests confirmed that the motorist did not have a controlled substance, and the substance in question was later identified as vaginal suppositories.

31.     Although Commissioner Gramaglia ultimately sustained a truthfulness charge against one of the officers, it took repeated conversations and insistence on my part. And in the end, the officers were not terminated, they were placed on temporary administrative leave.

32.    Indeed, in all of my time on the force, including in the IAD, I cannot recall any instances where a BPD officer was fired for racial discrimination or misconduct during traffic stops. Instead, officers who were the subject of complaints were protected and sometimes even promoted.

33.    The Commissioners' failure to regularly impose discipline on officers empowered and emboldened officers to continue doing the wrong thing and continue making questionable stops and searches targeting Black and Latino drivers. As a result, many of the same officers kept being brought to IAD based on civilian complaints alleging similar misconduct. It was a vicious cycle.

34.    Because BPD officers had a direct financial incentive for writing traffic summons and making arrests, making "collars for dollars" was also a customary practice within the BPD. Officers knew that the more arrests and summons they made, the more court time they would receive, which translated into overtime income, particularly for officers who worked nights. I am aware of officers who almost doubled their annual take home salary through overtime.

35.    During my time with the BPD, I observed BPD officers engage in predatory ticketing and traffic enforcement practices in order to boost their salaries. These revenue-raising practices primarily targeted racial minorities in Buffalo.

36.    In contrast, when I worked in the A District in South Buffalo, which is primarily white, at the start of my career in 1997 and 1998, I was assigned to desk duty for six months for writing traffic tickets and impounding the cars of the "wrong people"—i.e. white motorists, some of whom had political connections.

37.    It was common knowledge within the BPD that tinted window tickets primarily went to Black drivers, even though in my experience, motorists of all races drive with tints. Even

though tint meters were not supplied by the Department, some officers invested in tint meters themselves because writing tinted window tickets was a revenue raiser for BPD officers because it generated court time which netted overtime income.

38.     I observed the BPD's practice of issuing multiple tinted window tickets firsthand while working in IAD, because complainants came objecting to officers' conduct at traffic stops. The IAD complainants who had multiple tinted window tickets were mostly Black.

39.     Based on my 25+ years of experience within the BPD and my observations as an IAD officer, racial discrimination and bias by BPD officers and predatory practices like "collars for dollars" will not improve unless there are outside reforms and accountability mechanisms.

Dated: _6 May 2025_