UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DORETHEA FRANKLIN, TANIQUA SIMMONS, DE'JON HALL, JANE DOE, Individually and on behalf of a class of Others similarly situated, SHIRLEY SARMIENTO, EBONY YELDON, CHARLES PALMER, SHAKETA REDDEN, and JOSEPH BONDS, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 1:18-cv-00719 |
| CITY OF BUFFALO, N.Y., BYRON B. BROWN, Mayor of the City of Buffalo, in his individual and official capacities, BYRON C. LOCKWOOD, Commissioner of the Buffalo Police Department, in his individual capacity, DANIEL DERENDA, former Commissioner of the Buffalo Police Department, in his individual capacity, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION TO RECONSIDER OR RENEW THE MOTION TO CERTIFY THE TRAFFIC ENFORCEMENT CLASS AND DENYING PLAINTIFFS' MOTION TO INTERVENE MARKEL NANCE AND THOMAS CHRISTOPHER WILLIAMS, JR. AS PLAINTIFFS AND REPRESENTATIVES OF THE TRAFFIC ENFORCEMENT CLASS**
(Docs. 326 & 327)

**I.    Procedural Background.**

Plaintiffs Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, and Jasmine Evans bring this action against the City of Buffalo, New York (the "City"); former City of Buffalo Mayor Byron B. Brown; former Buffalo Police Department ("BPD") Commissioner

Byron C. Lockwood; and former BPD Commissioner Daniel Derenda (collectively, "Defendants") on behalf of themselves and other Black and Latino motorists in the City.[1]

Plaintiffs claim that the City has unlawfully targeted Black and Latino motorists through the use of administrative traffic checkpoints (the "Checkpoints"). Even after the Checkpoints were discontinued, they assert City police officers continue to systematically target Black and Latino motorists for traffic enforcement, fines, and penalties. Plaintiffs allege violations under the Fourth Amendment, Fourteenth Amendment Equal Protection Clause, Fourteenth Amendment Due Process Clause, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d).

Plaintiffs filed an amended class action complaint ("Amended Complaint"), (Doc. 63), on May 21, 2020, and a motion for class certification on May 29, 2024. (Doc. 202.) On April 22, 2025, the court certified two distinct classes: (1) a "Checkpoint Class"[2] and (2) a "Tinted Windows Class".[3] (Doc. 261.) The court denied certification for a third class, the "Traffic Enforcement Class," finding the class lacked standing, was unascertainable, and the injunctive relief primarily requested an "obey the law" injunction. *Id.* Only that decision is at issue in Plaintiffs' motion for reconsideration.

Plaintiffs define the Traffic Enforcement Class as: "All Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." *Id.* Alternatively, they characterize the class as "Black individuals who plan to continue to drive in the City of Buffalo[.]" (Doc. 327-1 at 15.)

---

[1] On October 3, 2025, the court granted Plaintiffs' consent motion to dismiss Black Love Resists in the Rust as a plaintiff and to dismiss claims against Defendants Young, Brinkworth, Serafini, Thomas, and the Unknown Defendants. (Doc. 349.)

[2] Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.)

[3] Plaintiffs define the Tinted Windows Class as: "All Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2025." *Id.*

Plaintiffs seek a declaration that Defendants have violated Plaintiffs' constitutional rights and a class-wide injunction mandating significant changes in Defendants' policies, practices and/or customs, as well as an award of monetary damages, attorneys' fees, and costs.

On July 11, 2025, Plaintiffs filed a motion to reconsider the denial of the motion to certify the Traffic Enforcement Class pursuant to Fed. R. Civ. P. 54(b) or, in the alternative, to renew the motion to certify pursuant to Fed. R. Civ. P. 23(c)(1)(C). (Doc. 327.) Simultaneously, Plaintiffs filed a motion to intervene Markel Nance and Thomas Christopher Williams, Jr. (collectively, the "Proposed Intervenors") as plaintiffs and representatives of the Traffic Enforcement Class, seeking either mandatory or permissive intervention in this class action pursuant to Fed. R. Civ. P. 24. (Doc. 326.) Defendants opposed both motions on September 26, 2025, (Doc. 338), and Plaintiffs filed a reply on October 10, 2025. (Doc. 351.) A hearing was held on October 17, 2025, at which time the court took the pending motions under advisement.

Plaintiffs are represented by Andrea Chinyere Ezie, Esq., Baher Azmy, Esq., Christine Adrienne Nelson, Esq., Claudia Wilner, Esq., Joseph A. Kelemen, Esq., Matthew Alan Parham, Esq., Philip A. Irwin, Esq., and Jordan Scott Joachim, Esq. Defendants are represented by Peter A. Sahasrabudhe, Esq., Robert Emmet Quinn, Esq., Cheyenne Nicole Freely, Esq., and Hugh M. Russ, III, Esq.

## II.    Plaintiffs' Motion for Reconsideration.

### A.    Standard of Review.

The standard for reconsideration in the Second Circuit is an exacting one. "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Id.* A party may "obtain relief only when the [party] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or

prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 108 (2d Cir. 2013) (internal quotation marks and citation omitted).

Plaintiffs contend that reconsideration is warranted because the court's standing analysis contained two errors: (1) the court incorrectly limited its standing analysis to Checkpoints and (2) it evaluated injunctive standing based on recent events rather than as of the date individual plaintiffs joined the action.

