UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

DORETHEA FRANKLIN, TANIQUA )
SIMMONS, DE'JON HALL, JANE DOE, )
individually and on behalf of a class of )
others similarly situated, SHIRLEY )
SARMIENTO, EBONY YELDON, )
CHARLES PALMER, SHAKETA )
REDDEN, and JOSEPH BONDS, )
)
Plaintiffs, )
)
v. )
) Case No. 1:18-cv-00719
CITY OF BUFFALO, N.Y., BYRON B. )
BROWN, Mayor of the City of Buffalo, in his )
individual and official capacities, BYRON )
C. LOCKWOOD, Commissioner of the )
Buffalo Police Department, in his individual )
capacity, DANIEL DERENDA, former )
Commissioner of the Buffalo Police )
Department, in his individual capacity, )
)
Defendants. )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
(Docs. 252 & 253)

## I.    Procedural Background.

Plaintiffs Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Shirley Sarmiento,

Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, and Jasmine Evans[1]

bring this action against the City of Buffalo, New York (the "City"); former City of

Buffalo Mayor Byron B. Brown; Buffalo Police Department ("BPD") Commissioner

---

[1] In a declaration filed May 20, 2025, Ms. Evans identified herself as "one of the Plaintiffs in this action (formerly known as 'Jane Doe.')." (Doc. 298 at 1, ¶ 1.)

Byron C. Lockwood; and former BPD Commissioner Daniel Derenda (collectively, "Defendants") on behalf of themselves and other Black and Latino motorists in the City.

Plaintiffs claim that the City has unlawfully targeted Black and Latino motorists through the use of administrative traffic checkpoints (the "Checkpoints"). Even after the Checkpoints were discontinued, they assert City police officers continue to systematically target Black and Latino motorists for traffic enforcement, fines, and penalties. Plaintiffs allege violations under the Fourth Amendment, Fourteenth Amendment Equal Protection Clause, Fourteenth Amendment Due Process Clause, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

Plaintiffs filed an amended class action complaint ("Amended Complaint"), (Doc. 63), on May 21, 2020, and a motion for class certification on May 29, 2024. (Doc. 202.) On April 22, 2025, the court certified two distinct classes: (1) a "Checkpoint Class"[2] and (2) a "Tinted Windows Class."[3] (Doc. 261.) The court denied certification for a third class, the "Traffic Enforcement Class," finding the class lacked standing, was unascertainable, and the injunctive relief primarily requested an "obey the law" injunction. *Id.* at 8.

On July 11, 2025, Plaintiffs filed a motion to reconsider the denial of the motion to certify the Traffic Enforcement Class or, in the alternative, to renew the motion to certify. (Doc. 327.) Simultaneously, Plaintiffs filed a motion to intervene on behalf of two proposed intervenors as plaintiffs and representatives of the Traffic Enforcement Class. (Doc. 326.) On March 27, 2026, the court denied the motions for reconsideration and to intervene. (Doc. 357.) Plaintiffs have sought an interlocutory appeal of those decisions. Accordingly, the court does not consider summary judgment insofar as it pertains to the Traffic Enforcement Class.

---

[2] Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.)

[3] Plaintiffs define the Tinted Windows Class as: "All Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015." *Id.*

2

The Checkpoint Class, represented by Plaintiffs Bonds, Evans, and Redden, claims: (1) a violation of the Fourth Amendment; (2) a violation of the Fourteenth Amendment Equal Protection Clause; (3) a violation of the Fourteenth Amendment Due Process Clause; and (4) a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

The Tinted Windows Class, represented by Plaintiffs Franklin, Palmer, and Yeldon, claims: (1) a violation of the Fourteenth Amendment Equal Protection Clause; (2) a violation of the Fourteenth Amendment Due Process Clause; and (3) a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

On February 7, 2025, Defendants filed a motion for summary judgment, (Doc. 252), and Plaintiffs cross-moved for partial summary judgment on their Fourth Amendment claims for the Checkpoint Class. (Doc. 253.) The parties filed their respective oppositions on May 30, 2025, (Docs. 266 & 321), and their replies on August 1, 2025. (Doc. 331 & 332.) The court held a hearing on October 17, 2025, at which time it took the pending motions under advisement.

On October 3, 2025, the court granted Plaintiffs' consent motion to dismiss Black Love Resists in the Rust as a plaintiff and to dismiss claims against Defendants Young, Brinkworth, Serafini, Thomas, and the Unknown Officers and Supervisors. (Doc. 349.)

Plaintiffs are represented by Andrea Chinyere Ezie, Esq., Baher Azmy, Esq., Christine Adrienne Nelson, Esq., Claudia Wilner, Esq., Joseph A. Kelemen, Esq., Matthew Alan Parham, Esq., Philip A. Irwin, Esq., and Jordan Scott Joachim, Esq. Defendants are represented by Ava J. Horgan, Esq., Robert Emmet Quinn, Esq., Cheyenne Nicole Freely, Esq., and Hugh M. Russ, III, Esq.

## II.    Whether to Consider Plaintiffs' Additional Evidence.

Pursuant to Western District of New York Local Rule 56, a party opposing summary judgment

> shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs. Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by

3

correspondingly numbered paragraphs in such opposing statement with citation to admissible evidence or to evidence that can be presented in admissible form at trial as required by Fed. R. Civ. P. 56(c)(1)(A). In addition, when appropriate, the opposing party's statement may also contain a short and concise statement, in numbered paragraphs, of additional material facts (i) as to which the opposing party contends there is no genuine issue to be tried; and/or (ii) that the opposing party contends are in dispute.

W.D.N.Y. Loc. R. Civ. P. 56(a)(2).

In response to Defendants' Statement of Undisputed Material Facts ("SUMF"), Plaintiffs submitted a Counterstatement including 667 additional material facts ("CSMF"). (Doc. 345.) Plaintiffs' CSMF is supported by a declaration of a former BPD Internal Affairs Division ("IAD") employee (the "IAD Declaration"). Defendants object to consideration of this declaration because Plaintiffs initially filed it under seal without making a motion to seal as required by Western District of New York Local Rule 5.3. *See* W.D.N.Y. Loc. R. Civ. P. 5.3(c) ("A party seeking to have a document or portion of a document filed under seal on notice must . . . file . . . a notice of motion to seal[.]"). On September 26, 2025, however, Plaintiffs submitted a consent motion to partially unseal the IAD Declaration, (Doc. 340), which the court granted on September 29, 2025. (Doc. 342.) A redacted version of the IAD Declaration was filed on October 3, 2025. (Doc. 346.) The court will therefore consider the IAD Declaration to the extent it contains material facts.

Defendants assert that Plaintiffs' CSMF relies on individualized anecdotal evidence, which they argue is irrelevant and contradicts Plaintiffs' class action claims. Anecdotal evidence, however, can supplement statistical evidence of racial disparity, helping to bring "the cold numbers convincingly to life." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977). It is "relevant at both the class certification and merits stages." *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 565 (S.D.N.Y. 2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 358 (2011)); *see also Chalmers v. City of New York*, 2022 WL 4330119, at *13 (S.D.N.Y. Sept. 19, 2022) ("At the class certification stage, [p]laintiffs may provide 'significant proof' supporting their disparate

treatment claims via statistical and anecdotal evidence.") (quoting *Chen-Oster*, 325 F.R.D. at 76).

Defendants further challenge Plaintiffs' inclusion of facts concerning "the history of Buffalo's development and growth as a city[,]" particularly its "history of segregation and the resulting establishment of the virtually all-Black neighborhoods on the East Side[]" as irrelevant. (Doc. 331-13 at 15.) This challenge pertains to an expert witness report authored by Robert Silverman, PhD, a professor in the Department of Urban and Regional Planning at the University of Buffalo, wherein he describes the history of segregation in the City, including housing and public education policies from the 1930s through the 1980s, and opines that these policies contributed to the City's present de facto segregation. His report includes court cases from the 1970s against the BPD and the City's Board of Education for discriminatory practices, as well as research from the early 2000s regarding BPD stereotyping of Black residents. This history is relevant to Plaintiffs' claims because "'the historical background of the decision is one evidentiary source' for proof of intentional discrimination." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). However, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value . . . [and a court] cannot accept official actions taken long ago as evidence of current intent." *Id.* (citation omitted). Because the proffered historical evidence concerns actions taken decades before the challenged conduct, it would ordinarily be inadmissible, but, for purposes of summary judgment, the court will consider it only to the extent that it is reasonably contemporaneous and there is evidence that racial discrimination and de facto segregation persist.[4]

---

[4] At trial, the court is likely to require a more robust foundation for admissibility. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . [or] misleading the jury[.]"). "[W]hile it is not unheard of to exclude evidence under Rule 403 at the summary judgment stage, the balancing process contemplated by that rule is best undertaken at the trial itself." *Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363, 374 (S.D.N.Y. 2024) (alteration adopted) (internal quotation

Defendants object to the opinions of Plaintiffs' expert witnesses Michael Gennaco and David Bjerk as irrelevant because the experts lack "personal knowledge of any interaction that [has] taken place between a potential class member and a BPD officer." (Doc. 331-13 at 16.) Expert witnesses are not required to have personal knowledge to testify. *See, e.g.*, *United States v. Johnson*, 2017 WL 11490479, at *2 (E.D.N.Y. Aug. 4, 2017) ("Th[e] restriction that testimony must be based on personal perception does not, however, apply to 'a witness who is qualified as an expert by knowledge, skill, experience, training, or education,' i.e. an expert witness.") (alteration adopted) (emphasis omitted) (citing Fed. R. Evid. 602, 702).

Finally, Defendants challenge Plaintiffs' reliance on news articles as evidence. "[N]ewspaper articles offered for the truth of the matters asserted therein are inadmissible hearsay that may not be considered by the [c]ourt in deciding a motion for summary judgment." *Outerbridge v. City of New York*, 2015 WL 5813387, at *4 (S.D.N.Y. Sept. 30, 2015) (internal quotation marks and citation omitted). Accordingly, the court will not consider any factual assertions supported solely by newspaper articles as such evidence is inadmissible.

## III. Factual Background.

### A. The Undisputed Facts.

Plaintiffs are Black individuals who drive in the City and intend to do so in the future and who seek to serve as class representatives for Black and Latino motorists.

From 2012 to 2017, Daniel Derenda served as BPD Commissioner, the BPD's highest-ranking member, and Byron B. Brown served as the Mayor of the City. Bryon C. Lockwood served as BPD Commissioner after Defendant Derenda.

The BPD has received federal funds from the Department of Justice since at least 2015. The City has received Justice Assistance Award Grants from the Department of

---

marks and citation omitted); *cf. SEC v. McGinnis*, 2015 WL 5643186, at *15 n.12 (D. Vt. Sept. 23, 2015) ("[T]he reason for excluding evidence that is unfairly prejudicial (because it may inflame the jury) is simply not present at the summary judgment phase."); *Murray v. Miron*, 2015 WL 4041340, at *9 (D. Conn. July 1, 2015) (noting that the "fact-intensive, context-specific inquiry" required by Rule 403 "must be made at trial[]").

Justice, including in 2013, which it disbursed in part to the BPD to "reduce crime and promote public safety[.]" (Doc. 279-17 at 8.)

The New York State Vehicle and Traffic Law ("NYSVTL") contains more than nine hundred provisions. Depending on the gravity of the offense, an offense may be charged as a violation, misdemeanor, or felony and may include as criminal penalties incarceration as well as civil fines. BPD officers' general law enforcement duties include enforcement of the NYSVTL.

### 1.    The Strike Force and Housing Unit.

In 2012, the BPD created the Strike Force with the stated mission to: (1) "[t]arget and eliminate crime hotspots throughout the [C]ity[]"; (2) "[r]emove illegal [g]uns from [the City's streets]"; (3) administer "[s]trict [e]nforcement of the Mayor[']s Zero Tolerance Crime Policy"; and (4) "[m]ake [the City] a better place to live, work[,] and raise a family." (Doc. 254-21 at 2). According to Defendant Brown, the Strike Force "was designed to address crime overall and in general[,]" (Doc. 268-6 at 27:18-19), although he "wasn't involved in [its] creation. It was a recommendation of the" BPD. *Id.* at 24:7-8. "The purpose of the Strike Force Task Force [was] to target and eliminate high crime areas throughout the [C]ity . . . as well as other crime hotspots throughout the City." (Doc. 254-17 at 7, § 8.6.) In 2018, the Strike Force was disbanded during Defendant Lockwood's tenure as BPD Commissioner.

In 2010, the Housing Unit was created pursuant to a contract between the City and the Buffalo Municipal Housing Authority ("BMHA"). According to the BPD Manual of Procedures ("MOP"), as revised in August 2013, the Housing Unit was "responsible for all policing and security issues in the BMHA Housing Complexes located throughout the City" and was instructed to "work closely with the BMHA Staff, Council, outside agencies, as well as other units in the BPD to maintain strict enforcement of the Mayor's [Z]ero [T]olerance [C]rime [P]olicy." *Id.* at 7, § 8.5. Housing Unit officers were intended to be highly visible to deter crime and proactively enforce the NYSVTL in and around BMHA properties. The Housing Unit's contract to patrol BMHA properties expired in 2020.