**B.    Whether the Court Incorrectly Limited Its Standing Analysis.**

The court did not limit its standing analysis to Checkpoints. It instead considered allegations from Plaintiffs concerning "multiple traffic citations unrelated to Checkpoints." (Doc. 261 at 11.) The court recounted allegations from a 2017 traffic stop and 2019 and 2022 tickets issued while vehicles were parked in BMHA-owned parking lots. The court noted that "[a]ll of these incidents refer to past harm." *Id.* The court also considered Plaintiffs' non-Checkpoint claims when determining whether Plaintiffs could establish standing based on statistical disparities. *See id.* at 12 ("To the extent Plaintiffs rely on evidence that non-white motorists are statistically more likely to receive a traffic infraction ticket than white motorists, . . . this evidence also reflects past alleged harms . . . [and] does not rise to a real and immediate threat of future injury.") (internal quotation marks and citation omitted). Because Plaintiffs mischaracterize the court's decision as limiting its standing analysis to Checkpoints, it will not reconsider its previous decision on this basis.

**C.    Whether the Court Evaluated Injunctive Standing Using the Incorrect Date.**

To support their second argument in favor of reconsideration, Plaintiffs cite Second Circuit precedent that "'standing is to be determined as of the commencement of suit,' even for plaintiffs seeking forward-looking relief." *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Plaintiffs do not allege that each individual plaintiff's claims relate back to the date of original filing but, rather, assert that "standing for new plaintiffs is governed by the date on which they sought leave to join the action[,]" which Plaintiffs contend is June 28,

4

2018, the date the action was commenced, for Plaintiffs Simmons, Franklin, Evans, and Hall, and April 23, 2020, the date of the motion for leave to file an amended and supplemental complaint, for Plaintiffs Bonds, Yeldon, Sarmiento, and Redden.[4] (Doc. 327-1 at 18.)

Plaintiffs rely on two Second Circuit cases for their contention that the filing date of the original complaint and any amended complaint are the appropriate dates by which to evaluate standing, *Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993) and *Comer v. Cisneros*, 37 F.3d 775, 791 (2d Cir. 1994). In *Robidoux*, applicants for Vermont public assistance benefits brought an action challenging delays in the processing of their applications. Robidoux filed the complaint and motion for class certification on the same day. Other named plaintiffs later moved to intervene. At the time of both filings, the plaintiffs had not yet received their benefits. The district court denied the motion for class certification two months later. The Second Circuit found that the lower court erred in denying the motion for class certification because "at the material time," which the court determined was the date Robidoux filed her complaint, the injury was "capable of being redressed by declaratory or injunctive relief[.]" 987 F.2d at 938. In *Comer*, the plaintiffs moved for class certification less than two months after filing their complaint. And while the Second Circuit in *Comer* held that class certification would relate back to the date of the original filing, it did so by noting the district "court's failure to pass upon the plaintiffs' motion for class certification for over two years[.]" 37 F.3d at 799.

Defendants rely on *Jobie O. v. Spritzer*, 2007 WL 4302921 (S.D.N.Y. Dec. 5, 2007), to support their claim that "[w]here, as here, a complaint and a motion for class certification are not filed simultaneously, the timing of the motion for class certification is the material time for determining whether plaintiffs have standing." (Doc. 338 at 11.) In *Jobie O.*, the plaintiff intervened in the case in June 2006 and moved for class certification a year later in July 2007. Finding the plaintiff lacked standing in July 2007,

---

[4] Plaintiffs' motion did not mention Plaintiff Palmer, but he was added to the amended and supplemental complaint.

the court denied the motion for class certification. In doing so, the district court described the likelihood of future harm as too speculative and dependent upon a series of inferences that the plaintiff "would again become incarcerated in a New York City jail as a parole detainee for an excessive amount of time, awaiting an opening in a suitable MICA program[,]" placement in which was discretionary. *Jobie O.*, 2007 WL 4302921, at *15.

Plaintiffs oversimplify the *Jobie O.* court's ruling by characterizing it as predominantly a mootness analysis. As the court noted, "Because Mr. O. was no longer suffering the injury for which he seeks injunctive relief at the time he moved for class certification, *in order to have standing*, he would need to show that the threat of him suffering from the same injury is "'real and immediate," not "conjectural," or "hypothetical.""" *Id.* at *14 (emphasis supplied) (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). The court distinguished *Comer*, noting it was the plaintiff's failure to file a motion for class certification, not the court's failure to render a decision, that caused the individual plaintiff's claim to become moot. The court also distinguished *Robidoux*, because there the plaintiff filed the motion for class certification a year after his motion to intervene, rather than on the same day. In deciding the operative date for establishing standing, the *Jobie O.* court relied on *White v. Mathews*, 559 F.2d 852 (2d Cir. 1977), wherein the court "suggested that 'the material time' was the date on which the motion for class certification was filed[,]" which controls "when the complaint and the motion for class certification are *not* filed simultaneously[.]" *Jobie O.*, 2007 WL 4302921, at *11 (emphasis in original). In *White*, the Second Circuit evaluated standing for the class as of the date when the named plaintiff "*moved to certify the class* and still had not received a hearing[.]" 559 F.2d at 857 (emphasis supplied).