7

Both the Strike Force and the Housing Unit "were proactive in that they were not 'tied to the radio.'" (Doc. 345 at 6, ¶ 8.) At the direction of Defendant Derenda, officers in each unit were required to submit daily reports reflecting certain statistics including the number of arrests made, traffic summonses issued, impounds performed, and guns and cash seized, which was a reflection of Defendant Derenda's "philosophy [that] what gets measured gets done." (Doc. 254-5 at 8:10-11.)

### 2.    The Checkpoint Program.

Between June 2012 and November 2017, the City, through the BPD, operated the Checkpoints, which subjected every vehicle that passed through them to an initial stop regardless of whether there was individualized suspicion of wrongdoing (the "Checkpoint Program"). Under the Checkpoint Program, more than 1,600 Checkpoints occurred over a five-year period. Checkpoints took place almost daily, and thousands of motorists were stopped and ticketed, including Plaintiffs.

Defendant Derenda created and oversaw the Checkpoint Program, which was funded in part by a statewide crime control initiative called the "Gun Involved Violence Elimination (GIVE) Initiative[.]" Doc. 280-1 at 3. Checkpoints were expected to take place every day, one to four times per day, unless there were staffing or weather concerns.

Both the Strike Force and the Housing Unit conducted the Checkpoints and operated them in stages. During the first stage, all vehicles were subject to an initial stop, after which BPD officers could direct motorists to pull to the side of the road for a secondary stop. The duration of the stops varied, with some motorists detained briefly and others, including some Plaintiffs, subjected to prolonged stops. *See, e.g.*, Doc. 253-13 at 1, ¶ 5 ("Other times, BPD officers let me go without a ticket after holding and questioning me for a prolonged period.").

Under the "Roadblock Directive" of the Checkpoint Program, BPD officers were instructed to issue tickets and: (1) "[c]heck all drivers and passengers for seatbelts[]"; (2) "[c]heck all vehicles for valid registration stickers[]"; and (3) "[c]heck all vehicles for valid inspection stickers." (Doc. 254-30 at 2.) They were expected to issue tickets for other violations of the NYSVTL as well. Officers were permitted to "[a]ct on any and all

8

probable cause resulting from information obtained from the mobile plate reader or from 'plain view' observations." *Id.* On at least one occasion in a June 29, 2012 email, Defendant Derenda directed officers to "impound as many vehicles as legally possible" and "make arrests and write traffic summons[es,] as many as possible[.]" (Doc. 254-19 at 2.)

The Roadblock Directive directed officers to "[m]ake the [Checkpoint] obvious[,]" with "[o]verhead flashing lights . . . activated on all vehicles taking part in the [Checkpoint]." (Doc. 252-42 at 2.) The Checkpoint could not "be unreasonably intrusive to motorists[]" but should be set up in such a way that minimized the ability of motorists to avoid it. *Id.* BPD officers were directed to conduct a traffic stop of any motorist that attempted to avoid a Checkpoint.

Checkpoints were located throughout the City, including the East Side, which consists of majority Black and Latino neighborhoods. At the start of the Checkpoint Program, Defendant Derenda was responsible for selecting Checkpoint locations. There was no policy that required locations to be selected based on vehicle or traffic safety or violations data, and Defendants "cannot specifically identify any instance where a [C]heckpoint location was chosen due to" motor vehicle accidents or particular traffic violations but deny "that general vehicle and traffic safety concerns did not, at times, play a role in choosing the locations of [C]heckpoints." (Doc. 254-14 at 4.) Neither the BPD nor the City conducted a formal analysis as to whether the Checkpoint Program improved traffic safety.

As mayor of the City, Defendant Brown supported "[t]he [C]heckpoint [P]rogram as it was proposed and administered[.]" (Doc. 268-6 at 45:10-11.) He did not "issue[] any directives prohibiting the [C]heckpoint [P]rogram from continuing." *Id.* at 45:15-16.

The Checkpoint Program was suspended in November 2017. Current BPD Commissioner Alfonso Wright has attested that, under his tenure, "the BPD will not conduct vehicle and traffic safety Checkpoints as they were conducted while . . . the Housing Unit and Strike Force existed." (Doc. 252-6 at 3, ¶ 6.)

9

Plaintiffs Bonds, Evans, Franklin, Hall, Redden, Simmons, and Yeldon were each stopped at one or more Checkpoints under the Checkpoint Program. Plaintiffs Yeldon, Franklin, and Hall did not receive any traffic tickets in the course of their stops. Plaintiffs Bonds, Evans, Redden, and Simmons each received one or more tickets.

Plaintiff Bonds was ticketed across the street from a Checkpoint for expired insurance, although he claims he had renewed his insurance that day and showed BPD officers the receipt of payment. He challenged his ticket in court, and it was dismissed.

Plaintiff Evans received three tickets for seat belt violations for her own lack of a seat belt and improper car seats for her two children, as well as a ticket for driving with only a learner's permit. Plaintiff Evans claims that she removed her seat belt only after she was stopped at the Checkpoint. She does not apparently dispute the claim that she had only a learner's permit or that her children were improperly secured.

Plaintiffs Redden and Simmons each received a ticket for an expired inspection sticker. Plaintiff Redden admits her inspection sticker was expired at the time of her ticket, but Plaintiff Simmons does not recall whether hers was expired.

### 3.    Written BPD Policies and Procedures.

Defendants cite the 1997 version of BPD's MOP, (Doc. 252-40), which was updated in 2013. Because Plaintiffs identify the relevant time period for this action as June 2015 to present, BPD policies and procedures as articulated in the 2013 version of the MOP governed. *See* Doc. 273-4.[5]

---

[5] Section 1.2 of the MOP, entitled "ATTITUDE AND IMPARTIALITY[,]" states "Employees, while vigorous and unrelenting in the enforcement of the law, must maintain a strictly impartial attitude toward complainants, violators, witnesses[,] and suspects." (Doc. 273-4 at 580.) The MOP contains a "Law Enforcement Code of Ethics[,]" which "sets the ideal standards which all members should strive to attain[]" and states that BPD officers "will never act officiously or permit personal feelings, prejudices, animosities[,] or friendships to influence [their] decisions." *Id.* at 552.

In 2021, the BPD issued General Order 2021-009, which identifies the core principles of the BPD's traffic enforcement policy as follows:

> Traffic Enforcement and Safety. The purpose of conducting traffic enforcement is to favorably alter the violator's future driving behavior and to foster public safety.

### 4.    BPD Ticketing Practices.

BPD officers were not required to satisfy specific ticket quotas[6] but were instructed to keep their numbers high and were questioned when numbers dipped. Defendant Derenda testified in a Fed. R. Civ. P. 30(b)(6) deposition that he would inquire when he thought units were not producing enough tickets because he wanted to "make sure people were doing what they were being paid to do." (Doc. 254-5 at 25:18-19.) Officers had discretion to issue as many citations for tinted windows as there were tinted

---

> Members shall engage in traffic enforcement for public safety purposes and not for the purpose of making an arrest.
>
> Constitutional Stops. Members may conduct a brief vehicle stop for a traffic violation when the member has Probable Cause to believe that the driver has committed a traffic violation. The stop may last no longer than the time reasonably required to issue a summons for the violation.
>
> Procedural Justice. Procedural justice refers to the perception of fairness in an encounter. Members shall treat all persons with dignity and respect, give persons a voice during encounters, be impartial in their decision[-]making, and convey trustworthy motives.
>
> Non-Discriminatory Policing. Members shall not consider demographic category (including but not limited to race, ethnicity, national origin, religion, gender, sexual orientation, age, disability, gender identity or expression, or affiliation with any other similar identifiable group) as a factor in conducting a vehicle stop. Targeting specific neighborhoods for traffic enforcement based on these demographic categories is a form of discriminatory policing and is prohibited.
>
> Least Intrusive Response. Considering the circumstances presented at the time, members should always take the least intrusive action, consistent with the goal of public safety. For most minor violations, warrantless arrest is not the preferred option, and certain violations only allow for the issuance of a traffic summons or a traffic stop receipt . . . and not arrest. A member should issue a summons or make an arrest only when doing so directly advances the goal of public safety[] and the situation cannot be effectively resolved in a less intrusive manner with the issuance of a traffic stop receipt.

(Doc. 252-41 at 2-3.)

[6] There is at least one instance from April 2012, however, when a BPD Chief designated a tickets-per-officer goal, prior to the June 2015 time period at issue in this case.

11

windows on a vehicle. This means that a single vehicle could receive multiple tinted window citations.[7]

Plaintiffs Franklin, Palmer, and Yeldon each received multiple tinted window tickets in a single stop. Plaintiff Franklin was issued two tinted window tickets in a single traffic stop. She admits that her windows were tinted, but claims they were lawfully tinted due to an unspecified medical condition. Her tickets were ultimately dismissed on that basis. Plaintiff Franklin recalls that the police officer "was very aggressive[,] would[ ]n[o]t tell [her] why he was pulling [her] over[,]" and asked her questions unrelated to traffic safety, such as why she was driving to where she was driving. (Doc. 291 at 5, ¶ 20.)

Plaintiff Palmer was issued two tinted window tickets in one traffic stop, four tickets in another stop, and four tickets in a third stop. He concedes that his windows were tinted, but attests they were tinted to accommodate medical issues related to light sensitivity and vision problems. Like Plaintiff Franklin, Plaintiff Palmer alleges he was asked questions during these encounters "that had nothing to do with traffic safety, like where [he] was going." (Doc. 290 at 2, ¶ 10.)

Plaintiff Yeldon was issued two tinted window tickets in a single traffic stop while driving a taxi owned by her employer. She acknowledges that her windows were slightly tinted, but disputes that the alleged tint of seventeen percent violates the NYSVTL. According to Plaintiff Yeldon, the BPD officer asked her "non-traffic related questions, such as where [she] was coming and going[]" and told her she was "lucky that he only gave [her] two tinted windows tickets instead of four." (Doc. 293 at 1, ¶ 5, 2 ¶¶ 8, 11.) She recounts that "[t]hroughout the encounter, [the BPD officer's] demeanor was rude and demeaning[,]" *id.* at 2, ¶ 11, but does not provide specific examples.

### 5.    Buffalo Traffic Violations Agency ("BTVA").

In 2015, the New York State Legislature authorized, and the City established, the BTVA with the stated goals to (1) "assist the Buffalo City Court in the disposition of

---

[7] *See* N.Y. Veh. & Tr. Law § 375(12-a)(b).

violations of the [NYSVTL] that occur in the City of Buffalo" and (2) "administer punitive punishment that is reasonable, but not more than necessary, to: [] [g]enerate revenue; and, [] [a]chieve rehabilitation of offender-motorists." (Doc. 277-12 at 2.) The BTVA processes non-criminal traffic offenses within the City. Offenses are prosecuted by a salaried city prosecutor ineligible for bonuses or overtime. Motorists may take a plea offer or proceed in traffic court to a trial "held in front of a judicial hearing officer, who makes the final determination." (Doc. 252-22 at 9:21-23.) Motorists can appeal the determination of a judicial hearing officer in Erie County Court or challenge the ticket through a New York Civil Practice Law & Rules Article 78 proceeding.

Prior to the establishment of the BTVA, all revenue derived from traffic tickets went to the State of New York. After its establishment, by state law, the City retained most of the revenue. During the 2018-2019 fiscal year, traffic violation fines and parking tag fines and penalties accounted for approximately $10.1 million, or 2.1%, of the City's reported $492 million total revenue.

## B.    The Disputed Facts.

### 1.    BPD Compensation for Overtime and Time in Court.

Defendants assert that overtime was awarded solely on the basis of seniority[8] and there was no financial incentive associated with issuing tickets. They contend there is no evidence that the BPD ever established ticketing quotas and cite BPD officers' testimony that they were not promised overtime in exchange for a high number of tickets, arrests, or summonses.[9]

In contrast, Plaintiffs argue that BPD emails reveal an expectation that overtime would generate tickets, summonses, and arrests. *See, e.g.,* Doc. 275-19 at 2 (BPD captain instructing lieutenants to inform "officers that [they] are looking for production in the

---

[8] *See, e.g.,* Doc. 331-6 at 4:22-5:1 ("Q. . . . In the [H]ousing [U]nit, how was overtime allocated among officers? A. Seniority, everything is by seniority.").

[9] *See, e.g.,* Doc. 252-26 at 5:4-7 ("Q[.] And did a supervising officer ever tell you that more overtime shifts would be available if Strike Force officers issued a higher number of summonses? A[.] Never."); Doc 331-6 at 7:11-23 (BPD officer testifying that overtime shifts were not rewarded for high number of tickets, arrests, or summonses).