Plaintiffs filed their motion for class certification six years after their initial complaint. Even if the filing date for the class certification motion was the operative date, the standing analysis would remain unchanged because every Plaintiff and every Proposed Intervenor for the Traffic Enforcement Class alleges infrequent and past harm. Like the plaintiff in *Jobie O.*, their risk of future harm depends upon a speculative chain of inferences based upon a belief that if they continue to drive in Buffalo, they will suffer

6

discriminatory treatment after they either commit or do not commit a traffic infraction. This type of harm is unparticularized, impossible to redress through a narrowly tailored injunction,[5] and would require an individualized evidentiary analysis of each traffic stop that took place for all Black and Latino drivers, anywhere in Buffalo, for eternity. The court declined to find an imminent risk of concrete, non-speculative, irreparable harm based on those facts.

In denying class certification, the court further found that the Traffic Enforcement Class was unascertainable because it "is virtually limitless because it does not specify a time period for class membership or specify a future duration for the proposed injunction[,]" (Doc. 261 at 9), and because it would encompass every Black and Latino driver who planned to drive in the City. The practices Plaintiffs sought to enjoin other than the Checkpoints, which were discontinued as of the filing of their motion, were similarly unascertainable and amorphous and consisted of alleged discriminatory traffic enforcement writ large as opposed to specific, discrete practices.[6] Enforcement of and

---

[5] "An injunction is a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), that must be narrowly tailored to redress a particularized and non-speculative harm. *See, e.g., Forschner Grp., Inc. v. Arrow Trading Co. Inc.*, 124 F.3d 402, 406 (2d Cir. 1997) (requiring the court "to grant relief no broader than necessary to cure the effects of the harm caused by the violation[]"); *Transamerica Rental Fin. Corp. v. Rental Experts*, 790 F. Supp. 378, 382 (D. Conn. 1992) ("In fashioning an injunction, the court should make the relief as narrow as required to attain the desired result.").

[6] Plaintiffs sought class certification under Fed. R. Civ. P. 23(a) and 23(b)(2) for the Traffic Enforcement Class. "Rule 23(b)(2) allows class treatment when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). "The key to the (b)(2) class is 'the indivisible nature of the injunctive . . . remedy warranted—the notion that the conduct is such that it can be enjoined . . . only as to all of the class members or as to none of them.'" *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). "In other words, Rule 23(b)(2) applies only when a single injunction . . . would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction . . . against the defendant." *Id.* (emphasis in original).

Although "'civil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture[,]" *id.* at 361 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997), the practices the Traffic Enforcement Class seeks to

compliance with such an injunction would, among other things, require law enforcement to make assumptions regarding a vehicle operator's race and may require intervention at every turn. The court could not prohibit law enforcement from issuing tickets for motor vehicle violations, nor could it micromanage how those interactions took place, including whether the operator was Black or Latino, whether a traffic stop or other enforcement mechanism was justified, whether the fines imposed or other consequences were merited by the severity of the infractions, and whether the encounter as a whole was lawful or discriminatory. Plaintiffs cite no precedent for issuing an injunction of that nature.

Finally, in denying class certification, the court determined that the Traffic Enforcement Class primarily requested an impermissible "obey the law" injunction. *Id.* at 9; *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (alteration adopted) (finding that injunctions that "impose[d] on defendants an obligation to act 'in full conformity with applicable laws pertaining to firearms,' and to 'adopt appropriate prophylactic measures to prevent violation' of those laws[]" failed under Rule 65(d)); *Wakefield v. Scott*, 2021 WL 10342467, at *4 (D. Vt. June 24, 2021) (noting plaintiff's claims for injunctive relief failed "because her request for a command to 'direct defendants from violating the law' did not comply with Federal Rule of Civil Procedure 65(d) and Second Circuit precedent requiring that an injunction be more specific than a simple command that the defendant obey the law[]") (citation omitted)). All of these concerns remain and have little to nothing to do with the date of the court's standing analysis.

Because Plaintiffs have failed to satisfy the exacting standard for reconsideration, their motion for reconsideration is DENIED.

### III.   Plaintiffs' Motion to Intervene.

Plaintiffs claim that new evidence in the form of a motion to intervene provides a basis for reconsideration because the Proposed Intervenors have had more recent

---

enjoin are as varied as the number of traffic infractions in the NYSVTL, rendering each individual class member "entitled to a *different* injunction[.]" *Id.* at 360 (emphasis in original).

8

experiences of what they allege are racist and discriminatory traffic stops and other encounters with law enforcement. They also cite what they claim is new statistical evidence that bolsters their claim of racial disparities in policing that can only be explained by racial discrimination.[7]

Defendants point out that both the intervenors and the statistical evidence are not new; both were reasonably available when Plaintiffs filed their motion for class certification or shortly thereafter, and the allegedly new evidence cures none of the deficiencies the court identified in denying certification to the Traffic Enforcement Class.

### A.    Proposed Intervenors' Factual Allegations.

The following facts are taken from Proposed Intervenors' Class Action Complaint in Intervention. (Doc. 326-3.)