13

form of arrests, summonses, etc.").[10] They claim overtime opportunities were related to "production[,]" *id.*, with one BPD lieutenant's email stating, "[o]fficers will be required to write [NYSVTL] summonses, parking tags, impounds[,] and city ordinances. Numbers will be expected to justify the overtime!" (Doc. 277-11 at 2) (capitalization removed); *see also* Doc. 276 at 2 (a BPD email directing lieutenants to "[i]nstruct officers working [overtime] details . . . to show some activity in the boxes marked [NYS]VTL Summons[es], [Parking Violations Bureau] Tags[,] etc. . . . We must be able to show that to keep our [overtime] levels where they are.").

Plaintiffs further contend that BPD officers were financially incentivized to issue more tickets while working both regular and overtime shifts in order to increase opportunities for overtime. Overtime was viewed by at least some BPD officers as a reward for the production of tickets, summonses, and arrests[11] because officers were paid time and a half.

According to a report by the City's Department of Audit and Control, "[i]n [fiscal year] 2016, 25% of the BPD workforce earned more than $25,000 in [overtime]." (Doc. 281-14 at 6.) BPD officers testified that overtime pay comprised a "pretty substantial" portion of their total pay. (Doc. 269-17 at 6:4); *see also* Doc. 270-4 at 42:22-43:1 (BPD lieutenant describing overtime as a "big part of Strike Force officers' salaries[]"); Doc. 269 at 16:13 (BPD officer describing overtime as a "bump in the paycheck[]"). Overtime increased BPD officers' pensions, which were generally based on the average of the highest-earning three years of their career. BPD officers were also compensated above their salary for their time in court; however, this pay was independent of the outcome.

---

[10] *See also* Doc. 274 at 2 (BPD email to E-District supervisors informing them that "[o]fficers will be held accountable and traffic summons[es] will be expected with a detail[ed] report reflecting daily stat[istic]s. Please let the [o]fficers [know] what will be expected when calling in the overtime[]").

[11] *See, e.g.*, 275-19 at 3 (BPD Captain Serafini opining that overtime was "starting a month" earlier than the previous year as "a reward for the good work that all of [the] officers and [l]ieutenants perform on a daily basis."); Doc. 281-10 at 2 (email to Defendant Derenda describing BPD officers as "highly motivated" and requesting "a limited daytime [overtime] [d]etail[]" as "a great reward" that "would be great for morale[]").

## 2.    The Primary Purpose of the Checkpoints.

Defendant Brown, former mayor of the City, initially testified that the Strike Force was created to respond to residents' vehicle and traffic complaints and that its mission was focused on vehicle and traffic concerns.[12] He later clarified in the same deposition, however, that he "was misinterpreting the purpose of the traffic stops and the Strike Force. The purpose of the traffic stops [was] for vehicle and traffic issues. The Strike Force was a proactive unit that was designed to address crime overall and in general." (Doc. 268-6 at 27:14-19.)

Plaintiffs claim that Defendants "concede[d]" in their motion for summary judgment "that a *primary* purpose of the Checkpoints was preventing and suppressing crime through 'high visibility' policing." (Doc. 344 at 36) (emphasis in original). Plaintiffs further argue that the design and implementation of the Checkpoint Program, as reflected by where Checkpoints were located and how their success was measured, demonstrate that the true primary purpose was general crime control. They contend that ninety percent of Checkpoints were in majority Black or Latino neighborhoods, *see* Doc. 345 at 50, ¶ 285, and that it was not until news articles and an inquiry by the City Common Council that the BPD began placing Checkpoints in majority white neighborhoods. *See* Doc. 271-18 at 2 (June 29, 2017 email from BPD captain informing lieutenants of "adjustments" to the Checkpoints, with one Checkpoint located "in the designated Hot Spots[]" four days a week and "an area other tha[n] the East Side[]" two days a week, and the "other two daily [C]heckpoints . . . done either on the South, North[,] or West Side of the City.").

---

[12] *See, e.g.*, Doc. 252-11 at 12:4-10 ("Q. Was that a major policy decision of the BPD, the creation of the Strike Force? A. Yes, it was. I think clearly the police department was trying to respond to vehicle and traffic complaints of residents and that was the impetus for the establishment of that unit."); *id.* at 13:16-21 ("A. The mission of the Strike Force in its creation was to deal with vehicle and traffic concerns related to speeding, dangerous driving, going through stop signs, traffic signals, speeding through neighborhoods, speeding past schools, yes.").

15

Defendants respond that "[t]he primary purposes of the Checkpoints were traffic safety and high visibility to curtail the unsafe operation of vehicles." (Doc. 252-46 at 17.) They maintain that the "primary programmatic purpose" of the Checkpoint Program was "vehicle and traffic safety and the enforcement of the [NYSVTL,]" (Doc. 254-13 at 3), although they acknowledge that it served additional purposes including "vehicle and traffic interdiction" (Doc. 254-2:6-7) and high-visibility policing.[13]

Defendant Derenda, former BPD Commissioner, chose the location of the Checkpoints at the onset of the Checkpoint Program, before eventually turning it over to "lieutenants[.]" (Doc. 252-15 at 8:21.) He identified a variety of factors that impacted the Checkpoints' locations, including where Strike Force and Housing Unit officers were assigned; certain crime statistics; and citizen complaints concerning individuals driving without licenses, speeding, and other unsafe driving behavior. Plaintiffs challenge the claim that Checkpoint locations were based on citizen complaints and proffer statistics that show race was the strongest predictor of Checkpoint locations. They cite emails

---

[13] *See, e.g.*, Doc. 252-11 at 14:1-2 (Defendant Brown testifying that "the primary purpose of [C]heckpoints was traffic safety[]"); *id.* at 15:17-16:8 ("It is my testimony that there were a large number of complaints from residents about speed, running through red lights, running through traffic signals, speeding in neighborhoods, speeding past schools[,] and endangering the community. Initially[,] traffic interdiction, traffic [C]heckpoints, were established to address those issues[,] and as a secondary purpose it was found that caught in those traffic [C]heckpoints were people with criminal backgrounds, with illegal guns, with illegal drugs that were threatening the safety of the community and that that was also a major concern of the residents of the City of Buffalo."); Doc. 252-12 at 5:6-18 (Defendant Derenda testifying that "the roadblocks were primarily for traffic safety, but what they also accomplished is high visibility[]"); Doc. 252-14 at 8:17-21 (BPD lieutenant stating that "the [C]heckpoint is for [vehicle and traffic], but we also wanted it for the high visibility[,] and if that resulted in various things, [like] keeping the residents happy or ultimately deterring crime, that was certainly a bonus, too[]"); Doc 252-15 at 6:21-7:5 (retired BPD lieutenant testifying that the primary purpose of the Checkpoints was "for traffic control[]" and to "check the registrations, the inspections, maybe tints, seat belts[]" and that "[a]nother primary purpose" was "to demonstrate high visibility[]"); Doc. 252-16 at 4:7-9 (BPD officer stating that the Checkpoints "were to ensure there w[ere] no expired inspections, registrations, things of that nature[]"); Doc. 252-17 at 4:14-18 (rejecting contention that Checkpoints were conducted to "target gang activity[]" and testifying that the Checkpoints were for "vehicle and traffic, roadway safety[;] [t]hey were specific on vehicle and traffic violations[]"); Doc. 252-18 at 4:13 (BPD officer describing the purpose of the Checkpoints as "safety checkpoints[]").

16

between Defendants that refer to the Checkpoints as a "proactive violence prevention strategy." (Doc. 274-1 at 2.)

### 3.    How the Checkpoints Were Marked.

Defendants claim that, in accordance with the Roadblock Directive, BPD officers placed "a number of [police] cars in the center of the street or on the side with lights on so that [they] could be visible from a long distance away[.]" (Doc. 252-10 at 4:2-5.) Plaintiffs, based on their own experiences, challenge this contention and assert that the BPD did not consistently turn on their police cruiser lights while conducting Checkpoints nor consistently take other steps to alert motorists of the Checkpoints' locations.

### 4.    How Motorists Were Treated During Checkpoint Stops.

Defendants contend that all motorists at Checkpoints were treated with respect. Plaintiffs dispute this characterization and allege that they felt "stigmatized and targeted" (Doc. 297 at 2, ¶ 14) and "discriminated against" because of their race. (Doc. 298 at 4, ¶ 16.) They claim that BPD officers spoke to them "disrespectful[ly,]" *id.*, "were often rude and degrading," (Doc. 291 at 3, ¶ 12), treated them "like criminals[,]" (Doc. 306 at 3, ¶ 13), and asked them irrelevant questions, such as questions about their path of travel.

### 5.    Whether Defendant Brown Attempted to Conceal the Discriminatory Impact of the Checkpoint Program.

According to Plaintiffs, Defendant Brown participated in "an elaborate pretextual coverup to conceal the racially discriminatory impact of the [Checkpoints] . . . from the public." (Doc. 344 at 28.) Some of the cited evidence, however, refers to actions taken by Defendant Derenda, not Defendant Brown.[14] Other evidence cited includes Defendant Brown's alleged contact with the University of Buffalo in an effort to, as characterized by Plaintiffs, "quash a [University of Buffalo] Law School professor's public criticism of the Checkpoints[,]" *id.*, but the document in question only indicates Defendant Brown's plan

---

[14] For this claim, Plaintiffs rely on their CSMF that identifies a series of alleged actions undertaken by Defendant Derenda. *See, e.g.*, Doc. 345 at 51, ¶ 286 ("The BPD had records of the location and frequency of Checkpoints for the requested time period which would have revealed racial disparities in Checkpoint locations. . . . [Defendant] Derenda never gave the records to the [Common] Council.").

to share concerns regarding a particular document in response to an invitation to do so by the university. *See* Doc. 310-13 at 2 (email from Defendant Derenda explaining that, "[a]fter hearing our concerns, some members of [the University of Buffalo] committee sent the City the document this morning and have offered to meet, listen to the City's concerns[,] and potentially make modifications before the document is released.").

### 6.    Motivation of Traffic Enforcement Actions.

Plaintiffs rely on statistical evidence, including the number of civil rights complaints filed against the City and BPD,[15] for their contention that Defendants' traffic enforcement actions were racially motivated. They point out that Defendants never conducted a formal analysis as to whether the Checkpoint Program improved traffic safety and argue that this raises questions regarding the true objective of the Checkpoint Program. They also proffer what they describe as direct evidence of discriminatory intent, including Defendant Brown's admission that racism in the police force contributed to police violence in the City and a D-District Police Chief's admission that the Strike Force was disbanded because of racial profiling. Defendants reject this characterization of their motivation, pointing to race-neutral considerations that informed enforcement actions and Checkpoint locations.

### 7.    The Bjerk Report.

Plaintiffs retained David Bjerk, PhD, an economics professor at Claremont McKenna College, to conduct a statistical analysis of the BPD's traffic enforcement practices between January 2012 and December 2022.

---

[15] According to Plaintiffs, thirty-seven complaints between January 2013 and June 2018 "plausibly allege racially discriminatory traffic enforcement[.]" (Doc. 345 at 41, ¶ 197.) "From 2012 to the present, at least 123 people filed 126 complaints to [IAD] alleging racial discrimination, [eighty-four] of which were in the context of traffic enforcement." *Id.* Plaintiffs further note that, "[i]n recent years," *id.* at ¶ 199, fourteen "lawsuits or notices of claims have included allegations that involve racially biased conduct, [eleven] of which were in the context of traffic stops." *Id.* at ¶ 200. "Whether or not the claims had validity, the very assertion of a number of such claims put the [c]ity on notice that there was a possibility that its police officers had" committed constitutional violations. *Fiacco v. City of Rensselaer, N.Y.,* 783 F.2d 319, 328 (2d Cir. 1986), *cert. denied,* 480 U.S. 922 (1987).

18

Dr. Bjerk considered and compared "five distinct time eras: (i) the Pre-Strike[ F]orce Era (January 2012 – June 2012)[;] (ii) the Strike[ F]orce Era (July 2012 – June 2015)[;] (iii) the BTVA Era (July 2015 – January 2018)[;] (iv) the Post-Strike[ F]orce Era (February 2018 – February 2020)[; and] (v) the Current Era (March 2020 onward)." (Doc. 273 at 25, ¶ 85.) He grouped census tract data into categories based on "the percentage of the residents of that tract that are classed as Minority [(Black or Hispanic)], using [American Community Survey] data" produced by the United States Census Bureau. *Id.* at 28, ¶ 94. This resulted in five groups: 0-20% Minority; 20-40% Minority; 40-60% Minority; 60-80% Minority; and 80-100% Minority.