### 1.    Mr. Nance.

Markel Nance is a 25-year-old Black male and Buffalo resident. On May 22, 2021, around 4:00 a.m., Mr. Nance was pulled over by the BPD on his way home with his girlfriend while driving a luxury vehicle. The BPD officer, who is White, told Mr. Nance he stopped him for speeding, which the officer measured using his own cruiser's speed. The BPD officer instructed Mr. Nance to exit his vehicle, patted him down for weapons, and placed him in the back of the patrol car. Mr. Nance contends that the officer had no basis for the pat down or to detain him in the patrol car.

During the traffic stop, the BPD officer spoke to Mr. Nance "in a demeaning manner, addressing him as 'my man,' 'my guy,' and 'dog.'" *Id.* at 5, ¶ 14. In response to Mr. Nance requesting a lieutenant, the BPD officer called Mr. Nance a "smartass[]" and accused him of being racist. *Id.* at ¶ 17 (internal quotation marks omitted). "When Mr. Nance responded that he could[ not] be racist because he is Black, [the officer] responded, 'Must be nice.'" *Id.* at ¶ 18. The officer also allegedly "commented that his supervisor 'is Black, so you guys will have a great conversation.'" *Id.* Mr. Nance was

---

[7] To the extent Plaintiffs developed additional statistical evidence after the court's hearing on class certification, they never requested to supplement the record with it.

issued three tickets for "speed not reasonable and prudent," and failing to observe a traffic signal, which were allegedly unjustified, as well as unlicensed operation. *Id.* at 6, ¶ 19 (internal quotation marks omitted). At the conclusion of the traffic stop, the officer told Mr. Nance "'[p]eace out homie,' and flashed a peace sign[.]" (Doc. 325-3 at 6, ¶ 20.)

Mr. Nance reported the encounter to the BPD's Internal Affairs Division ("IAD") as a racially discriminatory traffic stop. IAD interviewed Mr. Nance but not his girlfriend, who witnessed the stop. IAD told Mr. Nance in a letter that "the Police Commissioner would determine what disciplinary action the officer should face, though [Mr. Nance] was never informed if any such disciplinary action was taken." *Id.* at ¶ 22.

On January 6, 2022, Mr. Nance had another encounter with BPD while driving a rental car. As Mr. Nance drove by BPD officers conducting a different traffic stop, his passenger placed his head out the rental car's window. The officers pulled Mr. Nance over, questioned him about whether his name was on the rental agreement, and issued him four tickets. One ticket was for unlicensed operation. Mr. Nance had a valid license but had only a learner's permit in his possession at the time. The officers also cited him for failing to stop at a stop sign, which Mr. Nance asserts is false. Upon telling the officers he was going to file a complaint with IAD, an officer allegedly responded, "Go to IA. I don't give a f[**]k. What are they going to do?" *Id.* at 7, ¶ 25 (internal quotation marks omitted). Mr. Nance filed a complaint with IAD, which did not interview a witness to the stop or inform Mr. Nance of the outcome of any investigation.

Mr. Nance was pulled over again while driving a rental car in March 2022. The BPD officer told Mr. Nance he did not come to a complete stop at the stop sign, which Mr. Nance claims is untrue. He was issued a ticket for failure to stop. Mr. Nance contested this ticket in court and the case was dismissed.

On November 24, 2023, Mr. Nance was stopped by BPD officers on his way home after passing around a turning car. Two officers made a U-turn and pulled him over before two additional officers arrived. The officers "asked [Mr. Nance] to exit his car [and] then placed him in the back of the patrol car while they searched his car without justification

or permission." *Id.* at 8, ¶ 29. After the search, they "issued him two tickets for imprudent speed and unsafe lane movement and told him he was free to go." *Id.*

Mr. Nance was pulled over again in March 2024. He does not provide information about the operation that initiated this encounter, but he alleges he was issued "six tickets, including two misdemeanors, for [his] single insurance lapse." *Id.* at ¶ 30.

### 2.    Mr. Williams.

Thomas Christoper Williams, Jr. is a 20-year-old African American male who was born and raised on the East Side of the City and continues to live and study in the City.

On March 26, 2024, around 11:30 p.m., Mr. Williams was waiting at a traffic light when a BPD officer driving in the opposite direction "looked at him with a hostile expression that made Mr. Williams fear for his life and then proceeded to make a U-turn and pulled up behind Mr. Williams." (Doc. 326-3 at 9, ¶ 36.) Mr. Williams drove home and the BPD officers, both of whom are White, followed him, turned into his driveway, activated their lights, and "barricad[ed] his car in the driveway." *Id.* at ¶ 37. The officers approached Mr. Williams and asked, "You live here, brother?" *Id.* at ¶ 38 (internal quotation marks omitted). Mr. Williams stated that he did and provided the officers with his license, registration, and insurance information, as well as his father's business card indicating his father was a Sergeant with the Police Department of Anne Arundel County, Maryland.

The officers questioned Mr. Williams about a variety of matters, including "what he was doing, where he was coming from, whether he lived in [the] house, and why he was[ not] wearing a coat[,]" as well as "his gym, his school, his areas of study, his grades, why he was nervous, and if the car was stolen[.]" *Id.* at 10, ¶ 40. They also asked him if he had warrants or had been on probation or parole. He told them "no" and they told him "they had to run his license." *Id.* Despite holding his license, they called him by the wrong name, "James." *Id.* (internal quotation marks omitted).