Considering the "mean monthly citation counts by tract type across the five []eras for . . . excessively tinted windows," Dr. Bjerk found that:

> during the Pre-Strike[ F]orce era, there were exceedingly few citations for tinted windows in any type of tracts (an average of less than two such citations per month per tract during this era), with no significant disparity in such citations across tract types. Moving to the Strike[ F]orce and BTVA eras, . . . tinted window citations in 0-20% Minority tracts stayed largely constant and increased to an average of nearly [four] per month in the 20-40% Minority tracts. But tinted window[] citations increased in the higher Minority tracts to a far greater extent. . . . [I]n the 60-80% Minority tracts, the average number of tinted window[] citations went from 1.4 per month Pre-Strike[ F]orce to almost [eleven] per month. In the 80-100% Minority tracts, they went from an average of 1.2 per month Pre-Strike[ F]orce to an average of [sixteen] per month—a more than thirteen-fold increase. Citations for tinted windows dropped substantially in all census tract categories in the Post-Strike[ F]orce era. Even then, however, there were still an average of two to five times as many such citations per month in the [twenty-one] tracts that were 80-100% Minority, relative to the [nineteen] tracts that were 0-20% Minority and the [twenty-one] tracts that were 20-40% Minority tracts, respectively. . . . [T]inted window citations again became infrequent in all tract categories during the Current era.

*Id.* at 59, ¶ 195. Narrowing his analysis to the issuance of multiple tinted window tickets in a single stop and comparing citations of Minority drivers to Non-Minority drivers, Dr. Bjerk found that:

> in the Pre-Strike[ F]orce era, a relatively small fraction of tinted window incidents resulted in multiple tinted window tickets across all races.

19

However, starting in the Strike[ F]orce era, the fraction of tinted window incidents that led to multiple tinted wi[n]dow tickets went up to just over 50% for those recorded as Non-Minorities, but to almost 65% for those recorded as Minorities. During the BTVA era, the rate at which multiple tinted window[] tickets were issued in incidents involving tinted windows climbed to 75% for drivers recorded as Non-Minorities but almost 90% for drivers recorded as Minorities during the BTVA era. Rates of multiple tinted window tickets in tinted window incidents remained close to as high in the Post-Strike[ F]orce era, as did the racial discrepancy in such multiple ticketing for tinted windows. . . . [T]hese racial discrepancies in the rates at which drivers were issued multiple tinted window citations in incidents involving at least one tinted window citation are compounding upon the already vast underlying racial discrepancies, highlighted earlier, in the rates at which drivers are cited for tinted windows. In other words, Minority drivers are not only much more likely to be cited for tinted windows in the first place, but also more likely to receive multiple tickets if they are cited for tinted []window[] violations. And while it is possible that the underlying rate at which drivers of different races receive tinted[] window[] citations could reflect underlying differences in the rates at which drivers of different races have their windows tinted (or excessively tinted), it seems unlikely that there are racial differences in the rates at which drivers who have one or more windows tinted have multiple windows ticketed, or that underlying behavior with respect to tinted windows changed dramatically between 2012 and 2016.

*Id.* at 109, ¶ 295. Employing a regression prediction analysis, he found that during the Strike Force, BTVA, and Post-Strike Force eras, "the actual likelihood of receiving multiple tinted window citations in tinted window incidents is [ten] to [twelve] percentage points higher for those classified as Minorities than would be predicted if such individuals had been treated the same as Non-Minorities. These differences are all statistically significant at the 1% level." [16] *Id.* at 111, ¶ 299.

When analyzing the relationship between the location of Checkpoints and the racial demographics of neighborhoods surrounding the locations, Dr. Bjerk consolidated

---

[16] "Statistical significance" refers to the likelihood that an observed phenomenon, like racial disparity, will have arisen by chance. Dr. Bjerk's finding that the result is significant at the 1% level "means that there is not more than a [one] percent chance that the observed relationship is purely random." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015).

20

the data into three categories: "(i) High-Minority (60% or more of the population is Black and/or Hispanic), (ii) Mixed-Race (between 40% and 60% of the population is Black and/or Hispanic), or (iii) Low-Minority (40% or less of the population is Black and/or Hispanic)." *Id.* at 29, ¶ 95. His "results show that the BPD overwhelmingly located these [C]heckpoints in higher Minority neighborhoods[]" and that "this greater tendency to set[ ]up [C]heckpoints in higher Minority neighborhoods cannot be fully explained by the BPD simply choosing to locate [C]heckpoints in neighborhoods with high crime or a high number of accidents." (Doc. 273 at 116, ¶ 311.) In particular, he found that:

> 60% of Low-Minority tracts experienced fewer than five [C]heckpoints, less than 15% experienced more than fifteen [C]heckpoints, and none experienced more than thirty [C]heckpoints. By contrast, less than 15% of High-Minority tracts experienced fewer than five [C]heckpoints, and almost 15% experienced more than thirty. Indeed, four High-Minority tracts experienced over 100 [C]heckpoints each. This is particularly notable again given that High-Minority and Low-Minority tracts on average have very similar populations.

*Id.* at ¶ 312.

Controlling for high-violence crime ("HVC") tracts, Dr. Bjerk calculated that "the average number of [C]heckpoints in each High-Minority HVC tract is over six times higher than the average number of [C]heckpoints per tract in each Low-Minority HVC tract." *Id.* at 118, ¶ 316. He opined that this "indicates that whether or not a tract was High-Minority is a much stronger predictor of [C]heckpoints than whether or not a tract had high rates of violent crime." *Id.* Dr. Bjerk then applied a

> regression prediction approach, where [he] estimate[d] how accidents and criminal activity relate to [C]heckpoint counts in Low-Minority tracts, and use[d] th[o]se estimates to predict the number of [C]heckpoint counts that should arise in High-Minority . . . tracts if the relationship between prior accidents and criminal activity and subsequent [C]heckpoint deployment was the same in High-Minority . . . tracts as it was in Low-Minority tracts. [He] then calculate[d] the difference between actual and predicted [C]heckpoint[] counts for each tract to see how much these differ on average.

*Id.* at 119, ¶ 320. Based on this methodology, Dr. Bjerk found that, "on average, between July 2012 and December 2017, High-Minority tracts experienced over [thirty-three] more

21

[C]heckpoints each than would be predicted by how such [C]heckpoints were allocated in Low-Minority tracts. This result is significant at the 1% level." *Id.* at 120, ¶ 322. He concluded that "these discrepancies cannot be fully explained by differences in the rates at which criminal incidents or traffic accidents occurred between High-Minority neighborhoods and Low-Minority neighborhoods." (Doc. 271 at 123, ¶ 331.)

### 8.    The Gennaco Report.

Plaintiffs retained Michael Gennaco, a proffered expert in police practices regarding accountability, supervision, and training, to prepare a report analyzing the BPD's "practices concerning the handling of bias-based complaints relating to traffic enforcement[.]" (Doc. 273-1 at 5.) Mr. Gennaco relied on seventy-four "racial bias complaint investigation files" from January 2012 through March 2024 and which "arose in the context of traffic enforcement and raised an indicium of racial bias," as well as his own experience, deposition testimony, documents, news articles, and other academic and industry materials regarding accepted police practices. *Id.*

He was asked to offer opinions concerning:

a. Whether the City has responded to the community, institutional, and individual complaints of racially biased policing in an adequate manner and in a manner consistent with generally accepted practices;

b. Whether the City's investigation and accountability practices and systems are consistent with generally accepted practices and sufficient and adequate to address the problem and risk of racially biased policing;

c. Whether the City's supervision, oversight, monitoring[,] and training practices and systems are consistent with generally accepted practices and sufficient and adequate to address the problem and risk of racially biased policing;

d. Whether the City's multiple ticketing and pretextual policing and related supervision practices have any law-enforcement or safety-related benefits and create a risk of racially biased policing.

*Id.*

Mr. Gennaco concluded "that the BPD employs inadequate and deficient practices, policies, and procedures that frequently depart from accepted standards and are indicative

22

of an environment that disregards concerns about racially biased policing." *Id.* at 6. He found that, between 2012 and 2024,

> the number, severity, and scope of . . . complaints should have made clear to the City and [BPD] that there were serious concerns being repeatedly raised about potential racially biased traffic enforcement within the BPD[] and the [BPD] needed to take meaningful steps to reduce the risk of BPD officers targeting people of color in a racially biased manner through traffic enforcement.

*Id.* at 6-7. He opined that BPD's "policies and practices for identifying and addressing racial bias fall well below accepted practices within the policing industry[,]" and described the BPD's intake system as "broken[,]" undermining the BPD's ability to "learn whether an officer has practiced biased policing and to deter future misconduct." *Id.* at 7. Mr. Gennaco further determined that the BPD provides those investigating complaints "with no formal training and scant guidance on how to investigate such matters[.]" (Doc. 273-1 at 8.) Based on documented statements by BPD supervisors, he opined that they have "a mind[-]set predisposed against the complainant as opposed to allowing the facts and evidence developed through the investigative process to determine the outcome." Mr. Gennaco summarized his findings as follows:

> The BPD's policies and practices, including the supervision and accountability deficiencies I have described throughout this report, as well as its failure to create and enforce rules to cabin these tactics, [have] also led officers to engage in aggressive multiple ticketing practices, retaliatory policing, and pretextual policing that can, and [have], contributed to racially disparate policing practices that disproportionately harm Black and Latino drivers. These biased policies and practices have not just resulted in unequal outcomes by race but have marginal or no public safety benefit. In fact, they risk alienating targeted communities[] and undermine the public trust of the department[,] which impacts their ability to solve crime.

> The BPD's affirmative policies and practices and its surrendering of managerial prerogatives designed to identify and address inappropriate police actions, while maintaining an inadequate complaint investigation and supervision system[] that falls below generally accepted practices, create an institutional culture whereby officers can engage in biased traffic enforcement with little concern for detection and intervention. Accountability, supervision, and effective corrective intervention of officers who engage in misconduct is critical to identifying, addressing, and

23

ultimately reducing racially biased policing, but the BPD has declined to engage in any such interventions meaningfully, thereby perpetuating the risk of racially biased misconduct and eroding public trust in the BPD.

*Id.* at 14.

Plaintiffs cite Mr. Gennaco's report as evidence that the BPD engaged in racial stereotyping when selecting the locations of the Checkpoints[17] and as support for their contention that multiple tinted window tickets serve no public safety benefit and are counterproductive.

### 9.    The IAD Declaration.

A former member of BPD IAD (the "IAD Witness"), who served in the BPD for twenty-five years, alleged that the BPD culture was "consistently racist, sexist, and toxic" over her years of service. (Doc. 346 at 2, ¶ 5.) She observed that "BPD supervisors—including Lieutenants responsible for training new recruits or for supervising officers at the District level—were openly racist." *Id.* at ¶ 7. She recalled "instances where white BPD officers used racial slurs when speaking to Buffalo residents from minority backgrounds[,]" including "derogatory language [like] the word 'ghetto,' 'baby daddy,' and 'baby mama' to refer to Black Buffalo residents." *Id.* at ¶ 8. The IAD Witness also "heard former Commissioner Daniel Derenda use terms like 'gangbanger' and 'thug' to refer to young Black men." *Id.* She was not aware of officers being disciplined for using such language.

The IAD Witness asserted she has personal knowledge that BPD officers "frequently" engaged in "racial profiling[.]" *Id.* at 3, ¶ 11. It was her experience that BPD officers believed that "if they stop enough cars containing Black men, they will eventually hit something." *Id.* at ¶ 12. For example, "[i]t was common knowledge within the BPD that tinted window tickets primarily went to Black drivers, even though in [her] experience, motorists of all races drive with tints." (Doc. 346 at 8, ¶ 37.) "Almost all of

---

[17] Plaintiffs argue that Defendants defended the Checkpoints in part by claiming that only the "criminal element" would complain about them, relying on Mr. Gennaco's report for the assertion that Defendants "employ[ed] 'criminal element' as a code word for Black people generally." (Doc. 344 at 80) (citing Doc. 273-1 at 101).

24

the IAD complaints [the BPD] received alleging abusive treatment by BPD officers and officer misconduct during traffic stops, vehicle searches, traffic and non-traffic arrests, and impounds were from Black and Latino complainants." *Id.* at 6, ¶ 24. "Although the BPD Commissioners received these complaints, they rarely resulted in officer discipline during [her] time in IAD." *Id.* According to the IAD Witness, this lack of discipline "emboldened officers to continue doing the wrong thing and continue making questionable stops and searches targeting Black and Latino drivers." *Id.* at 8, ¶ 33.

The IAD Witness claimed that "BPD officers had a direct financial incentive for writing traffic summons[es] and making arrests" because they "knew that the more arrests and summons[es] they made, the more court time they would receive, which translated into overtime income[.]" *Id.* at ¶ 34. She described officers as engaging in "predatory ticketing and traffic enforcement practices in order to boost their salaries." *Id.* at ¶ 35.

## IV.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248).

On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

25

477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Where there are "cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Kee v. City of New York*, 12 F.4th 150, 166-67 (2d Cir. 2021)). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks omitted). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

**B.    Whether Defendants or Plaintiffs Are Entitled to Summary Judgment on Plaintiffs' Fourth Amendment Claim (Count I).**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile

26

by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996).