The officers advised Mr. Williams that "they just had one of these cars stolen and that Mr. Williams 'scared' the officer by pulling into his driveway[.]" (Doc. 326-3 at 10, ¶ 41.) The officers gave different reasons for the stop, including that Mr. Williams had not

11

used his directional signal when turning into his driveway, "that he had pulled all the way into his driveway and appeared nervous, and that they were not sure if he lived in the house." *Id.* at ¶ 42. They later also claimed that he was speeding before turning into the driveway.

As the officers continued to question Mr. Williams, his mother and aunt came out of the house. Mr. Williams's mother confirmed that he was her son, he lived at the house, and the car was not stolen. Mr. Williams's mother called Mr. Williams's father, who also confirmed to the officers that Mr. Williams was his son and was driving the family car. Despite these representations from Mr. Williams's parents, the officers "r[a]n Mr. Williams['s] name and license" and checked for warrants. *Id.* at 11, ¶ 44. They neither ticketed Mr. Williams nor issued him a stop receipt. Mr. Williams claims there was "no legal basis to prolong the stop to run a background check and ask extensive questions unrelated to the stop[.]" *Id.* at ¶ 45.

Following this encounter, Mr. Williams and his family met with E District Chief Todd McAllister regarding their concerns that the traffic stop was racially discriminatory. Chief McAllister allegedly acknowledged that the vehicle driven by Mr. Williams was not the same make or model of any reports of stolen cars that evening and "told them that it was an unfair and bad stop, that the officers did a lot of things wrong, and that they should not have stopped Mr. Williams or pulled into his driveway." *Id.* at 12, ¶ 48. He "described how the E District has had a racial profiling problem in part because . . . there are no Black officers who work at night[.]" *Id.* at ¶ 49. Chief McAllister said he would file a racial discrimination complaint with IAD. Six weeks later, IAD conducted short interviews of Mr. Williams and his father, lasting approximately ten and four minutes, respectively. The interviewer "used an indifferent and curt tone[.]" (Doc. 326-3 at 12, ¶ 50.) At the end of the investigation, all the officers involved were exonerated.

On September 21, 2024, two BPD police cars "sandwiched" a convertible BMW M8, worth over $100,000, in which Mr. Williams and one other Black male were passengers, with one police car in front and one behind the car. *Id.* at 14, ¶ 56. The officers claimed the operator, who was Mr. Williams's brother, did not stop at a stop sign.

12

The four White officers commented on how expensive the car was and asked the operator who it belonged to and how he got it. They asked everyone for their driver's licenses, and one officer told Mr. Williams he looked familiar despite Mr. Williams having never previously encountered the officer. Mr. Williams describes this encounter as a pretextual and discriminatory stop.

### B.    Standard of Review.

Mr. Nance and Mr. Williams seek to intervene as of right pursuant to Fed. R. Civ. P. 24(a)(2) or, in the alternative, request permissive intervention pursuant to Fed. R. Civ. P. 24(b). Defendants oppose the motion, arguing it is untimely and futile because Proposed Intervenors lack standing.

Pursuant to Rule 24(a)(2), a court "must permit anyone to intervene" if that party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). A party seeking to intervene as of right must "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 128-29 (2d Cir. 2001) (internal quotation marks omitted). "Failure to satisfy *any one* of these requirements is a sufficient ground to deny the application." *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 300 (2d Cir. 2003) (emphasis in original) (internal quotation marks omitted).

If intervention as of right is not warranted, "[a] district court may grant a motion for permissive intervention if the application is timely and if the 'applicant's claim or defense and the main action have a question of law or fact in common.'" *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 202 (2d Cir. 2000) (quoting Fed. R. Civ. P. 24(b)(2)). "The court considers substantially the same factors whether the claim for intervention is 'of right' under Fed. R. Civ. P. 24(a)(2), or 'permissive' under Fed. R. Civ. P. 24(b)(2)." *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006).

13

## C.    Whether the Motion to Intervene is Timely.

"A district court has broad discretion in assessing the timeliness of a motion to intervene[.]" *Holocaust Litig.*, 225 F.3d at 198.

> Timeliness defies precise definition, although it certainly is not confined strictly to chronology. Among the circumstances generally considered are: (1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness.

*United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994); *see also Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 182 (2d Cir. 2001). "Generally, the court's analysis must take into consideration the totality of the circumstances." *Holocaust Litig.*, 225 F.3d at 198.

This case has been pending since June 28, 2018. As Defendants point out, Proposed Intervenors have had a purported interest in this case since its inception in 2018, their alleged experiences of racial discrimination took place years ago, and Plaintiffs waited "three months after the Class Certification ruling and until the tail-end of summary judgment briefing to move to intervene." (Doc. 338 at 19.) The deadline for joinder of parties was May 14, 2020. *See* Doc. 48. The court agrees that, against this backdrop, Plaintiffs' motion to intervene is not timely and will result in both unreasonable delay and prejudice to Defendants.[8]

### 1.    Notice.

With respect to notice, the relevant inquiry is when an intervenor "became aware that its interest would no longer be adequately represented." *Nat'l Fuel Gas Distrib. Corp. v. Templeton Energy, Inc.*, 1986 WL 12486, at *1 (W.D.N.Y. Nov. 7, 1986). In some cases, the filing of the complaint serves as that triggering event. However, "[i]n cases where the potential intervenor's interest is, at least at the outset, subsumed by that

---

[8] Pending before the court is Defendants' motion for summary judgment (Doc. 252) and Plaintiffs' motion for partial summary judgment, (Doc. 253), both of which have been fully briefed and argued and for which the record exceeds five hundred pages and six hundred exhibits.

of a representative litigant, the trigger requiring intervention does not occur until it is apparent that the representative no longer protects the intervenor's interest." *Chen-Oster v. Goldman, Sachs & Co.*, 2015 WL 4619663, at *6 (S.D.N.Y. Aug. 3, 2015). Class actions are one such circumstance, "for as long as the interests of class members are fully represented by the named plaintiffs, there is no incentive, and therefore no obligation, to intervene." *Id.* Prior to certification, potential class members are "mere passive beneficiaries of the action brought in their behalf." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552 (1973).