Generally, "[t]he Fourth Amendment requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Wilson*, 699 F.3d 235, 242 (2d Cir. 2012) (alteration, internal quotation marks, and citation omitted). While a "search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing[,] . . . certain regimes of suspicionless searches" have been upheld "where the program was designed to serve 'special needs, beyond the normal need for law enforcement.'" *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). To be constitutional, the program of suspicionless searches or seizures must both serve a "special need" and be reasonable "on the basis of the individual circumstances." *Wagner v. Swarts*, 827 F. Supp. 2d 85, 96 (N.D.N.Y. 2011) (internal quotation marks and citation omitted).

Defendants argue that Plaintiffs failed to respond to their argument regarding Plaintiffs' non-Checkpoint Fourth Amendment claims and thereby abandoned these claims. *See* Doc. 331-13 at 34. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one claim and the party opposing summary judgment fails to address the argument in any way." *Curry v. Keefe*, 2021 WL 1087444, at *6 (D. Vt. Mar. 22, 2021) (internal quotation marks omitted) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)); *see also Celotex*, 477 U.S. at 323 ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."). The court agrees that Plaintiffs do not address non-Checkpoint traffic stops under the Fourth Amendment in their briefs.[18] Plaintiffs' non-Checkpoint Fourth Amendment claims are thus deemed abandoned.

---

[18] The Tinted Windows class does not assert a Fourth Amendment claim.

Defendants' motion for summary judgment on Plaintiffs' non-Checkpoint Fourth Amendment claims is therefore GRANTED.

With respect to the Checkpoints, the parties agree that the Checkpoints constituted suspicionless searches and seizures. Defendants contend that they are entitled to summary judgment on Plaintiffs' Checkpoints Fourth Amendment claim because the Checkpoints' primary purpose was a recognized special need of traffic safety and the Checkpoints were reasonable in light of the gravity of the public concern, their advancement of the public interest, and their limited interference with individual liberty.

In contrast, Plaintiffs claim they are entitled to summary judgment on their cross-motion with respect to their Fourth Amendment claim because the Checkpoints' primary purpose was general crime control, which does not constitute a special need. They alternatively argue that Defendants are not entitled to summary judgment because the primary purpose of the Checkpoints was not traffic safety and the Checkpoints were not reasonable as required by the Fourth Amendment.

### 1.    Whether There Is a Genuine Dispute that the Checkpoints Served a "Special Need."

The special needs exception is a "closely guarded" one, *Chandler v. Miller*, 520 U.S. 305, 309 (1997), which "applies only in 'exceptional circumstances." *Jones v. Cnty. of Suffolk*, 936 F.3d 108, 115 (2d Cir. 2019) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring)).

"[A]s a threshold inquiry, 'a court must conduct []an inquiry into purpose at the programmatic level, applying the special needs doctrine only if the primary programmatic purpose of the searches is unrelated to the government's general interest in crime control.'" *McLennon v. City of New York*, 171 F. Supp. 3d 69, 84 (E.D.N.Y. 2016) (alterations adopted) (quoting *Lynch v. City of New York*, 589 F.3d 94, 100 (2d Cir. 2009)). For that reason, the exception is limited to "special needs, beyond the normal need for law enforcement." *Edmond*, 531 U.S. at 37 (internal quotation marks omitted). Stated differently, "the government's asserted 'special need' must not be isomorphic with law enforcement needs, but rather go beyond them." *Cassidy v. Chertoff*, 471 F.3d 67, 81

28

(2d Cir. 2006); *see also Jones*, 936 F.3d at 115 (observing that a program serves a special need if it "serves as its immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation[]") (internal quotation marks and citation omitted).

"To qualify as a special need, the governmental interest in the objective must be 'substantial'; that is, 'sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion.'" *Jones*, 936 F.3d at 115 (quoting *Chandler*, 520 U.S. at 318). The primary purpose of a program is the "immediate objective of the challenged program, not its ultimate goal." *Id.* (alteration adopted) (citing *Lynch v. City of New York*, 737 F.3d 150, 158 (2d Cir. 2013)). A program may have more than one purpose, "and the mere fact that crime control is one purpose—but not the *primary* purpose—of a program of searches does not bar the application of the special needs doctrine." *Lynch*, 589 F.3d at 102 (emphasis in original) (internal citation omitted).

"To determine a program's 'immediate objective,' [courts] 'conduct a close review' and consider 'all the available evidence.'" *Jones*, 936 F.3d at 115-16 (quoting *Lynch*, 737 F.3d at 157-58). They do not "simply accept the [government's] invocation of a 'special need.'" *Ferguson v. City of Charleston*, 532 U.S. 67, 81 (2001). This inquiry prevents the "'broader social purpose or objective'" law enforcement serves from "immunizing 'virtually any' warrantless search or seizure." *Jones*, 936 F.3d at 115 (quoting *Ferguson*, 532 U.S. at 84).

"The assumption underlying the search for the 'primary purpose' is that several purposes might have moved the police to set up a particular roadblock. This is why finding the primary or predominant purpose will often prove difficult, as the Supreme Court acknowledged in *Edmond*[.]" *United States v. Davis*, 270 F.3d 977, 982 (D.C. Cir. 2001).

To the extent Plaintiffs argue that "vehicle and traffic safety and the enforcement of the [NYSVTL,]" (Doc. 331-13 at 37), is an impermissible law enforcement purpose

29

and sweeps broader than any special need recognized by courts, they are wrong.[19] The Supreme Court has affirmed the constitutionality of vehicle checkpoints in a variety of contexts. *See, e.g., United States v. Martinez-Fuerte*, 428 U.S. 543, 566 (1976) (to intercept individuals entering the country illegally at a fixed Border Patrol checkpoint); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 455 (1990) (to remove drunk drivers from the road at sobriety checkpoints); *but see Edmond*, 531 U.S. at 43-44 (striking down vehicle checkpoints designed to interdict unlawful drugs when "justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime[]").

Although vehicle checkpoints with a primary purpose of vehicle and traffic safety may serve a special need, they must be readily distinguishable "from the general interest in crime control[,]" *Edmond*, 531 U.S. at 44, and "distinct from the ordinary evidence gathering associated with crime investigation." *Jones*, 936 F.3d at 115 (internal quotation marks omitted). As the *Edmond* Court recognized, a state has a "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." 531 U.S. at 39 (internal quotation marks omitted) (quoting *Delaware v. Prouse*, 440 U.S. 648, 658 (1979)).

In this case, BPD officers at Checkpoints were instructed to and did in fact check for valid registrations, valid inspections, and proper seatbelt usage. The Supreme Court in

---

[19] Courts have affirmed the constitutionality of checkpoints related to traffic and vehicle safety. *See, e.g., Wagner v. Swarts*, 827 F. Supp. 2d 85, 94 (N.D.N.Y. 2011) (finding that checkpoints enacted to promote motorcycle safety served a special need and were constitutional); *Wagner v. Sprague*, 489 F. App'x 500, 501 (2d Cir. 2012) (same); *United States v. Henson*, 351 F. App'x 818, 821 (4th Cir. 2009) (holding that vehicle checkpoint with a primary purpose of "promot[ing] traffic safety by allowing police to check drivers' licenses and vehicle registration" was constitutional); *United States v. Regan*, 218 F. App'x 902, 905 (11th Cir. 2007) (holding that vehicle checkpoint with dual purpose of traffic safety and law enforcement had primary purpose of traffic safety and thus served a special need); *United States v. Bowman*, 496 F.3d 685, 692 (D.C. Cir. 2007) ("[A] roadblock is constitutionally permissible where its principal purpose is to regulate vehicular traffic by allowing police to check driver's licenses and vehicle registrations.") (internal quotation marks and alteration omitted).

*Edmond* and *Prouse* noted that these legitimate objectives are designed to ensure vehicles are safe for operation and that the individuals operating them are lawfully permitted to do so. Here, the parties agree that a stated purpose of the Checkpoints was "vehicle and traffic safety and the enforcement of the [NYSVTL]." (Doc. 331-13 at 37, Doc. 253-1 at 7.) They diverge, however, regarding whether traffic safety was the primary and immediate objective of the Checkpoints or whether traffic safety was a pretextual justification for general and discriminatory crime control.

Defendants cite testimony from City employees and BPD officials, as well as the Roadblock Directive governing the Checkpoints, as undisputed evidence that the primary purpose of the Checkpoints was traffic safety. Defendant Brown testified that "the primary purpose of [the C]heckpoints was traffic safety[,]" (Doc. 252-11 at 14:1-2), as well as "vehicle and traffic interdiction." (Doc. 254-2 at 18:6-7.)[20] He further attested that the Checkpoints were deployed in response to resident complaints about traffic violations like speeding and running red lights and traffic signals but had a secondary effect of finding illegal guns and drugs. Defendant Derenda likewise testified that "the roadblocks were primarily for traffic safety," with the goal of enforcing the NYSVTL and the added benefit of high police visibility. (Doc. 252-12 at 5:6-7.) BPD officers offered similar statements and Defendants note that the stated purpose of the Checkpoints under the Roadblock Directive was "to ensure 'roadway safety'" by checking for seatbelts and valid registration and inspection stickers, although officers were also allowed to "[a]ct on any and all probable cause resulting from information obtained from the mobile plate reader or from 'plain view' observations." (Doc. 254-30 at 2.)

Plaintiffs argue that the alleged stated purpose of the Checkpoints was pretextual and that the design and implementation of the Checkpoint Program reveals that the true

---

[20] The *Ferguson* court cautioned that courts must not accept the stated purpose on face value, *Ferguson v. City of Charleston*, 532 U.S. 67, 81 (2001), but must probe to determine the true immediate objective. To do so in this case would require an assessment of the credibility of BPD officials, Defendant Brown, and Defendant Derenda. Correspondingly, the court cannot accept Plaintiffs' invitation to weigh other evidence and find these individuals untruthful.

primary purpose of the Checkpoints was general crime control, specifically reducing drug, gun, and gang activity. They observe that: (1) the Checkpoints were funded in part by a statewide crime control initiative (the GIVE Initiative); (2) BPD records and officer testimony demonstrate the Checkpoints served a broader crime-prevention strategy; (3) the Checkpoints were operated by police units who missions were crime control, not traffic safety; (4) crime, not traffic, data informed the locations of the Checkpoints; and (5) crime, not traffic, data was used to measure the Checkpoints' success.[21]

To the extent the Checkpoints "formed part of a crime prevention strategy" and thus had a crime control purpose, that, alone, does not render the Checkpoints unconstitutional. *See Lynch*, 589 F.3d at 102. "'The law does not require the police to ignore evidence of other crimes in conducting legitimate roadblocks.'" *United States v. Bernacet*, 724 F.3d 269, 273 (2d Cir. 2013) (quoting *United States v. Lopez*, 777 F.2d 543, 547 (10th Cir. 1985)). Plaintiffs are correct, however, that courts have considered a program's funding when deciphering a search's "programmatic purpose[.]" *Edmond*, 531 U.S. at 46. The Sixth Circuit, for example, held that a vehicle checkpoint did not serve a special need of preventing drunk driving in part because funding for it came from a drug interdiction program. *See United States v. Huguenin*, 154 F.3d 547, 555 (6th Cir. 1998); *but see Wagner*, 827 F. Supp. 2d at 94-95 (upholding a traffic safety checkpoint even though its funding included money for intelligence gathering and criminal enforcement).

The D.C. Circuit has considered the customary duties and responsibilities of the law enforcement officers conducting a roadblock relevant to its programmatic purpose. *See United States v. Bowman*, 496 F.3d 685, 693 (D.C. Cir. 2007) (finding the lower court

---

[21] To rebut Plaintiffs' claim that traffic safety was never measured as an output of the Checkpoints, a point Defendants concede, Defendants note that empirical evidence of the Checkpoints' efficiency is not required to demonstrate a special need. They cite *United States v. Fraire*, in which the Ninth Circuit rejected the argument that the absence of empirical data is a dispositive factor when common sense suggests a checkpoint would be a reasonably efficient tool to meet the governmental goal. 575 F.3d 929 (9th Cir. 2009). Defendants misapprehend Plaintiffs' argument. Plaintiffs do not cite the lack of empirical evidence as dispositive of a lack of a special need but, rather, as a factor to be considered in determining whether the stated purpose of traffic safety was pretextual.

erred in concluding that "there was no evidence to counter the government's description of the roadblock's primary purpose[]" of promoting traffic safety where the general responsibilities of the police force operating the roadblock were to combat crime and retrieve narcotics and guns from the streets) (emphasis, internal quotation marks, and citation omitted); *see also United States v. Hudson*, 2007 WL 1656282, at *6 (D.D.C. June 5, 2007) (considering the primary purpose of police unit conducting roadblocks when determining the primary purpose of the roadblock). Courts have also considered the location of such checkpoints as relevant to their purpose. *See, e.g.*, *Hudson*, 2007 WL 1656282, at *6 (reasoning that a checkpoint location previously used for a crime initiative undermines argument that roadblock's purpose was to reduce speeding); *Huguenin*, 154 F.3d at 555 (finding that when it comes to determining the primary purpose, "actions speak louder than . . . words[]").