> Not until the existence and limits of the class have been established and notice of membership has been sent does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case.

*Id.* For this reason, the Supreme Court has allowed post-judgment intervention by a class member when the named plaintiffs declined to appeal a denial of class certification. *See United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977) ("In short, as soon as it became clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representatives, she promptly moved to intervene to protect those interests.").

In this case, the Proposed Intervenors' interests were previously represented and protected by the named plaintiffs seeking class certification and injunctive relief on behalf of the Traffic Enforcement Class. Indeed, as Defendants repeatedly point out, the Proposed Intervenors' interests are identical to those individuals they seek to replace even if based on widely divergent fact patterns. Proposed Intervenors' interests did not become unrepresented by class members who refused to advocate on their behalf. Instead, they apparently claim they will be better suited as class representatives for purposes of standing because their police encounters were more numerous and more recent. Plaintiffs proffer no explanation as to why these class representatives were not previously chosen. Because Plaintiffs had notice of the need for adequate class representatives who had standing, Proposed Intervenors could have been chosen as class representatives much

15

earlier in the case. The court's denial of class certification did not create that need nor does it render their motion timely.[9]

### 2.    Prejudice to Existing Parties.

Prejudice has been found where potential intervenors sought to "radically change the definition of the proposed class[,]" *Allen v. Dairy Farmers of Am., Inc.*, 2011 WL 1706778, at *6 (D. Vt. May 4, 2011), or where intervention threatened to destroy the settlement reached by the parties and "send[] them back to the drawing board." *Holocaust Litig.*, 225 F.3d at 199; *see also Sheppard v. Phoenix*, 1998 WL 397846, at *2 (S.D.N.Y. July 16, 1998) ("To abort the [s]ettlement at this process, at this late critical stage would prejudice the parties to this litigation."). This action has been pending for seven years. The parties have conducted extensive discovery. Until April 2025, the action proposed a Traffic Enforcement Class for whom solely injunctive relief was sought. As admitted by Plaintiffs, Proposed Intervenors incorporate "the same allegations as Plaintiffs have already made in this action, and they seek the same relief." (Doc. 326-1 at 15) (emphasis omitted). Intervention is effectively an offshoot of Plaintiffs' motion to reconsider, with the proposed intervention characterized as quasi-new evidence which the court must reconsider. As Defendants assert, intervention "would set this case back to the discovery phase[]" and "add, at a minimum, six months to this action" as they "gather paper discovery on the Proposed Intervenors and depose them." (Doc. 338 at 20.) Defendants have therefore established they will suffer unfair prejudice if the motion to intervene is granted.

---

[9] Courts generally expect an intervenor to act promptly upon receipt of notice. *See, e.g., Pike Co. v. Universal Concrete Prods., Inc.*, 284 F. Supp. 3d 376, 394-96 (W.D.N.Y. 2018) (finding motion to intervene was timely when filed within approximately five months of receiving notice); *Range v. Nat'l R.R. Passenger Corp.*, 176 F.R.D. 85, 88-89 (W.D.N.Y. 1997) (holding motion to intervene was timely when filed less than three months after notice); *cf. United States v. New York*, 820 F.2d 554, 557 (2d Cir. 1987) (finding untimely a motion to intervene that was filed fifteen months after proposed intervenor knew or should have known of his interest in the case).

### 3.    Prejudice to Applicants.

The Second Circuit has held that if intervenors "remain free to file a separate action, they have not established that they will be prejudiced if their motion to intervene is denied." *Holocaust Litig.*, 225 F.3d at 199. Even where they may face "many significant obstacles" in filing their own lawsuit, permission to intervene need not be granted. *Id.* Plaintiffs argue that Proposed Intervenors "would be greatly prejudiced by a denial of their motion[]" as a result of inefficiency and duplicative work that intervention would prevent. (Doc. 326-1 at 15.) Nothing prevents Proposed Intervenors from filing their own lawsuit against Defendants, however, and mere inconvenience does not suffice to establish prejudice.

### 4.    Unusual Circumstances.

Neither Defendants nor Proposed Intervenors have identified any unusual circumstances to militate for or against a finding of timeliness.