The Checkpoints at issue in this case were funded in part by a statewide crime control initiative and were staffed by Strike Force and Housing Unit officers. The mission of the Strike Force was to: "1. Target and eliminate crime hotspots throughout the [C]ity. 2. Remove illegal [g]uns from [the City]. 3. Strict [e]nforcement of the Mayor[']s Zero Tolerance Crime Policy[.] 4. Make [the City] a better place to live, work[,] and raise a family." (Doc. 254-21 at 2.) The Housing Unit was "responsible for all policing and security issues in the BMHA Housing Complexes located throughout the City" and was to work "to maintain strict enforcement of the Mayor's zero tolerance crime policy." (Doc. 254-17 at 7, § 8.5.) Neither unit's mission addressed traffic safety.

BPD officers testified that Checkpoints were often placed in locations experiencing recent violent crime,[22] and Defendant Derenda evaluated the effectiveness of the Strike Force by considering crime trends and statistics. *See* Doc. 268-9 at 61:8-13

---

[22] *See, e.g.*, Doc. 269-19 at 37:11-17 ("[I]f there was a shooting, for example, the night before or if they had problems while they were working the night before, if they heard violence going on in a certain area, then the next day they were expected to set up the traffic safety [C]heckpoint in that area or around that area."); Doc. 270-9 at 13:16-19 ("Q[.] . . . So your testimony is that these [C]heckpoints would have been run to address gun violence and to provide high visibility patrols? A[.] Yes.").

("There were no evaluations done on checkpoints. However, I did do evaluations on the overall effectiveness of the Strike Force and I did that by looking at crime trends and statistics[.]").

Viewing the totality of the evidence, there is a genuine dispute of material fact regarding whether the primary purpose and immediate objective of the Checkpoints was traffic safety or whether it was general crime control which created an environment conducive to discriminatory policing. To decide this issue, credibility determinations and the weighing of competing evidence must be undertaken by the trier of fact. Only then can the court determine the Checkpoints' primary purpose. *Lynch*, 589 F.3d at 102-03 (noting that "even though the [d]istrict [c]ourt found that crime control was one purpose of the breathalyzer policy, the [c]ourt correctly applied the special needs doctrine upon finding that crime control was not the policy's *primary* purpose[]") (emphasis in original).

For the reasons stated above, Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment claim (Count I) is DENIED. For the same reasons, Plaintiffs' cross-motion for partial summary judgment on the same claim is DENIED.

### 2. Whether the Checkpoints Satisfy the Special Needs Balancing Test.

If a special need is found as a primary purpose, the search or seizure is not "automatically, or even presumptively[,] constitutional." *Jones*, 936 F.3d at 118 (internal quotation marks and citation omitted). The search or seizure "still must be 'reasonable' to comport with the Fourth Amendment." *Torcivia v. Suffolk Cnty., N.Y.*, 17 F.4th 342, 359 (2d Cir. 2021) (citing *Jones*, 936 F.3d at 118). The reasonableness of the search or seizure is determined by the court "balanc[ing] the government's [special] need against the plaintiff's liberty interest[.]" *Jones*, 936 F.3d at 118. The court, not the jury, makes the reasonableness determination. *See MacWade v. Kelly*, 460 F.3d 260, 269 (2d Cir. 2006) ("[T]he court determines whether the search is reasonable by balancing several competing considerations.").

34

Plaintiffs and Defendants disagree regarding the appropriate balancing test. Plaintiffs cite *Torcivia*, which directs courts to balance four factors: "(1) the weight and immediacy of the government interest, (2) the nature of the privacy interest allegedly compromised by the [search or] seizure, (3) the character of the intrusion imposed by the [search or] seizure, and (4) the efficacy of the [search or] seizure in advancing the government interest." *Torcivia*, 17 F.4th at 359 (alterations adopted) (internal quotation marks omitted) (quoting *MacWade*, 460 F.3d at 269); *accord Jones*, 936 F.3d at 118 (quoting *Berg v. Kelly*, 897 F.3d, 99, 108 (2d Cir. 2018)).

Defendants rely on *Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012), which identifies three factors: (1) "the gravity of the public concerns served by the [search or] seizure"; (2) "the degree to which the [search or] seizure advances the public interest"; and (3) "the severity of the interference with individual liberty." *Id.* at 501 (internal quotation marks omitted) (quoting *Brown v. Texas*, 443 U.S. 47, 50-51 (1979)).

The *Torcivia* standard, unlike the *Wagner*, includes a consideration of the privacy interest at issue, which the court agrees is appropriate. It is also precedential whereas *Wagner* is not. Defendants nonetheless argue that the *Wagner* standard is appropriate in the instant case because *Wagner* involved vehicle and traffic safety checkpoints whereas *Torcivia* concerned a firearms-seizure policy. They alternatively argue that, "as a matter of procedure, *Torcivia* did not overturn *Wagner*, so that the two standards should not be read as being inconsistent with each other." (Doc. 331-13 at 45.) The court agrees with Defendants that "[i]n analyzing the severity of the interference with individual liberty, as articulated by *Wagner* [], courts must expressly determine what the nature of that individual liberty or privacy interest is." *Id.* It therefore adopts a blend of *Torcivia* and *Wagner* as the appropriate standard.

Because there are genuine issues of material fact which must be resolved in order for the court to determine the primary purpose of the Checkpoints, the court cannot determine whether, as a matter of law, they were reasonable. Even assuming *arguendo* that the Checkpoints' primary purpose was vehicle and traffic safety, there remain genuine disputes regarding how the Checkpoints were located, administered, marked, and

measured, which, in turn, are relevant to a reasonableness determination. Questions about "the character of the intrusion imposed by the [search or] seizure," *Torcivia*, 17 F.4th at 359 (alteration adopted), are questions of fact to be answered by the jury, not matters of law for the court on summary judgment. *See also Allen v. Schiff*, 908 F. Supp. 2d 451, 461 (S.D.N.Y. 2012) ("Although the reasonableness of a search is a matter of law, the character and manner of the search is a matter of fact.") (citing *O'Connor v. Ortega*, 480 U.S. 709, 726-29 (1987) (finding that district court erred in granting summary judgment where "[t]here was a dispute of fact about the character of the search" and "no findings were made as to the scope of the search[,]" rendering "the record . . . inadequate for a determination on motion for summary judgment of the reasonableness of the search and seizure")). For this reason, the issue of Fourth Amendment reasonableness, which the court must ultimately decide, cannot be determined on summary judgment. Defendants' motion for summary judgment asking the court to find the Checkpoints reasonable as a matter of law is DENIED as is Plaintiffs' cross-motion seeking a declaration that the Checkpoints violate the Fourth Amendment.

C.    **Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Equal Protection Claim (Count II).**

"To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him [or her] on the basis of his [or her] race." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 337 (2d Cir. 2000).

> Applying Supreme Court precedent, [the Second Circuit has] generally recognized three types of discriminatory laws: (1) a facially discriminatory law or policy that expressly classifies individuals on the basis of race; (2) a facially neutral law that is enforced in a discriminatory fashion; and (3) a facially neutral law that was adopted with discriminatory intent and resulted in a discriminatory effect.

*Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 170 (2d Cir. 2024); *see also Pyke v. Cuomo*, 567 F.3d 74, 78 (2d Cir. 2009) ("Plaintiffs challenging . . . facially neutral laws on equal protection grounds bear the burden of making out a prima facie case of discriminatory purpose.") (internal quotation marks and citation omitted).

36

In some contexts, plaintiffs bringing equal protection claims are required "to plead the existence of a similarly situated group that was treated differently." *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001) (internal quotation marks and citation omitted). However, a plaintiff who

> alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner, or that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus, is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection.

*Id.* at 110.

A plaintiff always retains the burden of demonstrating that the "defendants harbored a discriminatory intent" in addition to disparate impact. *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999). Discriminatory intent "implies that the decision[-]maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). A mere "difference in race between the person stopped [for a traffic violation] and the officer" does not "establish[] a prima facie case of racial discrimination." *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) (internal quotation marks omitted).

It is undisputed that BPD policies governing the Checkpoints and tinted window ticketing do not expressly classify motorists on the basis of race. Plaintiffs, instead, argue that the policies were facially neutral policies but: (1) were applied in an intentionally discriminatory manner and (2) had an adverse impact and were motivated by discriminatory animus. Defendants do not dispute the discriminatory effect of the challenged practices but, rather, argue that Plaintiffs proffer insufficient evidence of discriminatory intent to survive summary judgment.

### 1. Whether There is a Genuine Dispute that the Checkpoints Were Motivated by a Discriminatory Intent.

With regard to the Checkpoints, Defendants contend that the evidence shows, at most, an awareness "that, by responding to citizen complaints and proactively enforcing

traffic on the East Side [of the City], more minorities would be ticketed[,]" and assert that "mere knowledge of a disparate impact is insufficient to show discriminatory intent." (Doc. 252-46 at 32) (citing *Arlington Heights*, 429 U.S. at 268-70). Correspondingly, they assert "that statistical disparities alone, without evidence of actual discriminatory intent, are insufficient to prove intentional discrimination for equal protection purposes." *Id.* at 33-34.

In support of the claim that statistical evidence alone is insufficient to establish discriminatory intent, Defendants rely on *Vitolo v. Guzman*, which acknowledges that "extreme differences among races may permit an inference of intentional discrimination[.]" 999 F.3d 353, 362 (6th Cir. 2021). Defendants compare the instant case to *Moore v. Bitca*, in which the District of Vermont dismissed a Title VI claim relying in part on racial disparities in Vermont traffic data "because disparate impact alone does not establish intentional discrimination." 2020 WL 5821378, at *23 (D. Vt. Sept. 30, 2020). In *Moore*, however, the court also relied on the fact that the plaintiff's allegations were contradicted by video and audio evidence, leaving the complaint supported by mere conclusory allegations. *See id.* at *22 (observing that plaintiff's allegations of race discrimination "do not alter the conclusion that dismissal is required because they are contradicted by video and audio evidence[]").

Plaintiffs respond that Defendants misrepresent testimonial evidence regarding how Checkpoint locations were chosen. They cite statistical and other evidence which demonstrate that minority neighborhoods were targeted and that white neighborhoods had Checkpoints only after complaints regarding the Checkpoints became public. They argue that substantial evidence of discriminatory impact provides sufficient circumstantial evidence to infer discriminatory intent, rendering the question of intent one for the jury.

The Second Circuit has held that "statistics alone may be sufficient[]" to create a plausible inference of discriminatory intent under the Equal Protection Clause. *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015) (collecting cases). "[T]he statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very

38

unlikely." *Id.* "Federal cases have recognized that statistical differences greater than two or three standard deviations provide an acceptable basis to infer discrimination[,]" but no "bright-line rule" exists, and "[t]he 'significance' or 'substantiality' of any numerical disparities must be evaluated in light of the facts of each particular case." *Santiago v. Miles*, 774 F. Supp. 775, 799 (W.D.N.Y. 1991) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994-95 (1988)). "The existence of a [five percent] level of statistical significance indicates that it is fairly unlikely that an observed disparity is due to chance, and it can provide indirect support for the proposition that disparate results are intentional rather than random." *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 372 (2d Cir. 1989).[23]

In this case, Plaintiffs have provided statistical evidence revealing allegedly substantial racial disparities in the locations of the Checkpoints. Regression analysis by Dr. Bjerk concluded that the difference

> in terms of average number of [C]heckpoints per tract . . . is statistically significant at the 1% level between all High-Minority and Low-Minority tracts, and between HVC High-Minority and HVC Low-Minority tracts. Indeed, the average number of [C]heckpoints in each High-Minority HVC tract is over six times higher than the average number of [C]heckpoints per tract in each Low-Minority HVC tract. This . . . indicates that whether or not a tract was High-Minority is a much stronger predictor of [C]heckpoints than whether or not a tract had high rates of violent crime.

(Doc. 273 at 118, ¶ 316.) Controlling for the total population of a tract and the number of minor accidents, injury accidents, violent accidents, and property accidents in a tract, Dr. Bjerk found that "High-Minority tracts experienced over [thirty-three] more [C]heckpoints each than would be predicted by how such [C]heckpoints were allocated in Low-Minority Tracts. This result is significant at the 1% level." *Id.* at 120, ¶ 322. He further found that "these discrepancies cannot be fully explained by differences in the

---

[23] The Second Circuit has been clear, however, that "[b]y no means . . . is a five percent probability of chance (or approximately two standard deviations) considered an exact legal threshold." *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 372 (2d Cir. 1989) (internal quotation marks and citation omitted).

rates at which criminal incidents or traffic accidents occurred between High-Minority neighborhoods and Low-Minority neighborhoods." *Id.* at 123, ¶ 331.

Although a close question, the degree of the racial disparities in Checkpoint locations raises some inference of discriminatory intent in BPD practices. *See, e.g., Crudup v. Dist. of Columbia*, 2023 WL 2682113, at *12 (D.D.C. Mar. 29, 2023) (finding statistics reporting ninety-three percent of stop and frisks and eighty-seven percent of non-traffic stops were of Black individuals could provide inference of unconstitutional discriminatory intent); *Myers v. Cnty. of Nassau*, 2024 WL 3675815, at *7 (E.D.N.Y. Aug. 6, 2024) (holding that statistical evidence met *Burgis* standard where police hiring was roughly three times higher for white than Black applicants).