### D.    Whether Intervention is Futile.

An additional threshold consideration, however, is whether intervenors have standing. If intervenors lack standing, the motion to intervene would be futile and denial appropriate. *See, e.g., Dynamic Sys., Inc. v. Skanska USA Bldg. Inc.*, 2021 WL 6063609, at *2 (S.D.N.Y. Dec. 21, 2021) ("[C]ourts have held that futility is a proper basis for denying a motion to intervene.") (internal quotation marks and citation omitted); *N.Y. Life Ins. Co. v. Sahani*, 730 F. App'x 45, 50 (2d Cir. 2018) (affirming denial of motion to intervene based on futility); *Cross Sound Cable Co. v. Long Island Lighting Co.*, 2022 WL 247996, at *6 (E.D.N.Y. Jan. 27, 2022) (denying motion to intervene as futile because underlying claim did not confer subject matter jurisdiction or standing and would have been untimely).

### 1.    Proposed Intervenors' Standing.

The Supreme Court is clear that "standing is not dispensed in gross." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (internal quotation marks and citation omitted). "To the contrary, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Id.* (quoting *Davis v. Fed.*

17

*Election Comm'n*, 554 U.S. 724, 734 (2008)); *see also Los Angeles v. Lyons*, 461 U.S. 95, 106 n.7 (1983) (a plaintiff who has standing to seek damages must also demonstrate standing to pursue injunctive relief). "The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester*, 581 U.S. at 439.

Proposed Intervenors seek to preliminarily and permanently enjoin Defendants:

(a) From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of their race and ethnicity;

(b) From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints for improper pecuniary purposes;

(c) To institute and implement policies and programs with respect to training, supervision, and discipline that will eliminate the policy, pattern, practice, and custom of:

> (i) conducting vehicle Checkpoints for the purpose of general crime control; and

> (ii) enforcing traffic laws in a manner that targets Buffalo residents on the basis of their race and ethnicity or that reflect an improper pecuniary motive[;]

(d) To implement appropriate measures to ensure that BPD officers and personnel document all traffic stops and vehicle Checkpoints in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act;

(e) To implement appropriate measures to ensure that documentation of all traffic stops and vehicle Checkpoints is retained in a single, up-to-date computerized database.

(Doc. 326-3 at 19, ¶ 77.)

The court previously determined that the requested injunctive relief primarily consists of an impermissible "obey the law" injunction. The court further found Plaintiffs lacked standing—not based upon the timing of their complaint or motion for class certification—but based upon their reliance on past, infrequent harm to establish imminent, irreparable, and non-speculative future harm.

Plaintiffs contend that Proposed Intervenors have standing because they have "been subject to a recent discriminatory traffic stop or ticketing by the BPD pursuant to

an ongoing municipal policy, custom, or practice targeting Black and Latino motorists on the basis of race[.]" (Doc. 326-1 at 21.) They do not deny, however, that the Proposed Intervenors allege past harm as well as the same harm as the class representatives they seek to replace.

In his declaration, Mr. Nance states that he was subjected to discriminatory stops by the BPD approximately once a year in 2021, 2022, 2023, and 2024. He asserts that, in each instance, he was targeted and ticketed because he was a Black man, citing what he contends is racially demeaning language.

Mr. Williams declared that he was subjected to two traffic stops by the BPD in 2024. In one encounter, two BPD officers allegedly followed Mr. Williams home and unjustifiably barricaded his car in his driveway and interrogated him. In another encounter, the BPD stopped a car in which Mr. Williams was a passenger and his brother was driving. The officers commented on how expensive the car was, questioned Mr. Williams, and asked for everyone's driver's licenses.

In *Floyd v. City of New York*, the Southern District of New York found that a plaintiff seeking an injunction mandating changes to New York City's stop and frisk program had standing because (1) the plaintiff had been stopped and frisked four separate times; (2) the plaintiff's "future injury does not depend on his being arrested for unlawful conduct and so he cannot avoid that injury by following the law"; and (3) "the frequency of alleged injuries inflicted by the practices at issue here creates a likelihood of future injury[.]"[10] 283 F.R.D. 153, 169-70 (S.D.N.Y. 2012). *Floyd* is not controlling precedent.

The challenged governmental policy at issue in *Floyd* was ongoing at the time of the lawsuit, involved a specific policy and practice of stop and frisk unrelated to

---

[10] The district court had previously "declar[ed] the Street Crime Unit's ('SCU') practice and/or custom of suspicionless stops and frisks to be unconstitutional." *Nat'l Cong. for Puerto Rican Rts. v. City of New York*, 75 F. Supp. 2d 154, 158 (S.D.N.Y. 1999). The court found the individual plaintiffs had established standing because: (1) "there is [a] difference in the number of alleged constitutional violations resulting from the challenged policies"; (2) the victims "claim they have been victimized by [the] unconstitutional practices repeatedly"; and (3) "there is no chain of contingencies making the threat of future harm speculative. . . . [P]laintiffs do not have to break the law to be exposed to the alleged constitutional violations." *Id.* at 161.

19

reasonable suspicion or probable cause, and of the four instances in which the plaintiff had been stopped, three were in the same year as the request for injunctive relief.

Proposed Intervenors allege that the BPD policy of targeting Black and Latino motorists for traffic enforcement is ongoing. However, neither the recency nor the frequency found in *Floyd* is present in this case, traffic enforcement with regard to motor vehicle operators of designated racial backgrounds cannot be entirely enjoined, a discrete practice or policy is not at issue, and past allegations of harm once or twice a year two to four years ago do not "create[] a likelihood of future injury[.]" *Id.* at 170. In addition, unlike in *Floyd*, the alleged constitutional violations are not subject to targeted injunctive relief. Instead, Proposed Intervenors cite widely divergent fact patterns and ask the court to either enjoin those fact patterns in the future or issue a broad "obey the law" injunction.