To bolster their claim of discriminatory intent based on discriminatory impact, Plaintiffs offer alleged direct evidence of intent. Plaintiffs testified that BPD officers at Checkpoints spoke to them "disrespectful[ly,]" (Doc. 298 at 4, ¶ 16), "were often rude and degrading," (Doc. 291 at 3, ¶ 12), treated them "like criminals[,]" (Doc. 306 at 3, ¶ 13), and asked them questions unrelated to traffic safety. They further cite the IAD Declaration, wherein the IAD Witness acknowledged that racial profiling and racial discrimination were rampant throughout the BPD during the relevant time period and condoned or modeled by BPD law enforcement officers in supervisory roles.

Relying on Mr. Gennaco's expert witness report, Plaintiffs point to the number of complaints filed against the City and BPD about the Checkpoints, and the BPD's alleged inadequate investigation of the complaints, as further evidence of discriminatory intent in the form of deliberate indifference.[24] *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d

---

[24] Mr. Gennaco summarized his opinion as follows:

> The BPD's affirmative policies and practices and its surrendering of managerial prerogatives designed to identify and address inappropriate police actions, while maintaining an inadequate complaint investigation and supervision system[] that falls below generally accepted practices, create an institutional culture whereby officers can engage in biased traffic enforcement with little concern for detection and intervention. Accountability, supervision, and effective corrective intervention of officers who engage in misconduct is critical to identifying, addressing, and ultimately reducing racially biased policing, but the BPD has declined to engage

40

540, 666-67 (S.D.N.Y. 2013) (holding that, under *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978) liability, deliberate indifference constitutes evidence of discriminatory intent); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62-63 (2d Cir. 2014) (finding deliberate indifference when repeated complaints of harassment were well known to a variety of county officials but where not addressed); *Floyd v. City of New York*, 813 F. Supp. 2d 417, 452-53 (S.D.N.Y. 2011) (concluding that statistical evidence of disparate impact coupled with inadequacy of city's remedial steps raised a genuine issue of material fact whether city intentionally discriminated against plaintiffs).

Community complaints about the Checkpoints were also provided to City and BPD officials directly. *See, e.g.*, Doc. 271-4 at 13 (report of the questions from a community and police forum indicating that residents asked why it "seem[ed] that police checks happen only in [B]lack neighborhoods and rarely in white neighborhoods[]" and wanted to know "[w]hat efforts [the BPD would] make to make sure that equal police checks happen in ALL neighborhoods equally[]") (capitalization in original). Plaintiffs emphasize Defendant Brown's survey response that racism on the police force had contributed to police violence in the City[25] and a D-District Police Chief's alleged statement that the Strike Force had been disbanded because of racial profiling.[26]

The statistical disparity in Checkpoint locations unexplained by race-neutral factors coupled with the allegations of direct evidence of discriminatory intent raises a

---

in any such interventions meaningfully, thereby perpetuating the risk of racially biased misconduct and eroding public trust in the BPD.

(Doc. 273-1 at 14.)

[25] Defendant Brown allegedly participated in the 2020 Menino Survey of Mayors (the "Survey"), conducted by Boston University. A record of his responses was created by an interviewer for the Survey, who "was instructed to record [Defendant Brown's] responses as accurately as possible." (Doc. 268-18 at 2.) The Survey asked participants, "If police violence has been a problem in your city, how much do[es racism on the police force] contribute to it?" *Id.* at 35. In response, Defendant Brown allegedly answered, "[a] moderate amount[.]" *Id.* at 20. It is not clear whether Defendant Brown's answer was from a selection of options or in his own words.

[26] Plaintiff Hall attests that, "[o]n July 10, 2019, [he] attended a community meeting" and the "D[-]District Chief at the time[] also attended" and "stated that BPD disbanded the Strike Force Unit because of racial profiling." (Doc. 294 at 6, ¶ 19.)

genuine issue of material fact regarding whether Defendants had discriminatory intent in designing and implementing the Checkpoints. "[I]mproper intent" is "a pure issue of fact[,]" *Crawford-El v. Britton*, 523 U.S. 574, 589 (1998), that must be decided by a jury. Defendants' motion for summary judgment on Plaintiffs' Equal Protection claim arising from the Checkpoints is therefore DENIED.

### 2. Whether There Is a Genuine Dispute that Multiple Tinted Window Tickets Were Motivated by a Discriminatory Intent.

Plaintiffs rely on statistics to support their Equal Protection claim regarding tinted window citations. Dr. Bjerk found that, prior to 2012, there were no significant racial disparities, while citations between 2012 and 2015 remained relatively flat in predominantly non-Minority neighborhoods but

> in the 60-80% Minority tracts, the average number of tinted window[] citations went from 1.4 per month Pre-Strike[ F]orce to almost [eleven] per month. In the 80-100% Minority tracts, they went from an average of 1.2 per month Pre-Strike[ F]orce to an average of [sixteen] per month—a more than thirteen-fold increase. Citations for tinted windows dropped substantially in all census tract categories in the Post-Strike[ F]orce era. Even then, however, there were still an average of two to five times as many such citations per month in the [twenty-one] tracts that were 80-100% Minority, relative to the [nineteen] tracts that were 0-20% Minority and the [twenty-one] tracts that were 20-40% Minority tracts, respectively.

(Doc. 273 at 59, ¶ 195.) He also determined that during the Strike Force, BTVA, and Post-Strike Force eras, "the actual likelihood of receiving multiple tinted window citations in tinted window incidents is [ten] to [twelve] percentage points higher for those classified as Minorities than would be predicted if such individuals had been treated the same as Non-Minorities. These differences are all statistically significant at the 1% level." *Id.* at 111, ¶ 299.

Dr. Bjerk was "not aware of any evidence suggesting that among drivers who tint their windows, Non-Minorities are more likely than Minorities to tint only one window" and opined that, "to the extent that there are racial differences in the likelihood of receiving multiple tinted window tickets within tinted window incidents, it is difficult to think of any race-neutral explanation for that discrepancy." (Doc. 273 at 47, ¶ 151.)

42

Plaintiffs note that "while BPD officers may not have known every motorist's race prior to making the initial traffic stop, they unquestionably had ample opportunity to observe each motorist's race prior to deciding how many tickets to issue." (Doc. 344 at 52.)

Plaintiffs proffer evidence of City and BPD officials' awareness of complaints about multiple tinted window tickets as evidence of discriminatory intent. The IAD Witness attested that "[i]t was common knowledge within the BPD that tinted window tickets primarily went to Black drivers, even though in [her] experience, motorists of all races drive with tints." (Doc. 346 at 8, ¶ 37); *see also* Doc. 268-8 at 29:1-7 (Defendant Derenda testifying that he was aware of complaints filed with IAD, including complaints about "writing numerous tickets for one car for tinted windows").

As with the Checkpoints, the severity of the racial disparities and the alleged lack of race-neutral explanations for those disparities raises a genuine dispute as to whether Defendants acted with discriminatory intent in their practices concerning tinted windows ticketing. *See, e.g., Adams,* 116 F.4th at 172 ("[A]ggregate disproportionate impact on a particular racial group *may* be evidence of discriminatory animus or discriminatory effect[.]") (emphasis in original). Defendants' motion for summary judgment on Plaintiffs' Equal Protection claim arising from tinted window ticketing is thus DENIED.

### 3.    Whether There Is a Genuine Dispute that Discriminatory Intent Was Present in Individual Plaintiffs' Claims.

Defendants argue that the individual Plaintiffs have failed to show race played any role in their respective traffic enforcement actions, as each has admitted that he or she was ticketed for legitimate NYSVTL violations and there is allegedly no evidence of individualized racial animus. The Supreme Court has recognized "that the Constitution prohibits selective enforcement of the law based on considerations such as race[]" under the Equal Protection Clause. *Whren,* 517 U.S. at 813.[27]

---

[27] Defendants cannot defeat Plaintiffs' Equal Protection claim based on the presence of probable cause. *See Ballew v. City of Pasadena,* 642 F. Supp. 3d 1146, 1168 (C.D. Cal. 2022) ("[A] traffic stop motivated, at least in part, by race still constitutes an equal protection violation, even if the officers also had a legitimate basis for the stop.").

In *McCleskey v. Kemp*, the Supreme Court held that a criminal defendant who brought an Equal Protection claim against an imposed death sentence "must prove that the decision[-]makers in *his* case acted with discriminatory purpose." 481 U.S. at 292 (emphasis in original). The Court rejected the claim because the plaintiff offered "no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence." *Id.* at 292-93. *McCleskey* is arguably distinguishable because it concerned capital sentencing. In the context of capital sentencing, "each particular decision to impose the death penalty is made by a petit jury selected from a properly constituted venire[]" and "[e]ach jury is unique in its composition" and "the Constitution requires that its decision rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense" *Id.* at 294. In contrast, no "innumerable factors that vary according to the characteristics of the individual" motorist play a role in the issuance of a traffic citation. *Id.*

Plaintiffs Redden and Evans were ticketed at Checkpoints and Plaintiffs Franklin, Palmer, and Yeldon received multiple tinted-window tickets in a single stop, coupled with evidence of discriminatory intent or animus. Plaintiffs have thus identified sufficient evidence that they were each subjected to a "neutral law that was discriminatorily applied[,]" *Moore*, 2020 WL 5821378, at *21. Defendants' motion for summary judgment on Count II is therefore DENIED.

**D.    Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Procedural Due Process Claim (Count III).**

"The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978). "A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).

44

> The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision[-]making process.

*Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). Plaintiffs' Due Process claim is brought only against the City, and they do not challenge the BTVA's adjudication or appellate procedures as discriminatory.[28] Instead, they allege BPD officers individually and institutionally possessed a pecuniary interest in the issuance of citations and adjudications that undermined the neutrality of the BTVA proceedings. Citing the award of overtime for high ticket production and the institutional interest from the City's reliance on revenue from traffic violations to balance its budget, they claim a Due Process violation on this basis.

In *Jerrico*, the Supreme Court acknowledged that Due Process protections against partiality in the adjudicator can extend to the prosecutor where decisions "were motivated by improper factors or were otherwise contrary to law." *Id.* at 249. It observed that "the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication[,]" and explained that "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Id.* at 249-50. Recognizing that police officers are part of the enforcement process, some courts have extended Due Process neutrality requirements to police officers. *See, e.g., Coleman v. Town of Brookside, Ala.*, 663 F. Supp. 3d 1261, 1272 (N.D. Ala. 2023) ("Although judges are held to a stricter standard, constitutional scrutiny has also been applied to the pecuniary interest of prosecutors and police officers in enforcing

---

[28] As Defendants point out, "the availability of Article 78 proceedings adequately serves as a mechanism to cure any bias." *Torres v. City of New York*, 590 F. Supp. 3d 610, 622 (S.D.N.Y. 2022).

the law.") (citing *Brucker v. City of Doraville*, 38 F.4th 876, 886-87 (11th Cir. 2022));
*McNeil v. Cmty. Prob. Servs., LLC*, 2021 WL 365844, at *15 (M.D. Tenn. Feb. 3, 2021)
(applying due process neutrality requirement to probation and parole officers who
traditionally perform both quasi-judicial and enforcement functions).

To find a Due Process violation, however, the personal interest of the government
actor must not be remote. For this reason, the Supreme Court declined to find a Due
Process violation where the salaries of the officials involved in enforcement were fixed
and the revenue collected from enforcement was less than one percent of the entity's
budget, characterizing the "influence alleged to impose bias [as] exceptionally remote."
*Jerrico*, 446 U.S. at 250. The Eleventh Circuit similarly considered the possibility of
police officer bias too remote where, even though penalties and fees generated from
tickets amounted to eleven to twenty-five percent of the city's revenue, police officers'
compensation and employment were not tied to the number of citations they issued. It
explained that "[eleven] to [twenty-five] percent is still a far cry from the kind of bounty
system that raises core due process concerns. . . . [I]t is too low for us to conclude that the
police department was 'financially dependent on the maintenance of a high level of
penalties.'" *Brucker*, 38 F.4th at 888 (quoting *Jerrico*, 446 U.S. at 251). In instances
where courts have found partiality violative of procedural due process, the share of
revenue from fines and penalties constituted close to a majority of municipal revenue or
there was a direct pecuniary interest in the outcome of a case. *See, e.g., Coleman*, 663 F.
Supp. 3d. at 1272 (observing that fines and penalties constituted forty-nine percent of
town's total revenue); *Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927) (noting that
mayor's compensation was dependent on conviction).