Because neither Proposed Intervenor has established that he is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,]" *Shain*, 356 F.3d at 215 (internal quotation marks omitted) (quoting *Lyons*, 461 U.S. at 101-02), Proposed Intervenors have failed to established standing for injunctive relief, and intervention would be futile.

For the reasons stated above, Plaintiffs' motion to intervene as of right is therefore DENIED. For the same reasons, Plaintiffs' motion for permissive intervention is DENIED. *See Town of Chester*, 581 U.S. at 439-40.

## IV.    Plaintiffs' Motion to Renew.

### A.    Standard of Review.

Fed. R. Civ. P. 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." The purpose of this rule is to allow plaintiffs to address a district court's concerns after initial denials of class certification. *See In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007). "District courts have ample discretion to consider (or to decline to consider) a revised class certification motion after an initial denial." *Id.* However, "the [c]ourt may not disturb its prior certification findings absent some significant intervening event, or a

20

showing of compelling reasons to reexamine the question." *Gortat v. Capala Bros., Inc.*, 2012 WL 1116495, at *2 (E.D.N.Y. Apr. 3, 2012) (alteration adopted) (quoting *Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011)).

Plaintiffs move to renew on two bases: (1) the proposed intervention of Mr. Nance and Mr. Williams as plaintiffs and (2) new statistical evidence of the BPD's ongoing program of racially discriminatory pretextual stops. Because the court denied Plaintiffs' motion to intervene, intervention cannot support the motion to renew.

### B.   Whether New Evidence Warrants Renewal of the Class Certification Motion.

Where an earlier motion for class certification has been denied, courts in the Second Circuit generally hold that "any renewed motion for class certification by Plaintiffs must be based on a more robust submission that points to admissible evidence where necessary to establish the Rule 23 requirements for class certification." *Vega v. Semple*, 2023 WL 5395479, at *3 (D. Conn. Aug. 22, 2023); *see also Dash v. Seagate Tech. (US) Holdings, Inc.*, 2016 WL 4491822, at *1 (E.D.N.Y. July 12, 2016) ("Plaintiff's counsel is hereby advised that the [renewed] motion shall not contain arguments or evidence previously submitted to the [c]ourt on the prior motion . . . [and] if the [c]ourt finds the renewed motion for class certification to be a frivolous attempt at reargument of the prior motion, costs may be imposed."). "Alternatively, plaintiffs could opt to propose a different and more supportable class definition on a renewed motion, without showing a change in the law or new evidence." *Savinova v. Nova Home Care, LLC*, 2024 WL 3552425, at *7 (D. Conn. July 26, 2024) (citing *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 476-77 (3d Cir. 2020)). This mirrors the standard required for reconsideration.

Plaintiffs neither propose a new definition of the Traffic Enforcement Class nor do they seek more narrowly tailored injunctive relief. Instead, they claim they have developed better and more recent statistical and video evidence of discriminatory traffic enforcement.

In reconsideration cases, evidence within a party's possession prior to the court's ruling is rarely deemed "newly available evidence." *See, e.g., First State Ins. Co. v.*

21

*Ferguson Enters., Inc.*, 2019 WL 2521838, at \*5 (D. Conn. June 18, 2019) ("[E]vidence in a party's possession before a court's ruling is not considered 'newly available' evidence."); *Ahmad v. Int'l Bus. Machs. Corp.*, 2013 WL 12221829, at \*6 (D. Vt. Mar. 28, 2013) (ruling that evidence party had for two years prior to court's decision was not new); *Winkler v. Grant*, 2008 WL 3539898, at \*1 (W.D.N.Y. Aug. 12, 2008) ("Evidence that a party had prior to judgment being entered is not considered new evidence, and does not entitle the party to reconsideration.") (citing *Stewart Park & Rsrv. Coal. Inc. v. Slater*, 374 F. Supp. 2d 243, 253 (N.D.N.Y. 2005)).

Here, the new evidence cited by Plaintiffs includes "emerging statistical evidence" available after depositions taken in the summer and fall of 2024 that allegedly shows "BPD routinely conducts racially disproportionate traffic stops without constitutionally sufficient bases to do so[,]" (Doc. 344 at 57) (capitalization omitted), based on video evidence of allegedly pretextual stops from the last six months of 2024 first provided by Defendants in December 2024. This evidence was not available prior to the October 23, 2024 hearing to certify the Traffic Enforcement Class. However, all of the evidence was available prior to the court's April 22, 2025 ruling on class certification. Plaintiffs did not request to supplement the record with it, nor do they establish it materially transforms the record before the court such that a different outcome is warranted. Accordingly, it does not justify renewal of class certification.

For the same reasons that reconsideration was denied, Plaintiffs' motion to renew is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiffs' motion to reconsider or renew, (Doc. 327), and DENIES Plaintiffs' motion to intervene Market Nance and Thomas Christopher Williams, Jr. as plaintiffs and representatives of the Traffic Enforcement Class. (Doc. 326.)

SO ORDERED.

Dated this ___27ᵗʰ___ day of March, 2026.

Christina Reiss, District Judge
United States District Court

23