In this case, like *Jerrico* and *Brucker*, the salary of the officials involved in
adjudication is fixed,[29] police officers' salaries and pay rates are fixed, and the revenue

---

[29] When a motorist receives a traffic ticket, the case is prosecuted by a lawyer whose salary is
fixed and who has no financial stake in the outcome and adjudicated by a neutral hearing officer
with no financial stake in the outcome. *See* Doc. 331-4 at 4:22-6:2 (BTVA prosecutor testifying

collected from traffic enforcement is only one to three percent of the City's budget. Unlike *Brucker*, BPD officers do not try their own cases. There is also no evidence BPD officers were given a quota or bounty per ticket nor threatened with termination or other discipline if they did not satisfy a quota even if they were encouraged to be productive to justify any overtime awarded. Time in court was compensated at an increased rate regardless of the outcome.[30]

Although officers were able to increase their salary significantly with overtime, the ability to do so is virtually universal among police officers, and the availability of overtime pay based on either seniority or productivity is too remote under applicable precedent to constitute a procedural Due Process violation. Defendants' motion for summary judgment with respect to Plaintiffs' Fourteenth Amendment Procedural Due Process claim (Count III) is therefore GRANTED.

### E.   Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Title VI Claim (Count IV).

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Title VI affords a private right of action only for intentional discrimination, *see Alexander v. Sandoval*, 532 U.S. 275, 294 (2001), and requires a plaintiff to show (1) "that the defendant discriminated against him [or her] on the basis of race"; (2) "that that discrimination was intentional"; and (3) "that the discrimination was a substantial or motivating factor for the defendant's actions[.]" *Tolbert v. Queens Coll.*, 242 F.3d 58, 69

---

in deposition that he is compensated under an annual salary determined by the City and is not eligible for bonuses or overtime).

[30] At the October 17, 2025 hearing, Plaintiffs and Defendants disagreed about the rate at which court time was compensated. Plaintiffs represented court time pay as time and a half while Defendants believed it to be four hours' pay. Both parties agree, however, that court time represents pay above an officer's salary.

47

(2d Cir. 2001) (internal quotation marks and citations omitted). Under the statute, "program or activity" includes:

> (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a state or local government[.]

42 U.S.C. § 2000d-4a(1).

In their reply, Defendants argue, for the first time, that the City, because it is a municipality, is not a "program or activity" under Title VI. They cite *Wilkins v. City of Chicago*, in which the Northern District of Illinois concluded that "Chicago is a municipality, not a 'program' or 'activity', and therefore does not fit under the scope of Title VI's coverage." 736 F. Supp. 3d 616, 622 (N.D. Ill. 2024). Because Defendants raise this argument for the first time in their reply, the court will not consider it. *See McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) ("[W]e ordinarily will not consider issues raised for the first time in a reply brief.").[31] Defendants may nonetheless renew this argument in a motion *in limine* or in a motion for a directed verdict.

### 1. Whether Title VI Requires a Nexus Between a Contested Action and a Federally Funded Program.

Defendants allege that, under Title VI, not only must the program or activity be a recipient of federal funds, but the contested action must be in furtherance of a federally

---

[31] Although some courts, like the Northern District of Illinois, have concluded that a municipality does not constitute a "program or activity" under Title VI, the Second Circuit has not decided this issue. Second Circuit courts have permitted Title VI actions against municipalities. *See, e.g., Davis v. City of New York*, 959 F. Supp. 2d 324, 365 (S.D.N.Y. 2013) (allowing Title VI claim to proceed against New York City upon finding it was a recipient of federal financial assistance); *cf. Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 11629176, at *9 (E.D.N.Y. Aug. 5, 2021) (noting that "[a] municipality cannot be liable under Title VI on a theory of *respondeat superior*, and it cannot be liable unless it had actual knowledge of discrimination and was deliberately indifferent to it[]"); *Ass'n Against Discrimination in Emp. v. City of Bridgeport*, 647 F.2d 256 (2d Cir. 1981) (vacating lower court's ruling that city violated Title VI for failure to establish logical nexus between federal funding and challenged practice, not because entity was a city).

48

funded program. Stated differently, Defendants argue that there must be a nexus between the contested action and a federally funded program. *See Moore v. City of New York*, 2017 WL 35450, at *14 (S.D.N.Y. Jan. 3, 2017), *report & recommendation adopted by* 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017) (holding that to survive a motion to dismiss, "a plaintiff must sufficiently set forth a logical nexus between the federally funded program and the employment discrimination suffered that is supported by evidence proffered in the complaint[]") (internal quotation marks omitted); *see also Bhanusali v. Orange Reg'l Med. Ctr.*, 2012 WL 13059694, at *9 (S.D.N.Y. Jan. 20, 2012) (determining that an orthopedic surgeon failed to plead a Title VI claim when he failed to show "that the funds were primarily intended to provide employment"). Plaintiffs contend that there is no such requirement.

The Second Circuit articulated the nexus requirement in *Ass'n Against Discrimination in Employment v. City of Bridgeport*, 647 F.2d 256 (2d Cir. 1981), based on the language of 42 U.S.C. § 2000d-3, a provision of Title VI applicable only to claims of discriminatory employment practices. *See id.* at 276 ("[42 U.S.C. § 2000d-3] in effect requires a logical nexus between the use of federal funds and the practice toward which agency action is directed."); *see also* 42 U.S.C. § 2000d-3 ("Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment."). "Defendants have cited no binding Second Circuit precedent extending the logical nexus requirement outside the employment discrimination context." *Alexander v. Hunt*, 2018 WL 3801240, at *8 (D. Vt. Aug. 9, 2018). There is thus no requirement of a logical nexus between the federal funds and the contested action outside the employment practice context. Rather, it is sufficient that the City received federal funds. Defendants agree that this requirement was satisfied.

49

### 2. Whether There is a Genuine Dispute that the City Intentionally Discriminated Against Plaintiffs.

The parties agree that the discriminatory intent element of the Title VI claim rises or falls with Plaintiffs' Equal Protection claim. Because the court found a genuine issue of material fact concerning discriminatory intent for Plaintiffs' Equal Protection claim, Defendants' motion for summary judgment with respect to Plaintiffs' Title VI claim (Count IV) is also DENIED.

### F. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Claim for Injunctive Relief.

Following the court's April 22, 2025 Opinion and Order granting in part and denying in part Plaintiffs' motion to certify class, (Doc. 261), and the court's March 27, 2026 Opinion and Order denying Plaintiffs' motion to reconsider or renew, (Doc. 357), Plaintiffs' requests for injunctive relief have been dismissed. Defendants' motion for summary judgment on Plaintiffs' claim for injunctive relief is therefore DENIED AS MOOT.

### G. Whether Defendants Brown, Derenda, and Lockwood Are Entitled to Qualified Immunity.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "When a defendant moves for summary judgment based on qualified immunity, courts consider whether the facts shown make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (alteration adopted) (citation and internal quotation marks omitted).

Whether a defendant's conduct is objectively reasonable for qualified immunity purposes "is always a question of law for the court." *Gonzales v. Duran*, 590 F.3d 855, 864 (10th Cir. 2009) (Ebel, J., concurring); *see also Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (observing that if there are no "disputed facts that are material to the

50

qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court[]"). However, where there are disputed issues of material fact, a determination of qualified immunity is often inappropriate at the summary judgment stage. *See Husain v. Springer*, 494 F.3d 108, 133 (2d Cir. 2007) (noting that "summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness[]") (alteration adopted) (internal quotation marks and citation omitted).

Plaintiffs have established that there are genuine disputes of material fact regarding whether the Checkpoints were a pretext for unlawful discrimination and whether they were motivated by discriminatory intent. Correspondingly, there are genuine disputes of material fact regarding whether Defendants Brown, Derenda, and Lockwood violated the Constitution and, if so, how that violation occurred. The court thus cannot determine whether any constitutional violation was clearly established. Defendants' motion for summary judgment with respect to qualified immunity for Defendants Brown, Derenda, and Lockwood is therefore DENIED.

## H.    Whether Defendant Brown Is Liable Under § 1983.

"To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). A plaintiff must "establish a deliberate, intentional act on the part of the defendant to violate the plaintiff's legal rights." *Tangreti v. Bachman*, 983 F.3d 609, 618 (2d Cir. 2020) (internal quotation marks and citation omitted). "A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

In *Ashcroft v. Iqbal*, the Supreme Court clarified that "the term 'supervisory liability' is a misnomer" because, "[a]bsent vicarious liability, each [g]overnment official, his or her title notwithstanding, is only liable for his or her own misconduct." 556 U.S. 662, 677 (2009). After *Iqbal*, "there is no special rule for supervisory liability." *Tangreti*, 983 F.3d at 618. Instead, "[t]he [alleged constitutional] violation must be established

51

against the supervisory official directly[,]" *id.*, and "a plaintiff must plead that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 616 (quoting *Iqbal*, 556 U.S. at 676) (internal quotation marks omitted). The "factors necessary to establish" that a supervisor violated the plaintiff's constitutional rights "will vary with the constitutional provision at issue because the elements of different constitutional violations vary." *Id.* at 618 (internal quotation marks and citation omitted). "The focus is on what the supervisor did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'" *Id.* (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327-28 (10th Cir. 2010) (emphasis omitted)).

A supervisor may generally be held liable as a "direct participant" in a constitutional violation only where he or she "authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) (internal quotation marks and citation omitted). In addition, "'direct participation' by a supervisor in a constitutional violation 'requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.'" *Ruggiero v. Cnty. of Orange*, 2023 WL 7005074, at *11 (S.D.N.Y. Oct. 24, 2023) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). Sufficient personal involvement has been found to exist where:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Hawthorne by Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 293 (S.D.N.Y. 2020) (alteration in original) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013)). "If a defendant has not *personally* violated a plaintiff's constitutional rights, the

plaintiff cannot succeed on a § 1983 action against the defendant." *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014) (emphasis in original).

Defendant Brown served as the mayor of the City for almost twenty years, including for most of the time at issue in this action. In his role as mayor, he was a policymaking official of the City, whose role he described as "developing programs and initiatives that help to deliver services to the residents of the community and to introduce legislation that can be reviewed and approved[ and] passed by the City Council." (Doc. 268-6 at 8:15-19.) He was also "the chief executive officer of the administration of City government" and "manage[d] the work of the commissioners that manage the various departments of City government." *Id.* at 10:7-11. Defendant Brown appointed the BPD commissioners, including Defendant Derenda. He was mayor when the Checkpoint Program began. At no point did he issue a formal directive terminating the Checkpoints or preventing them from resuming.

Plaintiffs argue that Defendant Brown's direct participation in the alleged constitutional violations of the Checkpoints stems from his authorization of the Checkpoints and his role in "an elaborate pretextual cover[-]up to conceal the racially discriminatory impact of the [Checkpoints] . . . from the public." (Doc. 344 at 28.) Plaintiffs rely on *Goodall v. New York State Dep't of Corrections & Community Supervision*, in which the court permitted a § 1983 claim to proceed to trial against the acting commissioner of the New York State Department of Corrections for the implementation of a challenged policy. 725 F. Supp. 3d 248, 269 (N.D.N.Y. 2024). The *Goodall* court noted that the acting commissioner had signed the directive at issue, had promulgated rules and regulations for the challenged program, and had the authority to designate facilities where the challenged policy would be administered.

Defendant Brown testified that he "wasn't involved in the creation [of the Strike Force.] It was a recommendation of the police department[.]" (Doc. 268-6 at 24:5-8.) He explained that, as mayor, he reviewed recommendations for BPD policy from BPD commissioners and that he would "offer [his] concerns or recommendations for the concerns of the community and then the commissioner and the commissioner's

53

management team would make decisions." *Id.* at 14:19-15:1. However, there is evidence that Defendant Brown "approved of the Checkpoint Program in all respects[,]" (Doc. 344 at 28), as he testified that, "[t]he [C]heckpoint [P]rogram as it was proposed and administered I did support at the time." (Doc. 268-6 at 45:10-11.) This support may be more than "mere knowledge and acquiescence to unconstitutional conduct, or mere failure to act on a complaint[.]" *Hawthorne*, 492 F. Supp. 3d at 294 (internal quotation marks and citations omitted).

Although a close question, in the light most favorable to Plaintiffs, the undisputed and disputed evidence construed in Plaintiffs' favor supports a conclusion that Defendant Brown was a direct participant in the challenged conduct and alleged ensuing constitutional violations. Defendants' motion for summary judgment with respect to Defendant Brown's liability is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART. (Doc. 252.) The court GRANTS Defendants' motion for summary judgment on Count III and on Count I to the extent Plaintiffs assert non-Checkpoint claims. The court DENIES Defendants' motion for summary judgment on Count I to the extent Plaintiffs assert Checkpoint claims, Count II, and Count IV. The court DENIES Defendants' motion for summary judgment with respect to qualified immunity for Defendants Brown, Derenda, and Lockwood and Defendant Brown's liability. The court DENIES AS MOOT Defendants' motion for summary judgment on Plaintiffs' injunctive relief. The court DENIES Plaintiffs' motion for partial summary judgment. (Doc. 253.)

SO ORDERED.

Dated this ___29ᵗʰ___ day of May, 2026.

Christina Reiss, District Judge
United States District Court

54